**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | |
|---|---|---|
| **In Re:** Highland Capital Management, L.P | § | Case No. 19-34054-SGJ-11 |
| Highland Capital Management Fund Advisors, L.P. et al | § | |
| Appellant | § | |
| vs. | § | |
| Highland Capital Management, L.P., | § | |
| | § | 3:21-CV-00538-N |
| Appellee | § | |

[1943] **Order confirming the fifth amended chapter 11 plan,** Entered on 2/22/2021.

## APPELLANT RECORD
## VOLUME 5

MUNSCH HARDT KOPF & HARR, P.C.
Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
3800 Ross Tower
500 N. Akard Street
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

ATTORNEYS FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P. AND
NEXPOINT ADVISORS, L.P.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | ) | Case No. 19-34054 (SGJ11) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

_I N D E X_

## AMENDED DESIGNATION BY NEXPOINT ADVISORS, L.P. AND HIGHLAND
## CAPITAL MANAGEMENT FUND ADVISORS, L.P.
## OF ITEMS FOR THE RECORD ON APPEAL

COME NOW Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors,

L.P. (the "Appellants"), creditors and parties-in-interest in the above styled and numbered

bankruptcy case (the "Bankruptcy Case") of Highland Capital Management, L.P. (the "Debtor"),

and, with respect to their *Notice of Appeal* [docket no. 1957], hereby file their *Amended*

*Designation of Items for the Record on Appeal* (the "Designation") as follows:

| | Item | Bankruptcy Docket Number | Description |
|---|---|---|---|
| | | | **Pleadings and Items on Docket** |
| *Vol. 1* 000001 | 1 | 1957 | Notice of Appeal |
| 000165 000326 | 2 | 1943 | Order (i) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief |
| | 3 | | Docket Sheet of Bankruptcy Case No. 19-34054 |
| *Vol. 2* 000639 | 4 | 1606 | Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 000666 | 5 | 1648 | Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| 000675 | 6 | 1656 | Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 000820 | 7 | 1670 | Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 000870 | 8 | 1719 | Second Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| *Vol. 3* 000880 | 9 | 1749 | Third Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| 000886 | 10 | 1772 | Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 000901 | 11 | 1791 | Notice of Withdrawal of Certain Executory Contracts and Unexpired Leases from List of Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan |
| 000906 | 12 | 1807 | Debtor's Omnibus Reply to Objections to Confirmation of the Fifth Amended Chapter 11 Plan of Reorganization of Highland Capital Management |
| 001031 | 13 | 1808 | Debtor's Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) |
| *Vol. 4* 001097 | 14 | 1811 | Notice of Filing Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (with Technical Modifications) |
| *Vol. 5* 001346 | 15 | 1814 | Debtor's Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |

| | 16 | 1847 | Fourth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
|---|---|---|---|
| | 17 | 1873 | Fifth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| | 18 | 1875 | Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland of Highland Capital Management, L.P. (As Modified) |
| | 19 | 1887 | Supplemental Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| | 20 | 1671 | United States Trustee's Limited Objection to Confirmation of Debtors' Fifth Amended Plan of Reorganization |
| | | | **Evidence and Transcripts** |
| | 21 | 1894 | Transcript of February 2, 2021 Confirmation Hearing |
| | 22 | 1905 | Transcript of February 3, 2021 Confirmation Hearing |
| | 23 | 1917 | Transcript of February 8, 2021 Bench Ruling |
| | 24 | 1794 | All exhibits admitted into evidence during February 2 and February 3, 2021 Confirmation Hearing |
| | | 1795 | |
| | | 1822 | |
| | | 1863 | |
| | | 1866 | |
| | | 1877 | |
| | | 1895 | |
| | | 1915 | |

*Handwritten annotations in left margin:*

Vol 5  
001414  
001421  
001427  
001475  
001482  
001485  
081783  
002040  
082091  
002188  
Vol 12 - 002931  
Vol 50 - 013295  
-013297  
Vol 51 - 013373  
Vol 54 - 014182  
Vol 55 - 014506  

*Handwritten note below table:*

✳ 1822 - Vol. 12 - 50 (39 Volumes)

RESPECTFULLY SUBMITTED this 22d day of March, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    3800 Ross Tower
    500 N. Akard Street
    Dallas, Texas 75201-6659
    Telephone: (214) 855-7500
    Facsimile: (214) 855-7584
    Email: drukavina@munsch.com

**ATTORNEYS FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P. AND
NEXPOINT ADVISORS, L.P.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 22d day of March, 2021, true and correct copies of this document were electronically served by the Court's ECF system on parties entitled to notice thereof, including on counsel for the Debtor.

By: /s/ Davor Rukavina
    Davor Rukavina, Esq.

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054 |
| | § | Chapter 11 |
| | § | |
| Debtor. | § | |
| | § | |

**DEBTOR'S MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF THE FIFTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT L.P.**

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

# TABLE OF CONTENTS

Page

Preliminary Statement ................................................................................. 1

Background ................................................................................................. 4

   I.     Procedural Background ...................................................................... 4

   II.    Solicitation and Notification Process. ............................................... 6

Argument .................................................................................................. 13

   III.   The Plan Satisfies Each Requirement for Confirmation. ................... 13

        A.    The Plan Complies with the Applicable Provisions of the
               Bankruptcy Code (Section 1129(a)(1)). ..................................... 13

        B.    The Debtor Has Complied with the Applicable Provisions of the
               Bankruptcy Code (Section 1129(a)(2)). ..................................... 23

        C.    The Debtor Proposed the Plan in Good Faith and Not by Any
               Means Forbidden by Law (Section 1129(a)(3)). ......................... 26

        D.    The Debtor is Seeking to Pay Certain Professional Fees and
               Expenses Subject to Bankruptcy Court Approval (Section
               1129(a)(4)). ............................................................................... 28

        E.    The Debtor Has Complied with the Bankruptcy Code's
               Governance Disclosure Requirement (Section 1129(a)(5)). .......... 29

        F.    The Plan Does Not Require Government Regulatory Approval of
               Rate Changes (Section 1129(a)(6)). ........................................... 34

        G.    The Plan Is in the Best Interests of Holders of Claims and Interests
               (Section 1129(a)(7)). ................................................................. 34

        H.    The Plan Complies with the Requirements of Section 1129(a)(8) of
               the Bankruptcy Code. ................................................................ 40

        I.    The Plan Complies With Statutorily Mandated Treatment of
               Administrative and Priority Tax Claims (Section 1129(a)(9)). ...... 40

        J.    At Least One Impaired Class of Claims Has Accepted the Plan,
               Excluding the Acceptances of Insiders (Section 1129(a)(10)). ...... 42

001347

K.  The Plan Is Feasible and Is Not Likely to Be Followed by the Need for Further Financial Reorganization (Section 1129(a)(11)). .................. 43

L.  The Plan Provides for the Payment of All Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12)). ....................................................... 44

M.  The Plan Complies with Section 1129(a)(13) of the Bankruptcy Code. ............................................................................................. 44

N.  Sections 1129(a)(14) through Sections 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan. ........................................... 45

O.  The Plan Satisfies the Cramdown Requirements (Section 1129(b)). ...... 45

P.  The Plan satisfies the "Cramdown" Requirements of the Bankruptcy Code. ..................................................................... 48

Q.  The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code (Sections 1129(c)-(e)). ........................................ 51

IV.  The Plan's Release, Exculpation, and Injunction Provisions Are Appropriate and Comply with the Bankruptcy Code for the Reasons Articulated in the Omnibus Reply. ........................................................ 51

A.  The Debtor Complied with Section 1129(d) of the Bankruptcy Code. ............................................................................................. 52

B.  Modifications to the Plan. ....................................................................... 52

Conclusion ...................................................................................................................... 56

DOCS_SF:104703.16 36027/002

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
526 U.S. 434 n.13 (1999).................................................................................. 34, 46, 48

*Boullion v. McClanahan*,
639 F.2d 213 (5th Cir. 1981) ............................................................................... 39

*In re Acis Capital Management*,
2019 Bankr. LEXIS 294, *116 (Bankr. N.D. Tex. January 31, 2019) ..................................... 38

*In re Ambanc La Mesa Ltd. P'ship*,
115 F.3d 650 (9th Cir. 1997) ............................................................................... 47, 48

*In re American Solar King Corp.*,
90 B.R. 808 (Bankr. W.D. Tex. 1988)...................................................................... 53

*In re Aztec Co.*,
107 B.R. 585 (Bankr. M.D. Tenn. 1989) ................................................................... 47

*In re Block Shim Dev. Company-Irving*,
939 F.2d 289 (5th Cir. 1991) ............................................................................... 26

*In re Bowles*,
48 B.R. 502 (Bankr. E.D. Va. 1985)........................................................................ 47

*In re Cypresswood Land Partners, I*,
409 B.R. 396 (Bankr. S.D. Tex. 2009) ............................................................... 13, 23, 26

*In re Freymiller Trucking, Inc.*,
190 B.R. 913 (Bankr. W.D. Okla. 1996) ................................................................... 47

*In re Friendship Dairies*,
2012 Bankr. LEXIS 13, **22-23 (Bankr. N.D. Tex. Jan. 3, 2014) ......................................... 54

*In re Global Safety Textiles Holdings LLC*,
No. 09-12234 (KG), 2009 WL 6825278, at *4 (Bankr. D. Del. Nov. 30, 2009)..................... 53

*In re J T Thorpe Co.*,
308 B.R. 782 (Bankr. S.D. Tex. 2003) ..................................................................... 13

*In re Johns-Manville Corp.*,
68 B.R. 618 (Bankr. S.D.N.Y. 1986)........................................................................ 47

*In re Joint E. & S. Dist. Asbestos Litig.*,
982 F.2d 721 (2d Cir. 1992) ................................................................................ 18

*In re Kolton*,
No. 89-53425-C, 1990 WL 87007 at *5 (Bankr. W.D. Tex. Apr. 4, 1990)............................. 47

*In re Landing Assocs., Ltd.*,
157 B.R. 791 (Bankr. W.D. Tex. 1993)................................................................. 29, 43

*In re Lason, Inc.*,
300 B.R. 227 (Bankr. D. Del. 2003) ....................................................................... 40

DOCS_SF:104703.16 36027/002

001349

*In re Mirant Corp.*,
   348 B.R. 725 (Bankr. N.D. Tex. 2006)................................................................... 46

*In re Neff*,
   60 B.R. 448 (Bankr. N.D. Tex. 1985)..................................................................... 40

*In re Quigley Co., Inc.*,
   377 B.R. 110 (Bankr. S.D.N.Y. 2007)................................................................... 18

*In re Sentry Operating Co. of Tex., Inc.*,
   264 B.R. 850 (Bankr. S.D. Tex. 2001).................................................................. 14

*In re Sentry Operating Co. of Texas, Inc.*,
   264 B.R. 850 (Bankr. S.D. Tex. 2001).................................................................. 53

*In re Star Ambulance Service, LLC*,
   540 B.R. 251 (Bankr. S.D. Tex. 2015) .................................................................. 43

*In re Sun Country Dev., Inc.*,
   764 F.2d 406 (5th Cir. 1985) ................................................................................. 26

*In re Tex. Extrusion Corp.*,
   844 F.2d 1142 n. 23 (5th Cir. 1988) ..................................................................... 34

*In re T-H New Orleans Ltd. P'ship*,
   116 F.3d 790 (5th Cir. 1997) ................................................................................. 43

*In re W.R. Grace & Co.*,
   729 F.3d 311 (3d. Cir 2013) .................................................................................. 18

*In re Wilson Metal Fabricators*,
   No. 19-31452,**9-10 (Bankr. N.D. Tex. SGJ May 18, 2020) ............................. 38

*John Hancock*,
   987 F.2d at 157 n.5 ............................................................................................... 48

*Kane v. Johns-Manville Corp.*,
   843 F.2d 636 (2d Cir. 1988) ................................................................................. 47

*Mabey v. Sw. Elec. Power Co.*
   *(In re Cajun Elec. Power Coop., Inc.)*,
   150 F.3d 503 (5th Cir. 1998) ................................................................................. 28

*Matter of Cajun Elec. Power Co-op., Inc.*,
   150 F.3d 503 (5th Cir. 1998) ................................................................................. 24

*Paradigm Air Carriers, Inc. v. Tex. Rangers Baseball Partners*
   *(In re Tex. Rangers Baseball Partners)*,
   521 B.R. 134 (Bankr. N.D. Tex 2014).................................................................. 54

*Pub. Fin. Corp. v. Freeman*,
   712 F.2d 219 (5th Cir. 1983) ................................................................................. 26

## STATUTES

11 U.S.C. § 101.............................................................................................................. 22, 51

11 U.S.C. § 1114.................................................................................................................. 44

11 U.S.C. § 1123.................................................................................................... 17, 21, 23, 51

001350

11 U.S.C. § 1125 ......................................................................................................... 23

11 U.S.C. § 1126 ..................................................................................................... 6, 25

11 U.S.C. § 1129 ................................................................................................. passim

## OTHER AUTHORITIES

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977),
  *reprinted in* 1978 U.S.C.C.A.N. 5936, 6368 ........................................................ 13

S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978),
  *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912 ........................................................ 13

DOCS_SF:104703.16 36027/002

001351

The above-captioned debtor and debtor in possession (the "Debtor") files this memorandum of law (this "Memorandum") in support of confirmation of the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (as Modified) (the "Plan").[2] Concurrently herewith, the Debtor has filed its *Omnibus Reply to Objections to Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management L.P.* (the "Omnibus Reply"), which addresses and responds to the each of objections to confirmation of the Plan.[3]

**Preliminary Statement**

1.      After fourteen long months in a chapter 11 process that has often times been contentious between the Debtor, the Committee, and the estate's largest creditors, the Debtor seeks confirmation of its Plan that enjoys the support of the Committee and virtually all of its non-affiliated creditors. As the Debtor told the Court when it approved the installation of the Independent Board on January 9, 2020, the new Board intended to change the culture of litigation that was the Debtor's trademark prepetition. While the negotiations have been difficult and testy at times, the Debtor successfully resolved its disputes with the Redeemer Committee, Acis and HarbourVest and has reached settlements in principal with UBS—an accomplishment that seemed impossible a few months ago. In fact, the Plan is supported by the holders of approximately 95% of creditors who collectively hold $345 million in claims against the estate that voted on the Plan. In accomplishing these goals, the Independent Board has resolved litigation that has been pending in some cases for over a decade and in several courts, including

---

[2] Unless otherwise noted, capitalized terms used in this Memorandum have the meanings ascribed in the Plan.

[3] To the extent that a party has raised a specific objection to the statutory provisions set forth in 1123 and 1129 of the Bankruptcy Code, those objections are addressed herein as part of the Debtor's *prima facie* showing that it has satisfied the statutory requirements to confirm the Plan.

001352

this Court in the Acis bankruptcy case, has positioned the Debtor to be able to put contentious litigation with legitimate creditors behind it and promptly monetize its assets and make distributions to general unsecured creditors. The Debtor worked extremely hard during the bankruptcy case to develop a "grand bargain" plan that would achieve a global resolution of all disputes between the Debtor, its creditors and Mr. Dondero. Unfortunately, such a plan was not attainable.

2. What stands in the Debtor's way to confirmation of the Plan is a series of objections filed by Mr. Dondero and entities owned and/or controlled by him (collectively, the "Dondero Entities") and certain of the Debtor's current and ex-employees, two of whom the Debtor recently terminated for cause and others whose blind fealty to Mr. Dondero led them to vote against the Plan for no apparent economic reason. The common theme in all of the objections is not a desire for better treatment of creditors, which is not surprising since the objectors' economic interests in the Debtor are tenuous at best. Rather, the focus of the objections are challenges to Plan provisions, including the injunction, release and exculpation provisions, which will limit the Dondero Entities' ability to continue their litigation crusade against anyone who dared stand in Mr. Dondero's way long after the Plan has been confirmed. As the Court is aware from its experience, according to Mr. Dondero, no claim is too frivolous to be brought, no appeal too impossible to succeed and no court too far away in which to commence litigation. As will be discussed herein, the Court has the authority and jurisdiction to approve provisions in the Plan which will minimize the Dondero Entities' ability to harass parties with vindictive litigation designed to interfere with post-confirmation efforts. For the

DOCS_SF:104703.16 36027/002

Court's convenience, attached as **Exhibit A** hereto is a chart that sets for the relationships between the various Dondero Entities.

3.     As more fully set forth in the Omnibus Reply, and as summarized on **Exhibit B** hereto, the Dondero Entities' interests in this case arise primarily from their direct and indirect equity interests in the Debtor.  While certain of the Dondero Entities assert claims against the Debtor, those claims either arise out of their equity interests that the Debtor will seek to subordinate under Section 510 of the Bankruptcy Code or are frivolous claims that target certain conduct of the Independent Directors.  Other Dondero Entities object to the Debtor's attempt to assume certain executory contracts to which they are not a party and lack standing to do so.  Accordingly any objections to the Plan based upon the treatment of claims or the manner in which assets are proposed to be monetized post-confirmation are a smokescreen.

4.     Moreover, any argument that the Dondero Entities are seeking to protect the value of their equity interests is specious.  Mr. Dondero has told the Court on numerous occasions that his so-called "pot plan" proposal to acquire substantially all of the assets of the Debtor for $160 million (which is really $130 million because the proposal acquires approximately $30 million of the Debtor's cash) fairly values the Debtor's assets.  Accordingly, under Mr. Dondero's own assumptions, equity is out of the money as the total amount of allowed claims in this case exceeds Mr. Dondero's valuation by a factor of more than two.  The only way creditors in the Debtor's estate will receive full payment on account of their claims—a prerequisite to any distributions to the Dondero Entities' indirect equity interests and related claims arising from such interests—would be for the Estate to monetize its multiple claims against the Dondero

Entities for well in excess of $100 million. It is through this lens that the Court should view the Dondero Entities' confirmation objections.

5. The hard-fought victories obtained by the Debtor in negotiating the settlement of substantially all of the litigation that has plagued it for years should not be singularly undone by the Dondero Entities and his army of loyal employees and ex-employees. Mr. Dondero should not be allowed to use this Court and his frivolous litigation to upend the settlements achieved to date by the Debtor. The Plan should be confirmed to allow the Reorganized Debtor and the Claimant Trustee to complete the process of winding down the Debtor's assets, satisfying creditor claims, and implementing the other wind-down provisions of the Plan without interference by the Dondero Entities.

## Background

### I. Procedural Background

6. On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

7. On October 29, 2019, the Official Committee of Unsecured Creditors (the "Committee") was appointed by the U.S. Trustee in the Delaware Court.

8. On December 4, 2019, the Delaware Court entered an order transferring venue of the Debtor's bankruptcy case to this Court [Docket No. 186].[4]

---

[4] All docket numbers refer to the docket maintained by this Court.

DOCS_SF:104703.16 36027/002

9.      The Debtor has continued in the possession of its property and has continued to
operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108
of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case.
However, on January 9, 2020, the Court entered its *Order Approving Settlement With Official
Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for
Operations in the Ordinary Course* [D.I. 339] pursuant to which the Court approved the
appointment of an Independent Board of Directors for Strand Advisors, Inc., the general partner
of the Debtor (the "Settlement Order").  On July 16, 2020, the Court entered its *Order Approving
Debtor's Motion Under Bankruptcy Code Sections 105(A) and 363(B) Authorizing Retention of
James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign
Representative Nunc Pro Tunc to March 15, 2020* [D.I. 854], pursuant to which James Seery, Jr.,
was approved as the Debtor's Chief Executive Officer, Chief Restructuring Officer, and Foreign
Representative.

10.      On November 24, 2020, the Bankruptcy Court entered the *Order (A) Approving
the Adequacy of the Disclosure Statement, (B) Scheduling a Hearing to Confirm the Fifth
Amended Plan of Reorganization; (C) Establishing Deadline for Filing Objections to
Confirmation of Plan; (D) Approving Form of Ballots, Voting Deadline and Solicitation
Procedures; And (E) Approving Form and Manner of Notice* [D.I. No. 1476] (the "Disclosure
Statement Order").  The Disclosure Statement Order approved the Disclosure Statement as
containing "adequate information" within the meaning of section 1125 of the Bankruptcy Code

DOCS_SF:104703.16 36027/002

and also approved, among other things, the proposed procedures for solicitation of the Plan and related notices, forms, and ballots (collectively, the "Solicitation Packages").

11.     The deadline for all Holders of Claims and Equity Interests entitled to vote on the Plan to cast their ballots and the deadline to file objections to confirmation of the Plan was January 5, 2021, at 5:00 p.m. (prevailing Central Time) subject to extension by the Debtor, in its discretion (the "Voting Deadline"). On January 19, 2021, the Debtor filed the Voting Report, which is summarized below. The hearing on confirmation of the Plan (the "Confirmation Hearing") is scheduled for January 26, 2021, at 9:30 a.m. (prevailing Central Time).[5]

**II. Solicitation and Notification Process.**

12.     In compliance with the Bankruptcy Code and the Disclosure Statement Order, only Holders of Claims and Equity Interests in Impaired Classes receiving or retaining property on account of such Claims or Equity Interests were entitled to vote to accept or reject the Plan.[6] Holders of Claims and Equity Interests were not entitled to vote if their rights are Unimpaired under the Plan (in which case such Holders were conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code).[7] The voting results, as reflected in the Voting Report, are summarized as follows:

---

[5] The Confirmation Hearing was initially scheduled to take place on January 13, 2021, but was continued by the Bankruptcy Court at the Debtor's request.

[6] *See* 11 U.S.C. § 1126.

[7] There were no Impaired Classes of Claims or Equity Interests conclusively deemed to reject the Plan pursuant section 1126(g) of the Bankruptcy Code.

DOCS_SF:104703.16 36027/002

001357

| CLASSES | TOTAL BALLOTS RECEIVED | | | |
| | Accept | | Reject | |
| | AMOUNT (% of Amount/Shares Voting) | NUMBER (% of Number Voting) | AMOUNT (% of Amount/Shares Voting) | NUMBER (% of Number Voting) |
|---|---|---|---|---|
| Class 2 Frontier Secured Claim | $5,209,963.62 (100%) | 1 (100%) | $0 (0%) | 0 (0%) |
| Class 7 Convenience Claims | $2,765,906.51 (100%) | 14 (100%) | $0 (0%) | 0 (0%) |
| Class 8 General Unsecured Claims[8] | $301,826,418.36 (93.54%) | 12 (27.9%) | $20,833,059.67 (6.46%) | 31 (72.10%) |
| Class 9 Subordinated Claims | $35,000,000 (100%) | 6 (100%) | $0 (0%) | 0 (0%) |
| Class 10 B/C Limited Partnership Interests | None | None | None | None |
| Class 11 Class A Limited Partnership Interests | 0% | 0% | $100% | 100% |

13. <u>Class 2</u>. Class 2 consists of one member (Frontier Secured Claim) and this creditor voted to accept the Plan.

14. <u>Class 7</u>. Class 7 consists of the Convenience Claims. 100% of the fourteen valid members of Class 7 each voted to accept the Plan.[9] The votes of the Senior Employees—Mr. Ellington and Mr. Leventon—who attempted to partially vote certain Claims in Class 7 and

---

[8] The Debtor recently settled the objections filed by Senior Employees Thomas Surgent and Frank Waterhouse, who previously were included in the Senior Employee Objection. Mssrs. Surgent and Waterhouse have each agreed to execute the Senior Employee Stipulation and to vote their Class 7 and Class 8 Claims to accept the Plan. This chart reflects the results of the voting report filed with Court on January 19, 2021 [D.I. 1772] and does not reflect the subsequent settlements with Mssrs. Surgent and Waterhouse and their acceptance of the Plan.

[9] In accordance with the Voting Procedures Order, the Debtor accepted the late vote of Siepe Systems (which was cast on the Voting Deadline, but after the 5:00 Central Time cut off). The Debtor also accepted the late votes of each of: (i) Stinson Leonard Street, who also voted to accept the Plan on January 14, 2021, and (ii) the HarbourVest entities, who were entitled to both Class 8 General Unsecured Claims and Class 9 Subordinated Claims pursuant to the Court's allowance of these claims at a hearing conducted on January 14, 2021 [D.I. 1788] with respect to the compromise of HarbourVest's claims against the Debtor, as explained below.

other Claims in Class 8—should be disallowed for the reasons more specifically addressed in the

Omnibus Reply. However, regardless of the invalid votes cast by the Senior Employees are

counted, Class 7 Convenience Claims have accepted the Plan in both requisite dollar amount and

voting number. First, each of these two "Senior Employees"[10] filed unliquidated proofs of claim

with the Bankruptcy Court, yet are attempting to split their claims between Class 7 and Class 8

without having executed the Senior Employee Stipulation and in violation of the Plan, the Voting

Procedures Order, and applicable law. Second, even if the Senior Employees were deemed to

hold separate, liquidated claims on account of their asserted annual bonus and deferred

compensation claims that could be split from their Class 8 Claims, the Plan's Convenience Class

Election does not morph a Class 8 Claim into a Class 7 Claim for voting purposes. A valid

election of the Convenience Class Election would only entitle the electing creditor to receive the

treatment under Class 7, not to vote its claim in that class. *See* Plan, §1.B.43.

15. Class 8. Over 93% of the dollar amount of Class 8 Claims voted to accept the

Plan. However, more than 50% of the holders of Class 8 Claims did not accept the Plan as a

result of the votes cast by approximately 27 employees holding contingent claims (including the

split Class votes cast by Mssrs. Ellington and Leventon[11]) to reject the Plan. The contingent

claims of the Debtor's other employees that voted against the Plan are (i) in respect to the

---

[10] As the Court is aware, the Debtor terminated the employment of both Mssrs. Ellington and Leventon on January 5, 2021 and these individuals are no longer employees of the Debtor.

[11] As noted above, the Debtor has agreed to a settlement of the Senior Employee Objection with respect to Mr. Surgent and Mr. Waterhouse, each of whom will vote their claims to accept the Plan.

DOCS_SF:104703.16 36027/002

unvested claims under the Debtor's deferred compensation bonus plan[12] for amounts that would not be payable, if at all, until May 2021 and May 2022 and would only be payable if such employees were employed as of those vesting dates, which they will not be; and (ii) PTO Claims, which are unimpaired and treated by either Class 4 (PTO Claim) or Class 6 (Priority Non-Tax Claims).

16.  Class 9.  Class 9 consists of the subordinated claims of HarbourVest that were allowed pursuant to the Court's granting of the *Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1625] (the "Motion") at a hearing conducted on January 14, 2021, pursuant to which HarbourVest was granted both allowed Class 9 Claims in the aggregate amount of $35 million and Allowed Class 8 Claims in the amount of $45 million with respect to the claims filed by HarbourVest.[13]  The HarbourVest Subordinated Claims are the only current members of Class 9.  Although Class 9 has unanimously accepted the Plan, the Debtor is not asserting that Class 9 constitutes the accepting impaired class of claims,

---

[12] On January 14, 2021, the Debtor terminated its annual bonus plan.  The Debtor's employees previously held contingent claims under the annual bonus plan for amounts that would have vested in February 2021 and August 2021 (subject to the employee remaining employed as of those dates and other conditions) and replaced it with a proposed retention plan that is subject of the Debtor's *Motion of the Debtor for Entry of an Order Authorizing the Debtor to Implement a Key Employee Retention Plan with Non-Insider Employees and Granting Related Relief* filed on January 20, 2021.  These employees (except for Mssrs. Surgent, Waterhouse, Ellington and Leventon, who were not paid any postpetition amounts with respect to either bonus plan) were paid the vested amounts owed to them under the annual bonus plan and deferred bonus plan, as applicable, in the ordinary course of business and in accordance with *the Order Authorizing the Debtor to Pay and Honor Ordinary Course Obligations Under Employee Bonus Plans and Granting Related relief* [D.I. 380] entered on January 22, 2020.  Thus, the Debtor's non-Senior Employees no longer have any contingent claims under the now-terminated annual bonus plan because they have already been paid their vested amounts.

[13] The $345 million claims estimate includes the claim of UBS Securities, LLC which has been allowed in the amount of $94,761,076 for voting purposes only.  As the Debtor has informed the Court, the Debtor has reached an agreement in principal with UBS to resolve its claims which agreement is subject to internal approvals at UBS and documentation.

exclusive of insiders, required to cram down the Plan pursuant to section 1129(b) of the Bankruptcy Code, as discussed below in the cramdown section of the Memorandum.

17.    Several objections address the mechanics of how Class 9 Claims may be subordinated and the scope of any such subordination.  Mr. Dondero, Dugaboy, NexBank, and NexPoint each argue that section III.J of the Plan provides "no mechanism, hearing requirement or deadline" to subordinate claims.   Dondero Objection, at IV; NexPoint Objection, at 7; NexBank Objection at II.A.

18.    Section III.J of the Plan does not categorically subordinate claims.  Rather, Class 9 provides that holders of Subordinated Claims will receive the treatment provided to General Unsecured Claims unless they are subordinated either pursuant to an order of the Court upon notice to the relevant party or otherwise consensually.  In other words, the Debtor, Reorganized Debtor or Claimant Trustee must obtain an order from the Bankruptcy Court subordinating the subject Claim.  To the extent the Bankruptcy Court orders subordination of the Claim, it will receive the treatment provided for Class 9 Subordinated Claims.  If no subordination order is obtained, then the Claim will receive the treatment afforded to Class 8 General Unsecured Claims.  To illustrate this point, the vote cast by Raymond Joseph Dougherty as a Class 9 Subordinated Claim should be tabulated in Class 8 because there is no order or agreement with this creditor to subordinate his claims to those of Class 8 General Unsecured Claims.  As discussed below, the Plan is being amended to clarify this treatment.   Thus, the Plan does not afford the Debtor (or any other party) with the discretion to subordinate claims on their own. This determination will be made by the Court.

DOCS_SF:104703.16 36027/002

001361

19.     In order to clarify the treatment and procedure to subordinate claims, the Debtor

has made the following amendments to the Plan.  Section III.J of the Plan has been amended

with the bolded language below to clarify the requirement of an opportunity for a hearing with

respect to any proceeding to subordinate any claims:

> Under section 510 of the Bankruptcy Code, upon written notice **and hearing,** the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to **seek entry of an order by the Bankruptcy Court** to re-classify or to ~~seek to~~ subordinate any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan.

20.     In addition, the Debtor has amended the treatment of Subordinated Claims in

Section III.H.9 of the Plan to only treat claims that are or have been subordinated under section

510 of the Bankruptcy Court order entered by the Bankruptcy Court and which fall within the

Plan definition of Subordinated Claims:

> *Treatment*:  On the Effective Date, Holders of Subordinated Claims shall receive either (i) their Pro Rata share of the Subordinated Claimant Trust Interests or, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee may agree upon in writing.
>
> ~~*Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 9 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive either (i) the treatment provided to Allowed Class 8 Claims or (ii) if such Allowed Class 9 Claim is subordinated to the Convenience Claims and General Unsecured Claims pursuant to 11 U.S.C. § 510 or Final Order of the Bankruptcy Court, its Pro Rata share of the Subordinated Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.~~

21.     In response to Mr. Dondero's objection asserting the lack of a time period to

commence proceedings to subordinate Claims, the Debtor has amended the Plan to clarify that

the timing by which parties in interest may object to the allowance of a potentially Subordinated

Claim and seek to have the claim treated as a Class 9 Subordinated Claim is now included in the

Claims Objection Deadline by the addition of the bolded language to Section VII.B of the Plan.

> Following the Effective Date, each of the Reorganized Debtor or the Claimant Trustee, as applicable, may File with the Bankruptcy Court an objection to the allowance of any Disputed Claim or Disputed Equity Interest, **request the Bankruptcy Court subordinate any Claims to Subordinated Claims**, or any other appropriate motion or adversary proceeding with respect ~~thereto which shall be litigated to Final Order~~ **to the foregoing by the Claims Objection Deadline**, or, at the discretion of the Reorganized Debtor or Claimant Trustee, as applicable, compromised, settled, withdrew or resolved without further order of the Bankruptcy Court…

22.     Finally, the limited objection to the Plan filed by Jack Yang and Brad Borud [D.I. 1666] and joined by Deadman, Travers and Kaufmann [D.I. 1674, 1679] also objects to the Plan definition of "Subordinated Claims" and asserts that the Plan is not permissible under Bankruptcy Code section 510 to the extent it intends to subordinate any and all claims of partners of the Debtor, including claims "solely in respect of compensation owed to such person for their services as an employee."  The Plan does not intend to categorically subordinate these claims or expand the reach of section 510 of the Bankruptcy Code.  However, in order to clarify this treatment and address the concerns raised by these individuals, the Plan has been amended as set forth below.

> "Subordinated Claim" means any claim that ~~(i)~~ is ~~or may be~~ subordinated to the Convenience Claims and General Unsecured Claims pursuant to 11 U.S.C. § 510 or order entered by ~~Final Order of~~ the Bankruptcy Court ~~or (ii) arises from a Class A Limited Partnership Interest or a Class B/C Limited Partnership Interest~~.

23.     <u>Class 10 and Class 11</u>.  Class 10 and 11 consist of the separate classes of Equity Interests in the Debtor owned by affiliates of Mr. Dondero.  Class 10 did not cast a vote to accept or reject the Plan.  Class 11 voted to reject the Plan.

24.     As explained more fully below, the Debtor may confirm the Plan pursuant to the cram down provisions of 1129(b) of the Bankruptcy Code notwithstanding the rejection and/or non-acceptance of the Plan by Classes 8, 10 and 11.

<u>**Argument**</u>

25.     To confirm the Plan, the Bankruptcy Court must find that the Debtor has satisfied the provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence.[14] As described in detail below, the Plan complies with all relevant provisions of the Bankruptcy Code and all other applicable law. The Plan is supported by voting creditors holding $345 million in claims consisting of approximately 95% of the claims in this case. As set forth in this Memorandum and based upon the evidence that will be presented at the Confirmation Hearing, the Debtor will satisfy the evidentiary requirements necessary to confirm the Plan. The Debtor thus respectfully requests that the Bankruptcy Court confirm the Plan.

**III.    The Plan Satisfies Each Requirement for Confirmation.**

**A.      The Plan Complies with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(1)).**

26.     Section 1129(a)(1) of the Bankruptcy Code requires that a plan comply with the applicable provisions of the Bankruptcy Code.[15] The principal goal of this provision is to ensure compliance with the sections of the Bankruptcy Code governing classification of claims and interests and the contents of a plan of reorganization.[16] Accordingly, the determination of

---

[14] *See In re Cypresswood Land Partners, I*, 409 B.R. 396, 422 (Bankr. S.D. Tex. 2009); *In re J T Thorpe Co.*, 308 B.R. 782, 785 (Bankr. S.D. Tex. 2003).

[15] 11 U.S.C. § 1129(a)(1).

[16] *See* S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912; H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5936, 6368.

DOCS_SF:104703.16 36027/002

**001364**

whether the Plan complies with section 1129(a)(1) of the Bankruptcy Code requires an analysis of sections 1122 and 1123 of the Bankruptcy Code.

> **1.** **The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.**

27.     Section 1122 of the Bankruptcy Code provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." Because claims only need to be "substantially" similar to be placed in the same class, plan proponents have broad discretion in determining how to classify claims.[17]

28.     The Plan's classification of Claims and Equity Interests satisfies the requirements of section 1122 of the Bankruptcy Code because the Plan places Claims and Equity Interests into a number of separate Classes, with each Class differing from the Claims and Equity Interests in each other Class in a legal or factual nature or based on other relevant criteria.[18] Specifically, the Plan provides for the separate classification of Claims and Equity Interests into the following Classes:

> Class 1: Jefferies Secured Claim;
>
> Class 2: Frontier Secured Claim
>
> Class 3: Other Secured Claims;
>
> Class 4: Priority Non-Tax Claims;

---

[17] *See In re Sentry Operating Co. of Tex., Inc.*, 264 B.R. 850, 860 (Bankr. S.D. Tex. 2001) (recognizing that section 1122 is broadly permissive of any classification scheme that is not specifically proscribed, and that substantially similar claims may be separately classified where separate classification has a basis independent of the plan proponent's efforts to secure a class of claims that will accept the plan).

[18] Plan, Art. III.

Class 5: Retained Employee Claims;

Class 6: PTO Claims;

Class 7: Convenience Claims;

Class 8: General Unsecured Claims;

Class 9: Subordinated Claims;

Class 10: Class B/C Limited Partnership Interests; and

Class 11: Class A Limited Partnership Interests.

29.     Claims and Equity Interests assigned to each particular Class described above are

substantially similar to the other Claims or Equity Interests in such Class. Valid business, legal,

and factual reasons justify the separate classification of the particular Claims or Equity Interests

into the Classes created under the Plan, and no unfair discrimination exists between or among

Holders of Claims and Equity Interests. For example, the PTO Claims in Class 6 relate solely to

claims of the Debtor's employees for unpaid paid time off in excess of the $13,650 statutory cap

amount under sections 507(a)(4) and (a)(5) of the Bankruptcy Code and are dissimilar from other

unsecured claims. The treatment of the unsecured Convenience Claims in Class 7 is to allow

holders of eligible and liquidated claims (below a certain threshold dollar amount) to receive a

cash payout of the lesser of 85% of the Allowed amount of the creditor's claim or such holders

*pro rata* share of the Convenience Claims Cash Pool. The Plan also provides for reciprocal "opt

out" mechanisms to allow holders of Class 7 Claims to elect to receive the treatment for Class 8

Claims.

001366

30.     Section III.C of the Plan provides for the elimination of classes that do not have a least one holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for purposes "of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class." Plan, § III.D.  The purpose of this provision is to provide that a Class that does not have voting members shall not be included in the tabulation of whether that Class has accepted or rejected the Plan.

31.     Mr. Dondero objects to the elimination of the "vacant" Class provision in Article III.C because such elimination would not provide for treatment of a Claim that may be later classified in vacant class.  Dondero Objection, at IV.14.  However, the reference to vacant Classes in Article III.C refers only to the tabulation of votes cast to accept or reject the Plan, not to the treatment of claims that may later be classified in a class even if there were no voting members as of the Confirmation Hearing.  For example, Class 5 (Retained Employee Claims) does not have any voting members because the existence of any Claims in this Class would not arise except for any current employees of the Debtor who will be employed on the Effective Date.  Plan, § I.B.116.  Thus, Class 5 is disregarded solely for purposes of determining whether or not the Plan has been accepted or rejected under Section 1129(a)(8) of the Bankruptcy Code because there are no current members in that Class.  However, the Plan may treat Claims that may eventually become members of Class 5 post-confirmation.

32.     The Debtor submits that the Plan fully complies with and satisfies section 1122 of the Bankruptcy Code.  Each of these categories of Claims and Equity Interests have distinct

DOCS_SF:104703.16 36027/002

rights under the Plan (and applicable non-bankruptcy law), and the Debtor has a valid business justification for the respective treatments of the Classes of Claims and Equity Interests. The Plan's classifications not only serve the purpose of facilitating ease of distributions on the Effective Date but also acknowledge the fundamental differences between those types of Claims and Equity Interests. For the foregoing reasons, the Plan satisfies section 1122 of the Bankruptcy Code.

   **2.**   **The Plan Satisfies the Seven Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code.**

   33.   The applicable requirements of section 1123(a) of the Bankruptcy Code generally relate to the specification of claims treatment and classification, the equal treatment of claims within classes, and the mechanics of implementing a plan. The Plan satisfies each of these requirements.

   34.   <u>Specification of Classes, Impairment, and Treatment</u>. The first three requirements of section 1123(a) are that a plan specify (a) the classification of claims and interests, (b) whether such claims and interests are impaired or unimpaired, and (c) the precise nature of their treatment under the plan.[19] The Plan sets forth these specifications in detail in satisfaction of these three requirements in Article III.[20]

   35.   <u>Equal Treatment</u>. The fourth requirement of section 1123(a) is that a plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment." The Plan meets this

---

[19] 11 U.S.C. § 1123(a)(1)-(3).

[20] Plan, Art. III.A–B.

requirement because Holders of Allowed Claims or Equity Interests in each Class will receive the same rights and treatment as other Holders of Allowed Claims or Equity Interests within such Holders' respective Class. Thus, the Plan satisfies section 1123(a)(4).[21]

36.     Mr. Daugherty and the Senior Employees each argue that the Plan does not satisfy Bankruptcy Code section 1123(a)(4). Mr. Daugherty asserts that the Plan provides for different treatment of Disputed Claims versus Allowed Claims, and therefore provides disparate treatment in violation of Section 1123(a)(4) of the Bankruptcy Code. This is not correct because the Plan provides for the same <u>treatment</u> of claims within a particular class. The Disputed Claims Reserve shall reserve funds for the potential allowance of Claims that are not allowed at the time the Claimant Trustee makes distributions.[22] The Disputed Claims Reserve also does not allow the Debtor to unilaterally determine the amount of any reserve; that will be decided by the Bankruptcy Court absent agreement by the relevant parties. The Debtor—or any holder of a Disputed Claim—may file a motion with the Bankruptcy Court and request that the Claimant Trustee set aside a specific amount in the Disputed Claims Reserve pending the ultimate allowance/disallowance of the Claim.

---

[21]  *See In re Quigley Co., Inc.*, 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007) ("[s]ection 1123(a)(4) does not require precise equality, only approximate equality"; and"); *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d. Cir 2013) (same); *see also In re Joint E. & S. Dist. Asbestos Litig.*, 982 F.2d 721, 749 (2d Cir. 1992) ("[T]he 'same treatment' standard of section 1123(a)(4) does not require that all claimants within a class receive the same amount of money.").

[22]  The Plan provides that the Disputed Claims Reserve amount is either (1) the amount set forth on either the Schedules or applicable Proof of Claim; (2) the amount agreed by the Holder of the Disputed Claim and the Reorganized Debtor or Claimant Trustee; (3) the amount ordered by the Bankruptcy Court if it enters an order disallowing, in whole or in part, a Disputed Claim, or (4) as otherwise ordered by the Bankruptcy Court, including an order estimating the Disputed Claim. *See* Plan, § 1.B.49.

001369

37.     Mr. Daugherty's suggestion that the Bankruptcy Court's estimation of disputed claims for purposes of establishing a Disputed Claims Reserve somehow constitutes disparate treatment of similarly classified claims is also devoid of merit. Mr. Daugherty's argument would effectively mean that the Debtor would have to set aside the asserted amount of any Disputed Claim, regardless of how specious it may be, until the claim is ultimately resolved pursuant to a final order. Such a requirement would essentially provide a creditor with a stay pending appeal of the ultimate of allowance of the claim. Moreover, such a requirement would effectively prevent the Debtor from distributing <u>any</u> portion of the reserved funds to holders of Allowed Claims until the Disputed Claim is litigated to final order of the Supreme Court or such other applicable court of last resort—a process that could take years, and as evidenced by the length of time of the pending litigation in this case already waged by Mr. Daugherty, Mr. Dondero and others. If Mr. Daugherty—or any creditor—believes the Debtor's proposed estimate for its Disputed Claim is insufficient, Mr. Daugherty has an adequate remedy under the Plan and can request that the Bankruptcy Court estimate a sufficient amount for deposit into the Disputed Claims Reserve to satisfy his Claim to the extent it is ultimately Allowed.

38.     The Senior Employees argue that the Plan violates section 1123(a)(4) because the Senior Employees are treated differently than other employees in that they are required to sign the Senior Employee Stipulation in order to obtain the benefit of the Debtor's release provided in Section IX.D. This assertion is patently false and conflates treatment of claims within a Class with the Debtor's voluntary release of <u>its own</u> claims and causes of action. First, the treatment of all Class 8 Claims for the Debtor's employees is the same and nothing in the Plan provides for

any disparate or different treatment. Any affirmative claims that belong to the Debtor against the Senior Employees (and other parties) are irrelevant to the claims held by creditors against the Debtor and treated by the Plan. The Plan provides that in order to obtain the benefit of the Debtor release, the Debtor's employees must provide sufficient consideration to obtain this release. They do not get it for free—this issue was substantially argued before this Court at prior hearings.[23] One of the conditions of obtaining the Debtor release for the Senior Employees is that they would be required to execute the Senior Employee Stipulation (in addition to the fulfilling the other Plan requirements of the Debtor's release of employee claims) to provide consideration for the release of claims against these high level Senior Employees, two of whom were recently terminated for cause. As the Debtor's counsel explained at the Disclosure Statement Hearing conducted on November 23, 2020, the decision to purchase the Debtor release and execute the Senior Employee Stipulation (or not) rested with each Senior Employee, but has no nexus to the treatment of claims of the Senior Employee against the Debtor.[24]

---

[23] The limitations on the release of all Employees (including the Senior Employees) is also intended to address the Bankruptcy Court's concerns on this issue articulated at the first Disclosure Statement Hearing on October 27, 2020, and at a hearing held on October 28, 2020.

"With regard to these releases—and they are, I'll just be clear, Debtor releases, not third parties releasing third parties. But nevertheless, you know, I think there's an issue thereof they would need to be fair and equitable, in the best interest of creditors, and in the paramount interest of creditors would be something the Court would focus on there . . . This is not your normal case where this is the type of provision you see in many, many, many Chapter 11 plans." Transcript of Proceedings Conducted on October 27, 2020; pg 32, lines 10-20.

[24] As explained at the Disclosure Statement Hearing by Debtor's counsel:

"With respect to senior employees—who include Scott Ellington, Isaac Leventon, Frank Waterhouse, and Thomas Surgent—if they want to obtain a release, and there's no requirement that they agree, they must also execute what we refer to as the Senior Employee Stipulation, which is included in the supplement, in order to receive their release. If they execute that stipulation, they would receive their release. If they don't execute that stipulation, they wouldn't." Transcript of Proceedings Conducted on November 23, 2021, pg 9, lines 12-19.

DOCS_SF:104703.16 36027/002

001371

39.    Thus, there is no disparate treatment of Claims within each Class and the Plan does not violate section 1123(a)(4) of the Bankruptcy Code.

40.    <u>Adequate Means for Implementation</u>.  The fifth requirement of section 1123(a) is that a plan must provide adequate means for its implementation.[25]  The Plan, together with the documents and forms of agreement included in the Plan Supplements, provides a detailed blueprint for the transactions contemplated by the Plan.  Essentially, the Plan's various mechanisms provide for the Debtor's continued operation after the Effective Date, the monetization of the Debtor's remaining assets, and payment of the Claims of the Debtor's creditors.  Upon full payment of Allowed Claims, any residual value would then flow to the Debtor's equity security holders in accordance with the Bankruptcy Code's priority scheme.

41.    Article IV of the Plan, in particular, sets forth the means for implementation of the Plan with the establishment of:  (i) the Claimant Trust, (ii) the Litigation Sub-Trust; and (iii) the Reorganized Debtor.  The Claimant Trust Agreement provides for the management of the Reorganized Debtor, including the utilization of a Sub-Servicer, with the Claimant Trust serving as the managing member of New GP LLC (a wholly-owned subsidiary of the Claimant Trust and which will manage the Reorganized Debtor).[26]  The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets and the management of the

---

[25] 11 U.S.C. § 1123(a)(5).  Section 1123(a)(5) specifies that adequate means for implementation of a plan may include: retention by the debtor of all or part of its property; the transfer of property of the estate to one or more entities; cancellation or modification of any indenture; curing or waiving of any default; amendment of the debtor's charter; or issuance of securities for cash, for property, for existing securities, in exchange for claims or interests or for any other appropriate purpose.  *Id.*

As Mr. Ellington and Mr. Leventon are no longer employed by the Debtor they are no longer eligible to execute the Senior Employee Stipulation.

[26] For the avoidance of doubt, the Reorganized Debtor's general partner will not be named "New GP LLC."  That name is simply a placeholder.

Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will all be managed and overseen by the Claimant Trust Oversight Committee.

42. The Claimant Trust will administer the Claimant Trust Assets as provided under the Plan and the Claimant Trust Agreement contained in the Plan Supplements. The Litigation Trustee is charged with pursuing any Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan. Finally, the Reorganized Debtor will administer the Reorganized Debtor Assets, which includes managing the wind down of the Managed Funds. The precise terms governing the execution of these transactions are set forth in greater detail in the applicable definitive documents included in the Plan Supplements, including the Claimant Trust Agreement, the Litigation Sub Trust Agreement, and the Schedule of Retained Causes of Action.[27] Thus, the Plan satisfies section 1123(a)(5).

43. <u>Non-Voting Stock</u>. The sixth requirement of section 1123(a) is that, with respect to a corporate debtor, a plan must contemplate a provision in the reorganized debtor's corporate charter that prohibits the issuance of non-voting equity securities or, with respect to preferred stock, adequate provisions for the election of directors upon an event of default. The Debtor is a limited partnership and there not a corporation.[28]

44. <u>Selection of Officers and Directors</u>. Finally, section 1123(a)(7) requires that a plan "contain only provisions that are consistent with the interests of creditors and equity

---

[27] *See* Notices of Filing Plan Supplements [Docket Nos. 1389, 1606, 1656 and on January 22, 2021] (as modified, amended, or supplemented from time to time, the "<u>Plan Supplements</u>").

[28] *See* 11 U.S.C. § 101(9) (B) ("The term 'corporation' . . . does not include limited partnerships").

security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan."[29] The disclosure of the individuals to provide services to the Reorganized Debtor and entities created under the Plan and qualifications of these individuals is discussed below in section I.E of this Memorandum in conjunction with the Debtor's satisfaction of the provisions of section 1125(a)(5) of the Bankruptcy Code which overlap and address similar issues.

> **B.** **The Debtor Has Complied with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2)).**

45. Section 1129(a)(2) of the Bankruptcy Code requires that plan proponents comply with the applicable provisions of the Bankruptcy Code. Case law and legislative history indicate this section principally reflects the disclosure and solicitation requirements of section 1125 of the Bankruptcy Code,[30] which prohibits the solicitation of plan votes without a court-approved disclosure statement.[31]

> **1.** **The Debtor Complied with Section 1125 of the Bankruptcy Code.**

46. Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a plan of reorganization "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."[32] Section

---

[29] 11 U.S.C. § 1123(a)(7).

[30] *See Cypresswood*, 409 B.R. at 424 ("Bankruptcy courts limit their inquiry under § 1129(a)(2) to ensuring that the plan proponent has complied with the solicitation and disclosure requirements of § 1125.").

[31] 11 U.S.C. § 1125(b).

[32] *Id.*

DOCS_SF:104703.16 36027/002

1125 of the Bankruptcy Code ensures that parties in interest are fully informed regarding the debtor's condition so they may make an informed decision whether to approve or reject a plan.[33]

47. Section 1125 of the Bankruptcy Code is satisfied here. Before the Debtor solicited votes on the Plan, the Bankruptcy Court entered the Disclosure Statement Order.[34] The Bankruptcy Court also approved the contents of the Solicitation Packages provided to Holders of Claims and Equity Interests entitled to vote on the Plan, the notices provided to parties not entitled to vote on the Plan, and the deadlines for voting on and objecting to the Plan.[35] The Debtor, through the Solicitation Agent, complied with the content and delivery requirements of the Disclosure Statement Order, thereby satisfying sections 1125(a) and (b) of the Bankruptcy Code. The Debtor also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to each holder of a claim or interest in a particular class. The Debtor caused the same Disclosure Statement to be transmitted to all holders of Claims and Equity Interests entitled to vote on the Plan.[36]

48. Based on the foregoing, the Debtor has complied in all respects with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure Statement Order.

---

[33] *See Matter of Cajun Elec. Power Co-op., Inc.*, 150 F.3d 503, 518 (5th Cir. 1998) (finding that section 1125 of the Bankruptcy Code obliges a debtor to engage in full and fair disclosure that would enable a hypothetical reasonable investor to make an informed judgment about the plan).

[34] *See* Disclosure Statement Order [Docket No. 576].

[35] *See id.*

[36] *See id.*

DOCS_SF:104703.16 36027/002

### 2. The Debtor Complied with Section 1126 of the Bankruptcy Code.

49. Section 1126 of the Bankruptcy Code provides that only holders of allowed claims and equity interests in impaired classes that will receive or retain property under a plan on account of such claims or equity interests may vote to accept or reject a plan.[37] Accordingly, the Debtor did not solicit votes on the Plan from the following Classes:

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Jefferies Secured Claim | Unimpaired | Deemed to Accept |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4 | Priority Non-Tax Claims | Unimpaired | Deemed to Accept |
| 5 | Retained Employee Claims | Unimpaired | Deemed to Accept |
| 6 | PTO Claims | Unimpaired | Deemed to Accept |

50. The Debtor solicited votes only from Holders of Allowed Claims in Classes 2, 7, 8 and 9 and Equity Interests in Classes 10 and 11 (collectively, the "Voting Classes") because each of these Classes is Impaired and entitled to vote to accept or reject the Plan.[38] The Voting Report reflects the results of the voting process in accordance with section 1126 of the Bankruptcy Code.[39] Based on the foregoing, the Debtor has satisfied the requirements of section 1129(a)(2).

---

[37] *See* 11 U.S.C. § 1126.

[38] *See* Plan, Art. III. A–B.

[39] A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of section 1126, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of section 1126, that have accepted or rejected such plan. 11 U.S.C. § 1126(c). A class of interests has accepted a plan if such plan has been accepted by holders of such interests, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount of the allowed interests of such class held by holders of such interests, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan. 11 U.S.C. §1126(d).

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 2 | Frontier Secured Claim | Impaired | Entitled To Vote |
| 7 | Convenience Claims | Impaired | Entitled To Vote |
| 8 | General Unsecured Claims | Impaired | Entitled To Vote |
| 9 | Subordinated Claims | Impaired | Entitled To Vote |
| 10 | Class B/C Limited Partnership Interests | Impaired | Entitled To Vote |
| 11 | Class A Limited Partnership Interests | Impaired | Entitled To Vote |

### C. The Debtor Proposed the Plan in Good Faith and Not by Any Means Forbidden by Law (Section 1129(a)(3)).

51. Section 1129(a)(3) of the Bankruptcy Code requires that the proponent of a plan propose the plan "in good faith and not by any means forbidden by law."[40] In assessing the good faith standard, courts in the Fifth Circuit consider whether the plan was proposed with "the legitimate and honest purpose to reorganize and has a reasonable hope of success."[41] A plan must also achieve a result consistent with the Bankruptcy Code.[42] The purpose of chapter 11 is to enable a distressed business to reorganize and achieve a fresh start.[43] Whether a plan is proposed in good faith must be determined in light of the totality of the circumstances of the case.[44]

52. During the last several months, the Debtor has negotiated extensively with the Committee regarding all aspects of the Plan. Such negotiations have been hard fought and intense. As the Court will recall, the Committee objected to approval of the Disclosure Statement

---

[40] 11 U.S.C. § 1129(a)(3).

[41] See In re Sun Country Dev., Inc., 764 F.2d 406, 408 (5th Cir. 1985).

[42] See In re Block Shim Dev. Company-Irving, 939 F.2d 289, 292 (5th Cir. 1991).

[43] See Sun Country Dev., 764 F.2d at 408 ("The requirement of good faith must be viewed in light of the totality of circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code to give debtors a reasonable opportunity to make a fresh start.").

[44] See id.; see also Pub. Fin. Corp. v. Freeman, 712 F.2d 219 (5th Cir. 1983); Cypresswood, 409 B.R. at 425.

26

at the initial Disclosure Statement hearing which objection resulted in a continuance of that

hearing. In the subsequent weeks the Debtor and the Committee continued their negotiations and

ultimately reached substantial agreement on the terms of the Plan prior to the November 23,

2020 Disclosure Statement hearing. The parties continued their negotiations over the subsequent

weeks which resulted in the Plan currently before the Court for confirmation. This history

conclusively demonstrates that the Plan is being proposed in good faith within the meaning of

Section 1129(a)(3).

53.     Moreover, the mechanical distributions contemplated under the Plan were

proposed in good faith, are not prohibited by applicable law, and were crafted to efficiently

monetize the Debtor's assets and pursue Causes of Action while bestowing the Claimant Trustee

Oversight Committee with ultimate oversight over this process. The Plan provides for the

transfer of the majority of the Debtor's Assets to the Claimant Trust. The balance of the Debtor's

Assets, including the management of the Managed Funds, will remain with the Reorganized

Debtor. The Reorganized Debtor will be managed by New GP LLC—a wholly-owned

subsidiary of the Claimant Trust. This structure will allow for continuity in the Managed Funds

and an orderly and efficient monetization of the Debtor's Assets. The Claimant Trust, the

Litigation Sub-Trust, or the Reorganized Debtor, as applicable, will institute, file, prosecute,

enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action without

any further order of the Bankruptcy Court, and the Claimant Trust and Reorganized Debtor, as

applicable, will sell, liquidate, or otherwise monetize all Claimant Trust Assets and Reorganized

Debtor Assets and resolve all Claims, except as otherwise provided in the Plan, the Claimant

Trust Agreement, or the Reorganized Limited Partnership Agreement. The Plan also provides for the reconciliation and potential objection to Claims filed against the Debtor and a procedure to administer Disputed Claims. Thus, the Plan satisfies section 1129(a)(3) of the Bankruptcy Code.

**D.      The Debtor is Seeking to Pay Certain Professional Fees and Expenses Subject to Bankruptcy Court Approval (Section 1129(a)(4)).**

54.      Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, by the debtor, or by a person receiving distributions of property under the plan, be approved by the Bankruptcy Court as reasonable or subject to approval by the Bankruptcy Court as reasonable. The Fifth Circuit has held this is a "relatively open-ended standard" that involves a case-by-case inquiry and, under appropriate circumstances, does not necessarily require that a bankruptcy court review the amount charged.[45] As to routine legal fees and expenses that have been approved as reasonable in the first instance, "the court will ordinarily have little reason to inquire further with respect to the amount charged."[46]

55.      In general, the Plan provides that the Claims held by professionals retained by the Debtor or the Committee (the "<u>Professionals</u>") for their services and related expenses are subject to prior Court approval and the reasonableness requirements under sections 328 or 330 of the Bankruptcy Code. Moreover, Article II.B of the Plan provides that Professionals shall file all final requests for payment of Professional Fee Claims no later than 60 days after the Effective

---

[45] *See Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*, 150 F.3d 503, 517-18 (5th Cir. 1998) ("What constitutes a reasonable payment will clearly vary from case to case and, among other things, will hinge to some degree upon who makes the payments at issue, who receives those payments, and whether the payments are made from assets of the estate.").

[46] *Id.* at 517.

DOCS_SF:104703.16 36027/002

001379

Date, thereby providing an adequate period of time for interested parties to review such Professional Fee Claims.[47] The Plan also provides for the establishment of the Professional Fee Escrow Account by the Claimant Trustee to provide sufficient funds to satisfy in full unpaid Allowed Professional Fee Claims. Plan, § I.B.101. For the foregoing reasons, the Debtor submits that the Plan complies with section 1129(a)(4) of the Bankruptcy Code.

### E. The Debtor Has Complied with the Bankruptcy Code's Governance Disclosure Requirement (Section 1129(a)(5)).

56. The Bankruptcy Code requires the proponent of a plan to disclose the identity and affiliation of any individual proposed to serve as a director or officer of the debtor or a successor to the debtor under the plan.[48] It further requires that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.[49] Lastly, it requires that the plan proponent has disclosed the identity of insiders to be retained by the reorganized debtor and the nature of any compensation for such insider.[50] Courts have held that these provisions ensure that the post-confirmation governance of a reorganized debtor is in "good hands."[51]

57. The Plan provides that James P. Seery, Jr., the Debtor's current Chief Executive Officer, Chief Financial Officer and Foreign Representative, shall serve as the Claimant Trustee

---

[47] Plan. Art. II.B.

[48] 11 U.S.C. § 1129(a) (5)(A)(i).

[49] 11 U.S.C. § 1129(a)(5)(A)(ii).

[50] 11 U.S.C. § 1129(a)(5)(B).

[51] *See In re Landing Assocs., Ltd.*, 157 B.R. 791, 817 (Bankr. W.D. Tex. 1993) ("In order to lodge a valid objection under § 1129(a)(5), a creditor must show that a debtor's management is unfit or that the continuance of this management post-confirmation will prejudice the creditors").

and Marc S. Kirschner shall serve as the Litigation Trustee. *See* Plan Supplement at Exhibits M and O. Mr. Seery currently serves as the Debtor's Chief Executive Officer and Chief Restructuring Officer and also serves as one of the Independent Directors. Mr. Seery shall be paid $150,000 per month, for services rendered after the Effective Date and for his services as Claimant Trustee, plus a success fee that shall be the subject of negotiation between him and the Claimant Trust Oversight Committee post-Effective Date, which negotiation shall take place within forty-five (45) days after the Effective Date. Finally, the Claimant Trust Agreement discloses the five members of the Claimant Trust Oversight Committee, which consists of: (1) Eric Felton, as representative of the Redeemer Committee; (2) Josh Terry, as representative of Acis; (3) Elizabeth Kozlowski, as representative of UBS; (4) Paul McVoy, as representative of Meta-e Discovery; and (5) David Pauker. *See* Plan Supplement at Exhibits A, M, and N.

58.     HCMFA's objection asserts that "neither the identity nor the compensation of the people who control and manage the Reorganized Debtor is provided, much less as to who may be a Sub-Servicer." HCMFA Objection ¶ 74. The identity of the individuals who will manage the Reorganized Debtor, the Claimant Trust, and Litigation Sub-Trust are set forth above, along with the proposed compensation for any insider. Moreover, the Claimant Trust Agreement provides that the Claimant Trustee "shall engage professionals from time to time in conjunction with the services provided hereunder. Claimant Trustee's engagement of such professionals shall be approved by a majority of the Oversight Committee as set forth in Section 3.3(b) [of the Claimant Trust Agreement]." Claimant Trust Agreement, § 3.13(b).

59.     In addition to satisfying the disclosure requirements of Bankruptcy Code section 1125(a)(5), the appointment of Messrs. Seery, Kirschner and the members of the Claimant Trust Oversight Committee is consistent with the interests of creditors and equity security holders and with public policy pursuant to section 1123(a)(7) of the Bankruptcy Code.  As noted above, Mr. Seery has served as an Independent Board member since January 2020, and as the Chief Executive Officer and Chief Restructuring Officer since July 2020.  As set forth in the CEO/CRO Motion, Mr. Seery has extensive management and restructuring experience.  Mr. Seery recently served as a Senior Managing Director at Guggenheim Securities, LLC, where he was responsible for helping direct the development of a credit business.  Prior to joining Guggenheim, Mr. Seery was the President and a senior investing partner of River Birch Capital, LLC, where he was responsible for originating, executing, and managing stressed and distressed credit investments.  Mr. Seery is also a long-time attorney licensed to practice in New York who has run corporate reorganization groups and numerous restructuring matters.  He also served as a Commissioner of the *American Bankruptcy Institute's Commission to Study the Reform of Chapter 11*.  Mr. Seery was also a Managing Director and the Global Head of Lehman Brothers' Fixed Income Loan business where he was responsible for managing the firm's investment grade and high yield loans business, including underwriting commitments, distribution, hedging, trading and sales (including CLO manager relationships), portfolio management and restructuring.  From 2000 to 2004, Mr. Seery ran Lehman Brothers' restructuring and workout businesses with responsibility for the management of distressed corporate debt investments and was a key member of the small team that successfully sold Lehman Brothers to Barclays in 2008.

DOCS_SF:104703.16 36027/002

001382

60.     In addition to his ample qualifications, as the Court is aware from the numerous times Mr. Seery has testified before the Court, Mr. Seery has made substantial demonstrative contributions to the success of this chapter 11 case through both the resolution of the Debtor's pending litigation claims and the development of the Plan.  In his roles with the Debtor, he is familiar with the Debtor's operations and its business as well as the Claims that will be treated under the Plan.  Accordingly, it is reasonable to continue his employment post-emergence as the Claimant Trustee, subject to the supervision of the Claimant Trust Oversight Committee, which is comprised of several of the largest creditors of the Debtor, including UBS, Redeemer Committee and Acis, as well as Meta-e, all of whom currently serve on the Committee.

61.     Mr. Kirschner has been practicing law since 1967 and has substantial experience in bankruptcy litigation matters, particular with respect to his prior experience as a litigation trustee.  He serves as the trustee for:  the Tribune Litigation Trust; Millennium Health Corporate Claim and Lender Claims Trusts; and the Nine West Trust.  He is currently a Senior Managing Director at Goldin Associates, LLC specializing, among other things in, restructuring advisory, valuation, solvency/fraudulent conveyance issues.  He is also a member of the American College of Bankruptcy.  Mr. Kirschner was also a partner and the former head of the New York Restructuring of the global law firm of Jones Day.  Mr. Kirschner shall be paid $40,000 per month for the first three months and $20,000 per month thereafter.[52]  In addition, Mr. Kirchner

---

[52] Mr. Kirschner will receive support services from his consulting firm, Teneo.  Teneo will provide services at a 10% discount from their rates. Teneo has agreed to freeze their rates in effect for 2021 through the end of 2022. Teneo shall also be entitled to reimbursement of expenses.

001383

will receive a 1.50% fee of any "Net Litigation Trust Proceeds"[53] up to $100 million, and an additional 2% fee of any Net Litigation Trust Proceeds in excess of $100 million.

62. As noted above, four of the members of the Claimant Trust Oversight Committee are the holders of most of the largest Claims against the Debtor and current members of the Committee. Each of these creditors have actively participated in the Debtor's case both through their roles as Committee members and in their separate capacities as individual creditors. They are therefore familiar with the Debtor, its operations and assets.

63. The fifth member of the Clamant Trustee Oversight Committee, David Pauker, is a restructuring advisor and turnaround manager with more than 25 years of experienced advising public and private companies and their investors. Mr. Pauker is a fellow of the American College of Bankruptcy. Mr. Pauker has substantial experience overseeing, advising or investigating troubled companies in the financial services industry and has advised or managed such companies on behalf of boards or directors, court-appointed trustees, examiners and special masters, government agencies and private investor parties, including Lehman Brothers, Monarch Capital, Government Development Bank Debt Recovery Authority of Puerto Rico, MCorp, Refco, and Residential Capital. Mr. Pauker, who will be the only paid member of the initial Claimant Trust Oversight Board, will be paid $250,000 for the first year of his service and $150,000 per year thereafter. The Plan therefore satisfies the requirements of Bankruptcy Code

---

[53] Net Litigation Trust Proceeds is defined as gross Litigation Trust proceeds, less Teneo and Litigation Trust counsel hourly fees, expert witness, e-discovery, court and discovery expenses. Gross recoveries are not to be reduced by the cost of insurance, tax accounting work which would be outsourced, potential contingency fees, or litigation funding financing and/or related contingent fee charges.

sections 1129(a)(5) and 1123(a)(7) with respect to the individuals responsible for the post-confirmation administration and oversight of the Reorganized Debtor.

**F.   The Plan Does Not Require Government Regulatory Approval of Rate Changes (Section 1129(a)(6)).**

64.   Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the Plan.  No such rate changes are provided for in the Plan.  Thus, section 1129(a)(6) of the Bankruptcy Code is inapplicable to this chapter 11 case.

**G.   The Plan Is in the Best Interests of Holders of Claims and Interests (Section 1129(a)(7)).**

65.   The best interests of creditors test requires that, "[w]ith respect to each impaired class of claims or interests," members of such class that have not accepted the plan will receive at least as much as they would in a hypothetical chapter 7 liquidation.[54]  The best interests test applies to each non-consenting member of an impaired class, and is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate against the estimated recoveries under that debtor's plan of reorganization.[55]

66.   As demonstrated in the liquidation analysis and financial projections attached to the Disclosure Statement as Exhibit C (the "Liquidation Analysis"), which was prepared by the

---

[54] 11 U.S.C. § 1129(a) (7).

[55] *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 442 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *In re Tex. Extrusion Corp.*, 844 F.2d 1142, 1159 n. 23 (5th Cir. 1988) (stating that under section 1129(a)(7) of the Bankruptcy Code a bankruptcy court was required to determine whether impaired claims would receive no less under a reorganization than through a liquidation).

Debtor with the assistance of its advisors, all Holders of Claims and Equity Interests in all Impaired Classes will recover at least as much under the Plan as they would in a hypothetical chapter 7 liquidation.[56] Specifically, the projected recoveries under the Plan and the results of the Liquidation Analysis for Holders of Claims estimates a 92.51% distribution to holders of general unsecured claims under the Plan compared to an estimated 66.14% distribution under a hypothetical liquidation of the Debtor.[57]

67. Mr. Dondero argues that the Plan fails to satisfy the requirements of Bankruptcy Code section 1129(a)(7) due to "lack of appropriate sale procedures for post-confirmation operations" and because there is no oversight or predetermined procedures to ensure that the liquidation of the Debtor's assets is both value maximizing and transparent. *See* Dondero Objection, ¶10. Dugaboy—Mr. Dondero's family trust—filed a similar objection and asserts that the absence of reporting requirements to the beneficial holders of Claimant Trust, lack of oversight on the Claimant Trustee's ability to liquidate assets violates section 1129(a)(7) and that a chapter 7 trustee would require to obtain court approval to effect the same sales. Dugaboy also argues that the Claimant Trustee's limitation of liability only applies to gross negligence and willful misconduct, so that the Claimant Trustee cannot be held liable for breach of fiduciary duty and, therefore, derives great protections than a hypothetical chapter 7 trustee would have.

---

[56] *See* Disclosure Statement Ex. C.

[57] *See* Disclosure Statement Ex C. With respect to the other impaired classes of Claims and Equity Interests, the Liquidation Analysis projects a 100% distribution on account of the Class 2 Frontier Secured Claim under either scenario and projects no distributions holders of Class 9 Subordinated Claims, Class 10 Class B/C Limited Partnership Interests and Class 11 Class A Limited Partnership Interests either under the Plan or under a hypothetical liquidation of the Debtor.

35

68. This objection is being made by parties with virtually no economic interest in the Debtor. Neither Dugaboy nor Mr. Dondero have any legitimate claims against the Debtor and based upon Mr. Dondero's "pot plan" proposal their equity is completely out of the money. Moreover, as discussed below, the argument that increased reporting obligations to creditor beneficiaries (who they are not), a requirement to seek Court approval of sales and the establishment of a standard of care for the Claimant Trustee somehow translates into creditors doing better in a chapter 7 makes no sense, and, in any event, is not an argument supported by any creditor not related to Mr. Dondero..

69. As set forth above, the Liquidation Analysis filed with the Disclosure Statement provides a side by side comparison of distributions to creditors under a hypothetical chapter 7 liquidation and under the Plan and clearly demonstrates that creditors will receive at least as much under the Plan as they would in a chapter 7 proceeding. None of the objectors provide any arguments to refute the analysis in the Liquidation Analysis or how a hypothetical chapter 7 trustee would liquidate the Debtor's remaining assets that would definitively provide a greater distribution to creditors in chapter 7 liquidation rather than in chapter 11. To the contrary, Mr. Dondero suggests (without any factual basis) that the Debtor's creditors and equity holders "could receive a higher recovery from the liquidation of the Debtor under Chapter 7 of the Bankruptcy Code in which sale procedures are governed by the Bankruptcy Court to ensure maximization or value through auction or other market-testing means." Dondero Objection ¶ 11.

70. Nothing in the opposition suggests that the Claimant Trustee (subject to supervision by the Claimant Trust Oversight Committee) will not undertake the same value

DOCS_SF:104703.16 36027/002

001387

maximizing measures suggested by Mr. Dondero in order to maximize the value of the Reorganized Debtor's assets. The only difference is that the Claimant Trustee would be able to consummate these sales in the ordinary course of business compared to a trustee, who would have to negotiate (and presumably discount) every sale with the caveat that it is subject to court approval and a period of time by which parties, such as Mr. Dondero has throughout this case, can object and potentially frustrate any proposed sale. Mr. Dondero also assumes that the chapter 7 trustee could operate the Debtor's business in chapter 7.[58] Aside from the complete lack of institutional knowledge of the Debtor and its business, it is doubtful that a chapter 7 trustee would be able to operate the Debtor's business without the benefit of the executory contracts and unexpired leases that the Reorganized Debtor seeks to assume in order to monetize the remaining assets. There is no factual basis to conclude that a hypothetical chapter 7 trustee could monetize the Debtor's remaining assets any better than the Claimant Trustee, who has both the expertise and institutional knowledge of the Debtor and who is subject to an oversight committee consisting of the largest creditors in the Debtor's case.

71. Second, it is standard for a chapter 11 plan to allow the post confirmation administrators (in this case, the Claimant Trustee, the Litigation Trustee, and Reorganized Debtor) to monetize a debtor's assets without having to first obtain court approval or otherwise condition any sales on the consent to the holders of claims or interests. It is neither novel nor unusual for chapter 11 plans to allow the post-confirmation vehicle to sell assets, compromise

---

[58] Even if a hypothetical trustee were appointed under Mr. Dondero's argument, the trustee would be subject to election pursuant 11 U.S.C. § 702. The largest creditors of the Debtor (most of whom are serving on the Claimant Trust Oversight Committee) would control the selection of the trustee of the Debtor after conversion. Yet these creditors support confirmation of the Plan and the structure by which they, as members of the Claimant Trust Oversight Committee, will oversee the Claimant Trustee's monetization of assets.

controversies and employ professionals without mandatory application to the Court to approve these standard post-confirmation transactions, including chapter 11 cases confirmed by this Court. *See, e.g. In re Acis Capital Management*, 2019 Bankr. LEXIS 294, *116 (Bankr. N.D. Tex. January 31, 2019) (plan providing "[o]n and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire or dispose of property without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order."); *In re Wilson Metal Fabricators,* No. 19-31452,**9-10 (Bankr. N.D. Tex. SGJ May 18, 2020), ECF No. 92 (Order confirming plan providing that reorganized debtor "may deal with its assets and property and conduct its affairs without any supervision by, or permission from, the Court or the Office of the United States Trustee, and free of any restriction imposed on the Debtor by the Bankruptcy Code or by the Court during the case.").

72.     Finally, Dugaboy's argument that the standard of liability for the Claimant Trustee provided in the Claimant Trust Agreement is not appropriate and confers greater protections those applicable to a chapter 7 trustee is wrong. This objection is yet another example of the Dondero Entities' efforts to place as many roadblocks as possible to halt post-confirmation asset sales and maintain the ability to litigate (or threaten to litigate) against the entities charged with implementing the monetization of assets required under the Plan.

73.     The standard of liability imposed on the Claimant Trustee pursuant to the Clamant Trust Agreement is appropriately limited to gross negligence and willful misconduct and Dugaboy and the Dondero Entities do not describe how the standard of liability has any impact

DOCS_SF:104703.16 36027/002

001389

on the distributions creditors will receive under the Plan. First, the Claimant Trustee does have fiduciaries duties to the trust beneficiaries under the terms of the Claimant Trust Agreement, but claims against the Claimant Trustee are limited to acts of gross negligence and willful misconduct.[59] Second, Dugaboy misstates the standard of liability that would otherwise be imposed on a chapter 7 trustee. A chapter 7 trustee would actually have a more relaxed standard of liability than that imposed on the Claimant Trustee because it is well established that trustees have qualified immunity for acts taken within the scope of their appointment. *Boullion v. McClanahan*, 639 F.2d 213, 214 (5th Cir. 1981) ("The question in this case is whether a trustee acting at the direction of a bankruptcy judge is clothed with absolute immunity against tort actions grounded on his conduct as trustee …. In the instant case, the court-approved trustee was acting under the supervision and subject to the orders of the bankruptcy judge. We hold that since [the trustee], as an arm of the Court, sought and obtained court approval of his actions, he is entitled to derived immunity.") Thus, a chapter 7 trustee's qualified immunity would protect it from heightened negligent breach of fiduciary duty claims whereas the Claimant Trust Agreement provides that the Claimant Trustee is only protected from simple negligent breach of fiduciary claims.

---

[59] *See, e.g.* Claimant Trust Agreement Section 2.3(b)(vii). "The Claimant Trust shall be administered by the Claimant Trustee, in accordance with this Agreement, for the following purpose … (viii) to oversee the management and monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement, in its capacity as the sole member and manager of New GP LLC pursuant to the terms of the New GP LLC Documents, all with a view toward maximizing value in a reasonable time in a manner consistent with the Reorganized Debtor's fiduciary duties as investment adviser to the Managed Funds. The Debtor has amended the Plan to conform with the Claimant Trust Agreement.

74. Accordingly, the Plan satisfies section 1129(a)(7) of the Bankruptcy Code and the best interests test.[60]

### H. The Plan Complies with the Requirements of Section 1129(a)(8) of the Bankruptcy Code.

75. The Bankruptcy Code generally requires that each class of claims or interests must either accept the plan or be unimpaired under the plan.[61] Each of the non-Voting Classes that were not entitled to vote on the Plan are Unimpaired and conclusively deemed to accept the Plan.

### I. The Plan Complies With Statutorily Mandated Treatment of Administrative and Priority Tax Claims (Section 1129(a)(9)).

76. Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments. In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy Code—administrative claims allowed under section 503(b) of the Bankruptcy Code—must receive on the effective date cash equal to the allowed amount of such claims. Section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim of a kind specified in section 507(a)(1) or (4) through (7) of the Bankruptcy Code—which generally include domestic support obligations, wage, employee benefit, and deposit claims entitled to priority—must

---

[60] *See In re Neff*, 60 B.R. 448, 452 (Bankr. N.D. Tex. 1985) aff'd, 785 F.2d 1033 (5th Cir. 1986) (stating that "best interests" of creditors means "creditors must receive distributions under the Chapter 11 plan with a present value at least equal to what they would have received in a Chapter 7 liquidation of the Debtor as of the effective date of the Plan"); *In re Lason, Inc*., 300 B.R. 227, 232 (Bankr. D. Del. 2003) ("Section 1129(a)(7)(A) requires a determination whether 'a prompt chapter 7 liquidation would provide a better return to particular creditors or interest holders than a chapter 11 reorganization.'") (internal citations omitted).

[61] 11 U.S.C. § 1129(a) (8).

40

001391

receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such class has accepted the plan), or cash of a value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan). Finally, section 1129(a)(9)(C) provides that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code—i.e., priority tax claims—must receive cash payments over a period not to exceed five years from the petition date, the present value of which equals the allowed amount of the claim

77.     The Plan satisfies section 1129(a)(9) of the Bankruptcy Code. First, Article II.A of the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code because it provides that each Holder of an Allowed Administrative Claim will receive Cash equal to the amount of such Allowed Administrative Claim on the Effective Date, or as soon as reasonably practicable thereafter, or at such other time as defined in Article II.A of the Plan. Second, the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because no Holders of the types of Claims specified by 1129(a)(9)(B) are Impaired under the Plan.[62]  Finally, Article II.C of the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code because it specifically provides that each Holder of an Allowed Priority Tax Claim shall receive payment in an amount equal to the amount of the Allowed Priority Tax Claim unless otherwise agreed between such holder and the Debtor. .[63]  Thus, the Plan satisfies each of the requirements set forth in section 1129(a)(9) of the Bankruptcy Code.

---

[62] See Plan, Art. III.B.

[63] As noted below in the discussion on Plan modifications, the Debtor has clarified the treatment of priority tax claims in accordance with 11 U.S.C. §1129(a)(9)(C) pursuant to the objection raised on this point by the Internal Revenue Service ("IRS").

DOCS_SF:104703.16 36027/002

001392

78.     The IRS and certain Texas taxing authorities (the "<u>Texas Taxing Authorities</u>")
each filed objections to the Plan.  The Debtor is in the process of negotiating "neutrality"
language with the Texas Taxing Authorities concerning the application of the Plan injunction
and other provisions to the claims asserted by this creditor. The Debtor expects to consensually
resolve the Texas Taxing Authorities' objection with agreeable language in the Confirmation
Order.  As more fully explained in the Omnibus Reply in response to the IRS's plan objection,
the IRS has rejected the Debtor's Plan neutrality language and is insisting on the modification of
the Plan to contain litany of provisions that are ambiguous, overbroad and, most importantly,
attempt to pre-determine the IRS's rights and remedies as opposed to having these issues
determined in accordance with nonbankruptcy law with each parties' rights and defenses
preserved.

### J.     At Least One Impaired Class of Claims Has Accepted the Plan, Excluding the Acceptances of Insiders (Section 1129(a)(10)).

79.     Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is
an impaired class of claims, at least one impaired class of claims must accept the plan "without
including any acceptance of the plan by any insider."  As detailed herein and in the Voting
Report, Class 2 (Frontier Secured Claim) and Class 7 (Convenience Claims) are impaired classes
of claims and each voted to accept the Plan, exclusive of any acceptances by insiders.
Accordingly, the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.
However, as explained below, even though not all of the Voting Classes accepted the Plan, the
Plan may still be confirmed by cram down because the requirements of section 1129(b) are
satisfied.

K.      **The Plan Is Feasible and Is Not Likely to Be Followed by the Need for Further Financial Reorganization (Section 1129(a)(11)).**

80.     Feasibility refers to the Bankruptcy Code's requirement that plan confirmation must not be "likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . . unless such liquidation or reorganization is proposed in the plan."[64]  To satisfy this standard, the Fifth Circuit has held that a plan need only have a "reasonable probability of success."[65]  Indeed, a relatively low threshold of proof will satisfy section 1129(a)(11) so long as adequate evidence supports a finding of feasibility.[66]  In particular, according to Fifth Circuit law, "[w]here the projections are credible, based upon the balancing of all testimony, evidence, and documentation, even if the projections are aggressive, the court may find the plan feasible."[67]

81.     The Plan provides for the Reorganized Debtor to manage the wind down of the Managed Funds as well as the monetization of the balance of the Reorganized Debtor Assets.  As set forth in the Liquidation Analysis, the projections prepared by the Debtor show that it will be able to meet its obligations under the Plan.  The Plan also does not provide any guaranty as to what holders of Class 8 General Unsecured Claims will receive; they will receive their *pro rata* payment of whatever net funds realized from the asset monetization process reflected in the projections.  Therefore, the Plan is feasible.  Thus, the Plan satisfies section 1129(a)(11) of the Bankruptcy Code under Fifth Circuit law.

---

[64] 11 U.S.C. § 1129(a) (11).

[65] *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 801 (5th Cir. 1997) (quoting *In re Landing Assocs., Ltd.*, 157 B.R. 791, 820 (Bankr. W.D. Tex. 1993)).

[66] *In re Star Ambulance Service, LLC*, 540 B.R. 251, 266 (Bankr. S.D. Tex. 2015).

[67] *T-H New Orleans*, 116 F.3d at 802.

**L.**      **The Plan Provides for the Payment of All Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12)).**

82.      The Bankruptcy Code requires the payment of all fees payable under 28 U.S.C. § 1930.[68] The Plan includes an express provision requiring payment of all such fees.[69] In addition, at the request of the United States Trustee, the Debtor has added language to the Confirmation Order that makes the Reorganized Debtor, the Claimant Trustee and Litigation Trustee jointly and severally liable for payment of statutory fees owed to the United States Trustee. The Plan, therefore, complies with section 1129(a)(12) of the Bankruptcy Code.

**M.**      **The Plan Complies with Section 1129(a)(13) of the Bankruptcy Code.**

83.      The Bankruptcy Code requires that all retiree benefits continue post-confirmation at any levels established in accordance with section 1114 of the Bankruptcy Code. Section 1114(a) of the Bankruptcy Code defines retiree benefits as medical benefits.[70] Article IV.K of the Plan provides for the assumption of the Pension Plan (to the extent that this plan is governed under section 1114 of the Bankruptcy Code) as well as additional language requested by the Pension Benefits Guaranty Corporation. Accordingly, the Plan complies with section 1129(a)(13) of the Bankruptcy Code.

---

[68] 11 U.S.C. § 1129(a) (12).

[69] Plan, Art. XIII.D.

[70] Section 1114(a) defines "retiree benefits" as: ". . . payments to any entity or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under this title." 11 U.S.C. § 1114(e) (emphasis added).

DOCS_SF:104703.16 36027/002

### N.     Sections 1129(a)(14) through Sections 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan.

84.     A number of the Bankruptcy Code's confirmation requirements are inapplicable to the Plan. Section 1129(a)(14) of the Bankruptcy Code does not apply because the Debtor is not subject to any domestic support obligations.[71]   Section 1129(a)(15) of the Bankruptcy Code is inapplicable because the Debtor is not an "individual" as defined in the Bankruptcy Code.[72] Section 1129(a)(16) of the Bankruptcy Code is inapposite because the Plan does not provide for any property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.[73]

### O.     The Plan Satisfies the Cramdown Requirements (Section 1129(b)).

85.     If an impaired class has not voted to accept the plan, the plan must be "fair and equitable" and not "unfairly discriminate" with respect to that class.[74]   The Plan has been accepted by Voting Classes 2, 7, and 9.[75]   Voting Classes 8 (General Unsecured Claims) and Class 11 (Class A Limited Partnership Interests) voted to reject the Plan and Class 10 (Class B/C Limited Partnership Interests), did not vote.   However, the Plan still satisfies the "cramdown" requirements with respect to non-accepting Classes of Claims and Equity Interests.

---

[71] *See* 11 U.S.C. § 1129(a) (14).

[72] *See* 11 U.S.C. § 1129(a)(15).

[73] *See* 11 U.S.C. § 1129(a)(16).

[74] *See* 11 U.S.C. § 1129(b)(1).

[75] As noted below, Class 9 has also accepted the Plan, but the Debtor is not including Class 9 as one of the accepting impaired classes to satisfy the cram down requirements of section 1129(b)(1) of the Bankruptcy Code.

DOCS_SF:104703.16 36027/002

001396

### 3. The Plan Is Fair and Equitable.

86.     A plan is "fair and equitable" with respect to an impaired class of claims or

interests that rejects the plan (or is deemed to reject the plan) if it follows the "absolute priority

rule."[76]  This requires that an impaired rejecting class of claims or interests either be paid in full

or that a class junior to the impaired rejecting class not receive any distribution under a plan on

account of its junior claim or interest.[77]   The Plan satisfies section 1129(b) of the Bankruptcy

Code.  The objecting parties' arguments that the Plan is not "fair and equitable" ignore this

standard.

87.     As explained earlier, all similarly situated holders of Claims and Equity Interests

will receive substantially similar treatment and the Plan's classification mechanics rests on a

legally acceptable rationale.  To the extent any impaired rejecting class of claims or interests is

not paid in full, no class junior to the impaired rejecting class will receive any distribution under

the Plan on account of its junior claim or interest.  Therefore, the Plan satisfies the "fair and

equitable" requirement.

### 4. The Plan Does Not Unfairly Discriminate Against the Rejecting Classes.

88.     The Bankruptcy Code does not provide a standard for determining "unfair

discrimination."  Rather, courts typically examine the facts and circumstances of the particular

---

[76] *Bank of Am. Nat'l Tr. & Savings Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441-42 (1999) ; *In re Mirant Corp.*, 348 B.R. 725, 738 (Bankr. N.D. Tex. 2006).

[77] *Id.*

001397

case to determine whether unfair discrimination exists.[78] At a minimum, the unfair discrimination standard prevents creditors and interest holders with similar legal rights from receiving materially different treatment under a proposed plan without compelling justifications for doing so.[79] The unfair discrimination requirement, which involves a comparison of classes, is distinct from the equal treatment requirement of section 1123(a)(4), which involves a comparison of the treatment of claims within a particular class. A plan does not unfairly discriminate where it provides different treatment to two or more classes which are comprised of dissimilar claims or interests.[80] Likewise, there is no unfair discrimination if, taking into account the particular facts and circumstances of the case, there is a reasonable basis for the disparate treatment.[81]

89.     The Plan's treatment of these Classes is proper because all similarly situated holders of Claims and Equity Interests will receive substantially similar treatment and the Plan's classification scheme rests on a legally acceptable rationale. Accordingly, the Plan does not discriminate unfairly in contravention of section 1129(b)(1) of the Bankruptcy Code.

---

[78] *See In re Kolton*, No. 89-53425-C, 1990 WL 87007 at *5 (Bankr. W.D. Tex. Apr. 4, 1990) (quoting *In re Bowles*, 48 B.R. 502, 507 (Bankr. E.D. Va. 1985) ("[W]hether or not a particular plan does [unfairly] discriminate is to be determined on a case-by-case basis . . . ")); *see also In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances").

[79] *See Idearc Inc.*, 423 B.R. at 171, ("[T]he unfair discrimination standard prevents creditors and equity interest holders with similar legal rights from receiving materially different treatment under a proposed plan without compelling justifications for doing so."); *In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 654 (9th Cir. 1997); *In re Aztec Co.*, 107 B.R. 585, 589-91 (Bankr. M.D. Tenn. 1989); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).

[80] *See In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 655 (9th Cir. 1997) ; *In re Aztec Co.*, 107 B.R. 585, 589-91 (Bankr. M.D. Tenn. 1989); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987); *aff'd sub nom., Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).

[81] *Aztec Co.*, 107 B.R. at 590.

47

P.     **The Plan satisfies the "Cramdown" Requirements of the Bankruptcy Code.**

90.     Section 1129(b)(1) of the Bankruptcy Code provides that, if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8) of the Bankruptcy Code, a plan may be confirmed so long as the requirements set forth in section 1129(b) of the Bankruptcy Code are satisfied. To confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[82]

91.     A plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects a plan (or is deemed to reject a plan) if it follows the "absolute priority" rule.[83] This requires that an impaired rejecting class of claims or interests either be paid in full or that a class junior to the impaired accepting class not receive any distribution under a plan on account of its junior claim or interest.[84] The Debtor submits that the Plan satisfies the "fair and equitable" requirement notwithstanding the non-acceptance of the Plan by Classes 8, 10 and 11.

92.     With respect to Class 8 General Unsecured Claims, there is no Class of equal priority receiving more favorable treatment and no classes that are junior to Class 8 will receive or retain any property under the Plan unless Class 8 creditors receive or retain, on account of

---

[82] *See John Hancock*, 987 F.2d at 157 n.5; *In re Ambanc La Mesa L.P.*, 115 F.3d 650, 653 (9th Cir. 1997) ("the [p]lan satisfies the 'cramdown' alternative . . . found in 11 U.S.C. § 1129(b), which requires that the [p]lan 'does not discriminate unfairly' against and 'is fair and equitable' towards each impaired class that has not accepted the [p]lan.").

[83] *See Bank of Amer.*, 526 U.S. at 441-42 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii). That latter condition is the core of what is known as the 'absolute priority rule.'").

[84] *See id.*

their claims, a value as of the Effective Date equal to the amount of such Claim, plus interest as provided under the Plan. Thus, Holders of Class 9 Subordinated Claims will not receive any distributions unless and until Class 8 Claims are fully paid pursuant to section 1129(b)(2)(B) of the Bankruptcy Code. Holders of Equity Interests in Class 10 and 11 will not receive any distributions absent full payment to holders of Allowed Class 8 General Unsecured Claims and Allowed Class 9 Subordinated Claims. There are no Claims or Equity Interests junior to the Equity Interests in Class 10 and Class 11. Therefore, the Plan is fair and equitable as to Equity Interests in Class 10 and 11 because no class junior to equity will receive or retain any property under the Plan. 11 U.S.C. § 1129(b)(2)(C).

93. Moreover, while Class 8 did not accept the Plan, requiring the Debtor to resort to "cram down" under Section 1129(b), over 93% of the dollar amount of claims in Class 8 voted to accept the Plan. Those votes included the votes of Redeemer, Acis, UBS, and the HarbourVest entities. Similarly, the Committee, as the fiduciary for all Class 8 General Unsecured Claims, also enthusiastically supports the Plan. As discussed above, the only reason Class 8 General Unsecured Claims voted to reject the Plan was because of (i) 24 employees holding contingent $1.00 claims with respect to unvested amounts under the Debtor's deferred compensation program voted against the Plan;[85] yet these employees ultimately will not have any General Unsecured Claims because the Debtor will terminate their employment before their entitlement to such amounts will vest, thereby eliminating the contingent claims and (ii) certain other employees, including Scott Ellington and Isaac Leventon who are loyal to Mr. Dondero and who

---

[85] As noted above, the Debtor resolved the confirmation objection of Mr. Surgent and Mr. Waterhouse, each of whom voted to reject (Waterhouse) or voted to abstain (Surgent) with respect the Plan.

001400

also rejected the Plan.   Based upon the foregoing, the Plan may satisfy the cram down requirements and can be confirmed notwithstanding the non-acceptance of the Plan by Class 8, Class 10 and Class 11.

94.    NPA argues that Plan violates the absolute priority rule with respect to unsecured creditors to the extent that it provides equity in the Reorganized Debtor to existing equity holders.   NPA Objection, ¶ 92.   This assertion is incorrect.   As explained above, Equity Interests in Class 10 and 11 will neither receive nor retain any property under the Plan until Allowed Claims in Class 8 and Class 9 are paid in full (with appropriate interest) pursuant to the terms of the Plan.   The Contingent Claimant Trust Interests granted to Equity Interests in Classes 10 and 11 will not vest unless and until the Claimant Trustee files a certification that all Holders of Allowed unsecured claims have been indefeasibly paid, inclusive of interest.   *See* Plan, § I.B.44. Thus, the absolute priority rule is not violated by because the treatment of Class 8 and Class 9 Claims satisfies section 1129(b)(2)(B).[86]   Indeed, the failure to provide a mechanism for the potential distribution of Equity Security Interests after payment of all senior Claims would violate the treatment of the equity security interests in the Debtor because such senior Claims would be receiving more than the full amount of their Claims.   *See* 11 U.S. § 1129(b) (2)(C)(i).

---

[86] The absolute priority rule is also satisfied with respect to Class 7 Convenience Claims. First, Class 7 has accepted the Plan. Second, even if Class 7 were not to have accepted the Plan, the members of Class 7 were afforded the option on their ballots to accept the treatment provided under Class 8 if they so elected.

DOCS_SF:104703.16 36027/002

001401

**Q.** **The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code (Sections 1129(c)-(e)).**

95.     The Plan satisfies the remaining provisions of section 1129 of the Bankruptcy Code.  Section 1129(c) of the Bankruptcy Code, which prohibits confirmation of multiple plans, is not implicated because there is only one proposed Plan.[87]

96.     The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933.  Moreover, no governmental unit or any other party has requested that the Bankruptcy Court decline to confirm the Plan on such grounds.  Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

97.     Lastly, section 1129(e) of the Bankruptcy Code is inapplicable because the Debtor's chapter 11 case is not a "small business case."[88]

98.     In sum, the Plan satisfies all of the Bankruptcy Code's mandatory chapter 11 plan confirmation requirements.

**IV.    The Plan's Release, Exculpation, and Injunction Provisions Are Appropriate and Comply with the Bankruptcy Code for the Reasons Articulated in the Omnibus Reply.**

99.     The Bankruptcy Code identifies various additional provisions that may be incorporated into a chapter 11 plan, including "any other appropriate provision not inconsistent with the applicable provisions of this title."[89]  Among other discretionary provisions, the Plan contains certain Debtor releases,[90] an exculpation provision, and an injunction provision.[91]

---

[87] 11 U.S.C. § 1129(c).

[88] 11 U.S.C. § 1129(e). A "small business debtor" cannot be a member "of a group of affiliated debtors that has aggregate noncontingent liquidated secured and unsecured debts in an amount greater than $2,000,000 (excluding debt owed to 1 or more affiliates or insiders)."  11 U.S.C. § 101 (51D)(B)(i).

[89] 11 U.S.C. § 1123 (b)(1)-(6).

[90] Plan, Art. IX

Notably, the Plan does <u>not</u> contain a mechanism typically included in chapter 11 plans, which contain broad third party releases by creditors or other parties in interest, unless they opt out of the release. While certain objectors argue that the Plan nonetheless contains inappropriate third party releases in disguise, such arguments lack merit as set forth in the Omnibus Reply. These provisions are the product of extensive good faith, arms'-length negotiations and comply with the Bankruptcy Code and prevailing law. The Debtor has separately responded to the objections filed by certain parties to these provisions in the Omnibus Reply, which also addresses the proposed modifications made to the Plan injunction provision. Accordingly, the Debtor respectfully requests that the Bankruptcy Court approve the Plan's Debtor release, exculpation, and injunction provisions for the reasons set forth in the Omnibus Reply.

### A.    The Debtor Complied with Section 1129(d) of the Bankruptcy Code.

100.    The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933. Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code, and no party has asserted otherwise.

### B.    Modifications to the Plan.

101.    Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation as long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code. Further, when the proponent of a plan files the plan with modifications with the court, the plan as modified becomes the plan. Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed

---

[91] *Id.*

accepted by all creditors and equity security holders who have previously accepted the plan if the court finds that the proposed modifications do not adversely change the treatment of the claim of any creditor or the interest of any equity security holder.[92]

102.    The Senior Employees argue that the Debtor and the Committee seek "carte blanche to make amendments to the Plan post-confirmation without complying with § 1127 of the Bankruptcy Code." Senior Employee Objection, at p. 15.

103.    These arguments are baseless and are contradicted by Article XII of the Plan, which explicitly requires that modifications to the Plan be in compliance with section 1127.

> After the entry of the Confirmation Order, the Debtor may, after notice and hearing and entry of an order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

Plan, Art. XII.B.

104.    Dugaboy objects that the Plan does not comply with section 1127(a) of the Bankruptcy Code and asserts that the Plan is not "final" and "as of the writing of this Objection and possibly even after the hearing on confirmation of the Debtor's Plan, parties in interest will not have seen the documents that will become an essential part of the Plan." Dugaboy Objection, page 4.

---

[92] *See, e.g., In re American Solar King Corp.*, 90 B.R. 808, 823 (Bankr. W.D. Tex. 1988) (finding that nonmaterial modifications that do not adversely impact parties who have previously voted on the plan do not require additional disclosure or resolicitation); *In re Sentry Operating Co. of Texas, Inc.*, 264 B.R. 850, 857 (Bankr. S.D. Tex. 2001) (same). *See also In re Global Safety Textiles Holdings LLC*, No. 09-12234 (KG), 2009 WL 6825278, at *4 (Bankr. D. Del. Nov. 30, 2009) (finding that nonmaterial modifications to plan do not require additional disclosure or resolicitation).

DOCS_SF:104703.16 36027/002

001404

105. As noted earlier in the Memorandum, the Debtor has already filed three Plan Supplements and will file a fourth Plan Supplement prior to the Confirmation Hearing. The Plan Supplements filed to date already contain the Retained Causes of Action, the Claimant Trust Agreement, the Litigation Trust Agreement that Dugaboy complains are lacking. The Debtor has also filed three notices of executory contracts and unexpired leases to be assumed under the Plan. Thus, the Plan will be "final" will contain final version of all of the post-confirmation documents and executory contracts to be assumed in advance of the Confirmation Hearing, in compliance with section 1127(a) of the Bankruptcy Code. *See, e.g., In re Friendship Dairies*, 2012 Bankr. LEXIS 13, **22-23 (Bankr. N.D. Tex. Jan. 3, 2014) ("Section 1127(a) of the Code allows a plan proponent, the Debtor here, to modify its plan at any time before confirmation. In addition, '[a]fter the proponent of a plan files a modification of such plan with the court, the plan as modified becomes *the plan.*'") (quoting 11 U.S.C. §1127(a) emphasis in original); *Paradigm Air Carriers, Inc. v. Tex. Rangers Baseball Partners (In re Tex. Rangers Baseball Partners*), 521 B.R. 134, 176 (Bankr. N.D. Tex 2014) ("As a modified plan becomes the confirmed plan pursuant to section 1127(a) of the Bankruptcy Code, this maxim applies equally to plans as modified"). As Dugaboy concedes, the Plan appropriately restates the standards for post-confirmation plan modifications under section 1127(b), which would require notice and a hearing, among other requirements. *See* Plan, §XII.B.

106. As noted in this Memorandum, the Debtor has made certain modifications to the Plan in order to both (1) clarify language in response to certain of the objections raised by the Objectors and (2) additional modifications to the Plan. These modifications comply with section

1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019. A summary of the Plan

modifications is set forth in the chart below:

| **Plan Modification and Applicable Plan Section** |
| --- |
| Treatment of Subordinated Claims Treatment Procedural Requirements.  Modifications that are responsive to the objections to the definition and treatment of Subordinated Claims, including (1) the definition of Subordinated Claims to eliminate categorical subordination of claims relating to limited partnership interests and replacement of Final Order to order entered by the Bankruptcy Court (Section I.B.129); (2) the classification and treatment of Subordinated Claims in Class 9 is only to the extent an order subordinating the claim is entered (Section III.H.9); (3) the addition of requirement of a  hearing, in addition to notice, with respect to any subordination proceeding and subject to entry of order of the Bankruptcy Court (Section III.J); and (4) a requirement to bring subordination proceedings by Claims Objection Deadline and the ability to request that the Bankruptcy Court subordinate claims by the Claims Objection Deadline (Section VII.B). |
| Priority Tax Claims.  Modification in response to IRS Objection to provide that the payment of Allowed Priority Tax Claims to be in accordance with section 1129(a)(9)(C) unless such Allowed Claim is either paid in full on the Initial Distribution Date or otherwise agreed by the parties (Section II.C). |
| Assumption/Rejection of Executory Contracts.  Modifications in response to objections to require assumption/rejection of contracts to be determined by Confirmation Hearing, rather than the Effective Date (Section V.A-C). |
| Claimant Trust and Related Provisions.  Modification to permit Claimant Trustee to set aside a reserve for potential indemnification claims (Section IV.B.5); modification to conform Claimant Trustee's fiduciary duties to Claimant Trust Agreement (Section IV.B.5). |
| Issuance of New Partnership Interests.  Clarifications that Reorganized Limited Partnership Agreement not providing indemnification obligations (Section IV.C.3). |
| Conditions to Effective Date.  Modifications to conditions to effectiveness of Plan to require (1) Confirmation Order must be become a Final Order; (2) obtaining acceptable directors and officers insurance coverage which coverage is acceptable to the Debtor, Committee, the Oversight Committee Board, Claimant Trustee, and Litigation  Trustee (Section VIII.A); (3) deletion of section VIII.C of Plan regarding effect of non-occurrence of conditions to effectiveness. |
| Retention of Jurisdiction.  Modification in response to objections to clarify existing language that provides that the Bankruptcy Court shall retain jurisdiction "to the maximum extent" legally permissible (Section XI). |
| Injunction and Related Provisions.  Modifications to the Plan injunction, term of injunction and continuance of January 9 Order provisions (Sections IX.F, G and H). Inclusion of additional Plan |

definitional changes/additions for "Affiliate" (Section I.B.5, "Enjoined Parties" (Section I.B.56) and "Related Entity" (Section I.B.110); "Related Entity List" (Section I.B.111) and "Related Persons" (Section I.B.112). Also, Injunction language highlighted pursuant to Bankruptcy Rule 3016 (Section IX.F).

107.     Accordingly, the Debtor submits that no additional solicitation or disclosure is required on account of the Plan modifications, and that such modifications should be deemed accepted by all creditors that previously accepted the Plan.

## Conclusion

108.     For the reasons set forth herein, the Debtor respectfully requests that the Bankruptcy Court confirm the Plan and enter the Confirmation Order.

DOCS_SF:104703.16 36027/002

001407

Dated: January 22, 2021           PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717)
(*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084)
(*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992)
(*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:     jpomerantz@pszjlaw.com
           ikharasch@pszjlaw.com
           gdemo@pszjlaw.com

-and-

*/s/ Zachery Z. Annable*
HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

DOCS_SF:104703.16 36027/002

001408

**EXHIBIT A**

001409

# Plan Objections from Dondero-Related Entities: Organizational Charts

[1] CLO Holdco, Ltd., is a wholly-owned subsidiary of the Charitable Donor Advised Fund, L.P. (the "DAF"). HCMLP has terminated its shared services agreement with the DAF. The DAF owes HCMLP past due fees and expenses.
[2] Amounts owed as of November 30, 2020.

**EXHIBIT B**

001411

| Objector | Objection | Claim | Status |
|---|---|---|---|
| James Dondero | D.I. 1661 | Claim No. 138 | Withdrawn with prejudice [D.I. 1510] |
| | | Claim No. 141 | Arises from equity; subject to subordination |
| | | Claim No. 142 | Arises from equity; subject to subordination |
| | | Claim No. 145 | Arises from equity; subject to subordination |
| | | Claim No. 188 | Withdrawn with prejudice [D.I. 1510] |
| | | Indirect Equity Interest | Represents an indirect interest in Class A interests. Subordinated to Class B/C. Structurally subordinate. Represents 0.25% of total equity. |
| Get Good Trust | D.I. 1667 | Claim No. 120 | Arises from equity; subject to subordination |
| | | Claim No. 128 | Arises from equity; subject to subordination |
| | | Claim No. 129 | Arises from equity; subject to subordination |
| Dugaboy Investment Trust | D.I. 1667 | Claim No. 113 | Arises from equity; subject to subordination |
| | | Claim No. 131 | Objection filed and in litigation. Seeks to pierce the veil and hold the Debtor liable for subsidiary debts. Debtor believes claim is frivolous. |
| | | Claim No. 177 | Objection filed and in litigation. Seeks damages for postpetition management of estate. Debtor believes claim is frivolous. |
| | | Class A Interests | Subordinated to Class B/C. Represents 0.1866% of total equity. |
| Highland Capital Management Fund Advisors, L.P. | D.I. 1676 | Claim No. 95 | Expunged [D.I. 1233] |
| | | Claim No. 119 | Expunged [D.I. 1233] |
| Highland Fixed Income Fund | D.I. 1676 | Claim No. 109 | Expunged [D.I. 1233] |
| Highland Funds I and its series | D.I. 1676 | Claim No. 106 | Expunged [D.I. 1233] |
| Highland Funds II and its series | D.I. 1676 | Claim No. 114 | Expunged [D.I. 1233] |
| Highland Global Allocation Fund | D.I. 1676 | Claim No. 98 | Expunged [D.I. 1233] |
| Highland Healthcare Opportunities Fund | D.I. 1676 | Claim No. 116 | Expunged [D.I. 1233] |
| Highland Income Fund | D.I. 1676 | Claim No. 105 | Expunged [D.I. 1233] |
| Highland Merger Arbitrate Fund | D.I. 1676 | Claim No. 132 | Expunged [D.I. 1233] |
| Highland Opportunistic Credit Fund | D.I. 1676 | Claim No. 100 | Expunged [D.I. 1233] |
| Highland Small-Cap Equity Fund | D.I. 1676 | Claim No. 127 | Expunged [D.I. 1233] |
| Highland Socially Responsible Equity Fund | D.I. 1676 | Claim No. 115 | Expunged [D.I. 1233] |
| Highland Total Return Fund | D.I. 1676 | Claim No. 126 | Expunged [D.I. 1233] |
| Highland/iBoxx Senior Loan ETF | D.I. 1676 | Claim No. 122 | Expunged [D.I. 1233] |
| NexPoint Advisors, L.P. | D.I. 1676 | Claim No. 104 | Expunged [D.I. 1233] |
| | | Claim No. 108 | Expunged [D.I. 1233] |
| NexPoint Capital, Inc. | D.I. 1676 | Claim No. 107 | Expunged [D.I. 1233] |
| | | Claim No. 140 | Expunged [D.I. 1233] |
| NexPoint Real Estate Strategies Fund | D.I. 1676 | Claim No. 118 | Expunged [D.I. 1233] |

| NexPoint Strategic Opportunities Fund | D.I. 1676 | Claim No. 103 | Expunged [D.I. 1233] |
|---|---|---|---|
| CLO Holdco, Ltd. | D.I. 1675 | Claim No. 133 | Claim voluntarily reduced to $0.00 |
| | | Claim No. 198 | Claim voluntarily reduced to $0.00 |
| NexBank Title, Inc. | D.I. 1676 | None | N/A |
| NexBank Securities, Inc. | D.I. 1676 | None | N/A |
| NexBank Capital, Inc. | D.I. 1676 | None | N/A |
| NexBank | D.I. 1676 | Claim No. 178 | Expunged [D.I. 1155] |
| NexPoint Real Estate Finance Inc. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Capital, LLC | D.I. 1677 | None | N/A |
| NexPoint Residential Trust, Inc. | D.I. 1677 | None | N/A |
| NexPoint Hospitality Trust | D.I. 1677 | None | N/A |
| NexPoint Real Estate Partners, LLC | D.I. 1677 | None | N/A |
| NexPoint Multifamily Capital Trust, Inc. | D.I. 1677 | None | N/A |
| VineBrook Homes Trust, Inc. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Advisors, L.P. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Advisors II, L.P. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Advisors III, L.P. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Advisors IV, L.P. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Advisors V, L.P. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Advisors VI, L.P. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Advisors VII, L.P. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Advisors VIII, L.P. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC | D.I. 1673 | Claim No. 146 | Objection filed and in litigation. Debtor believes claim is frivolous. |
| Scott Ellington | D.I. 1669 | Claim No. 187 | Terminated for cause. Debtor exploring options. |
| | | Claim No. 192 | Terminated for cause. Debtor exploring options. |
| Isaac Leventon | D.I. 1669 | Claim No. 184 | Terminated for cause. Debtor exploring options. |

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

**FOURTH**[2] **NOTICE OF (I) EXECUTORY CONTRACTS
AND UNEXPIRED LEASES TO BE ASSUMED BY THE
DEBTOR PURSUANT TO THE FIFTH AMENDED PLAN, (II) CURE AMOUNTS,
IF ANY, AND (III) RELATED PROCEDURES IN CONNECTION THEREWITH**

      **PLEASE TAKE NOTICE THAT** on November 24, 2020, the United States Bankruptcy
Court for the Northern District of Texas (the "Bankruptcy Court") entered an order [Docket No.
1476] (the "Disclosure Statement Order") that, among other things: (a) approved the *Disclosure*

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service
address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] This Fourth Notice identifies executory contracts and unexpired leases to be assumed *in addition* to any executory
contract and unexpired lease identified previously in Docket Nos. 1648, 1719, 1749 and 1811-8.

001414

*Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125(a) of the title 11 of the United States Bankruptcy Code (the "Bankruptcy Code"); and (b) authorized the above-captioned debtor and debtor-in-possession (the "Debtor") to solicit acceptances of the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (the "Plan").[3]

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider Confirmation of the Plan (the "Confirmation Hearing") will commence on February 2, 2021 at 9:30 a.m. prevailing Central Time, before The Honorable Stacey G. C. Jernigan, in the United States Bankruptcy Court for the Northern District of Texas (Dallas Division), located at Earle Cabell Federal Building, 1100 Commerce Street, 14th Floor, Courtroom No. 1, Dallas, TX 75242-1496. The deadline for filing objections to the Plan was January 5, 2021, at 5:00 p.m., prevailing Central Time.

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice because the Debtor's records reflect that you are a party to a contract to be assumed by the Debtor pursuant to the Plan Supplement [Docket No. 1606] filed on December 18, 2020. Therefore, you are advised to review carefully the information contained in this notice and the related provisions of the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the Debtor is proposing to assume your Executory Contract(s) and Unexpired Lease(s), listed in **Schedule A** attached hereto, to which you are a party.[4]

**PLEASE TAKE FURTHER NOTICE THAT** section 365(b)(1) of the Bankruptcy Code requires a chapter 11 debtor to cure, or provide adequate assurance that it will promptly cure, any defaults under executory contracts and unexpired leases at the time of assumption. Accordingly, the Debtor has conducted a thorough review of its books and records and has determined the amounts required to cure defaults, if any, under the Executory Contract(s) and Unexpired Lease(s), which amounts are listed in the table on **Schedule A** attached hereto. Please note that if no amount is stated for a particular Executory Contract or Unexpired Lease, the Debtor believes that there is no cure amount outstanding for such contract or lease.

**PLEASE TAKE FURTHER NOTICE THAT**, absent any pending dispute, the monetary amounts required to cure any existing defaults arising under the Executory Contract(s) and Unexpired Lease(s) identified on **Schedule A** attached hereto will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by the Debtor in Cash on the Effective Date or as soon as reasonably practicable thereafter. In the event of a dispute, however, payment of the cure amount would be made following the entry of a final order(s) resolving the dispute and

---

[3] Capitalized terms not defined herein shall have the same meaning as ascribed in the Plan.

[4] Nothing contained in the Plan or the Debtor's schedule of assets and liabilities shall constitute an admission by the Debtor that any such contract or lease is in fact an Executory Contract or Unexpired Lease capable of assumption that the Debtor or the Reorganized Debtor(s) has any liability thereunder, or that such Executory Contract or Unexpired Lease is necessarily a binding and enforceable agreement. Further, the Debtor expressly reserves the right to remove any Executory Contract or Unexpired Lease from assumption by the Debtor and reject such Executory Contract or Unexpired Lease pursuant to the terms of the Plan.

001415

approving the assumption. If an objection to the proposed assumption or related cure amount is sustained by the Court, however, the Debtor may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the assumption of an Executory Contract or Unexpired Lease is **February 1, 2021, at 12:00 noon,** prevailing Central Time. Any objection to the assumption of your Executory Contract or Unexpired Lease must: (a) be in writing; (b) comply with the Federal Rules of Bankruptcy Procedure and the Bankruptcy Local Rules for the Northern District of Texas; (c) state, with particularity, the name and address of the objecting party, the basis and nature of any objection the assumption of the Executory Contract or Unexpired Lease, and, if practicable, a proposed modification such proposed assumption that would resolve such objection; (d) be served on counsel for the Debtor set forth in the signatory block below; and (e) be filed with the Court on or before February 1, 2021 at 12:00 noon prevailing Central Time.

**PLEASE TAKE FURTHER NOTICE THAT** any objections to the Plan in connection with the assumption of the Executory Contract(s) and Unexpired Lease(s) proposed in connection with the Plan that remain unresolved as of the Confirmation Hearing will be heard at the first omnibus hearing following the Confirmation Hearing (or such other date as fixed by the Court).

> **PLEASE TAKE FURTHER NOTICE THAT ANY COUNTERPARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT FAILS TO OBJECT TIMELY TO EITHER THE PROPOSED ASSUMPTION OF SUCH CONTRACT OR LEASE OR THE CURE AMOUNT WILL BE DEEMED TO HAVE ASSENTED TO SUCH ASSUMPTION AND CURE AMOUNT.**

**PLEASE TAKE FURTHER NOTICE THAT ASSUMPTION OF ANY EXECUTORY CONTRACT OR UNEXPIRED LEASE PURSUANT TO THE PLAN OR OTHERWISE SHALL RESULT IN THE FULL RELEASE AND SATISFACTION OF ANY CLAIMS OR DEFAULTS, WHETHER MONETARY OR NONMONETARY, INCLUDING DEFAULTS OF PROVISIONS RESTRICTING THE CHANGE IN CONTROL OR OWNERSHIP INTEREST COMPOSITION OR OTHER BANKRUPTCY-RELATED DEFAULTS, ARISING UNDER ANY ASSUMED EXECUTORY CONTRACT OR UNEXPIRED LEASE AT ANY TIME BEFORE THE DATE THE DEBTOR OR REORGANIZED DEBTOR ASSUMES SUCH EXECUTORY CONTRACT OR UNEXPIRED LEASE. ANY PROOFS OF CLAIM FILED WITH RESPECT TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT HAS BEEN ASSUMED SHALL BE DEEMED DISALLOWED AND EXPUNGED, WITHOUT FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT.**

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement Order, Disclosure Statement, the Plan, the Plan Supplement, or related documents, you may: (a) access the Debtor's restructuring website at http://www.kccllc.net/hcmlp; (b) write to HCMLP Ballot Processing Center, c/o KCC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245; (c) call toll free: (877) 573-3984 or

001416

international: (310) 751-1829 and request to speak with a member of the Solicitation Group; or (d) email HighlandInfo@kccllc.com and reference "Highland" in the subject line. You may also obtain copies of any pleadings filed in this case for a fee via PACER at: pacer.uscourts.gov.

Alternatively, you can obtain a copy of these documents by contacting counsel for the Debtor (a) by e-mail, at gdemo@pszjlaw.com, (b) by telephone, by contacting Gregory Demo at (212) 561-7700, or (c) by mail, at Pachulski Stang Ziehl & Jones LLP, Attn: Gregory Demo, 780 Third Avenue, 34th Floor, New York, NY 10017. Please specify whether you would like to receive copies of these documents by (i) **e-mail transmission** (in which case, please include your e-mail address), (ii) on a **CD-ROM or flash drive** delivered by return mail, or (iii) in **paper copies** delivered by return mail.

> **THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE SOLICITATION AGENT.**

Dated: January 27, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA  90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email:      jpomerantz@pszjlaw.com
             ikharasch@pszjlaw.com
             gdemo@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

001418

## Schedule A

**Schedule of Assumed Contracts and Leases and Proposed Cure**

001419

| Debtor | Counterparty | Description of Assumed Contracts or Leases | Cure |
|---|---|---|---|
| Highland Capital Management, L.P. | Via West[5] | Master Service Agreement | $0.00 |
| Highland Capital Management, L.P. | Via West[6] Attn: John Greenwood | Master Service Agreement | $0.00 |
| Highland Capital Management, L.P. | Bloomberg Finance, L.P. Attn:  Levi Halberstam | Amendment to Bloomberg Order Management System Addendum and Bloomberg Order Management System Schedule of Services Account No. 167969 | $0.00 |
| Highland Capital Management, L.P. | Markit WSO Corporation Attn: John Taylor | Fourth Amendment to Software License and Services Agreement | Parties are jointly confirming cure amount |
| Highland Capital Management, L.P. | Siepe Services, LLC Attn: Michael Pusateri | Master Services Agreement, First Amendment to Master Services Agreement, Second Amendment and Restatement of Master Services Agreement | $80,184.00 |
| Highland Capital Management, L.P. | AT&T | Internet Agreement[7] Account No. 831-000-7888-651 | $0.00 |
| Highland Capital Management, L.P. | AT&T | Landline Fax Agreement 831-000-2532-176 | $0.00 |
| Highland Capital Management, L.P. | Amazon Web Services, Inc. | Account No. 353534426569 | $0.00 |
| Highland Capital Management, L.P. | WP Engine | Website Hosting Agreement Account No. 325667 | $0.00 |

---

[5] The Via West Master Service Agreements were erroneously included in the *Notice of Withdrawal of Certain Executory Contract(s) and Unexpired Lease(s) from List of Executory Contract(s) and Unexpired Lease(s) to be Assumed by the Debtor Pursuant to the Fifth Amended Plan* [Docket No. 1791].

[6] The Via West Master Service Agreements were erroneously included in the *Notice of Withdrawal of Certain Executory Contract(s) and Unexpired Lease(s) from List of Executory Contract(s) and Unexpired Lease(s) to be Assumed by the Debtor Pursuant to the Fifth Amended Plan* [Docket No. 1791].

[7] The Internet Agreement with AT&T corrects, replaces and supersedes the Executory Contract identified at #45 in Docket No. 1811-8.

001420

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

## FIFTH[2] NOTICE OF (I) EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES TO BE ASSUMED BY THE
## DEBTOR PURSUANT TO THE FIFTH AMENDED PLAN, (II) CURE AMOUNTS,
## IF ANY, AND (III) RELATED PROCEDURES IN CONNECTION THEREWITH

**PLEASE TAKE NOTICE THAT** on November 24, 2020, the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") entered an order [Docket No. 1476] (the "Disclosure Statement Order") that, among other things: (a) approved the *Disclosure*

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] This Fifth Notice identifies executory contracts and unexpired leases to be assumed *in addition* to any executory contract and unexpired lease identified previously in Docket Nos. 1648, 1719, 1749, 1811-8 and 1847.

001421

*Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125(a) of the title 11 of the United States Bankruptcy Code (the "Bankruptcy Code"); and (b) authorized the above-captioned debtor and debtor-in-possession (the "Debtor") to solicit acceptances of the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (the "Plan").[3]

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider Confirmation of the Plan (the "Confirmation Hearing") will commence on February 2, 2021 at 9:30 a.m. prevailing Central Time, before The Honorable Stacey G. C. Jernigan, in the United States Bankruptcy Court for the Northern District of Texas (Dallas Division), located at Earle Cabell Federal Building, 1100 Commerce Street, 14th Floor, Courtroom No. 1, Dallas, TX 75242-1496. The deadline for filing objections to the Plan was January 5, 2021, at 5:00 p.m., prevailing Central Time.

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice because the Debtor's records reflect that you are a party to a contract to be assumed by the Debtor pursuant to the Plan Supplement [Docket No. 1606] filed on December 18, 2020. Therefore, you are advised to review carefully the information contained in this notice and the related provisions of the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the Debtor is proposing to assume your Executory Contract(s) and Unexpired Lease(s), listed in **Schedule A** attached hereto, to which you are a party.[4]

**PLEASE TAKE FURTHER NOTICE THAT** section 365(b)(1) of the Bankruptcy Code requires a chapter 11 debtor to cure, or provide adequate assurance that it will promptly cure, any defaults under executory contracts and unexpired leases at the time of assumption. Accordingly, the Debtor has conducted a thorough review of its books and records and has determined the amounts required to cure defaults, if any, under the Executory Contract(s) and Unexpired Lease(s), which amounts are listed in the table on **Schedule A** attached hereto. Please note that if no amount is stated for a particular Executory Contract or Unexpired Lease, the Debtor believes that there is no cure amount outstanding for such contract or lease.

**PLEASE TAKE FURTHER NOTICE THAT**, absent any pending dispute, the monetary amounts required to cure any existing defaults arising under the Executory Contract(s) and Unexpired Lease(s) identified on **Schedule A** attached hereto will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by the Debtor in Cash on the Effective Date or as soon as reasonably practicable thereafter. In the event of a dispute, however, payment of the cure amount would be made following the entry of a final order(s) resolving the dispute and

---

[3] Capitalized terms not defined herein shall have the same meaning as ascribed in the Plan.

[4] Nothing contained in the Plan or the Debtor's schedule of assets and liabilities shall constitute an admission by the Debtor that any such contract or lease is in fact an Executory Contract or Unexpired Lease capable of assumption that the Debtor or the Reorganized Debtor(s) has any liability thereunder, or that such Executory Contract or Unexpired Lease is necessarily a binding and enforceable agreement. Further, the Debtor expressly reserves the right to remove any Executory Contract or Unexpired Lease from assumption by the Debtor and reject such Executory Contract or Unexpired Lease pursuant to the terms of the Plan.

approving the assumption. If an objection to the proposed assumption or related cure amount is sustained by the Court, however, the Debtor may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the assumption of an Executory Contract or Unexpired Lease is **at the Confirmation Hearing**.

**PLEASE TAKE FURTHER NOTICE THAT** any objections to the Plan in connection with the assumption of the Executory Contract(s) and Unexpired Lease(s) proposed in connection with the Plan that remain unresolved as of the Confirmation Hearing will be heard at the first omnibus hearing following the Confirmation Hearing (or such other date as fixed by the Court).

> **PLEASE TAKE FURTHER NOTICE THAT ANY COUNTERPARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT FAILS TO OBJECT TIMELY TO EITHER THE PROPOSED ASSUMPTION OF SUCH CONTRACT OR LEASE OR THE CURE AMOUNT WILL BE DEEMED TO HAVE ASSENTED TO SUCH ASSUMPTION AND CURE AMOUNT.**

**PLEASE TAKE FURTHER NOTICE THAT ASSUMPTION OF ANY EXECUTORY CONTRACT OR UNEXPIRED LEASE PURSUANT TO THE PLAN OR OTHERWISE SHALL RESULT IN THE FULL RELEASE AND SATISFACTION OF ANY CLAIMS OR DEFAULTS, WHETHER MONETARY OR NONMONETARY, INCLUDING DEFAULTS OF PROVISIONS RESTRICTING THE CHANGE IN CONTROL OR OWNERSHIP INTEREST COMPOSITION OR OTHER BANKRUPTCY-RELATED DEFAULTS, ARISING UNDER ANY ASSUMED EXECUTORY CONTRACT OR UNEXPIRED LEASE AT ANY TIME BEFORE THE DATE THE DEBTOR OR REORGANIZED DEBTOR ASSUMES SUCH EXECUTORY CONTRACT OR UNEXPIRED LEASE. ANY PROOFS OF CLAIM FILED WITH RESPECT TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT HAS BEEN ASSUMED SHALL BE DEEMED DISALLOWED AND EXPUNGED, WITHOUT FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT.**

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement Order, Disclosure Statement, the Plan, the Plan Supplement, or related documents, you may: (a) access the Debtor's restructuring website at http://www.kccllc.net/hcmlp; (b) write to HCMLP Ballot Processing Center, c/o KCC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245; (c) call toll free: (877) 573-3984 or international: (310) 751-1829 and request to speak with a member of the Solicitation Group; or (d) email HighlandInfo@kccllc.com and reference "Highland" in the subject line. You may also obtain copies of any pleadings filed in this case for a fee via PACER at: pacer.uscourts.gov.

Alternatively, you can obtain a copy of these documents by contacting counsel for the Debtor (a) by e-mail, at gdemo@pszjlaw.com, (b) by telephone, by contacting Gregory Demo at (212) 561-7700, or (c) by mail, at Pachulski Stang Ziehl & Jones LLP, Attn: Gregory Demo, 780 Third Avenue, 34th Floor, New York, NY 10017. Please specify whether you would like to

001423

receive copies of these documents by (i) **e-mail transmission** (in which case, please include your e-mail address), (ii) on a **CD-ROM or flash drive** delivered by return mail, or (iii) in **paper copies** delivered by return mail.

> **THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE SOLICITATION AGENT.**

Dated: February 1, 2021

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:      jpomerantz@pszjlaw.com
            ikharasch@pszjlaw.com
            gdemo@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

001424

## Schedule A

**Schedule of Assumed Contracts and Leases and Proposed Cure**

| Debtor | Counterparty | Description of Assumed Contracts or Leases | Cure |
|---|---|---|---|
| Highland Capital Management, L.P. | Bloomberg Finance, L.P<br>Attn: Levi Halberstam | Bloomberg (Terminal) Agreement No. 306371[5] | $0.00 |

---

[5] The Debtor is currently in discussions with Bloomberg regarding the assumption of this agreement.

DOCS_DE:232725.4 36027/002

001426

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

**DEBTOR'S NOTICE OF FILING OF PLAN SUPPLEMENT TO THE FIFTH
AMENDED PLAN OF REORGANIZATION OF HIGHLAND CAPITAL
MANAGEMENT, L.P. (AS MODIFIED)**

     **PLEASE TAKE NOTICE** that on January 22, 2021, the Debtor filed the *Fifth Amended*

*Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1808]

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

001427

(as subsequently amended and/or modified, the "Plan").[2]

**PLEASE TAKE FURTHER NOTICE** that Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession (the "Debtor"), filed the *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* on November 24, 2020 [Docket No. 1473] (the "Disclosure Statement").

**PLEASE TAKE FURTHER NOTICE** that attached as Exhibit C to the Disclosure Statement was the Debtor's Liquidation Analysis/Financial Projections.

**PLEASE TAKE FURTHER NOTICE** that attached hereto as **Exhibit A** are the Debtor's amended Liquidation Analysis/Financial Projections (the "Amended Liquidation Analysis/Financial Projections"), which supersede the Liquidation Analysis/Financial Projections filed on November 24, 2020, with the Disclosure Statement.

**PLEASE TAKE FURTHER NOTICE** that a prior version of the Amended Liquidation Analysis/Financial Projections was provided to parties in interests on January 28, 2021, in advance of the deposition of James P. Seery, Jr., the Debtor's Chief Executive Officer and Chief Restructuring Officer, and that the Amended Liquidation Analysis/Financial Projections differ from such version in two respects:

- The Amended Liquidation Analysis/Financial Projections include the settlement in principle between UBS and the Debtor, which provides for UBS receiving a Class 8 (General Unsecured Claim) of $50,000,000 and a Class 9 (Subordinated Claim) of $25,000,000. The prior Liquidation Analysis/Financial Projections included a Class 8 (General Unsecured Claim) in the amount of $94,761,076 pursuant to the Court's order temporarily allowing the UBS claim in that amount for voting purposes; and

- The Debtor inadvertently understated the aggregate amount of Class 8 (General Unsecured Claims) by $4,392,937, which error is corrected in the Amended Liquidation Analysis/Financial Projections.

**PLEASE TAKE NOTICE** that the Debtor hereby files the documents included herewith

---

[2] All capitalized terms used but not defined herein have the meanings given to them in the Plan.

DOCS_NY:42174.4 36027/002

001428

as **Exhibits DD-FF** (collectively, the "Fifth Plan Supplement") as Exhibits DD-FF to the Plan:

> **Exhibit DD**:  Schedule of Retained Causes of Action (supersedes Exhibits E, L, and Q);
>
> **Exhibit EE**:  Revisions to Form of Claimant Trust Agreement (amends Exhibit R); and
>
> **Exhibit FF**:  Schedule of Contracts and Leases to Be Assumed (supersedes Exhibit H, I, and X).[3]

**PLEASE TAKE NOTICE** that the Debtor hereby gives notice of supplemental amendments (the "Plan Amendments") to the Plan, which are set forth in the redlined excerpts of the Plan attached hereto as **Exhibit B**.

*[Remainder of Page Intentionally Blank]*

---

[3] The Schedule of Contracts and Leases includes an agreement with Bloomberg Finance, L.P. ("Bloomberg").  The Debtor is currently in discussions with Bloomberg regarding the assumption of such agreement.

DOCS_NY:42174.4 36027/002

001429

Dated: February 1, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
ikharasch@pszjlaw.com
gdemo@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

DOCS_NY:42174.4 36027/002

# EXHIBIT A

*Highland Capital Management, L.P.*
*Disclaimer For Financial Projections*

This document includes financial projections for July 2020 through December 2022 (the "Projections") for Highland Capital Management, L.P. "Company"). These Projections have been prepared by DSI with input from management at the Company. The historical information utilized in these Projections has not been audited or reviewed for accuracy by DSI.

This document includes certain statements, estimates and forecasts provided by the Company with respect to the Company's anticipated future performance. These estimates and forecasts contain significant elements of subjective judgment and analysis that may or may not prove to be accurate or correct. There can be no assurance that these statements, estimates and forecasts will be attained and actual outcomes and results may differ materially from what is estimated or forecast herein.

These Projections should not be regarded as a representation of DSI that the projected results will be achieved.

Management may update or supplement these Projections in the future, however, DSI expressly disclaims any obligation to update its report. These Projections were not prepared with a view toward compliance with published guidelines of the Securities and Exchange Commission or the American Institute of Certified Public Accountants regarding historical financial statements, projections or forecasts.

2/1/2021

2/1/2021

*Highland Capital Management, L.P.*
*Statement of Assumptions*

A. Plan effective date is March 1, 2021

B. All investment assets are sold by December 31, 2022.

C. All demand notes are collected in the year 2021; 3 term notes defaulted and have been demanded based on default provisions; payment estimated in 2021

D. Dugaboy term note with maturity date beyond 12/31/2022 are sold in Q1 2022; in the interim interest income and principal payments are not collected due to prepayment on note

E. Fixed assets currently used in daily operations are sold in June 2021 for $0

F. Highland bonus plan has been terminated in accordance with its terms. Accrual for employee bonuses as of January 2021 are reversed and not paid.

G. All Management advisory or shared service contracts are terminated on their terms by the effective date or shortly thereafter

H. Post-effective date, the reorganized Debtor would retain up to ten HCMLP employees (or hire similar employees) to help monetize the remaining assets.

I. Litigation Trustee budget is $6,500,000.

J. Unrealized gains or losses are not recorded on a monthly basis; all gains or losses are recorded as realized gains or losses upon sale of asset.

K. Plan does not provide for payment of interest to Class 8 holders of general unsecured claims, as set forth in the Plan. If holders of general unsecured claims receive 100% of their allowed claims, they would then be entitled to receive interest at the federal judgement rate, prior to any funds being available for claims or interest of junior priority.

L. Plan assumes zero allowed claims for IFA and Hunter Mountain Investment Trust ("HMI").

M. Claim amounts listed in Plan vs. Liquidation schedule are subject to change; claim amounts in Class 8 assume $0 for IFA and HMI, $50.0 million for UBS and $45 million HV. Assumes RCP claims will offset HCMLP's interest in fund and will not be paid from Debtor assets

N. With the exception of Class 2 - Frontier, Classes 1-7 will be paid in full within 30 days of effective date.

O. Class 7 payout limited to 85% of each individual creditor claim or in the aggregate $13.15 million. Plan currently projects Class 7 payout of $10.3 million.

P. See below for Class 8 estimated payout schedule; payout is subject to certain assets being monetized by payout date (no Plan requirement to do so):

   o By September 30, 2021 - $50,000,000
   o By March 31, 2022 – additional $50,000,000
   o By June 30, 2022 – additional $25,000,000
   o All remaining proceeds are assumed to be paid out on or soon after all remaining assets are monetized.

Q. Assumptions subject to revision based on business decision and performance of the business

001433

2/1/2021

Case 19-34054-sgj11 Doc 1875-1 Filed 02/01/21   Entered 02/01/21 16:22:31   Page 4 of 8

**Highland Capital Management, L.P.**
*Plan Analysis Vs. Liquidation Analysis*
*(US $000's)*

| | Plan Analysis | Liquidation Analysis |
|---|---|---|
| Estimated cash on hand at 1/31/2020 | $ 24,290 | $ 24,290 |
| Estimated proceeds from monetization of assets [1][2] | 257,941 | 191,946 |
| Estimated expenses through final distribution[1][3] | (59,573) | (41,488) |
| Total estimated $ available for distribution | 222,658 | 174,748 |
| Less: Claims paid in full | | |
| Unclassified [4] | (1,080) | (1,080) |
| Administrative claims [5] | (10,574) | (10,574) |
| Class 1 - Jefferies Secured Claim | - | - |
| Class 2 - Frontier Secured Claim [6] | (5,781) | (5,781) |
| Class 3 - Other Secured Claims | (62) | (62) |
| Class 4 - Priority Non-Tax Claims | (16) | (16) |
| Class 5 - Retained Employee Claims | - | - |
| Class 6 - PTO Claims [5] | - | - |
| Class 7 – Convenience Claims [7][8] | (10,280) | - |
| Subtotal | (27,793) | (17,514) |
| Estimated amount remaining for distribution to general unsecured claims | 194,865 | 157,235 |
| % Distribution to Class 7 (Class 7 claims included in Class 8 in Liquidation scenario) | 85.00% | 0.00% |
| Class 8 – General Unsecured Claims [8][10] | 273,219 | 286,100 |
| Subtotal | 273,219 | 286,100 |
| % Distribution to general unsecured claims | 71.32% | 54.96% |
| Estimated amount remaining for distribution | - | - |
| Class 9 – Subordinated Claims | no distribution | no distribution |
| Class 10 – Class B/C Limited Partnership Interests | no distribution | no distribution |
| Class 11 – Class A Limited Partnership Interest | no distribution | no distribution |

*Footnotes:*
[1] Assumes chapter 7 Trustee will not be able to achieve same sales proceeds as Claimant Trustee
   Assumes Chapter 7 Trustee engages new professionals to help liquidate assets and terminates any management agreements with funds or CLOS
[2] Sale of investment assets, sale of fixed assets, collection of accounts receivable and interest receivable; Plan includes revenue from managing CLOs
[3] Estimated expenses through final distribution exclude non-cash expenses:
   Depreciation of $462 thousand in 2021; Bad debt of $124K in 2021
[4] Unclassified claims include payments for priority tax claims and settlements with previously approved by the Bankruptcy Court
[5] Represents $4.7 million in unpaid professional fees, $4.5 million in timing of payments to vendors and $1.2 million to pay PTO
[6] Debtor will pay all unpaid interest approximate at $253 thousand of Frontier on effective date and continue to pay interest quarterly at 5.25% until Frontier's collateral is sold
[7] Claims payout limited to 85% of each individual creditor claim or limited to a total class payout of $13.15 million
[8] Plan: Class 7 includes $1.2 million estimate for aggregate contract rejections damage; Liquidation Class 8 includes $2.0 million for estimated rejection damages
[10] Class estimates $0 allowed claim for the following creditors: IFA and HM; assumes RCP claims offset against HCMLP interest in RCP fund
   UBS claim included at $50.0 million.

*Notes:*
All claim amounts are estimated as of February 1, 2020 and subject to change

2/1/2021

001435

**Highland Capital Management, L.P.**
*Balance Sheet*
*(US $000's)*

| | Actual Jun-20 | Actual Sep-20 | Forecast --> Dec-20 | Mar-21 | Jun-21 | Sep-21 | Dec-21 | Mar-22 | Jun-22 | Sep-22 | Dec-22 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | | |
| Cash and Cash Equivalents | $ 14,994 | $ 5,888 | $ 31,047 | $ 10,328 | $ 40,063 | $ 42,833 | $ 135,137 | $ 80,733 | $ 72,238 | $ 69,368 | $ - |
| Other Current Assets | 13,182 | 13,651 | 13,784 | 15,172 | 14,671 | 14,220 | 9,943 | 8,268 | 8,417 | 8,567 | - |
| Investment Assets | 320,912 | 305,961 | 283,812 | 280,946 | 233,234 | 171,174 | 47,503 | 47,503 | 25,888 | 25,888 | - |
| Net Fixed Assets | 3,055 | 2,823 | 2,592 | 1,348 | - | - | - | - | - | - | - |
| **TOTAL ASSETS** | $ 352,142 | $ 328,323 | $ 331,235 | $ 307,793 | $ 287,968 | $ 228,227 | $ 192,583 | $ 136,504 | $ 106,542 | $ 103,823 | $ - |
| **Liabilities** | | | | | | | | | | | |
| Post-petition Liabilities | $ 142,730 | $ 135,597 | $ 131,230 | $ 12,891 | $ 10,249 | $ 10,503 | $ - | $ - | $ - | $ - | $ - |
| Pre-petition Liabilities | 9,861 | 9,884 | 10,000 | - | - | - | - | - | - | - | - |
| Claims | | | | | | | | | | | |
| Unclassified | - | - | - | - | - | - | - | - | - | - | - |
| Class 1 – Jefferies Secured Claim | - | - | - | - | - | - | - | - | - | - | - |
| Class 2 – Frontier Secured Claim | - | - | - | 5,528 | - | - | - | - | - | - | - |
| Class 3 – Other Secured Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 4 – Priority Non-Tax Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 5 – Retained Employee Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 6 – PTO Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 7 – Convenience Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 8 – General Unsecured Claims | - | - | - | 273,219 | 273,219 | 223,219 | 223,219 | 173,219 | 148,219 | 148,219 | 78,354 |
| Class 9 – Subordinated Claims [1] | - | - | - | - | - | - | - | - | - | - | - |
| Class 10 – Class B/C Limited Partnership Interests | - | - | - | - | - | - | - | - | - | - | - |
| Class 11 – Class A Limited Partnership Interests | - | - | - | - | - | - | - | - | - | - | - |
| Claim Payable | 9,861 | 9,884 | 10,000 | 278,747 | 273,219 | 223,219 | 223,219 | 173,219 | 148,219 | 148,219 | 78,354 |
| **TOTAL LIABILITIES** | $ 152,591 | $ 145,481 | $ 141,230 | $ 291,639 | $ 283,468 | $ 233,723 | $ 223,219 | $ 173,219 | $ 148,219 | $ 148,219 | $ 78,354 |
| Partners' Capital | 199,551 | 182,842 | 190,005 | 16,154 | 4,500 | (5,495) | (30,636) | (36,715) | (41,677) | (44,396) | (78,354) |
| **TOTAL LIABILITIES AND PARTNERS' CAPITAL** | $ 352,142 | $ 328,323 | $ 331,235 | $ 307,793 | $ 287,968 | $ 228,227 | $ 192,583 | $ 136,504 | $ 106,543 | $ 103,823 | $ - |

[1] Class 9 has $60 million of subordinated claims; Debtor anticipates no distributions to Class 9

**Highland Capital Management, L.P.**
*Profit/Loss*
*(US $000's)*

| | Actual Jan 2020 to June 2020 Total | Actual 3 month ended Sept 2020 | Forecast --> 3 month ended Dec 2020 | Total 2020 | 3 month ended Mar 2021 | 3 month ended Jun 2021 | 3 month ended Sept 2021 | 3 month ended Dec 2021 | Total 2021 |
|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | |
| Management Fees | $ 6,572 | $ 1,949 | $ 2,804 | $ 11,325 | $ 1,329 | $ 856 | $ 856 | $ 856 | $ 3,897 |
| Shared Service Fees | 7,672 | 3,765 | 3,788 | 15,225 | 1,373 | 45 | 45 | - | 1,463 |
| Other Income | 3,126 | 538 | 340 | 4,004 | 316 | 274 | - | - | 590 |
| Total revenue | $ 17,370 | $ 6,252 | $ 6,931 | $ 30,554 | $ 3,018 | $ 1,176 | $ 901 | $ 856 | $ 5,951 |
| Operating Expenses [1] | 13,328 | 9,171 | 9,399 | 31,899 | 12,168 | 4,897 | 3,973 | 3,333 | 24,371 |
| Income/(loss) From Operations | $ 4,042 | $ (2,918) | $ (2,468) | $ (1,345) | $ (9,149) | $ (3,722) | $ (3,072) | $ (2,477) | $ (18,420) |
| Professional Fees | 17,522 | 7,707 | 8,351 | 33,581 | 7,478 | 6,583 | 2,268 | 1,810 | 18,139 |
| Other Income/(Expenses) [2] | 2,302 | 1,518 | 1,059 | 4,879 | (156,042) | 326 | (93) | 29 | (155,780) |
| Operating Gain/(Loss) | $ (11,178) | $ (9,107) | $ (9,761) | $ (30,046) | $ (172,669) | $ (9,978) | $ (5,433) | $ (4,259) | $ (192,339) |
| **Realized and Unrealized Gain/(Loss)** | | | | | | | | | |
| Other Realized Gains/(Loss) | - | - | - | - | (1,013) | 522 | - | - | (491) |
| Net Realized Gain/(Loss) on Sale of Investment | (28,418) | 1,549 | (8,850) | (35,719) | (168) | (2,198) | (4,563) | (7,581) | (14,510) |
| Net Change in Unrealized Gain/(Loss) of Investments | (29,259) | (7,450) | 4,523 | (32,857) | - | - | - | - | - |
| Net Realized Gain /(Loss) from Equity Method Investees | - | - | (364) | (364) | - | - | - | (13,301) | (13,301) |
| Net Change in Unrealized Gain /(Loss) from Equity Method Investees | (80,782) | (1,700) | - | (82,482) | - | - | - | - | - |
| Total Realized and Unrealized Gain/(Loss) | $ (139,129) | $ (7,601) | $ (4,692) | $ (151,422) | $ (1,182) | $ (1,675) | $ (4,563) | $ (20,882) | $ (28,302) |
| Net Income | $ (150,307) | $ (16,708) | $ (14,453) | $ (181,468) | $ (173,851) | $ (11,654) | $ (9,996) | $ (25,141) | $ (220,641) |

*Footnotes:*
[1] Operating expenses include an adjustment in January 2021 to account for expenses that have not been accrued or paid prior to effective date.
[2] Other income and expenses of $197.3 million in Q1 2021 includes:
   [a] $209.7 million was expensed to record for the increase of allowed claims.
   [b] Income of $11.7 million for the accrued, but unpaid payroll liability related to the Debtor's deferred bonus programs amount written-off.

**Highland Capital Management, L.P.**
*Profit/Loss*
*(US $000's)*

| | Forecast --> | | | | | |
|---|---|---|---|---|---|---|
| | 3 month ended Mar 2022 | 3 month ended Jun 2022 | 3 month ended Sept 2022 | 3 month ended Dec 2022 | Total 2022 | Plan |
| **Revenue** | | | | | | |
| Management Fees | $ 580 | $ 580 | $ 580 | $ 580 | $ 2,318 | $ 6,215 |
| Shared Service Fees | - | - | - | - | - | 1,463 |
| Other Income | - | - | - | - | - | 591 |
| Total revenue | $ 580 | $ 580 | $ 580 | $ 580 | $ 2,318 | $ 8,269 |
| Operating Expenses | 3,635 | 2,679 | 1,739 | 6,425 | 14,478 | 38,849 |
| Income/(loss) From Operations | $ (3,056) | $ (2,099) | $ (1,159) | $ (5,846) | $ (12,160) | $ (30,580) |
| Professional Fees | 2,921 | 2,761 | 1,461 | 2,176 | 9,318 | 27,455 |
| Other Income/(Expenses) | (103) | (101) | (100) | (350) | (654) | (156,434) |
| Operating Gain/(Loss) | $ (6,079) | $ (4,961) | $ (2,719) | $ (8,371) | $ (22,131) | $ (214,470) |
| **Realized and Unrealized Gain/(Loss)** | | | | | | |
| Other Realized Gains/(Loss) | | | | | | |
| Net Realized Gain/(Loss) on Sale of Investment | - | - | - | (25,587) | (25,587) | (26,078) |
| Net Change in Unrealized Gain/(Loss) of Investments | - | - | - | - | - | (14,510) |
| Net Realized Gain /(Loss) from Equity Method Investees | - | - | - | - | - | - |
| Net Change in Unrealized Gain /(Loss) from Equity Method Investees | - | - | - | - | - | (13,301) |
| Total Realized and Unrealized Gain/(Loss) | $ - | $ - | $ - | $ (25,587) | $ (25,587) | $ (53,889) |
| Net Income | $ (6,079) | $ (4,961) | $ (2,719) | $ (33,958) | $ (47,718) | $ (268,359) |

*Highland Capital Management, L.P.*
*Cash Flow Indirect*
*(US $000's)*

Forecast --->

| | Sep-20 | Dec-20 | Mar-21 | Jun-21 | Sep-21 | Dec-21 | Mar-22 | Jun-22 | Sep-22 | Dec-22 |
|---|---:|---:|---:|---:|---:|---:|---:|---:|---:|---:|
| Net (Loss) Income | (16,708) | (14,453) | (173,851) | (11,654) | (9,996) | (25,141) | (6,079) | (4,961) | (2,719) | (33,168) |
| Cash Flow from Operating Activity | | | | | | | | | | |
| (Increase) / Decrease in Cash | | | | | | | | | | |
| Depreciation and amortization | 231 | 231 | 231 | 231 | - | - | - | - | - | - |
| Other realized (gain)/loss | - | - | 1,013 | (522) | - | - | - | - | - | 25,208 |
| Investment realized (gain)/ loss | (1,549) | 9,214 | 168 | 2,198 | 4,563 | 20,882 | - | - | - | - |
| Unrealized (gain)/ loss | (9,150) | 4,523 | - | - | - | - | - | - | - | - |
| (Increase) Decrease in Current Assets | (470) | (133) | (1,388) | 501 | 450 | 4,277 | 1,675 | (149) | (150) | - |
| Increase (Decrease) in Current Liabilities | (7,110) | (4,251) | (44,172) | (2,643) | 255 | (10,503) | - | - | - | - |
| Net Cash Increase / (Decrease) - Operating Activities | (34,757) | (4,868) | (217,998) | (11,889) | (4,727) | (10,485) | (4,404) | (5,110) | (2,870) | (7,960) |
| Cash Flow From Investing Activities | | | | | | | | | | |
| Proceeds from Sale of Fixed Assets | - | - | - | - | - | - | - | - | - | - |
| Proceeds from Investment Assets | 25,650 | 30,027 | 2,698 | 47,152 | 57,498 | 102,788 | - | 21,616 | - | 7,143 |
| Net Cash Increase / (Decrease) - Investing Activities | 25,650 | 30,027 | 2,698 | 47,152 | 57,498 | 102,788 | - | 21,616 | - | 7,143 |
| Cash Flow from Financing Activities | | | | | | | | | | |
| Claims payable | - | - | (73,997) | (5,528) | (50,000) | - | (50,000) | (25,000) | - | - |
| Claim reclasses/(paid) | - | - | 278,747 | - | - | - | - | - | - | - |
| Maple Avenue Holdings | - | - | (4,975) | - | - | - | - | - | - | - |
| Frontier Note | - | - | (5,195) | - | - | - | - | - | - | - |
| Net Cash Increase / (Decrease) - Financing Activities | - | - | 194,580 | (5,528) | (50,000) | - | (50,000) | (25,000) | - | - |
| Net Change in Cash | (9,107) | 25,159 | (20,719) | 29,735 | 2,770 | 92,303 | (54,404) | (8,495) | (2,870) | (817) |
| Beginning Cash | 14,994 | 5,888 | 31,047 | 10,328 | 40,063 | 42,833 | 135,137 | 80,733 | 72,238 | 69,368 |
| Ending Cash | 5,888 | 31,047 | 10,328 | 40,063 | 42,833 | 135,137 | 80,733 | 72,238 | 69,368 | 68,551 |

# EXHIBIT B

001439

61. "*Estate Claims*" has the meaning given to it in <u>Exhibit A</u> to the *Notice of Final Term Sheet* [D.I. 354].

62. "*Exculpated Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

63. "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

64. "*Exhibit*" means an exhibit annexed hereto or to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time), which are incorporated by reference herein.

65. "*Federal Judgment Rate*" means the post-judgment interest rate set forth in 28 U.S.C. § 1961 as of the Effective Date.

66. "*File*" or "*Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Case.

67. "*Final Order*" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, or, in the event that an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or *certiorari*, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

9

126. "*Strand*" means Strand Advisors, Inc., the Debtor's general partner.

127. "*Sub-Servicer*" means a third-party selected by the Claimant Trustee to service or sub-service the Reorganized Debtor Assets.

128. "*Sub-Servicer Agreement*" means the agreement that may be entered into providing for the servicing of the Reorganized Debtor Assets by the Sub-Servicer.

129. "*Subordinated Claim*" means any Claim that is subordinated to the Convenience Claims and General Unsecured Claims pursuant to ~~11 U.S.C. § 510 or~~an order entered by the Bankruptcy Court (including any other court having jurisdiction over the Chapter 11 Case) after notice and a hearing.

130. "*Subordinated Claimant Trust Interests*" means the Claimant Trust Interests to be distributed to Holders of Allowed Subordinated Claims under the Plan, which such interests shall be subordinated in right and priority to the Claimant Trust Interests distributed to Holders of Allowed General Unsecured Claims as provided in the Claimant Trust Agreement.

131. "*Trust Distribution*" means the transfer of Cash or other property by the Claimant Trustee to the Claimant Trust Beneficiaries.

132. "*Trustees*" means, collectively, the Claimant Trustee and Litigation Trustee.

133. "*UBS*" means, collectively, UBS Securities LLC and UBS AG London Branch.

134. "*Unexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

135. "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

136. "*Voting Deadline*" means the date and time by which all Ballots to accept or reject the Plan must be received in order to be counted under the under the Order of the Bankruptcy Court approving the Disclosure Statement as containing adequate information pursuant to section 1125(a) of the Bankruptcy Code and authorizing the Debtor to solicit acceptances of the Plan.

137. "*Voting Record Date*" means November 23, 2020.

~~16~~

16

001441

Professional Fee Claim Objection Deadline. Each Holder of an Allowed Professional Fee Claim will be paid by the Debtor or the Claimant Trust, as applicable, in Cash within ten (10) Business Days of entry of the order approving such Allowed Professional Fee Claim.

On the Effective Date, the Claimant Trustee shall establish the Professional Fee Reserve. The Professional Fee Reserve shall vest in the Claimant Trust and shall be maintained by the Claimant Trustee in accordance with the Plan and Claimant Trust Agreement. The Claimant Trust shall fund the Professional Fee Reserve on the Effective Date in an estimated amount determined by the Debtor in good faith prior to the Confirmation Date and that approximates the total projected amount of unpaid Professional Fee Claims on the Effective Date. Following the payment of all Allowed Professional Fee Claims, any excess funds in the Professional Fee Reserve shall be released to the Claimant Trust to be used for other purposes consistent with the Plan and the Claimant Trust Agreement.

**C.     Priority Tax Claims**

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtor: (a) Cash in an amount of a total value as of the Effective Date of the Plan equal to the amount of such Allowed Priority Tax Claim, (b)  in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, or (b) if paid over time, payment of such Allowed Priority Tax Claim in accordance with section 1129(a)(9)(C) of the Bankruptcy Code; or (c) such other less favorable treatment as agreed to in writing by the Debtor and such Holder. Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree; *provided, however,* that the Debtor may prepay any or all such Claims at any time, without premium or penalty.

**ARTICLE III.**
**CLASSIFICATION AND TREATMENT OF**
**CLASSIFIED CLAIMS AND EQUITY INTERESTS**

**A.     Summary**

All Claims and Equity Interests, except Administrative Expense Claims and Priority Tax Claims, are classified in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, and Priority Tax Claims have not been classified.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within

18

**I.**  **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

**J.**  **Subordinated Claims**

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. ~~Under section 510 of the Bankruptcy Code, upon~~Upon written notice and hearing, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to seek entry of an order by the Bankruptcy Court to re-classify or to subordinate any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

**ARTICLE IV.**
**MEANS FOR IMPLEMENTATION OF THIS PLAN**

**A.**  **Summary**

As discussed in the Disclosure Statement, the Plan will be implemented through (i) the Claimant Trust, (ii) the Litigation Sub-Trust, and (iii) the Reorganized Debtor.

On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be cancelled, and new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC – a newly-chartered limited liability company wholly-owned by the Claimant Trust. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner. The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited Partnership Agreement. Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC. The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to this Plan and the Claimant Trust Agreement, and the Litigation Trustee will pursue, if applicable, the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan. The Reorganized Debtor will administer the Reorganized Debtor Assets and, if needed, with the utilization of a Sub-Servicer, which administration will include, among other things, managing the wind down of the Managed Funds.

~~25~~

25

001443

Notwithstanding anything herein to the contrary, the Debtor shall assume or reject that certain real property lease with Crescent TC Investors L.P. ("Landlord") for the Debtor's headquarters located at 200/300 Crescent Ct., Suite #700, Dallas, Texas 75201 (the "Lease") in accordance with the notice to Landlord, procedures and timing required by 11 U.S.C. §365(d)(4), as modified by that certain *Agreed Order Granting Motion to Extend Time to Assume or Reject Unexpired Nonresidential Real Property Lease* [Docket No. 1122].

**B.** **Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Any Executory Contract or Unexpired Lease not assumed or rejected on or before the Confirmation Date shall be deemed rejected, pursuant to the Confirmation Order. Any Person asserting a Rejection Claim shall File a proof of claim within thirty days of the ~~Effective~~Confirmation Date. Any Rejection Claims that are not timely Filed pursuant to this Plan shall be forever disallowed and barred. If one or more Rejection Claims are timely Filed, the Claimant Trustee may File an objection to any Rejection Claim.

Rejection Claims shall be classified as General Unsecured Claims and shall be treated in accordance with ARTICLE III of this Plan.

**C.** **Cure of Defaults for Assumed or Assigned Executory Contracts and Unexpired Leases**

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed or assigned hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtor upon assumption or assignment thereof, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts may otherwise agree. The Debtor may serve a notice on the Committee and parties to Executory Contracts or Unexpired Leases to be assumed or assigned reflecting the Debtor's or Reorganized Debtor's intention to assume or assign the Executory Contract or Unexpired Lease in connection with this Plan and setting forth the proposed cure amount (if any).

If a dispute regarding (1) the amount of any payments to cure a default, (2) the ability of the Debtor, the Reorganized Debtor, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assigned or (3) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or assignment.

Assumption or assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable cure amounts pursuant to this ARTICLE V.C shall result in the full release and satisfaction of any cure amounts, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assigned Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assignment. Any and all Proofs of Claim based upon Executory Contracts

~~39~~

forth in the Plan Documents; (ii) the provisions of the Confirmation Order and this Plan are nonseverable and mutually dependent; (iii) the implementation of this Plan in accordance with its terms is authorized; (iv) pursuant to section 1146 of the Bankruptcy Code, the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with this Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of Assets contemplated under this Plan, shall not be subject to any Stamp or Similar Tax; and (v) the vesting of the Claimant Trust Assets in the Claimant Trust and the Reorganized Debtor Assets in the Reorganized Debtor, in each case as of the Effective Date free and clear of liens and claims to the fullest extent permissible under applicable law pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

- All documents and agreements necessary to implement this Plan, including without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, in each case in form and substance reasonably acceptable to the Debtor and the Committee, shall have (a) been tendered for delivery, and (b) been effected by, executed by, or otherwise deemed binding upon, all Entities party thereto and shall be in full force and effect. All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

- All authorizations, consents, actions, documents, approvals (including any governmental approvals), certificates and agreements necessary to implement this Plan, including, without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws and any applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain or prevent effectiveness or consummation of the Restructuring.

- The Debtor shall have obtained applicable directors' and officers' insurance coverage that is acceptable to each of the Debtor, the Committee, the Claimant Trust Oversight Committee, the Claimant Trustee and the Litigation Trustee.

- The Professional Fee Reserve shall be funded pursuant to this Plan in an amount determined by the Debtor in good faith.

**B.     Waiver of Conditions**

The conditions to effectiveness of this Plan set forth in this ARTICLE VIII (other than that the Confirmation Order shall have been entered) may be waived in whole or in part by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee) and any applicable parties in Section VII.A of this Plan, without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or

47

47

001445

# EXHIBIT DD

001446

Schedule of Causes of Action

The Causes of Action shall include, *without limitation*, any cause of action based on the following:

breach of fiduciary duties, breach of duty of care, breach of duty of loyalty, usurpation of corporate opportunities, breach of implied covenant of good faith and fair dealing, conversion, misappropriation of assets, misappropriation of trade secrets, unfair competition, breach of contract, breach of warranty, fraud, constructive fraud, negligence, gross negligence, fraudulent conveyance, fraudulent transfer, fraudulent misrepresentation, negligent misrepresentation, fraudulent concealment, fraudulent inducement, tortious interference, *quantum meruit*, unjust enrichment, abuse of process, alter ego, substantive consolidation, recharacterization, business disparagement, indemnity, claims for recovery of distributions or dividends, claims for indemnification, promissory estoppel, quasi-contract claims, any counterclaims, equitable subordination, avoidance actions provided for under sections 544 or 547 of the Bankruptcy Code, claims brought under state law, claims brought under federal law, claims under any common-law theory of tort or law or equity, and any claims similar in nature to the foregoing claims.

The Causes of Action shall include, *without limitation*, any cause of action against the following persons and entities:

James Dondero, Mark Okada, Grant Scott, John Honis, any current or former insider of the Debtor, the Dugaboy Investment Trust, Charitable DAF Holdco, Ltd, Hunter Mountain Investment Trust, Nexbank Capital, Inc. Highland Capital Management Services, Inc., NexPoint Advisors GP, LLC, NexPoint Advisors, L.P., Strand Advisors XVI, Inc., Highland Capital Management Fund Advisors, L.P., NexAnnuity Holdings, Inc., the entities listed on the attached **Annex 1** hereto, any current or former employee of the Debtor, and any entity directly or indirectly owned, controlled, or operated for the benefit of the foregoing persons or entities.

The Causes of Action shall include, *without limitation*, any cause of action arising from the following transactions:

The transfer of ownership interests in the Debtor to Hunter Mountain Investment Trust, the creation or transfer of any notes receivable from the Debtor or from any entity related to the Debtor, the creation or transfer of assets to or from any charitable foundation or trust, the formation, performance, or breach of any contract for the Debtor to provide investment management, support services, or any other services, and the distribution of assets or cash from the Debtor to partners of the Debtor.

001447

## Annex 1

11 Estates Lane, LLC

1110 Waters, LLC

140 Albany, LLC

1525 Dragon, LLC

17720 Dickerson, LLC

1905 Wylie LLC

2006 Milam East Partners GP, LLC

2006 Milam East Partners, L.P.

201 Tarrant Partners, LLC

2014 Corpus Weber Road LLC

2325 Stemmons HoldCo, LLC

2325 Stemmons Hotel Partners, LLC

2325 Stemmons TRS, Inc.

300 Lamar, LLC

3409 Rosedale, LLC

3801 Maplewood, LLC

3801 Shenandoah, L.P.

3820 Goar Park LLC

400 Seaman, LLC

401 Ame, L.P.

4201 Locust, L.P.

4312 Belclaire, LLC

5833 Woodland, L.P.

5906 DeLoache, LLC

5950 DeLoache, LLC

7758 Ronnie, LLC

7759 Ronnie, LLC

AA Shotguns, LLC

Aberdeen Loan Funding, Ltd.

Acis CLO 2017-7 Ltd

Acis CLO Management GP, LLC

Acis CLO Management GP, LLC *(fka Acis CLO Opportunity Funds GP, LLC)*

Acis CLO Management Holdings, L.P.

Acis CLO Management Intermediate Holdings I, LLC

Acis CLO Management Intermediate Holdings II, LLC

Acis CLO Management, LLC *(fka Acis CLO Opportunity Funds SLP, LLC)*

Acis CLO Trust

Acis CLO Value Fund II Charitable DAF Ltd.

Acis CMOA Trust

Advisors Equity Group LLC

Alamo Manhattan Hotel I, LLC (Third Party)

Allenby, LLC

Allisonville RE Holdings, LLC

AM Uptown Hotel, LLC

Apex Care, L.P

Asbury Holdings, LLC *(fka HCSLR Camelback Investors (Delaware), LLC)*

Ascendant Advisors

Atlas IDF GP, LLC

Atlas IDF, LP

BB Votorantim Highland Infrastructure, LLC

BDC Toys Holdco, LLC

Beacon Mountain, LLC

Bedell Trust Ireland Limited (Charitable trust account)

Ben Roby (third party)

BH Equities, LLC

BH Heron Pointe, LLC

BH Hollister, LLC

BH Willowdale Manager, LLC

Big Spring Partners, LLC

Blair Investment Partners, LLC

Bloomdale, LLC

Brave Holdings III Inc.

Brentwood CLO, Ltd.

Brentwood Investors Corp.

Brian Mitts

Bristol Bay Funding Ltd.

Bristol Bay Funding, Ltd.

BVP Property, LLC

C-1 Arbors, Inc.

C-1 Cutter's Point, Inc.

C-1 Eaglecrest, Inc.

C-1 Silverbrook, Inc.

Cabi Holdco GP, LLC

Cabi Holdco I, Ltd

Cabi Holdco I, Ltd.

Cabi Holdco, L.P.

California Public Employees' Retirement System

Camelback Residential Investors, LLC

Camelback Residential Investors, LLC *(fka Sevilla Residential Partners, LLC)*

Camelback Residential Partners, LLC

Capital Real Estate - Latitude, LLC

Castle Bio Manager, LLC

Castle Bio, LLC

Cayco Admin Ltd.

Cayco Insolvency Ltd.

CG Works, Inc.

CG Works, Inc. (fka Common Grace Ventures, Inc.)

Charitable DAF Fund, L.P.

Charitable DAF GP, LLC

Charitable DAF HoldCo, Ltd

Charitable DAF HoldCo, Ltd.

Claymore Holdings, LLC

CLO HoldCo, Ltd

CLO Holdco, Ltd.

Corbusier, Ltd.

Cornerstone Healthcare Group Holding, Inc.

Corpus Weber Road Member LLC

CP Equity Hotel Owner, LLC

CP Equity Land Owner, LLC

CP Equity Owner, LLC

CP Hotel TRS, LLC

CP Land Owner, LLC

CP Tower Owner, LLC

CRE - Lat, LLC

Credit Suisse, Cayman Islands Branch

Crossings 2017 LLC

Crown Global Insurance Company (third party)

Dallas Cityplace MF SPE Owner LLC

Dallas Lease and Finance, L.P.

Dana Scott Breault
James Dondero
Reese Avry Dondero
Jameson Drue Dondero

Dana Sprong (Third Party)

David c. Hopson

De Kooning, Ltd.

deKooning, Ltd.

DFA/BH Autumn Ridge, LLC

Dolomiti, LLC

DrugCrafters, L.P.

Dugaboy Investment Trust

Dugaboy Management, LLC

Dugaboy Project Management GP, LLC

Eagle Equity Advisors, LLC

Eames, Ltd.

Eastland CLO, Ltd.

Eastland Investors Corp.

EDS Legacy Heliport, LLC

EDS Legacy Partners Owner, LLC

EDS Legacy Partners, LLC

Empower Dallas Foundation, Inc.

ENA 41, LLC

Entegra Strat Superholdco, LLC

Entegra-FRO Holdco, LLC

Entegra-FRO Superholdco, LLC

Entegra-HOCF Holdco, LLC

Entegra-NHF Holdco, LLC

Entegra-NHF Superholdco, LLC

Entegra-RCP Holdco, LLC

Estates on Maryland Holdco, LLC

Estates on Maryland Owners SM, Inc.

Estates on Maryland Owners, LLC

Estates on Maryland, LLC

Falcon E&P Four Holdings, LLC

Falcon E&P One, LLC

Falcon E&P Opportunities Fund, L.P.

Falcon E&P Opportunities GP, LLC

Falcon E&P Royalty Holdings, LLC

Falcon E&P Six, LLC

Falcon E&P Two, LLC

Falcon Four Midstream, LLC

Falcon Four Upstream, LLC

Falcon Incentive Partners GP, LLC

Falcon Incentive Partners, LP

Falcon Six Midstream, LLC

Flamingo Vegas Holdco, LLC *(fka Cabi Holdco, LLC)*

001449

Four Rivers Co-Invest GP, LLC

Four Rivers Co-Invest, L.P.

FRBH Abbington SM, Inc.

FRBH Abbington, LLC

FRBH Arbors, LLC

FRBH Beechwood SM, Inc.

FRBH Beechwood, LLC

FRBH C1 Residential, LLC

FRBH Courtney Cove SM, Inc.

FRBH Courtney Cove, LLC

FRBH CP, LLC

FRBH Duck Creek, LLC

FRBH Eaglecrest, LLC

FRBH Edgewater JV, LLC

FRBH Edgewater Owner, LLC

FRBH Edgewater SM, Inc.

FRBH JAX-TPA, LLC

FRBH Nashville Residential, LLC

FRBH Regatta Bay, LLC

FRBH Sabal Park SM, Inc.

FRBH Sabal Park, LLC

FRBH Silverbrook, LLC

FRBH Timberglen, LLC

FRBH Willow Grove SM, Inc.

FRBH Willow Grove, LLC

FRBH Woodbridge SM, Inc.

FRBH Woodbridge, LLC

Freedom C1 Residential, LLC

Freedom Duck Creek, LLC

Freedom Edgewater, LLC

Freedom JAX-TPA Residential, LLC

Freedom La Mirage, LLC

Freedom LHV LLC

Freedom Lubbock LLC

Freedom Miramar Apartments, LLC

Freedom Sandstone, LLC

Freedom Willowdale, LLC

Fundo de Investimento em Direitos Creditorios BB Votorantim Highland Infraestrutura

G&E Apartment REIT The Heights at Olde Towne, LLC

G&E Apartment REIT The Myrtles at Olde Towne, LLC

GAF REIT, LLC

GAF Toys Holdco, LLC

Gardens of Denton II, L.P.

Gardens of Denton III, L.P.

Gleneagles CLO, Ltd.

Goverannce RE, Ltd.

Governance Re, Ltd.

Governance, Ltd.

Grant Scott

Grant Scott, Trustee of The SLHC Trust

Grayson CLO, Ltd.

Grayson Investors Corp.

Greater Kansas City Community Foundation (third party)

Greenbriar CLO, Ltd.

Greg Busseyt

Gunwale LLC

Gunwale, LLC

Hakusan, LLC

Hammark Holdings LLC

Hampton Ridge Partners, LLC

Harko, LLC

Harry Bookey/Pam Bookey (third party)

Haverhill Acquisition Co., LLC

Haygood, LLC

HB 2015 Family LP (third party)

HCBH 11611 Ferguson, LLC

HCBH Buffalo Pointe II, LLC

HCBH Buffalo Pointe III, LLC

HCBH Buffalo Pointe, LLC

HCBH Hampton Woods SM, Inc.

HCBH Hampton Woods, LLC

HCBH Overlook SM, Inc.

HCBH Overlook, LLC

HCBH Rent Investors, LLC

HCMS Falcon GP, LLC

HCMS Falcon, L.P.

HCO Holdings, LLC

HCOF Preferred Holdings, L.P.

HCOF Preferred Holdings, LP

HCOF Preferred Holdings, Ltd.

HCRE 1775 James Ave, LLC

HCRE Addison TRS, LLC

HCRE Addison, LLC *(fka HWS Addison, LLC)*

HCRE Hotel Partner, LLC *(fka HCRE HWS Partner, LLC)*

HCRE Las Colinas TRS, LLC

HCRE Las Colinas, LLC *(fka HWS Las Colinas, LLC)*

HCRE Plano TRS, LLC

HCRE Plano, LLC *(fka HWS Plano, LLC)*

HCREF-I Holding Corp.

HCREF-II Holding Corp.

HCREF-III Holding Corp.

HCREF-IV Holding Corp.

HCREF-IX Holding Corp.

HCREF-V Holding Corp.

HCREF-VI Holding Corp.

HCREF-VII Holding Corp.

HCREF-VIII Holding Corp.

HCREF-XI Holding Corp.

HCREF-XII Holding Corp.

HCREF-XIII Holding Corp.

HCREF-XIV Holding Corp.

HCREF-XV Holding Corp.

HCSLR Camelback Investors (Cayman), Ltd.

HCSLR Camelback, LLC

HCT Holdco 2 Ltd.

HCT Holdco 2, Ltd.

HE 41, LLC

HE Capital 232 Phase I Property, LLC

HE Capital 232 Phase I, LLC

HE Capital Asante, LLC

HE Capital Fox Trails, LLC

HE Capital KR, LLC

HE Capital, LLC

HE CLO Holdco, LLC

HE Mezz Fox Trails, LLC

HE Mezz KR, LLC

HE Peoria Place Property, LLC

HE Peoria Place, LLC

Heron Pointe Investors, LLC

Hewett's Island CLO I-R, Ltd.

HFP Asset Funding II, Ltd.

HFP Asset Funding III, Ltd.

HFP CDO Construction Corp.

HFP GP, LLC

HFRO Sub, LLC

Hibiscus HoldCo, LLC

Highland - First Foundation Income Fund

Highland 401(k) Plan

Highland 401K Plan

Highland Argentina Regional Opportunity Fund GP, LLC

Highland Argentina Regional Opportunity Fund, L.P.

Highland Argentina Regional Opportunity Fund, Ltd.

Highland Argentina Regional Opportunity Master Fund, L.P.

Highland Brasil, LLC

Highland Capital Brasil Gestora de Recursos *(fka Highland Brasilinvest Gestora de Recursos, LTDA; fka HBI Consultoria Empresarial, LTDA)*

Highland Capital Management (Singapore) Pte Ltd

Highland Capital Management AG

Highland Capital Management AG (Highland Capital Management SA) (Highland Capital Management Ltd)

Highland Capital Management Fund Advisors, L.P.

Highland Capital Management Fund Advisors, L.P. *(fka Pyxis Capital, L.P.)*

Highland Capital Management Korea Limited

Highland Capital Management Latin America, L.P.

Highland Capital Management LP Retirement Plan and Trust

Highland Capital Management Multi-Strategy Insurance Dedicated Fund, L.P.

Highland Capital Management Real Estate Holdings I, LLC

Highland Capital Management Real Estate Holdings II, LLC

Highland Capital Management Services, Inc.

Highland Capital Management, L.P.

Highland Capital Management, L.P. Charitable Fund

Highland Capital Management, L.P. Retirement Plan and Trust

Highland Capital Management, L.P., as trustee of Acis CMOA Trust and nominiee for and on behalf of Highland CLO Assets Holdings Limited

Highland Capital Management, L.P., as trustee of Highland Latin America Trust and nominee for and on behalf of Highland Latin America LP, Ltd.

Highland Capital Management, L.P., as trustee of Highland Latin America Trust and nominiee for and on behalf of Highland Latin America LP, Ltd.

Highland Capital Management, LP

Highland Capital Management, LP Charitable Fund

Highland Capital Multi-Strategy Fund, LP

Highland Capital of New York, Inc.

Highland Capital Special Allocation, LLC

Highland CDO Holding Company

Highland CDO Opportunity Fund GP, L.P.

Highland CDO Opportunity Fund, L.P.

Highland CDO Opportunity Fund, Ltd.

Highland CDO Opportunity GP, LLC

Highland CDO Opportunity Master Fund, L.P.

Highland CDO Trust

Highland CLO 2018-1, Ltd.

Highland CLO Assets Holdings Limited

Highland CLO Funding, Ltd.

Highland CLO Funding, Ltd.

Highland CLO Funding, Ltd. *(fka Acis Loan Funding, Ltd.)*

Highland CLO Gaming Holdings, LLC

Highland CLO Holdings Ltd.

Highland CLO Holdings, Ltd. (as of 12.19.17)

Highland CLO Management Ltd.

Highland CLO Trust

Highland Credit Opportunities CDO Asset Holdings GP, Ltd.

Highland Credit Opportunities CDO Asset Holdings, L.P.

Highland Credit Opportunities CDO Financing, LLC

Highland Credit Opportunities CDO, Ltd.

Highland Credit Opportunities Holding Corporation

Highland Credit Opportunities Japanese Feeder Sub-Trust

Highland Credit Opportunities Japanese Unit Trust (Third Party)

Highland Credit Strategies Fund, L.P.

Highland Credit Strategies Fund, Ltd.

Highland Credit Strategies Holding Corporation

Highland Credit Strategies Holding Corporation

Highland Credit Strategies Master Fund, L.P.

Highland Dallas Foundation, Inc.

Highland Dynamic Income Fund GP, LLC

Highland Dynamic Income Fund GP, LLC *(fka Highland Capital Loan GP, LLC)*

Highland Dynamic Income Fund, L.P.

Highland Dynamic Income Fund, L.P. *(fka Highland Capital Loan Fund, L.P.)*

Highland Dynamic Income Fund, Ltd.

Highland Dynamic Income Fund, Ltd. *(fka Highland Loan Fund, Ltd.)*

Highland Dynamic Income Master Fund, L.P.

Highland Dynamic Income Master Fund, L.P. *(fka Highland Loan Master Fund, L.P.)*

Highland Employee Retention Assets LLC

Highland Energy Holdings, LLC

Highland Energy MLP Fund *(fka Highland Energy and Materials Fund)*

Highland Equity Focus Fund, L.P.

Highland ERA Management, LLC

Highland eSports Private Equity Fund

Highland Financial Corp.

Highland Financial Partners, L.P.

Highland Fixed Income Fund

Highland Flexible Income UCITS Fund

Highland Floating Rate Fund

Highland Floating Rate Opportunites Fund

Highland Floating Rate Opportunities Fund

Highland Fund Holdings, LLC

Highland Funds I

Highland Funds II

Highland Funds III

Highland GAF Chemical Holdings, LLC

Highland General Partner, LP

Highland Global Allocation Fund

Highland Global Allocation Fund
*(fka Highland Global Allocation Fund II)*

Highland GP Holdings, LLC

Highland HCF Advisor Ltd.

Highland HCF Advisor, Ltd., as Trustee for
and on behalf of Acis CLO Trust, as nominee
for and on behalf of Highland CLO Funding,
Ltd. (as of 3.29.18)

Highland Healthcare Equity Income and
Growth Fund

Highland iBoxx Senior Loan ETF

Highland Income Fund

Highland Income Fund  *(fka Highland
Floating Rate Opportunities Fund)*

Highland Kansas City Foundation, Inc.

Highland Latin America Consulting, Ltd.

Highland Latin America GP, Ltd.

Highland Latin America LP, Ltd.

Highland Latin America Trust

Highland Legacy Limited

Highland LF Chemical Holdings, LLC

Highland Loan Funding V, LLC

Highland Loan Funding V, Ltd.

Highland Long/Short Equity Fund

Highland Long/Short Healthcare Fund

Highland Marcal Holding, Inc.

Highland Merger Arbitrage Fund

Highland Multi Strategy Credit Fund GP, L.P.

Highland Multi Strategy Credit Fund GP, L.P.
*(fka Highland Credit Opportunities CDO GP,
L.P.)*

Highland Multi Strategy Credit Fund, L.P.

Highland Multi Strategy Credit Fund, L.P. *(fka
Highland Credit Opportunities Fund, L.P., fka
Highland Credit Opportunities CDO, L.P.)*

Highland Multi Strategy Credit Fund, Ltd.

Highland Multi Strategy Credit Fund, Ltd. *(fka
Highland Credit Opportunities Fund, Ltd.)*

Highland Multi Strategy Credit GP, LLC

Highland Multi Strategy Credit GP, LLC *(fka
Highland Credit Opportunities CDO GP, LLC)*

Highland Multi-Strategy Fund GP, LLC

Highland Multi-Strategy Fund GP, LP

Highland Multi-Strategy IDF GP, LLC

Highland Multi-Strategy Master Fund, L.P.

Highland Multi-Strategy Master Fund, LP

Highland Multi-Strategy Onshore Master
SubFund II, LLC

Highland Multi-Strategy Onshore Master
Subfund, LLC

Highland Opportunistic Credit Fund

Highland Park CDO 1, Ltd.

Highland Park CDO I, Ltd.

Highland Premier Growth Equity Fund

Highland Premium Energy & Materials Fund

Highland Prometheus Feeder Fund I, L.P.

Highland Prometheus Feeder Fund I, LP

Highland Prometheus Feeder Fund II, L.P.

Highland Prometheus Feeder Fund II, LP

Highland Prometheus Master Fund, L.P.

Highland Receivables Finance I, LLC

Highland Restoration Capital Partners GP,
LLC

Highland Restoration Capital Partners Master,
L.P.

Highland Restoration Capital Partners
Offshore, L.P.

Highland Restoration Capital Partners, L.P.

Highland Santa Barbara Foundation, Inc.

Highland Select Equity Fund GP, L.P.

Highland Select Equity Fund, L.P.

Highland Select Equity GP, LLC

Highland Select Equity Master Fund, L.P.

Highland Small-Cap Equity Fund

Highland Socially Responsible Equity Fund

Highland Socially Responsible Equity Fund
*(fka Highland Premier Growth Equity Fund)*

Highland Special Opportunities Holding
Company

Highland SunBridge GP, LLC

Highland Tax-Exempt Fund

Highland TCI Holding Company, LLC

Highland Total Return Fund

Highland's Roads Land Holding Company,
LLC

Hinduja Bank (Switzerland) Ltd

Hirst, Ltd.

HMCF PB Investors, LLC

HMx2 Investment Trust
(Matt McGraner)

Hockney, Ltd.

HRT North Atlanta, LLC

HRT Timber Creek, LLC

HRTBH North Atlanta, LLC

HRTBH Timber Creek, LLC

Huber Funding LLC

Hunter Mountain Investment Trust

HWS Investors Holdco, LLC

Internal Investors

Intertrust

James D. Dondero
Reese Avry Dondero
Jameson Drue Dondero

James Dondero

James Dondero and Mark Okada

James Dondero
Reese Avry Dondero
Jameson Drue Dondero

Japan Trustee Services Bank, Ltd.

Jasper CLO, Ltd.

Jewelry Ventures I, LLC

JMIJM, LLC

Joanna E. Milne Irrevocable Trust dated Nov
25 1998 (third party)

John Honis

John L. Holt, Jr.

John R. Sears, Jr.

Karisopolis, LLC

Keelhaul LLC

KHM Interests, LLC (third party)

Kuilima Montalban Holdings, LLC

Kuilima Resort Holdco, LLC

KV Cameron Creek Owner, LLC

Lakes at Renaissance Park Apartments
Investors, L.P.

Lakeside Lane, LLC

Landmark Battleground Park II, LLC

Lane Britain

Larry K. Anders

LAT Battleground Park, LLC

LAT Briley Parkway, LLC

Lautner, Ltd.

Leawood RE Holdings, LLC

Liberty Cayman Holdings, Ltd.

Liberty CLO Holdco, Ltd.

Liberty CLO, Ltd.

Liberty Sub, Ltd.

Long Short Equity Sub, LLC

Longhorn Credit Funding LLC

Longhorn Credit Funding LLC - A

Longhorn Credit Funding LLC - B

Longhorn Credit Funding LLC (LHB)

Longhorn Credit Funding, LLC

Lurin Real Estate Holdings V, LLC

Maple Avenue Holdings, LLC

MaplesFS Limited

Marc C. Manzo

Mark and Pam Okada Family Trust - Exempt
Descendants' Trust

Mark and Pam Okada Family Trust - Exempt
Trust #2

Mark and Pamela Okada Family Trust -
Exempt Descendants' Trust

Mark and Pamela Okada Family Trust -
Exempt Descendants' Trust #2

Mark and Pamela Okada Family Trust -
Exempt Trust #2

Mark K. Okada

Mark Okada
Mark Okada and Pam Okada
Mark Okada and Pam Okada, as joint owners
Mark Okada/Pamela Okada
Markham Fine Jewelers, L.P.
Markham Fine Jewelers, LP
Matt McGraner
Meritage Residential Partners, LLC
MGM Studios HoldCo, Ltd.
Michael Rossi
ML CLO XIX Sterling (Cayman), Ltd.
N/A
Nancy Dondero
NCI Apache Trail LLC
NCI Assets Holding Company LLC
NCI Country Club LLC
NCI Fort Worth Land LLC
NCI Front Beach Road LLC
NCI Minerals LLC
NCI Royse City Land LLC
NCI Stewart Creek LLC
NCI Storage, LLC
Neil Labatte
Neutra, Ltd.
New Jersey Tissue Company Holdco, LLC
*(fka Marcal Paper Mills Holding Company, LLC)*

NexAnnuity Holdings, Inc.
NexBank Capital Trust I
NexBank Capital, Inc.
NexBank Land Advisors, Inc.
NexBank Securities Inc.
NexBank Securities, Inc.

NexBank SSB
NexBank Title, Inc.
(dba NexVantage Title Services)

NexBank, SSB
NexPoint Advisors GP, LLC
NexPoint Advisors, L.P.
NexPoint Capital REIT, LLC
NexPoint Capital, Inc.

NexPoint Capital, Inc. *(fka NexPoint Capital, LLC)*
NexPoint CR F/H DST, LLC
NexPoint Credit Strategies Fund
NexPoint Discount Strategies Fund
*(fka NexPoint Discount Yield Fund)*
NexPoint DRIP
NexPoint Energy and Materials Opportunities Fund *(fka NexPoint Energy Opportunities Fund)*

NexPoint Event-Driven Fund
*(fkaNexPoint Merger Arbitrage Fund)*

NexPoint Flamingo DST
NexPoint Flamingo Investment Co, LLC
NexPoint Flamingo Leaseco, LLC
NexPoint Flamingo Manager, LlC
NexPoint Flamingo Property Manager, LlC
NexPoint Healthcare Opportunities Fund
NexPoint Hospitality Trust
NexPoint Hospitality, Inc.
NexPoint Hospitality, LLC
NexPoint Insurance Distributors, LLC
NexPoint Insurance Solutions GP, LLC
NexPoint Insurance Solutions GP, LLC
*(fka Highland Capital Insurance Solutions GP, LLC)*

NexPoint Insurance Solutions, L.P.
*(fka Highland Capital Insurance Solutions, L.P.)*

NexPoint Latin American Opportunities Fund
NexPoint Legacy 22, LLC
NexPoint Lincoln Porte Equity, LLC
NexPoint Lincoln Porte Manager, LLC
NexPoint Lincoln Porte, LLC
*(fka NREA Lincoln Porte, LLC)*
NexPoint Multifamily Capital Trust, Inc.
NexPoint Multifamily Capital Trust, Inc.
*(fka NexPoint Multifamily Realty Trust, Inc., fka Highland Capital Realty Trust, Inc.)*

NexPoint Multifamily Operating Partnership, L.P.

NexPoint Peoria, LLC
NexPoint Polo Glen DST

NexPoint Polo Glen Holdings, LLC

NexPoint Polo Glen Investment Co, LLC

NexPoint Polo Glen Leaseco, LLC

NexPoint Polo Glen Manager, LLC

NexPoint RE Finance Advisor GP, LLC

NexPoint RE Finance Advisor, L.P.

NexPoint Real Estate Advisors GP, LLC

NexPoint Real Estate Advisors II, L.P.

NexPoint Real Estate Advisors II, L.P.

NexPoint Real Estate Advisors III, L.P.

NexPoint Real Estate Advisors IV, L.P.

NexPoint Real Estate Advisors V, L.P.

NexPoint Real Estate Advisors VI, L.P.

NexPoint Real Estate Advisors VII GP, LLC

NexPoint Real Estate Advisors VII, L.P.

NexPoint Real Estate Advisors VIII, L.P.

NexPoint Real Estate Advisors, L.P.

NexPoint Real Estate Capital, LLC

NexPoint Real Estate Capital, LLC *(fka Highland Real Estate Capital, LLC, fka Highland Multifamily Credit Fund, LLC)*

NexPoint Real Estate Finance OP GP, LLC

NexPoint Real Estate Finance Operating Partnership, L.P.

NexPoint Real Estate Finance, Inc.

NexPoint Real Estate Opportunities, LLC

NexPoint Real Estate Opportunities, LLC *(fka Freedom REIT LLC)*

NexPoint Real Estate Partners, LLC (fka HCRE Partners, LLC)

NexPoint Real Estate Partners, LLC (fka HCRE Partners, LLC)

NexPoint Real Estate Strategies Fund

NexPoint Residential Trust Inc.

NexPoint Residential Trust Operating Partnership GP, LLC

NexPoint Residential Trust Operating Partnership, L.P.

NexPoint Residential Trust Operating Partnership, L.P.

NexPoint Residential Trust, Inc.

NexPoint Securities, Inc. *(fka Highland Capital Funds Distributor, Inc.) (fka Pyxis Distributors, Inc.)*

NexPoint Strategic Income Fund *(fka NexPoint Opportunistic Credit Fund, fka NexPoint Distressed Strategies Fund)*

NexPoint Strategic Opportunities Fund

NexPoint Strategic Opportunities Fund *(fka NexPoint Credit Strategies Fund)*

NexPoint Texas Multifamily Portfolio DST *(fka NREA Southeast Portfolio Two, DST)*

NexPoint WLIF I Borrower, LLC

NexPoint WLIF I, LLC

NexPoint WLIF II Borrower, LLC

NexPoint WLIF II, LLC

NexPoint WLIF III Borrower, LLC

NexPoint WLIF III, LLC

NexPoint WLIF, LLC (Series I)

NexPoint WLIF, LLC (Series II)

NexPoint WLIF, LLC (Series III)

NexStrat LLC

NexVest, LLC

NexWash LLC

NFRO REIT Sub, LLC

NFRO TRS, LLC

NHF CCD, Inc.

NHT 2325 Stemmons, LLC

NHT Beaverton TRS, LLC *(fka NREA Hotel TRS, Inc.)*

NHT Beaverton, LLC

NHT Bend TRS, LLC

NHT Bend, LLC

NHT Destin TRS, LLC

NHT Destin, LLC

NHT DFW Portfolio, LLC

NHT Holdco, LLC

NHT Holdings, LLC

NHT Intermediary, LLC

NHT Nashville TRS, LLC

NHT Nashville, LLC

NHT Olympia TRS, LLC

NHT Olympia, LLC

NHT Operating Partnership GP, LLC

NHT Operating Partnership II, LLC
NHT Operating Partnership, LLC
NHT Salem, LLC
NHT SP Parent, LLC
NHT SP TRS, LLC
NHT SP, LLC
NHT Tigard TRS, LLC
NHT Tigard, LLC
NHT TRS, Inc.
NHT Uptown, LLC
NHT Vancouver TRS, LLC
NHT Vancouver, LLC
NLA Assets LLC
NMRT TRS, Inc.
NREA Adair DST Manager, LLC
NREA Adair Investment Co, LLC
NREA Adair Joint Venture, LLC
NREA Adair Leaseco Manager, LLC
NREA Adair Leaseco, LLC
NREA Adair Property Manager LLC
NREA Adair, DST
NREA Ashley Village Investors, LLC
NREA Cameron Creek Investors, LLC
NREA Cityplace Hue Investors, LLC
NREA Crossing Investors LLC
NREA Crossings Investors, LLC
NREA Crossings Ridgewood Coinvestment, LLC *(fka NREA Crossings Ridgewood Investors, LLC)*

NREA DST Holdings, LLC
NREA El Camino Investors, LLC
NREA Estates Inc.
NREA Estates Investment Co, LLC
NREA Estates Leaseco, LLC
NREA Estates Manager, LLC
NREA Estates Property Manager, LLC
NREA Estates, DST
NREA Gardens DST Manager LLC
NREA Gardens DST Manager, LLC
NREA Gardens Investment Co, LLC
NREA Gardens Leaseco Manager, LLC
NREA Gardens Leaseco, LLC
NREA Gardens Property Manager, LLC

NREA Gardens Springing LLC
NREA Gardens Springing Manager, LLC
NREA Gardens, DST
NREA Hidden Lake Investment Co, LLC
NREA Hue Investors, LLC
NREA Keystone Investors, LLC
NREA Meritage Inc.
NREA Meritage Investment Co, LLC
NREA Meritage Leaseco, LLC
NREA Meritage Manager, LLC
NREA Meritage Property Manager, LLC
NREA Meritage, DST
NREA Oaks Investors, LLC
NREA Retreat Investment Co, LLC
NREA Retreat Leaseco, LLC
NREA Retreat Manager, LLC
NREA Retreat Property Manager, LLC
NREA Retreat, DST
NREA SE MF Holdings LLC
NREA SE MF Holdings, LLC
NREA SE MF Investment Co, LLC
NREA SE MF Investment Co, LLC
NREA SE Multifamily LLC
NREA SE Multifamily, LLC
NREA SE One Property Manager, LLC
NREA SE Three Property Manager, LLC
NREA SE Two  Property Manager, LLC
NREA SE1 Andros Isles Leaseco, LLC
NREA SE1 Andros Isles Manager, LLC
NREA SE1 Andros Isles, DST
(Converted from DK Gateway Andros, LLC)
NREA SE1 Arborwalk Leaseco, LLC
NREA SE1 Arborwalk Manager, LLC
NREA SE1 Arborwalk, DST
(Converted from MAR Arborwalk, LLC)
NREA SE1 Towne Crossing Leaseco, LLC
NREA SE1 Towne Crossing Manager, LLC
NREA SE1 Towne Crossing, DST
(Converted from Apartment REIT Towne Crossing, LP)

NREA SE1 Walker Ranch Leaseco, LLC
NREA SE1 Walker Ranch Manager, LLC

NREA SE1 Walker Ranch, DST
(Converted from SOF Walker Ranch Owner, L.P.)

NREA SE2 Hidden Lake Leaseco, LLC

NREA SE2 Hidden Lake Manager, LLC

NREA SE2 Hidden Lake, DST

NREA SE2 Hidden Lake, DST
(Converted from SOF Hidden Lake SA Owner, L.P.)

NREA SE2 Vista Ridge Leaseco, LLC

NREA SE2 Vista Ridge Manager, LLC

NREA SE2 Vista Ridge, DST

NREA SE2 Vista Ridge, DST
(Converted from MAR Vista Ridge, L.P.)

NREA SE2 West Place Leaseco, LLC

NREA SE2 West Place Manager, LLC

NREA SE2 West Place, DST
(Converted from Landmark at West Place, LLC)

NREA SE3 Arboleda Leaseco, LLC

NREA SE3 Arboleda Manager, LLC

NREA SE3 Arboleda, DST
(Converted from G&E Apartment REIT Arboleda, LLC)

NREA SE3 Fairways Leaseco, LLC

NREA SE3 Fairways Manager, LLC

NREA SE3 Fairways, DST
(Converted from MAR Fairways, LLC)

NREA SE3 Grand Oasis Leaseco, LLC

NREA SE3 Grand Oasis Manager, LLC

NREA SE3 Grand Oasis, DST
(Converted from Landmark at Grand Oasis, LP)

NREA Southeast Portfolio One Manager, LLC

NREA Southeast Portfolio One, DST

NREA Southeast Portfolio One, DST

NREA Southeast Portfolio Three Manager, LLC

NREA Southeast Portfolio Three, DST

NREA Southeast Portfolio Three, DST

NREA Southeast Portfolio Two Manager, LLC

NREA Southeast Portfolio Two, DST

NREA Southeast Portfolio Two, LLC

NREA SOV Investors, LLC

NREA Uptown TRS, LLC

NREA VB I LLC

NREA VB II LLC

NREA VB III LLC

NREA VB IV LLC

NREA VB Pledgor I LLC

NREA VB Pledgor I, LLC

NREA VB Pledgor II LLC

NREA VB Pledgor II, LLC

NREA VB Pledgor III LLC

NREA VB Pledgor III, LLC

NREA VB Pledgor IV LLC

NREA VB Pledgor IV, LLC

NREA VB Pledgor V LLC

NREA VB Pledgor V, LLC

NREA VB Pledgor VI LLC

NREA VB Pledgor VI, LLC

NREA VB Pledgor VII LLC

NREA VB Pledgor VII, LLC

NREA VB SM, Inc.

NREA VB V LLC

NREA VB VI LLC

NREA VB VII LLC

NREA Vista Ridge Investment Co, LLC

NREC AR Investors, LLC

NREC BM Investors, LLC

NREC BP Investors, LLC

NREC Latitude Investors, LLC

NREC REIT Sub, Inc.

NREC TRS, Inc.

NREC WW Investors, LLC

NREF OP I Holdco, LLC

NREF OP I SubHoldco, LLC

NREF OP I, L.P.

NREF OP II Holdco, LLC

NREF OP II SubHoldco, LLC

NREF OP II, L.P.

NREF OP IV REIT Sub TRS, LLC

NREF OP IV REIT Sub, LLC

NREF OP IV, L.P.

NREO NW Hospitality Mezz, LLC

NREO NW Hospitality, LLC

NREO Perilune, LLC

NREO SAFSStor Investors, LLC

NREO TRS, Inc.

NRESF REIT Sub, LLC

NXRT Abbington, LLC

NXRT Atera II, LLC

NXRT Atera, LLC

NXRT AZ2, LLC

NXRT Barrington Mill, LLC

NXRT Bayberry, LLC

NXRT Bella Solara, LLC

NXRT Bella Vista, LLC

NXRT Bloom, LLC

NXRT Brandywine GP I, LLC

NXRT Brandywine GP I, LLC

NXRT Brandywine GP II, LLC

NXRT Brandywine GP II, LLC

NXRT Brandywine LP, LLC

NXRT Brandywine LP, LLC

NXRT Brentwood Owner, LLC

NXRT Brentwood, LLC

NXRT Cedar Pointe Tenant, LLC

NXRT Cedar Pointe, LLC

NXRT Cityview, LLC

NXRT Cornerstone, LLC

NXRT Crestmont, LLC

NXRT Crestmont, LLC

NXRT Enclave, LLC

NXRT Glenview, LLC

NXRT H2 TRS, LLC

NXRT Heritage, LLC

NXRT Hollister TRS LLC

NXRT Hollister, LLC

NXRT LAS 3, LLC

NXRT Master Tenant, LLC

NXRT Nashville Residential, LLC

NXRT Nashville Residential, LLC *(fka Freedom Nashville Residential, LLC)*

NXRT North Dallas 3, LLC

NXRT Old Farm, LLC

NXRT Pembroke Owner, LLC

NXRT Pembroke, LLC

NXRT PHX 3, LLC

NXRT Radbourne Lake, LLC

NXRT Rockledge, LLC

NXRT Sabal Palms, LLC

NXRT SM, Inc.

NXRT Steeplechase, LLC

NXRT Stone Creek, LLC

NXRT Summers Landing GP, LLC

NXRT Summers Landing LP, LLC

NXRT Torreyana, LLC

NXRT Vanderbilt, LLC

NXRT West Place, LLC

NXRTBH AZ2, LLC

NXRTBH Barrington Mill Owner, LLC

NXRTBH Barrington Mill SM, Inc.

NXRTBH Barrington Mill, LLC

NXRTBH Bayberry, LLC

NXRTBH Cityview, LLC

NXRTBH Colonnade, LLC

NXRTBH Cornerstone Owner, LLC

NXRTBH Cornerstone SM, Inc.

NXRTBH Cornerstone, LLC

NXRTBH Dana Point SM, Inc.

NXRTBH Dana Point, LLC

NXRTBH Foothill SM, Inc.

NXRTBH Foothill, LLC

NXRTBH Heatherstone SM, Inc.

NXRTBH Heatherstone, LLC

NXRTBH Hollister Tenant, LLC

NXRTBH Hollister, LLC

NXRTBH Madera SM, Inc.

NXRTBH Madera, LLC

NXRTBH McMillan, LLC

NXRTBH North Dallas 3, LLC

NXRTBH Old Farm II, LLC

NXRTBH Old Farm Tenant, LLC

NXRTBH Old Farm, LLC

NXRTBH Radbourne Lake, LLC

NXRTBH Rockledge, LLC

NXRTBH Sabal Palms, LLC

NXRTBH Steeplechase, LLC
(dba Southpoint Reserve at Stoney Creek)-VA

NXRTBH Stone Creek, LLC

NXRTBH Vanderbilt, LLC

001459

NXRTBH Versailles SM, Inc.
NXRTBH Versailles, LLC
Oak Holdco, LLC
Oaks CGC, LLC
Okada Family Revocable Trust
Oldenburg, Ltd.
Pam Capital Funding GP Co. Ltd.
Pam Capital Funding, L.P.
PamCo Cayman Ltd.
Park West 1700 Valley View Holdco, LLC
Park West 2021 Valley View Holdco, LLC
Park West Holdco, LLC
Park West Portfolio Holdco, LLC
Participants of Highland 401K Plan
Patrick Willoughby-McCabe
PCMG Trading Partners XXIII, L.P.
PCMG Trading Partners XXIII, LP
PDK Toys Holdco, LLC
Pear Ridge Partners, LLC
Penant Management GP, LLC
Penant Management LP
PensionDanmark Holding A/S
PensionDanmark
Pensionsforsikringsaktieselskab
Peoria Place Development, LLC
(30% cash contributions - profit participation
only)
Perilune Aero Equity Holdings One, LLC
Perilune Aviation LLC
PetroCap Incentive Holdings III. L.P.
PetroCap Incentive Partners II GP, LLC
PetroCap Incentive Partners II, L.P.
PetroCap Incentive Partners III GP, LLC
PetroCap Incentive Partners III, LP
PetroCap Management Company LLC
PetroCap Partners II GP, LLC
PetroCap Partners II, L.P.
PetroCap Partners III GP, LLC
PetroCap Partners III, L.P.
Pharmacy Ventures I, LLC
Pharmacy Ventures II, LLC
Pollack, Ltd.
Powderhorn, LLC

PWM1 Holdings, LLC
PWM1, LLC
RADCO - Bay Meadows, LLLP
RADCO - Bay Park, LLLP
RADCO NREC Bay Meadows Holdings, LLC
RADCO NREC Bay Park Holdings, LLC
Ramarim, LLC
Rand Advisors Series I Insurance Fund
Rand Advisors Series II Insurance Fund
Rand Advisors, LLC
Rand PE Fund I, L.P.
Rand PE Fund I, L.P. - Series 1
Rand PE Fund Management, LLC
Rand PE Holdco, LLC
Realdania
Red River CLO, Ltd.
Red River Investors Corp.
Riverview Partners SC, LLC
Rockwall CDO II Ltd.
Rockwall CDO II, Ltd.
Rockwall CDO, Ltd.
Rockwall Investors Corp.
Rothko, Ltd.
RTT Bella Solara, LLC
RTT Bloom, LLC
RTT Financial, Inc.
RTT Hollister, LLC
RTT Rockledge, LLC
RTT Torreyana, LLC
SALI Fund Partners, LLC
SAS Management
SAS Asset Recovery Ltd.

San Diego County Employees Retirement
Association
Sandstone Pasadena Apartments, LLC
Sandstone Pasadena, LLC
Santa Barbara Foundation (third party)
Saturn Oil & Gas LLC
SBC Master Pension Trust
Scott Matthew Siekielski
SE Battleground Park, LLC
SE Battleground Park, LLC

SE Glenview, LLC

SE Governors Green Holdings, L.L.C.

SE Governors Green Holdings, L.L.C.
*(fka SCG Atlas Governors Green Holdings, L.L.C.)*

SE Governors Green I, LLC

SE Governors Green II, LLC

SE Governors Green II, LLC

SE Governors Green REIT, L.L.C.

SE Governors Green REIT, L.L.C.
*(fka SCG Atlas Governors Green REIT, L.L.C.)*

SE Governors Green, LLC
*(fka SCG Atlas Governors Green, L.L.C.)*

SE Gulfstream Isles GP, LLC

SE Gulfstream Isles GP, LLC

SE Gulfstream Isles LP, LLC

SE Gulfstream Isles LP, LLC

SE Heights at Olde Towne, LLC

SE Heights at Olde Towne, LLC

SE Lakes at Renaissance Park GP I, LLC

SE Lakes at Renaissance Park GP II, LLC

SE Lakes at Renaissance Park GP II, LLC

SE Lakes at Renaissance Park LP, LLC

SE Lakes at Renaissance Park LP, LLC

SE Multifamily Holdings LLC

SE Multifamily Holdings, LLC

SE Multifamily REIT Holdings LLC

SE Myrtles at Olde Towne, LLC

SE Myrtles at Olde Towne, LLC

SE Oak Mill I Holdings, LLC

SE Oak Mill I Holdings, LLC *(fka SCG Atlas Oak Mill I Holdings, L.L.C.)*

SE Oak Mill I Owner, LLC *(fka SCG Atlas Oak Mill I, L.L.C.)*

SE Oak Mill I REIT, LLC

SE Oak Mill I REIT, LLC *(fka SCG Atlas Oak Mill I REIT, L.L.C.)*

SE Oak Mill I, LLC

SE Oak Mill I, LLC

SE Oak Mill II Holdings, LLC

SE Oak Mill II Holdings, LLC *(fka SCG Atlas Oak Mill II Holdings, L.L.C.)*

SE Oak Mill II Owner, LLC *(fka SCG Atlas Oak Mill II, L.L.C.)*

SE Oak Mill II REIT, LLC

SE Oak Mill II REIT, LLC *(fka SCG Atlas Oak Mill II REIT, L.L.C.)*

SE Oak Mill II, LLC

SE Oak Mill II, LLC

SE Quail Landing, LLC

SE River Walk, LLC

SE Riverwalk, LLC

SE SM, Inc.

SE Stoney Ridge Holdings, L.L.C. *(fka SCG Atlas Stoney Ridge Holdings, L.L.C.)*

SE Stoney Ridge Holdings, LLC

SE Stoney Ridge I, LLC

SE Stoney Ridge I, LLC

SE Stoney Ridge II, LLC

SE Stoney Ridge II, LLC

SE Stoney Ridge REIT, L.L.C. *(fka SCG Atlas Stoney Ridge REIT, L.L.C.)*

SE Stoney Ridge REIT, LLC

SE Stoney Ridge, LLC *(fka SCG Atlas Stoney Ridge, L.L.C.)*

SE Victoria Park, LLC

SE Victoria Park, LLC

Sentinel Re Holdings, Ltd.

Sentinel Reinsurance Ltd.

Sentinel Reinsurance Limited

SFH1, LLC

SFR WLIF I, LLC
*(fka NexPoint WLIF I, LLC)*

SFR WLIF II, LLC
*(NexPoint WLIF II, LLC)*

SFR WLIF III, LLC
*(NexPoint WLIF III, LLC)*

SFR WLIF Manager, LLC
*(NexPoint WLIF Manager, LLC)*

SFR WLIF, LLC
*(NexPoint WLIF, LLC)*

SFR WLIF, LLC Series I

SFR WLIF, LLC Series II

SFR WLIF, LLC Series III

SH Castle BioSciences, LLC

Small Cap Equity Sub, LLC

Socially Responsible Equity Sub, LLC

SOF Brandywine I Owner, L.P.

SOF Brandywine II Owner, L.P.

SOF-X GS Owner, L.P.

Southfork Cayman Holdings, Ltd.

Southfork CLO, Ltd.

Specialty Financial Products Designated
Activity Company *(fka Specialty Financial
Products Limited)*

Spiritus Life, Inc.

SRL Sponsor LLC

SRL Whisperwod LLC

SRL Whisperwood Member LLC

SRL Whisperwood Venture LLC

SSB Assets LLC

Starck, Ltd.

Stemmons Hospitality, LLC

Steve Shin

Stonebridge Capital, Inc.

Stonebridge-Highland Healthcare Private
Equity Fund

Strand Advisors III, Inc.

Strand Advisors IV, LLC

Strand Advisors IX, LLC

Strand Advisors V, LLC

Strand Advisors XIII, LLC

Strand Advisors XVI, Inc.

Strand Advisors, Inc.

Stratford CLO, Ltd.

Summers Landing Apartment Investors, L.P.

Term Loan B
(10% cash contributions - profit participation
only)

The Dallas Foundation

The Dallas Foundation (third party)

The Dondero Insurance Rabbi Trust

The Dugaboy Investment Trust

The Dugaboy Investment Trust U/T/A Dated
Nov 15, 2010

The Get Good Non-Exempt Trust No. 1

The Get Good Non-Exempt Trust No. 2

The Get Good Trust

The Mark and Pamela Okada Family Trust -
Exempt Descendants' Trust

The Mark and Pamela Okada Family Trust -
Exempt Trust #2

The Ohio State Life Insurance Company

The Okada Family Foundation, Inc.

The Okada Insurance Rabbi Trust

The SLHC Trust

The Trustees of Columbia University in the
City of New York

The Twentysix Investment Trust
(Third Party Investor)

Thomas A. Neville

Thread 55, LLC

Tihany, Ltd.

Todd Travers

Tranquility Lake Apartments Investors, L.P.

Tuscany Acquisition, LLC

Uptown at Cityplace Condominium
Association, Inc.

US Gaming OpCo, LLC

US Gaming SPV, LLC

US Gaming, LLC

Valhalla CLO, Ltd.

VB GP LLC

VB Holding, LLC

VB One, LLC

VB OP Holdings LLC

VBAnnex C GP, LLC

VBAnnex C Ohio, LLC

VBAnnex C, LP

Ventoux Capital, LLC
(Matt Goetz)

VineBrook Annex B, L.P.

VineBrook Annex I, L.P.

VineBrook Homes Merger Sub II LLC

VineBrook Homes Merger Sub LLC

VineBrook Homes OP GP, LLC

VineBrook Homes Operating Partnership, L.P.

VineBrook Homes Trust, Inc.

VineBrook Partners I, L.P.

VineBrook Partners II, L.P.

VineBrook Properties, LLC

Virginia Retirement System

Vizcaya Investment, LLC

Wake LV Holdings II, Ltd.

Wake LV Holdings, Ltd.

Walter Holdco GP, LLC

Walter Holdco I, Ltd.

Walter Holdco, L.P.

Warhol, Ltd.

Warren Chang

Westchester CLO, Ltd.

William L. Britain

Wright Ltd.

Wright, Ltd.

Yellow Metal Merchants, Inc.

# **EXHIBIT EE**

001464

accounting or seek approval of any court with respect to the administration of the Claimant Trust, or as a condition for managing any payment or distribution out of the Claimant Trust Assets.

(b)     The Claimant Trustee shall provide quarterly reporting to the Oversight Board and Claimant Trust Beneficiaries of (i) the status of the Claimant Trust Assets, (ii) the balance of Cash held by the Claimant Trust (including in each of the Claimant Trust Expense Reserve and Disputed Claim Reserve), (iii) the determination and any re-determination, as applicable, of the total amount allocated to the Disputed Claim Reserve, (iv) the status of Disputed Claims and any resolutions thereof, (v) the status of any litigation, including the pursuit of the Causes of Action, (vi) the Reorganized Debtor's performance, and (vii) operating expenses; provided, however, that the Claimant Trustee may, with respect to any Member of the Oversight Board or Claimant Trust Beneficiary, redact any portion of such reports that relate to such Entity's Claim or Equity Interest, as applicable and any reporting provided to Claimant Trust Beneficiaries may be subject to such Claimant Trust Beneficiary's agreement to maintain confidentiality with respect to any non-public information.

(c)     The Claimant Trustee may dispose some or all of the books and records maintained by the Claimant Trustee at the later of (i) such time as the Claimant Trustee determines, with the unanimous consent of the Oversight Board, that the continued possession or maintenance of such books and records is no longer necessary for the benefit of the Claimant Trust, or (ii) upon the termination and winding up of the Claimant Trust under Article IX of this Agreement; provided, however, the Claimant Trustee shall not dispose of any books and records related to the Estate Claims or Employee Claims without the consent of the Litigation Trustee. Notwithstanding the foregoing, the Claimant Trustee shall cause the Reorganized Debtor and its subsidiaries to retain such books and records, and for such periods, as are required to be retained pursuant to Section 204-2 of the Investment Advisers Act or any other applicable laws, rules, or regulations.

3.13    Compensation and Reimbursement; Engagement of Professionals.

(a)     Compensation and Expenses.

(i)     Compensation.  As compensation for any services rendered by the Claimant Trustee in connection with this Agreement, the Claimant Trustee shall receive compensation of $150,000 per month (the "Base Salary").  Within the first forty-five days following the Confirmation Date, the Claimant Trustee, on the one hand, and the Committee, if prior to the Effective Date, or the Oversight Board, if on or after the Effective Date, on the other, will negotiate go-forward compensation for the Claimant Trustee which will include (a) the Base Salary a base salary, (b) a success fee, and (c) severance.

(ii)    Expense Reimbursements.  All reasonable out-of-pocket expenses of the Claimant Trustee in the performance of his or her duties hereunder, shall be reimbursed as Claimant Trust Expenses paid by the Claimant Trust.

19

# EXHIBIT FF

## Schedule of Contracts and Leases to Be Assumed

1. Advisory Services Agreement, dated November 21, 2011, effective June 20, 2011, by and between Carey International, Inc., and Highland Capital Management, L.P.

2. Amended and Restated Advisory Services Agreement, dated March 4, 2013, by and between Trussway Holdings, Inc., and Highland Capital Management, L.P.

3. Reference Portfolio Management Agreement, dated March 4, 2004, by and between Highland Capital Management, L.P., and Citibank N.A.

4. Advisory Services Agreement, dated May 25, 2011, by and between CCS Medical, Inc., and Highland Capital Management, L.P.

5. Amended and Restated Advisory Services Agreement, dated February 28, 2013, by and between Cornerstone Healthcare Group Holding, Inc., and Highland Capital Management, L.P.

6. Prime Brokerage Agreement by and between Jefferies LLC and Highland Capital Management, L.P., dated May 24, 2013.

7. Amended and Restated Shared Services Agreement, dated August 21, 2015, by and between Highland Capital Management, L.P., and Falcon E&P Opportunities GP, LLC.

8. Amended and Restated Administrative Services Agreement, effective as of August 21, 2015, by and between Highland Capital Management, L.P., and Petrocap Partners II GP, LLC.

9. Office Lease, between Crescent Investors, L.P., and Highland Capital Management, L.P.

10. Paylocity Corporation Services Agreement, between Highland Capital Management, L.P., and Paylocity Corporation, dated November 19, 2012.

11. Electronic Trading Services Agreement, between SunTrust Robinson Humphrey Inc., and Highland Capital Management, L.P., dated February 6, 2019.

12. Letter Agreement, between FTI Consulting, Inc., and Highland Capital Management, L.P., dated November 19, 2018.

13. Administrative Services Agreement, dated January 1, 2018, between Highland Capital Management, L.P., and Liberty Life Assurance Company of Boston.

14. Electronic Communications: Customer Authorization & Indemnification, between Highland Capital Management, L.P., and The Bank of New York Mellon Corporation, dated August 9, 2016.

15. Letter Agreement, dated August 9, 2016, Electronic Access Terms and Conditions, by and between The Bank of New York Mellon Trust Company, N.A., and Highland Capital Management, L.P.

16. Shared Services Agreement by and between Highland HCF Advisor, Ltd., and Highland Capital Management, L.P., dated effective October 27, 2017.

17.    Sub-Advisory Agreement, by and between Highland HCF Advisors, Ltd., and Highland Capital Management, dated effective October 27, 2017.

18.    Collateral Management Agreement, dated November 2, 2006, by and between Highland Credit Opportunities CDO Ltd. and Highland Capital Management, L.P.

19.    Management Agreement, dated November 15, 2007, between Highland Restoration Capital Partners, L.P., Highland Restoration Capital Partners Offshore, L.P., Highland Restoration Capital Partners Master L.P., Highland Restoration Capital Partners GP, LLC, and Highland Capital Management, L.P.

20.    Investment Management Agreement, between Highland Capital Multi-Strategy Fund, L.P., and Highland Capital Management, L.P., dated July 31, 2006.

21.    Investment Management Agreement, between Highland Capital Multi-Strategy Master Fund, L.P., and Highland Capital Management, L.P., dated July 31, 2006.

22.    Management Agreement, dated August 22, 2007, between and among Highland Capital Management, L.P., and Walkers Fund Services Limited, as trustee of Highland Credit Opportunities Japanese Unit Trust.

23.    Third Amended and Restated Investment Management Agreement, by and among Highland Multi Strategy Credit Fund, Ltd., Highland Multi Strategy Credit Fund, L.P., and Highland Capital Management, L.P., dated November 1, 2013.

24.    Investment Management Agreement, dated March 31, 2015, by and among Highland Select Equity Master Fund, L.P., Highland Select Equity Fund GP, L.P., and Highland Capital Management, L.P.

25.    Amended and Restated Investment Management Agreement, dated February 27, 2017, by and among Highland Prometheus Master Fund L.P., Highland Prometheus Feeder Fund I, L.P., Highland Prometheus Feeder Fund II, L.P., Highland SunBridge GP, LLC, and Highland Capital Management, L.P.

26.    Servicing Agreement, dated December 20, 2007, by and among Greenbriar CLO, Ltd., and Highland Capital Management, L.P.

27.    Investment Management Agreement, dated November 1, 2007, by and between Longhorn Credit Funding, LLC, and Highland Capital Management, L.P. (as amended)

28.    Reference Portfolio Management Agreement, dated August 1, 2016, by and between Highland Capital Management, L.P., and Valhalla CLO, Ltd.

29.    Collateral Servicing Agreement, dated December 20, 2006, by and among Highland Park CDO I, Ltd., and Highland Capital Management, L.P.

30.    Portfolio Management Agreement, dated March 15, 2005, by and among Southfork CLO Ltd., and Highland Capital Management, L.P.

31.    Amended and Restated Portfolio Management Agreement, dated November 30, 2005, by and among Jaspar CLO Ltd., and Highland Capital Management, L.P.

32.    Servicing Agreement, dated May 31, 2007, by and among Westchester CLO, Ltd., and Highland Capital Management, L.P.

33. Servicing Agreement, dated May 10, 2006, by and among Rockwall CDO Ltd. and Highland Capital Management, L.P. (as amended)

34. Portfolio Management Agreement, dated December 8, 2005, by and between Liberty CLO, Ltd., and Highland Capital Management, L.P.

35. Servicing Agreement, dated March 27, 2008, by and among Aberdeen Loan Funding, Ltd., and Highland Capital Management, L.P.

36. Servicing Agreement, dated May 9, 2007, by and among Rockwall CDO II Ltd. and Highland Capital Management, L.P.

37. Collateral Management Agreement, by and between, Highland Loan Funding V Ltd. and Highland Capital Management, L.P., dated August 1, 2001.

38. Collateral Management Agreement, dated August 18, 1999, by and between Highland Legacy Limited and Highland Capital Management, L.P.

39. Servicing Agreement, dated November 30, 2006, by and among Grayson CLO Ltd., and Highland Capital Management, L.P. (as amended)

40. Servicing Agreement, dated October 25, 2007, by and among Stratford CLO Ltd., and Highland Capital Management, L.P.

41. Servicing Agreement, dated August 3, 2006, by and among Red River CLO Ltd., and Highland Capital Management, L.P. (as amended)

42. Servicing Agreement, dated December 21, 2006, by and among Brentwood CLO, Ltd., and Highland Capital Management, L.P.

43. Servicing Agreement, dated March 13, 2007, by and among Eastland CLO Ltd., and Highland Capital Management, L.P.

44. Portfolio Management, Agreement, dated October 13, 2005, by and among Gleneagles CLO, Ltd., and Highland Capital Management, L.P.

45. AT&T Managed Internet Service, between Highland Capital Management, L.P. and AT&T Corp., dated February 24, 2015.

46. ViaWest, Master Service Agreement, dated October 3, 2011, between Highland Capital Management, L.P. and ViaWest

47. Stockholders' Agreement, dated April 15, 2005, by and between American Banknote Corporation and Highland Capital Management, L.P.

48. Stockholders' Agreement and Amendment No. 1, dated January 25, 2011, by and between Carey Holdings, Inc. and Highland Capital Management, L.P.

49. Stockholders' Agreement and Amendment, dated March 24, 2010, by and between Cornerstone Healthcare Group Holding, Inc. and Highland Capital Management, L.P.

50. Members' Agreement and Amendment, dated November 15, 2017, by and between Highland CLO Funding, Ltd. and Highland Capital Management, L.P.

51. Stock Purchase and Sale Agreement and Amendment, dated January 16, 2013, by and between Progenics Pharmaceuticals, Inc. and Highland Capital Management, L.P.

52. Stockholders' Agreement and Amendments, dated October 24, 2008, by and between JHT Holdings, Inc. and Highland Capital Management, L.P.

53. Amended and Restated Limited Partnership Agreement of Highland Dynamic Income Fund, L.P., dated February 25, 2013, by and between Highland Dynamic Income Fund GP, LLC and Highland Capital Management, L.P.

54. Highland Multi-Strategy Fund, L.P. Limited Partnership Agreement, dated July 6, 2006, by and between Highland Multi-Strategy Fund GP, L.P. and Highland Capital Management, L.P.

55. Operating Agreement of HE Capital, LLC (as amended), dated September 27, 2007, by and between ENA Capital, LLC Ellman Management Group, Inc. and Highland Capital Management, L.P.

56. Limited Liability Company Agreement of Highland Multi-Strategy Onshore Master SubFund II, LLC, dated February 27, 2007, by and between Highland Multi-Strategy Master Fund, L.P. and Highland Capital Management, L.P.

57. Limited Liability Company Agreement of Highland Multi-Strategy Onshore Master SubFund, LLC, dated July 19, 2006, by and between Highland Multi-Strategy Master Fund, L.P. and Highland Capital Management, L.P.

58. Highland Capital Management, L.P., Limited Liability Company Agreement of Highland Receivables Finance 1, LLC, by and between Highland Capital Management, L.P. and Highland Capital Management, L.P.

59. Agreement of Limited Partnership of Highland Restoration Capital Partners, L.P. and Amendments, dated November 6, 2007, by and between Highland Restoration Capital Partners GP, LLC and Highland Capital Management, L.P.

60. Agreement of Limited Partnership of Highland Select Equity Fund GP, L.P., dated October 2005, by and between Highland Select Equity Fund GP, LLC and Highland Capital Management, L.P.

61. Agreement of Limited Partnership of Penant Management LP, dated December 12, 2012, by and between Penant Management GP, LLC and Highland Capital Management, L.P.

62. Agreement of Limited Partnership of Petrocap Incentive Partners III, LP, dated April 12, 2018, by and between Petrocap Incentive Partners III GP, LLC, Petrocap Incentive Holdings III, LP and Highland Capital Management, L.P.

63. Amended and Restated Agreement of Limited Partnership of Petrocap Partners II, LP, dated October 30, 2014, by and between Petrocap Partners II GP, LLC, Petrocap Incentive Partners II, LP and Highland Capital Management, L.P.

64. Agreement of Limited Partnership of Highland Credit Opportunities CDO GP, L.P., dated December 29, 2005, by and between Highland Credit Opportunities CDO GP, LLC and Highland Capital Management, L.P.

65. Fourth Amended and Restated Limited Partnership Agreement of Highland Multi Strategy Credit Fund, L.P., dated November 1, 2014, by and between Highland Multi Strategy Credit Fund GP, L.P. and Highland Capital Management, L.P.

66. DUO Security, 2 factor authentication, by and between DUO Security and Highland Capital Management, L.P.

67. GoDaddy Domain Registrations, by and between GoDaddy and Highland Capital Management, L.P.

68. Highland Loan Fund, Ltd. et al, Investment Management Agreement, dated July 31, 2001, by and between Highland Loan Fund, Ltd. et al and Highland Capital Management, L.P.

69. E Mailflow Monitoring, by and between Mxtoolbox and Highland Capital Management, L.P.

70. Cloud single sign on for HR related employee login, by and between Onelogin and Highland Capital Management, L.P.

71. Collateral Management Agreement, dated May 19, 1998, by and between Pam Capital Funding LP, Ranger Asset Mgt LP and Highland Capital Management, L.P.

72. Collateral Management Agreement, dated August 6, 1997, by and between Pamco Cayman Ltd., Ranger Asset Mgt LP and Highland Capital Management, L.P.

73. Order Addenda, dated January 28, 2020, by and between CenturyLink Communications, LLC and Highland Capital Management, L.P.

74. Service Agreement (as amended), dated April 1, 2005, by and between Intex Solutions, Inc. and Highland Capital Management, L.P.

75. Amendment No. 1 to Servicing Agreement, October 2, 2007, between Highland Capital Management, L.P. and Red River CLO Ltd. et al

76. Interim Collateral Management Agreement, June 15, 2005, between Highland Capital Management, L.P. and Rockwall CDO Ltd

77. Amendment No. 1 to Servicing Agreement, October 2, 2007, between Highland Capital Management, L.P. and Rockwall CDO Ltd

78. Collateral Servicing Agreement dated December 20, 2006, between Highland Capital Management, L.P. and Highland Park CDO I, Ltd.; The Bank of New York Trust Company, National Association

79. Representations and Warranties Agreement, dated December 20, 2006, between Highland Capital Management, L.P. and Highland Park CDO I, Ltd.

80. Collateral Administration Agreement, dated March 27, 2008, between Highland Capital Management, L.P. and Aberdeen Loan Funding, Ltd.; State Street Bank and Trust Company

81. Collateral Administration Agreement, dated December 20, 2007, between Highland Capital Management, L.P. and Greenbriar CLO, Ltd.; State Street Bank and Trust Company

82. Collateral Acquisition Agreement, dated March 13, 2007, between Highland Capital Management, L.P. and Eastland CLO, Ltd

83. Collateral Administration Agreement, dated March 13, 2007, between Highland Capital Management, L.P. and Eastland CLO, Ltd. and Investors Bank and Trust Company

84. Collateral Administration Agreement, dated October 13, 2005, between Highland Capital Management, L.P. and Gleneagles CLO, Ltd.; JPMorgan Chase Bank, National Association

85. Collateral Acquisition Agreement, dated November 30, 2006, between Highland Capital Management, L.P. and Grayson CLO, Ltd.

86. Collateral Administration Agreement, dated November 30, 2006, between Highland Capital Management, L.P. and Grayson CLO, Ltd.; Investors Bank & Trust Company

87. Collateral Acquisition Agreement, dated August 3, 2006, between Highland Capital Management, L.P. and Red River CLO, Ltd.

88. Collateral Administration Agreement, dated August 3, 2006, between Highland Capital Management, L.P. and Red River CLO, Ltd.; U.S. Bank National Association

89. Master Warehousing and Participation Agreement, dated April 19, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Highland Special Opportunities Holding Company

90. Master Warehousing and Participation Agreement, dated February 2, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

91. Master Warehousing and Participation Agreement (Amendment No. 2), dated May 5, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

92. Master Warehousing and Participation Agreement (Amendment No. 1), dated April 12, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

93. Master Warehousing and Participation Agreement (Amendment No. 3), dated June 22, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

94. Master Warehousing and Participation Agreement (Amendment No. 4), dated July 17, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

95. Collateral Administration Agreement, dated February 2, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; U.S. Bank National Association; IXIS Financial Products Inc.

96. Collateral Administration Agreement, dated April 18, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Highland Special Opportunities Holding Company; U.S. Bank National Association

97. Master Participation Agreement, dated June 5, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Grand Central Asset Trust

98. A&R Asset Acquisition Agreement, dated July 18, 2001, between Highland Capital Management, L.P. and Salomon Smith Barney Inc.; Highland Loan Funding V Ltd.

99. A&R Master Participation Agreement, dated July 18, 2001, between Highland Capital Management, L.P. and Salomon Brothers Holding Company; Highland Loan Funding V Ltd.

100. Collateral Acquisition Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd.

101. Collateral Administration Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd.; JPMorgan Chase Bank, National Association

102. Master Warehousing and Participation Agreement, dated March 24, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd; MMP-5 Funding, LLC; and IXIS Financial Products Inc.

103. Master Warehousing and Participation Agreement (Amendment No. 1), dated May 16, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd; MMP-5 Funding, LLC; and IXIS Financial Products Inc.

104. Securities Account Control Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Highland CDO Opportunity Fund, Ltd.; JPMorgan Chase Bank, National Association

105. Collateral Administration Agreement, dated December 8, 2005, between Highland Capital Management, L.P. and Liberty CLO Ltd.

106. Collateral Administration Agreement, dated May 10, 2006, between Highland Capital Management, L.P. and Rockwall CDO Ltd; JPMorgan Chase Bank, National Association

107. Collateral Administration Agreement, dated May 9, 2007, between Highland Capital Management, L.P. and Rockwall CDO II, Ltd.; Investors Bank & Trust Company

108. Collateral Administration Agreement, dated March 15, 2005, between Highland Capital Management, L.P. and Southfork CLO Ltd.; JPMorgan Chase Bank, National Association

109. Collateral Administration Agreement, dated October 25, 2007, between Highland Capital Management, L.P. and Stratford CLO Ltd.; State Street

110. Collateral Administration Agreement, dated August 18, 2004, between Highland Capital Management, L.P. and Valhalla CLO, Ltd.; JPMorgan Chase Bank

111. Extension/Buy-Out Agreement, dated August 18, 2004, between Highland Capital Management, L.P. and Citigroup Financial Products Inc.; Citigroup Global Markets Inc.

112. Collateral Acquisition Agreement, dated May 31, 2007, between Highland Capital Management, L.P. and Westchester CLO, Ltd.

113. Collateral Administration Agreement, dated May 31, 2007, between Highland Capital Management, L.P. and Westchester CLO, Ltd.; Investors Bank & Trust Company

114. Collateral Administration Agreement, dated December 21, 2006, between Highland Capital Management, L.P. and Brentwood CLO, Ltd.; Investors Bank & Trust Company

115.  Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and James Seery

116.  Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and John Dubel

117.  Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and Russell Nelms

118.  Colocation Service Order dated October 14, 2019 between Highland Capital Management and Dawn US Holdings, LLC d/b/a Evoque Date Center Solutions

119.  Tradesuite Web Module Services/Agreement between Highland Capital Management and DTCC ITP LLC

120.  Bloomberg (Terminal) Agreement No. 306371 between Highland Capital Management and Bloomberg Finance, L.P.[1]

121.  Master Service Agreement between Highland Capital Management and Via West

122.  Amendment to Bloomberg Order Management System Addendum and Bloomberg Order Management System Schedule of Services Account No. 167969 between Highland Capital Management and Bloomberg Finance, L.P.

123.  Fourth Amendment to Software License and Services Agreement between Highland Capital Management and Markit WSO Corporation

124.  Master Services Agreement, First Amendment to Master Services Agreement, Second Amendment and Restatement of Master Services Agreement between Highland Capital Management and Siepe Services, LLC

125.  Internet Agreement Account No. 831-000-7888-651 between Highland Capital Management and AT&T

126.  Landline Fax Agreement Account No. 831-000-2532-176 between Highland Capital Management and AT&T

127.  Amazon Web Services Account No. 353534426569 between Highland Capital Management and Amazon Web Service, Inc.

128.  Website Hosting Agreement  Account No. 325667 between Highland Capital Management and WP Engine

---

[1] The Debtor is currently in discussions with Bloomberg regarding the assumption of this agreement.

001474

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-34054 (SGJ) |
| | ) |
| Debtor. | ) |
| | ) |

### SUPPLEMENTAL CERTIFICATION OF PATRICK M. LEATHEM WITH RESPECT TO THE TABULATION OF VOTES ON THE FIFTH AMENDED PLAN OF <u>REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P.</u>

I, Patrick M. Leathem, depose and say under the penalty of perjury:

1.  I am a Senior Consultant in Corporate Restructuring Services, employed by Kurtzman Carson Consultants LLC ("**KCC**"), located at 222 N. Pacific Coast Highway, 3rd Floor, El Segundo, California 90245. I am over the age of 18 and not a party to this action.

2.  On October 18, 2019, the United States Bankruptcy Court for the District of Delaware Court entered the *Order Appointing Kurtzman Carson Consultants as Claims and Noticing Agent for the Debtor Pursuant to 28 U.S.C. § 156(c), 11 U.S.C. § 105(a) and Local Rule 2002-1(f)* (Docket No. 43), prior to a venue transfer to this District.

3.  On January 19, 2021, the Debtor filed the *Certification of Patrick M. Leathem with Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (Docket No. 1772) (the "**Original Voting Certification**"). This certification supplements the Original Voting Certification to reflect the updated tabulation of votes for Class 7 and Class 8.

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

001475

4.      KCC has considerable experience in soliciting and tabulating votes to accept or reject proposed chapter 11 plans.  Except as otherwise stated, I could and would testify to the following based upon my personal knowledge.  I am authorized to submit this Certification on behalf of KCC.

5.      Pursuant to the terms of the settlement between the Debtor and the Senior Employees and the Debtor's settlement with Patrick Daugherty, the updated tabulation of votes reflecting the settlements is attached hereto as **Exhibit A**.  The detailed ballot reports for the affected classes (Voting Classes 7 and 8) are attached to this Certification as **Exhibits A-2** and **A-3**, along with a summary[2] provided to KCC by the Debtor with respect to the Debtor's position with respect to the tabulation and classification of votes in the Voting Classes pursuant to the Settlement, Disclosure Statement Order, Plan and applicable law.

## Conclusion

To the best of my knowledge, information and belief, the foregoing information concerning the distribution, submission and tabulation of Ballots in connection with the Plan is true.  The Ballots received by KCC are stored at KCC's office and are available for inspection by or submission to this Court.

Dated: February 3, 2021

                                    _/s/ Patrick M. Leathem_____
                                    Patrick M. Leathem

---

[2] Please see footnotes on the detailed ballot reports with respect to tabulation of certain ballots in Class 7 and Class 8.  The changes reflecting the voting tabulation with respect to the Debtor's settlement with the Senior Employees and with Mr. Daugherty are highlighted in the Exhibits to this Supplemental Certification.   The voting summaries and tabulations remain as set forth in the Original Voting Certification, except to the extent modified by this Supplemental Certification.

DOCS_SF:104985.1

001476

# EXHIBIT A

Case 19-34054-sgj11 Doc 1887 Filed 02/03/21   Entered 02/03/21 08:39:30   Page 4 of 7

Exhibit A

Revised Ballot Tabulation Summary

| Class | Ballots Not Tabulated[1] | Number Accepting | Number Rejecting | Amount Accepting | Amount Rejecting | Voting Result |
|---|---|---|---|---|---|---|
| Class 2 - Frontier Secured Claim | | 1 | 0 | $5,209,963.62 | $0.00 | Accepted in Number |
| | | 100.00% | 0.00% | 100.00% | 0.00% | Accepted in Dollar |
| Class 7 - Convenience Claims | 0 | 16 | 0 | $4,155,683.51 | $0.00 | Accepted in Number |
| | | 100.00% | 0.00% | 100.00% | 0.00% | Accepted in Dollar |
| Class 8 - General Unsecured Claims | 1 | 17 | 27 | $324,578,303.49 | $650,025.00 | Rejected in Number |
| | | 38.64% | 61.36% | 99.80% | 0.20% | Accepted in Dollar |
| Class 9 - Subordinated Claims | 0 | 5 | 0 | $35,000,000.00 | $0.00 | Accepted in Number |
| | | 100.00% | 0.00% | 100.00% | 0.00% | Accepted in Dollar |

| Class | Ballots Not Tabulated | Number Accepting | Number Rejecting | Amount of Interests Accepting | Amount of Interests Rejecting | Voting Result |
|---|---|---|---|---|---|---|
| Class 10 - Class B/C Limited Partnership Interests | 0 | 0 | 0 | 0.00 | 0.00 | No Votes |
| | | 0.00% | 0.00% | 0.00% | 0.00% | No Votes |
| Class 11 - Class A Limited Partnership Interests | 0 | 0 | 1 | 0.00 | 37.37% Interests | Rejected in Number |
| | | 0.00% | 100.00% | 0.00% | 100.00% | Rejected in Amount |

[1] The only vote not tabulated was Class 8 Ballot No. 15 of HarbourVest Partners L.P. on behalf of funds and accounts under management, that cast a vote under Bankruptcy Rule 3018, which was not allocated a voting amount under the HarbourVest settlement.

Page 1 of 1

In re Highland Capital Management, L.P.
Case No. 19-34054 (SGJ)

001478

**Revised Class 7 Ballot Detail**
**Convenience Claims**

| Creditor Name[1] | Ballot No. | Voting Amount | Date Filed | Vote |
|---|---|---|---|---|
| Argo Partners | 3 | $10,000.00 | 12/08/2020 | Accept |
| CBIZ Valuation Group, LLC | 48 | $8,269.26 | 01/05/2021 | Accept |
| Contrarian Funds, LLC | 1 | $268,095.08 | 12/04/2020 | Accept |
| Crescent TC Investors, L.P. | 41 | $27,480.67 | 01/04/2021 | Accept |
| Daniel Sheehan & Associates, PLLC | 6 | $32,433.75 | 12/21/2020 | Accept |
| Department of the Treasury - Internal Revenue Service | 39 | $85,281.32 | 01/04/2021 | Accept |
| Katten Muchin Rosenman LLP | 4 | $16,695.00 | 12/10/2020 | Accept |
| MCS Capital LLC c/o STC, Inc. | 8 | $507,430.34 | 12/21/2020 | Accept |
| Meta-e Discovery, LLC | 9 | $779,969.84 | 12/22/2020 | Accept |
| Parmentier, Andrew | 51 | $136,350.00 | 01/05/2021 | Accept |
| Pivotal Research Group LLC | 11 | $2,500.00 | 12/29/2020 | Accept |
| Ryan P. Newell (Connolly Gallagher LLP) | 12 | $166,062.22 | 12/31/2020 | Accept |
| Siepe Services, LLC | 64 | $80,183.88 | 01/05/2021 | Accept |
| Stinson Leonard Street LLP | 65 | $645,155.15 | 01/14/2021 | Accept |
| Isaac Leventon | 61 | $598,198.00 | 01/05/2021 | Accept |
| Frank Waterhouse | 59 | $791,579.00 | 01/05/2021 | Accept |
| **Total Class Members** | 16 | $4,155,683.51 | | |
| **Accepting** | 16 | $4,155,683.51 | | 100% |
| **Rejecting** | 0 | $0.00 | | 0% |

[1] The Debtor has advised that pursuant to the terms of the Settlement between the Debtor and the Senior Employees, Waterhouse shall have a Class 7 Claim in the amount of $791,579.00 and vote to accept the Plan, with such claim to be treated pursuant to the terms of the Settlement; and (ii) Leventon will have a Class 7 Claim in the amount of $598,198.00 and vote to accept the Plan, with such claim to be treated in accordance with the terms of the Settlement.

**Revised Class 8 Ballot Detail**
**General Unsecured Claims**

| Creditor Name[1] | Ballot No. | Voting Amount | Date Filed | Vote |
|---|---|---|---|---|
| Acis Capital Management L.P. and Acis Capital Management GP, LLC | 45 | $23,000,000.00 | 01/05/2021 | Accept |
| Charlotte Investor IV, L.P. | 19 | $1.00 | 12/31/2020 | Accept |
| Contrarian Funds, LLC[3] | 20 | $1,318,730.36 | 01/04/2021 | Accept |
| Ellington, Scott | 56 | $7,604,375.00 | 01/05/2021 | Accept |
| Employee 01 | 50 | $1.00 | 01/05/2021 | Reject |
| Employee 02 | 52 | $1.00 | 01/05/2021 | Reject |
| Employee 03 | 2 | $1.00 | 12/07/2020 | Accept |
| Employee 04 | 26 | $1.00 | 01/04/2021 | Reject |
| Employee 06 | 32 | $1.00 | 01/04/2021 | Reject |
| Employee 08 | 28 | $1.00 | 01/04/2021 | Reject |
| Employee 09 | 40 | $1.00 | 01/04/2021 | Reject |
| Employee 11 | 24 | $1.00 | 01/04/2021 | Reject |
| Employee 12 | 29 | $1.00 | 1/4/2021 | Reject |
| Employee 13 | 25 | $1.00 | 01/04/2021 | Reject |
| Employee 14 | 27 | $1.00 | 01/04/2021 | Reject |
| Employee 15 | 30 | $1.00 | 01/04/2021 | Reject |
| Employee 16 | 43 | $1.00 | 01/04/2021 | Reject |
| Employee 17 | 47 | $1.00 | 01/05/2021 | Reject |
| Employee 18 | 34 | $1.00 | 01/04/2021 | Reject |
| Employee 19 | 38 | $1.00 | 01/04/2021 | Reject |
| Employee 20 | 49 | $1.00 | 01/05/2021 | Reject |
| Employee 22 | 44 | $1.00 | 01/05/2021 | Reject |
| Employee 23 | 23 | $1.00 | 01/04/2021 | Reject |
| Employee 25 | 33 | $1.00 | 01/04/2021 | Reject |
| Employee 26 | 31 | $1.00 | 01/04/2021 | Reject |
| Employee 27 | 36 | $1.00 | 01/04/2021 | Reject |
| Employee 28 | 46 | $1.00 | 01/05/2021 | Reject |
| Employee 29 | 21 | $1.00 | 01/04/2021 | Reject |
| Employee 30 | 37 | $1.00 | 01/04/2021 | Reject |
| HarbourVest 2017 Global AIF L.P. | 18 | $4,366,125.00 | 12/31/2020 | Accept |
| HarbourVest 2017 Global Fund L.P. | 17 | $2,183,085.00 | 12/31/2020 | Accept |
| HarbourVest Dover Street IX Investment L.P. | 16 | $31,954,320.00 | 12/31/2020 | Accept |
| HarbourVest Skew Base AIF L.P. | 13 | $648,990.00 | 12/31/2020 | Accept |
| Highland Crusader Offshore Partners, L.P., et al. | 10 | $50,000.00 | 12/28/2020 | Accept |
| Hunter Covitz | 35 | $250,000.00 | 01/04/2021 | Reject |

**Revised Class 8 Ballot Detail**
**General Unsecured Claims**

| Creditor Name[1] | Ballot No. | Voting Amount | Date Filed | Vote |
|---|---|---|---|---|
| HV International VIII Secondary L.P. | 14 | $5,847,480.00 | 12/31/2020 | Accept |
| Jean Paul Sevilla | 63 | $400,000.00 | 01/05/2021 | Reject |
| Leventon, Isaac | 58 | $744,181.00 | 01/05/2021 | Accept |
| Patrick Hagaman Daugherty | 42 | $9,134,019.00 | 01/04/2021 | Accept |
| Raymond Joseph Dougherty | 62 | $1.00 | 01/05/2021 | Reject |
| Redeemer Commttee Highland Crusader Fund | 5 | $137,696,610.00 | 12/16/2020 | Accept |
| Surgent, Thomas | 57 | $3,958,628.14 | 01/05/2021 | Accept |
| UBS Securities LLC | 22 | $94,761,076.00 | 01/04/2021 | Accept |
| Waterhouse, Frank | 59 | $1,310,681.99 | 01/05/2021 | Accept |
| | | | | |
| | Number | Amount | | |
| Total Class Members | 44 | $325,228,328.49 | | |
| Accepting | 17 (38.64%) | $324,578,303.49 (99.80%) | | |
| Rejecting | 27 (61.36%) | $650,025.00 (0.20%) | | |

[1] The Debtor has advised that pursuant to the Settlement agreed to by and between the Debtor, on the one hand, and Ellington, Waterhouse, Surgent and Leventon (the "Settlement"), the parties agreed that:  (i) Ellington shall vote his entire Class 8 Claim in the amount of $7,604,375.00 to accept the Plan, of which amount $1,367,197.00 will receive the treatment provided for Class 7 Convenience Claims in accordance with the terms of the Settlement;   (ii) Surgent shall vote his entire Class 8 Claim in the amount of $3,958,628.14 to accept the Plan, of which $1,191,748.00 will receive the treatment provided for Class 7 Convenience Claims in accordance with the terms of the Settlement; (iii) Leventon will reduce his Class 8 Claim by $598,198 from $1,342,379 to $744,181 and vote to accept the Plan.  Leventon will have a Class 7 Claim in the amount of $598,198.00 and receive the treatment provided to Class 7 Convenience Claims in accordance with the terms of the Settlement; and (iv) Waterhouse will reduce his Class 8 Claim by $791,579.00 from $2,102,260.99 to $1,310,681.99.  Waterhouse will have a a Class 7 Claim in the voting amount of  $791,579.00 and receive the treatment provided to Class 7 Convenience Claims in accordance with the terms of the Settlement. In addition, Daugherty has agreed to change his vote to accept the Plan.

United States Department of Justice
Office of the United States Trustee
1100 Commerce St. Room 976
Dallas, Texas 75242
(202) 834-4233

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Case No. 19-34054** |
| | § | |
| | § | |
| | § | |
| **Debtors-in-Possession.** | § | |

---

### United States Trustee's Limited Objection to Confirmation of Debtors' Fifth Amended Plan of Reorganization (Docket Entry No. 1472)

---

**To the Honorable Stacey J. Jernigan,**
**United States Bankruptcy Judge:**

The United States Trustee for Region 6 files this Limited Objection (the "**Objection**") to the Debtor's Fifth Amended Plan of Reorganization (the "Plan" -- docket entry [D.E.] 1472, filed 11/24/2020). In support of the relief requested, the United States Trustee respectfully submits as follows:

### <u>Summary</u>

The United States Trustee objects to confirmation of the Plan because the releases exceed the scope permitted by Fifth Circuit precedent. The United States Trustee has resolved other objections with the Debtors, and these resolutions will be announced and incorporated in the confirmation order.

## **Facts: Relevant Plan Provisions**

**Salient Definitions:**

1.      The Plan defines exculpated and released parties as follows:

a.   "Exculpated Parties" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); provided, however, that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

b.   "Released Parties" means, collectively, (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities), (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees.

Plan, D.E. 1472; definitions 61, 111, p. 16.

**Releasing Third Parties:**

2.   The Plan releases third parties who would share liability with the Debtor:

"[E]ach Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.

Plan, D.E. 1472, p. 48.

3.     The releases for Released Parties exclude "any Causes of Action arising from willful misconduct, criminal misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction." Plan, D.E. 1472, pp. 48-49.

4.     The Plan releases do not contemplate any type of channeling injunction.

**Exculpating Third Parties:**

5.     The exculpation provisions broadly cover third parties:

Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements,

instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(v); provided, however, the foregoing will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2, protecting such Exculpated Parties from liability.

## **Argument and Authority**

**Plan Contains Non-Consensual Third-Party Releases and Exculpation in Contravention of Fifth Circuit Precedent.**

6.      The Plan contains non-consensual third-party releases that should be stricken under Fifth Circuit precedent.

7.      The Plan's exculpation provisions are similarly overbroad.

8.      While the Plan specifies that the releases and exculpation are allowed to "the maximum extent allowed by law," the law in the Fifth Circuit is that they are not allowed.

9.      Like the Highland Capital Plan, the *Pacific Lumber* plan contained exculpation and release provisions that carved out willful or intentional conduct. *Scotia Pacific Co., LLC v. Official Unsecured Creditors' Committee (In re Pacific Lumber Co.),* 584 F.3d 229

(5th Cir. 2009). Reviewing four prior Fifth Circuit bankruptcy cases, the *Pacific Lumber* court concluded these cases "seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions." *Id.* at 252 (citations omitted). The Fifth Circuit struck these non-consensual provisions as to parties who were co-liable with the debtor but noted that committee members and committee professionals received qualified immunity. *Id.*

10.  The *Pacific Lumber* court disallowed the exculpation and releases of the debtors' officers, directors, and professionals because there was no evidence that they "were jointly liable for any . . . pre-petition debt. They are not guarantors or sureties, nor are they insurers. Instead, the essential function of the exculpation clause . . . is to absolve the released parties from any negligent conduct that occurred during the course of the bankruptcy. The fresh start § 524(e) provides to debtors is not intended to serve this purpose." *Id.* at 252-53.

11.  Bankruptcy Courts in the Northern District of Texas have resolved objections to exculpation or release provisions by replacing such provisions with channeling injunctions. *See* Memorandum Opinion and Order, Docket Entry No. 4614, *In re Pilgrim's Pride Corporation, et al.*, Case No. 08-45664-DML-11 (January 14, 2010); Fourth Amended Joint Chapter 11 Plan of CHC Group Ltd. and its Affiliated Debtors (Section 10.8), Docket Entry No. 1701, *In re CHC Group, Ltd.*, Case No. 16-31854-BJH-11, United States Bankruptcy Court for the Northern District of Texas, Dallas Division (February 16, 2017).

12.  The Plan release and exculpation provisions should be limited. Unless they exclude the Debtors' professionals, the Debtors' officers and directors, and others not protected by quasi-immunity, confirmation should be denied.

## Conclusion

Wherefore, the United States Trustee requests that the Court deny approval of the Plan and grant to the United States Trustee such other and further relief as is just and proper.

DATED: January 5, 2021                    Respectfully submitted,

                                          WILLIAM T. NEARY
                                          UNITED STATES TRUSTEE

                                          */s/ Lisa L. Lambert*
                                          Lisa L. Lambert
                                          Asst. U.S. Trustee, TX 11844250
                                          Office of the United States Trustee
                                          1100 Commerce Street, Room 976
                                          Dallas, Texas  75242
                                          (202) 834-4233

## Certificate of Service

There undersigned hereby certifies that on January 5, 2020, a copy of the foregoing pleading was served via ECF to parties requesting notice via ECF.

                                          */s/  Lisa L. Lambert*
                                          Lisa L. Lambert

```
                    IN THE UNITED STATES BANKRUPTCY COURT
                     FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION

                              )    Case No. 19-34054-sgj-11
In Re:                        )    Chapter 11
                              )
HIGHLAND CAPITAL              )    Dallas, Texas
MANAGEMENT, L.P.,             )    Tuesday, February 2, 2021
                              )    9:30 a.m. Docket
          Debtor.             )
                              )    CONFIRMATION HEARING [1808]
                              )    AGREED MOTION TO ASSUME [1624]
_____)
```

<div align="center">

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

</div>

WEBEX APPEARANCES:

| | |
|---|---|
| For the Debtor: | Jeffrey Nathan Pomerantz<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>10100 Santa Monica Blvd.,<br> 13th Floor<br>Los Angeles, CA  90067-4003<br>(310) 277-6910 |
| For the Debtor: | John A. Morris<br>Gregory V. Demo<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>780 Third Avenue, 34th Floor<br>New York, NY  10017-2024<br>(212) 561-7700 |
| For the Debtor: | Ira D. Kharasch<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>10100 Santa Monica Blvd.,<br> 13th Floor<br>Los Angeles, CA  90067-4003<br>(310) 277-6910 |
| For the Official Committee<br>of Unsecured Creditors: | Matthew A. Clemente<br>SIDLEY AUSTIN, LLP<br>One South Dearborn Street<br>Chicago, IL  60603<br>(312) 853-7539 |

001488

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 2 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 149 of 222 PageID 4206

2

```
 1    APPEARANCES, cont'd.:

 2    For Redeemer Committee of    Terri L. Mascherin
      the Highland Crusader        JENNER & BLOCK, LLP
 3    Fund:                        353 N. Clark Street
                                   Chicago, IL  60654-3456
 4                                 (312) 923-2799

 5    For Acis Capital            Rakhee V. Patel
      Management GP, LLC:         WINSTEAD, P.C.
 6                                2728 N. Harwood Street, Suite 500
                                  Dallas, TX  75201
 7                                (214) 745-5250

 8    For UBS Securities, LLC:     Andrew Clubok
                                   LATHAM & WATKINS, LLP
 9                                 555 Eleventh Street, NW,
                                     Suite 1000
10                                 Washington, DC  20004
                                   (202) 637-2200
11
      For Patrick Daugherty:       Jason Patrick Kathman
12                                 PRONSKE & KATHMAN, P.C.
                                   2701 Dallas Parkway, Suite 590
13                                 Plano, TX  75093
                                   (214) 658-6500
14
      For HarbourVest, et al.:     Erica S. Weisgerber
15                                 DEBEVOISE & PLIMPTON, LLP
                                   919 Third Avenue
16                                 New York, NY  10022
                                   (212) 909-6000
17
      For James Dondero:           Clay M. Taylor
18                                 John Y. Bonds, III
                                   D. Michael Lynn
19                                 Bryan C. Assink
                                   BONDS ELLIS EPPICH SCHAFER
20                                   JONES, LLP
                                   420 Throckmorton Street,
21                                   Suite 1000
                                   Fort Worth, TX  76102
22                                 (817) 405-6900

23    For Get Good Trust and       Douglas S. Draper
      Dugaboy Investment Trust:    HELLER, DRAPER & HORN, LLC
24                                 650 Poydras Street, Suite 2500
                                   New Orleans, LA  70130
25                                 (504) 299-3300
```

001489

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 3 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 150 of 222 PageID 4207

3

```
      APPEARANCES, cont'd.:
 1
      For Certain Funds and      Davor Rukavina
 2    Advisors:                  Julian Vasek
                                 MUNSCH, HARDT, KOPF & HARR
 3                               500 N. Akard Street, Suite 3800
                                 Dallas, TX  75201-6659
 4                               (214) 855-7587

 5    For Certain Funds and      A. Lee Hogewood, III
      Advisors:                  K&L GATES, LLP
 6                               4350 Lassiter at North Hills
                                   Avenue, Suite 300
 7                               Raleigh, NC  27609
                                 (919) 743-7306
 8
      For the NexPoint           Lauren K. Drawhorn
 9    Parties:                   WICK PHILLIPS
                                 3131 McKinney Avenue, Suite 100
10                               Dallas, TX  75204
                                 (214) 692-6200
11
      For Scott Ellington,       Frances A. Smith
12    Isaac Leventon, Thomas     ROSS & SMITH, P.C.
      Surgent, and Frank         Plaza of the Americas
13    Waterhouse:               700 N. Pearl Street, Suite 1610
                                 Dallas, TX  75201
14                               (214) 593-4976

15    For Scott Ellington,       Debra A. Dandeneau
      Isaac Leventon, Thomas     BAKER & MCKENZIE, LLP
16    Surgent, and Frank         452 Fifth Avenue
      Waterhouse:               New York, NY  10018
17                               (212) 626-4875

18    For CLO Holdco, Ltd.:      John J. Kane
                                 KANE RUSSELL COLEMAN LOGAN, P.C.
19                               901 Main Street, Suite 5200
                                 Dallas, TX  75202
20                               (214) 777-4261

21    For Davis Deadman, Todd    Jason Patrick Kathman
      Travers, and Paul Kauffman: PRONSKE & KATHMAN, P.C.
22                               2701 Dallas Parkway, Suite 590
                                 Plano, TX  75093
23                               (214) 658-6500

24

25
```

001490

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 4 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 151 of 222 PageID 4208

4

```
 1   APPEARANCES, cont'd.:

 2   For the United States        David G. Adams
     of America (IRS):            U.S. STATES DEPARTMENT OF JUSTICE,
 3                                  TAX DIVISION
                                  717 N. Harwood Street, Suite 400
 4                                Dallas, TX  75201
                                  (214) 880-2432
 5
     For Highland CLO Funding,    Rebecca Matsumura
 6   Ltd.:                        KING & SPALDING, LLP
                                  500 West 2nd Street, Suite 1800
 7                                Austin, TX  78701
                                  (512) 457-2024
 8
     For Crescent TC             Michael S. Held
 9   Investors:                  JACKSON WALKER, LLP
                                  2323 Ross Avenue, Suite 600
10                                Dallas, TX  75201
                                  (214) 953-5859
11
     For the Issuer Group:        Amy K. Anderson
12                                JONES WALKER, LLP
                                  811 Main Street, Suite 2900
13                                Houston, TX  77002
                                  (713) 437-1866
14
     Recorded by:                 Michael F. Edmond, Sr.
15                                UNITED STATES BANKRUPTCY COURT
                                  1100 Commerce Street, 12th Floor
16                                Dallas, TX  75242
                                  (214) 753-2062
17
     Transcribed by:              Kathy Rehling
18                                311 Paradise Cove
                                  Shady Shores, TX  76208
19                                (972) 786-3063

20

21

22

23

24        Proceedings recorded by electronic sound recording;
            transcript produced by transcription service.
25
```

001491

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 5 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 152 of 222 PageID 4209

5

1          DALLAS, TEXAS - FEBRUARY 2, 2021 - 9:38 A.M.

2          THE COURT:  Good morning.  Please be seated.  All

3    right.  We are ready to get started now in Highland Capital.

4    We have a confirmation hearing as well as a motion to assume

5    the non-residential real property lease at the headquarters.

6    All right.  This is Case No. 19-34054.  I know we're going to

7    have a lot of appearances today.  I think we're just down to a

8    handful of objections, but I'm nevertheless going to go ahead

9    and get formal appearances from our key parties that we've had

10   historically in this case.

11       First, for the Debtor team, do we have Mr. Pomerantz and

12   your crew?

13          MR. POMERANTZ:  Yes.  Good morning, Your Honor.  Jeff

14   Pomerantz, along with John Morris, Ira Kharasch, and Greg

15   Demo, on behalf of the Debtor-in-Possession, Highland Capital.

16          THE COURT:  All right.  Good morning.  All right.

17   For the Unsecured Creditors' Committee team, do we have Mr.

18   Clemente and others?

19          MR. CLEMENTE:  Yes.  Good morning, Your Honor.

20   Matthew Clements; Sidley Austin; on behalf of the Official

21   Committee of Unsecured Creditors.

22          THE COURT:  All right.  I'm actually going to call a

23   roll call for the Committee members who have obviously been

24   very active during this case.  For the Redeemer Committee and

25   Crusader Fund, do we have Ms. Mascherin and her team?

001492

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 6 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 153 of 222 PageID 4210

6

1    (Pause.)  Okay.  We're -- if -- you must be on mute.

2              MS. MASCHERIN:  Your Honor, I apologize.

3              THE COURT:  Okay.  Go ahead.

4              MS. MASCHERIN:  I apologize, Your Honor.  I was on

5    mute and could not figure out how to unmute myself quickly.

6    Terri Mascherin; Jenner & Block; on behalf of the Redeemer

7    Committee.

8              THE COURT:  All right.  Good morning.

9         All right.  What about Acis?  Do we have Ms. Patel and

10   others for the Acis team?

11             MS. PATEL:  Good morning, Your Honor.  Rakhee Patel

12   on behalf of Acis Capital Management.

13             THE COURT:  Good morning.

14        All right.  Mr. Clubok, I see you there for the UBS team,

15   correct?

16             MR. CLUBOK:  Yes.  Good morning, Your Honor.

17             THE COURT:  Good morning.

18        All right.  For Patrick Daugherty, I think I see Mr.

19   Kathman out there, correct?

20             MR. KATHMAN:  Good morning, Your Honor.  Jason

21   Kathman on behalf of Patrick Daugherty.

22             THE COURT:  All right.  Good morning.

23        All right.  What about HarbourVest?  Anyone on the line

24   for HarbourVest?

25             MS. WEISGERBER:  Good morning, Your Honor.  Erica

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 7 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 154 of 222 PageID 4211

7

1   Weisgerber for HarbourVest.

2           THE COURT:  All right.  Very good.

3       All right.  Well, I'll now, I guess, turn to some of the

4   Objectors that I haven't hit yet.  Who do we have appearing

5   for Mr. Dondero this morning?

6           MR. TAYLOR:  Good morning, Your Honor.  Clay Taylor

7   of the law firm of Bonds Ellis Eppich Schaefer & Jones

8   appearing on behalf of Mr. Dondero.  I have with me, of

9   course, Mr. Dondero, who is in the room with me.  Dennis

10  Michael Lynn, John Bonds, and Bryan Assink are also appearing

11  on behalf of Mr. Dondero.

12          THE COURT:  All right.  Thank you, Mr. Taylor.

13      All right.  For the Dugaboy Trust and Get Good Trust, do

14  we have Mr. Draper and others?

15          MR. DRAPER:  Yes, Your Honor.  This is Douglas Draper

16  on the line.

17          THE COURT:  All right.  Good morning.

18          MR. DRAPER:  Good morning, Your Honor.

19          THE COURT:  All right.  What about what I'll call

20  Highland Fund, the Highland Funds and Advisors?  Do we have

21  Mr. Rukavina this morning, or who do we have?

22          MR. RUKAVINA:  Your Honor, good morning.  Davor

23  Rukavina and Julian Vasek for the Funds and Advisors.  I can

24  make a full appearance, but it's the parties listed on Docket

25  1670.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 8 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 155 of 222 PageID 4212

8

1          THE COURT:  All right.  Thank you, Mr. Rukavina.

2      All right.  What about --

3          MR. HOGEWOOD:  Your Honor?

4          THE COURT:  Go ahead.

5          MR. HOGEWOOD:  Your Honor, Lee Hogewood.  I'm sorry,

6   Your Honor.  Lee Hogewood is also here on behalf of the same

7   parties.

8          THE COURT:  All right.  Thank you, sir.

9      All right.  What about NexPoint Real Estate Partners, HCRE

10  Partners?

11         MS. DRAWHORN:  Good morning, Your Honor.  Lauren

12  Drawhorn with Wick Phillips on behalf of NexPoint Real Estate

13  Partners, LLC.  I'm also here on behalf of the NexPoint Real

14  Estate entities which are listed on Docket 1677, and NexBank,

15  which is -- their objection is 1676.

16         THE COURT:  All right.  Thank you.

17     All right.  Let's cover some of the employees.  I think I

18  see Ms. Smith out there.  Are you appearing for Mr. Ellington

19  and Mr. Leventon?

20         MS. SMITH:  Yes, Your Honor.  Frances Smith with Ross

21  & Smith, along with Debra Dandeneau of Baker McKenzie, on

22  behalf of Scott Ellington, Isaac Leventon, Thomas Surgent, and

23  Frank Waterhouse.

24         THE COURT:  All right.  Could you spell the last name

25  of your co-counsel from Baker McKenzie?  I didn't clearly get

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 9 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 156 of 222 PageID 4213

9

1  that.

2  MS. SMITH:  Yes, Your Honor.  It's Debra Dandeneau,

3  D-A-N-D-E-N-N-A-U [sic].

4  THE COURT:  Okay.  Thank you.

5  All right.  CLO Holdco, do we have you appearing this

6  morning?

7  MR. KANE:  Your Honor, John Kane on behalf of CLO

8  Holdco.

9  THE COURT:  Thank you, Mr. Kane.

10  All right.  I know we had a different group of current or

11  former employees -- Brad Borud, Jack Yang -- and some joining

12  parties:  Kauffman, Travers, Deadman.  Who do we have

13  appearing for those?  (Pause.)  Anyone?  If you're appearing,

14  we're not hearing you.  Go ahead.

15  MR. KATHMAN:  Good morning, Your Honor.  Jason

16  Kathman.  I represent Mr. Deadman, Mr. Travers, and Mr.

17  Kauffman as well.

18  THE COURT:  Okay.  Thank you.  And I can't remember

19  who represents Mr. Borud and Yang.  Someone separately.

20  MR. KATHMAN:  It's Mr. Winikka, Your Honor.

21  THE COURT:  Oh, Mr. Winikka.

22  MR. KATHMAN:  And I haven't scrolled through to see

23  whether he's with -- in the 120 people signed in this morning.

24  But I believe that objection has been resolved.  I think Mr.

25  Pomerantz will probably address that later.  So Mr. Winikka

Case 19-34054-sgj11  Doc 1894  Filed 02/04/21  Entered 02/04/21 10:28:30  Page 10 of 295
Case 3:21-cv-00538-N  Document 26-5  Filed 06/09/21  Page 157 of 222  PageID 4214

10

1   may not be appearing.

2           THE COURT:  Okay.  All right.  Well, anyone for the

3   IRS?

4           MR. ADAMS:  Good morning, Your Honor.  David Adams,

5   Department of Justice, on behalf of the United States and its

6   agency, the Internal Revenue Service.

7           THE COURT:  Thank you, Mr. Adams.

8       For the U.S. Trustee, who do we have appearing this

9   morning?  (No response.)  I'm not hearing you.  If you're

10  trying to appear, you must be on mute.  (No response.)  All

11  right.  Well, I suspect at some point we'll hear from the U.S.

12  Trustee, even though I don't hear anyone now.

13      At this point, I will open it up to anyone else who wishes

14  to appear who I failed to call.

15          MS. MATSUMURA:  Your Honor, this is Rebecca Matsumura

16  from King & Spalding representing Highland CLO Funding, Ltd.

17  Thank you.

18          THE COURT:  All right.  Thank you, Ms. Matsumura.

19  HCLOF.

20      Anyone else?

21          MR. HELD:  Your Honor, this is Michael Held with the

22  law firm of Jackson Walker, LLP on behalf of the office

23  landlord, Crescent TC Investors, LP.

24          THE COURT:  All right.  Thank you, Mr. Held.

25          MR. HELD:  Thank you, Your Honor.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 11 of 295
Case 3:21-cv-00538-N   Document 26-5   Filed 06/09/21   Page 158 of 222   PageID 4215

11

1          THE COURT:  Okay.  Any other lawyer appearances?

2      All right.  Well, again, if there's anyone out there who

3  did not get to appear, maybe we'll hear from you at some point

4  as the day goes on.

5      All right.  Mr. Pomerantz, this is an important day,

6  obviously.  How did you want to begin things?

7          MR. POMERANTZ:  So, Your Honor, I have a brief

8  opening to talk about what I plan to do, and a little more

9  lengthy opening, and it'll be come clear.  So if I may

10  proceed, Your Honor?

11          THE COURT:  You may.

12          MR. POMERANTZ:  Your Honor, we're here to request

13  that the Court confirm the Debtor's Fifth Amended Plan of

14  Reorganization, as modified.  The operative documents before

15  Your Honor are the Fifth Amended Plan, as modified, that was

16  filed along with our pleadings in support of confirmation on

17  January 22nd and the minor amendments that we filed on

18  February 1st.

19      Here is my proposal on how we can proceed this morning.  I

20  would intend to provide the Court with an opening statement

21  that would last approximately 20 minutes.  And then after any

22  other party who desires to make an opening statement, I would

23  propose that the Debtor put on its evidence that it intends to

24  rely on in support of confirmation.  The evidence consists of

25  the exhibits that the Debtor filed with its witness and

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 12 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 159 of 222 PageID 4216

12

1  exhibit list on January 22nd and certain amendments that we

2  filed yesterday.

3     We would also put on the testimony of the following

4  witnesses: Jim Seery, the Debtor's chief executive officer,

5  who Your Honor is very familiar with, and also a member of

6  Strand's board of directors; John Dubel, a member of Strand's

7  board of directors; and Mark Tauber, a vice president with Aon

8  Financial Services, the Debtor's D&O broker.

9     We have also submitted the declaration of Patrick Leatham,

10  who is with KCC, the Debtor's balloting agent. And we don't

11  intend to put Mr. Leatham on the stand, but he is available on

12  the WebEx for cross-examination, to the extent necessary.

13     I propose that I would leave the bulk of my argument,

14  which includes going through the Section 1129 requirements for

15  plan confirmation, as well as responding to the remaining

16  outstanding objections, until my closing argument.

17     With that, Your Honor, I will pause and ask the Court if

18  Your Honor has any questions before I proceed.

19        THE COURT: I do not have questions, so your method

20  of going forward sounds appropriate. You may go ahead.

21        MR. POMERANTZ: Thank you, Your Honor.

22       OPENING STATEMENT ON BEHALF OF THE DEBTOR

23        MR. POMERANTZ: As I indicated, Your Honor, we stand

24  here side by side with the Creditors' Committee asking that

25  the Court confirm the Debtor's plan of reorganization.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 13 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 160 of 222 PageID 4217

13

1    As Your Honor is well aware, this case started in December

2   in -- October 2019, was transferred to Your Honor's court in

3   December 2019, and has been pending for approximately 15

4   months.

5    On January 9, 2020, I stood before Your Honor seeking the

6   approval of the independent board of directors of Strand, the

7   general partner of the Debtor, pursuant to a heavily-

8   negotiated agreement with the Committee.  And as the Court has

9   remarked on occasions throughout the case, the economic

10  stakeholders in this case believed that the installation of a

11  new board consisting of highly-qualified restructuring

12  professionals and a bankruptcy judge, a former bankruptcy

13  judge, was far more attractive than the alternative, which was

14  appointment of a trustee.  And upon approval of the

15  settlement, members of the board -- principally, Mr. Seery --

16  testified that one of the board's goals was to change the

17  culture of litigation that plagued Highland in the decade

18  before filing and threatened to embroil the Debtor in

19  continued litigation if changes were not made.

20   And as Your Honor is well aware, the last 14 months have

21  not been easy.  The board took its role as an independent

22  fiduciary extremely seriously, much to the consternation of

23  the Committee at times, and more recently, to the

24  consternation of Mr. Dondero and his affiliated entities.

25   And what has the Debtor, under the leadership of the

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 14 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 161 of 222 PageID 4218

14

1    board, been able to accomplish during this case?  The answer

2    is a lot more than many parties believed when the board was

3    installed.

4         The Debtor reached a settlement with the Redeemer

5    Committee, resolving disputes that had been litigated for many

6    years, in many forums, and that resulted in an arbitration

7    award that was the catalyst for the bankruptcy filing.

8         Participating in a court-ordered mediation at the end of

9    August 2020 and September, the Debtor reached agreement with

10   Acis and Josh Terry.  The Court is all too familiar with the

11   years of disputes between the Debtor and Acis and Josh Terry,

12   which spanned arbitration proceedings and an extremely

13   combative Chapter 11 that Your Honor presided over.

14        The Debtor next reached an agreement with HarbourVest

15   regarding their assertion of over $300 million of claims

16   against the estate.  The HarbourVest litigation stemmed from

17   its investment in the Acis CLOs and would have resulted in

18   complex, fact-intensive litigation which would have forced the

19   Court to revisit many of the issues addressed in the Acis

20   case.

21        And perhaps most significantly, Your Honor, the Debtor was

22   able to resolve disputes with UBS, disputes which took the

23   most time of any claim in this case, through a contested stay

24   relief motion, a hotly-contested summary judgment motion, and

25   a Rule 3018 motion.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 15 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 162 of 222 PageID 4219

15

1    While the Debtor and UBS hoped to file a 9019 motion prior

2    to the commencement of the hearing, they were not able to do

3    so.  However, I am now in a position to disclose to the Court

4    the terms of the settlement, which is the subject of

5    documentation acceptable to the Debtor and UBS.  The

6    settlement provides for, among other things, the following

7    terms:

8    UBS will receive a $50 million Class 8 general unsecured

9    claim against the Debtor.

10   UBS will receive a $25 million Class 9 subordinated

11   general unsecured claim against the Debtor.

12   UBS will receive a cash payment of $18.5 million from

13   Multi-Strat, which was a defendant and the subject of

14   fraudulent transfer claims.

15   The Debtor will use reasonable efforts to assist UBS to

16   collect its Phase I judgment against CDL Fund and assets CDL

17   Fund may have.

18   The parties will also agree to mutual and general

19   releases, subject to agreed carve-outs.

20   And, of course, the parties will not be bound until the

21   Court approves the settlement pursuant to a 9019 motion we

22   would hope to get on file shortly.

23   I am also pleased to let the Court know -- breaking news

24   -- that this morning we reached an agreement to settle Patrick

25   Daugherty's claims.  I would now like to, at the request of

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 16 of 295
Case 3:21-cv-00538-N   Document 26-5   Filed 06/09/21   Page 163 of 222   PageID 4220

16

1    Mr. Kathman, read into the record the Patrick Daugherty

2    settlement.

3        Under the Patrick Daugherty settlement, Mr. Daugherty will

4    receive a $750,000 cash payment on the effective date.  He

5    will receive an $8.25 million general unsecured claim, and he

6    will receive a $2.75 million Class 9 subordinated claim.

7        The settlement of all claims against the Debtor and its

8    affiliates -- and affiliates will be defined in the documents

9    -- with the exception of the tax claim against the Debtor, Mr.

10   Dondero, and Mr. Okada -- and for the avoidance of doubt,

11   except as I describe below, nothing in the settlement is

12   intended to affect any pending litigation Mr. Daugherty has

13   against Mr. Dondero, Scott Ellington, Isaac Leventon, Marc

14   Katz, Michael Hurst, and Hunton Andrew Kurth.

15       Mr. Daugherty will release the Debtor and its affiliates

16   and current employees for all claims and causes of action,

17   except for the agreements I identify below, and dismiss all

18   current employees as to pending actions.  We believe this only

19   applies to Thomas Surgent and no other employee is implicated.

20       Mr. Surgent and other employees, including but not limited

21   to David Klos, Frank Waterhouse, Brian Collins, Lucy Bannon,

22   and Matt Diorio, will receive releases similar to the covenant

23   in Paragraph 1D of the Acis settlement agreement, which

24   essentially provided the release would go away if they

25   assisted anyone in pursuing claims against Mr. Daugherty.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 17 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 164 of 222 PageID 4221

17

1      Highland and the above-mentioned parties will accept

2    service of any subpoenas and acknowledge the jurisdiction of

3    the Delaware Chancery Court for the purposes of accepting any

4    subpoenas. And for the avoidance of doubt, Highland will

5    accept service on behalf of the employees only in their

6    capacity as such.

7      Highland will also use material -- will use reasonable

8    efforts at no material cost to assist Daugherty in vacating a

9    Texas judgment that was issued against him. We've also looked

10    at a form of the motion and believe we have agreed on the form

11    of the motion.

12      Highland, its affiliates, and current employees will

13    covenant and agree they will not pursue or seek to enforce the

14    injunction and the Texas judgment against Daugherty.

15      And lastly, Daugherty will not be able to settle any

16    claims for negligence or other claims that might be subject to

17    indemnification by the Debtor or any successor.

18      Accordingly, Your Honor, other than the claims of Mr.

19    Dondero and his related entities, and the unliquidated claims

20    of certain employees, substantially all claims have been

21    resolved in this case, a truly remarkable achievement.

22      Separate and apart, Your Honor, from the work done

23    resolving the claims, the Debtor, under the direction of the

24    independent board, has worked extremely hard to develop a plan

25    of reorganization.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 18 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 165 of 222 PageID 4222

18

1    After the independent board got its bearings, it started

2   to work on various plan alternatives.  And the board received

3   a lot of pressure from the Committee to go straight to a plan

4   seeking to monetize assets like the one before Your Honor

5   today.  However, the board believed that before proceeding to

6   do so and go down an asset monetization path, it should

7   adequately diligence all alternatives, including a

8   continuation of the current business model, a reorganization

9   sponsored by Mr. Dondero and his affiliates, a sale of the

10   Debtor's assets, including a sale to Mr. Dondero.

11    In June 2020, plan negotiations proceeded in earnest, and

12   the Debtor started to negotiate an asset monetization plan

13   with the Committee, while still pursuing other alternatives.

14    Preparation of an asset monetization plan is not typically

15   a complicated process.  However, creating the appropriate

16   structure for a business like the Debtor's was extremely

17   complicated, because of the contractual, regulatory, tax, and

18   governance issues that had to be carefully considered.

19    At the same time the Committee negotiations were

20   proceeding down that path, Mr. Seery continued to spend

21   substantial time trying to negotiate a grand bargain plan with

22   Mr. Dondero.  It is not an exaggeration to say that over the

23   last several months Mr. Seery has dedicated hundreds of hours

24   towards a potential grand bargain plan.

25    And why did he do it?  Because he has always believed that

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 19 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 166 of 222 PageID 4223

19

1    a global restructuring among all parties was the best

2    opportunity to fully and finally resolve the acrimony that

3    continued to plague the Debtor.

4         Notwithstanding Mr. Seery's and the independent board's

5    best efforts, they were not able to reach consensus on a grand

6    bargain plan, and the Debtor filed the plan, the initial plan,

7    on August 12th, which ultimately evolved into the plan before

8    the Court today.

9         The Court conducted an initial hearing on the disclosure

10   statement on October 27th, and then ultimately approved -- the

11   Court approved the disclosure statement at a hearing on

12   November 23rd.

13        While the Debtor continued to work towards resolving

14   issues with the Committee with the filed plan, Mr. Dondero,

15   beginning to finally see that the train was leaving the

16   station, started to do whatever he could to get in the way of

17   plan confirmation.

18        He objected to the Acis settlement.  When his objection

19   was overruled, he filed an appeal.

20        He objected to the HarbourVest settlement.  When his

21   objection was overruled, he had Dugaboy file an appeal.

22        He started to interfere with the Debtor's management of

23   its CLOs, stopping trades, refusing to provide support, and

24   threatening Mr. Seery and the Debtor's employees.

25        He had his Advisors and Funds that he owned and controlled

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 20 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 167 of 222 PageID 4224

20

1    file motions that Your Honor said was a waste of time.

2        He had those same Funds and Advisors threaten to terminate

3    the Debtor as a manager, in blatant violation of the Court's

4    January 9, 2020 order.

5        His conduct was so egregious that it warranted entry of a

6    temporary restraining order and preliminary injunction against

7    him.  And of course, he has appealed that ruling as well.

8        But that was not all.  He brazenly threw out his phone, in

9    what the Court has remarked was spoliation of evidence, and he

10   violated the TRO in other ways, actions for which he will

11   answer for at the contempt hearing scheduled later this week.

12       And, of course, he and his pack of related entities have

13   filed a series of objections.  We have received 12 objections

14   to the plan, Your Honor, excluding three joinders.  And as I

15   mentioned, we have been pleased to report that we've been able

16   to resolve six of them:  those of the Senior Employees, those

17   of Patrick Daugherty, those of CLO Holdco, those of the IRS,

18   those of Texas Taxing Authorities, and those of Jack Young and

19   Brad Borud.

20       The CLO Holdco objection was withdrawn in connection with

21   the settlement reached with them in connection with the

22   preliminary injunction hearing that the Court heard -- started

23   to hear last week.

24       The Taxing Authorities' objections have been resolved by

25   the Debtor agreeing to make certain modifications to the plan

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 21 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 168 of 222 PageID 4225

21

1    that were included in our filing yesterday and to include

2    certain provisions in the confirmation order to address other

3    concerns.

4         The group of employees who are referred to as the Senior

5    Employee are comprised of four individuals -- Frank

6    Waterhouse, Thomas Surgent, Scott Ellington, and Isaac

7    Leventon -- although Mr. Ellington and Mr. Leventon are no

8    longer employed by the Debtor.

9         On January 22nd, Your Honor, we filed executed

10   stipulations with Frank Waterhouse and Thomas Surgent.  These

11   stipulations were essentially the Senior Employee stipulations

12   that were referred to in the plan and the disclosure

13   statement.

14        And as part of those stipulations, the Debtor, in

15   consultation with and agreement from the Committee, agreed to

16   certain modifications of the prior version of the Senior

17   Employee stipulation with both Mr. Waterhouse and Mr. Surgent

18   that effectively reduced the compensation they needed to

19   provide for the release from 40 percent to five percent of

20   their claims.

21        The Debtor and the Committee believed the resolution with

22   Mr. Surgent and with Mr. Waterhouse was fair, given the

23   importance of these two people to the transition effort and

24   the increased reliance upon them that the Debtor would have

25   with the departure of Mr. Ellington and Mr. Leventon.  And as

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 22 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 169 of 222 PageID 4226

22

1    a result of that agreement, Your Honor, on January 27th, Mr.

2    Waterhouse and Mr. Surgent withdrew from the Senior Employee

3    objection.

4         Subsequently, we reached agreement with Mr. Ellington and

5    Mr. Leventon to resolve the objections they raised with

6    confirmation.  And at Ms. Dandeneau's request, I would like to

7    read into the record the agreement reached with both of them,

8    and I know she will correct me if I get anything wrong.

9              THE COURT:  Okay.

10             MR. POMERANTZ:  Among other things, Mr. Ellington and

11   Mr. Leventon asserted in their objection that they were

12   entitled to have their liquidated bonus claims treated as

13   Class 7 convenience claims under the plan, under their reading

14   of the plan, and their understanding of communications with

15   Mr. Seery.  The Debtor disputed the entitlement to elect Class

16   7 based upon the terms of the plan, the disclosure statement,

17   and applicable law.  But as I said, the parties have resolved

18   this dispute.

19        Mr. Ellington asserts liquidated bonus claims in the

20   aggregate amount of $1,367,197, which, to receive convenience

21   class treatment under anybody's analysis, would have had to be

22   reduced to a million dollars.

23        Mr. Leventon asserts a liquidated bonus claim in the

24   amount of $598,198.

25        If Mr. Ellington and Mr. Leventon were entitled to be

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 23 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 170 of 222 PageID 4227

23

1   included in the convenience class, as they claimed, they would

2   be entitled to receive 85 percent of their claim as and when

3   the claims were allowed under the plan.

4       To settle the dispute regarding whether, in fact, they

5   would be entitled to the convenience class treatment, they

6   have agreed to reduce the percentage they would otherwise be

7   entitled to receive from 85 percent to 70.125 percent. And as

8   a result, Mr. Ellington's Class 7 convenience claim would be

9   entitled to receive $701,250 if allowed, and Mr. Leventon's

10  Class 7 convenience claim would be entitled to receive

11  $413,175.10 if allowed.

12      Mr. Ellington and Mr. Leventon would reserve the right to

13  assert that a hundred percent of their liquidated bonus claims

14  are entitled to administrative priority, and the Debtor, the

15  Committee, the estate and their successors, would reserve all

16  rights to object.

17      If anyone did object to the allowance of the liquidated

18  bonus claims and Mr. Ellington and/or Mr. Leventon prevailed

19  in such disputes, then the discount that was previously agreed

20  to -- 85 percent to 70.125 percent -- would go away and they

21  would be entitled to receive the full 85 percent payout as

22  essentially a penalty for litigating against them on their

23  allowed claims and losing.

24      As an alternative to the estate preserving the right to

25  object to the allowance of Mr. Ellington and Mr. Leventon's

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 24 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 171 of 222 PageID 4228

24

1    liquidated bonus claims, the Debtor and the Committee have an

2    option to be exercised before the effective date to just agree

3    that both their claims will be allowed, and allowed as Class 7

4    convenience claims.  And if that agreement was reached, then

5    the amount of such liquidated bonus claims, they would receive

6    a payment equal to 60 percent of their allowed convenience

7    class claim.

8        In exchange, Mr. Ellington and Mr. Leventon would waive

9    their right to assert payment of a hundred percent of their

10   liquidated bonus claims as an administrative expense.

11       So, under this circumstance, Mr. Ellington would receive

12   an allowed claim of $600,000, which is 60 percent of a million

13   dollars, and Mr. Leventon will receive a payment on account of

14   his Class 7 claim of $358,918.80.

15       Under both scenarios, Mr. Ellington and Mr. Leventon would

16   preserve their paid time off claims that are treated in Class

17   6, and they would preserve their other claims in Class 8,

18   largely unliquidated indemnification claims, subject to the

19   rights of any party in interest to object to those claims.

20       Mr. Ellington will change his vote in Class 8 from

21   rejecting the plan to accepting the plan, and Mr. Leventon

22   would change his votes in Class 8 and Class 7 from rejecting

23   the plan to accepting the plan.  And Mr. Ellington and Mr.

24   Leventon would withdraw any remaining objections to

25   confirmation of the plan, and we intend to put this settlement

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 25 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 172 of 222 PageID 4229

25

1   in the confirmation order.

2        Your Honor, six objections to the plan remain outstanding.

3   One objection was filed by the Office of the United States

4   Trustee, and the remaining five objections are from Mr.

5   Dondero and his related entities.  And I would like to put up

6   a demonstrative on the screen which shows how all of these

7   objections lead back to Jim Dondero.

8             THE COURT:  All right.

9             MR. POMERANTZ:  You see on the top left, Your Honor,

10  there's a box in white that says A through E, which are the

11  five remaining objections.  And you can see how they relate.

12  But all of it goes back to that orange box in the middle, Jim

13  Dondero.

14       These objections, which I will address in my closing

15  argument in detail, are not really focused on concerns that

16  creditors are being treated unfairly, and that's because Mr.

17  Dondero and his entities don't really have any valid claims.

18  Mr. Dondero owns no equity in the Debtor.  He owns the

19  Debtor's general partner, Strand, which in turn owns a quarter

20  percent of the total equity in the Debtor.  Mr. Dondero's only

21  other claim is a claim for indemnification.  And as Your Honor

22  would expect, the Debtor intends to fight that claim

23  vigorously.

24       Dugaboy and Get Good have asserted frivolous

25  administrative and unsecured claims, which I will discuss in

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 26 of 295
Case 3:21-cv-00538-N   Document 26-5   Filed 06/09/21   Page 173 of 222   PageID 4230

26

1    more detail later.

2         Dugaboy does have an equity interest in the Debtor, but it

3    represents eighteen-hundredths of a percent of the Debtor's

4    total equity.

5         And Mr. Rukavina's clients similarly have no general

6    unsecured claims against the Debtor.  Either his clients did

7    not file proofs of claim or filed claims and then agreed to

8    have them expunged.  The only claims that his clients assert

9    is a disputed administrative claim filed by NexPoint Advisors.

10        And the objections aren't legitimately concerned about the

11   post-confirmation operations of the estate, to preserve equity

12   value, how much people are getting, whether Mr. Seery is

13   really the right person to run these estates.  That's because

14   Mr. Dondero has repeatedly told the Court that he believes his

15   offer, which doesn't come close to satisfying claims in full

16   in this case, is for fair value and that creditors, who are

17   owed more than $280 million, will not receive anywhere close

18   to the amount of their claims.

19        Rather, Mr. Dondero and his entities are concerned with

20   one thing and one thing only:  how to preserve their rights to

21   continue their frivolous litigation after confirmation against

22   the independent directors, the Claimant Trustee, the

23   Litigation Trustee, the employees, the Claimant Trust

24   Oversight Board, and anyone who will stand in their way.  For

25   Mr. Dondero, the decision is binary:  Either give him what he

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 27 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 174 of 222 PageID 4231

27

1   wants, or as he has told Mr. Seery, he will burn down the

2   place.

3       Your Honor will hear a lot of argument today about how the

4   -- and tomorrow, in closing -- about how the injunction, the

5   gatekeeper, and the exculpation provisions of the plan are not

6   appropriate under applicable law.  The Debtor, of course,

7   disagrees with these arguments, and I will address them in

8   detail in my closing argument.

9       But I do think it's important to focus the Court at the

10  outset on the January 9, 2020 order that the Court entered

11  which addressed some of these issues.  This order, which has

12  not been appealed, which was actually agreed to by Mr.

13  Dondero, has no expiration by its terms and will continue

14  post-confirmation, did some things that the Objectors just

15  refuse to recognize and accept.

16      It approved an exculpation for negligence for the

17  independent directors and their agents.  It provided that the

18  Court would be the gatekeeper to determine whether any claims

19  asserted for them -- against them for gross negligence and

20  willful misconduct could be pursued, and if so, provided that

21  this Court would have exclusive jurisdiction to adjudicate

22  those claims.  And it prevented Mr. Dondero and his related

23  entities from causing any related entity to terminate any

24  agreements with the Debtor.

25      I also note, Your Honor, that the Court's July 16, 2020

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 28 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 175 of 222 PageID 4232

28

1   order approving Mr. Seery as chief executive officer and chief

2   restructuring officer included the same exculpation and

3   gatekeeping provision as contained in the January 29th --

4   January 9th order.

5       Your Honor, we have all come too far to allow Mr. Dondero

6   to make good on his promise to Mr. Seery to burn down the

7   place if he didn't get what he wanted.  The Debtor deserves

8   better, the creditors deserve better, and this Court deserves

9   better.

10      That concludes my opening argument, Your Honor.

11          THE COURT:  All right.  Thank you.  I had one follow-

12  up question about the Daugherty settlement.  You did not

13  mention, is it going to be reflected in the confirmation

14  order, is it going to be the subject of a 9019 motion, or

15  something else?

16          MR. POMERANTZ:  It'll be subject to a -- it'll be

17  subject to a 9019 motion, Your Honor.

18          THE COURT:  All right.

19          MR. POMERANTZ:  I apologize for leaving that out.

20          THE COURT:  All right.  Thank you.  Well, --

21          MR. KATHMAN:  Your --

22          THE COURT:  -- I appreciate that you stuck closely to

23  your 20-minute time estimate.

24      As far as other opening statements today, I'm going to

25  start with the objections that were resolved.  Mr. Kathman, I

Case 19-34054-sgj11  Doc 1894  Filed 02/04/21  Entered 02/04/21 10:28:30  Page 29 of 295
Case 3:21-cv-00538-N  Document 26-5  Filed 06/09/21  Page 176 of 222  PageID 4233

29

1  see you there.  Who will speak on behalf of Patrick Daugherty

2  and the announced settlement?

3        OPENING STATEMENT ON BEHALF OF PATRICK DAUGHERTY

4        MR. KATHMAN:  Good morning, Your Honor.  Jason

5  Kathman on behalf of Mr. Daugherty.

6        Mr. Pomerantz correctly recited the bullet points of the

7  settlement that we agreed to in principle this morning.  There

8  was one that he did leave off that I do want to make sure that

9  I mention and that it's read into the record.  And he read at

10  the top end that Mr. Daugherty does maintain his ability to

11  pursue his 2008 tax refund bonus claim, or tax refund

12  compensation claim.  If the Court will recall, there's a

13  contingent liability out there based on how compensation was

14  paid back in 2008 that's the subject of an IRS audit.  And so

15  the settlement expressly contemplates that those -- that that

16  claim will be preserved and Mr. Daugherty may pursue that

17  claim.  Should the IRS have an adverse ruling and we have to

18  pay money back, we get to preserve that claim.

19        And so the one thing that is preserved, Your Honor -- and

20  the same way that Mr. Pomerantz read verbatim the words, I'm

21  going to read verbatim the words that we've agreed to:

22  Daugherty maintains and may pursue the 2008 tax refund

23  compensation portion of his claim that is currently a disputed

24  contingent liability.  The Debtor and all successors reserve

25  the right to assert any and all defenses to this portion of

Case 19-34054-sgj11  Doc 1894  Filed 02/04/21    Entered 02/04/21 10:28:30    Page 30 of 295
Case 3:21-cv-00538-N   Document 26-5   Filed 06/09/21    Page 177 of 222   PageID 4234

30

1   the Daugherty claim.  The litigation of this claim shall be

2   stayed until the IRS makes a final determination, provided,

3   however, Daugherty may file a motion with the Bankruptcy Court

4   seeking to have the amount of his tax claim determined for

5   reservation purposes as a "disputed claim" under the Debtor's

6   plan.  The Debtor and all successors reserve the right to

7   assert any and all defenses to any such motion.

8        So the Debtor's plan says that they can make estimations

9   for disputed claims.  There is not currently something

10  reserving this particular claim, so we wanted to make sure we

11  reserve our rights to be able to have that amount reserved

12  under the Debtor's plan.  And the Debtor obviously preserves

13  their ability to object to that.

14       With that, Your Honor, it is going to be papered up in a

15  9019, and we'll have some further things to say at the 9019

16  hearing, but didn't want to derail the Debtor's confirmation

17  hearing this morning.

18            THE COURT:  All right.  And --

19            MR. POMERANTZ:  And Mr. Kathman is -- Mr. Kathman is

20  correct.  I neglected to mention that provision, but he is --

21  he read it, and that's agreed to.

22            THE COURT:  All right.  And I did not hear anything

23  about Mr. Daugherty's vote on the plan.  Is there an agreement

24  to change or a motion to change the vote from no to yes?

25            MR. KATHMAN:  Your Honor, that wasn't, I think,

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 31 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 178 of 222 PageID 4235

31

1    directly -- and Mr. Pomerantz can correct me if I'm wrong, or

2    Mr. Morris, actually, probably more could -- that wasn't

3    directly addressed, but I think the answer to that is probably

4    they don't need our vote.

5            THE COURT:  Okay.

6            MR. KATHMAN:  I think they have enough votes in that

7    class to carry.

8            THE COURT:  Okay.

9            MR. KATHMAN:  But the answer directly is that that

10   wasn't specifically addressed one way or the other.

11           THE COURT:  All right.

12           MR. POMERANTZ:  That is correct, Your Honor.  We

13   would, of course, not oppose Mr. Daugherty changing his vote,

14   but as Your Honor saw in the ballot summary, we are way over

15   the amount in dollar amounts of claims.  But if they wanted to

16   change their vote, we wouldn't oppose.

17           THE COURT:  All right.  Well, --

18           MR. KATHMAN:  Your Honor, I have -- I have the

19   benefit of Mr. Daugherty.  He is on -- I should note, Mr.

20   Daugherty is on the hearing this morning.  He just let me know

21   that he is willing to change his vote.  If the Debtor were to

22   so make a motion, we're fine changing our vote to in favor of

23   the plan.

24           THE COURT:  All right.  All right.  Well, we'll get

25   the ballot agent declaration or testimony later.  At one time

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 32 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 179 of 222 PageID 4236

32

1    when I had checked, there was a numerosity problem but not a

2    dollar amount problem.  And it sounds like that is no longer

3    an issue, perhaps because of the employee votes, or I don't

4    know.

5         But, all right.  Well, thank you.

6              MR. POMERANTZ:  Your Honor, there is still a

7    numerosity problem.

8              THE COURT:  Okay.

9              MR. POMERANTZ:  There's not a dollar amount problem.

10             THE COURT:  Okay.

11             MR. POMERANTZ:  But we'll address that and cram-down

12   in closing.

13             THE COURT:  All right.  Very good.

14        All right.  Well, I want to hear from the -- what we've

15   called the Senior Employee group.  Is Ms. Dandeneau going to

16   confirm the announcement of Mr. Pomerantz?

17             MS. DANDENEAU:  Yes, Your Honor.  I confirm that Mr.

18   Pomerantz's recitation of the terms to which we've agreed is

19   accurate.

20             THE COURT:  All right.  Very good.

21        All right.  I suppose I should circle back to UBS.  We've,

22   of course, heard in prior hearings the past few weeks that

23   there was a settlement with UBS, but Mr. Clubok, could I get

24   you to confirm what Mr. Pomerantz announced earlier about the

25   UBS settlement?

001519

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 33 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 180 of 222 PageID 4237

33

1          MR. CLUBOK:  Yes.  Good morning again, Your Honor.

2        Yes, we have reached a settlement, and it's just -- and

3    it's been approved internally at UBS and obviously by the

4    Debtor.  It's just subject to the final documentation.  And we

5    are working very closely with the Debtor to try to do that as

6    quickly as possible.

7          THE COURT:  All right.  Thank you.

8        All right.  Well, let me go, then, to other opening

9    statements.  Is there anyone else who at this time wishes to

10   make an opening statement?  And, you know, for the pending

11   objectors, please, no more than 20 minutes.

12         MR. CLEMENTE:  Your Honor?  Your Honor, if I may,

13   it's Matt Clemente on behalf of the Committee.

14         THE COURT:  Okay.

15         MR. CLEMENTE:  I'd be very brief, but I would like to

16   make some remarks to Your Honor.  It'll be less than five

17   minutes.

18         THE COURT:  All right.  Go ahead.

19         MR. CLEMENTE:  Thank you, Your Honor.

20   OPENING STATEMENT ON BEHALF OF THE UNSECURED CREDITORS' COMMITTEE

21         MR. CLEMENTE:  Again, for the record, Matt Clemente;

22   Sidley Austin; on behalf of the Official Committee of

23   Unsecured Creditors.

24       Your Honor, to be clear, the Committee fully supports

25   confirmation of the Debtor's plan and believes the plan is

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 34 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 181 of 222 PageID 4238

34

1  confirmable and should be confirmed.

2      Although it has taken us quite some time to get to this

3  point, Your Honor, and as Mr. Pomerantz referred, the Debtor's

4  business is somewhat complex, the plan is remarkably

5  straightforward, Your Honor, and has only been made

6  complicated by the various objections filed by Mr. Dondero's

7  tentacles.

8      At bottom, Your Honor, the plan is designed to recognize

9  the reality of the situation that the Committee has

10  continually been expressing to Your Honor, and that is the

11  overwhelming amount of creditors in terms of dollars are

12  litigation creditors, creditors who are here entirely because

13  of the fraudulent and other conduct of Mr. Dondero and his

14  tentacles.

15      The other third-party creditors, Your Honor, by and large

16  are those collateral to these litigation claims in terms of

17  true trade creditors and service providers.

18      Recognizing this fact, Your Honor, the plan contains an

19  appropriate convenience class, which, in the Committee's view,

20  provides a fair way to capture a large number of claims and

21  appropriately recognizes the distinction between those claims

22  and the large litigation claims.  And the holders of these

23  large litigation claims, including now Mr. Daugherty, have

24  voted in favor of allowing this convenience class treatment.

25      Your Honor, after distributions are made to the

001521

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 35 of 295
Case 3:21-cv-00538-N   Document 26-5   Filed 06/09/21   Page 182 of 222   PageID 4239

35

1   administrative creditors, the priority creditors, the secured

2   creditors, and the convenience creditors, the remainder goes

3   to general unsecured creditors who will control how this value

4   is realized.  These are the large litigation creditors.

5       Additionally, Your Honor, recognizing the possibility of

6   recovery in excess of general unsecured claims plus interest,

7   and to thwart, from the Committee's perspective, what would

8   have undoubtedly been an argument by one of the Dondero

9   tentacles that the general unsecured creditors could be paid

10  more than they are owed, the plan provides for a contingent

11  interest to kick in after payment in full for interests of all

12  prior claims.

13      Your Honor, this is the sum and substance of the plan.  At

14  bottom, fairly straightforward.  And the true creditors, Your

15  Honor, have voted overwhelmingly in favor of the plan.  Class

16  8 has voted to support the plan.  Class 7 has voted to accept

17  the plan.  And now I believe, with Mr. Daugherty's settlement,

18  one hundred percent in amount of Class 8, non-insider, non-

19  Dondero-controlled or (audio gap) have voted in favor of the

20  plan.

21      To be clear, as Your Honor pointed out and as Mr.

22  Pomerantz referenced, there is not numerosity in Class 8, Your

23  Honor, but that is driven, as Your Honor will see, from

24  approximately 30 no-votes of current employees who the

25  Committee believes are not owed any amounts and therefore they

001522

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 36 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 183 of 222 PageID 4240

36

1    will not be receiving payments under the plan, yet they voted

2    against the plan.  So although we have a technical cram-down

3    plan from the Class 8 perspective, Your Honor, the plan voting

4    reflects the reality that the economic parties in interest

5    overwhelmingly support the plan.

6        So, Your Honor, cutting through the machinations of the

7    Dondero tentacles, we do have a fairly straightforward plan

8    and a plan that the Committee believes is confirmable and

9    should be confirmed.

10       Your Honor, since I've been in front of you for over a

11   year now, I've referred to the goals of the Committee in this

12   case, and the goals are straightforward in terms of expressing

13   them but can be difficult in reality to implement them.  The

14   Committee's goals have been two-fold:  to maximize the value

15   of the estate and therefore the recoveries for its

16   constituency, and to disentangle from the Dondero (audio gap).

17       As with all things Highland, although these goals are

18   straightforward, they're remarkably difficult to achieve,

19   given the Dondero tentacles.  However, the Committee strongly

20   believes the plan achieves these two goals.

21       First, the plan provides a credible path to maximize

22   recovery with Mr. Seery, who has gotten to know the assets and

23   who has performed skillfully and credibly throughout this very

24   difficult process.  It is a difficult set of assets and

25   complex set of assets, as Your Honor knows very well.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 37 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 184 of 222 PageID 4241

37

1    To be sure, there is uncertainty associated with the

2  Debtor's projections, but that is inherent in the nature of

3  the assets of the Debtor, and frankly, is inherent in the

4  nature of projections themselves.  And Mr. Dondero and his

5  tentacles will point to the downside, potentially, in those

6  projections, but the Court will be reminded that there is also

7  potential upside in those projections, an upside that would

8  inure to the benefit of the general unsecured claims.

9    Second, Your Honor, although it is seemingly impossible to

10  free yourself from the Dondero web until every single one of

11  the 2,000 barbed tentacles is painfully removed, if that's

12  even possible, Your Honor, the Reorganized Debtor, the

13  Claimant Trust, the Claimant Trustee, the Litigation Sub-

14  Trust, the Litigation Trustee, and the Oversight Board

15  construct and mechanisms is a structure that the Committee

16  believes provides the creditors with the best possibility to

17  do so, and that is to deal with what will undoubtedly be a

18  flurry of attacks from Mr. Dondero and his tentacles.

19    This is a virtual certainty, Your Honor.  The creditors

20  have seen this movie before and Your Honor has seen this movie

21  before.  They have seen Mr. Dondero make and break promises.

22  They have seen Mr. Dondero attempt to bludgeon adversaries

23  into submission in order to accept his offerings, and they

24  have heard Mr. Dondero say that which he has said in this

25  court during the preliminary injunction hearing --

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 38 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 185 of 222 PageID 4242

38

1    specifically, that the Debtor's plan "is going to end up in a

2    myriad of litigation."

3        The creditors are steeled in their will to be rid of Mr.

4    Dondero, and they're confident in this structure to do so.

5        To be clear, Your Honor, what is before the Court today

6    for confirmation is the Debtor's plan, not some other plan

7    that no one supports other than Mr. Dondero and his tentacles.

8    The question isn't whether Mr. Dondero has a better proposal

9    -- and footnote, Your Honor, the answer is he does not, both

10   from a qualitative and quantitative perspective -- but whether

11   the plan before the Court is in the best interest of creditors

12   and should be confirmed.  The Committee strongly believes it

13   is, and should, and all the Committee members support

14   confirmation of the Debtor's plan.

15       Recognizing Mr. Dondero's behavior, Your Honor, and

16   threats regarding how he will behave in the future, there are

17   certain provisions in the plan that are of critical importance

18   to the creditors.  Of course, all provisions in the plan are

19   extremely important, Your Honor, but as Mr. Pomerantz

20   referenced, the creditors need the gatekeeper, exculpation,

21   and injunction provisions.

22       The reason is obvious, and is emphasized by the

23   supplemental objection filed just yesterday by some of Mr.

24   Dondero's tentacles -- namely, the Dugaboy and the Get Good

25   Trusts.  And I quote, Your Honor:  "It is virtually certain

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 39 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 186 of 222 PageID 4243

39

1    that, under the Debtor's plan, there will be years of

2    litigation in multiple adversary proceedings, appeals, and

3    collection activities, all adding substantial uncertainty and

4    delay."

5      Additionally, Your Honor has seen from the proceedings in

6    this case and has expressed frustration at numerous times at

7    the myriad and at times baseless and borderline frivolous and

8    out of touch with reality suits and objections and proceedings

9    that the Dondero tentacles bring.  The creditors need the

10    gatekeeper, exculpation, and injunction provisions to preserve

11    and protect value.  And the record, I think, to this point is

12    clear, and will be further made clear through the confirmation

13    proceedings, that the protections are appropriate and entirely

14    within this Court's authority to grant.

15      In sum, Your Honor, the Committee fully supports

16    confirmation of the plan.  The Committee believes it is

17    confirmable and should be confirmed, and two classes of

18    creditors and the overwhelming amount of creditors in terms of

19    dollars agree.

20      That's it, Your Honor.  Unless you have questions for me,

21    I have nothing further at this time.

22         THE COURT:  All right.  Thank you, Mr. Clemente.

23         MR. CLEMENTE:  Thank you, Your Honor.

24         THE COURT:  All right.  Who else wishes to be heard?

25         MR. DRAPER:  Your Honor, this is Douglas Draper.  I'd

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 40 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 187 of 222 PageID 4244

40

1    like to be heard. I have a few -- I'll take five minutes, at

2    most --

3          THE COURT: All right. Go ahead.

4          MR. DRAPER: -- and just focus on a few things.

5    OPENING STATEMENT ON BEHALF OF THE GET GOOD TRUST AND DUGABOY

6                INVESTMENT TRUST

7          MR. DRAPER: I'm going to focus my opening remarks on

8    the releases, the exculpations, and channeling injunctions in

9    the plan. I'm not waiving my other objections, but, rather,

10    trying not to subject the Court to hearing the same argument

11    from multiple lawyers.

12      The good thing about the law is that it's absolute in

13    certain respects. It does not matter who is asserting a legal

14    protection, the law applies it. For example, a serial killer

15    is entitled to a *Miranda* warning and a protection against

16    unlawful search and seizure. The law does not allow tainted

17    evidence or an unlawful admission into evidence,

18    notwithstanding the fact that the lack of admission of that

19    evidence may lead to the freeing of that serial killer.

20      Today, you must make an independent evaluation as to

21    whether the plan complies with 1129 and applicable law. The

22    decision must be made notwithstanding the fact that it is

23    being made by a Dondero entity. It's not being -- it must be

24    applied notwithstanding the fact that it's being made by me.

25      We contend that the plan does not meet the hurdle and

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 41 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 188 of 222 PageID 4245

41

1   confirmation should be denied, notwithstanding the fact that

2   the infirmity with the plan is asserted by me and

3   notwithstanding the fact that Mr. Pomerantz and the unsecured

4   creditors have overwhelming support.

5        We all know 1141, the Barton Doctrine, and 544 -- 524

6   provide injunctions and protections for certain parties

7   associated with the Debtor.  Had the plan merely referenced

8   these sections and stated that the injunction, et cetera,

9   shall not exceed those allowed pursuant to *Pacific Lumber*, I

10  would not be making this argument.

11       Instead, we see a plan that has a definition of Exculpated

12  Parties, Released Parties, Related Parties, that exceed the

13  protections afforded by the Bankruptcy Code, the Barton

14  Doctrine, and 524.

15       We have a grant of jurisdiction and oversight that exceeds

16  that allowed under *Craig's Store*, the *Craig's Store* line of

17  cases.

18       We have releases of claims against non-debtor parties,

19  such as Strand, who is, under the Bankruptcy Code, under 723,

20  liable for the debts of the Debtor.

21       The plan, with its expansive releases, released parties,

22  grant of injunctions, exculpations and channeling injunctions,

23  are impermissible under Fifth Circuit case law.  And I would

24  ask the Court to look closely at those definitions, who is --

25  who the law allows to be exculpated and released and who the

001528

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 42 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 189 of 222 PageID 4246

42

1   law specifically prohibits being exculpated and released, and,

2   in fact, apply the *Pacific Lumber* line of -- case, as well as

3   524 and the Bankruptcy Code when you look at these issues.

4        Notwithstanding the overwhelming so-called support by the

5   creditors at issue, the law must be applied, and it must be

6   applied pursuant to what the Fifth Circuit requires.

7             THE COURT:  All right.  Thank you, Mr. Draper.

8        Other Objectors with opening statements?

9             MR. RUKAVINA:  Your Honor, Davor Rukavina.  Briefly?

10            THE COURT:  Okay.

11    OPENING STATEMENT ON BEHALF OF CERTAIN FUNDS AND ADVISORS

12            MR. RUKAVINA:  Your Honor, I represent various funds,

13   including three of which have independent boards.  The Debtor

14   manages more than $140 million of those funds, and the Debtor

15   manages around a billion dollars in CLOs.

16        Whether I am a tentacle of Mr. Dondero or not -- I'm not,

17   since there's an independent board -- the fact remains that

18   the Debtor wants to manage these assets and my clients' money

19   post-assumption and post-confirmation with effective judicial

20   immunity.  So our fundamental problem with this plan is the

21   assumption of those contracts under 365(c) and (b).  I think

22   we'll have to wait for the evidence to see what the Debtor

23   proposes and has, and I will reserve, I guess, the balance of

24   my arguments on that to closing, depending on what the

25   evidence is.

001529

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 43 of 295
Case 3:21-cv-00538-N   Document 26-5   Filed 06/09/21   Page 190 of 222   PageID 4247

43

1     But I don't want the Court to lose sight of the fact that

2   what the Debtor wants to do is, in contravention of our

3   desires, continue managing our assets post-confirmation, even

4   as it liquidates, just to make a buck.  It's our money, Your

5   Honor, and whether we're Dondero or not, we're a couple

6   hundred million, probably, or more, of third-party investment

7   professionals, pension funds, et cetera, and we should not be

8   all tainted without evidence as a tentacle of someone whom,

9   I'll remind everyone here, built a multi-billion dollar

10   company and made a lot of money for people.

11     The second objection, Your Honor, goes to the Class 8

12   rejection.  It sounds like there's still a problem with the

13   number of creditors, even though certain creditors have

14   switched their votes.  That raises now the fair and equitable

15   standard, together with the undue discrimination and the

16   absolute priority rule.  I think we'll have to let the

17   evidence play out, and I'll reserve the balance of my closing

18   or the balance of my remarks to closing on that issue.

19     The third issue, Your Honor, is the same exculpation and

20   release and injunction provisions that Mr. Draper raised.

21   Those are legal matters that I'll discuss at closing, but I do

22   note that the Debtor purports to prevent my clients from

23   exercising post-assumption post-confirmation rights, period.

24   And that's just inappropriate, because if the Debtor wants the

25   benefits of these agreements, well, then of course it has to

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 44 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 191 of 222 PageID 4248

44

1   comply with the burdens. And to say *a priori* that anything

2   that my clients might do post-confirmation would be the result

3   of a bad-faith Mr. Dondero strategy, there's no basis for that

4   and that's not the basis on which my clients' rights in the

5   future, when there is no bankruptcy estate and there is no

6   bankruptcy jurisdiction, can be enjoined.

7      And the final point, Your Honor, entails this channeling

8   injunction. I'll talk about it during closing. It is

9   inappropriate under 28 U.S.C. 959. This is not a Barton

10   Doctrine trustee issue, this is a debtor-in-possession, and a

11   channeling injunction, the Court will have no jurisdiction

12   post-confirmation.

13      Thank you, Your Honor.

14         THE COURT: All right. Thank you.

15      Does Mr. Dondero's counsel have an opening statement?

16         MR. TAYLOR: I do, Your Honor. I'll keep it brief.

17   This is Clay Taylor on behalf of Mr. Dondero.

18         THE COURT: Okay.

19      OPENING STATEMENT ON BEHALF OF JAMES D. DONDERO

20         MR. TAYLOR: Your Honor, the plan is clear in some

21   respects, and I'm not going to belabor these points, as other

22   objecting counsel have already addressed this. But the plan

23   does provide for non-debtor releases, and it provides for non-

24   debtor releases for parties beyond that which is allowed by

25   *Pacific Lumber* and under the Code.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 45 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 192 of 222 PageID 4249

45

1    It also provides for exculpations of non-debtor parties in

2    excess of that which is allowed under the Code and applicable

3    case law.

4        Finally -- or, not finally, but third, it requires this

5    Court to keep a broad retention of post-confirmation

6    jurisdiction that could go on for years, and that is improper.

7        Finally, it requires the parties to submit to the

8    jurisdiction of this Court via a channeling injunction, which

9    we believe is beyond that which is allowed under applicable

10   Fifth Circuit precedent.

11       What is clear, what the evidence will show -- and I

12   thought it was interesting that none of the proponents of plan

13   confirmation ever talk about what the evidence is going to

14   show.  They testified a lot before Your Honor, but they didn't

15   ever talk about what the evidence would show.  What the

16   evidence will show is this plan was solicited via a disclosure

17   statement that told all the unsecured creditors, we project

18   that you're going to receive 87 cents on the dollar on your

19   claim.

20       About two months later, and this was Friday of this past

21   week, they changed those projections, and those projections

22   then showed unsecured creditors, under a plan analysis, that

23   they were going to receive 62 cents on the dollar.  That is in

24   contrast to the liquidation analysis that had been prepared

25   just two months prior showing that, under a hypothetical

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 46 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 193 of 222 PageID 4250

46

1    Chapter 7 liquidation analysis, that the unsecured creditors

2    would receive 65 cents on the dollar.  Obviously, 62 cents is

3    less than 65 percent.

4         Realizing they had a problem, I guess, over the weekend,

5    they changed last night, the night before confirmation, and

6    sent us some new projections that now show that the unsecured

7    creditors under a plan would receive 71 cents on the dollar.

8         Your Honor, what the evidence will show, and it is

9    Highland's burden to show this, is that -- that they meet the

10   best interests of the creditors.  And part of that is that

11   they will do better under a plan rather than under a

12   hypothetical Chapter 7.

13        Quite simply, they don't have the evidence, nor have they

14   done the analysis to be able to prove that to this Court.

15        What the evidence will also show is clear is that Mr.

16   Seery, under the plan analysis, is scheduled to receive at

17   least $3.6 million over just the first two years of this plan

18   if it doesn't go any further.  And that's just for monthly

19   payouts of $150,000 per month.  That's not including a to-be-

20   agreed-upon success fee structure, which hasn't been

21   negotiated yet.  And if it hasn't been negotiated yet, it

22   can't be analyzed yet to see if those costs would exceed their

23   benefits and therefore drive the return down such that a

24   hypothetical Chapter 7 trustee could do better.

25        There is also going to be additional costs for the

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 47 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 194 of 222 PageID 4251

47

1    Litigation Trustee and the fees that they are going to charge.

2    There's going to be an Oversight Committee, and those fees are

3    also to be negotiated.  There's also U.S. Trustee fees, which

4    Mr. Seery tells us that he has calculated within the

5    liquidation and plan analysis numbers, albeit both myself and

6    Mr. Draper, as the evidence will show, have asked for the

7    rollups that come behind the liquidation and plan analysis in

8    each instance of the three iterations that have been done in

9    two months, and we have been denied that information.  That

10   evidence is not going to come in before this Court, and

11   without that rollup information, this Court can't make an

12   independent verification that this meets the best interests of

13   the creditor and better than a hypothetical Chapter 7 trustee.

14        What the evidence will also show, make an assumption that,

15   under a plan analysis, that Mr. Seery will be able to generate

16   higher returns on the sale of the assets of the Highland

17   debtor and its subsidiaries, to the neighborhood of $60

18   million higher.  There is no independent verification of this.

19   There has been no due diligence done.  It was merely an

20   assumption done by Mr. Seery and his advisors, and we submit

21   that they will not have the evidence to show that they can

22   beat a Chapter 7 trustee.

23        This Court does have an alternative before it.  There is

24   an alternative plan that has been filed under seal.  The Court

25   is aware of it.  And it guarantees that creditors will receive

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 48 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 195 of 222 PageID 4252

48

1    at least 65 cents on the dollar.  Moreover, those claims are

2    guaranteed -- and they're going to be secured that they will

3    be paid that money.

4           MR. POMERANTZ:  Your Honor, this is under -- this is

5    under seal.  And I never interrupt somebody's argument, but

6    this plan is under seal for a reason, Your Honor, and I object

7    to any description of the terms of a plan that's not before

8    Your Honor and is under seal.

9           THE COURT:  Okay.  I sustain that objection.

10          MR. TAYLOR:  Your Honor has a means to cut the

11   Gordian knot of the litigation and appeals before it and to

12   ensure that there is certainty for creditors.  It would

13   massively reduce the administrative fee burn that is

14   contemplated under the proposed plan before the Court.  As

15   I've mentioned, it's at least $3.6 million just in monthly

16   fees for Mr. Seery alone.  All of the rest of the fees are yet

17   to be determined and to be negotiated.  I don't see how any

18   analysis could have been done regarding the administrative fee

19   burn that is going to happen over the two years and

20   potentially much further as this case draws on.

21      For those reasons alone, Your Honor, we believe that the

22   plan confirmation should be denied and this Court should look

23   at the alternatives before it.

24          MR. KATHMAN:  Can I say something before --

25          MR. TAYLOR:  Thank you, Your Honor.

001535

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 49 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 196 of 222 PageID 4253

49

1          THE COURT:  All right.  Thank you.

2      All right.  Have I missed any Objectors?

3          MR. KATHMAN:  Your Honor?

4          MS. DRAWHORN:  Yes, Your Honor.

5          THE COURT:  Okay.  Ms. --

6          MR. KATHMAN:  Your Honor, if I could spend just one

7   minute, and I -- we -- I -- we filed a joinder on behalf of

8   Mr. -- or, Jason Kathman on behalf of Davis Deadman, Todd

9   Travers, and Paul Kauffman.

10         THE COURT:  Uh-huh.

11    OPENING STATEMENT ON BEHALF OF DAVIS DEADMAN, TODD TRAVERS,

12                    AND PAUL KAUFFMAN

13         MR. KATHMAN:  Mr. Pomerantz had noted, I think, at

14   the front end that the Debtor amended their plan that resolved

15   those objections.  I just want to say for the record that

16   those had been resolved.

17      And with that, Your Honor, may I be dismissed?

18         THE COURT:  Yes, you may.  Thank you.

19         MR. KATHMAN:  Thank you, Your Honor.

20         THE COURT:  All right.  Was Ms. Drawhorn speaking up

21   to make an opening statement?

22         MS. DRAWHORN:  Yes.

23         THE COURT:  Go ahead.

24         MS. DRAWHORN:  Yes, Your Honor.

25         THE COURT:  Go ahead.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 50 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 197 of 222 PageID 4254

50

1          OPENING STATEMENT ON BEHALF OF THE NEXPOINT PARTIES

2               MS. DRAWHORN:  Just very briefly, Lauren Drawhorn on

3     behalf of NexPoint Real Estate Partners, the NexPoint Real

4     Estate entities, and NexBank.

5          Just a very brief opening.  Just wanted to note that it

6     seems that the Debtor's and the Committee's position seems to

7     be if there's some way, any way, to connect an entity to Mr.

8     Dondero, then they don't need to perform any true evaluation

9     of potential claims or that party's rights or their concerns,

10    and that results in ignoring not only the merits of many

11    claims but also the basic requirements of due process and the

12    statutes, the Bankruptcy Code, and the case law.

13         We filed objections that were focused largely on the

14    injunctions and the releases, and then also the proposed

15    subordination provisions.

16         Two of my clients, one of them has a proof of claim, and

17    while it is being disputed, that claim is out there and should

18    get -- be entitled to be pursued and defended, and many of the

19    injunctions appear to prevent my client from doing so.

20         Similarly, it was mentioned that NexBank, in the

21    demonstrative, had a terminated service agreement, but there's

22    periods of time for which no services were provided but

23    payment was made, and that's a potential admin claim that has

24    been raised.  And the injunction, again, appears to prevent my

25    clients from pursuing these claims.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 51 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 198 of 222 PageID 4255

51

1    So I think, despite the general response to any connection

2    to Dondero means there's no merit, that's not what we're here

3    for today.  We need to really look at the merits of all

4    potential claims and all -- the rights of all parties and the

5    -- how the injunction and release provisions prevent that and

6    how they don't comply with the required law.

7        And, of course, we join in with many of the other

8    objections, but that's my main point for the opening today.

9            THE COURT:  All right.  Thank you.

10   All right.  I think I have covered all of the at least

11   pending objections except the U.S. Trustee.  I'll check again

12   to see if someone is out there for the U.S. Trustee.  (No

13   response.)  All right.  If you're there, we're not hearing

14   you.  You're on mute.

15   Okay.  Any other attorneys out there who wish to make an

16   opening statement?

17   All right.  Well, I'll turn back to Mr. Pomerantz.  You

18   may call your first witness.

19           MR. POMERANTZ:  Okay.  I will turn the virtual podium

20   over to my partner, John Morris, who will be putting on our

21   witnesses.

22           THE COURT:  All right.  Mr. Morris, you may call your

23   first witness.

24           MR. MORRIS:  Good morning, Your Honor.  John Morris

25   from Pachulski Stang Ziehl & Jones on behalf of the Debtor.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 52 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 199 of 222 PageID 4256

52

1    Can you hear me okay?

2              THE COURT:  I can.

3              MR. MORRIS:  Okay.  Thank you very much.

4       The Debtor calls James Seery as its first witness.

5              THE COURT:  All right.  Mr. Seery, if you could say,

6    "Testing, one, two," please.

7              MR. SEERY:  Testing, one, two.

8              THE COURT:  All right.  Hmm, I've not picked up your

9    video yet.  Let's try it again.

10             MR. SEERY:  Testing, one, two.  Testing.

11             MR. MORRIS:  We have the audio.

12             THE COURT:  We have the audio.

13             MR. SEERY:  Oh.

14             MR. MORRIS:  There we go.

15             THE COURT:  There you are.

16             MR. SEERY:  The video should be working.

17             THE COURT:  All right.

18             MR. POMERANTZ:  Yeah.  Actually, one -- Your Honor,

19   one thing before we start.  We have Patrick Leatham from KCC.

20   He is prepared to sit on the line for the whole day until his

21   time comes.  I would just like to know if anyone intends to

22   cross-examine him or object to his declaration.  Because if

23   they don't, we could excuse Mr. Leatham.

24             THE COURT:  All right.  What about that?  Anyone

25   want to cross-examine the balloting agent?

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 53 of 295
Case 3:21-cv-00538-N    Document 26-5    Filed 06/09/21    Page 200 of 222    PageID 4257

53

1          MR. RUKAVINA:  Your Honor, Davor Rukavina.  I do not.

2    If the Debtor would just state, with the change of votes in

3    Class 8, what the final tally is, I see no reason to dispute

4    that, and then we can dismiss this gentleman.  But I do think

5    that we should all know, with the change of votes, what it now

6    is.

7          THE COURT:  All right.

8          MR. POMERANTZ:  We will -- we will work on that, Your

9    Honor, with the changes as a result of the settlements today,

10   and including Mr. Daugherty's client.  We can get that

11   information sometime today.

12         THE COURT:  All right.  So, Mr. Rukavina, do you

13   agree that he can be excused with that representation, or do

14   you want --

15         MR. RUKAVINA:  Yes, Your Honor.

16         THE COURT:  Okay.  All right.  So, it's Mr. Leatham?

17   You are excused if you want to drop off this video.

18      All right.  Mr. Seery, please raise your right hand.

19            JAMES P. SEERY, DEBTOR'S WITNESS, SWORN

20         THE COURT:  All right.  Thank you.  Mr. Morris, go

21   ahead.

22         MR. MORRIS:  Thank you, Your Honor.

23      If I may, I'd like to just begin by moving my exhibits

24   into evidence so that it'll make this all go a little bit

25   smoother.

001540

Case 19-34054-sgj11  Doc 1894  Filed 02/04/21   Entered 02/04/21 10:28:30   Page 54 of 295
Case 3:21-cv-00538-N   Document 26-5   Filed 06/09/21   Page 201 of 222   PageID 4258

54

1          THE COURT:  All right.

2          MR. MORRIS:  And if you'll indulge me just a little

3    patience, please, because the Debtor's exhibits are found in

4    three separate places.

5          THE COURT:  Uh-huh.

6          MR. MORRIS:  And I would just take them one at a

7    time.

8       First, at Docket No. 1822, the Court will find Debtor's

9    Exhibits A through what I'm referring to as 6Z.  Six Zs.  So

10   the Debtor respectfully moves into evidence Exhibits A through

11   6Z on Docket No. 1822.

12         THE COURT:  All right.  Are there any objections?

13         MR. RUKAVINA:  Your Honor, I have a number of

14   targeted objections to all of the exhibits.  Did I hear Mr.

15   Morris say 6Z?

16         THE COURT:  Yes.

17         MR. MORRIS:  Yes.

18         MR. RUKAVINA:  Or six -- then, Your Honor, I can go

19   through my limited objections, if that pleases the Court.

20         THE COURT:  All right.  Go ahead.

21         MR. RUKAVINA:  Your Honor, Exhibit B, a transcript, B

22   as in boy.  Exhibit D, an email, D as in dog.  Exhibit E as in

23   Edward.  Moving on, Your Honor, 4D as in dog.  4E as in

24   Edward.

25         MR. MORRIS:  Slow down, please.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 55 of 295
Case 3:21-cv-00538-N   Document 26-5   Filed 06/09/21   Page 202 of 222   PageID 4259

55

1           THE COURT:  Okay.

2           MR. RUKAVINA:  I'm sorry.

3           THE COURT:  You said 4D as in dog, correct?

4           MR. RUKAVINA:  Then -- yes, Your Honor.  Then 4E as

5    in Edward.

6           THE COURT:  Okay.

7           MR. RUKAVINA:  4G as in George.  Your Honor, one,

8    two, three, four, five T.  5T as in Tom.  And then, Your

9    Honor, one, two -- 6R.  6S.  6T as in Tom.  And 6U as in

10   under.  That's it.

11          THE COURT:  All right.  Well, Mr. Morris, do you want

12   to carve those out for now and just offer them the old-

13   fashioned way and I can rule on the objections then?

14          MR. MORRIS:  Why don't we do that?  I may just deal

15   with it at the end of the case.  But subject to those

16   objections, the Debtor then moves into evidence the balance of

17   the exhibits on Docket 1822.

18          THE COURT:  All right.  So, for the record, the Court

19   will admit all exhibits at Docket No. 1822 at this time except

20   B, D, E, 4D, 4E, 4G, 5T, 6R, 6S, 6T, and 6U.

21      (Debtor's Docket 1822 exhibits, exclusive of Exhibits B,

22   D, E, 4D, 4E, 4G, 5T, 6R, 6S, 6T, and 6U, are received into

23   evidence.)

24          THE COURT:  All right.  Mr. Morris, continue.

25          MR. MORRIS:  Thank you, Your Honor.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 56 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 203 of 222 PageID 4260

56

1      Next, at Docket 1866, you'll find Debtor's Exhibits 7A

2  through 7E, and the Debtor respectfully moves those dockets --

3  documents into evidence.

4          THE COURT:  All right.  Any objection?  (No

5  response.)  Are there any objections?

6          MR. RUKAVINA:  Your Honor, not from -- not from me.

7          THE COURT:  All right.  Hearing no objections, the

8  Court will admit all Debtor exhibits appearing at Docket Entry

9  No. 1866.

10         MR. MORRIS:  Thank you, Your Honor.

11     (Debtor's Docket 1866 exhibits are received into

12  evidence.)

13         MR. MORRIS:  And finally, at Docket 1877, the Court

14  will find Debtor's Exhibits 7F through 7Q, and the Debtor

15  respectfully moves for the admission of those documents into

16  evidence.

17         THE COURT:  All right.  Any objection?

18         MR. RUKAVINA:  Your Honor, I might have to talk about

19  this with Mr. Morris, but I have 7F as any document entered in

20  the case, 7G as any document to be filed, et cetera.  Mr.

21  Morris, am I wrong about that?

22         MR. MORRIS:  I don't have that list in front of me.

23  So I'll reserve on those documents and we can talk about them

24  at a break, Your Honor.

25         THE COURT:  All right.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 57 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 204 of 222 PageID 4261

57

 1           MR. DRAPER:  Your Honor, this is Douglas Draper.  I

 2   object, and I don't have the number in front of me, it's the

 3   liquidation analysis and the plan summary.  It's a summary

 4   exhibit, and we've not been given the underlying documentation

 5   with respect to them.  I'd ask Mr. Morris to deal with that

 6   separately also.

 7           MR. MORRIS:  All right.  Well, we're certainly going

 8   to be moving that into evidence, so we can deal with that at

 9   the time, Your Honor.

10           THE COURT:  Okay.  Which documents are they?  Which

11   exhibits are those?

12           MR. DRAPER:  I don't have the number in front -- Mr.

13   Morris, do you have the number for that exhibit?

14           MR. MORRIS:  I do, but why don't we just deal with it

15   when I -- when I get into --

16           THE COURT:  Okay.

17           MR. MORRIS:  -- into the testimony?

18           THE COURT:  I just wanted the record clear what I am

19   admitting at this time at Docket Entry No. 1877.  Or do you

20   want to just --

21           MR. MORRIS:  Okay.

22           THE COURT:  -- hold all those --

23           MR. MORRIS:  Mr. Rukavina, other than F and G, which

24   you noted, is there any objection to any of the other

25   documents on that witness and exhibit list?

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 58 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 205 of 222 PageID 4262

Seery - Direct                                58

 1          MR. RUKAVINA:  Well, I also have H as impeachment/

 2  rebuttal, I as any document offered by any other party.  So I

 3  would suggest, Mr. Morris, that I have my associate confirm

 4  that I have the right -- the right stuff here, and we can take

 5  it up maybe during a break.  But I have F, G, H, I as so-

 6  called catchalls, not any discrete exhibits.

 7          MR. MORRIS:  All right.  All right, Your Honor.

 8  Let's, let's just proceed.  We've got -- we took care of

 9  Docket No. 1822 and 1866, and the balance we'll deal with at a

10  break, --

11          THE COURT:  All right.

12          MR. MORRIS:  -- unless they come up through

13  testimony.

14          THE COURT:  All right.  That sounds good.

15          MR. MORRIS:  Okay.  Thank you very much.  May I

16  proceed?

17          THE COURT:  You may.

18          MR. MORRIS:  Okay.

19                      DIRECT EXAMINATION

20  BY MR. MORRIS:

21  Q   Good morning, Mr. Seery.

22  A    (no response)

23  Q   Can you hear me?

24  A   Apologies.  I went on mute.  Can you hear me now?  I

25  apologize.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21  Entered 02/04/21 10:28:30  Page 59 of 295
Case 3:21-cv-00538-N  Document 26-5  Filed 06/09/21  Page 206 of 222  PageID 4263

Seery - Direct                          59

1   Q   Yes.  Good morning.

2           MR. MORRIS:  So, let's begin, Your Honor, with just a

3   little bit of background of Mr. Seery and how he got involved

4   in the case.

5   BY MR. MORRIS:

6   Q   Mr. Seery, what's your current position with the Debtor?

7   A   I am the CEO, the CRO -- the chief restructuring officer

8   -- as well as an independent director on the Strand Advisors

9   board of directors.

10  Q   Okay.

11          MR. MORRIS:  Your Honor, I'm going to ask Mr. Seery

12  to describe a bit for his background.  For the record, you'll

13  find that Exhibits 6X, 6Y, and 6Z, on the Debtor's exhibit

14  list at Docket 1822, the resumes and *C.V.s* of the three

15  independent members of the board.  If Your Honor has any

16  question about their qualifications and their experience, that

17  evidence is already in the record.

18          THE COURT:  Okay.

19  BY MR. MORRIS:

20  Q   But Mr. Seery, without going into the detail of everything

21  that's on your *C.V.*, can you just describe for the Court

22  generally your professional background, starting, well, with

23  your time as a lawyer?

24  A   I've been involved in the restructuring, finance,

25  investing and managing of assets and banking-type assets for

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 60 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 207 of 222 PageID 4264

Seery - Direct                        60

1  over 30 years.

2      I began in restructuring in real estate.  Became a lawyer,

3  and was a lawyer in private practice dealing with

4  restructuring and finance for approximately ten years, in

5  addition to time before that on the real estate side.

6      I joined Lehman Brothers on the business side in 1999,

7  where I immediately began working on the -- with a distress

8  team as a team member investing off the balance sheet, Lehman

9  Brothers assets in various types of distressed financing

10  investments.  Bonds, loans, equities.  In addition, then I

11  became the head of Lehman's loan business globally.  I ran

12  that business for the number of years.  Was one of the key

13  players in selling Lehman Brothers to Barclays in a very

14  difficult situation and structure.

15      After that, joined some of my partners, we formed a hedge

16  fund called RiverBirch Capital, about a billion and a half

17  dollar hedge fund in -- operating in -- globally, but mostly

18  U.S. stressed/distressed assets that we invested in.

19  Oftentimes, though, we would run from high-grade assets all

20  the way down to equities, different types of investors,

21  different types of investments.

22      Thereafter, I left -- was -- joined Guggenheim.  I left

23  Guggenheim, and shortly thereafter became a director at

24  Strand.

25  Q   Prior to acceptance of the positions that you described

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 61 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 208 of 222 PageID 4265

Seery - Direct                              61

1    earlier, were you at all familiar with Highland or Mr.

2    Dondero?

3    A    Yeah.  I was, yes.

4    Q    Can you just describe for the Court how you became

5    familiar with Highland and Mr. Dondero?

6    A    Highland was a customer of Lehman Brothers, and it was --

7    particularly in the loan business.  And the CLO businesses.

8    Highland was run by Mr. Dondero, and I knew of that business

9    through that --

10        (Interruption.)

11        MR. MORRIS:  Can somebody please put their device on

12   mute?

13        A VOICE:  That's Mr. Taylor.

14        THE COURT:  Mr. Taylor, you were off mute,

15   apparently, for a moment.  Make sure you're staying on mute.

16   Thank you.

17        MR. TAYLOR:  Yes.  Sorry, Your Honor.  I thought we

18   might have a hearsay objection.  I wasn't sure what the answer

19   was going to be, so I wanted to be prepared to object.

20        THE COURT:  All right.  Thank you.

21   BY MR. MORRIS:

22   Q    Did you know or meet Mr. Dondero in the course of what you

23   just described?

24   A    Yes, I did.  I believe we met once or twice over the

25   years.  There was a senior team member who handled the

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 62 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 209 of 222 PageID 4266

Seery - Direct                                    62

1    Highland relationship.  He was quite good, quite experienced,

2    and he handled most of the Highland relationship issues.  But

3    Highland, we came across a number of times, whether it be in

4    -- I came across a number of times, whether it be in specific

5    investments we had where they would be either a competing

6    party or holding a similar interest, whether they were a

7    customer purchasing loans or securities, whether they were a

8    potential CLO customer where we were structuring some assets

9    for them.

10   Q    Okay.  And who are the two other members of the

11   independent board at Strand?

12   A    John Dubel and Russel Nelms.

13   Q    And had you had any personal experience with either of

14   those gentleman prior to this case?

15   A    I knew of Mr. Nelms and his experience as a bankruptcy

16   judge in the Northern District of Texas, and I had worked on

17   one matter with Mr. Dubel, but very, very briefly, while he

18   was the CEO of FGIC, which is a large insurer in the financial

19   insurance space that he was responsible for reorganizing and

20   ultimately winding down.

21   Q    Okay.  How did you learn about this particular case?  How

22   did you learn about the opportunity or the possibility of

23   becoming an independent director?

24   A    Initially, I was contacted by some of the creditors and

25   asked whether I was interested, and I indicated that I was.

001549

Case 19-34054-sgj11  Doc 1894  Filed 02/04/21    Entered 02/04/21 10:28:30    Page 63 of 295
Case 3:21-cv-00538-N   Document 26-5   Filed 06/09/21   Page 210 of 222   PageID 4267

Seery - Direct                                63

1    Subsequently, I received a call from the Debtor's

2    representatives as well meeting the counsel as well as the

3    financial advisor as well as specific members of the Debtor's

4    senior management.

5    Q    Do you know how long in advance of the January 9th

6    settlement you were first contacted?

7    A    Probably four, four or five days at the most, but started

8    working immediately at that time because it was a pretty

9    complicated matter and the interview process would be quick

10   because of the hearing date that was coming up.

11   Q    Do you recall the names of any of the creditors who

12   reached out to you?

13   A    I spoke to counsel for UBS.  Certainly, Committee counsel.

14   I don't recall if I spoke to anybody from Jenner Block in the

15   initial interview.  And then I spoke to representatives from

16   your firm as well as Mr. Leventon and ultimately Mr.

17   Ellington.

18   Q    Did you do any due diligence before accepting the

19   appointment?

20   A    I did, yes.

21   Q    Can you describe for the Court the due diligence you did

22   before accepting your appointment as independent director?

23   A    Well, I got the petition, I read the petition, as well as

24   the first day, as well as the venue-changing motion.  In

25   addition, I went through the schedules.  Ultimately, I took a

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 64 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 211 of 222 PageID 4268

Seery - Direct                    64

1   look at and examined the limited partnership agreement of the

2   Debtor, with particular focus on the indemnity provisions.  I

3   then sat down with the Committee to get their views as part of

4   the interview process, as well as the Debtor's counsel and

5   Debtor's representatives.

6   Q    Did you -- in the course of your diligence, did you come

7   to an understanding or did you form a view as to why an

8   independent board was being sought at that time?

9   A    Yes, I did.

10  Q    And what view or understanding did you come to?

11  A    There was extreme antipathy from the creditors, as

12  evidenced by the venue motion and the documents around that

13  venue motion.

14       In addition, in the first day order, or affidavit, you

15  could see the issues related to Redeemer and the length of

16  time that litigation has been gone on, going on.

17       The creditors became extremely concern with Mr. Dondero

18  having any control over the operations of the Debtor and

19  wanted to make sure that either he was removed from that or

20  that -- and someone else was brought in, or that the case was

21  somehow taken over by a trustee.

22  Q    Did you form any views as to the causes of the Debtor's

23  bankruptcy filing?

24  A    The initial cause was the entry or the soon-to-be-entered

25  order related to the arbitration with Redeemer, but it was

001551

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 65 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 212 of 222 PageID 4269

Seery - Direct                                      65

 1   pretty clear from looking at the first day that there was a

 2   number of litigations.  The bulk of the creditor body was made

 3   up of -- on the liquidated side was made up of litigation

 4   creditors.  And then the other creditors, the Committee

 5   members, other than Meta-e, were significant litigation

 6   creditors.

 7            MR. MORRIS:  Your Honor, I think Mr. Seery was sworn

 8   in, but unless -- unless you -- if you think there's a need,

 9   I'm happy to have you swear Mr. Seery in again just to make

10   sure his testimony is under oath.

11            THE WITNESS:  I was sworn in.

12            THE COURT:  Yes, I swore him in.

13            MR. MORRIS:  That's what I thought.  That's what I

14   thought.  Somebody had made the suggestion to me, so I was

15   just trying to make sure, because I didn't want any unsworn

16   testimony here today.

17            THE COURT:  We did.

18            MR. MORRIS:  Okay.

19            THE COURT:  We did.

20            MR. MORRIS:  Thank you.  Thank you.

21   BY MR. MORRIS:

22   Q    Ultimately, sir, just to move this along a little bit, do

23   you recall that an agreement was reached with the UCC and Mr.

24   Dondero and the Debtor concerning governance issues?

25   A    Yes, I do.

Case 19-34054-sgj11  Doc 1894  Filed 02/04/21  Entered 02/04/21 10:28:30  Page 66 of 295
Case 3:21-cv-00538-N  Document 26-5  Filed 06/09/21  Page 213 of 222  PageID 4270

Seery - Direct                                              66

1    Q    And did you accept your position as an independent

2    director at Strand as part of that corporate governance

3    settlement?

4    A    That, that was part of the appointment.  We -- the

5    independent directors were brought in to take -- really, to

6    take control of the company as independent fiduciaries.  And

7    the idea, I think, was that there was a Chapter 7 motion that

8    was about to be filed by the Committee, or at least that was

9    the representation, and the Debtor had a choice, they could

10   either accept the independent directors or they could face the

11   motion.

12        What actually happened was a little bit more complicated.

13   The creditors and the Debtor agreed on the selection of Mr.

14   Dubel and myself.  And then because they couldn't agree on the

15   third member of the independent board, they left it to Mr.

16   Dubel and myself to actually come up with a process, interview

17   candidates, and make that selection, which we did, which

18   ultimately became Mr. Nelms.

19   Q    And did all of this take place during that four- or five-

20   day period prior to January 9th?

21   A    It did, yes.

22   Q    Okay.  And let's talk about the makeup of the board.

23   You've identified the other individuals.  How would you

24   characterize the skillset and the capability of the

25   individual?

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 67 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 214 of 222 PageID 4271

Seery - Direct                                    67

1  A    Well, on paper, I think it's a pretty uniquely-constructed

2  board for this type of asset management business with the

3  diversity of these types of assets and the diversity of issues

4  that we had.

5      So, former Judge Nelms, obviously skilled in bankruptcy

6  and the law around bankruptcy, but also very skilled in

7  mediation, conflict resolution, and in particular his

8  prepetition or maybe pre-judicial experience in litigation and

9  litigation involving fiduciary duties we thought could be

10  very, very important because of the myriad of interrelated

11  issues that we could see that might arise.

12      John Dubel is an extremely well-known and respected

13  restructuring professional.  He has been dealing these kinds

14  of assignments as an independent fiduciary for, gosh, as long

15  as I can recall, but at least going back 15 to 20 years.  He

16  had experience in accounting, but he's also been the leader of

17  these kinds of organizations going through restructuring in

18  many operational type roles, and so he was a perfect fit.

19      And my experience in both restructuring as well as asset

20  management and investment I think dovetailed nicely with the

21  experience that Mr. Nelms and Mr. Dubel have.

22  Q    Okay.  Let's talk for just a moment at a high level of the

23  agreement that was reached.  Do you remember that there were

24  several documents that embodied the terms of the agreement?

25  A    Yes, I do.

001554

Seery - Direct                          68

1    Q    And do you remember one of them was an order that the

2    Court entered on January 9th?

3    A    Yes.

4         MR. MORRIS:  All right.  Your Honor, just for the

5    record, and we'll be looking at this, but that would be

6    document Exhibit 5Q as in queen, and that's at Docket No.

7    1822.

8    BY MR. MORRIS:

9    Q    Do you remember there was a separate term sheet, Mr.

10   Seery, that was also part of the agreement among the

11   constituents?

12   A    Yes.  There were -- I think there were a couple of term

13   sheets and stipulations, but I do recall that there was some

14   very specific term sheets with the terms.

15        MR. MORRIS:  All right.  And we'll look at that one

16   as well, Your Honor, but that can be found at Exhibit 5O as in

17   Oscar.

18   BY MR. MORRIS:

19   Q    And then, finally, do you recall that Mr. Dondero signed a

20   stipulation that was also part of the agreement?

21   A    Yes.  That was absolutely key to the agreement for the

22   creditors and perhaps the Court.  But it was really -- it

23   needed to be clear that he was signed on to this transaction.

24        MR. MORRIS:  Okay.  And we'll look at that as well.

25   That's Exhibit 7Q.  And remind me, we'll move that one into

Seery - Direct                                69

1    evidence.

2    BY MR. MORRIS:

3    Q    Did you and the other prospective independent directors

4    actually participate in the negotiation of any aspect of this

5    agreement that you've generally described?

6    A    Absolutely.  Although we hadn't been appointed yet, these

7    agreements were going to be the structure with which -- or

8    under which we would come in as independent fiduciaries.  They

9    would govern a lot of our relationships.  They would provide

10   for the protections that we required and that I required.  So

11   they were exceedingly important to me.

12   Q    Can you describe for the Court at a general level your

13   understanding of the overall structure of the corporate

14   governance settlement?

15   A    From a very high level, the settlement was -- Highland

16   Capital Partners is a limited partnership.  It's managed by

17   its general partner, Strand Advisors.  Although Strand is the

18   GP, its effective interest in Highland is minimal, about .25

19   percent of the effective partnership interest.  But it is the

20   general partner.  So it does govern the -- the partnership.

21       We came in as an independent board that would oversee and

22   control Strand Advisors and thereby, through the general

23   partner position, oversee and control HCMLP, the Debtor.

24       In addition, the Committee then overlaid what we could do

25   with respect to how we operated the business in the ordinary

001556

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 70 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 217 of 222 PageID 4274

Seery - Direct                                    70

1  course in Chapter 11 with a specific set of protocols that

2  governed certain transactions that we would have to get

3  permission from either the Committee or the Court to engage

4  in.

5      And in addition, Mr. Dondero, notwithstanding the

6  insertion of the independent board at Strand, also had a set

7  of restrictions around him, because, of course, not only was

8  he the former control entity at Highland and Strand, he also

9  had a hundred percent of the ownership -- indirectly, of

10  course -- of Strand and could have removed the board.  So

11  there were restrictions around what he could do with respect

12  to the board.  There were also restrictions around what he

13  could do through various entities to terminate contracts and

14  --

15  Q    All right.  We'll look at some of those in detail.  Did,

16  to the best of your recollection, did Mr. Dondero give up his

17  position as president or CEO of the Debtor?

18  A    He did, yes.

19  Q    And did he nevertheless stay on as an employee of the

20  Debtor and retain a position as portfolio manager?

21  A    He did.  At the last second, I believe it was the night

22  before, when we were actually in Dallas preparing for the

23  hearing, but Mr. Ellington raised the concern that if Dondero

24  was removed from not only the presidency but also the

25  portfolio management position, potentially there would be some

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 71 of 295
Case 3:21-cv-00538-N    Document 26-5    Filed 06/09/21    Page 218 of 222    PageID 4275

Seery - Direct                        71

 1 agreements that might or might not be subject to Court

 2 approval that could be terminated and value would be lost.  So

 3 this was a very last-second provision.  Obviously, the -- as

 4 new estate fiduciaries, we didn't want value to be lost

 5 instantly for key man or some other reason.  And the Committee

 6 ultimately, or I guess you'd say reluctantly, agreed to that

 7 because we just didn't have time to look at any of -- any such

 8 agreements.

 9            MR. MORRIS:  All right.  Let's -- can we put up on

10 the screen, Ms. Canty, Debtor's Exhibit 5Q?

11      And this is in evidence, Your Honor.  This is the January

12 9th order.

13      And can we please go to Paragraph 8?

14 BY MR. MORRIS:

15 Q   Mr. Seery, you had mentioned just a few minutes ago that

16 there were certain restrictions that were placed on Mr.

17 Dondero.  Does Paragraph 8, to the best of your recollection,

18 provide for the substance of at least some of those

19 restrictions?

20 A   It does, yes.

21 Q   And can you just describe for the Court your understanding

22 of the restrictions that were imposed on Mr. Dondero pursuant

23 to Paragraph 8?

24 A   Well, as I recall, when Mr. Ellington came in with the

25 last-minute request, the Committee was extremely upset about

001558

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 72 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 219 of 222 PageID 4276

Seery - Direct                                    72

1   it.  We talked about it.  Obviously, we, as an independent

2   board that was going to come in, didn't know the underlying

3   contracts and couldn't really render any judgment as to

4   whether there would be value lost.  So, the Committee agreed,

5   but they wanted to make sure that Mr. Dondero still reported

6   to -- directly to the board, and if the board asked Mr.

7   Dondero to leave, he would do so.

8   Q   Okay.  Just looking at this paragraph, is it your

9   understanding that the scope and responsibilities of Mr.

10  Dondero would be determined by the board?

11  A   Yes.

12  Q   And was it your understanding that Mr. Dondero would serve

13  without compensation?

14  A   Yes.

15          MR. DRAPER:  Objection.  Leading, Your Honor.

16          THE COURT:  Overruled.

17  BY MR. MORRIS:

18  Q   Was it your understanding that Mr. Dondero's role would be

19  subject to the direct supervision, direction, and authority of

20  the board?

21  A   That's, you know, that's what the order says and that's

22  what the agreement was.  In practice, that was really going to

23  have to evolve because we were coming in very cold and

24  obviously he'd been there for --

25          (Interruption.)

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 73 of 295
Case 3:21-cv-00538-N   Document 26-5   Filed 06/09/21   Page 220 of 222   PageID 4277

Seery - Direct                          73

 1              THE COURT:  All right.  Someone needs to put their

 2    phone on mute.  I don't know who it is.

 3    BY MR. MORRIS:

 4    Q    Was it also part of the agreement that Mr. Dondero would

 5    (garbled) upon the board's request?

 6    A    I think I got you, but yes, that's contained in this

 7    paragraph, and Mr. Dondero agreed to that.

 8              THE COURT:  All right.  Whoever LC is, your phone

 9    needs to be put on mute.  Okay.  Please be sensitive to

10    keeping your device on mute except for Mr. Morris and Mr.

11    Seery.

12         All right.  Go ahead.

13    BY MR. MORRIS:

14    Q    Do you recall, Mr. Seery, whether there were any

15    restrictions placed on Mr. Dondero's ability to terminate

16    agreements with the Debtor?

17    A    Yes.  That was a very specific provision as well.

18    Q    Can we take a look at Paragraph 9 below?  Is that the

19    provision that you're referring to?

20    A    That's the provision in the order.  I believe there were

21    other agreements -- certainly, discussion around it -- because

22    it was an important provision because it had been borne out of

23    some experience that Acis and Mr. Terry had had in particular.

24    So it was supposed to be broad and prevent both direct and

25    indirect termination of agreements.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 74 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 221 of 222 PageID 4278

Seery - Direct                                74

1  Q    Okay.  And do you know, do you recall that the definition

2  of related entity is contained within the term sheet that you

3  referred to earlier?

4  A    It's a pretty extensive -- I recall the definition not

5  specifically, but it's a pretty extensive definition.  It

6  includes any of the entities that he owns, that Mr. Dondero

7  owns, that Mr. Dondero controls, that Mr. Dondero manages,

8  that Mr. Dondero owns indirectly, that Mr. Dondero manages

9  indirectly, and it really covers a wide swath of those

10  entities in which he has interests and control.

11            MR. MORRIS:  All right.  Let's see if we could just

12  look at the definition specifically at Exhibit 5O as in Oscar.

13  And if we could just scroll down to the next page.

14       Now, this was -- this is part of the term sheet that was

15  filed at Docket 354.

16  BY MR. MORRIS:

17  Q    At Definition I(d), is that the definition of related

18  entity that you were referring to?

19  A    That's correct.

20  Q    Okay.  In addition to what you've described, I think you

21  also mentioned that there was a separate stipulation that Mr.

22  Dondero entered into as part of the corporate governance

23  settlement.  Do I have that right?

24  A    That's my recollection, yes.  And I believe he signed it,

25  and that was a key gating issue to the hearing that we had on

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 75 of 295
Case 3:21-cv-00538-N Document 26-5 Filed 06/09/21 Page 222 of 222 PageID 4279

Seery - Direct                    75

 1  January 9th.

 2  Q    And what do you recall about that document as being a key

 3  gating issue?

 4  A    The key gating issue that I recall is that it had to be

 5  signed.  And I don't believe it was signed until that very

 6  morning.

 7          MR. MORRIS:  All right.  Can we call up Exhibit 7Q as

 8  in queen?

 9  BY MR. MORRIS:

10  Q    All right.  Is this the stipulation that you were

11  referring to?  We can scroll down to any portion you want.

12  A    I believe that is, yes.

13          MR. MORRIS:  Okay.  Can we just scroll down to see

14  Mr. Dondero's signature?  Yeah.  That's -- okay.

15      So, that's dated January 9th.  This was filed at Docket

16  338.  It's on the Debtor's exhibit list as Exhibit 7Q.  And

17  the Debtor would respectfully move Exhibit 7Q into evidence.

18          THE COURT:  Any objection?  All right.  7Q is

19  admitted.

20      (Debtor's Exhibit 7Q is received into evidence.)

21          MR. MORRIS:  Okay.  And if we could just scroll up a

22  page or two to the four bullet points.  Yeah, right there.  A

23  little more.

24  BY MR. MORRIS:

25  Q    Okay.  So, do you see Paragraph 10 contains the