**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re:** Highland Capital Management, L.P    §   Case No.  19-34054-SGJ-11

Highland Capital Management Fund Advisors, L.P.

et al                                                      §

                          Appellant         §

vs.                                                         §

Highland Capital Management, L.P.,

                                §         3:21-CV-00538-N

                          Appellee          §

**[1943] Order confirming the fifth amended chapter 11 plan,** Entered on 2/22/2021.

## APPELLANT RECORD
## VOLUME 6

MUNSCH HARDT KOPF & HARR, P.C.
Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
3800 Ross Tower
500 N. Akard Street
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

ATTORNEYS FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P. AND
NEXPOINT ADVISORS, L.P.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | ) | Case No. 19-34054 (SGJ11) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

$\mathcal{I} \; \mathcal{N} \mathcal{D} \mathcal{E} \mathcal{X}$

## AMENDED DESIGNATION BY NEXPOINT ADVISORS, L.P. AND HIGHLAND
## CAPITAL MANAGEMENT FUND ADVISORS, L.P.
## OF ITEMS FOR THE RECORD ON APPEAL

COME NOW Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors,

L.P. (the "Appellants"), creditors and parties-in-interest in the above styled and numbered

bankruptcy case (the "Bankruptcy Case") of Highland Capital Management, L.P. (the "Debtor"),

and, with respect to their *Notice of Appeal* [docket no. 1957], hereby file their *Amended*

*Designation of Items for the Record on Appeal* (the "Designation") as follows:

---

| | Item | Bankruptcy Docket Number | Description |
|---|---|---|---|
| | | | **Pleadings and Items on Docket** |
| *Vol. 1* 000001 | 1 | 1957 | Notice of Appeal |
| 000165 000326 | 2 | 1943 | Order (i) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief |
| | 3 | | Docket Sheet of Bankruptcy Case No. 19-34054 |
| *Vol. 2* 000639 | 4 | 1606 | Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 000666 | 5 | 1648 | Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| 000675 | 6 | 1656 | Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 000820 | 7 | 1670 | Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 000870 | 8 | 1719 | Second Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| *Vol. 3* 000880 | 9 | 1749 | Third Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| 000886 | 10 | 1772 | Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 000901 | 11 | 1791 | Notice of Withdrawal of Certain Executory Contracts and Unexpired Leases from List of Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan |
| 000906 | 12 | 1807 | Debtor's Omnibus Reply to Objections to Confirmation of the Fifth Amended Chapter 11 Plan of Reorganization of Highland Capital Management |
| 001031 | 13 | 1808 | Debtor's Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) |
| *Vol. 4* 001097 | 14 | 1811 | Notice of Filing Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (with Technical Modifications) |
| *Vol. 5* 001346 | 15 | 1814 | Debtor's Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |

AMENDED DESIGNATION BY NEXPOINT ADVISORS, L.P. AND HIGHLAND CAPITAL MANAGEMENT
FUND ADVISORS, L.P. OF ITEMS FOR THE RECORD ON APPEAL—Page 2

| Vol 5 | 16 | 1847 | Fourth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| 001414 | | | |
| 001421 | 17 | 1873 | Fifth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| 001427 | 18 | 1875 | Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland of Highland Capital Management, L.P. (As Modified) |
| 001475 | 19 | 1887 | Supplemental Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 001482 | 20 | 1671 | United States Trustee's Limited Objection to Confirmation of Debtors' Fifth Amended Plan of Reorganization |
| | | **Evidence and Transcripts** | |
| 001488 / 001783 | 21 | 1894 | Transcript of February 2, 2021 Confirmation Hearing |
| 002040 | 22 | 1905 | Transcript of February 3, 2021 Confirmation Hearing |
| | 23 | 1917 | Transcript of February 8, 2021 Bench Ruling |
| 002091 / 002188 | 24 | 1794 / 1795 / 1822 / 1863 / 1866 / 1877 / 1895 / 1915 | All exhibits admitted into evidence during February 2 and February 3, 2021 Confirmation Hearing |

Vol 12 - 002931 Vol 50 - 013295 / 013297 Vol. 51 - 013373 Vol. 54 - 014182 Vol. 55 - 014506

✳ 1822 - Vol. 12 - 50 (39 VOLUMES)

RESPECTFULLY SUBMITTED this 22d day of March, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    3800 Ross Tower
    500 N. Akard Street
    Dallas, Texas 75201-6659
    Telephone: (214) 855-7500
    Facsimile: (214) 855-7584
    Email:   drukavina@munsch.com

**ATTORNEYS FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P. AND
NEXPOINT ADVISORS, L.P.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 22d day of March, 2021, true and correct copies of this document were electronically served by the Court's ECF system on parties entitled to notice thereof, including on counsel for the Debtor.

By: /s/ Davor Rukavina
    Davor Rukavina, Esq.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 76 of 295
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 6 of 225   PageID 4285

Seery - Direct                               76

1  stipulation?

2  A    Yes.

3  Q    And as you recall, Mr. Seery, in the events leading up to

4  the entry of the order approving the settlement, was this one

5  of the documents that was being negotiated among -- among the

6  parties?

7  A    Yes, it was.

8  Q    Okay.  You mentioned that there were certain provisions of

9  the January 9th order that were important to you and the other

10 independent directors.  Do I have that right?

11 A    Yes.

12        MR. MORRIS:  Let's see if we can back to Exhibit 5Q,

13 please, Paragraph 4.

14 BY MR. MORRIS:

15 Q    Okay.  Paragraph 4, can you tell me what Paragraph -- what

16 Paragraph 4 is and why it was important to you?

17 A    Well, there really were four key, I guess I'll use the

18 term gating items again, for my involvement, and ultimately in

19 discussions with Mr. Nelms and Mr. Dondero -- Mr. Dubel, their

20 involvement in the matter.

21       Because of the litigious nature of the Highland operations

22 and the expectations we had for more litigation after taking a

23 look at the Acis case, we wanted to make sure that, as

24 independents coming into a situation with really no stake in

25 the particular outcome, other than trying to achieve a

001563

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 77 of 295
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 7 of 225 PageID 4286

Seery - Direct                                    77

1    successful reorganization, that we were protected.  So, number

2    one, I looked at the limited partnership agreement.  I wanted

3    to make sure that the LPA contained broad and at least

4    standard indemnification provisions and that they would apply

5    to the board.

6         Number two, because -- that then requires you to look at

7    the indemnification provisions at Strand, because you're a

8    director of Strand, the GP.  So then we looked at those.  I

9    took a close examination of those.  They looked okay, except

10   Strand didn't have any assets other than its equity interest

11   in Highland, and if that equity interest turned out to be

12   zero, that indemnity wouldn't be very valuable.

13        So I wanted to make sure that Highland, the Debtor,

14   guaranteed the indemnity (garbled) on a postpetition basis, so

15   that if there were a failure of D&O, which I'll get to in a

16   second, or it wasn't enough, that we would have a senior claim

17   in the case, an admin claim in the case.

18        I then, of course, wanted to make sure that we had D&O

19   insurance.  This was very difficult to get, because, frankly,

20   there's a Dondero exclusion in some of the markets, we've been

21   told by our insurance brokers, and so getting the right policy

22   that would cover the independent board was difficult.  We did

23   get that.

24        And then ultimately there'll be another provision in the

25   agreement here -- I don't see it off the top of my head -- but

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 78 of 295
Case 3:21-cv-00538-N    Document 26-6    Filed 06/09/21    Page 8 of 225    PageID 4287

Seery - Direct                                78

1    a gatekeeper provision.  And that provision --

2    Q    Hold on one second, Mr. Seery, because we'd want to

3    scroll.  So Paragraph 4 and Paragraph 5, were those, were

4    those provisions put in there at the insistence of the

5    prospective independent directors?

6    A    Yes.  And remember, so the Paragraph 4, as I said, is the

7    guarantee of Strand's obligations for its indemnity.  Again,

8    Strand didn't have any money, so the Debtor had to be the one

9    purchasing the D&O for the directors and for Strand.  So those

10   are the two provisions that really worked to address my

11   concerns about the indemnities and then the D&O.

12          MR. MORRIS:  Okay.  Can we go to Paragraph 10,

13   please?  There you go.

14   BY MR. MORRIS:

15   Q    Is this the other provision that you were referring to?

16   A    This is.  It's come to be known as the gatekeeper

17   provision, but it's a provision that I actually got from other

18   cases.  Again, another very litigious case that I thought it

19   was appropriate to bring in to this case.

20       And the concept here is that when you're dealing with

21   parties that seem to be willing to engage in decade-long

22   litigation in multiple forums, not only domestically but even

23   throughout the world, it seemed important and prudent for me

24   and a requirement that I set out that somebody would have to

25   come to this Court, the court with jurisdiction over these

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 79 of 295
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 9 of 225   PageID 4288

Seery - Direct                              79

1    matters, to determine whether there was a colorable claim.

2    And that colorable claim would have to show gross negligence

3    and willful misconduct, *i.e.*, something that would not

4    otherwise be indemnified.

5         So it basically sets an exculpation standard for

6    negligence.  It exculpates the directors from negligence.  And

7    if somebody wants to bring a cause against the directors, they

8    have to come to this Court first and get a finding that

9    there's a colorable claim for gross negligence or willful

10   misconduct.

11   Q   Would you have accepted the engagement as an independent

12   director without the Paragraphs 4, 5, and 10 that we just

13   looked at?

14   A   No.  These were very specific requests.  The language here

15   has been 'smithed, to be sure, but I provided the original

16   language for 10 and insisted on the guaranty provision above

17   to assure that the indemnity would have some support.

18   Q   And ultimately, did the Committee and the Debtor agree to

19   provide all of the protection afforded by Paragraphs 4, 5, and

20   10?

21   A   Yes.

22   Q   Okay.

23         MR. MORRIS:  Your Honor, we're going to move on now

24   to good faith, Section 1129(e)(3), just to give you a little

25   bit of a roadmap of where we're going.

001566

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 80 of 295
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 10 of 225 PageID 4289

Seery - Direct                    80

1  BY MR. MORRIS:

2  Q    Let's talk about the process that led to the plan that the

3  Debtor is asking the Court to confirm today.  Real basic stuff

4  at the beginning.  Can you tell me your understanding of the

5  makeup of the UCC, of the Creditors' Committee?

6  A    The Creditors' Committee in this case has four members.

7  It's UBS, the Redeemer Committee, which are former holders of

8  interests in a fund called the Crusader Fund, which was a

9  Highland fund, who had redeemed and then had a dispute with

10 Highland.

11      And the next creditor is Mr. Terry and Acis.  We generally

12 group them as one, but the creditor is Acis.

13      And the fourth creditor is an entity called Meta-e, and

14 they provide litigation support and technical support and

15 discovery support in litigations for the Debtor, including in

16 this case now.

17 Q    All right.  Just focusing really on the early period, the

18 first few months, can you describe the early stages of the

19 negotiations with the UCC as best as you can recall?

20 A    Well, I think the early stage of the case wasn't directly

21 a negotiation; it was really trying to understand as best we

22 could the myriad of assets that we had here, the various

23 businesses that the Debtor either owned, controlled, or

24 managed, as well as the claims.

25      We went through a process of trying to understand each of

001567

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 81 of 295
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 11 of 225   PageID 4290

Seery - Direct                           81

1    the claims that the Debtor -- or against the Debtor that were

2    represented by the Committee, as well as some other claims

3    that were not on the Committee.

4    Q    Was the Debtor -- I mean, was the Committee initially

5    pushing the independent board to go to a monetization plan, an

6    asset monetization plan?

7    A    Very quickly and early on, the Debtor -- the Committee

8    took a pretty aggressive approach with the Debtor and the

9    independent board.  I think the Committee's perspective, as

10   articulated to me, and where -- at least how we took it, was

11   that they'd been litigating for years and they sort of knew

12   the situation and the value of their claims, that the Debtor

13   was insolvent, in their view, and that we should be operating

14   the estate in essence for the benefit of the creditors.

15   Q    And what was the board's view in reaction to that?

16   A    We disputed it.  And the reason we disputed it was very

17   straightforward.  Save for the Redeemer claim, which at least

18   had an arbitration award, Acis and Mr. Terry didn't have any

19   specific awards, notwithstanding the results of the Acis

20   bankruptcy, and UBS, while it had a judgment, that judgment

21   was not against the Debtor.

22        So our view was, until we have our hands around these

23   claims and we determine what the validity is in our estate,

24   that we would treat the Debtor as if it were solvent.  We also

25   wanted to assess the value of the assets.  So, looking at the

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 82 of 295
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 12 of 225   PageID 4291

Seery - Direct                              82

1   assets not just from a book value but what they might be

2   really worth in the market.

3   Q    And did the board in the early portion of the case

4   consider all strategic alternatives?

5   A    I don't know if we considered every strategic alternative,

6   but we certainly considered a lot of alternatives.

7   Q    Can you describe for the Court the alternatives that were

8   considered by the board before settling on the asset

9   monetization plan?

10  A    Well, early on, you know, we looked at each of the -- what

11  we would think of the large category types of ways to resolve

12  a case.  Number one, could we go through a very traditional

13  reorganization with either stretching out claims to creditors

14  after settlement or converting some of those to equity,

15  getting new equity infusions?  We considered those

16  alternatives.

17      Number two, we considered whether we should simply sell

18  the assets.  That's one of the things that the Committee was

19  pushing for.  They could be sold to third parties.  They could

20  be sold individually.  Mr. Dondero potentially could buy some

21  of the assets.  That'd be a reasonable reorganization in this

22  case.

23      We also considered whether that, you know, we would just

24  do a straight liquidation.  Is there some value to doing --

25  converting the case to a 7 and doing a straight liquidation?

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 83 of 295
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 13 of 225   PageID 4292

Seery - Direct                         83

1       We also considered a grand bargain plan, and this was

2   something that I worked on quite a bit.  The phrase is mine,

3   although no pride of authorship, certainly, since it didn't

4   work out.  But that perhaps we could come to an agreement with

5   the major creditors and with Mr. Dondero and then shift some

6   of the expenses in the case out further to litigate some of

7   the other claims while reorganizing around the base business.

8       And then, finally, we considered the asset monetization

9   plan, and ultimately that evolved into what we have today.

10  Q   Were there guiding principles or factors that the board

11  was focused on as it assessed these different options?

12  A   Well, the number one guiding principle was overall

13  fairness and equitable treatment of the various stakeholders.

14  So, again, at that point, we didn't know exactly what, if

15  anything, we would owe to claimants like UBS or HarbourVest or

16  even Mr. Terry and Acis.  We had a good sense of where we

17  would end up with Redeemer, I think, but we still had some

18  options and wanted to negotiate the issues related to

19  potential appeal rights that we had.  So I think that was the

20  number one overall concern.

21      But that did evolve over time.  Costs of the case were

22  exceptionally high.  And the reason they're so high is that

23  Highland was run for a long time, at least from what we can

24  tell, at an operating deficit.  Typically, what it would do is

25  run at a deficit and then sell assets to cover the shortfall,

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 84 of 295
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 14 of 225   PageID 4293

Seery - Direct                              84

1   and it would defer a whole bunch of employee -- potential

2   employee compensation.  And because of the way the environment

3   was going, particularly in the first half of the year, it

4   didn't look to us like there was going to be any great asset

5   increase that would somehow save us from the hole that was

6   being dug, the considerable amount of expenses to run the

7   case.

8   Q    Did changing the culture of litigation factor into the

9   path that the board considered?

10  A    Well, we certainly looked at the way the company had run

11  and why it got to where it is in terms of litigating.  And not

12  just litigating valid claims, but litigating any claim to the

13  *nth* degree.  And stories are legion, I won't talk about them,

14  but of Highland taking outrageous positions and then pursuing

15  them, hoping that the other side caves.

16       We determined that this estate couldn't bear that kind of

17  expense, and it wasn't fair and equitable to do that anyway.

18  So we wanted to attack the claims that we could -- and I say

19  attack; try to resolve them as swiftly as we could --

20  protecting the Debtor's interests but trying to find an

21  equitable resolution.

22       I'm not averse to litigating.  And I think when there are

23  claims that are legitimate, the Debtor should pursue them.

24  There's always -- a good settlement is always better than a

25  bad litigation.  But if there (indecipherable) to resolve

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 85 of 295
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 15 of 225 PageID 4294
Seery - Direct                                85

1    them, we should -- we should pursue those.  And if we have

2    defenses, we should pursue those, and not just be held up

3    because someone else is willing to, you know, take a more

4    difficult position than we are.

5        But in this case, it really did cry out for some sort of

6    resolution on many of these cases because they were far beyond

7    -- far beyond the facts and far beyond the dollars.  There was

8    personal antipathy involved in virtually every one of the

9    unlitigated or unliquidated Committee cases.

10   Q    Did the board, as it was assessing the various strategic

11   alternatives, consider maximization of the value?

12   A    Always number one was, can we maximize value?  But that

13   has to be done within the context of the risk you're taking

14   and the time it takes.  So, not all wine ages well in a cave

15   and not all investments get to be more valuable over time.  We

16   wanted to look at each individual asset that the Debtor had,

17   each claim that the Debtor had, each defense that the Debtor

18   had, and consider the time and the costs and then try to find

19   the best way to maximize value with those multiple

20   considerations.

21   Q    How about the role and support of the UCC, how did that

22   factor into the decision-making, the Debtor's decision-making

23   as to what plan to pursue?

24   A    Well, you know, the decision-making with the UCC was

25   cumbersome and oftentimes difficult.  Sometimes our relations

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 86 of 295
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 16 of 225 PageID 4295

Seery - Direct                                    86

1   were very contentious, and sometimes they continue to be.  But

2   the Committee had significant oversight because of the

3   protocols that had been agreed to.  Some of the disputes we

4   had with the Committee found their way into the court.  Those

5   time and that cost, some of which we won, some of which we

6   lost, but those factored into our analysis.

7        But eventually we knew that we were going to need to get,

8   you know, some significant portion of the Committee to agree,

9   because, at minimum, Meta-e had a liquidated claim, and

10  Redeemer was very close to fully liquidated, so we were going

11  to need support from the Committee with whatever we tried to

12  push through.  And so that's how we negotiated with the

13  Committee from that perspective.

14  Q   Is it fair to say that the Debtor and the Committee's

15  interests because aligned upon approval of the disclosure

16  statement back at the end of November?

17  A   I don't think they became perfectly aligned, because we

18  still have, you know, some disputes around, you know,

19  implementation and things like the employee releases, which

20  were very important to me.  But I think we're largely aligned

21  and that the Committee is supportive, as Mr. Clemente said at

22  the start of this hearing, of the plan.  We negotiated at

23  arm's length with them about most of the provisions.  I would

24  say virtually everything was a relatively significant

25  negotiation, or at least there was a good faith exchange of

001573

Seery - Direct                    87

1    views on each side and assessment of legal and financial

2    risks.  And I think at this point they're largely in support

3    of the plan.

4    Q    All right.  Let's -- you mentioned the grand bargain, and

5    I just want to spend a few minutes talking about that, how

6    that evolved.  Focusing your attention in the kind of late

7    spring/early summer, can you tell me what efforts you and the

8    board made in trying to achieve a grand bargain in that early

9    part of the case?

10   A    Well, we had -- at that point, we had reached agreement,

11   at least in principle, with Redeemer.  And the thought was --

12   my thought was that we could construct a plan, understanding

13   what the cash flows looked like and what we thought the base

14   value of the asset looked like -- and those are not just the

15   assets that are tangible assets, but the notes that are

16   collectible by the Debtor as well -- and then engage with UBS

17   in particular.  Redeemer.  To some degree, Mr. Terry.  We had

18   not yet reached any agreement with him.  But UBS, we thought

19   of as a slightly -- I don't mean this to be disparaging -- but

20   a slightly more commercial player than Acis because of the

21   history that Acis had to deal with and endure.

22        And we were hoping that we could get some sort of

23   coalescence around an agreed distribution that would require

24   those creditors to take a lot less than they might have

25   otherwise agreed, Mr. Dondero to put in more than he otherwise

001574

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 88 of 295
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 18 of 225   PageID 4297

Seery - Direct                          88

1    thought he could put in or would be willing to put in, and

2    then we would get out to Acis and the other creditors with a

3    plan.

4          And so I built, with the team at DSI, a detailed model on

5    how the distributions could work and what the potential timing

6    could be, trying to, each time, move in a multidimensional way

7    with UBS, Redeemer, Mr. Dondero, and to some degree Acis,

8    around the respective issues for their claims.

9          Again, UBS and Acis had not been resolved and weren't

10   close, but the thought was if we could get dollar agreements

11   for distribution, perhaps we could then figure out how to

12   construct settlements of their claims.

13   Q    During this time period, did you work directly with Mr.

14   Dondero in the formulation of a potential grand bargain?

15   A    I did, yes.

16   Q    And the model that you described, did that go through a

17   number of iterations?

18   A    It went through multiple iterations.  I don't believe I

19   ever shared the model with anybody.  One of the reasons for

20   that is I didn't want -- I felt I had -- if I was going to

21   share it with Mr. Dondero, for example, I'd have to share it

22   with UBS and I'd have to share it with Redeemer.  And I wanted

23   it to be -- I wanted it to be a working model with the team at

24   DSI.  In particular, we would make, you know, adjustments on

25   an almost-daily basis.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 89 of 295
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 19 of 225 PageID 4298

Seery - Direct                                89

1    Mr. Dondero had -- remember, he was still portfolio

2    manager at that time.  He also had a related-party interest,

3    as people have seen from some of the litigation around the

4    sales of securities.  He had access and was receiving emails

5    from the team as well as from the finance team.  So he had

6    access to the information at that point and had a view around

7    the value.  And this was more trying to adjust what those

8    distributions would look like depending on the amounts that he

9    would be willing to contribute.

10   Q    Moving on in time, did there come a time when the Debtor

11   participated in a mediation with certain of the major

12   constituents in the case?

13   A    Yes.  That was towards the end of the summer.

14   Q    And during that mediation, did the concept of a grand

15   bargain, was that put on the table?  Without discussing any

16   particulars about it, just as a matter of process, was the

17   grand bargain subject to the mediation discussions?

18   A    Well, the mediation had multiple components, so the answer

19   to the question in short is yes, but I'll go longer because I

20   tend to.  The grand bargain plan stayed in place, and that was

21   going to be an overall settlement.  The mediation was

22   initially, I think, as a main course, focused on Acis, UBS,

23   and then the third piece being the grand bargain.  And if you

24   could settle one of those claims, perhaps -- obviously, if you

25   could settle both of them, you could get to then focusing on

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 90 of 295
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 20 of 225   PageID 4299

Seery - Direct                        90

1  the grand bargain.

2      But even before we got to mediation, the idea of the

3  monetization plan had also been put forth.  Notwithstanding

4  that it wasn't my idea, I actually thought that it was a good

5  idea, ultimately.  Didn't initially.  And the reason for that

6  is that it set a marker for what a base expectation could be

7  for the creditors and just for Mr. Dondero.  And knowing that

8  that was out there, at least with them, that could hopefully

9  be a catalyst in the mediation for folks to say, let's see if

10 we can get our claims done and get a grand bargain done,

11 because if we don't we have this Debtor monetization plan.

12 And by that -- at that point, I don't think we had much

13 agreement with the Committee on anything, and certainly with

14 Mr. Dondero, on -- on a monetization plan.

15 Q    All right.  And let's just bring it forward from the fall,

16 post-mediation, to the present.  Has -- has -- have you and

17 the board continued discussing with Mr. Dondero the

18 possibility of a grand bargain?

19 A    Well, it's shifted.  So, the grand bargain discussions

20 really -- you had multiple phases.  So, you had pre-mediation.

21 There was the grand bargain discussions that I just described

22 previously that also involved UBS and Redeemer, and to some

23 degree Acis and Mr. Terry.  Then you have the mediation, which

24 is much more focused on the claims and whether they can fit

25 into the grand bargain with Mr. Dondero.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 91 of 295
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 21 of 225 PageID 4300

Seery - Direct                                                91

1        And the way that was conducted was a little bit more

2   separated, meaning the parties would talk to the mediator, the

3   mediator would then go and talk to other parties and try to

4   work a settlement on each of those components.

5        Subsequent to the mediation where we reached the agreement

6   with Acis and Mr. Terry, and we ultimately in that timeframe

7   banged out the final terms of our agreement with Redeemer, we

8   engaged with Mr. Dondero around -- I wouldn't call it the

9   grand bargain, but a different plan.  By that point, the

10  monetization plan had started to gain some traction with the

11  creditor group, and Mr. Dondero and his counsel, I believe,

12  focused on the potential of what was referred to as a pot

13  plan.  And while it has the -- it could have the ability of

14  being a resolution plan, it wasn't the grand bargain plan that

15  I had initially envisioned.  And pot plan was really a

16  misnomer, because it didn't have a whole pot, so -- so it's a

17  little bit of a hybrid.

18  Q    Did the board spend time during its meetings discussing

19  various pot plan proposals that had been put forth by Mr.

20  Dondero?

21  A    Oh, absolutely.  And not only the board.  I mean, we did

22  our own work as an independent board and then brought in our

23  professional advisors, both your firm and the DSI folks, to go

24  through analytics around the pot plan, and even before that,

25  the other plan alternatives, but we had direct discussions

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 92 of 295
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 22 of 225   PageID 4301

Seery - Direct                                    92

1  with Mr. Dondero and his counsel.

2  Q    And in the last couple of months, has the board listened

3  to presentations that were made by Mr. Dondero and his counsel

4  concerning various forms of the pot plan?

5  A    Yes.  At least two or three.

6  Q    And during this time, has the board and the Debtor

7  communicated with the Committee concerning different

8  iterations of the proposed pot plan?

9  A    Yes.  We've had continual discussions with the Committee

10  regarding the various iterations of the potential grand

11  bargain all the way through the pot plan.

12  Q    And during this process, did the Debtor provide Mr.

13  Dondero and his counsel with certain financial information

14  that had been requested?

15  A    Yes.  As I said, up 'til the point where he resigned and

16  was then ultimately, at the end of the year, removed from the

17  office, he had access to financial information related to the

18  Debtor and even got the information from the financial group.

19  Subsequent to that, we've provided him with requests -- with

20  financial information that was requested by his counsel.

21  Q    Okay.  Were your efforts at the grand bargain or the

22  pursuit of the pot plan successful?

23  A    No, they were not.

24  Q    Do you have an understanding as to -- just, again, without

25  going into -- into details about any particular proposal, do

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 93 of 295
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 23 of 225   PageID 4302

Seery - Direct                                93

1    you have an understanding as to what the barrier was to

2    success?

3    A    The grand bargain, we just never got the traction that we

4    needed to get that going and the sides were just far -- too

5    far apart.  And the pot plan, similarly.  Our discussions with

6    Mr. Dondero and the Committee, they're -- they're very far

7    apart.

8    Q    And is it fair to say that the Committee's lack of support

9    in either the grand bargain or the pot plan is the principal

10   cause as to why we're not talking about that today?

11   A    Well, it's -- it -- right now, we've got the plan that's

12   on file, the monetization plan.  The monetization plan has

13   gone out for creditor vote and has received support.  It

14   distributes, we think, equitably, as well as a significant

15   amount of distributions to unsecured creditors.  And there

16   really isn't an alternative that we see, based upon the

17   numbers I've seen, that competes with it or has any traction

18   with the largest creditors.

19   Q    All right.  So, now we've talked about various proposals

20   or alternatives that were considered by the board, including

21   the grand bargain and the pot plan.  Let's spend some time

22   talking about the plan that is before the Court today and how

23   we got here.  And I'd like to take you really back to the

24   beginning, if I may.

25       Tell us, tell the Court just what the board was doing in

Seery - Direct                          94

1    the early months after getting appointed, because I think

2    context is important here.  What were you all doing the first

3    few months of the case?

4    A    Well, the first few months, we really were drinking from

5    the proverbial fire hose, trying to get an understanding of

6    the business, how it had been managed previously, what the

7    issues related to the different parts of the business were.

8    And then an understanding of each of the employees that were

9    working under us, what their roles were, how they performed

10   them, who sat where with respect to each of the assets, what

11   the contracts looked like, whether they be shared service or

12   management agreements.  And then we started looking at the

13   individual assets in terms of value.

14        At the same time, we were trying to get up to speed on the

15   complex nature of the claims that were in the case.  The

16   liquidated claims were relatively easy, but there had been a

17   significant amount of transfers in and out of the Debtor, and

18   then there's a myriad of relationships involving related

19   entities that we had to understand, both with respect to the

20   claims as well as with respect to the assets.

21        And so that -- those were the main things we were doing

22   for those first few months in the case.

23   Q    Just a couple months into the case, the COVID pandemic

24   reared its head.  Do you recall that?

25   A    Yes.  We had been in Dallas every day working up 'til the

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 95 of 295
Case 3:21-cv-00538-N    Document 26-6    Filed 06/09/21    Page 25 of 225    PageID 4304

Seery - Direct                                95

1  time of the COVID and some of the shutdown orders,

2  particularly in the Northeast, and so that changed the dynamic

3  of how we could function every day.

4      Notwithstanding that, we -- we were able to manage from

5  afar, and ultimately, when there were some cases in the office

6  of COVID, we -- on the Highland side, not the related entity

7  side, but on the Highland side -- we determined that the staff

8  and the team should work from home, which they were able to do

9  quite well.

10 Q    Okay.  In those early months, do you recall that there was

11 a substantial erosion of value, at least as of the time you

12 were appointed in those first three or four months?

13 A    There was.  And I think we've heard some -- some noise

14 about what that value was and the drop in the asset value as

15 opposed to net value.  But the asset value did, did drop

16 significantly.

17 Q    Can you describe for the Court your recollection as to the

18 causes of the drop in the value that you just descried?

19 A    Yes.  The number one drop was a reservation that the board

20 took for a receivable from an entity called Hunter Mountain.

21 The quick version of this is that Hunter Mountain owns

22 Highland.  As I mentioned, while Strand is the GP, it only has

23 a quarter-percent interest in Highland.  The vast majority of

24 the interests are owned by an entity called the Hunter

25 Mountain Investment Trust in a very complicated, tax-driven

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 96 of 295
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 26 of 225 PageID 4305

Seery - Direct                                96

1    structure.

2        Dondero and Okada transferred their interests in Highland

3    at a high valuation to Hunter Mountain.  Hunter Mountain then

4    didn't have the money, so it, in essence, borrowed the money

5    from the Debtor in a note to pay for those interests.  There's

6    a circular running of the cash, but we were not sure where, if

7    any, where any assets are, if they would be sufficient.  So we

8    took a reservation of $58 million for that note.

9        The second biggest piece of the reduction in value was the

10   equity that was lost in the Select Equity account.  This is a

11   Debtor trading account that was managed by Mr. Dondero.  $54

12   million was lost in that account.  Basically, it was really

13   highly margined, very high leverage in that account when the

14   market volatility came in.  As it grew through January,

15   February, March, more and more margin calls.  Ultimately,

16   Jefferies, which had Safe Harbor protections -- technically,

17   the account was not a Debtor account, but they would have had

18   it anyway -- they seized that account.  $54 million in equity

19   was lost in that account.

20       The next highest amount is about $35 million, but it's

21   higher now.  That's just the bankruptcy costs, where we have

22   spent cash and Debtor assets in the case.  It was about $36 to

23   $40 million through the end of the year.  That's now higher.

24       About $30 million was lost in paying back Jefferies on the

25   asset side of the ledger in the Highland internal equity

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 97 of 295
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 27 of 225   PageID 4306

Seery - Direct                                      97

1  account.  This was similar to the equity -- the Select Equity

2  account, also managed by Mr. Dondero.  Extremely highly-

3  levered coming into the market volatility of the first

4  quarter, which was exacerbated, obviously, by the COVID.  That

5  was about $30 million that was repaid in margin loan in that

6  account.

7      In addition, $25 million of equity was lost in that

8  account while Mr. Dondero was managing it.  I took over

9  effectively managing it in mid-March and worked with Jefferies

10 to keep them from seizing the account.  We've since gotten a

11 bunch of value coming back from that account, but that was the

12 amount that was lost.

13     About $10 million was lost in the Carey Limousine loan

14 transaction.  That is a -- an interesting little company.  Has

15 done a nice job -- management did a very good job coming into

16 the year, and it actually had real value, notwithstanding the

17 changeover to Uber in people's preferences.  But with the

18 COVID, it really relied on events, airport travel, executive

19 travel, and that really took a bite out of it, although, you

20 know, we're hoping to be able to restructure, we have

21 restructured it to some degree, and we're hoping that there

22 could be value there.

23     And then about $7 million was lost in equity in an entity

24 called NexPoint Hospitality Trust.  This is another extremely

25 highly-levered hospitality REIT that NexPoint manages.  It

001584

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 98 of 295
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 28 of 225   PageID 4307
Seery - Direct                    98

1    trades on the Toronto Stock Exchange.  And I think likely that

2    -- it's got a lot of issues with respect to its mortgage debt.

3    And because it was hospitality, it was really hurt by the

4    COVID.

5       And I think that's probably -- those numbers add up to

6    north of $200 million of the loss.

7    Q    All right.  Thank you for that recitation, Mr. Seery.  So,

8    turning to the spring, after all of those issues were

9    addressed, at the same time you were working on the grand

10   bargain, did the Debtor and its professionals begin

11   formulating the monetization plan that we have today?

12   A    I'm sorry, in the spring?  I lost that question.  I

13   apologize.

14   Q    That's okay.  After you dealt with everything that you

15   just described, were you doing two things at once?  Were you

16   working on the grand bargain and the asset monetization plan

17   at the same time?

18   A    Yes, that's correct.

19   Q    All right.  Can you just describe for the Court kind of,

20   you know, how the asset monetization plan evolved up until the

21   point of the mediation?

22   A    Yes.  I alluded to it earlier, but because the Debtor was

23   running an operating deficit, we were very concerned about

24   liquidity.  Highland typically runs, from a liquidity

25   perspective and a cash perspective, very close to the edge.  I

001585

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 99 of 295
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 29 of 225 PageID 4308

Seery - Direct                99

1   don't feel particularly comfortable helping lead an

2   organization that's running that close to the edge.  And I was

3   very focused on the burn that we had on an operating basis, as

4   well as the professional cost burn, because for a case this

5   size it was significant.

6        The rest of the board felt similarly, and one of the

7   directors, and I'm not sure if it was Mr. Nelms or Mr. Dubel,

8   came up with the idea that we needed an alternative to

9   continuing to just burn assets while we were in this case.

10  There had to be some sort of catalyst to get the parties, both

11  Mr. Dondero as well as the creditors -- at that point, as I

12  said, we weren't settled with Acis or UBS, and we weren't,

13  frankly, close with either of them.  And so we needed what --

14  what I think the -- the idea was that we needed a catalyst to

15  have people focus on what the alternative was.  Because

16  continuing to run the case until we ran out of money was not

17  an acceptable alternative.

18       What I didn't like about the plan was it didn't have

19  anybody's support, and so I wasn't sure how we made progress

20  with it without having some Committee member or Mr. Dondero in

21  support of it.  I was outvoted, although maybe I came around

22  in the actual vote.  But ultimately, I think it was actually a

23  quite smart idea, because it did set the basis for what the

24  case would be.  Either there would be some resolution or it

25  would push towards the monetization plan, and parties could

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 100 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 30 of 225 PageID 4309

Seery - Direct                                    100

 1   then assess whether they liked the monetization plan or not.

 2   That if I was going to be the Claimant Trustee or the --

 3   defending the, you know, against the claims, they would have

 4   the pleasure of litigating with me for some period of time.

 5   Or they could come to some either grand bargain or ultimately

 6   some other resolution.

 7       And as we started to develop a plan and put more of a

 8   framework -- more flesh around the framework, it actually

 9   started to look more and more like a real viable alternative

10   to either long-term litigation or some other grand bargain if

11   we couldn't get there.

12   Q   And ultimately, did the board authorize the Debtor to file

13   its initial version of the asset monetization plan at around

14   the time of the mediation?

15   A   Yeah.  We developed it over the summer and really fleshed

16   it out in terms of how the structure would work, what the tax

17   issues were, what the governance issues were.  We did that

18   largely negotiating with ourselves, so we -- we were extremely

19   successful.  And then we filed, we filed that plan right

20   before the mediation.

21       And my recollection is that there was some concern from

22   the mediators that they thought that putting that plan out in

23   the public could upset the possibility of a grand bargain, so

24   we ended up filing that under seal.

25   Q   Do you recall what the Committee's initial reaction was to

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 101 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 31 of 225 PageID 4310
Seery - Direct                                                   101

1   the asset monetization plan that you filed under seal?

2   A   Well, initially, they -- the Committee didn't like it.

3   They didn't like the governance.  They didn't like the fact

4   that it set up for those creditors who didn't litigate the

5   prospect of litigations to try to resolve their claims.  It

6   effectively cut out some of the advisory that the Committee

7   currently had.  The -- one of the driving forces behind the

8   asset monetization plan and how we initially started it is we

9   can't continue these costs, as I said.  Well, an easy way to

10   get rid of -- to reduce the costs is to get rid of half of

11   them.

12      So if you could get rid of the Committee, effectively, and

13   coalesce around an asset monetization vehicle, then if folks

14   wanted to resolve their claim, you could.  If you had to

15   litigate it, you could, but you'd have one set of lawyers that

16   the estate was paying for, one set of financial advisors the

17   estate was paying for, as opposed to multiple sets.

18   Q   In addition to the corporate governance issues that you

19   just described, did the Committee and the Debtor quickly reach

20   an agreement on the terms of the treatment of employee claims

21   and the scope of the releases for the employees?

22   A   No.  Not very quickly at all.

23   Q   Yeah.

24   A   You know, again, one of the issues in this case that

25   drives perspectives is the history that creditors have in

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 102 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 32 of 225 PageID 4311

Seery - Direct                                102

1    dealing with Highland and in dealing with many of the

2    employees at Highland, you know, who had worked for Mr.

3    Dondero and served at his pleasure for a long time, and how

4    they had been treated in various of their attempts to collect

5    their claims.  So the idea of giving any sort of releases to

6    the employees was anathema to -- to many of the Committee

7    members.

8         From my perspective, you know, releases are particularly

9    important because there's a *quid pro quo* leading up to the

10   confirmation of a plan, particularly with a monetization plan

11   where it's clear that the employees are all going to be or

12   largely going to be either transitioned or terminated.  If

13   they're going to keep working towards that, we either have to

14   have some sort of financial incentive or some sort of

15   assurance that their actions which are done in good faith to

16   try to pursue this give them the benefit of more than just

17   their paycheck.

18        And so we thought we were setting up the *quid pro quo* in

19   terms of work towards the monetization, bring the case home,

20   and you're entitled to a release, so long as you haven't done

21   something that was grossly negligent or willful misconduct.

22   And the Committee, I think, wanted to have a more aggressive

23   posture.

24   Q    And did those disagreements over corporate governance and

25   the employee releases kind of spill out into the public at

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 103 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 33 of 225 PageID 4312

Seery - Direct                                                  103

1   that disclosure statement hearing in October?

2   A    I think they spilled out at that hearing as well as in the

3   hearing either the next day or two days later around Mr.

4   Daugherty's claim.  And again, it was -- it was contentious.

5   I tend to try to reach resolution, but I tend to hold firm

6   when I think that there's a good reason, an equitable reason

7   to do so, and compromising that issue was very difficult for

8   me.

9   Q    But in the weeks that followed, did the Committee and the

10  Debtor indeed negotiate to resolve to their mutual

11  satisfaction the issues surrounding corporate governance and

12  employee releases?

13  A    We did, yes.

14  Q    And were -- was the Debtor able to get its disclosure

15  statement approved with Committee support in late November?

16  A    We did, yes.

17  Q    Can you describe for the Court generally kind of the

18  process by which the Debtor negotiated with the Committee?

19  I'll ask it as broadly as I can, and I'll focus if I need to.

20  A    Yeah.  The process was usually in group settings with the

21  independent directors, professionals, and the Committee

22  members and their professionals.  Oftentimes, then, there

23  would be certain one-off conversations if there was a

24  particular issue that was more important to one Committee

25  member or another, or if they were designated by the Committee

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 104 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 34 of 225 PageID 4313

Seery - Direct                                104

1  to be the point on that.  And so I negotiated on behalf of the

2  Debtor, both collectively and individually, around these

3  points.

4       The biggest issues related to governance of the Claimant

5  Trust, the separation of the Claimant Trust and the Litigation

6  Trust, which was important to me, the treatment of employees

7  between the filing -- the time we came up with the case and

8  when we were going to exit, and then how that release

9  provision would work.

10 Q    Is it fair to say that numerous iterations of the various

11 documents that embodied the plan were exchanged between the

12 Debtor and the Committee?

13 A    Yes.  There were -- there were dozens.

14 Q    Fair to say that the negotiations were arm's length?

15 A    Absolutely.  Often contentious, always professional, but I

16 do think that there were, you know, well -- good-faith views

17 held by folks on both sides.  And I think we were fortunate to

18 be able to get resolution of those, because they were

19 strongly-held views.

20 Q    Okay.  And ultimately, I think you've already testified,

21 and Mr. Clemente certainly made it clear:  Is the Debtor --

22 does the Debtor have the Committee on board for their plan

23 today?

24 A    My understanding is again -- and you heard Mr. Clemente --

25 both the Committee and each of the individual members are

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 105 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 35 of 225 PageID 4314

Seery - Direct                    105

1  supportive of the plan.

2  Q   All right.  Let's switch to Mr. Dondero and his reaction

3  to the asset monetization plan.  Can you describe for the

4  Court based on your experience and your interaction with him

5  what you interpreted Mr. Dondero's position to be?

6            A VOICE:  Objection, hearsay, or --

7            MR. DRAPER:  Objection, hearsay.  Calls for

8  speculation, Your Honor.

9            THE COURT:  Overruled.

10           THE WITNESS:  Yeah.  I had direct discussions with

11 Mr. Dondero regarding the plan, the asset monetization plan,

12 as I mentioned, direct discussions regarding a potential grand

13 bargain.  The initial view from Mr. Dondero was, and he told

14 me, that if he didn't get a plan that he agreed to, if he

15 didn't have a specific control or agreement around what got

16 paid to Acis and Mr. Terry and what got paid to Redeemer

17 specifically, that he would, quote, burn the place down.  I

18 know that because it is, excuse the pun, seared into my mind,

19 but I also wrote it down.  And that was, you know, in the

20 early summer.

21     We had subsequent discussions around the plan, and as we

22 were talking about the -- about the grand bargain or -- the

23 pot plan hadn't come out at that point -- even on a large call

24 -- the plan initially called for a transition, and still does,

25 of employees of the Debtor to a related entity to continue

1  performing services that were under the prior shared service

2  agreements that we were going to terminate.

3      But that transition is wholly dependent on Mr. Dondero.

4  And we had a call with at least five to seven people on it

5  where I said to Mr. Dondero, look, this is going to be in your

6  financial interest to agree to a smooth transition.  These

7  people have worked for you for a long time.  It's for their

8  benefit.  You portfolio-manage these funds.  It's to the

9  benefit of those funds to do this smoothly.  And if there's

10 litigation between you and the estate later, then those chips

11 will fall where they may.

12     And he told me to be prepared for a much more difficult

13 transition than I envisioned.

14     And I specifically said to him, and this one sticks in my

15 mind because I recall it, I said, don't worry, Mr. Dondero --

16 I think I used Jim -- I will be prepared.  I was a Boy Scout

17 and we spend time preparing for these kinds of things.  So

18 we're -- we would love to get done the best transition we can,

19 but we will be prepared for a difficult one.

20     So, from the start, the idea of the monetization plan was

21 not something that obviously he supported.  We did agree with

22 -- after his inquiry or request with the mediators, to file it

23 under seal while we went into the mediation.

24 BY MR. MORRIS:

25 Q    And after, after that was filed in September, early

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 107 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 37 of 225   PageID 4316

Seery - Direct                                107

1   October, did Mr. Dondero start to act in a way that the board

2   perceived to be against the Debtor's interests?

3   A    Certainly.  I mean, he previously had shown inclinations

4   of that, but that -- it got very aggressive as he interfered

5   with the trades we were trying to do in terms of managing the

6   CLO assets.  He took a position that postpetition, which was

7   really one of his entities taking a position, that

8   postposition a sale of life policy assets was somehow not in

9   the best interests of the funds and that we had abused our

10  position, notwithstanding that he turned it over to us with no

11  liquidity to maintain those life policies.  There were several

12  other instances.  And those led to the decision to, one, have

13  him resign, and then ultimately, after the text to me that I

14  perceived as threatening, and we've had subsequent hearings on

15  it, we asked him to leave the office.

16  Q    Okay.  Let's move back to the plan here.  Can you

17  describe, you know, generally, if you can, the purpose and

18  intent of the asset monetization plan?

19  A    Well, very simply, the main purpose is to maximize value.

20  This is not a competition between Mr. Dondero and myself.  I

21  have no stake in getting more money out of the maximization

22  other than my duty to do the job that I was hired to do.

23       So our goal is to manage the assets in what we think is

24  the best way to do that over time, and find opportunities

25  where the market is right to monetize the assets, primarily

Seery - Direct                          108

1    through sales.  There may be other instances, depending on the

2    type of asset, whether a sale makes sense, if we can structure

3    it through some kind of distribution that's more structured.

4    Q   We've used the phrase a bunch of times already.  Can you

5    describe in your own words what an asset monetization plan is

6    in the context of the Debtor's proposal?

7    A   Well, it may be slightly an awkward moniker, but I think

8    it's not completely different than what you'd see, in some

9    respects, to a regular plan, where you equitize debt and you

10   operate the business for the benefit of the equitized debt.

11   Here, it's a little different in that we know exactly how

12   we're going to move forward.  We've effectively -- we'll

13   effectively turn the debt obligations into trust interests and

14   we will pay those as we sell down assets.  So we've got it

15   structured in a way where we can pivot depending on market

16   conditions and we'll be managing certain funds that the assets

17   sit in.

18        So there's really four assets where the assets sit, and

19   we'll manage those.  First are the ones that the Debtor owns

20   directly.  Second will be the ones that are in Restoration

21   Capital -- Restoration Capital Partners.  Third are the assets

22   in a fund called Multi-Strat.  Fourth is the direct ownership

23   interest in Cornerstone, and technically (garbled) would be

24   the -- would be the next one.

25        So we have the ability to manage these individual assets

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 109 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 39 of 225 PageID 4318
Seery - Direct 109

1    and then be able to sell them in what we determine to be the

2    best way to maximize value, depending on the timing.

3    Q    And when you say that you're going to continue to operate

4    the business, do you mean that the Debtor will continue to

5    manage the assets you've just described in the same way that

6    it had prior to the petition date?

7    A    It'll be a smaller team, but that's the Debtor's business.

8    So what we won't be doing are the shared services anymore.

9    That was part of the Debtor's business.  But we will be

10   managing the assets.  So the 1.0 CLOs, we'll manage those

11   assets.  The RCP assets, we'll manage those assets.  The

12   Trussway Holdings assets, we'll managing those assets.  Each

13   of them is a little bit different.  There's things as diverse

14   as operating companies to real estate.  We'll operate, subject

15   to final agreement, but the Longhorn A and B, which are

16   separate accounts that are -- were funded and are controlled

17   by the largest -- one of the largest investors in the world.

18   And so they have agreed that we should manage those assets for

19   them.

20       So we're -- that's the business that the Debtor is in.  It

21   won't be doing all of the businesses that the Debtor was in

22   before, like the shared services, but the management of the

23   assets will be very similar.

24   Q    And why do these funds and these assets need continued

25   management?  Why aren't you just selling them?

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 110 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21    Page 40 of 225   PageID 4319
Seery - Direct                          110

1   A    Well, in some respects, they could just be sold, but the

2   -- we believe that the value would be a lot lower.  So, a lot

3   of them are complex.  The time to sell them may not be now.

4   Some will require restructuring in some way, whether -- not

5   through a reorganization process, but some sort of structural

6   treatment to how the obligations at the individual asset are

7   treated, or the equity at the individual asset.  So we're

8   going to manage each of them and look for market opportunities

9   where we think the value can be maximized.

10          MR. MORRIS:  Your Honor, I'm about to switch to

11  another topic.  We have been going for a little bit more than

12  two and a half hours.  I'm happy to just continue if you and

13  the witness are, but I just wanted to give you a head's up

14  that I'm about to switch topics.  If you wanted to take a

15  short break, we could.  If you want me to continue, I'm happy

16  to do that, too.

17          THE COURT:  Well, let me ask you, how much longer do

18  you think you're going to take overall with Mr. Seery?

19          MR. MORRIS:  I think I'll probably have another hour

20  to an hour and a half, Your Honor.  We want to make a complete

21  factual record here.

22          THE COURT:  All right.  Well, it's 12:07 Central

23  time.  Why don't we take a 30-minute lunch break, okay?  Can

24  everybody do their lunch snack that fast?

25          MR. MORRIS:  Sure.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 111 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 41 of 225   PageID 4320

Seery - Direct                            111

1          THE COURT:  I think that would probably be the way to

2     go.  So we'll come back -- it's now 12:08.  We'll come back at

3     12:38 Central time and resume --

4          MR. MORRIS:  Okay.

5          THE COURT:  -- resume this direct testimony, okay?

6     So, see you in 30 minutes.

7          MR. MORRIS:  Thank you very much.

8          THE COURT:  Okay.

9          THE CLERK:  All rise.

10       (A recess ensued from 12:08 p.m. to 12:44 p.m.)

11         THE COURT:  We are going back on the record in the

12    Highland confirmation hearing.  It's 12:44 Central time.  I

13    took a little bit longer break than I said we would.

14      Mr. Morris and Mr. Seery, are you ready to resume?

15         MR. MORRIS:  I am, Your Honor.

16         THE WITNESS:  Yes, Your Honor.

17         THE COURT:  Okay, good.  A couple of things.  I'm

18    required to remind you you're still under oath, Mr. Seery.

19    And also, just for people's planning purposes, what I intend

20    to do is, when the direct examination of Mr. Seery is

21    finished, I'm going to allow cross-examination of the

22    Objectors in the same amount of time in the aggregate that the

23    Debtor got, okay?  So, Objectors, in the aggregate, you can

24    spend as long cross-examining as the Debtor spent examining.

25    I can figure out this is the most significant witness, so I'm

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 112 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 42 of 225 PageID 4321

Seery - Direct                                112

1   assuming that Debtor's other witnesses are going to be a lot

2   shorter than this, but --

3           MR. MORRIS:  Yes, I promise.

4           THE COURT:  -- that's how we'll proceed.  And I

5   expect to finish Mr. Seery today.

6       So, all right.  With that, you may proceed, Mr. Morris.

7           MR. MORRIS:  Okay.

8                   DIRECT EXAMINATION, RESUMED

9   BY MR. MORRIS:

10  Q   Can you hear me okay, Mr. Seery?

11  A   Yes, sir.

12  Q   Okay.  Before we move on to the next topic, you spent some

13  time describing the asset monetization plan.  Would it be fair

14  to describe that as a long-term going-concern liquidation?

15  A   Long-term is subjective.  We anticipate that we'll be able

16  to monetize the assets in two years.  We could go out longer

17  to three.  There's no absolute restriction that we couldn't

18  take longer, depending on what we see in the market, but the

19  objective would be to find maximization opportunities within

20  that time period.

21  Q   Okay.  So let's turn now to the post-confirmation

22  corporate governance structure.

23      (Interruption.)

24          THE WITNESS:  Mr. Golub (phonetic), you should mute.

25          THE COURT:  Yes.  I don't know -- I didn't catch who

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21  Entered 02/04/21 10:28:30  Page 113 of
Case 3:21-cv-00538-N  Document 26-6  Filed 06/09/21  Page 43 of 225  PageID 4322

Seery - Direct                    113

1   that was.  But anyway, anyone other than --

2          A VOICE:  It's someone named Garrett Golub.

3          THE COURT:  -- Morris and Seery, please mute.  All

4   right.  Go ahead.

5          MR. MORRIS:  Okay.

6   BY MR. MORRIS:

7   Q    At a high level, Mr. Seery, can you please describe for

8   the Court the post-confirmation structure that's envisioned

9   under the proposed plan?

10  A    At a high level, we anticipate reorganizing HCMLP such

11  that the current parties of interest will be extinguished and,

12  in exchange, creditors will get trust interests.  There'll be

13  a trust that will sit on top of HCMLP and it will have an

14  overall responsibility for the Claimant Trust, which will be

15  the HCMLP assets plus the assets that we move into the

16  Claimant Trust, depending on structural considerations.  And

17  then a Litigation Trust, which will be a separate trust, and

18  that will roll up into the main trust.  And the main trust

19  will be where the creditors hold their interests.  And those

20  interests take the form of senior interests or junior

21  interests.

22  Q    All right.  You mentioned a Claimant Trust.  Who is

23  proposed to serve as the Claimant Trustee?

24  A    I am.

25  Q    And you mentioned a Litigation Trust.  Is there someone

Seery - Direct                    114

1   proposed to serve as the Litigation Trustee?

2   A    A gentleman named Marc Kirschner.  He's been doing these

3   kinds of things for a long time.

4   Q    Is there going to be any kind of oversight group or

5   committee?

6   A    There is an oversight committee that sits at the main

7   trust.  Into it will report Mr. Kirschner and myself.  It has

8   oversight responsibilities similar to a board of directors in

9   terms of the operations of the Claimant Trust and the

10  Litigation Trust.

11  Q    Do you have an understanding as to who the initial members

12  of the Claimant Oversight Committee?

13  A    The initial members will be each of the members of the

14  Creditors' Committee.  So, UBS, Acis, Redeemer, a

15  representative from Redeemer, and Meta-e, as well as an

16  independent named David Pauker.  So that's the initial

17  structure.

18  Q    And can you describe for the Court, how did Mr. Pauker get

19  involved in this?

20  A    He was selected by the Committee.

21  Q    Okay.  Is there -- Meta-e is a convenience class claim

22  holder.  Do I have that right?

23  A    Yeah.  They're -- they -- as I went through earlier, they

24  had a liquidated claim for litigation services.  So we

25  expected that they'll be paid off rather early in the process.

001601

Seery - Direct                    115

1    At that point, we suspect they wouldn't -- they would no

2    longer be an Oversight Committee member and they would be

3    replaced by an independent.

4    Q    And do you have any understanding as to how that

5    independent will be chosen?

6    A    I believe it's chosen by the other members.

7    Q    Okay.  Can you describe your proposed compensation

8    structure as the proposed Claimant Trustee?

9    A    My compensation will be $150,000 a month, which is the

10   same compensation I have now.  In addition, we'll negotiate a

11   bonus structure with the Oversight Committee.  And that will

12   likely be a bonus not just for myself but for the entire team,

13   depending on performance.

14   Q    Okay.  And that -- and who is that negotiation going to be

15   had with?

16   A    The Oversight Committee.

17   Q    Okay.  Are you familiar with Mr. Pauker's compensation

18   structure?

19   A    I -- I've seen it.  I don't recall specifically.  I think

20   his -- from the models, I think he's about 40 or 50 grand a

21   month, something along those lines.

22   Q    Okay.  How about Mr. Kirschner?  Do you recall -- let me

23   just ask you this.  Does it refresh your recollection at all

24   if I said that 250 in year one for Mr. Pauker?

25   A    Yeah.  So maybe closer to $20,000 to $25,000 a month.  And

Seery - Direct                                    116

1   then Mr. Kirschner is a lower amount, but he would get a

2   contingency fee arrangement somewhere dependent on the

3   recoveries from his litigations.

4   Q   Okay.  You mentioned earlier that the Debtor intends to

5   continue operations at least for some period of time post-

6   effective date.  Do you have a view as to whether the post-

7   confirmation entity will have sufficient personnel to manage

8   the business?

9   A   I do, yes.

10  Q   And why is that?  What makes you believe that the Debtor

11  will have -- the post-confirmation Debtor will have sufficient

12  personnel to manage the business?

13  A   Well, we've gone through and looked at each of the assets

14  and what is required to manage those assets.  We have a lot of

15  experience doing it during the case.  The bulk of the

16  employees, who do a fine job, are really doing shared service

17  arrangements.  The direct asset management group is a smaller

18  group, and we'll be able to manage those with the team we're

19  putting together.

20  Q   Okay.  How does the ten employees compare to the original

21  plan that was set forth in the disclosure statement, if you

22  recall?

23  A   Well, we had less, and I believe the number was either two

24  or three, along with me, and then using a lot of outside

25  professional help.  But we determined that we wanted to have a

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 117 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 47 of 225   PageID 4326

Seery - Direct                           117

1    much more robust team, based on the litigation that we're

2    seeing around the case and we expect to continue post-exit, so

3    that the team can manage those assets unfettered.

4         In addition, we were taking on the CLO management, the 1.0

5    CLO contracts.  These one -- as I've mentioned before, they're

6    not traditional CLOs in the sense that they require the same

7    hands-on management, but they do require an experienced team

8    to help manage the exposures, most of which are cross-holdings

9    in different -- in different entities or different investments

10   that Highland also has exposure to.

11   Q    In addition to the assumption of the CLO management

12   agreements, has the Debtor made any decisions regarding the

13   possibility of hiring a sub-servicer?

14   A    We have, yes.

15   Q    And did that factor into the Debtor's decision to increase

16   the number of personnel it was going to retain?

17   A    Well, we determined we weren't going to hire a sub-

18   servicer.  And I'm not sure exactly when we made that

19   determination.  We do have a TPA, which is SEI, and that's a

20   third-party administrator, to sift through the funds and

21   provide accounting supporting to those, to those funds.  So

22   that -- they will help.  We also have an outside consultant

23   that we're using, Experienced Advisory Consultants, who are

24   financial consultants who've worked in the business.  So we do

25   have those.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 118 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 48 of 225   PageID 4327

Seery - Direct                        118

1      But we didn't think that we would get a third-party sub-

2   servicer, as was the case in Acis, and determined that wasn't

3   in the best interest of the estate.

4   Q   Can you just shed a little light on what factors the

5   Debtor took into account in deciding not to hire a sub-

6   servicer?

7   A   Well, we primarily looked at cost, as well as control of

8   the assets, and determined that that was -- those were in the

9   best interests of the estate, to keep them managed internally.

10  We reviewed that with the Committee, and they agreed.

11  Q   Okay.

12          MR. MORRIS:  Let's turn now to the best interests of

13  creditors' test, Your Honor, 1129(a)(7), and let's talk about

14  whether the plan is in the best interests of creditors.

15  BY MR. MORRIS:

16  Q   Has the Debtor done any analysis to determine the likely

17  value to be realized in a Chapter 7 liquidation?

18  A   We have, yes.

19  Q   And has the Debtor done any analysis to determine the

20  likely recoveries under the plan?

21  A   Yes.

22  Q   Okay.  Do you recall when these projections were first

23  prepared?

24  A   We started working on projections in the fall, as we were

25  developing the monetization plan.  We filed projections, I

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 119 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 49 of 225   PageID 4328
Seery - Direct                          119

1    believe, in November.  We've subsequently updated those

2    projections based on the claims, market condition, and value

3    of the assets.

4    Q    And were those updates provided to plan objectors last

5    week?

6    A    Yes, they were.

7    Q    Okay.  Can we refer to the projections that were in the

8    disclosure statement as the November projections?

9    A    That'd be fine.

10   Q    And can we refer to the projections that were provided to

11   the objectors last week as the January projections?

12   A    Yes.

13   Q    And as --

14   A    I think they're actually -- I think they're actually dated

15   February 1, is the most recent update.

16   Q    Okay.  And then was a further update provided yesterday

17   and filed on the docket, to the best of your knowledge?

18   A    Yes.

19   Q    All right.  We'll talk about some of the changes in those

20   projections.

21            MR. MORRIS:  Can we call up on the screen Debtor's

22   Exhibit 7D as in dog?  And this document is in evidence.  Um,

23   --

24            THE COURT:  No, this is -- oh, wait.  How many Ds is

25   it?  Seven?

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 120 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 50 of 225   PageID 4329

Seery - Direct                              120

1           MR. MORRIS:  It's 7D, so that would be on Docket

2     1866, all of which has been admitted.

3           THE COURT:  Okay.  You're right.

4           MR. MORRIS:  Okay.

5        And if we could just, I'm sorry, go to Page 3.

6     BY MR. MORRIS:

7     Q    Is there any way to look at this, Mr. Seery?  Is this the

8     January projections that were provided last week?

9     A    Yes.

10    Q    Okay.  Can you describe for the Court the process by which

11    this set of projections and the November projections were

12    prepared?  How did the Debtor go about preparing these

13    projections?

14    A    Yeah.  These are prepared what I would call bottoms-up.

15    So what we did was we looked at each of the assets that the

16    Debtor owns or manages or has a direct or indirect interest

17    in, used the values that we have for those assets, because we

18    do keep valuations for each of the assets that the Debtor owns

19    or manages in the ordinary course of business.  We then

20    adjusted those depending on what we saw as the outcomes for

21    the case, either a plan outcome or a liquidation outcome, and

22    then rolled those into the -- into the numbers that you see

23    here.

24        So the 257 and change.  And please excuse my eyesight.

25    I'm going to make this bigger.  The 257 is the estimated

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 121 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 51 of 225   PageID 4330

Seery - Direct                               121

1   proceeds from monetization.  Above that, you see cash.  That's

2   our estimated cash at 131.  And we monitor those, those values

3   daily.

4   Q   And were these projections prepared under your

5   supervision?

6   A   They were, yes.

7   Q   Okay.  And who was involved in the preparation of this

8   document and other iterations of the projections?

9   A   The team at DSI.  Obviously, myself; the team at DSI; as

10  well as the, at least from a review perspective, counsel.

11  Q   All of these contain various assumptions.  Do I have that

12  right?

13  A   Yes.

14        MR. MORRIS:  Can we go to the prior page, please, I

15  think is where the assumptions are?  And let's just look at a

16  few of them.  Okay.  Can we make that a little bigger, La

17  Asia?  Okay.  Good.

18  BY MR. MORRIS:

19  Q   Why does the Debtor's projections and liquidation analysis

20  contain any assumptions?  Why, why include assumptions?

21  A   Well, all projections contain assumptions.  So an

22  assumption -- I was strangely asked the question at

23  deposition, what does that mean?  It's a thing or fact that

24  one accepts as true for the purposes of analysis.  And so in

25  terms of looking out into the future as to what the potential

Seery - Direct                                    122

1   operation expenses will be and what the potential recoveries

2   will be, one has to make assumptions in order to be able to

3   compare apples to apples.

4   Q    And do you believe that these assumptions are reasonable?

5   A    Yes.  It would make no sense to have assumptions that

6   aren't reasonable.  I mean, and we've all seen that with

7   analysis through our respective careers.  It really should be

8   grounded in some fact and a reasonable projection on what can

9   happen in the future, based upon experience.

10  Q    Okay.  And have you personally vetted each of the

11  assumptions on this page?

12  A    Yes.

13  Q    Okay.  Let's just look at a few of them.  Let's start with

14  B.  It says, All investment assets are sold by December 31,

15  2022.  Do you see that?

16  A    Yes.

17  Q    Why did the Debtor make that assumption?

18  A    We looked at a two-year projection horizon.  We thought

19  that that was a reasonable amount of time, looking at these

20  assets, to monetize the assets.  Remember that we did go

21  through a process of the case over the last year, and we did

22  consider monetization asset events for certain of the assets

23  throughout the case, some of which we were successful on, some

24  of which we weren't, some we just determined to pull back.

25  But we do believe that, based upon our view of the market and

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 123 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 53 of 225   PageID 4332
225

Seery - Direct                          123

 1   where we think these assets will be positioned, that

 2   monetizing them over a two-year period makes sense.

 3   Q    And is it possible that it takes longer than that?

 4   A    It's possible.  The -- you know, we would be wrong about

 5   the market.  The -- we could go into a full-blown recession.

 6   Capital could dry up.  The financing markets could turn

 7   negative.  But they're extremely positive right now.  Those

 8   things could happen.  But we're assuming that they won't.

 9   Q    And is it possible that you complete the process on a more

10   accelerated timeframe?

11   A    That's always possible.  It's not, in my experience, a

12   good way to plan.  Luck really isn't a business strategy.  But

13   if good opportunity shows up and folks want to pay full value

14   for an asset, we certainly wouldn't turn them away just so we

15   could stretch out the time period.

16   Q    Is it fair to say that this projected time period is your

17   best estimate on the most likely timeframe needed?

18   A    It's -- I think it's the best estimate that we have based

19   upon our experience with the assets, again, and our projection

20   of the marketplace that we see now.  If things change, we'll

21   adjust it, but this is a fair estimate of when we can get the

22   monetization accomplished.

23   Q    Okay.  The next assumption relates to certain demand

24   notes.  Do you see that?

25   A    Yes.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 124 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21    Page 54 of 225   PageID 4333

Seery - Direct                    124

1    Q    Can you explain to the Court what that assumption is and

2    why the Debtor believed that it was reasonable?

3    A    Well, the Debtor has certain notes that are demand notes.

4    These are all from related entities.  Most of the notes, the

5    demand notes, we have demanded, and we've commenced litigation

6    to collect.  And we assume that we're going to be able to

7    collect those.

8         Three notes that were long-term notes -- these were notes

9    with maturities in 2047 that had been stretched out a couple

10   years ago -- were defaulted recently.  And we have accelerated

11   those notes and we've asserted demands and we have commenced

12   litigation, I believe, on each of those last week to collect.

13   So we do estimate that we will collect on all of the notes

14   that we've demanded and that we've commenced action on.  So

15   the demand notes as well as the accelerated notes.

16        The next, the next bullet shows there's one Dugaboy note

17   that has not defaulted.  That also has a 2047 maturity.  I

18   believe it's about $18 million.  And we expect that one to

19   stay current, because now I think the relater parties learned

20   that when you don't pay a long-dated note, it accelerates,

21   provided the holder, which is us, wishes to accelerate it,

22   which we did.  And so that note we do not expect to be

23   collected in the time period.

24   Q    Okay.

25            MR. MORRIS:  Let's go down to M.

001611

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 125 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 55 of 225   PageID 4334

Seery - Direct                    125

1  BY MR. MORRIS:

2  Q    M relates to certain claims.  Do you see that?

3  A    Yes.

4  Q    Can you just describe at a high level what assumption was

5  made with which -- with respect to which particular claims?

6  A    Well, we've summarized them there.  And what we've assumed

7  is that, with respect to Class 8, IFA, which is a derivative

8  litigation claim that seeks to hold, loosely, HCMLP liable for

9  obligations of NexBank, is worth zero.  I think that's pretty

10 close to settling.  We assumed here $94.8 million for UBS,

11 which was the estimated amount, and $45 million for

12 HarbourVest.

13 Q    And when you say the estimated amount, are you referring

14 to the 3018 order on voting?

15 A    Yes.  We just use the estimated amount in this projection

16 based upon the 3018 order.

17 Q    Okay.  And finally, let's look at P.  P has a payout

18 schedule.  Do I have that right?

19 A    That's an estimated payout schedule, yes.

20 Q    And what do you mean by that, that it's estimated?

21 A    Based upon our projections and how we perceive being able

22 to monetize the assets and reach the valuations that we want

23 to reach, we believe we could make these distributions.

24 However, there's no requirement to make them.

25     So the first and foremost objective we have, as I said

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 126 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 56 of 225 PageID 4335

Seery - Direct                                126

1  earlier, is to maximize value, and not -- it's not based on a

2  payment schedule, it's based upon the market opportunity.  And

3  we've estimated for our purposes here that we'll be able to

4  meet these distribution amounts, but there's no requirement to

5  do so.

6  Q    Okay.

7         MR. MORRIS:  Let's go to Page 3 of the document,

8  please.

9  BY MR. MORRIS:

10 Q    Can you just describe generally what this page reflects?

11 A    This is a comparison of the plan analysis and what we

12 expect to achieve under the plan and the liquidation analysis

13 if a trustee, a Chapter 7 trustee, were to take over.  And it

14 compares those two distribution amounts based upon the

15 assumptions on the prior page.

16 Q    All right.  Let's just look at some of the -- some of the

17 data points on here.  If we look at the plan analysis, what is

18 -- what is projected to be available for distribution, the

19 value that's available for distribution?

20 A    $222.6 million.

21 Q    Okay.  So, 222?  And on a claims pool that's estimated to

22 be, for this purpose, how much?

23 A    $313 million.

24 Q    And what is the distribution, the projected distribution

25 to general unsecured creditors on a percentage basis?

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 127 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 57 of 225   PageID 4336

Seery - Direct                        127

 1   A    On this analysis, to general unsecured creditors, it's

 2   62.14 percent.  But remember, that backs out the payment to

 3   the Class 7 creditors of 85 cents above.

 4   Q    Okay.  And does this plan analysis include any value for

 5   litigation claims?

 6   A    No, it does not.

 7   Q    And is that true for all forms of the Debtor's

 8   projections?

 9   A    That's correct, yes.

10   Q    Okay.  And let's look at the right-hand column for a

11   moment.  It says, Liquidation Analysis.  What does that column

12   represent?

13   A    That represents our estimate of what a Chapter 7 trustee

14   could achieve if it were to take over the assets, sell them,

15   and make distributions.

16   Q    Okay.  And let's just look at the comparable data points

17   there.  Under the liquidation analysis, as of -- the January

18   liquidation analysis as of last week, what was projected to be

19   available for distribution?

20   A    A hundred and -- approximately $175 million.

21   Q    Okay.  And what was the claims pool?

22   A    The claims pool was $326 million.  Recall that that's a

23   slightly larger claims pool because it doesn't back out the

24   Class 7 claims.

25   Q    Okay.  The convenience class claims?

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 128 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 58 of 225 PageID 4337

Seery - Direct                                              128

1   A    Correct.

2   Q    Okay.  And what's the projected recovery for general

3   unsecured claims under the liquidation analysis?

4   A    Based on this analysis and the assumptions, 48 (audio

5   gap).

6   Q    Okay.  Based on the Debtor's analysis, are creditors

7   expected to do better under this analysis in the -- under the

8   Debtor's plan versus the hypothetical Chapter 7 liquidation?

9   A    Yes.  Both -- both Class 7 and Class 8.

10  Q    Okay.  Now, this set of projections differs from the

11  projections that were included in the disclosure statement; is

12  that right?

13  A    That's correct.

14  Q    Okay.  Can we just talk about what the differences are

15  between the November projections that were in the disclosure

16  statement and the January projections that are up on the

17  screen?  Let's start with the monetization of assets, the

18  second line.  Do you recall if there was an increase, a

19  decrease, or did the value from the monetization of assets

20  stay the same between the November projections and the January

21  projections?

22  A    They increased from November 'til -- 'til now.

23  Q    Okay.  Can you explain to the judge why the value from the

24  monetization of assets increased from November to January?

25  A    Well, really, it's the composition of the assets and their

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 129 of
Case 3:21-cv-00538-N    Document 26-6    Filed 06/09/21    Page 59 of 225    PageID 4338

Seery - Direct                    129

1    value.  So there's four main drivers.

2         The first is HarbourVest.  We had a settlement with

3    HarbourVest, which include HarbourVest transferring to the

4    Debtor $22-1/2 million of HCLOF interests.  Those have a real

5    value, and we've now included them in the -- in the asset

6    pool.  We've also included HarbourVest in the claims pool.

7         The second was we talked a little bit earlier on the

8    assumptions on the notes.  We previously had anticipated that,

9    on the long-dated notes, a collection, we -- we'd receive

10   principal and interest currently, but we wouldn't receive the

11   full amount of the principal that was due well off in the

12   future, and we would sell it a discount.

13        So the amount of the asset pool has been increased by $24

14   million, and that reflects the delta between or the change

15   between what was in the prior plan, the notes paying and then

16   being sold at a discount, and what's in the current plan,

17   which include the accelerated notes, which is a $24 million

18   note that Advisors defaulted on that we have accelerated and

19   brought action on, as well as two six -- roughly $6 million

20   notes, one from Highland Capital Real Estate and the other

21   from HCM Services.  So that's, that's additional 24.

22        In addition, Trussway, we've reexamined where Trussway is

23   in the market, both its marketplace and its performance, and

24   reassessed where the value is.  So that has increased by about

25   $10.6 million.

001616

Seery - Direct                              130

1          That doesn't mean that we would sell it today.  It means

2     that, when you look at the performance of the company, what we

3     think are the best opportunities in the market.  As we see the

4     marketplace with managing the company over time, we think that

5     that asset has appreciated considerably since November.

6          And then, finally, there were additional revenues that

7     flow into the model from the November analysis which would be

8     distributable, and those include revenues from the 1.0 CLOs.

9     Q    Okay.  So that accounts for the difference and the

10    increase in value from the monetization of assets.  Is there

11    also an increase in expenses from the November projections to

12    the January projections?

13    A    Yeah.  It's -- it's about -- it's around $25 million

14    additional increase.

15    Q    And can you explain to the Court what is the driver behind

16    that increase in expenses?

17    A    Yeah.  There's several drivers to that.  The first one is

18    head count.  So our head count, we've increased.  As I

19    mentioned earlier, we determined that we wanted to have a much

20    more robust management presence.  So we've increased the head

21    count, so we have a base comp, compensation, about $5 million

22    more than we initially thought.

23         Secondly, we have bonus comp.  So we've back-ended --

24    structured a backend bonus performance bonus for the team, and

25    that will run another $5 million, roughly.

001617

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 131 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 61 of 225 PageID 4340

Seery - Direct                                    131

1        Previously, we had thought about, as you mentioned

2   earlier, the sub-servicing, but we've now talked about and we

3   have engaged a TPA, SEI, as well as experienced advisors.

4   That's another $1 to $2 million.

5        Operating expenses have increased by about $8 million,

6   based upon our assessment.  The biggest driver there is D&O,

7   which is up about $3 million.  In addition, we've gotten -- we

8   determined to keep a bunch of agreements related to data

9   collection and operations.  Those were requested by the

10  Committee, but they also serve us in performing our functions.

11  That's another couple million dollars.

12       My comp, my bonus comp was not in the prior model.  So I

13  have a bonus that has not been agreed to by the Court for the

14  bankruptcy performance.  This is not a future bonus.  And we

15  built that into the model.  Obviously, it's subject to Court

16  approval and Committee objection, and I suppose anybody else's

17  objection, but we'll -- we'll be before the Court for that.

18  But we wanted to build that into the model so that we had it

19  covered in the event that it was approved.

20  Q    Was there also a change in the assumption from November to

21  January with respect to the size of the general unsecured

22  claim pool?

23  A    Yes.  There have been -- there have been several changes

24  that have happened, and we've added those and refined the

25  claim pool numbers.

Seery - Direct                    132

1    Q    And are those changes reflected in the assumption we

2    looked at earlier, Exhibit -- Assumption M, which went through

3    certain claims that have been liquidated?

4    A    Some, some are.  That assumption, I don't believe, was --

5    it's not in front of me, but wasn't up to date.  So, that one,

6    for example, assumed UBS at the 3018 estimated amount.  We've

7    since refined that number to reflect the agreed-upon

8    transaction with UBS, which is subject to Court approval.

9    Q    Right.  But before we get to that, for purposes of the

10   January model, the one that's up on the page -- and if we need

11   to look at the prior page --

12        MR. MORRIS:  Let's go to the prior page, the

13   assumption.  Assumption M.

14   BY MR. MORRIS:

15   Q    Assume the UBS, the UBS claim at the $94.8 million, the

16   3018 number.  Do you remember that?

17   A    Yeah.  That's, that -- that's the assumption in this

18   model.  I think back in November we assumed HarbourVest at

19   zero and UBS at zero.  So we've since -- we've since refined

20   those numbers, obviously, through both the 3018 process as

21   well as the settlement with HarbourVest.

22   Q    And did the -- did the inclusion -- withdrawn.  At the

23   time that you prepared the November model -- withdrawn.  At

24   the time the Debtor prepared the November model, did it know

25   what the UBS or the HarbourVest claims would be valued at?

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 133 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 63 of 225 PageID 4342

Seery - Direct                              133

1   A    No.  We just had our assumption back then, which was zero.

2   And now, obviously, we know.

3   Q    And so the January model took into account the settlement

4   with HarbourVest and the 3018 motion; do I have that right?

5   A    That's correct.  That's in the assumptions.

6   Q    And what was the impact on the projected recoveries to

7   general unsecured creditors from the changes that you've just

8   described, including the increase in the claims amount?

9   A    Well, when -- like any fraction, the distribution will go

10  down if the claimant pool goes up.  So, with the denominator

11  going up by the UBS and the UBS amount -- the UBS and the

12  HarbourVest amounts, the distribution percentage went down.

13  Q    Okay.  I want to focus your attention on the second line

14  where we've got the monetization of assets under the plan at

15  $258 million but under the liquidation analysis it's $192

16  million.  Do you see that?

17  A    Yes.

18  Q    Can you tell Judge Jernigan why the Debtor believes that

19  under the plan the Debtor or the post-confirmation Debtor is

20  likely to receive or recover more for the --

21       (Interruption.)

22       THE COURT:  All right.  Hang on a minute.  Where is

23  that coming from, Mike?

24       THE CLERK:  Someone is calling in.

25       THE COURT:  Okay.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 134 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 64 of 225   PageID 4343

Seery - Direct                                            134

1          MR. MORRIS:  Thank you.

2          THE COURT:  Mr. --

3          MR. MORRIS:  Let me restate the question.

4          THE COURT:  Yes.  Restate.

5    BY MR. MORRIS:

6    Q    Can you explain to Judge Jernigan why the Debtor believes

7    that the -- under the plan corporate structure, the Debtor is

8    likely to recover more from the monetization of assets than a

9    Chapter 7 liquidation trustee would?

10   A    Sure.  My experience is that Chapter 7 trustees will

11   generally try to move quickly to monetize assets.  They will

12   retain their own professionals, they will examine the assets,

13   and they will look to sell those assets swiftly.

14        The monetization plan does not plan to do that.  I've got

15   a year's of experience -- a year now of experience with these

16   assets, as well as we'll have a team with several years at

17   least each of experience with the assets.  We intend to look

18   for market opportunities, and think we'll be able to do it in

19   a much better fashion than a liquidating Chapter 7 trustee.

20        The nature of these assets is complex.  Many of them are

21   private equity investments in operating businesses.  Certain

22   of them are complicated real estate structures that need to be

23   dealt with.  Some of them are securities that, depending on

24   when you want to sell them, we believe there'll be better

25   times than moving quickly forward to sell them now.

001621

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 135 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21    Page 65 of 225   PageID 4344

Seery - Direct                          135

1         So, with each of them, we think that we'll be able to do

2    better than a Chapter 7 trustee based upon our experience.

3    The only thing that we're level-set with a Chapter 7 trustee

4    on is that cash is cash.

5    Q    Do you have any concerns that a Chapter 7 trustee might

6    not be able to retain the same personnel that the Debtor is

7    projected to retain?

8    A    Well, again, in my experience, it would be very difficult

9    for a Chapter 7 trustee to retain the same professionals, and

10   typically they don't.

11        Secondly, retaining the individuals, I think, would be

12   very difficult for a Chapter 7 trustee, would not have a

13   relationship with them, and that gap of time and the risks

14   that they would have to take to join a Chapter 7 trustee I

15   think would lead most of them to look for different

16   opportunities.

17   Q    Okay.  One of the other things, one of the other changes I

18   think you mentioned between the November and the January

19   projections was the decision to assume the CLO management

20   contracts.  Do I have that right?

21   A    That's correct.

22   Q    And why has the Debtor decided to assume the CLO

23   management contracts?  How does that impact the analysis on

24   the screen?

25   A    Well, it does add to the expense, but it also adds to the

Seery - Direct                              136

1   proceeds.

2        When we did the HarbourVest settlement, we ended up with

3   the first significant interest in HCLOF.  HCLOF owns the vast

4   majority of the equity in Acis 7, and also owns significant

5   preferred share interests in the 1.0 CLOs.  And we think it's

6   in the best interest of the estate to keep the management of

7   those assets where we have an interest in the outcome of

8   maximizing value with the estate.

9        In addition, we're going to have employees who are going

10  to work with us to manage those specific assets, so we feel

11  like that will be something where we can control the

12  disposition much better.

13       There's also cross-interests that these CLOs have in --

14  the 1.0 CLOs have in a number of other investments that

15  Highland has.  As in all things Highland, it's interrelated,

16  and so many of the companies have direct loans from the CLOs.

17  We intend to refinance that, but we feel much more comfortable

18  and feel that there would be value maximization if we're able

19  to work directly with the Issuers as a manager while we seek

20  in those underlying investments to refinance the CLO debt.

21  Q   Has the Debtor -- has the Debtor reached an agreement with

22  the Issuers on the assumption of the CLO management

23  agreements?

24  A   Yes, we have.

25  Q   Can you describe for the Court the terms of the

Seery - Direct                                    137

1    assumption?

2            MR. RUKAVINA:  Your Honor, this --

3            THE WITNESS:  Yes.

4            MR. RUKAVINA:  Your Honor, this is Davor Rukavina.  I

5    would object to this as hearsay.

6            THE COURT:  Well, he has not --

7            MR. MORRIS:  It's --

8            THE COURT:  He's not said an out-of-court statement

9    yet, so I overrule.

10       Go ahead.

11           THE WITNESS:  Yeah, we -- we are going to assume the

12   CLO contracts.  We have had direct discussions with the

13   Issuers.  They have agreed.

14       The basic terms are that we're going to cure them by

15   satisfying about $500,000 of cure costs related to costs that

16   the CLO Issuers have incurred in respect of the case, and

17   we'll be able to pay that over time.

18           MR. RUKAVINA:  Your Honor, this is Davor Rukavina.  I

19   would renew my objection and move to strike his answer that

20   they've agreed.  That is hearsay, an out-of-court statement

21   offered to prove the truth of the matter asserted.

22           THE COURT:  Okay.  Mr. Morris, what is your response?

23           MR. MORRIS:  He's describing an agreement.  I

24   actually think it's in the Debtor's plan that's on file

25   already.  But he's describing the terms of an agreement.  He's

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 138 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21    Page 68 of 225   PageID 4347

Seery - Direct                                   138

1    not saying what anybody said.  There's no out-of-court

2    statement.  It's an agreement that's being described.

3              THE COURT:  All right.  Thank you.  I overrule the

4    objection.

5              MR. MORRIS:  Okay.

6    BY MR. MORRIS:

7    Q    Does the Debtor believe that the CLO agreements will be

8    profitable?

9    A    Yes.

10   Q    And why does the Debtor believe that the CLO agreements

11   will be profitable to the post-confirmation estate?

12   A    Well, we don't -- we don't break out profitability on a

13   line-by-line basis.  But the simple math is that the revenues

14   from the CLO contracts which will roll in to the Debtor from

15   the management fees are more than what we anticipate the

16   actual direct costs of monitoring and managing those assets

17   would be.

18   Q    Okay.  Are you aware that yesterday the Debtor filed a

19   further revised set of projections?

20   A    I am, yes.

21   Q    All right.  Let's call those the February projections.

22             MR. MORRIS:  Can we put those on the screen?

23        It's Exhibit 7P, Your Honor.

24             THE COURT:  Okay.

25             MR. MORRIS:  All right.  I think that for some reason

Seery - Direct                    139

1   -- yeah, okay.  There we go.  Perfect.  Right there.

2        Your Honor, these are the projections that were filed

3   yesterday.  I'm going to move for the admission into evidence

4   of these projections.

5            THE COURT:  All right.

6            MR. TAYLOR:  Your Honor, this is Clay Taylor.

7            THE COURT:  Go ahead.

8            MR. TAYLOR:  We object.  These were -- these were not

9   previously provided.  They were provided on the eve of the

10  confirmation hearing, after the Debtors had already revised

11  them once and provided those on -- after close of business on

12  a Friday before Mr. Seery's deposition.  And these were

13  provided even later, certainly not within the three days

14  required by the Rule.  And therefore we move to -- that these

15  should not be allowed into evidence.

16           THE COURT:  Mr. Morris, what is your response to

17  that?

18           MR. MORRIS:  Your Honor, first of all, the January

19  projections were provided in advance of Mr. Seery's deposition

20  and he was questioned extensively on it.  These projections

21  have been updated since then, I think for the singular purpose

22  of reflecting the UBS settlement.

23       As Your Honor just saw, the prior projections included an

24  assumption based on the 3018 motion.  Since Mr. Seery's

25  deposition, UBS and the Debtor have agreed to publicly

001626

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 140 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 70 of 225   PageID 4349

Seery - Direct                                 140

1   disclose the terms of the settlement, and that's reflected in

2   these revised numbers.  I think there was one other change

3   that Mr. Seery can testify to, but those are the only changes

4   that were made.

5           THE COURT:  All right.  Mr. Seery, what besides the

6   UBS settlement do you think was put in these overnight ones?

7           THE WITNESS:  I believe the only other change, Your

8   Honor, was correcting a mistake.  In Assumption M, the second

9   line is assumes RCP claims will offset against HCMLP's

10  interest in the fund and will not be paid from the Debtor's

11  assets.  That hasn't changed.

12      Basically, the Debtor got an advance from RCP that was to

13  -- for tax distributions, and did not repay it.  The RCP

14  investors are entitled to recovery of that.  So we had

15  previously backed that out.  It's about four million bucks.

16  What happened was it was just double-counted.

17          THE COURT:  Okay.

18          THE WITNESS:  So, as an additional claim, it was

19  counted as $8 million.  I think that's the only other change.

20          THE COURT:  All right.  I overrule the objection.

21  You may go forward.  I admit 7P.

22          MR. MORRIS:  Thank you, Your Honor.

23      (Debtor's Exhibit 7P is received into evidence.)

24          MR. MORRIS:  Can you just -- if we can go to the next

25  page, please.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 141 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 71 of 225   PageID 4350

Seery - Direct                          141

 1  BY MR. MORRIS:

 2  Q    So, with -- seeing that the claims pool under the plan

 3  previously was $313 million, and what's the claims pool under

 4  the projections up on the screen under the plan?

 5  A    Two -- well, remember, there's 273 for Class 8, and then

 6  you'd add in the Class 7 as well, which is the $10.2 million.

 7  So the 273 went from 313 to 273 with that settlement.

 8  Q    And is there any -- is there any reason for the decrease

 9  other than the change from the 3018 settlement -- order figure

10  to the actual settlement amount?

11  A    For the UBS piece, no.  And then, as I mentioned, I

12  believe the other piece would have been that four million --

13  that additional $4 million that was taken out.

14  Q    And did those two changes have a -- did those two changes

15  have an impact on the projected recoveries under the plan?

16  A    Sure, particularly with respect to -- to the Class 8.

17  Those recoveries went up significantly because the denominator

18  went up.

19  Q    Okay.  Does the Debtor believe that its plan is feasible?

20  A    Yes, absolutely.

21  Q    And do you know whether the administrative priority and

22  convenience class claims will be paid in full under the

23  Debtor's plan?

24  A    Yes.  We monitor the cash very closely, so we do have

25  additional cash to raise, but we're set to reach or exceed

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 142 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 72 of 225 PageID 4351

Seery - Direct                                    142

1   that target, so we do believe we'll be able to pay all the

2   administrative claims when they come in.  Obviously, we have

3   to see what they are.  We will be able to pay Class 7 on the

4   effective date.  Any other distributions, we expect to be able

5   to make as well.

6       So, and then it's -- then it's a question of going forward

7   with a few other claims that we have to pay over time.  We

8   have the cash flow to pay those.  Frontier, for example, we'll

9   be able to pay that claim over time in accordance with the

10  restructured terms.  If the assets that secure that claim are

11  sold, they would be paid when those assets are sold.

12  Q    Frontier, will the plan enable the Debtor to pay off the

13  Frontier secured claim?

14  A    Yes.  That's what I was explaining.  The cash flow is

15  sufficient to support the current P&I on that claim.  We will

16  be able to satisfy it from other assets if we determine not to

17  sell the asset securing the Frontier claim, or if we sell the

18  asset securing the Frontier claim we could satisfy that claim.

19  The asset far exceeds the value of the claim.

20  Q    Has the plan been proposed for the purpose of avoiding the

21  payment of any taxes?

22  A    No.  We expect all tax claims to be paid in accordance

23  with the Code, and to the extent that there are additional

24  taxes generated, we would pay them.

25  Q    Okay.  Let's just talk about Mr. Dondero for a moment

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 143 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 73 of 225 PageID 4352

Seery - Direct                                                143

1   before we move on.  Are you aware that Mr. Dondero's counsel

2   has requested the backup to, you know, these numbers,

3   including the asset values?

4   A    It -- I'm not sure if it was his counsel or one of the

5   other related-entity counsels.

6   Q    Okay.  But you're aware that a request was made for the

7   details regarding the asset values and the other aspects of

8   this?

9   A    Yes.

10  Q    Those were -- were those formal requests or informal

11  requests?

12  A    They were certainly at my deposition.

13  Q    Right.  But you haven't seen a document request or

14  anything like that, have you?

15  A    No.

16  Q    Did the Debtor make a decision as to whether or not to

17  provide the rollup, the backup information to Mr. Dondero or

18  the entities acting on his behalf?

19  A    Yes.

20  Q    And what did the Debtor decide?

21  A    We would not do that.

22  Q    And why did the Debtor decide that?

23  A    Well, I think that's pretty standard.  The underlying

24  documentation and the specific terms of the model are very

25  specific, and they are -- they are confidential business

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 144 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 74 of 225 PageID 4353

Seery - Direct                                      144

1    information that runs through what we expect to spend and what

2    we expect to receive and when we expect to sell assets and

3    then receive proceeds, and the prices at which we expect to

4    sell them.

5         To the extent that any entity wants to have that

6    information as a potential bidder, that would be very

7    detrimental to our ability to maximize value.  So, typically,

8    I wouldn't expect that to be given out, and I would not

9    approve it to be given out here.

10   Q    Did the Debtor disclose to Mr. Dondero's counsel or

11   counsel for one of his entities the agreement in principle

12   with UBS before the updated plan analysis was filed last

13   night?

14   A    I believe that disclosure was done a while ago, to Mr.

15   Lynn.

16   Q    So, to the best of your -- so, to the best of your

17   knowledge, the Debtor actually shared the specifics of the

18   agreement with UBS with Mr. Dondero and his counsel before

19   last night?

20   A    Yes.  I have specific personal knowledge of it because we

21   had to ask UBS for their permission, and they agreed.

22   Q    Okay.

23        MR. MORRIS:  All right.  Let's move on to 1129(b),

24   Your Honor, the cram-down portion.

25   BY MR. MORRIS:

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 145 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 75 of 225   PageID 4354

Seery - Direct                      145

 1   Q    Are you aware, Mr. Seery, how various classes have voted

 2   under the plan?

 3   A    I am generally, yes.

 4   Q    Okay.  Did any class vote to reject the plan, to the best

 5   of your knowledge?

 6   A    I don't -- I guess it depends on how you define the class.

 7   I think the answer is that I don't believe that, when you

 8   count the full votes of the -- the allowed claims and the

 9   votes in any class, I don't believe any of the classes voted

10   to reject the plan.

11   Q    What type of claims are in Class 8?

12   A    General unsecured claims.

13   Q    And what percentage of the dollar amount of Class 8 voted

14   to accept?

15   A    It's -- I think it's near -- now with the Daugherty

16   agreements, it's near a hundred percent of the third-party

17   dollars.  I don't know the individual employees' claims off

18   the top of my head.

19   Q    All right.  And what about the number in Class 8?  Have a

20   majority voted to accept or reject in Class 8?

21   A    If you include the employee claims -- which, again, we

22   think have no dollar amounts -- then I think it's a majority

23   would have rejected.  The vast dollar amounts did accept.

24   Q    Okay.  Let's talk about those employees claims for a

25   moment.  Do you have an understanding as to the basis of the

001632

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 146 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 76 of 225 PageID 4355
225

Seery - Direct                          146

1   claims?

2   A    Yes.

3   Q    What's your understanding of the basis of the claims?

4   A    Most of the claims are based on deferred compensation, and

5   that's the 2005 Highland Capital Management bonus plan.  And

6   that bonus plan provides certain deferred payment amounts to

7   the employees to be paid over multiple-year periods, provided

8   that they are in the seat when the payment is due.  That's the

9   vesting date.

10  Q    Okay.

11         MR. MORRIS:  Your Honor, just as a note-keeping

12  matter, the deferred compensation plan and the annual bonus

13  plan are Exhibits 6F and 6G, respectively, and they're on

14  Docket 1822.

15         THE COURT:  All right.

16  BY MR. MORRIS:

17  Q    And Mr. Seery, are you generally familiar with those

18  plans?

19  A    I am, yes.

20  Q    In order to receive benefits under the plans, are the

21  employees required to be employed at the time of vesting?

22  A    Yeah.  Our counsel refers to them, various terms, but

23  generally -- our outside labor counsel.  They're referred to

24  as seat-in-the-seat plans, meaning that your seat has to be in

25  a seat at the office at the day that the payment is due.  If

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 147 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 77 of 225   PageID 4356

Seery - Direct                              147

1   you're terminated for cause or if you resign, you're not

2   entitled to any payment.

3       So either you're there and you receive it or you're not

4   and you don't.  The only exception to that, I believe, is

5   death and disability.  Or disability.

6   Q   All right.  Did the Debtor terminate the annual bonus

7   plan?

8   A   Yes, we did.

9   Q   And in what context did the Debtor terminate the annual

10  bonus plan?

11  A   Well, we had discussion on it last week.  As Mr. Dondero

12  had also testified, the plan was to terminate all the

13  employees prior to the transition.  That's well known among

14  the employees.  The board terminated the 2005 bonus plan and

15  instead replaced it with a KERP plan that was approved by this

16  Court.

17  Q   And what was your understanding of the consequences of the

18  termination of the bonus plan for -- for purposes of the

19  claims that have been asserted by the employees who rejected

20  in Class 8?

21  A   It's clear that, under the 2005 HCMLP bonus plan, no

22  amounts are due because the plan has been terminated.

23  Q   All right.  Do you have an understanding as to when

24  payments become due under the deferred compensation -- under

25  the compensation plan?

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 148 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 78 of 225 PageID 4357

Seery - Direct                                           148

1    A    I do, yes.

2    Q    And when are they due?

3    A    The next payments are due in May.

4    Q    And what is the Debtor intending to do with respect to the

5    objecting employees?

6    A    The Debtor will have terminated all those employees before

7    that date.

8    Q    All right.  So, what's -- what are the consequences of

9    their termination vis-à-vis their claims under the deferred

10   compensation plan?

11   A    They won't have any claims.

12   Q    Okay.  So is it the Debtor's view that the employees who

13   voted to reject in Class 8 have no valid claims under the

14   annual comp -- annual bonus plan or the deferred compensation

15   plan?

16           MR. RUKAVINA:  Your Honor, this is Davor Rukavina.

17   With due respect, Your Honor, these employees have voted.  The

18   voting is on file.  There has been no claim objections to

19   their claims filed.  There's been no motion to designate their

20   votes filed.  So Mr. Seery's answer to this is irrelevant.

21   They have votes -- pursuant to this Court's disclosure

22   statement order, they have votes and they have counted, and

23   now Mr. Seery is attempting to basically impeach his own

24   balloting summary.

25           THE COURT:  Mr. Morris, what is your response?

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 149 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21    Page 79 of 225   PageID 4358

Seery - Direct                    149

1          MR. MORRIS:  The point of cram-down, Your Honor, is

2    it fair and equitable.  Does -- does -- is it really fair and

3    equitable to the 99 percent of the economic interests to allow

4    24 employees who have no valid claims to carry the day here?

5    And this is -- that's what cram-down is about, Your Honor.

6          THE COURT:  All right.  I overrule the objection.

7    BY MR. MORRIS:

8    Q    Let's talk about Class 7 for a moment, Mr. Seery.  That's

9    the convenience class; is that right?

10   A    That's correct.

11   Q    How and why was that created?

12   A    Well, initially, that was created because we had two types

13   of creditors in the case, broadly speaking.  We had liquidated

14   claims, which were primarily trade-type creditors, and we had

15   unliquidated claims, which were the litigation-type creditors.

16   And so that class was created to deal with the liquidated

17   claims, and the Class 8 would deal with the unliquidated

18   claims, which were expected to, as we talked about earlier

19   with respect to the monetization plan, take some time to

20   resolve.

21   Q    Was the creation of the convenience class a product of

22   negotiations with the Committee?

23   A    The initial discussion on how we set it up I believe was

24   generated by the Debtor's side, but how it evolved and who

25   would be in it and how it was treated in terms of

001636

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 150 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 80 of 225   PageID 4359

Seery - Direct                                    150

1   distributions was a product of negotiation with the Committee.

2   Q    Okay.  So how was the dollar threshold figure arrived at?

3   How did you actually determine to create a convenience class

4   at a million dollars?

5   A    It was through negotiation with the Committee.  So this

6   was one of those items that moved a fair bit, in my

7   recollection, through the many negotiations we had, heated

8   negotiations on some of these items, with the Committee.

9   Q    And are all convenience class -- all holders of

10  convenience class claims holders of claims that were

11  liquidated at the time the decision was made to create the

12  class?

13  A    I believe so.  I don't think there's been -- other than --

14  well, there -- we just had some settlements today, and I think

15  that relates to the employees, but those would be the only

16  ones that there would be disputes about, and that would roll

17  into the liquidat... the convenience class.

18  Q    Okay.  Finally, is there any circumstance under which

19  holders of Class 10 or 11, Class 10 or Class 11 claims will be

20  able to obtain a recovery under the plan?

21  A    Theoretically, there's a circumstance, and that is if

22  every other creditor in the case were to be paid in full, with

23  interest at the federal judgment rate, including Class 9,

24  which are the subordinated claims.  If those all got paid in

25  full, then theoretically the junior interest holders could

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 151 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21    Page 81 of 225   PageID 4360

Seery - Direct                                      151

 1   receive distributions.

 2       However, based upon our projections, that would be wholly

 3   dependent on a significant recovery in the Litigation -- by

 4   the Litigation Trustee.

 5   Q    Okay.  Let's move now to questions of the Debtor release

 6   and the plan injunction.  Is the Debtor providing a release

 7   under the plan?

 8   A    Yes.

 9   Q    Is anyone other than the Debtor providing a release under

10   the plan?

11   A    No.

12   Q    Who is the Debtor proposing to release under the plan?

13   A    The release parties are pretty similar to what you

14   typically would see, in my experience, in most plans.  You

15   have the independent board, myself as CEO and CRO, the

16   professional -- the Committee members, the professionals in

17   the case, and the employees that we reached agreement with

18   respect to certain of them who have signed on to a

19   stipulation, and others, get a broader release for negligence.

20   Q    Okay.  Is the Debtor aware of any facts that might give

21   rise to a colorable claim against any of the proposed release

22   parties?

23   A    Not with respect to any of the release parties.  So the --

24   obviously, I don't think there's any claims against me.  But

25   the same is true with respect to the oversight board, the

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 152 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 82 of 225 PageID 4361
Seery - Direct                          152

1    independent board.

2          The Committee has been, you know, working with us hand-in-

3    glove, and I think if they thought we -- there was something

4    there, we would have heard it.

5          With respect to the professionals, we haven't seen

6    anything as an independent board.

7          And with respect to the employees' that -- general

8    negligence release, these are current employees and we have

9    been monitoring them for a year and we don't have any evidence

10   or anything to suggest that there would be a claim against

11   them.

12   Q    Are there conditions to the employees' release?

13   A    There are.  So, the employee release, as we talked about

14   earlier, was highly negotiated with the Committee.  It

15   requires that employees assist in the monetization efforts,

16   which is really on the transition and the monetization.  They

17   don't have to assist in bringing litigations against anybody,

18   so that's not part of what the provision requires.  But it

19   does require that they assist generally in our efforts to

20   monetize assets.

21         We don't think that's going to be significant, but if

22   there are individual questions or help we need, we certainly

23   would reach out to them.  If it's significant time, that will

24   be a different discussion.

25         And then with respect to the two senior employees who

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 153 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21    Page 83 of 225   PageID 4362

Seery - Direct                        153

1  signed the stipulation, they have to give up a part of their

2  distribution for their release.

3  Q    All right.  I think you just alluded to this, but has the

4  release been the subject of negotiation with the Creditors'

5  Committee?

6  A    Yeah.  We've touched on it a bunch of times, and we

7  certainly, unfortunately, let it spill over into the court a

8  couple times.  It was a hotly-negotiated piece of the plan.

9  Q    Okay.  Has the Committee indicated to the Debtor in any

10  way that anybody subject to the release is the subject of a

11  colorable claim?

12  A    Anyone subject to the release?  No.

13  Q    Yeah.  All right.  Let's talk about the plan injunction

14  for a moment.  Are you familiar with the plan injunction?

15  A    Broadly, yes.

16  Q    And what is your broad understanding of the plan

17  injunction?

18  A    Anybody who has a claim or thinks they have a claim will

19  broadly be enjoined from bringing that, other than as it's

20  satisfied under the plan or else ultimately bringing it before

21  this Court.  And that's the gatekeeper part, which is a little

22  bit of combining the two pieces.

23  Q    And what's your understanding of the purpose of the

24  injunction?

25  A    It's really to prevent vexatious litigation.  We, as

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 154 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 84 of 225   PageID 4363

Seery - Direct                          154

1   independent directors, stepped into what I think most people

2   would fairly say is one of the more litigious businesses and

3   enterprises that they've seen.  And we have a plan that will

4   allow us to monetize assets for the benefit of the creditor

5   body, provided we're able to do that and not have to put out

6   fires every day on different fronts.  So what we're hoping to

7   do with the injunction is ensure that we can actually fulfill

8   the purposes of the plan.

9   Q   All right.  Let's talk about some of the litigation that

10  you're referring to.

11        MR. MORRIS:  Can we put up on the screen the

12  demonstrative for the Crusader litigation?

13  BY MR. MORRIS:

14  Q   And Mr. Seery, I would just ask you to kind of describe

15  your understanding in a general way about the history of the

16  Crusader litigation.

17        MR. MORRIS:  And, Your Honor, just to be clear here,

18  this is a demonstrative exhibit.  As you can see in the

19  footnotes, it's heavily footnoted to the documents and to --

20  and, really, to the court cases themselves.  The documents on

21  the exhibit list include the dockets from each of the

22  underlying litigations.  And I just want to just have Mr.

23  Seery describe at an extremely high level some of the

24  litigation that the Debtor has confronted over the years, you

25  know, as the driver, as he just testified to, for the decision

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 155 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 85 of 225   PageID 4364

Seery - Direct                          155

1  to seek this gatekeeper injunction.

2           THE COURT:  All right.

3  BY MR. MORRIS:

4  Q   So, Mr. Seery, can you just describe kind of in general

5  terms the Crusader litigation?

6  A    Yeah.  I apologize to the Redeemer team for maybe not

7  doing this justice.  But this is litigation that came out of a

8  financial crisis upheaval related to this fund.  Disputes

9  arose with respect to the holders of the interests, which were

10 the -- ultimately became the Redeemers, and Highland as the

11 manager.

12      That went through initial litigation, and then into the

13 Bermuda courts, where it was subject to a scheme.  The scheme

14 required or allowed for the liquidation of the fund and then

15 distributions to the -- to the holders, and then deferred many

16 of the payments to Highland.

17      At some point, Highland, frustrated that it wasn't able to

18 get the payments, decided to just take them, and I think, you

19 know, fairly -- can be fairly described, at least by the

20 arbitration panel, as coming up with reasons that may not have

21 been wholly anchored in reality as to what its reasons were

22 for taking that money.

23      That led to further disputes with the Redeemers, who then

24 terminated Highland and brought an arbitration action against

25 Highland.  They were successful in that arbitration and

Seery - Direct                    156

1    received a $137 arbitration award.  And right up to the

2    petition date, that arbitration pursued.  When they finally

3    got their -- the arbitration award, they were going to

4    Delaware Chancery Court to file it and perfect it, and the

5    Debtor filed.

6    Q    Okay.

7              MR. MORRIS:  Let's go to the next slide, the Terry/

8    Acis slide.  If we could just open that up a little bit.  It's

9    -- as you can imagine, Your Honor, it's a little difficult to

10   kind of summarize the Acis/Terry saga in one slide, but we've

11   done the best we can.

12   BY MR. MORRIS:

13   Q    Mr. Seery, can you describe generally for Judge Jernigan,

14   who is well-versed in the matter, the broad overview of this

15   litigation?

16   A    There's clearly nothing I can tell the Court about the

17   bankruptcy that it doesn't already know.  But very quickly,

18   for the record, Mr. Terry was an employee at Highland.  He

19   also has a partnership interest in Acis, which was, in

20   essence, the Highland CLO business.  He -- and he got into a

21   dispute with Mr. Dondero regarding certain transactions that

22   Mr. Dondero wanted to enter into and Mr. Terry didn't believe

23   were appropriate for the investors.

24        Strangely, the assets that underlie that dispute are still

25   in the Highland portfolio, both Targa (phonetic) and Trussway.

001643

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 157 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 87 of 225 PageID 4366

Seery - Direct                           157

1   Mr. Terry was terminated, or quit, depending on whose side of

2   the argument you take.  Mr. Terry then sought compensation in

3   the arbitration pursuant to the partnership agreement.

4   Ultimately, he was awarded an arbitration award of roughly $8

5   million.

6       When he went to enforce that -- that was against Acis.

7   When he went to enforce that against Acis, which had all the

8   contracts, Highland went about, I think, terribly denuding

9   Acis and moving value.  Mr. Terry ultimately was able to file

10  an involuntary against Acis, and after a tremendous amount of

11  litigation had a plan confirmed that gave him certain rights

12  in Acis and any ability to challenge certain transactions with

13  respect to Highland that formed the basis of his claims in the

14  Highland bankruptcy.

15      That wasn't the end of the saga, because Highland

16  commenced a litigation -- well, not Highland, but HCLOF and

17  others, directed by others -- commenced litigation against Mr.

18  Terry in Guernsey, an island in the English Channel.  That

19  litigation wound its way for a couple -- probably close to two

20  years, at least a year and a half, and ultimately was -- it

21  was dismissed in Mr. Terry's favor.

22      While that was pending, litigation was commenced in New

23  York Supreme Court against Mr. Terry and virtually anybody who

24  had ever associated with him in the business, including --

25  including some of the rating agencies.  That was withdrawn as

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 158 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 88 of 225 PageID 4367

Seery - Direct                          158

 1  part of our efforts working with DAF to try to bring a little

 2  bit of sanity to the case.  But it was withdrawn without

 3  prejudice.

 4       But ultimately, you know, we've agreed to a claims

 5  settlement, which was approved by this Court, with Acis and

 6  Mr. Terry.

 7  Q   All right.

 8            MR. MORRIS:  How about UBS?  Can we get the UBS

 9  slide?

10            THE WITNESS:  I should mention that there's other

11  litigations involving Mr. Terry and Highland individuals that

12  are outstanding, I believe, in Texas court.  We have not yet

13  had to deal with those.

14  BY MR. MORRIS:

15  Q   Okay.  Can you describe for the Court your general

16  understanding of the UBS litigation?

17  A   Again, UBS comes out of the financial crisis.  It was a

18  warehouse facility that UBS had established for Highland.  It

19  actually was a pre-crisis facility that was restructured in

20  early '08, while the markets were starting to slide but before

21  they really collapsed.  That litigation started after Highland

22  failed to make a margin call.  UBS foreclosed out -- or it

23  wasn't really a foreclosure, because it's a warehouse

24  facility, but basically closed out all the interest and sought

25  recovery from Highland for the shortfall.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 159 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 89 of 225 PageID 4368
Seery - Direct 159

1      Highland was one of the defendants, but there are numerous

2  defendants, including some foreign subsidiaries of Highland.

3      That case wend its way through the New York Supreme Court,

4  up and down between the Supreme and the Appellate Division,

5  which is the intermediate appellate court in New York.

6  Incredibly litigious effort over virtually every single item

7  you could possibly think of.

8      Ultimately, UBS got a judgment for $500-plus million and

9  -- plus prejudgment interest against two of the Highland

10  subsidiaries.  It then sought to commence action up -- enforce

11  its judgment through various theories against Highland.  That

12  is part of the settlement that we have -- it's been part of

13  the lift stay motion here, the 3019, as well as the 3018, and

14  as well as the ultimate settlement we've discussed today.

15  Q    Okay.  Moving on to Mr. Daugherty, can you describe for

16  the Court your understanding of the Daugherty litigation?

17  A    The Daugherty litigation goes back even further.  It did

18  -- I think the original disputes were -- or, again, started to

19  happen between Mr. Daugherty and Mr. Dondero even prior to the

20  crisis, but Mr. Dondero -- Daugherty certainly stayed with

21  Highland post-crisis.  And then when Mr. Daugherty was severed

22  or either resigned or terminated from his position, there was

23  various litigations that began between the parties very

24  intensely in state court, one of the more nasty litigations

25  that you can imagine, replete with salacious allegations and

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 160 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 90 of 225   PageID 4369

Seery - Direct                              160

1    press releases.

2         That litigation then led to an award originally for Mr.

3    Daugherty from HERA, which was an entity that had assets that

4    Mr. Daugherty alleges were stripped.  Mr. Daugherty had to pay

5    a judgment against Highland.  Ultimately, litigations were

6    commenced in both the state court and the Delaware Chancery

7    Court.  Those litigations, many of those continue, because

8    they're not just against the entities but specific

9    individuals.  Mr. Daugherty got a voting -- a claim allowed

10   for voting purposes in our case of $9.1 million, and we've

11   since reached an agreement with Mr. Daugherty on his claim,

12   save for a tax case which we announced earlier that relates to

13   compensation, claimed compensation with respect to a tax

14   distribution, which we have defenses for and he has claims

15   for.

16            MR. MORRIS:  All right.  We can take that down,

17   please.

18   BY MR. MORRIS:

19   Q    And let's just talk for a few minutes about some of the

20   things that have happened in this case.  Did Mr. Dondero

21   engage in conduct that caused the Debtor to seek and obtain a

22   temporary restraining order?

23   A    Yes, he did.

24   Q    And did the Debtor -- did Mr. Dondero engage in conduct

25   that caused the Debtor to seek and obtain a preliminary

001647

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 161 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 91 of 225 PageID 4370

Seery - Direct                                          161

1    injunction against him?

2    A    Yes.

3    Q    And has the Debtor filed a motion to hold Mr. Dondero in

4    contempt for violation of the TRO?

5    A    Yes.

6    Q    Are you aware that -- of the CLO-related motion that was

7    filed in mid-December?

8    A    It's similar in that these are controlled entities that

9    brought similar types of claims against the Debtor and

10   interfered in similar ways, albeit not as directly threatening

11   with respect to the personnel of the Debtor.

12   Q    Okay.  And you're aware of how that -- that motion was

13   resolved?

14   A    I know we resolved it, and I'm drawing a blank on that.

15   But --

16   Q    All right.  Are you aware, did Mr. Daugherty also object

17   to the Acis and HarbourVest settlements, or at least either

18   him or entities acting on his behalf?

19   A    I think you meant Mr. Dondero.  I don't believe Mr.

20   Daugherty did.

21   Q    You're right.  Thank you.  Let me ask the question again.

22   Thank you for the clarification.  We're almost done.  To the

23   best of your knowledge, did Mr. Dondero or entities that he

24   controls file objections to the Acis and HarbourVest

25   settlements?

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 162 of
Case 3:21-cv-00538-N    Document 26-6    Filed 06/09/21    Page 92 of 225    PageID 4371

Seery - Direct                    162

1   A   Yes, they did.

2   Q   And we're here today with this long recitation because the

3   remaining objectors are all Mr. Dondero or entities owned or

4   controlled by him; is that right?

5   A   That's correct.

6   Q   All right.

7           MR. RUKAVINA:  Your Honor, I didn't have a chance to

8   object in time.  Entities owned or controlled by Mr. Dondero.

9   There's no evidence of that with respect to at least three of

10  my clients, and this witness has not been asked predicate

11  questions to lay a foundation.  Mr. Dondero does not own or

12  control the three retail (inaudible).  So I move to strike

13  that answer.

14          MR. MORRIS:  Your Honor, I withdraw with respect to

15  the three funds.  It's fine.

16          THE COURT:  All right.  With that withdrawal, then I

17  think that resolves the objection.

18          MR. MORRIS:  Uh, --

19          THE COURT:  Or I overrule the remaining portion.

20      Okay.  Go ahead.

21          MR. RUKAVINA:  That does, Your Honor.  Thank you.

22  BY MR. MORRIS:

23  Q   Are -- are -- is everything that you just described, Mr.

24  Seery, the basis for the Debtor's request for the gatekeeper

25  and injunction features of the plan?

Seery - Direct                      163

1    A    Well, everything I described are a part of the basis for

2    that.  I didn't describe every single basis with respect to

3    why those --

4    Q    So what are -- what are the other reasons that the Debtor

5    is seeking the gatekeeper and injunction provisions in the

6    plan?

7    A    We really do need to be able to operate the business and

8    monetize the assets without direct interference and litigation

9    threats.  We didn't go through some of the specifics, and I

10   hesitate to burden the Court again, but the email to me, the

11   email to Mr. Surgent, the testimony threatening -- effectively

12   threatening Mr. Surgent, in my opinion, by Mr. Dondero, in the

13   court in previous weeks, statements by his counsel indicating

14   that Mr. Dondero is going to sue me for hundreds of millions

15   of dollars down the road.

16       I mean, this is nonstop.  I'm an independent fiduciary.

17   I'm trying to maximize value for the estate.  I've got some

18   guy who's threatening to sue me?  It's absurd.

19            MR. MORRIS:  Your Honor, I have no further questions,

20   but what I would respectfully request is that we take just a

21   short five-minute break.  I'd like to just confer with my

22   colleagues before I pass the witness.

23            THE COURT:  All right.  Five-minute break.

24            MR. MORRIS:  Thank you, Your Honor.

25            THE CLERK:  All rise.

Seery - Direct                    164

1          (A recess ensued from 1:58 p.m. to 2:06 p.m.)

2                THE CLERK:  All rise.

3                THE COURT:  All right.  Please be seated.  We're back

4    on the record in Highland.  Mr. Morris, anything else?

5                MR. MORRIS:  All right, Your Honor.  Can you hear me?

6                THE COURT:  I can, uh-huh.

7                MR. MORRIS:  Okay.  Mr. Seery, are you there?

8                THE WITNESS:  I am, yes.

9                MR. MORRIS:  I just have a few follow-up questions,

10   Your Honor, if I may.

11               THE COURT:  Okay.

12                    DIRECT EXAMINATION, RESUMED

13   BY MR. MORRIS:

14   Q    Okay.  Mr. Seery, we talked for a bit about the difference

15   between the convenience class and the general unsecured

16   claims.  Do you recall that?

17   A    Yes.

18   Q    And that's the difference between Class 7 and 8; do I have

19   that right?

20   A    Yes.

21   Q    And what is the recovery for claimants in Class 7, to the

22   best of your recollection, the convenience class?

23   A    It's 85 cents.

24   Q    And under --

25   A    On the dollar.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 165 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 95 of 225   PageID 4374
Seery - Direct                    165

1   Q    And under the projections that were filed last night, and

2   we can call them up on the screen if you don't have total

3   recall, do you recall what Class 8 is projected to recover now

4   that we've taken into account the UBS settlement?

5   A    Approximately 71.

6   Q    Okay.

7   A    Percent.  71 cents on the dollar.

8          THE COURT:  Okay.  The answer --

9   BY MR. MORRIS:

10  Q    Okay.  Do I this right --

11         THE COURT:  The answer was a little garbled.  Can you

12  repeat the answer, Mr. Seery?

13         THE WITNESS:  Approximately 71 cents on the dollar,

14  Your Honor.

15         THE COURT:  Okay.  Thank you.

16  BY MR. MORRIS:

17  Q    Okay.  And do I have that right, that that 71 cents

18  includes no value for potential litigation claims?

19  A    That's correct.  We didn't even put that in our

20  projections at all.

21  Q    So is it possible, depending on Mr. Kirschner's work, that

22  holders of Class 8 claims could recover an amount in excess of

23  85 percent?

24  A    It's possible, yes.

25  Q    Okay.  Are you aware that Dugaboy has suggested that the

001652

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 166 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 96 of 225 PageID 4375

Seery - Direct                    166

1   Debtor should resolicit because their -- their -- the

2   projections in the November disclosure statement were

3   misleading?

4   A   I'm aware that they've made allegations along those lines,

5   yes.

6   Q   Okay.  Do you think the November projections were

7   misleading in any way?

8   A   No, not at all.

9   Q   And why not?

10  A   Well, the plan was -- the projections are for the plan,

11  and they contain assumptions.  And it was clear in the plan

12  that those assumptions could change.  So the value of the

13  assets, which aren't static, does change.  The costs aren't

14  static.  They do change.  The amount of the claims, the

15  denominator, was not static and would change.

16  Q   Okay.  And were the -- were the changes in the claims, for

17  example, changes that were all subject to public viewing, as

18  the Court ruled on 3018, as the settlement with HarbourVest

19  was announced?

20  A   Well, the plan -- the terms of the plan made clear that

21  the Class 8 claims would -- would be whatever the final

22  amounts of those claims were going to be.  We did resolve the

23  claims of HarbourVest and then ultimately the settlement

24  announced today, but in front of -- in front of the world, in

25  front of the Court, with a 9019 motion.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 167 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 97 of 225 PageID 4376

Seery - Direct                                    167

 1  Q    Okay.  We had finished up with some questioning about the

 2  gatekeeper and the injunction provision.  Do you recall that?

 3  A    Yes, I do.

 4  Q    And you had testified as to the reasons why the Debtor was

 5  seeking that particular protection.  Do you recall that?

 6  A    Yes.

 7  Q    In the absence of that protection, does the Debtor have

 8  any concerns that interference by Mr. Dondero could adversely

 9  impact the timing of the Debtor's plan?

10  A    Well, that's my opinion and what I testified to before.  I

11  think the -- the injunction -- the exculpation, the

12  injunction, and the gatekeeper are really critical and

13  essential elements of this plan, because we have to have the

14  ability, unfettered by litigation, particularly vexatious

15  litigation in multiple jurisdictions, we have to be able to

16  avoid that and be able to focus on monetizing the assets and

17  try to maximize value.

18  Q    Is there a concern that that value would erode if

19  resources and time and attention are diverted to the

20  litigation you've just described?

21  A    Absolutely.  The focus of the team has to be on the

22  assets' monetization, creative ways to get the most value out

23  of those assets, and not on defending itself, trying to paper

24  up some sort of litigation defense against vexatious

25  litigation, and also spending time actually defending

001654

Seery - Direct                          168

1   ourselves in various courts.

2   Q    Okay.  Last couple of questions.  If there was no

3   gatekeeper provision in the plan, would you accept appointment

4   as the Claimant Trustee?

5   A    You broke up.  No which provision?

6   Q    If there was no gatekeeper provision in the -- in the

7   confirmation order, would you accept the position as Claimant

8   Trustee?

9   A    No, I wouldn't.  Just -- just like when I came on, there

10  were -- there are some pretty essential elements that I

11  mentioned before.  One is indemnification.  Two is directors

12  and officers insurance.  And three was a gatekeeper function.

13  I want to make sure that we're not at risk, that I'm not at

14  risk, for doing my job.

15  Q    And I think you just said it, but if you were unable to

16  obtain D&O insurance, would you accept the position as

17  Claimant Trustee?

18  A    No, I would not.

19         MR. MORRIS:  I have no further questions, Your Honor.

20         THE COURT:  All right.  So, you went two hours and 34

21  minutes in total with your direct.  So we'll now pass the

22  witness for cross.  And the Objectors get an aggregate of two

23  hours and 34 minutes.

24     Who's going to go first?

25         MR. RUKAVINA:  Your Honor, Davor Rukavina.  I will.

001655

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 169 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21    Page 99 of 225   PageID 4378

Seery - Direct                        169

 1              THE COURT:  Okay.  Go ahead.

 2              MR. RUKAVINA:  Mr. Vasek, if you can pull up Exhibit

 3    6N, the ballot summary, Page 7 of 15 on the top.

 4              MR. POMERANTZ:  Mr. Morris, you're not on mute.

 5              MR. MORRIS:  Thank you, sir.

 6              MR. RUKAVINA:  Mr. Vasek, did you hear me?  There it

 7    is.

 8                       CROSS-EXAMINATION

 9    BY MR. RUKAVINA:

10    Q    Mr. Seery, are you familiar with this ballot tabulation

11    that was filed with the Court and that has been admitted into

12    evidence?

13    A    Yes, I believe I've seen this.

14    Q    Okay.  And this says that 31 Class 8 creditors rejected

15    and 12 Class 8 creditors accepted the plan, correct?

16    A    That's correct.

17    Q    And since then, I think we've heard that Mr. Daugherty and

18    maybe two other employees have changed their vote to an

19    accept; is that correct?

20    A    That's correct, yes.

21    Q    Okay.  Other than three, those three employees that are

22    changing, do you know of any other Class 8 creditors that are

23    changing their votes?

24    A    Mr. Daugherty is not an employee.

25    Q    I apologize.  Other than those three Class 8 creditors

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 170 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 100 of 225 PageID 4379

Seery - Cross                    170

1  that are changing their votes, do you know of any other ones

2  that are changing their votes?

3  A    No.

4  Q    Okay.  You didn't tabulate the ballots, did you?

5  A    No, I did not.

6  Q    Do you have any reason to question the accuracy of this

7  ballot summary that's been filed with the Court?

8  A    No, I do not.

9  Q    Okay.  You mentioned that many of the people that rejected

10  the plan are former employees who you don't think will

11  ultimately have allowed claims, correct?

12  A    Not ultimately.  I said they don't have them now.

13  Q    Okay.  Are you aware that the Court ordered that

14  contingent unliquidated claims be allowed to vote in an

15  estimated amount of one dollar?

16  A    I'm aware of that, yes.

17  Q    Okay.  All right.  Now, no motion to reconsider that order

18  has been filed, correct?

19  A    Not to my knowledge.

20  Q    Okay.  No objection to these rejecting employees' claims

21  have been filed yet, correct?

22  A    Correct.

23  Q    Okay.  And no motion to strike or designate their vote has

24  been filed as of now, correct?

25  A    Correct.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 171 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21    Page 101 of 225    PageID 4380

Seery - Cross                          171

1           MR. RUKAVINA:  You can take down that exhibit, Mr.

2    Vasek.

3    BY MR. RUKAVINA:

4    Q   Mr. Seery, the Debtor itself is a limited partnership; I

5    think you confirmed that earlier, correct?

6    A   Correct.

7    Q   And its sole general partner is Strand Advisors, Inc.,

8    correct?

9    A   Correct.

10   Q   And to your understanding, the Debtor, as a limited

11   partnership, is managed by its general partner, correct?

12   A   Correct.

13   Q   Okay.  And Strand, that's where the independent board of

14   you, Mr. Nelms, and Mr. Dubel -- or I apologize if I'm

15   misspelling, misstating his name -- that's where the board

16   sits, at Strand, correct?

17   A   Yes.

18   Q   Okay.  And that board has been in place since about

19   January 9, 2020?

20   A   Yes.

21   Q   Okay.  Strand is not a debtor in bankruptcy, correct?

22   A   No.

23   Q   Okay.  Do you have any understanding as to whether, under

24   non-bankruptcy law, a general partner is liable for the debts

25   of the limited partnership that it manages?

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 172 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 102 of 225   PageID 4381

Seery - Cross                              172

1    A    I do.

2    Q    Okay.  What's your understanding?

3    A    Typically, a general partner is liable for the debts of

4    the partnership.

5    Q    Okay.  And under the plan, Strand itself is an exculpated

6    party and a protected party and a released party for matters

7    arising after January 9, 2020, correct?

8    A    Yes.

9    Q    Okay.  You mentioned that you're the chief executive

10   officer and chief restructuring officer in this case for the

11   Debtor, correct?

12   A    For the Debtor, yes.

13   Q    Yeah.  You are not a Chapter 11 trustee, right?

14   A    No.

15   Q    Okay.  You are one of the principal authors of this plan,

16   correct?

17   A    Consultant.

18          MR. MORRIS:  Objection to the form of the question.

19          THE COURT:  Sustained.

20   BY MR. RUKAVINA:

21   Q    You are --

22          THE COURT:  Sustained.

23   BY MR. RUKAVINA:

24   Q    You are --

25          THE COURT:  Rephrase.

001659

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 173 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21    Page 103 of 225    PageID 4382

Seery - Cross                                    173

 1  BY MR. RUKAVINA:

 2  Q    -- one of the principal --

 3           MR. RUKAVINA:  I apologize.

 4  BY MR. RUKAVINA:

 5  Q    You had input in creating this plan, didn't you?

 6  A    I did, yes.

 7  Q    Okay.  And you're familiar with the plan's provisions,

 8  aren't you?

 9  A    Yes.

10  Q    Okay.  And you, of course, approve of the plan, correct?

11  A    Yes.

12  Q    Okay.  And you are, of course, familiar generally with

13  what the property of the estate currently is, correct?

14  A    Yes.

15  Q    Okay.  And part of the purpose of the plan, I take it, is

16  to vest that property in the Claimant Trust in some respects

17  and the Reorganized Debtor in some respects, correct?

18  A    I don't -- I don't know if that's a fair characterization.

19  Some property -- maybe some property will stay with the

20  Debtor, some will be transferred directly to the Trust.

21  Q    Okay.  All property of the estate as it currently exists

22  will stay with the Debtor or go to the Trust, correct?

23  A    Yes.

24  Q    Okay.  And under the plan, the Creditor Trust will be

25  responsible for payment of prepetition claims, correct?

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 174 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 104 of 225 PageID 4383

Seery - Cross                    174

1   A    Yes.

2   Q    And under the plan, the Creditor Trust will be responsible

3   for the payment of postpetition pre-confirmation claims,

4   correct?

5   A    Do you mean admin claims?  I don't --

6   Q    Sure.

7   A    I don't understand your question.  I'm sorry.

8   Q    Yes.  We can call them admin claims.

9   A    Yeah.  Those -- they'll be -- they will be paid on the

10  effective date or in and around that time.  So I'm not sure if

11  that's actually going to be from the Trust, but I think it's

12  actually from the Debtor, as opposed to from the Trust.

13  Q    Okay.  But after the creation of the Claimant Trust, --

14  A    Uh-huh.

15  Q    -- whatever administrative claims are not paid by that

16  time will be assumed by and paid from the Claimant Trust,

17  correct?

18  A    I don't recall that specifically.

19  Q    Is it your testimony that the Reorganized Debtor will be

20  obligated post-effective date of the plan to pay any admin

21  claims that are then unpaid?

22           MR. MORRIS:  Objection to the form of the question.

23           THE COURT:  Sustained.  Rephrase.

24  BY MR. RUKAVINA:

25  Q    Who pays unpaid admin claims under the plan once the plan

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 175 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 105 of 225 PageID 4384

Seery - Cross                                                175

 1   goes effective?

 2   A    I believe the Debtor does.  The Reorganized Debtor.

 3   Q    Okay.  The Reorganized Debtor also gets a discharge,

 4   correct?

 5   A    Yes.

 6   Q    Okay.  And there is no bankruptcy estate left after the

 7   plan goes effective, correct?

 8            MR. MORRIS:  Objection to the form of the question.

 9            THE COURT:  Overruled.

10            MR. RUKAVINA:  Your Honor, I have the right to know

11   what the objection to my question is.

12            THE COURT:  I overruled.

13            MR. MORRIS:  Okay.

14            THE COURT:  I overruled the objection.

15            MR. RUKAVINA:  Thank you.

16   BY MR. RUKAVINA:

17   Q    Mr. Seery, do you remember my question?

18   A    That whether there was a bankruptcy estate after the

19   effective date?

20   Q    Yes.

21   A    There wouldn't be a bankruptcy estate anymore, no.

22   Q    Okay.  Under the plan, the creditors, to the extent that

23   they have their claims allowed, the prepetition creditors,

24   they're the beneficiaries of the Claimant Trust, correct?

25   A    They are some of the beneficiaries, yes.

Seery - Cross                      176

1   Q    Okay.  And you would be the Trustee, I think you said, of

2   the Claimant Trust?

3   A    Of the Claimant Trust, yes.

4   Q    Okay.  And you will have fiduciary duties to the

5   beneficiaries of the Claimant Trust, correct?

6   A    I believe I have some, yes.

7   Q    Okay.  Well, as the Trustee, you will have some fiduciary

8   duties; you do agree with that?

9   A    That's what I said, yes.

10  Q    Okay.  What's your understanding of what those fiduciary

11  duties to the beneficiaries of the Claimant Trust will be?

12  A    I think they'll be -- they are cabined to some degree by

13  the provisions of the agreement, but generally there will be a

14  duty of care and a duty of loyalty.

15  Q    Do you feel like you'll have a duty to try to maximize

16  their recoveries?

17  A    That depends.

18  Q    On what?

19  A    My judgment on what's the -- if I'm exercising my duty of

20  care and my duty of loyalty.

21  Q    Okay.  But surely you'd like to, whether you have a duty

22  or not, you'd like to maximize their recoveries as Trustee,

23  wouldn't you?

24  A    Yes.

25  Q    Okay.  Now, in addition to the beneficiaries, which I

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 177 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21    Page 107 of 225   PageID 4386

Seery - Cross                              177

1    believe are the Class 8 and Class 9 creditors, the plan

2    proposes to give non-vested contingent interests in the Trust

3    to certain holders of limited partnership interests, correct?

4    A    Yes.

5    Q    Okay.  And those non-vested contingent interests would

6    only be paid and would only vest if and when all unsecured

7    creditors and subordinated creditors are paid in full, with

8    interest, correct?

9    A    Yes.

10   Q    Okay.  And those non-vested contingent interests are a

11   property interest, although they're an inchoate property

12   interest, correct?

13   A    I don't know.  I think I testified in my deposition that I

14   -- I reached for inchoate, but I'm not an expert in the

15   definitions of property interests.  I don't know if they're

16   too ethereal to be considered a property interest.

17   Q    Okay.

18          MR. RUKAVINA:  Mr. Vasek, will you please pull up Mr.

19   Seery's deposition at Page 215?  And if you'll go to Page 200

20   -- can you zoom -- can you zoom that in a little bit?  Mr.

21   Vasek, can you zoom on that?

22          MR. VASEK:  Just a moment.  There's some sort of

23   issue here.

24          MR. RUKAVINA:  Okay.  And then go to Page 216.

25   Scroll down to 216, please.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 178 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21    Page 108 of 225   PageID 4387

Seery - Cross                            178

1          MR. VASEK:  Okay.  I can't see it, so --

2          MR. RUKAVINA:  Okay.  Stay, stay where you are.  Go

3   down one more row.

4   BY MR. RUKAVINA:

5   Q   Okay.  Mr. Seery, can you see this?

6   A   Yes.

7   Q   Okay.  So, I ask you on Line 21, "They may be a property

8   interest, but inchoate only, correct?"  And you answer, "That

9   is my belief.  I don't claim to be an expert on the different

10  types of property interests," --

11         MR. RUKAVINA:  Mr. Vasek, can you go to the next

12  page?

13  BY MR. RUKAVINA:

14  Q   (continues) "-- whether they be inchoate, reversionary,

15  ethereal.  I don't claim to be an expert on the different

16  types of property interests."

17      Do you see that answer, sir?

18  A   Yes.

19  Q   And do you stand by your answer given on Lines 23 through

20  Line 4 of the next page?

21  A   Yes.

22  Q   Okay.  And these non-vested contingency -- contingent

23  interests in the Claimant Trust, they may have some value in

24  the future, correct?

25  A   Yes.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 179 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 109 of 225 PageID 4388

Seery - Cross                                    179

1           MR. RUKAVINA:  Okay.  You can take that down, Mr.

2    Vasek.

3    BY MR. RUKAVINA:

4    Q    Have you tried to see whether anyone outside this case, or

5    anyone at all, would pay anything for those unvested

6    contingent interests to the Claimant Trust?

7    A    No.

8    Q    Okay.  Now, the Debtor is a registered investment advisor

9    under the Investment Advisers Act of 1940; is that correct?

10   A    That's correct.

11   Q    And under that Act, the Debtor owes a fiduciary duty to

12   the funds that it manages and to the investors of those funds,

13   correct?

14   A    Clearly to the funds, and generally to the investors more

15   broadly, yes.

16   Q    Okay.  And would you agree that that duty compels the

17   Debtor to look for the interests of the funds and the

18   investors of those funds ahead of its own interests?

19   A    Generally, but it's a much more fine line than what you're

20   describing.  It means you can't -- the manager can't put its

21   own interests in front of the investors and the funds.  It

22   doesn't mean that the manager subordinates its interest in the

23   -- to the investors and the funds.

24           MR. RUKAVINA:  Well, Mr. Vasek, please pull up the

25   October 20th transcript at Page 233.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 180 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 110 of 225   PageID 4389

Seery - Cross                      180

1          MR. MORRIS:  What transcript is this?

2          MR. RUKAVINA:  October 20, 2019.  Mr. Vasek has the

3    docket entry.

4          MR. MORRIS:  Oh, so it's the -- Your Honor, I just do

5    want to point out that Mr. Rukavina objected, in fact, to the

6    use of trial transcripts, but we'll get to that when we put on

7    our evidence, when we finish up.

8          MR. RUKAVINA:  Well, Your Honor, I believe that

9    you're allowed to use a trial transcript to impeach testimony,

10   which is what I'm going to do now.

11       So, for that purpose, Mr. Vasek, if you could -- are you

12   on Page 233?

13         THE COURT:  And just so the record is clear, this is

14   from October 2020, not October 2019, which is, I think, what I

15   heard.  Continue.

16         MR. MORRIS:  Your --

17         MR. RUKAVINA:  Your Honor, I apologize, you did hear

18   that and I did make a mistake.  Yes, this is at Docket 1271.

19       Mr. Vasek, if you'll scroll down, please.  Okay.  No, stop

20   there.

21   BY MR. RUKAVINA:

22   Q    And you see on Line 16, sir, you're asked your

23   understanding, and then you answer, "Okay."  "And in

24   exercising those duties, the manager, under the Advisers Act,

25   has a duty to subordinate its interests to the interests of

Seery - Cross                          181

1    those investors in the CLOs, correct?"  And you answer --

2              MR. RUKAVINA:  Go down, Mr. Vasek.

3    BY MR. RUKAVINA:

4    Q    -- "I think -- I think, generally, when you think about

5    the fiduciary duty, and I think that we -- I want to make sure

6    I'm very specific about this, is that the manager has a duty,

7    fiduciary duties -- there's a whole bunch of legal analysis of

8    what they are, but they are significant -- that the manager

9    owes to the investors.  And to the extent" --

10             MR. RUKAVINA:  Scroll down, please.

11   BY MR. RUKAVINA:

12   Q    "And to the extent that the manager's interests would

13   somehow be -- somehow interfere with the investors' in the

14   CLO, he is supposed to -- he or she is supposed to subordinate

15   those to the benefit of the investors."

16        Did I read that accurately, Mr. Seery?

17   A    You did.

18   Q    Was that your testimony on October 20th last?

19   A    Yes.

20   Q    Okay.  Are you willing to revise your testimony from a few

21   minutes ago that the manager does not have to subordinate its

22   interests to the interests of the investors?

23   A    No.  I think that's very similar.

24   Q    Okay.

25   A    You left out the part about garbled up top where I said it

001668

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 182 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 112 of 225 PageID 4391

Seery - Cross                          182

1    was nuanced, almost exactly what I just said.  On Line 9, I

2    believe, on the prior page.

3    Q    Well, I heard you say a couple of minutes ago, and maybe I

4    misunderstood because of the WebEx nature, that the manager

5    does not have to subordinate its interests to the interests of

6    the investors.  Did I misheard you say that a few minutes ago?

7    A    I think you misheard it.  I said it's a nuanced analysis,

8    and it's -- it's pretty significant.  But the manager does

9    subordinate his general interest and assures that the CLO or

10   any of the investors' interests are paramount, but he doesn't

11   subordinate every single interest.

12        For example, and I think it's in this testimony, the

13   manager, if the fund isn't doing well, doesn't just have to

14   take his fee and not get paid.  He's allowed -- entitled to

15   take his fee.  He doesn't subordinate every single interest of

16   his.  He doesn't give up his home and his family.  So it's --

17   it's a nuanced analysis.  The interests of the manager are

18   subordinated to the interests of the investors and the fund.

19   I don't -- I don't disagree with anything I said there.  I

20   think I'm consistent.

21   Q    Okay.

22        MR. RUKAVINA:  You can take that down, Mr. Vasek.

23   BY MR. RUKAVINA:

24   Q    So, how do you describe, sir, the fiduciary duty that the

25   Debtor owes to the funds that it manages and to the investors

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 183 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 113 of 225 PageID 4392

Seery - Cross                                    183

1  in those funds?

2              MR. MORRIS:  Objection to the -- to the extent it

3  calls for a legal conclusion, Your Honor.  I just want to make

4  sure we're -- we're asking a witness for his lay views.

5              THE COURT:  Okay.  I overrule the objection.  He can

6  answer.

7              THE WITNESS:  Yes.  As a manager of a fund, the

8  manager is a fiduciary to the fund, and sometimes to the

9  investors, depending on the structure of the fund.  Some funds

10  are purposely set up where the investors are actually debt-

11  holders, and their interests are much more cabined by the

12  terms of the contract, as opposed to straight equity holders.

13  But the manager has a duty to seek to maximize value of the

14  assets in the best interests of the underlying -- of the fund

15  and the underlying investors, to the extent that it can,

16  within the confines and structure of the fund.

17  BY MR. RUKAVINA:

18  Q    Okay.  And these duties as you just described them, they

19  would apply to the Reorganized Debtor, correct?

20  A    They would apply to the Reorganized Debtor to the extent

21  that it's a manager for a fund, not, for example, with respect

22  to necessarily interests -- the inchoate interests that we

23  talked about earlier.

24  Q    Sure.  And I apologize, I meant just for the fund.  And if

25  the manager, the Reorganized Debtor, breaches those duties,

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 184 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 114 of 225 PageID 4393

Seery - Cross                                184

1   then it's possible that there's going to be liability,

2   correct?

3   A    It's possible.

4   Q    Okay.  Now, under the plan, the limited partnership

5   interests in the Reorganized Debtor will be owned by the

6   Claimant Trust, correct?

7   A    Yes.

8   Q    Okay.  And there's a new entity called New GP, LLC that

9   will be created or already has been created, correct?

10  A    Yes.

11  Q    Okay.  And that entity will hold the general partnership

12  interest in the Reorganized Debtor, correct?

13  A    I believe that's correct.

14  Q    Okay.  And that entity -- that being New GP, LLC -- will

15  also be owned by the Claimant Trust, correct?

16  A    Yes.

17  Q    Okay.  Who will manage the Reorganized Debtor?

18  A    The G -- the GP will manage the Reorganized Debtor.

19  Q    Okay.  And will there be an officer or officers of the

20  Reorganized Debtor, or will it all be managed through the GP?

21  A    It'll be managed through the GP.

22  Q    Okay.  And who will manage the GP?

23  A    Likely, I will.

24  Q    Okay.  That's the current plan, that you will?

25  A    I'll be the Claimant Trustee, and I believe that I'll be

Seery - Cross                                    185

1    responsible for any assets that remain in the Reorganized

2    Debtor, yes.

3    Q    Okay.  Right now, the Debtor is managing its own assets as

4    the Debtor-in-Possession, right?

5    A    Yes.

6    Q    And it is managing various funds and CLOs, right?

7    A    Yes.

8    Q    Okay.  And right now, the Debtor is attempting to reduce

9    some of its assets to money, like the promissory notes that

10   you mentioned earlier that the Debtor filed suit on, correct?

11   A    Yes.

12   Q    And the Debtor is trying to reduce some of its assets to

13   money, like the promissory notes, to benefit its creditors,

14   correct?

15   A    Yes.

16   Q    Okay.  And correct me if I'm wrong, but the Committee has

17   filed various claims and causes of action against Mr. Dondero,

18   correct?

19   A    They -- they've filed some.  I haven't -- I haven't looked

20   at their (indecipherable) closely, but --

21   Q    Okay.

22   A    -- some are preserved in the case.

23   Q    You understand --

24   A    In the plan.  I'm sorry.

25   Q    You understand that the Committee is doing that for the

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 186 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 116 of 225 PageID 4395

Seery - Cross                    186

1  benefit of the estate, correct?

2  A    Yes.

3  Q    And you understand that they're also doing that for the

4  benefit of creditors, correct?

5  A    Yes.

6  Q    Okay.  And under the plan, just so that I'm clear, those

7  claims that the Committee has asserted will be preserved and

8  will vest in either the Claimant Trust or the Litigation Sub-

9  Trust, correct?

10  A    Yes.

11  Q    Okay.  And under the plan, the Reorganized Debtor would

12  continue to manage its assets, correct?

13  A    Yes.

14  Q    And it would continue to manage the Funds and the CLOs,

15  correct?

16  A    Yes.

17  Q    And the Claimant Trust would attempt to liquidate and

18  distribute to its beneficiaries the assets that are

19  transferred to it, correct?

20  A    Yes.

21  Q    Okay.  And you mentioned that the Claimant Trust will have

22  an Oversight Board comprised of five members, right?

23  A    Yes.

24  Q    And four of them will be the people that are currently on

25  the Committee, right?

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 187 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21    Page 117 of 225   PageID 4396

Seery - Cross                           187

1  A    Yes.

2  Q    And the fifth is David Pauker, and I think you mentioned

3  that he's independent.  David Pauker is the fifth member,

4  right?

5  A    Yes.

6  Q    Who -- who is he?

7  A    David Pauker is a very well-known professional in the

8  restructuring world.  He's a long-time financial advisor in --

9  in reorganizations.  He's served on numerous boards in

10  restructuring -- restructurings.

11  Q    Okay.  So, other than a different corporate structure and

12  the Claimant Trust, the monetization of assets for the benefit

13  of creditors would continue post-confirmation as now, correct?

14  A    I -- I believe so.  I'm not exactly sure what you asked

15  there.

16  Q    No one is putting in any new money under the plan, are

17  they?

18  A    No.  No.

19  Q    Okay.  There's no exit financing contingent on the plan

20  being confirmed, right?

21  A    You mean no exit -- the plan is not contingent on exit

22  financing.  I think you just mixed up your -- your financing

23  and your plan.

24  Q    I apologize.  There's no exit financing in place today,

25  correct?

Seery - Cross                     188

1   A    No.

2   Q    Okay.  So, post-confirmation, you are basically going to

3   continue managing the CLOs and funds and trying to monetize

4   assets for creditors the same as you are today, correct?

5   A    Similar, yes.

6   Q    Okay.  And just like the Committee has some oversight role

7   in the case, the members of the Oversight Board will have some

8   oversight role post-confirmation, correct?

9   A    Yes.

10  Q    Okay.  You don't need anything in the plan itself to

11  enable you to continue managing the Debtor and its assets,

12  correct?

13  A    I don't need anything in the plan?

14  Q    Correct.

15  A    I don't -- I don't understand the question.  Can you

16  rephrase it?

17  Q    Well, you are managing the Debtor and its assets today,

18  correct?

19  A    Yes.

20  Q    Okay.  Nothing in the plan is going to change that,

21  correct?

22  A    Well, it's going to change it a lot.

23  Q    Okay.  Well, with respect to you managing the Funds and

24  the CLOs, you don't need anything in the plan that you don't

25  have today to keep managing them, do you?

Seery - Cross                                189

1   A    No.  The Debtor manages them, and I will -- I'm the CEO

2   and I'll be in a similar position with a different team.

3   Q    Okay.  And I believe you told me that you expect the

4   Debtor to administer the CLOs for two or three years, maybe?

5   A    However long it takes, but we expect -- our projections

6   are that we'd be able to monetize most of the assets within

7   two years.

8   Q    Does that include the CLOs?

9   A    It does, yes.

10  Q    Okay.  Now, you're going to be the person for the

11  Reorganized Debtor in charge of managing the CLOs, correct?

12  A    I'll be the person responsible for managing the

13  Reorganized Debtor.  The Reorganized Debtor will be the

14  manager of the CLOs.

15  Q    Okay.  But the buck will stop with you at the Reorganized

16  Debtor, right?

17  A    Yes.

18  Q    Okay.  You're going to have a team of employees and

19  outside professionals helping you, but ultimately, on behalf

20  of the Reorganized Debtor, you're going to be the one in

21  charge of managing the CLOs, correct?

22  A    Yes.

23  Q    Okay.  That means that you'll also be making decisions as

24  to when to sell assets of the CLOs, correct?

25  A    Yes.

001676

Seery - Cross                    190

1   Q   Okay.  And to be clear, the CLOs, they own their own

2   assets, whatever they are, and the Debtor just manages those

3   assets, right?

4   A   Correct.

5   Q   The Debtor doesn't directly own those assets, right?

6   A   No.

7   Q   And currently there's more than one billion dollars in CLO

8   assets that the Debtor manages?

9   A   Approximately.

10  Q   Yeah.  And the Debtor receives fees for its services,

11  correct?

12  A   Yes.

13  Q   Can you generally describe how the amount of those fees is

14  calculated and paid, if you have an understanding?

15  A   How the fees are calculated and paid?

16  Q   Yes, sir.

17  A   It's a percentage of the assets.

18  Q   Assets administered or assets sold in any given time

19  period?

20  A   Administered.

21  Q   Okay.  So the sale of CLO assets does not affect the fees

22  that the Reorganized Debtor would receive under these

23  agreements?

24          MR. MORRIS:  Objection to the form of the question.

25          THE COURT:  Over --

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 191 of
Case 3:21-cv-00538-N    Document 26-6    Filed 06/09/21    Page 121 of 225    PageID 4400

Seery - Cross                    191

1          THE WITNESS:  That's not correct.

2          THE COURT:  Overruled.

3   BY MR. RUKAVINA:

4   Q    Okay.  What is not correct about that?

5   A    When you sell the assets, the amount administered shrinks,

6   so you have less fees.

7          MR. RUKAVINA:  Your Honor, the answer cut out at the

8   very end.  You have less--?

9          THE WITNESS:  Fees.

10  BY MR. RUKAVINA:

11  Q    Fees?  I understand.  Okay.  So are you saying that there

12  is a disincentive to the Reorganized Debtor to sell assets in

13  the CLOs?

14  A    No.

15  Q    Okay.  Is there an incentive to the Reorganized Debtor to

16  sell assets in the CLOs?

17  A    To do their job correctly, yes.

18  Q    Okay.  And the Debtor wishes to assume those contracts

19  because the Debtor will get those fees going forward and

20  there'll be a profit, even after the expenses of servicing

21  those contracts are taken out, correct?

22  A    They are profitable. That's one of the reasons that we're

23  assuming, yes.

24  Q    Okay.  Now, over my objection, you testified that the CLOs

25  have agreed to the assumption of these contracts, right?

001678

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 192 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 122 of 225   PageID 4401

Seery - Cross                    192

```
 1   A    Yes.
 2   Q    Okay.  Is there anything in the record other than your
 3   testimony here today demonstrating that?
 4   A    I believe there is, yes.
 5   Q    What do you believe there is in the record other than your
 6   testimony?
 7   A    I believe we filed a notice of assumption.
 8   Q    Okay.  My question is a little bit different.  You
 9   testified that the CLOs, over my objection, have agreed to the
10   assumption.  You did testify so, right?
11   A    Yes.
12   Q    Okay.  What is there in the record, sir, from the CLOs
13   confirming that?
14   A    You mean today's record?
15   Q    Yes, sir.
16   A    I'm the only one who's testified so far.
17   Q    Okay.  Are you aware of anything in the exhibits that
18   would confirm your testimony?
19   A    Not that I know of.
20   Q    Has there been an agreement with the CLOs that's been
21   reduced to writing?
22   A    Yes.
23   Q    So there is a written agreement with the CLOs providing
24   for assumption?
25   A    Yes.
```

Seery - Cross                          193

1  Q    A signed, written agreement?

2  A    No, it's -- it's email.

3  Q    Okay.  When was this email agreement reached?

4  A    Within the last couple weeks.  There's a number of back

5  and forths where that was agreed to, and I believe we filed a

6  notice of assumption.

7          MR. RUKAVINA:  Mr. Vasek, if you will please pull up

8  Mr. Seery's January 29th deposition.

9  BY MR. RUKAVINA:

10  Q   Mr. Seery, you remember me deposing you last Friday,

11  correct?

12  A   Yes.

13  Q   And you remember me asking you if there was a written

14  agreement in place with the CLOs?

15  A   I don't recall specifically.

16          MR. RUKAVINA:  Okay.  Mr. Vasek, if you would please

17  scroll to that.  Okay.  Stop there.

18  BY MR. RUKAVINA:

19  Q   Sir, you'll recall I also deposed you January 20th, right?

20  A   Yes.

21  Q   Okay.  And do you remember that we had some discussion

22  regarding whether the CLOs would consent or not?

23  A   Yes.

24  Q   Okay.  And do you remember telling me something like that

25  like you think that they will and that's still in the works on

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 194 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21    Page 124 of 225   PageID 4403

Seery - Cross                              194

1   January 20th?

2   A    I don't recall specifically, but if you say that's what it

3   says.

4   Q    Okay.  Well, here I'm asking you on January 29th, Line 17,

5   "I asked you before and you didn't have anything in writing by

6   then, so let me ask now.  As of today, do you have anything in

7   writing from the CLOs consenting to the assumption of those

8   management agreements?"  I'm sorry.  Contracts.  Answer, "I

9   don't believe that I do.  It could be on my email I opened.  I

10  don't recall."

11         MR. RUKAVINA:  Scroll down, Mr. Vasek.

12  BY MR. RUKAVINA:

13  Q    Okay.  Then I ask, "Do you have an understanding of

14  whether those CLOs have consented in writing to the assumption

15  of the management agreements?"  And you answer, "I believe

16  they have.  The actual final docs haven't been completed, but

17  I believe they have agreed in writing, yes."

18         Then I ask --

19         MR. RUKAVINA:  Scroll down a little bit more.

20  BY MR. RUKAVINA:

21  Q    I ask, "Do you expect the final docs to be completed

22  before Tuesday's confirmation hearing?"  Answer, "I don't know

23  whether they will be done by Tuesday."

24         Did I read all of that correctly, sir?

25  A    Other than your misstatement.  The word was "unopened."

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21  Entered 02/04/21 10:28:30  Page 195 of
Case 3:21-cv-00538-N  Document 26-6  Filed 06/09/21  Page 125 of 225  PageID 4404
Seery - Cross                              195

1  Q   Thank you.  So, let me ask you again today.  As of today,

2  is there a written agreement that has been signed by the

3  parties providing for the assumption of the CLO agreements?

4  A   When phrased the way you did, is it signed by the parties,

5  no.

6  Q   Okay.

7       MR. RUKAVINA:  You can take that down, Mr. Vasek.

8  BY MR. RUKAVINA:

9  Q   I think -- I'm not sure if you quantified this earlier,

10 but it might help.  I believe that the Reorganized Debtor

11 projects that it will generate revenue of $8.269 million post-

12 reorganization from managing the CLO contracts, correct?

13 A   It's in that neighborhood.  I did not testify to that

14 earlier.

15 Q   That's what I meant.  And when I asked you at deposition,

16 you were able to give me an estimate of how much it would cost

17 to generate that revenue, correct?

18 A   I was not?

19 Q   You were?  I'm sorry.  Let me --

20 A   Did you say I wasn't or I was?

21 Q   Let me -- I apologize.  Let me ask again.  I talk too fast

22 and I have an accent.  You have been able to give an estimate

23 of how much the Reorganized Debtor will expend to generate

24 that revenue, correct?

25 A   Yes.

Seery - Cross                          196

1   Q   Okay.  Do you remember what your estimate is?

2   A   I -- I think it was around $2 million a year.  It was a

3   portion of our employees plus the contracts.

4   Q   Okay.  So, over the life of the projection at $8.2

5   million, do you remember that you projected costs of about

6   $3.5 to $4 million to generate that revenue?

7   A   If -- if you are representing that to me, I'd accept it.

8   Yes, that sounds about right.

9   Q   Well, suffice it to say you're projecting at least $4

10  million in net profit over the next two years for the

11  Reorganized Debtor from managing the CLO agreements, correct?

12  A   Net profit is not a fair, fair way to analyze it, no.

13  Q   Okay.  Are you projecting any profit for the Reorganized

14  Debtor from managing the CLO agreements post-confirmation?

15  A   Yes.

16  Q   Okay.  Do you have an estimate of what that profit is?

17  A   General overview are the contracts are profitable to about

18  the tune of $4 million over that period.

19  Q   Okay.  Thank you.  If the Reorganized Debtor makes a

20  profit post-confirmation, is it fair to say that that would

21  then be dividended up or distributed up to the partners,

22  ultimately to the Claimant Trust?

23  A   I don't think that's fair to say, no.

24  Q   Okay.  So, if the Reorganized Debtor makes a profit post-

25  confirmation, where does that profit go?

001683

1  A    The Reorganized Debtor -- what kind of profit?  I don't

2  understand your question.

3  Q    Okay.  I apologize if I'm being too simplistic about it.

4  If a business, after it takes account of its expenses to

5  generate revenue, has any money left over, would that be

6  profit to you?

7  A    Yes.

8  Q    Okay.  Do you think that the Reorganized Debtor, post-

9  confirmation, will make a profit?

10  A    I don't know.

11  Q    Okay.  Do you think that the Reorganized Debtor, post-

12  confirmation, will lose money?

13  A    I think there will be costs, and the costs will exceed the

14  -- the amount that it generates on an income basis, yes.

15  Q    Okay.  Thank you.

16          MR. RUKAVINA:  Mr. Vasek, if you'll please pull up

17  the plan, the injunctions, and releases.  9F.

18      (Pause.)

19  BY MR. RUKAVINA:

20  Q    I apologize, Mr. Seery.

21          MR. RUKAVINA:  So, Mr. Vasek, if you'll go to the

22  bottom of the Page 51.  Stop there.

23  BY MR. RUKAVINA:

24  Q    So, I'm going to read just the first couple sentences

25  here, Mr. Seery, if you'll read it along with me.  Subject --

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 198 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 128 of 225 PageID 4407

Seery - Cross                                    198

1  this is the bottom paragraph:  Subject in all respects to

2  Article 12(b), no enjoined party may commence or pursue a

3  claim or cause of action of any kind against any protected

4  party that arose or arises from or is related to the Chapter

5  11 case, the negotiation of the plan, the administration of

6  the plan, or property to be distributed under the plan, the

7  wind-down of the business of the Debtor or Reorganized Debtor.

8       I'd like to stop there.  Do you see that clause there, Mr.

9  Seery, talking about the wind-down of the business of the

10  Debtor or Reorganized Debtor?  Do you see that, sir?

11  A   Yes.

12  Q   Okay.  Do I understand correctly that this provision we've

13  just read means that, upon the assumption of these CLO

14  management agreements, if the counterparties to those

15  agreements want to take any action against the Reorganized

16  Debtor, they first have to go through this channeling

17  injunction?

18  A   I believe that's what it says, yes.

19  Q   Okay.  Because the wind-down of the business of the

20  Reorganized Debtor will include the management of these CLO

21  portfolio management agreements, correct?

22  A   Yes.

23  Q   Okay.  As well as the management of various funds that the

24  Debtor owns, correct?

25  A   Yes.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 199 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 129 of 225   PageID 4408

Seery - Cross                          199

1   Q   Okay.  And would you agree with me that the new general

2   partner, New GP, LLC, is also a protected party under the

3   plan?

4   A   I assume it is.  I don't recall specifically.

5   Q   I believe you discussed to some degree postpetition

6   losses.  I'd like to visit a little bit about those.  Since

7   January 9th, 2020, Mr. Dondero was not an officer of the

8   Debtor, correct?

9   A   Correct.

10  Q   And since January 9th, 2020, he was no longer a director

11  of Strand, correct?

12  A   That's correct.

13  Q   Since January 9th, 2020, until he was asked to resign, he

14  was an employee, correct?

15  A   Yes.

16  Q   And about -- I'm trying to remember.  About when did he

17  resign?  October something of 2020?  Do you remember?

18  A   I don't recall.

19  Q   Okay.  Do you recall if it was in October 2020?

20  A   It was in the fall.

21  Q   Okay.  And he resigned because the independent board asked

22  him to resign, correct?

23  A   Yes.

24  Q   Okay.  And you mentioned that the estate has had a

25  postpetition drop in the value of its assets and the assets

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 200 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 130 of 225 PageID 4409

Seery - Cross                    200

1   that it manages.  Right?

2   A   I believe I went through the estate's assets.  The only

3   asset that wasn't a direct estate asset was the hundred

4   percent control of Select Equity Fund.  I didn't talk about

5   the Fund assets.

6   Q   Okay.  Do you recall that the disclosure statement that

7   the Court approved states that, postpetition, there was a drop

8   from approximately $566 million to $328 million in the value

9   of Debtor assets and assets under Debtor management?

10  A   Yes.  That's the $200 million I walked through earlier.

11  Q   Okay.  And I believe you mentioned some of it was due to

12  the pandemic, right?

13  A   It certainly impacted the markets.  The pandemic didn't

14  cause a specific loss.  It impacted the markets and the

15  ability to work within those markets.

16  Q   But you also believe that Mr. Dondero was responsible for

17  something like a hundred million dollars of these losses,

18  right?

19  A   Probably more.

20  Q   Okay.  Mr. Dondero is not being released or exculpated for

21  that, is he?

22  A   No.

23  Q   And while Mr. Dondero was an employee during the period of

24  these losses, he answered to you as CEO and CRO, correct?

25  A   Not during that period.  I wasn't (audio gap) until later.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 201 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 131 of 225 PageID 4410

Seery - Cross                                    201

1   Q    I'm sorry.  As of January 9th, 2020, were you the CEO of

2   the Debtor?

3   A    No.

4   Q    When did you become the CEO of the Debtor?

5   A    I believe the order was July 9th, retroactive to a date in

6   March.

7   Q    July 9th, 2020?

8   A    Correct.

9   Q    Okay.  And when did you become the CRO of the Debtor?

10  A    At the same time.

11  Q    Okay.  So, between January and July 2020, you were one of

12  the independent directors, correct?

13  A    Yes.

14  Q    Okay.  So, during that period of time, would Mr. Dondero

15  have answered to that independent board?

16  A    Yes.

17  Q    Okay.  Now, if someone alleges that that independent board

18  has any liability on account of Mr. Dondero's losses, that's

19  released under this plan, isn't it?

20  A    Yes.

21  Q    Okay.  And if someone alleges that Strand has any

22  liability on account of Mr. Dondero's losses, that's released

23  under this plan, correct?

24  A    Yes.

25  Q    Okay.  And if someone believes that the Debtor -- that the

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 202 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 132 of 225   PageID 4411
225

 1   way that the Debtor has managed the CLOs or its funds

 2   postpetition gives rise to a cause of action in negligence,

 3   that's also released and exculpated in the plan, correct?

 4   A    I believe it would be.  I'm not positive, but I believe it

 5   would be.

 6   Q    Well, let's be clear.  The plan does not release or

 7   exculpate you or Strand or the board for willful misconduct,

 8   gross negligence, fraud, or criminal conduct, correct?

 9   A    No, it does not.

10   Q    Okay.  And I'm not, just so we're clear, I'm not alleging

11   that, okay?  So I want the judge to understand I'm not

12   alleging that.  But the plan does release and exculpate for

13   negligence, right?

14   A    Yes.

15   Q    Okay.  Where do you have an understanding a cause of

16   action for breach of fiduciary duty lies on the spectrum of

17   negligence all the way to criminal conduct?

18   A    It's -- it's not -- generally not criminal, although I

19   suppose that breach of fiduciary duty could be criminal.

20   Typically, it's negligence, and that you would breach a duty

21   for either duty of care, duty of loyalty.  But it could slide

22   to willful.  And probably most of the instances where they

23   come up are where someone has done something willfully or

24   grossly negligent.

25   Q    Okay.  But -- and I would agree with you.  But there are

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 203 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 133 of 225 PageID 4412

Seery - Cross                                          203

1  certain breaches of fiduciary duty that are possible based on

2  simple negligence, correct?

3  A    They are, and in these instances, they don't -- they don't

4  rise to actionable claims because they're indemnified by the

5  funds.

6  Q    Okay.  You have to explain that to me.  So, the negligence

7  claim is not actionable because someone is indemnifying it?

8  A    Typically, there's no way to recover because it's

9  indemnified by the fund that the investor might be in.  If it

10 goes beyond that, then it wouldn't be.

11 Q    Okay.  So there are potential negligence breach of

12 fiduciary duty claims that might be subject to these

13 exculpations and releases that would not be indemnified?

14 A    Gross negligence and willful misconduct, certainly.

15 Q    Okay.  Now, post-confirmation, post-confirmation, if the

16 Debtor, or the Reorganized Debtor, rather, engages in

17 negligence or any actionable conduct, that's when the

18 channeling injunction comes into play, right?

19 A    I don't quite understand your question.

20 Q    Okay.

21 A    Can you repeat that?

22 Q    Sure.  To your understanding, does the channeling

23 injunction we're looking at right now -- and you can read it

24 if you need to -- does it apply to purely post-confirmation

25 alleged causes of action?

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 204 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 134 of 225   PageID 4413
Seery - Cross                                204

1   A    It does apply to those, yes.

2   Q    Okay.  And it says that the Bankruptcy Court will have

3   sole and exclusive jurisdiction to determine whether a claim

4   or cause of action is colorable, and, only to the extent

5   legally permissible and as provided for in Article 11, shall

6   have jurisdiction to adjudicate the underlying colorable claim

7   or cause of action.

8        Do you see that, sir?

9   A    I do.

10   Q    Okay.  And this -- the Bankruptcy Court's exclusive

11   jurisdiction here, that would continue after confirmation?  Is

12   that the intent behind the plan?

13   A    It has -- it says what it says.  Will have the sole and

14   exclusive jurisdiction to determine whether a claim is

15   colorable, and then, to the extent permissible, it'll have

16   jurisdiction to adjudicate.

17   Q    Okay.  Nothing in this plan limits the period of the

18   Bankruptcy Court's inquiry to the pre-confirmation time frame,

19   correct?

20   A    I don't believe it does, no.

21   Q    Okay.  Have you taken into account the potential that this

22   bankruptcy case will eventually be closed with a final decree?

23   A    Have I taken that into account?

24   Q    Well, do you know what a final decree in Chapter 11 is?

25   A    I do.

001691

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 205 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 135 of 225 PageID 4414

Seery - Cross                                           205

1    Q    Okay.  So, help me understand.  If there's a final decree

2    and the bankruptcy case is closed, then who do I go to,

3    because the Bankruptcy Court has exclusive jurisdiction, to

4    get this clearing injunction cleared?

5            MR. MORRIS:  Objection to the form of the question,

6    Your Honor.

7            THE COURT:  Sustained.  Rephrase.

8            MR. RUKAVINA:  Okay.

9    BY MR. RUKAVINA:

10   Q    Is it the plan's intent, Mr. Seery, that this channeling

11   injunction that we just looked at would continue to apply even

12   after a point in time in which the bankruptcy case is closed?

13   A    I don't believe so.

14           MR. RUKAVINA:  Again, Your Honor, someone -- I heard

15   someone's phone right when he answered, and I didn't hear his

16   answer, if he could please re-answer.

17           THE WITNESS:  I don't -- I don't think if the case is

18   closed that's the intention.

19   BY MR. RUKAVINA:

20   Q    Okay.  What about if there's a final decree entered?

21           MR. MORRIS:  Objection, Your Honor.  You know, the

22   document kind of speaks for itself.

23           THE COURT:  Overruled.  He can answer if he knows.

24           THE WITNESS:  Yeah.  I don't -- I don't -- I'm not

25   making a distinction between the case being closed and the

001692

Seery - Cross                          206

 1   final decree.  I believe in both instances they'll be pretty

 2   close to the same time and we'll make a judgment then as to

 3   how to close the case in accordance --

 4   Q    Okay.

 5   A    -- with the rules.

 6          MR. RUKAVINA:  Mr. Vasek, if you'll please scroll up

 7   to the beginning of this injunction.  A little bit higher.

 8   Right there.  Right there.

 9   BY MR. RUKAVINA:

10   Q    The very first clause, Mr. Seery, if you'll read with me,

11   says, Upon entry of the confirmation order -- pardon me --

12   all enjoined parties are and shall be permanently enjoined on

13   and after the effective date from taking any actions to

14   interfere with the implementation or consummation of the

15   plan.

16          Do you see that, sir?

17   A    I do, yes.

18   Q    What does interfering with the implementation or

19   consummation of the plan mean?

20   A    It means in some way taking actions to upset, distract,

21   stop, or otherwise prohibit or hurt the estate from

22   implementing or consummating the plan.

23   Q    Okay.  And is that intended -- is that clause we just

24   read and you described intended to be very broad?

25   A    I -- I think it's -- if the words have meaning, yes, that

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 207 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 137 of 225 PageID 4416

Seery - Cross                                    207

1  it should -- it's pretty broad.

2  Q    Okay.  Is the Debtor not able to state with more

3  specificity what it would believe interference with the

4  implementation or consummation of the plan would mean?

5          MR. MORRIS:  Objection to the form of the question.

6          THE COURT:  Sustained.

7          THE WITNESS:  I think it's -- I think it's --

8          THE COURT:  Sustained.

9          MR. RUKAVINA:  Okay.

10          THE WITNESS:  I'm sorry.

11  BY MR. RUKAVINA:

12  Q    Well, you just gave us four or five examples of what

13  interfering with the implementation or consummation of the

14  plan might be.  Why isn't that, those four or five examples,

15  why aren't they listed here?

16          MR. MORRIS:  Object to the form of the question.

17          MR. RUKAVINA:  Well, Your Honor, I'll withdraw it

18  and I'll argue this at closing argument.

19          THE COURT:  Okay.

20  BY MR. RUKAVINA:

21  Q    When did the Committee agree to you serving as the

22  Claimant Trustee?

23  A    In the late -- in the late fall.  I've been contemplated

24  to be the Claimant Trustee.  I'm willing to take -- if we can

25  come to an agreement.  They have their options open if we

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 208 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 138 of 225 PageID 4417

Seery - Cross                                        208

 1  can't come to an agreement on compensation.

 2  Q    Okay.  And since the Committee agreed to you being the

 3  Claimant Trustee, you have reached a resolution with UBS,

 4  correct?

 5  A    I don't think so.  I think that that was before UBS, the

 6  UBS resolution was reached.

 7  Q    I'm sorry.  When did you reach the UBS resolution in

 8  principle with UBS?

 9  A    I don't recall the exact date, but I do recall specific

10  conversations where some of the Committee members were

11  supportive.  I didn't know that UBS wasn't, but I assumed

12  that some meant not all.  And that was UBS, because I don't

13  think we had a deal yet.

14  Q    Well, let me ask the question in a little bit of a

15  different way.  Whenever the Debtor reached the agreement in

16  principle with UBS that your counsel described this morning,

17  whenever that point in time was, the Committee had already

18  agreed before that point in time to you serving as Claimant

19  Trustee, correct?

20  A    I believe so, yes.

21  Q    And is the answer the same with respect to the

22  HarbourVest settlement?

23  A    I believe so.  With HarbourVest, I believe so as well,

24  yes.

25  Q    What about the Acis settlement?

001695

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 209 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 139 of 225 PageID 4418

Seery - Cross                                    209

1  A   I don't believe so.  I think Acis came first.  I don't

2  think we settled on an agreement on Claimant Trustee until

3  after the Acis -- certainly after the Acis agreement, maybe

4  not after the Acis 9019.  I just don't recall.

5  Q   Okay.  And the million-dollar cutoff for convenience

6  class creditors, that number was a negotiated amount with the

7  Committee, correct?

8  A   Yes.

9  Q   Okay.  Thank you, Mr. Seery.

10         MR. RUKAVINA:  Your Honor, I'll pass the witness.

11         THE COURT:  All right.  Just for purposes of time,

12  it's 3:00 o'clock, so you went 48 minutes.

13     Who's next?

14         MR. DRAPER:  Mr. Taylor is.

15         THE COURT:  All right.  Mr. Taylor, go ahead.

16         MR. TAYLOR:  Yes, Your Honor.  At this time, what we

17  would like the Court to do, we are asking for a brief

18  continuance and to go into tomorrow, and there is a reason

19  for that and I would like to explain it.

20     Mr. Dondero has communicated an offer which we believe to

21  be a higher and better offer than what the plan analysis,

22  even in its most recent iteration that was just changed last

23  night, will yield significantly higher recoveries.  Those are

24  guaranteed recoveries.  There is a cash component to that

25  offer.  There are some debt components, but they would be

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21  Entered 02/04/21 10:28:30  Page 210 of
Case 3:21-cv-00538-N  Document 26-6  Filed 06/09/21  Page 140 of 225  PageID 4419
Seery - Cross                                    210

1   secured by substantially all of the assets of Highland.

2        We believe it's a higher and better offer, that the

3   creditors and the Creditors' Committee, Mr. Seery, who

4   obviously has been testifying all day on the stand, may have

5   heard some -- some inkling of it via a text or an email he

6   might have been able to glance at, or maybe not, because he's

7   been too busy, and that's understandable.

8        But we do believe it is a material offer.  It is a real

9   offer.  And for that reason, we would like to request the

10  Court's indulgence.  This has gone rather fast.  We believe

11  that in the event that it does not gain any traction, then we

12  could complete this confirmation hearing tomorrow, or it's

13  more than likely that we could.  And therefore we would

14  request a continuance until tomorrow morning beginning at

15  9:30 so all the parties can confer, consider that offer, and

16  see if it gains any traction.

17            THE COURT:  All right.

18            MR. POMERANTZ:  Your -- Your --

19            THE COURT:  Go ahead.  Mr. Morris?  Or who is going

20  to respond --

21            MR. POMERANTZ:  Your --

22            THE COURT:  -- to that?

23            MR. POMERANTZ:  Your Honor, this is Jeff --

24            THE COURT:  Mr. Pomerantz?

25            MR. POMERANTZ:  This is Jeff Pomerantz. I will

1   respond.

2       I think right at the beginning of the hearing, or

3   slightly after, I did receive an email from Michael Lynn

4   extending this offer.  The email was also addressed to Mr.

5   Clemente.  As we have told Your Honor before, if the Committee

6   is interested in continuing negotiations with Mr. Dondero, far

7   be it from us to stand in the way.

8       So what I would really ask is for Mr. Clemente to respond

9   to think if -- to see if he thinks that this offer is worthy.

10  If it's worthy and the Committee wants to consider it, we

11  would by all means support a continuance.  If it is not, I

12  think this is just a last-minute delay without a reason.  And

13  if there is no likelihood of that being acceptable or the

14  Committee wanting to engage, we would want to continue on.

15          THE COURT:  All right.  Mr. Clemente, what say you?

16          MR. CLEMENTE:  Yes.  Yes, Your Honor.  Matt Clemente

17  on behalf of the Committee.

18      Obviously, I haven't had a chance to confer with my

19  Committee members, but there's no reason to not continue the

20  confirmation hearing today.  I will be able to confer with

21  them over email, et cetera, this evening.  There's simply no

22  reason to not continue going forward at this particular point

23  in time, Your Honor.

24      So, although I haven't conferred with the Committee

25  members, that would be what I would recommend to them.  And so

Seery - Cross                                  212

1    my view, the Committee's view, I believe, would be let's

2    continue forward and we'll discuss Mr. Dondero's proposal that

3    I know came across after opening statements this morning, you

4    know, in due course.  But I do not believe that a continuance

5    here is necessary or appropriate.

6            THE COURT:  All right.  Mr. Taylor, that request is

7    denied, so you may cross-examine.

8            MR. TAYLOR:  Yes.  (Pause.)  I'm sorry, Your Honor.

9    I have a couple people that are in my ear.  But yes, I'm ready

10   to proceed.

11           THE COURT:  Okay.

12                        CROSS-EXAMINATION

13   BY MR. TAYLOR:

14   Q   Mr. Seery, I believe you can probably largely testify from

15   your memory of the various iterations of the plan analysis

16   versus the liquidation analysis.  But to the extent that

17   you're unable to, we can certainly pull those up.

18       Mr. Seery, you put forth or Highland put forth on November

19   24th of 2020 a plan analysis versus a liquidation analysis,

20   correct?

21   A   I think that's the approximate date, yes.

22   Q   Okay.  And do you recall what the plan analysis predicted

23   the recovery to general unsecured creditors in Class 8 would

24   be at that time?

25   A   I believe it was in the 80s.

001699

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 213 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 143 of 225 PageID 4422

Seery - Cross                                            213

1  Q    And approximately 87.44 percent?

2  A    That sounds close, yes.

3  Q    Okay.  And then just right before -- the evening before

4  your deposition that took place on January 29th, I believe a

5  revised plan analysis versus a liquidation analysis was

6  provided.  Do you remember that?

7  A    Yes.

8  Q    Okay.  And what was the predicted recovery to general

9  unsecured creditors under that analysis?

10  A    I believe that was --

11        MR. MORRIS:  Object to the form of the question.  I

12  just want to make sure that we're talking about the -- and

13  maybe I misunderstood the question -- plan versus liquidation.

14        THE COURT:  Okay.  Could you restate --

15        MR. TAYLOR:  I said plan analysis.

16        THE COURT:  Plan.

17        THE WITNESS:  I believe that that initially was in

18  the -- in the high 60s.

19  BY MR. TAYLOR:

20  Q    It was --

21  A    Might have been --

22  Q    -- 62.14 percent; is that correct?

23  A    Okay.  Yeah.  That sounds -- I'll take your

24  representation.  That's fine.

25  Q    Okay.  And going back to the November 28th liquidation

001700

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21  Entered 02/04/21 10:28:30  Page 214 of 225
Case 3:21-cv-00538-N  Document 26-6  Filed 06/09/21  Page 144 of 225  PageID 4423

Seery - Cross                                    214

 1   analysis, what did Highland believe that creditors in Class 8

 2   would get under a liquidation analysis?

 3   A    I don't recall the -- if you just tell me, I'll -- I'll --

 4   if you're reading it, I'll agree with -- because I -- from my

 5   memory.

 6   Q    62.6 percent?  Is that correct?

 7   A    That sounds about right.

 8   Q    You would agree with me, would you not, that 62.6 cents on

 9   the dollar is higher than 62.14 cents, correct?

10   A    Yes.

11   Q    And so at least comparing the January 28th versus -- of

12   2021 versus the November 24th of 2020, the liquidation

13   analysis actually ended up being higher than the plan

14   analysis, correct?

15   A    Yes.

16   Q    But there was -- there was some changes also in the plan

17   analysis.  I'm sorry.  There were some subsequent changes that

18   were done over the weekend that were provided on February 1st.

19   Is that correct?

20   A    Yes.

21   Q    Okay.  And what were -- give us an overview of what those

22   changes were.

23   A    What are -- what are you comparing?  What would you like

24   me to compare?

25   Q    Okay.  The January to February plan analysis, what were

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 215 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 145 of 225 PageID 4424

Seery - Cross                                    215

1   the changes?  Why did it go up from 62.6 to 71.3?

2   A    The main changes, as we discussed earlier, and maybe the

3   only major change, was the UBS claim amount, which went down

4   significantly from the earlier iteration.  And then there was

5   the small change related to the RCP recovery, which was a

6   double-count.

7   Q    Okay.  And you talked about earlier about what assumptions

8   went into these analyses, correct?

9   A    Yes.

10  Q    And you said these assumptions were always done after

11  careful consideration.  Is that a correct summation of what

12  you said?

13  A    I think that's fair.

14  Q    Okay.

15          MR. TAYLOR:  Mr. Assink, could you pull up the

16  November assumptions?

17  BY MR. TAYLOR:

18  Q    I believe that's coming up, Mr. Seery.  The Court.

19      (Pause.)

20          MR. TAYLOR:  And go down one page, please, Mr.

21  Assink.  Roll up.  The Assumption L.

22  BY MR. TAYLOR:

23  Q    So, these are the November assumptions, correct, Mr.

24  Seery?

25  A    I believe so, yes.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 216 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 146 of 225   PageID 4425

Seery - Cross                                216

1   Q    Okay.  And what was the assumption that you made after

2   careful consideration regarding the claims for UBS and

3   HarbourVest?

4   A    The plan assumes zero, that was L, for those claims.

5   Q    Okay.  And ultimately what did -- and I believe you just

6   announced this today and made this public today -- what is

7   UBS's claim?  What are you proposing that it be allowed at?

8   A    $50 million in Class 8, and then they have a junior claim

9   as well.

10  Q    Okay.  And what about HarbourVest?  What kind of allowed

11  claim did they end up with?

12  A    $45 million in Class 8 and a $35 million junior claim.

13  Q    So your well-reasoned assumption, carefully considered,

14  was off by $95 million; is that correct?

15          MR. MORRIS:  Objection to the form of the question.

16          THE COURT:  Overruled.

17          THE WITNESS:  The difference between zero and those

18  numbers is $95 million, yes.

19  BY MR. TAYLOR:

20  Q    You solicited creditors of the Highland estate based upon

21  the November plan analysis and liquidation analysis that was

22  provided and that we're looking at right now, correct?

23  A    It was one of the bases, yes.  It's the plan is what --

24  what we solicited votes for, not the projections.

25  Q    But this was included within the disclosure statement; is

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 217 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 147 of 225 PageID 4426
Seery - Cross 217

 1   that correct?

 2   A    It's one of the bases.  It was included, yes.

 3   Q    And this is the bases by which you believe that the best

 4   interests of the creditors have been met better than a Chapter

 5   7 liquidation, correct?

 6   A    I believe this evidences that the best interest test would

 7   be satisfied, yes.

 8   Q    And so the record is very clear, for this Court and

 9   anybody looking at the record, no solicitation was done of the

10   creditor body after the disclosure statement was sent out?  No

11   updates were sent, correct?

12   A    Updated projections were filed, but no solicitation was --

13   was -- there was only one solicitation.  We did not resolicit.

14   That's correct.

15   Q    Okay.  Mr. Seery, how much are you -- after this plan, or

16   if this plan is confirmed, how much are you going to be paid

17   per month to be the Trustee?

18   A    For the Trustee role, $150,000 per month is the base.

19   Q    It's a base amount?  On top of that, you're going to

20   receive some sort of bonus amount, correct?

21   A    There's two bonuses.  There's a bonus for the bankruptcy

22   case, which I'd need Court approval for, and then I'm going to

23   seek a bonus for the Trustee work, which would be a

24   combination of myself and the team for a performance bonus.

25   That's to be negotiated.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 218 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 148 of 225   PageID 4427

Seery - Cross                              218

1    To be fair, the Committee or the Oversight Group may not

2   agree to any change, in which case we would not have an

3   agreement.

4   Q   And what would happen if you don't come to an agreement,

5   Mr. Seery?

6   A   They would have to get a different Plan Trustee.

7   Q   Okay.  So it's certainly going to have to be greater than

8   zero, correct?

9   A   Typically.

10  Q   Is it going to be in the nature of three or four percent

11  of the sales proceeds, or have you considered that?

12  A   Oh, I'm sorry.  Yeah, you mean the bonus?  No.  I've been

13  thinking -- my apologies.  I misunderstood.  I thought you

14  meant any number.  I haven't -- I haven't had negotiation with

15  them.  I'm thinking about looking at the full recovery of the

16  team -- for the team, looking at expected performance numbers,

17  and then trying to negotiate a structure of bonus compensation

18  that would be payable to the whole team, and then allocated by

19  the CEO (garbled) which would be made.

20  Q   When predicting the expenses of the Trust going forward in

21  your projections, did you build in an amount for a bonus fee?

22  A   No.  It wouldn't be part of the expenses.  It would come

23  out at the end.

24  Q   Okay.  So those additional expenses are not shown in the

25  plan analysis, correct?

Seery - Cross                               219

1   A    No, they're not.  It's just not going to be an expense.

2   It'll be a -- as an operating expense.  It'll be an

3   expenditure at the end out of distributions.

4   Q    Okay.  And did you subtract those from the distributions?

5   A    No.

6   Q    Okay.  A Chapter 7 trustee is not going to charge $150,000

7   or more to monetize these assets, is he?

8   A    No.

9   Q    Have you priced how much D&O insurance is going to be on a

10  go-forward basis post-confirmation?

11  A    I'm sorry.  I couldn't -- couldn't hear you.

12  Q    Sorry.  Let me get closer to my mic.  Have you priced what

13  D&O insurance is going to run the Trust on a go-forward basis

14  post-confirmation?

15  A    Yes.

16  Q    Okay.  And what are you projecting that to run?

17  A    About $3-1/2 million.

18  Q    And is that per annum for over the two-year life of this

19  plan?

20  A    Well, it's the two-year projection period, not life.  But

21  I expect that that's for the two-year projection period.

22  Q    Okay.  So approximately one point -- I'm sorry, you said

23  $3.5 million, correct?

24  A    Yes.

25  Q    Okay.  So, $1.75 million per year?

001706

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 220 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 150 of 225 PageID 4429

Seery - Cross                                    220

1   A    Yes.

2   Q    On top of the minimum $1.8 million per year that you're

3   going to be paid, correct?

4   A    Well, that's -- that's the base compensation.  But, again,

5   to be fair to the Oversight Committee, they haven't approved

6   it yet.  So the Committee, the Committee reserves their rights

7   to negotiate a total package.

8   Q    And there's going to be a Litigation Trustee, correct?

9   A    Yes.

10  Q    And that Litigation Trustee is going to be paid some

11  amount of compensation, correct?

12  A    Yes.

13  Q    That has not been negotiated yet, correct?

14  A    No, I believe -- I believe the base piece has.  But his --

15  I don't know what the contingency fee or if that's been

16  negotiated yet.  I don't know.

17  Q    And what is the base fee for the Litigation Trustee?

18  A    My recollection is it was about $250,000 a year, some

19  number in that area.

20  Q    Thank you.  So, at this point, over the two-year period,

21  we're looking at approximately $3.6 million to you, $3.5

22  million to the D&O insurance, and approximately $500,000 base

23  fee to the Litigation Trustee, plus a contingency.  Is that

24  correct?

25  A    That's probably real close, yes.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 221 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 151 of 225 PageID 4430

Seery - Cross                                          221

 1   Q    Okay.  And how about U.S. Trustee fees?  You've estimated

 2   of how much those are going to be during the two-year period,

 3   correct?

 4   A    They're built into the plan up 'til -- I think it's only

 5   up until the actual effective date, but I don't recall the

 6   specifics.

 7   Q    Okay.  And U.S. Trustee fees, the case is going to stay

 8   open and those are going to continue to have to be paid, even

 9   after confirmation, correct?

10   A    Yes.

11   Q    Okay.  And do you have an estimate of how much those are

12   going to run per annum or over that two-year period?

13   A    I don't recall, no.

14   Q    Okay.  Well, they're provided within your projections,

15   correct?

16   A    Yes.

17   Q    Okay.  A Chapter 7 trustee would not have to incur any of

18   these costs, would they?

19   A    I don't think they'll have to incur Chapter -- U.S.

20   Trustee fees.  I don't know whether they would bring on a

21   litigation trustee or not.  I would assume, since there's --

22   appear to be valuable claims, they probably would, but perhaps

23   they would do it themselves.  So I don't know the specifics of

24   what they would do.

25   Q    In preparing your liquidation analysis, did you ask

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 222 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 152 of 225 PageID 4431
Seery - Cross 222

```
 1   Pachulski if they would be willing to work for a Chapter 7

 2   trustee if one was appointed?

 3   A    I didn't specifically ask, no.

 4   Q    Did you ask DIS, your, for lack of a better word,

 5   financial advisors in this case, if they would be willing to

 6   work with a Chapter 7 trustee?

 7   A    DSI.  No, I did not specifically ask them.

 8   Q    Okay.  All right.  Any of the accountants that you're

 9   working with, did you ask them if they would be willing to

10   work with a Chapter 7 trustee?

11   A    I didn't specifically ask them, no.

12   Q    Okay.  The proposed plan has no requirements that you

13   notice any potential sale of either Highland assets or

14   Highland subsidiary assets; is that correct?

15   A    Do you mean after the effective date?

16   Q    Yes.

17   A    No, it does not.

18   Q    In the SSP sale, which is a subsidiary of Trussway, which

19   is a subsidiary of Highland, or actually it's a sub of a sub

20   of Highland, you conducted the sale of SSP, correct?

21   A    The team did, yes.  I was part.

22   Q    All right.  That was not noticed to the creditor body; is

23   that correct?

24   A    That's correct.

25   Q    And it is the Debtor's and your position that no notice
```

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 223 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 153 of 225 PageID 4432

Seery - Cross                                    223

1    was required because this was a sub of a sub and therefore

2    this was in the ordinary course?

3    A    Not exactly, no.

4    Q    Okay.  Then what is your position?

5    A    It was in the ordinary course.  It was -- I believe it's a

6    sub of a sub of a sub, and a significant portion of the

7    interests are owned by third parties.

8    Q    It is possible, is it not, that had you noticed this to

9    the larger creditor body, that you might have engendered a

10   competitive bidding situation that might have reached a higher

11   return for investors, correct?

12   A    The same possibility is it could have gone lower.

13   Q    But it is possible, correct?

14   A    Certainly possible.

15   Q    In fact, there is normally requirements under the

16   Bankruptcy Code and the Rules that asset sales are noticed out

17   to the creditor body, correct?

18   A    Asset sales that -- property of the estate, yes.  Other

19   than in the ordinary course, of course.

20   Q    I believe you have described Mr. Dondero as being very

21   litigious within this case; is that correct?

22   A    I believe so, yes.

23   Q    Okay.  Did Mr. Dondero initiate any litigation in this

24   case prior to September 2020?

25   A    Prior to September?  I don't believe so.  I don't know

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 224 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 154 of 225 PageID 4433
225

Seery - Cross                                    224

1   when he filed the claim from NexPoint.  It certainly indicated

2   that -- I believe it was from NexPoint.  My memory is slightly

3   off here.  He filed a claim in -- administrative claim, which

4   effectively is like you're bringing a complaint, against HCMLP

5   for the management of Multi-Strat and the sale of the life

6   settlement policies out of Multi-Strat, which was conducted in

7   the spring.

8   Q    And wasn't Mr. Dondero seeking document production related

9   to that sale?

10  A    No.

11  Q    Okay.  I believe that the preliminary injunction that you

12  talked about and were questioned earlier, the plan asks to

13  enjoin (garbled) party from allowing the plan to go effective.

14  Is that correct?

15  A    I'm sorry.  I didn't understand you question.  There was a

16  -- there was a bunch of interference.

17  Q    Okay.  Sure.  I'm sorry about that.  I don't know if

18  that's -- I don't think that's me, but --

19  A    It may not be.  It sounded like someone else.

20  Q    The injunction prohibits anybody from interfering with the

21  plan going effective, correct?

22  A    The plan injunction?

23  Q    Yes.

24  A    Yes.

25  Q    Okay.  Just so I'm clear, is the plan injunction

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 225 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 155 of 225   PageID 4434

Seery - Cross                           225

 1  attempting to strip appellate rights of Mr. Dondero?

 2  A    No.

 3  Q    Okay.  So, if, for instance, if he were to file any appeal

 4  of an order confirming this plan, he wouldn't be in violation

 5  of that plan injunction?

 6  A    I don't think so, because the order wouldn't be final.

 7  Q    Okay.  But it -- it says upon entry of a confirmation

 8  order, you're enjoined from doing so.  So that's not the

 9  intent?

10  A    It certainly would not be my intent.  I don't think that

11  anybody had that in mind.

12  Q    Okay.  And if Mr. Dondero were to seek a stay pending

13  appeal either during that 14-day period or afterwards, is that

14  plan injunction attempting to stop that -- that sort of

15  action?

16  A    I apologize.  You're breaking up.  But I think I

17  understood your question.  No, it was -- it was your screen as

18  well.  No.  If either this Court stays its own order or a

19  higher court says that the order is stayed, then there would

20  be no way there could be any allegation that it's interfering

21  with an order if it's not effective.

22  Q    Mr. Dondero opposed the Acis sale, correct?

23  A    The Acis settlement?

24  Q    Correct.

25  A    Yes.

001712

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 226 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 156 of 225 PageID 4435

Seery - Cross                                    226

1  Q   After he opposed the Acis settlement, the next filing Mr.

2  Dondero made was requesting that the Debtor notice the sale of

3  any assets or any major subsidiary assets.  Is that correct?

4  A   I don't recall the sequence of his filings.  I think that

5  Judge Lynn at least sent a letter to that effect.  I don't

6  recall if there is a filing to that effect.

7  Q   Did Mr. Dondero, through his counsel, attempt to resolve

8  that motion without filing anything further?

9  A   I don't recall the specifics of the motion.  I know they

10 asked for some sort of relief that -- that we thought was

11 inappropriate.

12 Q   When the Court postponed any hearing on Mr. Dondero's

13 request for relief until the eve of the confirmation hearing,

14 and Mr. Pomerantz announced that no sales were expected before

15 confirmation, did Mr. Dondero withdraw his motion?

16 A   Again, I don't recall the specifics of the motion.  I only

17 recall the letter from Judge Lynn.

18 Q   Did Mr. Dondero do anything more than object to the

19 HarbourVest deal?

20 A   Not that I know of.

21 Q   Did Mr. Dondero do anything more than respond to the

22 Defendants' injunction suit?

23         MR. MORRIS:  Objection to the form of the question.

24 I mean, -- objection to the form.

25         THE COURT:  Overruled.

001713

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 227 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 157 of 225   PageID 4436

Seery - Cross                    227

 1              MR. TAYLOR:  I apologize.  I should have said the

 2    Debtor's injunction suit.

 3              THE WITNESS:  Yeah, the -- I'm not sure of the

 4    specific order, but certainly the communications with me,

 5    which I think are prior to the order.  The communications with

 6    Mr. Surgent, which I believe are after the order.  Certain

 7    communications with Mr. Waterhouse, which were oral.  Those

 8    were all similarly difficult and obstreperous actions.

 9    BY MR. TAYLOR:

10    Q   Has Mr. Dondero commenced any adversary proceeding or

11    litigation in this case other than filing a competing plan?

12              MR. MORRIS:  Objection to the form of the question.

13              THE COURT:  Over --

14              THE WITNESS:  Yeah, I don't --

15              THE COURT:  -- ruled.

16              THE WITNESS:  I don't believe he's commenced an

17    adversary.  I'm sorry, Judge.  I don't believe he's commenced

18    an adversary proceeding, no.

19    BY MR. TAYLOR:

20    Q   Mr. Dondero didn't file any opposition to the life

21    settlement sale, did he?

22    A   We didn't do the life settlement (garbled) Court.

23    Q   Right.  Again, that wasn't noticed through the -- this

24    Court, was it?

25    A   It was an -- the reason was it was an asset of Multi-Strat

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 228 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 158 of 225 PageID 4437

Seery - Cross                                              228

1   Fund.  It wasn't an asset of the Debtor's.

2   Q    Okay.  Mr. Dondero did have concerns regarding the life

3   settlement sale, correct?

4   A    Yes.

5   Q    In fact, he believed that they were being sold for

6   substantially less than what could have otherwise been

7   received, correct?

8   A    He may have.

9   Q    And if you conduct any subsequent sales for less than

10  market value that might ultimately prevent the waterfall from

11  ever reaching Mr. Dondero, he would have no recourse under

12  this proposed plan to object to this sale or otherwise have

13  any comment on it.  Is that correct?

14  A    I clearly object to the thinking that that was less than

15  market value.  It was -- it was more than market value.  So I

16  don't -- I disagree with the premise of your question.

17  Q    So, I don't believe that was the question that was asked.

18  The question that was asked is, as you move forward with your

19  -- what I will characterize as a wind-down plan, not putting

20  that word in your mouth -- but as you execute forward on your

21  plan, as these sales of these assets go through, no notice is

22  going to be provided, correct?

23  A    Not necessarily.  It depends on the asset and what we

24  think of the, you know, the -- the position of the parties at

25  the time.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 229 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 159 of 225   PageID 4438

Seery - Cross                                    229

1    If we have a -- if we have a transaction that's pending

2    that wouldn't be hurt by a notice and that we'd be able to get

3    the Court's imprimatur to maybe more better insulate, if you

4    will, against Mr. Dondero's attacks, then we may well come to

5    the Court to seek that.

6        The problem with noticing sales is that -- that it often

7    depresses value.  That's just not the way folks outside of the

8    bankruptcy world (audio gap) sales.

9    Q    So there's no requirement that either public or private

10   notice be provided, correct?

11   A    No.  Meaning it is correct.

12   Q    Okay.  And if Mr. Dondero had objections either to the

13   pricing of the sale or the manner and means by which the sale

14   was being conducted, he would be prohibited by the plan

15   injunction from bringing any objection to such sale, correct?

16   A    I believe so, yes.

17   Q    Mr. Dondero also had concerns regarding the OmniMax sale,

18   correct?

19   A    Mr. Dondero did not go along with the OmniMax sale with

20   the assets that he managed.  I don't know if he had concerns

21   with -- with our sale or OmniMax's interests.

22   Q    Did Mr. Dondero ever express to you any concern that the

23   value wasn't being maximized regarding the sale of those

24   assets?

25   A    He thought he could get more.  I don't know that he

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 230 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 160 of 225 PageID 4439

Seery - Cross                                230

1   thought that he could get more for his assets that he was

2   managing or whether he thought he could get more for all of

3   the assets.

4   Q   Other than voicing those concerns, did Mr. Dondero file

5   any pleading with this Court attempting to block that sale?

6   A   Pleading with the Court?  No.

7            MR. TAYLOR:  Your Honor, I would like to confer with

8   my colleagues just very briefly and see if they have anything

9   further.  And even if they don't, Mr. Lynn of my firm would

10  like a very brief moment to address the Court prior to me

11  passing the witness.

12       So, if I may have a literally hopefully one-minute break

13  where I can turn my camera off and my microphone off to confer

14  with my colleagues, and then move forward?

15           THE COURT:  Okay.  Well, you can have a one-minute

16  break, but we're going to continue on with cross-examination

17  at this point.  Okay?  I'm not sure what you meant by Mr. Lynn

18  wants to raise an issue at this point.  Could you elaborate?

19           MR. TAYLOR:  I will get some elaboration during our

20  30-second to one-minute break, Your Honor.  I was just passed

21  a note.

22           THE COURT:  All right.  So, but I'll just you know,

23  --

24           A VOICE:  Your Honor?

25           THE COURT:  -- I'm inclined to continue with the

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 231 of
Case 3:21-cv-00538-N    Document 26-6    Filed 06/09/21    Page 161 of 225    PageID 4440
Seery - Cross                         231

 1   cross-examination.  You know, this isn't a time for, you know,

 2   arguments or anything like that.  All right?

 3       So, we'll take a one-minute break.  You can turn off your

 4   audio and video for one minute, and come back.

 5       (Off the record, 3:33 p.m. to 3:34 p.m.)

 6           THE WITNESS:  Your Honor?

 7           THE COURT:  Yes?

 8           THE WITNESS:  It's Jim Seery.  Can I turn it into

 9   just a two-minute break, since I've sat in my seat, and it

10   would be better for him to just continue straight through.  I

11   could use one or two minutes.

12           THE COURT:  Okay.

13           THE WITNESS:  I apologize.

14           THE COURT:  All right.  Well, it's been more than

15   minute.  Let's just say a five-minute break for everyone, and

16   we'll come back at 3:39 Central time.  Okay.

17           THE WITNESS:  Okay.  Thank you, Your Honor.  I

18   appreciate that.

19       (A recess ensued from 3:35 p.m. until 3:40 p.m.)

20           THE CLERK:  All rise.

21           THE COURT:  Please be seated.  All right.  We are

22   back on the record.  Mr. Taylor, are you there?

23           MR. TAYLOR:  I am, Your Honor.  My video is not

24   wanting to start, but my -- I believe my audio is on.

25           THE COURT:  Okay.  After you went offline for your

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 232 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 162 of 225   PageID 4441

Seery - Cross                                    232

1    one-minute break, Mr. Seery asked for a five-minute bathroom

2    break, or a couple-minute.  Anyway, we've been gone on a

3    bathroom break.  We're back now.

4              MR. TAYLOR:  Thank you.  I was actually -- I was

5    still listening with one ear, --

6              THE COURT:  Okay.

7              MR. TAYLOR:  -- Your Honor, so I understand.

8              THE COURT:  All right.

9              MR. TAYLOR:  So, thank you.

10             THE COURT:  Are you finished with cross, or no?

11             MR. TAYLOR:  Just a little bit of a follow-up.

12                   CROSS-EXAMINATION, RESUMED

13   BY MR. TAYLOR:

14   Q   Mr. Seery, you had previously testified that Mr. Dondero's

15   counsel had threatened you and/or the independent board, I was

16   not exactly sure who you were referring to, with suits, and I

17   believe you said a hundred million dollars' worth of suits and

18   getting dragged into litigation.

19        Is that still your testimony today, that you were -- you

20   were threatened with suit by this firm of a suit of over a

21   hundred million dollars?

22   A   I believe what I was told by my counsel was that, not Mr.

23   Dondero's, but one of the other counsel, who I can name, said

24   specifically that Dondero will sue Seery for hundreds of

25   millions of dollars.  We're going to take it up to the Fifth

 1  Circuit, get it reversed, and he'll go after him.

 2  Q   Okay.  So it was not Mr. Dondero's counsel, and you were

 3  not -- is that correct?

 4  A    No.  It was one of the other counsel on the phone today.

 5  Q   Okay.  And you base that not upon your own personal

 6  knowledge but based on some -- something else that you were

 7  told, correct?

 8  A   Yes.  By my counsel.

 9  Q   Thank you.

10        MR. TAYLOR:  Yes, Your Honor.  We can pass the

11  witness.

12        THE COURT:  Okay.  So, you've gone, or you and Mr.

13  Rukavina collectively have gone one hour and 17 minutes.  Mr.

14  Draper, you're next.

15        MR. DRAPER:  Yes, Your Honor.  Thank you.  I

16  basically have no more than ten questions, so I gather the

17  Court will welcome that.

18        THE COURT:  Okay.

19                    CROSS-EXAMINATION

20  BY MR. DRAPER:

21  Q   Mr. Seery, has the new general partner been formed yet?

22  A   I don't know if they've been -- we've actually done the

23  formation, but it -- it would be in process.

24  Q   So it either has been formed or has not been formed?

25  A   I don't -- I don't know the answer.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 234 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 164 of 225 PageID 4443
Seery - Cross                                    234

 1  Q    Okay.  Now, going forward, Judge Nelms and Mr. Dubel will

 2  have nothing to do with the Reorganized Debtor, correct?

 3  A    Not necessarily, but they don't have a specific role at

 4  this time.

 5  Q    They won't be officers or directors of the new general

 6  partner or the Reorganized Debtor, correct?

 7  A    I don't -- I don't believe so, but it's not set in stone.

 8  Q    All right.  Has any finance -- has any party who is the

 9  beneficiary of an exculpation, a release, or the channeling

10  injunction contributed anything to this plan of reorganization

11  in terms of money?

12  A    No.

13  Q    Have you ever interviewed a trustee as to how they would

14  liquidate the assets or monetize the assets in this case?

15  A    No.

16  Q    And last question is, is there any bankruptcy prohibition

17  that you're aware of that a Chapter 7 trustee could not do

18  what you're doing?

19  A    Which -- which -- what do you mean, under the plan?

20  Q    No.  Could not monetize the assets of the estate in the

21  manner that you're attempting to monetize them.

22  A    I don't think there's a specific rule, but I just haven't

23  -- I haven't seen that before, no.  So I don't think there's a

24  specific rule that I know of.

25  Q    Okay.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 235 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 165 of 225 PageID 4444

Seery - Cross                              235

1          MR. DRAPER:  I have nothing further for this witness.

2          THE COURT:  All right.  I should have asked, we had a

3   couple of other objectors.  Ms. Drawhorn, did you have any

4   questions?

5          MS. DRAWHORN:  I have no questions, Your Honor.

6          THE COURT:  All right.  Were there any other

7   objectors out there that I missed that might have questions?

8      All right.  Any redirect?

9          MR. MORRIS:  Your Honor, if I may, can I -- can I

10  just take a short minute to confer with my colleagues?

11         THE COURT:  Sure.  You can --

12         MR. MORRIS:  Thank you.

13         THE COURT:  -- put you --

14         MR. MORRIS:  Two -- two minutes, Your Honor.

15         THE COURT:  Okay.

16     (Pause, 3:45 p.m. until 3:48 p.m.)

17         THE COURT:  All right.  We've been a couple of

18  minutes.  Mr. Morris?

19         MR. MORRIS:  Yes, Your Honor.

20         THE COURT:  What are --

21         MR. MORRIS:  Just, just a few points, Your Honor.

22         THE COURT:  Okay.

23         MR. MORRIS:  Hold on a sec.  You ready, Mr. Seery?

24         THE WITNESS:  I am, yes.

25                     REDIRECT EXAMINATION

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 236 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 166 of 225 PageID 4445

Seery - Redirect                                    236

1  BY MR. MORRIS:

2  Q    You were asked a number of questions about your

3  compensation.  Do you recall all that?

4  A    Yes, I do.

5  Q    And you testified to the $150,000 a month.  Do you recall

6  that?

7  A    Yes.

8  Q    Under the -- under the documentation right now, your

9  compensation is still subject to negotiation with the

10 Committee; is that right?

11 A    Yes, it is.

12 Q    Okay.  You were asked a couple of questions about the

13 conduct of Mr. Dondero.  Earlier, you testified that the

14 monetization plan was filed under seal at around the time of

15 the mediation.  Do I have that right?

16 A    Yes.  Right at the start of the mediation.

17 Q    Okay.  And is that the first time that the Debtor made the

18 constituents aware, including Mr. Dondero, that it intended to

19 use that as a catalyst towards getting to a plan?

20 A    That's the first time that we filed it, but that plan had

21 been discussed prior to that.

22 Q    And do you recall that there came a point in time where

23 you -- when the Debtor gave notice that it intended to

24 terminate the shared services agreements with the Dondero-

25 related entities?

001723

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 237 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 167 of 225   PageID 4446

Seery - Redirect                              237

1   A    Yes.

2   Q    And when did that happen?

3   A    That was about 60 -- now it's like 62 days ago.

4   Q    Uh-huh.  And you know, from your perspective, from the

5   filing of the monetization plan in August through the notice

6   of shared services, is that what you believe has contributed

7   to the resistance by Mr. Dondero to the Debtor's pursuit of

8   this plan?

9   A    Well, I think there's a number of factors that

10  contributed, but the evidence that I've seen is that when we

11  started talking about a transition, if there wasn't going to

12  be a deal, if Mr. Dondero couldn't reach a deal with the

13  creditors, we were going to push forward with the monetization

14  plan.  And the monetization plan required the transition of

15  the employees.  And indeed, it called specifically, and we had

16  testimony regarding it all through the case, about the

17  employees being terminated or transferred.

18       In order to transfer them over to an entity that's

19  related, Mr. Dondero pulls all of those strings.  And he

20  refused to engage on that.  We started in the fall.  We

21  specifically told employees of the Debtor not to engage.  They

22  couldn't spend his money, which made sense --

23           MR. TAYLOR:  Objection, Your Honor.

24           THE WITNESS:  So, very -- that --

25           THE COURT:  Just -- there's an objection.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 238 of
Case 3:21-cv-00538-N  Document 26-6  Filed 06/09/21   Page 168 of 225  PageID 4447
255

Seery - Redirect                    238

1            MR. MORRIS:  There's an objection.

2            THE WITNESS:  I'm sorry.

3            THE COURT:  There was an objection.

4            MR. TAYLOR:  Yes, Your Honor.  Object --

5            THE COURT:  Go ahead.

6            MR. TAYLOR:  Yes, Your Honor.  This is Clay, Clay

7    Taylor.  Objection.  He's directly said Mr. Dondero told other

8    employees $x$, and that is purely hearsay, not based upon his

9    personal opinion, or his personal knowledge, and therefore

10   that part of the answer should be struck.

11           MR. MORRIS:  Your Honor, it's a statement against

12   interest.

13           THE COURT:  Overrule the objection.  Go ahead.

14           THE WITNESS:  Yeah.  The difficulty of transitioning

15   this business, I've equated it to doing a corporate carve-out

16   transaction on an M&A side.  It's hard, and you need

17   counterparties on the other side willing to engage.  And what

18   we went through over the weekend, on Friday, was seemingly

19   that the Funds, you know, directed by Mr. Dondero, just

20   haven't engaged.

21       We actually gave them an extra two weeks to engage,

22   because it's -- they've really been unable to do anything.  I

23   mean, hopefully, we've got the employees working in a way that

24   can -- that can foster and get around some of this

25   obstreperousness, and I've used that word before, but that's

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 239 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21    Page 169 of 225   PageID 4448

Seery - Redirect                          239

 1    what it is.  It's really an attempt to just prevent the plan

 2    from going forward.

 3        And at some point, the plan will go forward.  And if we

 4    are unable to transition people, we will simply have to

 5    terminate them.  And that is not a good outcome for those

 6    employees, but it's not a good outcome for the Funds, either.

 7    And the Funds, Mr. Dondero, the Advisors, the boards, nobody

 8    wants to do anything except come in this court.

 9    BY MR. MORRIS:

10    Q    Do you recall being asked about Mr. Dondero and certain

11    things that he didn't do and certain actions that he hadn't

12    taken?

13    A    Yes.

14    Q    By Mr. Taylor?  To the best of your recollection, did Mr.

15    Dondero personally object to the HarbourVest settlement?

16    A    I -- I don't recall if he did or if it was one of the

17    entities.

18    Q    It was Dugaboy.  Does that refresh your recollection?

19    A    Dugaboy certainly objected, yes.

20    Q    And do you understand that Dugaboy has appealed the

21    granting of the 9019 order in the HarbourVest settlement?

22    A    Yes.

23    Q    And Mr. Taylor asked you to confirm that Mr. Dondero

24    hadn't taken any action with respect to the life settlement

25    deal.  Do you remember that?

Seery - Redirect                            240

1    A    I do.

2    Q    But are you aware that Dugaboy actually filed an

3    administrative claim relating to the alleged mismanagement of

4    the life settlement sale?

5    A    Yes, I did, I did allude to that.  I wasn't sure it was

6    Dugaboy, but -- but that was very --

7    Q    Uh-huh.

8    A    -- very early on, an objection filed in the form of an

9    administrative claim or complaint against, if you will,

10   against Highland for the management of Multi-Strat.

11   Q    Uh-huh.  And Mr. Dondero didn't personally file any motion

12   seeking to inhibit the Debtor from managing the CLO assets; is

13   that right?

14   A    No, not the CLO assets, no.

15   Q    Yeah.  But the Funds and the Advisors did.  That was the

16   hearing on December 16th.  Do you recall that?

17   A    Yeah.  That was the -- the Funds.  K&L Gates, the Funds,

18   and the various Advisors.

19   Q    All right.  Do you recall Mr. Rukavina asking you whether

20   there was any evidence in the record to support your testimony

21   that there was an agreement in place to assume the CLO

22   management agreements?

23   A    I recall the question, yes.

24   Q    Okay.

25            MR. MORRIS:  Your Honor, I'm going to ask Ms. Canty

001727

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 241 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 171 of 225 PageID 4450

Seery - Redirect                    241

 1  to put up on the screen the Debtor's omnibus reply to the plan

 2  objections.

 3          THE COURT:  Okay.

 4          MR. MORRIS:  It was filed -- it was filed on January

 5  22nd.  And if we can go, I think, to -- I think it's Paragraph

 6  -- I think it's Paragraph 135 on Page 71.  Yeah.  Okay.

 7  BY MR. MORRIS:

 8  Q    Take a look at that, Mr. Seery.  Does that -- does that

 9  statement in Paragraph 135 accurately reflect the

10  understanding that's been reached between the Debtor and the

11  CLO Issuers with respect to the Debtor's assumption of the CLO

12  management agreements?

13  A    Yes.  I think that's consistent with what I testified to

14  earlier, the substance of the agreement.

15          MR. MORRIS:  And if we can just scroll to the top,

16  just to see the date.  Or the bottom.  I guess the top.

17          THE WITNESS:  Do you mean the date of this pleading?

18  BY MR. MORRIS:

19  Q    Yeah.  So, it was filed on January 22nd, right, ten days

20  ago?  Okay.

21  A    That's correct.

22          MR. MORRIS:  I'd like to put up on the screen an

23  email, Your Honor, that I'd like to mark as Debtor's Exhibit

24  10A.  And this is --

25  BY MR. MORRIS:

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 242 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 172 of 225   PageID 4451

Seery - Redirect                                      242

 1  Q    Do you recall, Mr. Seery, you testified that the agreement

 2  was reflected in an email?

 3  A    Yes.

 4  Q    Is this the email that you're referring to?

 5          MR. MORRIS:  If we could scroll down.  Right there.

 6          THE WITNESS:  Yes.

 7          MR. MORRIS:  Okay.  One -- the email below.  Okay.

 8  Right there.

 9  BY MR. MORRIS:

10  Q    Is that the -- is that the email you had in mind?

11  A    It was the series of emails.  We -- we had a -- I think I

12  testified in the prior testimony, or my -- one of my

13  depositions, that we had had a number of conversations with

14  the Issuers and their counsel, and this was the summary of the

15  agreement that was contained in these emails.

16  Q    Okay.  And this is, this is the same date as the omnibus

17  reply that we just looked at, right, January 22nd?

18  A    That's correct.

19  Q    Okay.  You were asked a question, I think, late in your

20  cross-examination about a Chapter 7 trustee's ability to sell

21  the assets in the same way as you are proposing to do.  Do you

22  recall that testimony?

23  A    Yes.

24  Q    And I think, if I understood correctly, the question was

25  narrowly tailored to whether there was any legal impediment to

Seery - Redirect                    243

1    a trustee doing -- performing the same functions as you.  Do I

2    have that right?

3    A    That's the question I was asked, whether the Bankruptcy

4    Code had a specific prohibition.

5    Q    Okay.  And I think, I think you testified that you weren't

6    aware of anything.  Is that right?

7    A    That's correct.

8    Q    All right.  But let's talk about practice.  Do you think a

9    Chapter 7 trustee will realize the same value as you and the

10   team that you're assembling will, in terms of maximizing value

11   and getting the maximum recovery for the assets?

12   A    No.  As I testified earlier, you know, I've been working

13   with these assets now for a year.  It's a complicated

14   structure.  The assets are all slightly different.  And

15   sometimes much more than slightly.  And the team that we're

16   going to have helping managing is familiar with the assets as

17   well.  We believe we'll be able to execute very well in the

18   markets that we (garbled).

19   Q    Do you think a Chapter 7 trustee will have a steep

20   learning curve in trying to even begin to understand the

21   nature of the assets and how to market and sell them?

22   A    I think anybody coming into this, the way this company is

23   set up, as an asset manager, and the diversity of the assets,

24   would have a steep learning curve, yes.

25   Q    Do you have any view as to whether the perception in the

001730

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 244 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 174 of 225   PageID 4453

Seery - Redirect                                      244

1    marketplace of a Chapter 7 trustee taking over to sell the

2    assets will have an impact on value as compared to a post-

3    confirmation estate of the type that's being proposed under

4    the plan?

5    A    Yes, I do, and it certainly would be negative, in my

6    experience.  Typically, assets are not conducted -- asset

7    sales are not conducted through a bankruptcy court, and

8    certainly not with a Chapter 7 trustee that has to sell them,

9    and generally is viewed as having to sell them quickly.  So we

10   -- we approach each asset differently, but certainly in a way

11   that would be much more conducive to maximizing value than a

12   Chapter 7 trustee could, just by the nature of their role.

13   Q    Is it -- is it your understanding that, under the proposed

14   plan and under the proposed corporate governance structure,

15   that the Claims Oversight Committee will -- will manage you?

16   That you'll report to that Committee and that they'll have the

17   opportunity to make their assessment as to the quality of your

18   work?

19   A    Yeah, absolutely.  And that's consistent with what we've

20   done before in this case.  Even where it wasn't an asset of

21   the estate or was being sold in the ordinary course, we spent

22   time with the Committee and the Committee professionals before

23   selling assets.

24   Q    And you've worked with the Committee for over -- for a

25   year now, right?

001731

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 245 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21    Page 175 of 225   PageID 4454

Seery - Redirect                             245

1  A    It's over a year.

2  Q    And the Committee is comfortable with you taking this

3  role; is that right?

4  A    I think they're supportive of it.  Comfortable might be

5  not the right word choice.

6  Q    Okay.  I appreciate the clarification.  And do you have

7  any reason to believe that the -- that the Oversight Committee

8  is going to allow you the unfettered discretion to do whatever

9  you want with the assets of the Trust?

10  A    Not a chance.  Not with this group.  Nor would I want to.

11  There's no right or wrong answer for most of these things, and

12  the collaborative views from professionals and people who have

13  an economic stake in the outcome will be helpful.

14  Q    Okay.  You were asked some questions about the November

15  projections and the -- and the assumption that was made that

16  valued the HarbourVest and the UBS claims at zero.  Do you

17  recall that?

18  A    Yes.

19  Q    As of that time, was the Debtor still in active litigation

20  with both of those claim holders?

21  A    Very much so.

22  Q    And after the disclosure statement was issued, do you

23  recall that the Court entered its order on UBS's Rule 3018

24  motion?

25  A    Yes.

001732

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 246 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 176 of 225   PageID 4455

Seery - Redirect                         246

1    Q   And do you recall what the -- what the claims estimate was

2    for voting purposes under that order?

3    A   It was about $95 million.  That was -- it was together

4    with the summary judgment orders of that date.  They were

5    separate orders, but that was the lone hearing.

6    Q   And was that public information, that order was publicly

7    filed on the docket; isn't that right?

8    A   Yes, it was.

9    Q   Is there anything in the world that you can think of that

10   would have prevented any claim holder from doing the math to

11   try to figure out the impact on the estimated recoveries from

12   the -- by using that 3018 claims estimate?

13   A   No.  It would have -- it would have been quite easy to do.

14   Q   And, in fact, that's what you wound up doing with respect

15   to the January projections, right?

16   A   That's correct.

17   Q   And do you recall when the HarbourVest settlement, when

18   the 9019 motion was filed?

19   A   I don't recall the actual filing.  It was subsequent to

20   the UBS, though.

21           MR. MORRIS:  Ms. Canty, if you have it, can we just

22   put it on the screen, to see if we can refresh Mr. Seery's

23   recollection?  If we could just look at the very top.

24   BY MR. MORRIS:

25   Q   Does that refresh your recollection that the 9019 motion

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 247 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 177 of 225   PageID 4456

Seery - Redirect                                247

1   was filed on December 23rd?

2   A   Yes, it does.  The agreement was reached before that, but

3   it took a little bit of time to document the particulars and

4   then to -- to get it filed.

5   Q   And this wasn't filed under seal, to the best of your

6   recollection, was it?

7   A   No, no.  This was -- this was open, and we had a very open

8   hearing about it, because it was a related-party objection.

9   Q   And to the best of your recollection, did this 9019 motion

10  publicly disclose all of the material terms of the proposed

11  settlement?

12  A   Yes, it did.

13  Q   Can you think of anything in the world that would have

14  prevented any interested party from doing the math to figure

15  out how this particular settlement would impact the claim

16  recoveries set forth in the Debtor's disclosure statement?

17  A   No.  And just again, to be clear, the plan and the

18  projections had assumptions, but the plan was very clear that

19  the denominator was going to be determined by the total amount

20  of allowed claims.

21  Q   And, again, at the time that that was filed, you hadn't

22  reached a settlement with HarbourVest, had you?

23  A   No.

24  Q   And the order on the 3018 motion hadn't yet been filed; is

25  that right?

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 248 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 178 of 225   PageID 4457

Seery - Redirect                          248

1    A    That's correct.

2    Q    Okay.  Has -- are you aware of any creditor expressing any

3    interest in trying to change their vote as a result of the

4    updates of the forecasts?

5    A    Only Mr. Daugherty.  And actually, they have a stipulation

6    with the two -- the two former employees.

7    Q    All right.  But to be fair, that wasn't -- had nothing to

8    do with the revisions to the projections?  That was just in

9    connection with their settlement; is that right?

10   A    That's correct.  As was, I suspect, Mr. Daugherty's, but

11   he'd been aware of the settlements, just like everyone else.

12   Q    Okay.  You were asked a couple of questions, I think, by

13   Mr. Rukavina about whether there is anything that you need to

14   do your job on a go-forward basis.  And I think you said no.

15   Do I -- do I have that right?  Nothing further that you need?

16   A    I -- I'm not really sure what your question means, to be

17   honest.

18   Q    Okay.  Fair enough.  To be clear, is there any chance that

19   you would accept the position as the Claimant Trustee if the

20   gatekeeper and injunction provisions of the proposed plan were

21   extracted from those documents?

22   A    No.  As I said earlier, they're integral in my view to the

23   entire plan, but they're absolutely essential to my bottom.

24   Q    Okay.  And through -- through the date of the effective

25   date, are you relying on the exculpation clause of the -- have

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21  Entered 02/04/21 10:28:30  Page 249 of
Case 3:21-cv-00538-N  Document 26-6  Filed 06/09/21  Page 179 of 225  PageID 4458

Seery - Redirect                                    249

1  you been relying on the exculpation clause in the January 9th

2  order that you testified to at the beginning of this hearing?

3  A    Yeah.  Both the January 9th order as well as the July

4  order with respect to my CEO/CRO positions.

5  Q    Okay.

6          MR. MORRIS:  I've got nothing further, Your Honor.

7          THE COURT:  All right.  Any recross on that redirect?

8          A VOICE:  I believe Mr. Rukavina is speaking but is

9  muted, Your Honor.

10         THE COURT:  Mr. Rukavina, do you have any recross?

11         MR. RUKAVINA:  Your Honor, I do, yes.  Thank you.  I

12 apologize.

13         THE COURT:  Okay.

14         MR. RUKAVINA:  Can you hear me now?

15         THE COURT:  Yes.

16         THE WITNESS:  Yes.

17         MR. RUKAVINA:  Thank you.

18     Mr. Vasek, if you'll please pull up the Debtor's Omnibus

19 Reply, Docket 1807.  And if you'll go to Exhibit C.  Do a word

20 search for Exhibit C.  It's attached to it.  Okay.  Now scroll

21 down.  Stop there.

22                      RECROSS-EXAMINATION

23 BY MR. RUKAVINA:

24 Q    Mr. Seery, do you see what's attached as Exhibit C to the

25 Omnibus Reply, which is proposed language in the confirmation

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 250 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 180 of 225   PageID 4459
                    Seery - Recross                    250

1    order?

2    A    I see the exhibit.  I didn't know if this was -- I don't

3    know exactly what it's for.  If it's proposed language, I'll

4    accept your representation.

5              MR. RUKAVINA:  Well, scroll back up to Exhibit C, Mr.

6    Vasek.  I want to make sure that I understand what you're

7    saying.  Scroll back up.  Do the word search for where Exhibit

8    C appears first.  Start again.  Okay.  So scroll up.

9    BY MR. RUKAVINA:

10   Q    So, you'll recall Mr. Morris was asking you about the

11   paragraph in here where you outlined the terms of the

12   agreement with the CLOs.  Do you recall that testimony?

13   A    Yes.

14   Q    Okay.  And then you see it says, The Debtor and the CLOs

15   agreed to seek approval of this compromise by adding language

16   to the confirmation order.  A copy of that language is

17   attached hereto as Exhibit C and will be included in the

18   confirmation order.

19        Do you see that, sir?

20   A    I do.

21   Q    Okay.

22              MR. RUKAVINA:  Mr. Vasek, go back to Exhibit C.

23   BY MR. RUKAVINA:

24   Q    So it's correct that this Exhibit C is the referenced

25   agreement that the Debtor and the CLOs will seek approval of,

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 251 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21    Page 181 of 225   PageID 4460

Seery - Recross                              251

1    correct?

2    A    The -- the -- it may be word-splitting, but I believe it

3    says that they've reached agreement and this is the language

4    that will evidence that agreement or embody that agreement.

5    Q    Okay.

6            MR. RUKAVINA:  Scroll down, Ms. Vasek, to the next

7    page, please.

8    BY MR. RUKAVINA:

9    Q    Real quick, do the CLOs owe the Debtor any money for the

10   management fees?

11   A    I don't -- well, the answer is there are accrued fees that

12   haven't been paid, but when they have cash they run through

13   the waterfall and pay them.

14   Q    And I believe you mentioned to me those accrued fees

15   before.  They're several million dollars, correct?

16   A    It -- I don't know right off the top of my head.  They can

17   aggregate and then they get paid down in the quarter depending

18   on the waterfall.  And it's -- it's not a fair statement by

19   either of us to say the CLOs, as if they're all the same.

20   Each one is different.

21   Q    I understand.  But as of today, you agree that the CLOs

22   collectively owe some amount of money to the Debtor in accrued

23   and unpaid management fees?

24   A    I believe that's the case.

25   Q    Okay.  And do you believe it's north of a million dollars?

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 252 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 182 of 225 PageID 4461

Seery - Recross                                  252

1    A    I don't recall.

2    Q    Okay.

3          MR. RUKAVINA:  Well, scroll down a couple of more

4    lines, Mr. Vasek.  Stay there.

5    BY MR. RUKAVINA:

6    Q    Sir, if you'll read with me, isn't the Debtor releasing

7    each Issuer, which is the CLOs, for and from any and all

8    claims, debts, et cetera, by this provision?

9    A    Claims.  Not -- not fees, but claims.  I don't believe

10   there's any release of fees that the CLOs might owe and would

11   run through the waterfall here.

12   Q    Okay.  For and from any and all claims, debts,

13   liabilities, demands, obligations, promises, acts, agreements,

14   liens, losses, costs, and expenses, including without

15   limitation attorneys' fees and related costs, damages,

16   injuries, suits, actions, and causes of action, of whatever

17   kind or nature, whether known or unknown, suspected or

18   unsuspected, matured or unmatured, liquidated or unliquidated,

19   contingent or fixed.

20        Are you saying that that does not release whatever fees

21   have accrued and the CLOs owe?

22   A    I don't believe it would.  If it did, your client should

23   be ecstatic.  But I don't believe it does that.

24   Q    And you don't believe that it releases the CLOs of any and

25   all other obligations that they may have to the Debtor and the

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 253 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 183 of 225 PageID 4462
Seery - Recross                                    253

1   estate?

2   A    I -- again, I don't believe there are any, but I think

3   it's a broad release of claims away from the actual fees that

4   are generated by the Debtor.  I don't believe there's an

5   intention to release fees that have accrued.

6   Q    Have you seen this language before I showed it to you

7   right now?

8   A    I believe I have, yes.

9   Q    Okay.  Take a minute.  Can you point the Court to anywhere

10  where present or future fees under the CLO agreements are

11  excepted from the release?

12  A    I could go through, I'll take your representation, but I

13  don't believe that that's what it -- it's supposed to release

14  fees.  Again, if the fees are owed, they get paid, if there

15  are assets there to pay them.

16  Q    Okay.  This release and this settlement was never noticed

17  out as part of a 9019, was it?

18  A    I don't believe so, no.

19  Q    Okay.  So, other than bringing it up here today, this is

20  the first that the Court, at least, has heard of this,

21  correct?

22  A    Yeah, again, I don't --

23          MR. MORRIS:  Objection to the form of the question.

24          THE WITNESS:  Yeah.  I just stated before that I

25  don't think this is a -- that there claims.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 254 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 184 of 225 PageID 4463
Seery - Recross                                    254

1          THE COURT:  Wait.  Slow down.  I think --

2          MR. SEERY:  Oh, I'm sorry, Your Honor.

3          THE COURT:  -- there was an objection.  Go ahead, Mr.

4    Morris.

5          MR. MORRIS:  The notion that this is the first time

6    the Court has heard of this is just factually incorrect.

7    First of all, it's in the document from January 22nd.  Second

8    of all, Mr. Seery testified to it last week at the preliminary

9    injunction hearing.  I mean, --

10         THE COURT:  I -- I --

11         MR. MORRIS:  -- I don't know what the point of the

12   inquiry is, but there's -- this is not new news.

13         THE COURT:  Okay.  I sustain the objection.

14   BY MR. RUKAVINA:

15   Q    And Mr. Seery, can you point me to any document where

16   counsel for the CLOs has signed this particular confirmation

17   order or any other document agreeing to this language in the

18   confirmation order?

19   A    I don't think there's any document that's signed.  I think

20   we already went over that.  I think the email is evidence

21   their agreement to the general terms.  I don't see any

22   agreement with respect to this particular language.

23   Q    Well, you have no personal information?  You're going on

24   what your lawyers told you that the CLOs agreed to, correct?

25   A    That's correct.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 255 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 185 of 225 PageID 4464

Seery - Recross                                        255

1    Q    Okay.  You didn't personally --

2    A    Excuse me.  That's correct with respect to this language,

3    not with respect to the agreement.  I was on the phone when

4    they agreed.

5    Q    Okay.  And they agreed orally, you're saying, to basically

6    the assumption of the CLO management agreements?

7    A    Correct.

8    Q    Okay.

9              MR. RUKAVINA:  Thank you, Your Honor.  I'll pass the

10   witness.

11             THE COURT:  All right.  Other recross?

12             MR. TAYLOR:  Yes, Your Honor, I do.

13             THE COURT:  Go ahead.

14                         RECROSS-EXAMINATION

15   BY MR. TAYLOR:

16   Q    Mr. Seery, Clay Taylor again.  You worked -- I'm sorry,

17   let me restart.  I believe you testified earlier, in response

18   to questions by Mr. Morris, that you didn't believe a Chapter

19   7 trustee would be very effective in monetizing these assets,

20   correct?

21   A    I think I said I didn't believe that the Chapter 7 trustee

22   would be as effective at monetizing the assets as the

23   Reorganized Debtor would be, and me in the role as Claimant

24   Trustee.

25   Q    And one of the reasons that you gave is you believe that

001742

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 256 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21    Page 186 of 225    PageID 4465

Seery - Recross                        256

1  the Chapter 7 trustee had to liquidate assets so quickly that

2  it could not be effective; is that correct?

3  A    Typically, that's the case, yes.

4  Q    You worked for the Lehman trustee, correct?

5  A    That's incorrect.

6  Q    Okay.  Did you work on the Lehman case?

7  A    Did I work in the case?  No.

8  Q    Okay.  Did you -- how were you involved within -- within

9  the Lehman case?

10 A    It's a long history, but I was a relatively senior person,

11 not senior level, not senior management level person at

12 Lehman.  I ran the loan businesses and I helped a number of

13 other places and I -- in the organization.  I helped construct

14 the sale of Lehman to Barclays out of the broker-dealer and

15 then helped consummate that sale.

16 Q    Okay.  I believe, in that case, it was a SIPC -- the

17 trustee was a SIPC trustee, correct?

18 A    With respect to the broker-dealer.

19 Q    Okay.  And you believe that a SIPC trustee is very -- has

20 very similar rules with respect to asset sales; is that

21 correct?

22 A    There are some similarities, absolutely.

23 Q    Okay.  And so in that case, the trustee was in place for

24 seven years, yet you believe -- you want this Court to believe

25 that a Chapter 7 trustee has to liquidate assets in a very

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 257 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 187 of 225 PageID 4466

Seery - Recross                              257

1   short time frame, is that correct?

2            MR. MORRIS:  Objection to the form of the question.

3            THE WITNESS:  Yeah, in the Lehman case, --

4            THE COURT:  Overruled.

5            THE WITNESS:  I'm sorry, Judge.

6            THE COURT:  Go ahead.

7            THE WITNESS:  In the Lehman case, the SIPC trustee

8   spent years litigating, not liquidating.  The broker-dealer

9   was sold in our structured deal to Barclays, and then the SIPC

10  trustee liquidated the remainder of the estate, which was the

11  broker-dealer, but most of it had been sold to Barclays.  It

12  was really a litigation case.

13  BY MR. TAYLOR:

14  Q   But it did -- that trustee did sell off subsequent assets

15  after the initial sale, correct?

16  A   That trustee, I don't think, managed -- I don't know about

17  that.  The trustee didn't really manage any assets.  Other

18  than litigations.

19  Q   You've also testified that you didn't believe or that you

20  would not take on this role without the gatekeeper and

21  injunction -- gatekeeper role and injunction being in place;

22  is that correct?

23  A   Yes.

24  Q   And you're also familiar with the Barton Doctrine,

25  correct?

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 258 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 188 of 225   PageID 4467

Seery - Recross                    258

1   A    I'm not.

2   Q    Okay.  Do you believe that a Chapter 7 trustee could be

3   sued by third parties without obtaining either relief from

4   this Court -- let me just stop there.  Do you believe that a

5   Chapter 7 trustee could be sued without seeking leave of this

6   Court?

7   A    I think it would be difficult.  I know that Chapter 7

8   trustees have qualified immunity, so I think, whether it would

9   be leave of this Court or it's just that there's a very high

10  bar to suing them, I'm not exactly sure.  It's not something

11  I've spent time on.

12  Q    Okay.  So a hypothetical Chapter 7 trustee would have no

13  need of the gatekeeper role or injunction if this case were

14  converted to one under Chapter 7, correct?

15  A    That's probably true.

16  Q    Thank you.

17          MR. TAYLOR:  No further questions.

18          THE COURT:  All right.  Any other recross?

19          MR. DRAPER:  Your Honor, I have nothing --

20          THE COURT:  All right.

21          MR. DRAPER:  -- further.

22          THE COURT:  All right.  I think we're done, but

23  anyone I've missed?

24      All right.  Mr. Seery, it's been a long day.  You are

25  excused from the virtual witness stand.

001745

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 259 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 189 of 225   PageID 4468

Seery - Recross                                259

1              THE WITNESS:  Thank you, Your Honor.

2              THE COURT:  All right.  Mr. Morris, let's see if

3      there's anything else we can accomplish today.  It's 4:18

4      Central time.  Who would be your next witness?

5              MR. MORRIS:  My next witness would be John Dubel,

6      Your Honor.

7              THE COURT:  All right.  Can you give us a time

8      estimate for direct?

9              MR. MORRIS:  I wouldn't expect Mr. Dubel to be more

10     than 20 minutes or so, but I would offer the Court, if you

11     think it would be helpful, counsel for the CLO Issuers is on

12     the call, and I believe that they would be prepared to just

13     confirm for Your Honor that there is an agreement in

14     principle, just as Mr. Seery has testified to, and maybe you

15     want to hear from her.  I know she's not really a witness, but

16     she might be able to make some representations to give the

17     Court some comfort that everything Mr. Seery has said is true.

18             THE COURT:  I think that would be useful.  Is it Ms.

19     Anderson or who is it?

20             MS. ANDERSON:  That is -- it is, Your Honor.  And you

21     know, I appreciate the testimony given.  I certainly do not

22     want to testify, but thought it might be useful for the Court

23     to hear from us.

24        Amy Anderson on behalf of the Issuers from Jones Walker.

25     Schulte Roth also represents the Issuers.  And I can represent

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 260 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 190 of 225 PageID 4469

260

1    to the Court that the agreement as it's represented on Docket

2    1807, as more particularly described in Exhibit C, which Your

3    Honor has seen, is the agreement reached between the Issuers

4    and the Debtor.

5        There was some testimony about fees owed, accrued fees

6    owed to the Debtor.  I certainly cannot speak to the substance

7    of each particular management agreement with each CLO.  They

8    are all distinct and unique and very lengthy documents.  I

9    will -- I can represent to the Court that any accrued fees

10   that are owed were not intended to be included in the release.

11   It is -- it is not meant to release fees owed to Highland

12   under the particular management agreements.

13       Of course, if the Court has any questions or if I can

14   provide anything further, I'm happy to.  And I will be on the

15   hearing today and tomorrow, but I thought it might be useful,

16   given the topic of the testimony this afternoon.

17           THE COURT:  All right.  That was useful.  Thank you,

18   Ms. Anderson.

19       All right.  Well, Mr. Morris, shall we go ahead and hear

20   from Mr. Dubel today, perhaps finish up a second witness?

21           MR. MORRIS:  Yeah.  I think we have the time.  I

22   think Mr. Dubel is here.  Are you here, Mr. Dubel?

23           MR. DUBEL:  I am.  Can you hear me, Your Honor?

24           THE COURT:  I can hear you, but I cannot see you.

25   Oh, now I can see you.  Please raise your right hand.

Dubel - Direct                              261

1              JOHN S. DUBEL, DEBTOR'S WITNESS, SWORN

2              THE COURT:  All right.  Thank you.  Mr. Morris, go

3    ahead.

4              MR. MORRIS:  Thank you very much, Your Honor.

5                        DIRECT EXAMINATION

6    BY MR. MORRIS:

7    Q    Mr. Dubel, can you hear me?

8    A    I can, Mr. Morris.

9    Q    Okay.  Do you have a position today with the Debtor, sir?

10   A    I am a director of Strand Advisors, Inc., which is the

11   general partner of the Debtor.

12   Q    Okay.  And can you --

13             MR. MORRIS:  Your Honor, just as a reminder, I'm

14   going to ask Mr. Dubel to describe his professional experience

15   in some detail, to put into context his testimony, but his

16   *C.V.* can be found at Exhibit 6Y as in yellow on Docket No.

17   1822.

18             THE COURT:  All right.

19   BY MR. MORRIS:

20   Q    Mr. Dubel, can you describe your professional background?

21   A    Yes.  I have approximately, almost, and I hate to say it

22   because it's making me feel old, but I have almost 40 years of

23   experience working in the restructuring industry.

24        I have served in many roles in that, both as an advisor,

25   an investor in distressed debt, and also a member of

001748

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 262 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 192 of 225 PageID 4471
Dubel - Direct                                      262

1  management teams, and as a director, both an independent

2  director and a non-independent director.

3      My executive roles have included the -- both an executive

4  director, chief executive officer, president, chief

5  restructuring officer, chief financial officer.  And I have

6  been involved in some of the largest Chapter 11 cases over the

7  last several decades, including cases like *WorldCom* and

8  *SunEdison*.

9  Q   Let's focus your attention for a moment just on the

10 position of independent director.  Have you served in that

11 capacity before this case?

12 A   I have.

13 Q   Can you describe for the Court some of the cases in which

14 you've served as an independent director?

15 A   Sure.  I've served as an independent director in several

16 cases that were I'll call post-reorg cases.  *Werner Company*,

17 which was the largest climbing equipment manufacturer in the

18 world, manufacturer of ladders, Werner Ladders.  You'll see

19 them on every pickup truck running around the countryside.

20     *FXI Corporation*, which is a -- one of the largest foam

21 manufacturers.  Everybody's probably slept or sat on one of

22 their products.

23     *Barneys New York*, back in 2012, when they did an out-of-

24 court restructuring.  I had previously been involved with

25 Barneys 15 years before that, and so I was called upon because

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 263 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 193 of 225 PageID 4472

Dubel - Direct                                           263

1   of my knowledge to be an independent director in that

2   situation.  Have had no relationship with Barneys since it

3   emerged from Chapter 11 back in 1998.

4       I have been the independent director in *WMC Mortgage*,

5   which was a mortgage company owned by General Electric.

6       And I am currently serving as an independent director in a

7   company -- in two companies.  One, *Alpha Media*, which is a

8   large radio station chain that recently filed Chapter 11, I

9   believe it was late Sunday night, and I am also an independent

10  director in the *Purdue Pharma* bankruptcy, and have served

11  prior to the bankruptcy and am the chair of the special

12  independent committee of directors -- special committee of

13  independent directors in that particular situation.

14  Q   That sounds like a lot.  In terms of other fiduciary

15  capacities, I think your *C.V.* refers to Leslie Fay.  Were you

16  involved in that case, and if so, how?

17  A   I was.  That was -- for those people who may remember it,

18  that goes back into the 1993 era.  *Leslie Fay* was a large

19  apparel manufacturer, and at the time was one of the largest

20  companies that had gone through an extensive fraud.  I say at

21  the time because it was about a $180 million fraud, which

22  pales by some of the ones that have followed it.

23      I was brought in as the executive vice president in charge

24  of restructuring, chief financial officer, and was also added

25  to the board of directors.  Even though I wasn't independent,

001750

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 264 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 194 of 225 PageID 4473
Dubel - Direct                                264

1  I was added to the board of directors to have the fresh face

2  on the board in that particular situation because of the fraud

3  that had taken place.

4  Q    And --

5  A    *Sun* --

6  Q    Go ahead.

7  A    *SunEdison*, I was brought in as the CEO.  Actually,

8  initially, as the chief restructuring officer, with a mandate

9  to replace the CEO, which took place shortly after I was

10 brought on board and -- because of various issues surrounding

11 investigations by the SEC, DOJ, and allegations by the

12 creditors of fraud.  And so I was brought in to run the

13 company through its Chapter 11 process.

14       As I'd mentioned earlier, *WorldCom*, I was brought in at

15 the beginning of the case as the fresh chief financial

16 officer.  And I think everybody is familiar with what happened

17 in the *WorldCom* situation.

18 Q    All right.  Based on that experience, do you have a view

19 as to whether the appointment of independent directors is

20 unusual?

21 A    It is not.  More recently, it has -- it had been in the

22 past.  Usually, you know, they would try and take the existing

23 directors and form a special committee of the existing

24 directors.  But I think the state of the art has become more

25 where independent directors are brought in, mainly because the

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 265 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 195 of 225 PageID 4474

Dubel - Direct                                    265

1  cases have become a lot more complex in nature, and larger,

2  and the transactions themselves are much more sophisticated.

3  And so having somebody independent has been important for

4  analyzing the various transactions.  And also, quite often,

5  it's just bringing a fresh, independent voice to the company

6  on the board.

7  Q    Do you have an understanding as to the purpose and the

8  role of independent directors generally in restructuring and

9  bankruptcy cases?

10 A    Sure.  As I kind of alluded to a little bit earlier, the

11 -- probably the most critical thing is for restoring

12 confidence in the company and in the management in terms of

13 corporate governance, especially when there have been troubled

14 situations, where -- whether it's been fraud or allegations

15 made against the company and its prior management or when

16 management has left under difficult situations.

17      Also, you know, independent thought process being brought

18 to the board is very important for helping guide companies.

19 It's quite often the existing management team or the existing

20 board may get stuck in a rut, as you can say, you know, in

21 terms of their thinking on how to manage it, and having

22 somebody with restructuring experience who provides that

23 independent voice is very important to the operations.

24      In addition, having someone who can look at conflicts that

25 might arise between shareholders or shareholders and the board

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 266 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 196 of 225 PageID 4475

Dubel - Direct                                    266

1   members is important.  As I mentioned earlier, the *WMC*

2   *Mortgage* situation was one where I was brought on to -- as an

3   independent member of the board to effectively negotiate an

4   agreement or a settlement between WMC and its parent, General

5   Electric.  That entity was being -- WMC was being sued for

6   billions of dollars, and there were issues as to whether or

7   not General Electric should fund those obligations.  And so

8   that was a role that is quite often occurring in today's day

9   and age.

10      In addition, evaluating transactions for companies is

11  important, whereby either the shareholders who sit on the

12  board or board members may be involved in those transactions,

13  needing an independent voice to review it.  And, you know, I

14  have served in situations.  Again, *Barneys New York* and *Alpha*

15  *Media* is another example where, as an independent director, I

16  am one of the parties responsible for evaluating those

17  transactions and making recommendations to the entire board.

18      And then, again, you know, situations where it's just

19  highly-contentious and having, as I said, having that

20  independent view brought to the table is something that is

21  very helpful in these cases.

22  Q   I appreciate the fulsomeness of the answer.  During the

23  time that you served in these various fiduciary capacities, is

24  it fair to say you spent a lot of time considering and

25  addressing issues relating to D&O and other executive

Dubel - Direct                                  267

1   liability issues?

2   A    It's usually one of the things that you get involved with

3   thinking about prior to taking on the role because you want to

4   make sure that there are the appropriate protections for the

5   director.

6   Q    Can you describe for the Court some of the protections

7   that you've sought or that you've seen employed in some of the

8   cases you've worked on, including this one, by the way?

9   A    Sure.  I mean, one of the first things you look to is does

10  the company -- will the company indemnify the director for

11  serving in that capacity?  And if the company will not

12  indemnify, then there's always a question as to why not, and

13  it's probably something you don't want to get involved with.

14       Generally, that is something that I don't think I've ever

15  seen a case where there has not been indemnification.

16  Obviously, it would, you know, cause great pause or concern if

17  they weren't willing to indemnify.  But that is important.

18       Providing D&O insurance is very important.  And in most

19  situations, you know, over the last 10-15 years, if there's

20  not adequate D&O insurance -- quite often, the D&O insurance

21  has been tapped out because of claims that will -- have been

22  brought or are anticipated to be brought -- new D&O insurance

23  is something that's front and center for the minds of

24  independent directors such as myself.

25       As you -- that gets you into the case and gets you moving.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 268 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 198 of 225 PageID 4477

Dubel - Direct                                        268

 1   As you start to look towards the confirmation and exit from

 2   the case, things that would be appropriate, that, you know,

 3   would always be something you would want to look at would be

 4   exculpation language, releases.  And in this particular case,

 5   the injunction, or what Mr. Seery earlier referred to as the

 6   gatekeeper clause, is something that is very important for

 7   directors, both, you know, as they're thinking through it and

 8   as they emerge.

 9   Q    All right.  Let's shift now to this case, with that

10   background.  How did you learn about this case?

11   A    I had a party who was involved in the case reach out to me

12   in early part of December of 2019 to see if I would be

13   interested in getting involved.  I think that was about the

14   time -- it was after -- as I recall, it was after the case had

15   been moved to Dallas and when there was a -- consideration of

16   either a Chapter 11 or a Chapter 7 trustee.  I can't remember

17   exactly which it was.  But there was talk about a motion to

18   bring on a trustee and get rid of all the management and the

19   like and such.

20   Q    Can you describe in as much detail as you can recall the

21   facts and circumstances that led to your appointment as an

22   independent director?

23   A    Sure.  I, as I said, I had -- early December, I had an --

24   one of the parties involved -- had, probably within the next

25   week, probably two or three others -- that reached out to see

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 269 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 199 of 225 PageID 4478

Dubel - Direct                                            269

1    if I would be interested in participating.  I met with the

2    Creditors' Committee or -- I'm not sure if it was all the

3    members, but representatives of the Creditors' Committee,

4    along with counsel, and I believe financial advisors were

5    involved.  They walked me through the issues.  They wanted to

6    hear about my *C.V.*  Quite a few of them knew me, knew me well,

7    but others wanted to hear about my background and how I would

8    look at things as an independent director.

9        That went through into the latter part of December.  I

10   knew that they were talking to other parties.  I think it was

11   probably right around the first of the year or so that I was

12   informed, maybe a little bit earlier than that, that I was

13   informed that Mr. Seery was one of the other parties that they

14   were talking to, and Mr. Seery and I were put in touch with

15   each other.  I had worked with Mr. Seery back probably nine

16   years earlier when I was the CEO of FGIC.  He was involved in

17   a matter that we were restructuring, and so knew him a little

18   bit and was comfortable working with him as a, you know,

19   another independent director.

20       Then we took the time that we had to to -- or, I took the

21   time to -- from the beginning, you know, the early part of

22   December, look at the docket, understand what was taking

23   place.  I -- in addition, I met with the company and its

24   advisors, in-house counsel, the folks at DSI who were at the

25   time the CRO and the company's counsel to better understand

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 270 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 200 of 225 PageID 4479

Dubel - Direct                                    270

1   some of the issues.

2       Mr. Seery and I, as I said, were both selected, and we

3   went through the process of, I guess, breaking the tie, I

4   think, if I could say it that way, amongst the creditors and

5   the Debtor as to who would be the third member of the board.

6   And we were given the opportunity to go out, interview, and

7   select the third member, which resulted in Russell Nelms'

8   appointment to the board.  And also during that time, we were

9   given the opportunity to have some input -- not a hundred

10  percent input, but some input -- on the January 9th order that

11  -- the January 9, 2020 order that was put in place appointing

12  us and giving us some of the protections that we felt were

13  appropriate and necessary in this case.

14  Q   All right.  We'll get to that in a moment, but during this

15  diligence period, did you form an understanding as to why an

16  independent board was being formed, why it was being sought?

17  A   Yes.  There was, my words, there was a lot of distrust

18  between the creditors and the management -- not the CRO, but

19  the prior management of the company -- and there had been a

20  motion brought both to obviously bring the case back to Dallas

21  from I think it was originally in Delaware and then there was

22  a motion to seek, you know, to remove management and put in a

23  trustee.

24      There had been a dozen years of litigation with one party,

25  about eight or nine years with another major party, and

001757

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 271 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 201 of 225 PageID 4480

Dubel - Direct                                    271

1    several other of the major creditors were litigants.  The

2    other, as I understood, the other creditors, main creditors in

3    the case were all lawyers who had not yet gotten paid for the

4    litigation work that they had done.  And so it was obvious

5    that this was a very -- a highly-litigious situation.

6    Q    In addition to speaking with the various constituents, did

7    you do any diligence on your own to try to understand the case

8    before you accepted the appointment?

9    A    Yes.  I went to the docket to look at all the -- not every

10   single thing that had been filed, but to try and look at all

11   the key, relevant items that had been filed, get a better

12   understanding of what was out there.  Looked at some of the

13   initial filings of the company in terms of the, you know, the

14   creditors, to understand who the creditor base was per the

15   schedules that had been filed.  Looked at the -- some of the

16   various pleadings that had been put in place.

17   Q    Did you form a view as to the causes of the bankruptcy

18   filing?

19   A    Litigation.  That was my clear view.  This company had

20   been in litigation with multiple parties, various different

21   parties, since around 2008.  Generally, you would see

22   litigation like the types that were, you know, that were here,

23   you know, you'd litigate for a while, then you'd try and

24   settle it.

25        It did not appear to me that there was any intention on

Dubel - Direct                          272

1    the -- the Debtor to settle these litigations, but would

2    rather just continue the process and proceed forward on the

3    litigation until the very last minute.  And so it was obvious

4    that this was going to -- that the Debtor was a, as I said, a

5    highly-litigious shop, and that was one of the causes,

6    obviously, the cause of the filing, along with the fact that

7    judgments were about to be entered against the Debtor.

8    Q    All right.  And in January 2020, do you recall that's when

9    the agreement was reached between the Debtor, the Committee,

10   and Mr. Dondero?

11   A    Yeah, it was the first week or so, which resulted in a

12   hearing on I believe it was January 9th in front of Judge

13   Jernigan.

14   Q    And as a part of that -- I think you testified at that

15   hearing.  Do I have that right?

16   A    I don't recall if I did.  I might have.  I might have

17   testified at a subsequent hearing.  But --

18   Q    But was --

19   A    -- I was in the courtroom for that hearing, yes.

20   Q    Was it part of that process by which you accepted the

21   appointment as independent director?

22   A    I accepted it based upon the order that had been

23   negotiated amongst the parties, the creditors, the Debtor, Mr.

24   Dondero, and others.  And that was the key thing that was --

25   and approved by the Court on that date.  And that was key for

Dubel - Direct                          273

1  my acceptance of the role as an independent director.

2  Q    And did you and the other prospective independent

3  directors participate in the negotiation of the substance of

4  the agreement?

5  A    We did.  We didn't have a hundred percent say over it, but

6  we were able to get our voices heard.  As Mr. Seery testified

7  earlier, he was instrumental in coming up with an idea about

8  how to put in place the injunction, you know, the -- I think

9  he referred to it as the gatekeeper injunction, which was

10  obviously in this case very critical to all three of us:  Mr.

11  Seery, Mr. Nelms, and myself.

12  Q    Can you describe for the Court kind of the issues of

13  concern to you and the other prospective board members?  What

14  was it that you were focused on in terms of the negotiations?

15  A    Well, obviously, indemnification was important, but that

16  was something that was going to be granted.  Having the right

17  to obtain separate D&O insurance just for the three directors

18  was important.  We were concerned that Strand Advisors, Inc.

19  really had no assets, and so we wanted to make sure that the

20  Debtor was going to get -- was going to basically guarantee

21  the indemnification.

22      The -- because of the litigious nature and what we had

23  heard from all of the various parties involved, including

24  people inside the Debtor who we had talked with, that it would

25  be something that was important for us to make sure that the

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 274 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 204 of 225   PageID 4483

Dubel - Direct                                274

 1   injunction, the gatekeeper injunction was put in place.

 2   Q    And can you elaborate a little bit on I think you said you

 3   had done some diligence and you had formed a view as to the

 4   causes of the bankruptcy filing, but did this case present any

 5   specific concerns or issues that you and the board members had

 6   to address perhaps above and beyond what you experienced in

 7   some of the other cases you described?

 8   A    Well, as I said earlier, the fact that the litigation --

 9   the various litigations with the creditors have been going on

10   for what I viewed as an inordinate amount of years, and that

11   it was clear from my diligence that I had done that this had

12   been directed by Mr. Dondero, to keep this moving forward in

13   the litigation, and to, in essence, just, you know, never give

14   up on the litigation.

15        It was important that the types of protections that we

16   were afforded in the January 9th order were put in place,

17   because we -- none of us -- none of the three of us, and

18   myself in particular, did not want to be in a position where

19   we would be sued and harassed through lawsuits for the next,

20   you know, ten years or so.  That's not something anybody would

21   want to sign up for.

22   Q    All right.  Let's look at the January 9th order and the

23   specific provisions I think that you're alluding to.

24              MR. MORRIS:  Can we call up Exhibit 5Q, please?

25              THE WITNESS:  Pardon me while I put my glasses on to

1    read this.

2            MR. MORRIS:    All right.  And if we can go to

3    Paragraph 4.

4    BY MR. MORRIS:

5    Q    Is that the paragraph, sir, that was intended to address

6    the concern that you just articulated about Strand not having

7    any assets of its own?

8    A    Yes, it is.

9    Q    And can you just describe for the Court how that

10   particular provision addressed that concern?

11   A    Sure.  Since we were directors of Strand, which is the

12   general partner of the Debtor, we felt it was important that

13   the general -- that Highland, the Debtor, would provide the

14   guaranty on indemnification, because Highland had the assets

15   to back up the indemnification.

16        It was also pretty clear, from my experience in having

17   placed D&O insurance, you know, over the last 25-30 years,

18   that if there was no, you know, opportunity for

19   indemnification, putting in place insurance would be very

20   difficult or exorbitantly expensive.  So having this

21   indemnification by Highland was a very important piece of the

22   order that we were seeking.

23   Q    And the next piece is the insurance piece in Paragraph 5.

24   Do you see that?

25   A    I do.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 276 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 206 of 225 PageID 4485

Dubel - Direct                                                  276

1  Q   Did you have any involvement in the Debtor's efforts to

2  obtain D&O insurance for the independent board?

3  A   I did.

4  Q   Can you just describe for the Court what role you played

5  and what issues came up as the Debtor sought to obtain that

6  insurance?

7  A   Sure.  The Debtors had been looking to get an insurance

8  policy in place.  They were not able to do that.  I happen to

9  have worked with an insurance broker on D&O situations in some

10 very difficult situations over the years and brought them into

11 the mix.  They were able to go out to the market and find a

12 policy that would cover us, the -- kind of the key components

13 of that policy, though, were, number one, the guaranty that

14 HCMLP would give -- I'm sorry, the guaranty that HCMLP would

15 give to Strand's obligations, and also the -- I'll call it the

16 gatekeeper provision was very important because these parties

17 did not want to have -- they wanted to have what was referred

18 to, commonly referred to as the Dondero Exclusion.

19      So while we were -- we purchased a policy that covered us,

20 it did have an exclusion, unless there were no assets left,

21 and then the what I'll call -- we refer to as kind of a Side A

22 policy would kick in.

23 Q   Okay.  What do you mean by the Dondero Exclusion?

24 A   The insurers did not want to cover the -- any litigation

25 that Mr. Dondero would bring against directors.  It was pretty

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 277 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21    Page 207 of 225    PageID 4486
Dubel - Direct                              277

1  commonly known in the marketplace that Mr. Dondero was very

2  litigious, and insurers were not willing to write the

3  insurance without the protections that this order afforded

4  because they did not want to be hit with frivolous -- hit with

5  claims on the policy for frivolous litigation that might be

6  brought.

7          MR. TAYLOR:  Your Honor, this is Mr. Taylor.  I've

8  got to object to the last answer.  He testified as to what the

9  insurers' belief was and what they would or would not do based

10 upon their own knowledge.  It's not within his personal

11 knowledge.  And therefore we'd move to strike.

12         THE COURT:  I overrule that objection.

13         MR. MORRIS:  Your Honor?

14         THE COURT:  I overrule the objection.

15         MR. MORRIS:  Thank you.  Thank you, Your Honor.

16 BY MR. MORRIS:

17 Q   Mr. Dubel, can you explain to the Court, in your work in

18 trying to secure the D&O insurance, what rule the gatekeeper

19 provision played in the Debtor's ability to get that?

20 A   Based upon my discussions with the insurance broker, who I

21 have worked with for 25-plus years, had that gatekeeper

22 provision not been put in place, we would not have been able

23 to get insurance.

24 Q   All right.  Let's look at the gatekeeper provision.

25         MR. MORRIS:  Can we go down to Paragraph 10, please?

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 278 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 208 of 225 PageID 4487

Dubel - Direct                                              278

1   Perfect.  Right there.

2   BY MR. MORRIS:

3   Q    Is this gatekeeper provision, is this also the source of

4   the exculpation that you referred to?

5   A    Yes.

6   Q    And what's your understanding of how the exculpation and

7   gatekeeper functions together?

8   A    Well, my apologies, I'm not an attorney, so just from a

9   business point of view, the way I look at this is that, you

10  know, obviously, we're -- you know, the directors are not

11  protected from willful misconduct or gross negligence, but any

12  negligence -- you know, claims brought under negligence and

13  the likes of such, and things that might be considered

14  frivolous, would have to first go to Your Honor in the

15  Bankruptcy Court for a review to determine if they were claims

16  that should be entitled to be brought.

17  Q    If you take a look at the provision, right, do you

18  understand that nobody can bring a claim without -- in little

19  i, it says, first determining -- without the Court first

20  determining, after notice, that such claim or cause of action

21  represents a colorable claim of willful misconduct or gross

22  negligence against an indirect -- independent director.  Do

23  you see that?

24  A    I do.

25  Q    Is it your understanding that parties can only bring

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 279 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 209 of 225 PageID 4488

Dubel - Direct                                          279

```
 1   claims for gross negligence or willful misconduct if the Court
```
```
 2   makes a determination that there is a colorable claim?
```
```
 3   A    That's my understanding.
```
```
 4   Q    And the second --
```
```
 5   A    I think they have the right -- I think they have the right
```
```
 6   to go to the Court to ask if they can bring the claim, but the
```
```
 7   Court has to make the determination that it's a colorable
```
```
 8   claim for willful misconduct or gross negligence.
```
```
 9   Q    And if the Court -- is it your understanding that if the
```
```
10   Court doesn't find that there is a colorable claim of willful
```
```
11   misconduct or gross negligence, then the claim can't be
```
```
12   brought against the independent directors?
```
```
13   A    That is my understanding, yes.
```
```
14   Q    And was -- taken together, Paragraphs 4, 5, and 10, were
```
```
15   they of importance to you and the other independent directors
```
```
16   before accepting the position?
```
```
17   A    They were absolutely critical to me and definitely
```
```
18   critical to the other directors, because we all negotiated
```
```
19   that together, and it would -- I don't -- I don't think any of
```
```
20   the three of us would have taken on this role if those
```
```
21   paragraphs had not been included in the order.
```
```
22   Q    Okay.  Just speaking for yourself personally, is there any
```
```
23   chance you would have accepted the appointment without all
```
```
24   three of those provisions?
```
```
25   A    I would not have.
```

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 280 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 210 of 225 PageID 4489
285

1  Q    And why is that?  In this particular case, why did you

2  personally believe that you needed all three of those

3  provisions?

4  A    Well, you know, people like myself, you know, someone

5  who's coming in as an independent director, come in in a

6  fiduciary capacity.  And, you know, we take on risks.  Now,

7  granted, in a Chapter 11 case, as the saying goes, you know,

8  it's a lot safer because everything has to be approved by the

9  Court, but there are still opportunities for parties to, in

10  essence, have mischief going on and bring nuisance lawsuits

11  that would take a lot of time and effort away from either the

12  role of our job of restructuring the entity or post-

13  restructuring, would just be nuisance things that would cost

14  us money.  And we, you know, I did not want to be involved in

15  that situation, knowing the litigious nature of Mr. Dondero

16  from the research that I had done, you know, the diligence

17  that I had done.  I did not want to subject myself to that.

18  And it has proven an appropriate and very solid order because

19  of the conduct of Mr. Dondero, as Mr. Seery has testified to

20  earlier.

21  Q    Do you have a view as to what the likely effect would be

22  on future corporate restructurings if you and your fellow

23  directors weren't able to obtain the type of protection

24  afforded in the January 9th order?

25  A    I think it would be very difficult to find qualified

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 281 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21    Page 211 of 225   PageID 4490

Dubel - Direct                          281

1   people who would be willing to serve in these types of

2   positions if they knew they had a target on their backs.  You

3   know, it was something that was clear to us, to Mr. Seery, Mr.

4   Nelms, myself at the time, that if we had a target -- we felt

5   like we would have a target on our back if we didn't have

6   these protections.

7        It just wasn't worth the risk, the stress, the

8   uncertainty, the potential cost to us.  And so I don't think

9   anybody else would be, you know, willing to take on the roles

10  as an independent director with the facts and circumstances

11  and the players involved in this particular case.

12            MR. MORRIS:  I have no further questions, Your Honor.

13            THE COURT:  All right.  Pass the witness.  Let's see.

14  You went -- I'm going to give a time.  You went 32 minutes.

15  So, for cross of this witness, I'm going to limit it to an

16  aggregate of 32 minutes.  Who wants to go first?

17            MR. DRAPER:  Your Honor, this is Douglas Draper.

18  I'll be happy to go first.

19            THE COURT:  All right.

20                      CROSS-EXAMINATION

21  BY MR. DRAPER:

22  Q   Mr. Dubel, prior to your engagement, did you happen to

23  read the case of *Pacific Lumber*?

24  A   I did not.

25  Q   And were you advised about *Pacific Lumber* by somebody

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 282 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21    Page 212 of 225   PageID 4491

Dubel - Cross                              282

 1 | other than a -- your lawyer?

 2 | A    I'm not familiar with the case at all, Mr. Draper.

 3 | Q    Are you aware, and you've been around a long time, that

 4 | different circuits have different rules for liabilities of

 5 | officers, directors, and people like that?

 6 | A    I am aware that there are different, I don't know what the

 7 | right term is, but precedents, I guess, in different circuits

 8 | for any number of things, whether it's a sale motion or

 9 | protections of officers and directors or anything.  So each

10 | circuit has its own unique situations.

11 | Q    And one last question.  On a go-forward, after -- if this

12 | plan is confirmed and on the effective date, you will not have

13 | any role whatsoever as an officer or director of the new

14 | general partner, correct?

15 | A    I have not been asked to.  As Mr. Seery testified, he may

16 | ask for assistance or just -- in most situations that I'm

17 | involved with, I may have a continuing role just as a -- I'll

18 | call it an advisor or somebody to provide a history.  But at

19 | this point in time, I have not been asked to have any

20 | involvement.

21 | Q    And based on your experience, you know that there's a

22 | different liability for a director and an officer versus

23 | somebody who is an advisor?

24 |           MR. MORRIS:  Objection to the form of the question.

25 | No foundation.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 283 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 213 of 225 PageID 4492

Dubel - Cross                                    283

1          THE COURT:  Overruled.

2          MR. DRAPER:  Mr. Dubel has shown --

3          THE COURT:  Mr. Dubel, you can answer if you know.

4          MR. DRAPER:  Mr. Dubel, you can answer.

5          THE WITNESS:  I'm sorry, Your Honor, I didn't hear

6    you say overruled.  Thank you.

7       Mr. Draper, I apologize, could you repeat the question?

8    BY MR. DRAPER:

9    Q    The question is you know from your experience that there's

10   a different liability for somebody who is an officer or

11   director versus somebody who's an advisor?

12   A    Yes, that's my experience, which is why in several

13   situations post-reorganization, while I have not been involved

14   *per se*, and I use the term involved meaning, you know, on a

15   day-to-day basis, if someone asks me to assist, I'll usually

16   ask them to bring me in as a non -- an unpaid employee or a,

17   you know, a nominally-amount-paid employee, so that I would be

18   protected by whatever protections the company might provide.

19          MR. DRAPER:  I have nothing further for this witness,

20   Your Honor.

21          THE COURT:  All right.  Other cross?

22          MR. TAYLOR:  Yes, Your Honor.

23          MR. RUKAVINA:  Yes, Your Honor.

24          MR. TAYLOR:  Oh, go ahead, Davor.

25          MR. RUKAVINA:  No, Clay, go ahead.

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21   Entered 02/04/21 10:28:30   Page 284 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21   Page 214 of 225   PageID 4493

Dubel - Cross                                    284

1                    CROSS-EXAMINATION

2   BY MR. TAYLOR:

3   Q   Mr. Dubel, this is Clay Taylor here on behalf on Mr.

4   Dondero.  I believe you had previously testified in response

5   to questions from Mr. Morris that Mr. Dondero had engaged in a

6   pattern of litigious behavior; is that correct?

7   A   I believe that's the testimony I gave, yes.

8   Q   Okay.  And please give me the specific examples of which

9   cases you believe he has engaged in overly-litigious behavior.

10  A   Well, all of the cases that resulted in creditors, large

11  creditors in our bankruptcy.  That would be the UBS situation,

12  the Crusader situation which became the Redeemer Committee,

13  litigation with Mr. Daugherty, with Acis and Mr. Terry.  And

14  as I mentioned earlier, I'd, you know, been informed by

15  members of the management team that it was Mr. Dondero's style

16  to just litigate until the very end to try and grind people

17  down.

18  Q   Okay.  Was Mr. Dondero or a Highland entity the plaintiff

19  in the UBS case?

20  A   No, but what was referred -- what I was referring to was

21  the nature in which he defended it and went overboard and

22  refused to ever, you know, try and settle things in a manner

23  that would have gotten things done.  And just looking at,

24  having been involved in the restructuring industry for the

25  last 40 years, as I said, almost 40 years, and been involved

Dubel - Cross                                              285

1    in many, many litigious situations, it's obvious when someone

2    is litigious, whether they're the plaintiff or the defendant.

3    Q    So are you personally familiar with the settlement

4    negotiations in the UBS case that happened pre-bankruptcy,

5    then?

6    A    I have been informed that there were settlement

7    negotiations, and subsequently determined, through discussions

8    with the parties, that they weren't really close to -- to a

9    settlement.

10   Q    But are you aware of --

11   A    Mr. Dondero might have thought they were, but they were

12   not.

13   Q    Okay.  Would you be surprised to learn if UBS had offered

14   to settle pre-bankruptcy for $7 million?

15   A    As I understand, settlements -- settlement offers pre-

16   bankruptcy had a tremendous number of -- I don't know what the

17   right term is -- things tied to it and that clearly were never

18   going to get done.

19   Q    Okay.  When you say things were tied to it, what things

20   were tied to it?

21   A    I don't know all of the settlement discussions that took

22   place, but what I was informed was that there were a lot of

23   conditions that were included in that.  And it's -- if it had

24   been an offer of $7 million and Mr. Dondero didn't settle for

25   that, there must have been a reason why.  So, you know, since

001772

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 286 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21    Page 216 of 225    PageID 4495

Dubel - Cross                                    286

```
 1   the entities -- all of the entities within the Highland

 2   Capital empire, if you'd call it that, were being sued for

 3   almost a billion dollars.

 4   Q   Okay.  And you say there was lots of conditions that were

 5   tied to that.  What were the conditions?

 6   A   As I said earlier, I wasn't informed of them on all the

 7   prepetition settlements.  That's just what I was told, there

 8   was conditions.

 9   Q   Okay.  And who were you told these things by?

10   A   Both external counsel and internal counsel.  Mr.

11   Ellington, Scott Ellington, and Isaac -- the litigation

12   counsel.

13   Q   Okay.  So --

14   A   That's -- sorry.

15   Q   Okay.  In each of these cases, you were informed by your

16   views by statements that were made to you by other people?

17   A   Yes.

18   Q   Okay.

19   A   Made -- and particularly made by members of management of

20   the Debtor, which is pretty informed.

21   Q   Okay.  Which members of management were those?

22   A   As I just testified, it was Mr. Ellington, who was the

23   general -- the Debtor's general counsel, and Mr. Leventon,

24   Isaac Leventon, who was the -- I believe his title was

25   associate general counsel in charge of litigation.
```

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 287 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 217 of 225 PageID 4496

Dubel - Cross                                           287

1    Q    Okay.  Thank you.

2              MR. TAYLOR:  No further questions.

3              THE COURT:  All right.  Mr. Rukavina?

4                    CROSS-EXAMINATION

5    BY MR. RUKAVINA:

6    Q    Mr. Dubel, we've never met, although I think we were on

7    the phone once together.  I know you're a director, so you're

8    at the top, but having been in this case for more than a year,

9    you probably have some understanding of the assets that the

10   Debtor has, don't you?

11   A    I do, but I'm not as facile with it as Mr. Seery,

12   obviously.

13   Q    Sure.  Is it true, to your understanding, that the Debtor

14   owns various equity interests in third-party companies?

15   A    Either directly or indirectly.  That's my understanding,

16   yes.

17   Q    Okay.  Have you heard of an entity called Highland Select

18   Equity Fund, LP?

19   A    I have.

20   Q    And is that a publicly-traded company?

21   A    I'm not familiar with its nature there, no.

22   Q    Do you know how much of the equity of that entity the

23   Debtor owns?

24   A    I don't know off the top of my head, no.

25   Q    And again, these may be unfair questions because you're at

001774

Dubel - Cross                                    288

1   the top, so I'm not trying to make you look foolish.  I'm just

2   trying to see.  Let me ask one more.  Have you heard of

3   Wright, W-R-I-G-H-T, Limited?

4           MR. MORRIS:  Objection, Your Honor.  Beyond the

5   scope.

6           MR. RUKAVINA:  Your Honor, I can recall him on my

7   direct, then.

8           THE COURT:  Yeah.  I'll --

9           MR. RUKAVINA:  But I'd just rather get it over with.

10          THE COURT:  I'll allow it.

11          MR. MORRIS:  All right.  If we're going to get rid of

12  --

13          THE COURT:  Overruled.

14          MR. MORRIS:  No, that's fine.

15  BY MR. RUKAVINA:

16  Q   Have you heard of Wright, W-R-I-G-H-T, Limited?

17  A   I think I have, but I just don't recall it, Mr. Rukavina.

18  I'm sorry, Rukavina.  Sorry.

19  Q   It's okay.  It's a --

20  A   I'm looking at your chart here, at your name here, and it

21  looks like Drukavina, so I really apologize.

22  Q   Believe it or not, it's actually a very famous name in

23  Croatia, although it means nothing here.

24      So, all of the entities that the Debtor owns equity in, I

25  guess you probably, just because, again, you're not in the

Dubel - Cross                    289

1    weeds, you can't tell us how much of that equity the Debtor

2    owns, can you?

3    A    I can't individually, no.  You know, Mr. Seery is our CEO

4    and he's responsible for the day-to-day, you know, issues.  So

5    usually we look at it more on a consolidated basis and not in

6    the, you know, down in the weeds, as you refer to it, unless

7    something specific came up.

8    Q    Well, would you remember whether, when Mr. Seery or the

9    prior CRO would provide you, as the board member, financial

10   reports, whether that included P&Ls and balance sheets and

11   financial reports for the entities that the Debtor owned

12   interests in?

13   A    We might -- we would have seen certain consolidating

14   reports that might -- that would be, you know, consolidating

15   financial statements that would be P&Ls.  Where we didn't

16   consolidate them, I'm not sure we saw the actual individual-

17   entity P&Ls on a regular basis.  We might have seen them if

18   there was a transaction taking place.  But again, you know, I

19   don't have -- I don't remember every single one of them, no.

20   Q    And you would agree with me, sir, that the Pachulski law

21   firm is an excellent restructuring, reorganization, insolvency

22   law firm, wouldn't you?

23   A    Yes, I would agree with you there.

24   Q    Okay.  And you would expect them to ensure that anything

25   that has to be filed with Her Honor is timely filed, wouldn't

Dubel - Cross                                    290

1   you?

2   A    I would expect that they would follow the rules.

3   Q    Okay.  And you have the utmost of confidence, I take it,

4   in your CRO, don't you?

5   A    I have a tremendous amount of confidence in our CEO, who

6   also happens to hold the title of CRO, yes, if that's what

7   you're referring to as, Mr. Seery.

8        (Interruption.)

9             MR. RUKAVINA:  John.

10  BY MR. RUKAVINA:

11  Q    Okay, I think -- yeah, I think I heard that you have

12  tremendous confidence in the CEO, who happens to be the CRO,

13  right?

14  A    Yes, that's the case.

15            MR. RUKAVINA:  Thank you, Your Honor.  I'll pass the

16  witness.

17            THE COURT:  All right.  Any other cross of Mr. Dubel?

18      All right.  Mr. Morris, redirect?

19            MR. MORRIS:  Yeah, just very briefly, Your Honor.

20                      REDIRECT EXAMINATION

21  BY MR. MORRIS:

22  Q    You were asked about that *Pacific Lumber* case, Mr. Dubel;

23  do you remember that?

24  A    I do remember being asked about it.

25  Q    And you weren't familiar with that case, right?

001777

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 291 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 221 of 225 PageID 4500

Dubel - Redirect                                    291

 1  A    I'm not familiar with the name of the case, no.

 2  Q    But you did know that the exculpation and gatekeeping

 3  provisions were going to be included in the order; is that

 4  fair?

 5  A    I did.

 6  Q    And did you testify that you wouldn't have accepted the

 7  position without it?

 8  A    I did testify that way.

 9  Q    And if you knew that you couldn't get those provisions in

10  the Fifth Circuit, would you ever accept a position as an

11  independent director in the Fifth Circuit on a go-forward

12  basis?

13  A    Not in a situation such as this, no.

14  Q    Okay.  Okay.

15          MR. MORRIS:  No further questions, Your Honor.

16          THE COURT:  All right.  Any recross on that narrow

17  redirect?

18      All right.  Well, Mr. Dubel, you are excused from the

19  virtual witness stand.

20          THE WITNESS:  Thank you, Your Honor.

21          THE COURT:  All right.  I want to go ahead and --

22          MR. DUBEL:  Do you mind if I turn my video off?

23          THE COURT:  I'm sorry, what?

24          MR. DUBEL:  I said, do you mind if I turn my video

25  off?

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 292 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 222 of 225 PageID 4501

292

1          THE COURT:  No, you may.  That's fine.

2          MR. DUBEL:  Thank you, Your Honor.

3          THE COURT:  All right.  I want to break now, unless

4     there's any quick housekeeping matter.  Anything?

5          MR. MORRIS:  No, Your Honor, but I would just ask

6     all parties to let me know by email if they have any

7     objections to any of the exhibits on the witness list that was

8     filed at Docket No. 1877, because I want to begin tomorrow by

9     putting into evidence the balance of our exhibits.

10          MR. RUKAVINA:  And Your Honor, I was responsible for

11    this due to an internal mistake.  The only ones I have an

12    objection to are -- is that 7?  John, is that 7, right, 7OO --

13          MR. MORRIS:  Yes.

14          MR. RUKAVINA:  Your Honor, I only have an objection

15    to 7O and 7P, although I think -- think the Court has already

16    admitted 7P, so my objection is moot.

17          THE COURT:  I have.

18          MR. RUKAVINA:  Okay.

19          THE COURT:  So, what --

20          MR. RUKAVINA:  Then it would just be --

21          THE COURT:  Go ahead.

22          MR. RUKAVINA:  I'm sorry.  It would just be 7O.

23    Septuple O or whatever the word is.

24          THE COURT:  All right.  So I will go ahead and admit

25    7F through 7Q, with the exception of 7O.  Again, these appear

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 293 of
Case 3:21-cv-00538-N   Document 26-6   Filed 06/09/21    Page 223 of 225   PageID 4502

293

```
1    at Docket Entry 1877.  And Mr. Morris, you can try to get in

2    7O the old-fashioned way if you want to.

3            MR. MORRIS:  Yeah, I'll deal with 7O and the very

4    limited number of other objections at the beginning of

5    tomorrow's hearing.

6            THE COURT:  All right.

7        (Debtor's Exhibits 7F through 7Q, with the exception of

8    7O, are received into evidence.)

9            THE COURT:  So we will reconvene at 9:30 Central time

10   tomorrow.  I think we're going to hear from the Aon, the D&O

11   broker, Mr. Tauber; is that correct?

12           MR. MORRIS:  That's right.  And that should be

13   shorter than even Mr. Dubel.

14           THE COURT:  All right.  Well, we will see you at 9:30

15   in the morning.  We are in recess.

16           MR. MORRIS:  Thank you so much.

17           THE CLERK:  All rise.

18       (Proceedings concluded at 5:09 p.m.)

19                           --oOo--

20                          CERTIFICATE

21       I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23    /s/ Kathy Rehling                        02/04/2021

24   _____     _____
     Kathy Rehling, CETD-444                      Date
25   Certified Electronic Court Transcriber
```

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21 Entered 02/04/21 10:28:30 Page 294 of
Case 3:21-cv-00538-N Document 26-6 Filed 06/09/21 Page 224 of 225 PageID 4503

294

INDEX

PROCEEDINGS                                                          5

OPENING STATEMENTS

- By Mr. Pomerantz                                                  12
- By Mr. Kathman                                                    29
- By Mr. Clemente                                                   33
- By Mr. Draper                                                     40
- By Mr. Rukavina                                                   42
- By Mr. Taylor                                                     44
- By Mr. Kathman                                                    49
- By Ms. Drawhorn                                                   50

WITNESSES

Debtor's Witnesses

James P. Seery
- Direct Examination by Mr. Morris                                  58
- Cross-Examination by Mr. Rukavina                                169
- Cross-Examination by Mr. Taylor                                  212
- Cross-Examination by Mr. Draper                                  233
- Redirect Examination by Mr. Morris                               236
- Recross-Examination by Mr. Rukavina                              249
- Recross-Examination by Mr. Taylor                                255

John S. Dubel
- Direct Examination by Mr. Morris                                 261
- Cross-Examination by Mr. Draper                                  281
- Cross-Examination by Mr. Taylor                                  284
- Cross-Examination by Mr. Rukavina                                287
- Redirect Examination by Mr. Morris                               290

EXHIBITS

Debtor's Docket 1822 Exhibits                          Received  55
   (exclusive of Exhibits B, D, E, 4D, 4E, 4G,
    5T, 6R, 6S, 6T, and 6U)
Debtor's Docket 1866 Exhibits                          Received  56
Debtors' Exhibits 7F through 7Q (exclusive of          Received 293
   Exhibit 7O)
Debtor's Exhibit 7P                                    Received 140
Debtor's Exhibit 7Q                                    Received  75

Case 19-34054-sgj11 Doc 1894 Filed 02/04/21    Entered 02/04/21 10:28:30    Page 295 of
Case 3:21-cv-00538-N  Document 26-6  Filed 06/09/21    Page 225 of 225  PageID 4504

295

1                                    INDEX
                                    Page 2
2

3    RULINGS

4    Confirmation Hearing [1808] - *Continued to 2/3/2021*        293

5    Agreed Motion to (1) Assume Non-Residential Real Property     293
     Lease with Crescent TC Investors, LP upon Confirmation of
6    Plan and (II) Extend Assumption Deadline [1624] -
     *Continued to 2/3/2021*
7
     END OF PROCEEDINGS                                           293
8
     INDEX                                                    294-295
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

001782