**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | |
|---|---|---|
| **In Re:** Highland Capital Management, L.P | § | Case No. 19-34054-SGJ-11 |
| Highland Capital Management Fund Advisors, L.P. | | |
| et al | § | |
| Appellant | § | |
| vs. | § | |
| Highland Capital Management, L.P., | | |
| | § | 3:21-CV-00538-N |
| Appellee | § | |

[1943] **Order confirming the fifth amended chapter 11 plan,** Entered on 2/22/2021.

# APPELLANT RECORD
# VOLUME 7

MUNSCH HARDT KOPF & HARR, P.C.
Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
3800 Ross Tower
500 N. Akard Street
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

ATTORNEYS FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P. AND
NEXPOINT ADVISORS, L.P.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | ) | Case No. 19-34054 (SGJ11) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

$I \, NDEX$

## AMENDED DESIGNATION BY NEXPOINT ADVISORS, L.P. AND HIGHLAND
## CAPITAL MANAGEMENT FUND ADVISORS, L.P.
## OF ITEMS FOR THE RECORD ON APPEAL

COME NOW Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors,

L.P. (the "Appellants"), creditors and parties-in-interest in the above styled and numbered

bankruptcy case (the "Bankruptcy Case") of Highland Capital Management, L.P. (the "Debtor"),

and, with respect to their *Notice of Appeal* [docket no. 1957], hereby file their *Amended*

*Designation of Items for the Record on Appeal* (the "Designation") as follows:

| | Item | Bankruptcy Docket Number | Description |
|---|---|---|---|
| | | | **Pleadings and Items on Docket** |
| Vol. 1 00000 1 | 1 | 1957 | Notice of Appeal |
| 000165 000326 | 2 | 1943 | Order (i) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief |
| | 3 | | Docket Sheet of Bankruptcy Case No. 19-34054 |
| Vol. 2 000639 | 4 | 1606 | Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 000 666 | 5 | 1648 | Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| 000675 | 6 | 1656 | Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 000 820 | 7 | 1670 | Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 000870 | 8 | 1719 | Second Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| Vol. 3 000880 | 9 | 1749 | Third Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| 000886 | 10 | 1772 | Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 000901 | 11 | 1791 | Notice of Withdrawal of Certain Executory Contracts and Unexpired Leases from List of Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan |
| 000906 | 12 | 1807 | Debtor's Omnibus Reply to Objections to Confirmation of the Fifth Amended Chapter 11 Plan of Reorganization of Highland Capital Management |
| 001031 | 13 | 1808 | Debtor's Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) |
| Vol. 4 001097 | 14 | 1811 | Notice of Filing Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (with Technical Modifications) |
| Vol. 5 001346 | 15 | 1814 | Debtor's Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |

AMENDED DESIGNATION BY NEXPOINT ADVISORS, L.P. AND HIGHLAND CAPITAL MANAGEMENT
FUND ADVISORS, L.P. OF ITEMS FOR THE RECORD ON APPEAL—Page 2

| | 16 | 1847 | Fourth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
|---|---|---|---|
| | 17 | 1873 | Fifth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| | 18 | 1875 | Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland of Highland Capital Management, L.P. (As Modified) |
| | 19 | 1887 | Supplemental Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| | 20 | 1671 | United States Trustee's Limited Objection to Confirmation of Debtors' Fifth Amended Plan of Reorganization |
| | **Evidence and Transcripts** | | |
| | 21 | 1894 | Transcript of February 2, 2021 Confirmation Hearing |
| | 22 | 1905 | Transcript of February 3, 2021 Confirmation Hearing |
| | 23 | 1917 | Transcript of February 8, 2021 Bench Ruling |
| | 24 | 1794 | All exhibits admitted into evidence during February 2 and February 3, 2021 Confirmation Hearing |
| | | 1795 | |
| | | 1822 | |
| | | 1863 | |
| | | 1866 | |
| | | 1877 | |
| | | 1895 | |
| | | 1915 | |

*Handwritten annotations in left margin:*
Vol 5
001414
001421
001427
001475
001482
001488
001783
002040
002091
002188
Vol 12 - 002931
Vol 50 - 013295
- 013297
Vol. 51 - 013373
Vol. 54 - 014182
Vol. 55 - 014506

✱ 1822 - Vol. 12 — 50 ( 39 VOLUMES)

RESPECTFULLY SUBMITTED this 22d day of March, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    3800 Ross Tower
    500 N. Akard Street
    Dallas, Texas 75201-6659
    Telephone: (214) 855-7500
    Facsimile: (214) 855-7584
    Email:   drukavina@munsch.com

**ATTORNEYS FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P. AND
NEXPOINT ADVISORS, L.P.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 22d day of March, 2021, true and correct copies of this document were electronically served by the Court's ECF system on parties entitled to notice thereof, including on counsel for the Debtor.

By: /s/ Davor Rukavina
    Davor Rukavina, Esq.

```
                  IN THE UNITED STATES BANKRUPTCY COURT
                  FOR THE NORTHERN DISTRICT OF TEXAS
                            DALLAS DIVISION

                                )   Case No. 19-34054-sgj-11
In Re:                          )   Chapter 11
                                )
HIGHLAND CAPITAL                )   Dallas, Texas
MANAGEMENT, L.P.,               )   Wednesday, February 3, 2021
                                )   9:30 a.m. Docket
         Debtor.                )
                                )   CONFIRMATION HEARING [1808]
                                )   AGREED MOTION TO ASSUME [1624]
                                )
                                )   Continued from 02/02/2021
_____)

                      TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                    UNITED STATES BANKRUPTCY JUDGE.
```

WEBEX APPEARANCES:

| | |
|---|---|
| For the Debtor: | Jeffrey Nathan Pomerantz |
| | PACHULSKI STANG ZIEHL & JONES, LLP |
| | 10100 Santa Monica Blvd., |
| | 13th Floor |
| | Los Angeles, CA  90067-4003 |
| | (310) 277-6910 |
| | |
| For the Debtor: | John A. Morris |
| | PACHULSKI STANG ZIEHL & JONES, LLP |
| | 780 Third Avenue, 34th Floor |
| | New York, NY  10017-2024 |
| | (212) 561-7700 |
| | |
| For the Debtors: | Ira D. Kharasch |
| | PACHULSKI STANG ZIEHL & JONES, LLP |
| | 10100 Santa Monica Blvd., |
| | 13th Floor |
| | Los Angeles, CA  90067-4003 |
| | (310) 277-6910 |
| | |
| For the Official Committee | Matthew A. Clemente |
| of Unsecured Creditors: | SIDLEY AUSTIN, LLP |
| | One South Dearborn Street |
| | Chicago, IL  60603 |
| | (312) 853-7539 |

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 2 of 257
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 7 of 313 PageID 4511

2

```
 1    APPEARANCES, cont'd.:

 2    For James Dondero:          Clay M. Taylor
                                  BONDS ELLIS EPPICH SCHAFER
 3                                  JONES, LLP
                                  420 Throckmorton Street,
 4                                  Suite 1000
                                  Fort Worth, TX  76102
 5                                (817) 405-6900

 6    For Get Good Trust and      Douglas S. Draper
      Dugaboy Investment Trust:   HELLER, DRAPER & HORN, LLC
 7                                650 Poydras Street, Suite 2500
                                  New Orleans, LA  70130
 8                                (504) 299-3300

 9    For Certain Funds and       Davor Rukavina
      Advisors:                   Julian Vasek
10                                MUNSCH, HARDT, KOPF & HARR
                                  500 N. Akard Street, Suite 3800
11                                Dallas, TX  75201-6659
                                  (214) 855-7587
12
      For the NexPoint            Lauren K. Drawhorn
13    Parties:                    WICK PHILLIPS
                                  3131 McKinney Avenue, Suite 100
14                                Dallas, TX  75204
                                  (214) 692-6200
15
      For the U.S. Trustee:       Lisa L. Lambert
16                                OFFICE OF THE UNITED STATES
                                    TRUSTEE
17                                1100 Commerce Street, Room 976
                                  Dallas, TX  75242
18                                (214) 767-8967

19    For Scott Ellington,        Debra A. Dandeneau
      Isaac Leventon, Thomas      BAKER & MCKENZIE, LLP
20    Surgent, and Frank          452 Fifth Avenue
      Waterhouse:                 New York, NY 10018
21                                (212) 626-4875

22    For Certain Funds and       A. Lee Hogewood, III
      Advisors:                   K&L GATES, LLP
23                                4350 Lassiter at North Hills
                                    Avenue, Suite 300
24                                Raleigh, NC  27609
                                  (919) 743-7306
25
```

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 3 of 257
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 8 of 313 PageID 4512

3

```
 1  Recorded by:              Michael F. Edmond, Sr.
                              UNITED STATES BANKRUPTCY COURT
 2                            1100 Commerce Street, 12th Floor
                              Dallas, TX  75242
 3                            (214) 753-2062

 4  Transcribed by:           Kathy Rehling
                              311 Paradise Cove
 5                            Shady Shores, TX  76208
                              (972) 786-3063
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24         Proceedings recorded by electronic sound recording;
               transcript produced by transcription service.
25
```

001785

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 4 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 9 of 313   PageID 4513

4

1          DALLAS, TEXAS - FEBRUARY 3, 2021 - 9:38 A.M.

2              THE CLERK:  All rise.  The United States Bankruptcy

3     Court for the Northern District of Texas, Dallas Division, is

4     now in session, the Honorable Stacey Jernigan presiding.

5              THE COURT:  Good morning.  Please be seated.  All

6     right.  We are ready for Day Two of the confirmation hearing

7     in Highland Capital Management, LP, Case No. 19-34054.  I'll

8     just make sure we've got the key parties at the moment.  Do we

9     have Mr. Pomerantz, Mr. Morris, for the Debtor team?

10             MR. POMERANTZ:  Yes.  Good morning, Your Honor.  Jeff

11    Pomerantz for the Debtors.

12             MR. MORRIS:  And I'm here as well, Your Honor.

13             THE COURT:  All right.  Good.

14        All right.  For our objecting parties, do we have Mr.

15    Taylor and your crew for Mr. Dondero?

16             MR. TAYLOR:  Yes, Your Honor.

17             THE COURT:  Good morning.

18        All right.  For Dugaboy Trust and Get Good Trust, do we

19    have Mr. Draper?  (No response.)  All right.  I do see Mr.

20    Draper.  I didn't hear an appearance.  You must be on mute.

21             MR. DRAPER:  I'm present, --

22             THE COURT:  Okay.

23             MR. DRAPER:  -- Your Honor.

24             THE COURT:  Okay.  Good morning.

25             MR. DRAPER:  I'm present, Your Honor.

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21  Entered 02/05/21 17:38:18  Page 5 of 257
Case 3:21-cv-00538-N  Document 26-7  Filed 06/09/21  Page 10 of 313  PageID 4514

5

1          THE COURT:  Good morning.  I heard you that time.

2    Thank you.

3       All right.  And now for what I'll call the Funds and

4    Advisors Objectors, do we have Ms. Rukavina present?

5          MR. RUKAVINA:  Yes, Your Honor.  Good morning.

6          THE COURT:  Good morning.  All right.  And I will

7    check.  Do we have Mr. Clemente or your team there?

8          MR. CLEMENTE:  Yes.  Good morning, Your Honor.  Matt

9    Clemente from Sidley Austin on behalf of the Committee.

10          THE COURT:  All right.  Ms. Drawhorn, do we have you

11    there for the NexPoint Real Estate Partners and related funds?

12          MS. DRAWHORN:  Yes, Your Honor.  Good morning.

13          THE COURT:  Good morning.  All right.  Did I miss --

14    I think that captured all of our Objectors.  Anyone who I've

15    missed?

16       All right.  Well, when we recessed yesterday, Mr. Morris,

17    I think you were about to call your third witness; is that

18    correct?

19          MR. MORRIS:  It is, Your Honor.  But if I may, I'd

20    like to just address the objections to the remaining exhibits,

21    since I hope that won't take too long.

22          THE COURT:  All right.  You may.

23          MR. POMERANTZ:  Actually, Your Honor, before we go

24    there, we filed the supplemental declaration of Patrick

25    Leatham, as we indicated we would do yesterday.  We just

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 6 of 257
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 11 of 313 PageID 4515

6

1    wanted to get confirmation again that nobody intends to cross-

2    examine him, so that he doesn't have to sit through the

3    festivities today.

4          THE COURT: All right. Well, I did see that you

5    filed that.

6      Does anyone anticipate wanting to cross-examine Mr.

7    Leatham, the balloting agent?

8          MR. RUKAVINA: Your Honor, I take it that that

9    declaration is part of the record. As long as the Court

10    confirms that, I do not intend to call the gentlemen.

11          THE COURT: All right. Well, I will take judicial

12    notice of it and make it part of the record. It appears at

13    Docket Entry No. 1887. Again, it was filed -- well, it was

14    actually filed early this morning, I think. So, all right.

15    So, with --

16          MR. MORRIS: And to avoid --

17          THE COURT: Go ahead.

18          MR. MORRIS: To -- I was just going to say, to avoid

19    any ambiguity, Your Honor, the Debtor respectfully moves that

20    document into the evidentiary record.

21          THE COURT: All right. The Court will --

22      (Interruption.)

23          THE COURT: Someone needs to put their phone on mute,

24    perhaps. Unless someone was intentionally speaking.

25      All right. So, I will grant that request. Docket Entry

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 7 of 257
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 12 of 313 PageID 4516

7

1  No. 1887 will be part of the confirmation evidence of this

2  hearing.

3      (Debtor's Patrick Leatham Declaration at Docket 1887 is

4  received into evidence.)

5          THE COURT:  All right.  Anything else?  There were

6  other exhibits I think you were going to talk about?

7          MR. MORRIS:  Yeah.  Let me just go through them one

8  at a time, if I may, Your Honor.

9          THE COURT:  Okay.

10         MR. MORRIS:  All right.  So, I'm going to deal with

11 the transcripts that have been objected to one at a time.  And

12 I'll just take them in order.  The first one can be found at

13 Exhibit B.  It is on Docket No. 1822.

14         THE COURT:  Okay.

15         MR. MORRIS:  Exhibit B is the deposition transcript

16 from the December 16, 2020 hearing on the Advisor and the

17 Funds' motion for an order restricting the Debtor from

18 engaging in certain CLO-related transactions.

19     During that hearing, the Court heard the testimony of

20 Dustin Norris.  Mr. Norris is an executive vice president for

21 each of the Funds and each of the Advisors.

22     We would be offering the transcript for the limited

23 purposes of establishing Mr. Dondero's ownership and control

24 over the Advisors.

25     Mr. Norris also gave some pretty substantial testimony

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 8 of 257
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 13 of 313 PageID 4517

8

1   concerning the so-called independent board of the Funds.

2       And as a general matter, Your Honor, to the extent that

3   the objection is on hearsay grounds, the transcript -- at

4   least the portions relating to Mr. Norris's testimony --

5   simply are not hearsay under Evidentiary Rule 801(d)(2).

6   These are statements of an opposing party, and I think we fall

7   well within that.

8       So, we would respectfully request that the Court admit

9   into the record the transcript from December 16th, at least

10  the portions of which are Mr. Norris's testimony.

11          THE COURT:  All right.  And, again, these appear at

12  -- I think I heard you say B and then E.  Is that correct?

13          MR. MORRIS:  Just B.  Just B at the moment.  B as in

14  boy.

15          THE COURT:  Okay.  Just B at the moment?

16      All right.  Any objections to that?

17          MR. RUKAVINA:  Your Honor, I had objected, but now

18  that it's offered for that limited purpose, I withdraw my

19  objection.

20          THE COURT:  All right.  Then B -- I'm sorry.  Was

21  there anyone else speaking?

22      B will be admitted.  And, again, it appears at Docket

23  Entry 1822.

24      (Debtor's Exhibit B, Docket Entry 1822, is received into

25  evidence.)

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 9 of 257
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 14 of 313 PageID 4518

9

1          MR. MORRIS:  Okay.  Next, the next transcript can be

2    found at Exhibit 6R, and that's Docket 1866.  Exhibit 6R is

3    the transcript of the January 9, 2020 hearing where the Court

4    approved the corporate governance settlement.  We think that

5    that transcript is highly relevant, Your Honor, because it

6    reflects not only Mr. Dondero's notice and active

7    participation in the consummation of the corporate governance

8    agreement, but it also reflects the Court and the parties'

9    views and expectations that were established at that time,

10   such that if anybody contends that there's any ambiguity about

11   any aspect of the order, I believe that that would be the best

12   evidence to resolve any such disputes.

13        So, for the purpose of establishing Mr. Dondero's notice,

14   Mr. Dondero's participation, and the parties' discussions and

15   expectations with regard to every aspect of the corporate

16   governance settlement, including Mr. Dondero's stipulation,

17   the order that emerged from it, and the term sheet, we think

18   that that's properly into evidence.

19          THE COURT:  Any objection?

20        All right.  6R will be admitted.  Again, at Docket Entry

21   1822.

22        (Debtor's Exhibit 6R, Docket Entry 1822, is received into

23   evidence.)

24          MR. MORRIS:  Next, Your Honor, we've got Exhibits 6S

25   as in Sam and 6T as in Thomas.  They're companions.  And they

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 10 of 257
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 15 of 313 PageID 4519

10

1   can be found at Docket 1866.  And those are the transcripts.

2   The first one is from the October 27th disclosure statement

3   hearing, and the second one actually is from the Patrick

4   Daugherty, I believe, lift stay motion.

5       I'll deal with the first one first, Your Honor.  We

6   believe that the transcript of the October 27th hearing goes

7   to the good faith nature of the Debtor's proposed plan.  It

8   shows that the Debtor and the Committee were not always

9   aligned on every interest.  It shows that the Committee, in

10  fact, strenuously objected to certain aspects of the then-

11  proposed plan by the Debtors.  And we just think it goes to

12  the heart of the good faith argument.

13      The transcript for the 28th, we would propose to offer for

14  the limited purpose of the commentary that you offered at the

15  end of that hearing, where Your Honor made it clear that

16  employee releases would not be -- would not likely be

17  acceptable to the Court unless there was some consideration

18  paid.

19      And it was really, frankly, Your Honor's comments that

20  helped spur the Committee and the Debtor to discuss over the

21  next few weeks the resolution of the issues concerning the

22  employee releases.

23      So we're not offering Exhibit 6T for anything having to do

24  with Mr. Daugherty or his claim, but just the latter portion

25  relating to the discussion about the employee releases.  And,

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 11 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 16 of 313   PageID 4520

11

1    with that, we'd move those transcripts into evidence.

2                THE COURT:  Any objection?

3                MR. RUKAVINA:  Your Honor, yes, I do object.  6S is

4    hearsay, and under Rule 804(b)(1) it's admissible only if the

5    witnesses are unavailable to be called.  There's been no

6    suggestion that they're not.

7         As far as 6T, what Your Honor says is not hearsay, so as

8    long as it's just what Your Honor was saying, I do not object

9    to 6T.  I object to the balance of it.

10               THE COURT:  Okay.  What about that objection on 6S?

11               MR. MORRIS:  Yeah.  One second, Your Honor.  I would

12   go to the residual exception to the hearsay rule under 807.

13   807 specifically applies if the statement being offered is

14   supported by sufficient guarantees of trustworthiness and it's

15   more probative on the point -- and the point here is simply to

16   help buttress the Debtor's good faith argument -- and it's

17   more probative on the point than any other evidence.  And I'm

18   not sure what better evidence there would be than an on-the-

19   record discussion between the Debtor and the Committee as to

20   the disputes they were having on the disclosure statement.

21               THE COURT:  All right.  I'm going to overrule the

22   objection and accept that 807 exception as being valid here.

23   So, I am admitting both 6S and 6T.  And for the record, I

24   think you said they appeared at 1866.  They actually appear at

25   1822.

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21    Entered 02/05/21 17:38:18    Page 12 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 17 of 313   PageID 4521

12

1        MR. MORRIS:  Okay, Your Honor.  I am corrected.  It

2   is 6S and 6T, and they are indeed at 1822.  Forgive me.

3        THE COURT:  Okay.

4      (Debtor's Exhibits 6S and 6T, Docket Entry 1822, is

5   received into evidence.)

6        MR. MORRIS:  The next transcript and the last one is

7   6U, which is also at 1822.  6U is the transcript from the

8   December 10th hearing on the Debtor's motion for a TRO against

9   Mr. Dondero.  We believe the entirety of that transcript is

10  highly relevant, and it relates specifically to the Debtor's

11  request for the exculpation, gatekeeper, and injunction

12  provisions of their plan.  And on that basis, we would offer

13  that into evidence.

14        THE COURT:  Any objection?

15        MR. TAYLOR:  Yes, Your Honor.  This is Clay Taylor on

16  behalf of Mr. Dondero.

17      We do object, on the same basis that it is hearsay.  There

18  has certainly been plenty of testimony before this Court and

19  on the record as to why the Debtor believes that its plan

20  provisions are appropriate and allowable, and there's no need

21  to allow hearsay in for that.  All of the witnesses were

22  available to be called by the Debtor.  The Debtor is in the

23  midst of its case and can call whoever else it needs to call

24  to get these into evidence or to get those docs into evidence.

25  And therefore, we don't believe that any residual exception

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 13 of 257
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 18 of 313 PageID 4522

13

1   should apply.

2            THE COURT:  Mr. Morris, your response?

3            MR. MORRIS:  First, Your Honor, any statements made

4   by or on behalf of Mr. Dondero would not be hearsay under

5   801(d)(2).

6       And secondly, there is no other evidence of the Debtor's

7   motion of the -- of the argument that was had.  There is no

8   other evidence, let alone better evidence, than the transcript

9   itself.  And I believe 807 is certainly the best rule to

10  capture that.

11      It is a statement that's supported by sufficient

12  guarantees of trustworthiness.  Again, these are the litigants

13  appearing before Your Honor.  It may not be sworn testimony,

14  but I would hope that everybody is doing their best to comply

15  with the guarantee of trustworthiness in that regard, putting

16  aside advocacy.

17      And it is more probative on the point for which we're

18  offering -- and that is on the very issues of exculpation,

19  gatekeeper, and injunction -- than anything else we can offer

20  in that regard.

21            THE COURT:  All right.  I overrule the objection and

22  I will admit 6U.  Okay.

23      (Debtor's Exhibit 6U, Docket Entry 1822, is received into

24  evidence.)

25            MR. MORRIS:  All right.  Going back to the top, Your

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 14 of 257
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 19 of 313 PageID 4523

14

1    Honor, Companions Exhibit D as in David and E as in Edward,

2    which are at Docket 1822.

3        Exhibit D is an email string that relates to the Debtor's

4    communications with the Creditors' Committee concerning a

5    transaction known as SSP, which stands for Steel Products --

6    Structural and Steel Products.  So that was an asset that the

7    Debtor was selling, trying to sell at a particular point in

8    time.  And Exhibit E is a deck that the Debtor had prepared

9    for the benefit of the UCC.

10        And if we looked that those documents, Your Honor, you'd

11    see that the Debtor was properly following the protocols that

12    were put in place in connection with the January 9th corporate

13    governance settlement.  And the Committee is being informed by

14    the Debtor of what the Debtor intends to do with that

15    particular asset.

16        And the reason that it's particularly relevant here, Your

17    Honor, is Dustin Norris had submitted a declaration in support

18    of their motion that was heard on September -- on December

19    16th.  That declaration is an exhibit to what is Exhibit A on

20    Docket 1822.  Exhibit A on the docket is the Advisor and the

21    Funds' motion.  Okay?  So, Exhibit A is the motion.  Attached

22    to that Exhibit A is an exhibit, which is Mr. Norris's

23    declaration.

24        At Paragraph 9 of Mr. Norris's declaration, he takes issue

25    with the Debtor's process for the sale of that particular

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21    Entered 02/05/21 17:38:18    Page 15 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 20 of 313   PageID 4524

15

1    asset.

2        And so, having admitted already into the record Mr.

3    Norris's declaration, we believe that these documents rebut

4    the statements made in Mr. Norris's declaration, and indeed,

5    were part of the transcript that has now already been admitted

6    into evidence.  So we think the documents are needed because

7    they were exhibits during that hearing.

8            THE COURT:  All right.  Any objection?

9            MR. RUKAVINA:  Your Honor, yes, I object based on

10   authenticity.  This document has not been authenticated, nor

11   has the attachment.  And on hearsay.  And I don't think that

12   the Debtor can introduce one exhibit just to introduce another

13   to rebut the first.

14           THE COURT:  Your response?

15           MR. MORRIS:  You know, in all honesty, I wish that

16   the authenticity objection had been made yesterday and I might

17   have been able to deal with that.

18       These documents have already been admitted by the Court

19   against these very same parties.  I think it would be a little

20   unfair for them now to exclude the document that they had no

21   objection to the first time around.  They clearly relate to

22   Paragraph 9 of Mr. Norris's declaration, which was admitted

23   into evidence in this case without objection.

24           THE COURT:  All right.  I overrule the objection.  D

25   and E are admitted.

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21    Entered 02/05/21 17:38:18    Page 16 of 257
Case 3:21-cv-00538-N    Document 26-7    Filed 06/09/21    Page 21 of 313    PageID 4525

16

1      (Debtor's Exhibits D and E, Docket Entry 1822, is received

2   into evidence.)

3          MR. MORRIS:  Next, Your Honor, we have Exhibits 4D as

4   in David, 4E as in Edward, and 4G as in Gregory.  And those

5   can all be found on Docket 1822.  And to just cut to the

6   chase, Your Honor, these are the K&L Gates letter that were

7   sent in late December and my firm's responses to those

8   letters.

9       Those letters are being offered, again, to support --

10  well, the Debtor contends that, in the context of this case,

11  and at the time and under the circumstances, the letters

12  constituted interference and evinces a disregard for the

13  January 9th order, for Mr. Dondero's TRO, and for the Court's

14  comments at the December 16th hearing.  And they go

15  specifically to the Debtor's request for the gatekeeper,

16  exculpation, and injunction provisions.

17      To the extent that those exhibits contain the letters that

18  were sent on behalf of the Funds and on behalf of the

19  Advisors, they would simply not be hearsay under 801(d)(2).

20  And to the extent the objection goes to my firm's response, I

21  think just as a matter of completeness the Court -- I won't

22  offer them for the truth of the matter asserted.  I'll simply

23  offer the Pachulski responses at those exhibits for the

24  purpose of stating the Debtor's position, without regard to

25  the truth of the matter asserted.

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 17 of 257
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 22 of 313 PageID 4526

17

1          THE COURT:  All right.  Any objection?

2          MR. RUKAVINA:  Your Honor, with that understanding,

3    I'll withdraw my objection to these exhibits.

4          THE COURT:  All right.  So, 4D, 4E, and 4G are

5    admitted.

6       (Debtor's Exhibits 4D, 4E, and 4G, Docket Entry 1822, are

7    received into evidence.)

8          MR. MORRIS:  Next, Your Honor, we've got Exhibit 5T

9    as in Thomas.  That document can be found at Docket No. 1822.

10   Your Honor, that document is a schedule of a long list of

11   promissory notes that are owed to the Debtor by the Advisors,

12   Dugaboy, and Mr. Dondero.  But I think that, upon reflection,

13   I'll withdraw that exhibit.

14         THE COURT:  All right.

15      (Debtor's Exhibit 5T is withdrawn.)

16         MR. MORRIS:  And then, finally, just one last one.  I

17   think Mr. Rukavina objected to Exhibit 7O as in Oscar, which

18   can be found at Docket No. 1877.  Exhibit 7O are the documents

19   that were admitted in the January 21st hearing, and I believe

20   that they all go -- they're being offered to support the

21   Debtor's application for the gatekeeper, exculpation, and

22   injunction provisions.

23         THE COURT:  All right.  7O is being offered.  Any

24   objection?

25         MR. RUKAVINA:  Yes, Your Honor.  I do object.  Those

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21    Entered 02/05/21 17:38:18    Page 18 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 23 of 313   PageID 4527

18

1    are exhibits from a separate adversary proceeding that has not

2    been concluded.  In fact, my witness is still on the stand in

3    that.

4        And I'll note that that's another 20,000 pages that's very

5    duplicative of the current record, and we already are going to

6    have an unwieldy record.  So I question why Mr. Norris -- why

7    Mr. Morris would even need this.

8        So that's my objection, Your Honor.

9            MR. MORRIS:  You know what?  That's a fair point,

10   Your Honor.  And -- that is a fair point, and I guess what I'd

11   like to do is at some point this morning see if I can single

12   out documents that are not duplicative and come back to you

13   with very specific documents.  I think that's a very fair

14   point.

15           THE COURT:  All right.

16           MR. MORRIS:  And with that, Your Honor, I think we've

17   now addressed every single document that the Debtor has

18   offered into evidence, and I believe, other than the

19   withdrawal of --

20           THE COURT:  5T.

21           MR. MORRIS:  -- 5T --

22           THE COURT:  Uh-huh.

23           MR. MORRIS:  -- and the open question on 7O, I

24   believe every single document at Docket 1822, 1866, and 1877

25   has been admitted.  Do I have that right?

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21    Entered 02/05/21 17:38:18    Page 19 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 24 of 313   PageID 4528

19

1          THE COURT:  All right.  Yes, because I did admit

2    yesterday 7F through 7Q, minus 7O, at 1877.  So, yes, I agree

3    with what you just said.

4          MR. RUKAVINA:  Your Honor, I apologize.  And Mr.

5    Morris.  I have that 5S -- or six -- that 5S and 6C, Legal

6    Entities List, have not been admitted.  But if I'm wrong on

7    that, then I apologize.

8          THE COURT:  Okay.  5S was part of 1866, which I

9    admitted entirely.

10       And what was the other thing?

11         MR. RUKAVINA:  I'm counting letters, Your Honor.

12   One, two, three, four.  6D, Legal Entities List, Redacted.

13         THE COURT:  Okay.  6B would have been --

14         MR. RUKAVINA:  D, Your Honor, as in dog.  I'm sorry.

15   6-dog.

16         THE COURT:  Okay.  6D, yeah, that was part of 1822

17   that I admitted *en masse* yesterday.

18         MR. MORRIS:  Yeah, I didn't hear an objection to that

19   one yesterday, and I agree, Your Honor.  My records show that

20   it was already admitted.

21         MR. RUKAVINA:  Then I apologize to the Court.

22         THE COURT:  All right.  Any --

23         MR. MORRIS:  No worries.  Let's get --

24         THE COURT:  Any other housekeeping matters before we

25   go to the next witness?

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 20 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 25 of 313   PageID 4529

20

1          MR. MORRIS:  No, Your Honor.  Not from the Debtor.

2          THE COURT:  Anyone else?

3      All right.  Well, let's hear from the next witness.

4          MR. MORRIS:  All right, Your Honor.  The Debtor calls

5  as its next and last witness Marc Tauber.

6          THE COURT:  All right.  Mr. --

7          MR. MORRIS:  Mr. Tauber, if you're on the phone,

8  please identify yourself.

9      (No response.)

10         THE COURT:  Mr. Tauber, we're not hearing you.

11  Perhaps you are on mute.  Could you unmute your device?

12     (No response.)

13         THE COURT:  All right.  If it's a phone, you need to

14  hit *6.

15     Hmm.  Any -- do you know which caller he is?

16         THE CLERK:  I'm trying to find out.

17         THE COURT:  All right.  We've got well over a hundred

18  people, so we can't easily identify where he is at the moment.

19     All right.  Mr. Tauber, Marc Tauber?  This is Judge

20  Jernigan.  We cannot hear you, so -- all right.  Well, maybe

21  we can --

22         MR. MORRIS:  Can we just take a three-minute break

23  and let me see if I can track him down?

24         THE COURT:  Yes.  Why don't you do that?  So let's

25  take a three-minute break.

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 21 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 26 of 313   PageID 4530

21

1          MR. MORRIS:  Thank you, Your Honor.

2          THE COURT:  Okay.

3      (A recess ensued from 10:02 a.m. until 10:04 a.m.)

4          MR. MORRIS:  Your Honor, if we may, he'll be dialing

5  in in a moment.  But I've been reminded that there is one more

6  exhibit.  It's the exhibit I used on rebuttal yesterday with

7  Mr. Seery.  There was the one document that was on the docket,

8  and that was the Debtor's omnibus reply to the plan

9  objections, where we looked at Paragraph 135, I believe.  And

10 we would offer that into evidence for the purpose of just

11 establishing that the Debtor had given notice no later than

12 January 22nd of its agreement in principle to assume the CLO

13 management contracts.

14      And then the second exhibit that we had offered that I

15 think I suggested could be marked as Exhibit 10A was the email

16 string between my firm and counsel for the CLO Issuers where

17 they agreed to the agreement in principle for the Debtor's

18 assumption of the CLO management contracts.

19      And we would offer both of those documents into evidence

20 as well.

21          THE COURT:  All right.  Any objections?

22      All right.  Well, I will admit them.

23      As far as this email string with the CLO Issuers that you

24 called 10A, does that appear on the docket?  I remember you

25 putting it on the screen, but, if not, you'll need to file a

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 22 of 257
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 27 of 313 PageID 4531

22

1    supplement to the record, a supplemental exhibit.

2            MR. MORRIS:  We will, Your Honor.  We'll do that for

3    both of those exhibits.

4            THE COURT:  And then as -- okay, for both?  Because I

5    -- I've read that reply, and I could reference the docket

6    number if we need to.

7            MR. MORRIS:  We'll clean that up, Your Honor.

8            THE COURT:  Okay.

9        (Debtor's Exhibit 10A is received into evidence.)

10       (Clerk advises Court re new caller.)

11           THE COURT:  Oh, okay.  Just a minute.  I was looking

12   up something.

13       (Pause.)

14           THE COURT:  All right.  Well, you're going to file --

15   hmm, I really wanted to just reference where that reply brief

16   appears on the record.  There were a heck of a lot of things

17   filed on January 22nd.

18       (Interruption.)

19           THE COURT:  Okay.  We'll --

20           MR. MORRIS:  All right.  We're just going to need one

21   more minute with Mr. Tauber.  It's my fault, Your Honor.

22           THE COURT:  Okay.

23           MR. MORRIS:  I didn't send him easily-digestible

24   dial-in instructions.  He'll be just a moment.

25           THE COURT:  Okay.

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 23 of 257
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 28 of 313 PageID 4532

23

1      (Court confers with Clerk regarding exhibit.)

2           THE COURT:  Oh, it's at 1807?  Okay.  So, the reply

3   brief that we talked about Paragraph 35, that is at Docket No.

4   1807.  Okay?  All right.

5      (Debtor's Omnibus Reply to Plan Objections, Docket 1807,

6   is received into evidence.)

7      (Pause.)

8           MR. TAUBER:  Hi.  It's Marc Tauber.

9           THE COURT:  All right.

10          MR. MORRIS:  Excellent.

11          THE COURT:  Mr. Tauber, this is Judge Jernigan.  I

12  can hear you, but I can't see you.  Do you have a video --

13          MR. TAUBER:  Yeah, I don't know why it's not working.

14          THE COURT:  Hmm.

15          MR. TAUBER:  I'm on WebEx all day.  Usually it works

16  no problem.

17          THE COURT:  Okay.  Well, do you want to give it

18  another try or two?

19          MR. TAUBER:  Yeah.  It looks like it's starting to

20  come up.  It's all -- pictures, so --

21          THE COURT:  Okay.

22          MR. TAUBER:  -- hopefully you'll be able to see me in

23  a second.

24          THE COURT:  Okay.  The first thing I'm going to need

25  to do is swear you in, so we'll see if the video comes up here

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 24 of 257
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 29 of 313 PageID 4533

24

1  in a minute.

2            MR. TAUBER:  Okay.

3            THE COURT:  Can you see us, Mr. Tauber?

4            MR. TAUBER:  I can see four people.  The rest are

5  just names still.

6            THE COURT:  Okay.

7            MR. TAUBER:  I can go out and try to come back in, if

8  you think that's --

9            THE COURT:  I'm afraid of losing you.  So, your

10  audio, is it on your phone or is it on --

11            MR. TAUBER:  No.

12            THE COURT:  -- a computer?

13            MR. TAUBER:  On the computer.  Yeah.

14            THE COURT:  Okay.  So you're coming through loud and

15  clear on your computer.

16            MR. TAUBER:  Yeah.  Like I said, we use WebEx for

17  work, so I have them on all day long without any issues,

18  typically.

19            THE COURT:  Okay.

20        (Court confers with Clerk.)

21            THE COURT:  Okay.  Our court reporter thinks it's a

22  bandwidth issue on your end, so I don't --

23            MR. TAUBER:  There's only two of us here at home on

24  the line right now, so I don't know why.  It looks like it's

25  trying to come in, and then just keeps --

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 25 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 30 of 313   PageID 4534

Tauber - Direct                    25

 1            THE COURT:  I at least see your name on the screen
 2    now, which I did not before.
 3            MR. TAUBER:  Yeah.
 4            THE COURT:  So hopefully we're going to -- ah.  We
 5    got you.
 6            MR. TAUBER:  There it is.
 7            THE COURT:  All right.
 8            MR. TAUBER:  Yeah.
 9            MR. MORRIS:  There we go.
10            MR. TAUBER:  I might lose you, though.  Give me one
11    second, because I have a thing saying the WebEx meeting has
12    stopped working.  Let me close that.
13            THE COURT:  Okay.  We've still got you.  Please raise
14    your right hand.
15            MR. TAUBER:  Okay.
16               MARC TAUBER, DEBTOR'S WITNESS, SWORN
17            THE COURT:  All right.  Thank you.  Mr. Morris?
18            MR. MORRIS:  Thank you, Your Honor.
19                         DIRECT EXAMINATION
20    BY MR. MORRIS:
21    Q    Good morning, Mr. Tauber.
22    A    Good morning.
23    Q    I apologize for the delay in getting you the information.
24    Are you currently employed, sir?
25    A    Yes, sir.

Tauber - Direct                    26

1    Q    By whom?

2    A    Aon Financial Services.

3    Q    And does Aon Financial Services provide insurance

4    brokerage services among its services?

5    A    Yes.

6    Q    And what position do you currently hold?

7    A    Vice president.

8    Q    How long have you been a vice president at Aon?

9    A    Since October of 2019.

10   Q    Can you just describe for the Court generally your

11   professional background?

12   A    Sure.  I spent about 20 years on Wall Street, working in a

13   variety of jobs, in research, trading, and as the COO of a

14   hedge fund.  And then in 2010 I switched to the insurance

15   world.  I was an underwriter for ten-plus years for Zurich and

16   QBE.  And then in 2019 switched to the brokering side for Aon.

17   Q    And what are your duties and responsibilities as a vice

18   president at Aon?

19   A    Well, we're responsible or my team and I are responsible

20   for creating bespoke insurance programs, focusing on D&O and

21   E&O insurance for our insureds.

22   Q    And what is, for the benefit of the record, what do you

23   mean by bespoke insurance program?

24   A    Well, each client is different, so the programs and the

25   policies that we put in place might be off-the-shelf policies,

001808

Tauber - Direct                    27

1    but we endorse and amend them as needed to meet the needs of

2    the individual client.

3    Q    And during your work, both as an underwriter and now as a

4    broker, have you familiarized yourself with the market for D&O

5    and E&O insurance policies?

6    A    Yes.

7    Q    All right.  Let's talk about the early part of this case.

8    Did there come a time in early 2020 when Aon was asked to

9    place insurance on behalf of the board of Strand Advisors?

10   A    Yes.

11   Q    Can you describe for the Court how that came about?

12   A    Sure.  One of our account executives, a man by the name of

13   Jim O'Neill, had a relationship with a man named John Dubel,

14   who was one of the appointees to serve on -- as a member of

15   Strand, which was being appointed, as we understood it, to be

16   the general partner of Highland Capital Management by the

17   Bankruptcy Court.  And they -- we had done -- or, Jim and John

18   had a longstanding relationship.  I had actually underwritten

19   an account for a previous appointment of John's when I was an

20   underwriter, so I had some familiarity with John as well, and

21   actually brokered a subsequent deal for John at Aon.

22        So I had, again, some familiarity with John, and we were,

23   you know, tasked with going out and finding a program for

24   Strand.

25   Q    Can you describe what happened next?  How did you go about

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21    Entered 02/05/21 17:38:18    Page 28 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 33 of 313   PageID 4537

Tauber - Direct                          28

1    accomplishing that task?

2    A    So, there are a number of markets or insurance companies

3    that provide management liability insurance, which this was a

4    management liability-type policy.  D&O is a synonym for

5    management liability, I guess you'd say.  And we approached

6    the, I think, 14 or 15 markets that we knew to provide

7    insurance in this space and that would be willing to buy the

8    type of policy we were seeking and have interest in a risk

9    like this, which had a little hair on it.  Obviously, there

10   was the Dondero involvement, as well as the bankruptcy.

11   Q    As part of that process, did you and your firm put

12   together a package of information for prospective interested

13   parties?

14   A    Yes.

15   Q    Can you describe for the Court what was contained in the

16   package?

17   A    Had the *C.V.s*, some relevant pleadings from the case,

18   court order.  I'd have to go back and look exactly.  But sort

19   of just general, you know, general information that was

20   available about the situation at hand and Strand's

21   appointment.

22   Q    And the court order that you just mentioned, is that the

23   one that had that gatekeeper provision in it?

24   A    Correct.

25   Q    And can you explain to the Court why you and your team

001810

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 29 of 257
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 34 of 313 PageID 4538

Tauber - Direct                    29

1  decided to include the order with the gatekeeper provision in

2  the package that you were delivering to prospective carriers?

3  A    Sure.  In our initial conversations to discuss our

4  engagement, the gatekeeper function was explained to us by

5  John.  And I'm not sure who else was on the initial call.

6  And, but it was explained to us that I guess Judge Jernigan

7  would sit as the gatekeeper between any potential claimant

8  against the insureds and, you know, would basically have to

9  approve any claim that would be made against (indecipherable),

10  which would thereby prevent any frivolous claims from

11  happening.

12  Q    All right.  Let's just talk for a moment.  How did you and

13  your firm decide which underwriters to present the package to?

14  A    Again, you know, I -- my background, or my Wall Street

15  background, obviously, sort of made me have a -- it was very

16  unique for the insurance world when I switched over, so I had

17  sort of risen to a certain level of expertise within the

18  space.  And, you know, our team also is very experienced, and

19  decades of experience in the insurance world.  So we're very

20  familiar with the markets that are willing to provide these

21  types of policies and the markets that would be likely to take

22  a look at a risk such as this.

23  Q    Okay.  You mentioned that there was -- I think your words

24  were a little hair on this, and one of the things you

25  mentioned was bankruptcy.  How did the fact that Strand was

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 30 of 257
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 35 of 313 PageID 4539

Tauber - Direct                                    30

1    the general partner of a debtor in bankruptcy impact your

2    ability to solicit D&O insurance?

3    A    Well, it's just not a plain vanilla situation, so people

4    are somewhat, you know, are -- I think -- so, the type of

5    insurance, D&O insurance, that we write is very different from

6    auto insurance, as an example.  Auto insurance, people expect

7    there to be a certain amount of claims, and they expect the

8    premiums to cover the claims plus the expenses and then

9    provide them a reasonable profit on top of that.

10       Our insurance is really much more by binary.  The

11   expectation for underwriters is that they will be completing

12   ignoring -- or, avoiding risk at all costs, wherever possible.

13   So anytime there is a situation that looks a little risky, so

14   the premium might be a little higher, the deductible might be

15   a little higher, but, again, the underwriters are really

16   making a bet that they will not have a claim.  Because the

17   premiums pale in comparison to the limits that are available

18   to the policyholder.

19   Q    And so --

20   A    So, -- I'm sorry.  What were you going to say?

21   Q    I didn't mean to interrupt.

22   A    Yeah.

23   Q    Have you finished your answer?

24   A    Sure.

25   Q    Okay.  So, were some of the 14 or 15 markets that you

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 31 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 36 of 313   PageID 4540

Tauber - Direct                          31

1   contacted reluctant to underwrite because there was a

2   bankruptcy ongoing?

3   A    Well, I think that probably -- I mean, there are certain

4   markets that we didn't go to in the beginning because they

5   would be very reluctant to write a risk that had that kind of

6   hair on it, based on our experience from dealing with them.

7   And, you know, I think the bankruptcy was certainly a little

8   bit of an issue.  And then, obviously, as people did their

9   research and -- or if they weren't already familiar with

10  Highland and got to know, you know, got -- I will just say for

11  a simple Google search and learned a little bit about Mr.

12  Dondero, I think there was definitely some significant

13  reluctance to write this program.

14  Q    Was the fact that the Debtor -- was the fact that the

15  Debtor is a partnership an issue that came up, in your -- in

16  your process?

17  A    There are certainly some carriers who won't write what's

18  known as general partnership liability insurance.  So, yes,

19  that is part of that.  It was part of the limiting factor in

20  terms of who we went to.

21  Q    Okay.  And, finally, you mentioned Mr. Dondero.  What role

22  did he play in your ability to obtain insurance for the Strand

23  board?

24  A    Well, that's a very significant role.  As, you know, as

25  mentioned, the underwriters are very risk-averse, so the

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 32 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 37 of 313   PageID 4541

Tauber - Direct                    32

1    litigiousness of Mr. Dondero is a very strong red flag

2    prohibiting a number of people from writing the insurance at

3    all.  And the ones that were writing, that were willing to

4    provide options, were looking for protections from Mr.

5    Dondero.

6    Q    And what kind of protections were they looking for?

7    A    Well, the gatekeeper function was a key factor.  That was

8    really the only way we could even start a conversation with

9    any of the people that we were able to engage.  And in

10   addition, they wanted a, you know, sort of a belts and

11   suspenders additional protection of having an exclusion

12   preventing any litigation brought by or on behalf of Mr.

13   Dondero.

14   Q    Were you able to identify any carrier who was prepared to

15   underwrite D&O insurance for Strand without the gatekeeper

16   provision or without a Dondero exclusion?

17   A    We were not.

18   Q    Okay.  Let's fast-forward now.  Has your firm been

19   requested to obtain professional management insurance for the

20   contemplated post-confirmation debtor entities and individuals

21   associated with those entities?

22   A    Yes.

23   Q    Okay.  So let's just talk about the entities first, the

24   Claimant Trust and the Litigation Trust.  In response to that

25   request, have you and your team gone out into the marketplace

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 33 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 38 of 313   PageID 4542
Tauber - Direct                    33

1    to try to find an underwriter willing to underwrite a policy

2    for those entities?

3    A    Yes.

4    Q    And have you been able to find any carrier who's willing

5    to provide coverage for the Claimant Trust and the Litigation

6    Trust?

7    A    Yes.

8    Q    And how many -- how many have expressed a willingness to

9    do that?

10   A    Two.

11   Q    And have those two carriers indicated that there would be

12   conditions to coverage for the entities?

13   A    Both will require a -- the continuation of the gatekeeper

14   function, as well as a Dondero exclusion.

15   Q    Okay.  Have you also been tasked with the responsibility

16   of trying to find coverage for the individuals associated with

17   the Claimant Trust and the Litigation Trust, meaning the

18   Claimant Trustee, the Litigation Trustee, and the Oversight

19   Board?

20   A    Yes.  So we did it concurrently.

21   Q    Okay.  So, are the two firms that you just mentioned

22   willing to provide insurance for the individuals as well as

23   the entities?

24   A    Correct.  With the same stipulations.

25   Q    They require -- they both require the gatekeeper and the

001815

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 34 of 257
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 39 of 313 PageID 4543
Tauber - Direct                    34

1    Dondero exclusion?

2    A    That's correct.

3    Q    Is there any other firm who has indicated a willingness to

4    consider providing D&O insurance for the individuals?

5    A    There is one that is willing to do so, as long as the

6    gatekeeper function remains in place.  They have indicated

7    that if the gatekeeper function was to be removed, that they

8    would then add a Dondero exclusion to their coverage.

9    Q    So is there any insurance carrier that you're aware of who

10   is prepared to insure either the individuals or the entities

11   without a gatekeeper provision?

12   A    No.

13   Q    And that last company, I just want to make sure the record

14   is clear:  If the gatekeeper provision is overturned on appeal

15   or is otherwise not effective, do you have an understanding as

16   to what happens to the insurance coverage?

17   A    They will either add an exclusion for any claims brought

18   by or on behalf of Mr. Dondero or cancel the coverage

19   altogether.

20         MR. MORRIS:  I have no further questions, Your Honor.

21         THE COURT:  All right.  Cross of this witness?

22                        CROSS-EXAMINATION

23   BY MR. RUKAVINA:

24   Q    Mr. Tauber, I'm a little confused.  So, the insurance

25   that's being written now for the post-bankruptcy entities, did

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21    Entered 02/05/21 17:38:18    Page 35 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 40 of 313   PageID 4544

Tauber - Cross                              35

1    I hear you say that there is one carrier that would give that

2    insurance subject to having a Dondero exclusion?

3    A    So, first of all, there's nothing currently being written.

4    We have solicited quotes.  So, just to make sure that that --

5    I want to make sure that's clear.

6        We have three carriers that are willing to provide varying

7    levels of coverage.  All three will only do so with the

8    existence of the gatekeeper function continuing to be in

9    place.  One of the three has -- two of those three will also

10   provide the coverage with -- even with the gatekeeper function

11   and the Dondero exclusion.  The third one was not requiring a

12   Dondero exclusion unless the gatekeeper function goes away.

13   Q    Okay.  So the third one, you believe, will, whatever the

14   term is, write the insurance or provide the coverage without a

15   gatekeeper, as long as there is a strong Dondero exclusion?

16   A    No.  Their initial requirement is that the gatekeeper

17   function remains in place.  That is their preferred option.

18   If the gatekeeper function is removed, then they will add a

19   Dondero exclusion in place of the gatekeeper exclusion.  In

20   addition, that carrier is only willing to provide coverage for

21   the individuals, not for the entities.

22   Q    Okay.  Thank you.

23           MR. RUKAVINA:  I'll pass the witness, Your Honor.

24           THE COURT:  All right.  Other cross?

25           MR. TAYLOR:  Clay Taylor on behalf of Mr. Dondero.

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 36 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 41 of 313   PageID 4545

Tauber - Cross                          36

1          THE COURT:  Okay.

2                       CROSS-EXAMINATION

3   BY MR. TAYLOR:

4   Q    Good morning, Mr. Tauber.

5   A    Good morning.

6   Q    Are you generally familiar with placing D&O insurance at

7   distressed debt level private equity firms?

8   A    I am familiar with it probably more from the underwriting

9   side, and I also worked at a fund that was distressed and had

10  to be liquidated, so I -- as the COO, so I have a fair amount

11  of familiarity, yes.

12  Q    Okay.  Before taking this to market for the first time for

13  the pre-confirmation policies that you have in place, did your

14  firm conduct any due diligence or analysis of comparing the

15  amount of litigation the Highland entities and Mr. Dondero

16  were involved in as compared to other comparable firms in the

17  marketplace?  Say, you know, Apollo, Fortress, Cerberus, other

18  similar market participants?

19  A    Well, it wouldn't really be our role as the broker.

20  That's the role of the underwriter.

21  Q    Are you familiar if any of the underwriters undertook any

22  such analysis?

23  A    I would assume that they did, since they all had concerns

24  about Mr. Dondero almost immediately.

25  Q    Do you have any -- you didn't conduct any personal due

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21    Entered 02/05/21 17:38:18    Page 37 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 42 of 313   PageID 4546

Tauber - Cross                                    37

1   diligence on comparing the amount of litigation that the

2   Highland entities were involved in as compared to, say,

3   Fortress, do you?

4   A    Well, again, that wouldn't really be my role as the

5   broker.  But I will say that I used to write the primary

6   insurance for Fortress Investment Group when I was at Zurich.

7   So I'm extremely familiar with Fortress, to use your example,

8   and I would say that the level of litigation at Fortress was

9   much, just out of personal knowledge, was significantly less

10  than I had encountered or than I had read about at Highland.

11  Q    That you have read about?  Is that based upon a number of

12  cases where Fortress was a plaintiff as compared to Highland

13  was a plaintiff?  Over what time period?

14  A    Again, not my role.  Not something that I've done.  I'm

15  just generally familiar with Fortress and I'm generally

16  familiar with Highland.

17  Q    All right.  So you're generally familiar and you say that

18  -- you're telling me and this Court that Fortress is involved

19  in less litigation.  Could you quantify that for me, please?

20  A    No, but it's really irrelevant to the situation at hand.

21  The issue is not my feelings whatsoever.  The issue is the

22  underwriters' feelings and their concern with Mr. Dondero, not

23  mine or anybody else's.

24  Q    So, I appreciate your answer and thank you for that, but I

25  believe the question that was before you is, have you

quantitatively -- do you have any quantitative analysis by which you can back up the statement that Fortress is less litigious than Highland?
A I wouldn't even try, no.
Q Okay. Do you have any quantitative analysis for -- that Cerberus is any less litigious than Highland?
A I don't have any real knowledge of Cerberus's litigiousness.
Q Same question as to Apollo.
A Again, the Fortress, you just happened to mention Fortress, which was a special case because I used to be their primary underwriter. I don't have any specific -- I'm not a claims attorney. I don't have any specific knowledge of the level of litigiousness.
And, again, it's not up to me, my decision. It's the underwriters' decision of whether or not they're willing to write the coverage, not mine.
Q You mentioned that the -- when you took this out to market, it had a little hair on it. Correct?
A Correct.
Q And you put together a package of materials that you sent out to 14 or 15 market participants; is -- did I get that correct?
A Yes.
Q And in that package, you had certain pleadings, including

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 39 of 257
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 44 of 313 PageID 4548

Tauber - Cross                                    39

1    the court order, correct?

2    A    Yes.  I believe that's correct.

3    Q    And that was after your initial conversation with John and

4    -- where he pointed out the gatekeeper role.  Correct?

5    A    Correct.

6    Q    And so when you went out to market, presumably you

7    highlighted the gatekeeper role to all the people you

8    solicited offers from because you thought it included less

9    risk, correct?

10   A    It offered a level of protection that was not -- that's

11   not common.  So it's, yes, it's a huge selling point for the

12   risk.

13   Q    Okay.  So, to be clear, you never went out to the market

14   to even see if you could get underwriting the first time

15   without the gatekeeper function; is that correct?

16   A    Well, it's my job as a broker to present the risk in the

17   best possible light.  So if we have a fact that makes the risk

18   a better write for the underwriters, we, of course, will

19   highlight it.  So, no, I did not do that.

20   Q    Okay.  So, the quick answer to the question is no, you did

21   not go out and solicit any bids without the gatekeeper

22   function?

23   A    Correct.

24   Q    When you have approached the market for the post-

25   confirmation potential coverage, did you approach the same 14

001821

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 40 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 45 of 313   PageID 4549

Tauber - Cross                         40

1    or 15 parties that you did before?

2    A    I don't have the two lists in front of me.  They would

3    have been vastly similar, yes.

4    Q    Okay.  And so, again, all of the 14 or 15 parties or the

5    lists that you solicited were already familiar with the

6    gatekeeper function, correct?

7    A    Yes.

8    Q    And so therefore they already had that right; they're not

9    going to trade against themselves and therefore say that,

10   without it, we'll go ahead and write coverage.  Correct?

11   A    I -- I -- it'd be hard to answer that question.  I don't

12   know.

13   Q    Okay.  Because you didn't try that, did you?

14   A    I would have had no reason to, no.

15   Q    Okay.  So you don't know if a market exists without the

16   gatekeeper function because you haven't asked, have you?

17   A    I guess that's fair, yeah.

18          MR. TAYLOR:  I have no further questions.

19          THE COURT:  All right.  Any other Objectors with

20   cross-examination?

21          MR. DRAPER:  I have no questions for the witness,

22   Your Honor.

23          THE COURT:  All right.  Anyone else?  Mr. Morris,

24   redirect?

25          MR. MORRIS:  Just one.

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21  Entered 02/05/21 17:38:18  Page 41 of 257
Case 3:21-cv-00538-N  Document 26-7  Filed 06/09/21  Page 46 of 313  PageID 4550

Tauber - Redirect                           41

1                    REDIRECT EXAMINATION

2   BY MR. MORRIS:

3   Q   One question, Mr. Tauber.  Is there any -- do all

4   underwriters -- any underwriters for Fortress require, as a

5   condition to underwriting the D&O insurance, require a

6   gatekeeping provision?

7   A    In my, you know, 11, 12 years of experience in this

8   industry, in this space, I have never seen that gatekeeper

9   function be available, as an underwriter or as a broker.  So,

10  no.

11          MR. MORRIS:  No further questions, Your Honor.

12          THE COURT:  Any recross on that redirect?

13      All right.  Well, Mr. Tauber, you are excused.  We thank

14  you for your testimony today.  So you can log off.

15          THE WITNESS:  Thank you.

16          THE COURT:  Okay.

17      (The witness is excused.)

18          THE COURT:  Mr. Morris, does the Debtor rest?

19          MR. MORRIS:  The Debtor does rest, Your Honor.

20          THE COURT:  All right.  Well, what are we going to

21  have from the Objectors as far as evidence?

22          MR. RUKAVINA:  Your Honor, I will be very short.  I

23  will call Mr. Seery for less than ten minutes.  I will call

24  Mr. Post for less than ten minutes.  I will have one exhibit.

25  And I think that that's it for all the Objectors, unless I'm

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 42 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 47 of 313   PageID 4551

42

1    mistaken, gentlemen.

2          MR. TAYLOR:  Your Honor, I had one witness, Mr.

3    Sevilla, under subpoena to testify, and needed a brief moment

4    to discuss with my colleagues whether we're going to call him,

5    and if so, put him on notice that he would be coming up

6    probably about -- I don't know your schedule, Your Honor, but

7    probably, I'm guessing, either before lunch or after, and I

8    need to let him know that also.

9       So I do need a brief three to five minutes to confer with

10   my colleagues and some direction from the Court to, if we

11   decide to call him, as to when we would tell him to be

12   available.

13         THE COURT:  All right.  Well, before I get to that,

14   Mr. Draper, do you have any witnesses?

15         MR. DRAPER:  I do not.

16         THE COURT:  All right.  Well, let's see.  It's 10:34.

17   We're making good time this morning.  If Seery is truly ten

18   minutes of direct, and Post is truly ten minutes of direct,

19   and I don't know how long the documentary exhibits are going

20   to take, it sounds to me like we are very likely to get to Mr.

21   Sevilla before a lunch break.

22      So if you want to -- you know, I don't know what that

23   involves, you sending text messages or making a quick phone

24   call.  Do you need a five-minute break for that?

25         MR. TAYLOR:  Yes, Your Honor.  It involves a phone

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 43 of 257
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 48 of 313 PageID 4552

43

1    call and an email.  Just a confirmatory phone call just to

2    make sure that the guy -- just so you know who he is, he is

3    actually a Highland employee, but he's represented by separate

4    counsel, and so we do need to go through him just because

5    that's the right thing to do.

6          THE COURT:  All right.  Well, again, I mean, I never

7    know how long cross is going to take, but I'm guessing, you

8    know, we're going to get to him in an hour or so, if not

9    sooner, it sounds like.  So, all right.  So, do we need a

10   five-minute break?

11         MR. RUKAVINA:  And Your Honor, it might make more

12   sense to make it a ten-minute break.  I suspect that Mr.

13   Taylor will be able to release his witness if he and I will

14   just be able to talk.  So I would ask the Court's indulgence

15   for a ten-minuter.

16         THE COURT:  Okay.  We'll take a ten-minute break.

17   We'll come back at 10:46 Central time.

18         THE CLERK:  All rise.

19     (A recess ensued from 10:36 a.m. until 10:46 a.m.)

20         THE CLERK:  All rise.

21         THE COURT:  Please be seated.  We're going back on

22   the record in the Highland confirmation hearing.  Are the

23   Objectors ready to proceed?

24         MR. RUKAVINA:  Your Honor, Davor Rukavina.  We are.

25         THE COURT:  All right.  Well, Mr. Rukavina, are you

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 44 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 49 of 313   PageID 4553

44

1    going to call your witnesses first?

2            MR. RUKAVINA:  Yes, I will.  Before that, if it might

3    help the Court and Mr. Morris:  Mr. Morris, with respect to

4    that last exhibit, I do not object to the admission of any of

5    the exhibits that were admitted at that PI hearing.

6        But I do think, Your Honor, for the record, that -- and I

7    would ask Mr. Morris that he should refile those exhibits here

8    in this case, except for those that are duplicative.  Because,

9    again, there's 10,000 pages of indentures, et cetera.

10           MR. MORRIS:  Thank you very much, sir.

11       Your Honor, if that's acceptable to you, we'll do that as

12   soon as possible.

13           THE COURT:  All right.  And let me make sure the

14   record is clear.  Are we talking about what you've described

15   as 7O?  I'm getting mixed up now.  Am I --

16           MR. MORRIS:  Yes, Your Honor.

17           THE COURT:  Okay.

18           MR. MORRIS:  It's 7O, which is the documents that

19   were introduced into evidence in the prior hearing.  And Mr.

20   Rukavina is exactly right, that there is substantial overlap

21   between that and other documents that have already been

22   admitted in the record in this case.  So we'll just file an

23   abridged version of Exhibit O that only includes non-

24   duplicative documents.

25           THE COURT:  All right.  So that will be admitted, and

Seery - Direct                    45

1    we'll look for your filed abridged version to show up on the

2    docket.  7O.

3        (Debtor's Exhibit 7O is received into evidence as

4    specified.)

5            THE COURT:  All right.  What's next?

6            MR. RUKAVINA:  Your Honor, Jim Seery, please.  Mr.

7    James Seery.

8            THE COURT:  All right.  Mr. Seery, welcome back.

9    Please raise your right hand.

10           MR. SEERY:  Can you -- can you hear me, Your Honor?

11           THE COURT:  I can now.

12     JAMES P. SEERY, CERTAIN FUNDS AND ADVISORS' WITNESS, SWORN

13           THE COURT:  All right.  Thank you.

14       Mr. Rukavina, go ahead.

15                     DIRECT EXAMINATION

16   BY MR. RUKAVINA:

17   Q   Mr. Seery, --

18           MR. RUKAVINA:  Thank you.

19   BY MR. RUKAVINA:

20   Q   Mr. Seery, good morning.

21           MR. RUKAVINA:  Mr. Vasek, if you'll please pull up

22   the schedules.

23       What we have here, Your Honor, is Docket 247, the Debtor's

24   schedules.  I'd ask the Court to take judicial notice of it.

25           THE COURT:  All right.  The Court will do so.

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 46 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 51 of 313   PageID 4555

Seery - Direct                                    46

 1  BY MR. RUKAVINA:

 2  Q    Mr. Seery, are you familiar with these entities listed

 3  here on the Debtor's schedules?

 4  A    Generally.  Each one a little bit different.

 5  Q    Okay.  Do you agree that the Debtor still owns equity

 6  interests in these entities?

 7  A    I believe it does, yes.

 8  Q    Okay.  Is it true that none of these entities are publicly

 9  traded?

10  A    I don't believe any of these are publicly-traded entities,

11  no.

12  Q    Okay.  And none of these, to your knowledge, are debtors

13  in this bankruptcy case, right?

14  A    No.  We only have one debtor in the case.

15  Q    Okay.  So, Highland Select Equity Fund, LP, the Debtor

16  owns more than 20 percent of the equity in that entity, right?

17  A    I believe the Debtor owns the majority of that entity.

18  That is a fund with an on- and offshore feeder.  And I, off

19  the top of my head, don't recall exactly how the allocations

20  of equity work.  But I believe we do.

21  Q    Does 67 percent refresh your memory?  Are you prepared to

22  say that the Debtor owns 67 percent of that equity?

23  A    I'm not prepared to say that, no.

24  Q    Okay.  Wright, Ltd.  Does the Debtor own more than 20

25  percent of that equity?

001828

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 47 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 52 of 313   PageID 4556
Seery - Direct                          47

1    A    There's about -- I don't recall.  There's about at least

2    25 artist, designers, or designs.  Wright, AMES, Hockney,

3    Rothco, all own in different places, and they all own in turn

4    some other thing.  So I don't know what each of them, off the

5    top of my head, own.  There's -- they're part of a myriad of

6    corporate structures here.

7    Q    Strak, Ltd.  Do you know whether the Debtor owns more than

8    20 percent of the equity of that entity?

9    A    Stark?  I don't know.

10   Q    Okay.  I don't know how to pronounce the next one.  Eamis

11   (phonetic) Ltd.  Do you know whether the Debtor owns more than

12   20 percent of that equity?

13   A    Off the top of my head, I don't recall.

14   Q    What about Maple Avenue Holdings, LLC?

15   A    I believe, I don't know if it's directly or indirectly,

16   that we own a hundred percent of that entity.  But I'm not

17   sure.

18   Q    What about Highland Capital Management Korea, Ltd.?

19   A    Effectively, Highland Capital Management is owned a

20   hundred percent.

21   Q    What about Highland Capital Management Singapore Pte.

22   Ltd.?

23   A    We are in the process of shutting it down, so I don't know

24   that -- what the equity percentages are.  It's really just a

25   question -- it's -- it's dissolved save for a signature from a

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 48 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 53 of 313   PageID 4557

Seery - Direct                    48

1   Singaporean.

2   Q   Okay.  But did the Debtor own more than 20 percent of that

3   entity?

4   A   I don't know the specific allocations of equity ownership.

5   Q   Okay.  What about Pennant (phonetic) Management, LP?  Do

6   you know whether the Debtor owns or owned more than 20 percent

7   of that entity?

8   A   I don't recall, no.

9         MR. RUKAVINA:  You can take that exhibit down, Mr.

10  Vasek.

11  BY MR. RUKAVINA:

12  Q   Mr. Seery, very quick, are you familiar with Bankruptcy

13  Rule 2015.3?

14  A   I am, yes.

15  Q   Okay.  Has the Debtor filed any Rule 2015.3 statements in

16  this case?

17  A   I don't believe we have.

18  Q   Okay.

19        MR. RUKAVINA:  Thank you, Your Honor.  I'll pass the

20  witness.

21        THE COURT:  All right.  Any other Objector

22  questioning?  None from Mr. Taylor, none from Mr. Draper, none

23  from Ms. Drawhorn?

24     All right.  Any cross -- any examination from you, Mr.

25  Morris?

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 49 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 54 of 313   PageID 4558

Seery - Cross                              49

1          MR. MORRIS:  Just one question.

2          THE COURT:  Go ahead.

3                          CROSS-EXAMINATION

4    BY MR. MORRIS:

5    Q    Mr. Seery, do you know why the Debtor has not yet filed

6    the 2015.3 statement?

7    A    I have a recollection of it, yes.

8    Q    Can you just describe that for the Court?

9    A    When we -- when we initially filed, when the Debtor filed

10   and it was transferred over, we started trying to get all the

11   various rules completed.  There are, as the Court is aware, at

12   least a thousand and maybe more, more like three thousand,

13   entities in the total corporate structure.

14        We pushed our internal counsel to try to get that done,

15   and were never able to really get it completed.  We did not

16   have -- we were told we didn't have separate consolidating

17   statements for every entity, and it would be difficult.  And

18   just in the rush of things that happened from the first

19   quarter into the COVID into the year, we just didn't complete

20   that filing.  There was no reason for it other than we didn't

21   get it done initially and I think it fell through the cracks.

22        MR. MORRIS:  Nothing further, Your Honor.

23        THE COURT:  All right.  Anything further, Mr.

24   Rukavina?

25                      REDIRECT EXAMINATION

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 50 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 55 of 313   PageID 4559

Seery - Redirect                          50

1  BY MR. RUKAVINA:

2  Q    Mr. Seery, I appreciate that answer.  But you never sought

3  leave from the Bankruptcy Court to postpone the deadlines for

4  filing 2015.3, did you?

5  A    No.  If it hadn't fallen through the cracks, it would have

6  been something we recalled and we would have done something

7  with it.  But, frankly, it just fell off the -- through the

8  cracks.  We didn't deal with it.

9  Q    Okay.

10         MR. RUKAVINA:  Thank you, Your Honor.  Thank you, Mr.

11  Seery.

12         THE COURT:  All right.  Any other Objector

13  examination?

14     Mr. Morris, anything further on that point?

15         MR. MORRIS:  No, thank you, Your Honor.  No further

16  questions.

17         THE COURT:  All right.  Mr. Seery, thank you.  You're

18  excused once again from the witness stand.

19     (The witness is excused.)

20         THE COURT:  Your next witness?

21         MR. SEERY:  Thank you, Your Honor.

22         THE COURT:  Uh-huh.

23         MR. RUKAVINA:  Your Honor, I'll call Jason Post.  Mr.

24  Post, if you're listening, which I believe you are, if you'll

25  please activate your camera.

1           THE COURT:  Mr. Post, we do not see or hear you yet.

2           MR. RUKAVINA:  Talk, Mr. Post, and I think it'll

3  focus on you.

4           MR. POST:  Yes.  Can you hear me now?

5           THE COURT:  We can hear you.  We cannot see you yet.

6  Could you say, "Testing, one, two; testing, one, two"?

7           MR. POST:  Testing, one, two.  Testing, one, two.

8           THE COURT:  There you are.  Okay.  Please raise your

9  right hand.

10     JASON POST, CERTAIN FUNDS AND ADVISORS' WITNESS, SWORN

11           THE COURT:  All right.  Thank you.  You may proceed.

12                    DIRECT EXAMINATION

13  BY MR. RUKAVINA:

14  Q   Mr. Post, good morning.  State your name for the record,

15  please.

16  A   Robert Jason Post.

17  Q   How are you employed?

18  A   I'm employed by NexPoint Advisors, LP.

19  Q   What is your title?

20  A   Chief compliance officer.

21  Q   Were you ever employed by the Debtor here?

22  A   Yes.

23  Q   Between when and when?  Approximately?

24  A   I believe it was July of '08 through October of 2020.

25  Q   What was your last title while you were employed at the

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21    Entered 02/05/21 17:38:18    Page 52 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 57 of 313   PageID 4561

Post - Direct                                      52

1   Debtor?

2   A    Still chief compliance officer.  For the retail funds.

3   Q    Okay.  Very, very quickly, what does a chief compliance

4   officer do?  Or what do you do?

5   A    It's multiple things.  Interaction with the regulators.

6   Adherence to prospectus and SAI limitations for the funds.

7   And then establishment of written policies and procedures to

8   prevent and detect violations of the federal securities laws

9   and then testing those on a frequent basis.

10  Q    And I believe you mentioned you're the CCO for NexPoint

11  Advisors and Highland Capital Management Fund Advisors.  Are

12  you also the CCO for any funds that they advise?

13  A    Yes.  For all the funds that they advise.

14  Q    Okay.  Does that include so-called retail funds?

15  A    Yes.  They're all retail funds.

16  Q    What is a retail fund?

17  A    It typically constitutes funds that are subject to the

18  Investment Company Act of 1940, such as open-end mutual funds,

19  closed-end funds, ETFs.

20  Q    Obviously, you know who my clients are.  Are any of my

21  clients so-called retail funds that you just described?

22  A    Yes.

23  Q    Name them, please.

24  A    You've got NexPoint Capital, Inc., Highland Income Fund,

25  and NexPoint Strategic Opportunities Fund.

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 53 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 58 of 313   PageID 4562

Post - Direct                                    53

1   Q    Do those three retails funds hold any voting preference

2   shares in the CLOs that the Debtor manages?

3   A    Yes.

4         MR. RUKAVINA:  Mr. Vasek, if you'll please pull up

5   Exhibit 2.

6      Your Honor, I believe I have a stipulation with Mr. Morris

7   that this exhibit can be admitted, so I'll move for its

8   admission.

9         MR. MORRIS:  No objection, Your Honor.

10        THE COURT:  All right.  Exhibit 2 will be admitted.

11   And let's be clear.  That appears at -- is it Docket No. --

12   let's see.  Is it 1673 that you have your -- no, no, no, no.

13   1670?  Is that where your exhibits are?

14        MR. RUKAVINA:  No, Your Honor.  It's 1863.  I think

15   we did an amended one because we numbered our exhibits instead

16   of having seventeen Os and Ps.  So it's 1863.

17        THE COURT:  1863?  Okay.  All right.  There it is.

18   Okay.  Again, this is -- I'm sorry.  I got sidetracked.  What

19   exhibit?  It's Exhibit 2, is admitted.  Okay.

20        MR. RUKAVINA:  Thank you, Your Honor.

21      (Certain Funds and Advisors' Exhibit 2 is received into

22   evidence.)

23   BY MR. RUKAVINA:

24   Q    Real quick, Mr. Seery.  What do these HIF, NSOF, NC, what

25   do they stand for?  Do they stand for the retail funds you

Post - Direct                            54

1   just named?

2              MR. SEERY:  I don't think he meant me.

3              THE WITNESS:  Yeah.

4   BY MR. RUKAVINA:

5   Q   I'm sorry, Mr. Post.  I didn't hear you.

6   A   You addressed me as Mr. Seery.

7   Q   Oh.  I apologize.  What do those initials stand for?

8   A   The names of the funds that I mentioned.

9   Q   Okay.  And what do these percentages show?

10  A   The percentages show the amount of shares outstanding and

11  the preference shares that each of the respective funds hold

12  of the named CLOs.

13  Q   And those CLOs on the left there, those are the CLOs that

14  the Debtor manages pursuant to agreements, correct?

15  A   Yes.  Those are some of them, correct.

16  Q   Yes.  The ones that the retail funds you mentioned have

17  interests in, correct?

18  A   Correct.

19  Q   And what does the far-right column summarize or show?

20  A   That would be the aggregate across the three retail funds.

21  Q   In each of those CLOs?

22  A   Correct.

23  Q   Thank you.

24             MR. RUKAVINA:  Mr. Vasek, you may pull this down.

25  BY MR. RUKAVINA:

Post - Direct                          55

1   Q   Mr. Post, in the aggregate, how much do those three retail

2   funds have invested in those CLOs, ballpark?

3   A   I believe it's approximately $130 million, give or take.

4   Q   Is it closer to 140 or 130?

5   A   A hundred -- I think it's 140, actually.

6   Q   Okay.  Thank you.  Who controls those three retail funds?

7   A   Ultimately, the board --

8   Q   And what --

9   A   -- of the funds.

10  Q   What is -- what do you mean by the board?  Do they have

11  independent boards?

12  A   Yes.  They have a majority independent board, the funds

13  do.

14  Q   Do you report to that board?

15  A   Yes.

16  Q   Does Mr. Dondero sit on those boards?

17  A   He does not.

18  Q   Okay.

19          MR. RUKAVINA:  I'll pass the witness, Your Honor.

20  Thank you, Mr. Post.

21          THE COURT:  All right.  Any other Objector

22  examination of Mr. Post?

23      All right.  Mr. Morris, do you have cross?

24          MR. MORRIS:  Yes, Your Honor, I do.

25          THE COURT:  Okay.

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21    Entered 02/05/21 17:38:18    Page 56 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 61 of 313   PageID 4565
Post - Cross                                    56

1                           CROSS-EXAMINATION

2    BY MR. MORRIS:

3    Q    Mr. Post, can you hear me okay, sir?

4    A    Yes, I can hear you.

5    Q    Okay.  Nice to see you again.  When did you first join

6    Highland?

7    A    I believe it was July of '08.

8    Q    So you've worked with the Highland family of companies for

9    about a dozen years now; is that right?

10   A    Yes.

11   Q    And you were actually employed by the Debtor from 2008

12   until October 2020; is that right?

13   A    Correct.

14   Q    And you left at that time and went to join Mr. Dondero as

15   the chief compliance office of the Advisors; do I have that

16   right?

17   A    Yes.  I transitioned to NexPoint Advisors shortly, I

18   believe, after Mr. Dondero left, but I was already the named

19   CCO for that entity.

20   Q    Right, but your employment status changed from being an

21   employee of the Debtor to being an employee of NexPoint; is

22   that right?

23   A    Correct.

24   Q    And that happened shortly after Mr. Dondero resigned from

25   the Debtor and went to NexPoint Advisors, correct?

001838

Post - Cross                                57

1  A    Correct.

2  Q    Okay.  You mentioned that the funds are controlled by

3  independent boards; do I have that right?

4  A    It's a majority independent board, correct.

5  Q    Okay.  There's no independent board member testifying in

6  this hearing, is there?

7  A    I --

8         MR. RUKAVINA:  Your Honor, Mr. Post wouldn't know

9  that, but I'll stipulate to that as a fact.

10        THE COURT:  All right.

11        MR. MORRIS:  Okay.

12  BY MR. MORRIS:

13  Q    Did you -- do you speak with the board members from time

14  to time?

15  A    Yes.

16  Q    Did you tell them that it might be best if they came and

17  identified themselves and helped persuade the Court that they

18  were, in fact, independent?

19  A    They have counsel to assist them with that determination.

20  I never mentioned anything along those line to them.

21  Q    Okay.  Can you tell me who the board members are?

22  A    Yes.  Ethan Powell, Bryan Ward, Dr. Bob Froehlich, John

23  Honis, and then Ed Constantino.  He is only a board member,

24  though, for NSOF.  NexPoint Strategic Opportunities Fund.

25  Q    All right.  Mr. Honis, is he -- has he been determined to

001839

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21    Entered 02/05/21 17:38:18    Page 58 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 63 of 313   PageID 4567

Post - Cross                                    58

1   be an interested director, for purposes of the securities

2   laws?

3   A    Yes.

4   Q    Okay.  Mr. Froeh..., do you know much about his

5   background?

6   A    I believe he worked at Deutsche Bank and a couple of the

7   other -- or maybe a couple of other investment firms in the

8   past.  And he also owns a minor league baseball team.

9   Q    Do you know how long he served as a director of the funds?

10  A    I don't know, approximately.  I think maybe seven -- six,

11  seven years.

12  Q    Okay.  How about Mr. Ward?  Did Mr. Froehlich ever work

13  for Highland?

14  A    Not that I can recall.

15  Q    Did Mr. Ward ever work for Highland?

16  A    Not that I can recall.

17  Q    Do you recall how long he's been serving as a director of

18  the funds?

19  A    Mr. Ward?

20  Q    Yes.

21  A    I believe -- I'd be -- I don't recall specifically.  I

22  think it's been, you know, 10 to 12 years, give or take.

23  Q    He was a director when you got to Highland; isn't that

24  right?

25  A    He was on the board of directors.

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 59 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 64 of 313   PageID 4568

Post - Cross                              59

1   Q    Yeah.  So fair to say that Mr. Ward has been a director

2   since at least the mid to late oughts?  2005 to 2008?

3   A    I'm sorry, you cut out.  Late what?

4   Q    The late oughts.  Withdrawn.  Is it fair to say that Mr.

5   Ward's been a director of the funds since somewhere between

6   2005 and 2008?

7   A    Again, I don't recall specifically.  You know, I joined

8   the complex, the retail complex as the named CCO in 2015, and

9   he had been serving in that role prior to that, and I believe

10  it was for probably a period of five to seven years, so that

11  sounds in line.

12  Q    Did you have a chance to review Dustin Norris's testimony

13  from the December 16th hearing?

14  A    I did not.

15  Q    Do you know -- are you aware that he testified at some

16  length regarding the relationship of each of these directors

17  to Mr. Dondero and Highland?

18  A    I didn't review anything, so I don't know what he said or

19  how long it took.

20  Q    Do you know if Mr. Powell's ever worked for Highland?

21  A    He has.

22  Q    Do you know in what capacity and during what time periods?

23  A    He was -- I think his last title was -- I believe was

24  chief product strategist, I believe.  And he was also the

25  named PM for one of -- or, a suite of ETF funds.  I think he

001841

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21    Entered 02/05/21 17:38:18    Page 60 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21    Page 65 of 313   PageID 4569

Post - Cross                             60

1    was last employed maybe --from my recollection, 2014,

2    possibly.  Or 2015.  Somewhere around in there.

3    Q    Okay.  And to the best of your knowledge, did Mr. Dondero

4    appoint Mr. Powell to be the chief product strategist?

5    A    I don't -- I don't know.  I wasn't involved in the

6    decision for his appointment.  I don't know how he attained

7    that role.

8    Q    To the best of your knowledge, did Mr. Dondero appoint Mr.

9    Powell as the PM of the ETF funds?

10   A    Again, I wasn't involved in that determination, but he

11   probably would have had a role in making the determination on

12   who was the PM, along with probably some other investment

13   professionals.

14   Q    Okay.  And did Mr. Powell join the board of the funds

15   before or after he left Highland around 2015?

16   A    I can't recall specifically if he was already on the board

17   or was an interested member, but I believe he, you know, I

18   believe he joined shortly after he left.

19   Q    Okay.  So he went from being an employee and being a

20   portfolio manager at Highland to being on the board of these

21   funds.  Do I have that right?

22   A    Again, I can't recall specifically.  He may have already

23   been on the board as an interested board member.  But, you

24   know, I believe, you know, if that wasn't the case, he would

25   have joined the board shortly after leaving.

001842

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21    Entered 02/05/21 17:38:18    Page 61 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21    Page 66 of 313   PageID 4570

Post - Cross                          61

1   Q   And Mr. Ward, I think you said, has been on the funds'

2   board since somewhere between 2005 and 2008.  Does that sound

3   right?

4   A   I think that was a time frame you referenced, and I think

5   that was kind of in line, walking it back.  But I don't recall

6   specifically when he joined.

7   Q   And to the best of your knowledge, have the Advisors for

8   which you serve as the chief compliance officer managed the

9   Funds for which Mr. Ward has served as a director since the

10  time he became a director?

11  A   I'm sorry.  Can you repeat the question?

12  Q   Yeah.  I'm just trying to understand if the advisors --

13  withdrawn.  The Advisors manage the Funds; do I have that

14  right?

15  A   They provide investment advice on behalf of the Funds.

16  Q   And they do that pursuant to written agreements; do I have

17  that right?

18  A   Correct.

19  Q   And is it your understanding that, for the entire time

20  that Mr. Ward has served as a member of the board of the

21  Funds, the Advisors have provided the investment advice to

22  each of those Funds?

23  A   Yes, in one form or fashion.  I believe at one period in

24  time, historically, the Advisor may have changed its name, but

25  it would have been, you know, at the end of the day, one or

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 62 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 67 of 313   PageID 4571

Post - Cross                                           62

1   more -- one of either NexPoint Advisors or Highland Capital

2   Management Fund Advisors would have advised those Funds.

3   Q    Is it fair to say that each of the Advisors for which you

4   serve as the chief compliance officer has always been managed

5   by an Advisor owned and controlled by Mr. Dondero?

6   A    I believe so, yes.

7          MR. MORRIS:  I have no further questions, Your Honor.

8          THE COURT:  All right.  Any redirect?

9          MR. RUKAVINA:  Yes.

10          THE COURT:  Okay.  Mr. Rukavina?

11          MR. RUKAVINA:  Your Honor, was I on mute?  I

12   apologize.

13          THE COURT:  Yes.

14                       REDIRECT EXAMINATION

15   BY MR. RUKAVINA:

16   Q    Mr. Post, why did you leave Highland?

17   A    It -- because I was a HCMLP employee and it was --

18   basically, there was conflicts that were created by being an

19   employee of the Debtor and by also serving as the CCO to the

20   named Funds and the Advisors, and it coincided with Jim

21   toggling over from HCMLP to NexPoint.  It just made sense more

22   functionally and from a silo perspective for me to be the

23   named CCO for that entity since he was no longer an employee

24   of HCMLP.

25   Q    And by Jim, you mean Jim Dondero?

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 63 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 68 of 313   PageID 4572

Post - Redirect/Recross                    63

 1   A   Yes, sorry.  Jim Dondero.

 2   Q   You're not some kind of lackey for Mr. Dondero, where you

 3   go wherever he goes, are you?

 4           MR. MORRIS:  Objection to the question.

 5           THE WITNESS:  No.

 6           THE COURT:  Overruled.  He can answer.

 7           MR. RUKAVINA:  Okay.

 8           THE WITNESS:  No.

 9           MR. RUKAVINA:  Okay.  Thank you, Your Honor.  I'll

10   pass the witness.

11           THE COURT:  Any other Objector examination?

12       All right.  Any recross, Mr. Morris?

13                         RECROSS-EXAMINATION

14   BY MR. MORRIS:

15   Q   Just one question, sir.  The conflicts that you just

16   mentioned, they were in existence for the one-year period

17   between the petition date and the date you left; isn't that

18   right?

19   A   I think -- I believe so, and I think they became more

20   evident as, you know, time progressed.

21   Q   Okay.  But they existed on day one of the bankruptcy

22   proceeding; isn't that right?

23   A   Yes, I believe so.

24   Q   All right.

25           MR. MORRIS:  No further questions, Your Honor.

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 64 of 257
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 69 of 313 PageID 4573

Post - Recross 64

1          THE COURT:  All right.  Thank you, Mr. Post.  You're

2     excused from the virtual witness stand.

3       (The witness is excused.)

4          THE COURT:  All right.  Your next witness?

5          MR. RUKAVINA:  Your Honor, my exhibit has been

6     admitted, I promised I'd be short, and my evidentiary

7     presentation is done.  Thank you.

8          THE COURT:  All right.  Well, Mr. Taylor, your

9     evidence?

10          MR. TAYLOR:  First of all, given the testimony that

11     we have received just recently, we have released Mr. Sevilla

12     from his subpoena and are not going to call him.

13       With that being said, we do have some documents that we

14     would like to get into evidence.  We filed our witness and

15     exhibit list at Docket No. 1874.  I don't believe any of these

16     are controversial.  I'm trying to keep from duplicating those

17     that are already into evidence by the Debtor.  And therefore I

18     would like to offer into evidence Exhibits No. 6 through 12

19     and 17.  And that is it, Your Honor.

20          THE COURT:  Okay.  Is there any objection to Dondero

21     Exhibits 6 through 12 and 17, appearing at Docket 1874?

22          MR. MORRIS:  I just want to be clear that Exhibits 6

23     and 7, which are letters, I believe, from Mr. Lee (phonetic)

24     are not being offered for the truth of the matter asserted in

25     either letter.

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 65 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 70 of 313   PageID 4574

65

1          MR. TAYLOR:  That is correct, Your Honor.  Just

2   merely that those requests and the words that were stated in

3   there were indeed sent on those dates.

4          MR. MORRIS:  And the same comment, Your Honor, with

5   respect to Exhibits 9 through 12, that those documents are not

6   being offered for the truth of the matter asserted.

7          MR. TAYLOR:  Again, just that those requests were

8   sent and those responses as stated were sent.

9       And I apologize.  I missed one, Your Honor.  Also No. 15.

10   6 through 12, 15, and 17.

11          MR. MORRIS:  Your Honor, the Debtor has no objection

12   to Exhibits 15, 16, and 17.

13          THE COURT:  All right.  So, so they are all admitted

14   with the representation that 6 and 9 through 12 are not being

15   offered for the truth of the matter asserted.  With that

16   representation, you have no objection, Mr. Morris?

17          MR. MORRIS:  That's right.  I do just want to get

18   confirmation that Exhibits 1 through 5 and 13 through 16 -- 13

19   and 14 are not being offered at all.

20          THE COURT:  Mr. Taylor?

21          MR. TAYLOR:  So, that -- that is correct.  1 through

22   5 would be duplicative of what has already been introduced

23   into the record by Mr. Morris, so I am not offering those.

24   And do not believe that 13 and 14 are relevant anymore, and so

25   therefore did not offer those.

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21    Entered 02/05/21 17:38:18    Page 66 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 71 of 313   PageID 4575

66

1          THE COURT:  Okay.  So, with that, I have admitted 6

2     through 12, 15, 16, and 17 at Docket Entry 1874.

3          (Dondero Exhibits 6 through 12 and 15 through 17 are

4     received into evidence.)

5          THE COURT:  All right.  Anything else, Mr. Taylor?

6          MR. TAYLOR:  No, Your Honor.  We are not calling any

7     witnesses.

8          THE COURT:  All right.  Mr. Draper, what about you?

9     Any evidence?

10         MR. DRAPER:  No evidence or witnesses.  The evidence

11    that's been introduced by Mr. Taylor and Mr. Rukavina are

12    sufficient for me.

13         THE COURT:  All right.  Ms. Drawhorn, anything from

14    you?

15         MS. DRAWHORN:  No additional evidence, Your Honor.

16         THE COURT:  All right.  Well, then, Mr. Morris, did

17    you have anything in rebuttal?

18         MR. MORRIS:  No, Your Honor.  I think we can proceed

19    to closing statements.  I would just appreciate confirmation

20    by the Objecting Parties that they rest.

21         THE COURT:  All right.  Well, I guess we'll get that

22    clear if it is isn't clear.  All of the Objectors rest.

23    Confirm, yes, Mr. Rukavina?

24         MR. RUKAVINA:  Confirm.

25         THE COURT:  And Mr. Taylor?

001848

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 67 of 257
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 72 of 313 PageID 4576

67

```
 1              MR. TAYLOR:  Confirmed, Your Honor.

 2              THE COURT:  Okay.  And Draper and Drawhorn?

 3              MR. DRAPER:  Yes, Your Honor.

 4              MS. DRAWHORN:  Confirmed, Your Honor.

 5              THE COURT:  All right.  By the way, I assume Mr.

 6    Dondero has been participating this morning.  I didn't

 7    actually get that clarification before we started.  Mr.

 8    Taylor, is he there with you this morning?

 9              MR. TAYLOR:  Your Honor, he is.  He has been

10    participating.  He is sitting directly to my left about

11    slightly more than six feet apart.

12              THE COURT:  Okay.  All right.  Good.

13        All right.  Well, let's talk about our closing arguments

14    and let me figure out, do we have -- should we break a bit

15    before starting?  I have an idea in my brain about a time

16    limitation, but before I do that, let me ask.  Mr. Morris,

17    first I'll ask you.  How much time do you think you need for a

18    closing argument?

19              MR. MORRIS:  Your Honor, --

20              MR. POMERANTZ:  Your Honor?

21              MR. MORRIS:  -- I'll defer to Mr. Pomerantz, who's

22    going to deliver that portion of our presentation today.

23              THE COURT:  All right.  Mr. Pomerantz?

24              MR. POMERANTZ:  Your Honor, I will be making -- yes,

25    Your Honor.  I will be making the majority portion of the
```

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 68 of 257
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 73 of 313 PageID 4577

68

1    argument.  Mr. Kharasch will be making the portion of the

2    argument dealing with the Advisor and Funds' objection.  But I

3    expect my closing to be quite lengthy, given the 1129

4    requirements, all the legal issues, which I plan to spend a

5    fair amount of time.  So I would anticipate a range of an hour

6    and 45 minutes.

7            THE COURT:  An hour and 45 minutes?  All right.

8    Well, --

9            MR. POMERANTZ:  Correct.

10           THE COURT:  I'm getting an echo.

11           MR. CLEMENTE:  Your Honor, it's Matt Clemente on

12   behalf on the Committee.  I'll have 15 minutes or less, Your

13   Honor.  Just some things I would like to touch on.

14           THE COURT:  All right.  So, two hours.  If I were to

15   --

16           MR. POMERANTZ:  And then you need, Your Honor, to add

17   Mr. Kharasch.  I think he's on.  He can indicate how long his

18   part of the closing will be.

19           THE COURT:  Mr. Kharasch?

20           MR. KHARASCH:  Yes.  I would figure my argument would

21   probably be about 20 minutes to 30 minutes.

22           THE COURT:  Okay.

23           MR. RUKAVINA:  Your Honor, let me interject something

24   that I think will help everyone out.  With the CLOs having

25   consented through their counsel to the assumption, the bulk of

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21    Entered 02/05/21 17:38:18    Page 69 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 74 of 313   PageID 4578

69

1  my objection is now moot.  We no longer can and will argue

2  that the contracts are unassignable under 365(b) or (c)

3  because we do have now their consent.  So that will hopefully

4  help the Debtor on that issue.

5          MR. KHARASCH:  Your Honor, Ira Kharasch again.  I was

6  not anticipating that.  I believe that that will take away the

7  bulk of my argument.  I'm still going to be dealing with some

8  of the other non-assumption-type arguments raised by the CLO

9  Objectors, kind of dovetailing with Mr. Pomerantz's arguments

10  on the injunction.  But that will greatly reduce, Your Honor,

11  my argument.

12          THE COURT:  All right.  So if I say two hours of

13  argument for the Debtor and Creditors' Committee, Rukavina,

14  Taylor and Draper and Drawhorn, can you collectively manage to

15  share that two hours?  Have a two-hour argument in the

16  aggregate?  That seems fair to me.

17          MR. RUKAVINA:  Your Honor, I think -- I think that's

18  fine, Your Honor.

19          THE COURT:  All right.  And I guess I'll --

20          MR. TAYLOR:  This is Mr. Taylor.  And yes, I agree.

21          THE COURT:  Okay.  And Mr. Draper?

22          MR. DRAPER:  This is Douglas Draper.  I agree.  I

23  agree also, Your Honor.

24          THE COURT:  All right.  And I'm going to ask --

25          MR. POMERANTZ:  Your Honor, I --

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 70 of 257
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 75 of 313 PageID 4579

70

1          THE COURT:  Go ahead.

2          MR. POMERANTZ:  Your Honor, we -- I think we may need

3   like two hours and ten minutes, because mine was 1:45, Mr.

4   Clemente was 15, and then Mr. Kharasch.  But we'll be around

5   that.  And I tend to speak fast, so I might even shorten mine.

6          THE COURT:  Okay.  You negotiated me up to two hours

7   and ten minutes, Debtors/Objectors, each.

8      I'm going to ask one more time.  The U.S. Trustee lobbed a

9   written objection, but we've not heard anything from the U.S.

10  Trustee.  Are you out there wanting to make an oral argument?

11         MS. LAMBERT:  Yes, Your Honor.  The United States

12  Trustee is on the line.  And we've been listening to the

13  hearing.  I can turn my video on.  I think you're --

14         THE COURT:  Yes.  I can hear you.  I can't see you.

15         MS. LAMBERT:  Okay.  All right.  And so the U.S.

16  Trustee feels that the issues about the releases have been

17  adequately joined and raised by the other parties and that

18  it's an issue of law.  The U.S. Trustee does not feel that we

19  can add to that dialogue by, you know, wasting more of the

20  Court's time.  I think it's been adequately briefed and it's

21  been adequately argued here today.

22         THE COURT:  Okay.

23         MS. LAMBERT:  And we do have an agreement to include

24  governmental release language in the order.  I understand that

25  agreement is still being honored.  That's a separate agreement

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 71 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 76 of 313   PageID 4580

71

1  than the issue of whether the releases are precluded.  But

2  we're going to let the other people carry the water on that.

3          THE COURT:  Okay.

4          MR. POMERANTZ:  Yeah.  And that is correct.  That is

5  correct, Your Honor.  They asked for some information -- a

6  provision on government releases.  They also asked for a

7  provision regarding joint and several liability for Trustee

8  fees.

9      As I mentioned previously, the IRS has asked for a

10  provision in the confirmation order, as have the Texas Taxing

11  Authorities.

12     We have not uploaded a proposed confirmation order, but I

13  will state right now on the record that, before we do so, we

14  will, of course, give Ms. Lambert, Mr. Adams, and the Texas

15  Taxing Authorities the opportunity to review.  We expect there

16  won't be any issue because the language has already been

17  agreed to.

18          THE COURT:  All right.  Well, how about this.  It's

19  11:23 Central time.  Let's break until 12:00 noon Central

20  time, okay, so that gives everyone a little over 30 minutes to

21  have a snack and get their notes together, and we'll start

22  with closing arguments at 12:00 noon.  All right?  So we're in

23  recess until then.

24          THE CLERK:  All rise.

25      (A recess ensued from 11:24 a.m. until 12:05 p.m.)

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 72 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 77 of 313   PageID 4581

72

1          THE COURT:  All right.  Please be seated.  All right.

2     This is Judge Jernigan.  We are back on the record in

3     Highland.  Let me make sure we have the people we need.  Do we

4     have the Pachulski team there?  Mr. Pomerantz, Mr. Kharasch?

5          MR. POMERANTZ:  Yes, you do, Your Honor.

6          THE COURT:  All right.  For our Objectors, Mr.

7     Taylor, are you there?

8          MR. TAYLOR:  Yes, Your Honor, I am.

9          THE COURT:  All right.  I see Mr. Draper there on the

10    video.  You're there.

11         MR. DRAPER:  I'm here.  Can you hear me?

12         THE COURT:  I can hear you loud and clear, yes.

13         MR. DRAPER:  Great, because I didn't -- I'm not

14    hearing, something so I apologize.

15         THE COURT:  All right.  So we have Mr. Rukavina, and

16    I think I see Mr. Hogewood there as well.  Is that correct?

17    You're ready to go forward?

18         MR. RUKAVINA:  Yes, Your Honor.

19         THE COURT:  All right.

20         MR. RUKAVINA:  Yes, Your Honor.  Good afternoon.

21         THE COURT:  All right.  And Ms. Drawhorn, you're

22    there?

23         MS. DRAWHORN:  Yes, Your Honor.

24         THE COURT:  Okay.  Committee.  Mr. Clemente, are you

25    there?

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 73 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 78 of 313   PageID 4582

73

1          MR. CLEMENTE:  Yes, Your Honor.  I'm here, Your

2    Honor.

3          THE COURT:  Okay.  Very good.  All right.  So, let me

4    reiterate.  We've given two-hour and 10-minute time

5    limitations for the Debtor, and that'll be both any time you

6    reserve for rebuttal and your closing, initial closing

7    argument.  Mr. Clemente, you're going to be in that time frame

8    as well.  Okay?

9          MR. CLEMENTE:  Yes, Your Honor.

10          THE COURT:  And so, as supporters of the plan.

11       And then, of course, the Objectors, they have collectively

12    two hours and ten minutes.

13       A couple of things.  I'm going to have my law clerk, Nate,

14    who you can't see but he's to my right, he's going to keep

15    time.  I promise I won't be a jerk and cut anyone off

16    midsentence, but please don't push the limit if I say, you

17    know, "Time."

18       The other thing I will tell you is I'll probably have some

19    questions here or there.  And I've told Nate, cut off the

20    timer if we're in a question-answer session.  I won't count

21    that as part of the two hours and ten minutes.

22       All right.  So, with that, Mr. Pomerantz, you may begin.

23             CLOSING STATEMENT ON BEHALF OF THE DEBTOR

24          MR. POMERANTZ:  Thank you, Your Honor.  As Your Honor

25    is aware, the Debtor has been able to resolve all objections

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 74 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 79 of 313   PageID 4583

74

 1   to confirmation other than the objection by Mr. Dondero or his

 2   entities and the United States Trustee.

 3       Your Honor, I have a very lengthy closing argument, given

 4   the number of issues that are raised in the objections, and I

 5   want to make a complete record, since I understand that

 6   there's a good likelihood that (garbled) appeal.

 7       With that in mind, Your Honor, I'm prepared to go through

 8   each and every confirmation requirement in Section 1129.

 9   However, as an alternative, I might propose that I can go

10   through each of the Section 1129 requirements that are the

11   subject of pending objections or otherwise depend upon

12   evidence that Your Honor has heard.

13           THE COURT:  Okay.

14           MR. POMERANTZ:  And of course, I'll be happy to

15   answer any questions that you have in the process.

16           THE COURT:  Okay.

17           MR. POMERANTZ:  And after my closing argument, I will

18   turn it over to Mr. Kharasch to address the Advisor and Funds'

19   objections.

20           THE COURT:  Okay.

21           MR. POMERANTZ:  Before I walk the Court through the

22   confirmation requirements, I did want to note for the Court,

23   as I did previously, that we filed an updated ballot summary

24   at Docket No. 1887.  And as reflected in the summary, Classes

25   2 and 7 have voted to accept the plan with the respective

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 75 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 80 of 313   PageID 4584

75

1    numerosity and amounts required.  In fact, the votes are a

2    hundred percent.

3        Class 8, however, has voted to reject the plan.  Seventeen

4    creditors in Class 8 voted yes and 24 objectors, which are, I

5    think, all but one the employees with one-dollar claims for

6    voting purposes, voted against.

7        In dollar amount, Class 8 has accepted the plan by 99.8

8    percent of the claims.  And I will address the issues of the

9    cram-down over that class a little bit later on.

10       Lastly, during the course of my presentation, I will

11   identify for the Court certain modifications we have made to

12   address the objections that were filed on January 22nd and

13   then also on February 1st.  And at the end of my presentation,

14   I will raise a couple of other modifications that I won't get

15   to during my presentation and will explain to the Court why

16   all the modifications do not require resolicitation and are

17   otherwise appropriate under Section 1127.

18       Your Honor, as Your Honor is aware, Section 1129 requires

19   the Debtors to demonstrate to the court that the plan

20   satisfies a number of statutory requirements.  1129(a)(1)

21   provides that the plan requires -- complies with all statutory

22   provisions of Title 11, and courts interpreted this provision

23   as requiring the debtor to demonstrate it complies with

24   Section 1122 and 1123.

25       With respect to classification, Your Honor, there has been

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 76 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 81 of 313   PageID 4585

76

1   one objection that was raised to essentially a classification,

2   and that was raised by Mr. Dondero to Article 3C of the plan

3   on the grounds that it purports to eliminate a class that did

4   not have any claims in it as of the effective date but which

5   may later have a claim in that class.

6      I think he was primarily concerned about Class 9

7   subordinated claims.  But Mr. Dondero misunderstands the

8   provision.  It only eliminates a claim for voting purposes,

9   and if there's later a claim in that class, it will be treated

10   as the plan provides the treatment.

11      In any event, Class 9, as we know now, will be populated

12   by the HarbourVest claims, as well as the UBS claims and the

13   Patrick Daugherty claims, if the Court approves the settlement

14   approving those claims.

15      Next, Your Honor, Section 1123(a) contains seven mandatory

16   requirements that a plan must include.  Sections 1, 2, and 3

17   of 1123(a) apply to the classification of claims and where

18   they're impaired and treatment.  The plan does that.

19      There has been an objection to 1123(a)(3) raised by

20   several parties with respect to the classification and

21   treatment of subordinated claims.  The concerns stem from the

22   mistaken belief that the Debtor reserved the right to

23   subordinate claims without providing parties with notice and

24   without obtaining a court order.

25      The Debtor never intended to have unilateral ability to

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 77 of 257
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 82 of 313 PageID 4586

77

1   subordinate claims without affording parties due process

2   rights, and we've added some clarificatory language to so

3   provide.

4         We made changes to the plan on January 22nd, and then on

5   February 1st, and the plan addresses all those issues in

6   Article 3(j) and it talks about when a claim is going to be

7   subordinated as a non-creditor.  We've also redefined the

8   definition of subordinated claims to make clear that a claim

9   is only subordinated upon entry of an order subordinating that

10  claim.

11        Mr. Dondero also objected on the grounds that the plan did

12  not contain a deadline pursuant to which the Debtor would be

13  required to seek any subordination, and we have revised

14  Article 7(b) of the plan to provide that any request to

15  subordinate a claim would have to be made on or before the

16  claim objection deadline, which is 180 days after the

17  effective date.

18        Lastly, certain former employees, Mr. Yang and Borud,

19  objection also joined by Mr. Deadman, Travers, and Kauffman,

20  objected to the inclusion of language in the definition of

21  "Subordinated Claims" that a claims arising from a Class A, B,

22  or C limited partnership is deemed automatically subordinated.

23  The concerns were that the language could broadly apply to any

24  potential claims by a former partner, and could be also read

25  to encompass claims outside the statutory scope of 510(b) or

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 78 of 257
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 83 of 313 PageID 4587

78

1    otherwise relating to limited partnership interests.

2        While the Debtor does reserve the right to seek to

3    subordinate the claims on any basis, we have modified the plan

4    to address that concern and to address the concern that we're

5    not attempting to create any new causes of action for

6    subordination that don't otherwise exist under applicable law,

7    but it just preserves the parties' rights with respect to

8    subordination and deals with that at a later date.

9        Next, Your Honor, Section 1123(a)(5).  I skipped over

10   1123(a)(4) because there are no objections to that provision.

11           THE COURT:  Okay.

12           MR. POMERANTZ:  Section 1123(a)(5), a plan must

13   provide for adequate means of implementation.  And the plan

14   provides a detailed structure and blueprint how the Debtor's

15   operations will continue, how the assets will be monetized,

16   including the establishment of the Claimant Trust,

17   establishment of the Litigation Sub-Trust, the Reorganized

18   Debtor, the Claimant Trust Oversight Board.  And the documents

19   precisely describing how this will occur were filed as part of

20   the various plan supplements.

21       1123(a)(7), Your Honor, requires that the plan only

22   contain provisions that are consistent with the interest of

23   equity holders and creditors with respect to the manner,

24   selection, and -- of any director, officer, or trustee under

25   the plan.  And as discussed in the plan, at the disclosure

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21    Entered 02/05/21 17:38:18    Page 79 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 84 of 313   PageID 4588

79

1    statement, and as testified to by Mr. Seery, the Committee and

2    the Debtor had arm's-length negotiations regarding the post-

3    effective date corporate governance and believe that the

4    selection of the claimant Trustee, the Litigation Sub-Trustee,

5    and the Claimant Trust Oversight Board are in the best

6    interest of stakeholders.

7        HCMFA has raised a particular objection, I think, to these

8    issues, but I will address it in the context of the

9    requirement under Section 1129(a)(5).

10       Your Honor, Section 1129(a)(2) requires that the plan

11   comply with the disclosure and solicitation requirements under

12   the plan.  Section 1125 requires that the Debtor only solicit

13   with a court-approved disclosure statement.  The Court

14   approved the disclosure statement on November 23rd, and

15   pursuant to the proofs of service on file, the plan and

16   disclosure statement were mailed, along with solicitation

17   materials that the court approved.

18       Now, there has been an objection raised by Dugaboy, and

19   also alluded to by Mr. Taylor in some of his comments before,

20   that the plan does violate 1129(a)(2) because the Debtor's

21   disclosure statement was deficient.

22       In support of that argument, Dugaboy points to the

23   reduction in the anticipated distribution to creditors from

24   the November plan analysis to the January plan analysis, and

25   argues that that reduction requires resolicitation.  However,

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21    Entered 02/05/21 17:38:18    Page 80 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 85 of 313   PageID 4589

80

1  those arguments are not well-taken.

2      First, none of the people making these objections were

3  solicited for their vote on the plan, or if they had been,

4  they didn't vote or decided to reject the plan.  And to the

5  extent that Class 8 creditors, the distribution has gone down

6  -- that's the class that Mr. Taylor and Mr. Draper are

7  concerned about -- you don't hear the Committee, Acis,

8  Redeemer, UBS, HarbourVest, Daugherty, or the Senior Employees

9  making their argument, this argument, and they represent over

10 99 percent of the claims in that class.  And in fact, of the

11 17 Class 8 creditors that have accepted the plan, 15 are

12 represented by the parties I just mentioned.

13     So who are the two creditors that they're so concerned

14 about?  One is Contrarian, which is a claims trader that

15 actually elected to be treated in Class 7, and one is one of

16 the employees who voted to accept the plan.

17     Second, Your Honor, the argument conflates the difference

18 between adverse change to the treatment of a claim or interest

19 that would require a resolicitation under Section 1127 and a

20 change to the distribution that would not.

21     More importantly, Your Honor, the argument is specious.

22 As Mr. Seery testified yesterday, the material differences

23 between the analysis contained on November and late January

24 and the one we filed on February 1st were based on three types

25 of changes:  an update regarding the increased value of assets

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21    Entered 02/05/21 17:38:18    Page 81 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 86 of 313   PageID 4590

81

1    based upon events that had transpired during this period,

2    which included an increase in asset value, no recoveries, and

3    revenues expected to be generated by the CLO management

4    agreements; an update to the expected costs of the Reorganized

5    Debtor and the Claimant Trust as a result of the continued

6    evaluation of staffing needs, operational expenses, and

7    professional fees; and an update to reflect resolution of the

8    HarbourVest and UBS claims.

9        In the filing Monday, Your Honor, we updated the plan

10   projection, a liquidation analysis which revised the unsecured

11   claims based upon the UBS settlement that I was able to

12   disclose to Your Honor.  And in the filing, the distribution

13   now revised to Class 8 creditors is now 71 percent, compared

14   to the 87 percent that was in the disclosure statement that

15   went out for solicitation.

16       Your Honor, there can be no serious argument that the

17   creditors in this case were not fully aware of the potential

18   for the UBS and HarbourVest creditors receiving claims.  Your

19   Honor's UBS 3018 order granting its claim for voting purposes

20   was entered right around the time that the disclosure

21   statement was approved.  And, in fact, a last-minute addition

22   to the disclosure statement disclosed the 3018 amount,

23   although the amount did not make it to the attachment to the

24   disclosure statement.  And that reference, Your Honor, to the

25   UBS claim being allowed for voting purposes can be found at

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 82 of 257
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 87 of 313 PageID 4591

82

1   Page 41 of Docket No. 1473.

2        And the HarbourVest settlement was filed on about December

3   23, two weeks before the voting deadline, sufficient time for

4   people to take that into consideration.

5        And as Your Honor surely knows, the hearings in this case

6   have been very well-attended by the major parties, and I

7   believe that if we went back and looked at the records of who

8   was on the WebEx system during the HarbourVest and UBS

9   hearings, you would find that representatives of basically

10  every creditor, every major creditor in this case in Class 8

11  participated.

12       Moreover, Your Honor, creditors were not guaranteed any

13  percentage recovery under the plan and disclosure statement,

14  which clearly identified the size of the claims pool as a

15  material risk.

16       Article 4(a)(7) of the disclosure statement, which is at

17  Docket 1473, is entitled "Claims Estimation" and warns

18  creditors that there can be no assurances that the Debtor's

19  claims estimates will prove correct, and that the actual

20  amount of the allowed claims may vary materially.

21       And if Dugaboy is arguing it was misled as the holder of a

22  disputed administrative claim and general unsecured claim,

23  that argument is simply preposterous.

24       Dugaboy cites several cases for the proposition that

25  deficient disclosure may warrant resolicitation, and the

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 83 of 257
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 88 of 313 PageID 4592

83

1    Debtor agrees with the proposition as a general matter.  But

2    if one looks at the cases that were filed -- that Dugaboy

3    cited to, it will see that they are clearly inapposite and

4    distinguishable.

5        *In re Michaelson*, the Bankruptcy Court for the Eastern

6    District of California, revoked confirmation because the

7    debtor failed to disclose in the disclosure statement a mail

8    fraud indictment of the turnaround specialist who was to lead

9    the reorganization effort and a prior Chapter 7 company he

10   drove into the ground.

11       In *In re Brotby*, the Ninth Circuit BAP affirmed a decision

12   of the Bankruptcy Court that the individual debtor's decision

13   to modify its financial projections on the eve of confirmation

14   did not require a resolicitation.  And there, the financial

15   projections were off by 75 percent.

16       And in *Renegade Holdings*, the Bankruptcy Court granted a

17   motion by a group of states to revoke confirmation by the

18   debtors, who manufactured and distributed tobacco products,

19   because the debtors failed to disclose in its disclosure

20   statement that the debtor and its principals were under

21   criminal investigation for unlawful trafficking in cigarettes,

22   which was not disclosed to creditors.

23       Your Honor, none of these cases are remotely analogous to

24   this case, and they certainly do not stand for the proposition

25   that the Debtor was required to resolicit.

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 84 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 89 of 313   PageID 4593

84

1        Next, Your Honor, the next requirement is 1129(a)(3),

2    which requires that any plan be proposed in good faith.  As

3    Mr. Seery testified at length, and the Court has personal

4    knowledge of, having presided over this case for a year, the

5    plan is the result of substantial arm's-length negotiations

6    with the Committee over a period of several months.

7        Mr. Seery testified yesterday that, soon after the board

8    was appointed, the Committee wanted to immediately pursue down

9    the path of an asset monetization plan.  However, as Mr. Seery

10   testified, the board decided that it was inappropriate to rush

11   to judgment and that it should consider all potential

12   restructuring alternatives for the Debtor.  And Mr. Seery

13   testified what those alternatives were:  a traditional

14   restructuring and continuation of the Debtor's business; a

15   potential sale of the Debtor's assets in one or more

16   transactions; an asset monetization plan like the one before

17   the Court today; and, last but not least, a grand bargain plan

18   that would involve Mr. Dondero sponsoring the plan with a

19   substantial equity infusion.

20       As Mr. Seery testified, by the early summer of 2020, the

21   Debtor decided that it was appropriate to start moving down

22   the path of an asset monetization plan while it continued to

23   work on the grand bargain plan.  Accordingly, Mr. Seery

24   testified that the Debtor commenced good-faith negotiations

25   with the Committee regarding the asset monetization plan, and

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 85 of 257
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 90 of 313 PageID 4594

85

1   that those negotiations took several months, were hard-fought

2   and at arm's-length, and involved substantial analysis of the

3   appropriate post-confirmation corporate structure, governance,

4   operational, regulatory, and tax issues.  And on August 12th,

5   Your Honor, the plan was filed with the Court.

6       And although the Debtor at that time had not reached an

7   agreement with the Committee on some of the most significant

8   issues, Mr. Seery testified that the independent board

9   believed that it was important to file that plan at that time,

10  a proverbial stake in the ground to act as a catalyst for

11  reaching a consensual plan with the Committee or others, which

12  it has done.

13      As Mr. Seery testified, he continued to work with Mr.

14  Dondero to try to achieve a grand bargain plan, while at the

15  same time proceeding down the path of the filed plan.

16      He testified that the parties participated in mediation at

17  the end of August and early September to try to reach an

18  agreement on a grand bargain plan, but were unsuccessful.  And

19  the Debtor proceeded on the path of the August 12th plan and

20  sought approval of its disclosure statement on August 27th,

21  2020.

22      Mr. Seery testified that, at that time, the Debtor still

23  had not reached an agreement with the Committee on certain

24  significant issues involving post-confirmation governance and

25  the scope of releases.  And as a result, after a contested

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21    Entered 02/05/21 17:38:18    Page 86 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 91 of 313   PageID 4595

86

1   hearing, Your Honor, Your Honor did not approve the disclosure

2   statement on October 27th, but asked us to go back again to

3   try to work out the issues, and we came back on November 23rd.

4       Mr. Seery testified that the Debtor continued to negotiate

5   with the Committee to resolve the material disputes leading --

6   which led up to the November 23rd hearing, where we came in

7   with the support of the Committee.  But as Mr. Seery has also

8   testified, he has continued to try to reach a consensus on a

9   global plan, notwithstanding the approval of the disclosure

10  statement.  And he spent personally several hundred hours

11  since his appointment trying to build consensus.

12      As part of this process, Mr. Seery testified that Mr.

13  Dondero received access to substantial information regarding

14  the Debtor's assets and liabilities, most recently in

15  connection with a series of informal document requests which

16  were made at the end of December.

17      And after the Court asked the parties to again reengage in

18  efforts to try to reach a global hearing after the Debtor's

19  preliminary injunction motion, Mr. Seery testified that he and

20  the board participated in calls with Mr. Dondero and his

21  advisors and the Committee to see if common ground could be

22  attained.

23      Unfortunately, as Mr. Seery testified, the Committee and

24  Mr. Dondero were not able to reach an agreement.

25      Accordingly, Your Honor, the testimony unequivocally and

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21    Entered 02/05/21 17:38:18    Page 87 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 92 of 313   PageID 4596

87

1    overwhelmingly demonstrates that the plan was proposed in good

2    faith.

3        I expect the Objectors may argue in closing that they have

4    filed a plan under seal that is a better alternative than that

5    being proposed by the plan that the Debtor seeks to confirm.

6    Your Honor, as a threshold matter, yesterday I said any

7    mention of the specifics of the recent plan would be

8    inappropriate.  We are not here today to debate the merits of

9    Mr. Dondero's plan, which the Court permitted him to file

10   under seal.  He had ample opportunity to file this plan after

11   exclusivity was terminated, seek approval of a disclosure

12   statement, and, if approved, solicit votes in connection with

13   a confirmation hearing, but he failed to do so.

14       What matters today, Your Honor, is whether the Debtor's

15   plan, the plan that has been accepted by 99.8 percent of the

16   amount of creditors, and opposed only by Mr. Dondero, his

17   related entities, and certain employees, meets the

18   confirmation requirements of Section 1129, which we most

19   certainly argue it does.

20       And perhaps most importantly, Your Honor, the Court

21   remarked at the last hearing that, without the Committee's

22   support for a competing plan, Mr. Dondero's plan would be dead

23   on arrival.  And as you have heard from Mr. Clemente, Mr.

24   Dondero does not yet have the Committee's support.

25       Next, Your Honor, is Section 1129(a)(5).  That requires

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 88 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 93 of 313   PageID 4597

88

1   that the plan disclose the identity of any director,

2   affiliate, officer, or insider of the debtor, and such

3   appointment be consistent with the best interest of creditors

4   and equity holders.  Courts have held that this section

5   requires the disclosure of the post-confirmation governance of

6   the reorganized entity.

7       HCMFA objects to the plan, arguing that it did not comply

8   with Section 1129(a)(5) because it didn't disclose the people

9   who would control and manage the Reorganized Debtor and who

10   might be a sub-servicer.  HCMFA's objection is off-base.

11   Under the plan, Mr. Seery will be the claimant Trustee and

12   Marc Kirschner will be the Litigation Trustee.  Mr. Seery

13   testified extensively about his background, and he has

14   appeared before the Court many times and the Court is familiar

15   with him.  We have also introduced his *C.V.* into evidence.

16       As he testified, he will be paid $150,000 per month,

17   subject to further negotiations with the Claimant Trust

18   Oversight Committee regarding the monthly amount and any

19   success fee and severance fee, which negotiation is expected

20   to be completed within the 45 days following the effective

21   date.

22       Mr. Seery also testified regarding the names of the

23   members of the Claimant Trust Oversight Committee, which

24   information was also contained in the plan supplement and it

25   generally includes the four members of the Committee and David

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 89 of 257
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 94 of 313 PageID 4598

89

1  Pauker, a restructuring professional with decades of

2  restructuring experience.

3      The members of the Oversight Committee will serve without

4  compensation, except for Mr. Pauker, who Mr. Seery testified

5  will receive $250,000 in the first year and $150,000 for

6  subsequent years.

7      As set forth in the Claimant Trust agreement, if at any

8  time there is a vacant seat to be filled by another

9  independent member, their compensation will be negotiated by

10  and between the Claimant Trust Oversight Board and them.

11      Mr. Seery has also testified that he believed the Claimant

12  Trust will have sufficient personnel to manage its business.

13  Specifically, he has testified that he intends to employ

14  approximately ten of the Debtor's employees, who will be

15  sufficient to enable him to continue to operate the Debtor's

16  business, including as an advisor to the managed funds and the

17  CLOs, until the Claimant Trust is able to effectively and

18  efficiently monetize its assets for fair value, whether that

19  takes two years or whether that takes 18 months or whether

20  that takes longer.

21      Mr. Seery further testified that he believes that the

22  operations can be best conducted by the Debtor's employees.

23  And while he did consider the retention of a sub-servicer, he

24  ultimately decided, in consultation with the Committee, that

25  the monetization would be a lot more effective if done with a

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 90 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 95 of 313   PageID 4599

90

1   subset of the Debtor's current employees.

2       The proposed corporate governance is also consistent with

3   the interests of the Debtor and its stakeholders.  The Court

4   is very familiar with Mr. Seery and the Debtor, and I believe

5   that Mr. Clemente, when he comments, will say the Committee

6   can think of no better person to continue managing the

7   Claimant Trust than Mr. Seery.

8       Mr. Kirschner is also well qualified to be the Litigation

9   Trustee.  His *C.V.* is part of the evidence that's been

10   admitted and contains additional information regarding his

11   background.  And he will receive $40,000 a month for the first

12   three months and $20,000 a month thereafter, plus a to-be-

13   negotiated success fee.

14       There just simply can be no challenge to Mr. Seery's or

15   Mr. Kirschner's qualifications or abilities to act in a manner

16   contemplated by the plan or that their involvement is not in

17   the best interest of the estate and its creditors.

18       Your Honor, the next requirement that is objected to is

19   Section 1129(a)(7).  That, of course, requires the Debtor to

20   demonstrate that creditors will receive not less under the

21   plan than they would receive if the Debtor was to be

22   liquidated in Chapter 7.  And on February 1st, Your Honor, we

23   filed our updated liquidation analysis, which contains the

24   latest-and-greatest evidence to support that.

25       These documents, the updated documents, in connection with

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 91 of 257
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 96 of 313 PageID 4600

91

1     the prior analysis, was provided to objecting parties in

2     advance of the January 29th deposition, and Your Honor has

3     heard the differences between the January 29th and the

4     February 1st documents being very minimal.

5          The Court heard extensive evidence and testimony from Mr.

6     Seery regarding the assumptions that went into the preparation

7     of the liquidation analysis and the differences of what

8     creditors are projected to receive under the plan as compared

9     to what they are projected to receive in a Chapter 7.

10         Such testimony also included a comparison between the

11    liquidation analysis that was filed with the plan in November,

12    the updated liquidation analysis filed on the -- or, provided

13    to parties on January 28th, and the last version, filed on

14    February 1st.

15         Mr. Seery testified that, on the revenue side, the

16    liquidation analysis was updated to include the HCLOF

17    interest, which was required as part of the settlement with

18    HarbourVest; the increase in value of certain assets,

19    including Trussway; revenue expected to be generated from

20    continued management of the CLOs; and increased recovery on

21    notes as a result of the acceleration of certain related

22    notes.

23         On the expense side, Mr. Seery testified regarding his

24    best estimate of the likely expenses to be incurred by a

25    Chapter 7 trustee -- by the Claimant Trust, including

001873

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 92 of 257
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 97 of 313 PageID 4601

92

1    personnel costs; professional costs, which increase because of

2    the litigious nature this case has become; and operating

3    expenses.

4        And lastly, on the claim side, Your Honor, Mr. Seery

5    testified that the claims numbers have been updated to include

6    the settlement from HarbourVest and initially the amount

7    approved to UBS pursuant to the 3018 order and then the

8    reduction at $50 million based upon the settlement announced.

9    And like the prior liquidation analysis, the current analysis

10   demonstrates that creditors will fare substantially better

11   under in Chapter -- under the plan than in Chapter 7.  In

12   fact, the projected recovery under the plan is 85 percent for

13   Class 7 creditors and 71.32 percent for Class 8 creditors, as

14   compared to 54.96 percent for all unsecured creditors in a

15   Chapter 7.

16       Mr. Seery also testified that expenses are expected to be

17   more under Chapter 11 than under Chapter 7, but he also

18   testified that the tens of millions of dollars in greater

19   revenue and asset recoveries under the plan will more than

20   offset the additional expenses.

21       As a result, the Court has more than sufficient

22   evidentiary basis to conclude that the Debtor has carried its

23   burden to prove that it meets the best interest of creditors

24   best.

25       But Mr. Dondero's counsel spent a lot of time crossing --

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21    Entered 02/05/21 17:38:18    Page 93 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 98 of 313   PageID 4602

93

1    cross-examining Mr. Seery, in a vain attempt to demonstrate to

2    the Court that a Chapter 7 actually would be much better for

3    creditors.  And this argument has also been made by Dugaboy

4    and the Advisors and the Funds.

5        Before I address these arguments on its merits, Your

6    Honor, I just wanted to remind the Court of the Objectors --

7    these Objectors' interest in this case.  Mr. Dondero owns no

8    equity in the Debtor.  He owns a general partner.  Strand, in

9    turn, owns a quarter-percent -- a quarter of one percent of

10   the total equity in the Debtor.  And Mr. Dondero's claim, it's

11   only a claim for indemnification.  Dugaboy asserts two claims:

12   a frivolous administrative claim relating to the postpetition

13   management of a Multi-Strat, which, as an administrative

14   claim, if it's valid, would not even be affected by the best

15   interest of creditors test, because it would have to be paid

16   in full.  And he also asserts a claim that the Debtor's

17   subsidiary -- against the Debtor's subsidiary for which it

18   tries to pierce the corporate veil.

19       Just think about it.  Dugaboy, Mr. Dondero's entity, is

20   arguing that he should be able to pierce the corporate veil to

21   get at the entity that was his before the bankruptcy.

22       Dugaboy's only other interest in this case relates to a --

23   a one -- point eighteen and several-hundredths percent of the

24   equity interest of the Debtor, and that is out of the money.

25       And as I mentioned previously, Your Honor, Mr. Rukavina's

001875

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 94 of 257
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 99 of 313 PageID 4603

94

1    clients either didn't file any general unsecured claims or

2    filed them and withdrew them.  Their only claim is a disputed

3    administrative claim against the Debtor that was filed a week

4    ago and which, at the appropriate time, the Debtor will

5    demonstrate is without merit.

6         And I understand that, just today, NexPoint Advisors also

7    filed administrative claim.

8         So I'm not going to argue to Your Honor that these parties

9    do not have standing, although their standing is tenuous, at

10   best, to assert this argument.  The Court should keep their

11   relative interests in mind when evaluating the merits and the

12   good faith of this objection.

13        The principal objection, as I said, is that creditors will

14   do better in a Chapter 7.  Essentially, they argue that a

15   Chapter 7 trustee can liquidate the assets just as well as Mr.

16   Seery can and not require the cost structure that is included

17   in the Debtor's plan projections.  Yes, they argue that a

18   Chapter 7 will be more efficient.

19        Mr. Seery's testimony, the only testimony on the topic,

20   however, establishes that this preposterous proposition has no

21   basis in reality.  Mr. Seery testified that a Chapter 7

22   trustee's mandate would be to reduce Debtor's assets as fast

23   as possible, while he will monetize assets as and when

24   appropriate to maximize the value.

25        But even if you can assume that the Chapter 7 trustee

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 95 of 257
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 100 of 313 PageID 4604

95

1  could get court authority in a Chapter 7 to operate, there are

2  several reasons Mr. Seery testified why a liquidation by a

3  Chapter 7 trustee would be far worse than the plan.

4       First, Your Honor, no matter how competent the Chapter 7

5  trustee is -- and Mr. Seery did not say he is more competent

6  than anyone else out there -- the lack of a learning curve

7  that Mr. Seery established through the 13 months in this case

8  puts Mr. Seery at such a major advantage compared to a Chapter

9  7 trustee.

10      Second, Mr. Seery questioned whether the Chapter 7 trustee

11  would be able to retain the Debtor's existing professionals,

12  even assuming they were willing to be retained.  I'm not sure

13  what's the Court's practice or the practice in the Northern

14  District, but in many districts around the country debtor's

15  counsel and professionals cannot be retained by Chapter 7

16  trustee, as general counsel, at least.

17      And I could just imagine, Your Honor, Mr. Dondero's

18  position if the Chapter 7 trustee actually sought to hire

19  Pachulski Stang and DSI.

20      Third, Your Honor, regardless of whether the Chapter 7

21  trustee obtained some operating authority, the market

22  perception will be that a Chapter 7 trustee will sell assets

23  for less value than would Mr. Seery as claimant Trustee.  Mr.

24  Seery testified to that.

25      The argument that the Objectors make that a Chapter 7

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 96 of 257
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 101 of 313   PageID 4605

96

1    process, whereby the trustee would seek court approval of

2    assets, is better for value than a process overseen by the

3    Claimant Trust Board lacks any evidentiary basis and also is

4    contradicted by Mr. Seery's testimony.

5        In fact, Mr. Seery testified that the Chapter 7 process,

6    the public process of it, would very likely result in less

7    recovery than a sale conducted in the Claimant Trust.

8        And lastly, Mr. Seery testified that it's unlikely that

9    the ten or so valuable employees who Mr. Seery is planning to

10   heavily rely on to assist him with post-confirmation would

11   agree to a work for Chapter 7 trustee.  Your Honor is all too

12   familiar with the fights in the *Acis* case and Chapter 7

13   trustee, and it's just hard to believe that any of the

14   Highland employees would go work for the Chapter 7 trustee.

15       So why is Mr. Dugaboy -- why is Dugaboy and Mr. Dondero

16   actually making this objection and advocating for a Chapter 7?

17   It's because they would expect to buy the Debtor's assets on

18   the cheap from a Chapter 7 trustee, exactly what they've been

19   trying to do in this case.

20       Your Honor, moving right now to Section 1129(a)(11), that

21   requires the debtor to demonstrate that the plan is feasible.

22   In other words, it's not likely to be followed by a further

23   liquidation or restructuring.  Under the Fifth Circuit law,

24   the debtor need only demonstrate that the plan will have a

25   reasonable probability of success to satisfy the feasibility

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 97 of 257
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 102 of 313 PageID 4606

97

1    requirement, and the Debtor has easily met this standard.

2        As Mr. Seery testified, the Debtor's plan contemplates

3    continued operations through which time the assets will be

4    monetized for the benefit of creditors.  The plan contemplates

5    that Class 7 creditors will be paid off shortly after the

6    effective date.  Class 8 creditors are not guaranteed any

7    recovery but will receive pro rata distributions over a period

8    of time.  Class 2, Frontier secured claim, will be paid off

9    over time, and the projections demonstrate that it will -- the

10   Debtor will have money to do so.

11       Mr. Seery testified at length regarding the assumptions

12   that went into the preparation of the projections most

13   recently filed on February 1, and based on that testimony, the

14   Debtor has clearly demonstrated that the plan is feasible.

15       Your Honor, I think that brings us to Section 1129(b).  Of

16   course, again, Your Honor, if Your Honor has any other

17   questions with the sections I'm skipping over.  I believe

18   we've adequately covered them in the briefs and I don't think

19   there's any objection.

20       But as I mentioned before, we have three classes that have

21   voted to reject the plan.  Class 8 is the general unsecured

22   claims.  They voted to reject the plan.  Yes.  Even though,

23   based upon the ballot summary, 99 percent of the amount of

24   claims in that class voted to accept the plan, approximately

25   24 employees voted to reject the plan.  And accordingly, the

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 98 of 257
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 103 of 313 PageID 4607

98

1    Debtor cannot satisfy the numerosity requirement of Section

2    1126(c).

3        I do want to briefly recount for Your Honor Mr. Seery's

4    testimony regarding the nature of the claims of the 24

5    employees who voted to reject the plan.  And I'm not doing

6    this to argue that the votes from these contingent creditors

7    are not valid or that the Debtor doesn't need to satisfy the

8    cram-down requirements.  The Debtor understands it needs to

9    demonstrate to the Court that Section 1129(b) is satisfied for

10   the Court to confirm the plan.

11       Rather, why I do this, Your Honor, is to provide the Court

12   with context about the nature and extent of the creditors in

13   this class as the Court determines whether the plan is, in

14   fact, fair and equitable and can be crammed down to a

15   dissenting vote.

16       Mr. Seery testified that these employees originally had

17   claims under the annual bonus plan and the deferred

18   compensation plan.  And as he testified, in order for claims

19   under each of those plans to vest -- I think he referred to

20   them as be-in-the-seat plans -- the employee was required to

21   remain employed as of that date.

22       Mr. Seery testified that the Debtor terminated the annual

23   bonus plan in the middle of January and replaced it with the

24   key employee retention plan that the Court previously

25   approved.

001880

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21    Entered 02/05/21 17:38:18    Page 99 of 257
Case 3:21-cv-00538-N    Document 26-7    Filed 06/09/21    Page 104 of 313    PageID 4608

99

1        Accordingly, Mr. Seery testified that no employee who

2   voted to reject the plan anymore has a claim on the annual

3   bonus plan.  He also testified that, with respect to the

4   deferred compensation plan, people have contingent claims

5   under that plan and that no payments are due until May 20 --

6   2021.

7        As Mr. Seery testified, if the employees who would be

8   entitled to receive payments under the deferred compensation

9   plan do not agree to enter into a separation agreement that

10  was approved by the Court, they will be terminated before May

11  and there will no -- not longer be any deferred compensation

12  due.

13       Accordingly, while the 24 employees who voted to reject

14  the plan do technically have claims at this time they have

15  voted, Mr. Seery testified the claims will go away soon.

16       I do want to point out something that's obviously

17  painfully obvious at this point, that while Class 8 voted to

18  reject the plan, the Committee, the statutory fiduciary for

19  all unsecured creditors, supports the plan enthusiastically

20  and I believe it does so unanimously.

21       The other classes to reject the plan, Your Honor, are

22  Class 11, the A limited partnerships, and none of the holders

23  in Class B and C limited partnerships voted on the plan, so

24  cram-down is required over those classes as well.  So Your

25  Honor is able to confirm the plan pursuant to the cram-down

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 100 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 105 of 313 PageID 4609

100

1   procedures under 1129(b) if the Court determines that the plan

2   is fair and equitable and does not discriminate unfairly

3   against the rejecting classes.

4       Let's first turn to the fair and equitable requirement.  A

5   plan is fair and equitable if it follows the absolute priority

6   rule, meaning that if a class does not receive payment in

7   full, no junior class will receive anything under the plan.

8   With respect to Class 8, no junior class -- junior class to

9   Class 8 will receive payment, and here is the key point,

10  unless Class 8 is paid in full, with appropriate interest.

11  NPA and Dugaboy -- Dugaboy in a brief filed on Monday -- argue

12  that the plan does not satisfy the absolute priority rule

13  because Class 10 and Class Equity Interests have a contingent

14  right to receive property under the plan.

15      Your Honor, this argument misunderstands the absolute

16  priority rule.  Class 10 and Class Creditors will only receive

17  payment after distribution to 8 and 9, the unsecured claims

18  and the subordinated claims, are all paid in full, plus

19  interest.

20      And, in fact, Dugaboy, in its brief, to its credit, admits

21  that the argument is contrary to the Bankruptcy Court's

22  decision of Judge Gargotta in the Western District case of *In*

23  *re Introgen Therapeutics*.  There, the Court was faced with a

24  similar argument by a group of unsecured creditors who argued

25  that the debtor's plan violated the absolute priority rule

001882

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 101 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 106 of 313 PageID 4610

101

1  because equity was retaining a contingent interest that would

2  only be payable if general unsecured claims were paid in full.

3      In rejecting the argument, the Court reasoned, and I

4  quote, "The only way Class 4 will receive anything is if Class

5  3, in fact, gets paid in full, in satisfaction of

6  1129(b)(2)(B)(i)," meaning that the absolute priority rule

7  would not be an issue.  If Class 3 is not paid in full, Class

8  4's property interest is not -- is just -- is not just

9  valueless, it just doesn't exist.

10      Your Honor, this is precisely the situation in this case.

11  Equity interests will only receive a recovery if Class 8 and 9

12  are paid in full.

13      But Dugaboy attempts to escape the logical reading of the

14  absolute priority rule by claiming that *Introgen* was wrongly

15  decided and goes against the Supreme Court's decision in

16  *Ellers* (phonetic).  Dugaboy argues that because the Supreme

17  Court decided that property given to a junior class without

18  paying a senior class in full is property, even if it's

19  worthless.

20      But Dugaboy misses the point.  Like the debtor in the

21  *Introgen*, the Debtor here is not arguing that the property  --

22  the absolute priority rule is not violated because the

23  contingent trust is worthless.  Rather, the argument is that

24  the absolute priority rule is not violated; it's, in order to

25  receive anything on account of the junior -- of the equity,

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 102 of
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 107 of 313   PageID 4611

102

1    the senior creditors have to be paid a hundred percent plus

2    interest.

3       In fact, Your Honor, if the plan just didn't give any

4    recovery to the equity Class 10 and 11, I bet you Dugaboy and

5    Mr. Dondero would be arguing that it violated the absolute

6    priority rule because senior classes, unsecured creditors,

7    could potentially receive more than a hundred percent of their

8    interest.  And there's a case in the Southern District of

9    Texas, *In re MCorp*, where the Bankruptcy Court said that for a

10    plan to be confirmed, its stockholders eliminated, creditors

11    must not receive more than payment in full.

12       Excess proceeds, Your Honor, if any, have to go somewhere.

13    They can't go to creditors, so they have to go to equity.  And

14    the absolute priority rule is not violated.

15       And how is Dugaboy harmed?  They say they may want to buy

16    the contingent interests, and the lack of a marketing effort

17    violates the *LaSalle* opinion as well.  And who holds the Class

18    B and Class C partnership interests that come before Dugaboy

19    that Dugaboy is concerned may have this opportunity rather

20    than them?  Yes, it's Hunter Mountain, Your Honor, an entity,

21    like Dugaboy, that's owned and controlled by Mr. Dondero.

22       Accordingly, the argument that the plan violates the

23    absolute priority rule is actually a frivolous argument.

24       Turning now to unfair discrimination, Your Honor, Dugaboy

25    argued in its brief Monday that because the projected

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 103 of
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 108 of 313   PageID 4612

103

1   distribution to unsecured creditors has gone down in the

2   recent plan projections, the discrepancy between Class 7 and

3   Class 8 is so large that that amounts to unfair

4   discrimination.

5       Again, the Court should first ask why is Dugaboy even the

6   right party to be making the objection.  Its claim against the

7   Debtor to pierce the corporate veil, as I mentioned, is

8   frivolous.  It's subject to objection.  It didn't even bother

9   to have the claim temporarily allowed for voting purposes, as

10  did other creditors who thought they had a valid claim.  Yet

11  this is another example of Mr. Dondero, through Dugaboy,

12  trying to throw as many roadblocks in front of confirmation as

13  he can.

14      But this argument, like the other ones, fails as well.

15  Class 8 contains the general unsecured creditor claims,

16  predominately litigation claims that have been pending against

17  the Debtor for years.  The Debtor was justified in treating

18  the other unsecured creditors differently.

19      Class 6 consists of the PTO claims in excess of the cap,

20  which are of different quality and nature than the other

21  claims.

22      Class 7 consists of the convenience class.  And it's

23  appropriate to bribe convenience class creditors with a

24  discount option for smaller claims to be cashed out for

25  administrative convenience.

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 104 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 109 of 313 PageID 4613

104

1    Mr. Seery testified that when the plan was formulated, the

2  concept was to separately classify liquidated claims in small

3  amounts in Class 7 and unliquidated claims in Class 8.  Mr.

4  Seery also testified that there's a valid business

5  justification to treat the -- hold business 7 -- Class 7

6  claims differently.  These creditors had a reasonable

7  expectation of getting paid promptly, as compared to

8  litigation creditors, who would expect to be paid over time.

9    As the Court is aware, the litigation claims in Class 8

10  involve litigation that has been pending for several years in

11  the case of Acis, Daugherty, Redeemer, and more than a decade

12  in UBS.

13    And most importantly, as Mr. Seery testified, the

14  Committee and the Debtor had significant negotiation regarding

15  the classification and treatment provisions of the plan for

16  Class 7.

17    The Committee does have one constituent who is a Class 7

18  creditor.  However, the other three creditors are all in Class

19  8 and hold claims in excess of $200 million and supported the

20  separate classification and the different treatment.

21    So, Your Honor, discrimination, different treatment among

22  Class 7 and 8 is appropriate, and the different treatment is

23  not unfair.  In the February 1 projections, the Class 8

24  creditors are estimated to receive 71.32 percent of their

25  claims, but that's just an estimate.  As Mr. Seery testified,

1    the number can go up based upon the value he can generate from

2    the assets and, importantly, from litigation claims. Class 8

3    creditors could up end up receiving a hundred percent on

4    account of their claims. Class 7 creditors are fixed at 85

5    percent.

6        Giving Class 8 creditors the opportunity to roll the dice

7    and potentially get more or less than the 85 percent offered

8    to Class 7 is not at all unfair.

9        For these reasons, Your Honor, the Court has the ability

10   and should confirm the plan pursuant to the cram-down

11   provisions of 1129(b).

12       Your Honor, I'm now going to switch from the statutory

13   requirements to all the issues raised by the release,

14   injunction, and exculpation provisions.

15       I'd just like to take a brief sip of water.

16       Dugaboy -- I will first deal with the Debtor release

17   provided in Article 9(f) of the plan, which we claim is

18   appropriate. Dugaboy and the U.S. Trustee have objected to

19   the release contained in Article 9(f). Dugaboy objects

20   because it believes that the Debtor release releases claims

21   that the Claimant Trust or Litigation Trust have that have not

22   yet arisen, and the U.S. Trustee objects because it believes

23   that the release is a third-party release.

24       These objections have no merit, and they should be

25   overruled.

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 106 of
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 111 of 313   PageID 4615

106

1     I would like to ask Ms. Canty to put up a demonstrative

2   which contains the provision Article 9(f) of the plan.

3     Your Honor, as set forth in this Article 9(f), only the

4   Debtor is granting any release.  While that --

5         THE COURT:  And for the record, it's 9(d)?  9(d),

6   right?

7         MR. POMERANTZ:  9(d)?  9(d), correct, Your Honor.

8         THE COURT:  Yes.  Okay.

9         MR. POMERANTZ:  Sorry about that.

10         THE COURT:  Uh-huh.

11         MR. POMERANTZ:  While the release is broad, it does

12   not purport to release the claims of any third party.  The

13   Claimant Trust and the Litigation Trust are only included in

14   the release as successors of the Debtor.  The release is

15   specifically only for claims that the Debtor or the estate

16   would have been legally entitled to assert in their own right.

17     Section 1123(b)(3)(A) of the Bankruptcy Code provides that

18   a plan may provide for the settlement or adjustment of any

19   claims or interests belonging to the debtor or the estate, and

20   that's exactly what the Debtor release provides.

21     Accordingly, Dugaboy is wrong that the release effects a

22   release of claims that the Claimant Trust or the Litigation

23   Sub-Trust have that won't arise until after the effective

24   date.  And the U.S. Trustee is simply wrong; there's no third-

25   party release aspect under the release.

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 107 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 112 of 313 PageID 4616

107

1   The last point I will address on the release, Your Honor,

2   is who is being released and why and what does the evidence

3   show.  The Debtor release extends to release parties which

4   include the independent directors, Strand, for actions after

5   January 9th, Jim Seery as the CEO and CRO, the Committee,

6   members of the Committee, professionals, and employees.

7   You have heard Mr. Seery's testimony that the Debtor does

8   not believe that any claims against the parties that are

9   proposed to be released actually exist.  You have heard Mr.

10  Seery's testimony that he worked closely with the employees

11  and believes that not only have they all been instrumental in

12  getting the Debtor to the -- be on the cusp of plan

13  confirmation, but that also Mr. Seery is not aware of any

14  claims against them.

15  Moreover, as Mr. Seery testified, the release for the

16  employees is only conditional.  He testified that the

17  employees are required to assist in the monetization of assets

18  and the resolution of claims, and if they do not like -- if

19  they do not lose their release, then any Debtor claims are

20  tolled, such that could be pursued by the Litigation Trustee

21  at a future time.

22  Lastly, I'm sure that the Dondero entities will argue that

23  someone needs to investigate claims against Mr. Seery for

24  mismanagement or for, God forbid, having failed to file the

25  2015.3 statements.  Such claims are part of the continuing

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21    Entered 02/05/21 17:38:18    Page 108 of
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21    Page 113 of 313   PageID 4617

108

 1  harassment of Mr. Seery that the Dondero entities have

 2  embarked on after it was apparent that nobody would support

 3  their plan.

 4      There is no evidence of any claims that exist, Your Honor.

 5  In fact, the Committee and its professionals have watched the

 6  Debtor through this case like a hawk.  They have not been

 7  afraid to challenge the Debtor's actions in general and Mr.

 8  Seery's in particular.  FTI has worked on a daily basis with

 9  DSI and the company, had access to information.  When COVID

10  was happening, they were looking at trades going on on a daily

11  basis.

12      So if the Committee, whose members hold approximately $200

13  million of claims against the estate, are okay with the

14  release against the independent directors and Mr. Seery, that

15  should provide the Court with comfort to approve the releases

16  as part of the plan.

17      In summary, Your Honor, the Debtor release is entirely

18  appropriate and does not affect the release of third-party

19  claims that have not yet arisen.

20      Next, Your Honor, I want to go to the discharge.  There's

21  been objections to the discharge.  Dugaboy and NexPoint have

22  objected that the Debtor receiving a discharge under the plan

23  -- argue a debtor is liquidating.  The objection is not well

24  taken based upon Mr. Seery's testimony regarding what it is

25  the Claimant Trust and the Reorganized Debtor plan to do after

1   the effective date, as compared to what the limitations of a

2   discharge are under 1141(d)(3).

3       Your Honor, Article 9 of the -- 9(b) of the plan provides

4   that as -- except as otherwise expressly provided in the plan

5   or the confirmation order, upon the effective date, the Debtor

6   and its estate will be discharged or released under and to the

7   fullest extent provided under 1141(d)(A) [sic] and other

8   applicable provisions of the Bankruptcy Court.  Bankruptcy

9   Code.

10      Section 1141(d)(3) provides an exception to the discharge,

11  and I'd like to have that section put up for Your Honor at

12  this point.  Ms. Canty?

13      As this -- as the section reflects, and as the Fifth

14  Circuit has ruled in the *TH-New Orleans Limited Partnership*

15  case cited in our materials, in order to deny the debtor a

16  discharge under 1141(d)(3), three things must be true:  (1)

17  the plan provides for the liquidation of all or substantially

18  all of the property in the estate; (2) the debtor does not

19  engage in business after consummation of the plan; and (3) the

20  debtor would be denied a discharge under 727(a) of this title

21  if the case was converted to Chapter 7.  Here, only C applies.

22      With respect to A, Your Honor, while the plan does project

23  that it will take approximately two years to monetize the

24  Debtor's assets for fair value, the Debtor is just not

25  liquidating within the meaning of Section A.

001891

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21    Entered 02/05/21 17:38:18    Page 110 of
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 115 of 313   PageID 4619

110

1      As Mr. Seery testified, during the post-confirmation

2   period, post-effective date period, the Debtor will continue

3   to manage its funds and conduct the same type of business it

4   conducted prior to the effective date.  It'll manage the CLOs.

5   It'll manage Multi-Strat.  It'll manage Restoration Capital.

6   It'll manage the Select Fund, and it'll manage the Korea Fund.

7      The Bankruptcy Court for the Southern District of New

8   York's 2000 opinion in *Enron*, cited in our materials, is on

9   point.  There, the Court found that a debtor liquidating its

10   assets over an indefinite period of time that is likely to

11   take years is not liquidating within the meaning of Section

12   1141(b)(3)(A), justifying a denial of discharge.

13      But even if we failed A, based upon Mr. Seery's testimony,

14   we would not fail B.  The Debtor will be continuing to do what

15   it has done during the case, as it did before, as I said,

16   managing its business.  B says the debtor does not engage in

17   the business after management.  So while Mr. Seery testified

18   that it would take approximately two years, it could take

19   more, it could take less, and there is no requirement to

20   liquidate assets over a period of time.

21      Accordingly, Your Honor, the Debtor is conducting the type

22   of business contemplated by Section B so as not to just deny a

23   discharge.

24      As the Fifth Circuit said in the *TH-New Orleans* case, the

25   court granted a discharge there because it was likely that the

1   debtor would be liquidating its assets and conducting business

2   (indecipherable) years following a confirmation date.  And

3   this result makes sense, Your Honor, because the Debtor will

4   need the discharge and the tenant injunctions, which I'll get

5   to in a moment, in order to prevent interference with the

6   Debtor's ability to implement the terms of the plan and make

7   distributions to creditors.

8       I would now like, Your Honor, to turn to the exculpation

9   provisions, which there's been -- there's been a lot of

10  briefing on it, and I know Your Honor is very aware of the

11  exculpation provisions and the *Pacific Lumber* case.  And

12  several parties have objected to the exculpation contained in

13  the plan, based primarily on the Fifth Circuit ruling in

14  *Pacific Lumber*.

15      The exculpation provision, which is not dissimilar to what

16  is found in many plans around the country, including in plans

17  confirmed in bankruptcy courts in the Fifth Circuit, acts to

18  exculpate the exculpated parties for negligent-only acts as it

19  contains the standard carve-outs for gross negligence,

20  intentional conduct, and willful misconduct.

21      I do want to bring to the Court's attention a deletion we

22  made to the parties protected by the exculpation in the plan

23  and now -- were filed on February 1st.  The definition of

24  exculpated parties included, before February 1, not only the

25  Debtor but its direct and indirect majority-owned subsidiaries

001893

1    and the managed funds.  In the plan amendment, we have deleted

2    the Debtor's direct and indirect majority-owned subsidiaries

3    and managed funds from the definition and are not seeking

4    exculpation for those entities.

5        But before, Your Honor, I address *Pacific Lumber* and why

6    the Debtor believes it does not preclude the Court from

7    approving the exculpation in this case, I do want to focus on

8    something that the Objectors conveniently ignore from their

9    argument.

10       As I mentioned in my opening argument, Your Honor, the

11   independent directors were appointed pursuant to the Court's

12   order on January 9, 2020.  They have resolved many issues

13   between the Debtor and the Committee, and avoided the

14   appointment of a Chapter 11 trustee.

15       The January 9th order was specifically approved by Mr.

16   Dondero, who was in control of the Debtor at the time, and I

17   believe the transcripts that are admitted into evidence will

18   demonstrate that he was fully behind the approval of the

19   January 9th order.

20       In addition to appointing the independent directors into

21   what was sure to be a contentiously litigious case, the

22   January 9th order set the standard of care for the independent

23   directors, and specifically exculpated them from negligence.

24       You have heard Mr. Seery and Mr. Dubel testify that they

25   had input into what the order said and would have not agreed

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 113 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 118 of 313 PageID 4622

113

1    to be appointed as independent directors if it did not include

2    Paragraph 10, as well as the provisions regarding

3    indemnification and D&O insurance.

4        I would like to put a demonstrative on the screen, which

5    is actually Paragraph 10 of that order.  Your Honor, Paragraph

6    10, there's two concepts embedded here.  First, it requires

7    any parties wishing to sue the independent directors or their

8    agents to first seek such approval from the Bankruptcy Court.

9    Secondly, and importantly for purposes of the independent

10   directors and their agents, who would include the employees,

11   it set the standard of care for them during the Chapter 11 and

12   entitled them to exculpation for negligence.  Paragraph 10

13   says the Court will only permit a suit to go forward if such

14   claim represents a colorable claim for willful misconduct or

15   gross negligence.

16       And Your Honor, Paragraph 10 does not expire by its terms.

17       By not including negligence in the definition of what a

18   colorable claim might be, the Court has already exculpated the

19   independent directors and their agents, which include the

20   employees acting at their direction.

21       And because the independent directors and their agents are

22   exculpated under Paragraph 10, Strand needs to be exculpated

23   as well for actions occurring after January 9th.  This is

24   because a suit against Strand for conduct after the

25   independent board was appointed is effectively a suit against

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 114 of
Case 3:21-cv-00538-N  Document 26-7  Filed 06/09/21   Page 119 of 313   PageID 4623

114

1    the independent directors, who were the only people in control

2    of Strand at that time.

3        After the effective date, Mr. Dondero will regain control

4    of Strand, as the independent directors will be discharged.

5    And for parties able to sue Strand essentially for negligence

6    for conduct conducted by the independent directors after

7    January 9th, Strand will then be able to seek indemnification

8    from the Debtor under the Debtor's partnership agreement

9    because the partnership agreement does provide the general

10   partner is entitled to indemnification.

11       Accordingly, an exculpation for Strand is really the

12   functional equivalent of an exculpation for the independent

13   directors and the Debtor.

14       The January 9th order was not appealed, and an objection

15   to exculpation at this point as it relates to the independent

16   directors, their agents, and Strand is a collateral attack on

17   this order.  So, Your Honor, Your Honor does not even need to

18   get to the thorny issues addressed by *Pacific Lumber*.

19       However, even in the absence of the January 9th order,

20   exculpation of the independent directors and their employees,

21   as well as the other exculpated parties, is not prohibited by

22   *Pacific Lumber*.  In *Pacific Lumber*, the Fifth Circuit reversed

23   a bankruptcy court order confirming a plan because the

24   exculpation provision was too broad and included parties that

25   the Fifth Circuit thought could not be exculpated under

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 115 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 120 of 313 PageID 4624

115

1   Section 524(e) of the Code.

2        A close look at the issue before the Court, Your Honor,

3   the reasoning for the Court's ruling and why certain parties

4   like Committee and its members were entitled to exculpation,

5   reflects that this case does not prevent the Court from

6   approving exculpation of this case.

7        A careful read of the underlying briefs and opinions in

8   *Pacific Lumber* reveals that the concern that the Appellants

9   had in that case was the application of exculpation to non-

10  fiduciary sponsors.  There were two competing plans in the

11  case.  The first was filed by the indenture trustee.  The

12  second was filed by the debtor's parent and lender, and was

13  deemed -- called the Marathon Plan.  The Court confirmed the

14  Marathon Plan, and the indenture trustee appealed, and the

15  indenture trustee argued that the plan sponsors could not be

16  exculpated.

17       After determining that the appeal of the exculpation

18  provisions were not equitably moot, the Fifth Circuit

19  determined that exculpation was not authorized under 524(e) of

20  the Code because that section provides a discharge of the

21  debtor does not affect the liability of any other entity on

22  such debt.

23       However, and here's the important part, Your Honor:  The

24  Fifth Circuit did not say that all exculpations are prohibited

25  under the Code and authorized the exculpation of the Committee

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 116 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 121 of 313 PageID 4625

116

1    and its members.  And why did the Court do that?  Because it

2    looked at the Committee's qualified immunity under 1103 and

3    also reasoned that Committee members are essentially

4    disinterested volunteers that should be entitled to

5    exculpation on negligence.

6        The Court also cited approvingly *Colliers* for the

7    proposition that if Committee members were not exculpated for

8    negligence and subject to suit by people who are unhappy with

9    them, they just would not serve.

10       Accordingly, the Fifth Circuit based its willingness to

11   exculpate Committee members on the strong public policy that

12   supports exculpation for those parties under those

13   circumstances.  And against this backdrop, Your Honor, there

14   are several reasons why the Court should authorize exculpation

15   in this case, notwithstanding *Pacific Lumber*.

16       First, Your Honor, the independent directors in this case

17   are analogous -- much more analogous to the Committee members

18   that the Fifth Circuit ruled were entitled to than the

19   incumbent officer and directors.

20       Your Honor has the following facts before the Court, based

21   upon the testimony of Mr. Seery and Mr. Dubel and other

22   evidence in the record.  The independent board members were

23   not part of the Highland enterprise before the Court appointed

24   them on January 9th.  The Court appointed the independent

25   directors in lieu of a Chapter 11 trustee to address what the

 1  Court perceived as the serious conflicts of interest and

 2  fiduciary duty concerns with current management, as identified

 3  by the Committee.

 4      The independent directors would not have agreed to accept

 5  their role without indemnification, insurance, exculpation,

 6  and the gatekeeper function provided by the January 9th order.

 7      And Mr. Dubel testified regarding the significant

 8  experience he has as an independent director during his 30-

 9  plus years in the restructuring community, including several

10  engagements as an independent director in Chapter 11 cases.

11  And he testified that independent directors have become

12  commonplace in complex restructurings over the last several

13  years and have been appointed in many cases, including high-

14  profile cases.  We've cited to just a few of those cases in

15  our brief, but we could go on and on.

16      Mr. Dubel testified that the independent directors are a

17  critical tool in proper corporate governance and restoring

18  creditor confidence in management in modern-day

19  restructurings, and he testified that, based upon his

20  experience, independent directors expect to be indemnified by

21  the company, expect to obtain directors and officers

22  insurance, and expect to be exculpated from claims of

23  negligence when they agree to be appointed.

24      He further testified that if independent directors cannot

25  be assured that they will be exculpated for simple negligence,

001899

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 118 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 123 of 313 PageID 4627

118

1    he believes they will be unwilling to serve in contentious

2    cases like the one we have here, which will have a material

3    adverse effect on the Chapter 11 restructuring process as we

4    know it.

5         Based upon the foregoing testimony, Your Honor, which is

6    uncontroverted, the Court should have no problem finding that

7    the independent directors are much more analogous to the

8    Committee members in *Pacific Lumber* who the Fifth Circuit said

9    could be exculpated.

10        The facts, these facts also distinguish this case from the

11   *Dropbox v. Thru* case which Your Honor decided and which was

12   reversed on this issue by the District Court.  In neither

13   *Pacific Lumber* or *Thru* was there an argument that the policy

14   reasons that supported exculpation of Committee members also

15   supported the exculpation of the parties sought to be

16   exculpated.

17        Moreover, Your Honor, the independent directors in this

18   case were pointed as essentially as substitute for a Chapter

19   11 trustee.  There was a Chapter 11 trustee motion filed a few

20   days before, I believe, and the Court, in approving this, said

21   that you -- better than a Chapter 11 trustee.  And Chapter 11

22   Trustees are entitled to qualified immunity.  So, while, yes,

23   the independent directors aren't truly Chapter 11 trustees,

24   they are analogous.

25        Second, Your Honor, while there is language in *Pacific*

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 119 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 124 of 313 PageID 4628

119

1    *Lumber* that says that the directors and officers of the debtor

2    are not entitled to exculpation, the issue before the Court

3    really on appeal was the plan sponsors and whether they were.

4    So I would argue that any discussion of the exculpation not

5    being available for directors and officers in the Fifth

6    Circuit opinion in *Palco* is actually dicta.

7       Third, Your Honor, as I discussed before, the *Pacific*

8    *Lumber* decision was based solely on 524(e) of the Bankruptcy

9    Code, which only says that the discharge of a claim against

10    the debtor does not affect the discharge of a third party.

11    However, the Debtor is not relying on 524(e) as the basis of

12    their exculpation.  As we outline in our brief, Your Honor, we

13    believe that the exculpation is appropriate under Section 105

14    and 1123(b)(6) as a means -- part of an implementation of the

15    plan.

16       Importantly, Your Honor, as other courts hostile to third-

17    party releases have determined, exculpation only sets a

18    standard of care for parties and is not an effort to relieve

19    fiduciaries of liability.

20       Other courts that have aligned with the Fifth Circuit and

21    rejected third-party releases, like the Ninth Circuit, have

22    recently determined exculpation has nothing to do with 524(e).

23    In *In re Blixseth*, a Ninth Circuit case decided at the end of

24    2020 cited in our materials, they examined several of their

25    circuit cases that had strongly prohibited non-consensual

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 120 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 125 of 313 PageID 4629

120

1   third-party releases under 524(e).  But again, the Court

2   concluded that 524(e) only prohibits third parties from being

3   released from liability of a prepetition claim for which the

4   debtor receives a discharge.  The Court reasoned that the

5   exculpation clause, however, protects parties from negligence

6   claims relating to matters that occurred during the Chapter 11

7   case and has nothing to do with 524(e).

8       The Ninth Circuit, which along with the Fifth Circuit has

9   been notorious for prohibiting third-party releases, issued

10  its ruling against this backdrop and said that exculpations

11  are appropriate.

12      Your Honor, the Objectors made a point yesterday of

13  pointing out that Strand, as the Debtor's general partner, is

14  liable for the debts under applicable law.  To the extent they

15  intend to argue that the exculpation is seeking to discharge

16  any such prepetition liability, they would be wrong.  The

17  exculpation only applies to postpetition matters.  And to the

18  extent they argue that the exculpation seeks to discharge

19  Strand's potential postpetition liability, for the reasons I

20  discussed, a claim against Strand will essentially be a claim

21  against the Debtor because the Debtor will be obligated to

22  indemnify them.

23      Accordingly, Your Honor, we submit that if this matter

24  goes up to appeal to the Fifth Circuit, which it may very well

25  do, that the Fifth Circuit may very well come out the same way

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 121 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 126 of 313 PageID 4630

121

1  as the Ninth Circuit and start relaxing the standard or

2  otherwise provide that the independent directors are much more

3  like Committee members.

4     Lastly, Your Honor, if the Court does confirm the plan,

5  which we certainly hope it will do, it will have made a

6  finding that the plan has been proposed in good faith, and in

7  doing so, the Court essentially finds that the independent

8  directors and their agents have acted appropriately and

9  consistent with their fiduciary duties, and it makes --

10  exculpation for negligence naturally flows from that finding.

11     Your Honor, I would now like to go to the injunction

12  provisions, and my argument is that the injunction provisions

13  as amended are appropriate.

14       THE COURT:  Can I stop you?

15       MR. POMERANTZ:  We received several of -- yes.

16       THE COURT:  I want to just recap a couple of things I

17  think I heard you say.  You're not asking this Court, you say,

18  to go contrary to *Pacific Lumber* per se.  You have thrown out

19  there the possibility that *Pacific Lumber* mistakenly relied on

20  524(e) in rejecting exculpations of plan sponsors.  You're

21  saying, eh, as a technical matter, I think they were wrong in

22  focusing on that statute because that statute seems to deal

23  with prepetition liability.  Okay?  Its actual wording, 524(e)

24  states, discharge of a debt of a debtor does not affect the

25  liability of any other entity on such debts.

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 122 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 127 of 313 PageID 4631

122

1    And reading between the lines, I think you're saying --

2   well, maybe this isn't what you're saying, but here's what I

3   inferred -- "debt" is defined in 101(12) to mean liability on

4   a claim, and then "claim" is defined in 101(5) of the

5   Bankruptcy Code as meaning right to payment.  It doesn't say

6   as of the petition date, but I think if you look at, then,

7   Section 502 of the Bankruptcy Code that addresses claims and

8   interests, clearly, it seems to be referring to the

9   prepetition time period, you know, claims and interest as of

10  the petition date.  And then -- that's 502.  And then 503

11  speaks of, for the most part, postpetition administrative

12  expenses.

13    So that was my rambling way of saying I'm understanding

14  you to say, eh, as a technical matter, we think the Fifth

15  Circuit was wrong to focus on 524(e) because when you're

16  talking about exculpation you're talking about postpetition

17  liability, not prepetition liability.  And 524(e) is talking

18  more about prepetition liability.

19    But I think what I also hear you saying is, at bottom,

20  *Pacific Lumber* was sort of a policy-driven holding where, you

21  know, we're worried about no one would ever sign up for being

22  on an unsecured creditors' committee if they could be exposed

23  to lawsuits.  They're fiduciaries, we think, for policy

24  reasons.  Exculpation is appropriate for this one group.  And

25  you're saying, well, they didn't have an independent board

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 123 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 128 of 313 PageID 4632

123

1    that they were considering.  They were just considering non-

2    fiduciary plan sponsors.  And so the rationale presented by

3    *Pacific Lumber* applies equally here, and just they didn't make

4    a holding in this factual context.

5         Have I recapped what you're saying?

6              MR. POMERANTZ:  Your Honor, that's generally --

7    generally correct, with a couple of nuances.  So, yes, first,

8    I think, on a policy basis, Your Honor -- again, putting aside

9    the January 9th order, because we don't see --

10             THE COURT:  Right.  Right.

11             MR. POMERANTZ:  -- Your Honor even needs to get to

12   this issue.

13             THE COURT:  I understand.

14             MR. POMERANTZ:  But if Your Honor does get to this

15   issue, we think, as a first point, Your Honor could be totally

16   consistent with *Pacific Lumber* because there's policy reasons

17   and there was not a categorical rejection of exculpation.

18   Okay.  So if there was a categorical rejection, then it

19   wouldn't have been okay for committee members.  Okay.

20        Second argument, yes, we don't think -- we think it's part

21   of dicta.  It's not part of the holding.  We understand that

22   other courts may have not agreed, maybe your *Thru* case, which

23   Your Honor was appealed on.

24        But the third issue, our argument is all they looked at

25   was 524(e).  They said 523 -- 4(e) does not authorize it.

001905

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21    Entered 02/05/21 17:38:18    Page 124 of
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21    Page 129 of 313   PageID 4633

124

1  They did not say 524(e) prohibits it.

2      We think there's other provisions in the Code.  And then

3  when you basically add in the analysis that Your Honor

4  provided, which we agree with, and what 524 was -- to do,

5  524(e) just says that discharge doesn't affect.  It doesn't

6  say that under another provision of the Code or for another

7  reason you are authorized to give an exculpation.  I think

8  it's a nuance and it's a difference there.

9      And my point of bringing up the *Blixseth* case -- which, of

10 course, is Ninth Circuit and it's not binding on Your Honor,

11 it's not binding on the Fifth Circuit -- is to say, when that

12 was presented to them, they saw the distinction that 524(e)

13 has nothing to do with an exculpation.  And while, yes, the

14 Fifth Circuit hasn't ruled on that, and if the Fifth -- if

15 that argument is made to the Fifth Circuit, we don't know how

16 they would rule, I think that, based upon their analysis --

17 which, again, Your Honor, is no more than a page and a half of

18 their opinion, right, of a long, lengthy opinion on the

19 confirmation issues.  So I think, Your Honor, with the Fifth

20 Circuit, there is a good chance that based upon the developing

21 case law of exculpation, based upon the sister circuit in

22 *Blixseth* making that distinction, that there is a very good

23 chance that the Fifth Circuit would change.

24      But look, I recognize that argument requires Your Honor to

25 say, okay, this is outside and -- and what *Pacific Lumber* did

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 125 of
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 130 of 313   PageID 4634

125

1   or didn't do.  But I think, Your Honor, there's several

2   potential reasons, there's several potential arguments that

3   you can get to the same place.

4           THE COURT:  Okay.  Thank you.

5           MR. POMERANTZ:  Okay.  If I may just get another

6   glass of -- sip of water before my time starts?

7           THE COURT:  Okay.

8           MR. POMERANTZ:  Okay, Your Honor.  We're now turning

9   to the injunction provision.  The Debtor received several

10  objections to the injunction provisions in -- I think I have

11  it right now -- Article 9(f) to the plan.  And we've modified

12  Article 9(f) to address certain of those concerns, and we

13  believe that, as modified, that the injunction provision

14  implements and enforces the plan's discharge, release, and

15  exculpation provisions to prevent parties from pursuing claims

16  in interest that are addressed by the plan and otherwise

17  interfering with consummation and implementation of the plan.

18      I'd like to put up the first paragraph of the injunction

19  on the screen now.

20      Okay, Your Honor.  The first paragraph, all it does is

21  prohibits the enjoined parties from taking action to interfere

22  with consummation or implementation of the plan.  I suspect a

23  sentence like that is probably in hundreds of plans in the

24  Fifth Circuit and elsewhere.

25      Initially, to address a concern that it applied to too

1  many parties, the Debtor added a definition in the revised

2  plan that defines "enjoined parties," which I'd like to now

3  put that definition up on the screen.

4      The changes -- it's a little hard to read there, but you

5  have it in the -- oh, there you go.  The changes made clear

6  that only parties who have a relationship to this case, either

7  holding a claim or interest, having appeared in the case, be a

8  -- or be a party in interest, Jim Dondero, or related entity,

9  or related person of the foregoing are covered.  The claim

10  objectors argue that the word "implementation and

11  consummation" is vague, or vague and unclear.  Your Honor,

12  these terms are both defined in the Bankruptcy Code and under

13  the case law, and they're, as I said, common features of many

14  plans.

15      Section 1123(a)(5) of the Code provides that a plan shall

16  provide for its implementation, and identifies a list of items

17  that the plan can include.  Article 4 of our plan is defined

18  as "Means of Implementation of This Plan," and describes the

19  various corporate steps required to implement the provisions

20  of the plan, including canceling equity interests, creation of

21  new general partners and a limited part of the Reorganized

22  Debtor, the restatement of the limited partnership agreement,

23  and the establishment of the various trusts.

24      Paragraph 1 rightly and appropriately enjoins efforts to

25  interfere with these steps.

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 127 of
Case 3:21-cv-00538-N  Document 26-7  Filed 06/09/21   Page 132 of 313  PageID 4636

127

1    Nor is the term "consummation of the plan" vague.

2    "Consummation" also is a commonly-used term and has been

3    defined by the Fifth Circuit and the Code.  1102 -- 1101(2)

4    defines "Substantial Consummation" to be the transfer of

5    assets to be transferred under the plan, the assumption by the

6    debtor of the management of all the property dealt with by the

7    plan, and the commencement of distributions under the plan.

8    Section 1142 gives the Court authority to direct a party

9    to perform any act necessary for consummation of a plan.  And

10   as the Fifth Circuit, in *United States Brass Corp.*, which is

11   said in our material, states, said the Bankruptcy Court had

12   post-confirmation jurisdiction to enforce the unperformed

13   terms of a plan with respect to a matter that could affect the

14   parties' post-confirmation rights because the plan had not

15   been fully consummated.

16   And Your Honor just wrote on this issue last year in the

17   *Senior* -- the *Texas* -- the *TXMS Real Estate v. Senior Care*

18   case, and you cited to *U.S. Brass* to find that, in that case,

19   post-confirmation jurisdiction existed to resolve a dispute

20   relating to an assumed contract because the matter related to

21   interpretation, implementation, and execution of the plan.

22   Accordingly, Your Honor, neither implementation or

23   consummation are vague, and the first paragraph of the

24   injunction is necessary and appropriate to enforce the

25   Debtor's discharge.

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 128 of
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 133 of 313   PageID 4637

128

1    As I said before, I will leave it to Mr. Kharasch to

2    address specifically the concerns that the Advisor and the

3    Funds have with the injunction.

4    The second and third paragraphs of the injunction, Your

5    Honor, certain parties have objected to them on the ground

6    that they constitute an improper release of the independent

7    directors as well as the release of claims against the

8    Reorganized Debtor, the Claimant Trust, and the Litigation

9    Sub-Trust, entities that will not have come into existence

10   until after the effective date.

11   We believe we have addressed these concerns by

12   modifications to the second and third paragraphs of the

13   injunction, which I would now like to put the second and third

14   paragraphs on the screen.

15   (Pause.)

16       MR. POMERANTZ:  As that is happening, Your Honor, I

17   will -- there we go.

18   We believe that the changes that were made to these

19   paragraphs should address the Objectors' concerns.

20   First, as with the first paragraph, we have created a

21   defined term of "Enjoined Parties" who are subject to the

22   injunction which is narrower than all persons, I believe, or

23   all entities that was included in the prior plan.  So we've

24   narrowed that.

25   "Enjoined Parties" are generally defined, as I mentioned

1  before, as entities involved in this case or related to Jim

2  Dondero, or have appeared in this case.

3       Second, we have removed independent directors from these

4  paragraphs to address the concern that the injunction was a

5  disguised third-party release.

6       Third, we have removed the Reorganized Debtor and the

7  Claimant Trust from the second paragraph and moved them to the

8  third paragraph.  We did this to make clear that the

9  Reorganized Debtor and Claimant Trust were only getting the

10  benefit of the injunction as the successors to the Debtor.  As

11  the Reorganized Debtor and the Claimant Trust receives the

12  property from the Debtor free and clear of all claims and

13  interests and equity holders under 1141(c), they are entitled

14  to the benefit of the injunction.

15       Fourth, we have addressed the concern that the injunction

16  improperly affected set-off rights.  We added language to make

17  clear that the injunction would only affect the parties' set-

18  off of an obligation owed to the Debtor to the extent that

19  that was permissible under 553 and 1141 of the Bankruptcy

20  Code.

21       In other words, we are punting the issue for another day,

22  and there's nothing in the plan that gives the Debtor any more

23  set-off rights than it otherwise has under the Bankruptcy

24  Code.

25       Lastly, Your Honor, certain Objectors have argued that the

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 130 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 135 of 313 PageID 4639

130

1    injunction somehow prevents them from enforcing the rights

2    they have under the plan or the confirmation order.  We don't

3    really understand this concern, as the language leading into

4    the second paragraph of the injunction says, except as

5    expressly provided in the plan, the confirmation order, or a

6    separate order of the Bankruptcy Court.

7         With these modifications, Your Honor, the provisions do

8    nothing more than implement 1123(b)(6) and 1141 by preventing

9    parties from taking actions to interfere with the Debtor's

10   plan.

11        The Court has also heard testimony from Mr. Seery

12   regarding the importance of the injunction to implementation

13   of the plan.  He testified that he intends to monetize assets

14   in a way that will maximize value.  And to effectively do

15   that, he has testified that the Claimant Trust needs to be

16   able to pursue its objectives without interference and

17   continued harassment from Mr. Dondero and his related

18   entities.

19        In fact, Mr. Seery testified that if the Claimant Trust

20   were subject to interference by Mr. Dondero, it would take him

21   more time to monetize assets, they would be monetized for less

22   money, and creditors would be harmed.

23        If Your Honor doesn't have any questions for me on the

24   injunction provisions, I'd like to turn to the last part of

25   the injunction, which is really the gatekeeper provision.

001912

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 131 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 136 of 313 PageID 4640

131

1          THE COURT:  All right.  You may.

2          MR. POMERANTZ:  Your Honor, the last paragraph in

3    Article 9(f) is really not an injunction but is rather a

4    gatekeeper provision.  And as originally drafted, it'd do two

5    things:  first, it'd require that before any entity, which is

6    defined very broadly, could file an action against a protected

7    party relating to certain specified matters, the entity would

8    have to seek a determination from this Court that the claim

9    represented are colorable claim of bad faith, criminal

10   conduct, willful misconduct, fraud, or gross negligence.  The

11   specified matters to which the gatekeeper provision would

12   apply included the Chapter 11 case, negotiations regarding the

13   plan, the administration of the plan, the property to be

14   distributed under the plan, the wind-down of the Debtor's

15   business, the administration of the Claimant Trust, or

16   transactions related to the foregoing.

17        Subject to certain exceptions for Dondero-related parties,

18   protected parties were defined to include the Debtor, its

19   successors and assigns, indirect and direct, majority-owned

20   subsidiaries and managed funds, employees, Strand, Reorganized

21   Debtor, the independent directors, the Committee and its

22   members, the Claimant Trust, the Claimant Trustee, the

23   Litigation Trust, the Litigation Sub-Trustee, the members of

24   the Oversight Committee, retained professionals, the CEO and

25   CRO, and persons related to the foregoing.  Essentially,

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 132 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 137 of 313 PageID 4641

132

1    parties related to the pre-effective-date administration of

2    the estate or the post-confirmation implementation of the

3    plan.

4        Second, the gatekeeper provision as originally presented

5    gave the Bankruptcy Court exclusive jurisdiction to adjudicate

6    any cause of action that it determined would pass through the

7    gate.  The gatekeeper provision, Your Honor, is not a release

8    in any way.  Rather, it permits enjoined parties who believe

9    they have a claim against the protected parties to pursue such

10   a claim, provided they first make a showing that the claim is

11   colorable to the Bankruptcy Court.

12       Several parties, Your Honor, objected to the Bankruptcy

13   Court having exclusive jurisdiction to adjudicate the claims

14   that pass through the gate.  The Debtor believes that the

15   Bankruptcy Court would ultimately have jurisdiction of any of

16   those claims that pass through the gate.  However, the Debtor

17   did, upon reflection, appreciate the concern that if the Court

18   agreed to that now, it would essentially be determining its

19   jurisdiction before a claim was filed.

20       Accordingly, in the January 22nd plan, Your Honor, we

21   amended the provision to provide that the Bankruptcy Court

22   will only have jurisdiction over such claims to the extent it

23   was legally permissible to do so, essentially deferring the

24   issue to a later time.

25       And as Your Honor, I believe, in one of cases called the

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 133 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 138 of 313 PageID 4642

133

1   *Icing on the Cake*, the retention and jurisdiction provisions

2   in the plan only are to the extent under applicable law and

3   are quite broad and include the things that we would have the

4   Court -- have jurisdiction for the Court, otherwise

5   determined.

6       The Court made some other changes to the gatekeeper

7   provision, and I would like to place the amended gatekeeper

8   provision on the screen right now.  In addition to the change

9   I mentioned, the Debtor made the following changes:  the

10  provision is limited now to apply only to enjoined parties,

11  rather than any entity.  Than any entity.  Much narrower.  The

12  provision added the administration of the Litigation Sub-Trust

13  to the matters to which the provision would apply.  The

14  provision makes clear now that any claim, including

15  negligence, is a claim that could be sought and pursued

16  through the gatekeeper function.  And the provision made some

17  other syntax changes.

18      We believe, Your Honor, with these changes, we believe

19  that the gatekeeper provision is within the Court's

20  jurisdiction and it's appropriate to include under the plan.

21      But certain parties have argued that the Court does not

22  have the authority, the jurisdictional authority to perform

23  the gatekeeper function, separate and apart from whether it

24  has jurisdiction to adjudicate the claims that pass through

25  the gate.

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 134 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 139 of 313 PageID 4643

134

1     Your Honor, we submit that these arguments represent a

2  fundamental misunderstanding of Bankruptcy Court jurisdiction

3  and the Court's authority to make sure the Debtor is free of

4  interference in carrying out the plan which I'll get to in a

5  couple moments.

6     As a preliminary matter, Your Honor, it is important for

7  the Court to remember that Paragraph 10 of the January 9 order

8  already contains a gatekeeper provision as it relates to the

9  independent directors and their agents.  And as I mentioned on

10  a couple of occasions, that order is not going away, it

11  doesn't expire by its terms, and it cannot be collaterally

12  attacked in this forum.

13     The Debtor does acknowledge, though, that the gatekeeper

14  provision in the plan is broader in terms of the people it

15  protects and it applies to post-confirmation matters.

16     Before I address the Court's authority to approve the

17  gatekeeper provision, I want to summarize the evidence that it

18  has heard from Mr. Seery and Mr. Tauber regarding why the

19  gatekeeper is so important a provision to the success of the

20  plan.

21     Although the Court is all too familiar with the history of

22  litigation initiated by and filed against Mr. Dondero and his

23  related affiliates, Mr. Seery spent some time on the stand

24  testifying about the litigation so the Court would have a

25  complete record for this hearing.  He testified that prior to

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 135 of
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 140 of 313   PageID 4644

135

1   the petition date, the Debtor faced years of litigation from

2   Mr. Terry and Acis that led to the *Acis* bankruptcy case, which

3   Your Honor has said many times it's still in your mind.  Years

4   of litigation with the Redeemer Committee which precipitated

5   the filing of a bankruptcy case and resulted in an award very

6   critical of the Debtor's conduct.  Years of litigation with

7   UBS.  Years of litigation with Patrick Daugherty.  And we

8   placed all the dockets for all these matters before the Court.

9        Also, during the bankruptcy and after the Committee

10   essentially rejected the Debtor's pot plan proposal and

11   indicated -- and the Debtor indicated it would be terminating

12   the shared service agreements with Mr. Dondero and his related

13   entities, the Debtor was the subject of harassment from Mr.

14   Dondero and related entities which resulted in the temporary

15   restraining order against him, a preliminary injunction

16   against him, a contempt motion, which Your Honor is scheduled

17   to hear Friday, a motion by the Debtor's controlled -- by the

18   Dondero-controlled investors and funds in CLO managed --

19   managed by the Debtor, which the Court referred to that motion

20   as being frivolous and a waste of the Court's time.  Multiple

21   plan objections, most of which are focused on allowing the

22   Debtors to continue their litigation crusade against the

23   Debtor and its successors post-confirmation.  An objection to

24   the Debtor approval of the Acis order and a subsequent appeal.

25   An objection to the HarbourVest settlement and subsequent

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 136 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 141 of 313 PageID 4645

136

1  appeal.  A complaint and injunction against the Advisors and

2  the Funds to prevent them from violating Paragraph 9 of the

3  January 9th order.  And a temporary restraining order against

4  those parties, which was by consent.

5      Mr. Dondero's counsel tends to argue that he is the victim

6  here and that the litigation is being commenced against him

7  and -- instead of by him.  That response does not even deserve

8  a response, Your Honor.  It is disingenuous.

9      Mr. Tauber testified that he was part of the team at Aon

10 that sourced coverage for the independent directors after

11 their appointment in January 2020 and that he has over 20

12 years of underwriting experience.  He testified that at Aon he

13 builds bespoke insurance programs which are not cookie-cutter

14 programs for his clients, with an emphasis on D&O and E&O.

15 And he was asked by the independent board to obtain D&O and

16 E&O insurance after the board's appointment on January 9th.

17     Based upon the process Aon conducted in reaching out to

18 insurance carriers, Mr. Tauber testified that Aon was only

19 able to obtain D&O insurance based upon the inclusion of

20 Paragraph 10 of the January 9 order, the gatekeeper provision.

21 I know Mr. Taylor said that that was spoon-fed to the

22 insurers, but Mr. Tauber's testimony is they knew about Mr.

23 Dondero and they knew about his litigation tactics, so it is

24 not a good inference to be made from the testimony that they

25 would not have required something.  They probably would have

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 137 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 142 of 313 PageID 4646

137

1    just said no.

2         Aon has now been -- Mr. Tauber testified that Aon has now

3    been asked to obtain D&O coverage for the Claimant Trustee,

4    the Litigation Trustee, the Oversight Committee, the members,

5    the Claimant Trust, and the Litigation Sub-Trust.  He

6    testified that he and Aon have approached the insurance

7    carriers that they believe might be interested in underwriting

8    coverage.

9         And no, he hasn't approached every D&O and E&O carrier out

10   there, and there may be, just like an investment banker

11   doesn't have to approach everyone.  They are experts in the

12   field, and he testified they approached the people they

13   thought would likely be willing or interested and potentially

14   be willing to extend coverage.  And as a result of Aon's

15   efforts, Mr. Tauber has determined that there's a continued

16   resistance to provide any coverage that does not contain an

17   exclusion for actions relating to Mr. Dondero or his related

18   entities.  And he further believes that all carriers that will

19   -- that have discussed a willingness to provide coverage will

20   only do so if there is a gatekeeper provision, and only one

21   carrier will agree to provide coverage without a Dondero

22   exclusion.

23        Mr. Tauber testified that he believes that any ultimate

24   policy will provide that if at any time the gatekeeper

25   provision is not in place, either the carrier will not cover

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 138 of
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 143 of 313   PageID 4647

138

1    any actions related to Mr. Dondero or his affiliates or that

2    the coverage will be vacated or voided.

3        Based upon the foregoing record, Your Honor, which is

4    uncontroverted, there's ample justification on a factual basis

5    for approval of the gatekeeper provision.

6        I will now turn to the Court's authority to approve the

7    gatekeeper provision.

8        There are three alternative bases upon which the Court can

9    approve the gatekeeper provision.  First, several provisions

10   of the Bankruptcy Code give broad authority to approve a

11   provision like the gatekeeper provision.

12       Second, the Court can analogize to the Barton Doctrine the

13   facts and circumstances in this case and authorize the Court

14   to act as a gatekeeper to prevent frivolous litigation from

15   being filed against court-appointed officers and directors and

16   those that will lead the post-confirmation monetization of the

17   estate's assets.

18       And third, Your Honor, the Court can find that Mr. Dondero

19   and his entities are vexatious litigants, and use the

20   gatekeeper provision as a sanction to prevent the filing of

21   baseless litigation designed merely to harass those in charge

22   of the estate post-confirmation.

23       So, Bankruptcy Court authority.  Your Honor, there are

24   several provisions in the Bankruptcy Code which we rely on to

25   support the Court's authority.  First, Section 1123(a)(5)

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 139 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 144 of 313 PageID 4648

139

1    permits the plan to approve adequate means of implementation,

2    and contains a long, non-exclusive list.  Mr. Seery's

3    testimony is uncontroverted that a gatekeeper provision is

4    necessary for the adequate implementation of the plan.

5        Second, Your Honor, 1123(b)(6) authorizes a plan to

6    include any appropriate provision in a plan not inconsistent

7    with any other provision in this Code.  There are not any

8    provisions and none have been cited by the Objectors that

9    would prohibit a gatekeeper provision.  Section 1141

10   effectively holds that the terms of a plan bind the debtor and

11   its creditors and vest property in a reorganized debtor, free

12   and clear of the interests of third parties.

13       If nothing else, Your Honor, the spirit of 1141 allows the

14   Court to prevent, in appropriate cases, vexatious litigation

15   by unhappy creditors and parties in interest from torpedoing

16   the plan.

17       1142(b), Your Honor, provides that the confirmation --

18   that, after confirmation, the Court may direct any parties to

19   perform any act necessary for the consummation of the plan,

20   and requiring the party to seek court-approval before filing

21   an action is certainly an act.

22       And lastly, Your Honor, Section 105 allows the Court to

23   enter orders necessary to order other things, enforce orders

24   of the Court like the confirmation order, and prevent an abuse

25   of process which would certainly occur if baseless litigation

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 140 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 145 of 313 PageID 4649

140

1    were filed against the parties in charge of the Reorganized

2    Debtor and the trust vehicles entrusted with carrying out the

3    plan.

4          Your Honor, gatekeepers are not a novel concept and have

5    been approved by courts in appropriate circumstances.  In the

6    *Madoff* cases, the Court has been the gatekeeper post-

7    confirmation to determine whether investor claims are

8    derivative or direct claims.

9          In *General Motors*, the Court has been the gatekeeper post-

10   confirmation to determine whether product liability claims are

11   proper claims against the reorganized debtor.

12         Closer to home, Judge Lynn, Mr. Dondero's counsel,

13   approved a gatekeeper provision, arguably even more far-

14   reaching than the provision here, in the *Pilgrim's Pride* case.

15   In that case, Judge Lynn held that *Pacific Lumber* prevented

16   him -- prevented the Court from approving the exculpation

17   provision in the plan.  However, he did hold that it was

18   appropriate for the Court to ensure that debtor

19   representatives are not improperly pursued for their good-

20   faith actions by requiring that any actions against the debtor

21   or its representatives, and further, on the performance of

22   their obligations as debtor-in-possession, be heard

23   exclusively before the Bankruptcy Court.

24         And *Pilgrim's Pride* is not the only case in this district

25   to include a gatekeeper provision, as Judge Houser approved

001922

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 141 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 146 of 313 PageID 4650

141

1    one in the *CHC Group* in 2016, which is cited in our materials.

2            The theme in all these cases, Your Honor, is that there

3    are circumstances where it is necessary and appropriate for

4    the Bankruptcy Court to act as a gatekeeper as a means of

5    reducing litigation that could interfere with a confirmed plan

6    and that a Court has the authority to approve such provisions.

7            The Objectors argue that the Bankruptcy Court does not

8    have jurisdiction to approve that provision.  The Debtor

9    understands the argument as it related to the prior provision,

10   which gave the Court exclusive jurisdiction over any claim it

11   found colorable, and we've amended the plan to address that

12   issue.  The jurisdiction to deal with those claims could be

13   left to a later day.

14           But to the extent the Objectors still pursue the

15   jurisdiction argument in light of the current provision,

16   they're really conflating two very different things:  the

17   ability to determine whether a claim is colorable and the

18   ability to adjudicate that claim if the Court determines it's

19   colorable.

20           None of the authorities cited by the Objectors hold that

21   the Court is without jurisdiction to approve a gatekeeper

22   provision like the one here.  So, rather, what they do is they

23   try to -- they argue, based upon the *Craig's Stores* case,

24   which is narrower than other circuits of post-confirmation

25   jurisdiction in the Bankruptcy Court, and argue that the

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 142 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 147 of 313 PageID 4651

142

1  gatekeeper provision doesn't fall within that.  But that --

2  such reliance is misplaced, Your Honor.

3    *Craig* held that the Bankruptcy Court did not have

4  jurisdiction to adjudicate a post-confirmation dispute over a

5  private-label credit card agreement between the debtor and the

6  bank.  In declining to find jurisdiction, the Fifth Circuit

7  remarked that there was no antagonism or claim pending between

8  the parties as of the reorganization and no facts or law

9  deriving from the reorganization or the plan was necessary to

10  the claim asserted by the debtor.

11    However, in so ruling, Your Honor, the Fifth Circuit did

12  reason that post-confirmation jurisdiction in the Bankruptcy

13  Court continues to exist for matters pertaining to

14  implementation and execution of the plan.  Requiring parties

15  to seek Bankruptcy Court determination the claim is colorable

16  before embarking on litigation that will impact

17  indemnification rights and affect distributions to creditors

18  is not an expansion of jurisdiction and fits well within the

19  *Craig* reasoning.

20    Unlike the credit card agreement dispute in *Craig*, Mr.

21  Dondero and his entities have demonstrated tremendous

22  antagonism towards the Debtor.  And while the Debtor's plan

23  may be confirmed, further litigation has been threatened by

24  Mr. Dondero.  It's in the pleadings.  That's one of the

25  reasons Mr. Dondero says his plan is better.  It'll avoid

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 143 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 148 of 313 PageID 4652

143

1    tremendous amount of litigation.

2        After *Craig*, the Fifth Circuit again examined the

3    bankruptcy court's post-confirmation jurisdiction in the

4    *Stoneridge* case in 2005.  In that case, the Fifth Circuit

5    ruled that a bankruptcy court has post-confirmation

6    jurisdiction to resolve a dispute between two nondebtors that

7    could trigger indemnification claims against a liquidating

8    trust formed as a result of a confirmed plan.

9        And lastly, as I mentioned Your Honor's decision before,

10   the *TXMS Real Estate* case, I think just a couple of months

11   ago, it stands for the proposition that post-confirmation

12   jurisdiction exists for matters bearing on the implementation,

13   interpretation, and execution of a plan.  In that case, Your

14   Honor ruled that Your Honor had jurisdiction to resolve a

15   post-confirmation dispute between a liquidating trust formed

16   under a plan and a landlord, the result of which could

17   significantly and adversely affect the value of the

18   liquidating trust and monies available for unsecured

19   creditors.

20       And you have heard Mr. Seery testify that litigation will

21   have an adverse effect on the ability to make distributions to

22   creditors.

23       So, Your Honor, under these authorities, the Court

24   undoubtedly would have jurisdiction to act as the gatekeeper

25   for the litigation.

001925

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 144 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 149 of 313 PageID 4653

144

1    There's also an independent basis for the gatekeeper

2  provision, Your Honor, the Barton Doctrine, which the Court is

3  very familiar from your opinion in the *In re Ondova* case in

4  2017 and which provides that before a suit may be brought

5  against a trustee, leave of Court is required. In *Ondova*, the

6  Court reviewed the history of the doctrine in connection with

7  litigation brought by a highly-litigious debtor against a

8  trustee and his professionals. This Court noted that there

9  are several important policies followed by the doctrine,

10  including a concern for the overall integrity of the

11  bankruptcy process and the threat of trustees being distracted

12  from or intimidated from doing their jobs. And Your Honor's

13  language still: For example, losers in the bankruptcy process

14  might turn to other courts to try to become winners there by

15  alleging the trustee did a negligent job.

16    Your Honor, this is precisely what the Debtor is trying to

17  prevent here, Mr. Dondero and his entities from putting the

18  bad experience before Your Honor in this case behind it and

19  going to try to find better luck in a more hospitable court.

20    Your Honor, the Barton Doctrine originally only applied to

21  receivers, and over the course of time has been extended to

22  apply to various court-appointed fiduciaries, as we have cited

23  in our materials: trustees, debtors-in-possession, officers

24  and directors, employees, and attorneys representing the

25  debtor.

001926

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 145 of
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 150 of 313   PageID 4654

145

1       And I expect the Objectors to argue that there is a

2   statutory exception to the Barton Doctrine under 28 U.S.C. 959

3   and it does not apply to acts or transactions in carrying out

4   business conducted with a property.  The exception, Your

5   Honor, is very narrow and was meant to apply for things like

6   slip-and-fall cases.  In fact, the Eleventh Circuit in the

7   *Carter v. Rodgers* case, 220 F.3d 1249 in 2000, held that

8   Section 11 -- 28 U.S.C. 959(a) does not apply to suits against

9   trustees for administering or liquidating the bankruptcy

10   estate.

11       The Objectors also argue that the gatekeeper provision

12   violates *Stern v. Marshal*.  However, as the Court acknowledged

13   in *Ondova*, the Fifth Circuit in *Villegas v. Schmidt* has

14   recognized that the Barton Doctrine remains viable post-*Stern*

15   *v. Marshal*.  The Fifth Circuit reasoned that while Barton

16   Doctrine is jurisdictional in that a court does not have

17   jurisdiction of an action if preapproval has not been

18   obtained, it does not implicate the extent of a bankruptcy

19   court's jurisdiction to adjudicate the underlying claim,

20   precisely the distinction we're making here.  The bankruptcy

21   court would be the gatekeeper for deciding whether the claim

22   passes through the gate, and then after will decide if it has

23   jurisdiction to rule on the underlying claim.

24       And this is important especially in a case like this, Your

25   Honor, where Your Honor has had extensive experience with the

001927

1    parties and is in the best position to determine whether the

2    claims are valid or attempted to be used as harassment.

3        The Objectors will complain about the open-ended nature of

4    the gatekeeper provision, whether it will or won't apply after

5    the case is closed or a final decree is issued, and the unfair

6    burden of their rights.

7        Your Honor has a previous reported opinion where basically

8    jurisdiction does extend after a case is closed or a final

9    decree is entered, so that issue is a red herring.

10       As Your Honor is well aware, it's a decade-long -- a

11   decade of litigation against the Dondero-controlled entities

12   that caused the Highland bankruptcy.  And the Court is very

13   well aware of the litigation that occurred in *Acis*, very well

14   aware of the litigation that's occurred here that I mentioned

15   a few minutes ago.  Your Honor, it is not over, you'll be

16   presiding over the contempt hearing.

17       And if the Court needs yet another ground to approve the

18   gatekeeper provision, the Debtor submits that the procedure is

19   an appropriate sanction for Dondero's vexatious litigation

20   activities.  We cited the *In re Carroll* case in the Fifth

21   Circuit of 2017 that held that a bankruptcy court has the

22   authority to enjoin a litigant from filing any pleading in any

23   action without the prior authority from the bankruptcy court.

24       And in affirming the decision of the bankruptcy court, the

25   Fifth Circuit commented on the reasons the bankruptcy court

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 147 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 152 of 313 PageID 4656

147

1 gave for its ruling. After recounting the bad faith of

2 appellants, the bankruptcy court determined that the Carrolls'

3 true motives were to harass the trustee and thereby delay the

4 proper administration of the estate, in the hope that they

5 would be able to retain their assets or make pursuit of the

6 assets so unappealing that the trustee would be compelled to

7 settle on terms favorable to appellants.

8 Sounds familiar, Your Honor. The same can certainly be

9 said about what Mr. Dondero is doing in this case.

10 And to make a showing that a party is vexatious litigant,

11 the Court must find that the party has a history of vexatious

12 and harassing litigation, whether the party has a good faith

13 -- the litigation or has filed it as a means to harass, the

14 burden to the Court and other parties, and the adequacy of

15 alternative sanctions.

16 And as Your Honor is well aware from all the litigation,

17 Your Honor is well, well able to make the finding required for

18 the vexatious litigation finding.

19 But here, we don't ask for the drastic sanction of

20 enjoining from any further filings. Rather, we just ask for a

21 less-severe sanction, requiring Mr. Dondero and his entities

22 to first make a showing that he has a colorable claim.

23 The Fifth Circuit in *Baum v. Blue Moon*, 2007, did exactly

24 that. In *Baum*, the district court barred a vexatious litigant

25 from initiating litigation without first obtaining the

001929

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 148 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 153 of 313 PageID 4657

148

1   approval of the district court.  Ultimately, the matter

2   reached the Fifth Circuit after the district court had

3   modified the pre-filing injunction to limit it to a certain

4   case, and then broadened it again based upon continued bad

5   faith conduct.

6       On appeal, the Fifth Circuit, citing several prior cases,

7   noted that a district court has the authority to impose a pre-

8   filing injunction to defer vexatious, abusive, and harassing

9   litigation.

10      And for those reasons, Your Honor, the Debtor asks the

11  Court to overrule any objections to the gatekeeper provision.

12      Your Honor, I was just going to then go to the plan

13  modification provisions, but I wanted to stop and see if you

14  had any questions at this point.

15          THE COURT:  I do not.  Let's give him a time

16  estimate, Nate.  About how --

17          THE CLERK:  Twenty.

18          MR. POMERANTZ:  I have another five or six minutes, I

19  think, based upon --

20          THE COURT:  Okay.

21          MR. POMERANTZ:  And then I'll be ready to turn it

22  over to --

23          THE COURT:  Okay.

24          MR. POMERANTZ:  -- to Mr. Kharasch.

25          THE COURT:  All right.  Yes.  You've got -- you've

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 149 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 154 of 313 PageID 4658

149

1  done an hour and 33 minutes.  So you have about, I guess, 37

2  minutes left.  Okay.  Go ahead.

3          MR. POMERANTZ:  Thank you, Your Honor.

4      I would like to address the modifications of the plan that

5  were contained in our January 22nd plan and the additional

6  changes filed on February 1, several of which I have referred.

7      As a preliminary matter, Your Honor, under 1127(b), the

8  Debtor can modify a plan at any time prior to confirmation if

9  -- and not require resolicitation if there's no adverse change

10 in the treatment of claim or interest of any equity holder.

11     With that background, I won't go through the changes we

12 made that I've already discussed, but I will point out a

13 couple, Your Honor, that I would like to point out now.  We

14 have modified the plan with respect to conditions of the

15 effective date in Article 8.  First, a condition to the

16 effective date will now be entry of a final order confirming a

17 plan, as opposed just to entry of order.  And final order is

18 defined as the exhaustion of all appeals.

19     In addition, the ability to obtain directors and officers

20 insurance coverage on terms acceptable to the Debtor, the

21 Committee, the Claimant Trustee, the Claimant Trustee

22 Oversight Board, and the Litigation Trustee is now a condition

23 to the effective date.

24     The Court heard testimony today and has experienced

25 firsthand the litigiousness of Mr. Dondero and his related

1    entities.  And the Court heard testimony from Mr. Tauber and

2    Aon that the D&O insurance will not be available post-

3    effective date without assurances that the gatekeeper

4    provision will be in effect for the duration of the policy and

5    any run-off period.

6        Mr. Tauber further testified that he expected the final

7    terms from the insurance carrier to provide that if the

8    confirmation order was reversed on appeal and the gatekeeper

9    was removed, it would void -- it would either void the

10   directors and officers coverage or it'd result in a Dondero

11   exclusion.

12       Mr. Dondero and his entities are no strangers to the

13   appellate process, as Your Honor knows.  They appealed several

14   of your orders, and continue the tack in this case, having

15   appealed the Acis and the HarbourVest orders and the

16   preliminary injunction.  It would not surprise the Debtor if

17   Mr. Dondero and his entities appealed your confirmation order,

18   if Your Honor decides to confirm the plan.

19       The Debtor is confident that it will prevail on any appeal

20   in the confirmation order, as we believe the Debtor has made a

21   compelling case for confirmation.

22       The Debtor also believes a compelling case exists that if

23   the plan went effective without a stay pending appeal, that

24   the appeal would be equitably moot, but we understand we are

25   facing headwinds from the courts, bankruptcy court have

1 | addressed that issue before.

2 | However, given the effect a reversal would have on the

3 | availability of insurance coverage, the Claimant Trustee, the

4 | Claimant Oversight Committee, and the Litigation Trustee are

5 | just not willing to take that risk.

6 | We are hopeful that Mr. Dondero and his entities will

7 | recognize that any appeal is futile and step aside and let the

8 | plan proceed and become effective.

9 | If Mr. Dondero and his related entities do appeal the

10 | confirmation order, preventing it from becoming final and

11 | preventing the effective date from the occurring, the Debtor

12 | intends to work closely with the Committee to ratchet down

13 | costs substantially and proceed to operate and monetize assets

14 | as appropriate until an order becomes final.

15 | None of these modifications adversely affect the treatment

16 | of claims or interests under the plan, Your Honor, and for

17 | those reasons, Your Honor, we request that the Court approve

18 | those modifications.

19 | And with that, I would like to turn the podium over to Mr.

20 | Kharasch to briefly address the remaining CLO objections.

21 | THE COURT: All right. Mr. Kharasch?

22 | CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

23 | MR. KHARASCH: Good afternoon, Your Honor. I'll be

24 | as brief as possible. I know we're under a deadline.

25 | As you've heard yesterday, you've heard before in other

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 152 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 157 of 313 PageID 4661

152

1    proceedings, Your Honor, the CLO Objecting Parties, the so-

2    called investors, do have rights under the CLO management

3    agreements and indentures, including contractual rights to

4    terminate the management agreements under certain

5    circumstances.

6        What they complain about today, Your Honor, is that the

7    injunction language in the plan, including the language

8    preventing actions to interfere with the implementation and

9    consummation of the plan, is so broad and ambiguous that their

10    rights are or may be improperly impacted, especially any

11    rights to remove the manager for acts of malfeasance.

12        But the Debtor is primarily relying, Your Honor, not so

13    much on the plan injunctions but on the clear provisions of

14    the January 9 order, to which Mr. Dondero consented and which

15    provides that Mr. Dondero shall not cause any of his related

16    entities to terminate any agreements with the Debtor.

17        Yes, that is a broad provision, but it is very clear, and

18    it does not even allow the CLO Objecting Parties to come to

19    court under a gatekeeper-type provision.  But that is what Mr.

20    Dondero consented to on behalf of himself and his related

21    entities.

22        Important to note, Your Honor, we are not here today to

23    litigate who is and who is not a related entity.  That will be

24    left for another day.  However, Your Honor, we have considered

25    these issues, including last night and this morning, and we

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 153 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 158 of 313 PageID 4662

153

1   are going to propose -- well, we will modify our plan through

2   a provision in the confirmation order to provide the

3   following:  Notwithstanding anything in the plan or the

4   January 9 order, the CLO Objecting Parties will not be

5   precluded from exercising their contractual or statutory

6   rights in the CLOs based on negligence, malfeasance, or any

7   wrongdoing, but before exercising such rights shall come to

8   this Court to determine whether those rights are colorable and

9   to also determine whether they are a related entity.  If the

10  Court has jurisdiction, the Court can determine the underlying

11  colorable rights or claims.

12      This does not impact the separate settlement we have with

13  CLO Holdco, Your Honor.

14      We think that such modification addresses some of the

15  concerns raised yesterday by the objecting parties by

16  providing more clarity as to what the plan is doing and not

17  doing with respect to the plan and the January 9 order, and we

18  think it is also a fair resolution of some legitimate

19  concerns.

20      So, with that, Your Honor, we think that, with that

21  clarification that we did not have to make but are willing to

22  make, that this should fully satisfy the CLO Objecting Parties

23  with regard to their objections to the injunction and the

24  gatekeeper.

25      Thank you, Your Honor.

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 154 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 159 of 313 PageID 4663

154

1          THE COURT:  All right.  Mr. Clemente?

2        CLOSING ARGUMENT ON BEHALF OF THE CREDITORS' COMMITTEE

3          MR. CLEMENTE:  Yes, Your Honor.  And I actually am

4    going to be brief.  Mr. Pomerantz's discussion, obviously, was

5    very, very thorough, so I'm able to cut out a lot of stuff.

6      Thank you, Your Honor.  Matt Clemente, Sidley Austin, on

7    behalf of the Committee.

8      The plan, Your Honor, meets the confirmation standards and

9    should be confirmed.  Mr. Pomerantz covered a lot of ground,

10   and I will endeavor not to repeat that, but there are a few

11   points that I think the Committee wishes to emphasize.

12     Your Honor, since I first appeared in front of you, I have

13   maintained consistently that no plan can or should be

14   confirmed without the consent of the Committee.  Your Honor,

15   in her wisdom, understood this immediately, as it was obvious

16   -- it was the obvious conclusion, given the makeup of the

17   creditor body, the asset pool, and the impetus for the filing

18   of the case.

19     Unfortunately, not everyone came to this conclusion so

20   easily, and it took much hard-fought negotiations as well as a

21   defeated disclosure statement, among other things, and

22   tireless dedication and commitment by each individual

23   Committee member to drive for a value-maximizing plan that is

24   in the best interests of its constituencies and for us to get

25   to where we are today.

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 155 of
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 160 of 313   PageID 4664

155

1      And where we are today, Your Honor, is at confirmation for

2   a plan that the Committee unanimously supports, which was the

3   inevitable outcome for this case from the very beginning.

4      I've also said, Your Honor, that context is critical in

5   this case.  It has been from the beginning, and it remains so

6   now.  Mr. Draper, interestingly, began his comments yesterday

7   by saying that even a serial killer is entitled to *Miranda*

8   rights.  While I will admit that at times the rhetoric in this

9   case has been heated, I have never certainly likened Mr.

10  Dondero to a serial killer.  But the record shows, and Mr.

11  Dondero's own words and actions show, that he is, in fact, a

12  serial litigator who has no hesitation at all to take any

13  position in an attempt to leverage an outcome that suits his

14  self-interest.  And he has no hesitation at all to use his

15  many tentacles in a similar fashion.

16     That is a very important context in which the Court should

17  view the remaining objections of the Dondero tentacles and

18  weigh confirmation of the Debtor's plan.

19     Against this context of a serial litigator, Your Honor, we

20  have a plan supported by each member of the Official Committee

21  of Unsecured Creditors, accepted by two classes of claims,

22  Class 2 and Class 7, and holders of almost one hundred percent

23  in amount of non-insider claims in Class 8.

24     The parties that have voted against the plan are either

25  employees who are not receiving distributions under the plan

001937

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 156 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 161 of 313 PageID 4665

156

1    or are insiders or parties related to Mr. Dondero.

2         The overwhelming number and amount of creditors who are

3    receiving distributions under this plan, therefore, have

4    accepted the plan.  The true creditors and economic parties in

5    interest have spoken, they have spoken loudly, and they have

6    spoken in favor of confirming the plan.

7         Your Honor, I'm not going to address the technical

8    requirements, as Mr. Pomerantz did that.  So I'm going to skip

9    over my remarks in that regard, except I do want to emphasize

10   the remarks regarding the gatekeeper, exculpation, and

11   injunction provisions as they're of critical importance to the

12   plan.

13        The testimony has shown and the proceedings of this case

14   has shown, again, Mr. Dondero is a serial litigator with a

15   stated goal of causing destruction and delay through

16   litigation.

17        The testimony has further shown that none of the

18   independent board members would have signed onto the role

19   without the gatekeeper and injunction provisions and the

20   indemnity from the Debtor.

21        Therefore, it follows that such provisions are necessary

22   to entice parties to serve in the Claimant Trustee and other

23   roles under the plan, which, as I remarked in my opening

24   comments, are integral to providing the structure that the

25   creditors believe is necessary to unlocking the value and

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 157 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 162 of 313 PageID 4666

157

1    unlocking themselves from the Dondero web.

2         Regarding the exculpation and injunction provisions

3    specifically, Your Honor, the Court will recall that the

4    Committee raised objections to them in connection with the

5    first disclosure statement hearing.  In response, the Debtor

6    narrowed the provisions, and the Committee believes they

7    comply with the Fifth Circuit precedent, as Mr. Pomerantz ably

8    walked Your Honor through.

9         And to be clear, Your Honor, not only does the Committee

10   believe the exculpation and injunction provisions comply with

11   Fifth Circuit law, the Committee does not believe the estate

12   is harmed by such provisions, as the Committee does not

13   believe there are any cognizable claims that could or should

14   be raised that would otherwise be affected by the exculpation

15   or injunction, and, frankly, with respect to the release that

16   Mr. Pomerantz walked Your Honor through with respect to the

17   directors and the officers.

18        Regarding the gatekeeper, Your Honor, Your Honor

19   presciently approved it in her January 9th order, and the

20   developments since then only serve as further justification

21   for including it in the plan and confirmation order.  Mr.

22   Dondero is a serial and vexatious litigator, and the

23   instruments put in place under the plan to maximize value for

24   the creditors and to oversee that value-maximizing process

25   must be protected, and the gatekeeper function serves that

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 158 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 163 of 313 PageID 4667

158

1    protection while also, importantly, as Mr. Pomerantz pointed

2    out, providing Mr. Dondero with a forum to advance any

3    legitimate claims he and his tentacles may have.

4         In short, Your Honor, the gatekeeper provision is

5    necessary to the implementation to the plan, is fair under the

6    circumstances of the case, and is therefore within this

7    Court's authority, and it is appropriate to approve.

8         Your Honor, in sum, it has been a long road to get here

9    today, but we are finally here. And we are here, Your Honor,

10   I believe in large part as a result of the tireless efforts of

11   the individual members of my Committee, and for that I thank

12   them.

13        The Committee fully supports and unanimously supports

14   confirmation of the plan. As demonstrated by the evidence,

15   the plan meets all the requirements of the Bankruptcy Code.

16   The Committee believes the plan is in the best interests of

17   its constituencies. And therefore the Committee, along with

18   two classes of creditors and the overwhelming amount of

19   creditors in terms of dollars, urge you to confirm the plan.

20        That's all I have, Your Honor, but I'm happy to answer any

21   questions you may have for me.

22             THE COURT: Okay. Not at this time.

23        Nate, how much time --

24        (Clerk advises.)

25             THE COURT: Twenty-five minutes remaining? All

001940

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 159 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 164 of 313 PageID 4668

159

1    right.  Just so you know, you've got a collective Debtor's

2    counsel/Committee's counsel 25 minutes remaining for any

3    rebuttal, if you choose to make it.

4        Let's take a five-minute break, and then we'll hear the

5    Objectors' closing arguments.  Okay.

6            THE CLERK:  All rise.

7        (A recess ensued from 2:00 p.m. until 2:06 p.m.)

8            THE COURT:  All right.  Please be seated.  We're

9    going back on the record in Highland.  We're ready to hear the

10   Objectors' closing arguments.  Who wants to go first?

11           MR. DRAPER:  Your Honor, this -- this is Douglas

12   Draper.  I get the joy of going first.

13           THE COURT:  Okay.

14    CLOSING ARGUMENT ON BEHALF OF THE GET GOOD AND DUGABOY TRUSTS

15           MR. DRAPER:  We've heard a great deal of testimony

16   about the Debtor's belief that the circumstances in this case

17   warrant an exception to existing Fifth Circuit case law, the

18   Bankruptcy Code, and Court's post-confirmation jurisdiction.

19       I would not be standing here today objecting to the plan

20   if the Debtor didn't attempt to extend, move past and beyond

21   the Barton Doctrine, move beyond 1141, move beyond *Pacific*

22   *Lumber*.  In fact, I think I heard an argument that *Pacific*

23   *Lumber* is not applicable and this Court should disregard Fifth

24   Circuit case law.

25       Let's start with the exculpation provision.  And the focus

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 160 of
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 165 of 313   PageID 4669

160

1   of this case has been, and what we've heard over the last few

2   days, is about the independent directors.  I understand there

3   was an order entered earlier, the order stands, and the order

4   is applicable in this case.  It cuts off, however, when we

5   have a Reorganized Debtor, because these independent directors

6   are no longer independent directors.  It cuts off when we have

7   a new general partner.

8        And so the protections that were afforded by that order do

9   not need to be afforded to the new officers and new directors

10  of the new general partner.  And in fact, the protections that

11  they're entitled to are completely different than the

12  protections that were entitled -- that are covered by the

13  order that the Court has looked at.

14       Let's first focus on, however, the exculpation provision.

15  And I wanted to ask the Court to look at the exculpated

16  parties.  Have to be very careful and very interest -- and

17  focus solely on the independent directors.  But if you look at

18  the parties covered by exculpation provision, it includes the

19  professionals retained by the Debtor.  My reading of *Pacific*

20  *Lumber* is that neither the Creditors' Committee counsel nor

21  the Debtor can be covered by an exculpation provision.  This

22  in and of itself makes the plan non-confirmable.  This

23  exculpation provision is unwarranted and unnecessary.

24       Two, --

25            THE COURT:  Well, let's drill down on that.

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 161 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 166 of 313 PageID 4670

161

1           MR. DRAPER:  -- we have --

2           THE COURT:  Let's drill down on that.  Mr. Pomerantz

3  says that this wasn't what they considered one way or another

4  by *Pacific Lumber*.  Debtor, debtor professionals.  Okay?  Do

5  you disagree with that?

6           MR. DRAPER:  I disagree with that.  *Pacific Lumber*

7  said you could only have releases and exculpations for the

8  Creditors' Committee members.  And the rationale behind that

9  was that those people volunteered to be part and parcel of the

10  bankruptcy process, that those parties did not get paid.

11  Here, we have two professionals who both volunteered and are

12  being paid, and are not entitled to an exculpation under

13  *Pacific Lumber*.  They're not entitled to a --

14           THE COURT:  Okay.  So you say *Pacific* --

15           MR. DRAPER:  -- release.  Now, ultimately, they --

16           THE COURT:  -- *Pacific Lumber* categorically rejected

17  all exculpations except to Creditors' Committee and its

18  members.  That's your --

19           MR. DRAPER:  I agree.  That's --

20           THE COURT:  -- interpretation of *Pacific Lumber*?

21           MR. DRAPER:  Yes.

22           THE COURT:  Okay.  All right.  So you just absolutely

23  disagree, one by one, with every one of the arguments, that it

24  was really -- the only thing before the Fifth Circuit was plan

25  sponsors, okay?  A plan proponent that I think was like a

1    competitor previously of the debtor, and I think a large

2    creditor or secured creditor.  I think those were the two plan

3    proponents.

4        So you disagree -- I'm going to, obviously, go back and

5    line-by-line pour through *Pacific Lumber*, but you disagree

6    with Mr. Pomerantz's notion that, look, it was really a page

7    and a half or two of a multipage opinion where the Fifth

8    Circuit said, no, I don't think 524(e) is authority to give

9    exculpation from postpetition liability for negligence as to

10   these two plan sponsors.  And I guess it was also -- I don't

11   know.  They say, Pachulski's briefing says it was really only

12   looking at these two plan sponsors and the Committee and its

13   members on appeal, you know, going through the briefing, and

14   in such, you can see that these were all that was presented

15   and addressed by the Fifth Circuit.  You disagree with that?

16            MR. DRAPER:  Look, I know the facts of *Pacific Lumber*

17   and they -- I know what the posture of the case was.  However,

18   the literal language by the opinion in it, it transcends just

19   a dispute in the case.  And I think the U.S. Trustee's

20   position that this exculpation provision is correct as a

21   matter of law support -- is further evidence of the fact that

22   the U.S. Trustee, as watchdog of this process, and *Pacific*

23   *Lumber* say this cannot be done, period, end of story.

24            THE COURT:  Okay.  So you, at bottom, just totally

25   disagree with Mr. Pomerantz?  You say *Pacific Lumber* is

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21  Entered 02/05/21 17:38:18  Page 163 of
Case 3:21-cv-00538-N  Document 26-7  Filed 06/09/21  Page 168 of 313  PageID 4672

163

1     actually a very broad holding, and I guess, if such, there's a

2     conflict among the Circuits, right?

3              MR. DRAPER:  Well, that's okay.

4              THE COURT:  So, --

5              MR. DRAPER:  I mean, quite frankly, *Pacific Lumber* is

6     binding on you.

7              THE COURT:  Understood.

8              MR. DRAPER:  There may be a conflict in the Circuits,

9     and ultimately the Supreme Court may make a decision and

10    decide who's right and who's wrong.

11       But for purposes of today and for purposes of this

12    exculpation provision and for purposes of this confirmation,

13    *Pacific Lumber* is the applicable law.

14             THE COURT:  Okay.  Well, again, this is a hugely

15    important issue, although in many ways I don't understand why

16    it is, because we're just talking about postpetition acts and

17    negligence, okay?  You know, many might say it's much ado

18    about nothing, but it's front and center of your objection.

19    So I guess I'm just thinking through, if the Fifth Circuit was

20    presented these exact facts and was presented with the

21    argument, you know, the *Blixseth* case says 524(e) has nothing

22    to do with exculpation because exculpation is a postpetition

23    concept, and it's just talking about standard liability --

24    these people aren't going to be liable for negligence; they

25    can be liable for anything and everything else -- if presented

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 164 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 169 of 313 PageID 4673

164

1    with that *Blixseth* case, you know, there are several arguments

2    that Mr. Pomerantz has made why, if you accept that 524(e)

3    might not apply here, let's look at the reasoning, the little

4    bit of reasoning we had of *Pacific Lumber*, that it was really

5    a policy rationale, right?  These independent fiduciaries,

6    strangers to the company and case, they'd never want to do

7    this if they knew they were vulnerable for getting sued for

8    negligence.  Mr. Pomerantz's argument is that these

9    independent board members are exactly analogous to a

10   Committee, more than prepetition officers and directors.  What

11   do you have to say about that policy argument?

12         MR. DRAPER:  Well, I think there's a huge distinction

13   between the members of a Creditors' Committee who are

14   volunteers and are not paid versus a paid independent

15   director.  And more importantly, I think there's a huge

16   difference between a member of a Creditors' Committee who's

17   not paid and counsel for a Debtor and counsel for a Creditors'

18   Committee.

19         THE COURT:  Okay.

20         MR. DRAPER:  Look, you have -- you've --

21         THE COURT:  So, at bottom, it was all about

22   compensation to the Fifth Circuit?

23         MR. DRAPER:  Well, no.  The Fifth Circuit policy

24   decision was we want to protect a party who wants to serve and

25   do their civic duty to serve on a Creditors' Committee for no

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 165 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 170 of 313 PageID 4674

165

1  compensation.  I agree with that.  I think it's a laudable

2  policy decision.  I think it makes sense.

3      However, the Fifth Circuit in its language basically said,

4  nobody else gets it.  It didn't say, look, you know, if there

5  are circumstances that are different, we may look at it

6  differently.  The language is absolute in the opinion.  And

7  that's what I think is binding and I think that's what the

8  case stands for.

9      And look, just so the Court is very clear, when Pachulski

10  files its fee application and the Court grants the fee

11  application, any claim against them is res judicata.  So, in

12  fact, they do have -- they do have protection.  They do have

13  the ability to get out from under.  The Court -- they're just

14  not -- they just can't get out from under through an

15  exculpation provision.  And the same goes for Mr. Clemente and

16  his firm.

17              THE COURT:  Which, --

18              MR. DRAPER:  And the same goes for DSI.

19              THE COURT:  Which, by the way, that's one reason I

20  think sometimes this is much ado about nothing.  It goes both

21  ways.  The Debtor professionals, the Committee professionals,

22  estate professionals, they're going to get cleared on the day

23  any fee app is approved, right?  I mean, there's Fifth Circuit

24  law that says --

25              MR. DRAPER:  I -- I --

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21    Entered 02/05/21 17:38:18    Page 166 of
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21    Page 171 of 313   PageID 4675

166

1          THE COURT:  -- says that's res judicata as to any

2    future claims.

3        But I guess I'm really trying to understand, you know, at

4    bottom, I feel like the Fifth Circuit was making a holding

5    based on policy more than any directly applicable Code

6    provision.

7        I mean, it's been said, for example, that Committee

8    members, they're entitled to exculpation because of, what,

9    1103, some people argue, 1103, which subsection, (c)?  That's

10   been quoted as giving, quote, qualified immunity to

11   Committees.  But it doesn't really say that, right?  It's just

12   something you infer.

13          MR. DRAPER:  No.  Look, what I think, if you really

14   want to put the two concepts together, I think what the Fifth

15   Circuit, when they told lawyers and professionals that you

16   can't get an exculpation, was very mindful of the fact that

17   you can get released once your fee app is approved.  So, as a

18   policy, they didn't need to do it in a exculpation provision.

19   There was another methodology in which it could be done.

20          THE COURT:  Uh-huh.

21          MR. DRAPER:  And so that's -- you have to look at it

22   as holistic and not just focus on the exculpation provision.

23   Because, in fact, they recognize and they -- I'm sure they

24   knew their existing case law on res judicata, and that's why

25   they read it out.

001948

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21    Entered 02/05/21 17:38:18    Page 167 of
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21    Page 172 of 313   PageID 4676

167

1          So, honestly, there's no reason for Pachulski to be in

2     here.  There's no reason for Mr. Clemente to be in here.

3     There's no reason for the professionals employed by the Debtor

4     to be in here.  They have an exit not by virtue of the plan.

5               THE COURT:  But so then it boils down to the

6     independent directors and Strand post January 9th?

7               MR. DRAPER:  It boils down somewhat to them, but

8     quite frankly, there are two parts to this.  One is you have

9     an order that's in place.  I am not asking the Court to

10    overturn the order.  And quite frankly, this provision could

11    have been written to the effect that the order that was in

12    place on -- that's been presented to the Court is applicable

13    and applied.

14         However, let's parse that down.  Let's look at Mr. Seery.

15    The order that's in place solely protects the independent

16    directors acting in their capacities as independent directors.

17    If somebody's acting as -- and if you want to liken it to a

18    trustee, their protection is afforded by the Barton Doctrine,

19    and that's how the protection arises.

20         What's going on here is they're extending the provisions,

21    first of all, of the Court's order, and number two, of the

22    Barton Doctrine, which are -- which cannot be -- which should

23    not be extended.  The law limits what protections you have and

24    what protections you don't have.  And we, as lawyers -- look,

25    I'll give you the best example.  Think of all the times you

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 168 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 173 of 313 PageID 4677

168

1    had somebody write in the concept of superpriority in a cash

2    collateral order.  And how many times have you had a lawyer

3    rewrite the concept of the issue as to diminution in value?

4    The Code says diminution in value, and quite frankly, a cash

5    collateral order should just say if, to the extent there's

6    diminution in value, just apply the Code section.  It's

7    written there.  Smart people put it in, and Congress approved

8    it.  And once you start getting beyond that, those things

9    should be limited.

10        And what we have are lawyers trying to extend out by

11   definitions things that the Code limits by its reach.  That

12   goes for post-confirmation jurisdiction.  That goes for the

13   injunction.  That goes for the so-called gatekeeper provision.

14        And so, again, I would not be here if, in fact, they had

15   said, we have an injunction to the full extent allowed by the

16   Bankruptcy Code and *Pacific Lumber*.  We have an exculpation

17   provision that's allowed by virtue of the Court's order.  We

18   have the full extent and full reach of the Barton Doctrine.

19   Those are legitimate.  Once you start expanding upon that,

20   you're reaching into matters that are not authorized and not

21   allowed.

22        And then you get into 105 territory, which is always very

23   dangerous.  And that's really what's going on here.  And

24   that's the tenor of my argument and what I'm trying to say.

25   The Code gives protections.  It is not for us to extend the

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 169 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 174 of 313 PageID 4678

169

1  protections.  It's not for us to enlarge them, even under a,

2  gee, the other party's litigious.

3      And so that's -- let's take *Craig's Store*.  Attempted to

4  limit its reach.  *Craig's Store* says once you have a confirmed

5  plan, any dispute between the parties, for -- let's take an

6  executory contract.  If there's a breach of the executory

7  contract, that's a matter to be handled aft... by another

8  court.  It's not a matter to be handled by this Court.  This

9  Court lets the parties out.

10      And in this case, it's even worse, because you basically

11  have a new general partner coming in, you have an assumption

12  of various executory contracts, and you have a -- Strand is no

13  longer present.

14      If you adopted Mr. Seery's argument, anybody who appeals a

15  decision, questions what he does or how he does it, is a

16  vexatious litigator.  That's not the case.  And the fact that

17  we are appealing a decision is a right that we have.  It

18  shouldn't be limited, and it shouldn't be held against us.

19  Courts can rule against us.  That's fine.

20      And so that's really what the focus is here and that's why

21  I gave the opening that I had.  We are willing to be bound by

22  applicable law.  And quite frankly, the concept that the

23  exigencies of a case allow a court to change what applicable

24  law is is problematic.  I gave the criminal example as a

25  reason.  And the reason was that, in certain instances, the

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 170 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 175 of 313 PageID 4679

170

1   application of law may allow a criminal to go free.  It's a

2   problem with our system and how we work, but that's what the

3   law does, and it is absolute in its application.

4        Let me address the so-called gatekeeper provision.  The

5   gatekeeper provision, in a certain sense, is recognized in the

6   Barton Doctrine.  It's jurisdictional, and it says, to the

7   extent you're going to litigate with somebody who served

8   during the bankruptcy, who was a trustee, then you have to

9   come to the bankruptcy court and pass through a gate.  It

10  doesn't say you have to pass through a gate for a reorganized

11  debtor who does something after a plan is confirmed and going

12  forward.  And so that's -- there's a distinction.

13       And if you look at Judge Summerhays' decision, which I

14  will be happy to send to the Court, in *WRT* involving -- it's

15  kind of (indecipherable) and Mr. Pauker, where, in that case,

16  the trustee, the litigation trustee, spent more litigating

17  than it had in recoveries, and Baker Hughes filed suit.  Judge

18  Summerhays said, look, the Barton Doctrine only applies to a

19  certain extent.  It is limited once you get into post-

20  confirmation matters and related-to jurisdiction.

21       And so, again, the Barton Doctrine is what it stands for.

22  We agree with it, we recognize it, and it should be applied.

23  The Barton Doctrine, however, should not be extended, should

24  not go past its reach, and should not go past the grant of

25  jurisdiction for this Court.

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 171 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 176 of 313 PageID 4680

171

1      And so you have in here, though they have -- they have

2   tried to hide it in a limited fashion, this gatekeeper

3   provision.  The gatekeeper provision, as currently written,

4   covers post-confirmation claims that somebody has to come

5   before this Court to the extent there's a breach of a

6   contract.  That's not proper, and it's not covered by your

7   post-confirmation jurisdiction.  To the extent there's an

8   interpretation of an existing contract and an interpretation

9   of the order, you do have authority, and I don't question

10  that.

11          THE COURT:  But address Mr. Pomerantz's statement

12  that there's a difference between saying you have to go to the

13  bankruptcy court and make an argument, we have a colorable

14  claim that we would like to pursue, and having that

15  jurisdictional step required.  There's a difference between

16  that and the bankruptcy court adjudicating the claim.

17          MR. DRAPER:  Well, there are two parts to that.

18  Number one is there's an injunction in place from an action

19  taken post-confirmation against property of the estate.  We

20  all agree at that, correct?  And we believe that the

21  injunction applies to post-confirmation action against

22  property of the pre-confirmation estate.  We all agree to

23  that.

24      However, if in fact there's a breach of a contract

25  postpetition that the parties have a dispute about, that

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 172 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 177 of 313 PageID 4681

172

1   contract is now no longer under your purview once the contract

2   has been assumed.  And so they shouldn't have to make a

3   colorable claim to you that a breach of the contract has

4   occurred.  That should be the determining factor for another

5   court.

6        That's, in essence, what *Craig's Store* says.  Your

7   jurisdiction and the jurisdiction of a bankruptcy court is

8   limited.  It's limited by *Stern vs. Marshall*.  It's limited by

9   your ability to render findings of fact and conclusions of law

10  versus render a final decision.  That decision has been made

11  not by us, it's been made by Congress and it's been made by

12  the United States Constitution.

13        THE COURT:  All right.  And I think we all agree with

14  you regarding the holding of *Craig's Stores* and some of the

15  other post-confirmation bankruptcy subject matter jurisdiction

16  holdings.  But Mr. Pomerantz is arguing that this gatekeeping

17  function is warranted by, among other things, you know, there

18  was a district court holding, *Baum v. Blue Moon*, or a Fifth

19  Circuit case, that upheld a district court having the ability

20  to impose pre-filing injunctions in the context of a vexatious

21  litigator.  So, you know, that's a strong analogy he makes to

22  what's sought here.  What is your response to that?

23        MR. DRAPER:  My response to that is a district court

24  can do that.  A district court has jurisdiction to make that

25  decision.  And quite frankly, a district court can sanction a

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 173 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 178 of 313 PageID 4682

173

1 vexatious litigator under Rule 11.

2     So, in fact -- again, you have to bifurcate your power

3 versus the power that a district court has. And that

4 gatekeeper provision is allowed by a district court because

5 they had authority over the case. You may not have authority

6 over being the gatekeeper for a post-confirmation matter that

7 you had no jurisdiction over to start with.

8     THE COURT: Okay.

9     MR. DRAPER: That, that's the distinction between

10 here. That's -- what's going on here is they are -- they are

11 mashing together a whole load of concepts under the vexatious

12 litigator and the anti-Dondero function that fundamentally

13 abrogate the distinction between what your jurisdiction is

14 pre-confirmation versus your jurisdiction post-confirmation.

15 And that --

16     THE COURT: Do you think --

17     MR. DRAPER: -- is sacrosanct.

18     THE COURT: Do you think Judge Lynn got it wrong in

19 *Pilgrim's Pride*? Do you think Judge Houser got it wrong in

20 *CHC*? Or do you think this situation is different?

21     MR. DRAPER: There are two parts to that. I have

22 told Judge Lynn, since I have been working with him, that I

23 think *Pilgrim's Pride* is wrongfully decided. However, having

24 said that, *Pilgrim's Pride* and those cases dealt with claims

25 against the -- the channeling injunction affected actions

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 174 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 179 of 313 PageID 4683

174

1  during the bankruptcy.  It did not serve as a post-

2  jurisdictional grant of jurisdiction to the bankruptcy court.

3  It did not pose as an ability -- as a limitation on a post-

4  confirmation litigator or a post-effective date litigator to

5  address a wrong done to them by an independent director of a

6  general partner.

7      In a sense, Judge Lynn's determination, and Judge Houser,

8  is consistent somewhat with the Barton Doctrine.  Now, do I

9  agree that they're right?  No.  But I understand the decision

10  and I understand the context in which it was rendered and I

11  don't have a huge problem with it.

12      So, again, let's parse what we're trying to do here.

13  Number one, we are -- we have to bifurcate post-confirmation

14  jurisdiction or post-effective date jurisdiction and what you

15  can do as a post-effective date arbiter versus what you could

16  do pre-effective date and pre-effective date claims.  And

17  again, that's the problem with what's written here.  It is

18  designed one hundred percent to expand your post-effective

19  date jurisdiction through both the gatekeeper provision and

20  the jurisdictional grant that's here from your pre-effective

21  date capability, your pre-effective date jurisdiction, and

22  your pre-effective date ability to either curb a claim or not

23  to curb a claim.  And that, that's the issue.

24      And again, let's start talking about the independent

25  directors.  I recognize, again, that there's an order there.

1    But if Mr. Seery -- let's take Mr. Seery -- is acting as a

2    director of Strand but is also an accountant for the Debtor

3    and makes a mistake, he would be sued in his capacity as the

4    accountant for the Debtor, not as an independent director of

5    Strand.  That distinction needs to be made.

6         What we are doing here under this plan, and what's been

7    argued by Mr. Pomerantz, is too broad a brush.  It needs to be

8    cut back.  The Court needs to take a very hard look at what's

9    being presented here.

10        And again, the Court's order is very clear.  And this is

11   binding.  I recognize that.  But the protection they got was

12   serving as an independent director.  The protection they

13   didn't get was -- let's take Mr. Seery, if Mr. Seery was

14   serving as an accountant and blew a tax return.  Those are

15   distinctions that warrant analysis and warrant looking at

16   here.  And again, it is too broad a brush that's touted here,

17   and that is why this plan on its face is not confirmable with

18   respect to both the post-confirmation jurisdiction, the

19   gatekeeper provision, the exculpation provisions.

20        And so let me address a few other things, just to address

21   them.  Number one, the argument has been made with respect to

22   the creditors and the resolicitation issue and that creditors

23   could have come in looking, seen, followed the case, and

24   basically calculated and made the same calculation that the

25   Debtor made when they filed this and put forth the new plan

1  analysis versus liquidation analysis. And then they've also

2  made the argument, well, nobody came and complained. Well,

3  two parts to that.

4      Number one, as you know, a disclosure statement needs to

5  be on its face and should not require a creditor to go back in

6  and monitor the record -- and quite frankly, in this record,

7  there are thousands of pages -- and do the calculation

8  himself. This was incumbent upon the Debtor to possibly

9  resolicit when these material changes took place.

10     Number two, the recalculation has not been subject to the

11 entire creditor body seeing it. And anybody who wanted to

12 call them would have had to have seen the document they filed

13 on February 1st and made a telephone call basically

14 contemporaneous with seeing it.

15     Those are two things. The argument that they didn't call

16 me is just nonsensical. There's nobody -- you, you are

17 sitting here -- and I've had a number of battles over the

18 years with Judge (indecipherable), who was -- who -- and her

19 view was, I'm here to protect the little guy who's not --

20 didn't hire counsel, who's not represented by Mr. Clemente and

21 his huge clients who have voted in favor of the plan. It's

22 the little person, *i.e.*, the employees who would vote against

23 a plan that they so -- so desperately tried to get out from

24 under.

25          THE COURT: Well, --

1          MR. DRAPER:  It's really a function --

2          THE COURT:  -- Mr. Pomerantz argues it's not as

3   though there was a materially adverse change in treatment; it

4   was the disbursement estimate.  And doesn't every Chapter 11

5   plan -- most Chapter 11 plans, not every -- they make an

6   estimate.  I mean, and it's, frankly, it's very often a big

7   range of recovery, right, a big range of recovery, because we

8   don't know what the allowed claims are going to compute to at

9   the end of the day.  There's obviously liquidation of assets.

10  We don't know.  Isn't this sort of like every -- not, again,

11  not every other plan, but most other plans -- where there's a

12  big range of possible estimated distributions?  I mean, this

13  wasn't a change in treatment, right?

14         MR. DRAPER:  Well, let me address that.  There are

15  two parts to that.  Most plans I see that contain some sort of

16  analysis have a range.  This one doesn't have a range.  What

17  they've done is they've buried in a footnote or assumption

18  that these numbers may change.  So had they said, look, your

19  recovery can go from 60 cents to 85 cents, God bless, they

20  probably would have been right.

21         Number two, which is more problematic to me, to be honest

22  with you, is the fact that, number one, the operating expenses

23  have increased over a hundred percent.  And number two, the

24  Debtor has made a determination post-disclosure statement and

25  pre-hearing that they're going to change their model of

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 178 of
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 183 of 313   PageID 4687

178

1  business.

2      The original disclosure statement said we're not going to

3  get into the managing CLO part of the business and we're going

4  to let these contracts go.  However, at some point along the

5  way, they made a change.  I don't know to this day, because I

6  was never furnished the backup to the expense side.  I

7  understand what they said why they didn't give me the asset

8  side, but the expense side, they should have given me, and I

9  did ask for.

10      But, you know, what we have now is a more fundamental

11  problem with the execution of the plan and the expectation

12  that creditors -- what they're going to get, because, in fact,

13  the expense items have doubled.

14      I think creditors were entitled to know that, rather than

15  it having been sprung upon everybody, when I got it the day

16  before a deposition.  And so those are things that I think

17  warranted a change in solicitation.  Now, the result may have

18  been the same.  I don't know.  More people may have voted

19  against the plan.  More people may have opted in from Class 8

20  to Class 7, I mean, based upon that information.  That

21  information was not provided to them.

22      And so I look at two -- three things.  One is a range

23  could have been given, and they probably would have been a

24  whole lot better off.  Two, you have a material change in

25  expenses.  And three, you have a material change in business

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21    Entered 02/05/21 17:38:18    Page 179 of
Case 3:21-cv-00538-N  Document 26-7  Filed 06/09/21    Page 184 of 313  PageID 4688

179

```
 1    model.  Three things that occurred between November and this

 2    confirmation hearing.  Three things that were not known by the

 3    creditor body and not told to them.

 4              THE COURT:  Mr. Draper, I --

 5              MR. DRAPER:  Now, it may have been told --

 6              THE COURT:  I don't want to belabor this any more

 7    than I think we need to, but I've got a Creditors' Committee

 8    with very sophisticated professionals, very sophisticated

 9    members.  They're fiduciaries to this constituency.  You know,

10    you mentioned the little guy.  I'm not quite sure who is the

11    little guy in this case.  I think it's a case of all big guys.

12    But, I mean, they're fine with what's happened here.

13    Meanwhile, you -- I mean, clarify your standing here for

14    Dugaboy and Get Good.  I mean, --

15              MR. DRAPER:  I have --

16              THE COURT:  -- I know you have standing.  Mr.

17    Pomerantz did not say you don't have standing.  But in

18    pointing out the economic interests here, I think he said your

19    clients only have asserted a postpetition administrative

20    expense.  Is that correct?

21              MR. DRAPER:  No.  I have a post -- I have an -- I

22    have a claim that's been objected to.  I don't think my

23    economic --

24              THE COURT:  A claim of what amount?

25              MR. DRAPER:  I think it's $10 million.  But Mr.
```

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 180 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 185 of 313 PageID 4689

180

1   Pomerantz is right, it requires a looking through the --

2   through the entity that I had a loan relationship with.

3      I recognize all of those things.  I don't think that's

4   relevant to whether my argument is correct or incorrect.  I

5   have standing to do it.  I don't think whether my claim is 50

6   cents or $50 million should change the Court's view of whether

7   the claim is good or bad.

8          THE COURT:  Well, I do want to understand, though.

9   Okay.  So you have not asserted an administrative expense,

10  correct?

11         MR. DRAPER:  No.  There's been an administrative

12  expense that's been asserted, --

13         THE COURT:  For what?

14         MR. DRAPER:  -- but that --

15         THE COURT:  For what?

16         MR. DRAPER:  I don't have the number in front of me,

17  Your Honor.  I don't -- I don't have those numbers --

18         THE COURT:  Okay.  Well, then, --

19         MR. DRAPER:  -- in front of me.  I have asserted --

20         THE COURT:  -- what is the concept?  What is the

21  basis for it?

22         MR. DRAPER:  It deals with -- Mr. Pomerantz is

23  absolutely right as to how he's articulated it.

24         THE COURT:  I can't remember what he said.

25         MR. DRAPER:  It deals with -- it deals with a

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 181 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 186 of 313 PageID 4690

181

 1    transaction that's unrelated to the Debtor that deals with

 2    Multi-Strat.  I agree with that.

 3              THE COURT:  Okay.  So I remember him saying piercing

 4    the corporate veil.  Your trusts -- both of them, one of them,

 5    I don't know -- engaged in a transaction with Multi-Strat that

 6    you say --

 7              MR. DRAPER:  No, that --

 8              THE COURT:  -- gave -- okay.  Well, you say Multi-

 9    Strat is liable and the Debtor is also liable?

10              MR. DRAPER:  No.  Let me make two things.  The

11    administrative claim deals with a Multi-Strat transaction that

12    took place during the bankruptcy.  My unsecured claim deals

13    with a transaction that took place prior to the bankruptcy,

14    where we lent money to another entity that then funneled money

15    out into the Debtor.  We're -- our contention is that the

16    Debtor is liable for that loan.

17              THE COURT:  All right.  So both the administrative

18    expense as well as the prepetition claim require veil-piercing

19    to establish liability of the Debtor?

20              MR. DRAPER:  Or single business enterprise.  I don't

21    necessarily have to veil-pierce.

22              THE COURT:  Okay.  I'm not even sure that single

23    business enterprise is completely available anymore in Texas,

24    by the Texas legislature doing different things, assuming

25    Texas law applies.  I don't know, maybe Delaware does.  But I

182

 1   -- sorry.  Just let me let that sink in a little bit.  You're

 2   -- okay.  Okay.  Let me let it --

 3          MR. DRAPER:  Your Honor, I --

 4          THE COURT:  -- sink in a little bit.

 5          MR. DRAPER:  Okay.

 6          THE COURT:  These trusts -- of which Mr. Dondero is

 7   the beneficiary ultimately, right?

 8          MR. DRAPER:  Yes.  Well, and to --

 9          THE COURT:  So, your --

10          MR. DRAPER:  Again, I have not gone up --

11          THE COURT:  The beneficiary of your client --

12          MR. DRAPER:  Mr. Dondero is --

13          THE COURT:  The beneficiary of your client is

14   ultimately hoping to succeed on the administrative expense and

15   the claim on the basis that you should disregard the

16   separateness of Highland and these other entities?

17          MR. DRAPER:  Well, let's take the --

18          THE COURT:  When he's resisted that --

19          MR. DRAPER:  -- unsecured claim.  The --

20          THE COURT:  -- in multiple pieces of litigation?

21   Right?  I'm sorry.  I'm just trying to let this sink in.

22   Okay.  If you could elaborate.  I'm sorry.  I'm talking too

23   much.  You answer me.

24          MR. DRAPER:  Okay.  What we are saying is that, in

25   essence, the party we lent the money to was a conduit for the

001964

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 183 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 188 of 313 PageID 4692

183

1 | Debtor.

2 |       THE COURT: Okay. And who was that entity that

3 | either --

4 |       MR. DRAPER: Highland Select.

5 |       THE COURT: -- Dugaboy or Get Good lent money to?

6 |       MR. DRAPER: The Get Good claim is completely

7 | different. The Get Good claim is written as a tax claim.

8 | Honestly, I haven't taken a hard look at it. I will, once we

9 | get through this, and it may be withdrawn. The Dugaboy claim

10 | is a claim that arises through a conduit loan.

11 |       THE COURT: Okay. But to which entity?

12 |       MR. DRAPER: Highland Select.

13 |       THE COURT: Okay. All right. Well, continue with

14 | your argument. I'll get my flow chart out and --

15 |       MR. DRAPER: Well, let me -- again, I think I've made

16 | the points that I needed to make. I think I've done it in a

17 | sense that you -- what I think the Court needs to do is take a

18 | very hard look at the jurisdictional extension that's being

19 | granted here. I think the exculpation provision, in and of

20 | itself, just by the mere inclusion of Pachulski and the

21 | Debtor's professionals and the Committee professionals, is

22 | just unconfirmable. It has to be stricken.

23 |     And I think the injunction and the juris... the gatekeeper

24 | provision are not allowed by applicable law. If this plan

25 | merely said, we will enforce the Barton Doctrine, we will

001965

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 184 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 189 of 313 PageID 4693

184

1 abide -- and this order the Court has entered stands, the

2 injunction that's provided and the rights that we have under

3 1141 stand, nobody would be objecting. That's why the U.S.

4 Trustee has objected, because of the expansive nature of what

5 the -- what's been done in this plan.

6      And with that, I'll turn it over to Mr. Taylor or Davor.

7            THE COURT: All right. Who's next?

8            MR. RUKAVINA: Your Honor, Davor Rukavina. Can you

9 hear me?

10            THE COURT: I can.

11      CLOSING ARGUMENT ON BEHALF OF CERTAIN FUNDS AND ADVISORS

12            MR. RUKAVINA: Your Honor, thank you. I'll try not

13 to repeat the arguments from Mr. Draper, but I do want to

14 point out a couple bigger-picture issues, I think.

15      One, the issue today is not Mr. Dondero, what he has been

16 alleged to have done, what he is alleged to do in the future.

17 The Debtor has gone out of its way to create the impression

18 that we're all tentacles, we're vexatious litigants, we're

19 frivolous litigants. The issue today is whether this plan is

20 confirmable under 1129(a) and 1129(b). And I think that that

21 has to be the focus.

22      Nor is the issue, I think, today any motivation behind my

23 objection or Mr. Draper's or anything else.

24      And I do take issue that my motivation or my client's

25 motivation has some ulterior motive for a competing plan or

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 185 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 190 of 313 PageID 4694

185

1    burning down the house or anything like that. It's very, very

2    simple. My clients do not want $140 million of their money

3    and their investors' money, to whom they owe fiduciary duties,

4    to be managed by a liquidating debtor under new management

5    without proper staffing and with an obvious conflict of

6    interest in the form of Mr. Seery wearing two hats.

7         I respect very much that Mr. Seery wants to monetize

8    estate assets for the benefit of the estate creditors. That's

9    his job. That's incompatible with his job under the Advisers

10   Act and, as he said, to maximize value to my clients and over

11   a billion dollars of investments in these CLOs.

12        That should not be, Your Honor, a controversial

13   proposition. I should not be described as a tentacle or

14   vexatious because my clients don't want their money managed by

15   someone that they, in effect, did not contract with. I may be

16   -- I may lose that argument. The CLOs have obviously

17   consented to the assumption. But my argument should not be

18   controversial. It should not be painted with a broad brush of

19   somehow being done in bad faith by Mr. Dondero.

20        And in fact, Mr. Seery has admitted that the Debtor and he

21   are fiduciaries to us. The fact that today they call us

22   things like tentacles and serial litigants and vexatious

23   litigants -- we all know what a vexatious litigant is. We've

24   all dealt with those. The fact that our fiduciary would call

25   us that just reconfirms that it should have no business

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21    Entered 02/05/21 17:38:18    Page 186 of
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21    Page 191 of 313   PageID 4695

186

1  managing our or other people's money.

2       And then for what?  Mr. Seery has basically said that the

3  Debtor will make some $8.5 million in revenue from these

4  contracts, net out $4 million of expenses.  That's net profit

5  of $4.5 million.  But then they have to pay $3.5 million for

6  D&O insurance and $525,000 in cure claims.  But it's the

7  Debtor's business decision, not ours.

8       Your Honor, the second issue is the cram-down of Class 8.

9  There are two problems here:  the disparate treatment between

10  Class 7 and Class 8, which also raises classification, and

11  then the absolute priority rule.  Class 7 is a convenience

12  class claim -- is a convenience claim, Your Honor, with a $1

13  million threshold.  Objectively, that is not for

14  administrative convenience, as the Code allows.  And the only

15  evidence as to how that million dollars was arrived at was,

16  oh, it was a negotiation of the Committee.

17       There is no evidence justifying administrative

18  convenience.  Therefore, there is no evidence justifying

19  separate classification.  And on cram-down, the treatment has

20  to be fair and equitable, which *per se* it is not if there is

21  unfair discrimination.  And there is unfair discrimination,

22  because Class 8 will be paid less.

23       On the absolute priority rule, Your Honor, I think that

24  it's very simple.  I think that the Code is very clear that

25  equity cannot retain anything -- I'm sorry, equity cannot

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 187 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 192 of 313 PageID 4696

187

1  retain any property or be given any property.  Property is the

2  key word in 1129(b), not value.  It doesn't matter that this

3  property may not have any value, although Mr. Seery said that

4  it might.  What matters is whether these unvested contingent

5  interests in the trust are property.  And Your Honor, they are

6  property.  They have to be property.  They are trust

7  interests.

8      So the absolute priority rule is violated on its face.

9  There is no evidence that unsecured creditors in Class 8 will

10  receive hundred-cent dollars.  The only evidence is that

11  they'll receive 71 cents.  Mr. Seery said there's a potential

12  upside from litigation.  He never quantified that upside.  And

13  there is zero evidence that Class 8 creditors are likely to be

14  paid hundred-cent dollars.  So, again, you have the absolute

15  priority rule issue.

16      And this construct where, okay, well, equity won't be in

17  the money unless everyone higher above is paid in full, that

18  is just a way to try to get around the dictate of the absolute

19  priority rule.  If that logic flies, then the next time I have

20  a hotel client or a Chapter 11 debtor-in-possession client

21  where my equity wants to retain ownership, I'll just create

22  something like, well, here's a trust, creditors own the trust,

23  I won't distribute any money to equity, and equity can just

24  stay in control.

25      The point again is that this is property and it's being

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 188 of
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 193 of 313   PageID 4697

188

1   received on account of prepetition equity.

2       And there's also the control issue.  The absolute priority

3   rule, the Supreme Court is clear that control of the post-

4   confirmation equity is also subject to the absolute priority

5   rule.  Here you have the same prepetition management

6   postpetition controlling the Debtor and the assets.

7       Your Honor, the Rule 2015.3 issue, someone's going to say

8   that it's trivial.  Someone's going to accuse me of pulling

9   out nothing to make something.  Your Honor, it's not trivial.

10  That's part of the problem in this case, that this Debtor owns

11  other entities that own assets, and there's been precious

12  little window given into that during the case, during this

13  confirmation hearing, and in the disclosure statement.

14      Rule 2015.3 is mandatory.  It's a shall.  I respect very

15  much Mr. Seery's explanation that there was a lot going on

16  with the COVID and with everything and that it just fell

17  through the cracks.  That's an honest explanation.  But the

18  Rule has not been complied with.  And 1107(a) requires that

19  the debtor-in-possession comply with a trustee's duties under

20  704(a)(8).  Those duties include filing reports required by

21  the Rules.

22      So we have an 1129(a)(3) problem, Your Honor, because this

23  plan proponent has not complied with Chapter 11 and Title 11.

24  I'll leave it at that, because I suspect, again, someone will

25  accuse me of being trivial on that.  It is not trivial.  It is

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 189 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 194 of 313 PageID 4698

189

1  a very important rule.

2       On the releases and exculpations, Your Honor, I'm not

3  going to try -- I'm not going to hopefully repeat Mr. Draper.

4  But there's a couple of huge things here with this exculpation

5  that takes it outside of any possible universe of *Pacific*

6  *Lumber*.

7       First, you have a nondebtor entity that is being

8  exculpated. I understand the proposition that, during a

9  bankruptcy case, the professionals of a bankruptcy case might

10 be afforded some protection. I understand that proposition.

11 But here you have Strand and its board that's a nondebtor.

12      The other thing you have that takes this outside of any

13 plausible case law is that the Debtor is exculpated from

14 business decisions, including post-confirmation. I understand

15 that professionals in a case make decisions, and

16 professionals, at the end of the case, especially if the Court

17 is making findings about a plan's good faith, that

18 professionals making decisions on how to administer an estate

19 ought to have some protection.

20      That does not hold true for whether a debtor and its

21 professionals should have protection for how they manage their

22 business. GM cannot be exculpated for having manufactured a

23 defective product and sold it during its bankruptcy case.

24      Here, I asked Mr. Seery whether this language in these

25 provisions, talking about whether the administration of the

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 190 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 195 of 313 PageID 4699

190

1    estate and the implementation of the plan includes the

2    Debtor's management of those contracts and funds.  He said

3    yes.  He said yes.  So if you look at the exculpation

4    provision, it is not limited in time.  It affects, Your Honor,

5    I'm quoting, it affects the implementation of the plan.

6    That's going forward.

7         So you are exculpating the Debtor and its professionals

8    from business decisions, including post-confirmation, from

9    negligence.  Well, isn't negligence the number one protection

10   that people that have invested a billion dollars with the

11   Debtor have?  It's cold comfort to hear, well, you can come

12   after us for gross negligence or theft.  I get that.  What

13   about negligence?  Isn't that what professionals do?  Isn't

14   that why professionals have insurance, liability insurance?

15   It's called professional negligence for malpractice.

16        So this exculpation, let there be no mistake -- I heard

17   Your Honor's view and discussion -- this is a different

18   universe, both in space and in time.

19        And we don't have to worry about *Pacific Lumber* too much

20   because we have the *Dropbox* opinion in *Thru, Inc.*  We have

21   that opinion.  Whether it's sound law or not, I don't wear the

22   robe.  But the exculpation provision in that case was

23   virtually identical.  And Your Honor, that's a 2018 U.S. Dist.

24   LEXIS 179769.  In that opinion, Judge Fish -- I don't think

25   anyone could say that Judge Fish was not a very experienced

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21  Entered 02/05/21 17:38:18  Page 191 of
Case 3:21-cv-00538-N  Document 26-7  Filed 06/09/21  Page 196 of 313  PageID 4700

191

1  district court judge -- Judge Fish found that the exculpation

2  violated Fifth Circuit precedent.  That exculpation covered

3  the debtor's attorneys, the debtor, the very people that Mr.

4  Pomerantz is now saying, well, maybe the Fifth Circuit would

5  allow an exculpation for.

6  THE COURT:  Well, I think he is relying heavily on

7  the analogy of independent directors to Creditors' Committee

8  members, saying that's a different animal, if you will, than

9  prepetition officers and directors.  And he thinks, given the

10  little bit of policy analysis put out there by the Fifth

11  Circuit, they might agree that that's analogous and worthy of

12  an exculpation.

13  MR. RUKAVINA:  And they might.  And they might.  And

14  again, I usually do debtor cases.  You know that.  I'd love to

15  be exculpated.

16  THE COURT:  But --

17  MR. RUKAVINA:  And I think, again, I do -- I do --

18  THE COURT:  -- I really want people to give me their

19  best argument of why, you know, that's just flat wrong.  And

20  Mr. Draper just said it's, you know, there's a categorical --

21  MR. RUKAVINA:  Yeah.

22  THE COURT:  -- rejection of exculpations except for

23  Committee members and Committee in *Pacific Lumber*.  And I'm

24  scratching my head on that one.  And partly the reason I am,

25  while 524(e) was thrown out there, the fact is there's nothing

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 192 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 197 of 313 PageID 4701

192

1    explicitly in the Bankruptcy Code, right, that explicitly

2    permits exculpation to a Committee or Committee members.

3    There's just sort of this notion, you know, allegedly embodied

4    in 1103(c), or maybe there are cases you want to cite to me,

5    that they're fiduciaries, they're voluntary fiduciaries, they

6    ought to have qualified immunity.

7         And again, I see it as more of a policy rationale the

8    Fifth Circuit gave than pointing to a certain statute.  So if

9    it's really a policy rationale, then I think the analogy given

10   here to a newly-appointed independent board is pretty darn

11   good.

12        So tell me why I'm all wrong, why Mr. Pomerantz is all

13   wrong.

14             MR. RUKAVINA:  I am not going to tell you that you're

15   all wrong.  I'm not going to tell Mr. Pomerantz that he's all

16   wrong.  Although I am, I guess, a Dondero tentacle, I am not a

17   Mr. Draper tentacle, and I happen to disagree with him.

18   That's my right.  I respect the man very much.  I thought he

19   did a very honorable and ethical job explaining his position

20   to Your Honor.  I believe that the Fifth Circuit would approve

21   exculpations for postpetition pre-confirmation matters taken

22   by estate fiduciaries.  I do believe that they would.  And I

23   do believe that that should be the case.

24        But again, I'm telling you that this one is different.

25   It's -- Mr. Pomerantz is misdirecting you.  The estate

1    professionals manage the estate.  The Debtor manages its

2    business.  It goes out into the world and it manages business.

3    And as Your Honor knows, under that 1969 Supreme Court case,

4    of course I blanked, and under 28 U.S. 959, a debtor must

5    comply, when it's out there, with all applicable law.

6         So if the Debtor -- and I'm making this up, okay?  I am

7    making this up.  I'm not alleging anything.  But if the

8    Debtor, through actionable neglect, lost $500 million of its

9    clients' or its investor clients' money, I'm telling you that

10   under no theory can that be exculpated, and I'm telling you

11   that that's what this provision does.

12        The estate and the Debtor can release their claims.  It

13   happens all the time.  Whatever -- whatever claims the estate

14   may have against professionals, those can be released.  It's a

15   9019.  I'm not complaining about that.  Although I do think

16   that it's premature in this case, because we don't know

17   whether there's any liability for the $100 million that Mr.

18   Seery told you Mr. Dondero lost.  But in no event can business

19   -- business --

20            THE COURT:  I don't understand what you just said.

21            MR. RUKAVINA:  Your Honor, I --

22            THE COURT:  Mr. Dondero is not released --

23            MR. RUKAVINA:  -- went through Mr. Seery's --

24            THE COURT:  -- by the estate.

25            MR. RUKAVINA:  I understand.  I understand.  But we

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 194 of
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 199 of 313   PageID 4703

194

1    all have to also understand that a board of directors and

2    officers can be liable, breaches of fiduciary duty by not

3    properly managing an employee.  So I'm not suggesting -- I

4    mean, I know that there's been an examiner motion filed.  I'm

5    not suggesting that we have a mini-trial.  I'm not suggesting

6    there's actionable conduct.  What I'm telling you is that the

7    evidence shows that there's a large postpetition loss.  And

8    it's premature to prevent third parties that might have claims

9    from bringing those.

10        And then I think -- I'm not sure that Your Honor

11   understood my point.  Let me try to make it again.  This

12   exculpation is not limited in time.  This exculpation is

13   expressly not limited in time and applies to the

14   administration of the plan post-confirmation.  I don't think

15   under any theory would the Fifth Circuit or any court at the

16   appellate level allow an exculpation for purely post-

17   reorganization post-bankruptcy matters.  I have nothing more

18   to tell Your Honor on exculpation.

19            THE COURT:  Well, again, I -- perhaps I go down some

20   roads I really don't need to go down here, but I'm not sure I

21   read it the way you did.  I thought we were just talking about

22   pre -- postpetition, pre-confirmation.  Or pre-effective date.

23            MR. RUKAVINA:  Your Honor, Page --

24            THE COURT:  The --

25            MR. RUKAVINA:  Page 48 of the plan, Section C,

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 195 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 200 of 313 PageID 4704

195

1    Exculpation.  Romanette (iv).  The implementation of the plan.

2    And I -- and that's -- that's part of why I asked Mr. Seery

3    that yesterday.  Does the implementation of the plan, in his

4    understanding, include the Reorganized Debtor's management and

5    wind-down of the Funds, and he said yes.

6                THE COURT:  Okay.

7                MR. RUKAVINA:  So that's right there in black and

8    white.

9         It also includes the administration of the Chapter 11

10   case.  If that is defined broadly, as Mr. Seery wants it to

11   be, to define business decisions, then that also exceeds any

12   permissible exculpation.

13        So, again, I'm telling Your Honor, with due respect to you

14   and to Mr. Pomerantz, that the focus of Your Honor's

15   questioning is wrong.  The focus of Your Honor's questioning

16   should be on exculpation from what?  From business -- *i.e.*, GM

17   manufacturing and selling the car -- or from management of the

18   bankruptcy case?  Management of the bankruptcy case?  Okay.

19   Postpetition pre-confirmation managing business, never okay.

20        Your Honor, on the channeling -- and let me add, I think

21   it's very clear, there is no Barton Doctrine here.  This is

22   not a Chapter 11 trustee.  The Barton Doctrine does not

23   extend to debtors-in-possession.  And I can cite you to a

24   recent case, *In re Zaman*, 2020 Bankr. LEXIS 2361, that

25   confirms that the Barton Doctrine does not apply to a debtor-

001977

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 196 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 201 of 313 PageID 4705

196

1    in-possession.

2        I want to --

3            THE COURT:  Remind me of that --

4            MR. RUKAVINA:  -- discuss, Your Honor, the --

5            THE COURT:  Remind me of the facts of that case.  I

6    feel like I read it, but -- or saw it in the advance sheets,

7    maybe.

8            MR. RUKAVINA:  I honestly do not recall.  I read it a

9    few days ago, and since then, I hope Your Honor can

10   appreciate, I've been up very late trying to negotiate

11   something good in this case.

12           THE COURT:  I'd like to know --

13           MR. RUKAVINA:  So, I mean, I have the case in front

14   of me.

15           THE COURT:  I'd like to know about a holding that

16   says Barton Doctrine can't be applied in a Chapter 11 post-

17   confirmation context, if that's --

18           MR. RUKAVINA:  Well, I have it --

19           THE COURT:  -- indeed the holding.

20           MR. RUKAVINA:  I have it right in front of me here,

21   Your Honor, and I can certainly -- all I know is that this

22   case held that -- it rejected the notion that the Barton

23   Doctrine applies to a debtor-in-possession.

24           THE COURT:  Okay.

25           MR. RUKAVINA:  And maybe --

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 197 of
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 202 of 313   PageID 4706

197

1          THE COURT:  That --

2          MR. RUKAVINA:  There it is, right there.

3          THE COURT:  What judge?

4          MR. RUKAVINA:  Your Honor, it is the Southern

5    District of Florida, and it is the Honorable -- Your Honor, it

6    is the Honorable Mindy Mora.

7          THE COURT:  Okay.

8          MR. RUKAVINA:  M-O-R-A.

9          THE COURT:  Okay.

10         MR. RUKAVINA:  I have not had the pleasure of being

11   in front of that judge.

12      Your Honor, let me discuss the channeling injunction.

13   This is the big one for me.  This is the big one.  And I think

14   we have to begin -- and it's the big one, as I'll get to,

15   because Your Honor knows that the CLO management agreements

16   give my clients certain rights, and this injunction would

17   prevent those rights from being exercised post-confirmation.

18   It's not dissimilar from the PI hearing that we're in the

19   middle of in an adversary.

20      But I begin my analysis, again, with 28 U.S.C. 959.  Your

21   Honor, that -- the first sentence of that statute makes it

22   very clear that when it comes to carrying on a business, a

23   debtor-in-possession may be sued without leave of the court

24   appointing them.

25      So the first thing that this channel -- gatekeeper,

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 198 of
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 203 of 313   PageID 4707

198

1  channeling, I don't mean to miscall it -- the first thing that

2  this gatekeeping injunction does is it stands directly

3  opposite to 28 U.S.C. 959.

4       28 U.S.C. 959 also says that jury rights must be

5  preserved.  As I'll argue in a moment, this injunction also

6  affects those rights.

7       In addition to 959, we have the fundamental issue of post-

8  confirmation jurisdiction.  As Mr. Draper said, here, this

9  channeling injunction applies to post-confirmation matters.

10 Similar to my answer to you on exculpation, I can see there

11 being a place for a channeling injunction during the pendency

12 of a case or for claims that might have arisen during the

13 pendency of a case.  I cannot see that, and I don't know of

14 any court that, at least at a circuit level, that would agree

15 that this can apply post-confirmation.

16      It is, again, the equivalent of GM manufacturing a car

17 post-confirmation and having to go to bankruptcy court because

18 someone's wanting to sue it for product negligence or

19 liability.  It's unthinkable.  The reason why a debtor exits

20 bankruptcy is to go back out into the community.  It's no

21 longer under the protection of the bankruptcy court.  That's

22 what the media calls Chapter 11, it calls it the protection of

23 the court.  There's no such protection post-reorganization.

24 So, --

25           THE COURT:  Is that really analogous, Mr. Rukavina?

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 199 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 204 of 313 PageID 4708

199

1    Let's get real.  Is this really analogous --

2              MR. RUKAVINA:  It is.

3              THE COURT:  -- to GM --

4              MR. RUKAVINA:  It is.

5              THE COURT:  -- manufacturing thousands of cars?

6              MR. RUKAVINA:  It absolutely is analogous.  Because

7    this Debtor is going to assume these contracts and it is going

8    to go out there and it is going to make daily decisions

9    affecting a billion dollars of other people's money.  Each of

10   those decisions hopefully will be done correctly and make

11   everyone a lot of money, but each of those decisions is the

12   potential for claims and causes of action.

13       So it is analogous, Your Honor.  They want my clients and

14   others to come to you for purely post-confirmation matters.

15   The Court will not have that jurisdiction.  There will be no

16   bankruptcy estate, nor can the Court's limited jurisdiction to

17   ensure the implementation of the plan go to and affect a post-

18   confirmation business decision.

19       That's the distinction.  The Debtor's post-confirmation

20   business is not the implementation of a plan.  As Mr. Draper

21   said, there's a new entity.  There's a new general partner.

22   There's a new structure.  Go out there and do business,

23   Debtor.  That's what they're telling you.  They're telling you

24   this is not a liquidation because they're going to be in

25   business.  Okay.  Well, the consequence of that is that

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 200 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 205 of 313 PageID 4709

200

1     there's no post-confirmation jurisdiction.

2         Now, Mr. Pomerantz says, and I think you asked Mr. Draper,

3     well, the jurisdiction to adjudicate whether something is

4     colorable is different from the jurisdiction to adjudicate the

5     underlying matter. Your Honor, I don't understand that

6     argument, and I don't see a distinction. If the Court has no

7     jurisdiction to decide the underlying matter, then how can the

8     Court have any jurisdiction to pass on any aspect of that

9     underlying matter?

10         And whether something is colorable is a fundamental issue

11     in every matter. That's the thing that courts look at in a

12     12(b)(6), in a Rule 11 issue, in a 1927 issue. So they're

13     going to come -- or someone is going to have to come to Your

14     Honor and present evidence and law that something is

15     colorable. Let's say that we've said there's a breach of

16     contract. Aren't we going to have to show you, here's the

17     contract, here's the language, here's the facts giving rise to

18     the breach, here's the elements? And Your Honor is going to

19     have to pass on that. And if Your Honor decides that

20     something is not colorable, then there ain't no step two.

21         And if Your Honor decides that something is colorable,

22     then isn't that going to be binding on the future proceeding?

23     And if it's going to be binding on the future proceeding, then

24     of course you're exercising jurisdiction to adjudicate an

25     aspect of that lawsuit.

001982

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 201 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 206 of 313 PageID 4710

201

1   I don't think that that -- I don't know I can be clearer

2   than that, Your Honor, unless the Debtor has some other

3   understanding of what a colorable claim or cause of action is

4   that I'm misunderstanding.

5       And Your Honor, I would ask, when Your Honor is in

6   chambers, to look at one of these CLO management agreements.

7   I'm sure Your Honor has already.  I just pulled one out of the

8   Debtor's exhibits, Exhibit J as in Jason.  And Section 14, 14

9   talks about termination for cause.  Most of these contracts

10  are for cause.  So, Your Honor, cause includes willfully

11  breaching the agreement or violating the law, cause includes

12  fraud, cause includes a criminal matter, such as indictment.

13      So let's imagine, Your Honor, that I come to you a year

14  from now and I say, I would like to terminate this agreement

15  because I don't want the Debtor managing my $140 million

16  because of one of these causes.  What am I going to argue to

17  Your Honor?  I'm going to argue to Your Honor that those

18  causes exist.  And Your Honor is going to have to pass on

19  that.

20      And if Your Honor says they don't exist, again, I'm done.

21  I just got an effective final ruling from a federal judge that

22  my claim is without merit.  I'm done.  Your Honor has decided

23  the matter effectively, legally, and finally.

24      That's why, when Mr. Pomerantz says that the jurisdiction

25  to adjudicate the colorableness of a claim is different from

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 202 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 207 of 313 PageID 4711

202

1    adjudicating that claim, it's not correct.  They're part of

2    the same thing, Your Honor.

3        We strenuously object to that injunction, we think it's

4    unprecedented, and we strenuously object to that injunction

5    because we are not Mr. Dondero.

6        I understand the January 9th order.  I'll let Mr.

7    Dondero's counsel talk about why that was never intended to be

8    a perpetual order.  I'll let Mr. Dondero's counsel argue as to

9    why the extension of that order *ad infinitum* in the plan is

10   illegal.

11       But even if Mr. Dondero is enjoined in perpetuity from

12   causing the related parties to terminate these agreements,

13   Your Honor, the related parties themselves are not subject to

14   that injunction.  That's why you have the preliminary

15   injunction proceeding impending in front of you on ridiculous

16   allegations of tortious interference.

17       So whether the Court enjoins Mr. Dondero or not in

18   perpetuity is a separate matter.  The question is, as you've

19   heard, at least my retail clients, they have boards.  Those

20   boards are the final decision-makers.  Mr. Dondero is not on

21   those boards.

22       In other words, it is wrong to conclude *a priori* that

23   anything that my clients do has to be at the direction of Mr.

24   Dondero.  There is no evidence of that.  The evidence is to

25   the contrary.

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21    Entered 02/05/21 17:38:18    Page 203 of
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21    Page 208 of 313   PageID 4712

203

1    Yes, a couple of my clients, the Advisors are controlled

2  by Mr. Dondero.  Mr. Norris testified to that.  You'll not

3  find Mr. Norris anywhere testifying in that transcript that

4  Your Honor allowed into evidence that the funds, my retail

5  fund clients are controlled by Mr. Dondero.  You won't find

6  that evidence.  There was no evidence yesterday or today that

7  Mr. Dondero controls those retail funds.  The only evidence is

8  that they have independent boards.

9    So I ask the Court to see that it's a little bit of a

10  sleight of hand by the Debtor.  If I am to be enjoined or if I

11  am to have to come to Your Honor in the future as a vexatious

12  litigant or a tentacle or a frivolous litigant, whatever else

13  I've been called today, then let it be because of something

14  that I've done or failed to do, something that my client has

15  done to warrant such a serious remedy, not something that Mr.

16  Dondero is alleged to have done.

17    And what have my clients done, Your Honor?  What have we

18  done to be called vexatious litigants and serial litigants?

19  We've done nothing in this case, pretty much, until December

20  16th, when we filed a motion that was a poor motion,

21  unfortunately, the Court found it to be frivolous, and the

22  Court read us the riot act.

23    We refused, on December 22nd, we, my clients' employees,

24  to execute two trades that Mr. Dondero wanted us to execute.

25  We had no obligation to execute them.  We knew nothing about

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 204 of
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 209 of 313   PageID 4713

204

1   them.  And Mr. Seery -- I'm sorry.  Not Mr. Dondero, that Mr.

2   Seery wanted to execute.  And Mr. Seery closed those

3   transactions that same day.  And then a professional lawyer at

4   K&L Gates, a seasoned bankruptcy lawyer, sent three letters to

5   a seasoned professional lawyer at Pachulski, and the letters

6   were basically ignored.

7        Okay.  Those are the things that we've done.  Other than

8   that, we've defended ourselves against a TRO, we've defended

9   ourselves against a preliminary injunction, we will continue

10  to defend ourselves against a preliminary injunction, and we

11  defend ourselves against this plan because it takes away our

12  rights.  Is that vexatious litigation?  Is that, other than

13  the frivolous motion, is that frivolous litigation?

14       And we heard you loud and clear when you read us the riot

15  act on December 16th.  And I will challenge any of these

16  colleagues here today to point me to something that we have

17  filed since then that is in any way, shape, or form arguably

18  meritless.

19       So where is the evidence that my retail funds are

20  tentacles or vexatious litigants or anything else?  There is

21  no evidence, Your Honor, and the Debtor is doing its best to

22  give you smoke and mirrors to just make that mental jump from

23  Mr. Dondero to my clients, effectively an alter ego, without a

24  trial on alter ego.

25       Once these contracts are assumed, the Debtor must live

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 205 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 210 of 313 PageID 4714

205

1    with their consequences.  It's as simple as that.  Your Honor

2    has so held.  Your Honor has so held forcefully in the *Texas*

3    *Ballpark* case.  And the Court, I submit respectfully, cannot

4    excise by an injunction a provision of a contract.

5         Also, this injunction will -- is a permanent injunction.

6    We know from *Zale* and other cases the Fifth Circuit does

7    permit certain limited plan injunctions that are temporary in

8    hundred-cent plans.  This is a permanent one.  It doesn't even

9    pretend to be a temporary one.

10        It's also a permanent one because the Debtor knows and I

11   think the Debtor is banking on me being unable to get relief

12   in the Fifth Circuit before Mr. Seery is finished liquidating

13   these CLOs.

14        So what we are talking about today is effectively excising

15   valuable and important negotiated provisions of these

16   contracts, provisions that, although my clients are not

17   counterparties to these contracts, you've heard from at least

18   three of them we do control the requisite vote, the voting

19   percentages, to cause a termination, to remove the Debtor, or

20   to seek to enforce the Debtor's obligations under those

21   contracts.

22        And again, Your Honor, it's very simple.  Where those

23   contracts require cause, there either is cause or is not

24   cause.  If there is not cause, the Debtor has its remedies.

25   If there is cause, I'll have my remedies.  But it's not for

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21    Entered 02/05/21 17:38:18    Page 206 of
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21    Page 211 of 313   PageID 4715

206

1  this Court post-confirmation to be making that determination.

2  That's not my decision.  That's Congress's decision.

3      So, Your Honor, for those reasons, we object, and we

4  continue to object, and we'd ask that the Court not confirm

5  this plan because it is patently unconfirmable.  Or if the

6  Court does confirm the plan, that it excise those provisions

7  of the releases, exculpations, and injunction that I just

8  mentioned as being not in line with the Fifth Circuit or

9  Supreme Court precedent.

10      Thank you.

11          THE COURT:  All right.  Can I -- I meant to ask Mr.

12  Draper this.  Can we all agree that we do not have third-party

13  releases *per se* in this plan?  Can we all agree on that?

14          MR. DRAPER:  I don't know.  I have to look at that.

15  I think what you have are exculpations and channeling

16  injunctions for third parties who have not paid for those

17  channeling injunctions or those exculpations.

18          THE COURT:  All right.

19          MR. RUKAVINA:  Your Honor, was that question -- was

20  that question solely to Mr. Draper?

21          THE COURT:  Well, no, it was to all of you.  I

22  thought we could all agree that we don't have third party

23  releases *per se*.  Okay.  There was --

24          MR. RUKAVINA:  Your Honor, we --

25          THE COURT:  -- a little bit of glossing over that in

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 207 of
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 212 of 313   PageID 4716

207

1  some of the briefing, I can't remember whose.  But we have

2  Debtor releases, we have --

3         MR. RUKAVINA:  Yes.

4         THE COURT:  -- exculpations that deal with

5  postpetition negligence only, we have injunctions, which I

6  guess the Debtor would say merely serve to implement the plan

7  provisions and are commonplace, but Mr. Draper would say maybe

8  are tantamount to third-party releases.  Is that --

9         MR. RUKAVINA:  Your Honor, I don't think --

10        THE COURT:  -- where we are?

11        MR. RUKAVINA:  -- there's any question -- I don't

12 think there's any question that the exculpation is a third-

13 party release, and that that's also what Judge Fish held in

14 the *Dropbox* case.  It says that none of the exculpated parties

15 shall have any liability on any claim.  So, --

16        THE COURT:  All right.

17        MR. RUKAVINA:  -- that necessarily --

18        THE COURT:  I get what you're saying, but I just

19 think, in common bankruptcy lingo, most people regard a third-

20 party release as when third parties are releasing -- third

21 parties meaning, for example, creditors, interest holders --

22 are releasing officers and directors and other third parties

23 for anything and everything.

24    Exculpation, I get it, it's worded in a passive voice, but

25 it is third parties releasing third parties, but for a narrow

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 208 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 213 of 313 PageID 4717

208

1    thing, postpetition conduct that is negligent.  Okay.  So I

2    think -- while there's technically something like a third-

3    party release there, it's not in bankruptcy lingo what we call

4    a third-party release.  It's an exculpation means no liability

5    of the exculpated parties for postpetition conduct that's

6    negligent.  So I -- anyway, I think we all agree that, I mean,

7    can we all agree there aren't any *per se* third-party releases

8    as that term is typically used in bankruptcy parlance?

9            MR. RUKAVINA:   I apologize, Your Honor, and I'm not

10   trying to try your patience, but I cannot agree to that.

11   Whatever claims my client, a nondebtor, has against Strand, a

12   nondebtor, are gone.  Whether it's a release or exculpations,

13   they're gone.  So I apologize, I cannot agree to that, Your

14   Honor.

15           MR. DRAPER:  Your Honor, this is Douglas Draper.  I

16   can't agree, either.  I think it's definitional.  And quite

17   frankly, I think I'm looking at the functional effect of

18   what's here, and they appear to be third-party releases.

19           THE COURT:  Okay.  All right.  Who is making the

20   argument for Mr. Dondero?

21           MR. TAYLOR:  Your Honor, Clay Taylor appearing on

22   behalf of Mr. Dondero.

23           THE COURT:  Okay.

24          CLOSING ARGUMENT ON BEHALF OF JAMES D. DONDERO

25           MR. TAYLOR:  Your Honor, first of all, as this Court

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 209 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 214 of 313 PageID 4718

209

1   is well aware, this Court sits, as a bankruptcy court, as a

2   court of equity.  It has many different tools available to it.

3   One of those, of course, is denying confirmation of this plan

4   because of the laws that we have discussed today and that we

5   believe the evidence has shown, and I won't go into those.  Of

6   course, of course, Your Honor could confirm that plan.  Yet

7   another tool available to this Court is it can take it under

8   advisement.

9       To the extent that this Court decides to confirm this plan

10  and decides to confirm it today, it certainly takes a lot of

11  options off the table for all parties.  There are ongoing

12  discussions, I'm not going to go into any of the particulars

13  of those discussions, but a ruling on confirmation today would

14  effectively end that, because, absent, then, an order vacating

15  confirmation, there's a lot of eggs that can't become

16  unscrambled after a confirmation order is entered.

17      So we would respectively ask that, to the extent that the

18  Court is even considering confirmation, we don't believe it to

19  be appropriate, but at least take it under advisement for 30

20  days, or at least, in the very alternative, that it announce

21  some date which it is going to give a ruling, so that we kind

22  of know when that is going to come down, to see if any

23  positive ongoing discussions can result in more of a global

24  resolution that all parties can agree upon.

25      Addressing more the merits of the case, Your Honor, Mr.

1    Dondero does indeed object to the nondebtor releases, the

2    exculpations, the injunction.  I believe those have been

3    covered rather extensively in the prior argument, so I wasn't

4    going to go into those here because they've been addressed.

5    Of course, I will endeavor to answer any questions that Your

6    Honor may have on those.

7        I will say I think Your Honor asked for everybody's best

8    shot as to why this is different for a Committee member versus

9    the independent trustees here.  I will say my best shot is,

10   first of all, *Pacific Lumber* says what it says.  I believe Mr.

11   Pomerantz has indicated their position that that language is

12   dicta and therefore not binding upon this Court.  I

13   respectfully disagree with that.  But to the extent, more

14   directly answering Your Honor's question, to me, the

15   difference is clear.  Chapter 7 trustees are a creature of

16   statute.  So are Chapter 11 trustees.  And -- as are members

17   of a Committee that are seated pursuant to the Bankruptcy

18   Code.  Those are all creatures of statute.  And the

19   independent board of trustees, while there are certainly --

20   there are some analogies that can be made, undoubtedly, but

21   they are not a creature of statute.  There is no provision for

22   them under the Bankruptcy Code.  And therefore I don't believe

23   that they should and can receive the same protections under

24   *Pacific Lumber*.

25       And so hopefully that -- that is my best shot at

001992

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 211 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 216 of 313 PageID 4720

211

1  answering, directly answering the question that Your Honor

2  posed.

3          THE COURT:  Okay.

4          MR. DRAPER:  Mr. Dondero also has issue with the

5  overbroad continuing jurisdiction of this Court.  I believe

6  Mr. Rukavina has stated that rather succinctly, too.  Merely

7  ruling upon whatever claim is colorable or not certainly has

8  definite impacts.  If this Court has jurisdiction to do that

9  when it otherwise wouldn't have jurisdiction, it enacts an

10  expansion, a potentially impermissible expansion of this

11  Court's jurisdiction.  And for that reason, the plan should --

12  confirmation should be denied.

13      Getting into the particulars of 1129, Your Honor, there is

14  problems under 1129(a)(2).  Those are the solicitation

15  problems.  Let's just kind of look at what the evidence

16  showed.  On November 28th, there was a disclosure statement,

17  it was published to all creditors, and it said, under this

18  plan, you're going to get 87 cents.  It wasn't a range.  Now,

19  there was some assumptions that went in there, but they said,

20  under a liquidation of all these assets, you're going to get

21  62 cents.

22      The Debtors came back approximately two months later, on

23  January 28th, and said, oh, wait, we missed the boat here, and

24  actually, under the plan, you're going to get 61 cents.  And

25  under a liquidation, though, you'd only get 48.

1      Well, the problem is, already, two months later, they've

2   already told you they missed the boat on what the liquidation

3   analysis was just two months ago.  And two months ago, they

4   told you under a liquidation you'd get 62 cents, and now we're

5   telling you you're going to get less.  That's at least some

6   very good evidence that the best interests of the creditors

7   isn't being met, and potentially a liquidation is much better.

8      They then came back, potentially maybe realizing that

9   problem, also because some new information came in with the

10   employees, and also with UBS, which adjusted the overall

11   general unsecured claims pool, and said, well, under the plan

12   you're going to get 71 cents, and under a liquidation you're

13   going to get 55 cents.

14      In between those iterations from November to February,

15   they found $67 million more in assets.  So Mr. Seery testified

16   he believed some of that's as to market increases in values,

17   and some (garbling) investment, market -- securities.  And

18   some were just in these private equity investments.

19      There are indeed some rollups behind all of these numbers.

20   I do understand why they wouldn't want to make some of these

21   numbers public, because they might not be able to get --

22   create the upside for any particular asset class that they're

23   seeking to monetize.

24      However, we and others, including Mr. Draper, asked for

25   those rollups to be provided, and we certainly could have

1    taken those under seal or a confidentiality agreement, could

2    have also put those before this Court under seal and the

3    Debtor could have put those rollups before this Court under

4    seal.  It elected not to do so.

5        So, rather, what you have is the naked assumptions of this

6    is what we think we can monetize the assets, or we're not

7    going to tell you what it is, but trust me, Creditors, and

8    cool, we found $67 million worth of value in the past two

9    months, so therefore we're going to beat the liquidation

10    analysis that we previously told you just two months ago.

11        They also acknowledge that, in those two months, that

12    there was going to be about $26 million in increased costs

13    from their November analysis to their February analysis.  And

14    they included that in their projections.

15        Finally, they acknowledged, in those two months, that we

16    had previously estimated -- and they even have it in their

17    assumptions in November liquidation and plan analysis -- that

18    UBS, HarbourVest, and I believe it was Acis, were all going to

19    be valued at zero dollars, and that's what the claims were

20    going to be.  Well, they kind of missed the boat on those, and

21    they missed it by a lot.  They -- it increased all the claims

22    in the pool from $195 million to $273 million, or sorry, I

23    don't -- look at that again, but it was an increase of $95

24    million.  I'm sorry, 190 -- the claims pool increased from

25    $194 million to -- I'm sorry, Your Honor, I have too many

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 214 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 219 of 313 PageID 4723

214

1    papers in front of me -- on November, the claims pool was 176

2    and it increased by February 1st to 273.  Therefore,

3    approximately $95, almost $100 million worth of claims that

4    they weren't anticipating that actually came in.

5         That tells you about the quality of the assumptions that

6    went into the analysis to begin with.  They missed it by 50

7    percent on what the overall claims pool was going to be.

8    That's significant.  It's material.

9         There is a lot of other assumptions that could go into

10   this document, and one of those assumptions are how much are

11   we going to be able to monetize these assets for?  One other

12   assumption is, well, how much is it going to cost during the

13   two-year life of this wind-down?  Another assumption is going

14   to be, are we actually going to be able to wind down in two

15   years?  Because if we're not, well, guess what, all those

16   costs are going to go up.  Another assumption is, well, how

17   much are those fee claims going to be over the two-year

18   period?  Again, if it goes over two years, they're going to be

19   significantly higher.  Moreover, you might have just missed

20   what the burn rate is.

21        So I think it's rather telling that the assumptions made

22   of -- all the way back of over two -- of only two months ago

23   were off by $100 million, and therefore it skewed all of the

24   plan-versus-liquidation analysis all over the board.

25        That's the only evidence that the Debtor has put forth as

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 215 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 220 of 313 PageID 4724

215

1    to why it's in the best interest of the creditors.  And quite

2    frankly, we don't believe they have met their burden.  And it

3    is their burden to prove to Your Honor that the plan is better

4    than what a Chapter 7 trustee will -- can do.

5        What the evidence does show, as far as what the plan would

6    do as compared to a hypothetical Chapter 7 trustee, is that we

7    know for sure that the Claimant Trust base fee, just over the

8    two years, is going to be $3.6 million.

9        (Interruption.)

10           MR. TAYLOR:  I'm sorry.

11           THE COURT:  Someone needs to put their device on

12    mute.  I don't know who that was.

13           MR. TAYLOR:  Oh, I'm sorry.  I thought you said

14    something, Your Honor.

15           THE COURT:  No.

16           MR. TAYLOR:  So what we do know is the Claimant

17    Trustee base fee is going to be $3.6 million.  What we don't

18    know and what was not put into evidence because they are still

19    negotiating it is there's going to be a bonus fee on top of

20    that that's going to be paid to Mr. Seery.  Is that $2

21    million?  Is that $4 million?  Is that $10 million?  Well, we

22    don't know.  We can't perform that analysis as compared to

23    what a hypothetical Chapter 7 trustee could be.  Nor can Your

24    Honor, based upon the evidence presented.

25        And quite frankly, I don't see how one could ever conclude

001997

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 216 of
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 221 of 313   PageID 4725
267

216

1    -- and there are some other unknowns that we're about to go

2    over, including the Litigation Trust base fee and there are

3    collection fees, contingency fees.  Those are also to be

4    negotiated.  To be negotiated and unknown.  You can't perform

5    the analysis.  The Debtor couldn't perform the analysis

6    because those are to be negotiated, so you can't tell whether

7    a Chapter -- hypothetical Chapter 7 trustee might come out

8    better because he's not going to incur all these costs.  We

9    know that they're going to incur D&O costs.

10            THE COURT:  Let me interject right now.

11            MR. TAYLOR:  Sure.

12            THE COURT:  Again, I'm going to go back to

13   understanding who your client is arguing for.  Okay?  Again,

14   as we've said before, Mr. Pomerantz did not technically say no

15   standing, but he thought it was important to point out the

16   economic interests that our Objectors either have or don't

17   have.  Okay?

18       So I'm looking through my notes to see exactly what the

19   Dondero economic interest is.  I have something written in my

20   notes, but I'm going to let you tell me.  Tell me what his

21   economic interests are with regard to this Debtor, this

22   reorganization.

23            MR. TAYLOR:  Your Honor, I believe he has been placed

24   into Class 9, Subordinated Claims.  So to the extent that

25   there is recovery available to Class 9, he can recover on

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 217 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 222 of 313 PageID 4726

217

1   those claims.

2           THE COURT:  But what proof of claim --

3           MR. TAYLOR:  We also have --

4           THE COURT:  What proof of claim does he have pending

5   at this juncture?

6           MR. TAYLOR:  Your Honor, I would have to go back and

7   look.  I don't have the proofs of claim register in front of

8   me.  And I'm sorry, if I tried to speculate, I would be doing

9   a disservice to my client and this Court by trying to

10  speculate.  I did not prepare those proofs of claim.  People

11  in my firm did.  But I would be merely speculating if I tried

12  to give you an answer off the spot.  And I apologize.  I'm

13  happy to submit a post-confirmation hearing letter --

14          THE COURT:  No, no, no.

15          MR. TAYLOR:  -- as to that.

16          THE COURT:  I'm not going to allow one more piece of

17  paper in connection with confirmation.  I thought you would be

18  able to answer that.

19          MR. TAYLOR:  I'm sorry.  I just don't want to lie to

20  Your Honor.

21          THE COURT:  What about his -- what would be an

22  indirect equity interest?

23          MR. TAYLOR:  Well, again, there are a lot of people

24  that know this org chart a lot better than me.  This is me

25  going on hearsay myself.  But I understand he also owns a lot

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 218 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 223 of 313 PageID 4727

218

1   of indirect interests in subsidiaries, some of which are

2   majority, some of which are minority, and some of which he

3   owns maybe directly, some of which through other entities.  So

4   the way in which these assets could be monetized at the sub-

5   debtor level could certainly impact his economic rights and

6   could impact him greatly.  For instance, if the --

7               THE COURT:  I really wanted an exact answer.

8               MR. TAYLOR:  Mr. Seery --

9               THE COURT:  I really wanted an exact answer, not just

10   he has an indirect interest in, you know, some of the 2,000 --

11   I'm not going to say tentacles, but --

12      I'm going to interrupt briefly, because I really want to

13   nail down the answer as best I can.  Mr. Pomerantz, can you

14   just remind me of what your answer was or statement was

15   regarding Mr. Dondero, individually, his economic stake in all

16   this?

17               MR. POMERANTZ:  He has an indemnification claim

18   that's been objected to, --

19               THE COURT:  That's the one and only --

20               MR. POMERANTZ:  -- although it's not before --

21               THE COURT:  That's the one and only pending proof of

22   claim, right?

23               MR. POMERANTZ:  That's my understanding.  And while

24   it's not before the Court, we could all imagine whether Mr.

25   Dondero's going to be entitled to indemnification.

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 219 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 224 of 313 PageID 4728

219

1      He has an interest in Strand, which is the general

2   partner.

3           THE COURT:  Right.

4           MR. POMERANTZ:  And Strand owns a quarter-percent --

5   a quarter of one percent of the equity.  I believe that is all

6   of Mr. Dondero's economic interest in the Debtor.

7           THE COURT:  Okay.  So, again, I'm just trying to, you

8   know, understand who he's looking out for, for lack of a

9   better way of saying it, Mr. Taylor, in making these

10  arguments.

11          MR. TAYLOR:  So, there is also, and this is -- I'm

12  not involved in what are these going to be filed collection

13  suits, or some of which have been filed, some of which have

14  not been filed, none of which I believe the answer date has

15  been -- has passed or come to be yet.

16      But he is also a defendant in collection suits on these

17  notes, as you are undoubtedly aware.

18          THE COURT:  Okay.  He's a defendant in adversary

19  proceedings.  Okay?  That makes him a party in interest to --

20  well, I keep -- that makes him have standing to make an

21  1129(a)(7) argument?  That's why I'm going down this trail.

22  Because you've spent the last five minutes talking about, you

23  know, creditors could do better in a Chapter 7 liquidation.

24  I'm not sure he has standing to make that argument, so I'm

25  wanting you to address that squarely.

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 220 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 225 of 313 PageID 4729

220

1          MR. TAYLOR:  Your Honor, I believe he has economic

2     interests up and down the capital structure.  And I cannot

3     describe to you, without wildly speculating and potentially

4     lying to this Court, which I'm not going to do, without some

5     time to have looked at that, because I was -- I was not

6     involved in the proofs of claim and I am not his accountant.

7     So I could not do that without wildly speculating, so I just

8     -- I would like to more directly answer your question, Your

9     Honor.  I am not trying to avoid the question.  But I can't

10    honestly answer your question with true facts as we sit here

11    right now.

12          THE COURT:  All right.  But do you agree or disagree

13    with me that only parties -- the only parties that really can

14    make an 1129(a)(7) argument are holders of claims or interests

15    in impaired classes?

16          MR. TAYLOR:  Your Honor, I believe that Mr. Dondero

17    has standing to do so by virtue of claims for indemnification

18    --

19          THE COURT:  Okay.

20          MR. TAYLOR:  -- if these -- if these -- if this

21    Debtor (indecipherable) able to meet its obligations to

22    indemnify him.  And some of those are significant claims that

23    are being brought against him that could total millions, if

24    not tens of millions of dollars, just in defense costs alone,

25    that I do believe give some standing.

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21    Entered 02/05/21 17:38:18    Page 221 of
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21    Page 226 of 313   PageID 4730

221

1          THE COURT:  Okay.  So, assuming you're right, you

2     think the evidence does not show this is better than a Chapter

3     7 liquidation where we would have a stranger trustee come in

4     and just, yeah, I guess, cold-turkey liquidate it all.

5          MR. TAYLOR:  Your Honor, I do believe that the

6     evidence shows that the Debtor hasn't met its burden as to

7     this.  A Chapter 7 trustee doesn't necessarily have to

8     liquidate immediately.  It can run these -- these assets.  I

9     mean, Mr. Seery is going to do it with ten people.  At one

10    time, just two months ago, he said he was going to do it with

11    three people.  A Chapter 7 trustee could certainly have a

12    limited runway, or even an extended runway, if it so asked for

13    it, to liquate these Debtors.

14         Moreover, there would be at least the requirements that

15    the Chapter 7 trustee would request the sale, tell creditors

16    about it.  And, as many courts have said, the competitive

17    bidding process is the best way to make sure that you ensure

18    the highest and best offer that you can get.

19         Mr. Seery has not committed to providing notice of sales

20    to creditors and other parties in interest, potentially

21    bringing them in as bidders.  They -- he could name a stalking

22    horse, but he has not indicated any desire to do so.  A

23    Chapter 7 trustee would endeavor to do so.

24         So I do believe that there are some advantages.  And

25    you've heard no testimony that they've performed any analysis

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21    Entered 02/05/21 17:38:18    Page 222 of
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21    Page 227 of 313   PageID 4731

222

1  or conducted any interviews with any Chapter 7 trustees as to

2  whether or not this was possible or not.  They just made the

3  naked assumption that they would do work based upon what they

4  said was their experience.  And Mr. Seery's deposition, when

5  it was taken and noticed as a 30(b)(6) deposition, and I

6  believe it has been entered into evidence here, he said the

7  last time he dealt with a Chapter 7 trustee was 11 or 13 years

8  ago, and it was the *Lehman* case, and that was the -- a SIPC

9  trustee.  So --

10         THE COURT:  Well, --

11         MR. TAYLOR:  -- that's the last time he had any

12  experience with it.

13         THE COURT:  -- again, I don't mean to belabor this

14  point, just like I didn't mean to belabor a few others.  But,

15  you know, there is a mechanism, yes, in Chapter 7, Section

16  704, for a trustee to seek court authority to operate a

17  business.  But it's not a statute that contemplates long-term

18  operation.  Okay?  It's just, oh, we've got a little bit of --

19  you know, we have some assets here that really require a

20  short-term operation here.

21      If it's long-term, then you convert to Chapter 11.  Okay?

22  It's just a temporary tool, Section 704.  Right?  Would you

23  agree with me?

24         MR. TAYLOR:  That's typically how it has been used.

25         THE COURT:  Okay.

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 223 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 228 of 313 PageID 4732

223

1          MR. TAYLOR:  But that's not to say that it's limited

2    in time by the statute itself.  It doesn't say that it can't

3    go for one year or two years.  That can be a short wind-down

4    period.

5          THE COURT:  But hasn't your client's argument been

6    this past several weeks that Mr. Seery is moving too fast,

7    he's wanting to sell things and he needs to hold them longer?

8    I mean, these two argument seem inconsistent to me.

9          MR. TAYLOR:  So, just because a Chapter 7 trustee has

10   been appointed doesn't mean that he has to sell them any

11   faster than Mr. Seery.

12      I think what the -- the problem with the process that has

13   been going on with Mr. Seery, my client's problem with it, is

14   not necessarily the timing but the process that Mr. Seery is

15   going through with these sales.  Provide notice, allow more

16   bidders to come in, make sure that he's getting the highest

17   and best price.  And if that happens to be Mr. Dondero who

18   offers the highest and best price, great.  And if Mr. Dondero

19   gets outbid by somebody, well, that's all the more better for

20   the estate.

21          THE COURT:  Okay.  Continue your argument.

22          MR. TAYLOR:  I believe we covered a lot of it, Your

23   Honor, and the plan analysis is all based upon their

24   assumptions that there's $257 million worth of value.  Again,

25   there's no rollup provided as to how that asset allocation is

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 224 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 229 of 313 PageID 4733

224

1  broken out, but they consist of a couple of items.

2      First, there's the notes; and second, there's the assets.

3  The notes are either long-term or demand notes. Those long-

4  term notes, Mr. Seery will tell you some have been validly

5  accelerated and therefore are now due and payable. I think

6  there's arguments to the contrary. But those long-term notes

7  probably have some both time value of money and collection

8  costs. And then, of course, you have to discount them by

9  collectability issues, too.

10     I don't believe any analysis went into it, or at least the

11  Court was not provided any data or analysis as to what

12  discounts were applied to those notes. And, therefore, I

13  don't think that this Court can make any determination that

14  the best interests of the creditors have been met.

15     As far as the assets that are to be monetized, again,

16  there's two sub-buckets of those assets. There's securities

17  that are to be sold. Some of those are semi-public securities

18  that have markets. Those are somewhat more readily

19  ascertained. The others are holdings in private equity

20  companies, and sometimes holdings in companies that own other

21  companies.

22     There's no evidence of the value -- empirical evidence of

23  the value of those companies, nor of the assumptions that went

24  into as to when they should be sold, how much they'd be sold

25  for.

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21    Entered 02/05/21 17:38:18    Page 225 of
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21    Page 230 of 313   PageID 4734

225

1        Again, I do realize the sensitive nature of such

2   information, but that could have been placed under seal.  And

3   without that information, I don't believe that the Court can

4   conduct the due diligence it's necessary to say the best

5   interest of the creditors have been met.

6        To sum up, Your Honor -- oh, I'm sorry.  One other point

7   that I did want to talk about before I summed up is, you know,

8   Mr. Pomerantz and I were listening to a different record or I

9   was totally confused as to the testimony that was put forth

10  regarding the directors and officers.  I believe the testimony

11  in the record is extremely clear that the Debtor made no

12  effort to go out and find out if it could obtain directors and

13  officers insurance without a gatekeeping injunction or a

14  channeling injunction, whatever you want to call it.  I

15  believe that his testimony was extremely clear.  He didn't

16  shop it.  He doesn't know.  And that's what the record is

17  before this Court.

18       To the extent that the Debtor wants to rely upon we can't

19  get Debtor -- or, directors and officers insurance because

20  without this gatekeeping function we just can't get it, I

21  believe the record just wholly does not support that.  The

22  testimony was at least extremely clear, as how I heard it.

23  Your Honor will have to review the record herself, but I don't

24  believe that there was much argument about it.

25       I'm sure -- as I stated in the beginning, Your Honor, this

1    is a court of equity.  It could deny confirmation, as I

2    believe Your Honor should, based upon the flaws in the plan.

3         If Your Honor finds that the plan as written is

4    impermissible because of any of the exculpation or the

5    gatekeeping functions that they're asking, the testimony is

6    equally clear that the independent directors would not serve

7    in -- as officers of the Reorganized Debtor.  Any plan that is

8    put forth by the Debtor has to tell the people who are going

9    to be officers going forward.  And with that naked testimony

10   before the Court, that it's simply not feasible, and I don't

11   think it is one of the possible -- where the Court can come

12   back and say, well, I can't confirm this plan as written, but

13   if you change it and rewrite it to get rid of the certain

14   offensive parts of the exculpation or the gatekeeping

15   functions, then we can confirm this plan.  And I think the

16   evidence before this Court is it's not feasible because none

17   of the directors will serve in that capacity, and therefore

18   this plan should be dead on arrival if Your Honor agrees the

19   proposed provisions do not meet *Pacific Lumber*.

20        We would ask the Court to deny confirmation, but in the

21   alternative, to at least take this under advisement.  Give us

22   a time frame -- we'd ask for 30 days -- but give us a time

23   frame of when the Court is going to rule, to allow the

24   positive conversations to move forward.

25        To that end, Your Honor, there is, indeed, a hearing on

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 227 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 232 of 313 PageID 4736

227

1  the extension of a temporary injunction and contempt that is

2  scheduled for Friday. I understand that the parties, at least

3  the joint parties, will not -- will agree to, I'm sorry, will

4  agree to the extension of the temporary injunction until such

5  time as the Court can rule on confirmation. I do see that

6  there could be a lot of harm done at the Friday hearing. We

7  would ask that the Court additionally continue that hearing on

8  that motion and on the injunction, and contempt, until such

9  time as confirmation has been ruled upon. It will be both

10 efficient and allow discussions to continue regarding

11 potential global resolution.

12      And so that is the end of my argument, Your Honor.

13          THE COURT: All right. Thank you. All right. Mr.

14 Pomerantz, do you have any rebuttal?

15      REBUTTAL CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

16          MR. POMERANTZ: Yes, I do, Your Honor. I want to

17 address a couple of comments that Mr. Taylor made towards the

18 end. First of all -- and, actually, the beginning.

19      We think Your Honor should rule on confirmation. Ruling

20 on confirmation and having an entered confirmation order are

21 two separate things. We understand that a new offer was made.

22 Whether that's acceptable to the Committee -- I actually think

23 it will enhance the ability of the parties to see if they

24 could reach a deal if there's (audio gap) that Your Honor is

25 going to confirm the plan.

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 228 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 233 of 313 PageID 4737

228

1      Again, doesn't mean a confirmation order has to be

2   entered, but I think, based upon my personal experience in

3   negotiating with Mr. Dondero, that your clear communication to

4   the parties that, unless something happens, you will enter a

5   confirmation order, I think will change things.  Okay?

6   Without getting into settlement discussions, things have

7   changed over the last several days, and we wish you would have

8   -- wish things would have happened sooner.  But we totally

9   disagree that Your Honor should hold your ruling for 30 days

10  or any other period of time.

11      Part of the reason I think they are making that argument

12  is because they have an examiner motion and they recognize

13  that, upon confirmation, the examiner motion is moot.  So I

14  think there's strategic reasons as well.

15      We don't think there should be a continuance of the TRO

16  hearing and of the contempt hearing.  As Your Honor recalls,

17  the contempt motion was specifically set for this time to give

18  Mr. Dondero enough time to prepare.  Your Honor was sensitive

19  to his due process concerns.  We set the TRO, the preliminary

20  injunction hearing against the Advisors and the Funds, we set

21  that, again, knowing that it would be after confirmation.

22      So we do not agree that either should be continued.

23  Again, we think the more direct, unequivocal answers Your

24  Honor can give to the parties, the better off we'll be.

25      I guess -- Mr. Taylor and I do agree that the record was

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 229 of
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 234 of 313   PageID 4738

229

1  clear.  I guess we just disagree on the clarity of it.  I

2  heard Mr. Tauber testify that when he went out to people, to

3  insurance carriers, after he and Aon were engaged, they all

4  talked about a Dondero exclusion.  Okay?  They weren't

5  convinced into a gatekeeper provision because it was provided

6  as part of the normal materials you would provide in a

7  bankruptcy court and trying to get D&O liability in the

8  context of a bankruptcy case.  Mr. Tauber's testimony was

9  pretty clear, that carriers wanted to have a Dondero

10  exclusion.  And, in fact, the only reason we were able to get

11  any coverage was because of the gatekeeper.

12      So, yes, the record was clear.  We just disagree.

13      I'd like to go back to Mr. Draper's comments going -- and

14  a couple of things, obviously, overlap.  I guess one of the

15  things here, it's great that everyone is coming in here as

16  different interests and different parties or whatnot.  But as

17  I mentioned, Your Honor, at the outset, and I've repeated a

18  few times, these are all -- the only people we have not been

19  able to resolve issues with are the Dondero parties and the

20  related parties.  And I recall the tentacles.  Mr. Davor

21  questioned that.  Mr. Clemente, his comments.  But the fact of

22  the matter is, Your Honor, Your Honor has heard testimony.

23  Your Honor has had hearings.  Mr. Rukavina represents the

24  Advisors and the Funds.  Your Honor has never seen the

25  independent board member testify in this case to demonstrate

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 230 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 235 of 313 PageID 4739

230

1   how these entities are really different.  So while Mr.

2   Rukavina does -- you know, tries his best, and I think he has

3   limited stuff to work with, but I give him credit for doing

4   the best he can, these are all Dondero-related entities and

5   Your Honor has seen that.

6        So, Your Honor, going to the resolicitation argument, it

7   actually has taken up a lot more time than the argument is

8   worth, for one very simple reason.  As I said in my argument,

9   and as Mr. Taylor and Mr. Draper totally ignored, there were

10  17 creditors who voted yes, 17 creditors who were apparently

11  misled, that Mr. Draper is looking out for the little guy and

12  Mr. Taylor is fumbling over his reason for why that's

13  important to Dondero.  And of those 17 creditors that voted

14  yes, Your Honor, they were either the employees related to

15  HarbourVest, UBS, Redeemer, or Acis, except for two.  And you

16  know the other two?  One was Contrarian, a claim buyer, who,

17  yeah, elected to be in Class 7, and the other was an employee

18  with a dollar claim.

19       So the whole argument that there should be a

20  resolicitation is preposterous, Your Honor.  But to go to some

21  of the specifics in what they argued, we didn't require

22  creditors to monitor recovery.  The footnote -- as I

23  indicated, the UBS 3018 was in the disclosure statement that

24  went out.  It didn't make it to the projections.  It was

25  clearly -- and they characterize it, I think Mr. Draper

002012

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 231 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 236 of 313 PageID 4740

231

 1    characterized it as buried in the document.  There is a

 2    section that every disclosure statement is required to have

 3    called Risk Factors.  This disclosure statement had that.  And

 4    in the disclosure statement, it talked about the amount of

 5    claims being a risk factor.

 6        Mr. Draper also said that the Debtor totally changed its

 7    business model from the first to the second analysis.  That is

 8    incorrect.  The Debtor was always going to manage funds.  Yes,

 9    did they add the CLOs?  But before, they were going to manage

10    Multi-Strat, they were going to manage Restoration Capital,

11    they were going to oversee Korea, they were going to be doing

12    the management of the funds.  So there wasn't a big change in

13    the business model, Your Honor.

14        Mr. Taylor, on the solicitation issue, says we found $67

15    million in assets.  You know, that's a disingenuous statement.

16    I think over $20 million was found because his client and

17    related entities didn't make a payment on notes and they got

18    accelerated.  So while before we would have had to wait over

19    time if they were paid, it's not surprising that Mr. Dondero

20    and his related entities just failed to basically pay the

21    notes.

22        So that was, I think, over $20 million.  And then there

23    was the HCLOF asset.  That was acquired in the HarbourVest

24    settlement.  And then there was basically an increase in some

25    value to some assets.

1      So there wasn't anything mysterious here.  There wasn't

2   anything that the Debtor was trying to hide.  There weren't

3   any found assets.  It was based upon different circumstances.

4      Mr. Taylor complains about the lack of rollup of assets,

5   the lack of evidence on the best interests of creditors test.

6   Your Honor, you've had extensive testimony from Mr. Seery

7   about what would happen in a Chapter 7 and what would happen

8   in a Chapter 11.  And you know why we didn't provide the

9   information to Mr. Taylor and his client on what the rollup of

10   the assets would be, and do you know why he wants them?  He

11   wants to know what the assets are so he can try to bid.

12      And there also was the allegation that the failure to

13   allow them to bid means we're going to get less in a Chapter

14   11 than a 7.  Two comments to that, Your Honor.  Number one,

15   if that was the case, a debtor would never be able to satisfy

16   the best interests of creditors test.  If the existence of a

17   public process *de facto* meant you would get more value than

18   outside, you would never be able to satisfy that.  And, quite

19   honestly, that's just not the law, Your Honor.

20      You have an Oversight Committee with over $200 million of

21   creditors who are going to watch Mr. Seery like a hawk, like

22   they have watched him during the case.  And the concern that

23   somehow, because these assets are not put into full view to

24   sell, that they will get less value, it's just not -- it's not

25   supported by the evidence at all, Your Honor.  And Mr. Seery

002014

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 233 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 238 of 313 PageID 4742

233

1   will make the determination.  If it makes sense to notice up

2   and provide Mr. Dondero with notice, he will.  If he doesn't,

3   he won't.

4        Your Honor, going -- oh, and then the last comment on the

5   -- that I'll make on the resolicitation and the liquidation

6   analysis is Mr. Taylor chides us and we've been criticized for

7   not disclosing more about the HarbourVest and the UBS

8   settlements and that we were off substantially.  Your Honor,

9   you've heard testimony that we were in pending litigation with

10  HarbourVest and UBS at the time.  What kind of litigant would

11  we be if we came in and said, you know, Your Honor, you know,

12  Creditors, we think the UBS claim is going to be allowed at

13  $60 million and we think the HarbourVest claim is going to be

14  allowed at $30 million?  Would that really have benefited

15  creditors and this estate, to basically, after we took the

16  position, hard negotiations and hard pleadings that we

17  prepared, and in some cases filed, that we didn't have any

18  liability?  It would have made no sense, and it would have

19  been a dereliction of our duty to actually come out and say

20  what the claims -- the claims were, or what we thought they

21  could be settled for.

22       Your Honor, going back to Mr. Draper's comments.  He

23  started with the exculpation.  First he made a comment that I

24  don't think he intended what he said, but he said that the

25  exculpation order, the January 9th order, cuts off when the

002015

1   independent directors go away.  I think what he meant to say

2   is that since the three people are not going to be independent

3   directors anymore, that basically any actions going forward by

4   any of those three are not covered.  But let's be clear.  The

5   January 9th order is in effect, and if at some point in the

6   future somebody has a claim against those three gentleman, or

7   their agents, for what they did as independent directors or

8   their agents, that order will apply.

9       Your Honor, we next had a discussion, or Mr. Draper and

10  you had a discussion on professionals.  I'm aware of the Fifth

11  Circuit law that says res judicata, fee applications.  I think

12  that only applies to claims that the Debtor and estate would

13  have.  It doesn't really apply to an exculpation.  But there's

14  Texas state law that I identified in our brief and we cited to

15  that limits third parties' ability to go after professionals.

16      But the bottom line is the Fifth Circuit, in *Pacific

17  Lumber*, didn't deal with professionals.  Your Honor was

18  correct in pushing both Mr. Taylor and Mr. Rukavina.  What

19  really that was was a policy case.  And professionals have

20  nothing to do with 524(e).  So the *Palco* and the *Pacific

21  Lumber* reference and explanation of 524(e) doesn't have

22  anything to do with professionals.  And we would submit, Your

23  Honor, that an exculpation, especially in a case like this, is

24  important for professionals.

25      I understand Your Honor's comments that maybe it's much

002016

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21    Entered 02/05/21 17:38:18    Page 235 of
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21    Page 240 of 313   PageID 4744

235

1    ado about nothing, but I'm not really sure it's much ado about

2    nothing when we have Mr. Dondero and his affiliates who,

3    notwithstanding their efforts to just claim that all they are

4    doing is trying to get a fair shake, Your Honor knows better.

5    Your Honor knows better from the years you've been litigating

6    with them, and we know better and the Debtor knows better from

7    what the independent directors have been dealing with.

8            THE COURT:  Let me ask you this, though.  I came into

9    the hearing with the impression we were just talking about

10   postpetition pre-confirmation, or pre-effective date maybe I

11   should say, was the expanse of time covered by exculpation.

12   And Mr. Rukavina said no, no, no, go back, look at, I don't

13   know, Subsection 4 of something.  It is a post-confirmation

14   concept.  What is your response to that?

15           MR. POMERANTZ:  I believe it's implementation.  And,

16   again, --

17           THE COURT:  Implementation?  Yes.

18           MR. POMERANTZ:  -- I think Mr. Rukavina -- right.  I

19   think Mr. Rukavina and Mr. Taylor and Mr. Draper have done a

20   great job trying to muddy the issues.  They talk about our

21   sleight of hand and how we're trying to do things that are way

22   beyond the bankruptcy court's jurisdiction.  We are not.  I

23   think they are trying -- what they have done throughout the

24   case is throw up enough mud.  And here's, here's the answer to

25   that question, Your Honor.  Implementation.  Okay?  We know

002017

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21    Entered 02/05/21 17:38:18    Page 236 of
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21    Page 241 of 313   PageID 4745

236

1    what implementation means.  The plan says implementation is

2    cancelation of the equity interests, creation of new general

3    partners, restatement of the limited partners, establishment

4    of the Claimant Trust and Litigation Sub-Trust.  That's the

5    implementation.

6        We are not trying to get exculpation for post-confirmation

7    activity.  Actually, my partner, Mr. Kharasch, in specifically

8    addressing Mr. Rukavina's concern, said, look, if you have a

9    problem with cause, if you have a problem, want to exercise

10   your rights, we're only asking you to come back to the Court.

11   We are not stopping you.

12       So the whole argument that the exculpation is really broad

13   and is not really -- does not really cover just the plan, the

14   approved plan, I think is a red herring.  Implementation is

15   implementation in the context of the plan.

16       And also Mr. Rukavina tries to argue that, well, it's

17   administration, it's not really you acting any operation of

18   business.  I just don't think there's any support in the case

19   law.  Your Honor has overseen this case, overseen this

20   Debtor's activities, overseen the independent directors'

21   activities, overseen Strand's activities, overseen the

22   employees' activities.  And those activities have been

23   (indecipherable) administration of the case.  And his attempt

24   to create a different category for, well, it's not

25   administration, it's operation and so it doesn't apply, I just

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 237 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 242 of 313 PageID 4746

237

 1   think is wrong.

 2        Your Honor made a couple of comments about what was

 3   *Pacific Lumber* doing.  It was a policy decision.  If there was

 4   a bright-line rule, then nobody would be entitled to

 5   exculpation.  The very fact that the Fifth Circuit said that

 6   Committee members are different made -- makes it clear it was

 7   -- it was policy.

 8        And Mr. Taylor's comments that, well, their creation of

 9   statute, Chapter 11 trustees and Committee members, that's not

10   what basically the case said.  If you look at the citation to

11   touters in the case, it was we want people to volunteer and

12   who are needed for the process.  Committee members are needed

13   for the process.  We don't want to discourage them from coming

14   in.  And the only testimony you have on the independent

15   directors is from Mr. Dubel, and he testified the importance

16   of independent directors to modern-day Chapter 11 practice,

17   the importance of exculpation, indemnification, and D&O

18   insurance.  And his testimony: uncontroverted.  The Objectors

19   could have brought in someone to say something different, but

20   the only testimony before Your Honor is, if Your Honor does

21   not approve exculpations in cases like this, you will not get

22   independent directors and it will have an adverse effect on

23   the Chapter 11 process.

24        So, while I appreciate all the Objectors trying to say

25   bright line, trying to say *Pacific Lumber*, that is the gut

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 238 of
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 243 of 313   PageID 4747

238

1    reaction, right?  That's -- it's easy to say.  But Your Honor

2    will know better, from reading the cases, that's not what

3    *Pacific Lumber* says.  And for the several reasons I gave, it's

4    the reason why *Pacific Lumber* does not govern the decision in

5    this case.

6        Your Honor, Mr. Draper then started to talk about *Craig*.

7    And everyone cites *Craig* as this, you know, limiting

8    jurisdiction.  Now, we acknowledge that *Craig* and the Fifth

9    Circuit has a more limited post-confirmation jurisdiction

10   approach than the other Circuits, but it's not nonexistent.

11   And just because the Debtor is going out post-confirmation and

12   acting does not mean that the conduct that they are engaging

13   in is not -- and disputes that arise, doesn't come within the

14   Court's jurisdiction.  If that was the case, and I think Your

15   Honor recognized this, in your case it was the *TXMS* case,

16   while it's limited, more limited after confirmation, and I

17   think you even, in the case -- or, in one case of yours, said

18   that even after the case is closed there could be

19   jurisdiction.  So their just trying to argue *Craig* is just --

20   is just too much.

21       Going out of the gatekeeper, Mr. Draper tried to say we

22   are *Barton*, and that's it, and *Barton* has its limitations, et

23   cetera.  First of all, with respect to *Barton*, it is not

24   limited and doesn't include debtors-in-possession.  We have

25   cited cases in our materials where it has been applied to

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 239 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 244 of 313 PageID 4748

239

1    debtors-in-possession.

2        So, you know, look, maybe this is a provision -- this is a

3    proposition like many in bankruptcy, you could find a

4    bankruptcy court to agree with a proposition, but there's

5    cases all over the place on that.  There's cases applying to

6    post-confirmation.  The trend has been to expand *Barton*.  But

7    the beauty of it is, Your Honor, you don't have to rely on

8    *Barton*.  *Barton* was one of our arguments.  We gave *Barton* as,

9    you know, somewhat of an analogy but somehow applying because

10   in the -- because the independent directors were like the

11   trustees.

12       But we recognize it may be going farther than *Barton* has

13   previously gone.  But the case law is clear, it is being

14   extended.  But we -- I gave you several provisions of the

15   Bankruptcy Code that authorized you to enter a gatekeeper

16   order.  None of the Objectors objected on any of those

17   grounds.  They didn't say the statutes that I cited.  And it

18   wasn't only 105, I know bankruptcy practitioners love to cite

19   105, but there were three or four others that I mentioned, and

20   they're in our brief.  There's no case that they cited that

21   said that there is no authority on the gatekeeper.

22       But what was the argument that was raised?  And I think

23   Mr. Rukavina raised it, saying, you know, look, I don't

24   understand the argument of no jurisdiction, of jurisdiction

25   for a gatekeeper but no jurisdiction for underlying cause of

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 240 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 245 of 313 PageID 4749

240

1    action. Well, Mr. Rukavina should read and Your Honor should

2    read, when you're considering the plan, the case, the *Villegas*

3    case in the Fifth Circuit as it dealt with *Stern*. That was

4    particularly a case. Does *Barton* -- is *Barton* impacted from

5    *Stern*? By *Stern*? And *Stern*, we know, limits the bankruptcy

6    court's jurisdiction. But, no, the Fifth Circuit said, in

7    that case, no. Even though the bankruptcy court's

8    jurisdiction is limited to hear the claim, there is nothing

9    inconsistent with that and allowing the bankruptcy court to

10    act as a gatekeeper.

11    So Mr. Rukavina's argument that, well, he'll present to

12    you that there's cause and you'll find there's no cause and

13    then he will be without a remedy by someone that had

14    jurisdiction, that really sounds good but it just doesn't

15    withstand analytic scrutiny. There is a distinction. They

16    are glossing over the distinction. They don't like the

17    distinction.

18    And why is that distinction -- and why is it important in

19    this case? Again, we're not talking about garden-variety

20    people who are just involved with a debtor and will get caught

21    up in a bankruptcy. We narrowly tailored the gatekeeper to

22    enjoined parties. Enjoined parties are the people before Your

23    Honor, some of the people that have made the Debtor's life

24    miserable over the last few months.

25    We have every interest and desire, as does the Committee,

002022

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 241 of
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 246 of 313   PageID 4750

241

1    to go out post-confirmation and monetize these assets.  But we

2    see the clouds on the horizon.  We see all the pleadings that

3    have been filed by the Objectors saying how, if there's no

4    deal, there will be an unending amount of costs and appeals.

5    It's, you know, the point, not too subtle.  It wasn't lost on

6    us.

7        Your Honor, going to Mr. Rukavina's arguments on Class 8

8    cram down, again, it's really a hard argument to understand,

9    but first I want to make a point.  He sort of mentioned -- and

10   I'm not sure if he intends to preserve this on appeal, but it

11   was not objected to and I'll ask for a ruling on it, Your

12   Honor -- he said that there was inappropriate separate

13   classification.  That was not raised in any of the objections.

14   We don't think it was properly before the Court.  We

15   understand there's a component of that in unfair

16   discrimination in connection with a cram down, but there is no

17   objection, there was no filed objection, to the separate

18   classification of the deficiency claims and the Class 8

19   unsecured claims.

20       And if you look at the voting, you realize it wasn't done

21   for gerrymandering, because if you put both claims together,

22   both classes together, you would have had one class that voted

23   yes.

24       So I don't believe the separate classification under the

25   1129 standards is appropriate for Your Honor to consider,

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 242 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 247 of 313 PageID 4751

242

1    other than in connection with the cram down.

2         Now, Mr. Rukavina complains that the only way the

3    convenience class was decided was by way of negotiation.  Your

4    Honor, how else do provisions like that get decided?  And who

5    was the negotiation between?  It was between the Committee.

6    And one of the benefits of a Committee process, and I

7    represent a lot of Committees, you put people in a Committee

8    that have diverse interests and they can come up with an

9    appropriate result.  And here you have that.  You had one

10   creditor who was a convenience creditor.  You have three other

11   creditors who would lose liquidity if convenience payments are

12   made.

13        Do you think that UBS, Acis and Redeemer, do you think

14   they had a desire just to pay people off?  No.  It was part of

15   a collaborative process.  So to say that there was no basis

16   and no testimony on the appropriateness to have -- and how the

17   convenience class was put together just would be wrong.

18        And with respect to the absolute priority rule, Your

19   Honor, again, there's a missing link here, okay?  These are

20   contingent interests.  They are property.  No doubt they are

21   property.  But if I did not allow those creditors or those

22   equity to have a contingent interest, the argument would have

23   been made that the plan violates the absolute priority rule.

24   And I said that in my argument.  And why would it have

25   violated the absolute priority rule?  Because there's a

002024

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 243 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 248 of 313 PageID 4752

243

1　potential that creditors could get over a hundred cents on the

2　dollar, plus interest. So it's a game of gotcha, right?

3　　　And why do they really care? Mr. Dugaboy said in his --

4　Mr. Draper said in his brief that Dugaboy cares because they

5　may have wanted to buy the interest. Well, I'm sure they can

6　go to Hunter Mountain, you know, Mr. Dondero's left hand can

7　go to his right hand, and I'm sure he'd be happy to sell the

8　contingent interests.

9　　　And with respect to the argument that Mr. Rukavina made

10　about control, equity be in control, yeah, control is a right.

11　No doubt. You've got -- if you're giving control to the post-

12　confirmation Debtor, that could be a right and implicate the

13　absolute priority rule. But what is the control here? Equity

14　is not given any rights. Your Honor heard how the post-

15　confirmation entity is structured. It's going to be Mr.

16　Seery, overseen by an Oversight Board. So I really don't

17　understand the concept of control. There just is no violation

18　of the absolute priority rule.

19　　　Your Honor, Mr. Rukavina then took us to task for 2000 --

20　or, for not filing the 2015.3 statement. And if you take his

21　argument to the logical conclusion -- well, we didn't file it,

22　we didn't comply with that Rule, so we're not in compliance

23　with the Bankruptcy Code, so we can never basically get our

24　plan confirmed, right, because it's a violation and we didn't

25　file and seek an extension.

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 244 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 249 of 313 PageID 4753

244

1       That's just a preposterous argument, Your Honor.  Mr.

2   Seery poignantly told the Court, in the rush of things that

3   were going on, it wasn't filed.  Did Mr. Rukavina, before

4   yesterday, having Mr. Dubel on the stand, did he ever ask

5   where is our 2015.3 report?  He probably didn't ask it because

6   the answer -- when I told him the reason why it wasn't filed

7   before January 9 was because I don't think Mr. Dondero wanted

8   it filed, and I think that's why, as Mr. Seery testified, we

9   were having a challenging time getting that information from

10  the in-house -- in-house.

11      But, yes, should it have been filed?  Yes.  But if that is

12  all they could point to through the course of the case that

13  Mr. Seery or Mr. -- or the rest of the board did wrong, you

14  know, I think that just demonstrates they did a fine job.

15              THE COURT:  All right.

16              MR. POMERANTZ:  Your Honor?

17              THE COURT:  You've got four minutes left.

18              MR. POMERANTZ:  Oh.  Okay.  Your Honor, going to Mr.

19  Rukavina and the Strand argument that it's a nondebtor entity,

20  as I explained in my argument, the Strand -- Strand needs to

21  get exculpation or else that's a backdoor way to the Debtor.

22  Forget about the independent directors, it's a backdoor way to

23  the Debtor.  Because Mr. Dondero will be in control.  If

24  Strand is sued for post-January 9th activities, he will assert

25  an administrative claim.  And one thing from *Pacific Lumber* is

002026

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21    Entered 02/05/21 17:38:18    Page 245 of
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21    Page 250 of 313   PageID 4754

245

1    clear, the Debtor is entitled to an exculpation as part of the

2    injunction and the -- and the discharge.

3        Your Honor, Mr. Kharasch adequately addressed Mr.

4    Rukavina's comments with the gatekeeper and the gatekeeper

5    problem.  We are not seeking to stop his clients, however

6    related they may be, from exercising their rights.  We are

7    seeking a process that will not embroil the Debtor in

8    litigation going forward.  There is no problem with Your Honor

9    acting as the gatekeeper to do so.  And to the extent that

10   they are bound by the January 9th order is not really an issue

11   for today.  That'll be an issue at the temporary -- the

12   temporary -- at the preliminary injunction hearing.

13       I -- just one minute, Your Honor.

14       (Pause.)

15           MR. POMERANTZ:  Your Honor, I think I covered a lot.

16   If there's anything that any of the Objectors have mentioned

17   that I failed to respond to, I'd be happy to answer questions

18   Your Honor has.

19           THE COURT:  All right.  I guess there's, what, about

20   two minutes left, if Mr. Clemente had anything.

21       Mr. Clemente, have you drifted off?  I doubt it.  But

22   anything else from you, Mr. Clemente?

23           MR. TAYLOR:  Your Honor, I show him talking -- this

24   is Clay Taylor -- but no one's hearing him.

25           THE COURT:  Okay.  Mr. Clemente, we are not hearing

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 246 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 251 of 313 PageID 4755

246

1    you, or I'm not seeing you.  Make sure you're not on mute.

2              THE CLERK:  He's not on mute, Judge.

3              THE COURT:  He's not on mute?  So we must have a

4    bandwidth issue or something else.

5       All right.  Mr. Clemente, still not hearing or seeing you.

6    We'll give him another 30 seconds.

7              THE CLERK:  He's coming up.

8              THE COURT:  He's coming up?  Ah, I see his name now.

9              MR. CLEMENTE:  Your Honor, can you hear me?

10             THE COURT:  I can hear you now.

11             MR. CLEMENTE:  Okay, Your Honor.  I don't know what

12   happened.  I just switched another camera, so you may not be

13   able to see me, but can you hear me?  I'll be very quick.

14             THE COURT:  Okay.  I can hear you.

15             MR. CLEMENTE:  Can you hear me?

16             THE COURT:  Yes.

17             MR. CLEMENTE:  Okay.  Thank you, Your Honor.

18   CLOSING ARGUMENT ON BEHALF OF THE UNSECURED CREDITORS' COMMITTEE

19             MR. CLEMENTE:  Two things I want to say.  First, just

20   on Class 8, I think what's important, as my comments

21   emphasized earlier, the structure of Class 8.  We must

22   remember what it is.  It's really designed so that Class 8

23   holders receive their pro rata share of what's left after

24   prior claims are paid.  That's really what Class 8 creditors

25   voted on.  That's what the disclosure provided.  They did not

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 247 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 252 of 313 PageID 4756

247

1   vote on receiving a specific dollar or a specific recovery

2   percentage.

3       And regarding the projections and estimates, Your Honor,

4   we're talking about large litigation claims that were asserted

5   and then settled.  And given the nature of these assets, the

6   values fluctuate.  It's perfectly expected, Your Honor, and

7   indeed disclosed, that there could be wide swings in the

8   amount of claims.  That does not lead to the conclusion that

9   the plan needs to be resolicited.

10      And then, finally, Your Honor, again, Mr. Pomerantz

11  adequately addressed all the points, as he did with his

12  earlier presentation, so I'm not going to touch on them, but I

13  did want to respond to one thing that Mr. Taylor said.  And I,

14  of course, agree with Mr. Pomerantz.  The Committee believes

15  there's no reason for you to delay a ruling and would in fact

16  urge you to rule as soon as Your Honor is ready to rule.

17  Confirmation of the plan, to the extent that there are

18  conversations occurring, is not going to prevent those

19  conversations from taking place, and they can continue after

20  the plan is confirmed.  There's simply nothing inherent in

21  Your Honor confirming the plan that would prevent those

22  conversations from occurring or would ultimately prevent

23  parties from pivoting to a deal on the off-chance that one

24  should be reached.

25      So I just wanted to emphasize, Your Honor, again, Your

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 248 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 253 of 313 PageID 4757

248

1    Honor is going to rule when Your Honor rules, but the

2    Committee would urge you to rule, and certainly the idea that

3    there may or may not be discussions with Mr. Dondero should

4    not at all in any way lead you to the conclusion that you

5    shouldn't rule or that those conversations cannot continue

6    after plan confirmation.

7        Thank you, Your Honor.  Unless you have questions for me.

8    And my apologies with the technology.

9            THE COURT:  No problem.  All right.  Here's what I'm

10   going to do.  We can see you now, Mr. Clemente.

11           MR. CLEMENTE:  Oh.  I'm sorry, Your Honor.  I

12   switched to another camera again because it wasn't working.

13   So, I apologize.

14           THE COURT:  All right.  I am going to call you back

15   Monday.  What day of the week will that be?  Is that -- I

16   mean, Monday, what date, I should say.  That'll be the 8th,

17   right?  I am going to call you back Monday, this coming

18   Monday, February 8th, at 9:30 Central time, and I am going to

19   give you my ruling.  It will be a detailed oral bench ruling.

20   And I'm not going to leave you hanging on the edge of your

21   seat over the next few days.  I will tell you I'm inclined to

22   confirm this plan.  I think it meets all of the requirements

23   of 1129 and 1123 and 1122.

24       The thing that I am going to spend some time thinking

25   about between now and Monday morning is, no surprise, the

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 249 of
Case 3:21-cv-00538-N  Document 26-7  Filed 06/09/21   Page 254 of 313  PageID 4758

249

1   propriety of the exculpations, the propriety of the plan

2   injunctions, the propriety of the gatekeeper provisions.  I

3   certainly am duty-bound to go back and reread *Pacific Lumber*,

4   to go back and read *Thru, Inc.*, and to really think hard about

5   what is happening here.

6        So, I'm pretty much down, I think, to just those three

7   issues here.  I'll talk to my law clerk.  He may remind me of

8   something else that I'm not articulating right now.  But I

9   think I'm just down to those issues.  Okay?  So it's not going

10  to be a mystery very long.  We will come back Monday, 9:30.

11  My courtroom deputy will post on the docket the WebEx

12  connection instructions as usual, and we'll go from there.

13  Now, --

14        MR. POMERANTZ:  Your Honor?  Your Honor, this is Jeff

15  Pomerantz.  I have a question, and it's going to sound odd

16  coming from someone on the West Coast, but I was wondering if

17  you could do it earlier.  And the only reason I say that is,

18  the night before, I have to call in to see if I'm on jury duty

19  on Monday, and it would be helpful to me -- I assume your

20  reading the ruling would be within a half hour, 45 minutes.

21  That if you started at 9:00, if that was possible, I could

22  then get in a car, and if I'm actually called to jury duty, I

23  can get there.  Of course, I don't know if I will be called,

24  but I'd hate to miss it.

25        THE COURT:  Okay.  Well, I don't want to make you

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21    Entered 02/05/21 17:38:18    Page 250 of
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21    Page 255 of 313   PageID 4759

250

1    miss jury duty.  Okay.  We will do 9:00 o'clock.

2         MR. POMERANTZ:  Thank you, Your Honor.

3         THE COURT:  Hopefully no one will be, you know, hung

4    over from watching the Super Bowl.  Personally, I don't like

5    Tom Brady, so I may be boycotting the Super Bowl.  But maybe

6    I'll watch it.  Maybe I'll -- I'll watch it.  So we'll do it

7    9:00 o'clock.  So 9:00 o'clock next Monday.

8       Now, let's talk about next the currently-set hearing this

9    Friday, February 5th, on the injunction and contempt of court

10   motion as to Mr. Dondero and the other entities.  I want to

11   continue that, and here is what I am struggling with.  The

12   only day I have next week is Friday, the 12th, and I would

13   rather not use that date because I'm pretty jam-packed Monday

14   through Thursday, unless stuff has been settled that I haven't

15   become aware of.  So let me ask two things.  First, when is

16   the examiner motion set?  I'm just wondering if there's a

17   block of time we have coming up that --

18        MR. POMERANTZ:  I believe that's March 2nd, Your

19   Honor, so that's not for another month.

20        THE COURT:  Oh, that's not for another month?  All

21   right.

22      Traci, are you on the line?  I want to ask you --

23        THE CLERK:  Yes, I am.

24        THE COURT:  What about the following week?  I know

25   Monday, the 15th, is a federal holiday, but do we have

002032

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21   Entered 02/05/21 17:38:18   Page 251 of
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 256 of 313   PageID 4760

251

1  availability for -- I fear a full day is going to be needed

2  for continuing this Friday setting.

3        THE CLERK:  Wednesday, February 17th, is available.

4        THE COURT:  We've got all day on Wednesday, February

5  17th?

6        THE CLERK:  Yes.

7        THE COURT:  All right.  What about that?  I think I

8  heard Mr. Rukavina, I think he's the one who threw it out

9  there -- or maybe it was Mr. Taylor; I'm getting mixed up --

10  the possibility that they would agree to a continuation of the

11  preliminary injunction through -- well, I think you said

12  through confirmation.  Until the Court enters a confirmation

13  order.  And if I were to rule and approve confirmation Monday,

14  then we're talking about an order that might be entered sooner

15  than the 17th.  So, do you all have any --

16        MR. RUKAVINA:  Your Honor?

17        THE COURT:  -- mutually-agreeable suggestions?  If

18  not, I'm just going to set it the 12th and I'll, you know, I'm

19  killing myself, but I'll --

20        MR. TAYLOR:  Your Honor?

21        MR. RUKAVINA:  No, Your Honor.  I think Your Honor is

22  wise to do what's she's proposing.  The agreed TRO against my

23  clients expires on the 15th of February.

24        THE COURT:  Uh-huh.

25        MR. RUKAVINA:  We can easily move that back a week or

1  a sufficient amount of time so that there's no prejudice by

2  going on the 17th, if that would be acceptable to the Debtor,

3  and then we can just pick a date that's sufficiently after the

4  PI hearing so that there's protection for everyone.

5         THE COURT:  All right.  Mr. Taylor, do you agree?

6         MR. TAYLOR:  Yes, Your Honor.  That is acceptable to

7  Mr. Dondero.

8         THE COURT:  Okay.

9         MR. TAYLOR:  We can also push it back.  Can you hear

10  me?

11         THE COURT:  Yes, I can.  Uh-huh.

12         MR. TAYLOR:  Okay.

13         THE COURT:  All right.

14         MR. POMERANTZ:  I just want to make -- I just want to

15  make sure Mr. Morris, John Morris, is on, since he's taking

16  the lead in those matters.  I don't see his picture.

17         MR. MORRIS:  I am, Jeff, and I appreciate that.  I'm

18  available, Your Honor.  We were supposed to take the

19  depositions of Mr. Leventon and Mr. Ellington tomorrow.  I

20  don't know if their counsel is on the phone.  But given Your

21  Honor's decision to adjourn the hearing from Friday, I would

22  respectfully request at this time that counsel for those two

23  individuals work with me to find a date next week in order to

24  take those depositions.

25         THE COURT:  All right.  That's --

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21    Entered 02/05/21 17:38:18    Page 253 of
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21    Page 258 of 313   PageID 4762

253

1          MS. DANDENEAU:  Debra Dandeneau from --

2          THE COURT:  Go ahead.

3          MS. DANDENEAU:  This is Debra Dandeneau from Baker

4    McKenzie.  We agree, and we're happy to work with you on a

5    rescheduled time.

6          MR. MORRIS:  Thank you very much.

7          THE COURT: All right.  All right.  So, someone had

8    filed a motion to continue Friday's hearing.  I think it was

9    your firm, Mr. Taylor.  I already had a motion pending for a

10   few days now.  So I'm going to direct you to upload an order,

11   Mr. Taylor, or someone at your firm, continuing the hearing to

12   the 17th at 9:30, with language in there that your -- the

13   injunction is continuing at least through that date.  And,

14   again, it's a continuance of the motion for contempt as well

15   as the setting on the preliminary injunction.  And, of course,

16   run that by Mr. Morris and Mr. Rukavina.

17         MR. TAYLOR:  Sure.  Your Honor, this is -- I'm not

18   handling the injunction hearing, or at least I don't think I

19   am.  But just so that I'm clear, should maybe the injunction

20   continue through the next day or something, so depending on

21   how Your Honor rules, there's not a rush to try and get an

22   order to you?

23         MR. RUKAVINA:  Your Honor, I think that Mr. Morris

24   and I can work this out.  Mr. Taylor is not involved in that

25   adversary, that's true, but Mr. Morris and I will be able to

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21 Entered 02/05/21 17:38:18 Page 254 of
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 259 of 313 PageID 4763

254

1   very quickly enter a proposed agreed order that extends that

2   TRO for some period of time.

3         THE COURT: Okay.

4         MR. RUKAVINA: I'm not going to be difficult.

5         THE COURT: Okay. So we'll shift to you and Mr.

6   Morris to be the scriveners. I just -- I suggested that

7   because I thought there was a motion to link the order to that

8   had been filed by Bonds Ellis. I may be --

9         MR. MORRIS: There was, Your Honor. There was an

10   emergency motion to continue. We filed an opposition, and

11   Your Honor has not yet ruled on that motion. You're exactly

12   right.

13         THE COURT: Okay. All right.

14         MR. TAYLOR: Your Honor, this is Clay Taylor. I will

15   make sure the right people confer with Davor and John, and

16   we'll get -- we'll link it to that motion, because that makes

17   sense, to have something to link it to.

18         THE COURT: Okay. Yes. And it can be a two-

19   paragraph order, I would think.

20     All right. And then so I'm going to see you Monday at

21   9:00 o'clock Central time with the ruling.

22     Please, don't anyone file anymore paper. I threw that out

23   earlier today. I've got all the paper I need. And I will see

24   you Monday at 9:00 o'clock. Okay? We're adjourned.

25         MR. POMERANTZ: Thank you, Your Honor.

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21    Entered 02/05/21 17:38:18    Page 255 of
Case 3:21-cv-00538-N  Document 26-7  Filed 06/09/21    Page 260 of 313  PageID 4764

255

1          THE CLERK:  All rise.

2          MR. MORRIS:  Thank you, Your Honor.

3      (Proceedings concluded at 4:34 p.m.)

4                      --oOo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                  CERTIFICATE

21      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22    above-entitled matter.

23    **/s/ Kathy Rehling**                          **02/05/2021**

24  _____        _____
    Kathy Rehling, CETD-444                        Date
25  Certified Electronic Court Transcriber

256

INDEX

PROCEEDINGS                                                              4

WITNESSES

Debtor's Witnesses

Marc Tauber
- Direct Examination by Mr. Morris                                      25
- Cross-Examination by Mr. Rukavina                                     34
- Cross-Examination by Mr. Taylor                                       36
- Redirect Examination by Mr. Morris                                    41

Certain Funds and Advisors' Witnesses

James P. Seery
- Direct Examination by Mr. Rukavina                                    45
- Cross-Examination by Mr. Morris                                       49
- Redirect Examination by Mr. Rukavina                                  50

Robert Jason Post
- Direct Examination by Mr. Rukavina                                    51
- Cross-Examination by Mr. Morris                                       56
- Redirect Examination by Mr. Rukavina                                  62
- Recross-Examination by Mr. Morris                                     63

EXHIBITS

Debtor's Docket 1887 - Leatham Declaration         Received    6
Debtor's Exhibit B, Docket 1822                    Received    8
Debtor's Exhibit 6R, Docket Entry 1822             Received    9
Debtor's Exhibits 6S and 6T, Docket Entry 1822     Received   12
Debtor's Exhibit 6U, Docket Entry 1822             Received   13
Debtor's Exhibits D and E, Docket Entry 1822       Received   15
Debtor's Exhibits 4D, 4E, and 4G, Docket 1822      Received   17
Debtor's Exhibit 5T, Docket 1822                   Withdrawn  17
Debtor's Exhibit 10A                               Received   22
Debtor's Omnibus Reply to Plan Objections,         Received   23
    Docket 1807
Debtor's Exhibit 7O (Abridged)                     Received   44

Certain Funds and Advisors' Exhibit 2,             Received   53
    Docket Entry 1863

Dondero's Exhibits 6 through 12 and                Received   66
    15 through 17

Case 19-34054-sgj11 Doc 1905 Filed 02/05/21    Entered 02/05/21 17:38:18    Page 257 of
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21    Page 262 of 313   PageID 4766

257

1                                    INDEX
                                     Page 2
2

3   EXHIBITS, cont'd.

4   Judicial Notice to be Taken of Docket 1887,                6
       Patrick Leatham Declaration
5
    Judicial Notice to be Taken of Docket 247,                45
6      Schedules

7   CLOSING ARGUMENTS

8   - By Mr. Pomerantz                                        73
    - By Mr. Kharasch                                        151
9   - By Mr. Clemente                                        154
    - By Mr. Draper                                          159
10  - By Mr. Rukavina                                        184
    - By Mr. Taylor                                          208
11  - By Mr. Pomerantz                                       227
    - By Mr. Clemente                                        246
12

13  RULINGS

14  Confirmation Hearing [1808] - *Taken Under Advisement*    248

15  Agreed Motion to (1) Assume Non-Residential Real Property  248
    Lease with Crescent TC Investors, LP upon Confirmation of
16  Plan and (II) Extend Assumption Deadline [1624] - *Taken
    Under Advisement*
17

18  END OF PROCEEDINGS                                       255

19  INDEX                                                  256-257

20

21

22

23

24

25

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                   FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
 2
                                  )    Case No. 19-34054-sgj-11
 3   In Re:                       )    Chapter 11
                                  )
 4   HIGHLAND CAPITAL             )    Dallas, Texas
     MANAGEMENT, L.P.,            )    Monday, February 8, 2021
 5                                )    9:00 a.m. Docket
           Debtor.               )
 6                                )    BENCH RULING ON CONFIRMATION
                                  )    HEARING [1808] AND AGREED
 7                                )    MOTION TO ASSUME [1624]
     _____)
 8
                          TRANSCRIPT OF PROCEEDINGS
 9           BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                    UNITED STATES BANKRUPTCY JUDGE.
10
     WEBEX APPEARANCES:
11
     For the Debtor:              Jeffrey Nathan Pomerantz
12                                PACHULSKI STANG ZIEHL & JONES, LLP
                                  10100 Santa Monica Blvd.,
13                                 13th Floor
                                  Los Angeles, CA  90067-4003
14                                (310) 277-6910

15   For the Official Committee   Matthew A. Clemente
     of Unsecured Creditors:      SIDLEY AUSTIN, LLP
16                                One South Dearborn Street
                                  Chicago, IL  60603
17                                (312) 853-7539

18   For James Dondero:           D. Michael Lynn
                                  John Y. Bonds, III
19                                Bryan C. Assink
                                  BONDS ELLIS EPPICH SCHAFER
20                                 JONES, LLP
                                  420 Throckmorton Street,
21                                 Suite 1000
                                  Fort Worth, TX  76102
22                                (817) 405-6900

23   For Get Good Trust and       Douglas S. Draper
     Dugaboy Investment Trust:    HELLER, DRAPER & HORN, LLC
24                                650 Poydras Street, Suite 2500
                                  New Orleans, LA  70130
25                                (504) 299-3300
```

002040

2

```
 1    APPEARANCES, cont'd.:

 2    For Certain Funds and          Davor Rukavina
      Advisors:                      MUNSCH, HARDT, KOPF & HARR
 3                                    500 N. Akard Street, Suite 3800
                                      Dallas, TX  75201-6659
 4                                    (214) 855-7587

 5    For Certain Funds and          A. Lee Hogewood, III
      Advisors:                      K&L GATES, LLP
 6                                    4350 Lassiter at North Hills
                                        Avenue, Suite 300
 7                                    Raleigh, NC  27609
                                      (919) 743-7306
 8
      Recorded by:                   Michael F. Edmond, Sr.
 9                                    UNITED STATES BANKRUPTCY COURT
                                      1100 Commerce Street, 12th Floor
10                                    Dallas, TX  75242
                                      (214) 753-2062
11
      Transcribed by:                Kathy Rehling
12                                    311 Paradise Cove
                                      Shady Shores, TX  76208
13                                    (972) 786-3063

14

15

16

17

18

19

20

21

22

23

24
               Proceedings recorded by electronic sound recording;
25                transcript produced by transcription service.
```

002041

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21   Entered 02/09/21 12:03:25   Page 3 of 51
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 265 of 313   PageID 4769

3

1      DALLAS, TEXAS - FEBRUARY 8, 2021 - 9:08 A.M.

2           THE COURT:  Please be seated.

3      (Beeping.)

4           THE COURT:  Someone needs to turn off their whatever.

5      All right.  Good morning.  This is Judge Jernigan, and we

6  have scheduled today a bench ruling regarding the Debtor's

7  plan that we had a confirmation trial on last week.  This is

8  Highland Capital Management, LP, Case No. 19-34054.

9      Let me first make sure we've got Debtor's counsel on the

10 line.  Do we have --

11          MR. POMERANTZ:  Yes.

12          THE COURT:  -- Mr. Pomerantz?

13          MR. POMERANTZ:  Yes, Your Honor.  Good morning, Your

14 Honor.  Jeff Pomerantz; Pachulski Stang Ziehl & Jones; on

15 behalf of the Debtor.

16          THE COURT:  Okay.  Good morning.  Do we have the

17 Creditors' Committee on the phone?

18          MR. CLEMENTE:  Good morning, Your Honor.  Matthew

19 Clemente of Sidley Austin on behalf of the Creditors'

20 Committee.

21          THE COURT:  Good morning.  All right.  We had various

22 Objectors.  Do we have Mr. Dondero's counsel on the phone?

23          MR. LYNN:  Yes, Your Honor.  Michael Lynn, together

24 with John Bonds and Bryan Assink, for Jim Dondero.

25          THE COURT:  Good morning.  For the Trusts, the

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21 Entered 02/09/21 12:03:25 Page 4 of 51
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 266 of 313 PageID 4770

4

1    Dugaboy and Get Good Trusts, do we have Mr. Draper?

2              MR. DRAPER:  Yes.  Douglas Draper is on the line,

3    Your Honor.

4              THE COURT:  Good morning.  Now, for what I'll call

5    the Funds and Advisor Objectors, do we have Mr. Rukavina and

6    your crew on the line?

7              MR. RUKAVINA:  Davor Rukavina.  And Lee Hogewood is

8    also on the line.

9              THE COURT:  All right.  Good morning to you.  All

10   right.  And we had objections pending from the U.S. Trustee as

11   well.  Do we have the U.S. Trustee on the line?

12      (No response.)

13             THE COURT:  All right.  If you're appearing, you're

14   on mute.  We're not hearing you.

15      All right.  Well, we have lots of other folks.  I don't

16   mean to be neglectful of them, but we're going to get on with

17   the ruling this morning.  This is going to take a while.  This

18   is a complex matter, so it should take a while.

19      All right.  Before the Court, of course, for consideration

20   is the Debtor's Fifth Amended Plan, first filed on November

21   24, 2020, as later modified on or around January 22, 2021,

22   with more amendments filed on or around February 1, 2021.  The

23   Court will hereinafter refer to this as the "Plan."

24      The parties refer to the Plan as a monetization plan

25   because it involves the gradual wind-down of the Debtor's

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21 Entered 02/09/21 12:03:25 Page 5 of 51
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 267 of 313 PageID 4771

5

1   assets and certain of its funds over time, with the

2   Reorganized Debtor continuing to manage certain other funds

3   for a while, under strict governance and monitoring, and a

4   Claimants Trust will receive the proceeds of that process,

5   with the creditors receiving an interest in that trust.  There

6   is also anticipated to be Litigation Sub-Trust established for

7   the purpose of pursuing certain avoidance or other causes of

8   action for the benefit of creditors.

9        The recovery for general unsecured creditors is estimated

10  now at 71 percent.

11       The Plan was accepted by 99.8 percent of the dollar amount

12  of voting creditors in Class 8, the general unsecured class,

13  but as to numerosity, a majority of the class of general

14  unsecured creditors did not vote in favor of the plan.

15  Specifically, 27 claimants voted no and 17 claimants voted

16  yes.  All but one of the rejecting ballots were cast by

17  employees who, according to the Debtor, are unlikely to have

18  allowed claims because they are asserted for bonuses or other

19  compensation that will not become due.

20       Meanwhile, in a convenience class, Class 7, of general

21  unsecured claims under one million dollars, one hundred

22  percent of the 16 claimants who chose to vote in that class

23  chose to accept the Plan.

24       Because of the rejecting votes in Class 8, and because of

25  certain objections to the Plan, the Court heard two full days

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21 Entered 02/09/21 12:03:25 Page 6 of 51
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 268 of 313 PageID 4772

6

1  of evidence, considering testimony from five witnesses and

2  thousands of pages of documentary evidence, in considering

3  whether to confirm the Plan pursuant to Sections 1129(a) and

4  (b) of the Bankruptcy Code.

5       The Court finds and concludes that the Plan meets all of

6  the relevant requirements of Sections 1123, 1124, and 1129 of

7  the Code, and other applicable provisions of the Bankruptcy

8  Code, but is issuing this detailed ruling to address certain

9  pending objections to the Plan, including but not limited to

10 objections regarding certain Exculpations, Releases, Plan

11 Injunctions, and Gatekeeping Provisions of the Plan.

12      The Court reserves the right to amend or supplement this

13 oral ruling in more detailed findings of fact, conclusions of

14 law, and an Order.

15      First, by way of introduction, this case is not your

16 garden-variety Chapter 11 case.  Highland Capital Management,

17 LP is a multibillion dollar global investment advisor,

18 registered with the SEC pursuant to the Investment Advisers

19 Act of 1940.  It was founded in 1993 by James Dondero and Mark

20 Okada.  Mr. Okada resigned from his role with Highland prior

21 to the bankruptcy case being filed.  Mr. Dondero was in

22 control of the Debtor as of the day it filed bankruptcy, but

23 agreed to relinquish control of it on or about January 9,

24 2020, pursuant to an agreement reached with the Official

25 Unsecured Creditors' Committee, which will be described later.

002045

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21   Entered 02/09/21 12:03:25   Page 7 of 51
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 269 of 313   PageID 4773

7

1        Although Mr. Dondero remained on as an unpaid employee and

2   portfolio manager with the Debtor after January 9, 2020, his

3   employment with the Debtor terminated on October 9, 2020.  Mr.

4   Dondero continues to work for and essentially control numerous

5   nondebtor companies in the Highland complex of companies.

6        The Debtor is headquartered in Dallas, Texas.  As of the

7   October 2019 petition date, the Debtor employed approximately

8   76 employees.

9        Pursuant to various contractual arrangements, the Debtor

10  provides money management and advisory services for billions

11  of dollars of assets, including CLOs and other investments.

12  Some of these assets are managed pursuant to shared services

13  agreements with a variety of affiliated entities, including

14  other affiliated registered investment advisors.  In fact,

15  there are approximately 2,000 entities in the Byzantine

16  complex of companies under the Highland umbrella.

17       None of these affiliates of Highland filed for Chapter 11

18  protection.  Most, but not all, of these entities are not

19  subsidiaries, direct or indirect, of Highland.  And certain

20  parties in the case preferred not to use the term "affiliates"

21  when referring to them.  Thus, the Court will frequently refer

22  loosely to the so-called, in air quotes, "Highland complex of

23  companies" when referring to the Highland enterprise.  That's

24  a term many of the lawyers in the case use.

25       Many of the companies are offshore entities, organized in

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21   Entered 02/09/21 12:03:25   Page 8 of 51
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 270 of 313   PageID 4774

8

such faraway jurisdictions as the Cayman Islands and Guernsey.

The Debtor is privately owned 99.5 percent by an entity called Hunter Mountain Investment Trust; 0.1866 percent by the Dugaboy Investment Trust, a trust created to manage the assets of Mr. Dondero and his family; 0.0627 percent by Mark Okada, personally and through family trusts; and 0.25 percent by Strand Advisors, Inc., the general partner.

The Debtor's primary means of generating revenue has historically been from fees collected for the management and advisory services provided to funds that it manages, plus fees generated for services provided to its affiliates.

For additional liquidity, the Debtor, prior to the petition date, would sell liquid securities in the ordinary course, primarily through a brokerage account at Jefferies, LLC.  The Debtor would also, from time to time, sell assets at nondebtor subsidiaries and distribute those proceeds to the Debtor in the ordinary course of business.

The Debtor's current CEO, James Seery, credibly testified that the Debtor was "run at a deficient for a long time and then would sell assets or defer employee compensation to cover its deficits."  This Court cannot help but wonder if that was necessitated because of enormous litigation fees and expenses that Highland was constantly incurring due to its culture of litigation, as further addressed hereafter.

Highland and this case are not garden-variety for so many

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21 Entered 02/09/21 12:03:25 Page 9 of 51
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 271 of 313 PageID 4775

9

1  reasons.  One is the creditor constituency.  Highland did not

2  file bankruptcy because of some of the typical reasons a large

3  company files Chapter 11.  For example, it did not have a

4  large asset-based secured lender with whom it was in default.

5  It only had relatively insignificant secured indebtedness

6  owing to Jefferies, with whom it had a brokerage account, and

7  one other entity called Frontier State Bank.

8      Highland did not have problems with trade vendors or

9  landlords.  It did not suffer any type of catastrophic

10 business calamity.  In fact, it filed Chapter 11 six months

11 before the COVID-19 pandemic was declared.  The Debtor filed

12 Chapter 11 due to a myriad of massive unrelated business

13 litigation claims that it was facing, many of which had

14 finally become liquidated or were about to become liquidated

15 after a decade or more of contentious litigation in multiple

16 fora all over the world.

17     The Unsecured Creditors' Committee in this case has

18 referred to the Debtor under its former chief executive, Mr.

19 Dondero, as a serial litigator.  This Court agrees with that

20 description.  By way of example, the members of the Creditors'

21 Committee and their history of litigation with the Debtor and

22 others in the Highland complex are as follows:

23     First, the Redeemer Committee of the Highland Crusader

24 Fund, which I'll call the Redeemer Committee.  This Creditors'

25 Committee member obtained an arbitration award against the

002048

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21 Entered 02/09/21 12:03:25 Page 10 of 51
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 272 of 313 PageID 4776

10

1    Debtor of more than $190 million, inclusive of interest,

2    approximately five months before the petition date from a

3    panel of the American Arbitration Association. It was on the

4    verge of having that award confirmed by the Delaware Chancery

5    Court immediately prior to the petition date, after years of

6    disputes that started in late 2008 and included legal

7    proceedings in Bermuda. This creditor's claim was settled

8    during the bankruptcy case in the amount of approximately

9    $137.7 million. The Court is omitting various details and

10   aspects of that settlement.

11        The second Creditors' Committee member, Acis Capital

12   Management, LP, which was formerly in the Highland complex of

13   companies but was not affiliated with Highland as of the

14   petition date. This UCC member and its now-owner, Josh Terry,

15   were involved in litigation with Highland dating back to 2016.

16   Acis was forced into an involuntary bankruptcy in the

17   Bankruptcy Court for the Northern District of Texas, Dallas

18   Division, by Josh Terry, who was a former Highland portfolio

19   manager, in 2018 after Josh Terry obtained an approximately $8

20   million arbitration award and judgment against Acis that was

21   issued by a state court in Dallas County, Texas. Josh Terry

22   was ultimately awarded the equity ownership of Acis by the

23   Dallas Bankruptcy Court in the Acis bankruptcy case.

24        Acis subsequently asserted a multimillion dollar claim

25   against Highland in the Dallas Bankruptcy Court for Highland's

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21 Entered 02/09/21 12:03:25 Page 11 of 51
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 273 of 313 PageID 4777

11

1 alleged denuding of Acis in fraud of its creditors, primarily

2 Josh Terry.

3     The litigation involving Acis and Mr. Terry dates back to

4 mid-2016, and has continued on, with numerous appeals of

5 bankruptcy court orders, including one appeal still pending at

6 the United States Court of Appeals for the Fifth Circuit.

7     There was also litigation involving Josh Terry and Acis in

8 the Royal Court of the Island of Guernsey and in a court in

9 New York.

10     The Acis claim was settled during this bankruptcy case in

11 court-ordered mediation for approximately $23 million.  Other

12 aspects and details of this settlement are being omitted.

13     Now, the third Creditors' Committee member, UBS

14 Securities.  It's a creditor who filed a proof of claim in the

15 amount of $1,039,000,000 in the Highland case.  Yes, over one

16 billion dollars.  The UBS claim was based on the amount of a

17 judgment that UBS received from a New York state court in 2020

18 after a multi-week bench trial which had occurred many months

19 earlier on a breach of contract claim against other entities

20 in the Highland complex.  UBS alleged that the Debtor should

21 be liable for the judgment.  The UBS litigation related to

22 activities that occurred in 2008.  The litigation involving

23 UBS and Highland and its affiliates was pending for more than

24 a decade, there having been numerous interlocutory appeals

25 during its history.

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21   Entered 02/09/21 12:03:25   Page 12 of 51
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 274 of 313   PageID 4778

12

1      The Debtor and UBS recently announced a settlement of the

2   UBS claim, which came a few months after court-ordered

3   mediation.  The settlement is in the amount of $50 million as

4   a general unsecured claim, $25 million as a subordinated

5   claim, and $18 million of cash coming from a nondebtor entity

6   in the Highland complex known as Multistrat.  Other aspects of

7   this settlement are being omitted.

8      The fourth and last Creditors' Committee member is Meta-e

9   Discovery.  It is a vendor who happened to supply litigation

10  and discovery-related services to the Debtor over the years.

11  It had unpaid invoices on the petition date of more than

12  $779,000.

13     It is fair to say that the members of the Creditors'

14  Committee in this case all have wills of steel.  They fought

15  hard before and during the bankruptcy case.  The members of

16  the Creditors' Committee are highly sophisticated and have had

17  highly sophisticated professionals representing them.  They

18  have represented their constituency in this case as

19  fiduciaries extremely well.

20     In addition to these Creditors Committee members, who were

21  all embroiled in years of litigation with Highland and its

22  affiliates in various ways, the Debtor has been in litigation

23  with Patrick Daugherty, a former limited partner and employee

24  of Highland, for many years in both Delaware and Texas state

25  courts.  Patrick Daugherty filed a proof of claim for "at

002051

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21 Entered 02/09/21 12:03:25 Page 13 of 51
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 275 of 313 PageID 4779

13

1    least $37.4 million" relating to alleged breached employment-

2    related agreements and for the tort of defamation arising from

3    a 2017 press release posted by the Debtor.

4         The Debtor and Patrick Daugherty recently announced a

5    settlement of the Patrick Daugherty claim in the amount of

6    $750,000 cash on the effective date, an $8.25 million general

7    unsecured claim, and a $2.75 million subordinated claim.

8    Other aspects and details of this settlement are being

9    omitted.

10        Additionally, an entity known as HarbourVest, who invested

11   more than $70 million with an entity in the Highland complex,

12   asserted a $300 million proof of claim against Highland,

13   alleging, among other things, fraud and RICO violations.  The

14   HarbourVest claim was settled during the bankruptcy case for a

15   $45 million general unsecured claim and a $35 million junior

16   claim.

17        Other than these claims just described, most of the other

18   claims in this case are claims asserted against the Debtor by

19   other entities in the Highland complex, most of which entities

20   the Court finds to be controlled by Mr. Dondero; claims of

21   employees who believe that they are entitled to large bonuses

22   or other types of deferred compensation; and claims of

23   numerous law firms that did work for Highland and were unpaid

24   for amounts due to them on the petition date.

25        Yet another reason this is not your garden-variety Chapter

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21 Entered 02/09/21 12:03:25 Page 14 of 51
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 276 of 313 PageID 4780

14

1 11 case is its postpetition corporate governance structure.

2 Highland filed bankruptcy October 16, 2019. Contentiousness

3 with the Creditors' Committee began immediately, with first

4 the Committee's request for a change of venue from Delaware to

5 Dallas, and then a desire by the Committee and the U.S.

6 Trustee for a Chapter 11 or 7 trustee to be appointed due to

7 concerns over and distrust of Mr. Dondero and his numerous

8 conflicts of interest and alleged mismanagement or worse.

9 After many weeks of the threat of a trustee lingering, the

10 Debtor and the Creditors' Committee negotiated and the Court

11 approved a corporate governance settlement on January 9, 2020

12 that resulted in Mr. Dondero no longer being an officer or

13 director of the Debtor or of its general partner, Strand.

14 As part of the court-approved settlement, three eminently-

15 qualified Independent Directors were chosen by the Creditors'

16 Committee and engaged to lead Highland through its Chapter 11

17 case. They were James Seery, John Dubel, and Retired

18 Bankruptcy Judge Russell Nelms. They were technically the

19 Independent Directors of Strand, the general partner of the

20 Debtor. Mr. Dondero had previously been the sole director of

21 Strand, and thus the sole person in ultimate control of the

22 Debtor.

23 The three independent board members' resumes are in

24 evidence. James Seery eventually was named CEO of the Debtor.

25 Suffice it to say that this changed the entire trajectory of

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21 Entered 02/09/21 12:03:25 Page 15 of 51
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 277 of 313 PageID 4781

15

1    the case.  This saved the Debtor from a trustee.  The Court

2    trusted the new directors.  The Creditors' Committee trusted

3    them.  They were the right solution at the right time.

4         Because of the unique character of the Debtor's business,

5    the Court believed this solution was far better than a

6    conventional Chapter 7 or 11 trustee.  Mr. Seery, in

7    particular, knew and had vast experience at prominent firms

8    with high-yield and distressed investing similar to the

9    Debtor's business.  Mr. Dubel had 40 years of experience

10   restructuring large, complex businesses and serving on their

11   boards of directors in this context.  And Retired Judge Nelms

12   had not only vast bankruptcy experience but seemed

13   particularly well-suited to help the Debtor maneuver through

14   conflicts and ethical quandaries.

15        By way of comparison, in the Chapter 11 case of Acis, the

16   former affiliate of Highland that this Court presided over two

17   or three years ago, which company was much smaller in size and

18   scope than Highland, managing only five or six CLOs, a Chapter

19   11 trustee was elected by the creditors that was not on the

20   normal rotation panel for trustees in this district, but

21   rather was a nationally-known bankruptcy attorney with more

22   than 45 years of large Chapter 11 case experience.  This

23   Chapter 11 trustee performed valiantly, but was sued by

24   entities in the Highland complex shortly after he was

25   appointed, which this Court had to address.  The Acis trustee

002054

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21 Entered 02/09/21 12:03:25 Page 16 of 51
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 278 of 313 PageID 4782

16

1  could not get Highland and its affiliates to agree to any

2  actions taken in the case, and he finally obtained

3  confirmation of a plan over Highland and its affiliates'

4  objections in his fourth attempted plan, which confirmation

5  then was promptly appealed by Highland and its affiliates.

6      Suffice it to say it was not easy to get such highly-

7  qualified persons to serve as independent board members and

8  CEO of this Debtor.  They were stepping into a morass of

9  problems.  Naturally, they were worried about getting sued, no

10  matter how defensible their efforts might be, given the

11  litigation culture that enveloped Highland historically.  It

12  seemed as though everything always ended in litigation at

13  Highland.

14      The Court heard credible testimony that none of them would

15  have taken on the role of Independent Director without a good

16  D&O insurance policy protecting them, without indemnification

17  from Strand, guaranteed by the Debtor; without exculpation for

18  mere negligence claims; and without a gatekeeper provision,

19  such that the Independent Directors could not be sued without

20  the bankruptcy court, as a gatekeeper, giving a potential

21  plaintiff permission to sue.

22      With regard to the gatekeeper provision, this was

23  precisely analogous to what bankruptcy trustees have pursuant

24  to the so-called "Barton Doctrine," which was first

25  articulated in an old U.S. Supreme Court case.

002055

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21 Entered 02/09/21 12:03:25 Page 17 of 51
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 279 of 313 PageID 4783

17

1      The Bankruptcy Court approved all of these protections in

2    a January 9, 2020 order.  No one appealed that order.  And Mr.

3    Dondero signed the settlement agreement that was approved by

4    that order.

5      An interesting fact about the D&O policy came out in

6    credible testimony at the confirmation hearing.  Mr. Dubel and

7    an insurance broker from Aon, named Marc Tauber, both credibly

8    testified that the gatekeeper provision was needed because of

9    the so-called, and I quote, "Dondero Exclusion" in the

10    insurance marketplace.

11      Specifically, the D&O insurers in the marketplace did not

12    want to cover litigation claims that might be brought against

13    the Independent Directors by Mr. Dondero because the

14    marketplace of D&O insurers are aware of Mr. Dondero's

15    litigiousness.  The insurers would not have issued a D&O

16    policy to the Independent Directors without either the

17    gatekeeping provision or a "Dondero Exclusion" being in the

18    policy.

19      Thus, the gatekeeper provision was part of the January 9,

20    2020 settlement.  There was a sound business justification for

21    it.  It was reasonable and necessary.  It was consistent with

22    the Barton Doctrine in an extremely analogous situation --

23    *i.e.*, the independent board members were analogous to a three-

24    headed trustee in this case, if you will.  Mr. Dondero signed

25    off on it.  And, again, no one ever appealed the order

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21 Entered 02/09/21 12:03:25 Page 18 of 51
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 280 of 313 PageID 4784

18

1   approving it.

2       The Court finds that, like the Creditors' Committee, the

3   independent board members here have been resilient and

4   unwavering in their efforts to get the enormous problems in

5   this case solved.  They seem to have at all times negotiated

6   hard and with good faith.  As noted previously, they changed

7   the entire trajectory of this case.

8       Still another reason why this was not your garden-variety

9   case was the mediation effort.  In summer of 2020, roughly

10  nine months into the Chapter 11 case, this Court ordered

11  mediation among the Debtor, Acis, UBS, the Redeemer Committee,

12  and Mr. Dondero.  The Court selected co-mediators, since this

13  seemed like such a Herculean task, especially during COVID-19,

14  where people could not all be in the same room.  Those co-

15  mediators were Retired Bankruptcy Judge Allan Gropper from the

16  Southern District of New York, who had a distinguished career

17  presiding over complex Chapter 11 cases, and Ms. Sylvia Mayer,

18  who likewise has had a distinguished career, first as a

19  partner in a preeminent law firm working on complex Chapter 11

20  cases, and subsequently as a mediator and arbitrator in

21  Houston, Texas.

22      As noted earlier, the Acis claim was settled during the

23  mediation, which seemed nothing short of a miracle to this

24  Court, and the UBS claim was settled many months later, and

25  this Court believes the groundwork for that ultimate

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21 Entered 02/09/21 12:03:25 Page 19 of 51
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 281 of 313 PageID 4785

19

1  settlement was laid, or at least helped, through the

2  mediation.  And as earlier noted, other enormous claims have

3  been settled during this case, including that of the Redeemer

4  Committee, who, again, had asserted approximately or close to

5  a $200 million claim; HarbourVest, who asserted a $300 million

6  claim; and Patrick Daugherty, who asserted close to a $40

7  million claim.

8      This Court cannot stress strongly enough that the

9  resolution of these enormous claims and the acceptance of all

10  of these creditors of the Plan that is now before the Court

11  seems nothing short of a miracle.  It was more than a year in

12  the making.

13      Finally, a word about the current remaining Objectors to

14  the Plan before the Court.  Once again, the Court will use the

15  phrase "not garden-variety."  Originally, there were over one

16  dozen objections filed to this Plan.  The Debtor has made

17  various amendments or modifications to the Plan to address

18  some of these objections.  The Court finds that none of these

19  modifications require further solicitation, pursuant to

20  Sections 1125, 1126, 1127 of the Code, or Bankruptcy Rule

21  3019, because, among other things, they do not materially

22  adversely change the treatment of the claims of any creditor

23  or interest holder who has not accepted in writing the

24  modifications.

25      Among other things, there were changes to the projections

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21 Entered 02/09/21 12:03:25 Page 20 of 51
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 282 of 313 PageID 4786

20

1    that the Debtor filed shortly before the confirmation hearing

2    that, among other things, show the estimated distribution to

3    creditors and compare plan treatment to a likely disbursement

4    in a Chapter 7.

5        These do not constitute a materially adverse change to the

6    treatment of any creditors or interest holders.  They merely

7    update likely distributions based on claims that have now been

8    settled, and they've otherwise incorporated more recent

9    financial data.  This happens often before confirmation

10   hearings.  The Court finds that it did not mislead or

11   prejudice any creditors or interest holders, and certainly

12   there was no need to resolicit the Plan.

13       The only Objectors to the Plan left at this time were Mr.

14   Dondero and entities that the Court finds are controlled by

15   him.  The standing of these entities to object to the Plan

16   exists, but the remoteness of their economic interest is

17   noteworthy, and the Court questions the good faith of the

18   Objectors.  In fact, the Court has good reason to believe that

19   these parties are not objecting to protect economic interests

20   they have in the Debtor, but to be disruptors.

21       Mr. Dondero wants his company back.  This is

22   understandable.  But it's not a good faith basis to lob

23   objections to the Plan.  The Court has slowed down

24   confirmation multiple times on the current Plan and urged the

25   parties to talk to Mr. Dondero.  The parties represent that

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21 Entered 02/09/21 12:03:25 Page 21 of 51
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 283 of 313 PageID 4787

21

1   they have, and the Court believes that they have.

2       Now, to be specific about the remoteness of the objectors'

3   interests, the Court will address them each separately.

4   First, Mr. Dondero has a pending objection. Mr. Dondero's

5   only economic interest with regard to the Debtor at this point

6   is an unliquidated indemnification claim. And based on

7   everything this Court has heard, his indemnification claim

8   will be highly questionable at this juncture.

9       Second, a joint objection has been filed by the Dugaboy

10   Trust and the Get Good Trust. As for the Dugaboy Trust, it

11   was created to manage the assets of Mr. Dondero and his

12   family, and it owns a 0.1866 percent limited partnership

13   interest in the Debtor. The Court is not clear what economic

14   interest the Get Good Trust has, but it likewise seems to be

15   related to Mr. Dondero, and it has been represented to the

16   Court numerous times that the trustee is Mr. Dondero's college

17   roommate.

18       Another group of Objectors that has joined together in one

19   objection is what the Court will refer to as the Highland and

20   NexPoint Advisors and Funds. The Court understands they

21   assert disputed administrative expense claims against the

22   estate. While the evidence presented was that they have

23   independent board members that run these companies, the Court

24   was not convinced of their independence from Mr. Dondero.

25   None of the so-called independent board members of these

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21 Entered 02/09/21 12:03:25 Page 22 of 51
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 284 of 313 PageID 4788

22

1   entities have ever testified before the Court. Moreover, they

2   have all been engaged with the Highland complex for many

3   years.

4       The witness who testified on these Objectors' behalves at

5   confirmation, Mr. Jason Post, their chief compliance officer,

6   resigned from Highland after more than twelve years in October

7   2020, at the same time that Mr. Dondero resigned or was

8   terminated by Highland. And a prior witness recently for

9   these entities whose testimony was made part of the record at

10  the confirmation hearing essentially testified that Mr.

11  Dondero controlled these entities.

12      Finally, various NexBank entities objected to the Plan.

13  The Court does not believe they have liquidated claims. Mr.

14  Dondero appears to be in control of these entities as well.

15      To be clear, the Court has allowed all of these objectors

16  to fully present arguments and evidence in opposition to

17  confirmation, even though their economic interests in the

18  Debtor appear to be extremely remote and the Court questions

19  their good faith. Specifically on that latter point, the

20  Court considers them all to be marching pursuant to the orders

21  of Mr. Dondero.

22      In the recent past, Mr. Dondero has been subject to a TRO

23  and preliminary injunction by the Bankruptcy Court for

24  interfering with the current CEO's management of the Debtor in

25  specific ways that were supported by evidence. Around the

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21 Entered 02/09/21 12:03:25 Page 23 of 51
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 285 of 313 PageID 4789

23

1   time that this all came to light and the Court began setting

2   hearings on the alleged interference, Mr. Dondero's company

3   phone supplied to him by Highland, which he had been asked to

4   turn in, mysteriously went missing.  The Court merely mentions

5   this in this context as one of many reasons that the Court has

6   to question the good faith of Mr. Dondero and his affiliated

7   objectors.

8        The only other pending objection besides these objections

9   of the Dondero and Dondero-controlled entities is an objection

10  of the United States Trustee pertaining to the release,

11  exculpation, and injunction provisions in the Plan.

12       In juxtaposition to these pending objections, the Court

13  notes that the Debtor has resolved earlier-filed objections to

14  the Plan filed by the IRS, Patrick Daugherty, CLO Holdco,

15  Ltd., numerous local taxing authorities, and certain current

16  and former senior-level employees of the Debtor.

17       With that rather detailed factual background addressed,

18  because certainly context matters here, the Court now

19  addresses what it considers the only serious objections raised

20  in connection with confirmation.  Specifically, the Plan

21  contain certain releases, exculpation, plan injunctions, and a

22  gatekeeper provision which are obviously not fully consensual,

23  since there are objections.  Certainly, these provisions are

24  mostly consensual when you consider that parties with hundreds

25  of millions of dollars' worth of legitimate claims have not

002062

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21 Entered 02/09/21 12:03:25 Page 24 of 51
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 286 of 313 PageID 4790

24

1   objected to them.

2        First, a word about plan releases generally, since the

3   Objectors at times seem to gloss over, in this Court's view,

4   relevant distinctions, and seem to refer to the plan releases

5   in this Plan and the exculpations and the plan injunctions all

6   as impermissible third-party releases, when, in fact, they are

7   not, *per se*.

8        It has, without a doubt, become quite commonplace in

9   complex Chapter 11 bankruptcy cases to have three categories

10  of releases in plans.  These three types are as follows.

11       First, Debtor Releases.  A debtor release involves a

12  release by the debtor and its bankruptcy estate of claims

13  against nondebtor third-parties.  For example, a release may

14  be granted in favor of creditors, directors, officers,

15  employees, professionals who participated in the bankruptcy

16  process.  This is the least-controversial type of release

17  because the debtor is extinguishing its own claims, which are

18  property of the estate, that a debtor has authority to utilize

19  or not, pursuant to Sections 541 and 363 of the Bankruptcy

20  Code.

21       Authority for a debtor release pursuant to a plan arises

22  out of Section 1123(b)(3)(A), which indicates that a plan may

23  provide for "the settlement or adjustment of any claim or

24  interest belonging to the debtor or to the estate."

25       In this context, it would appear that the only analysis

002063

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21 Entered 02/09/21 12:03:25 Page 25 of 51
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 287 of 313 PageID 4791

25

1   required is to determine whether the release or settlement of

2   the claim is an exercise of reasonable business judgment on

3   that part of the debtor, is it fair and equitable, is it in

4   the best interest of the estate, given all the relevant facts

5   and circumstances?  Also relevant is whether there's

6   consideration given of some sort by the releasees.

7       Now, the second type of very commonplace Chapter 11 plan

8   release is an exculpation.  Chapter 11 plans also very often

9   have these exculpation provisions, and they're something much

10  narrower in scope and time than a full-fledged release.  An

11  exculpation provision is more like a shield for a certain

12  subset of key actors in the case for their acts during and in

13  connection with the case, which acts may have been merely

14  negligent.

15      Specifically, a plan may absolve certain actors -- usually

16  estate fiduciaries -- such as an Official Unsecured Creditors'

17  Committee and its members, Committee professionals, sometimes

18  Debtor professionals, senior management, officers and

19  directors of the Debtor, from any liability for postpetition

20  negligent conduct -- *i.e.*, conduct which occurred during the

21  administration of the Chapter 11 case and in the negotiation,

22  drafting, and implementation of a plan.  An exculpation

23  provision typically excludes gross negligence and willful

24  misconduct.  It is usually worded in a passive voice, so it

25  may seem a little unclear as to whether it is actually a

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21 Entered 02/09/21 12:03:25 Page 26 of 51
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 288 of 313 PageID 4792

26

1    release and by whom.

2        In any event, the rationale is that parties who actively

3    participate in a court-approved process -- often, court-

4    approved transactions by court order -- should receive

5    protection for their work.  Otherwise, who would want to work

6    in such a messy, contentious situation, only to be sued for

7    alleged negligence for less-than-perfect end results?

8        Chapter 11 end results are not always pretty.  One could

9    argue that these exculpation provisions, though, are much ado

10   about nothing.  Why?  For one thing, again, the shield is only

11   as to negligent conduct.  There is no shield for other

12   problematic conduct, such as gross negligence or willful

13   misconduct.

14       Second, in many situations, any claims or causes of action

15   that might arise will belong to the Debtor or its estate.

16   Thus, they would already be released pursuant to a debtor

17   release.

18       Additionally, there is case law stating that, where a

19   claim is brought against an estate professional whose fees

20   have already been approved in a final fee application, any

21   claims are barred by *res judicata*.  Thus, exculpated

22   professionals would only have potential exposure for a very

23   short window of time, until final fee applications.

24       Additionally, certain case law in Texas makes clear that

25   an attorney generally does not owe any duties to persons other

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21 Entered 02/09/21 12:03:25 Page 27 of 51
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 289 of 313 PageID 4793

27

1  than his own client.

2      All of this suggests that the shield of a typical

3  exculpation provision may rarely become useful or needed.

4      Moving now to the third type of release, a true third-

5  party release, Chapter 11 plans also sometimes contain third-

6  party releases.  A true third-party release involves the

7  release of claims held by nondebtor third parties against

8  other nondebtor third parties, and there is often no

9  limitation on the scope and time of the claims released.

10     This is the most heavily scrutinized of the three types of

11  plan releases.  Much of the case authority focuses on whether

12  a third-party release is consensual or not in analyzing their

13  propriety and/or enforceability.

14     In Highland, there are no third-party releases.  Rather,

15  there are debtor releases and exculpations.  There also happen

16  to be plan injunctions and gatekeeper provisions that have

17  been challenged.  The Objectors argue that these provisions

18  violate the Fifth Circuit's opinion in *Pacific Lumber* or are

19  otherwise beyond the jurisdiction or authority of the

20  bankruptcy court.  These arguments are now addressed.

21     First, the debtor release is found at Article IX.D of the

22  Plan.  The language, in pertinent part, reads as follows.  "On

23  and after the effective date, each Released Party is deemed to

24  be hereby conclusively, absolutely, unconditionally,

25  irrevocably, and forever released and discharged by the Debtor

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21 Entered 02/09/21 12:03:25 Page 28 of 51
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 290 of 313 PageID 4794

28

1   and the Estate, in each case on behalf of themselves and their

2   respective successors, assigns, and representatives, including

3   but not limited to the Claimant Trust and the Litigation Sub-

4   Trust, from any and all causes of action, including any

5   derivative claims, asserted on behalf of the Debtor, whether

6   known or unknown, foreseen or unforeseen, matured or

7   unmatured, existing or hereafter arising, in law, equity,

8   contract, tort, or otherwise, that the Debtor or the Estate

9   would have been legally entitled to assert in their own right,

10  whether individually or collectively, or on behalf of the

11  holder of any claim against, or interest in, a debtor or other

12  person."

13       There are certain exceptions discussed, and then Released

14  Parties are defined at Definition 113 of the Plan collectively

15  as:  the Independent Directors; Strand, solely from the date

16  of the appointment of the Independent Directors through the

17  effective date; the CEO/CRO; the Committee, the members of the

18  Committee, in their official capacities; the professionals

19  retained by the Debtor and the Committee in the Chapter 11

20  case; and the employees.  This is a defined term in the Plan

21  Supplement and does not include certain employees.

22       To be clear, these are not third-party releases such as

23  addressed in the *Pacific Lumber* case.  These are the Debtor's

24  and/or the bankruptcy estate's causes of action that are

25  proposed to be released.  Releases by a debtor are

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21 Entered 02/09/21 12:03:25 Page 29 of 51
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 291 of 313 PageID 4795

29

1  discretionary and can be provided by a debtor to persons who

2  have provided consideration to the debtor and the estate.

3  Section 1123(b)(3)(A) of the Bankruptcy Code permits this.

4       The evidence here supported the notion that these releases

5  are a *quid pro quo* for the Released Parties' significant

6  contributions to a highly complex and contentious

7  restructuring.  The Debtor is releasing its own claims.  Some

8  of the Released Parties would have indemnification rights

9  against the Debtor.  And the Debtor's CEO, James Seery,

10 credibly testified that he does not believe any claims exist

11 as to the Released Parties.  The Court approves the Debtor

12 releases and overrules the objections to them.

13      Next, the exculpations appear at Article IX.C of the Plan

14 and provide as follows:  Subject in all respects to Article

15 XII.D of the Plan, to the maximum extent permitted by

16 applicable law, no Exculpated Party will have or incur, and

17 each Exculpated Party is hereby exculpated from, any claim,

18 obligation, suit, judgment, damage, demand, debt, right, cause

19 of action, remedy, loss, and liability for conduct occurring

20 on or after the petition date in connection with or arising

21 out of the filing and administration of the Chapter 11 case,

22 the negotiation and pursuit of a disclosure statement, the

23 Plan, or the solicitation of votes for or confirmation of the

24 Plan, the funding or consummation of the Plan, or any related

25 agreements, instruments, et cetera, et cetera, whether or not

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21 Entered 02/09/21 12:03:25 Page 30 of 51
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 292 of 313 PageID 4796

30

1   such Plan distributions occur following the effective date,

2   the implementation of the Plan, and any negotiation,

3   transactions, and documentation in connection with the

4   foregoing clauses, provided, however, the foregoing will not

5   apply to any acts or omissions of any Exculpated Party arising

6   out of or related to acts or omissions that constitute bad

7   faith, fraud, gross negligence, criminal misconduct, or

8   willful misconduct; or Strand or any employee other than with

9   respect to actions taken by such entities from the date of

10  appointment of the Independent Directors through the effective

11  date.

12      Exculpated Parties are later defined at Section -- or,

13  earlier defined at Section 62 of the Plan, Definition No. 62

14  of the Plan, as later limited by the Debtor, as announced in

15  the confirmation hearing.  And so these are the Exculpated

16  Parties:  the Debtor and its successors and assigns; the

17  employees, certain employees, as defined; Strand; the

18  Independent Directors; the Committee, the members of the

19  Committee, in their official capacities; the professionals

20  retained by the Debtor and the Committee in the Chapter 11

21  case; the CEO and CRO; and the related persons as to each of

22  these parties listed in Part (iv) through (viii) above;

23  provided, for the avoidance of doubt, and it goes on to say

24  Dondero, Mark Okada, and various others aren't Exculpated

25  Parties.

002069

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21 Entered 02/09/21 12:03:25 Page 31 of 51
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 293 of 313 PageID 4797

31

1      Now, as earlier mentioned, the Objectors argue that

2  *Pacific Lumber*, 584 F.3d 229, a Fifth Circuit case from 2009,

3  categorically rejects the permissibility of nonconsensual

4  exculpations as well as third-party releases in a Chapter 11

5  plan.  So the Court is going to take a deep dive into that

6  assertion.

7      In *Pacific Lumber*, the Fifth Circuit reviewed on appeal

8  numerous challenges to a confirmed plan of affiliated debtors

9  known as Palco and Scopac and four subsidiaries.  The debtor

10  Palco owned and operated the sawmill, a power plant, and even

11  a town called Scotia, California.  The debtor Scopac owned

12  timberlands.  A creditor, a secured creditor called Marathon

13  had a claim against Palco's assets.  Marathon estimated

14  Palco's assets were worth $110 million.  Its claim was $160

15  million.  Meanwhile, other parties had large secured claims

16  against the other debtor, Scopac.

17      The plan that the bankruptcy court confirmed, which was on

18  appeal to the Fifth Circuit, was filed by both the secured

19  creditor Marathon and a joint plan proponent called MRC.  MRC

20  was a competitor of the debtor Palco.  The Marathon/MRC plan

21  proposed to dissolve all the debtors, cancel intercompany

22  debts, and create two new entities, Townco and Newco.  Almost

23  all of the debtor Palco's assets, including the town of

24  Scotia, California, would be transferred to Townco.  The

25  timberlands and other assets, including the sawmill, would be

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21 Entered 02/09/21 12:03:25 Page 32 of 51
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 294 of 313 PageID 4798

32

1   placed in Newco.

2       Marathon and MRC proposed to contribute $580 million to

3   Newco to pay claims against Scopac.  And Marathon would

4   convert its secured claim against Palco's assets into equity,

5   giving it full ownership of Townco, a 15 percent stake in

6   Newco, and a new note for the sawmill's working capital.  MRC

7   would own the other 80 percent of Newco and would manage and

8   run the company.

9       An indenture trustee for the secured indebtedness against

10  Scopac -- which, by the way, had also been a plan proponent of

11  a competing plan -- appealed the confirmation order, raising

12  eight distinct issues on appeal.  One of the eight issues

13  pertained to what the Fifth Circuit referred to as a

14  "nondebtor exculpation and release clause."  This issue is

15  discussed on the last two pages of a very lengthy opinion.

16      While the complained-of provision is not quoted verbatim

17  in the *Pacific Lumber* opinion, it appears to have been a

18  typical exculpation clause.  Not a third-party release; a

19  typical exculpation clause.  The Fifth Circuit stated, "The

20  plan releases MRC, Marathon, Newco, Townco, and the Unsecured

21  Creditors' Committee, and their personnel, from liability,

22  other than for willful and gross negligence related to

23  proposing, implementing, and administering the plan" at Page

24  251.

25      The Fifth Circuit held that "the nondebtor releases must

002071

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21 Entered 02/09/21 12:03:25 Page 33 of 51
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 295 of 313 PageID 4799

33

1    be struck except with respect to the Creditors' Committee and

2    its members."

3        Footnote 26 of the opinion also states that the appellants

4    had "not briefed why Newco and Townco or their officers and

5    directors should not be released," and so "we do not analyze

6    their position."  Rather, the Fifth Circuit merely analyzed

7    why the exculpation provision was not permissible as to the

8    two plan proponents, MRC and Marathon.

9        Thus, the Court views *Pacific Lumber* as being a holding

10   that squarely addressed the propriety of two plan proponents,

11   a secured lender and a third-party competitor purchaser of the

12   Debtors, obtaining nonconsensual exculpation in the plan.

13   However, its reasoning certainly cannot be ignored, strongly

14   suggesting it would not be inclined to approve an exculpation

15   for any party other than a Creditors' Committee or its

16   members.

17       As far as the Fifth Circuit's reasoning, it relied on

18   Bankruptcy Code Section 524(e) for striking down the

19   exculpations, stating, "The law states, however, that

20   discharge of a debt of the debtor does not affect the

21   liability of any other entity on such debt."  Page 251.  The

22   opinion suggests that MRC and Marathon may have tried to argue

23   that 524(e) did not apply to their exculpations because MRC

24   and Marathon were not liable as co-obligors in any way on any

25   of the debtor's debt.

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21    Entered 02/09/21 12:03:25    Page 34 of 51
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 296 of 313   PageID 4800

34

1      The Fifth Circuit seemed dismissive of this argument,

2 stating as follows, "MRC/Marathon insist the release clause is

3 part of their bargain because, without the clause, neither

4 company would have been willing to provide the plan's

5 financing.  Nothing in the records suggests that MRC/Marathon,

6 the Committee, or the Debtor's officers and directors were co-

7 liable for the Debtor's prepetition debts.  Instead, the

8 bargain the proponents claim to have purchased is exculpation

9 from any negligence that occurred during the course of the

10 case.  Any costs the released parties might incur defending

11 against suits alleging such negligence are unlikely to swamp

12 either of these parties or the consummated reorganization.  We

13 see little equitable about protecting the released nondebtors

14 from negligence suits arising out of the reorganization."

15      The Court goes on to note that, in a variety of cases,

16 that releases have been approved, but these cases "seem

17 broadly to foreclose nonconsensual nondebtor releases and

18 permanent injunctions."

19      The Court then adds at Footnote 27 that the Fifth Circuit

20 in the past did not set aside challenged plan releases that

21 were in final nonappealable orders and were the subject of

22 collateral attack much later, citing its famous *Republic*

23 *Supply v. Shoaf* case, where the Fifth Circuit ruled that *res*

24 *judicata* barred a debtor from bringing a claim that was

25 specifically and expressly released by a confirmed

002073

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21 Entered 02/09/21 12:03:25 Page 35 of 51
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 297 of 313 PageID 4801

35

1    reorganization plan because the debtor -- the objector failed

2    to object to the release at confirmation.

3        The Fifth Circuit in *Pacific Lumber* also noted that the

4    Bankruptcy Code permits bankruptcy courts to enjoin third-

5    party asbestos claims under certain circumstances, 524(g),

6    which the Court said suggests nondebtor releases are most

7    appropriate as a method to channel mass tort claims towards a

8    specific pool of assets, citing numerous cases, including

9    *Johns-Manville*.

10       In reach its holding, the Fifth Circuit saw no reason to

11   uphold exculpation to the plan proponents MRC and Marathon,

12   seeming to find it inconsistent with 524(e) under the facts at

13   bar, but the Court did uphold exculpation for the Creditors'

14   Committee and its members, stating, "We agree, however, with

15   courts that have held that 1103(c) under the Code, which lists

16   the Creditors' Committee's powers, implies Committee members

17   have qualified immunity for actions within the scope of their

18   duties."  Numerous cites.  "The Creditors' Committee and its

19   members are the only disinterested volunteers among the

20   parties sought to be released here.  The scope of protection,

21   which does not insulate them from willful and gross

22   negligence, is adequate."

23       Thus, the Court held that the exculpation provisions in

24   *Pacific Lumber* must be struck except with regard to the

25   Creditors' Committee and its members.

002074

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21   Entered 02/09/21 12:03:25   Page 36 of 51
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 298 of 313   PageID 4802

36

1    Now, after all of that, this Court believes the following

2    can be gleaned from *Pacific Lumber*.  First, the Fifth Circuit

3    hinted that consensual exculpations and/or consensual

4    nondebtor third-party releases are permissible.  The Court

5    was, of course, dealing with nonconsensual exculpations in

6    *Pacific Lumber*.  In this regard, I note Page 252, where the

7    Court cited various prior Fifth Circuit authority and then

8    stated, "These cases seem broadly to foreclose nonconsensual

9    nondebtor releases and permanent injunctions."

10    The second thing that can be gleaned from *Pacific Lumber*:

11    The Fifth Circuit hinted that nondebtor releases may be

12    permissible in cases involving global settlements of mass

13    claims against the debtors and co-liable parties.  The Court,

14    of course, referred to 524(g), but various other cases which

15    approved nondebtor releases where mass claims were channeled

16    to a specific pool of assets.

17    Third, the Fifth Circuit outright held that exculpations

18    from negligence for a Creditors' Committee and its members are

19    permissible because the concept is both consistent with

20    1103(c), "which implies Committee members have qualified

21    immunity for actions within the scope of their duties," and a

22    good policy result, since "if members of the Committee can be

23    sued by persons unhappy with the outcome of the case, it will

24    be extremely difficult to find members to serve on an official

25    committee."

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21   Entered 02/09/21 12:03:25   Page 37 of 51
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 299 of 313   PageID 4803

37

1      Fourth, the Fifth Circuit recognized in *Pacific Lumber*

2  that *res judicata* may bar complaints regarding an

3  impermissible plan release, citing to its earlier *Republic*

4  *Supply v. Shoaf* opinion.

5      Now, being ever-mindful of the Fifth Circuit's words in

6  *Pacific Lumber*, this Court cannot help but wonder about at

7  least three things.

8      First, did the Fifth Circuit leave open the door that

9  facts/equities might sometimes justify approval of an

10  exculpation for a person other than a Creditors' Committee and

11  its members?  For example, the Fifth Circuit stated, in

12  referring to the plan proponents Marathon and MRC, that "Any

13  costs the released parties might incur defending against suits

14  alleging such negligence are unlikely to swamp either of these

15  parties or the consummated reorganization."  Here, this Court

16  can easily expect the proposed exculpated parties to incur

17  costs that could swamp them and the reorganization based on

18  the past litigious conduct of Mr. Dondero and his controlled

19  entities.  Do these words of the Fifth Circuit hint that

20  equities/economics might sometimes justify an exculpation?

21      Second, did the Fifth Circuit's rationale for permitted

22  exculpations to Creditors' Committee and their members, which

23  was clearly policy-based, based on their implied qualified

24  immunity flowing from their duties in Section 1103 and their

25  disinterestedness, and the importance of their role in a

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21 Entered 02/09/21 12:03:25 Page 38 of 51
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 300 of 313 PageID 4804

38

1    Chapter 11 case, did this rationale leave open the door to

2    sometimes permitting exculpations to other parties in a

3    particular Chapter 11 case besides Creditors' Committees and

4    their members?  For example, in a situation such as the

5    Highland case, in which Independent Directors, brought in to

6    avoid a trustee, are more like a Creditors' Committee than an

7    incumbent board of directors.

8        Third, the Fifth Circuit's sole statutory basis was

9    Section 524(e).  This Court would humbly submit that this is a

10   statute dealing with prepetition liability in which some

11   nondebtor is liable with the Debtor.  Exculpation is a concept

12   dealing with postpetition liability.

13       The Ninth Circuit recently, in a case called *Blixseth v.*

14   *Credit Suisse*, 961 F.3d 1074 (9th Cir. 2020), approved the

15   validity of an exculpation clause incorporated into a

16   confirmed Chapter 11 plan that purported to absolve certain

17   nondebtor parties that were "closely involved" in drafting the

18   plan.  They were the largest secured creditor, a purchaser,

19   and an individual who was an indirect owner of certain of the

20   debtor companies.  The exculpation was from any negligence,

21   liability, for "any act or omission in connection with,

22   related to, or arising out of the Chapter 11 cases."

23       By the time the appeal was before the Ninth Circuit, the

24   only issue was the propriety of the exculpation clause as to

25   the large secured creditor, which was also a plan proponent,

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21 Entered 02/09/21 12:03:25 Page 39 of 51
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 301 of 313 PageID 4805

39

1  since all the other exculpated parties had settled with the

2  appellant.

3      The Court, in determining that the exculpation clause was

4  permissible as to the secured lender, concluded that Section

5  524(e) "does not bar a narrow exculpation clause of the kind

6  here at issue -- that is, one focused on actions of various

7  participants in the plan approval process and relating only to

8  that process," Page 1082.  Why?  Because "Section 524(e)

9  establishes that discharge of a debt of the debtor does not

10 affect the liability of any other entity on such debt."  In

11 other words, the discharge in no way affects the liability of

12 any other entity for the discharged debt.  By its terms,

13 524(e) prevents a bankruptcy court from extinguishing claims

14 of creditors against nondebtors over the very discharged debt

15 through the bankruptcy proceedings.

16     The Court went on to explicitly disagree with *Pacific*

17 *Lumber* in its analysis of 524(e), reiterating that an

18 exculpation clause covers only liabilities arising from the

19 bankruptcy proceedings and not of any of the debtor's

20 discharged debt.  Footnote 7, Page 1085.

21     Ultimately, the Court held that under Section 105(a),

22 which empowers a bankruptcy court to issue any order, process,

23 or judgment that is necessary or appropriate to carry out the

24 provisions of Chapter 11 and Section 1123, which establishes

25 the appropriate content of the bankruptcy plan, under these

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21 Entered 02/09/21 12:03:25 Page 40 of 51
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 302 of 313 PageID 4806

40

1    sections, the bankruptcy court had authority to approve an

2    exculpation clause intended to trim subsequent litigation over

3    acts taken during the bankruptcy proceedings and so render the

4    plan viable.

5         This Court concludes that, just as the Fifth Circuit left

6    open the door for consensual exculpations and releases in

7    *Pacific Lumber*, just as it left open the door for consensual

8    exculpations and releases in *Pacific Lumber*, its dicta

9    suggests that an exculpation might be permissible if there is

10   a showing that "costs that the released parties might incur

11   defending against suits alleging such negligence are likely to

12   swamp either the Exculpated Parties or the reorganization."

13   Again, that was a quote from the Fifth Circuit.

14        If ever there were a risk of that happening in a Chapter

15   11 reorganization, it is this one.  The Debtor's current CEO

16   credibly testified that Mr. Dondero has said outside the

17   courtroom that if Mr. Dondero's own pot plan does not get

18   approved, that he will "burn the place down."  Here, this

19   Court can easily expect the proposed exculpated parties might

20   expect to incur costs that could swamp them and the

21   reorganization process based on the past litigious conduct of

22   Mr. Dondero and his controlled entities.

23        Additionally, this Court concludes that the Fifth

24   Circuit's rationale in *Pacific Lumber* for permitted

25   exculpations to Creditors' Committees and their members, which

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21 Entered 02/09/21 12:03:25 Page 41 of 51
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 303 of 313 PageID 4807

41

1  was clearly policy-based based on their implied qualified

2  immunity flowing from Section 1103 and their importance in a

3  Chapter 11 case, leaves the door open to sometimes permitting

4  exculpations to other parties in a particular Chapter 11 case

5  besides a UCC and its members.

6      Again, if there was ever such a case, the Court believes

7  it is this one, in which Independent Directors were brought in

8  to avoid a trustee and are much more like a Creditors'

9  Committee than an incumbent board of directors.  While,

10  admittedly, there are a few exculpated parties here proposed

11  beyond the independent board, such as certain employees, it

12  would appear that no one is invulnerable to a lawsuit here if

13  past is prologue in this Highland saga.

14      The Creditors' Committee was initially not keen on

15  exculpations for certain employees.  However, Mr. Seery

16  credibly testified that there was a contentious arm's-length

17  negotiation over this and that he needs these employees to

18  preserve value implementing the Plan.  Mr. Dondero has shown

19  no hesitancy to litigate with former employees in the past, to

20  the *nth* degree, and there is every reason to believe he would

21  again in the future, if able.

22      Finally, in this situation, in the case at bar, we would

23  appear to have a *Shoaf* reason to approve the exculpations.

24  The January 9, 2020 order of this Court, Docket Entry 339,

25  which approved the independent board and an ongoing corporate

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21 Entered 02/09/21 12:03:25 Page 42 of 51
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 304 of 313 PageID 4808

42

1  governance structure for this case, and which is incorporated

2  into the Plan at Article IX.H, provided as follows:  "No

3  entity may commence or pursue a claim or cause of action of

4  any kind against any Independent Director, any Independent

5  Director's agents, or any Independent Director's advisors

6  relating in any way to the Independent Director's role as an

7  Independent Director of Strand without the Court (1) first

8  determining, after notice, that such claim or cause of action

9  represents a colorable claim of willful misconduct or gross

10  negligence against Independent Director, any Independent

11  Director's agents, or any Independent Director's advisors; and

12  (2) specifically authorizing such entity to bring such a

13  claim.  The Court will have sole jurisdiction to adjudicate

14  any claim for which approval of the Court to commence or

15  pursue has been granted."

16      This was both an exculpation from negligence as to the

17  Independent Directors and their agents and advisors, as well

18  as a gatekeeping provision.  This Court believes that this

19  provision basically approved an exculpation for the

20  Independent Directors way back on January 9, 2020 for their

21  postpetition conduct that might be negligent.  And this is the

22  law of the case and has *res judicata* preclusive effect now.

23      Thus, as to the three Independent Directors, as well as

24  the other named parties in the January 9, 2020 order, their

25  agents, their advisors, we have a situation that fits within

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21 Entered 02/09/21 12:03:25 Page 43 of 51
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 305 of 313 PageID 4809

43

1    *Republic Supply v. Shoaf*, and we fit within the exception

2    articulated in *Pacific Lumber*.

3         The Court reserves the right to supplement these findings

4    and conclusions as to the exculpations, but based on the

5    foregoing, they are approved and the objections are overruled.

6         Now, turning to the Plan objection, it appears at Article

7    IX.F of the Plan and provides, in pertinent part, as follows:

8    Upon entry of the confirmation order, all enjoined parties are

9    and shall be permanently enjoined on and after the effective

10   date from taking any action to interfere with the

11   implementation or consummation of the Plan.  Except as

12   expressly provided in the Plan, the confirmation order, or a

13   separate order of the Bankruptcy Court, all Enjoined Parties

14   are and shall be permanently enjoined on and after the

15   effective date, with respect to any claims and interests, from

16   directly or indirectly -- and then commencing, conducting,

17   continuing any suit, action, proceeding of any kind, and

18   numerous other acts of that vein.

19        The injunction set forth herein shall extend to and apply

20   to any act of the type set forth in any of the causes above

21   against any successors to the Debtor, including but not

22   limited to the Reorganized Debtor, the Litigation Sub-Trust,

23   and the Claimant Trust, and their respective property and

24   interests in property.

25        Plan injunctions like this are commonplace and

002082

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21 Entered 02/09/21 12:03:25 Page 44 of 51
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 306 of 313 PageID 4810

44

1    appropriate.  They are entirely consistent with and

2    permissible under Bankruptcy Code Sections 1123(a)(5),

3    1123(a)(6), 1141(a) and (c), and 1142, as well as Bankruptcy

4    Rule 3016(c), which articulates the form that a plan

5    injunction must be set forth in a plan.

6        The Court finds the objections to the Plan Injunctions to

7    be unfounded, and they are thus overruled without much

8    discussion here.

9        Now, lastly, the Gatekeeper Provision.  It appears at

10   Paragraph 4 of Article IX.F of the Plan and provides, in

11   pertinent part, "Subject in all respects to Article XII.D, no

12   Enjoined Party may commence or pursue a claim or cause of

13   action of any kind against any Protected Party that arose or

14   arises from or is related to the Chapter 11 case, the

15   negotiation of the Plan, the administration of the Plan, or

16   property to be distributed under the Plan, the wind-down of

17   the business of the Debtor or Reorganized Debtor, the

18   administration of the Claimant Trust or the Litigation Sub-

19   Trust, or the transactions in furtherance of the foregoing,

20   without the Bankruptcy Court (1) first determining, after

21   notice and a hearing, that such claim or cause of action

22   represents a colorable claim of any kind, including but not

23   limited to negligence, bad faith, criminal misconduct and

24   willful misconduct, fraud, or gross negligence against a

25   Protected Party; and (2) specifically authorizing such

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21 Entered 02/09/21 12:03:25 Page 45 of 51
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 307 of 313 PageID 4811

45

1  Enjoined Party to bring such claim or cause of action against

2  such Protected Party, provided, however, that the foregoing

3  will not apply to a claim or cause of action against Strand or

4  against any employee other than with respect to actions taken,

5  respectively, by Strand or any such employee from the date of

6  appointment of the Independent Directors through the effective

7  date.  The Bankruptcy Court will have sole and exclusive

8  jurisdiction to determine whether a claim or cause of action

9  is colorable and, only to the extent legally permissible and

10  as provided for in Article XI, shall have jurisdiction to

11  adjudicate the underlying colorable claim or cause of action."

12      This gatekeeper provision appears necessary and reasonable

13  in light of the litigiousness of Mr. Dondero and his

14  controlled entities that has been described at length herein.

15  Provisions similar to this have been approved in this district

16  in the *Pilgrim's Pride* case and the *CHC Helicopter* case.  The

17  provision is within the spirit of the Supreme Court's Barton

18  Doctrine.  And it appears consistent with the notion of a pre-

19  filing injunction to deter vexatious litigants that has been

20  approved by the Fifth Circuit in such cases as *Baum v. Blue*

21  *Moon Ventures*, 513 F.3d 181, and in the *In re Carroll* case,

22  850 F.3d 811, which arose out of a bankruptcy pre-filing

23  injunction.

24      The Fifth Circuit, in fact, noted in the *Carroll* case that

25  federal courts have authority to enjoin vexatious litigants

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21   Entered 02/09/21 12:03:25   Page 46 of 51
Case 3:21-cv-00538-N   Document 26-7   Filed 06/09/21   Page 308 of 313   PageID 4812

46

1    under the All Writs Act, 28 U.S.C. § 1651.  And additionally,

2    under the Bankruptcy Code, a bankruptcy court can issue any

3    order, including a civil contempt order, necessary or

4    appropriate to carry out the provisions of the Code, citing,

5    of course, 105 of the Bankruptcy Code.

6         The Fifth Circuit stated that, when considering whether to

7    enjoin future filings against a vexatious litigant, a

8    bankruptcy court must consider the circumstances of the case,

9    including four factors:  (1)  the party's history of

10   litigation; in particular, whether he has filed vexatious,

11   harassing, or duplicative lawsuits; (2) whether the party had

12   a good faith basis for pursuing the litigation, or perhaps

13   intended to harass; (3) the extent of the burden on the courts

14   and other parties resulting from the party's filings; and (4)

15   the adequacy of alternatives.

16        In the *Baum* case, the Fifth Circuit stated that the

17   traditional standards for injunctive relief -- *i.e.*,

18   irreparable harm and inadequate remedy at law -- do not apply

19   to the issuance of an injunction against a vexatious litigant.

20        Here, although I have not been asked to declare Mr.

21   Dondero and his affiliated entities as vexatious litigants *per

22   se*, it is certainly not beyond the pale to find that his long

23   history with regard to the major creditors in this case has

24   strayed into that possible realm, and thus this Court is

25   justified in approving this provision.

002085

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21 Entered 02/09/21 12:03:25 Page 47 of 51
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 309 of 313 PageID 4813

47

1      One of the Objectors' lawyers stated very eloquently in

2  closing argument, in opposing the plan injunction and

3  gatekeeping provisions, that "Even a serial killer has

4  constitutional rights," suggesting that these provisions would

5  deprive Mr. Dondero and his controlled entities of fundamental

6  rights or due process somehow.  But to paraphrase the district

7  court in the *Carroll* case, no one, rich or poor, is entitled

8  to abuse the judicial process.  There exists no constitutional

9  right of access to the courts to prosecute actions that are

10  frivolous or malicious.  The Plan injunction and gatekeeper

11  provisions in Highland's plan simply set forth a way for this

12  Court to use its tools, its inherent powers, to avoid abuse of

13  the court system, protect the implementation of the Plan, and

14  preempt the use of judicial time that properly could be used

15  to consider the meritorious claims of other litigants.

16      Accordingly, the Objectors' objections to this provision

17  are overruled.

18      As earlier stated, this Court reserves the right to alter

19  or supplement this ruling in a written order.  In this regard,

20  the Court directs Debtor's counsel -- I hope you are still

21  awake; it's been a long time -- the Court directs Debtor's

22  counsel to submit a form of order.  And specifically, I assume

23  that you've already prepared or have been in the process of

24  preparing a set of findings of fact, conclusions of law, and

25  confirmation order that tracks the confirmation evidence and

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21 Entered 02/09/21 12:03:25 Page 48 of 51
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 310 of 313 PageID 4814

48

1    recites conclusions of law that the Plan complies with all the

2    various provisions of Section 1123, 1129, and other applicable

3    Code provisions.

4        What I want you to do is take this bench ruling and add it

5    to what you've prepared.  And what I mean is, as you can tell,

6    I've been reading:  I will have my courtroom deputy email to

7    you all a copy of what I just read.  I'll have her obviously

8    copy the Debtor's counsel, Creditors' Committee, Dondero and

9    the other Objectors, copy them on this written document she's

10   going to send out.  And, again, I want you to kind of meld it

11   into what you've already been preparing.

12       Obviously, I did not address in this oral ruling every

13   provision of 1129(a) and (b).  I did not address every 1123

14   objection.  I did not even address every single objection of

15   the Objectors.  But, again, any objection I've not

16   specifically addressed today is overruled.

17       The briefing, I should say, that the Debtor submitted,

18   there was a Memorandum of Law in Support of Confirmation filed

19   on January 22nd.  There was also a reply brief, a hundred

20   pages or so, separately filed, replying to all the objections.

21   I don't disagree with anything that was in that.  So, again,

22   to the extent you want to send me conclusions of law that are

23   along the lines of that briefing, I would consider that.

24       And so what I thought is you'll send me the melded

25   document and I will edit it if I see fit.  I recognize this

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21 Entered 02/09/21 12:03:25 Page 49 of 51
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 311 of 313 PageID 4815

49

1   may take a few days, so I don't give you a strict timetable,

2   just hopefully it won't take too many days.

3       All right.  Is there anyone out there -- Mr. Pomerantz,

4   you had to go to jury duty, except I can't believe --

5           MR. POMERANTZ:  No, I --

6           THE COURT:  I can't believe you were called, but are

7   you there?

8           MR. POMERANTZ:  Your Honor, I am here.  I was luckily

9   excused, because I probably wouldn't have made it.

10      Your Honor, one just comment I'd make.  You referred to

11  the January 9th order.  You didn't refer to the CEO order,

12  which is your order July 16th, which had the same gatekeeper

13  provision.  I assume that was the same analysis?

14          THE COURT:  That was an oversight.  Same analysis.

15  And that's exactly why I said I reserve the right to

16  supplement or amend, because I know there had to be places

17  like that where I omitted to mention something important.

18          MR. POMERANTZ:  But thank you, Your Honor, for your

19  thoughtful ruling, and we will certainly incorporate your

20  materials into the order that we're working on and get it to

21  you when we can.  But we appreciate it on behalf of the

22  Debtor.  We know this took a lot of time and a lot of effort.

23  Hopefully, you got a chance to still watch the Super Bowl

24  yesterday.

25          THE COURT:  Well, when I saw that Tom Brady was going

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21 Entered 02/09/21 12:03:25 Page 50 of 51
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 312 of 313 PageID 4816

50

1    to win, I turned it off.

2        I'm sorry.  That's terrible.  You know, my law clerk, my

3    law clerk that you can't see, Nate, he is from Ann Arbor,

4    Michigan, University of Michigan, and he almost cried when I

5    said I didn't like Tom Brady the other day.  So, I apologize.

6            MR. POMERANTZ:  Your Honor, one other comment.  We

7    had our motion to assume our nonresidential real property

8    lease that was also on.  It got missed in all the fanfare, but

9    it was -- it has been unopposed and essentially done pursuant

10   to stipulation.  So we'd like to submit an order on that as

11   well.

12           THE COURT:  Okay.  I have seen that, and I approve it

13   under 365.  You may submit the order.  Okay.  Thank you.

14           MR. POMERANTZ:  Thank you, Your Honor.

15           THE CLERK:  All rise.

16       (Proceedings concluded at 10:35 a.m.)

17                       --oOo--

18

19

20                     CERTIFICATE

21       I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23    **/s/ Kathy Rehling**                        **02/09/2021**

24   _____    _____
     Kathy Rehling, CETD-444                     Date
25   Certified Electronic Court Transcriber

002089

Case 19-34054-sgj11 Doc 1917 Filed 02/09/21 Entered 02/09/21 12:03:25 Page 51 of 51
Case 3:21-cv-00538-N Document 26-7 Filed 06/09/21 Page 313 of 313 PageID 4817

51

INDEX

PROCEEDINGS                                                           3

WITNESSES

-none-

EXHIBITS

-none-

RULINGS

Confirmation Hearing [1808]                                          3

Agreed Motion to (1) Assume Non-Residential Real Property           50
Lease with Crescent TC Investors, LP upon Confirmation of
Plan and (II) Extend Assumption Deadline [1624]

END OF PROCEEDINGS                                                  50

INDEX                                                               51