**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | |
|---|---|---|
| **In Re:** Highland Capital Management, L.P<br>Highland Capital Management Fund Advisors, L.P.<br>et al | § | Case No. 19-34054-SGJ-11 |
| | § | |
| Appellant | § | |
| vs. | § | |
| Highland Capital Management, L.P., | | |
| | § | 3:21-CV-00538-N |
| Appellee | § | |

[1943] **Order confirming the fifth amended chapter 11 plan,** Entered on 2/22/2021.

# APPELLANT RECORD
# VOLUME 12

MUNSCH HARDT KOPF & HARR, P.C.
Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
3800 Ross Tower
500 N. Akard Street
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

ATTORNEYS FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P. AND
NEXPOINT ADVISORS, L.P.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | Case No. 19-34054 (SGJ11) |
| Debtor. | |

*INDEX*

## AMENDED DESIGNATION BY NEXPOINT ADVISORS, L.P. AND HIGHLAND
## CAPITAL MANAGEMENT FUND ADVISORS, L.P.
## OF ITEMS FOR THE RECORD ON APPEAL

COME NOW Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors,

L.P. (the "Appellants"), creditors and parties-in-interest in the above styled and numbered

bankruptcy case (the "Bankruptcy Case") of Highland Capital Management, L.P. (the "Debtor"),

and, with respect to their *Notice of Appeal* [docket no. 1957], hereby file their *Amended

Designation of Items for the Record on Appeal* (the "Designation") as follows:

| | Item | Bankruptcy Docket Number | Description |
|---|---|---|---|
| *Vol. 1* 000001 | | | **Pleadings and Items on Docket** |
| | 1 | 1957 | Notice of Appeal |
| 000165 000326 | 2 | 1943 | Order (i) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief |
| | 3 | | Docket Sheet of Bankruptcy Case No. 19-34054 |
| *Vol. 2* 000639 | 4 | 1606 | Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 000666 | 5 | 1648 | Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| 000675 | 6 | 1656 | Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 000820 | 7 | 1670 | Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 000870 | 8 | 1719 | Second Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| *Vol. 3* 000880 | 9 | 1749 | Third Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| 000886 | 10 | 1772 | Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 000901 | 11 | 1791 | Notice of Withdrawal of Certain Executory Contracts and Unexpired Leases from List of Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan |
| 000906 | 12 | 1807 | Debtor's Omnibus Reply to Objections to Confirmation of the Fifth Amended Chapter 11 Plan of Reorganization of Highland Capital Management |
| 001031 | 13 | 1808 | Debtor's Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) |
| *Vol. 4* 001097 | 14 | 1811 | Notice of Filing Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (with Technical Modifications) |
| *Vol. 5* 001346 | 15 | 1814 | Debtor's Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |

Handwritten left margin annotations: Vol 5, 001414, 001421, 00142(7), 001475, 001482, 00148(8), 081183, 002040, 082091, 002188, Vol 12 - 002931, Vol 50 - 013295, -013297, Vol. 51 - 013373, Vol 54 - 014182, Vol 55 - 014506

| | 16 | 1847 | Fourth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| | 17 | 1873 | Fifth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| | 18 | 1875 | Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland of Highland Capital Management, L.P. (As Modified) |
| | 19 | 1887 | Supplemental Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| | 20 | 1671 | United States Trustee's Limited Objection to Confirmation of Debtors' Fifth Amended Plan of Reorganization |
| **Evidence and Transcripts** | | | |
| | 21 | 1894 | Transcript of February 2, 2021 Confirmation Hearing |
| | 22 | 1905 | Transcript of February 3, 2021 Confirmation Hearing |
| | 23 | 1917 | Transcript of February 8, 2021 Bench Ruling |
| | 24 | 1794 1795 1822* 1863 1866 1877 1895 1915 | All exhibits admitted into evidence during February 2 and February 3, 2021 Confirmation Hearing |

*1822 - Vol. 12 — 50 (39 Volumes)

RESPECTFULLY SUBMITTED this 22d day of March, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina

Davor Rukavina, Esq.
Texas Bar No. 24030781
3800 Ross Tower
500 N. Akard Street
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584
Email: drukavina@munsch.com

**ATTORNEYS FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P. AND
NEXPOINT ADVISORS, L.P.**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on this the 22d day of March, 2021, true and correct copies of this document were electronically served by the Court's ECF system on parties entitled to notice thereof, including on counsel for the Debtor.

By: /s/ Davor Rukavina

Davor Rukavina, Esq.

# EXHIBIT A

002931

K&L GATES LLP
Artoush Varshosaz (TX Bar No. 24066234)
1717 Main Street, Suite 2800
Dallas, TX 75201
Tel: (214) 939-5659
artoush.varshosaz@klgates.com

Stephen G. Topetzes (*pro hac vice*)
1601 K Street, NW
Washington, DC 20006-1600
Tel: (202) 778-9328
stephen.topetzes@klgates.com

James A. Wright III (*pro hac vice*)
1 Lincoln Street
Boston, MA 02110
Tel: (617) 261-3193
james.wright@klgates.com

*Counsel for Highland Capital Management Fund Advisors, L.P.,*
*NexPoint Advisors, L.P., Highland Income Fund, NexPoint*
*Strategic Opportunities Fund, and NexPoint Capital, Inc.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | Case No. 19-34054 (SGJ11) |
| Debtors. | (Jointly Administered) |

## MOTION FOR ORDER IMPOSING TEMPORARY
## RESTRICTIONS ON DEBTOR'S ABILITY, AS PORTFOLIO
## MANAGER, TO INITIATE SALES BY NON-DEBTOR CLO VEHICLES

Highland Capital Management Fund Advisors, L.P. ("**HCMFA**") and NexPoint

Advisors, L.P. ("**NexPoint**", and together with HCMFA, the "**Advisors**"), and Highland

Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint Capital, Inc. (together, the

¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦
1934054201209000000000005

002932

"**Funds**"), by and through their undersigned counsel, hereby submit this motion for an order of the Court under Bankruptcy Code §§ 105(a), 363, and 1107 imposing temporary restrictions on Highland Capital Management, L.P.'s (the "**Debtor**") ability to initiate sales as portfolio manager (or other similar capacity) for certain non-debtor investment vehicles (the "**CLOs**"). In support of the Motion, the Funds and Advisors submit the Declaration of Dustin Norris (the "**Declaration**") attached hereto and state as follows:

## BACKGROUND

### A.   *General Background on the Advisors and their Advised Funds*

1.      Each Advisor is registered with the U.S. Securities and Exchange Commission ("**SEC**") as an investment advisor under the Investment Advisers Act of 1940, as amended (the "**Advisers Act**").

2.      Each of the Advisors advises several funds, including the Funds. Each of the Funds is a registered investment company or business development company under the Investment Company Act of 1940 (as amended, the "**1940 Act**").

3.      As an investment company or business development company, each Fund is overseen by a majority independent board of trustees subject to 1940 Act requirements. That board reviews and approves contracts with one of the Advisors for the respective Fund. The Funds do not have employees. Instead, each Fund relies on its respective Advisor, acting pursuant to advisory agreements, to provide the services necessary to the Fund's operations.

### B.   *The CLOs*

4.      The CLOs are Aberdeen Loan Funding, Ltd., Brentwood CLO, Ltd., Eastland CLO, Ltd., Gleneagles CLO, Ltd., Grayson CLO, Ltd., Greenbriar CLO, Ltd., Jasper CLO, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Rockwall CDO, Ltd., Rockwall CDO II Ltd.,

308324533.913

002933

Southfork CLO, Ltd., Stratford CLO Ltd., Loan Funding VII, LLC, and Westchester CLO, Ltd.

5.     The CLOs are securitization vehicles formed to acquire and hold pools of debt obligations. They also issued various tranches of notes and preference shares, which are intended to be repaid from proceeds of the subject CLO's pool of debt obligations. The notes issued by the CLOs are paid according to a contractual waterfall, with the value remaining in the CLO after the notes are fully paid flowing to the holders of the preference shares.

6.     The CLOs were created many years ago. Most of the CLOs are, at this point, past their reinvestment period and have paid off all the tranches of notes or, in a few instances, all but the last and most junior tranche. Accordingly, most of the economic value remaining in the CLOs, and all of the upside, belongs to the holders of the preference shares. The repayment status of the notes in the CLOs as of November 2020 is shown on Exhibit A to the Declaration, and the Funds' collective ownership of the preference shares is shown on Exhibit B to the Declaration. As shown on Exhibit B, the Funds hold a majority of the preference shares in three of the CLOs, Grayson CLO, Ltd., Greenbriar CLO, Ltd., and Stratford CLO Ltd., and material interests in most of the other CLOs.

7.     The CLOs have each separately contracted for the Debtor to serve as the CLO's portfolio manager.[1] In this capacity, the Debtor is responsible, among other things, for making decisions to sell the CLOs' assets. Although the portfolio management agreements vary, the agreements generally impose a duty on the Debtor when acting as portfolio manager to maximize the value of the CLO's assets for the benefit of the CLO's noteholders and preference

---

[1] The title given to the Debtor by the CLOs varies from CLO to CLO based on the relevant agreements, but the Debtor has the same general rights and obligations for each CLO. In this Motion, the Funds and Advisors have used the term "portfolio manager" when referring to the Debtor's role for each CLO regardless of the precise title in the underlying documents.

002934

shareholders.

        **C.**        ***The Operating Protocols***

8.      As part of the resolution of certain disputes between the Debtor and the Official

Committee of Unsecured Creditors (the "**Committee**"), the Debtor is operating under the

restrictions and provisions of certain operating protocols (the "**Operating Protocols**") approved

by the Court. See Notice of Debtor's Amended Operating Protocols (Docket No. 466). Among

other things, the Operating Protocols include provisions regulating the Debtor's actions on

behalf of other entities. With respect to the CLOs, however, the Operating Protocols generally

exempt the Debtor from the regular approval process involving the Committee where the Debtor

acts as portfolio manager for the CLOs. See, e.g., Operating Protocols at § IV(B)(3)(a).

        **C.**        ***Recent Asset Sales and the Advisors' Requests for a Temporary Pause in Sales***

9.      The Court recently approved the Debtor's Disclosure Statement for the Fifth

Amended Plan of Reorganization of Highland Capital Management, L.P. (Docket No. 1473)

(the "Disclosure Statement").

10.     The Disclosure Statement discusses the Debtor's role as portfolio manager for

the CLOs (which the Disclosure Statement defines as "Issuers") in Article II(U) (pg. 32). After

explaining the Debtor's role and noting some proofs of claim filed by the CLOs, the Disclosure

Statement states as follows:

> The Issuers have taken the position that the rejection of the Portfolio
> Management Agreements (including any ancillary documents) would result in
> material rejection damages and have encouraged the Debtor to assume such
> agreements. Nonetheless, the Issuers and the Debtor are working in good faith
> to address any outstanding issues regarding such assumption. The Portfolio
> Management Agreements may be assumed either pursuant to the Plan or by
> separate motion filed with the Bankruptcy Court.

002935

The Debtor is still assessing its options with respect to the Portfolio Management Agreements, including whether to assume the Portfolio Management Agreements.

11.    The Financial Projections attached as Exhibit C to the Disclosure Statement make clear that, assuming confirmation of the Debtor's chapter 11 plan in its current form, the Debtor intends to liquidate its remaining assets over the next two years, concluding in December 2022.

12.    The Funds and Advisors do not agree with recent sales executed by the Debtor in certain CLOs, including sales during the historically light Thanksgiving trading week, because the Funds and Advisors view those assets as having greater value if held as long-term investments. When the Advisors became aware the Debtor was considering these transactions, NexPoint requested that the Debtor not consummate the sales.

13.    NexPoint has requested in two letters that the Debtor refrain from causing the CLOs to sell further assets without prior notice and consent of NexPoint. Counsel to the Funds and Advisors has also requested by email that the Debtor agree consensually to temporarily suspend further sales of the CLOs' assets and/or confirm that the Debtor is not presently planning further sales in the immediate future. The Debtor has refused these requests.

### D.    *HCMLP Decisions Illustrating Its Short-Term Approach*

14.    Consistent with its proposal to liquidate all of its assets by the end of 2022 per the Disclosure Statement, HCMLP has engaged in transactions taking a short-term approach to value.

15.    In addition to the sales noted above during Thanksgiving week, during the chapter 11 case, the Debtor has directed the disposition of other assets in a manner that suggests a focus on quick monetization at the expense of maximizing returns for investors and/or the

estate. For example, Debtor-controlled entities sold a collective majority interest in an unsecured term loan to OmniMax International, Inc. Other non-Debtor controlled entities, advised by the Advisors, were able to secure a substantially better price for their stake in the same asset by being willing to hold it and transacting at a later date. Given the Debtor-controlled entities large ownership in the unsecured loan, the Advisors believe the Debtor was well-positioned to realize a higher price.

16.     Also, upon information and belief, the Debtor, through its wholly owned subsidiary Trussway Holdings, LLC ("**Trussway**"), consummated a sale transaction where Trussway sold a division, SSP Holdings, LLC, in which Trussway had a majority interest. Upon information and belief, the sale was conducted without a formal competitive bidding process and resulted in a loss of $10 million, despite certain metrics of SSP Holdings, LLC having improved materially since it was acquired in 2014.

## **REQUEST FOR RELIEF**

17.     The Funds and Advisors request that the Court, under Bankruptcy Code sections 105(a), 363, and 1107(a) impose a temporary restriction on the Debtor's ability, as portfolio manager, to cause the CLOs to sell assets. The Funds and Advisors request that the Court prohibit the Debtor from authorizing any such sales for a period of 30 days, absent further order of the Court.

18.     Bankruptcy Code section 363 governs the Debtor's use of estate property. 11 U.S.C. § 363. Section 363 authorizes the Debtor to use that property outside of the ordinary course of business "after notice and a hearing," and in the ordinary course of business without notice and a hearing "unless the court orders otherwise . . . ." 11 U.S.C. § 363(b-c). Bankruptcy Code section 1107(a) grants the Debtor, as debtor-in-possession, the powers of a chapter 11 trustee, subject to "such limitations or conditions as the court prescribes . . . ." 11 U.S.C.

6

002937

§ 1107(a). And Bankruptcy Code section 105(a) empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. 11 U.S.C. § 105(a).

19.    Consistent with these powers, the Court implemented the Operating Protocols earlier in this case regarding the Debtor's actions on behalf of other non-debtor entities. Unlike where the Debtor directs sales of assets for other entities, however, the Operating Protocols generally do not restrict the Debtor's actions as portfolio manager for the CLOs. <u>See</u> Operating Protocols at IV(B)(3)(a).[2] The Funds and Advisors submit that the relief requested does not conflict with the Operating Protocols, but to the extent necessary, the Funds and Advisors request that the Court modify the Operating Protocols in the limited and temporary way requested in this Motion.

20.    The Funds and Advisors seek this relief to preserve the status quo at the CLOs while the Funds and Advisors explore replacing the Debtor as portfolio manager either

---

[2] Section IV(B)(3)(a) (Transactions involving entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest)(Operating Requirements)(Third Party Transactions: All Stages) provides in full:

> **Except** (x) as set forth in (b) and (c) below and **(y) for any Transaction involving a Specified Entity and the sale or purchase by such Specified Entity of an asset that is not an obligation or security issued or guaranteed by any of the Debtor, a Related Entity or a fund, account, portfolio company owned, controlled or managed by the Debtor or a Related Entity, where such Transaction is effected in compliance with the collateral management agreement to which such Specified Entity is party,** any Transaction that decreases the NAV of an entity managed by the Debtor in excess of the greater of (i) 10% of NAV or (ii) $3,000,000 requires five business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

(emphasis added). "Specified Entity" is defined in section I(K) of the Operating Protocols to include the CLOs referenced in this Motion.

002938

consensually or through the contractual processes laid out in the relevant underlying agreements.

21.     In the Disclosure Statement, the Debtor states that it has not determined if it wants to continue to serve as portfolio manager for the CLOs. The Debtor also has not sought input from the Funds and Advisers, even though the Funds are among the largest stakeholders indirectly and significantly affected by the Debtor's actions with respect to the CLOs.

22.     The Advisers Act places a fiduciary duty on investment advisers comprising a duty of care and duty of loyalty. See, e.g., SEC Release No. IA-3248, "Commission Interpretation Regarding Standard of Conduct for Investment Advisers," (July 12, 2019). This means an adviser, like the Debtor, must, at all times, serve the best interest of its client and not subordinate its client's interest to its own. See id. This combination of care and loyalty obligations has been characterized as requiring the investment adviser to act in the "best interest" of its client at all times. See SEC v. Tambone, 550 F.3d 106, 146 (1st Cir. 2008) ("Section 206 imposes a fiduciary duty on investment advisers to act at all times in the best interest of the fund . . . ."); SEC v. Moran, 944 F. Supp. 286, 297 (S.D.N.Y. 1996) ("Investment advisers are entrusted with the responsibility and duty to act in the best interest of their clients.").

23.     Although the Debtor's nominal "clients" are the CLOs themselves, the true parties in interest are the holders of beneficial interests in the CLOs, such as the Funds. Most or all of the other layers of CLO interests have been paid out, and the Funds hold either the majority or a substantial portion of most of the remaining CLO interests. In these circumstances, the Funds and the other preference shareholders are the parties who are economically affected by the Debtor's actions as portfolio manager.

002939

24.     The Funds and Advisors believe replacing the Debtor as portfolio manager is appropriate in light of the reduced staffing the Debtor anticipates having once the Debtor's chapter 11 plan goes effective. The Funds and Advisors also believe it is appropriate in light of the Debtor's reduced investment time horizon under the chapter 11 plan. As noted above, the Debtor intends to liquidate its investments in the next two years. The Funds, on the other hand, have a much longer investment time horizon and, as a result, have very different financial incentives with respect to their investments. The Funds and Advisors accordingly believe that the Funds and the other preference shareholders would be best served by a portfolio manager with a similar long-term perspective.

25.     Upon information and belief, none of the CLOs needs liquidity at the current time, as the next quarterly waterfall payments are not due until February 2021. The Funds and Advisors accordingly submit that none of the CLOs, the other holders of preference shares and notes issued by the CLOs, or the Debtor will be harmed by the temporary restriction proposed by this Motion. Notably, the Funds and Advisors are not seeking to restrict the Debtor from performing any of its other functions for the CLOs or to modify the Debtor's compensation from the CLOs in any way.

*[Remainder of Page Intentionally Left Blank]*

308324533.313

002940

## CONCLUSION

26.     For the reasons set forth above, the Funds and Advisors respectfully request that

the Court grant the relief requested in the Motion and such other and further relief as the Court

deems just and proper.

Dated:      December 8, 2020

K&L GATES LLP

*/s/ Artoush Varshosaz*
Artoush Varshosaz (TX Bar No. 24066234)
1717 Main Street, Suite 2800
Dallas, TX 75201
Tel: (214) 939-5659
artoush.varshosaz@klgates.com

Stephen G. Topetzes (*pro hac vice*)
1601 K Street, NW
Washington, DC 20006-1600
Tel: (202) 778-9328
stephen.topetzes@klgates.com

James A. Wright III (*pro hac vice*)
1 Lincoln Street
Boston, MA 02110
Tel: (617) 261-3193
james.wright@klgates.com

*Counsel for Highland Capital Management Fund
Advisors, L.P., NexPoint Advisors, L.P.,
Highland Income Fund, NexPoint Strategic
Opportunities Fund, and NexPoint Capital, Inc.*

308324533.3

002941

## CERTIFICATE OF SERVICE

I hereby certify that on December 8, 2020, I caused the foregoing document to be served via first class United States mail, postage prepaid and/or electronic email through the Court's CM/ECF system to the parties that consented to such service, as each are listed in the debtor's service list filed at docket entry 1442, Exhibits A and B.

This the 8th day of December, 2020

*/s/  Artoush Varshosaz*
Artoush Varshosaz

## CERTIFICATE OF CONFERENCE

I hereby certify that on December 7, 2020, I conferred with Mr. Greg Demo, counsel for the Debtors, regarding the relief requested in the motion.  Mr. Demo informed me that the Debtors do not consent to the relief sought in the motion.

This the 8th day of December, 2020

*/s/  James A. Wright III*
James A. Wright III

002942

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | ) | Case No. 19-34054 (SGJ11) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DECLARATION OF DUSTIN NORRIS

I, Dustin Norris, hereby declare pursuant to 28 U.S.C. § 1746, that the following is true and correct.

1.      I am the Executive Vice President of NexPoint Advisors, L.P. ("**NexPoint**").

2.      I submit this Declaration based on my personal knowledge and information supplied to me by other members of NexPoint's management. I submit this Declaration in support of the Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles (the "Motion") by NexPoint, Highland Capital Management Fund Advisors, L.P. ("**HCMFA**", and together with NexPoint, the "**Advisors**"), Highland Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint Capital, Inc. (together, the "**Funds**").

3.      The Motion concerns the following non-debtor investment vehicles: Aberdeen Loan Funding, Ltd., Brentwood CLO, Ltd., Eastland CLO, Ltd., Gleneagles CLO, Ltd., Grayson CLO, Ltd., Greenbriar CLO, Ltd., Jasper CLO, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Rockwall CDO, Ltd., Rockwall CDO II Ltd., Southfork CLO, Ltd., Stratford CLO Ltd., Loan Funding VII, LLC, and Westchester CLO, Ltd. (collectively, the "**CLOs**").

4.      The Funds each hold interests in the CLOs.

5.      The CLOs are securitization vehicles formed to acquire and hold pools of debt obligations. They also issued various tranches of notes and preference shares, which are intended to be repaid from proceeds of the subject CLO's pool of debt obligations. The notes issued by the CLOs are paid according to a contractual waterfall, with the value remaining in the CLO after the notes are fully paid flowing to the holders of the preference shares.

6.      The CLOs were created many years ago. Most of the CLOs are, at this point, past their reinvestment period and have paid off all the tranches of notes or, in a few instances, all but the last and most junior tranche. Accordingly, most of the economic value remaining in the CLOs, and all of the upside, belongs to the holders of the preference shares. The repayment status of the notes in the CLOs as of November 2020 is shown on Exhibit A hereto, and the Funds' collective ownership of the preference shares is shown on Exhibit B hereto.

7.      The CLOs have each separately contracted for Highland Capital Management, L.P. (the "**Debtor**") to serve as the CLO's portfolio manager. The title given to the Debtor by the CLOs varies from CLO to CLO based on the relevant agreements, but the Debtor has the same general rights and obligations for each CLO. In this capacity, the Debtor is responsible, among other things, for making decisions to sell the CLOs assets. Although the portfolio management agreements vary, the agreements generally impose a duty on the Debtor when acting as portfolio manager to maximize the value of the CLO's assets for the benefit of the CLO's noteholders and preference shareholders.

8.      During the chapter 11 case, the Debtor has directed the disposition of other assets in a manner that suggests a focus on quick monetization at the expense of maximizing returns for investors and/or the estate. For example, Debtor-controlled entities sold a collective majority

2

002944

interest in an unsecured term loan to OmniMax International, Inc. Other non-Debtor controlled entities, advised by the Advisors, were able to secure a substantially better price for their stake in the same asset by being willing to hold it and transacting at a later date. Given the Debtor-controlled entities large ownership in the unsecured loan, the Advisors believe the Debtor was well-positioned to realize a higher price.

9.      Also, upon information and belief, the Debtor, through its wholly owned subsidiary Trussway Holdings, LLC ("**Trussway**"), consummated a sale transaction where Trussway sold a division, SSP Holdings, LLC, in which Trussway had a majority interest. Upon information and belief, the sale was conducted without a formal competitive bidding process and resulted in a loss of $10 million, despite certain metrics of SSP Holdings, LLC having improved materially since it was acquired in 2014.

10.      The Advisors did not agree with the Debtor's decision to execute recent sales for certain of the CLOs, because the Advisors viewed those assets as having greater value if held as long-term investments. When the Advisors became aware the Debtor was considering these transactions, NexPoint requested that the Debtor not consummate the sales.

11.      Upon information and belief, none of the CLOs need liquidity at the current time, as the next quarterly waterfall payments are not due until February 2021.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 8th day of December, 2020, in Allen, Texas,

By:      _____
        Dustin Norris

**EXHIBIT A**

002946

## CLO Note Repayment Status[1]

Aberdeen Loan Funding, Ltd.

| Security | CUSIP | Remaining Balance |
|---|---|---|
| Class A Notes | 00306LAA2 | $0 |
| Class B Notes | 00306LAB0 | $0 |
| Class C Notes | 00306LAC8 | $0 |
| Class D Notes | 00306LAD6 | $0 |
| Class E Notes | 00306MAA0 | $0 |
| Class I Preference Shares | 00306M201 | $12,000,000.00 |
| Class II Preference Shares | 00306M300 | $36,000,000.00 |

Brentwood CLO, Ltd.

| Security | CUSIP | Remaining Balance |
|---|---|---|
| Class A-1A Notes | 107265AA8 | $0 |
| Class A-1B Notes | 107265AM2 | $0 |
| Class A-2 Notes | 107265AC4 | $0 |
| Class B Notes | 107265AE0 | $0 |
| Class C Notes | 107265AG5 | $0 |
| Class D Notes | 107265AK5 | $10,279,258.35 |
| Class I Preference Shares | 107264202 | $34,400,000.00 |
| Class II Preference Shares | 107264400 | $37,000,000.00 |

Eastland CLO, Ltd.

| Security | CUSIP | Remaining Balance |
|---|---|---|
| Class A-1 Notes | 277345AA2 | $0 |
| Class A-2a Notes | 277345AC8 | $0 |
| Class A-2b Notes | 277345AE4 | $0 |
| Class A-3 Notes | 277345AG9 | $0 |
| Class B Notes | 277345AJ3 | $0 |
| Class C Notes | 277345AL8 | $0 |
| Class D Notes | 27734AAA1 | $3,251,287.27 |
| Class I Preference Shares | 27734A202 | $85,000,000.00 |
| Class II Preference Shares | 27734A400 | $38,500,000.00 |

---

[1] As of December 1, 2020.

Gleneagles CLO, Ltd.

| Security | CUSIP | Remaining Balance |
|---|---|---|
| Class A-1 Notes | | $0 |
| Class A-2 Notes | | $0 |
| Class B Notes | | $0 |
| Class C Notes | | $0 |
| Class D Notes | | $0 |
| Class 1 Combination Notes | | $0 |
| Class 2 Combination Notes | | $0 |
| Preference Shares | 37866PAB5 & G39165AA6 | $91,000,000.00 |

Grayson CLO, Ltd.

| Security | CUSIP | Remaining Balance |
|---|---|---|
| Class A-1a Notes | 389669AA0 | $0 |
| Class A-1b Notes | 389669AB8 | $0 |
| Class A-2 Notes | 389669AC6 | $0 |
| Class B Notes | 389669AD4 | $0 |
| Class C | 389669AE2 | $0 |
| Class D | 389668AA2 | $9,011,534.74 |
| Class I Preference Shares | 389669203 | $52,500,000.00 |
| Class II Preference Shares | 389669302 | $75,000,000.00 |

Greenbriar CLO, Ltd.

| Security | CUSIP | Remaining Balance |
|---|---|---|
| Class A Notes | 393647AA0 | $0 |
| Class B Notes | 393647AB8 | $0 |
| Class C Notes | 393647AC6 | $0 |
| Class D Notes | 393647AD4 | $0 |
| Class E Notes | 39364PAA0 | $0 |
| Class I Preference Shares | 39364P201 | $20,000,000.00 |
| Class II Preference Shares | 39364P300 | $60,000,000.00 |

Jasper CLO, Ltd.

| Security | CUSIP | Remaining Balance |
|---|---|---|
| Class A Notes | | $0 |
| Class B Notes | | $0 |
| Class C Notes | | $0 |
| Class D-1 Notes | | $0 |
| Class D-2 Notes | | $0 |
| Preference Shares | 471315200 | $70,000,000.00 |

308354413 v10

002948

Liberty CLO, Ltd.

| Security | CUSIP | Remaining Balance |
|---|---|---|
| Class A-1a Notes | | $0 |
| Class A-1b Notes | | $0 |
| Class A-1c Notes | | $0 |
| Class A-2 Notes | | $0 |
| Class A-3 Notes | | $0 |
| Class A-4 Notes | | $0 |
| Class B Notes | | $0 |
| Class C Notes | | $0 |
| Class Q-1 Notes | | $0 |
| Class P-1 Notes | | $0 |
| Class E Certificates | EP0175232 & 530360205 | $94,000,000.00 |

Red River CLO, Ltd.

| Security | CUSIP | Remaining Balance |
|---|---|---|
| Class A Notes | 75686VAA2 | $0 |
| Class B Notes | 75686VAB0 | $0 |
| Class C Notes | 75686VAC8 | $0 |
| Class D Notes | 75686VAD2 | $0 |
| Class E Notes | 75686XAA8 | $0 |
| Class I Preference Shares | 75686X209 | $36,000,000.00 |
| Class II Preference Shares | 75686X308 | $45,000,000.00 |

Rockwall CDO, Ltd.

| Security | CUSIP | Remaining Balance |
|---|---|---|
| Class A-1LA Notes | 774262AA7 | $0 |
| Class A-1LB Notes | 774262AB5 | $0 |
| Class A-2L Notes | 774262AC3 | $0 |
| Class A-3L Notes | 774262AD1 | $0 |
| Class A-4L Notes | 774262AE9 | $0 |
| Class B-1L Notes | 774262AF6 | $0 |
| Class X Notes | 774262AG4 | $0 |
| Class I Preference Shares | 774272207 | $33,200,000.00 |
| Class II Preference Shares | 774261127 | $45,000,000.00 |

308354413 v10

002949

Rockwall CDO II Ltd.

| Security | CUSIP | Remaining Balance |
|---|---|---|
| Class A-1LA Notes | 77426NAA1 | $0 |
| Class A-1LB Notes | 77426NAB9 | $0 |
| Class A-2L Notes | 77426NAC7 | $0 |
| Class A-3L Notes | 77426NAD5 | $0 |
| Class B-1L Notes | 77426NAE3 | $0 |
| Class B-2L Notes | 77426RAA2 | $9,838,508.11 |
| Class I Preference Shares | 77426R203 | $42,200,000.00 |
| Class II Preference Shares | 77426R401 | $44,000,000.00 |

Southfork CLO, Ltd.

| Security | CUSIP | Remaining Balance |
|---|---|---|
| Class A-1a Notes | | $0 |
| Class A-1b Notes | | $0 |
| Class A-1g Notes | | $0 |
| Class A-2 Notes | | $0 |
| Class A-3a Notes | | $0 |
| Class B Notes | | $0 |
| Class C Notes | | $0 |
| Preference Shares | 84427P202 | $80,200,000.00 |
| Class I Composite Note | | $2,000,000.00 |

Stratford CLO Ltd.

| Security | CUSIP | Remaining Balance |
|---|---|---|
| Class A-1 Notes | 86280AAA5 | $0 |
| Class A-2 Notes | 86280AAC1 | $0 |
| Class B Notes | 86280AAD9 | $0 |
| Class C Notes | 86280AAE7 | $0 |
| Class D Notes | 86280AAF4 | $0 |
| Class E Notes | 86280AAG2 | $0 |
| Class I Preference Shares | 86280A202 | $17,500,000.00 |
| Class II Preference Shares | 86280A301 | $45,500,000.00 |

8

002950

Loan Funding VII, LLC (aka Valhalla)

| Security | CUSIP | Remaining Balance |
|---|---|---|
| Class A-1-A Notes | | |
| Class A-2 Notes | | |
| Class B Notes | | |
| Class C-1 Notes | | |
| Class C-2 Notes | | |
| Class I Preference Shares | 91914QAA4 | $82,000,000.00 |

Westchester CLO, Ltd.

| Security | CUSIP | Remaining Balance |
|---|---|---|
| Class A-1-A Notes | 95736XAA6 | $0 |
| Class A-1-B Notes | 95736XAB4 | $0 |
| Class B Notes | 95736XAD0 | $0 |
| Class C Notes | 95736XAE8 | $0 |
| Class D Notes | 95736XAF5 | $0 |
| Class E Notes | 95736XAG3 | $9,141,575.05 |
| Class I Preference Shares | 95736T206 | $80,000,000.00 |

308354413 v10

002951

## EXHIBIT B

308354413 v10

002952

**Holdings of Preference Shares[1] in CLOs**

| CLO | HIF | NSOF | NC | Total |
|---|---|---|---|---|
| Aberdeen | 0% | 30.21% | 0% | **30.21%** |
| Brentwood | 0% | 40.06% | 0% | **40.06%** |
| Eastland | 31.16% | 10.53% | 0% | **41.69%** |
| Gleneagles | 9.74% | 8.52% | 0% | **18.26%** |
| Grayson | 49.10% | 10.75% | 0.63% | **60.48%** |
| Greenbriar | 0% | 53.44% | 0% | **53.44%** |
| Jasper | 0% | 17.86% | 0% | **17.86%** |
| Liberty | 0% | 10.64% | 0% | **10.64%** |
| Red River | 0% | 10.49% | 0% | **10.49%** |
| Rockwall | 6.14% | 19.57% | 0% | **25.71%** |
| Rockwall II | 14.56% | 5.65% | 0% | **20.21%** |
| Southfork | 0% | 7.30% | 0% | **7.30%** |
| Stratford | 0% | 69.05% | 0% | **69.05%** |
| Loan Funding VII (aka Valhalla) | 0% | 1.83% | 0% | **1.83%** |
| Westchester | 0% | 44.38% | 0% | **44.38%** |

---

[1] Class E Certificates for Liberty CLO, Ltd.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | ) | Case No. 19-34054 (SGJ11) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |

**ORDER GRANTING MOTION FOR ORDER IMPOSING TEMPORARY
RESTRICTIONS ON DEBTOR'S ABILITY, AS PORTFOLIO
MANAGER, TO INITIATE SALES BY NON-DEBTOR CLO VEHICLES**

Upon the Motion (the "**Motion**"),[1] filed by Highland Capital Management Fund
Advisors, L.P. ("**HCMFA**") and NexPoint Advisors, L.P. ("**NexPoint**," and together with
HCMFA, the "**Advisors**"), and Highland Income Fund, NexPoint Strategic Opportunities Fund,
and NexPoint Capital, Inc. (together, the "**Funds**"), seeking an order, pursuant to sections
105(a), 363, and 1107 of the Bankruptcy Code, imposing temporary restrictions on the Debtor's

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

ability to initiate sales as portfolio manager (or other similar capacity) for certain non-debtor

investment

308355009 v2

002955

vehicles (the "**CLOs**"); and upon the Declaration of Dustin Norris (the "**Declaration**"); and the Court, having reviewed the Motion and the Declaration; and due and sufficient notice of the Motion having been given; and it appearing that no other or further notice need be provided; and upon the record before the Court; and a hearing having been held on the Motion; and it appearing to the Court that good cause exists to grant the relief requested by the Motion;

IT IS HEREBY ORDERED THAT:

1.     The Motion is GRANTED as set forth herein.

2.     For a period of thirty days, commencing on the date hereof, the Debtor, in its capacity as portfolio manager or such other similar role with respect to the CLOs, is hereby prohibited from causing the CLOs to engage in any asset sales until January ___, 2021.

3.     The Court shall retain jurisdiction over all matters involving the enforcement, implementation and interpretation of this Order.

# # # END OF ORDER # # #

Submitted by:

K&L Gates LLP
*/s/ Artoush Varshosaz*
Artoush Varshosaz (TX Bar No. 24066234)
1717 Main Street, Suite 2800
Dallas, TX 75201
Tel: (214) 939-5659
artoush.varshosaz@klgates.com

Stephen G. Topetzes (*pro hac vice*)
1601 K Street, NW
Washington, DC 20006-1600
Tel: (202) 778-9328
stephen.topetzes@klgates.com

James A. Wright III (*pro hac vice*)
1 Lincoln Street
Boston, MA 02110
Tel: (617) 261-3193
james.wright@klgates.com

*Counsel for Highland Capital Management Fund Advisors, L.P.,*
*NexPoint Advisors, L.P., Highland Income Fund, NexPoint*
*Strategic Opportunities Fund, and NexPoint Capital, Inc.*

308355009 v2

002957

# EXHIBIT B

002958

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |  |
|---|---|---|
| In Re: | ) | **Case No. 19-34054-sgj-11** |
|  | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL | ) | Dallas, Texas |
| MANAGEMENT, L.P., | ) | Wednesday, December 16, 2020 |
|  | ) | 1:30 p.m. Docket |
| Debtor. | ) |  |
|  | ) | - MOTION FOR ORDER IMPOSING |
|  | ) | TEMPORARY RESTRICTIONS [1528] |
|  | ) | - DEBTOR'S EMERGENCY MOTION TO |
|  | ) | QUASH SUBPOENA AND FOR ENTRY |
|  | ) | OF PROTECTIVE ORDER [1564, |
|  | ) | 1565] |
|  | ) | - JAMES DONDERO'S MOTION FOR |
|  | ) | ENTRY OF ORDER REQUIRING |
|  | ) | NOTICE AND HEARING [1439] |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

WEBEX APPEARANCES:

For the Debtor:              Jeffrey N. Pomerantz
                             PACHULSKI STANG ZIEHL & JONES, LLP
                             10100 Santa Monica Blvd.,
                              13th Floor
                             Los Angeles, CA  90067-4003
                             (310) 277-6910

For the Debtor:              John A. Morris
                             Gregory V. Demo
                             PACHULSKI STANG ZIEHL & JONES, LLP
                             780 Third Avenue, 34th Floor
                             New York, NY  10017-2024
                             (212) 561-7700

For the Official Committee   Matthew A. Clemente
of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                             One South Dearborn Street
                             Chicago, IL  60603
                             (312) 853-7539

002959

2

```
 1   APPEARANCES, cont'd.:

 2   For James Dondero:        D. Michael Lynn
                               Bryan C. Assink
 3                             BONDS ELLIS EPPICH SCHAFER
                                 JONES, LLP
 4                             420 Throckmorton Street,
                                 Suite 1000
 5                             Fort Worth, TX  76102
                               (817) 405-6900
 6
     For the Issuer Group:     James E. Bain
 7                             JONES WALKER, LLP
                               811 Main Street, Suite 2900
 8                             Houston, TX  77002
                               (713) 437-1820
 9
     For the NexPoint Parties: James A. Wright, III
10                             K&L GATES
                               State Street Financial Center
11                             One Lincoln Street
                               Boston, MA  02111
12                             (617) 261-3193

13   For Highland CLO Funding, Rebecca Matsumura
     Ltd.:                     KING & SPALDING, LLP
14                             500 West 2nd Street, Suite 1800
                               Austin, TX  78701
15                             (512) 457-2024

16   Recorded by:              Michael F. Edmond, Sr.
                               UNITED STATES BANKRUPTCY COURT
17                             1100 Commerce Street, 12th Floor
                               Dallas, TX  75242
18                             (214) 753-2062

19   Transcribed by:           Kathy Rehling
                               311 Paradise Cove
20                             Shady Shores, TX  76208
                               (972) 786-3063
21

22

23

24
            Proceedings recorded by electronic sound recording;
25               transcript produced by transcription service.
```

002960

Case 19-34054-sgj11 Doc 1822-2 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 4 of 67
Case 3:21-cv-00538-N   Document 26-12   Filed 06/09/21   Page 36 of 114   PageID 5713

3

1    <u>DALLAS, TEXAS - DECEMBER 16, 2020 - 1:35 P.M.</u>

2         THE COURT:  All right.  This is Judge Jernigan.  We

3    have settings in Highland.  We have -- I guess the very first

4    thing that we had set today was a motion of Dondero, Mr.

5    Dondero wanting some sort of revised procedures for "future

6    estate transactions occurring outside the ordinary course of

7    business."  Then, related to that, we received the other day

8    -- I'm not showing it on the calendar, I'm not sure if that

9    means it's moot now or not, but we had a motion for protective

10   order and a motion to quash with regard to certain depositions

11   that Mr. Dondero wanted in connection with his motion.  The

12   Debtor filed that motion to quash.  It was to quash a

13   deposition of Mr. Dubel, Mr. Nelms, Mr. Sevilla, and Mr.

14   Caruso.  And then we have the CLO Motion, what I'm calling the

15   CLO Motion, of --

16        (Interruption.)

17        THE COURT:  Okay.  Let's --

18        MR. POMERANTZ:  Your Honor, this is Jeff Pomerantz.

19   The first two motions have been resolved.  And after Your

20   Honor takes appearances, I'm happy to inform the Court of the

21   proposed resolution, and there's an agreed order that we would

22   upload after the hearing.

23        THE COURT:  Okay.  Well, that is certainly music to

24   my ears.  All right.  So I was just trying to lay out the

25   program for what I thought was set, potentially three motions,

Case 19-34054-sgj11 Doc 1822-2 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 5 of 67
Case 3:21-cv-00538-N   Document 26-12   Filed 06/09/21   Page 37 of 114   PageID 5714

4

1   one of which was a deposition dispute.

2       All right.  So let's go ahead and get appearances.  Mr.

3   Pomerantz, you're obviously appearing for the Debtor team.

4           MR. POMERANTZ:  Yes.  Good morning, Your Honor.  Or

5   good afternoon, Your Honor.  Jeff Pomerantz; Pachulski Stang

6   Ziehl & Jones.  Also on the video with me today are John

7   Morris and Greg Demo.  They will be handling the CLO Motion,

8   and I will be reporting to the Court on the resolution of Mr.

9   Dondero's motion and our corollary discovery motions.

10          THE COURT:  Okay.  All right.  Well, why don't I take

11  an appearance from Mr. Dondero next.  Mr. Lynn, I see you

12  there.

13          MR. LYNN:  Yes, Your Honor.  I am here with Bryan

14  Assink, who will replace me after the preliminaries when our

15  business is done.  Other than concurring with Mr. Pomerantz, I

16  wanted to advise Your Honor that in the last 30 minutes we

17  filed an additional motion where we're seeking a clarification

18  with respect to the temporary restraining order that the Court

19  entered last week.

20          THE COURT:  All right.  Well, I did see an email from

21  my courtroom deputy right before walking in about that motion,

22  and so that's why I was a little surprised and said "Music to

23  my ears" that there was an agreed order on the Dondero

24  motions.  But I'll get the details --

25          MR. LYNN:  Well, we're --

Case 19-34054-sgj11 Doc 1822-2 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 6 of 67
Case 3:21-cv-00538-N Document 26-12 Filed 06/09/21 Page 38 of 114 PageID 5715

5

1          THE COURT:  I'll get the details about that in a

2     minute.  Let me go ahead and get the other appearances.

3        For the Movants on what I've called the CLO Motion, who do

4     we have appearing?

5          MR. WRIGHT:  Good afternoon, Your Honor.  It's James

6     Wright of K&L Gates for the -- I guess I'll call them the

7     Movant for this motion.

8          THE COURT:  Yes.  Sometimes you're referred to as the

9     Advisors and the Funds and -- but Movants on Docket Entry

10    1528.

11        All right.  For the Committee, I know you have weighed in

12    on a couple of these motions.  Who do we have?

13          MR. CLEMENTE:  Good afternoon, Your Honor.  Matt

14    Clemente with Sidley Austin on behalf of the Committee.

15          THE COURT:  All right.  Well, we have a lot of folks

16    on the phone.  I think I've covered everybody who filed a

17    pleading for today.  Is there anyone else who would like to

18    appear?  I'd really like to restrict it only to those who have

19    filed pleadings today.

20          MS. MATSUMURA:  This is Rebecca Matsumura from King &

21    Spalding representing Highland CLO Funding, Ltd.  I don't

22    expect I'll be weighing in today, but there are a couple

23    issues that I may say a sentence on, so I want to go ahead and

24    make my appearance now.

25          THE COURT:  All right.  Thank you.  Anyone else?

6

1          MR. BAIN:  Yes, Your Honor.  Joseph Bain; Jones

2     Walker; on behalf of the CLO Issuers.

3          THE COURT:  All right.

4          MR. BAIN:  And Your Honor, if we may make certain

5     comments at the requisite time, we'd appreciate it.

6          THE COURT:  All right.  Thank you.  Anyone else?

7        All right.  Well, Mr. Pomerantz, let's hear about the

8     agreements you have on the Dondero-related motions.

9          MR. POMERANTZ:  Happy to, Your Honor.  And yes, Mr.

10    Lynn is correct, we saw also an emergency motion that came

11    through that I'll have a couple of comments at the end of my

12    presentation.

13       So, as I mentioned before, Your Honor, I'm pleased to

14    report that with respect to the two motions that Your Honor

15    scheduled for today's hearing, we have an agreement with Mr.

16    Dondero.  One was the motion of Mr. Dondero requiring

17    transactions out of the ordinary course to be brought before

18    this Court.  The second was the Debtor's motion to quash a

19    series of subpoenas that had been issued in the last two days,

20    requiring board members and others to testify.

21       As part of the agreement, we have agreed with Mr. Dondero

22    that his motion, which is presently set for today, shall be

23    continued to January 4th, which is the same date set as the

24    continued hearing on the preliminary injunction relating to

25    the TRO that Your Honor had entered last week.

Case 19-34054-sgj11 Doc 1822-2 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 8 of 67
Case 3:21-cv-00538-N  Document 26-12  Filed 06/09/21  Page 40 of 114  PageID 5717

7

1      As part of that agreement, the Debtor has agreed that it

2   will provide Mr. Dondero with three business days' notice

3   before selling any non-security assets from any managed funds

4   accounts through and including January 13th, which is the date

5   set for confirmation.

6      While, as the Court is aware, the Debtor doesn't believe

7   that any notice, opportunity for hearing, or an order from the

8   Court is required in connection with such transactions, as the

9   Debtor does not have any current plans to sell non-security

10   assets from managed funds before confirmation, it was willing

11   to agree to the notice requirement as essentially a way of

12   resolving the motion before Your Honor today and continuing

13   until the 4th.

14      As part of the agreement as well, Your Honor, the parties

15   have agreed that there will be no further discovery in

16   connection with the motion that is set.  That'll be no

17   additional discovery by Mr. Dondero, so he is withdrawing the

18   subpoenas as it relates to this motion, and there will be no

19   further discovery as -- by the Debtor.  As Your Honor, I

20   think, is aware, there were depositions conducted of both Mr.

21   Seery and Mr. Dondero on Monday in connection with this

22   motion, but the discovery will not happen over the next couple

23   of weeks.

24      Mr. Dondero wanted to make sure, and the Debtor didn't

25   have any opposition, that that agreement with respect to no

Case 19-34054-sgj11 Doc 1822-2 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 9 of 67
Case 3:21-cv-00538-N   Document 26-12   Filed 06/09/21   Page 41 of 114   PageID 5718

8

1    discovery only relates to the pending motion before the Court.

2    And in connection with any other matters relating to this

3    bankruptcy case, Mr. Dondero would reserve the right to pursue

4    discovery, and of course the Debtors would reserve the right

5    to challenge discovery if we believed it was inappropriate or

6    unduly burdensome.

7        With respect to the motion that was just filed, Your

8    Honor, we had a chance to briefly review it.  We haven't had a

9    chance to discuss it with the board.  In any event, we don't

10   think there's an emergency.  Mr. Dondero wants the opportunity

11   to approach and communicate with the board.  I've told Mr.

12   Lynn that communications regarding the plan are to go through

13   Mr. Seery.  Mr. Seery is the Debtor's chief executive officer.

14   He's the chief restructuring officer.  And at this point, the

15   board doesn't see a reason or have a desire to meet with Mr.

16   Dondero to talk about his plan, but, again, would be happy to

17   receive any written communications that Mr. Dondero has.

18       Mr. Dondero has sought to modify the TRO to allow him to

19   speak to the board.  Again, if the board agreed to speak with

20   Mr. Dondero, that wouldn't violate the TRO, provided that

21   counsel would be present.  But at this point, the board has

22   decided that it would be inappropriate and not a good use of

23   anyone's time to have that communication and that Mr. Dondero

24   should continue to communicate through Mr. Seery, the Debtor's

25   chief executive officer.

Case 19-34054-sgj11 Doc 1822-2 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 10 of
Case 3:21-cv-00538-N Document 26-12 Filed 06/09/21 Page 42 of 114 PageID 5719

9

1    If Your Honor, after reading the motion and hearing my

2    comments, and I'm sure Judge Lynn's comments that he will make

3    to Your Honor, Your Honor wants to set it for hearing, we

4    would submit, Your Honor, there's no emergency and that a

5    hearing could be set next week, but we would think Your Honor

6    might be able to dispose of the motion just on the papers and

7    the limited argument that would go on today.

8         THE COURT:  All right.

9         MR. POMERANTZ:  Thank you, Your Honor.

10         THE COURT:  All right.  Mr. Lynn, first, could you

11    confirm the terms of the agreed order that Mr. Pomerantz just

12    announced are consistent with what you and your client

13    believed was negotiated?

14         THE CLERK:  He's on mute.

15         THE COURT:  You're on mute, sir.

16         MR. LYNN:  Mr. Pomerantz has correctly stated the

17    agreement of the parties.  I am pleased to advise Your Honor

18    that I expect that we will withdraw the motion that is

19    presently pending to be heard on January 4th, since all we

20    were asking for was notice until confirmation date.  If those

21    sales are going to take place before then, we don't have a

22    problem any longer with the pre-confirmation activity of Mr.

23    Seery.

24    With regard to the motion that we filed requesting that

25    the temporary restraining order be modified, we would point

002967

Case 19-34054-sgj11 Doc 1822-2 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 11 of
Case 3:21-cv-00538-N   Document 26-12   Filed 06/09/21   Page 43 of 114   PageID 5720

10

1    out, respectfully, that the independent board is the board of

2    directors of Strand Advisors.  Strand Advisors belongs to Mr.

3    Dondero.  It is not unreasonable for the sole stockholder of

4    Strand Advisors to ask the board questions or present thoughts

5    to the board or ask its advice.  Mr. Seery, on the other hand,

6    while being a member of the board of Strand, is the chief

7    executive officer and the chief restructuring officer of

8    Highland, which is not the same as Strand.

9         Furthermore, Your Honor, Mr. Dondero has been attempting

10   for several months to negotiate an arrangement by which the

11   Debtor can continue as a going concern.  It is his desire to

12   discuss further with the board as a whole what he can do in

13   that regard.  I think the Court, by directing him originally

14   to participate in the mediation that took place in September,

15   expected him to do so.  He has attempted to do so.  And while

16   he has not gotten a response from the Creditors' Committee

17   that is definitive, he has at least caught the interest of Mr.

18   Seery, though that interest may have died for a variety of

19   reasons in recent weeks.

20        And by the way, next week is fine with us.  We're not in a

21   hurry beyond that if the Court feels further discussion would

22   be useful.

23             MR. POMERANTZ:  Your Honor, just a couple of points

24   in response.

25        Mr. Dondero has the right to request an audience with the

Case 19-34054-sgj11 Doc 1822-2 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 12 of
Case 3:21-cv-00538-N   Document 26-12   Filed 06/09/21    Page 44 of 114   PageID 5721

11

1    board.  He has requested the audience with the board.  The

2    board has considered it and decided not to communicate in that

3    fashion with Mr. Dondero at this time.  There is nothing that

4    Your Honor can do in the TRO that would change that, other

5    than ordering the board to speak with Mr. Dondero, which I

6    highly doubt Your Honor would do.

7         Having said that, this board in general and Mr. Seery in

8    particular have been very supportive of an overall resolution

9    to this case, not only with the creditors, but with Mr.

10   Dondero.  Mr. Seery has spent tens if not hundreds of hours

11   over the last several months working with Mr. Dondero to try

12   to get him in a position to present something that would have

13   traction with the Unsecured Creditors.  Unfortunately, that

14   hasn't occurred.  We understand there have been communications

15   between Mr. Lynn and Mr. Clemente.  And if there is any hope

16   of a plan and any traction with the creditors, this Debtor in

17   general and Mr. Seery in particular stands ready, willing, and

18   able to do anything within the Debtor's power to help that

19   out.

20        So, it's not really the Debtor standing in the way.  It's

21   an economic agreement ultimately that needs to be reached with

22   Mr. Clemente and his constituents and Mr. Lynn.  And if that

23   can be reached, we will be the first to jump on that bandwagon

24   and do everything humanly possible to have that occur.

25        Thank you, Your Honor.

Case 19-34054-sgj11 Doc 1822-2 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 13 of
Case 3:21-cv-00538-N   Document 26-12   Filed 06/09/21   Page 45 of 114   PageID 5722

12

1          THE COURT:  All right.  Well, again, I've not read

2    the motion.  I've just seen an email that I have this motion.

3    I'm a little bit confused.  I don't want to spend too long on

4    this because we have another motion to get to.  But I'm a

5    little bit confused on how Dondero wants the TRO to be

6    modified.  If he has the right already to request an audience

7    of the board, what is it that is problematic about the TRO

8    that he wants modified?

9          THE CLERK:  He's on mute.

10          THE COURT:  You're on mute.

11          MR. LYNN:  Sorry, Your Honor.  As I told you before,

12    you must forgive me, my command of technology is not great.

13      In response, I would say that I question whether it is

14    appropriate, in advance of a meeting with the board of his

15    company, that what he wants to talk about should be screened.

16    And that is what has occurred in our effort to meet by

17    telephone with the board.

18      Any such meeting would, of course, be subject to the

19    restraints that are included in the temporary restraining

20    order, in that both Mr. Pomerantz or his designee and I would

21    participate in any such discussion.  I respectfully submit

22    Strand is his.  Nobody may like that, but it is his, and he

23    ought to be able to talk to his own board.

24          THE COURT:  Is this about having a conversation

25    without the Committee's involvement?  I just don't -- hmm.  I

Case 19-34054-sgj11 Doc 1822-2 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 14 of
Case 3:21-cv-00538-N Document 26-12 Filed 06/09/21 Page 46 of 114 PageID 5723

13

1  just need to see the motion.

2      Mr. Clemente, anything you want to add at this juncture?

3  Have you even reviewed the motion yet?

4          MR. CLEMENTE:  Your Honor, I apologize.  I haven't

5  actually even seen the motion.  And so I have no comment on

6  it, Your Honor.  I apologize for not having been able to look

7  at it.

8          THE COURT:  Okay.  Well, what about the agreed order

9  that's been announced?  Any comment on that?

10          MR. CLEMENTE:  Your Honor, we support the resolution

11  that Mr. Pomerantz announced on the record.

12          THE COURT:  Okay.  All right.  Well, I assume there's

13  nothing further, then, on the Dondero motions that were

14  scheduled today?

15      All right.  So I will happily accept the agreed order that

16  has been announced.  For now, we will continue the Dondero

17  motion that was Docket Entry No. 1439 to January 4th, when the

18  preliminary injunction hearing is set.  And we -- I understand

19  there are going to be no more discovery requests in connection

20  with these matters that were set today.

21      And I will review the motion that Mr. Dondero has filed

22  shortly before today's hearing in chambers later, and I will

23  have my courtroom deputy communicate to the lawyers whether I

24  see fit to set it for an emergency hearing next week or rule

25  on the pleadings or set it for January 4th.  Those are, I

Case 19-34054-sgj11 Doc 1822-2 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 15 of
Case 3:21-cv-00538-N   Document 26-12   Filed 06/09/21   Page 47 of 114   PageID 5724

14

1   guess, the three possibilities I can think of that I might

2   decide upon.

3       So, again, I'm not making any ruling at all on a motion I

4   haven't read yet.  So I'll -- the courtroom deputy will let

5   you all know, if not later today, tomorrow.  Probably

6   tomorrow, because I have a confirmation hearing set later

7   today in another case.

8       All right.  So, thank you all for working these issues

9   out.  And Mr. Pomerantz, Mr. Dondero -- or, excuse me, Mr.

10  Lynn, anything further on the Dondero disputes?

11          MR. POMERANTZ:  Nothing from the Debtor, Your Honor.

12          MR. LYNN:  Your Honor, nothing from Mr. Dondero.  May

13  I be excused?

14          THE COURT:  Is anyone anticipating needing Mr.

15  Dondero's counsel for the other matter?  All right.  If not,

16  then I certainly have no problem with you dropping off the

17  line, Mr. Lynn.  Thank you.

18          MR. LYNN:  Thank you, Your Honor.

19          THE COURT:  Okay.  All right.  So let's turn next to

20  the CLO Motion.  I take it there are no agreements on this

21  one?

22          MR. POMERANTZ:  There are not, Your Honor.

23          MR. WRIGHT:  There are not, Your Honor.  I can

24  confirm that.

25          THE COURT:  All right.  Mr. Wright, do you have

Case 19-34054-sgj11 Doc 1822-2 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 16 of
Case 3:21-cv-00538-N    Document 26-12    Filed 06/09/21    Page 48 of 114    PageID 5725

15

1   anything you want to say as far as an opening statement before

2   we go to the evidence?

3         MR. WRIGHT:  I don't, Your Honor.  My intention, if

4   it's okay with you, you asked me to bring a witness, so I do

5   have Mr. Norris from my client, and I was going to just remind

6   the Court who I am and state the name of all of my Movants,

7   and then I was going to move directly to put him on the stand

8   and go through a brief direct.

9         THE COURT:  All right.  I think I heard Mr. Morris is

10  going to handle this phase of the hearing.

11        MR. DEMO:  And Your Honor, this is Greg Demo from

12  Pachulski on behalf of the Debtor.

13        THE COURT:  Oh, okay.

14        MR. DEMO:  We would like to make a brief opening

15  statement before we have witnesses, if that's all right with

16  Your Honor.

17        THE COURT:  All right.  I'm fine with that.  So, --

18        MR. DEMO:  All right.

19        THE COURT:  -- go ahead.

20        MR. DEMO:  All right.  Well, thank you, Your Honor.

21  Again, Greg Demo; Pachulski Stang; on behalf of the Debtor.

22     We are here today on what really amounts to the third of

23  three motions that deal with Mr. Dondero's attempts, either

24  directly or through a proxy, to transfer control away from the

25  Debtor and back to Mr. Dondero.

Case 19-34054-sgj11 Doc 1822-2 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 17 of
Case 3:21-cv-00538-N   Document 26-12   Filed 06/09/21   Page 49 of 114   PageID 5726

16

1      The current motion is filed by NexPoint Capital and

2    Highland Capital Management Fund Advisors and three of their

3    managed funds:  Highland Income Fund, NexPoint Capital, and

4    NexPoint Strategic Opportunities Funds.

5      Mr. Dondero owns and controls NexPoint Capital and

6    Highland Capital Management Fund Advisors.  While both

7    NexPoint Capital and Highland Capital Management Fund Advisors

8    are governed by boards, the boards have no investment

9    authority with respect to the funds they manage, nor was the

10   boards' approval necessary to file the motion, or obtained.

11     Mr. Dondero is the sole portfolio manager for NexPoint

12   Strategic Opportunities Fund and Highland Income Fund.  Mr.

13   Dondero is one of three portfolio managers for NexPoint

14   Capital.  Mr. Dondero's decisions are not subject to

15   oversight.

16     The Movants disclosed these facts in their recent SEC

17   filings, and there can be no dispute that Mr. Dondero is the

18   controlling figure behind the Movants in the relief being

19   sought in the motion which seeks to impede the Debtor's

20   efforts to exercise its rights as a CLO manager.

21     The fact that this motion was even filed is quite

22   surprising, since on December 7th the Debtor filed a complaint

23   and TRO based upon Mr. Dondero's unlawful efforts to frustrate

24   the Debtor's efforts to sell assets from the very CLOs that

25   are the subject of this motion.

Case 19-34054-sgj11 Doc 1822-2 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 18 of
Case 3:21-cv-00538-N   Document 26-12   Filed 06/09/21   Page 50 of 114   PageID 5727

17

1      The Court granted the TRO on December 10th.  Mr. Dondero

2  also filed a motion seeking similar relief in November, which

3  has now been adjourned to January 4th.

4      The Movants are essentially now seeking an order from this

5  Court enjoining the Debtor from exercising its rights as a CLO

6  manager and requiring the Debtor to seek the Movants' and Mr.

7  Dondero's permission to fulfill its obligations as a manager

8  for the CLOs.

9      The Movants, however, do not come right out and say this,

10  and instead couch the motion as seeking to simply pause the

11  CLOs' asset sales while the Movants and the Debtor engage in

12  discussions regarding the future of the CLOs' management.

13      In the motion, the Movants also argue the Debtor has made

14  decisions detrimental to the interests of the preference

15  shareholders because the Debtor is trying to monetize its

16  assets in a manner inconsistent with the preference shares'

17  objectives.

18      The Movants simply mischaracterize the facts, the parties'

19  respective rights under contracts, and the law.

20      First, to the extent the Movants hold interests, they hold

21  only preference shares in the CLOs and are minority investors

22  in the preference shares of 12 of the 15 CLOs at issue.  In

23  one third of the CLOs, the Movants' interests sit behind

24  senior debt which must be paid first.

25      Notably, Your Honor, no other investors in the CLOs are

Case 19-34054-sgj11 Doc 1822-2 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 19 of
Case 3:21-cv-00538-N   Document 26-12   Filed 06/09/21   Page 51 of 114   PageID 5728

18

1    here or have expressed support for the Movants' position.

2         Second, the Movants simply have no right under the

3    contracts governing the CLOs to the relief they are

4    requesting.  The CLOs are governed by a series of agreements

5    which were agreed to long ago and dictate the rights of all

6    investors of the CLOs.  The enforceability of those agreements

7    is relied on by all investors, not just the Movants.

8         Under these agreements, investment discretion is given to

9    the CLOs' manager -- in this case, the Debtor -- and no

10   investor has the right to direct the CLO manager.  The manager

11   was chosen to manage the CLOs' assets.  No individual investor

12   was chosen to manage the CLOs' assets.

13        Simply said, there will be no evidence that the Movants

14   have the right to do what they're trying to do, and there will

15   be no evidence that the Movants' preferences with respect to

16   the CLOs' assets is in line with that of the other investors

17   in the CLOs.

18        Under the relevant agreements, if an investor is not happy

19   with a manager's performance, the investor's rights are

20   generally limited to replacing the manager.  The investors

21   here -- excuse me, the Movants here -- have not done that and

22   cannot do that.  Under the agreements, replacement requires at

23   least the majority of the preference shares that are not

24   affiliates of the managers.  In 12 of the 15 CLOs, the Movants

25   hold a substantial minority interest position.  They are not

Case 19-34054-sgj11 Doc 1822-2 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 20 of
Case 3:21-cv-00538-N Document 26-12 Filed 06/09/21 Page 52 of 114 PageID 5729

19

1    the majority.  In the three CLOs in which they are the

2    majority, the Movants still cannot replace the Debtor as the

3    investment manager because they are the Debtor's affiliates.

4         It is indisputable that, prior to January 9th, when Mr.

5    Dondero was removed from control of the Debtor, that the

6    Debtor, NexPoint Advisors, Highland Capital Management Fund

7    Advisors, and the three funds were the Debtor's affiliates

8    because of Mr. Dondero's common control.

9         After January 9th, where the Court removed Mr. Dondero

10   from control of the Debtor, the Debtor is arguably, under the

11   documents, not an affiliate.  However, Your Honor, the Movants

12   have disclosed in their recent proxy statements filed in 2020

13   that they still consider themselves the Debtor's affiliate,

14   and they should be bound by that statement.  The Movants, by

15   virtue of Mr. Dondero's being removed from control of the

16   Debtor, should not be able to use that removal to reassert

17   control over the CLOs that were taken away from Mr. Dondero

18   when he was removed in January 2020.

19        The Debtor believes that additional briefing may be needed

20   on this issue, and that a ruling specifically on this issue

21   and the parties' relative rights under the CLO management

22   agreements may be needed.  The Debtor reserves its right to

23   brief this issue and to bring it before this Court, either as

24   a declaratory judgment or any other procedurally-appropriate

25   motion.

Case 19-34054-sgj11 Doc 1822-2 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 21 of
Case 3:21-cv-00538-N Document 26-12 Filed 06/09/21 Page 53 of 114 PageID 5730

20

1        Because the Debtor -- excuse me.  The Movants have no

2    right to the relief requested.  They argue that the relief is

3    justified because of the mismatch between the investors'

4    timelines and the Movants'.  This is not true.  The Movants

5    cite to three transactions to justify their statement in the

6    motion:  SSP, OmniMax, and certain recent transactions.

7        The recent transactions were the attempted sales of two

8    public equities immediately before Thanksgiving that Mr.

9    Dondero interfered with.  You'll hear testimony from Mr. Seery

10   about each of these transactions and how each was in the best

11   interest of the CLOs.

12       First, SSP.  SSP is a steel business that was suffering

13   for a number of reasons.  The Debtor's investment team

14   believed SSP should be sold since 2019.  The Debtor received

15   multiple offers for SSP, the Debtor evaluated these offers,

16   and the Debtor choose the one that was the best.  The SSP sale

17   closed in early November.

18       Notably, Your Honor, none of the CLOs held an equity

19   interest in SSP, its parent, or in Trussway.  Instead, they

20   held debt, and they got exactly what they bargained for,

21   repayment of their debt obligations in full.

22       OmniMax, Your Honor, is the second one.  It is a

23   fabricator of building materials.  The CLOs and the Movants

24   held an interest in OmniMax debt which they have been trying

25   to refinance or equitize since 2019.  That deal was intended

Case 19-34054-sgj11 Doc 1822-2 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 22 of
Case 3:21-cv-00538-N   Document 26-12   Filed 06/09/21    Page 54 of 114   PageID 5731

21

1 to include the Movants, but instead of working with the

2 Debtor, Mr. Dondero held out and used the threat of litigation

3 against OmniMax to secure a higher price for the Movants, to

4 the detriment of the CLOs.

5   As Mr. Seery will testify, these two transactions were all

6 about maximizing value and have nothing to do with investment

7 timelines.

8   Finally, Your Honor, the Movants reference the

9 Thanksgiving transactions.  These transactions were discussed

10 in the context of Mr. Dondero's TRO.  Mr. Seery directed

11 Debtor personnel, on the advice of his investment team, to

12 sell these securities.  Mr. Dondero blocked those trades.  Now

13 the Movants argue that the reason those trades were blocked

14 was because of a mismatch between the Movants' and the

15 Debtor's investment timelines.  That is not the case.  Mr.

16 Seery will testify as to these trades.  The Debtor is an

17 investment manager and appreciates that its decisions with

18 respect to how it manages its assets are -- is a judgment

19 call.  The evidence, however, will show that the Debtor at all

20 times exercised that judgment in good faith based on all

21 available information.

22   The Movants may disagree with the Debtor's judgment, Your

23 Honor, but that is irrelevant.  The Movants have no right to

24 interfere with the Debtor's management of the CLOs.  There is

25 simply no statutory or contractual basis for this, not under

Case 19-34054-sgj11 Doc 1822-2 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 23 of
Case 3:21-cv-00538-N   Document 26-12   Filed 06/09/21    Page 55 of 114   PageID 5732

22

1    Section 363 and not under the CLO agreements.

2         Finally, Your Honor, -- I guess not finally.  There's one

3    more point I want to make.  But Your Honor, this -- what we're

4    here on today is notably similar to the Acis bankruptcy that

5    Your Honor noted last time we were here last week.  In that

6    bankruptcy, HCLOF tried to direct the collateral manager to

7    take certain actions that HCLOF thought were in the best

8    interest of the CLOs.  In this case, the Movants, through Mr.

9    Dondero, are trying to file an action that functionally seeks

10   to direct the Debtor to take interests that the Movants

11   believe are in their best interest.  There is substantial

12   overlap between the litigation in Acis and the litigation

13   here.

14        Finally, Your Honor, the Debtor has been in discussions

15   with the CLOs' counsel on this issue.  And the Debtor has been

16   informed that the CLOs' position is that the Debtor's ability

17   to operate under the management agreements should not be

18   interfered with, not by the Movants or not by any other party.

19        Thank you, Your Honor.  With that, I will turn it over to

20   Mr. Norris.  Or, I'm sorry, Mr. Wright.

21            THE COURT:  All right.  Mr. Wright, you may call your

22   witness.

23            MR. WRIGHT:  All right, Your Honor.  Dustin Norris

24   should be -- should be dialed in and should be available on

25   screens.

Norris - Direct                           23

1           THE COURT:  Okay.  I'm going to --

2           MR. WRIGHT:  I'll pause and have him confirm that.

3           THE COURT:  I'm going to ask you, Mr. Wright, to

4    speak up or closer to your device.  I didn't hear the name of

5    your witness.

6           MR. WRIGHT:  Sure.  Sorry.  It's Dustin Norris.  I --

7    last time, you were having trouble hearing me, and so I'm

8    trying a different device this time.  I actually followed the

9    instructions that I found very helpful, so I'm trying my phone

10   in hopes that it will work better.

11          THE COURT:  All right.

12          MR. WRIGHT:  But, yeah, it's Dustin Norris.  D-U-S-T-

13   I-N, N-O-R-R -- N-O-R-R-I-S.

14          THE COURT:  All right.  Mr. Norris, can you say

15   "Testing one two" so we pick up your video?

16          MR. NORRIS:  Testing one two.

17          THE COURT:  All right.

18          MR. NORRIS:  Testing one two.

19          THE COURT:  All right.  Please raise your right hand.

20          DUSTIN NORRIS, MOVANTS' WITNESS, SWORN

21          THE COURT:  All right.  Mr. Wright, you may proceed.

22          MR. WRIGHT:  Thank you, Your Honor.

23                     DIRECT EXAMINATION

24   BY MR. WRIGHT:

25   Q   Mr. Norris, you're employed by NexPoint Advisors?

002981

Norris - Direct                            24

1   A    I am.  That's correct.

2   Q    And what is your title and role there?

3   A    Yeah.  I am the executive vice president of NexPoint

4   Advisors.  In that role, I oversee business development,

5   marketing, sales, investor relations.  And as far as the funds

6   advised by the advisor, I'm the liaison with the independent

7   board on the business side.

8   Q    Thank you.  Do you also have a role for Highland Capital

9   Management Fund Advisors?

10  A    I do.  I'm also the same executive vice president and

11  fulfill that same role as it pertains to business development,

12  sales, investor relations.  And in both, I'm also working on

13  product development.  So, launching, developing new products

14  and investment funds.

15  Q    Do you also have a role for Highland Income Fund, NexPoint

16  Strategic Opportunities Fund, and NexPoint Capital, Inc.?

17  A    I do.  I'm also executive vice president for each of those

18  funds.

19  Q    Thank you.  Have you ever served on the boards of these

20  three funds?

21  A    I have.  I've served as the interested trustee, sole

22  interested trustee for each of these funds.  I'm no longer the

23  board member or interested trustee, but still serve as an

24  officer, executive vice president, for each fund.

25  Q    At times, I'm going to refer to NexPoint Advisors, LP and

Norris - Direct                                        25

1  Highland Capital Management Fund Advisors, LP simply as the

2  Advisors, to avoid having to keep saying their long names.

3  And similarly with the three funds that are part of the

4  motion, I may just call them the Funds.

5      Can you explain the relationship between the Advisors and

6  the Funds, briefly?

7  A   Yeah.  So, each of these are investment companies that are

8  registered under the Investment Company Act of 1940.  So, with

9  that comes a unique relationship between an investment advisor

10 and the funds themselves.  The Funds don't have employees.

11 They rely on the investment advisor and investment advisor

12 employees.  And between the Funds and the Advisors is an

13 investment advisory agreement.  And the Funds themselves are

14 also overseen by an independent board, and that's by statute

15 by the 1940 Act.

16 Q   Okay.  And just to be clear, when you said that these are

17 -- entities are investment companies, you meant that the three

18 Funds are investment companies?

19 A   Correct.  Correct.  The three Funds are investment

20 companies.  The investment advisors are not investment

21 companies.

22 Q   Thank you.  Can you explain the role of the board for the

23 Funds?

24 A   Yeah.  So, as prescribed by the Investment Company Act of

25 1940, there are certain obligations related to an investment

Case 19-34054-sgj11 Doc 1822-2 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 27 of
Case 3:21-cv-00538-N   Document 26-12   Filed 06/09/21   Page 59 of 114   PageID 5736

Norris - Direct                           26

1    company, and one of those is they must be overseen by an

2    independent board.  And the independent board has a

3    responsibility to oversee the -- certain material agreements,

4    including the advisory agreement.  And we meet regularly with

5    the boards.  They overseas certain processes and, again, all

6    material contracts.  And the board is, by Section 15(c) of the

7    1940 Act, required by law to annually review the capabilities

8    of the Advisor and to either approve or reject the advisory

9    contracts.  So, each year, those contracts are renewed by the

10   independent board.

11        There are certain obligations of the Fund and operations

12   that are delegated responsibility to the investment advisors.

13   That includes portfolio management and investment decisions.

14   But all those are overseen by the board.

15   Q    Okay.  And are the boards involved in the day-to-day

16   operations of the Funds?

17   A    They're not.

18   Q    Okay.  And do you know who the members of the boards of

19   these three Funds are?

20   A    I do.

21   Q    Could you share that with us?

22   A    Yeah.  So, the -- there is one interested trustee of each

23   board, and that's John Honis.  And then for the Highland

24   Income Fund and the NexPoint Strategic Opportunities Fund --

25   sorry, for NexPoint -- for Highland Income Fund and NexPoint

Case 19-34054-sgj11 Doc 1822-2 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 28 of
Case 3:21-cv-00538-N Document 26-12 Filed 06/09/21 Page 60 of 114 PageID 5737

Norris - Direct                                27

1   Capital, we have the same three disinterested or independent

2   trustees, and that's Bryan Ward, Dr. Bob Froehlich, and Ethan

3   Powell.  And for NexPoint Strategic Opportunities Fund, we

4   have the same four trustees, one interested, three

5   independent, but there's another fourth independent trustee,

6   Ed Constantino.

7   Q    And when you refer to independent trustees, do you mean

8   independent for purposes of the Investment Company Act of

9   1940, as amended?

10  A    That's correct.  They, by statute, they are independent

11  trustees.  They also have an independent legal counsel.  Stacy

12  Louizos represents them from Blank Rome.  And also two of

13  these Funds are listed on the New York Stock Exchange, and the

14  New York Stock Exchange has various independence requirements

15  that each independent director has met.

16  Q    Thank you.  And which are the two Funds that are listed on

17  NYSE?

18  A    The Highland Income Fund and the NexPoint Strategic

19  Opportunities Fund are both NYSE-listed.

20  Q    And I know you probably haven't memorized everybody who

21  invests in the Funds, but can you give us a general idea of

22  who invests in these Funds?

23  A    Certainly.  I definitely have not memorized them.  There

24  are thousands of individual investors in each of these Funds.

25  Part of my role overseeing investor relations and sales, I do

Case 19-34054-sgj11 Doc 1822-2 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 29 of
Case 3:21-cv-00538-N Document 26-12 Filed 06/09/21 Page 61 of 114 PageID 5738

Norris - Direct                                          28

1    talk to a lot of those investors.  But the majority of the

2    investors in each of these Funds are individual investors.

3         As '40 Act Funds, almost anybody with a brokerage account

4    can buy them.  They have tickers, particularly the Funds that

5    are listed.  Closed-end funds.  And so, with that, it is mom-

6    and-pop investors.  It's retail investors, including myself.

7    I've allocated my 401(k) to these funds, the majority of my

8    401(k) to these funds.  But there are also institutional

9    investors.  There's hedge funds.  There's ETFs.  There are

10   large high-net-worth individuals.  But the majority of it is

11   individual investors that have invested through their

12   brokerage firms, be it Wells Fargo, Morgan Stanley, or Cetera.

13   These are -- these are -- these are the individual investors.

14   Q    Thank you.  Does Mr. Dondero have investments in the

15   Funds?  Do you know?

16   A    He does.  He's invested in each of the Funds.

17   Q    Does he have a majority investment in any of the Funds?

18   A    He does not have a majority investment in any of the

19   Funds.

20   Q    Thank you.  Does Mr. Dondero have a control relationship

21   with the two Advisors?

22   A    Yes.  He does.  With the Advisors.

23   Q    And does he have a control relationship with the Funds?

24   A    As it pertains to portfolio management, he is a portfolio

25   manager of each Fund.  But as discussed, as I mentioned, the

Norris - Direct                                           29

1 │ independent board on an annual basis has the ability to

2 │ terminate or renew our advisory contracts, and that -- that

3 │ dynamic removes the control, overall control, of the Funds in

4 │ that regard.

5 │ Q    Are you familiar with the motion that the Court I think

6 │ has accurately referred to as the CLO Motion that was filed by

7 │ the two Advisors and the three Funds?

8 │ A    Yes.  I am familiar with it.

9 │ Q    And I'm going to ask you a question now that I think is of

10 │ interest to the Court, based on the last time I was in front

11 │ of Judge Jernigan.  Were any employees of the Debtor involved

12 │ in deciding to bring this motion or in preparing the motion?

13 │ A    No.  None of the HCMLP employees, to my knowledge, were

14 │ involved in preparing or deciding to bring the motion.

15 │ Q    Okay.  And you investigated who was involved in preparing

16 │ the motion, so your knowledge is pretty good on this point?

17 │ A    Correct.  I have.  And none were involved, based on that

18 │ investigation.

19 │ Q    (garbled) involved in deciding to bring a motion,

20 │ preparing it, other than outside counsel and my firm?

21 │ A    Yeah.  So, the initial cause for concern was raised by Mr.

22 │ Dondero himself to our legal -- internal legal team and

23 │ compliance team.  And working together with them, myself, and

24 │ outside counsel, and senior management of Highland Capital

25 │ Management Fund Advisors, including Joe Sowin, we prepared the

Case 19-34054-sgj11 Doc 1822-2 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 31 of
Case 3:21-cv-00538-N   Document 26-12   Filed 06/09/21   Page 63 of 114   PageID 5740

Norris - Direct                                    30

1    order.  Or, sorry, not the order, the motion.

2    Q   All right.  Thank you.  Were the boards of the three Funds

3    involved at all with bringing the motion?

4    A   They were not involved in the preparation of the motion

5    itself.  They were aware and supportive, but they did not

6    prepare the motion.

7    Q   You provided a (audio gap), correct?

8    A   Sorry.  You did cut out there.  I didn't hear the

9    question.

10   Q   I'll try again.  You provided a declaration (garbled)

11   motion, correct?

12   A   I did, yes.

13   Q   And there are two exhibits to your declaration.  There's

14   an Exhibit A and an Exhibit B.

15   A   Correct.

16   Q   Exhibit A, does this reflect the current repayment status

17   of the various CLOs as we -- as you understand it to be as of

18   December 1st?

19   A   Yes, it does.

20   Q   And does Exhibit (garbled) of the three Funds --

21           THE COURT:  Okay.  Mr. --

22   BY MR. WRIGHT:

23   Q   -- and the various CLOs, --

24           THE COURT:  Mr. Wright?

25   BY MR. WRIGHT:

Norris - Direct                           31

1   Q   -- as you understand it?

2            THE COURT:  Mr. Wright, time out.  Two things.

3   First, I don't know what you can do to improve --

4            MR. WRIGHT:  Sure.

5            THE COURT:  -- your connection, but you're

6   occasionally breaking up a little.

7        But second, can we be clear for myself, the record,

8   everyone else, what you're referring to right now?  We have an

9   Advis... your witness and exhibit list is at Docket 1573.  Is

10  that what I should be looking at first?

11           MR. WRIGHT:  Yes, Your Honor.  The declaration of Mr.

12  Norris.  It's Docket 1522-1.  And it's on our exhibit list.

13  It may be the only exhibit on our exhibit list, frankly.

14           THE COURT:  Okay.  So you're talking about his

15  declaration now, not the witness and exhibit list with the

16  attachments to it?  Actually, it is attached here.  Exhibit A.

17  Okay.  I'm there.  I went to Exhibit A in your attachments to

18  your exhibit list at 1573.

19       All right.  Let's try again with your question you just

20  asked.

21           MR. WRIGHT:  Sure.

22  BY MR. WRIGHT:

23  Q   So, Mr. Norris, Exhibit A, this reflects the current

24  repayment status of the CLOs that are the subject of the

25  motion as of December 1.  Correct?

Case 19-34054-sgj11 Doc 1822-2 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 33 of
Case 3:21-cv-00538-N  Document 26-12   Filed 06/09/21    Page 65 of 114  PageID 5742

Norris - Direct                           32

1  A    Correct.

2  Q    And then --

3           MR. WRIGHT:  Your Honor, if you turn to Exhibit B,

4  which is just a couple pages forward.

5           MR. MORRIS:  Your Honor, I would ask that this be put

6  up on the screen, if possible.

7           THE COURT:  Yes.  Can you do that, please?

8           MR. WRIGHT:  I'm sorry.  I couldn't hear that, John.

9           THE COURT:  He asked if you could --

10          MR. MORRIS:  I would --

11          THE COURT:  -- share your screen.  Can you share your

12 screen as to what you're looking at?

13          MR. WRIGHT:  Can I share my screen?  Last time I was

14 using a computer and you were having trouble hearing me, so

15 this time I'm doing it on my phone.  So my phone, no, I don't

16 have this on my phone to share my screen that way.  It's

17 Docket 1522-1, and it's the only exhibit that was on our

18 exhibit list.

19          MR. MORRIS:  No objection, Your Honor.

20          MR. WRIGHT:  All it shows is the holdings in Funds in

21 the CLOs.  That's all it is.

22          MR. MORRIS:  No objection, Your Honor.

23          THE COURT:  Okay.

24          MR. NORRIS:  I'm sorry, John.  I didn't hear.

25          THE COURT:  Give me a minute, because I was at 1573,

Case 19-34054-sgj11 Doc 1822-2 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 34 of
Case 3:21-cv-00538-N Document 26-12 Filed 06/09/21 Page 66 of 114 PageID 5743

Norris - Direct                              33

 1  your witness and exhibit list.

 2        (Pause.)

 3              THE COURT:  Okay.  That's not the correct docket

 4  number.

 5              MR. MORRIS:  Your Honor?

 6              THE COURT:  Yes?

 7              MR. MORRIS:  If I may, it's John -- it's John Morris.

 8  It's Docket No. 1528.  And the declaration can be found at

 9  Page 12 of 26.

10              MR. WRIGHT:  Thank you.

11              THE COURT:  1528?

12              MR. WRIGHT:  That's bizarre, because I have a

13  printout of it and it says Docket 1522-1.

14              THE COURT:  Okay.  1528 is the -- the actual motion

15  we've set for hearing.

16              MR. MORRIS:  And it's attached to that, yes.  If you

17  -- if you go to PDF Page 12, it's the first page of the

18  declaration.

19              THE COURT:  Okay.  I'm there now.  Okay.  So we're on

20  that declaration.  And then you were having the witness look

21  first at Exhibit A to that declaration.  And then where are

22  you having him look next?  Exhibit B, which is entitled

23  "Holdings of Preferred Shares in CLOs"?

24              MR. WRIGHT:  Exhibit B, Your Honor.

25              THE COURT:  Okay.  Continue.

002991

Norris - Direct                              34

1              MR. WRIGHT:  (garbled) I think some of the exhibits

2     that I have had the wrong docket number printed on the top,

3     and I --

4     BY MR. WRIGHT:

5     Q    Exhibit B.  So, Mr. Norris, Exhibit B to your declaration

6     shows the holdings of the preference shares of the Funds in

7     the various CLOs that are the subject of the motion, correct?

8     A    That's correct.  One clarification.  It shows the

9     percentage ownership of each of those preference share

10    tranches that each Fund owns.

11    Q    Thank you.  Mr. Norris, do the three Funds have a date by

12    which they have to liquidate their investments?

13    A    Sorry, you did skip out there.  If you could you repeat

14    the question.  I apologize.

15    Q    It's frustrating.  Do the three Funds have a date by which

16    they must liquidate their investments?

17    A    No.  They do not.

18    Q    Okay.  Can you briefly explain why the Advisors and the

19    Funds brought this motion?

20    A    Yeah.  The Advisors and the Funds were concerned with

21    certain transactions, as described in the motion.  As

22    preference share owners, we own the majority or a substantial

23    portion of the economics of most of these CLOs, and in three

24    instances the majority of the economic benefit.  And there was

25    concern with the way that the sales were executed.  And so,

002992

Norris - Cross                              35

1    with that, we're simply asking for a temporary relief in order

2    to benefit and to maximize the recovery for our preference

3    shares that we own.

4    Q    Thank you.

5         MR. WRIGHT:  All right, Your Honor.  I have no

6    further questions for Mr. Norris, although I guess I reserve

7    the right to redirect.

8         THE COURT:  All right.  Cross-examination?

9         MR. MORRIS:  Thank you, Your Honor.

10                          CROSS-EXAMINATION

11   BY MR. MORRIS:

12   Q    Good afternoon, Mr. Norris.  Can you hear me?

13   A    I can.  Thank you, Mr. Morris.

14   Q    All right.  I'm going to go into a little bit more detail

15   about some of the topics that you discussed.  To be clear

16   here, there are five moving parties; is that right?

17   A    That's correct.  The two Advisors and the three Funds.

18   Q    And one of the advisory firms is Highland Capital

19   Management Fund Advisors, LP; is that right?

20   A    That's correct.

21   Q    And I'll refer to that as Fund Advisors; is that okay?

22   A    That's great.

23   Q    James Dondero and Mark Okada are the beneficial owners of

24   Fund Advisors, correct?

25   A    That is my understanding, yes.

Norris - Cross                              36

1   Q    And your understanding is that Mr. Dondero controls Fund

2   Advisors, correct?

3   A    That's correct.

4   Q    And the other advisory firm that brought the motion is

5   NexPoint Advisors, LP; is that right?

6   A    That is correct.

7   Q    And Mr. Dondero is the beneficial owner of NexPoint; is

8   that right?

9   A    A family trust where Jim is the sole beneficiary, I

10  believe, controls or owns NexPoint Advisors.

11  Q    Okay.  And Mr. Dondero --

12  A    Or 99.9 percent of NexPoint Advisors.

13  Q    Thank you for the clarification.  Mr. Dondero controls

14  NexPoint; is that right?

15  A    Correct.

16  Q    All right.  And I'm going to refer to Fund Advisors and

17  NexPoint as the Advisors going forward; is that fair?

18  A    That's fair.

19  Q    Each of the Advisors manages certain funds; is that right?

20  A    That is correct.

21  Q    And three of those funds that are managed by the Advisors

22  are the Movants on this motion, correct?

23  A    Correct.

24  Q    All right.  The Advisors caused these three Funds to

25  invest in CLOs that are managed by the Debtor; is that right?

Norris - Cross                    37

1   A    The portfolio managers working for the Advisors did.

2   That's correct.

3   Q    And Mr. Dondero is the portfolio manager of the Highland

4   Income Fund; is that right?

5   A    He is one of the portfolio managers for that Fund.

6   Q    And he's also --

7   A    I believe there are two.

8   Q    And he's also a portfolio manager of NexPoint Capital,

9   Inc., one of the Movants here, right?

10  A    That is correct.

11  Q    And he's also the portfolio manager of NexPoint Strategic

12  Opportunities Fund, another Movant; is that right?

13  A    Yes.  That is correct.

14  Q    Okay.  And I think you testified earlier that each of

15  these Funds has a board.  Is that right?

16  A    That is correct.

17  Q    But the boards don't make investment decisions for the

18  Funds, do they?

19  A    They do not.  They have delegated that authority.

20  Q    And that authority to make investment decisions is

21  delegated to the Advisors; is that right?

22  A    Yes.

23  Q    Okay.  And none of the boards of the Funds who are Movants

24  here adopted any resolution authorizing the Funds to file this

25  motion; is that right?

Case 19-34054-sgj11 Doc 1822-2 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 39 of
Case 3:21-cv-00538-N Document 26-12 Filed 06/09/21 Page 71 of 114 PageID 5748

Norris - Cross                                  38

1   A    To my knowledge, that is correct.

2   Q    And in fact, the boards were not required to approve the

3   filing of this motion, correct?

4   A    I'm not -- I believe that's a legal question, but to my

5   knowledge, there was not a requirement of the board to -- or,

6   to adopt a resolution for that.

7   Q    Okay.  Let's talk a little bit about your background.  I

8   think you testified that you're the executive vice president

9   at NexPoint Advisors, one of the Movants.  Is that right?

10  A    That's right.

11  Q    Who's the president of NexPoint Advisors, LP?

12  A    Mr. Dondero.

13  Q    And you report directly to him; is that right?

14  A    I do.

15  Q    You're also the executive vice president of Fund Advisors,

16  another Movant; is that right?

17  A    Correct.

18  Q    And Mr. Dondero is the president of Fund Advisors; is that

19  right?

20  A    He is not.  There is no president of Fund Advisors.  But

21  he -- yeah.

22  Q    You're the president of another entity called NexPoint

23  Securities; is that right?

24  A    That's correct.

25  Q    And you're also the executive vice president of the 11 or

Case 19-34054-sgj11 Doc 1822-2 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 40 of
Case 3:21-cv-00538-N   Document 26-12   Filed 06/09/21    Page 72 of 114   PageID 5749

Norris - Cross                                   39

 1  12 funds that are managed by the Advisors here, right?

 2  A    Yes.  That is correct.

 3  Q    Okay.  You've been working for Highland Capital Management

 4  or other Highland-related entities for a little more than a

 5  decade; is that right?

 6  A    That's correct.  Since June 2010.

 7  Q    Okay.  Now, you don't personally make any investment

 8  decisions for -- for the Funds.  Is that right?

 9  A    That's correct.

10  Q    And you don't hold yourself out as an investment manager,

11  do you?

12  A    I do not.

13  Q    And you've never worked for a CLO, have you?

14  A    Never worked for a -- for a C -- employed by a CLO.

15  Worked on accounting, various other aspects, but never worked

16  for a CLO.

17  Q    Okay.  You referred earlier to the declaration that you've

18  submitted in support of the motion.  Do you remember that?

19  A    I do.

20  Q    I've got an assistant on the line here.

21       MR. MORRIS:  Ms. Cantey, can we put up onto the

22  screen Debtor's Exhibit C, which I believe was Mr. Norris's

23  declaration?  And if we could go to Page 12 of 26.  Oh, all

24  right.

25  BY MR. MORRIS:

Case 19-34054-sgj11 Doc 1822-2 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 41 of
Case 3:21-cv-00538-N   Document 26-12   Filed 06/09/21   Page 73 of 114   PageID 5750

Norris - Cross                              40

1    Q   And, again, Mr. Norris, as we did in the deposition

2    yesterday, I'll remind you of the difficulty of doing a

3    virtual examination.  And if at any time I ask you a question

4    about your declaration that prompts you to think you need to

5    see another portion of the declaration, will you let me know

6    that?

7    A   Yes, I will.

8    Q   Okay.  Because I'm not here to test your memory.  I'm just

9    here to ask you certain questions.  So please let me know if

10   you need to see something that's not on the screen itself.

11       You didn't write any portion of this declaration; is that

12   right?

13   A   I did not.

14   Q   And you didn't provide any substantive comments to the

15   declaration as drafted because you agreed with -- with the

16   declaration as written by others; is that fair?

17   A   Correct.

18   Q   And all of the key information in your declaration was

19   supplied by NexPoint's management; isn't that right?

20   A   Correct.

21   Q   The individuals who provided the information that's in

22   your declaration include D.C. Sauter, Jason Post, Mr. Dondero,

23   and outside counsel at K&L Gates; is that right?

24   A   Correct.

25   Q   And Mr. Sauter is in-house counsel at the Advisors; is

Norris - Cross                                41

1   that right?

2   A    That is right.

3   Q    And Mr. Post is the chief compliance officer at NexPoint;

4   is that right?

5   A    That's correct.

6   Q    The whole idea for this motion initiated with Mr. Dondero;

7   isn't that right?

8   A    The concern, yes, the concern originated, and his concern

9   was voiced to our legal and compliance team.

10  Q    Okay.

11          MR. MORRIS:  Can we take the declaration down for --

12  oh, actually, no, I'm sorry, leave it there, and let's talk

13  about Exhibit B.  Now we can all see it.  If you can scroll

14  down to Exhibit B, please.  Okay.

15  BY MR. MORRIS:

16  Q    This page is attached to your declaration, right?

17  A    That's correct.

18  Q    And this page is intended to show the percentage of

19  preferred shares owned by each of the Movant Funds and the 15

20  different CLOs, right?

21  A    That's right.

22  Q    And the Debtor is the portfolio manager for each of these

23  CLOs; is that right?

24  A    Yes.

25  Q    And it's your understanding that the Debtor's management

Case 19-34054-sgj11 Doc 1822-2 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 43 of
Case 3:21-cv-00538-N   Document 26-12   Filed 06/09/21    Page 75 of 114   PageID 5752

Norris - Cross                           42

1  of the CLOs on this page is governed by written agreements

2  between the Debtor and each of the CLOs, right?

3  A    Yes.

4  Q    None of the Movants are parties to the agreements between

5  the Debtor and each of the CLOs pursuant to which the Debtor

6  serves as portfolio manager; is that correct?

7  A    I believe that is correct.  One, I think, important --

8  even though they're not subject to the agreement, they are the

9  -- they have the economic ownership of each of these CLOs.

10 Q    But they're not party to the agreement; is that right?

11 A    Not that I'm aware of.

12 Q    Okay.  And in preparing for this motion and preparing for

13 your testimony, you didn't personally review any of the

14 agreements between the Debtor and any of the CLOs listed on

15 this page, right?

16 A    No.  I relied on legal counsel for that review.

17 Q    Okay.  And, but even though you didn't review the

18 agreements, it's your understanding that among the

19 responsibilities that the Debtor has as the portfolio manager

20 is buying and selling assets on behalf of the CLOs; is that

21 right?

22 A    Yes.  And I believe I specifically stated in my statement,

23 if you want to turn to it, what I (audio gap) to regarding the

24 CLOs' duties under the agreements.

25 Q    Okay.  It's your understanding, in fact, that nobody other

003000

Case 19-34054-sgj11 Doc 1822-2 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 44 of
Case 3:21-cv-00538-N   Document 26-12   Filed 06/09/21    Page 76 of 114   PageID 5753

Norris - Cross                                    43

1    than the Debtor has the right or the authority to buy and sell

2    assets on behalf of the CLOs listed on Exhibit B, correct?

3    A    That's my understanding.

4    Q    Okay.  And it's also your understanding, your specific

5    understanding, that holders of preferred shares do not make

6    investment decisions on behalf of the CLO; is that right?

7    A    Correct.

8    Q    And that's something that the Advisors knew when they

9    decided to invest in the CLOs on behalf of the Movant Funds;

10   is that fair?

11   A    That's right.  And at that time, the knowledge in the

12   purchase was with Highland Capital Management, LP and the

13   portfolio management team at that time.

14   Q    And it's still with Highland Capital Management, LP; isn't

15   that right?

16   A    That's correct.  I'm not sure that the portfolio

17   management team looks the same, but it was HCMLP.

18   Q    Okay.  Let's just look at this document for a second.  The

19   first column has the list of the CLOs in which the Movant

20   Funds have invested; is that right?

21   A    Correct.

22   Q    And the second column, HIF, that stands for Highland

23   Income Fund; is that right?

24   A    Yes, sir.

25   Q    And Highland Income Fund is one of the Funds who are the

1    Movants here, right?

2    A    That is correct.

3    Q    And the percentages below that show the percentage of the

4    preference shares of each of the CLOs that that particular

5    fund holds; is that right?

6    A    That's right.

7    Q    And then the third column relates to NexPoint Strategic

8    Opportunities Fund, one of the Movants here; is that right?

9    A    That's correct.

10   Q    And the next column, the fourth column, relates to

11   NexPoint Capital, Inc.'s holding of preference shares in the

12   15 CLOs, right?

13   A    That's right.

14   Q    So, NexPoint Capital doesn't hold any preference shares in

15   any of the CLOs except for a less-than-one-percent interest in

16   Grayson; am I reading that correctly?

17   A    Yes, that's correct.

18   Q    Okay.  And then the last column is intended to show the

19   aggregate portion or percentage of preference shares that the

20   three moving Funds have in each of the 15 CLOs; is that right?

21   A    Yes, that's right.

22   Q    Okay.  Am I reading this correctly that, for 12 of the 15

23   Funds, the moving Funds own less than a majority of the

24   outstanding preferred shares?

25   A    Yes, that's correct.

Norris - Cross                         45

1  Q    And is it also -- am I also reading this correctly to

2  conclude that the moving Funds owned less than 70 percent of

3  every one of these CLOs; is that right?

4  A    That's correct.

5  Q    You don't know who owns the preferred shares in the CLOs

6  that are not owned by the Movant Funds, do you?

7  A    I don't know any -- any specific owners.

8  Q    And some of these CLOs still have notes that are

9  outstanding; is that right?

10 A    Yes.  Very small amounts as a percentage of the overall

11 CLO original capital structure, but yes, some still have small

12 --

13 Q    So, --

14 A    -- notes.  Small amounts of notes.

15 Q    Okay.  I'm sorry to interrupt.  If we looked at Exhibit A,

16 if we took the time to look at Exhibit A, Exhibit A would

17 show, for each of the 15 CLOs, which of those CLOs still had

18 notes outstanding and the amount of out -- the dollar value of

19 those notes.  Is that right?

20 A    That's correct.

21 Q    Okay.  And your understanding is that -- your

22 understanding -- withdrawn.  The payment -- the distributions

23 from the CLOs are made pursuant to a waterfall; is that right?

24 A    Yes, that's correct.

25 Q    And your understanding of the waterfall process is that

Case 19-34054-sgj11 Doc 1822-2 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 47 of
Case 3:21-cv-00538-N   Document 26-12   Filed 06/09/21   Page 79 of 114   PageID 5756

Norris - Cross                           46

1    the notes that are still outstanding at any CLO must be paid

2    -- must be paid in full before the preferred shares receive

3    any recovery; is that right?

4    A    So, I would say that my understanding is slightly

5    different.  It's going to be dependent on each indenture.

6    But, in general, interest payments are made to the debt

7    holders, and anything extra is then allocated to the equity.

8    But ultimate recovery, to your point, would be once those --

9    once the debt is paid off.  And that's the critical thing

10   here, where the preference shares here now with most of these

11   CLOs almost all the way wound down, with the exception of a

12   small piece of debt.  The equity owns the lion's share of the

13   economic interest of every one of these CLOs.  And I think

14   that's important.

15   Q    Okay.  Some of the CLOs still have outstanding notes.  Is

16   that right?

17   A    Yes.  As we discussed on -- Exhibit A will have the notes

18   that are -- that are remaining on those.

19   Q    And you don't know who holds the notes in the other CLOs,

20   right?

21   A    I don't.

22   Q    The only holders of preferred shares that are pursuing

23   this motion are the three Funds managed by the Advisors,

24   right?

25   A    In this motion, yes.

003004

Case 19-34054-sgj11 Doc 1822-2 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 48 of
Case 3:21-cv-00538-N Document 26-12 Filed 06/09/21 Page 80 of 114 PageID 5757

Norris - Cross                                    47

1    Q    You're not aware of any holder of preferred shares

2    pursuing this motion other than the three Funds managed by the

3    Advisors, correct?

4    A    No, I'm not aware of any others.

5    Q    You didn't personally inform any holder of preferred

6    shares, other than the Funds that are the Movants, that this

7    motion would be filed, did you?

8    A    No, I did not.

9    Q    You're not aware of any steps taken by either of the

10   Advisors to provide notice to holders of preferred shares that

11   this motion was going to be filed, are you?

12   A    I'm not, no.

13   Q    And you're not aware of any attempt that was made to

14   obtain the consent of all of the holders of the preferred

15   shares to seek the relief sought in this motion, correct?

16   A    That's correct.

17   Q    You don't have any personal knowledge, personal knowledge,

18   as to whether any holder of preferred shares other than the

19   Funds managed by the Advisors wants the relief sought in the

20   motion, correct?

21   A    Correct.

22   Q    You don't have any personal knowledge as to whether any of

23   the CLOs that are subject to the contracts that you described

24   want the relief that's being requested in this motion, right?

25   A    That's correct.  I have not spoken or been involved at all

003005

Norris - Cross                    48

1    directly with the CLOs.  I'm representing the Funds.

2    Q    Okay.  Now, two of the Funds, two of the three Movant

3    Funds, I believe you testified are publicly traded; is that

4    right?

5    A    That's correct.

6    Q    And that's the Highland Income Fund and the NexPoint

7    Strategic Opportunities Fund; is that right?

8    A    That's right.  That's right.

9    Q    And because they are publicly-traded, the shareholders in

10   those two funds can sell their shares any time the market is

11   open; is that right?

12   A    If they're willing to take the price that the market is

13   willing to give, yes.

14   Q    Yes.

15   A    Between market hours.

16   Q    And if they -- if they don't like the way the assets that

17   are -- that the Funds have been invested, one of the things

18   they could do is simply sell their shares, right?

19   A    Yes.

20   Q    And the third fund, the shareholders in the third fund

21   have the right to sell out not on a public market but on a

22   quarterly basis; is that right?

23   A    Correct.

24   Q    That third Movant Fund is NexPoint Capital; do I have that

25   right?

Norris - Cross                          49

1   A   Correct.

2   Q   So they also have the ability to exit if they don't like

3   management on a quarterly basis; is that right?

4   A   Correct.

5   Q   All right.  Can we turn to Paragraph -- Paragraphs 8 and 9

6   of your declaration?  Okay.  Paragraph 8 describes a

7   transaction that's been referred to as OmniMax; is that right?

8   A   Yes.

9   Q   And Paragraph 9 refers to a transaction involving SSP

10  Holdings, LLC; do I have that right?

11  A   That's correct.

12  Q   Do you know what SSP stands for?

13  A   See if we say it in there.  SSP Holdings, LLC.

14  Q   Right.  Do you know what SSP stands for?

15  A   I don't.  Something Steel Products.  I --

16  Q   Okay.  You don't need to guess.  These are the only two

17  transactions that the Movants question; is that right?

18  A   These transactions, as well as certain transactions around

19  Thanksgiving time.

20  Q   Okay.  We'll talk about those.  But those transactions

21  about -- around Thanksgiving time aren't in your declaration,

22  are they?

23  A   Not specifically mentioned by name.

24  Q   Okay.  Let's talk about the two that are mentioned by

25  name, Trussway and SSP.  The Movants do not contend that

003007

Norris - Cross                                50

1   either transaction was the product of fraudulent conduct, do

2   they?

3   A    No.

4   Q    The Movants do not contend that the Debtor breached any

5   agreement by effectuating these transactions, do they?

6   A    I don't believe so.

7   Q    In fact, the Movants do not contend that the Debtor

8   violated any agreement at any time in the management of the

9   CLOs listed on Exhibit B; is that right?

10  A    That's right.

11  Q    The Movants don't even question the Debtor's business

12  judgment, only the results of the trans -- of these two

13  transactions.  Is that right?

14  A    That's right.  And results is the key here and the

15  approach.

16  Q    I see.  And the reason the Movants do not question the

17  Debtor's business judgment is because you don't know what

18  factor or factors the Debtor considered in executing these

19  transactions, right?

20  A    That's right.  I can't look into the mind or know the

21  business judgment and the inputs that went into this.  We do

22  know the outcomes.  And to us, that's troubling, right, as the

23  owners of the lion's share or the majority or even significant

24  amounts of the economic ownership of the CLOs.  And having

25  insight into those transactions, as mentioned in my statement,

Norris - Cross                                    51

1  really just trying to maximize recoveries for our Funds.

2              MR. MORRIS:  Your Honor, I move to strike the portion

3  of his answer following that which was responsive to the

4  question.

5              THE COURT:  All right.  I grant that motion.

6              MR. MORRIS:  Okay.

7  BY MR. MORRIS:

8  Q   Sir, you never asked the Debtor what factors it considered

9  in making these trades, right?

10 A   I did not.

11 Q   And you have no reason to believe that anyone on behalf of

12 the Movants ever asked the Debtor why it executed these

13 trades, right?

14 A   I don't have any knowledge.  There could have been

15 somebody from -- from the Movants.  But I did not.

16 Q   Okay.  On OmniMax, the Movants disagree with the price at

17 which the Debtor effectuated the trade, right?

18 A   Correct.

19 Q   And I believe there was a meeting of the boards of the

20 Funds back in August at which Mr. Seery appeared.  Do I have

21 that right?

22 A   I believe it was August, but he did appear.

23 Q   And the purpose of the appearance was so that Mr. Seery

24 could give an update on the bankruptcy; is that right?

25 A   That's correct, and on the services provided by Highland

Case 19-34054-sgj11 Doc 1822-2 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 53 of
Case 3:21-cv-00538-N Document 26-12 Filed 06/09/21 Page 85 of 114 PageID 5762

Norris - Cross                                    52

1  Capital Management, LP to our Advisor.  Advisors.  They

2  provide various shared services.

3  Q    And it was during that meeting that Mr. Seery forthrightly

4  told the boards the price at which he was planning to execute

5  the OmniMax transaction, correct?

6  A    Correct.

7  Q    The transaction hadn't yet occurred, right?

8  A    I'm not sure if it had been finalized.  He had a price,

9  and these -- these things are negotiated.  This was, I

10 believe, a company in restructuring.  So I don't know whether

11 it had been transacted or not.

12 Q    Okay.  The board didn't ask Mr. Seery not to execute the

13 transaction, did it?

14 A    Not to my knowledge.  The board wouldn't -- I don't think

15 the board would have that authority, either.

16 Q    Okay.  But it's here asking the Court to cause the Debtor

17 to pause in the execution of any trades in the CLOs; is that

18 right?

19 A    I think the order speaks in that regard.

20 Q    Yeah.  Okay.  Let's talk about the SSP transaction for a

21 moment.  It's your understanding that Trussway Holdings, LLC

22 owned a majority interest in SSP Holdings, LLC, right?  That's

23 in Paragraph 9.

24 A    Yes.  The statement in Paragraph 9 is what I believe is

25 correct.

003010

Case 19-34054-sgj11 Doc 1822-2 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 54 of
Case 3:21-cv-00538-N   Document 26-12   Filed 06/09/21    Page 86 of 114   PageID 5763

Norris - Cross                                      53

1    Q    Okay.  And it's also your understanding that Trussway is a

2    wholly-owned subsi... I'm sorry, that SSP Holdings is a

3    wholly-owned subsidiary -- withdrawn.  It's also your

4    understanding that Trussway is a wholly-owned subsidiary of

5    the Debtor, right?

6    A    Yes.

7    Q    But Trussway is not a debtor in bankruptcy, right?

8    A    I'm not sure.

9    Q    Okay.  You have no reason to believe that; is that fair?

10   A    That it's not a debtor in bankruptcy?  That Trussway is

11   not in bankruptcy itself?

12   Q    Correct.

13   A    Yeah.  I have no knowledge of Trussway's situation.

14   Q    Okay.  But you -- but according to your declaration that

15   was prepared by the Advisors' management team, Trussway and

16   not the Debtor owned SSP Holdings, LLC.  Is that right?

17   A    I'm looking here at the statement just to make sure.

18   Q    Sure.

19        (Pause.)

20   A    I -- again, I -- the statement is correct, and I believe

21   speaks for itself regarding entity ownership.

22   Q    The only things you know about the SSP transaction are,

23   one, that you believe it was made without a formal bidding

24   process; and two, that it resulted in a $10 million loss.  Is

25   that right?

Case 19-34054-sgj11 Doc 1822-2 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 55 of
Case 3:21-cv-00538-N   Document 26-12   Filed 06/09/21    Page 87 of 114   PageID 5764

Norris - Cross                                54

1   A    Correct.

2   Q    Okay.  But, again, neither you, or to the best of your

3   knowledge, anybody at Advisors, ever spoke with anybody at the

4   Debtor about the circumstances concerning either of the

5   transactions, right?

6   A    I don't know the conversations that were had at anyone

7   else from our Advisors, but this is the knowledge that -- that

8   I have.

9   Q    Okay.  And it's the only knowledge you have, right?  You

10  don't know anything about the SSP transaction other than those

11  two facts, right?

12  A    Correct.

13  Q    In fact, I think you testified yesterday that you've been

14  very remote from the SSP transaction, right?

15  A    That's correct.

16  Q    And that it's not a transaction that you have much

17  knowledge on.  Fair?

18  A    Fair.

19  Q    Let's just talk briefly about the transactions that

20  occurred (garbled) Thanksgiving.  They're not specifically

21  referred to in your declaration; is that right?

22  A    That's correct.

23  Q    And you have no knowledge about any transaction that Mr.

24  Seery wanted to execute around Thanksgiving; is that right?

25  A    I know there were transactions and there were concerns

1    from our management team, but I'm not aware of what the

2    transactions were.

3    Q    In fact, you can't even identify the assets that Mr. Seery

4    wanted to sell around Thanksgiving, or at least you couldn't

5    at the time of your deposition yesterday.  Is that right?

6    A    That's correct.

7    Q    And you have no knowledge as to why Mr. Seery wanted to

8    make those particular trades at around Thanksgiving?

9    A    No, I don't.

10   Q    And in fact, you don't even know if the transactions that

11   Mr. Seery wanted to close around Thanksgiving ever in fact

12   closed.  Is that fair?

13   A    Correct.

14   Q    Okay.  Let's just -- let's just finish up with a few

15   questions about the boards.

16          MR. MORRIS:  Ms. Cantey, can we put up Debtor's

17   Exhibit EEEE?  Four E's, Your Honor.  Thank you.

18   BY MR. MORRIS:

19   Q    This particular page identifies the directors for each of

20   the three Movant Funds; is that right?

21   A    Let me take a look and confirm.  (Pause.)  Yes.  That

22   looks correct.

23   Q    Okay.  And this was prepared by the Movants; is that

24   right?

25   A    I'm not sure who prepared it.

Norris - Cross                              56

1   Q    Okay.  To the best of your knowledge, does this document

2   accurately reflect the composition of the boards of each of

3   the three Movant Funds?

4   A    Yes, it does.

5   Q    Okay.  John Honis, I think you mentioned him earlier.

6   He's on all three boards.  Is that right?

7   A    That's correct.  And the reason being we have a unitary

8   board structure, so -- which is very common in '40 Act Fund

9   land, where the board sits, for efficiency purposes, on

10  multiple fund boards, and there's a lot of economies of scale

11  from an operating standpoint.  So, yes, they sit on multiple

12  boards.

13  Q    Okay.  And for purposes of the '40 Act, Mr. Honis has been

14  deemed to be an interested trustee.  Is that right?

15  A    That's correct.

16  Q    Okay.  But you don't specifically know what facts caused

17  that designation; you only know that the designation exists.

18  Right?

19  A    That's right.  And I know they are disclosed in the proxy

20  -- or, in the -- the relative filings related to those Funds.

21  Q    Okay.  Three other people are common to all three of the

22  Movant Funds.  I think you've got Dr. Froehlich, Ethan Powell,

23  --

24  A    Froehlich.

25  Q    Froehlich.  Ethan Powell and Bryan Ward.  Right?

003014

Norris - Cross                                    57

1   A    That is correct.

2   Q    Okay.  All three of those individuals actually serve on

3   the 11 or 12 boards that you mentioned earlier that are

4   managed by the Advisors, right?

5   A    Yes, that is correct.

6   Q    And they're the same Funds for which you serve as an

7   executive vice president, right?

8   A    Yes.  That's correct.

9   Q    So, for all of the Funds that are managed by the Advisors,

10  you serve as executive vice president and all four of these

11  directors -- trustees serve as trustees on the boards, right?

12  A    Yes, that's correct.

13  Q    Okay.  In exchange for serving on all of these boards, the

14  three individuals -- Dr. Froehlich, Mr. Ward, and Mr. Powell

15  -- each receive $150,000 a year for services across the

16  Highland complex; is that right?

17  A    That's correct.

18  Q    Dr. Froehlich has been serving as a board member across

19  the Highland complex for seven or eight years now; is that

20  right?

21  A    That's correct.

22  Q    Mr. --

23  A    I believe it's about seven or eight years.

24  Q    And Mr. Powell, he actually was employed by Highland or

25  related entities from about 2007 or 2008 until 2015, right?

Norris - Cross                          58

1   A    That's correct.

2   Q    And Mr. Ward, the third of the independent trustees, he's

3   been serving as a board member on various Highland-related

4   funds on a continuous basis since about 2004.  Do I have that

5   right?

6   A    Yeah, I believe that's correct.

7   Q    Okay.  Just a couple of final questions.  You would agree,

8   would you not, sir, that portfolio managers have an obligation

9   to effectuate transactions concerning the assets that they

10  manage based on their business judgment?

11  A    Yes.  And in accordance with whatever governing documents

12  govern the fund structure.

13  Q    And you would personally expect a portfolio manager to

14  execute a transaction that he or she reasonably believes in

15  good faith and in their business judgment would maximize value

16  for the CLO, even if the CLO did not need cash at that

17  particular time.  Is that right?

18  A    I think it would come down to the governing documents.

19  And I think what you're getting at here is, in this instance,

20  these sales and the intent of the portfolio manager.  And our

21  view, again, is -- and the request for the motion is simply

22  there is a lot at play here.  Several negotiations.  And in

23  order to maximize returns, simply asking for a pause on

24  transactions.

25  Q    All right.  Let me -- let me ask the question again, and I

003016

1    would ask that you please listen carefully to the question.

2    You would expect a portfolio manager would execute a

3    transaction that he or she believes maximizes value, even if

4    the CLO didn't need cash at that particular moment in time.

5    Correct?

6    A    Yeah.  As long as that is maximizing value for the

7    stakeholders, and in the instance of a CLO, the economic

8    interest is owned by the equity holders.  So, to their

9    benefit, yes, that -- that would be the idea.

10              MR. MORRIS:  Your Honor, I have no further questions.

11              THE COURT:  Any redirect, Mr. Wright?

12              MR. WRIGHT:  Only briefly, Your Honor.

13                        REDIRECT EXAMINATION

14   BY MR. WRIGHT:

15   Q    Mr. Norris, I think you were asked at one point about how

16   long you'd been working for Highland Capital Management, which

17   there's -- there's Highland Capital Management Fund Advisors

18   and then there's Highland Capital Management, LP, Debtor.  And

19   I wanted to give you an opportunity to just explain when and

20   what years you worked for HCMLP and then when and what years

21   you worked for NexPoint Advisors or Highland Capital

22   Management Fund Advisors.

23   A    Yes.  From June 2010, I was employed by Highland Capital

24   Management, LP, until July or August of 2012, at which time I

25   was then hired by Highland Capital Management Fund Advisors,

1    not HCML -- no longer employed by HCMLP, and have worked since

2    that time for HCMFA and NexPoint Advisors and not for the

3    Debtor, HCMLP.

4    Q   Okay.  So -- and I'm sorry if I missed a year, but it's

5    been about ten years since you had worked for HCMLP or been an

6    employee of HCMLP, correct?

7    A   Yeah.  It's been over eight years since I have left

8    employment by HCMLP.  Ten and a half years ago, I started

9    working for HCMLP, and then two years after that transitioned

10   away and started working for the Advisors that are part of

11   this motion.

12   Q   Thank you for clarifying.

13         MR. WRIGHT:  Your Honor, I hope -- you directed us to

14   have a witness here today, and so we do.  And I know that you

15   had asked me at the last hearing some questions about the

16   involvement of people at HCMLP, which I tried to address with

17   Mr. Norris in my direct.  But I, you know, I do want to make

18   sure that we've answered any questions that you have.

19         THE COURT:  All right.  Yes, that's fine.  Are you

20   -- does that conclude your redirect?

21         MR. WRIGHT:  It does, Your Honor.

22         THE COURT:  Any recross, Mr. Morris, on that

23   redirect?

24         MR. MORRIS:  No, thank you, Your Honor.

25         THE COURT:  All right, then.  That concludes the

Case 19-34054-sgj11 Doc 1822-2 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 62 of
Case 3:21-cv-00538-N   Document 26-12   Filed 06/09/21   Page 94 of 114   PageID 5771

61

1    testimony of Mr. Norris.

2         Any other evidence, Mr. Wright?

3              MR. WRIGHT:  I do not, Your Honor, although I guess I

4    would offer the Exhibit A and Exhibit B to Mr. Norris's

5    declaration --

6              THE COURT:  Any objection to that?

7              MR. WRIGHT:  -- into evidence.

8              MR. MORRIS:  No, Your Honor.

9              THE COURT:  All right.  Those are admitted.

10         (Movants' Exhibits A and B are received into evidence.)

11             THE COURT:  All right.  Well, Mr. Morris, did you

12   want to put on any evidence?

13             MR. MORRIS:  Does the -- do the Movants rest, Your

14   Honor?

15             THE COURT:  I understood that they rest.  Correct,

16   Mr. Wright?

17             MR. WRIGHT:  That's correct, Your Honor.

18             MR. MORRIS:  Your Honor, I would move, effectively,

19   for a directed verdict here.  The Movants have the burden of

20   establishing a *prima facie* case to entitlement to the relief

21   that's been requested, and they have failed to meet that

22   burden.  The Debtor has -- we -- the undisputed facts are the

23   Debtor has the contractual right, and indeed, the obligation,

24   to serve as the portfolio manager of the CLOs pursuant to

25   written agreements.

Case 19-34054-sgj11 Doc 1822-2 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 63 of
Case 3:21-cv-00538-N Document 26-12 Filed 06/09/21 Page 95 of 114 PageID 5772

62

 1     The Movants are not parties to those agreements.  The

 2   testimony is undisputed that there are many holders of

 3   preferred shares and notes that have had no notice of this

 4   proceeding that will undoubtedly be impacted by the tying of

 5   the hands of the portfolio manager.  The chart that was

 6   attached as Exhibit B expressly shows just what a large

 7   portion of interested parties and people who would be affected

 8   by this motion are not -- they didn't get notice.  There was

 9   no attempt to get notice.  There was no attempt to get their

10   consent.  All of that testimony is now in the record, and I

11   think due process alone would prevent the entry or even the

12   consideration of an order of this type.

13     There is nothing improper that's been alleged.  There is

14   no -- there is no allegation of fraud.  There is no allegation

15   of breach of contract of any kind.  There's not even a

16   question of business judgment.  The Movants didn't even do

17   their diligence to ask the Debtor why they made these

18   transactions.  There is nothing in the record that shows that

19   the Debtor, as the portfolio manager of the CLOs, did anything

20   improper.

21     The only thing that the Movants care about is that they

22   don't like the results in two particular trades.  I don't

23   think that that meets their burden of persuasion that the

24   Court should enter an order of this type, and I would like to

25   relieve Mr. Seery of the burden, frankly, and the Court, of

003020

Case 19-34054-sgj11 Doc 1822-2 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 64 of
Case 3:21-cv-00538-N Document 26-12 Filed 06/09/21 Page 96 of 114 PageID 5773

63

1  having to put on testimony to justify transactions that really

2  aren't even being questioned, Your Honor.

3      So the Debtor would respectfully move for the denial of

4  the motion and the relief sought therein.

5          THE COURT: All right. Your request for a directed

6  verdict, something equivalent to a directed verdict here, is

7  granted. I agree that the Movant has wholly failed to meet

8  its burden of proof here today to show the Court, persuade the

9  Court that, as Mr. Morris said, I should essentially tie the

10 hands of the Debtor as a portfolio manager here, as stated.

11 Nothing improper has been alleged. There has been no showing

12 of a statutory right here, or a contractual right here, on the

13 part of the Movants.

14     I am -- I'm utterly dumbfounded, really. I agree with the

15 -- I was going to say innuendo; not really innuendo -- I agree

16 with part of the theme, I think, asserted by the Debtor here

17 today that this is Mr. Dondero, through different entities,

18 through a different motion. I feel like he sidestepped the

19 requirement that I stated last week that if we had a contested

20 hearing on his motion, Dondero's motion, that I was going to

21 require Mr. Dondero to testify. He apparently worked out an

22 eleventh hour agreement with the Debtor on his motion to avoid

23 that. But, again, these so-called CLO Motions very clearly,

24 very clearly, in this Court's view, were pursued at his sole

25 direction here.

003021

64

1    This is almost Rule 11 frivolous to me. You know, we're

2   -- we didn't have a Rule 11 motion filed, and, you know, I

3   guess, frankly, I'm glad that a week before the holidays begin

4   we don't have that, but that's how bad I think it was, Mr.

5   Wright and Mr. Norris. This is a very, very frivolous motion.

6   Again, no statutory basis for it. No contractual basis. You

7   know, you didn't even walk me through the provisions of the

8   contracts. I guess that would have been fruitless. But you

9   haven't even shown something equitable, some lack of

10  reasonable business judgment.

11    Bluntly, don't waste my time with this kind of thing

12  again. You wasted my time. We have 70 people on the video.

13  Utter waste of time.

14    All right. So, motion is denied. Mr. Morris, please

15  upload an order.

16         MR. MORRIS: Thank you, Your Honor.

17         THE COURT: All right. Do we have any other business

18  to accomplish today?

19         MR. POMERANTZ: I don't think so, Your Honor. I know

20  we will see you tomorrow in connection with Mr. Daugherty's

21  relief from stay motion.

22         THE COURT: Well, yeah, we do have that. Okay. We

23  will see you tomorrow. We stand adjourned.

24         MR. CLEMENTE: Thank you, Your Honor.

25         MR. MORRIS: Thank you, Your Honor.

003022

Case 19-34054-sgj11 Doc 1822-2 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 66 of
Case 3:21-cv-00538-N   Document 26-12   Filed 06/09/21   Page 98 of 114   PageID 5775

65

1              THE CLERK:  All rise.

2              (Proceedings concluded at 3:05 p.m.)

3                          --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19                       CERTIFICATE

20     I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
21 above-entitled matter.

22   **/s/ Kathy Rehling**                        **12/17/2020**

23 _____    _____

   Kathy Rehling, CETD-444                      Date
24 Certified Electronic Court Transcriber

25


003023

66

                                    INDEX

1

   PROCEEDINGS                                                    3

2

   WITNESSES

3

   Movants' Witnesses

4

5   Dustin Norris
   - Direct Examination by Mr. Wright                              23
6   - Cross-Examination by Mr. Morris                               35
   - Redirect Examination by Mr. Wright                            59

7

   EXHIBITS

8

   Movants' Exhibits A and B                          Received 61

9

   RULINGS

10

   Debtor's Emergency Motion to Quash Subpoena and for            13
11   Entry of a Protective Order or, in the Alternative,
   for an Adjournment (1564, 1565) - *Agreed Order*

12

   James Dondero's Motion for Entry of an Order Requiring         13
13   Notice and Hearing for Future Estate Transactions
   Occurring Outside the Ordinary Course of Business (1439)
14   - *Continued to 01/04/2021*

15   Motion for Directed Verdict - *Granted*                        63

16   Motion for Order Imposing Temporary Restrictions on           63
   Debtor's Ability, as Portfolio Manager, to Initiate Sales
17   by Non-Debtor CLO Vehicles Highland Capital Management Fund
   Advisors, L.P., Highland Fixed Income Fund, NexPoint
18   Advisors, L.P., NexPoint Capital, Inc., NexPoint Strategic
   Opportunities Fund (1528) - *Denied*

19

   END OF PROCEEDINGS                                             65

20

   INDEX                                                         66

21

22

23

24

25

003024

# EXHIBIT C

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed December 18, 2020**

**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| Debtor. | ) | |

**ORDER DENYING MOTION**
**FOR ORDER IMPOSING TEMPORARY RESTRICTIONS ON DEBTOR'S ABILITY,**
**AS PORTFOLIO MANAGER, TO INITIATE SALES BY NON-DEBTOR CLO VEHICLES**

This matter having come before the Court on the *Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles* [Dkt. No. 1528] (the "CLO Motion"),[2] filed by Highland Capital Management Fund Advisors, L.P. ("HCMFA"), and NexPoint Advisors, L.P. ("NexPoint, and together with

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms not otherwise defined in this Order shall have the meaning ascribed to them in the CLO Motion.

HCMFA, the "Advisors"), Highland Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint Capital, Inc. (together, the "Funds," and collectively, with the Advisors, the "Movants"); and this Court having considered (a) the CLO Motion and evidence submitted in support thereof, (b) the *Debtor's Response to Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles* [Dkt. No. 1578] (the "Opposition"), filed by Highland Capital Management, L.P. (the "Debtor"), and the evidence submitted in support thereof, (c) the oral and documentary evidence admitted into evidence during the hearing held on December 16, 2020 (the "Hearing"), and (d) the arguments made during the Hearing,

It is hereby **ORDERED** that:

1.      The CLO Motion is **DENIED** in its entirety.

2.      The Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

<div align="center">###End of Order###</div>

DOCS_NY:41773.1 36027/002

003027

# EXHIBIT D

003028

**From:** James Romey [mailto:jromey@DSIConsulting.com]
**Sent:** Tuesday, September 29, 2020 10:46 PM
**To:** Clemente, Matthew A.; Twomey, Dennis M.; Russell, Alyssa; Bromagen, Elliot A.; Samuel Star; Conor P. Tully; O'Brien, Dan; Cheng, Earnestiena; Brunner, Ellory
**Cc:** Bradley Sharp; Fred Caruso; Jack Donohue; Jeff Pomerantz; Ira Kharasch; Gregory V. Demo; James Seery
**Subject:** RE: Notice to the Committee: Pending Asset Sale, Pre-Authorization Requested

Matt, Sam, and Sidley/FTI,

The HCM team continues to work through the SSP transaction and issues related to the flow of funds. Accordingly, a revised deck for the UCC is attached which includes an updated waterfall analysis.

At issue, as noted on the updated waterfall (and detailed on page 8 of the PDF), is a Restricted Distribution provision related to section 5.3 of the 4th Amended and Restated Credit and Guarantee Agreement for loans at Trussway Industries, LLC where Trussway Holdings, LLC is the Guarantor and subject to the agreement. This restriction limits the amount of money Trussway Holdings can distribute to a bucket of $5 million in the aggregate based on certain types of distributions. HCM believes that $2.3 million of that bucket remains eligible for distribution as illustrated in the updated waterfall.

The SSP sale process and issues related to the flow of funds will be covered by Jim Seery on tomorrow's call with the UCC.


**James E. Romey**
Development Specialists, Inc.
110 East 42nd Street
Suite 1818
New York City, NY 10017
Tel: (212) 425-4141 Ext. 1174
www.dsiconsulting.com

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

**From:** James Romey
**Sent:** Thursday, September 24, 2020 2:54 PM
**To:** Clemente, Matthew A. <mclemente@sidley.com>; Twomey, Dennis M. <dtwomey@sidley.com>; Russell, Alyssa <alyssa.russell@sidley.com>; Bromagen, Elliot A. <ebromagen@sidley.com>; Star, Samuel <Samuel.Star@FTIConsulting.com>; Tully, Conor <Conor.Tully@FTIConsulting.com>; O'Brien, Dan <Daniel.H.O'Brien@fticonsulting.com>; Cheng, Earnestiena <Earnestiena.Cheng@fticonsulting.com>; Brunner, Ellory <Ellory.Brunner@fticonsulting.com>
**Cc:** Bradley Sharp <bsharp@DSIConsulting.com>; Fred Caruso <fcaruso@DSIConsulting.com>; Jack Donohue <JDonohue@DSIConsulting.com>; Jeffrey N. Pomerantz - Pachulski Stang Ziehl & Jones (jpomerantz@pszjlaw.com) <jpomerantz@pszjlaw.com>; Ira D. Kharasch (ikharasch@pszjlaw.com) <ikharasch@pszjlaw.com>; Gregory V. Demo <GDemo@pszjlaw.com>; James Seery <jpseeryjr@gmail.com>
**Subject:** Notice to the Committee: Pending Asset Sale, Pre-Authorization Requested

**CONFIDENTIAL - NOTICE OF PENDING ASSET SALE**

Matt, Sam, and Sidley/FTI,

1

003029

We are providing you with Notice of a potential Transaction as required by the Protocols, Section (II)(B)(3)(a). The Transaction will be with an independent third-party, but we anticipate that it will be in excess of $2,000,000. The Independent Board of HCMLP is requesting immediate pre-authorization from the UCC to complete the transaction at a final negotiated price that will be approved of by the Independent Board in the interest of all stakeholders. We believe any delay in the sale process could impact value. As such, this emails serves as the required **three business day advance notice of the potential Transaction**. Jim Seery and the HCM team can make themselves available for a call to discuss the transaction if requested.

1. Assets:        All debt, equity and other interest in SSPI Holdings, Inc. (DE)
2. Seller:        Trussway Holdings, LLC
3. Price:        Final price is TBD, and requires Independent Board approval.  Terms are currently being negotiated.
   The company received a Letter of Intent indicating a transaction for $50MM. **To the extent agreed, the negotiations require immediate agreement by HCMLP**.
4. Structure:        Stock sale
5. Purchaser:        Race Rock Group (or an Affiliate)
6. Timing:        Immediate.  However, closing of the sale and receipt of proceeds not expected until late October or early November.

The sale of this asset is a critical component for the execution of any confirmed plan. We ask that you review the attached deck that includes a brief background information on the company, a summary of the extensive sale process, and a potential waterfall of proceeds. Also included are copies of the Dugaboy note at Trussway Holdings, LLC (and its amended and restated note) that are under review.

The attached deck is shared on a Confidential basis. Please let us know at your earliest convenience.

**James E. Romey**
Development Specialists, Inc.
110 East 42nd Street
Suite 1818
New York City, NY 10017
Tel: (212) 425-4141 Ext. 1174
www.dsiconsulting.com

This e-mail message may contain legally privileged and/or confidential information.  If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited.  If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

003030

# EXHIBIT E

003031

Case 19-34054-sgj11 Doc 1822-5 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 2 of 9
CONFIDENTIAL. INSTITUTIONAL USE ONLY. NOT FOR PUBLIC DISTRIBUTION.

# HIGHLY CONFIDENTIAL

# STRUCTURAL AND STEEL PRODUCTS

# SITUATION OVERVIEW

# IMMEDIATE ATTENTION

## SEPTEMBER 29, 2020

**HIGHLAND CAPITAL**
**MANAGEMENT**

003032

EXPERIENCED. DISCIPLINED. BOLD.

DRAFT – HIGHLY CONFIDENTIAL

DRAFT – STRICTLY CONFIDENTIAL

# SSP OVERVIEW

- Structural and Steel Products ("SSP") is a manufacturer/distributor of highway products based in Texas

- Product offerings include distributed products (guardrails, crash cushions) and manufactured product (overhead sign structures, lighting/cell/utility poles, rail)

- Principal equity holders:

  - Highland Select Equity Fund, L.P. (via Trussway Holdings, LLC [1]): 76.6%
  - Patriot Capital: 12.1%
  - SSP Management Members: 6.6%
  - Non-Management Members: 4.7%

Note: [1] Trussway Holdings, LLC equity is 90% owned by Highland Select Equity Fund, L.P.
  - See **Exhibit A** for organizational chart
  - See **Exhibit B** for capital structure

CONFIDENTIAL. INSTITUTIONAL USE ONLY. NOT FOR PUBLIC DISTRIBUTION.

003033

1

DRAFT – HIGHLY CONFIDENTIAL

## SSP SALE PROCESS OVERVIEW

- In the last ~12 months, SSP received indications of interest ranging from $45-$50MM from several different interested parties:

  - September 2019 – Arcosa: $45.0 - $50.0MM (for manufacturing business only)
  - November 2019 & January 2020 – VP of Guardrail: $7.5 - $10.0MM (for guardrail business only)
  - January 2020 – Merit Capital Partners (former Sponsor): $38.5MM (for entire business)
  - February 2020 – Millerbernd provided a verbal indication of $30.0 - $32.0 (for the manufacturing business only)
  - May 2020 – Race Rock Group ("RRG"): $45.0 - $50.0MM (for entire business)
  - July 2020 – DWM Holdings: $50MM (for entire business)

- In addition to the IOIs received from the parties above, NDAs were executed, and confidential information shared with Sabre and Valmont. Both parties passed on the potential transaction with SSP, and, ultimately, they determined it was cheaper to build capacity than to buy SSP.

- In August of 2020, SSP went exclusive with RRG and executed an LOI at $50MM; due diligence is underway and on-going with most of the due diligence completed, environmental and ERISA reviews remain outstanding.

| ($MM) | EBITDA | $50 LOI |
|---|---|---|
| LTM | $ 9.0 | 5.6x |
| 2020E | $ 8.2 | 6.1x |
| 3-Year Avg. | $ 6.9 | 7.2x |

CONFIDENTIAL. INSTITUTIONAL USE ONLY. NOT FOR PUBLIC DISTRIBUTION.

003034

2



HIGHLY CONFIDENTIAL

## SSP SALE PROCESS OVERVIEW – RACE ROCK GROUP

- SSP is in the process of negotiating a definitive agreement with Race Rock Group ("RRG") to sell the business for $50MM

  - RRG is a Houston-based private investment firm focused on making control, growth-oriented investments in lower middle-market businesses throughout the US Gulf Coast and Mid America regions

- It's estimated that the transaction proceeds will generate approximately $6.5MM for HCMLP

  - ~$2.0MM for the Select Fund's net interests

  - Trussway Holdings, LLC proceeds will repay the ~$1.2MM HCMLP loans

  - SSP will payoff the ~$2.7MM subordinated loan to HCMLP with the sales proceeds

  - HCMLP will receive ~$0.5MM in management fees from SSP per the terms of a 2019 management services agreement

  - See **Exhibit C** for the complete waterfall of sale proceeds

- It's estimated that the transaction proceeds will also generate ~$8.4MM, net for Trussway Holdings, LLC

- Trussway Holdings, LLC  appears to currently owe ~$2.5MM to Dugaboy via a loan. This is under review, and the amount may be reserved for. The amended and restated note had a principal amount of $2.09MM as of Feb. 2019 and matures on Nov. 1, 2021. ~$370k of PIK interest has accrued since Feb 2019.

- A simultaneous signing and closing is anticipated to occur in late Oct. or early Nov. subject to completion of due diligence by RRG.

- ==The Debtor believes a potential sale of SSP maximizes value for all stakeholders and any delay in the sale process could impact value. The Debtor is seeking immediate pre-approval from the UCC to proceed with a potential transaction.==

CONFIDENTIAL. INSTITUTIONAL USE ONLY. NOT FOR PUBLIC DISTRIBUTION.

3

003035

**EXHIBIT A - EXISTING ORGANIZATIONAL STRUCTURE**

DRAFT - HIGHLY CONFIDENTIAL



003036

CONFIDENTIAL. INSTITUTIONAL USE ONLY. NOT FOR PUBLIC DISTRIBUTION.



Case 19-34054-sgj11 Doc 1822-5 Filed 01/22/21   Entered 01/22/21 21:50:07 Page 70 of 72

DRAFT — HIGHLY CONFIDENTIAL

**EXHIBIT B - SSP CAPITAL STRUCTURE**

- No current HCMLP employees have SSP Ownership
  - Note: Jason Jelen and John Walker are current NexBank Securities, Inc. employees

| Member | Capital Contribution | Class A Units | Class B Units | Class P Units | Sharing Ratio |
|---|---|---|---|---|---|
| Trussway Holdings LLC | $19,058,098.18 | 19,058,098.18 | - | - | 76.6% |
| Patriot Capital III SBIC, L.P. | $3,000,000 | - | 3,000,000 | - | 12.1% |
| Matt Brace | $0 | - | 0 | 1,015,050 | 4.1% |
| Christine Klote | $375,000 | - | 375,000 | - | 1.5% |
| Joseph Troop | $300,000 | - | 300,000 | - | 1.2% |
| Chuck Steier | $0 | - | 0 | 253,763 | 1.0% |
| 2911 Capital Fund LP | $200,000 | - | 200,000 | - | 0.8% |
| 118 Capital Fund Inc. | $200,000 | - | 200,000 | - | 0.8% |
| Matthew Jameson* | $100,000 | - | 100,000 | - | 0.4% |
| Lee Blackwell Parker III* | $100,000 | - | 100,000 | - | 0.4% |
| 1610 Foundation Inc. | $100,000 | - | 100,000 | - | 0.4% |
| Teri Robertson | $60,000 | - | 60,000 | - | 0.2% |
| William Carl Moore, Jr.* | $40,000 | - | 40,000 | - | 0.2% |
| Jason Jelen | $30,000 | - | 30,000 | - | 0.1% |
| Richard Thomas | $25,000 | - | 25,000 | - | 0.1% |
| Scott Wilson* | $25,000 | - | 25,000 | - | 0.1% |
| John Jeffrey Walker | $10,000 | - | 10,000 | - | 0.0% |
| **Totals:** | $23,623,098.18 | 19,058,098.18 | 4,565,000.00 | 1,268,813.00 | 100.0% |
| **Authorized Units** | | 19,058,098.18 | 4,565,000.00 | 1,753,224.00 | |

*Denotes former Highland Capital Management, LP employee



CONFIDENTIAL. INSTITUTIONAL USE ONLY. NOT FOR PUBLIC DISTRIBUTION.

003037

5

Case 19-34054-sgj11 Doc 1822-5 Filed 01/22/21   Entered 01/22/21 21:50:07 Page 8 of 109   DRAFT - CONFIDENTIAL

## EXHIBIT C - WATERFALL

| | | |
|---|---:|---|
| SSP Sale Price | $ | 50,000,000 | |
| Estimated closing adjustments | | |
| Less: Principal & Interest | | (34,689,920) | Note 1: It's anticipated that $3.2MM will be held in escrow until SSP's PPP loans are forgiven (SSP expects to receive forgiveness and expects to receive forgiveness in 90-120 days). An additional $500k is estimated to be held in escrow for the R&W policy. |
| Less: Accrued Mgmt. Fees | | (532,053) | |
| Less: Closing Costs | | (750,000) | |
| Plus: Cash | | 4,755,502 | |
| Total estimated closing adjustments | $ | (31,216,471) | |
| Net Proceeds | $ | 18,783,529 | |
| Trussway Holdings, LLC | | 76.56% | Note 2: Per section 5.3 of the 4th A&R Credit & Guaranty Agreement, absent a waiver or amendment, a maximum of $5 million in the aggregate is allowed to be distributed, however, $2.7MM has already been paid out. |
| Cash proceeds to Trussway Holdings, LLC [1] | | 14,381,312 | |
| Potential Reserve for Dugaboy Note | | (2,455,668) | |
| Repayment of HCMLP Note | | (1,158,429) | |
| Net cash at Trussway Holdings, LLC | $ | 10,767,215 | |
| Maximum Restricted Distribution [2] | $ | 2,337,093 | |
| Highland Select Equity Fund, L.P. | | 89.90% | $1.0MM: March '19 |
| Cash proceeds to Select Fund [3] | $ | 2,101,046 | $1.7MM: September '18 |
| Highland Capital Management, LP | | 99.95% | |
| Cash proceeds to HCMLP | | 2,099,996 | |
| HCMLP Note + Interest from Trussway Holdings, LLC | | 1,158,429 | |
| HCMLP Subordinated Note + Interest | | 2,661,928 | |
| HCMLP Management Fees | | 532,053 | |
| Total estimated cash proceeds to HCMLP | $ | 6,452,406 | |

[1] $2.8 million is held in escrow
[2] Maximum allowable distribution per section 5.3 of 4th A&R Credit & Guaranty Agreement
[3] Excludes paydown of any debt at Highland Select Equity Fund, L.P.

CONFIDENTIAL. INSTITUTIONAL USE ONLY. NOT FOR PUBLIC DISTRIBUTION.

003038

6

**4TH A&R CREDIT & GUARANTY AGREEMENT HIGHLIGHTS**



- Trussway Holdings, LLC is a Guarantor of the loan to Trussway Industries, LLC

    - THIS FOURTH AMENDED AND RESTATED CREDIT AND GUARANTY AGREEMENT dated as of May 15, 2017 among TRUSSWAY INDUSTRIES, LLC, as borrower ("Borrower"), the Guarantors party hereto (the Borrower and the Guarantors being collectively referred to herein as the "Credit Parties", and each individually, a "Credit Party"), the financial institutions from time to time parties hereto, each as a Lender (collectively, the "Lenders"), and NEXBANK, SSB, as administrative agent for the Lenders ("Agent").

- "Restricted Distribution" is defined as, with respect "to any Person (i) any dividend or other distribution on any equity interest in such Person or (ii) any payment on account of (a) the purchase, redemption, retirement, defeasance, surrender or acquisition of any equity interests in such Person or any claim respecting the purchase or sale of any equity interest in such Person or (b) any option, warrant or other right to acquire any equity interests in such Person; provided that, the term "Restricted Distribution" shall not include any dividend or distribution payable solely in equity interests of such Person or warrants, options or other rights to purchase such equity interests."

- Section 5.3 – Restricted Distributions. Borrower will not, and will not permit any Guarantor to, directly or indirectly, declare, order, pay, make or set apart any sum for any Restricted Distribution; provided that the foregoing shall not restrict or prohibit any wholly-owned Guarantor from making dividends or distributions to Borrower or any other wholly-owned Guarantor and provided, further, that the foregoing shall not restrict or prohibit Borrower from making dividends or distributions to Holdings on the Closing Date in the amount of up to $20,500,000.00, which amount represents funds received by Borrower from Trussway, LLC in connection with the Amegy Credit Facility. Notwithstanding the foregoing, Holdings may make Restricted Distributions in connection with the repurchase, redemption or retirement of its membership interests, or otherwise make payment in connection with appraisal rights related thereto, in each case, in an aggregate amount not to exceed $5,000,000.00.

CONFIDENTIAL. INSTITUTIONAL USE ONLY. NOT FOR PUBLIC DISTRIBUTION.