**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | |
|---|---|---|
| **In Re:** Highland Capital Management, L.P | § | Case No. 19-34054-SGJ-11 |
| Highland Capital Management Fund Advisors, L.P. | | |
| et al | § | |
| Appellant | § | |
| vs. | § | |
| Highland Capital Management, L.P., | | |
| | § | 3:21-CV-00538-N |
| Appellee | § | |

[1943] **Order confirming the fifth amended chapter 11 plan,** Entered on 2/22/2021.

# APPELLANT RECORD
# VOLUME 28

MUNSCH HARDT KOPF & HARR, P.C.
Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
3800 Ross Tower
500 N. Akard Street
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

ATTORNEYS FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P. AND
NEXPOINT ADVISORS, L.P.

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | ) | Case No. 19-34054 (SGJ11) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

$\mathcal{I} \, \mathcal{N} \mathcal{D} \mathcal{E} \mathcal{X}$

## AMENDED DESIGNATION BY NEXPOINT ADVISORS, L.P. AND HIGHLAND
## CAPITAL MANAGEMENT FUND ADVISORS, L.P.
## OF ITEMS FOR THE RECORD ON APPEAL

COME NOW Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors,

L.P. (the "Appellants"), creditors and parties-in-interest in the above styled and numbered

bankruptcy case (the "Bankruptcy Case") of Highland Capital Management, L.P. (the "Debtor"),

and, with respect to their *Notice of Appeal* [docket no. 1957], hereby file their *Amended

Designation of Items for the Record on Appeal* (the "Designation") as follows:

| Item | Bankruptcy Docket Number | Description |
|---|---|---|
| | | **Pleadings and Items on Docket** |
| 1 | 1957 | Notice of Appeal |
| 2 | 1943 | Order (i) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief |
| 3 | | Docket Sheet of Bankruptcy Case No. 19-34054 |
| 4 | 1606 | Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 5 | 1648 | Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| 6 | 1656 | Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 7 | 1670 | Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 8 | 1719 | Second Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| 9 | 1749 | Third Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| 10 | 1772 | Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 11 | 1791 | Notice of Withdrawal of Certain Executory Contracts and Unexpired Leases from List of Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan |
| 12 | 1807 | Debtor's Omnibus Reply to Objections to Confirmation of the Fifth Amended Chapter 11 Plan of Reorganization of Highland Capital Management |
| 13 | 1808 | Debtor's Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) |
| 14 | 1811 | Notice of Filing Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (with Technical Modifications) |
| 15 | 1814 | Debtor's Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |

Handwritten annotations in left margin:
- Vol. 1
- 000001
- 000165
- 000326
- Vol. 2
- 000639
- 000666
- 000675
- 000820
- 000870
- Vol. 3
- 000880
- 000886
- 000901
- 000906
- 001031
- Vol. 4
- 001097
- Vol. 5
- 001346

| | 16 | 1847 | Fourth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
|---|---|---|---|
| | 17 | 1873 | Fifth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| | 18 | 1875 | Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland of Highland Capital Management, L.P. (As Modified) |
| | 19 | 1887 | Supplemental Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| | 20 | 1671 | United States Trustee's Limited Objection to Confirmation of Debtors' Fifth Amended Plan of Reorganization |
| | **Evidence and Transcripts** | | |
| | 21 | 1894 | Transcript of February 2, 2021 Confirmation Hearing |
| | 22 | 1905 | Transcript of February 3, 2021 Confirmation Hearing |
| | 23 | 1917 | Transcript of February 8, 2021 Bench Ruling |
| | 24 | 1794 | All exhibits admitted into evidence during February 2 and February 3, 2021 Confirmation Hearing |
| | | 1795 | |
| | | 1822 | |
| | | 1863 | |
| | | 1866 | |
| | | 1877 | |
| | | 1895 | |
| | | 1915 | |

*Handwritten annotations in left margin:*

Vol 5
001414
001421
001427
001475
001482
001486
001783
002040
002091
002188
Vol 12 - 002931
Vol 50 - 013295
- 013297
Vol. 51 - 013373
Vol. 54 - 014182
Vol 55 - 014506

*Handwritten note below table:*

✳ 1822 - Vol. 12 — 50 (39 Volumes)

RESPECTFULLY SUBMITTED this 22d day of March, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
     Davor Rukavina, Esq.
     Texas Bar No. 24030781
     3800 Ross Tower
     500 N. Akard Street
     Dallas, Texas 75201-6659
     Telephone: (214) 855-7500
     Facsimile: (214) 855-7584
     Email:   drukavina@munsch.com

**ATTORNEYS FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P. AND
NEXPOINT ADVISORS, L.P.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 22d day of March, 2021, true and correct copies of this document were electronically served by the Court's ECF system on parties entitled to notice thereof, including on counsel for the Debtor.

By: /s/ Davor Rukavina
     Davor Rukavina, Esq.

# EXHIBIT KK

007212

**LIBERTY CLO, LTD.**

Issuer,

**LIBERTY CLO, CORP.**

Co-Issuer,

and

**JPMORGAN CHASE BANK, NATIONAL ASSOCIATION**

Trustee

**INDENTURE**

Dated as of December 8, 2005

TABLE OF CONTENTS

*Page*

ARTICLE 1 DEFINITIONS ...................................................................................................3

Section 1.1. Definitions. ...............................................................................3
Section 1.2. Assumptions as to Pledged Obligations; Construction Conventions. .................. 82
Section 1.3. Rules of Interpretation. ...............................................................84

ARTICLE 2 THE NOTES ....................................................................................................85

Section 2.1. Forms Generally. ........................................................................85
Section 2.2. Forms of Indenture Securities and Certificate of Authentication. ...................... 86
Section 2.3. Authorized Amount; Denominations. ...................................................88
Section 2.4. Extension of Reinvestment Period and Stated Maturity. ...............................91
Section 2.5. Execution, Authentication, Delivery, and Dating. ......................................94
Section 2.6. Registration, Registration of Transfer and Exchange. .................................94
Section 2.7. Mutilated, Destroyed, Lost, or Stolen Notes. .........................................112
Section 2.8. Payment of Principal and Interest and Other Amounts; Principal and
Interest Rights Preserved; Withholding. .............................................113
Section 2.9. Persons Considered Owners. ..........................................................117
Section 2.10. Cancellation. ..........................................................................118
Section 2.11. Indenture Securities Beneficially Owned by Non-Permitted Holders
and Non-Permitted ERISA Holders. ................................................118
Section 2.12. Borrowings Under Class A–1A Notes ...............................................119
Section 2.13. Drawdowns Under Class A–1B Notes ...............................................119
Section 2.14. Class Q-1 Securities ..................................................................120
Section 2.15. Class P Securities .....................................................................124

ARTICLE 3 CONDITIONS PRECEDENT ...........................................................................128

Section 3.1. Conditions to Issuance of Notes on Closing Date. ...................................128
Section 3.2. Custodianship; Delivery of Collateral Obligations and Eligible
Investments. ..........................................................................132
Section 3.3. Representations as to Collateral. ......................................................133
Section 3.4. Conditions to Issuance of Additional Class E Certificates. ...........................135

ARTICLE 4 SATISFACTION AND DISCHARGE ..................................................................135

Section 4.1. Satisfaction and Discharge of Indenture. .............................................135
Section 4.2. Application of Trust Money. ...........................................................137
Section 4.3. Repayment of Monies Held by Paying Agent. ........................................137

ARTICLE 5 REMEDIES ....................................................................................................137

Section 5.1. Events of Default. ......................................................................137
Section 5.2. Acceleration of Maturity; Rescission and Annulment. ...............................139
Section 5.3. Collection of Indebtedness and Suits for Enforcement by Trustee. ..................140

i

| | | |
|---|---|---|
| Section 5.4. | Remedies. | 142 |
| Section 5.5. | Optional Preservation of Collateral. | 143 |
| Section 5.6. | Trustee May Enforce Claims Without Possession of Notes. | 144 |
| Section 5.7. | Application of Money Collected. | 145 |
| Section 5.8. | Limitation on Suits. | 145 |
| Section 5.9. | Unconditional Rights of Holders of Notes. | 145 |
| Section 5.10. | Restoration of Rights and Remedies. | 146 |
| Section 5.11. | Rights and Remedies Cumulative. | 146 |
| Section 5.12. | Delay or Omission Not Waiver. | 146 |
| Section 5.13. | Control by Majority of the Controlling Class. | 146 |
| Section 5.14. | Waiver of Past Defaults. | 147 |
| Section 5.15. | Undertaking for Costs. | 147 |
| Section 5.16. | Waiver of Stay or Extension Laws. | 148 |
| Section 5.17. | Sale of Collateral. | 148 |
| Section 5.18. | Action on the Notes. | 148 |

ARTICLE 6 THE TRUSTEE ........................................................................................ 149

| | | |
|---|---|---|
| Section 6.1. | Certain Duties and Responsibilities. | 149 |
| Section 6.2. | Notice of Default. | 150 |
| Section 6.3. | Certain Rights of Trustee. | 150 |
| Section 6.4. | Not Responsible for Recitals or Issuance of Indenture Securities. | 152 |
| Section 6.5. | May Hold Indenture Securities. | 152 |
| Section 6.6. | Money Held in Trust. | 152 |
| Section 6.7. | Compensation and Reimbursement. | 153 |
| Section 6.8. | Corporate Trustee Required; Eligibility. | 154 |
| Section 6.9. | Resignation and Removal; Appointment of Successor. | 154 |
| Section 6.10. | Acceptance of Appointment by Successor. | 155 |
| Section 6.11. | Merger, Conversion, Consolidation, or Succession to Business of Trustee. | 156 |
| Section 6.12. | Co-Trustees. | 156 |
| Section 6.13. | Certain Duties of Trustee Related to Delayed Payment of Proceeds. | 157 |
| Section 6.14. | Authenticating Agents. | 157 |
| Section 6.15. | Fiduciary for Holders of Notes Only; Agent for Secured Parties. | 158 |
| Section 6.16. | Representations and Warranties of the Bank. | 158 |
| Section 6.17. | Additional Reporting Requirements. | 158 |

ARTICLE 7 COVENANTS .......................................................................................... 159

| | | |
|---|---|---|
| Section 7.1. | Payment of Principal and Interest. | 159 |
| Section 7.2. | Maintenance of Office or Agency. | 159 |
| Section 7.3. | Money for Note Payments to be Held in Trust. | 160 |
| Section 7.4. | Existence of Co-Issuers. | 161 |
| Section 7.5. | Protection of Collateral. | 163 |
| Section 7.6. | Opinions as to Collateral. | 164 |
| Section 7.7. | Performance of Obligations. | 164 |
| Section 7.8. | Negative Covenants. | 164 |
| Section 7.9. | Notice of Default; Statement as to Compliance. | 168 |
| Section 7.10. | Co-Issuers May Consolidate, etc., Only on Certain Terms. | 168 |
| Section 7.11. | Successor Substituted. | 169 |

Section 7.12.  No Other Business. ...................................................................... 170
Section 7.13.  Annual Rating Review. ................................................................. 170
Section 7.14.  Reporting. ..................................................................................... 170
Section 7.15.  Calculation Agent. ....................................................................... 171
Section 7.16.  Certain Tax Matters. .................................................................... 171
Section 7.17.  Securities Lending. ...................................................................... 173
Section 7.18.  Purchase of Collateral Obligations; Ramp-Up Completion Date. ..... 176
Section 7.19.  Posting of Reports on Repository. ............................................... 177
Section 7.20.  [Reserved] .................................................................................... 177
Section 7.21.  Section 3(c)(7) Procedures. ......................................................... 177
Section 7.22.  Listing. ......................................................................................... 178

ARTICLE 8 SUPPLEMENTAL INDENTURES ................................................................. 178

Section 8.1.  Supplemental Indentures Without Consent of Holders. ............... 178
Section 8.2.  Supplemental Indentures With Consent of Holders. ................... 182
Section 8.3.  Execution of Supplemental Indentures. ....................................... 184
Section 8.4.  Effect of Supplemental Indentures; Certain Required Consents. .... 185
Section 8.5.  Reference in Notes to Supplemental Indentures. ........................ 185

ARTICLE 9 REDEMPTION OF NOTES ............................................................................ 185

Section 9.1.  Mandatory Redemption. ............................................................... 185
Section 9.2.  Optional Redemption. .................................................................. 186
Section 9.3.  Redemption Procedures. ............................................................... 187
Section 9.4.  Notes Payable on Redemption Date ............................................. 190
Section 9.5.  Special Redemption. ..................................................................... 190
Section 9.6.  Amendment Buy-Out. ................................................................... 191
Section 9.7.  Prepayments of Class A–1A Notes. ............................................. 192

ARTICLE 10 ACCOUNTS, ACCOUNTINGS, AND RELEASES ..................................... 192

Section 10.1.  Collection of Money. ................................................................... 192
Section 10.2.  Collection Account. ..................................................................... 192
Section 10.3.  Other Accounts. ........................................................................... 194
Section 10.4.  Investment of Funds in Accounts; Reports by Trustee. .............. 200
Section 10.5.  Synthetic Security Counterparty Account. ................................. 202
Section 10.6.  Accountings. ................................................................................ 202
Section 10.7.  Release of Collateral. .................................................................. 211
Section 10.8.  Reports by Independent Accountants. ........................................ 212
Section 10.9.  Reports to Rating Agencies. ....................................................... 213

ARTICLE 11 APPLICATION OF MONIES ....................................................................... 213

Section 11.1.  Disbursements of Monies from Payment Account. ..................... 213
Section 11.2.  Payments on Class P Securities . ................................................ 219

ARTICLE 12 SALE OF COLLATERAL OBLIGATIONS; PURCHASE OF COLLATERAL
        OBLIGATIONS ................................................................................................. 222

007216

Section 12.1. Sales of Collateral Obligations. ..........................................................222
Section 12.2. Purchase of Collateral Obligations. ....................................................225
Section 12.3. Conditions Applicable to All Sale and Purchase Transactions. ..........227
Section 12.4. Certain Determinations Relating to Collateral Obligations. ...............228

ARTICLE 13 NOTEHOLDERS' RELATIONS .............................................................229

Section 13.1. Subordination. ....................................................................................229
Section 13.2. Standard of Conduct. ..........................................................................230
Section 13.3. Class A-1 Funding Allocations. ...........................................................230

ARTICLE 14 MISCELLANEOUS ................................................................................231

Section 14.1. Form of Documents Delivered to Trustee. ...........................................231
Section 14.2. Acts of Noteholders or Holders of Class E Certificates. .....................232
Section 14.3. Notices, etc., to Certain Persons or Parties. .......................................232
Section 14.4. Notices to Holders, the Class E Certificates Paying Agent; Waiver. ...234
Section 14.5. Effect of Headings and Table of Contents. ..........................................236
Section 14.6. Successors and Assigns. ......................................................................236
Section 14.7. Separability. ........................................................................................236
Section 14.8. Benefits of Indenture. ..........................................................................236
Section 14.9. [Reserved]. ..........................................................................................236
Section 14.10. Governing Law. ..................................................................................236
Section 14.11. Submission to Jurisdiction. ................................................................237
Section 14.12. Counterparts. .....................................................................................237
Section 14.13. Acts of Issuer. ....................................................................................237
Section 14.14. Consent to Posting of Documents on Repository ...............................237
Section 14.15. Liability of Co-Issuers. .......................................................................237
Section 14.16. Indemnity of Co-Issuer. ......................................................................238

ARTICLE 15 ASSIGNMENT OF MANAGEMENT AGREEMENT; HEDGE AGREEMENTS ...............238

Section 15.1. Assignment of Management Agreement. ...............................................238
Section 15.2. Hedge Agreements. ..............................................................................240
Section 15.3. Synthetic Securities. .............................................................................243

Schedules and Exhibits

Schedule 1 – Collateral Obligations

Schedule 2 – Moody's Industry Classification Group List

Schedule 3 – S&P Industry Classifications

Schedule 4 – Diversity Score Calculation

Schedule 5 – Moody's Structured Finance Obligation Recovery Rates

Schedule 6 – S&P Structured Finance Obligation Recovery Rates

Schedule 7 – Certain Defined Terms Relating to S&P Rating and Moody's Rating

Schedule 8 – Certain Tax Provisions

007217

| Exhibit A | – | Forms of Notes |
| A1–N– | Form of Temporary Regulation S Global Security for Notes |
| A1–Q– | Form of Temporary Regulation S Global Security for Class Q-1 Securities |
| A1–P– | Form of Temporary Regulation S Global Security for Class P Securities |
| A2–N– | Form of Regulation S Global Security for Notes |
| A2–Q– | Form of Regulation S Global Security for Class Q-1 Securities |
| A2–P– | Form of Regulation S Global Security for Class P Securities |
| A3– | Form of Rule 144A Global Note |
| A4-A1A– | Form of Certificated Class A-1A Note |
| A4-A1B– | Form of Certificated Class A-1B Note |
| A4-Q– | Form of Certificated Class Q-1 Security |
| A4-P– | Form of Certificated Class P Security |

Exhibit B – Forms of Note Transfer and Exchange Certificates

B1– Form of Transfer Certificate for Regulation 144A Global Note to Temporary Regulation S Global Security or Regulation S Global Security

B2– Form of Transfer Certificate for Temporary Regulation S Global Security or Regulation S Global Security to Regulation 144A Global Note

B3– Form of Transfer Certificate for Certificated Class A-1A Notes

B4– Form of Transfer Certificate for Certificated Class A-1B Notes

B5–1 Form of Transfer Certificate for Class Q-1 Securities in the form of Temporary Regulation S Global Security or Regulation S Global Security or in the form of Certificated Class Q-1 Securities to Certificated Class Q-1 Securities

B5–2 Form of Transfer Certificate for Certificated Class Q-1 Securities to Class Q-1 Securities in the form of Temporary Regulation S Global Security or Regulation S Global Security

B6–1 Form of Transfer Certificate for Class P Securities in the form of Temporary Regulation S Global Security or Regulation S Global Security or in the form of Certificated Class P Securities to Certificated Class P Securities

B6–2 Form of Transfer Certificate for Certificated Class P Securities to Class P Securities in the form of Temporary Regulation S Global Security or Regulation S Global Security

Exhibit C – Form of Cleary Gottlieb Steen & Hamilton LLP Opinion

Exhibit D – Form of Walkers Opinion

Exhibit E – Form of Gardere Wynne Sewell LLP Opinion

Exhibit F – Form of Orrick, Herrington & Sutcliffe LLP Opinion

Exhibit G – Form of Account Agreement

Exhibit H – Forms of Section 3(c)(7) Notices

007218

| | | |
|---|---|---|
| H-1 | – | Form of Section 3(c)(7) Reminder Notice |
| H-2 | – | Form of Important Section 3(c)(7) Reminder Notice |
| Exhibit I | – | Form of Beneficial Owner Certificate |
| Exhibit J | – | Form of Extension Notice |
| Exhibit K | | Form of Class P Certificate of Ownership |
| Annex A | | Class P-1 U.S. Treasury Component - Reference Prices |
| Annex B | | Class P-2 U.S. Treasury Component - Reference Prices |

007219

Indenture, dated as of December 8, 2005, among LIBERTY CLO, LTD. (the "Issuer"), LIBERTY CLO, CORP. (the "Co-Issuer") and JPMorgan Chase Bank, National Association, as trustee (together with its permitted successors, the "Trustee").

PRELIMINARY STATEMENT

The Co-Issuers are duly authorized to execute and deliver this Indenture to provide for the Class A-1A Notes, Class A-1B Notes, the Class A-1C Notes, the Class A-2 Notes, the Class A-3 Notes, the Class A-4 Notes, the Class B Notes, the Class C Notes, the Class Q-1 Securities, the Class P-1 Securities and the Class P-2 Securities, in each case issuable as provided in this Indenture. All covenants and agreements made by the Co-Issuers in this Indenture are for the benefit and security of the Secured Parties and the Class P Securityholders as described herein. The Co-Issuers are entering into this Indenture, and the Trustee is accepting the trusts created by this Indenture, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

All things necessary to make this Indenture a valid agreement of the Co-Issuers in accordance with the agreement's terms have been done.

GRANTING CLAUSES

The Issuer Grants to the Trustee, for the benefit and security of the Noteholders, the Trustee, the Portfolio Manager and each Hedge Counterparty (collectively, the "Secured Parties"), all of its right, title, and interest in, to, and under, in each case, whether now owned or existing, or hereafter acquired or arising:

(a)     the Collateral Obligations (listed, as of the Closing Date, in Schedule 1 to this Indenture and as such Schedule 1 may be modified, amended and revised subsequent to the Closing Date by the Issuer) and all Workout Assets, including any part thereof which consists of general intangibles (as defined in the UCC) relating thereto, all payments made or to be made thereon or with respect thereto, which are delivered or credited to the Trustee, or for which a Security Entitlement is delivered or credited to the Trustee or which are credited to one or more of the Issuer Accounts on or after the Closing Date and all payments made or to be made thereon or with respect thereto;

(b)     the Custodial Account, the Collection Account, the Payment Account, the Revolving Reserve Account, the Class A-1A Funding Account, the Class A-1B Funding Account, the Interest Reserve Account, the Synthetic Security Collateral Account, the Hedge Counterparty Collateral Account, the Closing Date Expense Account, the Expense Reimbursement Account, and the Securities Lending Account (collectively, the "Issuer Accounts") and the Synthetic Security Counterparty Account (subject to, in the case of any Synthetic Security Counterparty Account, any security interest in favor of the applicable Synthetic Security Counterparty), Eligible Investments purchased with funds on deposit in the Issuer Accounts, and all income from the investment of funds in the Issuer Accounts;

(c)     the Management Agreement, the Securities Lending Agreements, the Hedge Agreements as set forth in Article 15 and the Collateral Administration Agreement to the extent of any rights of the Issuer therein;

(d)     all Cash or money delivered to the Trustee (or its bailee);

(e)     all securities, investments, investment property, general intangibles, instruments, money and agreements of any nature in which the Issuer has an interest (except for money, securities and

1

investments in the Issuer's bank account in the Cayman Islands and except the Class P Accounts and any proceeds of any type credited thereto or deposited therein); and

(f)   all proceeds with respect to the foregoing.

(all of the property and assets described in the foregoing clauses (a) through (g), but excluding the Class P Collateral, the "Collateral").

The Issuer as a second and separate grant Grants to the Trustee, for the benefit and security solely of the Class P-1 Securityholders, all of its right, title and interest in, to and under, in each case, whether now owned or existing, or hereafter acquired or arising, the Class P-1 Accounts and any property of any type deposited into such accounts (including the Class P-1 U.S. Treasury Component) and all proceeds with respect to the foregoing (all of the foregoing, the "Class P-1 Collateral"), which security interest secures the Issuer's obligations under the Class P-1 Securities to pay in full aggregate amounts equal to the Class P-1 Nominal Principal Outstanding.

The Issuer as a third and separate grant Grants to the Trustee, for the benefit and security solely of the Class P-2 Securityholders, all of its right, title and interest in, to and under, in each case, whether now owned or existing, or hereafter acquired or arising, the Class P-2 Accounts and any property of any type deposited into such accounts (including the Class P-2 U.S. Treasury Component) and all proceeds with respect to the foregoing (all of the foregoing, the "Class P-2 Collateral"), which security interest secures the Issuer's obligations under the Class P-2 Securities to pay in full aggregate amounts equal to the Class P-2 Nominal Principal Outstanding.

For the avoidance of doubt, (i) the Class P Securityholders shall not be secured by the Collateral, (ii) the other Secured Parties shall not be secured by and shall have no claim to, allocation of, or other interest, in the Class P Collateral, (iii) the Class P-1 Securityholders shall not be secured by and shall have no claim to, allocation of, or other interest, in the Class P-2 Collateral and (iv) the Class P-2 Securityholders shall not be secured by and shall have no claim to, allocation of, or other interest in, the Class P-1 Collateral.

These Grants are not intended to and do not transfer any liability under the Collateral or the Class P Collateral, which liabilities shall remain the sole obligation of the Issuer. These Grants are made, however, in trust, to secure the Notes and other obligations listed in the following paragraph in the case of the first grant, only the Class P-1 Securities in the case of the second grant (to the extent provided therein) and only the Class P-2 Securities (to the extent provided therein) in the case of the third grant. Except as provided in Article 13 and the priorities set forth in the Priority of Payments, the Notes are secured by the first grant equally and ratably without prejudice, priority or distinction between any Note and any other Note because of difference in time of issuance or otherwise. The Class P-1 Securities are secured in accordance with their terms by the second grant equally and ratably without prejudice, priority or distinction because of difference in time of issuance or incurrence or otherwise. The Class P-2 Securities are secured in accordance with their terms by the third grant equally and ratably without prejudice, priority or distinction because of difference in time of issuance or incurrence or otherwise.

The first Grant is made to secure, in accordance with the priorities in the Priority of Payments and Article 13:

(i)   the payment of all amounts due on the Notes equally and ratably without prejudice, priority or distinction between any Note and any other Note, because of difference in time of issuance or otherwise, in accordance with their terms;

2

007221

(ii)   the payment of all other sums payable under this Indenture (other than amounts payable in respect of the Class E Certificates and payable to the Class P Securityholders);

(iii)   the payment of sums payable to any Hedge Counterparty under a Hedge Agreement;

(iv)   the payment of sums payable to the Portfolio Manager under the Management Agreement; and

(v)   compliance with this Indenture;

all as provided in this Indenture.

For the avoidance of doubt, the Issuer's obligations under the Class E Certificates (including any Class E Certificate Components) shall not be secured by the Collateral or the Class P Collateral.

The Trustee acknowledges the Grants, accepts the trusts under this Indenture in accordance with this Indenture, and agrees to perform its duties in this Indenture in accordance with the provisions hereof.

ARTICLE 1

DEFINITIONS

Section 1.1.    Definitions.

Except as otherwise specified in this Indenture or as the context may otherwise require, the following terms have the respective meanings provided below for all purposes of this Indenture.

"1940 Act":  The United States Investment Company Act of 1940, as amended.

"A/B Exchange":  An exchange of one security (the "A Security") for another security (the "B Security") of the same issuer or issuers, which security shall have substantially identical terms to the A Security except that one or more transfer restrictions applicable to the A Security are inapplicable to the B Security.

"Accounts":  The Issuer Accounts and the Class P Accounts.

"Accountants' Certificate":  An agreed upon procedures report of a firm of Independent certified public accountants of international reputation appointed by the Issuer pursuant to Section 10.8(a), which may be the firm of Independent accountants that performs certain accounting services for the Issuer or the Portfolio Manager.

"Accredited Investor":  The meaning specified in Rule 501(a) of Regulation D of the Securities Act.

"Accrued Interest On Sale":  Interest accrued on a Collateral Obligation at the time of sale or other disposition to the extent paid to the Issuer as part of the sale or other disposition price of the Collateral Obligation after deduction of any amount representing Accrued Interest Purchased With Principal of the Collateral Obligation.

"Accrued Interest Purchased With Principal": (i) Interest accrued on or purchased with a Collateral Obligation as part of the price paid by the Issuer to acquire the Collateral Obligation less any amount of Interest Proceeds (applied as Interest Proceeds) applied by the Issuer to acquire the accrued interest at the time of purchase and (ii) interest accrued on a Warehoused Loan as part of the price paid by the Issuer, if any, to repurchase and terminate the related participation under the Warehouse Agreement.

"Act": The meaning specified in Section 14.2.

"Additional Class E Certificate": The meaning set forth in the Class E Certificates Paying Agency Agreement.

"Additional Class E Certificate Closing Date": The meaning set forth in the Class E Certificates Paying Agency Agreement.

"Administration Agreement": The Administration Agreement, between the Issuer and the Administrator, providing for the administrative functions of the Issuer, as modified, amended, and supplemented and in effect from time to time.

"Administrative Expense Cap": An amount on any Payment Date equal to the excess of:

(a)     the sum of 0.04% of the Maximum Investment Amount on the related Determination Date plus $150,000, over

(b)     the sum of the amounts paid for Administrative Expenses in the twelve months preceding the current Payment Date;

*provided* that the Administrative Expense Cap for each of the first three Payment Dates shall be an amount equal to the excess of:

(a) the sum of (x) 0.04% of the Maximum Investment Amount plus $150,000, *multiplied by* (y) the actual days elapsed from the Closing Date to such Payment Date divided by 360, over

(b) the sum of the amounts paid as Administrative Expenses since (but excluding) the Closing Date.

"Administrative Expenses": Amounts due or accrued representing

(a)     tax preparation, filing, and registration fees or expenses and any other filing and registration fees owed by the Co-Issuers (including all filing, registration, and annual return fees payable to the Cayman Islands government and registered office fees);

(b)     fees, indemnities and expenses of the Trustee (including all amounts under Section 6.7), the Administrator, the Class E Certificates Paying Agent, the Collateral Administrator, the Revolving Note Agent and the Delayed Drawdown Note Agent;

(c)     fees, indemnities and expenses of either of the Co-Issuers and of accountants, agents, and counsel for either of the Co-Issuers;

(d)     fees and expenses of the Rating Agencies in connection with any rating of the Notes owed by either Co-Issuer (including fees and expenses for ongoing surveillance, credit estimates, and other fees owing to the Rating Agencies);

4

007223

(e)        expenses and indemnities (but not Management Fees) of the Portfolio Manager if payable under the Management Agreement;

(f)        fees, expenses and indemnities for third-party loan pricing services and accountants; and

(g)        any other amounts due to any other person (except the Portfolio Manager) if specifically provided for in this Indenture, including fees, expenses and indemnities in connection with any Securities Lending Agreement.

For the avoidance of doubt, any Class P Administrative Expenses shall not constitute Administrative Expenses but rather shall be paid in accordance with Section 11.2.

"Administrator":  Walkers SPV Limited or any successor appointed by the Issuer.

"Affiliate" or "Affiliated":  With respect to a person,

(a)        any other person who, directly or indirectly, is in control of, or controlled by, or is under common control with, the person, or

(b)        any other person who is a director, officer, or employee (A) of the person, (B) of any subsidiary or parent company of the person, or (C) of any person described in clause (i) above.

For the purposes of this definition, control of a person shall mean the power, direct or indirect,

(i)        to vote more than 50% of the securities having ordinary voting power for the election of directors of the person, or

(ii)        to direct the corporate management and corporate policies of the person whether by contract or otherwise (this does not include the Management Agreement unless it is amended expressly to provide those services).

For the purpose of this definition, the Administrator and its Affiliates are neither Affiliates of nor Affiliated with the Co-Issuers and the Co-Issuers are neither Affiliates of nor Affiliated with the Administrator, or any of its Affiliates.

"Agent Members":  Members of, or participants in, a Depositary.

"Aggregate Commitment Amount":  The aggregate of all Commitments with respect to all Class A-1A Notes.

"Aggregate Outstanding Amount":  When used with respect to (i) any of the Notes (other than the Class A-1A Notes and the Class A-1B Notes) as of any date, the aggregate principal amount of the Notes (including, in the case of the Class C Notes, the Class Q-1 Note Component) on that date, (ii) the Class A-1A Notes as of any date, (a) prior to the termination date of the Commitments (x) for purposes of any Overcollateralization Test and the Reinvestment Overcollateralization Test, the aggregate Drawn Amount of Class A-1A Notes *plus* an amount equal to the lesser of (A) the Aggregate Undrawn Amount of the Class A-1A Notes and (B) the Aggregate Unfunded Amount *minus* the amount credited to the Revolving Reserve Account, and (y) for any other purpose, the Aggregate Commitment Amount and (b) after the termination date of the Commitments, for all purposes, the aggregate Drawn Amount, (iii) the

Class A-1B Notes as of any date, (a) prior to the first Payment Date, the Fully Drawn Amount and (b) from and after the first Payment Date, the aggregate principal amount of the Class A-1B Notes on that date, (iv) the Class E Certificates as of any date, means the number of such Class E Certificates Outstanding on such date in respect of such Class E Certificates, and (v) the Class P Securities, the Class P-1 Nominal Principal Outstanding and the Class P-2 Nominal Principal Outstanding, as applicable, on the date of determination.

Except as otherwise provided herein:

(a)     the Aggregate Outstanding Amount of the Class A-1A Notes at any time shall include any Defaulted Interest in respect thereof and (to the extent not included in any such Defaulted Interest) accrued interest on such Defaulted Interest;

(b)     the Aggregate Outstanding Amount of the Class A-1B Notes at any time shall include any Defaulted Interest in respect thereof and (to the extent not included in any such Defaulted Interest) accrued interest on such Defaulted Interest;

(c)     the Aggregate Outstanding Amount of the Class A-1C Notes at any time shall include any Defaulted Interest in respect thereof and (to the extent not included in any such Defaulted Interest) accrued interest on such Defaulted Interest;

(d)     the Aggregate Outstanding Amount of the Class A-2 Notes at any time shall include any Defaulted Interest in respect thereof and (to the extent not included in any such Defaulted Interest) accrued interest on such Defaulted Interest;

(e)     the Aggregate Outstanding Amount of the Class A-3 Notes at any time shall include any Defaulted Interest in respect thereof and (to the extent not included in any such Defaulted Interest) accrued interest on such Defaulted Interest;

(f)     the Aggregate Outstanding Amount of the Class A-4 Notes at any time shall include any Defaulted Interest in respect thereof and (to the extent not included in any such Defaulted Interest) accrued interest on such Defaulted Interest;

(g)     the Aggregate Outstanding Amount of the Class B Notes at any time shall include all Class B Deferred Interest attributed thereto; and

(h)     the Aggregate Outstanding Amount of the Class C Notes at any time shall include all Class C Deferred Interest attributed thereto.

"Aggregate Principal Balance":  When used with respect to the Pledged Obligations, the sum of the Principal Balances of all the Pledged Obligations.  When used with respect to a portion of the Pledged Obligations, the sum of the Principal Balances of that portion of the Pledged Obligations.

"Aggregate Principal Reduction Amount":  The meaning specified in Section 13.3(a).

"Aggregate Purchase Price Amount":  When used with respect to the Pledged Obligations, the sum of the Purchase Price Amounts of all the Pledged Obligations.  When used with respect to a portion of the Pledged Obligations, the sum of the Purchase Price Amounts of that portion of the Pledged Obligations.

007225

"Aggregate Undrawn Amount":  At any time, (i) with respect to the Class A-1A Notes, the aggregate Undrawn Amounts of all Class A-1A Notes; and (ii) with respect to the Class A-1B Notes, the aggregate Undrawn Amounts of all Class A-1B Notes.

"Aggregate Unfunded Amount":  As of any date of determination, the aggregate Unfunded Amounts with respect to all Revolving Loans and Delayed Drawdown Loans held by the Issuer as of such date.

"Allocable Principal Balance":  With respect to a Synthetic Security based upon or relating to a senior secured index investment providing non-leveraged credit exposure to a basket of credit default swaps referencing a diversified group of Reference Obligations with respect to which the principal or notional amount of the credit exposure to any single Reference Obligation does not increase over time, the portion of the aggregate Principal Balance of such Synthetic Security that is allocable to each Reference Obligation comprising such index or indices based upon allocating the Principal Balance of such Synthetic Security among such Reference Obligations in the same proportion as each Reference Obligation bears to the aggregate Principal Balance of such Synthetic Security.

"Amendment Buy-Out":  The meaning specified in Section 9.6(a).

"Amendment Buy-Out Option":  The meaning specified in Section 9.6(a).

"Amendment Buy-Out Purchase Price":  The purchase price payable by the Amendment Buy-Out Purchaser for Securities purchased in an Amendment Buy-Out, if any, in an amount equal to (i) in the case of (x) the Notes (other than the Class A-1A Notes and Class A-1B Notes), the Aggregate Outstanding Amount thereof, (y) the Class A-1A Notes, the aggregate Drawn Amount thereof and (z) in the case of the Class A-1B Notes, the aggregate principal amount thereof, plus in the case of each of (x), (y) and (z) accrued and unpaid interest (including Deferred Interest, if any) to the date of purchase by the Amendment Buy-Out Purchaser, payable to the Non-Consenting Holder (giving effect to any amounts paid by the Issuer to the Holder on such date), plus any unpaid Extension Bonus Payment, plus in the case of the Class A-1A Notes, any accrued and unpaid Commitment Fee and in the case of the Class A-1B Notes, any accrued and unpaid Delayed Drawdown Fee, plus in the case of any Class A-1 Notes purchased in an Amendment Buy-Out prior to the end of the Non-Call Period only, an amount equal to the sum of the present values as of the date of the Amendment Buy-Out of the spread portion of the interest amount that would be payable with respect to (x) the aggregate Drawn Amount of such Class A-1A Notes as of the date of the Amendment Buy-Out and (y) the aggregate principal amount of such Class A-1B Notes and the Class A-1C Notes, as applicable, as of the date of the Amendment Buy-Out, in each case on each Payment Date from the date of the Amendment Buy-Out to the end of the Non-Call Period, discounted at the applicable forward LIBOR rate for the period from the date of the Amendment Buy-Out to the relevant Payment Date, (ii) in the case of the Class E Certificates, an amount that, when taken together with all payments and distributions made in respect of such Class E Certificates since the Closing Date (and amounts, if any, that due to the fact that the date of the Amendment Buy-Out is after the related Record Date, are payable to the Non-Consenting Holder on the next succeeding Payment Date notwithstanding the Amendment Buy-Out) would cause such Class E Certificates to have received (as of the date of purchase thereof by the Amendment Buy-Out Purchaser) a Class E Certificate Internal Rate of Return of 12% (assuming such purchase date was a Payment Date); provided, however, that in any Amendment Buy-Out from and after the date on which the Non-Consenting Holders of Class E Certificates have received a Class E Certificate Internal Rate of Return equal to or in excess of 12%, the Amendment Buy-Out Purchase Price for such Class E Certificates shall be zero; and (iii) in the case of the Class Q-1 Securities, based on the respective purchase prices for the relevant Class Q-1 Note Component and the Class Q-1 Class E Certificate Component thereof.

7

"Amendment Buy-Out Purchaser": The Portfolio Manager (or any of its Affiliates acting as principal or agent); provided that in the event that the Portfolio Manager elects not to purchase Securities from Holders pursuant to Section 9.6, "Amendment Buy-Out Purchaser" shall mean one or more qualifying purchasers (which may include the Initial Purchaser or the Placement Agent or any of its Affiliates acting as principal or agent) designated by the Portfolio Manager; provided, however, none of the Portfolio Manager, the Initial Purchaser, the Placement Agent or any of their respective Affiliates shall have any duty to act as an Amendment Buy-Out Purchaser.

"Amendment Buy-Out Trade Date": The meaning specified in Section 9.6(a).

"Applicable Issuer" or "Applicable Issuers": With respect to the Class A Notes, the Class B Notes and the Class C Notes, each of the Co-Issuers. With respect to the Class E Certificates, the Class Q-1 Securities and the Class P Securities, the Issuer only.

"Applicable Note Interest Rate": With respect to the Notes of any Class, the Note Interest Rate with respect to such Class.

"Applicable Percentage": The lesser of the Moody's Priority Category Recovery Rate and the S&P Priority Category Recovery Rate applicable to the Collateral Obligation as specified in the tables below. High-Yield Bonds do not include Structured Finance Obligations for this purpose.

| Moody's Priority Category | Moody's Priority Category Recovery Rate |
|---|---|
| Synthetic Securities | In the case of: |
| | (i) a Form-Approved Synthetic Security, the "Moody's Priority Category Recovery Rate" given by Moody's to the Form-Approved Synthetic Security at the time of approval of the Form-Approved Synthetic Security by Moody's, and |
| | (ii) any other Synthetic Security, the "Moody's Priority Category Recovery Rate" given by Moody's to the Synthetic Security at the time of acquisition of the Synthetic Security. |
| Structured Finance Obligations | The Moody's Priority Category Recovery Rate determined in accordance with the Moody's Structured Finance Obligation Recovery Rates set forth in Schedule 5 by reference to the type of asset and its then Moody's Rating (or, with respect to assets to which that schedule does not apply, on a case-by-case basis in connection with the Grant of the relevant Collateral Obligation). |
| Unsecured DIP Loans and any Collateral Obligations not covered above or below | As determined by Moody's on a case-by-case basis. |

For High-Yield Bonds, Moody's Senior Secured Loans and Moody's Non Senior Secured Loans, the relevant Moody's Priority Category Recovery Rate is the rate determined pursuant to the table below based on the number of rating subcategories difference between the High-Yield Bond's or Loan's Moody's Obligation Rating and its Moody's Default Probability Rating (for purposes of clarification, if

8

the Moody's Obligation Rating is higher than the Moody's Default Probability Rating, the rating
subcategories difference will be positive and if it is lower, negative):

| Number of Moody's Rating Subcategories Difference Between the Moody's Obligation Rating and the Moody's Default Probability Rating | Moody's Senior Secured Loans | Moody's Non Senior Secured Loans | High-Yield Bonds |
|---|---|---|---|
| +2 or more | 60.0% | 45.0% | 40.0% |
| +1 | 50.0% | 42.5% | 35.0% |
| 0 | 45.0% | 40.0% | 30.0% |
| -1 | 40.0% | 30.0% | 15.0% |
| -2 | 30.0% | 15.0% | 10.0% |
| -3 or less | 20.0% | 10.0% | 2.0% |

If no Moody's Priority Category Recovery Rate has been specifically assigned with respect to a Loan
pursuant to the above table, and the Loan is a secured DIP Loan, the relevant Moody's Priority Category
Recovery Rate is 50.0%.

| S&P Priority Category | S&P Priority Category Recovery Rate |
|---|---|
| Senior Secured Loans (other than DIP Loans) | 55.0% |
| Senior Unsecured Loans | 37.5% |
| Second Lien Loans | 37.5% |
| Subordinated Lien Loans (other than DIP Loans) | 21.5% |
| Senior secured High-Yield Bonds (other than Structured Finance Obligations) | 44.0% |
| Senior unsecured High-Yield Bonds (other than Structured Finance Obligations) | 30.0% |
| Subordinated High-Yield Bonds (other than Structured Finance Obligations) | 18.0% |
| Structured Finance Obligations | The S&P Priority Category Recovery Rate determined in accordance with the S&P Structured Finance Obligation Recovery Rates set forth in Schedule 6 by reference to the type of asset and its then S&P Rating (or, with respect to assets to which that table does not apply, on a case by case basis in connection with the Grant of the relevant Collateral Obligation). |

9

007228

| S&P Priority Category | S&P Priority Category Recovery Rate |
|---|---|
| Synthetic Securities | As assigned by S&P on a case-by-case basis in connection with the Grant of the relevant Collateral Obligation. |
| DIP Loans and any Collateral Obligation not covered above | As assigned by S&P on a case-by-case basis. |

"Approved Credit Support Document":  A security agreement in the form of the 1994 ISDA Credit Support Annex (ISDA Agreements Subject to New York Law Only), as modified by the Paragraph 13 thereto.

"Approved Pricing Service":  Loan Pricing Corporation, LoanX Inc., Markit Group Limited or any other nationally recognized loan pricing service approved in writing by S&P.

"Ask-Side Market Value":  As of any Measurement Date, the market value determined by the Portfolio Manager and reported to the Trustee as an amount rather than as a percentage or fraction of par (expressed in Dollars) of any lent Collateral Obligation based upon the Portfolio Manager's commercially reasonable judgment and based upon the following order of priority:  (i) the average of the ask-side market prices obtained by the Portfolio Manager from three Independent broker-dealers active in the trading of such obligations or (ii) if the foregoing set of prices were not obtained, the higher of the ask-side market prices obtained by the Portfolio Manager from two Independent broker-dealers active in the trading of such obligations or (iii) if the foregoing sets of prices were not obtained, the average of the ask-side prices for the purchase of such Collateral Obligation determined by an Approved Pricing Service (Independent from the Portfolio Manager) that derives valuations by polling broker-dealers (Independent from the Portfolio Manager); provided that if the Ask-Side Market Value of any lent Collateral Obligation cannot be so determined then such Collateral Obligation shall be deemed to have a Market Value equal to the outstanding principal balance thereof.

"Assigned Moody's Rating":  The meaning set forth in Schedule 7.

"Authenticating Agent":  With respect to the Notes, the Trustee or the person designated by the Trustee to authenticate the Notes on behalf of the Trustee pursuant to Section 6.14.

"Authorized Class Q-1 Denomination":  The meaning specified in Section 2.3.

"Authorized Class P-1 Denomination":  The meaning specified in Section 2.3.

"Authorized Class P-2 Denomination":  The meaning specified in Section 2.3.

"Authorized Officer":  With respect to the Issuer or the Co-Issuer, any Officer or agent who is authorized to act for the Issuer or the Co-Issuer, as applicable, in matters relating to, and binding on, the Issuer or the Co-Issuer.  With respect to the Portfolio Manager, any managing member, Officer, manager, employee, partner or agent of the Portfolio Manager who is authorized to act for the Portfolio Manager in matters relating to, and binding on, the Portfolio Manager with respect to the subject matter of the request, certificate, or order in question.  With respect to the Trustee or any other bank or trust company acting as trustee of an express trust or as custodian, a Trust Officer.  Each party may receive and accept a certification of the authority of any other party as conclusive evidence of the authority of any person to act, and the certification may be considered as in full force and effect until receipt by the other party of written notice to the contrary.

007229

"Average Life": As of any Measurement Date with respect to any Collateral Obligation (other than any Defaulted Collateral Obligation), the quotient obtained by dividing:

(a)      the sum of the products of:

(i)      the number of years (rounded to the nearest hundredth) from the Measurement Date to the respective dates of each successive scheduled payment of principal of the Collateral Obligation, and

(ii)      the respective amounts of the successive scheduled payments of principal of the Collateral Obligation, by

(b)      the sum of all successive scheduled payments of principal of the Collateral Obligation.

"Bank": JPMorgan Chase Bank, National Association, in its individual capacity and not as Trustee.

"Bankruptcy Code": The U.S. Bankruptcy Code, Title 11 of the United States Code.

"Bankruptcy Law": The Bankruptcy Code, Part V of the Companies Law (2004 Revision) of the Cayman Islands and the Bankruptcy Law (1997 Revision) of the Cayman Islands.

"Beneficial Owner": Any person owning an interest in a Global Security as reflected on the books of the Depositary or on the books of an Agent Member or on the books of an indirect participant for which an Agent Member acts as agent.

"Board Resolution": With respect to the Issuer, a resolution of the board of directors of the Issuer and, with respect to the Co-Issuer, a resolution of the board of directors of the Co-Issuer.

"Borrowing": The meaning specified in Section 2.12(a).

"Borrowing Date": The meaning specified in Section 2.12(a).

"Bridge Loan": Any obligation or security incurred in connection with a merger, acquisition, consolidation, sale of all or substantially all of the assets of a person or entity, restructuring or similar transaction, which obligation or security by its terms is required to be repaid within one year of the incurrence thereof with proceeds from additional borrowings or other refinancing (other than any additional borrowing or refinancing if one or more financial institutions shall have provided the issuer of such obligation or security with a binding written commitment to provide the same). For the avoidance of doubt, a DIP Loan will not constitute a Bridge Loan.

"Business Day": A day on which commercial banks and foreign exchange markets settle payments in New York City and any other city in which the Corporate Trust Office of the Trustee is located and, in the case of the final payment of principal of any Note, the place of presentation of the Note designated by the Trustee; provided, however, that, for purposes of determining LIBOR, "Business Day" must also be a day on which dealings in deposits in Dollars are transacted in the London interbank market.

"Buy-Out Amount": The meaning set forth in the Management Agreement.

11

007230

"Calculation Agent": The meaning specified in Section 7.15.

"Cash": Such coin or currency of the United States of America as at the time shall be legal tender for payment of all public and private debts.

"Cayman Islands Stock Exchange": The Cayman Islands Stock Exchange.

"CCC/Caa Collateral Obligations": The Collateral Obligations (excluding any Defaulted Collateral Obligations) that on the relevant date have (i) a Moody's Rating of "Caa1" or lower and/or (ii) an S&P Rating of "CCC+" or lower.

"Certificate of Authentication": The meaning specified in Section 2.1.

"Certificated Class A-1A Notes": The meaning specified in Section 2.2(d).

"Certificated Class A-1B Notes": The meaning specified in Section 2.2(d)

"Certificated Indenture Securities": The Certificated Class A-1A Notes, the Certificated Class A-1B Notes, the Certificated Class Q-1 Securities and/or the Certificated Class P Securities.

"Certificated Class Q-1 Securities": The meaning specified in Section 2.2(d).

"Certificated Class P Securities": The meaning specified in Section 2.2(d).

"Certificated Class P-1 Securities": The meaning specified in Section 2.2(d).

"Certificated Class P-2 Securities": The meaning specified in Section 2.2(d).

"Certificated Security": The meaning specified in Section 8-102(a)(4) of the UCC.

"Class": With respect to the Securities (other than the Class E Certificates), all of the Securities having the same priority and the same Stated Maturity, with respect to the Class E Certificates, all of the Class E Certificates; provided, however, unless otherwise expressly provided for herein, (i) the Class A-1A Notes, the Class A-1B Notes and the Class A-1C Notes shall be considered the same Class, (ii) each of the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes and the Class A-4 Notes shall be a separate Class, and (iii) each of the Class P-1 Securities and the Class P-2 Securities shall be a separate Class.

"Class A Notes": The Class A-1A Notes, the Class A-1B Notes, the Class A-1C Notes, the Class A-2 Notes, the Class A-3 Notes and the Class A-4 Notes.

"Class A-1 Notes": The Class A-1A Notes, the Class A-1B Notes and the Class A-1C Notes.

"Class A-1A Funding Account": The trust account established pursuant to Section 10.3(j).

"Class A-1A Note Purchase Agreement": The Note Purchase Agreement dated as of the Closing Date, entered into among the Issuer, the Co-Issuers, the Revolving Note Agent, the Trustee and the Holders of the Class A–1A Notes, as from time to time amended, modified or supplemented.

007231

"Class A-1A Notes": The Class A-1A Revolving Floating Rate Senior Secured Extendable Notes issued by the Co-Issuers pursuant to this Indenture and having the characteristics specified in Section 2.3.

"Class A-1A Principal Reduction Amount": The meaning specified in Section 13.3.

"Class A-1B Funding Account": The trust account established pursuant to Section 10.3(k).

"Class A-1B Note Purchase Agreement": The Note Purchase Agreement dated as of the Closing Date, entered into among the Issuer, the Co-Issuers, the Delayed Drawdown Note Agent, the Trustee and the Holders of the Class A–1B Notes, as from time to time amended, modified or supplemented.

"Class A-1B Notes": The Class A-1B Delayed Drawdown Floating Rate Senior Secured Extendable Notes issued by the Co-Issuers pursuant to this Indenture and having the characteristics specified in Section 2.3.

"Class A-1C Notes": The Class A-1C Floating Rate Senior Secured Extendable Notes issued by the Co-Issuers pursuant to this Indenture and having the characteristics specified in Section 2.3.

"Class A-2 Notes": The Class A-2 Floating Rate Senior Secured Extendable Notes issued by the Co-Issuers pursuant to this Indenture and having the characteristics specified in Section 2.3.

"Class A-3 Notes": The Class A-3 Floating Rate Senior Secured Extendable Notes issued by the Co-Issuers pursuant to this Indenture and having the characteristics specified in Section 2.3.

"Class A-4 Notes": The Class A-4 Floating Rate Senior Secured Extendable Notes issued by the Co-Issuers pursuant to this Indenture and having the characteristics specified in Section 2.3.

"Class A Coverage Tests": The Overcollateralization Test and the Interest Coverage Test, each as applied with respect to the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes and the Class A-4 Notes (as a single Class).

"Class B Coverage Tests": The Overcollateralization Test and the Interest Coverage Test, each as applied with respect to the Class B Notes.

"Class B Deferred Interest": Deferred Interest with respect to the Class B Notes.

"Class B Notes": The Class B Floating Rate Deferrable Senior Secured Extendable Notes issued by the Co-Issuers pursuant to this Indenture and having the characteristics specified in Section 2.3.

"Class C Coverage Tests": The Overcollateralization Test and the Interest Coverage Test, each as applied with respect to the Class C Notes.

"Class C Deferred Interest": Deferred Interest with respect to the Class C Notes.

"Class C Notes": The Class C Floating Rate Deferrable Senior Secured Extendable Notes issued by the Co-Issuers pursuant to this Indenture and having the characteristics specified in Section 2.3.

007232

"Class E Certificate Components": Collectively, the Class Q-1 Class E Certificate Component, the Class P-1 Class E Certificate Component and the Class P-2 Class E Certificate Component. All references in this Indenture to the Class E Certificates shall include the Class E Certificate Components, unless the context otherwise requires.

"Class E Certificate Documents": The Issuer's Memorandum and Articles of Association, the Class E Certificates Paying Agency Agreement and the resolutions of the Issuer's Board of Directors authorizing the issuance of the Class E Certificates passed on or before the Closing Date.

"Class E Certificate Internal Rate of Return": With respect to any Payment Date, the internal rate of return (computed using the "XIRR" function in Microsoft® Excel 2002 or an equivalent function in another software package), stated on a per annum basis, for the following cash flows, assuming all Class E Certificates were purchased on the Closing Date at their Face Amount:

(i)     each distribution of Interest Proceeds made to the Holders of the Class E Certificates on any prior Payment Date and, to the extent necessary to reach the applicable Class E Certificate Internal Rate of Return, the current Payment Date; and

(ii)     each distribution of Principal Proceeds made to the Holders of the Class E Certificates on any prior Payment Date and, to the extent necessary to reach the applicable Class E Certificate Internal Rate of Return, the current Payment Date.

"Class E Certificates": The Class E Certificates issued by the Issuer pursuant to the Issuer's Memorandum and Articles of Association and the resolutions of the Issuer's Board of Directors authorizing the issuance of the Class E Certificates (and including any Additional Class E Certificates issued pursuant to Section 4.4 of the Class E Certificates Paying Agency Agreement).

"Class E Certificates Distribution Account": A separate segregated non interest bearing trust account established by the Class E Certificates Paying Agent pursuant to the Class E Certificates Paying Agency Agreement into which the Class E Certificates Paying Agent will deposit all amounts received from the Issuer and payable to the Holders of the Class E Certificates under the Priority of Payments.

"Class E Certificates Paying Agency Agreement": The Class E Certificates Paying Agency Agreement, dated as of the Closing Date, between the Issuer and the Class E Certificates Paying Agent, as amended from time to time in accordance with the terms thereof.

"Class E Certificates Paying Agent": JPMorgan Chase Bank, National Association, in its capacity as Class E Certificates Paying Agent under the Class E Certificates Paying Agency Agreement, unless a successor Person shall have become the Class E Certificates paying agent pursuant to the applicable provisions of the Class E Certificates Paying Agency Agreement, and thereafter "Class E Certificates Paying Agent" shall mean such successor person.

"Class E Certificates Registrar": Walkers SPV Limited.

"Class P Accounts Securities Intermediary": The Class P-1 Accounts Securities Intermediary and/or the Class P-2 Accounts Securities Intermediary, as the context may require.

"Class P Accounts": Collectively, the Class P-1 Accounts and the Class P-2 Accounts.

14

"Class P Administrative Expenses": Collectively, the Class P-1 Administrative Expenses and the Class P-2 Administrative Expenses.

"Class P Class E Certificate Components": The Class P-1 Class E Certificate Component and the Class P-2 Class E Certificate Component.

"Class P Collateral": The Class P-1 Collateral and the Class P-2 Collateral.

"Class P Redemption Price": The Class P-1 Redemption Price and the Class P-2 Redemption Price.

"Class P Securities":  Collectively, the Class P-1 Securities and the Class P-2 Securities.

"Class P Securities Due Period": With respect to any Class P Securities Payment Date, the period commencing on and including the day immediately following the second Business Day prior to the preceding Class P Securities Payment Date (or in the case of the Class P Securities Due Period relating to the first Class P Securities Payment Date, commencing on the Closing Date) and ending on and including the second Business Day prior to such Class P Securities Payment Date (or, in the case of a Class P Securities Due Period that is applicable to the Class P Securities Payment Date relating to the Stated Maturity of any Security, ending on and including the day preceding such Class P Securities Payment Date).

"Class P Securities Payment Date": The tenth Business Day after each Payment Date or, if such Payment Date coincides with the Stated Maturity, the Class P Securities Payment Date will be such Payment Date.

"Class P Securityholders": Collectively, the Class P-1 Securityholders and the Class P-2 Securityholders.

"Class P U.S. Treasury Components":  Collectively, the Class P-1 U.S. Treasury Component and the Class P-2 U.S. Treasury Component.

"Class P U.S. Treasury Bid": The current bid-side market price of the applicable U.S. Treasury security represented by the Class P-1 U.S. Treasury Component or the Class P-2 U.S. Treasury Component, as quoted by a dealer in U.S. Treasury securities (which may be the Bank or the Initial Purchaser) to the Trustee.

"Class P-1 Accelerated Payment Notional Amount": With respect to each Class P Securities Payment Date, an amount equal to a portion of the Class P-1 U.S. Treasury Component with a face amount equal to the sum of (rounded down to the nearest U.S.$1,000) (a) the aggregate sum of distributions made with respect to the Class P-1 Class E Certificate Component since the Closing Date up to and including such Class P Securities Payment Date *plus* (b) the aggregate Class P-1 Optional Accelerated Payments and the aggregate Class P-1 Mandatory Accelerated Payments made on all prior Class P Securities Payment Dates *minus* (c) the aggregate face amount of the Class P-1 U.S. Treasury Component liquidated on all prior Class P Securities Payment Dates.

007234

"Class P-1 Accounts": Collectively, the Class P-1 Collection Account, the Class P-1 U.S. Treasury Component Account and the Class P-1 Principal Reserve Account.

"Class P-1 Accounts Securities Intermediary": The Securities Intermediary for the Class P-1 Accounts.

"Class P-1 Administrative Expenses": The administrative fees and expenses (including additional fees of the Trustee set forth in a separate fee letter dated as of the Closing Date by and between the Trustee and the Issuer) attributable to and taxes associated with the liquidation of the U.S. Treasury securities represented by the Class P-1 U.S. Treasury Component and any taxes attributable to the related Class P-1 Collateral.

"Class P-1 Class E Certificate Component": The U.S. $6,180,000 aggregate Face Amount of Class E Certificates comprising the Class P-1 Class E Certificate Component of the Class P-1 Securities.

"Class P-1 Collateral":  The meaning specified in the Granting Clauses.

"Class P-1 Collection Account": The trust account designated as the Class P-1 Collection Account established pursuant to Section 10.3(o).

"Class P-1 Components": The Class P-1 U.S. Treasury Component and/or the Class P-1 Class E Certificate Component, as the context may require.

"Class P-1 Mandatory Accelerated Payment": The meaning set forth in Section 11.2(a)(i).

"Class P-1 Net Periodic Distribution": With respect to each Class P Securities Payment Date, an amount equal to the sum of (a) any distributions received with respect to the Class P-1 Class E Certificate Component during the related Class P Securities Due Period *plus* (b) the Class P-1 Mandatory Accelerated Payment (if any) for such Class P Securities Due Period *plus* (c) the Class P-1 Optional Accelerated Payment (if any) for such Class P Securities Due Period *plus* (d) any payments or distributions received with respect to the Class P-1 U.S. Treasury Component during such Class P Securities Due Period net of any Class P-1 Administrative Expenses.

"Class P-1 Nominal Principal Outstanding": With respect to any day on or prior to the first Class P Securities Payment Date, U.S.$20,000,000, and on any date of determination thereafter (i) the Class P-1 Nominal Principal Outstanding on the prior Class P Securities Payment Date *less* (ii) the amount equal to (x) the aggregate amount of all distributions payable to the Class P-1 Securityholders in respect of its related Class P-1 Components on such prior Class P Securities Payment Date pursuant to the Indenture *minus* (y) the Class P-1 Notional Coupon Payment on such prior Class P Securities Payment Date; provided that the amount is greater than zero. For the avoidance of doubt, if the amount in clause (ii) under clause (ii) above is less than zero, the Class P-1 Notional Principal Outstanding will increase by the absolute value of such amount.

"Class P-1 Notional Coupon Payment": With respect to any Class P Securities Payment Date, an amount equal to notional interest for the related period on the Class P-1 Nominal Principal

16

007235

Outstanding at the Class P-1 Notional Coupon Rate. The Class P-1 Notional Coupon Payment shall be computed for each Interest Period on the basis of a 360-day year consisting of twelve 30-day months.

"Class P-1 Notional Coupon Rate": A rate of 6.5% per annum; _provided_ that no later than 15 Business Days before each Class P Securities Payment Date, the Class P-1 Securityholders representing a Majority of the Class P-1 Securities may, by written notice to the Trustee and the Issuer, alter the Class P-1 Notional Coupon Rate to be applied to such Class P Securities Payment Date, subject to Section 11.2(e).

"Class P-1 Optional Accelerated Payment": The meaning set forth in Section 11.2(a)(i).

"Class P-1 Optional Accelerated Payment Notional Amount": The meaning set forth in Section 11.2(a)(i).

"Class P-1 Principal Reserve Account": The trust account designated as the Class P-1 Principal Reserve Account and established pursuant to Section 10.3(n).

"Class P-1 Rated Principal": As of any Measurement Date, the U.S.$20,000,000 original stated amount of the Class P-1 Securities as of the Closing Date _minus_ the aggregate amount of all distributions paid to the Class P-1 Securityholders in respect of the related Class P-1 Components (whether characterized as interest or principal or otherwise) on or prior to such Measurement Date; _provided_ that the Class P-1 Rated Principal shall not be less than $1; _provided, further_ that the Issuer or the Portfolio Manager on its behalf shall notify Moody's once the Class P-1 Rated Principal is reduced to $1, including a statement as to the face value of the remaining Class P-1 U.S. Treasury Component.

"Class P-1 Redemption Price": With respect to the Class P-1 Securities, in the aggregate (i) a cash distribution in an amount equal to the sum of (x) the amount, if any, payable as the redemption price or otherwise as a final distribution with respect to the Class E Certificates represented by the Class P-1 Class E Certificate Component and (y) any other Class P-1 Collateral other than the Class P-1 U.S. Treasury Component and (ii) a distribution in kind of the Class P-1 U.S. Treasury Component; _provided_ that any Class P-1 Securityholder may elect instead of a distribution in kind of its _pro rata_ share of the Class P-1 U.S. Treasury Component to enter into another arrangement with the Issuer (satisfactory to the Issuer and the Trustee in their sole discretion) with respect to its _pro rata_ share of the Class P-1 U.S. Treasury Component; _provided_ that any administrative expenses with respect to such arrangement will be paid by such Class P-1 Securityholder.

"Class P-1 Securities": The U.S. $20,000,000 Class P-1 Extendable Securities (comprised of the Class P-1 U.S. Treasury Component and the Class P-1 Class E Certificate Component) issued by the Issuer pursuant to this Indenture and having the characteristics specified in Section 2.3.

"Class P-1 Securityholder": A Holder of the Class P-1 Securities.

"Class P-1 U.S. Treasury Component": The U.S. $20,000,000 face value of U.S. Treasury securities due November 15, 2013 (CUSIP No. 912833KB5) comprising the Class P-1 U.S. Treasury Component of the Class P-1 Securities.

007236

"Class P-1 U.S. Treasury Component Account": The trust account designated as the Class P-1 U.S. Treasury Component Account established pursuant to Section 10.3(l).

"Class P-2 Accelerated Payment Notional Amount": With respect to each Class P Securities Payment Date, an amount equal to a portion of the Class P-2 U.S. Treasury Component with a face amount equal to the sum of (rounded down to the nearest U.S.$1,000) (a) the aggregate sum of distributions made with respect to the Class P-2 Class E Certificate Component since the Closing Date up to and including such Class P Securities Payment Date *plus* (b) the aggregate Class P-2 Optional Accelerated Payments and the aggregate Class P-2 Mandatory Accelerated Payments made on all prior Class P Securities Payment Dates *minus* (c) the aggregate face amount of the Class P-2 U.S. Treasury Component liquidated on all prior Class P Securities Payment Dates.

"Class P-2 Accounts": Collectively, the Class P-2 Collection Account and the Class P-2 U.S. Treasury Component Account.

"Class P-2 Accounts Securities Intermediary": The Securities Intermediary for the Class P-2 Accounts.

"Class P-2 Administrative Expenses": The administrative fees and expenses (including additional fees of the Trustee set forth in a separate fee letter dated as of the Closing Date by and between the Trustee and the Issuer) attributable to and taxes associated with the liquidation of the U.S. Treasury securities represented by the Class P-2 U.S. Treasury Component and any taxes attributable to the related Class P-2 Collateral.

"Class P-2 Class E Certificate Component": The U.S. $1,500,000 aggregate Face Amount of Class E Certificates comprising the Class P-2 Class E Certificate Component of the Class P-2 Securities.

"Class P-2 Collateral":  The meaning specified in the Granting Clauses.

"Class P-2 Collection Account": The trust account designated as the Class P-2 Collection Account established pursuant to Section 10.3(p).

"Class P-2 Components": The Class P-2 U.S. Treasury Component and/or the Class P-2 Class E Certificate Component, as the context may require.

"Class P-2 Mandatory Accelerated Payment": The meaning set forth in Section 11.2(a)(i).

"Class P-2 Net Periodic Distribution": With respect to each Class P Securities Payment Date, an amount equal to the sum of (a) any distributions received with respect to the Class P-2 Class E Certificate Component during the related Class P Securities Due Period *plus* (b) the Class P-2 Mandatory Accelerated Payment (if any) for such Class P Securities Due Period *plus* (c) the Class P-2 Optional Accelerated Payment (if any) for such Class P Securities Due Period *plus* (d) any payments or distributions received with respect to the Class P-2 U.S. Treasury Component during such Class P Securities Due Period net of any Class P-2 Administrative Expenses.

18

"Class P-2 Nominal Principal Outstanding": With respect to any day on or prior to the first Class P Securities Payment Date, U.S.$5,000,000, and on any date of determination thereafter (i) the Class P-2 Nominal Principal Outstanding on the prior Class P Securities Payment Date *less* (ii) the amount equal to the aggregate amount of all distributions payable to the Class P-2 Securityholders in respect of its related Class P-2 Components on such Class P Securities Payment Date pursuant to the Indenture; provided that the amount is greater than zero.

"Class P-2 Optional Accelerated Payment": The meaning set forth in Section 11.2(a)(ii).

"Class P-2 Optional Accelerated Payment Notional Amount": The meaning set forth in Section 11.2(a)(ii).

"Class P-2 Rated Principal": As of any Measurement Date, the U.S.$5,000,000 original stated amount of the Class P-2 Securities as of the Closing Date *minus* the aggregate amount of all distributions paid to the Class P-2 Securityholders in respect of the related Class P-2 Components (whether characterized as interest or principal or otherwise) on or prior to such Measurement Date; *provided* that the Class P-2 Rated Principal shall not be less than $1; *provided, further* that the Issuer or the Portfolio Manager on its behalf shall notify Moody's once the Class P-2 Rated Principal is reduced to $1, including a statement as to the face value of the remaining Class P-2 U.S. Treasury Component.

"Class P-2 Redemption Price": With respect to the Class P-2 Securities, in the aggregate (i) a cash distribution in an amount equal to the sum of (x) the amount, if any, payable as the redemption price or otherwise as a final distribution with respect to the Class E Certificates represented by the Class P-2 Class E Certificate Component and (y) any other Class P-2 Collateral other than the Class P-2 U.S. Treasury Component and (ii) a distribution in kind of the Class P-2 U.S. Treasury Component; provided that any Class P-2 Securityholder may elect instead of a distribution in kind of its *pro rata* share of the Class P-2 U.S. Treasury Component to enter into another arrangement with the Issuer (satisfactory to the Issuer and the Trustee in their sole discretion) with respect to its *pro rata* share of the Class P-2 U.S. Treasury Component; provided that any administrative expenses with respect to such arrangement will be paid by such Class P-2 Securityholder.

"Class P-2 Securities": The U.S. $5,000,000 Class P-2 Extendable Securities (comprised of the Class P-2 U.S. Treasury Component and the Class P-2 Class E Certificate Component) issued by the Issuer pursuant to this Indenture and having the characteristics specified in Section 2.3.

"Class P-2 Securityholder": A Holder of the Class P-2 Securities.

"Class P-2 U.S. Treasury Component": The U.S. $5,000,000 face value of U.S. Treasury securities due November 15, 2013 (CUSIP No. 912833KB5) comprising the Class P-2 U.S. Treasury Component of the Class P-2 Securities.

"Class P-2 U.S. Treasury Component Account": The trust account designated as the Class P-2 U.S. Treasury Component Account and established pursuant to Section 10.3(m).

"Class Q-1 Class E Certificate Component": The U.S. $7,400,000 aggregate Face Amount of Class E Certificates comprising the Class Q-1 Class E Certificate Component of the Class Q-1 Securities.

19

"Class Q-1 Components": The Class Q-1 Note Component and the Class Q-1 Class E Certificate Component.

"Class Q-1 Note Component": The U.S. $12,600,000 initial aggregate principal amount of Class C Notes comprising the Class Q-1 Note Component of the Class Q-1 Securities.

"Class Q-1 Rated Principal": For the first Interest Period, U.S. $20,000,000 original stated amount of the Class Q-1 Securities as of the Closing Date, and for any Interest Period thereafter, the Class Q-1 Rated Principal for the prior Interest Period minus the aggregate amount of all distributions paid to the Holders of Class Q-1 Securities in respect of the related Class Q-1 Components (whether characterized as interest or principal or otherwise) for the Payment Date occurring at the beginning of such current Interest Period; provided that the Class Q-1 Rated Principal cannot be negative.

"Class Q-1 Securities": The U.S. $20,000,000 Class Q-1 Extendable Securities (comprised of the Class Q-1 Note Component and the Class Q-1 Class E Certificate Component) issued by the Issuer pursuant to this Indenture and having the characteristics specified in Section 2.14.

"Class Scenario Loss Rate": With respect to any Class of Notes rated by S&P, an estimate of the cumulative default rate for the Current Portfolio or the Proposed Portfolio, as applicable, consistent with S&P's rating of such Class of Notes on the Closing Date, determined by application of the S&P CDO Monitor.

"Clearing Agency": An organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act.

"Clearing Corporation": The meaning specified in Section 8-102(a)(5) of the UCC.

"Clearing Corporation Security": A "security" (as defined in Section 8-102(a)(15) of the UCC) that (i) is a debt or Equity Security and (ii) is in the custody of or maintained on the books of a Clearing Corporation or its nominee.

"Clearstream": Clearstream Banking, société anonyme, a corporation organized under the laws of the Duchy of Luxembourg.

"Closing Date": December 8, 2005.

"Closing Date Expense Account": The trust account established pursuant to Section 10.3(g).

"Code": The United States Internal Revenue Code of 1986, as amended.

"Co-Issuer": The person named as such on the first page of this Indenture.

"Co-Issuers": The Issuer and the Co-Issuer.

"Collateral": The meaning specified in the Granting Clauses.

"Collateral Administration Agreement": The agreement dated as of the Closing Date among the Issuer, the Portfolio Manager, and the Collateral Administrator, as modified, amended, and supplemented and in effect from time to time.

007239

"Collateral Administrator": The Bank in its capacity as collateral administrator under the Collateral Administration Agreement.

"Collateral Assignment of Hedge Agreements": With respect to each Hedge Agreement, the assignment of all of the Issuer's interest in the Hedge Agreement to the Trustee and acknowledged by the Hedge Counterparty to create a security interest therein in favor of the Trustee.

"Collateral Obligation": Any obligation or security that, when the Issuer commits to purchase (or otherwise acquire) the obligation or security, is a Loan, High-Yield Bond, Structured Finance Obligation, or Synthetic Security with a Reference Obligation that is a Loan, a Structured Finance Obligation, or High-Yield Bond, in each case that is:

(a)    denominated and payable in U.S. Dollars and is not convertible by its obligor into any other currency;

(b)    an obligation of an obligor Domiciled in an Eligible Country;

(c)    an obligation that is eligible by its terms to be assigned to the Issuer and pledged by the Issuer to the Trustee for inclusion in the Collateral;

(d)    not an exchangeable or convertible security that is exchangeable or convertible at the option of its issuer;

(e)    not an Equity Security or a component of an Equity Security or a security that has a component that is an Equity Security (other than for avoidance of doubt, a pass-through trust certificate in a trust holding Collateral Obligations);

(f)    not an obligation or security that has been called for redemption and is not an obligation or security that is the subject of an Offer other than a Permitted Offer or an exchange offer in which a security that is not registered under the Securities Act is exchanged for (i) a security that has substantially identical terms (except for transfer restrictions) but is registered under the Securities Act or (ii) a security that would otherwise qualify for purchase under Article 12;

(g)    an obligation that (a) has a Moody's Rating (including any estimated or confidential rating which is in respect of the full obligation of the obligor and which is monitored) and (b) has an S&P Rating (including any confidential rating which is in respect of the full obligation of the obligor and which is monitored), which S&P Rating does not have a "p", "pi", "q", "r", "st" or "t" subscript unless S&P otherwise authorizes in writing;

(h)    an obligation that is a Finance Lease (if it is a lease) and the Rating Condition has been satisfied with respect to the acquisition thereof;

(i)    an obligation that is not a Current-Pay Obligation, Non-Performing Collateral Obligation or Credit Risk Obligation, and in the case of a Collateral Obligation that has a Moody's Rating of "Caa1" or lower or an S&P Rating of "CCC+" or lower, is an obligation for which the Portfolio Manager has certified in writing that such Collateral Obligation is not a Credit Risk Obligation;

(j)    an obligation that (unless it is a High-Yield Bond) is not subordinated by its terms to other indebtedness for borrowed money of the applicable issuer; provided that for the avoidance of doubt, this clause shall not prohibit the inclusion as Collateral Obligations of Second Lien Loans or Subordinated Lien Loans;

21

(k)       an obligation that (i) bears simple interest payable in cash no less frequently than annually (although, in the case of a PIK Security, interest may be deferrable) at a fixed or floating rate that is paid on a periodic basis on an unleveraged basis and, in the case of a floating rate, computed on a benchmark interest rate plus or minus a spread, if any (which may vary under the terms of the obligation) and (ii) provides for a fixed amount of principal payable in cash according to a fixed schedule (which may include optional call dates) or at maturity (or a fixed notional amount in the case of Synthetic Securities);

(l)       except in the case of a Synthetic Security, an obligation the payment or repayment of the principal, if any, of which is not an amount determined by reference to any formula or index or subject to any contingency under the terms thereof;

(m)       an obligation the portion of which to be acquired (including through a Synthetic Security with respect to the Reference Obligation) does not represent, directly or indirectly, more than a 25% interest in the obligation;

(n)       not an obligation with a maturity later than two years after the Stated Maturity of the Notes;

(o)       an obligation upon which no payments are subject to withholding tax imposed by any jurisdiction unless the obligor thereof or counterparty with respect thereto is required to make "gross-up" payments that cover the full amount of any such withholding tax on an after-tax basis (other than withholding taxes with respect to commitment fees associated with Collateral Obligations constituting Revolving Loans or Delayed Drawdown Loans);

(p)       not a Loan or Synthetic Security that would require the Issuer after its purchase of the Loan or Synthetic Security to advance any funds to the related borrower or Synthetic Security Counterparty or permit the borrower or Synthetic Security Counterparty to require that any future advances be made except for:

(A)       any Revolving Loan or Delayed Drawdown Loan if, the aggregate Balance of all Eligible Investments credited to the Revolving Reserve Account will be at least equal to the Revolver Funding Reserve Amount, and

(B)       any Synthetic Security if the Issuer posts cash collateral with (or for the benefit of) the Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into the Synthetic Security in an amount not exceeding the amount of any future advances;

(q)       if such obligation is a Structured Finance Obligation that is a collateralized loan obligation, such obligation:

(A)       has been assigned a rating by both Moody's and S&P;

(B)       has a Moody's Rating of "Ba3" or higher and an S&P Rating of "BB-" or higher; and

(C)       has not been placed on the watch list for possible downgrade by Moody's or S&P;

(r)       if such obligation is a Structured Finance Obligation managed by the Portfolio Manager that is other than a collateralized loan obligation primarily secured by Senior Secured Loans, the Rating Condition has been satisfied;

22

007241

(s)     not a Loan that is an obligation of a debtor in possession or a trustee for a debtor in an insolvency proceeding other than a DIP Loan;

(t)     with respect to an obligation that provides for the payment of interest at a floating rate, an obligation for which such floating rate is determined by reference to the U.S. Dollar prime rate or other base rate, London interbank offered rate or similar interbank offered rate, commercial deposit rate or any other index with respect to which the Rating Condition is satisfied;

(u)     in the case of a Synthetic Security, a Synthetic Security for which the counterparty or issuer, as the case may be, has a long-term senior unsecured rating by Moody's of at least "A1", and if rated "A1" by Moody's, such rating is not on watch for downgrade, and an issuer credit rating by S&P of at least "A+";

(v)     not Margin Stock;

(w)     not a Zero-Coupon Security;

(x)     not an obligation that is currently deferring interest or paying interest "in kind" or otherwise has an interest "in kind" balance outstanding at the time of purchase, which interest is otherwise payable in cash, unless the Rating Condition has been satisfied with respect to the acquisition thereof;

(y)     not a security whose repayment is subject to substantial non-credit related risk as determined by the Portfolio Manager;

(z)     not an obligation the interest payments of which are scheduled to decrease (although interest payments may decrease due to unscheduled events such as a decrease if the index relating to a Floating Rate Obligation, the change from a default rate of interest to a non-default rate of interest or an improvement in the obligor's financial condition);

(aa)     not an obligation that will cause the Issuer, the Co-Issuer, or the pool of Collateral to be required to be registered as an investment company under the Investment Company Act;

(bb)     not an asset, the acquisition (including the manner of acquisition), ownership, enforcement or disposition of which would cause the Issuer to be treated as engaged in a trade or business within the United States for United States federal income tax purposes or otherwise as subject to tax on a net income basis in any jurisdiction outside the Issuer's jurisdiction of incorporation; and

(cc)     not a Bridge Loan.

Pursuant to the definition of "Synthetic Security", any "deliverable obligation" that may be delivered to the Issuer as a result of the occurrence of any "credit event" must qualify (when the Issuer purchases the related Synthetic Security and when such "deliverable obligation" is delivered to the Issuer as a result of the occurrence of any "credit event") as a Collateral Obligation, except that such "deliverable obligation" may constitute a Defaulted Collateral Obligation when delivered upon a "credit event".

"Collateral Quality Tests": The Diversity Test, the Weighted Average Life Test, the Weighted Average Moody's Recovery Rate Test, the Weighted Average S&P Recovery Rate Test, the Weighted Average Fixed Rate Coupon Test, the Weighted Average Spread Test, the Weighted Average Rating Factor Test, and the S&P CDO Monitor Test.

007242

"Collection Account":  The trust account established pursuant to Section 10.2(a).

"Commitment":  At any time in respect of any Class A–1A Note, the maximum aggregate outstanding principal amount of advances (whether at the time funded or unfunded) that the Holder of such Class A–1A Note is obligated from time to time under the Class A-1A Note Purchase Agreement to make to the Issuer.

"Commitment Fee":  With respect to the Class A–1A Notes, the Commitment Fee Rate multiplied by the Aggregate Undrawn Amount of the Class A–1A Notes for each day during the Draw Period, except that no Commitment Fee shall be paid with respect to the Aggregate Undrawn Amount attributable to a Holder that has breached its obligation to fund a request for a Borrowing from the date of such breach to and until the date such breach has been cured.

"Commitment Fee Amount":  With respect to the Class A–1A Notes as of any Payment Date, the sum of (i) the aggregate amount of Commitment Fee accrued and unpaid as of such Payment Date plus (ii) interest accrued for the Interest Period for such Payment Date at the Note Interest Rate of the Class A–1A Notes on any accrued and unpaid Commitment Fees that became payable on any prior Payment Date.

"Commitment Fee Rate":  A rate per annum equal to 0.17%.

"Commitment Termination Date":  With respect to the Commitments, the earliest of: (i) the Stated Maturity, (ii) the date on which the Commitments are reduced to zero and (iii) any date as of which (x) an Event of Default described in clause (g) or (h) of the definition thereof has occurred and is continuing or (y) (A) any other Event of Default there has occurred and is continuing and (B) the Securities have been declared to be due and payable pursuant to the Indenture (or, in the absence of such declaration, the Holders of at least 66 2/3% of the Aggregate Outstanding Amount of the Class A-1A Notes have directed the Trustee to give notice to the Issuer of the termination of the Commitments under the Class A-1A Note Purchase Agreement) and in the case of (x) and (y) the Holders of the Class A-1A Notes have satisfied their funding obligations as a result thereof pursuant to the Class A-1A Note Purchase Agreement.

"Components":  The Class Q-1 Note Component, the Class Q-1 Class E Certificate Component, the Class P-1 Class E Certificate Component, the Class P-2 Class E Certificate Component, the Class P-1 U.S. Treasury Component and the Class P-2 U.S. Treasury Component, as the context may require.

"Concentration Limitations":  The limit set forth below with respect to a particular type of Investment Obligation (measured by Aggregate Principal Balance) as a percentage of the Maximum Investment Amount:

| | | Percentage of the Maximum Investment Amount |
|---|---|---|
| (1) | Senior Secured Loans, Second Lien Loans, Subordinated Lien Loans and Eligible Investments | ≥ 92.5% |
| | (a) except that Senior Secured Loans shall meet or exceed the percentage of the Maximum Investment Amount specified in the right column | ≥ 87.5% |

24

007243

| | Percentage of the Maximum Investment Amount |
|---|---|
| (2) Unsecured Loans | ≤ 3.0% |
| (3) Subordinated Lien Loans and Second Lien Loans | ≤ 10.0% |
| (4) High-Yield Bonds | ≤ 7.5% |
| (5) Subordinated Lien Loans, Second Lien Loans and High-Yield Bonds | ≤ 15.0% |
| (6) Revolving Loans and Delayed Drawdown Loans | ≤ 15.0% |
| (7) DIP Loans | ≤ 5.0% |
| (a) except that with satisfaction of the Rating Condition, DIP Loans may constitute up to the percentage of the Maximum Investment Amount specified in the right column | ≤ 7.5% |
| (8) S&P Unrated DIP Loans | ≤ 2.5% |
| (9) PIK Securities | ≤ 3.0% |
| (10) Structured Finance Obligations | ≤ 7.5% |
| (a) except that Structured Finance Obligations managed by the Portfolio Manager may not exceed the percentage of the Maximum Investment Amount specified in the right column; | ≤ 5.0% |
| (b) except that a single issuer together with any of its Affiliates (excluding Secondary Risk Counterparties) of a Structured Finance Obligation may not exceed the percentage of the Maximum Investment Amount specified in the right column; and | ≤ 3.0% |
| (c) except that any single issuer whose long-term debt obligations are rated below BBB- by S&P, or are rated BBB- by S&P and are on negative watch for downgrade, other than an issuer with respect to which the Rating Condition has been satisfied, may not exceed the percentage of the Maximum Investment Amount specified in the right column; | 0% |
| (11) obligors Domiciled other than in the United States and Canada | ≤ 15.0% |
| (12) obligors Domiciled in Canada or any single Moody's Group I Country | ≤ 10.0% |

007244

|  | Percentage of the Maximum Investment Amount |
|---|---|
| (13) obligors Domiciled in any single Moody's Group II Country | ≤ 5.0% |
| (14) obligors Domiciled in any single Moody's Group III Country | ≤ 2.5% |
| (15) obligors organized in a Tax Advantaged Jurisdiction | ≤ 5.0% |
| (16) obligations in the same S&P Industry Classification | ≤ 8.0% |
| (a) except that Investment Obligations belonging to two S&P Industry Classifications (not including Telecommunications) may each constitute up to the percentage of the Maximum Investment Amount specified in the right column | ≤ 12.0% |
| (17) obligations of a single issuer or any of its Affiliates (excluding Secondary Risk Counterparties); provided that | ≤ 1.5% |
| (a) obligations of a single issuer or any of its Affiliates (excluding Secondary Risk Counterparties) that are Loans that are part of a credit facility with a total global aggregate commitment amount of less than $75,000,000 may each constitute up to the percentage of the Maximum Investment Amount specified in the right column; and | ≤ 1.0% |
| (b) obligations (other than described in (a) above) of up to each of five individual issuers (including any of their respective Affiliates but excluding issuers that the Portfolio Manager reasonably determines are Affiliated but are not dependent upon one another for credit support and are not dependent upon a Person by which they are commonly controlled for credit support) may each constitute up to the percentage of the Maximum Investment Amount specified in the right column | ≤ 2.0% |
| (18) Fixed Rate Obligations | ≤ 7.5% |
| (19) obligations that pay interest less frequently than quarterly but no less frequently than annually | ≤ 7.5% |
| (20) Synthetic Securities | ≤ 20.0% |

007245

|  |  | | Percentage of the Maximum Investment Amount |
|---|---|---|---|
| | (a) | except that Synthetic Securities that provide for settlement other than by physical delivery may not exceed the percentage of the Maximum Investment Amount specified in the right column | ≤ 5.0% |
| | (b) | except that Synthetic Securities that reference a senior secured index investment providing non-leveraged credit exposure to a basket of credit default swaps referencing a diversified group of Reference Obligations, with respect to which the principal or notional amount of the credit exposure to any single Reference Obligation does not increase over time may not exceed the percentage of the Maximum Investment Amount specified in the right column | ≤ 5.0% |
| (21) | Participations (provided, that no Investment Obligations may be a Participation in a Participation) | | ≤ 20.0% |
| (22) | Investment Obligations of which are (i) obligors Domiciled other than in the United States, (ii) Collateral Obligations lent under Securities Lending Agreements, (iii) Participations and (iv) Synthetic Securities, in the aggregate may not exceed the percentage of the Maximum Investment Amount specified in the right column | | ≤ 20.0% |
| (23) | Investment Obligations of which are (i) obligors Domiciled other than in the United States, (ii) Collateral Obligations lent under Securities Lending Agreements, (iii) Participations and (iv) Synthetic Securities, entered into with, or issued by, a single Secondary Risk Counterparty | | ≤ respective percentage in Secondary Risk Table under "Individual Counterparty Limit" for applicable rating* |
| (24) | Investment Obligations of which are (i) obligors Domiciled other than in the United States, (ii) Collateral Obligations lent under Securities Lending Agreements, (iii) Participations and (iv) Synthetic Securities, entered into with, or issued by, all Secondary Risk Counterparties | | ≤ respective percentage in Secondary Risk Table under "Aggregate Counterparty Limit" for applicable rating** |
| (25) | Deep Discount Obligations | | ≤ 10.0% |
| (26) | CCC/Caa Collateral Obligations | | ≤ 7.5% |
| (27) | Long-Dated Collateral Obligations | | ≤ 4.0% |

007246

|  | Percentage of the Maximum Investment Amount |
|---|---|
| (28) Collateral Obligations lent under Securities Lending Agreements | ≤ 15.0% |
| (29) Floating Rate Obligations providing for interest at a non-London interbank offered rate | ≤ 5.0% |
| (30) Collateral Obligations that are Loans that are part of a credit facility with a total global aggregate commitment amount of less than $75,000,000 | ≤ 10.0% |
| (31) Collateral Obligations representing units consisting of debt and warrants to purchase equity securities; provided that, with respect to each Collateral Obligation which consists of such unit of debt and warrants, at the time of purchase of such Collateral Obligation, the aggregate value of the warrants included in such unit must be determined by the Portfolio Manager in good faith to be no more than 2% of the outstanding principal amount of the debt included in such unit. | ≤ 5.0% |
| (32) Finance Leases | ≤ 5.0% |

\*    Applicable long-term unsecured rating by Moody's or S&P of such Secondary Risk Counterparty (using the limit for the lower of such ratings if different).

\*\*   Long-term unsecured rating by Moody's or S&P at or below a level specified in the Secondary Risk Table (using the lower of such ratings for a Secondary Risk Counterparty, if different).

        Subject to the right of the Portfolio Manager to determine otherwise as set out in Section 1.2(h), solely for the purpose of determining whether the Concentration Limitations are met, Eligible Investments and Cash will be treated as Senior Secured Loans and Floating Rate Obligations.

        "Controlling Class": The Class A-1A Notes, the Class A-1B Notes and the Class A-1C Notes (voting together as a single Class), so long as any Class A-1 Notes are Outstanding; then the Class A-2 Notes, so long as any Class A-2 Notes are Outstanding; then the Class A-3 Notes, so long as any Class A-3 Notes are Outstanding; then the Class A-4 Notes, so long as any Class A-4 Notes are Outstanding; then the Class B Notes, so long as any Class B Notes are Outstanding; and then the Class C Notes, so long as any Class C Notes are Outstanding.

        "Corporate Trust Office": The corporate trust office of the Trustee at which the Trustee performs its duties under this Indenture, currently having an address of 600 Travis Street, 50th Floor, Houston, Texas 77002, telecopy no. (713) 216-2101, Attention: Worldwide Securities Services—Liberty CLO, Ltd. or any other address the Trustee designates from time to time by notice to the Noteholders, the Portfolio Manager, the Class E Certificates Paying Agent, the Issuer and each Rating Agency or the principal corporate trust office of any successor Trustee.

        "Coverage Tests": The Overcollateralization Tests and the Interest Coverage Tests.

28

007247

"Credit Improved Obligation":  Any Collateral Obligation that in the commercially reasonable judgment of the Portfolio Manager, has improved in credit quality; provided that, if a Credit Rating Event is in effect, such Collateral Obligation will be considered a Credit Improved Obligation only if in addition to the above:

(a)  the Collateral Obligation has been upgraded or has been put on credit watch list with the potential for developing positive credit implications by either of the Rating Agencies since the date the Issuer first acquired the Collateral Obligation under this Indenture;

(b)  such Collateral Obligation has experienced a reduction in credit spread of (A) 0.25% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such decrease) less than or equal to 2.00%, (B) 0.375% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such decrease) greater than 2.00% but less than or equal to 4.00% or (C) 0.50% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such decrease) greater than 4.00%, in each case compared to the credit spread at the time such Collateral Obligation was acquired by the Issuer, determined by reference to an applicable index selected by the Portfolio Manager (such index selection subject to satisfaction of the Rating Condition with respect to Moody's);

(c)  (x) in the case of a Loan, the Market Value of such Collateral Obligation has increased by at least 1.00% from the Market Value of such Collateral Obligation as of its date of acquisition, as determined by the Portfolio Manager (provided that this subclause (c)(x) will be deemed satisfied if Market Value increases to 101%), or (y) in the case of a bond, the Market Value of such Collateral Obligation has changed since its date of acquisition by a percentage more positive than the percentage change in the Merrill Lynch US High Yield Master II Index, Bloomberg ticker H0A0, plus 3.00%, over the same period; or

(d)  a Super Majority of the Controlling Class have voted to suspend the limitations on a Collateral Obligation being a Credit Improved Obligation, and for each subsequent downgrade by Moody's after a vote to suspend the limitations pursuant to this clause (d) has occurred, a Super Majority of the Controlling Class must again vote to suspend the limitations on the Collateral Obligation being a Credit Improved Obligation for this clause (d) to remain applicable.

A Synthetic Security shall be considered a Credit Improved Obligation if:

(a)  the Synthetic Security itself is a Credit Improved Obligation or

(b)  the Reference Obligation of the Synthetic Security would, if it were a Collateral Obligation, be a Credit Improved Obligation.

"Credit Rating Event":  An event that is in effect if the rating by Moody's:

(a)  of the Class A-1A Notes, the Class A-1B Notes, the Class A-1C Notes, the Class A-2 Notes, the Class A-3 Notes or the Class A-4 Notes has been withdrawn or is one or more rating sub-categories below its respective Initial Rating; or

(b)  of the Class B Notes or the Class C Notes has been withdrawn or is two or more rating sub-categories below its respective Initial Rating.

For the purposes of this definition, any withdrawal or reduction in rating shall not be effective if after the withdrawal or reduction Moody's has upgraded the reduced or withdrawn rating to at

007248

least the Initial Rating in the case of the Class A-1A Notes, the Class A-1B Notes, the Class A-1C Notes, the Class A-2 Notes, the Class A-3 Notes or the Class A-4 Notes, or to only one subcategory below their Initial Rating in the case of the Class B Notes and the Class C Notes.

"Credit Risk Obligation":  Any Collateral Obligation (other than a Defaulted Collateral Obligation) that, in the commercially reasonable judgment of the Portfolio Manager, has a significant risk of declining in credit quality and, with a lapse of time, becoming a Defaulted Collateral Obligation.

So long as a Credit Rating Event is in effect, no Collateral Obligation shall be eligible to be a Credit Risk Obligation unless in addition to the above, as of the date of determination:

(a)  the Collateral Obligation has been downgraded or has been put on credit watch list with the potential for developing negative credit implications by either of the Rating Agencies since the date the Issuer first acquired the Collateral Obligation under this Indenture;

(b)  such Collateral Obligation has experienced an increase in credit spread of (A) 0.25% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such increase) less than or equal to 2.00%, (B) 0.375% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such increase) greater than 2.00% but less than or equal to 4.00% or (C) 0.50% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such increase) greater than 4.00%, in each case compared to the credit spread at the time such Collateral Obligation was acquired by the Issuer, determined by reference to an applicable index selected by the Portfolio Manager (such index selection subject to satisfaction of the Rating Condition with respect to Moody's);

(c)  (x) in the case of a Loan, the Market Value of such Collateral Obligation has decreased by at least 2.50% from the Market Value of such Collateral Obligation as of its date of acquisition, as determined by the Portfolio Manager, and (y) in the case of a bond, the Market Value of such Collateral Obligation has changed since its date of acquisition by a percentage more negative, or less positive, as the case may be, than the percentage change in the Merrill Lynch US High Yield Master II Index, Bloomberg ticker H0A0, less 3.00%, over the same period; or

(d)  a Super Majority of the Controlling Class have voted to suspend the limitations on a Collateral Obligation being a Credit Risk Obligation, and for each subsequent downgrade by Moody's after a vote to suspend the limitations pursuant to this clause (d) has occurred, a Super Majority of the Controlling Class must again vote to suspend the limitations on the Collateral Obligation being a Credit Risk Obligation for this clause (d) to remain applicable.

A Synthetic Security shall be considered a Credit Risk Obligation if:

(a)  the Synthetic Security itself is a Credit Risk Obligation, or

(b)  the Reference Obligation of the Synthetic Security would, if it were a Collateral Obligation, be a Credit Risk Obligation.

"Current-Pay Obligation":  A Collateral Obligation as to which:

(a)  except with respect to a DIP Loan, an Insolvency Event has occurred with respect to its obligor or as to which its obligor is rated "D" or "SD" by S&P or its obligor has previously been rated "CCC-" by S&P and the rating has been withdrawn,

007249

(b)        no default as to the payment of principal or interest with respect to the Collateral Obligation is then continuing and the Portfolio Manager has delivered to the Trustee an officer's certificate to the effect that the Portfolio Manager expects that the obligor will make payments on the Collateral Obligation as they become due,

(c)        (A) if the rating by Moody's of the Collateral Obligation is at least "Caa1" (and not on credit watch with negative implications) the Market Value of the Collateral Obligation is at least equal to 80% of its Principal Balance, (B) if the rating by Moody's of the Collateral Obligation is less than "Caa1" or is "Caa1" and on credit watch with negative implications, but greater than or equal to Caa2 without credit watch with negative implications, the Market Value of the Collateral Obligation is at least equal to 85% of its Principal Balance; provided that if the Moody's Rating of the Collateral Obligation has been withdrawn but the obligation had a Moody's rating of at least "Caa2" without credit watch with negative implications at the time of default, such Collateral Obligation may be treated as a Current Pay Obligation if its Market Value is at least equal to 85% of its Principal Balance, or (C) if the rating by Moody's of the Collateral Obligation is less than "Caa2" or is "Caa2" and on credit watch with negative implications, but greater than or equal to "Caa3" without credit watch with negative implications, the Market Value of the Collateral Obligation is at least equal to 90% of its Principal Balance; provided that if the Moody's Rating of the Collateral Obligation has been withdrawn but the obligation had a Moody's rating of at least "Caa3" without credit watch with negative implications at the time of default, such Collateral Obligation may be treated as a Current Pay Obligation if its Market Value is at least equal to 90% of its Principal Balance;

(d)        if an Insolvency Event has occurred with respect to the obligor of the Collateral Obligation, a bankruptcy court has authorized the payment of interest payable on the Collateral Obligation, and

(e)        the Portfolio Manager has designated in writing to the Trustee the Collateral Obligation as a Current-Pay Obligation.

If the Aggregate Principal Balance of Collateral Obligations that would otherwise be Current-Pay Obligations exceeds 5% of the Maximum Investment Amount, all or a portion of one or more Collateral Obligations that would otherwise be Current-Pay Obligations with an Aggregate Principal Balance equal to the amount of the excess shall not be Current-Pay Obligations (and will therefore be Defaulted Collateral Obligations). The Portfolio Manager shall designate in writing to the Trustee the Collateral Obligations that shall not be Current-Pay Obligations pursuant to the preceding sentence as the Collateral Obligations (or portions thereof) that have the lowest Market Value on any applicable date of determination.

The Portfolio Manager may, by notice to the Issuer, the Trustee, and the Collateral Administrator, change the definition of "Current-Pay Obligation" or how Current-Pay Obligations are treated in this Indenture, subject to the satisfaction of the Rating Condition with respect to each Rating Agency but without amendment of this Indenture.

"Current Portfolio": At any time, the portfolio (measured by Aggregate Principal Balance) of Collateral Obligations, Principal Proceeds held as Cash on deposit in the Collection Account, and other Eligible Investments purchased with Principal Proceeds on deposit in the Collection Account that exists before the sale, maturity, or other disposition of a Collateral Obligation or before the acquisition of a Collateral Obligation, as the case may be.

"Custodial Account": The custodial account established in the name of the Trustee pursuant to Section 10.3(a).

007250

"Deep Discount Obligation":  In the case of any Collateral Obligation, until the average Market Value Percentage of the Collateral Obligation, as determined daily for any period of 30 consecutive days, equals or exceeds 90%, any such Collateral Obligation acquired by the Issuer for a Purchase Price less than 85% of its Principal Balance. For such purpose, the Market Value Percentage of a Collateral Obligation on a day that is not a Business Day shall be deemed to be the Market Value Percentage of the Collateral Obligation on the immediately preceding Business Day.

"Default":  Any Event of Default or any occurrence that, with notice or the lapse of time or both, would become an Event of Default.

"Defaulted Collateral Obligation":  Any Collateral Obligation or other obligation included in the Collateral:

(a)     as to which there has occurred and is continuing a default with respect to the payment of interest or principal with respect to such Collateral Obligation, without giving effect to any applicable grace period or waiver (provided that, if the Portfolio Manager certifies to the Trustee in writing that such default is for non-credit related reasons, the related Collateral Obligation shall not be treated as a Defaulted Collateral Obligation under this clause (i) unless and until such default has continued for a period of three (3) consecutive Business Days), but, in any case, only until such default has been cured;

(b)     the maturity of all or a portion of the principal amount of such Collateral Obligation has been accelerated as a consequence of a default (other than any payment default) under the instruments evidencing or relating to such Collateral Obligation; unless such default or event of default has been fully cured or waived and is no longer continuing and such acceleration has been rescinded;

(c)     with respect to which there has been effected any distressed exchange or other debt restructuring where the obligor has offered the holders thereof a new security or instrument or package of securities or instruments that, in the commercially reasonable judgment of the Portfolio Manager, either (x) amounts to a diminished financial obligation or (y) has the sole purpose of enabling the obligor to avoid a default;

(d)     (1) that is pari passu with or subordinated to other indebtedness for borrowed money owing by its obligor ("Other Indebtedness"), (2) the obligor has defaulted in the payment of principal or interest (without regard to any applicable grace or notice period and without regard to any waiver of the default) on the Other Indebtedness, unless, in the case of a failure of the obligor to make required interest payments, the obligor has resumed current Cash payments of interest previously scheduled and unpaid on the Other Indebtedness and has paid in full any accrued interest due and payable thereon, in which case the Collateral Obligation shall cease to be classified as a Defaulted Collateral Obligation and (3) the Portfolio Manager (provided that the related Collateral Obligation has not been downgraded after the default on such Other Indebtedness has occurred) determines (in its commercially reasonable judgment) that such Other Indebtedness is material;

(e)     (other than a Current-Pay Obligation or a DIP Loan) as to which:

(A)     an Insolvency Event has occurred with respect to its obligor, or

(B)     the obligation is rated "D", "SD", "C" or "CC" by S&P or was so rated immediately prior to such rating being withdrawn, or has previously been rated "CCC-" or lower by S&P and the rating has been withdrawn;

007251

(f)     if the Collateral Obligation is a Structured Finance Obligation, it is rated "CC" or below by S&P, or it was rated "CC" or below by S&P but the rating has since been withdrawn, or it is rated "Ca" or below by Moody's, or it was rated "Ca" or below by Moody's but the rating has since been withdrawn;

(g)     that is a Participation that would, if the underlying Loan were a Collateral Obligation, be a Defaulted Collateral Obligation under any of clauses (a) through (e) above or with respect to which the Participating Institution has defaulted in the performance of any of its payment obligations under the Participation;

(h)     that is a Synthetic Security referencing a Reference Obligation that would, if the Reference Obligation were a Collateral Obligation, be a Defaulted Collateral Obligation under any of clauses (a) through (f) above or with respect to which the Synthetic Security Counterparty has defaulted in the performance of any of its payment obligations under the Synthetic Security; provided, however, with respect to a Synthetic Security based upon or relating to a senior secured index investment providing non-leveraged credit exposure to a basket of credit default swaps referencing a diversified group of Reference Obligations, with respect to which the principal or notional amount of the credit exposure to any single Reference Obligation does not increase over time: (x) a determination whether the Reference Obligations upon which such Synthetic Security is based would, if such Reference Obligations were Collateral Obligations, be a Defaulted Collateral Obligation, shall be determined by treating such Synthetic Security as a direct investment by the Issuer in each of the Reference Obligations on which such Synthetic Security is based in an amount equal to the Allocable Principal Balance of such Reference Obligation and (y) the "Defaulted Collateral Obligation" for purposes of this clause (h) shall be limited to the Allocable Principal Balance of each Reference Obligation that would, if the Reference Obligation were a Collateral Obligation, be a Defaulted Collateral Obligation under any of clauses (a) through (f) above;

(i)     that is a Written-Down Obligation;

(j)     that is a DIP Loan as to which an order has been entered converting the debtor's chapter 11 case to a case under chapter 7 of the Bankruptcy Code; or

(k)     that is declared to be a Defaulted Collateral Obligation by the Portfolio Manager.

Any Collateral Obligation that is classified as a Defaulted Collateral Obligation shall cease to be so classified if the Collateral Obligation, at any date thereafter,

(1)     would not otherwise be classified as a Defaulted Collateral Obligation in accordance with this definition; and

(2)     otherwise meets the Eligibility Criteria as of that date.

If any portion of a Collateral Obligation has a maturity later than two years after the Stated Maturity of the Notes due to a change in the payment schedule of the Collateral Obligation occurring after its acquisition by the Issuer, that portion of the Collateral Obligation shall be considered a Defaulted Collateral Obligation.

"Defaulted Hedge Termination Payment": Any termination payment required to be made by the Issuer to a Hedge Counterparty pursuant to a Hedge Agreement upon a termination of the Hedge Agreement in respect of which the Hedge Counterparty is the sole Defaulting Party or Affected Party (each as defined in the Hedge Agreements).

33

"Defaulted Interest":  Any interest (and in the case of the Class A–1A Notes, the Commitment Fee Amount and in the case of the Class A-1B Notes, the Delayed Drawdown Fee) payable in respect of any Class of Notes that is not punctually paid or duly provided for on the applicable Payment Date or at Stated Maturity.

"Defaulted Interest Charge":  To the extent lawful, interest on any Defaulted Interest at the Default Interest Rate.

"Default Interest Rate":  With respect to any specified Class of Notes, the per annum interest rate equal to the Note Interest Rate payable on the Notes of such Class.

"Deferred Interest":  With respect to any specified Class of Deferred Interest Notes, the meaning specified in Section 2.8(a).

"Deferred Interest Notes":  The Class B Notes and the Class C Notes.

"Delayed Drawdown Fee":  With respect to the Class A–1B Notes and (i) the first Payment Date, the Delayed Drawdown Fee Rate multiplied by the Aggregate Undrawn Amount of the Class A–1B Notes for each day during the Delayed Drawdown Period (except that no Delayed Drawdown Fee shall be paid with respect to the Aggregate Undrawn Amount attributable to a Holder that has breached its obligation to fund a request for a Drawdown from the date of such breach to and until the date such breach has been cured) and (ii) any Payment Date thereafter, any Delayed Drawdown Fee not paid in full on the first Payment Date plus interest accrued thereon for the Interest Period for such Payment Date at the Note Interest Rate of the Class A–1B Notes.

"Delayed Drawdown Fee Rate":  A rate per annum equal to 0.17%.

"Delayed Drawdown Loan":  A Loan or any Synthetic Security with a Reference Obligation that

(a)        requires the Issuer to make one or more future advances to the borrower under its Underlying Instruments,

(b)        specifies a maximum amount that can be borrowed on one or more fixed borrowing dates, and

(c)        does not permit the re-borrowing of any amount previously repaid.

A Loan or Synthetic Security shall only be considered to be a Delayed Drawdown Loan for so long as its Unfunded Amount is greater than zero.

"Delayed Drawdown Note Agent":  The meaning specified in the Class A-1B Note Purchase Agreement.

"Delayed Drawdown Note Agent Expenses":  Amounts due to the Delayed Drawdown Note Agent and payable in arrears to the Delayed Drawdown Note Agent pursuant to the Class A-1B Note Purchase Agreement (other than the Delayed Drawdown Note Agent Fee); provided that the Delayed Drawdown Note Agent Expenses will be payable on any Payment Date only to the extent that funds are available for such purpose in accordance with the Priority of Payments.

007253

"Delayed Drawdown Note Agent Fee": Only during the Delayed Drawdown Period, the quarterly fee accrued and payable to the Delayed Drawdown Note Agent on each Payment Date pursuant to the Class A-1B Note Purchase Agreement; provided that the Delayed Drawdown Note Agent Fee will be payable on each Payment Date only to the extent that funds are available for such purpose in accordance with the Priority of Payments.

"Delayed Drawdown Period": The period commencing on and including the Closing Date and ending on the earlier to occur of (a) the date on which the Fully Drawn Amount of Class A-1B Notes is fully drawn and (b) February 27, 2006.

"Deliver" or "Delivered" or "Delivery": The taking of the following steps:

(a) in the case of each Certificated Security (other than a Clearing Corporation Security) or Instrument,

(A) causing the delivery of such Certificated Security or Instrument to the Custodian registered in the name of the Relevant Securities Intermediary or its affiliated nominee or endorsed to the Custodian or in blank,

(B) causing the Relevant Securities Intermediary to continuously indicate on its books and records that such Certificated Security or Instrument is credited to the applicable Account, and

(C) causing the Relevant Securities Intermediary to maintain continuous possession of such Certificated Security or Instrument;

(b) in the case of each Uncertificated Security (other than a Clearing Corporation Security),

(A) causing such Uncertificated Security to be continuously registered on the books of the issuer thereof to the Relevant Securities Intermediary, and

(B) causing the Relevant Securities Intermediary to continuously indicate on its books and records that such Uncertificated Security is credited to the applicable Account;

(c) in the case of each Clearing Corporation Security,

(A) causing the relevant Clearing Corporation to credit such Clearing Corporation Security to the securities account of the Relevant Securities Intermediary, and

(B) causing the Relevant Securities Intermediary to continuously indicate by on its books and records that such Clearing Corporation Security is credited to the applicable Account;

(d) in the case of each security issued or guaranteed by the United States of America or agency or instrumentality thereof and that is maintained in book-entry records of a Federal Reserve Bank ("FRB") (each such security, a "Government Security"),

(A) causing the creation of a Security Entitlement to such Government Security by the credit of such Government Security to the securities account of the Relevant Securities Intermediary at such FRB, and

007254

(B)	causing the Relevant Securities Intermediary to continuously indicate on its books and records that such Government Security is credited to the applicable Account;

(e)	in the case of each Financial Asset not governed by clauses (a) through (d) above,

(A)	causing a Securities Intermediary (x) to indicate on its books and records that the underlying Financial Asset has been credited to be the Relevant Securities Intermediary's securities account, (y) to receive a Financial Asset from a Securities Intermediary or acquiring the underlying Financial Asset for a Securities Intermediary, and in either case, accepting it for credit to the Custodian's securities account or (z) to become obligated under other law, regulation or rule to credit the underlying Financial Asset to a Security Intermediary's securities account,

(B)	causing such Securities Intermediary to make entries on its books and records continuously identifying such Security Entitlement as belonging to the Relevant Securities Intermediary and continuously indicating on its books and records that such Security Entitlement is credited to the Relevant Securities Intermediary's securities account, and

(C)	causing the Relevant Securities Intermediary to continuously indicate on its books and records that such Security Entitlement (or all rights and property of the Relevant Securities Intermediary representing such Security Entitlement) is credited to the applicable Account;

(f)	in the case of cash or money,

(A)	causing the delivery of such cash or money to the Custodian,

(B)	causing the Relevant Securities Intermediary to treat such cash or money as a Financial Asset maintained by such Relevant Securities Intermediary for credit to the applicable Account in accordance with the provisions of Article 8 of the UCC, and

(C)	causing the Relevant Securities Intermediary to continuously indicate on its books and records that such cash or money is credited to the applicable Account or Class P Account; and

(g)	in the case of each general intangible (including any Participation in which the Participation is not represented by an Instrument) notifying the obligor thereunder of the Grant to the Trustee (unless not applicable law requires such notice);

(h)	causing the filing of a Financing Statement in the office of the Recorder of Deeds of the District of Columbia, Washington, DC, and

(i)	causing the registration of this Indenture in the Register of Mortgages of the Issuer at the Issuer's registered office in the Cayman Islands.

In addition, the Portfolio Manager on behalf of the Issuer will obtain any and all consents required by the underlying agreements relating to any such general intangibles for the transfer of ownership and/or pledge hereunder (except to the extent that the requirement for such consent is rendered ineffective under Section 9-406 of the UCC).

36

007255

In addition to the methods specified above, any Collateral may be delivered in accordance with any other method specified in an Opinion of Counsel delivered to the Trustee as sufficient to establish a first priority perfected security interest therein.

"Depositary" or "DTC": The Depository Trust Company and its nominees.

"Determination Date": The last day of any Due Period.

"DIP Loan": Any Loan

(i) that has a rating assigned by Moody's (or if the Loan does not have a rating assigned by Moody's, the Portfolio Manager has commenced the process of having a rating assigned by Moody's within five Business Days of the date the Loan is acquired by the Issuer) and a rating assigned by S&P (or if the Loan does not have a rating assigned by S&P, the Portfolio Manager has commenced the process of having a rating assigned by S&P within two Business Days of the date the Loan is acquired by the Issuer),

(ii) that is an obligation of a debtor in possession as described in Section 1107 of the Bankruptcy Code or a trustee (if appointment of a trustee has been ordered pursuant to Section 1104 of the Bankruptcy Code) (a "Debtor") organized under the laws of the United States or any state of the United States; and

(iii) the terms of which have been approved by a final order of the United States Bankruptcy Court, United States District Court, or any other court of competent jurisdiction, the enforceability of which order is not subject to any pending contested matter or proceeding (as those terms are defined in the Federal Rules of Bankruptcy Procedure) and which order provides that:

(A) the Loan is secured by liens on the Debtor's otherwise unencumbered assets pursuant to Section 364(c)(2) of the Bankruptcy Code;

(B) the Loan is secured by liens of equal or senior priority on property of the Debtor's estate that is otherwise subject to a lien pursuant to Section 364(d) of the Bankruptcy Code;

(C) the Loan is fully secured (based on a current valuation or appraisal report) by junior liens on the Debtor's encumbered assets; or

(D) if any portion of the Loan is unsecured, the repayment of the Loan retains priority over all other administrative expenses pursuant to Section 364(c)(1) of the Bankruptcy Code (and in the case of this clause (D), before the acquisition of the Loan, the Rating Condition is satisfied with respect to each Rating Agency).

"Diversity Score": A single number that indicates collateral concentration in terms of both issuer and industry concentration, calculated as set forth in Schedule 4 to this Indenture.

"Diversity Test": A test that will be satisfied as of any Measurement Date if the Diversity Score equals or exceeds the Minimum Diversity Score.

"Dollar" or "U.S. Dollar" or "U.S.$": A dollar or other equivalent unit in such coin or currency of the United States of America as at the time shall be legal tender for all debts, public and private.

007256

"Domicile" or "Domiciled": With respect to each Collateral Obligation, (i) the jurisdiction of incorporation, organization or creation of the related obligor or (ii) in the case of a Collateral Obligation that would otherwise be considered to be domiciled pursuant to clause (i) in a Tax Advantaged Jurisdiction, the jurisdiction in which, in the commercially reasonable judgment of the Portfolio Manager, the related obligor conducts substantially all of its business operations and in which the assets primarily responsible for generating its revenues are located.

"Draw Period": The period beginning on the Closing Date and ending on the earlier to occur of (a) the later of (i) the end of the Reinvestment Period and (ii) the date on which the Aggregate Unfunded Amount is zero and, (b) the Commitment Termination Date.

"Drawdown": The meaning specified in Section 2.13(a).

"Drawdown Date": The meaning specified in Section 2.13(a).

"Drawn Amount": At any time (a) with respect to the Class A-1A Notes, the aggregate principal amount of the Class A–1A Notes funded on the Closing Date or by one or more Borrowings after the Closing Date and not repaid hereunder and (ii) with respect to the Class A-1B Notes, the aggregate principal amount of the Class A-1B Notes funded on the Closing Date or by one or more Drawdowns after the Closing Date.

"Due Date": Each date on which any payment is due on a Pledged Obligation in accordance with its terms.

"Due Period": Means: (a) for all purposes other than payments and receipts under Hedge Agreements, with respect to (i) the first Payment Date, the period from and including the Closing Date to and including February 28, 2006, (ii) the second Payment Date, the period from and including March 1, 2006 up to but excluding the Business Day after the eighth Business Day before the second Payment Date and (iii) any Payment Date thereafter, the period from and including the Business Day after the eighth Business Day before the previous Payment Date up to but excluding the Business Day after the eighth Business Day before the Payment Date (or in the case of the final Payment Date or any Payment Date that is a Redemption Date, through the Business Day before the Payment Date, and (b) for payments and receipts under Hedge Agreements the period from and including the day after the previous Payment Date (or in the case of the first Payment Date from the Closing Date) to but excluding the Payment Date).

"Eligibility Criteria": The meaning specified in Section 12.2(b).

"Eligible Collateral": Means: (i) Cash, (ii) U.S. Treasury obligations, (iii) U.S. agency obligations or (iv) commercial paper obligations rated at least "P-1" by Moody's (and not on watch for downgrade) and "A-1+" by S&P, in each case to collateralize fully on a mark-to-market basis the obligations of a Hedge Counterparty under the related Hedge Agreement.

"Eligible Country": The United States, Canada and any country classified by Moody's as a Moody's Group I Country, Moody's Group II Country or Moody's Group III Country; provided that such country has not imposed currency exchange controls.

"Eligible Investments": Any Dollar-denominated investment that, when it is pledged by the Issuer to the Trustee under this Indenture, is one or more of the following:

(a)        Cash;

38

007257

(b)       direct Registered obligations of, and Registered obligations the timely payment of principal and interest on which is fully and expressly guaranteed by, the United States or any agency or instrumentality of the United States the obligations of which are expressly backed by the full faith and credit of the United States, which in each case are not zero coupon securities;

(c)       [Reserved]

(d)       any demand and time deposits in, trust accounts, certificates of deposit payable within 91 days of issuance of, bankers' acceptances payable within 91 days of issuance issued by, or Federal funds sold by any depository institution or trust company incorporated under the laws of the United States or any state thereof and subject to supervision and examination by Federal and/or state banking authorities so long as the commercial paper and/or the debt obligations of such depository institution or trust company (or, in the case of the principal depository institution in a holding company system, the commercial paper or debt obligations of such holding company), at the time of such investment or contractual commitment providing for such investment and throughout the term of the investment, have a credit rating of not less than "Aaa" by Moody's and "AAA" by S&P and in each case are not on watch for downgrade, or "P-1" by Moody's and "A-1+" by S&P in the case of commercial paper and short-term debt obligations; provided that, in any case, the issuer thereof must have at the time of such investment a long-term credit rating of not less than "AA-" by S&P and "Aa3" by Moody's and a short-term rating of "A-1+" by S&P and "P-1" by Moody's, and if so rated, is not on watch for downgrade;

(e)       commercial paper or other short-term obligations with a maturity of not more than 183 days from the date of issuance and having at the time of such investment a credit rating of at least "P-1" by Moody's and "A-1+" by S&P, provided that, in any case, the issuer thereof must have at the time of such investment a long-term credit rating of not less than "Aa2" by Moody's, and if so rated, such rating is not on watch for downgrade;

(f)       unleveraged repurchase obligations (if treated as debt for tax purposes by the issuer thereof or obligor thereon) with respect to any security described in clause (b) above entered into with a U.S. federal or state depository institution or trust company (acting as principal) described in clause (c) above or entered into with a corporation (acting as principal) whose long-term credit rating is not less than "Aaa" by Moody's and "AAA" by S&P and in each case are not on watch for downgrade or whose short-term credit rating is "P-1" by Moody's and "A-1+" by S&P at the time of such investment and throughout the term of the investment; provided that, if such repurchase obligation has a maturity of longer than 91 days, the counterparty thereto must also have at the time of such investment and throughout the term of the investment a long-term credit rating of not less than "Aa2" by Moody's and "AAA" by S&P, and if so rated, such rating is not on watch for downgrade;

(g)       any money market fund or similar investment vehicle having at the time of investment therein and throughout the term of the investment a credit rating of "MR1+" by Moody's and "AAAm" by S&P; including any fund for which the Trustee or an Affiliate of the Trustee serves as an investment advisor, administrator, shareholder servicing agent, custodian or subcustodian, notwithstanding that (A) the Trustee or an Affiliate of the Trustee charges and collects fees and expenses from such funds for services rendered (provided that such charges, fees and expenses are on terms consistent with terms negotiated at arm's length) and (B) the Trustee charges and collects fees and expenses for services rendered, pursuant to this Indenture; provided that (x) such fund or vehicle is formed and has its principal office outside of the United States and (y) the ownership of an interest in such fund or vehicle will not subject the Issuer to net income tax in any jurisdiction;

39

007258

(h)      a guaranteed reinvestment agreement from a bank (if treated as a deposit by such bank), insurance company or other corporation or entity organized under the laws of the United States or any state thereof (if treated as debt by such insurance company or other corporation or entity), providing for periodic payments thereunder during each Due Period; provided that each such agreement provides that it is terminable by the purchaser, without premium or penalty, in the event that the rating assigned to such agreement by either Moody's or S&P is at any time lower than the then current ratings assigned to the Class A-1A Notes, the Class A-1B Notes, the Class A-1C Notes, the Class A-2 Notes, the Class A-3 Notes, the Class A-4 Notes, the Class B Notes or the Class C Notes; provided, further, that, at the time of investment therein and throughout the term of the investment, the issuer of such agreement has a senior unsecured long-term debt rating, issuer rating or counterparty rating of at least "Aaa" by Moody's, a short-term debt rating of "P-1" by Moody's (and not on watch for downgrade), a short-term debt rating of at least "A-1+" by S&P and a long-term debt rating of at least "AAA" by S&P (and not on watch for downgrade); and

(i)      such other investments with respect to which the Rating Condition is satisfied, if the acquisition (including manner of acquisition), ownership, enforcement and disposition of such investments does not cause the Issuer to be treated as engaged in a trade or business within the United States for United Sates federal income tax purposes;

and, in each case, with a stated maturity (giving effect to any applicable grace period) no later than the Business Day before the Payment Date next succeeding the date of the investment.

Eligible Investments on deposit in the Revolving Reserve Account, or the Synthetic Security Collateral Account must have a stated maturity no later than one Business Day after the date of their purchase.

Eligible Investments may not include:

(i)      any interest-only security, mortgage-backed security, any security purchased at a price in excess of 100% of its par value, or any security whose repayment is subject to substantial non-credit related risk as determined in the commercially reasonable judgment of the Portfolio Manager;

(ii)      any security whose rating assigned by S&P includes the subscript "r," "t," "p," "pi," or "q" or that does not have a rating assigned by S&P;

(iii)      any floating rate security whose interest rate is inversely or otherwise not proportionately related to an interest rate index or is calculated as other than the sum of an interest rate index plus a spread (which spread may be zero);

(iv)      any security that is subject to an exchange or tender offer; or

(v)      any security that has payments subject to foreign or United States withholding tax, unless the obligor thereof is required to make "gross-up" payments that cover the full amount of any such withholding tax on an after-tax basis.

Eligible Investments may include Eligible Investments for which the Trustee or an Affiliate of the Trustee provides services.  Eligible Investments may not include obligations principally secured by real property.

007259

"Emerging Market Security": A security or obligation issued by a sovereign or non-sovereign issuer located in a country (excluding the Cayman Islands, Bermuda, the British Virgin Islands, the Netherlands Antilles, and the Channel Islands):

(a)        that is in Latin America, Asia, Africa, Eastern Europe, or the Caribbean, or

(b)        the long-term foreign currency debt obligations of which are rated below "Aa2" or "Aa2" and on credit watch with negative implications by Moody's or the foreign currency issuer credit rating of which is below "AA" by S&P.

"Equity Security": (a) Any equity security or any other security which is not eligible for purchase by the Issuer and is received with respect to a Collateral Obligation or a Defaulted Collateral Obligation and (b) any similar security purchased as part of a "unit" with a Collateral Obligation and which itself is not eligible for purchase by the Issuer.

"ERISA": The United States Employee Retirement Income Security Act of 1974, as amended.

"ERISA Restricted Indenture Securities": The Class Q-1 Securities, the Class P-1 Securities and the Class P-2 Securities.

"Euroclear": Euroclear Bank S.A./N.V., as operator of the Euroclear system.

"Event of Default": The meaning specified in Section 5.1.

"Excess CCC/Caa Collateral Obligations": As of any date of determination, the Principal Balance of all CCC/Caa Collateral Obligations constituting the excess of (a) the greater of (i) the aggregate principal amount of all Collateral Obligations that have S&P Ratings of "CCC+" or lower (other than any Defaulted Securities) and (ii) the aggregate principal amount of all Collateral Obligations that have Moody's Default Probability Ratings of "Caa1" or lower (other than any Defaulted Securities) over (b) 7.5% of the Maximum Investment Amount, as of such date of determination. The Portfolio Manager shall designate in writing to the Trustee the CCC/Caa Collateral Obligations that shall constitute the Excess CCC/Caa Collateral Obligations pursuant to the preceding sentence as the CCC/Caa Collateral Obligations (or portions thereof) that have the lowest Market Value on any applicable date of determination.

"Exchange Act": The United States Securities Exchange Act of 1934, as amended.

"Exchange Date": The meaning specified in Section 2.2(b).

"Expense Reimbursement Account": The trust account established pursuant to Section 10.3(c).

"Extended Reinvestment Period End Date": In the case of the first Extension pursuant to Section 2.4, the Payment Date in November 2016, in the case of any subsequent Extension, the sixteenth Payment Date after the then current Extended Reinvestment Period End Date; provided that the "Extended Reinvestment Period End Date" will in no event be a date later than the Payment Date in November 2028.

"Extended Stated Maturity Date": In the case of the first Extended Stated Maturity Date, the Payment Date in November 2021 and in the case of any subsequent Maturity Extension, the sixteenth

007260

Payment Date after the then current Extended Stated Maturity Date; provided that the "Extended
Maturity Date" will in no event be a date later than the Payment Date in November 2033.

"Extended Weighted Average Life Date": In the case of the first Maturity Extension, the
Payment Date in May 2019 and in the case of any subsequent Maturity Extension, the sixteenth Payment
Date after the then current Extended Weighted Average Life Date; provided that the "Extended Weighted
Average Life Date" will in no event be a date later than the Payment Date in May 2031.

"Extension": An extension of the Reinvestment Period, the Stated Maturity of the Notes
and the Weighted Average Life Test pursuant to Section 2.4.

"Extension Bonus Payment": With respect to each Maturity Extension, a single payment
to each applicable Beneficial Owner pursuant to Section 2.4(g), in an amount equal to (1) in the case of
the Class A-1A Notes, the Class A-1B Notes, the Class A-1C Notes, the Class A-2 Notes, the Class A-3
Notes and the Class A-4 Notes, 0.25% of the Aggregate Outstanding Amount thereof held by such
Beneficial Owner as of the applicable Extension Effective Date, (2) in the case of the Class B Notes,
0.25% of the Aggregate Outstanding Amount thereof held by such Beneficial Owner as of the applicable
Extension Effective Date, (3) in the case of the Class C Notes, 0.5% of the Aggregate Outstanding
Amount thereof held by such Beneficial Owner as of the applicable Extension Effective Date and (4) in
the case of the Class Q-1 Securities, 0.5% of the Aggregate Outstanding Amount of Class C Notes
represented by the Class Q-1 Note Component.

"Extension Bonus Eligibility Certification": With respect to each Maturity Extension
and each Beneficial Owner of Notes (including each Beneficial Owner of Class Q-1 Securities to the
extent of the Class Q-1 Note Component) other than Extension Sale Securities, the written certification by
such Beneficial Owner substantially in the form annexed as enclosure B to Exhibit J to the effect that it
held Notes (including Class C Notes represented by the Class Q-1 Note Component) other than Extension
Sale Securities on the applicable Extension Effective Date, including the Aggregate Outstanding Amount
thereof and wire transfer instructions for the Extension Bonus Payment and any required documentation
thereunder (including tax certifications).

"Extension Conditions": The meaning specified in Section 2.4(c).

"Extension Determination Date": The eighth Business Day prior to each Extension
Effective Date.

"Extension Effective Date": In the case of the first Maturity Extension, the Payment
Date in November, 2010 and in the case of any subsequent Maturity Extension, the sixteenth Payment
Date after the then current Extension Effective Date.

"Extension Notice": The meaning specified in Section 2.4(b).

"Extension Purchase Price": The purchase price payable by the Extension Qualifying
Purchasers for Extension Sale Securities in connection with each Maturity Extension, if any, in an amount
equal to (i) in the case of (x) the Notes (other than the Class A-1A Notes), the Aggregate Outstanding
Amount thereof and (y) the Class A-1A Notes, the aggregate Drawn Amount thereof, plus in the case of
both (x) and (y) accrued and unpaid interest (including Deferred Interest, if any) as of the applicable
Extension Effective Date (giving effect to any amounts paid to the Holder on such date), plus in the case
of the Class A-1A Notes, any accrued and unpaid Commitment Fee and in the case of the Class A-1B
Notes, any accrued and unpaid Delayed Drawdown Fee, (ii) in the case of the Class E Certificates, an
amount that, when taken together with all payments and distributions made in respect of such Class E

007261

Certificates since the Closing Date would cause such Class E Certificates to have received (as of the date of purchase thereof by the Extension Qualifying Purchaser) a Class E Certificate Internal Rate of Return of 12% (assuming such purchase date was a Payment Date); provided, that if the applicable Extension Effective Date is on or after the date on which such Holders have received a Class E Certificate Internal Rate of Return equal to or in excess of 12%, the applicable Extension Purchase Price for such Class E Certificates shall be zero; provided, however that in the case of the 3rd or 4th Maturity Extension, for any one Holder of Class E Certificates who holds Class E Certificate with an aggregate "face amount" of at least U.S.$30,000,000 and cannot consent to the Maturity Extension due to tax, regulatory, compliance or accounting rules or investment policies (whether internally or externally governed), the purchase price payable to such Holder for its Extension Sale Securities consisting of its Class E Certificates will be an amount that, when taken together with all payments and distributions made in respect of such Class E Certificates since the Closing Date would cause such Class E Certificates to have received (as of the date of purchase thereof by the Extension Qualifying Purchaser) a Class E Certificate Internal Rate of Return of 15% (assuming such purchase date was a "Payment Date" under the Indenture), provided, that if the applicable Extension Effective Date is on or after the date on which such Holder has received a Class E Certificate Internal Rate of Return equal to or in excess of 15%, the applicable Extension Purchase Price for such Class E Certificates shall be zero; and (iii) in the case of the Class Q Securities, a purchase price determined based on the respective purchase prices for the Class Q-1 Note Component and the Class Q-1 Class E Certificate Component.

"Extension Qualifying Purchasers": The Portfolio Manager (or any of its Affiliates acting as principal or agent); provided that in the event the Portfolio Manager elects not to purchase Securities from Holders pursuant to the Extension Conditions set forth in Section 2.4(c), "Extension Qualifying Purchasers" shall mean one or more qualifying purchasers (which may include the Placement Agent or any of their Affiliates acting as principal or agent) designated by the Portfolio Manager; provided, however, none of the Portfolio Manager, the Initial Purchaser, the Placement Agent, or any of their respective Affiliates shall have any duty to act as an Extension Qualifying Purchaser.

"Extension Sale Notice": The meaning specified in Section 2.4(d).

"Extension Sale Notice Period": The meaning specified in Section 2.4(d).

"Extension Sale Securities": The meaning specified in Section 2.4(b).

"Face Amount": With respect to any Class E Certificate, the amount set forth therein as the "face amount" thereof, which "face amount" shall be $1,000 per Class E Certificate.

"Finance Lease": A lease agreement or other agreement entered into in connection with and evidencing a Leasing Finance Transaction.

"Financial Asset": The meaning specified in Section 8-102(a)(9) of the UCC.

"Financing Statements": Financing statements relating to the Collateral naming the Issuer as debtor and the Trustee on behalf of the Secured Parties as secured party.

"Fixed Rate Excess": As of any Measurement Date, a fraction whose numerator is the product of:

(a) the greater of zero and the excess of the Weighted Average Fixed Rate Coupon for the Measurement Date over the minimum percentage specified to pass the Weighted Average Fixed Rate Coupon Test, and

007262

(b)      the Aggregate Principal Balance of all Fixed Rate Obligations (excluding any Non-Performing Collateral Obligations) held by the Issuer as of the Measurement Date,

and whose denominator is the Aggregate Principal Balance of all Floating Rate Obligations (excluding any Non-Performing Collateral Obligations) held by the Issuer as of the Measurement Date.

In computing the Fixed Rate Excess on any Measurement Date, the Weighted Average Fixed Rate Coupon for the Measurement Date will be computed as if the Spread Excess were equal to zero.

"Fixed Rate Obligation": Any Collateral Obligation that bears interest at a fixed rate, including a Collateral Obligation that does not bear interest on a floating rate index and whose interest rate is scheduled to increase one or more times over the life of the Collateral Obligation.

"Floating Rate Obligation": Any Collateral Obligation that bears interest based on a floating rate index.

"Form-Approved Synthetic Security": A Synthetic Security:

(i) (A)  each of the Reference Obligations of which satisfy the definition of "Collateral Obligation" and either (x) is in a form which conforms to a form that has been expressly identified and approved in writing in connection with a request under this Indenture by S&P, has an S&P Recovery Rate assigned by S&P and each of the Reference Obligations of which could be purchased by the Issuer without satisfaction of the Rating Condition or any other action by the Rating Agencies or (y) which the Rating Agencies have otherwise approved; or

(B)  each of the Reference Obligations of which would satisfy clause (A) above but for the currency in which the Reference Obligation is payable and the Synthetic Security is payable in Dollars, does not provide for physical settlement, and does not expose the Issuer to Dollar currency risk;

(i)  the Synthetic Security Agreement of which conforms (but for the amount and timing of periodic payments, the name of the Reference Obligation, the notional amount, the effective date, the termination date, and other similar necessary changes) to a form that has been expressly identified and approved in writing in connection with a request under this Indenture by Moody's and S&P; and

(ii)  that is with a counterparty with respect to which the Rating Condition has been satisfied by each of Moody's and S&P prior to the acquisition of any such Form-Approved Synthetic Security, and such approval has not been withdrawn.

Moody's or S&P may at any time, by notice to the Portfolio Manager, withdraw its approval of any such form. A withdrawal of approval shall have no effect on any Synthetic Security acquired, entered into, or committed to before the date on which the Portfolio Manager receives the notice of withdrawal.

"Fully Drawn Amount": The maximum aggregate principal amount that can be drawn under the Class A-1B Notes, in an amount equal to $50,000,000.

"GAAP": The meaning specified in Section 6.3(j).

007263

"Global Securities": Any Temporary Regulation S Global Securities, Temporary Regulation S Global Securities or Rule 144 A Global Notes.

"Grant": To grant, bargain, sell, warrant, alienate, remise, demise, release, convey, assign, transfer, mortgage, pledge, create, and grant a security interest in and right of setoff against, deposit, set over, and confirm. A Grant of the Collateral (including the Pledged Obligations), the Class P Collateral or of any other instrument, shall include all rights, powers, and options of the granting party thereunder, including the immediate continuing right to claim for, collect, receive, and receipt for principal and interest payments in respect of thereof, and all other monies payable thereunder, to give and receive notices and other communications, to make waivers or other agreements, to exercise all rights and options, to bring Proceedings in the name of the granting party or otherwise, and generally to do and receive anything that the granting party is or may be entitled to do or receive thereunder or with respect thereto.

"Hedge Agreements": Collectively, all interest rate cap or interest rate swap agreements between the Issuer and any Hedge Counterparty, and any replacement agreement entered into pursuant to Section 15.2.

"Hedge Counterparty": Any counterparty which as of the date the Issuer enters into any Hedge Agreement with such counterparty satisfies the requirements of Section 15.2(b) or for which the Rating Condition with respect to each Rating Agency is satisfied.

"Hedge Counterparty Collateral Account": The trust account established pursuant to Section 10.3(d).

"Hedge Termination Receipt": Any termination payment paid by the Hedge Counterparty to the Issuer upon any early termination of a Hedge Agreement with respect to which the Hedge Counterparty is the sole Defaulting Party or Affected Party (each as defined in the Hedge Agreements).

"High-Yield Bond": Any debt security other than a Loan, including any Structured Finance Obligation, that is either Registered or, if not Registered, (i) it is issued by an obligor that is not resident in the United States, (ii) the payments on it are not subject to United States withholding tax and (iii) it is held through a financial institution pursuant to the procedures described in Treasury Regulation Section 1.165-12(c)(3).

"Holder": With respect to any Note, Class Q-1 Securities and Class P Securities, the person whose name appears on the Indenture Register as the registered holder of such Security; and with respect to any Class E Certificate, the person whose name appears in the Class E Certificate register related thereto as the registered holder of such Class E Certificate.

"Important Section 3(c)(7) Reminder Notice": A notice substantially in the form of Exhibit H-2.

"Incentive Management Fee": On each Payment Date, the fee payable to the Portfolio Manager in an amount equal to: (i) 20% of the remaining Interest Proceeds, if any, available for payment in respect of the Incentive Management Fee pursuant to Section 11.1(a)(i)(23) of the Priority of Payments and (ii) 20% of the remaining Principal Proceeds, if any, available for payment in respect of the Incentive Management Fee pursuant to Section 11.1(a)(ii)(9) of the Priority of Payments.

007264

"Indenture":  This instrument as originally executed and, if from time to time supplemented or amended by one or more indentures supplemental to this Indenture entered into pursuant to this Indenture, as so supplemented or amended.

"Indenture Register":  The meaning specified in Section 2.6(a).

"Indenture Registrar":  The meaning specified in Section 2.6(a).

"Indenture Securities": Collectively, the Notes, Class Q-1 Securities and Class P Securities.

"Independent":  As to any person, any other person (including, in the case of an accountant or lawyer, a firm of accountants or lawyers, and any member of the firm, or an investment bank and any member of the bank) who

(i)     does not have and is not committed to acquire any material direct or any material indirect financial interest in the person or in any Affiliate of the person, and

(ii)     is not connected with the person as an Officer, employee, promoter, underwriter, voting trustee, partner, director, or person performing similar functions.

"Independent" when used with respect to any accountant may include an accountant who audits the books of the person if in addition to satisfying the criteria above the accountant is independent with respect to the person within the meaning of Rule 101 of the Code of Ethics of the American Institute of Certified Public Accountants.

Whenever any Independent person's opinion or certificate is to be furnished to the Trustee, the opinion or certificate shall state that the signer has read this definition and that the signer is Independent within the meaning of this Indenture.

"Initial Collateral Obligations": The Collateral Obligations purchased by the Issuer on or before the Closing Date.

"Initial Consent Period":  The period of 15 Business Days from but excluding the date on which the Trustee provided notice of a proposed supplemental indenture pursuant to Section 8.2(e) to the Holders of Securities.

"Initial Purchaser":  With respect to the Notes (other than the Class A-1A Notes and the Class A-1B Notes), the Class Q-1 Securities and the Class P Securities, Citigroup Global Markets Inc.

"Initial Rating":  The ratings with respect to each Class of Securities assigned by Moody's and S&P on the Closing Date as set forth in the table in Section 2.3(a).

"Insolvency Event":  With respect to any person, means that:

(i)     an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking:

(A)     liquidation, reorganization, or other relief in respect of the person or its debts, or of all or substantially all of its assets, under any bankruptcy, insolvency, receivership, or similar law now or hereafter in effect, or

007265

(B)     the appointment of a receiver, trustee, custodian, sequestrator, conservator, or similar official for the person or for all or substantially all of its assets,

and, in any such case, the proceeding or petition shall continue undismissed for 30 days; or an order or decree approving or ordering any of the foregoing shall be entered, or

(ii)   the person shall:

(A)     voluntarily commence any proceeding or file any petition seeking liquidation, reorganization, or other relief under any bankruptcy, insolvency, receivership, or similar law now or hereafter in effect,

(B)     consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (i) above,

(C)     apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, or conservator or for all or substantially all of its assets,

(D)     file an answer admitting the material allegations of a petition filed against it in any such proceeding, or

(E)     make a general assignment for the benefit of creditors.

"Instrument":  The meaning specified in Section 9-102(a)(47) of the UCC.

"Interest Coverage Ratio":  With respect to any specified Class of Notes (treating the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes and the Class A-4 Notes as one Class for this purpose) on any Measurement Date, the ratio calculated by dividing:

(i)   the sum of:

(A)     the Interest Proceeds received or scheduled to be received with respect to the Due Period in which the Measurement Date occurs, minus

(B)     amounts payable under clauses (1), (2), (3) and (4) of Section 11.1(a)(i) on the related Payment Date, by:

(ii)   all accrued and unpaid interest on the specified Class of Notes (and the Commitment Fee Amount with respect to the Class A–1A Notes and the Delayed Drawdown Fee with respect to the Class A-1B Notes), and all Notes ranking senior to the Class on the related Payment Date, but excluding any Deferred Interest as of the related Payment Date.

For purposes of the Interest Coverage Ratio, only the amount of any interest payment (including any "gross up" payment) on any Collateral Obligation in excess of any withholding tax or other deductions on account of tax of any jurisdiction on any date of determination shall be included in Interest Proceeds.

"Interest Coverage Test":  A test the first Measurement Date for which will be on the Determination Date immediately preceding the second Payment Date and that is satisfied with respect to any specified Class of Notes (treating the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes and the Class A-4 Notes as one Class for this purpose) if, as of the Determination Date immediately preceding the second Payment Date and any Measurement Date thereafter on which any Notes remain Outstanding,

47

the Interest Coverage Ratio equals or exceeds the applicable required level in the table below for the specified Class:

| Test | Required Level |
|------|----------------|
| Class A Interest Coverage Test | 125% |
| Class B Interest Coverage Test | 115% |
| Class C Interest Coverage Test | 110% |

"Interest Period": Initially, the period from and including the Closing Date to but excluding the first Payment Date, and, thereafter, each successive period from and including each Payment Date to but excluding the following Payment Date; provided that with respect to any Borrowing made under the Class A-1A Notes and any Drawdown made under the Class A-1B Notes, the first Interest Period shall be the period from and including the date of such Borrowing or Drawdown, as applicable, to but excluding the Payment Date following such date, unless in the case of a Borrowing, the date of such Borrowing falls in the period from and including a Determination Date to and including the day prior to the related Payment Date, in which case such first Interest Period shall run from and including the date of such Borrowing to but excluding the second Payment Date following such date.

"Interest Proceeds": With respect to any Due Period, the sum (without duplication) of all amounts received in Cash during the Due Period (or as otherwise specified below) by the Issuer with respect to the Collateral that are:

(i) payments of interest, fees (including commitment fees with respect to the Unfunded Amount of any Revolving Loan or Delayed Drawdown Loan), and commissions (excluding (A) Accrued Interest Purchased With Principal, (B) interest and dividends on Workout Assets, (C) fees and commissions from Defaulted Collateral Obligations, and (D) syndication and other up-front fees and any up-front fixed payments received in connection with entering into a Synthetic Security);

(ii) any portion of the Sale Proceeds of a Collateral Obligation (other than a Defaulted Collateral Obligation) representing Accrued Interest On Sale;

(iii) all payments of principal on, or disposition proceeds from the sale of, Eligible Investments to the extent purchased with Interest Proceeds;

(iv) payments with respect to the Hedge Agreements received on or before the related Payment Date other than (x) any amount payable under any Hedge Agreement because of any early termination or notional amount reduction, (y) any Sale Proceeds with respect to any Hedge Agreement (except to the extent that they were purchased with Interest Proceeds) and (z) any payments (including any Sale Proceeds purchased with Interest Proceeds) with respect to any Hedge Agreement used in entering into a replacement Hedge Agreement;

(v) all fees received pursuant to any Securities Lending Agreements;

(vi) during the continuance of an "event of default" (under and as defined in the related Securities Lending Agreement), all interest received from the related Securities Lending Collateral;

007267

(vii)    amounts in the Collection Account designated for distribution as Interest Proceeds pursuant to the Priority of Payments (including any amount transferred from the Interest Reserve Account);

(viii)    all earnings on amounts in the Revolving Reserve Account deposited to the Collection Account in accordance with Section 10.3(b);

(ix)    amounts in the Expense Reimbursement Account on the Payment Date for the relevant Due Period; and

(x)    any recoveries (including interest) received on a Defaulted Collateral Obligation in excess of the principal balance of such Defaulted Collateral Obligation (as of the date the related Collateral Obligation became a Defaulted Collateral Obligation).

Interest Proceeds shall not include earnings on amounts on deposit in the Securities Lending Account to the extent the earnings are payable by the Issuer to a Securities Lending Counterparty.

Each reference in the definition of "Interest Proceeds" to a Collateral Obligation shall include a Collateral Obligation that has been loaned pursuant to a Securities Lending Agreement and Interest Proceeds shall include any amounts referred to in clauses (i) through (iii) above received by the Issuer in respect of the Collateral Obligation indirectly from the related Securities Lending Counterparty pursuant to the Securities Lending Agreement.

For the avoidance of doubt, "Interest Proceeds" shall not include the Class P Collateral or any proceeds thereof.

"Interest Reserve Account": The trust account established pursuant to Section 10.3(i).

"Investment Company Act": The United States Investment Company Act of 1940, as amended.

"Investment Criteria Adjusted Balance": For any Collateral Obligation other than Deep Discount Obligations, its Principal Balance; and for any Deep Discount Obligation its Purchase Price; provided, however, that the Investment Criteria Adjusted Balance for any Excess CCC/Caa Collateral Obligation shall be the product of (i) its Principal Balance and (ii) the lower of (a) the weighted average Market Value (for this purpose expressed as a percentage of principal balance) of all Excess CCC/Caa Collateral Obligations, expressed as a percentage of their outstanding principal balances and (b) 70%.

"Investment Obligation": For a Collateral Obligation that is a Synthetic Security, the Reference Obligation of the Synthetic Security, and otherwise the Collateral Obligation.

"Irish Paying and Listing Agent": The meaning specified in Section 7.2.

"Irish Stock Exchange": The Irish Stock Exchange Limited.

"Issuer": The person named as such on the first page of this Indenture.

"Issuer Accounts": The meaning assigned in the Granting Clauses.

"Issuer Accounts Securities Intermediary": The Securities Intermediary for the Issuer Accounts.

"Issuer Order" and "Issuer Request": A written order or request dated and signed in the name of the Issuer or the Co-Issuer by an Authorized Officer of the Issuer or the Co-Issuer, as applicable, or by the Portfolio Manager by an Authorized Officer of the Portfolio Manager, on behalf of the Issuer or the Co-Issuer.

"Issuer Ordinary Shares": The ordinary shares, par value $1.00 per share, of the Issuer, which have been issued by the Issuer and are outstanding from time to time.

"Junior Class": With respect to a particular Class of Notes, each Class of Notes that is subordinated to that Class, as indicated in Section 13.1.

"Knowledgeable Employee": The meaning specified in Rule 3c-5 under the Investment Company Act.

"Leasing Finance Transaction": Any transaction pursuant to which the obligations of the lessee to pay rent or other amounts on a triple net basis under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, are required to be classified and accounted for as a capital lease on a balance sheet of such lessee under generally accepted accounting principles in the United States of America; but only if (a) such lease or other transaction provides for the unconditional obligation of the lessee to pay a stated amount of principal no later than a stated maturity date, together with interest thereon, and the payment of such obligation is not subject to any material non-credit related risk as determined by the Portfolio Manager, (b) the obligations of the lessee in respect of such lease or other transaction are fully secured, directly or indirectly, by the property that is the subject of such lease and (c) the interest held by the Issuer in respect of such lease or other transaction is treated as debt for U.S. federal income tax purposes.

"LIBOR": Determined by the Calculation Agent for any Interest Period, the offered rate, as determined by the Calculation Agent, for three month Dollar deposits that appears on Moneyline Telerate Page 3750 as reported on Bloomberg Financial Markets Commodities News (or a page that replaces Moneyline Telerate Page 3750 for the purpose of displaying comparable rates), as of 11:00 a.m. (London time) on the second Business Day before the first day of the relevant Interest Period.

If, on the second Business Day before the first day of any relevant Interest Period, that rate does not appear on Moneyline Telerate Page 3750 as reported on Bloomberg Financial Market Commodities News (or a page that replaces Moneyline Telerate Page 3750 for the purpose of displaying comparable rates), the Calculation Agent shall determine the arithmetic mean of the offered quotations of the Reference Banks to prime banks in the London interbank market for three month Dollar deposits in Europe, by reference to requests by the Calculation Agent to four major banks in the London interbank market selected by the Calculation Agent (after consultation with the Portfolio Manager) (the "Reference Banks") for quotations as of approximately 11:00 a.m. (London time) on the second Business Day before the first day of the Interest Period. If at least two of the Reference Banks provide quotations as requested, LIBOR shall equal such arithmetic mean. If fewer than two Reference Banks provide quotations, LIBOR shall be the arithmetic mean of the offered quotations that leading banks in New York City selected by the Calculation Agent (after consultation with the Portfolio Manager) are quoting to the principal London offices of leading banks in the London interbank market on the second Business Day before the first day of the relevant Interest Period for three month Dollar deposits.

007269

If the Calculation Agent is unable to determine a rate in accordance with any of the above procedures, LIBOR for the Interest Period shall be calculated on the last day of the Interest Period and shall be the arithmetic mean of the rate of interest for each day during the Interest Period determined by the Calculation Agent as being the rate of interest most recently announced by the Bank at its New York office as its base rate, prime rate, reference rate, or similar rate for Dollar loans (or if the Bank ceases to exist or is not quoting a base rate, prime rate, reference rate, or similar rate for Dollar loans, another major money center commercial bank in New York City selected by the Calculation Agent (after consultation with the Portfolio Manager)).

For the first Interest Period, LIBOR shall be 4.44672%. All calculations shall be calculated to at least four decimal places and rounded to four decimal places.

"Loan": Any interest in a fully committed, senior secured, unsecured, or revolving loan (including loans involving credit linked deposits) that is acquired by assignment or by Participation (including any DIP Loan) that is either:

(i)     Registered, or

(ii)     issued by an obligor that is not resident in the United States:

(A)     whose payments are not subject to United States withholding tax; and

(B)     that is held through a financial institution pursuant to the procedures described in Treasury Regulation Section 1.165-12(c)(3).

"Long-Dated Collateral Obligation": Any Collateral Obligation with a stated maturity later than the Stated Maturity of the Notes other than a Collateral Obligation with a stated maturity later than the Stated Maturities of the Notes that includes a "put" option to its obligor at a price of at least par payable on or before the Stated Maturity of the Notes; provided that such Collateral Obligation shall in no event have a stated maturity later than two years after the Stated Maturity of the Notes.

"Majority": With respect to any Class or group of Securities (other than the Class Q-1 Securities and the Class P Securities), the Holders of more than 50% of the Aggregate Outstanding Amount of that Class or group of Securities. Holders of Class Q-1 Securities shall be included in the determination of a Majority of Holders of Class C Notes as if they were Holders of the Class C Notes in the Aggregate Outstanding Amount represented by the Class Q-1 Note Component and in the determination of a Majority of Holders of the Class E Certificates as if they were Holders of the number of Class E Certificates represented by the Class Q-1 Class E Certificate Component. Holders of the Class P-1 Securities and the Class P-2 Securities shall be included in the determination of a Majority of Holders of the Class E Certificates as if they were Holders of the number of Class E Certificates represented by the Class P-1 Class E Certificate Component or the Class P-2 Class E Certificate Component, as applicable. With respect to the Class Q-1 Securities as such, the Class P-1 Securities as such and the Class P-2 Securities as such "Majority" means the Holders of more than 50% of the respective stated amount thereof.

"Management Agreement": The Portfolio Management Agreement, dated as of the Closing Date, between the Issuer and the Portfolio Manager, as modified, amended, and supplemented and in effect from time to time.

"Management Fee": The Senior Management Fee, the Subordinated Management Fee, and the Incentive Management Fee. The Portfolio Manager may, in its sole discretion:

007270

(i)        waive all or any portion of the Management Fee, any funds representing the waived Management Fees to be retained in the Collection Account for distribution as either Interest Proceeds or Principal Proceeds (as determined by the Portfolio Manager) pursuant to the Priority of Payments; or

(ii)        defer all or any portion of the Management Fee, any funds representing the deferred Management Fees to be retained in the Collection Account, when they will become payable in the same manner and priority as their original characterization would have required unless deferred again.

"Margin Stock": "Margin Stock" as defined under Regulation U issued by the Board of Governors of the Federal Reserve System, including any debt security that is by its terms convertible into Margin Stock.

"Market Value": As of any Measurement Date, the market value determined by the Portfolio Manager and reported to the Trustee as an amount rather than as a percentage or fraction of par (expressed in Dollars) of any Collateral Obligation based upon the Portfolio Manager's commercially reasonable judgment and based upon the following order of priority: (i) the average of the bid-side market prices obtained by the Portfolio Manager from three Independent broker-dealers active in the trading of such obligations or (ii) if the foregoing set of prices were not obtained, the lower of the bid-side market prices obtained by the Portfolio Manager from two Independent broker-dealers active in the trading of such obligations or (iii) if the foregoing sets of prices were not obtained, the average of the bid-side prices for the purchase of the Collateral Obligation determined by an Approved Pricing Service (Independent from the Portfolio Manager) that derives valuations by polling broker-dealers (Independent from the Portfolio Manager); provided that if a Market Value of any Collateral Obligation cannot be so determined for a period of 30 consecutive days then such Collateral Obligation shall be deemed to have a Market Value of zero; provided, further, that during such 30-day period, such Collateral Obligation shall be deemed to have a Market Value equal to the lower of (i) (if any) the Market Value of such Collateral Obligation as most recently determined by the Portfolio Manager in accordance with the foregoing and (ii) the current market value of such Collateral Obligation as determined by the Portfolio Manager in its commercially reasonable judgment; provided, further, that the maximum amount of Collateral Obligations having a Market Value assigned pursuant to the immediately preceding proviso shall be limited to 5.0% of the Maximum Investment Amount (and any amount in excess of 5.0% of the Maximum Investment Amount shall be deemed to have a Market Value of zero).

"Market Value Percentage": For any Collateral Obligation, the ratio obtained by dividing:

(i)        the Market Value of the Collateral Obligation, by

(ii)        the Principal Balance of the Collateral Obligation.

"Maturity": With respect to any Note, the date on which the unpaid principal of the Note becomes payable as provided in the Note or this Indenture, whether at the Stated Maturity or by declaration of acceleration, call for redemption, or otherwise.

"Maturity Extension": The meaning specified in Section 2.4(a).

"Maximum Investment Amount": An amount equal to:

(i)        on any Measurement Date during the Ramp-Up Period, U.S.$900,000,000; and

007271

(ii)     on any Measurement Date after the Ramp-Up Completion Date:

(A)     the aggregate Principal Balance of all Collateral Obligations plus the aggregate outstanding principal amount of any Defaulted Collateral Obligations; plus

(B)     Cash representing Principal Proceeds on deposit in the Collection Account; plus

(C)     Eligible Investments (other than Cash) purchased by the Issuer with Principal Proceeds on deposit in the Collection Account; plus

(D)     without duplication, an amount equal to the excess of (x) the Aggregate Undrawn Amount of Class A-1A Notes over (y) the Aggregate Unfunded Amount minus the amount credited to the Revolving Reserve Account; plus

(E)     without duplication, an amount equal to the Aggregate Undrawn Amount of the Class A-1B Notes.

"Maximum Weighted Average Moody's Rating Factor":  As of any Measurement Date, a rate equal to the sum of (i) the number set forth in the column entitled "Maximum Weighted Average Moody's Rating Factor" in the Ratings Matrix based upon the applicable "row/column combination" chosen by the Portfolio Manager (or the interpolation between two adjacent rows and/or two adjacent columns, as applicable) plus (ii) the Recovery Rate Modifier.

"Measurement Date":  Any date:

(i)     on which the Issuer commits to acquire or dispose of any Collateral Obligation;

(ii)     on which a Collateral Obligation becomes a Defaulted Collateral Obligation;

(iii)    that is a Determination Date;

(iv)    that is the Ramp-Up Completion Date; and

(v)     as of which the information in a Monthly Report is calculated pursuant to Section 10.6.

"Memorandum and Articles of Association":  The memorandum and articles of association of the Issuer, as amended and restated before the Closing Date or in accordance with this Indenture.

"Merging Entity":  The meaning specified in Section 7.10.

"Minimum Diversity Score":  As of any Measurement Date, a score equal to the number set forth in the column entitled "Minimum Diversity Score" in the Ratings Matrix based upon the applicable "row/column combination" chosen by the Portfolio Manager (or the interpolating between two adjacent rows and/or two adjacent columns, as applicable).

"Minimum Weighted Average Commitment Fee":  As of any Measurement Date, 0.4%.

"Minimum Weighted Average Spread":  As of any Measurement Date, the spread equal to the percentage set forth in the row entitled "Minimum Weighted Average Spread" in the Ratings

53

Matrix based upon the applicable "row/column combination" chosen by the Portfolio Manager (or the interpolating between two adjacent rows and/or two adjacent columns, as applicable).

"Monthly Determination Date": The meaning specified in Section 10.6(a).

"Monthly Report": The meaning specified in Section 10.6(a).

"Moody's": Moody's Investors Service, Inc.

"Moody's Default Probability Rating": The meaning set forth in Schedule 7.

"Moody's Equivalent Senior Unsecured Rating": The meaning set forth in Schedule 7.

"Moody's Group I Country": Any of the following countries: Australia, the Netherlands, the United Kingdom and any country subsequently determined by Moody's to be a Moody's Group I Country.

"Moody's Group II Country": Any of the following countries: Germany, Ireland, Sweden, Switzerland and any country subsequently determined by Moody's to be a Moody's Group II Country.

"Moody's Group III Country": Any of the following countries: Austria, Belgium, Denmark, Finland, France, Iceland, Liechtenstein, Luxembourg, Norway, Spain and any country subsequently determined by Moody's to be a Moody's Group III Country.

"Moody's Industry Classification": The industry classifications in Schedule 2 as modified, amended, and supplemented from time to time by Moody's.

"Moody's Non Senior Secured Loan": Any Loan that is not a Moody's Senior Secured Loan.

"Moody's Obligation Rating": The meaning set forth in Schedule 7.

"Moody's Priority Category": Each type of Collateral Obligation specified in the definition of "Applicable Percentage" as a "Moody's Priority Category."

"Moody's Priority Category Recovery Rate": For any Collateral Obligation, the percentage specified in the definition of "Applicable Percentage" opposite the Moody's Priority Category of the Collateral Obligation.

"Moody's Rating": The meaning set forth in Schedule 7.

"Moody's Rating Factor": The number in the table below opposite the rating of the Collateral Obligation (excluding Synthetic Securities where an Assigned Moody's Rating is not available).

| Moody's Rating | Moody's Rating Factor | Moody's Rating | Moody's Rating Factor |
|---|---|---|---|
| Aaa | 1 | Ba1 | 940 |

54

007273

| Moody's Rating | Moody's Rating Factor | Moody's Rating | Moody's Rating Factor |
|---|---|---|---|
| Aa1 | 10 | Ba2 | 1350 |
| Aa2 | 20 | Ba3 | 1766 |
| Aa3 | 40 | B1 | 2220 |
| A1 | 70 | B2 | 2720 |
| A2 | 120 | B3 | 3490 |
| A3 | 180 | Caa1 | 4770 |
| Baa1 | 260 | Caa2 | 6500 |
| Baa2 | 360 | Caa3 | 8070 |
| Baa3 | 610 | Ca or lower | 10000 |

The Moody's Rating Factor for Collateral Obligations that are Synthetic Securities shall be determined by Moody's and obtained by the Issuer or the Portfolio Manager on a case-by-case basis, unless there is an Assigned Moody's Rating available for such Collateral Obligation that is a Synthetic Security, in which case such Assigned Moody's Rating shall be used to compute the Moody's Rating Factor for such Collateral Obligation that is a Synthetic Security.

"Moody's Senior Secured Loan":

(a)     A Loan that:

(i)     is not (and cannot by its terms become) subordinate in right of payment to any other obligation of the obligor of the Loan;

(ii)     is secured by a valid first priority perfected security interest or lien in, to or on specified collateral securing the obligor's obligations under the Loan; and

(iii)     the value of the collateral securing the Loan together with other attributes of the obligor (including, without limitation, its general financial condition, ability to generate cash flow available for debt service and other demands for that cash flow) is adequate (in the commercially reasonable judgment of the Portfolio Manager) to repay the Loan in accordance with its terms and to repay all other loans of equal seniority secured by a first lien or security interest in the same collateral; or

(b)     a Loan that:

(i)     is not (and cannot by its terms become) subordinate in right of payment to any other obligation of the obligor of the Loan, other than, with respect to a Loan described in clause (a) above, with respect to the liquidation of such obligor or the collateral for such loan;

(ii)     is secured by a valid second priority perfected security interest or lien in, to or on specified collateral securing the obligor's obligations under the Loan; and

(iii)     the value of the collateral securing the Loan together with other attributes of the obligor (including, without limitation, its general financial condition, ability to generate cash

55

flow available for debt service and other demands for that cash flow) is adequate (in the commercially reasonable judgment of the Portfolio Manager) to repay the Loan in accordance with its terms and to repay all other loans of equal or higher seniority secured by a first or second lien or security interest in the same collateral,

provided that such second lien Loan will only constitute a Moody's Senior Secured Loan if it has an Assigned Moody's Rating that is not lower than the corporate family rating by Moody's of the related obligor; and

(c)     the Loan is not: (i) a DIP Loan, (ii) a Loan for which the security interest or lien (or the validity or effectiveness thereof) in substantially all of its collateral attaches, becomes effective, or otherwise "springs" into existence after the origination thereof, or (iii) a type of loan that Moody's has identified as having unusual terms and with respect to which its Moody's Recovery Rate has been or is to be determined on a case-by-case basis.

"Moody's Weighted Average Recovery Rate": As of any Measurement Date, a rate equal to the number obtained by

(i)     summing the products obtained by multiplying the Principal Balance of each Collateral Obligation (other than Defaulted Collateral Obligations) by its respective Moody's Priority Category Recovery Rate,

(ii)     dividing the sum determined pursuant to clause (i) above by the sum of the Aggregate Principal Balance of all Collateral Obligations (other than Defaulted Collateral Obligations), and

(iii)     rounding up to the first decimal place.

"Non-Call Period": The period from the Closing Date to but not including the Payment Date in November 2010.

"Non-Consenting Holder": In connection with any supplemental indenture pursuant to Section 8.2 that requires the consent of one or more Holders of Securities, with respect to the Holders of the Securities, any such Holder or, in the case of such Securities represented by Global Securities, any Beneficial Owner thereof, that either (i) has declared in writing that it will not consent to such supplemental indenture or (ii) had not consented to such supplemental indenture within the applicable Initial Consent Period.

"Non-Performing Collateral Obligation": Any Defaulted Collateral Obligation and any PIK Security as to which its issuer or obligor has previously deferred or capitalized any interest due on it and all the interest so deferred or capitalized has not subsequently been paid in full in cash by:

(i)     if the PIK Security has a Moody's Rating of "Baa3" (and not on credit watch with negative implications) or above or an S&P Rating of "BBB-" (and not on credit watch with negative implications) or above, the earlier of its second payment date or one year following the date of the initial deferral or capitalization of interest due on it; or

(ii)     if the PIK Security has a Moody's Rating of "Baa3" and on credit watch with negative implications or below "Baa3," or an S&P Rating of "BBB-" and on credit watch with negative implications or below "BBB-," the earlier of its first payment date or six months following the date of the initial deferral or capitalization of interest due on it.

007275

"Non-Permitted Holder": (i) A Holder or Beneficial Owner of an interest in a Global
Security or Certificated Indenture Security that is (x) a U.S. person and (A) is not a QIB/QP and that
becomes the Beneficial Owner of an interest in a Rule 144A Global Note or (B) does not have an
exemption available under the Securities Act or (y) not a U.S. person and is determined not to have
acquired such beneficial interest in compliance with the requirements of Regulation S or have another
exemption available under the Securities Act and (ii) a Holder of a Certificated Indenture Security that is
in material breach of any representation or agreement set forth in the applicable transfer certificate.

"Non-Permitted ERISA Holder": The meaning specified in Section 2.11(d).

"Note Break-Even Loss Rate": With respect to each Class of Notes that is rated by S&P,
the maximum percentage of defaults that the Current Portfolio or Proposed Portfolio can sustain and
nevertheless sufficient funds will remain for the payment of principal of such Class of Notes in full by its
Stated Maturity and the timely payment of interest on the Class A-1A Notes, the Class A-1B Notes, the
Class A-1C Notes, the Class A-2 Notes, the Class A-3 Notes and the Class A-4 Notes and the ultimate
payment of interest on the Class B Notes and the Class C Notes using S&P's assumptions on recoveries,
defaults, and timing, and taking into account the Priority of Payments and the Adjusted Weighted
Average Spread level specified in the applicable row of the table below. The "Adjusted Weighted
Average Spread" as of any Measurement Date is the Weighted Average Spread as of the Measurement
Date minus the amount of any Spread Excess added to the Weighted Average Fixed Rate Coupon as of
the Measurement Date.

| Row | Adjusted Weighted Average Spread |
| :---: | :---: |
| 1 | Greater than or equal to 3.00% |
| 2 | Greater than or equal to 2.90% but less than 3.00% |
| 3 | Greater than or equal to 2.80% but less than 2.90% |
| 4 | Greater than or equal to 2.70% but less than 2.80% |
| 5 | Greater than or equal to 2.60% but less than 2.70% |
| 6 | Greater than or equal to 2.50% but less than 2.60% |
| 7 | Greater than or equal to 2.40% but less than 2.50% |
| 8 | Greater than or equal to 2.30% but less than 2.40% |
| 9 | Greater than or equal to 2.20% but less than 2.30% |

"Note Class Loss Differential": With respect to any Measurement Date and any Class of
Notes that is rated by S&P, the rate calculated by subtracting the Class Scenario Loss Rate for such Class
from the then-applicable Note Break-Even Loss Rate (corresponding to the S&P Monitor Test that is
created with the Adjusted Weighted Average Spread of the Current Portfolio) for such Class of Notes.

"Noteholder": A Holder of any Class of Notes (which shall include Holders of the Class
Q-1 Securities to the extent of the Class Q-1 Note Component).

"Note Interest Rate": With respect to any specified Class of Notes, the per annum
interest rate payable on the Notes of such Class with respect to each Interest Period equal to LIBOR for
the applicable Interest Period plus the spread specified in the "Interest Rate" rows of the tables in Section
2.3 with respect to such Notes, except in the first Interest Period.

57

"Notes":  The Class A-1A Notes, the Class A-1B Notes, the Class A-1C Notes, the Class A-2 Notes, the Class A-3 Notes, the Class A-4 Notes, the Class B Notes and the Class C Notes authorized by, and authenticated and delivered under, this Indenture or any supplemental indenture.

"Offer":  The meaning specified in Section 10.7(c).

"Offering":  The offering of the Notes and the Class E Certificates.

"Offering Memorandum":  The final Offering Memorandum, dated December 7, 2005, prepared and delivered in connection with the offer and sale of the Securities.

"Officer":  With respect to the Issuer and any corporation, any director, the Chairman of the board of directors, the President, any Vice President, the Secretary, an Assistant Secretary, the Treasurer, or an Assistant Treasurer of the entity; with respect to the Co-Issuer and any corporation, any director, the Chairman of the board of directors, the President, any Vice President, the Secretary, an Assistant Secretary, the Treasurer, or an Assistant Treasurer of the entity; with respect to any partnership, any of its general partners; and with respect to the Trustee, any Trust Officer.

"Opinion of Counsel":  A written opinion addressed to the Trustee and each Rating Agency, in form and substance reasonably satisfactory to the Trustee and each Rating Agency, of an attorney at law (or law firm with one or more partners) reasonably satisfactory to the Trustee and admitted to practice before the highest court of any state of the United States or the District of Columbia (or the Cayman Islands, in the case of an opinion relating to the laws of the Cayman Islands), which attorney (or law firm) may, except as otherwise expressly provided in this Indenture, be counsel for the Portfolio Manager, the Issuer or the Co-Issuer.  Whenever an Opinion of Counsel is required under this Indenture, the Opinion of Counsel may rely on opinions of other counsel who are so admitted and so satisfactory, which opinions of other counsel shall accompany the Opinion of Counsel and shall either be addressed to the Trustee and each Rating Agency or shall state that the Trustee and each Rating Agency may rely on it.  An Opinion of Counsel may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion.

"Optional Redemption":  A redemption of the Notes in accordance with Section 9.2.

"Other Indebtedness":  The meaning specified in the definition of "Defaulted Collateral Obligation."

"Outstanding":  With respect to:  (a) the Notes or any specified Class, as of any date of determination, all of the Notes, or all of the Notes of the specified Class, as the case may be, theretofore authenticated and delivered under this Indenture, (ii) with respect to the Class Q-1 Securities, as of any date of determination, all Class Q-1 Securities theretofore authenticated and delivered under the Indenture and (iii) the Class P-1 Securities and the Class P-2 Securities, as of any date of determination, all Class P-1 Securities and Class P-2 Securities, as applicable, theretofore authenticated and delivered under the Indenture, in each case except Notes, Class Q-1 Securities and Class P Securities, as applicable:

(i)    canceled by the Indenture Registrar or delivered to the Indenture Registrar for cancellation;

(ii)    for whose payment or redemption funds in the necessary amount have been theretofore irrevocably deposited with the Trustee or any Paying Agent in trust for their

58

007277

Holders pursuant to Section 4.1(a)(ii) and if such Securities are to be redeemed, notice of redemption has been duly given pursuant to this Indenture;

(iii) in exchange for or in lieu of which other Securities have been authenticated and delivered pursuant to this Indenture; and

(iv) alleged to have been destroyed, lost, or stolen for which replacement Securities have been issued as provided in Section 2.7, unless proof satisfactory to the Trustee is presented that any such Securities are held by a protected purchaser;

(b) the Class E Certificates, as of any date of determination, all of the Class E Certificates theretofore issued under the Class E Certificate Documents and listed in the Class E Certificate register of the Issuer as outstanding;

provided that, in determining whether the Holders of the requisite Aggregate Outstanding Amount of the Notes, Class Q-1 Securities, Class P Securities or the Class E Certificates have given any request, demand, authorization, direction, notice, consent, or waiver under this Indenture:

(i) (A) the Class C Notes represented by the Class Q-1 Note Component shall be considered to be Class C Notes and Holders of Class Q-1 Securities shall be entitled to vote the Class C Notes represented by the Class Q-1 Note Component, and (B) the Class E Certificates represented by any Class E Certificate Component shall be considered to be Class E Certificates and Holders of the Class Q-1 Securities shall be entitled to vote the Class E Certificates represented by the Class Q-1 Class E Certificate Component, Holders of the Class P-1 Securities shall be entitled to vote the Class E Certificates represented by the Class P-1 Class E Certificate Component and Holders of the Class P-2 Securities shall be entitled to vote the Class E Certificates represented by the Class P-2 Class E Certificate Component;

(ii) Securities owned or beneficially owned by the Issuer, the Co-Issuer, any Affiliate of either of them shall be disregarded and not be Outstanding; and

(iii) only (x) with respect to any matter affecting its status as Portfolio Manager, or (y) in any matter respecting an acceleration of any Class of Securities if the effect of the Portfolio Manager's action or inaction as a Holder of Securities would effectively prevent acceleration, Securities owned or beneficially owned by the Portfolio Manager and its Affiliates and any accounts over which the Portfolio Manager or its Affiliates have discretionary voting authority, shall be disregarded and not be Outstanding,

except that with respect to clause (ii) and clause (iii) above, in determining whether the Trustee shall be protected in relying on any request, demand, authorization, direction, notice, consent, or waiver, only Securities that a Trust Officer of the Trustee has actual knowledge to be so owned or beneficially owned shall be so disregarded. Securities so owned or beneficially owned that have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right so to act with respect to the Securities and that the pledgee is not the Issuer, the Co-Issuer, the Portfolio Manager, the Class E Certificates Paying Agent or any Affiliate of the Issuer or the Co-Issuer.

"Overcollateralization Ratio": With respect to any Class of Notes (treating the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes and the Class A-4 Notes as one Class for this purpose) on any Measurement Date, the ratio calculated by dividing:

(i) the Overcollateralization Ratio Numerator; by

59

(ii) the Aggregate Outstanding Amount of the Class of Notes and all Notes ranking senior to it (including, for the avoidance of doubt, any Deferred Interest on the Class of Notes and all Notes ranking senior to it).

"Overcollateralization Ratio Numerator": On any date, the sum of:

(1) the Aggregate Principal Balance of all Collateral Obligations (other than any Excess CCC/Caa Collateral Obligations, any Non-Performing Collateral Obligations, any Deep Discount Obligations, and any Collateral Obligations loaned pursuant to a Securities Lending Agreement with respect to which an "event of default" (under and as defined in the Securities Lending Agreement) is continuing); plus

(2) unpaid Accrued Interest Purchased With Principal (excluding any unpaid Accrued Interest Purchased With Principal in respect of Non-Performing Collateral Obligations); plus

(3) the Aggregate Principal Balance of any Eligible Investments that were purchased with Principal Proceeds and, without duplication, the amount of Principal Proceeds on deposit in the Collection Account; plus

(4) the Aggregate Principal Balance of Eligible Investments on deposit in a Securities Lending Account that relate to a Securities Lending Agreement with respect to which an "event of default" (under and as defined in the Securities Lending Agreement) is continuing; plus

(5) with respect to Collateral Obligation that are Non-Performing Collateral Obligations, Deep Discount Obligations or Excess CCC/Caa Collateral Obligations, the amount determined by using one of the following methods applicable to such type of Collateral Obligation; provided that if a Collateral Obligation falls within more than one of such types, the Issuer will be required to use the method that results in the smallest amount:

(A) with respect to any Excess CCC/Caa Collateral Obligations, an amount equal to the product of (i) the lower of (1) 70% and (2) the weighted average Market Value of all Excess CCC/Caa Collateral Obligations, expressed as a percentage of their outstanding principal balances multiplied by (ii) the Aggregate Principal Balance of the Excess CCC/Caa Collateral Obligations;

(B) with respect to any Non-Performing Collateral Obligations, the aggregate of the Applicable Collateral Obligation Amounts for all included Non-Performing Collateral Obligations (other than Defaulted Collateral Obligations that have been held by the Issuer for more than three years, which shall be deemed to be zero for purposes of this clause (B)); and

(C) with respect to any Deep Discount Obligations, the Aggregate Purchase Price Amount for all Deep Discount Obligations.

As used in this definition, "Applicable Collateral Obligation Amount" for any Non-Performing Collateral Obligation means:

(a) the lesser of:

(x) the Market Value Percentage of the Non-Performing Collateral Obligation; and

007279

(y) the Applicable Percentage for the Non-Performing Collateral Obligation;

*multiplied* by:

(b) if the Non-Performing Collateral Obligation is:

(1) any Pledged Obligation other than those in clauses (2) through (4) below, its outstanding principal amount as of the relevant Measurement Date;

(2) any Synthetic Security, the notional amount specified in such Synthetic Security;

(3) any Revolving Loan or Delayed Drawdown Loan, its funded principal amount outstanding plus any Unfunded Amount thereof (regardless of the nature of the contingency relating to the Issuer's obligation to fund the Unfunded Amount); and

(4) any PIK Security, its outstanding principal amount but excluding any principal amount representing previously deferred or capitalized interest;

provided however, that, for the avoidance of doubt, the Applicable Collateral Obligation Amount with respect to any Collateral Obligation in which the Trustee does not have a first priority perfected security interest shall be zero.

As used in the calculation of Market Value Percentage of the Non-Performing Collateral Obligation, the Principal Balance of any Defaulted Collateral Obligation shall be, if the Defaulted Collateral Obligation is:

(i) any Pledged Obligation other than those in clauses (ii) through (iv) below, its outstanding principal amount as of the relevant Measurement Date;

(ii) any Synthetic Security, the notional amount specified in such Synthetic Security;

(iii) any Revolving Loan or Delayed Drawdown Loan, its outstanding principal amount plus any unfunded amount thereof (regardless of the nature of the contingency relating to the Issuer's obligation to fund the unfunded amount); and

(iv) any PIK Security, its outstanding principal amount but excluding any principal amount representing previously deferred or capitalized interest.

"Overcollateralization Test": A test that is satisfied with respect to any Class of Notes (treating the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes and the Class A-4 Notes as one Class for this purpose) if, as of any Measurement Date, the Overcollateralization Ratio for such Class is at least equal to the required level for the specified Class indicated in the table below:

| Test | Required Level |
| --- | --- |
| Class A Overcollateralization Test | 111.7% |
| Class B Overcollateralization Test | 106.0% |
| Class C Overcollateralization Test | 103.8% |

61

"Participating Institution":  An institution that creates a participation interest and that has a long-term senior unsecured rating by Moody's of at least "A3" (and if so rated by Moody's such rating is not on watch for possible downgrade) and an issuer credit rating by S&P of at least "A".

"Participation":  A Loan acquired as a participation interest created by a Participating Institution.

"Paying Agent":  Any person authorized by the Issuer to pay the principal of or interest on any Notes on behalf of the Issuer as specified in Section 7.2.

"Payment Account":  The trust account established pursuant to Section 10.3(h).

"Payment Date":  (i) The first day of February, May, August and November in each year; *provided* that the first Payment Date shall be March 3, 2006 and the second Payment Date will be May 2, 2006, or, if any such day is not a Business Day, the next following Business Day, (ii) any other date on which the Notes are redeemed or paid before their Stated Maturity, and (iii) the Stated Maturity for the Notes.

"Permitted Offer":  An Offer pursuant to which the offeror offers to acquire a debt obligation (including a Collateral Obligation) in exchange solely for cash in an amount equal to or greater than the full face amount of the debt obligation plus any accrued and unpaid interest and as to which the Portfolio Manager has determined in its commercially reasonable judgment that the offeror has sufficient access to financing to consummate the Offer.

"Permitted Use":  With regard to Class A-1A Note Borrowings, a Borrowing to (i) acquire additional Collateral Obligations during the Ramp-up Period, (ii) acquire substitute Collateral Obligations during the Reinvestment Period (or after the Reinvestment Period pursuant to commitments to purchase made by the Issuer during the Reinvestment Period) and (iii) fund commitments of the Issuer to obligors under Revolving Loans or Delayed Drawdown Loans acquired during the Reinvestment Period.

"Person":  An individual, corporation (including a business trust), partnership, limited liability company, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated association or government or any agency or political subdivision thereof.

"PIK Cash-Pay Interest":  As to any PIK Security, the portion of interest required to be paid in cash (and not permitted to be added to the balance of such PIK Security or otherwise deferred and accrued) thereon pursuant to the terms of the related Underlying Instruments.

"PIK Security":  Any loan or debt obligation on which any portion of the interest accrued for a specified period of time or until the maturity thereof is, or at the option of the obligor may be, added to the principal balance of such loan or debt obligation or otherwise deferred rather than being paid in cash, underlined provided that such loan or debt obligation shall not be a PIK Security if the related PIK Cash-Pay Interest, if any, would result in the outstanding principal amount of such loan or debt obligation having an effective rate of PIK Cash-Pay Interest at least equal to (i) if such loan or debt obligation is a fixed rate loan or debt obligation, 4.0% per annum, or (ii) if such loan or debt obligation is a floating rate loan or debt obligation, LIBOR.

"Placed Securities":  The Class E Certificates, in each case placed by the Placement Agent pursuant to the Placement Agency Agreement.

"Placement Agency Agreement": A placement agency agreement dated December 7, 2005 between the Issuer and Citigroup Global Markets Inc. relating to the placement of the Placed Securities, as modified, amended and supplemented and in effect from time to time.

"Placement Agent": Citigroup Global Markets Inc.

"Plan": Any "employee benefit plan" within the meaning of Section 3(3) of ERISA subject to Title I of ERISA, any "plan" described by Section 4975(e)(1) of the Code subject to Section 4975 of the Code or any entity whose underlying assets include the assets of any plan by reason of U.S. Department of Labor regulation 2510.3-101 or otherwise.

"Pledged Obligations": As of any date of determination, the Collateral Obligations, the Workout Assets, the Eligible Investments, and any other securities or obligations that have been Granted to the Trustee that form part of the Collateral.

"Portfolio Manager": Highland Capital Management, L.P., and any successor Portfolio Manager pursuant to the Management Agreement.

"Prepayment": Any repayment of principal of the Class A–1A Notes pursuant to Section 9.7 prior to the Maturity of such Notes.

"Prepayment Date": Any date on which a Prepayment occurs.

"Principal Balance": With respect to:

(i) any Pledged Obligation other than those specifically covered in this definition, the outstanding principal amount of the Pledged Obligation as of the relevant Measurement Date;

(ii) any Synthetic Security, the notional amount specified in such Synthetic Security;

(iii) any Pledged Obligation in which the Trustee does not have a first priority perfected security interest, zero, except as otherwise expressly specified in this Indenture;

(iv) any Defaulted Collateral Obligation, except as otherwise provided, zero;

(v) any Collateral Obligation that has been loaned, its outstanding principal amount reduced by the excess of the amount of collateral required over the actual Market Value of the collateral;

(vi) any Revolving Loan or Delayed Drawdown Loan, its funded principal amount outstanding plus any Unfunded Amount thereof (regardless of the nature of the contingency relating to the Issuer's obligation to fund the Unfunded Amount), except as otherwise expressly specified in this Indenture;

(vii) any PIK Security and any Collateral Obligation that would be a PIK Security but for the proviso in the definition thereof, its outstanding principal amount but excluding any principal amount representing previously deferred or capitalized interest; and

(viii) any obligation or security that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation, zero.

007282

"Principal Proceeds": With respect to any Due Period, (i) all amounts received in Cash during the Due Period by the Issuer with respect to the Collateral that are not Interest Proceeds and (ii) the net proceeds received from any issuance of Additional Class E Certificates.

Principal Proceeds shall include any funds transferred from the Closing Date Expense Account into the Collection Account pursuant to Section 10.2.

Principal Proceeds do not include earnings on amounts on deposit in the Securities Lending Account to the extent the earnings are payable by the Issuer to a Securities Lending Counterparty.

At any time when an "event of default" under a Securities Lending Agreement has occurred and is continuing, any payments received by the Issuer from the related Securities Lending Collateral shall be Principal Proceeds.

For the avoidance of doubt, "Principal Proceeds" shall not include the Class P Collateral or any proceeds thereof.

"Priority Class": With respect to any specified Class of Notes, each Class of Notes that ranks senior to that Class, as indicated in Section 13.1.

"Priority of Payments": The meaning specified in Section 11.1(a).

"Proceeding": Any suit in equity, action at law, or other judicial or administrative proceeding.

"Proposed Portfolio": As of any Measurement Date, the portfolio (measured by Aggregate Principal Balance) of Collateral Obligations and Principal Proceeds held as Cash on deposit in the Collection Account and other Eligible Investments purchased with Principal Proceeds on deposit in the Collection Account resulting from the sale, maturity, or other disposition of a Collateral Obligation or a proposed reinvestment in a Collateral Obligation, as the case may be.

"Purchase Agreement": The agreement dated as of December 7, 2005 among the Co-Issuers and the Initial Purchaser relating to the initial purchase of the Notes (other than the Class A-1A Notes and the Class A-1B Notes), the Class Q-1 Securities and the Class P Securities, as amended from time to time.

"Purchase Price": With respect to the purchase of any Collateral Obligation (other than any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation), the net purchase price paid by the Issuer for the Collateral Obligation. The net purchase price is determined by subtracting from the purchase price the amount of any Accrued Interest Purchased With Principal and any syndication and other upfront fees paid to the Issuer and by adding the amount of any related transaction costs (including assignment fees) paid by the Issuer to the seller of the Collateral Obligation or its agent.

"Purchase Price Amount": With respect to any Collateral Obligation on any date of determination, the product of (i) the Purchase Price (stated as a percentage) thereof and (ii) the Principal Balance thereof on such date.

"QIB/QP": Any person that, at the time of its acquisition of Notes is both a Qualified Institutional Buyer and a Qualified Purchaser.

64

"Qualified Equity Security": Any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation that is stock or evidence of an interest in or a right to buy stock, or any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation but whose acquisition otherwise is a transaction in stocks or securities within the meaning of Section 864(b)(2)(A)(ii) of the Code and the regulations under the Code. Qualified Equity Securities do not include any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation and that will cause the Issuer to be treated as engaged in or having income from a United States trade or business for United States federal income tax purposes by virtue of its ownership or disposition of the obligation (without regard to the Issuer's other activities).

"Qualified Institutional Buyer": The meaning specified in Rule 144A under the Securities Act.

"Qualified Purchaser": The meaning specified in Section 2(a)(51) of the 1940 Act and the rules thereunder (including entities owned exclusively by Qualified Purchasers).

"Ramp-Up Completion Date": The earlier of:

(i)     the Business Day prior to March 3, 2006, and

(ii)     the first date on which the following conditions are satisfied:

(x) either (A) the Aggregate Principal Balance of the Collateral Obligations owned by the Issuer equals at least $900,000,000 or (B) the Aggregate Principal Balance of the Collateral Obligations purchased (or committed to be purchased) by the Issuer (in each case in this clause (B), measured solely as of the date of purchase or commitment, as the case may be (provided that with respect to the Initial Collateral Obligations, the date of purchase shall be the Closing Date)) equals at least $900,000,000 (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to any Collateral Obligations after the Closing Date and on or before the Ramp-Up Completion Date); and

(y)     the Overcollateralization Ratio Numerator is at least $900,000,000.

"Ramp-Up Period": The period from and including the Closing Date to and including the Ramp-Up Completion Date.

"Rating Agency": Each of Moody's and S&P or, with respect to Pledged Obligations generally, if at any time Moody's or S&P ceases to provide rating services with respect to high yield debt securities, any other nationally recognized statistical rating organization selected by the Issuer and reasonably satisfactory to a Majority of each Class of Notes and, in the case of Moody's ceasing to provide rating services only, a Majority of each of the Class Q-1 Securities, the Class P-1 Securities and the Class P-2 Securities. If at any time Moody's ceases to be a Rating Agency, references to rating categories of Moody's in this Indenture shall instead be references to the equivalent categories of the replacement rating agency as of the most recent date on which the replacement rating agency and Moody's published ratings for the type of security in respect of which the replacement rating agency is used. If at any time S&P ceases to be a Rating Agency, references to rating categories of S&P in this Indenture shall instead be references to the equivalent categories of the replacement rating agency as of the most recent date on which the replacement rating agency and S&P published ratings for the type of security in respect of which the replacement rating agency is used.

007284

"Rating Condition": With respect to any action taken or to be taken under this Indenture, a condition that is satisfied when both Rating Agencies, or, if expressly stated, a specified Rating Agency, has confirmed to the Portfolio Manager (as agent for the Issuer) in writing that no withdrawal, reduction, suspension, or other adverse action with respect to any then current rating by it (including any private or confidential rating) of any Class of Securities will occur as a result of the action. The Rating Condition with respect to any Rating Agency shall be satisfied for all purposes of this Indenture at any time when no Outstanding Securities are rated by it.

"Rating Confirmation": Confirmation in writing from each Rating Agency that it has not reduced, suspended, or withdrawn the Initial Rating assigned by it to any Class of Securities.

"Rating Confirmation Failure": A failure by the Issuer or the Portfolio Manager (on behalf of the Issuer) to obtain confirmation in writing from S&P and written confirmation from Moody's that it has not reduced, suspended, or withdrawn its Initial Rating of each Class of rated Securities and that it has not placed any Class of Securities on credit watch with negative implications by the Business Day after the 29th day after the Ramp-Up Completion Date.

"Rating Criteria": Criteria that will be satisfied on any date with respect to any Holder of Class A–1A Notes and any Holder of Class A-1B Notes, as applicable, if the short-term debt, deposit or similar obligations of such Holder (or its guarantor) are on such date rated at least "P-1" (but not "P-1" on credit watch for downgrade) by Moody's and "A-1" by S&P (but not on "A-1" on credit watch for downgrade).

"Ratings Matrix": The "row/column combination" of the table below selected by the Portfolio Manager on the Closing Date to apply initially for purposes of the Diversity Test, the Weighted Average Spread Test and the Weighted Average Rating Factor Test. Thereafter, on notice to the Trustee, the Portfolio Manager may select a different row of the Ratings Matrix to apply, or may interpolate between two adjacent rows and/or two adjacent columns, as applicable, on a straight-line basis and round the results to two decimal points.

| Minimum Weighted Average Spread | Minimum Diversity Score | | | | | | |
|---|---|---|---|---|---|---|---|
| | 50 | 55 | 60 | 65 | 70 | 75 | 80 |
| 2.2% | 2070 | 2100 | 2130 | 2160 | 2190 | 2220 | 2250 |
| 2.3% | 2130 | 2160 | 2190 | 2220 | 2250 | 2280 | 2310 |
| 2.4% | 2190 | 2220 | 2250 | 2280 | 2310 | 2340 | 2370 |
| 2.5% | 2250 | 2280 | 2310 | 2340 | 2370 | 2400 | 2430 |
| 2.6% | 2310 | 2340 | 2370 | 2400 | 2430 | 2460 | 2490 |
| 2.7% | 2370 | 2400 | 2430 | 2460 | 2490 | 2520 | 2550 |
| 2.8% | 2430 | 2460 | 2490 | 2520 | 2550 | 2580 | 2610 |
| 2.9% | 2490 | 2520 | 2550 | 2580 | 2610 | 2640 | 2670 |
| 3.0% | 2550 | 2580 | 2610 | 2640 | 2670 | 2700 | 2730 |
| Maximum Weighted Average Moody's Rating Factor | | | | | | | |

"Recovery Rate Modifier": As of any Measurement Date, the lesser of 60 and the product of:

007285

(i)    (a) the Moody's Weighted Average Recovery Rate <u>minus</u> the minimum percentage specified to pass the Weighted Average Moody's Recovery Rate Test (but not less than zero) <u>multiplied</u> by (b) 100; and

(ii)    40.

"<u>Record Date</u>": With respect to (a) any Payment Date, the date on which the Holders of Securities entitled to receive a payment on such Payment Date are determined, such date as to any Payment Date being the 15th day (whether or not a Business Day) before the applicable Payment Date; (b) any Prepayment Date, the date on which the Holders of the Class A-1A Notes entitled to receive a Prepayment are determined, such date as to any Prepayment Date being the 15th day (whether or not a Business Day) prior to the applicable Prepayment Date.

"<u>Redemption Date</u>": Any Payment Date specified for an Optional Redemption of Notes pursuant to Section 9.2.

"<u>Redemption Price</u>": With respect to any Optional Redemption pursuant to Section 9.2 and

(a) any Note (other than any Class A-1A Note to be redeemed pursuant to Section 9.2), an amount equal to:

(i)    the outstanding principal amount of the portion of the Note being redeemed; <u>plus</u>

(ii)    accrued and unpaid interest on the Note (including any Defaulted Interest and interest on Defaulted Interest); <u>plus</u>

(iii)    in the case of any Deferred Interest Note, the applicable Deferred Interest on the Note; <u>plus</u>

(iv)    in the case of the Class A-1B Notes, any accrued and unpaid Delayed Drawdown Fee; <u>plus</u>

(v)    any unpaid Extension Bonus Payment in respect of the Note.

(b) any Class A–1A Note, an amount equal to:

(i)    100% of the Drawn Amount of such Class A–1A Note to be redeemed, <u>plus</u>

(ii)    accrued and unpaid interest thereon (including any Defaulted Interest and interest on Defaulted Interest) <u>plus</u>

(iii)    and any accrued and unpaid Commitment Fee Amount, <u>plus</u>

(iv)    any unpaid Extension Bonus Payment in respect of the Note.

With respect to any Optional Redemption of the Class E Certificates pursuant to Section 9.2(b), "Redemption Price" means (i) the entire remaining amount of available funds after all prior applications pursuant to the Priority of Payments or (ii) as otherwise specified by the unanimous direction of the Holders of the Class E Certificates, in each case, as specified in Section 9.2(b).

007286

"Reference Obligation": An obligation that would, if acquired directly by the Issuer, satisfy the definition of "Collateral Obligation" and on which a Synthetic Security is based.

"Reference Obligor": The obligor of a Reference Obligation.

"Registered": With respect to a Collateral Obligation or Eligible Investment, means that it is issued after July 18, 1984 and is in registered form within the meaning of Section 881(c)(2)(B)(i) of the Code and the United States Department of the Treasury ("Treasury") regulations promulgated thereunder.

"Registered Office": The registered office of the Issuer, which shall be located outside of the United States.

"Regulation D": Regulation D under the Securities Act.

"Regulation S": Regulation S under the Securities Act.

"Regulation S Global Security": The meaning specified in Section 2.2(b).

"Reinvestment Overcollateralization Ratio": As of any Measurement Date, the ratio obtained by dividing:

    (i)    the Overcollateralization Ratio Numerator by

    (ii)    the Aggregate Outstanding Amount of the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes, the Class A-4 Notes, the Class B Notes and the Class C Notes (including, for the avoidance of doubt, any Deferred Interest, if any, on those Classes of Notes).

"Reinvestment Overcollateralization Test": A test that is satisfied as of any Measurement Date on which any Notes remain Outstanding, if the Reinvestment Overcollateralization Ratio as of such Measurement Date is at least equal to 104.8%.

"Reinvestment Period": The period from the Closing Date through and including the first to occur of:

    (i)    the Payment Date after the date that the Portfolio Manager notifies the Trustee, each Rating Agency, and the Administrator, in the sole discretion of the Portfolio Manager, that, in light of the composition of the Collateral, general market conditions, and other factors, investments in additional Collateral Obligations within the foreseeable future would either be impractical or not beneficial;

    (ii)    the Payment Date in November 2012 or, in the case of an Extension, the Extended Reinvestment Period End Date;

    (iii)    the Payment Date on which all Notes are to be optionally redeemed or an earlier date after notice of an Optional Redemption chosen by the Portfolio Manager to facilitate the liquidation of the Collateral for the Optional Redemption; and

    (iv)    the date on which the Reinvestment Period terminates or is terminated as a result of an Event of Default (subject to Section 5.2(b)).

007287

"Relevant Securities Intermediary": The Issuer Accounts Securities Intermediary, the Class P-1 Securities Intermediary or the Class P-2 Securities Intermediary, as the context may require.

"Removal Buy-Out Purchaser": The meaning specified in Section 2.14(e).

"Replacement Hedge": A replacement hedge agreement that qualifies to be a Hedge Agreement under this Indenture.

"Repository": The internet-based password protected electronic repository of transaction documents relating to privately offered and sold collateralized debt obligation securities located at "www.cdolibrary.com" operated by The Bond Market Association.

"Required Rating": The meaning specified in Section 15.2(b).

"Revolver Funding Reserve Amount": An amount, which cannot be negative, equal to the sum of (a) the Aggregate Unfunded Amount for all Revolving Loans and Delayed Drawdown Loans minus (b) the Aggregate Undrawn Amount of the Class A-1A Notes; provided, however, for purposes of this definition, the Aggregate Undrawn Amount of Class A-1A Notes used in such calculation shall not include the portion of the Aggregate Undrawn Amount attributable to each Holder of Class A-1A Notes at any time and for so long as and to the extent (x) such Holder does not meet the Rating Criteria and (y) has failed to fund the Undrawn Amount of its Class A-1A Notes when required to do so under the Class A-1A Note Purchase Agreement.

"Revolving Loan": A Loan or any Synthetic Security with a Reference Obligation (in each case excluding any Delayed Drawdown Loan) that requires the Issuer to make future advances to (or for the account of) the borrower under its Underlying Instruments (including any letter of credit for which the Issuer is required to reimburse the issuing bank for under it). A Loan or Synthetic Security shall only be considered to be a Revolving Loan for so long as its Unfunded Amount is greater than zero.

"Revolving Note Agent": The meaning specified in the Class A-1A Note Purchase Agreement.

"Revolving Note Agent Expenses": Amounts due to the Revolving Note Agent and payable in arrears to the Revolving Note Agent pursuant to the Class A-1A Note Purchase Agreement (other than the Revolving Note Agent Fee); provided that the Revolving Note Agent Expenses shall be payable on each Payment Date only to the extent that funds are available for such purpose in accordance with the Priority of Payments.

"Revolving Note Agent Fee": Only during the Draw Period, the quarterly fee accrued and payable to the Revolving Note Agent on each Payment Date pursuant to the Class A-1A Note Purchase Agreement; provided that the Revolving Note Agent Fee shall be payable on each Payment Date only to the extent that funds are available for such purpose in accordance with the Priority of Payments.

"Revolving Reserve Account": The trust account established pursuant to Section 10.3(b).

"Rule 144A": Rule 144A under the Securities Act.

"Rule 144A Global Note": The meaning specified in Section 2.2(c).

"Rule 144A Information": The meaning specified in Section 7.14.

007288

"S&P": Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.

"S&P CDO Monitor": A dynamic, analytical computer model developed by S&P, that may be modified by S&P from time to time, and provided to the Portfolio Manager and the Collateral Administrator to be used to calculate the default frequency in terms of the amount of debt assumed to default as a percentage of the original principal amount of the Collateral Obligations consistent with a specified benchmark rating level based on certain assumptions and S&P's proprietary corporate default studies. For the purpose (and only for the purpose) of applying the S&P CDO Monitor to a portfolio of obligations, for each obligation in the portfolio, the rating of the obligation shall be its S&P Rating.

"S&P CDO Monitor Test": A test that will be satisfied as of any Measurement Date if, after giving effect to the sale of a Collateral Obligation or the purchase of a Collateral Obligation, each Note Class Loss Differential of the Proposed Portfolio is positive. The S&P CDO Monitor Test shall be considered to be improved if each Note Class Loss Differential of the Proposed Portfolio is at least equal to the corresponding Note Class Loss Differential of the Current Portfolio. The S&P CDO Monitor Test is not required to be satisfied or improved upon the sale of a Credit Risk Obligation and the reinvestment of the related Sale Proceeds in additional Collateral Obligations as provided in Section 12.1(a). For purposes of the S&P CDO Monitor Test,

(i)     the S&P Rating of any S&P Unrated DIP Loan shall be "CCC-" and

(ii)     the S&P Industry Classification for a Synthetic Security shall be that of the related Reference Obligation and not the Synthetic Security.

"S&P Industry Classification": The S&P Industry Classifications in Schedule 3 as modified, amended, and supplemented from time to time by S&P.

"S&P Priority Category": Each type of Collateral Obligation specified in the definition of "Applicable Percentage" as an "S&P Priority Category."

"S&P Priority Category Recovery Rate": For any Collateral Obligation, the percentage specified in the definition of "Applicable Percentage" opposite the S&P Priority Category of the Collateral Obligation.

"S&P Rating": The meaning set forth in Schedule 7.

"S&P Unrated DIP Loan": A DIP Loan acquired by the Issuer that does not have a rating assigned by S&P and for which the Portfolio Manager has commenced the process of having a rating assigned by S&P (as specified in the definition of "DIP Loan").

"S&P Weighted Average Recovery Rate": As of any Measurement Date, a rate equal to the number obtained by

(i)     summing the products obtained by multiplying the Principal Balance of each Collateral Obligation by its respective S&P Priority Category Recovery Rate,

(ii)     dividing the sum determined pursuant to clause (i) above by the sum of the Aggregate Principal Balance of all Collateral Obligations, and

(iii)     rounding up to the first decimal place.

007289

"Sale": The meaning specified in Section 5.17.

"Sale Proceeds": All proceeds received (including any proceeds received with respect to any associated interest rate swap or security providing fixed annuity payments) with respect to Collateral Obligations or other Pledged Obligations as a result of their sales or other dispositions less any reasonable expenses expended by the Portfolio Manager or the Trustee in connection with the sales or other dispositions, which shall be paid from such proceeds notwithstanding their characterization otherwise as Administrative Expenses. For the avoidance of doubt, "Sale Proceeds" shall not include the Class P Collateral or any proceeds thereof.

"Schedule of Collateral Obligations": The Collateral Obligations listed on Schedule 1, which schedule shall include with respect to each listed Collateral Obligation:

      (A)     the name of the obligor and a unique Loan or other instrument identifier;

      (B)     the purchase price;

      (C)     the Principal Balance;

      (D)     the classification (including whether the Collateral Obligation is a Loan, a High-Yield Bond, a Synthetic Security, a Participation, a Structured Finance Obligation, a Revolving Loan, or a Delayed Drawdown Loan);

      (E)     the funded amount (stated as a percentage) in respect of a Collateral Obligation that is a Revolving Loan or a Delayed Drawdown Loan;

      (F)     the coupon or spread (as applicable);

      (G)     the Stated Maturity;

      (H)     the Moody's Rating;

      (I)     the S&P Rating; and

      (J)     the CUSIP and any ISIN, if applicable,

as the schedule may be amended from time to time to reflect the release of Collateral Obligations pursuant to Article 10 and the inclusion of Collateral Obligations as provided in Section 12.2.

"Second Lien Loan": A Secured Loan (other than a Senior Secured Loan) that has a junior contractual claim only to a Senior Secured Loan on tangible property (which property is subject to a prior lien (other than customary permitted liens, as such, but not limited to, any tax liens)) to secure payment of a debt or the fulfillment of a contractual obligation.

"Secondary Risk Counterparty": Any obligor Domiciled other than in the United States, any Participating Institution, any Synthetic Security Counterparty and any Securities Lending Counterparty.

"Secondary Risk Table": The table below:

71

| Long-Term Senior Unsecured Debt Rating of Secondary Risk Counterparty | | Individual Counterparty Limit | Aggregate Counterparty Limit |
|---|---|---|---|
| Moody's | S&P | | |
| Aaa | AAA | 20.0% | 20.0% |
| Aa1 | AA+ | 10.0% | 10.0% |
| Aa2 | AA | 10.0% | 10.0% |
| Aa3 | AA- | 10.0% | 10.0% |
| A1 | A+ | 5.0% | 10.0% |
| A2 or below | A or below | 0.0% | 0.0% |

If any Secondary Risk Counterparty's long-term senior unsecured debt rating or short-term rating is on credit watch for possible downgrade by Moody's or S&P, then for the purposes of the table above, its rating by the Rating Agency putting its rating on credit watch shall be one rating notch lower for that Rating Agency.

"Section 3(c)(7)": Section 3(c)(7) of the 1940 Act.

"Section 3(c)(7) Reminder Notice": A notice from the Issuer to the Noteholders (to be delivered in accordance with Sections 10.6(a) and (b)) substantially in the form of Exhibit H-1.

"Secured Loan": A Loan that (i) is not subordinated by its terms to other indebtedness of the borrower for borrowed money and (ii) is secured by a valid and perfected security interest in specified collateral.

"Secured Parties": The meaning specified in the Granting Clauses.

"Securities": Collectively, The Notes, Class Q-1 Securities, Class P Securities and the Class E Certificates.

"Securities Act": The United States Securities Act of 1933, as amended.

"Securities Intermediary": Any clearing corporation or any person, including a bank or broker, that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity.

"Securities Lending Account": The trust account established pursuant to Section 10.3(f).

"Securities Lending Agreements": The meaning specified in Section 7.17(a).

"Securities Lending Collateral": The meaning specified in Section 7.17(b).

"Securities Lending Counterparty": The meaning specified in Section 7.17(a).

"Security Entitlement": The meaning specified in Section 8-102(a)(17) of the UCC.

"Selected Collateral Quality Tests": The Weighted Average Moody's Recovery Rate Test, the Weighted Average Fixed Rate Coupon Test, the Weighted Average Spread Test, the Weighted

Average Life Test (after taking into consideration any applicable Maturity Extension), the Weighted Average Rating Factor Test and the Diversity Test.

"Senior Management Fee": A fee that accrues from the Closing Date payable to the Portfolio Manager in arrears on each Payment Date equal to 0.30% per annum of the Maximum Investment Amount as of the first day of the related Due Period if and to the extent funds are available for that purpose in accordance with the Priority of Payments. The Senior Management Fee shall be calculated on the basis of the actual number of days elapsed divided by 360.

"Senior Secured Loan": A Secured Loan that is not subordinated by its terms to indebtedness of the borrower for borrowed money, trade claims, capitalized leases, or other similar obligations, with a first priority security interest in collateral and with respect to which the Portfolio Manager determines that the value of the collateral securing such Secured Loan equal or exceeds the outstanding principal balance of the loan plus the aggregate outstanding balances of all other loans of equal or higher seniority secured by the same collateral.

"Senior Unsecured Loan": A Loan that (i) is not subordinated by its terms to indebtedness of the borrower for borrowed money and (ii) is not secured by a valid and perfected security interest in collateral.

"Share Trustee": Walkers SPV Limited.

"Special Redemption": The meaning specified in Section 9.5.

"Special Redemption Amount": The meaning specified in Section 9.5.

"Special Redemption Date": The meaning specified in Section 9.5.

"Spread Excess": As of any Measurement Date, a fraction whose:

(i)      numerator is the product of:

(A)      the greater of zero and the excess of the Weighted Average Spread for the Measurement Date over the Minimum Weighted Average Spread specified in the applicable row of the Ratings Matrix, and

(B)      the Aggregate Principal Balance of all Floating Rate Obligations (excluding any Non-Performing Collateral Obligations) held by the Issuer as of the Measurement Date, and

(ii)      denominator is the Aggregate Principal Balance of all Fixed Rate Obligations (excluding any Non-Performing Collateral Obligations) held by the Issuer as of the Measurement Date.

In computing the Spread Excess on any Measurement Date, the Weighted Average Spread for the Measurement Date will be computed as if the Fixed Rate Excess were equal to zero.

"Stated Maturity": With respect to any Collateral Obligation, the maturity date specified in it or the applicable Underlying Instrument (or, if earlier, the first date on which any person may be required by the Issuer to repurchase the entire principal amount of the Collateral Obligation at or above par) and with respect to the Notes of any Class, the Class Q-1 Securities and the Class P Securities, the Payment Date in November 2017, or upon a Maturity Extension (if any), the applicable Extended Stated

Maturity Date. Unless otherwise specified, "Stated Maturity" means the Stated Maturity of the Notes, Class Q-1 Securities and Class P Securities.

"Structured Finance Obligation": Any obligation (other than the Notes or any other security or obligation issued by the Issuer):

(i) secured directly by, referenced to, or representing ownership of, a pool of receivables or other assets of U.S. obligors, or obligors organized or incorporated in Moody's Group I Countries, Moody's Group II Countries or Moody's Group III Countries, including portfolio credit default swaps and collateralized debt obligations, but excludes:

(A) residential mortgage-backed securities;

(B) collateralized debt obligations backed by Emerging Market Securities;

(C) collateralized debt obligations primarily backed by asset-backed securities;

(D) market value collateralized debt obligations;

(E) securities backed by "future flow" receivables;

(F) securities backed by "trust preferred securities;"

(G) net interest margin securitizations;

(H) collateralized debt obligations backed by other collateralized debt obligations;

(I) collateralized debt obligations primarily backed by one or more credit default swaps (i.e. "synthetic CDOs"); and

(J) collateralized debt obligations a significant portion of which are backed by bonds;

(ii) that has an S&P Rating and an S&P Priority Category Recovery Rate;

(iii) that has a rating and a Moody's Priority Category Recovery Rate assigned by Moody's; and

(iv) whose ownership or disposition (without regard to the Issuer's other activities) by the Issuer will not cause the Issuer to be treated as engaged in a U.S. trade or business for United States federal income tax purposes or otherwise subject the Issuer to net income taxes.

In connection with the purchase of a Structured Finance Obligation, the Portfolio Manager shall obtain from Moody's the applicable Moody's Priority Category Recovery Rate.

For purposes of the Diversity Test, multiple Structured Finance Obligations from CDOs managed by the same Portfolio Manager or multiple Structured Finance Obligations issued by the same master trust will be considered to be obligations of one issuer.

007293

"Subordinated Lien Loan": A Secured Loan (other than a Second Lien Loan) secured by a second (or lower) priority security interest in the relevant collateral.

"Subordinated Management Fee": An amount equal to the sum of (i) a fee that accrues from the Closing Date payable to the Portfolio Manager in arrears on each Payment Date equal to 0.25% per annum of the Maximum Investment Amount as of the first day of the related Due Period if and to the extent funds are available for that purpose in accordance with the Priority of Payments, (ii) on any Payment Date that any part of the Senior Management Fee was not paid on the preceding Payment Date, an amount equal to interest on such unpaid amount at a rate of LIBOR for the applicable period plus 3.00% per annum and (iii) on any Payment Date that any part of the Subordinated Management Fee was not paid on the preceding Payment Date, an amount equal to interest on such unpaid amount at a rate of LIBOR for the applicable period plus 3.00% per annum. The portion of the Subordinated Management Fee or Senior Management Fee, as applicable, in clauses (i) through (iii) above, as applicable, shall be calculated on the basis of the actual number of days elapsed divided by 360.

"Successor Entity": The meaning specified in Section 7.10(a).

"Super Majority": With respect to any Class or group of Securities (other than the Class Q-1 Securities and the Class P Securities), the Holders of more than 66⅔% of the Aggregate Outstanding Amount of that Class or group of Securities. Holders of Class Q-1 Securities shall be included in the determination of a Super Majority of Holders of Class C Notes as if they were Holders of the Class C Notes in the Aggregate Outstanding Amount represented by the Class Q-1 Note Component and in the determination of a Super Majority of Holders of the Class E Certificates as if they were Holders of the number of Class E Certificates represented by the Class Q-1 Class E Certificate Component. Holders of the Class P-1 Securities and the Class P-2 Securities shall be included in the determination of a Super Majority of Holders of the Class E Certificates as if they were Holders of the number of Class E Certificates represented by the Class P-1 Class E Certificate Component or the Class P-2 Class E Certificate Component, as applicable. With respect to the Class Q-1 Securities as such, the Holders of more than 66-2/3% of the stated amount thereof. With respect to the Class P-1 Securities as such, the Holders of more than 66-2/3% of the stated amount thereof and with respect to the Class P-2 Securities as such, the Holders of more than 66-2/3% of the stated amount thereof.

"Synthetic Security": Any swap transaction, structured bond investment, credit linked note, or other derivative financial instrument relating to a debt instrument (but excluding any such instrument relating directly to a basket or portfolio of debt instruments) or an index or indices (such as the "SAMI" index published by Credit Suisse First Boston) in connection with a basket or portfolio of debt instruments or other similar instruments entered into by the Issuer with a Synthetic Security Counterparty that has in the Portfolio Manager's commercially reasonable judgment, equivalent expected loss characteristics (those characteristics, "credit risk") to those of the related Reference Obligations (taking account of those considerations as they relate to the Synthetic Security Counterparty), if (i) it is either a Form-Approved Synthetic Security or the Rating Condition for each Rating Agency is satisfied, and (ii) the Reference Obligations thereof have a weighted average Market Value of at least 85% at the time the Synthetic Security is entered into.

The maturity, interest rate, and other non-credit characteristics of a Synthetic Security may be different from the Reference Obligations to which the credit risk of the Synthetic Security relates.

No Synthetic Security shall require the Issuer to make any payment to the Synthetic Security Counterparty after its initial purchase other than any payments represented by the release of any cash collateral posted by the Issuer from the Collection Account to the Synthetic Security Counterparty Account simultaneously with the Issuer's purchase of or entry into the Synthetic Security in an amount

007294

not exceeding the amount of the posted cash collateral. Collateral may be posted only to a Synthetic Security Counterparty Account. No Synthetic Security shall result in the Issuer being a "buyer" of credit protection.

The term Synthetic Security shall not include any Structured Finance Obligation or any Participation, but the Reference Obligation of a Synthetic Security may be a Structured Finance Obligation.

Each Synthetic Security Agreement shall (i) contain appropriate limited recourse and non-petition provisions (to the extent the Issuer has contractual payment obligations to the Synthetic Security Counterparty) equivalent (mutatis mutandis) to those contained in this Indenture and (ii) include provisions satisfying Section 15.3 of this Indenture.

The ownership or disposition of any Synthetic Security (without regard to the Issuer's other activities) must not cause the Issuer to be treated as engaged in a U.S. trade or business for United States federal income tax purposes or otherwise subject the Issuer to net income taxes.

Any "deliverable obligation" that may be delivered to the Issuer as a result of the occurrence of any "credit event" under any proposed Synthetic Security must qualify (when the Issuer purchases the related Synthetic Security and when such "deliverable obligation" is delivered to the Issuer as a result of the occurrence of any "credit event") as a Collateral Obligation (except that such "deliverable obligation" may constitute a Defaulted Collateral Obligation when delivered upon a "credit event") and, unless the Rating Condition is otherwise satisfied, (i) must not provide that its transfer to the Issuer is subject to obtaining any consents, (ii) after giving effect to the delivery thereof would not cause the Concentration Limitations not to be satisfied and (iii) if the Reference Obligation of the Synthetic Security is a Senior Secured Loan then the "deliverable obligation" under the Synthetic Security must also be a Senior Secured Loan..

Synthetic Securities that are credit default swaps, credit linked notes, or other similar instruments may not provide for "restructuring" as a "credit event".

For purposes of the Coverage Tests and the Reinvestment Overcollateralization Test, unless the Rating Condition for each Rating Agency is satisfied in respect of any proposed alternative treatment, a Synthetic Security shall be included as a Collateral Obligation having the characteristics of the Synthetic Security and not of the related Reference Obligations.

For purposes of the Collateral Quality Tests (other than the Diversity Test and the S&P Industry Classification with respect to the S&P CDO Monitor Test), a Synthetic Security shall be included as a Collateral Obligation having the characteristics of the Synthetic Security and not of the related Reference Obligations.

For purposes of calculating compliance with the Concentration Limitations other than limits relating to payment characteristics, and all related definitions, unless otherwise specified in this Indenture or by the Rating Agencies, a Synthetic Security shall be included as a Collateral Obligation having the characteristics of its Reference Obligations and not the Synthetic Security. For purposes of calculating compliance with the Concentration Limitations relating to payment characteristics, and all related definitions, unless otherwise specified in this Indenture or by the Rating Agencies, a Synthetic Security shall be included as a Collateral Obligation having the characteristics of the Synthetic Security and not its Reference Obligation.

007295

With respect to a Synthetic Security based upon or relating to a senior secured index investment providing non-leveraged credit exposure to a basket of credit default swaps referencing a diversified group of Reference Obligations, with respect to which the principal or notional amount of the credit exposure to any single Reference Obligation does not increase over time, for purposes of: (i) calculating compliance with the Diversity Test, the S&P Industry Classification with respect to the S&P CDO Monitor Test, and the Concentration Limitations (other than limits relating to payment characteristics and except for clauses 20 and 20(a) of the definition of "Concentration Limitations"), and all related definitions, and (ii) any other provision or definition of this Indenture involving a determination with respect to a Reference Obligation, the characteristics of such Reference Obligations shall be determined by treating such Synthetic Security as a direct investment by the Issuer in each such Reference Obligation in an amount equal to the Allocable Principal Balance of such Reference Obligation.  In addition, each Reference Obligation under such Synthetic Security shall be assigned a Moody's Rating Factor equal to the sum of the Moody's Rating Factor of (i) the related Reference Obligor, (ii) the Synthetic Security Counterparty of such Synthetic Security and (iii) the Synthetic Security Collateral of such Synthetic Security.  In addition, the Moody's Priority Category Rate in respect of a Synthetic Security referencing multiple Reference Obligations pursuant to this paragraph shall be the Moody's Priority Category Rate as assigned by Moody's to each Reference Obligation underlying such Synthetic Security.  For the avoidance of doubt, Reference Obligations upon which a Synthetic Security is based as described in this paragraph must meet the definition of "Collateral Obligation" to the extent provided in this definition.

Any Synthetic Security shall be positively indexed to the Reference Obligation on no more than a one-for-one basis (i.e. unleveraged credit exposure).

If the Rating Condition must be satisfied to execute the purchase of any Synthetic Security, the Portfolio Manager, on behalf of the Issuer, shall give each applicable Rating Agency not less than 5 days' prior notice of the purchase of or entry into any Synthetic Security.

"Synthetic Security Agreement": The documentation governing any Synthetic Security.

"Synthetic Security Collateral": With respect to any Synthetic Security, amounts posted to the Synthetic Security Collateral Account by the Synthetic Security Counterparty in support of its obligations under the Synthetic Security, including (i) all Eligible Investments or (ii) investments that satisfy the Rating Condition with respect to Moody's, in each case that mature no later than the Stated Maturity, in the Synthetic Security Collateral Account that are purchased with Synthetic Security Collateral; provided that Synthetic Security Collateral may not include any investment the acquisition (including the manner of acquisition), ownership, enforcement or disposition of which will subject the Issuer to net income tax in any jurisdiction outside its jurisdiction of incorporation.

"Synthetic Security Collateral Account": The trust account established pursuant to Section 10.3(e).

"Synthetic Security Counterparty": An entity (other than the Issuer) required to make payments on a Synthetic Security (including any guarantor) to the extent that a Reference Obligor makes payments on a related Reference Obligation and meeting the Synthetic Security Counterparty Ratings Requirement.

"Synthetic Security Counterparty Account": The trust account established pursuant to Section 10.5.

007296

"Synthetic Security Counterparty Ratings Requirement": With respect to the Synthetic Security Counterparty and in respect of a Synthetic Security, a requirement that is satisfied if, at the time the Issuer enters into such Synthetic Security Agreement, the related Synthetic Security Counterparty has a senior unsecured credit rating assigned by S&P for short-term debt of at least "A-1+" or a senior unsecured credit rating assigned by S&P for long-term debt of at least "AA-".

"Tax Advantaged Jurisdiction": One of the Cayman Islands, Bermuda, the Netherlands Antilles or the tax advantaged jurisdiction of the Channel Islands, or such other jurisdiction with respect to which the Rating Condition with respect to each Rating Agency is satisfied.

"Tax Affected Security": Any asset received or otherwise acquired by the Issuer (including, without limitation, an Equity Security, Defaulted Collateral Obligation, ETB/897 Asset and Workout Asset) that will cause the Issuer to be deemed to be engaged in a trade or business in the United States for U.S. federal income tax purposes.

"Tax Event": An event that occurs if either:

(i)        (A) one or more Collateral Obligations that were not subject to withholding tax when the Issuer committed to purchase them have become subject to withholding tax ("New Withholding Tax Obligations") or the rate of withholding has increased on one or more Collateral Obligations that were subject to withholding tax when the Issuer committed to purchase them ("Increased Rate Withholding Tax Obligations") and (B) in any Due Period, the aggregate of the payments subject to withholding tax on New Withholding Tax Obligations and the increase in payments subject to withholding tax on Increased Rate Withholding Tax Obligations, in each case to the extent not "grossed-up" (on an after-tax basis) by the related obligor, represent 5% or more of Interest Proceeds for the Due Period; or

(ii)        taxes, fees, assessments, or other similar charges are imposed on the Issuer or the Co-Issuer in an aggregate amount in any twelve-month period in excess of U.S.$2,000,000, other than any deduction or withholding for or on account of any tax with respect to any payment owing in respect of any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation or Collateral Obligation.

"Temporary Regulation S Global Security": The meaning specified in Section 2.2(b).

"Transaction Reports": The meaning specified in Section 14.4(f).

"Transfer Agent": The person or persons, which may be the Issuer, authorized by the Issuer to exchange or register the transfer of Notes.

"Treasury Regulations": The regulations, including proposed or temporary regulations, promulgated under the Code. References herein to specific provisions of proposed or temporary regulations shall include analogous provisions of final Treasury Regulations or other successor Treasury Regulations.

"Trust Officer": When used with respect to the Trustee, any officer in the Corporate Trust Office (or any successor group of the Trustee) including any director, vice president, assistant vice president, associate, or any other officer of the Trustee customarily performing functions similar to those performed by such officers in the Corporate Trust Office, or to whom any corporate trust matter is referred at the Corporate Trust Office because of his knowledge of and familiarity with the particular subject and having direct responsibility for the administration of this Indenture.

007297

"Trustee": As defined in the first sentence of this Indenture.

"UCC": The Uniform Commercial Code as in effect from time to time in the State of New York.

"Uncertificated Security": The meaning specified in Section 8-102(a)(18) of the UCC.

"Underlying Instrument": The loan agreement, indenture, credit agreement, or other agreement pursuant to which a Pledged Obligation has been issued or created and each other agreement that governs the terms of or secures the obligations represented by the Pledged Obligation or of which the holders of the Pledged Obligation are the beneficiaries.

"Undrawn Amount": At any time (i) with respect to any Class A-1A Note the excess, if any, of (x) the Commitment relating to such Class A-1A Note over (y) the Drawn Amount under such Class A-1A Note; *provided* that any funds deposited with the Trustee in the Class A-1A Funding Account as a result of the failure of a Holder of such Class A-1A Note to satisfy the Rating Criteria during the Draw Period pursuant to Section 2.12(c) and any subsequent Prepayments in respect of such Holder's Class A-1A Note placed pursuant to the Indenture in a separate subaccount of that reserve account relating to such Holder will for all purposes be part of the Undrawn Amount of such Class A-1A Note and such Holder will be entitled to receive the applicable Commitment Fee thereon, and (ii) with respect to any Class A-1B Note, the excess, if any, of (x) the applicable portion of the Fully Drawn Amount relating to such Class A-1B Note over (y) the Drawn Amount under such Class A-1B Note; provided that any funds deposited with the Trustee in the Class A-1B Funding Account as a result of the failure of a Holder of a Class A-1B Note to satisfy the Rating Criteria during the Delayed Drawdown Period pursuant to Section 2.13(c) will for all purposes be part of the Undrawn Amount of such Class A-1B Note and such Holder will be entitled to receive the applicable Delayed Drawdown Fee thereon.

"Unfunded Amount": At any time, with respect to any Delayed Drawdown Loan or Revolving Loan, the excess, if any, of (i) the amount of the commitment with respect to such obligation over (ii) the funded principal amount outstanding on such obligation.

"Unregistered Securities": The meaning specified in Section 5.17(c).

"Unscheduled Principal Payments": Any principal payments received with respect to a Collateral Obligation as a result of optional redemptions, exchange offers, tender offers, other payments or prepayments made at the option of the issuer thereof or that are otherwise not scheduled to be made thereunder.

"U.S. Person": A Beneficial Owner of a Note that is, for U.S. federal income tax purposes, a citizen or individual resident of the United States of America, an entity treated for United States federal income tax purposes as a corporation or a partnership created or organized in or under the laws of the United States of America or any state thereof or the District of Columbia, an estate the income of which is includable in gross income for U.S. federal income tax purposes regardless of its source, or a trust if, in general, a court within the United States of America is able to exercise primary supervision over its administration and one or more U.S. persons have the authority to control all substantial decisions of such trust, and certain eligible trusts that have elected to be treated as United States persons.

"Valuation Report": The meaning specified in Section 10.6(b).

007298

"Warehouse Agreement": The Asset Acquisition Agreement and Master Participation Agreement, dated as of August 1, 2005, among Citigroup Financial Products Inc., as the Warehouse Provider, the Issuer and the Portfolio Manager, as amended.

"Warehoused Loans": Loans acquired by the Issuer before the Closing Date pursuant to the Warehouse Agreement.

"Weighted Average Commitment Fee": As of any Measurement Date, an amount (rounded up to the next 0.001%) equal to the weighted average commitment fee on all Revolving Loans and Delayed Drawdown Loans determined by dividing (i) the aggregate of all scheduled amounts (other than interest) of commitment fees or facility fees payable on the Aggregate Unfunded Amount of all Revolving Loans and Delayed Drawdown Loans held by the Issuer as of such Measurement Date by (ii) the Aggregate Unfunded Amount of all Revolving Loans and Delayed Drawdown Loans held by the Issuer as of such Measurement Date; provided that if such quotient is less than the Minimum Weighted Average Commitment Fee for such Measurement Date, there shall be added to the amount set forth in clause (i) above an amount equal to the Spread Excess, if any, as of such Measurement Date (less any portion of the Spread Excess that has been added to the Weighted Average Fixed Rate Coupon as of such Measurement Date pursuant to clause (iv) of the definition of "Weighted Average Fixed Rate Coupon"), and the Weighted Average Commitment Fee as of such Measurement Date shall be the amount calculated after giving effect to such addition.

"Weighted Average Fixed Rate Coupon": As of any Measurement Date, the rate obtained by

(i)     multiplying the Principal Balance of each Collateral Obligation that is a Fixed Rate Obligation held by the Issuer as of the Measurement Date by the current per annum rate at which it pays interest (which (x) for PIK Securities for which interest has been deferred or capitalized, will be deemed to be zero and (y) for Collateral Obligations that would be PIK Securities but for the proviso in the definition thereof, will be deemed to be equal to the effective rate of PIK Cash-Pay Interest), using only the effective after-tax interest rate determined by the Portfolio Manager on any Fixed Rate Obligation after taking into account any withholding tax or other deductions on account of tax of any jurisdiction and any gross-up paid by the obligor),

(ii)     summing the amounts determined pursuant to clause (i),

(iii)     dividing the sum by the Aggregate Principal Balance of all Collateral Obligations that are Fixed Rate Obligations held by the Issuer as of the Measurement Date, and

(iv)     if the result obtained in clause (iii) is less than the minimum percentage rate specified to satisfy the Weighted Average Fixed Rate Coupon Test, adding to the sum the amount of any Spread Excess as of the Measurement Date, but only to the extent required to satisfy the Weighted Average Fixed Rate Coupon Test.

"Weighted Average Fixed Rate Coupon Test": A test that is satisfied if, as of any Measurement Date, the Weighted Average Fixed Rate Coupon equals or exceeds 7.5%.

"Weighted Average Life": As of any Measurement Date, the number obtained by

(i)     summing the products obtained by multiplying

(A)     the Average Life at that time of each Collateral Obligation by

80

(B) the Principal Balance at that time of the Collateral Obligation and

(ii) dividing that sum by the Aggregate Principal Balance at that time of all Collateral Obligations.

"Weighted Average Life Test": A test that will be satisfied as of any Measurement Date if the Weighted Average Life on that date of all Collateral Obligations is equal to or less than the number of years (including any fraction of a year) between such Measurement Date and the Payment Date in May 2015 or, in the case of a Maturity Extension, the Extended Weighted Average Life Date.

"Weighted Average Moody's Rating Factor": The summation of the products obtained by multiplying the Principal Balance of each Collateral Obligation (excluding Eligible Investments) by its respective Moody's Rating Factor, dividing that sum by the Aggregate Principal Balance of all Collateral Obligations (excluding Eligible Investments) and rounding the result up to the nearest whole number.

"Weighted Average Moody's Recovery Rate Test": A test that is satisfied as of any Measurement Date if the Moody's Weighted Average Recovery Rate is greater than or equal to 44.75%.

"Weighted Average Rating Factor Test": A test that is satisfied as of any Measurement Date if the Weighted Average Moody's Rating Factor of the Collateral Obligations (excluding Eligible Investments) as of such Measurement Date is less than or equal to the Maximum Weighted Average Moody's Rating Factor.

"Weighted Average S&P Recovery Rate Test": A test that is satisfied as of any Measurement Date if the S&P Weighted Average Recovery Rate is greater than or equal to 51.5%.

"Weighted Average Spread": As of any Measurement Date, a rate obtained by:

(i) multiplying the Principal Balance of each Collateral Obligation that is a Floating Rate Obligation held by the Issuer as of the Measurement Date by the current per annum contract spread at which it pays interest (which (x) for PIK Securities for which interest has been deferred or capitalized, will be deemed to be zero and (y) for Collateral Obligations that would be PIK Securities but for the proviso in the definition thereof, will be deemed to be equal to the effective rate of PIK Cash-Pay Interest), determined with respect to any Floating Rate Obligation that does not bear interest based on a London interbank offered rate, by expressing the current interest rate on the Floating Rate Obligation as a spread above a three month London interbank offered rate calculated in a manner consistent with the calculation of LIBOR;

(ii) summing the amounts determined pursuant to clause (i);

(iii) dividing that sum by the Aggregate Principal Balance of all Floating Rate Obligations held by the Issuer as of the Measurement Date; and

(iv) if the result obtained in clause (iii) is less than the minimum percentage rate specified to pass the Weighted Average Spread Test, adding to that sum the amount of Fixed Rate Excess as of the Measurement Date.

For purposes of calculating the Weighted Average Spread, the Principal Balance of each Revolving Loan or Delayed Drawdown Loan shall not include any of its Unfunded Amount.

81

007300

"Weighted Average Spread Test": A test that is satisfied as of any Measurement Date if (i) the Weighted Average Spread as of the Measurement Date equals or exceeds the Minimum Weighted Average Spread and (ii) the Weighted Average Commitment Fee as of the Measurement Date equals or exceeds the Minimum Weighted Average Commitment Fee.

"Workout Assets": A Loan, High-Yield Bond, or Qualified Equity Security acquired in connection with the workout or restructuring of any Collateral Obligation that the Issuer does not advance any funds to purchase and that does not qualify as a Collateral Obligation.

"Written-Down Obligation": As of any date of determination, any Structured Finance Obligation as to which the Issuer or the Portfolio Manager, on behalf of the Issuer, has been notified by the issuer of the Structured Finance Obligation that the Aggregate Principal Balance of the Structured Finance Obligation and all other Structured Finance Obligations secured by the same pool of collateral that rank pari passu with or senior in priority of payment to the Structured Finance Obligation exceeds the aggregate principal balance (including reserved interest or other amounts available for overcollateralization) of all collateral securing the Structured Finance Obligation and such other pari passu and senior Structured Finance Obligations (excluding defaulted collateral).

"Zero-Coupon Security": A security that, at the time of determination, does not make periodic payments of interest. A Zero-Coupon Security shall not include a security that is a PIK Security.

Section 1.2.     Assumptions as to Pledged Obligations; Construction Conventions.

This Section 1.2 shall be applied in connection with all calculations required to be made pursuant to this Indenture:

- with respect to the scheduled payment of principal or interest on any assets included in the Collateral or the Class P Collateral,

- with respect to the sale of and reinvestment in Collateral Obligations,

- with respect to the income that can be earned on the scheduled payment of principal or interest on the Pledged Obligations and on any other amounts that may be received for deposit in the Collection Account, and

- with respect to the treatment of Collateral Obligations loaned pursuant to a Securities Lending Agreement.

The provisions of this Section 1.2 shall be applicable to any determination or calculation that is covered by this Section 1.2, whether or not reference is specifically made to Section 1.2, unless some other method of calculation or determination is expressly specified in the particular provision.

(a)     All calculations with respect to the scheduled payment of principal or interest on any assets shall be made on the basis of information as to the terms of each asset and on reports of payments received on the asset that are furnished by or on behalf of the issuer of the asset and, to the extent they are not manifestly in error, the information or report may be conclusively relied on in making the calculations.

(b)     For each Due Period and as of any Measurement Date, the scheduled payment of principal or interest on any Pledged Obligation shall be the sum of

82

(i)     the total amount of payments and collections reasonably expected to be received during the Due Period in respect of the Pledged Obligation that, if paid as scheduled, will be available for payment on the Notes and of certain expenses of the Issuer and the Co-Issuer in the Collection Account at the end of the Due Period; and

(ii)    any such amounts received in prior Due Periods that were not disbursed on a previous Payment Date.

Except as provided in paragraph (h) below, a Non-Performing Collateral Obligation shall be assumed to have a scheduled payment of principal and interest of zero.

The total amount of payments and collections reasonably expected to be received includes the proceeds of the sale of the Pledged Obligation received and, in the case of sales which have not yet settled, to be received during the Due Period and not reinvested in additional Collateral Obligations (including any related deposit into the Revolving Reserve Account or the posting by the Issuer of cash collateral with (or for the benefit of) a Synthetic Security Counterparty, Securities Lending Counterparty, or Hedge Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security, Securities Lending Agreement, or Hedge Agreement) or Eligible Investments or retained in the Collection Account for subsequent reinvestment pursuant to Section 12.2.

(c)     For purposes of the applicable determinations required by Article 12 and the definition of "Interest Coverage Ratio," the expected interest on Collateral Obligations shall be calculated using their then current interest rates.

(d)     With respect to any Collateral Obligation, the date on which it "matures" (or its "maturity" date) shall be the earlier of

(i)     the stated maturity of the obligation or

(ii)    if the Issuer has the right to require the issuer or obligor of the Collateral Obligation to purchase, redeem, or retire the Collateral Obligation at a price of at least par on any one or more dates before its Stated Maturity (a "put right") and the Portfolio Manager certifies to the Trustee that it will cause the Issuer to direct the Trustee to exercise the put right on a date, the maturity date shall be the date specified in the certification.

(e)     For purposes of calculating compliance with the Collateral Quality Tests (other than the Diversity Test and the S&P Industry Classification with respect to the S&P CDO Monitor Test), the Coverage Tests, and the Reinvestment Overcollateralization Test and all related definitions, unless otherwise specified in this Indenture a Synthetic Security shall be included as a Collateral Obligation having the characteristics of the Synthetic Security and not of the Reference Obligation.  For purposes of calculating compliance with the Concentration Limits other than limits relating to payment characteristics, and all related definitions, unless otherwise specified in this Indenture or by the Rating Agencies, a Synthetic Security shall be included as a Collateral Obligation having the characteristics of its Reference Obligations and not the Synthetic Security.  For purposes of calculating compliance with the Concentration Limits relating to payment characteristics, and all related definitions, unless otherwise specified in this Indenture or by the Rating Agencies, a Synthetic Security shall be included as a Collateral Obligation having the characteristics of the Synthetic Security and not its Reference Obligations.

(f)     Any Collateral Obligation loaned to a Securities Lending Counterparty shall be included in the Collateral Quality Tests, the Coverage Tests, and the Reinvestment Overcollateralization

83

007302

Test and the Principal Balance of any Collateral Obligation loaned to a Securities Lending Counterparty shall be included in the Aggregate Principal Balance of Collateral Obligations, in each case unless an "event of default" (under and as defined in the related Securities Lending Agreement) is continuing.

(g)     If a Class of Notes (treating the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes and the Class A-4 Notes as one Class for this purpose) ceases to be Outstanding, then any Coverage Test computed by reference to the Class of Notes (but not to any subordinate Class of Notes then Outstanding) shall cease to be of any force.

(h)     For purposes of calculating compliance with the Eligibility Criteria (other than the Weighted Average Life Test), at the direction of the Portfolio Manager by notice to the Trustee, during the Reinvestment Period any Eligible Investment purchased with Principal Proceeds received upon the maturity, redemption, sale, or other disposition of a Collateral Obligation (or, after the Reinvestment Period, with Principal Proceeds constituting Unscheduled Principal Payments and Sale Proceeds from Credit Improved Obligations) shall be deemed to have the characteristics of the disposed Collateral Obligation until reinvested in an additional Collateral Obligation.  The calculations shall be based on the Principal Balance of the disposed Collateral Obligations except in the case of Defaulted Collateral Obligations and Credit Risk Securities, in which case the calculations will be based on the Principal Proceeds received on the disposition or sale of the Defaulted Collateral Obligation or Credit Risk Obligation.

Section 1.3.     Rules of Interpretation.

Except as otherwise expressly provided in this Indenture or unless the context clearly requires otherwise:

(a)     Defined terms include, as appropriate, all genders and the plural as well as the singular.

(b)     References to designated articles, sections, subsections, exhibits, and other subdivisions of this Indenture, such as "Section 6.12 (a)," refer to the designated article, section, subsection, exhibit, or other subdivision of this Indenture as a whole and to all subdivisions of the designated article, section, subsection, exhibit, or other subdivision.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Indenture as a whole and not to any particular article, section, exhibit, or other subdivision of this Indenture.

(c)     Any term that relates to a document or a statute, rule, or regulation includes any amendments, modifications, supplements, or any other changes that may have occurred since the document, statute, rule, or regulation came into being, including changes that occur after the date of this Indenture.  References to law are not limited to statutes.  Any reference to any person includes references to its successors and assigns.

(d)     Any party may execute any of the requirements under this Indenture either directly or through others, and the right to cause something to be done rather than doing it directly shall be implicit in every requirement under this Indenture.  Unless a provision is restricted as to time or limited as to frequency, all provisions under this Indenture are implicitly available and things may happen from time to time.

(e)     The term "including" and all its variations mean "including but not limited to." Except when used in conjunction with the word "either," the word "or" is always used inclusively (for example, the phrase "A or B" means "A or B or both," not "either A or B but not both").

84

(f)        A reference to "a thing" or "any of a thing" does not imply the existence or occurrence of the thing referred to even though not followed by "if any," and "any of a thing" is any and all of it.  A reference to the plural of anything as to which there could be either one or more than one does not imply the existence of more than one (for instance, the phrase "the obligors on a note" means "the obligor or obligors on a note").  "Until something occurs" does not imply that it must occur, and will not be modified by the word "unless." The word "due" and the word "payable" are each used in the sense that the stated time for payment has passed.  The word "accrued" is used in its accounting sense, i.e., an amount paid is no longer accrued.  In the calculation of amounts of things, differences and sums may generally result in negative numbers, but when the calculation of the excess of one thing over another results in zero or a negative number, the calculation is disregarded and an "excess" does not exist. Portions of things may be expressed as fractions or percentages interchangeably.  The word "shall" is used in its imperative sense, as for instance meaning a party agrees to something or something must occur or exist.

(g)        All accounting terms used in an accounting context and not otherwise defined, and accounting terms partly defined in this Indenture, to the extent not completely defined, shall be construed in accordance with generally accepted accounting principles.  To the extent that the definitions of accounting terms in this Indenture are inconsistent with their meanings under generally accepted accounting principles, the definitions contained in this Indenture shall control.

(h)        In the computation of a period of time from a specified date to a later specified date or an open-ended period, the words "from" and "beginning" mean "from and including," the word "after" means "from but excluding," the words "to" and "until" mean "to but excluding," and the word "through" means "to and including." Likewise, in setting deadlines or other periods, "by" means "on or before." The words "preceding," "following," "before," "after," "next," and words of similar import, mean immediately preceding or following.  References to a month or a year refer to calendar months and calendar years.

(i)        Any reference to the enforceability of any agreement against a party means that it is enforceable against the party in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, and other similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

(j)        Except when only the registered holder is recognized, such as in Section 2.9., references to Noteholders, holders, and the like refer equally to Beneficial Owners who have an interest in a Note but are not reflected in the Indenture Register as the owner.

(k)        Unless otherwise indicated, all references in this Indenture to (A) the Class C Notes shall include the Class Q-1 Note Component, and (B) the Class E Certificates shall include the Class Q-1 Class E Certificate Component, the Class P-1 Class E Certificate Component and the Class P-2 Class E Certificate Component.

ARTICLE 2

THE NOTES

Section 2.1.    Forms Generally.

The Indenture Securities and the Trustee's or Authenticating Agent's certificate of authentication on them (the "Certificate of Authentication") shall be in substantially the forms required by this Article, with appropriate insertions, omissions, substitutions, and other variations required or

85

permitted by this Indenture, and may have any letters, numbers, or other marks of identification and any legends or endorsements on them that are consistent with this Indenture, as determined by the Authorized Officers of the Issuer executing the Indenture Securities, as applicable, as evidenced by their execution of the Indenture Securities.

Section 2.2.    <u>Forms of Indenture Securities and Certificate of Authentication</u>.

(a)    The Indenture Securities, including the Temporary Regulation S Global Securities, the Regulation S Global Securities, Rule 144A Global Notes, Certificated Class A-1A Notes, Certificated Class A-1B Notes, Certificated Class Q-1 Securities, Certificated Class P-1 Securities and Certificated Class P-2 Securities and the Certificate of Authentication shall be in the forms of the applicable portion of <u>Exhibit A</u>.

(b)    <u>Temporary Regulation S Global Securities and Regulation S Global Securities</u>. The Notes (other than the Class A-1A Notes and the Class A-1B Notes), the Class Q-1 Securities and the Class P Securities initially sold to non-U.S. persons in offshore transactions in reliance on Regulation S shall each be initially represented by one or more temporary global securities in definitive, fully registered form without interest coupons substantially in the form of <u>Exhibit A1-N</u>, <u>Exhibit A1-Q</u> and <u>Exhibit A1-P</u>, as applicable, including legends (the "<u>Temporary Regulation S Global Security</u>").  On or after the first Business Day following the 40th day after the later of the Closing Date and the commencement of the offering of the Notes (the "<u>Exchange Date</u>"), interests in a Temporary Regulation S Global Security will be exchangeable for interests in one or more permanent global notes of the same Class in definitive, fully registered form without interest coupons substantially in the form of <u>Exhibit A2-N</u>, <u>Exhibit A2-Q</u> and <u>Exhibit A2-P</u>, as applicable, including legends (each a "<u>Regulation S Global Security</u>"), upon certification that the beneficial interests in such Temporary Regulation S Global Security are owned by persons that are not U.S. persons.  The Temporary Regulation S Global Securities and Regulation S Global Securities shall be deposited on behalf of the subscribers for the Indenture Securities represented thereby with the Trustee as custodian for, and registered in the name of a nominee of, the Depositary for credit to Depositary participants that hold such positions on behalf of Euroclear and Clearstream, for further credit to the respective accounts of Euroclear and Clearstream, duly executed by the Applicable Issuers and authenticated by the Trustee as hereinafter provided.  The aggregate principal amount of the Regulation S Global Securities may from time to time be increased or decreased by adjustments made on the records of the Trustee or the Depositary, as the case may be, as hereinafter provided.  As used above and in subsection (c) below, "U.S. person" and "offshore transaction" have the meanings assigned to them in Regulation S.

(c)    <u>Rule 144A Global Notes</u>.  The Notes of each Class (other than the Class A-1A Notes and the Class A-1B Notes) initially sold to U.S. persons that are QIB/QPs shall each be issued initially in the form of one or more permanent global notes per Class in definitive, fully registered form without interest coupons substantially in the form of <u>Exhibit A3</u>, including legends (each, a "<u>Rule 144A Global Note</u>"), which shall be deposited on behalf of the subscribers for the Notes represented thereby with the Trustee as custodian for, and registered in the name of a nominee of, the Depositary, duly executed by the Applicable Issuers and authenticated by the Trustee as hereinafter provided.  The aggregate principal amount of the Rule 144A Global Notes may from time to time be increased or decreased by adjustments made on the records of the Trustee or the Depositary, as the case may be, as hereinafter provided.

(d)    (i) Class A–1A Notes and Class A-1B Notes shall be issued in the form of one or more Certificated Class A-1A Notes or Certificated Class A-1B Notes, as applicable, in definitive, fully registered form without interest coupons substantially in the form of <u>Exhibit A4-A1A</u> or <u>Exhibit A4-A1B</u>, as applicable, (each, a "<u>Certificated Class A–1A Note</u>" or "<u>Certificated Class A–1B Note</u>", as applicable,

007305

and collectively, the "Certificated Class A-1 Notes"), which shall be registered in the name of the beneficial owner or a nominee thereof, duly executed by the Issuer and the Co-Issuer and authenticated by the Trustee as hereinafter provided.

(ii) Class Q–1 Securities initially sold to U.S. persons shall each be issued initially in the form of one or more Certificated Class Q-1 Securities in definitive, fully registered form without interest coupons substantially in the form of Exhibit A4-Q (each, a "Certificated Class Q–1 Security"), which shall be registered in the name of the beneficial owner or a nominee thereof, duly executed by the Issuer and authenticated by the Trustee as hereinafter provided.

(iii) Class P–1 Securities and Class P-2 Securities initially sold to U.S. persons shall each be issued in the form of one or more Certificated Class P–1 Securities or Certificated Class P–2 Securities, as applicable, in definitive, fully registered form without interest coupons substantially in the form of Exhibit A4-P (each, a "Certificated Class P–1 Security" or "Certificated Class P–2 Security", as applicable, and collectively, the "Certificated Class P Securities"), which shall be registered in the name of the beneficial owner or a nominee thereof, duly executed by the Issuer and authenticated by the Trustee as hereinafter provided.

(e)     Book-Entry Provisions.  This Section 2.2(e) shall apply only to Global Securities deposited with or on behalf of the Depositary.  The provisions of the "Operating Procedures of the Euroclear System" of Euroclear and the "Terms and Conditions Governing Use of Participants" of Clearstream, respectively, shall be applicable to the Temporary Regulation S Global Securities and Regulation S Global Securities insofar as interests in the Global Securities are held by the Agent Members of Euroclear or Clearstream, as the case may be.

Agent Members shall have no rights under this Indenture with respect to any Global Security held on their behalf by the Trustee, as custodian for the Depositary and the Depositary may be treated by the Co-Issuers, the Trustee, and any agent of the Co-Issuers or the Trustee as the absolute owner of such Indenture Security for all purposes whatsoever.  Notwithstanding the foregoing, nothing in this Indenture shall prevent the Co-Issuers, the Trustee, or any agent of the Co-Issuers or the Trustee, from giving effect to any written certification, proxy, or other authorization furnished by the Depositary or impair, as between the Depositary and its Agent Members, the operation of customary practices governing the exercise of the rights of a Holder of any Indenture Security.

(f)     Notwithstanding anything to the contrary in paragraphs (b) and (c) above, if (i) the Depositary notifies the Co-Issuers that it is unwilling or unable to continue as depository for a Global Security or ceases to be a "Clearing Agency" registered under the Exchange Act and a successor depository is not appointed by the Issuer within 90 days of such notice, (ii) as a result of any amendment to or change in, the laws or regulations of the Cayman Islands or of any authority therein or thereof having power to tax or in the interpretation or administration of such laws or regulations which become effective on or after the Closing Date, the Issuer or the Paying Agent becomes aware that it is or will be required to make any deduction or withholding from any payment in respect of the Securities which would not be required if the Global Securities were in definitive form or (iii) an Event of Default under this Indenture has occurred and is continuing and has not been waived;  the Trustee shall execute an agreement with the Issuers amending this Indenture pursuant to Section 8.1 for the purpose of terminating the book entry deposit system and substituting definitive Securities for the Global Securities.  Such agreement shall provide for the form and terms of such definitive Securities and the place and manner in which a Securityholder may obtain possession of such definitive Securities; *provided*, that in no event may holders of beneficial interests in the Temporary Regulation S Global Securities receive definitive Securities pursuant to this provision prior to the Exchange Date and each such holder must certify to the Issuers and the Trustee that it is not a U.S. Person.  Such agreement shall also provide the procedures for

007306

registration of transfer or exchange of such definitive Securities, as well as such other provisions as the Issuer, the Co-Issuer and the Trustee may agree shall be necessary or appropriate to effect the substitution of definitive Securities for Global Securities and to modify the provisions of this Indenture to provide for the use of definitive Securities in lieu of a book-entry deposit system.

(g)     Upon the occurrence of any of the events described in paragraph (f) above, the Trustee shall notify all Holders of the Global Securities and shall advise such Holders of the Global Securities of the procedure by which the Global Securities shall be exchanged for definitive Securities. Each beneficial owner of Global Securities shall be entitled, at no cost to it, to have registered in the name of the beneficial owner of Global Securities one or more definitive Securities representing the same aggregate principal amount of Securities of the relevant Class as its beneficial interest in the related Global Security. Upon the occurrence of any such event, (i) the Trustee at the expense of the Issuer shall obtain from the Depositary a listing of the Participants then holding Book-Entry Securities on the records of the Depositary and (ii) upon surrender by the Depositary to the Trustee of the Global Securities for each Class, the Trustee shall cancel such Global Securities and the Issuers shall execute and deliver to such Participants definitive Securities representing in the aggregate the identical Aggregate Outstanding Amount (or stated amount, as applicable) of beneficial interests in the Global Securities held by such Participants on the records of the Depositary, registered in such names as such Participants shall have provided to the Trustee; *provided, however*, that the Trustee shall not register any such definitive Security or deliver any such definitive Security to a Participant unless and until such Participant shall have provided to the Trustee a certification acceptable to the Trustee that such registration instructions were given, and delivery of such definitive Security will be made, in accordance with the directions of the beneficial owners of Securities represented by such Participant. Neither the Issuers nor the Trustee shall be liable for any delay in delivery of such registration instructions by any Participant and each of them may conclusively rely on, and shall be protected in relying on, (i) information contained in the Participant listing provided by the Depositary regarding the names of the Participants holding beneficial interests in the Global Securities and the Aggregate Outstanding Amount of Securities represented by the beneficial interests in the Global Securities held by each such Participant, and (ii) the foregoing registration instructions and certifications provided by each such Participant with respect to definitive Securities representing the same Aggregate Outstanding Amounts of definitive Securities as the beneficial interests in the Global Securities stated to be held by such Participant in such Participant listing. If definitive Securities are issued in replacement of Notes listed on the Irish Stock Exchange, the Issuer will publish in the Republic of Ireland thereafter information explaining the payment, transfer and exchange procedures for the definitive Securities. The Trustee shall recognize the registered holders of the definitive Securities as Holders of the Securities hereunder. The Registrar shall reflect on its records the issuance of definitive Securities in exchange for the Global Securities.

In the event that certificated Securities for any reason are not so issued by the Co-Issuers to such beneficial owners of interests in Global Securities, the Issuer expressly acknowledges that such beneficial owners shall be entitled to pursue any remedy that the Holders of a Global Security would be entitled to pursue in accordance with the Indenture (but only to the extent of such beneficial owner's interest in the Global Security) as if certificated Securities had been issued. Payments on such certificated Securities will be made by wire transfer in immediately available funds to a Dollar-denominated account maintained by the owner or, if a wire transfer cannot be effected, by a Dollar check delivered to the Holder.

Section 2.3.     Authorized Amount; Denominations.

(a)     The aggregate principal amount of Notes that may be authenticated and delivered under this Indenture is limited to U.S.$827,000,000, except for Notes authenticated and delivered upon registration of, transfer of, or in exchange for, or in lieu of, other Notes pursuant to Section 2.6, 2.7 or 8.5 of this Indenture.

88

The Securities shall be divided into the following Classes (including one class of Class Q-1 Combination Securities and two classes of Class P Securities), having the designations, original principal amounts and other characteristics as follows:

| Class | A-1A | A-1B | A-1C | A-2 | A-3 | A-4 | B | C |
|---|---|---|---|---|---|---|---|---|
| Original Principal Amount | U.S.$ 50,000,000 [1] | U.S.$ 50,000,000 [2] | U.S.$ 446,000,000 | U.S.$ 68,500,000 | U.S.$ 68,500,000 | U.S.$ 43,000,000 | U.S.$ 49,000,000 | U.S.$ 52,000,000 [5] |
| Interest Rate | LIBOR + 0.29% [3] | LIBOR + 0.25% [4] | LIBOR + 0.25% | LIBOR +0.375% | LIBOR + 0.50% | LIBOR + 0.55% | LIBOR + 0.90% | LIBOR + 1.90% |
| Initial Rating (Moody's/ S&P) | Aaa/AAA | Aaa/AAA | Aaa/AAA | Aaa/AAA | Aa1/AAA | Aa2/AA | A2/A | Baa2/BBB |

———————————

1     The original principal amount shown above in respect of the Class A–1A Notes is the Commitment for such Class on the Closing Date. Except as otherwise provided, for purposes of this Indenture, references to the principal of Class A-1A Notes shall mean the Drawn Amount thereof from time to time.

2     The original principal amount shown above in respect of the Class A–1B Notes is the Fully Drawn Amount for such Class. Except as otherwise provided, for purposes of this Indenture, references to the principal of Class A-1B Notes shall mean the Drawn Amount thereof from time to time.

3     The Class A-1A Notes also will be entitled to the Commitment Fee on the Aggregate Undrawn Amount of Class A-1A Notes.

4     The Class A-1B Notes also will be entitled to the Delayed Drawdown Fee on the Aggregate Undrawn Amount of Class A-1B Notes.

5     Includes U.S.$12,600,000 representing the Class Q-1 Note Component.

| Class | Class E Certificates [1] | Q-1 | P-1 | P-2 |
|---|---|---|---|---|
| Face Amount/Stated Amount | U.S.$94,000,000 [2] | U.S.$ 20,000,000 [3] | U.S.$ 20,000,000 [4] | U.S.$ 5,000,000 [5] |
| Interest Rate | N/A | [6] | N/A | N/A |
| Initial Rating (Moody's/S&P) | N/A | Baa2/N/A | Aaa/N/A | Aaa/N/A |

007308

1 The Issuer will also issue Class E Certificates pursuant to the Class E Certificate Documents. The Class E Certificates will be issued with a Face Amount of U.S.$1,000 per certificate. The Class E Certificates are not issued pursuant to or secured by the lien of this Indenture.

2 The aggregate Face Amount of the Class E Certificates includes (i) the U.S.$7,400,000 aggregate Face Amount of Class E Certificates represented by the Class Q-1 Class E Certificate Component, (ii) the U.S.$6,180,000 aggregate Face Amount of Class E Certificates represented by the Class P-1 Class E Certificate Component and (iii) the U.S.$1,500,000 aggregate Face Amount of Class E Certificates represented by the Class P-2 Class E Certificate Component.

3 The Class Q-1 Securities consist of the Class Q-1 Note Component representing U.S.$12,600,000 aggregate principal amount of Class C Notes and the Class Q-1 Class E Certificate Component representing an aggregate Face Amount of Class E Certificates of U.S.$7,400,000.

4 The Class P-1 Securities consist of the Class P-1 Class E Certificate Component representing 6,180 Class E Certificates and the Class P-1 U.S. Treasury Component representing U.S.$20,000,000 (face value) U.S. Treasury securities with zero coupon due November 15, 2013.

5 The Class P-2 Securities consist of the Class P-2 Class E Certificate Component representing 1,500 Class E Certificates and the Class P-2 U.S. Treasury Component representing U.S.$5,000,000 (face value) U.S. Treasury securities with zero coupon due November 15, 2013.

6 The Class Q-1 Note Component bears interest at the same rate as the Class C Notes represented by it and the Class Q-1 Class E Certificate Component bears the right to receive Interest Proceeds in the same manner as the Class E Certificates. Any amounts payable thereon shall be subject to the availability of funds for such payment with respect to the underlying Class Q-1 Components in accordance with the Priority of Payments, and the Class Q-1 Security shall not be entitled to any payments in addition to the payments required to be made on its underlying Class Q-1 Components.

The Notes will be issuable in minimum denominations of U.S.$500,000 principal amount, and integral multiples of U.S.$1,000 in excess of that amount. The Class Q-1 Securities shall be issuable in minimum denominations such that each Class Q-1 Component meets the minimum authorized denomination of the underlying Class and the proportion among the Class Q-1 Components is maintained (an "Authorized Class Q-1 Denomination"), which shall mean that the Authorized Class Q-1 Denomination shall be $1,400,000 in stated amount (consisting of $882,000 Aggregate Outstanding Amount of the Class Q-1 Note Component and $518,000 aggregate Face Amount of the Class Q-1 Class E Certificate Component) and integral multiples of U.S.$100,000 in excess thereof.

The Class P Securities shall be issuable in minimum denominations such that the Class P Class E Certificate Component meets the minimum authorized denomination of 500 Class E Certificates (and the Class P U.S. Treasury Component meets the minimum authorized denominations thereof) and the proportion among the relevant Class P Components is maintained (an "Authorized Class P-1 Denomination" or an "Authorized Class P-2 Denomination", as applicable), which shall mean that the authorized minimum denomination for the Class P-1 Securities shall be U.S.$2,000,000 in stated amount (in which the Class P-1 Class E Certificates Component consist of Class E Certificates with an aggregate Face Amount of U.S.$618,000) and integral multiples of U.S.$1,000,000 in excess thereof and the authorized minimum denomination for the Class P-2 Securities shall be U.S.$1,700,000 in stated amount

90

007309

(in which the Class P-2 Class E Certificates Component consist of Class E Certificates with an aggregate Face Amount of U.S.$510,000) and integral multiples of U.S.$50,000 in excess thereof.

(b)     The Issuer will also issue 94,000 Class E Certificates (with an aggregate Face Amount of U.S.$94,000,000 pursuant to the Class E Certificate Documents, simultaneously with the issuance of the Indenture Securities under this Indenture. The Class E Certificates are not issued pursuant to or secured by the lien of this Indenture. Any payments to be made by the Trustee hereunder with respect to the Class E Certificates will be released by the Trustee to the Class E Certificates Paying Agent in accordance with the Priority of Payments for deposit into the Class E Certificates Distribution Account for payment (subject to the laws of the Cayman Islands) to Holders of the Class E Certificates as dividends or redemption price, as applicable.

Section 2.4.     <u>Extension of Reinvestment Period and Stated Maturity</u>.

(a)     The Issuer, if directed by the Portfolio Manager, shall be entitled on each Extension Effective Date to extend the Stated Maturity to the applicable Extended Stated Maturity Date if (i) in the case of an Extension Effective Date occurring after the first Extension Effective Date, the Issuer has previously effected a Maturity Extension for each preceding Extension Effective Date in accordance with this Section 2.4 and (ii) the Extension Conditions set forth in Section 2.4(c) are satisfied and the Issuer has given written notice to the Trustee of its election to extend the Stated Maturity no later than 60 days and no earlier than 90 days prior to such Extension Effective Date. If the Extension Conditions are satisfied, the Stated Maturity of the Indenture Securities shall be automatically extended to the related Extended Stated Maturity Date (and the Scheduled Class E Certificate Redemption Date shall be automatically extended to the related Extended Scheduled Class E Certificate Redemption Date), the Weighted Average Life Test shall be automatically extended to the related Extended Weighted Average Life Date and the Reinvestment Period shall be automatically extended to the related Extended Reinvestment Period End Date, without any requirement for approval or consent of any Holders of Indenture Securities or Class E Certificates or amendment or supplement to this Indenture or the Class E Certificate Documents (the "<u>Maturity Extension</u>"); <u>provided</u> that the Issuer will not be permitted to effect more than four Maturity Extensions.

(b)     In the case of a Maturity Extension, any Holder of Indenture Securities or Class E Certificates wishing to sell such Indenture Securities or Class E Certificates to an Extension Qualifying Purchaser pursuant to the Extension Conditions must provide the applicable Extension Sale Notice within the Extension Sale Notice Period pursuant to Section 2.4(d) (such Indenture Securities and Class E Certificates as to which an Extension Sale Notice has been duly given, "<u>Extension Sale Securities</u>"); provided that in the case of Holders of Class P Securities wishing to sell such Class P Securities to an Extension Qualifying Purchaser, such Class P Securities will be deemed exchanged for their respective Components, only the Class E Certificate represented by the related Class E Certificate Component shall constitute Extension Sale Securities and are to be purchased by an Extension Qualifying Purchaser for a price equal to the Extension Purchase Price, which will in case of such sale be distributed to the related selling Holders of Class P Securities, and such Holders will receive a distribution in kind of the related pro rata amount of the Class P U.S. Treasury Component. Notwithstanding anything to the contrary herein, each Holder providing an Extension Sale Notice shall be deemed to agree that no Extension Sale Securities of any Holder shall be purchased unless all Extension Sale Securities of all Holders are purchased and settled at the applicable Extension Purchase Price on the applicable Extension Effective Date and the other Extension Conditions are satisfied as of such date.

(c)     The Maturity Extension shall be effective only if the following conditions (the "<u>Extension Conditions</u>") are satisfied:

007310

(i)    the purchase of all Extension Sale Securities has been settled by the designated Extension Qualifying Purchasers at the applicable Extension Purchase Prices as of the applicable Extension Effective Date;

(ii)    all such purchases of Extension Sale Securities individually and in the aggregate comply with the applicable transfer restrictions in this Indenture and the Class E Certificate Documents and the legends on such Notes or Class E Certificates and all applicable law, rules and regulations (including, without limitation, rules, regulations and procedures of any applicable securities exchange, self-regulatory organization or clearing agency);

(iii)    (a) the Rating Condition has been satisfied with respect to S&P (so long as any Notes are then rated by S&P) and (b) either (i) all Coverage Tests and the Selected Collateral Quality Tests are satisfied as of the related Extension Determination Date, the rating of each Class of Notes then rated by Moody's has not been downgraded, withdrawn or qualified from that in effect on the Closing Date (unless it subsequently has been reinstated to the rating assigned on the Closing Date) and the Overcollateralization Ratio Numerator is at least $900,000,000 or (ii) the Rating Condition has been satisfied with respect to Moody's (so long as any Notes are then rated by Moody's); and

(iv)    the Issuer has not effected more than three prior Maturity Extensions.

The Issuer, the Trustee and, by its acceptance of the Indenture Securities or Class E Certificates, each Holder of Indenture Securities or Class E Certificates agrees that neither the Initial Purchaser nor the Placement Agent shall be responsible for causing the Extension Conditions to be satisfied or liable to any such person or Holder of Indenture Securities or Class E Certificates (whether or not such Holder gave an Extension Sale Notice with respect to its Notes or Class E Certificates) or to any other person if the Extension Conditions are not satisfied. Failure of the Extension Conditions to be satisfied shall not constitute a Default or Event of Default under this Indenture.

(d)    Extension Procedure.

(i)    No later than three Business Days following receipt by the Trustee of the notice given by the Issuer of its election to extend the Stated Maturity (the "Extension Notice"), the Trustee shall mail the Extension Notice to all Holders of Indenture Securities and the Class E Certificates Paying Agent (for forwarding to the Holders of the Class E Certificates) and each Rating Agency (so long as any rated Notes are Outstanding), in the form of Exhibit J, and shall request the Rating Condition for the Maturity Extension from S&P, if applicable;

(ii)    Any Holder of Indenture Securities or Class E Certificates may give irrevocable notice (an "Extension Sale Notice") within 30 days after the Trustee has mailed the Extension Notice (the "Extension Sale Notice Period") of its intention to sell its Indenture Securities or Class E Certificates to an Extension Qualifying Purchaser in the case of a Maturity Extension;

(iii)    Any Extension Sale Notice received by the Trustee after the Extension Sale Notice Period shall be disregarded and deemed not to have been given. No Holder of Indenture Securities or Class E Certificates that has not given such an Extension Sale Notice within the Extension Sale Notice Period shall be entitled to sell its Indenture Securities or Class E Certificates to an Extension Qualifying Purchaser in connection with the Maturity Extension; and

007311

(iv) If clause (iii)(b)(i) of the Extension Conditions is not satisfied as of the applicable Extension Determination Date as determined by the Issuer (or the Portfolio Manager on its behalf), the Trustee shall request the Rating Condition to be satisfied with respect to Moody's.

(e) On the applicable Extension Determination Date, the Issuer (or the Portfolio Manager on its behalf) shall confirm (i) whether or not Extension Qualifying Purchasers for all Extension Sale Securities have been designated to purchase such Indenture Securities or Class E Certificates in compliance with all transfer restrictions in this Indenture (and in the case of the Class A-1A Notes, the Class A-1A Note Purchase Agreement and in the case of the Class A-1B Notes, the Class A-1B Note Purchase Agreement, as applicable) and the legends on such Indenture Securities or Class E Certificates and all applicable laws, rules and regulations (including, without limitation, any rules, regulations and procedures of any securities exchange, self-regulatory organization or clearing agency), (ii) whether the requirements of clause (c)(iii) of the Extension Conditions are satisfied as of the applicable Extension Determination Date and (iii) whether all other Extension Conditions can be satisfied as of the applicable Extension Effective Date. For the avoidance of doubt, in the case of Class A-1A Notes that are Extension Sale Securities, the purchase thereof by the Extension Qualifying Purchaser shall include the related Commitment thereunder.

(f) On each Extension Effective Date, the Maturity Extension shall automatically become effective under the terms of this Indenture; provided that all Extension Conditions set forth in clauses (a) and (c) above are satisfied as certified by the Issuer (or the Portfolio Manager on its behalf). No later than two Business Days after each Extension Effective Date, the Trustee based on a determination made by the Issuer in consultation with the Portfolio Manager, at the expense of the Co-Issuers, shall mail a notice to all Holders of Indenture Securities, the Class E Certificates Paying Agent (for forwarding to the Holders of Class E Certificates), the Portfolio Manager, the Initial Purchaser, the Placement Agent, each Rating Agency (so long as any rated Notes are Outstanding), the Irish Listing and Paying Agent for forwarding to the Irish Stock Exchange (if and for so long as any Class of Securities is listed thereon) and the Administrator for forwarding to the Cayman Islands Stock Exchange (if and for so long as any Class of Securities is listed thereon) confirming whether or not the Maturity Extension became effective. If the Maturity Extension became effective, the Issuer or the Portfolio Manager on its behalf shall make any required notifications thereof to the Depositary for any Indenture Securities or Class E Certificates subject to the Maturity Extension.

(g) In the case of a Maturity Extension, each Beneficial Owner of Notes (including in the form of the Class Q-1 Note Component) other than Extension Sale Securities shall be entitled to receive an amount equal to the applicable Extension Bonus Payment. Holders of the Class E Certificates, Class P-1 Securities and Class P-2 Securities shall not be entitled to receive any Extension Bonus Payment.

The Extension Bonus Payment shall be payable to any applicable qualifying Beneficial Owners who have provided the Trustee with an Extension Bonus Eligibility Certification on or before the 5th Business Day prior to the first Payment Date from and including each Extension Effective Date on which funds are available to be used for such purposes in accordance with Priority of Payments, but in any event, no later than the earlier of the Stated Maturity and the date of redemption of the Notes. Extension Bonus Payments which are not available to be paid on a Payment Date in accordance with the Priority of Payments on a Payment Date shall not be considered "due and payable" hereunder. The failure to pay any such Extension Bonus Payment on such date shall not be an Event of Default, unless the Issuer shall fail to pay in full such Extension Bonus Payment on the earlier of the Stated Maturity and the date of redemption in full of the relevant Notes. Unpaid Extension Bonus Payments shall not accrue interest. Such amounts shall be paid, in the case of the Notes, to the accounts designated in the applicable

93

Extension Bonus Eligibility Certification or, to the extent otherwise required by the rules of any applicable securities exchange or clearing agency, in a manner determined by the Issuer.

Section 2.5.    Execution, Authentication, Delivery, and Dating.

The Indenture Securities shall be executed on behalf of each of the Applicable Issuers by one of their respective Authorized Officers. The signature of the Authorized Officer on the Indenture Securities may be manual or facsimile.

Indenture Securities bearing the manual or facsimile signatures of individuals who were at any time the Authorized Officers of the Issuer or the Co-Issuer, as applicable, shall bind the Issuer and the Co-Issuer, notwithstanding that any of them have ceased to hold their offices before the authentication and delivery of the Indenture Securities or did not hold their offices at the date of issuance of the Indenture Securities.

At any time and from time to time after the execution and delivery of this Indenture, the Issuer and the Co-Issuer may deliver Indenture Securities executed by the Applicable Issuers to the Trustee or the Authenticating Agent for authentication and the Trustee or the Authenticating Agent, upon Issuer Order, shall authenticate and deliver the Indenture Securities as provided in this Indenture and not otherwise.

Each Indenture Security authenticated and delivered by the Trustee or the Authenticating Agent upon Issuer Order on the Closing Date shall be dated as of the Closing Date. All other Indenture Securities that are authenticated after the Closing Date for any other purpose under this Indenture shall be dated the date of their authentication.

Indenture Securities issued upon transfer, exchange, or replacement of other Indenture Securities shall be issued in authorized denominations reflecting the original Aggregate Outstanding Amount (or, in the case of the Class Q-1 Securities, original stated amount) of the Indenture Securities s so transferred, exchanged, or replaced, but shall represent only the current outstanding principal amount of the Indenture Securities so transferred, exchanged, or replaced. If any Indenture Security is divided into more than one Indenture Security in accordance with this Article 2, the original principal amount of the Indenture Security shall be proportionately divided among the Indenture Securities delivered in exchange for it and shall be the original aggregate principal amount of the subsequently issued Indenture Securities.

No Indenture Security shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose, unless there appears on the Indenture Security a Certificate of Authentication executed by the Trustee or by the Authenticating Agent by the manual signature of one of their Authorized Officers, and that certificate on any Indenture Security shall be conclusive evidence, and the only evidence, that the Indenture Security has been duly authenticated and delivered under this Indenture.

Section 2.6.    Registration, Registration of Transfer and Exchange.

(a)    The Issuer shall cause a register (the "Indenture Register") to be kept in which the Issuer shall provide for the registration of Indenture Securities and the registration of transfers of Indenture Securities. The Trustee is hereby initially appointed "Indenture Registrar" for the purpose of registering Indenture Securities and transfers of the Indenture Securities as provided in this Indenture. The Issuer may rely conclusively on any such information provided to it by the Trustee. Upon any resignation or removal of the Indenture Registrar, the Issuer shall promptly appoint a successor and notify

007313

the Portfolio Manager of the appointment or, in the absence of such appointment, assume the duties of Indenture Registrar.

        If the Issuer appoints a person other than the Trustee to be Indenture Registrar, the Issuer will give the Trustee prompt written notice of the appointment of the Indenture Registrar and of the location, and any change in the location, of the Indenture Register. The Trustee may inspect the Indenture Register at all reasonable times and obtain copies of it. The Trustee may rely on a certificate executed on behalf of the Indenture Registrar by an Officer of the Indenture Registrar as to the names and addresses of the Holders of the Indenture Securities and the principal amounts and number of the Indenture Securities.

        Upon surrender for registration of transfer of any Indenture Securities at the office or agency of the Co-Issuers to be maintained pursuant to Section 7.2, if the requirements of this Indenture are met the Applicable Issuers shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferees, new Indenture Securities of any authorized denomination and of a like original Aggregate Outstanding Amount (or, in the case of the Class Q-1 Securities, original stated amount).

        At the option of its holder, Indenture Securities may be exchanged for Indenture Securities of like terms, in any authorized denominations and of like aggregate principal amount, upon surrender of the Indenture Securities to be exchanged at the office or agency of the Co-Issuers to be maintained pursuant to Section 7.2. Whenever any Indenture Security is surrendered for exchange, the Applicable Issuers shall execute, and the Trustee shall authenticate and deliver, the Indenture Securities that the Holder making the exchange is entitled to receive.

        All Indenture Securities issued on any registration of transfer or exchange of Indenture Securities shall be the valid obligations of the Applicable Issuers evidencing the same obligations, and entitled to the same benefits under this Indenture, as the Indenture Securities surrendered for registration of transfer or exchange.

        Every Indenture Security presented or surrendered for registration of transfer or exchange shall be duly endorsed, or be accompanied by a written instrument of transfer in form satisfactory to the Indenture Registrar duly executed by its holder or his attorney duly authorized in writing.

        No Holder shall incur a service charge for any registration of transfer or exchange of the Indenture Securities, but the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

        (b)      No Indenture Security may be sold or transferred (including by pledge or hypothecation) unless the sale or transfer is exempt from the registration requirements of the Securities Act, is exempt from the registration requirements under applicable state securities laws, and will not cause either of the Co-Issuers to become subject to the requirement that it register as an investment company under the 1940 Act. None of the Co-Issuers, the Trustee, or any other person shall have any obligation to register the Indenture Securities under the Securities Act or any state securities laws.

        (c)      (i) Until the end of the Draw Period, transfers of beneficial interests in Class A– 1A Notes will be permitted only to transferees that satisfy the Rating Criteria and (ii) until the end of the Delayed Drawdown Period, transfers of beneficial interests in Class A–1B Notes will be permitted only to transferees that satisfy the Rating Criteria. In addition to the requirements of this Section 2.6 (including 2.6(h)) and Section 2.5, all transfers of Class A-1A Notes shall be made in accordance with the Class A-1A Note Purchase Agreement and all transfers of Class A-1B Notes shall be made in accordance with the Class A-1B Note Purchase Agreement if then in effect.

007314

(d)      (i) No Note may be transferred to any Plan or any governmental, foreign or church plan subject to any federal, state, local or non-U.S. law that is substantially similar to Section 406 of ERISA or Section 4975 of the Code, unless such Plan's purchase, holding and disposition of such Note will not result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or, in the case of a governmental, foreign or church plan, any federal, state, local or non-U.S. law that is substantially similar to Section 406 of ERISA or Section 4975 of the Code, for which an exemption is not available, all of the conditions of which are satisfied;

(ii)      No ERISA-Restricted Indenture Security may be transferred, and the Trustee shall not register any such proposed transfer, to a proposed transferee that has represented that it is a Plan.

(e)      Neither the Trustee nor the Indenture Registrar shall be responsible for ascertaining whether any transfer complies with, or for otherwise monitoring or determining compliance with, the requirements or terms of the Securities Act, applicable state securities laws, ERISA, the Code or the 1940 Act; except that if a certificate or any other document is specifically required by this Section 2.6 to be provided to the Trustee by a prospective transferee, the Trustee shall be under a duty to receive and examine the same to determine whether it conforms substantially on its face to the applicable requirements of this Section 2.6.

(f)      For so long as any of the Indenture Securities are Outstanding, the Issuer shall not issue or register the transfer of any Issuer Ordinary Shares to U.S. persons and the Co-Issuer shall not issue or register the transfer of any of its shares of the Co-Issuer to U.S. persons.  As used in this subsection (f), "U.S. person" has the meaning assigned to it in Regulation S.

(g)      So long as a Global Security remains Outstanding and is held by or on behalf of the Depositary, transfers of the Global Security, in whole or in part, shall only be made in accordance with Sections 2.2(b) and (c) and this Section 2.6(g).

(i)      Subject to clauses (ii), (iii), (iv) and (v) of this Section 2.6(g), transfers of a Global Security shall be limited to transfers of such Global Security in whole, but not in part, to nominees of the Depositary.

(ii)      Rule 144A Global Note to Temporary Regulation S Global Security or Regulation S Global Security.  If a Holder of a beneficial interest in a Rule 144A Global Note deposited with the Depositary wishes at any time to exchange its interest in the Rule 144A Global Note for an interest in the corresponding Temporary Regulation S Global Security or Regulation S Global Security, or to transfer its interest in such Rule 144A Global Note to a person who wishes to take delivery of it in the form of an interest in the corresponding Temporary Regulation S Global Security or Regulation S Global Security, such Holder may exchange or transfer such interest for an equivalent beneficial interest in the corresponding Temporary Regulation S Global Security or Regulation S Global Security (subject to the rules and procedures of the Depositary) if the Holder after the exchange or transfer is not a U.S. person.

In the case of the transfer of a Rule 144A Global Note, the Indenture Registrar shall instruct the Depositary to reduce the principal amount of the Rule 144A Global Note and to increase the principal amount of the Temporary Regulation S Global Security or Regulation S Global Security, as the case may be, by the aggregate principal amount of the beneficial interest in the Rule 144A Global Note to be exchanged or transferred, but not less than the minimum denomination applicable to the Holder's Notes, and to credit or cause to be credited to the securities account of the person specified in such instructions a beneficial interest in the corresponding Temporary Regulation S

007315

Global Security or Regulation S Global Security equal to the reduction in the principal amount of the Rule 144A Global Security upon receipt by the Indenture Registrar of:

> (A)     instructions given in accordance with the Depositary's procedures from an Agent Member directing the Indenture Registrar to credit or cause to be credited a beneficial interest in the corresponding Temporary Regulation S Global Security or Regulation S Global Security, but not less than the minimum denomination applicable to such Holder's Notes, in an amount equal to the beneficial interest in the Rule 144A Global Note to be exchanged or transferred;

> (B)     a written order given in accordance with the Depositary's procedures containing information regarding the participant account of the Depositary and the Euroclear or Clearstream account to be credited with such increase; and

> (C)     a certificate in the form of <u>Exhibit B1</u> attached hereto given by the Holder of such beneficial interest stating that the exchange or transfer of such interest has been made in compliance with the transfer restrictions applicable to the Global Securities, including that the Holder or the transferee, as applicable, is not a U.S. person, and that the transfer has been made pursuant to and in accordance with Regulation S.

(iii)     <u>Temporary Regulation S Global Security or Regulation S Global Security to Rule 144A Global Note</u>. If a Holder of a Note held as a beneficial interest in a Temporary Regulation S Global Security or Regulation S Global Security deposited with the Depositary, Euroclear or Clearstream, as applicable, wishes at any time to exchange its interest in such Temporary Regulation S Global Security or Regulation S Global Security for an interest in the corresponding Rule 144A Global Note or to transfer its interest in such Temporary Regulation S Global Security or Regulation S Global Security to a person who wishes to take delivery of it in the form of an interest in the corresponding Rule 144A Global Note, such Holder may exchange or transfer, or cause the exchange or transfer of, such interest for an equivalent beneficial interest in the corresponding Rule 144A Global Note (subject to the rules and procedures of Euroclear, Clearstream, or the Depositary, as the case may be) if the Holder after the exchange or transfer is a QIB/QP.

In the case of an exchange or transfer of a Temporary Regulation S Global Security or Regulation S Global Security, the Indenture Registrar shall instruct Euroclear, Clearstream, or the Depositary, as the case may be, to reduce, or cause to be reduced, the Temporary Regulation S Global Security or Regulation S Global Security by the aggregate principal amount of the beneficial interest in the Temporary Regulation S Global Security or Regulation S Global Security to be transferred or exchanged and Regulation S Global Security to be exchanged and concurrently with such reduction, the Indenture Registrar shall instruct the Depositary to credit or cause to be credited to the securities account of the person specified in such instructions a beneficial interest in the corresponding Rule 144A Global Note equal to the reduction in the amount of the Temporary Regulation S Global Security or Regulation S Global Security, in each case upon receipt by the Indenture Registrar of:

> (A)     instructions from Euroclear, Clearstream and/or the Depositary, as the case may be, directing the Indenture Registrar to cause to be credited a beneficial interest in such Temporary Regulation S Global Security or Regulation S Global Security, but not less than the minimum denomination applicable to such Holder's Notes, to be exchanged or transferred, such instructions to contain information regarding the participant account with the Depositary to be credited with such increase; and

007316

(B)       a certificate in the form of Exhibit B2 attached hereto given by the Holder of such beneficial interest and stating that, in the case of a transfer, the person transferring  such interest in such Temporary Regulation S Global Security or Regulation S Global Security reasonably believes that the person acquiring such interest in a Rule 144A Global Note is a Qualified Institutional Buyer, is obtaining the beneficial interest in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction, and is also a Qualified Purchaser.

(iv)   Temporary Regulation S Global Security to Regulation S Global Security.  On or after the Exchange Date, interests in a Temporary Regulation S Global Security may be exchanged for interests in the corresponding Regulation S Global Security in the form of the Exhibit A2 hereto. Any such Regulation S Global Security shall be so issued and delivered in exchange for only that portion of the Temporary Regulation S Global Security in respect of which there shall have been presented to the Depositary by Euroclear or Clearstream a certification to the effect that it has received from or in respect of a person entitle to an interest (as shown by its records) therein a certification that the beneficial interests in such Temporary Regulation S Global Security are owned by persons who are not U.S. persons (as defined in Regulation S).

(v)   Other Exchanges.  If a Global Security is exchanged for the Notes in definitive registered form without interest coupons pursuant to Section 2.11 hereof, the Notes may be exchanged for one another only in accordance with such procedures as are substantially consistent with the provisions above (including certification requirements intended to insure that such transfers are made only to Holders who are Qualified Purchasers acquiring in compliance with Rule 144A or are to non-U.S. persons (as defined in Regulation S) who are non-U.S. residents (as determined for purposes of the Investment Company Act) acquiring in compliance with Regulation S and as may be from time to time adopted by the Co-Issuers and the Trustee.

(h)       So long as any Certificated Class A-1A Notes or Certificated Class A-1B Notes remain Outstanding, transfers and exchanges of the Certificated Class A-1 Notes, in whole or in part, shall only be made in accordance with this Section 2.6(h) and the Class A-1A Note Purchase Agreement or Class A-1B Note Purchase Agreement, as applicable, if then in effect.

(i)   Transfer of Certificated Class A-1Notes.  If a Holder of a Certificated Class A-1 Note wishes at any time to transfer its interest in such Certificated Class A-1 Note, such Holder may transfer or cause the transfer of such interest for an equivalent interest in one or more such Certificated Class A-1 Notes as provided below.  Upon receipt by the Issuer and the Trustee, as Indenture Registrar, of:

(A)       such Holder's Certificated Class A-1 Note properly endorsed for assignment to the transferee, and

(B)       a Transfer Certificate substantially in the form of Exhibit B3 (in the case of Certificated Class A-1A Notes) or Exhibit B4 (in the case of Certificated Class A-1B Notes), as applicable, given by the transferee of such beneficial interest,

the Trustee, as Indenture Registrar, shall cancel such Certificated Class A-1 Note in accordance with Section 2.10, record the transfer in the Indenture Register in accordance with Section 2.6(a) and shall instruct the Co-Issuers to execute the applicable Certificated Class A-1 Notes and the Trustee shall authenticate and deliver applicable Certificated Class A-1 Notes bearing the same designation as the Certificated Class A-1 Notes endorsed for transfer, registered in the names specified in the assignment

98

007317

described in clause (A) above, in principal amounts designated by the transferee (the aggregate of such amounts being the same as the beneficial interest in the Certificated Class A-1 Note surrendered by the transferor), and in Authorized Denominations. Any purported transfer in violation of the foregoing requirements (including a purported transfer or request to transfer by delivery to the Trustee of any patently false certificate pursuant to clause (C) above) shall be null and void *ab initio*, and the Trustee shall not register any such purported transfer and shall not authenticate and deliver such Certificated Class A-1 Notes.

(ii)    Exchange of Certificated Class A-1 Notes. If a holder of a Certificated Class A-1A Note or Certificated Class A-1B Notes wishes at any time to exchange such Certificated Class A-1 Note for one or more such Certificated Class A-1 Notes or Certificated Class A-1B Notes, as applicable of different principal amounts, such holder may exchange or cause the exchange of such interest for an equivalent beneficial interest in Certificated Class A-1A Notes or Certificated Class A-1B Notes, as applicable, bearing the same designation as the Certificated Class A-1A Note or Certificated Class A-1B Note, as applicable, endorsed for exchange as provided below. Upon receipt by the Trustee, as Indenture Registrar, of:

(A)    such Holder's Certificated Class A-1A Note or Class A-1B Note, as applicable, properly endorsed for such exchange and

(B)    written instructions from such Holder designating the number and principal amounts of the Certificated Class A-1A Notes or Certificated Class A-1B Notes, as applicable, to be issued (the aggregate principal amounts of such Certificated Class A-1A Notes or Class A-1B Notes, as applicable, being the same as the Certificated Class A-1A Note or Certificated Class A-1B Note, as applicable, surrendered for exchange),

the Trustee, as Indenture Registrar, shall cancel such Certificated Class A-1 Note in accordance with Section 2.10, record the exchange in the Indenture Register in accordance with Section 2.6(a) and shall instruct the Co-Issuers to execute the Certificated Class A-1 Notes and the Trustee shall authenticate and deliver one or more Certificated Class A-1 Notes of the same Class bearing the same designation as the Certificated Class A-1 Note endorsed for exchange, registered in the same names as the Certificated Class A-1 Note surrendered by such holder or such different names as are specified in the endorsement described in clause (A) above, in different principal amounts designated by such holder (the aggregate principal amounts being the same as the beneficial interest in the Certificated Class A-1 Notes surrendered by such holder), and in Authorized Denominations.

(i)    If the Indenture Securities are issued upon the transfer, exchange, or replacement of Indenture Securities bearing the applicable legends in the applicable portion of Exhibit A, and if a request is made to remove the legend on the Indenture Securities, the legend shall not be removed unless the Trustee and the Applicable Issuers received satisfactory evidence, which may include an Opinion of Counsel acceptable to them, reasonably required by the Applicable Issuers (and which shall by its terms permit reliance by the Trustee), to the effect that neither the legend nor the restrictions on transfer in it are required to ensure that transfers of the Indenture Securities comply with the Securities Act, the 1940 Act, ERISA, and the Code (or applicable exceptions therefrom). Upon provision of satisfactory evidence, the Trustee or its Authenticating Agent, at the written direction of the Applicable Issuers, shall, after due execution by the Applicable Issuers, authenticate and deliver Indenture Securities that do not bear the applicable legend.

(j)    Each initial purchaser and subsequent transferee who is purchasing an interest in a Rule 144A Global Note will be deemed to have represented and agreed as follows:

99

(i)     It (a) is a Qualified Institutional Buyer and is acquiring the Notes in reliance on the exemption from Securities Act registration provided by Rule 144A thereunder, (b) is a Qualified Purchaser and (c) understands the Notes will bear the legend set forth in this Indenture and be represented by one or more Rule 144A Global Notes.  In addition, it represents and warrants that it (i) was not formed for the purpose of investing in the Notes, (ii) has received the necessary consent from its beneficial owners if the purchaser is a private investment company formed before April 30, 1996, (iii) is not a broker-dealer that owns and invests on a discretionary basis less than U.S. $25,000,000 in securities of unaffiliated issuers, (iv) is not a partnership, common trust fund, special trust, pension, profit sharing or other retirement trust fund or plan in which the partners, beneficiaries or participants, as applicable, may designate the particular investments to be made, (v) is acquiring its Notes in a transaction that may be effected without loss of any applicable Investment Company Act exemption, (vi) will provide notice to any subsequent transferee of the transfer restrictions applicable to such Notes under this Indenture or provided in the legend of such Notes, (vii) will hold and transfer its beneficial interest in any Note only in a principal amount of not less than the applicable minimum denomination and (viii) will provide the Issuer from time to time such information as it may reasonably request in order to ascertain compliance with this subclause (i).

(ii)    The Notes are being purchased or transferred in accordance with the transfer restrictions set forth in this Indenture and pursuant to an exemption from Securities Act registration, and in accordance with applicable state securities laws or securities laws of any other relevant jurisdiction.  It understands that the Notes have been offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act, the Notes have not been and will not be registered under the Securities Act or the securities laws of any states, and, if in the future it decides to offer, resell, pledge or otherwise transfer the Notes, such Notes may be offered, resold, pledged or otherwise transferred only in accordance with an exemption from registration under such laws and pursuant to the provisions of this Indenture and the legend on such Notes. In particular, it understands that interests in the Notes may be transferred only to (a) a Qualified Purchaser that is a Qualified Institutional Buyer or (b) a person that is not a "U.S. person" as defined in Regulation S under the Securities Act.  Purchasers and transferees who reside in certain states or jurisdictions may be subject to additional suitability standards and/or specific holding periods before the Notes may be resold or otherwise transferred.  It acknowledges that no representation is made as to the availability of any exemption under the Securities Act or any state or other securities laws for resale of the Notes.

(iii)   In connection with the purchase of the Notes:  (a) it understands that none of the Issuer, the Portfolio Manager, the Initial Purchaser, the Placement Agent, the Collateral Administrator, the Revolving Note Agent, the Delayed Drawdown Agent or any of their respective affiliates is acting as a fiduciary or financial or investment adviser for such beneficial owner; (b) such beneficial owner is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral) of the Issuer, the Portfolio Manager, the Initial Purchaser, the Placement Agent, the Trustee, the Class E Certificates Paying Agent, the Collateral Administrator or any of their respective affiliates, agents and independent contractors in their capacities as such other than statements, if any, of such person in a current offering memorandum for the Notes; (c) such beneficial owner has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisers to the extent it has deemed necessary and has made its own investment decisions based upon its own judgment and upon any advice from such advisers as it has deemed necessary and not upon any view expressed by the Issuer, the Portfolio Manager, the Initial Purchaser, the Placement Agent, the Trustee, the Class E Certificates Paying Agent, the Collateral Administrator or any of their respective affiliates, agents and independent contractors in their capacities as such; (d) such beneficial owner's purchase of the Notes will comply with all applicable laws in any jurisdiction in which it resides or is located; (e)

007319

such beneficial owner is acquiring the Notes as principal solely for its own account for investment and not with a view to the resale, distribution or other disposition thereof in violation of the Securities Act; (f) such beneficial owner has made investments prior to the date hereof and was not formed solely for the purpose of investing in the Notes; (g) such beneficial owner shall not hold any Notes for the benefit of any other person, it shall at all times be the sole beneficial owner thereof for purposes of the Investment Company Act and all other purposes and it shall not sell participation interests in the Notes or enter into any other arrangement pursuant to which any other person shall be entitled to a beneficial interest in the distributions on the Notes; (h) all Notes (together with any other securities of the Issuer) purchased and held directly or indirectly by such beneficial owner constitute in the aggregate an investment of no more than 40% of its assets or capital and (i) it is a sophisticated investor and is purchasing the Notes with a full understanding of all of the terms, conditions and risks thereof, and it is capable of assuming and willing to assume those risks.

(iv) On each day from the date on which it acquires its interest in the Notes through and including the date on which it disposes of its interest in such Notes, either (A) it is not, and is not acting on behalf of or using the asset of, a Plan or a governmental, foreign or church plan that is subject to any federal, state, local or non-U.S. law which is substantially similar to the provisions of Section 406 of ERISA or Section 4975 of the Code or (B) its purchase, holding and disposition of such Notes (or interest therein) will not constitute or result in a prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or, in the case of a governmental, foreign or church plan, a violation of any substantially similar federal, state, local or other law, for which an exemption is not available, all of the conditions of which are satisfied.

(v) It understands that this Indenture permits the Issuer to demand that any holder of a beneficial interest in a Rule 144A Global Note who is determined not to be both a Qualified Institutional Buyer and a Qualified Purchaser sell the Notes (a) to a person who is both a Qualified Institutional Buyer and a Qualified Purchaser in a transaction meeting the requirements of Rule 144A or (b) to a Person who will take delivery of the holder's interest in the Rule 144A Global Note in the form of an interest in a Temporary Regulation S Global Note or Regulation S Global Note, as applicable, and who is not a U.S. person (as defined in Regulation S) in a transaction meeting the requirements of Regulation S and, if the holder does not comply with such demand within 30 days thereof, the Issuer may cause such Holder of the beneficial interest to sell such holder's interest in the Note on such terms as the Issuer may choose.

(vi) It acknowledges that it is its intent and that it understands it is the intent of the Issuer that, for purposes of U.S. federal income, state and local income and franchise tax and any other income taxes, the Issuer will be treated as a corporation, the Notes will be treated as indebtedness of the Issuer, the Class E Certificates (in the absence of an administrative determination or judicial ruling to the contrary) will be treated as equity in the Issuer and the Class Q-1 Securities and Class P Securities will be treated as a direct ownership interest in the corresponding components of such Security; it agrees to such treatment and agrees to take no action inconsistent with such treatment.

(vii) It is not purchasing the Securities in order to reduce any United States federal income tax liability or pursuant to a tax avoidance plan. In the case of a purchaser that is a bank (as defined in Section 881(c)(3)(a) of the Code) or an affiliate of such a bank, the purchaser (a) is acquiring the Notes as a capital markets investment and will not for any purpose treat the assets of the Issuer as loans acquired in its banking business, and (b) has not proposed or identified, and will not propose or identify, any security or loan for inclusion in the Collateral.

007320

(viii) In the case of any purchaser that is not a United States person (as defined in Section 7701(a)(30) of the Code), it is not a bank (as defined in Section 881(c)(3)(a) of the Code) or an affiliate of such a bank, unless the purchaser is a person that is eligible for benefits under an income tax treaty with the United States that eliminates United States federal income taxation of United States source interest not attributable to a permanent establishment in the United States.

(ix) It is aware that, except as otherwise provided in this Indenture, the Notes being sold to it will be represented by one or more Global Notes, and that beneficial interests therein may be held only through the Depositary.

(x) It acknowledges that no governmental agency has passed upon the Notes or made any finding or determination as to the fairness of an investment in the Notes.

(xi) It acknowledges that certain persons or organizations will perform services on behalf of the Issuer and will receive fees and/or compensation for performing such services as described in the Offering Memorandum and this Indenture.

(xii) It acknowledges that the Notes do not represent deposits with or other liabilities or obligations of, and are not guaranteed or endorsed by, the Placement Agent, the Initial Purchaser, the Portfolio Manager, the Trustee, the Class E Certificates Paying Agent, the Collateral Administrator or any of their respective affiliates or any entity related to any of them or any other Holder of Notes. It acknowledges that none of such persons will, in any way, be responsible for or stand behind the value or the performance of the Notes or the assets held by the Issuer. It acknowledges that purchase of Notes involves investment risks including possible delay in payment of distributions and loss of income and principal invested.

(xiii) It understands that the maturity of the Notes is subject to up to four extensions of four years each (to a latest possible date of November 1, 2033) without consent of any beneficial owners of Securities if certain conditions are satisfied.

(xiv) It understands that in the case of any amendment to this Indenture that requires consent of one or more holders of Notes, this Indenture permits the Amendment Buy-Out Purchaser to purchase at the Amendment Buy-Out Purchase Price, the beneficial interest in the Notes from any holder thereof that either (i) has declared in writing that it will not consent to such amendment or (ii) had not consented to such amendment by the last day on which consent could be given in accordance with the request therefor, and such holder will be required to sell its beneficial interest in the Notes to the Amendment Buy-Out Purchaser at the applicable Amendment Buy-Out Purchase Price.

(xv) It understands that the Issuer, the Trustee, the Portfolio Manager, the Initial Purchaser, the Placement Agent, the Collateral Administrator and their respective counsel will rely upon the accuracy and truth of the foregoing representations, and it hereby consents to such reliance.

(k) Each initial purchaser and subsequent transferee who is purchasing an interest in a Temporary Regulation S Global Note or a Regulation S Global Note will be deemed to have made the representations set forth in Section 2.6(j)(ii), (iii), (iv), (vi), (vii), (viii), (x), (xi), (xii), (xiii) and (xiv), and in addition to have further represented and agreed as follows:

(i) It is aware that the sale of Notes to it is being made in reliance on the exemption from registration provided by Regulation S and understands that the Notes offered in reliance on

007321

Regulation S will bear the legend set forth in the applicable Note. It and each beneficial owner of its Notes is not, and will not be, a U.S. person as defined in Regulation S under the Securities Act, and its purchase of the Notes will comply with all applicable laws in any jurisdiction in which it resides or is located. In addition, it represents and warrants that it will (i) provide notice to any subsequent transferee of the transfer restrictions provided in such legend and in this Indenture, (ii) hold and transfer its beneficial interest in any Note only in a principal amount of not less than the applicable minimum denomination and (iii) provide the Issuer from time to time such information as it may reasonably request in order to ascertain compliance with this subclause (i).

(ii)     It understands that this Indenture permits the Issuer to demand that any holder of a beneficial interest in a Temporary Regulation S Global Note or Regulation S Global Note who is determined not to have acquired such beneficial interest in compliance with the requirements of Regulation S or who is a U.S. person (as defined in Regulation S) sell such beneficial interest (a) to a Person who is not a U.S. person (as defined in Regulation S) in a transaction meeting the requirements of Regulation S or (b) to a Person who will take delivery of the holder's beneficial interest in the Temporary Regulation S Global Notes or Regulation S Global Notes in the form of an interest in a Rule 144A Global Note, who is both a Qualified Institutional Buyer and a Qualified Purchaser in a transaction meeting the requirements of Rule 144A under the Securities Act and, if the holder does not comply with such demand within 30 days thereof, the Issuer may cause the holder to sell its beneficial interest on such terms as the Issuer may choose.

(iii)     Such beneficial owner is aware that, except as otherwise provided in this Indenture, the Notes being sold to it will be represented (a) initially, by one or more Temporary Regulation S Global Notes and (b) after the Exchange Date, by one or more Regulation S Global Notes, and that beneficial interests therein may be held only through Euroclear or Clearstream.

(iv)     A holder of a beneficial interest in a Temporary Regulation S Global Note must provide Euroclear or Clearstream or the participant organization through which it holds such interest, as applicable, with a certificate certifying that the beneficial owner of the interest in the Temporary Regulation S Global Note is a non-U.S. person (as defined in Regulation S) and Euroclear or Clearstream, as applicable, must provide to the Trustee a certificate to such effect, prior to (a) the payment of interest or principal with respect to such holder's beneficial interest in the Temporary Regulation S Global Note and (b) any exchange of such beneficial interest for a beneficial interest in a Regulation S Global Note, and no payment will be made to the holder of any beneficial interest in a Temporary Regulation S Global Note unless such holder has provided Euroclear or Clearstream or such participant organization through which it holds such interest with such certificate.

(v)     It understands that any resale or other transfer of beneficial interests in a Temporary Regulation S Global Note or Regulation S Global Note to U.S. persons (as defined in Regulation S) shall not be permitted.

(vi)     It understands that the Issuer, the Trustee, the Portfolio Manager, the Initial Purchaser, the Placement Agent, the Collateral Administrator and their respective counsel will rely upon the accuracy and truth of the foregoing representations, and it hereby consents to such reliance.

(l)     Each initial purchaser and subsequent transferee who is purchasing an interest in a Class Q-1 Security represented by a Temporary Regulation S Global Security or a Regulation S Global Security will be deemed to have represented and agreed as follows:

007322

    (i)    It is aware that the sale of Class Q-1 Securities to it is being made in reliance on the exemption from registration provided by Regulation S and understands that the Class Q-1 Securities offered in reliance on Regulation S will bear the legend set forth in the applicable Class Q-1 Security. It and each beneficial owner of its Class Q-1 Securities is not, and will not be, a U.S. person as defined in Regulation S under the Securities Act, and its purchase of the Class Q-1 Securities will comply with all applicable laws in any jurisdiction in which it resides or is located. In addition, it represents and warrants that it will (i) provide notice to any subsequent transferee of the transfer restrictions provided in such legend and in the Indenture, (ii) hold and transfer its beneficial interest in any Class Q-1 Securities only in not less than the applicable minimum denomination; and (iii) provide the Issuer from time to time such information as it may reasonably request in order to ascertain compliance with this paragraph (i).

    (ii)    The Class Q-1 Securities are being purchased or transferred in accordance with the transfer restrictions set forth in this Indenture and pursuant to an exemption from Securities Act registration, and in accordance with applicable state securities laws or securities laws of any other relevant jurisdiction. It understands that the Class Q-1 Securities have been offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act, the Class Q-1 Securities have not been and will not be registered under the Securities Act or the securities laws of any states, and, if in the future it decides to offer, resell, pledge or otherwise transfer the Class Q-1 Securities, such Class Q-1 Securities may be offered, resold, pledged or otherwise transferred only in accordance with an exemption from registration under such laws and pursuant to the provisions of this Indenture and the legend on such Class Q-1 Securities. In particular, it understands that the Class Q-1 Securities may be transferred only (a) in the form of a Certificated Class Q-1 Security to a Qualified Purchaser that is also a Qualified Institutional Buyer or (b) in the form of an interest in a Temporary Regulation S Global Security or Regulation S Global Security to a person that is not a "U.S. person" as defined in Regulation S under the Securities Act. Purchasers and transferees who reside in certain states or jurisdictions may be subject to additional suitability standards and/or specific holding periods before the Class Q-1 Securities may be resold or otherwise transferred. It acknowledges that no representation is made as to the availability of any exemption under the Securities Act or any state or other securities laws for resale of the Class Q-1 Securities.

    (iii)    In connection with the purchase of the Class Q-1 Securities: (a) it understands that none of the Issuer, the Co-Issuer, the Portfolio Manager, the Initial Purchaser, the Placement Agent, the Class E Certificate Paying Agent, the Collateral Administrator, the Revolving Note Agent, the Delayed Drawdown Note Agent and or any of their respective Affiliates is acting as a fiduciary or financial or investment adviser for it; (b) it is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (in each case whether written or oral) of the Co-Issuers, the Portfolio Manager, the Initial Purchaser, the Placement Agent, the Trustee, the Class E Certificate Paying Agent, the Revolving Note Agent, the Delayed Drawdown Note Agent, the Collateral Administrator or any of their respective Affiliates, agents and independent contractors in their capacities as such other than statements, if any, of such person in a current offering memorandum for the Class Q-1 Securities; (c) it has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisers to the extent it has deemed necessary and has made its own investment decisions based upon its own judgment and upon any advice from such advisers as it has deemed necessary and not upon any view expressed by the Issuer, the Initial Purchaser, the Placement Agent, the Portfolio Manager, the Trustee, the Class E Certificates Paying Agent, the Revolving Note Agent, the Delayed Drawdown Note Agent, the Collateral Administrator or any of their respective Affiliates, agents and independent contractors in their capacities as such; (d) its purchase of the Class Q-1 Securities will comply with all applicable laws in any jurisdiction in which it resides or is located; (e) it is acquiring the Class Q-1 Securities

007323

as principal solely for its own account for investment and not with a view to the resale, distribution or other disposition thereof in violation of the Securities Act; (f) it has made investments prior to the date hereof and was not formed solely for the purpose of investing in the Class Q-1 Securities; (g) it will not hold any Class Q-1 Securities for the benefit of any other person, it will at all times be the sole beneficial owner thereof for purposes of the Investment Company Act and all other purposes and it will not sell participation interests in the Class Q-1 Securities or enter into any other arrangement pursuant to which any other person shall be entitled to a beneficial interest in the dividends or distributions on the Class Q-1 Securities; (h) all Class Q-1 Securities (together with any other securities of the Co-Issuers) purchased and held directly or indirectly by it constitute in the aggregate an investment of no more than 40% of its assets or capital; and (i) it is a sophisticated investor and is purchasing the Class Q-1 Securities with a full understanding of all of the terms, conditions and risks thereof, and it is capable of assuming and willing to assume those risks.

(iv)   On each day from the date on which it acquires its interest in the Class Q-1 Securities through and including the date on which it disposes of its interest in such Class Q-1 Securities, (a) it is not, and is not acting on behalf of or using the assets of, a Plan; (b) if it is a governmental plan (as defined in Section 3(32) of ERISA), church plan (as defined in Section 3(33) of ERISA) or a non-US plan (as described in Section 4(b)(4) of ERISA), its purchase, holding and subsequent transfer of the Class Q-1 Securities will not result in a violation of any applicable laws, rules, regulations, policies and guidelines to which it and its investments are subject; and (c) it and any person causing it to acquire any Class Q-1 Securities agrees to indemnify and hold harmless the Issuer, Co-Issuer, Portfolio Manager, Class E Certificates Paying Agent, Trustee, Collateral Administrator, the Revolving Note Agent, the Delayed Drawdown Note Agent, Placement Agent and Initial Purchaser and their respective Affiliates from any cost, damage or loss, liability, expense, claim, proceeding or excise tax incurred by them as a result of any of the foregoing representations being or becoming untrue.  It understands that the Issuer may require any holder of the Class Q-1 Securities that has made a false representation with respect to the foregoing matters to sell the Class Q-1 Securities and, if such holder does not comply with such demand within 30 days thereof, the Issuer may sell such holder's interest in the Class Q-1 Securities.  It understands that any transfer effected in connection with such a representation that was false will be of no force and effect, will be void *ab initio*, and will not operate to transfer any rights to the transferee, notwithstanding any instructions to the contrary to the Issuer, the Class E Certificates Paying Agent or any intermediary.

(v)   It understands that this Indenture permits the Issuer to demand that any holder of a beneficial interest in Class Q-1 Securities in the form of a Temporary Regulation S Global Security or Regulation S Global Security who is determined not to have acquired such beneficial interest in compliance with the requirements of Regulation S or who is a U.S. person (as defined in Regulation S) sell such beneficial interest (a) to a Person who is not a U.S. person (as defined in Regulation S) in a transaction meeting the requirements of Regulation S or (b) to a Person who will take delivery of the holder's interest in the Temporary Regulation S Global Securities or Regulation S Global Securities in the form of a Certificated Class Q-1 Security, who is both (i) a Qualified Institutional Buyer and (ii) a Qualified Purchaser, in a transaction meeting the requirements of Rule 144A of the Securities Act and, if the holder does not comply with such demand within 30 days thereof, the Issuer may cause the holder to sell its beneficial interest on such terms as the Issuer may choose.

(vi)   It agrees to treat the Class Q-1 Security as a direct ownership interest in the different Classes of Securities corresponding to the components of the Class Q-1 Security. It acknowledges that it is its intent and that it understands it is the intent of the Issuer that, for purposes of U.S. federal income tax, state and local income and franchise tax and any other income

taxes, the Issuer will be treated as a corporation, the Notes will be treated as indebtedness of the Issuer and the Class E Certificates (including the Class Q-1 Class E Certificate Component) (in the absence of an administrative determination or judicial ruling to the contrary) will be treated as equity in the Issuer; it agrees to such treatment and agrees to take no action inconsistent with such treatment.

(vii)  It acknowledges that the Issuer is not authorized to engage in activities that could cause it to constitute a finance or lending business for federal income tax purposes and agrees that it will report its investment in the Class Q-1 Securities in a manner consistent with such limitation, and in particular will not treat the Issuer as an "eligible controlled foreign corporation" for purposes of Section 954(h) of the Code or as deriving income described in Section 1297(b)(2) of the Code.

(viii) It is not purchasing the Class Q-1 Securities in order to reduce any United States federal income tax liability or pursuant to a tax avoidance plan.  In the case of a purchaser that is a bank (as defined in Section 881(c)(3)(A) of the Code) or an affiliate of such a bank, the purchaser (a) is acquiring the Class Q-1 Securities as a capital markets investment and will not for any purpose treat the assets of the Issuer as loans acquired in its banking business and (b) has not proposed or identified, and will not propose or identify, any security or loan for inclusion in the Collateral.

(ix)  In the case of any purchaser that is not a United States person (as defined in Section 7701(a)(30) of the Code), the purchaser is not a bank (as defined in Section 881(c)(3)(A) of the Code) or an affiliate of such a bank, unless the purchaser is a person that is eligible for benefits under an income tax treaty with the United States that eliminates United States federal income taxation of United States source interest not attributable to a permanent establishment in the United States.

(x)  Such beneficial owner is aware that, except as otherwise provided in this Indenture, the Class Q-1 Securities being sold to it will be represented (a) initially, by one or more Temporary Regulation S Global Securities and (b) after the Exchange Date, by one or more Regulation S Global Securities, and that beneficial interests therein may be held only through Euroclear or Clearstream.

(xi)  A holder of a beneficial interest in a Temporary Regulation S Global Security must provide Euroclear or Clearstream or the participant organization through which it holds such interest, as applicable, with a certificate certifying that the beneficial owner of the interest in the Temporary Regulation S Global Security is a non-U.S. person, and Euroclear or Clearstream, as applicable, must provide to the Trustee a certificate to such effect, prior to (a) the payment of interest or principal or other amounts with respect to such holder's beneficial interest in the Temporary Regulation S Global Security and (b) any exchange of such beneficial interest for a beneficial interest in a Regulation S Global Security and no payment will be made to the holder of any beneficial interest in a Temporary Regulation S Global Security unless such holder has provided Euroclear or Clearstream or such participant organization through which it holds such interest with such certificate.

(xii)  It understands that any resale or other transfer of beneficial interests in a Temporary Regulation S Global Security or Regulation S Global Security to U.S. persons shall not be permitted.

(xiii) It acknowledges that no governmental agency has passed upon the Class Q-1 Securities or made any finding or determination as to the fairness of an investment in the Class Q-1 Securities.

(xiv) It acknowledges that certain persons or organizations will perform services on behalf of the Co-Issuers and will receive fees and/or compensation for performing such services as described in the Offering Memorandum and this Indenture and Class E Certificate Documents.

(xv)  It acknowledges that the Class Q-1 Securities do not represent deposits with or other liabilities or obligations of, and are not guaranteed or endorsed by, the Placement Agent, the Initial Purchaser, the Portfolio Manager, the Trustee, the Class E Certificates Paying Agent, the Revolving Note Agent, the Delayed Drawdown Note Agent, the Collateral Administrator or any of their respective Affiliates or any entity related to any of them or any other holder of Class Q-1 Securities.  It acknowledges that none of such persons will, in any way, be responsible for or stand behind the value or the performance of the Class Q-1 Securities.  It acknowledges that purchase of Class Q-1 Securities involves investment risks including possible delay in payment of distributions and loss of income and principal invested.

(xvi) It understands that the Stated Maturity of the Class Q-1 Securities is subject to up to four extensions of four years each (to a latest possible date of November 1, 2033) without consent of any beneficial owners of Securities if certain conditions are satisfied.

(xvii) It understands that in the case of any amendment to this Indenture that requires consent of one or more holders of Class Q-1 Securities (or holders of any Class of Securities that constitutes a Class Q-1 Component thereof), this Indenture and Class E Certificate Documents permit the Amendment Buy-Out Purchaser to purchase at the Amendment Buy-Out Purchase Price, the Class Q-1 Securities (or the affected Component thereof) from any holder thereof that either (i) has declared in writing that it will not consent to such amendment or (ii) had not consented to such amendment by the last day on which consent could be given in accordance with the request therefor, and such holder will be required to sell its Class Q-1 Securities or the affected Component thereof (at the holder's option) to the Amendment Buy-Out Purchaser at the applicable Amendment Buy-Out Purchase Price.  In addition, in the case of any vote by holders of Class E Certificates to remove the Portfolio Manager without cause, the Class E Certificate Documents permit the Removal Buy-Out Purchaser to purchase at the Buy-Out Amount, the Class E Certificates represented by the Class Q-1 Class E Certificate Component from any holder that voted in favor of such removal, and in such case such holder's Class Q-1 Securities will be deemed exchanged into their Components and the resulting Class E Certificates sold to the Removal Buy-Out Purchaser at the applicable Buy-Out Amount.

(xviii)      It understands that the Co-Issuers, the Trustee, the Class E Certificates Paying Agent, the Initial Purchaser, the Placement Agent, the Portfolio Manager, the Revolving Note Agent, the Delayed Drawdown Note Agent, the Collateral Administrator and their respective counsel will rely upon the accuracy and truth of the foregoing representations, and it hereby consents to such reliance.

(m)      Each initial purchaser and subsequent transferee who is purchasing an interest in a Class P Security represented by a Temporary Regulation S Global Security or a Regulation S Global Security will be deemed to have represented and agreed as follows:

(i)      It is aware that the sale of Class P Securities to it is being made in reliance on the exemption from registration provided by Regulation S and understands that the Class P Securities

offered in reliance on Regulation S will bear the legend set forth in the applicable Class P Security. It and each beneficial owner of its Class P Securities is not, and will not be, a U.S. person as defined in Regulation S under the Securities Act, and its purchase of the Class P Securities will comply with all applicable laws in any jurisdiction in which it resides or is located. In addition, it represents and warrants that it will (i) provide notice to any subsequent transferee of the transfer restrictions provided in such legend and in this Indenture, (ii) hold and transfer its beneficial interest in any Class P Securities only in not less than the applicable minimum denomination; and (iii) provide the Issuer from time to time such information as it may reasonably request in order to ascertain compliance with this paragraph (i).

(ii) The Class P Securities are being purchased or transferred in accordance with the transfer restrictions set forth in this Indenture and pursuant to an exemption from Securities Act registration, and in accordance with applicable state securities laws or securities laws of any other relevant jurisdiction. It understands that the Class P Securities have been offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act, the Class P Securities have not been and will not be registered under the Securities Act or the securities laws of any states, and, if in the future it decides to offer, resell, pledge or otherwise transfer the Class P Securities, such Class P Securities may be offered, resold, pledged or otherwise transferred only in accordance with an exemption from registration under such laws and pursuant to the provisions of this Indenture and the legend on such Class P Securities. In particular, it understands that the Class P Securities may be transferred only (a) in the form of a Certificated Class P Certificate to a Qualified Purchaser that is a Qualified Institutional Buyer or (b) in the form of an interest in a Temporary Regulation S Global Security or Regulation S Global Security to a person that is not a "U.S. person" as defined in Regulation S under the Securities Act. Purchasers and transferees who reside in certain states or jurisdictions may be subject to additional suitability standards and/or specific holding periods before the Class P Securities may be resold or otherwise transferred. It acknowledges that no representation is made as to the availability of any exemption under the Securities Act or any state or other securities laws for resale of the Class P Securities.

(iii) In connection with the purchase of the Class P Securities: (a) it understands that none of the Issuer, the Co-Issuer, the Portfolio Manager, the Initial Purchaser, the Placement Agent, the Class E Certificate Paying Agent, the Collateral Administrator, the Revolving Note Agent, the Delayed Drawdown Note Agent or any of their respective Affiliates is acting as a fiduciary or financial or investment adviser for it; (b) it is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (in each case whether written or oral) of the Co-Issuers, the Portfolio Manager, the Initial Purchaser, the Placement Agent, the Trustee, the Class E Certificates Paying Agent, the Revolving Note Agent, the Delayed Drawdown Note Agent, the Collateral Administrator or any of their respective Affiliates, agents and independent contractors in their capacities as such other than statements, if any, of such person in a current offering memorandum for the Class P Securities; (c) it has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisers to the extent it has deemed necessary and has made its own investment decisions based upon its own judgment and upon advice from such advisers as it has deemed necessary and not upon any view expressed by the Issuer, the Initial Purchaser, the Placement Agent, the Portfolio Manager, the Trustee, the Class E Certificates Paying Agent, the Revolving Note Agent, the Delayed Drawdown Note Agent, the Collateral Administrator or any of their respective Affiliates, agents and independent contractors in their capacities as such; (d) its purchase of the Class P Securities will comply with all applicable laws in any jurisdiction in which it resides or is located; (e) it is acquiring the Class P Securities as principal solely for its own account for investment and not with a view to the resale, distribution or other disposition thereof in violation of the Securities Act; (f) it has made investments prior to the date hereof and was not formed solely for the purpose of investing in the Class P Securities; (g) it

108

will not hold any Class P Securities for the benefit of any other person, it will at all times be the sole beneficial owner thereof for purposes of the Investment Company Act and all other purposes and it will not sell participation interests in the Class P Securities or enter into any other arrangement pursuant to which any other person shall be entitled to a beneficial interest in the dividends or distributions on the Class P Securities; (h) all Class P Securities (together with any other securities of the Co-Issuers) purchased and held directly or indirectly by it constitute in the aggregate an investment of no more than 40% of its assets or capital; and (i) it is a sophisticated investor and is purchasing the Class P Securities with a full understanding of all of the terms, conditions and risks thereof, and it is capable of assuming and willing to assume those risks.

(iv)    On each day from the date on which it acquires its interest in the Class P Securities through and including the date on which it disposes of its interest in such Class P Securities, (a) it is not, and is not acting on behalf of or using the assets of, a Plan; (b) if it is a governmental plan (as defined in Section 3(32) of ERISA), church plan (as defined in Section 3(33) of ERISA) or a non-US plan (as described in Section 4(b)(4) of ERISA), its purchase, holding and subsequent transfer of the Class P Securities will not result in a violation of any applicable laws, rules, regulations, policies and guidelines to which it and its investments are subject; and (c) it and any person causing it to acquire any Class P Securities agrees to indemnify and hold harmless the Issuer, Co-Issuer, Portfolio Manager, Class E Certificates Paying Agent, Trustee, Collateral Administrator, the Revolving Note Agent, the Delayed Drawdown Note Agent, Placement Agent and Initial Purchaser and their respective Affiliates from any cost, damage or loss, liability, expense, claim, proceeding or excise tax incurred by them as a result of any of the foregoing representations being or becoming untrue.  It understands that the representations made by it pursuant to this paragraph (iii) shall be deemed made on each day from the date made through and including the date on which it disposes of its interests in the Class P Securities.  It understands that the Issuer may require any holder of the Class P Securities that has made a false representation with respect to the foregoing matters to sell the Class P Securities and, if such holder does not comply with such demand within 30 days thereof, the Issuer may sell such holder's interest in the Class P Securities.  It understands that any transfer effected in connection with such a representation that was false will be of no force and effect, will be void *ab initio*, and will not operate to transfer any rights to the transferee, notwithstanding any instructions to the contrary to the Issuer, the Class E Certificates Paying Agent or any intermediary.

(v)    It understands that this Indenture permits the Issuer to demand that any holder of a beneficial interest in Class P Securities in the form of a Temporary Regulation S Global Security or Regulation S Global Security who is determined not to have acquired such beneficial interest in compliance with the requirements of Regulation S or who is a U.S. person (as defined in Regulation S) sell such beneficial interest (a) to a Person who is not a U.S. person (as defined in Regulation S) in a transaction meeting the requirements of Regulation S or (b) to a Person who will take delivery of the holder's interest in the Temporary Regulation S Global Securities or Regulation S Global Securities in the form of a Certificated Class P Certificate, who is both (i) a Qualified Institutional Buyer and (ii) a Qualified Purchaser, in a transaction meeting the requirements of Rule 144A of the Securities Act, and, if the holder does not comply with such demand within 30 days thereof, the Issuer may cause the holder to sell its beneficial interest on such terms as the Issuer may choose.

(vi)    It agrees to treat the Class P Security as a direct ownership interest in the corresponding components of the Class P Security. It acknowledges that it is its intent and that it understands it is the intent of the Issuer that, for purposes of U.S. federal income tax, state and local income and franchise tax and any other income taxes, the Issuer will be treated as a corporation, the Notes will be treated as indebtedness of the Issuer and the Class E Certificates (in the absence of an

007328

administrative determination or judicial ruling to the contrary) will be treated as equity in the Issuer; it agrees to such treatment and agrees to take no action inconsistent with such treatment.

(vii)  It acknowledges that the Issuer is not authorized to engage in activities that could cause it to constitute a finance or lending business for federal income tax purposes and agrees that it will report its investment in the Class P Securities in a manner consistent with such limitation, and in particular will not treat the Issuer as an "eligible controlled foreign corporation" for purposes of Section 954(h) of the Code or as deriving income described in Section 1297(b)(2) of the Code.

(viii)  It is not purchasing the Class P Securities in order to reduce any United States federal income tax liability or pursuant to a tax avoidance plan.  In the case of a purchaser that is a bank (as defined in Section 881(c)(3)(A) of the Code) or an affiliate of such a bank, the purchaser (a) is acquiring the Class P Securities as a capital markets investment and will not for any purpose treat the assets of the Issuer as loans acquired in its banking business and (b) has not proposed or identified, and will not propose or identify, any security or loan for inclusion in the Collateral.

(ix)  In the case of any purchaser that is not a United States person (as defined in Section 7701(a)(30) of the Code), the purchaser is not a bank (as defined in Section 881(c)(3)(A) of the Code) or an affiliate of such a bank, unless the purchaser is a person that is eligible for benefits under an income tax treaty with the United States that eliminates United States federal income taxation of United States source interest not attributable to a permanent establishment in the United States.

(x)  Such beneficial owner is aware that, except as otherwise provided in this Indenture, the Class P Securities being sold to it will be represented (a) initially, by one or more Temporary Regulation S Global Securities and (b) after the Exchange Date, by one or more Regulation S Global Securities, and that beneficial interests therein may be held only through Euroclear or Clearstream.

(xi)  A holder of a beneficial interest in a Temporary Regulation S Global Security must provide Euroclear or Clearstream or the participant organization through which it holds such interest, as applicable, with a certificate certifying that the beneficial owner of the interest in the Temporary Regulation S Global Security is a non-U.S. person (as defined in Regulation S), and Euroclear or Clearstream, as applicable, must provide to the Trustee a certificate to such effect, prior to (a) the payment of interest or principal or other amounts with respect to such holder's beneficial interest in the Temporary Regulation S Global Security and (b) any exchange of such beneficial interest for a beneficial interest in a Regulation S Global Security and no payment will be made to the holder of any beneficial interest in a Temporary Regulation S Global Note unless such holder has provided Euroclear or Clearstream or such participant organization through which it holds such interest with such certificate.

(xii)  It understands that any resale or other transfer of beneficial interests in a Temporary Regulation S Global Security or Regulation S Global Security to U.S. persons (as defined in Regulation S)shall not be permitted.

(xiii)  It acknowledges that no governmental agency has passed upon the Class P Securities or made any finding or determination as to the fairness of an investment in the Class P Securities.

007329

(xiv) It acknowledges that certain persons or organizations will perform services on behalf of the Co-Issuers and will receive fees and/or compensation for performing such services as described in the Offering Memorandum and this Indenture and Class E Certificate Documents.

(xv) It acknowledges that the Class P Securities do not represent deposits with or other liabilities or obligations of, and are not guaranteed or endorsed by, the Placement Agent, the Initial Purchaser, the Portfolio Manager, the Trustee, the Class E Certificates Paying Agent, the Revolving Note Agent, the Delayed Drawdown Note Agent, the Collateral Administrator or any of their respective Affiliates or any entity related to any of them or any other holder of Class P Securities. It acknowledges that none of such persons will, in any way, be responsible for or stand behind the value or the performance of the Class P Securities. It acknowledges that purchase of Class P Securities involves investment risks including possible delay in payment of distributions and loss of income and principal invested.

(xvi) It understands that the Stated Maturity of the Class P Securities is subject to up to four extensions of four years each (to a latest possible date of November 1, 2033) without consent of any beneficial owners of Securities if certain conditions are satisfied.

(xvii) It understands that in the case of any amendment to this Indenture that requires consent of one or more holders of Class P Securities, this Indenture and Class E Certificate Documents permit the Amendment Buy-Out Purchaser to purchase at the Amendment Buy-Out Purchase Price the Class P Class E Certificate Component of Class P Securities from any holder thereof that either (i) has declared in writing that it will not consent to such amendment or (ii) had not consented to such amendment by the last day on which consent could be given in accordance with the request therefor, and such holder will be required to exchange its Class P Securities for the components thereof and sell the Class E Certificates represented by such Class E Certificate Component to the Amendment Buy-Out Purchaser at the Amendment Buy-Out Purchase Price. In addition, in the case of any vote by holders of Class P Securities to remove the Portfolio Manager without cause, the Class E Certificate Documents permit the Removal Buy-Out Purchaser to purchase at the Buy-Out Amount, the Class P Class E Certificate Component thereof from any holder that voted in favor of such removal, and such holder will be required to exchange its Class P Securities for the components thereof and sell the Class E Certificates represented by such Class E Certificate Component to the Removal Buy-Out Purchaser at the Buy-out Amount.

(xviii) It understands that the Co-Issuers, the Trustee, the Class E Certificates Paying Agent, the Initial Purchaser, the Placement Agent, the Portfolio Manager, the Revolving Note Agent, the Delayed Drawdown Note Agent, the Collateral Administrator and their respective counsel will rely upon the accuracy and truth of the foregoing representations, and it hereby consents to such reliance.

(n) Notwithstanding anything contained in this Section 2.6 to the contrary:

(i) Restrictions on U.S. Transfers. Transfers of an interest in Notes in the form of a Temporary Regulation S Global Security or a Regulation S Global Security that are not made in an offshore transaction pursuant to Regulation S or are made to U.S. persons (as defined in Regulation S), shall be limited to transfers made pursuant to the provisions of Section 2.6(g)(iii).

(ii) Beneficial interests in a Temporary Regulation S Global Security or Regulation S Global Security may only be held through Euroclear or Clearstream.

007330

(o)    Each person who becomes a beneficial owner of a Note evidenced by an interest in a Global Security, shall be deemed to make the representations, warranties and agreements set forth in the applicable legends of the Notes set forth in Exhibit A1-N, A2-N or A3 hereto, as applicable, hereto upon such person's purchase or other acquisition of the relevant Global Security.

(p)    The aggregate principal amount of any Global Security may be increased or decreased by adjustments made on the records of the Trustee, as custodian for DTC for the Global Security, which adjustments shall be conclusive as to the aggregate principal amount of any Global Security.

(q)    Any purported transfer of a Note not in accordance with this Section 2.6 shall be null and void and shall not be given effect for any purpose whatsoever.

Section 2.7.    Mutilated, Destroyed, Lost, or Stolen Notes.

If the Applicable Issuers, the Trustee, and the relevant Transfer Agent receive evidence to their satisfaction of the destruction, loss, or theft of any Indenture Security, and they receive the security or indemnity they require to hold each of them harmless, or if any mutilated Indenture Security is surrendered to a Transfer Agent, then, in the absence of notice to the Applicable Issuers, the Trustee, or the Transfer Agent that the Indenture Security has been acquired by a protected purchaser, the Applicable Issuers shall execute and the Trustee shall authenticate and deliver, in exchange for the mutilated, destroyed, lost, or stolen Indenture Security, a replacement Indenture Security, of like tenor and equal principal amount.

If, after delivery of the replacement Indenture Security or payment on it, a protected purchaser of the predecessor Indenture Security presents it for payment, transfer, or exchange, the Applicable Issuers, the Transfer Agent, and the Trustee may recover the replacement Indenture Security (or the payment on it) from the person to whom it was delivered or any person taking the replacement Indenture Security from the person to whom the replacement Indenture Security was delivered or any assignee of that person, except a protected purchaser, and may recover on the security or indemnity provided therefor to the extent of any loss, damage, cost, or expense incurred by the Applicable Issuers, the Trustee, and the Transfer Agent in connection with it.

If any mutilated, destroyed, lost, or stolen Indenture Security has become payable, the Applicable Issuers in their discretion may, instead of issuing a new Indenture Security pay the Indenture Security without requiring its surrender except that any mutilated Indenture Security shall be surrendered.

Upon the issuance of any new Indenture Security under this Section 2.7, the Applicable Issuers or the Trustee may require the payment by its holder of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with the issuance and any other expenses (including the fees and expenses of the Trustee) connected with it.

Every new Indenture Security issued pursuant to this Section 2.7 in replacement for any mutilated, destroyed, lost, or stolen Indenture Security shall be an original additional contractual obligation of the Applicable Issuers and the new Indenture Security shall be entitled to all the benefits of this Indenture equally and proportionately with all other Indenture Securities of the same Class duly issued under this Indenture.

The provisions of this Section 2.7 are exclusive and shall preclude (to the extent lawful) all other rights with respect to the replacement or payment of mutilated, destroyed, lost, or stolen Indenture Securities.

007331

Section 2.8.    Payment of Principal and Interest and Other Amounts; Principal and Interest Rights Preserved; Withholding.

(a)    The Notes of each Class (other than the Class A-1A Notes and, with respect to the first Interest Period only, the Class A-1B Notes) shall accrue interest during each Interest Period on their Aggregate Outstanding Amount (in each case determined as of the first day of the Interest Period and after giving effect to any redemption or other payment of principal occurring on that day), the Class A-1A Notes shall accrue interest during each Interest Period on their Drawn Amount and the Class A-1B Notes shall accrue interest during the first Interest Period on their Drawn Amount and any Interest Period thereafter on their Aggregate Outstanding Amount (determined as of the first day of the Interest Period and after giving effect to any redemption or other payment of principal occurring on that day), in each case at the Applicable Note Interest Rate.  Interest shall be payable in arrears on each Payment Date. Payment of interest on each Class of Notes shall be subordinated to the payments of interest on the related Priority Classes and other amounts in accordance with the Priority of Payments. The Commitment Fee on the Class A-1A Notes shall accrue as specified in the definition thereof and will be payable in arrears on each Payment Date.  Interest shall accrue at the Note Interest Rate for the Class A-1A Notes on the accrued and unpaid Commitment Fees as specified in the definition of Commitment Fee Amount and shall be payable in arrears on each Payment Date in accordance with the Priority of Payments. The Delayed Drawdown Fee on the Class A-1B Notes shall accrue as specified in the definition thereof and will be payable in arrears on the first Payment Date. To the extent the Delayed Drawdown Fee is not paid in full on the first Payment Date, interest shall accrue at the Note Interest Rate for the Class A-1B Notes on such accrued and unpaid Delayed Drawdown Fee as specified in the definition thereof and such unpaid Delayed Drawdown Fee and the interest thereon shall be payable in arrears on each Payment Date in accordance with the Priority of Payments until paid in full.

So long as any Priority Classes are Outstanding with respect to any Class of Deferred Interest Notes, any payment of interest due on the Class of Deferred Interest Notes that is not available to be paid ("Deferred Interest") in accordance with the Priority of Payments on any Payment Date shall not be considered "payable" for the purposes of this Indenture (and the failure to pay such interest shall not be an Event of Default) until the earlier of (i) the Stated Maturity or the date of redemption in full of the relevant Notes and (ii) the first Payment Date on which funds are available to be used for payment of such interest in accordance with the Priority of Payments.

Interest shall cease to accrue on each Note, or in the case of a partial repayment, on the part repaid, from the date of repayment or its Stated Maturity unless payment of principal is improperly withheld or unless there is some other default with respect to the payments of principal.

To the extent lawful and enforceable, interest on Deferred Interest with respect to any Class of Deferred Interest Notes shall accrue at the Note Interest Rate for such Class and, to the extent not paid as current interest on the Payment Date after the Interest Period in which it accrues, shall thereafter be additional Deferred Interest, until paid as provided in this Indenture.

(b)    The principal of each Note of each Class (other than the Class A-1A Notes) and in the case of the Class A-1A Notes, the Drawn Amount, matures at par and is payable on the Payment Date that is the Stated Maturity for the Class of Notes, unless the unpaid principal of the Note becomes payable at an earlier date by declaration of acceleration, call for redemption, or otherwise (or, with respect to the Class A-1A Notes, as a Prepayment in accordance with the provisions of this Indenture). Notwithstanding the foregoing, the payment of principal of each Class of Notes:

(i)    may only occur after principal on each Class of Notes that is a Priority Class with respect to the Class has been paid in full; and

113

(ii)   is subordinated to the payment on each Payment Date of the principal and interest payable on the Priority Classes, and other amounts in accordance with the Priority of Payments;

provided that, notwithstanding the foregoing, Interest Proceeds may be used in certain circumstances to pay principal of the Class C Notes on any Payment Date, prior to the payment in full of Class A Notes and Class B Notes, to the extent necessary to satisfy the Class C Coverage Tests.

(c)   Principal payments on the Notes shall be made in accordance with the Priority of Payments and Section 9.1.

(d)   As a condition to the payment of principal of and interest on any Indenture Security without the imposition of U.S. withholding tax, the Paying Agent shall require the previous delivery of appropriate properly completed and signed original forms United States federal income tax certifications (generally, an Internal Revenue Service Form W-9 (or applicable successor form) in the case of a person that is a "United States person" within the meaning of Section 7701(a)(30) of the Code or an appropriate Internal Revenue Service Form W-8 (or applicable successor form) in the case of a person that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code) or any other certification acceptable to it to enable the Issuer, the Co-Issuer, the Trustee, and any Paying Agent to determine their duties and liabilities with respect to any taxes or other charges that may be required to deduct or withhold from payments on the Indenture Security under any present or future law of the United States or any present or future law of any political subdivision of the United States or taxing authority in the United States or to comply with any reporting or other requirements under any such law.

(e)   (A) Payments in respect of interest on and principal of any Note (including the Class Q-1 Note Component) shall be made by the Trustee, or by the Irish Paying and Listing Agent, if applicable, in U.S. Dollars to the Depositary or its designee with respect to a Global Security, by wire transfer, as directed by the Holder, in immediately available funds to a U.S. Dollar account maintained by the Depositary.  Payments in respect of distributions on any Class E Certificate (including Class E Certificates represented by the Class E Certificate Components) payable to the Class E Certificates Paying Agent in accordance with the Priority of Payments for payments on the Class E Certificates in accordance with the Class E Certificate Documents shall be payable by wire transfer in immediately available funds (or by internal transfer if the Trustee and the Class E Certificates Paying Agent are the same Person) to the Class E Certificates Distribution Account.

(B)   On each Payment Date on which payments, whether from Principal Proceeds or Interest Proceeds or upon redemption or otherwise are made on the Class C Notes or distributions are made to the Holders of the Class E Certificates, a portion of such payment and distributions shall be allocated to the Class Q-1 Security (to the extent of the Class Q-1 Note Component and the Class Q-1 Class E Certificate Component) or, in the case of distributions on the Class E Certificates only, allocated to the Class P-1 Securities (to the extent of the Class P-1 Class E Certificate Component) and the Class P-2 Securities (to the extent of the Class P-2 Class E Certificate Component) in the proportion that the principal of such Component bears to the principal of the related Class C Notes or Class E Certificates, as applicable, as a whole (in each case including the Components), and, in accordance with the other conditions set forth for payments on the Notes and distributions on the Class E Certificates pursuant to this Indenture, as applicable.  No other payments will be made on the Class Q-1 Securities or Class P Securities (except, with respect to the Class P Securities, payments made in connection with Section 11.2).  Such payments on the Class Q-1 Securities or Class P Securities shall be made by wire transfer in immediately available funds to a U.S. dollar account maintained by the related Holder or its nominee or, if wire transfer cannot be effected, by a U.S. dollar check sent to such Holder, at such Holder's address appearing in the

114

007333

applicable Indenture Register, or its nominee. Final payments in respect of principal on the Class Q-1 Securities and the Class P Securities shall be made only against surrender of such Class Q-1 Securities and Class P Securities at the office designated by any Paying Agent.

If appropriate instructions for the wire transfer are not received by the related Record Date, then the payment will be made by check drawn on a U.S. bank mailed to the address of the Holder in the Indenture Register. Upon final payment due on the Maturity of an Indenture Security, its Holder shall present and surrender the Indenture Security at the office designated by the Trustee on or before the Maturity; provided that no presentation of (x) a Class Q-1 Security shall be required until the final payment of the Class Q-1 Class E Certificate Component thereof and (y) a Class P-1 Security or Class P-2 Security shall be required until the later of the final payment of the Class E Certificate Component thereof and the final payment of the Class P U.S. Treasury Component thereof. If the Trustee and the Applicable Issuers have been furnished the security or indemnity they require to save each of them harmless and an undertaking thereafter to surrender the certificate, then, in the absence of notice to the Applicable Issuers or the Trustee that the applicable Indenture Security has been acquired by a protected purchaser, the final payment shall be made without presentation or surrender. Neither the Co-Issuers, the Trustee, the Class E Certificates Registrar, nor any Paying Agent shall have any responsibility or liability for any aspects of the records maintained by the Depositary, Euroclear, Clearstream, or any of the Agent Members relating to or for payments made thereby on account of beneficial interests in a Global Security.

In the case where any final payment of principal and interest is to be made on any Note (other than on its Stated Maturity and except as otherwise provided in this Indenture), the Trustee, in the name and at the expense of the Applicable Issuers shall, not more than 30 nor less than 10 days before the date on which the payment is to be made, mail (by first-class mail, postage prepaid) to the persons entitled thereto at their addresses appearing on the Indenture Register, a notice specifying the date on which the payment will be made, the amount of the payment per U.S.$100,000 original principal amount of Notes and the place where the Notes may be presented and surrendered for payment. If the Trustee and the Issuer have been furnished any security or indemnity they require to save each of them harmless and an undertaking thereafter to surrender the certificate, then, in the absence of notice to the Issuer or the Trustee that the applicable certificate has been acquired by a protected purchaser, final payment shall be made without presentation or surrender of the applicable certificate.

(f)     Payments of principal to Holders of the Notes of each Class shall be made in the proportion that the Aggregate Outstanding Amount of the Notes of the Class registered in the name of each Holder on the applicable Record Date bears to the Aggregate Outstanding Amount of all Notes of the Class on the Record Date. Prepayments to Holders of Class A-1A Notes shall be made in the proportion that the portion of the Drawn Amount in respect of the Class A-1A Note registered on the Record Date for such Prepayment Date bears to the aggregate Drawn Amount of the Class A-1A Notes on such date.

(g)     Interest accrued shall be calculated on the basis of the actual number of days elapsed in the applicable Interest Period divided by 360.

(h)     All reductions in the principal amount of a Note (or one or more predecessor Notes) effected by payments of installments of principal made on any Payment Date or Redemption Date shall be binding on all future Holders of the Note and of any Note issued upon the registration of its transfer, exchange, or replacement, whether or not the payment is noted on such Note.

(i)     (A) Notwithstanding any other provision of this Indenture, (x) the obligations of the Co-Issuers under the Notes and under this Indenture are limited recourse debt obligations of the Issuer and non-recourse obligations of the Co-Issuer, and the obligations of the Issuer under the Class Q-1

115

007334

Securities (to the extent of the Class Q-1 Note Component) are limited recourse debt obligations of the Issuer, in each case payable solely from the Collateral and following realization of the assets, application of their proceeds in accordance with this Indenture and the reduction of the proceeds of the Collateral to zero, all obligations of, and any claims against, the Co-Issuers under this Indenture or under the Notes and Class Q-1 Securities or arising in connection therewith shall be extinguished and shall not thereafter revive. No recourse shall be had against any Officer, director, employee, shareholder, or incorporator of either of the Co-Issuers or their respective successors or assigns for any amounts payable under the Notes or this Indenture. The foregoing provisions of this paragraph (i) shall not (1) prevent recourse to the Collateral for the sums due or to become due under any security, instrument, or agreement that is part of the Collateral or (2) be a waiver, release, or discharge of any indebtedness or obligation evidenced by the Notes or Class Q-1 Securities or secured by this Indenture until the Collateral have been realized. The foregoing provisions of this paragraph (i) shall not limit the right of any person to name the Issuer or the Co-Issuer as a party defendant in any Proceeding or in the exercise of any other remedy under the Indenture Securities or this Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability is sought or (if obtained) enforced against the person.

(B)     The obligations of the Issuer under the Class P-1 Securities (other than in respect of the Class P Class E Certificate Component thereof) are limited recourse debt obligations of the Issuer payable solely from the Class P-1 Collateral in accordance with the terms of this Indenture. Once the Class P-1 Collateral has been realized and applied in accordance with Section 11.2, any such outstanding obligations of the Issuer shall be extinguished. No recourse shall be had for the payment of any amount owing in respect of the Class P-1 Securities or this Indenture against any officer, director, employee, administrator, shareholder or incorporator of the Issuer or any successors or assigns thereof for any amounts payable under the Class P-1 Securities or this Indenture. It is understood that the foregoing provisions of this clause (B) shall not (x) prevent recourse to the Class P-1 Collateral for the sums due or to become due under any security, instrument or agreement which is part of the Class P-1 Collateral, or (y) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by the Class P-1 Securities or secured by this Indenture, and the same shall continue until paid or discharged. It is further understood that the foregoing provisions of this clause (B) shall not limit the right of any Person to name the Issuer as a party defendant in any action or suit or in the exercise of any other remedy under the Class P-1 Securities or this Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against any such Person or entity.

(C)     The obligations of the Issuer under the Class P-2 Securities (other than with respect to the Class P Class E Certificate Component thereof) are limited recourse debt obligations of the Issuer payable solely from the Class P-2 Collateral in accordance with the terms of this Indenture. Once the Class P-2 Collateral has been realized and applied in accordance with Section 11.2, any such outstanding obligations of the Issuer shall be extinguished. No recourse shall be had for the payment of any amount owing in respect of the Class P-2 Securities or this Indenture against any officer, director, employee, administrator, shareholder or incorporator of the Issuer or any successors or assigns thereof for any amounts payable under the Class P-2 Securities or this Indenture. It is understood that the foregoing provisions of this clause (B) shall not (x) prevent recourse to the Class P-2 Collateral for the sums due or to become due under any security, instrument or agreement which is part of the Class P-2 Collateral, or (y) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by the Class P-2 Securities or secured by this Indenture, and the same shall continue until paid or discharged. It is further understood that the foregoing provisions of this clause (B) shall not limit the right of any Person to name the Issuer as a party defendant in any action or suit or in the exercise of any other remedy under the Class P-2 Securities or this Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against any such Person or entity.

007335

(j)      If any withholding tax is imposed on the Issuer's payment (or allocations of income) under the Notes to any Noteholder, the tax shall reduce the amount otherwise distributable to the Noteholder.  The Trustee is hereby authorized and directed to retain from amounts otherwise distributable to any Noteholder sufficient funds for the payment of any tax that is legally owed, or required by law to be collected, by or on behalf of the Issuer (but the authorization shall not prevent the Trustee or the Issuer from contesting any such tax in appropriate proceedings and withholding payment of the tax, if permitted by law, pending the outcome of the proceedings).  The amount of any withholding tax imposed with respect to any Noteholder shall be treated as Cash distributed to the Noteholder when it is withheld by the Trustee and remitted to the appropriate taxing authority.  If there is a possibility that withholding tax is payable with respect to a distribution, the Trustee may in its sole discretion withhold the amounts in accordance with this Section 2.8(j).  If any Noteholder wishes to apply for a refund of any such withholding tax, the Trustee shall reasonably cooperate with the Noteholder in making the claim by providing information readily available to the Trustee so long as the Noteholder agrees to reimburse the Trustee for any out-of-pocket expenses incurred and provides the Trustee with security reasonably acceptable to the Trustee assuring the reimbursement.  The Trustee hereby provides notice to each Noteholder that the failure by the Noteholder to provide the Trustee with appropriate tax certifications may result in amounts being withheld from payments to the Noteholder.  Nothing in this Indenture shall impose an obligation on the part of the Trustee to determine the amount of any tax or withholding obligation on the part of the Issuer or in respect of the Notes.

(k)      For so long as any of the Indenture Securities are listed on any stock exchange, to the extent required by the rules of such stock exchange, either of the Issuer or the Trustee shall notify the applicable listing agent (for forwarding such notice to the applicable stock exchange, if and to the extent such notification is then required by the rules of such stock exchange) in the event that the Notes do not receive scheduled payments of principal or interest on any Payment Date or the Maturity Date.

Section 2.9.      <u>Persons Considered Owners</u>.

(a)      The Issuer, the Co-Issuer, the Trustee, and any agent of the Co-Issuers or the Trustee may treat as the owner of the Indenture Security the person in whose name any Indenture Security is registered on the Indenture Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on or any other payment with respect to the Indenture Security and on any other date for all other purposes whatsoever (whether or not the Indenture Security is overdue), and neither the Issuer, the Co-Issuer, nor the Trustee nor any agent of the Issuer, the Co-Issuer, or the Trustee shall be affected by notice to the contrary.  The Portfolio Manager shall notify the Trustee of any Affiliate of the Portfolio Manager that owns Indenture Securities or Class E Certificates.

(b)      The Holders of Class Q-1 Securities shall be entitled to voting rights of the Class C Notes and the Class E Certificates represented by the Class Q-1 Note Component and the Class Q-1 Class E Certificate Component, respectively, in the proportion that such Class Q-1 Component bears to the Aggregate Outstanding Amount of the Class C Notes (in the case of the Class Q-1 Note Component) or to the aggregate number of Class E Certificates (in the case of the Class Q-1 Class E Certificate Component), in each case including the related Components.  The Holders of Class Q-1 Securities shall not be entitled to any rights to vote as separate Classes except with respect to matters that only affect Holders of Class Q-1 Securities and as expressly permitted by this Indenture.

(c)      The Class P Securityholders shall be entitled to voting rights in the Class E Certificates relating to the Class P-1 Class E Certificate Component or the Class P-2 Class E Certificate Component, as applicable, in the proportion that such Class P Class E Certificate Component bears to the aggregate number of Class E Certificates (including the Class E Certificate Components).  The Class P

007336

Securityholders shall not be entitled to any rights to vote as separate Classes except with respect to matters that only affect the Class P Securityholders and as expressly permitted by this Indenture.

Section 2.10.    Cancellation.

All Indenture Securities surrendered for payment, registration of transfer, exchange, or redemption, or lost or stolen, shall be promptly canceled by the Trustee and may not be reissued or resold. No Indenture Securities shall be authenticated in lieu of or in exchange for any Indenture Securities canceled as provided in this Section 2.10, except as expressly permitted by this Indenture. All canceled Indenture Securities held by the Trustee shall be destroyed by the Trustee in accordance with its standard policy unless the Co-Issuers direct by an Issuer Order delivered to the Trustee prior to cancellation and destruction that they be returned to the Issuer.

Section 2.11.    Indenture Securities Beneficially Owned by Non-Permitted Holders and Non-Permitted ERISA Holders.

(a)    Notwithstanding anything to the contrary elsewhere in this Indenture, any transfer of, or transfer of a beneficial interest in, any Indenture Security to (i) a U.S. person (as defined in Regulation S) (for purposes of this Section 2.11 as defined in Regulation S) that is not a QIB/QP and (ii) a non-U.S. person (as defined in Regulation S) which transfer that does not comply with the requirements of Regulation S under the Securities Act, and that is not in each case made pursuant to an applicable exemption under the Securities Act, shall be void *ab initio* and any such purported transfer of which the Issuer, the Co-Issuer, or the Trustee has notice may be disregarded by the Issuer, the Co-Issuer, and the Trustee for all purposes.

(b)    After discovery by the Issuer, the Co-Issuer, or the Trustee (and notice by the Trustee or the Co-Issuer to the Issuer, if either of them makes the discovery), that a person is a Non-Permitted Holder, the Issuer shall promptly send notice to the Non-Permitted Holder demanding that the Non-Permitted Holder transfer its interest to a person that is not a Non-Permitted Holder within 30 days of the date of the notice. If the Non-Permitted Holder fails to so transfer its Indenture Securities or interest in the Indenture Securities, without further notice to the Non-Permitted Holder, the Issuer may sell the Indenture Securities or interest in the Indenture Securities to a purchaser selected by the Issuer that is a not a Non-Permitted Holder on any terms the Issuer chooses. The Issuer, or the Trustee acting on behalf of the Issuer, may select the purchaser by soliciting bids (or by appointing an investment bank at the expense of the Issuer to solicit bids) from brokers or other market professionals that regularly deal in securities similar to the Indenture Securities, and selling the Indenture Securities, or interest in the Indenture Securities to the highest bidder. However, the Issuer or the Trustee may select a purchaser by any other means determined by it in its sole discretion. The Holder of each Indenture Security, the beneficial owner of each interest in a Indenture Security, the Non-Permitted Holder, and each other person in the chain of title from the Holder or beneficial owner to the Non-Permitted Holder, by its acceptance of an interest in the Indenture Securities agrees to cooperate with the Issuer and the Trustee to effect the transfers. The proceeds of the sale, net of any commissions, expenses of the Trustee or otherwise, and taxes due in connection with the sale shall be remitted to the Non-Permitted Holder. The terms of any sale under this subsection shall be determined in the sole discretion of the Issuer (or the Trustee acting on its behalf), and the Issuer and the Trustee shall not be liable to any person having an interest in the Notes sold as a result of any such sale or the exercise of its discretion.

(c)    Notwithstanding anything to the contrary herein, no purchase by or proposed transfer to any Person of ERISA Restricted Indenture Securities will be permitted if such Person has represented that it is, or is acting on behalf of or using the assets of, a Plan, and the Trustee shall not register or permit the registration of any such purchase or transfer.

118

007337

(d)    If any Person shall become the beneficial owner of an interest in any ERISA Restricted Indenture Securities who has made an ERISA-related representation required by this Indenture that is subsequently shown to be false or misleading (any such person a "Non-Permitted ERISA Holder"), the Issuer shall, promptly after discovery that such person is a Non-Permitted ERISA Holder by the Issuer or the Trustee (and notice by the Trustee to the Issuer, if either of them makes the discovery), send notice to such Non-Permitted ERISA Holder demanding that such Non-Permitted ERISA Holder transfer all of the ERISA Restricted Indenture Securities held by such Person to a Person that is not a Non-Permitted ERISA Holder within 30 days of the date of such notice.  If such Non-Permitted ERISA Holder fails to so transfer such ERISA Restricted Indenture Securities the Issuer shall have the right, without further notice to the Non-Permitted ERISA Holder, to sell such ERISA Restricted Indenture Securities or interest in such ERISA Restricted Indenture Securities to a purchaser selected by the Issuer that is not a Non-Permitted ERISA Holder on such terms as the Issuer may choose. The Holder of each ERISA Restricted Indenture Security, the Non-Permitted ERISA Holder and each other Person in the chain of title from the Holder to the Non-Permitted ERISA Holder, by its acceptance of an interest in the ERISA Restricted Indenture Securities agrees to cooperate with the Issuer and the Trustee to effect such transfers.  The proceeds of such sale, net of any commissions, expenses and taxes due in connection with such sale shall be remitted to the Non-Permitted ERISA Holder.  The terms and conditions of any sale under this subsection shall be determined in the sole discretion of the Issuer, and the Issuer shall not be liable to any Person having an interest in the ERISA Restricted Indenture Securities sold as a result of any such sale or the exercise of such discretion.

Section 2.12.    Borrowings Under Class A–1A Notes

(a)    On any Business Day during the Draw Period, the Co-Issuers may borrow amounts under the Class A–1A Notes (together with amounts, if any, paid by Holders of Class A–1A Notes on the Closing Date and amounts, if any, funded by the Holders of the Class A-1A Notes under Section 2.3 of the Class A-1A Note Purchase Agreement, each a "Borrowing") at the direction of the Portfolio Manager acting pursuant to the Management Agreement for a Permitted Use; provided, in each case that (i) each applicable condition to such Borrowing specified in Section 3 of the Class A-1A Note Purchase Agreement is satisfied on the date of such Borrowing (a "Borrowing Date"), (ii) in no event may the aggregate amount of Borrowings outstanding under the Class A–1A Notes exceed the aggregate amount of Commitments to make advances in respect of the Class A–1A Notes; and (iii) after giving effect to the Borrowing, the amount on reserve in the Revolving Reserve Account will either (x) equal 100% of the Revolver Funding Reserve Amount or (y) the Issuer will deposit therein Principal Proceeds and/or proceeds of the Borrowing in the amount required for clause (x) to be satisfied immediately after the Borrowing.

(b)    Notice of any Borrowing shall be given by the Issuer (or the Portfolio Manager on behalf of the Issuer acting pursuant to the Management Agreement) to the Revolving Note Agent, the Portfolio Manager and the Trustee in accordance with the Class A-1A Note Purchase Agreement.

(c)    If any Holder of Class A–1A Notes shall at any time during the Draw Period fails to satisfy the Rating Criteria, the Issuer will enforce its rights under the Class A-1A Note Purchase Agreement to require such Holder to fund the full undrawn amount of its Commitment into a reserve account.

Section 2.13.    Drawdowns Under Class A–1B Notes

(a)    On any Business Day during the Delayed Drawdown Period, the Co-Issuers may draw down amounts under the Class A–1B Notes (together with amounts paid by Holders of Class A–1B Notes on the Closing Date, each a "Drawdown") at the direction of the Portfolio Manager acting pursuant to the

007338

Management Agreement; provided, in each case that (i) each applicable condition to such Drawdown specified in Section 3 of the Class A-1B Note Purchase Agreement is satisfied on the date of such Drawdown (a "Drawdown Date") and (ii) in no event may the aggregate amount of Drawdowns outstanding under the Class A–1B Notes exceed the Fully Drawn Amount.

(b)  Notice of any Drawdown shall be given by the Issuer (or the Portfolio Manager on behalf of the Issuer acting pursuant to the Management Agreement) to the Delayed Drawdown Note Agent, the Portfolio Manager and the Trustee in accordance with the Class A-1B Note Purchase Agreement.

(c)  If any Holder of Class A–1B Notes shall at any time during the Delayed Drawdown Period fail to satisfy the Rating Criteria, the Issuer will enforce its rights under the Class A-1B Note Purchase Agreement to require such Holder to fund the full undrawn amount of its Commitment into a reserve account.

Section 2.14.  Class Q-1 Securities

The provisions of this Section 2.14 shall apply only to the Class Q-1 Securities and shall override any contrary or inconsistent provisions of this Indenture.  Subject to the foregoing sentence, the other provisions of Article 2 shall apply to the Class Q-1 Securities to the same extent as to the Notes.

(a)  No transfer of a Class Q-1 Security will be permitted to a person that would not be permitted to acquire the Class C Notes and Class E Certificates comprising the Class Q-1 Components of the Class Q-1 Security under this Indenture.

Transfers of Class Q-1 Securities or interests therein may only be made as set forth in this subsection.  As used in this subsection, "U.S. person" has the meaning set forth in Regulation S.

(i)  Certificated Class Q-1 Security to Certificated Class Q-1 Security. Each purchaser or transferee of a Certificated Class Q-1 Security will be required to provide to the Trustee a properly completed certificate in the form of Exhibit B5-1 (with appropriate modifications acceptable to the Issuer and the Trustee, including in the case of a transfer that is a mortgage, charge, pledge or hypothecation) (a "Class Q-1 Transferee Certificate") in which it shall represent, warrant and agree as set forth therein.  If a Holder of a Certificated Class Q-1 Security wishes at any time to transfer such Certificated Class Q-1 Security to a U.S. person, such Person shall take delivery thereof in the form of a Certificated Class Q-1 Security. In such case such Holder may transfer or cause the transfer of such Certificated Class Q-1 Security as follows: Upon receipt by the Indenture Registrar of (A) such Holder's Certificated Class Q-1 Security properly endorsed for assignment to the transferee and (B) a properly completed Class Q-1 Transferee Certificate by the transferee, and any other documentation as may be required thereunder, the Trustee will cancel such Certificated Class Q-1 Security in accordance with this Indenture, cause the Indenture Registrar to record the transfer in the Indenture Register and, upon execution by the Issuer, deliver to the transferee one or more Certificated Class Q-1 Securities in the aggregate stated amount transferred and in the Authorized Class Q-1 Denomination.

(ii)  Class Q-1 Security in the form of a Temporary Regulation S Global Security or Regulation S Global Security to Certificated Class Q-1 Security.  An interest in a Class Q-1 Security in the form of a Temporary Regulation S Global Security or a Regulation S Global Security may be transferred only to (a) another person that is not a U.S. person that takes delivery in the form of or interest in Temporary Regulation S Global Security or Regulation S Global Security or (b) a U.S. person who takes delivery in the form of a Certificated Class Q-1 Security and is both (x) a Qualified Institutional Buyer and (y) a Qualified Purchaser. If a holder

120

of a beneficial interest in a Class Q-1 Security in the form of a Temporary Regulation S Global Security or Regulation S Global Security wishes at any time to transfer its interest in such Security, in the United States or to a U.S. person, the transferee must take delivery thereof in the form of a Certificated Class Q-1 Security. Such Holder may, subject to the rules and procedures of the Depositary, transfer or cause the transfer of such interest for an equivalent interest in one or more such Certificated Class Q-1 Securities as described below. Upon receipt by the Indenture Registrar of (A) instructions given in accordance with the Applicable Procedures from a Participant, directing the Indenture Registrar to deliver one or more such Certificated Class Q-1 Securities designating the registered name or names, address, payment instructions, and the number and stated amount (and Aggregate Principal Amount of the related Class Q-1 Components) of such Certificated Class Q-1 Securities to be executed and delivered (the aggregate stated amount of such Certificated Class Q-1 Securities being equal to the aggregate stated amount of the interest in the related Temporary Regulation S Global Security or Regulation S Global Security to be transferred), in an Authorized Class Q-1 Denomination and (B) a properly completed transfer certificate in the form of Exhibit B5-1 and any other documentation as may be required thereunder, then the Indenture Registrar will instruct the Depositary to reduce, or cause to be reduced, the applicable Temporary Regulation S Global Security or Regulation S Global Security by the aggregate stated amount of the beneficial interest in such Temporary Regulation S Global Security or Regulation S Global Security to be transferred and the Indenture Registrar shall record the transfer in the Indenture Register and authenticate and deliver one or more Certificated Class Q-1 Securities, registered in the names specified in the certificate described in clause (B) above in the stated amount designated by the transferee (the aggregate of such stated amount being equal to the beneficial interest in the Temporary Regulation S Global Security or Regulation S Global Security to be transferred) and in the applicable Authorized Class Q-1 Denomination. Any purported transfer in violation of this provision shall be null and void *ab initio*.

(iii) Certificated Class Q-1 Security to Class Q-1 Security in the form of a Temporary Regulation S Global Security or Regulation S Global Security. If a Holder of a Certificated Class Q-1 Security wishes at any time to transfer such Certificated Class Q-1 Security to a person that is not a U.S. person in an offshore transaction in reliance on Regulation S, such Person shall take delivery thereof in the form of an interest in the corresponding Temporary Regulation S Global Security or Regulation S Global Security. In such case such Holder may exchange or transfer, or cause the exchange or transfer of, such Certificated Class Q-1 Security for an equivalent beneficial interest in the corresponding Temporary Regulation S Global Security or Regulation S Global Security, provided, that such proposed transferee or the person requesting such exchange, as applicable, is not a U.S. person and such transfer is otherwise being made pursuant to and in accordance with Regulation S. Upon receipt by the Indenture Registrar of (A) such Certificated Class Q-1 Security properly endorsed for such transfer, and written instructions from such Holder directing the Indenture Registrar to cause to be credited a beneficial interest in the Temporary Regulation S Global Security or Regulation S Global Security in an amount equal to the stated amount transferred of such Certificated Class Q-1 Security, (B) a written order containing information regarding the Euroclear or Clearstream account to be credited with such increase and (C) a certificate in the form of Exhibit B5-2 attached hereto, given by the Holder of such Certificated Class Q-1 Security stating that the exchange or transfer of such interest has been made in compliance with the transfer restrictions applicable to the Temporary Regulation S Global Security or Regulation S Global Security, including that the proposed transferee or the person requesting such exchange, as the case may be, is not a U.S. person and that the proposed transfer is being made pursuant to and in accordance with Regulation S, then the Indenture Registrar shall cancel such Certificated Class Q-1 Security in accordance with Section 2.10 record the transfer in the Indenture Register in

accordance with Section 2.6(a) and instruct DTC to increase the stated amount of the Temporary Regulation S Global Security or Regulation S Global Security by the aggregate stated amount of the Certificated Class Q-1 Security to be transferred, and to credit or cause to be credited to the account of the Person specified in such instructions a beneficial interest in the Temporary Regulation S Global Security or Regulation S Global Security equal to the amount specified in the instructions received pursuant to clause (A) above. Notwithstanding anything else in this Section 2.14(a)(iii), prior to the Exchange Date a Certificated Class Q-1 Security may only be exchanged or transferred for an equivalent beneficial interest in the corresponding Temporary Regulation S Global Security.

(iv)     Notwithstanding anything to the contrary herein, no purchase or proposed transfer of Class Q-1 Securities will be permitted, and the Trustee shall not register or permit the registration of any such purchase or transfer, to a Person that has represented that it is a Plan. Any purported transfer in violation of this provision shall be null and void *ab initio*.

(b)     Except as otherwise provided herein, the rights and obligations of Holders of the Class Q-1 Securities shall consist solely of the rights and obligations of Holders of the applicable Class Q-1 Components. References herein to the rights and obligations of the Holders of Class C Notes or Class E Certificates include the rights and obligations of the Holders of Class Q-1 Securities to the extent of the applicable Class Q-1 Components.

(c)     A Holder or beneficial owner of a Class Q-1 Security may exchange, subject to the applicable minimum denomination requirements, Class Q-1 Securities for interests in the Class C Notes (in an amount equal to the Class Q-1 Note Component) and Class E Certificates (in an amount equal to the Class Q-1 Class E Certificate Component), as applicable, that comprise the Class Q-1 Components of such Class Q-1 Securities, in the manner provided herein, in the case of the Class Q-1 Note Component, for transfer of beneficial interests to a Rule 144A Global Security, Regulation S Global Security or Temporary Regulation S Global Security, as applicable, and in the case of the Class Q-1 Class E Certificate Component, in the manner provided in the Class E Certificate Documents for transfer of a Certificated Class E Certificate or an interest in a Class E Certificate in the form of a Regulation S Global Security or Temporary Regulation S Global Security, as applicable:

(i)     In the case of the exchange by a beneficial owner of an interest in Class Q-1 Securities in the form of a Temporary Regulation S Global Note or a Regulation S Global Security, upon receipt by the Indenture Registrar and the Class E Certificate Paying Agent of instructions given in accordance with the Applicable Procedures from a Participant, directing the Indenture Registrar (with respect to the Class Q-1 Note Component to be exchanged) and the Class E Certificate Paying Agent (with respect to the Class Q-1 Class E Certificate Component to be exchanged) to cause to be credited (to the same Euroclear or Clearstream Account to which the interest in the Class Q-1 Security to be exchanged was credited), (x) a beneficial interest in the Class C Notes in the form of a Temporary Regulation S Global Security or Regulation S Global Security, as applicable, in an amount equal to the aggregate principal amount of the Class Q-1 Note Component being exchanged, and (y) a beneficial interest in the Class E Certificates in the form of a Temporary Regulation S Global Security or Regulation S Global Security, as applicable, in an amount equal to the aggregate Face Amount of the Class Q-1 Class E Certificate Component being exchanged, the Indenture Registrar shall instruct the Depositary to reduce, or cause to be reduced, the Class Q-1 Security in the form of a Temporary Regulation S Global Security or Regulation S Global Security, as applicable, by the aggregate stated amount of the beneficial interest in such Temporary Regulation S Global Security or Regulation S Global Security to be exchanged and increase the aggregate principal amount of the Class C Notes in the form of a Temporary Regulation S Global Security or Regulation S Global Security, as

122

applicable, by an amounts equal to the Class P-1 Note Component to be exchanged, and the Class E Certificate Paying Agent shall instruct DTC to increase the aggregate Face Amount of the Class E Certificates in the form of a Temporary Regulation S Global Security or Regulation S Global Security, as applicable, by an amount equal to the Class Q-1 Class E Certificate Component being exchanged, and in each case credit such increases as instructed;

(ii) In the case of the exchange by a Holder of Certificated Class Q-1 Securities, upon receipt by (x) the Indenture Registrar of the Certificated Class Q-1 Security surrendered for exchange and written instructions from such Holder directing the Indenture Registrar to cause to be credited a beneficial interest in the Class C Notes in the form of a Rule 144A Global Security, in an amount equal to the aggregate principal amount of the Class Q-1 Note Component being exchanged, including a written order containing information regarding the account to be credited with such interest in the Class C Notes and (y) written instructions from such Holder, directing the Class E Certificate Paying Agent to cause to be issued to such Holder a Certificated Class E Certificate in an aggregate Face Amount equal to the aggregate Face Amount of the Class Q-1 Class E Certificate Component being exchanged, the Trustee shall cancel such Certificated Class Q-1 Security in accordance with this Indenture and cause the Indenture Registrar to record the exchange in the Indenture Register, the Indenture Registrar shall instruct DTC to increase the aggregate principal amount of the Class C Notes in the form of a 144A Global Security by the applicable amount and credit such increase as instructed and the Class E Certificate Paying Agent shall direct the Class E Certificate Registrar to effect the exchange in accordance with the Class E Certificate Documents by making all necessary entries, if any, in the Register of Members, and shall deliver the Certificated Class E Certificate in a Face Amount equal to the Class Q-1 Class E Certificate Component being exchanged.

(iii) After any such exchange, the Holder of or Beneficial Owner of and interest in the Class Q-1 Security so exchanged will be the Holder of or Beneficial Owner of an interest in, as applicable, the Class C Notes and the Class E Certificates received upon such an exchange. No Holder of or Beneficial Owner of interests in the Class C Notes or Class E Certificates (including following such an exchange) will be entitled to exchange such Class C Notes and Class E Certificates for a Class Q-1 Security. No service charge shall be made for any such exchange of Class Q-1 Securities, but the Issuer or the Trustee may require payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with such exchange. Each Holder and Beneficial Owner of a Class Q-1 Security, by its acceptance thereof, acknowledges that upon any such exchange, the rating of such Class Q-1 Security by any Rating Agency will not apply to the Securities received in such exchange. Upon the exchange of all outstanding Class Q-1 Securities pursuant to this provision, the Issuer will notify each Rating Agency then rating the Class Q-1 Securities.

(d) Each Holder of a Class Q-1 Security, by its acquisition thereof, acknowledges that the rating of the Class Q-1 Securities by Moody's addresses solely the return of the Class Q-1 Rated Principal.

(e) The Class E Components of Class Q-1 Securities that constitute Directing Class E Certificates (as defined in the Management Agreement) shall be subject to purchase under the terms and conditions set forth in Section 12(c) of the Management Agreement. If the Portfolio Manager or other applicable purchaser under such provisions (the "Removal Buy-Out Purchaser") elects to make such purchase, the Class Q-1 Securities that include such Class E Components shall be deemed exchanged for their respective components, the Class E Certificates represented by such Class E Components shall be so purchased and the applicable Buy-Out Amount shall be distributed to the Holders of such Class Q-1 Securities, and such Holders will receive in accordance with the provisions hereof the Class C Notes represented by the Class Q-1 Note Component of their Class Q-1 Securities.

123

007342

Section 2.15.    Class P Securities

The provisions of this Section 2.15 shall apply only to the Class P Securities and shall override any contrary or inconsistent provisions of this Indenture. Subject to the foregoing sentence, the other provisions of Article 2 shall apply to the Class P Securities to the same extent as the Notes.

(a)    No transfer of a Class P Security will be permitted to a person that would not be permitted to acquire Class E Certificates comprising the Class P Class E Certificate Component under the Class E Certificate Documents and this Indenture. Transfers of Class P Securities or interests therein may only be made as set forth in this subsection.  As used in this subsection, "U.S. person" has the meaning set forth in Regulation S.

(i)    Certificated Class P Security to Certificated Class P Security. Each purchaser or transferee of a Certificated Class P Security will be required to provide to the Trustee a properly completed certificate in the form of Exhibit B6-1 (with appropriate modifications acceptable to the Issuer and the Trustee, including in the case of a transfer that is a mortgage, charge, pledge or hypothecation) (a "Class P Transferee Certificate") in which it shall represent, warrant and agree as set forth therein.  If a Holder of a Certificated Class P Security wishes at any time to transfer such Certificated Class P Security to a U.S. person, such Person shall take delivery thereof in the form of a Certificated Class P Security. In such case such Holder may transfer or cause the transfer of such Certificated Class P Security as follows:  Upon receipt by the Indenture Registrar of (A) such Holder's Certificated Class P Security properly endorsed for assignment to the transferee and (B) a properly completed Class P Transferee Certificate by the transferee, and any other documentation as may be required thereunder, the Trustee will cancel such Certificated Class P Security in accordance with this Indenture, cause the Indenture Registrar to record the transfer in the Indenture Register and, upon execution by the Issuer, deliver to the transferee one or more Certificated Class P Securities in the aggregate stated amount transferred and in the Authorized Class P-1 Denomination or Class P-2 Denomination, as applicable.

(ii)    Class P Security in the form of a Temporary Regulation S Global Security or Regulation S Global Security to Certificated Class P Security.    An interest in a Class P Security in the form of a Temporary Regulation S Global Security or a Regulation S Global Security may be transferred only to (a) another person that is not a U.S. person who takes delivery in the form of or interest in a Temporary Regulation S Global Security or Regulation S Global Security or (b) a U.S. Person who takes delivery in the form of a Certificated Class P Security and is both (x) a Qualified Institutional Buyer and (y) a Qualified Purchaser. If a holder of a beneficial interest in a Class P Security in the form of a Temporary Regulation S Global Security or Regulation S Global Security wishes at any time to transfer its interest in such Security, in the United States or to a U.S. person, the transferee must take delivery thereof in the form of a Certificated Class P Security. Such Holder may, subject to the rules and procedures of the Depositary, transfer or cause the transfer of such interest for an equivalent interest in one or more such Certificated Class P Securities as described below.  Upon receipt by the Indenture Registrar of (A) instructions given in accordance with the Applicable Procedures from a Participant, directing the Indenture Registrar to deliver one or more such Certificated Class P Securities and designating the registered name or names, address, payment instructions, and the number and stated amount of such Certificated Class P Securities to be executed and delivered (the aggregate stated amount of such Certificated Class P Securities being equal to the aggregate stated amount of the interest in the related Temporary Regulation S Global Security or Regulation S Global Security to be transferred), in an Authorized Class P-1 Denomination or Class P-2 Denomination, as applicable and (B) a properly completed transfer certificate in the form of

124

007343

Exhibit B6-1 and any other documentation as may be required thereunder, then the Indenture Registrar will instruct the Depositary to reduce, or cause to be reduced, the applicable Temporary Regulation S Global Security or Regulation S Global Security by the aggregate stated amount of the beneficial interest in such Temporary Regulation S Global Security or Regulation S Global Security to be transferred and the Indenture Registrar shall record the transfer in the Indenture Register and authenticate and deliver one or more Certificated Class P Securities, registered in the names specified in the certificate described in clause (B) above in the stated amount designated by the transferee (the aggregate of such stated amount being equal to the beneficial interest in the Temporary Regulation S Global Security or Regulation S Global Security to be transferred) and in the applicable Authorized Class P Denomination. Any purported transfer in violation of this provision shall be null and void *ab initio*.

(iii)    Certificated Class P Security to Class P Security in the form of a Temporary Regulation S Global Security or Regulation S Global Security.    If a Holder of a Certificated Class P Security wishes at any time to transfer such Certificated Class P Security to a person that is not a U.S. person in an offshore transaction in reliance on Regulation S, such Person shall take delivery thereof in the form of an interest in the corresponding Temporary Regulation S Global Security or Regulation S Global Security. In such case such Holder may exchange or transfer, or cause the exchange or transfer of, such Certificated Class P Security for an equivalent beneficial interest in the corresponding Temporary Regulation S Global Security or Regulation S Global Security, provided, that such proposed transferee or the person requesting such exchange, as applicable, is not a U.S. person and such transfer is otherwise being made pursuant to and in accordance with Regulation S.  Upon receipt by the Indenture Registrar of (A) such Certificated Class P Security properly endorsed for such transfer, and written instructions from such Holder directing the Indenture Registrar to cause to be credited a beneficial interest in the Temporary Regulation S Global Security or Regulation S Global Security in an amount equal to the stated amount transferred of such Certificated Class P Security, (B) a written order containing information regarding the Euroclear or Clearstream account to be credited with such increase and (C) a certificate in the form of Exhibit B6-2 attached hereto, given by the Holder of such Certificated Class P Security stating that the exchange or transfer of such interest has been made in compliance with the transfer restrictions applicable to the Temporary Regulation S Global Security or Regulation S Global Security, including that the proposed transferee or the person requesting such exchange, as the case may be, is not a U.S. person and that the proposed transfer is being made pursuant to and in accordance with Regulation S, then the Indenture Registrar shall cancel such Certificated Class P Security in accordance with Section 2.10 record the transfer in the Indenture Register in accordance with Section 2.6(a) and instruct DTC to increase the stated amount of the Temporary Regulation S Global Security or Regulation S Global Security by the aggregate stated amount of the Certificated Class P Security to be transferred, and to credit or cause to be credited to the account of the Person specified in such instructions a beneficial interest in the Temporary Regulation S Global Security or Regulation S Global Security equal to the amount specified in the instructions received pursuant to clause (A) above.  Notwithstanding anything else in this Section 2.15(a)(iii), prior to the Exchange Date a Certificated Class P Security may only be exchanged or transferred for an equivalent beneficial interest in the corresponding Temporary Regulation S Global Security.

(iv)    Notwithstanding anything to the contrary herein, no purchase or proposed transfer of Class P Securities will be permitted, and the Trustee shall not register or permit the registration of any such purchase or transfer, to a Person that has represented that it is a Plan.  Any purported transfer in violation of this provision shall be null and void *ab initio*.

007344

(b)    References herein to the rights and obligations of the Holders of Class E Certificates include the rights and obligations of the Holders of Class P Securities to the extent of the applicable Class P Class E Certificate Component.

(c)    A Holder or Beneficial Owner of a Class P Security may exchange, subject to the applicable minimum denomination requirements, its Class P Securities for interests in the Class E Certificates (in an amount equal to the applicable Class P Class E Certificate Component) and the U.S. Treasury securities represented by the applicable Class P U.S. Treasury Component, as applicable, that comprise such Class P Components of such Class P Securities, in the manner provided herein and in the case of the Class P Class E Certificate Component, in the manner provided in the Class E Certificate Documents for transfer of a Certificated Class E Certificate or an interest in a Class E Certificate in the form of a Regulation S Global Security or Temporary Regulation S Global Security, as applicable:

(i)    In the case of the exchange by a beneficial owner of an interest in Class P Securities in the form of a Temporary Regulation S Global Security or a Regulation S Global Security, upon receipt by (x) the Class E Certificate Paying Agent of instructions given in accordance with the Applicable Procedures from a Participant, directing the Class E Certificate Paying Agent (with respect to the Class P Class E Certificate Component to be exchanged) to cause to be credited (to the same Euroclear or Clearstream Account to which the interest in such Class P Security to be exchanged was credited), a beneficial interest in the Class E Certificates in the form of a Temporary Regulation S Global Security or Regulation S Global Security, as applicable, in an amount equal to the aggregate Face Amount of the Class P Class E Certificate Component being exchanged, and (y) the Indenture Registrar of instructions to deliver to such beneficial owner the applicable Class P U.S. Treasury Component, (A) the Class E Certificate Paying Agent shall instruct DTC to increase the aggregate Face Amount of the Class E Certificates in the form of a Temporary Regulation S Global Security or Regulation S Global Security, as applicable, by an amount equal to the Class P Class E Certificate Component being exchanged, and credit such increase as instructed, (B) the Indenture Registrar shall instruct the Depositary to reduce, or cause to be reduced, the Class P Security in the form of a Temporary Regulation S Global Security or Regulation S Global Security, as applicable, by the aggregate stated amount of the beneficial interest in such Temporary Regulation S Global Security or Regulation S Global Security to be exchanged and (C) the Trustee shall deliver to such beneficial owner the applicable Class P U.S. Treasury Component in accordance with market practice for transfer of such asset;

(ii) In the case of the exchange by a Holder of Certificated Class P Securities, upon receipt by (x) the Indenture Registrar of the Certificated Class P Security surrendered for exchange and written instructions to deliver to such Holder the applicable Class P U.S. Treasury Component and (y) the Class E Certificate Paying Agent of written instructions to cause to be issued to such Holder a Certificated Class E Certificate in an aggregate Face Amount equal to the aggregate Face Amount of the Class P Class E Certificate Component being exchanged, the Trustee shall cancel such Certificated Class P Security in accordance with this Indenture (and cause the Indenture Registrar to record the exchange in the Indenture Register) and deliver to such beneficial owner the applicable Class P U.S. Treasury Component in accordance with market practice for such asset and the Class E Certificate Paying Agent shall direct the Class E Certificate Registrar to effect the exchange in accordance with the Class E Certificate Documents by making all necessary entries, if any, in the Register of Members, and shall deliver the Certificated Class E Certificate in a Face Amount equal to the Class P Class E Certificate Component being exchanged.

007345

(iii) A Holder or beneficial owner of a Class P Security will be required to exchange all but not less than all of its interest in a Class P Security for interests in the Class E Certificates (in an amount equal to the applicable Class P Class E Certificate Component) on the Class P Payment Date next following the earlier of the maturity or full liquidation of the U.S. Treasury securities represented by the applicable Class P U.S. Treasury Component, in the manner provided herein and in the manner provided in the Class E Certificate Documents.

(iv) The Class P Securityholders shall cooperate fully with the Trustee, the Indenture Registrar, the Class E Certificate Paying Agent, the Class E Certificate Registrar and the Issuer in effecting any exchange, and shall provide all appropriate transfer forms, representations, delivery instructions and other materials requested by any of them, in connection with such exchange. The Issuer and the Trustee shall use its reasonable efforts to effect any such exchange and shall have no liability for any delay incurred in such exchange or the failure thereof as a result of the Class P Securityholders to provide appropriate documentation or otherwise.

(v) After any such exchange, the Holder of or Beneficial Owner of and interest in the Class P Security so exchanged will be the Holder of or Beneficial Owner of an interest in, as applicable, the Class E Certificates received upon such an exchange. No Holder or Beneficial Owner of interests in Class E Certificates and U.S. Treasury securities (including following such an exchange) will be entitled to exchange such Class E Certificates and U.S. Treasury securities for any Class P Security. No service charge shall be made for any such exchange of Class P Securities, but the Issuer or the Trustee may require payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with such exchange. Each Holder and Beneficial Owner of a Class P Security, by its acceptance thereof, acknowledges that upon any such exchange, the rating of such Class P Security by any Rating Agency will not apply to the Securities received in such exchange. Upon the exchange of all outstanding Class P Securities pursuant to this provision, the Issuer will notify each Rating Agency then rating the Class P Securities.

(d) Prior to the issuance of the Class P Securities pursuant to this Indenture, the Trustee shall, in addition to other conditions precedent set forth in this Indenture, have received:

(i) The second Grant and the third Grant pursuant to the Granting Clause hereof of all of the Issuer's right, title and interest in and to the Class P-1 Collateral and the Class P-2 Collateral, respectively, and delivery of the Class P-1 Collateral and Class P-2 Collateral to the Trustee or its nominee, which, if any Class P Collateral is held through an intermediary shall be deemed to have occurred upon receipt of evidence satisfactory to the Trustee that on or before the Closing Date, the Issuer shall have purchased and entered into agreements to purchase such Class P Collateral and the Class P Collateral has been credited by the Class P-1 Accounts Securities Intermediary or the Class P-2 Account Securities Intermediary, as applicable, to the Class P-1 U.S. Treasury Component Account or the Class P-2 U.S. Treasury Component Account.

(ii) A certificate of an Authorized Officer of the Issuer, dated as of the Closing Date, to the effect of Section 3.1(xix) with respect to each item of Class P Collateral pledged to the Trustee for inclusion in the Class P Collateral.

(e) Each Holder of a Class P-1 Security, by its acquisition thereof, acknowledges that the rating of the Class P-1 Securities by Moody's addresses solely the ultimate payment of the Class P-1 Rated Principal and each Holder of a Class P-2 Security, by its acquisition thereof, acknowledges that

007346

the rating of the Class P-2 Securities by Moody's addresses solely the ultimate payment of the Class P-2 Rated Principal.

(f)     The Trustee shall not sell or otherwise dispose of the Class P Collateral or any part thereof, except in accordance with Section 11.2 and this paragraph (f). Upon the occurrence of any Event of Default, the Trustee shall administer the Class P-1 Collateral and Class P-2 Collateral in accordance with Article 5 but solely for the benefit of the applicable Holders of Class P-1 Securities and Class P-2 Securities, respectively. The Majority of the Class P-1 Securityholder will have the right to direct the Trustee as to the exercise of any remedies with respect to the Class P-1 Collateral and the Majority of the Class P-2 Securityholder will have the right to direct the Trustee as to the exercise of any remedies with respect to the Class P-2 Collateral. Any money collected in respect of the Class P-1 Collateral shall be applied solely for the benefit of the Holders of the Class P-1 Securities to make payments solely on the Class P-1 Securities. Any money collected in respect of the Class P-2 Collateral shall be applied solely for the benefit of the Holders of the Class P-2 Securities to make payments solely on the Class P-2 Securities.

(g)     The Class E Certificate Components of Class P Securities that constitute Directing Class E Certificates (as defined in the Management Agreement) shall be subject to purchase by the Buy-Out Purchaser under the terms and conditions set forth in Section 12(c) of the Management Agreement. If the Removal Buy-Out Purchaser elects to make such purchase, the Class P Securities that include such Class E Certificate Components shall be deemed exchanged for their respective Components, the Class E Certificates represented by such Class E Certificate Components shall be so purchased and the applicable Buy-Out Amount shall be distributed to the Holders of such Class P Securities, and such Holders will receive a distribution in kind of the related pro rata amount of the Class P U.S. Treasury Component.


ARTICLE 3 CONDITIONS PRECEDENT

Section 3.1.     Conditions to Issuance of Notes on Closing Date.

The Indenture Securities to be issued on the Closing Date shall be executed by the Applicable Issuers and delivered to the Trustee for authentication and thereupon the same shall be authenticated and delivered by the Trustee upon Issuer Order and upon receipt by the Trustee of the following:

(i)     Officers' Certificates of the Co-Issuers Regarding Corporate Matters. An Officer's certificate of each of the Co-Issuers:

(A)   (1) evidencing (x) the authorization by Board Resolution of the execution and delivery of this Indenture, the Purchase Agreement, the Class A-1A Note Purchase Agreement, the Class A-1B Note Purchase Agreement and, in the case of the Issuer, the Placement Agency Agreement, the Management Agreement, the Class E Certificates Paying Agency Agreement, the Collateral Administration Agreement and the Hedge Agreements being entered into on or before the Closing Date (if any), and related transaction documents and (y) the execution, authentication, and delivery of the Indenture Securities applied for by it and specifying the Stated Maturity, principal amount or stated amount, as applicable, and, with respect to the Notes, the Note Interest Rate of each Class of Notes to be authenticated and delivered and (2) evidencing the authorization by Board Resolution of the issuance, terms and number of Class E Certificates issued on the Closing Date, and that each of the foregoing is in accordance with the terms of the Board Resolution, and

007347

(B) certifying that (1) the attached copy of the Board Resolution is an accurate copy, (2) the resolutions have not been rescinded and are in full force on and as of the Closing Date, and (3) the Officers authorized to execute and deliver the documents hold the offices and have the signatures indicated on the documents.

(ii) <u>Governmental Approvals</u>. From each of the Co-Issuers either:

(A) a certificate of the Applicable Issuer or other official document evidencing the due authorization, approval, or consent of any governmental bodies, at the time having jurisdiction in the premises, together with an Opinion of Counsel of the Applicable Issuer that no other authorization, approval, or consent of any governmental body is required for the valid issuance of the Notes applied for by it, or

(B) an Opinion of Counsel of the Applicable Issuer that no authorization, approval, or consent of any governmental body is required for the valid issuance of the Indenture Securities except as have been given; <u>provided</u> that the opinions of Cleary Gottlieb Steen & Hamilton LLP and Walkers substantially in the forms of <u>Exhibit C</u> and <u>Exhibit D</u>, respectively, shall satisfy this clause (B).

(iii) <u>Co-Issuers' and Portfolio Manager's U.S. Counsel Opinion</u>. An opinion of Cleary Gottlieb Steen & Hamilton LLP, special U.S. counsel to the Co-Issuers and Orrick, Herrington & Sutcliffe LLP, counsel to the Portfolio Manager, dated the Closing Date, substantially in the forms of <u>Exhibit C</u>, and <u>Exhibit F</u>.

(iv) <u>Issuer's Cayman Counsel Opinion</u>. An opinion of Walkers, Cayman Islands counsel to the Issuer, dated the Closing Date, substantially in the form of <u>Exhibit D</u>.

(v) <u>Trustee's Counsel Opinion</u>. An opinion of Gardere Wynne Sewell LLP, counsel to the Trustee, dated the Closing Date, substantially in the form of <u>Exhibit E</u>.

(vi) <u>Officers' Certificates of Co-Issuers Regarding Indenture</u>. An Officer's certificate of each of the Co-Issuers stating that, to the best of the Officer's knowledge,

(A) the Applicable Issuer is not in default under this Indenture and that the issuance of the Indenture Securities applied for by it will not result in a default or a breach of, or be a default under, its organizational documents, any indenture or other agreement or instrument to which it is a party or by which it is bound, or any order of any court or administrative agency entered in any Proceeding to which it is a party or by which it may be bound or to which it may be subject;

(B) all conditions precedent in this Indenture relating to the issuance, authentication and delivery of the Indenture Securities have been complied with;

(C) all expenses due or accrued with respect to the Offering or relating to actions taken on or in connection with the Closing Date have been paid or reserves therefor have been made; and

(D) The Officer's certificate of the Issuer shall also state that, to the best of the Officer's knowledge, all of its representations and warranties contained in this Indenture are accurate as of the Closing Date.

007348

(vii)     <u>Hedge Agreements</u>.  Executed copies of the Hedge Agreements being entered into on or entered into before the Closing Date, if any.

(viii)     <u>Management Agreement</u>.  Executed copy of the Management Agreement.

(ix)     <u>Class E Certificates</u>.  Copies of executed Class E Certificate certificates to be issued on the Closing Date.

(x)     <u>Class E Certificate Documents</u>.  An executed counterpart of each of the Class E Certificate Documents.

(xi)     <u>Collateral Administration Agreement</u>.  Executed copy of the Collateral Administration Agreement.

(xii)     <u>Grant of Collateral Obligations</u>.  (A) Evidence of the first Grant pursuant to the Granting Clauses of this Indenture of all of the Issuer's interest in the Collateral pledged to the Trustee, on the Closing Date and Delivery of the Collateral (including any promissory notes and all other Underlying Instruments related to such collateral to the extent received by the Issuer) to the Trustee as contemplated by Section 3.2, (B) evidence of the second Grant pursuant to the Granting Clauses of this Indenture of all of the Issuer's interest in the Class P-1 Collateral pledged to the Trustee for the benefit of the Class P-1 Securityholders, on the Closing Date and Delivery of the Class P-1 Collateral (including any promissory notes and all other Underlying Instruments related to such collateral to the extent received by the Issuer) to the Trustee as contemplated by Section 3.2 and (C) evidence of the third Grant pursuant to the Granting Clauses of this Indenture of all of the Issuer's interest in the Class P-2 Collateral pledged to the Trustee for the benefit of the Class P-2 Securityholders, on the Closing Date and Delivery of the Class P-2 Collateral (including any promissory notes and all other Underlying Instruments related to such collateral to the extent received by the Issuer) to the Trustee as contemplated by Section 3.2.

(xiii)     <u>Certificate of the Portfolio Manager</u>.  A certificate of an Authorized Officer of the Portfolio Manager, dated as of the Closing Date, to the effect that, with respect to the Collateral Obligations pledged to the Trustee for inclusion in the Collateral on the Closing Date, immediately before the delivery of the Collateral Obligation on the Closing Date:

(A)   the Collateral Obligations in the aggregate satisfy the "row/column combination" of the table appearing in the definition of "Ratings Matrix" selected by the Portfolio Manager on the Closing Date;

(B)   the information with respect to each Collateral Obligation in the Schedule of Collateral Obligations is correct;

(C)   each Collateral Obligation satisfies the requirements of the definition of "Collateral Obligation" and of Section 3.1(xix)(B); and

(D)   no Deep Discount Obligation is included in the Collateral on the Closing Date.

(xiv)     <u>*Rating Letters*</u>.  An Officer's certificate of the Issuer to the effect that attached is an accurate copy of a letter signed by each Rating Agency and confirming that each Class of Indenture Securities rated by the Rating Agency has been assigned the applicable Initial Rating and that the ratings are in full force on the Closing Date.

007349

(xv)    <u>Accounts</u>. Evidence that each of the Accounts and the Class P Accounts has been established.

(xvi)    <u>Issuer Order for Deposit of Funds into Accounts</u>. An Issuer Order signed in the name of the Issuer by an Authorized Officer of the Issuer, dated as of the Closing Date, authorizing the deposit of approximately U.S.$75,518,237.99 into the Collection Account for use pursuant to Section 7.18, the deposit of approximately U.S.$16,300,000 into the Closing Date Expense Account for use pursuant to Section 10.3(g) and the deposit of approximately U.S.$ 4,100,000 into the Interest Reserve Account for use pursuant to Section 10.3(i).

(xvii)    <u>Issuer Order for Authentication of Securities</u>. An Issuer Order signed in the name of the Issuer by an Authorized Officer of the Issuer, dated as of the Closing Date, directing the Trustee to authenticate the Securities in the amounts, in the registered names, and with the CUSIP numbers in the Issuer Order.

(xviii)    <u>Accountants' Certificate</u>. An Accountants' Certificate (A) confirming the information with respect to each Collateral Obligation on the Schedule of Collateral Obligations attached as <u>Schedule 1</u>, by reference to such sources as shall be specified therein (B) confirming that the Aggregate Principal Balance of the Collateral Obligations that the Issuer has committed to purchase in accordance with customary settlement procedures in the relevant markets, is at least U.S.$815,000,000, that each Concentration Limitation is satisfied taking into account all of the Collateral Obligations acquired as of the Closing Date (including binding agreements to purchase Collateral Obligations in effect on the Closing Date), that the Weighted Average Spread Test is satisfied as of the Closing Date, that the Weighted Average Rating Factor Test is satisfied as of the Closing Date, that the Weighted Average Life Test is satisfied as of the Closing Date, that each Overcollateralization Test is satisfied as of the Closing Date, that the Weighted Average Moody's Recovery Rate Test is satisfied as of the Closing Date, that the Weighted Average S&P Recovery Rate Test is satisfied as of the Closing Date and that the Weighted Average Fixed Rate Coupon Test is satisfied as of the Closing Date and a calculation of the Diversity Score and, with respect to each such test, specifying the percentage or other numerical value required in order to satisfy the applicable test, (C) specifying the procedures undertaken by them to review data and computations relating to this Section 3.1(xviii) and (D) confirming the weighted average purchase price of the Collateral Obligations.

(xix)    <u>Certificate of the Issuer Regarding Collateral</u>. A certificate of an Authorized Officer of the Issuer, dated as of the Closing Date, to the effect that, to the knowledge of the Issuer, in the case of each Collateral Obligation pledged to the Trustee for inclusion in the Collateral, on the Closing Date, immediately before the delivery thereof on the Closing Date:

(A)    the Issuer is the owner of the Collateral Obligation free of any liens, claims, or encumbrances of any nature whatsoever except for those that are being released on the Closing Date and except for those Granted pursuant to or contemplated by this Indenture;

(B)    the Issuer has acquired its ownership in the Collateral Obligation in good faith without notice of any adverse claim, except as described in paragraph (A) above;

(C)    the Issuer has not assigned, pledged, or otherwise encumbered any interest in the Collateral Obligation (or, if any interest in the Collateral Obligation has been assigned, pledged, or otherwise encumbered, it has been released before the Closing Date or is being released on the Closing Date) other than interests Granted pursuant to or contemplated by this Indenture;

007350

(D)     the Issuer has full right to Grant a security interest in and assign and pledge the Collateral Obligations to the Trustee;

(E)     upon Grant by the Issuer, the Trustee has a first priority security interest in the Collateral (subject, in the case of the Synthetic Security Counterparty Account to any lien in favor of the Synthetic Security Counterparty) and the Class P Collateral;

(F)     based solely on the Accountant's Certificate set forth in clause (xviii) above, the weighted average purchase price of the Collateral Obligations in the portfolio as of the Closing Date is at least 100.10% of the aggregate par amount thereof; and

(G)     based on the certification provided by the Portfolio Manager on the Closing Date pursuant to Section 3.1(xiii), no Deep Discount Obligation is included in the Collateral on the Closing Date.

(xx)     Certificate of the Issuer Regarding Important Section 3(c)(7) Reminder Notice. A certificate of an Authorized Officer of the Issuer, dated as of the Closing Date, to the effect that, on or prior to the Closing Date the Issuer provided to the Depositary the Important Section 3(c)(7) Reminder Notice, substantially in the form of Exhibit H-2.

(xxi)     Other Documents.  Any other documents the Trustee reasonably requires. Nothing in this clause (xxi) shall imply or impose a duty on the part of the Trustee to require any other documents.

Section 3.2.     Custodianship; Delivery of Collateral Obligations and Eligible Investments.

(a)     (i) The Issuer or the Portfolio Manager on behalf of the Issuer shall Deliver or cause to be Delivered all Collateral, all Class P-1 Collateral and all Class P-2 Collateral.  Initially, the Issuer Account Securities Intermediary and the Class P-1 Accounts Securities Intermediary and Class P-2 Accounts Securities Intermediary shall be JPMorgan Chase Bank, National Association.  Any successor securities intermediary shall be a state or national bank or trust company that is not an Affiliate of the Issuer or the Co-Issuer and has capital and surplus of at least U.S.$200,000,000 and is a Securities Intermediary.  Subject to the limited right to relocate Pledged Obligations as provided in Section 7.5(b), the Trustee shall hold all Collateral Obligations, Eligible Investments, other investments purchased in accordance with this Indenture (other than Loans, Participations and general intangibles) and Cash in the relevant Account established and maintained pursuant to Article 10, as to which in each case the Trustee shall have entered into an agreement with the Relevant Securities Intermediary substantially in the form of Exhibit G providing, *inter alia*, that the establishment and maintenance of the Account shall be governed by the law of a jurisdiction acceptable to the Issuer and the Trustee.

(b)     Each time that the Issuer, or the Portfolio Manager on behalf of the Issuer, directs or causes the acquisition of any Collateral Obligation, Eligible Investment, or other investments, the Portfolio Manager (on behalf of the Issuer) shall, if the Collateral Obligation, Eligible Investment, or other investment is required to be, but has not already been, transferred to the relevant Account, cause the Collateral Obligation, Eligible Investment, or other investment to be Delivered to the Trustee to be held in the Custodial Account in the case of property constituting Collateral (or in the case of any such investment that is not a Collateral Obligation, in the Account in which the funds used to purchase the investment are held in accordance with Article 10) and in the relevant Class P Account in the case of property constituting Class P Collateral for the benefit of the Trustee in accordance with this Indenture. The security interest of the Trustee in the funds or other property used in connection with the acquisition shall, immediately and without further action on the part of the Trustee, be released.  The security interest

132

of the Trustee shall nevertheless come into existence and continue in the Collateral Obligation, Eligible Investment, or other investment so acquired, including all interests of the Issuer in to any contracts related to and proceeds of the Collateral Obligations, Eligible Investments, or other investments.

Section 3.3.    Representations as to Collateral.

(a)    The Issuer hereby represents and warrants to the Secured Parties and the Class P Securityholders, as the case may be, as to the Collateral and the Class P Collateral as follows (which representations are repeated on each day on which the Issuer acquires new Collateral and Class P Collateral):

(i)    This Indenture creates a valid and continuing security interest (as defined in the applicable Uniform Commercial Code) in the Collateral and the Class P Collateral in favor of the Trustee, which security interest is prior to all other liens, charges, claims, security interests, mortgages, and other encumbrances except as otherwise contemplated herein, and is enforceable as such as against creditors of and purchasers from the Issuer.

(ii)    Except for any Securities Lending Collateral and Synthetic Securities Collateral, the Issuer has good and marketable title to and is the owner of each item of Collateral and Class P Collateral free of any liens, claims, or encumbrances of any nature whatsoever except for liens (A) that are being released on the Closing Date and (B) granted pursuant to or permitted by this Indenture. The Issuer has a first priority security interest in all Securities Lending Collateral to secure all obligations of Securities Lending Counterparty under the Securities Lending Agreement and a first priority interest in all Synthetic Securities Collateral to secure all obligations of Synthetic Securities Counterparty under the Synthetic Securities Agreement.

(iii)    The Issuer has not assigned, pledged, or otherwise encumbered any interest in the Collateral or the Class P Collateral (or, if any interest in such collateral has been assigned, pledged, or otherwise encumbered, it has been released before the Closing Date or is being released on the Closing Date) other than interests granted pursuant to or contemplated by this Indenture.

(iv)    The Issuer has full right, and has received all consents and approvals required by the related Underlying Instruments, to grant a security interest in its rights in the Collateral and the Class P Collateral to the Trustee.

(v)    Each Collateral Obligation included in the Collateral and the Class P Collateral satisfied the requirements of the definition of "Collateral Obligation" or Class P-1 U.S. Treasury Component or Class P-2 U.S. Treasury Component, as the case may be, as of the date the Issuer committed to purchase the same or, in the case of obligations acquired on or prior to the Closing Date, as of the Closing Date.

(vi)    All Collateral Obligations, any obligation that at the time of acquisition, conversion, or exchange did not satisfy the requirements of a Collateral Obligation, and Eligible Investments (other than, in each case, "general intangibles" within the meaning of the applicable Uniform Commercial Code) have been and will have been credited to one of the Accounts. The Relevant Securities Intermediary for each Account has agreed to treat all assets credited to the Accounts as "financial assets" within the meaning of the applicable Uniform Commercial Code.

(vii)    The Issuer has pledged to the Trustee all of the Issuer's interest in the Collateral and the Class P Collateral pursuant to the Granting Clauses of this Indenture and has

133

delivered each Collateral Obligation (including any promissory note and all its other Underlying Instruments to the extent received by the Issuer) to the Trustee as contemplated by Section 3.2.

(viii) Each item of the Collateral and the Class P Collateral constitutes "general intangibles," "certificated securities," "instruments," "securities entitlements," or "uncertificated securities," each within the meaning of the applicable Uniform Commercial Code, or any other category of collateral under the applicable Uniform Commercial Code as to which the Issuer has complied with its obligations under Section 3.3(b).

(ix) The Issuer has caused (or will have caused within 10 days following the Closing Date) the filing of appropriate financing statements in the proper filing offices in the appropriate jurisdictions under applicable law to perfect the security interest in the portion of the Collateral and the Class P Collateral pledged to the Trustee under this Indenture that may be perfected by the filing of financing statements.

(x) The Issuer has not authorized the filing of and is not aware of any financing statements against the Issuer that include a description of collateral covering the Collateral or the Class P Collateral other than any financing statement (A) relating to the security interest in the Collateral or the Class P Collateral granted to the Trustee under this Indenture, (B) that has been terminated, or (C) that names the Trustee as the secured party. On the date of this Indenture, the Issuer is not aware of any judgment or Pension Benefit Guaranty Corporation or tax lien filings against the Issuer.

(xi) The Issuer has delivered to the Trustee a fully executed agreement pursuant to which the Relevant Securities Intermediary for each Account has agreed to comply with all instructions originated by the Trustee relating to the Account without further consent by the Issuer.

(xii) All original executed copies of each "instrument" (as defined in each applicable Uniform Commercial Code) that are or evidence the Collateral or Class P Collateral have been delivered to the Relevant Securities Intermediary, to the extent received by the Issuer. None of the instruments that are or evidence the Collateral or the Class P Collateral has any marks or notations indicating that they are then pledged or otherwise assigned to any person other than the Trustee.

(xiii) The Accounts are not in the name of any person other than the Trustee. The Issuer has not consented to the securities intermediary of any Account to comply with instructions of any person other than the Trustee.

(xiv) All "certificated securities" (as defined in each applicable Uniform Commercial Code) that are or evidence the Collateral or the Class P Collateral have been delivered to the Relevant Securities Intermediary, to the extent received by the Issuer, registered in the name of the Relevant Securities Intermediary or indorsed to the Relevant Securities Intermediary or in blank. The Issuer has received a written acknowledgment from the Relevant Securities Intermediary that the Relevant Securities Intermediary is holding all the certificated securities delivered to it that are or evidence the Collateral or the Class P Collateral solely on behalf and for the benefit of the Trustee.

(xv) The Issuer has caused all "uncertificated securities" (as defined in each applicable Uniform Commercial Code) that are or evidence the Collateral or the Class P Collateral to be registered in the name of the Relevant Securities Intermediary.

007353

(xvi)    Upon grant by the Issuer, the Trustee has a first priority security interest in the Collateral and the Class P Collateral, subject in the case of the Synthetic Security Counterparty Account to any lien in favor of the Synthetic Security Counterparty.

(xvii)    The parties to this Indenture (i) shall not waive any of the representations in this Section 3.3, unless the Rating Condition is satisfied in connection with such waiver; (ii) shall provide each of the Rating Agencies with prompt written notice of any breach of the representations contained in this Section 3.3 upon becoming aware thereof, and shall not waive a breach of any of the representations in this Section 3.3, unless the Rating Condition is satisfied (as determined after any adjustment or withdrawal of the ratings following notice of such breach) in connection with such waiver.

(b)    If the Issuer acquires Collateral or Class P Collateral that is not "general intangibles," "certificated securities," "instruments," "securities entitlements," or "uncertificated securities," each within the meaning of the applicable Uniform Commercial Code, or another category of collateral under the applicable Uniform Commercial Code as to which the Issuer has complied with its obligations under this Section 3.3(b), then on or before the date on which the Issuer acquires the Collateral or the Class P Collateral, as the case may be, the Issuer (or the Portfolio Manager on behalf of the Issuer) shall notify S&P and the Trustee (with respect to the Collateral, for the benefit of the Secured Parties) of its acquisition or intended acquisition of the Collateral or the Class P Collateral, as the case may be, and the Issuer shall represent to S&P and to the Trustee (with respect to such collateral, for the benefit of the Secured Parties and the Class P Securityholders, as the case may be) as to the category of such collateral under the applicable Uniform Commercial Code and shall make any further representations as to the perfection and priority of the security interest in such collateral Granted under this Indenture acceptable to S&P.

Section 3.4.    Conditions to Issuance of Additional Class E Certificates.

Any Additional Class E Certificates to be issued on an Additional Class E Certificates Closing Date pursuant to Section 4.4 of the Class E Certificates Paying Agency Agreement shall satisfy the conditions precedent set forth in Section 4.4 of the Class E Certificates Paying Agency Agreement.

ARTICLE 4

SATISFACTION AND DISCHARGE

Section 4.1.    Satisfaction and Discharge of Indenture.

This Indenture shall be discharged and shall cease to be of further effect with respect to the Indenture Securities and the Collateral and the Class P Collateral except as to:

(i)    rights of registration of transfer and exchange,

(ii)    substitution of mutilated, destroyed, lost, or stolen Notes,

(iii)    rights of Holders of the Indenture Securities to receive payments of principal and interest on, or other amounts (including without limitation Extension Bonus Payments, as applicable) owing in respect of, the Indenture Securities, as provided in this Indenture,

007354

(iv)     the rights, indemnities, and immunities of the Trustee under this Indenture and the obligations of the Trustee under Section 7.3 of this Indenture with respect to the holding and paying of unclaimed funds,

(v)     for so long as any Class E Certificates remain Outstanding, any provisions hereof conferring any rights or remedies upon the Holders of the Class E Certificates or the Class E Certificates Paying Agent on behalf of the Holders of the Class E Certificates, including but not limited to, the provisions of Articles 7, 8, 10, 11, 12, 14 and 15,

(vi)     for so long as any Class E Certificates remain Outstanding, the provisions of Articles 10, 11 and 12 relating to the acquisition, retention, disbursement and reinvestment of Collateral,

(vii)     the rights, obligations, and immunities of the Portfolio Manager under this Indenture and under the Management Agreement, and

(viii)     the rights of Holders of the Indenture Securities as beneficiaries of this Indenture with respect to the property deposited with the Trustee (other than the Class P Collateral) and payable to any of them and the rights of Class P-1 Securityholders with respect to the Class P-1 Collateral and the rights of the Class P-2 Securityholders with respect to the Class P-2 Collateral (and the Trustee, on demand of and at the expense of the Issuer, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture),

when:

(a)     either:

(i)     all Indenture Securities theretofore authenticated and delivered (other than (A) Indenture Securities that have been destroyed, lost, or stolen and which have been replaced or paid as provided in Section 2.7 and (B) Indenture Securities for whose payment money has theretofore irrevocably been deposited in trust and thereafter repaid to the Issuer or discharged from the trust, as provided in Section 7.3), have been delivered to the Trustee for cancellation; or

(ii)     all Indenture Securities not theretofore delivered to the Trustee for cancellation

(A)     have become payable, or

(B)     will become payable at their Stated Maturity within one year, or

(C)     are to be called for redemption pursuant to Article 9 under an arrangement satisfactory to the Trustee for the giving of notice of redemption by the Applicable Issuers pursuant to Section 9.3,

and the Issuer has irrevocably deposited with the Trustee, in trust for such purpose Cash or non-callable obligations of the United States of America. The obligations deposited under Section 4.1(a)(ii) must be entitled to the full faith and credit of the United States of America or be debt obligations that are rated "Aaa" by Moody's and "AAA" by S&P, in an amount sufficient, as verified by a firm of Independent certified public accountants that are nationally recognized, to pay and discharge the entire indebtedness on the Indenture Securities not theretofore delivered to the Trustee for cancellation, for principal and interest to the date of the deposit (in the case of

136

Indenture Securities that have become payable), or to the respective Stated Maturity or the respective Redemption Date, as the case may be, and the Issuer shall have Granted to the Trustee a valid perfected security interest in the Eligible Investment that is of first priority, free of any adverse claim, and shall have furnished an Opinion of Counsel with respect thereto. Section 4.1(a)(ii) shall not apply if an election to act in accordance with Section 5.5(a) has been made and not rescinded. The Class Q-1 Securities shall be treated as cancelled for purposes of this Section 4.1(a) if all amounts with respect to the Class Q-1 Components represented thereby have been paid in full. In addition, the Issuer shall cause delivery to the Trustee of an Opinion of Counsel of Independent U.S. tax counsel of nationally recognized standing in the United States experienced in such matters to the effect that the Holders of Notes would recognize no income, gain or loss for U.S. federal income tax purposes as a result of the deposit and satisfaction and discharge of this Indenture;

(b) the Issuer has paid all other sums then payable under this Indenture by the Issuer and no other amounts are scheduled to be payable by the Issuer; and

(c) the Co-Issuers have delivered to the Trustee Officer's certificates and an Opinion of Counsel, each stating that all conditions precedent in this Indenture provided for relating to the satisfaction and discharge of this Indenture have been complied with.

Notwithstanding the satisfaction and discharge of this Indenture, the rights and obligations of the Co-Issuers, the Trustee, the Portfolio Manager and, if applicable, the Securityholders under Sections 2.8, 4.2, 5.4(d), 5.9, 5.18, 6.6, 6.7, 7.1, 7.3, 13.1, and 14.14 shall survive.

Section 4.2.   Application of Trust Money.

All monies deposited with the Trustee pursuant to Section 4.1 shall be held in trust for the person entitled to it and applied by the Trustee in accordance with the Indenture Securities and this Indenture, including, without limitation, the Priority of Payments, to the payment of principal and interest (and any Commitment Fee and Delayed Drawdown Fee), either directly or through any Paying Agent, as the Trustee may determine. The money shall be held in a segregated non-interest bearing trust account identified as being held in trust for the benefit of the Secured Parties or the Class P-1 Securityholders or Class P-2 Securityholders, as applicable.

Section 4.3.   Repayment of Monies Held by Paying Agent.

In connection with the satisfaction and discharge of this Indenture with respect to the Notes, all monies then held by any Paying Agent other than the Trustee under this Indenture shall, upon demand of the Co-Issuers, be paid to the Trustee to be held and applied pursuant to Section 7.3 and in accordance with the Priority of Payments and thereupon the Paying Agent shall be released from all further liability with respect to the monies.

ARTICLE 5

REMEDIES

Section 5.1.   Events of Default.

"Event of Default," wherever used in this Indenture, means any one of the following events whatever the reason:

007356

(a)       a default for four Business Days in the payment of any interest on any of the Class A-1A Notes (or of the Commitment Fee Amount with respect to the Class A–1A Notes), the Class A-1B Notes (or of the Delayed Drawdown Fee with respect to the Class A-1B Notes), the Class A-1C Notes, the Class A-2 Notes, the Class A-3 Notes or the Class A-4 Notes or, after no Class A Notes are Outstanding, on any Class of Notes that is currently part of the Controlling Class when it becomes payable (or in the case of a default in payment due to an administrative error or omission by the Trustee, any Paying Agent or the Indenture Registrar, after seven Business Days);

(b)       a default in the payment of principal (including Deferred Interest) of any Note, when the same becomes payable, at its Stated Maturity or on the Redemption Date or otherwise (or, in the case of a default in payment due to an administrative error or omission by the Trustee, any Paying Agent or the Indenture Registrar, such default has continued for three Business Days);

(c)       the failure on any Payment Date to disburse amounts available in the Payment Account in accordance with the Priority of Payments and the failure continues for three Business Days (or in the case of a failure to disburse such amounts due to an administrative error or omission by the Trustee, any Paying Agent or the Indenture Registrar, such failure continues for six Business Days);

(d)       on any Measurement Date for so long as any Class A-1A Notes, Class A-1B Notes, Class A-1C Notes, Class A-2 Notes, Class A-3 Notes or Class A-4 Notes are Outstanding, the Overcollateralization Ratio Numerator is less than 100% of the Aggregate Outstanding Amount of the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes and the Class A-4 Notes;

(e)       either of the Co-Issuers or the pool of Collateral becomes an investment company under the 1940 Act;

(f)       breach of any other covenant or other agreement or warranty of the Issuer or the Co-Issuer in this Indenture (other than any failure to satisfy any of the Collateral Quality Tests, any of the Concentration Limitations, any of the Coverage Tests, the Reinvestment Overcollateralization Test, or other covenants or agreements for which a specific remedy has been provided in this Section 5.1) in any material respect, or the failure of any representation or warranty of the Issuer or the Co-Issuer in this Indenture or in any certificate or other writing delivered pursuant thereto, or in connection therewith, to be correct in any material respect when made, and the breach or failure continues for 30 days after either of the Co-Issuers has actual knowledge of it or after notice to the Issuer, the Co-Issuer, and the Portfolio Manager by the Trustee or to the Issuer, the Co-Issuer, the Portfolio Manager, and the Trustee by the Holders of at least 25% of the Aggregate Outstanding Amount of the Controlling Class by registered or certified mail or overnight courier specifying the breach or failure and requiring it to be remedied and stating that the notice is a "Notice of Default" under this Indenture;

(g)       the entry of a decree or order by a court having competent jurisdiction adjudging the Issuer or the Co-Issuer as bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment, or composition of the Issuer or the Co-Issuer under the Bankruptcy Law or any other applicable law, or appointing a receiver, liquidator, assignee, or sequestrator (or other similar official) of the Issuer or the Co-Issuer or of any substantial part of its property, or ordering the winding up or liquidation of its affairs, and if the decree or order remains unstayed and in effect for 45 consecutive days;

(h)       the institution by the shareholders of the Issuer or the Co-Issuer of Proceedings to have the Issuer or the Co-Issuer, as the case may be, adjudicated as bankrupt or insolvent, or the consent by the shareholders of the Issuer or the Co-Issuer to the institution of bankruptcy or insolvency Proceedings against the Issuer or the Co-Issuer, or the filing by the Issuer or the Co-Issuer of a petition or

007357

answer or consent seeking reorganization or relief under the Bankruptcy Law or any other similar applicable law, or the consent by the Issuer or the Co-Issuer to the filing of any such petition or to the appointment of a receiver, liquidator, assignee, trustee, or sequestrator (or other similar official) of the Issuer or the Co-Issuer or of any substantial part of its property, or the making by the Issuer or the Co-Issuer of an assignment for the benefit of creditors, or the admission by the Issuer or the Co-Issuer in writing of its inability to pay its debts generally as they become due, or the taking of any action by the Issuer or the Co-Issuer in furtherance of any such action; or

(i)        one or more final judgments is rendered against the Issuer or the Co-Issuer that exceed in the aggregate U.S.$2,000,000 (or any lesser amount specified by Moody's) and that remain unstayed, undischarged, and unsatisfied for 30 days after the judgments become nonappealable, unless adequate funds have been reserved or set aside for their payment, unless (except as otherwise specified in writing by Moody's) the Rating Condition with respect to Moody's is satisfied with respect thereto.

Section 5.2.    <u>Acceleration of Maturity; Rescission and Annulment</u>.

(a)        If an Event of Default is continuing (other than an Event of Default specified in Section 5.1(e), (g), (h) or (i)), the Trustee may, with the consent of a Majority of the Controlling Class, and upon the written direction of a Majority of the Controlling Class shall, declare the principal of all the Notes to be immediately payable by notice to the Applicable Issuers, and upon that declaration the unpaid principal of all the Notes, together with all its accrued and unpaid interest (and any applicable Defaulted Interest Charge), and other amounts payable under this Indenture, shall become immediately payable. The Reinvestment Period shall terminate upon a declaration of acceleration (subject to re-commencement pursuant to Section 5.2(b)(x)).  If an Event of Default specified in Section 5.1(e), (g), (h) or (i) occurs, all unpaid principal, together with all its accrued and unpaid interest (and any applicable Defaulted Interest Charge), of all the Notes, and other amounts payable under this Indenture, shall automatically become payable without any declaration or other act on the part of the Trustee or any Noteholder and the Reinvestment Period shall terminate automatically (subject to re-commencement pursuant to Section 5.2(b)).

(b)        At any time after the declaration of acceleration of maturity has been made and before a judgment or decree for payment of the money due has been obtained by the Trustee, a Majority of the Controlling Class by written notice to the Issuer, the Trustee and the Class E Certificates Paying Agent may rescind the declaration and its consequences if:

(i)    The Issuer has paid or deposited with the Trustee a sum sufficient to pay;

(A)    all unpaid installments of interest and principal on the Notes then due (other than as a result of the acceleration);

(B)    to the extent that payment of the interest is lawful, interest on any Deferred Interest and Defaulted Interest at the Applicable Note Interest Rate or Default Interest Rate, as applicable;

(C)    all Administrative Expenses of the Co-Issuers and other sums paid or advanced by the Trustee under this Indenture;

(D)    all unpaid Senior Management Fees;

(E)    all amounts then payable to any Hedge Counterparty; and

007358

(ii)   The Trustee has determined that all Events of Default, other than the nonpayment of the interest on or principal of the Notes that have become due solely by such acceleration, have been (A) cured, and a Majority of the Controlling Class by written notice to the Trustee has agreed with that determination, or (B) waived as provided in Section 5.14.

No such rescission shall affect any subsequent Default or impair any right consequent thereon.  The Issuer shall not terminate any Hedge Agreement at any time after a declaration of acceleration of Maturity of the Notes has been made, unless such declaration and its consequences may no longer be rescinded and annulled in accordance with this Section 5.2(b) and liquidation of the Collateral has begun.

If a declaration of acceleration is rescinded as described above:

(x)   the Reinvestment Period, if terminated by the declaration, shall re-commence on the date of the rescission (unless the Reinvestment Period would have otherwise terminated before that date pursuant to clauses (i), (ii), or (iii) of its definition); and

(y)   the Trustee shall preserve the Collateral in accordance with this Indenture.  If the preservation of the Collateral is rescinded pursuant to Section 5.5, the Notes may again be accelerated pursuant to Section 5.2(a), notwithstanding any previous rescission of a declaration of acceleration pursuant to this Section 5.2(b)).

No rescission shall affect any subsequent Default or impair any right resulting from the Default.

(c)   Notwithstanding anything in this Section 5.2 to the contrary, the Notes will not be subject to acceleration by the Trustee, a Majority of the Controlling Class, or any other Holders solely as a result of the failure to pay any amount due on Notes that are not of the Controlling Class.

Section 5.3.   Collection of Indebtedness and Suits for Enforcement by Trustee.

The Applicable Issuers covenant that if a default occurs in the payment of any principal of or interest when payable on any Note, upon demand of the Trustee or the Holder of any affected Note, the Applicable Issuers shall pay to the Trustee, for the benefit of such Holder of the Note, the whole amount then payable on the Note for principal and interest with interest on the overdue principal and, to the extent that payments of the interest shall be legally enforceable, on overdue installments of interest and all other amounts owing to the Holders of such Notes under this Indenture, at the Applicable Note Interest Rate or Default Interest Rate, as applicable, and, in addition, an amount sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements, and advances of the Trustee and the Holders and their agents and counsel.

If the Issuer or the Co-Issuer fails to pay those amounts immediately on demand, the Trustee, in its own name and as Trustee of an express trust, may, and shall at the direction of a Majority of the Controlling Class, institute a Proceeding for the collection of the sums due, may prosecute the Proceeding to judgment or final decree, and may enforce the same against the Applicable Issuers or any other obligor on the Notes and collect the monies determined to be payable in the manner provided by law out of the Collateral.

If an Event of Default is continuing, the Trustee may, and shall upon written direction of a Majority of the Controlling Class, proceed to protect and enforce its rights and the rights of the Holders of the Notes by any appropriate Proceedings as is deemed most effective (if no direction is received by

007359

the Trustee) or as the Trustee may be directed by a Majority of the Controlling Class, to protect and enforce the rights of the Trustee and the Holders of the Notes, whether for the specific enforcement of any agreement in this Indenture or in aid of the exercise of any power granted in this Indenture, or to enforce any other proper remedy or legal or equitable right vested in the Trustee by this Indenture or by law. The reasonable compensation, costs, expenses, disbursements and advances incurred or paid by the Trustee and its agents and counsel, in connection with such Proceeding, including, without limitation, the exercise of any remedies pursuant to Section 5.4, shall be reimbursed to the Trustee pursuant to Section 6.7.

If any Proceedings are pending relating to the Issuer or the Co-Issuer or any other obligor on the Notes under the Bankruptcy Law or any other applicable bankruptcy, insolvency, or other similar law, or if a receiver, assignee, or trustee in bankruptcy or reorganization, liquidator, sequestrator, or similar official has been appointed for or taken possession of the Issuer, the Co-Issuer or their respective property or any other obligor on the Notes or its property, or if any other comparable Proceedings are pending relating to the Issuer, the Co-Issuer, or other obligor on the Notes, or the creditors or property of the Issuer, the Co-Issuer, or other obligor on the Notes or the Co-Issuer, regardless of whether the principal of any Notes is then payable by declaration or otherwise and regardless of whether the Trustee has made any demand pursuant to this Section 5.3, may, by intervention in the Proceedings or otherwise:

(a)     file and prove claims for the whole amount of principal and interest owing and unpaid in respect of the Notes, and file any other papers or documents appropriate and take any other appropriate action (including sitting on a committee of creditors) to have the claims of the Trustee (including any claim for reasonable compensation to the Trustee and each predecessor Trustee, and their respective agents, attorneys, and counsel, and for reimbursement of all expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee, except as a result of negligence or bad faith) and of the Holders of the Notes allowed in any Proceedings relating to the Issuer, the Co-Issuer, or other obligor on the Notes or to the creditors or property of the Issuer, the Co-Issuer, or other obligor on the Notes;

(b)     unless prohibited by applicable law, vote on behalf of the Holders of the Notes in any election of a trustee or a standby trustee in arrangement, reorganization, liquidation, or other bankruptcy or insolvency Proceedings or person performing similar functions in comparable Proceedings; and

(c)     collect and receive any monies or other property payable to or deliverable on any such claims, and distribute all amounts received with respect to the claims of the Holders of the Notes and of the Trustee on their behalf; and any trustee, receiver or liquidator, custodian, or other similar official is authorized by each of the Holders of the Notes to make payments to the Trustee, and, if the Trustee consents to making payments directly to the Holders of the Notes, to pay to the Trustee amounts sufficient to cover reasonable compensation to the Trustee, each predecessor Trustee, and their respective agents, attorneys, and counsel, and all other reasonable expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee except as a result of negligence or bad faith.

Nothing in this Indenture shall authorize the Trustee to authorize or consent to or vote for or accept or adopt on behalf of the Holder of any Note, any plan of reorganization, arrangement, adjustment, or composition affecting the Notes or any Holder of Notes, or to authorize the Trustee to vote on the claim of the Holder of any Note in any Proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar person.

Notwithstanding anything in this Section 5.3 to the contrary, the Trustee may not sell or liquidate the Collateral or institute Proceedings in furtherance of the sale or liquidation of the Collateral pursuant to this Section 5.3 except according to Section 5.5(a).

007360

Section 5.4.   <u>Remedies</u>.

     (a)    If an Event of Default is continuing, and the Notes have been declared payable and the declaration and its consequences have not been rescinded, or at any time after the Stated Maturity, the Co-Issuers agree that the Trustee may, and shall, upon written direction of a Majority of the Controlling Class, to the extent permitted by applicable law, exercise one or more of the following rights:

     (i)    institute Proceedings for the collection of all amounts then payable on the Notes or otherwise payable under this Indenture, whether by declaration or otherwise, enforce any judgment obtained, and collect from the Collateral any monies adjudged due;

     (ii)    sell or liquidate all or a portion of the Collateral or interests in it, at one or more public or private sales called and conducted in any manner permitted by law and in accordance with Section 5.17;

     (iii)    institute Proceedings from time to time for the complete or partial foreclosure of this Indenture with respect to the Collateral;

     (iv)    exercise any remedies of a secured party under the UCC and take any other appropriate action to protect and enforce the rights of the Trustee and the Holders of the Notes under this Indenture; and

     (v)    exercise any other rights that may be available at law or in equity;

*except* that the Trustee may not sell or liquidate the Collateral or institute Proceedings in furtherance of the sale or liquidation of the Collateral pursuant to this Section 5.4 except according to Section 5.5(a).

     (b)    If an Event of Default as described in Section 5.1(f) is continuing the Trustee may, with the consent of, and shall, at the direction of, the Holders of not less than 25% of the Aggregate Outstanding Amount of the Controlling Class, institute a Proceeding solely to compel performance of the covenant or agreement or to cure the representation or warranty, the breach of which gave rise to the Event of Default under Section 5.1(f), and enforce any equitable decree or order arising from the Proceeding.

     (c)    Upon any sale, whether made under the power of sale given under this Indenture or by virtue of judicial Proceedings, any Holders or the Portfolio Manager (subject to the Management Agreement) may bid for and purchase any part of the Collateral and, upon compliance with the terms of sale, may hold, retain, possess, or dispose of the Collateral in its or their own absolute right without accountability.

     Upon any sale, whether made under the power of sale given under this Indenture or by virtue of judicial Proceedings, the receipt of the Trustee, or of the Officer making a sale under judicial Proceedings, shall be a sufficient discharge to the purchasers at any sale for their purchase money, and the purchasers shall not be obliged to see to its application.

     Any sale, whether under any power of sale given under this Indenture or by virtue of judicial Proceedings, shall bind the Co-Issuers, the Trustee, and the Holders of the Notes, shall operate to divest all interest whatsoever, either at law or in equity, of each of them in the property sold, and shall be a perpetual bar, both at law and in equity, against each of them and their successors and assigns, and against all persons claiming through or under them.

007361

(d)     Notwithstanding any other provision of this Indenture, none of the Secured Parties may, before the date that is one year and one day (or if longer, any applicable preference period plus one day) after the payment in full of all Notes and the reduction of the Commitment to zero in the case of the Class A-1A Notes, institute against, or join any other person in instituting against, the Issuer or the Co-Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium, or liquidation Proceedings, or other Proceedings under the Bankruptcy Law or any similar laws in any jurisdiction. Nothing in this Section 5.4 shall preclude the Trustee or any Secured Party (i) from taking any action before the expiration of that period in (A) any case or Proceeding voluntarily filed or commenced by the Issuer or the Co-Issuer or (B) any involuntary insolvency Proceeding filed or commenced by a person other than a Secured Party, or (ii) from commencing against the Issuer or the Co-Issuer or any of its properties any legal action that is not a bankruptcy, reorganization, arrangement, insolvency, moratorium, or liquidation Proceeding.

Section 5.5.     Optional Preservation of Collateral.

(a)     Notwithstanding anything to the contrary in this Indenture, if an Event of Default is continuing, the Trustee shall retain the Collateral intact, collect, and cause the collection of the proceeds of the Collateral and make and apply all payments and deposits and maintain all accounts in respect of the Collateral and the Notes, and any Hedge Agreements (other than amounts received under a Hedge Agreement that are used in putting a Replacement Hedge in place), in accordance with the Priority of Payments and Article 10 and Article 12 unless:

(i)     the Trustee determines that the anticipated net proceeds of a sale or liquidation of the Collateral would be sufficient to discharge in full the amounts then due and unpaid on the Notes for principal and interest (including Defaulted Interest and Deferred Interest and any interest on the Defaulted Interest and Deferred Interest), all Administrative Expenses, all other amounts (if any) then payable to any Hedge Counterparty by the Issuer (including any applicable termination payments) net of all amounts then payable to the Issuer by any Hedge Counterparty and all other amounts then payable under clause (3) of Section 11.1(a)(i) and a Majority of the Controlling Class agrees with that determination; or

(ii)     in the case of an Event of Default other than pursuant Section 5.1 (d), the Holders of a Majority of each of the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes, the Class A-4 Notes, the Class B Notes and the Class C Notes direct the sale and liquidation of the Collateral; or

(iii)     in the event of an Event of Default pursuant to Section 5.1(d), a Majority of the Holders of the Class A Notes (voting together as a single Class) direct the sale and liquidation of the Collateral.

The Trustee shall give written notice of the retention of the Collateral to the Issuer with a copy to the Co-Issuer and the Portfolio Manager. So long as the Event of Default is continuing, any retention pursuant to this Section 5.5(a) may be rescinded at any time when the conditions specified in clause (i) or (ii) exist.

(b)     Nothing contained in Section 5.5(a) shall be construed to require the Trustee to sell the Collateral if the conditions in clause (i) or (ii) of Section 5.5(a) are not satisfied. Nothing contained in Section 5.5(a) shall be construed to require the Trustee to preserve the Collateral if prohibited by applicable law.

007362

(c)      In determining whether the condition specified in Section 5.5(a)(i) exists, the Trustee shall obtain bid prices with respect to each security contained in the Collateral from two nationally recognized dealers (or if there is only one market maker, that market maker and if there is no market maker, from a pricing service), at the time making a market in those securities, and shall compute the anticipated proceeds of sale or liquidation on the basis of the lower of the bid prices for each security. In addition, for the purposes of determining issues relating to the valuation of the Collateral, the satisfaction of the conditions specified in this Indenture, the execution of a sale or liquidation of the Collateral, and the execution of a sale or other liquidation of the Collateral in connection with a determination whether the condition specified in Section 5.5(a)(i) exists, the Trustee may retain, at the Issuer's expense, and rely on an opinion of an Independent investment banking firm of national reputation, which may be the Placement Agent.

The Trustee shall deliver to the Class E Certificates Paying Agent (for forwarding to the Holders of Class E Certificates), the Holders of the Notes, the Co-Issuers, the Initial Purchaser, the Portfolio Manager and the Hedge Counterparties a report stating the results of any determination required pursuant to Section 5.5(a)(i). The Trustee shall make the determinations required by Section 5.5(a)(i) after an Event of Default at the request of a Majority of the Controlling Class at any time during which the Trustee retains the Collateral pursuant to Section 5.5(a). The Trustee shall obtain (at the Issuer's expense) a letter of a firm of Independent certified public accountants confirming the accuracy of each calculation made by the Trustee pursuant to Section 5.5(a)(i) and certifying their conformity to the requirements of this Indenture.

(d)      Notwithstanding anything in this Indenture to the contrary, the Trustee may not, and the Holders of the Notes representing the requisite percentage of the Aggregate Outstanding Amount of the Notes specified in Section 5.4 or 5.5, may not instruct the Trustee to sell or liquidate or (except in connection with the concurrent execution of a Replacement Hedge) terminate any Hedge Agreement during the continuance of an Event of Default until all Collateral other than the Hedge Agreements has been sold or liquidated and its proceeds applied in accordance with this Indenture.

(e)      Collateral may not be sold or liquidated pursuant to Section 5.5(a)(i) after the last date on which the sale or liquidation is permitted under Section 5.5(a)(i) with respect to a determination made pursuant to Section 5.5(a)(i) (the last permitted date being determined by the Trustee under Section 5.5(a)(i)), unless a new determination is made in accordance with Section 5.5(a)(i) and the Collateral is sold or liquidated before the last sale date permitted in accordance with the new determination.

Section 5.6.      <u>Trustee May Enforce Claims Without Possession of Notes</u>.

All rights of action and claims under this Indenture or under any of the Notes may be prosecuted and enforced by the Trustee without the possession of any of the Notes or their production in any trial or other Proceeding relating to them, and any Proceeding instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment shall be applied as provided in Section 5.7.

In any Proceedings brought by the Trustee (and any Proceedings involving the interpretation of any provision of this Indenture to which the Trustee shall be a party) the Trustee shall be held to represent all the Holders of the Notes.

007363

Section 5.7.    <u>Application of Money Collected</u>.

Any money collected by the Trustee with respect to the Notes pursuant to this Article 5 and any money that may then be held or subsequently received by the Trustee with respect to the Notes under this Indenture shall be applied, subject to Section 13.1 and in accordance with Section 11.1, at the dates fixed by the Trustee.

Section 5.8.    <u>Limitation on Suits</u>.

No Holder of any Note shall have any right to institute any Proceedings, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy under this Indenture, unless:

(a)       the Holder has previously given to the Trustee written notice of an Event of Default;

(b)       the Holders of not less than 25% of the Aggregate Outstanding Amount of the Controlling Class shall have made written request to the Trustee to institute Proceedings with respect to the Event of Default in its own name as Trustee under this Indenture and the Holders have offered to the Trustee indemnity satisfactory to it against the expenses and liabilities to be incurred in compliance with the request;

(c)       the Trustee for 30 days after its receipt of the notice, request, and offer of indemnity has failed to institute a Proceeding; and

(d)       no direction inconsistent with the written request has been given to the Trustee during the 30 day period by a Majority of the Controlling Class.

No one or more Holders of Notes have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect the rights of any other Holders of Notes of the same Class or to obtain or to seek to obtain priority or preference over any other Holders of the Notes of the same Class or to enforce any right under this Indenture, except in the manner provided in this Indenture and for the equal and ratable benefit of all the Holders of Notes of the same Class subject to and in accordance with Section 13.1 and the Priority of Payments.

If the Trustee receives conflicting or inconsistent requests and indemnity from two or more groups of Holders of the Controlling Class, each representing less than a Majority of the Controlling Class, the Trustee shall take the action requested by the Holders of the largest percentage in Aggregate Outstanding Amount of the Controlling Class, notwithstanding any other provisions of this Indenture.

Section 5.9.    <u>Unconditional Rights of Holders of Notes</u>.

Notwithstanding any provision of this Indenture other than this Section 5.9 and Sections 2.8(i), 5.4(d), and 13.1, the Holder of any Note shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest on such Note as it comes due in accordance with the Priority of Payments and Section 13.1, and, subject to Section 5.8, to institute proceedings for the enforcement of any such payment, and that right shall not be impaired without the consent of the Holder. Holders of Notes ranking junior to Notes still Outstanding may not institute proceedings for the enforcement of any such payment until no Note ranking senior to their Note remains Outstanding, subject to Section 5.8, and shall not be impaired without the consent of any such Holder.  For so long as any Notes are Outstanding, the Class E Certificates Paying Agent shall not be entitled to any payment of any

145

amount for payments to the Holders of the Class E Certificates pursuant to the Class E Certificate Documents, to the extent legally permitted, on a claim against the Issuer unless there are sufficient funds to pay such amounts to the Class E Certificates Paying Agent in accordance with the Priority of Payments.

Section 5.10.     Restoration of Rights and Remedies.

If the Trustee or the Holder of any Note has instituted any Proceeding to enforce any right under this Indenture and the Proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to the Holder, then, subject to any determination in the Proceeding, the Co-Issuers, the Trustee and the Holder shall be restored to their former positions under this Indenture, and thereafter all rights of the Trustee and the Holder shall continue as though no Proceeding had been instituted.

Section 5.11.     Rights and Remedies Cumulative.

No right in this Indenture conferred on or reserved to the Trustee or to the Holders of Notes is intended to be exclusive of any other right, and every right shall, to the extent permitted by law, be cumulative and in addition to every other right given under this Indenture or now or hereafter existing at law or in equity or otherwise.  The assertion or employment of any right under this Indenture, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right.

Section 5.12.     Delay or Omission Not Waiver.

No delay or omission of the Trustee or the Holder of any Note to exercise any right accruing upon any Event of Default shall impair the right or be a waiver of the Event of Default or an acquiescence in it or of a subsequent Event of Default.  Every right given by this Article 5 or by law to the Trustee or to the Holders of Notes may be exercised from time to time, and as often as deemed expedient, by the Trustee or by the applicable Holders.

Section 5.13.     Control by Majority of the Controlling Class.

(a)     Notwithstanding any other provision of this Indenture, during the continuance of an Event of Default, a Majority of the Controlling Class, with respect to the Notes, may institute and direct the time, method, and place of conducting any Proceeding for any remedy available to the Trustee, or exercising any right of the Trustee with respect to the Notes, if:

(i)     the direction does not conflict with any rule of law or with any express provision of this Indenture; and

(ii)     the Trustee has been indemnified to its reasonable satisfaction (and the Trustee need not take any action that it determines might involve it in liability unless it has received an indemnity against the liability).

Notwithstanding the foregoing, only a Majority of the Controlling Class may direct proceedings with respect to remedies specified in Section 5.4(a) or otherwise with respect to the Collateral.

(b)     The Trustee may take any other action deemed proper by the Trustee that is not inconsistent with a direction under Section 5.13(a).  Subject to Section 6.1, the Trustee need not take any action that it determines might involve it in liability (unless the Trustee has received an indemnity against the liabilities reasonably satisfactory to it) and during the continuance of an Event of Default that has not

146

been cured, or waived, the Trustee shall, before receiving directions from a Majority of the Controlling Class exercise the rights expressly vested in it by this Indenture and use the same degree of care and skill in their exercise with respect to the Event of Default as is required by Section 6.1(b).

(c)     Any direction to the Trustee to undertake a Sale of the Collateral shall be in accordance with Section 5.4 or 5.5.

Section 5.14.     Waiver of Past Defaults.

Before a judgment or decree for payment of any money due has been obtained by the Trustee, as provided in this Article 5, a Majority of the Controlling Class may on behalf of the Holders of all the Notes waive any past Default and its consequences, except a Default:

(a)     in the payment of the principal or Redemption Price of any Note or in the payment of interest (including Defaulted Interest, Deferred Interest, and any interest on Defaulted Interest or Deferred Interest) on the Notes;

(b)     with respect to a provision of this Indenture that under Section 8.2 cannot be modified or amended without the waiver or consent of the Holder of each Outstanding Note adversely affected by the modification or amendment;

(c)     in the payment of amounts due to the Portfolio Manager, the Trustee or the Hedge Counterparty, which may only be waived with the consent of the affected party; or

(d)     arising as a result of an Event of Default described in Section 5.1(e), (g) or (h).

Upon any such waiver, the Default shall cease to exist, and any Event of Default arising from it shall be cured, for every purpose of this Indenture, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereto. The Trustee shall promptly give written notice of any such waiver to the Portfolio Manager, the Class E Certificates Paying Agent (for forwarding to the Holders of Class E Certificates) and each Holder of Notes.

Section 5.15.     Undertaking for Costs.

All parties to this Indenture agree, and each Holder of any Note by its acceptance of its Note agrees, that in any suit for the enforcement of any right under this Indenture, or in any suit against the Trustee or the Portfolio Manager for any action taken or omitted by it as Trustee or for any action taken or omitted by the Portfolio Manager, as applicable, any court may in its discretion require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and that the court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section 5.15 shall not apply to any suit instituted by the Trustee, the Portfolio Manager, to any suit instituted by any Holder, or group of Holders, of Notes holding in the aggregate more than 10% in Aggregate Outstanding Amount of the Controlling Class, or to any suit instituted by any Holder of Notes for the enforcement of the payment of the principal of or interest or distributions on, as the case may be any Note or any other amount payable under this Indenture after the applicable Stated Maturity (or, in the case of redemption, after the applicable Redemption Date).

007366

Section 5.16.    Waiver of Stay or Extension Laws.

          To the extent that they may lawfully do so, the Co-Issuers covenant that they will not at any time insist on, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law or any valuation, appraisement, redemption, or marshalling law or rights, in each case wherever enacted, now or at any time hereafter in force, that may affect the covenants, the performance of, or any remedies under this Indenture.  To the extent that they may lawfully do so, the Co-Issuers expressly waive all benefit or advantage of any such law or rights, and covenant that they shall not delay or impede the execution of any power in this Indenture granted to the Trustee or the Holders of the Notes but will permit the execution of every power as though the law had not been enacted or rights created.

Section 5.17.    Sale of Collateral.

          (a)      The power to effect any sale (a "Sale") of any portion of the Collateral pursuant to Sections 5.4 and 5.5 shall not be exhausted by any one or more Sales as to any portion of the Collateral remaining unsold, but shall continue unimpaired until the entire Collateral is sold or all amounts secured by the Collateral have been paid.  The Trustee may upon notice to the Holders of the Notes and the Class E Certificates Paying Agent (for forwarding to the Holders of Class E Certificates), and shall, at the direction of a Majority of the Controlling Class from time to time postpone any Sale by public announcement made at the time and place of the Sale.  The Trustee waives its rights to any amount fixed by law as compensation for any Sale.  The Trustee may deduct the reasonable expenses incurred by it in connection with a Sale from its proceeds notwithstanding Section 6.7.

          (b)      The Trustee may bid for and acquire any portion of the Collateral in connection with a public Sale of the Collateral, and may pay all or part of the purchase price by crediting against amounts owing on the Notes or other amounts secured by the Collateral all or part of the net proceeds of the Sale after deducting the reasonable expenses incurred by the Trustee in connection with the Sale notwithstanding Section 6.7.  The Notes need not be produced to complete any Sale, or for the net proceeds of the Sale to be credited against amounts owing on the Notes (in the case of the Collateral).  The Trustee may hold, lease, operate, manage, or otherwise deal with any property so acquired in any manner permitted by law in accordance with this Indenture.

          (c)      If any portion of the Collateral consists of securities issued without registration under the Securities Act ("Unregistered Securities"), the Trustee may seek an Opinion of Counsel, or, if no Opinion of Counsel can be obtained, seek a no action position from the Securities and Exchange Commission or any other relevant federal or state regulatory authorities, regarding the legality of a public or private Sale of the Unregistered Securities.

          (d)      The Trustee shall execute and deliver an appropriate instrument of transfer transferring its interest in any portion of the Collateral in connection with its Sale.  In addition, the Trustee is irrevocably appointed the agent and attorney-in-fact of the Issuer to transfer its interest in any portion of the Collateral in connection with its Sale, and to take all action necessary to effect the Sale.  No purchaser or transferee at a Sale shall be bound to ascertain the Trustee's authority, to inquire into the satisfaction of any conditions precedent, or see to the application of any monies.

Section 5.18.    Action on the Notes.

          The Trustee's right to seek and recover judgment on the Notes or under this Indenture shall not be affected by the seeking or obtaining of or application for any other relief under or with respect to this Indenture.  Neither the lien of this Indenture nor any rights or remedies of the Trustee or

007367

the Holders of the Notes shall be impaired by the recovery of any judgment by the Trustee against the Issuer or by the levy of any execution under the judgment on any portion of the Collateral or on any of the assets of the Issuer or the Co-Issuer.

ARTICLE 6

THE TRUSTEE

Section 6.1.     <u>Certain Duties and Responsibilities</u>.

(a)          Except during the continuance of an Event of Default:

(i)     the Trustee undertakes to perform the duties and only the duties specifically provided in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(ii)     in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, on certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; the Trustee shall examine any certificates or opinions that by any provision of this Indenture are specifically required to be furnished to the Trustee to determine whether or not they substantially conform on their face to the requirements of this Indenture and shall promptly notify the party delivering the same if the certificate or opinion does not conform.  If a corrected form has not been delivered to the Trustee within 15 days after the notice from the Trustee, the Trustee shall so notify the Holders of the Notes and the Class E Certificates Paying Agent (for forwarding to the Holders of Class E Certificates).

(b)          If the Trustee has actual knowledge that an Event of Default is continuing, the Trustee shall, before the receipt of directions from a Majority of the Controlling Class, exercise the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise, as a prudent person would use under the circumstances in the conduct of the person's own affairs.

(c)          No provision of this Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(i)     this subsection shall not be construed to limit the effect of subsection (a) of this Section 6.1;

(ii)     the Trustee shall not be liable for any error of judgment made in good faith by a Trust Officer, unless it is proven that the Trustee was negligent in ascertaining the pertinent facts;

(iii)     the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Issuer or the Co-Issuer or the Portfolio Manager in accordance with this Indenture or a Majority (or the other percentage required by this Indenture) of the Controlling Class (or other Class if required or permitted by this Indenture); and

(iv)     no provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any extraordinary financial liability in the performance of any of its duties under this Indenture, or in the exercise of any of its rights contemplated under this Indenture, if it

149

has reasonable grounds for believing that repayment of the funds or indemnity satisfactory to it against the risk or liability is not reasonably assured to it; provided that the reasonable costs of performing its ordinary services under this Indenture shall not be deemed an "extraordinary financial liability" for purposes hereof.

(d)     For all purposes under this Indenture, the Trustee shall not have notice or knowledge of any Event of Default described in Section 5.1(d) through 5.1(i) or any Default described in Section 5.1(e) through 5.1(i) unless a Trust Officer assigned to and working in the Corporate Trust Office has actual knowledge of it or unless written notice of any event that is in fact the an Event of Default or Default is received by the Trustee at the Corporate Trust Office, and the notice references the Notes generally the Issuer, the Co-Issuer, the Collateral or this Indenture.  For purposes of determining the Trustee's responsibility and liability under this Indenture, whenever reference is made in this Indenture to an Event of Default or a Default, the reference shall be construed to refer only to an Event of Default or Default of which the Trustee has notice as described in this Section 6.1.

(e)     Whether or not therein expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to this Section 6.1 and Section 6.3.

Section 6.2.     Notice of Default.

Promptly (and in no event later than five Business Days) after the occurrence of any Default known to the Trustee or after any declaration of acceleration has been made or delivered to the Trustee pursuant to Section 5.2, the Trustee shall transmit notice of all Defaults under this Indenture known to the Trustee, unless the Default has been cured or waived, and of the declaration by mail to the Portfolio Manager and the Co-Issuers, each Rating Agency, the Class E Certificates Paying Agent (for forwarding to the Holders of Class E Certificates) and to all Holders of Notes, as their names and addresses appear on the Indenture Register, and, upon written request therefor by a Beneficial Owner in the form of Exhibit I certifying that it is a Beneficial Owner, to the Beneficial Owner (or its designee).  In addition, (i) if and for so long as any Class of Notes is listed on the Irish Stock Exchange and so long as the rules of such stock exchange so require, notices to the Holders of such Notes shall also be given by the Irish Paying and Listing Agent by publishing in the Irish Stock Exchange's Daily Official List and (ii) the Cayman Islands Stock Exchange, for so long as any Class E Certificates, Class Q-1 Securities or Class P Securities are listed on the Cayman Islands Stock Exchange and so long as the rules of the exchange so require.

Section 6.3.     Certain Rights of Trustee.

Except as otherwise provided in Section 6.1:

(a)     the Trustee may rely and shall be protected in acting or refraining from acting on any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, note, or other paper or document (including but not limited to any reports prepared and delivered under Article 10) believed by it to be genuine and to have been signed or presented by the proper party or parties;

(b)     any request or direction of the Issuer or the Co-Issuer mentioned in this Indenture shall be sufficiently evidenced by an Issuer Request or Issuer Order;

(c)     whenever in the administration of this Indenture the Trustee

007369

(i) deems it desirable that a matter be proved or established before taking, suffering, or omitting any action under this Indenture, the Trustee may, in the absence of bad faith on its part, rely on an Officer's certificate (unless other evidence is specifically prescribed in this Indenture) or

(ii) is required to determine the value of, or any other matter with respect to, any Collateral or funds under this Indenture or the cash flows projected to be received therefrom, the Trustee may, in the absence of bad faith on its part, rely on reports of nationally recognized accountants, investment bankers, or other persons qualified to provide the information required to make the determination, including nationally recognized dealers in securities of the type being valued and securities quotation services;

(d) as a condition to taking or omitting to take any action under this Indenture, the Trustee may consult with counsel and the advice of the counsel or any Opinion of Counsel shall be full and complete authorization and protection with respect to any action taken or omitted by it under this Indenture in good faith and in reliance thereon;

(e) the Trustee need not exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the Holders of the Indenture Securities pursuant to this Indenture, unless the Holders have offered to the Trustee security or indemnity satisfactory to it against the costs and liabilities that might reasonably be incurred by it in compliance with the request or direction;

(f) the Trustee need not make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, note, or other paper or document, but the Trustee, in its discretion, may, and upon the written direction of a Majority of the Controlling Class or of a Rating Agency shall, make any the further inquiry or investigation into the facts or matters that it deems appropriate or as it is directed, and the Trustee shall be entitled, on reasonable prior notice to the Co-Issuers and the Portfolio Manager, to examine the books and records relating to the Notes and the Collateral, personally or by agent or attorney, during the Co-Issuers' or the Portfolio Manager's normal business hours. The Trustee shall, and shall cause its agents to, hold in confidence all such information, except to the extent (i) disclosure may be required by law by any regulatory or administrative authority and (ii) that the Trustee, in its sole judgment, determines that disclosure is consistent with its obligations under this Indenture; provided, however, that the Trustee may disclose on a confidential basis any such information to its agents, attorneys and auditors in connection with the performance of its responsibilities hereunder;

(g) the Trustee may execute any of the trusts or powers under this Indenture or perform any duties under this Indenture either directly or by or through agents or attorneys, and the Trustee shall not be responsible for any misconduct or negligence on the part of any non-Affiliated agent, or non-Affiliated attorney, appointed with due care by it under this Indenture;

(h) the Trustee shall not be liable for any action it takes or omits to take in good faith that it reasonably believes to be authorized or within its rights or powers under this Indenture;

(i) nothing in this Indenture shall be construed to impose an obligation on the Trustee to recalculate, evaluate, or verify any report, certificate, or information received from the Issuer or Portfolio Manager;

(j) the Trustee may request and receive (and rely on) instruction from the Issuer, the Portfolio Manager, or the accountants identified in the Accountants' Certificate (and in the absence of its receipt of timely instruction from them, may obtain from an Independent accountant at the expense of the

151

Issuer) as to the application of GAAP to the extent any defined term in this Indenture, or any calculation required to be made or determined by the Trustee under this Indenture, is dependent on or defined by reference to United States generally accepted accounting principles ("GAAP"), in any instance;

(k)     the permissive rights of the Trustee to take or refrain from taking any actions enumerated in this Indenture are not duties;

(l)     the Trustee is not responsible for the accuracy of the books and records of, or for any acts or omissions of, the Depositary, any Transfer Agent, Custodian, Issuer Accounts Securities Intermediary, Class P-1 Accounts Securities Intermediary, Class P-2 Accounts Securities Intermediary, Collateral Administrator, Clearstream, Euroclear, Calculation Agent, or any Paying Agent (in each case, other than the Bank acting in that capacity);

(m)     in making or disposing of any investment permitted by this Indenture, the Trustee is authorized to deal with itself (in its individual capacity) or with any one or more of its Affiliates, whether it or the Affiliate is acting as a subagent of the Trustee or for any third person or dealing as principal for its own account. If otherwise qualified, obligations of the Bank or any of its Affiliates shall qualify as Eligible Investments under this Indenture; and

(n)     if the Bank is also acting in the capacity of Paying Agent, Transfer Agent, Custodian, Calculation Agent, Issuer Accounts Securities Intermediary, Class P-1 Accounts Securities Intermediary or Class P-2 Accounts Securities Intermediary under this Indenture, the rights protections, immunities, and indemnities afforded to the Trustee pursuant to this Article 6 shall also be afforded to the Bank acting in those capacities.

Section 6.4.     Not Responsible for Recitals or Issuance of Indenture Securities.

The recitals contained in this Indenture and in the Indenture Securities, other than the Certificate of Authentication, shall be taken as the statements of the Applicable Issuers. The Trustee assumes no responsibility for their correctness. The Trustee makes no representation as to the validity or sufficiency of this Indenture (except as may be made with respect to the validity of the Trustee's obligations under this Indenture), the Collateral or the Indenture Securities. The Trustee shall not be accountable for the use or application by the Co-Issuers of the Indenture Securities or their proceeds or any money paid to the Co-Issuers pursuant to this Indenture.

Section 6.5.     May Hold Indenture Securities.

The Trustee, any Paying Agent, Indenture Registrar, or any other agent of the Co-Issuers, in its individual or any other capacity, may become the owner or pledgee of Indenture Securities and may otherwise deal with the Co-Issuers or any of their Affiliates with the same rights it would have if it were not Trustee, Paying Agent, Indenture Registrar, or other agent.

Section 6.6.     Money Held in Trust.

Money held by the Trustee under this Indenture shall be held in trust to the extent required in this Indenture. The Trustee shall be under no liability for interest on any money received by it under this Indenture except as otherwise agreed on with the Issuer and except to the extent of income or other gain on investments that are deposits in or certificates of deposit of the Bank in its commercial capacity and income or other gain actually received by the Trustee on Eligible Investments. Under no circumstances shall the Trustee be responsible for any losses on investments made in accordance with an

007371

Issuer Order or a written order or request by the Portfolio Manager, unless such investment is made in an obligation of the Trustee in its corporate capacity.

Section 6.7.       Compensation and Reimbursement.

(a)       The Issuer agrees:

(i)       to pay the Trustee on each Payment Date reasonable compensation for all services rendered by it under this Indenture in accordance with its letter agreement with the Trustee (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust);

(ii)       except as otherwise expressly provided in this Indenture or in its letter agreement with the Trustee, to reimburse the Trustee in a timely manner upon its request for all reasonable expenses, disbursements, and advances incurred or made by the Trustee in accordance with this Indenture (including securities transaction charges and the reasonable compensation and expenses and disbursements of its agents and legal counsel and of any accounting firm or investment banking firm employed by the Trustee pursuant to Section 5.4, 5.5, 10.5, or 10.7, except any such expense, disbursement, or advance attributable to its negligence, willful misconduct, or bad faith) but with respect to securities transaction charges, only to the extent they have not been waived during a Due Period due to the Trustee's receipt of a payment from a financial institution with respect to certain Eligible Investments, as specified by the Portfolio Manager;

(iii)       to indemnify the Trustee and its officers, directors, employees, and agents for any loss, liability, or expense incurred without negligence, willful misconduct, or bad faith on their part, arising out of or in connection with the acceptance or administration of this trust, including the costs and expenses of defending themselves (including reasonable attorney's fees and costs) against any claim or liability in connection with the exercise or performance of any of their powers or duties under this Indenture; and

(iv)       to pay the Trustee reasonable additional compensation together with its expenses (including reasonable counsel fees and costs) for any collection action taken pursuant to Section 6.13.

(b)       The Trustee's fees shall be calculated on the basis of the actual number of days elapsed divided by 360.

(c)       The Trustee shall receive amounts pursuant to this Section 6.7 as provided in Sections 11.1(a)(i) and (ii) but only to the extent that funds are available for their payment. Subject to Section 6.9, the Trustee shall continue to serve as Trustee under this Indenture notwithstanding the fact that the Trustee has not received amounts due to it under this Indenture. No direction by the Holders of the Indenture Securities shall affect the right of the Trustee to collect amounts owed to it under this Indenture. If on any date when a fee is payable to the Trustee pursuant to this Indenture insufficient funds are available for its payment any portion of a fee not so paid shall be deferred and payable on the next date on which a fee is payable and sufficient funds are available for it.

(d)       The Trustee agrees not to cause the filing of a petition in bankruptcy against the Issuer for the non-payment to the Trustee of any amounts provided by this Section 6.7 until at least one year and one day, or if longer the applicable preference period then in effect plus one day, after the payment in full of all Notes issued under this Indenture (and the reduction of the Commitment in respect of the Class A-1A Notes to zero) and the payment to the Class E Certificates Paying Agent of all amounts

153

payable with respect to the Class E Certificates in accordance with the Priority of Payments. Nothing in this Section 6.7(d) shall prohibit or otherwise prevent the Trustee from filing proofs of claim in any bankruptcy, insolvency or similar proceeding.

Section 6.8.     Corporate Trustee Required; Eligibility.

There shall at all times be a Trustee under this Indenture that is an Independent entity organized and doing business under the laws of the United States of America or of any state of the United States, authorized under those laws to exercise corporate trust powers, having a combined capital and surplus of at least U.S.$200,000,000, subject to supervision or examination by federal or state banking authority, having a rating of at least "Baa1" (and not on credit watch with negative implications) by Moody's and at least "BBB+" by S&P, and having an office within the United States. If the Trustee publishes reports of condition at least annually, pursuant to law or to the requirements of its supervising or examining authority, then for the purposes of this Section 6.8, the combined capital and surplus of the Trustee shall be its combined capital and surplus in its most recent published report of condition. If at any time the Trustee ceases to be eligible in accordance with this Section 6.8, it shall resign immediately in the manner and with the effect specified in Section 6.9.

Section 6.9.     Resignation and Removal; Appointment of Successor.

(a)     No resignation or removal of the Trustee and no appointment of a successor Trustee pursuant to this Article 6 shall become effective until the acceptance of appointment by the successor Trustee under Section 6.10. The indemnification in favor of the Trustee shall survive any resignation or removal of the Trustee.

(b)     The Trustee may resign at any time by giving not less than 30 days written notice to the Co-Issuers, the Portfolio Manager, the Holders of the Notes, the Class E Certificates Paying Agent (for forwarding to the Holders of Class E Certificates) and each Rating Agency. Upon receiving the notice of resignation, the Co-Issuers shall at the direction of a Majority of the Controlling Class promptly appoint a successor trustee satisfying the requirements of Section 6.8, by written instrument, in duplicate, executed by an Authorized Officer of the Issuer and an Authorized Officer of the Co-Issuer, one copy of which shall be delivered to the resigning Trustee and one copy to the successor Trustee, together with a copy to each Holder of Notes, the Class E Certificates Paying Agent (for forwarding to the Holders of Class E Certificates) and the Portfolio Manager. If no successor Trustee has been appointed and an instrument of acceptance by a successor Trustee has not been delivered to the Trustee within 60 days after the giving of the notice of resignation, the resigning Trustee or any Holder of a Note, on behalf of himself and all others similarly situated, may petition any court of competent jurisdiction for the appointment of a successor Trustee satisfying the requirements of Section 6.8.

(c)     The Trustee may be removed (i) at any time (including, for the avoidance of doubt, when an Event of Default is continuing) by a Majority of the Controlling Class, or (ii) by order of a court of competent jurisdiction, delivered to the Trustee and to the Co-Issuers.

(d)     If at any time:

(i)     the Trustee ceases to be eligible under Section 6.8 and fails to resign after written request by the Co-Issuers or a Majority of the Controlling Class; or

(ii)     the Trustee becomes incapable of acting or is adjudged bankrupt or insolvent or a receiver or liquidator of the Trustee or of its property appointed or any public officer takes charge

007373

or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation, or liquidation,

then, in any such case (subject to Section 6.9(a)), (A) the Co-Issuers, by Issuer Order, may, and at the direction of a Majority of the Controlling Class shall, remove the Trustee, or (B) subject to Section 5.15, or any Holder may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(e)      If the Trustee is removed or becomes incapable of acting, or if a vacancy occurs in the office of the Trustee for any reason (other than resignation), the Co-Issuers, by Issuer Order or at the direction of a Majority of the Controlling Class, shall promptly appoint a successor Trustee.  If the Co-Issuers fail to appoint a successor Trustee within 60 days after the removal or incapability or the occurrence of the vacancy, a successor Trustee may be appointed by a Majority of the Controlling Class by written instrument delivered to the Issuer and the retiring Trustee.  The successor Trustee so appointed shall, upon its acceptance of its appointment, become the successor Trustee and supersede any successor Trustee proposed by the Co-Issuers.  If no successor Trustee has been so appointed by the Co-Issuers or a Majority of the Controlling Class and accepted appointment pursuant to Section 6.10, subject to Section 5.15, then the Trustee to be replaced, or any Holder, may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Trustee.

(f)      The Co-Issuers shall give prompt notice of each resignation and each removal of the Trustee and each appointment of a successor Trustee by mailing written notice of the event by first-class mail, postage prepaid, to the Portfolio Manager, to each Rating Agency, to the Holders of Notes as their names and addresses appear in the Indenture Register and to the Class E Certificates Paying Agent (for forwarding to the Holders of Class E Certificates).  Each notice shall include the name of the successor Trustee and the address of its Corporate Trust Office.  If the Co-Issuers fail to mail the notice within ten days after acceptance of appointment by the successor Trustee, the successor Trustee shall cause the notice to be given at the expense of the Co-Issuers.

Section 6.10.      Acceptance of Appointment by Successor.

Every successor Trustee appointed under this Indenture shall execute, acknowledge, and deliver to the Co-Issuers and the retiring Trustee an instrument accepting its appointment.  Upon delivery of the required instruments, the resignation or removal of the retiring Trustee shall become effective and the successor Trustee, without any further act, shall become vested with all the rights and obligations of the retiring Trustee; but, on request of the Co-Issuers or a Majority of any Class of Notes or the successor Trustee, the retiring Trustee shall, upon payment of any amounts then due to it, execute and deliver an instrument transferring to the successor Trustee all the rights and obligations of the retiring Trustee, and shall duly assign, transfer, and deliver to the successor Trustee all property and money held by the retiring Trustee under this Indenture.  Upon request of any successor Trustee, the Co-Issuers shall execute any instruments to more fully and certainly vest in and confirm to the successor Trustee all the rights and obligations of the Trustee under this Indenture.

No successor Trustee shall accept its appointment unless at the time of its acceptance the successor is qualified and eligible under Section 6.8 and either (a) each Rating Agency has been notified and the successor has long-term debt rated within the four highest rating categories by each Rating Agency, or (b) if not rated within the four highest categories by each Rating Agency, the Rating Condition with respect to each Rating Agency is satisfied with respect thereto.

007374

Section 6.11.    <u>Merger, Conversion, Consolidation, or Succession to Business of Trustee</u>.

       Any entity into which the Trustee may be merged or converted or with which it may be consolidated, or any entity resulting from any merger, conversion, or consolidation to which the Trustee is a party, or any entity succeeding to all or substantially all of the corporate trust business of the Trustee, shall be the successor of the Trustee under this Indenture (and of the Bank under all of its other capacities under this Indenture, including as Custodian, Issuer Accounts Securities Intermediary, Class P-1 Accounts Securities Intermediary, Class P-2 Accounts Securities Intermediary, Indenture Registrar, and Paying Agent) without the execution or filing of any paper or any further act on the part of any of the parties hereto. If any of the Notes have been authenticated, but not delivered, by the Trustee then in office, any successor by merger, conversion, or consolidation to the authenticating Trustee may adopt the authentication and deliver the Notes so authenticated with the same effect as if the successor Trustee had itself authenticated the Notes.

Section 6.12.    <u>Co-Trustees</u>.

       At any time, to meet the legal requirements of any jurisdiction in which any part of the Collateral may at the time be located, the Co-Issuers and the Trustee may appoint a co-trustee (subject to the approval of the Rating Agencies) to act jointly with the Trustee, with respect to all or any part of the Collateral, with the power to file proofs of claim and take any other actions pursuant to Section 5.6 in this Indenture and to make claims and enforce rights of action on behalf of the Holders of the Notes and the, as the Holders themselves have the right to do, subject to the other provisions of this Section 6.12.

       The Co-Issuers shall join with the Trustee in the execution, delivery, and performance of all instruments and agreements necessary or proper to appoint a co-trustee. If the Co-Issuers do not join in the appointment within 15 days after they receive a request to do so, the Trustee may make the appointment.

       Any instruments to more fully confirm a co-trustee's appointment shall, on request, be executed, acknowledged, and delivered by the Co-Issuers. The Co-Issuers agree to pay (but only from and to the extent of the Collateral), to the extent funds are available therefor under Section 11.1(a)(i)(1), any reasonable fees and expenses in connection with the appointment.

       Every co-trustee shall, to the extent permitted by law, but to that extent only, be appointed subject to the following terms:

       (a)    the Notes shall be authenticated and delivered and all rights and obligations under this Indenture in respect of the custody of securities, cash, and other personal property held by, or required to be deposited or pledged with, the Trustee under this Indenture, shall be exercised solely by the Trustee;

       (b)    the rights and obligations conferred or imposed on the Trustee in respect of any property covered by the appointment of a co-trustee shall be conferred or imposed on and exercised or performed by the Trustee or by the Trustee and the co-trustee jointly as provided in the instrument appointing the co-trustee;

       (c)    the Trustee at any time, by an instrument in writing executed by it, with the concurrence of the Co-Issuers evidenced by an Issuer Order, may accept the resignation of or remove any co-trustee appointed under this Section 6.12, and if an Event of Default is continuing, the Trustee shall have the power to accept the resignation of, or remove, any co-trustee without the concurrence of the Co-

156

Issuers. A successor to any co-trustee so resigned or removed may be appointed in the manner provided in this Section 6.12;

(d)     no co-trustee under this Indenture shall be personally liable because of any act or omission of the Trustee under this Indenture;

(e)     the Trustee shall not be liable because of any act or omission of a co-trustee; and

(f)     any Act of Holders of Notes delivered to the Trustee shall be deemed to have been delivered to each co-trustee.

Section 6.13.     Certain Duties of Trustee Related to Delayed Payment of Proceeds.

If in any month the Trustee has not received a payment with respect to any Pledged Obligation on its Due Date:

(a)     the Trustee shall promptly notify the Issuer and the Portfolio Manager in writing, and

(b)     unless the payment is received by the Trustee within three Business Days (or the end of the applicable grace period for the payment, if longer) after the notice, or unless the Issuer, in its absolute discretion (but only to the extent permitted by Section 10.2(a)), makes provision for the payment satisfactory to the Trustee in accordance with Section 10.2(a),

the Trustee shall request the issuer of the Pledged Obligation, the trustee under the related Underlying Instrument, or paying agent designated by either of them to make the payment as soon as practicable after the request but in no event later than three Business Days after the date of the request. If the payment is not made within that time period, the Trustee, subject to clause (iv) of Section 6.1(c), shall take the action directed by the Portfolio Manager in writing. Any such action shall be without prejudice to any right to claim a Default or Event of Default under this Indenture. If the Issuer or the Portfolio Manager requests a release of a Pledged Obligation or delivers a Collateral Obligation in connection with any such action under the Management Agreement, the release or substitution shall be subject to Section 10.7 and Article 12. Notwithstanding any other provision of this Indenture, the Trustee shall deliver to the Issuer or its designee any payment with respect to any Pledged Obligation or any Collateral Obligation received after its Due Date to the extent the Issuer previously made provisions for the payment satisfactory to the Trustee in accordance with this Section 6.13 and the payment shall not be part of the Collateral.

Section 6.14.     Authenticating Agents.

Upon the request of the Co-Issuers, the Trustee shall, and if the Trustee so chooses the Trustee may, appoint one or more Authenticating Agents with power to act on its behalf and subject to its direction in the authentication of Indenture Securities in connection with issuance, transfers, and exchanges under Sections 2.4, 2.5, 2.6, 2.7 and 8.5, as fully to all intents and purposes as though each Authenticating Agent had been expressly authorized by those Sections to authenticate the Notes. For all purposes of this Indenture, the authentication of Indenture Securities by an Authenticating Agent pursuant to this Section 6.14 shall be the authentication of Indenture Securities "by the Trustee."

Any Authenticating Agent may at any time resign by giving written notice of resignation to the Trustee and the Issuer. The Trustee may at any time terminate the agency of any Authenticating Agent by giving written notice of termination to the Authenticating Agent and the Co-Issuers.

157

007376

The Co-Issuers agree to pay to each Authenticating Agent from time to time reasonable compensation for its services, and reimbursement for its reasonable expenses relating to its services as an Administrative Expense; provided, however, that if the Trustee elects to appoint an Authenticating Agent without the approval or request of the Co-Issuers, then the Trustee shall pay such compensation and reimbursement. Sections 2.9, 6.4, and 6.5 shall be applicable to any Authenticating Agent.

Section 6.15.    Fiduciary for Holders of Notes Only; Agent for Secured Parties.

With respect to the security interest created under this Indenture, the Delivery of any Pledged Obligation to the Trustee is to the Trustee as fiduciary for the Holders of Notes and agent for the other Secured Parties. With respect to the security interest created under this Indenture, the Delivery of any Class P-1 Collateral to the Trustee is to the Trustee as fiduciary for the Holders of Class P-1 Securities. With respect to the security interest created under this Indenture, the Delivery of any Class P-2 Collateral to the Trustee is to the Trustee as fiduciary for the Holders of Class P-2 Securities.

Section 6.16.    Representations and Warranties of the Bank.

The Bank represents and warrants as follows for the benefit of the Noteholders:

(a)    Organization.  The Bank has been duly organized and is validly existing as a national banking association and has the power to conduct its business and affairs as a trustee.

(b)    Authorization; Binding Obligations.  The Bank has the corporate power and authority to perform the duties and obligations of trustee under this Indenture.  The Bank has taken all necessary corporate action to authorize the execution, delivery, and performance of this Indenture, and all of the documents required to be executed by the Bank pursuant to this Indenture.  Upon execution and delivery by the Bank, this Indenture will be the valid and legally binding obligation of the Bank enforceable in accordance with its terms.

(c)    Eligibility.  The Bank is eligible under Section 6.8 to serve as Trustee under this Indenture.

Section 6.17.    Additional Reporting Requirements.

If the Initial Purchaser elects to enter into a posting dealer agreement pursuant to Section 7.19, upon the effectiveness of the posting dealer agreement, the Issuer shall provide to The Bond Market Association certain documents for posting in the Repository as mutually agreed between the Portfolio Manager and the Initial Purchaser.

If the Initial Purchaser has entered into a posting dealer agreement, as promptly as possible following the execution of any supplemental indenture under Article 8, the Trustee, on behalf of and at the expense of the Issuer, shall deliver a copy of such supplemental indenture to the Repository in the manner described in Section 14.3(a)(viii).

007377

ARTICLE 7

COVENANTS

Section 7.1.    <u>Payment of Principal and Interest</u>.

The Applicable Issuers shall pay the principal of and interest on the Notes in accordance with the Notes and this Indenture.  The Issuer shall, subject to the Priority of Payments, reimburse the Co-Issuer for any amounts paid by the Co-Issuer pursuant to the Notes or this Indenture.  The Co-Issuer shall not reimburse the Issuer for any amounts paid by the Issuer pursuant to the Notes or this Indenture.

Amounts properly withheld under the Code or other applicable law by any person from a payment to any Holder shall be considered as having been paid by the Applicable Issuers to the Holder for all purposes of this Indenture.

All payments under the Class A–1A Notes and the Class A-1B Notes to any Holder thereof will be made by the Issuer without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If the Issuer is so required to deduct or withhold, then the Issuer (or its agent) will: (i) notify each affected Holder of such requirement no later than ten days prior to the date of the payment from which amounts are required to be withheld (*provided* that, despite the failure of the Issuer to give such notice, amounts withheld pursuant to applicable laws shall be considered as having been paid by the Co-Issuers as provided above); (ii) pay to the relevant authorities the full amount required to be deducted or withheld promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against the affected Holder; and (iii) promptly forward to the affected Holder documentation reasonably acceptable to the affected Holder evidencing such payment to such authorities.

Section 7.2.    <u>Maintenance of Office or Agency</u>.

The Co-Issuers appoint the Trustee as a Paying Agent for the payment of principal of and interest on the Notes.  The Co-Issuers appoint JPMorgan Chase Bank, National Association, 600 Travis Street, 50th Floor, Houston, Texas 77002, telecopy no. (713) 216-2101, Attention:  Worldwide Securities Services—Liberty CLO, Ltd., as the Co-Issuers' agent where notices and demands on the Co-Issuers in respect of the Notes or this Indenture may be served and where Notes may be surrendered for registration of transfer or exchange.

The Co-Issuers may at any time and from time to time vary or terminate the appointment of any Paying Agent and/or appoint any additional agents, including, without limitation, as may be required under the rules of the Irish Stock Exchange or the Cayman Islands Stock Exchange.

So long as any Notes are listed on the Irish Stock Exchange and the rules of such exchange so require, the Co-Issuers shall maintain in Ireland a Paying Agent and an office or agency where notices and demands to or upon the Co-Issuers in respect of such Notes and this Indenture may be served.

The Co-Issuers hereby appoint, for so long as any Class of Notes is listed on the Irish Stock Exchange, NCB Stockbrokers (the "<u>Irish Paying and Listing Agent</u>") as Paying Agent and Listing Agent in Ireland with respect to the Notes listed on the Irish Stock Exchange, for the payment of principal and interest on such Notes and as the Co-Issuers' agent where notices and demands to or upon the Co-Issuers in respect of such Notes or this Indenture may be served.  In the event that the Irish Paying and

007378

Listing Agent is replaced at any time during such period, notice of the appointment of any replacement will be published in the *Daily Official List* of the Irish Stock Exchange as promptly as practicable after such appointment.

The Co-Issuers shall maintain in the Borough of Manhattan, The City of New York, an office or agency where notices and demands on the Co-Issuers in respect of the Notes and this Indenture may be served and an office or agency outside of the United States where Notes may be presented and surrendered for payment.

No paying agent shall be appointed in a jurisdiction that subjects payments on the Notes to withholding tax.

If at any time the Co-Issuers fail to maintain any required office or agency in the Borough of Manhattan, The City of New York, or outside the United States, or fail to furnish the Trustee with their addresses, notices and demands may be served on the Co-Issuers.

Section 7.3.   <u>Money for Note Payments to be Held in Trust</u>.

All payments of amounts payable with respect to any Notes that are to be made from amounts withdrawn from the Payment Account shall be made on behalf of the Applicable Issuers by the Trustee or a Paying Agent with respect to payments on the Notes.

When the Applicable Issuers have a Paying Agent that is not also the Indenture Registrar, they shall furnish no later than the fifth calendar day after each Record Date a list in the form the Paying Agent reasonably requests, of the names and addresses of the Holders and of the certificate numbers of individual Notes held by each Holder.

Whenever the Applicable Issuers have a Paying Agent other than the Trustee, they shall, on or before the Business Day before each Payment Date or Redemption Date direct the Trustee to deposit on the Payment Date with the Paying Agent an aggregate sum sufficient to pay the amounts then becoming due (to the extent funds are then available for that purpose in the Payment Account), that sum to be held in trust for the benefit of the persons entitled to it and (unless the Paying Agent is the Trustee) the Co-Issuers shall promptly notify the Trustee of its action or failure so to act.  Any monies deposited with a Paying Agent (other than the Trustee) in excess of an amount sufficient to pay the amounts then becoming due on the Notes with respect to which the deposit was made shall be paid over by the Paying Agent to the Trustee for application in accordance with Article 10.

Additional or successor Paying Agents shall be appointed by Issuer Order with written notice of the appointment to the Trustee.  So long as Notes of any Class are rated by a Rating Agency any Paying Agent must either have a long-term debt rating of "Aa3" (and not on credit watch with negative implications) or higher by Moody's and "AA-" or higher by S&P or a short-term debt rating of "P-1" (and not on credit watch for possible downgrade) by Moody's and "A-1+" by S&P or the Rating Condition with respect to each Rating Agency must be satisfied with respect to its appointment.  If a successor Paying Agent ceases to have a long-term debt rating of "Aa3" (and not on credit watch with negative implications) or higher by Moody's and "AA-" or higher by S&P or a short-term debt rating of "P-1" (and not on credit watch for possible downgrade) by Moody's and a short-term debt rating of "A-1+" by S&P, the Co-Issuers shall promptly remove the Paying Agent and appoint a successor Paying Agent.  The Co-Issuers shall not appoint any Paying Agent that is not, at the time of the appointment, a depository institution or trust company subject to supervision and examination by federal or state or national banking authorities.  The Co-Issuers shall cause each Paying Agent other than the Trustee to

execute and deliver to the Trustee an instrument in which the Paying Agent agrees with the Trustee, subject to this Section 7.3, that the Paying Agent will:

(i)     allocate all sums received for payment to the Holders of Notes for which it acts as Paying Agent on each Payment Date and any Redemption Date among the Holders in the proportion specified in the applicable report to the extent permitted by applicable law;

(ii)     hold all sums held by it for the payment of amounts due with respect to the Notes in trust for the benefit of the persons entitled to them until they are paid or otherwise disposed of as provided in this Indenture;

(iii)     immediately resign as a Paying Agent and forthwith pay to the Trustee all sums held by it in trust for the payment of the Notes if at any time it ceases to meet the standards required to be met by a Paying Agent at the time of its appointment;

(iv)     immediately give the Trustee notice of any default by the Issuer or the Co-Issuer (or any other obligor on the Notes) in the making of any payment required to be made; and

(v)     during the continuance of any such default, upon the written request of the Trustee, forthwith pay to the Trustee all sums so held in trust by the Paying Agent.

To obtain the satisfaction and discharge of this Indenture or for any other purpose, the Co-Issuers may at any time pay, or by Issuer Order direct any Paying Agent to pay, to the Trustee all sums held in trust by the Co-Issuers or the Paying Agent, and, upon the payment by any Paying Agent to the Trustee, the Paying Agent shall be released from all further liability with respect to the money paid.

Any money deposited with a Paying Agent and not previously returned that remains unclaimed for 20 Business Days shall be returned to the Trustee. Except as otherwise required by applicable law, any money deposited with the Trustee or any Paying Agent in trust for the payment of the principal of or interest on any Note and remaining unclaimed for two years after the principal or interest has become payable shall be paid to the Applicable Issuers. The Holder of the Note shall thereafter look only to the Applicable Issuers for payment of the amounts due to it as an unsecured general creditor and all liability of the Trustee or the Paying Agent with respect to that money (but only to the extent of the amounts so paid to the Applicable Issuers) shall thereupon cease. The Trustee or the Paying Agent, before being required to release any payment, may, but shall not be required to, adopt and employ, at the expense of the Applicable Issuers any reasonable means of notification of the release of the payment, including mailing notice of the release to Holders whose Notes have been called but have not been surrendered for redemption or whose right to or interest in monies payable but not claimed is determinable from the records of any Paying Agent, at the last address of record of each Holder.

Section 7.4.     Existence of Co-Issuers.

(a)     The Issuer and the Co-Issuer shall maintain in full force their existence and rights as companies incorporated or organized under the laws of the Cayman Islands and the State of Delaware, respectively, and shall obtain and preserve their qualification to do business as foreign corporations in each jurisdiction in which the qualifications are necessary to protect the validity and enforceability of this Indenture, the Notes, the Class E Certificates Paying Agency Agreement, the Class E Certificates or any of the Collateral.

However, the Issuer may change its jurisdiction of incorporation from the Cayman Islands to any other jurisdiction outside the United States reasonably selected by the Issuer so long as:

007380

(A)   the Issuer has received a legal opinion (on which the Trustee may rely) to the effect that the change is not disadvantageous in any material respect to the Holders, the Portfolio Manager or any Hedge Counterparty,

(B)   written notice of the change has been given by the Issuer to the Trustee, the Holders of the Notes, the Class E Certificates Paying Agent (for forwarding to the Holders of the Class E Certificates), the Portfolio Manager, any Hedge Counterparty and each Rating Agency, and

(C)   on or before the 15th Business Day following its receipt of the notice the Trustee has not received written notice from a Majority of the Controlling Class objecting to the change.

The Issuer may take any action required by this Indenture within the United States notwithstanding any provision of this Indenture requiring the Issuer to take the action outside of the United States so long as before taking the action the Issuer receives a legal opinion from nationally recognized legal counsel to the effect that it is not necessary to take the action outside of the United States or any political subdivision of the United States to prevent the Issuer from becoming subject to any United States federal, state, or local withholding, income or other taxes.

(b)   The Issuer and the Co-Issuer shall ensure that all corporate or other formalities regarding their respective existences (including holding regular board of directors' and shareholders', or other similar, meetings to the extent required by applicable law) are followed. Neither the Issuer nor the Co-Issuer shall take any action, or conduct its affairs in a manner, that is likely to result in its separate existence being ignored or in its assets and liabilities being substantively consolidated with any other person in a bankruptcy, reorganization, or other insolvency proceeding. Without limiting the foregoing,

(i)   the Issuer shall not have any subsidiaries other than an entity the sole asset of which consists of, and the sole activity of which is the acquisition and ownership of, ETB/897 Assets or other Tax Affected Securities;

(ii)   the Co-Issuer shall not have any subsidiaries;

(iii)   the Issuer shall maintain at all times at least one director who is Independent of the Portfolio Manager, the Trustee, and any of their respective Affiliates,

(iv)   the Issuer shall not commingle its funds with the funds of any other person, except as expressly permitted by this Indenture, and

(v)   except to the extent contemplated in the Management Agreement, the Administration Agreement, the Class E Certificates Paying Agency Agreement and the declaration of trust by the Share Trustee, the Issuer and the Co-Issuer shall not:

(A)   have any employees (other than their respective directors),

(B)   engage in any transaction with any shareholder that would be a conflict of interest (the entry into the Administration Agreement with the Administrator shall not be deemed a conflict of interest), or

(C)   pay dividends in violation of this Indenture, the resolutions of its board of directors and the Class E Certificate Documents.

007381

Section 7.5.     Protection of Collateral.

(a)     The Issuer shall cause the Portfolio Manager, on behalf of the Issuer, to procure any action within the Portfolio Manager's control that is reasonably necessary to maintain the perfection and priority of the security interest of the Trustee in the Collateral and the Class P Collateral.  The Issuer from time to time shall execute and deliver any supplements and amendments to this Indenture and shall execute and deliver any Financing Statements, continuation statements, instruments of further assurance, and other instruments and shall take any other action appropriate to secure the rights and remedies of the Secured Parties and Class P Securityholders under this Indenture and to:

(i)     Grant more effectively all or any portion of the Collateral and Class P Collateral;

(ii)     maintain or preserve the lien (and its priority) of this Indenture or to carry out more effectively the purposes of this Indenture;

(iii)     perfect, publish notice of, or protect the validity of any Grant made by this Indenture (including any actions appropriate as a result of changes in law);

(iv)     enforce any rights under any Collateral or Class P Collateral;

(v)     preserve and defend title to the Collateral and the Class P Collateral and the rights of the Secured Parties in the Collateral and the Class P Securityholders in the applicable Class P Collateral against the claims of anyone; and

(vi)     pay when due all taxes levied or assessed on any part of the Collateral or Class P Collateral.

The Issuer designates the Portfolio Manager as its agent and attorney in fact to execute any Financing Statement, continuation statement, and all other instruments, and take all other actions, required pursuant to this Section 7.5.

The Issuer hereby authorizes the filing of a financing statement that names the Issuer as "debtor" and JPMorgan Chase Bank, National Association as "secured party" and that describes the Collateral and the Class P Collateral as "all assets in which the debtor now or hereafter has rights."

(b)     The Trustee shall not, except in accordance with Section 10.7, permit the removal of any portion of the Collateral or Class P Collateral or transfer any such Collateral or Class P Collateral from the Account to which it is credited, or cause or permit any change in the Delivery made pursuant to Section 3.2 with respect to any Collateral or Class P Collateral, if after giving effect thereto the jurisdiction whose law governs the perfection of the Trustee's security interest in such Collateral or Class P Collateral is different from the jurisdiction whose law governed perfection at the time of delivery of the most recent Opinion of Counsel pursuant to Section 7.6 (or, if no Opinion of Counsel has yet been delivered pursuant to Section 7.6, the Opinion of Counsel delivered at the Closing Date pursuant to Section 3.1(iii)), unless the Trustee shall have received an Opinion of Counsel to the effect that the lien and security interest created by this Indenture with respect to such property will continue to be maintained after giving effect to such action or actions.

(c)     Without at least 30 days' prior written notice to the Trustee and the Portfolio Manager, the Issuer shall not change its "location" (as defined in Section 9-307 of the UCC) or change its name from the name shown on the signature pages of this Indenture.

007382

(d)     The Issuer shall, subject to the Priority of Payments, enforce all of its material rights and remedies under the Management Agreement, the Collateral Administration Agreement, the Class E Certificates Paying Agency Agreement, each Hedge Agreement, each Securities Lending Agreement and each Synthetic Security Agreement.

(e)     The Issuer shall pay any taxes levied because any Collateral or Class P Collateral is owned by the Issuer.

(f)     The Portfolio Manager on behalf of the Issuer will either exercise the "put" option that prevents a Collateral Obligation from being a Long-Dated Collateral Obligation on the last available date before the Stated Maturity of the Notes or sell the Collateral Obligation for Sale Proceeds at least equal to the Principal Balance of the Collateral Obligation, in either case by the Stated Maturity of the Notes.

Section 7.6.     Opinions as to Collateral.

On or before March 31 in each calendar year, commencing in 2007, the Issuer shall furnish to the Trustee, the Portfolio Manager and each Rating Agency an Opinion of Counsel from each relevant jurisdiction stating that, in the counsel's opinion, as of the date of the opinion, all actions necessary to maintain the lien and security interest created by this Indenture with respect to the Collateral and the Class P Collateral have been taken and that no further action (other than as specified in the opinion) needs to be taken for the continued effectiveness and perfection of the lien over the next year. The opinion may be subject to customary assumptions and qualifications.

Section 7.7.     Performance of Obligations.

(a)     The Co-Issuers, each as to itself, shall not take any action, and shall use their reasonable commercial efforts not to permit any action to be taken by others, that would release any person from any of the person's covenants or obligations under any instrument included in the Collateral or Class P Collateral, except in the case of enforcement action taken with respect to any Defaulted Collateral Obligation in accordance with this Indenture and actions by the Portfolio Manager under the Management Agreement and in conformity with this Indenture or as otherwise required by this Indenture.

(b)     The Applicable Issuers may, with the prior written consent of a Majority of each Class of Notes and a Majority of the Class E Certificates (except in the case of the Management Agreement and the Collateral Administration Agreement as initially executed), contract with other persons (including the Portfolio Manager, the Trustee, and the Collateral Administrator) for the performance of actions and obligations to be performed by the Applicable Issuers under this Indenture. Notwithstanding any such arrangement, the Applicable Issuers shall remain primarily liable for performance under this Indenture. The Applicable Issuers shall punctually perform, and use their reasonable commercial efforts to cause the Portfolio Manager, the Trustee, the Collateral Administrator, the Class E Certificates Paying Agent and any other person to perform, all of their obligations in the Management Agreement, this Indenture, the Collateral Administration Agreement, the Class E Certificates Paying Agency Agreement or any other agreement.

Section 7.8.     Negative Covenants.

(a)     The Issuer shall not and, with respect to clauses (ii), (iii), (iv), (vi), (viii), (ix) and (x), the Co-Issuer shall not, in each case from and after the Closing Date:

(i)     sell, transfer, assign, exchange, or otherwise dispose of, or pledge, mortgage, hypothecate, or otherwise encumber (or permit or suffer the sale, transfer, assignment, exchange, or other disposition of, or pledge, mortgage, hypothecation, or other encumbering of), any part of the Collateral or Class P Collateral, except as expressly permitted or contemplated by this Indenture and the Management Agreement;

(ii)    claim any credit on, make any deduction from, or, to the fullest extent permitted by applicable laws, dispute the enforceability of payment of the principal or interest (or any other amount) payable in respect of the Notes (other than amounts withheld in accordance with the Code or any applicable laws of the Cayman Islands) or assert any claim against any present or future Holder of Notes because of the payment of any taxes levied or assessed on any part of the Collateral or Class P Collateral;

(iii)   (A) incur or assume or guarantee any indebtedness, other than the Notes and this Indenture and the transactions contemplated by this Indenture (including, as contemplated hereby, entering into the Hedge Agreements and Securities Lending Agreements), or (B) issue any additional class of securities other than the Class E Certificates issued on or before the Closing Date, except as otherwise permitted by the Class E Certificate Documents;

(iv)    (A) permit the validity or effectiveness of this Indenture or any Grant under this Indenture to be impaired, or permit the lien of this Indenture to be amended, hypothecated, subordinated, terminated, or discharged, or permit any person to be released from any covenants or obligations with respect to this Indenture or the Notes, except as may be expressly permitted by this Indenture or by the Management Agreement, (B) permit any lien, charge, adverse claim, security interest, mortgage, or other encumbrance (other than any lien of or contemplated by this Indenture) to be created on or extend to or otherwise arise on or burden any part of the Collateral or the Class P Collateral, any interest in it, or its proceeds of, or (C) take any action that would permit the lien of this Indenture not to be a valid first priority perfected security interest in the Collateral or Class P Collateral, subject in the case of a Synthetic Security Counterparty Account, to any lien in favor of the Synthetic Securities Counterparty;

(v)     amend the Management Agreement except pursuant to its terms and Section 15.1(f)(v) or amend the Collateral Administration Agreement except pursuant to its terms unless the Rating Condition with respect to each Rating Agency is satisfied with respect to the amendment or enter into any waiver in respect of any of the foregoing agreements without providing written notice to each Rating Agency and the Trustee (and, with respect to the Collateral Administration Agreement, without the consent of the Trustee);

(vi)    to the extent permitted by applicable law, dissolve or liquidate in whole or in part, except as permitted under this Indenture;

(vii)   pay any dividends or other distributions other than in accordance with the Priority of Payments and the Class E Certificate Documents;

(viii)  conduct business under any name other than its own;

(ix)    have any employees (other than directors and officers to the extent they are employees);

(x)     except for any Underlying Instrument and agreements involving the purchase or sale of Collateral Obligations having customary purchase or sale terms and documented with

007384

customary trading documentation (but not excepting any Synthetic Security or Hedge Agreement), enter into any agreement unless the agreement contains "non-petition" and "limited recourse" provisions and shall not amend such provisions without prior satisfaction of the Rating Condition;

(xi)  operate so as to be subject to U.S. federal, state or local income or franchise taxes on its net income except that it may acquire Tax Affected Securities as expressly provided herein, pending their sale or transfer in accordance with Section 12.1 hereof); and will not, without limiting the generality of the foregoing, (A) originate or make loans or hold itself out through advertising or otherwise, as originating loans, lending funds or making a market in or dealing in loans or other assets, (B) hold itself out as being willing and able to enter into derivative contracts or otherwise to enter into transactions with customers in the ordinary course of business, (C) solicit, advertise or publish its ability to, or otherwise hold itself out as generally willing to enter into, assume, offset, assign or otherwise terminate positions in, credit default swaps, total return swaps or other derivative transactions at the request of others, or (D) post or publish bid or offer quotations on or otherwise indicate its willingness to enter into or terminate credit default swaps, total return swaps and other derivative transactions on, any regular trading medium or quotation service for credit default swaps, total return swaps or other derivative transactions;

(xii)  earn or receive from any Person any fee or other compensation for services, however denominated, in connection with its purchase or sale of a Collateral Obligation or entering into a Synthetic Security except for (A) commitment fees or facility maintenance fees that are received by the Issuer in connection with Revolving Loans or Delayed Drawdown Loans; (B) yield maintenance and prepayment penalty fees; (C) fees on account of the Issuer's consenting to amendments, waivers or other modifications of the terms of any Collateral Obligations; (D) fees from permitted securities lending; and (E) upfront payments in lieu of periodic payments under a Synthetic Security.

(xiii)  except for services provided in connection with permitted fees as described in clause (xii) above, provide services to any Person;

(xiv)  purchase any asset (directly or synthetically) that is treated for U.S. federal income tax purposes as: (A) an equity interest in a "partnership"(within the meaning of Section 7701(a)(2) of the Code) or other fiscally transparent entity engaged or deemed to be engaged in a trade or business within the United States, or (B) a "United States real property interest" as defined in Section 897 of the Code and the Treasury Regulations promulgated thereunder; provided that the Issuer may acquire stock of a subsidiary and cause such subsidiary to acquire assets set forth in clauses (A) or (B) above (an "ETB/897 Asset") that are received in connection with the workout of defaulted Collateral Obligations, so long as the acquisition of ETB/897 Assets by such subsidiary will not cause the stock of such subsidiary to be deemed to be an ETB/897 Asset;

(xv)  acquire or enter into any Synthetic Security with respect to any Reference Obligation the direct acquisition of which would violate any provision of this Indenture hereto;

(xvi)  use Synthetic Securities as a means of making advances to the Synthetic Security Counterparty following the date on which the Synthetic Security is acquired or entered into (for the avoidance of doubt, the establishment of Synthetic Security Collateral Accounts and the payment of Synthetic Security Counterparties from the amounts on deposit therein, in each case in accordance with the Indenture, shall not constitute the making of advances);

(xvii) acquire Synthetic Securities that require that the purchaser of credit protection thereunder own the applicable Reference Obligation or require by its terms the delivery of reports

or other information relating to the Reference Obligation if the effect of such requirement is that the purchaser of credit protection thereunder would be required to own the applicable Reference Obligation;

(xviii)     purchase any Collateral Obligation primarily for the purpose of entering into a securities lending agreement with respect thereto and will not hold itself out as being willing or able to lend securities in the ordinary course of business;

(xix)  register as, hold itself out as, or become subject to regulatory supervision or other legal requirements under the laws of any country or political subdivision thereof as a brokerdealer, a bank, an insurance company, financial guarantor, surety bond issuer, or a company engaged in loan origination;

(xx)  take any action causing it to be treated as a bank, insurance company, or company engaged in loan origination for purposes of any tax, securities law or other filing or submission made to any governmental authority;

(xxi)  hold itself out, through advertising or otherwise, as originating, funding, guaranteeing or insuring debt obligations or as being willing and able to enter into transactions (either purchases or sales of debt obligations or entries into, assignments or terminations of hedging or derivative instruments, including Synthetic Securities) at the request of others;

(xxii) treat Synthetic Securities as insurance, reinsurance, indemnity bonds, guaranties, guaranty bonds or suretyship contracts for any purpose;

(xxiii)     disclose the identity of any holder of its Securities to any person from whom it purchases Collateral Obligations or attempt to obtain more favorable terms from any seller as a result of the identity of any holder of a Security;

(xxiv)     allow any non-U.S. bank or lending institution who is a holder of a Security to control or direct the Portfolio Manager's or Issuer's decision to invest in a particular asset except as otherwise allowed to such a holder, acting in that capacity, under the Indenture or acquire a Collateral Obligation conditioned upon a particular person or entity holding Securities;

(xxv) acquire any asset whose ownership or disposition (without regard to the Issuer's other activities) would cause the Issuer to be subject to income tax on a net income basis (other than a Tax Affected Security as expressly permitted herein, pending its sale or transfer in accordance with Section 12.1 hereto);

(xxvi)     hold any security as nominee for another person; or

(xxvii)     buy securities with the intent to subdivide them and sell the components or to buy securities and sell them with different securities as a package or unit.

(b)     Neither the Issuer nor the Trustee shall sell, transfer, exchange, or otherwise dispose of Collateral or Class P Collateral, or enter into an agreement or commitment to do so, or enter into or engage in any business with respect to any part of the Collateral or Class P Collateral, except as expressly permitted by this Indenture and, with respect to the Issuer, the Management Agreement.

(c) The Co-Issuer shall not invest any of its assets in "securities" as the term is defined in the 1940 Act, and shall keep all of its assets in Cash.

007386

(d) Neither the Issuer nor the Co-Issuer shall use the proceeds of the Notes to buy or carry Margin Stock.

Section 7.9.    Notice of Default; Statement as to Compliance.

(a)    The Co-Issuers shall notify the Trustee, the Portfolio Manager, the Rating Agencies, and each Hedge Counterparty within 10 days of acquiring actual knowledge of Default.

(b)    On or before March 31 in each calendar year commencing in 2007 and prior to the issuance of any Additional Class E Certificates, the Issuer shall deliver to the Trustee (to be forwarded by the Trustee to the Portfolio Manager and each Holder of Notes making a written request therefor and, upon written request therefor by a Beneficial Owner in the form of Exhibit I certifying that it is a Beneficial Owner, to the Beneficial Owner (or its designee) and each Rating Agency) a certificate of an Authorized Officer of the Issuer that, to the best knowledge of the Issuer, no Default exists, and no Default has existed since the date of the last certificate or, if a Default does then exist or had existed, specifying the same and its nature and status, including actions undertaken to remedy it, and that the Issuer has complied with all of its obligations under this Indenture or, if that is not the case, specifying those obligations with which it has not complied.

Section 7.10.    Co-Issuers May Consolidate, etc., Only on Certain Terms.

Neither the Issuer nor the Co-Issuer (the "Merging Entity") shall consolidate or merge with or into any other person or transfer or convey all or substantially all of its assets to any person, unless permitted by Cayman Islands law (in the case of the Issuer) or United States and Delaware law (in the case of the Co-Issuer) and unless:

(a)    the Merging Entity shall be the surviving corporation, or the person (if other than the Merging Entity) formed by the consolidation or into which the Merging Entity is merged or to which all or substantially all of the assets of the Merging Entity are transferred (the "Successor Entity"),

(i)    if the Merging Entity  is the Issuer, is a company organized and existing under the laws of the Cayman Islands or another jurisdiction approved by a Majority of the Controlling Class (except that no approval shall be required in connection with any such transaction undertaken solely to effect a change in the jurisdiction of incorporation pursuant to Section 7.4), and

(ii)    in any case shall expressly assume, by an indenture supplemental to this Indenture, executed and delivered to the Trustee and each Noteholder, the due and punctual payment of all amounts on all Notes issued by the Merging Entity and the performance and observance of every covenant of this Indenture on its part to be performed or observed, all as provided in this Indenture;

(b)    each Rating Agency shall have been notified of the consolidation, merger, transfer, or conveyance and the Rating Condition with respect to each Rating Agency is satisfied with respect to the transaction;

(c)    if the Merging Entity is not the surviving corporation, the Successor Entity shall have agreed with the Trustee,

(i)    to observe the same legal requirements for the recognition of the formed or surviving corporation as a legal entity separate and apart from any of its Affiliates as are applicable to the Merging Entity with respect to its Affiliates,

007387

(ii)    not to consolidate or merge with or into any other person or transfer or convey the Collateral or all or substantially all of its assets to any other person except in accordance with this Section 7.10; and

(iii)    in any case shall expressly assume by an indenture supplemental to this Indenture, executed and delivered to the Trustee, each Noteholder and the Class E Certificates Paying Agent (for forwarding to the Holders of Class E Certificates), the due and punctual payment of all amounts on all Notes issued by the Merging Entity and the performance and observance of every covenant of this Indenture on its part to be performed or observed, all as provided in this Indenture;

(d)    if the Merging Entity is not the surviving corporation, the Successor Entity shall have delivered to the Trustee and each Rating Agency an Officer's certificate and an Opinion of Counsel each stating that it is duly organized, validly existing, and in good standing in the jurisdiction in which it is organized; that it has sufficient power and authority to assume the obligations in subsection (a) above and to execute and deliver an indenture supplemental to this Indenture for the purpose of assuming the obligations in subsection (a) above; that it has duly authorized the execution, delivery, and performance of an indenture supplemental to this Indenture for the purpose of assuming the obligations in subsection (a) above and that the supplemental indenture is its valid and legally binding obligation, enforceable in accordance with its terms, subject only to bankruptcy, reorganization, insolvency, moratorium, and other laws affecting the enforcement of creditors' rights generally and to general principles of equity; if the Merging Entity is the Issuer, that, following the event that causes the Successor Entity to become the successor to the Issuer, (i) the Successor Entity has title, free of any lien, security interest, or charge, other than the lien and security interest of this Indenture, to the Collateral, and (ii) the lien of this Indenture continues to be effective in the Collateral; and in each case as to any other matters the Trustee or any Noteholder reasonably requires;

(e)    after giving effect to the transaction, no Default or Event of Default shall be continuing;

(f)    the Merging Entity shall have notified each Rating Agency of the consolidation, merger, transfer, or conveyance and shall have delivered to the Trustee, each Noteholder and the Class E Certificates Paying Agent (for forwarding to the Holders of Class E Certificates) an Officer's certificate and an Opinion of Counsel each stating that the consolidation, merger, transfer, or conveyance and the supplemental indenture comply with this Article 7 and that all conditions precedent in this Article 7 relating to the transaction have been complied with and that no adverse tax consequences will result therefrom to the Holders of the Notes or Class E Certificates;

(g)    the Merging Entity shall have delivered to the Trustee an Opinion of Counsel stating that after giving effect to the transaction, neither of the Co-Issuers (or, if applicable, the Successor Entity) nor the pool of Collateral will be an investment company under the 1940 Act; and

(h)    after giving effect to the transaction, the outstanding stock of the Merging Entity (or, if applicable, the Successor Entity) will not be beneficially owned within the meaning of the 1940 Act by any U.S. person.

Section 7.11.    Successor Substituted.

Upon any consolidation or merger, or transfer or conveyance of all or substantially all of the assets of the Issuer or the Co-Issuer, in accordance with Section 7.10 in which the Merging Entity is not the surviving corporation, the Successor Entity shall succeed to, and may exercise every right of, the

169

Merging Entity under this Indenture with the same effect as if the person had been named as the Issuer or the Co-Issuer, as the case may be, in this Indenture. Upon any such consolidation, merger, transfer, or conveyance, the person named as the "Issuer" or the "Co-Issuer" in the first paragraph of this Indenture or any successor may be dissolved, wound up, and liquidated at any time thereafter, and the person thereafter shall be released from its liabilities as obligor and maker on all the Notes and from its obligations under this Indenture.

Section 7.12.   <u>No Other Business</u>.

(a)     The Issuer shall not engage in any business or activity other than (i) acquisition and disposition of, and investment and reinvestment in, Collateral Obligations, Eligible Investments, other Collateral described in clauses (a) to (g) of the Granting Clauses hereof, for its own account; (ii) entering into, and performing its obligations under, the Indenture, the Class E Certificate Documents, any Hedge Agreements, the Securities Lending Agreements, the Management Agreement, the Collateral Administration Agreement, the Administration Agreement, the Purchase Agreement, the Placement Agreement, the Class A-1A Note Purchase Agreement and the Class A-1B Note Purchase Agreement; (iii) the issuance and sale of the Securities and the Ordinary Shares; (iv) the pledge of the Collateral as security for its obligations in respect of the Notes and any Hedge Agreements; (v) the pledge of the Class P-1 Collateral as security for certain obligations in respect of the Class P-1 Securities and the pledge of the Class P-2 Collateral as security for certain obligations in respect of the Class P-2 Securities; and (vi) undertaking certain other activities incidental to the foregoing and permitted by this Indenture. The Issuer shall not enter into any derivative transaction except as expressly provided in this Indenture. The Issuer shall not engage in any business or activity or purchase any asset that would cause the Issuer to be engaged in a U.S. trade or business for U.S. federal income tax purposes, except as the result of ownership of Tax Affected Securities to the extent permitted herein and pending their sale or transfer in accordance with Section 12.1 hereto.

(b)     The Issuer and the Co-Issuer may amend, or permit the amendment of, their Memorandum and Articles or the Certificate of Incorporation and By-laws if the Rating Condition with respect to each Rating Agency is satisfied with respect to the amendment (but not otherwise).

Section 7.13.   <u>Annual Rating Review</u>.

So long as any Notes of any Class remain Outstanding, the Co-Issuers shall obtain and pay for an ongoing surveillance of the rating of each Outstanding Class of Notes from each Rating Agency. The Co-Issuers shall promptly notify the Trustee and the Portfolio Manager in writing (and the Trustee shall promptly provide a copy of the notice to the Holders of the Notes) and the Class E Certificates Paying Agent (for forwarding to the Holders of Class E Certificates) if at any time the rating of any Class of Notes has been, or is known will be, changed or withdrawn.

Section 7.14.   <u>Reporting</u>.

At any time when the Co-Issuers are not subject to Section 13 or 15(d) of the Exchange Act and are not exempt from reporting pursuant to Rule 12g3-2(b) under the Exchange Act, upon the request of a Holder or Beneficial Owner of any Note, the Co-Issuers shall promptly furnish "Rule 144A Information" to the Holder or Beneficial Owner, to a prospective purchaser of a Note designated by the Holder or Beneficial Owner or to the Trustee for delivery to the Holder or Beneficial Owner or a prospective purchaser designated by the Holder or Beneficial Owner, as the case may be, to permit compliance by the Holder or Beneficial Owner with Rule 144A under the Securities Act in connection with the resale of the Note by the Holder or Beneficial Owner. "<u>Rule 144A Information</u>" is the information specified pursuant to Rule 144A(d)(4) under the Securities Act.

007389

Section 7.15.    Calculation Agent.

(a)    The Issuer agrees that for so long as any Notes remain Outstanding an agent will always have been appointed (that does not control and is not controlled by or under common control with the Issuer or its Affiliates) to calculate LIBOR in respect of each Interest Period (the "Calculation Agent").  The Issuer has initially appointed the Trustee as Calculation Agent.  The Issuer may remove the Calculation Agent at any time.  If the Calculation Agent is unable or unwilling to act as such or is removed by the Issuer, the Issuer or the Portfolio Manager (on its behalf) shall promptly appoint a replacement Calculation Agent.  The Calculation Agent may not resign its duties without a successor having been duly appointed.  For so long as any Class of Notes is listed on the Irish Stock Exchange and the rules of such exchange so require, notice of the appointment of any replacement Calculation Agent shall be published by or on behalf of the Issuer in the *Daily Official List* of the Irish Stock Exchange as promptly as practicable after such appointment.

(b)    As soon as possible after 11:00 a.m., London time, on the second Business Day before the first day of each Interest Period, but in no event later than 11:00 a.m., London time, on the next Business Day, the Calculation Agent shall calculate the Note Interest Rate for each Class of Notes for the next Interest Period.  The Calculation Agent shall communicate those rates and amounts to the Co-Issuers, the Trustee, each Paying Agent, the Portfolio Manager, the Depositary and, except for the Note Interest Rate for the Class A–1A Notes and Commitment Fee and the Note Interest Rate for the Class A-1B Notes and Delayed Drawdown Fee, Euroclear, Clearstream and, so long as any of the Notes are listed thereon and the rules of the exchange so require, the Irish Stock Exchange.  In the latter case, such information will be published by the Irish Paying and Listing Agent in the *Daily Official List* of the Irish Stock Exchange as soon as possible after its determination.  The Calculation Agent shall separately notify the Irish Stock Exchange of such information.  The Calculation Agent shall also specify to the Co-Issuers the quotations on which the foregoing rates are based, and in any event the Calculation Agent shall notify the Co-Issuers before 7:00 p.m., London time, on the second Business Day before the first day of each Interest Period that either:

(i)    it has determined or is in the process of determining the Note Interest Rate for each Class of Notes, or

(ii)    it has not determined and is not in the process of determining any such Note Interest Rate together with its reasons therefor.

The Calculation Agent's determination of the foregoing rates for any Interest Period shall (in the absence of manifest error) be final and binding on all parties and the Holders and Beneficial Owners of the Class E Certificates.

Section 7.16.    Certain Tax Matters.

(a)    The Issuer will not elect to be treated as a partnership for U.S. federal income tax purposes and shall make any election necessary to avoid classification as a partnership or disregarded entity for U.S. federal income tax purposes.

(b)    The Issuer shall file, or cause to be filed, any tax returns, including information tax returns, required by any governmental authority; provided, however, that the Issuer shall not file, or cause to be filed, any income or franchise tax return in any state of the United States unless it shall have obtained an Opinion of Counsel from a tax counsel of nationally recognized standing experienced in such matters prior to such filing that, under the laws of such jurisdiction, the Issuer is required to file such income or franchise tax return.

007390

(c)     Notwithstanding any contrary agreement or understanding, the Portfolio Manager, the Issuers, the Trustee and the Holders and beneficial owners of the Notes (and each of their respective employees, representatives or other agents) may disclose to any and all Persons, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated by this Indenture and all materials of any kind (including opinions or other tax analyses) that are provided to them relating to such tax treatment and tax structure.  The foregoing provision shall apply from the beginning of discussions between the parties.  For this purpose, the tax treatment of a transaction is the purported or claimed U.S. tax treatment of the transaction under applicable U.S federal, state and local law, and the tax structure of a transaction is any fact that may be relevant to understanding the purported or claimed U.S. tax treatment of the transaction under applicable U.S. federal, state and local law.

(d)     If the Issuer is aware that it has purchased an interest in a "reportable transaction" within the meaning of Section 6011 of the Code, and a Holder of a Security requests information about any such transactions in which the Issuer is an investor, the Issuer shall provide such information it has reasonably available as soon as practicable after such request.

(e)     The Issuer shall not conduct any business other than the business that the Issuer is permitted to conduct under this Indenture.

(f)     Upon written request by the Independent accountants, the Indenture Registrar shall provide to the Independent accountants that information contained in the Indenture Register requested by the Independent accountants to comply with this Section 7.16.

(g)     The Issuer will treat each purchase of Collateral Obligations and Eligible Investments as a "purchase" for tax accounting and reporting purposes.

(h)     Upon the Trustee's receipt of a request of a Holder holding a Security that is issued with original issue discount for U.S. Federal income tax purposes for the information described in Treasury regulation section 1.1275-3(b)(1) that is applicable to such Security that is issued with original issue discount for U.S. Federal income tax purposes, the Issuer will cause its independent accountants to provide promptly to the Trustee and such requesting Holder all of such information.  Any issuance of additional Securities will be accomplished in a manner that will allow the Issuer to accurately provide the same information as the foregoing to the Holders of such additional Securities.

(i)     Each Holder and beneficial owner of a Security, by acceptance of its Security or its interest in a Security, shall be deemed to understand and acknowledge that failure to provide the Paying Agent with the applicable U.S. federal income tax certifications (generally, a United States Internal Revenue Service Form W-9 (or successor applicable form) in the case of a person that is a "United States person" within the meaning of Section 7701(a)(30) of the Code or an appropriate United States Internal Revenue Service Form W-8 (or successor applicable form) in the case of a person that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code) may result in U.S. federal back-up withholding from payments in respect of such Note.

(j)     The Issuer and each Holder of a Note shall treat the Notes as debt and the Class E Certificates as equity for U.S. federal income tax purposes and further agrees not to take any action inconsistent with such treatment. The Issuer and each Holder of Class P Securities or Class Q-1 Securities shall treat each Class Q-1 Security and Class P Security as a direct ownership interest in the corresponding components of such Security.

(k)     The Issuer shall provide, or cause the independent accountants to provide, within 90 days after the end of the Issuer's tax year, to each Holder of a Security, upon written request and, upon

007391

written request therefor, all information that a U.S. shareholder making a "qualified electing fund" election (as defined in the Code) with respect to the Security is required to obtain from the Issuer for U.S. federal income tax purposes, and a "PFIC Annual Information Statement" as described in United States Treasury Regulation Section 1.1295-1(g)(1) (or any successor Treasury Regulation), including all representations and statements required by such statement, and the Issuer will take or cause the accountants to take any other reasonable steps to facilitate such election by a Holder or beneficial owner of a Security.

(l)       The Issuer will provide, or cause its Independent accountants to provide, to a Holder of a Security, upon written request and, upon written request therefor, any information that such Holder or beneficial owner reasonably requests to assist such Holder or beneficial owner with regard to filing requirements that such Holder or beneficial owner is required to satisfy as a result of the controlled foreign corporation rules under the Code.

(m)       The Issuer shall not purchase any asset if the acquisition (including the manner of acquisition), ownership, enforcement or disposition of such asset would cause the Issuer to be treated as engaged in a trade or business for United States federal income tax purposes or otherwise as subject to tax on a net income basis in any jurisdiction outside the Issuer's jurisdiction of incorporation.

Section 7.17.       Securities Lending.

(a)       So long as no Event of Default is continuing and if after the completion of the transaction the limit in clause (28) of the definition of "Concentration Limitations" would be satisfied, the Portfolio Manager may cause Collateral Obligations that are not Defaulted Collateral Obligations to be lent for a term of 90 days or less to banks, broker-dealers, and other financial institutions (other than insurance companies) having long-term and short-term senior unsecured debt ratings or guarantors with ratings of at least "A1" (and not "A1" but on credit watch with negative implications) and "P-1" (and not on credit watch for possible downgrade) from Moody's and a long-term senior unsecured debt rating of at least "A+" from S&P (each, a "<u>Securities Lending Counterparty</u>") pursuant to one or more agreements (each, a "<u>Securities Lending Agreement</u>"); <u>provided</u> that Collateral Obligations whose Market Value cannot be determined under clause (i), (ii) or (iii) of that definition may not be lent pursuant to a Securities Lending Agreement. Upon receipt of an Issuer Order, the Trustee shall release any lent Collateral Obligations to a Securities Lending Counterparty as directed by the Portfolio Manager. The Securities Lending Counterparties may be Affiliates of the Placement Agent or Affiliates of the Portfolio Manager. The duration of any Securities Lending Agreement shall not exceed the Stated Maturity of the Notes.

(b)       Each Securities Lending Agreement shall be on market terms as determined by the Portfolio Manager (except as may be required below) and shall:

(i)       require that the Securities Lending Counterparty return to the Issuer debt obligations that are identical (in terms of issue and class) to the lent Collateral Obligations;

(ii)       require that the Securities Lending Counterparty pay to the Issuer amounts equivalent to all interest and other payments that the owner of the lent Collateral Obligation is entitled to for the period during which the Collateral Obligation is lent and require that any such payments not be subject to withholding tax imposed by any jurisdiction unless the Securities Lending Counterparty is required under the Securities Lending Agreement to make "gross-up" payments to the Issuer that cover the full amount of the withholding tax on an after-tax basis;

007392

(iii)   require that the Rating Condition with respect to each Rating Agency shall be satisfied with respect to the execution of the Securities Lending Agreement;

(iv)   satisfy any other requirements of Section 1058 of the Code and the Treasury Regulations promulgated under it;

(v)   be governed by the laws of New York;

(vi)   permit the Issuer to assign its rights under the Securities Lending Agreement to the Trustee pursuant to this Indenture;

(vii)   provide for early termination and the delivery of any lent Collateral Obligation with no penalty if the Collateral Obligation becomes a Credit Risk Obligation or is subject to redemption in accordance with its terms;

(viii)   provide for early termination and the delivery of any lent Collateral Obligation with no penalty upon any redemption of the Notes in whole;

(ix)   require the Securities Lending Counterparty to post with the Trustee collateral consisting of Cash or direct registered debt obligations of the United States of America that have a maturity date no later than the Business Day preceding the stated termination date of the Securities Lending Agreement (the "Securities Lending Collateral") to secure its obligation to return the Collateral Obligations or in the alternative post the Securities Lending Collateral with a custodian for the benefit of the Issuer designated by the Securities Lending Counterparty that satisfies the requirements with respect to being a securities intermediary with respect to the posted collateral if that custodian would qualify to be a successor trustee under Section 6.8;

(x)   provide that the Securities Lending Collateral shall be maintained at all times in an amount equal to at least 102% of the current Ask-Side Market Value (determined daily and monitored by the Portfolio Manager) of the lent Collateral Obligations and if securities are delivered to the Trustee as security for the obligations of the Securities Lending Counterparty under the related Securities Lending Agreement, the Portfolio Manager on behalf of the Issuer will negotiate with the Securities Lending Counterparty a rate for the loan fee to be paid to the Issuer for lending the lent Collateral Obligations;

(xi)   the lent Collateral Obligations shall be marked-to-market on a daily basis by the Portfolio Manager on the basis of their Market Value;

(xii)   the Collateral will include the Issuer's rights under the related Securities Lending Agreement rather than the loaned Collateral Obligation;

(xiii)   provide for early termination within 10 days at the option of the Issuer and the delivery of any lent Collateral Obligation with no penalty if the Securities Lending Counterparty is no longer in compliance with the requirements relating to the credit ratings of the Securities Lending Counterparty and the noncompliance is not cured as provided in this Indenture; and

(xiv)   contain appropriate limited recourse and non-petition provisions (to the extent the Issuer has contractual payment obligations to the Securities Lending Counterparty) equivalent (mutatis mutandis) to those in this Indenture.

174

(c)     If either Moody's or S&P downgrades a Securities Lending Counterparty such that the Securities Lending Agreements to which the Securities Lending Counterparty is a party are no longer in compliance with the requirements relating to the credit ratings of the Securities Lending Counterparty, then the Portfolio Manager on behalf of the Issuer, within 10 days of the downgrade, shall

(i)     terminate its Securities Lending Agreements with the Securities Lending Counterparty unless a guarantor for the Securities Lending Counterparty's obligations under the Securities Lending Agreements has been obtained; or

(ii)     reduce the percentage of the Aggregate Principal Balance of the Collateral Obligations lent to the downgraded Securities Lending Counterparty so that the Securities Lending Agreements to which the Securities Lending Counterparty is a party, together with all other Securities Lending Agreements, are in compliance with the requirements relating to the credit ratings of Securities Lending Counterparties; or

(iii)     take any other steps Moody's or S&P may require to cause the Securities Lending Counterparty's obligations under the Securities Lending Agreements to which the Securities Lending Counterparty is a party to be treated by Moody's or S&P, as the case may be, as if the obligations were owed by a counterparty having a rating at least equivalent to the rating that was assigned by Moody's or S&P, as the case may be, to the downgraded Securities Lending Counterparty before its being downgraded.

(d)     In connection with any such direction by the Portfolio Manager to enter into a Securities Lending Agreement, the Trustee may receive and rely on an Issuer Order to the effect that the Securities Lending Agreement, and its Securities Lending Counterparty, is each in compliance with the requirements of this Indenture (including the definition of "Securities Lending Counterparty"). The Issuer and the Trustee may enter into any Securities Lending Agreement (and any related account control agreement) at the instruction of the Portfolio Manager, and deliver and accept delivery and return of any Collateral Obligations pursuant to the Securities Lending Agreement, or pursuant to instructions from the Portfolio Manager in connection with the Securities Lending Agreement. The Trustee may take any actions and exercise any rights and remedies under any Securities Lending Agreement that the Portfolio Manager instructs. The Trustee need not enter into any Securities Lending Agreement (or any related account control agreement) that would in its judgment, subject it to any liability, whether financial or otherwise, or cause it to incur or subject it to risk of any cost or disbursement for which it is not, in its judgment, adequately indemnified, or that would impose on it any obligations or administrative burdens that are unacceptable to it. The Portfolio Manager shall instruct the Trustee in writing with respect to the administration of any Securities Lending Agreement (including with respect to any default and the exercise of rights under it). The Trustee shall not have any responsibility for evaluating the sufficiency, validity, or acceptability of any Securities Lending Agreement or for the qualifications or eligibility of any Securities Lending Counterparty. Nothing in this Indenture shall be construed to cause the Trustee to have any fiduciary duties to any Securities Lending Counterparty.

So long as any Collateral Obligation is on loan pursuant to a Securities Lending Agreement,

(a)     the Trustee shall have no liability for any failure or inability on its part to receive any information or take any action with respect to the Collateral Obligation because of its being on loan (including any failure to take action with respect to a notice of redemption, consent solicitation, exchange or tender offer, or similar corporate action), and

(b)     the loaned Collateral Obligations shall not be disqualified for return to the Trustee as a Collateral Obligation by any change in circumstance or status during the time while on loan

007394

(including any change that would cause the Collateral Obligation to be ineligible for purchase by the Issuer under this Indenture if applied to a proposed purchase of it in the open market at the time of its return from loan).

Section 7.18.    <u>Purchase of Collateral Obligations; Ramp-Up Completion Date</u>.

(a)    The Issuer shall use commercially reasonable efforts to purchase (or enter into commitments to purchase (with settlement as soon as practicable after such commitment, but in any event no later than 60 days thereafter) Collateral Obligations for inclusion in the Collateral on any Business Day during the Ramp-Up Period, in each case, such that as of the Business Day prior to March 3, 2006, either (A) the Aggregate Principal Balance of the Collateral Obligations owned by the Issuer equals at least $900,000,000 or (B) the Aggregate Principal Balance of the Collateral Obligations purchased (or committed to be purchased) by the Issuer (in each case in this clause (B), measured solely as of the date of purchase or commitment, as the case may be (provided that with respect to the Initial Collateral Obligations, the date of purchase shall be the Closing Date)) equals at least $900,000,000 (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to any Collateral Obligations after the Closing Date and on or before the Ramp-Up Completion Date).

(b)    Notwithstanding the foregoing, or any other provision of this Indenture, if the Issuer has previously entered into a commitment to purchase a Collateral Obligation to be included in the Collateral, such commitment not to exceed 60 days, and at the time of the commitment the Collateral Obligation complied with the definition of "Collateral Obligation" and the requirements set forth in this Section 7.18, the Issuer may consummate the purchase of the Collateral Obligation notwithstanding that the Collateral Obligation fails to comply with the definition of "Collateral Obligation" and the requirements set out above on the date of settlement.

(c)    Within 5 Business Days after the Ramp-Up Completion Date, the Issuer or the Portfolio Manager (on behalf of the Issuer) shall request a Rating Confirmation and shall provide a report to the Rating Agencies substantially in the form of a Monthly Report as of the Ramp-Up Completion Date identifying the Collateral Obligations then included in the Collateral (and, with respect to S&P, an excel file containing the S&P CDO Monitor input file and with respect to each Collateral Obligation, the name of the related obligor thereon, the CUSIP number thereof (if applicable) and the S&P Priority Category thereof) and the Issuer shall obtain and deliver to the Trustee and the Rating Agencies (together with the delivery of such report), an Accountants' Certificate:

(i)    confirming the maturity date, rating, spread and recovery rate for each Collateral Obligation owned by the Issuer as of the Ramp-Up Completion Date and the information provided by the Issuer with respect to every other asset included in the Collateral, by reference to such sources as shall be specified therein;

(ii)    confirming that as of the Ramp-Up Completion Date:

(1)  each of the Coverage Tests is satisfied;

(2)  the Aggregate Principal Balance of Collateral Obligations that the Issuer owned or committed to purchase as of the Ramp-Up Completion Date is at least equal to the Maximum Investment Amount; and

007395

(3) the Collateral Obligations comply with all of the requirements of the Collateral Quality Tests and the Concentration Limitations and the criteria set forth in Section 12.2 of this Indenture; and

(iii) specifying the procedures undertaken by them to review data and computations relating to the foregoing statements.

(d) If a Rating Confirmation Failure occurs, the Notes will be redeemed pursuant to, and to the extent provided in, Section 9.1(a).

Section 7.19.    Posting of Reports on Repository.

(a) If the Initial Purchaser has entered into a posting dealer agreement with The Bond Market Association relating to the transactions contemplated by this Indenture, each of the Issuer and the Portfolio Manager acknowledges and agrees that each Monthly Report and Valuation Report shall be posted to the Repository for use in the manner provided in the Repository. In connection therewith, the Trustee, on behalf of and at the expense of the Issuer, agrees to make available in accordance with Section 14.3(a)(viii) each Monthly Report or Valuation Report to the operator of the Repository for posting on the Repository.

(b) Notwithstanding anything herein to the contrary, none of the Issuer, the Co-Issuer or the Trustee makes any representation or warranty to The Bond Market Association (or any successor thereto) or any affiliate thereof or any Person having or obtaining access to the information maintained in the Repository or to any of such Person's affiliates regarding the accuracy or completeness of any information, document, report or other communication transmitted to the Repository, and no Person having or obtaining access to the information maintained in the Repository shall have any rights under this Indenture or any other transaction document or otherwise by reason of the transmission of any such information, document, report or other communication to the Repository.

Section 7.20.    [Reserved]

Section 7.21.    Section 3(c)(7) Procedures.

In addition to the notices required to be given under Section 10.6 hereof, the Issuer shall take the following actions to ensure compliance with the requirements of Section 3(c)(7) of the 1940 Act (provided that such procedures and disclosures may be revised by the Issuer to be consistent with generally accepted practice for compliance with the requirements of Section 3(c)(7) of the 1940 Act):

(a) Section 3(c)(7) Notice to Investors. The Issuer shall (i) request the Depositary to cause, and cooperate with the Depositary in causing, the Depositary's security description and delivery order to include a "3(c)(7) marker" and the Depositary's user manual to contain an accurate description of the restrictions on the holding and transfer of the Notes due to the Issuer's reliance on the exclusion to registration provided by Section 3(c)(7) of the 1940 Act, (ii) request that the Depositary send, and cooperate with the Depositary in causing the Depositary to send, to its Agent Members (x) the Important Section 3(c)(7) Reminder Notice substantially in the form of Exhibit H-2 in connection with the initial offering of the Notes and (y) the Section 3(c)(7) Reminder Notice substantially in the form of Exhibit H-1 as set forth in Section 10.6(a) and (b) and (iii) request that the Depositary cause, and cooperate with the Depositary in causing, the Depositary's Reference Directory to include each Class of Notes (and the applicable CUSIP numbers for the Notes) in the listing of 3(c)(7) issues together with an attached description of the limitations as to the distribution, purchase, sale and holding of the Notes.

(b)     CUSIP Numbers. The Issuer shall (a) request of S&P, and shall cooperate with S&P to ensure that all CUSIP numbers identifying the Notes shall have a "fixed field" attached thereto that contains "3c7" and "144A" indicators and (b) take steps to cause the Placement Agent, the Initial Purchaser and any market makers to require that all "confirms" of trades of the Notes contain CUSIP numbers with such "fixed field" identifiers.

(c)     Bloomberg and other Third-Party Vendor Screens. The Issuer shall use all reasonable efforts to cause the Bloomberg screen or screens containing information about the Notes to include the following language: (a) the "Note Box" on the bottom of the "Security Display" page describing the Notes shall state: "Iss'd Under 144A/3(c)(7)", (b) the "Security Display" page shall have the flashing red indicator "See Other Available Information", and (c) the indicator shall link to the "Additional Security Information" page, which shall state that the securities are "being offered in reliance on the exemption from registration under Rule 144A of the Securities Act of 1933, as amended (the "Securities Act") to persons who are both (x) qualified institutional buyers (as defined in Rule 144A under the Securities Act) and (y) qualified purchasers (as defined under Section 3(c)(7) under the Investment Company Act of 1940)". The Issuer shall use all reasonable efforts to require that any other third-party vendor screens containing information about the Notes include substantially similar language to clauses (a) through (c) above.

Section 7.22.    Listing.

(a) So long as any Class of Notes listed on the Irish Stock Exchange is Outstanding, the Issuer shall (i) use all reasonable efforts to maintain the listing of such Class of Notes on the Irish Stock Exchange; provided, however, that the Issuer will not be required to maintain a listing on the Irish Stock Exchange or any other E.U. stock exchange if compliance with requirements of the European Commission or a relevant Member State becomes commercially unreasonable in the sole judgment of the Portfolio Manager, (ii) notify the Irish Stock Exchange if the rating assigned to any Class of Notes has been qualified, downgraded or withdrawn; and (iii) make available for inspection at the office of the Irish Paying and Listing Agent copies of its Articles, bylaws, and resolutions authorizing the issuance of the Notes and this Indenture.

(b) So long as any Class E Certificates listed on the Cayman Islands Stock Exchange are Outstanding, the Issuer shall (i) use all reasonable efforts to maintain the listing of such Class E Certificates on the Cayman Islands Stock Exchange; provided, however, that the Issuer will not be required to maintain a listing on the Cayman Islands Stock Exchange or any other stock exchange if compliance with requirements of such stock exchange becomes commercially unreasonable in the sole judgment of the Portfolio Manager; and (ii) make available for inspection at the office of the Administrator copies of its Articles, bylaws, and resolutions authorizing the issuance of the Class E Certificates and the Class E Certificate Documents.

ARTICLE 8

SUPPLEMENTAL INDENTURES

Section 8.1.    Supplemental Indentures Without Consent of Holders.

(a)     Without the consent of the Holders of any Indenture Securities (except as specifically provided in clauses (7), (16) and (17) below) or the Holders of any Class E Certificates, when authorized by respective Board Resolutions, and subject to the requirement provided below in this Section

007397

8.1 with respect to satisfaction of the Rating Condition, the Co-Issuers and the Trustee may execute one or more indentures supplemental to this Indenture, in form satisfactory to the Trustee, to:

(1) evidence the succession of another person to the Issuer or the Co-Issuer and the assumption by the successor person of the obligations of the Issuer or the Co-Issuer in this Indenture and in the Indenture Securities;

(2) add to the covenants of the Co-Issuers or the Trustee for the benefit of the Holders of the Indenture Securities or to surrender any right in this Indenture conferred on the Co-Issuers;

(3) convey, transfer, assign, mortgage, or pledge any property to the Trustee, or add to the conditions, limitations, or restrictions on the authorized amount, terms, and purposes of the issue, authentication, and delivery of the Indenture Securities;

(4) evidence and provide for the acceptance of appointment under this Indenture by a successor Trustee and to add to or change any of the provisions of this Indenture necessary to facilitate the administration of the trusts under this Indenture by more than one Trustee, pursuant to the requirements of Sections 6.9, 6.10, and 6.12;

(5) correct or amplify the description of any property at any time subject to the lien of this Indenture, or to better assure, convey, and confirm to the Trustee any property subject or required to be subject to the lien of this Indenture (including all actions appropriate as a result of changes in law) or to subject to the lien of this Indenture any additional property;

(6) modify the restrictions on and procedures for resales and other transfers of the Indenture Securities to reflect any changes in applicable law (or its interpretation) or to enable the Co-Issuers to rely on any less restrictive exemption from registration under the Securities Act or the 1940 Act or to remove restrictions on resale and transfer to the extent not required under this Indenture;

(7) with the consent of the Portfolio Manager and a Majority of the Controlling Class (by Act of the Holders of the Controlling Class), to modify the restrictions on the sales of Collateral Obligations in Section 12.1 or the Eligibility Criteria in Section 12.2 (and the definitions related thereto) in a manner not materially adverse to the Holders of any Class of the Notes or the Class E Certificates as evidenced by an Opinion of Counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion) or a certificate of an officer of the Portfolio Manager to the effect that the modification would not be materially adverse to the Holders of any Class of the Notes or the Class E Certificates;

(8) make any changes required by (i) the Irish Stock Exchange (so long as any of the Notes are listed thereon) or (ii) the Cayman Islands Stock Exchange (so long as any of the Class E Certificates, Class Q-1 Securities or Class P Securities are listed thereon) or (iii) any other stock exchange on which any Class of Securities is listed in order to permit or maintain the listing of any Securities thereon;

(9) otherwise to correct any inconsistency or cure any ambiguity or errors in this Indenture or to conform the Indenture to the Offering Memorandum;

(10) accommodate the issuance of the Securities in book-entry form through the facilities of DTC or otherwise;

179

007398

(11) to take any appropriate action to prevent the Issuer, the Holders of Securities, or the Trustee from becoming subject to withholding or other taxes, fees, or assessments or to prevent the Issuer from being treated as being engaged in a U.S. trade or business or otherwise being subject to U.S. federal, state, or local income tax on a net income basis, so long as the action will not cause the Holders of any Securities to be adversely affected to any material extent by any change to the timing, character, or source of the income from the Securities, as evidenced by an Opinion of Counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion);

(12) to authorize the appointment of any listing agent, Transfer Agent, Paying Agent, or additional registrar for any Class of Securities appropriate in connection with the listing of any Class of Securities on the Irish Stock Exchange, the Cayman Islands Stock Exchange or any other stock exchange, and otherwise to amend this Indenture to incorporate any changes required or requested by any governmental authority, stock exchange authority, listing agent, Transfer Agent, Paying Agent, or additional registrar for any Class of Securities in connection with its appointment, so long as the supplemental indenture would not materially and adversely affect any Holder of Securities, as evidenced by an Opinion of Counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion) or a certificate of an Authorized Officer of the Portfolio Manager, to the effect that the modification would not be materially adverse to the Holders of any Class of the Securities;

(13) to amend, modify, enter into, or accommodate the execution of any contract relating to a Synthetic Security (including posting collateral under a Synthetic Security Agreement);

(14) to modify Section 3.3 to be consistent with applicable laws or Rating Agency requirements;

(15) to evidence any waiver by any Rating Agency as to any requirement or condition, as applicable, of the Rating Agency set forth in this Indenture;

(16) with the consent of a Majority of the Controlling Class (by Act of the Holders of the Controlling Class), modify the calculation of the Collateral Quality Tests, Concentration Limitations or the Coverage Tests or related definitions to correspond with written changes in the guidelines, methodology or standards established by the Rating Agencies or as otherwise permitted by the Rating Agencies;

(17) (a) with the consent of a Majority of the Class A-1A Notes (by Act of the Holders of the Class A-1A Notes), to amend any provisions herein relating solely to the manner, timing and conditions of Borrowings; and (b) with the consent of a Majority of the Class A-1B Notes (by Act of the Holders of the Class A-1B Notes), to amend any provisions herein relating solely to the manner, timing and conditions of Drawdowns;

(18) to facilitate the issuance of participation notes, combination notes, combination securities and other similar securities;

(19) to facilitate hedging transactions;

(20) to facilitate the ability of the Issuer to lend Collateral Obligations pursuant to a Securities Lending Agreement;

180

007399

(21)  to modify any provision to facilitate an A/B Exchange, including to effect any serial designation relating to the exchange;

(22)  with the consent of the Portfolio Manager, to enter into any additional agreements not expressly prohibited by this Indenture as well as any amendment, modification, or waiver if the Issuer determines that the amendment, modification, or waiver would not, upon or after becoming effective, materially and adversely affect the rights or interest of the Holders of any Class of Securities as evidenced by an Opinion of Counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion) or a certificate of an officer of the Portfolio Manager to the effect that the modification would not be materially adverse to the Holders of any Class of Securities; or

(23)  provide for the issuance of Additional Class E Certificates to the extent permitted by the Class E Certificate Documents and to extend to such Additional Class E Certificates the benefits applicable to the Class E Certificates hereunder and under the Class E Certificate Documents.

(b)  Without the consent of the Portfolio Manager, no supplemental indenture may be entered into that would reduce the rights, decrease the fees or other amounts payable to the Portfolio Manager under this Indenture or increase the duties or obligations of the Portfolio Manager.

(c)  The Trustee is authorized to join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations that may be in the agreements, but the Trustee shall not be obligated to enter into any such supplemental indenture that affects the Trustee's own rights, duties, liabilities, or immunities under this Indenture or otherwise, except to the extent required by law.  Unless notified by a Majority of any Class of the Securities that the Class of Securities would be materially and adversely affected, the Trustee may rely on a certificate of the Portfolio Manager and an Opinion of Counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion) as to whether the interests of any Holder of Securities would be materially and adversely affected by any such supplemental indenture.  The Trustee shall give notice of any such supplemental indenture described in Section 8.1 to the Holders of Indenture Securities and to the Class E Certificates Paying Agent (for forwarding to the Holders of Class E Certificates) at least 15 Business Days before execution of any supplemental indenture by the Trustee (or 60 calendar days before execution, in the case of a supplemental indenture for the purpose described in paragraph (7), (16) and (17) of Section 8.1(a), which shall be identified as such in a certificate of the Portfolio Manager delivered to the Trustee before the date on which such notice is required to be given).

(d)  Except for a supplemental indenture described in Section 8.1(a)(23) above, if any Outstanding Notes are rated by a Rating Agency, the Trustee shall enter into a supplemental indenture pursuant to this Section 8.1 only if either (1) the Rating Condition with respect to each Rating Agency is satisfied with respect to the supplemental indenture or (2) the Portfolio Manager and the Holders of 100% in Aggregate Outstanding Amount of each Class of Notes the ratings on which would be reduced or withdrawn consent to the supplemental indenture.  Prior to the entry into any supplemental indenture with respect to which a Rating Condition for one or more Classes of Indenture Securities is not expected to be delivered, the Trustee shall provide written notice to each Holder of each Outstanding Indenture Security informing them of such fact.

(e)  Without limiting any other requirement to deliver notice pursuant to this Section 8.1, at the cost of the Co-Issuers, the Trustee shall provide to each Rating Agency (for so long as any

181

rated Notes are Outstanding), the Holders of the Indenture Securities and the Class E Certificates Paying Agent (for forwarding to the Holders of Class E Certificates), the Irish Listing and Paying Agent for forwarding to the Irish Stock Exchange (if and for so long as any Class of Notes is listed thereon), the Administrator for forwarding to the Cayman Islands Stock Exchange (if and for so long as any Class E Certificates, Class Q-1 Securities or Class P Securities are listed thereon) and each Hedge Counterparty a copy of any proposed supplemental indenture pursuant to this Section 8.1 at least 15 Business Days before its execution by the Trustee.

Section 8.2.    Supplemental Indentures With Consent of Holders.

(a)    If the Rating Condition is satisfied with respect to each Rating Agency, the Trustee and the Co-Issuers may execute one or more indentures supplemental to this Indenture to add any provisions to, or change in any manner, or eliminate any of the provisions of, this Indenture or modify in any manner the rights of the Holders of the Notes under this Indenture with the consent of:

(1) the Portfolio Manager if the supplemental indenture would reduce the rights, decrease the fees or other amounts payable to it under this Indenture or increase the duties or obligations of the Portfolio Manager;

(2) a Majority of each Class of Indenture Securities adversely affected thereby, by Act of the Holders of each such Class of Indenture Securities; and

(3) a Majority of the Class E Certificates adversely affected thereby, by Act of the Holders of the Class E Certificates.

Any proposed supplemental indenture that would also necessitate a change to the Memorandum and Articles of Association may only be made after a Special Resolution (as defined in the Memorandum and Articles of Association) has been passed to permit the Issuer's constitutional documents to be altered to conform them to the proposed change to this Indenture as certified to the Trustee by the Issuer.

Notwithstanding anything in this Indenture to the contrary, without the consent of the Holder of each Outstanding Note adversely affected thereby and the Holder of each Class E Certificate adversely affected thereby, no supplemental indenture shall:

(i)    change the Stated Maturity of the principal of or the due date of any installment of interest on any Note or of any payment to the Class E Certificates Paying Agent for payment to the Holders of the Class E Certificates, reduce the principal amount or the rate of interest on any Note, or the Default Interest Rate or the Redemption Price with respect to any Note or Class E Certificate, or change the earliest date on which Notes or Class E Certificates may be redeemed at the option of the Issuer, change the provisions of this Indenture relating to the application of proceeds of any Collateral to the payment of principal of or interest on Notes, or to payment to the Class E Certificates Paying Agent for payment to the Holders of the Class E Certificates, or change any place where, or the coin or currency in which principal, interest or other distributions on Securities are paid or impair the right to institute suit for the enforcement of any such payment on or after their Stated Maturity (or, in the case of redemption, on or after the applicable Redemption Date);

(ii)    reduce the percentage of the Aggregate Outstanding Amount of Holders of Notes of each Class or Holders of Class E Certificates whose consent is required for the authorization of any such supplemental indenture or for any waiver of compliance with certain provisions of this

007401

Indenture or certain defaults under this Indenture or their consequences provided for in this Indenture;

(iii) permit the creation of any lien ranking prior to or on a parity with the lien of this Indenture with respect to any part of the Collateral or Class P Collateral or terminate the lien on any property at any time subject hereto or deprive the Holder of any Note of the security afforded by the lien of this Indenture;

(iv) reduce the percentage of the Aggregate Outstanding Amount of Holders of Notes of each Class whose consent is required to direct remedies or to sell or liquidate the Collateral, pursuant to Section 5.4 or 5.5;

(v) modify any of the provisions of this Section, or to provide that certain other provisions of this Indenture cannot be modified or waived without the consent of the Holder of each Outstanding Note and Class E Certificate affected thereby;

(vi) modify the definition of "Outstanding," "Controlling Class," or "Majority," or the Priority of Payments in Section 11.1(a) or Section 13.1; or

(vii) modify any of the provisions of this Indenture in such a manner as to affect the calculation of the amount of any payment of Redemption Price or of interest or principal on any Note or any payment to the Class E Certificates Paying Agent for the payment of dividends or other payments on the Class E Certificates on any Payment Date or to affect the rights of the Holders of Notes or Class E Certificates to the benefit of any provisions for the redemption of the Notes or the Class E Certificates contained in this Indenture.

Prior to the entry into any supplemental indenture with respect to which the Rating Condition for one or more Classes of Indenture Securities is not expected to be delivered, the Trustee shall provide written notice to each Holder of each Outstanding Indenture Security and the Class E Certificates Paying Agent (for forwarding to the Holders of Class E Certificates) informing them of such fact.

(b) No supplemental indenture may modify the terms of the Class Q-1 Securities as such in a manner that would adversely affect the Class Q-1 Securities without the prior written consent of a majority of the stated amount of the Class Q-1 Securities, or the consent of the Holders of each Outstanding Class Q-1 Security adversely affected thereby as set forth above. Except for any proposed such supplement that would affect the terms of the Class Q-1 Securities as such or as provided in subsection (a) above, Holders of Class Q-1 Securities shall be entitled to vote under this Section 8.2 only as Holders of the respective related Class Q-1 Components.

(c) No supplemental indenture may modify the terms of the Class P-1 Securities or the Class P-2 Securities, in each case as such, in a manner that would adversely affect the Class P-1 Securities or Class P-2 Securities, as applicable, without the prior written consent of a majority of the stated amount of the Class P-1 Securities or Class P-2 Securities, as applicable, or the consent of the Holders of each Outstanding Class Q Security adversely affected thereby as set forth above. Except for any proposed such supplement that would affect the terms of the Class P-1 Securities or Class P-2 Securities, as applicable, as such or as provided in subsection (a) above, Holders of Class P Securities shall be entitled to vote under this Section 8.2 only as Holders of the respective Class E Certificates represented by the related Class P Class E Certificate Component.

007402

(d)  At the cost of the Co-Issuers, for so long as any Notes are Outstanding and rated by a Rating Agency, the Trustee shall provide to the Rating Agency a copy of any proposed supplemental indenture pursuant to this Section 8.2 at least 15 Business Days before its execution by the Trustee.

(e)  Not later than 15 Business Days prior to the execution of any proposed supplemental indenture pursuant to this Section 8.2, the Trustee, at the expense of the Co-Issuers, shall mail to the Holders of the Notes, the Portfolio Manager, the Class E Certificates Paying Agent (for forwarding to the Holders of Class E Certificates) and each Rating Agency (so long as any rated Notes are Outstanding) a copy of such supplemental indenture and shall request any required consent from the applicable Holders of Notes or Class E Certificates to be given within the Initial Consent Period.  Any consent given to a proposed supplemental indenture by the Holder of any Notes or Class E Certificates, as applicable, shall be irrevocable and binding on all future Holder or beneficial owners of that Note or Class E Certificate, irrespective of the execution date of the supplemental indenture.  If the Holders of less than the required percentage of the Aggregate Outstanding Amount of the relevant Notes or Class E Certificates consent to a proposed supplemental indenture within the Initial Consent Period, on the first Business Day after the Initial Consent Period, the Trustee shall notify the Issuer and the Portfolio Manager which Holders of Notes or Class E Certificates have consented to the proposed supplemental indenture and, which Holders (and, to the extent such information is reasonably available to the Trustee, which beneficial owners) have not consented to the proposed supplemental indenture.  If it intends to exercise its Amendment Buy-Out Option pursuant to Section 9.6, the Amendment Buy-Out Purchaser shall so notify the Trustee (which notice shall designate a date for the Amendment Buy-Out to occur no earlier than 10 Business Days after the date of such notice) no later than five (5) Business Days after so being notified by the Trustee and the Trustee shall mail such notice to all Holders of Notes and the Class E Certificates Paying Agent (for forwarding to the Holders of Class E Certificates).  Any Non-Consenting Holder may give consent (by Act of such Holder) to the related proposed supplemental indenture until the 5th Business Day prior to the date of the Amendment Buy-Out designated by the Amendment Buy-Out Purchaser, and in such case shall cease to be a Non-Consenting Holder for purposes of the Amendment Buy-Out.  If the Amendment Buy-Out Purchaser exercises its Amendment Buy-Out Option and purchases the applicable Securities pursuant to Section 9.6 below, the Amendment Buy-Out Purchaser, as Holder or beneficial owner of the applicable Notes or Class E Certificates, may consent to the related proposed supplemental indenture within five (5) Business Days of the Amendment Buy-Out.

(f)  It shall not be necessary for any Act of Holders of Notes under this Section 8.2 to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if the Act or consent approves its substance.

(g)  The Trustee, at the expense of the Co-Issuers, shall mail to the Holders of the Indenture Securities, the Portfolio Manager, the Class E Certificates Paying Agent (for forwarding to the Holders of Class E Certificates) and each Rating Agency a copy of any supplemental indenture pursuant to this Section 8.2 promptly after its execution by the Co-Issuers and the Trustee.  Any failure of the Trustee to mail a copy of any supplemental indenture as provided in this Indenture, or any defect in the mailing, shall not in any way affect the validity of the supplemental indenture.

Section 8.3.    Execution of Supplemental Indentures.

In executing or accepting the additional trusts created by any supplemental indenture permitted by this Article 8 or the modifications thereby of the trusts created by this Indenture, the Trustee may receive, and (subject to Sections 6.1 and 6.3) shall be fully protected in relying upon, an Opinion of Counsel stating that the execution of the supplemental indenture is authorized or permitted by this Indenture and that all conditions precedent to the execution of such supplemental indenture have been satisfied.  In the event that any supplemental indenture is consented to by the Issuer, the Co-Issuer and

184

007403

100% of the Aggregate Outstanding Amount of each Class of Notes and the Rating Condition is satisfied or is specifically waived by all consenting parties, all conditions precedent to the execution of such supplemental indenture shall be deemed satisfied, the execution of such supplemental indenture shall be authorized or permitted by this Indenture, and the Trustee shall execute and accept the additional trusts created by such supplemental indenture pursuant to this Article 8 or modification thereby of the trusts created by this Indenture without obtaining an Opinion of Counsel. The Trustee may, but shall not be obligated to, enter into any such supplemental indenture that affects the Trustee's own rights, duties, or immunities under this Indenture or otherwise. The Portfolio Manager shall not be bound by any amendment or supplement to this Indenture that would reduce the rights, decrease the fees or other amounts payable to it under this Indenture or increase the duties or obligations of the Portfolio Manager unless the Portfolio Manager consents to it in writing, such consent not to be unreasonably withheld or delayed. The Portfolio Manager shall follow any amendment or supplement to this Indenture by which it is bound of which it has received written notice from the time it receives a copy of the amendment from the Issuer or the Trustee.

Section 8.4.    Effect of Supplemental Indentures; Certain Required Consents.

Upon the execution of any supplemental indenture under this Article 8, this Indenture shall be modified in accordance therewith, and the supplemental indenture shall form a part of this Indenture for all purposes; and every Holder of Indenture Securities and Class E Certificates theretofore and thereafter authenticated and delivered under this Indenture shall be bound thereby.

Without the approval of each Hedge Counterparty to a then existing Hedge Agreement (so long as the Hedge Counterparty is not in default under any Hedge Agreement to which it is party), no supplemental indenture will be effective, and the Co-Issuers will not consent to any supplemental indenture, that would have a material adverse effect on the Hedge Counterparty. For purposes of this paragraph, any supplemental indenture will be deemed not to have a material adverse effect on the Hedge Counterparty if it does not object within 10 days of delivery of such supplemental indenture by the Trustee.

Section 8.5.    Reference in Notes to Supplemental Indentures.

Notes authenticated and delivered after the execution of any supplemental indenture pursuant to this Article 8 may, and if required by the Trustee shall, bear a notice in form approved by the Trustee as to any matter provided for in the supplemental indenture. If the Applicable Issuers shall so determine, new Notes, so modified as to conform in the opinion of the Trustee and the Co-Issuers to any such supplemental indenture, may be prepared and executed by the Applicable Issuers and authenticated and delivered by the Trustee in exchange for Outstanding Notes.

ARTICLE 9

REDEMPTION OF NOTES

Section 9.1.    Mandatory Redemption.

(a)    If either (a) a Coverage Test is not met on any Determination Date or (b) a Rating Confirmation Failure occurs, principal payments on the Notes shall be made on the related Payment Date (without payment of any Redemption Price) in accordance with the Priority of Payments.

Upon receipt of notice of a Rating Confirmation Failure and if available Interest Proceeds and Principal Proceeds are insufficient to effect the redemption of the Notes, at par on any

subsequent Payment Date in accordance with the Priority of Payments as and to the extent necessary for each of Moody's and S&P to confirm in writing the Initial Ratings assigned by it on the Closing Date to the Notes, then the Portfolio Manager, in its sole discretion may direct the Trustee to sell, and if so directed, the Trustee shall sell in accordance with the instructions of the Portfolio Manager, Collateral Obligations so that the proceeds from the sale and all other funds available for the purpose in the Collection Account will be used to redeem the Notes (but only to the extent necessary for each of Moody's and S&P to confirm in writing the Initial Ratings assigned by it on the Closing Date to the Notes) pursuant to the Priority of Payments. Any sale under this Section 9.1 shall be conducted in such a manner that:

(i) after giving effect to the sale each Overcollateralization Test is satisfied or, if any Overcollateralization Test is not satisfied, the extent of compliance with the Overcollateralization Test is not reduced,

(ii) if the sale occurs on or after the second Payment Date, after giving effect to the sale each Interest Coverage Test is satisfied or, if any Interest Coverage Test is not satisfied, the extent of compliance with the Interest Coverage Test is not reduced, and

(iii) after giving effect to the sale each Collateral Quality Test is satisfied or, if any Collateral Quality Test is not satisfied, the extent of compliance with the Collateral Quality Test is not reduced.

(b) The Class E Certificates will be redeemed in whole in accordance with the Priority of Payments and the Class E Certificate Documents on any Payment Date on which a mandatory redemption of the Notes pursuant to Section 9.1(a) results in the payment in full of the Aggregate Outstanding Amount of each Class of Notes.

Section 9.2. Optional Redemption.

(a) Upon the occurrence of a Tax Event, or at any time after the Non-Call Period, the Notes shall be redeemed by the Applicable Issuers, in whole but not in part, on any Payment Date from Principal Proceeds and all other funds available for that purpose in the Collection Account, the Payment Account, the Interest Reserve Account, the Closing Date Expense Account and the Revolving Reserve Account, at the direction of the Holders of at least a Majority of the Aggregate Outstanding Amount of Class E Certificates, which direction must be given to the Class E Certificates Paying Agent, the Trustee, the Issuer and the Portfolio Manager not later than 45 days before the Payment Date on which the redemption is to be made, at the applicable Redemption Price (exclusive of installments of interest and principal maturing on or before that date, payment of which shall have been made or duly provided for, to the Holders of the Notes on relevant Record Dates or as otherwise provided in this Indenture). All Notes must be simultaneously redeemed, and any termination payments pursuant to Hedge Agreements must be paid. The Class A-1A Notes also may be prepaid during the Reinvestment Period.

Upon receipt of a notice of redemption pursuant to this Section 9.2(a), the Portfolio Manager in its sole discretion will (subject to the standard of care specified in the Management Agreement), on behalf of the Issuer, direct the sale of the Collateral Obligations so that the proceeds from the sale and all other funds available for such purpose in the Collection Account, the Interest Reserve Account, the Closing Date Expense Account, and the Revolving Reserve Account, will be at least sufficient to redeem all of the Notes and to pay all administrative and other fees and expenses payable under the Priority of Payments without regard to any payment limitations. If, in the Portfolio Manager's

reasonable discretion, the sale would not be sufficient to redeem the Notes, and to pay the fees, expenses, and obligations, no Collateral Obligations shall be sold and the Notes shall not be redeemed.

Upon any redemption pursuant to this Section 9.2(a), the Issuer shall, at least 30 days before the Redemption Date (unless the Trustee shall agree to a shorter notice period), notify the Trustee, the Class E Certificates Paying Agent (for forwarding to the Holders of Class E Certificates) and each Rating Agency of the Redemption Date, the applicable Record Date, the principal amount of Notes to be redeemed on the Redemption Date, and the applicable Redemption Prices.

(b)        On any Payment Date on or after payment in full of the Notes, all administrative and other fees (without regard to any payment limitations) payable under the Priority of Payments (including the Senior Management Fee and the Subordinated Management Fee), all amounts owing under this Indenture and all amounts owing under this Indenture and any Hedge Agreement to any Hedge Counterparty have been discharged,

(i)        at the direction of a Majority of the Class E Certificates, the Issuer shall cause the Trustee to make payments in redemption of all of the Class E Certificates, in an aggregate amount equal to all of the proceeds from the sale or other disposition of all of the remaining Collateral less any fees and expenses owed by the Issuer (including the Redemption Price of any Notes being simultaneously redeemed), the aggregate amount to be distributed to the Class E Certificates Paying Agent for distribution to the Holders of the Class E Certificates pro rata in accordance with their respective holdings; or

(ii)        at the unanimous direction of the Holders of the Class E Certificates, the Issuer shall cause the Trustee to make payments in redemption of all or a directed portion (representing less than all) of the Class E Certificates to the Class E Certificates Paying Agent for distribution to the Holders of the Class E Certificates based upon such direction.

Upon a distribution pursuant to Section 9.2(b)(i), the Portfolio Manager will (subject to the standard of care specified in the Management Agreement), on behalf of the Issuer (and subject to Section 9.2(b)(ii)), direct the sale of all remaining Collateral Obligations. Upon a distribution pursuant to Section 9.2(b)(ii), the Portfolio Manager will effect the sale of Collateral Obligations in accordance with the unanimous direction of the Holders of the Class E Certificates.

Section 9.3.        Redemption Procedures.

(a)        Upon any redemption pursuant to Section 9.2, a notice of redemption shall be given by first-class mail, postage prepaid, mailed not later than 10 Business Days and not earlier than 30 days before the applicable Redemption Date, each Holder of Notes to be redeemed, at the Holder's address in the Indenture Register or otherwise in accordance with the rules and procedures of DTC, Euroclear, and Clearstream, as applicable, to the Class E Certificates Paying Agent (for forwarding to the Holders of Class E Certificates), and (in the case of a redemption pursuant to Section 9.2(a)) to each Rating Agency. In addition, (i) for so long as any Notes are listed on the Irish Stock Exchange and so long as the rules of such exchange so require, notice of such redemption pursuant to Section 9.2 shall also be given to the Noteholders by the Irish Listing and Paying Agent publishing in the *Daily Official List* of the Irish Stock Exchange and (ii) for so long as any Class E Certificates, Class Q-1 Securities or Class P Securities are listed on the Cayman Islands Stock Exchange and so long as the rules of the exchange so require, notice of redemption of Securities pursuant to Section 9.2 shall also be given to the Administrator for forwarding to the Cayman Islands Stock Exchange.

(b)        All notices of redemption delivered pursuant to Section 9.3(a) shall state:

007406

(i)    the applicable Redemption Date;

(ii)    the Redemption Price of the Notes to be redeemed (in the case of a redemption pursuant to Section 9.2(a));

(iii)    in the case of a redemption pursuant to Section 9.2(a), that all of the Notes, are to be redeemed in full and that interest on the Notes to be redeemed shall cease to accrue on the Payment Date specified in the notice; and

(iv)    the places where the Notes to be redeemed in whole are to be surrendered for payment of the Redemption Price, which shall be the office or agency of the Co-Issuers to be maintained as provided in Section 7.2 and, so long as any Notes are listed on the Irish Stock Exchange, the Irish Paying and Listing Agent.

Any such notice of redemption may be withdrawn by the Issuer up to the fourth Business Day before the scheduled Redemption Date by written notice to the Class E Certificates Paying Agent (for forwarding to the Holders of Class E Certificates), the Trustee and the Portfolio Manager only if:

(A)    in the case of a redemption pursuant to Section 9.2(a), the Portfolio Manager does not deliver the sale agreement or certifications (described in Section 9.3(c) and 12.1(f)), as the case may be, in form satisfactory to the Trustee,

(B)    in the case of a redemption pursuant to Section 9.2(a) or Section 9.2(b)(i), the Issuer receives the written direction of Holders of Class E Certificates holding Class E Certificates in an aggregate Face Amount at least equal to the Face Amount of the Holders of Class E Certificates that had requested redemption under Section 9.2(a) or Section 9.2(b)(i), as applicable, to withdraw the notice of, and

(C)    in the case of a redemption pursuant to Section 9.2(b)(ii), the Issuer receives the unanimous written direction of the Holders of the Class E Certificates to withdraw the notice of redemption (and the Issuer hereby agrees for the benefit of the directing person to withdraw the applicable notice of redemption if it receives the written direction referred to in the preceding clause (B) or this clause (C)).

Notice of any withdrawal shall be sent, not later than the third Business Day before the scheduled Redemption Date (assuming that the Trustee has received timely written notice from the Issuer as provided above), by the Trustee, to each Holder of Notes scheduled to be redeemed at the Holder's address in the Indenture Register by overnight courier guaranteeing next day delivery (or, to the extent the address contained in the Indenture Register is not sufficient for that purpose, by first class mail) and the Class E Certificates Paying Agent (for forwarding to each Holder of Class E Certificates). If the Issuer so withdraws any notice of redemption or is otherwise unable to complete any redemption of the Notes, the Sale Proceeds received from the sale of any Collateral Obligations sold pursuant to Sections 9.2 and 12.1(f) may, during the Reinvestment Period (and, in respect of Sale Proceeds from Credit Improved Obligations, after the Reinvestment Period) at the Portfolio Manager's discretion, be reinvested in accordance with the Eligibility Criteria.

Notice of redemption shall be given by the Co-Issuers or, upon an Issuer Order, by the Trustee in the name and at the expense of the Co-Issuers. Failure to give notice of redemption, or any defect therein, to any Holder of any Note selected for redemption or the Class E Certificates Paying Agent (for forwarding to each Holder of Class E Certificates) shall not impair or affect the validity of the redemption of any other Notes or Class E Certificates.

188

007407

(c)     The Notes may not be redeemed pursuant to Section 9.2(a) unless either of the following conditions are satisfied:

(i)     At least ten Business Days before the Redemption Date, the Portfolio Manager shall have furnished to the Trustee evidence (in form reasonably satisfactory to the Trustee) that the Issuer has entered into a binding agreements (with a financial or other institution or entity whose short-term unsecured debt obligations (other than obligations whose rating is based on the credit of a person other than the institution) have a credit rating of at least "A-1" from S&P and of "P-1" (and not on credit watch for possible downgrade) from Moody's (or to any other institution or entity if the Rating Condition with respect to Moody's is satisfied with respect to the other entity)) to sell to the financial or other institutions, not later than the Business Day before the Redemption Date in immediately available funds, all or part of the Collateral (directly or by participation or other arrangement) at a Purchase Price at least equal to an amount sufficient (together with any Cash and other Eligible Investments not subject to the agreements and maturing on or before the Redemption Date and any payments to be received with respect to the Hedge Agreements on or before the Redemption Date) to pay all administrative and other fees and expenses payable under the Priority of Payments without regard to any payment limitations (including the Senior Management Fee and the Subordinated Management Fee), all amounts owing under this Indenture, all amounts owing under the Hedge Agreements to the Hedge Counterparties, and to redeem the Notes on the Redemption Date at the applicable Redemption Prices; or

(ii)     Before entering into any binding agreement to sell all or a portion of the Collateral and selling or terminating any Hedge Agreement, the Portfolio Manager shall have certified that, in its commercially reasonable judgment, the settlement dates of the sales will be scheduled to occur on or before the Business Day before the Redemption Date and that the expected proceeds from the sales are to be delivered to the Trustee no later than the Business Day before the Redemption Date, in immediately available funds, in an amount (calculated as applicable in the manner provided below) sufficient (together with any Cash and other Eligible Investments not subject to the agreements and maturing on or before the Redemption Date and any payments to be received with respect to the Hedge Agreements on or before the Redemption Date) to pay all administrative and other fees and expenses payable under the Priority of Payments (including the Senior Management Fee and the Subordinated Management Fee), all amounts owing under this Indenture, all amounts owing under the Hedge Agreements to the Hedge Counterparties, and to redeem the Notes on the Redemption Date at the applicable Redemption Prices.  For purposes of this paragraph, the amount shall be calculated with respect to the classes of Collateral listed in the table below by multiplying the expected proceeds of sale of the Collateral by the indicated percentage in the table below.

| | | Number of Business Days Between Certification to the Trustee and Sale | | | |
|---|---|---|---|---|---|
| | | Same Day | 1 to 2 | 3 to 5 | 6 to 15 |
| 1 | Cash or other Eligible Investments | 100% | 100% | 100% | 100% |
| 2 | Loans (other than 5 below) | 100% | 93% | 92% | 88% |
| 3 | High-Yield Bonds (other than 5 below) and Structured Finance Obligations (in each case, other than 4 below) | 100% | 89% | 85% | 75% |
| 4 | High-Yield Bonds (other than 5 below) and Structured Finance Obligations, in | 100% | 75% | 65% | 55% |

189

007408

| | | Number of Business Days Between Certification to the Trustee and Sale | | | |
|---|---|---|---|---|---|
| | | Same Day | 1 to 2 | 3 to 5 | 6 to 15 |
| | each case with a Moody's Rating of "B3" and on credit watch with negative implications or below "B3" | | | | |
| 5 | Synthetic Securities | 100% | 65% | 55% | 35% |

Any certification delivered pursuant to this Section 9.3(c) shall include (A) the prices of, and expected proceeds from, the sale of any Collateral Obligations, Eligible Investments, or Hedge Agreements and (B) all calculations required by this Section 9.3(c).

Section 9.4.    Notes Payable on Redemption Date.

(a)    Notice of redemption pursuant to Section 9.3 having been given as aforesaid, the Notes to be redeemed shall, on the Redemption Date, become payable at the Redemption Price therein specified and from and after the Redemption Date (unless the Issuer shall default in the payment of the Redemption Price and accrued interest) the Notes shall cease to bear interest on the Redemption Date. Upon final payment on a Note to be so redeemed, the Holder shall present and surrender the Note at the place specified in the notice of redemption on or before the Redemption Date unless the Co-Issuers and the Trustee receive the security or indemnity required by them to save each of them harmless and an undertaking thereafter to surrender the Note, and in the absence of notice to the Co-Issuers and the Trustee, that the applicable Note has been acquired by a protected purchaser, the final payment shall be made without presentation or surrender. Payments of interest on Notes so to be redeemed whose Stated Maturity is on or before the Redemption Date shall be payable to the Holders of the Notes, or one or more predecessor Notes, registered as such at the close of business on the relevant Record Date if the Record Date is a Business Day (or, if the Record Date is not a Business Day, the close of business on the Business Day before the Record Date) according to Section 2.8(e).

(b)    If any Note called for redemption is not paid on its surrender for redemption, its principal shall bear interest from the Redemption Date at the Applicable Note Interest Rate for each successive Interest Period the Note remains Outstanding if the reason for the non-payment is not the fault of the Holder of the Note.

Section 9.5.    Special Redemption.

Principal payments on the Notes shall be made in whole or in part, at par, in accordance with the Priority of Payments if, at any time during the Reinvestment Period, the Portfolio Manager elects (subject to the Management Agreement) to notify the Trustee and each Rating Agency that it has been unable, for 45 consecutive Business Days, to identify additional Collateral Obligations that are deemed appropriate by the Portfolio Manager in its sole discretion and meet the Eligibility Criteria in sufficient amounts to permit the investment or reinvestment of all or a portion of the funds then in the Collection Account available to be invested in additional Collateral Obligations (a "Special Redemption").

On the first Payment Date following the Due Period for which the notice is effective (a "Special Redemption Date"), the funds in the Collection Account or the Payment Account representing Principal Proceeds that, by operation of the preceding paragraph, are not reinvested in additional Collateral Obligations (the "Special Redemption Amount") will be available to be applied in accordance with the Priority of Payments under Section 11.1(a)(ii). Notice of payments pursuant to this Section 9.5

190

shall be given by first-class mail, postage prepaid, mailed not later than three Business Days before the applicable Special Redemption Date, to each Holder of Notes to be redeemed, at the Holder's address in the Indenture Register or otherwise in accordance with the rules and procedures of DTC. In addition, (i) for so long as any Notes are listed on the Irish Stock Exchange and so long as the rules of such exchange so require, notice of Special Redemption shall also be given by the Issuer or, upon Issuer Order, by the Irish Paying and Listing Agent in the name and at the expense of the Co-Issuers, to Noteholders by publication in the *Daily Official List* of the Irish Stock Exchange and (ii) for so long as any Class E Certificates, Class Q-1 Securities or Class P Securities are listed on the Cayman Islands Stock Exchange and so long as the rules of the exchange so require, notice of Special Redemption of Notes shall also be given to the Administrator for forwarding to the Cayman Islands Stock Exchange.

Section 9.6.     Amendment Buy-Out.

(a)     In the case of any supplemental indenture pursuant to Section 8.2 that requires the consent of one or more Holders of Securities, the Amendment Buy-Out Purchaser shall have the right, but not the obligation, to purchase from Non-Consenting Holders all Securities held by such Holders of the Class of Securities whose consent was solicited with respect to such supplemental indenture (the "Amendment Buy-Out Option") for the applicable Amendment Buy-Out Purchase Price. If the Amendment Buy-Out Option is exercised, the Amendment Buy-Out Purchaser must purchase all such Securities of Non-Consenting Holders, regardless of the applicable percentage of the Aggregate Outstanding Amount of the Securities the consent of whose Holders is required for such supplemental indenture (an "Amendment Buy-Out"). By its acceptance of its Securities hereunder, each Holder of Securities agrees that if the Amendment Buy-Out Option is exercised, any Non-Consenting Holder will be required to sell its applicable Securities to the Amendment Buy-Out Purchaser; provided that if the solicited consent to a supplemental indenture only applies to one Class Q-1 Component, the Non-consenting Holder will be required to sell, at the Non-consenting Holder's option, its Class Q-1 Security as a whole or solely the affected Class Q-1 Component; provided, further that in the case of the Class P Securities of Non-consenting Holders, such Class P Securities will be deemed exchanged for their respective Components, only the Class E Certificates represented by the related Class E Certificate Component must be sold to an Amendment Buy-Out Purchaser for a price equal to the Amendment Buy-Out Purchase Price, which will be distributed to such Non-consenting Holders, and such Non-Consenting Holders will receive a distribution in kind of the related pro rata amount of the Class P U.S. Treasury Component. In the case of the Class A-1 Notes, if an Amendment Buy-Out occurs on a day (the "Amendment Buy-Out Trade Date") other than a Payment Date, the settlement of such Amendment Buy-Out will be deferred until the next following Payment Date (and, for the avoidance of doubt, the Non-Consenting Holder will be entitled to any payments received on such Payment Date and the Amendment Buy-Out Purchase Price will be calculated as of such Payment Date); provided that all other rights of a Holder or Beneficial Owner of such securities will be deemed transferred to the Amendment Buy-Out Purchaser as of the Amendment Buy-Out Trade Date. Neither the Amendment Buy-Out Purchaser nor any other Person shall have any liability to any Holder or beneficial owner of Notes or Class E Certificates as a result of an election by the Amendment Buy-Out Purchaser not to exercise the Amendment Buy-Out Option.

(b)     All purchases made pursuant to an Amendment Buy-Out Option individually and in the aggregate must comply with the applicable transfer restrictions for the relevant Indenture Securities or Class E Certificates set forth herein (and in the case of the Class A-1A Notes, the Class A-1A Note Purchase Agreement and in the case of the Class A-1B Notes, the Class A-1B Note Purchase Agreement, as applicable) and all applicable laws, rules and regulations (including, without limitation, any rules, regulations and procedures of any securities exchange, self-regulatory organization or clearing agency). For the avoidance of doubt, any Amendment Buy-out of Class A-1A Notes shall include the

related Commitment thereunder and any Amendment Buy-out of Class A-1B Notes shall include the related obligation to fund the Fully Drawn Amount.

Section 9.7.     Prepayments of Class A–1A Notes.

(a)     During the Reinvestment Period, the Class A–1A Notes may be prepaid without premium on any Business Day (in whole or in part) at the option of the Issuer (at the direction of the Portfolio Manager acting pursuant to the Management Agreement) from (i) Principal Proceeds otherwise available for reinvestment in Collateral Obligations pursuant to the terms hereof or (ii) amounts credited to the Revolving Reserve Account so long as, after giving effect thereto, the aggregate Balance of all Eligible Investments credited to the Revolving Reserve Account will be at least equal to the Revolver Funding Reserve Amount.  Furthermore, any amounts repaid may be reborrowed until the Commitment Termination Date.

(b)     Any Prepayment shall be made pro rata according to the Drawn Amount of the Class A–1A Notes.

(c)     The Issuer will duly and punctually perform each of its obligations under the Note Purchase Agreement.

(d)     Subject to the requirement that the Aggregate Principal Balance of all Eligible Investments standing to the credit of the Revolving Reserve Account is at least equal to the Revolver Funding Reserve Amount, the Commitments in respect of the Class A–1A Notes will reduce automatically to the extent that principal is paid on the Class A–1A Notes as the result of a Mandatory Redemption or Special Redemption.  Any such reduction will be final.

ARTICLE 10

ACCOUNTS, ACCOUNTINGS, AND RELEASES

Section 10.1.     Collection of Money.

Except as otherwise expressly provided in this Indenture, the Trustee may demand payment or delivery of, and shall receive and collect, directly and without intervention or assistance of any fiscal agent or other intermediary, all money and other property payable to or receivable by the Trustee pursuant to this Indenture, including all payments due on any item of Collateral, in accordance with the terms of such Collateral.  The Trustee shall segregate and hold all money and property received by it in trust for the Secured Parties or the applicable Class P Securityholders, as the case may be, and shall apply it as provided in this Indenture.  Any Account may contain any number of sub-accounts for the convenience of the Trustee or as required by the Portfolio Manager for convenience in administering the Accounts or the Collateral or the Class P Collateral

Section 10.2.     Collection Account.

(a)     Before the Closing Date, the Trustee shall establish a single, segregated non-interest bearing trust account that shall be designated as the Collection Account, that shall be held in trust in the name of the Trustee for the benefit of the Secured Parties over which the Trustee shall have exclusive control and the sole right of withdrawal, and into which the Trustee shall from time to time deposit, in addition to the deposits required pursuant to Section 10.7(e), immediately upon the Trustee's receipt thereof:

192

(i)     any funds transferred from (1) the Closing Date Expense Account pursuant to Section 10.3(g) or (2) the Interest Reserve Account pursuant to Section 10.3(i),

(ii)     all Principal Proceeds (unless (1) simultaneously reinvested in Collateral Obligations in accordance with Article 12, (2) deposited into the Revolving Reserve Account, (3) posted by the Issuer as cash collateral with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security or in Eligible Investments or (4) used to make Prepayments with respect to the Class A-1A Notes), received by the Trustee,

(iii)     all Interest Proceeds received by the Trustee (unless simultaneously reinvested in accrued interest in respect of Collateral Obligations in accordance with Article 12 or in Eligible Investments), and

(iv)     all other funds received by the Trustee and not excluded above.

In addition to the items described above, the Issuer may, but under no circumstances shall be required to, deposit from time to time any monies in the Collection Account it deems, in its sole discretion, to be advisable (and may designate any amounts deposited pursuant to this sentence as Principal Proceeds or Interest Proceeds in its discretion). Any Principal Proceeds received during the Reinvestment Period, and Sale Proceeds from the sale of Credit Improved Obligations and Unscheduled Principal Payments received after the Reinvestment Period, which have not been reinvested in additional Collateral Obligations on the Business Day of receipt shall be deposited in the Collection Account and shall at the direction of the Portfolio Manager be applied to the purchase of additional Collateral Obligations in accordance with the Eligibility Criteria and the other requirements set forth herein or the purchase of Eligible Investments pending such investment or used to enter into additional Hedge Agreements or used in connection with a Special Redemption. Principal Proceeds (other than Sale Proceeds from the sale of Credit Improved Obligations and Unscheduled Principal Payments) received after the Reinvestment Period shall be deposited into the Collection Account and applied to the purchase of Eligible Investments. All monies deposited from time to time in the Collection Account pursuant to this Indenture shall be held by the Trustee as part of the Collateral and shall be applied to the purposes provided in this Indenture. Amounts in the Collection Account shall be reinvested pursuant to Section 10.4(a).

(b)     Within one Business Day after receipt of any distribution or other proceeds of the Collateral that are not Cash, the Trustee shall so notify the Issuer and the Portfolio Manager. Within five Business Days of receipt of the notice from the Trustee, the Portfolio Manager, on behalf of the Issuer, shall sell the distribution or other proceeds for Cash in an arm's length transaction to a person that is not the Portfolio Manager or an Affiliate of the Portfolio Manager and deposit its proceeds in the Collection Account. The Issuer need not sell the distributions or other proceeds if it delivers an Issuer Order or an Officer's certificate to the Trustee and the Portfolio Manager certifying that the distributions or other proceeds are Collateral Obligations, Eligible Investments, or Workout Assets (other than Tax Affected Securities).

(c)     During the Reinvestment Period (or, in respect of Principal Proceeds constituting Unscheduled Principal Payments and Sale Proceeds from Credit Improved Obligations, after the Reinvestment Period), at the direction of the Portfolio Manager, the Issuer may by Issuer Order direct the Trustee to, and upon receipt of the Issuer Order the Trustee shall withdraw funds on deposit in the Collection Account representing Principal Proceeds (and, to the extent expressly provided in this Indenture, Interest Proceeds) and reinvest (or invest, in the case of funds referred to in Section 7.18) the funds in Collateral Obligations (including any related deposit into the Revolving Reserve Account or the posting by the Issuer of cash collateral into the Synthetic Security Counterparty Account with (or for the

007412

benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security), or use such Principal Proceeds to make Prepayments on the Class A-1A Notes in accordance with Section 9.7, in each case in accordance with the requirements of Article 12 and the Issuer Order.

(d)        At any time during or after the Reinvestment Period, at the direction of the Portfolio Manager, the Issuer may by Issuer Order direct the Trustee to, and upon receipt of the Issuer Order the Trustee shall, pay from amounts on deposit in the Collection Account on any Business Day during any Interest Period from Interest Proceeds only, any Administrative Expenses that require payment before the next Payment Date to the extent that the amount of the payments does not exceed the aggregate amount that may be paid on the next Payment Date under, and at the level of priority specified by, Section 11.1(a)(i)(1).

(e)        The Trustee shall transfer to the Payment Account from the Collection Account for application pursuant to Section 11.1(a) on or not later than the Business Day preceding each Payment Date, the amount set forth to be so transferred in the Valuation Report for the Payment Date.

Section 10.3.    Other Accounts.

(a)        Custodial Account.  Before the Closing Date, the Trustee shall establish a single, segregated trust account that shall be designated as the Custodial Account, that shall be held in trust in the name of the Trustee for the benefit of the Secured Parties, over which the Trustee shall have exclusive control and the sole right of withdrawal, and into which the Trustee shall deposit the Collateral Obligations and other Collateral not deposited elsewhere in accordance with this Indenture (other than Loans, Participations and general intangibles, which in the case of Loans and Participations, shall be held by the Trustee as provided in Section 3.2).  All assets or securities at any time on deposit in, or otherwise to the credit of, the Custodial Account shall be held in trust by the Trustee for the benefit of the Secured Parties and any funds in the Custodial Account, if invested, shall be invested in Eligible Investments.  The only permitted withdrawals from the Custodial Account shall be in accordance with this Indenture.  The Co-Issuers shall not have any legal, equitable, or beneficial interest in the Custodial Account other than in accordance with Section 3.2 and the Priority of Payments.

(b)        Revolving Reserve Account.  Before the Closing Date, the Trustee shall establish a single, segregated non-interest bearing trust account which shall be designated as the Revolving Reserve Account which shall be held in trust in the name of the Trustee for the benefit of the Secured Parties, over which the Trustee shall have exclusive control and the sole right of withdrawal. Upon the purchase of any Collateral Obligation that is a Revolving Loan or Delayed Drawdown Loan, at the direction of the Portfolio Manager, the Trustee shall deposit and at all times maintain Principal Proceeds and amounts drawn under the Class A-1A Notes into the Revolving Reserve Account, such that the amount of funds on deposit in the Revolving Reserve Account will be at least equal to 100% of the Revolver Funding Reserve Amount.  Such Principal Proceeds so deposited shall be considered part of the Purchase Price of the related Revolving Loan or Delayed Drawdown Loan for purposes of Article 12.  All principal payments received on any Revolving Loan (except to the extent of any concurrent commitment reduction) will be deposited within two Business Days directly into the Revolving Reserve Account (and will not be available for distribution as Principal Proceeds) to the extent required to maintain the Revolver Funding Reserve Amount (including with respect to the amount of such principal payments that may be re-borrowed under such Revolving Loan).  Amounts on deposit in the Revolving Reserve Account shall be reinvested pursuant to Section 10.4(b).  All interest and other income from amounts in the Revolving Reserve Account deposited to the Collection Account pursuant to Section 10.4(b) shall be considered Interest Proceeds in the Due Period in which they are so deposited.  At the direction of the Portfolio Manager at any time during or after the Reinvestment Period, the Trustee shall withdraw funds from the

Revolving Reserve Account to fund extensions of credit pursuant to Revolving Loans or Delayed Drawdown Loans, respectively. Upon the sale, maturity or termination of a Revolving Loan or Delayed Drawdown Loan in whole or in part or the reduction in part or termination of the Issuer's commitment thereunder, any funds in the Revolving Reserve Account in excess of the amount needed to maintain the Revolver Funding Reserve Amount shall be transferred from time to time by the Trustee (upon the direction of the Portfolio Manager) to the Collection Account and treated as Principal Proceeds.

(c)     Expense Reimbursement Account.  Before the Closing Date, the Trustee shall establish a single, segregated non-interest bearing trust account that shall be designated as the Expense Reimbursement Account, that shall be held in trust in the name of the Trustee for the benefit of the Secured Parties, over which the Trustee shall have exclusive control and the sole right of withdrawal. On any Payment Date and on any date between Payment Dates, the Trustee will apply amounts, if any, in the Expense Reimbursement Account to the payment of expenses and fees that must be paid between Payment Dates or that are due on that Payment Date under Section 11.1(a)(i)(1) and the Trustee shall on any Payment Date other than on the final redemption date of the Class E Certificates transfer to the Expense Reimbursement Account an amount equal to the excess, if any, of the Administrative Expense Cap over the amounts due under Section 11.1(a)(i)(1) to the Expense Reimbursement Account in accordance with Section 11.1(a)(i)(2).  Funds in the Expense Reimbursement Account shall be invested in accordance with Section 10.4(a). Any funds remaining in the Expense Reimbursement Account as of the Determination Date relating to the final redemption date of the Class E Certificates shall be deposited in the Collection Account as Interest Proceeds for distribution on the Scheduled Class E Certificate Redemption Date as described under Section 11.1(a)(i).

(d)     Hedge Counterparty Collateral Account.  Before the Closing Date, the Trustee shall establish a single, segregated non-interest bearing trust account that shall be designated as the Hedge Counterparty Collateral Account, that shall be held in trust in the name of the Trustee for the benefit of the Secured Parties (other than the Hedge Counterparty pledging the Collateral), over which the Trustee shall have exclusive control, the sole right of withdrawal and a lien for the benefit of the Secured Parties. The Trustee shall deposit all collateral received from a Hedge Counterparty under any Hedge Agreement into the Hedge Counterparty Collateral Account.  The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Hedge Counterparty Collateral Account shall be:

(i)     for application to obligations of the relevant Hedge Counterparty to the Issuer under a Hedge Agreement if the Hedge Agreement becomes subject to early termination, or

(ii)     to return collateral to the relevant Hedge Counterparty when and as required by the relevant Hedge Agreement, in each case as directed by the Portfolio Manager.

Amounts on deposit in the Hedge Counterparty Collateral Account shall be invested pursuant to Section 10.4(a) and shall not be considered an asset of the Issuer for the purposes of the Coverage Tests.

(e)     Synthetic Security Collateral Account.  Before the Closing Date, the Trustee shall establish a single, segregated non-interest bearing trust account that shall be designated as the Synthetic Security Collateral Account, that shall be held in trust in the name of the Trustee for the benefit of the Secured Parties over which the Trustee shall have exclusive control, the sole right of withdrawal, and a lien for the benefit of the Secured Parties.  On or before the date on which the Issuer enters into a Synthetic Security and delivers a copy of it to the Trustee, the Trustee shall create a sub-account of the Synthetic Security Collateral Account with respect to the Synthetic Security.

All Synthetic Security Collateral posted by any Synthetic Security Counterparty in support of its respective obligation under a Synthetic Security shall be immediately deposited into the

195

Synthetic Security Collateral Account and posted to the sub-account related to the Synthetic Security. On each day on which amounts are payable to the Issuer out of Synthetic Security Collateral, the Issuer by Issuer Order shall direct the Trustee to, and upon receipt of the Issuer Order, the Trustee shall, withdraw amounts on deposit in the Synthetic Security Collateral Account in an amount sufficient to make the payment as provided in the Issuer Order (including any total or partial release of Synthetic Security Collateral). The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Synthetic Security Collateral Account shall be (i) for application to the obligations of the relevant Synthetic Security Counterparty under a Synthetic Security Agreement or (ii) to return Synthetic Security Collateral to the relevant Synthetic Security Counterparty at the termination of the relevant Synthetic Security Agreement or as otherwise required by the Synthetic Security Agreement, in each case as directed by the Portfolio Manager.

Amounts on deposit in the Synthetic Security Collateral Account shall be invested pursuant to Section 10.4(b) and shall not be considered an asset of the Issuer for the purposes of the Coverage Tests.

(f)     Securities Lending Account.  Before the Closing Date, the Trustee shall establish a single, segregated non-interest bearing trust account that shall be designated as the Securities Lending Account, that shall be held in trust in the name of the Trustee for the benefit of the Secured Parties, over which the Trustee shall have exclusive control, the sole right of withdrawal, and a lien for the benefit of the Secured Parties.  On or before the date on which the Issuer enters into a Securities Lending Agreement and delivers a copy of it to the Trustee, the Trustee shall create a sub-account of the Securities Lending Account with respect to the Securities Lending Agreement.  All Securities Lending Collateral posted by any Securities Lending Counterparty in support of its respective obligation under a Securities Lending Agreement shall be immediately deposited into the Securities Lending Account and posted to the sub-account related to the Securities Lending Agreement.  The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Securities Lending Account shall be:

(i)     for application to obligations of the relevant Securities Lending Counterparty to the Issuer under a Securities Lending Agreement if the Securities Lending Agreement becomes subject to early termination or in the exercise of remedies under the related Securities Lending Agreement upon any "event of default" under and as defined in the related Securities Lending Agreement, including liquidating the related Securities Lending Collateral, or

(ii)     to return the Securities Lending Collateral to the relevant Securities Lending Counterparty when and as required by the relevant Securities Lending Agreement, in each case as directed by the Portfolio Manager.

Amounts on deposit in the Securities Lending Account shall be invested pursuant to Section 10.4(c).  To the extent provided in a Securities Lending Agreement, earnings on amounts on deposit in the Securities Lending Account shall be payable by the Issuer to the related Securities Lending Counterparty.

Amounts on deposit in the Securities Lending Account shall not be considered an asset of the Issuer for the purposes of the Coverage Tests, but the loaned security or asset that relates to the Securities Lending Account shall be so considered an asset of the Issuer.

(g)     Closing Date Expense Account.  Before the Closing Date, the Trustee shall establish a single, segregated non-interest bearing trust account that shall be designated as the Closing Date Expense Account, that shall be held in trust in the name of the Trustee for the benefit of the Secured Parties, over which the Trustee shall have exclusive control and the sole right of withdrawal.  On the

007415

Closing Date, the Trustee, at the direction of the Issuer, shall deposit into the Closing Date Expense Account approximately U.S.$16,300,000 from the gross proceeds of the Offering. At any time before the earlier of (i) the Ramp-Up Completion Date and (ii) the Payment Date in March 2006, at the direction of the Portfolio Manager, the Issuer may by Issuer Order direct the Trustee to, and upon receipt of the Issuer Order the Trustee shall, pay from amounts on deposit in the Closing Date Expense Account any applicable fees and expenses of the Offering. On the Payment Date in March 2006, the Trustee shall transfer all funds on deposit in the Closing Date Expense Account to the Collection Account as Principal Proceeds and close the Closing Date Expense Account.

Amounts on deposit in the Closing Date Expense Account shall be invested pursuant to Section 10.4(a) and shall not be considered an asset of the Issuer for the purposes of the Coverage Tests.

(h)     Payment Account. Before the Closing Date, the Trustee shall establish a single, segregated non-interest bearing trust account that shall be designated as the Payment Account, that shall be held in trust in the name of the Trustee for the benefit of the Secured Parties, over which the Trustee shall have exclusive control and the sole right of withdrawal. The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Payment Account shall be to pay amounts due and payable on the Notes in accordance with their terms and the provisions of this Indenture and to pay Administrative Expenses and other amounts specified in this Indenture, each in accordance with the Priority of Payments. Funds on deposit in the Payment Account, if invested, shall be invested in Eligible Investments. The Co-Issuers shall not have any legal, equitable, or beneficial interest in the Payment Account other than in accordance with the Priority of Payments.

(i)     Interest Reserve Account. Before the Closing Date, the Trustee shall establish a single, segregated non-interest bearing trust account that shall be designated as the Interest Reserve Account, that shall be held in trust in the name of the Trustee for the benefit of the Secured Parties, over which the Trustee shall have exclusive control and the sole right of withdrawal. On the Closing Date, the Trustee, at the direction of the Issuer, shall deposit into the Interest Reserve Account approximately U.S.$4,100,000 from the gross proceeds of the Offering. On the first Payment Date, the Trustee at the direction of the Issuer or the Portfolio Manager on its behalf shall pay from amounts on deposit in the Interest Reserve Account the amount necessary such that the amounts referred to in Section 11.1(a)(i)(1) through (17) will be paid in full on the first Payment Date. In addition, at the direction of the Portfolio Manager, the Issuer may by Issuer Order direct the Trustee to, and upon receipt of the Issuer Order the Trustee shall deposit all or any portion of the funds remaining on deposit in the Interest Reserve Account after application pursuant to the preceding sentence into the Collection Account as Interest Proceeds and/or as Principal Proceeds (allocated in such proportion as the Portfolio Manager directs in its sole discretion) for distribution on the first Payment Date. On the second Payment Date, the Trustee at the direction of the Issuer or the Portfolio Manager on its behalf shall pay from any funds remaining on deposit in the Interest Reserve Account after the first Payment Date the amount necessary such that the amounts referred to in Section 11.1(a)(i)(1) through (17) will be paid in full on the second Payment Date. The Trustee shall transfer any remaining funds on deposit in the Interest Reserve Account on the second Payment Date (after application of any monies therefrom on such date) to the Collection Account, as directed by the Portfolio Manager in its sole discretion as Interest Proceeds and/or as Principal Proceeds (allocated in such proportion as the Portfolio Manager directs in its sole discretion) for distribution on the second Payment Date and close the Interest Reserve Account. Amounts on deposit in the Interest Reserve Account shall be invested pursuant to Section 10.4(a).

(j)     Class A–1A Funding Account. The Trustee shall, prior to the Closing Date, establish a segregated trust account designated the Class A-1A Funding Account. Any Aggregate Undrawn Amount deposited with the Trustee pursuant to Section 2.12(c) as a result of the failure of a Holder of a Class A-1A Note to satisfy the Rating Criteria during the Draw Period and any subsequent

007416

Prepayments in respect of such Holder's Class A-1A Notes shall be placed in a separate subaccount of the Class A-1A Funding Account relating to such Holder and shall be used by the Trustee to fund such holder's *pro rata* portion of any subsequent Borrowing on the Class A-1A Notes. Amounts so placed in the Class A-1A Funding Account shall, for all purposes under this Indenture, be part of the Aggregate Undrawn Amount and such Holder shall be entitled to receive the applicable Commitment Fee thereon. During the Reinvestment Period, amounts held in each subaccount of the Class A-1A Funding Account shall be invested in Eligible Investments at the direction of the related Holder (or, in the absence of such direction, in investments set forth in clause (i) of the definition of Eligible Investments) and the income from such investments shall be remitted to such Holder on each Payment Date. At the end of the Draw Period or as soon as practical after the Holder (or a transferee of such Holder) satisfies the Rating Criteria, any amounts remaining in the Class A-1A Funding Account or the related subaccount thereof shall be refunded to the related Holder along with any income and proceeds thereon.

(k)     Class A–1B Funding Account.  The Trustee shall, prior to the Closing Date, establish a segregated trust account designated the Class A-1B Funding Account. Any Aggregate Undrawn Amount deposited with the Trustee pursuant to Section 2.13(c) as a result of the failure of a Holder of a Class A-1B Note to satisfy the Rating Criteria during the Delayed Drawdown Period shall be placed in a separate subaccount of the Class A-1B Funding Account relating to such Holder and shall be used to fund such holder's *pro rata* portion of any subsequent Drawdown under the Class A-1B Notes.  Amounts so placed in the Class A-1B Funding Account shall, for all purposes under this Indenture, be part of the Aggregate Undrawn Amount and such Holder shall be entitled to receive the applicable Delayed Drawdown Fee thereon.  During the Delayed Drawdown Period, amounts held in each subaccount of the Class A-1B Funding Account shall be invested in Eligible Investments at the direction of the related Holder (or, in the absence of such direction, in investments set forth in clause (i) of the definition of Eligible Investments). Amounts in the Class A-1B Funding Account as of the Business Day prior to the first Payment Date will be automatically converted to constitute Drawn Amounts under the related Class A-1A Notes; provided that to the extent the amount in the Class A-1B Funding Account exceeds the related Holders pro rata share of the Fully Drawn Amount, such excess shall be remitted to such Holder on the first Payment Date.

(l)     Class P-1 U.S. Treasury Component Account.   The Issuer shall, on or prior to the Closing Date, establish a segregated trust account designated the Class P-1 U.S. Treasury Component Account that shall be held in trust in the name of the Trustee for the benefit of the Class P-1 Securityholders, over which the Trustee shall have exclusive control and the sole right of withdrawal, and into which the Trustee shall deposit the Class P-1 U.S. Treasury Component, which Class P-1 U.S. Treasury Component shall be delivered to the Trustee by the Issuer on the Closing Date. All assets or securities at any time on deposit in, or otherwise to the credit of, the Class P-1 U.S. Treasury Component Account shall be held in trust by the Trustee for the benefit of the Class P-1 Securityholders. The only permitted withdrawals from the Class P-1 U.S. Treasury Component Account shall be in accordance with this Indenture.  None of the Co-Issuers, the Holders of the Securities (other than the Class P-1 Securityholders) or any other Secured Party shall not have any legal, equitable, or beneficial interest in the Class P-1 U.S. Treasury Component Account other than in accordance with Section 3.2 and the Priority of Payments. Any funds in the Class P-1 U.S. Treasury Account, if invested, shall be invested in Eligible Investments pursuant to Section 11.2(b).

(m)     Class P-2 U.S. Treasury Component Account.   The Issuer shall, on or prior to the Closing Date, establish a segregated trust account designated the Class P-2 U.S. Treasury Component Account that shall be held in trust in the name of the Trustee for the benefit of the Class P-2 Securityholders, over which the Trustee shall have exclusive control and the sole right of withdrawal, and into which the Trustee shall deposit the Class P-2 U.S. Treasury Component, which Class P-2 U.S. Treasury Component shall be delivered to the Trustee by the Issuer on the Closing Date. All assets or

007417

securities at any time on deposit in, or otherwise to the credit of, the Class P-2 U.S. Treasury Component Account shall be held in trust by the Trustee for the benefit of the Class P-2 Securityholders. The only permitted withdrawals from the Class P-2 U.S. Treasury Component Account shall be in accordance with this Indenture. None of the Co-Issuers, the Holders of the Securities (other than the Class P-2 Securityholders) or any other Secured Party shall have any legal, equitable, or beneficial interest in the Class P-2 U.S. Treasury Component Account other than in accordance with Section 3.2 and the Priority of Payments. Any funds in the Class P-2 U.S. Treasury Account, if invested, shall be invested in Eligible Investments pursuant to Section 11.2(b).

(n)     Class P-1 Principal Reserve Account.  Before the Closing Date, the Trustee shall establish a single, segregated non-interest bearing trust account that shall be designated as the Class P-1 Principal Reserve Account, that shall be held in trust in the name of the Trustee for the benefit of the Class P-1 Securityholders, over which the Trustee shall have exclusive control and the sole right of withdrawal.  The Trustee shall deposit into the Class P-1 Principal Reserve Account the amounts required to be deposited pursuant to Section 11.2(b).  All assets or securities at any time on deposit in, or otherwise to the credit of, the Class P-1 Principal Reserve Account shall be held in trust by the Trustee for the benefit of the Class P-1 Securityholders.  The only permitted withdrawals from the Class P-1 Principal Reserve Account shall be in accordance with this Indenture.  None of the Co-Issuers, the Holders of the Securities (other than the Class P-1 Securityholders) or any other Secured Party shall have any legal, equitable, or beneficial interest in the Class P-1 Principal Reserve Account. Any funds in the Class P-1 Principal Reserve Account, if invested, shall be invested in Eligible Investments pursuant to Section 11.2(b).

(o)     Class P-1 Collection Account.  Before the Closing Date, the Trustee shall establish a single, segregated non-interest bearing trust account that shall be designated as the Class P-1 Collection Account, that shall be held in trust in the name of the Trustee for the benefit of the Class P-1 Securityholders, into which the Issuer shall from time to time deposit all proceeds of the Class P-1 Collateral and payments on the Class P-1 Class E Certificate Component.  In addition, the Issuer may, but under no circumstances shall be required to, deposit or cause to be deposited from time to time such monies in the Class P-1 Collection Account as it deems, in its sole discretion, to be advisable.  All monies deposited from time to time in the Class P-1 Collection Account pursuant to this Indenture shall be held in trust by the Trustee as part of the Class P-1 Collateral and shall be applied to the purposes provided herein.  The Trustee agrees to give the Issuer immediate notice if it becomes aware or written notice that the Class P-1 Collection Account or any funds on deposit therein, or otherwise to the credit of the Class P-1 Collection Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. Any funds in the Class P-1 Collection Account, if invested, shall be invested in Eligible Investments pursuant to Section 11.2(b).

(p)     Class P-2 Collection Account.  Before the Closing Date, the Trustee shall establish a single, segregated non-interest bearing trust account that shall be designated as the Class P-2 Collection Account, that shall be held in trust in the name of the Trustee for the benefit of the Class P-2 Securityholders, into which the Issuer shall from time to time deposit all proceeds of the Class P-2 Collateral and payments on the Class P-2 Class E Certificate Component.  In addition, the Issuer may, but under no circumstances shall be required to, deposit or cause to be deposited from time to time such monies in the Class P-2 Collection Account as it deems, in its sole discretion, to be advisable.  All monies deposited from time to time in the Class P-2 Collection Account pursuant to this Indenture shall be held in trust by the Trustee as part of the Class P-2 Collateral and shall be applied to the purposes provided herein.  The Trustee agrees to give the Issuer immediate notice if it becomes aware or written notice that the Class P-2 Collection Account or any funds on deposit therein, or otherwise to the credit of the Class P-2 Collection Account, shall become subject to any writ, order, judgment, warrant of attachment,

007418

execution or similar process. Any funds in the Class P-2 Collection Account, if invested, shall be invested in Eligible Investments pursuant to Section 11.2(b).

(q)  In addition to any deposit, withdrawal, transfer or other application of funds with respect to any Account set forth in this Section 10.3 or in Section 10.2, any deposit, withdrawal, transfer or other application of funds with respect to any Account authorized elsewhere in this Indenture is hereby authorized pursuant to this Section 10.3.

(r)  In order to comply with its obligations under the USA Patriot Act of 2001, if any, the Trustee shall be entitled to request and verify, and the Holders of Indenture Securities, beneficial owners, the Co-Issuers and other parties related to this Indenture shall be obligated to provide to the Trustee all the necessary information required by the USA Patriot Act of 2001.

Section 10.4.    Investment of Funds in Accounts; Reports by Trustee.

(a)  By Issuer Order (which may be in the form of standing instructions), at the direction of the Portfolio Manager, the Issuer shall at all times before an Event of Default occurs, direct the Trustee to, and, upon receipt of the Issuer Order, the Trustee shall, invest all funds on deposit in the Collection Account, the Hedge Counterparty Collateral Account, the Expense Reimbursement Account, the Closing Date Expense Account and the Interest Reserve Account as so directed in Eligible Investments having Stated Maturities no later than the Business Day before the next Payment Date.  All investments on any Business Day shall be subject to the timely receipt of the funds and the availability of any investments.  Before an Event of Default occurs, if the Issuer has not given investment directions, the Trustee shall seek instructions from the Portfolio Manager within three Business Days after transfer of any funds to the Collection Account, the Hedge Counterparty Collateral Account, the Expense Reimbursement Account, the Closing Date Expense Account or the Interest Reserve Account.  If the Trustee does not receive written instructions from the Portfolio Manager within five Business Days after transfer of the funds to the account, it shall invest and reinvest the funds held in the account, as fully as practicable, but only in one or more Eligible Investments of the type described in clause (c) of the definition of "Eligible Investments" maturing no later than the Business Day before the next Payment Date.  After an Event of Default occurs, if the Issuer does not give investment directions to the Trustee for three consecutive days, the Trustee shall invest and reinvest the monies as fully as practicable in Eligible Investments of the type described in clause (c) of the definition of "Eligible Investments" maturing not later than the earlier of (i) 30 days after the date of the investment or (ii) the Business Day before the next Payment Date.  All interest and other income from the investments shall be deposited in the Collection Account, any gain realized from the investments shall be credited to the Collection Account, and any loss resulting from the investments shall be charged to the Collection Account.  Subject to Section 6.6, the Trustee shall not in any way be held liable for the selection of investments or because of any insufficiency of the Collection Account, the Hedge Counterparty Collateral Account, the Expense Reimbursement Account, the Closing Date Expense Account or the Interest Reserve Account or any other account that results from any loss relating to any such investment.

(b)  By Issuer Order (which may be in the form of standing instructions), at the direction of the Portfolio Manager, the Issuer shall at all times direct the Trustee to, and, upon receipt of the Issuer Order, the Trustee shall, invest all funds on deposit in the Revolving Reserve Account, and the Synthetic Security Collateral Account in Eligible Investments having Stated Maturities not later than one Business Day after the date of their purchase.  All investments on any Business Day shall be subject to the timely receipt of the funds and the availability of any investments.  If before an Event of Default, the Issuer does not give investment directions, the Trustee shall seek instructions from the Portfolio Manager within three Business Days after transfer of any funds to the Revolving Reserve Account, or the Synthetic Security Collateral Account.  If the Trustee does not thereupon receive written instructions from the

007419

Portfolio Manager within five Business Days after transfer of the funds to the account, it shall invest and reinvest the funds held in the account, as fully as practicable, but only in one or more Eligible Investments of the type described in clause (e) of the definition of "Eligible Investments" that are overnight funds. If after an Event of Default, the Issuer does not give investment directions to the Trustee for three consecutive days, the Trustee shall invest and reinvest the monies as fully as practicable in Eligible Investments of the type described in clause (e) of the definition of "Eligible Investments" that are overnight funds. All interest and other income from the investments shall be deposited in the Collection Account, any gain realized from the investments shall be credited to the Collection Account, and any loss resulting from the investments shall be charged to the Collection Account.

(c)     By Issuer Order (which may be in the form of standing instructions), at the direction of the Portfolio Manager, the Issuer shall at all times direct the Trustee to, and, upon receipt of the Issuer Order, the Trustee shall, invest all funds on deposit in the Securities Lending Account in Eligible Investments having Stated Maturities no later than the Business Day before the stated termination date of the related Securities Lending Agreement. All investments on any Business Day shall be subject to the timely receipt of the funds and the availability of any investments. The interest on the Eligible Investments shall be allocated between the Issuer and the Securities Lending Counterparty pursuant to the related Securities Lending Agreement. If before an Event of Default, the Issuer does not give investment directions, the Trustee shall seek instructions from the Portfolio Manager within three Business Days after transfer of any funds to the Securities Lending Account. If the Trustee does not thereupon receive written instructions from the Portfolio Manager within five Business Days after transfer of the funds to the account, it shall invest and reinvest the funds held in the account, as fully as practicable, but only in one or more Eligible Investments of the type described in clause (e) of the definition of "Eligible Investments" that mature no later than the Business Day before the stated termination date of the related Securities Lending Agreement. If after an Event of Default, the Issuer does not give investment directions to the Trustee for three consecutive days, the Trustee shall invest and reinvest the monies as fully as practicable in Eligible Investments of the type described in clause (e) of the definition of "Eligible Investments" maturing no later than the Business Day before the stated termination date of the related Securities Lending Agreement. All interest and other income from the investments shall be deposited in the Collection Account, any gain realized from the investments shall be credited to the Collection Account, and any loss resulting from the investments shall be charged to the Collection Account.

(d)     The Trustee agrees to give the Issuer notice as soon as reasonably practicable if a Trust Officer obtains actual knowledge that any Account or any funds on deposit in any Account, or otherwise to the credit of an Account, shall become subject to any writ, order, judgment, warrant of attachment, execution, or similar process. All Accounts shall remain at all times with the Custodian or a financial institution having a long-term debt rating of at least "Baa1" (and not on credit watch with negative implications) by Moody's and at least "BBB+" by S&P and having combined capital and surplus of at least U.S.$200,000,000 that has entered into a securities account control agreement substantially in the form of Exhibit G.

(e)     The Trustee shall supply, in a timely fashion, to the Co-Issuers and the Portfolio Manager any information regularly maintained by the Trustee that the Co-Issuers or the Portfolio Manager may from time to time request with respect to the Pledged Obligations, the Accounts and the Collateral and provide any other requested information reasonably available to the Trustee because of its acting as Trustee under this Indenture and required to be provided by Section 10.6, to permit the Portfolio Manager to perform its obligations under the Management Agreement. The Trustee shall promptly forward to the Portfolio Manager copies of notices and other writings received by it from the issuer of any Collateral Obligation or from any Clearing Agency with respect to any Collateral Obligation which notices or writings advise the holders of the security of any rights that the holders might have with respect to the Collateral Obligation (including requests to vote with respect to amendments or waivers and notices

007420

of prepayments and redemptions) as well as all periodic financial reports received from the issuer and Clearing Agencies with respect to the issuer.

Section 10.5.        Synthetic Security Counterparty Account.

(a)        To the extent that any Synthetic Security requires the Issuer to secure its obligations to the Synthetic Security Counterparty, the Issuer shall direct the Trustee and the Trustee shall establish a segregated non-interest bearing trust account for the Synthetic Security which shall be held in trust for the benefit of the related Synthetic Security Counterparty and over which the Trustee shall have exclusive control and the sole right of withdrawal in accordance with the applicable Synthetic Security and this Indenture (a "Synthetic Security Counterparty Account").  In the alternative, a Synthetic Security Counterparty Account may be established with a third party custodian designated by the Synthetic Security Counterparty if such custodian would qualify to be a successor trustee under Section 6.8 and the account satisfies the other requirements of this Section 10.5.

As directed in writing by the Portfolio Manager, the Trustee shall deposit (or deliver for deposit) into each Synthetic Security Counterparty Account all amounts or securities that are required to secure the obligations of the Issuer in accordance with the related Synthetic Security, including the entire notional amount of any Synthetic Security in the form of a credit default swap or other similar transaction. The Portfolio Manager shall direct any such deposit only during the Reinvestment Period and only to the extent that monies are available for the purchase of Collateral Obligations pursuant to this Indenture.  Any income received on amounts in the Synthetic Security Counterparty Account shall, after application in accordance with the relevant Synthetic Security, be withdrawn from the Synthetic Security Counterparty Account and deposited in the Collection Account for distribution as Interest Proceeds.

(b)        As directed by the Portfolio Manager in writing and in accordance with the applicable Synthetic Security and this Indenture, amounts on deposit in a Synthetic Security Counterparty Account shall be invested in Synthetic Security Collateral.

(c)        In connection with the occurrence of a credit event or an event of default or a termination event (each as defined in the applicable Synthetic Security) under the related Synthetic Security, amounts in any Synthetic Security Counterparty Account shall be withdrawn by the Trustee (or the Trustee shall request their withdrawal) and applied toward the payment of any amounts payable by the Issuer to the related Synthetic Security Counterparty in accordance with the Synthetic Security, as directed by the Portfolio Manager in writing.  Any excess amounts held in a Synthetic Security Counterparty Account, or held directly by a Synthetic Security Counterparty, after payment of all amounts owing from the Issuer to the related Synthetic Security Counterparty in accordance with the related Synthetic Security shall be withdrawn from the Synthetic Security Counterparty Account and deposited in the Collection Account for distribution as Principal Proceeds.

(d)        Amounts on deposit in any Synthetic Security Counterparty Account shall not be considered an asset of the Issuer for the purposes of the Coverage Tests, but the Synthetic Security that relates to the Synthetic Security Counterparty Account shall be so considered an asset of the Issuer (with the notional amount as the Principal Balance unless a default exists under the applicable Synthetic Security).

Section 10.6.        Accountings.

(a)        Monthly.  Commencing the earlier of (a) the first full month after the Ramp-Up Completion Date and (b) the month ending March 2006, in the case of each month in which there is no Payment Date, not later than the eighth Business Day after the last calendar day of such month, the Issuer

007421

shall cause to be compiled and provided to the Portfolio Manager, the Trustee, the Class E Certificates Paying Agent (for forwarding to each Holder of Class E Certificates), the Placement Agents, each Hedge Counterparty, the Rating Agencies, the Irish Paying and Listing Agent for forwarding to the Irish Stock Exchange (so long as any Notes are listed on the Irish Stock Exchange and the rules of the Irish Stock Exchange so require), the Administrator for forwarding to the Cayman Islands Stock Exchange (so long as any Class E Certificates, Class Q-1 Securities or Class P Securities are listed on the Cayman Islands Stock Exchange and the rules of the Cayman Islands Stock Exchange so require), (if so requested by the Initial Purchaser or the Placement Agent) the Repository in accordance with Section 14.3(a)(viii) or each Holder of a Note who makes a written request therefor and, upon written request therefor by a Beneficial Owner in the form of Exhibit I certifying that it is a Beneficial Owner, the Beneficial Owner (or its designee), a monthly report (the "Monthly Report"). Each Monthly Report shall be accompanied by a Section 3(c)(7) Reminder Notice. The Monthly Report shall contain the following information, determined as of the last day of the applicable month, based in part on information provided by the Portfolio Manager (the "Monthly Determination Date"):

    (i)    Portfolio:

        (A)    The Aggregate Principal Balance (and, in the case of a Revolving Loan or Delayed Drawdown Loan, its funded and unfunded amount), interest rate, Stated Maturity, and obligor of each Collateral Obligation;

        (B)    The stated principal balance of Defaulted Collateral Obligations;

        (C)    The identity of all Collateral Obligations and all obligations that at the time of acquisition, conversion, or exchange do not satisfy the requirements of a Collateral Obligation that were released for sale or other disposition (and, for each obligation sold, indicating whether sold as a Credit Risk Obligation, a Credit Improved Obligation, a Current-Pay Obligation, a Defaulted Collateral Obligation, a Workout Asset, or an obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation or whether sold in connection with any withholding tax pursuant to Section 12.1(e) or sold as a discretionary sale pursuant to Section 12.1(h)); and the identity of all Collateral Obligations that were acquired, in each case since the date of the previous Monthly Report;

        (D)    The obligor of each Workout Asset;

        (E)    The Purchase Price of each Collateral Obligation acquired, the sale price of each Collateral Obligation sold (or the adjusted purchase or sale price with respect to any exchange of securities requiring an allocation by the Portfolio Manager) since the date of the previous Monthly Report, and the gain or loss (measured against its Purchase Price) on each sale;

        (F)    The identity of each Collateral Obligation (1) that is a Defaulted Collateral Obligation, a Workout Asset or a PIK Security, and in the case of a PIK Security (i) the principal amount of previously deferred or capitalized interest and (ii) the change in the principal amount of previously deferred or capitalized interest since the most recent Monthly Report or (2) in respect of which an obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation has been received, in each case indicating the date of such default, as applicable, and reporting any Other Indebtedness, as defined in clause (ii) in the

007422

definition of "Defaulted Collateral Obligation," that the Portfolio Manager has determined not to be material;

(G)     The S&P Industry Classification and the Moody's Industry Classification for each Collateral Obligation and the five highest concentrations of Collateral Obligations in the Moody's Industry Classification groups and the five highest concentrations of Collateral Obligations in the S&P Industry Classification groups;

(H)     For each Collateral Obligation, the country of the obligor (and the related foreign currency debt rating) and, in the case of a country other than the United States of America, whether the obligor is Domiciled in a Moody's Group I Country, Moody's Group II Country, or Moody's Group III Country and the percentage of the Aggregate Principal Balance of the Collateral Obligations issued by issuers in the applicable country;

(I)     For each Collateral Obligation, the Moody's Priority Category Recovery Rate and S&P Priority Category Recovery Rate;

(J)     For each Collateral Obligation, the S&P Rating, and if any S&P Rating for any Collateral Obligation in any Monthly Report is a credit estimate, "non-public" rating or "shadow" rating, the rating shall not be disclosed, but shall be replaced with an asterisk in the place of the applicable credit estimate, "non-public" rating or "shadow" rating;

(K)     For each Collateral Obligation, the Moody's Rating and the Moody's Rating Factor, determined, for this purpose, and set forth both with and without regard to whether the Collateral Obligation has been put on watch for possible upgrade or downgrade, and if any Moody's Rating for any Collateral Obligation in any Monthly Report is an "estimated" or "shadow" rating, the rating shall not be disclosed, but shall be replaced with an asterisk in the place of the applicable "estimated" or "shadow" rating;

(L)     The Aggregate Principal Balance of the Collateral Obligations that have a Moody's Rating of "Caa1" or lower;

(M)     The Aggregate Principal Balance of the Collateral Obligations that have an S&P Rating of "CCC+" or lower;

(N)     For each Collateral Obligation that is a Participation or a Synthetic Security or is loaned pursuant to a Securities Lending Agreement, the related Secondary Risk Counterparty and each Rating Agency's long-term unsecured debt rating of the Secondary Risk Counterparty;

(O)     Certain S&P benchmarks relating to the portfolio as provided by S&P in the S&P CDO Monitor regardless whether or not the S&P CDO Monitor passes or fails, including (1) S&P Default Measure (Annualized Portfolio Default Rate), (2) S&P Variability Measure (Annualized Standard Deviation of Portfolio Default Rate), (3) S&P Correlation Measure (Ratio of Standard Deviation of Portfolio with Correlation to Standard Deviation of Portfolio without Correlation), and (4) Weighted Average Default Correlation;

007423

(P)     The identity and Market Value of each Collateral Obligation whose Market Value (in the determination of the Overcollateralization Ratio Numerator) was determined pursuant to last proviso in the definition of "Market Value";

(Q)     The identity of each Collateral Obligation participated from or entered into with a Secondary Risk Counterparty; and

(R)     The identity of each Collateral Obligation owned by the Issuer that has not been disposed of within the time limits required by this Indenture.

(ii)   Accounts:

(A)     The amount of any proceeds in the Collection Account, distinguishing between amounts credited as Interest Proceeds, Principal Proceeds (excluding Uninvested Proceeds), and Uninvested Proceeds;

(B)     The amount of any Principal Proceeds in the Revolving Reserve Account;

(C)     The amount of any Principal Proceeds in the Synthetic Security Collateral Account;

(D)     The amount of any Principal Proceeds in the Securities Lending Account; and

(E)     The amount of any proceeds in the Hedge Counterparty Collateral Account;

(iii)   Hedge Agreements:

(A)     The outstanding notional amount of each Hedge Agreement; and

(B)     The amount scheduled to be received and paid by the Issuer pursuant to each Hedge Agreement on the next Payment Date (as specified by the calculation agent under each Hedge Agreement);

(iv)   Coverage Tests, Collateral Quality Tests and Reinvestment Overcollateralization Test:

(A)     The Overcollateralization Ratios and the Overcollateralization Ratios as of the Ramp-Up Completion Date; a statement as to whether each of the Overcollateralization Tests is satisfied and a statement as to whether the Reinvestment Overcollateralization Test is satisfied;

(B)     The Interest Coverage Ratios and, on and after the second Payment Date, a statement as to whether each of the Interest Coverage Tests is satisfied;

(C)     The Diversity Score and, on and after the Ramp-Up Completion Date, a statement as to whether the Diversity Test is satisfied;

(D)     The Weighted Average Life of the Collateral Obligations and, on and after the Ramp-Up Completion Date, a statement as to whether the Weighted Average Life Test is satisfied;

(E)     The Moody's Weighted Average Recovery Rate, the S&P Weighted Average Recovery Rate and, on and after the Ramp-Up Completion Date, a statement as to whether the Weighted Average Moody's Recovery Rate Test with respect to the Moody's Weighted Average Recovery Rate and Weighted Average S&P Recovery Rate Test with respect to the S&P Weighted Average Recovery Rate is satisfied;

(F)     The Weighted Average Fixed Rate Coupon of the Collateral Obligations and, on and after the Ramp-Up Completion Date, a statement as to whether the Weighted Average Fixed Rate Coupon Test is satisfied and a statement as to the amount of Spread Excess was used to satisfy the Weighted Average Fixed Rate Coupon Test;

(G)     The Weighted Average Spread of the Collateral Obligations and, on and after the Ramp-Up Completion Date, a statement as to whether the Weighted Average Spread Test is satisfied and a statement as to the amount of Fixed Rate Excess was used to satisfy the Weighted Average Spread Test;

(H)     The Weighted Average Moody's Rating Factor and, on and after the Ramp-Up Completion Date, a statement as to whether the Weighted Average Rating Factor Test is satisfied; and

(I)     The S&P CDO Monitor Test and, on and after the Ramp-Up Completion Date, a statement as to whether the S&P CDO Monitor Test is satisfied and the Class Scenario Loss Rate and the then applicable Note Break-Even Loss Rate with respect to each Class of Notes that is rated by S&P and the Adjusted Weighted Average Spread level determined as set forth in the definition of "Note Break-Even Loss Rate";

(v)     Concentration Limitations and Withholding Taxes:

(A)     The percentage of the Maximum Investment Amount itemized against each element of the Concentration Limitations and a statement as to whether each Concentration Limitation is satisfied; and

(B)     Any withholding tax on payments under any Collateral Obligation;

(vi)     Securities Lending Agreements:

(A)     Each Collateral Obligation loaned or borrowed pursuant to a Securities Lending Agreement and the percentage of the Maximum Investment Amount that represents Collateral Obligations that are loaned or borrowed pursuant to Securities Lending Agreements; and

(B)     With respect to each Securities Lending Agreement in effect as of the Monthly Determination Date, a list setting forth:

(1)     for each Collateral Obligation loaned or borrowed under it as of the first day of the loan, (x) its Principal Balance, (y) its Market Value, and (z) its Principal Balance expressed as a percentage of the Maximum Investment Amount,

206

007425

(2) the term of the loan of the Collateral Obligation,

(3) the expiration date of the Securities Lending Agreement,

(4) the Moody's Rating and S&P Rating for each loaned or borrowed Collateral Obligation,

(5) the principal amount of the related Securities Lending Collateral held in the Securities Lending Account, and

(6) the Eligible Investments held as Securities Lending Collateral pursuant to the related Securities Lending Agreement; and

(vii) Any other information the Trustee reasonably requests;

Upon receipt of each Monthly Report, the Trustee shall compare the information contained in the Monthly Report to the information contained in its records with respect to the Collateral and shall, within three Business Days after receipt of such Monthly Report, notify the Issuer, the Class E Certificates Paying Agent and the Portfolio Manager if the information contained in the Monthly Report does not conform to the information maintained by the Trustee with respect to the Collateral, and shall detail any discrepancies. In the event that any discrepancy exists, the Trustee, the Issuer, and the Portfolio Manager shall attempt to resolve the discrepancy. If such discrepancy cannot be promptly resolved, the Trustee shall within five Business Days after notification of such discrepancy cause the Independent accountants appointed by the Issuer pursuant to Section 10.8 to review such Monthly Report and the Trustee's records to determine the cause of such discrepancy. If such review reveals an error in the Monthly Report or the Trustee's records, the Monthly Report or the Trustee's records shall be revised accordingly and, as so revised, shall be used in making all calculations pursuant to this Indenture and notice of any error in the Monthly Report shall be sent as soon as practicable by the Issuer to all recipients of the report. If the review by the Independent accountants does not resolve the discrepancy, the Trustee, upon receipt of an Officer's certificate of the Portfolio Manager certifying that, the information contained in the related Monthly Report is correct, shall conform the information it maintains to the Monthly Report received.

(b) Payment Date Accounting. The Issuer shall cause to be rendered an accounting report (the "Valuation Report"), determined as of the close of business on each Determination Date, and provided to the Portfolio Manager, the Trustee, the Class E Certificates Paying Agent (for forwarding to each Holder of Class E Certificates), the Issuer, the Placement Agent, each Hedge Counterparty, the Rating Agencies, each Noteholder (if so requested by the Placement Agent), the Repository in accordance with Section 14.3(a)(viii), the Depositary (with instructions to forward it to each of its Agent Members who are holders of Notes), the Irish Paying and Listing Agent for forwarding to the Irish Stock Exchange (so long as any Notes are listed on the Irish Stock Exchange and the rules of the Irish Stock Exchange so require), the Administrator for forwarding to the Cayman Islands Stock Exchange (so long as any Class E Certificates, Class Q-1 Securities or Class P Securities are listed on the Cayman Islands Stock Exchange and the rules of the Cayman Islands Stock Exchange so require), and upon written request therefor by a Beneficial Owner in the form of Exhibit I certifying that it is a Beneficial Owner and the Beneficial Owner (or its designee) not later than the second Business Day preceding the related Payment Date. Each Valuation Report shall be accompanied by a Section 3(c)(7) Reminder Notice. The Valuation Report shall contain the following information as of the related Determination Date (unless otherwise stated), based in part on information provided by the Portfolio Manager:

(i) Securities:

207

(A)     The amount of principal payments to be made on each Class of Notes on the related Payment Date;

(B)     The Aggregate Outstanding Amount of each Class of Notes after giving effect to any principal payments on the related Payment Date and, for each Class of Notes, the percentage of its initial Aggregate Outstanding Amount that amount represents;

(C)     For each Class of Notes, the percentage of the initial Aggregate Outstanding Amount of all of the Notes that its initial Aggregate Outstanding Amount represented and, after giving effect to any principal payments on the related Payment Date, the percentage of the Aggregate Outstanding Amount of all of the Notes that its Aggregate Outstanding Amount represents;

(D)     The interest payable in respect of each Class of Notes on the related Payment Date (in the aggregate and by Class) and its calculation in reasonable detail; and

(E)     The amounts to be paid, if any, to the Class E Certificates Paying Agent for payments on the Class E Certificates on the related Payment Date, showing separately the payments from Interest Proceeds and the payments from Principal Proceeds;

(F)     with respect to the Class Q-1 Securities, (A) the stated amount of the Class Q-1 Securities and (B) the Class Q-1 Rated Principal;

(G)     With respect to the Class P Notes, the Class P-1 Nominal Principal Outstanding, the Class P-1 Rated Principal, the Class P-2 Nominal Principal Outstanding and the Class P-2 Rated Principal (in each case, after giving effect to the calculations required in the definition thereof for the next Class P Securities Payment Date);

(ii)     Payment Date Payments:

(A)     The amounts to be distributed under each clause of Sections 11.1(a)(i) and 11.1(a)(ii) itemized by clause, and to the extent applicable, by type of distribution under the clause; and

(B)     Any amounts payable under the Hedge Agreements by any Hedge Counterparty on or before the related Payment Date and its calculation in reasonable detail (as specified by the calculation agent under the Hedge Agreement);

(iii)     Accounts:

(A)     The amount of any proceeds in the Collection Account, distinguishing between amounts credited as Interest Proceeds, Principal Proceeds (excluding Uninvested Proceeds) and Uninvested Proceeds;

(B)     The amount in the Collection Account after all payments and deposits to be made on the related Payment Date, distinguishing between amounts credited as Interest Proceeds and as Principal Proceeds;

(C)     The amount of any Principal Proceeds in the Revolving Reserve Account;

007427

(D)     The amount of any Principal Proceeds in the Synthetic Security Collateral Account;

(E)     The amount of any Principal Proceeds in the Securities Lending Account;

(F)     The amount in the Hedge Counterparty Collateral Account; and

(G)     The amount in the Expense Reimbursement Account;

(iv)  A notice setting forth LIBOR, as calculated by the Calculation Agent, for the next Interest Period and each Note Interest Rate for the next Payment Date;

(v)  All information required to be contained in the Monthly Report pursuant to Section 10.6(a) determined as of the Determination Date; and

(vi)  Any other information the Trustee reasonably requests;

provided that the Determination Date for the Valuation Report for the first Payment Date shall be February 28, 2006 and provided further that with respect to the first Payment Date, (x) the Issuer shall caused to be rendered the Valuation Report not later than March 10th, 2006 and (y) in addition, the Issuer shall cause to be rendered to the persons and in the manner described above not later than the related Payment Date a short form valuation report which shall contain the following information as of the related Determination Date (unless otherwise stated), based in part on information provided by the Portfolio Manager:

(A)     The Aggregate Outstanding Amount of each Class of Securities as of the Closing Date;

(B)     The amount of principal payments to be made on each Class of Notes on the related Payment Date;

(C)     The Aggregate Outstanding Amount of each Class of Notes after giving effect to any principal payments on the related Payment Date and, for each Class of Notes, the percentage of its initial Aggregate Outstanding Amount that amount represents;

(D)     For each Class of Notes, the percentage of the initial Aggregate Outstanding Amount of all of the Notes that its initial Aggregate Outstanding Amount represented and, after giving effect to any principal payments on the related Payment Date, the percentage of the Aggregate Outstanding Amount of all of the Notes that its Aggregate Outstanding Amount represents;

(E)     The interest (Commitment Fee and Delayed Drawdown Fee) payable in respect of each Class of Notes on the related Payment Date (in the aggregate and by Class) and its calculation in reasonable detail;

(F)     The amounts to be paid, if any, to the Class E Certificates Paying Agent for payments on the Class E Certificates on the related Payment Date, showing separately the payments from Interest Proceeds and the payments from Principal Proceeds;

007428

(G)     with respect to the Class Q-1 Securities, ((A) the stated amount of the Class Q-1 Securities and (B) the Class Q-1 Rated Principal; and

(H)     With respect to the Class P Notes, the Class P-1 Nominal Principal Outstanding, the Class P-1 Rated Principal, the Class P-2 Nominal Principal Outstanding and the Class P-2 Rated Principal (in each case, after giving effect to the calculations required in the definition thereof for the next Class P Securities Payment Date).

Upon receipt of each Valuation Report, the Trustee shall compare the information contained in the Valuation Report to the information contained in its records with respect to the Collateral and shall, within three Business Days after receipt of such Valuation Report, notify the Issuer, the Class E Certificates Paying Agent and the Portfolio Manager if the information contained in the Valuation Report does not conform to the information maintained by the Trustee with respect to the Collateral, and shall detail any discrepancies. In the event that any discrepancy exists, the Trustee, the Issuer, and the Portfolio Manager shall attempt to resolve the discrepancy. If such discrepancy cannot be promptly resolved, the Trustee shall within five Business Days after notification of such discrepancy cause the Independent accountants appointed by the Issuer pursuant to Section 10.8 to review such Valuation Report and the Trustee's records to determine the cause of such discrepancy. If such review reveals an error in the Valuation Report or the Trustee's records, the Valuation Report or the Trustee's records shall be revised accordingly and, as so revised, shall be used in making all calculations pursuant to this Indenture and notice of any error in the Valuation Report shall be sent as soon as practicable by the Issuer to all recipients of such report. If the review by the Independent accountants does not resolve the discrepancy, the Trustee, upon receipt of an Officer's certificate of the Portfolio Manager certifying that, the information contained in the related Valuation Report is correct, shall conform the information it maintains to the Valuation Report received.

(c)     Failure to Provide Accounting. If the Trustee shall not have received any accounting provided for in Section 10.6(b) on the first Business Day after the date on which the accounting is due to the Trustee, the Trustee shall notify the Issuer and the Portfolio Manager, and the Portfolio Manager shall use all reasonable efforts to cause the accounting to be made by the applicable Payment Date. To the extent the Trustee is required to provide any information or reports pursuant to this Section 10.6 as a result of the failure of the Issuer (or anyone acting on the Issuer's behalf) to provide the information or reports, the Trustee may retain an Independent certified public accountant in connection therewith and the reasonable costs incurred by the Trustee for the Independent certified public accountant shall be reimbursed pursuant to Section 6.7.

(d)     Quarterly Letter. The Portfolio Manager shall provide a quarterly letter to the recipients of the Valuation Report highlighting events occurring during the related quarterly period within 30 days of the date of the delivery of the Valuation Report.

(e)     S&P CDO Monitor. On or after the Ramp-Up Completion Date and together with each Monthly Report, the Issuer shall provide to S&P the Excel Default Model Input File.

(f)     Payments or Transfers from the Payment Account. Each Valuation Report shall constitute instructions to the Trustee to withdraw on the related Payment Date from the Payment Account and pay or transfer amounts set forth in such Valuation Report in the manner specified and in accordance with the priority established in Section 11.1 hereof.

(g)     Net Asset Value Calculation. The Trustee shall forward to the Portfolio Manager, the Class E Certificates Paying Agent (for forwarding to each Holder of Class E Certificates), the Placement Agent, the Initial Purchaser, each Hedge Counterparty, the Rating Agencies, the

210

007429

Repository (but only if so requested by the Placement Agent) in accordance with Section 14.3(a)(viii) or each Holder of a Note who makes a written request therefor, and, upon written request therefor by a Beneficial Owner in the form of Exhibit I certifying that it is a Beneficial Owner, the Beneficial Owner (or its designee), any net asset value report with respect to the Issuer which the Trustee receives from the asset value calculation agent appointed pursuant to Section 10.8(a) hereof.

Section 10.7.    Release of Collateral.

(a)    The Trustee shall present Collateral for redemption or payment in full in accordance with the terms of the Collateral upon receipt of an Issuer Order.  The Issuer may, by Issuer Order executed by an Authorized Officer of the Portfolio Manager, delivered to the Trustee at least two Business Days before the settlement date for any sale of an obligation certifying that the sale of the Collateral is being made in accordance with Sections 12.1 and 12.3 and the sale complies with all applicable requirements of Section 12.1, direct the Trustee to release the Collateral and, upon receipt of the Issuer Order, the Trustee shall deliver any such Collateral, if in physical form, duly endorsed to the broker or purchaser designated in the Issuer Order or otherwise cause an appropriate transfer of it to be made, in each case against receipt of the sales price therefor as specified by the Portfolio Manager in the Issuer Order.  The Trustee may deliver any such Collateral in physical form for examination pursuant to a bailee letter.

(b)    The Trustee shall upon an Issuer Order executed by an Authorized Officer of the Portfolio Manager deliver any Pledged Obligation that is set for any mandatory call or redemption or payment in full to the appropriate paying agent on or before the date set for the call, redemption, or payment, in each case against receipt of its call or redemption price or payment in full and provide notice of it to the Portfolio Manager.

(c)    Upon receiving actual notice of any Offer, the Trustee on behalf of the Issuer shall notify the Portfolio Manager of any Collateral Obligation that is subject to a tender offer, voluntary redemption, exchange offer, conversion, or other similar action (an "Offer").  If no Event of Default is continuing, the Portfolio Manager may direct the Trustee to accept or participate in or decline or refuse to participate in the Offer and, in the case of acceptance or participation, to dispose of the Collateral Obligation in accordance with the Offer against receipt of payment for it.  If the consideration to be received by the Issuer for the Collateral Obligation is other than Cash, the consideration must be a Collateral Obligation that would be eligible for purchase by the Issuer pursuant to Section 12.2 assuming for this purpose that the Issuer committed to purchase the same on the date on which the Issuer accepts the Offer.

(d)    Upon disposition by the Trustee of Collateral to any person against receipt of payment therefore as provided in any of the foregoing clauses (a), (b), or (c), the Collateral shall be free of the lien of this Indenture.  The lien shall continue in the proceeds received from the disposition.

(e)    As provided in Section 10.2(b), the Trustee shall deposit any proceeds received by it from the disposition of a Pledged Obligation in the Collection Account, unless simultaneously applied to the purchase of additional Collateral Obligations (including any related deposit into the Revolving Reserve Account or the posting by the Issuer of cash collateral with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security) or Eligible Investments as permitted under and in accordance with the requirements of this Article 10 and Article 12.

(f)    Subject to Article 4, the Trustee shall, upon receipt of an Issuer Order when no Notes are Outstanding (and the Commitment of the Class A-1A Notes has been reduced to zero) and all

211

obligations of the Co-Issuers under this Indenture have been satisfied, as evidenced by an Officer's Certificate or an Opinion of Counsel, release any remaining Collateral from the lien of this Indenture.

(g)    The Trustee shall release from the lien of this Indenture any Collateral that is provided directly to a Synthetic Securities Counterparty or deposited in a segregated account in accordance with Section 10.5. Any Collateral or proceeds received by or redeposited by the Issuer into the Collection Account in accordance with Section 10.5 shall again be subject to the lien of this Indenture.

Any collateral deposited in a segregated account in accordance with Section 10.3(d), (e), and (f) shall be subject to the lien of this Indenture for the benefit of the Secured Parties. Any collateral withdrawn by the Issuer in accordance with Section 10.3(d), (e), and (f) shall be released from the lien of this Indenture by the Trustee to the extent returned to the appropriate counterparty pursuant to Sections 10.3(d), (e), and (f).

Section 10.8.    Reports by Independent Accountants.

(a)    At the Closing Date, the Issuer, at the direction of the Portfolio Manager, shall appoint a firm of Independent certified public accountants of recognized international reputation for purposes of preparing and delivering the reports or certificates of the accountants required by this Indenture. Within 30 days of any resignation by the firm, the Issuer, at the direction of the Portfolio Manager, shall promptly appoint by Issuer Order delivered to the Trustee and each Rating Agency a successor firm that is a firm of Independent certified public accountants of recognized international reputation. If the Issuer, at the direction of the Portfolio Manager, fails to appoint a successor to a firm of Independent certified public accountants which has resigned within 30 days after the resignation, the Trustee, in consultation with the Portfolio Manager, shall promptly appoint a successor firm of Independent certified public accountants of recognized international reputation. In addition, the Issuer shall appoint an net asset value calculation agent to prepare and deliver to the Trustee a net asset value report with respect to the Issuer. The fees of such Independent certified public accountants, the NAV calculation agent and their respective successors shall be payable by the Issuer as an Administrative Expense.

(b)    On or before December 31 of each year commencing in 2006, the Issuer shall cause to be delivered to the Trustee, the Class E Certificates Paying Agent (for forwarding to the Holders of Class E Certificates), the Portfolio Manager or each Noteholder or Holder of Class E Certificates upon written request therefor, upon written request therefor by a Beneficial Owner in the form of Exhibit I certifying that it is a Beneficial Owner, to the Beneficial Owner (or its designee) and each Rating Agency a statement from a firm of Independent certified public accountants indicating (i) that the firm has reviewed each Valuation Report received since the last review and applicable information from the Trustee, (ii) that the calculations within those Valuation Reports have been performed in accordance with the applicable provisions of this Indenture (except as otherwise noted in the statement), and (iii) the Aggregate Principal Balance of the Collateral Obligations owned by the Issuer as of the preceding Determination Date. If a conflict exists between the firm of Independent certified public accountants and the Issuer with respect to any matter in this Section 10.8, the determination by that firm of Independent public accountants shall be conclusive. The statement shall be in the form of an Accountant's Certificate issued to the Issuer, the form of which shall be agreed on by the Portfolio Manager on behalf of the Issuer.

(c)    Upon the written request of the Class E Certificates Paying Agent or any Holder of Class E Certificates, the Issuer shall cause the firm of Independent certified public accountants appointed pursuant to Section 10.8(a) to provide any Holder of Class E Certificates with all information

007431

requested pursuant to Section 7.16(k) and (l) or provide the Issuer with any assistance required in its preparation.

Section 10.9.    Reports to Rating Agencies.

          In addition to the information and reports specifically required to be provided to each Rating Agency pursuant to this Indenture, the Issuer shall provide each Rating Agency with the Accountants' Certificates delivered to the Trustee under this Indenture, and such additional information as either Rating Agency may from time to time reasonably request.  In addition, any notices of restructurings and amendments received by the Issuer or the Trustee in connection with the Issuer's ownership of a DIP Loan shall be delivered by the Issuer or the Trustee, as the case may be, promptly to the Rating Agencies.

ARTICLE 11

APPLICATION OF MONIES

Section 11.1.    Disbursements of Monies from Payment Account.

          (a)        Notwithstanding any other provision in this Indenture, but subject to the other subsections of this Section 11.1 and to Section 13.1, on each Payment Date, the Trustee shall disburse available amounts from the Payment Account as follows and for application by the Trustee in accordance with the following priorities (the "Priority of Payments"):

          (i)        On each Payment Date, Interest Proceeds with respect to the related Due Period (other than Interest Proceeds previously used during such Due Period to purchase accrued interest in respect of Collateral Obligations or otherwise used as permitted by Section 10.2) shall be distributed in the following order of priority:

          (1) to the payment of any taxes and registration and filing fees owed by the Co-Issuers (without limit) and then to the payment of Administrative Expenses up to the Administrative Expense Cap as follows:

          First, in the following order of priority,

          (i)        fees, expenses and indemnities of the Trustee; and then

          (ii)        fees, expenses and indemnities of the Collateral Administrator; and then

          (iii)        fees, expenses and indemnities of the Class E Certificates Paying Agent;

          (iv)        pro rata, fees, expenses and indemnities of the Revolving Note Agent and the Delayed Drawdown Note Agent; and

          Second, in the following order of priority,

          (x)        fees and expenses of the Administrator; and then

          (y)        fees and expenses of the Co-Issuers (including fees and expenses of counsel and surveillance, credit estimate, and other fees owing to the Rating Agencies) and any other person (except the Portfolio Manager) if specifically provided for in this

213

007432

Indenture, and to the expenses (but not fees) of the Portfolio Manager if payable under the Management Agreement;

(2) other than on the final redemption date of the Class E Certificates, the excess, if any, of the Administrative Expense Cap over the amounts paid pursuant to clause (1) above to deposit into the Expense Reimbursement Account;

(3) to the payment to the Portfolio Manager of any accrued and unpaid Senior Management Fee then due and payable;

(4) to the payment of all amounts due to the Hedge Counterparties under the Hedge Agreements (if any) other than any Defaulted Hedge Termination Payments;

(5) *pro rata* to the payment of (a) accrued and unpaid interest on the Class A-1A Notes, the Class A-1B Notes and the Class A-1C Notes and any accrued and unpaid Defaulted Interest on, and any Defaulted Interest Charge with respect to, the Class A-1A Notes, the Class A-1B Notes and the Class A-1C Notes (in each case *pro rata* in proportion to the respective amounts of interest, Defaulted Interest and Defaulted Interest Charge then due on such Classes), (b) any accrued and unpaid Commitment Fee Amount, and (c) any accrued and unpaid Delayed Drawdown Fee;

(6) to the payment of accrued and unpaid interest on the Class A-2 Notes, and any accrued and unpaid Defaulted Interest on, any Defaulted Interest Charge with respect to, the Class A-2 Notes;

(7) to the payment of accrued and unpaid interest on the Class A-3 Notes and any accrued and unpaid Defaulted Interest on, and any Defaulted Interest Charge with respect to, the Class A-3 Notes;

(8) to the payment of accrued and unpaid interest on the Class A-4 Notes and any accrued and unpaid Defaulted Interest on, and any Defaulted Interest Charge with respect to, the Class A-4 Notes;

(9) if either of the Class A Coverage Tests is not satisfied as of the related Determination Date, to the payment of *first,* the principal of the Class A-1A Notes, the Class A-1B Notes and the Class A-1C Notes, to be allocated as provided in Section 13.3(a), *second* the principal of the Class A-2 Notes, *third* the principal of the Class A-3 Notes and *fourth* the principal of the Class A-4 Notes, to the extent necessary to cause both Class A Coverage Tests to be met as of such Determination Date on a *pro forma* basis after giving effect to any payments in reduction of the principal of Notes made through this clause, or until paid in full (Interest Proceeds to be applied pursuant to this clause (9) before the application of any Principal Proceeds pursuant to Section 11.1(a)(ii)(1) on the current Payment Date);

(10) to the payment of accrued and unpaid interest on the Class B Notes (excluding Class B Deferred Interest, but including interest accrued for the preceding Interest Period on Class B Deferred Interest);

(11) if either of the Class B Coverage Tests is not satisfied as of the related Determination Date, to the payment of *first,* the principal of the Class A-1A Notes, the Class A-1B Notes and the Class A-1C Notes, to be allocated as provided in

214

007433

Section 13.3(a), *second* the principal of the Class A-2 Notes, *third* the principal of the Class A-3 Notes, *fourth* the principal of the Class A-4 Notes, *fifth* the Deferred Interest on the Class B Notes and *sixth* the principal of the Class B Notes, to the extent necessary to cause both Class B Coverage Tests to be met as of such Determination Date on a *pro forma* basis after giving effect to any payments in reduction of the principal of Notes made through this clause, or until paid in full (Interest Proceeds to be applied pursuant to this clause (11) before the application of any Principal Proceeds pursuant to Section 11.1(a)(ii)(1) on the current Payment Date);

       (12)  to the payment of Class B Deferred Interest;

       (13)  to the payment of accrued and unpaid interest on the Class C Notes (excluding Class C Deferred Interest but including interest accrued for the preceding Interest Period on Class C Deferred Interest);

       (14)  if either of the Class C Coverage Tests is not satisfied as of the related Determination Date, (1) if the Class A Coverage Tests and the Class B Coverage Tests were satisfied on such Determination Date without giving effect to any payments pursuant to clauses (9) and (11), as applicable, *first* to pay Deferred Interest on the Class C Notes and *second* to pay the principal of the Class C Notes, to the extent necessary to cause both Class C Coverage Tests to be met as of such Determination Date, or (2) if any of the Class A Coverage Tests or the Class B Coverage Tests were not satisfied on such Determination Date without giving effect to any payments pursuant to clauses (9) and (11), as applicable, to the payment of *first,* the principal of the Class A-1A Notes, the Class A-1B Notes and the Class A-1C Notes, to be allocated as provided in Section 13.3(a), *second* the principal of the Class A-2 Notes, *third* the principal of the Class A-3 Notes, *fourth* the principal of the Class A-4 Notes, *fifth* the Deferred Interest on the Class B Notes, *sixth* the principal of the Class B Notes, *seventh* the Deferred Interest on the Class C Notes and *eighth* the principal of the Class C Notes, to the extent necessary to cause both Class C Coverage Tests to be met as of such Determination Date, in each case on a *pro forma* basis after giving effect to any payments in reduction of the principal of Notes made through this clause, or until paid in full (Interest Proceeds to be applied pursuant to this clause (14) before the application of any Principal Proceeds Section 11.1(a)(ii)(1) on the current Payment Date);

       (15)  to the payment of Class C Deferred Interest;

       (16)  in the event of a Rating Confirmation Failure, to the payment of *first,* the principal of the Class A-1A Notes, the Class A-1B Notes and the Class A-1C Notes, to be allocated as provided in Section 13.3(a), *second* the principal of the Class A-2 Notes, *third* the principal of the Class A-3 Notes, *fourth* the principal of the Class A-4 Notes, *fifth* the Deferred Interest on the Class B Notes, *sixth* the principal of the Class B Notes, *seventh* the Deferred Interest on the Class C Notes and *eighth* the principal of the Class C Notes, in each case until and to the extent necessary for each Rating Agency to confirm the ratings assigned by it on the Closing Date to each Class of Notes;

       (17)  during the Reinvestment Period, if the Reinvestment Overcollateralization Test is not satisfied as of the related Determination Date after giving effect to payments pursuant to clauses (1)-(16), for deposit to the Collection Account as Principal Proceeds for the purchase of additional Collateral Obligations 50%

007434

of the remaining Interest Proceeds available after the payments pursuant to clause (16) above;

(18) to the payment of any remaining Administrative Expenses not paid under clause (1) above in the respective priorities specified in clause (1);

(19) to the payment, to the Portfolio Manager, of accrued and unpaid Subordinated Management Fee then due and payable;

(20) to each Holder of Notes entitled thereto, the applicable Extension Bonus Payment pursuant to, and in accordance with, Section 2.4(g);

(21) to the payment to the Hedge Counterparties of any Defaulted Hedge Termination Payments;

(22) to the Class E Certificates Paying Agent, on behalf of the Issuer, for deposit into the Class E Certificates Distribution Account for distribution to the Holders of the Class E Certificates until the Holders of the Class E Certificates have realized a Class E Certificate Internal Rate of Return of 12.0%;

(23) to the payment to the Portfolio Manager of the Incentive Management Fee, if applicable; and

(24) any remaining Interest Proceeds, to the Class E Certificates Paying Agent, on behalf of the Issuer, for deposit into the Class E Certificates Distribution Account for distribution to the Holders of the Class E Certificates.

Notwithstanding the foregoing, Interest Proceeds shall not be applied in accordance with the Priority of Payments to pay Class P Administrative Expenses, which amounts will be payable only pursuant to Section 11.2.

(ii) On each Payment Date, Principal Proceeds with respect to the related Due Period other than:

(A) Principal Proceeds previously reinvested in Collateral Obligations (including any related deposit into the Revolving Reserve Account or the posting by the Issuer of cash collateral with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security) or otherwise used as permitted by Section 10.2, including for Prepayments on the Class A-1A Notes;

(B) Principal Proceeds on deposit in the Revolving Reserve Account, the Synthetic Security Counterparty Account or the Securities Lending Account; and

(C) Principal Proceeds on deposit in the Collection Account in an aggregate amount equal to the agreed Purchase Prices for Collateral Obligations with respect to which the Issuer has entered into a commitment before the end of the Due Period for their purchase, but has not settled the purchase by the end of the Due Period;

shall be distributed in the following order of priority:

216

007435

(1) to the payment of the amounts referred to in clauses (1) through (13) of Section 11.1(a)(i) (and in the same manner and order of priority) to the extent not previously paid in full thereunder, <u>provided</u>, that each payment of any of the amounts referred to in clauses (10), (12) and (13) of Section 11.1(a)(i) may only be made, if and to the extent each Coverage Test is met on a *pro forma* basis after giving effect to such payment;

(2) if any Class C Coverage Test is not satisfied as of the related Determination Date, to the payment of *first* the principal of the Class A-1A Notes, the Class A-1B Notes and the Class A-1C Notes, to be allocated as provided in Section 13.3(a), *second* the principal of the Class A-2 Notes, *third* the principal of the Class A-3 Notes, *fourth* the principal of the Class A-4 Notes, *fifth* the Deferred Interest on the Class B Notes, *sixth* the principal of the Class B Notes, *seventh* the Deferred Interest on the Class C Notes, and *eighth* the principal of the Class C Notes, to the extent necessary to cause both Class C Coverage Tests to be met as of such Determination Date on a *pro forma* basis after giving effect to any payments in reduction of the principal of Notes made through this clause, or until paid in full;

(3) to the payment of the amounts referred to in clause (15) of Section 11.1(a)(i) to the extent not previously paid in full thereunder; <u>provided</u>, that such payment may only be made if and to the extent each Coverage Test is met on a *pro forma* basis after giving effect to such payment;

(4) in the event of a Rating Confirmation Failure and to the extent payments pursuant to clause (16) of Section 11.(a)(i) above were not sufficient to cause each Rating Agency to confirm the ratings assigned by it on the Closing Date to each Class of Notes, to the payment of *first* the principal of the Class A-1A Notes, the Class A-1B Notes and the Class A-1C Notes, to be allocated as provided in Section 13.3(a), *second* the principal of the Class A-2 Notes, *third* the principal of the Class A-3 Notes, *fourth* the principal of the Class A-4 Notes, *fifth* the Deferred Interest on the Class B Notes, *sixth* the principal of the Class B Notes, *seventh* the Deferred Interest on the Class C Notes, and *eighth* the principal of the Class C Notes, in each case until and to the extent necessary for each Rating Agency to confirm the ratings assigned by it on the Closing Date to each Class of Notes;

(5) if the Payment Date is a Special Redemption Date, to the payment of *first* the principal of the Class A-1A Notes, the Class A-1B Notes and the Class A-1C Notes, to be allocated as provided in Section 13.3(a), *second* the principal of the Class A-2 Notes, *third* the principal of the Class A-3 Notes, *fourth* the principal of the Class A-4 Notes, *fifth* the Deferred Interest on the Class B Notes, *sixth* the principal of the Class B Notes, *seventh* the Deferred Interest on the Class C Notes, and *eighth* the principal of the Class C Notes, in an aggregate amount equal to the Special Redemption Amount;

(6) (a) during the Reinvestment Period, the remaining Principal Proceeds for deposit to the Collection Account for the purchase of additional Collateral Obligations in accordance with the provisions of Section 7.18 and Article 12 (including any related deposit into the Revolving Reserve Account or the posting by the Issuer of cash collateral into the Synthetic Security Counterparty Account with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security), or (b) after the Reinvestment Period, (i) at the discretion of the Portfolio Manager and solely to the extent of Principal Proceeds constituting

217

Unscheduled Principal Payments and Sale Proceeds from the sale of Credit Improved Obligations, for deposit to the Collection Account for the purchase of additional Collateral Obligations in accordance with the provision of Section 7.19 and Article 12 (including any related deposit into the Revolving Reserve Account or the posting by the Issuer of cash collateral with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security) when appropriate Collateral Obligations are available and (ii) all other remaining amounts to the payment of *first* the principal of the Class A-1A Notes, the Class A-1B Notes and the Class A-1C Notes, to be allocated as provided in Section 13.3(a), *second* the principal of the Class A-2 Notes, *third* the principal of the Class A-3 Notes, *fourth* the principal of the Class A-4 Notes, *fifth* the Deferred Interest on the Class B Notes, *sixth* the principal of the Class B Notes, *seventh* the Deferred Interest on the Class C Notes, and *eighth* the principal of the Class C Notes;

(7)  to the payment of the amounts referred in clauses (18) through (21) of Section 11.1(a)(i) to the extent not previously paid in full thereunder;

(8)  to the Class E Certificates Paying Agent, on behalf of the Issuer, for deposit into the Class E Certificates Distribution Account for payment to the Holders of the Class E Certificates until the Holders of the Class E Certificates have realized a Class E Certificate Internal Rate of Return of 12%;

(9)  to the payment to the Portfolio Manager of the Incentive Management Fee, if applicable; and

(10)  to the Class E Certificates Paying Agent, on behalf of the Issuer, for deposit into the Class E Certificates Distribution Account for payment to the Holders of the Class E Certificates.

The calculation on any Coverage Test on any Measurement Date shall be made by giving effect to all payments to be made pursuant to all subclauses of the Priority of Payments as applicable, payable on the Payment Date following such Measurement Date.  In addition no Principal Proceeds will be used to pay a subordinated Class on a Payment Date if, after giving effect to such payment, any Coverage Test of a more senior Class of Notes is failing on such Payment Date or would fail as a result of such application of the Principal Proceeds on such Payment Date.

Notwithstanding the foregoing, Principal Proceeds shall not be applied in accordance with the Priority of Payments to pay Class P Administrative Expenses, which amounts will be payable only pursuant to Section 11.2.

(b)  If on any Payment Date the amount available in the Payment Account is insufficient to make the full amount of the disbursements required, the Trustee shall make the disbursements called for in the order and according to the priority under Section 11.1(a), subject to Section 13.1, to the extent funds are available therefor.

(c)  The Trustee shall remit funds to pay Administrative Expenses of the Issuer or the Co-Issuer in accordance with Section 11.1(a), to the extent available, to the Issuer, the Co-Issuer as directed and designated in an Issuer Order (which may be in the form of standing instructions) delivered to the Trustee on each Payment Date.

007437

(d)     If the Hedge Counterparty defaults in the payment of its obligations to the Issuer under the respective Hedge Agreements on the date on which any payment is due thereunder, the Trustee shall make a demand on the Hedge Counterparty, or any guarantor, if applicable, demanding payment by 12:30 p.m., New York time, on that date.  The Trustee shall give notice to the Noteholders, the Class E Certificates Paying Agent (for forwarding to the Holders of Class E Certificates), the Portfolio Manager and each Rating Agency upon the continuing failure by the Hedge Counterparty to perform its obligations during the two Business Days following a demand made by the Trustee on, the Hedge Counterparty, and shall take the action with respect to the continuing failure as directed by the Portfolio Manager unless an Event of Default has occurred and is continuing in which case direction is to be taken pursuant to Section 5.13.

(e)     Except as otherwise expressly provided in Section 11.1(a) above, if on any Payment Date, the amount available in the Payment Account from amounts received in the related Due Period is insufficient to make the full amount of the disbursements required by any numbered or lettered paragraph or clause of Section 11.1(a) to different persons, the Trustee shall make the disbursements called for by the paragraph or clause ratably in accordance with the respective amounts of the disbursements then payable, subject to Section 13.1, to the extent funds are available therefor.

Section 11.2.     Payments on Class P Securities .

(a)     *Mandatory Accelerated Payments; Optional Accelerated Payments.*

(i)     On each Payment Date, until the outstanding balance of the Class P-1 U.S. Treasury Component is reduced to $10,000, the Trustee shall obtain an Class P U.S. Treasury Bid on a portion of the Class P-1 U.S. Treasury Component with a face amount equal to the Class P-1 Accelerated Payment Notional Amount as of such Payment Date.  If such Class P U.S. Treasury Bid is equal to or higher than the corresponding reference price set forth in Annex A, the Trustee shall liquidate, on behalf of the Class P-1 Securityholders, a portion of the Class P-1 U.S. Treasury Component with a face amount equal to the Class P-1 Accelerated Payment Notional Amount at such Class P U.S. Treasury Bid (such sale proceeds less any transaction costs, the "Class P-1 Mandatory Accelerated Payment") not later than 2 Business Days after such Payment Date; provided, that, not later than 15 Business Days prior to any Payment Date, a Majority of the Class P-1 Securityholders may elect, by written notice to the Trustee, to waive the Class P-1 Mandatory Accelerated Payment for such Payment Date and all Payment Dates thereafter; provided, further, that not later than 15 Business Days prior to any subsequent Payment Date, a Majority of the Class P-1 Securityholders may, by written notice to the Trustee, reinstate the Class P-1 Mandatory Accelerated Payment for such Payment Date and/or all Payment Dates thereafter, as set forth in such notice.  If the Class P-1 U.S. Treasury Bid is lower than the corresponding reference price set forth in Annex A, the Trustee shall notify the Class P-1 Securityholders of such Class P-1 U.S. Treasury Bid not later than 2 Business Days after such Payment Date.  Not later than 3 Business Days after such notice, the Class P-1 Securityholders representing a Majority of the Class P-1 Securities may instruct the Trustee of a face amount of the Class P-1 U.S. Treasury Component to liquidate (the "Class P-1 Optional Accelerated Payment Notional Amount", which amount shall not exceed the applicable Class P-1 Accelerated Payment Notional Amount) and the minimum acceptable liquidation value.  Not later than 2 Business Days after such direction, the Trustee shall liquidate, on behalf of the Class P-1 Securityholders, a portion of the Class P-1 U.S. Treasury Component with a face amount equal to the Class P-1 Optional Accelerated Payment Notional Amount at the then-prevailing Class P U.S. Treasury Bid (such sale proceeds less any transaction costs, the "Class P-1 Optional Accelerated Payment"); provided, that the liquidation value at such Class P U.S. Treasury Bid is equal to or higher than the minimum acceptable liquidation value provided by the Class P-1 Securityholders.  If no such direction is given by the Class P-1 Securityholders representing a Majority of the Class P-1 Securities or if the then-prevailing Class P U.S. Treasury Bid would result in a liquidation value that is lower than the minimum

acceptable liquidation value provided by the Class P-1 Securityholders, the Trustee shall not liquidate any portion of the Class P-1 U.S. Treasury Component. All proceeds from the liquidation of the Class P-1 U.S. Treasury Component shall be deposited into the Class P-1 Collection Account.

(ii)     On each Payment Date, until the outstanding balance of the Class P-2 U.S. Treasury Component is reduced to $10,000, the Trustee shall obtain an Class P U.S. Treasury Bid on a portion of the Class P-2 U.S. Treasury Component with a face amount equal to the Class P-2 Accelerated Payment Notional Amount as of such Payment Date. If such Class P U.S. Treasury Bid is equal to or higher than the corresponding reference price set forth in Annex B, the Trustee shall liquidate, on behalf of the Class P-2 Securityholders, a portion of the Class P-2 U.S. Treasury Component with a face amount equal to the Class P-2 Accelerated Payment Notional Amount at such Class P U.S. Treasury Bid (such sale proceeds less any transaction costs, the "Class P-2 Mandatory Accelerated Payment") not later than 2 Business Days after such Payment Date; provided, that, not later than 15 Business Days prior to any Payment Date, a Majority of the Class P-2 Securityholders may elect, by written notice to the Trustee, to waive the Class P-2 Mandatory Accelerated Payment for such Payment Date and all Payment Dates thereafter; provided, further, that not later than 15 Business Days prior to any subsequent Payment Date, a Majority of the Class P-2 Securityholders may, by written notice to the Trustee, reinstate the Class P-2 Mandatory Accelerated Payment for such Payment Date and/or all Payment Dates thereafter, as set forth in such notice. If the Class P-2 U.S. Treasury Bid is lower than the corresponding reference price set forth in Annex B, the Trustee shall notify the Class P-2 Securityholders of such Class P-2 U.S. Treasury Bid not later than 2 Business Days after such Payment Date. Not later than 3 Business Days after such notice, the Class P-2 Securityholders representing a Majority of the Class P-2 Securities may instruct the Trustee of a face amount of the Class P-2 U.S. Treasury Component to liquidate (the "Class P-2 Optional Accelerated Payment Notional Amount", which amount shall not exceed the applicable Class P-2 Accelerated Payment Notional Amount) and the minimum acceptable liquidation value. Not later than 2 Business Days after such direction, the Trustee shall liquidate, on behalf of the Class P-2 Securityholders, a portion of the Class P-2 U.S. Treasury Component with a face amount equal to the Class P-2 Optional Accelerated Payment Notional Amount at the then-prevailing Class P U.S. Treasury Bid (such sale proceeds less any transaction costs, the "Class P-2 Optional Accelerated Payment"); provided, that the liquidation value at such Class P U.S. Treasury Bid is equal to or higher than the minimum acceptable liquidation value provided by the Class P-2 Securityholders. If no such direction is given by the Class P-2 Securityholders representing a Majority of the Class P-2 Securities or if the then-prevailing Class P U.S. Treasury Bid would result in a liquidation value that is lower than the minimum acceptable liquidation value provided by the Class P-2 Securityholders, the Trustee shall not liquidate any portion of the Class P-2 U.S. Treasury Component. All proceeds from the liquidation of the Class P-2 U.S. Treasury Component shall be deposited into the Class P-2 Collection Account.

(b)     *Deposit in the Class P Accounts*.     On each Payment Date, amounts distributable to the Class P Securityholders with respect to the Class P Class E Certificate Components shall be deposited into the Class P-1 Collection Account and the Class P-2 Collection Account, as applicable. The applicable Class P Accounts Securities Intermediary shall promptly invest amounts held in such accounts in the JPMorgan Fleming U.S. Dollar Liquidity Fund Premier #6052, to the extent such investment constitutes an Eligible Investment, or in other Eligible Investments as directed by the Issuer. Subject to clause (e) below, all monies deposited (or to be deposited) in the Class P-1 Collection Account and the proceeds thereof shall be used solely for payments on the Class P-1 Securities and payment of the Class P-1 Administrative Expenses. Subject to clause (e) below, all monies deposited (or to be deposited) in the Class P-2 Collection Account and the proceeds thereof shall be used solely for payments on the Class P-2 Securities and payment of the Class P-2 Administrative Expenses.

(c)     *Class P Securities Payment Date*. On each Class P Securities Payment Date, (i) an amount equal to the Class P-1 Net Periodic Distribution for such Class P Securities Payment Date shall

007439

be distributed to the Class P-1 Securityholders and (ii) an amount equal to the Class P-2 Net Periodic Distribution for such Class P Securities Payment Date shall be distributed to the Class P-2 Securityholders. Except as provided in clause (e), no other amounts shall be payable by the Issuer with respect to the Class P Securities.

(d)     *Redemption; Liquidation.*     Following (i) an Optional Redemption (or other earlier redemption) of the Class E Certificates or (ii) the liquidation and distribution of the Collateral in full, if any Class P Securities are then Outstanding, each Class P Security will be redeemed by the Issuer, in whole, but not in part, on the next following Class P Securities Payment Date from the Class P-1 Collateral or Class P-2 Collateral, as applicable, available for that purpose, in each case, at the applicable Class P-1 Redemption Price or Class P-2 Redemption Price.

(e)     *Class P-1 Stated Maturity.*     Prior to the Stated Maturity, the Class P-1 Nominal Principal Outstanding shall not be reduced to less than $500,000, and following the reduction of the Class P-1 Nominal Principal Amount Outstanding to $500,000, on each Class P Securities Payment Date an amount equal to the amount that would otherwise be distributed with respect to the Class P-1 Securities on such date *less* the Class P-1 Notional Coupon Payment on the applicable Class P Securities Payment Date (so long as such Class P-1 Notional Coupon Payment is greater than zero) shall be withheld and deposited into the Class P-1 Principal Reserve Account until the balance of the Class P-1 Principal Reserve Account is equal to $500,000. On the Stated Maturity (or, if earlier, redemption of the Class P-1 Securities), the Class P-1 Principal Reserve Account shall be liquidated and distributed to the Class P-1 Securityholders as the final payment on the Class P-1 Securities. The Class P-1 Notional Coupon Rate shall be adjusted upward accordingly should such final payment be higher than the Class P-1 Nominal Principal Outstanding at that time.

(f)     In connection with the liquidation of any U.S. Treasury securities represented by a Class P U.S. Treasury Component (or portion thereof), the Class P Securityholders, by their purchase of such Class P Securities, acknowledge and agree that (i) the Trustee may utilize any dealer, including the Initial Purchaser, to accomplish the liquidation of such U.S. Treasury securities (or portion thereof), (ii) the price obtained by the Trustee from such dealer shall be deemed to be the fair market value for such U.S. Treasury securities represented by the Class P U.S. Treasury Component (or portion thereof) and (iii) they shall have no recourse to the Trustee or such dealer in connection with such liquidation..

(g)     In the event that (i) the Class P-1 Collateral is not sufficient to pay the Aggregate Outstanding Amount of the Class P-1 Securities or (ii) the Class P-2 Collateral is not sufficient to pay the Aggregate Outstanding Amount of the Class P-2 Securities, the Issuer shall have no obligation whatsoever to pay any such deficiency, except, in each case to the extent of payment with respect to the related Class P Class E Certificate Component in accordance with the Priority of Payments and the Class E Certificate Documents.

(h)     For the purpose of determining whether any percentage of Class P-1 Securityholders or Class P-2 Securityholders have consented or instructed the Issuer or the Trustee as provided herein, the Issuer and the Trustee shall exclusively rely and be fully protected when calculating the applicable percentages on the last Class P Certificate of Ownership filed with the Trustee prior to the date the Class P-1 Securityholders or Class P-2 Securityholders, as applicable, instructed the Issuer or the Trustee or granted their consent for any action. The Issuer and the Trustee shall have no knowledge of any beneficial owners except as set forth in the certificate (the "Class P Certificate of Ownership") attached hereto as Exhibit K. On or promptly after the Closing Date, each beneficial owner of the Class P-1 Noteholders or Class P-2 Noteholders shall file with the Trustee a Class P Certificate of Ownership. Upon transfer of its beneficial interest in accordance with this Indenture, the transferor and transferee shall file a new Class P Certificate of Ownership.

ARTICLE 12

SALE OF COLLATERAL OBLIGATIONS;
PURCHASE OF COLLATERAL OBLIGATIONS

Section 12.1.     Sales of Collateral Obligations.

        Subject to the satisfaction of the conditions specified in Section 10.6, Section 12.1 and Section 12.3 and if no Event of Default is continuing as evidenced by an Officer's Certificate of the Portfolio Manager provided to the Trustee, the Issuer may, at the direction of the Portfolio Manager, direct the Trustee to sell any Collateral Obligation or Workout Asset if the Portfolio Manager certifies to the Trustee that the sale meets the requirements of any one of paragraphs (a) through (i) of this Section 12.1, and the Issuer shall direct the Trustee to sell assets as set forth in paragraph (j) below. In addition, the Issuer (or the Portfolio Manager on its behalf) shall within 5 Business Days of its receipt (or within 5 Business Days after such later date as such asset may first be sold in accordance with its terms and applicable law), sell any Tax Affected Security or transfer such Tax Affected Security to a subsidiary the sole assets of which consist of, and the sole activity of which is the acquisition and ownership of, Tax Affected Securities. If the Issuer sells any Collateral Obligation or Workout Asset during the Reinvestment Period, the proceeds shall be reinvested in accordance with Section 12.2.

        (a)     Credit Risk Obligations.  At the direction of the Portfolio Manager, the Issuer may direct the Trustee to sell any Credit Risk Obligation at any time during or after the Reinvestment Period without restriction and the Trustee shall sell the Credit Risk Obligation in accordance with such direction.  Following any sale of a Credit Risk Obligation pursuant to this Section 12.1(a) during the Reinvestment Period, at the direction of the Portfolio Manager, the Issuer shall use commercially reasonable efforts to purchase in compliance with Section 12.2 additional Collateral Obligations (to the extent the purchase is in the best interest of the Issuer) with an Aggregate Principal Balance at least equal to the Sale Proceeds received by the Issuer with respect to the Collateral Obligation sold.  For this purpose, the Principal Balance of any Revolving Loan or Delayed Drawdown Loan shall only include its funded amount.

        (b)     Credit Improved Obligations.  At the direction of the Portfolio Manager, the Issuer may direct the Trustee to sell any Credit Improved Obligation if either:

            (i)     during the Reinvestment Period, (x) the Portfolio Manager believes before the sale that it will be able to cause the Issuer to reinvest its Sale Proceeds, in compliance with the Eligibility Criteria, in one or more additional Collateral Obligations with an Aggregate Principal Balance at least equal to the Investment Criteria Adjusted Balance of the Credit Improved Obligation by the end of the immediately succeeding Due Period (for this purpose, the Principal Balance of any Revolving Loan or Delayed Drawdown Loan shall only include its funded amount and the Principal Balance of any Collateral Obligation in which the Trustee does not have a first priority perfected security interest shall be its outstanding principal amount) or (y) the Portfolio Manager intends to use the Sale Proceeds to make Prepayments on the Class A-1A Notes; or

            (ii)     after the Reinvestment Period, the Sale Proceeds received in respect of the Credit Improved Obligation are at least equal to its Investment Criteria Adjusted Balance.  For this purpose, the Principal Balance of any Revolving Loan or Delayed Drawdown Loan shall only include its funded amount and the Principal Balance of any Collateral Obligation in which the

007441

Trustee does not have a first priority perfected security interest shall be its outstanding principal amount;

and the Trustee shall sell the Credit Improved Obligation in accordance with such direction.

(c)     Non-Performing Collateral Obligations and Current-Pay Obligations.  At the direction of the Portfolio Manager, the Issuer may direct the Trustee to sell any Non-Performing Collateral Obligation or Current-Pay Obligation at any time during or after the Reinvestment Period without restriction and the Trustee shall sell the Non-Performing Collateral Obligation or Current-Pay Obligation in accordance with such direction.  Non-Performing Collateral Obligations may be sold regardless of price; provided that, the Principal Balance of any Collateral Obligation purchased with proceeds of any Current-Pay Obligation shall equal or exceed the Principal Balance of such Current-Pay Obligation that was sold.

(d)     Non-qualifying Collateral Obligations.  At the direction of the Portfolio Manager, the Issuer may direct the Trustee to sell any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation at any time during or after the Reinvestment Period without restriction and the Trustee shall sell that obligation in accordance with such direction.

(e)     Withholding Tax Sales.  At the direction of the Portfolio Manager, the Issuer may direct the Trustee to sell any Collateral Obligation subject to withholding tax at any time during or after the Reinvestment Period without restriction and the Trustee shall sell the Collateral Obligation in accordance with such direction.

(f)     Optional Redemption.  After the Issuer has notified the Trustee of an Optional Redemption of the Notes in accordance with Article 9, at the direction of the Portfolio Manager, the Issuer shall direct the Trustee to sell all or a portion of the Collateral Obligations as contemplated therein if (i) the requirements of Article 9 are satisfied and (ii) the Independent certified public accountants appointed pursuant to Section 10.8 have confirmed the calculations contained in any required certificate furnished by the Portfolio Manager pursuant to Section 9.3(c).  After a Majority of the Class E Certificates have directed an Optional Redemption of the Class E Certificates in accordance with Section 9.2(b), at the direction of the Portfolio Manager, the Issuer shall direct the Trustee to sell all of the remaining Collateral Obligations (in the case of an Optional Redemption pursuant to Section 9.2(b)(i)) or all or a portion of the remaining Collateral Obligations in accordance with the unanimous directions of Holders of the Class E Certificates (in the case of an Optional Redemption pursuant to Section 9.2(b)(ii)) and the Trustee shall sell the remaining Collateral Obligations in accordance with such direction.

(g)     Rating Confirmation Failure.  After the Portfolio Manager has received notice of a Rating Confirmation Failure and if available Interest Proceeds and Principal Proceeds are insufficient to effect the redemption of the Notes on any subsequent Payment Date in accordance with the Priority of Payments as and to the extent necessary for each of Moody's and S&P to confirm the Initial Ratings of the Notes, the Issuer may, if so directed by the Portfolio Manager in the Portfolio Manager's sole discretion, direct the Trustee to sell Collateral Obligations as contemplated in Section 9.1 and the Trustee shall sell the Collateral Obligations in accordance with such direction.

(h)     Discretionary Sales.  In addition to sales permitted under the foregoing clauses, at the direction of the Portfolio Manager, the Issuer may direct the Trustee to sell any Collateral Obligation, at any time during the Reinvestment Period:

007442

(i) at any time on or before the Ramp-Up Completion Date (without regard to any restriction specified in clause (ii) below); and

(ii) at any time after the Ramp-Up Completion Date if:

(A) after giving effect to the sale and the sale of any other Collateral Obligations whose sale is pending, the Aggregate Principal Balance of all Collateral Obligations sold pursuant to this Section 12.1(h)(ii) in any calendar year (in each case determined as of the date the direction to sell is given) is not greater than 20% of the Maximum Investment Amount as of January 1 of such calendar year (or, for the first calendar year, as of the Ramp-Up Completion Date); and

(B) (x) the Portfolio Manager believes before the sale that it will be able to cause the Issuer within 30 days thereafter to reinvest or commit to reinvest its Sale Proceeds, in compliance with the Eligibility Criteria, in one or more additional Collateral Obligations with an Aggregate Principal Balance at least equal to (i) as long as the Class C Overcollateralization Test is satisfied, the Investment Criteria Adjusted Balance of the Collateral Obligation and (ii) if the Class C Overcollateralization Test is not satisfied, the Aggregate Principal Balance of the sold Collateral Obligation (for the purpose of both (B)(i) and (B)(ii), the Principal Balance of any Revolving Loan or Delayed Drawdown Loan shall only include its funded amount and the Principal Balance of any Collateral Obligation in which the Trustee does not have a first priority perfected security interest shall be its outstanding principal amount) or (y) the Portfolio Manager intends to use the Sale Proceeds to make Prepayments on the Class A-1A Notes;

and the Trustee shall sell the Collateral Obligations in accordance with such direction. However, if the rating by Moody's of any of the Class A-1A Notes, the Class A-1B Notes, Class A-1C Notes, Class A-2 Notes, Class A-3 Notes or the Class A-4 Notes is one or more rating sub-categories below the Initial Rating of the Class A-1A Notes, the Class A-1B Notes, Class A-1C Notes, Class A-2 Notes, Class A-3 Notes or the Class A-4 Notes or has been withdrawn or the rating by Moody's of the Class B Notes or the Class C Notes is two or more rating sub-categories below the Initial Rating of the Class B Notes or the Class C Notes or has been withdrawn, the Issuer shall not instruct the Trustee to sell any Collateral Obligations pursuant to this Section 12.1(h). This restriction may be waived by written consent of a Majority of the Controlling Class. For the purposes of this subsection (h), any withdrawal or reduction in rating shall not restrict the sale of any Collateral Obligations pursuant to this subsection (h) if after the withdrawal or reduction Moody's has upgraded the reduced or withdrawn rating to at least the Initial Rating in the case of the Class A-1A Notes, the Class A-1B Notes, Class A-1C Notes, Class A-2 Notes, Class A-3 Notes and the Class A-4 Notes or to only one subcategory below their Initial Rating in the case of the Class B Notes and the Class C Notes.

For the purposes of determining the percentage of Collateral Obligations sold during any period in Section 12.1(h)(ii)(A):

(i) the amount of any Collateral Obligation sold shall be reduced:

(A) to the extent of any purchases of Collateral Obligations of the same obligor (that are *pari passu* with the sold Collateral Obligation) occurring within 30 Business Days of the sale (determined based on the date of any relevant trade confirmation or commitment letter) (but only for so long as (x) the Collateral Obligations purchased have not been downgraded by any of the Rating Agencies during the 30 Business Day period, (y) the Collateral Obligations have not been purchased from the

224

Portfolio Manager or any of its Affiliates acting, in each case, as principal or from any funds or accounts advised or managed by the Portfolio Manager or any of its Affiliates, and (z) the purchase price of each purchased Collateral Obligation must not exceed the sale price of the sold Collateral Obligation), and

(B)     to the extent of any purchases of Collateral Obligations permitted pursuant to Section 12.2(c); and

(ii)     any Synthetic Security based upon or relating to a senior secured index investment providing non-leveraged credit exposure to a basket of credit default swaps referencing a diversified group of Reference Obligations, with respect to which the principal or notional amount of the credit exposure to any single Reference Obligation does not increase over time that is invested into a substantially similar Synthetic Security but with a later maturity shall be treated as having been sold.

(i)     Workout Assets.  At the direction of the Portfolio Manager, the Issuer may direct the Trustee to sell any Workout Asset at any time during or after the Reinvestment Period without restriction and regardless of price and the Trustee shall sell the Workout Assets in accordance with such direction.

(j)     Margin Stock.  Notwithstanding anything to the contrary herein, the Issuer shall direct the Trustee to sell any asset that is Margin Stock within 45 days of the later of (i) the acquisition of such asset by the Issuer or (ii) such asset's becoming Margin Stock, and the Trustee shall sell such asset in accordance with such direction.

Section 12.2.     Purchase of Collateral Obligations.

(a)     On any date during the Reinvestment Period (and, in respect of Principal Proceeds constituting Unscheduled Principal Payments and Sale Proceeds from Credit Improved Obligations, on any date after the Reinvestment Period), so long as no Event of Default is continuing, at the direction of the Portfolio Manager, the Issuer may direct the Trustee to invest or reinvest Principal Proceeds (together with Interest Proceeds, but only to the extent used to pay for accrued interest on Collateral Obligations) and the funds available from Borrowings on the Class A-1A Notes and Drawdowns under the Class A-1B Notes in additional Collateral Obligations (including any related deposit into the Revolving Reserve Account or the posting by the Issuer of cash collateral with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security) if the Portfolio Manager certifies to the Trustee that the conditions specified in this Section 12.2 and Section 12.3 are met.

(b)     Eligibility Criteria.  No obligations may be purchased unless each of the conditions in the following clauses (i) through (xii) (the "Eligibility Criteria") is satisfied as evidenced by a certificate of the Portfolio Manager as of the date the Issuer commits to make the purchase, in each case after giving effect to the purchase and all other purchases and sales previously or simultaneously committed to:

(i)     the obligation is a Collateral Obligation;

(ii)     for any date occurring during the Reinvestment Period:

225

007444

(A)     each Overcollateralization Test is satisfied and, if the commitment is made on or after the second Payment Date, each Interest Coverage Test is satisfied, or

(B)     if any such Coverage Test is not satisfied, both:

(1)  the extent of satisfaction of such Coverage Test is not reduced, and

(2)  the Collateral Obligation is being purchased with Principal Proceeds other than:

(x)     Principal Proceeds received in respect of a Defaulted Collateral Obligation, or

(y)     Principal Proceeds received in respect of a Workout Asset that has been received in exchange for a Defaulted Collateral Obligation;

(iii)     for any date occurring during the Reinvestment Period, the Diversity Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(iv)     for any date occurring during the Reinvestment Period, the Weighted Average Rating Factor Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(v)     for any date occurring during the Reinvestment Period, each of the limits in the definition of "Concentration Limitations" is satisfied or, if any such limit is not satisfied, the extent of satisfaction is not reduced;

(vi)     for any date occurring during the Reinvestment Period, the Weighted Average Spread Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(vii)     for any date occurring during the Reinvestment Period, the Weighted Average Fixed Rate Coupon Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(viii)     for any date occurring during the Reinvestment Period, the Weighted Average Life Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(ix)     for any date occurring during the Reinvestment Period, the Weighted Average Moody's Recovery Rate Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(x)     for any date occurring during the Reinvestment Period, the Weighted Average S&P Recovery Rate Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(xi)     for any date occurring during the Reinvestment Period, the S&P CDO Monitor Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced; provided, however, that this Eligibility Criterion (xi) shall not apply either to reinvestment of the proceeds

226

007445

from the sale of a Credit Risk Obligation, Non-Performing Collateral Obligation or Workout Asset or to the reinvestment of Principal Proceeds in respect of Defaulted Collateral Obligations; and

(xii)    for any date occurring after the Reinvestment Period:

(A)    each Coverage Test is satisfied and the extent of satisfaction is not reduced;

(B)    each Collateral Quality Test is maintained or improved;

(C)    each Concentration Limitation is maintained or improved;

(D)    the maturity date of such Collateral Obligation will occur on or prior to the Stated Maturity of the Notes and the Weighted Average Life Test is satisfied;

(E)    the S&P Rating of such Collateral Obligation is at least equal to the S&P Rating of the Collateral Obligation being the source of the Unscheduled Principal Payments or of the Credit Improved Obligation being the source of Sale Proceeds, as applicable; and

(F)    the Aggregate Principal Balance of Collateral Obligations to be purchased in connection with such sale or prepayment must be no less than the Aggregate Principal Balance of the Collateral Obligations sold or prepaid.

(c)    Certain Permitted Exchanges.  The Issuer may, at the direction of the Portfolio Manager (and regardless of the foregoing restrictions), exchange a Collateral Obligation for another Collateral Obligation in an A/B Exchange.

(d)    Certification by Portfolio Manager.  Not later than the Business Day preceding the settlement date for any Collateral Obligation purchased after the Closing Date (but in any event no later than the release of Cash for the Purchase Price of the purchase), the Portfolio Manager shall deliver to the Trustee an Officer's certificate of the Portfolio Manager certifying that the purchase complies with this Section 12.2 and with Section 12.3 (determined as of the date that the Issuer commits to make the purchase).

(e)    Investment in Eligible Investments.  Cash on deposit in the Collection Account may be invested at any time in Eligible Investments in accordance with Section 10.4(a) pending investment in Collateral Obligations.

Section 12.3.    Conditions Applicable to All Sale and Purchase Transactions.

(a)    Any sale or purchase by the Issuer of a Collateral Obligation shall be conducted on an arm's length basis and, if effected with the Portfolio Manager or a person Affiliated with the Portfolio Manager or any fund or account for which the Portfolio Manager or an Affiliate of the Portfolio Manager acts as investment adviser, shall be effected in accordance with the requirements of Section 5 of the Management Agreement on terms no less favorable to the Issuer than would be the case if the person were not so Affiliated.  The Trustee shall have no responsibility to oversee compliance with this clause (a) by the other parties.

007446

(b)      Upon any acquisition of any Collateral Obligation or Class P-1 U.S. Treasury Component or Class P-2 U.S. Treasury Component, each such item of Collateral or Class P Collateral, shall be Delivered to the Trustee pursuant to this Indenture.

Section 12.4.      <u>Certain Determinations Relating to Collateral Obligations</u>.

(a)      Notwithstanding anything to the contrary contained in this Indenture, solely for the purpose of calculations in connection with the Eligibility Criteria, the Issuer or the Portfolio Manager on behalf of the Issuer shall be deemed to have purchased any Collateral Obligations as of the date on which the Issuer delivers to the Trustee a contract to purchase, a commitment letter, a confirmation or a due bill for such Collateral Obligation, in each case entitling the Issuer (or the Trustee as assignee thereof) to receive such Collateral Obligations and, in such event, the Issuer shall be deemed to have acquired, granted or delivered, as the case may be, such Collateral Obligations on such date.  Notwithstanding anything to the contrary in this Indenture, any certifications or other documents required to be delivered by the Portfolio Manager or the Issuer in connection with the purchase or sale of Collateral during the Reinvestment Period may be delivered by the Issuer or the Portfolio Manager on the settlement date for such Collateral even if such date occurs after the Reinvestment Period.

(b)      Notwithstanding anything to the contrary contained in this Indenture, solely for the purpose of calculations in connection with the Eligibility Criteria, the Issuer or the Portfolio Manager on behalf of the Issuer shall be deemed to have sold any Collateral Obligations as of the date on which the Issuer delivers to the Trustee a contract to sell, a commitment letter, a confirmation or a due bill for such Collateral Obligation, in each case entitling the Issuer (or the Trustee as assignee thereof) to sell, and requiring the purchaser to purchase, such Collateral Obligations and, in such event, the Issuer shall be deemed to have sold such Collateral Obligations on such date.

(c)      Under the circumstances described in subsections (a) and (b) above, if the transaction contemplated by the contract, commitment letter, confirmation or due bill referred to therein does not settle on or before the 60th day following the scheduled settlement date (the "***Deadline***"), the deemed purchase or sale shall be deemed not to have occurred; <u>provided</u>, <u>however</u>, that the Portfolio Manager shall have the right to extend the Deadline for an additional period (not to exceed an additional 60 days) by notice to the Trustee, which notice shall include the Portfolio Manager's certification to the effect that the Portfolio Manager believes that the settlement shall occur on or before the extended Deadline.

(d)      Scheduled distributions with respect to any Pledged Collateral Obligation shall be determined in accordance with the applicable provisions of this Indenture.

007447

ARTICLE 13

NOTEHOLDERS' RELATIONS

Section 13.1.    Subordination.

(a)    With respect to each Class of Notes and the Class E Certificates, the Classes of Notes and the Class E Certificates that are Priority Classes and Junior Classes are as follows:

| Class | Junior Classes | Priority Classes |
|---|---|---|
| Class A-1A | A-2, A-3, A-4, B, C, Class E Certificates | None |
| Class A-1B | A-2, A-3, A-4, B, C, Class E Certificates | None |
| Class A-1C | A-2, A-3, A-4, B, C, Class E Certificates | None |
| Class A-2 | A-3, A-4, B, C, Class E Certificates | A-1A, A-1B, A-1C |
| Class A-3 | A-4, B, C, Class E Certificates | A-1A, A-1B, A-1C, A-2 |
| Class A-4 | B, C, Class E Certificates | A-1A, A-1B, A-1C, A-2, A-3 |
| Class B | C, Class E Certificates | A-1A, A-1B, A-1C, A-2, A-3, A-4 |
| Class C | Class E Certificates | A-1A, A-1B, A_1C, A-2, A-3, A-4, B |
| Class E Certificates | None* | A-1A, A-1B, A-1C, A-2, A-3, A-4, B, C |

\*  The Class E Certificates will be entitled to certain residual cashflow after payment of senior obligations in accordance with the Priority of Payments.

(b)    Anything in this Indenture or the Notes to the contrary notwithstanding, the Holders of each Class of Notes that is a Junior Class agree for the benefit of the Holders of the Notes of each Priority Class with respect to the Junior Class that the Junior Class shall be subordinate and junior to the Notes of each Priority Class to the extent and in the manner provided in this Indenture.  If any Event of Default has not been cured or waived and acceleration occurs and is continuing in accordance with Article 5, each Priority Class of Notes shall be paid in full in Cash or, to the extent a Majority of the Class consents, other than in Cash, before any further payment or distribution is made on account of any Junior Class of Notes with respect to the Priority Class.  The Holders of each Junior Class of Notes agree, for the benefit of the Holders of the Notes of each Priority Class in respect of the Junior Class, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due to the Junior Class, of the Notes or each Class of Notes, as the case may be, or under this Indenture until the payment in full of the Priority Classes or all the Classes, as the case may be, and not before one year and a day, or if longer, the applicable preference period then in effect and a day, has elapsed since the payment in full of all Notes issued under the Indenture.

229

007448

(c)　　　If, notwithstanding the provisions of this Indenture, any Holder of Notes of any Junior Class has received any payment or distribution in respect of the Notes contrary to the provisions of this Indenture, then, until each Priority Class with respect to such Junior Class of Notes has been paid in full in Cash or, to the extent a Majority of the Priority Class consents, other than in Cash in accordance with this Indenture, the payment or distribution shall be received and held in trust for the benefit of, and shall forthwith be paid over and delivered to, the Trustee, which shall pay and deliver the same to the Holders of the applicable Priority Classes of Notes in accordance with this Indenture. If any such payment or distribution is made other than in Cash, it shall be held by the Trustee as part of the Collateral and subject in all respects to this Indenture, including this Section 13.1.

(d)　　　Each Holder of Notes of any Junior Class agrees with all Holders of the applicable Priority Classes that the Holder of a Junior Class of Notes shall not demand, accept, or receive any payment or distribution in respect of the Notes in violation of this Indenture including this Section 13.1. After a Priority Class has been paid in full, the Holders of the Notes of the related Junior Class or Classes shall be fully subrogated to the rights of the Holders of the Priority Class. Nothing in this Section 13.1 shall affect the obligation of the Issuer to pay Holders of any Junior Class of Notes.

(e)　　　Distributions to Holders of the Class E Certificates are subordinate to distributions on the Notes as described in the Priority of Payments.

(f)　　　The Management Fees shall have priority only to the extent provided in the Priority of Payments.

Section 13.2.　　<u>Standard of Conduct</u>.

In exercising any of its or their voting rights, rights to direct and consent, or any other rights as a Noteholder under this Indenture, a Noteholder shall not have any obligation or duty to any person or to consider or take into account the interests of any person and shall not be liable to any person for any action taken by it or them or at its or their direction or any failure by it or them to act or to direct that an action be taken, without regard to whether the action or inaction benefits or adversely affects any Noteholder, the Issuer, or any other person, except for any liability to which the Noteholder may be subject to the extent the same results from the Noteholders taking or directing an action, or failing to take or direct an action, in bad faith or in violation of the express terms of this Indenture.

Section 13.3.　　<u>Class A-1 Funding Allocations</u>.

(a)　　　In the event that the Class A-1 Notes are to be redeemed pursuant to the Priority of Payments, including by reason of (i) the failure of a Coverage Test to be satisfied on any date of determination or as contemplated by clause (9), (11) or (14) of Section 11.1(a)(i), (ii) in connection with a Rating Confirmation Failure as contemplated by clause (16) of Section 11.1(a)(i) or clause (4) of Section 11.1(a)(ii), or (iii) in connection with a Special Redemption as contemplated by clause (5) of Section 11.1(a)(ii), the aggregate amount required to be applied to the Class A-1A Notes (the "<u>Aggregate Principal Reduction Amount</u>") shall be applied as follows: (1) the Aggregate Commitment Amount shall be reduced (but not below zero) by an amount equal to (i) the Aggregate Principal Reduction Amount *multiplie*d by (ii) the Aggregate Commitment Amount in effect on the Closing Date *divided* by (iii) the sum of the Aggregate Commitment Amount in effect on the Closing Date *plus* the Aggregate Outstanding Amount of the Class A-1C Notes as of the Closing Date *plus* the Fully Drawn Amount of the Class A-1B Notes (such portion of the Aggregate Principal Reduction Amount, the "<u>Class A-1A Principal Reduction Amount</u>") and the Class A-1A Principal Reduction Amount shall be applied to repay any Drawn Amount on the Class A-1A Notes (with any remaining portion of the Class A-1A Principal Reduction Amount deposited in the Revolving Reserve Account); and (2) the Aggregate Outstanding Amount of the Class A-

007449

1B Notes and the Class A-1C Notes shall be prepaid (but not below zero) in an amount equal to their respective *pro rata* shares (based on the Aggregate Outstanding Amount of the Class A-1B Notes and the Class A-1C Notes) of (i) the Aggregate Principal Reduction Amount *multiplied* by (ii) the sum of the Aggregate Outstanding Amount of the Class A-1C Notes as of the Closing Date and the Fully Drawn Amount of the Class A-1B Notes *divided* by (iii) the sum of the Aggregate Commitment Amount in effect on the Closing Date *plus* the Aggregate Outstanding Amount of the Class A-1C Notes as of the Closing Date *plus* the Fully Drawn Amount of the Class A-1B Notes. Notwithstanding the foregoing, to the extent that the Revolver Funding Reserve Amount after giving effect to any application described in clause (1) above exceeds the amount on deposit in the Revolving Reserve Account any repayment of the Drawn Amount of the Class A-1A Notes and reduction in the Aggregate Commitment Amount will be reduced by an amount that if deposited in the Revolving Reserve Account would cause the aggregate balance of all Eligible Investments credited to the Revolving Reserve Account to equal the Revolver Funding Reserve Amount. Any amount that would have otherwise been applied to prepay the Class A-1A Notes but for such reduction will be deposited into the Revolving Reserve Account in order to satisfy such funding requirement.

(b)     The Issuer will apply any advances under the Class A-1A Notes made pursuant to Section 2.3(c) of the Class A-1A Note Purchase Agreement to repay principal of the Class A-1B Notes and the Class A-1C Notes, *pro rata* based on their respective Aggregate Outstanding Amounts, independent of the Priority of Payments. Such payments will be deemed to occur prior to any other principal payments on any date pursuant to the Priority of Payments.

ARTICLE 14
MISCELLANEOUS

Section 14.1.     Form of Documents Delivered to Trustee.

In any case where several matters are required to be certified by, or covered by an opinion of, any specified person, it is not necessary that all the matters be certified by, or covered by the opinion of, only one person, or that they be so certified or covered by only one document, but one such person may certify or give an opinion with respect to some matters and one or more other such persons as to other matters, and any such person may certify or give an opinion as to the matters in one or several documents.

Any certificate or opinion of an Officer of the Issuer, the Co-Issuer, or the Portfolio Manager may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless the Officer knows, or should know that the certificate or opinion or representations with respect to the matters upon which his certificate or opinion is based are erroneous. Any such certificate of an Officer of the Issuer, the Co-Issuer or the Portfolio Manager or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, the Issuer, the Co-Issuer, the Portfolio Manager, or any other person, stating that the information with respect to the factual matters is in the possession of the Issuer, the Co-Issuer, the Portfolio Manager, or the other person, unless the Officer of the Issuer, the Co-Issuer, or the Portfolio Manager or the counsel knows that the certificate or opinion or representations with respect to factual matters are erroneous. Any Opinion of Counsel may also be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an Officer of the Issuer or the Co-Issuer, stating that the information with respect to factual matters is in the possession of the Issuer or the Co-Issuer, unless the counsel knows that the certificate or opinion or representations with respect to factual matters are erroneous.

231

007450

Where any person is required to make, give, or execute two or more applications, requests, consents, certificates, statements, opinions, or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Whenever this Indenture provides that the absence of the continuation of a Default or Event of Default is a condition precedent to the taking of any action by the Trustee at the request or direction of either Co-Issuer, then notwithstanding that the satisfaction of the condition is a condition precedent to the Co-Issuer's right to make the request or direction, the Trustee shall be protected in acting in accordance with the request or direction if it does not have knowledge of the continuation of the Default or Event of Default as provided in Section 6.1(d).

Section 14.2.    Acts of Noteholders or Holders of Class E Certificates.

(a)    Any request, demand, authorization, direction, notice, consent, waiver, or other action provided by this Indenture to be given or taken by Noteholders or Holders of Class E Certificates may be embodied in and evidenced by one or more instruments (which may be an electronic document, including but not limited to in the form of e-mail, to the extent permitted by applicable law) of substantially similar tenor signed by Noteholders or Holders of Class E Certificates in person or by agents duly appointed in writing (provided that no signature shall be required on electronic documents, including but not limited to in the form of e-mail).  Except as otherwise expressly provided in this Indenture the action shall become effective when the instruments are delivered to the Trustee (which instrument or instruments may be delivered through the Class E Certificates Paying Agent, in the case of the Holders of the Class E Certificates) and, if expressly required, to the Issuer.  The instruments (and the action embodied in them) are referred to as the "Act" of the Noteholders or the Holders of Class E Certificates signing the instruments.  Proof of execution of any instrument or of a writing appointing an agent for a Noteholder or Holder of a Class E Certificate shall be sufficient for any purpose of this Indenture and conclusive in favor of the Trustee and the Issuer, if made in the manner provided in this Section 14.2.

(b)    The fact and date of the execution by any person of any instrument may be proved by an affidavit of a witness to the execution or the certificate of any notary public or other person authorized by law to acknowledge the execution of deeds.  Any certificate on behalf of a jural entity executed by a person purporting to have authority to act on behalf of the jural entity shall itself be sufficient proof of the authority of the person executing it to act.  The fact and date of the execution by any person of any instrument may also be proved in any other manner that the Trustee deems sufficient.

(c)    The Indenture Register shall prove the ownership of Indenture Securities and the principal amount and registered numbers of Indenture Securities and the number of Class E Certificates held by and the number(s) of the Class E Certificate certificate(s) issued to, any Person shall be proved by the Class E Certificate register.

(d)    Any Act by the Holder of a Note shall bind every Holder of the same Note and every Note issued on its transfer or in exchange for it or in lieu of it, in respect of anything done, omitted, or suffered to be done by the Trustee or the Issuer in reliance on the Act, whether or not notation of the action is made on the Note or Class E Certificates.

Section 14.3.    Notices, etc., to Certain Persons or Parties.

(a)    Any request, demand, authorization, direction, order, notice, consent, waiver, or Act of Noteholders or other documents provided or permitted by this Indenture to be made, given, or furnished to, or filed with:

007451

(i)  the Trustee or Class E Certificates Paying Agent shall be sufficient for every purpose under this Indenture if in writing and made, given, furnished, or filed to and mailed, by certified mail, return receipt requested, hand delivered, sent by overnight courier service guaranteeing next day delivery, or by telecopy in legible form, to the Trustee or Class E Certificates Paying Agent addressed to it at its Corporate Trust Office, telecopy no. (713) 216-2101, or at any other address previously furnished in writing to the other parties hereto by the Trustee (any request, direction, order, notice or other communication from the Portfolio Manager to the Trustee under Article 12 (other than required certifications) may be by electronic mail, which shall be deemed to be in writing);

(ii)  the Co-Issuers shall be sufficient for every purpose under this Indenture (unless otherwise in this Indenture expressly provided) if in writing and mailed, first-class postage prepaid, hand delivered, sent by overnight courier service, or by telecopy in legible form, to the Issuer addressed to it at c/o Walkers SPV Limited, P.O. Box 908GT, Walker House, Mary Street, George Town, Grand Cayman, Cayman Islands, facsimile:  (345) 945-4757, Attention:  The Directors, or to the Co-Issuer addressed to it at 2711 Centerville Road, Suite 400, Wilmington, Delaware, 19808, Attention:  Donald J. Puglisi, or at any other address previously furnished in writing to the other parties hereto by the Issuer or the Co-Issuer, as the case may be, with a copy to the Portfolio Manager at its address below;

(iii)  the Portfolio Manager shall be sufficient for every purpose under this Indenture if in writing and mailed, first-class postage prepaid, hand delivered, sent by overnight courier service, or by telecopy in legible form, to the Portfolio Manager addressed to it at Two Galleria Tower, 13455 Noel Road, Suite 1300, Dallas, Texas 75240, telecopy no. (972) 628-4147, Attention: James Dondero, or at any other address previously furnished in writing to the other parties hereto;

(iv)  Citigroup Global Markets Inc. as the Placement Agent and Initial Purchaser shall be sufficient for every purpose under this Indenture if in writing and mailed, first-class postage prepaid, hand delivered, sent by overnight courier service, or by telecopy in legible form, to the Placement Agent or Initial Purchaser, as applicable, addressed to them at Citigroup Global Markets Inc., 390 Greenwich Street, 4th Floor, New York, NY 10013, Facsimile Number: 212-723-8671,Attention:  Managing Director, Global Portfolio Solutions, respectively or at any other address previously furnished in writing to the Co-Issuers, the Portfolio Manager, and the Trustee by an Officer of the Placement Agent or Initial Purchaser, as applicable;

(v)  any Hedge Counterparty shall be sufficient for every purpose under this Indenture (unless otherwise in this Indenture expressly provided) if in writing and mailed, first-class postage prepaid, hand delivered or sent by overnight courier service or by telecopy in legible form to the Hedge Counterparty addressed to it at the address specified in the relevant Hedge Agreement or at any other address previously furnished in writing to the Issuer or the Trustee by the Hedge Counterparty;

(vi)  the Rating Agencies shall be sufficient for every purpose under this Indenture (unless otherwise in this Indenture expressly provided) if in writing and mailed, first-class postage prepaid, hand delivered, sent by overnight courier service, or by telecopy in legible form, to each Rating Agency addressed to it at Moody's Investors Service, Inc., CDO Group, 99 Church Street, New York, New York, 10007, Telecopy No. (212) 553-4170, cdomonitoring@moodys.com, Attention: CBO/CLO Monitoring, and Standard & Poor's, 55 Water Street, 41st Floor, New York, New York 10041-0003, telecopy no. (212) 438-2664, Attention: Asset Backed-CBO/CLO

Surveillance and each Monthly Report shall also be sent to S&P electronically to CDO_Surveillance@standardandpoors.com;

(vii)     the Administrator shall be sufficient for every purpose under this Indenture (unless otherwise in this Indenture expressly provided) if in writing and mailed, first-class postage prepaid, hand delivered, sent by overnight courier service, or by facsimile in legible form, addressed to Walkers SPV Limited, P.O. Box 908GT, Walker House, Mary Street, George Town, Grand Cayman, Cayman Islands, telecopy no. (345) 945-4757, Attention: The Directors;

(viii)     the Repository shall be sufficient for every purpose under this Indenture if delivered to the Repository at CDO Library, c/o The Bond Market Association, 360 Madison Avenue, 18th Floor, New York, New York 10017, electronic mail address: admin@cdolibrary.com. Notwithstanding any provision to the contrary contained herein, any document, report, statement or other information required to be delivered or made available to the Repository by the Trustee may be delivered or made available by providing the operator of the Repository with access to the Trustee's website containing such information;

(ix)     the Irish Paying and Listing Agent shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to and mailed, by certified mail, return receipt requested, hand delivered, sent by overnight courier service guaranteeing next day delivery or by facsimile in legible form, to the Irish Paying and Listing Agent addressed to it at NCB Stockbrokers, 3 George's Dock, Dublin 1, Ireland, or at any other address previously furnished in writing to the other parties hereto by the Irish Paying and Listing Agent; or

(x)     the Cayman Island Stock exchange shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to and mailed, by certified mail, return receipt requested, hand delivered, sent by overnight courier service guaranteeing next day delivery or by facsimile in legible form, to the Administrator at the contact details set forth above, for forwarding to the Cayman Islands Stock Exchange.

(b)     If any provision in this Indenture calls for any notice or document to be delivered simultaneously to the Trustee and any other person, the Trustee's receipt of the notice or document shall entitle the Trustee to assume that the notice or document was delivered to the other person unless otherwise expressly specified in this Indenture.

Section 14.4.     Notices to Holders, the Class E Certificates Paying Agent; Waiver.

(a) Except as otherwise expressly provided in this Indenture, where this Indenture provides for notice to the Noteholders or the Class E Certificates Paying Agent (for forwarding to the Holders of Class E Certificates) of any event,

(i)     the notice shall be sufficiently given to the Noteholders or the Class E Certificates Paying Agent if in writing and mailed, first-class postage prepaid, each Noteholder affected by the event or the Class E Certificates Paying Agent, at the address of the Holder as it appears in the Indenture Register or at the address of the Class E Certificates Paying Agent supplied by the Class E Certificates Paying Agent supplied by the Class E Certificates Paying Agent to the Trustee, as applicable, not earlier than the earliest date and not later than the latest date, prescribed for the giving of the notice; provided, that, in addition, so long as any of the Notes are listed on the Irish Stock Exchange and so long as the rules of such stock exchange so require, notice to the Noteholders shall also be given in the Irish Stock Exchange's Daily

Official List by the Trustee forwarding all notices to the Irish Paying and Listing Agent for publication;

(ii) the notice shall be in the English language; and

(iii) Notices shall be deemed to have been given on the date of their mailing.

(b) Notwithstanding clause (a)(i), a Noteholder or the Class E Certificates Paying Agent may give the Trustee a written notice that it is requesting that notices to it be given by facsimile transmissions and stating the telecopy number for the transmission. Thereafter, the Trustee shall give notices to the Holder or the Class E Certificates Paying Agent by facsimile transmission. If the notice also requests that notices be given by mail, then the notice shall also be given by mail in accordance with clause (a)(i) above, as the case may be.

(b) The Trustee shall deliver to the Holders of Notes any information or notice relating to this Indenture requested to be so delivered by at least 10% (by Aggregate Outstanding Amount) of the Holders of any Class of Notes at the expense of the Issuer. The Trustee shall deliver to the Class E Certificates Paying Agent any information or notice that the Class E Certificates Paying Agent certifies was requested to be so delivered by at least 10% (by Aggregate Outstanding Amount) of the Holders of the Class E Certificates at the expenses of the Issuer.

(c) Neither the failure to mail any notice, nor any defect in any notice so mailed, to any particular Noteholder or the Class E Certificates Paying Agent shall affect the sufficiency of the notice with respect to other Noteholders or the Class E Certificates Paying Agent. If it is impracticable to give the notice by mail of any event to Noteholders or the Class E Certificates Paying Agent when the notice is required to be given pursuant to any provision of this Indenture because of the suspension of regular mail service as a result of a strike, work stoppage, or similar activity or because of any other cause, then the notification to Noteholders or the Class E Certificates Paying Agent as shall be made with the approval of the Trustee shall be a sufficient notification to the Holders for every purpose under this Indenture.

(d) Where this Indenture provides for notice in any manner, the notice may be waived in writing by any person entitled to receive the notice, either before or after the event, and the waiver shall be the equivalent of the notice. Waivers of notice by Noteholders or the Class E Certificates Paying Agent shall be filed with the Trustee but the filing shall not be a condition precedent to the validity of any action taken in reliance on the waiver.

(e) So long as any Class E Certificates are listed on the Cayman Islands Stock Exchange and the rules of the exchange so require, all notices to the Class E Certificates Paying Agent (for forwarding to Holders of Class E Certificates) shall also be given to the Administrator for forwarding to the Cayman Islands Stock Exchange.

(f) The Issuer shall (and authorizes the Trustee to) deliver to the Initial Purchaser and the Placement Agent all periodic reports, notices, demands, and other written information delivered or received by the Issuer, the Portfolio Manager, trustees, paying agents, accountants, or other persons pursuant to this Indenture and other operative documentation relating to the Securities requested by the Initial Purchaser and the Placement Agent (collectively, the "Transaction Reports") and the Issuer consents to the Initial Purchaser and the Placement Agent providing Transaction Reports received by them to current and prospective investors in the Securities (including by means of electronic transmissions or posting the Transaction Reports on internet sites maintained by the Initial Purchaser or the Placement Agent or any of their Affiliates).

235

(g)     Until such time as AG Financial Products Inc. ("AGFP") notifies the Trustee in writing that it is no longer providing credit protection to certain initial holders of Class A-1 Notes, the Trustee (without assuming any obligations to AGFP, including for its failure to do so) shall make available to AGFP (including by access to its password protected website) duplicate copies of all reports, notices and statements that the Trustee is required to deliver to any Holder of Class A-1 Notes, at the following address (or at any other address furnished in writing from time to time by AGFP to the Trustee): AG Financial Products Inc., 1325 Avenue of the Americas, New York, New York 10019, Attention: Risk Management Department, Re: Liberty CLO, Ltd., Reference Nos. D-2005-100, D-2005-105, D-2005-106, D-2005-107, Telecopy No.: (212) 581-3266, Confirmation: (212) 974-0100; E-mail: RiskManagementDept@assuredguaranty.com, with a copy to Attention: General Counsel.  For the avoidance of doubt, AGFP shall be entitled to request directly that the Trustee provide it with the above-mentioned documents in accordance with this Section 14.4. In addition, the Trustee shall forward to AGFP a copy of the Monthly Reports delivered pursuant to Section 10.6(a) and Valuation Reports delivered pursuant to Section 10.6(b) without the necessity of a request from AGFP for such reports.

Section 14.5.     Effect of Headings and Table of Contents.

The Article and Section headings in this Indenture and the Table of Contents are for convenience only and shall not affect the construction of this Indenture.

Section 14.6.     Successors and Assigns.

All covenants and agreements in this Indenture by the Co-Issuers shall bind their respective successors and assigns, whether so expressed or not.

Section 14.7.     Separability.

Except to the extent prohibited by applicable law, in case any provision in this Indenture, in the Notes shall be invalid, illegal, or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 14.8.     Benefits of Indenture.

Nothing in this Indenture or in the Notes, expressed or implied, shall give to any person, other than the parties hereto and their successors under this Indenture, the Portfolio Manager, the Noteholders, the Holders of Class E Certificates or the Class E Certificates Paying Agent any benefit or any legal or equitable right, remedy, or claim under this Indenture.

Section 14.9.     [Reserved].

Section 14.10.     Governing Law.

(a)     THIS INDENTURE AND THE INDENTURE SECURITIES (EXCEPT WITH RESPECT TO ANY CLASS E CERTIFICATE COMPONENT) SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF STATE OF NEW YORK, WITHOUT REFERENCE TO ITS PROVISIONS THAT WOULD RESULT IN THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.

007455

Section 14.11.    Submission to Jurisdiction.

The Co-Issuers and the Trustee hereby irrevocably submit to the non-exclusive jurisdiction of any New York State or federal court sitting in the Borough of Manhattan in The City of New York in any action or proceeding arising out of or relating to the Notes, the Class E Certificates or this Indenture, and the Co-Issuers and the Trustee hereby irrevocably agree that all claims in respect of the action or proceeding may be heard and determined in the New York State or federal court.  The Co-Issuers and the Trustee hereby irrevocably waive, to the fullest extent that they may legally do so, the defense of an inconvenient forum to the maintenance of the action or proceeding.  The Co-Issuers and the Trustee irrevocably consent to the service of all process in any action or proceeding by the mailing or delivery of copies of the process to the Co-Issuers at the office of the Co-Issuers' agent in Section 7.2 and to the Trustee at the Corporate Trust Office.  The Co-Issuers and the Trustee agree that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

Section 14.12.    Counterparts.

This Indenture may be executed in any number of copies, and by the different parties on the same or separate counterparts, each of which shall be considered to be an original instrument.

Section 14.13.    Acts of Issuer.

Any request, demand, authorization, direction, notice, consent, waiver, or other action provided by this Indenture to be given or performed by the Issuer shall be effective if given or performed by the Issuer or by the Portfolio Manager on the Issuer's behalf.

Section 14.14.    Consent to Posting of Documents on Repository

The Issuer hereby consents to (a) the posting of the final Offering Memorandum, this Indenture and the periodic reports to be delivered pursuant to the transaction documents and any amendments or other modifications thereto on the Repository for use in the manner provided in the Repository; and (b) the display of its name on the Repository in connection therewith.  Notwithstanding anything herein to the contrary, none of the Issuer, the Co-Issuer and the Trustee makes any representation or warranty to The Bond Market Association (or any successor thereto) or any affiliate thereof or any Person having or obtaining access to the information maintained in the Repository or to any of such Person's affiliates regarding the accuracy or completeness of any information, document, report or other communication transmitted to the Repository, and no Person having or obtaining access to the information maintained in the Repository shall have any rights under this Indenture or otherwise by reason of the transmission of any such information, document, report or other communication to the Repository.

Section 14.15.    Liability of Co-Issuers.

Notwithstanding any other terms of this Indenture, the Notes, or any other agreement entered into by either the Co-Issuers or otherwise, neither of the Co-Issuers shall have any liability whatsoever to the other Co-Issuers under this Indenture, the Notes, any other agreement, or otherwise. Without prejudice to the generality of the foregoing, neither of the Co-Issuers may take any action to enforce, or bring any action or proceeding, in respect of this Indenture, the Notes, any other agreement, or otherwise against the other of the Co-Issues.  In particular, neither of the Co-Issuers may petition or take any other steps for the winding up or bankruptcy of the other of the Co-Issuers and neither of the Co-Issuers shall have any claim with respect to any assets of the other of the Co-Issuers.

007456

Section 14.16.    Indemnity of Co-Issuer.

      The Issuer agrees to indemnify the Co-Issuer for any payments that may become due from the Co-Issuer under Article 11 with respect to any Notes issued under this Indenture and any administrative, legal or other costs incurred by the Co-Issuer in connection with those payments.

ARTICLE 15

ASSIGNMENT OF MANAGEMENT AGREEMENT; HEDGE AGREEMENTS

Section 15.1.    Assignment of Management Agreement.

      (a)    The Issuer, in furtherance of the covenants of this Indenture and as security for the Notes and amounts payable to the Secured Parties under this Indenture and the performance and observance of the provisions of this Indenture, acknowledges that its Grant pursuant to the first Granting Clause includes all of the Issuer's interest in the Management Agreement, including:

      (i)    the right to give all notices, consents, and releases under it,

      (ii)    the right to give all notices of termination pursuant to the Management Agreement and to take any legal action upon the breach of an obligation of the Portfolio Manager under it, including the commencement, conduct, and consummation of proceedings at law or in equity,

      (iii)    the right to receive all notices, accountings, consents, releases, and statements under it, and

      (iv)    the right to do all other things whatsoever that the Issuer is or may be entitled to do under it.

Notwithstanding anything in this Indenture to the contrary, the Trustee may not exercise any of the rights in (i) through (iv) above or that may otherwise arise as a result of the Grant until the occurrence of an Event of Default under this Indenture and the authority shall terminate when the Event of Default is cured or waived.

      (b)    The assignment made hereby is executed as security, and the execution and delivery hereby shall not in any way impair or diminish the obligations of the Issuer under the Management Agreement, nor shall any of the obligations contained in the Management Agreement be imposed on the Trustee.

      (c)    Upon the retirement of the Notes and the release of the Collateral from the lien of this Indenture, this assignment, and all rights in this Indenture assigned to the Trustee for the benefit of the Noteholders shall cease and terminate and all the interest of the Trustee in the Management Agreement shall revert to the Issuer and no further instrument or act shall be necessary to evidence the termination and reversion.

      (d)    The Issuer represents that the Issuer has not executed any other assignment of the Management Agreement.

      (e)    The Issuer agrees that this assignment is irrevocable, and that it shall not take any action that is inconsistent with this assignment or make any other assignment inconsistent herewith.

007457

The Issuer shall, from time to time upon the request of the Trustee, execute all instruments of further assurance and all such supplemental instruments with respect to this assignment as the Trustee may reasonably request.

(f)     The Issuer agrees to obtain the agreement and consent of the Portfolio Manager in the Management Agreement to the following:

(i)     The Portfolio Manager consents to this collateral assignment and agrees to perform any provisions of this Indenture made expressly applicable to the Portfolio Manager pursuant to the Management Agreement.

(ii)     The Portfolio Manager acknowledges that the Issuer is collaterally assigning all of its interest in the Management Agreement to the Trustee for the benefit of the Secured Parties and the Portfolio Manager agrees that all of the representations, covenants and agreements made by the Portfolio Manager in the Management Agreement are also for the benefit of the Secured Parties.

(iii)     The Portfolio Manager shall deliver to the Trustee duplicate original copies of all notices, statements, communications, and instruments delivered or required to be delivered to the Issuer pursuant to the Management Agreement (other than any of them delivered to the Issuer by the Trustee or the Collateral Administrator).

(iv)     The Issuer shall appoint a successor manager at the direction of a Super Majority of the Class E Certificates (excluding any Class E Certificates held by the retiring Portfolio Manager or any of its Affiliates and accounts over which the retiring Portfolio Manager or any of its Affiliates exercise discretionary voting authority) only if (a) the Rating Condition with respect to each Rating Agency with respect thereto is satisfied, (b) such successor has agreed in writing to assume all of the Portfolio Manager's duties and obligations pursuant to the Management Agreement, this Indenture and the Collateral Administration Agreement, (c) the written consent of a Majority of the Controlling Class for such appointment has been received and (d) such successor portfolio manager is not objected to within 30 days after notice of such succession by a Majority in Aggregate Outstanding Amount of the Notes (voting as a single Class (excluding any Notes held by the retiring Portfolio Manager or any of its Affiliates and accounts over which the retiring Portfolio or any of its Affiliates exercise discretionary voting authority)); provided that if two or more successor managers have been so nominated but have not been so appointed by the Issuer within 30 days of the date of notice of removal, termination or resignation of the Portfolio Manager, then the Issuer shall appoint a successor manager at the direction of a Majority of the Controlling Class only if (a) the Rating Condition with respect to each Rating Agency with respect thereto is satisfied, (b) such successor has agreed in writing to assume all of the Portfolio Manager's duties and obligations pursuant to the Management Agreement and the Indenture and (c) such successor portfolio manager is not objected to within 30 days after notice of such succession by either (x) the Majority of the Class E Certificates (excluding any Class E Certificates held by the retiring Portfolio Manager or any of its Affiliates and accounts over which the retiring Portfolio Manager or any of its Affiliates exercise discretionary voting authority) or (y) a Majority in Aggregate Outstanding Amount of the Notes (voting as a single Class (excluding any Notes held by the retiring Portfolio Manager or any of its Affiliates and accounts over which the retiring Portfolio or any of its Affiliates exercise discretionary voting authority)).

(v)     Neither the Issuer nor the Portfolio Manager shall enter into any agreement amending or modifying the Management Agreement (other than an amendment or modification of the type that may be made to this Indenture without Holder consent) (a) without

007458

satisfying the Rating Condition with respect to each Rating Agency with respect thereto and (b) if a Majority of the Controlling Class or a Majority of the Class E Certificates have objected in writing to such amendment or modification within 30 days of notice thereof.

(vi)     Except as otherwise provided in this Indenture and the Management Agreement, subject to the resignation rights of the Portfolio Manager pursuant to Section 12 of the Management Agreement, the Portfolio Manager shall continue to serve as Portfolio Manager under the Management Agreement notwithstanding that the Portfolio Manager shall not have received amounts due it under the Management Agreement because sufficient funds were not then available under this Indenture to pay the amounts pursuant to the Priority of Payments.  The Portfolio Manager agrees not to cause the filing of a petition in bankruptcy against the Issuer for the nonpayment of the fees or other amounts payable by the Administrative Agent to the Portfolio Manager under the Management Agreement until the payment in full of all Notes issued under this Indenture and the payment to the Class E Certificates Paying Agent of all amounts payable with respect to the Class E Certificates in accordance with the Priority of Payments and the expiration of a period equal to the greater of (A) the applicable preference period plus one day or (B) one year and one day following the payment.  Notwithstanding the foregoing, the Portfolio Manager may commence any legal action that is not a bankruptcy, insolvency, liquidation, or similar proceeding against the Issuer or the Co-Issuer or or any of its properties and may take any action it deems appropriate at any time in any bankruptcy, insolvency, liquidation, or similar proceeding and any other Proceeding voluntarily commenced by the Issuer or the Co-Issuer or involuntarily commenced against the Issuer or the Co-Issuer by anyone other than the Portfolio Manager or any Affiliate of the Portfolio Manager.

(vii)     The Portfolio Manager irrevocably submits to the non-exclusive jurisdiction of any New York State or federal court sitting in the Borough of Manhattan in The City of New York in any action or proceeding arising out of or relating to the Notes, the Class E Certificates or this Indenture, and the Portfolio Manager irrevocably agrees that all claims in respect of the action or proceeding may be heard and determined in the New York State or federal court.  The Portfolio Manager irrevocably waives, to the fullest extent it may legally do so, the defense of an inconvenient forum to the maintenance of the action or proceeding.  The Portfolio Manager irrevocably consents to the service of all process in any action or Proceeding by the mailing or delivery of copies of the process to it the address provided for in Section 14.3.  The Portfolio Manager agrees that a final and non-appealable judgment by a court of competent jurisdiction in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(g)     Following the resignation or removal of the Portfolio Manager, the Issuer shall use its best efforts to appoint a successor Portfolio Manager, and the Issuer, the Trustee, and the resigning or removed Portfolio Manager shall take any action consistent with the Management Agreement and this Indenture applicable to the Portfolio Manager, necessary to effectuate any such succession.

Section 15.2.     Hedge Agreements.

(a)     At any time and from time to time after the Closing Date, the Issuer, at the direction of the Portfolio Manager, shall enter into the Hedge Agreements and shall assign its rights (but none of its obligations) under the Hedge Agreements to the Trustee pursuant to this Indenture and the Collateral Assignment of Hedge Agreements.  The Portfolio Manager, on behalf of the Issuer, shall obtain the approval of each new Hedge Agreement from each Hedge Counterparty to a then-existing Hedge Agreement.  The Trustee shall, on behalf of the Issuer and in accordance with the Valuation Report, pay

amounts due to the Hedge Counterparties under the Hedge Agreements on any Payment Date in accordance with Section 11.1.

(b)        The Issuer shall not enter into any Hedge Agreement unless at the time of entering the Hedge Agreement the Hedge Counterparty has:

(i)        a debt rating by Moody's for long-term debt of "Aa3" (which rating of "Aa3" is not on credit watch for possible downgrade) or higher if the Hedge Counterparty has only a long-term rating; or a debt rating by Moody's for long-term debt of "A1" (which rating of "A1" is not on credit watch for possible downgrade) or higher and a debt rating by Moody's for short-term debt of "P-1" (which rating of "P-1" is not on credit watch for possible downgrade) if the Hedge Counterparty has both long-term and short-term ratings; and

(ii)        a short-term debt rating by S&P of not less than "A-1" or a long-term debt rating of not less than "A+" (the "Required Rating").

(c)        If at any time a Hedge Counterparty has:

(A)        no short-term Moody's rating and a long-term Moody's rating and that rating is below "Aa3" or is "Aa3" and has been placed on credit watch for possible downgrade by Moody's; or

(B)        both a short-term and long-term Moody's rating; and either:

(i)        the long-term Moody's rating is below "A1" or that rating is "A1" and has been placed on credit watch for possible downgrade by Moody's, or

(ii)        the short-term Moody's rating is below "P-1" or that rating is "P-1" and has been placed on credit watch for possible downgrade by Moody's

then the Hedge Counterparty shall be required, at its sole expense, to, within 30 days, either:

(i)        post collateral with the Trustee to secure the Hedge Counterparty's obligations under the Hedge Agreement, in an amount and of the type sufficient to cause the Rating Condition with respect to Moody's to be satisfied;

(ii)        obtain a guarantor whose short-term and long-term debt ratings equal or exceed the above criteria;

(iii)        replace itself under the related or substantially equivalent Hedge Agreement with a substitute Hedge Counterparty whose short-term and long-term debt ratings equal or exceed the above criteria; or

(iv)        take other actions to satisfy the Rating Condition with respect to Moody's;

(d)        If at any time the Hedge Counterparty has:

241

(A) no short-term Moody's rating and a long-term Moody's rating that is "A2" or below or has been suspended or withdrawn;

(B) both a short-term and long-term Moody's rating; and either:

(i) the long-term Moody's rating is "A3" or below or is suspended or withdrawn, or

(ii) the short-term Moody's rating is "P-2" or below, or

(C) a short-term debt rating by S&P below "A-1" or, if the Hedge Counterparty has no short-term rating by S&P, a long-term rating by S&P below "A+" or that has been suspended or withdrawn;

then the Hedge Counterparty shall be required, at its sole expense, to, within 30 days, either:

(i) post collateral as required by the Hedge Agreement to secure the Hedge Counterparty's obligations under the Hedge Agreement in an amount and of the type sufficient to cause the Rating Condition with respect to Moody's and S&P to be satisfied; or

(ii) (x) obtain a guarantor that has a Required Rating and that will satisfy the Rating Condition with respect to S&P with respect to its appointment;

(y) replace itself under the related or substantially equivalent Hedge Agreement with a substitute Hedge Counterparty that has a Required Rating and the appointment of which will satisfy the Rating Condition with respect to S&P; or

(z) take such other actions to satisfy the Ratings Condition;

provided that, if at any time the Hedge Counterparty has a short-term debt rating by S&P below "A-3" or, if the Hedge Counterparty has no short-term rating by S&P, a long-term rating by S&P below "BBB-" or such Hedge Counterparty's rating has been suspended or withdrawn, then the Hedge Counterparty shall be required, at its sole expense, to within 7 days replace itself under the related or substantially equivalent Hedge Agreement with a substitute Hedge Counterparty that has a Required Rating and the appointment of which will satisfy the Rating Condition with respect to S&P.

Whenever a Hedge Agreement is being entered into, the Hedge Counterparty shall comply with the then current rating criteria.

(e) If the Issuer has the right under a Hedge Agreement at any time to demand that the related Hedge Counterparty deliver Eligible Collateral in accordance with an Approved Credit Support Document, the Issuer shall make the demand.

(f) Any payments required to be made under the Hedge Agreements shall be made in accordance with the Priority of Payments. Subordinated Defaulted Hedge Termination Payments shall

be subordinate to interest and principal payments on the Notes and any other payments required to be made by the Issuer under the Hedge Agreements, but senior to distributions to Holders of the Class E Certificates.

(g)     Except as provided in paragraph (h) of this Section 15.2, the Issuer, at the direction of the Portfolio Manager, shall, promptly following the early termination of a Hedge Agreement (other than on a Redemption Date) (but no later than 60 days after the early termination), at the expense of the Issuer and to the extent possible through application of Hedge Termination Receipts, enter into a Replacement Hedge, unless, in the exercise of the Portfolio Manager's commercially reasonable judgment, to do so would not be in the best interest of the Issuer and the Rating Condition with respect to each Rating Agency is satisfied with respect to the non-entry into the a Replacement Hedge. In addition, a Replacement Hedge may not be entered into unless the Issuer provides the Rating Agencies with at least seven Business Days' prior written notice of its intention to enter into the agreement, together with its form and the Rating Condition with respect to each Rating Agency is satisfied with respect to the Replacement Hedge. The Issuer shall use commercially reasonable efforts to cause the termination of a Hedge Agreement (other than a termination resulting from the bankruptcy, insolvency, or similar event with respect to the Hedge Counterparty) to become effective simultaneously with its entering into a Replacement Hedge. To the extent that (i) the Portfolio Manager determines not to replace the Hedge Agreement and the Rating Condition with respect to each Rating Agency is satisfied with respect to the determination; or (ii) termination is occurring on a Redemption Date, the Hedge Termination Receipts shall become part of Principal Proceeds and be distributed in accordance with Section 11.1 on the next following Payment Date (or on the Redemption Date, if the Notes are redeemed on the Redemption Date).

(h)     Notwithstanding Section 15.2(g), the applicable requirements of Section 15.2(g) shall not have to be met if the Rating Condition with respect to each Rating Agency is otherwise satisfied with respect thereto.

(i)     The notional amounts of the Hedge Agreements outstanding at any time may be reduced or increased from time to time, by the Issuer, and the Hedge Agreements may be amended, modified, or terminated in accordance with the Hedge Agreements if the Rating Condition with respect to each Rating Agency is satisfied with respect to the reduction, increase, amendment, modification, or termination, as the case may be.

(j)     Each Hedge Agreement may be terminated pursuant to its terms upon an Optional Redemption of the Notes or an acceleration of maturity of the Notes after an Event of Default. The Hedge Agreement will not be permitted to be terminated as the result of a Default or Event of Default unless any acceleration of maturity of the Notes resulting from the Event of Default is no longer permitted to be rescinded and liquidation of the Collateral has begun pursuant to this Indenture.

(k)     The Issuer shall not enter into a hedge agreement (including any Hedge Agreement) unless (i) the Rating Condition with respect to each Rating Agency is satisfied and (ii) the entry into, performance and termination of such hedge agreement will not subject the Issuer to net income tax in any jurisdiction outside its jurisdiction of incorporation.

Section 15.3.     Synthetic Securities.

The Issuer shall not enter into a Synthetic Security Agreement with a Synthetic Security Counterparty unless the terms of such Synthetic Security Agreement provide that, if at any time the Synthetic Security Counterparty does not meet the Synthetic Security Counterparty Ratings Requirement, such Synthetic Security Counterparty shall (at the sole cost and expense of the Synthetic Security

243

007462

Counterparty) take one of the following actions within 30 days following the date on which the Synthetic Security Counterparty fails to meet such Synthetic Security Counterparty Ratings Requirement:

(a)     post collateral with the Trustee to secure the Synthetic Security Counterparty's obligations under the Synthetic Security Agreement, in an amount and of the type sufficient to cause the Rating Condition with respect to S&P to be satisfied; *provided* that, if the Synthetic Security Counterparty's senior unsecured credit rating by S&P for long-term debt of such Synthetic Security Counterparty are rated below "BBB+" and the senior unsecured, credit rating by S&P for short-term senior debt of such Synthetic Security Counterparty are rated below "A 2" (if such Synthetic Counterparty has a short term rating from Standard & Poor's), the Synthetic Security Counterparty shall obtain or provide a legal opinion addressed to the Issuer and the Trustee acceptable to S&P to the effect that the collateral will be available to the Trustee and the Noteholders in the event of the insolvency of such Synthetic Security Counterparty;

(b)     obtain a guarantor whose short-term and long-term debt ratings equal or exceed the Synthetic Security Counterparty Ratings Requirement;

(c)     cause an entity who satisfies the Security Counterparty Ratings Requirement to issue in favor of the Issuer a credit support of such Synthetic Security Counterparty's obligations under the related Synthetic Security acceptable in form and substance to the Issuer and that satisfies the Rating Condition;

(d)     replace itself under the related or substantially equivalent Synthetic Security Agreement with a substitute Synthetic Security Counterparty whose short-term and long-term debt ratings equal or exceed the Synthetic Security Counterparty Ratings Requirement; *provided* that, upon successful consummation of any such substitution and assignment, the related Synthetic Security Counterparty's obligations to post collateral contemplated by clause (a) above shall terminate and Issuer shall release its security interest in, and return to the related Synthetic Security Counterparty, any then posted collateral; or

(e)     take other actions to satisfy the Rating Condition with respect to S&P.

If the Synthetic Security Counterparty has taken action pursuant to clause (b) above, the Issuer (or the Portfolio Manager on its behalf) shall, in the event that the Synthetic Security Counterparty fails to meet its payment obligations under the Synthetic Security Agreement, demand payment from the guarantor on the day such payment from the Synthetic Security Counterparty is due for the purposes of requiring such guarantor to make payment on such same day.

007463

IN WITNESS WHEREOF, we have set our hands as of the day and year first written above.

EXECUTED AS A DEED BY

**LIBERTY CLO, LTD.,**
AS ISSUER

By:_____
Name: David Egglishaw
Title: Director

**LIBERTY CLO, CORP.,**
AS CO-ISSUER

By:_____
Name:
Title:

**JPMORGAN CHASE BANK, NATIONAL**
**ASSOCIATION,**
AS TRUSTEE

By:_____
Name:
Title:

S-1                                  Indenture

007464

IN WITNESS WHEREOF, we have set our hands as of the day and year first written above.

EXECUTED AS A DEED BY

**LIBERTY CLO, LTD.,**
AS ISSUER


By:_____
Name:
Title:


**LIBERTY CLO, CORP.,**
AS CO-ISSUER


By: _____
Name:   Donald J. Pughsi
Title:    President


**JPMORGAN CHASE BANK, NATIONAL
ASSOCIATION,**
AS TRUSTEE


By:_____
Name:
Title:

Indenture

007465

IN WITNESS WHEREOF, we have set our hands as of the day and year first written above.

EXECUTED AS A DEED BY

**LIBERTY CLO, LTD.,**
AS ISSUER


By:_____
Name:
Title:


**LIBERTY CLO, CORP.,**
AS CO-ISSUER


By:_____
Name:
Title:


**JPMORGAN CHASE BANK, NATIONAL ASSOCIATION,**
AS TRUSTEE


By: _Elaine Mah_____
Name: Elaine Mah
Title: Vice President

S-1

Indenture

007466

Schedule 1

**List of Collateral Obligations**

007467

<u>Schedule 2</u>

**Moody's Industry Classification Group List**

**Aerospace and Defense**: Major Contractor, Subsystems, Research, Aircraft Manufacturing, Arms, Ammunition

**Automobile**: Automotive Equipment, Auto-Manufacturing, Auto Parts Manufacturing, Personal Use Trailers, Motor Homes, Dealers

**Banking**: Bank Holding, Savings and Loans, Consumer Credit, Small Loan, Agency, Factoring, Receivables

**Beverage, Food and Tobacco**: Beer and Ale, Distillers, Wines and Liquors, Distributors, Soft Drink Syrup, Bottling, Bakery, Mill Sugar, Canned Foods, Corn Refiners, Dairy Products, Meat Products, Poultry Products, Snacks, Packaged Foods, Distributors, Candy, Gum, Seafood, Frozen Food, Cigarettes, Cigars, Leaf/Snuff, Vegetable Oil

**Buildings and Real Estate**: Brick, Cement, Climate Controls, Contracting, Engineering, Construction, Hardware, Forest Products (building-related only), Plumbing, Roofing, Wallboard, Real Estate, Real Estate Development, REITs, Land Development

**Chemicals, Plastics and Rubber**: Chemicals (non-agriculture), Industrial Gases, Sulfur, Plastics, Plastic Products, Abrasives, Coatings, Paints, Varnish, Fabricating

**Containers, Packaging and Glass**: Glass, Fiberglass, Containers made of: Glass, Metal, Paper, Plastic, Wood or Fiberglass

**Personal and Non Durable Consumer Products (Manufacturing Only)**: Soaps, Perfumes, Cosmetics, Toiletries, Cleaning Supplies, School Supplies

Diversified/Conglomerate Manufacturing

Diversified/Conglomerate Service

Diversified Natural Resources, Precious Metals and Minerals: Fabricating, Distribution, Mining and Sales

**Ecological**: Pollution Control, Waste Removal, Waste Treatment, Waste Disposal

**Electronics**: Computer Hardware, Electric Equipment, Components, Controllers, Motors, Household Appliances, Information Service, Communication Systems, Radios, TVs, Tape Machines, Speakers, Printers, Drivers, Technology

**Finance**: Investment Brokerage, Leasing, Syndication, Securities

**Farming and Agriculture**: Livestock, Grains, Produce, Agricultural Chemicals, Agricultural Equipment, Fertilizers

**Grocery**: Grocery Stores, Convenience Food Stores

**Healthcare, Education and Childcare**: Ethical Drugs, Proprietary Drugs, Research, Health Care Centers, Nursing Homes, HMOs, Hospitals, Hospital Supplies, Medical Equipment

3

007468

Home and Office Furnishings, Housedress, and Durable Consumer Products: Carpets, Floor Coverings, Furniture, Cooking, Ranges

Hotels, Motels, Inns and Gaming

**Insurance**: Life, Property and Casualty, Broker, Agent, Surety

**Leisure, Amusement, Entertainment**: Boating, Bowling, Billiards, Musical Instruments, Fishing, Photo Equipment, Records, Tapes, Sports, Outdoor Equipment (camping), Tourism, Resorts, Games, Toy Manufacturing, Motion Picture Production, Theatres, Motion Picture Distribution

Machinery (Non-Agriculture, Non-Construction, Non-Electronic): Industrial, Machine Tools, Steam Generators

**Mining, Steel, Iron and Non-Precious Metals**: Coal, Copper, Lead, Uranium, Zinc, Aluminum, Stainless Steel, Integrated Steel, Ore Production, Refractories, Steel Mill Machinery, Mini-Mills, Fabricating, Distribution and Sales

**Oil and Gas**: Crude Producer, Retailer, Well Supply, Service and Drilling

Personal, Food and Miscellaneous

**Printing and Publishing**: Graphic Arts, Paper, Paper Products, Business Forms, Magazines, Books, Periodicals, Newspapers, Textbooks

**Cargo Transport**: Rail, Shipping, Railroads, Rail-car Builders, Ship Builders, Containers, Container Builders, Parts, Overnight Mail, Trucking, Truck Manufacturing, Trailer Manufacturing, Air Cargo, Transport

**Retail Stores**: Apparel, Toy, Variety, Drugs, Department, Mail Order Catalogue, Showroom

Structured Finance

**Telecommunications**: Local, Long Distance, Independent, Telephone, Telegraph, Satellite, Equipment, Research, Cellular

**Textiles and Leather**: Producer, Synthetic Fiber, Apparel Manufacturer, Leather Shoes **Personal Transportation**: Air, Bus, Rail, Car, Rental

**Utilities**: Electric, Water, Hydro Power, Gas, Diversified

**Broadcasting and Entertainment**: Recording Industry, Motion Exhibition Theatres, Motion Picture Production and Distribution, Radio, TV, Cable Broadcasting, Broadcasting Equipment

007469

Schedule 3

**S&P Industry Classifications**

<u>Corporate Obligations</u>

0.      Zero Default Risk
1.      Aerospace & Defense
2.      Air transport
3.      Automotive
4.      Beverage & Tobacco
5.      Radio & Television
6.      Brokerages, Dealers & Investment houses
7.      Building & Development
8.      Business equipment & services
9.      Cable & satellite television
10.     Chemical & plastics
11.     Clothing/textiles
12.     Conglomerates
13.     Containers & glass products
14.     Cosmetics/toiletries
15.     Drugs
16.     Ecological services & equipment
17.     Electronics/electrical
18.     Equipment leasing
19.     Farming/agriculture
20.     Financial Intermediaries
21.     Food/drug retailers
22.     Food products
23.     Food service
24.     Forest products
25.     Health care
26.     Home furnishings
27.     Lodging & casinos
28.     Industrial equipment
29.     Insurance
30.     Leisure goods/activities/movies
31.     Nonferrous metals/minerals
32.     Oil & gas
33.     Publishing
34.     Rail Industries
35.     Retailers (except food & drug)
36.     Steel
37.     Surface transport
38.     Telecommunications
39.     Utilities

<u>Corporate Structured Obligations</u>

50.     CDOs

5

007470

Structured Obligations

51. ABS Consumer
52. ABS Commercial
53. CMBS Diversified (Conduit and CTL)
54. CMBS (Large Loan, Single Borrower, and Single Property)
55. REITs and REOCs
56. RMBS A
57. RMBS B&C, HELs, HELOCs, and Tax Lien
58. Manufactured Housing
59. U.S. Agency (Explicitly Guaranteed)
60. Monoline/FER Guaranteed
61. Non-FER Company Guaranteed
62. FFELP Student Loans (Over 70% FFELP)
63. CLO of SME's

007471

<u>Schedule 4</u>

**Diversity Score Calculation**

The Diversity Score for the Collateral Obligations is calculated by summing each of the Industry Diversity Scores, which are calculated as follows:

 (i) An "Obligor Par Amount" is calculated for each obligor represented in the Collateral Obligations (other than Defaulted Collateral Obligations) by summing the par amounts of all Collateral Obligations in the Collateral (other than Defaulted Collateral Obligations) issued by that obligor or any Affiliate of that obligor (other than obligors that the Portfolio Manager reasonably determines are Affiliated but are not dependent upon one another for credit support and are not dependent upon a Person by which they are commonly controlled for credit support).

 (ii) An "Average Par Amount" is calculated by summing the Obligor Par Amounts and dividing by the number of obligors represented. For purposes of calculating the number of issuers of the Collateral Obligations (other than Defaulted Collateral Obligations), any issuers Affiliated with one another shall be considered one issuer (other than obligors that the Portfolio Manager reasonably determines are Affiliated but are not dependent upon one another for credit support and are not dependent upon a Person by which they are commonly controlled for credit support).

 (iii) An "Equivalent Unit Score" is calculated for each obligor represented in the Collateral Obligations (other than Defaulted Collateral Obligations) by taking the lesser of (A) one and (B) the Obligor Par Amount for the obligor divided by the Average Par Amount. For purposes of calculating the Equivalent Unit Score, any issuers Affiliated with one another shall be considered one issuer (other than obligors that the Portfolio Manager reasonably determines are Affiliated but are not dependent upon one another for credit support and are not dependent upon a Person by which they are commonly controlled for credit support).

 (iv) An "Aggregate Industry Equivalent Unit Score" is then calculated for each of the Moody's industrial classification groups by summing the Equivalent Unit Scores for each obligor in the industry.

 (v) An "Industry Diversity Score" is then established by reference to the Diversity Score Table shown below for the related Aggregate Industry Equivalent Unit Score. If any Aggregate Industry Equivalent Unit Score falls between any two the scores then the applicable Industry Diversity Score shall be the lower of the two Industry Diversity Scores in the Diversity Score Table.

7

### DIVERSITY SCORE TABLE

| Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score |
|---|---|---|---|---|---|---|---|
| 0.0000 | 0.0000 | 5.0500 | 2.7000 | 10.1500 | 4.0200 | 15.2500 | 4.5300 |
| 0.0500 | 0.1000 | 5.1500 | 2.7333 | 10.2500 | 4.0300 | 15.3500 | 4.5400 |
| 0.1500 | 0.2000 | 5.2500 | 2.7667 | 10.3500 | 4.0400 | 15.4500 | 4.5500 |
| 0.2500 | 0.3000 | 5.3500 | 2.8000 | 10.4500 | 4.0500 | 15.5500 | 4.5600 |
| 0.3500 | 0.4000 | 5.4500 | 2.8333 | 10.5500 | 4.0600 | 15.6500 | 4.5700 |
| 0.4500 | 0.5000 | 5.5500 | 2.8667 | 10.6500 | 4.0700 | 15.7500 | 4.5800 |
| 0.5500 | 0.6000 | 5.6500 | 2.9000 | 10.7500 | 4.0800 | 15.8500 | 4.5900 |
| 0.6500 | 0.7000 | 5.7500 | 2.9333 | 10.8500 | 4.0900 | 15.9500 | 4.6000 |
| 0.7500 | 0.8000 | 5.8500 | 2.9667 | 10.9500 | 4.1000 | 16.0500 | 4.6100 |
| 0.8500 | 0.9000 | 5.9500 | 3.0000 | 11.0500 | 4.1100 | 16.1500 | 4.6200 |
| 0.9500 | 1.0000 | 6.0500 | 3.0250 | 11.1500 | 4.1200 | 16.2500 | 4.6300 |
| 1.0500 | 1.0500 | 6.1500 | 3.0500 | 11.2500 | 4.1300 | 16.3500 | 4.6400 |
| 1.1500 | 1.1000 | 6.2500 | 3.0750 | 11.3500 | 4.1400 | 16.4500 | 4.6500 |
| 1.2500 | 1.1500 | 6.3500 | 3.1000 | 11.4500 | 4.1500 | 16.5500 | 4.6600 |
| 1.3500 | 1.2000 | 6.4500 | 3.1250 | 11.5500 | 4.1600 | 16.6500 | 4.6700 |
| 1.4500 | 1.2500 | 6.5500 | 3.1500 | 11.6500 | 4.1700 | 16.7500 | 4.6800 |
| 1.5500 | 1.3000 | 6.6500 | 3.1750 | 11.7500 | 4.1800 | 16.8500 | 4.6900 |
| 1.6500 | 1.3500 | 6.7500 | 3.2000 | 11.8500 | 4.1900 | 16.9500 | 4.7000 |
| 1.7500 | 1.4000 | 6.8500 | 3.2250 | 11.9500 | 4.2000 | 17.0500 | 4.7100 |
| 1.8500 | 1.4500 | 6.9500 | 3.2500 | 12.0500 | 4.2100 | 17.1500 | 4.7200 |
| 1.9500 | 1.5000 | 7.0500 | 3.2750 | 12.1500 | 4.2200 | 17.2500 | 4.7300 |
| 2.0500 | 1.5500 | 7.1500 | 3.3000 | 12.2500 | 4.2300 | 17.3500 | 4.7400 |
| 2.1500 | 1.6000 | 7.2500 | 3.3250 | 12.3500 | 4.2400 | 17.4500 | 4.7500 |
| 2.2500 | 1.6500 | 7.3500 | 3.3500 | 12.4500 | 4.2500 | 17.5500 | 4.7600 |
| 2.3500 | 1.7000 | 7.4500 | 3.3750 | 12.5500 | 4.2600 | 17.6500 | 4.7700 |
| 2.4500 | 1.7500 | 7.5500 | 3.4000 | 12.6500 | 4.2700 | 17.7500 | 4.7800 |
| 2.5500 | 1.8000 | 7.6500 | 3.4250 | 12.7500 | 4.2800 | 17.8500 | 4.7900 |
| 2.6500 | 1.8500 | 7.7500 | 3.4500 | 12.8500 | 4.2900 | 17.9500 | 4.8000 |
| 2.7500 | 1.9000 | 7.8500 | 3.4750 | 12.9500 | 4.3000 | 18.0500 | 4.8100 |

8

| Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score |
|---|---|---|---|---|---|---|---|
| 2.8500 | 1.9500 | 7.9500 | 3.5000 | 13.0500 | 4.3100 | 18.1500 | 4.8200 |
| 2.9500 | 2.0000 | 8.0500 | 3.5250 | 13.1500 | 4.3200 | 18.2500 | 4.8300 |
| 3.0500 | 2.0333 | 8.1500 | 3.5500 | 13.2500 | 4.3300 | 18.3500 | 4.8400 |
| 3.1500 | 2.0667 | 8.2500 | 3.5750 | 13.3500 | 4.3400 | 18.4500 | 4.8500 |
| 3.2500 | 2.1000 | 8.3500 | 3.6000 | 13.4500 | 4.3500 | 18.5500 | 4.8600 |
| 3.3500 | 2.1333 | 8.4500 | 3.6250 | 13.5500 | 4.3600 | 18.6500 | 4.8700 |
| 3.4500 | 2.1667 | 8.5500 | 3.6500 | 13.6500 | 4.3700 | 18.7500 | 4.8800 |
| 3.5500 | 2.2000 | 8.6500 | 3.6750 | 13.7500 | 4.3800 | 18.8500 | 4.8900 |
| 3.6500 | 2.2333 | 8.7500 | 3.7000 | 13.8500 | 4.3900 | 18.9500 | 4.9000 |
| 3.7500 | 2.2667 | 8.8500 | 3.7250 | 13.9500 | 4.4000 | 19.0500 | 4.9100 |
| 3.8500 | 2.3000 | 8.9500 | 3.7500 | 14.0500 | 4.4100 | 19.1500 | 4.9200 |
| 3.9500 | 2.3333 | 9.0500 | 3.7750 | 14.1500 | 4.4200 | 19.2500 | 4.9300 |
| 4.0500 | 2.3667 | 9.1500 | 3.8000 | 14.2500 | 4.4300 | 19.3500 | 4.9400 |
| 4.1500 | 2.4000 | 9.2500 | 3.8250 | 14.3500 | 4.4400 | 19.4500 | 4.9500 |
| 4.2500 | 2.4333 | 9.3500 | 3.8500 | 14.4500 | 4.4500 | 19.5500 | 4.9600 |
| 4.3500 | 2.4667 | 9.4500 | 3.8750 | 14.5500 | 4.4600 | 19.6500 | 4.9700 |
| 4.4500 | 2.5000 | 9.5500 | 3.9000 | 14.6500 | 4.4700 | 19.7500 | 4.9800 |
| 4.5500 | 2.5333 | 9.6500 | 3.9250 | 14.7500 | 4.4800 | 19.8500 | 4.9900 |
| 4.6500 | 2.5667 | 9.7500 | 3.9500 | 14.8500 | 4.4900 | 19.9500 | 5.0000 |
| 4.7500 | 2.6000 | 9.8500 | 3.9750 | 14.9500 | 4.5000 | | |
| 4.8500 | 2.6333 | 9.9500 | 4.0000 | 15.0500 | 4.5100 | | |
| 4.9500 | 2.6667 | 10.0500 | 4.0100 | 15.1500 | 4.5200 | | |

007474

Schedule 5

**Moody's Structured Finance Obligation Recovery Rates**

The Moody's Recovery Rate for a Structured Finance Obligation will be the applicable rate set forth below based on the appropriate sector as categorized by Moody's:

**Diversified Securities** primarily include (1) Automobile Securities; (2) Car Rental Receivable Securities; (3) Credit Card Securities; (4) Student Loan Securities

**Residential Securities** primarily include (1) Home Equity Loan Securities; (2) Manufactured Housing Securities; (3) Residential A Mortgage Securities; (4) Residential B/C Mortgage Securities

**Undiversified Securities** primarily include (1) CMBS Conduit; (2) CMBS Credit Tenant Lease; (3) CMBS Large Loan; (4) those ABS Sectors not included in Diversified Securities

**Collateralized Debt Obligations** include (1) High-diversity CDOs (Diversity Score in excess of 20); (2) Low-Diversity CDOs (Diversity Score of 20 or less)

**Diversified Securities**

| % of Underlying Capital Structure (1) | Initial Rating of Structured Finance Obligation | | | | | |
|---|---|---|---|---|---|---|
| | Aaa | Aa | A | Baa | Ba | B |
| >70% | 85% | 80% | 70% | 60% | 50% | 40% |
| <=70% >10% | 75% | 70% | 60% | 50% | 40% | 30% |
| <=10% | 70% | 65% | 55% | 45% | 35% | 25% |

**Residential Securities**

| % of Underlying Capital Structure (1) | Initial Rating of Structured Finance Obligation | | | | | |
|---|---|---|---|---|---|---|
| | Aaa | Aa | A | | Ba | B |

10

007475

| | | | | Baa | | |
|---|---|---|---|---|---|---|
| >70% | 85% | 80% | 65% | 55% | 45% | 30% |
| <=70% >10% | 75% | 70% | 55% | 45% | 35% | 25% |
| <=10% >5% | 65% | 55% | 45% | 40% | 30% | 20% |
| <=5% >2% | 55% | 45% | 40% | 35% | 25% | 15% |
| <=2% | 45% | 35% | 30% | 25% | 15% | 10% |

**Undiversified Securities**

| % of Underlying Capital Structure (1) | Initial Rating of Structured Finance Obligation | | | | | |
|---|---|---|---|---|---|---|
| | Aaa | Aa | A | Baa | Ba | B |
| >70% | 85% | 80% | 65% | 55% | 45% | 30% |
| <=70% >10% | 75% | 70% | 55% | 45% | 35% | 25% |
| <=10% >5% | 65% | 55% | 45% | 35% | 25% | 15% |
| <=5% >2% | 55% | 45% | 35% | 30% | 20% | 10% |
| <=2% | 45% | 35% | 25% | 20% | 10% | 5% |

**High Diversity Collateralized Debt Obligations**

| % of Underlying Capital | Initial Rating of Underlying Asset | | | | Ba | |
|---|---|---|---|---|---|---|

11

| Structure (1) | Aaa | Aa | A | Baa | | B |
|---|---|---|---|---|---|---|
| >70% | 85% | 80% | 65% | 55% | 45% | 30% |
| <=70% >10% | 75% | 70% | 60% | 50% | 40% | 25% |
| <=10% >5% | 65% | 55% | 50% | 40% | 30% | 20% |
| <=5% >2% | 55% | 45% | 40% | 35% | 25% | 10% |
| <=2% | 45% | 35% | 30% | 25% | 10% | 5% |

**Low Diversity Collateralized Debt Obligations**

| % of Underlying Capital Structure (1) | Initial Rating of Underlying Asset | | | | | |
|---|---|---|---|---|---|---|
| | Aaa | Aa | A | Baa | Ba | B |
| >70% | 80% | 75% | 60% | 50% | 45% | 30% |
| <=70% >10% | 70% | 60% | 55% | 45% | 35% | 25% |
| <=10% >5% | 60% | 50% | 45% | 35% | 25% | 15% |
| <=5% >2% | 50% | 40% | 35% | 30% | 20% | 10% |
| <=2% | 30% | 25% | 20% | 15% | 7% | 4% |

(1) Initial par amount of tranche to which Structured Finance Obligation relates **divided by** initial par amount of total securities issued by Structured Finance Obligation issuer.

12

007477

**S&P Structured Finance Obligation Recovery Rates***

The S&P Priority Category Recovery Rate for a Structured Finance Obligation will be the applicable rate set forth below based on the appropriate asset class and liability rating as categorized by S&P:

Senior Asset Class

| | Liability rating | | | | | | |
|------|------|------|------|------|------|------|------|
| | AAA | AA | A | BBB | BB | B | CCC |
| AAA | 80.0% | 85.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| AA | 70.0% | 75.0% | 85.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| A | 60.0% | 65.0% | 75.0% | 85.0% | 90.0% | 90.0% | 90.0% |
| BBB | 50.0% | 55.0% | 65.0% | 75.0% | 85.0% | 85.0% | 85.0% |

Junior Asset Class

| | Liability rating | | | | | | |
|------|------|------|------|------|------|------|------|
| | AAA | AA | A | BBB | BB | B | CCC |
| AAA | 55.0% | 65.0% | 75.0% | 80.0% | 80.0% | 80.0% | 80.0% |
| AA | 40.0% | 45.0% | 55.0% | 65.0% | 80.0% | 80.0% | 80.0% |
| A | 30.0% | 35.0% | 40.0% | 45.0% | 50.0% | 60.0% | 70.0% |
| BBB | 10.0% | 10.0% | 10.0% | 25.0% | 35.0% | 40.0% | 50.0% |
| B | 2.5% | 5.0% | 5.0% | 10.0% | 10.0% | 20.0% | 25.0% |
| CCC | 0.0% | 0.0% | 0.0% | 0.0% | 2.5% | 5.0% | 5.0% |

\* This table shall not apply to project finance, future flows, synthetics, CDO repacks of ABS or CDOs, guaranteed ABS, distressed debt CDOs, synthetic CDOs, or emerging market CDOs. Recovery rates for such Structured Finance Obligations will be assigned by S&P on a case-by-case basis.

007478

<u>Schedule 7</u>

**Certain Defined Terms Relating to S&P Rating and Moody's Rating**

"<u>Assigned Moody's Rating</u>": The monitored publicly available rating or the monitored estimated rating expressly assigned to a debt obligation (or facility) by Moody's that addresses the full amount of the principal and interest promised.

"<u>Moody's Default Probability Rating</u>": With respect to any Collateral Obligation, as of any date of determination, the rating determined in accordance with the following, in the following order of priority:

      (a)   with respect to a Moody's Senior Secured Loan:

         (i)   if the Loan's obligor has a corporate family rating from Moody's, such corporate family rating; and

         (ii)   if the preceding clause does not apply, the Moody's Obligation Rating of such Loan;

         (iii)   if the preceding clauses do not apply, the rating that is one subcategory above the Moody's Equivalent Senior Unsecured Rating;

      (b)   with respect to a Moody's Non Senior Secured Loan or a bond, the Moody's Equivalent Senior Unsecured Rating of such Collateral Obligation;

      (c)   with respect to a Collateral Obligation that is a DIP Loan, the rating that is one rating subcategory below the Assigned Moody's Rating thereof;

      (d)   with respect to a Structured Finance Obligation, the Assigned Moody's Rating thereof (or, if the obligation does not have an Assigned Moody's Rating but has a rating by S&P, the rating that is the number of rating subcategories specified by Moody's below such S&P rating); and

      (e)   with respect to a Synthetic Security, the Assigned Moody's Rating thereof.

Notwithstanding the foregoing, if the Moody's rating or ratings used to determine the Moody's Default Probability Rating are on watch for downgrade or upgrade by Moody's, such rating or ratings will be adjusted down one subcategory (if on watch for downgrade) or up one subcategory (if on watch for upgrade).

"<u>Moody's Equivalent Senior Unsecured Rating</u>": With respect to any Collateral Obligation that is a Loan or bond and the obligor thereof, as of any date of determination, the rating determined in accordance with the following, in the following order of priority:

      (a)   if the obligor has a senior unsecured obligation with an Assigned Moody's Rating, such Assigned Moody's Rating;

      (b)   if the preceding clause does not apply, the Moody's "Issuer Rating" for the obligor;

      (c)   if the preceding clauses do not apply, but the obligor has a subordinated obligation with an Assigned Moody's Rating, then

14

007479

(i) if such Assigned Moody's Rating is at least "B3" (and, if rated "B3," not on watch for downgrade), the Moody's Equivalent Senior Unsecured Rating shall be the rating which is one rating subcategory higher than such Assigned Moody's Rating, or

(ii) if such Assigned Moody's Rating is less than "B3" (or rated "B3" and on watch for downgrade), the Moody's Equivalent Senior Unsecured Rating shall be such Assigned Moody's Rating;

(d) if the preceding clauses do not apply, but the obligor has a senior secured obligation with an Assigned Moody's Rating, then:

(i) if such Assigned Moody's Rating is at least "Caa3" (and, if rated "Caa3," not on watch for downgrade), the Moody's Equivalent Senior Unsecured Rating shall be the rating which is one subcategory below such Assigned Moody's Rating, or

(ii) if such Assigned Moody's Rating is less than "Caa3" (or rated "Caa3" and on watch for downgrade), then the Moody's Equivalent Senior Unsecured Rating shall be "C";

(e) if the preceding clauses do not apply, but such obligor has a corporate family rating from Moody's, the Moody's Equivalent Senior Unsecured Rating shall be one rating subcategory below such corporate family rating;

(f) if the preceding clauses do not apply, but the obligor has a senior unsecured obligation (other than a bank loan) with a monitored public rating from S&P (without any postscripts, asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), then the Moody's Equivalent Senior Unsecured Rating shall be:

(i) one rating subcategory below the Moody's equivalent of such S&P rating if it is "BBB–" or higher,

(ii) two rating subcategories below the Moody's equivalent of such S&P rating if it is "BB+" or lower; or

(iii) "B3" until the Issuer or the Portfolio Manager obtains an estimated rating from Moody's if (A) the Portfolio Manager certifies to the Trustee that in its commercially reasonable judgment, it believes an estimated rating equivalent to a rating no lower than "B3" will be assigned by Moody's and the Issuer or the Portfolio Manager on its behalf applies for an estimated rating from Moody's within five Business Days of the date of the commitment to purchase the Loan or bond, (B) the aggregate Principal Balance of Collateral Obligations having an Assigned Moody's Rating pursuant to either this clause (f)(iii), or clauses (g)(iii) or (h)(iii) does not exceed 5% of the Maximum Investment Amount, and (C) all the Coverage Tests and the Collateral Quality Tests are satisfied;

(g) if the preceding clauses do not apply, but the obligor has a subordinated obligation (other than a bank loan) with a monitored public rating from S&P (without any postscripts, asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), the Assigned Moody's Rating shall be deemed to be:

(i) one rating subcategory below the Moody's equivalent of such S&P rating if it is "BBB–" or higher;

007480

(ii) two rating subcategories below the Moody's equivalent of such S&P rating if it is "BB+" or lower, and the Moody's Equivalent Senior Unsecured Rating shall be determined pursuant to clause (c) above; or

(iii) "B3" until the Issuer or the Portfolio Manager obtains an estimated rating from Moody's if (A) the Portfolio Manager certifies to the Trustee that in its commercially reasonable judgment, it believes an estimated rating equivalent to a rating not lower than "B3" will be assigned by Moody's and the Issuer or the Portfolio Manager on its behalf applies for an estimated rating from Moody's within five Business Days of the date of the commitment to purchase the Loan or bond, (B) the aggregate Principal Balance of Collateral Obligations having an Assigned Moody's Rating pursuant to either this clause (g)(iii), or clauses (f)(iii) or (h)(iii) does not exceed 5% of the Maximum Investment Amount, and (C) all the Coverage Tests and the Collateral Quality Tests are satisfied;

(h) if the preceding clauses do not apply, but the obligor has a senior secured obligation with a monitored public rating from S&P (without any postscripts, asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), the Assigned Moody's Rating shall be deemed to be:

(i) one rating subcategory below the Moody's equivalent of such S&P rating if it is "BBB–" or higher;

(ii) two rating subcategories below the Moody's equivalent of such S&P rating if it is "BB+" or lower, and the Moody's Equivalent Senior Unsecured Rating shall be determined pursuant to clause (d) above; or

(iii) "B3" until the Issuer or the Portfolio Manager obtains an estimated rating from Moody's if (A) the Portfolio Manager certifies to the Trustee that in its commercially reasonable judgment, it believes an estimated rating equivalent to a rating not lower than "B3" will be assigned by Moody's and the Issuer or the Portfolio Manager on its behalf applies for an estimated rating from Moody's within five Business Days of the date of the commitment to purchase the Loan or bond, (B) the aggregate Principal Balance of Collateral Obligations having an Assigned Moody's Rating pursuant to either this clause (h)(iii), or clauses (f)(iii) or (g)(iii) does not exceed 5% of the Maximum Investment Amount, and (C) all the Coverage Tests and the Collateral Quality Tests are satisfied;

(i) if the preceding clauses do not apply and each of the following clauses (i) through (viii) do apply, the Moody's Equivalent Senior Unsecured Rating will be "Caa1":

(i) neither the obligor nor any of its Affiliates is subject to reorganization or bankruptcy proceedings,

(ii) no debt securities or obligations of the obligor are in default,

(iii) neither the obligor nor any of its Affiliates has defaulted on any debt during the preceding two years,

(iv) the obligor has been in existence for the preceding five years,

(v) the obligor is current on any cumulative dividends,

16

(vi) the fixed-charge ratio for the obligor exceeds 125% for each of the preceding two fiscal years and for the most recent quarter,

(vii) the obligor had a net profit before tax in the past fiscal year and the most recent quarter, and

(viii) the annual financial statements of such obligor are unqualified and certified by a firm of Independent accountants of international reputation, and quarterly statements are unaudited but signed by a corporate officer;

(j) if the preceding clauses do not apply but each of the following clauses (i) and (ii) do apply, the Moody's Equivalent Senior Unsecured Rating will be "Caa3":

(i) neither the obligor nor any of its Affiliates is subject to reorganization or bankruptcy proceedings; and

(ii) no debt security or obligation of such obligor has been in default during the past two years; and

(k) if the preceding clauses do not apply and a debt security or obligation of the obligor has been in default during the past two years, the Moody's Equivalent Senior Unsecured Rating will be "Ca."

Notwithstanding the foregoing, not more than 10% of the Maximum Investment Amount may consist of Investment Obligations given a Moody's Equivalent Senior Unsecured Rating based on a rating given by S&P as provided in clauses (f), (g) and (h) above.

"Moody's Obligation Rating": With respect to any Collateral Obligation as of any date of determination, the rating determined in accordance with the following, in the following order of priority:

(a) With respect to a Moody's Senior Secured Loan:

(i) if it has an Assigned Moody's Rating, such Assigned Moody's Rating; or

(ii) if the preceding clause does not apply, the rating that is one rating subcategory above the Moody's Equivalent Senior Unsecured Rating; and

(b) With respect to a Moody's Non Senior Secured Loan or a bond:

(i) if it has an Assigned Moody's Rating, such Assigned Moody's Rating; or

(ii) if the preceding clause does not apply, the Moody's Equivalent Senior Unsecured Rating; and

(c) With respect to a Synthetic Security or a DIP Loan, the Assigned Moody's Rating thereof.

Notwithstanding the foregoing, if the Moody's rating or ratings used to determine the Moody's Obligation Rating are on watch for downgrade or upgrade by Moody's, such rating or ratings will be adjusted down one subcategory (if on watch for downgrade) or up one subcategory (if on watch for upgrade).

007482

"Moody's Rating": The Moody's Default Probability Rating; provided that, with respect to the Collateral Obligations generally, if at any time Moody's or any successor to it ceases to provide rating services, references to rating categories of Moody's in this Indenture shall be deemed instead to be references to the equivalent categories of any other nationally recognized investment rating agency selected by the Portfolio Manager, as of the most recent date on which such other rating agency and Moody's published ratings for the type of security in respect of which such alternative rating agency is used.

"S&P Rating": With respect to any Collateral Obligation, as of any date of determination, the rating determined in accordance with the following methodology:

(i)     If there is an issuer credit rating of the borrower of the Collateral Obligation (the "Borrower"), or the guarantor who unconditionally and irrevocably guarantees the Collateral Obligation (the "Guarantor") by S&P, the most current issuer credit rating for such Borrower or Guarantor;

(ii)     (a) if there is not an issuer credit rating of the Borrower or its Guarantor by S&P, but there is a rating by S&P on a senior secured obligation of the Borrower or its Guarantor, then the S&P Rating of the Collateral Obligation will be one subcategory below such rating; (b) if there is not a rating by S&P on a senior secured obligation of the Borrower or its Guarantor, but there is a rating by S&P on a senior unsecured obligation of the Borrower or its Guarantor, then the S&P Rating will be such rating; and (c) if there is not a rating by S&P on a senior obligation of the Borrower or its Guarantor, but there is a rating by S&P on a subordinated obligation of the Borrower or its Guarantor, then the S&P Rating will be two subcategories above such rating if such rating is "BBB-" or higher and will be one subcategory above such rating if such rating is "BB+" or lower; or

(iii)   if there is neither an issuer credit rating of the Borrower or its Guarantor by S&P nor a rating by S&P on an obligation of the Borrower or its Guarantor, then the S&P Rating may be determined using any one of the methods below:

(A)     if an obligation of the Borrower or its Guarantor is publicly rated by Moody's, then the S&P Rating will be determined in accordance with the methodologies for establishing the Moody's Default Probability Rating, except that the S&P Rating of such obligation will be (1) one subcategory below the S&P equivalent of the rating assigned by Moody's if such security is rated "Baa3" or higher by Moody's and (2) two subcategories below the S&P equivalent of the rating assigned by Moody's if such security is rated "Ba1" or lower by Moody's; provided that Collateral Obligations constituting no more than 5% of the Maximum Investment Amount (which concentration may be increased to 10% upon satisfaction of the Rating Condition with respect to S&P) may be given a S&P Rating based on a rating given by Moody's as provided in this subclause (a) (after giving effect to the addition of the relevant Collateral Obligation, if applicable);

(B)     if no other security or obligation of the Borrower or its Guarantor is rated by S&P or Moody's, then the Portfolio Manager may apply to S&P for a S&P credit rating estimate, which will be its S&P Rating; or

(C)     (1) if such Collateral Obligation (other than a Current-Pay Obligation) is not rated by Moody's or S&P, no other security or obligation of the Borrower or its Guarantor is rated by S&P or Moody's and if the Portfolio Manager determines in its sole

18

discretion based on information available to it after reasonable inquiry that such Borrower (x) is not subject to any bankruptcy or reorganization proceedings nor in default on any of its obligations (unless the subject of a good faith business dispute), (y) is a legally constituted corporate entity having the minimum legal, financial and operational infrastructure to carry on a definable business, deliver and sell a product or service and report its results in generally accepted accounting terms as verified by a reputable audit firm and (z) is not so vulnerable to adverse business, financial and economic conditions that default in its financial or other obligations is foreseeable in the near term if current operating trends continue, then the S&P Rating will be "B-"; provided that the Portfolio Manager must apply to S&P for a S&P credit rating on such Borrower within 30 days after the addition of the relevant Collateral Obligation; provided, further, that Collateral Obligations constituting no more than 5% of the Maximum Investment Amount may be given an S&P Rating based on this subclause (C) (after giving effect to the addition of the relevant Collateral Obligation, if applicable) or (2) if such Collateral Obligation is a Current-Pay Obligation and is not rated by Moody's or S&P and no other security or obligation of the Borrower or its Guarantor is rated by S&P or Moody's, then the S&P Rating will be "CCC-";

provided that if (i) the relevant Borrower or Guarantor or obligation is placed on any positive "credit watch" list by S&P, such rating will be increased by one rating subcategory or (ii) the relevant Borrower or Guarantor or obligation is placed on any negative "credit watch" list by S&P, such rating will be decreased by one rating subcategory.

Notwithstanding the foregoing, in the case of a Collateral Obligation that is a DIP Loan, the S&P Rating shall be (A) the rating assigned thereto by S&P if the rating is public, (B) the rating assigned by S&P if the rating is confidential, but only if all appropriate parties have provided written consent to its disclosure and use, (C) the rating assigned by S&P thereto through an estimated rating or (D) the rating assigned thereto by S&P in connection with the acquisition thereof upon the request of the Portfolio Manager. In the case of a Collateral Obligation that is a PIK Security, Structured Finance Obligation or Synthetic Securities, the S&P Rating may not be determined pursuant to clause (iii)(A) above.

S&P Ratings for entities or obligations relevant hereunder other than Borrowers and Collateral Obligations shall be determined in a corresponding manner.

Exhibit A1

**Form of Temporary Regulation S Global Security**

20

007485

Exhibit A2

**Form of Regulation S Global Security**

007486

Exhibit A3

**Form of Rule 144A Global Note**

22

007487

<u>Exhibit B1</u>

**Form of Transfer Certificate for**
**Rule 144A Global Note to Temporary Regulation S Global Security or Regulation S Global**
**Security**

23

007488

Exhibit B2

**Form of Transfer Certificate for**
**Temporary Regulation S Global Security or Regulation S Global Security to Rule 144A Global**
**Note**

007489

<u>Exhibit C</u>

**Form of Cleary Gottlieb Steen & Hamilton LLP Opinion**

25

<u>Exhibit D</u>

**Form of Walkers Opinion**

26

007491

Exhibit E

**Form of Gardere Wynne Sewell LLP Opinion**

27

007492

<u>Exhibit F</u>

**Form of Orrick, Herrington & Sutcliffe LLP Opinion**

007493

Exhibit G

**Form of Account Agreement**

007494

<u>Exhibit H</u>

**Forms of Section 3(c)(7) Notices**

007495

<u>Exhibit H-1</u>

**Form of Section 3(c)(7) Reminder Notice**

31

007496

<u>Exhibit H-2</u>

**Form of Important Section 3(c)(7) Reminder Notice**

007497

<u>Exhibit I</u>

**Form of Extension Notice**

007498