**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re:** Highland Capital Management, L.P

Highland Capital Management Fund Advisors, L.P.

et al

§ Case No. 19-34054-SGJ-11

§

Appellant   §

§

vs.   §

Highland Capital Management, L.P.,

§   3:21-CV-00538-N

Appellee   §

**[1943] Order confirming the fifth amended chapter 11 plan,** Entered on 2/22/2021.

# APPELLANT RECORD
# VOLUME 31

MUNSCH HARDT KOPF & HARR, P.C.
Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
3800 Ross Tower
500 N. Akard Street
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

ATTORNEYS FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P. AND
NEXPOINT ADVISORS, L.P.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | ) | Case No. 19-34054 (SGJ11) |
| | ) | |
| Debtor. | ) | |
| | ) | |

$\mathcal{I} \, \mathcal{NDEX}$

## AMENDED DESIGNATION BY NEXPOINT ADVISORS, L.P. AND HIGHLAND
## CAPITAL MANAGEMENT FUND ADVISORS, L.P.
## OF ITEMS FOR THE RECORD ON APPEAL

COME NOW Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors,

L.P. (the "Appellants"), creditors and parties-in-interest in the above styled and numbered

bankruptcy case (the "Bankruptcy Case") of Highland Capital Management, L.P. (the "Debtor"),

and, with respect to their *Notice of Appeal* [docket no. 1957], hereby file their *Amended*

*Designation of Items for the Record on Appeal* (the "Designation") as follows:

| Item | Bankruptcy Docket Number | Description |
|---|---|---|
| | | **Pleadings and Items on Docket** |
| 1 | 1957 | Notice of Appeal |
| 2 | 1943 | Order (i) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief |
| 3 | | Docket Sheet of Bankruptcy Case No. 19-34054 |
| 4 | 1606 | Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 5 | 1648 | Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| 6 | 1656 | Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 7 | 1670 | Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 8 | 1719 | Second Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| 9 | 1749 | Third Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| 10 | 1772 | Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 11 | 1791 | Notice of Withdrawal of Certain Executory Contracts and Unexpired Leases from List of Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan |
| 12 | 1807 | Debtor's Omnibus Reply to Objections to Confirmation of the Fifth Amended Chapter 11 Plan of Reorganization of Highland Capital Management |
| 13 | 1808 | Debtor's Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) |
| 14 | 1811 | Notice of Filing Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (with Technical Modifications) |
| 15 | 1814 | Debtor's Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |

Handwritten annotations in left margin:
Vol. 1
0000 01
000165
000326
Vol. 2
000639
000 666
000675
000 820
000870
Vol. 3
000880
000886
000901
000906
001031
Vol. 4
001097
Vol 5
001346

AMENDED DESIGNATION BY NEXPOINT ADVISORS, L.P. AND HIGHLAND CAPITAL MANAGEMENT
FUND ADVISORS, L.P. OF ITEMS FOR THE RECORD ON APPEAL—Page 2

| | 16 | 1847 | Fourth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
|---|---|---|---|
| | 17 | 1873 | Fifth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| | 18 | 1875 | Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland of Highland Capital Management, L.P. (As Modified) |
| | 19 | 1887 | Supplemental Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| | 20 | 1671 | United States Trustee's Limited Objection to Confirmation of Debtors' Fifth Amended Plan of Reorganization |
| | | | **Evidence and Transcripts** |
| | 21 | 1894 | Transcript of February 2, 2021 Confirmation Hearing |
| | 22 | 1905 | Transcript of February 3, 2021 Confirmation Hearing |
| | 23 | 1917 | Transcript of February 8, 2021 Bench Ruling |
| | 24 | 1794 | All exhibits admitted into evidence during February 2 and February 3, 2021 Confirmation Hearing |
| | | 1795 | |
| | | 1822 | |
| | | 1863 | |
| | | 1866 | |
| | | 1877 | |
| | | 1895 | |
| | | 1915 | |

Handwritten annotations (left margin and below table):

Vol 5
001414
001421
00142?
00147?
001482
00148?
081783
002040
082091
002188
Vol 12 - 002931
Vol 50 - 013295
- 013297
Vol. 51 - 013373
Vol. 54 - 014182
Vol. 55 - 014506

* 1822 - Vol. 12 — 50 (39 Volumes)

RESPECTFULLY SUBMITTED this 22d day of March, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    3800 Ross Tower
    500 N. Akard Street
    Dallas, Texas 75201-6659
    Telephone: (214) 855-7500
    Facsimile: (214) 855-7584
    Email: drukavina@munsch.com

**ATTORNEYS FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P. AND
NEXPOINT ADVISORS, L.P.**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on this the 22d day of March, 2021, true and correct copies of this document were electronically served by the Court's ECF system on parties entitled to notice thereof, including on counsel for the Debtor.

By: /s/ Davor Rukavina
    Davor Rukavina, Esq.

# EXHIBIT RR

008136

EXECUTION COPY

## SERVICING AGREEMENT

This Servicing Agreement, dated as of August 3, 2006 is entered into by and among RED RIVER CLO LTD., an exempted company incorporated under the laws of the Cayman Islands, with its registered office located at the offices of Ogier Fiduciary Services (Cayman) Limited, P.O. Box 1234, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands (together with successors and assigns permitted hereunder, the "Issuer"), and HIGHLAND CAPITAL MANAGEMENT, L.P., a Delaware limited partnership, with its principal offices located at Two Galleria Tower, 13455 Noel Road, Suite 1300, Dallas, Texas 75240, as servicer ("Highland" or, in such capacity, the "Servicer").

### WITNESSETH:

WHEREAS, the Issuer and RED RIVER CLO CORP. (the "Co-Issuer" and together with the Issuer, the "Co-Issuers") intend to issue U.S.$657,000,000 of their Class A Floating Rate Senior Secured Extendable Notes due 2018 (the "Class A Notes"), U.S.$45,000,000 of their Class B Floating Rate Senior Secured Extendable Notes due 2018 (the "Class B Notes"), U.S.$40,500,000 of their Class C Floating Rate Senior Secured Deferrable Interest Extendable Notes due 2018 (the "Class C Notes"), and U.S.$45,000,000 of their Class D Floating Rate Senior Secured Deferrable Interest Extendable Notes due 2018 (the "Class D Notes"), and the Issuer will individually issue U.S.$31,500,000 of its Class E Floating Rate Senior Secured Deferrable Interest Extendable Notes due 2018 (the "Class E Notes" and together with the Class A Notes, Class B Notes, Class C Notes and Class D Notes, the "Notes") pursuant to the Indenture dated as of August 3, 2006 (the "Indenture"), among the Co Issuers and U.S. Bank National Association, as trustee (the "Trustee") and 36,000 Class I Preference Shares, $0.01 par value (the "Class I Preference Shares") and 45,000 Class II Preference Shares, $0.01 par value (the "Class II Preference Shares" and, together with the Class I Preference Shares, the "Preference Shares" and, together with the Notes, the "Securities") pursuant to the Preference Share Documents;

WHEREAS, the Issuer intends to pledge certain Collateral Obligations, Eligible Investments and Cash (all as defined in the Indenture) and certain other assets (all as set forth in the Indenture) (collectively, the "Collateral") to the Trustee as security for the Notes;

WHEREAS, the Issuer wishes to enter into this Servicing Agreement, pursuant to which the Servicer agrees to perform, on behalf of the Issuer, certain duties with respect to the Collateral in the manner and on the terms set forth herein; and

WHEREAS, the Servicer has the capacity to provide the services required hereby and is prepared to perform such services upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual agreements herein set forth, the parties hereto agree as follows:

1.  Definitions.

Terms used herein and not defined below shall have the meanings set forth in the Indenture.

"Advisers Act" shall mean the Investment Advisers Act of 1940, as amended.

008137

"Agreement" shall mean this Servicing Agreement, as amended from time to time.

"Governing Instruments" shall mean the memorandum, articles or certificate of incorporation or association and by-laws, if applicable, in the case of a corporation; the certificate of formation, if applicable, or the partnership agreement, in the case of a partnership; or the certificate of formation, if applicable, or the limited liability company agreement, in the case of a limited liability company.

"HFP" shall mean collectively, Highland Financial Partners, L.P. and any subsidiary thereof.

"Independent Advisor" shall have the meaning specified in Section IV.B. of the Collateral Acquisition Agreement.

"Offering Memorandum" shall mean the Offering Memorandum of the Issuer dated July 31, 2006 prepared in connection with the offering of the Securities.

"Servicer Breaches" shall have the meaning specified in Section 10(a).

"Special Procedures Obligation" shall have the meaning specified in Section IV.A. of the Collateral Acquisition Agreement.

2.    General Duties of the Servicer.

(a)    The Servicer shall provide services to the Issuer as follows:

(i)    Subject to and in accordance with the terms the Indenture and this Agreement, the Servicer shall supervise and direct the administration, acquisition and disposition of the Collateral, and shall perform on behalf of the Issuer those duties and obligations of the Servicer required by the Indenture and this Agreement, and including the furnishing of orders, requests and officer's certificates, and such certifications as are required of the Servicer under the Indenture with respect to permitted purchases and sales of the Collateral Obligations, Eligible Investments and other assets, and other matters, and, to the extent necessary or appropriate to perform such duties, the Servicer shall have the power to execute and deliver all necessary and appropriate documents and instruments on behalf of the Issuer with respect thereto. The Servicer shall, subject to the terms and conditions of this Agreement and the Indenture, perform its obligations hereunder and thereunder with reasonable care and in good faith, using a degree of skill and attention no less than that which the Servicer exercises with respect to comparable assets that it services or manages for others having similar objectives and restrictions, and in a manner consistent with practices and procedures followed by institutional servicers or managers of national standing relating to assets of the nature and character of the Collateral for clients having similar objectives and restrictions, except as expressly provided otherwise in this Agreement and/or the Indenture. To the extent not inconsistent with the foregoing, the Servicer shall follow its customary standards, policies and procedures in performing its duties under the Indenture and hereunder. The Servicer shall comply with all terms and conditions of the Indenture affecting the duties and functions to be performed hereunder. The Servicer shall not be bound to follow any amendment to the Indenture until it has received written notice thereof and until it has received a copy of the amendment from the Issuer or the Trustee; provided, however, that the Servicer shall not be bound by any amendment to the Indenture that affects the rights,

008138

powers, obligations or duties of the Servicer unless the Servicer shall have consented thereto in writing. The Issuer agrees that it shall not permit any amendment to the Indenture that (x) affects the rights, powers, obligations or duties of the Servicer or (y) affects the amount or priority of any fees payable to the Servicer to become effective unless the Servicer has been given prior written notice of such amendment and consented thereto in writing;

(ii) the Servicer shall select any Collateral which shall be acquired by the Issuer pursuant to the Indenture in accordance with the Eligibility Criteria;

(iii) the Servicer shall monitor the Collateral on an ongoing basis and provide to the Issuer all reports, certificates, schedules and other data with respect to the Collateral which the Issuer is required to prepare and deliver under the Indenture and any Hedge Agreement, in the form and containing all information required thereby and in reasonable time for the Issuer to review such required reports, certificates, schedules and data and to deliver them to the parties entitled thereto under the Indenture; the Servicer shall undertake to determine to the extent reasonably practicable whether a Collateral Obligation has become a Defaulted Collateral Obligation; and the Servicer shall monitor any Hedge Agreements and direct the Trustee on behalf of the Issuer in respect of all actions to be taken thereunder by the Issuer;

(iv) the Servicer, subject to and in accordance with the provisions of the Indenture, may, at any time permitted under the Indenture, and shall, when required by the Indenture, direct the Trustee to (x) dispose of a Collateral Obligation, Equity Security or Eligible Investment or other securities received in respect thereof in the open market or otherwise, (y) acquire, as security for the Notes in substitution for or in addition to any one or more Collateral Obligations or Eligible Investments included in the Collateral, one or more substitute Collateral Obligations or Eligible Investments, or (z) direct the Trustee to take the following actions with respect to a Collateral Obligation or Eligible Investment:

(1) retain such Collateral Obligation or Eligible Investment; or

(2) if applicable, tender such Collateral Obligation or Eligible Investment pursuant to an Offer; or

(3) if applicable, consent to any proposed amendment, modification or waiver pursuant to an Offer; or

(4) retain or dispose of any securities or other property (if other than Cash) received pursuant to an Offer; or

(5) waive any default with respect to any Defaulted Collateral Obligation; or

(6) vote to accelerate the maturity of any Defaulted Collateral Obligation; or

(7) exercise any other rights or remedies with respect to such Collateral Obligation or Eligible Investment as provided in the related

008139

Underlying Instruments, including in connection with any workout situations, or take any other action consistent with the terms of the Indenture which is in the best interests of the Holders of the Securities;

(v)      subject to and in accordance with the terms of the Indenture and this Agreement, the Servicer on behalf of the Issuer shall determine whether to enter into any additional hedging arrangements, increase or reduce the notional amounts of existing Hedge Agreements or terminate existing Hedge Agreements, and the Servicer shall use its reasonable efforts to cause the Issuer, promptly following the early termination of a Hedge Agreement (other than on a Redemption Date) and to the extent possible through application of funds received as a result of the early termination (including the proceeds of the liquidation of any collateral pledged by the hedge counterparty), to enter into a replacement Hedge Agreement;

(vi)      the Servicer shall on or prior to any day which is a Redemption Date, direct the Trustee to enter into contracts to dispose of the Collateral Obligations and any other Collateral pursuant to the Indenture and otherwise comply with all redemption procedures and certification requirements in the Indenture in order to allow the Trustee to effect such redemption; and

(vii)      if the Servicer, on behalf of the Issuer, desires to make distributions of Eligible Equity Securities on any Payment Date pursuant to Section 2(e) of the Preference Shares Paying Agency Agreement, the Servicer shall so notify the Trustee and the Preference Shares Paying Agent and provide the Trustee and the Preference Shares Paying Agent (for forwarding to each Holder of the Preference Shares with respect to the applicable Record Date) details of such Eligible Equity Securities in accordance with the procedure set forth in Section 3(b) of the Preference Shares Paying Agency Agreement.

(b)      In performing its duties hereunder, the Servicer shall seek to preserve the value of the Collateral for the benefit of the Holders of the Securities taking into account the collateral criteria and limitations set forth herein and in the Indenture and the Servicer shall use reasonable efforts to select and service the Collateral in such a way that will permit a timely performance of all payment obligations by the Issuer under the Indenture; provided, that the Servicer shall not be responsible if such objectives are not achieved so long as the Servicer performs its duties under this Agreement in the manner provided for herein, and provided, further, that there shall be no recourse to the Servicer with respect to the Notes or the Preference Shares. The Servicer and the Issuer shall take such other action, and furnish such certificates, opinions and other documents, as may be reasonably requested by the other party hereto in order to effectuate the purposes of this Agreement and to facilitate compliance with applicable laws and regulations and the terms of this Agreement.

(c)      The Servicer hereby agrees to the following:

(i)      The Servicer agrees not to institute against, or join any other Person in instituting against, the Issuer or the Co-Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings or other proceedings under federal or state bankruptcy or similar laws of any jurisdiction until at least one year and one day (or if longer, any applicable preference period plus one day) after the payment in full of all Notes issued under the Indenture; provided, however, that nothing in this clause (i) shall preclude, or be deemed to estop, the Servicer (A) from taking any action prior to the expiration of such period in (x) any case or proceeding voluntarily

filed or commenced by the Issuer or the Co-Issuer, as the case may be, or (y) any involuntary insolvency proceeding filed or commenced against the Issuer or the Co-Issuer, as the case may be, by a Person other than the Servicer, or (B) from commencing against the Issuer or the Co-Issuer or any properties of the Issuer or the Co-Issuer any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium, liquidation or similar proceeding.

(ii) The Servicer shall cause each sale or purchase of any Collateral Obligations or Eligible Investment to be conducted on an arm's-length basis.

(iii) The Servicer shall notify the Trustee, the Share Registrar and the Holding Share Registrar of any Affiliate of the Servicer that owns the Securities or the Holding Preference Shares.

(iv) The Servicer and/or its Affiliates will purchase Class E Notes having an aggregate principal amount equal to U.S.$31,500,000 and the Servicer and/or its Affiliates (other than HFP) will purchase Holding Preferences Shares having an aggregate Face Amount equal to U.S.$21,000,000.

(d)     The Servicer shall not act for the Issuer in any capacity except as provided in this Section 2. In providing services hereunder, the Servicer may employ third parties, including its Affiliates, to render advice (including advice with respect to the servicing of the Collateral) and assistance; provided, however, that the Servicer shall not be relieved of any of its duties or liabilities hereunder regardless of the performance of any services by third parties. Notwithstanding any other provision of this Agreement, the Servicer shall not be required to take any action required of it pursuant to this Agreement or the Indenture if such action would constitute a violation of any law.

(e)     Notwithstanding any other provision of this Agreement or the Indenture, (i) any granted signatory powers or authority granted to the Servicer on behalf of the Issuer with respect to the Special Procedures Obligations shall be conditioned upon the prior written approval of the Independent Advisor and (ii) neither the Servicer nor any Affiliate of the Servicer shall have any authority to enter into agreements, or take any action, on behalf of the Issuer with respect to the Special Procedures Obligations without the prior written approval of the Independent Advisor.

008141

3.     Brokerage.

The Servicer shall seek to obtain the best prices and execution for all orders placed with respect to the Collateral, considering all reasonable circumstances. Subject to the objective of obtaining best prices and execution, the Servicer may take into consideration research and other brokerage services furnished to the Servicer or its Affiliates by brokers and dealers which are not Affiliates of the Servicer. Such services may be used by the Servicer or its Affiliates in connection with its other servicing or advisory activities or operations. The Servicer may aggregate sales and purchase orders of securities placed with respect to the Collateral with similar orders being made simultaneously for other accounts serviced or managed by Servicer or with accounts of the Affiliates of the Servicer, if in the Servicer's reasonable judgment such aggregation shall result in an overall economic benefit to the Issuer, taking into consideration the advantageous selling or purchase price, brokerage commission and other expenses. In the event that a sale or purchase of a Collateral Obligation or Eligible Investment (in accordance with the terms of the Indenture) occurs as part of any aggregate sales or purchase orders, the objective of the Servicer (and any of its Affiliates involved in such transactions) shall be to allocate the executions among the accounts in an equitable manner and consistent with its obligations hereunder and under applicable law.

In addition to the foregoing and subject to the provisions of Section 2 and the limitations of Section 5, the objective of obtaining best prices and execution and to the extent permitted by applicable law, the Servicer may, on behalf of the Issuer, direct the Trustee to acquire any and all of the Eligible Investments or other Collateral from, or sell Collateral Obligations or other Collateral to, the Placement Agents, the Trustee or any of their respective Affiliates, or any other firm.

4.     Additional Activities of the Servicer.

Nothing herein shall prevent the Servicer or any of its Affiliates from engaging in other businesses, or from rendering services of any kind to the Trustee, the Holders of the Securities, or any other Person or entity to the extent permitted by applicable law. Without prejudice to the generality of the foregoing, the Servicer and partners, directors, officers, employees and agents of the Servicer or its Affiliates may, among other things, and subject to any limits specified in the Indenture:

(a)     serve as directors (whether supervisory or managing), officers, partners, employees, agents, nominees or signatories for any issuer of any obligations included in the Collateral or their respective Affiliates, to the extent permitted by their Governing Instruments, as from time to time amended, or by any resolutions duly adopted by the Issuer, its Affiliates or any issuer of any obligations included in the Collateral or their respective Affiliates, pursuant to their respective Governing Instruments; provided, that in the reasonable judgment of the Servicer, such activity shall not have a material adverse effect on any item of Collateral or the ability of the Issuer to comply with each Collateral Quality Test; provided, further, that nothing in this paragraph shall be deemed to limit the duties of the Servicer set forth in Section 2 hereof;

(b)     receive fees for services of any nature rendered to the issuer of any obligations included in the Collateral or their respective Affiliates; provided, that in the reasonable judgment of the Servicer, such activity shall not have a material adverse effect on any item of Collateral or the ability of the Issuer to comply with each Collateral Quality Test; and provided, further that if any portion of such services are related to the purchase by the Issuer of any obligations included in the Collateral, the portion of such fees relating to such obligations shall be applied to the purchase price of such obligations; and

008142

(c) be a secured or unsecured creditor of, or hold an equity interest in, the Issuer, its Affiliates or any issuer of any obligation included in the Collateral; provided, that in the reasonable judgment of the Servicer, such activity shall not have a material adverse effect on any item of Collateral or the ability of the Issuer to comply with each Collateral Quality Test; provided, further, that nothing in this paragraph shall be deemed to limit the duties of the Servicer set forth in Section 2 hereof.

It is understood that the Servicer and any of its Affiliates may engage in any other business and furnish servicing, investment management and advisory services to others, including Persons which may have policies similar to those followed by the Servicer with respect to the Collateral and which may own securities of the same class, or which are the same type, as the Collateral Obligations or other securities of the issuers of Collateral Obligations. The Servicer shall be free, in its sole discretion, to make recommendations to others, or effect transactions on behalf of itself or for others, which may be the same as or different from those effected with respect to the Collateral.

Unless the Servicer determines in its reasonable judgment that such purchase or sale is appropriate, the Servicer may refrain from directing the purchase or sale hereunder of securities issued by (i) Persons of which the Servicer, its Affiliates or any of its or their officers, directors or employees are directors or officers, (ii) Persons for which the Servicer or its Affiliate act as financial adviser or underwriter or (iii) Persons about which the Servicer or any of its Affiliates have information which the Servicer deems confidential or non-public or otherwise might prohibit it from trading such securities in accordance with applicable law. The Servicer shall not be obligated to pursue any particular strategy or opportunity with respect to the Collateral.

5.      Conflicts of Interest.

(a) The Servicer shall not direct the Trustee to acquire an obligation to be included in the Collateral from the Servicer or any of its Affiliates as principal or to sell an obligation to the Servicer or any of its Affiliates as principal unless (i) the Issuer shall have received from the Servicer such information relating to such acquisition or sale as it may reasonably require and shall have approved such acquisition, which approval shall not be unreasonably withheld, (ii) in the judgment of the Servicer, such transaction is on terms no less favorable than would be obtained in a transaction conducted on an arm's length basis between third parties unaffiliated with each other and (iii) such transaction is permitted by the Advisers Act.

(b) The Servicer shall not direct the Trustee to acquire an obligation to be included in the Collateral directly from any account or portfolio for which the Servicer serves as servicer or investment adviser, or direct the Trustee to sell an obligation directly to any account or portfolio for which the Servicer serves as servicer or investment adviser unless such acquisition or sale is (i) in the judgment of the Servicer, on terms no less favorable than would be obtained in a transaction conducted on an arm's length basis between third parties unaffiliated with each other and (ii) permitted by the Advisers Act.

(c) The Servicer shall not undertake any transaction described in this Section 5 unless such transaction is exempt from the prohibited transaction rules of ERISA and the Code. In addition, after the initial distribution of the Class E Notes and the Preference Shares, neither the Servicer nor any of its affiliates (as defined in the Plan Asset Regulation) shall acquire any Class E Notes or Preference Shares (including pursuant to the Extension Procedure or the Amendment Buy-Out Option) unless such acquisition would not, as determined by the Trustee in reliance on representations made in the applicable transfer certificates with respect thereto, result in persons that have represented that they are Benefit Plan Investors owning 25% or more of the aggregate outstanding amount of any of the Class E Notes, the Class I Preference Shares or the Class II Preference Shares immediately after such acquisition

008143

(determined in accordance with the Plan Asset Regulation, the Indenture and the Preference Share Documents). The Class E Notes and the Preference Shares held as principal by the Servicer or any of its affiliates shall be disregarded and shall not be treated as outstanding for purposes of determining compliance with such 25% limitation to the extent that such person has represented that it is not a Benefit Plan Investor.

6.    Records; Confidentiality.

The Servicer shall maintain appropriate books of account and records relating to services performed hereunder, and such books of account and records shall be accessible for inspection by a representative of the Issuer, the Trustee, the Collateral Administrator, the Holders of the Securities and the Independent accountants appointed by the Issuer pursuant to the Indenture at a mutually agreed time during normal business hours and upon not less than three Business Days' prior notice. At no time shall the Servicer make a public announcement concerning the issuance of the Notes or the Preference Shares, the Servicer's role hereunder or any other aspect of the transactions contemplated by this Agreement and the Indenture. The Servicer shall keep confidential any and all information obtained in connection with the services rendered hereunder and shall not disclose any such information to non-affiliated third parties except (i) with the prior written consent of the Issuer, (ii) such information as either Rating Agency shall reasonably request in connection with the rating of any class of Securities, (iii) as required by law, regulation, court order or the rules or regulations of any self regulating organization, body or official having jurisdiction over the Servicer, (iv) to its professional advisers, (v) such information as shall have been publicly disclosed other than in violation of this Agreement, or (vi) such information that was or is obtained by the Servicer on a non-confidential basis, provided, that the Servicer does not know or have reason to know of any breach by such source of any confidentiality obligations with respect thereto. For purposes of this Section 6, the Trustee, the Collateral Administrator and the Holders of the Securities shall in no event be considered "non-affiliated third parties."

Notwithstanding anything in this Agreement or the Indenture to the contrary, the Servicer, the Co-Issuers, the Trustee and the Holders of the Securities (and the beneficial owners thereof) (and each of their respective employees, representatives or other agents) may disclose to any and all Persons, without limitation of any kind, the U.S. tax treatment and U.S. tax structure of the transactions contemplated by this Agreement and all materials of any kind (including opinions or other tax analyses) that are provided to them relating to such U.S. tax treatment and U.S. tax structure, as such terms are defined under U.S. federal, state or local tax law.

7.    Obligations of Servicer.

Unless otherwise specifically required by any provision of the Indenture or this Agreement or by applicable law, the Servicer shall use its best reasonable efforts to ensure that no action is taken by it, and shall not intentionally or with reckless disregard take any action, which would (a) materially adversely affect the Issuer or the Co-Issuer for purposes of Cayman Islands law, United States federal or state law or any other law known to the Servicer to be applicable to the Issuer or the Co-Issuer, (b) not be permitted under the Issuer's or the Co-Issuer's respective governing instruments, (c) violate any law, rule or regulation of any governmental body or agency having jurisdiction over the Issuer or the Co-Issuer including, without limitation, any Cayman Islands or United States federal, state or other applicable securities law the violation of which has or could reasonably be expected to have a material adverse effect on the Issuer, the Co-Issuer or any of the Collateral, (d) require registration of the Issuer, the Co-Issuer or the pool of Collateral as an "investment company" under the Investment Company Act, (e) cause the Issuer or the Co-Issuer to violate the terms of the Indenture, including, without limitation, any representations made by the Issuer or Co-Issuer therein, or any other agreement contemplated by the Indenture or (f) not be permitted by the Collateral Acquisition Agreement and would

subject the Issuer to U.S. federal or state income or franchise taxation or cause the Issuer to be engaged in a trade or business in the United States for U.S. federal income tax purposes. The Servicer covenants that it shall comply in all material respects with all laws and regulations applicable to it in connection with the performance of its duties under this Agreement and the Indenture. Notwithstanding anything in this Agreement to the contrary, the Servicer shall not be required to take any action under this Agreement or the Indenture if such action would violate any applicable law, rule, regulation or court order.

8.  Compensation.

(a)  The Issuer shall pay to the Servicer, for services rendered and performance of its obligations under this Agreement, the Servicing Fee, which shall be payable in such amounts and at such times as set forth in the Indenture. The provisions of the Indenture which relate to the amount and payment of the Servicing Fee shall not be amended without the written consent of the Servicer. If on any Payment Date there are insufficient funds to pay the Servicing Fee (and/or any other amounts due and payable to the Servicer) in full, the amount not so paid shall be deferred and shall be payable with accrued interest on such later Payment Date on which funds are available therefor as provided in the Indenture.

The Servicer hereby agrees to waive the Class II Preference Share Portion of the Servicing Fees deposited by the Trustee into the Class II Preference Share Special Payment Account pursuant to the Indenture, which would otherwise be payable to the Servicer as Servicing Fees, on each Payment Date during the first two years following the Closing Date. After the two-year anniversary of the Closing Date, the Servicer may, in its sole discretion, at any time waive the Class II Preference Share Portion of its Servicing Fees then due and payable, in which event an amount equal to such waived portion will be paid by the Issuer as Class II Preference Share Special Payments pursuant to the Indenture. For purposes of any calculation under this Agreement and the Indenture, the Servicer shall be deemed to have received the Servicing Fee in an amount equal to the sum of the Servicing Fee actually paid to the Servicer and the amount distributed to the Holders of the Class II Preference Shares as Class II Preference Share Special Payments.

In addition, notwithstanding anything set out above, the Servicer may, in its sole discretion: (i) waive all or any portion of the Servicing Fee, any funds representing the waived Servicing Fees to be retained in the Collection Account for distribution as either Interest Proceeds or Principal Proceeds (as determined by the Servicer) pursuant to the Priority of Payments; or (ii) defer all or any portion of the Servicing Fee, any funds representing the deferred Servicing Fees to be retained in the Collection Account, when they will become payable in the same manner and priority as their original characterization would have required unless deferred again.

(b)  The Servicer shall be responsible for the ordinary expenses incurred in the performance of its obligations under this Agreement and the Indenture; provided, however, that any extraordinary expenses actually incurred by the Servicer in the performance of such obligations (including, but not limited to, any fees, expenses or other amounts payable to the Rating Agencies, the Collateral Administrator, the Trustee and the accountants appointed by the Issuer, the reasonable expenses incurred by the Servicer to employ outside lawyers or consultants reasonably necessary in connection with the evaluation, transfer or restructuring of any Collateral Obligations or other unusual matters arising in the performance of its duties under this Agreement and the Indenture, any reasonable expenses incurred by the Servicer in obtaining advice from outside counsel with respect to its obligations under this Agreement, brokerage commissions, transfer fees, registration costs, taxes and other similar costs and transaction related expenses and fees arising out of transactions effected for the Issuer's account and the portion allocated to the Issuer of any other fees and expenses that the Servicer customarily allocates among all of the funds or portfolios that it services or manages) shall be reimbursed by the

008145

Issuer to the extent funds are available therefor in accordance with and subject to the priority of payments and the other limitations contained in the Indenture.

(c)     If this Agreement is terminated pursuant to Section 12, Section 14 or otherwise, the fees payable to the Servicer shall be prorated for any partial periods between Payment Dates during which this Agreement was in effect and shall be due and payable on the first Payment Date following the date of such termination and on any subsequent Payment Dates to the extent remaining unpaid and in accordance with, and to the extent provided in, the Indenture.

9.     Benefit of the Agreement.

The Servicer agrees that its obligations hereunder shall be enforceable at the instance of the Issuer, the Trustee, on behalf of the Noteholders, or the requisite percentage of Noteholders or the Holders of the Preference Shares, as applicable, as provided in the Indenture or the Preference Share Paying Agency Agreement, as applicable.

10.     Limits of Servicer Responsibility; Indemnification.

(a)     The Servicer assumes no responsibility under this Agreement other than to render the services called for hereunder and under the terms of the Indenture made applicable to it pursuant to the terms of this Agreement in good faith and, subject to the standard of liability described in the next sentence, shall not be responsible for any action of the Issuer or the Trustee in following or declining to follow any advice, recommendation or direction of the Servicer. The Servicer, its directors, officers, stockholders, partners, agents and employees, and its Affiliates and their directors, officers, stockholders, partners, agents and employees, shall not be liable to the Issuer, the Co-Issuer, the Trustee, the Preference Shares Paying Agent, the Holders of the Securities or any other person, for any losses, claims, damages, judgments, assessments, costs or other liabilities (collectively, "Liabilities") incurred by the Issuer, the Co-Issuer, the Trustee, the Preference Shares Paying Agent, the Holders of the Securities or any other person, that arise out of or in connection with the performance by the Servicer of its duties under this Agreement and the Indenture, except by reason of (i) acts or omissions constituting bad faith, willful misconduct, gross negligence or breach of fiduciary duty in the performance, or reckless disregard, of the obligations of the Servicer hereunder and under the Indenture or (ii) with respect to any information included in the Offering Memorandum in the sections entitled "The Servicer" and "Risk Factors—Relating to Certain Conflicts of Interest—The Issuer Will Be Subject to Various Conflicts of Interest Involving the Servicer" that contain any untrue statement of material fact or omits to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading (the preceding clauses (i) and (ii) collectively being the "Servicer Breaches"). For the avoidance of doubt, the Servicer shall have no duty to independently investigate any laws not otherwise known to it in connection with its obligations under this Agreement and the Indenture. The Servicer shall be liable for any non-waivable breaches of applicable securities laws. The Servicer shall be deemed to have satisfied the requirements of the Indenture and this Agreement relating to not causing the Issuer to be treated as engaged in a trade or business in the United States for U.S. federal income tax purposes (including as those requirements relate to the acquisition (including manner of acquisition), ownership, enforcement, and disposition of Collateral) to the extent the Servicer (i) complies with the requirements set forth in the Collateral Acquisition Agreement and (ii) the Servicer does not have actual knowledge that its actions with respect to a Collateral Obligation or an Eligible Investment would violate Section 7(f).

(b)     The Issuer shall indemnify and hold harmless (the Issuer in such case, the "Indemnifying Party") the Servicer, its directors, officers, stockholders, partners, agents and employees (such parties collectively in such case, the "Indemnified Parties") from and against any and all

008146

Liabilities, and shall reimburse each such Indemnified Party for all reasonable fees and expenses (including reasonable fees and expenses of counsel) (collectively, the "Expenses") as such Expenses are incurred in investigating, preparing, pursuing or defending any claim, action, proceeding or investigation with respect to any pending or threatened litigation (collectively, the "Actions"), caused by, or arising out of or in connection with, the issuance of the Securities, the transactions contemplated by the Offering Memorandum, the Indenture or this Agreement, and/or any action taken by, or any failure to act by, such Indemnified Party; provided, however, that no Indemnified Party shall be indemnified for any Liabilities or Expenses it incurs as a result of any acts or omissions by any Indemnified Party constituting Servicer Breaches. Notwithstanding anything contained herein to the contrary, the obligations of the Issuer under this Section 10 shall be payable solely out of the Collateral in accordance with the priorities set forth in the Indenture and shall survive termination of this Agreement.

(c)     With respect to any claim made or threatened against an Indemnified Party, or compulsory process or request or other notice of any loss, claim, damage or liability served upon an Indemnified Party, for which such Indemnified Party is or may be entitled to indemnification under this Section 10, such Indemnified Party shall (or with respect to Indemnified Parties that are directors, officers, stockholders, agents or employees of the Servicer, the Servicer shall cause such Indemnified Party to):

(i)     give written notice to the Indemnifying Party of such claim within ten (10) days after such Indemnified Party's receipt of actual notice that such claim is made or threatened, which notice to the Indemnifying Party shall specify in reasonable detail the nature of the claim and the amount (or an estimate of the amount) of the claim; provided, however, that the failure of any Indemnified Party to provide such notice to the Indemnifying Party shall not relieve the Indemnifying Party of its obligations under this Section 10 unless the Indemnifying Party is materially prejudiced or otherwise forfeits rights or defenses by reason of such failure;

(ii)     at the Indemnifying Party's expense, provide the Indemnifying Party such information and cooperation with respect to such claim as the Indemnifying Party may reasonably require, including, but not limited to, making appropriate personnel available to the Indemnifying Party at such reasonable times as the Indemnifying Party may request;

(iii)     at the Indemnifying Party's expense, cooperate and take all such steps as the Indemnifying Party may reasonably request to preserve and protect any defense to such claim;

(iv)     in the event suit is brought with respect to such claim, upon reasonable prior notice, afford to the Indemnifying Party the right, which the Indemnifying Party may exercise in its sole discretion and at its expense, to participate in the investigation, defense and settlement of such claim;

(v)     neither incur any material expense to defend against nor release or settle any such claim or make any admission with respect thereto (other than routine or incontestable admissions or factual admissions the failure to make which would expose such Indemnified Party to unindemnified liability) nor permit a default or consent to the entry of any judgment in respect thereof, in each case without the prior written consent of the Indemnifying Party; and

(vi)    upon reasonable prior notice, afford to the Indemnifying Party the right, in its sole discretion and at its sole expense, to assume the defense of such claim, including, but not limited to, the right to designate counsel reasonably acceptable to the Indemnified Party and to control all negotiations, litigation, arbitration, settlements, compromises and appeals of such claim; provided, that if the Indemnifying Party assumes the defense of such claim, it shall not be liable for any fees and expenses of counsel for any Indemnified Party incurred thereafter in connection with such claim except that if such Indemnified Party reasonably determines that counsel designated by the Indemnifying Party has a conflict of interest in connection with its representation of such Indemnified Party, such Indemnifying Party shall pay the reasonable fees and disbursements of one counsel (in addition to any local counsel) separate from its own counsel for all Indemnified Parties in connection with any one action or separate but similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances; provided, further, that prior to entering into any final settlement or compromise, such Indemnifying Party shall seek the consent of the Indemnified Party and use its commercially reasonable efforts in the light of the then prevailing circumstances (including, without limitation, any express or implied time constraint on any pending settlement offer) to obtain the consent of such Indemnified Party as to the terms of settlement or compromise. If an Indemnified Party does not consent to the settlement or compromise within a reasonable time under the circumstances, the Indemnifying Party shall not thereafter be obligated to indemnify the Indemnified Party for any amount in excess of such proposed settlement or compromise.

(d)    In the event that any Indemnified Party waives its right to indemnification hereunder, the Indemnifying Party shall not be entitled to appoint counsel to represent such Indemnified Party nor shall the Indemnifying Party reimburse such Indemnified Party for any costs of counsel to such Indemnified Party.

(e)    Notwithstanding any other provision of this Agreement, nothing herein shall in any way constitute a waiver or limitation of any rights which the Issuer or the Holders of the Securities may have under any U.S. federal securities laws.

11.    No Partnership or Joint Venture.

The Issuer and the Servicer are not partners or joint venturers with each other and nothing herein shall be construed to make them such partners or joint venturers or impose any liability as such on either of them. The Servicer's relation to the Issuer shall be deemed to be that of an independent contractor.

12.    Term; Termination.

(a)    This Agreement shall commence as of the date first set forth above and shall continue in force and effect until the first of the following occurs: (i) the payment in full of the Notes, the termination of the Indenture in accordance with its terms and the redemption in full of the Preference Shares; (ii) the liquidation of the Collateral and the final distribution of the proceeds of such liquidation to the Holders of the Securities; or (iii) the termination of this Agreement in accordance with subsection (b), (c), (d) or (e) of this Section 12 or Section 14 of this Agreement.

(b)    Subject to Section 12(e) below, the Servicer may resign, upon 90 days' written notice to the Issuer (or such shorter notice as is acceptable to the Issuer). If the Servicer resigns,

008148

the Issuer agrees to appoint a successor Servicer to assume such duties and obligations in accordance with Section 12(e).

(c)     This Agreement shall be automatically terminated in the event that the Issuer determines in good faith that the Issuer or the pool of Collateral has become required to be registered under the provisions of the Investment Company Act, and the Issuer notifies the Servicer thereof.

(d)     If this Agreement is terminated pursuant to this Section 12, neither party shall have any further liability or obligation to the other, except as provided in Sections 2(c)(i), 8, 10 and 15 of this Agreement.

(e) No removal or resignation of the Servicer shall be effective unless:

(i)     (A) the Issuer appoints a successor Servicer at the written direction of a Majority of the Preference Shares (excluding any Preference Shares held by the retiring Servicer, any of its Affiliates or any account over which the retiring Servicer or its Affiliates have discretionary voting authority (or, with respect to Class I Preference Shares held by Investors Corp. at such time, Holding Preference Shares held by the retiring Servicer, any of its Affiliates or any account over which the retiring Servicer or its Affiliates have discretionary voting authority) other than, with respect to the Class II Preference Shares, HFP; provided that, with respect to the voting authority of Class II Preference Shares owned by HFP, such vote shall not be excluded only if such vote is determined by a vote of the majority of the "independent directors" (determined in accordance with the governing documents of HFP and certified in writing to the Preference Shares Paying Agent by any of the "independent directors" of HFP) of HFP) (each such non-excluded Preference Share, a "Voting Preference Share"), (B) such successor Servicer has agreed in writing to assume all of the retiring Servicer's duties and obligations pursuant to this Agreement and the Indenture and (C) such successor Servicer is not objected to within 30 days after notice of such succession by either (x) a Super Majority of the Controlling Class of Notes (excluding any Notes held by the retiring Servicer, its Affiliates or any account over which the retiring Servicer or its Affiliates have discretionary voting authority other than HFP; provided that, with respect to the voting authority of Notes owned by HFP, such vote shall not be excluded only if such vote is determined by a vote of the majority of the "independent directors" (determined in accordance with the governing documents of HFP and certified in writing to the Trustee by any of the "independent directors" of HFP) of HFP) (each such non-excluded Note, a "Voting Note") or (y) a Majority in Aggregate Outstanding Amount of the Voting Notes (voting as a single class); or

(ii)     if a Majority of the Voting Preference Shares has nominated two or more successor Servicers that have been objected to pursuant to the preceding clause (i)(C) or has otherwise failed to appoint a successor Servicer that has not been objected to pursuant to the preceding clause (i)(C) within 60 days of the date of notice of such removal or resignation of the Servicer, then (A) any Holder of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) or the Trustee may petition a court of competent authority to appoint a successor Servicer, (B) such court appoints a successor Servicer and (C) such successor Servicer has agreed in writing to assume all of the retiring Servicer's duties and obligations pursuant to this Agreement and the Indenture.

008149

In addition, any successor Servicer must be an established institution which (i) has demonstrated an ability to professionally and competently perform duties similar to those imposed upon the Servicer hereunder, (ii) is legally qualified and has the capacity to act as Servicer hereunder, as successor to the Servicer under this Agreement in the assumption of all of the responsibilities, duties and obligations of the Servicer hereunder and under the applicable terms of the Indenture, (iii) shall not cause the Issuer or the pool of Collateral to become required to register under the provisions of the Investment Company Act, (iv) shall perform its duties as Servicer under this Agreement and the Indenture without causing the Issuer, the Co Issuer or any Holder of Preference Shares to become subject to tax in any jurisdiction where such successor Servicer is established as doing business and (v) each Rating Agency has confirmed that the appointment of such successor Servicer shall not cause its then current rating of any Class of Notes to be reduced or withdrawn. No compensation payable to a successor Servicer from payments on the Collateral shall be greater than that paid to the retiring Servicer without the prior written consent of a Super Majority of the Controlling Class of Notes, a Majority of the Noteholders and a Majority of the Preference Shares. The Issuer, the Trustee and the successor Servicer shall take such action (or cause the retiring Servicer to take such action) consistent with this Agreement and the terms of the Indenture applicable to the Servicer, as shall be necessary to effectuate any such succession.

(f)    In the event of removal of the Servicer pursuant to this Agreement, the Issuer shall have all of the rights and remedies available with respect thereto at law or equity, and, without limiting the foregoing, the Issuer or, to the extent so provided in the Indenture, the Trustee may by notice in writing to the Servicer as provided under this Agreement terminate all the rights and obligations of the Servicer under this Agreement (except those that survive termination pursuant to Section 12(d) above). Upon expiration of the applicable notice period with respect to termination specified in this Section 12 or Section 14 of this Agreement, as applicable, all authority and power of the Servicer under this Agreement, whether with respect to the Collateral or otherwise, shall automatically and without further action by any person or entity pass to and be vested in the successor Servicer upon the appointment thereof.

13.    Delegation; Assignments.

This Agreement, and any obligations or duties of the Servicer hereunder, shall not be delegated by the Servicer, in whole or in part, without the prior written consent of the Issuer, a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) and a Majority of the Voting Preference Shares and, notwithstanding any such consent, no delegation of obligations or duties by the Servicer (including, without limitation, to an entity described above) shall relieve the Servicer from any liability hereunder.

Subject to Section 12, any assignment of this Agreement to any Person, in whole or in part, by the Servicer shall be deemed null and void unless (i) such assignment is consented to in writing by the Issuer, a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) and a Majority of the Voting Preference Shares and (ii) the Rating Agency Confirmation is satisfied with respect to any such assignment. Any assignment consented to by the Issuer, a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) and a Majority of the Voting Preference Shares shall bind the assignee hereunder in the same manner as the Servicer is bound. In addition, the assignee shall execute and deliver to the Issuer and the Trustee a counterpart of this Agreement naming such assignee as Servicer. Upon the execution and delivery of such a counterpart by the assignee and consent thereto by the Issuer, a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) and a Majority of the Voting Preference Shares, the Servicer shall be released from further obligations pursuant to this Agreement, except with respect to its obligations arising under Section 10 of this Agreement prior to such assignment and except with respect to its obligations under Sections 2(c)(i) and 15 hereof. This Agreement shall not be assigned by the Issuer without the prior written consent of the Servicer and the Trustee, except in the case of

008150

assignment by the Issuer to (i) an entity which is a successor to the Issuer permitted under the Indenture, in which case such successor organization shall be bound hereunder and by the terms of said assignment in the same manner as the Issuer is bound thereunder or (ii) the Trustee as contemplated by the Indenture. In the event of any assignment by the Issuer, the Issuer shall cause its successor to execute and deliver to the Servicer such documents as the Servicer shall consider reasonably necessary to effect fully such assignment. The Servicer hereby consents to the matters set forth in Article 15 of the Indenture.

14.    <u>Termination by the Issuer for Cause</u>.

Subject to Section 12(e) above, this Agreement shall be terminated and the Servicer shall be removed by the Issuer for cause upon 10 days' prior written notice to the Servicer and upon written notice to the Holders of the Securities as set forth below, but only if directed to do so by (1) the Trustee, acting at the direction of a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) or (2) the Holders of a Majority of the Voting Preference Shares. For purposes of determining "cause" with respect to any such termination of this Agreement, such term shall mean any one of the following events:

(a)    the Servicer willfully breaches in any respect, or takes any action that it knows violates in any respect, any provision of this Agreement or any terms of the Indenture applicable to it;

(b)    the Servicer breaches in any material respect any provision of this Agreement or any terms of the Indenture or the Collateral Administration Agreement applicable to it, or any representation, warranty, certification or statement given in writing by the Servicer shall prove to have been incorrect in any material respect when made or given, and the Servicer fails to cure such breach or take such action so that the facts (after giving effect to such action) conform in all material respects to such representation, warranty, certificate or statement, in each case within 30 days of becoming aware of, or receiving notice from, the Trustee of, such breach or materially incorrect representation, warranty, certificate or statement;

(c)    the Servicer is wound up or dissolved (other than a dissolution in which the remaining members elect to continue the business of the Servicer in accordance with its Governing Instruments) or there is appointed over it or a substantial portion of its assets a receiver, administrator, administrative receiver, trustee or similar officer, or the Servicer (i) ceases to be able to, or admits in writing its inability to, pay its debts as they become due and payable, or makes a general assignment for the benefit of or enters into any composition or arrangement with, its creditors generally; (ii) applies for or consents (by admission of material allegations of a petition or otherwise) to the appointment of a receiver, trustee, assignee, custodian, liquidator or sequestrator (or other similar official) of the Servicer or of any substantial part of its properties or assets, or authorizes such an application or consent, or proceedings seeking such appointment are commenced without such authorization, consent or application against the Servicer and continue undismissed for 60 days; (iii) authorizes or files a voluntary petition in bankruptcy, or applies for or consents (by admission of material allegations of a petition or otherwise) to the application of any bankruptcy, reorganization, arrangement, readjustment of debt, insolvency or dissolution, or authorizes such application or consent, or proceedings to such end are instituted against the Servicer without such authorization, application or consent and are approved as properly instituted and remain undismissed for 60 days or result in adjudication of bankruptcy or insolvency; or (iv) permits or suffers all or any substantial part of its properties or assets to be sequestered or attached by court order and the order remains undismissed for 60 days;

008151

(d)     the occurrence of any Event of Default under the Indenture that results from any breach by the Servicer of its duties under the Indenture or this Agreement, which breach or default is not cured within any applicable cure period; or

(e)     (x) the occurrence of an act by the Servicer related to its activities in any servicing, securities, financial advisory or other investment business that constitutes fraud, (y) the Servicer being indicted, or any of its principals being convicted, of a felony criminal offense related to its activities in any servicing, securities, financial advisory or other investment business or (z) the Servicer being indicted for, adjudged liable in a civil suit for, or convicted of a violation of the Securities Act or any other United States Federal securities law or any rules or regulations thereunder.

If any of the events specified in this Section 14 shall occur, the Servicer shall give prompt written notice thereof to the Issuer, the Trustee and the Holders of all outstanding Notes and Preference Shares upon the Servicer's becoming aware of the occurrence of such event.

15.     Action Upon Termination.

(a)     From and after the effective date of termination of this Agreement, the Servicer shall not be entitled to compensation for further services hereunder, but shall be paid all compensation accrued to the date of termination, as provided in Section 8 hereof, and shall be entitled to receive any amounts owing under Section 10 hereof.  Upon the effective date of termination of this Agreement, the Servicer shall as soon as practicable:

(i)     deliver to the Issuer all property and documents of the Trustee or the Issuer or otherwise relating to the Collateral then in the custody of the Servicer; and

(ii)     deliver to the Trustee an accounting with respect to the books and records delivered to the Trustee or the successor Servicer appointed pursuant to Section 12(e) hereof.

Notwithstanding such termination, the Servicer shall remain liable to the extent set forth herein (but subject to Section 10 hereof) for its acts or omissions hereunder arising prior to termination and for any expenses, losses, damages, liabilities, demands, charges and claims (including reasonable attorneys' fees) in respect of or arising out of a breach of the representations and warranties made by the Servicer in Section 16(b) hereof or from any failure of the Servicer to comply with the provisions of this Section 15.

(b)     The Servicer agrees that, notwithstanding any termination of this Agreement, it shall reasonably cooperate in any Proceeding arising in connection with this Agreement, the Indenture or any of the Collateral (excluding any such Proceeding in which claims are asserted against the Servicer or any Affiliate of the Servicer) upon receipt of appropriate indemnification and expense reimbursement.

16.     Representations and Warranties.

(a)     The Issuer hereby represents and warrants to the Servicer as follows:

(i)     The Issuer has been duly registered and is validly existing under the laws of the Cayman Islands, has full power and authority to own its assets and the securities proposed to be owned by it and included in the Collateral and to transact the business in which it is presently engaged and is duly qualified under the laws of each

008152

jurisdiction where its ownership or lease of property or the conduct of its business requires, or the performance of its obligations under this Agreement, the Indenture or the Securities would require, such qualification, except for failures to be so qualified, authorized or licensed that would not in the aggregate have a material adverse effect on the business, operations, assets or financial condition of the Issuer.

(ii)     The Issuer has full power and authority to execute, deliver and perform this Agreement, the Indenture and the Securities and all obligations required hereunder and thereunder and has taken all necessary action to authorize this Agreement, the Indenture and the Securities on the terms and conditions hereof and thereof and the execution by the Issuer, delivery and performance of this Agreement, the Indenture and the Securities and the performance of all obligations imposed upon it hereunder and thereunder. No consent of any other person including, without limitation, shareholders and creditors of the Issuer, and no license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority, other than those that may be required under state securities or "blue sky" laws and those that have been or shall be obtained in connection with the Indenture and the Securities is required by the Issuer in connection with this Agreement, the Indenture and the Securities or the execution, delivery, performance, validity or enforceability of this Agreement, the Indenture and the Securities or the obligations imposed upon it hereunder or thereunder. This Agreement constitutes, and each instrument or document required hereunder, when executed and delivered hereunder, shall constitute, the legally valid and binding obligation of the Issuer enforceable against the Issuer in accordance with its terms, subject to (a) the effect of bankruptcy, insolvency or similar laws affecting generally the enforcement of creditors' rights and (b) general equitable principles.

(iii)     The execution by the Issuer, delivery and performance of this Agreement and the documents and instruments required hereunder shall not violate any provision of any existing law or regulation binding on the Issuer, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on the Issuer, or the Governing Instruments of, or any securities issued by, the Issuer or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which the Issuer is a party or by which the Issuer or any of its assets may be bound, the violation of which would have a material adverse effect on the business, operations, assets or financial condition of the Issuer, and shall not result in or require the creation or imposition of any lien on any of its property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking (other than the lien of the Indenture).

(iv)     The Issuer is not in violation of its Governing Instruments or in breach or violation of or in default under the Indenture or any contract or agreement to which it is a party or by which it or any of its assets may be bound, or any applicable statute or any rule, regulation or order of any court, government agency or body having jurisdiction over the Issuer or its properties, the breach or violation of which or default under which would have a material adverse effect on the validity or enforceability of this Agreement or the performance by the Issuer of its duties hereunder.

(v)     True and complete copies of the Indenture and the Issuer's Governing Instruments have been delivered to the Servicer.

008153

The Issuer agrees to deliver a true and complete copy of each amendment to the documents referred to in Section 16(a)(v) above to the Servicer as promptly as practicable after its adoption or execution.

(b) The Servicer hereby represents and warrants to the Issuer as follows:

(i) The Servicer is a limited partnership duly organized and validly existing and in good standing under the laws of the State of Delaware, has full power and authority to own its assets and to transact the business in which it is currently engaged and is duly qualified and in good standing under the laws of each jurisdiction where its ownership or lease of property or the conduct of its business requires, or the performance of this Agreement would require such qualification, except for those jurisdictions in which the failure to be so qualified, authorized or licensed would not have a material adverse effect on the business, operations, assets or financial condition of the Servicer or on the ability of the Servicer to perform its obligations under, or on the validity or enforceability of, this Agreement and the provisions of the Indenture applicable to the Servicer.

(ii) The Servicer has full power and authority to execute, deliver and perform this Agreement and all obligations required hereunder and under the provisions of the Indenture applicable to the Servicer, and has taken all necessary action to authorize this Agreement on the terms and conditions hereof and the execution, delivery and performance of this Agreement and all obligations required hereunder and under the terms of the Indenture applicable to the Servicer. No consent of any other person, including, without limitation, creditors of the Servicer, and no license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority is required by the Servicer in connection with this Agreement or the execution, delivery, performance, validity or enforceability of this Agreement or the obligations required hereunder or under the terms of the Indenture applicable to the Servicer. This Agreement has been, and each instrument and document required hereunder or under the terms of the Indenture applicable to the Servicer shall be, executed and delivered by a duly authorized partner of the Servicer, and this Agreement constitutes, and each instrument and document required hereunder or under the terms of the Indenture applicable to the Servicer when executed and delivered by the Servicer hereunder or under the terms of the Indenture applicable to the Servicer shall constitute, the valid and legally binding obligations of the Servicer enforceable against the Servicer in accordance with their terms, subject to (a) the effect of bankruptcy, insolvency or similar laws affecting generally the enforcement of creditors' rights and (b) general equitable principles.

(iii) The execution, delivery and performance of this Agreement and the terms of the Indenture applicable to the Servicer and the documents and instruments required hereunder or under the terms of the Indenture applicable to the Servicer shall not violate or conflict with any provision of any existing law or regulation binding on or applicable to the Servicer, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on the Servicer, or the Governing Instruments of, or any securities issued by the Servicer or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which the Servicer is a party or by which the Servicer or any of its assets may be bound, the violation of which would have a material adverse effect on the business, operations, assets or financial condition of the Servicer or its ability to perform its obligations under this Agreement and

008154

the provisions of the Indenture applicable to the Servicer, and shall not result in or require the creation or imposition of any lien on any of its material property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking.

       (iv)    There is no charge, investigation, action, suit or proceeding before or by any court pending or, to the best knowledge of the Servicer, threatened that, if determined adversely to the Servicer, would have a material adverse effect upon the performance by the Servicer of its duties under, or on the validity or enforceability of, this Agreement and the provisions of the Indenture applicable to the Servicer.

       (v)    The Servicer is a registered investment adviser under the Advisers Act.

       (vi)    The Servicer is not in violation of its Governing Instruments or in breach or violation of or in default under any contract or agreement to which it is a party or by which it or any of its property may be bound, or any applicable statute or any rule, regulation or order of any court, government agency or body having jurisdiction over the Servicer or its properties, the breach or violation of which or default under which would have a material adverse effect on the validity or enforceability of this Agreement or the provisions of the Indenture applicable to the Servicer, or the performance by the Servicer of its duties hereunder.

17.    <u>Notices</u>.

    Unless expressly provided otherwise herein, all notices, requests, demands and other communications required or permitted under this Agreement shall be in writing (including by telecopy) and shall be deemed to have been duly given, made and received when delivered against receipt or upon actual receipt of registered or certified mail, postage prepaid, return receipt requested, or, in the case of telecopy notice, when received in legible form, addressed as set forth below:

    (a) If to the Issuer:

Red River CLO Ltd.
c/o Ogier Fiduciary Services (Cayman) Limited
P.O. Box 1093GT
Queensgate House
South Church Street
George Town, Grand Cayman, Cayman Islands
Telephone: (345) 945-6264
Telecopy: (345) 945-6265
Attention: The Directors

    (b) If to the Servicer:

Highland Capital Management, L.P.
Two Galleria Tower
13455 Noel Road, Suite 1300
Dallas, Texas 75240
Telephone: (972) 628-4100

008155

Telecopy: (972) 628-4147
Attention: James Dondero

(c) If to the Trustee:

U.S. Bank National Association
One Federal Street, 3rd Floor
Mailcode: EX-MA-FED
Boston, Massachusetts 02110
Telecopy: (866) 350-3148
Attention: CDO Unit – Red River CLO Ltd.

(d) If to the Noteholders:

In accordance with Section 14.4 of the Indenture, at their respective addresses set forth on the Note Register.

(e) If to the Holders of the Preference Shares:

In accordance with Section 14.4 of the Indenture, to the Preference Shares Paying Agent at the address identified therein.

(f) if to the Rating Agencies:

In accordance with Section 14.3 of the Indenture, to the rating Agencies at the address identified therein.

Any party may alter the address or telecopy number to which communications or copies are to be sent by giving notice of such change of address in conformity with the provisions of this Section 17 for the giving of notice.

18. <u>Binding Nature of Agreement; Successors and Assigns</u>.

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and permitted assigns as provided herein. The Servicer hereby consents to the collateral assignment of this Agreement as provided in the Indenture and further agrees that the Trustee may enforce the Servicer's obligations hereunder.

19. <u>Entire Agreement</u>.

This Agreement contains the entire agreement and understanding among the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, understandings, inducements and conditions, express or implied, oral or written, of any nature whatsoever with respect to the subject matter hereof. The express terms hereof control and supersede any course of performance and/or usage of the trade inconsistent with any of the terms hereof. This Agreement may not be modified or amended other than by an agreement in writing executed by the parties hereto and in accordance with the terms of Section 15.1(h) of the Indenture.

008156

20. <u>Conflict with the Indenture</u>.

Subject to the last two sentences of Section 2(a)(i), in the event that this Agreement requires any action to be taken with respect to any matter and the Indenture requires that a different action be taken with respect to such matter, and such actions are mutually exclusive, the provisions of the Indenture in respect thereof shall control.

21. <u>Priority of Payments</u>.

The Servicer agrees that the payment of all amounts to which it is entitled pursuant to this Agreement and the Indenture shall be due and payable only in accordance with the priorities set forth in the Indenture and only to the extent funds are available for such payments in accordance with such priorities.

22. <u>Governing Law</u>.

**THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS PROVISIONS THAT WOULD RESULT IN THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.**

23. <u>Indulgences Not Waivers</u>.

Neither the failure nor any delay on the part of any party hereto to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege preclude any other or further exercise of the same or of any other right, remedy, power or privilege, nor shall any waiver of any right, remedy, power or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence. No waiver shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver.

24. <u>Costs and Expenses</u>.

Except as may otherwise be agreed in writing, the costs and expenses (including the fees and disbursements of counsel and accountants) incurred by each party in connection with the negotiation and preparation of and the execution of this Agreement, and all matters incident thereto, shall be borne by such party.

25. <u>Titles Not to Affect Interpretation</u>.

The titles of paragraphs and subparagraphs contained in this Agreement are for convenience only, and they neither form a part of this Agreement nor are they to be used in the construction or interpretation hereof.

26. <u>Execution in Counterparts</u>.

This Agreement may be executed in any number of counterparts by facsimile or other written form of communication, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

008157

27.  Provisions Separable.

In case any provision in this Agreement shall be invalid, illegal or unenforceable as written, such provision shall be construed in the manner most closely resembling the apparent intent of the parties with respect to such provision so as to be valid, legal and enforceable; provided, however, that if there is no basis for such a construction, such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability and, unless the ineffectiveness of such provision destroys the basis of the bargain for one of the parties to this Agreement, the validity, legality and enforceability of the remaining provisions hereof or thereof shall not in any way be affected or impaired thereby.

28.  Number and Gender.

Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context requires.

29.  Written Disclosure Statement.

The Issuer and the Trustee acknowledge receipt of Part II of the Servicer's Form ADV filed with the Securities and Exchange Commission, as required by Rule 204-3 under the Advisers Act, more than 48 hours prior to the date of execution of this Agreement.

30.  Miscellaneous.

(a)  In the event that any vote is solicited with respect to any Collateral Obligation, the Servicer, on behalf of the Issuer, shall vote or refrain from voting any such security in any manner permitted by the Indenture that the Servicer has determined in its reasonable judgment shall be in the best interests of the Holders of the Securities.  In addition, with respect to any Defaulted Collateral Obligation, the Servicer, on behalf of the Issuer, may instruct the trustee for such Defaulted Collateral Obligation to enforce the Issuer's rights under the Underlying Instruments governing such Defaulted Collateral Obligation and any applicable law, rule or regulation in any manner permitted under the Indenture that the Servicer has determined in its reasonable judgment shall be in the best interests of the Holders of the Securities.  In the event any Offer is made with respect to any Collateral Obligation, the Servicer, on behalf of the Issuer, may take such action as is permitted by the Indenture and that the Servicer has determined in its reasonable judgment shall be in the best interests of the Holders of the Securities.

(b)  In connection with taking or omitting any action under the Indenture or this Agreement, the Servicer may consult with counsel and may rely in good faith on the advice of such counsel or any opinion of counsel.

Any corporation, partnership or limited liability company into which the Servicer may be merged or converted or with which it may be consolidated, or any corporation, partnership or limited liability company resulting from any merger, conversion or consolidation to which the Servicer shall be a party, or any corporation, partnership or limited liability company succeeding to all or substantially all of the servicing and collateral management business of the Servicer, shall be the successor to the Servicer without any further action by the Servicer, the Co-Issuers, the Trustee, the Noteholders or any other person or entity.

US_WEST:29738243.5

-22-

008158

31.    Limitation of Liabilities.

The Issuer's obligations hereunder are solely the corporate obligations of the Issuer and the Servicer shall not have any recourse to any of the directors, officers, shareholders, members or incorporators of the Issuer with respect to any claims, losses, damages, liabilities, indemnities or other obligations in connection with any transactions contemplated hereby, except for any claims, losses, damages, liabilities, indemnities or other obligations caused by the gross negligence, bad faith or willful misconduct of such directors, officers, shareholders, members or incorporators of the Issuer. The obligations of the Issuer hereunder shall be limited to the net proceeds of the Collateral, if any, and following realization of the Collateral and its application in accordance with the Indenture, any outstanding obligations of the Issuer hereunder shall be extinguished and shall not thereafter revive. The provisions of this section shall survive termination of this Agreement.

32.    Consent to Posting of Documents on Repository.

The Servicer hereby consents to (i) the posting of the final Offering Memorandum, the Indenture and any Hedge Agreements (collectively, the "Documents") and the periodic reports to be delivered pursuant to the Documents and any amendments or other modifications thereto on the Repository (as such term is defined in the Indenture) for use in the manner provided in the Repository; and (ii) the display of its name on the Repository in connection therewith.

008159

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.


HIGHLAND CAPITAL MANAGEMENT, L.P.
in its capacity as Servicer


BY:  STRAND ADVISORS, INC., as General Partner


By: _____
Todd Travers, Assisant Secretary
    Name:
    Title:
Strand Advisors, Inc., General Partner of
Highland Capital Management, L.P.

RED RIVER CLO Ltd., as Issuer


By: _____
    Name:
    Title:

Servicing Agreement

008160

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

HIGHLAND CAPITAL MANAGEMENT, L.P.
in its capacity as Servicer

BY: STRAND ADVISORS, INC., as General Partner

By: _____
  Name:
  Title:

RED RIVER CLO LTD., as Issuer

By: _____
  Name: **SCOTT DAKERS**
  Title: P.RECTOR

008161

# EXHIBIT SS

008162

**EXECUTION COPY**

**RED RIVER CLO LTD.**

Issuer

**RED RIVER CLO CORP.**

Co-Issuer

AND

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

Servicer

**AMENDMENT NO. 1**

**TO**

**SERVICING AGREEMENT**

Dated as of October 2, 2007

———————————————————————

**COLLATERALIZED DEBT OBLIGATIONS**

———————————————————————

**THIS AMENDMENT NO. 1 TO SERVICING AGREEMENT** (the "Amendment"), dated as of October 2, 2007, among Red River CLO Ltd. (the "Issuer"), Red River CLO Corp. (the "Co-Issuer") and Highland Capital Management, L.P. (the "Servicer"), hereby amends the Servicing Agreement, dated as August 3, 2006, among the Issuer, the Co-Issuer and the Servicer.

W I T N E S S E T H

WHEREAS, the Issuer, the Co-Issuer and the Servicer entered into the Servicing Agreement;

WHEREAS, the Issuers and the Servicer desire to change certain provisions with respect to the Servicer's ability to waive certain Servicing Fees;

WHEREAS, Section 19 of the Servicing Agreement provides that the Servicing Agreement may be amended by the Issuer, Co-Issuer and the Servicer in accordance with the terms of Section 15.1(h) of the Indenture;

WHEREAS, Section 15.1(h) of the Indenture provides that the Servicing Agreement may be amended by the Issuer, Co-Issuer and the Servicer with the consent of Majority of each Class of Notes or a Majority of the Preference Shares have not objected in writing to such amendment;

WHEREAS, the necessary consents pursuant to the preceding paragraph have been obtained;

WHEREAS, Section 15.1(h) of the Indenture provides that the Ratings Agencies shall confirm that this Amendment to the Indenture will not cause the rating of any Class of Notes to be reduced or withdrawn; and

WHEREAS, the Ratings Agencies have confirmed that this Amendment to the Indenture will not cause the rating of any Class of Notes to be reduced or withdrawn.

NOW, THEREFORE, the parties hereto agree as follows:

SECTION 1.   Defined Terms.

For purposes of this Amendment, all capitalized terms which are used but not otherwise defined herein shall have the respective meanings assigned to such terms in the Indenture.

SECTION 2.   Amendment.

Section 8(a) of the Servicing Agreement is hereby amended and replaced in its entirety with the following:

8.   Compensation.

(a)   The Issuer shall pay to the Servicer, for services rendered and performance of its obligations under this Agreement, the Servicing Fee, which shall be payable in such

amounts and at such times as set forth in the Indenture. The provisions of the Indenture which relate to the amount and payment of the Servicing Fee shall not be amended without the written consent of the Servicer. If on any Payment Date there are insufficient funds to pay the Servicing Fee (and/or any other amounts due and payable to the Servicer) in full, the amount not so paid shall be deferred and shall be payable with accrued interest on such later Payment Date on which funds are available therefor as provided in the Indenture.

The Servicer hereby agrees to waive the Class II Preference Share Portion of the Servicing Fees deposited by the Trustee into the Class II Preference Share Special Payment Account pursuant to the Indenture, which would otherwise be payable to the Servicer as Servicing Fees, on each Payment Date prior to February 3, 2008. With respect to any Payment Date after February 3, 2008, the Servicer may, in its sole discretion, at any time waive a portion (or all) of its Servicing Fees then due and payable, in which event an amount equal to such waived portion will be paid by the Issuer as Class II Preference Share Special Payments pursuant to the Indenture; provided that with respect to the Payment Date in May 2008 such Class II Preference Share Special Payments will, at a minimum, include amounts that would otherwise constitute a portion (representing the Class II Preference Share Percentage) of the Servicing Fees that have accrued from the Payment Date in February 2008 through February 3, 2008. For purposes of any calculation under this Agreement and the Indenture, the Servicer shall be deemed to have received the Servicing Fee in an amount equal to the sum of the Servicing Fee actually paid to the Servicer and the amount distributed to the Holders of the Class II Preference Shares as Class II Preference Share Special Payments.

In addition, notwithstanding anything set out above, the Servicer may, in its sole discretion waive all or any portion of the Subordinate Servicing Fee or Supplemental Servicing Fee, any funds representing the waived Subordinate Servicing Fees or Supplemental Servicing Fees to be retained in the Collection Account for distribution as either Interest Proceeds or Principal Proceeds (as determined by the Servicer) pursuant to the Priority of Payments.

SECTION 3. Effect of Amendment.

Upon execution of this Amendment, the Indenture shall be, and be deemed to be, modified and amended in accordance herewith and the respective rights, limitations, obligations, duties, liabilities and immunities of the Issuer, Co-Issuer and the Servicer shall hereafter be determined, exercised and enforced subject in all respects to such modifications and amendments, and all the terms and conditions of this Amendment shall be deemed to be part of the terms and conditions of the Indenture for any and all purposes. Except as modified and expressly amended by this Amendment, the Indenture is in all respects ratified and confirmed, and all the terms, provisions and conditions thereof shall be and remain in full force and effect.

SECTION 4. Binding Effect.

The provisions of this Amendment shall be binding upon and inure to the benefit of the Issuer, the Co-Issuer and the Servicer and each of their respective successors and assigns.

2

008165

SECTION 5.   GOVERNING LAW.

THIS AMENDMENT TO THE INDENTURE SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED THEREIN WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

SECTION 6.   Severability of Provisions.

If any one or more of the provisions or terms of this Amendment shall be for any reason whatsoever held invalid, then such provisions or terms shall be deemed severable from the remaining provisions or terms of this Amendment and shall in no way affect the validity or enforceability of the other provisions or terms of this Amendment.

SECTION 7.   Section Headings.

The section headings herein are for convenience of reference only, and shall not limit or otherwise affect the meaning hereof.

SECTION 8.   Counterparts.

This Amendment may be executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

[Signature pages follow]

008166

IN WITNESS WHEREOF, the Issuer, Co-Issuer and the Servicer have caused their names to be signed hereto by their respective officers thereunto duly authorized, all as of the day and year first above written.

RED RIVER CLO LTD.,
as Issuer

By:_____
    Name:  **VIJAYABALAN MURUGESU**
    Title:   **DIRECTOR**

RED RIVER CLO CORP.,
as Co-Issuer

By:_____
    Name:
    Title:

HIGHLAND CAPITAL MANAGEMENT,
L.P., as Servicer

By:_____
    Name:
    Title:

008167

IN WITNESS WHEREOF, the Issuer, Co-Issuer and the Servicer have caused their names to be signed hereto by their respective officers thereunto duly authorized, all as of the day and year first above written.

RED RIVER CLO LTD.,
as Issuer

By:_____
    Name:
    Title:

RED RIVER CLO CORP.,
as Co-Issuer

By:_____
    Name:  Donald J. Puglisi
    Title:  President

HIGHLAND CAPITAL MANAGEMENT,
L.P., as Servicer

By:_____
    Name:
    Title:

008168

IN WITNESS WHEREOF, the Issuer, Co-Issuer and the Servicer have caused their names to be signed hereto by their respective officers thereunto duly authorized, all as of the day and year first above written.

RED RIVER CLO LTD.,
as Issuer

By:_____

    Name:
    Title:

RED RIVER CLO CORP.,
as Co-Issuer

By:_____

    Name:
    Title:

HIGHLAND CAPITAL MANAGEMENT, L.P., as Servicer

By:_____

    Name:          Todd Travers
    Title:         Senior Portfolio Manager
                Highland Capital Management, L.P.

008169

**CONSENTED AND AGREED TO BY**:

Name: _Todd Travers_

Title: _CEO & CIO_

E-mail address: _tatravers@hcmlp.com_

Aggregate Outstanding Amount/Face Amount of Class II
Preference Shares Held: _$5,000,000_

CUSIP/ISIN: _756873204_

008170

# EXHIBIT TT

008171

## IMPORTANT NOTICE

Attached is an electronic copy of the final Confidential Offering Circular (the "Offering Circular"), dated May 8, 2006, relating to the offering by Rockwall CDO Ltd. (the "Issuer") and Rockwall CDO (Delaware) Corp. (the "Co-Issuer" and, together with the Issuer, the "Co-Issuers") of U.S. $538,000,000 Class A-1LA Floating Rate Extendable Notes Due August 2021, U.S. $96,000,000 Class A-1LB Floating Rate Extendable Notes Due August 2021, U.S. $76,000,000 Class A-2L Floating Rate Extendable Notes Due August 2021, U.S. $36,500,000 Class A-3L Floating Rate Extendable Notes Due August 2021, U.S. $10,000,000 Class A-4L Floating Rate Extendable Notes Due August 2021, U.S. $21,000,000 Class B-1L Floating Rate Notes Due August 2021 and U.S. $14,000,000 Class X Floating Rate Notes Due August 2013.

No registration statement relating to these securities has been filed with the Securities and Exchange Commission. These securities are being offered pursuant to an exemption from the registration requirements of the United States Securities Act of 1933, as amended. This Offering Circular is confidential and will not constitute an offer to sell or the solicitation of an offer to buy, nor will there be any sale of these securities in any jurisdiction where such offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of any jurisdiction.

No purchase of these securities may be made except pursuant to the final Confidential Offering Circular. The final Confidential Offering Circular may be transmitted electronically, but each investor in the securities should receive a printed version thereof prior to purchase. If you do not receive a printed version of such final Confidential Offering Circular, please contact your Initial Purchaser representative at the address provided herein.

Distribution of this electronic transmission of the Offering Circular to any person other than (a) the person receiving this electronic transmission from either Initial Purchaser on behalf of the Issuer and/or the Co-Issuer and (b) any person retained to advise the person receiving this electronic transmission with respect to the offering contemplated by the Offering Circular (each, an "Authorized Recipient") is unauthorized. Any photocopying, disclosure or alteration of the contents of this Offering Circular, and any forwarding of a copy of this Offering Circular or any portion thereof by electronic mail or any other means to any person other than an Authorized Recipient, is prohibited. By accepting delivery of this Offering Circular, each recipient hereof agrees to the foregoing.

# ROCKWALL CDO LTD.
# ROCKWALL CDO (DELAWARE) CORP.

### U.S.$538,000,000 Class A-1LA Floating Rate Extendable Notes Due August 2021
### U.S.$96,000,000 Class A-1LB Floating Rate Extendable Notes Due August 2021
### U.S.$76,000,000 Class A-2L Floating Rate Extendable Notes Due August 2021
### U.S.$36,500,000 Class A-3L Floating Rate Extendable Notes Due August 2021
### U.S.$10,000,000 Class A-4L Floating Rate Extendable Notes Due August 2021
### U.S.$21,000,000 Class B-1L Floating Rate Extendable Notes Due August 2021
### U.S.$14,000,000 Class X Floating Rate Notes Due August 2013

The Notes, consisting of the Class A-1LA Floating Rate Extendable Notes Due August 2021 (the "**Class A-1LA Notes**") in the aggregate principal amount of U.S.$538,000,000, the Class A-1LB Floating Rate Extendable Notes Due August 2021 (the "**Class A-1LB Notes**" and, with the Class A-1LA Notes, the "**Class A-1L Notes**") in the aggregate principal amount of U.S.$96,000,000, the Class A-2L Floating Rate Extendable Notes Due August 2021 (the "**Class A-2L Notes**" and, with the Class A-1L Notes, the "**Senior Class A Notes**") in the aggregate principal amount of U.S.$76,000,000, the Class A-3L Floating Rate Extendable Notes Due August 2021 (the "**Class A-3L Notes**") in the aggregate principal amount of U.S. $36,500,000, the Class A-4L Floating Rate Extendable Notes Due August 2021 (the "**Class A-4L Notes**" and, with the Senior Class A Notes and the Class A-3L Notes, the "**Class A Notes**") in the aggregate principal amount of U.S.$10,000,000, the Class B-1L Floating Rate Extendable Notes Due August 2021 (the "**Class B-1L Notes**") in the aggregate principal amount of U.S.$21,000,000 and the Class X Floating Rate Notes Due August 2013 (the "**Class X Notes**" and, with the Class B-1L Notes and the Class A Notes, the "**Notes**") in the aggregate principal amount of U.S.$14,000,000 are being issued by Rockwall CDO Ltd. (the "**Issuer**"),

It is a condition of issuance that the Class A-1LA Notes, the Class A-1LB Notes and the Class X Notes each be rated "AAA" by Standard & Poor's Ratings Services ("**S&P**") and "Aaa" by Moody's Investors Service, Inc. ("**Moody's**"), the Class A-2L Notes are rated at least "AA" by S&P` and at least "Aa2" by Moody's, the Class A-3L Notes be rated at least "A" by S&P and at least "A2" by Moody's, the Class A-4L Notes be rated at least "A-" by S&P and at least "A3" by Moody's and the Class B-1L Notes be rated at least "BBB" by S&P and at least "Baa2" by Moody's.  See "Ratings".  Each of the ratings of the Notes described herein assume that no Maturity Extension occurs after the Closing Date.

Application may be made to the Irish Stock Exchange to admit the Notes to the Official List of the Irish Stock Exchange.  There can be no assurance that such admission will be granted or maintained.

**For certain factors to be considered in connection with an investment in the Notes, see "Special Considerations" and "Notices to Purchasers."**

No.: _____                Recipient: _____

**This Confidential Offering Circular is intended for the exclusive use of the recipient whose name appears above and such recipient's advisors, and may not be reproduced or used for any other purpose or furnished to any other party.**

_____

The Notes are being offered in registered form to "qualified institutional buyers" within the meaning of Rule 144A ("**Rule 144A**") under the U.S. Securities Act of 1933, as amended (the "**Securities Act**"), and to certain persons in transactions outside the United States in reliance on Regulation S under the Securities Act, all of whom (other than non-U.S. Persons purchasing in offshore transactions under Regulation S) are also "qualified purchasers" within the meaning of Section 3(c)(7) of the U.S. Investment Company Act of 1940, as amended (the "**Investment Company Act**").  Settlement of the Notes will be made in immediately available funds.

_____

THE NOTES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT NOR HAS EITHER OF THE CO-ISSUERS BEEN REGISTERED UNDER THE INVESTMENT COMPANY ACT.  THE NOTES MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO U.S. PERSONS (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT), EXCEPT TO "QUALIFIED INSTITUTIONAL BUYERS" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT).  THE NOTES MAY ALSO BE OFFERED OR SOLD TO CERTAIN PERSONS IN TRANSACTIONS OUTSIDE THE UNITED STATES IN RELIANCE ON REGULATION S. THE NOTES MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO U.S. PERSONS EXCEPT TO "QUALIFIED PURCHASERS" (WITHIN THE MEANING OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT) IN A TRANSACTION THAT DOES NOT CAUSE EITHER OF THE CO-ISSUERS TO BE REQUIRED TO REGISTER UNDER THE INVESTMENT COMPANY ACT.  FOR CERTAIN RESTRICTIONS ON RESALE SEE "DELIVERY OF THE NOTES; TRANSFER RESTRICTIONS; SETTLEMENT".

_____

The Notes are offered by the Co-Issuers through Bear, Stearns & Co. Inc. ("**Bear Stearns**" or the "**Initial Purchaser**") to prospective purchasers from time to time in negotiated transactions at varying prices to each in each case at the time of sale.   The Notes are offered when, as and if issued by the Co-Issuers, subject to prior sale or withdrawal, cancellation or modification of the offer without notice and subject to approval of certain legal matters by counsel and certain other conditions.  It is expected that delivery of the Notes will be made on or about [May 10], 2006 (the "**Closing Date**"), against payment in immediately available funds.  See "Plan of Distribution."

The Notes of each Class sold to Non-U.S. Persons, if any, will be represented on the Closing Date by temporary global notes (the "**Temporary Regulation S Global Note(s)**"), which will be deposited with a custodian for and registered in the name of a nominee of The Depository Trust Company ("**DTC**") for the accounts of Euroclear Bank S.A./N.V., as operator of the Euroclear System ("**Euroclear**") and Clearstream Banking, société anonyme ("**Clearstream**").  The Notes sold to U.S. Persons, if any, will be issued, sold and delivered in book-entry form only through the facilities of The Depository Trust Company.

*(Continued on next page)*

## Bear, Stearns & Co. Inc.

This Confidential Offering Circular is dated May 8, 2006.

*(continued from previous page)*

a recently formed exempted company incorporated with limited liability under the laws of the Cayman Islands and will be co-issued by Rockwall CDO (Delaware) Corp., a recently formed Delaware corporation (the "**Co-Issuer**" and, together with the Issuer, the "**Co-Issuers**"), on a non-recourse basis as described herein. The Issuer will receive all of the net proceeds of the offering of the Notes, which, together with certain proceeds from the sale of the Preferred Shares (as defined herein) of the Issuer on the Closing Date (defined below) will be used by the Issuer to purchase, or commit to purchase, on and after the Closing Date and before the Effective Date (defined below) a portfolio of commercial loans (the "**Portfolio Loans**") and collateralized loan obligations (the "**CLO Securities**"), pledged to secure the Notes (together with the additional commercial loans and collateralized loan obligations, including synthetic securities, that will be purchased by the Issuer from time to time and pledged to secure the Notes and certain other obligations as described herein, the "**Portfolio Collateral**"). As described herein, the Portfolio Collateral will consist primarily of commercial loans and collateralized loan obligations that are rated below investment grade issued by U.S. and certain non-U.S. issuers and that satisfy the criteria described herein.

The Class A-1LA Notes, the Class A-1LB Notes, the Class A-2L Notes, the Class A-3L Notes, the Class A-4L Notes, the Class B-1L Notes and the Class X Notes will provide for the payment of Periodic Interest (as defined herein) (to the extent of funds available therefor as described herein) for each Periodic Interest Accrual Period (as defined herein) at the rate of 0.30%, 0.50%, 0.65%, 1.40%, 1.70%, 2.25% and 0.36% *per annum*, respectively, above the London interbank offered rate for three-month U.S. dollar deposits (or, for the period from the Closing Date to the first Payment Date, as described herein) ("**LIBOR**") (determined as described herein). Such payments are in each case to be made at the times and subject to the priority of payments described herein.

The Final Maturity Dates of the Notes (other than the Class X Notes) are subject to multiple extensions to the applicable Extended Final Maturity Date if the Issuer provides timely notice and the Extension Conditions are satisfied as described herein.

Principal of the Notes will be payable at the times, in the amounts, and subject to the priority of payment provisions described herein. **The Notes are subject to redemption at the times and under the circumstances described herein, including, without limitation, Initial Deposit Redemption, O/C Redemption (other than with respect to the Class X Notes), Optional Redemption, Special Redemption (other than with respect to the Class X Notes), Tax Event Redemption and Rating Confirmation Failure Redemption as described herein.**

The Notes are non-recourse obligations of the Co-Issuers, payable solely from the Trust Estate as described herein. The Class B-1L Notes are subordinated to the Class A Notes and the Class X Notes, the Class A-4L Notes are subordinated to the Class A-3L Notes, the Senior Class A Notes and the Class X Notes, the Class A-3L Notes are subordinated to the Senior Class A Notes and the Class X Notes, the Class A-2L Notes are subordinated to the Class A-1L Notes and the Class X Notes and the Class A-1LB Notes are subordinated to the Class A-1LA Notes, in each case to the extent described herein. To the extent the assets of the Trust Estate are insufficient to pay in full all amounts due on the Notes, the Co-Issuers shall have no further obligations in respect of the Notes and any sums outstanding and unpaid shall be extinguished.

008174

**NOTICES TO PURCHASERS**

THE NOTES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR THE SECURITIES LAWS OF ANY OTHER JURISDICTION AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED WITHIN THE UNITED STATES, OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, UNITED STATES PERSONS, UNLESS A REGISTRATION STATEMENT WITH RESPECT THERETO IS THEN EFFECTIVE UNDER THE SECURITIES ACT OR AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS IS AVAILABLE. THE CO-ISSUERS HAVE NO OBLIGATION OR CURRENT INTENTION TO EFFECT SUCH REGISTRATION. THE CO-ISSUERS ARE RELYING ON AN EXCLUSION FROM REGISTRATION UNDER THE INVESTMENT COMPANY ACT, PURSUANT TO THE EXEMPTIONS PROVIDED IN RULE 3a-7 AND/OR SECTION 3(c)(7) UNDER THE INVESTMENT COMPANY ACT, AND NO TRANSFER OF A NOTE MAY BE MADE WHICH WOULD CAUSE THE CO-ISSUERS TO BECOME SUBJECT TO THE REGISTRATION REQUIREMENTS OF THE INVESTMENT COMPANY ACT. THE NOTES ARE ALSO SUBJECT TO CERTAIN OTHER RESTRICTIONS ON TRANSFER DESCRIBED HEREIN. PROSPECTIVE PURCHASERS OF THE NOTES SHOULD PROCEED ON THE ASSUMPTION THAT THEY MUST HOLD THEIR INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

THE PURCHASER OF A NOTE, BY ITS ACCEPTANCE THEREOF, REPRESENTS, ACKNOWLEDGES AND AGREES THAT IT WILL NOT RESELL, PLEDGE OR OTHERWISE TRANSFER SUCH NOTE EXCEPT IN COMPLIANCE WITH THE SECURITIES ACT AND OTHER APPLICABLE LAWS AND EXCEPT (A) IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER AS DEFINED IN RULE 144A PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER, WHOM THE SELLER HAS INFORMED, IN EACH CASE, THAT THE RESALE, PLEDGE OR OTHER TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, PROVIDED THAT SUCH PURCHASER DELIVERS ALL DOCUMENTS AND CERTIFICATIONS AS THE CO-ISSUERS OR THE TRUSTEE MAY REASONABLY REQUEST; (B) OUTSIDE THE UNITED STATES IN COMPLIANCE WITH RULE 903 OR 904 OF REGULATION S UNDER THE SECURITIES ACT, PROVIDED THAT SUCH PURCHASER DELIVERS ALL DOCUMENTS AND CERTIFICATIONS AS THE CO-ISSUERS OR THE TRUSTEE MAY REASONABLY REQUEST; OR (C) TO THE CO-ISSUERS OR THEIR AFFILIATES, IN EACH CASE IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAW OF ANY STATE OF THE UNITED STATES AND ANY OTHER JURISDICTION. IN ADDITION, THE PURCHASER OF A NOTE, BY ITS ACCEPTANCE THEREOF, REPRESENTS, ACKNOWLEDGES AND AGREES THAT IT WILL NOT RESELL, PLEDGE OR OTHERWISE TRANSFER SUCH NOTE OTHER THAN TO A NON-U.S. PERSON IN AN "OFFSHORE TRANSACTION" IN COMPLIANCE WITH REGULATION S EXCEPT TO A "QUALIFIED PURCHASER" WITHIN THE MEANING OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT IN A TRANSACTION THAT DOES NOT CAUSE THE CO-ISSUERS TO BE REQUIRED TO REGISTER UNDER THE INVESTMENT COMPANY ACT AND WILL ALSO BE DEEMED TO HAVE MADE THE REPRESENTATIONS SET FORTH UNDER "DELIVERY OF THE NOTES; TRANSFER RESTRICTIONS; SETTLEMENT." FURTHER, THE NOTES MAY NOT BE SOLD OR TRANSFERRED UNLESS SUCH SALE OR TRANSFER WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER ERISA OR SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"). THE CLASS B-1L NOTES MAY NOT BE SOLD OR TRANSFERRED TO ANY PLAN SUBJECT TO TITLE I OF ERISA OR SECTION 4975 OF THE CODE, OR TO ANY PERSON ACTING ON BEHALF OF OR WITH "PLAN ASSETS" OF ANY SUCH PLAN, INCLUDING AN INSURANCE COMPANY GENERAL ACCOUNT, UNLESS THE PURCHASER OR TRANSFEREE IS ELIGIBLE FOR THE EXEMPTIVE RELIEF AVAILABLE UNDER PTCE 96-23, 95-60, 91-38, 90-1 OR 84-14.

THE NOTES ARE NON-RECOURSE OBLIGATIONS OF THE CO-ISSUERS. PRINCIPAL OF AND INTEREST ON THE NOTES WILL BE PAID SOLELY FROM AND TO THE EXTENT OF THE AVAILABLE PROCEEDS FROM THE DISTRIBUTIONS ON THE PORTFOLIO COLLATERAL AND, UNDER CERTAIN CIRCUMSTANCES, AMOUNTS ON DEPOSIT IN THE INITIAL DEPOSIT ACCOUNT, WHICH ARE THE ONLY SOURCE OF PAYMENT OF PRINCIPAL OF, INTEREST ON AND OTHER AMOUNTS PAYABLE IN

RESPECT OF THE NOTES. TO THE EXTENT SUCH SOURCES OF PAYMENT ARE INSUFFICIENT TO PAY IN FULL ALL AMOUNTS DUE ON THE NOTES, THE CO-ISSUERS SHALL HAVE NO FURTHER OBLIGATIONS IN RESPECT OF THE NOTES AND ANY SUMS OUTSTANDING AND UNPAID SHALL BE EXTINGUISHED.

FOR THESE REASONS, AMONG OTHERS, AN INVESTMENT IN THE NOTES IS NOT SUITABLE FOR ALL INVESTORS AND IS APPROPRIATE ONLY FOR AN INVESTOR CAPABLE OF (A) ANALYZING AND ASSESSING THE RISKS ASSOCIATED WITH DEFAULTS, LOSSES AND RECOVERIES ON, APPLICATION OF PROCEEDS OF AND OTHER CHARACTERISTICS OF, DEBT SECURITIES SUCH AS THE PORTFOLIO COLLATERAL, AND (B) BEARING SUCH RISKS AND FINANCIAL CONSEQUENCES THEREOF AS THEY RELATE TO AN INVESTMENT IN THE NOTES.

EACH PURCHASER OF A NOTE BY ITS ACCEPTANCE THEREOF ACKNOWLEDGES THAT IT IS USING ITS INDEPENDENT JUDGMENT IN ASSESSING THE OPPORTUNITIES AND RISKS PRESENTED BY THE NOTES FOR ITS INVESTMENT PORTFOLIO AND IN DETERMINING WHETHER THE ACQUISITION IS SUITABLE AND COMPLIES WITH SUCH PURCHASER'S INVESTMENT OBJECTIVES AND POLICIES.

EXCEPT AS SET FORTH IN THIS CONFIDENTIAL OFFERING CIRCULAR, NO PERSON IS AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION NOT CONTAINED IN THIS CONFIDENTIAL OFFERING CIRCULAR AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MUST NOT BE RELIED UPON. THIS CONFIDENTIAL OFFERING CIRCULAR DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY ANY OF THE NOTES OFFERED HEREBY IN ANY JURISDICTION TO ANY PERSON TO WHICH IT IS UNLAWFUL TO MAKE SUCH OFFER IN SUCH JURISDICTION NOR TO ANY PERSON WHO HAS NOT RECEIVED A COPY OF EACH CURRENT AMENDMENT OR SUPPLEMENT HERETO, IF ANY.

THIS CONFIDENTIAL OFFERING CIRCULAR IS FURNISHED ON A CONFIDENTIAL BASIS SOLELY FOR THE PURPOSE OF EVALUATING THE INVESTMENT OFFERED HEREBY. THE INFORMATION CONTAINED HEREIN MAY NOT BE REPRODUCED OR USED IN WHOLE OR IN PART FOR ANY OTHER PURPOSE.

NOTWITHSTANDING ANY OTHER EXPRESS OR IMPLIED AGREEMENT TO THE CONTRARY, THE ISSUER, THE SERVICER, THE INITIAL PURCHASER, THE TRUSTEE, THE COLLATERAL ADMINISTRATOR AND EACH RECIPIENT HEREOF AGREE THAT EACH OF THEM AND EACH OF THEIR EMPLOYEES, REPRESENTATIVES, AND OTHER AGENTS MAY DISCLOSE, IMMEDIATELY UPON COMMENCEMENT OF DISCUSSIONS, TO ANY AND ALL PERSONS, WITHOUT LIMITATION OF ANY KIND, THE TAX TREATMENT AND TAX STRUCTURE OF THE TRANSACTION AND ALL MATERIALS OF ANY KIND (INCLUDING OPINIONS OR OTHER TAX ANALYSES) THAT ARE PROVIDED TO ANY OF THEM RELATING TO SUCH TAX TREATMENT AND TAX STRUCTURE.

THE NOTES ARE BEING OFFERED ONLY TO A LIMITED NUMBER OF INVESTORS (ALL OF WHICH ARE REQUIRED TO BE QUALIFIED INSTITUTIONAL BUYERS OR INVESTORS WHO ARE OUTSIDE THE UNITED STATES IN COMPLIANCE WITH RULE 903 OR RULE 904 OF REGULATION S OF THE SECURITIES ACT) THAT ARE WILLING AND ABLE TO CONDUCT AN INDEPENDENT INVESTIGATION OF THE CHARACTERISTICS OF THE NOTES AND RISKS OF OWNERSHIP OF THE NOTES. IT IS EXPECTED THAT PROSPECTIVE INVESTORS INTERESTED IN PARTICIPATING IN THIS OFFERING WILL CONDUCT AN INDEPENDENT INVESTIGATION OF THE RISKS POSED BY AN INVESTMENT IN THE NOTES. OFFICERS AND OTHER REPRESENTATIVES OF THE CO-ISSUERS AND THE INITIAL PURCHASER WILL BE AVAILABLE TO ANSWER QUESTIONS CONCERNING THE CO-ISSUERS, THE NOTES AND THE COLLATERAL AND WILL, UPON REQUEST, MAKE AVAILABLE SUCH OTHER INFORMATION AS INVESTORS MAY REASONABLY REQUEST.

008176

THIS CONFIDENTIAL OFFERING CIRCULAR IS NOT INTENDED TO FURNISH LEGAL, REGULATORY, TAX, ACCOUNTING, INVESTMENT OR OTHER ADVICE TO ANY PROSPECTIVE PURCHASER OF THE NOTES. THIS CONFIDENTIAL OFFERING CIRCULAR SHOULD BE REVIEWED BY EACH PROSPECTIVE PURCHASER AND ITS LEGAL, REGULATORY, TAX, ACCOUNTING, INVESTMENT AND OTHER ADVISORS.

INVESTORS WHOSE INVESTMENT AUTHORITY IS SUBJECT TO LEGAL RESTRICTIONS SHOULD CONSULT THEIR OWN LEGAL ADVISORS TO DETERMINE WHETHER AND TO WHAT EXTENT THE NOTES CONSTITUTE LEGAL INVESTMENTS FOR THEM.

NO INVITATION MAY BE MADE TO THE PUBLIC IN THE CAYMAN ISLANDS TO SUBSCRIBE FOR THE NOTES.

THE INITIAL PURCHASER AND THE CO-ISSUERS: (A) HAVE ONLY COMMUNICATED OR CAUSED TO BE COMMUNICATED AND WILL ONLY COMMUNICATE OR CAUSE TO BE COMMUNICATED ANY INVITATION OR INDUCEMENT TO ENGAGE IN INVESTMENT ACTIVITY (WITHIN THE MEANING OF SECTION 21 OF THE FINANCIAL SERVICES AND MARKETS ACT 2000 ("FSMA")) RECEIVED BY THEM IN CONNECTION WITH THE ISSUE OR SALE OF ANY OFFERED SECURITIES IN CIRCUMSTANCES IN WHICH SECTION 21(1) OF THE FSMA DOES NOT APPLY TO THE ISSUER; AND (B) HAVE COMPLIED AND WILL COMPLY WITH ALL APPLICABLE PROVISIONS OF THE FSMA WITH RESPECT TO ANYTHING DONE BY THEM IN RELATION TO THE OFFERED SECURITIES IN, FROM OR OTHERWISE INVOLVING THE UNITED KINGDOM.

NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE REVISED STATUTES WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

THE DISTRIBUTION OF THIS CONFIDENTIAL OFFERING CIRCULAR AND THE OFFER OR SALE OF NOTES MAY BE RESTRICTED BY LAW IN CERTAIN JURISDICTIONS. NONE OF THE ISSUER, THE CO-ISSUER, THE SERVICER OR THE INITIAL PURCHASER REPRESENTS THAT THIS DOCUMENT MAY BE LAWFULLY DISTRIBUTED, OR THAT ANY NOTES MAY BE LAWFULLY OFFERED, IN COMPLIANCE WITH ANY APPLICABLE REGISTRATION OR OTHER REQUIREMENTS IN ANY SUCH JURISDICTION, OR PURSUANT TO AN EXEMPTION AVAILABLE THEREUNDER, OR ASSUME ANY RESPONSIBILITY FOR FACILITATING ANY SUCH DISTRIBUTION OR OFFERING. IN PARTICULAR, NO ACTION HAS BEEN TAKEN BY THE ISSUER, THE CO-ISSUER, THE SERVICER OR THE INITIAL PURCHASER WHICH WOULD PERMIT A PUBLIC OFFERING OF ANY NOTES OR DISTRIBUTION OF THIS DOCUMENT IN ANY JURISDICTION WHERE ACTION FOR THAT PURPOSE IS REQUIRED. ACCORDINGLY, NO NOTES MAY BE OFFERED OR SOLD, DIRECTLY OR INDIRECTLY, AND NEITHER THIS OFFERING CIRCULAR NOR ANY ADVERTISEMENT OR OTHER OFFERING MATERIAL MAY BE DISTRIBUTED OR PUBLISHED IN ANY JURISDICTION, EXCEPT UNDER CIRCUMSTANCES THAT WILL RESULT IN COMPLIANCE WITH ANY APPLICABLE LAWS AND REGULATIONS. PERSONS INTO WHOSE POSSESSION THIS OFFERING CIRCULAR OR ANY NOTES COME MUST INFORM THEMSELVES ABOUT AND OBSERVE ANY SUCH RESTRICTIONS.

THE TRUSTEE AND ITS AFFILIATES HAVE NOT PARTICIPATED IN THE PREPARATION OF THIS CONFIDENTIAL OFFERING CIRCULAR AND DO NOT ASSUME ANY RESPONSIBILITY FOR ITS CONTENTS.

v

008177

## AVAILABLE INFORMATION

To permit compliance with Rule 144A under the Securities Act for resales of Notes, the Co-Issuers will make available to Holders and prospective purchasers who request such information, the information required to be delivered under Rule 144A(d)(4) under the Securities Act if at the time of the request either the Issuer or the Co-Issuer is not a reporting company under Section 13 or Section 15(d) of the Exchange Act or if either the Issuer or the Co-Issuer is not exempt from reporting pursuant to Rule 12g3-2(b) under the Exchange Act.  Copies of all such documents may be obtained free of charge from the office of the Trustee or the Irish Paying Agent.  Neither of the Co-Issuers expects to become such a reporting company or to be so exempt from reporting.

008178

**CONFIDENTIAL OFFERING CIRCULAR SUMMARY**

The following summary is qualified in its entirety by reference to the more detailed information appearing elsewhere in this Confidential Offering Circular and the documents referred to herein. A glossary (the "**Glossary**") of certain defined terms used herein appears as Annex A to this Confidential Offering Circular.

| | |
|---|---|
| The Issuer | Rockwall CDO Ltd., a recently formed limited liability company incorporated under the laws of the Cayman Islands (the "**Issuer**"). The activities of the Issuer will be limited to (i) the acquisition and disposition of Portfolio Collateral and other assets permitted by the Indenture, (ii) the issuance of the Notes, which will be secured by the Portfolio Collateral and certain other assets pledged by the Issuer under the Indenture, (iii) the issuance of the Preferred Shares, and (iv) other activities incidental to the foregoing, including the ownership of 100% of the stock of the Co-Issuer. |
| The Co-Issuer | Rockwall CDO (Delaware) Corp., a recently formed Delaware corporation (the "**Co-Issuer**" and, together with the Issuer, the "**Co-Issuers**"). The Co-Issuer will have no substantial assets. |
| Securities Offered | U.S.$538,000,000 aggregate principal amount of Class A-1LA Floating Rate Extendable Notes Due August 1, 2021 (the "**Class A-1LA Notes**"), U.S. $96,000,000 aggregate principal amount of Class A-1LB Floating Rate Extendable Notes Due August 1, 2021 (the "**Class A-1LB Notes**" and, together with the Class A-1LA Notes, the "**Class A-1L Notes**") U.S.$76,000,000 aggregate principal amount of Class A-2L Floating Rate Extendable Notes Due August 1, 2021 (the "**Class A-2L Notes**" and, with the Class A-1L Notes, the "**Senior Class A Notes**"), U.S.$36,500,000 aggregate principal amount of Class A-3L Floating Rate Notes Extendable Due August 1, 2021 (the "**Class A-3L Notes**"), U.S. $10,000,000 aggregate principal amount of Class A-4L Floating Rate Extendable Notes Due August 1, 2021 (the "**Class A-4L Notes**" and, with the Senior Class A Notes and the Class A-3L Notes, the "**Class A Notes**"), U.S.$21,000,000 aggregate principal amount of Class B-1L Floating Rate Extendable Notes Due August 1, 2021 (the "**Class B-1L Notes**") and U.S.$14,000,000 aggregate principal amount of Class X Floating Rate Notes Due August 1, 2013 (the "**Class X Notes**" and, together with the Class B-1L Notes and the Class A Notes, the "**Notes**"). |

The Notes will be issued on the Closing Date pursuant to an indenture (the "**Indenture**"), to be dated as of May 10, 2006, among the Co-Issuers and JPMorgan Chase Bank, National Association, as trustee (the "**Trustee**") and as securities intermediary. **The Notes will be non-recourse obligations of the Co-Issuers and all amounts payable in respect of the Notes will be paid solely from and to the extent of the available proceeds from the Trust Estate. To the extent the assets of the Trust Estate are insufficient to pay all amounts due on the Notes, the Co-Issuers shall have no further obligations in respect of the Notes and any sums outstanding and unpaid shall be extinguished.**

On the Closing Date, the Issuer will also issue its Class I Preferred Shares (the "**Class I Preferred Shares**") and its Class II Preferred Shares (the "**Class II Preferred Shares**" and, together with the Class I Preferred Shares, the "**Preferred Shares**"). The Preferred Shares are not offered hereby. On the Closing Date, Rockwall Investors Corp. ("**Investor Corp.**") is expected to purchase 100% of the Class I Preferred Shares of the Issuer and will issue an equivalent number of its preferred shares to third party investors and

1

Highland Capital Management, L.P.

| | |
|---|---|
| <u>Final Maturity Date</u> | The August 1, 2021 Payment Date with respect to the Notes (or, in the case of the Class X Notes, the August 1, 2013 Payment Date) or such earlier date as the Aggregate Principal Amount of each Class of Notes is paid in full; *provided that*, the Final Maturity Dates of the Notes (other than the Class X Notes) are extendable upon a Maturity Extension (if any) as described herein, in which case the Final Maturity Date of such Notes will be extended to the applicable Extended Final Maturity Date.  See "Description of the Notes— Extension of the Revolving Period and the Final Maturity Date". |
| <u>Use of Proceeds</u> | The proceeds from the sale of the Notes (the date of such sale being referred to herein as the "**Closing Date**"), together with certain proceeds from the sale of the Preferred Shares will be used by the Issuer to (i) to fund the purchase (or the entering into of binding commitments to purchase) of a diversified pool of at least U.S.$765,000,000 (the "**Initial Portfolio Collateral Amount**") in aggregate principal amount of commercial loans and collateralized loan obligations which will be pledged on the Closing Date as security for the Notes (the "**Initial Portfolio Collateral**" and, together with all other commercial loans and collateralized loan obligations, including synthetic securities, purchased by the Issuer from time to time and pledged to secure the Notes as described herein, the "**Portfolio Collateral**"), (ii) to fund the deposit (the "**Deposit**") in an account with the Trustee (the "**Initial Deposit Account**") on the Closing Date of cash in an amount, which, together with the Initial Portfolio Collateral Amount, is expected as of such date to enable the Issuer to purchase, or commit to purchase, on or before September 10, 2006 (the "**Effective Date**") an Aggregate Principal Amount of Original Portfolio Collateral equal to at least U.S.$850,000,000 (the "**Required Portfolio Collateral Amount**"), which amount will be held in Eligible Investments pending the purchase of additional Original Portfolio Collateral on or before the Effective Date, subject to certain restrictions set forth in the Indenture as described below, (iii) to fund the deposit in an account with the Trustee (the "**Expense Reimbursement Account**") on the Closing Date of U.S.$50,000, which  amount will be available for payment from time to time of future expenses of the Issuer pending the receipt of collections in respect of the Portfolio Collateral as described herein, (iv) to fund an account with the Trustee (the "**Closing Expense Account**") on the Closing Date, which will be used to pay fees and other expenses related to the transaction, and (v) an amount equal to U.S.$1,600,000 to fund a portion of amounts payable by the Issuer on any Payment Date (the "**Reserve Amount**") in accordance with the Priority of Payments.  Portfolio Collateral purchased or committed to be purchased on or before the Effective Date is referred to herein as "**Original Portfolio Collateral**."  Portfolio Collateral purchased by the Issuer with Collections is referred to herein as "**Additional Portfolio Collateral**," and Portfolio Collateral purchased by the Issuer with Collateral Disposition Proceeds from the disposition of Portfolio Collateral after the Closing Date is referred to herein as "**Substitute Portfolio Collateral**." |
| <u>Form, Denominations and Record Dates</u> | The Notes of each Class offered and sold outside the United States pursuant to Regulation S under the Securities Act of 1933, as amended (the "**Securities Act**"), initially will be evidenced by a temporary global note which will be exchangeable for a permanent global note with respect to such Class as described herein.  The Notes sold to Qualified Institutional Buyers (as defined herein) pursuant to Rule 144A under the Securities Act will be issued in book-entry form only through the facilities of The Depository Trust |

008180

Company.

Subject to the foregoing, the Notes will be issued in minimum denominations of U.S.$200,000 and integral multiples of U.S.$1 in excess thereof. No Notes will be issued in bearer form. The Notes are subject to certain restrictions on transfer. The record date (the "**Record Date**") for each Payment Date (including the Final Maturity Date) (as each such term is defined below) is the Business Day immediately preceding such Payment Date; *provided, however,* if Definitive Notes are issued, the Record Date for such Definitive Notes shall be the fifteenth calendar day preceding such Payment Date.

<u>Class A-1L Notes</u>

*General.* The Co-Issuers expect to issue approximately U.S.$538,000,000 in aggregate principal amount of Class A-1LA Notes and U.S. $96,000,000 in aggregate principal amount of Class A-1LB Notes, each to be secured by the Portfolio Collateral pursuant to the Indenture.

*Interest.* The Class A-1L Notes will provide for the payment of periodic interest ("**Periodic Interest**" with respect to the Class A-1L Notes) (to the extent of funds available therefor as described herein) for each Periodic Interest Accrual Period (as defined herein) at the rate of 0.30% with respect to the Class A-1LA Notes and 0.50% with respect to the Class A-1LB Notes, *per annum* above the three-month London interbank offered rate for three-month U.S. dollar deposits (or, for the period from the Closing Date to the first Payment Date, as described herein) ("**LIBOR**") (determined as described herein) (the "**Applicable Periodic Rate**" with respect to the Class A-1LA Notes and Class A-1LB Notes, respectively) on the 1st day of November, February, May and August of each year or, if any such day is not a Business Day, then on the next succeeding Business Day (each such date, a "**Payment Date**"), commencing on November 1, 2006. Interest will be calculated on the basis of a year of 360 days and the actual number of days elapsed. Payments of interest to the Class A-1L Notes and the Class X Payment will be payable *pari passu* among the Class A-1L Notes and the Class X Notes as described herein.

*Principal.* No principal will be payable in respect of the Class A-1L Notes (and principal collections on the Portfolio Collateral will be applied as described herein) during the Revolving Period, except in the event of an Initial Deposit Redemption, an Optional Redemption, a Special Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class A-1L Notes as described herein. On each Payment Date with respect to the Amortization Period, the principal of the Class A-1L Notes will be payable (to the extent of funds available therefor and in the order of priority described herein) first to the Class A-1LA Notes and then to the Class A-1LB Notes until the Aggregate Principal Amount of the Class A-1L Notes has been paid in full. The Class A-1LB Notes are subordinated in right of payment to the Class A-1LA Notes to the extent described herein. In addition, all payments of principal on the Class A-1LA Notes that are made in connection with an Initial Deposit Redemption, a Rating Confirmation Failure, a Tax Event Redemption or an Optional Redemption will be paid on a *pro rata* basis with the Class X Notes as described herein. All outstanding principal of the Class A-1L Notes, together with the other amounts described herein, will be due and payable on the Final Maturity Date.

<u>Class A-2L Notes</u>

*General.* The Co-Issuers expect to issue approximately U.S.$76,000,000 in aggregate principal amount of Class A-2L Notes to be secured by the

008181

Portfolio Collateral pursuant to the Indenture.

*Interest*. **No interest will be payable in respect of the Class A-2L Notes on any Payment Date unless the Holders of the Class A-1L Notes have been paid the Cumulative Interest Amount due to them on such Payment Date, the Holders of the Class X Notes have been paid the Cumulative Class X Payment due to them on such Payment Date and, in the case of the Final Maturity Date, until the Aggregate Principal Amount of the Class A-1L Notes and the Class X Notes have been paid in full.**

The Class A-2L Notes will provide for the payment of periodic interest ("**Periodic Interest**" with respect to the Class A-2L Notes) (to the extent of funds available therefor as described herein) for each Periodic Interest Accrual Period at the rate of 0.65% *per annum* above LIBOR (the "**Applicable Periodic Rate**" with respect to the Class A-2L Notes) on each Payment Date, commencing on the November 1, 2006 Payment Date. Interest will be calculated on the basis of a year of 360 days and the actual number of days elapsed.

*Principal*. No principal will be payable in respect of the Class A-2L Notes (and principal collections on the Portfolio Collateral will be applied as described herein) during the Revolving Period, except in the event of a Special Redemption, an Optional Redemption, a Tax Event Redemption or a Mandatory Redemption (in whole or in part) of the Class A-2L Notes. In connection with a Special Redemption, a Tax Event Redemption, a Total Optional Redemption or a Mandatory Redemption, no principal in respect of the Class A-2L Notes will be payable until the Aggregate Principal Amount of the Class A-1L Notes and the Class X Notes (other than with respect to a Special Redemption or an O/C Redemption) have been paid in full. On each Payment Date with respect to the Amortization Period after the Class A-1L Notes and the Class X Notes have been paid in full, principal of the Class A-2L Notes will be payable (to the extent of funds available therefor and in the order of priority described herein) until the Aggregate Principal Amount of the Class A-2L Notes has been paid in full. All outstanding principal of the Class A-2L Notes, together with the other amounts described herein, will be due and payable on the Final Maturity Date. The Class A-2L Notes are subordinated in right of payment to the Class A-1L Notes and the Class X Notes to the extent described herein.

Class A-3L Notes

*General*. The Co-Issuers expect to issue approximately U.S.$36,500,000 in aggregate principal amount of Class A-3L Notes to be secured by the Portfolio Collateral pursuant to the Indenture.

*Interest*. **No interest will be payable on the Class A-3L Notes on any Payment Date unless the Holders of the Class A-1L Notes and the Class A-2L Notes have been paid the Cumulative Interest Amount due to them on such Payment Date, the Holders of the Class X Notes have been paid the Cumulative Class X Payment due to them on such Payment Date, and, in the case of the Final Maturity Date, until the Aggregate Principal Amount of the Senior Class A Notes and the Class X Notes have been paid in full.**

The Class A-3L Notes will provide for the payment of periodic interest ("**Periodic Interest**" with respect to the Class A-3L Notes) (to the extent of funds available therefor as described herein) for each Periodic Interest

008182

|  |  |
|---|---|
|  | Accrual Period at the rate of 1.40% *per annum* above LIBOR (the "**Applicable Periodic Rate**" with respect to the Class A-3L Notes) on each Payment Date commencing on the November 1, 2006 Payment Date. The failure to pay in full Periodic Interest on the Class A-3L Notes as a result of insufficient funds being available therefor will not constitute an Event of Default so long as any Senior Class A Notes or Class X Notes are Outstanding. Any shortfall in the payment of Periodic Interest to the Class A-3L Notes on any Payment Date will be payable, together with interest thereon at the Applicable Periodic Rate, on one or more subsequent Payment Dates (to the extent funds are available therefor and subject to the priority of distribution provisions described herein). Interest will be calculated on the basis of a year of 360 days and the actual number of days elapsed. |
|  | *Principal*. No principal will be payable in respect of the Class A-3L Notes (and principal collections on the Portfolio Collateral will be applied as described herein) during the Revolving Period, except in the event of a Special Redemption, an Optional Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class A-3L Notes. On each Payment Date with respect to the Amortization Period after the Class A-1L Notes, Class A-2L Notes and the Class X Notes have been paid in full, principal of the Class A-3L Notes will be payable (to the extent of funds available therefor and in the order of priority described herein) until the Payment Date on which the Aggregate Principal Amount of the Class A-3L Notes has been paid in full. In connection with a Special Redemption, a Tax Event Redemption, a Total Optional Redemption or a Mandatory Redemption, no principal in respect of the Class A-3L Notes will be payable until the Aggregate Principal Amount of the Class A-1L Notes, the Class A-2L Notes and (other than with respect to an O/C Redemption or a Special Redemption) the Class X Notes have been paid in full. All outstanding principal of the Class A-3L Notes, together with the other amounts described herein, will be due and payable on the Final Maturity Date. The Class A-3L Notes are subordinated in right of payment to the Senior Class A Notes and the Class X Notes to the extent described herein. |
| Class A-4L Notes | *General*. The Co-Issuers expect to issue approximately U.S.$10,000,000 in aggregate principal amount of Class A-4L Notes to be secured by the Portfolio Collateral pursuant to the Indenture. |
|  | *Interest*. **No interest will be payable on the Class A-4L Notes on any Payment Date unless the Holders of the Class A-1L Notes and the Class A-2L Notes have been paid the Cumulative Interest Amount due to them on such Payment Date, the Holders of the Class A-3L Notes have been paid the Periodic Interest Amount due to them on such Payment Date, the Holders of the Class X Notes have been paid the Cumulative Class X Payment due to them on such Payment Date, and, in the case of the Final Maturity Date, until the Aggregate Principal Amount of the Senior Class A Notes, the Class A-3L Notes and the Class X Notes have been paid in full.** |
|  | The Class A-4L Notes will provide for the payment of periodic interest ("**Periodic Interest**" with respect to the Class A-4L Notes) (to the extent of funds available therefor as described herein) for each Periodic Interest Accrual Period at the rate of 1.70% *per annum* above LIBOR (the "**Applicable Periodic Rate**" with respect to the Class A-4L Notes) on each Payment Date commencing on the November 1, 2006 Payment Date. The failure to pay in full Periodic Interest on the Class A-4L Notes as a result of |

008183

insufficient funds being available therefor will not constitute an Event of Default so long as any Senior Class A Notes, the Class A-3L Notes or Class X Notes are Outstanding. Any shortfall in the payment of Periodic Interest to the Class A-4L Notes on any Payment Date will be payable, together with interest thereon at the Applicable Periodic Rate, on one or more subsequent Payment Dates (to the extent funds are available therefor and subject to the priority of distribution provisions described herein). Interest will be calculated on the basis of a year of 360 days and the actual number of days elapsed.

*Principal*. No principal will be payable in respect of the Class A-4L Notes (and principal collections on the Portfolio Collateral will be applied as described herein) during the Revolving Period, except in the event of a Special Redemption, an Optional Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class A-4L Notes. On each Payment Date with respect to the Amortization Period after the Class A-1L Notes, Class A-2L Notes, Class A-3L Notes and the Class X Notes have been paid in full, principal of the Class A-4L Notes will be payable (to the extent of funds available therefor and in the order of priority described herein) until the Payment Date on which the Aggregate Principal Amount of the Class A-4L Notes has been paid in full. In connection with a Special Redemption, a Tax Event Redemption, a Total Optional Redemption or a Mandatory Redemption, no principal in respect of the Class A-4L Notes will be payable until the Aggregate Principal Amount of the Class A-1L Notes, the Class A-2L Notes, Class A-3L Notes and (other than with respect to an O/C Redemption or a Special Redemption) the Class X Notes have been paid in full. All outstanding principal of the Class A-4L Notes, together with the other amounts described herein, will be due and payable on the Final Maturity Date. The Class A-4L Notes are subordinated in right of payment to the Senior Class A Notes, the Class A-3L Notes and the Class X Notes to the extent described herein.

Class B-1L Notes

*General*. The Co-Issuers expect to issue approximately U.S.$21,000,000 in aggregate principal amount of Class B-1L Notes to be secured by the Portfolio Collateral pursuant to the Indenture.

*Interest*. **No interest will be payable on the Class B-1L Notes on any Payment Date unless the Holders of the Class A-1L Notes and the Class A-2L Notes have been paid the Cumulative Interest Amount due to them on such Payment Date, the Holders of the Class A-3L Notes and the Class A-4L Notes have been paid the Periodic Interest Amount due to them on such Payment Date, the Holders of the Class X Notes have been paid the Cumulative Class X Payment due to them on such Payment Date, the Overcollateralization Tests with respect to the Class A Notes and the Interest Coverage Test have been satisfied, and, in the case of the Final Maturity Date, until the Aggregate Principal Amount of the Class A Notes and the Class X Notes have been paid in full.**

The Class B-1L Notes will provide for the payment of periodic interest ("**Periodic Interest**" with respect to the Class B-1L Notes) (to the extent funds are available therefor and in the order of priority described herein) for each Periodic Interest Accrual Period at the rate of 2.25% *per annum* above LIBOR (the "**Applicable Periodic Rate**" with respect to the Class B-1L Notes) on each Payment Date commencing on the November 1, 2006 Payment Date. The failure to pay in full Periodic Interest on the Class B-1L Notes as a result of insufficient funds being available therefor will not constitute an Event of Default so long as any Class A Notes or Class X Notes

008184

|  | are Outstanding.  Any shortfall in the payment of Periodic Interest to the Class B-1L Notes on any Payment Date will be payable, together with interest thereon at the Applicable Periodic Rate, on one or more subsequent Payment Dates (to the extent that funds are available therefor and subject to the priority of distribution provisions described herein).  Interest will be calculated on the basis of a year of 360 days and the actual number of days elapsed. |
|  | *Principal*. No principal will be payable in respect of the Class B-1L Notes until the Aggregate Principal Amount of the Class A Notes and the Class X Notes have been paid in full, except with respect to the Additional Collateral Deposit Requirement.  Principal payments are not expected to begin until the commencement of the Amortization Period (except in the event of a Special Redemption, an Optional Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class B-1L Notes or in connection with the Additional Collateral Deposit Requirement) and are to continue until the Payment Date on which the Aggregate Principal Amount of the Class B-1L Notes has been paid in full.  In connection with a Special Redemption, a Tax Event Redemption, a Total Optional Redemption or a Mandatory Redemption, no principal in respect of the Class B-1L Notes will be payable until the Aggregate Principal Amount of the Class A Notes and (other than with respect to an O/C Redemption or a Special Redemption) the Class X Notes have been paid in full.    All outstanding principal of the Class B-1L Notes, together with the other amounts described herein, will be due and payable on the Final Maturity Date.  The Class B-1L Notes are subordinated in right of payment to the Class A Notes and the Class X Notes to the extent described herein. |
| <u>Class X Notes</u> | *General.*  The Co-Issuers expect to issue approximately U.S.$14,000,000 in aggregate principal amount of Class X Notes to be secured by the Portfolio Collateral pursuant to the Indenture. |
|  | *Class X Payment*. The Class X Notes will provide for a periodic payment (the **"Class X Interest Payment"**) (to the extent of funds available therefor as described herein) for each Periodic Interest Accrual Period at the rate of 0.36% per annum above LIBOR (the **"Class X Periodic Interest Rate"**) on each Payment Date, commencing on the November 1, 2006 Payment Date through and including the August 1, 2013 Payment Date.  Such amount may be reduced in connection with a redemption of the Class X Notes, as set forth in the Indenture.  Any shortfall in the payment of the Class X Payment to the Class X Notes on any Payment Date will be payable, together with interest thereon at the Class X Periodic Interest Rate, on one or more subsequent Payment Dates (to the extent funds are available therefor and subject to the priority of distribution provisions described herein). Any such interest will be calculated on the basis of a year of 360 days and the actual number of days elapsed.   Payments of interest to the Class A-1L Notes and the Class X Payment will be payable *pari passu* among the Class A-1L Notes and the Class X Notes as described herein. |
|  | Payments of principal on the Class X Notes that are made in connection with an Initial Deposit Redemption, a Tax Event Redemption, an Optional Redemption or a Rating Confirmation Failure Redemption will be paid on a *pro rata* basis with the Class A-1LA Notes as described herein.  The Class X Notes are not subject to an O/C Redemption or a Special Redemption.  The Aggregate Principal Amount of the Class X Notes will be reduced on each Payment Date by the Class X Principal Payment for such Payment Date beginning on November 1, 2007, in accordance with the amortization |

|  | schedule provided in the Indenture. The Class X Principal Payment will be made from available Adjusted Collateral Interest Collections. The Holders of the Class X Notes are entitled to receive the Aggregate Principal Amount of the Class X Notes on the Final Maturity Date, whether such Final Maturity Date occurs in connection with a redemption of the Class X Notes as described herein or otherwise. |
|---|---|
| Application of Funds | On each Payment Date and on the Final Maturity Date, Collateral Interest Collections and Collateral Principal Collections, to the extent of Available Funds in the Collection Account, will be applied by the Trustee in the manner and order of priority set forth herein under "Description of the Notes—Payments on the Notes; Priority of Distributions." |
| Overcollateralization Tests | The "**Overcollateralization Tests**" are applicable until the Notes are retired and all amounts payable in respect thereof are paid, and are satisfied if the Class A Overcollateralization Ratio is at least equal to the Class A Overcollateralization Percentage (the "**Class A Overcollateralization Test**") and the Class B-1L Overcollateralization Ratio is at least equal to the Class B-1L Overcollateralization Percentage (the "**Class B-1L Overcollateralization Test**"). |
| Applicability of Overcollateralization Tests | At any time that any of the Notes are Outstanding, if on any Calculation Date related to a Payment Date any Overcollateralization Test is not satisfied, amounts that are junior in right of payment to such Overcollateralization Test, as described under "Description of the Notes—Payments on the Notes; Priority of Distributions", will be applied to the redemption of the Class A Notes and the Class B-1L Notes (or, in the case of the Class B-1L Notes, first to pay accrued and unpaid interest from prior Payment Dates, then to pay principal) until each such Class is paid in full, in the order and according to the priorities described herein, to the extent necessary to satisfy such Overcollateralization Test, in accordance with the provisions described herein. In addition, generally, satisfaction or, in certain cases, maintenance of the Overcollateralization Tests is a condition to the purchase or sale of Portfolio Collateral during certain specified periods. |
| Interest Coverage Test | The "**Interest Coverage Test**" is applicable on each Payment Date after the second Payment Date and on certain measurement dates after the second Payment Date, and is satisfied if the Interest Coverage Ratio (as described under "Description of the Notes—Interest Coverage Test") is at least 1.5%. |
| Applicability of Interest Coverage Test | At any time after the second Payment Date, if on any Calculation Date related to a Payment Date the Interest Coverage Test is not satisfied, amounts that are junior in right of payment to the Interest Coverage Test as described under "Description of the Notes—Payments on the Notes; Priority of Distributions", will be applied to the redemption of the Class A Notes until each such Class is paid in full, in the order and according to the priorities described herein, to the extent necessary to satisfy the Interest Coverage Test in accordance with the provisions described herein. In addition, satisfaction of the Interest Coverage Test on the prior Payment Date is a condition to certain purchases and sales of Portfolio Collateral during certain specified periods as described herein. |

008186

| | |
|---|---|
| Additional Collateral Deposit Requirement | As described under "Description of the Notes—Additional Collateral Deposit Requirement," even if the Overcollateralization Tests and the Interest Coverage Test are satisfied, on each Payment Date after the second Payment Date, Collateral Interest Collections that would otherwise be used for payments that are junior in right of payment to the Additional Collateral Deposit Requirement as described under "Description of the Notes—Payments on the Notes; Priority of Distributions", will be applied (i) during the Revolving Period, to the payment of principal of the Class B-1L Notes and to the purchase of Additional Portfolio Collateral, as described herein, and (ii) during the Amortization Period, to the payment of principal of the Class B-1L Note and to the payment of principal of each Class of Notes, in each case, in the order and according to the priorities described herein, in an amount equal to the Additional Collateral Deposit Requirement as described herein. |
| Rating Confirmation Failure | The Issuer will request that each Rating Agency confirm after the Effective Date that it has not reduced or withdrawn (and not restored) the ratings assigned by it on the Closing Date to the Notes (a "**Rating Confirmation**"). If the Issuer is unable to obtain a Rating Confirmation by the 35th day after the Effective Date (a "**Rating Confirmation Failure**"), on the next Payment Date and on each subsequent Payment Date during the Revolving Period, amounts that are junior in right of payment to such Rating Confirmation Failure, as described under "Description of the Notes—Payments on the Notes; Priority of Distributions", will be applied to the redemption of the Notes (or, in the case of the Class B-1L Notes, first to pay accrued and unpaid interest from prior Payment Dates, then to pay principal) until each such Class is paid in full, in the order and according to the priorities described herein (a "**Rating Confirmation Failure Redemption**"), to the extent necessary to receive a Rating Confirmation, in accordance with the provisions described herein. |
| O/C Redemption | If on the Calculation Date related to any Payment Date any Overcollateralization Test or, after the second Payment Date, the Interest Coverage Test is not satisfied, amounts that are junior in right of payment to such test as described under "Description of the Notes—Payments on the Notes; Priority of Distributions", will be applied by the Issuer to the redemption of the Class A Notes and the Class B-1L Notes (or, in the case of the Class B-1L Notes, first to pay accrued and unpaid interest from prior Payment Dates, then to pay principal)  until each such Class is paid in full, in each case on a *pro rata* basis among the Noteholders of the applicable Class and in the order and according to the priorities described herein (an "**O/C Redemption**") to the extent necessary to satisfy the Overcollateralization Tests and the Interest Coverage Test, as applicable.  See "Description of the Notes—O/C Redemption." A redemption of the Notes through a Rating Confirmation Failure Redemption or an O/C Redemption is sometimes referred to herein as a "**Mandatory Redemption**."  The Class X Notes are not subject to O/C Redemption, but are subject to Rating Confirmation Failure. |
| Initial Deposit Redemption | To the extent that the full amount of the Deposit is not used to purchase or commit to purchase Original Portfolio Collateral having an Aggregate Principal Amount (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to the Original Portfolio Collateral on or before the Effective Date) at least equal to the Required Portfolio Collateral Amount in accordance with the guidelines described herein on or before the |

008187

Effective Date, an amount (not in excess of the unused amount of the Deposit) equal to the difference between the Required Portfolio Collateral Amount and the par amount of Portfolio Collateral actually acquired (or committed to be acquired) (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to the Original Portfolio Collateral on or before the Effective Date) will be applied by the Issuer on the November 2006 Payment Date (the "**Initial Deposit Redemption Date**") to principal payments of the Class A-1LA Notes and the Class X Notes, on a *pro rata* basis (an "**Initial Deposit Redemption**"), except, if the amount of the Deposit not so used to purchase or commit to purchase Original Portfolio Collateral does not exceed U.S.$2,000,000 in the aggregate, such amount will be transferred to the Collection Account on the Effective Date and applied as Collateral Principal Collections. See "Description of the Notes—Initial Deposit Redemption."

Special Redemption

The Notes (other than the Class X Notes) are redeemable in part at the option of the Issuer, as directed by and at the discretion of the Servicer, on one or more Payment Dates during the Revolving Period, to the extent the Issuer is unable to reinvest more than U.S.$2,000,000 of principal collections in Additional Portfolio Collateral selected by the Servicer and satisfying the criteria described herein for at least ninety days after receipt, in an amount of at least U.S.$2,000,000. See "Description of the Notes—Special Redemption."

Optional Redemption

The Notes are redeemable in whole or in part (an "**Optional Redemption**") at the option of the Issuer at the direction of (i) at least 75% of the Preferred Shares eligible to vote (including any Class II Preferred Shares held by Highland Financial Partners L.P. or an affiliate or subsidiary thereof ("**HFP**") and any other Preferred Shares held by the Servicer, entities affiliated with the Servicer or clients of the Servicer (collectively, the "**Servicer Entities**") up to a maximum amount equal to the amount of Class II Preferred Shares acquired by HFP on the Closing Date ("**Original HFP Share Amount**"), but excluding any other Preferred Shares beneficially owned or controlled by the Servicer Entities which shall be deemed ineligible to vote) in the case of an Optional Redemption in whole (a "**Total Optional Redemption**"), and (ii) at least 10% of the Preferred Shares eligible to vote (any Class II Preferred Shares held by HFP or any other Preferred Shares beneficially owned or controlled by any other Servicer Entities shall be deemed ineligible to vote) in the case of an Optional Redemption in part (a "**Partial Optional Redemption**"), in the case of either (i) or (ii) above on any Payment Date on or after the Payment Date occurring on August 1, 2010 (the "**Optional Redemption Date**," which date shall then be considered the Final Maturity Date in the case of a Total Optional Redemption at a price equal to the Optional Redemption Price. See "Description of the Notes—Optional Redemption."

Tax Event Redemption

The Notes are redeemable, at the option of the Issuer, acting at the direction of at least a Majority of the Preferred Shares or a majority of the Controlling Class (but only if the Aggregate Principal Balance of Portfolio Collateral is less than 100% of the Class A-1L Notes) (a "**Tax Event Redemption**"), in whole but not in part, at a price equal to the Tax Event Redemption Price if as a result of a change in tax law, rule or regulation or the interpretation thereof, the payments to be received on the Portfolio Collateral are reduced as a result of the imposition of withholding tax or the Issuer is otherwise subjected to tax such that the income of the Issuer is reduced in an amount determined by such Holders of the Preferred Shares to be material. See "Description of the

008188

Notes—Tax Event Redemption."

| | |
|---|---|
| Amendment Buy-Out | In the case of any supplemental indenture that requires the consent of one or more Holders of the Notes or Preferred Shares, the Amendment Buy-Out Purchaser shall have the right, but not the obligation, to purchase from all Non-Consenting Holders all Notes and Preferred Shares held by such Holders whose consent was solicited with respect to such supplemental indenture, with certain exceptions as set forth in "Legal Structure—The Indenture; Amendment Buy-Out" (the "**Amendment Buy-Out Option**") for the applicable Amendment Buy-Out Purchase Price. If such option is exercised, the Amendment Buy-Out Purchaser must purchase all Notes and Preferred Shares of Non-Consenting Holders (an "**Amendment Buy-Out**"). By its acceptance of a Note or Preferred Share, each such Holder agrees that if the Amendment Buy-Out Option is exercised, any Non-Consenting Holder will be required to sell its Notes or Preferred Shares to the Amendment Buy-Out Purchaser. See "Legal Structure—The Indenture; Amendment Buy-Out." |
| | All purchases made pursuant to the Amendment Buy-Out Option individually and in the aggregate must comply with the applicable transfer restrictions for the relevant Notes set forth in "Delivery of the Notes; Transfer Restrictions; Settlement" herein and all applicable laws, rules and regulations (including, without limitation, any rules, regulations and procedures of any securities exchange, self-regulatory organization or clearing agency). |
| Security for the Notes | The Notes are non-recourse obligations of the Co-Issuers, with recourse therefor limited solely to any funds and other assets available in the Trust Estate, including the Portfolio Collateral and the proceeds therefrom. All payments on the Notes are subject to the priority of distribution provisions described herein. |
| | The Notes will be secured by the Trust Estate, consisting of substantially all property of the Issuer, including the Portfolio Collateral, the Collection Account, the Initial Deposit Account, the Loan Funding Account, the Expense Reimbursement Account, the Closing Expense Account, the Reserve Account, each Default Swap Collateral Account and the Default Swap Issuer Account (collectively, the "**Trust Estate**"). The security interest granted under the Indenture in each Default Swap Collateral Account is subject to and subordinate to the security interest and rights of the relevant Default Swap Counterparty in and to such Default Swap Collateral Account and the security interest granted under the Indenture in the Default Swap Issuer Account is subject to the rights of the relevant Default Swap Counterparty to the extent described in the related Default Swap. References to the Collection Account, the Initial Deposit Account, the Loan Funding Account, the Expense Reimbursement Account, the Closing Expense Account, the Reserve Account the Default Swap Collateral Account and the Default Swap Issuer Account, when used with respect to the contents of the Trust Estate, shall include all proceeds of such Accounts and all Eligible Investments purchased with funds on deposit in such Accounts. |
| Portfolio Collateral and Deposit | The Portfolio Collateral will consist of United States dollar denominated commercial loans and collateralized loan obligations, including synthetic securities, that are rated primarily below investment grade issued by corporations, partnerships, limited liability companies or trusts. Interests in commercial loans included in the Portfolio Collateral, which may be in the form of participations and assignments, are referred to herein as "**Portfolio Loans**" and the collateralized loan obligations included in the Portfolio |

008189

Collateral are referred to herein as "**CLO Securities**." See "Security for the Notes—Portfolio Collateral—General."

The Issuer will acquire all of the Initial Portfolio Collateral from various sources, including Bear, Stearns & Co. Inc., in each case, at negotiated prices acceptable to the Issuer. Between the Closing Date and the Effective Date, purchases of additional Original Portfolio Collateral from the Deposit together with the Initial Portfolio Collateral will be required to meet the criteria described herein. See "Security for the Notes—Changes in Composition of Portfolio Collateral."

During the Revolving Period, certain collections and disposition proceeds in respect of Portfolio Collateral may be applied to purchase Additional Portfolio Collateral or Substitute Portfolio Collateral, respectively, subject to satisfaction of the collateral criteria described herein and the satisfaction or, in certain cases, maintenance of the Overcollateralization Tests and, after the second Payment Date, the Interest Coverage Test. In addition, after the Revolving Period, certain limited collections and certain disposition proceeds in respect of Portfolio Collateral may be applied to purchase Additional Portfolio Collateral and Substitute Portfolio Collateral subject to satisfaction of the Overcollateralization Tests, the Interest Coverage Test and the collateral criteria contained herein. The Indenture also authorizes the Servicer to direct the Trustee to sell items of Defaulted Portfolio Collateral, Equity Portfolio Collateral, Credit Risk Portfolio Collateral, Credit Improved Portfolio Collateral and other items of Portfolio Collateral, subject to the limitations set forth therein and described herein under "Security for the Notes—Changes in Composition of Portfolio Collateral," "The Servicer" and "The Servicing Agreement." During any Due Period when certain collections are to be used to purchase Additional Portfolio Collateral, the Servicer generally will have the authority to commence the purchase of such Additional Portfolio Collateral if collections have been or are scheduled to be received during such Due Period in an amount at least equal to the sum of the Periodic Reserve Amount.

Notwithstanding anything contained herein to the contrary, no item of Portfolio Collateral may be disposed of, and no item of Portfolio Collateral may be acquired, for the primary purpose of recognizing gains or decreasing losses resulting from market value changes. See "Security for the Notes—Portfolio Collateral—General."

Extension of the Revolving Period
and the Final Maturity Date

The Issuer, if directed by the Servicer, shall be entitled on each Extension Effective Date up to a maximum of four times (so that the Notes can only be extended to 2037) to extend the Revolving Period to the applicable Extended Revolving Period End Date if (i) in the case of an Extension Effective Date occurring after the first Extension Effective Date, the Issuer has previously affected a Maturity Extension for each preceding Extension Effective Date, (ii) the Extension Conditions are satisfied, (iii) the Issuer has given written notice of its election to extend the Revolving Period no later than 60 days and no earlier than 90 days prior to such Extension Effective Date and (iv) no Event of Default has occurred and is continuing. For purposes of the foregoing, "**Extension Effective Date**" means if an Extension has occurred, the sixteenth Payment Date after the then current Extension Effective Date (or, in the case of the first Extension Effective Date, the Payment Date in August 2011) and "**Extended Revolving Period End Date**" means, if an Extension has occurred, the sixteenth Payment Date after the then current Extended Revolving Period End Date (or, in the case of the first Extension,

008190

the Payment Date in August 2015). If the Extension Conditions are satisfied, the Final Maturity Date of the Notes (other than the Class X Notes) shall be extended to the related Extended Final Maturity Date and the Weighted Average Life Test shall be automatically extended to the related Extended Weighted Average Life Date, without any requirement for approval or consent of any Holders of the Notes or the Preferred Shares or amendment or supplement to the Indenture or any other transaction document (the "**Maturity Extension**"). For purposes of the foregoing, "**Extended Final Maturity Date**" means, if a Maturity Extension has occurred, the sixteenth Payment Date after the then current Extended Final Maturity Date (or, in the case of the first Extended Final Maturity Date, the Payment Date in August 2025) and "**Extended Weighted Average Life Date**" means, if a Maturity Extension has occurred, the sixteenth Payment Date after the then current Extended Weighted Average Life Date (or, in the case of the first Extended Weighted Average Life Date, May 1, 2019); *provided* that if the Extension Conditions are not satisfied because the Holders of the Class A-1LA Notes have failed to deliver an Extension Sale Notice or have failed to provide their written consent to the related Maturity Extension, then the Servicer may exceed seven Business Days after the then proposed Extension Effective Date) if the Servicer shall cause the Extension Conditions set forth in clause (v) of such definition to be satisfied as of such later date. As a condition to a Maturity Extension, any Holder of Notes (other than the Class X Notes) will have the right to offer to sell their Notes to one or more Extension Qualifying Purchasers for purchase on the applicable Extension Effective Date. If all Extension Conditions are satisfied and a Maturity Extension is effected, each Holder of such Notes, other than Extension Sale Securities will be entitled to receive the applicable Extension Bonus Payment, in each case to the extent of available funds and as provided in the priority of payments. Holders of Preferred Shares will not be entitled to receive any Extension Bonus Payment. The obligation to make any Extension Bonus Payment shall not be rated by the Rating Agencies. See "Special Considerations—A Maturity Extension," "Maturity and Prepayment Considerations," "Description of the Notes—Extension of the Revolving Period and the Final Maturity Date". The Class X Notes are not subject to Maturity Extension.

Additional Issuance

At any time during the Revolving Period, the Issuer, as applicable, may issue and sell Additional Preferred Shares and use the proceeds therefrom to purchase additional eligible Portfolio Collateral and pay the expenses of such additional issuance (an "**Additional Issuance**"); *provided* that certain conditions precedent specified in the Indenture (as described herein) are satisfied. See "Description of the Notes—Additional Issuance." Any amendment to the Indenture, Issuer's Memorandum of Association and Articles of Association or any other related documents required to provide for or facilitate such Additional Issuance will not require the consent of the Holders of Securities.

Accounts

All Collections (together with any income thereon) will be remitted to the Trustee and deposited into the Collection Account and will be available, to the extent described herein, for application in the manner and for the purposes as described herein. Funds held in the Collection Account that are not used to purchase Additional Portfolio Collateral or Substitute Portfolio Collateral will be applied as promptly as practicable to purchase Eligible Investments. All cash pledged to the Trustee on the Closing Date which is to be subsequently used to purchase Original Portfolio Collateral on or before the Effective Date will be deposited into the Initial Deposit Account. Funds held in the Initial Deposit Account pending application to purchase Original Portfolio Collateral will be held

008191

|  | in Eligible Investments at the direction of the Issuer. A Closing Expense Account will be established by the Trustee for the payment of fees, commissions and expenses associated with the issuance of the Notes. A Reserve Account will be established by the Trustee to fund a portion of the payments to be made in accordance with the Priority of Payments, or to otherwise fund any payments of interest or principal on the Notes at the direction of the Servicer. An Expense Reimbursement Account of U.S.$50,000 will be established by the Trustee for the payment of Issuer administrative expenses which become due and must be paid between Payment Dates. Any amounts withdrawn from the Expense Reimbursement Account will be reimbursed on each Payment Date in accordance with the priority of distribution provisions described herein. The Trustee will establish a Loan Funding Account into which certain amounts with respect to any Delayed Drawdown Loans and Revolving Bank Loans will be deposited. The Trustee will establish the Default Swap Collateral Account to which Default Swap Collateral will be credited for the benefit of the related Default Swap Counterparties. In addition, if the terms of any Default Swap require the related Default Swap Counterparty to secure its obligations with respect to such Default Swap, the Trustee will cause to be established a Default Swap Issuer Account in respect of such Default Swap. Funds held in such Accounts will be held in Eligible Investments. See "Security for the Notes—Accounts." |
|---|---|
| The Servicer | Highland Capital Management, L.P. (the "**Servicer**" or "**Highland**"), will service the Portfolio Collateral and perform certain other reporting functions pursuant to a servicing agreement with the Issuer (the "**Servicing Agreement**"). See "The Servicer" and "The Servicing Agreement." |
|  | It is expected that Highland Financial Partners, L.P. or an affiliate or subsidiary thereof ("**HFP**") will purchase approximately 45,000,000 Class II Preferred Shares of the Issuer on the Closing Date, representing approximately 58% of the total Preferred Shares outstanding (the "**Original HFP Share Amount**"). It is also expected that Highland will purchase approximately 10,000,000 of the preferred shares of Investor Corp. and approximately U.S$2,000,000 Aggregate Principal Amount of the Class B-1L Notes on the Closing Date. In addition, the Servicer Entities may also acquire Notes or Preferred Shares upon the occurrence of an Amendment Buy-Out or a Maturity Extension as described herein. See "Special Considerations—Conflicts of Interest," "Special Considerations—Amendment Buy-Out Risk", "Special Considerations—Amendment Buy-Out Risk," "Legal Structure—The Indenture; Amendment Buy-Out," "Description of the Notes—Extension of the Revolving Period and the Final Maturity Date" and "The Servicing Agreement." |
| The Trustee | JPMorgan Chase Bank, National Association, as Trustee under the Indenture. The Trustee maintains its principal corporate trust offices at 600 Travis Street, 50th Floor, Houston, Texas 77002, at which the Notes may be surrendered for payment or for transfer or exchange. |
| Independent Accountants | A firm of Independent Accountants as selected by the Servicer, or any successor accounting firm selected pursuant to the Indenture, will periodically perform certain procedures with respect to the Portfolio Collateral and the compliance with the Overcollateralization Tests and the Interest Coverage Test as required by the Indenture. |
| The Administrator | Maples Finance Limited (the "**Administrator**") will act as administrator for the Issuer in the Cayman Islands and will perform certain administrative services on behalf of the Issuer. The Administrator maintains its offices at |

008192

|  | P.O. Box 1093 GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands. |
|---|---|
| Option to Acquire Credit Enhancement | The Indenture will provide that Holders of any Class of Notes may elect to acquire bond insurance, a surety bond or similar credit enhancement supporting the payment of principal and/or interest on such Class of Notes, on terms and conditions acceptable to such Holders. Any Class of Notes subject to such enhancement will be designated as Insured Notes of such Class. Premiums for any such enhancement will be payable from amounts otherwise payable to such Class of Insured Notes or in such other manner chosen by such Holder. Any Insured Notes of a Class for substantially all other purposes will be treated as Notes of such Class, except that the issuer of the bond insurance policy, surety bond or other such credit enhancement will generally be deemed to be the Holder of the Notes of such Class enhanced by such entity and will in such capacity be entitled to exercise the rights otherwise exercisable by Holders of such Notes. |
| Certain Federal Income Tax Consequences | *Federal Income Tax Consequences to U.S. Holders of Notes.* The Notes should be treated as debt of the Issuer for United States federal income tax purposes. Under rules applicable to original issue discount, a U.S. Holder of a Class A-3L Note, a Class A-4L Note or a Class B-1L Note may need to include all stated interest as original issue discount in gross income as it accrues according to a constant yield method based on daily compounding, regardless of such Holder's method of accounting. See "Certain Tax Considerations." |
|  | *Federal Income Tax Consequences to Non-U.S. Holders.* A Non-U.S. Holder that has no connection with the United States other than holding its Note will not be subject to United States federal withholding tax or income tax on payments of principal and interest (including original issue discount) in respect of a Note. See "Certain Tax Considerations—Non-U.S. Holders." |
|  | *Federal Income Tax Consequences to the Issuer.* The Issuer generally expects not to be subject to United States federal withholding tax (*provided* certain tax representations are made) or income tax on interest income (including original issue discount) or gain from the Portfolio Collateral or the Eligible Investments. See "Certain Tax Considerations." |
| Certain ERISA Considerations | Fiduciaries and other persons investing "plan assets" of employee benefit or other plans subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), or Section 4975 of the Internal Revenue Code of 1986, as amended (the "**Code**") (each, a "**Plan**"), should consider the fiduciary investment standards and prohibited transaction rules of ERISA and Section 4975 of the Code before authorizing an investment of "plan assets" of any Plan in the Notes. Each person purchasing a Class X Note, a Class A-1LA Note, a Class A-1LB Note, a Class A-2L Note, a Class A-3L Note or a Class A-4L Note will be deemed to have made certain representations regarding the prohibited transaction rules of ERISA and Section 4975 of the Code. The Class B-1L Notes may not be sold or transferred to any Plan, or to any person acting on behalf of or with "plan assets" of any Plan, including an insurance company general account, unless the purchaser or transferee is eligible for the exemptive relief available under PTCE 96-23, 95-60, 91-38, 90-1 or 84-14. See "Certain ERISA Considerations." |
| Legal Investment | Institutions whose investment activities are subject to legal investment laws and regulations or to review by certain regulatory authorities may be subject to conditions on investment in the Notes. See "Certain Legal Investment |

008193

|  | Considerations." |
|---|---|
| Rating of Notes | It is a condition to the issuance of the Notes that the Class X Notes, the Class A-1LA Notes and the Class A-1LB Notes be rated "AAA" by Standard & Poor's Ratings Services ("**S&P**") and "Aaa" by Moody's Investors Service, Inc. ("**Moody's**"), that the Class A-2L Notes be rated at least "AA" by S&P and at least "Aa2" by Moody's, that the Class A-3L Notes be rated at least "A" by S&P and at least "A2" by Moody's, that the Class A-4L Notes be rated at least "A-" by S&P and at least "A3" by Moody's and that the Class B-1L Notes be rated at least "BBB" by S&P and at least "Baa2" by Moody's. Each of S&P and Moody's is sometimes referred to herein as a "**Rating Agency**." Each of the ratings of the Notes described herein assume that no Maturity Extension occurs after the Closing Date. |
|  | **The ratings of the Notes by S&P address solely the likelihood of timely payment of the Periodic Interest Amount on and the ultimate payment of the Aggregate Principal Amount of each Class of Senior Class A Notes, the timely payment of the Class X Payment and the ultimate payment of the Cumulative Interest Amount and the Aggregate Principal Amount of the Class A-3L Notes, the Class A-4L Notes and the Class B-1L Notes. The ratings of the Notes by Moody's address the ultimate cash receipt of all required payments as provided by the governing documents, and are based on the expected loss to the Noteholders of each Class relative to the promise of receiving the present value of such payments. Any obligation to make an Extension Bonus Payment will not be rated by the Rating Agencies. A rating is not a recommendation to purchase, hold or sell securities, in as much as such rating does not comment as to market price or suitability for a particular investor and may be subject to revision or withdrawal at any time by the assigning rating organization.** |
|  | Security ratings are subject to revision or withdrawal at any time by the assigning Rating Agency. In the event that any rating initially assigned to the Notes is subsequently lowered for any reason, no person or entity is obligated to provide any additional support or credit enhancement with respect to the Notes, nor will any other remedies be available to Noteholders. The Issuer has not requested a rating on the Notes by any rating agencies other than S&P and Moody's, although data with respect to the Portfolio Collateral may have been provided to other rating agencies solely for informational purposes. There can be no assurance that, if a rating is assigned to the Notes by any other rating agency, such rating will be as high as that assigned by the applicable Rating Agencies. |
| Listing | Application may be made to the Irish Stock Exchange to admit the Notes to the Official List. There can be no assurance that such admission will be granted or maintained. |

008194

## SPECIAL CONSIDERATIONS

Prospective Holders of Notes should consider, among other things, the following factors in connection with the purchase of the Notes.

1. <u>Non-recourse Obligations</u>. The Notes will be non-recourse obligations of the Co-Issuers, payable solely from the Portfolio Collateral (including the Portfolio Collateral initially pledged to secure the Notes, as well as Additional Portfolio Collateral and Substitute Portfolio Collateral to be purchased from time to time as described herein), the Collection Account, the Initial Deposit Account, the Loan Funding Account, the Default Swap Collateral Account (subject to the rights of the related Default Swap Counterparty), the Default Swap Issuer Account (subject to the rights of the related Default Swap Counterparty) the Expense Reimbursement Account and the Closing Expense Account, including all proceeds of such Accounts and all Eligible Investments purchased with funds on deposit in such Accounts (collectively, the "**Trust Estate**") pledged to secure the Notes. The Issuer, as a special purpose Cayman Islands company, will have no significant assets other than the Trust Estate. The Co-Issuer will have no substantial assets, and no other person or entity except for the Co-Issuers will be obligated to make any payments on the Notes. Consequently, Holders of the Notes must rely solely upon distributions on the Trust Estate for the payment of amounts payable in respect of the Notes. If distributions on the Trust Estate are insufficient to make payments on the Notes, no other assets of the Issuer or any other person or entity will be available for the payment of the deficiency, the Co-Issuers shall have no further obligation to pay such deficiency, and any sums outstanding and unpaid shall be extinguished.

2. <u>Subordination</u>. The Class A-1LB Notes are subordinated to the Class A-1LA Notes with respect to principal only, to the extent described herein, the Class A-2L Notes are subordinated to the Class A-1L Notes and the Class X Notes, the Class A-3L Notes are subordinated to the Senior Class A Notes and the Class X Notes, the Class A-4L Notes are subordinated to the Senior Class A-Notes, the Class A-3L Notes and the Class X Notes and the Class B-1L Notes are subordinated to the Class A Notes and the Class X Notes, and, in the case of each Class of Notes, to the payment of certain fees and expenses as described herein. Payments of principal and interest on the Notes are subject to the priority of distribution provisions described herein. The failure to pay interest on the Class A-3L Notes will not constitute an Event of Default so long as any Senior Class A Notes or Class X Notes remain Outstanding, the failure to pay interest on the Class A-4L Notes will not constitute an Event of Default so long as any Senior Class A Notes, as Class A-3L Notes or Class X Notes remain Outstanding and the failure to pay interest on the Class B-1L Notes will not constitute an Event of Default so long as any Class A Notes or Class X Notes remain Outstanding. In addition, in the case of a Default or an Event of Default, so long as any Senior Class A Notes or Class X Notes remain Outstanding, the Holders of such Senior Class A Notes or Class X Notes will generally be entitled to determine the remedies to be exercised under the Indenture. Remedies pursued by the Holders of the Class A-1LA Notes and the Class X Notes could be adverse to the interests of the Class A-1LB Notes, the Class A-2L Notes, the Class A-3L Notes, the Class A-4L Notes and the Class B-1L Notes. Once an Event of Default has occurred and the Notes have been accelerated, Holders of the Class A-2L Notes are not entitled to be paid the Cumulative Interest Amount with respect thereto and the Aggregate Principal Amount thereof unless the Class A-1L Notes and the Class X Notes have been paid such amounts in full in cash, Holders of the Class A-3L Notes are not entitled to be paid the Cumulative Interest Amount with respect thereto and the Aggregate Principal Amount thereof unless the Senior Class A Notes and the Class X Notes have been paid such amounts in full in cash, Holders of the Class A-4L Notes are not entitled to be paid the Cumulative Interest Amount with respect thereto and the Aggregate Principal Amount thereof unless the Senior Class A Notes, the Class A-3L Notes and the Class X Notes have been paid such amounts in full in cash, and Holders of the Class B-1L Notes are not entitled to be paid the Cumulative Interest Amount with respect thereto and the Aggregate Principal Amount thereof unless the Class A Notes and the Class X Notes have been paid such amounts in full in cash. Notwithstanding such subordination, the Holders of the Class B-1L Notes may be entitled to payments of principal in connection with the Additional Collateral Deposit Requirement before the Notes senior thereto receive any payments of principal.

3. <u>Nature of Collateral Pledged to Secure the Notes; Ability to Obtain Additional Portfolio Collateral; Availability of Funds for Subordinate Payments</u>. The Portfolio Collateral pledged to secure the Notes includes commercial loans and collateralized loan obligations of both U.S. and certain non-U.S. obligors rated below investment grade, which have greater credit and liquidity risk than more highly rated obligations, and synthetic securities.

008195

The Portfolio Collateral will consist primarily of senior secured floating rate term commercial loans. Other loans in which the Issuer may invest include unsecured loans, second lien loans, debtor-in-possession financings and delayed drawdown loans and revolving bank loans. Loans are not generally traded on organized exchange markets but rather would typically be traded by banks and other institutional investors engaged in loan syndications. The liquidity of the Portfolio Loans will therefore depend on the liquidity of this market. Trading in loans is subject to delays as transfers may require extensive and customized documentation, the payment of significant fees and the consent of the agent bank or underlying obligor. Furthermore, Portfolio Loans typically provide that the applicable interest rate may be computed by reference to any of several base indices, at the option of the obligor. The interest rates of the Notes generally are calculated by reference to three-month LIBOR as an index. See "—Interest Rate Risk."

The Issuer intends to purchase Participations of Portfolio Loans in certain circumstances. Participations held by the Issuer in a Selling Institution's portion of a Portfolio Loan typically result in a contractual relationship only with such Selling Institution, not with the obligor. The Issuer has the right to receive payments of principal, interest and any fees to which it is entitled only from the Selling Institution selling the Participation and only upon receipt by such Selling Institution of such payments from the obligor. In connection with purchasing Participations, the Issuer generally will have no right to enforce compliance by the obligor with the terms of the related loan agreement, nor any rights of set-off against the obligor and the Issuer may not directly benefit from the collateral supporting the Portfolio Loan in which it has purchased the Participation. As a result, the Issuer will assume the credit risk of both the obligor and the Selling Institution selling the Participation. In the event of the insolvency of such Selling Institution, the Issuer may be treated as a general creditor of such Selling Institution, and may not benefit from any set-off between such Selling Institution and the obligor. When the Issuer holds a Participation in a Portfolio Loan it may not have the right to vote to waive enforcement of any restrictive covenant breached by an obligor or, if the Issuer does not vote as requested by the Selling Institution, it may be subject to repurchase of the Participation at par. Selling Institutions voting in connection with a potential waiver of a restrictive covenant may have interests different from those of the Issuer, and such Selling Institutions may not consider the interests of the Issuer in connection with their votes.

The Issuer will also purchase Assignments. The purchaser of an Assignment typically succeeds to all the rights and obligations of the assignor of the loan and becomes a lender under the loan agreement and other operative agreements relating to the Portfolio Loan. Assignments are, however, arranged through private negotiations between potential assignees and potential assignors, and the rights and obligations acquired by the purchaser of an Assignment may differ from, and be more limited than, those held by the assignor of the loan. In contrast to the rights of the Issuer as an owner of a Participation, the Issuer, as an assignee, will generally have the right to receive directly from the obligor all payments of principal, interest and any fees to which it is entitled. In some Assignments, the obligor may have the right to continue to make payments to the assignor with respect to the assigned portion of the Portfolio Loan. In such a case, the assignor would be obligated to receive such payments as agent for the Issuer and to promptly pay over to the Issuer such amounts as are received. As a purchaser of an Assignment, the Issuer typically will have the same voting rights as other lenders under the applicable loan agreement and will have the right to vote to waive enforcement of breaches of covenants. The Issuer will also have the same rights as other lenders to enforce compliance by the obligor with the terms of the loan agreement, to set-off claims against the obligor and to have recourse to collateral supporting the Portfolio Loan. As a result, the Issuer may not bear the credit risk of the assignor and the insolvency of an assignor of a loan should have little effect on the ability of the Issuer to continue to receive payments of principal, interest or fees from the obligor. The Issuer will, however, assume the credit risk of the obligor. Non-performing Portfolio Loans may require substantial workout negotiations or restructuring that may entail, among other things, a substantial reduction in the interest rate, a substantial write-down of the principal and/or a substantial extension of the amortization and/or maturity date of the Portfolio Loan. Any such reduction, write-down or extension will likely cause a significant decrease in the interest collections on the Portfolio Loans and any such write-down or extension will likely also cause a significant decrease in the principal collections on the Portfolio Loans.

The Portfolio Collateral will also consist of CLO Securities. CLO Securities generally are limited-recourse obligations of the issuer thereof payable solely from the underlying securities of such issuer or proceeds thereof. Consequently, holders of CLO Securities must rely solely on distributions on the underlying securities or proceeds thereof for payment in respect thereof. If distributions on the underlying securities are insufficient to make payments on the CLO Securities, no other assets will be available for payment of the deficiency and following

008196

realization of the underlying assets, the obligations of such issuer to pay such deficiency shall be extinguished. Such underlying securities are expected to consist mainly of loans and other debt instruments, generally rated below investment grade (or of equivalent credit quality). In addition, certain CLO Securities (particularly subordinated CLO Securities) provide that the non payment of interest in cash on such securities will not constitute an event of default in certain circumstances and the holders of such securities will not have available to them any associated default remedies. Interest not paid in cash will generally be capitalized and added to the outstanding principal balance of the related security. Any such deferral will reduce the yield on such CLO Securities. Loan securities may be unsecured and may be subordinated to certain other obligations of the issuer thereof. The lower rating of below investment grade loans reflects a greater possibility that adverse changes in the financial condition of an issuer or in general economic conditions or both may impair the ability of the issuer to make payments of principal or interest. Such Portfolio Collateral may be speculative.

Issuers of CLO Securities may acquire interests in loans and other debt obligations by way of sale, assignment or participation. The purchaser of an assignment typically succeeds to all the rights and obligations of the assigning institution and becomes a lender under the credit agreement with respect to the debt obligation; however, its rights can be more restricted than those of the assigning institution.

CLO Securities are also subject to interest rate risk. The underlying securities of an issuer of CLO Securities may bear interest at a floating rate while the CLO Securities issued by such issuer may bear interest at a fixed rate (or the reverse may be true). As a result, there could be a floating/fixed rate or basis mismatch between such CLO Securities and underlying securities. In addition, there may be a timing mismatch between the CLO Securities and underlying securities that bear interest at a floating rate, as the interest rate on such floating rate underlying securities may adjust more frequently or less frequently, on different dates and based on different indices, than the interest rates on the CLO Securities. As a result of such mismatches, an increase or decrease in the level of the floating rate indices could adversely impact the ability of the issuers thereof to make payments on the CLO Securities.

In order to purchase and hold CLO Securities, the Issuer must satisfy at all times the investor qualifications in the indenture for each such obligation and in applicable securities laws. Generally, such indentures and applicable securities laws require that the Issuer either be a Qualified Institutional Buyer which is also a Qualified Purchaser or that it be a non-U.S. Person (as defined in Regulation S) which is also not a U.S. resident for purposes of the Investment Company Act. There can be no assurance that the Issuer will satisfy these requirements. In the event that the Issuer does not satisfy these requirements at any time, it will not be able to purchase CLO Securities, and it may be required under the underlying indentures for such underlying securities to sell CLO Securities which it previously purchased; any such "forced sale" by the Issuer is likely to be made at a loss.

In addition, a portion of the Portfolio Collateral may consist of Synthetic Securities. With respect to Synthetic Securities, the Issuer will usually have a contractual relationship only with the counterparty of such Synthetic Security, and not the Reference Obligor on the Reference Obligation. The Issuer generally will have no right directly to enforce compliance by the Reference Obligor with the terms of the Reference Obligation nor any rights of set-off against the Reference Obligor, nor have any voting or other consensual rights of ownership with respect to the Reference Obligation. The Issuer will not directly benefit from any collateral supporting the Reference Obligation and will not have the benefit of the remedies that would normally be available to a holder of such Reference Obligation. In addition, in the event of the insolvency of the counterparty, the Issuer will be treated as a general creditor of such counterparty, and will not have any claim of title with respect to the Reference Obligation. Consequently, the Issuer will be subject to the credit risk of the counterparty as well as that of the Reference Obligor. As a result, concentrations of Synthetic Securities entered into with any one counterparty will subject the Notes to an additional degree of risk with respect to defaults by such counterparty as well as by the Reference Obligor. One or more affiliates of the Initial Purchaser may act as counterparty with respect to all or a portion of the Synthetic Securities. These relationships may create certain conflicts of interest. See "—Potential Conflicts of Interest."

All or a portion of the Synthetic Securities are expected to consist of "pay as you go" credit default swaps. The obligation of the Issuer to make payments to the Default Swap Counterparties under the Default Swaps creates credit exposure to the related Reference Obligations (as well as to the default risk of the Default Swap Counterparties). Following the occurrence of a "credit event" with respect to any Reference Obligation (a "**Credit**

008197

Event"), the Issuer will be required to pay to the Default Swap Counterparty an amount equal to the relevant "physical settlement amount" in return for the Reference Obligation. The payment of any physical settlement amount will be funded by the Issuer by drawing on amounts standing to the credit of the related Default Swap Collateral Account. In addition, each Default Swap will require the Issuer, in its capacity as protection seller, to pay "floating amounts" to the Default Swap Counterparty equal to any principal shortfalls, writedowns and interest shortfalls under the Reference Obligation upon the occurrence thereof (any such payment, a "**Credit Protection Payment**"). Although the Default Swap Counterparty, in its capacity as protection buyer, will be obligated to reimburse all or part of such Credit Protection Payments to the Issuer if the writedowns of the related shortfalls are ultimately paid to holders of the Reference Obligations or if the related Reference Obligations are written up, the amounts available to the Issuer to make payments in respect of the Notes and Preferred Shares will be reduced after payment by the Issuer of the relevant Credit Protection Payment to the Default Swap Counterparty until the Issuer receives such reimbursement, if any, from the Default Swap Counterparty. Under the Default Swaps, a writedown or failure to pay principal in respect of a Reference Obligation will entitle the Default Swap Counterparty, as protection buyer, to elect whether to require the Issuer to pay a physical settlement amount or a Credit Protection Payment under the related Default Swap.

In certain other circumstances in which a Default Swap may be terminated early, a termination payment may be due to or from the Issuer. If the Issuer is required to make a termination payment to the Default Swap Counterparty, such termination payment may be substantial and may affect the ability of the Issuer to make payments to the Noteholders and to the Holders of the Preferred Shares. Termination payments payable by the Issuer in respect of any Default Swap will include the market value to the Default Swap Counterparty of such terminated Default Swap, which may expose the Issuer to deterioration in the credit of the Reference Obligations and result in losses to the Issuer, even where no Credit Event has occurred. Even if the Default Swap Counterparty is required to make a termination payment to the Issuer, there is no assurance that the amount of such payment would be sufficient such that payments to the Holders of the Notes and the Preferred Shares would not be affected.

It is expected that the Issuer will acquire all of the Initial Portfolio Collateral to be acquired on the Closing Date from various sources, including Bear Stearns, at prices agreed upon by the Issuer with the advice of the Servicer. The price to be paid by the Issuer for such securities may be higher or lower, based on market conditions at the time of purchase by Bear Stearns or such other sources than the prices the Issuer would have paid had such securities all been purchased by such persons on the date such securities were sold to the Issuer. After the Closing Date, the Issuer with the advice of the Servicer may acquire from or through various sources, including Bear, Stearns & Co. Inc., Portfolio Collateral at current market prices which will be negotiated by or on behalf of the Issuer at such time. The Indenture does not restrict the ability of the Issuer to invest in Portfolio Collateral on the basis of its market value.

As described herein, the Indenture provides that the Servicer and the Issuer will seek to invest the Deposit in Original Portfolio Collateral having an Aggregate Principal Amount at least equal to the Required Portfolio Collateral Amount no later than the Effective Date, and that during certain specified periods thereafter significant portions of the collections received in respect of the Portfolio Collateral will be used to purchase Additional Portfolio Collateral to secure the Notes, which securities in any such case must satisfy the criteria specified in the Indenture. In addition, Collateral Disposition Proceeds may be used to purchase Substitute Portfolio Collateral, subject to satisfaction of the specified criteria. The ability of the Issuer to obtain such Original Portfolio Collateral, Additional Portfolio Collateral or Substitute Portfolio Collateral (and the rates and other terms thereof) and the terms on which such securities can be obtained, as well as the timing and amount of draws under the Delayed Drawdown Loans and the Revolving Loans and the rates and other terms obtained in connection with the funds held in Eligible Investments (including the Loan Funding Account), may affect the timing and amount of payments received by the Noteholders.

The Issuer will purchase and sell Portfolio Collateral from or to the Servicer and its affiliates, including assets managed by the Servicer and its affiliates, only to the extent the Servicer determines that such purchases and sales are consistent with the collateral guidelines and objectives of the Issuer, the restrictions contained in the Indenture and the Servicing Agreement and applicable law. In any event, all purchases or sales of Portfolio Collateral from such entities will be on an arms'-length basis for a price at least equal to the Market Value thereof.

On each Payment Date, subject to the satisfaction of the Overcollateralization Tests and, after the second Payment Date, the Interest Coverage Test and application of the Additional Collateral Deposit Requirement, and in

008198

accordance with the priority of distribution provisions described herein, certain collections on the Portfolio Collateral will be used to make certain subordinate payments free and clear of the lien of the Indenture, including payment of certain fees to the Servicer, payment of certain administrative expenses of the Issuer and payment to fund distributions to Holders of the Preferred Shares. To the extent that any such distributions are made rather than retained as additional collateral for the Notes, the amounts so distributed will not be available to support payments of principal and interest subsequently payable in respect of the Notes.

4. <u>Default Rates of Commercial Loans and CLO Securities</u>. There are varying sources of statistical default rate data for commercial loans and collateralized loan obligations and numerous methods for measuring default rates. The historical performance of the loan market or collateralized loan market is not necessarily indicative of its future performance. Should increases in default rates occur with respect to the type of collateral comprising the Portfolio Collateral, the actual default rates of the Portfolio Collateral may exceed the hypothetical default rates used herein. See "Maturity and Prepayment Considerations." PROSPECTIVE PURCHASERS OF THE NOTES SHOULD CONSIDER AND DETERMINE FOR THEMSELVES THE LIKELY LEVEL OF DEFAULTS AND THE LEVEL OF RECOVERIES ON THE PORTFOLIO COLLATERAL DURING THE TERM OF THE NOTES.

5. <u>Potential Illiquidity of Portfolio Collateral</u>. There is no established, liquid secondary market for many of the CLO Securities and Portfolio Loans which the Issuer may purchase and the lack of such an established, liquid secondary market may have an adverse effect on the market value of such CLO Securities and Portfolio Loans and the Issuer's ability to dispose of them. Such illiquidity may adversely affect the price and timing of the Issuer's liquidation of CLO Securities and Portfolio Loans, including the liquidation of CLO Securities and Portfolio Loans following the occurrence of an Event of Default under the Indenture or in connection with a redemption of the Notes.

Further, the items of Portfolio Collateral will be subject to certain transfer restrictions that may further restrict liquidity. Therefore, no assurance can be given that if the Issuer were to dispose of a particular item of Portfolio Collateral held by the Issuer, it could dispose of such Portfolio Collateral at the previously prevailing market price. A decrease in the market value of Portfolio Collateral would adversely affect the sale proceeds that could be obtained upon the sale of Portfolio Collateral and could ultimately affect the ability of the Co-Issuers to effect an Optional Redemption or Tax Event Redemption or pay the principal of the Notes, upon a liquidation of the Portfolio Collateral following the occurrence of an Event of Default.

The market value of the Portfolio Collateral will generally fluctuate with, among other things, changes in prevailing interest rates, general economic and political conditions, the condition of certain financial markets, developments or trends in any particular industry and the financial condition of the issuers of the Portfolio Collateral.

Any concentration of Portfolio Collateral in any one issuer, servicer or other characteristic may expose the Issuer to greater risk than would be the case if the Portfolio Collateral were more diversified, which would affect the Issuer's ability to make payments on the Notes.

The description of the Portfolio Collateral herein and the risks related thereto is general in nature and prospective purchasers should review the descriptions and risk factors relating to each item of Portfolio Collateral set forth in the underlying disclosure documents, transaction documents and servicing reports. PROSPECTIVE PURCHASERS SHOULD ASSESS FOR THEMSELVES THE RISKS INHERENT IN THE PORTFOLIO COLLATERAL.

6. <u>The Issuer and Investors Will Have Limited Control of the Administration and Amendment of Portfolio Loans</u>. The Servicer will cause the Issuer to exercise or enforce, or refrain from exercising or enforcing, any or all of its rights in connection with the Portfolio Loans or any related documents or will refuse amendments or waivers of the terms of any Portfolio Loan and related documents in accordance with its customary business practices as if the Servicer were administering the Portfolio Loans for its own account. The authority of the Servicer to cause the Issuer to change the terms of the Portfolio Loans will generally not be restricted by the Indenture or the Servicing Agreement. As a result, the Issuer will be relying on the Servicer's customary business practices with respect to the

008199

servicing of the Portfolio Loans.  The Holders of the Notes and the Issuer will not have any right to compel the Issuer or the Servicer to take or refrain from taking any actions other than in accordance with its customary business practices.

The terms and conditions of the loan agreements and related assignments may be amended, modified or waived only by the agreement of the lenders.  Generally, any such agreement must include a majority or a super majority (measured by outstanding loans or commitments) or, in certain circumstances, a unanimous vote of the lenders.  Consequently, the terms and conditions of the payment obligation arising from loan agreements could be modified, amended or waived in a manner contrary to the preferences of the Servicer or the Issuer, as the case may be, if a sufficient number of the other lenders concurred with such modification, amendment or waiver.  There can be no assurance that any obligations arising from a loan agreement will maintain the terms and conditions to which the Issuer originally agreed.

The exercise of remedies may also be subject to the vote of a specified percentage of the lenders thereunder.  The Servicer will have the authority to cause the Issuer to consent to certain amendments, waivers or modifications to the Portfolio Loans requested by obligors or the lead agents for loan syndication agreements.  The Servicer may, in accordance with its servicing standards and subject to the transaction documents, cause the Issuer to extend or defer the maturity, adjust the outstanding balance of any Portfolio Loan, reduce or forgive interest or fees, release material collateral or guarantees, or otherwise amend, modify or waive the terms of any related loan agreement, including the payment terms thereunder.  The Servicer will make such determinations in accordance with its servicing standards.  Any amendment, waiver or modification of a Portfolio Loan could postpone the expected maturity of the Notes and/or reduce the likelihood of timely and complete payment of interest or principal under the Notes, as well as the timing and amount of payments to Holders of the Preferred Shares.

7.   <u>Sale of Portfolio Collateral by Servicer Under Certain Circumstances</u>.  Under the Indenture, the Servicer may only direct the disposition of Portfolio Collateral under certain limited circumstances.  More specifically, the Servicer may direct the disposition of Portfolio Collateral that meets the definition of Defaulted Portfolio Collateral, Equity Portfolio Collateral, and, subject to satisfaction of the conditions set forth herein, Credit Risk Portfolio Collateral or Credit Improved Portfolio Collateral [or Collateral other than Credit Risk Portfolio Collateral].  Furthermore, the Servicer's ability to dispose of Portfolio Collateral may be subject to greater restrictions if any Class of Notes is downgraded.  See "Security for the Notes—Changes in Composition of Portfolio Collateral." **Notwithstanding such restrictions and satisfaction of the conditions set forth in the Indenture, sales and purchases by the Servicer of Portfolio Collateral could result in losses by the Issuer, which losses may result in the reduction or withdrawal of the rating of any or all of the Notes by any of the Rating Agencies.**  On the other hand, circumstances may exist under which the Servicer may believe that it is in the best interests of the Issuer to dispose of Portfolio Collateral, but the Issuer will not be permitted to do so under the restrictions and conditions of the Indenture.

A portion of the Portfolio Collateral may have fixed interest rates that remain constant until a specified date or their maturity, and a portion of the Portfolio Collateral will bear interest based on a fixed margin over a reference rate, which margin will generally remain constant until the maturity of such Portfolio Collateral.  Accordingly, the market value of the fixed rate Portfolio Collateral will generally decrease as market rates of interest increase.  The market value of such Portfolio Collateral will also generally fluctuate with, among other things, general economic conditions, world political events, developments or trends in any particular industry, the conditions of financial markets and the financial condition, results of operations and prospects of the Portfolio Collateral issuers.  The Issuer will be relying on Rule 3a-7 and/or Section 3(c)(7) of the U.S. Investment Company Act of 1940, as amended (the "**Investment Company Act**") for its exemption from the Investment Company Act.  The Rule 3a-7 exemption restricts the Issuer from disposing of any item of Defaulted Portfolio Collateral, Equity Portfolio Collateral, Credit Risk Portfolio Collateral or Credit Improved Portfolio Collateral or acquiring any item of Portfolio Collateral for the primary purpose of recognizing gains or decreasing losses resulting from market value changes.  These restrictions mean that the Issuer may be required to hold an item of Portfolio Collateral or precluded from acquiring an item of Portfolio Collateral when it would have sold such item of Portfolio Collateral or acquired such item of Portfolio Collateral, as applicable, had it based such determination on expected market value changes.  As a result, greater losses on the Portfolio Collateral may be sustained and there may be insufficient proceeds on any Payment Date to pay in full any expenses of the Issuer or any amounts payable to the Trustee or the Administrator (all of which

008200

amounts are payable prior to payments in respect of the Notes) and the principal of and interest on the Notes. See "Security for the Notes—Changes in Composition of Portfolio Collateral."

8.  <u>Sale of Collateral Upon Default of the Notes</u>. The market value of the Portfolio Collateral will generally fluctuate with, among other things, general economic conditions, world political events, developments or trends in any particular industry, the conditions of financial markets and the financial condition of the issuers of the Portfolio Collateral. In addition, CLO Securities included in the Portfolio Collateral, which will comprise no more than 35% of the Aggregate Principal Amount of the Portfolio Collateral included in the Trust Estate, may have interest rates that remain constant until their maturity. Accordingly, their market value will generally fluctuate with changes in market rates of interest. Therefore, if an Event of Default occurs with respect to the Notes, there can be no assurance that the proceeds of any sale by the Trustee of the Portfolio Collateral and the other collateral securing the Notes will be sufficient to pay in full the principal of and interest on the Notes and any amounts payable to the Trustee. However, certain conditions set forth in the Indenture must be satisfied before the Trustee is permitted to sell the Portfolio Collateral and other collateral pledged as security for the Notes following an Event of Default. See "Legal Structure—The Indenture—Events of Default."

9.  <u>Restrictions on Transfer</u>. The Notes have not been registered under the U.S. Securities Act of 1933, as amended (the "**Securities Act**"), or under any U.S. state securities or "Blue Sky" laws or the securities laws of any other jurisdiction and are being issued and sold in reliance upon exemptions from registration provided by such laws. There is no market for the Notes being offered hereby and, as a result, a purchaser must be prepared to hold the Notes for an indefinite period of time or until the maturity thereof. No Note may be sold or transferred unless such sale or transfer (i) is exempt from the registration requirements of the Securities Act (for example, in reliance on exemptions provided by Rule 144A or Regulation S under the Securities Act) and applicable state securities laws, (ii) will not constitute or result in a non-exempt "prohibited transaction" under ERISA or Section 4975 of the Code and (iii) does not cause either of the Co-Issuers to become subject to the registration requirements of the Investment Company Act. In addition, the Class B-1L Notes may not be sold or transferred to any Plan or to any person acting on behalf of or with "plan assets" of any such Plan, including an insurance company general account, unless the purchaser or transferee is eligible for the exemptive relief available under PTCE 96-23, 95-60, 91-38, 90-1 or 84-14. Prospective transferees of the Notes will be required pursuant to the terms of the Indenture to deliver a certificate to the Trustee and the Co-Issuers relating to compliance with the Securities Act, applicable state securities laws, ERISA, Section 4975 of the Code and the Investment Company Act. The Co-Issuers will not provide registration rights to any purchaser of the Notes and neither of the Co-Issuers, the Trustee, nor any other person may register the Notes under the Securities Act or any state securities or "Blue Sky" laws nor may the Co-Issuers or the Trustee take such action with respect to the Portfolio Collateral. See "Description of the Notes—General." The Notes will be owned by a relatively small number of investors and it is highly unlikely that an active secondary market for the Notes will develop. Purchasers of the Notes may find it difficult or uneconomic to liquidate their investment at any particular time.

The Issuer has not registered as an investment company under the Investment Company Act in reliance on the exception provided under Rule 3a-7 and/or Section 3(c)(7) thereof. While counsel will opine in connection with the sale of the Notes to the Initial Purchaser that neither the Issuer nor the Co-Issuer is on the Closing Date required to register as an investment company (assuming the Notes are sold to the Initial Purchaser in accordance with the terms of the Purchase Agreement (as defined herein) and that the Servicer services the Portfolio Collateral and other assets of the Issuer in accordance with the terms of the Servicing Agreement (as defined herein)), no opinion or no-action position has been requested of the United States Securities and Exchange Commission (the "**SEC**"). If the SEC or a court of competent jurisdiction were to find that the Issuer or the Co-Issuer is required to register as an investment company, possible consequences include, but are not limited to, the SEC applying to enjoin the violation, investors suing the Issuer or the Co-Issuer, as applicable, to recover any damages caused by the violation and any contract to which the Issuer or the Co-Issuer, as applicable, is a party made in violation or whose performance involves a violation of the Investment Company Act being unenforceable unless enforcing such contract would produce a more equitable result. Should the Issuer or the Co-Issuer be subjected to any or all of the foregoing or to any other consequences, the Issuer or the Co-Issuer, as the case may be, would be materially and adversely affected.

Each transferee of a Note (except with respect to a transfer pursuant to Regulation S under the Securities Act) will be deemed to make certain representations at the time of transfer relating to compliance with Section 3(c)(7) of the Investment Company Act. See "Delivery of the Notes; Transfer Restrictions; Settlement."

008201

The Indenture will provide that if, notwithstanding the restrictions on transfer contained therein, the Issuer determines any beneficial owner or Holder of a Note (other than a Note transferred in reliance on Regulation S of the Securities Act) is not a Qualified Institutional Buyer and a Qualified Purchaser, the Issuer will require that such beneficial owner or Holder sell all of its right, title and interest in such Note to a person who is so qualified, with such sale to be effected within 30 days after notice of such sale requirement is given. If such sale is not effected within such 30 days, upon written direction from the Issuer, the Trustee (or an investment banker selected by the Trustee and approved by the Issuer) will be authorized to conduct a commercially reasonable sale of such Note to a person who does so qualify and pending transfer, no further payments will be made in respect of such Note or any beneficial interest therein.

10. Final Maturity Date; Average Life and Prepayment Considerations; Redemption. The Final Maturity Date of each Class of Notes (other than the Class X Notes) will be the Payment Date occurring in August 1, 2021 and the Final Maturity Date of the Class X Notes will be the Payment Date occurring in August 1, 2013; *provided that*, the Final Maturity Dates of the Notes (other than the Class X Notes) are extendable upon a Maturity Extension (if any) as described herein, in which case the Final Maturity Date of such Notes will be extended to the applicable Extended Final Maturity Date. See "Description of the Notes—Extension of the Revolving Period and the Final Maturity Date". The average life of each Class of Notes is expected to be shorter than the number of years until the Final Maturity Date, and the average lives may vary due to various factors affecting the early retirement of the Portfolio Collateral and the ability of the Servicer to invest collections in Additional Portfolio Collateral or reinvest disposition proceeds in Substitute Portfolio Collateral. Retirement of an item of Portfolio Collateral prior to that item of Portfolio Collateral's respective final maturity will depend, among other things, on the financial condition of the issuer and the characteristics of the underlying item of Portfolio Collateral, including the existence and frequency of exercise of any prepayment or redemption features, the prevailing level of interest rates, the prepayment or redemption price and the actual default rate and the actual amount collected on any Defaulted Portfolio Collateral. See "Maturity and Prepayment Considerations" and "Security for the Notes—Changes in Composition of Portfolio Collateral." The ability of the Issuer to reinvest proceeds in securities with comparable interest rates, with final maturity dates on or before the Calculation Date prior to the Final Maturity Date and otherwise satisfying the criteria specified herein may affect the timing and amount of payments received by the Noteholders and the yield to maturity of the Notes. If the Issuer is unable to reinvest more than U.S.$2,000,000 of collections of principal in Additional Portfolio Collateral selected by the Servicer meeting the criteria described herein for ninety days after receipt, the Servicer may direct the Trustee to apply such amounts to pay principal of the Notes (other than the Class X Notes) in a Special Redemption. Any such application will affect the timing and amount of payments received by the Noteholders and the average life and yield to maturity of the Notes.

As described herein, the Notes are subject to a Tax Event Redemption on any Payment Date, at the option of the Issuer acting at the direction of at least a Majority of the Preferred Shares or a majority of the Controlling Class (but only if the Aggregate Principal Balance of Portfolio Collateral is less than 100% of the Class A-1L Notes), if as a result of a change in tax law, rule or regulation or the interpretation thereof, the payments to be received on the Portfolio Collateral are reduced as a result thereof as described herein.

As described herein, the Notes will be subject to an Optional Redemption, at the option of the Issuer acting at the direction of the Holders of the requisite amount of the Preferred Shares eligible to vote for any such redemption (See "Description of the Notes—Optional Redemption"), on any Optional Redemption Date, at a price equal to the Optional Redemption Price.

As described herein, at any time that the Notes are Outstanding, if any Overcollateralization Test or, after the second Payment Date, the Interest Coverage Test is not satisfied on any Payment Date, amounts that are junior in right of payment to such test as described under "Description of the Notes—Payments on the Notes; Priority of Distributions", will be applied to the redemption of the Class A Notes and the Class B-1L Notes (or, in the case of the Class B-1L Notes, first to pay accrued and unpaid interest from prior Payment Dates, then to pay principal) in an O/C Redemption on each such Payment Date, in the order described under "Description of the Notes—Payments on the Notes; Priority of Distributions," to the extent necessary to satisfy both the Overcollateralization Tests and the Interest Coverage Test. Further, if following the Effective Date, the Issuer is not able to receive a Rating Confirmation, amounts that are junior in right of payment to such redemption as described herein, will be applied to the redemption of the Notes until the earlier of the Ratings Confirmation being received or each such Class being

008202

paid in full, in the order and according to the priorities described herein. The Class X Notes are not subject to redemption in connection with an O/C Redemption, but are subject to Rating Confirmation Failure Redemption.

The Class B-1L Notes may be retired early as a result of principal payments made to the Class B-1L Notes in connection with the Additional Collateral Deposit Requirement.

As described herein, if the Issuer or the Servicer is unable to use (or commit) the full amount of the Deposit to purchase Original Portfolio Collateral having an Aggregate Principal Amount (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to the Original Portfolio Collateral on or before the Effective Date) at least equal to the Required Portfolio Collateral Amount and meeting the specified requirements no later than the Effective Date, an amount (not in excess of the amount of the Deposit not so used or committed for use) equal to the difference between the Required Portfolio Collateral Amount and the par amount of Portfolio Collateral actually acquired (or committed to be acquired) (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to the Original Portfolio Collateral on or before the Effective Date) shall be used to make principal payments of the Class A-1LA Notes and the Class X Notes, on a *pro rata* basis, on the Initial Deposit Redemption Date except, if the amount of the Deposit not so used (or committed to be used) does not exceed U.S.$2,000,000 in the aggregate, such amount will be transferred to the Collection Account on the Effective Date.

11. <u>Maturity Extension Risk</u>. Under the Indenture, the Issuer, at the direction of the Servicer, shall be entitled on each Extension Effective Date, to extend the Revolving Period to the applicable Extended Revolving Period End Date up to a maximum of four times (so that the Notes can only be extended to 2037) if (i) in the case of an Extension Effective Date occurring after the first Extension Effective Date, the Issuer has previously affected a Maturity Extension for each preceding Extension Effective Date, (ii) the Extension Conditions are satisfied and (iii) the Issuer has given written notice of its election to extend the Revolving Period no later than 60 days and no earlier than 90 days prior to such Extension Effective Date. Under the Indenture, if the Revolving Period is so extended, the Final Maturity Date of the Notes (other than the Class X Notes) will be equally extended and the Weighted Average Life Test shall be extended without the requirement for any approval or consent of any Holders of Notes or Preferred Shares; *provided* that if the Extension Conditions are not satisfied because the Holders of the Class A-1LA Notes have failed to deliver an Extension Sale Notice or have failed to provide their written consent to the related Maturity Extension, then the Servicer may exceed seven Business Days after the then proposed Extension Effective Date) if the Servicer shall cause the Extension Conditions set forth in clause (iv) of such definition to be satisfied as of such later date. Holders of the Notes will not be able to prevent or prohibit the extension of the Final Maturity Date so long as the Extension Conditions are satisfied, which include the ability of Holders of such Notes to sell their Notes at the designated purchase price to a designated purchaser under the Indenture. In the case of the Preferred Shares and any Maturity Extension, Holders of Preferred Shares that have received an Internal Rate of Return equal to or in excess of 12.0% as of the Extension Effective Date will not receive any payment in exchange for their Preferred Shares sold in connection with a Maturity Extension. See "Description of the Notes—Extension of the Revolving Period and the Final Maturity Date." As a consequence, if the Servicer elects to extend the Revolving Period and the Extension Conditions are satisfied, the Holders of the Notes (other than the Class X Notes) and the Preferred Shares may either be required to hold their Notes and Preferred Shares for a significantly longer period of time or be forced to sell their Notes and Preferred Shares for the applicable purchase price under the Indenture, resulting in a shorter holding period than expected at the time of investment in the Notes and Preferred Shares.

12. <u>Amendment Buy-Out Risk</u>. Any Non-Consenting Holder of Notes or Preferred Shares with respect to an amendment of the Indenture (which includes Holders that fail to respond to a consent solicitation within the applicable period) may be forced to sell their applicable Notes or Preferred Shares to the Amendment Buy-Out Purchaser at the Amendment Buy-Out Purchase Price, resulting in a shorter holding period than expected at the time of investment in the Notes or Preferred Shares; *provided* that during the Non-Call Period, "Non-Consenting Holder" shall exclude any Holder of Class A-1LA Notes (unless such Holder has consented in writing to be designated as a Non-Consenting Holder) and the Amendment Buy-Out Option shall not be applicable to such Class A-1LA Notes. In the case of the Preferred Shares, the Indenture provides that the Amendment Buy-Out Purchase Price will be zero

008203

for Non-Consenting Holders that have received an Internal Rate of Return equal to or in excess of 12.0% as of the Amendment Buy-Out Date. See "Legal Structure—The Indenture; Amendment Buy-Out." A Holder's ability to vote against an amendment or affect or influence the amendment process with respect to the Indenture will be limited by the possibility of an Amendment Buy-Out. The Amendment Buy-Out will also increase the ability of the Servicer to affect or influence the amendment process.

13. Interest Rate Risk. The Notes generally will bear interest at a rate based on three-month LIBOR, as described herein. While most of the Portfolio Collateral will bear interest at floating rates, up to 5% of the Portfolio Collateral may bear interest at fixed rates. Further, the obligors under the Portfolio Loans which are Floating Rate Collateral may choose different interest indices than the London interbank rate for three-month U.S. dollar deposits or the interest rates on the Floating Rate Collateral may be determined or adjustments may take effect on different dates than is the case for the Notes. Additionally, interest on the Notes is payable quarterly on each Payment Date while a portion of the Portfolio Collateral may provide for semiannual payments of interest. Any such mismatches may adversely affect the Issuer's ability to pay amounts due in respect of the Notes.

14. The Issuer. The Issuer is a recently formed entity and has no significant prior history. The Issuer has no significant assets other than the Trust Estate. The Issuer will not engage in any business activity other than the co-issuance of the Notes and the issuance of the Preferred Shares and the ordinary shares as described herein, the acquisition and disposition of Portfolio Collateral as described herein, certain activities conducted in connection with the payment of amounts in respect of the Notes and the Preferred Shares and the management of the collateral and other activities incidental to the foregoing. Income derived from the collateral will be the Issuer's principal source of cash. The Issuer is a limited liability company incorporated under the laws of the Cayman Islands. Because the Issuer is a Cayman Islands company and some of its directors reside in the Cayman Islands, it may not be possible for investors to effect service of process within the United States on such persons or to enforce against them or against the Issuer in United States courts judgments predicated upon the civil liability provisions of the United States securities laws. None of the directors, security holders, members, officers or incorporators of the Co-Issuers, the Servicer, any of their respective affiliates or any other person or entity (other than the Issuer) will be obligated to make payments on the Notes or the Preferred Shares.

15. The Co-Issuer. The Co-Issuer is a newly-formed entity and has no prior operating history. The Co-Issuer has no substantial assets. The Co-Issuer will not engage in any business activity other than the co-issuance of the Class X Notes, the Class A-1LA Notes, the Class A-1LB Notes, the Class A-2L Notes, the Class A-3L Notes, the Class A-4L Notes and the Class B-1L Notes.

16. Fraudulent Conveyance Considerations. Various federal and state laws enacted for the protection of creditors may apply to the Portfolio Collateral by virtue of the Issuer's role as a creditor with respect to such Portfolio Collateral. If a court in a lawsuit brought by an unpaid creditor or representative of creditors of an obligor under an item of Portfolio Collateral, such as a trustee in bankruptcy or the obligor as debtor-in-possession, were to find that the obligor did not receive fair consideration or reasonably equivalent value for incurring indebtedness evidenced by an item of Portfolio Collateral, and the grant of any security interest or other lien securing such Portfolio Collateral, and, after giving effect to the incurring of such indebtedness, the obligor (i) was insolvent, (ii) was engaged in a business for which the assets remaining in such obligor constituted unreasonably small capital, or (iii) intended to incur, or believed that it would incur, debts beyond its ability to pay such debts as they mature, such court could invalidate, in whole or in part, such indebtedness and such security interest or other lien as fraudulent conveyances, subordinate such indebtedness to existing or future creditors of the obligor or recover amounts previously paid by the obligor (including to the Issuer) in satisfaction of such indebtedness or proceeds of such security interest or other lien previously applied in satisfaction of such indebtedness. In addition, in the event of the insolvency of an issuer or other obligor of an item of Portfolio Collateral, payments made on the Portfolio Collateral could be subject to avoidance as a "preference" if made within a certain period of time (which may be as long as one year) before insolvency depending on a number of factors, including the amount of equity of the obligor owned by the Issuer and its affiliates and any contractual arrangements between the obligor, on the one hand, and the Issuer and its affiliates, on the other hand. The measure of insolvency for purposes of the foregoing will vary depending on the law of the jurisdiction which is being applied. Generally, however, an obligor would be considered insolvent at a particular time if the sum of its debts was greater than all of its property at a fair valuation or if the present fair saleable value of its assets was then less than the amount that would be required to pay its probable liabilities on its

008204

existing debts as they became absolute and matured. There can be no assurance as to what standard a court would apply in order to determine whether an obligor was insolvent after giving effect to the incurrence of the loan or that, regardless of the method of evaluation, a court would not determine that the obligor was "insolvent" upon giving effect to such incurrence.

In general, if payments on Portfolio Collateral are avoidable, whether as fraudulent conveyances or preferences, such payments can be recaptured either from the initial recipient (such as the Issuer) or from subsequent transferees of such payments, including Holders of the Notes.

17. <u>Lender Liability Considerations</u>. In recent years, a number of judicial decisions in the United States have upheld the right of borrowers to sue lending institutions on the basis of various evolving legal theories, including equitable subordination (collectively termed "**lender liability**"). Generally, lender liability is founded upon the premise that the institutional lender has violated a duty (whether implied or contractual) of good faith and fair dealing owed to the borrower or has assumed a degree of control over the borrower resulting in the creation of a fiduciary duty owed to the borrower. Although the Issuer is not engaged in the business of lending, the Issuer, as a creditor, may be subject to allegations of lender liability. Furthermore, the Issuer and the Servicer may be unable to control the conduct of the lenders under a loan syndication agreement requiring less than a unanimous vote, yet the Issuer may be subject to lender liability for such conduct.

18. <u>Environmental Risks</u>. Real property pledged as security with respect to an item of Portfolio Collateral may be subject to potential environmental risks. Of particular concern may be those mortgaged properties which are, or have been, the site of manufacturing, industrial or disposal activity. Such environmental risks may give rise to a diminution in the value of property securing any item of Portfolio Collateral or liability for cleanup costs or other remedial actions, which liability could exceed the value of such property or the principal balance of the related item of Portfolio Collateral. In certain circumstances, a lender may choose not to foreclose on contaminated property rather than risk incurring liability for remedial actions.

19. <u>Potential Conflicts of Interest</u>. It is expected that Highland Financial Partners, L.P. or an affiliate or subsidiary thereof ("**HFP**") will purchase approximately 45,000,000 of the Class II Preferred Shares of the Issuer on the Closing Date, representing approximately 58% of the total Preferred Shares outstanding (the "**Original HFP Share Amount**"). It is also expected that Highland will purchase approximately 10,000,000 of the preferred shares of Investor Corp. and approximately U.S.$2,000,000 Aggregate Principal Amount of the Class B-1L Notes on the Closing Date. In addition, the Servicer, entities affiliated with the Servicer or clients of the Servicer (collectively, the "**Servicer Entities**") may also acquire Notes or Preferred Shares upon the occurrence of an Amendment Buy-Out or a Maturity Extension as described herein. The interests of the Holders of the Preferred Shares and the Class B-1L Notes that are Servicer Entities, or any other Notes owned by the Servicer Entities, may be different from or adverse to the interests of the Holders of the other Notes and Preferred Shares. As the result of the ownership of Preferred Shares and Notes by the Servicer Entities, and the ability to vote the Preferred Shares and the Notes owned by the Servicer Entities up to a maximum amount equal to the Original HFP Share Amount, the affirmative vote or approval of the Preferred Shares owned by such Servicer Entities, may be required in order to cause an Optional Redemption or a Tax Redemption of the Notes. Preferred Shares owned or controlled by the Servicer Entities above the Original HFP Share Amount will be excluded from voting on certain matters including any Optional Redemption.

In addition to the Base Servicing Fee, the Servicer is entitled to receive an Additional Servicing Fee and an Supplemental Servicing Fee (if any) after all other distributions (other than certain distributions with respect to the Preferred Shares and certain administrative expenses) are made, which is dependent in large part on the performance of the securities purchased by the Servicer on behalf of the Issuer. This could create an inducement for the Servicer to service the Issuer's assets in such a manner as to seek to maximize the return on such securities. This could result in increasing the volatility of the Portfolio Collateral and could contribute to a decline in the aggregate value of the Portfolio Collateral. However, the Servicer's servicing of the Issuer's assets is restricted by the requirement that it comply with the restrictions described in "Security for the Notes" and by its internal policies with respect to the management of securities accounts.

008205

Various potential and actual conflicts of interest may arise from the overall activity of the Servicer, its affiliates and their respective clients. The following briefly summarizes some of these conflicts, but is not intended to be an exhaustive list of all such conflicts.

Certain Holders of the Notes and certain Holders of the Preferred Shares may be clients of the Servicer or one of its affiliates. Certain clients of the Servicer and its affiliates may invest in securities that would be appropriate for inclusion in the Trust Estate. Further, the Servicer currently serves and may in the future serve as servicer, collateral manager or the equivalent for other issuers of collateralized debt obligations, including collateralized debt obligation vehicles having objectives similar to those of the Issuer. The Servicer and its affiliates may make asset management decisions for its clients and affiliates that may be different from those made by the Servicer on behalf of the Issuer. The Servicer and its affiliates may also have ongoing relationships with, and may own or invest assets of their clients in, equity securities issued by issuers of Portfolio Collateral. In addition, affiliates and clients of the Servicer may invest in securities that are senior to, or have interests different from or adverse to, the securities included in the Trust Estate. An affiliate of the Servicer may earn fees with respect to financial advisory services rendered to companies in connection with workouts or the subsequent restructuring of such companies. Such fees and advice may continue for a period of time after any such workout or restructure. The Issuer may own an interest in the securities of such companies.

The Amendment Buy-Out will increase the ability of the Servicer to affect or influence the amendment process under the Indenture and will limit any Holder's ability to vote against an amendment or affect or influence the amendment process with respect to the Indenture.

If the Servicer elects to extend the Revolving Period and the Extension Conditions are satisfied, the Holders of the Notes and the Preferred Shares may either be required to hold their Notes and Preferred Shares for a significantly longer period of time or be forced to sell their Notes and Preferred Shares for the applicable purchase price under the Indenture, resulting in a shorter holding period than expected at the time of investment in the Notes and Preferred Shares.

In addition to acting as Servicer to the Issuer, Highland Capital Management L.P. will act as manager for HFP, which will, on the Closing Date, purchase all of the Class II Preferred Shares. Because Highland Capital Management will receive both a servicing fee from the Issuer for servicing the Portfolio Collateral and a management fee from HFP for managing HFP's assets, which will include the Class II Preferred Shares (and therefor a residual interest in the Portfolio Collateral), Highland Capital Management has agreed, in connection with the capital raising of HFP, to waive a portion of its servicing fees from the Issuer for two years following the Closing Date so as not to reduce the return on investment realized by HFP in respect of the Class II Preferred Shares. Thereafter Highland Capital Management may at its discretion continue to waive such portion of its servicing fees or may elect to receive such servicing fees in their entirety. Accordingly, during the first two years following the Closing Date, a portion (representing the percentage ownership of the Preferred Shares represented by the Class II Preferred Shares, which will initially be owned entirely by HFP) of the amounts that would otherwise be payable to the Servicer as a servicing fee will instead be payable on the Class II Preferred Shares as the Class II Preferred Share Dividends in accordance with the Priority of Payments. Thereafter, the Servicer may elect to continue to waive such same portion of the amounts that would otherwise be payable to the Servicer as a servicing fee, or any lesser portion of such amounts, and have such amounts be paid instead as the Class II Preferred Share Dividends. The Class II Preferred Shares and the Class I Preferred Shares will vote together as a single class and the existence of the Class II Preferred Share Dividends may cause HFP to have interests different from the holders of the Class I Preferred Shares.

The Trustee and its affiliates may invest in the loans or securities that would be appropriate for inclusion in the Trust Estate and the Trustee has no duty, in making those investments, to act in a way that is favorable to the Issuer or the Holders of the Notes or the Preferred Shares. The Trustee's affiliates currently serve and may in the future serve as collateral manager or the equivalent for other issuers of collateralized loan obligations.

It is expected that the Issuer will acquire all of the Initial Portfolio Collateral to be acquired on the Closing Date from Bear Stearns or other sources in each case, at prices agreed upon by the Issuer with the advice of the Servicer. Certain of such securities will be securities of issuers for which Bear Stearns has acted as underwriter, agent, placement agent or principal or of which Bear Stearns is an equity owner or which the Servicer or an affiliate

008206

of the Servicer has acted as manager, principal or counterparty. The price to be paid by the Issuer for such securities may be higher or lower, based on market conditions at the time of purchase from such sellers, than the prices the Issuer would have paid had such securities all been purchased from such sellers on the date such securities were sold to the Issuer. After the Closing Date, the Issuer with the advice of the Servicer may acquire from or through Bear Stearns or other sources Portfolio Collateral at current market prices which will be negotiated by or on behalf of the Issuer at such time. In addition, from time to time the Servicer may sell Portfolio Collateral through Bear Stearns. Bear Stearns will also receive compensation for the sale of the Notes and the Preferred Shares. See "Use of Proceeds" and "Plan of Distribution" herein. Bear Stearns has also entered into certain indemnification agreements with the Servicer relating to, among other things, the acquisition of the Initial Portfolio Collateral. An affiliate of the Initial Purchaser may be a Synthetic Security Counterparty and/or a Default Swap Counterparty.

20. <u>Servicer Affiliates Reliance on Rule 3a-7; Potential Indenture Amendments</u>. HFP, an affiliate of the Servicer will, on the Closing Date, purchase all of the Class II Preferred Shares. The Servicer will act as the manager for HFP. HFP and Highland Financial Trust, the owner of substantially all of the limited partnership interests of HFP, are relying on an exception from the definition of investment company and the requirement to register under the Investment Company Act that in turn depends, in part, upon the Issuer not being an investment company required to register under the Investment Company Act by reason of Rule 3a-7 thereunder. It is expected that, in connection with certain capital raising activities of Highland Financial Trust, the SEC may consider the applicability of Rule 3a-7 to the Issuer. If it were determined that the Issuer cannot rely on Rule 3a-7, the Servicer may cause the Issuer to amend the Indenture without the consent of the Holders of the Notes and without the consent of the Holders of the Preferred Shares to enable the Issuer to rely on Rule 3a-7, which could require additional limitations and prohibitions on the circumstances under which the Issuer may sell assets, on the type of assets that the Issuer may acquire out of the proceeds of assets that mature, are refinanced or otherwise sold, on the period during which such transactions may occur, on the level of transactions that may occur or on other provisions of the Indenture and could adversely affect the earnings of the Issuer and its ability to make payments on the Notes and distributions to the Preferred Shares. As a condition to the effectiveness of any such amendment to the Indenture, the Issuer, the Trustee and the Initial Purchaser will (i) satisfy the Rating Condition with respect to such amendment and (ii) receive a customary, unqualified opinion of counsel from a nationally recognized law firm providing that, after giving effect to such amendment and assuming compliance with the Indenture as so amended, the Issuer is exempt from registration as an "investment company" under the Investment Company Act. Such nationally recognized law firm may also be acting as counsel to the Servicer, certain Holders of Notes and/or Preferred Shares. The interests of any such parties may not coincide with the interest of other Holders of Notes and/or Preferred Shares. See "Legal Structure—The Indenture—Modification of Indenture."

21. <u>Dependence on Key Personnel of the Servicer</u>. The performance of the Portfolio Collateral will be highly dependent on the financial and managerial expertise of the Servicer. See "The Servicer" and "The Servicing Agreement." The loss of one or more of the individuals servicing the Portfolio Collateral could have a significant material adverse effect on the performance of the Portfolio Collateral. Although the Servicer will commit a significant amount of its efforts to the servicing of the Portfolio Collateral, it manages and will manage in the future other products and vehicles and is not required (and will not be able) to devote all of its time to the servicing of the Portfolio Collateral.

22. <u>Ratings of the Notes</u>. The ratings of the Notes by S&P address solely the likelihood of timely payment of the Periodic Interest Amount on and the ultimate payment of the Aggregate Principal Amount of each Class of Senior Class A Notes, the timely payment of the Class X Payment and the ultimate payment of the Cumulative Interest Amount and the Aggregate Principal Amount of the Class A-3L Notes, the Class A-4L Notes and the Class B-1L Notes. The ratings of the Notes by Moody's address the ultimate cash receipt of all required payments as provided by the governing documents, and are based on the expected loss to the Noteholders of each Class relative to the promise of receiving the present value of such payments. A rating is not a recommendation to purchase, hold or sell securities, in as much as such rating does not comment as to market price or suitability for a particular investor and may be subject to revision or withdrawal at any time by the assigning rating organization.

23. <u>Certain Tax Considerations</u>. Investors in the Notes should review carefully the tax considerations set forth in "Certain Tax Considerations" herein.

008207

24. <u>Certain ERISA Considerations</u>. Investors in the Notes should review carefully the ERISA considerations set forth in "Certain ERISA Considerations" herein.

25. <u>Legislation and Regulations In Connection With the Prevention of Money Laundering</u>. The Uniting and Strengthening America By Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "**USA PATRIOT Act**"), signed into law and effective as of October 26, 2001, imposes anti-money laundering obligations on different types of financial institutions, including banks, broker-dealers and investment companies. The USA PATRIOT Act requires the Secretary of the United States Department of the Treasury (the "**Treasury**") to prescribe regulations to define the types of investment companies subject to the USA PATRIOT Act and the related anti-money laundering obligations. It is not clear whether Treasury will require entities such as the Issuer to enact anti-money laundering policies. It is possible that Treasury will promulgate regulations requiring the Co-Issuers or the Initial Purchaser or other service providers to the Co-Issuers, in connection with the establishment of anti-money laundering procedures, to share information with governmental authorities with respect to investors in the Notes and/or the Preferred Shares. Such legislation and/or regulations could require the Co-Issuers to implement additional restrictions on the transfer of the Notes and/or the Preferred Shares. As may be required, the Issuer reserves the right to request such information and take such actions as are necessary to enable it to comply with the USA PATRIOT Act.

26. <u>Emerging Requirements of the European Union.</u> As part of the harmonization of transparency requirements, the European Commission is scheduled to adopt a directive known as the Transparency Obligations Directive that, among other things, will regulate issuers of securities that are offered to the public or admitted to trading on a European Union regulated market. The listing of Notes on any European Union stock exchange would subject the Issuer to regulation under this directive, although the requirements applicable to the Issuer are not yet fully clarified. The Indenture will not require the Issuer to apply for, list or maintain a listing for any Class of Notes on a European Union stock exchange if compliance with this directive (or other requirements adopted by the European Commission or a relevant member state) becomes burdensome in the sole judgment of the Servicer. Should the Notes be delisted from any exchange, the ability of the Holders of such Notes to sell such Notes in the secondary market may be negatively affected.

27. <u>Document Repository</u>. Pursuant to the Indenture, the Issuer will consent to the posting of this Confidential Offering Circular, the Indenture and certain periodic reports required to be delivered pursuant to the Indenture, together with any amendments or modifications thereto, to the internet-based password protected electronic repository of transaction documents relating to privately offered and sold collateralized debt obligation securities located at "www.cdolibrary.com".

**THE ISSUER AND THE CO-ISSUER**

<u>The Issuer</u>

Rockwall CDO Ltd. (the "**Issuer**") was incorporated in the Cayman Islands on June 7, 2005, for the express purpose of issuing the Notes and the Preferred Shares, acquiring, disposing of and holding the assets described herein and engaging in the related transactions contemplated hereby.

The Issuer has no significant prior operating experience. The purposes for which the Issuer has been established are set forth in clause 3 of its Memorandum of Association and are unrestricted; however, the business activities in which the Issuer may engage will be limited by the Indenture to the issuance of the Notes and the Preferred Shares, the acquisition and disposition of Portfolio Collateral as described herein, ownership of the Co-Issuer's shares and certain activities conducted in connection with the payment of amounts in respect of the Notes and the Preferred Shares and the management of the collateral. Cash flow derived from the Portfolio Collateral and other collateral securing the Notes will be the Issuer's only sources of cash.

The registered office of the Issuer is at the offices of Maples Finance Limited, P.O. Box 1093 GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands and the registered number of the Issuer is 150044.

008208

The proceeds of the offering of Notes will be used, together with the proceeds of the sale of the Preferred Shares, to purchase Portfolio Collateral, to fund the Deposit and the Expense Reimbursement Account and to pay organizational, structuring, legal and offering fees and expenses.

Investor Corp.

On the Closing Date, Rockwall Investors Corp. ("**Investor Corp.**"), an exempted limited liability corporation incorporated under the laws of the Cayman Islands, is expected to purchase 100% of the Class I Preferred Shares of the Issuer issued on the Closing Date, and will issue an equivalent number of its preferred shares to third party investors and to Highland.

The Administrator

The Issuer has appointed Maples Finance Limited in the Cayman Islands, as Administrator to perform certain administrative functions on its behalf.

Share Capital

The Issuer's authorized share capital is U.S.$600,250 and consists of 250 ordinary shares of U.S.$1.00 par each, 300,000,000 Class I Preferred Shares of U.S.$0.001 par each and 300,000,000 Class II Preferred Shares of U.S.$0.001 par each. As of the Closing Date, 250 ordinary shares, 33,200,000 Class I Preferred Shares and 45,000,000 Class II Preferred Shares will have been issued and will be fully paid-up. All of the issued and outstanding ordinary shares of the Issuer are held in trust for the benefit of certain charitable entities.

The Class I Preferred Shares and the Class II Preferred Shares will be identical in all respects except that the Class II Preferred Shares will also be entitled, subject to any restrictions under Cayman Islands law, to the Class II Preferred Share Dividends. In addition to the Class II Preferred Share Dividends payable on the Class II Preferred Shares, regular dividends will be payable on the Class II Preferred Shares and the Class I Preferred Shares on each Payment Date in the amounts and in the priority described under the Priority of Payments; *provided* that, if and to the extent sufficient funds to pay such regular dividends in accordance with the Priority of Payments and Cayman Islands law are not available on any Payment Date, such unpaid regular dividends will cease to be payable on such Payment Date or any other date. Class II Preferred Share Dividends will be paid to the Holders of the Class II Preferred Shares on a *pro rata* basis according to the number of Class II Preferred Shares held by each Holder. All other dividends and distributions in respect of the Preferred Shares will be paid to the Holders of the Preferred Shares on a *pro rata* basis according to the number of Preferred Shares held by each Holder. Following the liquidation of the Collateral and the distribution of any available remaining funds following a redemption of the Notes and payment of all other obligations of the Co-Issuers (other than amounts payable by the Issuer to the Holders of the Preferred Shares) or an Event of Default under the Indenture or otherwise, the Preferred Shares will be redeemed, whether or not the Holders thereof receive any payments in respect of such redemption.

The Directors of the Issuer are responsible for the management and administration of the Issuer. Currently, the Directors are Wendy Ebanks and Guy Major. As of the Closing Date, HFP, which will hold all of the Class II Preferred Shares, will have full voting rights with respect to the appointment and removal of the Directors of the Issuer.

The Co-Issuer

The Co-Issuer was incorporated on June 7, 2005, under the laws of the State of Delaware and its registered office is c/o Donald J. Puglisi, 850 Library Avenue, Suite 204, City of Newark, County of New Castle, Delaware 19711. The Co-Issuer will not have any substantial assets and will not pledge any assets to secure the Notes.

The Co-Issuer will be capitalized only to the extent of its common equity of $10, will have no assets other than its equity capital. The Issuer will own 100% of the stock of the Co-Issuer.

008209

## DESCRIPTION OF THE NOTES

Certain definitions used herein are set forth in the Glossary of Certain Defined Terms (the "**Glossary**") set forth as Annex A hereto.

<u>General</u>

The Notes will be issued on the Closing Date pursuant to an indenture (the "**Indenture**"), to be dated as of the Closing Date, among the Co-Issuers and JPMorgan Chase Bank, National Association, as trustee (the "**Trustee**") and as securities intermediary. The following summaries generally describe certain provisions of the Notes and the Indenture. The summaries do not purport to be complete and are subject to, and are qualified in their entirety by reference to, the provisions of the Notes and the Indenture. When particular provisions or terms used in the Notes and the Indenture are referred to, the actual provisions (including definitions of terms) are incorporated by reference. Copies of the Indenture may be obtained by Holders of the Notes upon request to the Issuer or the Initial Purchaser.

The Indenture limits the amount of Notes that can be issued thereunder to the Class X Notes, the Class A-1LA Notes, the Class A-1LB Notes, the Class A-2L Notes, the Class A-3L Notes, the Class A-4L Notes and the Class B-1L Notes in the aggregate principal amounts and notional principal amounts, as applicable, set forth on the cover hereof. Subject to the foregoing, the Notes will be issued in minimum denominations of U.S.$200,000 and integral multiples of U.S.$1 in excess of such minimum denomination.

**The Notes will be non-recourse obligations of the Co-Issuers and all amounts payable in respect of the Notes will be paid solely from and to the extent of the available proceeds from the Trust Estate. To the extent the assets of the Trust Estate are insufficient to pay all amounts due on the Notes on each Payment Date, on the Final Maturity Date or otherwise, the Co-Issuers shall have no further obligations in respect of the Notes and any sums outstanding and unpaid shall be extinguished.**

The Record Date for each Payment Date (including the Final Maturity Date) is the Business Day immediately preceding such Payment Date; *provided, however,* if Definitive Notes are issued, the Record Date for such Definitive Notes shall be the fifteenth calendar day preceding such Payment Date. Payments of interest and principal or any other amount payable on or in respect of the Notes will be made on each Payment Date by wire transfer to registered Holders of the Notes on the Record Date applicable to such Payment Date to accounts maintained by such registered Holders as reflected in the Note Register. In the case of redemption, notice will be mailed to each Holder of record no later than twenty days before the Payment Date on which the final principal payment is expected to be made to such Holder.

Under the terms of the Indenture, the Trustee will act as a paying agent (together with any other paying agent appointed by the Co-Issuers from time to time, the "**Paying Agents**"). JPMorgan Chase Bank, National Association will act as the paying and transfer agent for the Preferred Shares (the "**Paying and Transfer Agent**"). The Issuer will appoint an off-shore Paying and Transfer Agent (other than in the Cayman Islands) (in addition to and not in lieu of JPMorgan Chase Bank, National Association) if requested by at least 33-2/3% of the Preferred Shares, with the cost of any such agent to be borne by the Issuer. There can be no assurance that any investor requesting payment from an off-shore paying agent will receive payments on the same day that they would have received such payments had the payments been made by JPMorgan Chase Bank, National Association. Payments of principal of and interest on and other amounts in respect of the Notes will be made by the Trustee to the Paying Agents from funds available in the Collection Account established under the Indenture as described herein.

All distributions in respect of the Portfolio Collateral will be deposited directly into the Collection Account and will be available to the extent described herein for the payment of amounts payable in respect of the Notes and, under the circumstances set forth herein and in the Indenture, for the applications described herein.

The Notes are subject to restrictions on transfer. See "—Form, Transfer and Transfer Restrictions." Subject to such restrictions, the Notes may be transferred or exchanged at the office designated by the Trustee for such purposes without the payment of any service charge, other than tax or other governmental charges payable in connection therewith.

008210

Payments on the Notes; Priority of Distributions

General.  The Class A-1L Notes will provide for the payment of periodic interest on the Aggregate Principal Amount thereof ("**Periodic Interest**" and, the amount of such periodic interest, the "**Periodic Interest Amount**" with respect to the Class A-1L Notes) (to the extent of funds available therefor as described herein) for each Periodic Interest Accrual Period at the rate of 0.30% with respect to the Class A-1LA Notes and 0.50% with respect to the Class A-1LB Notes, *per annum* above the London interbank offered rate for three-month U.S. dollar deposits (or, for the period from the Closing Date to the first Payment Date, as described herein) ("**LIBOR**") (determined as described herein) (the "**Applicable Periodic Rate**" with respect to the Class A-1LA Notes and the Class A-1LB Notes, as applicable) on the 1st day of November, February, May and August of each year, or, if any such day is not a Business Day, then on the next succeeding Business Day (each such date, a "**Payment Date**"), commencing on the November 1, 2006 Payment Date.  Payments of interest on the Class A-1L Notes will be payable *pari passu* among the Class A-1L Notes and with the Class X Notes Payment as described herein. "**Periodic Interest Accrual Period**" is the period from the Closing Date through the day preceding the subsequent Payment Date and during each period thereafter from each Payment Date through the day preceding the subsequent Payment Date.  To the extent Periodic Interest accrued at the Applicable Periodic Rate with respect to any Periodic Interest Accrual Period is not paid on the related Payment Date, the amount of such interest shortfall will accrue interest at the Applicable Periodic Rate and will be paid (to the extent funds are available therefor as described herein) on one or more subsequent Payment Dates after payment of interest at the Applicable Periodic Rate with respect to the Periodic Interest Accrual Period relating to such subsequent Payment Date (the amount of such shortfall, together with interest thereon at the Applicable Periodic Rate, the "**Periodic Rate Shortfall Amount**" and, with the Periodic Interest Amount for such subsequent Payment Date, the "**Cumulative Interest Amount**" with respect to such Payment Date).  Interest will be calculated on the basis of a year of 360 days and the actual number of days elapsed.  Payments of interest to the Class A-1L Notes and the Class X Payment will be payable *pari passu* among the Class A-1L Notes and the Class X Notes as described herein.

No principal will be payable in respect of the Class A-1L Notes (and principal collections on the Portfolio Collateral will be applied as described herein) during the Revolving Period, except in the event of an Initial Deposit Redemption, an Optional Redemption, a Special Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class A-1LA Notes as described herein.  On each Payment Date with respect to the Amortization Period, the principal of the Class A-1L Notes will be payable (to the extent of funds available therefor and in the order of priority described herein) first to the Class A-1LA Notes and then to the Class A-1LB Notes until the Aggregate Principal Amount of the Class A-1L Notes has been paid in full.  The Class A-1LB Notes are subordinated in right of payment to the Class A-1LA Notes to the extent described herein.  In addition, all payments of principal on the Class A-1L Notes that are made in connection with an Initial Deposit Redemption, a Rating Confirmation Failure, a Tax Event Redemption or an Optional Redemption will be paid on a *pro rata* basis with the Class X Notes as described herein.  All outstanding principal of the Class A-1L Notes, together with the other amounts described herein, will be due and payable on the Final Maturity Date.

No interest will be payable in respect of the Class A-2L Notes on any Payment Date unless the Holders of the Class A-1L Notes have been paid the Cumulative Interest Amount due to them on such Payment Date, the Holders of the Class X Notes have been paid the Cumulative Class X Payment due to them on such Payment Date and, in the case of the Final Maturity Date, until the Aggregate Principal Amount of the Class A-1L Notes and the Class X Notes have been paid in full.

The Class A-2L Notes will provide for the payment of periodic interest on the Aggregate Principal Amount thereof ("**Periodic Interest**" and, the amount of such periodic interest, the "**Periodic Interest Amount**" with respect to the Class A-2L Notes) (to the extent of funds available therefor as described herein) for each Periodic Interest Accrual Period at the rate of 0.65% *per annum* above LIBOR (the "**Applicable Periodic Rate**" with respect to the Class A-2L Notes) on each Payment Date commencing on the November 1, 2006 Payment Date.  To the extent Periodic Interest accrued at the Applicable Periodic Rate with respect to any Periodic Interest Accrual Period is not paid on the related Payment Date, the amount of such interest shortfall will accrue interest at the Applicable Periodic Rate and will be paid (to the extent funds are available therefor as described herein) on one or more subsequent Payment Dates after payment of interest at the Applicable Periodic Rate with respect to the Periodic Interest Accrual Period relating to such subsequent Payment Date (the amount of such shortfall, together with interest thereon at the

008211

Applicable Periodic Rate, the "**Periodic Rate Shortfall Amount**" and, with the Periodic Interest Amount for such subsequent Payment Date, the "**Cumulative Interest Amount**" with respect to such Payment Date). Interest will be calculated on the basis of a year of 360 days and the actual number of days elapsed.

No principal will be payable in respect of the Class A-2L Notes (and principal collections on the Portfolio Collateral will be applied as described herein) during the Revolving Period, except in the event of a Special Redemption, an Optional Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class A-2L Notes. In connection with a Special Redemption, a Tax Event Redemption, an Optional Redemption or a Mandatory Redemption, no principal in respect of the Class A-2L Notes will be payable until the Aggregate Principal Amount of the Class A-1L Notes and the Class X Notes (other than with respect to a Special Redemption or an O/C Redemption) have been paid in full. On each Payment Date with respect to the Amortization Period after the Class A-1L Notes and the Class X Notes have been paid in full, principal of the Class A-2L Notes will be payable (to the extent of funds available therefor and in the order of priority described herein) until the Aggregate Principal Amount of the Class A-2L Notes has been paid in full. All outstanding principal of the Class A-2L Notes, together with the other amounts described herein, will be due and payable on the Final Maturity Date. The Class A-2L Notes are subordinated in right of payment to the Class A-1L Notes and the Class X Notes to the extent described herein.

No interest will be payable in respect of the Class A-3L Notes on any Payment Date unless the Holders of the Senior Class A Notes have been paid the Cumulative Interest Amount due to them on such Payment Date and the Holders of the Class X Notes have been paid the Cumulative Class X Payment due to them on such Payment Date and, in the case of the Final Maturity Date, until the Aggregate Principal Amount of the Senior Class A Notes and the Class X Notes have been paid in full.

The Class A-3L Notes will provide for the payment of periodic interest on the Aggregate Principal Amount thereof ("**Periodic Interest**" and, the amount of such periodic interest, the "**Periodic Interest Amount**" with respect to the Class A-3L Notes) (to the extent of funds available therefor as described herein) for each Periodic Interest Accrual Period at the rate of 1.40% *per annum* above LIBOR (the "**Applicable Periodic Rate**" with respect to the Class A-3L Notes) on each Payment Date commencing on the November 1, 2006 Payment Date. To the extent Periodic Interest accrued at the Applicable Periodic Rate with respect to any Periodic Interest Accrual Period is not paid on the related Payment Date, the amount of such interest shortfall will accrue interest at the Applicable Periodic Rate and will be paid (to the extent funds are available therefor as described herein) on one or more subsequent Payment Dates after payment of interest at the Applicable Periodic Rate with respect to the Periodic Interest Accrual Period relating to such subsequent Payment Date (the amount of such shortfall, together with interest thereon at the Applicable Periodic Rate, the "**Periodic Rate Shortfall Amount**" and, with the Periodic Interest Amount for such subsequent Payment Date, the "**Cumulative Interest Amount**" with respect to such Payment Date). The failure to pay in full Periodic Interest on the Class A-3L Notes as a result of insufficient funds being available therefor will not constitute an Event of Default so long as any Senior Class A Notes or Class X Notes are Outstanding. Interest will be calculated on the basis of a year of 360 days and the actual number of days elapsed.

No principal will be payable in respect of the Class A-3L Notes (and principal collections on the Portfolio Collateral will be applied as described herein) during the Revolving Period, except in the event of a Special Redemption, an Optional Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class A-3L Notes. On each Payment Date with respect to the Amortization Period after the Class A-1L Notes, Class A-2L Notes and the Class X Notes have been paid in full, principal of the Class A-3L Notes will be payable (to the extent of funds available therefor and in the order of priority described herein) until the Payment Date on which the Aggregate Principal Amount of the Class A-3L Notes has been paid in full. In connection with a Special Redemption, a Tax Event Redemption, an Optional Redemption or a Mandatory Redemption, no principal in respect of the Class A-3L Notes will be payable until the Aggregate Principal Amount of the Class A-1L Notes, the Class A-2L Notes and (other than with respect to an O/C Redemption or a Special Redemption) the Class X Notes have been paid in full. All outstanding principal of the Class A-3L Notes, together with the other amounts described herein, will be due and payable on the Final Maturity Date. The Class A-3L Notes are subordinated in right of payment to the Senior Class A Notes and the Class X Notes to the extent described herein.

No interest will be payable in respect of the Class A-4L Notes on any Payment Date unless the Holders of the Class A-1L Notes and the Class A-2L Notes have been paid the Cumulative Interest Amount due to them on such Payment Date, the Holders of the Class A-3L Notes have been paid the Periodic Interest Amount due to them

008212

on such Payment Date, the Holders of the Class X Notes have been paid the Cumulative Class X Payment due to them on such Payment Date, and, in the case of the Final Maturity Date, until the Aggregate Principal Amount of the Senior Class A Notes and the Class X Notes have been paid in full.

The Class A-4L Notes will provide for the payment of periodic interest on the Aggregate Principal Amount thereof ("**Periodic Interest**" and, the amount of such periodic interest, the "**Periodic Interest Amount**" with respect to the Class A-4L Notes) (to the extent of funds available therefor as described herein) for each Periodic Interest Accrual Period at the rate of 1.70% per annum above LIBOR (the "**Applicable Periodic Rate**" with respect to the Class A-3L Notes) on each Payment Date commencing on the November 1, 2006 Payment Date. To the extent Periodic Interest accrued at the Applicable Periodic Rate with respect to any Periodic Interest Accrual Period is not paid on the related Payment Date, the amount of such interest shortfall will accrue interest at the Applicable Periodic Rate and will be paid (to the extent funds are available therefor as described herein) on one or more subsequent Payment Dates after payment of interest at the Applicable Periodic Rate with respect to the Periodic Interest Accrual Period relating to such subsequent Payment Date (the amount of such shortfall, together with interest thereon at the Applicable Periodic Rate, the "Periodic Rate Shortfall Amount" and, with the Periodic Interest Amount for such subsequent Payment Date, the "Cumulative Interest Amount" with respect to such Payment Date). The failure to pay in full Periodic Interest on the Class A-4L Notes as a result of insufficient funds being available therefor will not constitute an Event of Default so long as any Senior Class A Notes, the Class A-3L Notes or Class X Notes are Outstanding. Interest will be calculated on the basis of a year of 360 days and the actual number of days elapsed.

No principal will be payable in respect of the Class A-4L Notes (and principal collections on the Portfolio Collateral will be applied as described herein) during the Revolving Period, except in the event of a Special Redemption, an Optional Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class A-4L Notes. On each Payment Date with respect to the Amortization Period after the Class A-1L Notes, Class A-2L Notes, Class A-3L Notes and the Class X Notes have been paid in full, principal of the Class A-4L Notes will be payable (to the extent of funds available therefor and in the order of priority described herein) until the Payment Date on which the Aggregate Principal Amount of the Class A-4L Notes has been paid in full. In connection with a Special Redemption, a Tax Event Redemption, an Optional Redemption or a Mandatory Redemption, no principal in respect of the Class A-4L Notes will be payable until the Aggregate Principal Amount of the Class A-1L Notes, the Class A-2L Notes, the Class A-3L Notes and (other than with respect to an O/C Redemption or a Special Redemption) the Class X Notes have been paid in full. All outstanding principal of the Class A-4L Notes, together with the other amounts described herein, will be due and payable on the Final Maturity Date. The Class A-4L Notes are subordinated in right of payment to the Senior Class A Notes, the Class A-3L Notes and the Class X Notes to the extent described herein.

No interest will be payable in respect of the Class B-1L Notes on any Payment Date unless the Holders of the Class A-1L Notes and the Class A-2L Notes have been paid the Cumulative Interest Amount due to them on such Payment Date, the Holders of the Class A-3L Notes and Class A-4L Notes have been paid the Periodic Interest Amount due to them on such Payment Date, the Class X Notes have been paid the Cumulative Class X Payment due to them on such Payment Date, the Overcollateralization Tests with respect to the Class A Notes and the Interest Coverage Test have been satisfied, and, on the Final Maturity Date, unless the Aggregate Principal Amount of the Class A Notes and the Class X Notes have been paid in full.

The Class B-1L Notes will provide for the payment of periodic interest on the Aggregate Principal Amount thereof ("**Periodic Interest**" and, the amount of such periodic interest, the "**Periodic Interest Amount**" with respect to the Class B-1L Notes) (to the extent funds are available therefor as described herein) for each Periodic Interest Accrual Period at the rate of 2.25% *per annum* above LIBOR (the "**Applicable Periodic Rate**" with respect to the Class B-1L Notes) on each Payment Date commencing on the November 1, 2006 Payment Date. To the extent Periodic Interest accrued at the Applicable Periodic Rate with respect to any Periodic Interest Accrual Period is not paid on the related Payment Date, the amount of such interest shortfall will accrue interest at the Applicable Periodic Rate and will be paid (to the extent funds are available therefor as described herein) on one or more subsequent Payment Dates after payment of interest at the Applicable Periodic Rate with respect to the Periodic Interest Accrual Period relating to such subsequent Payment Date (the amount of such shortfall, together with interest thereon, at the Applicable Periodic Rate, the "**Periodic Rate Shortfall Amount**" and, together with the Periodic Interest Amount for such subsequent Payment Date, the "**Cumulative Interest Amount**" with respect to such Payment Date). The failure to pay in full Periodic Interest on the Class B-1L Notes as a result of insufficient funds being available

008213

therefor will not constitute an Event of Default so long as any Class A Notes or Class X Notes are Outstanding. Interest will be calculated on the basis of a year of 360 days and the actual number of days elapsed.

No principal will be payable in respect of the Class B-1L Notes until the Aggregate Principal Amount of the Class A Notes and the Class X Notes have been paid in full, except with respect to the Additional Collateral Deposit Requirement.  Principal payments are not expected to begin until the commencement of the Amortization Period (except in the event of a Special Redemption, an Optional Redemption, a Tax Redemption or a Mandatory Redemption of the Class B-1L Notes or in connection with the Additional Collateral Deposit Requirement) and are to continue until the Payment Date on which the Aggregate Principal Amount of the Class B-1L Notes has been paid in full.  In connection with a Special Redemption, a Tax Event Redemption, an Optional Redemption or a Mandatory Redemption, no principal in respect of the Class B-1L Notes will be payable until the Aggregate Principal Amount of the Class A Notes and (other than with respect to an O/C Redemption or a Special Redemption) the Class X Notes have been paid in full.    All outstanding principal of the Class B-1L Notes, together with the other amounts described herein, will be due and payable on the Final Maturity Date.  The Class B-1L Notes are subordinated in right of payment to the Class A Notes and the Class X Notes to the extent described herein.

The Class X Notes will provide for the payment of periodic interest on the Aggregate Principal Amount thereof ("**Periodic Interest**" and, the amount of such periodic interest, the "**Periodic Interest Amount**" with respect to the Class X Notes) (to the extent of funds available therefor as described herein) for each Periodic Interest Accrual Period at the rate of 0.36% per annum above LIBOR (the "**Applicable Periodic Rate**" with respect to the Class X Notes) on each Payment Date, commencing on the November 1, 2006 Payment Date through and including the August 1, 2013 Payment Date.  Any such interest will be calculated on the basis of a year of 360 days and the actual number of days elapsed.  Such amount may be reduced in connection with a redemption of the Class X Notes, as set forth in the Indenture.

To the extent the Class X Payment is not paid on any Payment Date, the amount of such shortfall will accrue interest at the rate of 0.36% *per annum*  above LIBOR (the "**Class X Periodic Interest Rate**") (to the extent funds are available therefor and subject to the priority of distribution provisions described herein) on one or more subsequent Payment Dates (the amount of such shortfall, together with interest thereon, calculated at the Class X Periodic Interest Rate, the "**Class X Shortfall Amount**" and, together with the Class X Payment for such subsequent Payment Date, the "**Cumulative Class X Payment**" with respect to such Payment Date).  The Class X Shortfall Amount shall be payable after payment of the Class X Payment relating to such subsequent Payment Date.  Any such interest will be calculated on the basis of a year of 360 days and the actual number of days elapsed.  The Aggregate Principal Amount of the Class X Notes, together with the other amounts described herein, will be due and payable on the Final Maturity Date of the Class X Notes.

Payments of principal on the Class X Notes that are made in connection with an Initial Deposit Redemption, a Tax Event Redemption, an Optional Redemption or a Rating Confirmation Failure Redemption will be paid on a *pro rata* basis with the Class A-1LA Notes as described herein.  The Class X Notes are not subject to an O/C Redemption or a Special Redemption.  The Aggregate Principal Amount of the Class X Notes will be reduced on each Payment Date by the Class X Principal Payment for such Payment Date. The Holders of the Class X Notes are entitled to receive the Aggregate Principal Amount of the Class X Notes on the Final Maturity Date, whether such Final Maturity Date occurs in connection with a redemption of the Class X Notes as described herein or otherwise.

To the extent assets of the Trust Estate are insufficient to pay all amounts due on the Notes, the Co-Issuers shall have no further obligations in respect of the Notes.

The Co-Issuers will not be required to pay additional amounts to Holders of any Class of Notes if taxes or related amounts are withheld from payments on the Notes or any payments on any item of Portfolio Collateral or other assets of the Co-Issuers.  However, such withholding tax on  payments on items of Portfolio Collateral could result in the Notes being redeemed by the Issuer. See "—Tax Event Redemption."

008214

Determination of LIBOR

For purposes of calculating the Applicable Periodic Rate, the Issuer initially will appoint JPMorgan Chase Bank, National Association, as agent with respect to the determination of LIBOR (in such capacity, the "**Calculation Agent**"). LIBOR will be determined by the Calculation Agent in accordance with the following provisions:

On the second London Business Day prior to the commencement of a Periodic Interest Accrual Period (each such day, a "**LIBOR Determination Date**"), LIBOR shall equal the rate, as obtained by the Calculation Agent, for three-month U.S. dollar deposits which appears on Telerate Page 3750 (as defined in the 2000 ISDA Definitions and as reported by Bloomberg Financial Markets Commodities News) or such other page as may replace such Page 3750, as of 11:00 a.m. (London time) on such LIBOR Determination Date. Notwithstanding the foregoing, LIBOR for the initial Periodic Interest Accrual Period will be determined through the use of straight-line interpolation by reference to two rates calculated in accordance with the provisions above, one of which shall be for five-month U.S. dollar deposits and the other of which shall be for six-month U.S. dollar deposits.

If, on any LIBOR Determination Date, such rate does not appear on Telerate Page 3750 or such other page as may replace such Page 3750, the Calculation Agent shall determine the arithmetic mean of the offered quotations of the Reference Banks to leading banks in the London interbank market for three-month (or five-month and six-month, as applicable) U.S. dollar deposits in an amount determined by the Calculation Agent by reference to requests for quotations as of approximately 11:00 a.m. (London time) on the LIBOR Determination Date made by the Calculation Agent to the Reference Banks. If, on any LIBOR Determination Date, at least two of the Reference Banks provide such quotations, LIBOR shall equal such arithmetic mean of such quotations. If, on any LIBOR Determination Date, only one or none of the Reference Banks provide such quotations, LIBOR shall be deemed to be the arithmetic mean of the offered quotations that leading banks in The City of New York selected by the Calculation Agent (after consultation with the Servicer) are quoting on the relevant LIBOR Determination Date for three-month (or five-month and six-month, as applicable) U.S. dollar deposits in an amount determined by the Calculation Agent that is representative of a single transaction in such market at such time by reference to the principal London offices of leading banks in the London interbank market; *provided* that, if the Calculation Agent is required but is unable to determine a rate in accordance with at least one of the procedures provided above, LIBOR shall be LIBOR as determined on the previous LIBOR Determination Date. As used herein, "**Reference Banks**" means four major banks in the London interbank market selected by the Calculation Agent (after consultation with the Servicer).

As soon as possible after 11:00 a.m. (New York time) on each LIBOR Determination Date, but in no event later than 11:00 a.m. (New York time) on the Business Day immediately following each LIBOR Determination Date, the Calculation Agent will notify the Issuer, the Trustee, the Servicer and (for so long as any Class of Notes is listed on the Irish Stock Exchange) the Irish Stock Exchange, of LIBOR for the next Periodic Interest Accrual Period. The Calculation Agent will also specify to the Issuer the quotations upon which LIBOR is based, and in any event the Calculation Agent shall notify the Issuer before 5:00 p.m. (New York time) on each LIBOR Determination Date that either: (i) it has determined or is in the process of determining LIBOR or (ii) it has not determined and is not in the process of determining LIBOR together with its reasons therefor.

Upon receipt of notice of LIBOR for each Periodic Interest Accrual Period from the Calculation Agent as described in the preceding paragraph, the Trustee will determine the Applicable Periodic Rate for each Class of Notes for such Periodic Interest Accrual Period and notify the Irish Stock Exchange of the Applicable Periodic Rate for each Class of Notes (for so long as any Class of Notes is listed on the Irish Stock Exchange). The determination of LIBOR by the Calculation Agent and the Applicable Periodic Rate by the Trustee (in the absence of manifest error) will be final and binding upon all parties.

The Calculation Agent may be removed by the Issuer at any time. If the Calculation Agent is unable or unwilling to act as such or is removed by the Issuer, or if the Calculation Agent fails to determine LIBOR for a Periodic Interest Accrual Period, the Issuer will promptly appoint as a replacement Calculation Agent a leading bank which is engaged in transactions in U.S. dollar deposits in the international U.S. dollar market and which does not

008215

control or is not controlled by or under common control with the Issuer or its affiliates. The Calculation Agent may not resign or be removed from its duties without a successor having been duly appointed.

<u>Adjusted Collateral Collections</u>

On each Payment Date, in accordance with the Note Valuation Report for the Calculation Date immediately preceding such Payment Date, Collateral Interest Collections, to the extent of Available Funds in the Collection Account (excluding from such Available Funds any Collateral Disposition Proceeds received during the Due Period relating to such Calculation Date to be applied by the Trustee during the related Due Period or the immediately succeeding Due Period to purchase Substitute Portfolio Collateral and, with respect to the purchase of Additional Portfolio Collateral as described in the Indenture, certain Collateral Principal Collections with respect to which the Issuer has entered into a commitment to purchase Portfolio Collateral prior to the end of such Due Period), and a portion of the proceeds from the sale of the Notes in an amount equal to U.S.$1,600,000 (the "**Reserve Amount**") to fund a portion of the payments to be made in accordance with Priority of Payments on any Payment Date constituting Collateral Interest Collections or Collateral Principal Collections at the direction of the Servicer, will be applied by the Trustee to pay each of the following in the order of priority set forth below:

(A) the Trustee Administrative Expenses with respect to such Payment Date and any Trustee Administrative Expenses with respect to a previous Payment Date that were not paid on a previous Payment Date,

(B) the Preferred Shares Administrative Expenses with respect to such Payment Date and any Preferred Shares Administrative Expenses that were not paid on a previous Payment Date,

(C) the Issuer Base Administrative Expenses with respect to such Payment Date and any Issuer Base Administrative Expenses with respect to a previous Payment Date that were not paid on a previous Payment Date,

(D) for the replenishment of the Expense Reimbursement Account up to an amount equal to U.S.$50,000 to the extent any of the amounts referred to in clause (C) have already been paid from funds on deposit therein (the aggregate of the amounts set forth in clauses (A), (B), (C) and (D) shall not exceed (i) U.S.$250,000 *per annum* plus (ii) the greater of U.S.$75,000 *per annum* and 0.0275% *per annum* of the Aggregate Par Amount on the related Calculation Date, and

(E) the Base Servicing Fee with respect to such Payment Date, and any Base Servicing Fee that was not paid on a previous Payment Date, and to the Holders of the Class II Preferred Shares in accordance with the Paying and Transfer Agency Agreement, the Class II Preferred Share Base Dividend with respect to such Payment Date, and any Class II Preferred Share Base Dividend that was not paid on a previous Payment Date (the aggregate of clauses (A), (B), (C), (D) and (E), the "**Aggregate Base Fees and Expenses**").

Collateral Interest Collections net of the Aggregate Base Fees and Expenses payable on a Payment Date, represent "**Adjusted Collateral Interest Collections**" for such Payment Date.

On each Payment Date, in accordance with the Note Valuation Report for the Calculation Date immediately preceding such Payment Date, Collateral Principal Collections, to the extent of Available Funds in the Collection Account (excluding from such Available Funds any Collateral Disposition Proceeds received during the Due Period relating to such Calculation Date to be applied by the Trustee during the related Due Period or the immediately succeeding Due Period to purchase Substitute Portfolio Collateral and, with respect to the purchase of Additional Portfolio Collateral as described in the Indenture, certain Collateral Principal Collections with respect to which the Issuer has entered into a commitment to purchase Portfolio Collateral prior to the end of such Due Period), will be applied by the Trustee to pay the Aggregate Base Fees and Expenses, in the order set forth above, to the extent not paid or replenished from Collateral Interest Collections with respect to such Payment Date (the remaining amount, the "**Adjusted Collateral Principal Collections**" for such Payment Date).

008216

Revolving Period.

I.  Collateral Interest Collections.

On each Payment Date with respect to the **Revolving Period**, Adjusted Collateral Interest Collections for such Payment Date will be applied by the Trustee in the following order of priority:

(i)        to pay, *pari passu*, (i) the Cumulative Interest Amount with respect to the Class A-1LA Notes and the Class A-1LB Notes and such Payment Date and, (ii) on each Payment Date through the August 1, 2013 Payment Date, the Cumulative Class X Payment with respect to the Class X Notes and such Payment Date;

(ii)       to pay the Cumulative Interest Amount with respect to the Class A-2L Notes and such Payment Date;

(iii)      to pay the Cumulative Interest Amount with respect to the Class A-3L Notes and such Payment Date;

(iv)      to pay the Cumulative Interest Amount with respect to the Class A-4L Notes and such Payment Date;

(v)       to the payment of principal in the amount, if any, required to be paid in order to satisfy the Class A Overcollateralization Test and, on each Payment Date after the second Payment Date, the Interest Coverage Test, such amount to be paid first, to the Class A-1LA Notes; second, to the Class A-1LB Notes; third, to the Class A-2L Notes, fourth, to any Periodic Rate Shortfall Amount with respect to the Class A-3L Notes, and then to principal of the Class A-3L Notes; and fifth, to any Periodic Rate Shortfall Amount with respect to the Class A-4L Notes, and then to principal of the A-4L Notes, in that order, until each such Class is paid in full, to the extent required to satisfy the Class A Overcollateralization Test and the Interest Coverage Test;

(vi)      to pay the Periodic Interest Amount with respect to the Class B-1L Notes and such Payment Date;

(vii)     to the payment of principal as an O/C Redemption or a Rating Confirmation Failure Redemption in the amount, if any, required to be paid in order to satisfy the Class B-1L Overcollateralization Test or in order to receive a Rating Confirmation, as applicable, such amount to be paid first, *pro rata*, to the Class X Notes, only in connection with a Rating Confirmation Failure Redemption, and to the Class A-1LA Notes; second, to the Class A-1LB Notes; third, to the Class A-2L Notes; fourth, any Periodic Rate Shortfall Amount with respect to the Class A-3L and then to principal of the Class A-3L Notes; and fifth, to any Periodic Rate Shortfall Amount with respect to the Class A-4L Notes and then to principal of the Class A-4L Notes and sixth, to principal of the Class B-1L Notes, in that order, until each such Class is paid in full, to the extent required to satisfy the Class B-1L Overcollateralization Test or in order to receive a Rating Confirmation, as applicable;

(viii)    to the payment to the Holders of the Class B-1L Notes of an amount equal to the Cumulative Interest Amount for the Class B-1L Notes and such Payment Date to the extent not paid to the Holders of the Class B-1L Notes pursuant to clauses (vi) and (vii) of this section;

(ix)      on each Payment Date after the second Payment Date, *pro rata*, to the extent of available funds, an amount equal to 35% of the funds available up to the Additional Collateral Deposit Requirement to the payment of principal of the Class B-1L Notes until such Class is paid in full and an amount equal to 65% (or, after the Class B-1L Notes are paid in full, 100%) of the funds available up to the Additional Collateral Deposit Requirement to the purchase of Additional Portfolio Collateral (other than CLO Securities) as directed by the Servicer or the Issuer meeting certain specified requirements set forth in the Indenture and described herein during the Due Period in which such Payment Date occurs or the immediately succeeding Due Period;

(x)       to the payment to the Default Swap Counterparty any Default Swap Counterparty Termination Payment;

008217

(xi)  to the payment, *first* (a) to the Servicer of the Additional Servicing Fee with respect to such Payment Date and (b) to the Holders of the Class II Preferred Shares in accordance with the Paying and Transfer Agency Agreement, the Class II Preferred Share Additional Dividend then due and unpaid, and *second*, to the Holders of the Notes any due and unpaid Extension Bonus Payment;

(xii)  to the payment to the Issuer of the Issuer Excess Administrative Expenses with respect to such Payment Date and then any Issuer Excess Administrative Expenses with respect to a previous Payment Date that were not paid on a previous Payment Date;

(xiii)  if the Internal Rate of Return of the Preferred Shares as of such Payment Date is less than 12%, to the payment to the Holders of the Preferred Shares, but only up to an amount that would cause the Internal Rate of Return of the Preferred Shares to equal 12% and;

(xiv)  any remaining amounts, (a) 20% to (x) the payment of the Supplemental Servicing Fee for such Payment Date, and (y) the Holders of the Class II Preferred Shares in accordance with the Paying and Transfer Agency Agreement, the Class II Preferred Share Supplemental Dividend then due and unpaid, and (b) 80% to the Holders of the Preferred Shares in accordance with the Paying and Transfer Agency Agreement, as a dividend thereon or as a redemption payment on the Redemption Date, as applicable.

II.  Collateral Principal Collections.

On each Payment Date with respect to the **Revolving Period**, Adjusted Collateral Principal Collections for such Payment Date will be applied by the Trustee in the following order of priority:

(i)  to the payment of the amounts described in clauses (i) through (vii) with respect to Collateral Interest Collections and the Revolving Period, in the order described therein, in each case to the extent such amounts have not been paid from Adjusted Collateral Interest Collections with respect to such Payment Date; *provided however* that, with respect to the payment described in clause (iii) above, so long as any Class X Notes, Class A-1L Notes or Class A-2L Notes are Outstanding, the Class A-3L Notes shall only be entitled to receive an amount sufficient to pay the Periodic Interest Amount (or, after the Class A-2L Notes are paid in full, the Cumulative Interest Amount) due to the Class A-3L Notes for such Payment Date from Collateral Principal Collections, but only to the extent this payment will not cause the failure of the Class B-1L Overcollateralization Test, with respect to (iv) above, so long as any Class X Notes, Class A-1L Notes, Class A-2L Notes or Class A-3L Notes are Outstanding, the Class A-4L Notes shall only be entitled to receive an amount sufficient to pay the Periodic Interest Amount (or, after the Class A-3L Notes are paid in full, the Cumulative Interest Amount) due to the Class A-4L Notes for such Payment Date from Collateral Principal Collections, but only to the extent this payment will not cause the failure of the Class B-1L Overcollateralization Test, and with respect to (vi) above, so long as any Class X Notes, Class A-1L Notes, Class A-2L Notes, Class A-3L Notes or Class A-4L Notes are Outstanding, the Class B-1L Notes shall only be entitled to receive an amount sufficient to pay the Periodic Interest Amount due to the Class B-1L Notes for such Payment Date from Collateral Principal Collections but only to the extent this payment will not cause the failure of the Class B-1L Overcollateralization Test; and *provided further*, so long as any Class A-1L Notes or Class A-2L Notes are not Outstanding, the Class A-3L Notes shall be entitled to receive an amount sufficient to pay the Cumulative Interest Amount due to the Class A-3L Notes for such Payment Date from Collateral Principal Collections and, so long as any Class A-1L Notes, Class A-2L Notes or Class A-3L Notes are not Outstanding, the Class A-4L Notes shall be entitled to receive an amount sufficient to pay the Cumulative Interest Amount due to the Class A-4L Notes for such Payment Date from Collateral Principal Collections, and then any remaining amounts shall be distributed pursuant to clauses (v) through (vii) above, in the order described therein;

(ii)  to pay principal of the Notes in a Special Redemption, such amount to be paid first, (A) to the Class A-1LA Notes; second, to the Class A-1LB Notes; third, to the Class A-2L Notes; fourth, to any Periodic Rate Shortfall Amount with respect to the Class A-3L Notes; fifth, to principal of the Class A-3L Notes; sixth, to any Periodic Rate Shortfall Amount with respect to the Class A-4L Notes; seventh, to principal of the Class A-4L Notes; and eighth,, to the Class B-1L Notes, in that order, until each such Class is paid in full; and

(iii)      as directed by the Servicer or the Issuer (or deposited by the Trustee in the Collection Account), to the purchase of Additional Portfolio Collateral meeting the specified requirements no later than the last day of the Due Period relating to the Payment Date next following such Payment Date, such amounts to be applied in the manner described herein.

Amortization Period.

I.  Collateral Interest Collections.

On each Payment Date with respect to the **Amortization Period**, Adjusted Collateral Interest Collections for such Payment Date will be applied by the Trustee in the following order of priority:

(i)      to pay, *pari passu*, (i) the Cumulative Interest Amount with respect to the Class A-1LA Notes and the Class A-1LB Notes and such Payment Date and (ii) on each Payment Date through the August 2013 Payment Date, the Cumulative Class X Payment with respect to the Class X Notes and such Payment Date;

(ii)      to pay the Cumulative Interest Amount with respect to the Class A-2L Notes and such Payment Date;

(iii)      to pay the Cumulative Interest Amount with respect to the Class A-3L Notes and such Payment Date;

(iv)      to pay the Cumulative Interest Amount with respect to the Class A-4L Notes and such Payment Date;

(v)      to the payment of principal as an O/C Redemption in the amount, if any, required to be paid in order to satisfy the Class A Overcollateralization Test and, on each Payment Date after the second Payment Date, the Interest Coverage Test, such amount to be paid first, to the Class A-1LA Notes; second, to the Class A-1LB Notes; third, to the Class A-2L Notes, fourth, to any Periodic Rate Shortfall Amount with respect to the Class A-3L Notes and then to principal of the Class A-3L Notes; and fifth, to any Periodic Rate Shortfall Amount with respect to the Class A-4L Notes and then to principal of the A-4L Notes, in that order, until each such Class is paid in full, to the extent required to satisfy the Class A Overcollateralization Test and the Interest Coverage Test;

(vi)      to pay the Periodic Interest Amount with respect to the Class B-1L Notes and such Payment Date;

(vii)      to the payment of principal as an O/C Redemption in the amount, if any, required to be paid in order to satisfy the Class B-1L Overcollateralization Test, such amount to be paid first, to the Class A-1LA Notes; second, to the Class A-1LB Notes; third, to the Class A-2L Notes; fourth, to any Periodic Rate Shortfall Amount and then to principal of the Class A-3L Notes; and fifth, to any Periodic Rate Shortfall Amount and then to principal of the Class B-1L Notes, in that order, until each such Class is paid in full, to the extent required to satisfy the Class B-1L Overcollateralization Test;

(viii)      to the payment to the Holders of the Class B-1L Notes of an amount equal to the Cumulative Interest Amount for the Class B-1L Notes and such Payment Date to the extent not paid to the Holders of the Class B-1L Notes pursuant to clauses (vi) and (vii) of this section;

(ix)      to the payment of, *pro rata*, to the extent of available funds, an amount equal to 35% of the Additional Collateral Deposit Requirement to the payment of principal of the Class B-1L Notes until such Class is paid in full and an amount equal to 65% (or, after the Class B-1L Notes are paid in full, 100%) of the funds available up to the Additional Collateral Deposit Requirement to the payment of principal of the Notes (other than the Class X Notes) in the order of priority described in clause (vii) above;

(x)      to the payment to the Default Swap Counterparty any Default Swap Counterparty Termination Payment;

(xi)      to the payment, *first* (a) to the Servicer of the Additional Servicing Fee with respect to such Payment Date and (b) to the Holders of the Class II Preferred Shares in accordance with the Paying and Transfer

41

Agency Agreement, the Class II Preferred Share Additional Dividend then due and unpaid, and *second*, to the Holders of the Notes any due and unpaid Extension Bonus Payment;

(xii)    to the payment to the Issuer of the Issuer Excess Administrative Expenses with respect to such Payment Date and then any Issuer Excess Administrative Expenses with respect to a previous Payment Date that were not paid on a previous Payment Date;

(xiii)    if the Internal Rate of Return of the Preferred Shares as of such Payment Date is less than 12%, to the payment to the Holders of the Preferred Shares, but only up to an amount that would cause the Internal Rate of Return of the Preferred Shares to equal 12% and;

(xiv)    any remaining amounts, (a) 20% to (x) the payment of the Supplemental Servicing Fee for such Payment Date, and (y) the Holders of the Class II Preferred Shares in accordance with the Paying and Transfer Agency Agreement, the Class II Preferred Share Supplemental Dividend then due and unpaid, and (b) 80% to the Holders of the Preferred Shares in accordance with the Paying and Transfer Agency Agreement, as a dividend thereon or as a redemption payment on the Redemption Date, as applicable.

II.  Collateral Principal Collections.

On each Payment Date with respect to the **Amortization Period**, Adjusted Collateral Principal Collections with respect to such Payment Date will be applied by the Trustee in the following order of priority:

(i)    to the payment of the amounts described in clauses (i) through (vii) with respect to Collateral Interest Collections and the Amortization Period, in the order described therein, in each case to the extent such amounts have not been paid from Adjusted Collateral Interest Collections with respect to such Payment Date; *provided however* that, with respect to the payment described in clause (iii) above, so long as any Class X Notes, Class A-1L Notes or Class A-2L Notes are Outstanding, the Class A-3L Notes shall only be entitled to receive an amount sufficient to pay the Periodic Interest Amount (or, after the Class A-2L Notes are paid in full, the Cumulative Interest Amount) due to the Class A-3L Notes for such Payment Date from Collateral Principal Collections, but only to the extent this payment will not cause the failure of the Class B-1L Overcollateralization Test, with respect to (iv) above, so long as any Class X Notes, Class A-1L Notes, Class A-2L Notes or Class A-3L Notes are Outstanding, the Class A-4L Notes shall only be entitled to receive an amount sufficient to pay the Periodic Interest Amount (or, after the Class A-3L Notes are paid in full, the Cumulative Interest Amount) due to the Class A-4L Notes for such Payment Date from Collateral Principal Collections, but only to the extent this payment will not cause the failure of the Class B-1L Overcollateralization Test, and with respect to (vi) above, so long as any Class X Notes, Class A-1L Notes, Class A-2L Notes, Class A-3L Notes or Class A-4L Notes are Outstanding, the Class B-1L Notes shall only be entitled to receive an amount sufficient to pay the Periodic Interest Amount due to the Class B-1L Notes for such Payment Date from Collateral Principal Collections but only to the extent this payment will not cause the failure of the Class B-1L Overcollateralization Test; and *provided further*, so long as any Class A-1L Notes or Class A-2L Notes are not Outstanding, the Class A-3L Notes shall be entitled to receive an amount sufficient to pay the Cumulative Interest Amount due to the Class A-3L Notes for such Payment Date from Collateral Principal Collections and , so long as any Class A-1L Notes, Class A-2L Notes or Class A-3L Notes are not Outstanding, the Class A-4L Notes shall be entitled to receive an amount sufficient to pay the Cumulative Interest Amount due to the Class A-4L Notes for such Payment Date from Collateral Principal Collections, and then any remaining amounts shall be distributed pursuant to clauses (v) through (vii) above, in the order described therein;

(ii)    so long as no Event of Default has occurred and is continuing and as directed by the Servicer or the Issuer (or deposited by the Trustee in the Collection Account), to the purchase of Additional Portfolio Collateral from the proceeds of Collateral Principal Collections from any unscheduled prepayment or to the purchase of Substitute Portfolio Collateral from the sales proceeds of Credit Improved Portfolio Collateral, meeting the specified requirements with respect to the Amortization Period no later than ninety days after receipt of such amounts, to be applied in the manner described herein; and

008220

(iii)    to pay the Notes as follows: first, to the Class A-1LA Notes until the Aggregate Principal Amount thereof has been paid in full; second, to the Class A-1LB Notes until the Aggregate Principal Amount thereof has been paid in full; third, to the Class A-2L Notes until the Aggregate Principal Amount thereof has been paid in full; fourth, to any Periodic Rate Shortfall Amount with respect to the Class A-3L Notes and then to principal of the Class A-3L Notes until the Aggregate Principal Amount thereof has been paid in full; fifth, to any Periodic Rate Shortfall Amount with respect to the Class A-4L Notes and then to principal of the Class A-4L Notes until the Aggregate Principal Amount thereof has been paid in full; and sixth, to any Periodic Rate Shortfall Amount with respect to Class B-1L Notes and then to principal of the Class B-1L Notes until the Aggregate Principal Amount thereof has been paid in full.

Final Maturity Date.

On the **Final Maturity Date** (including an Optional Redemption Date or a Tax Event Redemption or any other Payment Date on which the Aggregate Principal Amount of the Notes is paid in full as described herein), in accordance with the Note Valuation Report for the Calculation Date immediately preceding the Final Maturity Date (or in the case of an Optional Redemption or a Tax Event Redemption, in accordance with the related redemption date statement delivered pursuant to the Indenture), Available Funds in the Collection Account in an amount equal to the sum of Adjusted Collateral Collections *plus* Collateral Disposition Proceeds, together with all available funds in the Expense Reimbursement Account and the Loan Funding Account, will be applied by the Trustee in the following order of priority:

(i)    to pay, *pari passu*, the Cumulative Interest Amount with respect to the Class A-1LA Notes, the Cumulative Interest Amount with respect to the Class A-1LB Notes and such Payment Date and the Class X Shortfall Amount plus the Periodic Interest Amount for the Class X Notes and such Payment Date;

(ii)    first, to pay the Aggregate Principal Amount of the Class A-1L Notes and the Class X Notes and then to pay the Aggregate Principal Amount of the Class A-1LB Notes;

(iii)    to pay the Cumulative Interest Amount with respect to the Class A-2L Notes and such Payment Date;

(iv)    to pay the Aggregate Principal Amount of the Class A-2L Notes;

(v)    to pay the Cumulative Interest Amount with respect to the Class A-3L Notes and such Payment Date;

(vi)    to pay the Aggregate Principal Amount of the Class A-3L Notes;

(vii)    to pay the Cumulative Interest Amount with respect to the Class A-4L Notes and such Payment Date;

(viii)    to pay the Cumulative Interest Amount with respect to the Class B-1L Notes and such Payment Date;

(ix)    to pay the Aggregate Principal Amount of the Class B-1L Notes;

(x)    to pay any Default Swap Counterparty Termination Payments;

(xi)    to pay, *first*, (a) to the Servicer the Additional Servicing Fee with respect to such Payment Date and (b) to the Holders of the Class II Preferred Shares in accordance with the Paying and Transfer Agency Agreement, the Class II Preferred Share Additional Dividend then due and unpaid and, *second*, to the Holders of the Notes any due and unpaid Extension Bonus Payment;

008221

(xii)     to pay to the Issuer the Issuer Excess Administrative Expenses with respect to such Payment Date and any Issuer Excess Administrative Expenses with respect to a previous Payment Date that were not paid on a previous Payment Date;

(xiii)    if the Internal Rate of Return of the Preferred Shares as of such Payment Date is less than 12%, to the payment to the Holders of the Preferred Shares, but only up to an amount that would cause the Internal Rate of Return of the Preferred Shares to equal 12%; and

(xiv)    any remaining amounts, (a) 20% to (x) the payment of the Supplemental Servicing Fee for such Payment Date, and (y) the Holders of the Class II Preferred Shares in accordance with the Paying and Transfer Agency Agreement, the Class II Preferred Share Supplemental Dividend then due and unpaid, and (b) 80% to the Holders of the Preferred Shares in accordance with the Paying and Transfer Agency Agreement, as a redemption payment on the Redemption Date, as applicable.

The amount and frequency of principal and interest payments will depend on, among other things, the extent to which the Portfolio Collateral pledged to secure the Notes become items of Defaulted Portfolio Collateral, are subject to early payment provisions or are retired prior to the Final Maturity Date through mandatory or optional redemption, sale, maturity or other liquidation or disposition and the extent to which Additional Portfolio Collateral meeting the requirements specified herein are available for purchase in circumstances in which Available Funds are to be used for the purchase of Additional Portfolio Collateral or in circumstances in which the Issuer may dispose of Portfolio Collateral and apply the proceeds thereof to the purchase of Substitute Portfolio Collateral as described herein as well as other factors, including the interest rates obtained in connection with the purchase of any such item of Portfolio Collateral or any Eligible Investment in which funds held in the accounts described herein may be maintained.

Notwithstanding anything contained herein to the contrary, with respect to Adjusted Collateral Collections held in the Collection Account in Eligible Investments pending application to purchase Portfolio Collateral, any such amounts not used to purchase Portfolio Collateral by the last day of the Due Period next succeeding the Due Period in which such amounts were collected may be used to purchase Portfolio Collateral in subsequent Due Periods in accordance with "Security for the Notes."

In addition, notwithstanding anything to the contrary, upon the direction of the Issuer (as directed by and in the time and manner directed by the Servicer), Payment Date Equity Securities may be distributed on any Payment Date in lieu of cash as follows:

(i)     Payment Date Equity Securities will be paid as Collateral Interest Collections in accordance with the Priority of Payments with respect to the Preferred Shares, and upon such payment, the aggregate amount of Collateral Interest Collections distributable to the Holders of the Preferred Shares on such Payment Date will be reduced by the value of such Payment Date Equity Securities. Payment Date Equity Securities distributed on any Payment Date shall be distributed to the Holders of the Preferred Shares in the same manner as Collateral Interest Collections would be distributable to such Holders of Preferred Shares on such Payment Date and subject to the same restriction as to payment set out in the Paying and Transfer Agency Agreement; and

(ii)    in calculating the amounts of Collateral Interest Collections and Collateral Principal Collections for such Payment Date, Collateral Interest Collections in an amount equal to the value of Payment Date Equity Securities distributed to the Holders of the Preferred Shares shall be recharacterized as Collateral Principal Collections and distributed in accordance with the Priority of Payments herein.

Overcollateralization Tests

The "**Overcollateralization Tests**" are applicable until the Notes are retired and all amounts payable in respect thereof are paid, and are satisfied if the Class A Overcollateralization Ratio is at least equal to the Class A Overcollateralization Percentage (the "**Class A Overcollateralization Test**") and the Class B-1L Overcollateralization Ratio is at least equal to the Class B-1L Overcollateralization Percentage (the "**Class B-1L Overcollateralization Test**").

008222

The "**Class A Overcollateralization Percentage**" is 107% and the "**Class B-1L Overcollateralization Percentage**" is 106%.

The "**Class A Overcollateralization Ratio**" means, with respect to a determination made as of any date of calculation, the ratio (expressed as a percentage) obtained by dividing (a) the sum of (1) the Aggregate Principal Amount of the Portfolio Collateral in the Trust Estate as of such date, calculated in accordance with the Overcollateralization Ratio Adjustment *plus* (2) the sum of the Balance of Eligible Investments and cash in the Collection Account representing Collateral Principal Collections *plus* the Balance of Eligible Investments and cash in the Initial Deposit Account *plus* unpaid Purchased Accrued Interest, each as of such date by (b) the sum of the Aggregate Principal Amount of the Class A Notes (including for this purpose any Periodic Rate Shortfall Amounts with respect to such Classes of Notes not paid when due, until such amounts, if any, are paid in full) as of such date.

The "**Class B-1L Overcollateralization Ratio**" is calculated in the same manner, but reduces the numerator by the Overcollateralization Haircut Amount and includes in the denominator the Class B-1L Notes (including, in each case any Periodic Rate Shortfall Amounts with respect to such Classes of Notes not paid when due, until any such amounts are paid in full).

With respect to an item of Portfolio Collateral that it is both eligible to be included in the Overcollateralization Haircut Amount and is subject to an Overcollateralization Ratio Adjustment, for purposes of calculating the Class B-1L Overcollateralization Ratio, such item of Portfolio Collateral will not be discounted multiple times, but will be treated in the category that results in the largest discount to the par amount of the Portfolio Collateral.

The "**Overcollateralization Ratio Adjustment**" means, for purposes of calculating the Overcollateralization Ratios (i) items of Equity Portfolio Collateral shall not be included as Portfolio Collateral, (ii) items of Deferred Interest PIK Bonds and Defaulted Portfolio Collateral shall be included at the lesser of (a) the Market Value of such Deferred Interest PIK Bond and item of Defaulted Portfolio Collateral and (b) the Applicable Percentage for such Deferred Interest PIK Bond and item of Defaulted Portfolio Collateral multiplied by its Principal Balance; *provided that* any Portfolio Loan that has been an item of Defaulted Portfolio Collateral for four years shall not be included as Portfolio Collateral and any CLO Security that has been an item of Defaulted Portfolio Collateral for three years shall not be included as Portfolio Collateral, (iii) with respect to items of Discount Portfolio Collateral, an amount equal to the original purchase price of such item of Discount Portfolio Collateral shall be included as Portfolio Collateral and (iv) to the extent the Aggregate Principal Amount of Current Pay Obligations exceeds 7.5% of the Aggregate Par Amount, such excess shall be included as Defaulted Portfolio Collateral. If an item of Portfolio Collateral could be classified in more than one of the categories set forth in clauses (i) through (iv), such item of Portfolio Collateral will not be discounted multiple times but will be treated in the applicable category that results in the largest discount to the par amount of such item of Portfolio Collateral. Notwithstanding the foregoing, there may be included as Portfolio Collateral (with respect to items (i) through (iv) above) such greater amount as confirmed by the Rating Agencies which will not result in a reduction or withdrawal of the then-current ratings assigned by them to any Class of the Notes.

Applicability of Overcollateralization Tests

At any time that the Notes are Outstanding, if any Overcollateralization Test is not satisfied on any Calculation Date related to a Payment Date, amounts that are junior in right of payment to such Overcollateralization Test as described under "—Payments on the Notes; Priority of Distributions", will be applied to the payment of principal of the Class A Notes and the Class B-1L Notes (or, in the case of the Class A-3L Notes, the Class A-4L Notes and Class B-1L Notes, first to pay Periodic Rate Shortfall Amounts and then to pay principal), in the order described under "—Payments on the Notes; Priority of Distributions", in an O/C Redemption to the extent necessary to satisfy the applicable Overcollateralization Tests (recalculated on such Payment Date, but as of such Calculation Date, after taking into account such O/C Redemption) in accordance with the provisions described herein.

In addition, generally, satisfaction or, in certain cases, maintenance, of both Overcollateralization Tests is a condition to the purchase or sale of Portfolio Collateral during certain specified periods. See "Security for the Notes—Changes in Composition of Portfolio Collateral".

008223

Interest Coverage Test

The "**Interest Coverage Test**" is applicable on each Payment Date after the second Payment Date and will be satisfied as of such Payment Date if the Interest Coverage Ratio is at least equal to 1.5%. The "**Interest Coverage Ratio**" means, with respect to any Payment Date after the second Payment Date, a number (expressed as a percentage) calculated by dividing (a) four times the amount by which (i) the Collateral Interest Collections received or scheduled to be received during the Due Period in which such calculation occurs (other than Collateral Interest Collections (including deferred interest thereon) scheduled to be received on any item of Portfolio Collateral that is not paying or expected to pay current interest), exceeds (ii) the Periodic Reserve Amount (excluding amounts payable on the Class B-1L Notes) as of such Payment Date, by (b) the Aggregate Principal Amount of Class A Notes with respect to such Payment Date, as adjusted, to take into account any O/C Redemption to occur on the Payment Date related to such Due Period pursuant the Indenture.

Applicability of Interest Coverage Test

At any time after the second Payment Date that any of the Notes are Outstanding, if the Interest Coverage Test is not satisfied on any Calculation Date related to a Payment Date, amounts that are junior in right of payment to the Interest Coverage Test as described under "—Payments on the Notes; Priority of Distributions", will be applied to the payment of principal of the Class A Notes in the order described under "—Payments on the Notes; Priority of Distributions", in an O/C Redemption to the extent necessary to satisfy the Interest Coverage Test (recalculated on such Payment Date, but as of such Calculation Date, after taking into account such O/C Redemption) in accordance with the provisions described herein.

In addition, satisfaction of the Interest Coverage Test on the prior Payment Date is a condition to certain purchases and sales of Portfolio Collateral during certain specified periods as described herein. See "Security for the Notes—Changes in Composition of Portfolio Collateral."

Additional Collateral Deposit Requirement

On each Payment Date after the second Payment Date, even if the Overcollateralization Tests and the Interest Coverage Test are satisfied, Collateral Interest Collections that would otherwise be used for payments that are junior in right of payment to the Additional Collateral Deposit Requirement, as described under "—Payments on the Notes; Priority of Distributions—Revolving Period," will be applied during the Revolving Period, to the payment of principal of the Class B-1L Notes and will be made available to purchase Additional Portfolio Collateral or, during the Amortization Period, will be applied to the payment of the Class B-1L Notes and to pay principal of the Notes (other than the Class X Notes) in the order described under "—Payments on the Notes; Priority of Distributions—Amortization Period." The "Additional Collateral Deposit Requirement" with respect to any Payment Date is the amount necessary such that:

(a) the sum of:

(i) the Aggregate Principal Amount of the Portfolio Collateral in the Trust Estate as of the Calculation Date relating to such Payment Date, *plus*

(ii) the sum of the Balance of Eligible Investments and cash in the Collection Account representing Collateral Principal Collections *plus* the Balance of Eligible Investments and cash in the Initial Deposit Account *plus* unpaid Purchased Accrued Interest as of such date, less

(iii) the Overcollateralization Haircut Amount (if any),

equals or exceeds:

(b) 107% of the amount necessary, after giving effect to the amount applied to any O/C Redemption of the Notes (other than the Class X Notes) to satisfy the Overcollateralization Tests and the Interest Coverage Test (if applicable) on such Payment Date, to repay the Aggregate Principal Amount of the Notes (other than the Class X Notes), including any Periodic Rate Shortfall Amounts. Notwithstanding the foregoing, if the Additional Collateral

008224

Deposit Requirement is a positive number that is more than the amount available therefor in the Priority of Payments, then the amount distributed with respect to the Additional Collateral Deposit Requirement shall be such lesser amount available.

For purposes of the Additional Collateral Deposit Requirement, no item of Equity Portfolio Collateral shall be included as Portfolio Collateral. In addition for purposes of this requirement, (i) with respect to Defaulted Portfolio Collateral as to which there has occurred a payment default or an event of bankruptcy, only the portion equal to the lesser of (a) the Market Value of such item of Defaulted Portfolio Collateral and (b) the Applicable Percentage multiplied by the Principal Balance of such item of Portfolio Collateral, shall be included as Portfolio Collateral and (ii) with respect to items of Discount Portfolio Collateral, only an amount equal to the original purchase price of such item of Discount Portfolio Collateral shall be included as Portfolio Collateral. For purposes of calculating the Additional Collateral Deposit Requirement, to the extent an item of Portfolio Collateral is considered Defaulted Portfolio Collateral, Discount Portfolio Collateral and/or is included in the Overcollateralization Haircut Amount, such item of Portfolio Collateral will not be discounted multiple times, but will be treated in the category that results in the largest discount to the par amount of the Portfolio Collateral.

Rating Confirmation Failure

The Issuer will request that each Rating Agency confirm after the Effective Date that it has not reduced or withdrawn (and not restored) the ratings assigned by it on the Closing Date to the Notes (a "**Rating Confirmation**"). If the Issuer is unable to obtain a Rating Confirmation by the 35th day after the Effective Date (a "**Rating Confirmation Failure**"), on the next Payment Date and on each subsequent Payment Date during the Revolving Period, amounts that are junior in right of payment to such Rating Confirmation Failure, as described under "Description of the Notes—Payments on the Notes; Priority of Distributions", will be applied to the redemption of the Notes (or, in the case of the Class B-1L Notes, first to pay Periodic Rate Shortfall Amounts, then to pay principal) until each such Class is paid in full, in the order and according to the priorities described herein (a "**Rating Confirmation Failure Redemption**"), to the extent necessary to receive a Rating Confirmation, in accordance with the provisions described herein. The Trustee will give notice of a Rating Confirmation Failure Redemption to the Company Announcements Office of the Irish Stock Exchange if any Class of Notes is then listed on the Irish Stock Exchange.

O/C Redemption

If on any Calculation Date any of the Overcollateralization Tests or the Interest Coverage Test are required to be satisfied and are not satisfied, amounts that are junior in right of payment to such test as described under "—Payments on the Notes; Priority of Distributions", will be applied to the redemption of the Class A Notes and the Class B-1L Notes (or, in the case of the Class B-1L Notes, first to pay Periodic Rate Shortfall Amounts, then to pay principal) in the order described under "—Payments on the Notes; Priority of Distributions" (an "**O/C Redemption**") to the extent necessary in order to satisfy both the Overcollateralization Tests and the Interest Coverage Test. A redemption of the Notes through a Rating Confirmation Failure Redemption or an O/C Redemption is sometimes referred to herein as a "**Mandatory Redemption**". Any Mandatory Redemption will be effected at par. The Class X Notes are not subject to O/C Redemption, but are subject to Rating Confirmation Failure Redemption. The Trustee will give notice of a Mandatory Redemption to the Company Announcements Office of the Irish Stock Exchange if any Class of Notes is then listed on the Irish Stock Exchange.

Initial Deposit Redemption

On the Effective Date, to the extent that the full amount of the Deposit is not used to purchase or committed to be used to purchase Original Portfolio Collateral having an Aggregate Principal Amount (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to the Original Portfolio Collateral on or before the Effective Date) at least equal to the Required Portfolio Collateral Amount in accordance with the guidelines described herein and in the Indenture, an amount (not in excess of the amount of the Deposit not so used to purchase or committed to be used to purchase) equal to the excess of the Required Portfolio Collateral Amount over the par amount of Portfolio Collateral actually acquired (or committed to be acquired) (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to the Original

008225

Portfolio Collateral on or before the Effective Date) will be applied by the Issuer on the November 2006 Payment Date (the "**Initial Deposit Redemption Date**") to make principal payments on the Class A-1LA Notes and the Class X Notes, on a *pro rata* basis (an "**Initial Deposit Redemption**") except, if the amount of the Deposit not so used to purchase or committed to be used to purchase Original Portfolio Collateral does not exceed U.S.$2,000,000 in the aggregate, such amount will be transferred to the Collection Account on the Effective Date and applied as Collateral Principal Collections. The Trustee will give notice of an Initial Deposit Redemption to the Company Announcements Office of the Irish Stock Exchange if any Class of Notes is then listed on the Irish Stock Exchange.

Optional Redemption

On any Payment Date after the Non-Call Period (the "**Optional Redemption Date**," which date shall be considered the Final Maturity Date in the case of a Total Optional Redemption (as hereinafter defined)), subject to satisfaction of certain conditions described herein, the Notes will be redeemed, in whole or in part, by the Co-Issuers or the Issuer, as applicable, in accordance with the priority of distributions described herein, if such redemption is directed by the holders of Preferred Shares in the amounts described below.

(a) In the case of an Optional Redemption in whole (a "**Total Optional Redemption**"):

(i) the Holders of at least 75% of the outstanding Preferred Shares eligible to vote direct the Co-Issuer or the Issuer to redeem the Notes; *provided* that any Preferred Shares beneficially owned or controlled by the Servicer, entities affiliated with the Servicer or clients of the Servicer (collectively, the "**Servicer Entities**") in excess of the Original HFP Share Amount, shall be excluded from, and be deemed ineligible to participate in, any such vote to direct any Total Optional Redemption;

(ii) sufficient liquidation proceeds from the Portfolio Collateral must exist to effect the redemption of all Notes in full at their Redemption Price in accordance with the priority of distributions described herein; and

(b) in the case of an Optional Redemption in part (a "**Partial Optional Redemption**" and together with a Total Optional Redemption, referred to herein as an "**Optional Redemption**"):

(i) the Holders of at least 10% of the outstanding Preferred Shares eligible to vote direct the Co-Issuer or the Issuer to redeem the Notes in part; *provided* that any Preferred Shares beneficially owned or controlled by the Servicer Entities, including any HFP Shares, shall be excluded from, and be deemed ineligible to participate in, any such vote to direct any Partial Optional Redemption;

(ii) the Holders of Preferred Shares directing such Partial Optional Redemption shall specify the percentage of Notes that will be subject to redemption *pro rata* (the "**Partial Redemption Percentage**"); *provided* that the Partial Redemption Percentage must be the percentage equivalent to at least 10% of the aggregate outstanding principal amount of the Notes as of the Closing Date; and

(iii) the following conditions must be satisfied:

(1) the Partial Redemption Percentage of the Notes must be redeemed *pro rata* at their respective Optional Redemption Price,

(2) the Collateral Quality Matrix tests, Overcollateralization Tests, Interest Coverage Tests and any other eligibility criteria with respect to the Portfolio Collateral must be satisfied before and after giving effect to such redemption; *provided* that the degree of compliance with the Moody's Weighted Average Rating Test and the Weighted Average Margin Test shall not be diminished after giving effect to such redemption,

(3) any applicable Default Swaps of the Issuer must be modified or terminated in a manner consistent with the economic effect of such redemption and in consideration of the Portfolio Collateral and Eligible Investments that will be owned by the Issuer after giving effect to such redemption, and any net termination payments payable by the Issuer must be paid,

008226

(4) the Rating Condition must be satisfied with respect to each Rating Agency,

(5) not more than three (3) prior Partial Optional Redemptions may have occurred, and

(6) no claims may be pending against the Issuer or the Co-Issuer and no judgments may have been rendered against the Issuer or the Co-Issuer which exceed, or reasonably could be expected to result in liabilities that exceed, in the aggregate, $100,000, unless adequate funds have been reserved or set aside for the payment thereof.

In connection with any Optional Redemption, the Issuer may use all funds credited to the Collection Account to provide for payment of the Optional Redemption Price. If there are not sufficient funds in the Collection Account as of the date the notice of redemption is given to pay the Optional Redemption Price on the Optional Redemption Date and all such payments, fees and expenses (including any termination payments with respect to any Synthetic Securities and any Default Swaps), the Servicer is required to give the Trustee written direction to sell Portfolio Collateral in an amount sufficient to provide funds to pay the Optional Redemption Price in full. The Trustee will give notice of an Optional Redemption to the Company Announcements Office of the Irish Stock Exchange if any Class of Notes is then listed on the Irish Stock Exchange.

The Servicer shall have the right to purchase the Preferred Shares held by any Holder that directs the Issuer to effect a Partial Optional Redemption at a price equal to the liquidation value of such Preferred Shares.

Tax Event Redemption

The Notes are also subject to redemption on any Payment Date, at the option of the Issuer, in whole but not in part, at the direction of at least 66-2/3% of the Preferred Shares or a majority of the Controlling Class (but only if the Aggregate Principal Balance of Portfolio Collateral is less than 100% of the Class A-1L Notes) on any Payment Date at the Tax Event Redemption Price, if as a result of (i) change in tax law, rule or regulation or the interpretation thereof, the payments to be received on the Portfolio Collateral are reduced as a result of the imposition of withholding tax, (ii) the Issuer is otherwise subjected to tax such that the income of the Issuer is reduced in an amount determined by such holders of Preferred Shares to be material, (iii) (A) one or more items of Portfolio Collateral that were not subject to withholding tax when the Issuer committed to purchase them have become subject to withholding tax or the rate of withholding has increased on one or more items of Portfolio Collateral that were subject to withholding tax when the Issuer committed to purchase them and (B) in any Due Period the aggregate of the payments subject to withholding tax on new withholding tax obligations and the increase in payments subject to withholding tax on increased rate withholding tax obligations, in each case to the extent not "grossed-up" (on an after-tax basis) by the related obligor, represent 5% or more of Interest Proceeds for the Due Period, or (iv) taxes, fees, assessments or other similar charges are imposed on the Issuer or the Co-Issuer in an aggregate amount in any 12-month period in excess of $2,000,000, other than liabilities for withholding taxes included in clause (iii) above.

As the result of the ownership of Preferred Shares and Notes by the Servicer Entities, and the ability to vote the Preferred Shares and the Notes owned by the Servicer Entities up to a maximum amount equal to the Original HFP Share Amount, the affirmative vote or approval of the Preferred Shares owned by such Servicer Entities, may be required in order to cause an Optional Redemption or a Tax Redemption of the Notes.

Special Redemption

The Notes (other than the Class X Notes) are subject to redemption in part on any Payment Date (and on one or more Payment Dates) during the Revolving Period, at the option of the Issuer acting at the direction of the Servicer, if more than U.S.$2,000,000 of Collateral Principal Collections received are not applied to the purchase of Additional Portfolio Collateral selected by the Servicer and satisfying the criteria described herein by the earlier of ninety days of receipt or the last day of the Revolving Period, in an amount of at least U.S.$2,000,000 as described under "—Payments on the Notes; Priority of Distributions—Revolving Period—Collateral Principal Collections".

008227

The Trustee will give notice of any redemption which the Issuer and the Servicer have directed to the Company Announcements Office of the Irish Stock Exchange if any Class of Notes is then listed on the Irish Stock Exchange.

Extension of the Revolving Period and the Final Maturity Date

*General*

The Issuer, if directed by the Servicer, shall be entitled on each Extension Effective Date to extend the Revolving Period to the applicable Extended Revolving Period End Date up to a maximum of four times (so that the Notes can only be extended to 2037) if (i) in the case of an Extension Effective Date occurring after the first Extension Effective Date, the Issuer has previously affected a Maturity Extension for each preceding Extension Effective Date, (ii) the Extension Conditions are satisfied, (iii) the Issuer has given written notice of its election to extend the Revolving Period no later than 60 days and no earlier than 90 days prior to such Extension Effective Date and (iv) no Event of Default has occurred and is continuing. If the Extension Conditions are satisfied, the Final Maturity Date of the Notes (other than the Class X Notes) shall be automatically extended to the related Extended Final Maturity Date and the Weighted Average Life Test shall be extended to the related Extended Weighted Average Life Date, without any requirement for approval or consent of any Holders of Notes (other than the Holders of the Class A-1LA Notes) or Preferred Shares (other than as may be required pursuant to the Extension Conditions) or amendment or supplement to the Indenture or any other transaction document (the "**Maturity Extension**").  In the case of a Maturity Extension, any Holder of Notes or Preferred Shares wishing to sell such Notes or Preferred Shares to an Extension Qualifying Purchaser pursuant to the Extension Conditions must provide the applicable Extension Sale Notice within the Extension Sale Notice Period pursuant to "—Extension Procedure" below (such Notes or Preferred Shares as to which an Extension Sale Notice has been duly given, "**Extension Sale Securities**"). Each Holder providing an Extension Sale Notice shall be deemed to agree that no Extension Sale Securities shall be purchased unless all Extension Sale Securities are purchased and settled at the applicable Extension Purchase Price on the applicable Extension Effective Date and the other Extension Conditions are satisfied as of such date. The Maturity Extension shall be effective only if the following conditions (the "**Extension Conditions**") are satisfied:

(i) the purchase of all Extension Sale Securities has been settled by the designated Extension Qualifying Purchasers at the applicable Extension Purchase Price as of the applicable Extension Effective Date;

(ii) all such purchases of Extension Sale Securities individually and in the aggregate comply with the applicable transfer restrictions herein, in the Indenture and the Preferred Share Paying and Transfer Agency Agreement immediately after such purchase and the legends on such Notes and Preferred Shares and all applicable law, rules and regulations (including, without limitation, rules, regulations and procedures of any applicable securities exchange, self-regulatory organization or clearing agency);

(iii) (a) the Rating Condition has been satisfied with respect to S&P (so long as any Notes are then rated by S&P) and (b) either (A) the Class B-1L Overcollateralization Ratio is at least 107.5% and the Collateral Quality Tests are satisfied as of the related Extension Determination Date and the Interest Coverage Test was satisfied on the immediately preceding Payment Date, the rating of each Class of Notes by Moody's has not been downgraded, withdrawn or qualified from that in effect on the Closing Date (unless it subsequently has been reinstated the rating assigned on the Closing Date) or (B) the Rating Condition has been satisfied with respect to Moody's (so long as any Notes are then rated by Moody's); and

(iv) (a) the Holders of 100% of the Outstanding Aggregate Principal Amount of the Class A-1LA Notes have delivered the Extension Sale Notice in the Extension Sale Notice Period or (b) if the Holders of 100% of the Aggregate Outstanding Amount of the Class A-1LA Notes fail to deliver an Extension Sale Notice pursuant to the preceding clause (a), either (A) the Issuer, acting through the Servicer, notifies the Holders of the Class A-1LA Notes in writing not later than the last day of the Extension Sale Notice Period that such Class A-1LA Notes shall constitute "Extension Sale Securities" (as a result of which such Class A-1LA Notes must be purchased by an Extension Qualifying Purchaser) or (B) the Holders of 100% of the Aggregate Outstanding Amount of the Class A-1LA Notes have consented in writing to the Maturity Extension not later than the last day of the Extension Sale Notice Period.

008228

In the case of a Maturity Extension, each Holder of Notes other than Extension Sale Securities and the Class X Notes shall be entitled to receive an amount equal to the applicable Extension Bonus Payment. Holders of Preferred Shares shall not be entitled to receive any Extension Bonus Payment. The obligation to make any Extension Bonus Payment shall not be rated by the Rating Agencies. The Extension Bonus Payment shall be payable to any applicable qualifying beneficial owners who have provided the Trustee with an Extension Bonus Eligibility Certification. Extension Bonus Payments which are not available to be paid on a Payment Date in accordance with the priority of distributions on a Payment Date shall not be considered "due and payable" hereunder. The failure to pay any such Extension Bonus Payment on such date shall not be an Event of Default, unless the Issuer shall fail to pay in full such Extension Bonus Payment on the earlier of the Final Maturity Date and the date of redemption in full of the relevant Notes. Unpaid Extension Bonus Payments shall not accrue interest. Such amounts shall be paid to the accounts designated in the applicable Extension Bonus Eligibility Certification or, to the extent otherwise required by the rules of any applicable securities exchange or clearing agency, in a manner determined by the Issuer.

*Extension Procedure*

No later than three Business Days following receipt by the Trustee of the notice given by the Issuer of its election to extend the Revolving Period (the "**Extension Notice**"), the Trustee shall deliver the Extension Notice to all Holders of Notes (other than the Class X Notes) and the Preferred Shares Paying and Transfer Agent (for forwarding to the Holders of the Preferred Shares) and each Rating Agency (so long as any rated Notes are Outstanding), in the form set out in the Indenture, and shall request the Rating Condition for the Maturity Extension from S&P, if applicable. Any Holder of Notes (other than the Class X Notes) and Preferred Shares may give irrevocable notice (an "**Extension Sale Notice**") within 30 days after the Trustee has delivered the Extension Notice (the "**Extension Sale Notice Period**") of its intention to sell its Notes or Preferred Shares to an Extension Qualifying Purchaser in the case of a Maturity Extension. If the Holders of 100% of the Outstanding Aggregate Principal Amount of the Class A-1LA Notes have not delivered the Extension Sale Notice to the Trustee by the 20th calendar day after the date of the Extension Notice, the Trustee shall notify the Holders of the Class A-1LA Notes of the date on which the Extension Sale Notice Period shall end and include a statement to the effect that (i) no Extension Sale Notice delivered after the end of the Extension Sale Notice Period shall be effective and (ii) the Class A-1LA Notes for which no Extension Sale Notice has been delivered may be treated as Extension Sale Securities pursuant to clause (v) of the Extension Conditions (as a result of which the Class A-1LA Notes must be purchased by an Extension Qualifying Purchaser). Any Extension Sale Notice received by the Trustee after the Extension Sale Notice Period shall be disregarded and deemed not to have been given. No Holder of Notes or Preferred Shares that has not given such an Extension Sale Notice within the Extension Sale Notice Period shall be entitled to sell its Notes or Preferred Shares to an Extension Qualifying Purchaser in connection with the Maturity Extension. If clause (iii)(b)(A) of the Extension Conditions is not satisfied as of the applicable Extension Determination Date as determined by the Issuer (or its agent), the Trustee shall request the Rating Condition to be satisfied with respect to Moody's. On the applicable Extension Determination Date, the Issuer (or its agent) shall confirm (i) whether or not Extension Qualifying Purchasers for all Extension Sale Securities have been designated to purchase such Notes or Preferred Shares in compliance with all transfer restrictions in the Indenture and the legends on such Notes or Preferred Shares and all applicable laws, rules and regulations (including, without limitation, any rules, regulations and procedures of any securities exchange, self-regulatory organization or clearing agency), (ii) whether the requirements of clause (iii) of the Extension Conditions are satisfied as of the applicable Extension Determination Date and (iii) whether all other Extension Conditions can be satisfied as of the applicable Extension Effective Date. On each Extension Effective Date, the Maturity Extension shall become effective under the terms of the Indenture; *provided that* all Extension Conditions set forth above are satisfied. No later than two Business Days after each Extension Effective Date, the Trustee based on a determination made by the Issuer, at the expense of the Co-Issuers, shall deliver a notice to all Holders of Notes and the Preferred Shares Paying and Transfer Agent (for forwarding to the Holders of Preferred Shares), the Servicer, the Initial Purchaser, each Rating Agency (so long as any rated Notes are Outstanding) and the Irish Stock Exchange (if and for so long as any Class of Notes is listed thereon) confirming whether or not the Maturity Extension became effective. If the Maturity Extension became effective, the Issuer shall make any required notifications thereof to the Depositary for any Notes subject to the Maturity Extension. None of the Initial Purchaser, the Servicer or any of their respective Affiliates shall have any duty to act as an Extension Qualifying Purchaser.

<u>Additional Issuance</u>

008229

At any time during the Revolving Period, the Issuer, as applicable, may issue and sell Additional Preferred Shares and use the proceeds from such issuance and sale (net of any fees and expenses incurred in connection with the issuance thereof, including, without limitation, compensation payable to the Initial Purchaser or any placement agent for any services provided in connection therewith) to purchase additional eligible Portfolio Collateral (which may include eligible Portfolio Collateral purchased from any Servicer Entity on an arms-length transaction basis) (an "**Additional Issuance**"); *provided* that certain conditions are satisfied, including without limitation: (a) such Additional Issuance will be a percentage (the "**Additional Issuance Percentage**") specified by the Servicer, of the original issue price of the Preferred Shares issued and Outstanding on the date of the Additional Issuance; (b) such Additional Preferred Shares must be issued for a cash sales price (the net sale proceeds to be used to purchase eligible Portfolio Collateral (or, pending such applications, deposited into the Collection Account and held in Eligible Investments)); (c) the terms (other than the date of issuance, the issue price, the date from which dividends will accrue and similar matters) of such Preferred Shares must be identical to the terms of the applicable Class of Preferred Shares; (d) the Holders of Preferred Shares must be notified in writing 30 days prior to such issuance; (e) the Servicer must consent to such Additional Issuance; and (f) Initial Purchaser must be notified in writing at least 30 days prior to such issuance.

Any amendment to the Indenture, Issuer's Memorandum of Association and Articles of Association or any other related documents required to provide for or facilitate such Additional Issuance will not require the consent of the Holders of Securities.

Prescription

Payment in respect of the Notes will cease to be due if not paid to the Holder due to insufficient instructions for a period of twenty years from the Relevant Date therefor. "**Relevant Date**" means the date on which the final payment in respect of the Notes first becomes due, except that if the full amount of the monies payable has not been duly received by the Paying Agent on or prior to such due date, it means the date on which such monies have been so received.

Form, Transfer and Transfer Restrictions

Upon issuance, the Notes of each Class sold to non-U.S. Persons (as defined in Regulation S under the Securities Act ("**Regulation S**")) (each, a "**non-U.S. Person**") in Offshore Transactions (as defined in Regulation S) in reliance on Regulation S, initially will be represented by a single, temporary global note in fully registered form without interest coupons (the "**Temporary Regulation S Global Note**"), which will be deposited with the Trustee as custodian for, and registered in the name of a nominee on behalf of The Depository Trust Company ("**DTC**") on behalf of Euroclear Bank, S.A./N.V., as operator of The Euroclear System ("**Euroclear**") and Clearstream Banking, société anonyme ("**Clearstream**").

Subject to the receipt by the Trustee of a certificate in the form provided by the Indenture from the person holding such interest, a beneficial interest in the Temporary Regulation S Global Note may be exchanged for (i) after the 40th day after the later of the conclusion of the offering and the Closing Date (the "**Exchange Date**"), an interest in a permanent global note in fully registered form without coupons (the "**Permanent Regulation S Global Note**" and, together with the Temporary Regulation S Global Note, the "**Regulation S Global Notes**"), in an amount equal to the aggregate principal amount of such interest in the Temporary Regulation S Global Note or (ii) at any time for an interest in a Rule 144A Global Note (defined below), if a beneficial interest in a Regulation S Global Note will be transferred to a Qualified Institutional Buyer who is a U.S. Person (defined below), which note will be registered in the name of such person.

Upon deposit of the Permanent Regulation S Global Note of a Class with the Trustee, as custodian for DTC or the common depository, as applicable, Euroclear or Clearstream, as the case may be, will credit each purchaser (or its agent or custodian) with a principal amount of Notes of such Class equal to the principal amount thereof for which it has paid. The Holder of the Regulation S Global Notes (which will be DTC or its nominee) shall be the only person entitled to receive payments in respect of the Notes represented by such Regulation S Global Notes, and the Co-Issuers will be discharged by payment to, or to the order of, such Holder of such Regulation S Global Notes in respect of each amount so paid. Each of the persons shown in the records of Euroclear or of Clearstream as the Holder of a particular principal amount of Regulation S Global Notes must look solely to Euroclear or Clearstream, as the case may be, for its share of each payment so made by the Co-Issuers to, or to the order of, the Holder of such

008230

Regulation S Global Notes. No person other than the Holder of the Regulation S Global Notes shall have any claim against the Co-Issuers in respect of any payments due on the Regulation S Global Notes.

Payments on the Regulation S Global Notes will be made pursuant to certain procedures established by DTC, *provided* that the final payment of principal and interest will be made upon presentation and endorsement of such Regulation S Global Notes at the office of a Paying Agent.

Definitive fully registered notes ("**Definitive Notes**") will be issued and exchanged for each Permanent Regulation S Global Note within 30 days of the occurrence of any of the following: (i) the Notes or any of them become immediately due and payable following an Event of Default under the Indenture; (ii) either Euroclear or Clearstream is closed for business for a continuous period of 14 days (other than by reason of holiday, statutory or otherwise) or announces an intention permanently to cease business and no alternative clearance system satisfactory to the Trustee is available; or (iii) as a result of any amendment to, or change in, the laws or regulations of the Cayman Islands or of any authority therein or thereof having power to tax or in the interpretation or administration of such laws or regulations which becomes effective on or after the Closing Date, the Co-Issuers or the Paying Agents are or will be required to make any deduction or withholding from any payment in respect of the Notes which would not be required were the Notes in definitive registered form. Notwithstanding the foregoing, interests in any Temporary Regulation S Global Note or any definitive registered Note purchased by a non-U.S. Person in an Offshore Transaction in accordance with Regulation S may not be exchanged for a Definitive Note until receipt by the Trustee from the owner of such beneficial interest of a certificate in the form provided by the Indenture.

Upon issuance, the Notes sold in the United States to Qualified Institutional Buyers will be issued in book-entry form ("**Rule 144A Global Notes**") only through the facilities of DTC. So long as DTC or its nominee is the registered Holder of the Rule 144A Global Notes, DTC or such nominee, as the case may be, will be considered the absolute owner or Holder of such the Notes represented by such Rule 144A Global Notes for all purposes under the Indenture and such Notes. DTC or such nominee, as the case may be, will be the only person entitled to receive payments in respect of the Notes represented by such Rule 144A Global Notes and the Co-Issuers will be discharged by payment to DTC or such nominee. Each of the persons shown in the records of DTC as the beneficial owner of a Rule 144A Global Note must look solely to DTC for its share of each payment made by the Issuer to DTC. No person other than DTC shall have any claim against the Co-Issuers in respect of any payment due under the Rule 144A Global Notes.

Payments on the Rule 144A Global Notes will be made in accordance with the established procedures of DTC and the Co-Issuers will have no liability therefor. In addition, no beneficial owner of an interest in a Rule 144A Global Note will be able to exchange or transfer such interest except in accordance with the applicable procedures of DTC. None of the Issuer, the Co-Issuer, the Trustee, the Registrar or any Paying Agent will have any responsibility or liability for any aspect of the records relating to or payments made on account of beneficial ownership interests in the Rule 144A Global Notes or for maintaining, supervising or reviewing any records relating thereto.

Definitive Notes will be issued and exchanged for each Rule 144A Global Note within 30 days of the occurrence of any of the following: (i) the Notes or any of them become immediately due and payable following an Event of Default under the Indenture; or (ii) DTC notifies the Issuer or the Trustee in writing that it is unwilling or unable to discharge properly its responsibilities as a depository with respect to the Rule 144A Global Notes or it ceases to be a "clearing agency" registered under the Exchange Act (defined below), and the Issuer and the Trustee are unable to locate a qualified successor within 90 days after such notice.

Definitive Notes may be presented for registration of transfer (with the form of transfer endorsed thereon duly executed), at the office of the Registrar, without service charge but upon payment of any taxes and other governmental charges as described in the Indenture. Any registration of transfer will be effected upon the Trustee being satisfied with the documents of title and identity of the person making the request, upon their receipt of any applicable certificates and opinions relating to transfer restrictions, as described below, and subject to such reasonable regulations as the Issuer may from time to time agree with the Trustee, all as described in the Indenture.

The Issuer has initially appointed the Trustee as Registrar. Definitive Notes may be presented for payment or for transfer or exchange at the offices of the Registrar's agent, JPMorgan Chase Bank, National Association, 4 New York Plaza, ground floor, New York, New York 10004, Attention: WSS Window – WSS (Houston) – Rockwall CDO. The Issuer reserves the right to vary or terminate the appointment of the Registrar or to appoint

008231

additional or other registrars or to approve any change in the office through which any Registrar acts, *provided* that there will at all times be an office or agent located in New York, New York at which the Definitive Notes may be presented for payment or for transfer or exchange.

For so long as any Class of Notes is listed on the Irish Stock Exchange and the rules of such exchange shall so require, the Issuer will have a listing agent and a paying agent (which shall be the "**Irish Paying Agent**") for the Notes in Ireland and payments on such Notes may be effected through the Irish Paying Agent. In the event that the Irish Paying Agent is replaced at any time during such period, notice of the appointment of any replacement will be given to the Company Announcements Office of the Irish Stock Exchange.

A beneficial interest in a Regulation S Global Note may only be transferred to (a) a non-U.S. Person in an offshore transaction (as defined in Regulation S) (an "**Offshore Transaction**") in accordance with Regulation S (and in accordance with certain certification requirements in the Indenture) or (b) after the Exchange Date, a person who takes delivery in the form of an interest in a Rule 144A Global Note and who delivers a written certification (in the form provided in the Indenture) to the effect that such person is a Qualified Institutional Buyer and is acquiring such interest for its own account (together with certain other requirements set forth in the Indenture). Upon any exchange of a portion of a Regulation S Global Note for a Definitive Note, the Trustee shall endorse such Regulation S Global Note to reflect the reduction of the principal amount evidenced thereby.

Definitive Notes (or any interest therein) may only be transferred in accordance with the applicable laws of any state of the United States and (a) in a transaction exempt from the registration requirements of the Securities Act involving a Qualified Institutional Buyer who is a U.S. Person as transferee (in accordance with the certification requirements of the Indenture) or (b) to a person who takes delivery in the form of a beneficial interest in a Regulation S Global Note and in such case only upon receipt by the Trustee of a written certification from the transferor (in the form provided in the Indenture) to the effect that such transfer is being made to a non-U.S. Person in accordance with Regulation S. Upon any exchange of a Definitive Note for a beneficial interest in a Regulation S Global Note, the Trustee shall endorse such Regulation S Global Note to reflect the increase in the principal amount evidenced thereby.

The Registrar for the Notes will not be required to accept for registration of transfer any Note except upon presentation of a certificate substantially in the form required by the Indenture representing that these restrictions on transfer have been complied with, and, if requested by the Issuer or the Trustee, an opinion of counsel in form and substance satisfactory to the Issuer or the Trustee to the effect that such transfer has been made in compliance with an applicable exemption from the registration requirements of the Securities Act and in accordance with any applicable securities laws of any state of the United States and any other jurisdiction. See "Delivery of the Notes; Transfer Restrictions; Settlement."

No Note may be sold or transferred unless such sale or transfer will not constitute or result in a non-exempt prohibited transaction under ERISA or Section 4975 of the Code. In addition, no Class B-1L Note may be sold or transferred to any Plan, or to any person acting on behalf of or with "plan assets" of any Plan, including an insurance company general account, unless the purchaser or transferee is eligible for the exemptive relief available under PTCE 96-23, 95-60, 91-38, 90-1 or 84-14. See "Certain ERISA Considerations."

In addition, sales or other transfers of the Notes may only be made to a purchaser or other transferee (other than a non-U.S. Person in an offshore transaction under Regulation S) that is a Qualified Purchaser in a sale or transfer that would not require the Co-Issuers to become subject to the requirements of the Investment Company Act and the Notes will bear a legend to this effect. See "Delivery of the Notes; Transfer Restrictions; Settlement."

Each prospective purchaser will be deemed to (i) represent that such prospective purchaser is a Qualified Institutional Buyer and is purchasing or acquiring Notes solely for its own account or is a non-U.S. Person, (ii) that it and each account for which it is purchasing is purchasing a Class of Notes in at least the related minimum denomination, (iii) that it is a 'single beneficial owner' for purposes of Section 3(c)(1) of the Investment Company Act and (iv) have made the additional representations described under "Delivery of the Notes; Transfer Restrictions; Settlement."

DTC is a limited purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code and a "clearing agency" registered pursuant to Section 17A of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"). DTC was created to hold securities for its participants (the "**DTC Participants**") and to facilitate the clearance and settlement of securities transactions between DTC Participants through electronic computerized book-entries, thereby eliminating the need for physical movement of certificates. DTC Participants include securities brokers and dealers, banks, trust companies and clearing corporations. Indirect access to the DTC system also is available to others such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a DTC Participant, either directly or indirectly ("**Indirect Participants**").

Unless and until Definitive Notes are issued, all references to actions by Holders of the Rule 144A Global Notes holding through DTC will refer to actions taken by DTC upon instructions received from beneficial owners of the Rule 144A Global Notes through DTC Participants, and all references herein to payments, notices, reports, statements and other information to Holders of Rule 144A Global Notes will refer to payments, notices, reports and statements to DTC or its nominees, as the registered Holder of the Rule 144A Global Notes, for distribution to beneficial owners of Rule 144A Global Notes through DTC Participants in accordance with DTC procedures.

Clearstream is incorporated under the laws of Luxembourg as a professional depository. Clearstream holds securities for its participating organizations ("**Clearstream, Luxembourg Participants**") and facilitates the clearance and settlement of securities transactions between Clearstream, Luxembourg Participants through electronic book-entry changes in accounts of Clearstream, Luxembourg Participants, thereby eliminating the need for physical movement of certificates. Clearstream provides to its Clearstream, Luxembourg Participants, among other things, services for safekeeping, administration, clearance and settlement of internationally traded securities and securities lending and borrowing. Clearstream interfaces with domestic markets in several countries. As a professional depository, Clearstream is subject to regulation by the Luxembourg Monetary Institute. Clearstream, Luxembourg Participants are recognized financial institutions around the world, including underwriters, securities brokers and dealers, banks, trust companies, clearing corporations and certain other organizations and may include the Initial Purchaser. Indirect access to Clearstream is also available to others, such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a Clearstream, Luxembourg Participant, either directly or indirectly.

Euroclear was created to hold securities for participants of Euroclear ("**Euroclear Participants**") and to clear and settle transactions between Euroclear Participants through simultaneous electronic book-entry delivery against payment, thereby eliminating the need for physical movement of certificates and any risk from lack of simultaneous transfers of securities and cash. Euroclear includes various other services, including securities lending and borrowing and interfaces with domestic markets in several countries generally similar to the arrangements for cross-market transfers with DTC described above. Euroclear is operated by Euroclear Bank S.A./N.V. (the "**Euroclear Operator**"), under contract with Euroclear Clearance System, S.C., a Belgian cooperative corporation (the "**Cooperative**"). All operations are conducted by the Euroclear Operator, and all Euroclear securities clearance accounts and Euroclear cash accounts are accounts with the Euroclear Operator, not the Cooperative. The Cooperative establishes policy for Euroclear on behalf of Euroclear Participants. Euroclear Participants include banks (including central banks), securities brokers and dealers and other professional financial intermediaries and may include the Initial Purchaser. Indirect access to Euroclear is also available to other firms that clear through or maintain a custodial relationship with a Euroclear Participant, either directly or indirectly.

The Euroclear Operator is the Belgian branch of a New York banking corporation which is a member bank of the Federal Reserve System. As such, it is regulated and examined by the Board of Governors of the Federal Reserve System and the New York State Banking Department, as well as the Belgian Banking Commission.

Securities clearance accounts and cash accounts with the Euroclear Operator are governed by the Terms and Conditions Governing Use of Euroclear and the related Operating Procedures of Euroclear and applicable Belgian law (collectively, the "**Terms and Conditions**"). The Terms and Conditions govern transfers of securities and cash within Euroclear, withdrawal of securities and cash from Euroclear, and receipts of payments with respect to securities in Euroclear. All securities in Euroclear are held on a fungible basis without attribution of specific certificates to specific securities clearance accounts. The Euroclear Operator acts under the Terms and Conditions

only on behalf of Euroclear Participants and has no record of or relationship with persons holding through Euroclear Participants.

Option to Acquire Bond Insurance

The Indenture will provide that Holders of any Class of Notes may elect to acquire bond insurance, a surety bond or similar credit enhancement supporting the payment of principal and/or interest on such Class of Notes, on terms and conditions acceptable to such Holders. Any Class of Notes subject to such enhancement will be designated as **"Insured Notes"** of such Class. Premiums for any such enhancement will be payable from amounts otherwise payable to such Class of Insured Notes or in such other manner chosen by such Holder. Any Insured Notes of a Class for substantially all other purposes will be treated as Notes of such Class, except that the issuer of the bond insurance policy, surety bond or other such credit enhancement will generally be deemed to be the Holder of the Notes of such Class enhanced by such entity and will in such capacity be entitled to exercise the rights otherwise exercisable by Holders of such Notes.

## SECURITY FOR THE NOTES

The Notes will be secured by the Trust Estate. The Trust Estate will consist of substantially all property of the Issuer, including the Portfolio Collateral, the Collection Account, the Initial Deposit Account, the Loan Funding Account, the Expense Reimbursement Account and the Closing Expense Account.

Portfolio Collateral—General

The Portfolio Collateral (including Original Portfolio Collateral, Additional Portfolio Collateral and Substitute Portfolio Collateral) when purchased (or when committed to be purchased) by the Issuer, will consist of (I) United States dollar denominated commercial loans in registered form, including participation and assignment interests therein, collateralized loan obligations, including synthetic securities, of any corporation, partnership, limited liability company or trust, of the United States government or any agency or instrumentality thereof or of other sovereign issuers, which obligations:

(a)        are "eligible assets" as defined in Rule 3a-7;

(b)        except as described below, provide for periodic payments of interest thereon in cash no less frequently than semiannually;

(c)        provide for a fixed amount of principal to be payable according to a fixed schedule or at maturity;

(d)        are not items of Defaulted Portfolio Collateral, items of Equity Portfolio Collateral or a margin stock, or, except as described below, items of Credit Risk Portfolio Collateral;

(e)        except as described below, are not zero-coupon bonds, bonds that provide for a combination of no coupon and a fixed coupon, step-up bonds (except for step-up bonds providing for the payment of current interest at a rate no less than 5% *per annum* or Collateral LIBOR, if floating rate), other than with respect to the Initial Portfolio Collateral on the Closing Date, Partial Deferred Interest Bonds (except for such bonds providing for the payment of current interest at a rate no less than 5% *per annum* or Collateral LIBOR, if floating rate);

(f)        are not currently the subject of an Offer that would result in (i) the Issuer owning a security not meeting the requirements of Portfolio Collateral, not paying current interest, or, in the reasonable judgment of the Servicer, not expected to pay in full at maturity, or (ii) the Issuer receiving Eligible Investments or cash in a par amount less than that of the original security or the subject of an Exchange Offer;

(g)        do not provide for conversion or exchange into equity capital at any time over their respective lives (other than the exercise of any warrant, profit participation or other equity-like interest which is a component of a Unit);

56

008234

(h)     with respect to Portfolio Collateral which consists of Floating Rate Collateral, have an interest rate which adjusts periodically in accordance with changes in one or more established indices at least one of which is the London interbank offered rate for one-, two-, three- or six-month U.S. dollar deposits and which adjusts at least semiannually or, with respect to items of Fixed Rate Collateral, have an interest rate that remains constant until the maturity of such obligations or are Reset Debt Securities; *provided* that not more than 5.0% of the Aggregate Principal Amount of the Portfolio Collateral included in the Trust Estate may include items of Portfolio Collateral the interest rate on which adjusts in accordance with one or more indices that do not include the London interbank offered rate for one-, two-, three-, or six-month U.S. dollar deposits;

(i)     have coupon or other payments that are not subject to U.S. withholding tax and are not at time of purchase subject to foreign withholding tax unless the issuer of the security is required to make "gross-up" payments sufficient to cause the net amount to be received on the debt obligations to equal the amount that would have been paid had no such withholding tax applied;

(j)     mature on or before August 1, 2021 or, if a Maturity Extension as occurred, the then applicable Extended Final Maturity Date, except that up to 5.0% of the Aggregate Par Amount may mature after such date but before 5 years after such date; *provided that*, with respect to Portfolio Loans, no more than 3.0% of the Aggregate Par Amount may mature after August 1, 2021 or, if a Maturity Extension as occurred, the then applicable Extended Final Maturity Date, but before two years after such date and no Portfolio Loans may mature after two years after such date;

(k)     the terms of which do not, unless they are Delayed Drawdown Loans or Revolving Loans, require the Holder to assume or otherwise undertake any funding obligations or liabilities (of a contingent nature or otherwise);

(l)     are payable only in United States dollars;

(m)     are not Current Pay Obligations

(n)     are not Debt Securities;

(o)     the S&P Rating of which does not include a subscript of "r", "t", "p", "pi" or "q" unless otherwise agreed to by Standard & Poor's in writing and a Moody's Rating that addresses the full amount of principal or interest indicated would be paid;

(p)     and, during the Revolving Period, CLO Securities having a Moody's Rating of "Ba2" or higher and an S&P Rating of "BB" or higher and, after the Revolving Period are not CLO Securities;

(q)     are not PIK Bonds which are currently deferring interest payments or receiving payments in-kind pursuant to the terms of the related Underlying Instrument; and

(r)     satisfy, together with the other Portfolio Collateral to be concurrently included in the Trust Estate, the other applicable criteria set forth in the Indenture, including the ratings guidelines and guidelines concerning issuer concentration and industry concentration described below; or

(II)     Synthetic Securities (as described herein); *provided* that the Servicer concludes, based on advice of counsel, that the Synthetic Securities are "eligible assets" for purposes of Rule 3a-7.

Interests in commercial loans included in the Portfolio Collateral are referred to herein as "**Portfolio Loans**," and interests in collateralized loan obligations in the Portfolio Collateral are referred to herein as "**CLO Securities**." The Issuer may invest in participations ("**Participations**") in Portfolio Loans, or purchase assignments ("**Assignments**") of portions of Portfolio Loans.

In addition, up to 20% of the Aggregate Par Amount may consist of Synthetic Securities. The purchase of Synthetic Securities may involve certain additional risks not present in the purchase of other Portfolio Collateral.

008235

See "Special Considerations—Nature of Collateral Pledged to Secure the Notes; Ability to Obtain Additional Portfolio Collateral; Availability of Funds for Subordinate Payments" For purposes of the eligibility criteria and related tests, a Synthetic Security will generally be included as an item of Portfolio Collateral having the maturity, interest rate and other payment characteristics of the Synthetic Security and not of the Reference Obligation (including characterization as either an item of Fixed Rate Collateral or Floating Rate Collateral) and, with respect to all other characteristics, will be included as an item of Portfolio Collateral having the relevant characteristics of the related Reference Obligation and not of the Synthetic Security.

Notwithstanding anything contained herein to the contrary, in no event may the Issuer acquire or dispose of any item of Portfolio Collateral or other eligible asset (as defined in Rule 3a-7) for the primary purpose of recognizing gains or decreasing losses resulting from market value changes.

Notwithstanding the foregoing, if the Issuer or the Servicer has previously entered into a commitment to purchase an item of Portfolio Collateral to be included in the Trust Estate and at the time of such commitment such item of Portfolio Collateral complied with the definition of Portfolio Collateral, then the Issuer or Servicer may consummate the purchase of such item of Portfolio Collateral notwithstanding that such item of Portfolio Collateral fails to comply with the definition of Portfolio Collateral on the date of settlement.

The Servicer may only direct the Trustee to sell an item of Portfolio Collateral that is the subject of an Offer or call for redemption, if together with its direction to sell such security, the Servicer certifies to the Trustee that the sales price for such Security is equal to or greater than 1% less than the price available pursuant to such Offer or call and such sale will be treated as if the Offer or call were consummated for purposes of determining the Collections for the Due Period relating to the date on which such sale occurs.

The manner and timing for any purchase or sale of any item of Portfolio Collateral and the determination of when any such purchase or sale becomes effective for purposes of any calculations of the Overcollateralization Tests or other collateral criteria shall be set forth in the Indenture.

If an item of Portfolio Collateral becomes subject to an Exchange Offer after it has been purchased by the Issuer, the Servicer will be permitted to take such action with respect to the Underlying Instrument or the issuer thereof as may be required to convert such item of Portfolio Collateral into an item of Equity Portfolio Collateral.

Simultaneously with the issuance of the Notes, an Aggregate Principal Amount of Initial Portfolio Collateral securing the Notes at least equal to the Initial Portfolio Collateral Amount will be acquired or committed to be acquired by the Issuer from the net proceeds of the sale of the Notes and the Preferred Shares. The Issuer will also pledge the Deposit (consisting of cash deposited in the Initial Deposit Account in the approximate amount such that the Issuer can purchase or commit to purchase an Aggregate Principal Amount of Original Portfolio Collateral on or before November 1, 2006 (the "**Effective Date**"), at least equal the Required Portfolio Collateral Amount) to the Trustee on the Closing Date, which Deposit will be used to purchase Eligible Investments at the direction of the Issuer pending application to purchase or commit to purchase Portfolio Collateral on or before the Effective Date, subject to the requirements and restrictions set forth in the Indenture. A portion of the Initial Portfolio Collateral, and the remaining Portfolio Collateral may be, acquired from or through Bear Stearns, the Servicer or their affiliates, at negotiated prices acceptable to the Issuer and the Servicer or if purchased from the Servicer or its affiliates at prices determined in accordance with the procedures described under "Special Considerations—Potential Conflicts of Interest."

The Issuer and the Servicer will seek to use the Deposit to purchase additional Original Portfolio Collateral prior to the Effective Date in accordance with the guidelines described herein and in the Indenture. If the Issuer and the Servicer are unable to use or commit to use the full amount of the Deposit on or prior to the Effective Date to purchase additional Original Portfolio Collateral having an Aggregate Principal Amount (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to the Original Portfolio Collateral on or before the Effective Date) at least equal to the Required Portfolio Collateral Amount, the Issuer will be required to effect an Initial Deposit Redemption on the Initial Deposit Redemption Date as described herein except, if the amount of the Deposit not so used or committed does not exceed U.S.$2,000,000 in the aggregate, such amount will be transferred to the Collection Account as Collateral Principal Collections on the Effective Date.

008236

If a Suspension Trigger Event is in effect, a majority of the Controlling Class may deliver notice to the Issuer directing the Issuer and the Servicer to suspend any purchases of additional items for inclusion in the Trust Estate as an item of Portfolio Collateral. Such suspension shall automatically terminate once a Suspension Trigger Event is no longer in effect.

Criteria for Purchase and Substitution of Collateral

The Issuer's entry into a commitment to purchase any additional collateralized loan obligations, synthetic securities and commercial loans after the Effective Date (each, an item of "**Additional Portfolio Collateral**") with Available Funds is subject to the limitations described under "Security for the Notes—Changes in Composition of Portfolio Collateral" and further is subject in each case to the following restrictions: (i) each of the Overcollateralization Tests is satisfied (*provided* that unscheduled principal proceeds may be used to purchase Additional Portfolio Collateral even if such tests are not satisfied, so long as the results of such tests would not be diminished) and (ii) the collateral criteria specified below are satisfied or the degree of compliance with such collateral criteria would not be diminished. In addition, during the Amortization Period, Collateral Principal Collections from any unscheduled prepayment may be used to purchase Additional Portfolio Collateral as described and meeting the requirements herein. The Issuer's entry into a commitment to purchase any substitute collateralized loan obligations, synthetic securities and commercial loans (each, an item of "**Substitute Portfolio Collateral**") with Collateral Disposition Proceeds during the Revolving Period is subject in each case to the following restrictions: (i) the Overcollateralization Tests and the collateral criteria specified herein are satisfied and the Interest Coverage Test (after the second Payment Date) for the most recent Payment Date was satisfied or (ii) if the Overcollateralization Tests and the collateral criteria specified below are not satisfied, the degree of compliance with such tests or criteria would not be diminished. In connection with a sale of an item of Credit Improved Portfolio Collateral after the Revolving Period or the receipt of Collateral Principal Collections in connection with an unscheduled prepayment after the Revolving Period, the Issuer may enter into commitments to apply such net disposition proceeds or such unscheduled prepayments (net of accrued interest and costs) to the purchase of Portfolio Loans either as Additional Portfolio Collateral or Substitute Portfolio Collateral. Substitute Portfolio Collateral may not be purchased with Collateral Disposition Proceeds from the sale of Defaulted Portfolio Collateral unless, after giving effect to such purchase, each of the Overcollateralization Tests is satisfied and the Interest Coverage Test for the most recent Payment Date was satisfied. The Issuer is not required, and may not be permitted under certain circumstances, to purchase or sell Portfolio Collateral and the rules described above are limited as set forth below under "—Changes in Composition of Portfolio Collateral."

Notwithstanding the foregoing, if there is no appointment of a successor Servicer within 90 days after the resignation or termination of the Servicer, any sales or disposition of Portfolio Collateral shall be limited to Credit Risk Portfolio Collateral and Defaulted Portfolio Collateral; provided that such restriction on the sale or disposition of Portfolio Collateral shall not apply if the Portfolio Collateral is being liquidated in whole or in part in connection with an acceleration or early termination of the Notes.

S&P CDO Monitor Test

The "**S&P CDO Monitor Test**" will be satisfied if, after giving effect to the purchase or sale of an item of Portfolio Collateral (or both), as the case may be, (i) the S&P Loss Differential (defined below) of the Proposed Portfolio (defined below) is positive or (ii) the S&P Loss Differential of the Proposed Portfolio is greater than the S&P Loss Differential of the Current Portfolio (defined below). The S&P CDO Monitor Test is not applicable and does not have to be satisfied or maintained when reinvesting the proceeds of Defaulted Portfolio Collateral or Credit Risk Portfolio Collateral.

The "**S&P Loss Differential**" at any time, is the rate calculated by subtracting the S&P Scenario Default Rate (defined below) from the S&P Break-Even Default Rate (defined below) at such time.

The "**S&P Scenario Default Rate**" at any time, is an estimate of the cumulative default rate for the Current Portfolio or the Proposed Portfolio, as applicable, consistent with a "AAA" rating by S&P with respect to the Class A-1L Notes and the Class X Notes, a "AA" rating by S&P with respect to the Class A-2L Notes, a "A" rating by

008237

S&P with respect to the Class A-3L Notes, a "A-" rating by S&P with respect to the Class A-4L Notes and a "BBB" rating by S&P with respect to the Class B-1L Notes, determined by application of the S&P CDO Monitor (defined below) at such time.

The "**S&P Break-Even Default Rate**" at any time, is the maximum percentage of defaults which the Current Portfolio or the Proposed Portfolio, as applicable, can sustain, as determined by S&P through application of the S&P CDO Monitor which, after giving effect to S&P's assumptions on recoveries and timing and to the priority of payments, will result in sufficient funds remaining for the principal repayment of the Notes in full and the timely payment, as applicable, of interest on each Class of Notes as set forth in the Indenture.

The "**Current Portfolio**" means the Pledged Securities in the Trust Estate immediately prior to the sale, maturity or other disposition of an item of Portfolio Collateral or immediately prior to the acquisition of an item of Portfolio Collateral, as the case may be.

The "**Proposed Portfolio**" means the Aggregate Par Amount resulting from the sale, maturity or other disposition of an item of Portfolio Collateral or a proposed purchase of an item of Portfolio Collateral, as the case may be.

The "**S&P CDO Monitor**" is a dynamic, analytical computer model developed by S&P and used to estimate default risk of items of Portfolio Collateral and provided to the Servicer and the Issuer on or before the Closing Date, as it may be modified by S&P from time to time in connection with its confirmation of the ratings of the Notes following the Closing Date. The S&P CDO Monitor measures the cumulative default rate of a pool of Portfolio Collateral consistent with a specified benchmark rating level based upon S&P's proprietary corporate debt default studies. In calculating the S&P Scenario Default Rate, the S&P CDO Monitor considers each obligor's most senior unsecured debt rating, the number of obligors in the portfolio, the obligor and industry concentration in the portfolio and the remaining weighted average maturity of the Portfolio Collateral and calculates a cumulative default rate based on the statistical probability of distributions of defaults on the Portfolio Collateral.

<u>Moody's Asset Correlation Test and Weighted Average Rating Test</u>

The Moody's Asset Correlation Test and weighted average rating of the Portfolio Collateral will be calculated in accordance with the methodology prescribed by Moody's and more fully described in the Indenture. The MAC Test and "**Weighted Average Rating Test**" will be satisfied in accordance with the application of the Collateral Quality Matrix described below.

The Moody's Asset Correlation ("**MAC**") Test (the "**MAC Test**") will be satisfied on each Measurement Date if the Moody's Correlation Factor on such Measurement Date (rounded up to the nearest whole number) is equal to or less than the designated Moody's Correlation Factor determined by application of the Collateral Quality Matrix. In connection with the MAC Test, the Moody's Correlation Factor is a single number determined in accordance with the correlation methodology provided to the Servicer and the Collateral Administrator by Moody's.

<u>Collateral Quality Matrix Tests</u>

Under the Indenture, the Servicer will be permitted to select from a table (that will be included in the Indenture, the "**Collateral Quality Matrix**"), a different group of thresholds for satisfying or otherwise determining the following tests:

- the Moody's Asset Correlation Test;

- the Minimum Average Recovery Rate Test;

- the Weighted Average Rating Test; and

- the Weighted Average Margin Test.

008238

Therefore, notwithstanding anything to the contrary described herein, after giving effect to the proposed purchase of any Portfolio Collateral, the minimum/maximum amounts required to satisfy each of such tests may vary from time to time. In determining whether the criteria set forth in the Collateral Quality Matrix are satisfied, the Servicer may use the Collateral Quality Formula (as set forth in the Indenture) to interpolate between values of such criteria or may use any other method that is agreed to by the Issuer and Moody's. Depending on the combination of thresholds in the Collateral Quality Matrix selected by the Servicer at any time, except as described below, the minimum required MAC Test can range from 3.0% to 4.0%; the maximum permitted weighted average rating factor prescribed by Moody's can range from 1500 to 2500; the minimum required average recovery rate prescribed by Moody's can range from 40.0% to 45.5% and the minimum Weighted Average Margin can range from 1.50% to 3.00%.

Each group of minimum/maximum amounts included in the Collateral Quality Matrix will include a combination of the minimum/maximum scores that are required to satisfy each of the Collateral Quality Matrix Tests. The Servicer may elect from time to time to have different combinations apply so long as (a) immediately after giving effect to the change in combinations, each of the applicable tests will be satisfied or not diminished and (b) the S&P CDO Monitor Test would have been satisfied as of the date of the most recent purchase or sale of an item of Portfolio Collateral had such test been calculated using the Current Portfolio, the Proposed Portfolio, and the S&P Scenario Default Rate that was in effect immediately prior to such purchase or sale, but using the S&P Break-Even Default Rate applicable to the Notes that would have been applicable after giving effect to the change in combinations. In no event will the Servicer be obligated to change the combinations contemplated by the Collateral Quality Matrix. Notwithstanding the foregoing, the combination of scores required to satisfy each of the Collateral Quality Matrix Tests may be changed if the Rating Condition is satisfied with respect to such change and, as a result, the minimum/maximum amounts may change as well.

Weighted Average Margin Test

The **"Weighted Average Margin Test"** will be determined by application of the Collateral Quality Matrix described above, after giving effect to any Coupon Adjustment.

The **"Weighted Average Margin"** refers to the amount (rounded up to the nearest 0.001%) equal to (i) the sum of the products obtained by multiplying the margin over Collateral LIBOR on each item of Floating Rate Collateral (other than items of Defaulted Portfolio Collateral) as of the date of calculation (which will be determined for items of Floating Rate Collateral that do not bear interest based on Collateral LIBOR by expressing the current interest rate on such Floating Rate Collateral as a margin above or below three-month LIBOR on the date of determination, which margin will be expressed as a negative number if such current interest rate is lower than three-month LIBOR) by the Principal Balance of such item of Floating Rate Collateral (other than items of Defaulted Portfolio Collateral) as of such date, divided by (ii) the Aggregate Principal Amount of all such Floating Rate Collateral (other than items of Defaulted Portfolio Collateral) on such date.

For purposes of calculating the Weighted Average Margin for any Delayed Drawdown Loan or Revolving Bank Loan, the principal balance representing the funded portion will be multiplied by the margin above Collateral LIBOR and the principal balance representing the unfunded portion will be multiplied by the commitment fee related thereto.

If an item of Floating Rate Portfolio Collateral does not provide for Collateral LIBOR, the margin for this purpose shall be equal to the then applicable interest rate minus then current LIBOR. If an item of Floating Rate Portfolio Collateral has a Collateral LIBOR floor, the excess of such floor rate over Collateral LIBOR will be added to the margin above Collateral LIBOR for purposes of calculating the Weighted Average Margin of such item of Floating Rate Portfolio Collateral.

Weighted Average Coupon Test

The **"Weighted Average Coupon Test"** will be satisfied if, after the Effective Date, none of the Portfolio Collateral is Fixed Rate Portfolio Collateral or if, after giving effect to the proposed purchase of any Portfolio Collateral and after giving effect to any Coupon Adjustment, the Weighted Average Coupon is at least equal to 7.5%

008239

*per annum* as of the date of determination (or such lower per annum rate that the Rating Agencies have confirmed would not result in a withdrawal or downgrade of any of the then current ratings assigned by them to the Notes).

The **"Weighted Average Coupon"** refers to the amount (rounded up to the nearest 0.001%) determined by summing the products obtained by multiplying, for each item of Fixed Rate Collateral then included in the Trust Estate (other than items of Defaulted Portfolio Collateral), the Principal Balance of such item of Portfolio Collateral and the stated rate of interest of such item of Portfolio Collateral and then dividing such sum by the Aggregate Principal Amount of all of the Fixed Rate Collateral included in the Trust Estate (other than items of Defaulted Portfolio Collateral) as of such date of determination.

Minimum Average Recovery Rate Test. The Minimum Average Recovery Rate will be calculated in accordance with the methodology prescribed by Moody's and S&P and more fully described in the Indenture. The **"Minimum Average Recovery Rate Test"** with respect to Moody's, will be determined by application of the Collateral Quality Matrix described above and with respect to S&P, will be determined as set forth in the Indenture.

Weighted Average Life Requirement. The **"Weighted Average Life Requirement"** will be satisfied on any date of determination if the Weighted Average Life on such date of all items of Portfolio Collateral is equal to or less than the number of years set forth in Schedule I to the Indenture opposite the period set forth in Schedule I to the Indenture in which such requirement is being measured or, in the case of a Maturity Extension, the Extended Weighted Average Life Date. Notwithstanding the foregoing, the Weighted Average Life may vary from the restrictions set forth in the Indenture if the Rating Agencies have confirmed such variance would not result in a withdrawal or downgrade of any of the then current ratings assigned by them to the Notes.

The **"Weighted Average Life"** refers to the amount determined by summing the products obtained by multiplying, for each item of Portfolio Collateral (other than items of Defaulted Portfolio Collateral) then included in the Trust Estate, the Principal Balance of such item of Portfolio Collateral and the Average Life (as such term is defined below) of such item of Portfolio Collateral as of such date of determination and then dividing such sum by the Aggregate Principal Amount of all of the Portfolio Collateral (other than items of Defaulted Portfolio Collateral and Current Pay Obligations) included in the Trust Estate as of such date of determination. For any item of Portfolio Collateral, the "Average Life" shall be equal to the number of years obtained by dividing (a) the Principal Balance of such item of Portfolio Collateral into (b) the sum of the products obtained by multiplying (i) the amount of each of the remaining, required principal payments on such item of Portfolio Collateral by (ii) the number of years (calculated to the nearest one-twelfth) that will have elapsed between such date of determination and the making of such payment.

Rating. After giving effect to the proposed purchase of any Portfolio Collateral: (i) at least 90% of the Aggregate Principal Amount of the Portfolio Collateral included in the Trust Estate must be obligations of issuers having at least one class of indebtedness actually rated by Moody's (either publicly or privately) and (ii) at least 90% of the Aggregate Principal Amount of the Portfolio Collateral in the Trust Estate must be obligations of issuers having at least one class of indebtedness actually rated by S&P (either publicly or privately).

CCC/Caa Portfolio Collateral Limitation. The proposed purchase of any Portfolio Collateral may not increase the Aggregate Principal Amount of CCC/Caa Portfolio Collateral in the Trust Estate to more than 5.0% of the Aggregate Par Amount; *provided that* the Issuer may purchase CCC/Caa Portfolio Collateral which would increase the Aggregate Principal Amount of CCC/Caa Portfolio Collateral in the Trust Estate above 5.0% of the Aggregate Par Amount with the proceeds of CCC/Caa Portfolio Collateral; and *provided further* that no CLO Securities may be included in the determination of this CCC/Caa Portfolio Collateral Limitation.

Limitation on Non-U.S. Debt. After giving effect to the proposed purchase of any Portfolio Collateral,

(a) not more than 10% of the Aggregate Par Amount may consist of items of Portfolio Loans that are obligations of Permitted Non-U.S. Obligors;

(b) not more than 10% of the Aggregate Par Amount may consist of items of Portfolio Loans that are obligations of Permitted Non-U.S. Obligors in any single Group A Country;

008240

(c) not more than 5% of the Aggregate Par Amount included may consist of items of Portfolio Loans that are obligations of Permitted Non-U.S. Obligors in all Group B Countries;

(d) not more than 2% of the Aggregate Par Amount may consist of items of Portfolio Loans that are obligations of Permitted Non-U.S. Obligors in any single Group B Country;

(e) not more than 2.5% of the Aggregate Par Amount may consist of items of Portfolio Loans that are obligations of Permitted Non-U.S. Obligors in all jurisdictions that are not Group A Countries or Group B Countries;

(f) not more than 1% of the Aggregate Par Amount may consist of items of Portfolio Loans that are obligations of Permitted Non-U.S. Obligors in any single jurisdiction that is not a Group A Country or Group B Country; and

(g) no Portfolio Collateral may consist of CLO Securities that are obligations of Non-U.S. Obligors.

Issuer Limitation.  (i) After giving effect to the proposed purchase of any Portfolio Loan, no more than 1.50% of the Aggregate Par Amount may represent obligations of any single obligor, *provided* that obligations of not more than five obligors of Portfolio Loans may represent no more than 2.00% of the Aggregate Par Amount and (ii) after giving effect to the proposed purchase of any CLO Security, no more than 2.75% of the Aggregate Par Amount may represent obligations of any single obligor.

Industry Category Concentration.  (i) No more than 8% of the Aggregate Par Amount is in any one Standard & Poor's Industry Category; *provided, however,* in the case of three (3) Standard & Poor's Industry Categories, 12% of the Aggregate Par Amount may consist of items of Portfolio Collateral that are obligations of obligors in any one Standard & Poor's Industry Category, and (ii) no more than 32% of the Aggregate Par Amount may consist of items of Portfolio Collateral that are obligations of obligors in any three Standard & Poor's Industry Categories.

Limitation on Fixed Rate Collateral.  After giving effect to the proposed purchase of any Portfolio Collateral, no more than 5% of the Aggregate Par Amount may bear interest at a fixed rate.

Limitation on Portfolio Loans. After giving effect to the proposed purchase of any Portfolio Collateral,

(a) at least 70% of the Aggregate Principal Amount of the Portfolio Collateral included in the Trust Estate must be Portfolio Loans (including Synthetic Securities, the Reference Obligations of which are loans); and

(b) not more than 10% of the Aggregate Principal Amount of the Portfolio Collateral included in the Trust Estate may be Portfolio Loans that are not Senior Secured Loans (including Synthetic Securities, the Reference Obligations of which are loans).

Limitation on CLO Securities.  After giving effect to the proposed purchase of any Portfolio Collateral,

(a) not more than 30% of the Aggregate Par Amount may be CLO Securities;

(b) not more than 10% of the Aggregate Par Amount may consist of CLO Securities that have a Moody's Rating below "Baa3" or an S&P Rating below "BBB-", *provided* that not more than 2.0% of the Aggregate Par Amount may consist of a single CLO Security with such ratings;

(c) not more than 4.0% of the Aggregate Par Amount may consist of CLO Securities of a single manager which shall not be any of the Servicer Entities; and

(d) not more than 5.0% of the Aggregate Par Amount may consist of CLO Securities managed by any of the Servicer Entities; *provided* that not more than 1.5% of the Aggregate Par Amount may consist of CLO Securities of a single issuer serviced or managed by the Servicer;

008241

*provided*, that no CLO Securities may be purchased after August 1, 2009, unless an Extension shall occur in which case CLO Securities may be purchased during the full period of such Extension in accordance with all the criteria and restrictions provided herein that are applicable during the Revolving Period.

Limitations on Step-Up Bonds. After giving effect to the proposed purchase of any Portfolio Collateral, no more than 5% of the Aggregate Par Amount may include step-up bonds.

Limitation on Semiannual Portfolio Collateral. After giving effect to the proposed purchase of any Portfolio Collateral, no more than 5% of the Aggregate Par Amount may include items of Portfolio Collateral that provide for the periodic payment in cash of interest less frequently than quarterly, but not less frequently than semiannually.

Limitation on Participations, Synthetic Securities and Non-U.S. Portfolio Loans. After giving effect to the proposed purchase of any Substitute Portfolio Collateral or Additional Portfolio Collateral, no more than 20% of the Aggregate Par Amount may be Participations, Synthetic Securities, securities lending agreements or Portfolio Loans that are obligations of non-U.S. entities which are not in a Group A Country. Further, no Participation may be purchased from any Selling Institution (including for this purpose the seller of any participation and the seller of any sub-participation) rated below "A" by S&P or "A2" by Moody's. In addition, the table below generally describes limitations on (i) the percentage of the Aggregate Par Amount which consist of Synthetic Securities related to the long-term debt rating of the Synthetic Security Counterparty, (ii) the percentage of the Aggregate Par Amount which consists of Participations related to the long-term debt rating of the related Selling Institution, and (iii) the limitations on the percentage of the Aggregate Par Amount which consists of Participations and Synthetic Securities in the aggregate related to the long-term debt rating of the Selling Institution or Synthetic Security Counterparty, as the case may be.

| Rating (S&P/Moody's) | Individual Synthetic Security Counterparty Limit | Individual Participation Selling Institution Limit | Aggregate Synthetic Security Counterparty and Participation Selling Institution Limit |
|---|---|---|---|
| AAA/Aaa | 20.0% | 20.0% | 20.0% |
| AA+/Aa1 | 10.0% | 10.0% | 20.0% |
| AA/Aa2 | 10.0% | 10.0% | 17.5% |
| AA-/Aa3 | 10.0% | 10.0% | 15.0% |
| A+/A1 | 5.0% | 5.0% | 10.0% |
| A/A2 | 5.0% | 5.0% | 7.5% |

*provided*, that no more than 3% of the Aggregate Par Amount may be Synthetic Securities consisting of Default Swaps. For purposes of the foregoing, the limitations shall be calculated separately for each of Standard & Poor's and Moody's and each such limitation must be satisfied.

Original Issue Size. After giving effect to the proposed purchase of any Portfolio Collateral, at least 80% of the Aggregate Principal Amount of the Portfolio Collateral included in the Trust Estate will be Portfolio Loans that are part of a senior credit facility whose aggregate original principal amount (whether or not funded and including all tranches thereunder) is not less than U.S.$100,000,000. No item of Portfolio Collateral included in the Trust Estate will be CLO Securities that are part of an issuer's aggregate issuance whose aggregate original principal amount (including all tranches thereunder) is less than U.S.$100,000,000. No item of Portfolio Collateral included in the Trust Estate will be Portfolio Loans that are part of a senior credit facility whose aggregate original principal amount (whether or not funded and including all tranches thereunder) is less than $50,000,000.

Delayed Drawdown Loans and Revolving Loans. After giving effect to the proposed purchase of any Portfolio Collateral, no more than 5% of the Aggregate Par Amount may consist of Delayed Drawdown Loans and no more than 7.5% of the Aggregate Par Amount may consist of Revolving Loans; provided that no more than 10% of the Aggregate Par Amount may consist of Delayed Drawdown Loans and Revolving Loans in the aggregate.

008242

A Delayed Drawdown Loan will not be eligible for purchase by the Issuer for inclusion in the Trust Estate unless the agreement or instrument that governs the rights and obligations of the related borrower and lender or lenders provides (i) that advances may be made for a period not to exceed one (1) year from the date of origination of the Delayed Drawdown Loan and in any event before the end of the Revolving Period; (ii) for a maximum amount that can be borrowed from the Issuer on one or more specified borrowing dates; (iii) that funds borrowed from the Issuer and subsequently repaid may not be reborrowed and (iv) that the borrower is entitled to such additional advances only upon the achievement of financial performance or other objective criteria established at origination and set forth in such credit agreement.

In addition, simultaneously with the Issuer's purchase of any Delayed Drawdown Loan or Revolving Loan, the Issuer is required to deposit into the Loan Funding Account the full amount of any advances or delayed draws that may be required of the Issuer thereunder and principal repaid under any Revolving Loan is required to be deposited in the Loan Funding Account to the extent the Issuer's obligation to fund any future advances has not been irrevocably reduced.

Debtor-in-Possession Financings. After giving effect to the proposed purchase of any Portfolio Collateral, no more than 5% of the Aggregate Par Amount may consist of DIP Loans. Any such items of Portfolio Collateral must be assigned a formal or estimated rating by Moody's and S&P.

Collateral Obligations Loaned under Securities Lending Agreements. No more than 15% of the Aggregate Par Amount may include Portfolio Collateral subject to any securities lending agreement as set forth in the Indenture.

PIK Bonds. No more than 30% of the Aggregate Par Amount may consist of PIK Bonds.

No Event of Default. No Event of Default shall have occurred and be continuing.

Changes in Composition of Portfolio Collateral

The Portfolio Collateral may be retired prior to their respective final maturities, as a result of, among other things, the existence and frequency of exercise of any optional or mandatory redemption features of such securities. Subject to the terms of the Servicing Agreement and the Indenture, the Servicer is also permitted to direct the Trustee to sell (i) any Defaulted Portfolio Collateral and (ii) any Equity Portfolio Collateral.

In addition, subject to the terms of the Servicing Agreement and the Indenture, including the restrictions described herein, the Servicer may, at any time during the life of the Notes, direct the Trustee to dispose of one or more items of Portfolio Collateral in cases where (i) an item of Portfolio Collateral is, in the Servicer's sole judgment (which judgment shall not be questioned as a result of subsequent events), likely to decline in credit quality and, with the passage of time, become an item of Defaulted Portfolio Collateral; *provided,* that in forming such judgment an increase in credit spread or a decrease in Market Value of such item of Portfolio Collateral may only be utilized as corroboration of other bases of such judgment ("**Credit Risk Portfolio Collateral**") or (ii) an item of Portfolio Collateral has, in the Servicer's sole judgment, improved in credit quality or otherwise satisfies the Credit Improved Criteria (subject to the proviso thereof); *provided,* that in forming such judgment a reduction in credit spread or an increase in Market Value of such item of Portfolio Collateral may only be utilized as corroboration of other bases of such judgment ("**Credit Improved Portfolio Collateral**"). Notwithstanding anything to the contrary stated herein, if any item of Portfolio Collateral is to be purchased with the Collateral Disposition Proceeds of one or more assets that are not Credit Risk Portfolio Collateral, Defaulted Portfolio Collateral, Portfolio Collateral Sold pursuant to a Portfolio Improvement Exchange or Portfolio Collateral that has become subject to withholding tax, the purchase of the proposed item of Portfolio Collateral must (i) restore compliance with the collateral criteria described above, the Interest Coverage Test or the Overcollateralization Tests (or bring the total Portfolio Collateral closer to compliance with any such test or limitation) not then satisfied or (ii) on a net basis improve the quality of the Portfolio Collateral as measured by such collateral criteria, Interest Coverage Test or Overcollateralization Tests and (iii) in the case of each of clause (i) and (ii) without causing any other collateral criteria, Interest Coverage Test or Overcollateralization Test to be violated or significantly increase the likelihood of such violation in the future.

In determining whether any Portfolio Collateral is likely to decline in credit quality and, with the passage of time become Defaulted Portfolio Collateral, the Servicer may, in its sole judgment, consider any relevant factor,

008243

including (without limitation) whether any of the Credit Risk Criteria exist. Notwithstanding the foregoing, the existence or absence of any particular factor shall not require or prevent the Servicer's determination that any Portfolio Collateral is likely to decline in credit quality and, with the passage of time, become Defaulted Portfolio Collateral; *provided* that in forming such determination an increase in credit spread or a decrease in Market Value of such item of Portfolio Collateral may only be used as corroboration of other bases for such determination. Substitute Portfolio Collateral may not be purchased with Collateral Disposition Proceeds from the sale of Defaulted Portfolio Collateral unless, after giving effect to such purchase, each of the Overcollateralization Tests is satisfied and the Interest Coverage Test for the most recent Payment Date was satisfied.

In determining whether any Portfolio Collateral meets the definition of Credit Improved Portfolio Collateral, the Servicer may, in its sole judgment, consider any relevant factor, including (without limitation) whether any of the Credit Improved Criteria exist. Notwithstanding the foregoing, the existence or absence of any particular factor shall not require or prevent the Servicer's determination that any Portfolio Collateral has a market price that is greater than the price that is warranted by its terms and credit characteristics; *provided*, that in forming such judgment a reduction in credit spread or an increase in Market Value of such item of Credit Improved Portfolio Collateral may only be utilized as corroboration or other bases for such judgment.

Subject to the Sale Restriction Condition, Credit Risk Portfolio Collateral may be sold at any time. In connection with a sale of an item of Credit Improved Portfolio Collateral during the Revolving Period, the Servicer (x) is required to identify in writing before the sale one or more specific manners in which it will be able, in accordance with the requirements of the Indenture, to cause the Issuer to apply the Collateral Disposition Proceeds of such sale (net of accrued interest and costs) to the purchase of Substitute Portfolio Collateral having an Aggregate Principal Amount equal to or greater than the Principal Balance of such item of Credit Improved Portfolio Collateral by the end of the immediately succeeding Due Period (it being understood that such identification shall not be considered a requirement or an assurance that my specific purchase will be consummated) and (y) is required to certify that it reasonably believes at the time of such sale that, after giving effect to such sale and subsequent purchase, either (i) the Overcollateralization Tests and all other criteria for the purchase of Portfolio Collateral are satisfied or (ii) if one or more of such tests or criteria is not satisfied, the degree of compliance with such test or criteria would not be diminished. Notwithstanding the foregoing, any Portfolio Collateral may also be sold upon the advice of an opinion of counsel that such item of Portfolio Collateral is, or may become, subject to a withholding or other similar tax. Notwithstanding anything to the contrary stated herein, the Servicer may direct the sale of an item of Portfolio Collateral that was CCC/Caa Portfolio Collateral or Discount Portfolio Collateral at the time of purchase only if it constitutes Credit Risk Portfolio Collateral or Defaulted Portfolio Collateral, is sold in connection with the Optional Redemption of Notes in whole or if the Servicer reasonably expects that the sale and any related purchase of Substitute Portfolio Collateral will restore compliance with any of the Interest Coverage Test, the collateral criteria described above or the Overcollateralization Tests that would be failed or not satisfied in the absence of such sale and purchase.

During any period after the first Due Period (x) with respect to sales of Credit Risk Portfolio Collateral, if the rating of the Class A-1LA Notes, the Class A-1LB Notes or the Class A-2L Notes has been downgraded at least one rating sub-category by Moody's (and has not been restored) or the rating of any of the Class A-3L Notes, the Class A-4L Notes or the Class B-1L Notes has been downgraded by at least two rating sub-categories by Moody's (and has not been restored to a rating no more than one rating sub-category below the original rating of such Class of Notes), or if the Class A Overcollateralization Ratio is less than 90% of the Class A Overcollateralization Percentage, or (y) with respect to sales of Credit Improved Portfolio Collateral, if the rating of the Class A-1L Notes, the Class A-1LB Notes or the Class A-2L Notes has been downgraded at least one rating sub-category by Moody's (and has not been restored) or the rating of any of the Class A-3L Notes, the Class A-4L Notes or the Class B-1L Notes has been downgraded by at least two rating sub-categories by Moody's (and has not been restored to a rating no more than one rating sub-category below the original rating of such Class of Notes) (each applicable condition described in clauses (x) and (y), a **"Sale Restriction Condition"**), the Issuer is required to send a notice to the Trustee and the Holders of the Notes to the effect that for so long as the applicable Sale Restriction Condition exists, unless the Holders of at least 60% in Aggregate Principal Amount of the Notes elect to retain the guidelines in effect on the Closing Date for sales of an item of Credit Risk Portfolio Collateral or Credit Improved Portfolio Collateral, as applicable, (i) no item of Credit Risk Portfolio Collateral may be sold unless (A) the rating of the obligor or of any debt or securities issued by the obligor under such an item of Credit Risk Portfolio Collateral has been lowered, withdrawn or put on any "credit watch" list (or similar list) with negative implications by S&P, Moody's or Fitch, or (B) such an item of Credit Risk Portfolio Collateral satisfies the Credit Risk Criteria and not

008244

objected to by the Holders of more than 60% in Aggregate Principal Amount of the Notes within forty-five (45) days of the date of such notice; *provided* that in making such determination to sell an item of Credit Risk Portfolio Collateral, an increase in credit spread or a decrease in Market Value of such item of Credit Risk Portfolio Collateral may only be used as corroboration of other bases for such determination or (ii) no item of Credit Improved Portfolio Collateral may be sold unless such item of Credit Improved Portfolio Collateral satisfies the Credit Improved Criteria and not objected to by the Holders of more than 60% in Aggregate Principal Amount of the Notes within forty-five (45) days of the date of such notice; *provided*, that in making such determination to sell such item of Credit Improved Portfolio Collateral, a reduction in credit spread or an increase in Market Value of such item of Credit Improved Portfolio Collateral may only be utilized as corroboration or other bases for such judgment.

During the Due Periods relating to the Revolving Period, and under certain circumstances during the Amortization Period as described below, certain Collections identified above under "Description of the Notes—Payments on the Notes; Priority of Distributions" will be used to purchase Additional Portfolio Collateral as described below subject to satisfaction or, in certain cases, maintenance of the Overcollateralization Tests and the collateral criteria described herein and satisfaction of the Interest Coverage Test (after the second Payment Date) for the most recent Payment Date as more specifically set forth in the Indenture.

During any period when certain Collections are to be used to purchase Additional Portfolio Collateral, the Servicer generally will have the authority to commit to a purchase of such Additional Portfolio Collateral upon the receipt (actual or scheduled) in the Collection Account of Collections of an amount at least equal to the Periodic Reserve Amount with respect to the relevant Payment Date. For purposes of this calculation, Collections will be deemed to include, as of any date of determination, the sum of 100% of all cash collections actually received in respect of the Portfolio Collateral as of such date of determination and 100% of all distributions scheduled or otherwise reasonably expected to be received in respect of the Portfolio Collateral (other than any items of Defaulted Portfolio Collateral or Equity Portfolio Collateral) during the period from such date of determination until the end of the applicable Due Period. In addition, the Indenture will permit the Servicer or the Issuer to direct the Trustee to deposit or retain in the Collection Account after the relevant Payment Date amounts that are to be used to purchase Additional Portfolio Collateral or Substitute Portfolio Collateral as long as such amounts are held in Eligible Investments pending such use to purchase Additional Portfolio Collateral or Substitute Portfolio Collateral and are used to purchase Additional Portfolio Collateral or Substitute Portfolio Collateral meeting the specified requirements no later than the last day of the Due Period relating to the Payment Date next following such Payment Date.

In connection with a sale of an item of Credit Improved Portfolio Collateral after the Revolving Period or the receipt of Collateral Principal Collections due to an unscheduled prepayment after the Revolving Period, the Servicer may enter into commitments to apply such Collateral Disposition Proceeds or such unscheduled prepayments (net of accrued interest and costs) to the purchase of Portfolio Loans as either Additional Portfolio Collateral or Substitute Portfolio Collateral having an Aggregate Principal Amount equal to or greater than the Principal Balance of the original item of Portfolio Collateral within 90 days of receipt of such proceeds, so long as the Servicer certifies as of the date of purchase that it reasonably believes at the time of such commitment that, after giving effect to such sale and subsequent purchase, (A) each of the Overcollateralization Tests and the other collateral criteria described herein would be satisfied and the Interest Coverage Test was satisfied for the most recent Payment Date, (B) such Portfolio Loan to be purchased has a Moody's Rating equal to or higher than the Moody's Rating of the original item of Portfolio Collateral, (C) such Portfolio Loan to be purchased has an S&P Rating equal to or higher than the S&P Rating of the original item of Portfolio Collateral, (D) such Portfolio Loan to be purchased has a stated maturity on or prior to the final maturity of such original item of Portfolio Collateral, (E) the Weighted Average Life of the Portfolio Collateral would not be increased and (F) neither Rating Agency has reduced or withdrawn (and not restored) the rating assigned by it on the Closing Date to any Class of Notes.

No purchase of Additional Portfolio Collateral or Substitute Portfolio Collateral will be permitted during the continuance of an Event of Default.

No acquisition or disposition of any item of Portfolio Collateral or other eligible asset (as defined in Rule 3a-7) will be permitted for the primary purpose of recognizing gains or decreasing losses resulting from market value changes. In addition, the Issuer may not dispose of any item of Portfolio Collateral unless such disposition is made on an "arm's-length basis" for fair market value (as determined at the time the Issuer first enters into a binding commitment to dispose of such item of Portfolio Collateral). Any disposition of Portfolio Collateral will be conducted in accordance with the requirements of the Servicing Agreement and, if effected with the Servicer, the

008245

Co-Issuers, the Trustee or any of their affiliates, will be effected in a secondary market transaction on terms as favorable to the holders of the Notes as would be the case if such person were not so affiliated. In the event of an Optional Redemption, or Tax Event Redemption, the Servicer may direct the Trustee to sell certain Portfolio Collateral without regard to the foregoing limitations (except for the limitation that no Portfolio Collateral be disposed of for the primary purpose of recognizing gains or decreasing losses resulting from market value changes); provided that (i) the proceeds therefrom will be at least sufficient to pay certain expenses and other amounts and redeem in whole but not in part all Notes to be redeemed simultaneously; and (ii) such proceeds are used to make such a redemption. See "Description of the Notes-Optional Redemption," "Tax Event Redemption" and "Special Redemption."

The Servicer will select the Initial Portfolio Collateral and will be responsible for monitoring the items of Portfolio Collateral that at any time are included in the Trust Estate, selecting Additional Portfolio Collateral and Substitute Portfolio Collateral and effecting additions and substitutions. Any addition or substitution of an item of Portfolio Collateral by the Servicer shall be in accordance with the applicable requirements provided in the Servicing Agreement.

Accounts

All Collections will be remitted to the Collection Account and will be available, to the extent described herein, for application in the manner and for the purposes described herein. Funds held in the Collection Account that are not used to purchase or committed to use to purchase Additional Portfolio Collateral or Substitute Portfolio Collateral will be held by the Trustee, as directed by the Servicer, as soon as practicable in Eligible Investments. All Eligible Investments in the Collection Account must mature on or before the Business Day prior to the next Payment Date. The Trustee may establish any number of sub-accounts to the Collection Account for its convenience in administering the accounts and the Trust Estate.

All cash pledged to the Trustee on the Closing Date which is to be used to purchase additional Original Portfolio Collateral on or before the Effective Date will be deposited into the Initial Deposit Account. Funds held in the Initial Deposit Account pending use to purchase additional Original Portfolio Collateral will be held by the Trustee, as directed by the Servicer, in Eligible Investments. Eligible Investments in the Initial Deposit Account are to mature no later than the Business Day prior to the date on which such funds are to be invested in additional Original Portfolio Collateral; provided that, to the extent the Deposit in the Initial Deposit Account is not so used or committed to be used on or before the Effective Date such unused amount will be applied to effect an Initial Deposit Redemption of the Class A-1LA Notes and the Class X Notes, in the order described herein, or deposited in the Collection Account as described herein.

If, at any time on or after the Effective Date, the Aggregate Principal Amount of the Portfolio Collateral (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to the Original Portfolio Collateral on or prior to such time) exceeds the Required Portfolio Collateral Amount and there are funds remaining from the Deposit held in the Initial Deposit Account, the Servicer may direct the Trustee to transfer up to the lesser of U.S.$1,000,000 and 25% of such funds to the Collection Account as additional Collateral Interest Collections; provided that the Overcollateralization Tests and the collateral criteria described herein are satisfied and the Interest Coverage Test for the most recent Payment Date was satisfied. The remainder of the Deposit shall be use to purchase Portfolio Collateral, as directed by the Servicer.

An Expense Reimbursement Account of U.S.$50,000 will be established by the Issuer and pledged to the Trustee for the payment of Issuer administrative expenses which become due and must be paid between Payment Dates. Any amounts withdrawn from the Expense Reimbursement Account will be reimbursed on each Payment Date in accordance with the priority of the distribution provisions described herein. Funds held in the Expense Reimbursement Account will be held by the Trustee, as directed by the Servicer, in Eligible Investments. Eligible Investments in the Expense Reimbursement Account are to mature on or before the date on which such funds are expected to be used by the Issuer for the payment of expenses.

A Closing Expense Account will be established by the Trustee. From the Closing Date to the Payment Date occurring in November 2006 (or February 2007, to the extent unpaid expenses are identified to the Trustee), funds deposited in the Closing Expense Account will be used to pay the fees, commissions and expenses associated

008246

with the issuance of the Notes. Funds held in the Closing Expense Account will be held by the Trustee, as directed by the Servicer, in Eligible Investments. On the Payment Date occurring in November 2006 (or February 2007, to the extent unpaid expenses are identified to the Trustee), any remaining funds in the Closing Expense Account (not being held for a pre-approved closing expense) will be transferred to the Collection Account and applied as Collateral Interest Collections.

A Reserve Account will be established by the Trustee for the benefit of the Noteholders and the other secured parties under the Indenture, over which the Trustee shall have exclusive control and the sole right of withdrawal at the direction of the Servicer. On the Closing Date, the Trustee, at the direction of the Issuer, shall deposit into the Reserve Account approximately $1,600,000 from the net proceeds of the Offering. Amounts on deposit in the Reserve Account shall be held in Eligible Investments in accordance with the Indenture.

A Loan Funding Account will be established by the Issuer with the Trustee into which an amount equal to the Issuer's commitment to make or otherwise fund advances related to the Delayed Drawdown Loans and the Revolving Loans will be deposited. Such amount will be reduced upon a sale in whole or in part of such Delayed Drawdown Loan or Revolving Loan as prescribed in the Indenture. Funds held in the Loan Funding Account will be held by the Trustee, as directed by the Servicer, in Eligible Investments. Eligible Investments in the Loan Funding Account are required to mature no later than one Business Day after the date such Eligible Investment is purchased.

A Default Swap Collateral Account will be established for each Default Swap. The Trustee will deposit into each such Default Swap Collateral Account on the Closing Date or on the date any such Default Swap is entered into, as applicable, the amount required to secure the obligations of the Issuer in accordance with the terms of the related Default Swap, which amount shall be at least equal to the amount referred to in paragraph (iv) of the definition of Default Swap Collateral.

Amounts on deposit in a Default Swap Collateral Account will be maintained in accordance with the terms and provisions of the related Default Swap. Amounts and property credited to a Default Swap Collateral Account shall be withdrawn by the Trustee and applied to the payment of any amounts payable by, or to the delivery of securities deliverable by, the Issuer to the related Default Swap Counterparty in accordance with the terms of such Default Swap. Income received on amounts on deposit in a Default Swap Collateral Account will be applied in accordance with the terms of the applicable Default Swap to the payment of any periodic amounts owed by the Issuer to the applicable Default Swap Counterparty on the date such amounts are due. After application of such amounts, any income then contained in such Default Swap Collateral Account will be withdrawn from such account and deposited in the Collection Account for distribution as Collateral Interest Collections. After payment of all amounts owing by the Issuer to a Default Swap Counterparty in accordance with the terms of the related Default Swap (other than any Default Swap Counterparty Termination Payment) the Trustee shall be directed to withdraw all funds and other property credited to the Default Swap Collateral Account related to such Default Swap and credit such funds and other property to the Collection Account, as Collateral Principal Collections (in the case of cash and Eligible Investments) and the Collateral Account (in the case of Portfolio Collateral and other financial assets) for application as Collateral Principal Collections (other than any income thereon which will be Collateral Interest Collections) in accordance with the terms of the Indenture. Any Default Swap Counterparty Termination Payments owed by the Issuer to the Default Swap Counterparty shall be paid solely from amounts available therefor under the priority of payment provisions described herein.

Except for interest on securities credited to a Default Swap Collateral Account payable to the Issuer as described pursuant to the preceding paragraph, funds and other property standing to the credit of a Default Swap Collateral Account will not be considered to be an asset of the Issuer for purposes of the Interest Coverage Test or the Overcollateralization Tests; *provided, however that* the Default Swap that relates to such Default Swap Collateral Account will be considered an asset of the Issuer for such purposes.

If the terms of any Default Swap require the Default Swap Counterparty to secure its obligations with respect to such Default Swap, the Trustee will cause to be established a Default Swap Issuer Account in respect of such Default Swap. The Trustee shall credit to any such Default Swap Issuer Account all funds and other property received from the applicable Default Swap Counterparty to secure the obligations of such Default Swap Counterparty in accordance with the terms of such Default Swap.

008247

Funds and other property standing to the credit of any Default Swap Issuer Account will not be considered to be an asset of the Issuer for purposes of the Interest Coverage Test or the Overcollateralization Tests; *provided, however that* the Default Swap that relates to such Default Swap Issuer Account will be considered an asset of the Issuer for such purposes.

In accordance with the terms of the applicable Default Swap, funds and other property standing to the credit of the related Default Swap Issuer Account will be withdrawn by the Trustee and applied to the payment of any amount owing by the related Default Swap Counterparty to the Issuer.  After payment of all amounts owing by the Default Swap Counterparty to the Issuer in accordance with the terms of the related Default Swap, all funds and other property standing to the credit of the related Default Swap Issuer Account will be withdrawn from such Default Swap Issuer Account and paid or transferred to the related Default Swap Counterparty in accordance with the applicable Default Swap.

Note Valuation Report; Noteholder Reports

Promptly after receipt by the Trustee thereof, but in any event not later than the Business Day prior to each Payment Date, the Trustee shall deliver (or otherwise make available) to each Noteholder and each Rating Agency a Noteholder report setting forth certain information regarding payments due to the Noteholders on such Payment Date and the Pledged Securities.  In addition, not later than the first day (or, if such day is not a Business Day, on the next succeeding Business Day) of each month (for months in which no Payment Date occurs) or the related Payment Date (for months in which a Payment Date occurs), commencing in July, 2006, the Issuer shall provide, or procure the provision, to each Rating Agency and the Trustee, who shall forward a copy (or otherwise make available) to each Noteholder, a monthly report containing additional information with respect to the Pledged Securities included in the Trust Estate.  Except as provided herein, the Indenture provides that the information contained in these reports is confidential and may not be disclosed, except as provided therein.

Pursuant to the Indenture, the Issuer will consent to the posting of each such report, together with this Confidential Offering Circular, the Indenture and any amendments or modifications thereto, to the internet based password protected electronic repository of transaction documents relating to privately offered and sold collateralized debt obligation securities located at "www.cdolibrary.com".

## MATURITY AND PREPAYMENT CONSIDERATIONS

The Final Maturity Date of the Class X Notes is the Payment Date occurring in August 2013 and the Final Maturity Date of each other Class of Notes is the Payment Date occurring in August 2021, or, upon a Maturity Extension (if any), the applicable Extended Final Maturity Date, and subject to prior redemption under the circumstances described herein.  The average life of each Class of Notes is expected to be shorter than the number of years until the Final Maturity Date, and the average lives may vary due to various factors.  The average life of each Class of Notes, refers to the weighted amount of time that will elapse from the date of delivery of such Notes until each dollar of the principal of such securities will be paid to the investor.  Such average lives will be determined by the amount and frequency of principal payments which in turn are dependent upon, among other things, the amount of sinking fund payments and other payments received at or in advance of the scheduled maturity of Portfolio Collateral (whether through sale, maturity, redemption, prepayment, default or other liquidation or disposition).  The actual average life and final maturity of each Class of Notes will be affected by the financial condition of the issuers of the underlying Portfolio Collateral and the characteristics of such collateral, including the existence and frequency of exercise of any optional or mandatory redemption features, the prevailing level of interest rates, the redemption price, the actual default rate and the actual level and timing of recoveries on any Defaulted Portfolio Collateral, the frequency of tender or exchange offers for such item of Portfolio Collateral, and the ability of the Issuer to reinvest proceeds in Additional Portfolio Collateral or Substitute Portfolio Collateral satisfying the criteria set forth in the Indenture and the interest rates obtained in connection with the purchase of such Additional Portfolio Collateral or Substitute Portfolio Collateral or in connection with the application of proceeds to purchase Eligible Investments.  It is expected that a substantial amount (by Principal Balance) of the Portfolio Collateral will be subject to mandatory redemption or optional redemption or prepayment by the issuer thereof or obligor thereunder.  Any acquisition of Additional Portfolio Collateral or Substitute Portfolio Collateral or disposition of an item of Portfolio Collateral will likely change the composition and characteristics of the Portfolio Collateral included in the Trust Estate and the rate of payment thereon, and, accordingly, may affect the actual average life of the Notes.  See "Security for the Notes—Changes in Composition

008248

of Portfolio Collateral."

In addition, the Notes are subject to redemption at the times and under the circumstances described herein, including Initial Deposit Redemption, O/C Redemption (other than with respect to the Class X Notes), Optional Redemption, Rating Confirmation Failure Redemption, Tax Event Redemption and Special Redemption (other than with respect to the Class X Notes), as described herein.  Any such redemption will affect the average lives of the Notes.

Under the assumptions identified below, the Class X Notes are expected to have an average life of approximately 4.35 years and an expected final payment occurring on the Payment Date in August 2013, the Class A-1LA Notes are expected to have an average life of approximately 6.80 years and an expected final payment occurring on the Payment Date in August 2014, the Class A-1LB Notes are expected to have an average life of approximately 8.23 years and an expected final payment occurring on the Payment Date in August 2014, the Class A-2L Notes are expected to have an average life of approximately 8.23 years and an expected final payment occurring on the Payment Date in August 2014, the Class A-3L Notes are expected to have an average life of approximately 8.23 years and an expected final payment occurring on the Payment Date in August 2014, the Class A-4L Notes are expected to have an average life of approximately 8.23 years and an expected final payment occurring on the Payment Date in August 2014, and the Class B-1L Notes are expected to have an average life of approximately 8.23 years and an expected final payment occurring on the Payment Date in August 2014.  There can be no assurance that the average lives and expected final payment of any Class of Notes will be as set forth above. Prospective investors should make their own determinations of the payments expected to be made in respect of the Notes.

The hypothetical scenario used to determine the average lives of the Notes is as follows:  (i) approximately U.S.$850,000,000 in Aggregate Principal Amount of various assumed Portfolio Collateral would be purchased on the Closing Date using all funds available on the Closing Date for the purchase of Portfolio Collateral; (ii) 100% of the Portfolio Collateral (by Aggregate Principal Amount) will consist of Floating Rate Collateral which will have a weighted average margin (in order to adjust for not being fully invested in Portfolio Collateral until after the second Payment Date) of (a) 2.5457% from the Closing Date to the first Payment Date and (b) 2.5900% thereafter; (iii) all Floating Rate Collateral bear interest based on three-month LIBOR.  Three-month LIBOR is approximately 5.2041% for the first period and 3 month forward LIBOR thereafter; (iv) the Portfolio Collateral has a scheduled maturity date of November 1, 2015, with respect to Portfolio Loans, and August 1, 2014, with respect to CLO Securities, with a weighted average maturity date of May 8, 2015; (v) no Initial Deposit Redemption, Special Redemption, Tax Event Redemption or Rating Confirmation Failure Redemption of the Notes is made; (vi) an Optional Redemption occurs on the Payment Date occurring in August 1, 2014; (vii) the Additional Portfolio Floating Collateral purchased from Collections as described herein will bear interest quarterly at the rate of 2.85% per annum above LIBOR for the first year, 2.95% per annum above LIBOR for the second year; 3.00% per annum above LIBOR for the third year; 3.00% per annum above LIBOR for the fourth year and 3.00% per annum above LIBOR thereafter; (viii) all Additional Portfolio Collateral in the portfolio become callable or prepayable on the payment date immediately following the purchase date and are callable at their respective call price; (ix) all Eligible Investments will bear interest at a rate of LIBOR *minus* 0.25% per annum; (x) the Additional Portfolio Collateral have an initial call price of par; and (xi) the Additional Portfolio Collateral have a 6 year maturity in the case of the Floating Rate Collateral.  In addition, it is assumed that no calls or defaults with respect to such Additional Portfolio Collateral will occur on the Final Maturity Date.

Further, the hypothetical scenario assumes that there are no defaults during the period from the Closing Date to February 1, 2007 and there are defaults equal to 3.00% per annum thereafter until the Optional Redemption occurs on the Payment Date occurring on August 1, 2014.  The principal recovery on any defaulted Portfolio Loan and any defaulted underlying loan in a CLO Security is assumed to be 75% and in each case such recovery is assumed to occur at the default date.  It is also assumed that the Scheduled Distributions on Portfolio Collateral are timely received and that such distributions earn the indicated interest rates until the next payment date without compounding.  It is assumed that Floating Rate Collateral has no prepayment for one period after the Closing Date; thereafter prepayments are calculated on a 20% per annum constant prepayment rate basis for Portfolio Loans.  It is assumed that during any period when the Overcollateralization Tests or the Interest Coverage Test are not satisfied, principal payments (or, in the case of the Class B-1L Notes, payments of accrued and unpaid interest and then

008249

principal) will be made in respect of the Notes to the extent necessary to satisfy the Overcollateralization Tests or the Interest Coverage Test, as applicable (to the extent funds are available therefor).

The Base Fee Amount and the Additional Fee Amount, are assumed to be approximately 0.55% *per annum* in aggregate, and the Trustee Administrative Expenses, Issuer Base Administrative Expenses and Issuer Excess Administrative Expenses will be 0.0275% (but no less than $75,000 *per annum*) *plus* U.S.$250,000 *per annum*, in the aggregate, each as a percentage of either the Aggregate Principal Amount of the Portfolio Collateral as of the first day of the Due Period relating to each Payment Date or the average of the Aggregate Principal Amount of the Portfolio Collateral as of the first day of the Due Period relating to each Payment Date and the last day of the Due Period relating to such Payment Date, as appropriate for the related fee and subject to the availability of funds in the performance scenario. For purposes of calculating the Base Fee Amount and the Additional Fee Amount, the Quarterly Collateral Amount on the first calculation date is assumed to be U.S.$850,000,000.

Cash received on or before a Calculation Date is assumed to be available on the following Payment Date. Cash collected after the Calculation Date but before the immediately following Payment Date is assumed to be used to purchase Eligible Investments until the second succeeding Payment Date. With respect to Floating Rate Collateral, the accrual date on Portfolio Collateral is assumed to be the full quarterly period before the Payment Date subsequent to the Closing Date.

The weighted average lives and expected final payment dates described above are included only for illustrative purposes. The usefulness of these scenarios is limited by, among other things, the predictive value of the underlying assumptions, the uncertain relevance of the assumptions as compared to other factors which have not been identified or taken into account, and assumptions incorporated with respect to the timing of cash flows, prepayments, defaults and recoveries on the Portfolio Collateral and available interest rates. The assumptions are inherently subject to significant economic uncertainties, all of which are impossible to predict and beyond the control of the Co-Issuers. **There can be no assurance that any particular performance scenario will be realized, and the performance of the Notes may be materially different from that shown. Such scenario is not a projection or forecast and was not prepared with a view to complying with published guidelines of the United States Securities and Exchange Commission or the American Institute of Certified Public Accountants regarding projections or forecasts. Under no circumstances should the inclusion of such information be regarded as a representation, warranty or prediction with respect to their accuracy or the accuracy or appropriateness of the underlying assumptions, or that the Notes will achieve or are likely to achieve any particular results. There can be no assurance that the actual performance of the Notes will not vary materially from the scenario and assumptions set forth herein or otherwise used by a prospective investor. Moreover, to the extent that the individual characteristics of the assumed Portfolio Collateral used for such purposes differ from the individual characteristics of the actual Portfolio Collateral purchased on the Closing Date and thereafter, the actual performance of the Notes may differ. Prospective investors should conduct such financial analysis as they deem prudent, which may include the preparation of their own performance scenarios under a range of economic and other assumptions chosen by such prospective investors or their advisers. Each prospective investor must make its own evaluation of the merits and risks of investment in the Notes. See "Special Considerations—Nature of Collateral Pledged to Secure the Notes; Ability to Obtain Additional Portfolio Collateral; Availability of Funds for Subordinate Payments," "Special Considerations-Sale of Portfolio Collateral by Servicer under Certain Circumstances" and "Special Considerations—Default Rates of Commercial Loans and CLO Securities."**

## LEGAL STRUCTURE

The Indenture

The following summaries generally describe certain provisions of the Indenture. The summaries do not purport to be complete and are subject to, and qualified in their entirety by reference to, the provisions of the Indenture.

Modification of Indenture. Except as set forth below, with the consent of the Requisite Noteholders and the Servicer, the Trustee and the Co-Issuers may execute a supplemental indenture to add provisions to, or change in any manner or eliminate any provisions of, the Indenture or modify in any manner the rights of the Holders of such

008250

Notes. However, without the consent of the Holders of each Outstanding Note affected thereby, and, to the extent provided in the Paying and Transfer Agency Agreement, the Holders of the Preferred Shares materially adversely affected thereby, no supplemental indenture may (i) change the maturity of the principal of or interest on any Note or reduce the principal amount thereof or the rate of interest thereon or change the time or amount of any other amount payable in respect of any Note, (ii) reduce the percentage of Holders of Notes whose consent is required for the authorization of any supplemental indenture or for any waiver of compliance with certain provisions of the Indenture, (iii) impair or adversely affect the Trust Estate securing the Notes, (iv) permit the creation of any lien ranking prior to or on parity with the lien of the Indenture with respect to any part of the Trust Estate or terminate the lien of the Indenture, (v) reduce the percentage of Holders of Notes whose consent is required to direct the Trustee to liquidate the Trust Estate, (vi) modify any of the provisions of the Indenture with respect to supplemental indentures or waiver of Defaults and their consequences except to increase the percentage of Outstanding Notes whose consent is required for any such action or to provide that other provisions of the Indenture cannot be modified or waived without the consent of the Holder of each Outstanding Note affected thereby, (vii) modify the provisions thereof relating to priority of distributions or subordination or the definition therein of the terms "Holder," "Noteholder," "Majority Noteholder," "Majority Preferred Shareholder," "Outstanding," or "Requisite Noteholder," (viii) modify any provisions in such a manner as to affect the calculation of the amount or timing of any payment of interest or principal due on any Note on any Payment Date (including the calculation of any of the individual components of such calculation) or to affect the rights of the Holders of Notes to the benefit of any provisions for the redemption of such Notes contained in the Indenture; (ix) modify any provision relating to the institution of proceedings for the Issuer or the Co-Issuer to be adjudicated as bankrupt or insolvent, (x) amend any provision that provides that the obligations of the Issuer or the Co-Issuer are non-recourse obligations or (xi) modify any of the provisions of the Indenture in such a manner as to affect the calculation of the amount of any payment of principal of or interest on or other amount in respect of any Note or to affect the right of the Holders of Notes to the benefit of any provisions for the redemption of such Notes contained therein.

The Co-Issuers and the Trustee may also enter into supplemental indentures with the consent of the Servicer but without obtaining the consent of Noteholders, in order to (i) evidence the succession of any person to the Co-Issuers, (ii) evidence the addition of an additional issuer or of a wholly owned subsidiary of the Issuer that, in either case, will acquire securities from the Issuer and pledge its assets to secure the obligations of the Issuer secured by the Trust Estate, to the extent necessary to permit the Issuer to comply with the Bank Holding Company Act of 1956, as amended, and the rules and regulations thereunder or any other statute, rule or regulation applicable to the Issuer, and the assumption by any such additional issuer or subsidiary of the covenants and obligations of the Issuer in the Indenture and, if applicable, in the Notes, (iii) add to the covenants of the Co-Issuers for the benefit of the Holders of the Notes or to surrender any right or power conferred upon the Co-Issuers, (iv) pledge any property to or with the Trustee, (v) evidence and provide for the acceptance of appointment by a successor trustee and to add to or change any of the provisions of the Indenture as shall be necessary to facilitate the administration of the Trust Estate by more than one Trustee, (vi) correct or amplify the description of any property at any time subject to the lien of the Indenture, or to better assure, convey and confirm unto the Trustee any property subject to the lien of the Indenture, (vii) take any action necessary or helpful to prevent the Issuer or the Trustee from becoming subject to any withholding or other taxes or assessments or to reduce the risk that the Issuer will be engaged in a United States trade or business or otherwise subject to United States income tax on a net income basis, (viii) correct any manifest error in the Indenture, (ix) facilitate the delivery and maintenance of the Notes in accordance with the requirements of DTC, Euroclear or Clearstream, (x) facilitate the listing of all or any of the Notes on one or more securities exchanges, (xi) modify the restrictions on and procedures for resale and other transfer of the Notes in accordance with any change in applicable law or regulation or enable the Co-Issuers to rely upon any less restrictive exemption from registration under the Securities Act or the Investment Company Act, (xii) cure any ambiguity, or correct, modify or supplement any provision which is defective or inconsistent with any other provision in the Indenture, (xiii) to effectuate a Noteholder's election to acquire bond insurance, a surety bond or similar credit enhancement as described in the Indenture, or (xiv) prevent the Issuer from becoming an "investment company" as defined in the Investment Company Act or better assure compliance with the requirements of Rule 3a-7 thereunder; *provided* that, as a condition to the effectiveness of any such supplemental indenture, each of the Issuer, the Trustee and the Initial Purchaser shall have (A) satisfied the Rating Condition with respect to such supplemental indenture and (B) received a customary, unqualified opinion of counsel from a nationally recognized law firm providing that, after giving effect to such supplemental indenture, the Issuer is exempt from registration as an "investment company" under the Investment Company Act; *provided* further that (A) any such amendment for any matters described in clauses (i) through (xiii) shall not materially adversely affect the interests of the Holders of the Notes and (B) no

008251

amendment shall be made that would cause the Issuer to register as an "investment company" under the Investment Company Act.

The Trustee will not be permitted to enter into any supplemental indenture if such amendment would materially adversely affect the interests of the Preferred Shareholders without the consent of the Holders representing at least 66-2/3% of the outstanding Preferred Shares.

Not later than 15 Business Days prior to the execution of any proposed supplemental indenture pursuant to the above provisions, the Trustee, at the expense of the Co-Issuers, shall deliver to the Holders of the Notes, the Servicer, the Preferred Share Paying and Transfer Agent (for forwarding to the Holders of Preferred Shares) and each Rating Agency (so long as any rated Notes are Outstanding) a copy of such supplemental indenture and shall request any required consent from the applicable Holders of Notes and Preferred Shares to be given within the Initial Consent Period. Any consent given to a proposed supplemental indenture by the Holder of any Notes or Preferred Shares shall be irrevocable and binding on all future Holders or beneficial owners of Notes or Preferred Shares, irrespective of the execution date of the supplemental indenture. If the Holders of less than the required percentage of the Aggregate Principal Amount of the relevant Notes or required percentage of the Preferred Shares consent to a proposed supplemental indenture within the Initial Consent Period, on the first Business Day after the Initial Consent Period, the Trustee shall notify the Issuer and the Servicer which Holders of Notes and Preferred Shares have consented to the proposed supplemental indenture and, which Holders (and, to the extent such information is reasonably available to the Trustee, which beneficial owners) have not consented to the proposed supplemental indenture. If the Amendment Buy-Out Purchaser intends to exercise the Amendment Buy-Out Option, the Amendment Buy-Out Purchaser shall so notify the Trustee (which notice shall designate a date for the Amendment Buy-Out to occur no earlier than 10 Business Days after the date of such notice) no later than five (5) Business Days after so being notified by the Trustee and the Trustee shall deliver such notice to all Holders of Notes and the Preferred Share Paying and Transfer Agent (for forwarding to the Holders of Preferred Shares). Any Non-Consenting Holder may give consent to the related proposed supplemental indenture until the 5th Business Day prior to the date of the Amendment Buy-Out designated by the Amendment Buy-Out Purchaser, and in such case shall cease to be a Non-Consenting Holder for purposes of the Amendment Buy-Out. If the Amendment Buy-Out Purchaser exercises its Amendment Buy-Out Option and purchases the applicable Notes or Preferred Shares, the Amendment Buy-Out Purchaser, as Holder or beneficial owner of the applicable Notes or Preferred Shares, may consent to the related proposed supplemental indenture within five (5) Business Days of the Amendment Buy-Out.

The Indenture provides that no amendment to any provision of the Indenture or any other transaction document that materially adversely affects the obligations of any Synthetic Security Counterparty will be of any effect without the consent of such Synthetic Security Counterparty and the Issuer will not enter into any such amendment unless such Synthetic Security Counterparty has consented thereto (which consent will not be unreasonably withheld).

The Co-Issuers and the Trustee may also enter into supplemental indentures upon satisfying the Rating Condition and receiving consent from the Servicer, but without obtaining the consent of any other Person, including any Noteholder or any Holder of Preferred Shares, in order to add additional rows to the Collateral Quality Matrix; *provided that* any such supplemental indenture which expands the minimum or maximum ranges of the Collateral Quality Matrix from that set forth in the Indenture on the Closing Date, shall require the prior consent of the Requisite Noteholders.

Notwithstanding the foregoing, the Trustee will not be permitted to enter into any supplemental indenture if, as a result of such supplemental indenture, the rating of any Class of Outstanding Notes (if then rated) would be reduced or withdrawn without the unanimous consent of the Holders of that Class of Notes.

Amendment Buy-Out

In the case of any supplemental indenture that requires the consent of one or more Holders of the Notes or Preferred Shares, the Amendment Buy-Out Purchaser shall have the right, but not the obligation, to purchase from Non-Consenting Holders all Notes and Preferred Shares held by such Holder whose consent was solicited with respect to such supplemental indenture (the "**Amendment Buy-Out Option**") for the applicable Amendment Buy-Out Purchase Price; *provided,* however, that the Amendment Buy-Out Purchaser may not exercise the Amendment Buy-Out Option during the Non-Call Period in connection with a proposed amendment to reduce the rate of interest

008252

on any Security, as applicable, or to change the earliest date on which Notes of any Class or Preferred Shares may be redeemed at the option of the Issuer; *provided*, further that notwithstanding the definition of Non-Consenting Holder, any Holder of Notes (other than the Class A-lLA Notes) or Preferred Shares who fails to respond to any such consent solicitation shall be deemed to have consented to any such supplemental indenture. Notwithstanding the foregoing, during the Non-Call Period, "Non-Consenting Holder" shall exclude any Holder of Class A-1LA Notes (unless such Holder has consented in writing to be designated as a Non-Consenting Holder) and the Amendment Buy-Out Option shall not be applicable to such Class A-1LA Notes. If such option is exercised, the Amendment Buy-Out Purchaser must purchase all Notes and Preferred Shares of Non-Consenting Holders, regardless of the applicable percentage of the Aggregate Principal Amount of the Notes or Preferred Shares the consent of whose Holders is required for such supplemental indenture (an "**Amendment Buy-Out**"). By its acceptance of a Note or Preferred Share, each Holder of a Note and Preferred Share agrees that if the Amendment Buy-Out Option is exercised, any Non-Consenting Holder will be required to sell its applicable Note or Preferred Share to the Amendment Buy-Out Purchaser. For the avoidance of doubt, nothing described above or in the Indenture shall in any way limit or restrict the rights of Holders of the Class A-1LA Notes to consent or withhold their consent to a supplemental indenture or otherwise vote their interest both during and after the Non-Call Period.

All purchases made pursuant to the Amendment Buy-Out Option individually and in the aggregate must comply with the applicable transfer restrictions for the relevant Notes and Preferred Shares set forth in "Delivery of the Notes; Transfer Restrictions; Settlement" herein and all applicable laws, rules and regulations (including, without limitation, any rules, regulations and procedures of any securities exchange, self-regulatory organization or clearing agency).

_Acts of Noteholders_. Under the Indenture, with respect to any Noteholder which has notified the Trustee in writing that pursuant to such Noteholder's organizational documents or other documents governing such Noteholder's actions, such Noteholder is not permitted to take any affirmative action approving, rejecting or otherwise acting upon any Issuer request including, but not limited to, a request for the consent of such Noteholder to a proposed amendment or waiver pursuant to this Indenture, the failure by such Noteholder to consent to or reject any such requested action will be deemed a consent by such Noteholder to the requested action.

_Consolidation, Merger or Transfer of Assets, Incurrence of Indebtedness, Conduct of Business_. The Co-Issuers may not consolidate with, merge into, or transfer or convey all or substantially all of their assets to, any other corporation, partnership, trust or other person or entity (except for sales or exchanges of Portfolio Collateral as contemplated by the Indenture). In addition, the Co-Issuers may not incur any indebtedness other than the Notes and trade debt incidental to the performance of their obligations under the Indenture or engage in any business or activity other than the issuance of the Notes, the Preferred Shares, the ordinary shares and the other transactions and activities, as applicable, contemplated herein. Pursuant to the Indenture and the Co-Issuers' organizational documentation, the Co-Issuers may also not, without the consent of the Requisite Noteholders, amend their organizational documentation if such amendment would have a material adverse effect on the right of the Noteholders.

_Events of Default_. An event of default ("**Event of Default**") is defined in the Indenture as being (i) a default for four Business Days or more (or in the case of a default in payment due to an administrative error or omission by the Trustee, any Paying Agent or the Note Registrar, for a period of seven Business Days or more, *provided* that the Trustee has notified each Rating Agency of any such administrative error or omission) in the payment of any amount payable in respect of any Note when due when funds in such amount are available for payment in accordance with the Indenture, (ii) a failure after four Business Days (or in the case of a default in payment due to an administrative error or omission by the Trustee, any Paying Agent or the Note Registrar, for a period of seven Business Days or more, *provided* that the Trustee has notified each Rating Agency of any such administrative error or omission), to apply available amounts in accordance with the priority of distribution set forth in the Indenture, (iii) a default for four Business Days or more (or in the case of a default in payment due to an administrative error or omission by the Trustee, any Paying Agent or the Note Registrar, for a period of seven Business Days or more, *provided* that the Trustee has notified each Rating Agency of any such administrative error or omission) in the payment of (A) the Periodic Interest Amount due on any Senior Class A Notes on any Payment Date or a Class X Payment due on any Class X Notes, (B) after the Senior Class A Notes and Class X Notes are paid in full, the Periodic Interest Amount due on the Class A-3L Notes on any Payment Date, (C) after the Senior Class A Notes, the Class A-3L Notes and the Class X Notes are paid in full, the Periodic Interest Amount due on the Class

A-4L Notes on any Payment Date and (D) after the Class A Notes and the Class X Notes are paid in full, the Periodic Interest Amount due on the Class B-1L Notes on any Payment Date; (iv) a default in the payment of the Aggregate Principal Amount and the Cumulative Interest Amount due on any Class of Notes on the Final Maturity Date, (v) a default in the performance, or a breach of any covenant, representation, warranty or other agreement of the Co-Issuers (or either one of them) other than compliance with the Overcollateralization Tests, the Interest Coverage Test or the collateral quality criteria described herein, or the failure of any representation or warranty of the Co-Issuers (or either one of them) in the Indenture or in any certificate or other writing delivered pursuant to or in connection with the Indenture to be correct in all material respects when the same shall have been made, in any such case which materially and adversely affects the rights of any Class of Noteholders and continuance of such default, breach or failure for a period of 30 days after written notice to the Co-Issuers or the Servicer by the Trustee or to the Co-Issuers or the Servicer and the Trustee by the Holders of at least a majority in principal amount of the Notes, (vi) certain events of bankruptcy, insolvency, receivership or reorganization of the Co-Issuers, (vii) either of the Co-Issuers or the pool of assets constituting the Trust Estate becomes required to register as an "investment company" under the Investment Company Act of 1940, (viii) the failure to maintain on any Calculation Date a Senior Class A Overcollateralization Ratio of at least 100%. The failure to pay in full Periodic Interest on the Class A-3L Notes as a result of insufficient funds being available therefor will not constitute an Event of Default so long as the Senior Class A Notes or Class X Notes are Outstanding. The failure to pay in full Periodic Interest on the Class A-4L Notes as a result of insufficient funds being available therefore will not constitute an Event of Default so long as the Senior Class A Notes, the Class A-3L Notes or the Class X Notes are Outstanding. The failure to pay in full Periodic Interest on the Class B-1L Notes as a result of insufficient funds being available therefor will not constitute an Event of Default so long as any Class A Notes or Class X Notes are Outstanding. An event of insolvency could result if relief has been ordered against the Co-Issuers in a case under applicable bankruptcy law and the Co-Issuers, the trustee, if any, for either of the Co-Issuers or a creditor of either of the Co-Issuers were to file an involuntary petition against either of the Co-Issuers. The filing of a petition against the Co-Issuers under applicable bankruptcy law could adversely affect the rights of the Holders of Notes to receive timely payments.

If an Event of Default (other than an Event of Default specified in clause (vi) above) under the Indenture should occur and be continuing with respect to the Notes, the Trustee may with the consent of the Requisite Noteholders, and shall, at the written direction of the Requisite Noteholders, declare the principal of the Notes to be immediately due and payable. Such declaration may under certain circumstances be rescinded by the Trustee with the consent of the Requisite Noteholders or at the written direction of the Requisite Noteholders. If an Event of Default specified in clause (vi) above should occur and be continuing, the principal of the Notes shall become immediately due and payable without the necessity of notice or any other action. If the Notes are accelerated, or if the Final Maturity Date has occurred, the Holders of the Notes shall be entitled to receive the Cumulative Interest Amount and the Aggregate Principal Amount with respect thereto (as calculated and accrued through the date of payment in full of the Aggregate Principal Amount of each Class of Notes) in the order of priority set forth under "Description of the Notes—Payments on the Notes; Priority of Distributions—Final Maturity Date."

If an Event of Default shall have occurred and be continuing or if the Final Maturity Date has occurred, the Trustee shall refrain from liquidating and shall preserve the Trust Estate intact unless (i) the Requisite Noteholders have directed the Trustee to sell or liquidate the Trust Estate or any portion thereof in the case of (A) an Event of Default resulting from failure to pay interest or principal on a Note or (B) a sale or liquidation of all or a portion of the Trust Estate at or above the aggregate par value of all Collateral so liquidated or sold (and Defaulted Portfolio Collateral may be liquidated or sold without reference to, or inclusion in the calculation of, such limitation), or (ii) 100% of the Noteholders have otherwise directed the Trustee to sell or liquidate the Trust Estate or any portion thereof. In addition, under certain circumstances, if an Event of Default as described under clauses (iii) and (iv) of "Events of Default" shall have occurred and be continuing, the Servicer may be terminated as described under "The Servicing Agreement—Termination of Servicing Agreement."

Pursuant to the Indenture, as security for the payment by the Issuer of the compensation and expenses of the Trustee and the Paying and Transfer Agent and any sums to which the Trustee and the Paying and Transfer Agent may be entitled to receive as indemnification by the Issuer, the Issuer has granted the Trustee a senior lien on the Trust Estate, which is senior to the lien of the Notes on the Trust Estate. These liens are exercisable by the Trustee or the Paying and Transfer Agent only if the Notes have been declared due and payable following an Event of Default, and the acceleration of the maturity of such Notes as a result of such Event of Default has not been rescinded or annulled.

008254

Subject to the provisions of the Indenture relating to the duties of the Trustee in case an Event of Default with respect to the Notes shall occur and be continuing, the Trustee will be under no obligation to exercise any of the rights or powers under the Indenture at the request or direction of any Holders of Notes, unless such Holders shall have offered to the Trustee security or indemnity reasonably satisfactory to it. Subject to such provisions for indemnification and certain limitations contained in the Indenture, the Requisite Noteholders will have the right to direct the time, method and place of conducting any proceeding of any remedy available to the Trustee or exercising any trust or power conferred on the Trustee with respect to the Notes; and, in certain cases, waive any default with respect to such Notes, except a default in payment of any amount payable in respect of any Note or a default in respect of a covenant or provision of the Indenture that cannot be modified without the waiver or consent of the Holder of each Outstanding Note affected thereby.

Rights Under the Indenture. No Holder of a Note will have the right to institute any proceeding with respect to the Indenture, unless (1) such Holder previously has given to the Trustee written notice of an Event of Default with respect to such Notes, (2) the Requisite Noteholders have made written request upon the Trustee to institute such proceedings in its own name as Trustee, (3) such Holder or Holders have offered the Trustee indemnity reasonably satisfactory to it as provided in the Indenture, (4) the Trustee has for 30 days failed to institute any such proceeding, and (5) no direction inconsistent with such written request has been given to the Trustee during such 30-day period by the Requisite Noteholders.

Satisfaction and Discharge of the Indenture. The Indenture will be discharged with respect to the collateral securing the Notes upon delivery to the Trustee for cancellation of all of the Notes, or, within certain limitations (including the obligation to pay principal and interest), upon deposit with the Trustee of cash or Eligible Investments sufficient for the amount thereof.

Trustee. JPMorgan Chase Bank, National Association will be the Trustee under the Indenture for the Notes. The Issuer, the Servicer and their affiliates may maintain other banking relationships in the ordinary course of business with the Trustee. The Indenture provides that the Trustee may appoint one or more co-trustees in the event that Holders of the Notes have conflicting interests and in certain other circumstances. The Trustee or an Affiliate of the Trustee may receive compensation in connection with the purchase of certain Eligible Investments as provided in the Indenture.

The parent company of the Trustee, JPMorgan Chase & Co. (**"JPMorgan"**), has entered into an agreement with The Bank of New York Company, Inc. (**"BNY"**) pursuant to which JPMorgan intends to exchange select portions of its corporate trust business, including municipal, corporate and structured finance trusteeships, for BNY's consumer, small-business and middle-market banking businesses. This transaction has been approved by both companies' boards of directors and is subject to regulatory approvals. It is expected to close in the late third quarter or fourth quarter of 2006.

The Indenture contains provisions for the indemnification of the Trustee for any loss, liability or expense incurred without negligence, willful misconduct or bad faith arising out of or in connection with the acceptance or administration of its duties under the Indenture.

The Trustee may resign at any time by giving notice as set forth in the Indenture. The Trustee may be removed for any reason by the Holders of more than 50% of the Aggregate Principal Amount of the Controlling Class, or by the Issuer if at any time the Trustee fails to meet certain eligibility criteria set forth in the Indenture or if the Trustee is adjudged to be bankrupt or insolvent or a receiver or liquidator or similar official of the Trustee or its property is appointed. No resignation or removal of the Trustee shall be effective until a successor trustee has been appointed pursuant to the terms of the Indenture.

Governing Law. The Indenture and the other documents relating to the Notes will be construed in accordance with the laws of the State of New York.

Notices. Notices to the Holders of the Notes will be given by first-class mail, postage prepaid, to the registered Holders of the Notes at their address appearing in the Note Register. In addition, for so long as any Class of Notes is listed on the Irish Stock Exchange and the rules of such exchange so require, notice given to the Holders of any such Class of Notes will also be given to the Company Announcements Office of the Irish Stock Exchange.

008255

_Voting Rights of Preferred Shares of HFP_.  The aggregate amount of the Preferred Shares owned or controlled by HFP and the Servicer Entities in excess of the Original HFP Share Amount will be excluded from voting on certain matters including any Optional Redemption.

## DELIVERY OF THE NOTES; TRANSFER RESTRICTIONS; SETTLEMENT

The Notes have not been registered under the Securities Act or any state securities laws and, accordingly, may not be reoffered, resold, pledged or otherwise transferred within the United States or to, or for the account or benefit of, U.S. Persons, except in accordance with the restrictions described under "Notices to Purchasers." Terms used in this paragraph have the meanings given to them by Regulation S.

Without limiting the foregoing, by holding a Note, each Holder will acknowledge and agree, among other things, that such Holder understands that neither of the Co-Issuers is registered as an investment company under the Investment Company Act, but that the Co-Issuers are exempt from registration as such by virtue of Section 3(c)(7) of the Investment Company Act, which in general excludes from the definition of an investment company any issuer whose outstanding securities are beneficially owned solely by Qualified Purchasers and which has not made and does not propose to make a public offering of its securities and Rule 3a-7.  Any sale or transfer which would violate these provisions shall be void from the time of such sale or transfer, and no sale or transfer may be made if such sale or transfer would require the Co-Issuers to become subject to the requirements of the Investment Company Act.

Each transferee of a Note (except with respect to a transfer pursuant to Regulation S) will be deemed to represent at time of transfer that the transferee is a Qualified Institutional Buyer and (i) that it is a Qualified Purchaser, (ii) that it is not formed for the purpose of investing in the Notes, unless all of its beneficial owners are Qualified Purchasers, (iii) that it is not a dealer described in paragraph (a)(1)(ii) of Rule 144A unless such transferee owns and invests on a discretionary basis at least U.S.$25 million in securities of issuers that are not affiliated persons of such dealer, (iv) that it is not a plan referred to in paragraph (a)(1)(i)(D) or (E) of Rule 144A or a trust fund referred to in paragraph (a)(1)(i)(F) of Rule 144A that holds the assets of such plan, unless investment decisions are made solely by the fiduciary, trustee or sponsor of such plan, (v) that it and each account for which it is purchasing is purchasing Notes in at least the minimum denomination and (vi) that it will provide written notice of the foregoing and any other applicable transfer restrictions to any transferee.

The Indenture provides that if, notwithstanding the restrictions on transfer contained therein, the Issuer determines any beneficial owner or Holder of a Note (other than a Note transferred in reliance on Regulation S) is not a Qualified Institutional Buyer and a Qualified Purchaser, the Issuer will require that such beneficial owner or Holder sell all of its right title and interest in such Note to a person who is so qualified, with such sale to be effected within 30 days after notice of such sale requirement is given.  If such sale is not effected within such 30 days, upon written direction from the Issuer, the Trustee (or an investment banker selected by the Trustee and approved by the Issuer) will be authorized to conduct a commercially reasonable sale of such Note to a person who does so qualify and pending transfer, no further payments will be made in respect of such Note or any beneficial interest therein.

Except for interests in Notes represented by a Regulation S Global Note or a Rule 144A Global Note as described herein, the Notes will be represented by definitive registered Notes registered in the name of the purchaser thereof.

Unless determined otherwise by the Co-Issuers in accordance with applicable law, the Notes will bear the legend set forth below:

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), ANY STATE SECURITIES LAWS IN THE UNITED STATES OR THE SECURITIES LAWS OF ANY OTHER JURISDICTION AND MAY NOT BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, UNITED STATES PERSONS, EXCEPT AS PERMITTED BY THIS LEGEND.  THE HOLDER HEREOF, BY ITS ACCEPTANCE OF THIS NOTE, REPRESENTS, ACKNOWLEDGES AND AGREES THAT IT WILL NOT REOFFER, RESELL, PLEDGE OR OTHERWISE TRANSFER THIS NOTE EXCEPT IN COMPLIANCE WITH THE SECURITIES ACT AND OTHER APPLICABLE LAWS AND EXCEPT (A) IN

008256

COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER AS DEFINED IN RULE 144A PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER, WHOM THE SELLER HAS INFORMED, IN EACH CASE, THAT THE REOFFER, RESALE, PLEDGE OR OTHER TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, PROVIDED THAT SUCH PURCHASER DELIVERS ALL DOCUMENTS AND CERTIFICATIONS AS THE CO-ISSUERS OR THE TRUSTEE MAY REASONABLY REQUIRE; (B) TO A NON U.S. PERSON OUTSIDE THE UNITED STATES IN COMPLIANCE WITH RULE 903 OR 904 OF REGULATION S UNDER THE SECURITIES ACT; OR (C) TO THE CO-ISSUERS OR THEIR AFFILIATES, IN EACH CASE IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAW OF ANY STATE OF THE UNITED STATES AND ANY OTHER JURISDICTION. THE HOLDER HEREOF, BY ITS ACCEPTANCE OF THIS NOTE, REPRESENTS, ACKNOWLEDGES AND AGREES THAT IT WILL NOT REOFFER, RESELL, PLEDGE OR OTHERWISE TRANSFER THIS NOTE EXCEPT TO A NON-U.S. PERSON OUTSIDE THE UNITED STATES IN COMPLIANCE WITH REGULATION S OR TO A "QUALIFIED PURCHASER" WITHIN THE MEANING OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "INVESTMENT COMPANY ACT"), IN A TRANSACTION THAT DOES NOT CAUSE THE CO-ISSUERS TO BE REQUIRED TO REGISTER UNDER THE INVESTMENT COMPANY ACT. FURTHER, THE CLASS X NOTES, THE CLASS A-1LA NOTES, THE CLASS A-1LB NOTES, THE CLASS A-2L NOTES, THE CLASS A-3L NOTES AND THE CLASS A-4L NOTES MAY NOT BE SOLD OR TRANSFERRED UNLESS SUCH SALE OR TRANSFER WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER ERISA OR SECTION 4975 OF THE CODE. THE CLASS B-1L NOTES MAY NOT BE SOLD OR TRANSFERRED TO ANY PLAN SUBJECT TO TITLE I OF ERISA OR SECTION 4975 OF THE CODE, OR TO ANY PERSON ACTING ON BEHALF OF OR WITH "PLAN ASSETS" OF ANY SUCH PLAN, INCLUDING AN INSURANCE COMPANY GENERAL ACCOUNT, UNLESS THE PURCHASER OR TRANSFEREE IS ELIGIBLE FOR THE EXEMPTIVE RELIEF AVAILABLE UNDER PTCE 96-23, 95-60, 91-38, 90-1 OR 84-14.

EACH TRANSFEREE OF A NOTE (EXCEPT WITH RESPECT TO A TRANSFER PURSUANT TO REGULATION S) WILL BE DEEMED TO REPRESENT AT TIME OF TRANSFER THAT SUCH TRANSFEREE IS A QUALIFIED INSTITUTIONAL BUYER OR A NON U.S. PERSON AND (I) THAT IT IS A QUALIFIED PURCHASER, (II) THAT IT IS NOT FORMED FOR THE PURPOSE OF INVESTING IN THE NOTES, UNLESS ALL OF ITS BENEFICIAL OWNERS ARE QUALIFIED PURCHASERS, (III) THAT IT IS NOT A DEALER DESCRIBED IN PARAGRAPH (a)(1)(ii) OF RULE 144A UNLESS SUCH TRANSFEREE OWNS AND INVESTS ON A DISCRETIONARY BASIS AT LEAST U.S.$25 MILLION IN SECURITIES OF ISSUERS THAT ARE NOT AFFILIATED PERSONS OF SUCH DEALER, (IV) THAT IT IS NOT A PLAN REFERRED TO IN PARAGRAPH (a)(1)(i)(D) OR (E) OF RULE 144A OR A TRUST FUND REFERRED TO IN PARAGRAPH (a)(1)(i)(F) OF RULE 144A THAT HOLDS THE ASSETS OF SUCH PLAN, UNLESS INVESTMENT DECISIONS ARE MADE SOLELY BY THE FIDUCIARY, TRUSTEE OR SPONSOR OF SUCH PLAN, (V) THAT IT AND EACH ACCOUNT FOR WHICH IT IS PURCHASING IS PURCHASING NOTES IN AT LEAST THE MINIMUM DENOMINATION AND (VI) THAT IT WILL PROVIDE WRITTEN NOTICE OF THE FOREGOING AND ANY OTHER APPLICABLE TRANSFER RESTRICTIONS TO ANY TRANSFEREE.

THE INDENTURE PROVIDES THAT IF, NOTWITHSTANDING THE RESTRICTIONS ON TRANSFER CONTAINED THEREIN, THE ISSUER DETERMINES ANY BENEFICIAL OWNER OR HOLDER OF A NOTE (OTHER THAN A NOTE TRANSFERRED IN RELIANCE ON REGULATION S) IS NOT A QUALIFIED INSTITUTIONAL BUYER AND A QUALIFIED PURCHASER, THE ISSUER WILL REQUIRE THAT SUCH BENEFICIAL OWNER OR HOLDER SELL ALL OF ITS RIGHT TITLE AND INTEREST IN SUCH NOTE TO A PERSON WHO IS SO QUALIFIED, WITH SUCH SALE TO BE EFFECTED WITHIN 30

008257

DAYS AFTER NOTICE OF SUCH SALE REQUIREMENT IS GIVEN. IF SUCH SALE IS NOT EFFECTED WITHIN SUCH 30 DAYS, UPON WRITTEN DIRECTION FROM THE ISSUER, THE TRUSTEE (OR AN INVESTMENT BANKER SELECTED BY THE TRUSTEE AND APPROVED BY THE ISSUER) WILL BE AUTHORIZED TO CONDUCT A COMMERCIALLY REASONABLE SALE OF SUCH NOTE TO A PERSON WHO DOES SO QUALIFY AND PENDING TRANSFER, NO FURTHER PAYMENTS WILL BE MADE IN RESPECT OF SUCH NOTE OR ANY BENEFICIAL INTEREST THEREIN.

TRANSFERS OF THE NOTES MUST GENERALLY BE ACCOMPANIED BY APPROPRIATE TAX TRANSFER DOCUMENTATION AND ARE SUBJECT TO RESTRICTIONS AS PROVIDED IN THE INDENTURE.

THE FOLLOWING INFORMATION IS PROVIDED PURSUANT TO UNITED STATES TREASURY REGULATION SECTION 1.1275-3(b). THIS NOTE HAS BEEN ISSUED WITH ORIGINAL ISSUE DISCOUNT FOR UNITED STATES FEDERAL INCOME TAX PURPOSES. THE HOLDER OF THIS NOTE MAY OBTAIN THE INFORMATION DESCRIBED IN UNITED STATES TREASURY REGULATION SECTION 1. 1275-3(b)(1)(i) FROM THE ADMINISTRATOR, AT THE FOLLOWING ADDRESS: P.O. BOX 1093 GT, GRAND CAYMAN, CAYMAN ISLANDS.

Subject to the restrictions on transfer set forth in the Indenture and the Notes and except with respect to transfer of an interest in a Regulation S Global Note or a Rule 144A Global Note (the procedure for which is set forth in the Indenture), the Holder of any Notes may transfer the same in whole or in part (in a principal amount equal to any authorized denomination) by surrendering such Notes at the corporate trust office of the Trustee or at the office of any transfer agent, together with an executed instrument of assignment and transfer substantially in the form attached to the Indenture. In exchange for any Notes properly presented for transfer with all necessary accompanying documentation, the Trustee will authenticate and deliver at the corporate trust office of the Trustee or the office of the transfer agent, as the case may be, to the transferee or send by first-class mail at the risk of the transferee to such address as the transferee may request, a Note or Notes, for a like aggregate principal amount and in such authorized denomination or denominations as may be requested. The presentation for transfer of any Notes will not be valid unless made at the office of the Trustee designated for such purpose or at the office of a transfer agent by the registered Holder in person, or by a duly authorized attorney-in-fact. The Holder of a Note will not be required to bear the costs and expenses of effecting any transfer or registration of transfer, except that the relevant Holder will be required to bear (i) the expenses of delivery by other than regular mail (if any) and (ii) if the Co-Issuers so require, the payment of a sum sufficient to cover any duty, stamp tax or governmental charge or insurance charges that may be imposed in relation thereto.

Settlement

All payments in respect of the Notes shall be made in United States dollars in same-day funds.

## CERTAIN TAX CONSIDERATIONS

Introduction

The following is a summary of certain of the United States federal income tax consequences of an investment in the Notes by purchasers that acquire their Notes in the initial offering. The discussion and the opinions referenced below are based upon laws, regulations, rulings, and decisions currently in effect, all of which are subject to change, possibly with retroactive effect. Prospective investors should note that no rulings have been or are expected to be sought from the Internal Revenue Service (the **"IRS"**) with respect to any of the United States federal income tax consequences discussed below, and no assurance can be given that the IRS will not take contrary positions. Further, the following summary does not deal with all United States federal income tax consequences applicable to any given investor, nor does it address the United States federal income tax considerations applicable to all categories of investors, some of which may be subject to special rules, such as Non-U.S. Holders (defined below), banks, REITs, RICs, insurance companies, tax-exempt organizations, dealers in securities or currencies, electing large partnerships, natural persons, cash method taxpayers, S corporations, estates and trusts, investors that

008258

hold their Notes as part of a hedge, straddle, or an integrated or conversion transaction, or investors whose "functional currency" is not the United States dollar. Furthermore, it does not address alternative minimum tax consequences, or the indirect effects on investors of equity interests in either a U.S. Holder (as defined below) or a Non-U.S. Holder. In addition, this summary is generally limited to investors that acquire their Notes on the Closing Date for the issue price applicable to such Notes and who will hold their Notes as "capital assets" within the meaning of Section 1221 of the Internal Revenue Code of 1986, as amended (the **"Code"**). Investors should consult their own tax advisors to determine the United States federal, state, local, and other tax consequences of the purchase, ownership, and disposition of the Notes.

As used herein, "**U.S. Holder**" means a beneficial owner of a Note that is an individual citizen or resident of the United States for United States federal income tax purposes, a corporation or other entity taxable as a corporation created or organized in or under the laws of the United States or any state thereof (including the District of Columbia), an estate the income of which is subject to United States federal income taxation regardless of its source, or a trust where a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons (as defined in the Code) have the authority to control all substantial decisions of the trust (or a trust that has made a valid election under United States Treasury Regulations to be treated as a domestic trust). If a partnership holds Notes, the tax treatment of a partner will generally depend upon the status of the partner and upon the activities of the partnership. Partners of partnerships holding Notes should consult their own tax advisors. "**Non-U.S. Holder**" means any holder (or beneficial holder) of a Note that is not a U.S. Holder.

United States Federal Income Tax Consequences to the Issuer

Upon the issuance of the Notes, Orrick, Herrington & Sutcliffe LLP, special United States tax counsel to the Issuer, will deliver an opinion generally to the effect that under current law, and assuming compliance with the Indenture (and certain other documents) and based on certain factual representations made by the Issuer and the Servicer, although the matter is not free from doubt, the Issuer will not be engaged in the conduct of a trade or business in the United States. Prospective investors should be aware that opinions of counsel are not binding on the IRS and the IRS might seek to treat the Issuer as engaged in a United States trade or business. In addition, the Issuer and Servicer are entitled to rely upon the advice and/or opinions of their selected counsel with respect to amendments, supplements and other modifications of the terms of the Portfolio Collateral and deviations from the investment guidelines set forth in the Servicing Agreement; the foregoing opinion assumes that any such advice and/or opinions will be correct and complete. It should be noted as well that the United States Treasury Department and the IRS recently announced that they are considering taxpayer requests for specific guidance on, among other things, whether a foreign person may be treated as engaged in a trade or business in the United States by virtue of entering into credit default swaps. No guidance has been issued to date. If any future guidance concludes that foreign persons entering into certain credit default swaps will be treated as engaged in a trade or business in the United States, such guidance would adversely impact the Issuer's ability to pay principal and interest on the Notes. Additionally, it should be noted that gain or loss on a disposition by a foreign person of a United States real property interest may be subject to United States federal income tax as if the foreign person were engaged in a United States trade or business (even if the foreign person is not actually so engaged). Because the determination of whether an asset constitutes a United States real property interest is made periodically, although the Issuer is prohibited from acquiring an asset that constitutes a United States real property interest, it is possible that an asset that was not a United States real property interest at the time such asset was acquired by the Issuer could become a United States real property interest after the asset is acquired. Similarly, if the Issuer accepted a new security in exchange for an existing security or if the terms of an existing security were modified, the new or modified security might cause the Issuer to become engaged in a United States trade or business for United States federal income tax purposes.

The Issuer intends to elect to be (and expects to be) treated as a partnership for United States federal income tax purposes. There can be no assurance, however, that the Issuer will not (at some point in time) become classified as a corporation for United States federal income tax purposes. If the Issuer were to be treated as a corporation and if the IRS were to successfully characterize the Issuer as engaged in a United States trade or business, among other consequences, the Issuer would be subject to net income taxation in the United States (as well as the branch profits tax) on its income that is effectively connected to the United States trade or business. The levying of such taxes would materially affect the Issuer's financial ability to pay principal and interest on the Notes.

008259

The Issuer intends to acquire the Portfolio Collateral the interest on which and any gain from the sale or disposition with respect to which is not expected to be subject to United States federal withholding tax or withholding tax imposed by other countries (unless, in the case of interest, the obligor is required to "gross up" its payments to compensate for these taxes). The Issuer will not, however, make any independent investigation of the circumstances surrounding the issuance of the individual assets comprising the Portfolio Collateral and, thus, there can be no assurance that payments of interest on and gain from the sale or disposition of the Portfolio Collateral will in all cases be received free of withholding tax. It is not expected that the Issuer will derive material amounts of any other items of income that will be subject to United States withholding taxes. Notwithstanding the foregoing, any commitment fee, facility fee or other similar fee that the Issuer earns may be subject to a 30% United States federal withholding tax and any lending fees received under a securities lending agreement may also be subject to such tax.

If withholding or deduction of any taxes from payments on the Notes is required by law in any jurisdiction, the Issuer shall be under no obligation to make any additional payments to any holder in respect of such withholding or deduction.

<u>Classification and Tax Treatment of the Notes</u>

The Issuer has agreed and, by its acceptance of a Note, each holder will be deemed to have agreed, to treat each of the Notes as debt of the Issuer for United States federal income tax purposes. Upon the issuance of the Notes, Orrick, Herrington & Sutcliffe LLP will deliver an opinion generally to the effect that, assuming compliance with the Indenture (and certain other documents) and based on certain factual representations made by the Issuer and the Servicer, the Notes should be characterized as debt of the Issuer for United States federal income tax purposes. Prospective investors should be aware that opinions of counsel are not binding on the IRS, and there can be no assurance that the IRS will not seek to characterize any Class of Notes as other than indebtedness. However, except as provided under "Alternative Characterizations of the Notes," the balance of this discussion assumes that the Notes will be characterized as debt of the Issuer for United States federal income tax purposes.

Each U.S. Holder will include interest on the Notes in income in accordance with its regular method of accounting for Federal income tax purposes unless the Notes are viewed as having being issued with original issue discount (**"OID"**) in which case, generally, each U.S. Holder would be required to accrue interest on the Note on an accrual basis under a constant yield methodology, based on the original yield to maturity of the Note. Because interest on the Class A-3L Notes, Class A-4L Notes and Class B-1L Notes may be deferred without giving rise to an Event of Default, all interest (including interest on accrued but unpaid interest) will be treated as OID unless the likelihood of deferral is remote. The Issuer has not determined whether the likelihood of interest being deferred is remote for this purpose, and hence will treat the interest on the Class A-3L Notes, Class A-4L Notes and Class B-1L Notes as OID. Even if the likelihood of deferral is remote, if the Issuer does in fact defer interest on a Class of Notes, a U.S. Holder would thereafter be required to accrue interest (including deferred interest) with respect to such Notes as OID. Any accrued but unpaid OID included in income by a U.S. Holder would increase the U.S. Holder's basis in the Note and thereby reduce the amount of gain or increase the amount of loss recognized by the U.S. Holder on a subsequent sale or other disposition of the Note.

If any of the Notes are viewed as having been issued with OID, the OID may be accruable under the special rules set forth in Section 1272(a)(6) of the Code (which apply to debt instruments that may be accelerated by reason of the prepayment of other debt obligations securing such debt instruments). If Section 1272(a)(6) does not apply, the Notes might be treated as "contingent payment debt instruments" (**"CPDIs"**) within the meaning of Treasury Regulation Section 1.1275-4. If any Class of Notes were considered CPDIs, among other consequences, gain on the sale of such Notes that might otherwise be capital gain would be ordinary income. Prospective investors should consult their own tax advisors regarding the potential application of Section 1272(a)(6) of the Code to the Notes and the rules governing CPDIs .

The United States federal income tax consequences of a Maturity Extension are unclear. If a Maturity Extension occurs with respect to the Notes (other than the Class X Notes), the Issuer intends to treat such Notes, solely for purposes of sections 1272 and 1273 of the Code, as having been retired and reissued for an amount equal to their adjusted issue price on the date of the new Extension Effective Date. Additionally, U.S. Holders may be deemed for United States federal income tax purpose to have exchanged their Notes in a taxable exchange for new

008260

notes with an extended final maturity date (the "New Notes") if, at such time, the Extension Qualifying Purchaser is related to the Issuer within the meaning of Section 267(b) or 707(b)(1) of the Code. If such relationship existed, U.S. Holders that did not exercise their right to put their Notes to the Extension Qualifying Purchaser may be treated as having acquired such New Notes with market discount or premium (and there might be other possible tax consequences). In addition, if the Notes are treated as exchanged for New Notes, the characterization of the New Notes (as debt or equity) would depend on the facts and circumstances existing at the time of such deemed exchange. In the event of a Maturity Extension, all U.S. Holders are urged to consult their own tax advisors with respect to whether the Extension Qualifying Purchaser is related to the Issuer, and, if so, the United States federal income tax consequences of any deemed exchange.

The tax treatment of the Extension Bonus Payment is also unclear. The Issuer intends to take the position that the Extension Bonus Payment is an incidental payment within the meaning of Treasury Regulation Section 1.1275-2(h)(3), and that the amount of such payment should be includible in income as ordinary income in accordance with the U.S. Holder's normal method of tax accounting. The Issuer's determination with respect to this issue will not be binding on the IRS, but will be binding on any U.S. Holder that does not disclose an objection on its timely filed tax return for the taxable year that includes the acquisition date of such Note. U.S. Holders should consult with their own tax advisors concerning the proper taxation and characterization of such payments, and whether the right to such payments could cause the Notes to be subject to the OID rules or to be treated as CPDIs.

In general, a U.S. Holder of a Note will have a basis in such Note equal to the cost of such Note to such U.S. Holder, increased by any amount includible in income by such U.S. Holder as OID and reduced by any amortized premium, any principal payments and any payments of OID. Upon a sale, exchange or other disposition of a Note, a U.S. Holder will generally recognize gain or loss equal to the difference between the amount realized on the sale, exchange or other disposition (less any accrued and unpaid interest, which would be taxable as such) and the U.S. Holder's tax basis in such Note (as reduced by any accrued and unpaid interest). Such gain or loss generally will be long-term capital gain or loss if the U.S. Holder held the Note for more than one year at the time of disposition (other than accrued market discount if the U.S. Holder did not elect to include such discount in income on a current basis). In certain circumstances, U.S. Holders that are individuals may be entitled to preferential treatment for net long-term capital gains; however, the ability of U.S. Holders to offset capital losses against ordinary income is limited.

The Indenture provides that Holders of any Class of Notes may elect to acquire credit enhancement on terms and conditions acceptable to such Holders. Prior to acquiring such enhancement, U.S. Holders should consult with their own tax advisors concerning the treatment of the credit enhancement for United States federal income tax purposes (including the viability of integrating the Notes and the credit enhancement).

Alternative Characterizations of the Notes

Notwithstanding special United States tax counsel's opinion, U.S. Holders should recognize that there is some uncertainty regarding the appropriate classification of instruments such as the Notes. It is possible, for example, that the IRS may contend that the Class B-1L Notes and, possibly, any other Class of Notes should be treated as equity interests in the Issuer. In such a case, payments on the Notes would likely be viewed as guaranteed payments (rather than as interest) for United States federal income tax purposes. Additionally, U.S. Holders would be required to file information returns with the IRS with respect to their acquisition of the Notes and be subject to significant penalties for failure to do so. Moreover, if the Issuer were classified as a corporation rather than as a partnership for United States federal income tax purposes and the Notes were viewed as equity in this corporation, the Issuer would constitute a passive foreign investment company and, possibly, a controlled foreign corporation, which would produce adverse tax consequences for U.S. Holders. Accordingly, all U.S. Holders are urged to consult their own tax advisors as to the consequences that would result if the Notes were characterized as equity (and the additional consequences that would result if the Issuer were classified as a corporation) for United States federal income tax purposes.

Information Reporting Requirements

Information reporting to the IRS may be required with respect to payments on the Notes, and proceeds of the sale of the Notes to holders other than corporations and certain other exempt recipients. A "backup" withholding tax may also apply to those payments if a holder fails to provide certain identifying information (such as the holder's taxpayer identification number or an attestation to the status of the holder as a Non-U.S. Holder).   Backup withholding is not an additional tax and may be refunded (or credited against the holder's U.S. federal income tax liability, if any) provided that certain required information is furnished to the IRS in a timely manner.

Prospective investors should consult with their own tax advisors regarding whether they are required to file an IRS Form 8886 in respect of this transaction (relating to certain "reportable transactions").   Thus, for example, if a U.S. Holder were to sell its Notes at a loss, it is possible that this loss could constitute a reportable transaction. and need to be reported on Form 8886  As another example, a transaction may be reportable if it is offered under conditions of confidentiality.   In this regard, each holder and beneficial holder of the Notes (and each of their respective employees, representatives or other agents) is hereby advised that it is permitted to disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transactions described herein (including the ownership and disposition of the Notes).  Significant penalties apply for failure to file Form 8886 when required, and holders are therefore urged to consult their own tax advisors.

Non-U.S. Holders

Assuming that the Issuer is not engaged in a United States trade or business, a Non-U.S. Holder of a Note that has no connection with the United States and is not related, directly or indirectly, with the Issuer or the holders of the Issuer's equity, will not be subject to United States withholding tax on interest payments.  Non-U.S. Holders may be required to make certain tax representations regarding the identity of the beneficial owner of the Notes in order to receive payments free of withholding.

Circular 230

Under 31 C.F.R. part 10, the regulations governing practice before the IRS (Circular 230), we and our tax advisors are (or may be) required to inform you that:

- Any advice contained herein, including any opinions of counsel referred to herein, is not intended or written to be used, and cannot be used by any taxpayer, for the purpose of avoiding penalties that may be imposed on the taxpayer;

- Any such advice is written to support the promotion or marketing of the Notes and the transactions described herein (or in such opinion or other advice); and

- Each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

## CAYMAN ISLANDS TAX CONSEQUENCES

The following discussion of certain Cayman Islands income tax consequences of an investment in the Notes is based on the advice of Maples and Calder as to Cayman Islands law.  The discussion is a general summary of present law, which is subject to prospective and retroactive change.  It assumes that the Issuer will conduct its affairs in accordance with assumptions made by, and representations made to, counsel.  It is not intended as tax advice, does not consider any investor's particular circumstances, and does not consider tax consequences other than those arising under Cayman Islands law.

Under existing Cayman Islands laws:

(i)        payments of principal and interest in respect of the Notes will not be subject to taxation in

the Cayman Islands and no withholding will be required on such payments to any Holder of a Note and gains derived from the sale of Notes will not be subject to Cayman Islands income or corporation tax.  The Cayman Islands currently have no income, corporation or capital gains tax and no estate duty, inheritance tax or gift tax; and

(ii)    the Holder of any Note (or the legal personal representative of such Holder) whose Note is brought into the Cayman Islands may in certain circumstances be liable to pay stamp duty imposed under the laws of the Cayman Islands in respect of such Note.

The Issuer has been incorporated under the laws of the Cayman Islands as an exempted company and, as such, has applied for and obtained an undertaking from the Governor In Cabinet of the Cayman Islands in the following form:

### The Tax Concessions Law

### (1999 Revision)

### Undertaking as to Tax Concessions

In accordance with Section 6 of the Tax Concessions Law (1999 Revision) the Governor in Cabinet undertakes with Rockwall CDO Ltd. (the "**Company**"):

(a)    that no law which is hereafter enacted in the Islands imposing any tax to be levied on profits, income, gains or appreciations shall apply to the Company or its operations; and

(b)    in addition, that no tax to be levied on profits, income, gains or appreciations or which is in the nature of estate duty or inheritance tax shall be payable

(i)    on or in respect of the shares, debentures or other obligations of the Company; or

(ii)    by way of the withholding in whole or in part of any relevant payment as defined in Section 6(3) of the Tax Concessions Law (1999 Revision).

These concessions shall be for a period of twenty years from the 21st day of June 2005.

### CERTAIN ERISA CONSIDERATIONS

The United States Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), imposes requirements on employee benefit plans (as defined in Section 3(3) of ERISA) subject to Title I of ERISA ("**ERISA Plans**") and on persons who are fiduciaries (as defined in Section 3(21) of ERISA) with respect to such ERISA Plans.  Investments by ERISA Plans are subject to ERISA's general fiduciary requirements, including the requirement of investment prudence and diversification, requirements respecting delegation of investment authority and the requirement that an ERISA Plan's investments be made in accordance with the documents governing the ERISA Plan.  Each ERISA Plan fiduciary should give appropriate consideration to the facts and circumstances that are relevant to an investment in the Notes, including the role that an investment in the Notes plays in the Plan's investment portfolio.  Before deciding to invest "plan assets" of any ERISA Plan in the Notes, the investing ERISA Plan fiduciary should be satisfied that investment in the Notes is a prudent investment for the ERISA Plan, that the investments of the ERISA Plan, including the investment in the Notes, are diversified so as to minimize the risk of large losses and that an investment in the Notes complies with the ERISA Plan and related trust documents.  Any person who decides to invest "plan assets" of an ERISA Plan in the Notes should consider, among other factors, the factors discussed above under "Special Considerations."

Section 406 of ERISA and Section 4975 of the Code prohibit ERISA Plans, as well as individual retirement accounts and Keogh plans, subject to either or both of such statutes (each, a "**Plan**") from engaging in certain transactions with persons that are "parties in interest" under ERISA or "disqualified persons" under Section 4975 of

008263

the Code (collectively, "**Parties in Interest**") with respect to such Plans. A violation of these prohibited transaction rules may result in an excise tax or other penalties and liabilities under ERISA and/or Section 4975 of the Code for such persons.

Certain transactions involving the purchase, holding or transfer of the Notes might be deemed to constitute or result in prohibited transactions under ERISA and/or Section 4975 of the Code. For example, if the "plan assets" of an investing Plan were deemed to include assets of the Issuer and if any of the Portfolio Collateral constitutes an obligation of or is purchased from or sold to a Party in Interest with respect to such Plan, an indirect prohibited transaction in the nature of an extension of credit or a purchase or sale of assets between such Plan and such Party in Interest might be deemed to occur. In addition, if the assets of the Issuer were deemed to be "plan assets" of any Plan investors, Notes sold to a Party in Interest with respect to such Plan would constitute a prohibited extension of credit transaction, possibly subjecting such Noteholder to excise taxes under Section 4975 of the Code. Under regulations issued by the United States Department of Labor, set forth in 29 C.F.R. § 2510.3-101 (the "**Plan Asset Regulations**"), the assets of the Issuer would be treated as "plan assets" of a Plan for purposes of ERISA and Section 4975 of the Code if the Plan acquires an equity interest in the Issuer and none of the exceptions contained in the Plan Asset Regulations applies. An equity interest is defined under the Plan Asset Regulations as any interest in an entity other than an instrument which is treated as indebtedness under applicable local law and which has no substantial equity features.

Although there is no authority directly on point, it is anticipated that the Notes should be treated as indebtedness under local law and should not be treated as having substantial equity features for purposes of the Plan Asset Regulations. However, without regard to whether (i) the Notes are treated as an equity interest for such purposes or (ii) the assets of the Issuer are deemed to be "plan assets" of an investing Plan, the acquisition or holding of Notes by or on behalf of, or with "plan assets" of, a Plan could be considered to give rise to a prohibited transaction if the Issuer, the Trustee, the Initial Purchaser, the Servicer, an issuer of an item of Portfolio Collateral, or any of their respective affiliates is or becomes a Party in Interest with respect to an investing Plan. Certain exemptions from the prohibited transaction rules could apply to the acquisition of a Note by or with "plan assets" of a Plan, depending on the type and circumstances of the Plan fiduciary making the decision to acquire a Note. Included among these exemptions are: Prohibited Transaction Class Exemption ("**PTCE**") 96-23, regarding transactions effected by certain "in-house asset managers"; PTCE 95-60, regarding investments by insurance company general accounts; PTCE 91-38, regarding investments by bank collective investment funds; PTCE 90-1, regarding investments by insurance company pooled separate accounts; and PTCE 84-14, regarding transactions effected by independent "qualified professional asset managers." However, even if the conditions specified in one or more of these exemptions are met, the scope of the relief provided by these exemptions might or might not cover all acts which might be construed as prohibited transactions and in particular would not apply to prohibited transactions arising from the operations of the Issuer.

In any event, a fiduciary or other person investing "plan assets" of any Plan should not purchase Notes if the Issuer, the Initial Purchaser, the Trustee, the Servicer or any of their respective affiliates (a) has investment discretion with respect to the investment of such assets; (b) has authority or responsibility to give or regularly gives investment advice with respect to such assets, for a fee, pursuant to an agreement or understanding that such advice will serve as a primary basis for investment decisions with respect to such assets and that such advice will be based on the particular investment needs of such Plan; or (c) unless PTCE 95-60, 91-38 or 90-1 is applicable, is an employer maintaining or contributing to such Plan. A party that is described in clause (a) or (b) of the preceding sentence is a fiduciary under ERISA with respect to the Plan and any such purchase might result in a non-exempt prohibited transaction under ERISA or Section 4975 of the Code.

As a general rule, certain employee benefit plans, including governmental plans (as defined in Section 3(32) of ERISA) and certain church plans (as defined in Section 3(33) of ERISA), are not subject to ERISA's requirements. Accordingly, assets of many such plans may be invested in the Notes without regard to ERISA prohibited transaction considerations described above, subject to the provisions of other applicable federal and state law. However, any such plan which is qualified and exempt from taxation under Sections 401(a) and 501(a) of the Code may nonetheless be subject to the prohibited transaction rules set forth in Section 503 of the Code and, under certain circumstances in the case of church plans, Section 4975 of the Code. Also, some governmental plans are subject to federal, state or local laws which are, to a material extent, similar to the provisions of Title I of ERISA or

008264

Section 4975 of the Code (a "**Similar Law**"). Each governmental plan fiduciary should make its own determination as to the need for and the availability of any exemptive relief under a Similar Law.

*Each Holder of a Class X Note, a Class A-1LA Note, a Class A-1LB, a Class A-2L Note, a Class A-3L Note or a Class A-4L Note, by its acquisition thereof, shall be deemed to represent to the Issuer, the Servicer and the Trustee that either (i) no part of the funds being used to pay the purchase price for such Note constitutes "plan assets" of any Plan, or (ii) if the funds being used to pay the purchase price for such Note includes "plan assets" of any Plan, an exemption to the prohibited transaction rules applies.*

*Each Holder of a Class B-1L Note by its acquisition thereof, shall be deemed to represent to the Issuer, the Servicer and the Trustee that either (a) the purchaser or transferee is not a Plan and is not acquiring the Class B-1L Note with assets of a Plan or (b) it is an insurance company and such funds include only assets of its general account, and its acquisition and holding of such Note are eligible for exemptive relief available under Section I of PTCE 95-60, or the acquisition and holding of the Class B-1L Notes by the purchaser or transferee are eligible for the exemptive relief under PTCE 96-23, 91-38, 90-1 or 84-14.*

**Any person proposing to invest assets of any Plan, or any governmental plan subject to Similar Law, in the Notes should consult with its counsel to confirm that such investment will not constitute or result in any prohibited transaction that is not subject to an exemption and will satisfy the other requirements of ERISA, the Code and, in the case of such a governmental plan, Similar Law.**

## CERTAIN LEGAL INVESTMENT CONSIDERATIONS

Institutions whose investment activities are subject to legal investment laws and regulations or to review by certain regulatory authorities may be subject to restrictions on investments in the Notes. Any such institution should consult its legal advisors in determining whether and to what extent there may be restrictions on its ability to invest in the Notes. Without limiting the foregoing, any financial institution that is subject to the jurisdiction of the Comptroller of Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of Thrift Supervision, the National Credit Union Administration, any state insurance commission, or any other federal or state agencies with similar authority should review any applicable rules, guidelines and regulations prior to purchasing the Notes. Depository institutions should review and consider the applicability of the Federal Financial Institutions Examination Council Supervisory Policy Statement on Securities Activities, which has been adopted by the respective federal regulators.

None of the Co-Issuers or the Initial Purchaser make any representation as to the proper characterization of the Notes for legal investment or other purposes, or as to the ability of particular investors to purchase the Notes for legal investment or other purposes, or as to the ability of particular investors to purchase the Notes under applicable investment restrictions. The Co-Issuers understand that certain state insurance regulators, in response to a request for guidance, may be considering the characterization (as U.S. domestic or foreign (non-U.S.)) of certain collateralized debt obligation securities co-issued by a non-U.S. issuer and a U.S. co-issuer. There can be no assurance as to the nature of any guidance or other action that may result from such consideration. The uncertainties described above (and any unfavorable future determinations concerning legal investment or financial institution regulatory characteristics of the Notes) may affect the liquidity of the Notes. Accordingly, all institutions whose activities are subject to legal investment laws and regulations, regulatory capital requirements or review by regulatory authorities should consult their own legal advisors in determining whether and to what extent the Notes are subject to investment, capital or other restrictions.

## RATINGS

It is a condition to the issuance of the Notes that the Class X Notes, Class A-1LA Notes and Class A-1LB Notes each be rated "AAA" by S&P and "Aaa" by Moody's, that the Class A-2L Notes be rated at least "AA" by S&P and at least "Aa2" by Moody's, that the Class A-3L Notes be rated at least "A" by S&P and at least "A2" by Moody's, that the Class A-4L Notes be rated at least "A-" by S&P and at least "A3" by Moody's and that the Class B-1L Notes be rated at least "BBB" by S&P and at least "Baa2" by Moody's. Each of the ratings of the Notes described herein assumes that no Maturity Extension occurs after the Closing Date. A security rating is not a

008265

recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning rating organization.

**The ratings of the Notes by S&P address solely the likelihood of timely payment of the Periodic Interest Amount on and the ultimate payment of the Aggregate Principal Amount of each Class of Senior Class A Notes, the timely payment of the Class X Payment and the ultimate payment of the Cumulative Interest Amount and the Aggregate Principal Amount of the Class A-3L Notes, the Class A-4L Notes and the Class B-1L Notes. The ratings of the Notes by Moody's address the ultimate cash receipt of all required payments as provided by the governing documents, and are based on the expected loss to the Noteholders of each Class relative to the promise of receiving the present value of such payments. A rating is not a recommendation to purchase, hold or sell securities, in as much as such rating does not comment as to market price or suitability for a particular investor and may be subject to revision or withdrawal at any time by the assigning rating organization.**

In the event that any rating initially assigned to the Notes is subsequently lowered for any reason, no person or entity is obligated to provide any additional support or credit enhancement with respect to the Notes. The Issuer has not requested a rating on the Notes by any rating agencies other than S&P and Moody's, although data with respect to the Portfolio Collateral may have been provided to other rating agencies solely for informational purposes. There can be no assurance that, if a rating is assigned to the Notes by any other rating agency, such rating will be as high as that assigned by S&P and Moody's.

## USE OF PROCEEDS

The net proceeds from the sale of the Notes as described herein, together with net proceeds from the sale of the Preferred Shares will be used by the Issuer to fund the purchase of a principal amount of the Initial Portfolio Collateral at least equal to the Initial Portfolio Collateral Amount, to fund the Deposit on the Closing Date of cash in the approximate amount such that the Aggregate Principal Amount of Original Portfolio Collateral originally purchased by the Issuer on or before the Effective Date will equal the Required Portfolio Collateral Amount and to fund the deposit in the Expense Reimbursement Account on the Closing Date of approximately U.S.$50,000, which Expense Reimbursement Account will be available for payment from time to time of future expenses of the Issuer pending the receipt of collections in respect of the Portfolio Collateral as described herein, to pay organizational, legal and other fees and expenses, related to the transaction, and to fund the Reserve Amount. The net proceeds from the sale of the Notes and the Preferred Shares will be approximately U.S.$856,312,500.

## PLAN OF DISTRIBUTION

The Initial Purchaser has advised the Co-Issuers that it proposes to offer the Notes to prospective purchasers from time to time in individually negotiated transactions at varying prices to be determined in each case at the time of sale. The price(s) paid by the Initial Purchaser for the Notes may be less than those paid by other purchasers of the Notes. The Initial Purchaser may offer or sell Notes to purchasers at negotiated prices, which may vary among different purchasers of Notes of any Class. In addition to the structuring and placement fees paid to the Initial Purchaser, the Initial Purchaser may be deemed to receive compensation for the sale of the Notes to the extent that the price(s) paid by it for Notes is less than the price(s) at which they are resold. The Notes are offered when, as and if issued by the Co-Issuers, subject to prior sale or withdrawal, cancellation or modification of the offer without notice and subject to approval of certain legal matters by counsel and certain other conditions. It is expected that delivery of the Notes will be made on or about the Closing Date, against payment in immediately available funds.

The Notes have not been registered under the Securities Act and may not be offered or sold within the United States or to, or for the account or benefit of, United States persons except to (i) Qualified Institutional Buyers in reliance on Rule 144A under the Securities Act and (ii) other persons or entities pursuant to other valid exemptions from the registration requirements of the Securities Act.

Without limiting the foregoing, no transfer of Notes may be made except to a non-U.S. Person in an offshore transaction in compliance with Regulation S or to a Qualified Purchaser or if such transfer would not

008266

require the Issuer or the Co-Issuer to become subject to the registration requirements of the Investment Company Act.

Each of the Co-Issuers and the Initial Purchaser represents and agrees that it (i) has only communicated or caused to be communicated and will only communicate or cause to be communicated any invitation or inducement to engage in investment activity (within the meaning of Section 21 of the Financial Services and Markets Act of 2000 ("FSMA")) received by it in connection with the issue or sale of any offered securities in circumstances in which Section 21(a) of the FSMA does not apply to the Issuer; and (ii) has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to the offered securities, in, from or otherwise involving the United Kingdom.

No invitation may be made to the public in the Cayman Islands to subscribe for the Notes.

Purchasers of Notes sold outside the United States may be required to pay stamp taxes and other charges in accordance with the laws and practices of the country of purchase in addition to the price charged to investors for the Notes.

The Notes are new securities for which there currently is no market. Accordingly, no assurance can be given as to the development or liquidity of any market for the Notes.

## THE SERVICER

**The information appearing in this Section has been prepared by Highland Capital Management, L.P. and has not been independently verified by the Issuer, the Co-Issuer or the Initial Purchaser. Accordingly, notwithstanding anything to the contrary herein, the Issuer, the Co-Issuer and the Initial Purchaser do not assume any responsibility for the accuracy, completeness or applicability of such information.**

General

Based in Dallas, Texas, Highland Capital is a registered investment adviser specializing in below investment grade credit and special situation investing. As of September 30, 2005, Highland Capital managed over $18 billion in leveraged loans, high yield bonds, structured products and other assets for banks, insurance companies, pension plans, foundations, and high net worth individuals.

Highland Capital manages these assets through a variety of fund structures including separate accounts, CDOs, hedge funds and mutual funds. As of September 30, 2005, Highland Capital had under management approximately 1,000 below investment grade and credit sensitive credit positions, and Highland Capital's 56 person credit team followed approximately 1,200 below investment grade and credit sensitive credit positions across over 40 industries. Highland Capital or an affiliate or predecessor thereof has been an SEC-registered investment adviser since April 1993.

Highland Capital has invested over $250 million of firm capital in its funds, and expects that HFP, one of its Affiliates, will on the Closing Date purchase 100% of the Class II Preferred Shares.

Philosophy and Process

Highland Capital has expertise in the fields of syndicated loans, high yield bonds, and distressed assets. Portfolio managers follow each credit and several times each year the entire professional staff reviews all positions during multi-day monitoring meetings. Highland Capital diversifies its portfolios with set limits on exposure to any one given industry or issuer.

Since 1990, Highland Capital has been using a committee to coordinate the selection, monitoring and servicing process. The committee, which consists of senior portfolio managers, Highland Capital's Chief Investment Officer and its Head of Structured Products, meets every morning to discuss the status of the credits. Collectively, the committee utilizes a selection process which is driven by credit research. Each portfolio manager/analyst makes

008267

specific credit recommendations based upon industry coverage.  The credit proposal is then brought to the committee for consideration.  Based upon the consensus decision, the portfolio manager will direct Highland traders to execute the trade.  Highland Capital has also provided its committee with a commitment to technology.  The firm developed Wall Street Office® which is a proprietary software system that allows Highland Capital to model, portfolio manage, and trade syndicated loans.  This software has been licensed to more than 70 financial institutions that invest in syndicated loans.

Professionals of the Servicer

Set forth below is information regarding certain persons who are currently employed by the Servicer.  Such persons may not necessarily continue to be so employed during the entire term of the Servicing Agreement.

**Senior Management**

**James Dondero, CFA, CPA, CMA** – *Managing Partner - President*

Mr. Dondero is a Founder and President of Highland Capital.  Formerly, Mr. Dondero served as Chief Investment Officer of Protective Life's GIC subsidiary.  His portfolio management experience includes mortgage-backed securities, investment grade corporates, leveraged bank loans, emerging markets, derivatives, preferred stocks and common stocks.  From 1985 to 1989, he managed fixed income funds for American Express. Prior to American Express, he completed the  financial training at Morgan Guaranty Trust Company.  Mr. Dondero is a Beta Gamma Sigma graduate of the University of Virginia, 1984 with degrees in Accounting and Finance.  Mr. Dondero is a Certified Public Accountant, Chartered Financial Analyst and a Certified Management Accountant.

**Mark Okada, CFA** – *Managing Partner - Chief Investment Officer*

Mr. Okada is a Founder and Chief Investment Officer of Highland Capital.  He is responsible for overseeing Highland Capital's investment activities for its various funds and has over 19 years of experience in the leveraged finance market.  Formerly, Mr. Okada served as Manager of Fixed Income for Protective Life's GIC subsidiary from 1990 to 1993.  He was primarily responsible for the bank loan portfolio and other risk assets.  From 1986 to 1990, he served as Vice President for Hibernia National Bank, managing over $1 billion of high yield bank loans.  Mr. Okada is an honors graduate of the University of California Los Angeles with degrees in Economics and Psychology.  He completed his credit training at Mitsui and is a Chartered Financial Analyst.  Mr. Okada is also Chairman of the Board of Directors of Common Grace Ministries Inc.

**Todd Travers, CFA** – *Head of Structured Products, Senior Portfolio Manager*

Mr. Travers is responsible for Highland Capital's CDO business and is the primary portfolio manager for Highland Capital's par debt funds.  He is a member of the Credit Committee and heads a team that is responsible for structuring new transactions and implementing additional opportunities in Highland Capital's core businesses. Formerly, Mr. Travers served as Portfolio Manager/Portfolio Analyst from 1994 to 1998 for Highland Capital.  In 1999, he was promoted to Senior Portfolio Manager and his duties were expanded beyond sector portfolio management to include the origination, structuring and issuance of new structured vehicles, including all structured vehicles since Highland Loan Funding V Ltd. and Restoration Funding Ltd.  His prior responsibilities included managing a portion of Highland Capital's leveraged loan and high yield debt portfolios with an emphasis on technology and aviation transactions.  Prior to joining Highland Capital, Mr. Travers was a Finance Manager at American Airlines.  Mr. Travers is a graduate of Iowa State University with a BS in Industrial Engineering.  He received his MBA with an emphasis in Finance from Southern Methodist University.  Mr. Travers is a Chartered Financial Analyst.

008268

**Portfolio Managers**

**Peter A. Strzalkowski, CFA** – *Portfolio Manager*

Prior to joining Highland Capital, Mr. Strzalkowski served as a Senior Portfolio Manager with Microsoft Corp. from June, 2003 to June, 2005. His primary responsibility was the management of various multi-billion fixed income portfolios that were comprised of; MBS, ABS, Credit, Governments, TIPS, Derivatives, including Swaps, Swaptions and Futures, and Global Fixed Income. In addition he managed an absolute return mandate with a $5 million daily VAR. Prior to Microsoft, Mr. Strzalkowski worked as a Vice President/Portfolio Manager at First Citizens Bank in Raleigh, NC where he managed $1.2 billion from 2000 to 2003. Before that, he was employed at Centura Banks in a Portfolio Manager role from 1998 to 2000. Formerly, Mr. Strzalkowski was a Vice President/Junior Portfolio Manager/Quantitative Analyst at Bank of America's Sovran Capital Management from 1993 to 1998. Mr. Strzalkowski received a BS in Business/Finance from Virginia Commonwealth University and he is a Chartered Financial Analyst charter holder.

**Senior Portfolio Analysts**

**Gibran Mahmud, CPA** – *Senior Portfolio Analyst*

Mr. Mahmud is involved in managing Highland's CDO funds and is part of the team that is responsible for structuring new transactions and implementing additional opportunities in Highland's core business. Formerly, Mr. Mahmud served as Controller at Highland from 2001 to 2003. Prior to joining Highland Capital, he served as a Senior Analyst at Fleet Capital where he was involved in the originating, structuring, modeling, and credit analysis for clients primarily in the manufacturing, retail, and services industries. Formerly, Mr. Mahmud was a senior accountant at Arthur Andersen. He received both a Bachelors in Accounting and an MBA with an emphasis in Finance from Baylor University. Mr. Mahmud is a Certified Public Accountant.

**Sundeep Agrawal** – *Senior Portfolio Analyst*

Prior to joining Highland, Mr. Agrawal worked as a Senior Investment Analyst at General Motors Asset Management in New York from 2003 to 2005. At GMAM Mr. Agrawal was responsible for the credit analysis and risk management of CDO and ABS securities for a $400 million Total Return Structured Credit Opportunity Fund and a $100 million CDO Equity Fund. In addition he was also involved in the analysis, portfolio construction and risk management of various Libor Plus strategies focusing on the HEL ABS and RMBS sectors. Prior to GMAM, Mr. Agrawal was an Assistant Vice President at Lehman Brothers in the Fixed Income Division in New York from 1998-2002. At Lehman Brothers he focused on the quantitative modeling and risk management of foreign exchange derivative products. He received an MBA in Finance from New York University's Leonard N. Stern School of Business, an M.S. in Systems Engineering from The University of Texas at Austin and a B.E. in Electrical Engineering from Delhi Institute of Technology, India.

**Brad Voss, CFA** – *Senior Portfolio Analyst*

Mr. Voss joined Highland in August 2005 and is involved in the analysis, selection, and monitoring of asset-backed securities for Highland-managed CDOs. Formerly he served as a Vice President for Bear Stearns, where he worked with institutional investors to incorporate Bear Stearns research into their investment processes. Prior to joining Bear Stearns he held a similar position at Donaldson, Lufkin & Jenrette. While a graduate student he completed an internship with State Street Research & Management in Boston and served as a portfolio manager and risk manager for a $13 million student-managed investment company. Mr. Voss holds an MBA from the University of Texas at Austin, a BBA from Texas Christian University, and has earned the right to use the Chartered Financial Analyst designation.

See "Special Considerations—Dependence on Key Personnel of the Servicer."

008269

## THE SERVICING AGREEMENT

The following summary describes certain provisions of the Servicing Agreement. The summary does not purport to be complete and is subject to, and qualified in its entirety by reference to, the Servicing Agreement.

The Servicer will select the Initial Portfolio Collateral and will select all remaining Portfolio Collateral. The Servicer will also monitor the performance and credit quality of all of the Portfolio Collateral on an ongoing basis as further provided in the Servicing Agreement. Pursuant to the terms of the Servicing Agreement and the Indenture, the Servicer will direct the Issuer with respect to the use of collections on Portfolio Collateral to purchase Substitute Portfolio Collateral or Additional Portfolio Collateral, direct the Trustee when to deliver an item of Credit Risk Portfolio Collateral, Credit Improved Portfolio Collateral, Equity Portfolio Collateral or other item of Portfolio Collateral for sale and direct the use of proceeds therefrom to purchase Substitute or Additional Portfolio Collateral and Eligible Investments. The Servicer will advise the Issuer with respect to the use of certain Collections as described herein to purchase Additional Portfolio Collateral meeting the specifications set forth herein. If any Portfolio Collateral is an item of Defaulted Portfolio Collateral, the Servicer will instruct the Trustee as to the appropriate action to be taken against the issuer of such item of Portfolio Collateral and whether to retain or dispose of such item of Portfolio Collateral. See "Security for the Notes—Changes in Composition of Portfolio Collateral."

Upon any disposition of Portfolio Collateral, the Trustee, upon direction of the Servicer, will either deposit the proceeds of such disposition in the Collection Account or apply the proceeds of such disposition to the purchase of an item of Additional Portfolio Collateral or Substitute Portfolio Collateral, all in accordance with the terms of the Indenture. Any such actions directed by the Servicer may change the composition and characteristics of the Portfolio Collateral included in the Trust Estate, the rate of payment thereon, and, accordingly, may affect the actual average life of the Notes.

The Indenture places significant restrictions on the ability of the Issuer to buy and sell securities for the Trust Estate, and the Servicer is subject to compliance with such document. Accordingly, during certain periods or in certain specified circumstances, the Issuer may be unable to buy or sell securities or to take other actions which the Servicer might consider in the interests of the Issuer and its creditors and the Holders of Preferred Shares.

In its capacity as servicer or manager, the Servicer engages in other business and furnishes asset management and other services to other clients which may differ from those followed by the Servicer on behalf of the Issuer, as required by the Indenture. The Servicer may make recommendations or effect transactions which may differ from those effected with respect to the securities in the Trust Estate.

The Servicing Agreement provides that the Servicer will not direct the Trustee to acquire an obligation to be included in the Collateral from the Servicer or any of its Affiliates as principal or to sell an obligation to the Servicer or any of its Affiliates as principal unless (i) the Issuer shall have received from the Servicer such information relating to such acquisition or sale as it may reasonably require and shall have approved such acquisition, which approval shall not be unreasonably withheld, (ii) in the judgment of the Servicer, such transaction is on terms no less favorable than would be obtained in a transaction conducted on an arm's length basis between third parties unaffiliated with each other and (iii) such transaction is permitted by the Investment Advisers Act of 1940. The Servicing Agreement also provides that the Servicer will not direct the Trustee to acquire an obligation to be included in the Collateral directly from any account or portfolio for which the Servicer serves as investment adviser, or direct the Trustee to sell an obligation directly to any account or portfolio for which the Servicer serves as investment adviser unless such acquisition or sale is (i) in the judgment of the Servicer, on terms no less favorable than would be obtained in a transaction conducted on an arm's length basis between third parties unaffiliated with each other and (ii) permitted by the Investment Advisers Act of 1940.

Compensation

As compensation for its services under the Servicing Agreement, the Servicer will be entitled to receive a Base Servicing Fee, an Additional Servicing Fee and a Supplemental Servicing Fee (if any).

008270

The Base Servicing Fee is a fee that will accrue from the Closing Date and be payable to the Servicer, if and to the extent funds are available for such purpose as described under "Description of the Notes—Payments on the Notes; Priority of Distributions", in arrears on each Payment Date. The Base Servicing Fee will be calculated on the basis of a 360-day year and the actual number of days elapsed. The Base Servicing Fee payable on any Payment Date will be payable from Collateral Interest Collections remaining after payment of certain fees and expenses of the Issuer but prior to payment of interest on the Notes. The Base Servicing Fee will accrue interest if unpaid. To the extent Collateral Interest Collections are insufficient to pay any accrued and unpaid Base Servicing Fee payable on any Payment Date, the Base Servicing Fee will be payable from Collateral Principal Collections available for such purpose as described under "Description of the Notes—Payments on the Notes; Priority of Distributions."

The Additional Servicing Fee is a fee that will accrue from the Closing Date and be payable to the Servicer, if and to the extent funds are available for such purpose as described under "Description of the Note—Payments on the Notes; Priority of Distributions", in arrears on each Payment Date (to the extent provided in the Servicing Agreement). The Additional Servicing Fee will be calculated on the basis of a 360-day year and the actual number of days elapsed. The Additional Servicing Fee payable on any Payment Date will be payable from Collateral Interest Collections remaining after payment of certain fees and expenses of the Issuer, the Base Servicing Fee, interest (and, if any of the Overcollateralization Tests or the Interest Coverage Test are not satisfied on the related Payment Date (other than the Interest Coverage Test on the first or second Payment Date) or if a Rating Confirmation Failure exists, principal) on the Notes and certain other amounts. The Additional Servicing Fee will accrue interest if unpaid.

The Supplemental Servicing Amount means an amount that will be payable to the Servicer in accordance with the Indenture on each Payment Date, if and to the extent funds are available for such purpose as described under "Description of the Notes—Payments on the Notes; Priority of Distributions." Excess cashflow remaining after the payment or deposit of the amounts described under "Description of the Notes—Payments on the Notes; Priority of Distributions" will be paid: (a) if the Internal Rate of Return of the Preferred Shares as of such Payment Date is less than 12%, to the Issuer to be applied to fund distributions to the Holders of the Preferred Shares, but only up to an amount that would cause the Internal Rate of Return of the Preferred Shares to equal 12%, and (b) if the Internal Rate of Return of the Preferred Shares as of such Payment Date is equal to or greater than 12%, after giving effect to any payments made under clause (a) above, (x) 20% of any remaining amount to (1) the Servicer in payment of the Supplemental Servicing Fee for such Payment Date, and (2) the Holders of the Class II Preferred Shares in accordance with the Paying and Transfer Agency Agreement, in payment of the Class II Preferred Share Supplemental Dividend then due and unpaid, and (y) 80% to the Holders of the Preferred Shares in accordance with the Paying and Transfer Agency Agreement, a dividend thereon or the redemption thereof, as applicable

If amounts distributable on any Payment Date as described under "Description of the Notes—Payments on the Notes; Priority of Distributions" are insufficient to pay the Base Servicing Fee or the Additional Servicing Fee, then the payment thereof will be deferred and will be payable with interest on subsequent Payment Dates as described herein.

The Servicer will have a senior lien on the Trust Estate with respect to its Base Servicing Fee and a junior lien on the Trust Estate with respect to its Additional Servicing Fee. The Servicer will receive reimbursement for certain expenses from the proceeds of the issuance of the Notes and the Preferred Shares. The Servicer will generally be responsible for its own expenses incurred in the course of performing its obligations under the Servicing Agreement, but may be reimbursed for certain expenses as provided in the Servicing Agreement. Generally, the Servicer will not be liable to the Issuer, the Trustee, the Holders of Notes or Preferred Shares for any loss incurred as a result of the actions taken or recommended by the Servicer under the Servicing Agreement or the Indenture, except by reason of acts constituting bad faith, willful misconduct, or gross negligence in the performance of its obligations thereunder. The Servicer will be entitled to indemnification by the Issuer under certain circumstances as described in the Servicing Agreement. In addition, the Servicer has entered into certain indemnification agreements with Bear Stearns Under certain circumstances the Servicer also may resign or be removed.

008271

Amendment to Servicing Agreement

The Servicing Agreement may not be amended (a) without satisfying the Rating Condition with respect to each Rating Agency or (b) if a Majority of the Controlling Class or a Majority of the Preferred Shares have objected in writing to such amendment or modification within 30 days of notice thereof.

Resignation of Servicer

Subject to the provisions for a successor Servicer discussed below, the Servicer may resign, upon 90 days' written notice to the Issuer (or such shorter notice as is acceptable to the Issuer).

Termination of Servicing Agreement

The Servicing Agreement will be terminated, and the Servicer will be removed, by the Issuer, if directed by a Majority of the Controlling Class of Notes or by at least 66 2/3% of the Holders of the Preferred Shares (excluding any Preferred Shares held by the Servicer or its Affiliates or any account for which the Servicer or its Affiliates have discretionary voting authority at the time of such vote), in each case for "cause" upon 10 days' prior written notice to the Servicer and upon written notice to the Noteholders and the Holders of the Preferred Shares as set forth below. For purposes of determining "cause" with respect to any such termination of the Servicing Agreement, such term shall mean any one of the following events:

(i)     the Servicer willfully breaches in any respect, or takes any action that it knows violates in any respect, any provision of the Servicing Agreement or any terms of the Indenture applicable to it;

(ii)    the Servicer breaches in any material respect any provision of the Servicing Agreement or any terms of the Indenture or the Collateral Administration Agreement applicable to it, or any representation, warranty, certification or statement given in writing by the Servicer shall prove to have been incorrect in any material respect when made or given, and the Servicer fails to cure such breach or take such action so that the facts (after giving effect to such action) conform in all material respects to such representation, warranty, certification or statement, in each case within 30 days of becoming aware of, or receiving notice from, the Trustee of, such breach or materially incorrect representation, warranty certification or statement;

(iii)   certain events of bankruptcy or insolvency occur with respect to the Servicer;

(iv)    the occurrence of any Event of Default under the Indenture that results from any breach by the Servicer of its duties under the Indenture or the Servicing Agreement, which breach or default is not cured within any applicable cure period; or

(v)     (x) the occurrence of an act by the Servicer related to its activities in any securities, servicing, financial advisory or other investment business that constitutes fraud, (y) the Servicer being indicted, or any of its principals being convicted, of a felony criminal offense related to its activities in any securities, servicing, financial advisory or other investment business or (z) the Servicer being indicted for, adjudged liable in a civil suit for, or convicted of a violation of the Securities Act or any other United States Federal securities law or any rules or regulations thereunder.

Successor Servicer

No removal, termination or resignation of the Servicer will be effective under the Servicing Agreement unless the Issuer appoints a successor Servicer:

I.  if the Class A-1LA Notes are Outstanding and (i) the sum of (A) the Aggregate Par Amount of Portfolio Collateral other than any Equity Portfolio Collateral and (B) the Market Value of all Equity Portfolio Collateral (as determined by the Servicer in a commercially reasonable manner), if any, is less than (ii) the sum of (A) the Aggregate Principal Amount of the Outstanding Notes other than the Class B-1L Notes plus any accrued and unpaid

008272

interest thereon and (B) 50% of the Aggregate Principal Amount of the Class B-1L Notes plus any accrued and unpaid interest thereon (a "**Preferred Share Event**"), then:

(a) (A) at the written direction of a Majority of the Notes (excluding any Notes held by the retiring Servicer or any of its Affiliates and accounts over which the retiring Servicer or any of its Affiliates exercise discretionary voting authority other than HFP), (B) such successor has agreed in writing to assume all of the Servicer's duties and obligations pursuant to the Servicing Agreement and the Indenture and (C) such successor Servicer is not objected to within 30 days after notice of such succession by a Majority of the Controlling Class of Notes; or

(b) if a Majority of the Notes (excluding any Notes held by the retiring Servicer or any of its Affiliates and accounts over which the retiring Servicer or any of its Affiliates exercise discretionary voting authority other than HFP) has nominated two or more successor Servicers that have been objected to pursuant to clause (a) above or has otherwise failed to appoint a successor Servicer that is not objected to pursuant to clause (C) under clause (a) above within 30 days of the date of notice of such removal, termination or resignation of the Servicer (or, if later, within 30 days of the last failure to successfully appoint a successor Servicer), then (A) at the direction of a Majority of the Controlling Class, (B) such successor has agreed in writing to assume all of the Servicer's duties and obligations pursuant to the Servicing Agreement and the Indenture and (C) such successor Servicer is not objected to within 30 days after notice of such succession by a Majority in Aggregate Outstanding Amount of the Notes (voting as a single Class (excluding any Notes held by the retiring Servicer or any of its Affiliates and accounts over which the retiring Portfolio or any of its Affiliates exercise discretionary voting authority, other than HFP));

II. if there is no Preferred Share Event in effect, then:

(a) (A) at the written direction of a Majority of the Preferred Shares (excluding any Preferred Shares held by the retiring Servicer or any of its Affiliates and accounts over which the retiring Servicer or any of its Affiliates exercise discretionary voting authority other than HFP up to the Original HFP Share Amount), (B) such successor has agreed in writing to assume all of the Servicer's duties and obligations pursuant to the Servicing Agreement and the Indenture and (C) such successor Servicer is not objected to within 30 days after notice of such succession by any of (x) a Majority of the Controlling Class of Notes or (y) a Majority in Aggregate Outstanding Amount of the Notes (voting as a single Class (excluding any Notes held by the retiring Servicer or any of its Affiliates and accounts over which the retiring Portfolio or any of its Affiliates exercise discretionary voting authority, other than HFP)); or

(b) if a Majority of the Preferred Shares (excluding any Preferred Shares held by the retiring Servicer or any of its Affiliates and accounts over which the retiring Servicer or any of its Affiliates exercise discretionary voting authority other than HFP) has nominated two or more successor Servicers that have been objected to pursuant to clause (a) above or has otherwise failed to appoint a successor Servicer that is not objected to pursuant to clause (C) of the preceding sentence within 30 days of the date of notice of such removal, termination or resignation of the Servicer (or, if later, within 30 days of the last failure to successfully appoint a successor Servicer), then a Majority of the Controlling Class may appoint a successor Servicer, which shall be the successor Servicer if, (A) such successor has agreed in writing to assume all of the Servicer's duties and obligations pursuant to the Servicing Agreement and the Indenture and (B) such successor Servicer is not objected to within 45 days after notice of such succession by either (x) the Majority of the Preferred Shares (excluding any Preferred Shares held by the retiring Servicer or any of its Affiliates and accounts over which the retiring Servicer or any of its Affiliates exercise discretionary voting authority other than HFP or any subsidiary of HFP) or (y) a Majority in Aggregate Outstanding Amount of the Notes (voting as a single Class (excluding any Notes held by the retiring Servicer or any of its Affiliates and accounts over which the retiring Portfolio or any of its Affiliates exercise discretionary voting authority, other than HFP up to the Original HFP Share Amount)).

If the Majority of the Controlling Class fails to appoint a successor Servicer pursuant to clause I(b) or clause II(b) above, or its appointee is objected to as therein provided, within 90 days of the date of notice of such removal, termination or resignation of the Servicer, the Majority of the Controlling Class may petition a court of competent authority to appoint a successor Servicer.

008273

In addition, any successor Servicer must be an established institution which (i) has demonstrated an ability to professionally and competently perform duties similar to those imposed upon the Servicer under the Servicing Agreement, (ii) is legally qualified and has the capacity to act as Servicer under the Servicing Agreement, as successor to the Servicer under the Servicing Agreement in the assumption of all of the responsibilities, duties and obligations of the Servicer under the Servicing Agreement and under the applicable terms of the Indenture, (iii) shall not cause the Issuer or the pool of Collateral to become required to register under the provisions of the Investment Company Act, (iv) shall perform its duties as Servicer under the Servicing Agreement and the Indenture without causing the Issuer or any Holder of Preferred Shares to become subject to tax in any jurisdiction where such successor Servicer is established as doing business and (v) each Rating Agency has confirmed that the appointment of such successor Servicer shall not cause its then-current rating of any Class of Notes to be reduced or withdrawn. No compensation payable to a successor from payments on the Collateral shall be greater than that paid to the Servicer without the prior written consent of a Majority of the Controlling Class of Notes, a Majority of the Notes (voting collectively) and a Majority of the Preferred Shares (voting collectively).

If there is no appointment of a successor Servicer within 90 days after the resignation or termination of the Servicer, any sales or disposition of Portfolio Collateral shall be limited to Credit Risk Portfolio Collateral, Defaulted Portfolio Collateral and Equity Portfolio Collateral; *provided that* such restriction on the sale or disposition of Portfolio Collateral shall not apply if the Portfolio Collateral is being liquidated in whole or in part in connection with an acceleration or early termination of the Notes.

Delegation

The Servicing Agreement, and any obligations or duties of the Servicer under the Servicing Agreement, cannot be delegated by the Servicer, in whole or in part, except to any entity that is both (i) controlled by any of James Dondero, Mark Okada and Todd Travers and (ii) one in which any of James Dondero, Mark Okada and Todd Travers is involved in the day to day management and operations (and in such case pursuant to an instrument of delegation in form and substance satisfactory to the Issuer), without the prior written consent of the Issuer, a Majority of the Controlling Class of Notes and a Majority of the Preferred Shares (excluding Preferred Shares held by the Servicer or any of its Affiliates), and, notwithstanding any such consent, no delegation of obligations or duties by the Servicer (including, without limitation, to an entity described above) shall relieve the Servicer from any liability under the Servicing Agreement.

## CERTAIN LEGAL MATTERS

The validity of the Notes and certain other legal matters, including certain matters relating to certain United States federal tax consequences of the ownership of the Notes, will be passed upon for the Issuer and the Initial Purchaser by Orrick, Herrington & Sutcliffe LLP, New York, New York. Certain legal matters will be passed upon for the Servicer by Orrick, Herrington & Sutcliffe LLP, Los Angeles, California. Certain legal matters relating to Cayman Islands law will be passed on for the Issuer by Maples and Calder. As to all matters of Cayman Islands law, Orrick, Herrington & Sutcliffe LLP will rely on the opinions of Maples and Calder.

008274

ANNEX A

## GLOSSARY OF CERTAIN DEFINED TERMS

Set forth below are definitions of certain defined terms used in this Confidential Offering Circular.

"Account Income":  Any interest or other earnings on funds in the Collection Account, the Initial Deposit Account, the Loan Funding Account or the Expense Reimbursement Account.

"Accounts":  The Collection Account, the Initial Deposit Account, the Loan Funding Account, the Expense Reimbursement Account, the Closing Expense Account, the Reserve Account, the Default Swap Collateral Account and the Default Swap  Issuer Account, as described in "Security for the Notes—Accounts."

"Accrued Interest on Sale":  Interest accrued on an item of Portfolio Collateral at the time of sale or other disposition to the extent paid to the Issuer as part of the sale or other disposition price of such item of Portfolio Collateral after deducting amounts representing Purchased Accrued Interest of such item of Portfolio Collateral.

"Additional Collateral Deposit Requirement":  As described under "Description of the Notes—Additional Collateral Deposit Requirement."

"Additional Fee Amount":  With respect to each Due Period, an amount equal to 0.35% per annum of the Quarterly Collateral Amount, calculated on the basis of a 360-day year and the actual number of days elapsed.

"Additional Issuance": As defined under "Description of the Notes—Additional Issuance."

"Additional Portfolio Collateral":  Any Portfolio Collateral purchased with Collections (other than Collateral Disposition Proceeds) in accordance with the terms of the Indenture.

"Additional Preferred Shares": Any additional Preferred Shares issued after the Closing Date as described in, and in accordance with the applicable terms of, the Indenture.

"Additional Servicing Fee":  For any Payment Date, an amount equal to the sum of (a) product of (i) the Additional Fee Amount for such Payment Date and (ii) the Servicing Fee Portion for such Payment Date plus (b) on any Payment Date that any part of the Base Servicing Fee was not paid on the preceding Payment Date, interest on such unpaid amount in an amount equal to the product of (i) LIBOR for the applicable period plus 3.0% per annum and (ii) the actual number of days in such Due Period, divided by 360 plus (c) on any Payment Date that any part of the Additional Servicing Fee was not paid on the preceding Payment Date, such unpaid Additional Servicing Fee and  interest thereon in an amount equal to the product of (i) LIBOR for the applicable period plus 3.0% per annum and (ii) the actual number of days in such Due Period divided by 360; *provided* that in the event that the Servicer is removed or resigns, the amount of such fee accrued to the effective date of such removal or resignation will be payable to the Servicer on the next succeeding Payment Date or Payment Dates on which such amount may be paid, in accordance with the Priority of Payments (provided that the payment of any fee payable pursuant to this proviso will be *pari passu* with the payment of any servicing fees to the then-current servicer).

"Adjusted Collateral Collections": With respect to any Payment Date, the sum of (i) the Adjusted Collateral Interest Collections collected during the applicable Due Period, (ii) the Adjusted Collateral Principal Collections collected during the applicable Due Period and (iii) the available funds in the Expense Reimbursement Account, as each is determined as of the Calculation Date relating to such Payment Date.

"Adjusted Collateral Interest Collections": As defined under "Description of the Notes—Payments on the Notes; Priority of Distributions—Adjusted Collateral Collections."

"Adjusted Collateral Principal Collections": As defined under "Description of the Notes—Payments on the Notes; Priority of Distributions—Adjusted Collateral Collections."

"<u>Administration Agreement</u>":  The Administration Agreement, dated as of May 10, 2006, between the Issuer and the Administrator.

"<u>Administrator</u>":  Maples Finance Limited, or any successor appointed by the Issuer.

"<u>Affiliate</u>": With respect to any specified Person, any other Person controlling or controlled by or under common control with such specified Person.  For the purposes of this definition, "control," when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing; *provided* that (for the avoidance of doubt) the only Affiliate of the Issuer shall be the Co-Issuer and the only Affiliate of the Co-Issuer shall be the Issuer.

"<u>Aggregate Base Fees and Expenses</u>": As defined under "Description of the Notes—Payments on the Notes; Priority of Distributions—Adjusted Collateral Collections."

"<u>Aggregate Par Amount</u>":  With respect to any date of determination, the Aggregate Principal Amount of the Portfolio Collateral in the Trust Estate, including cash and Eligible Investments representing Collateral Principal Collections on deposit in the Collection Account and the Initial Deposit Account.

"<u>Aggregate Principal Amount</u>":  With respect to any date of determination, when used with respect to the Portfolio Collateral, the aggregate Principal Balances of such items of Portfolio Collateral on such date of determination.  With respect to any date of determination, when used with respect to any Eligible Investments, the Balance of such Eligible Investments on such date of determination.  When used with respect to any Note or Class of Notes, as of any date of determination, the original principal amount of such Note or Class of Notes, as applicable, reduced by all prior payments, if any, made with respect to principal of such Notes, including Class X Principal Payments, in the case of the Class X Notes.  When used with respect to the Notes in the aggregate, the sum of the Aggregate Principal Amount of each Class of Outstanding Notes.

"<u>Amendment Buy-Out</u>": As described under "Legal Structure—The Indenture; Amendment Buy-Out."

"<u>Amendment Buy-Out Option</u>":  As described under "Legal Structure—The Indenture; Amendment Buy-Out."

"<u>Amendment Buy-Out Purchase Price</u>":  Shall mean the price payable by the Amendment Buy-Out Purchaser for Notes or Preferred Shares purchased in an Amendment Buy-Out in an amount equal to (i) in the case of Notes, the Aggregate Principal Amount thereof, plus accrued and unpaid interest to the date of purchase payable to the Non-Consenting Holder (giving effect to all amounts paid to such Holder on such date) and plus any unpaid Extension Bonus Payment, and (ii) in the case of the Preferred Shares, an amount that, when taken together with all payments and distributions made in respect of such Preferred Shares since the Closing Date (and any amounts payable, if any to such Holder on the next succeeding Payment Date) would cause such Preferred Shares to have received (as of the date of purchase thereof) an Internal Rate of Return of 12.0% (assuming such date was a Payment Date under the Indenture); *provided that*, after the date on which any Holder of Preferred Shares has received an Internal Rate of Return equal to or in excess of 12.0%, the Amendment Buy-Out Purchase Price for such Preferred Shares shall be equal to zero.

"<u>Amendment Buy-Out Purchaser</u>": Shall mean the Servicer (or any of its affiliates acting as principal or agent); *provided that* in the event that the Servicer elects not to purchase Notes or Preferred Shares from Holders pursuant to the Amendment Buy-Out, "Amendment Buy-Out Purchaser" shall mean one or more qualifying purchasers (which may include the Initial Purchaser) or any of its affiliates acting as principal or agent) designated by the Servicer; *provided, howeve*r, none of the Servicer, the Initial Purchaser or any of their respective affiliates shall have any duty to act as an Amendment Buy-Out Purchaser.

"<u>Amortization Period</u>":  The period beginning on the day after the end of the Revolving Period and ending on the Payment Date upon which the Aggregate Principal Amount of the Notes is paid in full.

"<u>Applicable Periodic Rate</u>": With respect to each Class of Notes and for each Periodic Interest Accrual Period as described under "Description of the Notes—Payments on the Notes; Priority of Distributions—General."

"<u>Applicable Percentage</u>": Shall mean the lesser of the Moody's Priority Category Recovery Rate and the S&P Priority Category Recovery Rate applicable to such item of Portfolio Collateral, set forth in the Indenture.

"<u>Approved Pricing Service</u>": Any pricing service (including any of its successors and assigns) listed as an Approved Pricing Service on a schedule to the Indenture or otherwise disclosed in writing by the Issuer to the Trustee and the Holders of the Notes and not objected to by the Requisite Noteholders within 15 days of such disclosure, *provided* that the Rating Condition has been satisfied with respect to any pricing service not included on the schedule to the Indenture.

"<u>Asset Backed Security</u>": Any obligation that is either (i) a security that is primarily serviced by the cash flows of a discrete pool of receivables or other financial assets, either fixed or revolving, and that, by its terms converts into cash within a finite time period, *plus* any rights or other assets designed to assure the servicing or timely distribution of proceeds to the Holders thereof or (ii) an "asset-backed security" as such term may be defined from time to time in the "General Instructions to Form S-3 Registration Statement" promulgated under the Securities Act, including collateralized bond obligations and collateralized loan obligations.

"<u>Assignment</u>": An arrangement whereby a creditor assigns an interest in a loan to the Issuer.

"<u>Available Funds</u>": With respect to any Payment Date, the amount of any positive balance in the Collection Account as of the Calculation Date relating to such Payment Date.

"<u>Average Life</u>": As described under "Security for the Notes—Weighted Average Life Requirement."

"<u>Balance</u>": On any date, with respect to cash or Eligible Investments in the Collection Account, the Initial Deposit Account, the Loan Funding Account or the Expense Reimbursement Account, the aggregate (i) face amount or current balance, as the case may be, of cash, demand deposits, time deposits, certificates of deposit, bankers' acceptances, federal funds and commercial bank money market accounts; (ii) outstanding principal amounts of interest-bearing government and corporate securities, and (iii) purchase price of non-interest-bearing government and corporate securities, commercial paper and repurchase obligations.

"<u>Base Fee Amount</u>": With respect to each Due Period, an amount equal to 0.20% per annum of the Quarterly Collateral Amount, calculated on the basis of a 360-day year and the actual number of days elapsed.

"<u>Base Servicing Fee</u>": For any Payment Date, an amount equal to the product of (a) the Base Fee Amount for such Payment Date and (b) the Servicing Fee Portion for such Payment Date; *provided* that in the event that the Servicer is removed or resigns, the amount of such fee accrued to the effective date of such removal or resignation will be payable to the Servicer on the next succeeding Payment Date or Payment Dates on which such amount may be paid, in accordance with the Priority of Payments (provided that the payment of any fee payable pursuant to this proviso will be *pari passu* with the payment of any servicing fees to the then-current servicer).

"<u>B Rating Category</u>": Having a Moody's Rating of "B1" or below or an S&P Rating of "B+" or below.

"<u>BB Rating Category</u>": Having a Moody's Rating of "Ba1" or below or an S&P Rating of "BB+" or below.

"<u>Bear Stearns</u>": Bear, Stearns & Co. Inc.

"<u>Benefit Plan Investor</u>": As defined in United States Department of Labor Regulation Section 2510.3-101(f)(2).

"<u>Business Day</u>": Any day that is not a Saturday, Sunday or other day on which commercial banking institutions in the City of New York, the state of New York, or in the city in which the Trustee's corporate trust office is located or, to the extent action is required of a Paying Agent, including the Trustee, in the city of the place

of payment, are authorized or obligated by law or executive order to be closed. To the extent action is required of the Irish Paying Agent, Dublin, Ireland shall be considered in determining "Business Day" for purposes of determining when such Irish Paying Agent action is required.

"Calculation Agent": Initially, JPMorgan Chase Bank, National Association.

"Calculation Date": The last day of each Due Period.

"CCC/Caa Portfolio Collateral": Portfolio Collateral (excluding Defaulted Portfolio Collateral) that has a Moody's Rating below "B3" or an S&P Rating below "B-".

"CCC Rating Category": Having a Moody's Rating of "Caa1" or below or an S&P Rating of "CCC+" or below.

"Class": The Class X Notes, the Class A-1LA Notes, the Class A-1LB Notes, the Class A-2L Notes, the Class A-3L Notes, the Class A-4L Notes and the Class B-1L Notes, as the case may be.

"Class A Notes": The Class A-1LA Notes, the Class A-1LB Notes, the Class A-2L Notes, the Class A-3L Notes and the Class A-4L Notes.

"Class A Overcollateralization Percentage": The overcollateralization percentage applicable to the Notes set forth under "Description of the Notes—Overcollateralization Tests."

"Class A Overcollateralization Test": As described in "Description of the Notes—Overcollateralization Tests."

"Class A Overcollateralization Ratio": As described under "Description of the Notes—Overcollateralization Tests."

"Class A-1LA Notes": The U.S.$538,000,000 Class A-1LA Floating Rate Extendable Notes due August 2021.

"Class A-1LB Notes": The U.S.$96,000,000 Class A-1LB Floating Rate Extendable Notes due August 2021.

"Class A-2L Notes": The U.S.$76,000,000 Class A-2L Floating Rate Extendable Notes due August 2021.

"Class A-3L Notes": The U.S.$36,500,000 Class A-3L Floating Rate Extendable Notes due August 2021.

"Class A-4L Notes": The U.S.$10,000,000 Class A-4L Floating Rate Extendable Notes due August 2021.

"Class B-1L Notes": The U.S.$21,000,000 Class B-1L Floating Rate Extendable Notes due August 2021.

"Class B-1L Overcollateralization Percentage": The overcollateralization percentage applicable to the Class B-1L Notes set forth under "Description of the Notes—Overcollateralization Tests".

"Class B-1L Overcollateralization Ratio": As described under "Description of the Notes—Overcollateralization Tests".

"Class I Preferred Shares": The Class I Preferred Shares, par value $0.001 per share, issued by the Issuer; *provided* that any transfer of Class I Preferred Shares to HFP from any third party shall require the exchange and conversion of such Class I Preferred Shares into Class II Preferred Shares.

"Class II Preferred Shares": The Class II Preferred Shares, par value $0.001 per share, issued by the Issuer and held by HFP; *provided* that any transfer of Class II Preferred Shares by HFP to any third party shall require that

such Class II Preferred Shares be redeemed by the Issuer and a corresponding amount of Class I Preferred Shares be issued to Investor Corp. which will in turn issue its preferred shares to such investor.

"Class II Preferred Share Additional Dividend":  For any Payment Date, an amount equal to the sum of (a) the product of (i) the Additional Fee Amount for such Payment Date and (ii) the Class II Preferred Share Portion for such Payment Date plus (b) on any Payment Date that any part of the Class II Preferred Share Base Dividend was not paid on the preceding Payment Date, interest on such unpaid amount in an amount equal to the product of (i) LIBOR for the applicable period and (ii) the actual number of days in such Due Period, divided by 360 plus (c) on any Payment Date that any part of the Class II Preferred Share Additional Dividend was not paid on the preceding Payment Date, such unpaid Class II Preferred Share Additional Dividend and interest thereon in an amount equal to the product of (i) LIBOR for the applicable period and (ii) the actual number of days in such Due Period divided by 360.

"Class II Preferred Share Base Dividend":  For any Payment Date, an amount equal to the product of (a) the Base Fee Amount for such Payment Date and (b) the Class II Preferred Share Portion for such Payment Date.

"Class II Preferred Share Dividend":  Class II Preferred Share Base Dividend, Class II Preferred Share Additional Dividend and Class II Preferred Share Supplemental Dividend.

"Class II Preferred Share Percentage":  For any Payment Date, a fraction, expressed as a percentage, the numerator of which is the number of Outstanding Class II Preferred Shares on the Calculation Date related to such Payment Date and the denominator of which is the total number of Outstanding Preferred Shares on such Calculation Date.

"Class II Preferred Share Portion":  For any Payment Date, 100% minus the Servicing Fee Portion for such Payment Date.

"Class II Preferred Share Supplemental Dividend":  For any Payment Date, an amount equal to the product of (a) the Supplemental Fee Amount for such Payment Date and (b) the Class II Preferred Share Portion for such Payment Date.

"Class X Interest Payment":  The Periodic Interest Amount with respect to the Class X Notes.

"Class X Notes":  The U.S.$14,000,000 Class X Floating Rate Notes Due August 2013.

"Class X Payment":  With respect to each Payment Date; the Class X Interest Payment and the Class X Principal Payment; *provided*, such amount may be reduced in connection with a redemption of the Class X Notes, as set forth in the Indenture.

"Class X Principal Payment":  With respect to the Class X Notes and any Payment Date, beginning on the November 1, 2007 Payment Date, in accordance with the amortization schedule provided in the Indenture.

"Class X Shortfall Amount":  With respect to the Class X Notes and any Payment Date, any shortfall or shortfalls in the payment of the Class X Payment with respect to any preceding Payment Date or Payment Dates together with interest accrued thereon at the Periodic Interest Rate relating to the Class X Notes (net of all Class X Shortfall Amounts, if any, paid with respect to the Class X Notes prior to such Payment Date).

"Clearstream":  Clearstream Banking, société anonyme.

"Closing Date":  May 10, 2006.

"Closing Expense Account":  An account maintained by the Issuer with the Trustee into which an amount necessary to pay closing expenses will be deposited on the Closing Date.

008279

"CLO Security":  A U.S. dollar-denominated collateralized loan obligation or a similar obligation that entitles the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the CLO Securities) on the credit exposure to, or cash flow from, a portfolio of collateral of which at least 75% consists of commercial loans (including eligible synthetic securities whose reference obligations consist of commercial loans); *provided* that not more than 25% of the Aggregate Principal Amount of any CLO Security may be comprised of Synthetic Securities; and *provided* further that each CLO Security must have a public or an estimated rating from each of the Rating Agencies.

"Code":  The United States Internal Revenue Code of 1986, as amended from time to time.

"Co-Issuer": Rockwall CDO (Delaware) Corp., a Delaware corporation.

"Co-Issuers":  The Issuer and the Co-Issuer.

"Collateral":  All money, instruments and other property and rights subject or intended to be subject to the lien of the Indenture including all proceeds thereof, including the Portfolio Collateral, the Collection Account, the Initial Deposit Account, the Reserve Account, the Expense Reimbursement Account, the Loan Funding Account, the Closing Expense Account, the Default Swap Collateral Account (subject to the rights of the related Default Swap Counterparty) and the Default Swap Issuer Account (subject to the rights of the related Default Swap Counterparty).

"Collateral Disposition Proceeds": All proceeds (including, to the extent so determined by the Servicer, any payments received in connection with a consent or similar solicitation and including amounts received in connection with an item of Defaulted Portfolio Collateral up to an amount equal to, in the aggregate, the Principal Balance of such item of Defaulted Portfolio Collateral) received during a Due Period from the sale or other disposition of any Portfolio Collateral included in the Trust Estate, net of any reasonable amounts expended by the Trustee in connection with such sale or other disposition (including without limitation disposition proceeds from liquidation of the Trust Estate).  Accrued interest may be treated as Collateral Disposition Proceeds (y) to the extent necessary to pay for the principal amount of or accrued interest on Substitute Portfolio Collateral if the item of sold Portfolio Collateral paid interest before, and in the same Due Period as, the date of sale or (z) to the extent such amounts are Purchased Accrued Interest treated as Collateral Principal Collections hereunder.  Amounts received with respect to Equity Portfolio Collateral or in connection with a consent or similar solicitation shall be treated as Collateral Interest Collections to the extent such proceeds are in excess of the Principal Balance (determined immediately prior to such Portfolio Collateral becoming Equity Portfolio Collateral) of the Portfolio Collateral disposed of.

"Collateral Interest Collections":  With respect to any Payment Date, the sum of (i) all payments of interest with respect to any Portfolio Collateral (excluding accrued interest classified as Collateral Disposition Proceeds but including any other receipts of accrued interest (including Accrued Interest on Sale) and, to the extent so determined by the Servicer, any payments (other than principal) received pursuant to a consent or similar solicitation, fees received in connection with an amendment (but only to the extent such amendment does not result in diminishing the principal money terms of such item of Portfolio Collateral) and including any commitment, standby or similar fees with respect to the unfunded portion of the Issuer's commitment to make or otherwise fund advances with respect to a Delayed Drawdown Loan or a Revolving Loan which are received during the applicable Due Period, less any Retained Accrued Interest, (ii) the Account Income, if any, in the Collection Account, the Initial Deposit Account and the Loan Funding Account which is received during the applicable Due Period, as each is determined as of the Calculation Date relating to such Payment Date (including, without limitation, Account Income on funds on deposit in the Initial Deposit Account transferred to the Collection Account on the Effective Date pursuant to the Indenture, (iii) any amount transferred from the Initial Deposit Account at the discretion of the Servicer as described under "Security for the Notes—Accounts" and (iv) income on Eligible Investments in and/or the securities credited to the Default Swap Collateral Account (to the extent the Issuer is entitled to receive such  income pursuant to the Indenture).

"Collateral LIBOR": With respect to any item of Portfolio Collateral, the London interbank offered rate for U.S. dollar deposits as set forth in the applicable Underlying Instrument.

"Collateral Principal Collections": With respect to any Payment Date, all payments of any principal with respect to any Portfolio Collateral including (i) any remaining Deposit (other than Account Income thereon and

amounts described in clause (iii) of the definition of "Collateral Interest Collections" herein) not applied to purchase Original Portfolio Collateral or to effect an Initial Deposit Redemption, (ii) any payment of Premium, (iii) to the extent so determined by the Servicer, including any payments received in connection with a consent or similar solicitation, fees received in connection with an amendment and including principal received in connection with or any payments received with respect to an item of Credit Risk Portfolio Collateral in connection with a consent or similar solicitation, (iv) all proceeds received from the sale of any warrant (whether sold as part of a Unit or separately), (v) any Collateral Disposition Proceeds which are received during the applicable Due Period, as determined as of the Calculation Date relating to such Payment Date, (vi) amounts representing Purchased Accrued Interest, (vii) amounts transferred from the Loan Funding Account upon the sale or disposition of Delayed Drawdown Loans or Revolving Loans or upon the expiration of a drawdown period or revolving period. Collateral Principal Collections shall include any other amounts not included in Collateral Interest Collections or Adjusted Collateral Interest Collections, including any payments received with respect to an item of Defaulted Portfolio Collateral up to, in the aggregate, the Principal Balance of such item of Defaulted Portfolio Collateral, (viii) funds (other than income thereon) transferred from a Default Swap Collateral Account to the Collection Account, (ix) any amounts received by the Issuer that do not qualify as Collateral Interest Collections (other than those standing to the credit of any Default Swap Collateral Account or Default Swap Issuer Account) and (x) on or after the Effective Date, any funds in the Initial Deposit Account not considered Collateral Interest Collections). Notwithstanding the foregoing, Collateral Principal Collections shall include (A) any other amounts not included in Collateral Interest Collections or Adjusted Collateral Interest Collections, (B) any payments received with respect to an item of Defaulted Portfolio Collateral up to, in the aggregate, the Principal Balance of such item of Defaulted Portfolio Collateral and (C) any amounts recharacterized as Collateral Principal Collections in connection with any distribution of Payment Date Equity Securities.

"Collateral Quality Formula": As such term is defined in the Indenture.

"Collateral Quality Matrix": As described under "Security for the Notes—Criteria for Purchase and Substitution of Collateral—Collateral Quality Matrix Tests."

"Collection Account": The account established with the Trustee for use in connection with the collection and disbursement of Collections.

"Collections": With respect to any Payment Date, the sum of (i) the Collateral Interest Collections collected during the applicable Due Period and (ii) the Collateral Principal Collections collected during the applicable Due Period, as each is determined as of the Calculation Date relating to such Payment Date.

"Controlling Class": Shall mean the Class A-1LA Notes and the Class X Notes, so long as any Class A-1LA Notes or Class X Notes are Outstanding, then the Class A-1LB Notes, so long as any Class A-1LB Notes are Outstanding, then the Class A-2L Notes, so long as any Class A-2L Notes are Outstanding, then the Class A-3L Notes, so long as any Class A-3L Notes are Outstanding, then the Class A-4L Notes, as long as any Class A-4L Notes are Outstanding, then the Class B-1L Notes, so long as any Class B-1L Notes are Outstanding.

"Coupon Adjustment": A proportional reduction of the required Weighted Average Coupon of the Fixed Rate Collateral or the required Weighted Average Margin of the Floating Rate Collateral, as determined in accordance with the Indenture, to the extent that either the actual Weighted Average Margin of the Floating Rate Collateral or the actual Weighted Average Coupon of the Fixed Rate Collateral, respectively, exceeds the required amount specified in the Indenture, in each case without regard to any Coupon Adjustment.

"Credit Event": As defined under "Special Considerations—Nature of Collateral Pledged to Secure the Notes; Ability to Obtain Additional Portfolio Collateral; Availability of Funds for Subordinate Payments."

"Credit Improved Criteria": Shall mean with respect to any item of Portfolio Collateral, in the Servicer's reasonable judgment, such item of Portfolio Collateral has significantly improved in credit quality, and:

(a) Moody's, S&P or Fitch has placed such item of Portfolio Collateral or any other class of security issued together with such item of Portfolio Collateral (or, if such item of Portfolio Collateral is not rated, the issuer

008281

thereof) on its credit watch list (or similar list) with the potential for developing positive credit implications since the date the Issuer first acquired such item of Portfolio Collateral (and for so long as such item of Portfolio Collateral or issuer, as applicable, remains on such list) or there has been an upgrade in the rating of such item of Portfolio Collateral, issuer or other class of security issued together with such item of Portfolio Collateral, as applicable, by Moody's, S&P or Fitch by one or more subcategories from the rating of such item of Portfolio Collateral or issuer, as applicable, by Moody's, S&P or Fitch, as applicable, in effect on the date the Issuer first acquired such item of Portfolio Collateral;

(b) with respect to a Portfolio Loan, since the date on which such Portfolio Loan was first acquired by the Issuer, has increased in price to 101.5% or more of its original purchase price or the spread of which over the related reference rate has been reduced, in each case, in accordance with its Underlying Instruments since the date on which such item of Portfolio Collateral was first acquired by the Issuer by 0.25% or more (in the case of an item of Portfolio Collateral with a spread over the related reference rate less than or equal to 2.00% at the time such item of Portfolio Collateral was first acquired by the Issuer) or 0.50% or more (in the case of an item of Portfolio Collateral with a spread over the related reference rate greater than 2.00% at the time such item of Portfolio Collateral was first acquired by the Issuer) for reasons primarily due to an improvement in the related borrower's financial ratios or financial results and not as a result of general market conditions; or

(c) with respect to any item of Portfolio Collateral which is not a Portfolio Loan, an increase in the market price (expressed as a percentage of par value) since the date of purchase of such item of Portfolio Collateral which, compared to the change in the average market price of a representative sample (as determined by the Servicer) of other debt securities with similar terms and credit characteristics and that would be eligible to be pledged as Portfolio Collateral, is greater than 3.00% of the par value or more relative to such representative sample; or a decrease since the date of purchase of such item of Portfolio Collateral of more than 10.0% in the difference between the yield to worst call on such item of Portfolio Collateral compared to the yield on the relevant United States Treasury security;

*provided, however*, that the criteria in (b) and (c) above may be used only as corroboration of other bases for the Servicer's Judgment.

"Credit Improved Portfolio Collateral":  Any item of Portfolio Collateral which, (a) in the Servicer's commercially reasonable judgment consistent with the standard of care set forth in the Servicing Agreement (*provided*, that in forming such judgment a decrease in credit spread or an increase in Market Value of such item of Portfolio Collateral may only by utilized as corroboration of other bases of such judgment), has improved in credit quality or otherwise satisfies the Credit Improved Criteria or (b) is sold pursuant to a Credit Improvement Exchange; *provided* that the Aggregate Principal Amount of any such Portfolio Collateral sold pursuant to clause (b) shall not exceed, during any twelve-month period, 20% (or such lower amount as determined by the Servicer) of the Aggregate Par Amount as of the first day of such period.

"Credit Protection Payment":  As defined under "Special Considerations—Nature of Collateral Pledged to Secure the Notes; Ability to Obtain Additional Portfolio Collateral; Availability of Funds for Subordinate Payments.

"Credit Risk Criteria": Shall mean with respect to any item of Portfolio Collateral:

(a) Moody's, Fitch or S&P has placed such item of Portfolio Collateral or any other class of security issued together with such item of Portfolio Collateral (or, if such item of Portfolio Collateral is not rated, the issuer thereof) on its credit watch list with the potential for developing negative credit implications (or similar list) since the date the Issuer first acquired such item of Portfolio Collateral (and for so long as such item of Portfolio Collateral or issuer, as applicable, remains on such list) or there has been a reduction in the rating of such item of Portfolio Collateral, issuer or other class of security issued together with such item of Portfolio Collateral, as applicable, by Moody's, Fitch or S&P, as applicable, by one or more subcategories from the rating of such item of Portfolio Collateral or issuer, as applicable, by Moody's, Fitch or S&P, as applicable, in effect on the date the Issuer first acquired such item of Portfolio Collateral;

(b) which is a Portfolio Loan, the spread over the applicable reference rate has been increased in accordance with the related Underlying Instruments since the date on which such Portfolio Loan was first acquired by the Issuer by 0.50% or more (in the case of a Portfolio Loan with a spread over the applicable reference rate at the time such Portfolio Loan was first acquired by the Issuer less than or equal to 2.00%) or 0.75% or more (in the case of a Portfolio Loan with a spread over the applicable reference rate at the time such Portfolio Loan was first acquired by the Issuer greater than 2.00%) primarily due to a deterioration in the related borrower's financial ratios or financial results and not as a result of general market conditions; provided, however, that the criteria in this paragraph (b) may be used only as corroboration of other bases for the Servicer's judgment;

(c) which is a CLO Security, a decline in the par amount of underlying collateral such that the aggregate par amount of the entire class of securities to which such item of Portfolio Collateral belongs and all other securities secured by the same pool of collateral and that rank senior in priority of payment to such class of securities exceeds the aggregate par amount of all collateral (excluding defaulted collateral) securing such securities; or

(d) it is a Deferred Interest PIK Bond or a partial Deferred Interest PIK Bond.

"Credit Risk Portfolio Collateral": Any item of Portfolio Collateral (other than an item of Defaulted Portfolio Collateral) which, in the Servicer's commercially reasonable judgment consistent with the standard of care set forth in the Servicing Agreement (which judgment shall not be questioned as a result of subsequent events; provided that in forming such judgment an increase in credit spread or a decrease in Market Value of such item of Portfolio Collateral may only be initialized as corroboration of other bases of such judgment), (i) is likely to decline in credit quality and, with the passage of time, become Defaulted Portfolio Collateral and (ii) if a Sales Restriction Condition has occurred, otherwise satisfies the Credit Risk Criteria.

"Cumulative Class X Payment": With respect to any Payment Date and the Class X Notes, the Class X Payment with respect to such Payment Date and the Class X Shortfall Amount, if any, with respect to such Payment Date.

"Cumulative Interest Amount": With respect to a Payment Date and a Class of Notes, the applicable Periodic Interest Amount with respect to such Payment Date and the applicable Periodic Rate Shortfall Amount, if any, with respect to such Payment Date.

"Current Pay Obligation": An item of Portfolio Collateral that would otherwise be an item of Defaulted Portfolio Collateral but as to which (i) no interest payments (including deferred interest) or scheduled principal payments are due and payable that are unpaid and the Servicer reasonably expects that the issuer or obligor of such item of Portfolio Collateral will continue to make scheduled payments in cash of interest or principal thereon and will pay the principal thereof by maturity, (ii) if the issuer or obligor of such item of Portfolio Collateral is subject to a bankruptcy proceeding, a bankruptcy court has authorized the payment of interest due and payable on such item of Portfolio Collateral, and (iii) either (a) the Market Value of such item of Portfolio Collateral is equal to or greater than 80% of par and the Moody's Rating of such item of Portfolio Collateral is at least "Caa1" or (b) the Market Value of such item of Portfolio Collateral is equal to or greater than 85% of par and the Moody's Rating of such item of Portfolio Collateral is at least "Caa2" (or, if the Moody's Rating has been withdrawn, the Moody's Rating of such item of Portfolio Collateral was at least "Caa2" prior to withdrawal) or (c) if the Moody's Rating of such item of Portfolio Collateral is less than "Caa2" or is "Caa2" and on credit watch with negative implications, but greater than or equal to "Caa3" without credit watch with negative implications, the Market Value of the such item of Portfolio Collateral is at least equal to 90% of its Principal Balance; provided that if the Moody's Rating of the item of Portfolio Collateral has been withdrawn but the obligation had a Moody's rating of at least "Caa3" without credit watch with negative implications at the time of default, such item of Portfolio Collateral may be treated as a Current Pay Obligation if its Market Value is at least equal to 90% of its Principal Balance.

"Current Portfolio": As described under "Security for the Notes—S&P CDO Monitor Test."

"Debt Security": Each Structured Finance Investment and interests in corporate and other debt securities (including senior secured rate floating notes) included in the Portfolio Collateral (other than Eligible Investments,

008283

CLO Securities and Portfolio Loans) and, for the avoidance of doubt, Portfolio Loans shall not be considered Debt Securities.

"Default": Any event or condition the occurrence or existence of which would, with the giving of notice or lapse of time or both become, an Event of Default.

"Defaulted Portfolio Collateral": Any item of Portfolio Collateral (other than an item of Portfolio Collateral which is a DIP Loan, unless such item of Portfolio Collateral itself is in default since acquisition), including with respect to a Synthetic Security, the related Reference Obligation, with respect to which:

(i) the issuer thereof has defaulted in the payment of principal or interest (in respect of Portfolio Loans only, beyond five Business Days, *provided* the Servicer certifies in writing to the Trustee that it believes, in its reasonable business judgment, that such delay is not credit related), unless, in the case of a failure of such issuer to make required interest payments, such issuer has resumed current cash payments of interest and paid in full any accrued interest due and payable thereon;

(ii) such item of Portfolio Collateral is *pari passu* with or subordinated to other material indebtedness for borrowed money owing by the issuer thereof ("Other Indebtedness") and such issuer has defaulted in the payment of principal or interest (beyond any applicable grace or notice period and without regard to any waiver of such default) on such Other Indebtedness, unless, in the case of a failure of such issuer to make required interest payments, such issuer has resumed current cash payments of interest and has paid in full any accrued interest due and payable thereon;

(iii) certain bankruptcy or insolvency events have occurred;

(iv) the Servicer has knowledge (or such rating information has been published) that the issuer thereof is rated "D" or "SD" (or S&P has withdrawn its rating which prior to such withdrawal was rated "D" or "SD");

(v) there has been proposed or effected any distressed exchange or other distressed debt restructuring where the issuer of such Portfolio Collateral has offered the debt holders a new security or package of securities that, in the commercially reasonable judgment of the Servicer amounts to a diminished financial obligation;

(vi) such item of Portfolio Collateral is declared to be an item of Defaulted Portfolio Collateral by the Servicer, but only so long as it remains so designated by the Servicer in its sole discretion; or

(vii) such item of Portfolio Collateral is a CLO Security which is rated "CC" or below by S&P (or S&P has withdrawn its rating which prior to such withdrawal was rated "CC"), or rated "C" or "Ca" or below by Moody's;

*provided* that any item of Portfolio Collateral that is classified as an item of "Defaulted Portfolio Collateral" will cease to be so classified if such item of Portfolio Collateral, at any date thereafter, (a) would not otherwise be classified as an item of Defaulted Portfolio Collateral in accordance with the definition of such term and (b) otherwise meets the collateral criteria described herein as of such date.

"Default Swap": Any U.S. dollar denominated "pay as you go" credit default swap or total return swap with respect to a Reference Obligation, which the Issuer (directly or indirectly) purchased from or entered into with a Default Swap Counterparty, which contains equivalent probability of default, recovery upon default (or a specific percentage thereof), expected loss, maturity, interest rate and other non-credit characteristics as those of the related Reference Obligation (without taking account of such considerations as they relate to the Default Swap Counterparty); *provided that* (i) the Reference Obligation is a CLO Security, (ii) such Default Swap will not cause the Issuer to be treated as engaged in a trade or business in the United States for U.S. Federal income tax purposes or otherwise subject the Issuer to U.S. Federal income tax on a net income tax basis, (iii) either (a) amounts receivable by the Issuer are not expected to (based on the Servicer's determination, which may include consultation with counsel to the Issuer) be subject to U.S. or foreign withholding tax in respect of the Default Swap or (b) the Default Swap Counterparty is required to make "gross-up" payments pursuant to the related Underlying Instruments that cover the full amount of any such withholding tax on an after-tax basis (including any tax on such additional

008284

payments), (iv) the Issuer has caused to be deposited in a Default Swap Collateral Account an amount in cash at least equal to the aggregate of (or the amount required under the terms of the Synthetic Security to provide for) all further payments (contingent or otherwise) that the Issuer is or may be required to make to the Default Swap Counterparty under the Default Swap; (v) the agreement relating to such Default Swap contains "non-petition" provisions with respect to the Issuer and "limited recourse" provisions limiting the Default Swap Counterparty's rights in respect of the Default Swap Collateral to the funds and other property credited to the Default Swap Collateral Account related to such Default Swap; (vi) the notional amount of such Default Swap is equal to the principal amount of the Reference Obligation; (vii) the agreement relating to such Default Swap Collateral contains provisions to the effect that upon the occurrence of an "Event of Default" or "Termination Event" (other than an "Illegality" or "Tax Event"), if any, where the Default Swap Counterparty is the sole "Defaulting Party" or the sole "Affected Party" ("Event of Default," "Termination Event," "Illegality," "Tax Event," "Defaulting Party" or "Affected Party," as applicable, as such terms are defined in the ISDA Master Agreement relating to such Default Swap), (a) the Issuer may terminate its obligations under such Default Swap and upon such termination and payment of any termination amount payable under the Default Swap, any lien in favor of the Default Swap Counterparty over its related Default Swap Collateral Account will be terminated and (b) upon payment of any termination amount payable under the Default Swap, the Issuer will no longer be obligated to make any payments to the Default Swap Counterparty with respect to such Default Swap, (viii) any Default Swap shall be positively indexed to the related Reference Obligation on no more than a one-to-one basis, (ix) if any Reference Obligation delivered pursuant to any Default Swap does not constitute Portfolio Collateral and it would cause any collateral quality test or concentration limitation not to be satisfied, such Reference Obligation shall be deemed Equity Portfolio Collateral, and (x) (a) such Default Swap shall be documented with a standard ISDA form master agreement, as modified by appropriate schedules and confirmations and (b) (1) such Default Swap is a Form-Approved Synthetic Security or (2) the Rating Condition has been satisfied with respect to the purchase of or entry into such Default Swap.

"Default Swap Collateral": Means cash, securities or other collateral purchased or posted by the Issuer for the benefit of the Default Swap Counterparty in connection with the purchase of a Default Swap, including without limitation a payment of cash or delivery of securities by the Issuer.

"Default Swap Collateral Account": The account established by the Trustee under the Indenture with respect to Default Swap Collateral, which account will be held in the name of the Trustee in trust for the benefit of the related Default Swap Counterparty.

"Default Swap Counterparty": Any entity, whose long term senior unsecured debt or derivatives counterparty rating shall be at least "A2" by Moody's and a long term rating of at least "A" or a short term rating of at least "A-1" by S&P, required to make payments on Synthetic Portfolio Collateral pursuant to the terms of such Default Swap or any guarantee thereof to the extent that a Reference Obligor makes payments on a related Reference Obligation.

"Default Swap Counterparty Termination Payment": An amount payable by the Issuer to a Default Swap Counterparty that is due following the designation of an "Early Termination Date" (as defined in the related credit default swap) (other than in respect of "Illegality" or a "Tax Event" (each as defined in the related credit default swap)), as to which the Default Swap Counterparty is the sole "Defaulting Party" or the sole "Affected Party" (as each such term is defined in the ISDA Master Agreement related to such Synthetic Security).

"Default Swap Issuer Account": The account established by the Trustee under the Indenture with respect to any Synthetic Security if the terms of such Default Swap require the Default Swap Counterparty to secure its obligations with respect to such Default Swap, which account will be held in the name of the Trustee in trust for the benefit of the Noteholders and the other secured parties under the Indenture.

"Deferred Interest PIK Bond": As of any date of determination, any PIK Bond that is not an item of Defaulted Portfolio Collateral that has, in accordance with its terms, deferred or paid "in-kind" any amount of interest for a period equal to:

(a) in the case of an item of Portfolio Collateral that has a Moody's Rating below "Baa3" (or, if rated "Baa3," is on credit watch for possible downgrade) or, if rated by S&P, a rating by S&P below "BBB-" (or, if rated "BBB-," is on credit watch for possible downgrade), the shorter of one accrual period or six months; and

(b)       in all other cases, the shorter of two accrual periods or twelve months;

and has not, as of such date of determination, resumed timely payment of current interest in cash and repaid all outstanding deferred or capitalized interest in cash. For the avoidance of doubt, an item of Portfolio Collateral will not constitute a Deferred Interest PIK Bond if it resumes timely payment of current interest in cash and repays all outstanding deferred or capitalized interest in cash on the Payment Date immediately succeeding the end of the interest accrual period(s) set forth above.

"Definitive Notes": With respect to any Class, the definitive fully registered Notes of each Class sold in the United States to Qualified Institutional Buyers who are U.S. Persons or issued in lieu of a Regulation S Global Note under the circumstances described herein.

"Delayed Drawdown Loan": A Portfolio Loan that, pursuant to the related Underlying Instrument or Underlying Loan and Security Agreement and lender or lenders, would obligate the Issuer, if the Issuer were to become a lender thereunder by purchasing such Portfolio Loan for inclusion in the Trust Estate, to make or otherwise fund one or more future advances to the related borrower and meeting the criteria described under "Security for the Notes—Criteria for Purchase and Substitution of Collateral"; provided that, if a Delayed Drawdown Loan has been drawn in full and there are no future advance obligations to the related borrower, such Portfolio Loan will no longer be considered a Delayed Drawdown Loan.

"Deposit": The cash deposited in the Initial Deposit Account on the Closing Date, including any reimbursement for amounts withdrawn therefrom as described under "Security for the Notes—Accounts" (excluding any Account Income thereon), which amount shall include certain amounts related to interest received on Portfolio Collateral as specified in the Indenture.

"DIP Loan": Any interest in a loan or financing facility (a) which at the time of purchase is an obligation of a debtor-in-possession pursuant to Section 364 of United States the Bankruptcy Code, (b) the terms of which have been approved by an order of a United States Bankruptcy Court, a United States District Court, or any other court of competent jurisdiction, the enforceability of which order is not subject to any pending contested matter or proceeding (as such terms are defined in the Federal Rules of Bankruptcy Procedure), (c) which has the priority allowed by either Section 364(c) or 364(d) of the Bankruptcy Code, (d) which pays interest in cash on a current basis and (e) as to which the obligor has paid its most recent scheduled interest and principal payments (if any) and the Servicer reasonably expects that such obligor will continue to pay interest and principal payments. For purposes hereof, a DIP Loan shall not be considered a Current Pay Obligation. Any DIP Loan added as an item of Portfolio Collateral must be assigned a formal or estimated rating by each of the Rating Agencies.

"Discount Portfolio Collateral": (a) Any Portfolio Loan which had a Moody's Rating of at least "B3" at the time of purchase and which was purchased at a price less than 85% of the Principal Balance thereof, (b) any Portfolio Loan which had a Moody's Rating below "B3" at the time of purchase and which was purchased at a price less than 90% of the Principal Balance thereof, (c) any item of Portfolio Collateral which is not a Portfolio Loan and which had a Moody's Rating of at least "B3" at the time of purchase and which was purchased at a price less than 80% of the Principal Balance thereof, (d) any item of Portfolio Collateral which is not a Portfolio Loan and which had a Moody's Rating below "B3" at the time of purchase and which was purchased at a price less than 85% of the Principal Balance thereof and (e) any CLO Security which had a Moody's Rating of "Aa3" or greater at the time of purchase or originally rated "Aa3" or greater by Moody's which was purchased at a price less than 92% of the Principal Balance thereof and the provisions outlined below will not be applicable to these CLO Securities with a Moody's Rating of at least "Aa3"; provided that, (i) any item of Portfolio Collateral that would otherwise be considered Discount Portfolio Collateral, but that has a Market Value above 90% of its Principal Balance for 22 consecutive Business Days if it is a Portfolio Loan or above 85% of its Principal Balance for 60 consecutive days if it is a CLO Security, after being purchased by the Issuer, will no longer be considered Discount Portfolio Collateral and (ii) any item of Portfolio Collateral that would otherwise be considered Discount Portfolio Collateral, but that is purchased with the proceeds of sale of an item of Portfolio Collateral that was not an item of Discount Portfolio Collateral at the time of its purchase, so long as such item of Portfolio Collateral (a) was purchased or committed to be purchased within five Business Days of such sale, (b) was purchased at a price (as a percentage of par) equal to or greater than the sale price of the sold item of Portfolio Collateral, (c) was purchased at a purchase price not less than 65% of the Principal Balance thereof and (d) had a rating equal to or greater than the rating of the sold item of

Portfolio Collateral, will not be considered Discount Portfolio Collateral. Notwithstanding the foregoing, at no time during the period commencing on the Closing Date through the Final Maturity Date, shall the Aggregate Principal Amount of all items of Discount Portfolio Collateral purchased pursuant to clause (ii) exceed in the aggregate 10% of the Required Portfolio Collateral Amount; *provided* that no more than 3% of the Required Portfolio Collateral Amount of such 10% cumulative limitation may consist of CLO Securities; *provided* that if a Portfolio Loan purchased pursuant to clause (ii) above is repaid in full, is sold for a price equal to at least 97.5% of its unpaid Principal Balance or has a Market Value above 90% of its Principal Balance for at least 22 consecutive Business Days after being purchased, such Portfolio Loan shall not be taken into account for purposes of clause (ii) above; *provided* further that, as of any date of determination, the Aggregate Principal Amount of items of Portfolio Collateral in the Trust Estate purchased pursuant to clause (ii) above, may not exceed (x) 5% of the Aggregate Par Amount or (y) if the weighted average purchase price of Portfolio Collateral purchased pursuant to clause (b) above is less than 75% as of such date of determination, 2.5% of the Aggregate Par Amount.

"<u>Distributable Equity Securities</u>": Any and all Equity Portfolio Collateral, which cannot be sold by the Servicer as a result of the regulatory, market or other restrictions, as determined in good faith by the Servicer, and shall have the value as determined by an independent third party with relevant experience in making such valuation.

"<u>DTC</u>": The Depository Trust Company or any successor thereto.

"<u>Due Period</u>": With respect to any Payment Date, the period beginning on the day following the last day of the immediately preceding Due Period (or, in the case of the Due Period that is applicable to the first Payment Date beginning on the Closing Date) and ending at the close of business on the seventh Business Day preceding such Payment Date.

"<u>Effective Date</u>": The earlier of (i) the first date on which the Deposit has been applied to the purchase (or committed to the purchase), of Original Portfolio Collateral such that the Aggregate Principal Amount of the Portfolio Collateral (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to any of the Original Portfolio Collateral on or before the Effective Date) is at least equal to the Required Portfolio Collateral Amount or (ii) September 10, 2006.

"<u>Eligible Investments</u>": Any U.S. dollar denominated investment that is one or more of the following (including security entitlements thereto):

        (a) direct registered obligations of, and registered obligations fully guaranteed by, the United States of America or any agency or instrumentality of the United States of America the obligations of which are backed by the full faith and credit of the United States of America or United States Security Entitlements (as defined in the Indenture) other than obligations or security entitlements of the Federal Home Loan Mortgage Corporation; *provided, however,* that, in the case of obligations or United States Security Entitlements that are rated, each such obligation shall, at the time of its inclusion in the Trust Estate, have a credit rating of "AA-" or better or "A-1+" or better, as applicable, by S&P (except that Eligible Investments in an amount up to 20% of the Aggregate Principal Amount of the Notes Outstanding may be rated "A-1") and "Aa3" or better (if such obligation has a long-term rating) or "P-1" or better by Moody's, and, in each case, is not put on credit watch (with negative implications);

        (b) demand and time deposits in, trust accounts with, and certificates of deposit of, any depository institution or trust company (including the Trustee) incorporated under the laws of the United States of America or any state thereof and subject to the supervision and examination by federal and/or state banking authorities so long as the commercial paper and/or debt obligations of such depository institution or trust company (or, in the case of the principal depository institution in a holding company system, the commercial paper or debt obligations of such holding company) at the time of purchase or contractual commitment providing for such purchase have a credit rating of "AA-" or better, in the case of debt obligations, or "A-1+" or better, in the case of commercial paper, by S&P (except that Eligible Investments in an amount up to 20% of the Aggregate Principal Amount of the Notes Outstanding may be

008287

rated "A-1") and "Aa3" or better (if such obligation has a long-term rating) or "P-1" or better by Moody's, and, in each case, is not put on credit watch (with negative implications);

(c)     registered securities bearing interest or sold at a discount issued by any corporation incorporated under the laws of the United States of America or any state thereof that have a credit rating of "AA-" or better by S&P and "Aa3" or better (if such obligation has a long-term rating) or "P-1" or better by Moody's at the time of such purchase or contractual commitment providing for such purchase, and, in each case, is not put on credit watch (with negative implications);

(d)     repurchase obligations with respect to any security described in clause (a) above, entered into with a depository institution or trust company (acting as principal) described in clause (b) above (including the Trustee) or entered into with a corporation (acting as principal) whose short-term debt has a credit rating of "A-1+" (except that Eligible Investments in an amount up to 20% of the Aggregate Principal Amount of the Notes Outstanding may be rated "A-1") or better by S&P and "Aa3" or better (if such obligation has a long-term rating) or "P-1" or better by Moody's at the time of purchase in the case of any repurchase obligation for a security having a maturity not more than 183 days from the date of its issuance or whose long-term debt has a credit rating of "AA-" or better by S&P and "Aa3" or better (if such obligation has a long-term rating) by Moody's at the time of purchase in the case of any repurchase obligation for a security having a maturity more than 183 days from its date of its issuance and, in each case, is not put on credit watch (with negative implications);

(e)     commercial paper having at the time of purchase a credit rating of "A-l+" (except that an amount up to 20% of the Aggregate Principal Amount of the Notes Outstanding may be rated "A-1") or better by S&P and "Aa3" or better (if such obligation has a long-term rating) or "P-1" or better by Moody's and that has a maturity of not more than 183 days from its date of issuance; *provided, however,* that in the case of commercial paper with a maturity of longer than 91 days, the issuer of such commercial paper (or, in the case of a principal depository institution in a holding company system, the holding company of such system), if rated by S&P, must have at the time of purchase a long-term credit rating of "AA-" or better by S&P and "Aa3" or better (if such obligation has a long-term rating) by Moody's and, in each case, is not put on credit watch (with negative implications);

(f)     off-shore money market funds, which funds have, at all times, the highest credit rating assigned to such investment category by S&P and Moody's; and

(g)     such other Eligible Investments acceptable to the Rating Agencies.

*provided, however,* that: (i) Eligible Investments purchased with funds in the Collection Account shall be held until maturity (or sold only for an amount at least equal to the par amount of such Eligible Investment) and shall include only such obligations or securities as mature no later than the Business Day prior to the next Payment Date and Eligible Investments purchased with funds in the Initial Deposit Account shall be held until maturity (or sold only for an amount at least equal to the par amount of such Eligible Investment) and shall include only such obligations or securities as mature no later than the Business Day prior to the date expected to be used and in any event prior to the Initial Deposit Redemption Date; (ii) none of the foregoing obligations or securities shall constitute Eligible Investments if all, or substantially all, of the remaining amounts payable thereunder shall consist of interest and not principal payments; (iii) none of the S&P ratings required above shall have a subscript of "r", "t", "p", "pi" or "q"; (iv) none of the foregoing obligations or securities shall constitute Eligible Investments if such obligations or securities are mortgage-backed securities; (v) no such obligation may be margin stock, securities which have a mandatory or optional conversion to equity or securities which are subject to an Offer; (vi) no such obligation may have coupons or other payments that are subject to U.S. withholding tax or are subject to foreign withholding under the terms of the underlying instruments where the issuer is not required to make "gross-up" payments sufficient to cause the net amount to be received on the debt obligations to equal the amount that would have been paid had no such withholding tax applied; and (vii) any such Eligible Investment purchased on the basis of S&P's short-term rating of "A-1" shall mature not later than thirty (30) days after the date of purchase. Eligible Investments may include those Eligible Investments with respect to which the Trustee or its Affiliates provide services.

008288

"Equity Portfolio Collateral": Any security (or any other right, interest or property or securities entitlement) which does not entitle the holder thereof to receive periodic payments of interest no less frequently than semiannually and one or more installments of principal, in cash and sufficient to retire in full the stated principal amount thereof on the stated maturity date therefor; *provided, however,* that such definition will not include warrants, profit participations or similar equity-based rights that are a component of a Unit to the extent that the Aggregate Principal Amount of Portfolio Collateral in the Trust Estate with a warrant, profit participation or similar equity-based right attached thereto as a component of a Unit does not exceed 10% of the Aggregate Principal Amount of all Pledged Securities in the Trust Estate.

"ERISA": The United States Employee Retirement Income Security Act of 1974, as amended from time to time.

"Euroclear": Euroclear Bank S.A./N.V., as operator of The Euroclear System, and any successor thereto.

"Event of Default": The meaning specified herein under "Legal Structure—The Indenture—Events of Default."

"Exchange Act": The United States Securities Exchange Act of 1934, as amended.

"Exchange Date": As defined under "Description of the Notes—Form, Transfer and Transfer Restrictions."

"Exchange Offer": With respect to any item of Portfolio Collateral, (i) an offer by the issuer of such item of Portfolio Collateral or by any other Person made to all holders of such item of Portfolio Collateral to exchange such item of Portfolio Collateral held by them for an item of Equity Portfolio Collateral or other debt instruments that do not otherwise satisfy the definition of Portfolio Collateral or (ii) any solicitation by such issuer or other Person to amend, modify or waive any provision of such item of Portfolio Collateral or of the related Underlying Instrument, the effect of which would be to convert such item of Portfolio Collateral into an item of Equity Portfolio Collateral or other debt instruments that do not otherwise satisfy the definition of Portfolio Collateral.

"Expected Maturity Date": With respect to the Class X Notes, the Payment Date occurring in August 2013.

"Expense Reimbursement Account": An account maintained by the Trustee on behalf of the Issuer into which U.S. $50,000 will be deposited on the Closing Date for the purpose of paying Issuer Base Administrative Expenses which are paid between Payment Dates when they are due and payable during such time.

"Extended Final Maturity Date": Shall mean, if a Maturity Extension has occurred, the sixteenth Payment Date after the then current Extended Final Maturity Date (or, in the case of the First Extended Final Maturity Date, the Payment Date in August 2025).

"Extended Revolving Period End Date": As defined under "Confidential Offering Circular Summary—Extension of the Revolving Period and the Final Maturity Date."

"Extended Weighted Average Life Date": As defined under "Confidential Offering Circular Summary—Extension of the Revolving Period and the Final Maturity Date."

"Extension": Shall mean an extension of the Revolving Period, the Stated Maturity of the Notes and the Weighted Average Life Test in accordance with the Indenture.

"Extension Bonus Payment": Shall mean, with respect to each Maturity Extension, a single payment to each applicable Noteholder set forth in "Description of the Notes— Extension of the Revolving Period and the Final Maturity Date" in an amount equal to (1) in the case of the Class A-1LA Notes, 0.25% of the Aggregate Principal Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, (2) in the case of the Class A-1LB Notes, 0.25% of the Aggregate Principal Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, (3) in the case of the Class A-2L Notes, 0.25% of the Aggregate Principal Amount thereof held by such beneficial owner as of the applicable Extension Date, (4) in the case of the Class A-3L Notes, 0.50% of the Aggregate Principal Amount thereof held by such beneficial owner as of the applicable

008289

Extension Effective Date, (5) in the case of the Class A-4L Notes, 0.50% of the Aggregate Principal Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, and (6) in the case of the Class B-1L Notes, 0.50% of the Aggregate Principal Amount thereof held by such beneficial owner as of the applicable Extension Effective Date.

"Extension Bonus Eligibility Certification": Shall mean, with respect to each Maturity Extension and each beneficial owner of Notes other than Extension Sale Securities, the written certification by such beneficial owner acceptable to the Issuer to the effect that it held Notes other than Extension Sale Securities on the applicable Extension Effective Date, including the Aggregate Principal Amount thereof and wire transfer instructions for the Extension Bonus Payment and any required documentation thereunder.

"Extension Conditions": As defined under "Description of the Notes—Extension of the Revolving Period and the Final Maturity Date."

"Extension Determination Date": Shall mean the 8th Business Day prior to each Extension Effective Date.

"Extension Effective Date": As defined under "Confidential Offering Circular Summary—Extension of the Revolving Period and the Final Maturity Date."

"Extension Notice": As defined under "Description of the Notes—Extension of the Revolving Period and the Final Maturity Date."

"Extension Purchase Price": Shall mean the purchase price payable by the Extension Qualifying Purchasers for Extension Sale Securities in connection with each Maturity Extension, if any, in an amount equal to (i) in the case of the Notes, the Aggregate Principal Amount thereof, plus accrued and unpaid interest as of the applicable Extension Effective Date (giving effect to any amounts paid to the Holder on such date), (ii) in the case of the Preferred Shares, an amount that, when taken together with all payments and distributions made in respect of such Preferred Shares since the Closing Date would cause such Preferred Shares to have received (as of the date of purchase thereof) an Internal Rate of Return of 12.0% (assuming such purchase date was a "Payment Date" under the Indenture); *provided, however, that* if the applicable Extension Effective Date is on or after the date on which such Holders have received an Internal Rate of Return equal to or in excess of 12.0%, the applicable Extension Purchase Price for such Preferred Shares shall be zero.

"Extension Qualifying Purchasers": Shall mean the Servicer (or any of its Affiliates acting as principal or agent); provided that in the event the Servicer elects not to purchase Securities from Holders pursuant to the Extension Conditions set forth in "Description of the Notes—Extension of the Revolving Period and the Final Maturity Date"; "Extension Qualifying Purchasers" shall mean one or more qualifying purchasers (which may include the Initial Purchaser or any of its Affiliates acting as principal or agent) designated by the Servicer; *provided, however*, none of the Servicer, the Initial Purchaser, or any of their respective Affiliates shall have any duty to act as an Extension Qualifying Purchaser.

"Extension Sale Notice": As defined under "Description of the Notes—Extension of the Revolving Period and the Final Maturity Date."

"Extension Sale Notice Period": As defined under "Description of the Notes—Extension of the Revolving Period and the Final Maturity Date."

"Extension Sale Securities": As defined under "Description of the Notes—Extension of the Revolving Period and the Final Maturity Date."

"Final Maturity Date": With respect to the Notes (other than the Class X Notes) the Payment Date occurring in August 2021 and with respect to the Class X Notes, the Payment Date occurring in August 2013 or such earlier date on which the Aggregate Principal Amount of each Class of Notes, is paid in full, including in connection with an Optional Redemption; *provided that* the "Final Maturity Date" with respect to the Notes (other than the Class X Notes) will be extended to the applicable Extended Final Maturity Date upon the occurrence of a Maturity Extension.

"Fitch": Fitch Ratings or any successor thereto.

008290

"Fixed Rate Collateral": An item of Portfolio Collateral that bears interest at a fixed rate.

"Floating Rate Collateral": An item of Portfolio Collateral that bears interest at a floating rate.

"Form-Approved Synthetic Security": A Synthetic Security (a)(i) the Reference Obligation of which would be eligible for purchase by the Issuer as an item of Portfolio Collateral without any required action by the Rating Agencies or for which each of the Rating Agencies has confirmed in writing that the use of which would not result in a reduction or withdrawal of the then-current rating of any Class of Notes or (ii) the Reference Obligation of which would satisfy clause (i) but for the currency in which it is payable and such Synthetic Security is payable in U.S. dollars, does not provide for physical settlement and does not expose the Issuer to currency risk, (b) the documentation of which conforms (but for the amount and timing of periodic payments, the name of the Reference Obligation, the notional amount, the effective date, the termination date and other similarly necessary changes) to a form in respect of which each of the Rating Agencies has confirmed in writing that the use of which would not result in a reduction or withdrawal of the then-current rating of any Class of Notes was previously obtained, (c) which provides that any "credit event" thereunder shall not include restructuring (other than modified restructuring as defined in the 2003 ISDA Credit Derivative Definitions), repudiation, moratorium, obligation default or obligation acceleration unless such Synthetic Security may be settled only through a physical settlement of a deliverable obligation to the Issuer and not in cash, (d) which has been certified in writing by the Servicer to the Trustee and the Issuer as meeting the requirements of this definition and (e) for which the Issuer has provided S&P and Moody's notice of the purchase of such Synthetic Security no less than five Business Days prior to such purchase; *provided* that Moody's or S&P may revoke its consent to a Form-Approved Synthetic Security upon 30 days' written notice to the Trustee and the Issuer.

"Global Note": Rule 144A Global Notes, together with Regulation S Global Notes.

"Group A Country": Australia, Canada, the United Kingdom, the Federal Republic of Germany or The Netherlands (so long as the U.S. dollar denominated sovereign debt obligations of such jurisdiction are rated at least "Aa2" by Moody's and the foreign currency issuer credit rating assigned by S&P to such jurisdiction is at least "AA" and, in each case, is not put on credit watch (with negative implications)).

"Group B Country": Austria, Belgium, Bermuda, Denmark, Finland, France, Ireland, Italy, Liechtenstein, Luxembourg, New Zealand, Norway, Portugal, Spain, Sweden or Switzerland or any other member state of the European Union (as of the Closing Date) identified from time to time by the Servicer and subject to the satisfaction of the Rating Condition with respect to each Rating Agency with respect thereto (so long as the U.S. dollar denominated sovereign debt obligations of such jurisdiction are rated at least "Aa2" by Moody's and the foreign currency issuer credit rating assigned by S&P to such jurisdiction is at least "AA" and, in each case, is not put on credit watch (with negative implications)).

"HFP": Highland Financial Partners, L.P., or an affiliate or subsidiary thereof, in each case, an affiliate of the Servicer.

"HFP Shares": Preferred Shares beneficially owned or controlled by HFP.

"Highland": Highland Capital Management, L.P.

"Holder" and "Noteholder": The Person in whose name a Note is registered in the Note Register or in whose name a Preferred Share is registered in the Preferred Share Register.

"Indenture": The Indenture to be dated as of May 10, 2006 among the Issuer, the Co-Issuer and JPMorgan Chase Bank, National Association, as trustee and as securities intermediary, pursuant to which the Notes will be issued, as it may be amended or supplemented from time to time.

"Initial Consent Period": Shall mean the period of 15 Business Days from but excluding the date on which the Trustee provided notice of a proposed supplemental indenture pursuant to the Indenture to the Holders of any Notes or Preferred Shares.

008291

"Initial Deposit Account": An account maintained by the Trustee on behalf of the Issuer into which the cash constituting the Deposit will be deposited on the Closing Date pending use to purchase additional Original Portfolio Collateral.

"Initial Deposit Redemption": A redemption of the Class X Notes and the Class A-1LA Notes as described under "Description of the Notes—Initial Deposit Redemption."

"Initial Deposit Redemption Date": The November 2006 Payment Date.

"Initial Portfolio Collateral": The Portfolio Collateral that, in the case of CLO Securities, will be purchased on or prior to the Closing Date and, in the case of Portfolio Loans, will be purchased on or before the Closing Date or identified by the Issuer and for which commitments will be entered into on or prior to the Closing Date for purchase on or as soon as practicable after (not scheduled to exceed sixty (60) days after) the Closing Date with the net proceeds from the sale of the Notes and the net proceeds from the sale of the Preferred Shares on the Closing Date, which Initial Portfolio Collateral is set forth in the Indenture.

"Initial Portfolio Collateral Amount": U.S.$765,000,000 (or such larger Aggregate Principal Amount of Portfolio Collateral as may be purchased on or before the Closing Date by the Issuer).

"Initial Purchaser": Bear, Stearns & Co. Inc.

"Insured Notes": As described under "Description of the Notes—Option to Acquire Bond Insurance."

"Interest Coverage Ratio": As described under "Description of the Notes—Interest Coverage Test".

"Interest Coverage Test": A test which is applicable on each Payment Date after the second Payment Date and will be satisfied as of such determination date if the Interest Coverage Ratio will be at least 1.5%.

"Internal Rate of Return": With respect to any Payment Date, the annualized discount rate at which the sum of the discounted values of the following cashflows is equal to zero, assuming discounting on a quarterly basis as of each Payment Date: (1) the Notional Amount of the Preferred Shares (which amount will be deemed to be negative for purposes of this calculation), (2) each distribution of Collateral Interest Collections made to the holders of the Preferred Shares on any prior Payment Date and, to the extent necessary to reach the applicable Internal Rate of Return, such Payment Date and (3) each distribution of Collateral Principal Collections made to the holders of the Preferred Shares on any prior Payment Date and, to the extent necessary to reach the applicable Internal Rate of Return, such Payment Date.

"Investment Company Act": The United States Investment Company Act of 1940, as amended from time to time.

"Investor Corp.": Rockwall Investors Corp., a Cayman Islands limited liability company, which will hold all of the Class I Preferred Shares, and which will issue its preferred shares to third party investors.

"Irish Paying Agent": RSM Robson Rhodes LLP, or any successors thereto.

"Issuer": Rockwall CDO Ltd., an exempted company incorporated with limited liability under the laws of the Cayman Islands.

"Issuer Base Administrative Expenses": With respect to any Payment Date, the administrative expenses paid or payable by the Issuer during the applicable Due Period, including, without limitation, taxes, government fees, indemnities, registered office fees and expenses for third party loan pricing services and accountants, if any, in the following order: (i) *pro rata*, taxes of the Co-Issuers, surveillance fees, shadow rating fees and credit estimate fees, if any, of the Rating Agencies; fees due to any Listing and Paying Agent; fees due to any stock exchange on which any Class of the Notes or the Preferred Shares are listed; governmental fees, registered office fees and any other fees which are deemed necessary by the Servicer for administration of the Trust Estate, and (ii) *pro rata*

008292

reimbursement of expenses (including indemnities) of the Servicer required to be paid pursuant to the Servicing Agreement; and all expenses of the Administrator, the Listing and Paying Agent, the Securities Intermediary (if not the same person as the Trustee), the accountants, any fiscal agent retained in connection with the issuance of income notes, if any, in which the primary collateral for such income notes are obligations of the Issuer, any expenses of Investor Corp. and all other administrative expenses of the Co-Issuers, each as determined as of the Calculation Date relating to such Payment Date and as set forth in the related Note Valuation Report.

"Issuer Excess Administrative Expenses": With respect to any Payment Date, (i) the administrative expenses (including indemnities) or other amounts paid or payable by the Issuer during the applicable Due Period, as determined as of the Calculation Date relating to such Payment Date and as set forth in the related Note Valuation Report, in excess of the amount of the Issuer Base Administrative Expenses for the corresponding period, (ii) the Trustee's administrative expenses for the Due Period relating to such Payment Date in excess of the amount provided for in the definition of Trustee Administrative Expenses and (iii) Preferred Shares Administrative Expenses for the Due Period relating to such Payment Date in excess of the amount provided for in clause (B) under "Description of the Notes—Adjusted Collateral Collections."

"LIBOR": For any Periodic Interest Accrual Period, the London interbank offered rate for three-month U.S. dollar deposits as determined by the Calculation Agent as described under "Description of the Notes—Payments on the Notes; Priority of Distributions" herein. LIBOR for the initial Periodic Interest Accrual Period will be determined through the use of straight-line interpolation by reference to two rates calculated in accordance with the provisions above, one of which shall be for five-month U.S. dollar deposits and the other of which shall be for six-month U.S. dollar deposits.

"LIBOR Determination Date": The second London Business Day prior to the commencement of a Periodic Interest Accrual Period.

"Loan Funding Account": An account maintained by the Trustee on behalf of the Issuer into which the Issuer will be required to remit the full amount of the Issuer's commitment to make or otherwise fund draws related to any Delayed Drawdown Loans and Revolving Loans in the Portfolio Collateral.

"London Business Day": Any day on which dealings in deposits in U.S. dollars are transacted in the London interbank market.

"Majority": With respect to the Notes, the Holders of more than 50% of the Aggregate Principal Amount of the Outstanding Notes, voting as a single class; provided that upon the occurrence of a Default or an Event of Default under the Indenture, "Majority" shall mean the Holders of more than 50% of the Controlling Class, voting together as a single class. With respect to the Preferred Shares, the Holders of more than 50% of the Preferred Shares.

"Mandatory Redemption": An O/C Redemption or a Rating Confirmation Failure Redemption.

"Market Value": On any date of determination with respect to an item of Portfolio Collateral, any of:

(a) the average of the bid-side prices for the purchase of such item of Portfolio Collateral determined by an Approved Pricing Service that derives valuations by polling broker-dealers (independent from the Servicer); or

(b) the arithmetic average of bid-side quotations for the purchase of such item of Portfolio Collateral obtained by the Servicer from three or more broker-dealers (provided if upon reasonable efforts of the Servicer, quotations from three broker-dealers are not available, the lower of the quotations from two broker-dealers may be used), in each case, independent from the Servicer, in the relevant market; provided that one such bid must be from a broker-dealer other than Bear Stearns or an Affiliate of Bear Stearns and any bid received from Bear Stearns or an Affiliate of Bear Stearns hereunder cannot be more than 10% higher than the next highest bid; and

(c)        if the determinations of the broker-dealers specified in the foregoing clauses (a) or (b) are not available (as reasonably determined by the Servicer) and so long as the Servicer is subject to the Investment Advisors Act of 1940, as amended, the bid-side market value of such item of Portfolio Collateral as certified by the Servicer as consistent with reasonable and customary market practice; *provided*, that, as of any date of determination (x) no more than 5.0% of the Aggregate Principal Amount of Portfolio Collateral may have market values determined in the manner provided in this clause (c) and (y) if the item of Portfolio Collateral constitutes collateral for any other issuer or account managed by the Servicer or its Affiliates, the Market Value of such item of Portfolio Collateral determined pursuant to this clause (c) shall be consistent with the market value applied by the Servicer or its Affiliates for such item of Portfolio Collateral for such for such other issuers or accounts; and

(d)        if the market value cannot be determined in the manner described in clause (a), (b) or (c) above, an amount equal to the Principal Balance of the Portfolio Collateral as of such date multiplied by the Applicable Percentage for such item of Portfolio Collateral; *provided,* that if the market value cannot be determined in the manner described in clause (a), (b) or (c) above for more than thirty (30) Business Days immediately following any date such market value is determined pursuant to this clause (d), then the market value of such item of Portfolio Collateral shall be automatically deemed to be zero following such thirty (30) Business Day period until the market value can be determined in the manner described in clause (a), (b) or (c) above as of any date of determination;

*provided* that (A) for purposes of determining Market Value, but subject to clause (b) hereof, Bear Stearns will be deemed to be independent from the Servicer (*provided* that any quotes received from such entity will be on an arm's-length basis); (B) the Market Value of any item of Portfolio Collateral with respect to which the Issuer has entered into a commitment to sell but has not settled will be deemed to be the agreed sales price therefor (determined exclusive of accrued interest); and (c) the Market Value is determined only for purposes of compliance with covenants, coverage tests, overcollateralization tests, or any other requirements or tests set forth herein, or the determination of redemption prices.

"Maturity Extension":  As defined under "Confidential Offering Circular Summary—Extension of the Revolving Period and the Final Maturity Date."

"Minimum Average Recovery Rate":  As described under "Security for the Notes—Criteria for Purchase and Substitution of Collateral—Collateral Quality Matrix Tests."

"Minimum Average Recovery Rate Test":  As described under "Security for the Notes—Criteria for Purchase and Substitution of Collateral—Minimum Average Recovery Rate Test."

"Moody's":  Moody's Investors Service, Inc. or any successor thereto.

"Moody's Asset Correlation Test" or "MAC Test":  As described under "Security for the Notes—Criteria for Purchase and Substitution of Collateral—Moody's Asset Correlation Test and Weighted Average Rating Test."

"Moody's Rating":  The rating determined in accordance with the methodology described in the Indenture.

"Non-Call Period": The period beginning on the Closing Date and ending on August 1, 2010.

"Non-Consenting Holder":  With respect to any supplemental indenture proposed pursuant to the Indenture that requires the consent of one or more Holders of the Notes or the Preferred Shares, any such Holder, or, in the case of Notes or Preferred Shares in global form, any beneficial owner, that either (i) has declared in writing that it will not consent to such supplemental indenture or (ii) has not consented to such supplemental indenture within 15 Business Days from the date on which the Trustee provided notice of such proposed supplemental indenture pursuant to the Indenture to such Holder or beneficial owner; *provided,* that in the case of the Non-Call Period, "Non-Consenting Holder" shall exclude any Holder of Class A-1LA Notes (unless such Holder has consented in writing to be designated as a Non-Consenting Holder) and the Amendment Buy-Out Option shall not be applicable to such Class A-1LA Notes.

008294

"Non-U.S. Obligor":  An issuer of or obligor on an item of Portfolio Collateral that is located outside the United States and is not a Permitted Non-U.S. Obligor.

"Note Valuation Report":  With respect to each Payment Date, the report prepared by or on behalf of the Issuer in accordance with the Indenture reflecting, among other things, the Collections made during the applicable Due Period and the distributions to be made on such Payment Date.

"Notes":  The Class X Notes, the A-1LA Notes, the Class A-1LB Notes, the Class A-2L Notes, the Class A-3L Notes, the Class A-4L Notes and the Class B-1L Notes.

"Notional Amount":  When used with respect to the Preferred Shares as of any date of determination, $1.00 per Preferred Share.

"O/C Redemption":  The redemption of a Class or Classes of the Notes other than the Class X Notes (including, with respect to the Class B-1L Notes, the applicable Periodic Rate Shortfall Amount, as described herein) to the extent necessary such that both the Overcollateralization Tests and the Interest Coverage Test are satisfied.

"Offer":  With respect to any security, (a) any offer by the issuer of such security or by any other Person made to all of the holders of such class of security to purchase or otherwise acquire all such securities (other than pursuant to any redemption in accordance with the terms of the related Underlying Instruments) or to exchange such securities for any other security or other property or (b) any solicitation by the issuer of such security or any other Person to amend, modify or waive any provision of such security or any related Underlying Instrument.

"Optional Redemption":  The redemption of the Notes, in whole or in part, at the direction of a specified amount of Preferred Shares, on any Optional Redemption Date and in accordance with the terms specified herein.

"Optional Redemption Date":  The Payment Date fixed by the Issuer for an Optional Redemption which shall be no earlier than the first Payment Date occurring in August 1, 2010.

"Optional Redemption Price":  With respect to each Class of Notes, an amount equal to the aggregate of (i) the Aggregate Principal Amount of such Class of Notes as of the Optional Redemption Date, (ii) the applicable Cumulative Interest Amount with respect to the Optional Redemption Date and (iii) any unpaid Extension Bonus Payments in respect of such Notes.

For any Partial Optional Redemption, the Optional Redemption Price shall be equal to the applicable Partial Redemption Percentage of the Optional Redemption Price that would have applied for a Total Optional Redemption occurring on the applicable Optional Redemption Date.

"Original HFP Share Amount":  The amount of HFP Shares acquired by the Servicer Entities on the Closing Date.

"Original Portfolio Collateral":   The Portfolio Collateral, including the Initial Portfolio Collateral, purchased by the Issuer with the Deposit on or before the Effective Date and, in the case of Portfolio Loans, which will be identified by the Issuer and for which commitments will be entered into on or prior to the Effective Date for purchase on or as soon as practicable thereafter (but not scheduled to exceed sixty (60) days thereafter).

"Outstanding":  With respect to the Notes, as of the date of determination, "Outstanding" refers to all Notes theretofore authenticated and delivered under the Indenture except:

(i)    Notes theretofore canceled by the Registrar or delivered (or to be delivered pursuant to the Indenture) to the Registrar for cancellation;

(ii)    Notes or portions thereof for whose payment or redemption money in the necessary amount has been theretofore irrevocably deposited with the Trustee or any Paying Agent in trust for the Holders of such Notes; *provided* that, if such Notes or

008295

portions thereof are to be redeemed, notice of such redemption has been duly given pursuant to the Indenture or provision therefor satisfactory to the Trustee has been made;

(iii) Notes in exchange for or in lieu of which other Notes have been authenticated and delivered pursuant to the Indenture, unless proof satisfactory to the Trustee is presented that any such Notes are held by a protected purchaser; and

(iv) Notes alleged to have been mutilated, destroyed, lost or stolen for which replacement Notes have been issued as provided in the Indenture;

*provided* that, in determining whether the Holders of the requisite Aggregate Principal Amount have given any request, demand, authorization, direction, notice, consent or waiver under the Indenture, Notes owned by or pledged to the Issuer, the Trustee or any other obligor upon the Notes or any Affiliate of the Issuer, the Trustee or of such other obligor, and solely for purposes of termination of the Servicer, the Servicer and any Affiliate thereof, shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Notes that a responsible officer of the Trustee has actual knowledge to be so owned or pledged shall be so disregarded.

With respect to the Preferred Shares, as of the date of determination, "Outstanding" refers to the total aggregate amount of all Class I Preferred Shares and Class II Preferred Shares issued and outstanding as indicated in the share register of the Issuer.

"Overcollateralization Haircut Amount": With respect to any date of determination, an amount equal to the sum of:

(A) the greatest of the following:

(a) the product of (i) the applicable Overcollateralization Haircut Percentage multiplied by (ii) the Aggregate Principal Amount of all CLO Securities (other than Deferred Interest PIK Bonds and Defaulted Portfolio Collateral) on such date of determination that have an S&P Rating or a Moody's Rating within the CCC Rating Category;

(b) the product of (i) the applicable Overcollateralization Haircut Percentage multiplied by (ii) the excess, if any, of (x) the Aggregate Principal Amount of all CLO Securities included in the pledged Portfolio Collateral (other than Deferred Interest PIK Bonds and Defaulted Portfolio Collateral) on such date of determination that have an S&P Rating or a Moody's Rating within the B Rating Category or an S&P Rating or a Moody's Rating within the CCC Category over (y) 5.0% of the Aggregate Par Amount as of the date of the applicable Overcollateralization Test; *provided* that at no time during the period commencing on the Closing Date through the Final Maturity Date, shall the Aggregate Principal Amount of all CLO Securities exempt from haircut based on subclause (y) above exceed in the aggregate 5% of the Required Overcollateralization Collateral Amount; and

(c) the product of (i) the applicable Overcollateralization Haircut Percentage multiplied by (ii) the excess, if any, of (x) the Aggregate Principal Amount of all CLO Securities included in the pledged Portfolio Collateral (other than Deferred Interest PIK Bonds and Defaulted Portfolio Collateral) on such date of determination that have an S&P Rating or a Moody's Rating within the BB Rating Category, the B Rating Category or the CCC Rating Category over (y) 10.25% of the Aggregate Par Amount as of the date of the applicable Overcollateralization Test; *provided* that if at the date of measurement, Portfolio Loans within the CCC Rating Category is less than 6.25% of the Aggregate Par Amount, then 10.25% will be increased by the difference between 6.25% and percentage of the Aggregate Par Amount representing Portfolio Loans in the CCC Rating Category;

*provided that* for the avoidance of doubt, for purposes of clauses (a), (b) and (c) above, the applicable Overcollateralization Haircut Percentage shall always be applied first to the lowest rated Portfolio Collateral that falls within such clause, then to the next lowest rated Portfolio Collateral, etc., so that the maximum applicable haircut shall be applied to the Portfolio Collateral;

plus

008296

(B)     the product of (i) the applicable Overcollateralization Haircut Percentage multiplied by (ii) the excess, if any, of (x) the Aggregate Principal Amount of all Portfolio Loans included in the pledged Portfolio Collateral (other than Deferred Interest PIK Bonds and Defaulted Portfolio Collateral) on such date of determination that have an S&P Rating or a Moody's Rating within the CCC Rating Category over (y) 6.25% of the Aggregate Par Amount as of the applicable Overcollateralization Test.

"Overcollateralization Haircut Percentage": (i) With respect to CLO Securities with an S&P Rating or a Moody's Rating falling within the BB Rating Category, 10%, (ii) with respect to CLO Securities with an S&P Rating or a Moody's Rating falling within the B Rating Category, 20%, (iii) with respect to Portfolio Loans with an S&P Rating or a Moody's Rating falling within the CCC Rating Category, the greater of (x) 30% and (y) one minus the weighted average Market Value of all Portfolio Loans with an S&P Rating or a Moody's Rating falling within the CCC Rating Category and (iv) with respect to CLO Securities with an S&P Rating or a Moody's Rating falling within the CCC Rating Category, 50%.

"Overcollateralization Ratio": The Class A Overcollateralization Ratio or the Class B-1L Overcollateralization Ratio, as the context may require.

"Overcollateralization Ratio Adjustment": As described under "Description of the Notes—Overcollateralization Tests."

"Overcollateralization Tests": With respect to any date of determination, tests met when the Class A Overcollateralization Ratio is at least equal to the Class A Overcollateralization Percentage and the Class B-1L Overcollateralization Ratio is at least equal to the Class B-1L Overcollateralization Percentage, each relating to such date of determination.

"Partial Deferred Interest Bonds": Any debt obligation, with respect to which a portion of the interest thereon can be partially deferred without causing a payment default of such debt obligation under its underlying documents. For purposes of calculating the Weighted Average Coupon, the portion of interest that is deferrable with respect to any Partial Deferred Interest Bond will be assumed to be zero.

"Partial Optional Redemption": An Optional Redemption in part, in accordance with the terms specified herein.

"Participation": With respect to a Portfolio Loan, a participation interest in a commercial loan purchased from a Selling Institution which does not entitle the holder thereof to direct rights against the obligor.

"Paying Agent": The Trustee, the Irish Paying Agent or any other depository institution or trust company authorized by the Co-Issuers pursuant to the Indenture to pay principal of or any interest that may become payable on any Class of Notes on behalf of the Co-Issuers.

"Paying and Transfer Agency Agreement": The Paying and Transfer Agency Agreement dated as of May 10, 2006, relating to the Preferred Shares.

"Paying and Transfer Agent": JPMorgan Chase Bank, National Association, as Paying and Transfer Agent with respect to (i) the Preferred Shares and (ii) the preferred shares issued by Investor Corp.

"Payment Date": November 1, February 1, May 1 and August 1 of each year, commencing November 1, 2006 (or if any such date is not a Business Day, the next succeeding Business Day).

"Payment Date Equity Securities": With respect to any Payment Date, Distributable Equity Securities that the Issuer, in its sole discretion but on the advice of the Servicer, elects to distribute in lieu of cash on such Payment Date to the Holders of Preferred Shares in accordance with the terms hereof.

"Periodic Interest": With respect to each Class of Notes, interest on such Class payable on each Payment Date and accruing during each Periodic Interest Accrual Period at the Applicable Periodic Rate.

008297

"<u>Periodic Interest Accrual Period</u>": With respect to any Payment Date, the period commencing on the prior Payment Date (or the Closing Date in the case of the first Payment Date) and ending on the day preceding such Payment Date.

"<u>Periodic Interest Amount</u>": With respect to the Class A-1LA Notes, the Class A-1LB and the Class X Notes and any Payment Date, the aggregate amount of interest accrued at the Applicable Periodic Rate during the related Periodic Interest Accrual Period on (i) with respect to the first Payment Date, the daily average Aggregate Principal Amount of such Class of Notes during such Periodic Interest Accrual Period, and (ii) thereafter, the Aggregate Principal Amount of such Class of Notes on the first day of such Periodic Interest Accrual Period (after giving effect to any payment of principal of such Class of Notes on such day). With respect to each other Class of Notes and any Payment Date, the aggregate amount of interest accrued at the Applicable Periodic Rate during the related Periodic Interest Accrual Period on the Aggregate Principal Amount of such Class on the first day of such Periodic Interest Accrual Period (after giving effect to any payment of principal of such Class of Notes on such date, including in connection with a redemption of a Class of Notes on any date during the related Periodic Interest Accrual Period).

"<u>Periodic Rate Shortfall Amount</u>": With respect to each Class of Notes and any Payment Date, any shortfall or shortfalls in the payment of the Periodic Interest Amount on such Class of Notes with respect to any preceding Payment Date or Payment Dates together with interest accrued thereon at the Applicable Periodic Rate (net of all Periodic Rate Shortfall Amounts, if any, paid with respect to such Class of Notes prior to such Payment Date).

"<u>Periodic Reserve Amount</u>": As of any date of determination, an amount equal to the sum of (i) the Trustee Administrative Expenses and Preferred Shares Administrative Expenses payable on the next succeeding Payment Date; (ii) without duplication of amounts payable pursuant to clause (i) hereof, the Issuer Base Administrative Expenses payable on the next succeeding Payment Date; (iii) the Base Fee Amount payable on the next succeeding Payment Date; (iv) the Cumulative Interest Amount for the Class A-1LA Notes, the Class A-1LB, the Class A-2L Notes, the Class A-3L and the Class A-4L Notes and the Periodic Interest Amount for the Class B-1L Notes due on the next succeeding Payment Date; and (v) the Cumulative Class X Payment due on the next succeeding Payment Date.

"<u>Permanent Regulation S Global Note</u>": With respect to any Class, the permanent global note issued to non-U.S. Persons in exchange for the Temporary Regulation S Global Note of such Class after the Distribution Compliance Period.

"<u>Permitted Non-U.S. Obligor</u>": An issuer of or obligor on an item of Portfolio Collateral that is located in (a) a Group A Country or (b)(i) a Group B Country, (ii) any tax advantaged jurisdiction (including the Cayman Islands, Netherlands Antilles, Bermuda, Ireland, Luxembourg and the Channel Islands) or (iii) any tax advantaged jurisdiction or any tax neutral or other jurisdiction subject to Moody's and S&P confirming to the Issuer, the Trustee and the Servicer that an immediate withdrawal, reduction or other adverse action with respect to any then current rating (including any private or confidential rating) of any Class of Notes will not occur as a result of such obligor being a Permitted Non-U.S. Obligor; *provided* that, with respect to the obligors of an item of Portfolio Collateral qualifying as Permitted Non-U.S. Obligors under this clause (b)(ii), at least 80% of such obligor's underlying assets must be domiciled in the United States or another Permitted Non-U.S. Obligor jurisdiction to so qualify as a Permitted Non-U.S. Obligor. For purposes of this definition, the Servicer may specify the location of a Permitted Non-U.S. Obligor to be the country in which at least 80% of such obligor's underlying assets are domiciled, if such assets are domiciled in the United States or another Permitted Non-U.S. Obligor jurisdiction; *provided* that the Aggregate Principal Amount of the Portfolio Collateral as to which the Servicer so specifies the location of a Permitted Non-U.S. Obligor may not exceed 5% of the Aggregate Par Amount. If the location of a Permitted Non-U.S. Obligor is specified by the Servicer to be in a country other than where it is domiciled in accordance with the foregoing sentence, for purposes of the concentration limitations and collateral quality tests described herein, such item of Portfolio Collateral will be considered to be domiciled in the country so specified.

"<u>Person</u>": Any individual, corporation, partnership, limited liability company, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization or government or any agency or political subdivision thereof.

008298

"PIK Bond": Any item of Portfolio Collateral that, pursuant to the terms of the related Underlying Instruments, permits the payment of interest thereon to be deferred and capitalized or otherwise provides that interest will accrue on such deferred interest or that issues identical securities in place of payments of interest in cash.

"Pledged Securities": On any date of determination, the Portfolio Collateral and the Eligible Investments in the Trust Estate.

"Portfolio Collateral": As described under "Security for the Notes—Portfolio Collateral—General."

"Portfolio Improvement Exchange": The disposition, during the Revolving Period, of an item of Portfolio Collateral and corresponding acquisition of one or more items of Substitute Portfolio Collateral which in the aggregate will result in (i) the collateral quality tests, the Interest Coverage Test, the Overcollateralization Tests and the other collateral criteria herein being satisfied (or bring the total Portfolio Collateral closer to compliance with any such test or limitation) or if one or more of such collateral quality tests, Interest Coverage Test, Overcollateralization Tests or collateral criteria is not satisfied, the degree of compliance therewith would be improved and (ii) improving, on a net basis, the quality of the Portfolio Collateral as measured by such collateral quality tests, Interest Coverage Test, Overcollateralization Tests and collateral criteria, and (iii) in the case of each of clause (i) and (ii) not causing any other collateral quality tests, Interest Coverage Test, Overcollateralization Tests or collateral criteria, to be violated or significantly increase the likelihood of such violation in the future.

"Portfolio Loan": Interests in commercial loans included in the Portfolio Collateral.

"Preferred Shares": The 33,200,000 Class I Preferred Shares of the Issuer, par value U.S.$0.001 per share, and the 45,000,000 Class II Preferred Shares of the Issuer, par value U.S.$0.001 per share, that will be issued on the Closing Date pursuant to the Issuer's Memorandum of Association and Articles of Association and any other Preferred Shares issued from time to time by the Issuer.

"Preferred Shares Administrative Expenses": With respect to any Payment Date (including without limitation the Final Maturity Date), the Paying and Transfer Agent's administrative expenses for the Due Period relating to such Payment Date.

"Premium": With respect to any item of Portfolio Collateral sold pursuant to the terms of the Indenture or called pursuant to the terms thereof, the excess of (a) the sale or call price of such item of Portfolio Collateral less any accrued interest with respect to such item of Portfolio Collateral over (b) the Aggregate Principal Amount of such item of Portfolio Collateral.

"Principal Balance": With respect to any Pledged Security, as of any date of determination, the outstanding principal amount of such Pledged Security, *provided* that (i) unless otherwise stated herein or in the Indenture, the "Principal Balance" of any Delayed Drawdown Loan or Revolving Loan shall refer to the sum of the outstanding aggregate principal amount of such Delayed Drawdown Loan or Revolving Loan *plus* the amount of the unfunded portion of the Issuer's commitment to make or otherwise fund advances related thereto (to the extent, and without duplication, of amounts on deposit in the Loan Funding Account available to fund such advances), (ii) the "Principal Balance" of any Synthetic Security shall be equal to (a) in the case of any Synthetic Security other than a Default Swap, the outstanding principal amount of the Reference Obligation or the notional amount of the Synthetic Security related thereto and (b) in the case of any Default Swap, the cash and the principal amount of the securities in the related Default Swap Collateral Account reduced by the amount of any payments due and payable to the Default Swap Counterparty by reason of the occurrence of one or more "credit events" or other similar circumstances to the extent such payments have not yet been made; and (iii) with respect to any item of Equity Portfolio Collateral, the "Principal Balance" shall equal zero.

"Priority of Payments": The priority of payments described under "Description of the Notes—Payments on the Notes; Priority of Distributions" in this Confidential Offering Circular.

"Proposed Portfolio":  As described under "Security for the Notes—S&P CDO Monitor Test."

"Purchase Agreement":  The Purchase Agreement, dated the Closing Date, between the Issuer and the purchaser of the Notes identified therein.

"Purchased Accrued Interest":  Interest accrued on or purchased with respect to an item of Portfolio Collateral as part of the price paid by the Issuer to acquire such item of Portfolio Collateral less any amount of Collateral Interest Collections applied by the Issuer to acquire such accrued interest at the time of purchase; *provided* that for the purchase of certain CLO Securities as of the Closing Date, such accrued interest purchased in connection therewith will not be considered Purchased Accrued Interest as set forth in the Indenture.

"Qualified Institutional Buyer":  A "qualified institutional buyer" as defined in Rule 144A(a)(1) promulgated under the Securities Act.

"Qualified Purchaser":  A "qualified purchaser" as defined in Section 3(c)(7) of the Investment Company Act.

"Quarterly Collateral Amount":  Shall mean, with respect to any Due Period, the average of (i) the Aggregate Principal Amount of Portfolio Collateral on the first day of such Due Period and (ii) the Aggregate Principal Amount of Portfolio Collateral on the last day of such Due Period.  For purposes of such amounts, Equity Portfolio Collateral and Defaulted Portfolio Collateral shall be excluded in calculating the Aggregate Principal Amount of the Portfolio Collateral.

"Rating Agencies":  S&P and Moody's, collectively.

"Rating Condition":  With respect to any Rating Agency and any action proposed to be taken under the Indenture, a condition that is satisfied when such Rating Agency has confirmed in writing to the Issuer, the Trustee and the Servicer that no withdrawal, reduction or suspension with respect to any then current rating, if any, by such Rating Agency (including any private or confidential rating) of any Class of Notes will occur as a result of such proposed action.

"Rating Confirmation":  Written confirmation from each of the Rating Agencies that it has not reduced or withdrawn (and not restored) the rating assigned by it on the Closing Date to any Class of Notes.

"Rating Confirmation Failure":  A failure to obtain Rating Confirmation by the 35th day after the Effective Date (or if such day is not a Business Day, the succeeding Business Day).

"Rating Confirmation Failure Redemption":  The redemption of a Class or Classes of Notes, as a result of a Rating Confirmation Failure.

"Record Date":  With respect to any Payment Date, the Business Day immediately preceding such Payment Date; *provided, however*, that if any Definitive Notes are issued, the Record Date for such Definitive Notes shall be the fifteenth day of the calendar month preceding the month in which such Payment Date occurs.

"Reference Banks":  Four major banks in the London interbank market selected by the Calculation Agent (after consultation with the Servicer).

"Reference Obligation":  A security or other debt obligation that satisfies the definition of Portfolio Collateral other than as to payment terms; *provided that* notwithstanding the definition thereof, a Reference Obligation may be a loan (but not a participation interest in a loan, except as permitted in the Indenture).

"Reference Obligor":  The obligor under a Reference Obligation.

"Registrar":  The Trustee.

"Regulation S Global Notes": Temporary Regulation S Global Notes, together with the Permanent Regulation S Global Notes.

"Relevant Date": As used in the Indenture, when referring to Initial Portfolio Collateral pledged to the Trustee on the Closing Date, the Closing Date and when referring to Portfolio Collateral pledged after the Closing Date, the date of such pledge.

"Required Portfolio Collateral Amount": U.S.$850,000,000.

"Requisite Noteholders": The Holders of at least 60% of the Aggregate Principal Amount of the Outstanding Notes (voting as a single class); *provided* that following the occurrence of a Default or an Event of Default under the Indenture, "Requisite Noteholders" shall mean 60% of the Aggregate Principal Amount of the Controlling Class, voting together as a single class. If the Person that is acting as Trustee under the Indenture is a Holder of any Note for its own account, such Person shall be excluded as a Holder for purposes of this definition in connection with the consent or approval by Noteholders of any supplemental indenture affecting the provisions thereof relating to the Trustee.

"Reserve Account": An account maintained by the Trustee for the benefit of the Noteholders and the other secured parties under the Indenture, over which the Trustee shall have exclusive control and the sole right of withdrawal at the direction of the Servicer.

"Reserve Amount": A portion of the proceeds from the sale of the Notes in an amount equal to US$1,600,000 to fund a portion of the payments to be made on any Payment Date in accordance with the Priority of Payments, or to otherwise fund any payments of interest or principal on the Notes at the direction and the sole discretion of the Servicer.

"Reset Debt Security": An item of Portfolio Collateral bearing a rate of interest that varies periodically (including, without limitation, daily) which at the time of its inclusion in the Trust Estate has a minimum rate of interest of at least 5.0% *per annum* with respect to Fixed Rate Collateral or Collateral LIBOR with respect to Floating Rate Collateral, and which minimum interest rate is not subject to adjustment on and after its inclusion in the Trust Estate, pursuant to the terms of the related Underlying Instrument, to a rate of interest which is lower than the rate of interest borne by such item of Portfolio Collateral on the date that such item of Portfolio Collateral was included in the Trust Estate.

"Retained Accrued Interest": Any accrued and unpaid interest with respect to any Portfolio Collateral which was not included in the purchase price for such collateral at the time of purchase.

"Revolving Loan": A Portfolio Loan that, pursuant to the Underlying Instrument or Underlying Loan and Security Agreement that governs the rights and obligations of the parties thereto, would obligate the Issuer, if the Issuer were to purchase such Portfolio Loan for inclusion in the Trust Estate, to make or otherwise fund one or more future advances to the related borrower and meets the criteria described under "Security for the Notes—Criteria for Purchase and Substitution of Collateral."

"Revolving Period": The period beginning on the Closing Date and ending on the earliest of (i) August 1, 2011 for Portfolio Loans or August 1, 2009 for CLO Securities or, in the case of an Extension, the Extended Revolving Period End Date; *provided* that Portfolio Loans and CLO Securities may be purchased for the full period of any such Extension, and (ii) the occurrence and continuance of an Event of Default; *provided* that in no event shall such date of termination of the Revolving Period be determined on the basis of the Market Value of the Portfolio Collateral.

"Rule 144A Global Note": With respect to any Class, the permanent global note issued to U.S. Persons.

"Rule 3a-7": Rule 3a-7 under the Investment Company Act.

"S&P": Standard & Poor's Ratings Services, a division of The McGraw Hill Companies, Inc. or any successor thereto.

008301

"<u>S&P Break-Even Default Rate</u>": As described under "Security for the Notes—S&P CDO Monitor Test."

"<u>S&P CDO Monitor</u>": As described under "Security for the Notes—S&P CDO Monitor Test."

"<u>S&P CDO Monitor Test</u>": As described under "Security for the Notes—S&P CDO Monitor Test."

"<u>S&P Loss Differential</u>": As described under "Security for the Notes—S&P CDO Monitor Test."

"<u>S&P Rating</u>": The rating determined in accordance with the methodology described in the Indenture.

"<u>S&P Scenario Default Rate</u>": As described under "Security for the Notes—S&P CDO Monitor Test."

"<u>Sale Restriction Condition</u>": As defined under "Security for the Notes—Changes in Composition of Portfolio Collateral."

"<u>Scheduled Distribution</u>": With respect to any Pledged Security, for each due date after the date of determination, the scheduled payment of principal and/or interest due on such due date with respect to such Pledged Security, determined in accordance with the assumptions set forth in the Indenture.

"<u>Securities</u>": The Notes and the Preferred Shares, collectively.

"<u>Securities Act</u>": The United States Securities Act of 1933, as amended.

"<u>Selling Institution</u>": The seller of a Participation or, if applicable, its guarantor, which has a long-term senior unsecured debt rating of at least "A2" by Moody's and at least "A" by S&P at the time such Participation is committed to be acquired by the Issuer.

"<u>Senior Class A Notes</u>": The Class A-1LA Notes, the Class A-1LB and the Class A-2L Notes.

"<u>Senior Class A Overcollateralization Ratio</u>": With respect to a determination made as of any date of calculation, the ratio (expressed as a percentage) obtained by dividing (a) the sum of (1) the Aggregate Principal Amount of the Portfolio Collateral in the Trust Estate (other than items of Equity Portfolio Collateral, which shall not be included as Portfolio Collateral) as of such date, *plus* (2) the sum of the Balance of Eligible Investments and cash in the Collection Account representing Collateral Principal Collections *plus* the Balance of Eligible Investments and cash in the Initial Deposit Account *plus* unpaid Purchased Accrued Interest, each as of such date by (b) the sum of the Aggregate Principal Amount of the Senior Class A-1L Notes (including for this purpose any Periodic Rate Shortfall Amounts with respect to such Class of Notes not paid when due, until such amounts, if any, are paid in full) as of such date.

"<u>Senior Secured Loan</u>": A loan that (i) is not (and by its terms is not permitted to become) subordinate in right of payment to any other debt for borrowed money incurred by the obligor under such loan and (ii) is secured by a valid first priority perfected security interest or lien on specified collateral securing the obligor's obligations under such Senior Secured Loan, which security interest or lien is not subordinate to the security interest or lien securing any other debt for borrowed money.

"<u>Servicer</u>": Highland Capital Management, L.P., until a successor Person becomes the manager pursuant to the provisions of the Servicing Agreement, and thereafter "Servicer" shall mean such successor Person.

"<u>Servicer Entities</u>": Collectively, the Servicer, entities affiliated with the Servicer or clients of the Servicer.

"<u>Servicing Agreement</u>": The Servicing Agreement, dated as of the Closing Date, between the Issuer and the Servicer, and if amended as permitted therein and in the Indenture, as so amended.

008302

"Servicing Fee Portion":  100% minus (a) for any Payment Date prior to the two-year anniversary of the Closing Date, the Class II Preferred Share Percentage for such Payment Date and (b) for any other Payment Date, a percentage selected by the Servicer in its sole discretion.

"Special Redemption":  As described under "Description of the Notes—Special Redemption."

"Substitute Portfolio Collateral":  An item of Portfolio Collateral that is purchased by the Trustee as security for the Notes as described herein with the proceeds of the sale of other Portfolio Collateral.

"Supplemental Fee Amount":  As described under "The Servicing Agreement—Compensation."

"Supplemental Servicing Fee":  For any Payment Date, an amount equal to the product of (a) the Supplemental Fee Amount for such Payment Date and (b) the Servicing Fee Portion for such Payment Date.

"Suspension Trigger Event":  As of any date of determination, (I) the ratio (expressed as a percentage) obtained by dividing (a) the sum of (1) the Aggregate Principal Amount of the Portfolio Collateral in the Trust Estate as of such date, calculated in accordance with the Overcollateralization Ratio Adjustment less the Overcollateralization Haircut Amount, if any, plus (2) the sum of the Balance of Eligible Investments and cash in the Collection Account, representing Collateral Principal Collections plus the Balance of Eligible Investments and cash in the Initial Deposit Account plus unpaid Purchased Accrued Interest, each as of such date by (b) the sum of the Aggregate Principal Amount of the Class A-1L Notes (including for this purpose any unpaid Periodic Rate Shortfall Amounts with respect to such Classes of Notes not paid when due, until such amounts, if any, are paid in full) as of such date, is than (II) 110%.

"Synthetic Security":  Any (I) U.S. dollar denominated swap transaction, security issued by a trust or similar vehicle or other asset purchased from or entered into by the Issuer with a Synthetic Security Counterparty the returns on which (as determined by the Servicer) are linked to the credit performance of a Reference Obligation, but which may provide for a different maturity, payment dates or interest rate or interest rate basis than such Reference Obligation; *provided* that, either (A) (i) such Synthetic Security will not require the Issuer to make any payment to the Synthetic Security Counterparty after the initial purchase thereof by the Issuer, (ii) the ownership of such Synthetic Security, based on the Servicer's determination (which may include consultation with counsel to the Issuer), is not expected to subject the Issuer to withholding tax, (iii) such Synthetic Security terminates on or prior to the redemption or repayment in full of the Reference Obligation, (iv) the principal amount of such Synthetic Security is equal to the principal amount of the Reference Obligation, (v) all scheduled payments made pursuant to the terms of such Synthetic Security are at a fixed or floating interest rate based on an interest rate used for borrowings or financings in domestic or international markets or are linked to the payments on one or more Reference Obligations (which payments are themselves at a fixed interest rate or such floating rate), (vi) the minimum coupon on such Synthetic Security is 6.0%, if such Synthetic Security is fixed rate, (vii) the minimum margin on such Synthetic Security is 0.60%, if such Synthetic Security is floating rate, (viii) the terms of such Synthetic Security provide that upon maturity, acceleration or any early termination of such Synthetic Security, the Synthetic Security Counterparty of such Synthetic Security must deliver the Reference Obligation or an amount greater than or equal to the then par amount of the Reference Obligation, except (a) the Issuer may accept an amount equal to the fair market value of the Reference Obligation if the Servicer chooses to terminate such Synthetic Security in connection with the sale of such Synthetic Security as Credit Risk Portfolio Collateral, Credit Improved Portfolio Collateral, Defaulted Portfolio Collateral or Equity Portfolio Collateral or pursuant to the right of the Issuer to sell Portfolio Collateral which is not Credit Improved Portfolio Collateral, Credit Risk Portfolio Collateral, Defaulted Portfolio Collateral or Equity Portfolio Collateral or (b) following a credit event with respect to the Reference Obligation, the Issuer may accept an amount equal to the fair market value of such Reference Obligation; provided, however, that this clause (viii) shall not apply to an acceleration or early termination upon the exercise of any put or call provision of the Synthetic Security or any Reference Obligation, (ix) upon the exercise of any put or call provision of the Synthetic Security or any Reference Obligation, the holder of such Synthetic Security will receive a Reference Obligation or an amount greater than or equal to the par amount of such Reference Obligation, plus, if the Reference Obligation is a bond, accrued interest, (x) such Synthetic Security will not constitute a commodity option, leverage transaction or futures contract that is subject to the jurisdiction of the U.S. Commodity Futures Trading Commission, (xi) the acquisition of such Synthetic Security would not cause the Issuer to be "engaged in a U.S. trade or business" for Federal income tax purposes or otherwise to become subject to U.S.

corporate net income tax, (xii) the Underlying Instrument with respect to such Synthetic Security is governed by the laws of the State of New York, contains a non-petition clause and a limited recourse clause, each as against the Issuer, and is documented with a standard ISDA form master agreement, as modified by appropriate schedules and confirmations and (xiii) total payments including termination payments may not exceed the notional amount of such Synthetic Security; *provided* that if any Reference Obligation delivered pursuant to any Synthetic Security does not constitute Portfolio Collateral and would cause a breach of any concentration limitation, such Reference Obligation shall be deemed Equity Portfolio Collateral, and (B) (i) such Synthetic Security is a Form-Approved Synthetic Security or (ii) the Rating Condition has been satisfied with respect to the purchase of such Synthetic Security; *provided* further, that any Synthetic Security shall be positively indexed to the related Reference Obligation on no more than a one-to-one basis and (II) any Default Swap.

"Synthetic Security Counterparty": An entity which is required to make payments to the Issuer on a Synthetic Security to the extent that the issuer of the related Reference Obligation makes payments thereon pursuant to the terms of such Synthetic Security and any Default Swap Counterparty.

"Tax Event Redemption": As defined under "Description of the Notes—Tax Event Redemption."

"Tax Event Redemption Price": With respect to each Class of Notes an amount equal to the aggregate of (i) the Aggregate Principal Amount of each Class of Notes as of the Tax Event Redemption Date and (ii) the applicable Cumulative Interest Amount with respect to each Class of Notes as of the Tax Event Redemption Date.

"Temporary Regulation S Global Note": With respect to any Class, the temporary global note issued to non-U.S. Persons in Offshore Transactions (as defined in Regulation S) in reliance on Regulation S.

"Total Optional Redemption": An Optional Redemption in whole, in accordance with the terms specified herein.

"Trust Estate": All money, instruments and other property and rights subject or intended to be subject to the lien of the Indenture including all proceeds thereof, including the Portfolio Collateral and the Accounts (subject to the prior lien of the related Default Swap Counterparty to each Default Swap Collateral Account and subject to the rights of the Default Swap Counterparty in the Default Swap Issuer Account).

"Trustee": JPMorgan Chase Bank, National Association, as trustee under the Indenture.

"Trustee Administrative Expenses": With respect to any Payment Date (including without limitation the Final Maturity Date), fees, expenses or other amounts due or accrued and payable to the Trustee pursuant to the Indenture, including fees and expenses pursuant to duties performed as collateral administrator and Paying and Transfer Agent and as paying and transfer agent of Investor Corp., *provided* such payment shall not exceed on such Payment Date one-quarter of 0.0275% of the Aggregate Par Amount as of the Calculation Date relating to such Payment Date (such amount subject to a minimum of $74,000 *per annum*), *plus* $7,500 *per annum* for payments of expenses and certain other amounts specified in the Indenture.

"Underlying Instrument": With respect to any item of Portfolio Collateral, any loan participation agreement, loan assignment agreement, indenture, pooling and servicing agreement, trust agreement, instrument, or other agreement pursuant to which such item of Portfolio Collateral has been created or issued or of which the holders of such item of Portfolio Collateral are the beneficiaries, and any instrument evidencing or constituting such item of Portfolio Collateral (in the case of Portfolio Collateral evidenced by or in the form of instruments).

"Underlying Loan and Security Agreement": Any agreement (other than an Underlying Instrument) which governs the terms of or guarantees or secures the obligations represented by any Portfolio Collateral or of which the holders of such Portfolio Collateral are the beneficiaries (which in the case of a Portfolio Loan which is a Participation shall include the loan and security documentation with respect to the underlying loan).

"Unit": An item of Portfolio Collateral with a warrant, profit participation or other equity-based feature (including but not limited to convertible bonds) included as a component thereof which otherwise meets the

008304

requirements for Portfolio Collateral; *provided* that (i) the value of such warrant, profit participation or other equity-based feature at the time of purchase, as determined by the Servicer in good faith, is less than 2% of the purchase price of such item of Portfolio Collateral and (ii) such warrant, profit participation or other equity-like feature at the time of purchase shall not, relate to or be exchangeable for, margin stock.

"USA PATRIOT Act":  The Uniting and Strengthening America By Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001.

"Weighted Average Coupon":  As described under "Security for the Notes—Weighted Average Coupon Test."

"Weighted Average Coupon Test":  As described under "Security for the Notes—Weighted Average Coupon Test."

"Weighted Average Life":  As described under "Security for the Notes—Weighted Average Life Requirement."

"Weighted Average Life Requirement":  As described under "Security for the Notes—Weighted Average Life Requirement."

"Weighted Average Margin":  As described under "Security for the Notes—Weighted Average Margin Test."

"Weighted Average Margin Test":  As described under "Security for the Notes—Weighted Average Margin Test."

"Weighted Average Rating Test":  As described under "Security for the Notes—Collateral Quality Matrix Tests."

008305

No securities dealer, salesperson or other person has been authorized to give any information or to make any representation not contained in this Confidential Offering Circular and, if given or made, such information or representation must not be relied upon as been authorized by the Co-Issuers or the Initial Purchaser. This Confidential Offering Circular does not constitute an offer to sell or a solicitation of an offer to buy any of the securities offered hereby in any jurisdiction to any person to whom it is unlawful to make such offer in such jurisdiction. Neither the delivery of this Confidential Offering Circular nor any sale made hereunder shall, under any circumstances, create any implication that the information herein is correct as of any time subsequent to the date hereof or that there has been no change in the affairs of the Co-Issuers or the Portfolio Collateral.

———————————

TABLE OF CONTENTS

Page

Notices to Purchasers...................................................iii
Available Information.................................................vi
Confidential Offering Circular Summary..................1
Special Considerations ...........................................16
The Issuer and the Co-Issuer ...................................30
Description of the Notes ...........................................32
Security for the Notes ..............................................56
Maturity and Prepayment Considerations...............70
Legal Structure ........................................................72
Delivery of the Notes; Transfer Restrictions;
  Settlement ...........................................................78
Certain Tax Considerations .....................................80
Cayman Islands Tax Consequences..........................84
Certain ERISA Considerations ................................85
Certain Legal Investment Considerations................87
Ratings.....................................................................87
Use of Proceeds .......................................................88
Plan of Distribution .................................................88
The Servicer.............................................................89
The Servicing Agreement ........................................92
Certain Legal Matters ..............................................96
Glossary of Certain Defined Terms......................A-1

ROCKWALL CDO LTD.

ROCKWALL CDO (DELAWARE) CORP.

U.S.$538,000,000 Class A-1LA Floating
Rate Extendable Notes Due August 2021

U.S.$96,000,000 Class A-1LB Floating
Rate Extendable Notes Due August 2021

U.S.$76,000,000 Class A-2L Floating
Rate Extendable Notes Due August 2021

U.S.$36,500,000 Class A-3L Floating
Rate Extendable Notes Due August 2021

U.S.$10,000,000 Class A-4L Floating
Rate Extendable Notes Due August 2021

U.S.$21,000,000 Class B-1L Floating
Rate Extendable Notes Due August 2021

U.S.$14,000,000 Class X Floating Rate Notes Due
August 2013

CONFIDENTIAL OFFERING CIRCULAR

# Bear, Stearns & Co. Inc.

## May 8, 2006

# EXHIBIT UU

008307

**IMPORTANT NOTICE**

Attached is an electronic copy of the Offering Circular (the "Offering Circular"), dated May 8, 2006 relating to the offering by Rockwall CDO Ltd. (the "Issuer") of 33,200,000 Class I Preferred Shares, par value U.S. $0.001 per share, and 45,000,000 Class II Preferred Shares, par value U.S. $0.001 per share.

No registration statement relating to these securities has been filed with the United States Securities and Exchange Commission. These securities are being offered pursuant to an exemption from the registration requirements of the United States Securities Act of 1933, as amended. This Offering Circular is confidential and will not constitute an offer to sell or the solicitation of an offer to buy, nor will there be any sale of these securities in any jurisdiction where such offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of any jurisdiction.

No purchase of these securities may be made except pursuant to this Offering Circular. This Offering Circular may be transmitted electronically, but each investor in the securities should receive a printed version of the final Offering Circular prior to purchase. If you do not receive a printed version of the final Offering Circular, please contact your Initial Purchaser representative at the address provided herein.

Distribution of this electronic transmission of the Offering Circular to any person other than (a) the person receiving this electronic transmission from the Initial Purchaser on behalf of the Issuer and/or the Co-Issuer and (b) any person retained to advise the person receiving this electronic transmission with respect to the offering contemplated by the Offering Circular (each, an "Authorized Recipient") is unauthorized. Any photocopying, disclosure or alteration of the contents of this Offering Circular, and any forwarding of a copy of this Offering Circular or any portion thereof by electronic mail or any other means to any person other than an Authorized Recipient, is prohibited. By accepting delivery of this Offering Circular, each recipient hereof agrees to the foregoing.

008308

## CONFIDENTIAL OFFERING CIRCULAR

## ROCKWALL CDO LTD.

## 33,200,000 CLASS I PREFERRED SHARES, PAR VALUE U.S. $0.001 PER SHARE

## 45,000,000 CLASS II PREFERRED SHARES, PAR VALUE U.S. $0.001 PER SHARE

The Class I Preferred Shares (the "**Class I Preferred Shares**") and the Class II Preferred Shares (the "**Class II Preferred Shares**" and, together with the Class I Preferred Shares, the "**Preferred Shares**") will be issued by Rockwall CDO Ltd. (the "**Issuer**"), an exempted limited liability company incorporated under the laws of the Cayman Islands. The Issuer was incorporated on June 7, 2005 and has no significant prior operating history.

INVESTORS INTERESTED IN PURCHASING PREFERRED SHARES SHOULD REVIEW THE CONFIDENTIAL OFFERING CIRCULAR RELATING TO THE NOTES ATTACHED HERETO (THE "**NOTE OFFERING CIRCULAR**") IN CONJUNCTION WITH THIS CONFIDENTIAL OFFERING CIRCULAR. Capitalized terms used herein and not otherwise defined herein have the respective meanings specified in the Note Offering Circular.

The activities of the Issuer will be limited as described herein. The Issuer will receive all of the net proceeds of the offering of the Notes and the Preferred Shares, which will be used by the Issuer to purchase Portfolio Collateral and to pay organizational expenses and the expenses of the issuance of the Notes, the Preferred Shares and the Holding Preferred Shares (as defined below).

**As described herein, the use by the Issuer of payments received in respect of the Portfolio Collateral for the payment of dividends on the Preferred Shares or redemption of the Preferred Shares will be subordinated to the use of such payments for the payment of interest on and principal of the Notes and will be payable, with respect to any Payment Date, only after all required payments are made to the holders of the Notes, the Trustee, the Paying and Transfer Agent and the Servicer and, except as described herein, after the payment of all other fees and expenses of the Issuer required to be made on such date. The ability of the holders of the Preferred Shares to vote on matters relating to the Issuer is limited.**

No.: _____          Recipient: _____

**This Confidential Offering Circular is intended for the exclusive use of the recipient whose name appears above and such recipient's advisors, and may not be reproduced or used for any other purpose or furnished to any other party.**

**For certain factors to be considered in connection with an investment in the Preferred Shares, see** "**Special Considerations**" **and** "**Notices to Purchasers**" **herein.**

There is currently no secondary market in the Preferred Shares and it is unlikely that one will develop or, if one does develop, that it will continue.

Distributions, including dividends, on the Preferred Shares will be paid solely from and to the extent of the available proceeds from the distributions on the Portfolio Collateral which is the only source of such distributions in respect of the Preferred Shares. To the extent the Portfolio Collateral is insufficient to pay dividends on or to redeem the Preferred Shares, the Issuer will have no obligation to pay any further amounts in respect of the Preferred Shares.

The Preferred Shares are being offered to "qualified institutional buyers," as defined in Rule 144A under the Securities Act of 1933, as amended (the "**Securities Act**"), and to certain persons in transactions outside the United States in reliance on Regulation S under the Securities Act each of whom is also a qualified institutional buyer. Each investor in the Preferred Shares (other than Non-U.S. Persons purchasing Preferred Shares in reliance on Regulation S) is required to be a "qualified purchaser" or "knowledgeable employee" within the meaning of Section 3(c)(7) of the Investment Company Act of 1940, as amended (the "**Investment Company Act**"). Settlement for the Preferred Shares will be made in immediately available funds.

The Preferred Shares are offered by the Issuer through Bear, Stearns & Co. Inc. ("**Bear Stearns**" or the "**Initial Purchaser**") to prospective purchasers from time to time in individually negotiated transactions at varying prices to be determined in each case at the time of sale. (See "Special Considerations—Certain Conflicts of Interest" in the Note Offering Circular.) The Preferred Shares are offered when, as and if issued by the Issuer, subject to prior sale or withdrawal, cancellation or modification of the offer without notice and subject to approval of certain legal matters by counsel and certain other conditions. See "Plan of Distribution." It is expected that delivery of the Preferred Shares will be made on or about May 10, 2006 (the "**Closing Date**"), against payment in immediately available funds. The Preferred Shares sold to Non-U.S. Persons will be represented by one or more permanent physical share certificates in fully registered definitive form (each a "**Global Preferred Share**"), which will be deposited with a specialized depository on behalf of Euroclear Bank, S.A./N.V., as operator of the Euroclear System ("**Euroclear**") and Clearstream Banking société anonyme ("**Clearstream**") on the Closing Date. Global Preferred Shares will, for purposes of trading within Euroclear and Clearstream, have a notional issue price equal to U.S. $1 for each Preferred Share. The Preferred Shares sold to U.S. Persons will be sold and delivered in definitive registered form.

## Bear, Stearns & Co. Inc.

This Confidential Offering Circular is dated May 8, 2006.

008309

<u>NOTICES TO PURCHASERS</u>

THE PREFERRED SHARES HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR THE SECURITIES LAWS OF ANY OTHER JURISDICTION, NOR HAS THE ISSUER BEEN REGISTERED UNDER THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "INVESTMENT COMPANY ACT"). THE PREFERRED SHARES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OF, U.S. PERSONS UNLESS A REGISTRATION STATEMENT WITH RESPECT THERETO IS THEN EFFECTIVE UNDER THE SECURITIES ACT OR AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT AND OTHER APPLICABLE SECURITIES LAWS IS AVAILABLE. THE ISSUER IS RELYING ON AN EXEMPTION FROM REGISTRATION UNDER THE INVESTMENT COMPANY ACT PURSUANT TO THE EXEMPTIONS PROVIDED IN RULE 3a-7 AND/OR SECTION 3(c)(7) UNDER THE INVESTMENT COMPANY ACT, AND NO TRANSFER OF PREFERRED SHARES MAY BE MADE WHICH WOULD CAUSE THE ISSUER TO BECOME SUBJECT TO THE REGISTRATION REQUIREMENTS OF THE INVESTMENT COMPANY ACT. THE PREFERRED SHARES ARE ALSO SUBJECT TO CERTAIN OTHER RESTRICTIONS ON TRANSFER DESCRIBED HEREIN AND IN THE PAYING AGENCY AGREEMENT.

EACH PURCHASER OF PREFERRED SHARES, BY ITS ACCEPTANCE THEREOF, REPRESENTS, ACKNOWLEDGES AND AGREES THAT IT WILL NOT RESELL, PLEDGE OR OTHERWISE TRANSFER SUCH PREFERRED SHARES EXCEPT IN COMPLIANCE WITH THE SECURITIES ACT AND OTHER APPLICABLE LAWS AND EXCEPT (A) IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER AS DEFINED IN RULE 144A PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER, WHOM THE SELLER HAS INFORMED, IN EACH CASE, THAT THE RESALE, PLEDGE OR OTHER TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, PROVIDED THAT SUCH PURCHASER DELIVERS ALL DOCUMENTS AND CERTIFICATIONS AS THE ISSUER OR THE PAYING AGENT MAY REASONABLY REQUEST; (B) OUTSIDE THE UNITED STATES IN COMPLIANCE WITH RULE 903 OR 904 OF REGULATION S UNDER THE SECURITIES ACT TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS ALSO A QUALIFIED INSTITUTIONAL BUYER AS DEFINED IN RULE 144A PROVIDED THAT SUCH PURCHASER DELIVERS ALL DOCUMENTS AND CERTIFICATIONS AS THE ISSUER OR THE PAYING AGENT MAY REQUEST; (C) TO THE ISSUER OR ITS AFFILIATES; OR (D) TO ANY OTHER PERSON OR ENTITY PURSUANT TO A VALID EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT PROVIDED THAT SUCH PURCHASER DELIVERS ALL DOCUMENTS AND CERTIFICATIONS AS THE ISSUER OR THE PAYING AGENT MAY REQUEST, IN EACH CASE IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAW OF THE UNITED STATES AND ANY STATE OF THE UNITED STATES AND ANY OTHER JURISDICTION IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE PAYING AGENCY AGREEMENT. IN ADDITION, THE PURCHASER OF A PREFERRED SHARE, BY ITS ACCEPTANCE THEREOF, REPRESENTS, ACKNOWLEDGES AND AGREES THAT IT WILL NOT RESELL, PLEDGE OR OTHERWISE TRANSFER SUCH PREFERRED SHARE EXCEPT TO A NON-U.S. PERSON THAT IS A QUALIFIED INSTITUTIONAL BUYER IN AN OFFSHORE TRANSACTION PURSUANT TO REGULATION S UNDER THE SECURITIES ACT OR TO A "QUALIFIED PURCHASER" OR "KNOWLEDGEABLE EMPLOYEE" WITHIN THE MEANING OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT THAT IS A QUALIFIED INSTITUTIONAL BUYER IN A TRANSACTION THAT DOES NOT CAUSE THE ISSUER TO BE REQUIRED TO REGISTER UNDER THE INVESTMENT COMPANY ACT.

008310

THE PREFERRED SHARES MAY NOT BE SOLD OR TRANSFERRED TO ANY PLAN SUBJECT TO TITLE I OF THE UNITED STATES EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), OR SECTION 4975 OF THE UNITED STATES INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), TO ANY PERSON ACTING ON BEHALF OF OR WITH "PLAN ASSETS" OF ANY SUCH PLAN, OR TO ANY OTHER "BENEFIT PLAN INVESTOR" (AS DEFINED IN UNITED STATES DEPARTMENT OF LABOR REGULATION SECTION 2510.3-101(f)(2)) (A "BENEFIT PLAN INVESTOR"), INCLUDING AN INSURANCE COMPANY GENERAL ACCOUNT, EXCEPT IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH HEREIN.

ANY SALE OR TRANSFER OF PREFERRED SHARES WHICH WOULD VIOLATE THE FOREGOING WILL BE NULL AND VOID.

THE PREFERRED SHARES ARE PART OF THE SHARE CAPITAL OF THE ISSUER AND, AS SUCH, THEIR ENTITLEMENT IS LIMITED TO THE ASSETS OF THE ISSUER AFTER PAYMENT OF ALL LIABILITIES RANKING AHEAD OF THEM ACCORDING TO THE ARTICLES OF ASSOCIATION OF THE ISSUER AND AT LAW. ACCORDINGLY, TO THE EXTENT THE PORTFOLIO COLLATERAL IS INSUFFICIENT TO PAY DIVIDENDS ON THE PREFERRED SHARES OR TO REDEEM THE PREFERRED SHARES, THE ISSUER WILL HAVE NO OBLIGATION TO PAY ANY FURTHER AMOUNTS IN RESPECT OF THE PREFERRED SHARES.

AN INVESTMENT IN THE PREFERRED SHARES IS NOT SUITABLE FOR ALL INVESTORS AND IS APPROPRIATE ONLY FOR AN INVESTOR CAPABLE OF ANALYZING AND ASSESSING THE RISKS ASSOCIATED WITH SECURITIES SUCH AS THE PREFERRED SHARES, AND BEARING SUCH RISKS AND THE FINANCIAL CONSEQUENCES THEREOF AS THEY RELATE TO AN INVESTMENT IN THE PREFERRED SHARES.

EACH PURCHASER OF A PREFERRED SHARE BY ITS ACCEPTANCE THEREOF ACKNOWLEDGES THAT IT IS USING ITS INDEPENDENT JUDGMENT IN ASSESSING THE OPPORTUNITIES AND RISKS PRESENTED BY THE PREFERRED SHARES FOR ITS INVESTMENT PORTFOLIO AND IN DETERMINING WHETHER THE ACQUISITION IS SUITABLE AND COMPLIES WITH SUCH PURCHASER'S INVESTMENT OBJECTIVES AND POLICIES.

EXCEPT AS SET FORTH IN THIS CONFIDENTIAL OFFERING CIRCULAR, NO PERSON IS AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION NOT CONTAINED IN THIS CONFIDENTIAL OFFERING CIRCULAR AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MUST NOT BE RELIED UPON. THIS CONFIDENTIAL OFFERING CIRCULAR DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY ANY OF THE PREFERRED SHARES OFFERED HEREBY IN ANY JURISDICTION TO ANY PERSON TO WHICH IT IS UNLAWFUL TO MAKE SUCH OFFER IN SUCH JURISDICTION NOR TO ANY PERSON WHO HAS NOT RECEIVED A COPY OF EACH CURRENT AMENDMENT OR SUPPLEMENT HERETO, IF ANY.

THIS CONFIDENTIAL OFFERING CIRCULAR IS FURNISHED ON A CONFIDENTIAL BASIS SOLELY FOR THE PURPOSE OF EVALUATING THE INVESTMENT OFFERED HEREBY. THE INFORMATION CONTAINED HEREIN MAY NOT BE REPRODUCED OR USED IN WHOLE OR IN PART FOR ANY OTHER PURPOSE. THIS CONFIDENTIAL OFFERING CIRCULAR SHOULD BE READ IN CONJUNCTION WITH THE NOTE OFFERING CIRCULAR.

008311

THE PREFERRED SHARES ARE BEING OFFERED ONLY TO A LIMITED NUMBER OF INVESTORS THAT ARE WILLING AND ABLE TO CONDUCT AN INDEPENDENT INVESTIGATION OF THE CHARACTERISTICS OF THE PREFERRED SHARES AND RISKS OF OWNERSHIP OF THE PREFERRED SHARES. IT IS EXPECTED THAT PROSPECTIVE INVESTORS INTERESTED IN PARTICIPATING IN THIS OFFERING WILL CONDUCT AN INDEPENDENT INVESTIGATION OF THE RISKS POSED BY AN INVESTMENT IN THE PREFERRED SHARES.  REPRESENTATIVES OF THE ISSUER AND THE SERVICER WILL BE AVAILABLE TO ANSWER QUESTIONS CONCERNING THE ISSUER, THE PREFERRED SHARES AND THE PORTFOLIO COLLATERAL AND WILL, UPON REQUEST, MAKE AVAILABLE SUCH OTHER INFORMATION AS INVESTORS MAY REASONABLY REQUEST. THE NOTE OFFERING CIRCULAR CONTAINS CERTAIN INFORMATION CONCERNING THE NOTES, THE ISSUER AND THE ISSUER'S ASSETS (INCLUDING THE PORTFOLIO COLLATERAL).  INVESTORS INTERESTED IN PURCHASING THE PREFERRED SHARES ARE STRONGLY URGED TO REVIEW THE NOTE OFFERING CIRCULAR, WHICH IS ATTACHED HERETO AS EXHIBIT A.

THIS CONFIDENTIAL OFFERING CIRCULAR IS NOT INTENDED TO FURNISH LEGAL, REGULATORY, TAX, ACCOUNTING, INVESTMENT OR OTHER ADVICE TO ANY PROSPECTIVE PURCHASER OF THE PREFERRED SHARES.  THIS CONFIDENTIAL OFFERING CIRCULAR (INCLUDING THE NOTE OFFERING CIRCULAR ATTACHED HERETO) SHOULD BE REVIEWED BY EACH PROSPECTIVE PURCHASER AND ITS LEGAL, REGULATORY, TAX, ACCOUNTING, INVESTMENT AND OTHER ADVISORS.

NOTWITHSTANDING ANY OTHER EXPRESS OR IMPLIED AGREEMENT TO THE CONTRARY, THE ISSUER, THE SERVICER, THE PAYING AND TRANSFER AGENT, THE TRUSTEE AND EACH RECIPIENT HEREOF AGREE THAT EACH OF THEM AND EACH OF THEIR EMPLOYEES, REPRESENTATIVES, AND OTHER AGENTS MAY DISCLOSE, IMMEDIATELY UPON COMMENCEMENT OF DISCUSSIONS, TO ANY AND ALL PERSONS, WITHOUT LIMITATION OF ANY KIND, THE TAX TREATMENT AND TAX STRUCTURE OF THE TRANSACTION AND ALL MATERIALS OF ANY KIND (INCLUDING OPINIONS OR OTHER TAX ANALYSES) THAT ARE PROVIDED TO ANY OF THEM RELATING TO SUCH TAX TREATMENT AND TAX STRUCTURE, EXCEPT WHERE CONFIDENTIALITY IS REASONABLY NECESSARY TO COMPLY WITH U.S. FEDERAL OR STATE SECURITIES LAWS.

INVESTORS WHOSE INVESTMENT AUTHORITY IS SUBJECT TO LEGAL RESTRICTIONS SHOULD CONSULT THEIR OWN LEGAL ADVISORS TO DETERMINE WHETHER AND TO WHAT EXTENT THE PREFERRED SHARES CONSTITUTE LEGAL INVESTMENTS FOR THEM.

THE INITIAL PURCHASER AND THE CO-ISSUERS:    (A) HAVE ONLY COMMUNICATED OR CAUSED TO BE COMMUNICATED AND WILL ONLY COMMUNICATE OR CAUSE TO BE COMMUNICATED ANY INVITATION OR INDUCEMENT TO ENGAGE IN INVESTMENT ACTIVITY (WITHIN THE MEANING OF SECTION 21 OF THE FINANCIAL SERVICES AND MARKETS ACT 2000 ("FSMA")) RECEIVED BY THEM IN CONNECTION WITH THE ISSUE OR SALE OF ANY OFFERED SECURITIES IN CIRCUMSTANCES IN WHICH SECTION 21(1) OF THE FSMA DOES NOT APPLY TO THE ISSUER; AND (B) HAVE COMPLIED AND WILL COMPLY WITH ALL APPLICABLE PROVISIONS OF THE FSMA WITH RESPECT TO ANYTHING DONE BY THEM IN RELATION TO THE OFFERED SECURITIES IN, FROM OR OTHERWISE INVOLVING THE UNITED KINGDOM.

008312

NO INVITATION MAY BE MADE TO THE PUBLIC IN THE CAYMAN ISLANDS TO SUBSCRIBE FOR THE PREFERRED SHARES.

NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE REVISED STATUTES WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

THE PAYING AGENT AND ITS AFFILIATES HAVE NOT PARTICIPATED IN THE PREPARATION OF THIS CONFIDENTIAL OFFERING CIRCULAR AND DO NOT ASSUME ANY RESPONSIBILITY FOR ITS CONTENTS.

*AVAILABLE INFORMATION*

To permit compliance with Rule 144A under the Securities Act for transfers of the Preferred Shares, the Issuer will make available to investors and prospective investors in the Preferred Shares who request such information, the information required to be delivered under Rule 144A(d)(4) under the Securities Act, if at the time of the request the Issuer is not a reporting company under Section 13 or Section 15(d) of the United States Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), or is not exempt from reporting pursuant to Rule 12g3-2(b) under the Exchange Act.  The Issuer does not expect to become such a reporting company or to be so exempt from reporting.

SPECIAL CONSIDERATIONS

An investment in the Preferred Shares may be affected by the following factors, as well as the factors described under "Special Considerations" in the Note Offering Circular. In order to fully understand the structure and characteristics of the Preferred Shares, and the potential merits and risks of an investment in the Preferred Shares, potential investors must review and be familiar with the Note Offering Circular, which is attached hereto and incorporated herein as an integral part hereof, as well as the Indenture to be dated as of the Closing Date between the Issuer, the Co-Issuer and JPMorgan Chase Bank, National Association as trustee (the "**Indenture**"). In particular the Note Offering Circular contains a description of the related Portfolio Collateral, the priority of distributions on the Notes and the Preferred Shares.

1. Limited Cash Flow Available to the Issuer. The Issuer has pledged substantially all of its assets to secure the Notes. Such assets will only be available to the Issuer to make payments on the Preferred Shares as and when released from the lien of the Indenture. Although the scheduled payments of principal and interest on the Portfolio Collateral are expected to exceed the amounts required to pay principal of and interest due on the Notes, failure to satisfy any of the Overcollateralization Tests, the Interest Coverage Test or the application of the Additional Collateral Deposit Requirement may result in temporary or permanent diversion of all or a portion of the amounts otherwise payable to the Issuer as Excess Cash Flow (as defined under "Description of the Preferred Shares—Distributions" herein). Furthermore, there can be no assurance that payments of principal and interest on, and other proceeds from, the Portfolio Collateral and the other collateral making up the Trust Estate will continue to exceed required fees and expenses and payments of principal and interest on the Notes and be sufficient to provide Excess Cash Flow. The amount and frequency of distributions of Excess Cash Flow to the Issuer will depend on, among other things: (i) the purchase rate in respect of new Portfolio Collateral, (ii) the level of LIBOR, (iii) returns with respect to Eligible Investments in which funds held in the accounts of the Issuer may be temporarily held, (iv) the extent to which the Portfolio Collateral pledged to secure the Notes becomes Defaulted Portfolio Collateral, is subject to scheduled payments of principal, or is retired prior to the stated maturity of the Notes through mandatory or optional redemption, sale, maturity or other liquidation or disposition and (v) the extent to which Substitute Portfolio Collateral is available for purchase in accordance with the criteria described herein. See "Description of the Notes" in the Note Offering Circular. Such Excess Cash Flow would constitute the only assets available to the Issuer as a source for payment of amounts payable in respect of the Preferred Shares prior to the payment in full of the Notes.

2. Subordination of the Preferred Shares. Distributions on the Preferred Shares are fully subordinated to payments on the Notes and to payment of the Trustee Administrative Expenses, Preferred Shares Administrative Expenses, Issuer Base Administrative Expenses, Issuer Excess Administrative Expenses and the amounts owing to the Servicer, each as described more fully herein and in the Note Offering Circular. No distributions of Excess Cash Flow will be made to the Issuer on any Payment Date for distribution to holders of Preferred Shares until all senior obligations due on such date have been paid in full. See "Description of the Notes—Payment on the Notes; Priority of Distributions" in the Note Offering Circular. In addition, in case of an Event of Default under the Indenture, as long as any Notes are outstanding, the holders of such Notes will be entitled to determine the remedies to be exercised under the Indenture. Remedies pursued by the holders of Notes would likely adversely affect the interests of holders of Preferred Shares. On a winding up of the Issuer, holders of the Preferred Shares will rank after all creditors, secured and unsecured, of the Issuer and the holders of ordinary shares. In addition, Class II Preferred Share Dividends, which are generally senior to other payments by the Issuer, will be paid to the Holders of the Class II Preferred Shares.

1

008314

3. <u>Equity Status of the Preferred Shares</u>. The Preferred Shares are equity in the Issuer and are not secured by the Portfolio Collateral or any other Collateral securing the Notes. As such, the Holders of the Preferred Shares will rank behind all of the creditors, whether secured or unsecured and known or unknown, of the Issuer, including, without limitation, the Holders of the Notes and the Servicer. No person or entity other than the Issuer will be required to make any distributions on the Preferred Shares. Except with respect to the obligations of the Issuer to make payments pursuant to the priority of payments set forth in the Indenture and more fully described in the Note Offering Circular, the Issuer does not expect to have any creditors. Any amounts paid by the Paying and Transfer Agent as dividends or other distributions on the Preferred Shares in accordance with the priority of payments set forth in the Indenture and more fully described in the Note Offering Circular will be payable only to the extent of the Issuer's distributable profits and/or share premium determined in accordance with Cayman Islands law. In addition, such distributions will be payable only to the extent that the Issuer is solvent on the applicable Payment Date and the Issuer will not be insolvent after such distributions are paid. Under Cayman Islands law, a company is generally deemed to be solvent if it is able to pay its debts as they fall due.

To the extent the requirements under Cayman Islands law described in the preceding paragraph are not met, amounts otherwise payable to the Holders of the Preferred Shares will be retained in an account with the Paying and Transfer Agent (the "**Preferred Shares Collection Account**") until, in the case of any payment by way of dividend, the next succeeding Payment Date or (in the case of any payment which would otherwise be payable on a redemption date of the Preferred Shares) the next succeeding Business Day on which the Issuer notifies the Paying and Transfer Agent that such requirements are met and, in the case of any payment on redemption of the Preferred Shares, the next succeeding Business Day on which the Issuer notifies the Paying and Transfer Agent that such requirements are met. Amounts on deposit in the Preferred Shares Collection Account will not be available to pay amounts due to the Holders of the Notes, the Trustee or any other creditor of the Issuer whose claim is limited in recourse to the Portfolio Collateral. However, amounts on deposit in the Preferred Shares Collection Account may be subject to the claims of creditors of the Issuer that have not contractually limited their recourse to the Portfolio Collateral. The Indenture and the Paying Agency Agreement will limit the Issuer's activities to the issuance and sale of the Notes, the Preferred Shares and ordinary shares, the acquisition and disposition of the Portfolio Collateral, the acquisition and disposition of the Eligible Investments and the other activities related to the issuance and the sale of the Notes and the Preferred Shares described under "The Issuer" herein. The Issuer does not expect to have any significant full recourse liabilities that would be payable out of amounts on deposit in the Preferred Shares Collection Account.

4. <u>Restrictions on Transfer</u>. The Preferred Shares have not been registered under the U.S. Securities Act of 1933, as amended (the "**Securities Act**"), or under any U.S. state securities or "Blue Sky" laws or the securities laws of any other jurisdiction and are being issued and sold in reliance upon exemptions from registration provided by such laws. The Preferred Shares are extremely illiquid. There is no market for the Preferred Shares offered hereby (and none is likely to develop) and, as a result, a holder of the Preferred Shares may find it difficult or uneconomic to liquidate its investment at any particular time. In addition, there are restrictions on transfer of the Preferred Shares. See "Description of the Preferred Shares—Restrictions on Transfer" herein.

5. <u>The Issuer</u>. The Issuer was formed on June 7, 2005 and has no significant prior operating history. The Issuer has no significant assets other than the Trust Estate. The Issuer will not engage in any business activity other than the co-issuance of the Notes and the issuance of the Preferred Shares and the ordinary shares as described herein, the acquisition and disposition of Portfolio Collateral as described herein and in the Note Offering Circular, certain activities conducted in connection with the payment of amounts in respect of the Notes and the Preferred Shares and other activities incidental to the foregoing. Income derived from the Trust Estate will be the Issuer's principal source of cash. The Issuer is an

exempted limited liability company incorporated under the laws of the Cayman Islands. Because the Issuer is a Cayman Islands company and its directors may reside in the Cayman Islands, it may not be possible for investors to effect service of process within the United States on such persons or to enforce against them or against the Issuer in United States courts judgments predicated upon the civil liability provisions of the United States securities laws. None of the directors, security holders, members, officers or incorporators of the Co-Issuers, the Servicer, the Trustee, any of their respective affiliates or any other person or entity (other than the Issuer) will be obligated to make payments on the Notes or the Preferred Shares.

6. <u>Potential Conflicts of Interest</u>. It is expected that Highland Financial Partners, L.P. or an affiliate or subsidiary thereof ("**HFP**") will purchase approximately 45,000,000 of the Class II Preferred Shares of the Issuer on the Closing Date, representing approximately 58% of the total Preferred Shares outstanding (the "**Original HFP Share Amount**"). It is also expected that Highland will purchase approximately 10,000,000 of the preferred shares of Investors Corp. and approximately U.S.$2,000,000 Aggregate Principal Amount of the Class B-1L Notes on the Closing Date. In addition, the Servicer, entities affiliated with the Servicer or clients of the Servicer (collectively, the "**Servicer Entities**") may also acquire Notes or Preferred Shares upon the occurrence of an Amendment Buy-Out or a Maturity Extension as described herein. The interests of the Holders of the Preferred Shares and the Class B-1L Notes that are Servicer Entities, or any other Notes owned by the Servicer Entities, may be different from or adverse to the interests of the Holders of the other Notes and Preferred Shares. As the result of the ownership of Preferred Shares and Notes by the Servicer Entities, and the ability to vote the Preferred Shares and the Notes owned by the Servicer Entities up to a maximum amount equal to the Original HFP Share Amount, the affirmative vote or approval of the Preferred Shares owned by such Servicer Entities, may be required in order to cause an Optional Redemption or a Tax Redemption of the Notes. Preferred Shares owned or controlled by the Servicer Entities above the Original HFP Share Amount will be excluded from voting on certain matters including any Optional Redemption.

In addition to the Base Servicing Fee, the Servicer is entitled to receive an Additional Servicing Fee and an Supplemental Servicing Fee (if any) after all other distributions (other than certain distributions with respect to the Preferred Shares and certain administrative expenses) are made, which is dependent in large part on the performance of the securities purchased by the Servicer on behalf of the Issuer. This could create an inducement for the Servicer to service the Issuer's assets in such a manner as to seek to maximize the return on such securities. This could result in increasing the volatility of the Portfolio Collateral and could contribute to a decline in the aggregate value of the Portfolio Collateral. However, the Servicer's servicing of the Issuer's assets is restricted by the requirement that it comply with the restrictions described in "Security for the Notes" and by its internal policies with respect to the management of securities accounts.

Various potential and actual conflicts of interest may arise from the overall activity of the Servicer, its affiliates and their respective clients. The following briefly summarizes some of these conflicts, but is not intended to be an exhaustive list of all such conflicts.

Certain Holders of the Notes and certain Holders of the Preferred Shares may be clients of the Servicer or one of its affiliates. Certain clients of the Servicer and its affiliates may invest in securities that would be appropriate for inclusion in the Trust Estate. Further, the Servicer currently serves and may in the future serve as servicer, collateral manager or the equivalent for other issuers of collateralized debt obligations, including collateralized debt obligation vehicles having objectives similar to those of the Issuer. The Servicer and its affiliates may make asset management decisions for its clients and affiliates that may be different from those made by the Servicer on behalf of the Issuer. The Servicer and its affiliates may also have ongoing relationships with, and may own or invest assets of their clients in, equity securities issued by issuers of Portfolio Collateral. In addition, affiliates and clients of the Servicer

3

may invest in securities that are senior to, or have interests different from or adverse to, the securities included in the Trust Estate. An affiliate of the Servicer may earn fees with respect to financial advisory services rendered to companies in connection with workouts or the subsequent restructuring of such companies. Such fees and advice may continue for a period of time after any such workout or restructure. The Issuer may own an interest in the securities of such companies.

The Amendment Buy-Out will increase the ability of the Servicer to affect or influence the amendment process under the Indenture and will limit any Holder's ability to vote against an amendment or affect or influence the amendment process with respect to the Indenture.

If the Servicer elects to extend the Revolving Period and the Extension Conditions are satisfied, the Holders of the Notes and the Preferred Shares may either be required to hold their Notes and Preferred Shares for a significantly longer period of time or be forced to sell their Notes and Preferred Shares for the applicable purchase price under the Indenture, resulting in a shorter holding period than expected at the time of investment in the Notes and Preferred Shares.

In addition to acting as Servicer to the Issuer, Highland Capital Management will act as manager for HFP, which will, on the Closing Date, purchase all of the Class II Preferred Shares. Because Highland Capital Management will receive both a servicing fee from the Issuer for servicing the Portfolio Collateral and a management fee from HFP for managing HFP's assets, which will include the Class II Preferred Shares (and therefor a residual interest in the Portfolio Collateral), Highland Capital Management has agreed, in connection with the capital raising of HFP, to waive a portion of its servicing fees from the Issuer for two years following the Closing Date so as not to reduce the return on investment realized by HFP in respect of the Class II Preferred Shares. Thereafter Highland Capital Management may at its discretion continue to waive such portion of its servicing fees or may elect to receive such servicing fees in their entirety. Accordingly, during the first two years following the Closing Date, a portion (representing the percentage ownership of the Preferred Shares represented by the Class II Preferred Shares, which will initially be owned entirely by HFP) of the amounts that would otherwise be payable to the Servicer as a servicing fee will instead be payable on the Class II Preferred Shares as the Class II Preferred Share Dividends in accordance with the Priority of Payments. Thereafter, the Servicer may elect to continue to waive such same portion of the amounts that would otherwise be payable to the Servicer as a servicing fee, or any lesser portion of such amounts, and have such amounts be paid instead as the Class II Preferred Share Dividends. The Class II Preferred Shares and the Class I Preferred Shares will vote together as a single class and the existence of the Class II Preferred Share Dividends may cause HFP to have interests different from the holders of the Class I Preferred Shares..

For a further description of certain conflicts of interest with respect to the Servicer, Bear, Stearns & Co. Inc., and their respective affiliates and clients, see "Special Considerations—Potential Conflicts of Interest" in the Note Offering Circular.

7. <u>Certain Tax Considerations</u>. Investors in the Preferred Shares should review carefully the tax considerations set forth in "Certain Tax Considerations" and "Cayman Islands Taxation" herein.

8. <u>Certain ERISA Considerations</u>. Investors in the Preferred Shares should review carefully the ERISA considerations set forth in "Certain ERISA Considerations" herein.

9. <u>Servicer Affiliates Reliance of Rule 3a-7; Potential Indenture Amendments</u>. HFP, will, on the Closing Date, purchase all of the Class II Preferred Shares. The Servicer will act as the manager for HFP. HFP and Highland Financial Trust, the owner of substantially all of the limited partnership interests of HFP, are relying on an exception from the definition of investment company and the requirement to register under the Investment Company Act that in turn depends, in part, upon the Issuer not being an

008317

investment company required to register under the Investment Company Act by reason of Rule 3a-7 thereunder. It is expected that, in connection with certain capital raising activities of Highland Financial Trust, the SEC may consider the applicability of Rule 3a-7 to the Issuer. If it were determined that the Issuer cannot rely on Rule 3a-7, the Servicer may cause the Issuer to amend the Indenture without the consent of the Holders of the Notes and without the consent of the Holders of the Preferred Shares to enable the Issuer to rely on Rule 3a-7, which could require additional limitations and prohibitions on the circumstances under which the Issuer may sell assets, on the type of assets that the Issuer may acquire out of the proceeds of assets that mature, are refinanced or otherwise sold, on the period during which such transactions may occur, on the level of transactions that may occur or on other provisions of the Indenture and could adversely affect the earnings of the Issuer and its ability to make payments on the Notes and distributions to the Preferred Shares. As a condition to the effectiveness of any such amendment to the Indenture, the Issuer, the Trustee and the Initial Purchaser will (i) satisfy the Rating Condition with respect to such amendment and (ii) receive a customary, unqualified opinion of counsel from a nationally recognized law firm providing that, after giving effect to such amendment and assuming compliance with the Indenture as so amended, the Issuer is exempt from registration as an "investment company" under the Investment Company Act. Such nationally recognized law firm may also be acting as counsel to the Servicer, certain Holders of Notes and/or Preferred Shares. The interests of any such parties may not coincide with the interest of other Holders of Notes and/or Preferred Shares. See "Legal Structure—The Indenture—Modification of Indenture" in the Note Offering Circular.

10. <u>Legislation and Regulations In Connection With the Prevention of Money Laundering</u>. The Uniting and Strengthening America By Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the **USA PATRIOT Act**"), signed into law on and effective as of October 26, 2001, imposes anti-money laundering obligations on different types of financial institutions, including banks, broker-dealers and investment companies. The USA PATRIOT Act requires the Secretary of the United States Department of the Treasury (the "**Treasury**") to prescribe regulations to define the types of investment companies subject to the USA PATRIOT Act and the related anti-money laundering obligations. It is not clear whether the Treasury will require entities such as the Issuer to enact anti-money laundering policies. It is possible that the Treasury will promulgate regulations requiring the Co-Issuers or the Initial Purchaser or other service providers to the Co-Issuers, in connection with the establishment of anti-money laundering procedures, to share information with governmental authorities with respect to investors in the Notes and/or the Preferred Shares. Such legislation and/or regulations could require the Co-Issuers to implement additional restrictions on the transfer of the Notes and/or the Preferred Shares. As may be required, the Issuer reserves the right to request such information and take such actions as are necessary to enable it to comply with the USA PATRIOT Act.

11. <u>Emerging Requirements of the European Union</u>. As part of the harmonization of transparency requirements, the European Commission is scheduled to adopt a directive known as the Transparency Obligations Directive that, among other things, will regulate issuers of securities that are offered to the public or admitted to trading on a European Union regulated market. The listing of the Preferred Shares on any European Union stock exchange would subject the Issuer to regulation under this directive, although the requirements applicable to the Issuer are not yet fully clarified. The Indenture will not require the Issuer to apply for, list or maintain a listing for any Class of Notes or the Preferred Shares on a European Union stock exchange if compliance with this directive (or other requirements adopted by the European Commission or a relevant member state) becomes burdensome in the sole judgment of the Servicer. Should the Preferred Shares be delisted from any exchange, the ability of the holders of such Preferred Shares to sell such Preferred Shares in the secondary market may be negatively affected.

008318

<u>THE ISSUER</u>

The issuer of the Preferred Shares is Rockwall CDO Ltd., an exempted limited liability company incorporated under the laws of the Cayman Islands (the "**Issuer**"). The Issuer has been established to acquire a diversified portfolio of commercial loans (and participations therein) and to a limited extent, high yield corporate and other debt obligations and synthetic securities, as more fully described in the Note Offering Circular. See "Security for the Notes" in the Note Offering Circular. The Issuer's authorized share capital is U.S.$600,250 and consists of 250 ordinary shares of U.S.$1.00 par each, 300,000,000 Class I Preferred Shares of U.S.$0.001 par each and 300,000,000 Class II Preferred Shares of U.S.$0.001 par each. The activities of the Issuer will be limited to (i) the issuance of the Preferred Shares and its ordinary shares, (ii) the acquisition of the Portfolio Collateral and other assets permitted by the Indenture among the Issuer, the Co-Issuer and JPMorgan Chase Bank, National Association, as trustee and as securities intermediary, (iii) the ownership of 100% of the capital stock of the Co-Issuer, and (iv) other activities incidental to the foregoing and permitted by the Indenture. For a more complete discussion of the Issuer, see "The Issuer and the Co-Issuer" in the Note Offering Circular.

<u>DESCRIPTION OF THE PREFERRED SHARES</u>

<u>General</u>

The Issuer will issue 33,200,000 Class I Preferred Shares, par value U.S. $0.001 per share (the "**Class I Preferred Shares**") and 45,000,000 Class II Preferred Shares, par value U.S. $0.001 per share (the "**Class II Preferred Shares**" and, together with the Class I Preferred Shares, the "**Preferred Shares**"). The Preferred Shares will be entitled to all distributions made from the Portfolio Collateral after payment of all prior amounts in accordance with the priority of payments set out in the Indenture and more fully described in the Note Offering Circular.

The Issuer will appoint an off-shore Paying and Transfer Agent (in addition to and not in lieu of JPMorgan Chase Bank, National Association) if requested by at least 33-2/3% of the Preferred Shares, the cost of such agent to be borne by the Issuer. There can be no assurance that any investor requesting payment from an off-shore paying agent will receive payments on the same day that they would have had the payments been made by JPMorgan Chase Bank, National Association.

The Preferred Shares will be issued pursuant to the Articles of Association of the Issuer (the "**Articles**") and certain resolutions of the Board of Directors of the Issuer passed on or prior to the issue of the Preferred Shares as memorialized in the board minutes relating thereto (the "**Resolutions**") and distributions made thereon will be made pursuant to the Paying Agency Agreement, to be dated as of the Closing Date (the "**Paying Agency Agreement**"), between the Issuer and JPMorgan Chase Bank, National Association, as the Paying and Transfer Agent thereunder (in such capacity, the "**Paying Agent**"). The Notes will be issued pursuant to the Indenture.

The assets of the Issuer are expected to be limited to the Portfolio Collateral having the characteristics described in the Note Offering Circular under "Security for the Notes" and the Trust Estate described therein, all of which, pursuant to the Indenture, will be pledged to secure the Notes. The Preferred Shares are entitled to receive distributions only to the extent monies are released therefor from the lien of the Indenture, as described herein and in the Note Offering Circular, and distributions are only payable out of profits of the Issuer and/or its share premium, being the difference between the issue price for the shares and their par value, and to the extent that the Issuer is able to pay its debts as they fall due in the ordinary course of business immediately following such payments.

008319

<u>Form and Denomination</u>

Except with respect to Bear, Stearns & Co. Inc., the minimum number of Preferred Shares that may be purchased or transferred will be 200,000 and integral multiples of 1 share in excess thereof.

Upon issuance, the Preferred Shares sold to Non-U.S. Persons (as defined in Regulation S) under the Securities Act (each, a "**Non-U.S. Person**") that are also Qualified Institutional Buyers in Offshore Transactions (as defined in Regulation S) in reliance on Regulation S, initially will be represented by one or more permanent physical share certificates in fully registered definitive form (each a "**Global Preferred Share**"), which will be deposited with a specialized depository on behalf of Euroclear Bank S.A./N.V., as operator of The Euroclear System ("**Euroclear**") and Clearstream Banking, société anonyme ("**Clearstream**").

Subject to the receipt by the Paying Agent of a certificate in the form similar to the one provided by the Paying Agency Agreement from the person holding such interest, a beneficial interest in each Global Preferred Share may be transferred prior to the expiration of a one-year period beginning on the later of the Closing Date or on the day on which the offer of the Preferred Shares is completed (the "**Distribution Compliance Period**"), only to (i) a Non-U.S. Person who certifies that it is not a U.S. Person and is a Qualified Institutional Buyer and is not acquiring an interest in the Global Preferred Share for the account or benefit of any U.S. Person or (ii) after the Distribution Compliance Period, to a U.S. Person who certifies that it is a qualified institutional buyer (a "**Qualified Institutional Buyer**") as defined in Rule 144A under the Securities Act, and in each case only to a purchaser who is also a "qualified purchaser" or "knowledgeable employee" within the meaning of Section 3(c)(7) of the Investment Company Act, but only if such purchaser takes in the form of a Restricted Preferred Share (as defined below) registered in the name of such person.

Subject to the receipt by the Paying Agent of a certificate in the form similar to the one provided by the Paying Agency Agreement from the person holding such interest, a holder of a Restricted Preferred Share (as such term is defined below) who is a U.S. Person may at any time transfer its interest in such Preferred Share only (a) to a Non-U.S. Person pursuant to Regulation S who is also a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act or (b) to a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act, in each case in transactions not requiring registration under the Securities Act, and in the case of clause (b), only to a transferee who is also a "qualified purchaser" or "knowledgeable employee" within the meaning of Section 3(c)(7) of the Investment Company Act.

Upon deposit of the Global Preferred Share with the specialized depository, Euroclear or Clearstream, as the case may be, will credit each purchaser (or its agent or custodian) with the number of Preferred Shares for which it has paid. The holder of the Global Preferred Share will be the only entity entitled to receive payments in respect of the Preferred Shares represented by such Global Preferred Share, and the Issuer will be discharged by payment to, or to the order of, the holder of such Global Preferred Shares in respect of each amount so paid. Each of the persons shown in the records of Euroclear as the holder of Global Preferred Shares must look solely to Euroclear, for its share of each payment so made by the Issuer to, or to the order of, the holder of such Global Preferred Shares. No person other than the holder of the Global Preferred Shares shall have any claim against the Issuer in respect of any payments due on the Global Preferred Shares.

Payments on the Global Preferred Shares will be made pursuant to certain procedures established between the Paying Agent, the specialized depository, Euroclear and Clearstream, as the case may be. All such payments will be made by wire transfer to a United States dollar account maintained by such holder with a bank outside the United States.

008320

Global Preferred Shares will, for purposes of trading within Euroclear and Clearstream, have a notional issue price equal to U.S. $1 for each Preferred Share.

Definitive Preferred Share certificates, in fully registered form (**"Definitive Preferred Shares"**) will be issued and exchanged for each Global Preferred Share within 30 days of the occurrence of any of the following: (i) either Euroclear or Clearstream is closed for business for a continuous period of 14 days (other than by reason of holiday, statutory or otherwise) or announces an intention permanently to cease business and no alternative clearance system satisfactory to the Paying Agent is available, (ii) as a result of any amendment to, or change in, the laws or regulations of Cayman Islands or of any authority therein or thereof having power to tax or in the interpretation or administration of such laws or regulations which becomes effective on or after the Closing Date, the Issuer or the Paying Agent are or will be required to make any deduction or withholding from any payment in respect of the Preferred Shares which would not be required were the Preferred Shares in definitive registered form, or (iii) the Issuer so elects by notice to the Preferred Shareholders in accordance with the Paying Agency Agreement and Euroclear or Clearstream, as applicable, does not object.

The Preferred Shares sold in the United States to Qualified Institutional Buyers who are U.S. Persons will be represented, on issue, by definitive fully registered Preferred Share certificates bearing the appropriate legend ("**Restricted Preferred Shares**").

Payments on the Definitive Preferred Shares and Restricted Preferred Shares will be made pursuant to certain procedures established by the Paying Agent. All such payments on such Preferred Shares will be made by wire transfer to a United States dollar account maintained by such holder.

Under the terms of the Paying Agency Agreement, the Paying Agent will be the initial paying agent with respect to the Preferred Shares. The Issuer may not appoint a paying agent with respect to the Preferred Shares within the United States. Payments of dividends on the Preferred Shares and redemption payments will be made from funds available in the Collection Account and released to the Paying Agent by the Trustee under the Indenture and will only be payable if the Issuer has sufficient distributable profits and/or share premium. All interest and principal payments on the Portfolio Collateral will be deposited directly into the Collection Account and, together with any income thereon, will be available for payments first to certain expenses and the Notes and then to the Preferred Shares to the extent that the Issuer is and remains solvent after such payments are made. Under Cayman Islands law, a company is generally deemed to be solvent if it is able to pay its debts as they fall due.

<u>Status of Preferred Shares</u>

The Preferred Shares are part of the share capital of the Issuer and, as such, their entitlement is limited to the assets of the Issuer after payment of all liabilities ranking ahead of them according to the Articles and at law.

The Articles, in conjunction with the Resolutions, provide for payments of dividends and capital on redemption of the Preferred Shares and any payments on liquidation of the Issuer to rank after payments due on the Notes (other than certain amounts constituting the Class II Preferred Share Dividend which will be senior to payments on the Notes), and, except as described in the Note Offering Circular under "Description of the Notes—Payments on the Notes; Priority of Distributions," after the payment of fees and expenses.

008321

The Preferred Shares are entitled to receive the Excess Cash Flow, including in the case of the Class II Preferred Shares, the Class II Preferred Share Dividend. As a matter of Cayman Islands law, on a liquidation of the Issuer, the holders of the Preferred Shares will rank after all other creditors, both secured and unsecured, of the Issuer and holders of the ordinary shares.

<u>Distributions</u>

On each Payment Date and on the Final Maturity Date, the Paying Agent, on behalf of the holders of the Preferred Shares, will be entitled to receive from the Trustee (for payment to the holders of the Preferred Shares as a dividend or, on the Final Maturity Date, to redeem the Preferred Shares pursuant to the Paying Agency Agreement and in accordance with the Articles) all cash remaining after payment by the Trustee of all distributions which take priority over payments to the Issuer (including any Class II Preferred Share Dividend) described in detail in the Note Offering Circular under "Description of the Notes—Payments on the Notes; Priority of Distributions," if any, from the Collection Account (such remaining cash, if any, the "**Excess Cash Flow**").

<u>Priority of Distributions</u>

On each Payment Date, the Issuer will be entitled to receive any Excess Cash Flow as described in detail in the Secured Note Offering Circular under "Description of the Notes—Payments on the Notes; Priority of Distributions." Excess Cash Flow shall be distributed, in part, as follows:

(i)      if the Internal Rate of Return of the Preferred Shares as of such Payment Date is less than 12%, to the payment to the Holders of the Preferred Shares, but only up to an amount that would cause the Internal Rate of Return of the Preferred Shares to equal 12%; and

(ii)      any remaining amounts, (a) 20% to (x) the payment of the Supplemental Servicing Fee for such Payment Date, and (y) the Holders of the Class II Preferred Shares in accordance with the Paying and Transfer Agency Agreement, the Class II Preferred Share Supplemental Dividend then due and unpaid, and (b) 80% to the Holders of the Preferred Shares in accordance with the Paying and Transfer Agency Agreement, as a dividend thereon or as a redemption payment on the Redemption Date, as applicable.

Any Excess Cash Flow that constitutes part of the Class II Preferred Share Dividend will not be allocable to the Class I Preferred Shares, rather, such amounts will only be available for distributions on the Class II Preferred Shares on each Payment Date. The "**Class II Preferred Share Dividend**" shall mean the Class II Preferred Share Base Dividend, Class II Preferred Share Additional Dividend and Class II Preferred Share Supplemental Dividend, each as described in the Note Offering Circular.

Failure to satisfy any Overcollateralization Test, the Interest Coverage Test or the application of the Additional Collateral Deposit Requirement described under "Description of the Notes" in the Note Offering Circular may result in the temporary or permanent diversion of all or a portion of amounts otherwise payable as Excess Cash Flow (and will have a corresponding effect on Preferred Shares distributions). The amount and frequency of distributions of Excess Cash Flow to the Issuer will depend on, among other things, the purchase rate in respect of new Portfolio Collateral, the level of LIBOR, the extent to which the Portfolio Collateral pledged to secure the Notes becomes Defaulted Portfolio Collateral, is subject to scheduled payments of principal, or is retired prior to the stated maturity of the Notes through mandatory or optional redemption, sale, maturity or other liquidation or disposition and the extent to which Substitute Portfolio Collateral is available for purchase in accordance with the criteria described in the Note Offering Circular.

008322

<u>Payments of Dividends on Preferred Shares; Preferred Shares Redemption</u>

The Articles, in conjunction with the Resolutions, will provide for the payment of dividends on the Preferred Shares, without requiring any declaration by the board of directors, on each Payment Date through and including the Final Maturity Date, commencing on the first Payment Date. Such payment of dividends on each Payment Date will be in an amount equal to all Excess Cash Flow, if any, for such Payment Date in accordance with the priority of distributions less, with respect to the Final Maturity Date, such part of the Excess Cash Flow paid to redeem the Preferred Shares on such date. Such dividends, if any, will be paid on each Payment Date other than the Final Maturity Date to the holders of the Preferred Shares in whose names the Preferred Shares are registered at the close of business on the Record Date for such Payment Date.

No redemption of the Preferred Shares will be made from the Portfolio Collateral until the Notes are paid in full. Upon payment of the Notes in full, all Excess Cash Flow attributable to Adjusted Collateral Principal Collections will be paid to the holders of the Preferred Shares as dividends on or, with respect to the Final Maturity Date, as the redemption price on redemption of the Preferred Shares. The Preferred Shares are not subject to redemption at the option of the holders thereof, except in connection with a liquidation of the Trust Estate upon payment in full of the Notes at the direction of the holders of a Majority or more of the Preferred Shares. See "Description of the Preferred Shares—Termination of Trust Estate."

Payments of dividends and the redemption price on redemption of the Class I Preferred Shares and the Class II Preferred Shares will be made *pro rata* to registered holders of Class I Preferred Shares and the Class II Preferred Shares, respectively, according to the number of such Class I Preferred Shares and Class II Preferred Shares held by the respective Holders. The payment of dividends and the redemption of the Preferred Shares is subject to the Issuer having sufficient distributable profits and/or share premium (being the difference between the par value of the Preferred Shares and their issue price) of the Preferred Shares out of which to pay such amounts and, in the case of a payment from share premium, the Issuer being able to pay its debts as they fall due in the ordinary course of its business.

Notwithstanding the foregoing, upon any redemption of the Preferred Shares, any Excess Cash Flow that constitutes part of the Class II Preferred Share Dividend will not be allocable to the Class I Preferred Shares, rather, such amounts will only be available for distributions on the Class II Preferred Shares.

<u>Events of Default</u>

The Note Offering Circular describes those circumstances that would constitute an Event of Default under the Indenture. See "Legal Structure—The Indenture—Events of Default" in the Note Offering Circular.

If an Event of Default under the Indenture should occur and be continuing with respect to the Notes, the Trustee may, with the consent of the Requisite Noteholders, and shall at the direction of the Requisite Noteholders, declare the principal of the Notes to be immediately due and payable. Such declaration may under certain circumstances be rescinded by the Trustee at the direction of the Requisite Noteholders. As long as any Notes are outstanding, if an Event of Default under the Indenture should occur, the holders of such Notes will be entitled to determine the remedies to be exercised under the Indenture. Remedies pursued by the holders of the Notes would likely adversely affect the interests of the holders of the Preferred Shares.

008323

<u>Exchange and Transfer</u>

The Issuer shall maintain, or cause to be maintained, at a specified office a Share register (the "**Share Register**").

The Issuer will appoint a transfer agent (the "**Transfer Agent**"), at which office a holder of a Definitive Preferred Share may surrender such Preferred Share certificate for registration of transfer as described below. The Issuer has initially appointed the Paying Agent to act as Transfer Agent. The Issuer may at any time terminate the appointment of a Transfer Agent and appoint additional or other Transfer Agents. Notice of such termination or appointment and of any change in the specified office of a Transfer Agent will be provided in the manner described below in the Paying Agency Agreement.

The costs and expenses of effecting any exchange or registration of transfer pursuant to the foregoing provisions, except for the expense of delivery by other than regular mail (if any) and except, if the Issuer shall so require, the payment of a sum sufficient to cover any tax or other governmental charge or insurance charges that may be imposed in connection with any registration of transfer or exchange of any Preferred Shares, will be borne by the Issuer.

A beneficial interest in a Global Preferred Share may only be transferred to (a) a Non-U.S. Person, who is also a Qualified Institutional Buyer, in an offshore transaction (as defined in Regulation S) (an "**Offshore Transaction**") in accordance with Regulation S (and in accordance with certain certification requirements in the Paying Agency Agreement) or (b) after the Distribution Compliance Period, to a person who takes delivery in the form of a Definitive Preferred Share and delivers a written certification (in the form provided in the Paying Agency Agreement) to the effect that such person is a Qualified Institutional Buyer and is acquiring such interest for its own account (together with certain other requirements set forth in the Paying Agency Agreement) and is a Qualified Purchaser or Knowledgeable Employee. Upon any exchange of any number of Preferred Shares represented by a Global Preferred Share for a Definitive Preferred Share, the Paying Agent shall surrender the certificate representing the Global Preferred Share to the Issuer for cancellation and the Issuer shall issue a new certificate for the reduced number of Preferred Shares represented by the Global Preferred Share and a new certificate in respect of the Definitive Preferred Share. The Issuer shall cause the Share Register to be updated accordingly.

Definitive Preferred Shares and Restricted Preferred Shares (or any interest therein) may only be transferred in accordance with the applicable laws of any State of the United States and (a) in a transaction exempt from the registration requirements of the Securities Act involving a Qualified Institutional Buyer who is a U.S. Person as transferee and is a Qualified Purchaser or Knowledgeable Employee (in accordance with the certification requirements of the Paying Agency Agreement) or (b) to a person who takes delivery in the form of a beneficial interest in a Global Preferred Share and in such case only upon receipt by the Paying Agent of a written certification from the transferor (in the form provided in the Paying Agency Agreement) to the effect that such transfer is being made to a Non-U.S. Person, who is also a Qualified Institutional Buyer, in accordance with Regulation S. Upon any exchange of a Definitive Preferred Share for a beneficial interest in a Global Preferred Share, the Paying Agent shall surrender the Definitive Preferred Share certificate and the Global Preferred Share certificate to the Issuer for cancellation and the Issuer shall issue the Paying Agent with a new certificate for the Global Preferred Shares reflecting the increased number of Preferred Shares represented thereby. The Issuer shall cause the Share Register to be updated accordingly.

Upon surrender for registration of transfer of any Definitive Preferred Share at the office of the Paying Agent, the Paying Agent, subject to and in accordance with the terms of the Paying Agency Agreement, will deliver in the name of the designated transferee or transferees, or (in the case of a partial

transfer) the registered holder, one or more new certificates representing the registered Definitive Preferred Shares certificates. Every registered Preferred Share presented or surrendered for registration of transfer shall be duly endorsed, or be accompanied by a written instrument of transfer in form satisfactory to the Issuer and the Paying Agent, duly executed by the registered holder thereof or its attorney duly authorized in writing.

Preferred Share certificates issued upon any exchange or transfer will be delivered at the office of the Paying Agent or mailed, at the request, risk and expense of the holder, to the address reflected for such holder in the register or such other address as such holder shall request. No service charge (other than any cost of delivery) shall be made for any registration of transfer or exchange of Preferred Shares, but the Issuer may require payment from the holder of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection therewith.

During the period of 15 days preceding any date fixed for payment of dividends on or redemption of the Preferred Shares, the Issuer shall not be required to register the transfer of or to exchange any Preferred Shares.

Notwithstanding the foregoing, in the event any Holder of Class II Preferred Shares wishes to transfer all or a portion of its Class II Preferred Shares (the ""**Class II Seller**") to any qualified third party purchaser (the "**Class II Buyer**"), including any holders of preferred shares (the "**Holding Preferred Shares**") of Rockwall Investors Corp. ("**Investors Corp.** "), such transfer shall only be effected by the Issuer redeeming such Class II Preferred Shares and correspondingly issuing new Class I Preferred Shares and Investors Corp. issuing new Holding Preferred Shares in accordance with the mechanics described in this paragraph and the applicable provisions in the Articles of Association of each of the Issuer and Investors Corp. At least 10 days prior to any transfer by a Class II Seller to a Class II Buyer, such Class II Seller and Class II Buyer shall jointly notify the Issuer, the Transfer Agent, the Servicer and Investors Corp. of their intention to effect such transfer of Class II Preferred Shares, indicating the number of Class II Preferred Shares to be sold and the corresponding number of Class I Preferred Shares to be issued and sold to Investors Corp. and the number of Holding Preferred Shares to be issued and acquired by the Class II Buyer, the price for such purchase and sale and the date on which such purchase and sale is expected to occur (such notice, the "**Sale Notice**"). The Issuer shall, on the date indicated in the Sale Notice, subject to such redemption being approved in writing by the Board of Directors of the Issuer and subject to such redemption being in respect of 200,000 Class II Preferred Shares or more, redeem the indicated number of Class II Preferred Shares to be sold by the Class II Seller and shall issue an equal number of Class I Preferred Shares registered in the name of Investors Corp. Simultaneously with such redemption and new issuance by the Issuer, Investors Corp., pursuant to the Investors Corp. Paying and Transfer Agency Agreement, shall issue new Holding Preferred Shares to the Class II Buyer equal in number to the number of Class II Preferred Shares being sold by the Class II Seller as indicated in the Sale Notice. The Class II Buyer shall pay Investors Corp. for its subscription to such newly issued Holding Preferred Shares in an amount indicated in the Sale Notice, Investors Corp. shall immediately apply such amount to pay the subscription price to the Issuer for the newly issued Class I Preferred Shares, and the Issuer shall immediately apply such amount to pay the redemption price to the Class II Seller for the redemption of such Class II Seller's Class II Preferred Shares.

Notwithstanding anything to the contrary herein, in the event the Holder of any Class II Preferred Shares (the "**Holding Buyer**") wishes to acquire any Holding Preferred Shares from any holder of Holding Preferred Shares (the "**Holding Seller**"), such transfer shall only be effected by the Investors Corp. redeeming such Holding Preferred Shares and the Issuer redeeming a corresponding number of Class I Preferred Shares and issuing new Class II Preferred Shares in accordance with the mechanics described in this paragraph and the applicable provisions in the Articles of Association of each of the

008325

Issuer and Investors Corp. At least 10 days prior to any transfer by a Holding Seller to a Holding Buyer, such Holding Seller and Holding Buyer shall jointly notify the Issuer, the Transfer Agent, the Servicer and Investors Corp. of their intention to effect such acquisition of Holding Preferred Shares, indicating the number of Holding Preferred Shares to be sold by the Holding Seller, the corresponding number of Class I Preferred Shares to be redeemed by the Issuer and the number of Class II Preferred Shares to be issued and acquired by the Holding Buyer, respectively, the price for such purchase and sale and the date on which such purchase and sale is expected to occur (such notice, the "**Acquisition Notice**"). On the date indicated in the Sale Notice, Investors Corp. shall, subject to such redemption being approved in writing by the Board of Directors of Investors Corp. and subject to such redemption being in respect of 200,000 Class Holding Preferred Shares or more, redeem the indicated number of Holding Preferred Shares to be sold by Holding Seller and the Holding Buyer shall, subject to such redemption being approved in writing by the Board of Directors of the Issuer and subject to such redemption being in respect of 200,000 Class I Preferred Shares or more, redeem Class I Preferred Shares in an amount equal to the number of Holding Preferred Shares being sold as indicated in the Acquisition Notice. Simultaneously with such redemption of Class I Preferred Shares, the Issuer shall issue Class II Preferred Shares to the Holding Buyer in an amount equal to the amount of Class I Preferred Shares being redeemed as indicated in the Acquisition Notice. The Holding Buyer shall pay the Issuer for its subscription to such newly issued Class II Preferred Shares in an amount indicated in the Acquisition Notice, the Issuer shall immediately apply such amount to pay the redemption price to Investors Corp. for the redemption of the Class I Preferred Shares, and Investors Corp. shall immediately apply such amount to the pay the redemption price to the Holding Seller for the redemption of the Holding Preferred Shares.

Prescription

Payments in respect of the Preferred Shares will cease to be due if not paid to the holder due to insufficient instructions for a period of ten years from the Relevant Date therefor. "**Relevant Date**" means the date on which the final payment in respect of Preferred Shares first becomes due, except that if the full amount of the monies payable has not been duly received by the Paying Agent on or prior to such due date, it means the date on which such monies have been so received.

Restrictions on Transfer

The Preferred Shares have not been registered under the Securities Act, the securities laws of any state of the United States or the securities laws of any other jurisdiction, and are being issued and sold in reliance upon exemptions from registration provided by such laws. There is no market for the Preferred Shares being offered hereby and, as a result, a purchaser must be prepared to hold the Preferred Shares for an indefinite period of time. No Preferred Shares may be sold or transferred unless such sale or transfer (i) is exempt from the registration requirements of the Securities Act (for example, in reliance on exemptions provided by Rule 144A or Regulation S under the Securities Act) and other applicable securities laws, (ii) satisfies the transfer restrictions described in "Certain ERISA Considerations" herein, (iii) does not cause the Issuer to become subject to the registration requirements of the Investment Company Act, including by selling or otherwise transferring the Preferred Shares to a purchaser or other transferee (other than a Non-U.S. Person) which is not a "qualified purchaser" or "knowledgeable employee" within the meaning of Section 3(c)(7) of the Investment Company Act, and (iv) otherwise fully complies with the Articles. The Preferred Shares may not be sold or transferred to any Plan, to any person acting on behalf of or with "plan assets" of any Plan, or to any other Benefit Plan Investor other than as described herein under "Certain ERISA Considerations." Additionally, no transfer may be made unless the Issuer shall have determined that the transfer is not being effected through an "established securities market" within the meaning of Treasury Regulation Section 1.7704-1(b) and will not result in the Issuer having more than 75 shareholders (determined in conformity with Treasury Regulation Section 1.7704-1(h)(3)).

008326

Termination of Trust Estate

Upon payment in full of the Notes, the Issuer may elect, upon the direction of holders of a Majority of the Preferred Shares, voting as a single class, to liquidate the Trust Estate in whole or in part. Any amounts realized from any such liquidation, after payment of any amounts due and payable under the Indenture, will be distributed in accordance with the provisions of the Paying Agency Agreement.

The Issuer is permitted to exercise the Optional Redemption in accordance with the requirements of the Indenture when directed by the holders of the Preferred Shares holding at least a Majority of the Preferred Shares, voting as a single class.

Modification of Paying Agency Agreement and the Indenture

Without the consent of any holders of Preferred Shares, the Issuer and the Paying Agent, at any time and from time to time, may enter into one or more agreements supplemental to the Paying Agency Agreement for any of the following purposes: (a) to evidence the succession of a successor entity to the Issuer and the assumption by any such successor of the covenants of the Issuer therein and in the Preferred Shares; (b) to take any action deemed reasonably necessary by the Issuer to prevent the reduction of dividends payable on the Preferred Shares as a result of imposition of any taxes; (c) to evidence and provide for the acceptance of appointment thereunder by a successor Paying Agent with respect to the Preferred Shares; (d) to correct any manifest error with respect to any provision therein; (e) to cure any ambiguity, correct or supplement any provision therein which may be inconsistent with any other provision thereunder, or to make any other provisions with respect to matters or questions arising therein; (f) to take any action necessary or helpful to prevent the Issuer from being subject to any withholding or other taxes, fees or assessments or to reduce the risk that the Issuer or the Paying Agent, as applicable, will be engaged in a United States trade or business or otherwise subject to United States income tax on a net income basis; or (g) prevent the Issuer from becoming an "investment company" as defined in the Investment Company Act or better assure compliance with the requirements of Rule 3a-7 thereunder; *provided* that, as a condition to the effectiveness of any such supplemental indenture under this clause (g), each of the Issuer, the Trustee and the Initial Purchaser shall (A) have satisfied the Rating Condition with respect to such supplemental indenture and (B) received a customary, unqualified opinion of counsel from a nationally recognized law firm providing that, after giving effect to such supplemental agreement, the Issuer is exempt from registration as an "investment company" under the Investment Company Act; *provided* that in each case that such action for any matters described in clauses (a) through (f) will not adversely affect the interests of the holders of Preferred Shares in any material respect.

With the consent of the holders of not less than a Majority of the Preferred Shares (voting as a single class) affected by a supplemental agreement or agreement referred to below, the Issuer and the Paying Agent (and with the consent of the Servicer, if any supplemental agreement would reduce its rights or increase its obligations under the Collateral Management Agreement) may enter into an agreement or agreements supplemental to the Paying Agency Agreement for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Paying Agency Agreement or of modifying in any manner the rights of the holders of Preferred Shares under such agreement; *provided* that no such supplemental agreement will, without the consent of the holder of each outstanding Preferred Share affected thereby: (a) change the method or methods by which dividends will be determined for any Preferred Share or reduce the par value thereof or change the coin or currency in which such amounts are, or impair the right to institute suit for the enforcement of any such payment on or after the stated maturity thereof; or (b) reduce the percentage amount of the outstanding Preferred Shares, the consent of whose holders is required for any such supplemental agreement, or the consent of whose holders is required for any waiver of compliance with certain provisions of such agreement or certain defaults thereunder and their consequences provided for in such agreement; or (c) modify any of

008327

the provisions of the Paying Agency Agreement relating to the modification thereof, except to increase any such percentage or to provide that certain other provisions of such agreement cannot be modified or waived without the consent of the holder of each outstanding Preferred Share affected thereby.

In addition, as described in the Paying Agency Agreement, without the consent of at least 66-2/3% of the holders of the Preferred Shares materially and adversely affected thereby, the Issuer will not be permitted to enter into any supplemental indenture that would (i) increase the Applicable Periodic Rate for any Class of Notes, the Aggregate Principal Amount of any Class of Notes, the Optional Redemption Price or the mandatory redemption price, (ii) modify Article XI of the Indenture, (iii) change the maturity of the principal of or interest on any Note or reduce the principal amount thereof or the rate of interest thereon or change the time or amount of any other amount payable in respect of any Note or of any amount payable to the Issuer for distribution to the holders of the Preferred Shares, (iv) reduce the percentage of Holders of Notes or the percentage of the Preferred Shares whose consent is required for the authorization of any supplemental indenture or for any waiver of compliance with certain provisions of the Indenture, (v) impair or adversely affect the Trust Estate securing the Notes, (vi) permit the creation of any lien ranking prior to or on parity with the lien of the Indenture with respect to any part of the Trust Estate or terminate the lien of the Indenture, (vii) reduce the percentage of Holders of Notes or the holders of the Preferred Shares whose consent is required to direct the Trustee to liquidate the Trust Estate, (viii) modify any of the provisions of the Indenture with respect to whose consent is required for supplemental indentures or waiver of Defaults and their consequences except to increase the percentage of Outstanding Notes whose consent is required for any such action or to provide that other provisions of the Indenture cannot be modified or waived without the consent of the Holder of each Outstanding Note affected thereby, (ix) modify the provisions thereof relating to priority of distributions or subordination or the definition therein of the terms "Holder," "Noteholder," "Majority Noteholder," "Majority Preferred Shareholder," "Outstanding" or "Requisite Noteholder," (x) amend any provision that provides that the obligations of the Issuer or the Co-Issuer are non-recourse obligations or (xi) modify any of the provisions of the Indenture in such a manner as to affect the calculation of the amount of any payment of principal of or interest on or other amount in respect of any Note or of any payment to the Issuer for distribution to the holders of the Preferred Shares or to affect the right of the Holders of Notes to the benefit of any provisions for the redemption of such Notes contained therein.

Amendment Buy-Out

In the case of any supplemental indenture that requires the consent of one or more Holders of the Notes or Preferred Shares, the Amendment Buy-Out Purchaser shall have the right, but not the obligation, to purchase from Non-Consenting Holders all Notes and Preferred Shares held by such Holder whose consent was solicited with respect to such supplemental indenture (the "**Amendment Buy-Out Option**") for the applicable Amendment Buy-Out Purchase Price. If such option is exercised, the Amendment Buy-Out Purchaser must purchase all Notes and Preferred Shares of Non-Consenting Holders, regardless of the applicable percentage of the Aggregate Principal Amount of the Notes or Preferred Shares the consent of whose Holders is required for such supplemental indenture (an "**Amendment Buy-Out**"). By its acceptance of a Note or Preferred Share, each Holder of a Note and Preferred Share agrees that if the Amendment Buy-Out Option is exercised, any Non-Consenting Holder will be required to sell its applicable Note or Preferred Share to the Amendment Buy-Out Purchaser.

All purchases made pursuant to the Amendment Buy-Out Option individually and in the aggregate must comply with the applicable transfer restrictions for the relevant Notes and Preferred Shares set forth in "Delivery of the Notes; Transfer Restrictions; Settlement" in the Note Offering Circular and all applicable laws, rules and regulations (including, without limitation, any rules, regulations and procedures of any securities exchange, self-regulatory organization or clearing agency)

008328

Governing Law

The Notes, the Indenture and the Paying Agency Agreement will be governed by and construed in accordance with the laws of the State of New York. The rights attached to the Preferred Shares as set forth in the Articles will be governed by Cayman Islands law. The Issuer will irrevocably submit to the federal court sitting in the City and County of New York over any suit, action or proceeding arising out of or relating to any of the Notes, the Indenture and the Paying Agency Agreement.

THE SERVICER AND
THE SERVICING AGREEMENT

Highland Capital Management, L.P. (the "**Servicer**"), will service the Portfolio Collateral and perform certain other reporting functions pursuant to a servicing agreement with the Issuer (the "**Servicing Agreement**"). For a description of the Servicer and the Servicing Agreement, see "The Servicer" and "The Servicing Agreement" in the Note Offering Circular.

ASSETS OF THE ISSUER

For a description of the assets of the Issuer, including a description of the criteria for the purchase or substitution of the Portfolio Collateral, see "Security for the Notes" in the Note Offering Circular.

DELIVERY OF THE PREFERRED SHARES; TRANSFER RESTRICTIONS; SETTLEMENT

The Preferred Shares have not been registered under the Securities Act, any United States state securities or "Blue Sky" laws or the securities laws of any other jurisdiction and, accordingly, may not be reoffered, resold, pledged or otherwise transferred within the United States or to, or for the account or benefit of, U.S. Persons, except in accordance with the restrictions described under "Notices to Purchasers."

Without limiting the foregoing, by holding Preferred Shares, each holder will acknowledge and agree, among other things, that such holder understands that the Issuer is not registered as an investment company under the Investment Company Act, but that the Issuer is exempt from registration as such by virtue of Section 3(c)(7) of the Investment Company Act, which in general excludes from the definition of an "investment company" any issuer whose outstanding securities (other than securities sold to Non-U.S. Persons under Regulation S) are beneficially owned solely by Qualified Purchasers or Knowledgeable Employees and which has not made and does not propose to make a public offering of its securities. Any sale or transfer which would violate these provisions shall be void ab initio, and no sale or transfer may be made if such sale or transfer would require the Issuer to become subject to the requirements of the Investment Company Act.

Unless determined otherwise by the Issuer in accordance with applicable law, all certificates representing the Preferred Shares will bear the legend set forth below:

**THE PREFERRED SHARES HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), ANY STATE SECURITIES LAWS IN THE UNITED STATES OR THE SECURITIES LAWS OF ANY OTHER JURISDICTION AND MAY NOT BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED WITHIN THE UNITED STATES OR TO, OR**

16

008329

FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS, EXCEPT AS
PERMITTED BY THIS LEGEND. THE HOLDER OF ANY PREFERRED
SHARES REPRESENTED HEREBY, BY ITS ACCEPTANCE OF THIS
PREFERRED SHARE CERTIFICATE, REPRESENTS, ACKNOWLEDGES AND
AGREES THAT IT WILL NOT REOFFER, RESELL, PLEDGE OR
OTHERWISE TRANSFER THE PREFERRED SHARES REPRESENTED BY
THIS CERTIFICATE EXCEPT IN COMPLIANCE WITH THE SECURITIES
ACT AND OTHER APPLICABLE LAWS AND EXCEPT (A) IN COMPLIANCE
WITH RULE 144A UNDER THE SECURITIES ACT TO A PERSON WHOM
THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL
BUYER AS DEFINED IN RULE 144A PURCHASING FOR ITS OWN ACCOUNT
OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER,
WHOM THE SELLER HAS INFORMED, IN EACH CASE, THAT THE
REOFFER, RESALE, PLEDGE OR OTHER TRANSFER IS BEING MADE IN
RELIANCE ON RULE 144A, PROVIDED THAT SUCH PURCHASER
DELIVERS ALL DOCUMENTS AND CERTIFICATIONS AS THE ISSUER OR
THE PAYING AGENT MAY REASONABLY REQUIRE; (B) OUTSIDE THE
UNITED STATES IN COMPLIANCE WITH RULE 904 OF REGULATION S
UNDER THE SECURITIES ACT TO A PERSON WHO IS ALSO A QUALIFIED
INSTITUTIONAL BUYER AS DEFINED IN RULE 144A; (C) TO THE ISSUER
OR ITS AFFILIATES; OR (D) TO ANY OTHER PERSON OR ENTITY
PURSUANT TO A VALID EXEMPTION FROM THE REGISTRATION
REQUIREMENTS OF THE SECURITIES ACT PROVIDED THAT SUCH
PURCHASER DELIVERS ALL DOCUMENTS AND CERTIFICATIONS AS THE
ISSUER OR THE PAYING AGENT MAY REQUEST, IN EACH CASE IN
ACCORDANCE WITH ANY APPLICABLE SECURITIES LAW OF THE
UNITED STATES AND ANY STATE OF THE UNITED STATES AND ANY
OTHER JURISDICTION IN ACCORDANCE WITH THE RESTRICTIONS SET
FORTH IN THE PAYING AGENCY AGREEMENT. IN ADDITION, EACH
PURCHASER OF PREFERRED SHARES, BY ITS ACCEPTANCE THEREOF,
REPRESENTS, ACKNOWLEDGES AND AGREES THAT IT WILL NOT
RESELL, PLEDGE OR OTHERWISE TRANSFER SUCH PREFERRED
SHARES EXCEPT TO A NON-U.S. PERSON THAT IS A QUALIFIED
INSTITUTIONAL BUYER OR TO A "QUALIFIED PURCHASER" OR
"KNOWLEDGEABLE EMPLOYEE" WITHIN THE MEANING OF SECTION
3(c)(7) OF THE INVESTMENT COMPANY ACT THAT IS A QUALIFIED
INSTITUTIONAL BUYER IN A TRANSACTION THAT DOES NOT CAUSE
THE ISSUER TO BE REQUIRED TO REGISTER UNDER THE INVESTMENT
COMPANY ACT OF 1940. FURTHER, THE PREFERRED SHARES MAY NOT
BE SOLD OR TRANSFERRED TO ANY PLAN SUBJECT TO TITLE I OF
ERISA OR SECTION 4975 OF THE CODE, TO ANY PERSON ACTING ON
BEHALF OF OR WITH "PLAN ASSETS" OF ANY SUCH PLAN, OR TO ANY
OTHER BENEFIT PLAN INVESTOR (AS DEFINED IN UNITED STATES
DEPARTMENT OF LABOR REGULATION SECTION 2510.3-101(f)(2)),
INCLUDING AN INSURANCE COMPANY GENERAL ACCOUNT, EXCEPT IN
ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE
CONFIDENTIAL OFFERING CIRCULAR RELATING TO THE PREFERRED
SHARES. ADDITIONALLY, NO TRANSFER MAY BE MADE UNLESS THE
ISSUER SHALL HAVE DETERMINED THAT THE TRANSFER IS NOT BEING
EFFECTED THROUGH AN "ESTABLISHED SECURITIES MARKET"
WITHIN THE MEANING OF TREASURY REGULATION SECTION 1.7704-1(b)

008330

**AND WILL NOT RESULT IN THE ISSUER HAVING MORE THAN 75 SHAREHOLDERS (DETERMINED IN CONFORMITY WITH TREASURY REGULATION SECTION 1.7704-1(h)(3)).**

**TRANSFERS OF THE PREFERRED SHARES MAY ONLY BE MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE PAYING AGENCY AGREEMENT.**

**TRANSFERS OF THE PREFERRED SHARES MUST GENERALLY BE ACCOMPANIED BY APPROPRIATE TAX TRANSFER DOCUMENTATION.**

Subject to the restrictions on transfer set forth in the Paying Agency Agreement and on the Preferred Share certificates, the holder of any Preferred Shares may transfer the same in whole or in part (in any authorized denomination) by surrendering the certificate relating to such Preferred Shares at the specified office of the Paying Agent or at the office of any transfer agent, together with an executed instrument of assignment and transfer substantially in the form attached to the Paying Agency Agreement. In exchange for any certificate representing the Preferred Shares properly presented for transfer with all necessary accompanying documentation, the Paying Agent will, within five Business Days of such request if made at the specified office of the Paying Agent, or within ten Business Days if made at the office of a transfer agent, deliver at the specified office of the Paying Agent or the office of the transfer agent, as the case may be, to the transferee or send by first-class mail at the risk of the transferee to such address as the transferee may request a certificate in the name of the transferee representing the number of Preferred Shares transferred. The presentation for transfer of any Preferred Shares will not be valid unless made at the specified office of the Paying Agent or at the office of a transfer agent by the registered holder in person, or by a duly authorized attorney-in-fact. The holder of a Preferred Share certificate will not be required to bear the costs and expenses of effecting any transfer or registration of transfer, except that the relevant holder will be required to bear (i) the expenses of delivery by other than regular mail (if any) and (ii) if the Issuer so requires, the payment of a sum sufficient to cover any duty, stamp tax or governmental charge or insurance charges that may be imposed in relation thereto.

## CERTAIN TAX CONSIDERATIONS

<u>Introduction</u>

The following is a limited summary of certain United States federal income tax consequences pertaining to an investment in the Preferred Shares. As discussed herein, this summary is not intended to be complete, and is not complete; it addresses few of the tax consequences relating to an investor's tax treatment with respect to its investment in Preferred Shares, focusing principally on the certain consequences germane to the Issuer, and insofar as it may address investor tax consequences, it does so only as specifically set forth. The discussion and the opinions referenced below are based upon laws, regulations, rulings, and decisions currently in effect, all of which are subject to change, possibly with retroactive effect. Prospective investors should note that no rulings have been or are expected to be sought from the Internal Revenue Service (the "**IRS**") with respect to any of the United States federal income tax consequences discussed below, and no assurance can be given that the IRS will not take contrary positions. Further, the following summary does not deal with all United States federal income tax consequences applicable to any given investor, nor does it address the United States federal income tax considerations applicable to all categories of investors, some of which may be subject to special rules, such as, banks, real estate investment trusts, regulated investment companies, controlled foreign corporations, passive foreign investment companies, insurance companies, tax-exempt organizations, dealers in securities or currencies, electing large partnerships, natural persons, cash method taxpayers, S

008331

corporations, estates and trusts, investors that hold their Preferred Shares as part of a hedge, straddle, or an integrated or conversion transaction, or investors whose "functional currency" is not the United States dollar. Furthermore, it does not address alternative minimum tax consequences, or the indirect effects on investors of equity interests in a Holder. In addition, this summary is generally limited to investors that will hold their Preferred Shares as "capital assets" within the meaning of Section 1221 of the Internal Revenue Code of 1986, as amended (the "**Code**"). Investors should consult their own tax advisors to determine the United States federal, state, local, and other tax consequences of the purchase, ownership, and disposition of the Preferred Shares.

As used herein, "**U.S. Holder**" means a beneficial owner of a Preferred Share that is an individual citizen or resident of the United States for United States federal income tax purposes, a corporation or other entity taxable as a corporation created or organized in or under the laws of the United States or any state thereof (including the District of Columbia), an estate the income of which is subject to United States federal income taxation regardless of its source, or a trust where a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons (as defined in the Code) have the authority to control all substantial decisions of the trust (or a trust that has made a valid election under United States Treasury Regulations to be treated as a domestic trust). If a partnership holds Preferred Shares, the tax treatment of a partner will generally depend upon the status of the partner and upon the activities of the partnership. Partners of partnerships holding Preferred Shares should consult their own tax advisors. "**Non-U.S. Holder**" means any holder (or beneficial holder) of a Preferred Share that is not a U.S. Holder.

United States Federal Income Tax Consequences to the Issuer

Upon the issuance of the Preferred Shares, Orrick, Herrington & Sutcliffe LLP, special United States tax counsel to the Issuer, will deliver an opinion generally to the effect that under current law, and assuming compliance with the Indenture (and certain other documents) and based on certain factual representations made by the Issuer and the Servicer, although the matter is not free from doubt, the Issuer will not be engaged in the conduct of a trade or business in the United States. Prospective investors should be aware that opinions of counsel are not binding on the IRS and the IRS might seek to treat the Issuer as engaged in a United States trade or business. In addition, the Issuer and Servicer are entitled to rely upon the advice and/or opinions of their selected counsel with respect to amendments, supplements and other modifications of the terms of the Portfolio Collateral and deviations from the investment guidelines set forth in the Servicing Agreement; the foregoing opinion assumes that any such advice and/or opinions will be correct and complete. It should be noted as well that the United States Treasury Department and the IRS recently announced that they are considering taxpayer requests for specific guidance on, among other things, whether a foreign person may be treated as engaged in a trade or business in the United States by virtue of entering into credit default swaps. No guidance has been issued to date. If any future guidance concludes that foreign persons entering into certain credit default swaps will be treated as engaged in a trade or business in the United States, such guidance would adversely impact the Issuer's ability to makes payments on the Preferred Shares. Additionally, it should be noted that gain or loss on a disposition by a foreign person of a United States real property interest may be subject to United States federal income tax as if the foreign person were engaged in a United States trade or business (even if the foreign person is not actually so engaged). The determination of whether an asset constitutes a United States real property interest is made periodically and, therefore, notwithstanding that the Issuer is prohibited from acquiring an asset that constitutes a United States real property interest, it is possible that an asset that was not a United States real property interest at the time it was acquired by the Issuer could, thereafter, become a United States real property interest. Similarly, if the Issuer accepted a new security in exchange for an existing security or if the terms of an existing security were modified, the new or modified security might cause the Issuer to become engaged in a United States trade or business

008332

for United States federal income tax purposes. If the Issuer were viewed as engaged in a U.S. trade or business, a Non-U.S. Holder of Preferred Shares would be subject to net income taxation in the United States on its pro rata share of such of the Issuer's income as is effectively connected to the trade or business (as well as the branch profits tax, in the case of a corporate Non-U.S. Holder) assuming that the Issuer is properly characterized as a partnership for United States federal income tax purposes.

In this regard, the Issuer intends to elect to be (and expects to be) treated as a partnership for United States federal income tax purposes. There can be no assurance, however, that the Issuer will not (at some point in time) become classified as a corporation for United States federal income tax purposes. If the Issuer were to be treated as a corporation for United States federal income tax purposes and the IRS were successfully to characterize the Issuer as engaged in a United States trade or business, among other consequences, the Issuer would be subject to net income taxation in the United States on such of its income as is effectively connected with the United States trade or business (as well as the branch profits tax). The levying of such taxes would materially affect the Issuer's financial ability to make payments on the Preferred Shares.

<u>United States Federal Income Tax Consequences to Holders</u>

As indicated above, this discussion generally does not address tax consequences to Holders of any investment in the Preferred Shares. In particular, it does not address any consequences to U.S. Holders (including possible treatment of such Holders as investors in a controlled foreign corporation or passive foreign investment company), nor do the consequences to Non-U.S. Holders referenced below aim or purport to be complete in any respect. It does not address information reporting requirements that may apply to any Holder or to the Issuer, which can impose significant penalties for failures in compliance.

Assuming that the Issuer is properly classified as partnership for United States federal income tax purposes, the Issuer's income (and loss) will be allocated to the Holders of the Preferred Shares and any other entity viewed as holding equity in the Issuer (which could, possibly, include holders of certain classes of notes issued by the Issuer, as well as other persons). Many complex rules (not discussed herein) will apply for purposes of determining the income and loss of the Issuer for United States federal income tax purposes, some of which may have the effect of deferring or disallowing losses and deductions and/or recharacterizing items of capital gain into ordinary income items. The amount of United States federal income taxes payable in any year by a Holder with respect its distributive share of the Issuer's taxable income and loss could exceed the amount of cash, if any, received by the Holder in that year. The Issuer has not yet determined how it will allocate its distributive share of taxable income among Holders, and can offer no assurance that the methods ultimately adopted and followed will have substantial economic effect. If it were determined that one or more of the allocations did not have substantial economic effect, a Holder of Preferred Shares might be required to recognize a greater or smaller amount of income and loss than otherwise would have been the case (without any corresponding increase in distributions to the Holder). Numerous restrictions may limit the ability of a Holder of Preferred Shares to utilize any losses allocated to it for United States federal income tax purposes – such as, for example, the at-risk limitations under Section 465, the passive activity loss limitations under Section 469, the tax-exempt use property limitations under Section 470, the investment interest limitations under Section 163(d), and the basis limitations under Section 704(d). Investors are urged to consult their own tax advisors as to the application of these limitations.

008333

Circular 230

Under 31 C.F.R. part 10, the regulations governing practice before the IRS (Circular 230), we and our tax advisors are (or may be) required to inform you that:

- Any advice contained herein, including any opinions of counsel referred to herein, is not intended or written to be used, and cannot be used by any taxpayer, for the purpose of avoiding penalties that may be imposed on the taxpayer;

- Any such advice is written to support the promotion or marketing of the Preferred Shares and the transactions described herein (or in such opinion or other advice); and

- Each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

## CAYMAN ISLANDS TAXATION

The following discussion of certain Cayman Islands income tax consequences of an investment in the Preferred Shares is based on the advice of Maples and Calder as to Cayman Islands law. The discussion is a general summary of present law, which is subject to prospective and retroactive change. It assumes that the Issuer will conduct its affairs in accordance with assumptions made by, and representations made to, counsel. It is not intended as tax advice, does not consider any investor's particular circumstances, and does not consider tax consequences other than those arising under Cayman Islands law.

Under existing Cayman Islands laws:

(i)      payments on the Preferred Shares will not be subject to taxation in the Cayman Islands and no withholding will be required on such payments to any holder of a Preferred Share and gains derived from the sale of Preferred Shares will not be subject to Cayman Islands income or corporation tax. The Cayman Islands currently have no income, corporation or capital gains tax and no estate duty, inheritance tax or gift tax; and

(ii)      the Preferred Shares and transfers of Preferred Shares are not subject to Cayman Islands stamp duty but an agreement to transfer Preferred Shares if executed in or brought into the Cayman Islands will be subject to nominal Cayman Islands stamp duty.

The Issuer has been incorporated under the laws of the Cayman Islands as an exempted limited liability company and, as such, has applied for and obtained an undertaking from the Governor in Cabinet of the Cayman Islands in the following form:

**The Tax Concessions Law
(1999 Revision)
Undertaking as to Tax Concessions**

In accordance with Section 6 of the Tax Concessions Law (1999 Revision), the Governor in Cabinet undertakes with Rockwall CDO Ltd. (the "**Company**"):

(a)      that no law which is hereafter enacted in the Islands imposing any tax to be levied on profits, income, gains or appreciations will apply to the Company or its operations; and

008334

(b)      in addition, that no tax to be levied on profits, income, gains or appreciations or which is in the nature of estate duty or inheritance tax will be payable

(i)      on or in respect of the shares, debentures or other obligations of the Company; or

(ii)      by way of the withholding in whole or in part of any relevant payment as defined in Section 6(3) of the Tax Concessions Law (1999 Revision).

These concessions shall be for a period of twenty years from the 21st day of June, 2005.

The preceding discussion of certain Cayman Islands income tax consequences of an investment in the Preferred Shares is based on the advice of Maples and Calder as to Cayman Islands law. The discussion is a general summary of present law, which is subject to prospective and retroactive change. It assumes that the Issuer will conduct its affairs in accordance with assumptions made by, and representations made to, counsel. It is not intended as tax advice, does not consider any investor's particular circumstances, and does not consider tax consequences other than those arising under Cayman Islands law.

CERTAIN ERISA CONSIDERATIONS

The United States Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), imposes certain requirements on employee benefit plans (as defined in Section 3(3) of ERISA) subject to Title I of ERISA and on persons who are fiduciaries (as defined in Section 3(21)(A) of ERISA) with respect to such plans, and Section 406 of ERISA and Section 4975 of the Code prohibit such plans, as well as individual retirement accounts and Keogh plans, subject to such statutes (each, a "**Plan**") from engaging in certain transactions with persons that are "parties in interest" under ERISA or "disqualified persons" under Section 4975 of the Code (collectively, "**Parties in Interest**") with respect to such Plans. Any person who decides to invest "plan assets" of a Plan that is subject to Title I of ERISA in the Preferred Shares should consider, among other factors, the factors discussed above under "Special Considerations" herein.

Except as set forth below and except as otherwise provided in the Paying Agency Agreement with respect to the initial sale of the Preferred Shares, the Preferred Shares may not be acquired or held by any (i) employee benefit plan (as defined in Section 3(3) of ERISA), whether or not it is subject to Title I of ERISA; (ii) plan described in Section 4975(e)(1) of the Code; (iii) entity whose underlying assets include "plan assets" by reason of a Plan's investment in the entity; or (iv) person who is otherwise a "benefit plan investor" (as defined in the regulations issued by the United States Department of Labor set forth at 29 C.F.R. Section 2510.3-101) (a "**Benefit Plan Investor**"), including a life insurance company general account or a governmental or foreign plan that is generally not subject to Title I of ERISA or Section 4975 of the Code. However, Preferred Shares may be acquired and held by or on behalf of, or with "plan assets" of, a Plan or other Benefit Plan Investor if:

(a)      (1)(A) The investor is purchasing the Preferred Shares with assets of an "insurance company general account" (within the meaning of DOL Prohibited Transaction Class Exemption ("**PTCE**") 95-60) (a "**General Account**"); (B) the investor's purchase and holding of the Preferred Shares are eligible for the exemptive relief afforded under Section I of PTCE 95-60; (C) less than 25% of the assets of such General Account constitute "plan assets" of Benefit Plan Investors; and (D) if, after the initial acquisition of Preferred Shares, during any calendar quarter 25% or more of the assets of such General Account (as determined by such insurance company) constitute "plan assets" of any Plan or other Benefit Plan Investor and no exemption or exception

from the prohibited transaction rules applies such that the continued holding of the Preferred Shares would not result in violations of Section 406 of ERISA or Section 4975 of the Code, then such investor will dispose of all of the Preferred Shares then held in such General Account by the end of the next following calendar quarter; (2) the investor's purchase and holding of the Preferred Shares are eligible for the exemptive relief afforded under PTCE 96-23, 91-38, 90-1 or 84-14; or (3) it is purchasing the Preferred Shares solely with "plan assets" not subject to Title I of ERISA, Section 4975 of the Code or similar law; *and*

(b)     After giving effect to such purchase and all other purchases occurring simultaneously therewith, less than 25% of each Class of the Preferred Shares (excluding the Preferred Shares held by the Servicer and its affiliates or clients) will constitute "plan assets" of Benefit Plan Investors.

In addition, except as otherwise provided in the Paying Agency Agreement, if an investor (whether or not it is a Plan or any other Benefit Plan Investor) purchases a Preferred Share and if, after giving effect to such purchase, the investor (or its affiliates) will own 50% or more of the aggregate par value of the Preferred Shares, the investor should consult with its counsel regarding the effect such an investment may have on its ability (and that of its affiliates and their Plans) to purchase any Class of Notes in reliance upon any of PTCE 96-23, 95-60, 91-38, 90-1 or 84-14.

Except with respect to certain secondary market transactions through Bear, Stearns & Co. Inc., as more fully described in the Paying Agency Agreement, by its purchase of the Preferred Shares, each purchaser and transferee will be required to represent and warrant in writing to and agree with the Issuer, the Servicer, the Paying Agent and the Trustee that (i) its purchase and holding of such Preferred Shares will satisfy the ERISA requirements with respect to the 25% limitation described above and (ii) it will not assign or transfer such Preferred Shares unless (1) the proposed assignee or transferee delivers a letter to the Issuer evidencing its agreement to the foregoing ERISA representations and covenants with respect to its purchase, holding and transfer of such Preferred Shares and (2) if the investor:

(x)     is not (and is not acting on behalf of) a Benefit Plan Investor, the assignee or transferee will also not be a Benefit Plan Investor; *or*

(y)     is (or is acting on behalf of) a General Account, the assignee or transferee will be accurately identified in such letter as either another General Account or a person who is not (and is not acting on behalf of) a Benefit Plan Investor; *or*

(z)     is (or is acting on behalf of or with "plan assets" of) a Benefit Plan Investor (other than a General Account), the assignee or transferee will be accurately identified in such letter as either a General Account, another Benefit Plan Investor or a person who is not (and is not acting on behalf of) any Benefit Plan Investor.

<u>USE OF PROCEEDS</u>

The net proceeds from the sale of the Preferred Shares, together with the net proceeds from the sale of the Notes, will be applied by the Issuer in the manner described in the Note Offering Circular.

23

008336

<u>PLAN OF DISTRIBUTION</u>

The Issuer proposes to offer the Preferred Shares to prospective purchasers from time to time in individually negotiated transactions at varying prices to be determined in each case at the time of sale. On the Closing Date, Investors Corp. is expected to purchase 100% of the Class I Preferred Shares from the Issuer. In addition, it is expected that HFP or an affiliate or subsidiary thereof will purchase 45,000,000 Class II Preferred Shares of the Issuer on the Closing Date at negotiated prices. The Servicer, clients of the Servicer, entities identified by the Servicer and other entities identified by such entities, are expected to acquire 10,000,000 of the Holding Preferred Shares of Investors Corp. on the Closing Date at negotiated prices. See "Special Considerations—Potential Conflicts of Interest" in the Note Offering Circular. The Issuer may offer or sell Preferred Shares to purchasers at negotiated prices, which may vary among different purchasers of Preferred Shares. The Preferred Shares are offered when, as and if issued by the Issuer, subject to prior sale or withdrawal, cancellation or modification of the offer without notice and subject to approval of certain legal matters by counsel and certain other conditions. It is expected that delivery of the Preferred Shares will be made on or about the Closing Date, against payment in immediately available funds.

The Preferred Shares have not been registered under the Securities Act and may not be offered or sold within the United States or to, or for the account or benefit of, United States persons except to (i) Qualified Institutional Buyers in reliance on Rule 144A under the Securities Act, and (ii) other persons or entities pursuant to other valid exemptions from the registration requirements of the Securities Act and the Investment Company Act.

Without limiting the foregoing, no transfer of Preferred Shares may be made except to a Non-U.S. Person in compliance with Regulation S who is also a Qualified Institutional Buyer or to a Qualified Purchaser (or Knowledgeable Employee) or if such transfer would require the Issuer to become subject to the registration requirements of the Investment Company Act.

The Issuer represents and agrees that it (i) has only communicated or caused to be communicated and will only communicate or cause to be communicated any invitation or inducement to engage in investment activity (within the meaning of section 21 of the Financial Services and Markets Act 2000 ("FSMA")) received by them in connection with the issue or sale of any offered securities in circumstances in which section 21(1) of the FSMA does not apply to the Issuer and (ii) have complied and will comply with all applicable provisions of the FSMA with respect to anything done by them in relation to the Preferred Shares in, from or otherwise involving the United Kingdom.

No invitation may be made to the public in the Cayman Islands to subscribe for the Preferred Shares.

Purchasers of Preferred Shares sold outside the United States may be required to pay stamp taxes and other charges in accordance with the laws and practices of the country of purchase in addition to the price charged to investors for the Preferred Shares.

The Preferred Shares are new securities for which there currently is no market. Accordingly, no assurance can be given as to the development or liquidity of any market for the Preferred Shares.

008337

## CERTAIN LEGAL MATTERS

Certain legal matters, including certain matters relating to certain United States federal income tax consequences of the ownership of the Preferred Shares, will be passed upon for the Issuer by Orrick, Herrington & Sutcliffe LLP, New York, New York. Certain legal matters relating to the Preferred Shares, including matters relating to the laws of the Cayman Islands will be passed on for the Issuer by Maples and Calder. As to all matters of Cayman Islands law, Orrick, Herrington & Sutcliffe LLP will rely on the opinions of Maples and Calder.

008338

**EXHIBIT A**

NOTE OFFERING CIRCULAR

# ROCKWALL CDO LTD.
# ROCKWALL CDO (DELAWARE) CORP.

**U.S.$538,000,000 Class A-1LA Floating Rate Extendable Notes Due August 2021**
**U.S.$96,000,000 Class A-1LB Floating Rate Extendable Notes Due August 2021**
**U.S.$76,000,000 Class A-2L Floating Rate Extendable Notes Due August 2021**
**U.S.$36,500,000 Class A-3L Floating Rate Extendable Notes Due August 2021**
**U.S.$10,000,000 Class A-4L Floating Rate Extendable Notes Due August 2021**
**U.S.$21,000,000 Class B-1L Floating Rate Extendable Notes Due August 2021**
**U.S.$14,000,000 Class X Floating Rate Notes Due August 2013**

The Notes, consisting of the Class A-1LA Floating Rate Extendable Notes Due August 2021 (the "**Class A-1LA Notes**") in the aggregate principal amount of U.S.$538,000,000, the Class A-1LB Floating Rate Extendable Notes Due August 2021 (the "**Class A-1LB Notes**" and, with the Class A-1LA Notes, the "**Class A-1L Notes**") in the aggregate principal amount of U.S.$96,000,000, the Class A-2L Floating Rate Extendable Notes Due August 2021 (the "**Class A-2L Notes**" and, with the Class A-1L Notes, the "**Senior Class A Notes**") in the aggregate principal amount of U.S.$76,000,000, the Class A-3L Floating Rate Extendable Notes Due August 2021 (the "**Class A-3L Notes**") in the aggregate principal amount of U.S. $36,500,000, the Class A-4L Floating Rate Extendable Notes Due August 2021 (the "**Class A-4L Notes**" and, with the Senior Class A Notes and the Class A-3L Notes, the "**Class A Notes**") in the aggregate principal amount of U.S.$10,000,000, the Class B-1L Floating Rate Extendable Notes Due August 2021 (the "**Class B-1L Notes**") in the aggregate principal amount of U.S.$21,000,000 and the Class X Floating Rate Notes Due August 2013 (the "**Class X Notes**" and, with the Class B-1L Notes and the Class A Notes, the "**Notes**") in the aggregate principal amount of U.S.$14,000,000 are being issued by Rockwall CDO Ltd. (the "**Issuer**"),

It is a condition of issuance that the Class A-1LA Notes, the Class A-1LB Notes and the Class X Notes each be rated "AAA" by Standard & Poor's Ratings Services ("**S&P**") and "Aaa" by Moody's Investors Service, Inc. ("**Moody's**"), the Class A-2L Notes be rated at least "AA" by S&P` and at least "Aa2" by Moody's, the Class A-3L Notes be rated at least "A" by S&P and at least "A2" by Moody's, the Class A-4L Notes be rated at least "A-" by S&P and at least "A3" by Moody's and the Class B-1L Notes be rated at least "BBB" by S&P and at least "Baa2" by Moody's. See "Ratings". Each of the ratings of the Notes described herein assume that no Maturity Extension occurs after the Closing Date.

Application may be made to the Irish Stock Exchange to admit the Notes to the Official List of the Irish Stock Exchange. There can be no assurance that such admission will be granted or maintained.

**For certain factors to be considered in connection with an investment in the Notes, see "Special Considerations" and "Notices to Purchasers."**

No.: _____        Recipient: _____

**This Confidential Offering Circular is intended for the exclusive use of the recipient whose name appears above and such recipient's advisors, and may not be reproduced or used for any other purpose or furnished to any other party.**

————————————

The Notes are being offered in registered form to "qualified institutional buyers" within the meaning of Rule 144A ("**Rule 144A**") under the U.S. Securities Act of 1933, as amended (the "**Securities Act**"), and to certain persons in transactions outside the United States in reliance on Regulation S under the Securities Act, all of whom (other than non-U.S. Persons purchasing in offshore transactions under Regulation S) are also "qualified purchasers" within the meaning of Section 3(c)(7) of the U.S. Investment Company Act of 1940, as amended (the "**Investment Company Act**"). Settlement of the Notes will be made in immediately available funds.

————————————

THE NOTES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT NOR HAS EITHER OF THE CO-ISSUERS BEEN REGISTERED UNDER THE INVESTMENT COMPANY ACT. THE NOTES MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO U.S. PERSONS (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT), EXCEPT TO "QUALIFIED INSTITUTIONAL BUYERS" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT). THE NOTES MAY ALSO BE OFFERED OR SOLD TO CERTAIN PERSONS IN TRANSACTIONS OUTSIDE THE UNITED STATES IN RELIANCE ON REGULATION S. THE NOTES MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO U.S. PERSONS EXCEPT TO "QUALIFIED PURCHASERS" (WITHIN THE MEANING OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT) IN A TRANSACTION THAT DOES NOT CAUSE EITHER OF THE CO-ISSUERS TO BE REQUIRED TO REGISTER UNDER THE INVESTMENT COMPANY ACT. FOR CERTAIN RESTRICTIONS ON RESALE SEE "DELIVERY OF THE NOTES; TRANSFER RESTRICTIONS; SETTLEMENT".

————————————

The Notes are offered by the Co-Issuers through Bear, Stearns & Co. Inc. ("**Bear Stearns**" or the "**Initial Purchaser**") to prospective purchasers from time to time in negotiated transactions at varying prices to be determined in each case at the time of sale. The Notes are offered when, as and if issued by the Co-Issuers, subject to prior sale or withdrawal, cancellation or modification of the offer without notice and subject to approval of certain legal matters by counsel and certain other conditions. It is expected that delivery of the Notes will be made on or about [May 10], 2006 (the "**Closing Date**"), against payment in immediately available funds. See "Plan of Distribution."

The Notes of each Class sold to Non-U.S. Persons, if any, will be represented on the Closing Date by temporary global notes (the "**Temporary Regulation S Global Note(s)**"), which will be deposited with a custodian for and registered in the name of a nominee of The Depository Trust Company ("**DTC**") for the accounts of Euroclear Bank S.A./N.V., as operator of the Euroclear System ("**Euroclear**") and Clearstream Banking, société anonyme ("**Clearstream**"). The Notes sold to U.S. Persons, if any, will be issued, sold and delivered in book-entry form only through the facilities of The Depository Trust Company.

*(Continued on next page)*

# Bear, Stearns & Co. Inc.

This Confidential Offering Circular is dated May 8, 2006.

*(continued from previous page)*

a recently formed exempted company incorporated with limited liability under the laws of the Cayman Islands and will be co-issued by Rockwall CDO (Delaware) Corp., a recently formed Delaware corporation (the "**Co-Issuer**" and, together with the Issuer, the "**Co-Issuers**"), on a non-recourse basis as described herein. The Issuer will receive all of the net proceeds of the offering of the Notes, which, together with certain proceeds from the sale of the Preferred Shares (as defined herein) of the Issuer on the Closing Date (defined below) will be used by the Issuer to purchase, or commit to purchase, on and after the Closing Date and before the Effective Date (defined below) a portfolio of commercial loans (the "**Portfolio Loans**") and collateralized loan obligations (the "**CLO Securities**"), pledged to secure the Notes (together with the additional commercial loans and collateralized loan obligations, including synthetic securities, that will be purchased by the Issuer from time to time and pledged to secure the Notes and certain other obligations as described herein, the "**Portfolio Collateral**"). As described herein, the Portfolio Collateral will consist primarily of commercial loans and collateralized loan obligations that are rated below investment grade issued by U.S. and certain non-U.S. issuers and that satisfy the criteria described herein.

The Class A-1LA Notes, the Class A-1LB Notes, the Class A-2L Notes, the Class A-3L Notes, the Class A-4L Notes, the Class B-1L Notes and the Class X Notes will provide for the payment of Periodic Interest (as defined herein) (to the extent of funds available therefor as described herein) for each Periodic Interest Accrual Period (as defined herein) at the rate of 0.30%, 0.50%, 0.65%, 1.40%, 1.70%, 2.25% and 0.36% *per annum*, respectively, above the London interbank offered rate for three-month U.S. dollar deposits (or, for the period from the Closing Date to the first Payment Date, as described herein) ("**LIBOR**") (determined as described herein). Such payments are in each case to be made at the times and subject to the priority of payments described herein.

The Final Maturity Dates of the Notes (other than the Class X Notes) are subject to multiple extensions to the applicable Extended Final Maturity Date if the Issuer provides timely notice and the Extension Conditions are satisfied as described herein.

Principal of the Notes will be payable at the times, in the amounts, and subject to the priority of payment provisions described herein. **The Notes are subject to redemption at the times and under the circumstances described herein, including, without limitation, Initial Deposit Redemption, O/C Redemption (other than with respect to the Class X Notes), Optional Redemption, Special Redemption (other than with respect to the Class X Notes), Tax Event Redemption and Rating Confirmation Failure Redemption as described herein.**

The Notes are non-recourse obligations of the Co-Issuers, payable solely from the Trust Estate as described herein. The Class B-1L Notes are subordinated to the Class A Notes and the Class X Notes, the Class A-4L Notes are subordinated to the Class A-3L Notes, the Senior Class A Notes and the Class X Notes, the Class A-3L Notes are subordinated to the Senior Class A Notes and the Class X Notes, the Class A-2L Notes are subordinated to the Class A-1L Notes and the Class X Notes and the Class A-1LB Notes are subordinated to the Class A-1LA Notes, in each case to the extent described herein. To the extent the assets of the Trust Estate are insufficient to pay in full all amounts due on the Notes, the Co-Issuers shall have no further obligations in respect of the Notes and any sums outstanding and unpaid shall be extinguished.

008341

## NOTICES TO PURCHASERS

THE NOTES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR THE SECURITIES LAWS OF ANY OTHER JURISDICTION AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED WITHIN THE UNITED STATES, OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, UNITED STATES PERSONS, UNLESS A REGISTRATION STATEMENT WITH RESPECT THERETO IS THEN EFFECTIVE UNDER THE SECURITIES ACT OR AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS IS AVAILABLE. THE CO-ISSUERS HAVE NO OBLIGATION OR CURRENT INTENTION TO EFFECT SUCH REGISTRATION. THE CO-ISSUERS ARE RELYING ON AN EXCLUSION FROM REGISTRATION UNDER THE INVESTMENT COMPANY ACT, PURSUANT TO THE EXEMPTIONS PROVIDED IN RULE 3a-7 AND/OR SECTION 3(c)(7) UNDER THE INVESTMENT COMPANY ACT, AND NO TRANSFER OF A NOTE MAY BE MADE WHICH WOULD CAUSE THE CO-ISSUERS TO BECOME SUBJECT TO THE REGISTRATION REQUIREMENTS OF THE INVESTMENT COMPANY ACT. THE NOTES ARE ALSO SUBJECT TO CERTAIN OTHER RESTRICTIONS ON TRANSFER DESCRIBED HEREIN. PROSPECTIVE PURCHASERS OF THE NOTES SHOULD PROCEED ON THE ASSUMPTION THAT THEY MUST HOLD THEIR INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

THE PURCHASER OF A NOTE, BY ITS ACCEPTANCE THEREOF, REPRESENTS, ACKNOWLEDGES AND AGREES THAT IT WILL NOT RESELL, PLEDGE OR OTHERWISE TRANSFER SUCH NOTE EXCEPT IN COMPLIANCE WITH THE SECURITIES ACT AND OTHER APPLICABLE LAWS AND EXCEPT (A) IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER AS DEFINED IN RULE 144A PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER, WHOM THE SELLER HAS INFORMED, IN EACH CASE, THAT THE RESALE, PLEDGE OR OTHER TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, PROVIDED THAT SUCH PURCHASER DELIVERS ALL DOCUMENTS AND CERTIFICATIONS AS THE CO-ISSUERS OR THE TRUSTEE MAY REASONABLY REQUEST; (B) OUTSIDE THE UNITED STATES IN COMPLIANCE WITH RULE 903 OR 904 OF REGULATION S UNDER THE SECURITIES ACT, PROVIDED THAT SUCH PURCHASER DELIVERS ALL DOCUMENTS AND CERTIFICATIONS AS THE CO-ISSUERS OR THE TRUSTEE MAY REASONABLY REQUEST; OR (C) TO THE CO-ISSUERS OR THEIR AFFILIATES, IN EACH CASE IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAW OF ANY STATE OF THE UNITED STATES AND ANY OTHER JURISDICTION. IN ADDITION, THE PURCHASER OF A NOTE, BY ITS ACCEPTANCE THEREOF, REPRESENTS, ACKNOWLEDGES AND AGREES THAT IT WILL NOT RESELL, PLEDGE OR OTHERWISE TRANSFER SUCH NOTE OTHER THAN TO A NON-U.S. PERSON IN AN "OFFSHORE TRANSACTION" IN COMPLIANCE WITH REGULATION S EXCEPT TO A "QUALIFIED PURCHASER" WITHIN THE MEANING OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT IN A TRANSACTION THAT DOES NOT CAUSE THE CO-ISSUERS TO BE REQUIRED TO REGISTER UNDER THE INVESTMENT COMPANY ACT AND WILL ALSO BE DEEMED TO HAVE MADE THE REPRESENTATIONS SET FORTH UNDER "DELIVERY OF THE NOTES; TRANSFER RESTRICTIONS; SETTLEMENT." FURTHER, THE NOTES MAY NOT BE SOLD OR TRANSFERRED UNLESS SUCH SALE OR TRANSFER WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER ERISA OR SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"). THE CLASS B-1L NOTES MAY NOT BE SOLD OR TRANSFERRED TO ANY PLAN SUBJECT TO TITLE I OF ERISA OR SECTION 4975 OF THE CODE, OR TO ANY PERSON ACTING ON BEHALF OF OR WITH "PLAN ASSETS" OF ANY SUCH PLAN, INCLUDING AN INSURANCE COMPANY GENERAL ACCOUNT, UNLESS THE PURCHASER OR TRANSFEREE IS ELIGIBLE FOR THE EXEMPTIVE RELIEF AVAILABLE UNDER PTCE 96-23, 95-60, 91-38, 90-1 OR 84-14.

THE NOTES ARE NON-RECOURSE OBLIGATIONS OF THE CO-ISSUERS. PRINCIPAL OF AND INTEREST ON THE NOTES WILL BE PAID SOLELY FROM AND TO THE EXTENT OF THE AVAILABLE PROCEEDS FROM THE DISTRIBUTIONS ON THE PORTFOLIO COLLATERAL AND, UNDER CERTAIN CIRCUMSTANCES, AMOUNTS ON DEPOSIT IN THE INITIAL DEPOSIT ACCOUNT, WHICH ARE THE ONLY SOURCE OF PAYMENT OF PRINCIPAL OF, INTEREST ON AND OTHER AMOUNTS PAYABLE IN

RESPECT OF THE NOTES. TO THE EXTENT SUCH SOURCES OF PAYMENT ARE INSUFFICIENT TO PAY IN FULL ALL AMOUNTS DUE ON THE NOTES, THE CO-ISSUERS SHALL HAVE NO FURTHER OBLIGATIONS IN RESPECT OF THE NOTES AND ANY SUMS OUTSTANDING AND UNPAID SHALL BE EXTINGUISHED.

FOR THESE REASONS, AMONG OTHERS, AN INVESTMENT IN THE NOTES IS NOT SUITABLE FOR ALL INVESTORS AND IS APPROPRIATE ONLY FOR AN INVESTOR CAPABLE OF (A) ANALYZING AND ASSESSING THE RISKS ASSOCIATED WITH DEFAULTS, LOSSES AND RECOVERIES ON, APPLICATION OF PROCEEDS OF AND OTHER CHARACTERISTICS OF, DEBT SECURITIES SUCH AS THE PORTFOLIO COLLATERAL, AND (B) BEARING SUCH RISKS AND FINANCIAL CONSEQUENCES THEREOF AS THEY RELATE TO AN INVESTMENT IN THE NOTES.

EACH PURCHASER OF A NOTE BY ITS ACCEPTANCE THEREOF ACKNOWLEDGES THAT IT IS USING ITS INDEPENDENT JUDGMENT IN ASSESSING THE OPPORTUNITIES AND RISKS PRESENTED BY THE NOTES FOR ITS INVESTMENT PORTFOLIO AND IN DETERMINING WHETHER THE ACQUISITION IS SUITABLE AND COMPLIES WITH SUCH PURCHASER'S INVESTMENT OBJECTIVES AND POLICIES.

EXCEPT AS SET FORTH IN THIS CONFIDENTIAL OFFERING CIRCULAR, NO PERSON IS AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION NOT CONTAINED IN THIS CONFIDENTIAL OFFERING CIRCULAR AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MUST NOT BE RELIED UPON. THIS CONFIDENTIAL OFFERING CIRCULAR DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY ANY OF THE NOTES OFFERED HEREBY IN ANY JURISDICTION TO ANY PERSON TO WHICH IT IS UNLAWFUL TO MAKE SUCH OFFER IN SUCH JURISDICTION NOR TO ANY PERSON WHO HAS NOT RECEIVED A COPY OF EACH CURRENT AMENDMENT OR SUPPLEMENT HERETO, IF ANY.

THIS CONFIDENTIAL OFFERING CIRCULAR IS FURNISHED ON A CONFIDENTIAL BASIS SOLELY FOR THE PURPOSE OF EVALUATING THE INVESTMENT OFFERED HEREBY. THE INFORMATION CONTAINED HEREIN MAY NOT BE REPRODUCED OR USED IN WHOLE OR IN PART FOR ANY OTHER PURPOSE.

NOTWITHSTANDING ANY OTHER EXPRESS OR IMPLIED AGREEMENT TO THE CONTRARY, THE ISSUER, THE SERVICER, THE INITIAL PURCHASER, THE TRUSTEE, THE COLLATERAL ADMINISTRATOR AND EACH RECIPIENT HEREOF AGREE THAT EACH OF THEM AND EACH OF THEIR EMPLOYEES, REPRESENTATIVES, AND OTHER AGENTS MAY DISCLOSE, IMMEDIATELY UPON COMMENCEMENT OF DISCUSSIONS, TO ANY AND ALL PERSONS, WITHOUT LIMITATION OF ANY KIND, THE TAX TREATMENT AND TAX STRUCTURE OF THE TRANSACTION AND ALL MATERIALS OF ANY KIND (INCLUDING OPINIONS OR OTHER TAX ANALYSES) THAT ARE PROVIDED TO ANY OF THEM RELATING TO SUCH TAX TREATMENT AND TAX STRUCTURE.

THE NOTES ARE BEING OFFERED ONLY TO A LIMITED NUMBER OF INVESTORS (ALL OF WHICH ARE REQUIRED TO BE QUALIFIED INSTITUTIONAL BUYERS OR INVESTORS WHO ARE OUTSIDE THE UNITED STATES IN COMPLIANCE WITH RULE 903 OR RULE 904 OF REGULATION S OF THE SECURITIES ACT) THAT ARE WILLING AND ABLE TO CONDUCT AN INDEPENDENT INVESTIGATION OF THE CHARACTERISTICS OF THE NOTES AND RISKS OF OWNERSHIP OF THE NOTES. IT IS EXPECTED THAT PROSPECTIVE INVESTORS INTERESTED IN PARTICIPATING IN THIS OFFERING WILL CONDUCT AN INDEPENDENT INVESTIGATION OF THE RISKS POSED BY AN INVESTMENT IN THE NOTES. OFFICERS AND OTHER REPRESENTATIVES OF THE CO-ISSUERS AND THE INITIAL PURCHASER WILL BE AVAILABLE TO ANSWER QUESTIONS CONCERNING THE CO-ISSUERS, THE NOTES AND THE COLLATERAL AND WILL, UPON REQUEST, MAKE AVAILABLE SUCH OTHER INFORMATION AS INVESTORS MAY REASONABLY REQUEST.

008343

THIS CONFIDENTIAL OFFERING CIRCULAR IS NOT INTENDED TO FURNISH LEGAL, REGULATORY, TAX, ACCOUNTING, INVESTMENT OR OTHER ADVICE TO ANY PROSPECTIVE PURCHASER OF THE NOTES. THIS CONFIDENTIAL OFFERING CIRCULAR SHOULD BE REVIEWED BY EACH PROSPECTIVE PURCHASER AND ITS LEGAL, REGULATORY, TAX, ACCOUNTING, INVESTMENT AND OTHER ADVISORS.

INVESTORS WHOSE INVESTMENT AUTHORITY IS SUBJECT TO LEGAL RESTRICTIONS SHOULD CONSULT THEIR OWN LEGAL ADVISORS TO DETERMINE WHETHER AND TO WHAT EXTENT THE NOTES CONSTITUTE LEGAL INVESTMENTS FOR THEM.

NO INVITATION MAY BE MADE TO THE PUBLIC IN THE CAYMAN ISLANDS TO SUBSCRIBE FOR THE NOTES.

THE INITIAL PURCHASER AND THE CO-ISSUERS: (A) HAVE ONLY COMMUNICATED OR CAUSED TO BE COMMUNICATED AND WILL ONLY COMMUNICATE OR CAUSE TO BE COMMUNICATED ANY INVITATION OR INDUCEMENT TO ENGAGE IN INVESTMENT ACTIVITY (WITHIN THE MEANING OF SECTION 21 OF THE FINANCIAL SERVICES AND MARKETS ACT 2000 ("FSMA")) RECEIVED BY THEM IN CONNECTION WITH THE ISSUE OR SALE OF ANY OFFERED SECURITIES IN CIRCUMSTANCES IN WHICH SECTION 21(1) OF THE FSMA DOES NOT APPLY TO THE ISSUER; AND (B) HAVE COMPLIED AND WILL COMPLY WITH ALL APPLICABLE PROVISIONS OF THE FSMA WITH RESPECT TO ANYTHING DONE BY THEM IN RELATION TO THE OFFERED SECURITIES IN, FROM OR OTHERWISE INVOLVING THE UNITED KINGDOM.

NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE REVISED STATUTES WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

THE DISTRIBUTION OF THIS CONFIDENTIAL OFFERING CIRCULAR AND THE OFFER OR SALE OF NOTES MAY BE RESTRICTED BY LAW IN CERTAIN JURISDICTIONS. NONE OF THE ISSUER, THE CO-ISSUER, THE SERVICER OR THE INITIAL PURCHASER REPRESENTS THAT THIS DOCUMENT MAY BE LAWFULLY DISTRIBUTED, OR THAT ANY NOTES MAY BE LAWFULLY OFFERED, IN COMPLIANCE WITH ANY APPLICABLE REGISTRATION OR OTHER REQUIREMENTS IN ANY SUCH JURISDICTION, OR PURSUANT TO AN EXEMPTION AVAILABLE THEREUNDER, OR ASSUME ANY RESPONSIBILITY FOR FACILITATING ANY SUCH DISTRIBUTION OR OFFERING. IN PARTICULAR, NO ACTION HAS BEEN TAKEN BY THE ISSUER, THE CO-ISSUER, THE SERVICER OR THE INITIAL PURCHASER WHICH WOULD PERMIT A PUBLIC OFFERING OF ANY NOTES OR DISTRIBUTION OF THIS DOCUMENT IN ANY JURISDICTION WHERE ACTION FOR THAT PURPOSE IS REQUIRED. ACCORDINGLY, NO NOTES MAY BE OFFERED OR SOLD, DIRECTLY OR INDIRECTLY, AND NEITHER THIS OFFERING CIRCULAR NOR ANY ADVERTISEMENT OR OTHER OFFERING MATERIAL MAY BE DISTRIBUTED OR PUBLISHED IN ANY JURISDICTION, EXCEPT UNDER CIRCUMSTANCES THAT WILL RESULT IN COMPLIANCE WITH ANY APPLICABLE LAWS AND REGULATIONS. PERSONS INTO WHOSE POSSESSION THIS OFFERING CIRCULAR OR ANY NOTES COME MUST INFORM THEMSELVES ABOUT AND OBSERVE ANY SUCH RESTRICTIONS.

THE TRUSTEE AND ITS AFFILIATES HAVE NOT PARTICIPATED IN THE PREPARATION OF THIS CONFIDENTIAL OFFERING CIRCULAR AND DO NOT ASSUME ANY RESPONSIBILITY FOR ITS CONTENTS.

008344

## AVAILABLE INFORMATION

To permit compliance with Rule 144A under the Securities Act for resales of Notes, the Co-Issuers will make available to Holders and prospective purchasers who request such information, the information required to be delivered under Rule 144A(d)(4) under the Securities Act if at the time of the request either the Issuer or the Co-Issuer is not a reporting company under Section 13 or Section 15(d) of the Exchange Act or if either the Issuer or the Co-Issuer is not exempt from reporting pursuant to Rule 12g3-2(b) under the Exchange Act. Copies of all such documents may be obtained free of charge from the office of the Trustee or the Irish Paying Agent. Neither of the Co-Issuers expects to become such a reporting company or to be so exempt from reporting.

008345

**CONFIDENTIAL OFFERING CIRCULAR SUMMARY**

The following summary is qualified in its entirety by reference to the more detailed information appearing elsewhere in this Confidential Offering Circular and the documents referred to herein. A glossary (the "**Glossary**") of certain defined terms used herein appears as Annex A to this Confidential Offering Circular.

| | |
|---|---|
| The Issuer | Rockwall CDO Ltd., a recently formed limited liability company incorporated under the laws of the Cayman Islands (the "**Issuer**"). The activities of the Issuer will be limited to (i) the acquisition and disposition of Portfolio Collateral and other assets permitted by the Indenture, (ii) the issuance of the Notes, which will be secured by the Portfolio Collateral and certain other assets pledged by the Issuer under the Indenture, (iii) the issuance of the Preferred Shares, and (iv) other activities incidental to the foregoing, including the ownership of 100% of the stock of the Co-Issuer. |
| The Co-Issuer | Rockwall CDO (Delaware) Corp., a recently formed Delaware corporation (the "**Co-Issuer**" and, together with the Issuer, the "**Co-Issuers**"). The Co-Issuer will have no substantial assets. |
| Securities Offered | U.S.$538,000,000 aggregate principal amount of Class A-1LA Floating Rate Extendable Notes Due August 1, 2021 (the "**Class A-1LA Notes**"), U.S. $96,000,000 aggregate principal amount of Class A-1LB Floating Rate Extendable Notes Due August 1, 2021 (the "**Class A-1LB Notes**" and, together with the Class A-1LA Notes, the "**Class A-1L Notes**") U.S.$76,000,000 aggregate principal amount of Class A-2L Floating Rate Extendable Notes Due August 1, 2021 (the "**Class A-2L Notes**" and, with the Class A-1L Notes, the "**Senior Class A Notes**"), U.S.$36,500,000 aggregate principal amount of Class A-3L Floating Rate Notes Extendable Due August 1, 2021 (the "**Class A-3L Notes**"), U.S. $10,000,000 aggregate principal amount of Class A-4L Floating Rate Extendable Notes Due August 1, 2021 (the "**Class A-4L Notes**" and, with the Senior Class A Notes and the Class A-3L Notes, the "**Class A Notes**"), U.S.$21,000,000 aggregate principal amount of Class B-1L Floating Rate Extendable Notes Due August 1, 2021 (the "**Class B-1L Notes**") and U.S.$14,000,000 aggregate principal amount of Class X Floating Rate Notes Due August 1, 2013 (the "**Class X Notes**" and, together with the Class B-1L Notes and the Class A Notes, the "**Notes**"). |
| | The Notes will be issued on the Closing Date pursuant to an indenture (the "**Indenture**"), to be dated as of May 10, 2006, among the Co-Issuers and JPMorgan Chase Bank, National Association, as trustee (the "**Trustee**") and as securities intermediary. **The Notes will be non-recourse obligations of the Co-Issuers and all amounts payable in respect of the Notes will be paid solely from and to the extent of the available proceeds from the Trust Estate. To the extent the assets of the Trust Estate are insufficient to pay all amounts due on the Notes, the Co-Issuers shall have no further obligations in respect of the Notes and any sums outstanding and unpaid shall be extinguished.** |
| | On the Closing Date, the Issuer will also issue its Class I Preferred Shares (the "**Class I Preferred Shares**") and its Class II Preferred Shares (the "**Class II Preferred Shares**" and, together with the Class I Preferred Shares, the "**Preferred Shares**"). The Preferred Shares are not offered hereby. On the Closing Date, Rockwall Investors Corp. ("**Investor Corp.**") is expected to purchase 100% of the Class I Preferred Shares of the Issuer and will issue an equivalent number of its preferred shares to third party investors and |

008346

Highland Capital Management, L.P.

| | |
|---|---|
| <u>Final Maturity Date</u> | The August 1, 2021 Payment Date with respect to the Notes (or, in the case of the Class X Notes, the August 1, 2013 Payment Date) or such earlier date as the Aggregate Principal Amount of each Class of Notes is paid in full; *provided that*, the Final Maturity Dates of the Notes (other than the Class X Notes) are extendable upon a Maturity Extension (if any) as described herein, in which case the Final Maturity Date of such Notes will be extended to the applicable Extended Final Maturity Date. See "Description of the Notes—Extension of the Revolving Period and the Final Maturity Date". |
| <u>Use of Proceeds</u> | The proceeds from the sale of the Notes (the date of such sale being referred to herein as the "**Closing Date**"), together with certain proceeds from the sale of the Preferred Shares will be used by the Issuer (i) to fund the purchase (or the entering into of binding commitments to purchase) of a diversified pool of at least U.S.$765,000,000 (the "**Initial Portfolio Collateral Amount**") in aggregate principal amount of commercial loans and collateralized loan obligations which will be pledged on the Closing Date as security for the Notes (the "**Initial Portfolio Collateral**" and, together with all other commercial loans and collateralized loan obligations, including synthetic securities, purchased by the Issuer from time to time and pledged to secure the Notes as described herein, the "**Portfolio Collateral**"), (ii) to fund the deposit (the "**Deposit**") in an account with the Trustee (the "**Initial Deposit Account**") on the Closing Date of cash in an amount, which, together with the Initial Portfolio Collateral Amount, is expected as of such date to enable the Issuer to purchase, or commit to purchase, on or before September 10, 2006 (the "**Effective Date**") an Aggregate Principal Amount of Original Portfolio Collateral equal to at least U.S.$850,000,000 (the "**Required Portfolio Collateral Amount**"), which amount will be held in Eligible Investments pending the purchase of additional Original Portfolio Collateral on or before the Effective Date, subject to certain restrictions set forth in the Indenture as described below, (iii) to fund the deposit in an account with the Trustee (the "**Expense Reimbursement Account**") on the Closing Date of U.S.$50,000, which amount will be available for payment from time to time of future expenses of the Issuer pending the receipt of collections in respect of the Portfolio Collateral as described herein, (iv) to fund an account with the Trustee (the "**Closing Expense Account**") on the Closing Date, which will be used to pay fees and other expenses related to the transaction, and (v) an amount equal to U.S.$1,600,000 to fund a portion of amounts payable by the Issuer on any Payment Date (the "**Reserve Amount**") in accordance with the Priority of Payments. Portfolio Collateral purchased or committed to be purchased on or before the Effective Date is referred to herein as "**Original Portfolio Collateral**." Portfolio Collateral purchased by the Issuer with Collections is referred to herein as "**Additional Portfolio Collateral**," and Portfolio Collateral purchased by the Issuer with Collateral Disposition Proceeds from the disposition of Portfolio Collateral after the Closing Date is referred to herein as "**Substitute Portfolio Collateral**." |
| <u>Form, Denominations and Record Dates</u> | The Notes of each Class offered and sold outside the United States pursuant to Regulation S under the Securities Act of 1933, as amended (the "**Securities Act**"), initially will be evidenced by a temporary global note which will be exchangeable for a permanent global note with respect to such Class as described herein. The Notes sold to Qualified Institutional Buyers (as defined herein) pursuant to Rule 144A under the Securities Act will be issued in book-entry form only through the facilities of The Depository Trust |

2

|  | Company. |
|---|---|
|  | Subject to the foregoing, the Notes will be issued in minimum denominations of U.S.$200,000 and integral multiples of U.S.$1 in excess thereof. No Notes will be issued in bearer form. The Notes are subject to certain restrictions on transfer. The record date (the "**Record Date**") for each Payment Date (including the Final Maturity Date) (as each such term is defined below) is the Business Day immediately preceding such Payment Date; *provided, however,* if Definitive Notes are issued, the Record Date for such Definitive Notes shall be the fifteenth calendar day preceding such Payment Date. |
| <u>Class A-1L Notes</u> | *General.* The Co-Issuers expect to issue approximately U.S.$538,000,000 in aggregate principal amount of Class A-1LA Notes and U.S. $96,000,000 in aggregate principal amount of Class A-1LB Notes, each to be secured by the Portfolio Collateral pursuant to the Indenture. |
|  | *Interest.* The Class A-1L Notes will provide for the payment of periodic interest ("**Periodic Interest**" with respect to the Class A-1L Notes) (to the extent of funds available therefor as described herein) for each Periodic Interest Accrual Period (as defined herein) at the rate of 0.30% with respect to the Class A-1LA Notes and 0.50% with respect to the Class A-1LB Notes, *per annum* above the three-month London interbank offered rate for three-month U.S. dollar deposits (or, for the period from the Closing Date to the first Payment Date, as described herein) ("**LIBOR**") (determined as described herein) (the "**Applicable Periodic Rate**" with respect to the Class A-1LA Notes and Class A-1LB Notes, respectively) on the 1st day of November, February, May and August of each year or, if any such day is not a Business Day, then on the next succeeding Business Day (each such date, a "**Payment Date**"), commencing on November 1, 2006. Interest will be calculated on the basis of a year of 360 days and the actual number of days elapsed. Payments of interest to the Class A-1L Notes and the Class X Payment will be payable *pari passu* among the Class A-1L Notes and the Class X Notes as described herein. |
|  | *Principal.* No principal will be payable in respect of the Class A-1L Notes (and principal collections on the Portfolio Collateral will be applied as described herein) during the Revolving Period, except in the event of an Initial Deposit Redemption, an Optional Redemption, a Special Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class A-1L Notes as described herein. On each Payment Date with respect to the Amortization Period, the principal of the Class A-1L Notes will be payable (to the extent of funds available therefor and in the order of priority described herein) first to the Class A-1LA Notes and then to the Class A-1LB Notes until the Aggregate Principal Amount of the Class A-1L Notes has been paid in full. The Class A-1LB Notes are subordinated in right of payment to the Class A-1LA Notes to the extent described herein. In addition, all payments of principal on the Class A-1L Notes that are made in connection with an Initial Deposit Redemption, a Rating Confirmation Failure, a Tax Event Redemption or an Optional Redemption will be paid on a *pro rata* basis with the Class X Notes as described herein. All outstanding principal of the Class A-1L Notes, together with the other amounts described herein, will be due and payable on the Final Maturity Date. |
| <u>Class A-2L Notes</u> | *General.* The Co-Issuers expect to issue approximately U.S.$76,000,000 in aggregate principal amount of Class A-2L Notes to be secured by the |

3

008348

Portfolio Collateral pursuant to the Indenture.

*Interest*. **No interest will be payable in respect of the Class A-2L Notes on any Payment Date unless the Holders of the Class A-1L Notes have been paid the Cumulative Interest Amount due to them on such Payment Date, the Holders of the Class X Notes have been paid the Cumulative Class X Payment due to them on such Payment Date and, in the case of the Final Maturity Date, until the Aggregate Principal Amount of the Class A-1L Notes and the Class X Notes have been paid in full.**

The Class A-2L Notes will provide for the payment of periodic interest ("**Periodic Interest**" with respect to the Class A-2L Notes) (to the extent of funds available therefor as described herein) for each Periodic Interest Accrual Period at the rate of 0.65% *per annum* above LIBOR (the "**Applicable Periodic Rate**" with respect to the Class A-2L Notes) on each Payment Date, commencing on the November 1, 2006 Payment Date. Interest will be calculated on the basis of a year of 360 days and the actual number of days elapsed.

*Principal*.  No principal will be payable in respect of the Class A-2L Notes (and principal collections on the Portfolio Collateral will be applied as described herein) during the Revolving Period, except in the event of a Special Redemption, an Optional Redemption, a Tax Event Redemption or a Mandatory Redemption (in whole or in part) of the Class A-2L Notes. In connection with a Special Redemption, a Tax Event Redemption, a Total Optional Redemption or a Mandatory Redemption, no principal in respect of the Class A-2L Notes will be payable until the Aggregate Principal Amount of the Class A-1L Notes and the Class X Notes (other than with respect to a Special Redemption or an O/C Redemption) have been paid in full.  On each Payment Date with respect to the Amortization Period after the Class A-1L Notes and the Class X Notes have been paid in full, principal of the Class A-2L Notes will be payable (to the extent of funds available therefor and in the order of priority described herein) until the Aggregate Principal Amount of the Class A-2L Notes has been paid in full.  All outstanding principal of the Class A-2L Notes, together with the other amounts described herein, will be due and payable on the Final Maturity Date.  The Class A-2L Notes are subordinated in right of payment to the Class A-1L Notes and the Class X Notes to the extent described herein.

Class A-3L Notes

*General*.  The Co-Issuers expect to issue approximately U.S.$36,500,000 in aggregate principal amount of Class A-3L Notes to be secured by the Portfolio Collateral pursuant to the Indenture.

*Interest*.  **No interest will be payable on the Class A-3L Notes on any Payment Date unless the Holders of the Class A-1L Notes and the Class A-2L Notes have been paid the Cumulative Interest Amount due to them on such Payment Date, the Holders of the Class X Notes have been paid the Cumulative Class X Payment due to them on such Payment Date, and, in the case of the Final Maturity Date, until the Aggregate Principal Amount of the Senior Class A Notes and the Class X Notes have been paid in full.**

The Class A-3L Notes will provide for the payment of periodic interest ("**Periodic Interest**" with respect to the Class A-3L Notes) (to the extent of funds available therefor as described herein) for each Periodic Interest

Accrual Period at the rate of 1.40% *per annum* above LIBOR (the "**Applicable Periodic Rate**" with respect to the Class A-3L Notes) on each Payment Date commencing on the November 1, 2006 Payment Date. The failure to pay in full Periodic Interest on the Class A-3L Notes as a result of insufficient funds being available therefor will not constitute an Event of Default so long as any Senior Class A Notes or Class X Notes are Outstanding. Any shortfall in the payment of Periodic Interest to the Class A-3L Notes on any Payment Date will be payable, together with interest thereon at the Applicable Periodic Rate, on one or more subsequent Payment Dates (to the extent funds are available therefor and subject to the priority of distribution provisions described herein). Interest will be calculated on the basis of a year of 360 days and the actual number of days elapsed.

*Principal*. No principal will be payable in respect of the Class A-3L Notes (and principal collections on the Portfolio Collateral will be applied as described herein) during the Revolving Period, except in the event of a Special Redemption, an Optional Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class A-3L Notes. On each Payment Date with respect to the Amortization Period after the Class A-1L Notes, Class A-2L Notes and the Class X Notes have been paid in full, principal of the Class A-3L Notes will be payable (to the extent of funds available therefor and in the order of priority described herein) until the Payment Date on which the Aggregate Principal Amount of the Class A-3L Notes has been paid in full. In connection with a Special Redemption, a Tax Event Redemption, a Total Optional Redemption or a Mandatory Redemption, no principal in respect of the Class A-3L Notes will be payable until the Aggregate Principal Amount of the Class A-1L Notes, the Class A-2L Notes and (other than with respect to an O/C Redemption or a Special Redemption) the Class X Notes have been paid in full. All outstanding principal of the Class A-3L Notes, together with the other amounts described herein, will be due and payable on the Final Maturity Date. The Class A-3L Notes are subordinated in right of payment to the Senior Class A Notes and the Class X Notes to the extent described herein.

Class A-4L Notes

*General*. The Co-Issuers expect to issue approximately U.S.$10,000,000 in aggregate principal amount of Class A-4L Notes to be secured by the Portfolio Collateral pursuant to the Indenture.

*Interest*. **No interest will be payable on the Class A-4L Notes on any Payment Date unless the Holders of the Class A-1L Notes and the Class A-2L Notes have been paid the Cumulative Interest Amount due to them on such Payment Date, the Holders of the Class A-3L Notes have been paid the Periodic Interest Amount due to them on such Payment Date, the Holders of the Class X Notes have been paid the Cumulative Class X Payment due to them on such Payment Date, and, in the case of the Final Maturity Date, until the Aggregate Principal Amount of the Senior Class A Notes, the Class A-3L Notes and the Class X Notes have been paid in full.**

The Class A-4L Notes will provide for the payment of periodic interest ("**Periodic Interest**") with respect to the Class A-4L Notes) (to the extent of funds available therefor as described herein) for each Periodic Interest Accrual Period at the rate of 1.70% *per annum* above LIBOR (the "**Applicable Periodic Rate**" with respect to the Class A-4L Notes) on each Payment Date commencing on the November 1, 2006 Payment Date. The failure to pay in full Periodic Interest on the Class A-4L Notes as a result of

5

008350

insufficient funds being available therefor will not constitute an Event of Default so long as any Senior Class A Notes, the Class A-3L Notes or Class X Notes are Outstanding. Any shortfall in the payment of Periodic Interest to the Class A-4L Notes on any Payment Date will be payable, together with interest thereon at the Applicable Periodic Rate, on one or more subsequent Payment Dates (to the extent funds are available therefor and subject to the priority of distribution provisions described herein). Interest will be calculated on the basis of a year of 360 days and the actual number of days elapsed.

*Principal*. No principal will be payable in respect of the Class A-4L Notes (and principal collections on the Portfolio Collateral will be applied as described herein) during the Revolving Period, except in the event of a Special Redemption, an Optional Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class A-4L Notes. On each Payment Date with respect to the Amortization Period after the Class A-1L Notes, Class A-2L Notes, Class A-3L Notes and the Class X Notes have been paid in full, principal of the Class A-4L Notes will be payable (to the extent of funds available therefor and in the order of priority described herein) until the Payment Date on which the Aggregate Principal Amount of the Class A-4L Notes has been paid in full. In connection with a Special Redemption, a Tax Event Redemption, a Total Optional Redemption or a Mandatory Redemption, no principal in respect of the Class A-4L Notes will be payable until the Aggregate Principal Amount of the Class A-1L Notes, the Class A-2L Notes, Class A-3L Notes and (other than with respect to an O/C Redemption or a Special Redemption) the Class X Notes have been paid in full. All outstanding principal of the Class A-4L Notes, together with the other amounts described herein, will be due and payable on the Final Maturity Date. The Class A-4L Notes are subordinated in right of payment to the Senior Class A Notes, the Class A-3L Notes and the Class X Notes to the extent described herein.

Class B-1L Notes

*General*. The Co-Issuers expect to issue approximately U.S.$21,000,000 in aggregate principal amount of Class B-1L Notes to be secured by the Portfolio Collateral pursuant to the Indenture.

*Interest*. **No interest will be payable on the Class B-1L Notes on any Payment Date unless the Holders of the Class A-1L Notes and the Class A-2L Notes have been paid the Cumulative Interest Amount due to them on such Payment Date, the Holders of the Class A-3L Notes and the Class A-4L Notes have been paid the Periodic Interest Amount due to them on such Payment Date, the Holders of the Class X Notes have been paid the Cumulative Class X Payment due to them on such Payment Date, the Overcollateralization Tests with respect to the Class A Notes and the Interest Coverage Test have been satisfied, and, in the case of the Final Maturity Date, until the Aggregate Principal Amount of the Class A Notes and the Class X Notes have been paid in full.**

The Class B-1L Notes will provide for the payment of periodic interest ("**Periodic Interest**" with respect to the Class B-1L Notes) (to the extent funds are available therefor and in the order of priority described herein) for each Periodic Interest Accrual Period at the rate of 2.25% *per annum* above LIBOR (the "**Applicable Periodic Rate**" with respect to the Class B-1L Notes) on each Payment Date commencing on the November 1, 2006 Payment Date. The failure to pay in full Periodic Interest on the Class B-1L Notes as a result of insufficient funds being available therefor will not constitute an Event of Default so long as any Class A Notes or Class X Notes

are Outstanding. Any shortfall in the payment of Periodic Interest to the Class B-1L Notes on any Payment Date will be payable, together with interest thereon at the Applicable Periodic Rate, on one or more subsequent Payment Dates (to the extent that funds are available therefor and subject to the priority of distribution provisions described herein). Interest will be calculated on the basis of a year of 360 days and the actual number of days elapsed.

*Principal*. No principal will be payable in respect of the Class B-1L Notes until the Aggregate Principal Amount of the Class A Notes and the Class X Notes have been paid in full, except with respect to the Additional Collateral Deposit Requirement. Principal payments are not expected to begin until the commencement of the Amortization Period (except in the event of a Special Redemption, an Optional Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class B-1L Notes or in connection with the Additional Collateral Deposit Requirement) and are to continue until the Payment Date on which the Aggregate Principal Amount of the Class B-1L Notes has been paid in full. In connection with a Special Redemption, a Tax Event Redemption, a Total Optional Redemption or a Mandatory Redemption, no principal in respect of the Class B-1L Notes will be payable until the Aggregate Principal Amount of the Class A Notes and (other than with respect to an O/C Redemption or a Special Redemption) the Class X Notes have been paid in full. All outstanding principal of the Class B-1L Notes, together with the other amounts described herein, will be due and payable on the Final Maturity Date. The Class B-1L Notes are subordinated in right of payment to the Class A Notes and the Class X Notes to the extent described herein.

| Class X Notes | *General.* The Co-Issuers expect to issue approximately U.S.$14,000,000 in aggregate principal amount of Class X Notes to be secured by the Portfolio Collateral pursuant to the Indenture. |

*Class X Payment*. The Class X Notes will provide for a periodic payment (the "**Class X Interest Payment**") (to the extent of funds available therefor as described herein) for each Periodic Interest Accrual Period at the rate of 0.36% per annum above LIBOR (the "**Class X Periodic Interest Rate**") on each Payment Date, commencing on the November 1, 2006 Payment Date through and including the August 1, 2013 Payment Date. Such amount may be reduced in connection with a redemption of the Class X Notes, as set forth in the Indenture. Any shortfall in the payment of the Class X Payment to the Class X Notes on any Payment Date will be payable, together with interest thereon at the Class X Periodic Interest Rate, on one or more subsequent Payment Dates (to the extent funds are available therefor and subject to the priority of distribution provisions described herein). Any such interest will be calculated on the basis of a year of 360 days and the actual number of days elapsed. Payments of interest to the Class A-1L Notes and the Class X Payment will be payable *pari passu* among the Class A-1L Notes and the Class X Notes as described herein.

Payments of principal on the Class X Notes that are made in connection with an Initial Deposit Redemption, a Tax Event Redemption, an Optional Redemption or a Rating Confirmation Failure Redemption will be paid on a *pro rata* basis with the Class A-1LA Notes as described herein. The Class X Notes are not subject to an O/C Redemption or a Special Redemption. The Aggregate Principal Amount of the Class X Notes will be reduced on each Payment Date by the Class X Principal Payment for such Payment Date beginning on November 1, 2007, in accordance with the amortization

|  | schedule provided in the Indenture. The Class X Principal Payment will be made from available Adjusted Collateral Interest Collections. The Holders of the Class X Notes are entitled to receive the Aggregate Principal Amount of the Class X Notes on the Final Maturity Date, whether such Final Maturity Date occurs in connection with a redemption of the Class X Notes as described herein or otherwise. |
|---|---|
| Application of Funds | On each Payment Date and on the Final Maturity Date, Collateral Interest Collections and Collateral Principal Collections, to the extent of Available Funds in the Collection Account, will be applied by the Trustee in the manner and order of priority set forth herein under "Description of the Notes— Payments on the Notes; Priority of Distributions." |
| Overcollateralization Tests | The "**Overcollateralization Tests**" are applicable until the Notes are retired and all amounts payable in respect thereof are paid, and are satisfied if the Class A Overcollateralization Ratio is at least equal to the Class A Overcollateralization Percentage (the "**Class A Overcollateralization Test**") and the Class B-1L Overcollateralization Ratio is at least equal to the Class B-1L Overcollateralization Percentage (the "**Class B-1L Overcollateralization Test**"). |
| Applicability of Overcollateralization Tests | At any time that any of the Notes are Outstanding, if on any Calculation Date related to a Payment Date any Overcollateralization Test is not satisfied, amounts that are junior in right of payment to such Overcollateralization Test, as described under "Description of the Notes—Payments on the Notes; Priority of Distributions", will be applied to the redemption of the Class A Notes and the Class B-1L Notes (or, in the case of the Class B-1L Notes, first to pay accrued and unpaid interest from prior Payment Dates, then to pay principal) until each such Class is paid in full, in the order and according to the priorities described herein, to the extent necessary to satisfy such Overcollateralization Test, in accordance with the provisions described herein. In addition, generally, satisfaction or, in certain cases, maintenance of the Overcollateralization Tests is a condition to the purchase or sale of Portfolio Collateral during certain specified periods. |
| Interest Coverage Test | The "**Interest Coverage Test**" is applicable on each Payment Date after the second Payment Date and on certain measurement dates after the second Payment Date, and is satisfied if the Interest Coverage Ratio (as described under "Description of the Notes—Interest Coverage Test") is at least 1.5%. |
| Applicability of Interest Coverage Test | At any time after the second Payment Date, if on any Calculation Date related to a Payment Date the Interest Coverage Test is not satisfied, amounts that are junior in right of payment to the Interest Coverage Test as described under "Description of the Notes—Payments on the Notes; Priority of Distributions", will be applied to the redemption of the Class A Notes until each such Class is paid in full, in the order and according to the priorities described herein, to the extent necessary to satisfy the Interest Coverage Test in accordance with the provisions described herein. In addition, satisfaction of the Interest Coverage Test on the prior Payment Date is a condition to certain purchases and sales of Portfolio Collateral during certain specified periods as described herein. |

008353

| | |
|---|---|
| Additional Collateral Deposit Requirement | As described under "Description of the Notes—Additional Collateral Deposit Requirement," even if the Overcollateralization Tests and the Interest Coverage Test are satisfied, on each Payment Date after the second Payment Date, Collateral Interest Collections that would otherwise be used for payments that are junior in right of payment to the Additional Collateral Deposit Requirement as described under "Description of the Notes—Payments on the Notes; Priority of Distributions", will be applied (i) during the Revolving Period, to the payment of principal of the Class B-1L Notes and to the purchase of Additional Portfolio Collateral, as described herein, and (ii) during the Amortization Period, to the payment of principal of the Class B-1L Note and to the payment of principal of each Class of Notes, in each case, in the order and according to the priorities described herein, in an amount equal to the Additional Collateral Deposit Requirement as described herein. |
| Rating Confirmation Failure | The Issuer will request that each Rating Agency confirm after the Effective Date that it has not reduced or withdrawn (and not restored) the ratings assigned by it on the Closing Date to the Notes (a "**Rating Confirmation**"). If the Issuer is unable to obtain a Rating Confirmation by the 35th day after the Effective Date (a "**Rating Confirmation Failure**"), on the next Payment Date and on each subsequent Payment Date during the Revolving Period, amounts that are junior in right of payment to such Rating Confirmation Failure, as described under "Description of the Notes—Payments on the Notes; Priority of Distributions", will be applied to the redemption of the Notes (or, in the case of the Class B-1L Notes, first to pay accrued and unpaid interest from prior Payment Dates, then to pay principal) until each such Class is paid in full, in the order and according to the priorities described herein (a "**Rating Confirmation Failure Redemption**"), to the extent necessary to receive a Rating Confirmation, in accordance with the provisions described herein. |
| O/C Redemption | If on the Calculation Date related to any Payment Date any Overcollateralization Test or, after the second Payment Date, the Interest Coverage Test is not satisfied, amounts that are junior in right of payment to such test as described under "Description of the Notes—Payments on the Notes; Priority of Distributions", will be applied by the Issuer to the redemption of the Class A Notes and the Class B-1L Notes (or, in the case of the Class B-1L Notes, first to pay accrued and unpaid interest from prior Payment Dates, then to pay principal) until each such Class is paid in full, in each case on a *pro rata* basis among the Noteholders of the applicable Class and in the order and according to the priorities described herein (an "**O/C Redemption**") to the extent necessary to satisfy the Overcollateralization Tests and the Interest Coverage Test, as applicable. See "Description of the Notes—O/C Redemption." A redemption of the Notes through a Rating Confirmation Failure Redemption or an O/C Redemption is sometimes referred to herein as a "**Mandatory Redemption**." The Class X Notes are not subject to O/C Redemption, but are subject to Rating Confirmation Failure. |
| Initial Deposit Redemption | To the extent that the full amount of the Deposit is not used to purchase or commit to purchase Original Portfolio Collateral having an Aggregate Principal Amount (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to the Original Portfolio Collateral on or before the Effective Date) at least equal to the Required Portfolio Collateral Amount in accordance with the guidelines described herein on or before the |

008354

Effective Date, an amount (not in excess of the unused amount of the Deposit) equal to the difference between the Required Portfolio Collateral Amount and the par amount of Portfolio Collateral actually acquired (or committed to be acquired) (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to the Original Portfolio Collateral on or before the Effective Date) will be applied by the Issuer on the November 2006 Payment Date (the "**Initial Deposit Redemption Date**") to principal payments of the Class A-1LA Notes and the Class X Notes, on a *pro rata* basis (an "**Initial Deposit Redemption**"), except, if the amount of the Deposit not so used to purchase or commit to purchase Original Portfolio Collateral does not exceed U.S.$2,000,000 in the aggregate, such amount will be transferred to the Collection Account on the Effective Date and applied as Collateral Principal Collections. See "Description of the Notes—Initial Deposit Redemption."

Special Redemption

The Notes (other than the Class X Notes) are redeemable in part at the option of the Issuer, as directed by and at the discretion of the Servicer, on one or more Payment Dates during the Revolving Period, to the extent the Issuer is unable to reinvest more than U.S.$2,000,000 of principal collections in Additional Portfolio Collateral selected by the Servicer and satisfying the criteria described herein for at least ninety days after receipt, in an amount of at least U.S.$2,000,000. See "Description of the Notes—Special Redemption."

Optional Redemption

The Notes are redeemable in whole or in part (an "**Optional Redemption**") at the option of the Issuer at the direction of (i) at least 75% of the Preferred Shares eligible to vote (including any Class II Preferred Shares held by Highland Financial Partners L.P. or an affiliate or subsidiary thereof ("**HFP**") and any other Preferred Shares held by the Servicer, entities affiliated with the Servicer or clients of the Servicer (collectively, the "**Servicer Entities**") up to a maximum amount equal to the amount of Class II Preferred Shares acquired by HFP on the Closing Date ("**Original HFP Share Amount**"), but excluding any other Preferred Shares beneficially owned or controlled by the Servicer Entities which shall be deemed ineligible to vote) in the case of an Optional Redemption in whole (a "**Total Optional Redemption**"), and (ii) at least 10% of the Preferred Shares eligible to vote (any Class II Preferred Shares held by HFP or any other Preferred Shares beneficially owned or controlled by any other Servicer Entities shall be deemed ineligible to vote) in the case of an Optional Redemption in part (a "**Partial Optional Redemption**"), in the case of either (i) or (ii) above on any Payment Date on or after the Payment Date occurring on August 1, 2010 (the "**Optional Redemption Date**," which date shall then be considered the Final Maturity Date in the case of a Total Optional Redemption at a price equal to the Optional Redemption Price. See "Description of the Notes—Optional Redemption."

Tax Event Redemption

The Notes are redeemable, at the option of the Issuer, acting at the direction of at least a Majority of the Preferred Shares or a majority of the Controlling Class (but only if the Aggregate Principal Balance of Portfolio Collateral is less than 100% of the Class A-1L Notes) (a "**Tax Event Redemption**"), in whole but not in part, at a price equal to the Tax Event Redemption Price if as a result of a change in tax law, rule or regulation or the interpretation thereof, the payments to be received on the Portfolio Collateral are reduced as a result of the imposition of withholding tax or the Issuer is otherwise subjected to tax such that the income of the Issuer is reduced in an amount determined by such Holders of the Preferred Shares to be material. See "Description of the

Notes—Tax Event Redemption."

| | |
|---|---|
| Amendment Buy-Out | In the case of any supplemental indenture that requires the consent of one or more Holders of the Notes or Preferred Shares, the Amendment Buy-Out Purchaser shall have the right, but not the obligation, to purchase from all Non-Consenting Holders all Notes and Preferred Shares held by such Holders whose consent was solicited with respect to such supplemental indenture, with certain exceptions as set forth in "Legal Structure—The Indenture; Amendment Buy-Out" (the "**Amendment Buy-Out Option**") for the applicable Amendment Buy-Out Purchase Price. If such option is exercised, the Amendment Buy-Out Purchaser must purchase all Notes and Preferred Shares of Non-Consenting Holders (an "**Amendment Buy-Out**"). By its acceptance of a Note or Preferred Share, each such Holder agrees that if the Amendment Buy-Out Option is exercised, any Non-Consenting Holder will be required to sell its Notes or Preferred Shares to the Amendment Buy-Out Purchaser. See "Legal Structure—The Indenture; Amendment Buy-Out." |
| | All purchases made pursuant to the Amendment Buy-Out Option individually and in the aggregate must comply with the applicable transfer restrictions for the relevant Notes set forth in "Delivery of the Notes; Transfer Restrictions; Settlement" herein and all applicable laws, rules and regulations (including, without limitation, any rules, regulations and procedures of any securities exchange, self-regulatory organization or clearing agency). |
| Security for the Notes | The Notes are non-recourse obligations of the Co-Issuers, with recourse therefor limited solely to any funds and other assets available in the Trust Estate, including the Portfolio Collateral and the proceeds therefrom. All payments on the Notes are subject to the priority of distribution provisions described herein. |
| | The Notes will be secured by the Trust Estate, consisting of substantially all property of the Issuer, including the Portfolio Collateral, the Collection Account, the Initial Deposit Account, the Loan Funding Account, the Expense Reimbursement Account, the Closing Expense Account, the Reserve Account, each Default Swap Collateral Account and the Default Swap Issuer Account (collectively, the "**Trust Estate**"). The security interest granted under the Indenture in each Default Swap Collateral Account is subject to and subordinate to the security interest and rights of the relevant Default Swap Counterparty in and to such Default Swap Collateral Account and the security interest granted under the Indenture in the Default Swap Issuer Account is subject to the rights of the relevant Default Swap Counterparty to the extent described in the related Default Swap. References to the Collection Account, the Initial Deposit Account, the Loan Funding Account, the Expense Reimbursement Account, the Closing Expense Account, the Reserve Account the Default Swap Collateral Account and the Default Swap Issuer Account, when used with respect to the contents of the Trust Estate, shall include all proceeds of such Accounts and all Eligible Investments purchased with funds on deposit in such Accounts. |
| Portfolio Collateral and Deposit | The Portfolio Collateral will consist of United States dollar denominated commercial loans and collateralized loan obligations, including synthetic securities, that are rated primarily below investment grade issued by corporations, partnerships, limited liability companies or trusts. Interests in commercial loans included in the Portfolio Collateral, which may be in the form of participations and assignments, are referred to herein as "**Portfolio Loans**" and the collateralized loan obligations included in the Portfolio |

008356

Collateral are referred to herein as "**CLO Securities**." See "Security for the Notes—Portfolio Collateral—General."

The Issuer will acquire all of the Initial Portfolio Collateral from various sources, including Bear, Stearns & Co. Inc., in each case, at negotiated prices acceptable to the Issuer. Between the Closing Date and the Effective Date, purchases of additional Original Portfolio Collateral from the Deposit together with the Initial Portfolio Collateral will be required to meet the criteria described herein. See "Security for the Notes—Changes in Composition of Portfolio Collateral."

During the Revolving Period, certain collections and disposition proceeds in respect of Portfolio Collateral may be applied to purchase Additional Portfolio Collateral or Substitute Portfolio Collateral, respectively, subject to satisfaction of the collateral criteria described herein and the satisfaction or, in certain cases, maintenance of the Overcollateralization Tests and, after the second Payment Date, the Interest Coverage Test. In addition, after the Revolving Period, certain limited collections and certain disposition proceeds in respect of Portfolio Collateral may be applied to purchase Additional Portfolio Collateral and Substitute Portfolio Collateral subject to satisfaction of the Overcollateralization Tests, the Interest Coverage Test and the collateral criteria contained herein. The Indenture also authorizes the Servicer to direct the Trustee to sell items of Defaulted Portfolio Collateral, Equity Portfolio Collateral, Credit Risk Portfolio Collateral, Credit Improved Portfolio Collateral and other items of Portfolio Collateral, subject to the limitations set forth therein and described herein under "Security for the Notes—Changes in Composition of Portfolio Collateral," "The Servicer" and "The Servicing Agreement." During any Due Period when certain collections are to be used to purchase Additional Portfolio Collateral, the Servicer generally will have the authority to commence the purchase of such Additional Portfolio Collateral if collections have been or are scheduled to be received during such Due Period in an amount at least equal to the sum of the Periodic Reserve Amount.

Notwithstanding anything contained herein to the contrary, no item of Portfolio Collateral may be disposed of, and no item of Portfolio Collateral may be acquired, for the primary purpose of recognizing gains or decreasing losses resulting from market value changes. See "Security for the Notes—Portfolio Collateral—General."

<u>Extension of the Revolving Period and the Final Maturity Date</u>

The Issuer, if directed by the Servicer, shall be entitled on each Extension Effective Date up to a maximum of four times (so that the Notes can only be extended to 2037) to extend the Revolving Period to the applicable Extended Revolving Period End Date if (i) in the case of an Extension Effective Date occurring after the first Extension Effective Date, the Issuer has previously affected a Maturity Extension for each preceding Extension Effective Date, (ii) the Extension Conditions are satisfied, (iii) the Issuer has given written notice of its election to extend the Revolving Period no later than 60 days and no earlier than 90 days prior to such Extension Effective Date and (iv) no Event of Default has occurred and is continuing. For purposes of the foregoing, "**Extension Effective Date**" means if an Extension has occurred, the sixteenth Payment Date after the then current Extension Effective Date (or, in the case of the first Extension Effective Date, the Payment Date in August 2011) and "**Extended Revolving Period End Date**" means, if an Extension has occurred, the sixteenth Payment Date after the then current Extended Revolving Period End Date (or, in the case of the first Extension,

008357

the Payment Date in August 2015). If the Extension Conditions are satisfied, the Final Maturity Date of the Notes (other than the Class X Notes) shall be extended to the related Extended Final Maturity Date and the Weighted Average Life Test shall be automatically extended to the related Extended Weighted Average Life Date, without any requirement for approval or consent of any Holders of the Notes or the Preferred Shares or amendment or supplement to the Indenture or any other transaction document (the "**Maturity Extension**"). For purposes of the foregoing, "**Extended Final Maturity Date**" means, if a Maturity Extension has occurred, the sixteenth Payment Date after the then current Extended Final Maturity Date (or, in the case of the first Extended Final Maturity Date, the Payment Date in August 2025) and "**Extended Weighted Average Life Date**" means, if a Maturity Extension has occurred, the sixteenth Payment Date after the then current Extended Weighted Average Life Date (or, in the case of the first Extended Weighted Average Life Date, May 1, 2019; *provided* that if the Extension Conditions are not satisfied because the Holders of the Class A-1LA Notes have failed to deliver an Extension Sale Notice or have failed to provide their written consent to the related Maturity Extension, then the Servicer may exceed seven Business Days after the then proposed Extension Effective Date) if the Servicer shall cause the Extension Conditions set forth in clause (v) of such definition to be satisfied as of such later date. As a condition to a Maturity Extension, any Holder of Notes (other than the Class X Notes) will have the right to offer to sell their Notes to one or more Extension Qualifying Purchasers for purchase on the applicable Extension Effective Date. If all Extension Conditions are satisfied and a Maturity Extension is effected, each Holder of such Notes, other than Extension Sale Securities will be entitled to receive the applicable Extension Bonus Payment, in each case to the extent of available funds and as provided in the priority of payments. Holders of Preferred Shares will not be entitled to receive any Extension Bonus Payment. The obligation to make any Extension Bonus Payment shall not be rated by the Rating Agencies. See "Special Considerations—A Maturity Extension," "Maturity and Prepayment Considerations," "Description of the Notes—Extension of the Revolving Period and the Final Maturity Date". The Class X Notes are not subject to Maturity Extension.

Additional Issuance

At any time during the Revolving Period, the Issuer, as applicable, may issue and sell Additional Preferred Shares and use the proceeds therefrom to purchase additional eligible Portfolio Collateral and pay the expenses of such additional issuance (an "**Additional Issuance**"); *provided* that certain conditions precedent specified in the Indenture (as described herein) are satisfied. See "Description of the Notes—Additional Issuance." Any amendment to the Indenture, Issuer's Memorandum of Association and Articles of Association or any other related documents required to provide for or facilitate such Additional Issuance will not require the consent of the Holders of Securities.

Accounts

All Collections (together with any income thereon) will be remitted to the Trustee and deposited into the Collection Account and will be available, to the extent described herein, for application in the manner and for the purposes as described herein. Funds held in the Collection Account that are not used to purchase Additional Portfolio Collateral or Substitute Portfolio Collateral will be applied as promptly as practicable to purchase Eligible Investments. All cash pledged to the Trustee on the Closing Date which is to be subsequently used to purchase Original Portfolio Collateral on or before the Effective Date will be deposited into the Initial Deposit Account. Funds held in the Initial Deposit Account pending application to purchase Original Portfolio Collateral will be held

008358

|  | in Eligible Investments at the direction of the Issuer. A Closing Expense Account will be established by the Trustee for the payment of fees, commissions and expenses associated with the issuance of the Notes. A Reserve Account will be established by the Trustee to fund a portion of the payments to be made in accordance with the Priority of Payments, or to otherwise fund any payments of interest or principal on the Notes at the direction of the Servicer. An Expense Reimbursement Account of U.S.$50,000 will be established by the Trustee for the payment of Issuer administrative expenses which become due and must be paid between Payment Dates. Any amounts withdrawn from the Expense Reimbursement Account will be reimbursed on each Payment Date in accordance with the priority of distribution provisions described herein. The Trustee will establish a Loan Funding Account into which certain amounts with respect to any Delayed Drawdown Loans and Revolving Bank Loans will be deposited. The Trustee will establish the Default Swap Collateral Account to which Default Swap Collateral will be credited for the benefit of the related Default Swap Counterparties. In addition, if the terms of any Default Swap require the related Default Swap Counterparty to secure its obligations with respect to such Default Swap, the Trustee will cause to be established a Default Swap Issuer Account in respect of such Default Swap. Funds held in such Accounts will be held in Eligible Investments. See "Security for the Notes—Accounts." |
|---|---|
| The Servicer | Highland Capital Management, L.P. (the "**Servicer**" or "**Highland**"), will service the Portfolio Collateral and perform certain other reporting functions pursuant to a servicing agreement with the Issuer (the "**Servicing Agreement**"). See "The Servicer" and "The Servicing Agreement." |
|  | It is expected that Highland Financial Partners, L.P. or an affiliate or subsidiary thereof ("**HFP**") will purchase approximately 45,000,000 Class II Preferred Shares of the Issuer on the Closing Date, representing approximately 58% of the total Preferred Shares outstanding (the "**Original HFP Share Amount**"). It is also expected that Highland will purchase approximately 10,000,000 of the preferred shares of Investor Corp. and approximately U.S$2,000,000 Aggregate Principal Amount of the Class B-1L Notes on the Closing Date. In addition, the Servicer Entities may also acquire Notes or Preferred Shares upon the occurrence of an Amendment Buy-Out or a Maturity Extension as described herein. See "Special Considerations— Conflicts of Interest," "Special Considerations—Amendment Buy-Out Risk", "Special Considerations—Amendment Buy-Out Risk," "Legal Structure— The Indenture; Amendment Buy-Out," "Description of the Notes—Extension of the Revolving Period and the Final Maturity Date" and "The Servicing Agreement." |
| The Trustee | JPMorgan Chase Bank, National Association, as Trustee under the Indenture. The Trustee maintains its principal corporate trust offices at 600 Travis Street, 50th Floor, Houston, Texas 77002, at which the Notes may be surrendered for payment or for transfer or exchange. |
| Independent Accountants | A firm of Independent Accountants as selected by the Servicer, or any successor accounting firm selected pursuant to the Indenture, will periodically perform certain procedures with respect to the Portfolio Collateral and the compliance with the Overcollateralization Tests and the Interest Coverage Test as required by the Indenture. |
| The Administrator | Maples Finance Limited (the "**Administrator**") will act as administrator for the Issuer in the Cayman Islands and will perform certain administrative services on behalf of the Issuer. The Administrator maintains its offices at |

008359

|  | P.O. Box 1093 GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands. |
|---|---|
| Option to Acquire Credit Enhancement | The Indenture will provide that Holders of any Class of Notes may elect to acquire bond insurance, a surety bond or similar credit enhancement supporting the payment of principal and/or interest on such Class of Notes, on terms and conditions acceptable to such Holders. Any Class of Notes subject to such enhancement will be designated as Insured Notes of such Class. Premiums for any such enhancement will be payable from amounts otherwise payable to such Class of Insured Notes or in such other manner chosen by such Holder. Any Insured Notes of a Class for substantially all other purposes will be treated as Notes of such Class, except that the issuer of the bond insurance policy, surety bond or other such credit enhancement will generally be deemed to be the Holder of the Notes of such Class enhanced by such entity and will in such capacity be entitled to exercise the rights otherwise exercisable by Holders of such Notes. |
| Certain Federal Income Tax Consequences | *Federal Income Tax Consequences to U.S. Holders of Notes.* The Notes should be treated as debt of the Issuer for United States federal income tax purposes. Under rules applicable to original issue discount, a U.S. Holder of a Class A-3L Note, a Class A-4L Note or a Class B-1L Note may need to include all stated interest as original issue discount in gross income as it accrues according to a constant yield method based on daily compounding, regardless of such Holder's method of accounting. See "Certain Tax Considerations."

*Federal Income Tax Consequences to Non-U.S. Holders.* A Non-U.S. Holder that has no connection with the United States other than holding its Note will not be subject to United States federal withholding tax or income tax on payments of principal and interest (including original issue discount) in respect of a Note. See "Certain Tax Considerations—Non-U.S. Holders."

*Federal Income Tax Consequences to the Issuer.* The Issuer generally expects not to be subject to United States federal withholding tax (*provided* certain tax representations are made) or income tax on interest income (including original issue discount) or gain from the Portfolio Collateral or the Eligible Investments. See "Certain Tax Considerations." |
| Certain ERISA Considerations | Fiduciaries and other persons investing "plan assets" of employee benefit or other plans subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), or Section 4975 of the Internal Revenue Code of 1986, as amended (the "**Code**") (each, a "**Plan**"), should consider the fiduciary investment standards and prohibited transaction rules of ERISA and Section 4975 of the Code before authorizing an investment of "plan assets" of any Plan in the Notes. Each person purchasing a Class X Note, a Class A-1LA Note, a Class A-1LB Note, a Class A-2L Note, a Class A-3L Note or a Class A-4L Note will be deemed to have made certain representations regarding the prohibited transaction rules of ERISA and Section 4975 of the Code. The Class B-1L Notes may not be sold or transferred to any Plan, or to any person acting on behalf of or with "plan assets" of any Plan, including an insurance company general account, unless the purchaser or transferee is eligible for the exemptive relief available under PTCE 96-23, 95-60, 91-38, 90-1 or 84-14. See "Certain ERISA Considerations." |
| Legal Investment | Institutions whose investment activities are subject to legal investment laws and regulations or to review by certain regulatory authorities may be subject to conditions on investment in the Notes. See "Certain Legal Investment |

008360

Considerations."

| | |
|---|---|
| <u>Rating of Notes</u> | It is a condition to the issuance of the Notes that the Class X Notes, the Class A-1LA Notes and the Class A-1LB Notes be rated "AAA" by Standard & Poor's Ratings Services ("**S&P**") and "Aaa" by Moody's Investors Service, Inc. ("**Moody's**"), that the Class A-2L Notes be rated at least "AA" by S&P and at least "Aa2" by Moody's, that the Class A-3L Notes be rated at least "A" by S&P and at least "A2" by Moody's, that the Class A-4L Notes be rated at least "A-" by S&P and at least "A3" by Moody's and that the Class B-1L Notes be rated at least "BBB" by S&P and at least "Baa2" by Moody's. Each of S&P and Moody's is sometimes referred to herein as a "**Rating Agency**." Each of the ratings of the Notes described herein assume that no Maturity Extension occurs after the Closing Date. |

**The ratings of the Notes by S&P address solely the likelihood of timely payment of the Periodic Interest Amount on and the ultimate payment of the Aggregate Principal Amount of each Class of Senior Class A Notes, the timely payment of the Class X Payment and the ultimate payment of the Cumulative Interest Amount and the Aggregate Principal Amount of the Class A-3L Notes, the Class A-4L Notes and the Class B-1L Notes. The ratings of the Notes by Moody's address the ultimate cash receipt of all required payments as provided by the governing documents, and are based on the expected loss to the Noteholders of each Class relative to the promise of receiving the present value of such payments. Any obligation to make an Extension Bonus Payment will not be rated by the Rating Agencies. A rating is not a recommendation to purchase, hold or sell securities, in as much as such rating does not comment as to market price or suitability for a particular investor and may be subject to revision or withdrawal at any time by the assigning rating organization.**

Security ratings are subject to revision or withdrawal at any time by the assigning Rating Agency. In the event that any rating initially assigned to the Notes is subsequently lowered for any reason, no person or entity is obligated to provide any additional support or credit enhancement with respect to the Notes, nor will any other remedies be available to Noteholders. The Issuer has not requested a rating on the Notes by any rating agencies other than S&P and Moody's, although data with respect to the Portfolio Collateral may have been provided to other rating agencies solely for informational purposes. There can be no assurance that, if a rating is assigned to the Notes by any other rating agency, such rating will be as high as that assigned by the applicable Rating Agencies.

| | |
|---|---|
| <u>Listing</u> | Application may be made to the Irish Stock Exchange to admit the Notes to the Official List. There can be no assurance that such admission will be granted or maintained. |

008361

## SPECIAL CONSIDERATIONS

Prospective Holders of Notes should consider, among other things, the following factors in connection with the purchase of the Notes.

1. <u>Non-recourse Obligations</u>. The Notes will be non-recourse obligations of the Co-Issuers, payable solely from the Portfolio Collateral (including the Portfolio Collateral initially pledged to secure the Notes, as well as Additional Portfolio Collateral and Substitute Portfolio Collateral to be purchased from time to time as described herein), the Collection Account, the Initial Deposit Account, the Loan Funding Account, the Default Swap Collateral Account (subject to the rights of the related Default Swap Counterparty), the Default Swap Issuer Account (subject to the rights of the related Default Swap Counterparty) the Expense Reimbursement Account and the Closing Expense Account, including all proceeds of such Accounts and all Eligible Investments purchased with funds on deposit in such Accounts (collectively, the "**Trust Estate**") pledged to secure the Notes. The Issuer, as a special purpose Cayman Islands company, will have no significant assets other than the Trust Estate. The Co-Issuer will have no substantial assets, and no other person or entity except for the Co-Issuers will be obligated to make any payments on the Notes. Consequently, Holders of the Notes must rely solely upon distributions on the Trust Estate for the payment of amounts payable in respect of the Notes. If distributions on the Trust Estate are insufficient to make payments on the Notes, no other assets of the Issuer or any other person or entity will be available for the payment of the deficiency, the Co-Issuers shall have no further obligation to pay such deficiency, and any sums outstanding and unpaid shall be extinguished.

2. <u>Subordination</u>. The Class A-1LB Notes are subordinated to the Class A-1LA Notes with respect to principal only, to the extent described herein, the Class A-2L Notes are subordinated to the Class A-1L Notes and the Class X Notes, the Class A-3L Notes are subordinated to the Senior Class A Notes and the Class X Notes, the Class A-4L Notes are subordinated to the Senior Class A-Notes, the Class A-3L Notes and the Class X Notes and the Class B-1L Notes are subordinated to the Class A Notes and the Class X Notes, and, in the case of each Class of Notes, to the payment of certain fees and expenses as described herein. Payments of principal and interest on the Notes are subject to the priority of distribution provisions described herein. The failure to pay interest on the Class A-3L Notes will not constitute an Event of Default so long as any Senior Class A Notes or Class X Notes remain Outstanding, the failure to pay interest on the Class A-4L Notes will not constitute an Event of Default so long as any Senior Class A Notes, as Class A-3L Notes or Class X Notes remain Outstanding and the failure to pay interest on the Class B-1L Notes will not constitute an Event of Default so long as any Class A Notes or Class X Notes remain Outstanding. In addition, in the case of a Default or an Event of Default, so long as any Senior Class A Notes or Class X Notes remain Outstanding, the Holders of such Senior Class A Notes or Class X Notes will generally be entitled to determine the remedies to be exercised under the Indenture. Remedies pursued by the Holders of the Class A-1LA Notes and the Class X Notes could be adverse to the interests of the Class A-1LB Notes, the Class A-2L Notes, the Class A-3L Notes, the Class A-4L Notes and the Class B-1L Notes. Once an Event of Default has occurred and the Notes have been accelerated, Holders of the Class A-2L Notes are not entitled to be paid the Cumulative Interest Amount with respect thereto and the Aggregate Principal Amount thereof unless the Class A-1L Notes and the Class X Notes have been paid such amounts in full in cash, Holders of the Class A-3L Notes are not entitled to be paid the Cumulative Interest Amount with respect thereto and the Aggregate Principal Amount thereof unless the Senior Class A Notes and the Class X Notes have been paid such amounts in full in cash, Holders of the Class A-4L Notes are not entitled to be paid the Cumulative Interest Amount with respect thereto and the Aggregate Principal Amount thereof unless the Senior Class A Notes, the Class A-3L Notes and the Class X Notes have been paid such amounts in full in cash, and Holders of the Class B-1L Notes are not entitled to be paid the Cumulative Interest Amount with respect thereto and the Aggregate Principal Amount thereof unless the Class A Notes and the Class X Notes have been paid such amounts in full in cash. Notwithstanding such subordination, the Holders of the Class B-1L Notes may be entitled to payments of principal in connection with the Additional Collateral Deposit Requirement before the Notes senior thereto receive any payments of principal.

3. <u>Nature of Collateral Pledged to Secure the Notes; Ability to Obtain Additional Portfolio Collateral; Availability of Funds for Subordinate Payments</u>. The Portfolio Collateral pledged to secure the Notes includes commercial loans and collateralized loan obligations of both U.S. and certain non-U.S. obligors rated below investment grade, which have greater credit and liquidity risk than more highly rated obligations, and synthetic securities.

008362

The Portfolio Collateral will consist primarily of senior secured floating rate term commercial loans. Other loans in which the Issuer may invest include unsecured loans, second lien loans, debtor-in-possession financings and delayed drawdown loans and revolving bank loans. Loans are not generally traded on organized exchange markets but rather would typically be traded by banks and other institutional investors engaged in loan syndications. The liquidity of the Portfolio Loans will therefore depend on the liquidity of this market. Trading in loans is subject to delays as transfers may require extensive and customized documentation, the payment of significant fees and the consent of the agent bank or underlying obligor. Furthermore, Portfolio Loans typically provide that the applicable interest rate may be computed by reference to any of several base indices, at the option of the obligor. The interest rates of the Notes generally are calculated by reference to three-month LIBOR as an index. See "—Interest Rate Risk."

The Issuer intends to purchase Participations of Portfolio Loans in certain circumstances. Participations held by the Issuer in a Selling Institution's portion of a Portfolio Loan typically result in a contractual relationship only with such Selling Institution, not with the obligor. The Issuer has the right to receive payments of principal, interest and any fees to which it is entitled only from the Selling Institution selling the Participation and only upon receipt by such Selling Institution of such payments from the obligor. In connection with purchasing Participations, the Issuer generally will have no right to enforce compliance by the obligor with the terms of the related loan agreement, nor any rights of set-off against the obligor and the Issuer may not directly benefit from the collateral supporting the Portfolio Loan in which it has purchased the Participation. As a result, the Issuer will assume the credit risk of both the obligor and the Selling Institution selling the Participation. In the event of the insolvency of such Selling Institution, the Issuer may be treated as a general creditor of such Selling Institution, and may not benefit from any set-off between such Selling Institution and the obligor. When the Issuer holds a Participation in a Portfolio Loan it may not have the right to vote to waive enforcement of any restrictive covenant breached by an obligor or, if the Issuer does not vote as requested by the Selling Institution, it may be subject to repurchase of the Participation at par. Selling Institutions voting in connection with a potential waiver of a restrictive covenant may have interests different from those of the Issuer, and such Selling Institutions may not consider the interests of the Issuer in connection with their votes.

The Issuer will also purchase Assignments. The purchaser of an Assignment typically succeeds to all the rights and obligations of the assignor of the loan and becomes a lender under the loan agreement and other operative agreements relating to the Portfolio Loan. Assignments are, however, arranged through private negotiations between potential assignees and potential assignors, and the rights and obligations acquired by the purchaser of an Assignment may differ from, and be more limited than, those held by the assignor of the loan. In contrast to the rights of the Issuer as an owner of a Participation, the Issuer, as an assignee, will generally have the right to receive directly from the obligor all payments of principal, interest and any fees to which it is entitled. In some Assignments, the obligor may have the right to continue to make payments to the assignor with respect to the assigned portion of the Portfolio Loan. In such a case, the assignor would be obligated to receive such payments as agent for the Issuer and to promptly pay over to the Issuer such amounts as are received. As a purchaser of an Assignment, the Issuer typically will have the same voting rights as other lenders under the applicable loan agreement and will have the right to vote to waive enforcement of breaches of covenants. The Issuer will also have the same rights as other lenders to enforce compliance by the obligor with the terms of the loan agreement, to set-off claims against the obligor and to have recourse to collateral supporting the Portfolio Loan. As a result, the Issuer may not bear the credit risk of the assignor and the insolvency of an assignor of a loan should have little effect on the ability of the Issuer to continue to receive payments of principal, interest or fees from the obligor. The Issuer will, however, assume the credit risk of the obligor. Non-performing Portfolio Loans may require substantial workout negotiations or restructuring that may entail, among other things, a substantial reduction in the interest rate, a substantial write-down of the principal and/or a substantial extension of the amortization and/or maturity date of the Portfolio Loan. Any such reduction, write-down or extension will likely cause a significant decrease in the interest collections on the Portfolio Loans and any such write-down or extension will likely also cause a significant decrease in the principal collections on the Portfolio Loans.

The Portfolio Collateral will also consist of CLO Securities. CLO Securities generally are limited-recourse obligations of the issuer thereof payable solely from the underlying securities of such issuer or proceeds thereof. Consequently, holders of CLO Securities must rely solely on distributions on the underlying securities or proceeds thereof for payment in respect thereof. If distributions on the underlying securities are insufficient to make payments on the CLO Securities, no other assets will be available for payment of the deficiency and following

18

realization of the underlying assets, the obligations of such issuer to pay such deficiency shall be extinguished. Such underlying securities are expected to consist mainly of loans and other debt instruments, generally rated below investment grade (or of equivalent credit quality). In addition, certain CLO Securities (particularly subordinated CLO Securities) provide that the non payment of interest in cash on such securities will not constitute an event of default in certain circumstances and the holders of such securities will not have available to them any associated default remedies. Interest not paid in cash will generally be capitalized and added to the outstanding principal balance of the related security. Any such deferral will reduce the yield on such CLO Securities. Loan securities may be unsecured and may be subordinated to certain other obligations of the issuer thereof. The lower rating of below investment grade loans reflects a greater possibility that adverse changes in the financial condition of an issuer or in general economic conditions or both may impair the ability of the issuer to make payments of principal or interest. Such Portfolio Collateral may be speculative.

Issuers of CLO Securities may acquire interests in loans and other debt obligations by way of sale, assignment or participation. The purchaser of an assignment typically succeeds to all the rights and obligations of the assigning institution and becomes a lender under the credit agreement with respect to the debt obligation; however, its rights can be more restricted than those of the assigning institution.

CLO Securities are also subject to interest rate risk. The underlying securities of an issuer of CLO Securities may bear interest at a floating rate while the CLO Securities issued by such issuer may bear interest at a fixed rate (or the reverse may be true). As a result, there could be a floating/fixed rate or basis mismatch between such CLO Securities and underlying securities. In addition, there may be a timing mismatch between the CLO Securities and underlying securities that bear interest at a floating rate, as the interest rate on such floating rate underlying securities may adjust more frequently or less frequently, on different dates and based on different indices, than the interest rates on the CLO Securities. As a result of such mismatches, an increase or decrease in the level of the floating rate indices could adversely impact the ability of the issuers thereof to make payments on the CLO Securities.

In order to purchase and hold CLO Securities, the Issuer must satisfy at all times the investor qualifications in the indenture for each such obligation and in applicable securities laws. Generally, such indentures and applicable securities laws require that the Issuer either be a Qualified Institutional Buyer which is also a Qualified Purchaser or that it be a non-U.S. Person (as defined in Regulation S) which is also not a U.S. resident for purposes of the Investment Company Act. There can be no assurance that the Issuer will satisfy these requirements. In the event that the Issuer does not satisfy these requirements at any time, it will not be able to purchase CLO Securities, and it may be required under the underlying indentures for such underlying securities to sell CLO Securities which it previously purchased; any such "forced sale" by the Issuer is likely to be made at a loss.

In addition, a portion of the Portfolio Collateral may consist of Synthetic Securities. With respect to Synthetic Securities, the Issuer will usually have a contractual relationship only with the counterparty of such Synthetic Security, and not the Reference Obligor on the Reference Obligation. The Issuer generally will have no right directly to enforce compliance by the Reference Obligor with the terms of the Reference Obligation nor any rights of set-off against the Reference Obligor, nor have any voting or other consensual rights of ownership with respect to the Reference Obligation. The Issuer will not directly benefit from any collateral supporting the Reference Obligation and will not have the benefit of the remedies that would normally be available to a holder of such Reference Obligation. In addition, in the event of the insolvency of the counterparty, the Issuer will be treated as a general creditor of such counterparty, and will not have any claim of title with respect to the Reference Obligation. Consequently, the Issuer will be subject to the credit risk of the counterparty as well as that of the Reference Obligor. As a result, concentrations of Synthetic Securities entered into with any one counterparty will subject the Notes to an additional degree of risk with respect to defaults by such counterparty as well as by the Reference Obligor. One or more affiliates of the Initial Purchaser may act as counterparty with respect to all or a portion of the Synthetic Securities. These relationships may create certain conflicts of interest. See "—Potential Conflicts of Interest."

All or a portion of the Synthetic Securities are expected to consist of "pay as you go" credit default swaps. The obligation of the Issuer to make payments to the Default Swaps Counterparties under the Default Swaps creates credit exposure to the related Reference Obligations (as well as to the default risk of the Default Swap Counterparties). Following the occurrence of a "credit event" with respect to any Reference Obligation (a "**Credit**

008364

Event"), the Issuer will be required to pay to the Default Swap Counterparty an amount equal to the relevant "physical settlement amount" in return for the Reference Obligation. The payment of any physical settlement amount will be funded by the Issuer by drawing on amounts standing to the credit of the related Default Swap Collateral Account. In addition, each Default Swap will require the Issuer, in its capacity as protection seller, to pay "floating amounts" to the Default Swap Counterparty equal to any principal shortfalls, writedowns and interest shortfalls under the Reference Obligation upon the occurrence thereof (any such payment, a "**Credit Protection Payment**"). Although the Default Swap Counterparty, in its capacity as protection buyer, will be obligated to reimburse all or part of such Credit Protection Payments to the Issuer if the writedowns of the related shortfalls are ultimately paid to holders of the Reference Obligations or if the related Reference Obligations are written up, the amounts available to the Issuer to make payments in respect of the Notes and Preferred Shares will be reduced after payment by the Issuer of the relevant Credit Protection Payment to the Default Swap Counterparty until the Issuer receives such reimbursement, if any, from the Default Swap Counterparty. Under the Default Swaps, a writedown or failure to pay principal in respect of a Reference Obligation will entitle the Default Swap Counterparty, as protection buyer, to elect whether to require the Issuer to pay a physical settlement amount or a Credit Protection Payment under the related Default Swap.

In certain other circumstances in which a Default Swap may be terminated early, a termination payment may be due to or from the Issuer. If the Issuer is required to make a termination payment to the Default Swap Counterparty, such termination payment may be substantial and may affect the ability of the Issuer to make payments to the Noteholders and to the Holders of the Preferred Shares. Termination payments payable by the Issuer in respect of any Default Swap will include the market value to the Default Swap Counterparty of such terminated Default Swap, which may expose the Issuer to deterioration in the credit of the Reference Obligations and result in losses to the Issuer, even where no Credit Event has occurred. Even if the Default Swap Counterparty is required to make a termination payment to the Issuer, there is no assurance that the amount of such payment would be sufficient such that payments to the Holders of the Notes and the Preferred Shares would not be affected.

It is expected that the Issuer will acquire all of the Initial Portfolio Collateral to be acquired on the Closing Date from various sources, including Bear Stearns, at prices agreed upon by the Issuer with the advice of the Servicer. The price to be paid by the Issuer for such securities may be higher or lower, based on market conditions at the time of purchase by Bear Stearns or such other sources than the prices the Issuer would have paid had such securities all been purchased by such persons on the date such securities were sold to the Issuer. After the Closing Date, the Issuer with the advice of the Servicer may acquire from or through various sources, including Bear, Stearns & Co. Inc., Portfolio Collateral at current market prices which will be negotiated by or on behalf of the Issuer at such time. The Indenture does not restrict the ability of the Issuer to invest in Portfolio Collateral on the basis of its market value.

As described herein, the Indenture provides that the Servicer and the Issuer will seek to invest the Deposit in Original Portfolio Collateral having an Aggregate Principal Amount at least equal to the Required Portfolio Collateral Amount no later than the Effective Date, and that during certain specified periods thereafter significant portions of the collections received in respect of the Portfolio Collateral will be used to purchase Additional Portfolio Collateral to secure the Notes, which securities in any such case must satisfy the criteria specified in the Indenture. In addition, Collateral Disposition Proceeds may be used to purchase Substitute Portfolio Collateral, subject to satisfaction of the specified criteria. The ability of the Issuer to obtain such Original Portfolio Collateral, Additional Portfolio Collateral or Substitute Portfolio Collateral (and the rates and other terms thereof) and the terms on which such securities can be obtained, as well as the timing and amount of draws under the Delayed Drawdown Loans and the Revolving Loans and the rates and other terms obtained in connection with the funds held in Eligible Investments (including the Loan Funding Account), may affect the timing and amount of payments received by the Noteholders.

The Issuer will purchase and sell Portfolio Collateral from or to the Servicer and its affiliates, including assets managed by the Servicer and its affiliates, only to the extent the Servicer determines that such purchases and sales are consistent with the collateral guidelines and objectives of the Issuer, the restrictions contained in the Indenture and the Servicing Agreement and applicable law. In any event, all purchases or sales of Portfolio Collateral from such entities will be on an arms'-length basis for a price at least equal to the Market Value thereof.

On each Payment Date, subject to the satisfaction of the Overcollateralization Tests and, after the second Payment Date, the Interest Coverage Test and application of the Additional Collateral Deposit Requirement, and in

008365

accordance with the priority of distribution provisions described herein, certain collections on the Portfolio Collateral will be used to make certain subordinate payments free and clear of the lien of the Indenture, including payment of certain fees to the Servicer, payment of certain administrative expenses of the Issuer and payment to fund distributions to Holders of the Preferred Shares. To the extent that any such distributions are made rather than retained as additional collateral for the Notes, the amounts so distributed will not be available to support payments of principal and interest subsequently payable in respect of the Notes.

4.  <u>Default Rates of Commercial Loans and CLO Securities</u>. There are varying sources of statistical default rate data for commercial loans and collateralized loan obligations and numerous methods for measuring default rates. The historical performance of the loan market or collateralized loan market is not necessarily indicative of its future performance. Should increases in default rates occur with respect to the type of collateral comprising the Portfolio Collateral, the actual default rates of the Portfolio Collateral may exceed the hypothetical default rates used herein. See "Maturity and Prepayment Considerations." PROSPECTIVE PURCHASERS OF THE NOTES SHOULD CONSIDER AND DETERMINE FOR THEMSELVES THE LIKELY LEVEL OF DEFAULTS AND THE LEVEL OF RECOVERIES ON THE PORTFOLIO COLLATERAL DURING THE TERM OF THE NOTES.

5.  <u>Potential Illiquidity of Portfolio Collateral</u>. There is no established, liquid secondary market for many of the CLO Securities and Portfolio Loans which the Issuer may purchase and the lack of such an established, liquid secondary market may have an adverse effect on the market value of such CLO Securities and Portfolio Loans and the Issuer's ability to dispose of them. Such illiquidity may adversely affect the price and timing of the Issuer's liquidation of CLO Securities and Portfolio Loans, including the liquidation of CLO Securities and Portfolio Loans following the occurrence of an Event of Default under the Indenture or in connection with a redemption of the Notes.

Further, the items of Portfolio Collateral will be subject to certain transfer restrictions that may further restrict liquidity. Therefore, no assurance can be given that if the Issuer were to dispose of a particular item of Portfolio Collateral held by the Issuer, it could dispose of such Portfolio Collateral at the previously prevailing market price. A decrease in the market value of Portfolio Collateral would adversely affect the sale proceeds that could be obtained upon the sale of Portfolio Collateral and could ultimately affect the ability of the Co-Issuers to effect an Optional Redemption or Tax Event Redemption or pay the principal of the Notes, upon a liquidation of the Portfolio Collateral following the occurrence of an Event of Default.

The market value of the Portfolio Collateral will generally fluctuate with, among other things, changes in prevailing interest rates, general economic and political conditions, the condition of certain financial markets, developments or trends in any particular industry and the financial condition of the issuers of the Portfolio Collateral.

Any concentration of Portfolio Collateral in any one issuer, servicer or other characteristic may expose the Issuer to greater risk than would be the case if the Portfolio Collateral were more diversified, which would affect the Issuer's ability to make payments on the Notes.

The description of the Portfolio Collateral herein and the risks related thereto is general in nature and prospective purchasers should review the descriptions and risk factors relating to each item of Portfolio Collateral set forth in the underlying disclosure documents, transaction documents and servicing reports. PROSPECTIVE PURCHASERS SHOULD ASSESS FOR THEMSELVES THE RISKS INHERENT IN THE PORTFOLIO COLLATERAL.

6.  <u>The Issuer and Investors Will Have Limited Control of the Administration and Amendment of Portfolio Loans</u>. The Servicer will cause the Issuer to exercise or enforce, or refrain from exercising or enforcing, any or all of its rights in connection with the Portfolio Loans or any related documents or will refuse amendments or waivers of the terms of any Portfolio Loan and related documents in accordance with its customary business practices as if the Servicer were administering the Portfolio Loans for its own account. The authority of the Servicer to cause the Issuer to change the terms of the Portfolio Loans will generally not be restricted by the Indenture or the Servicing Agreement. As a result, the Issuer will be relying on the Servicer's customary business practices with respect to the

21

008366

servicing of the Portfolio Loans. The Holders of the Notes and the Issuer will not have any right to compel the Issuer or the Servicer to take or refrain from taking any actions other than in accordance with its customary business practices.

The terms and conditions of the loan agreements and related assignments may be amended, modified or waived only by the agreement of the lenders. Generally, any such agreement must include a majority or a super majority (measured by outstanding loans or commitments) or, in certain circumstances, a unanimous vote of the lenders. Consequently, the terms and conditions of the payment obligation arising from loan agreements could be modified, amended or waived in a manner contrary to the preferences of the Servicer or the Issuer, as the case may be, if a sufficient number of the other lenders concurred with such modification, amendment or waiver. There can be no assurance that any obligations arising from a loan agreement will maintain the terms and conditions to which the Issuer originally agreed.

The exercise of remedies may also be subject to the vote of a specified percentage of the lenders thereunder. The Servicer will have the authority to cause the Issuer to consent to certain amendments, waivers or modifications to the Portfolio Loans requested by obligors or the lead agents for loan syndication agreements. The Servicer may, in accordance with its servicing standards and subject to the transaction documents, cause the Issuer to extend or defer the maturity, adjust the outstanding balance of any Portfolio Loan, reduce or forgive interest or fees, release material collateral or guarantees, or otherwise amend, modify or waive the terms of any related loan agreement, including the payment terms thereunder. The Servicer will make such determinations in accordance with its servicing standards. Any amendment, waiver or modification of a Portfolio Loan could postpone the expected maturity of the Notes and/or reduce the likelihood of timely and complete payment of interest or principal under the Notes, as well as the timing and amount of payments to Holders of the Preferred Shares.

7. <u>Sale of Portfolio Collateral by Servicer Under Certain Circumstances</u>. Under the Indenture, the Servicer may only direct the disposition of Portfolio Collateral under certain limited circumstances. More specifically, the Servicer may direct the disposition of Portfolio Collateral that meets the definition of Defaulted Portfolio Collateral, Equity Portfolio Collateral, and, subject to satisfaction of the conditions set forth herein, Credit Risk Portfolio Collateral or Credit Improved Portfolio Collateral [or Collateral other than Credit Risk Portfolio Collateral]. Furthermore, the Servicer's ability to dispose of Portfolio Collateral may be subject to greater restrictions if any Class of Notes is downgraded. See "Security for the Notes—Changes in Composition of Portfolio Collateral." **Notwithstanding such restrictions and satisfaction of the conditions set forth in the Indenture, sales and purchases by the Servicer of Portfolio Collateral could result in losses by the Issuer, which losses may result in the reduction or withdrawal of the rating of any or all of the Notes by any of the Rating Agencies.** On the other hand, circumstances may exist under which the Servicer may believe that it is in the best interests of the Issuer to dispose of Portfolio Collateral, but the Issuer will not be permitted to do so under the restrictions and conditions of the Indenture.

A portion of the Portfolio Collateral may have fixed interest rates that remain constant until a specified date or their maturity, and a portion of the Portfolio Collateral will bear interest based on a fixed margin over a reference rate, which margin will generally remain constant until the maturity of such Portfolio Collateral. Accordingly, the market value of the fixed rate Portfolio Collateral will generally decrease as market rates of interest increase. The market value of such Portfolio Collateral will also generally fluctuate with, among other things, general economic conditions, world political events, developments or trends in any particular industry, the conditions of financial markets and the financial condition, results of operations and prospects of the Portfolio Collateral issuers. The Issuer will be relying on Rule 3a-7 and/or Section 3(c)(7) of the U.S. Investment Company Act of 1940, as amended (the "**Investment Company Act**") for its exemption from the Investment Company Act. The Rule 3a-7 exemption restricts the Issuer from disposing of any item of Defaulted Portfolio Collateral, Equity Portfolio Collateral, Credit Risk Portfolio Collateral or Credit Improved Portfolio Collateral or acquiring any item of Portfolio Collateral for the primary purpose of recognizing gains or decreasing losses resulting from market value changes. These restrictions mean that the Issuer may be required to hold an item of Portfolio Collateral or precluded from acquiring an item of Portfolio Collateral when it would have sold such item of Portfolio Collateral or acquired such item of Portfolio Collateral, as applicable, had it based such determination on expected market value changes. As a result, greater losses on the Portfolio Collateral may be sustained and there may be insufficient proceeds on any Payment Date to pay in full any expenses of the Issuer or any amounts payable to the Trustee or the Administrator (all of which

008367

amounts are payable prior to payments in respect of the Notes) and the principal of and interest on the Notes. See "Security for the Notes—Changes in Composition of Portfolio Collateral."

8.  <u>Sale of Collateral Upon Default of the Notes</u>.  The market value of the Portfolio Collateral will generally fluctuate with, among other things, general economic conditions, world political events, developments or trends in any particular industry, the conditions of financial markets and the financial condition of the issuers of the Portfolio Collateral.  In addition, CLO Securities included in the Portfolio Collateral, which will comprise no more than 35% of the Aggregate Principal Amount of the Portfolio Collateral included in the Trust Estate, may have interest rates that remain constant until their maturity.  Accordingly, their market value will generally fluctuate with changes in market rates of interest.  Therefore, if an Event of Default occurs with respect to the Notes, there can be no assurance that the proceeds of any sale by the Trustee of the Portfolio Collateral and the other collateral securing the Notes will be sufficient to pay in full the principal of and interest on the Notes and any amounts payable to the Trustee.  However, certain conditions set forth in the Indenture must be satisfied before the Trustee is permitted to sell the Portfolio Collateral and other collateral pledged as security for the Notes following an Event of Default.  See "Legal Structure—The Indenture—Events of Default."

9.  <u>Restrictions on Transfer</u>.  The Notes have not been registered under the U.S. Securities Act of 1933, as amended (the "**Securities Act**"), or under any U.S. state securities or "Blue Sky" laws or the securities laws of any other jurisdiction and are being issued and sold in reliance upon exemptions from registration provided by such laws.  There is no market for the Notes being offered hereby and, as a result, a purchaser must be prepared to hold the Notes for an indefinite period of time or until the maturity thereof.  No Note may be sold or transferred unless such sale or transfer (i) is exempt from the registration requirements of the Securities Act (for example, in reliance on exemptions provided by Rule 144A or Regulation S under the Securities Act) and applicable state securities laws, (ii) will not constitute or result in a non-exempt "prohibited transaction" under ERISA or Section 4975 of the Code and (iii) does not cause either of the Co-Issuers to become subject to the registration requirements of the Investment Company Act.  In addition, the Class B-1L Notes may not be sold or transferred to any Plan or to any person acting on behalf of or with "plan assets" of any such Plan, including an insurance company general account, unless the purchaser or transferee is eligible for the exemptive relief available under PTCE 96-23, 95-60, 91-38, 90-1 or 84-14.  Prospective transferees of the Notes will be required pursuant to the terms of the Indenture to deliver a certificate to the Trustee and the Co-Issuers relating to compliance with the Securities Act, applicable state securities laws, ERISA, Section 4975 of the Code and the Investment Company Act.  The Co-Issuers will not provide registration rights to any purchaser of the Notes and neither of the Co-Issuers, the Trustee, nor any other person may register the Notes under the Securities Act or any state securities or "Blue Sky" laws nor may the Co-Issuers or the Trustee take such action with respect to the Portfolio Collateral.  See "Description of the Notes—General."  The Notes will be owned by a relatively small number of investors and it is highly unlikely that an active secondary market for the Notes will develop.  Purchasers of the Notes may find it difficult or uneconomic to liquidate their investment at any particular time.

The Issuer has not registered as an investment company under the Investment Company Act in reliance on the exception provided under Rule 3a-7 and/or Section 3(c)(7) thereof.  While counsel will opine in connection with the sale of the Notes to the Initial Purchaser that neither the Issuer nor the Co-Issuer is on the Closing Date required to register as an investment company (assuming the Notes are sold to the Initial Purchaser in accordance with the terms of the Purchase Agreement (as defined herein) and that the Servicer services the Portfolio Collateral and other assets of the Issuer in accordance with the terms of the Servicing Agreement (as defined herein)), no opinion or no-action position has been requested of the United States Securities and Exchange Commission (the "**SEC**").  If the SEC or a court of competent jurisdiction were to find that the Issuer or the Co-Issuer is required to register as an investment company, possible consequences include, but are not limited to, the SEC applying to enjoin the violation, investors suing the Issuer or the Co-Issuer, as applicable, to recover any damages caused by the violation and any contract to which the Issuer or the Co-Issuer, as applicable, is a party made in violation or whose performance involves a violation of the Investment Company Act being unenforceable unless enforcing such contract would produce a more equitable result.  Should the Issuer or the Co-Issuer be subjected to any or all of the foregoing or to any other consequences, the Issuer or the Co-Issuer, as the case may be, would be materially and adversely affected.

Each transferee of a Note (except with respect to a transfer pursuant to Regulation S under the Securities Act) will be deemed to make certain representations at the time of transfer relating to compliance with Section 3(c)(7) of the Investment Company Act.  See "Delivery of the Notes; Transfer Restrictions; Settlement."

008368

The Indenture will provide that if, notwithstanding the restrictions on transfer contained therein, the Issuer determines any beneficial owner or Holder of a Note (other than a Note transferred in reliance on Regulation S of the Securities Act) is not a Qualified Institutional Buyer and a Qualified Purchaser, the Issuer will require that such beneficial owner or Holder sell all of its right, title and interest in such Note to a person who is so qualified, with such sale to be effected within 30 days after notice of such sale requirement is given.  If such sale is not effected within such 30 days, upon written direction from the Issuer, the Trustee (or an investment banker selected by the Trustee and approved by the Issuer) will be authorized to conduct a commercially reasonable sale of such Note to a person who does so qualify and pending transfer, no further payments will be made in respect of such Note or any beneficial interest therein.

10.  <u>Final Maturity Date; Average Life and Prepayment Considerations; Redemption</u>.  The Final Maturity Date of each Class of Notes (other than the Class X Notes) will be the Payment Date occurring in August 1, 2021 and the Final Maturity Date of the Class X Notes will be the Payment Date occurring in August 1, 2013; *provided that*, the Final Maturity Dates of the Notes (other than the Class X Notes) are extendable upon a Maturity Extension (if any) as described herein, in which case the Final Maturity Date of such Notes will be extended to the applicable Extended Final Maturity Date.  See "Description of the Notes—Extension of the Revolving Period and the Final Maturity Date".  The average life of each Class of Notes is expected to be shorter than the number of years until the Final Maturity Date, and the average lives may vary due to various factors affecting the early retirement of the Portfolio Collateral and the ability of the Servicer to invest collections in Additional Portfolio Collateral or reinvest disposition proceeds in Substitute Portfolio Collateral.  Retirement of an item of Portfolio Collateral prior to that item of Portfolio Collateral's respective final maturity will depend, among other things, on the financial condition of the issuer and the characteristics of the underlying item of Portfolio Collateral, including the existence and frequency of exercise of any prepayment or redemption features, the prevailing level of interest rates, the prepayment or redemption price and the actual default rate and the actual amount collected on any Defaulted Portfolio Collateral.  See "Maturity and Prepayment Considerations" and "Security for the Notes—Changes in Composition of Portfolio Collateral."  The ability of the Issuer to reinvest proceeds in securities with comparable interest rates, with final maturity dates on or before the Calculation Date prior to the Final Maturity Date and otherwise satisfying the criteria specified herein may affect the timing and amount of payments received by the Noteholders and the yield to maturity of the Notes.  If the Issuer is unable to reinvest more than U.S.$2,000,000 of collections of principal in Additional Portfolio Collateral selected by the Servicer meeting the criteria described herein for ninety days after receipt, the Servicer may direct the Trustee to apply such amounts to pay principal of the Notes (other than the Class X Notes) in a Special Redemption.  Any such application will affect the timing and amount of payments received by the Noteholders and the average life and yield to maturity of the Notes.

As described herein, the Notes are subject to a Tax Event Redemption on any Payment Date, at the option of the Issuer acting at the direction of at least a Majority of the Preferred Shares or a majority of the Controlling Class (but only if the Aggregate Principal Balance of Portfolio Collateral is less than 100% of the Class A-1L Notes), if as a result of a change in tax law, rule or regulation or the interpretation thereof, the payments to be received on the Portfolio Collateral are reduced as a result thereof as described herein.

As described herein, the Notes will be subject to an Optional Redemption, at the option of the Issuer acting at the direction of the Holders of the requisite amount of the Preferred Shares eligible to vote for any such redemption (See "Description of the Notes—Optional Redemption"), on any Optional Redemption Date, at a price equal to the Optional Redemption Price.

As described herein, at any time that the Notes are Outstanding, if any Overcollateralization Test or, after the second Payment Date, the Interest Coverage Test is not satisfied on any Payment Date, amounts that are junior in right of payment to such test as described under "Description of the Notes—Payments on the Notes; Priority of Distributions", will be applied to the redemption of the Class A Notes and the Class B-1L Notes (or, in the case of the Class B-1L Notes, first to pay accrued and unpaid interest from prior Payment Dates, then to pay principal) in an O/C Redemption on each such Payment Date, in the order described under "Description of the Notes—Payments on the Notes; Priority of Distributions," to the extent necessary to satisfy both the Overcollateralization Tests and the Interest Coverage Test.  Further, if following the Effective Date, the Issuer is not able to receive a Rating Confirmation, amounts that are junior in right of payment to such redemption as described herein, will be applied to the redemption of the Notes until the earlier of the Ratings Confirmation being received or each such Class being

24

008369

paid in full, in the order and according to the priorities described herein.  The Class X Notes are not subject to redemption in connection with an O/C Redemption, but are subject to Rating Confirmation Failure Redemption.

The Class B-1L Notes may be retired early as a result of principal payments made to the Class B-1L Notes in connection with the Additional Collateral Deposit Requirement.

As described herein, if the Issuer or the Servicer is unable to use (or commit) the full amount of the Deposit to purchase Original Portfolio Collateral having an Aggregate Principal Amount (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to the Original Portfolio Collateral on or before the Effective Date) at least equal to the Required Portfolio Collateral Amount and meeting the specified requirements no later than the Effective Date, an amount (not in excess of the amount of the Deposit not so used or committed for use) equal to the difference between the Required Portfolio Collateral Amount and the par amount of Portfolio Collateral actually acquired (or committed to be acquired) (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to the Original Portfolio Collateral on or before the Effective Date) shall be used to make principal payments of the Class A-1LA Notes  and the Class X Notes, on a *pro rata* basis, on the Initial Deposit Redemption Date except, if the amount of the Deposit not so used (or committed to be used) does not exceed U.S.$2,000,000 in the aggregate, such amount will be transferred to the Collection Account on the Effective Date.

11.  <u>Maturity Extension Risk</u>.  Under the Indenture, the Issuer, at the direction of the Servicer, shall be entitled on each Extension Effective Date, to extend the Revolving Period to the applicable Extended Revolving Period End Date up to a maximum of four times (so that the Notes can only be extended to 2037) if (i) in the case of an Extension Effective Date occurring after the first Extension Effective Date, the Issuer has previously affected a Maturity Extension for each preceding Extension Effective Date, (ii) the Extension Conditions are satisfied and (iii) the Issuer has given written notice of its election to extend the Revolving Period no later than 60 days and no earlier than 90 days prior to such Extension Effective Date. Under the Indenture, if the Revolving Period is so extended, the Final Maturity Date of the Notes (other than the Class X Notes) will be equally extended and the Weighted Average Life Test shall be extended without the requirement for any approval or consent of any Holders of Notes or Preferred Shares; *provided* that if the Extension Conditions are not satisfied because the Holders of the Class A-1LA Notes have failed to deliver an Extension Sale Notice or have failed to provide their written consent to the related Maturity Extension, then the Servicer may exceed seven Business Days after the then proposed Extension Effective Date) if the Servicer shall cause the Extension Conditions set forth in clause (iv) of such definition to be satisfied as of such later date.  Holders of the Notes will not be able to prevent or prohibit the extension of the Final Maturity Date so long as the Extension Conditions are satisfied, which include the ability of Holders of such Notes to sell their Notes at the designated purchase price to a designated purchaser under the Indenture. In the case of the Preferred Shares and any Maturity Extension, Holders of Preferred Shares that have received an Internal Rate of Return equal to or in excess of 12.0% as of the Extension Effective Date will not receive any payment in exchange for their Preferred Shares sold in connection with a Maturity Extension. See "Description of the Notes—Extension of the Revolving Period and the Final Maturity Date."  As a consequence, if the Servicer elects to extend the Revolving Period and the Extension Conditions are satisfied, the Holders of the Notes (other than the Class X Notes) and the Preferred Shares may either be required to hold their Notes and Preferred Shares for a significantly longer period of time or be forced to sell their Notes and Preferred Shares for the applicable purchase price under the Indenture, resulting in a shorter holding period than expected at the time of investment in the Notes and Preferred Shares.

12.  <u>Amendment Buy-Out Risk</u>.  Any Non-Consenting Holder of Notes or Preferred Shares with respect to an amendment of the Indenture (which includes Holders that fail to respond to a consent solicitation within the applicable period) may be forced to sell their applicable Notes or Preferred Shares to the Amendment Buy-Out Purchaser at the Amendment Buy-Out Purchase Price, resulting in a shorter holding period than expected at the time of investment in the Notes or Preferred Shares; *provided* that during the Non-Call Period, "Non-Consenting Holder" shall exclude any Holder of Class A-1LA Notes (unless such Holder has consented in writing to be designated as a Non-Consenting Holder) and the Amendment Buy-Out Option shall not be applicable to such Class A-1LA Notes. In the case of the Preferred Shares, the Indenture provides that the Amendment Buy-Out Purchase Price will be zero

for Non-Consenting Holders that have received an Internal Rate of Return equal to or in excess of 12.0% as of the Amendment Buy-Out Date. See "Legal Structure—The Indenture; Amendment Buy-Out." A Holder's ability to vote against an amendment or affect or influence the amendment process with respect to the Indenture will be limited by the possibility of an Amendment Buy-Out. The Amendment Buy-Out will also increase the ability of the Servicer to affect or influence the amendment process.

13.  Interest Rate Risk.  The Notes generally will bear interest at a rate based on three-month LIBOR, as described herein.  While most of the Portfolio Collateral will bear interest at floating rates, up to 5% of the Portfolio Collateral may bear interest at fixed rates.  Further, the obligors under the Portfolio Loans which are Floating Rate Collateral may choose different interest indices than the London interbank rate for three-month U.S. dollar deposits or the interest rates on the Floating Rate Collateral may be determined or adjustments may take effect on different dates than is the case for the Notes. Additionally, interest on the Notes is payable quarterly on each Payment Date while a portion of the Portfolio Collateral may provide for semiannual payments of interest.  Any such mismatches may adversely affect the Issuer's ability to pay amounts due in respect of the Notes.

14.  The Issuer.  The Issuer is a recently formed entity and has no significant prior operating history.  The Issuer has no significant assets other than the Trust Estate. The Issuer will not engage in any business activity other than the co-issuance of the Notes and the issuance of the Preferred Shares and the ordinary shares as described herein, the acquisition and disposition of Portfolio Collateral as described herein, certain activities conducted in connection with the payment of amounts in respect of the Notes and the Preferred Shares and the management of the collateral and other activities incidental to the foregoing. Income derived from the collateral will be the Issuer's principal source of cash.  The Issuer is a limited liability company incorporated under the laws of the Cayman Islands.  Because the Issuer is a Cayman Islands company and some of its directors reside in the Cayman Islands, it may not be possible for investors to effect service of process within the United States on such persons or to enforce against them or against the Issuer in United States courts judgments predicated upon the civil liability provisions of the United States securities laws.  None of the directors, security holders, members, officers or incorporators of the Co-Issuers, the Servicer, any of their respective affiliates or any other person or entity (other than the Issuer) will be obligated to make payments on the Notes or the Preferred Shares.

15.  The Co-Issuer.  The Co-Issuer is a newly-formed entity and has no prior operating history. The Co-Issuer has no substantial assets.  The Co-Issuer will not engage in any business activity other than the co-issuance of the Class X Notes, the Class A-1LA Notes, the Class A-1LB Notes, the Class A-2L Notes, the Class A-3L Notes, the Class A-4L Notes and the Class B-1L Notes.

16.  Fraudulent Conveyance Considerations.  Various federal and state laws enacted for the protection of creditors may apply to the Portfolio Collateral by virtue of the Issuer's role as a creditor with respect to such Portfolio Collateral.  If a court in a lawsuit brought by an unpaid creditor or representative of creditors of an obligor under an item of Portfolio Collateral, such as a trustee in bankruptcy or the obligor as debtor-in-possession, were to find that the obligor did not receive fair consideration or reasonably equivalent value for incurring indebtedness evidenced by an item of Portfolio Collateral, and the grant of any security interest or other lien securing such Portfolio Collateral, and, after giving effect to the incurring of such indebtedness, the obligor (i) was insolvent, (ii) was engaged in a business for which the assets remaining in such obligor constituted unreasonably small capital, or (iii) intended to incur, or believed that it would incur, debts beyond its ability to pay such debts as they mature, such court could invalidate, in whole or in part, such indebtedness and such security interest or other lien as fraudulent conveyances, subordinate such indebtedness to existing or future creditors of the obligor or recover amounts previously paid by the obligor (including to the Issuer) in satisfaction of such indebtedness or proceeds of such security interest or other lien previously applied in satisfaction of such indebtedness.  In addition, in the event of the insolvency of an issuer or other obligor of an item of Portfolio Collateral, payments made on the Portfolio Collateral could be subject to avoidance as a "preference" if made within a certain period of time (which may be as long as one year) before insolvency depending on a number of factors, including the amount of equity of the obligor owned by the Issuer and its affiliates and any contractual arrangements between the obligor, on the one hand, and the Issuer and its affiliates, on the other hand.  The measure of insolvency for purposes of the foregoing will vary depending on the law of the jurisdiction which is being applied.  Generally, however, an obligor would be considered insolvent at a particular time if the sum of its debts was greater than all of its property at a fair valuation or if the present fair saleable value of its assets was then less than the amount that would be required to pay its probable liabilities on its

008371

existing debts as they became absolute and matured. There can be no assurance as to what standard a court would apply in order to determine whether an obligor was insolvent after giving effect to the incurrence of the loan or that, regardless of the method of evaluation, a court would not determine that the obligor was "insolvent" upon giving effect to such incurrence.

In general, if payments on Portfolio Collateral are avoidable, whether as fraudulent conveyances or preferences, such payments can be recaptured either from the initial recipient (such as the Issuer) or from subsequent transferees of such payments, including Holders of the Notes.

17. <u>Lender Liability Considerations</u>. In recent years, a number of judicial decisions in the United States have upheld the right of borrowers to sue lending institutions on the basis of various evolving legal theories, including equitable subordination (collectively termed "**lender liability**"). Generally, lender liability is founded upon the premise that the institutional lender has violated a duty (whether implied or contractual) of good faith and fair dealing owed to the borrower or has assumed a degree of control over the borrower resulting in the creation of a fiduciary duty owed to the borrower. Although the Issuer is not engaged in the business of lending, the Issuer, as a creditor, may be subject to allegations of lender liability. Furthermore, the Issuer and the Servicer may be unable to control the conduct of the lenders under a loan syndication agreement requiring less than a unanimous vote, yet the Issuer may be subject to lender liability for such conduct.

18. <u>Environmental Risks</u>. Real property pledged as security with respect to an item of Portfolio Collateral may be subject to potential environmental risks. Of particular concern may be those mortgaged properties which are, or have been, the site of manufacturing, industrial or disposal activity. Such environmental risks may give rise to a diminution in the value of property securing any item of Portfolio Collateral or liability for cleanup costs or other remedial actions, which liability could exceed the value of such property or the principal balance of the related item of Portfolio Collateral. In certain circumstances, a lender may choose not to foreclose on contaminated property rather than risk incurring liability for remedial actions.

19. <u>Potential Conflicts of Interest</u>. It is expected that Highland Financial Partners, L.P. or an affiliate or subsidiary thereof ("**HFP**") will purchase approximately 45,000,000 of the Class II Preferred Shares of the Issuer on the Closing Date, representing approximately 58% of the total Preferred Shares outstanding (the "**Original HFP Share Amount**"). It is also expected that Highland will purchase approximately 10,000,000 of the preferred shares of Investor Corp. and approximately U.S.$2,000,000 Aggregate Principal Amount of the Class B-1L Notes on the Closing Date. In addition, the Servicer, entities affiliated with the Servicer or clients of the Servicer (collectively, the "**Servicer Entities**") may also acquire Notes or Preferred Shares upon the occurrence of an Amendment Buy-Out or a Maturity Extension as described herein. The interests of the Holders of the Preferred Shares and the Class B-1L Notes that are Servicer Entities, or any other Notes owned by the Servicer Entities, may be different from or adverse to the interests of the Holders of the other Notes and Preferred Shares. As the result of the ownership of Preferred Shares and Notes by the Servicer Entities, and the ability to vote the Preferred Shares and the Notes owned by the Servicer Entities up to a maximum amount equal to the Original HFP Share Amount, the affirmative vote or approval of the Preferred Shares owned by such Servicer Entities, may be required in order to cause an Optional Redemption or a Tax Redemption of the Notes. Preferred Shares owned or controlled by the Servicer Entities above the Original HFP Share Amount will be excluded from voting on certain matters including any Optional Redemption.

In addition to the Base Servicing Fee, the Servicer is entitled to receive an Additional Servicing Fee and an Supplemental Servicing Fee (if any) after all other distributions (other than certain distributions with respect to the Preferred Shares and certain administrative expenses) are made, which is dependent in large part on the performance of the securities purchased by the Servicer on behalf of the Issuer. This could create an inducement for the Servicer to service the Issuer's assets in such a manner as to seek to maximize the return on such securities. This could result in increasing the volatility of the Portfolio Collateral and could contribute to a decline in the aggregate value of the Portfolio Collateral. However, the Servicer's servicing of the Issuer's assets is restricted by the requirement that it comply with the restrictions described in "Security for the Notes" and by its internal policies with respect to the management of securities accounts.

008372

Various potential and actual conflicts of interest may arise from the overall activity of the Servicer, its affiliates and their respective clients. The following briefly summarizes some of these conflicts, but is not intended to be an exhaustive list of all such conflicts.

Certain Holders of the Notes and certain Holders of the Preferred Shares may be clients of the Servicer or one of its affiliates. Certain clients of the Servicer and its affiliates may invest in securities that would be appropriate for inclusion in the Trust Estate. Further, the Servicer currently serves and may in the future serve as servicer, collateral manager or the equivalent for other issuers of collateralized debt obligations, including collateralized debt obligation vehicles having objectives similar to those of the Issuer. The Servicer and its affiliates may make asset management decisions for its clients and affiliates that may be different from those made by the Servicer on behalf of the Issuer. The Servicer and its affiliates may also have ongoing relationships with, and may own or invest assets of their clients in, equity securities issued by issuers of Portfolio Collateral. In addition, affiliates and clients of the Servicer may invest in securities that are senior to, or have interests different from or adverse to, the securities included in the Trust Estate. An affiliate of the Servicer may earn fees with respect to financial advisory services rendered to companies in connection with workouts or the subsequent restructuring of such companies. Such fees and advice may continue for a period of time after any such workout or restructure. The Issuer may own an interest in the securities of such companies.

The Amendment Buy-Out will increase the ability of the Servicer to affect or influence the amendment process under the Indenture and will limit any Holder's ability to vote against an amendment or affect or influence the amendment process with respect to the Indenture.

If the Servicer elects to extend the Revolving Period and the Extension Conditions are satisfied, the Holders of the Notes and the Preferred Shares may either be required to hold their Notes and Preferred Shares for a significantly longer period of time or be forced to sell their Notes and Preferred Shares for the applicable purchase price under the Indenture, resulting in a shorter holding period than expected at the time of investment in the Notes and Preferred Shares.

In addition to acting as Servicer to the Issuer, Highland Capital Management L.P. will act as manager for HFP, which will, on the Closing Date, purchase all of the Class II Preferred Shares. Because Highland Capital Management will receive both a servicing fee from the Issuer for servicing the Portfolio Collateral and a management fee from HFP for managing HFP's assets, which will include the Class II Preferred Shares (and therefor a residual interest in the Portfolio Collateral), Highland Capital Management has agreed, in connection with the capital raising of HFP, to waive a portion of its servicing fees from the Issuer for two years following the Closing Date so as not to reduce the return on investment realized by HFP in respect of the Class II Preferred Shares. Thereafter Highland Capital Management may at its discretion continue to waive such portion of its servicing fees or may elect to receive such servicing fees in their entirety. Accordingly, during the first two years following the Closing Date, a portion (representing the percentage ownership of the Preferred Shares represented by the Class II Preferred Shares, which will initially be owned entirely by HFP) of the amounts that would otherwise be payable to the Servicer as a servicing fee will instead be payable on the Class II Preferred Shares as the Class II Preferred Share Dividends in accordance with the Priority of Payments. Thereafter, the Servicer may elect to continue to waive such same portion of the amounts that would otherwise be payable to the Servicer as a servicing fee, or any lesser portion of such amounts, and have such amounts be paid instead as the Class II Preferred Share Dividends. The Class II Preferred Shares and the Class I Preferred Shares will vote together as a single class and the existence of the Class II Preferred Share Dividends may cause HFP to have interests different from the holders of the Class I Preferred Shares.

The Trustee and its affiliates may invest in the loans or securities that would be appropriate for inclusion in the Trust Estate and the Trustee has no duty, in making those investments, to act in a way that is favorable to the Issuer or the Holders of the Notes or the Preferred Shares. The Trustee's affiliates currently serve and may in the future serve as collateral manager or the equivalent for other issuers of collateralized loan obligations.

It is expected that the Issuer will acquire all of the Initial Portfolio Collateral to be acquired on the Closing Date from Bear Stearns or other sources in each case, at prices agreed upon by the Issuer with the advice of the Servicer. Certain of such securities will be securities of issuers for which Bear Stearns has acted as underwriter, agent, placement agent or principal or of which Bear Stearns is an equity owner or which the Servicer or an affiliate

008373

of the Servicer has acted as manager, principal or counterparty. The price to be paid by the Issuer for such securities may be higher or lower, based on market conditions at the time of purchase from such sellers, than the prices the Issuer would have paid had such securities all been purchased from such sellers on the date such securities were sold to the Issuer. After the Closing Date, the Issuer with the advice of the Servicer may acquire from or through Bear Stearns or other sources Portfolio Collateral at current market prices which will be negotiated by or on behalf of the Issuer at such time.  In addition, from time to time the Servicer may sell Portfolio Collateral through Bear Stearns. Bear Stearns will also receive compensation for the sale of the Notes and the Preferred Shares.  See "Use of Proceeds" and "Plan of Distribution" herein.  Bear Stearns has also entered into certain indemnification agreements with the Servicer relating to, among other things, the acquisition of the Initial Portfolio Collateral.  An affiliate of the Initial Purchaser may be a Synthetic Security Counterparty and/or a Default Swap Counterparty.

20.  <u>Servicer Affiliates Reliance on Rule 3a-7; Potential Indenture Amendments</u>.  HFP, an affiliate of the Servicer will, on the Closing Date, purchase all of the Class II Preferred Shares.  The Servicer will act as the manager for HFP.  HFP and Highland Financial Trust, the owner of substantially all of the limited partnership interests of HFP, are relying on an exception from the definition of investment company and the requirement to register under the Investment Company Act that in turn depends, in part, upon the Issuer not being an investment company required to register under the Investment Company Act by reason of Rule 3a-7 thereunder.  It is expected that, in connection with certain capital raising activities of Highland Financial Trust, the SEC may consider the applicability of Rule 3a-7 to the Issuer.  If it were determined that the Issuer cannot rely on Rule 3a-7, the Servicer may cause the Issuer to amend the Indenture without the consent of the Holders of the Notes and without the consent of the Holders of the Preferred Shares to enable the Issuer to rely on Rule 3a-7, which could require additional limitations and prohibitions on the circumstances under which the Issuer may sell assets, on the type of assets that the Issuer may acquire out of the proceeds of assets that mature, are refinanced or otherwise sold, on the period during which such transactions may occur, on the level of transactions that may occur or on other provisions of the Indenture and could adversely affect the earnings of the Issuer and its ability to make payments on the Notes and distributions to the Preferred Shares.  As a condition to the effectiveness of any such amendment to the Indenture, the Issuer, the Trustee and the Initial Purchaser will (i) satisfy the Rating Condition with respect to such amendment and (ii) receive a customary, unqualified opinion of counsel from a nationally recognized law firm providing that, after giving effect to such amendment and assuming compliance with the Indenture as so amended, the Issuer is exempt from registration as an "investment company" under the Investment Company Act.  Such nationally recognized law firm may also be acting as counsel to the Servicer, certain Holders of Notes and/or Preferred Shares. The interests of any such parties may not coincide with the interest of other Holders of Notes and/or Preferred Shares. See "Legal Structure—The Indenture—Modification of Indenture."

21.  <u>Dependence on Key Personnel of the Servicer</u>.  The performance of the Portfolio Collateral will be highly dependent on the financial and managerial expertise of the Servicer.  See "The Servicer" and "The Servicing Agreement." The loss of one or more of the individuals servicing the Portfolio Collateral could have a significant material adverse effect on the performance of the Portfolio Collateral.  Although the Servicer will commit a significant amount of its efforts to the servicing of the Portfolio Collateral, it manages and will manage in the future other products and vehicles and is not required (and will not be able) to devote all of its time to the servicing of the Portfolio Collateral.

22.  <u>Ratings of the Notes</u>. The ratings of the Notes by S&P address solely the likelihood of timely payment of the Periodic Interest Amount on and the ultimate payment of the Aggregate Principal Amount of each Class of Senior Class A Notes, the timely payment of the Class X Payment and the ultimate payment of the Cumulative Interest Amount and the Aggregate Principal Amount of the Class A-3L Notes, the Class A-4L Notes and the Class B-1L Notes.  The ratings of the Notes by Moody's address the ultimate cash receipt of all required payments as provided by the governing documents, and are based on the expected loss to the Noteholders of each Class relative to the promise of receiving the present value of such payments.  A rating is not a recommendation to purchase, hold or sell securities, in as much as such rating does not comment as to market price or suitability for a particular investor and may be subject to revision or withdrawal at any time by the assigning rating organization.

23.  <u>Certain Tax Considerations</u>.  Investors in the Notes should review carefully the tax considerations set forth in "Certain Tax Considerations" herein.

008374

24. <u>Certain ERISA Considerations</u>. Investors in the Notes should review carefully the ERISA considerations set forth in "Certain ERISA Considerations" herein.

25. <u>Legislation and Regulations In Connection With the Prevention of Money Laundering</u>. The Uniting and Strengthening America By Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "**USA PATRIOT Act**"), signed into law and effective as of October 26, 2001, imposes anti-money laundering obligations on different types of financial institutions, including banks, broker-dealers and investment companies. The USA PATRIOT Act requires the Secretary of the United States Department of the Treasury (the "**Treasury**") to prescribe regulations to define the types of investment companies subject to the USA PATRIOT Act and the related anti-money laundering obligations. It is not clear whether Treasury will require entities such as the Issuer to enact anti-money laundering policies. It is possible that Treasury will promulgate regulations requiring the Co-Issuers or the Initial Purchaser or other service providers to the Co-Issuers, in connection with the establishment of anti-money laundering procedures, to share information with governmental authorities with respect to investors in the Notes and/or the Preferred Shares. Such legislation and/or regulations could require the Co-Issuers to implement additional restrictions on the transfer of the Notes and/or the Preferred Shares. As may be required, the Issuer reserves the right to request such information and take such actions as are necessary to enable it to comply with the USA PATRIOT Act.

26. <u>Emerging Requirements of the European Union.</u> As part of the harmonization of transparency requirements, the European Commission is scheduled to adopt a directive known as the Transparency Obligations Directive that, among other things, will regulate issuers of securities that are offered to the public or admitted to trading on a European Union regulated market. The listing of Notes on any European Union stock exchange would subject the Issuer to regulation under this directive, although the requirements applicable to the Issuer are not yet fully clarified. The Indenture will not require the Issuer to apply for, list or maintain a listing for any Class of Notes on a European Union stock exchange if compliance with this directive (or other requirements adopted by the European Commission or a relevant member state) becomes burdensome in the sole judgment of the Servicer. Should the Notes be delisted from any exchange, the ability of the Holders of such Notes to sell such Notes in the secondary market may be negatively affected.

27. <u>Document Repository</u>. Pursuant to the Indenture, the Issuer will consent to the posting of this Confidential Offering Circular, the Indenture and certain periodic reports required to be delivered pursuant to the Indenture, together with any amendments or modifications thereto, to the internet-based password protected electronic repository of transaction documents relating to privately offered and sold collateralized debt obligation securities located at "www.cdolibrary.com".

**THE ISSUER AND THE CO-ISSUER**

<u>The Issuer</u>

Rockwall CDO Ltd. (the "**Issuer**") was incorporated in the Cayman Islands on June 7, 2005, for the express purpose of issuing the Notes and the Preferred Shares, acquiring, disposing of and holding the assets described herein and engaging in the related transactions contemplated hereby.

The Issuer has no significant prior operating experience. The purposes for which the Issuer has been established are set forth in clause 3 of its Memorandum of Association and are unrestricted; however, the business activities in which the Issuer may engage will be limited by the Indenture to the issuance of the Notes and the Preferred Shares, the acquisition and disposition of Portfolio Collateral as described herein, ownership of the Co-Issuer's shares and certain activities conducted in connection with the payment of amounts in respect of the Notes and the Preferred Shares and the management of the collateral. Cash flow derived from the Portfolio Collateral and other collateral securing the Notes will be the Issuer's only sources of cash.

The registered office of the Issuer is at the offices of Maples Finance Limited, P.O. Box 1093 GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands and the registered number of the Issuer is 150044.

008375

The proceeds of the offering of Notes will be used, together with the proceeds of the sale of the Preferred Shares, to purchase Portfolio Collateral, to fund the Deposit and the Expense Reimbursement Account and to pay organizational, structuring, legal and offering fees and expenses.

Investor Corp.

On the Closing Date, Rockwall Investors Corp. ("**Investor Corp.**"), an exempted limited liability corporation incorporated under the laws of the Cayman Islands, is expected to purchase 100% of the Class I Preferred Shares of the Issuer issued on the Closing Date, and will issue an equivalent number of its preferred shares to third party investors and to Highland.

The Administrator

The Issuer has appointed Maples Finance Limited in the Cayman Islands, as Administrator to perform certain administrative functions on its behalf.

Share Capital

The Issuer's authorized share capital is U.S.$600,250 and consists of 250 ordinary shares of U.S.$1.00 par each, 300,000,000 Class I Preferred Shares of U.S.$0.001 par each and 300,000,000 Class II Preferred Shares of U.S.$0.001 par each. As of the Closing Date, 250 ordinary shares, 33,200,000 Class I Preferred Shares and 45,000,000 Class II Preferred Shares will have been issued and will be fully paid-up. All of the issued and outstanding ordinary shares of the Issuer are held in trust for the benefit of certain charitable entities.

The Class I Preferred Shares and the Class II Preferred Shares will be identical in all respects except that the Class II Preferred Shares will also be entitled, subject to any restrictions under Cayman Islands law, to the Class II Preferred Share Dividends. In addition to the Class II Preferred Share Dividends payable on the Class II Preferred Shares, regular dividends will be payable on the Class II Preferred Shares and the Class I Preferred Shares on each Payment Date in the amounts and in the priority described under the Priority of Payments; *provided* that, if and to the extent sufficient funds to pay such regular dividends in accordance with the Priority of Payments and Cayman Islands law are not available on any Payment Date, such unpaid regular dividends will cease to be payable on such Payment Date or any other date. Class II Preferred Share Dividends will be paid to the Holders of the Class II Preferred Shares on a *pro rata* basis according to the number of Class II Preferred Shares held by each Holder. All other dividends and distributions in respect of the Preferred Shares will be paid to the Holders of the Preferred Shares on a *pro rata* basis according to the number of Preferred Shares held by each Holder. Following the liquidation of the Collateral and the distribution of any available remaining funds following a redemption of the Notes and payment of all other obligations of the Co-Issuers (other than amounts payable by the Issuer to the Holders of the Preferred Shares) or an Event of Default under the Indenture or otherwise, the Preferred Shares will be redeemed, whether or not the Holders thereof receive any payments in respect of such redemption.

The Directors of the Issuer are responsible for the management and administration of the Issuer. Currently, the Directors are Wendy Ebanks and Guy Major. As of the Closing Date, HFP, which will hold all of the Class II Preferred Shares, will have full voting rights with respect to the appointment and removal of the Directors of the Issuer.

The Co-Issuer

The Co-Issuer was incorporated on June 7, 2005, under the laws of the State of Delaware and its registered office is c/o Donald J. Puglisi, 850 Library Avenue, Suite 204, City of Newark, County of New Castle, Delaware 19711. The Co-Issuer will not have any substantial assets and will not pledge any assets to secure the Notes.

The Co-Issuer will be capitalized only to the extent of its common equity of $10, will have no assets other than its equity capital. The Issuer will own 100% of the stock of the Co-Issuer.

008376

## DESCRIPTION OF THE NOTES

Certain definitions used herein are set forth in the Glossary of Certain Defined Terms (the "**Glossary**") set forth as Annex A hereto.

General

The Notes will be issued on the Closing Date pursuant to an indenture (the "**Indenture**"), to be dated as of the Closing Date, among the Co-Issuers and JPMorgan Chase Bank, National Association, as trustee (the "**Trustee**") and as securities intermediary.  The following summaries generally describe certain provisions of the Notes and the Indenture.  The summaries do not purport to be complete and are subject to, and are qualified in their entirety by reference to, the provisions of the Notes and the Indenture.  When particular provisions or terms used in the Notes and the Indenture are referred to, the actual provisions (including definitions of terms) are incorporated by reference. Copies of the Indenture may be obtained by Holders of the Notes upon request to the Issuer or the Initial Purchaser.

The Indenture limits the amount of Notes that can be issued thereunder to the Class X Notes, the Class A-1LA Notes, the Class A-1LB Notes, the Class A-2L Notes, the Class A-3L Notes, the Class A-4L Notes and the Class B-1L Notes in the aggregate principal amounts and notional principal amounts, as applicable, set forth on the cover hereof.  Subject to the foregoing, the Notes will be issued in minimum denominations of U.S.$200,000 and integral multiples of U.S.$1 in excess of such minimum denomination.

**The Notes will be non-recourse obligations of the Co-Issuers and all amounts payable in respect of the Notes will be paid solely from and to the extent of the available proceeds from the Trust Estate.  To the extent the assets of the Trust Estate are insufficient to pay all amounts due on the Notes on each Payment Date, on the Final Maturity Date or otherwise, the Co-Issuers shall have no further obligations in respect of the Notes and any sums outstanding and unpaid shall be extinguished.**

The Record Date for each Payment Date (including the Final Maturity Date) is the Business Day immediately preceding such Payment Date; *provided, however,* if Definitive Notes are issued, the Record Date for such Definitive Notes shall be the fifteenth calendar day preceding such Payment Date.  Payments of interest and principal or any other amount payable on or in respect of the Notes will be made on each Payment Date by wire transfer to registered Holders of the Notes on the Record Date applicable to such Payment Date to accounts maintained by such registered Holders as reflected in the Note Register.  In the case of redemption, notice will be mailed to each Holder of record no later than twenty days before the Payment Date on which the final principal payment is expected to be made to such Holder.

Under the terms of the Indenture, the Trustee will act as a paying agent (together with any other paying agent appointed by the Co-Issuers from time to time, the "**Paying Agents**").  JPMorgan Chase Bank, National Association will act as the paying and transfer agent for the Preferred Shares (the "**Paying and Transfer Agent**"). The Issuer will appoint an off-shore Paying and Transfer Agent (other than in the Cayman Islands) (in addition to and not in lieu of JPMorgan Chase Bank, National Association) if requested by at least 33-2/3% of the Preferred Shares, with the cost of any such agent to be borne by the Issuer.  There can be no assurance that any investor requesting payment from an off-shore paying agent will receive payments on the same day that they would have received such payments had the payments been made by JPMorgan Chase Bank, National Association.  Payments of principal of and interest on and other amounts in respect of the Notes will be made by the Trustee to the Paying Agents from funds available in the Collection Account established under the Indenture as described herein.

All distributions in respect of the Portfolio Collateral will be deposited directly into the Collection Account and will be available to the extent described herein for the payment of amounts payable in respect of the Notes and, under the circumstances set forth herein and in the Indenture, for the applications described herein.

The Notes are subject to restrictions on transfer.  See "—Form, Transfer and Transfer Restrictions." Subject to such restrictions, the Notes may be transferred or exchanged at the office designated by the Trustee for such purposes without the payment of any service charge, other than tax or other governmental charges payable in connection therewith.

008377

Payments on the Notes; Priority of Distributions

General. The Class A-1L Notes will provide for the payment of periodic interest on the Aggregate Principal Amount thereof ("**Periodic Interest**" and, the amount of such periodic interest, the "**Periodic Interest Amount**" with respect to the Class A-1L Notes) (to the extent of funds available therefor as described herein) for each Periodic Interest Accrual Period at the rate of 0.30% with respect to the Class A-1LA Notes and 0.50% with respect to the Class A-1LB Notes, *per annum* above the London interbank offered rate for three-month U.S. dollar deposits (or, for the period from the Closing Date to the first Payment Date, as described herein) ("**LIBOR**") (determined as described herein) (the "**Applicable Periodic Rate**" with respect to the Class A-1LA Notes and the Class A-1LB Notes, as applicable) on the 1st day of November, February, May and August of each year, or, if any such day is not a Business Day, then on the next succeeding Business Day (each such date, a "**Payment Date**"), commencing on the November 1, 2006 Payment Date. Payments of interest on the Class A-1L Notes will be payable *pari passu* among the Class A-1L Notes and with the Class X Notes as described herein. "**Periodic Interest Accrual Period**" is the period from the Closing Date through the day preceding the subsequent Payment Date and during each period thereafter from each Payment Date through the day preceding the subsequent Payment Date. To the extent Periodic Interest accrued at the Applicable Periodic Rate with respect to any Periodic Interest Accrual Period is not paid on the related Payment Date, the amount of such interest shortfall will accrue interest at the Applicable Periodic Rate and will be paid (to the extent funds are available therefor as described herein) on one or more subsequent Payment Dates after payment of interest at the Applicable Periodic Rate with respect to the Periodic Interest Accrual Period relating to such subsequent Payment Date (the amount of such shortfall, together with interest thereon at the Applicable Periodic Rate, the "**Periodic Rate Shortfall Amount**" and, with the Periodic Interest Amount for such subsequent Payment Date, the "**Cumulative Interest Amount**" with respect to such Payment Date). Interest will be calculated on the basis of a year of 360 days and the actual number of days elapsed. Payments of interest to the Class A-1L Notes and the Class X Payment will be payable *pari passu* among the Class A-1L Notes and the Class X Notes as described herein.

No principal will be payable in respect of the Class A-1L Notes (and principal collections on the Portfolio Collateral will be applied as described herein) during the Revolving Period, except in the event of an Initial Deposit Redemption, an Optional Redemption, a Special Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class A-1LA Notes as described herein. On each Payment Date with respect to the Amortization Period, the principal of the Class A-1L Notes will be payable (to the extent of funds available therefor and in the order of priority described herein) first to the Class A-1LA Notes and then to the Class A-1LB Notes until the Aggregate Principal Amount of the Class A-1L Notes has been paid in full. The Class A-1LB Notes are subordinated in right of payment to the Class A-1LA Notes to the extent described herein. In addition, all payments of principal on the Class A-1L Notes that are made in connection with an Initial Deposit Redemption, a Rating Confirmation Failure, a Tax Event Redemption or an Optional Redemption will be paid on a *pro rata* basis with the Class X Notes as described herein. All outstanding principal of the Class A-1L Notes, together with the other amounts described herein, will be due and payable on the Final Maturity Date.

No interest will be payable in respect of the Class A-2L Notes on any Payment Date unless the Holders of the Class A-1L Notes have been paid the Cumulative Interest Amount due to them on such Payment Date, the Holders of the Class X Notes have been paid the Cumulative Class X Payment due to them on such Payment Date and, in the case of the Final Maturity Date, until the Aggregate Principal Amount of the Class A-1L Notes and the Class X Notes have been paid in full.

The Class A-2L Notes will provide for the payment of periodic interest on the Aggregate Principal Amount thereof ("**Periodic Interest**" and, the amount of such periodic interest, the "**Periodic Interest Amount**" with respect to the Class A-2L Notes) (to the extent of funds available therefor as described herein) for each Periodic Interest Accrual Period at the rate of 0.65% *per annum* above LIBOR (the "**Applicable Periodic Rate**" with respect to the Class A-2L Notes) on each Payment Date commencing on the November 1, 2006 Payment Date. To the extent Periodic Interest accrued at the Applicable Periodic Rate with respect to any Periodic Interest Accrual Period is not paid on the related Payment Date, the amount of such interest shortfall will accrue interest at the Applicable Periodic Rate and will be paid (to the extent funds are available therefor as described herein) on one or more subsequent Payment Dates after payment of interest at the Applicable Periodic Rate with respect to the Periodic Interest Accrual Period relating to such subsequent Payment Date (the amount of such shortfall, together with interest thereon at the

33

Applicable Periodic Rate, the "**Periodic Rate Shortfall Amount**" and, with the Periodic Interest Amount for such subsequent Payment Date, the "**Cumulative Interest Amount**" with respect to such Payment Date). Interest will be calculated on the basis of a year of 360 days and the actual number of days elapsed.

No principal will be payable in respect of the Class A-2L Notes (and principal collections on the Portfolio Collateral will be applied as described herein) during the Revolving Period, except in the event of a Special Redemption, an Optional Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class A-2L Notes. In connection with a Special Redemption, a Tax Event Redemption, an Optional Redemption or a Mandatory Redemption, no principal in respect of the Class A-2L Notes will be payable until the Aggregate Principal Amount of the Class A-1L Notes and the Class X Notes (other than with respect to a Special Redemption or an O/C Redemption) have been paid in full. On each Payment Date with respect to the Amortization Period after the Class A-1L Notes and the Class X Notes have been paid in full, principal of the Class A-2L Notes will be payable (to the extent of funds available therefor and in the order of priority described herein) until the Aggregate Principal Amount of the Class A-2L Notes has been paid in full. All outstanding principal of the Class A-2L Notes, together with the other amounts described herein, will be due and payable on the Final Maturity Date. The Class A-2L Notes are subordinated in right of payment to the Class A-1L Notes and the Class X Notes to the extent described herein.

No interest will be payable in respect of the Class A-3L Notes on any Payment Date unless the Holders of the Senior Class A Notes have been paid the Cumulative Interest Amount due to them on such Payment Date and the Holders of the Class X Notes have been paid the Cumulative Class X Payment due to them on such Payment Date and, in the case of the Final Maturity Date, until the Aggregate Principal Amount of the Senior Class A Notes and the Class X Notes have been paid in full.

The Class A-3L Notes will provide for the payment of periodic interest on the Aggregate Principal Amount thereof ("**Periodic Interest**" and, the amount of such periodic interest, the "**Periodic Interest Amount**" with respect to the Class A-3L Notes) (to the extent of funds available therefor as described herein) for each Periodic Interest Accrual Period at the rate of 1.40% *per annum* above LIBOR (the "**Applicable Periodic Rate**" with respect to the Class A-3L Notes) on each Payment Date commencing on the November 1, 2006 Payment Date. To the extent Periodic Interest accrued at the Applicable Periodic Rate with respect to any Periodic Interest Accrual Period is not paid on the related Payment Date, the amount of such interest shortfall will accrue interest at the Applicable Periodic Rate and will be paid (to the extent funds are available therefor as described herein) on one or more subsequent Payment Dates after payment of interest at the Applicable Periodic Rate with respect to the Periodic Interest Accrual Period relating to such subsequent Payment Date (the amount of such shortfall, together with interest thereon at the Applicable Periodic Rate, the "**Periodic Rate Shortfall Amount**" and, with the Periodic Interest Amount for such subsequent Payment Date, the "**Cumulative Interest Amount**" with respect to such Payment Date). The failure to pay in full Periodic Interest on the Class A-3L Notes as a result of insufficient funds being available therefor will not constitute an Event of Default so long as any Senior Class A Notes or Class X Notes are Outstanding. Interest will be calculated on the basis of a year of 360 days and the actual number of days elapsed.

No principal will be payable in respect of the Class A-3L Notes (and principal collections on the Portfolio Collateral will be applied as described herein) during the Revolving Period, except in the event of a Special Redemption, an Optional Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class A-3L Notes. On each Payment Date with respect to the Amortization Period after the Class A-1L Notes, Class A-2L Notes and the Class X Notes have been paid in full, principal of the Class A-3L Notes will be payable (to the extent of funds available therefor and in the order of priority described herein) until the Payment Date on which the Aggregate Principal Amount of the Class A-3L Notes has been paid in full. In connection with a Special Redemption, a Tax Event Redemption, an Optional Redemption or a Mandatory Redemption, no principal in respect of the Class A-3L Notes will be payable until the Aggregate Principal Amount of the Class A-1L Notes, the Class A-2L Notes and (other than with respect to an O/C Redemption or a Special Redemption) the Class X Notes have been paid in full. All outstanding principal of the Class A-3L Notes, together with the other amounts described herein, will be due and payable on the Final Maturity Date. The Class A-3L Notes are subordinated in right of payment to the Senior Class A Notes and the Class X Notes to the extent described herein.

No interest will be payable in respect of the Class A-4L Notes on any Payment Date unless the Holders of the Class A-1L Notes and the Class A-2L Notes have been paid the Cumulative Interest Amount due to them on such Payment Date, the Holders of the Class A-3L Notes have been paid the Periodic Interest Amount due to them

on such Payment Date, the Holders of the Class X Notes have been paid the Cumulative Class X Payment due to them on such Payment Date, and, in the case of the Final Maturity Date, until the Aggregate Principal Amount of the Senior Class A Notes and the Class X Notes have been paid in full.

The Class A-4L Notes will provide for the payment of periodic interest on the Aggregate Principal Amount thereof ("**Periodic Interest**" and, the amount of such periodic interest, the "**Periodic Interest Amount**" with respect to the Class A-4L Notes) (to the extent of funds available therefor as described herein) for each Periodic Interest Accrual Period at the rate of 1.70% per annum above LIBOR (the "**Applicable Periodic Rate**" with respect to the Class A-3L Notes) on each Payment Date commencing on the November 1, 2006 Payment Date. To the extent Periodic Interest accrued at the Applicable Periodic Rate with respect to any Periodic Interest Accrual Period is not paid on the related Payment Date, the amount of such interest shortfall will accrue interest at the Applicable Periodic Rate and will be paid (to the extent funds are available therefor as described herein) on one or more subsequent Payment Dates after payment of interest at the Applicable Periodic Rate with respect to the Periodic Interest Accrual Period relating to such subsequent Payment Date (the amount of such shortfall, together with interest thereon at the Applicable Periodic Rate, the "Periodic Rate Shortfall Amount" and, with the Periodic Interest Amount for such subsequent Payment Date, the "Cumulative Interest Amount" with respect to such Payment Date). The failure to pay in full Periodic Interest on the Class A-4L Notes as a result of insufficient funds being available therefor will not constitute an Event of Default so long as any Senior Class A Notes, the Class A-3L Notes or Class X Notes are Outstanding. Interest will be calculated on the basis of a year of 360 days and the actual number of days elapsed.

No principal will be payable in respect of the Class A-4L Notes (and principal collections on the Portfolio Collateral will be applied as described herein) during the Revolving Period, except in the event of a Special Redemption, an Optional Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class A-4L Notes. On each Payment Date with respect to the Amortization Period after the Class A-1L Notes, Class A-2L Notes, Class A-3L Notes and the Class X Notes have been paid in full, principal of the Class A-4L Notes will be payable (to the extent of funds available therefor and in the order of priority described herein) until the Payment Date on which the Aggregate Principal Amount of the Class A-4L Notes has been paid in full. In connection with a Special Redemption, a Tax Event Redemption, an Optional Redemption or a Mandatory Redemption, no principal in respect of the Class A-4L Notes will be payable until the Aggregate Principal Amount of the Class A-1L Notes, the Class A-2L Notes, the Class A-3L Notes and (other than with respect to an O/C Redemption or a Special Redemption) the Class X Notes have been paid in full. All outstanding principal of the Class A-4L Notes, together with the other amounts described herein, will be due and payable on the Final Maturity Date. The Class A-4L Notes are subordinated in right of payment to the Senior Class A Notes, the Class A-3L Notes and the Class X Notes to the extent described herein.

No interest will be payable in respect of the Class B-1L Notes on any Payment Date unless the Holders of the Class A-1L Notes and the Class A-2L Notes have been paid the Cumulative Interest Amount due to them on such Payment Date, the Holders of the Class A-3L Notes and Class A-4L Notes have been paid the Periodic Interest Amount due to them on such Payment Date, the Class X Notes have been paid the Cumulative Class X Payment due to them on such Payment Date, the Overcollateralization Tests with respect to the Class A Notes and the Interest Coverage Test have been satisfied, and, on the Final Maturity Date, unless the Aggregate Principal Amount of the Class A Notes and the Class X Notes have been paid in full.

The Class B-1L Notes will provide for the payment of periodic interest on the Aggregate Principal Amount thereof ("**Periodic Interest**" and, the amount of such periodic interest, the "**Periodic Interest Amount**" with respect to the Class B-1L Notes) (to the extent funds are available therefor as described herein) for each Periodic Interest Accrual Period at the rate of 2.25% *per annum* above LIBOR (the "**Applicable Periodic Rate**" with respect to the Class B-1L Notes) on each Payment Date commencing on the November 1, 2006 Payment Date. To the extent Periodic Interest accrued at the Applicable Periodic Rate with respect to any Periodic Interest Accrual Period is not paid on the related Payment Date, the amount of such interest shortfall will accrue interest at the Applicable Periodic Rate and will be paid (to the extent funds are available therefor as described herein) on one or more subsequent Payment Dates after payment of interest at the Applicable Periodic Rate with respect to the Periodic Interest Accrual Period relating to such subsequent Payment Date (the amount of such shortfall, together with interest thereon, at the Applicable Periodic Rate, the "**Periodic Rate Shortfall Amount**" and, together with the Periodic Interest Amount for such subsequent Payment Date, the "**Cumulative Interest Amount**" with respect to such Payment Date). The failure to pay in full Periodic Interest on the Class B-1L Notes as a result of insufficient funds being available

008380

therefor will not constitute an Event of Default so long as any Class A Notes or Class X Notes are Outstanding. Interest will be calculated on the basis of a year of 360 days and the actual number of days elapsed.

No principal will be payable in respect of the Class B-1L Notes until the Aggregate Principal Amount of the Class A Notes and the Class X Notes have been paid in full, except with respect to the Additional Collateral Deposit Requirement. Principal payments are not expected to begin until the commencement of the Amortization Period (except in the event of a Special Redemption, an Optional Redemption, a Tax Redemption or a Mandatory Redemption of the Class B-1L Notes or in connection with the Additional Collateral Deposit Requirement) and are to continue until the Payment Date on which the Aggregate Principal Amount of the Class B-1L Notes has been paid in full. In connection with a Special Redemption, a Tax Event Redemption, an Optional Redemption or a Mandatory Redemption, no principal in respect of the Class B-1L Notes will be payable until the Aggregate Principal Amount of the Class A Notes and (other than with respect to an O/C Redemption or a Special Redemption) the Class X Notes have been paid in full. All outstanding principal of the Class B-1L Notes, together with the other amounts described herein, will be due and payable on the Final Maturity Date. The Class B-1L Notes are subordinated in right of payment to the Class A Notes and the Class X Notes to the extent described herein.

The Class X Notes will provide for the payment of periodic interest on the Aggregate Principal Amount thereof ("**Periodic Interest**" and, the amount of such periodic interest, the "**Periodic Interest Amount**" with respect to the Class X Notes) (to the extent of funds available therefor as described herein) for each Periodic Interest Accrual Period at the rate of 0.36% per annum above LIBOR (the "**Applicable Periodic Rate**" with respect to the Class X Notes) on each Payment Date, commencing on the November 1, 2006 Payment Date through and including the August 1, 2013 Payment Date. Any such interest will be calculated on the basis of a year of 360 days and the actual number of days elapsed. Such amount may be reduced in connection with a redemption of the Class X Notes, as set forth in the Indenture.

To the extent the Class X Payment is not paid on any Payment Date, the amount of such shortfall will accrue interest at the rate of 0.36% *per annum* above LIBOR (the "**Class X Periodic Interest Rate**") (to the extent funds are available therefor and subject to the priority of distribution provisions described herein) on one or more subsequent Payment Dates (the amount of such shortfall, together with interest thereon, calculated at the Class X Periodic Interest Rate, the "**Class X Shortfall Amount**" and, together with the Class X Payment for such subsequent Payment Date, the "**Cumulative Class X Payment**" with respect to such Payment Date). The Class X Shortfall Amount shall be payable after payment of the Class X Payment relating to such subsequent Payment Date. Any such interest will be calculated on the basis of a year of 360 days and the actual number of days elapsed. The Aggregate Principal Amount of the Class X Notes, together with the other amounts described herein, will be due and payable on the Final Maturity Date of the Class X Notes.

Payments of principal on the Class X Notes that are made in connection with an Initial Deposit Redemption, a Tax Event Redemption, an Optional Redemption or a Rating Confirmation Failure Redemption will be paid on a *pro rata* basis with the Class A-1LA Notes as described herein. The Class X Notes are not subject to an O/C Redemption or a Special Redemption. The Aggregate Principal Amount of the Class X Notes will be reduced on each Payment Date by the Class X Principal Payment for such Payment Date. The Holders of the Class X Notes are entitled to receive the Aggregate Principal Amount of the Class X Notes on the Final Maturity Date, whether such Final Maturity Date occurs in connection with a redemption of the Class X Notes as described herein or otherwise.

To the extent assets of the Trust Estate are insufficient to pay all amounts due on the Notes, the Co-Issuers shall have no further obligations in respect of the Notes.

The Co-Issuers will not be required to pay additional amounts to Holders of any Class of Notes if taxes or related amounts are withheld from payments on the Notes or any payments on any item of Portfolio Collateral or other assets of the Co-Issuers. However, such withholding tax on payments on items of Portfolio Collateral could result in the Notes being redeemed by the Issuer. See "—Tax Event Redemption."

008381

Determination of LIBOR

For purposes of calculating the Applicable Periodic Rate, the Issuer initially will appoint JPMorgan Chase Bank, National Association, as agent with respect to the determination of LIBOR (in such capacity, the "**Calculation Agent**"). LIBOR will be determined by the Calculation Agent in accordance with the following provisions:

On the second London Business Day prior to the commencement of a Periodic Interest Accrual Period (each such day, a "**LIBOR Determination Date**"), LIBOR shall equal the rate, as obtained by the Calculation Agent, for three-month U.S. dollar deposits which appears on Telerate Page 3750 (as defined in the 2000 ISDA Definitions and as reported by Bloomberg Financial Markets Commodities News) or such other page as may replace such Page 3750, as of 11:00 a.m. (London time) on such LIBOR Determination Date. Notwithstanding the foregoing, LIBOR for the initial Periodic Interest Accrual Period will be determined through the use of straight-line interpolation by reference to two rates calculated in accordance with the provisions above, one of which shall be for five-month U.S. dollar deposits and the other of which shall be for six-month U.S. dollar deposits.

If, on any LIBOR Determination Date, such rate does not appear on Telerate Page 3750 or such other page as may replace such Page 3750, the Calculation Agent shall determine the arithmetic mean of the offered quotations of the Reference Banks to leading banks in the London interbank market for three-month (or five-month and six-month, as applicable) U.S. dollar deposits in an amount determined by the Calculation Agent by reference to requests for quotations as of approximately 11:00 a.m. (London time) on the LIBOR Determination Date made by the Calculation Agent to the Reference Banks. If, on any LIBOR Determination Date, at least two of the Reference Banks provide such quotations, LIBOR shall equal such arithmetic mean of such quotations. If, on any LIBOR Determination Date, only one or none of the Reference Banks provide such quotations, LIBOR shall be deemed to be the arithmetic mean of the offered quotations that leading banks in The City of New York selected by the Calculation Agent (after consultation with the Servicer) are quoting on the relevant LIBOR Determination Date for three-month (or five-month and six-month, as applicable) U.S. dollar deposits in an amount determined by the Calculation Agent that is representative of a single transaction in such market at such time by reference to the principal London offices of leading banks in the London interbank market; *provided* that, if the Calculation Agent is required but is unable to determine a rate in accordance with at least one of the procedures provided above, LIBOR shall be LIBOR as determined on the previous LIBOR Determination Date. As used herein, "**Reference Banks**" means four major banks in the London interbank market selected by the Calculation Agent (after consultation with the Servicer).

As soon as possible after 11:00 a.m. (New York time) on each LIBOR Determination Date, but in no event later than 11:00 a.m. (New York time) on the Business Day immediately following each LIBOR Determination Date, the Calculation Agent will notify the Issuer, the Trustee, the Servicer and (for so long as any Class of Notes is listed on the Irish Stock Exchange) the Irish Stock Exchange, of LIBOR for the next Periodic Interest Accrual Period. The Calculation Agent will also specify to the Issuer the quotations upon which LIBOR is based, and in any event the Calculation Agent shall notify the Issuer before 5:00 p.m. (New York time) on each LIBOR Determination Date that either: (i) it has determined or is in the process of determining LIBOR or (ii) it has not determined and is not in the process of determining LIBOR together with its reasons therefor.

Upon receipt of notice of LIBOR for each Periodic Interest Accrual Period from the Calculation Agent as described in the preceding paragraph, the Trustee will determine the Applicable Periodic Rate for each Class of Notes for such Periodic Interest Accrual Period and notify the Irish Stock Exchange of the Applicable Periodic Rate for each Class of Notes (for so long as any Class of Notes is listed on the Irish Stock Exchange). The determination of LIBOR by the Calculation Agent and the Applicable Periodic Rate by the Trustee (in the absence of manifest error) will be final and binding upon all parties.

The Calculation Agent may be removed by the Issuer at any time. If the Calculation Agent is unable or unwilling to act as such or is removed by the Issuer, or if the Calculation Agent fails to determine LIBOR for a Periodic Interest Accrual Period, the Issuer will promptly appoint as a replacement Calculation Agent a leading bank which is engaged in transactions in U.S. dollar deposits in the international U.S. dollar market and which does not

008382

control or is not controlled by or under common control with the Issuer or its affiliates. The Calculation Agent may not resign or be removed from its duties without a successor having been duly appointed.

Adjusted Collateral Collections

On each Payment Date, in accordance with the Note Valuation Report for the Calculation Date immediately preceding such Payment Date, Collateral Interest Collections, to the extent of Available Funds in the Collection Account (excluding from such Available Funds any Collateral Disposition Proceeds received during the Due Period relating to such Calculation Date to be applied by the Trustee during the related Due Period or the immediately succeeding Due Period to purchase Substitute Portfolio Collateral and, with respect to the purchase of Additional Portfolio Collateral as described in the Indenture, certain Collateral Principal Collections with respect to which the Issuer has entered into a commitment to purchase Portfolio Collateral prior to the end of such Due Period), and a portion of the proceeds from the sale of the Notes in an amount equal to U.S.$1,600,000 (the "**Reserve Amount**") to fund a portion of the payments to be made in accordance with Priority of Payments on any Payment Date constituting Collateral Interest Collections or Collateral Principal Collections at the direction of the Servicer, will be applied by the Trustee to pay each of the following in the order of priority set forth below:

(A) the Trustee Administrative Expenses with respect to such Payment Date and any Trustee Administrative Expenses with respect to a previous Payment Date that were not paid on a previous Payment Date,

(B) the Preferred Shares Administrative Expenses with respect to such Payment Date and any Preferred Shares Administrative Expenses that were not paid on a previous Payment Date,

(C) the Issuer Base Administrative Expenses with respect to such Payment Date and any Issuer Base Administrative Expenses with respect to a previous Payment Date that were not paid on a previous Payment Date,

(D) for the replenishment of the Expense Reimbursement Account up to an amount equal to U.S.$50,000 to the extent any of the amounts referred to in clause (C) have already been paid from funds on deposit therein (the aggregate of the amounts set forth in clauses (A), (B), (C) and (D) shall not exceed (i) U.S.$250,000 *per annum* plus (ii) the greater of U.S.$75,000 *per annum* and 0.0275% *per annum* of the Aggregate Par Amount on the related Calculation Date, and

(E) the Base Servicing Fee with respect to such Payment Date, and any Base Servicing Fee that was not paid on a previous Payment Date, and to the Holders of the Class II Preferred Shares in accordance with the Paying and Transfer Agency Agreement, the Class II Preferred Share Base Dividend with respect to such Payment Date, and any Class II Preferred Share Base Dividend that was not paid on a previous Payment Date (the aggregate of clauses (A), (B), (C), (D) and (E), the "**Aggregate Base Fees and Expenses**").

Collateral Interest Collections net of the Aggregate Base Fees and Expenses payable on a Payment Date, represent "**Adjusted Collateral Interest Collections**" for such Payment Date.

On each Payment Date, in accordance with the Note Valuation Report for the Calculation Date immediately preceding such Payment Date, Collateral Principal Collections, to the extent of Available Funds in the Collection Account (excluding from such Available Funds any Collateral Disposition Proceeds received during the Due Period relating to such Calculation Date to be applied by the Trustee during the related Due Period or the immediately succeeding Due Period to purchase Substitute Portfolio Collateral and, with respect to the purchase of Additional Portfolio Collateral as described in the Indenture, certain Collateral Principal Collections with respect to which the Issuer has entered into a commitment to purchase Portfolio Collateral prior to the end of such Due Period), will be applied by the Trustee to pay the Aggregate Base Fees and Expenses, in the order set forth above, to the extent not paid or replenished from Collateral Interest Collections with respect to such Payment Date (the remaining amount, the "**Adjusted Collateral Principal Collections**" for such Payment Date).

008383

<u>Revolving Period.</u>

<u>I. Collateral Interest Collections.</u>

On each Payment Date with respect to the **Revolving Period**, Adjusted Collateral Interest Collections for such Payment Date will be applied by the Trustee in the following order of priority:

(i)      to pay, *pari passu*, (i) the Cumulative Interest Amount with respect to the Class A-1LA Notes and the Class A-1LB Notes and such Payment Date and, (ii) on each Payment Date through the August 1, 2013 Payment Date, the Cumulative Class X Payment with respect to the Class X Notes and such Payment Date;

(ii)      to pay the Cumulative Interest Amount with respect to the Class A-2L Notes and such Payment Date;

(iii)      to pay the Cumulative Interest Amount with respect to the Class A-3L Notes and such Payment Date;

(iv)      to pay the Cumulative Interest Amount with respect to the Class A-4L Notes and such Payment Date;

(v)      to the payment of principal in the amount, if any, required to be paid in order to satisfy the Class A Overcollateralization Test and, on each Payment Date after the second Payment Date, the Interest Coverage Test, such amount to be paid first, to the Class A-1LA Notes; second, to the Class A-1LB Notes; third, to the Class A-2L Notes, fourth, to any Periodic Rate Shortfall Amount with respect to the Class A-3L Notes, and then to principal of the Class A-3L Notes; and fifth, to any Periodic Rate Shortfall Amount with respect to the Class A-4L Notes, and then to principal of the A-4L Notes, in that order, until each such Class is paid in full, to the extent required to satisfy the Class A Overcollateralization Test and the Interest Coverage Test;

(vi)      to pay the Periodic Interest Amount with respect to the Class B-1L Notes and such Payment Date;

(vii)      to the payment of principal as an O/C Redemption or a Rating Confirmation Failure Redemption in the amount, if any, required to be paid in order to satisfy the Class B-1L Overcollateralization Test or in order to receive a Rating Confirmation, as applicable, such amount to be paid first, *pro rata*, to the Class X Notes, only in connection with a Rating Confirmation Failure Redemption, and to the Class A-1LA Notes; second, to the Class A-1LB Notes; third, to the Class A-2L Notes; fourth, any Periodic Rate Shortfall Amount with respect to the Class A-3L and then to principal of the Class A-3L Notes; and fifth, to any Periodic Rate Shortfall Amount with respect to the Class A-4L Notes and then to principal of the Class A-4L Notes and sixth, to principal of the Class B-1L Notes, in that order, until each such Class is paid in full, to the extent required to satisfy the Class B-1L Overcollateralization Test or in order to receive a Rating Confirmation, as applicable;

(viii)      to the payment to the Holders of the Class B-1L Notes of an amount equal to the Cumulative Interest Amount for the Class B-1L Notes and such Payment Date to the extent not paid to the Holders of the Class B-1L Notes pursuant to clauses (vi) and (vii) of this section;

(ix)      on each Payment Date after the second Payment Date, *pro rata*, to the extent of available funds, an amount equal to 35% of the funds available up to the Additional Collateral Deposit Requirement to the payment of principal of the Class B-1L Notes until such Class is paid in full and an amount equal to 65% (or, after the Class B-1L Notes are paid in full, 100%) of the funds available up to the Additional Collateral Deposit Requirement to the purchase of Additional Portfolio Collateral (other than CLO Securities) as directed by the Servicer or the Issuer meeting certain specified requirements set forth in the Indenture and described herein during the Due Period in which such Payment Date occurs or the immediately succeeding Due Period;

(x)      to the payment to the Default Swap Counterparty any Default Swap Counterparty Termination Payment;

008384

(xi)     to the payment, *first* (a) to the Servicer of the Additional Servicing Fee with respect to such Payment Date and (b) to the Holders of the Class II Preferred Shares in accordance with the Paying and Transfer Agency Agreement, the Class II Preferred Share Additional Dividend then due and unpaid, and *second*, to the Holders of the Notes any due and unpaid Extension Bonus Payment;

(xii)     to the payment to the Issuer of the Issuer Excess Administrative Expenses with respect to such Payment Date and then any Issuer Excess Administrative Expenses with respect to a previous Payment Date that were not paid on a previous Payment Date;

(xiii)     if the Internal Rate of Return of the Preferred Shares as of such Payment Date is less than 12%, to the payment to the Holders of the Preferred Shares, but only up to an amount that would cause the Internal Rate of Return of the Preferred Shares to equal 12% and;

(xiv)     any remaining amounts, (a) 20% to (x) the payment of the Supplemental Servicing Fee for such Payment Date, and (y) the Holders of the Class II Preferred Shares in accordance with the Paying and Transfer Agency Agreement, the Class II Preferred Share Supplemental Dividend then due and unpaid, and (b) 80% to the Holders of the Preferred Shares in accordance with the Paying and Transfer Agency Agreement, as a dividend thereon or as a redemption payment on the Redemption Date, as applicable.

II. Collateral Principal Collections.

On each Payment Date with respect to the **Revolving Period**, Adjusted Collateral Principal Collections for such Payment Date will be applied by the Trustee in the following order of priority:

(i)     to the payment of the amounts described in clauses (i) through (vii) with respect to Collateral Interest Collections and the Revolving Period, in the order described therein, in each case to the extent such amounts have not been paid from Adjusted Collateral Interest Collections with respect to such Payment Date; *provided however* that, with respect to the payment described in clause (iii) above, so long as any Class X Notes, Class A-1L Notes or Class A-2L Notes are Outstanding, the Class A-3L Notes shall only be entitled to receive an amount sufficient to pay the Periodic Interest Amount (or, after the Class A-2L Notes are paid in full, the Cumulative Interest Amount) due to the Class A-3L Notes for such Payment Date from Collateral Principal Collections, but only to the extent this payment will not cause the failure of the Class B-1L Overcollateralization Test, with respect to (iv) above, so long as any Class X Notes, Class A-1L Notes, Class A-2L Notes or Class A-3L Notes are Outstanding, the Class A-4L Notes shall only be entitled to receive an amount sufficient to pay the Periodic Interest Amount (or, after the Class A-3L Notes are paid in full, the Cumulative Interest Amount) due to the Class A-4L Notes for such Payment Date from Collateral Principal Collections, but only to the extent this payment will not cause the failure of the Class B-1L Overcollateralization Test, and with respect to (vi) above, so long as any Class X Notes, Class A-1L Notes, Class A-2L Notes, Class A-3L Notes or Class A-4L Notes are Outstanding, the Class B-1L Notes shall only be entitled to receive an amount sufficient to pay the Periodic Interest Amount due to the Class B-1L Notes for such Payment Date from Collateral Principal Collections but only to the extent this payment will not cause the failure of the Class B-1L Overcollateralization Test; and *provided further*, so long as any Class A-1L Notes or Class A-2L Notes are not Outstanding, the Class A-3L Notes shall be entitled to receive an amount sufficient to pay the Cumulative Interest Amount due to the Class A-3L Notes for such Payment Date from Collateral Principal Collections and, so long as any Class A-1L Notes, Class A-2L Notes or Class A-3L Notes are not Outstanding, the Class A-4L Notes shall be entitled to receive an amount sufficient to pay the Cumulative Interest Amount due to the Class A-4L Notes for such Payment Date from Collateral Principal Collections, and then any remaining amounts shall be distributed pursuant to clauses (v) through (vii) above, in the order described therein;

(ii)     to pay principal of the Notes in a Special Redemption, such amount to be paid first, (A) to the Class A-1LA Notes; second, to the Class A-1LB Notes; third, to the Class A-2L Notes; fourth, to any Periodic Rate Shortfall Amount with respect to the Class A-3L Notes; fifth, to principal of the Class A-3L Notes; sixth, to any Periodic Rate Shortfall Amount with respect to the Class A-4L Notes; seventh, to principal of the Class A-4L Notes; and eighth,, to the Class B-1L Notes, in that order, until each such Class is paid in full; and

008385

(iii) as directed by the Servicer or the Issuer (or deposited by the Trustee in the Collection Account), to the purchase of Additional Portfolio Collateral meeting the specified requirements no later than the last day of the Due Period relating to the Payment Date next following such Payment Date, such amounts to be applied in the manner described herein.

Amortization Period.

I. Collateral Interest Collections.

On each Payment Date with respect to the **Amortization Period**, Adjusted Collateral Interest Collections for such Payment Date will be applied by the Trustee in the following order of priority:

(i) to pay, *pari passu*, (i) the Cumulative Interest Amount with respect to the Class A-1LA Notes and the Class A-1LB Notes and such Payment Date and (ii) on each Payment Date through the August 2013 Payment Date, the Cumulative Class X Payment with respect to the Class X Notes and such Payment Date;

(ii) to pay the Cumulative Interest Amount with respect to the Class A-2L Notes and such Payment Date;

(iii) to pay the Cumulative Interest Amount with respect to the Class A-3L Notes and such Payment Date;

(iv) to pay the Cumulative Interest Amount with respect to the Class A-4L Notes and such Payment Date;

(v) to the payment of principal as an O/C Redemption in the amount, if any, required to be paid in order to satisfy the Class A Overcollateralization Test and, on each Payment Date after the second Payment Date, the Interest Coverage Test, such amount to be paid first, to the Class A-1LA Notes; second, to the Class A-1LB Notes; third, to the Class A-2L Notes, fourth, to any Periodic Rate Shortfall Amount with respect to the Class A-3L Notes and then to principal of the Class A-3L Notes; and fifth, to any Periodic Rate Shortfall Amount with respect to the Class A-4L Notes and then to principal of the A-4L Notes, in that order, until each such Class is paid in full, to the extent required to satisfy the Class A Overcollateralization Test and the Interest Coverage Test;

(vi) to pay the Periodic Interest Amount with respect to the Class B-1L Notes and such Payment Date;

(vii) to the payment of principal as an O/C Redemption in the amount, if any, required to be paid in order to satisfy the Class B-1L Overcollateralization Test, such amount to be paid first, to the Class A-1LA Notes; second, to the Class A-1LB Notes; third, to the Class A-2L Notes; fourth, to any Periodic Rate Shortfall Amount and then to principal of the Class A-3L Notes; and fifth, to any Periodic Rate Shortfall Amount and then to principal of the Class B-1L Notes, in that order, until each such Class is paid in full, to the extent required to satisfy the Class B-1L Overcollateralization Test;

(viii) to the payment to the Holders of the Class B-1L Notes of an amount equal to the Cumulative Interest Amount for the Class B-1L Notes and such Payment Date to the extent not paid to the Holders of the Class B-1L Notes pursuant to clauses (vi) and (vii) of this section;

(ix) to the payment of, *pro rata*, to the extent of available funds, an amount equal to 35% of the Additional Collateral Deposit Requirement to the payment of principal of the Class B-1L Notes until such Class is paid in full and an amount equal to 65% (or, after the Class B-1L Notes are paid in full, 100%) of the funds available up to the Additional Collateral Deposit Requirement to the payment of principal of the Notes (other than the Class X Notes) in the order of priority described in clause (vii) above;

(x) to the payment to the Default Swap Counterparty any Default Swap Counterparty Termination Payment;

(xi) to the payment, *first* (a) to the Servicer of the Additional Servicing Fee with respect to such Payment Date and (b) to the Holders of the Class II Preferred Shares in accordance with the Paying and Transfer

008386

Agency Agreement, the Class II Preferred Share Additional Dividend then due and unpaid, and *second*, to the Holders of the Notes any due and unpaid Extension Bonus Payment;

(xii)  to the payment to the Issuer of the Issuer Excess Administrative Expenses with respect to such Payment Date and then any Issuer Excess Administrative Expenses with respect to a previous Payment Date that were not paid on a previous Payment Date;

(xiii)  if the Internal Rate of Return of the Preferred Shares as of such Payment Date is less than 12%, to the payment to the Holders of the Preferred Shares, but only up to an amount that would cause the Internal Rate of Return of the Preferred Shares to equal 12% and;

(xiv)  any remaining amounts, (a) 20% to (x) the payment of the Supplemental Servicing Fee for such Payment Date, and (y) the Holders of the Class II Preferred Shares in accordance with the Paying and Transfer Agency Agreement, the Class II Preferred Share Supplemental Dividend then due and unpaid, and (b) 80% to the Holders of the Preferred Shares in accordance with the Paying and Transfer Agency Agreement, as a dividend thereon or as a redemption payment on the Redemption Date, as applicable.

II.  Collateral Principal Collections.

On each Payment Date with respect to the **Amortization Period**, Adjusted Collateral Principal Collections with respect to such Payment Date will be applied by the Trustee in the following order of priority:

(i)  to the payment of the amounts described in clauses (i) through (vii) with respect to Collateral Interest Collections and the Amortization Period, in the order described therein, in each case to the extent such amounts have not been paid from Adjusted Collateral Interest Collections with respect to such Payment Date; *provided however* that, with respect to the payment described in clause (iii) above, so long as any Class X Notes, Class A-1L Notes or Class A-2L Notes are Outstanding, the Class A-3L Notes shall only be entitled to receive an amount sufficient to pay the Periodic Interest Amount (or, after the Class A-2L Notes are paid in full, the Cumulative Interest Amount) due to the Class A-3L Notes for such Payment Date from Collateral Principal Collections, but only to the extent this payment will not cause the failure of the Class B-1L Overcollateralization Test, with respect to (iv) above, so long as any Class X Notes, Class A-1L Notes, Class A-2L Notes or Class A-3L Notes are Outstanding, the Class A-4L Notes shall only be entitled to receive an amount sufficient to pay the Periodic Interest Amount (or, after the Class A-3L Notes are paid in full, the Cumulative Interest Amount) due to the Class A-4L Notes for such Payment Date from Collateral Principal Collections, but only to the extent this payment will not cause the failure of the Class B-1L Overcollateralization Test, with respect to (vi) above, so long as any Class X Notes, Class A-1L Notes, Class A-2L Notes, Class A-3L Notes or Class A-4L Notes are Outstanding, the Class B-1L Notes shall only be entitled to receive an amount sufficient to pay the Periodic Interest Amount due to the Class B-1L Notes for such Payment Date from Collateral Principal Collections but only to the extent this payment will not cause the failure of the Class B-1L Overcollateralization Test; and *provided further*, so long as any Class A-1L Notes or Class A-2L Notes are not Outstanding, the Class A-3L Notes shall be entitled to receive an amount sufficient to pay the Cumulative Interest Amount due to the Class A-3L Notes for such Payment Date from Collateral Principal Collections and , so long as any Class A-1L Notes, Class A-2L Notes or Class A-3L Notes are not Outstanding, the Class A-4L Notes shall be entitled to receive an amount sufficient to pay the Cumulative Interest Amount due to the Class A-4L Notes for such Payment Date from Collateral Principal Collections, and then any remaining amounts shall be distributed pursuant to clauses (v) through (vii) above, in the order described therein;

(ii)  so long as no Event of Default has occurred and is continuing and as directed by the Servicer or the Issuer (or deposited by the Trustee in the Collection Account), to the purchase of Additional Portfolio Collateral from the proceeds of Collateral Principal Collections from any unscheduled prepayment or to the purchase of Substitute Portfolio Collateral from the sales proceeds of Credit Improved Portfolio Collateral, meeting the specified requirements with respect to the Amortization Period no later than ninety days after receipt of such amounts, to be applied in the manner described herein; and

008387

(iii)    to pay the Notes as follows: first, to the Class A-1LA Notes until the Aggregate Principal Amount thereof has been paid in full; second, to the Class A-1LB Notes until the Aggregate Principal Amount thereof has been paid in full; third, to the Class A-2L Notes until the Aggregate Principal Amount thereof has been paid in full; fourth, to any Periodic Rate Shortfall Amount with respect to the Class A-3L Notes and then to principal of the Class A-3L Notes until the Aggregate Principal Amount thereof has been paid in full; fifth, to any Periodic Rate Shortfall Amount with respect to the Class A-4L Notes and then to principal of the Class A-4L Notes until the Aggregate Principal Amount thereof has been paid in full; and sixth, to any Periodic Rate Shortfall Amount with respect to Class B-1L Notes and then to principal of the Class B-1L Notes until the Aggregate Principal Amount thereof has been paid in full.

<u>Final Maturity Date.</u>

On the **Final Maturity Date** (including an Optional Redemption Date or a Tax Event Redemption or any other Payment Date on which the Aggregate Principal Amount of the Notes is paid in full as described herein), in accordance with the Note Valuation Report for the Calculation Date immediately preceding the Final Maturity Date (or in the case of an Optional Redemption or a Tax Event Redemption, in accordance with the related redemption date statement delivered pursuant to the Indenture), Available Funds in the Collection Account in an amount equal to the sum of Adjusted Collateral Collections *plus* Collateral Disposition Proceeds, together with all available funds in the Expense Reimbursement Account and the Loan Funding Account, will be applied by the Trustee in the following order of priority:

(i)    to pay, *pari passu*, the Cumulative Interest Amount with respect to the Class A-1LA Notes, the Cumulative Interest Amount with respect to the Class A-1LB Notes and such Payment Date and the Class X Shortfall Amount plus the Periodic Interest Amount for the Class X Notes and such Payment Date;

(ii)    first, to pay the Aggregate Principal Amount of the Class A-1L Notes and the Class X Notes and then to pay the Aggregate Principal Amount of the Class A-1LB Notes;

(iii)    to pay the Cumulative Interest Amount with respect to the Class A-2L Notes and such Payment Date;

(iv)    to pay the Aggregate Principal Amount of the Class A-2L Notes;

(v)    to pay the Cumulative Interest Amount with respect to the Class A-3L Notes and such Payment Date;

(vi)    to pay the Aggregate Principal Amount of the Class A-3L Notes;

(vii)    to pay the Cumulative Interest Amount with respect to the Class A-4L Notes and such Payment Date;

(viii)    to pay the Cumulative Interest Amount with respect to the Class B-1L Notes and such Payment Date;

(ix)    to pay the Aggregate Principal Amount of the Class B-1L Notes;

(x)    to pay any Default Swap Counterparty Termination Payments;

(xi)    to pay, *first*, (a) to the Servicer the Additional Servicing Fee with respect to such Payment Date and (b) to the Holders of the Class II Preferred Shares in accordance with the Paying and Transfer Agency Agreement, the Class II Preferred Share Additional Dividend then due and unpaid and, *second*, to the Holders of the Notes any due and unpaid Extension Bonus Payment;

008388

(xii)      to pay to the Issuer the Issuer Excess Administrative Expenses with respect to such Payment Date and any Issuer Excess Administrative Expenses with respect to a previous Payment Date that were not paid on a previous Payment Date;

(xiii)      if the Internal Rate of Return of the Preferred Shares as of such Payment Date is less than 12%, to the payment to the Holders of the Preferred Shares, but only up to an amount that would cause the Internal Rate of Return of the Preferred Shares to equal 12%; and

(xiv)      any remaining amounts, (a) 20% to (x) the payment of the Supplemental Servicing Fee for such Payment Date, and (y) the Holders of the Class II Preferred Shares in accordance with the Paying and Transfer Agency Agreement, the Class II Preferred Share Supplemental Dividend then due and unpaid, and (b) 80% to the Holders of the Preferred Shares in accordance with the Paying and Transfer Agency Agreement, as a redemption payment on the Redemption Date, as applicable.

The amount and frequency of principal and interest payments will depend on, among other things, the extent to which the Portfolio Collateral pledged to secure the Notes become items of Defaulted Portfolio Collateral, are subject to early payment provisions or are retired prior to the Final Maturity Date through mandatory or optional redemption, sale, maturity or other liquidation or disposition and the extent to which Additional Portfolio Collateral meeting the requirements specified herein are available for purchase in circumstances in which Available Funds are to be used for the purchase of Additional Portfolio Collateral or in circumstances in which the Issuer may dispose of Portfolio Collateral and apply the proceeds thereof to the purchase of Substitute Portfolio Collateral as described herein as well as other factors, including the interest rates obtained in connection with the purchase of any such item of Portfolio Collateral or any Eligible Investment in which funds held in the accounts described herein may be maintained.

Notwithstanding anything contained herein to the contrary, with respect to Adjusted Collateral Collections held in the Collection Account in Eligible Investments pending application to purchase Portfolio Collateral, any such amounts not used to purchase Portfolio Collateral by the last day of the Due Period next succeeding the Due Period in which such amounts were collected may be used to purchase Portfolio Collateral in subsequent Due Periods in accordance with "Security for the Notes."

In addition, notwithstanding anything to the contrary, upon the direction of the Issuer (as directed by and in the time and manner directed by the Servicer), Payment Date Equity Securities may be distributed on any Payment Date in lieu of cash as follows:

(i)      Payment Date Equity Securities will be paid as Collateral Interest Collections in accordance with the Priority of Payments with respect to the Preferred Shares, and upon such payment, the aggregate amount of Collateral Interest Collections distributable to the Holders of the Preferred Shares on such Payment Date will be reduced by the value of such Payment Date Equity Securities.  Payment Date Equity Securities distributed on any Payment Date shall be distributed to the Holders of the Preferred Shares in the same manner as Collateral Interest Collections would be distributable to such Holders of Preferred Shares on such Payment Date and subject to the same restriction as to payment set out in the Paying and Transfer Agency Agreement; and

(ii)      in calculating the amounts of Collateral Interest Collections and Collateral Principal Collections for such Payment Date, Collateral Interest Collections in an amount equal to the value of Payment Date Equity Securities distributed to the Holders of the Preferred Shares shall be recharacterized as Collateral Principal Collections and distributed in accordance with the Priority of Payments herein.

Overcollateralization Tests

The **"Overcollateralization Tests"** are applicable until the Notes are retired and all amounts payable in respect thereof are paid, and are satisfied if the Class A Overcollateralization Ratio is at least equal to the Class A Overcollateralization Percentage (the **"Class A Overcollateralization Test"**) and the Class B-1L Overcollateralization Ratio is at least equal to the Class B-1L Overcollateralization Percentage (the **"Class B-1L Overcollateralization Test"**).

008389

The "**Class A Overcollateralization Percentage**" is 107% and the "**Class B-1L Overcollateralization Percentage**" is 106%.

The "**Class A Overcollateralization Ratio**" means, with respect to a determination made as of any date of calculation, the ratio (expressed as a percentage) obtained by dividing (a) the sum of (1) the Aggregate Principal Amount of the Portfolio Collateral in the Trust Estate as of such date, calculated in accordance with the Overcollateralization Ratio Adjustment *plus* (2) the sum of the Balance of Eligible Investments and cash in the Collection Account representing Collateral Principal Collections *plus* the Balance of Eligible Investments and cash in the Initial Deposit Account *plus* unpaid Purchased Accrued Interest, each as of such date by (b) the sum of the Aggregate Principal Amount of the Class A Notes (including for this purpose any Periodic Rate Shortfall Amounts with respect to such Classes of Notes not paid when due, until such amounts, if any, are paid in full) as of such date.

The "**Class B-1L Overcollateralization Ratio**" is calculated in the same manner, but reduces the numerator by the Overcollateralization Haircut Amount and includes in the denominator the Class B-1L Notes (including, in each case any Periodic Rate Shortfall Amounts with respect to such Classes of Notes not paid when due, until any such amounts are paid in full).

With respect to an item of Portfolio Collateral that it is both eligible to be included in the Overcollateralization Haircut Amount and is subject to an Overcollateralization Ratio Adjustment, for purposes of calculating the Class B-1L Overcollateralization Ratio, such item of Portfolio Collateral will not be discounted multiple times, but will be treated in the category that results in the largest discount to the par amount of the Portfolio Collateral.

The "**Overcollateralization Ratio Adjustment**" means, for purposes of calculating the Overcollateralization Ratios (i) items of Equity Portfolio Collateral shall not be included as Portfolio Collateral, (ii) items of Deferred Interest PIK Bonds and Defaulted Portfolio Collateral shall be included at the lesser of (a) the Market Value of such Deferred Interest PIK Bond and item of Defaulted Portfolio Collateral and (b) the Applicable Percentage for such Deferred Interest PIK Bond and item of Defaulted Portfolio Collateral multiplied by its Principal Balance; *provided that* any Portfolio Loan that has been an item of Defaulted Portfolio Collateral for four years shall not be included as Portfolio Collateral and any CLO Security that has been an item of Defaulted Portfolio Collateral for three years shall not be included as Portfolio Collateral, (iii) with respect to items of Discount Portfolio Collateral, an amount equal to the original purchase price of such item of Discount Portfolio Collateral shall be included as Portfolio Collateral and (iv) to the extent the Aggregate Principal Amount of Current Pay Obligations exceeds 7.5% of the Aggregate Par Amount, such excess shall be included as Defaulted Portfolio Collateral. If an item of Portfolio Collateral could be classified in more than one of the categories set forth in clauses (i) through (iv), such item of Portfolio Collateral will not be discounted multiple times but will be treated in the applicable category that results in the largest discount to the par amount of such item of Portfolio Collateral. Notwithstanding the foregoing, there may be included as Portfolio Collateral (with respect to items (i) through (iv) above) such greater amount as confirmed by the Rating Agencies which will not result in a reduction or withdrawal of the then-current ratings assigned by them to any Class of the Notes.

Applicability of Overcollateralization Tests

At any time that the Notes are Outstanding, if any Overcollateralization Test is not satisfied on any Calculation Date related to a Payment Date, amounts that are junior in right of payment to such Overcollateralization Test as described under "—Payments on the Notes; Priority of Distributions", will be applied to the payment of principal of the Class A Notes and the Class B-1L Notes (or, in the case of the Class A-3L Notes, the Class A-4L Notes and Class B-1L Notes, first to pay Periodic Rate Shortfall Amounts and then to pay principal), in the order described under "—Payments on the Notes; Priority of Distributions", in an O/C Redemption to the extent necessary to satisfy the applicable Overcollateralization Tests (recalculated on such Payment Date, but as of such Calculation Date, after taking into account such O/C Redemption) in accordance with the provisions described herein.

In addition, generally, satisfaction or, in certain cases, maintenance, of both Overcollateralization Tests is a condition to the purchase or sale of Portfolio Collateral during certain specified periods. See "Security for the Notes—Changes in Composition of Portfolio Collateral".

008390

Interest Coverage Test

The "**Interest Coverage Test**" is applicable on each Payment Date after the second Payment Date and will be satisfied as of such Payment Date if the Interest Coverage Ratio is at least equal to 1.5%. The "**Interest Coverage Ratio**" means, with respect to any Payment Date after the second Payment Date, a number (expressed as a percentage) calculated by dividing (a) four times the amount by which (i) the Collateral Interest Collections received or scheduled to be received during the Due Period in which such calculation occurs (other than Collateral Interest Collections (including deferred interest thereon) scheduled to be received on any item of Portfolio Collateral that is not paying or expected to pay current interest), exceeds (ii) the Periodic Reserve Amount (excluding amounts payable on the Class B-1L Notes) as of such Payment Date, by (b) the Aggregate Principal Amount of Class A Notes with respect to such Payment Date, as adjusted, to take into account any O/C Redemption to occur on the Payment Date related to such Due Period pursuant the Indenture.

Applicability of Interest Coverage Test

At any time after the second Payment Date that any of the Notes are Outstanding, if the Interest Coverage Test is not satisfied on any Calculation Date related to a Payment Date, amounts that are junior in right of payment to the Interest Coverage Test as described under "—Payments on the Notes; Priority of Distributions", will be applied to the payment of principal of the Class A Notes in the order described under "—Payments on the Notes; Priority of Distributions", in an O/C Redemption to the extent necessary to satisfy the Interest Coverage Test (recalculated on such Payment Date, but as of such Calculation Date, after taking into account such O/C Redemption) in accordance with the provisions described herein.

In addition, satisfaction of the Interest Coverage Test on the prior Payment Date is a condition to certain purchases and sales of Portfolio Collateral during certain specified periods as described herein. See "Security for the Notes—Changes in Composition of Portfolio Collateral."

Additional Collateral Deposit Requirement

On each Payment Date after the second Payment Date, even if the Overcollateralization Tests and the Interest Coverage Test are satisfied, Collateral Interest Collections that would otherwise be used for payments that are junior in right of payment to the Additional Collateral Deposit Requirement, as described under "—Payments on the Notes; Priority of Distributions—Revolving Period," will be applied during the Revolving Period, to the payment of principal of the Class B-1L Notes and will be made available to purchase Additional Portfolio Collateral or, during the Amortization Period, will be applied to the payment of the Class B-1L Notes and to pay principal of the Notes (other than the Class X Notes) in the order described under "—Payments on the Notes; Priority of Distributions—Amortization Period." The "Additional Collateral Deposit Requirement" with respect to any Payment Date is the amount necessary such that:

(a) the sum of:

(i) the Aggregate Principal Amount of the Portfolio Collateral in the Trust Estate as of the Calculation Date relating to such Payment Date, *plus*

(ii) the sum of the Balance of Eligible Investments and cash in the Collection Account representing Collateral Principal Collections *plus* the Balance of Eligible Investments and cash in the Initial Deposit Account *plus* unpaid Purchased Accrued Interest as of such date, less

(iii) the Overcollateralization Haircut Amount (if any),

equals or exceeds:

(b) 107% of the amount necessary, after giving effect to the amount applied to any O/C Redemption of the Notes (other than the Class X Notes) to satisfy the Overcollateralization Tests and the Interest Coverage Test (if applicable) on such Payment Date, to repay the Aggregate Principal Amount of the Notes (other than the Class X Notes), including any Periodic Rate Shortfall Amounts. Notwithstanding the foregoing, if the Additional Collateral

Deposit Requirement is a positive number that is more than the amount available therefor in the Priority of Payments, then the amount distributed with respect to the Additional Collateral Deposit Requirement shall be such lesser amount available.

For purposes of the Additional Collateral Deposit Requirement, no item of Equity Portfolio Collateral shall be included as Portfolio Collateral. In addition for purposes of this requirement, (i) with respect to Defaulted Portfolio Collateral as to which there has occurred a payment default or an event of bankruptcy, only the portion equal to the lesser of (a) the Market Value of such item of Defaulted Portfolio Collateral and (b) the Applicable Percentage multiplied by the Principal Balance of such item of Portfolio Collateral, shall be included as Portfolio Collateral and (ii) with respect to items of Discount Portfolio Collateral, only an amount equal to the original purchase price of such item of Discount Portfolio Collateral shall be included as Portfolio Collateral. For purposes of calculating the Additional Collateral Deposit Requirement, to the extent an item of Portfolio Collateral is considered Defaulted Portfolio Collateral, Discount Portfolio Collateral and/or is included in the Overcollateralization Haircut Amount, such item of Portfolio Collateral will not be discounted multiple times, but will be treated in the category that results in the largest discount to the par amount of the Portfolio Collateral.

Rating Confirmation Failure

The Issuer will request that each Rating Agency confirm after the Effective Date that it has not reduced or withdrawn (and not restored) the ratings assigned by it on the Closing Date to the Notes (a "**Rating Confirmation**"). If the Issuer is unable to obtain a Rating Confirmation by the 35th day after the Effective Date (a "**Rating Confirmation Failure**"), on the next Payment Date and on each subsequent Payment Date during the Revolving Period, amounts that are junior in right of payment to such Rating Confirmation Failure, as described under "Description of the Notes—Payments on the Notes; Priority of Distributions", will be applied to the redemption of the Notes (or, in the case of the Class B-1L Notes, first to pay Periodic Rate Shortfall Amounts, then to pay principal) until each such Class is paid in full, in the order and according to the priorities described herein (a "**Rating Confirmation Failure Redemption**"), to the extent necessary to receive a Rating Confirmation, in accordance with the provisions described herein. The Trustee will give notice of a Rating Confirmation Failure Redemption to the Company Announcements Office of the Irish Stock Exchange if any Class of Notes is then listed on the Irish Stock Exchange.

O/C Redemption

If on any Calculation Date any of the Overcollateralization Tests or the Interest Coverage Test are required to be satisfied and are not satisfied, amounts that are junior in right of payment to such test as described under "—Payments on the Notes; Priority of Distributions", will be applied to the redemption of the Class A Notes and the Class B-1L Notes (or, in the case of the Class B-1L Notes, first to pay Periodic Rate Shortfall Amounts, then to pay principal) in the order described under "—Payments on the Notes; Priority of Distributions" (an "**O/C Redemption**") to the extent necessary in order to satisfy both the Overcollateralization Tests and the Interest Coverage Test. A redemption of the Notes through a Rating Confirmation Failure Redemption or an O/C Redemption is sometimes referred to herein as a "**Mandatory Redemption**". Any Mandatory Redemption will be effected at par. The Class X Notes are not subject to O/C Redemption, but are subject to Rating Confirmation Failure Redemption. The Trustee will give notice of a Mandatory Redemption to the Company Announcements Office of the Irish Stock Exchange if any Class of Notes is then listed on the Irish Stock Exchange.

Initial Deposit Redemption

On the Effective Date, to the extent that the full amount of the Deposit is not used to purchase or committed to be used to purchase Original Portfolio Collateral having an Aggregate Principal Amount (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to the Original Portfolio Collateral on or before the Effective Date) at least equal to the Required Portfolio Collateral Amount in accordance with the guidelines described herein and in the Indenture, an amount (not in excess of the amount of the Deposit not so used to purchase or committed to be used to purchase) equal to the excess of the Required Portfolio Collateral Amount over the par amount of Portfolio Collateral actually acquired (or committed to be acquired) (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to the Original

008392

Portfolio Collateral on or before the Effective Date) will be applied by the Issuer on the November 2006 Payment Date (the "**Initial Deposit Redemption Date**") to make principal payments on the Class A-1LA Notes and the Class X Notes, on a *pro rata* basis (an "**Initial Deposit Redemption**") except, if the amount of the Deposit not so used to purchase or committed to be used to purchase  Original Portfolio Collateral does not exceed U.S.$2,000,000 in the aggregate, such amount will be transferred to the Collection Account on the Effective Date and applied as Collateral Principal Collections. The Trustee will give notice of an Initial Deposit Redemption to the Company Announcements Office of the Irish Stock Exchange if any Class of Notes is then listed on the Irish Stock Exchange.

Optional Redemption

On any Payment Date after the Non-Call Period (the "**Optional Redemption Date**," which date shall be considered the Final Maturity Date in the case of a Total Optional Redemption (as hereinafter defined)), subject to satisfaction of certain conditions described herein, the Notes will be redeemed, in whole or in part, by the Co-Issuers or the Issuer, as applicable, in accordance with the priority of distributions described herein, if such redemption is directed by the holders of Preferred Shares in the amounts described below.

(a) In the case of an Optional Redemption in whole (a "**Total Optional Redemption**"):

(i) the Holders of at least 75% of the outstanding Preferred Shares eligible to vote direct the Co-Issuer or the Issuer to redeem the Notes; *provided* that any Preferred Shares beneficially owned or controlled by the Servicer, entities affiliated with the Servicer or clients of the Servicer (collectively, the "**Servicer Entities**") in excess of the Original HFP Share Amount, shall be excluded from, and be deemed ineligible to participate in, any such vote to direct any Total Optional Redemption;

(ii) sufficient liquidation proceeds from the Portfolio Collateral must exist to effect the redemption of all Notes in full at their Redemption Price in accordance with the priority of distributions described herein; and

(b) in the case of an Optional Redemption in part (a "**Partial Optional Redemption**" and together with a Total Optional Redemption, referred to herein as an "**Optional Redemption**"):

(i) the Holders of at least 10% of the outstanding Preferred Shares eligible to vote direct the Co-Issuer or the Issuer to redeem the Notes in part; *provided* that any Preferred Shares beneficially owned or controlled by the Servicer Entities, including any HFP Shares, shall be excluded from, and be deemed ineligible to participate in, any such vote to direct any Partial Optional Redemption;

(ii) the Holders of Preferred Shares directing such Partial Optional Redemption shall specify the percentage of Notes that will be subject to redemption *pro rata* (the "**Partial Redemption Percentage**"); *provided* that the Partial Redemption Percentage must be the percentage equivalent to at least 10% of the aggregate outstanding principal amount of the Notes as of the Closing Date; and

(iii) the following conditions must be satisfied:

(1) the Partial Redemption Percentage of the Notes must be redeemed *pro rata* at their respective Optional Redemption Price,

(2) the Collateral Quality Matrix tests, Overcollateralization Tests, Interest Coverage Tests and any other eligibility criteria with respect to the Portfolio Collateral must be satisfied before and after giving effect to such redemption; *provided* that the degree of compliance with the Moody's Weighted Average Rating Test and the Weighted Average Margin Test shall not be diminished after giving effect to such redemption,

(3) any applicable Default Swaps of the Issuer must be modified or terminated in a manner consistent with the economic effect of such redemption and in consideration of the Portfolio Collateral and Eligible Investments that will be owned by the Issuer after giving effect to such redemption, and any net termination payments payable by the Issuer must be paid,

48

(4) the Rating Condition must be satisfied with respect to each Rating Agency,

(5) not more than three (3) prior Partial Optional Redemptions may have occurred, and

(6) no claims may be pending against the Issuer or the Co-Issuer and no judgments may have been rendered against the Issuer or the Co-Issuer which exceed, or reasonably could be expected to result in liabilities that exceed, in the aggregate, $100,000, unless adequate funds have been reserved or set aside for the payment thereof.

In connection with any Optional Redemption, the Issuer may use all funds credited to the Collection Account to provide for payment of the Optional Redemption Price. If there are not sufficient funds in the Collection Account as of the date the notice of redemption is given to pay the Optional Redemption Price on the Optional Redemption Date and all such payments, fees and expenses (including any termination payments with respect to any Synthetic Securities and any Default Swaps), the Servicer is required to give the Trustee written direction to sell Portfolio Collateral in an amount sufficient to provide funds to pay the Optional Redemption Price in full. The Trustee will give notice of an Optional Redemption to the Company Announcements Office of the Irish Stock Exchange if any Class of Notes is then listed on the Irish Stock Exchange.

The Servicer shall have the right to purchase the Preferred Shares held by any Holder that directs the Issuer to effect a Partial Optional Redemption at a price equal to the liquidation value of such Preferred Shares.

Tax Event Redemption

The Notes are also subject to redemption on any Payment Date, at the option of the Issuer, in whole but not in part, at the direction of at least 66-2/3% of the Preferred Shares or a majority of the Controlling Class (but only if the Aggregate Principal Balance of Portfolio Collateral is less than 100% of the Class A-1L Notes) on any Payment Date at the Tax Event Redemption Price, if as a result of (i) change in tax law, rule or regulation or the interpretation thereof, the payments to be received on the Portfolio Collateral are reduced as a result of the imposition of withholding tax, (ii) the Issuer is otherwise subjected to tax such that the income of the Issuer is reduced in an amount determined by such holders of Preferred Shares to be material, (iii) (A) one or more items of Portfolio Collateral that were not subject to withholding tax when the Issuer committed to purchase them have become subject to withholding tax or the rate of withholding has increased on one or more items of Portfolio Collateral that were subject to withholding tax when the Issuer committed to purchase them and (B) in any Due Period the aggregate of the payments subject to withholding tax on new withholding tax obligations and the increase in payments subject to withholding tax on increased rate withholding tax obligations, in each case to the extent not "grossed-up" (on an after-tax basis) by the related obligor, represent 5% or more of Interest Proceeds for the Due Period, or (iv) taxes, fees, assessments or other similar charges are imposed on the Issuer or the Co-Issuer in an aggregate amount in any 12-month period in excess of $2,000,000, other than liabilities for withholding taxes included in clause (iii) above.

As the result of the ownership of Preferred Shares and Notes by the Servicer Entities, and the ability to vote the Preferred Shares and the Notes owned by the Servicer Entities up to a maximum amount equal to the Original HFP Share Amount, the affirmative vote or approval of the Preferred Shares owned by such Servicer Entities, may be required in order to cause an Optional Redemption or a Tax Redemption of the Notes.

Special Redemption

The Notes (other than the Class X Notes) are subject to redemption in part on any Payment Date (and on one or more Payment Dates) during the Revolving Period, at the option of the Issuer acting at the direction of the Servicer, if more than U.S.$2,000,000 of Collateral Principal Collections received are not applied to the purchase of Additional Portfolio Collateral selected by the Servicer and satisfying the criteria described herein by the earlier of ninety days of receipt or the last day of the Revolving Period, in an amount of at least U.S.$2,000,000 as described under "—Payments on the Notes; Priority of Distributions—Revolving Period—Collateral Principal Collections".

008394

The Trustee will give notice of any redemption which the Issuer and the Servicer have directed to the Company Announcements Office of the Irish Stock Exchange if any Class of Notes is then listed on the Irish Stock Exchange.

Extension of the Revolving Period and the Final Maturity Date

*General*

The Issuer, if directed by the Servicer, shall be entitled on each Extension Effective Date to extend the Revolving Period to the applicable Extended Revolving Period End Date up to a maximum of four times (so that the Notes can only be extended to 2037) if (i) in the case of an Extension Effective Date occurring after the first Extension Effective Date, the Issuer has previously affected a Maturity Extension for each preceding Extension Effective Date, (ii) the Extension Conditions are satisfied, (iii) the Issuer has given written notice of its election to extend the Revolving Period no later than 60 days and no earlier than 90 days prior to such Extension Effective Date and (iv) no Event of Default has occurred and is continuing. If the Extension Conditions are satisfied, the Final Maturity Date of the Notes (other than the Class X Notes) shall be automatically extended to the related Extended Final Maturity Date and the Weighted Average Life Test shall be extended to the related Extended Weighted Average Life Date, without any requirement for approval or consent of any Holders of Notes (other than the Holders of the Class A-1LA Notes) or Preferred Shares (other than as may be required pursuant to the Extension Conditions) or amendment or supplement to the Indenture or any other transaction document (the "**Maturity Extension**"). In the case of a Maturity Extension, any Holder of Notes or Preferred Shares wishing to sell such Notes or Preferred Shares to an Extension Qualifying Purchaser pursuant to the Extension Conditions must provide the applicable Extension Sale Notice within the Extension Sale Notice Period pursuant to "—Extension Procedure" below (such Notes or Preferred Shares as to which an Extension Sale Notice has been duly given, "**Extension Sale Securities**"). Each Holder providing an Extension Sale Notice shall be deemed to agree that no Extension Sale Securities shall be purchased unless all Extension Sale Securities are purchased and settled at the applicable Extension Purchase Price on the applicable Extension Effective Date and the other Extension Conditions are satisfied as of such date. The Maturity Extension shall be effective only if the following conditions (the "**Extension Conditions**") are satisfied:

(i) the purchase of all Extension Sale Securities has been settled by the designated Extension Qualifying Purchasers at the applicable Extension Purchase Price as of the applicable Extension Effective Date;

(ii) all such purchases of Extension Sale Securities individually and in the aggregate comply with the applicable transfer restrictions herein, in the Indenture and the Preferred Share Paying and Transfer Agency Agreement immediately after such purchase and the legends on such Notes and Preferred Shares and all applicable law, rules and regulations (including, without limitation, rules, regulations and procedures of any applicable securities exchange, self-regulatory organization or clearing agency);

(iii) (a) the Rating Condition has been satisfied with respect to S&P (so long as any Notes are then rated by S&P) and (b) either (A) the Class B-1L Overcollateralization Ratio is at least 107.5% and the Collateral Quality Tests are satisfied as of the related Extension Determination Date and the Interest Coverage Test was satisfied on the immediately preceding Payment Date, the rating of each Class of Notes by Moody's has not been downgraded, withdrawn or qualified from that in effect on the Closing Date (unless it subsequently has been reinstated the rating assigned on the Closing Date) or (B) the Rating Condition has been satisfied with respect to Moody's (so long as any Notes are then rated by Moody's); and

(iv) (a) the Holders of 100% of the Outstanding Aggregate Principal Amount of the Class A-1LA Notes have delivered the Extension Sale Notice in the Extension Sale Notice Period or (b) if the Holders of 100% of the Aggregate Outstanding Amount of the Class A-1LA Notes fail to deliver an Extension Sale Notice pursuant to the preceding clause (a), either (A) the Issuer, acting through the Servicer, notifies the Holders of the Class A-1LA Notes in writing not later than the last day of the Extension Sale Notice Period that such Class A-1LA Notes shall constitute "Extension Sale Securities" (as a result of which such Class A-1LA Notes must be purchased by an Extension Qualifying Purchaser) or (B) the Holders of 100% of the Aggregate Outstanding Amount of the Class A-1LA Notes have consented in writing to the Maturity Extension not later than the last day of the Extension Sale Notice Period.

008395

In the case of a Maturity Extension, each Holder of Notes other than Extension Sale Securities and the Class X Notes shall be entitled to receive an amount equal to the applicable Extension Bonus Payment. Holders of Preferred Shares shall not be entitled to receive any Extension Bonus Payment. The obligation to make any Extension Bonus Payment shall not be rated by the Rating Agencies. The Extension Bonus Payment shall be payable to any applicable qualifying beneficial owners who have provided the Trustee with an Extension Bonus Eligibility Certification. Extension Bonus Payments which are not available to be paid on a Payment Date in accordance with the priority of distributions on a Payment Date shall not be considered "due and payable" hereunder. The failure to pay any such Extension Bonus Payment on such date shall not be an Event of Default, unless the Issuer shall fail to pay in full such Extension Bonus Payment on the earlier of the Final Maturity Date and the date of redemption in full of the relevant Notes. Unpaid Extension Bonus Payments shall not accrue interest. Such amounts shall be paid to the accounts designated in the applicable Extension Bonus Eligibility Certification or, to the extent otherwise required by the rules of any applicable securities exchange or clearing agency, in a manner determined by the Issuer.

*Extension Procedure*

No later than three Business Days following receipt by the Trustee of the notice given by the Issuer of its election to extend the Revolving Period (the "**Extension Notice**"), the Trustee shall deliver the Extension Notice to all Holders of Notes (other than the Class X Notes) and the Preferred Shares Paying and Transfer Agent (for forwarding to the Holders of the Preferred Shares) and each Rating Agency (so long as any rated Notes are Outstanding), in the form set out in the Indenture, and shall request the Rating Condition for the Maturity Extension from S&P, if applicable. Any Holder of Notes (other than the Class X Notes) and Preferred Shares may give irrevocable notice (an "**Extension Sale Notice**") within 30 days after the Trustee has delivered the Extension Notice (the "**Extension Sale Notice Period**") of its intention to sell its Notes or Preferred Shares to an Extension Qualifying Purchaser in the case of a Maturity Extension. If the Holders of 100% of the Outstanding Aggregate Principal Amount of the Class A-1LA Notes have not delivered the Extension Sale Notice to the Trustee by the 20th calendar day after the date of the Extension Notice, the Trustee shall notify the Holders of the Class A-1LA Notes of the date on which the Extension Sale Notice Period shall end and include a statement to the effect that (i) no Extension Sale Notice delivered after the end of the Extension Sale Notice Period shall be effective and (ii) the Class A-1LA Notes for which no Extension Sale Notice has been delivered may be treated as Extension Sale Securities pursuant to clause (v) of the Extension Conditions (as a result of which the Class A-1LA Notes must be purchased by an Extension Qualifying Purchaser). Any Extension Sale Notice received by the Trustee after the Extension Sale Notice Period shall be disregarded and deemed not to have been given. No Holder of Notes or Preferred Shares that has not given such an Extension Sale Notice within the Extension Sale Notice Period shall be entitled to sell its Notes or Preferred Shares to an Extension Qualifying Purchaser in connection with the Maturity Extension. If clause (iii)(b)(A) of the Extension Conditions is not satisfied as of the applicable Extension Determination Date as determined by the Issuer (or its agent), the Trustee shall request the Rating Condition to be satisfied with respect to Moody's. On the applicable Extension Determination Date, the Issuer (or its agent) shall confirm (i) whether or not Extension Qualifying Purchasers for all Extension Sale Securities have been designated to purchase such Notes or Preferred Shares in compliance with all transfer restrictions in the Indenture and the legends on such Notes or Preferred Shares and all applicable laws, rules and regulations (including, without limitation, any rules, regulations and procedures of any securities exchange, self-regulatory organization or clearing agency), (ii) whether the requirements of clause (iii) of the Extension Conditions are satisfied as of the applicable Extension Determination Date and (iii) whether all other Extension Conditions can be satisfied as of the applicable Extension Effective Date. On each Extension Effective Date, the Maturity Extension shall become effective under the terms of the Indenture; *provided that* all Extension Conditions set forth above are satisfied. No later than two Business Days after each Extension Effective Date, the Trustee based on a determination made by the Issuer, at the expense of the Co-Issuers, shall deliver a notice to all Holders of Notes and the Preferred Shares Paying and Transfer Agent (for forwarding to the Holders of Preferred Shares), the Servicer, the Initial Purchaser, each Rating Agency (so long as any rated Notes are Outstanding) and the Irish Stock Exchange (if and for so long as any Class of Notes is listed thereon) confirming whether or not the Maturity Extension became effective. If the Maturity Extension became effective, the Issuer shall make any required notifications thereof to the Depositary for any Notes subject to the Maturity Extension. None of the Initial Purchaser, the Servicer or any of their respective Affiliates shall have any duty to act as an Extension Qualifying Purchaser.

Additional Issuance

At any time during the Revolving Period, the Issuer, as applicable, may issue and sell Additional Preferred Shares and use the proceeds from such issuance and sale (net of any fees and expenses incurred in connection with the issuance thereof, including, without limitation, compensation payable to the Initial Purchaser or any placement agent for any services provided in connection therewith) to purchase additional eligible Portfolio Collateral (which may include eligible Portfolio Collateral purchased from any Servicer Entity on an arms-length transaction basis) (an "**Additional Issuance**"); *provided* that certain conditions are satisfied, including without limitation: (a) such Additional Issuance will be a percentage (the "**Additional Issuance Percentage**") specified by the Servicer, of the original issue price of the Preferred Shares issued and Outstanding on the date of the Additional Issuance; (b) such Additional Preferred Shares must be issued for a cash sales price (the net sale proceeds to be used to purchase eligible Portfolio Collateral (or, pending such applications, deposited into the Collection Account and held in Eligible Investments)); (c) the terms (other than the date of issuance, the issue price, the date from which dividends will accrue and similar matters) of such Preferred Shares must be identical to the terms of the applicable Class of Preferred Shares; (d) the Holders of Preferred Shares must be notified in writing 30 days prior to such issuance; (e) the Servicer must consent to such Additional Issuance; and (f) Initial Purchaser must be notified in writing at least 30 days prior to such issuance.

Any amendment to the Indenture, Issuer's Memorandum of Association and Articles of Association or any other related documents required to provide for or facilitate such Additional Issuance will not require the consent of the Holders of Securities.

Prescription

Payment in respect of the Notes will cease to be due if not paid to the Holder due to insufficient instructions for a period of twenty years from the Relevant Date therefor. "**Relevant Date**" means the date on which the final payment in respect of the Notes first becomes due, except that if the full amount of the monies payable has not been duly received by the Paying Agent on or prior to such due date, it means the date on which such monies have been so received.

Form, Transfer and Transfer Restrictions

Upon issuance, the Notes of each Class sold to non-U.S. Persons (as defined in Regulation S under the Securities Act ("**Regulation S**")) (each, a "**non-U.S. Person**") in Offshore Transactions (as defined in Regulation S) in reliance on Regulation S, initially will be represented by a single, temporary global note in fully registered form without interest coupons (the "**Temporary Regulation S Global Note**"), which will be deposited with the Trustee as custodian for, and registered in the name of a nominee on behalf of The Depository Trust Company ("**DTC**") on behalf of Euroclear Bank, S.A./N.V., as operator of The Euroclear System ("**Euroclear**") and Clearstream Banking, société anonyme ("**Clearstream**").

Subject to the receipt by the Trustee of a certificate in the form provided by the Indenture from the person holding such interest, a beneficial interest in the Temporary Regulation S Global Note may be exchanged for (i) after the 40th day after the later of the conclusion of the offering and the Closing Date (the "**Exchange Date**"), an interest in a permanent global note in fully registered form without coupons (the "**Permanent Regulation S Global Note**" and, together with the Temporary Regulation S Global Note, the "**Regulation S Global Notes**"), in an amount equal to the aggregate principal amount of such interest in the Temporary Regulation S Global Note or (ii) at any time for an interest in a Rule 144A Global Note (defined below), if a beneficial interest in a Regulation S Global Note will be transferred to a Qualified Institutional Buyer who is a U.S. Person (defined below), which note will be registered in the name of such person.

Upon deposit of the Permanent Regulation S Global Note of a Class with the Trustee, as custodian for DTC or the common depository, as applicable, Euroclear or Clearstream, as the case may be, will credit each purchaser (or its agent or custodian) with a principal amount of Notes of such Class equal to the principal amount thereof for which it has paid. The Holder of the Regulation S Global Notes (which will be DTC or its nominee) shall be the only person entitled to receive payments in respect of the Notes represented by such Regulation S Global Notes, and the Co-Issuers will be discharged by payment to, or to the order of, such Holder of such Regulation S Global Notes in respect of each amount so paid. Each of the persons shown in the records of Euroclear or of Clearstream as the Holder of a particular principal amount of Regulation S Global Notes must look solely to Euroclear or Clearstream, as the case may be, for its share of each payment so made by the Co-Issuers to, or to the order of, the Holder of such

008397

Regulation S Global Notes. No person other than the Holder of the Regulation S Global Notes shall have any claim against the Co-Issuers in respect of any payments due on the Regulation S Global Notes.

Payments on the Regulation S Global Notes will be made pursuant to certain procedures established by DTC, *provided* that the final payment of principal and interest will be made upon presentation and endorsement of such Regulation S Global Notes at the office of a Paying Agent.

Definitive fully registered notes ("**Definitive Notes**") will be issued and exchanged for each Permanent Regulation S Global Note within 30 days of the occurrence of any of the following: (i) the Notes or any of them become immediately due and payable following an Event of Default under the Indenture; (ii) either Euroclear or Clearstream is closed for business for a continuous period of 14 days (other than by reason of holiday, statutory or otherwise) or announces an intention permanently to cease business and no alternative clearance system satisfactory to the Trustee is available; or (iii) as a result of any amendment to, or change in, the laws or regulations of the Cayman Islands or of any authority therein or thereof having power to tax or in the interpretation or administration of such laws or regulations which becomes effective on or after the Closing Date, the Co-Issuers or the Paying Agents are or will be required to make any deduction or withholding from any payment in respect of the Notes which would not be required were the Notes in definitive registered form. Notwithstanding the foregoing, interests in any Temporary Regulation S Global Note or any definitive registered Note purchased by a non-U.S. Person in an Offshore Transaction in accordance with Regulation S may not be exchanged for a Definitive Note until receipt by the Trustee from the owner of such beneficial interest of a certificate in the form provided by the Indenture.

Upon issuance, the Notes sold in the United States to Qualified Institutional Buyers will be issued in book-entry form ("**Rule 144A Global Notes**") only through the facilities of DTC. So long as DTC or its nominee is the registered Holder of the Rule 144A Global Notes, DTC or such nominee, as the case may be, will be considered the absolute owner or Holder of such the Notes represented by such Rule 144A Global Notes for all purposes under the Indenture and such Notes. DTC or such nominee, as the case may be, will be the only person entitled to receive payments in respect of the Notes represented by such Rule 144A Global Notes and the Co-Issuers will be discharged by payment to DTC or such nominee. Each of the persons shown in the records of DTC as the beneficial owner of a Rule 144A Global Note must look solely to DTC for its share of each payment made by the Issuer to DTC. No person other than DTC shall have any claim against the Co-Issuers in respect of any payment due under the Rule 144A Global Notes.

Payments on the Rule 144A Global Notes will be made in accordance with the established procedures of DTC and the Co-Issuers will have no liability therefor. In addition, no beneficial owner of an interest in a Rule 144A Global Note will be able to exchange or transfer such interest except in accordance with the applicable procedures of DTC. None of the Issuer, the Co-Issuer, the Trustee, the Registrar or any Paying Agent will have any responsibility or liability for any aspect of the records relating to or payments made on account of beneficial ownership interests in the Rule 144A Global Notes or for maintaining, supervising or reviewing any records relating thereto.

Definitive Notes will be issued and exchanged for each Rule 144A Global Note within 30 days of the occurrence of any of the following: (i) the Notes or any of them become immediately due and payable following an Event of Default under the Indenture; or (ii) DTC notifies the Issuer or the Trustee in writing that it is unwilling or unable to discharge properly its responsibilities as a depository with respect to the Rule 144A Global Notes or it ceases to be a "clearing agency" registered under the Exchange Act (defined below), and the Issuer and the Trustee are unable to locate a qualified successor within 90 days after such notice.

Definitive Notes may be presented for registration of transfer (with the form of transfer endorsed thereon duly executed), at the office of the Registrar, without service charge but upon payment of any taxes and other governmental charges as described in the Indenture. Any registration of transfer will be effected upon the Trustee being satisfied with the documents of title and identity of the person making the request, upon their receipt of any applicable certificates and opinions relating to transfer restrictions, as described below, and subject to such reasonable regulations as the Issuer may from time to time agree with the Trustee, all as described in the Indenture.

The Issuer has initially appointed the Trustee as Registrar. Definitive Notes may be presented for payment or for transfer or exchange at the offices of the Registrar's agent, JPMorgan Chase Bank, National Association, 4 New York Plaza, ground floor, New York, New York 10004, Attention: WSS Window – WSS (Houston) – Rockwall CDO. The Issuer reserves the right to vary or terminate the appointment of the Registrar or to appoint

008398

additional or other registrars or to approve any change in the office through which any Registrar acts, *provided* that there will at all times be an office or agent located in New York, New York at which the Definitive Notes may be presented for payment or for transfer or exchange.

For so long as any Class of Notes is listed on the Irish Stock Exchange and the rules of such exchange shall so require, the Issuer will have a listing agent and a paying agent (which shall be the "**Irish Paying Agent**") for the Notes in Ireland and payments on such Notes may be effected through the Irish Paying Agent. In the event that the Irish Paying Agent is replaced at any time during such period, notice of the appointment of any replacement will be given to the Company Announcements Office of the Irish Stock Exchange.

A beneficial interest in a Regulation S Global Note may only be transferred to (a) a non-U.S. Person in an offshore transaction (as defined in Regulation S) (an "**Offshore Transaction**") in accordance with Regulation S (and in accordance with certain certification requirements in the Indenture) or (b) after the Exchange Date, a person who takes delivery in the form of an interest in a Rule 144A Global Note and who delivers a written certification (in the form provided in the Indenture) to the effect that such person is a Qualified Institutional Buyer and is acquiring such interest for its own account (together with certain other requirements set forth in the Indenture). Upon any exchange of a portion of a Regulation S Global Note for a Definitive Note, the Trustee shall endorse such Regulation S Global Note to reflect the reduction of the principal amount evidenced thereby.

Definitive Notes (or any interest therein) may only be transferred in accordance with the applicable laws of any state of the United States and (a) in a transaction exempt from the registration requirements of the Securities Act involving a Qualified Institutional Buyer who is a U.S. Person as transferee (in accordance with the certification requirements of the Indenture) or (b) to a person who takes delivery in the form of a beneficial interest in a Regulation S Global Note and in such case only upon receipt by the Trustee of a written certification from the transferor (in the form provided in the Indenture) to the effect that such transfer is being made to a non-U.S. Person in accordance with Regulation S. Upon any exchange of a Definitive Note for a beneficial interest in a Regulation S Global Note, the Trustee shall endorse such Regulation S Global Note to reflect the increase in the principal amount evidenced thereby.

The Registrar for the Notes will not be required to accept for registration of transfer any Note except upon presentation of a certificate substantially in the form required by the Indenture representing that these restrictions on transfer have been complied with, and, if requested by the Issuer or the Trustee, an opinion of counsel in form and substance satisfactory to the Issuer or the Trustee to the effect that such transfer has been made in compliance with an applicable exemption from the registration requirements of the Securities Act and in accordance with any applicable securities laws of any state of the United States and any other jurisdiction. See "Delivery of the Notes; Transfer Restrictions; Settlement."

No Note may be sold or transferred unless such sale or transfer will not constitute or result in a non-exempt prohibited transaction under ERISA or Section 4975 of the Code. In addition, no Class B-1L Note may be sold or transferred to any Plan, or to any person acting on behalf of or with "plan assets" of any Plan, including an insurance company general account, unless the purchaser or transferee is eligible for the exemptive relief available under PTCE 96-23, 95-60, 91-38, 90-1 or 84-14. See "Certain ERISA Considerations."

In addition, sales or other transfers of the Notes may only be made to a purchaser or other transferee (other than a non-U.S. Person in an offshore transaction under Regulation S) that is a Qualified Purchaser in a sale or transfer that would not require the Co-Issuers to become subject to the requirements of the Investment Company Act and the Notes will bear a legend to this effect. See "Delivery of the Notes; Transfer Restrictions; Settlement."

Each prospective purchaser will be deemed to (i) represent that such prospective purchaser is a Qualified Institutional Buyer and is purchasing or acquiring Notes solely for its own account or is a non-U.S. Person, (ii) that it and each account for which it is purchasing is purchasing a Class of Notes in at least the related minimum denomination, (iii) that it is a 'single beneficial owner' for purposes of Section 3(c)(1) of the Investment Company Act and (iv) have made the additional representations described under "Delivery of the Notes; Transfer Restrictions; Settlement."

008399

DTC is a limited purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code and a "clearing agency" registered pursuant to Section 17A of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"). DTC was created to hold securities for its participants (the "**DTC Participants**") and to facilitate the clearance and settlement of securities transactions between DTC Participants through electronic computerized book-entries, thereby eliminating the need for physical movement of certificates. DTC Participants include securities brokers and dealers, banks, trust companies and clearing corporations. Indirect access to the DTC system also is available to others such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a DTC Participant, either directly or indirectly ("**Indirect Participants**").

Unless and until Definitive Notes are issued, all references to actions by Holders of the Rule 144A Global Notes holding through DTC will refer to actions taken by DTC upon instructions received from beneficial owners of the Rule 144A Global Notes through DTC Participants, and all references herein to payments, notices, reports, statements and other information to Holders of Rule 144A Global Notes will refer to payments, notices, reports and statements to DTC or its nominees, as the registered Holder of the Rule 144A Global Notes, for distribution to beneficial owners of Rule 144A Global Notes through DTC Participants in accordance with DTC procedures.

Clearstream is incorporated under the laws of Luxembourg as a professional depository. Clearstream holds securities for its participating organizations ("**Clearstream, Luxembourg Participants**") and facilitates the clearance and settlement of securities transactions between Clearstream, Luxembourg Participants through electronic book-entry changes in accounts of Clearstream, Luxembourg Participants, thereby eliminating the need for physical movement of certificates.  Clearstream provides to its Clearstream, Luxembourg Participants, among other things, services for safekeeping, administration, clearance and settlement of internationally traded securities and securities lending and borrowing. Clearstream interfaces with domestic markets in several countries. As a professional depository, Clearstream is subject to regulation by the Luxembourg Monetary Institute. Clearstream, Luxembourg Participants are recognized financial institutions around the world, including underwriters, securities brokers and dealers, banks, trust companies, clearing corporations and certain other organizations and may include the Initial Purchaser. Indirect access to Clearstream is also available to others, such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a Clearstream, Luxembourg Participant, either directly or indirectly.

Euroclear was created to hold securities for participants of Euroclear (the "**Euroclear Participants**") and to clear and settle transactions between Euroclear Participants through simultaneous electronic book-entry delivery against payment, thereby eliminating the need for physical movement of certificates and any risk from lack of simultaneous transfers of securities and cash.  Euroclear includes various other services, including securities lending and borrowing and interfaces with domestic markets in several countries generally similar to the arrangements for cross-market transfers with DTC described above. Euroclear is operated by Euroclear Bank S.A./N.V. (the "**Euroclear Operator**"), under contract with Euroclear Clearance System, S.C., a Belgian cooperative corporation (the "**Cooperative**"). All operations are conducted by the Euroclear Operator, and all Euroclear securities clearance accounts and Euroclear cash accounts are accounts with the Euroclear Operator, not the Cooperative. The Cooperative establishes policy for Euroclear on behalf of Euroclear Participants. Euroclear Participants include banks (including central banks), securities brokers and dealers and other professional financial intermediaries and may include the Initial Purchaser. Indirect access to Euroclear is also available to other firms that clear through or maintain a custodial relationship with a Euroclear Participant, either directly or indirectly.

The Euroclear Operator is the Belgian branch of a New York banking corporation which is a member bank of the Federal Reserve System. As such, it is regulated and examined by the Board of Governors of the Federal Reserve System and the New York State Banking Department, as well as the Belgian Banking Commission.

Securities clearance accounts and cash accounts with the Euroclear Operator are governed by the Terms and Conditions Governing Use of Euroclear and the related Operating Procedures of Euroclear and applicable Belgian law (collectively, the "**Terms and Conditions**"). The Terms and Conditions govern transfers of securities and cash within Euroclear, withdrawal of securities and cash from Euroclear, and receipts of payments with respect to securities in Euroclear. All securities in Euroclear are held on a fungible basis without attribution of specific certificates to specific securities clearance accounts. The Euroclear Operator acts under the Terms and Conditions

008400

only on behalf of Euroclear Participants and has no record of or relationship with persons holding through Euroclear Participants.

Option to Acquire Bond Insurance

The Indenture will provide that Holders of any Class of Notes may elect to acquire bond insurance, a surety bond or similar credit enhancement supporting the payment of principal and/or interest on such Class of Notes, on terms and conditions acceptable to such Holders. Any Class of Notes subject to such enhancement will be designated as "**Insured Notes**" of such Class. Premiums for any such enhancement will be payable from amounts otherwise payable to such Class of Insured Notes or in such other manner chosen by such Holder. Any Insured Notes of a Class for substantially all other purposes will be treated as Notes of such Class, except that the issuer of the bond insurance policy, surety bond or other such credit enhancement will generally be deemed to be the Holder of the Notes of such Class enhanced by such entity and will in such capacity be entitled to exercise the rights otherwise exercisable by Holders of such Notes.

## SECURITY FOR THE NOTES

The Notes will be secured by the Trust Estate. The Trust Estate will consist of substantially all property of the Issuer, including the Portfolio Collateral, the Collection Account, the Initial Deposit Account, the Loan Funding Account, the Expense Reimbursement Account and the Closing Expense Account.

Portfolio Collateral—General

The Portfolio Collateral (including Original Portfolio Collateral, Additional Portfolio Collateral and Substitute Portfolio Collateral) when purchased (or when committed to be purchased) by the Issuer, will consist of (I) United States dollar denominated commercial loans in registered form, including participation and assignment interests therein, collateralized loan obligations, including synthetic securities, of any corporation, partnership, limited liability company or trust, of the United States government or any agency or instrumentality thereof or of other sovereign issuers, which obligations:

(a)     are "eligible assets" as defined in Rule 3a-7;

(b)     except as described below, provide for periodic payments of interest thereon in cash no less frequently than semiannually;

(c)     provide for a fixed amount of principal to be payable according to a fixed schedule or at maturity;

(d)     are not items of Defaulted Portfolio Collateral, items of Equity Portfolio Collateral or a margin stock, or, except as described below, items of Credit Risk Portfolio Collateral;

(e)     except as described below, are not zero-coupon bonds, bonds that provide for a combination of no coupon and a fixed coupon, step-up bonds (except for step-up bonds providing for the payment of current interest at a rate no less than 5% *per annum* or Collateral LIBOR, if floating rate), other than with respect to the Initial Portfolio Collateral on the Closing Date, Partial Deferred Interest Bonds (except for such bonds providing for the payment of current interest at a rate no less than 5% *per annum* or Collateral LIBOR, if floating rate);

(f)     are not currently the subject of an Offer that would result in (i) the Issuer owning a security not meeting the requirements of Portfolio Collateral, not paying current interest, or, in the reasonable judgment of the Servicer, not expected to pay in full at maturity, or (ii) the Issuer receiving Eligible Investments or cash in a par amount less than that of the original security or the subject of an Exchange Offer;

(g)     do not provide for conversion or exchange into equity capital at any time over their respective lives (other than the exercise of any warrant, profit participation or other equity-like interest which is a component of a Unit);

008401

(h)     with respect to Portfolio Collateral which consists of Floating Rate Collateral, have an interest rate which adjusts periodically in accordance with changes in one or more established indices at least one of which is the London interbank offered rate for one-, two-, three- or six-month U.S. dollar deposits and which adjusts at least semiannually or, with respect to items of Fixed Rate Collateral, have an interest rate that remains constant until the maturity of such obligations or are Reset Debt Securities; *provided* that not more than 5.0% of the Aggregate Principal Amount of the Portfolio Collateral included in the Trust Estate may include items of Portfolio Collateral the interest rate on which adjusts in accordance with one or more indices that do not include the London interbank offered rate for one-, two-, three-, or six-month U.S. dollar deposits;

(i)     have coupon or other payments that are not subject to U.S. withholding tax and are not at time of purchase subject to foreign withholding tax unless the issuer of the security is required to make "gross-up" payments sufficient to cause the net amount to be received on the debt obligations to equal the amount that would have been paid had no such withholding tax applied;

(j)     mature on or before August 1, 2021 or, if a Maturity Extension as occurred, the then applicable Extended Final Maturity Date, except that up to 5.0% of the Aggregate Par Amount may mature after such date but before 5 years after such date; *provided that*, with respect to Portfolio Loans, no more than 3.0% of the Aggregate Par Amount may mature after August 1, 2021 or, if a Maturity Extension as occurred, the then applicable Extended Final Maturity Date, but before two years after such date and no Portfolio Loans may mature after two years after such date;

(k)     the terms of which do not, unless they are Delayed Drawdown Loans or Revolving Loans, require the Holder to assume or otherwise undertake any funding obligations or liabilities (of a contingent nature or otherwise);

(l)     are payable only in United States dollars;

(m)     are not Current Pay Obligations

(n)     are not Debt Securities;

(o)     the S&P Rating of which does not include a subscript of "r", "t", "p", "pi" or "q" unless otherwise agreed to by Standard & Poor's in writing and a Moody's Rating that addresses the full amount of principal or interest indicated would be paid;

(p)     and, during the Revolving Period, CLO Securities having a Moody's Rating of "Ba2" or higher and an S&P Rating of "BB" or higher and, after the Revolving Period are not CLO Securities;

(q)     are not PIK Bonds which are currently deferring interest payments or receiving payments in-kind pursuant to the terms of the related Underlying Instrument; and

(r)     satisfy, together with the other Portfolio Collateral to be concurrently included in the Trust Estate, the other applicable criteria set forth in the Indenture, including the ratings guidelines and guidelines concerning issuer concentration and industry concentration described below; or

(II)     Synthetic Securities (as described herein); *provided* that the Servicer concludes, based on advice of counsel, that the Synthetic Securities are "eligible assets" for purposes of Rule 3a-7.

Interests in commercial loans included in the Portfolio Collateral are referred to herein as "**Portfolio Loans**," and interests in collateralized loan obligations in the Portfolio Collateral are referred to herein as "**CLO Securities**." The Issuer may invest in participations ("**Participations**") in Portfolio Loans, or purchase assignments ("**Assignments**") of portions of Portfolio Loans.

In addition, up to 20% of the Aggregate Par Amount may consist of Synthetic Securities. The purchase of Synthetic Securities may involve certain additional risks not present in the purchase of other Portfolio Collateral.

008402

See "Special Considerations—Nature of Collateral Pledged to Secure the Notes; Ability to Obtain Additional Portfolio Collateral; Availability of Funds for Subordinate Payments" For purposes of the eligibility criteria and related tests, a Synthetic Security will generally be included as an item of Portfolio Collateral having the maturity, interest rate and other payment characteristics of the Synthetic Security and not of the Reference Obligation (including characterization as either an item of Fixed Rate Collateral or Floating Rate Collateral) and, with respect to all other characteristics, will be included as an item of Portfolio Collateral having the relevant characteristics of the related Reference Obligation and not of the Synthetic Security.

Notwithstanding anything contained herein to the contrary, in no event may the Issuer acquire or dispose of any item of Portfolio Collateral or other eligible asset (as defined in Rule 3a-7) for the primary purpose of recognizing gains or decreasing losses resulting from market value changes.

Notwithstanding the foregoing, if the Issuer or the Servicer has previously entered into a commitment to purchase an item of Portfolio Collateral to be included in the Trust Estate and at the time of such commitment such item of Portfolio Collateral complied with the definition of Portfolio Collateral, then the Issuer or Servicer may consummate the purchase of such item of Portfolio Collateral notwithstanding that such item of Portfolio Collateral fails to comply with the definition of Portfolio Collateral on the date of settlement.

The Servicer may only direct the Trustee to sell an item of Portfolio Collateral that is the subject of an Offer or call for redemption, if together with its direction to sell such security, the Servicer certifies to the Trustee that the sales price for such Security is equal to or greater than 1% less than the price available pursuant to such Offer or call and such sale will be treated as if the Offer or call were consummated for purposes of determining the Collections for the Due Period relating to the date on which such sale occurs.

The manner and timing for any purchase or sale of any item of Portfolio Collateral and the determination of when any such purchase or sale becomes effective for purposes of any calculations of the Overcollateralization Tests or other collateral criteria shall be set forth in the Indenture.

If an item of Portfolio Collateral becomes subject to an Exchange Offer after it has been purchased by the Issuer, the Servicer will be permitted to take such action with respect to the Underlying Instrument or the issuer thereof as may be required to convert such item of Portfolio Collateral into an item of Equity Portfolio Collateral.

Simultaneously with the issuance of the Notes, an Aggregate Principal Amount of Initial Portfolio Collateral securing the Notes at least equal to the Initial Portfolio Collateral Amount will be acquired or committed to be acquired by the Issuer from the net proceeds of the sale of the Notes and the Preferred Shares. The Issuer will also pledge the Deposit (consisting of cash deposited in the Initial Deposit Account in the approximate amount such that the Issuer can purchase or commit to purchase an Aggregate Principal Amount of Original Portfolio Collateral on or before November 1, 2006 (the "**Effective Date**"), at least equal the Required Portfolio Collateral Amount) to the Trustee on the Closing Date, which Deposit will be used to purchase Eligible Investments at the direction of the Issuer pending application to purchase or commit to purchase Portfolio Collateral on or before the Effective Date, subject to the requirements and restrictions set forth in the Indenture. A portion of the Initial Portfolio Collateral, and the remaining Portfolio Collateral may be, acquired from or through Bear Stearns, the Servicer or their affiliates, at negotiated prices acceptable to the Issuer and the Servicer or if purchased from the Servicer or its affiliates at prices determined in accordance with the procedures described under "Special Considerations—Potential Conflicts of Interest."

The Issuer and the Servicer will seek to use the Deposit to purchase additional Original Portfolio Collateral prior to the Effective Date in accordance with the guidelines described herein and in the Indenture. If the Issuer and the Servicer are unable to use or commit to use the full amount of the Deposit on or prior to the Effective Date to purchase additional Original Portfolio Collateral having an Aggregate Principal Amount (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to the Original Portfolio Collateral on or before the Effective Date) at least equal to the Required Portfolio Collateral Amount, the Issuer will be required to effect an Initial Deposit Redemption on the Initial Deposit Redemption Date as described herein except, if the amount of the Deposit not so used or committed does not exceed U.S.$2,000,000 in the aggregate, such amount will be transferred to the Collection Account as Collateral Principal Collections on the Effective Date.

008403

If a Suspension Trigger Event is in effect, a majority of the Controlling Class may deliver notice to the Issuer directing the Issuer and the Servicer to suspend any purchases of additional items for inclusion in the Trust Estate as an item of Portfolio Collateral. Such suspension shall automatically terminate once a Suspension Trigger Event is no longer in effect.

<u>Criteria for Purchase and Substitution of Collateral</u>

The Issuer's entry into a commitment to purchase any additional collateralized loan obligations, synthetic securities and commercial loans after the Effective Date (each, an item of "**Additional Portfolio Collateral**") with Available Funds is subject to the limitations described under "Security for the Notes—Changes in Composition of Portfolio Collateral" and further is subject in each case to the following restrictions:  (i) each of the Overcollateralization Tests is satisfied (*provided* that unscheduled principal proceeds may be used to purchase Additional Portfolio Collateral even if such tests are not satisfied, so long as the results of such tests would not be diminished) and (ii) the collateral criteria specified below are satisfied or the degree of compliance with such collateral criteria would not be diminished.  In addition, during the Amortization Period, Collateral Principal Collections from any unscheduled prepayment may be used to purchase Additional Portfolio Collateral as described and meeting the requirements herein.  The Issuer's entry into a commitment to purchase any substitute collateralized loan obligations, synthetic securities and commercial loans (each, an item of "**Substitute Portfolio Collateral**") with Collateral Disposition Proceeds during the Revolving Period is subject in each case to the following restrictions: (i) the Overcollateralization Tests and the collateral criteria specified herein are satisfied and the Interest Coverage Test (after the second Payment Date) for the most recent Payment Date was satisfied or (ii) if the Overcollateralization Tests and the collateral criteria specified below are not satisfied, the degree of compliance with such tests or criteria would not be diminished.  In connection with a sale of an item of Credit Improved Portfolio Collateral after the Revolving Period or the receipt of Collateral Principal Collections in connection with an unscheduled prepayment after the Revolving Period, the Issuer may enter into commitments to apply such net disposition proceeds or such unscheduled prepayments (net of accrued interest and costs) to the purchase of Portfolio Loans either as Additional Portfolio Collateral or Substitute Portfolio Collateral.  Substitute Portfolio Collateral may not be purchased with Collateral Disposition Proceeds from the sale of Defaulted Portfolio Collateral unless, after giving effect to such purchase, each of the Overcollateralization Tests is satisfied and the Interest Coverage Test for the most recent Payment Date was satisfied.  The Issuer is not required, and may not be permitted under certain circumstances, to purchase or sell Portfolio Collateral and the rules described above are limited as set forth below under "—Changes in Composition of Portfolio Collateral."

Notwithstanding the foregoing, if there is no appointment of a successor Servicer within 90 days after the resignation or termination of the Servicer, any sales or disposition of Portfolio Collateral shall be limited to Credit Risk Portfolio Collateral and Defaulted Portfolio Collateral; provided that such restriction on the sale or disposition of Portfolio Collateral shall not apply if the Portfolio Collateral is being liquidated in whole or in part in connection with an acceleration or early termination of the Notes.

<u>S&P CDO Monitor Test</u>

The "**S&P CDO Monitor Test**" will be satisfied if, after giving effect to the purchase or sale of an item of Portfolio Collateral (or both), as the case may be, (i) the S&P Loss Differential (defined below) of the Proposed Portfolio (defined below) is positive or (ii) the S&P Loss Differential of the Proposed Portfolio is greater than the S&P Loss Differential of the Current Portfolio (defined below).  The S&P CDO Monitor Test is not applicable and does not have to be satisfied or maintained when reinvesting the proceeds of Defaulted Portfolio Collateral or Credit Risk Portfolio Collateral.

The "**S&P Loss Differential**" at any time, is the rate calculated by subtracting the S&P Scenario Default Rate (defined below) from the S&P Break-Even Default Rate (defined below) at such time.

The "**S&P Scenario Default Rate**" at any time, is an estimate of the cumulative default rate for the Current Portfolio or the Proposed Portfolio, as applicable, consistent with a "AAA" rating by S&P with respect to the Class A-1L Notes and the Class X Notes, a "AA" rating by S&P with respect to the Class A-2L Notes, a "A" rating by

S&P with respect to the Class A-3L Notes, a "A-" rating by S&P with respect to the Class A-4L Notes and a "BBB" rating by S&P with respect to the Class B-1L Notes, determined by application of the S&P CDO Monitor (defined below) at such time.

The "**S&P Break-Even Default Rate**" at any time, is the maximum percentage of defaults which the Current Portfolio or the Proposed Portfolio, as applicable, can sustain, as determined by S&P through application of the S&P CDO Monitor which, after giving effect to S&P's assumptions on recoveries and timing and to the priority of payments, will result in sufficient funds remaining for the principal repayment of the Notes in full and the timely payment, as applicable, of interest on each Class of Notes as set forth in the Indenture.

The "**Current Portfolio**" means the Pledged Securities in the Trust Estate immediately prior to the sale, maturity or other disposition of an item of Portfolio Collateral or immediately prior to the acquisition of an item of Portfolio Collateral, as the case may be.

The "**Proposed Portfolio**" means the Aggregate Par Amount resulting from the sale, maturity or other disposition of an item of Portfolio Collateral or a proposed purchase of an item of Portfolio Collateral, as the case may be.

The "**S&P CDO Monitor**" is a dynamic, analytical computer model developed by S&P and used to estimate default risk of items of Portfolio Collateral and provided to the Servicer and the Issuer on or before the Closing Date, as it may be modified by S&P from time to time in connection with its confirmation of the ratings of the Notes following the Closing Date. The S&P CDO Monitor calculates the cumulative default rate of a pool of Portfolio Collateral consistent with a specified benchmark rating level based upon S&P's proprietary corporate debt default studies. In calculating the S&P Scenario Default Rate, the S&P CDO Monitor considers each obligor's most senior unsecured debt rating, the number of obligors in the portfolio, the obligor and industry concentration in the portfolio and the remaining weighted average maturity of the Portfolio Collateral and calculates a cumulative default rate based on the statistical probability of distributions of defaults on the Portfolio Collateral.

<u>Moody's Asset Correlation Test and Weighted Average Rating Test</u>

The Moody's Asset Correlation Test and weighted average rating of the Portfolio Collateral will be calculated in accordance with the methodology prescribed by Moody's and more fully described in the Indenture. The MAC Test and "**Weighted Average Rating Test**" will be satisfied in accordance with the application of the Collateral Quality Matrix described below.

The Moody's Asset Correlation ("**MAC**") Test (the "**MAC Test**") will be satisfied on each Measurement Date if the Moody's Correlation Factor on such Measurement Date (rounded up to the nearest whole number) is equal to or less than the designated Moody's Correlation Factor determined by application of the Collateral Quality Matrix. In connection with the MAC Test, the Moody's Correlation Factor is a single number determined in accordance with the correlation methodology provided to the Servicer and the Collateral Administrator by Moody's.

<u>Collateral Quality Matrix Tests</u>

Under the Indenture, the Servicer will be permitted to select from a table (that will be included in the Indenture, the "**Collateral Quality Matrix**"), a different group of thresholds for satisfying or otherwise determining the following tests:

- the Moody's Asset Correlation Test;

- the Minimum Average Recovery Rate Test;

- the Weighted Average Rating Test; and

- the Weighted Average Margin Test.

008405

Therefore, notwithstanding anything to the contrary described herein, after giving effect to the proposed purchase of any Portfolio Collateral, the minimum/maximum amounts required to satisfy each of such tests may vary from time to time. In determining whether the criteria set forth in the Collateral Quality Matrix are satisfied, the Servicer may use the Collateral Quality Formula (as set forth in the Indenture) to interpolate between values of such criteria or may use any other method that is agreed to by the Issuer and Moody's. Depending on the combination of thresholds in the Collateral Quality Matrix selected by the Servicer at any time, except as described below, the minimum required MAC Test can range from 3.0% to 4.0%; the maximum permitted weighted average rating factor prescribed by Moody's can range from 1500 to 2500; the minimum required average recovery rate prescribed by Moody's can range from 40.0% to 45.5% and the minimum Weighted Average Margin can range from 1.50% to 3.00%.

Each group of minimum/maximum amounts included in the Collateral Quality Matrix will include a combination of the minimum/maximum scores that are required to satisfy each of the Collateral Quality Matrix Tests. The Servicer may elect from time to time to have different combinations apply so long as (a) immediately after giving effect to the change in combinations, each of the applicable tests will be satisfied or not diminished and (b) the S&P CDO Monitor Test would have been satisfied as of the date of the most recent purchase or sale of an item of Portfolio Collateral had such test been calculated using the Current Portfolio, the Proposed Portfolio, and the S&P Scenario Default Rate that was in effect immediately prior to such purchase or sale, but using the S&P Break-Even Default Rate applicable to the Notes that would have been applicable after giving effect to the change in combinations. In no event will the Servicer be obligated to change the combinations contemplated by the Collateral Quality Matrix. Notwithstanding the foregoing, the combination of scores required to satisfy each of the Collateral Quality Matrix Tests may be changed if the Rating Condition is satisfied with respect to such change and, as a result, the minimum/maximum amounts may change as well.

Weighted Average Margin Test

The **"Weighted Average Margin Test"** will be determined by application of the Collateral Quality Matrix described above, after giving effect to any Coupon Adjustment.

The **"Weighted Average Margin"** refers to the amount (rounded up to the nearest 0.001%) equal to (i) the sum of the products obtained by multiplying the margin over Collateral LIBOR on each item of Floating Rate Collateral (other than items of Defaulted Portfolio Collateral) as of the date of calculation (which will be determined for items of Floating Rate Collateral that do not bear interest based on Collateral LIBOR by expressing the current interest rate on such Floating Rate Collateral as a margin above or below three-month LIBOR on the date of determination, which margin will be expressed as a negative number if such current interest rate is lower than three-month LIBOR) by the Principal Balance of such item of Floating Rate Collateral (other than items of Defaulted Portfolio Collateral) as of such date, divided by (ii) the Aggregate Principal Amount of all such Floating Rate Collateral (other than items of Defaulted Portfolio Collateral) on such date.

For purposes of calculating the Weighted Average Margin for any Delayed Drawdown Loan or Revolving Bank Loan, the principal balance representing the funded portion will be multiplied by the margin above Collateral LIBOR and the principal balance representing the unfunded portion will be multiplied by the commitment fee related thereto.

If an item of Floating Rate Portfolio Collateral does not provide for Collateral LIBOR, the margin for this purpose shall be equal to the then applicable interest rate minus then current LIBOR. If an item of Floating Rate Portfolio Collateral has a Collateral LIBOR floor, the excess of such floor rate over Collateral LIBOR will be added to the margin above Collateral LIBOR for purposes of calculating the Weighted Average Margin of such item of Floating Rate Portfolio Collateral.

Weighted Average Coupon Test

The **"Weighted Average Coupon Test"** will be satisfied if, after the Effective Date, none of the Portfolio Collateral is Fixed Rate Portfolio Collateral or if, after giving effect to the proposed purchase of any Portfolio Collateral and after giving effect to any Coupon Adjustment, the Weighted Average Coupon is at least equal to 7.5%

008406

*per annum* as of the date of determination (or such lower per annum rate that the Rating Agencies have confirmed would not result in a withdrawal or downgrade of any of the then current ratings assigned by them to the Notes).

The **"Weighted Average Coupon"** refers to the amount (rounded up to the nearest 0.001%) determined by summing the products obtained by multiplying, for each item of Fixed Rate Collateral then included in the Trust Estate (other than items of Defaulted Portfolio Collateral), the Principal Balance of such item of Portfolio Collateral and the stated rate of interest of such item of Portfolio Collateral and then dividing such sum by the Aggregate Principal Amount of all of the Fixed Rate Collateral included in the Trust Estate (other than items of Defaulted Portfolio Collateral) as of such date of determination.

Minimum Average Recovery Rate Test. The Minimum Average Recovery Rate will be calculated in accordance with the methodology prescribed by Moody's and S&P and more fully described in the Indenture. The **"Minimum Average Recovery Rate Test"** with respect to Moody's, will be determined by application of the Collateral Quality Matrix described above and with respect to S&P, will be determined as set forth in the Indenture.

Weighted Average Life Requirement. The **"Weighted Average Life Requirement"** will be satisfied on any date of determination if the Weighted Average Life on such date of all items of Portfolio Collateral is equal to or less than the number of years set forth in Schedule I to the Indenture opposite the period set forth in Schedule I to the Indenture in which such requirement is being measured or, in the case of a Maturity Extension, the Extended Weighted Average Life Date. Notwithstanding the foregoing, the Weighted Average Life may vary from the restrictions set forth in the Indenture if the Rating Agencies have confirmed such variance would not result in a withdrawal or downgrade of any of the then current ratings assigned by them to the Notes.

The **"Weighted Average Life"** refers to the amount determined by summing the products obtained by multiplying, for each item of Portfolio Collateral (other than items of Defaulted Portfolio Collateral) then included in the Trust Estate, the Principal Balance of such item of Portfolio Collateral and the Average Life (as such term is defined below) of such item of Portfolio Collateral as of such date of determination and then dividing such sum by the Aggregate Principal Amount of all of the Portfolio Collateral (other than items of Defaulted Portfolio Collateral and Current Pay Obligations) included in the Trust Estate as of such date of determination. For any item of Portfolio Collateral, the "Average Life" shall be equal to the number of years obtained by dividing (a) the Principal Balance of such item of Portfolio Collateral into (b) the sum of the products obtained by multiplying (i) the amount of each of the remaining, required principal payments on such item of Portfolio Collateral by (ii) the number of years (calculated to the nearest one-twelfth) that will have elapsed between such date of determination and the making of such payment.

Rating. After giving effect to the proposed purchase of any Portfolio Collateral: (i) at least 90% of the Aggregate Principal Amount of the Portfolio Collateral included in the Trust Estate must be obligations of issuers having at least one class of indebtedness actually rated by Moody's (either publicly or privately) and (ii) at least 90% of the Aggregate Principal Amount of the Portfolio Collateral in the Trust Estate must be obligations of issuers having at least one class of indebtedness actually rated by S&P (either publicly or privately).

CCC/Caa Portfolio Collateral Limitation. The proposed purchase of any Portfolio Collateral may not increase the Aggregate Principal Amount of CCC/Caa Portfolio Collateral in the Trust Estate to more than 5.0% of the Aggregate Par Amount; *provided that* the Issuer may purchase CCC/Caa Portfolio Collateral which would increase the Aggregate Principal Amount of CCC/Caa Portfolio Collateral in the Trust Estate above 5.0% of the Aggregate Par Amount with the proceeds of CCC/Caa Portfolio Collateral; and *provided further* that no CLO Securities may be included in the determination of this CCC/Caa Portfolio Collateral Limitation.

Limitation on Non-U.S. Debt. After giving effect to the proposed purchase of any Portfolio Collateral,

(a) not more than 10% of the Aggregate Par Amount may consist of items of Portfolio Loans that are obligations of Permitted Non-U.S. Obligors;

(b) not more than 10% of the Aggregate Par Amount may consist of items of Portfolio Loans that are obligations of Permitted Non-U.S. Obligors in any single Group A Country;

008407

(c) not more than 5% of the Aggregate Par Amount included may consist of items of Portfolio Loans that are obligations of Permitted Non-U.S. Obligors in all Group B Countries;

(d) not more than 2% of the Aggregate Par Amount may consist of items of Portfolio Loans that are obligations of Permitted Non-U.S. Obligors in any single Group B Country;

(e) not more than 2.5% of the Aggregate Par Amount may consist of items of Portfolio Loans that are obligations of Permitted Non-U.S. Obligors in all jurisdictions that are not Group A Countries or Group B Countries;

(f) not more than 1% of the Aggregate Par Amount may consist of items of Portfolio Loans that are obligations of Permitted Non-U.S. Obligors in any single jurisdiction that is not a Group A Country or Group B Country; and

(g) no Portfolio Collateral may consist of CLO Securities that are obligations of Non-U.S. Obligors.

Issuer Limitation. (i) After giving effect to the proposed purchase of any Portfolio Loan, no more than 1.50% of the Aggregate Par Amount may represent obligations of any single obligor, *provided* that obligations of not more than five obligors of Portfolio Loans may represent no more than 2.00% of the Aggregate Par Amount and (ii) after giving effect to the proposed purchase of any CLO Security, no more than 2.75% of the Aggregate Par Amount may represent obligations of any single obligor.

Industry Category Concentration. (i) No more than 8% of the Aggregate Par Amount is in any one Standard & Poor's Industry Category; *provided, however,* in the case of three (3) Standard & Poor's Industry Categories, 12% of the Aggregate Par Amount may consist of items of Portfolio Collateral that are obligations of obligors in any one Standard & Poor's Industry Category, and (ii) no more than 32% of the Aggregate Par Amount may consist of items of Portfolio Collateral that are obligations of obligors in any three Standard & Poor's Industry Categories.

Limitation on Fixed Rate Collateral. After giving effect to the proposed purchase of any Portfolio Collateral, no more than 5% of the Aggregate Par Amount may bear interest at a fixed rate.

Limitation on Portfolio Loans. After giving effect to the proposed purchase of any Portfolio Collateral,

(a) at least 70% of the Aggregate Principal Amount of the Portfolio Collateral included in the Trust Estate must be Portfolio Loans (including Synthetic Securities, the Reference Obligations of which are loans); and

(b) not more than 10% of the Aggregate Principal Amount of the Portfolio Collateral included in the Trust Estate may be Portfolio Loans that are not Senior Secured Loans (including Synthetic Securities, the Reference Obligations of which are loans).

Limitation on CLO Securities. After giving effect to the proposed purchase of any Portfolio Collateral,

(a) not more than 30% of the Aggregate Par Amount may be CLO Securities;

(b) not more than 10% of the Aggregate Par Amount may consist of CLO Securities that have a Moody's Rating below "Baa3" or an S&P Rating below "BBB-", *provided* that not more than 2.0% of the Aggregate Par Amount may consist of a single CLO Security with such ratings;

(c) not more than 4.0% of the Aggregate Par Amount may consist of CLO Securities of a single manager which shall not be any of the Servicer Entities; and

(d) not more than 5.0% of the Aggregate Par Amount may consist of CLO Securities managed by any of the Servicer Entities; *provided* that not more than 1.5% of the Aggregate Par Amount may consist of CLO Securities of a single issuer serviced or managed by the Servicer;

008408

*provided*, that no CLO Securities may be purchased after August 1, 2009, unless an Extension shall occur in which case CLO Securities may be purchased during the full period of such Extension in accordance with all the criteria and restrictions provided herein that are applicable during the Revolving Period.

Limitations on Step-Up Bonds.  After giving effect to the proposed purchase of any Portfolio Collateral, no more than 5% of the Aggregate Par Amount may include step-up bonds.

Limitation on Semiannual Portfolio Collateral.  After giving effect to the proposed purchase of any Portfolio Collateral, no more than 5% of the Aggregate Par Amount may include items of Portfolio Collateral that provide for the periodic payment in cash of interest less frequently than quarterly, but not less frequently than semiannually.

Limitation on Participations, Synthetic Securities and Non-U.S. Portfolio Loans.  After giving effect to the proposed purchase of any Substitute Portfolio Collateral or Additional Portfolio Collateral, no more than 20% of the Aggregate Par Amount may be Participations, Synthetic Securities, securities lending agreements or Portfolio Loans that are obligations of non-U.S. entities which are not in a Group A Country.  Further, no Participation may be purchased from any Selling Institution (including for this purpose the seller of any participation and the seller of any sub-participation) rated below "A" by S&P or "A2" by Moody's. In addition, the table below generally describes limitations on (i) the percentage of the Aggregate Par Amount which consist of Synthetic Securities related to the long-term debt rating of the Synthetic Security Counterparty, (ii) the percentage of the Aggregate Par Amount which consists of Participations related to the long-term debt rating of the related Selling Institution, and (iii) the limitations on the percentage of the Aggregate Par Amount which consists of Participations and Synthetic Securities in the aggregate related to the long-term debt rating of the Selling Institution or Synthetic Security Counterparty, as the case may be.

| Rating (S&P/Moody's) | Individual Synthetic Security Counterparty Limit | Individual Participation Selling Institution Limit | Aggregate Synthetic Security Counterparty and Participation Selling Institution Limit |
|---|---|---|---|
| AAA/Aaa | 20.0% | 20.0% | 20.0% |
| AA+/Aa1 | 10.0% | 10.0% | 20.0% |
| AA/Aa2 | 10.0% | 10.0% | 17.5% |
| AA-/Aa3 | 10.0% | 10.0% | 15.0% |
| A+/A1 | 5.0% | 5.0% | 10.0% |
| A/A2 | 5.0% | 5.0% | 7.5% |

*provided*, that no more than 3% of the Aggregate Par Amount may be Synthetic Securities consisting of Default Swaps.  For purposes of the foregoing, the limitations shall be calculated separately for each of Standard & Poor's and Moody's and each such limitation must be satisfied.

Original Issue Size.  After giving effect to the proposed purchase of any Portfolio Collateral, at least 80% of the Aggregate Principal Amount of the Portfolio Collateral included in the Trust Estate will be Portfolio Loans that are part of a senior credit facility whose aggregate original principal amount (whether or not funded and including all tranches thereunder) is not less than U.S.$100,000,000.  No item of Portfolio Collateral included in the Trust Estate will be CLO Securities that are part of an issuer's aggregate issuance whose aggregate original principal amount (including all tranches thereunder) is less than U.S.$100,000,000.  No item of Portfolio Collateral included in the Trust Estate will be Portfolio Loans that are part of a senior credit facility whose aggregate original principal amount (whether or not funded and including all tranches thereunder) is less than $50,000,000.

Delayed Drawdown Loans and Revolving Loans.  After giving effect to the proposed purchase of any Portfolio Collateral, no more than 5% of the Aggregate Par Amount may consist of Delayed Drawdown Loans and no more than 7.5% of the Aggregate Par Amount may consist of Revolving Loans; provided that no more than 10% of the Aggregate Par Amount may consist of Delayed Drawdown Loans and Revolving Loans in the aggregate.

008409

A Delayed Drawdown Loan will not be eligible for purchase by the Issuer for inclusion in the Trust Estate unless the agreement or instrument that governs the rights and obligations of the related borrower and lender or lenders provides (i) that advances may be made for a period not to exceed one (1) year from the date of origination of the Delayed Drawdown Loan and in any event before the end of the Revolving Period; (ii) for a maximum amount that can be borrowed from the Issuer on one or more specified borrowing dates; (iii) that funds borrowed from the Issuer and subsequently repaid may not be reborrowed and (iv) that the borrower is entitled to such additional advances only upon the achievement of financial performance or other objective criteria established at origination and set forth in such credit agreement.

In addition, simultaneously with the Issuer's purchase of any Delayed Drawdown Loan or Revolving Loan, the Issuer is required to deposit into the Loan Funding Account the full amount of any advances or delayed draws that may be required of the Issuer thereunder and principal repaid under any Revolving Loan is required to be deposited in the Loan Funding Account to the extent the Issuer's obligation to fund any future advances has not been irrevocably reduced.

Debtor-in-Possession Financings. After giving effect to the proposed purchase of any Portfolio Collateral, no more than 5% of the Aggregate Par Amount may consist of DIP Loans. Any such items of Portfolio Collateral must be assigned a formal or estimated rating by Moody's and S&P.

Collateral Obligations Loaned under Securities Lending Agreements. No more than 15% of the Aggregate Par Amount may include Portfolio Collateral subject to any securities lending agreement as set forth in the Indenture.

PIK Bonds. No more than 30% of the Aggregate Par Amount may consist of PIK Bonds.

No Event of Default. No Event of Default shall have occurred and be continuing.

Changes in Composition of Portfolio Collateral

The Portfolio Collateral may be retired prior to their respective final maturities, as a result of, among other things, the existence and frequency of exercise of any optional or mandatory redemption features of such securities. Subject to the terms of the Servicing Agreement and the Indenture, the Servicer is also permitted to direct the Trustee to sell (i) any Defaulted Portfolio Collateral and (ii) any Equity Portfolio Collateral.

In addition, subject to the terms of the Servicing Agreement and the Indenture, including the restrictions described herein, the Servicer may, at any time during the life of the Notes, direct the Trustee to dispose of one or more items of Portfolio Collateral in cases where (i) an item of Portfolio Collateral is, in the Servicer's sole judgment (which judgment shall not be questioned as a result of subsequent events), likely to decline in credit quality and, with the passage of time, become an item of Defaulted Portfolio Collateral; *provided,* that in forming such judgment an increase in credit spread or a decrease in Market Value of such item of Portfolio Collateral may only be utilized as corroboration of other bases of such judgment ("**Credit Risk Portfolio Collateral**") or (ii) an item of Portfolio Collateral has, in the Servicer's sole judgment, improved in credit quality or otherwise satisfies the Credit Improved Criteria (subject to the proviso thereof); *provided,* that in forming such judgment a reduction in credit spread or an increase in Market Value of such item of Portfolio Collateral may only be utilized as corroboration of other bases of such judgment ("**Credit Improved Portfolio Collateral**"). Notwithstanding anything to the contrary stated herein, if any item of Portfolio Collateral is to be purchased with the Collateral Disposition Proceeds of one or more assets that are not Credit Risk Portfolio Collateral, Defaulted Portfolio Collateral, Portfolio Collateral Sold pursuant to a Portfolio Improvement Exchange or Portfolio Collateral that has become subject to withholding tax, the purchase of the proposed item of Portfolio Collateral must (i) restore compliance with the collateral criteria described above, the Interest Coverage Test or the Overcollateralization Tests (or bring the total Portfolio Collateral closer to compliance with any such test or limitation) not then satisfied or (ii) on a net basis improve the quality of the Portfolio Collateral as measured by such collateral criteria, Interest Coverage Test or Overcollateralization Tests and (iii) in the case of each of clause (i) and (ii) without causing any other collateral criteria, Interest Coverage Test or Overcollateralization Test to be violated or significantly increase the likelihood of such violation in the future.

In determining whether any Portfolio Collateral is likely to decline in credit quality and, with the passage of time become Defaulted Portfolio Collateral, the Servicer may, in its sole judgment, consider any relevant factor,

008410

including (without limitation) whether any of the Credit Risk Criteria exist. Notwithstanding the foregoing, the existence or absence of any particular factor shall not require or prevent the Servicer's determination that any Portfolio Collateral is likely to decline in credit quality and, with the passage of time, become Defaulted Portfolio Collateral; *provided* that in forming such determination an increase in credit spread or a decrease in Market Value of such item of Portfolio Collateral may only be used as corroboration of other bases for such determination. Substitute Portfolio Collateral may not be purchased with Collateral Disposition Proceeds from the sale of Defaulted Portfolio Collateral unless, after giving effect to such purchase, each of the Overcollateralization Tests is satisfied and the Interest Coverage Test for the most recent Payment Date was satisfied.

In determining whether any Portfolio Collateral meets the definition of Credit Improved Portfolio Collateral, the Servicer may, in its sole judgment, consider any relevant factor, including (without limitation) whether any of the Credit Improved Criteria exist. Notwithstanding the foregoing, the existence or absence of any particular factor shall not require or prevent the Servicer's determination that any Portfolio Collateral has a market price that is greater than the price that is warranted by its terms and credit characteristics; *provided*, that in forming such judgment a reduction in credit spread or an increase in Market Value of such item of Credit Improved Portfolio Collateral may only be utilized as corroboration or other bases for such judgment.

Subject to the Sale Restriction Condition, Credit Risk Portfolio Collateral may be sold at any time. In connection with a sale of an item of Credit Improved Portfolio Collateral during the Revolving Period, the Servicer (x) is required to identify in writing before the sale one or more specific manners in which it will be able, in accordance with the requirements of the Indenture, to cause the Issuer to apply the Collateral Disposition Proceeds of such sale (net of accrued interest and costs) to the purchase of Substitute Portfolio Collateral having an Aggregate Principal Amount equal to or greater than the Principal Balance of such item of Credit Improved Portfolio Collateral by the end of the immediately succeeding Due Period (it being understood that such identification shall not be considered a requirement or an assurance that my specific purchase will be consummated) and (y) is required to certify that it reasonably believes at the time of such sale that, after giving effect to such sale and subsequent purchase, either (i) the Overcollateralization Tests and all other criteria for the purchase of Portfolio Collateral are satisfied or (ii) if one or more of such tests or criteria is not satisfied, the degree of compliance with such test or criteria would not be diminished. Notwithstanding the foregoing, any Portfolio Collateral may also be sold upon the advice of an opinion of counsel that such item of Portfolio Collateral is, or may become, subject to a withholding or other similar tax. Notwithstanding anything to the contrary stated herein, the Servicer may direct the sale of an item of Portfolio Collateral that was CCC/Caa Portfolio Collateral or Discount Portfolio Collateral at the time of purchase only if it constitutes Credit Risk Portfolio Collateral or Defaulted Portfolio Collateral, is sold in connection with the Optional Redemption of Notes in whole or if the Servicer reasonably expects that the sale and any related purchase of Substitute Portfolio Collateral will restore compliance with any of the Interest Coverage Test, the collateral criteria described above or the Overcollateralization Tests that would be failed or not satisfied in the absence of such sale and purchase.

During any period after the first Due Period (x) with respect to sales of Credit Risk Portfolio Collateral, if the rating of the Class A-1LA Notes, the Class A-1LB Notes or the Class A-2L Notes has been downgraded at least one rating sub-category by Moody's (and has not been restored) or the rating of any of the Class A-3L Notes, the Class A-4L Notes or the Class B-1L Notes has been downgraded by at least two rating sub-categories by Moody's (and has not been restored to a rating no more than one rating sub-category below the original rating of such Class of Notes), or if the Class A Overcollateralization Ratio is less than 90% of the Class A Overcollateralization Percentage, or (y) with respect to sales of Credit Improved Portfolio Collateral, if the rating of the Class A-1L Notes, the Class A-1LB Notes or the Class A-2L Notes has been downgraded at least one rating sub-category by Moody's (and has not been restored) or the rating of any of the Class A-3L Notes, the Class A-4L Notes or the Class B-1L Notes has been downgraded at least two rating sub-categories by Moody's (and has not been restored to a rating no more than one rating sub-category below the original rating of such Class of Notes) (each applicable condition described in clauses (x) and (y), a **"Sale Restriction Condition"**), the Issuer is required to send a notice to the Trustee and the Holders of the Notes to the effect that for so long as the applicable Sale Restriction Condition exists, unless the Holders of at least 60% in Aggregate Principal Amount of the Notes elect to retain the guidelines in effect on the Closing Date for sales of an item of Credit Risk Portfolio Collateral or Credit Improved Portfolio Collateral, as applicable, (i) no item of Credit Risk Portfolio Collateral may be sold unless (A) the rating of the obligor or of any debt or securities issued by the obligor under such an item of Credit Risk Portfolio Collateral has been lowered, withdrawn or put on any "credit watch" list (or similar list) with negative implications by S&P, Moody's or Fitch, or (B) such an item of Credit Risk Portfolio Collateral satisfies the Credit Risk Criteria and not

008411

objected to by the Holders of more than 60% in Aggregate Principal Amount of the Notes within forty-five (45) days of the date of such notice; *provided* that in making such determination to sell an item of Credit Risk Portfolio Collateral, an increase in credit spread or a decrease in Market Value of such item of Credit Risk Portfolio Collateral may only be used as corroboration of other bases for such determination or (ii) no item of Credit Improved Portfolio Collateral may be sold unless such item of Credit Improved Portfolio Collateral satisfies the Credit Improved Criteria and not objected to by the Holders of more than 60% in Aggregate Principal Amount of the Notes within forty-five (45) days of the date of such notice; *provided*, that in making such determination to sell such item of Credit Improved Portfolio Collateral, a reduction in credit spread or an increase in Market Value of such item of Credit Improved Portfolio Collateral may only be utilized as corroboration or other bases for such judgment.

During the Due Periods relating to the Revolving Period, and under certain circumstances during the Amortization Period as described below, certain Collections identified above under "Description of the Notes— Payments on the Notes; Priority of Distributions" will be used to purchase Additional Portfolio Collateral as described below subject to satisfaction or, in certain cases, maintenance of the Overcollateralization Tests and the collateral criteria described herein and satisfaction of the Interest Coverage Test (after the second Payment Date) for the most recent Payment Date as more specifically set forth in the Indenture.

During any period when certain Collections are to be used to purchase Additional Portfolio Collateral, the Servicer generally will have the authority to commit to a purchase of such Additional Portfolio Collateral upon the receipt (actual or scheduled) in the Collection Account of Collections of an amount at least equal to the Periodic Reserve Amount with respect to the relevant Payment Date. For purposes of this calculation, Collections will be deemed to include, as of any date of determination, the sum of 100% of all cash collections actually received in respect of the Portfolio Collateral as of such date of determination and 100% of all distributions scheduled or otherwise reasonably expected to be received in respect of the Portfolio Collateral (other than any items of Defaulted Portfolio Collateral or Equity Portfolio Collateral) during the period from such date of determination until the end of the applicable Due Period. In addition, the Indenture will permit the Servicer or the Issuer to direct the Trustee to deposit or retain in the Collection Account after the relevant Payment Date amounts that are to be used to purchase Additional Portfolio Collateral or Substitute Portfolio Collateral as long as such amounts are held in Eligible Investments pending such use to purchase Additional Portfolio Collateral or Substitute Portfolio Collateral and are used to purchase Additional Portfolio Collateral or Substitute Portfolio Collateral meeting the specified requirements no later than the last day of the Due Period relating to the Payment Date next following such Payment Date.

In connection with a sale of an item of Credit Improved Portfolio Collateral after the Revolving Period or the receipt of Collateral Principal Collections due to an unscheduled prepayment after the Revolving Period, the Servicer may enter into commitments to apply such Collateral Disposition Proceeds or such unscheduled prepayments (net of accrued interest and costs) to the purchase of Portfolio Loans as either Additional Portfolio Collateral or Substitute Portfolio Collateral having an Aggregate Principal Amount equal to or greater than the Principal Balance of the original item of Portfolio Collateral within 90 days of receipt of such proceeds, so long as the Servicer certifies as of the date of purchase that it reasonably believes at the time of such commitment that, after giving effect to such sale and subsequent purchase, (A) each of the Overcollateralization Tests and the other collateral criteria described herein would be satisfied and the Interest Coverage Test was satisfied for the most recent Payment Date, (B) such Portfolio Loan to be purchased has a Moody's Rating equal to or higher than the Moody's Rating of the original item of Portfolio Collateral, (C) such Portfolio Loan to be purchased has an S&P Rating equal to or higher than the S&P Rating of the original item of Portfolio Collateral, (D) such Portfolio Loan to be purchased has a stated maturity on or prior to the final maturity of such original item of Portfolio Collateral, (E) the Weighted Average Life of the Portfolio Collateral would not be increased and (F) neither Rating Agency has reduced or withdrawn (and not restored) the rating assigned by it on the Closing Date to any Class of Notes.

No purchase of Additional Portfolio Collateral or Substitute Portfolio Collateral will be permitted during the continuance of an Event of Default.

No acquisition or disposition of any item of Portfolio Collateral or other eligible asset (as defined in Rule 3a-7) will be permitted for the primary purpose of recognizing gains or decreasing losses resulting from market value changes. In addition, the Issuer may not dispose of any item of Portfolio Collateral unless such disposition is made on an "arm's-length basis" for fair market value (as determined at the time the Issuer first enters into a binding commitment to dispose of such item of Portfolio Collateral). Any disposition of Portfolio Collateral will be conducted in accordance with the requirements of the Servicing Agreement and, if effected with the Servicer, the

008412

Co-Issuers, the Trustee or any of their affiliates, will be effected in a secondary market transaction on terms as favorable to the holders of the Notes as would be the case if such person were not so affiliated. In the event of an Optional Redemption, or Tax Event Redemption, the Servicer may direct the Trustee to sell certain Portfolio Collateral without regard to the foregoing limitations (except for the limitation that no Portfolio Collateral be disposed of for the primary purpose of recognizing gains or decreasing losses resulting from market value changes); provided that (i) the proceeds therefrom will be at least sufficient to pay certain expenses and other amounts and redeem in whole but not in part all Notes to be redeemed simultaneously; and (ii) such proceeds are used to make such a redemption. See "Description of the Notes-Optional Redemption," "Tax Event Redemption" and "Special Redemption."

The Servicer will select the Initial Portfolio Collateral and will be responsible for monitoring the items of Portfolio Collateral that at any time are included in the Trust Estate, selecting Additional Portfolio Collateral and Substitute Portfolio Collateral and effecting additions and substitutions. Any addition or substitution of an item of Portfolio Collateral by the Servicer shall be in accordance with the applicable requirements provided in the Servicing Agreement.

Accounts

All Collections will be remitted to the Collection Account and will be available, to the extent described herein, for application in the manner and for the purposes described herein. Funds held in the Collection Account that are not used to purchase or committed to use to purchase Additional Portfolio Collateral or Substitute Portfolio Collateral will be held by the Trustee, as directed by the Servicer, as soon as practicable in Eligible Investments. All Eligible Investments in the Collection Account must mature on or before the Business Day prior to the next Payment Date. The Trustee may establish any number of sub-accounts to the Collection Account for its convenience in administering the accounts and the Trust Estate.

All cash pledged to the Trustee on the Closing Date which is to be used to purchase additional Original Portfolio Collateral on or before the Effective Date will be deposited into the Initial Deposit Account. Funds held in the Initial Deposit Account pending use to purchase additional Original Portfolio Collateral will be held by the Trustee, as directed by the Servicer, in Eligible Investments. Eligible Investments in the Initial Deposit Account are to mature no later than the Business Day prior to the date on which such funds are to be invested in additional Original Portfolio Collateral; provided that, to the extent the Deposit in the Initial Deposit Account is not so used or committed to be used on or before the Effective Date such unused amount will be applied to effect an Initial Deposit Redemption of the Class A-1LA Notes and the Class X Notes, in the order described herein, or deposited in the Collection Account as described herein.

If, at any time on or after the Effective Date, the Aggregate Principal Amount of the Portfolio Collateral (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to the Original Portfolio Collateral on or prior to such time) exceeds the Required Portfolio Collateral Amount and there are funds remaining from the Deposit held in the Initial Deposit Account, the Servicer may direct the Trustee to transfer up to the lesser of U.S.$1,000,000 and 25% of such funds to the Collection Account as additional Collateral Interest Collections; provided that the Overcollateralization Tests and the collateral criteria described herein are satisfied and the Interest Coverage Test for the most recent Payment Date was satisfied. The remainder of the Deposit shall be use to purchase Portfolio Collateral, as directed by the Servicer.

An Expense Reimbursement Account of U.S.$50,000 will be established by the Issuer and pledged to the Trustee for the payment of Issuer administrative expenses which become due and must be paid between Payment Dates. Any amounts withdrawn from the Expense Reimbursement Account will be reimbursed on each Payment Date in accordance with the priority of the distribution provisions described herein. Funds held in the Expense Reimbursement Account will be held by the Trustee, as directed by the Servicer, in Eligible Investments. Eligible Investments in the Expense Reimbursement Account are to mature on or before the date on which such funds are expected to be used by the Issuer for the payment of expenses.

A Closing Expense Account will be established by the Trustee. From the Closing Date to the Payment Date occurring in November 2006 (or February 2007, to the extent unpaid expenses are identified to the Trustee), funds deposited in the Closing Expense Account will be used to pay the fees, commissions and expenses associated

008413

with the issuance of the Notes. Funds held in the Closing Expense Account will be held by the Trustee, as directed by the Servicer, in Eligible Investments. On the Payment Date occurring in November 2006 (or February 2007, to the extent unpaid expenses are identified to the Trustee), any remaining funds in the Closing Expense Account (not being held for a pre-approved closing expense) will be transferred to the Collection Account and applied as Collateral Interest Collections.

A Reserve Account will be established by the Trustee for the benefit of the Noteholders and the other secured parties under the Indenture, over which the Trustee shall have exclusive control and the sole right of withdrawal at the direction of the Servicer. On the Closing Date, the Trustee, at the direction of the Issuer, shall deposit into the Reserve Account approximately $1,600,000 from the net proceeds of the Offering. Amounts on deposit in the Reserve Account shall be held in Eligible Investments in accordance with the Indenture.

A Loan Funding Account will be established by the Issuer with the Trustee into which an amount equal to the Issuer's commitment to make or otherwise fund advances related to the Delayed Drawdown Loans and the Revolving Loans will be deposited. Such amount will be reduced upon a sale in whole or in part of such Delayed Drawdown Loan or Revolving Loan as prescribed in the Indenture. Funds held in the Loan Funding Account will be held by the Trustee, as directed by the Servicer, in Eligible Investments. Eligible Investments in the Loan Funding Account are required to mature no later than one Business Day after the date such Eligible Investment is purchased.

A Default Swap Collateral Account will be established for each Default Swap. The Trustee will deposit into each such Default Swap Collateral Account on the Closing Date or on the date any such Default Swap is entered into, as applicable, the amount required to secure the obligations of the Issuer in accordance with the terms of the related Default Swap, which amount shall be at least equal to the amount referred to in paragraph (iv) of the definition of Default Swap Collateral.

Amounts on deposit in a Default Swap Collateral Account will be maintained in accordance with the terms and provisions of the related Default Swap. Amounts and property credited to a Default Swap Collateral Account shall be withdrawn by the Trustee and applied to the payment of any amounts payable by, or to the delivery of securities deliverable by, the Issuer to the related Default Swap Counterparty in accordance with the terms of such Default Swap. Income received on amounts on deposit in a Default Swap Collateral Account will be applied in accordance with the terms of the applicable Default Swap to the payment of any periodic amounts owed by the Issuer to the applicable Default Swap Counterparty on the date such amounts are due. After application of such amounts, any income then contained in such Default Swap Collateral Account will be withdrawn from such account and deposited in the Collection Account for distribution as Collateral Interest Collections. After payment of all amounts owing by the Issuer to a Default Swap Counterparty in accordance with the terms of the related Default Swap (other than any Default Swap Counterparty Termination Payment) the Trustee shall be directed to withdraw all funds and other property credited to the Default Swap Collateral Account related to such Default Swap and credit such funds and other property to the Collection Account, as Collateral Principal Collections (in the case of cash and Eligible Investments) and the Collateral Account (in the case of Portfolio Collateral and other financial assets) for application as Collateral Principal Collections (other than any income thereon which will be Collateral Interest Collections) in accordance with the terms of the Indenture. Any Default Swap Counterparty Termination Payments owed by the Issuer to the Default Swap Counterparty shall be paid solely from amounts available therefor under the priority of payment provisions described herein.

Except for interest on securities credited to a Default Swap Collateral Account payable to the Issuer as described pursuant to the preceding paragraph, funds and other property standing to the credit of a Default Swap Collateral Account will not be considered to be an asset of the Issuer for purposes of the Interest Coverage Test or the Overcollateralization Tests; *provided, however that* the Default Swap that relates to such Default Swap Collateral Account will be considered an asset of the Issuer for such purposes.

If the terms of any Default Swap require the Default Swap Counterparty to secure its obligations with respect to such Default Swap, the Trustee will cause to be established a Default Swap Issuer Account in respect of such Default Swap. The Trustee shall credit to any such Default Swap Issuer Account all funds and other property received from the applicable Default Swap Counterparty to secure the obligations of such Default Swap Counterparty in accordance with the terms of such Default Swap.

008414

Funds and other property standing to the credit of any Default Swap Issuer Account will not be considered to be an asset of the Issuer for purposes of the Interest Coverage Test or the Overcollateralization Tests; *provided, however that* the Default Swap that relates to such Default Swap Issuer Account will be considered an asset of the Issuer for such purposes.

In accordance with the terms of the applicable Default Swap, funds and other property standing to the credit of the related Default Swap Issuer Account will be withdrawn by the Trustee and applied to the payment of any amount owing by the related Default Swap Counterparty to the Issuer. After payment of all amounts owing by the Default Swap Counterparty to the Issuer in accordance with the terms of the related Default Swap, all funds and other property standing to the credit of the related Default Swap Issuer Account will be withdrawn from such Default Swap Issuer Account and paid or transferred to the related Default Swap Counterparty in accordance with the applicable Default Swap.

Note Valuation Report; Noteholder Reports

Promptly after receipt by the Trustee thereof, but in any event not later than the Business Day prior to each Payment Date, the Trustee shall deliver (or otherwise make available) to each Noteholder and each Rating Agency a Noteholder report setting forth certain information regarding payments due to the Noteholders on such Payment Date and the Pledged Securities. In addition, not later than the first day (or, if such day is not a Business Day, on the next succeeding Business Day) of each month (for months in which no Payment Date occurs) or the related Payment Date (for months in which a Payment Date occurs), commencing in July, 2006, the Issuer shall provide, or procure the provision, to each Rating Agency and the Trustee, who shall forward a copy (or otherwise make available) to each Noteholder, a monthly report containing additional information with respect to the Pledged Securities included in the Trust Estate. Except as provided herein, the Indenture provides that the information contained in these reports is confidential and may not be disclosed, except as provided therein.

Pursuant to the Indenture, the Issuer will consent to the posting of each such report, together with this Confidential Offering Circular, the Indenture and any amendments or modifications thereto, to the internet based password protected electronic repository of transaction documents relating to privately offered and sold collateralized debt obligation securities located at "www.cdolibrary.com".

## MATURITY AND PREPAYMENT CONSIDERATIONS

The Final Maturity Date of the Class X Notes is the Payment Date occurring in August 2013 and the Final Maturity Date of each other Class of Notes is the Payment Date occurring in August 2021, or, upon a Maturity Extension (if any), the applicable Extended Final Maturity Date, and subject to prior redemption under the circumstances described herein. The average life of each Class of Notes is expected to be shorter than the number of years until the Final Maturity Date, and the average lives may vary due to various factors. The average life of each Class of Notes, refers to the weighted amount of time that will elapse from the date of delivery of such Notes until each dollar of the principal of such securities will be paid to the investor. Such average lives will be determined by the amount and frequency of principal payments which in turn are dependent upon, among other things, the amount of sinking fund payments and other payments received at or in advance of the scheduled maturity of Portfolio Collateral (whether through sale, maturity, redemption, prepayment, default or other liquidation or disposition). The actual average life and final maturity of each Class of Notes will be affected by the financial condition of the issuers of the underlying Portfolio Collateral and the characteristics of such collateral, including the existence and frequency of exercise of any optional or mandatory redemption features, the prevailing level of interest rates, the redemption price, the actual default rate and the actual level and timing of recoveries on any Defaulted Portfolio Collateral, the frequency of tender or exchange offers for such item of Portfolio Collateral, and the ability of the Issuer to reinvest proceeds in Additional Portfolio Collateral or Substitute Portfolio Collateral satisfying the criteria set forth in the Indenture and the interest rates obtained in connection with the purchase of such Additional Portfolio Collateral or Substitute Portfolio Collateral or in connection with the application of proceeds to purchase Eligible Investments. It is expected that a substantial amount (by Principal Balance) of the Portfolio Collateral will be subject to mandatory redemption or optional redemption or prepayment by the issuer thereof or obligor thereunder. Any acquisition of Additional Portfolio Collateral or Substitute Portfolio Collateral or disposition of an item of Portfolio Collateral will likely change the composition and characteristics of the Portfolio Collateral included in the Trust Estate and the rate of payment thereon, and, accordingly, may affect the actual average life of the Notes. See "Security for the Notes—Changes in Composition

008415

of Portfolio Collateral."

In addition, the Notes are subject to redemption at the times and under the circumstances described herein, including Initial Deposit Redemption, O/C Redemption (other than with respect to the Class X Notes), Optional Redemption, Rating Confirmation Failure Redemption, Tax Event Redemption and Special Redemption (other than with respect to the Class X Notes), as described herein. Any such redemption will affect the average lives of the Notes.

Under the assumptions identified below, the Class X Notes are expected to have an average life of approximately 4.35 years and an expected final payment occurring on the Payment Date in August 2013, the Class A-1LA Notes are expected to have an average life of approximately 6.80 years and an expected final payment occurring on the Payment Date in August 2014, the Class A-1LB Notes are expected to have an average life of approximately 8.23 years and an expected final payment occurring on the Payment Date in August 2014, the Class A-2L Notes are expected to have an average life of approximately 8.23 years and an expected final payment occurring on the Payment Date in August 2014, the Class A-3L Notes are expected to have an average life of approximately 8.23 years and an expected final payment occurring on the Payment Date in August 2014, the Class A-4L Notes are expected to have an average life of approximately 8.23 years and an expected final payment occurring on the Payment Date in August 2014, and the Class B-1L Notes are expected to have an average life of approximately 8.23 years and an expected final payment occurring on the Payment Date in August 2014. There can be no assurance that the average lives and expected final payment of any Class of Notes will be as set forth above. Prospective investors should make their own determinations of the payments expected to be made in respect of the Notes.

The hypothetical scenario used to determine the average lives of the Notes is as follows: (i) approximately U.S.$850,000,000 in Aggregate Principal Amount of various assumed Portfolio Collateral would be purchased on the Closing Date using all funds available on the Closing Date for the purchase of Portfolio Collateral; (ii) 100% of the Portfolio Collateral (by Aggregate Principal Amount) will consist of Floating Rate Collateral which will have a weighted average margin (in order to adjust for not being fully invested in Portfolio Collateral until after the second Payment Date) of (a) 2.5457% from the Closing Date to the first Payment Date and (b) 2.5900% thereafter; (iii) all Floating Rate Collateral bear interest based on three-month LIBOR. Three-month LIBOR is approximately 5.2041% for the first period and 3 month forward LIBOR thereafter; (iv) the Portfolio Collateral has a scheduled maturity date of November 1, 2015, with respect to Portfolio Loans, and August 1, 2014, with respect to CLO Securities, with a weighted average maturity date of May 8, 2015; (v) no Initial Deposit Redemption, Special Redemption, Tax Event Redemption or Rating Confirmation Failure Redemption of the Notes is made; (vi) an Optional Redemption occurs on the Payment Date occurring in August 1, 2014; (vii) the Additional Portfolio Floating Collateral purchased from Collections as described herein will bear interest quarterly at the rate of 2.85% per annum above LIBOR for the first year, 2.95% per annum above LIBOR for the second year; 3.00% per annum above LIBOR for the third year; 3.00% per annum above LIBOR for the fourth year and 3.00% per annum above LIBOR thereafter; (viii) all Additional Portfolio Collateral in the portfolio become callable or prepayable on the payment date immediately following the purchase date and are callable at their respective call price; (ix) all Eligible Investments will bear interest at a rate of LIBOR *minus* 0.25% per annum; (x) the Additional Portfolio Collateral have an initial call price of par; and (xi) the Additional Portfolio Collateral have a 6 year maturity in the case of the Floating Rate Collateral. In addition, it is assumed that no calls or defaults with respect to such Additional Portfolio Collateral will occur on the Final Maturity Date.

Further, the hypothetical scenario assumes that there are no defaults during the period from the Closing Date to February 1, 2007 and there are defaults equal to 3.00% per annum thereafter until the Optional Redemption occurs on the Payment Date occurring on August 1, 2014. The principal recovery on any defaulted Portfolio Loan and any defaulted underlying loan in a CLO Security is assumed to be 75% and in each case such recovery is assumed to occur at the default date. It is also assumed that the Scheduled Distributions on Portfolio Collateral are timely received and that such distributions earn the indicated interest rates until the next payment date without compounding. It is assumed that Floating Rate Collateral has no prepayment for one period after the Closing Date; thereafter prepayments are calculated on a 20% per annum constant prepayment rate basis for Portfolio Loans. It is assumed that during any period when the Overcollateralization Tests or the Interest Coverage Test are not satisfied, principal payments (or, in the case of the Class B-1L Notes, payments of accrued and unpaid interest and then

principal) will be made in respect of the Notes to the extent necessary to satisfy the Overcollateralization Tests or the Interest Coverage Test, as applicable (to the extent funds are available therefor).

The Base Fee Amount and the Additional Fee Amount, are assumed to be approximately 0.55% *per annum* in aggregate, and the Trustee Administrative Expenses, Issuer Base Administrative Expenses and Issuer Excess Administrative Expenses will be 0.0275% (but no less than $75,000 *per annum*) *plus* U.S.$250,000 *per annum*, in the aggregate, each as a percentage of either the Aggregate Principal Amount of the Portfolio Collateral as of the first day of the Due Period relating to each Payment Date or the average of the Aggregate Principal Amount of the Portfolio Collateral as of the first day of the Due Period relating to each Payment Date and the last day of the Due Period relating to such Payment Date, as appropriate for the related fee and subject to the availability of funds in the performance scenario. For purposes of calculating the Base Fee Amount and the Additional Fee Amount, the Quarterly Collateral Amount on the first calculation date is assumed to be U.S.$850,000,000.

Cash received on or before a Calculation Date is assumed to be available on the following Payment Date. Cash collected after the Calculation Date but before the immediately following Payment Date is assumed to be used to purchase Eligible Investments until the second succeeding Payment Date. With respect to Floating Rate Collateral, the accrual date on Portfolio Collateral is assumed to be the full quarterly period before the Payment Date subsequent to the Closing Date.

The weighted average lives and expected final payment dates described above are included only for illustrative purposes. The usefulness of these scenarios is limited by, among other things, the predictive value of the underlying assumptions, the uncertain relevance of the assumptions as compared to other factors which have not been identified or taken into account, and assumptions incorporated with respect to the timing of cash flows, prepayments, defaults and recoveries on the Portfolio Collateral and available interest rates. The assumptions are inherently subject to significant economic uncertainties, all of which are impossible to predict and beyond the control of the Co-Issuers. **There can be no assurance that any particular performance scenario will be realized, and the performance of the Notes may be materially different from that shown. Such scenario is not a projection or forecast and was not prepared with a view to complying with published guidelines of the United States Securities and Exchange Commission or the American Institute of Certified Public Accountants regarding projections or forecasts. Under no circumstances should the inclusion of such information be regarded as a representation, warranty or prediction with respect to their accuracy or the accuracy or appropriateness of the underlying assumptions, or that the Notes will achieve or are likely to achieve any particular results. There can be no assurance that the actual performance of the Notes will not vary materially from the scenario and assumptions set forth herein or otherwise used by a prospective investor. Moreover, to the extent that the individual characteristics of the assumed Portfolio Collateral used for such purposes differ from the individual characteristics of the actual Portfolio Collateral purchased on the Closing Date and thereafter, the actual performance of the Notes may differ. Prospective investors should conduct such financial analysis as they deem prudent, which may include the preparation of their own performance scenarios under a range of economic and other assumptions chosen by such prospective investors or their advisers. Each prospective investor must make its own evaluation of the merits and risks of investment in the Notes. See "Special Considerations—Nature of Collateral Pledged to Secure the Notes; Ability to Obtain Additional Portfolio Collateral; Availability of Funds for Subordinate Payments," "Special Considerations-Sale of Portfolio Collateral by Servicer under Certain Circumstances" and "Special Considerations—Default Rates of Commercial Loans and CLO Securities."**

## LEGAL STRUCTURE

<u>The Indenture</u>

The following summaries generally describe certain provisions of the Indenture. The summaries do not purport to be complete and are subject to, and qualified in their entirety by reference to, the provisions of the Indenture.

<u>Modification of Indenture</u>. Except as set forth below, with the consent of the Requisite Noteholders and the Servicer, the Trustee and the Co-Issuers may execute a supplemental indenture to add provisions to, or change in any manner or eliminate any provisions of, the Indenture or modify in any manner the rights of the Holders of such

008417

Notes. However, without the consent of the Holders of each Outstanding Note affected thereby, and, to the extent provided in the Paying and Transfer Agency Agreement, the Holders of the Preferred Shares materially adversely affected thereby, no supplemental indenture may (i) change the maturity of the principal of or interest on any Note or reduce the principal amount thereof or the rate of interest thereon or change the time or amount of any other amount payable in respect of any Note, (ii) reduce the percentage of Holders of Notes whose consent is required for the authorization of any supplemental indenture or for any waiver of compliance with certain provisions of the Indenture, (iii) impair or adversely affect the Trust Estate securing the Notes, (iv) permit the creation of any lien ranking prior to or on parity with the lien of the Indenture with respect to any part of the Trust Estate or terminate the lien of the Indenture, (v) reduce the percentage of Holders of Notes whose consent is required to direct the Trustee to liquidate the Trust Estate, (vi) modify any of the provisions of the Indenture with respect to supplemental indentures or waiver of Defaults and their consequences except to increase the percentage of Outstanding Notes whose consent is required for any such action or to provide that other provisions of the Indenture cannot be modified or waived without the consent of the Holder of each Outstanding Note affected thereby, (vii) modify the provisions thereof relating to priority of distributions or subordination or the definition therein of the terms "Holder," "Noteholder," "Majority Noteholder," "Majority Preferred Shareholder," "Outstanding," or "Requisite Noteholder," (viii) modify any provisions in such a manner as to affect the calculation of the amount or timing of any payment of interest or principal due on any Note on any Payment Date (including the calculation of any of the individual components of such calculation) or to affect the rights of the Holders of Notes to the benefit of any provisions for the redemption of such Notes contained in the Indenture; (ix) modify any provision relating to the institution of proceedings for the Issuer or the Co-Issuer to be adjudicated as bankrupt or insolvent, (x) amend any provision that provides that the obligations of the Issuer or the Co-Issuer are non-recourse obligations or (xi) modify any of the provisions of the Indenture in such a manner as to affect the calculation of the amount of any payment of principal of or interest on or other amount in respect of any Note or to affect the right of the Holders of Notes to the benefit of any provisions for the redemption of such Notes contained therein.

The Co-Issuers and the Trustee may also enter into supplemental indentures with the consent of the Servicer but without obtaining the consent of Noteholders, in order to (i) evidence the succession of any person to the Co-Issuers, (ii) evidence the addition of an additional issuer or of a wholly owned subsidiary of the Issuer that, in either case, will acquire securities from the Issuer and pledge its assets to secure the obligations of the Issuer secured by the Trust Estate, to the extent necessary to permit the Issuer to comply with the Bank Holding Company Act of 1956, as amended, and the rules and regulations thereunder or any other statute, rule or regulation applicable to the Issuer, and the assumption by any such additional issuer or subsidiary of the covenants and obligations of the Issuer in the Indenture and, if applicable, in the Notes, (iii) add to the covenants of the Co-Issuers for the benefit of the Holders of the Notes or to surrender any right or power conferred upon the Co-Issuers, (iv) pledge any property to or with the Trustee, (v) evidence and provide for the acceptance of appointment by a successor trustee and to add to or change any of the provisions of the Indenture as shall be necessary to facilitate the administration of the Trust Estate by more than one Trustee, (vi) correct or amplify the description of any property at any time subject to the lien of the Indenture, or to better assure, convey and confirm unto the Trustee any property subject to the lien of the Indenture, (vii) take any action necessary or helpful to prevent the Issuer or the Trustee from becoming subject to any withholding or other taxes or assessments or to reduce the risk that the Issuer will be engaged in a United States trade or business or otherwise subject to United States income tax on a net income basis, (viii) correct any manifest error in the Indenture, (ix) facilitate the delivery and maintenance of the Notes in accordance with the requirements of DTC, Euroclear or Clearstream, (x) facilitate the listing of all or any of the Notes on one or more securities exchanges, (xi) modify the restrictions on and procedures for resale and other transfer of the Notes in accordance with any change in applicable law or regulation or enable the Co-Issuers to rely upon any less restrictive exemption from registration under the Securities Act or the Investment Company Act, (xii) cure any ambiguity, or correct, modify or supplement any provision which is defective or inconsistent with any other provision in the Indenture, (xiii) to effectuate a Noteholder's election to acquire bond insurance, a surety bond or similar credit enhancement as described in the Indenture, or (xiv) prevent the Issuer from becoming an "investment company" as defined in the Investment Company Act or better assure compliance with the requirements of Rule 3a-7 thereunder; *provided* that, as a condition to the effectiveness of any such supplemental indenture, each of the Issuer, the Trustee and the Initial Purchaser shall have (A) satisfied the Rating Condition with respect to such supplemental indenture and (B) received a customary, unqualified opinion of counsel from a nationally recognized law firm providing that, after giving effect to such supplemental indenture, the Issuer is exempt from registration as an "investment company" under the Investment Company Act; *provided* further that (A) any such amendment for any matters described in clauses (i) through (xiii) shall not materially adversely affect the interests of the Holders of the Notes and (B) no

008418

amendment shall be made that would cause the Issuer to register as an "investment company" under the Investment Company Act.

The Trustee will not be permitted to enter into any supplemental indenture if such amendment would materially adversely affect the interests of the Preferred Shareholders without the consent of the Holders representing at least 66-2/3% of the outstanding Preferred Shares.

Not later than 15 Business Days prior to the execution of any proposed supplemental indenture pursuant to the above provisions, the Trustee, at the expense of the Co-Issuers, shall deliver to the Holders of the Notes, the Servicer, the Preferred Share Paying and Transfer Agent (for forwarding to the Holders of Preferred Shares) and each Rating Agency (so long as any rated Notes are Outstanding) a copy of such supplemental indenture and shall request any required consent from the applicable Holders of Notes and Preferred Shares to be given within the Initial Consent Period. Any consent given to a proposed supplemental indenture by the Holder of any Notes or Preferred Shares shall be irrevocable and binding on all future Holders or beneficial owners of Notes or Preferred Shares, irrespective of the execution date of the supplemental indenture. If the Holders of less than the required percentage of the Aggregate Principal Amount of the relevant Notes or required percentage of the Preferred Shares consent to a proposed supplemental indenture within the Initial Consent Period, on the first Business Day after the Initial Consent Period, the Trustee shall notify the Issuer and the Servicer which Holders of Notes and Preferred Shares have consented to the proposed supplemental indenture and, which Holders (and, to the extent such information is reasonably available to the Trustee, which beneficial owners) have not consented to the proposed supplemental indenture. If the Amendment Buy-Out Purchaser intends to exercise the Amendment Buy-Out Option, the Amendment Buy-Out Purchaser shall so notify the Trustee (which notice shall designate a date for the Amendment Buy-Out to occur no earlier than 10 Business Days after the date of such notice) no later than five (5) Business Days after so being notified by the Trustee and the Trustee shall deliver such notice to all Holders of Notes and the Preferred Share Paying and Transfer Agent (for forwarding to the Holders of Preferred Shares). Any Non-Consenting Holder may give consent to the related proposed supplemental indenture until the 5th Business Day prior to the date of the Amendment Buy-Out designated by the Amendment Buy-Out Purchaser, and in such case shall cease to be a Non-Consenting Holder for purposes of the Amendment Buy-Out. If the Amendment Buy-Out Purchaser exercises its Amendment Buy-Out Option and purchases the applicable Notes or Preferred Shares, the Amendment Buy-Out Purchaser, as Holder or beneficial owner of the applicable Notes or Preferred Shares, may consent to the related proposed supplemental indenture within five (5) Business Days of the Amendment Buy-Out.

The Indenture provides that no amendment to any provision of the Indenture or any other transaction document that materially adversely affects the obligations of any Synthetic Security Counterparty will be of any effect without the consent of such Synthetic Security Counterparty and the Issuer will not enter into any such amendment unless such Synthetic Security Counterparty has consented thereto (which consent will not be unreasonably withheld).

The Co-Issuers and the Trustee may also enter into supplemental indentures upon satisfying the Rating Condition and receiving consent from the Servicer, but without obtaining the consent of any other Person, including any Noteholder or any Holder of Preferred Shares, in order to add additional rows to the Collateral Quality Matrix; *provided that* any such supplemental indenture which expands the minimum or maximum ranges of the Collateral Quality Matrix from that set forth in the Indenture on the Closing Date, shall require the prior consent of the Requisite Noteholders.

Notwithstanding the foregoing, the Trustee will not be permitted to enter into any supplemental indenture if, as a result of such supplemental indenture, the rating of any Class of Outstanding Notes (if then rated) would be reduced or withdrawn without the unanimous consent of the Holders of that Class of Notes.

<u>Amendment Buy-Out</u>

In the case of any supplemental indenture that requires the consent of one or more Holders of the Notes or Preferred Shares, the Amendment Buy-Out Purchaser shall have the right, but not the obligation, to purchase from Non-Consenting Holders all Notes and Preferred Shares held by such Holder whose consent was solicited with respect to such supplemental indenture (the "**Amendment Buy-Out Option**") for the applicable Amendment Buy-Out Purchase Price; *provided,* however, that the Amendment Buy-Out Purchaser may not exercise the Amendment Buy-Out Option during the Non-Call Period in connection with a proposed amendment to reduce the rate of interest

on any Security, as applicable, or to change the earliest date on which Notes of any Class or Preferred Shares may be redeemed at the option of the Issuer; *provided*, further that notwithstanding the definition of Non-Consenting Holder, any Holder of Notes (other than the Class A-lLA Notes) or Preferred Shares who fails to respond to any such consent solicitation shall be deemed to have consented to any such supplemental indenture.  Notwithstanding the foregoing, during the Non-Call Period, "Non-Consenting Holder" shall exclude any Holder of Class A-1LA Notes (unless such Holder has consented in writing to be designated as a Non-Consenting Holder) and the Amendment Buy-Out Option shall not be applicable to such Class A-1LA Notes.  If such option is exercised, the Amendment Buy-Out Purchaser must purchase all Notes and Preferred Shares of Non-Consenting Holders, regardless of the applicable percentage of the Aggregate Principal Amount of the Notes or Preferred Shares the consent of whose Holders is required for such supplemental indenture (an "**Amendment Buy-Out**").  By its acceptance of a Note or Preferred Share, each Holder of a Note and Preferred Share agrees that if the Amendment Buy-Out Option is exercised, any Non-Consenting Holder will be required to sell its applicable Note or Preferred Share to the Amendment Buy-Out Purchaser. For the avoidance of doubt, nothing described above or in the Indenture shall in any way limit or restrict the rights of Holders of the Class A-1LA Notes to consent or withhold their consent to a supplemental indenture or otherwise vote their interest both during and after the Non-Call Period.

All purchases made pursuant to the Amendment Buy-Out Option individually and in the aggregate must comply with the applicable transfer restrictions for the relevant Notes and Preferred Shares set forth in "Delivery of the Notes; Transfer Restrictions; Settlement" herein and all applicable laws, rules and regulations (including, without limitation, any rules, regulations and procedures of any securities exchange, self-regulatory organization or clearing agency).

<u>Acts of Noteholders</u>.  Under the Indenture, with respect to any Noteholder which has notified the Trustee in writing that pursuant to such Noteholder's organizational documents or other documents governing such Noteholder's actions, such Noteholder is not permitted to take any affirmative action approving, rejecting or otherwise acting upon any Issuer request including, but not limited to, a request for the consent of such Noteholder to a proposed amendment or waiver pursuant to this Indenture, the failure by such Noteholder to consent to or reject any such requested action will be deemed a consent by such Noteholder to the requested action.

<u>Consolidation, Merger or Transfer of Assets, Incurrence of Indebtedness, Conduct of Business</u>.  The Co-Issuers may not consolidate with, merge into, or transfer or convey all or substantially all of their assets to, any other corporation, partnership, trust or other person or entity (except for sales or exchanges of Portfolio Collateral as contemplated by the Indenture).  In addition, the Co-Issuers may not incur any indebtedness other than the Notes and trade debt incidental to the performance of their obligations under the Indenture or engage in any business or activity other than the issuance of the Notes, the Preferred Shares, the ordinary shares and the other transactions and activities, as applicable, contemplated herein.  Pursuant to the Indenture and the Co-Issuers' organizational documentation, the Co-Issuers may also not, without the consent of the Requisite Noteholders, amend their organizational documentation if such amendment would have a material adverse effect on the right of the Noteholders.

<u>Events of Default</u>.  An event of default ("**Event of Default**") is defined in the Indenture as being (i) a default for four Business Days or more (or in the case of a default in payment due to an administrative error or omission by the Trustee, any Paying Agent or the Note Registrar, for a period of seven Business Days or more, *provided* that the Trustee has notified each Rating Agency of any such administrative error or omission) in the payment of any amount payable in respect of any Note when due when funds in such amount are available for payment in accordance with the Indenture, (ii) a failure after four Business Days (or in the case of a default in payment due to an administrative error or omission by the Trustee, any Paying Agent or the Note Registrar, for a period of seven Business Days or more, *provided* that the Trustee has notified each Rating Agency of any such administrative error or omission), to apply available amounts in accordance with the priority of distribution set forth in the Indenture, (iii) a default for four Business Days or more (or in the case of a default in payment due to an administrative error or omission by the Trustee, any Paying Agent or the Note Registrar, for a period of seven Business Days or more, *provided* that the Trustee has notified each Rating Agency of any such administrative error or omission) in the payment of (A) the Periodic Interest Amount due on any Senior Class A Notes on any Payment Date or a Class X Payment due on any Class X Notes, (B) after the Senior Class A Notes and Class X Notes are paid in full, the Periodic Interest Amount due on the Class A-3L Notes on any Payment Date, (C) after the Senior Class A Notes, the Class A-3L Notes and the Class X Notes are paid in full, the Periodic Interest Amount due on the Class

008420

A-4L Notes on any Payment Date and (D) after the Class A Notes and the Class X Notes are paid in full, the Periodic Interest Amount due on the Class B-1L Notes on any Payment Date; (iv) a default in the payment of the Aggregate Principal Amount and the Cumulative Interest Amount due on any Class of Notes on the Final Maturity Date, (v) a default in the performance, or a breach of any covenant, representation, warranty or other agreement of the Co-Issuers (or either one of them) other than compliance with the Overcollateralization Tests, the Interest Coverage Test or the collateral quality criteria described herein, or the failure of any representation or warranty of the Co-Issuers (or either one of them) in the Indenture or in any certificate or other writing delivered pursuant to or in connection with the Indenture to be correct in all material respects when the same shall have been made, in any such case which materially and adversely affects the rights of any Class of Noteholders and continuance of such default, breach or failure for a period of 30 days after written notice to the Co-Issuers or the Servicer by the Trustee or to the Co-Issuers or the Servicer and the Trustee by the Holders of at least a majority in principal amount of the Notes, (vi) certain events of bankruptcy, insolvency, receivership or reorganization of the Co-Issuers, (vii) either of the Co-Issuers or the pool of assets constituting the Trust Estate becomes required to register as an "investment company" under the Investment Company Act of 1940, (viii) the failure to maintain on any Calculation Date a Senior Class A Overcollateralization Ratio of at least 100%. The failure to pay in full Periodic Interest on the Class A-3L Notes as a result of insufficient funds being available therefor will not constitute an Event of Default so long as the Senior Class A Notes or Class X Notes are Outstanding. The failure to pay in full Periodic Interest on the Class A-4L Notes as a result of insufficient funds being available therefore will not constitute an Event of Default so long as the Senior Class A Notes, the Class A-3L Notes or the Class X Notes are Outstanding. The failure to pay in full Periodic Interest on the Class B-1L Notes as a result of insufficient funds being available therefor will not constitute an Event of Default so long as any Class A Notes or Class X Notes are Outstanding. An event of insolvency could result if relief has been ordered against the Co-Issuers in a case under applicable bankruptcy law and the Co-Issuers, the trustee, if any, for either of the Co-Issuers or a creditor of either of the Co-Issuers were to file an involuntary petition against either of the Co-Issuers. The filing of a petition against the Co-Issuers under applicable bankruptcy law could adversely affect the rights of the Holders of Notes to receive timely payments.

If an Event of Default (other than an Event of Default specified in clause (vi) above) under the Indenture should occur and be continuing with respect to the Notes, the Trustee may with the consent of the Requisite Noteholders, and shall, at the written direction of the Requisite Noteholders, declare the principal of the Notes to be immediately due and payable. Such declaration may under certain circumstances be rescinded by the Trustee with the consent of the Requisite Noteholders or at the written direction of the Requisite Noteholders. If an Event of Default specified in clause (vi) above should occur and be continuing, the principal of the Notes shall become immediately due and payable without the necessity of notice or any other action. If the Notes are accelerated, or if the Final Maturity Date has occurred, the Holders of the Notes shall be entitled to receive the Cumulative Interest Amount and the Aggregate Principal Amount with respect thereto (as calculated and accrued through the date of payment in full of the Aggregate Principal Amount of each Class of Notes) in the order of priority set forth under "Description of the Notes—Payments on the Notes; Priority of Distributions—Final Maturity Date."

If an Event of Default shall have occurred and be continuing or if the Final Maturity Date has occurred, the Trustee shall refrain from liquidating and shall preserve the Trust Estate intact unless (i) the Requisite Noteholders have directed the Trustee to sell or liquidate the Trust Estate or any portion thereof in the case of (A) an Event of Default resulting from failure to pay interest or principal on a Note or (B) a sale or liquidation of all or a portion of the Trust Estate at or above the aggregate par value of all Collateral so liquidated or sold (and Defaulted Portfolio Collateral may be liquidated or sold without reference to, or inclusion in the calculation of, such limitation), or (ii) 100% of the Noteholders have otherwise directed the Trustee to sell or liquidate the Trust Estate or any portion thereof. In addition, under certain circumstances, if an Event of Default as described under clauses (iii) and (iv) of "Events of Default" shall have occurred and be continuing, the Servicer may be terminated as described under "The Servicing Agreement—Termination of Servicing Agreement."

Pursuant to the Indenture, as security for the payment by the Issuer of the compensation and expenses of the Trustee and the Paying and Transfer Agent and any sums to which the Trustee and the Paying and Transfer Agent may be entitled to receive as indemnification by the Issuer, the Issuer has granted the Trustee a senior lien on the Trust Estate, which is senior to the lien of the Notes on the Trust Estate. These liens are exercisable by the Trustee or the Paying and Transfer Agent only if the Notes have been declared due and payable following an Event of Default, and the acceleration of the maturity of such Notes as a result of such Event of Default has not been rescinded or annulled.

008421

Subject to the provisions of the Indenture relating to the duties of the Trustee in case an Event of Default with respect to the Notes shall occur and be continuing, the Trustee will be under no obligation to exercise any of the rights or powers under the Indenture at the request or direction of any Holders of Notes, unless such Holders shall have offered to the Trustee security or indemnity reasonably satisfactory to it. Subject to such provisions for indemnification and certain limitations contained in the Indenture, the Requisite Noteholders will have the right to direct the time, method and place of conducting any proceeding of any remedy available to the Trustee or exercising any trust or power conferred on the Trustee with respect to the Notes; and, in certain cases, waive any default with respect to such Notes, except a default in payment of any amount payable in respect of any Note or a default in respect of a covenant or provision of the Indenture that cannot be modified without the waiver or consent of the Holder of each Outstanding Note affected thereby.

Rights Under the Indenture. No Holder of a Note will have the right to institute any proceeding with respect to the Indenture, unless (1) such Holder previously has given to the Trustee written notice of an Event of Default with respect to such Notes, (2) the Requisite Noteholders have made written request upon the Trustee to institute such proceedings in its own name as Trustee, (3) such Holder or Holders have offered the Trustee indemnity reasonably satisfactory to it as provided in the Indenture, (4) the Trustee has for 30 days failed to institute any such proceeding, and (5) no direction inconsistent with such written request has been given to the Trustee during such 30-day period by the Requisite Noteholders.

Satisfaction and Discharge of the Indenture. The Indenture will be discharged with respect to the collateral securing the Notes upon delivery to the Trustee for cancellation of all of the Notes, or, within certain limitations (including the obligation to pay principal and interest), upon deposit with the Trustee of cash or Eligible Investments sufficient for the amount thereof.

Trustee. JPMorgan Chase Bank, National Association will be the Trustee under the Indenture for the Notes. The Issuer, the Servicer and their affiliates may maintain other banking relationships in the ordinary course of business with the Trustee. The Indenture provides that the Trustee may appoint one or more co-trustees in the event that Holders of the Notes have conflicting interests and in certain other circumstances. The Trustee or an Affiliate of the Trustee may receive compensation in connection with the purchase of certain Eligible Investments as provided in the Indenture.

The parent company of the Trustee, JPMorgan Chase & Co. (**"JPMorgan"**), has entered into an agreement with The Bank of New York Company, Inc. (**"BNY"**) pursuant to which JPMorgan intends to exchange select portions of its corporate trust business, including municipal, corporate and structured finance trusteeships, for BNY's consumer, small-business and middle-market banking businesses. This transaction has been approved by both companies' boards of directors and is subject to regulatory approvals. It is expected to close in the late third quarter or fourth quarter of 2006.

The Indenture contains provisions for the indemnification of the Trustee for any loss, liability or expense incurred without negligence, willful misconduct or bad faith arising out of or in connection with the acceptance or administration of its duties under the Indenture.

The Trustee may resign at any time by giving notice as set forth in the Indenture. The Trustee may be removed for any reason by the Holders of more than 50% of the Aggregate Principal Amount of the Controlling Class, or by the Issuer if at any time the Trustee fails to meet certain eligibility criteria set forth in the Indenture or if the Trustee is adjudged to be bankrupt or insolvent or a receiver or liquidator or similar official of the Trustee or its property is appointed. No resignation or removal of the Trustee shall be effective until a successor trustee has been appointed pursuant to the terms of the Indenture.

Governing Law. The Indenture and the other documents relating to the Notes will be construed in accordance with the laws of the State of New York.

Notices. Notices to the Holders of the Notes will be given by first-class mail, postage prepaid, to the registered Holders of the Notes at their address appearing in the Note Register. In addition, for so long as any Class of Notes is listed on the Irish Stock Exchange and the rules of such exchange so require, notice given to the Holders of any such Class of Notes will also be given to the Company Announcements Office of the Irish Stock Exchange.

008422

<u>Voting Rights of Preferred Shares of HFP</u>.  The aggregate amount of the Preferred Shares owned or controlled by HFP and the Servicer Entities in excess of the Original HFP Share Amount will be excluded from voting on certain matters including any Optional Redemption.

**DELIVERY OF THE NOTES; TRANSFER RESTRICTIONS; SETTLEMENT**

The Notes have not been registered under the Securities Act or any state securities laws and, accordingly, may not be reoffered, resold, pledged or otherwise transferred within the United States or to, or for the account or benefit of, U.S. Persons, except in accordance with the restrictions described under "Notices to Purchasers." Terms used in this paragraph have the meanings given to them by Regulation S.

Without limiting the foregoing, by holding a Note, each Holder will acknowledge and agree, among other things, that such Holder understands that neither of the Co-Issuers is registered as an investment company under the Investment Company Act, but that the Co-Issuers are exempt from registration as such by virtue of Section 3(c)(7) of the Investment Company Act, which in general excludes from the definition of an investment company any issuer whose outstanding securities are beneficially owned solely by Qualified Purchasers and which has not made and does not propose to make a public offering of its securities and Rule 3a-7.  Any sale or transfer which would violate these provisions shall be void from the time of such sale or transfer, and no sale or transfer may be made if such sale or transfer would require the Co-Issuers to become subject to the requirements of the Investment Company Act.

Each transferee of a Note (except with respect to a transfer pursuant to Regulation S) will be deemed to represent at time of transfer that the transferee is a Qualified Institutional Buyer and (i) that it is a Qualified Purchaser, (ii) that it is not formed for the purpose of investing in the Notes, unless all of its beneficial owners are Qualified Purchasers, (iii) that it is not a dealer described in paragraph (a)(1)(ii) of Rule 144A unless such transferee owns and invests on a discretionary basis at least U.S.$25 million in securities of issuers that are not affiliated persons of such dealer, (iv) that it is not a plan referred to in paragraph (a)(1)(i)(D) or (E) of Rule 144A or a trust fund referred to in paragraph (a)(1)(i)(F) of Rule 144A that holds the assets of such plan, unless investment decisions are made solely by the fiduciary, trustee or sponsor of such plan, (v) that it and each account for which it is purchasing is purchasing Notes in at least the minimum denomination and (vi) that it will provide written notice of the foregoing and any other applicable transfer restrictions to any transferee.

The Indenture provides that if, notwithstanding the restrictions on transfer contained therein, the Issuer determines any beneficial owner or Holder of a Note (other than a Note transferred in reliance on Regulation S) is not a Qualified Institutional Buyer and a Qualified Purchaser, the Issuer will require that such beneficial owner or Holder sell all of its right title and interest in such Note to a person who is so qualified, with such sale to be effected within 30 days after notice of such sale requirement is given.  If such sale is not effected within such 30 days, upon written direction from the Issuer, the Trustee (or an investment banker selected by the Trustee and approved by the Issuer) will be authorized to conduct a commercially reasonable sale of such Note to a person who does so qualify and pending transfer, no further payments will be made in respect of such Note or any beneficial interest therein.

Except for interests in Notes represented by a Regulation S Global Note or a Rule 144A Global Note as described herein, the Notes will be represented by definitive registered Notes registered in the name of the purchaser thereof.

Unless determined otherwise by the Co-Issuers in accordance with applicable law, the Notes will bear the legend set forth below:

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), ANY STATE SECURITIES LAWS IN THE UNITED STATES OR THE SECURITIES LAWS OF ANY OTHER JURISDICTION AND MAY NOT BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, UNITED STATES PERSONS, EXCEPT AS PERMITTED BY THIS LEGEND.  THE HOLDER HEREOF, BY ITS ACCEPTANCE OF THIS NOTE, REPRESENTS, ACKNOWLEDGES AND AGREES THAT IT WILL NOT REOFFER, RESELL, PLEDGE OR OTHERWISE TRANSFER THIS NOTE EXCEPT IN COMPLIANCE WITH THE SECURITIES ACT AND OTHER APPLICABLE LAWS AND EXCEPT (A) IN

008423

COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER AS DEFINED IN RULE 144A PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER, WHOM THE SELLER HAS INFORMED, IN EACH CASE, THAT THE REOFFER, RESALE, PLEDGE OR OTHER TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, PROVIDED THAT SUCH PURCHASER DELIVERS ALL DOCUMENTS AND CERTIFICATIONS AS THE CO-ISSUERS OR THE TRUSTEE MAY REASONABLY REQUIRE; (B) TO A NON U.S. PERSON OUTSIDE THE UNITED STATES IN COMPLIANCE WITH RULE 903 OR 904 OF REGULATION S UNDER THE SECURITIES ACT; OR (C) TO THE CO-ISSUERS OR THEIR AFFILIATES, IN EACH CASE IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAW OF ANY STATE OF THE UNITED STATES AND ANY OTHER JURISDICTION. THE HOLDER HEREOF, BY ITS ACCEPTANCE OF THIS NOTE, REPRESENTS, ACKNOWLEDGES AND AGREES THAT IT WILL NOT REOFFER, RESELL, PLEDGE OR OTHERWISE TRANSFER THIS NOTE EXCEPT TO A NON-U.S. PERSON OUTSIDE THE UNITED STATES IN COMPLIANCE WITH REGULATION S OR TO A "QUALIFIED PURCHASER" WITHIN THE MEANING OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "INVESTMENT COMPANY ACT"), IN A TRANSACTION THAT DOES NOT CAUSE THE CO-ISSUERS TO BE REQUIRED TO REGISTER UNDER THE INVESTMENT COMPANY ACT. FURTHER, THE CLASS X NOTES, THE CLASS A-1LA NOTES, THE CLASS A-1LB NOTES, THE CLASS A-2L NOTES, THE CLASS A-3L NOTES AND THE CLASS A-4L NOTES MAY NOT BE SOLD OR TRANSFERRED UNLESS SUCH SALE OR TRANSFER WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER ERISA OR SECTION 4975 OF THE CODE. THE CLASS B-1L NOTES MAY NOT BE SOLD OR TRANSFERRED TO ANY PLAN SUBJECT TO TITLE I OF ERISA OR SECTION 4975 OF THE CODE, OR TO ANY PERSON ACTING ON BEHALF OF OR WITH "PLAN ASSETS" OF ANY SUCH PLAN, INCLUDING AN INSURANCE COMPANY GENERAL ACCOUNT, UNLESS THE PURCHASER OR TRANSFEREE IS ELIGIBLE FOR THE EXEMPTIVE RELIEF AVAILABLE UNDER PTCE 96-23, 95-60, 91-38, 90-1 OR 84-14.

EACH TRANSFEREE OF A NOTE (EXCEPT WITH RESPECT TO A TRANSFER PURSUANT TO REGULATION S) WILL BE DEEMED TO REPRESENT AT TIME OF TRANSFER THAT SUCH TRANSFEREE IS A QUALIFIED INSTITUTIONAL BUYER OR A NON U.S. PERSON AND (I) THAT IT IS A QUALIFIED PURCHASER, (II) THAT IT IS NOT FORMED FOR THE PURPOSE OF INVESTING IN THE NOTES, UNLESS ALL OF ITS BENEFICIAL OWNERS ARE QUALIFIED PURCHASERS, (III) THAT IT IS NOT A DEALER DESCRIBED IN PARAGRAPH (a)(1)(ii) OF RULE 144A UNLESS SUCH TRANSFEREE OWNS AND INVESTS ON A DISCRETIONARY BASIS AT LEAST U.S.$25 MILLION IN SECURITIES OF ISSUERS THAT ARE NOT AFFILIATED PERSONS OF SUCH DEALER, (IV) THAT IT IS NOT A PLAN REFERRED TO IN PARAGRAPH (a)(1)(i)(D) OR (E) OF RULE 144A OR A TRUST FUND REFERRED TO IN PARAGRAPH (a)(1)(i)(F) OF RULE 144A THAT HOLDS THE ASSETS OF SUCH PLAN, UNLESS INVESTMENT DECISIONS ARE MADE SOLELY BY THE FIDUCIARY, TRUSTEE OR SPONSOR OF SUCH PLAN, (V) THAT IT AND EACH ACCOUNT FOR WHICH IT IS PURCHASING IS PURCHASING NOTES IN AT LEAST THE MINIMUM DENOMINATION AND (VI) THAT IT WILL PROVIDE WRITTEN NOTICE OF THE FOREGOING AND ANY OTHER APPLICABLE TRANSFER RESTRICTIONS TO ANY TRANSFEREE.

THE INDENTURE PROVIDES THAT IF, NOTWITHSTANDING THE RESTRICTIONS ON TRANSFER CONTAINED THEREIN, THE ISSUER DETERMINES ANY BENEFICIAL OWNER OR HOLDER OF A NOTE (OTHER THAN A NOTE TRANSFERRED IN RELIANCE ON REGULATION S) IS NOT A QUALIFIED INSTITUTIONAL BUYER AND A QUALIFIED PURCHASER, THE ISSUER WILL REQUIRE THAT SUCH BENEFICIAL OWNER OR HOLDER SELL ALL OF ITS RIGHT TITLE AND INTEREST IN SUCH NOTE TO A PERSON WHO IS SO QUALIFIED, WITH SUCH SALE TO BE EFFECTED WITHIN 30

008424

DAYS AFTER NOTICE OF SUCH SALE REQUIREMENT IS GIVEN. IF SUCH SALE IS NOT EFFECTED WITHIN SUCH 30 DAYS, UPON WRITTEN DIRECTION FROM THE ISSUER, THE TRUSTEE (OR AN INVESTMENT BANKER SELECTED BY THE TRUSTEE AND APPROVED BY THE ISSUER) WILL BE AUTHORIZED TO CONDUCT A COMMERCIALLY REASONABLE SALE OF SUCH NOTE TO A PERSON WHO DOES SO QUALIFY AND PENDING TRANSFER, NO FURTHER PAYMENTS WILL BE MADE IN RESPECT OF SUCH NOTE OR ANY BENEFICIAL INTEREST THEREIN.

TRANSFERS OF THE NOTES MUST GENERALLY BE ACCOMPANIED BY APPROPRIATE TAX TRANSFER DOCUMENTATION AND ARE SUBJECT TO RESTRICTIONS AS PROVIDED IN THE INDENTURE.

THE FOLLOWING INFORMATION IS PROVIDED PURSUANT TO UNITED STATES TREASURY REGULATION SECTION 1.1275-3(b). THIS NOTE HAS BEEN ISSUED WITH ORIGINAL ISSUE DISCOUNT FOR UNITED STATES FEDERAL INCOME TAX PURPOSES. THE HOLDER OF THIS NOTE MAY OBTAIN THE INFORMATION DESCRIBED IN UNITED STATES TREASURY REGULATION SECTION 1. 1275-3(b)(1)(i) FROM THE ADMINISTRATOR, AT THE FOLLOWING ADDRESS: P.O. BOX 1093 GT, GRAND CAYMAN, CAYMAN ISLANDS.

Subject to the restrictions on transfer set forth in the Indenture and the Notes and except with respect to transfer of an interest in a Regulation S Global Note or a Rule 144A Global Note (the procedure for which is set forth in the Indenture), the Holder of any Notes may transfer the same in whole or in part (in a principal amount equal to any authorized denomination) by surrendering such Notes at the corporate trust office of the Trustee or at the office of any transfer agent, together with an executed instrument of assignment and transfer substantially in the form attached to the Indenture. In exchange for any Notes properly presented for transfer with all necessary accompanying documentation, the Trustee will authenticate and deliver at the corporate trust office of the Trustee or the office of the transfer agent, as the case may be, to the transferee or send by first-class mail at the risk of the transferee to such address as the transferee may request, a Note or Notes, for a like aggregate principal amount and in such authorized denomination or denominations as may be requested. The presentation for transfer of any Notes will not be valid unless made at the office of the Trustee designated for such purpose or at the office of a transfer agent by the registered Holder in person, or by a duly authorized attorney-in-fact. The Holder of a Note will not be required to bear the costs and expenses of effecting any transfer or registration of transfer, except that the relevant Holder will be required to bear (i) the expenses of delivery by other than regular mail (if any) and (ii) if the Co-Issuers so require, the payment of a sum sufficient to cover any duty, stamp tax or governmental charge or insurance charges that may be imposed in relation thereto.

Settlement

All payments in respect of the Notes shall be made in United States dollars in same-day funds.

## CERTAIN TAX CONSIDERATIONS

Introduction

The following is a summary of certain of the United States federal income tax consequences of an investment in the Notes by purchasers that acquire their Notes in the initial offering. The discussion and the opinions referenced below are based upon laws, regulations, rulings, and decisions currently in effect, all of which are subject to change, possibly with retroactive effect. Prospective investors should note that no rulings have been or are expected to be sought from the Internal Revenue Service (the "**IRS**") with respect to any of the United States federal income tax consequences discussed below, and no assurance can be given that the IRS will not take contrary positions. Further, the following summary does not deal with all United States federal income tax consequences applicable to any given investor, nor does it address the United States federal income tax considerations applicable to all categories of investors, some of which may be subject to special rules, such as Non-U.S. Holders (defined below), banks, REITs, RICs, insurance companies, tax-exempt organizations, dealers in securities or currencies, electing large partnerships, natural persons, cash method taxpayers, S corporations, estates and trusts, investors that

008425

hold their Notes as part of a hedge, straddle, or an integrated or conversion transaction, or investors whose "functional currency" is not the United States dollar. Furthermore, it does not address alternative minimum tax consequences, or the indirect effects on investors of equity interests in either a U.S. Holder (as defined below) or a Non-U.S. Holder. In addition, this summary is generally limited to investors that acquire their Notes on the Closing Date for the issue price applicable to such Notes and who will hold their Notes as "capital assets" within the meaning of Section 1221 of the Internal Revenue Code of 1986, as amended (the **"Code"**). Investors should consult their own tax advisors to determine the United States federal, state, local, and other tax consequences of the purchase, ownership, and disposition of the Notes.

As used herein, "**U.S. Holder**" means a beneficial owner of a Note that is an individual citizen or resident of the United States for United States federal income tax purposes, a corporation or other entity taxable as a corporation created or organized in or under the laws of the United States or any state thereof (including the District of Columbia), an estate the income of which is subject to United States federal income taxation regardless of its source, or a trust where a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons (as defined in the Code) have the authority to control all substantial decisions of the trust (or a trust that has made a valid election under United States Treasury Regulations to be treated as a domestic trust). If a partnership holds Notes, the tax treatment of a partner will generally depend upon the status of the partner and upon the activities of the partnership. Partners of partnerships holding Notes should consult their own tax advisors. "**Non-U.S. Holder**" means any holder (or beneficial holder) of a Note that is not a U.S. Holder.

<u>United States Federal Income Tax Consequences to the Issuer</u>

Upon the issuance of the Notes, Orrick, Herrington & Sutcliffe LLP, special United States tax counsel to the Issuer, will deliver an opinion generally to the effect that under current law, and assuming compliance with the Indenture (and certain other documents) and based on certain factual representations made by the Issuer and the Servicer, although the matter is not free from doubt, the Issuer will not be engaged in the conduct of a trade or business in the United States. Prospective investors should be aware that opinions of counsel are not binding on the IRS and the IRS might seek to treat the Issuer as engaged in a United States trade or business. In addition, the Issuer and Servicer are entitled to rely upon the advice and/or opinions of their selected counsel with respect to amendments, supplements and other modifications of the terms of the Portfolio Collateral and deviations from the investment guidelines set forth in the Servicing Agreement; the foregoing opinion assumes that any such advice and/or opinions will be correct and complete. It should be noted as well that the United States Treasury Department and the IRS recently announced that they are considering taxpayer requests for specific guidance on, among other things, whether a foreign person may be treated as engaged in a trade or business in the United States by virtue of entering into credit default swaps. No guidance has been issued to date. If any future guidance concludes that foreign persons entering into certain credit default swaps will be treated as engaged in a trade or business in the United States, such guidance would adversely impact the Issuer's ability to pay principal and interest on the Notes. Additionally, it should be noted that gain or loss on a disposition by a foreign person of a United States real property interest may be subject to United States federal income tax as if the foreign person were engaged in a United States trade or business (even if the foreign person is not actually so engaged). Because the determination of whether an asset constitutes a United States real property interest is made periodically, although the Issuer is prohibited from acquiring an asset that constitutes a United States real property interest, it is possible that an asset that was not a United States real property interest at the time such asset was acquired by the Issuer could become a United States real property interest after the asset is acquired. Similarly, if the Issuer accepted a new security in exchange for an existing security or if the terms of an existing security were modified, the new or modified security might cause the Issuer to become engaged in a United States trade or business for United States federal income tax purposes.

The Issuer intends to elect to be (and expects to be) treated as a partnership for United States federal income tax purposes. There can be no assurance, however, that the Issuer will not (at some point in time) become classified as a corporation for United States federal income tax purposes. If the Issuer were to be treated as a corporation and if the IRS were to successfully characterize the Issuer as engaged in a United States trade or business, among other consequences, the Issuer would be subject to net income taxation in the United States (as well as the branch profits tax) on its income that is effectively connected to the United States trade or business. The levying of such taxes would materially affect the Issuer's financial ability to pay principal and interest on the Notes.

008426

The Issuer intends to acquire the Portfolio Collateral the interest on which and any gain from the sale or disposition with respect to which is not expected to be subject to United States federal withholding tax or withholding tax imposed by other countries (unless, in the case of interest, the obligor is required to "gross up" its payments to compensate for these taxes). The Issuer will not, however, make any independent investigation of the circumstances surrounding the issuance of the individual assets comprising the Portfolio Collateral and, thus, there can be no assurance that payments of interest on and gain from the sale or disposition of the Portfolio Collateral will in all cases be received free of withholding tax. It is not expected that the Issuer will derive material amounts of any other items of income that will be subject to United States withholding taxes. Notwithstanding the foregoing, any commitment fee, facility fee or other similar fee that the Issuer earns may be subject to a 30% United States federal withholding tax and any lending fees received under a securities lending agreement may also be subject to such tax.

If withholding or deduction of any taxes from payments on the Notes is required by law in any jurisdiction, the Issuer shall be under no obligation to make any additional payments to any holder in respect of such withholding or deduction.

Classification and Tax Treatment of the Notes

The Issuer has agreed and, by its acceptance of a Note, each holder will be deemed to have agreed, to treat each of the Notes as debt of the Issuer for United States federal income tax purposes. Upon the issuance of the Notes, Orrick, Herrington & Sutcliffe LLP will deliver an opinion generally to the effect that, assuming compliance with the Indenture (and certain other documents) and based on certain factual representations made by the Issuer and the Servicer, the Notes should be characterized as debt of the Issuer for United States federal income tax purposes. Prospective investors should be aware that opinions of counsel are not binding on the IRS, and there can be no assurance that the IRS will not seek to characterize any Class of Notes as other than indebtedness. However, except as provided under "Alternative Characterizations of the Notes," the balance of this discussion assumes that the Notes will be characterized as debt of the Issuer for United States federal income tax purposes.

Each U.S. Holder will include interest on the Notes in income in accordance with its regular method of accounting for Federal income tax purposes unless the Notes are viewed as having being issued with original issue discount (**"OID"**) in which case, generally, each U.S. Holder would be required to accrue interest on the Note on an accrual basis under a constant yield methodology, based on the original yield to maturity of the Note. Because interest on the Class A-3L Notes, Class A-4L Notes and Class B-1L Notes may be deferred without giving rise to an Event of Default, all interest (including interest on accrued but unpaid interest) will be treated as OID unless the likelihood of deferral is remote. The Issuer has not determined whether the likelihood of interest being deferred is remote for this purpose, and hence will treat the interest on the Class A-3L Notes, Class A-4L Notes and Class B-1L Notes as OID. Even if the likelihood of deferral is remote, if the Issuer does in fact defer interest on a Class of Notes, a U.S. Holder would thereafter be required to accrue interest (including deferred interest) with respect to such Notes as OID. Any accrued but unpaid OID included in income by a U.S. Holder would increase the U.S. Holder's basis in the Note and thereby reduce the amount of gain or increase the amount of loss recognized by the U.S. Holder on a subsequent sale or other disposition of the Note.

If any of the Notes are viewed as having been issued with OID, the OID may be accruable under the special rules set forth in Section 1272(a)(6) of the Code (which apply to debt instruments that may be accelerated by reason of the prepayment of other debt obligations securing such debt instruments). If Section 1272(a)(6) does not apply, the Notes might be treated as "contingent payment debt instruments" (**"CPDIs"**) within the meaning of Treasury Regulation Section 1.1275-4. If any Class of Notes were considered CPDIs, among other consequences, gain on the sale of such Notes that might otherwise be capital gain would be ordinary income. Prospective investors should consult their own tax advisors regarding the potential application of Section 1272(a)(6) of the Code to the Notes and the rules governing CPDIs .

The United States federal income tax consequences of a Maturity Extension are unclear. If a Maturity Extension occurs with respect to the Notes (other than the Class X Notes), the Issuer intends to treat such Notes, solely for purposes of sections 1272 and 1273 of the Code, as having been retired and reissued for an amount equal to their adjusted issue price on the date of the new Extension Effective Date. Additionally, U.S. Holders may be deemed for United States federal income tax purpose to have exchanged their Notes in a taxable exchange for new

008427

notes with an extended final maturity date (the "New Notes") if, at such time, the Extension Qualifying Purchaser is related to the Issuer within the meaning of Section 267(b) or 707(b)(1) of the Code. If such relationship existed, U.S. Holders that did not exercise their right to put their Notes to the Extension Qualifying Purchaser may be treated as having acquired such New Notes with market discount or premium (and there might be other possible tax consequences). In addition, if the Notes are treated as exchanged for New Notes, the characterization of the New Notes (as debt or equity) would depend on the facts and circumstances existing at the time of such deemed exchange. In the event of a Maturity Extension, all U.S. Holders are urged to consult their own tax advisors with respect to whether the Extension Qualifying Purchaser is related to the Issuer, and, if so, the United States federal income tax consequences of any deemed exchange.

The tax treatment of the Extension Bonus Payment is also unclear. The Issuer intends to take the position that the Extension Bonus Payment is an incidental payment within the meaning of Treasury Regulation Section 1.1275-2(h)(3), and that the amount of such payment should be includible in income as ordinary income in accordance with the U.S. Holder's normal method of tax accounting. The Issuer's determination with respect to this issue will not be binding on the IRS, but will be binding on any U.S. Holder that does not disclose an objection on its timely filed tax return for the taxable year that includes the acquisition date of such Note. U.S. Holders should consult with their own tax advisors concerning the proper taxation and characterization of such payments, and whether the right to such payments could cause the Notes to be subject to the OID rules or to be treated as CPDIs.

In general, a U.S. Holder of a Note will have a basis in such Note equal to the cost of such Note to such U.S. Holder, increased by any amount includible in income by such U.S. Holder as OID and reduced by any amortized premium, any principal payments and any payments of OID. Upon a sale, exchange or other disposition of a Note, a U.S. Holder will generally recognize gain or loss equal to the difference between the amount realized on the sale, exchange or other disposition (less any accrued and unpaid interest, which would be taxable as such) and the U.S. Holder's tax basis in such Note (as reduced by any accrued and unpaid interest). Such gain or loss generally will be long-term capital gain or loss if the U.S. Holder held the Note for more than one year at the time of disposition (other than accrued market discount if the U.S. Holder did not elect to include such discount in income on a current basis). In certain circumstances, U.S. Holders that are individuals may be entitled to preferential treatment for net long-term capital gains; however, the ability of U.S. Holders to offset capital losses against ordinary income is limited.

The Indenture provides that Holders of any Class of Notes may elect to acquire credit enhancement on terms and conditions acceptable to such Holders. Prior to acquiring such enhancement, U.S. Holders should consult with their own tax advisors concerning the treatment of the credit enhancement for United States federal income tax purposes (including the viability of integrating the Notes and the credit enhancement).

Alternative Characterizations of the Notes

Notwithstanding special United States tax counsel's opinion, U.S. Holders should recognize that there is some uncertainty regarding the appropriate classification of instruments such as the Notes. It is possible, for example, that the IRS may contend that the Class B-1L Notes and, possibly, any other Class of Notes should be treated as equity interests in the Issuer. In such a case, payments on the Notes would likely be viewed as guaranteed payments (rather than as interest) for United States federal income tax purposes. Additionally, U.S. Holders would be required to file information returns with the IRS with respect to their acquisition of the Notes and be subject to significant penalties for failure to do so. Moreover, if the Issuer were classified as a corporation rather than as a partnership for United States federal income tax purposes and the Notes were viewed as equity in this corporation, the Issuer would constitute a passive foreign investment company and, possibly, a controlled foreign corporation, which would produce adverse tax consequences for U.S. Holders. Accordingly, all U.S. Holders are urged to consult their own tax advisors as to the consequences that would result if the Notes were characterized as equity (and the additional consequences that would result if the Issuer were classified as a corporation) for United States federal income tax purposes.

008428

Information Reporting Requirements

Information reporting to the IRS may be required with respect to payments on the Notes, and proceeds of the sale of the Notes to holders other than corporations and certain other exempt recipients. A "backup" withholding tax may also apply to those payments if a holder fails to provide certain identifying information (such as the holder's taxpayer identification number or an attestation to the status of the holder as a Non-U.S. Holder). Backup withholding is not an additional tax and may be refunded (or credited against the holder's U.S. federal income tax liability, if any) provided that certain required information is furnished to the IRS in a timely manner.

Prospective investors should consult with their own tax advisors regarding whether they are required to file an IRS Form 8886 in respect of this transaction (relating to certain "reportable transactions"). Thus, for example, if a U.S. Holder were to sell its Notes at a loss, it is possible that this loss could constitute a reportable transaction. and need to be reported on Form 8886 As another example, a transaction may be reportable if it is offered under conditions of confidentiality. In this regard, each holder and beneficial holder of the Notes (and each of their respective employees, representatives or other agents) is hereby advised that it is permitted to disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transactions described herein (including the ownership and disposition of the Notes). Significant penalties apply for failure to file Form 8886 when required, and holders are therefore urged to consult their own tax advisors.

Non-U.S. Holders

Assuming that the Issuer is not engaged in a United States trade or business, a Non-U.S. Holder of a Note that has no connection with the United States and is not related, directly or indirectly, with the Issuer or the holders of the Issuer's equity, will not be subject to United States withholding tax on interest payments. Non-U.S. Holders may be required to make certain tax representations regarding the identity of the beneficial owner of the Notes in order to receive payments free of withholding.

Circular 230

Under 31 C.F.R. part 10, the regulations governing practice before the IRS (Circular 230), we and our tax advisors are (or may be) required to inform you that:

- Any advice contained herein, including any opinions of counsel referred to herein, is not intended or written to be used, and cannot be used by any taxpayer, for the purpose of avoiding penalties that may be imposed on the taxpayer;

- Any such advice is written to support the promotion or marketing of the Notes and the transactions described herein (or in such opinion or other advice); and

- Each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

## CAYMAN ISLANDS TAX CONSEQUENCES

The following discussion of certain Cayman Islands income tax consequences of an investment in the Notes is based on the advice of Maples and Calder as to Cayman Islands law. The discussion is a general summary of present law, which is subject to prospective and retroactive change. It assumes that the Issuer will conduct its affairs in accordance with assumptions made by, and representations made to, counsel. It is not intended as tax advice, does not consider any investor's particular circumstances, and does not consider tax consequences other than those arising under Cayman Islands law.

Under existing Cayman Islands laws:

(i) payments of principal and interest in respect of the Notes will not be subject to taxation in

008429

the Cayman Islands and no withholding will be required on such payments to any Holder of a Note and gains derived from the sale of Notes will not be subject to Cayman Islands income or corporation tax. The Cayman Islands currently have no income, corporation or capital gains tax and no estate duty, inheritance tax or gift tax; and

(ii) the Holder of any Note (or the legal personal representative of such Holder) whose Note is brought into the Cayman Islands may in certain circumstances be liable to pay stamp duty imposed under the laws of the Cayman Islands in respect of such Note.

The Issuer has been incorporated under the laws of the Cayman Islands as an exempted company and, as such, has applied for and obtained an undertaking from the Governor In Cabinet of the Cayman Islands in the following form:

### The Tax Concessions Law

### (1999 Revision)

### Undertaking as to Tax Concessions

In accordance with Section 6 of the Tax Concessions Law (1999 Revision) the Governor in Cabinet undertakes with Rockwall CDO Ltd. (the "**Company**"):

(a) that no law which is hereafter enacted in the Islands imposing any tax to be levied on profits, income, gains or appreciations shall apply to the Company or its operations; and

(b) in addition, that no tax to be levied on profits, income, gains or appreciations or which is in the nature of estate duty or inheritance tax shall be payable

(i) on or in respect of the shares, debentures or other obligations of the Company; or

(ii) by way of the withholding in whole or in part of any relevant payment as defined in Section 6(3) of the Tax Concessions Law (1999 Revision).

These concessions shall be for a period of twenty years from the 21st day of June 2005.

### CERTAIN ERISA CONSIDERATIONS

The United States Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), imposes requirements on employee benefit plans (as defined in Section 3(3) of ERISA) subject to Title I of ERISA ("**ERISA Plans**") and on persons who are fiduciaries (as defined in Section 3(21) of ERISA) with respect to such ERISA Plans. Investments by ERISA Plans are subject to ERISA's general fiduciary requirements, including the requirement of investment prudence and diversification, requirements respecting delegation of investment authority and the requirement that an ERISA Plan's investments be made in accordance with the documents governing the ERISA Plan. Each ERISA Plan fiduciary should give appropriate consideration to the facts and circumstances that are relevant to an investment in the Notes, including the role that an investment in the Notes plays in the Plan's investment portfolio. Before deciding to invest "plan assets" of any ERISA Plan in the Notes, the investing ERISA Plan fiduciary should be satisfied that investment in the Notes is a prudent investment for the ERISA Plan, that the investments of the ERISA Plan, including the investment in the Notes, are diversified so as to minimize the risk of large losses and that an investment in the Notes complies with the ERISA Plan and related trust documents. Any person who decides to invest "plan assets" of an ERISA Plan in the Notes should consider, among other factors, the factors discussed above under "Special Considerations."

Section 406 of ERISA and Section 4975 of the Code prohibit ERISA Plans, as well as individual retirement accounts and Keogh plans, subject to either or both of such statutes (each, a "**Plan**") from engaging in certain transactions with persons that are "parties in interest" under ERISA or "disqualified persons" under Section 4975 of

the Code (collectively, "**Parties in Interest**") with respect to such Plans. A violation of these prohibited transaction rules may result in an excise tax or other penalties and liabilities under ERISA and/or Section 4975 of the Code for such persons.

Certain transactions involving the purchase, holding or transfer of the Notes might be deemed to constitute or result in prohibited transactions under ERISA and/or Section 4975 of the Code. For example, if the "plan assets" of an investing Plan were deemed to include assets of the Issuer and if any of the Portfolio Collateral constitutes an obligation of or is purchased from or sold to a Party in Interest with respect to such Plan, an indirect prohibited transaction in the nature of an extension of credit or a purchase or sale of assets between such Plan and such Party in Interest might be deemed to occur. In addition, if the assets of the Issuer were deemed to be "plan assets" of any Plan investors, Notes sold to a Party in Interest with respect to such Plan would constitute a prohibited extension of credit transaction, possibly subjecting such Noteholder to excise taxes under Section 4975 of the Code. Under regulations issued by the United States Department of Labor, set forth in 29 C.F.R. § 2510.3-101 (the "**Plan Asset Regulations**"), the assets of the Issuer would be treated as "plan assets" of a Plan for purposes of ERISA and Section 4975 of the Code if the Plan acquires an equity interest in the Issuer and none of the exceptions contained in the Plan Asset Regulations applies. An equity interest is defined under the Plan Asset Regulations as any interest in an entity other than an instrument which is treated as indebtedness under applicable local law and which has no substantial equity features.

Although there is no authority directly on point, it is anticipated that the Notes should be treated as indebtedness under local law and should not be treated as having substantial equity features for purposes of the Plan Asset Regulations. However, without regard to whether (i) the Notes are treated as an equity interest for such purposes or (ii) the assets of the Issuer are deemed to be "plan assets" of an investing Plan, the acquisition or holding of Notes by or on behalf of, or with "plan assets" of, a Plan could be considered to give rise to a prohibited transaction if the Issuer, the Trustee, the Initial Purchaser, the Servicer, an issuer of an item of Portfolio Collateral, or any of their respective affiliates is or becomes a Party in Interest with respect to an investing Plan. Certain exemptions from the prohibited transaction rules could apply to the acquisition of a Note by or with "plan assets" of a Plan, depending on the type and circumstances of the Plan fiduciary making the decision to acquire a Note. Included among these exemptions are: Prohibited Transaction Class Exemption ("**PTCE**") 96-23, regarding transactions effected by certain "in-house asset managers"; PTCE 95-60, regarding investments by insurance company general accounts; PTCE 91-38, regarding investments by bank collective investment funds; PTCE 90-1, regarding investments by insurance company pooled separate accounts; and PTCE 84-14, regarding transactions effected by independent "qualified professional asset managers." However, even if the conditions specified in one or more of these exemptions are met, the scope of the relief provided by these exemptions might or might not cover all acts which might be construed as prohibited transactions and in particular would not apply to prohibited transactions arising from the operations of the Issuer.

In any event, a fiduciary or other person investing "plan assets" of any Plan should not purchase Notes if the Issuer, the Initial Purchaser, the Trustee, the Servicer or any of their respective affiliates (a) has investment discretion with respect to the investment of such assets; (b) has authority or responsibility to give or regularly gives investment advice with respect to such assets, for a fee, pursuant to an agreement or understanding that such advice will serve as a primary basis for investment decisions with respect to such assets and that such advice will be based on the particular investment needs of such Plan; or (c) unless PTCE 95-60, 91-38 or 90-1 is applicable, is an employer maintaining or contributing to such Plan. A party that is described in clause (a) or (b) of the preceding sentence is a fiduciary under ERISA with respect to the Plan and any such purchase might result in a non-exempt prohibited transaction under ERISA or Section 4975 of the Code.

As a general rule, certain employee benefit plans, including governmental plans (as defined in Section 3(32) of ERISA) and certain church plans (as defined in Section 3(33) of ERISA), are not subject to ERISA's requirements. Accordingly, assets of many such plans may be invested in the Notes without regard to ERISA prohibited transaction considerations described above, subject to the provisions of other applicable federal and state law. However, any such plan which is qualified and exempt from taxation under Sections 401(a) and 501(a) of the Code may nonetheless be subject to the prohibited transaction rules set forth in Section 503 of the Code and, under certain circumstances in the case of church plans, Section 4975 of the Code. Also, some governmental plans are subject to federal, state or local laws which are, to a material extent, similar to the provisions of Title I of ERISA or

86

008431

Section 4975 of the Code (a "**Similar Law**"). Each governmental plan fiduciary should make its own determination as to the need for and the availability of any exemptive relief under a Similar Law.

*Each Holder of a Class X Note, a Class A-1LA Note, a Class A-1LB, a Class A-2L Note, a Class A-3L Note or a Class A-4L Note, by its acquisition thereof, shall be deemed to represent to the Issuer, the Servicer and the Trustee that either (i) no part of the funds being used to pay the purchase price for such Note constitutes "plan assets" of any Plan, or (ii) if the funds being used to pay the purchase price for such Note includes "plan assets" of any Plan, an exemption to the prohibited transaction rules applies.*

*Each Holder of a Class B-1L Note by its acquisition thereof, shall be deemed to represent to the Issuer, the Servicer and the Trustee that either (a) the purchaser or transferee is not a Plan and is not acquiring the Class B-1L Note with assets of a Plan or (b) it is an insurance company and such funds include only assets of its general account, and its acquisition and holding of such Note are eligible for exemptive relief available under Section I of PTCE 95-60, or the acquisition and holding of the Class B-1L Notes by the purchaser or transferee are eligible for the exemptive relief under PTCE 96-23, 91-38, 90-1 or 84-14.*

*Any person proposing to invest assets of any Plan, or any governmental plan subject to Similar Law, in the Notes should consult with its counsel to confirm that such investment will not constitute or result in any prohibited transaction that is not subject to an exemption and will satisfy the other requirements of ERISA, the Code and, in the case of such a governmental plan, Similar Law.*

## CERTAIN LEGAL INVESTMENT CONSIDERATIONS

Institutions whose investment activities are subject to legal investment laws and regulations or to review by certain regulatory authorities may be subject to restrictions on investments in the Notes. Any such institution should consult its legal advisors in determining whether and to what extent there may be restrictions on its ability to invest in the Notes. Without limiting the foregoing, any financial institution that is subject to the jurisdiction of the Comptroller of Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of Thrift Supervision, the National Credit Union Administration, any state insurance commission, or any other federal or state agencies with similar authority should review any applicable rules, guidelines and regulations prior to purchasing the Notes. Depository institutions should review and consider the applicability of the Federal Financial Institutions Examination Council Supervisory Policy Statement on Securities Activities, which has been adopted by the respective federal regulators.

None of the Co-Issuers or the Initial Purchaser make any representation as to the proper characterization of the Notes for legal investment or other purposes, or as to the ability of particular investors to purchase the Notes for legal investment or other purposes, or as to the ability of particular investors to purchase the Notes under applicable investment restrictions. The Co-Issuers understand that certain state insurance regulators, in response to a request for guidance, may be considering the characterization (as U.S. domestic or foreign (non-U.S.)) of certain collateralized debt obligation securities co-issued by a non-U.S. issuer and a U.S. co-issuer. There can be no assurance as to the nature of any guidance or other action that may result from such consideration. The uncertainties described above (and any unfavorable future determinations concerning legal investment or financial institution regulatory characteristics of the Notes) may affect the liquidity of the Notes. Accordingly, all institutions whose activities are subject to legal investment laws and regulations, regulatory capital requirements or review by regulatory authorities should consult their own legal advisors in determining whether and to what extent the Notes are subject to investment, capital or other restrictions.

## RATINGS

It is a condition to the issuance of the Notes that the Class X Notes, Class A-1LA Notes and Class A-1LB Notes each be rated "AAA" by S&P and "Aaa" by Moody's, that the Class A-2L Notes be rated at least "AA" by S&P and at least "Aa2" by Moody's, that the Class A-3L Notes be rated at least "A" by S&P and at least "A2" by Moody's, that the Class A-4L Notes be rated at least "A-" by S&P and at least "A3" by Moody's and that the Class B-1L Notes be rated at least "BBB" by S&P and at least "Baa2" by Moody's. Each of the ratings of the Notes described herein assumes that no Maturity Extension occurs after the Closing Date. A security rating is not a

recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning rating organization.

**The ratings of the Notes by S&P address solely the likelihood of timely payment of the Periodic Interest Amount on and the ultimate payment of the Aggregate Principal Amount of each Class of Senior Class A Notes, the timely payment of the Class X Payment and the ultimate payment of the Cumulative Interest Amount and the Aggregate Principal Amount of the Class A-3L Notes, the Class A-4L Notes and the Class B-1L Notes. The ratings of the Notes by Moody's address the ultimate cash receipt of all required payments as provided by the governing documents, and are based on the expected loss to the Noteholders of each Class relative to the promise of receiving the present value of such payments. A rating is not a recommendation to purchase, hold or sell securities, in as much as such rating does not comment as to market price or suitability for a particular investor and may be subject to revision or withdrawal at any time by the assigning rating organization.**

In the event that any rating initially assigned to the Notes is subsequently lowered for any reason, no person or entity is obligated to provide any additional support or credit enhancement with respect to the Notes. The Issuer has not requested a rating on the Notes by any rating agencies other than S&P and Moody's, although data with respect to the Portfolio Collateral may have been provided to other rating agencies solely for informational purposes. There can be no assurance that, if a rating is assigned to the Notes by any other rating agency, such rating will be as high as that assigned by S&P and Moody's.

## USE OF PROCEEDS

The net proceeds from the sale of the Notes as described herein, together with net proceeds from the sale of the Preferred Shares will be used by the Issuer to fund the purchase of a principal amount of the Initial Portfolio Collateral at least equal to the Initial Portfolio Collateral Amount, to fund the Deposit on the Closing Date of cash in the approximate amount such that the Aggregate Principal Amount of Original Portfolio Collateral originally purchased by the Issuer on or before the Effective Date will equal the Required Portfolio Collateral Amount and to fund the deposit in the Expense Reimbursement Account on the Closing Date of approximately U.S.$50,000, which Expense Reimbursement Account will be available for payment from time to time of future expenses of the Issuer pending the receipt of collections in respect of the Portfolio Collateral as described herein, to pay organizational, legal and other fees and expenses, related to the transaction, and to fund the Reserve Amount. The net proceeds from the sale of the Notes and the Preferred Shares will be approximately U.S.$856,312,500.

## PLAN OF DISTRIBUTION

The Initial Purchaser has advised the Co-Issuers that it proposes to offer the Notes to prospective purchasers from time to time in individually negotiated transactions at varying prices to be determined in each case at the time of sale. The price(s) paid by the Initial Purchaser for the Notes may be less than those paid by other purchasers of the Notes. The Initial Purchaser may offer or sell Notes to purchasers at negotiated prices, which may vary among different purchasers of Notes of any Class. In addition to the structuring and placement fees paid to the Initial Purchaser, the Initial Purchaser may be deemed to receive compensation for the sale of the Notes to the extent that the price(s) paid by it for Notes is less than the price(s) at which they are resold. The Notes are offered when, as and if issued by the Co-Issuers, subject to prior sale or withdrawal, cancellation or modification of the offer without notice and subject to approval of certain legal matters by counsel and certain other conditions. It is expected that delivery of the Notes will be made on or about the Closing Date, against payment in immediately available funds.

The Notes have not been registered under the Securities Act and may not be offered or sold within the United States or to, or for the account or benefit of, United States persons except to (i) Qualified Institutional Buyers in reliance on Rule 144A under the Securities Act and (ii) other persons or entities pursuant to other valid exemptions from the registration requirements of the Securities Act.

Without limiting the foregoing, no transfer of Notes may be made except to a non-U.S. Person in an offshore transaction in compliance with Regulation S or to a Qualified Purchaser or if such transfer would not

require the Issuer or the Co-Issuer to become subject to the registration requirements of the Investment Company Act.

Each of the Co-Issuers and the Initial Purchaser represents and agrees that it (i) has only communicated or caused to be communicated and will only communicate or cause to be communicated any invitation or inducement to engage in investment activity (within the meaning of Section 21 of the Financial Services and Markets Act of 2000 ("FSMA")) received by it in connection with the issue or sale of any offered securities in circumstances in which Section 21(a) of the FSMA does not apply to the Issuer; and (ii) has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to the offered securities, in, from or otherwise involving the United Kingdom.

No invitation may be made to the public in the Cayman Islands to subscribe for the Notes.

Purchasers of Notes sold outside the United States may be required to pay stamp taxes and other charges in accordance with the laws and practices of the country of purchase in addition to the price charged to investors for the Notes.

The Notes are new securities for which there currently is no market. Accordingly, no assurance can be given as to the development or liquidity of any market for the Notes.

## THE SERVICER

**The information appearing in this Section has been prepared by Highland Capital Management, L.P. and has not been independently verified by the Issuer, the Co-Issuer or the Initial Purchaser. Accordingly, notwithstanding anything to the contrary herein, the Issuer, the Co-Issuer and the Initial Purchaser do not assume any responsibility for the accuracy, completeness or applicability of such information.**

General

Based in Dallas, Texas, Highland Capital is a registered investment adviser specializing in below investment grade credit and special situation investing. As of September 30, 2005, Highland Capital managed over $18 billion in leveraged loans, high yield bonds, structured products and other assets for banks, insurance companies, pension plans, foundations, and high net worth individuals.

Highland Capital manages these assets through a variety of fund structures including separate accounts, CDOs, hedge funds and mutual funds. As of September 30, 2005, Highland Capital had under management approximately 1,000 below investment grade and credit sensitive credit positions, and Highland Capital's 56 person credit team followed approximately 1,200 below investment grade and credit sensitive credit positions across over 40 industries. Highland Capital or an affiliate or predecessor thereof has been an SEC-registered investment adviser since April 1993.

Highland Capital has invested over $250 million of firm capital in its funds, and expects that HFP, one of its Affiliates, will on the Closing Date purchase 100% of the Class II Preferred Shares.

Philosophy and Process

Highland Capital has expertise in the fields of syndicated loans, high yield bonds, and distressed assets. Portfolio managers follow each credit and several times each year the entire professional staff reviews all positions during multi-day monitoring meetings. Highland Capital diversifies its portfolios with set limits on exposure to any one given industry or issuer.

Since 1990, Highland Capital has been using a committee to coordinate the selection, monitoring and servicing process. The committee, which consists of senior portfolio managers, Highland Capital's Chief Investment Officer and its Head of Structured Products, meets every morning to discuss the status of the credits. Collectively, the committee utilizes a selection process which is driven by credit research. Each portfolio manager/analyst makes

008434

specific credit recommendations based upon industry coverage. The credit proposal is then brought to the committee for consideration. Based upon the consensus decision, the portfolio manager will direct Highland traders to execute the trade. Highland Capital has also provided its committee with a commitment to technology. The firm developed Wall Street Office® which is a proprietary software system that allows Highland Capital to model, portfolio manage, and trade syndicated loans. This software has been licensed to more than 70 financial institutions that invest in syndicated loans.

Professionals of the Servicer

Set forth below is information regarding certain persons who are currently employed by the Servicer. Such persons may not necessarily continue to be so employed during the entire term of the Servicing Agreement.

**Senior Management**

**James Dondero, CFA, CPA, CMA** – *Managing Partner - President*

Mr. Dondero is a Founder and President of Highland Capital. Formerly, Mr. Dondero served as Chief Investment Officer of Protective Life's GIC subsidiary. His portfolio management experience includes mortgage-backed securities, investment grade corporates, leveraged bank loans, emerging markets, derivatives, preferred stocks and common stocks. From 1985 to 1989, he managed fixed income funds for American Express. Prior to American Express, he completed the financial training at Morgan Guaranty Trust Company. Mr. Dondero is a Beta Gamma Sigma graduate of the University of Virginia, 1984 with degrees in Accounting and Finance. Mr. Dondero is a Certified Public Accountant, Chartered Financial Analyst and a Certified Management Accountant.

**Mark Okada, CFA** – *Managing Partner - Chief Investment Officer*

Mr. Okada is a Founder and Chief Investment Officer of Highland Capital. He is responsible for overseeing Highland Capital's investment activities for its various funds and has over 19 years of experience in the leveraged finance market. Formerly, Mr. Okada served as Manager of Fixed Income for Protective Life's GIC subsidiary from 1990 to 1993. He was primarily responsible for the bank loan portfolio and other risk assets. From 1986 to 1990, he served as Vice President for Hibernia National Bank, managing over $1 billion of high yield bank loans. Mr. Okada is an honors graduate of the University of California Los Angeles with degrees in Economics and Psychology. He completed his credit training at Mitsui and is a Chartered Financial Analyst. Mr. Okada is also Chairman of the Board of Directors of Common Grace Ministries Inc.

**Todd Travers, CFA** – *Head of Structured Products, Senior Portfolio Manager*

Mr. Travers is responsible for Highland Capital's CDO business and is the primary portfolio manager for Highland Capital's par debt funds. He is a member of the Credit Committee and heads a team that is responsible for structuring new transactions and implementing additional opportunities in Highland Capital's core businesses. Formerly, Mr. Travers served as Portfolio Manager/Portfolio Analyst from 1994 to 1998 for Highland Capital. In 1999, he was promoted to Senior Portfolio Manager and his duties were expanded beyond sector portfolio management to include the origination, structuring and issuance of new structured vehicles, including all structured vehicles since Highland Loan Funding V Ltd. and Restoration Funding Ltd. His prior responsibilities included managing a portion of Highland Capital's leveraged loan and high yield debt portfolios with an emphasis on technology and aviation transactions. Prior to joining Highland Capital, Mr. Travers was a Finance Manager at American Airlines. Mr. Travers is a graduate of Iowa State University with a BS in Industrial Engineering. He received his MBA with an emphasis in Finance from Southern Methodist University. Mr. Travers is a Chartered Financial Analyst.

008435

**Portfolio Managers**

**Peter A. Strzalkowski, CFA** – *Portfolio Manager*

Prior to joining Highland Capital, Mr. Strzalkowski served as a Senior Portfolio Manager with Microsoft Corp. from June, 2003 to June, 2005. His primary responsibility was the management of various multi-billion fixed income portfolios that were comprised of; MBS, ABS, Credit, Governments, TIPS, Derivatives, including Swaps, Swaptions and Futures, and Global Fixed Income. In addition he managed an absolute return mandate with a $5 million daily VAR. Prior to Microsoft, Mr. Strzalkowski worked as a Vice President/Portfolio Manager at First Citizens Bank in Raleigh, NC where he managed $1.2 billion from 2000 to 2003. Before that, he was employed at Centura Banks in a Portfolio Manager role from 1998 to 2000. Formerly, Mr. Strzalkowski was a Vice President/Junior Portfolio Manager/Quantitative Analyst at Bank of America's Sovran Capital Management from 1993 to 1998. Mr. Strzalkowski received a BS in Business/Finance from Virginia Commonwealth University and he is a Chartered Financial Analyst charter holder.

**Senior Portfolio Analysts**

**Gibran Mahmud, CPA** – *Senior Portfolio Analyst*

Mr. Mahmud is involved in managing Highland's CDO funds and is part of the team that is responsible for structuring new transactions and implementing additional opportunities in Highland's core business. Formerly, Mr. Mahmud served as Controller at Highland from 2001 to 2003. Prior to joining Highland Capital, he served as a Senior Analyst at Fleet Capital where he was involved in the originating, structuring, modeling, and credit analysis for clients primarily in the manufacturing, retail, and services industries. Formerly, Mr. Mahmud was a senior accountant at Arthur Andersen. He received both a Bachelors in Accounting and an MBA with an emphasis in Finance from Baylor University. Mr. Mahmud is a Certified Public Accountant.

**Sundeep Agrawal** – *Senior Portfolio Analyst*

Prior to joining Highland, Mr. Agrawal worked as a Senior Investment Analyst at General Motors Asset Management in New York from 2003 to 2005. At GMAM Mr. Agrawal was responsible for the credit analysis and risk management of CDO and ABS securities for a $400 million Total Return Structured Credit Opportunity Fund and a $100 million CDO Equity Fund. In addition he was also involved in the analysis, portfolio construction and risk management of various Libor Plus strategies focusing on the HEL ABS and RMBS sectors. Prior to GMAM, Mr. Agrawal was an Assistant Vice President at Lehman Brothers in the Fixed Income Division in New York from 1998-2002. At Lehman Brothers he focused on the quantitative modeling and risk management of foreign exchange derivative products. He received an MBA in Finance from New York University's Leonard N. Stern School of Business, an M.S. in Systems Engineering from The University of Texas at Austin and a B.E. in Electrical Engineering from Delhi Institute of Technology, India.

**Brad Voss, CFA** – *Senior Portfolio Analyst*

Mr. Voss joined Highland in August 2005 and is involved in the analysis, selection, and monitoring of asset-backed securities for Highland-managed CDOs. Formerly he served as a Vice President for Bear Stearns, where he worked with institutional investors to incorporate Bear Stearns research into their investment processes. Prior to joining Bear Stearns he held a similar position at Donaldson, Lufkin & Jenrette. While a graduate student he completed an internship with State Street Research & Management in Boston and served as a portfolio manager and risk manager for a $13 million student-managed investment company. Mr. Voss holds an MBA from the University of Texas at Austin, a BBA from Texas Christian University, and has earned the right to use the Chartered Financial Analyst designation.

See "Special Considerations—Dependence on Key Personnel of the Servicer."

008436

## THE SERVICING AGREEMENT

The following summary describes certain provisions of the Servicing Agreement. The summary does not purport to be complete and is subject to, and qualified in its entirety by reference to, the Servicing Agreement.

The Servicer will select the Initial Portfolio Collateral and will select all remaining Portfolio Collateral. The Servicer will also monitor the performance and credit quality of all of the Portfolio Collateral on an ongoing basis as further provided in the Servicing Agreement. Pursuant to the terms of the Servicing Agreement and the Indenture, the Servicer will direct the Issuer with respect to the use of collections on Portfolio Collateral to purchase Substitute Portfolio Collateral or Additional Portfolio Collateral, direct the Trustee when to deliver an item of Credit Risk Portfolio Collateral, Credit Improved Portfolio Collateral, Equity Portfolio Collateral or other item of Portfolio Collateral for sale and direct the use of proceeds therefrom to purchase Substitute or Additional Portfolio Collateral and Eligible Investments. The Servicer will advise the Issuer with respect to the use of certain Collections as described herein to purchase Additional Portfolio Collateral meeting the specifications set forth herein. If any Portfolio Collateral is an item of Defaulted Portfolio Collateral, the Servicer will instruct the Trustee as to the appropriate action to be taken against the issuer of such item of Portfolio Collateral and whether to retain or dispose of such item of Portfolio Collateral. See "Security for the Notes—Changes in Composition of Portfolio Collateral."

Upon any disposition of Portfolio Collateral, the Trustee, upon direction of the Servicer, will either deposit the proceeds of such disposition in the Collection Account or apply the proceeds of such disposition to the purchase of an item of Additional Portfolio Collateral or Substitute Portfolio Collateral, all in accordance with the terms of the Indenture. Any such actions directed by the Servicer may change the composition and characteristics of the Portfolio Collateral included in the Trust Estate, the rate of payment thereon, and, accordingly, may affect the actual average life of the Notes.

The Indenture places significant restrictions on the ability of the Issuer to buy and sell securities for the Trust Estate, and the Servicer is subject to compliance with such document. Accordingly, during certain periods or in certain specified circumstances, the Issuer may be unable to buy or sell securities or to take other actions which the Servicer might consider in the interests of the Issuer and its creditors and the Holders of Preferred Shares.

In its capacity as servicer or manager, the Servicer engages in other business and furnishes asset management and other services to other clients which may differ from those followed by the Servicer on behalf of the Issuer, as required by the Indenture. The Servicer may make recommendations or effect transactions which may differ from those effected with respect to the securities in the Trust Estate.

The Servicing Agreement provides that the Servicer will not direct the Trustee to acquire an obligation to be included in the Collateral from the Servicer or any of its Affiliates as principal or to sell an obligation to the Servicer or any of its Affiliates as principal unless (i) the Issuer shall have received from the Servicer such information relating to such acquisition or sale as it may reasonably require and shall have approved such acquisition, which approval shall not be unreasonably withheld, (ii) in the judgment of the Servicer, such transaction is on terms no less favorable than would be obtained in a transaction conducted on an arm's length basis between third parties unaffiliated with each other and (iii) such transaction is permitted by the Investment Advisers Act of 1940. The Servicing Agreement also provides that the Servicer will not direct the Trustee to acquire an obligation to be included in the Collateral directly from any account or portfolio for which the Servicer serves as investment adviser, or direct the Trustee to sell an obligation directly to any account or portfolio for which the Servicer serves as investment adviser unless such acquisition or sale is (i) in the judgment of the Servicer, on terms no less favorable than would be obtained in a transaction conducted on an arm's length basis between third parties unaffiliated with each other and (ii) permitted by the Investment Advisers Act of 1940.

Compensation

As compensation for its services under the Servicing Agreement, the Servicer will be entitled to receive a Base Servicing Fee, an Additional Servicing Fee and a Supplemental Servicing Fee (if any).

008437

The Base Servicing Fee is a fee that will accrue from the Closing Date and be payable to the Servicer, if and to the extent funds are available for such purpose as described under "Description of the Notes—Payments on the Notes; Priority of Distributions", in arrears on each Payment Date. The Base Servicing Fee will be calculated on the basis of a 360-day year and the actual number of days elapsed. The Base Servicing Fee payable on any Payment Date will be payable from Collateral Interest Collections remaining after payment of certain fees and expenses of the Issuer but prior to payment of interest on the Notes. The Base Servicing Fee will accrue interest if unpaid. To the extent Collateral Interest Collections are insufficient to pay any accrued and unpaid Base Servicing Fee payable on any Payment Date, the Base Servicing Fee will be payable from Collateral Principal Collections available for such purpose as described under "Description of the Notes—Payments on the Notes; Priority of Distributions."

The Additional Servicing Fee is a fee that will accrue from the Closing Date and be payable to the Servicer, if and to the extent funds are available for such purpose as described under "Description of the Note—Payments on the Notes; Priority of Distributions", in arrears on each Payment Date (to the extent provided in the Servicing Agreement). The Additional Servicing Fee will be calculated on the basis of a 360-day year and the actual number of days elapsed. The Additional Servicing Fee payable on any Payment Date will be payable from Collateral Interest Collections remaining after payment of certain fees and expenses of the Issuer, the Base Servicing Fee, interest (and, if any of the Overcollateralization Tests or the Interest Coverage Test are not satisfied on the related Payment Date (other than the Interest Coverage Test on the first or second Payment Date) or if a Rating Confirmation Failure exists, principal) on the Notes and certain other amounts. The Additional Servicing Fee will accrue interest if unpaid.

The Supplemental Servicing Amount means an amount that will be payable to the Servicer in accordance with the Indenture on each Payment Date, if and to the extent funds are available for such purpose as described under "Description of the Notes—Payments on the Notes; Priority of Distributions." Excess cashflow remaining after the payment or deposit of the amounts described under "Description of the Notes—Payments on the Notes; Priority of Distributions" will be paid: (a) if the Internal Rate of Return of the Preferred Shares as of such Payment Date is less than 12%, to the Issuer to be applied to fund distributions to the Holders of the Preferred Shares, but only up to an amount that would cause the Internal Rate of Return of the Preferred Shares to equal 12%, and (b) if the Internal Rate of Return of the Preferred Shares as of such Payment Date is equal to or greater than 12%, after giving effect to any payments made under clause (a) above, (x) 20% of any remaining amount to (1) the Servicer in payment of the Supplemental Servicing Fee for such Payment Date, and (2) the Holders of the Class II Preferred Shares in accordance with the Paying and Transfer Agency Agreement, in payment of the Class II Preferred Share Supplemental Dividend then due and unpaid, and (y) 80% to the Holders of the Preferred Shares in accordance with the Paying and Transfer Agency Agreement, a dividend thereon or the redemption thereof, as applicable

If amounts distributable on any Payment Date as described under "Description of the Notes—Payments on the Notes; Priority of Distributions" are insufficient to pay the Base Servicing Fee or the Additional Servicing Fee, then the payment thereof will be deferred and will be payable with interest on subsequent Payment Dates as described herein.

The Servicer will have a senior lien on the Trust Estate with respect to its Base Servicing Fee and a junior lien on the Trust Estate with respect to its Additional Servicing Fee. The Servicer will receive reimbursement for certain expenses from the proceeds of the issuance of the Notes and the Preferred Shares. The Servicer will generally be responsible for its own expenses incurred in the course of performing its obligations under the Servicing Agreement, but may be reimbursed for certain expenses as provided in the Servicing Agreement. Generally, the Servicer will not be liable to the Issuer, the Trustee, the Holders of Notes or Preferred Shares for any loss incurred as a result of the actions taken or recommended by the Servicer under the Servicing Agreement or the Indenture, except by reason of acts constituting bad faith, willful misconduct, or gross negligence in the performance of its obligations thereunder. The Servicer will be entitled to indemnification by the Issuer under certain circumstances as described in the Servicing Agreement. In addition, the Servicer has entered into certain indemnification agreements with Bear Stearns Under certain circumstances the Servicer also may resign or be removed.

008438

Amendment to Servicing Agreement

The Servicing Agreement may not be amended (a) without satisfying the Rating Condition with respect to each Rating Agency or (b) if a Majority of the Controlling Class or a Majority of the Preferred Shares have objected in writing to such amendment or modification within 30 days of notice thereof.

Resignation of Servicer

Subject to the provisions for a successor Servicer discussed below, the Servicer may resign, upon 90 days' written notice to the Issuer (or such shorter notice as is acceptable to the Issuer).

Termination of Servicing Agreement

The Servicing Agreement will be terminated, and the Servicer will be removed, by the Issuer, if directed by a Majority of the Controlling Class of Notes or by at least 66 2/3% of the Holders of the Preferred Shares (excluding any Preferred Shares held by the Servicer or its Affiliates or any account for which the Servicer or its Affiliates have discretionary voting authority at the time of such vote), in each case for "cause" upon 10 days' prior written notice to the Servicer and upon written notice to the Noteholders and the Holders of the Preferred Shares as set forth below. For purposes of determining "cause" with respect to any such termination of the Servicing Agreement, such term shall mean any one of the following events:

(i)     the Servicer willfully breaches in any respect, or takes any action that it knows violates in any respect, any provision of the Servicing Agreement or any terms of the Indenture applicable to it;

(ii)     the Servicer breaches in any material respect any provision of the Servicing Agreement or any terms of the Indenture or the Collateral Administration Agreement applicable to it, or any representation, warranty, certification or statement given in writing by the Servicer shall prove to have been incorrect in any material respect when made or given, and the Servicer fails to cure such breach or take such action so that the facts (after giving effect to such action) conform in all material respects to such representation, warranty, certification or statement, in each case within 30 days of becoming aware of, or receiving notice from, the Trustee of, such breach or materially incorrect representation, warranty certification or statement;

(iii)     certain events of bankruptcy or insolvency occur with respect to the Servicer;

(iv)     the occurrence of any Event of Default under the Indenture that results from any breach by the Servicer of its duties under the Indenture or the Servicing Agreement, which breach or default is not cured within any applicable cure period; or

(v)     (x) the occurrence of an act by the Servicer related to its activities in any securities, servicing, financial advisory or other investment business that constitutes fraud, (y) the Servicer being indicted, or any of its principals being convicted, of a felony criminal offense related to its activities in any securities, servicing, financial advisory or other investment business or (z) the Servicer being indicted for, adjudged liable in a civil suit for, or convicted of a violation of the Securities Act or any other United States Federal securities law or any rules or regulations thereunder.

Successor Servicer

No removal, termination or resignation of the Servicer will be effective under the Servicing Agreement unless the Issuer appoints a successor Servicer:

I.  if the Class A-1LA Notes are Outstanding and (i) the sum of (A) the Aggregate Par Amount of Portfolio Collateral other than any Equity Portfolio Collateral and (B) the Market Value of all Equity Portfolio Collateral (as determined by the Servicer in a commercially reasonable manner), if any, is less than (ii) the sum of (A) the Aggregate Principal Amount of the Outstanding Notes other than the Class B-1L Notes plus any accrued and unpaid

008439

interest thereon and (B) 50% of the Aggregate Principal Amount of the Class B-1L Notes plus any accrued and unpaid interest thereon (a "**Preferred Share Event**"), then:

(a)    (A) at the written direction of a Majority of the Notes (excluding any Notes held by the retiring Servicer or any of its Affiliates and accounts over which the retiring Servicer or any of its Affiliates exercise discretionary voting authority other than HFP), (B) such successor has agreed in writing to assume all of the Servicer's duties and obligations pursuant to the Servicing Agreement and the Indenture and (C) such successor Servicer is not objected to within 30 days after notice of such succession by a Majority of the Controlling Class of Notes; or

(b)    if a Majority of the Notes (excluding any Notes held by the retiring Servicer or any of its Affiliates and accounts over which the retiring Servicer or any of its Affiliates exercise discretionary voting authority other than HFP) has nominated two or more successor Servicers that have been objected to pursuant to clause (a) above or has otherwise failed to appoint a successor Servicer that is not objected to pursuant to clause (C) under clause (a) above within 30 days of the date of notice of such removal, termination or resignation of the Servicer (or, if later, within 30 days of the last failure to successfully appoint a successor Servicer), then (A) at the direction of a Majority of the Controlling Class, (B) such successor has agreed in writing to assume all of the Servicer's duties and obligations pursuant to the Servicing Agreement and the Indenture and (C) such successor Servicer is not objected to within 30 days after notice of such succession by a Majority in Aggregate Outstanding Amount of the Notes (voting as a single Class (excluding any Notes held by the retiring Servicer or any of its Affiliates and accounts over which the retiring Portfolio or any of its Affiliates exercise discretionary voting authority, other than HFP));

II. if there is no Preferred Share Event in effect, then:

(a)    (A) at the written direction of a Majority of the Preferred Shares (excluding any Preferred Shares held by the retiring Servicer or any of its Affiliates and accounts over which the retiring Servicer or any of its Affiliates exercise discretionary voting authority other than HFP up to the Original HFP Share Amount), (B) such successor has agreed in writing to assume all of the Servicer's duties and obligations pursuant to the Servicing Agreement and the Indenture and (C) such successor Servicer is not objected to within 30 days after notice of such succession by any of (x) a Majority of the Controlling Class of Notes or (y) a Majority in Aggregate Outstanding Amount of the Notes (voting as a single Class (excluding any Notes held by the retiring Servicer or any of its Affiliates and accounts over which the retiring Portfolio or any of its Affiliates exercise discretionary voting authority, other than HFP)); or

(b)    if a Majority of the Preferred Shares (excluding any Preferred Shares held by the retiring Servicer or any of its Affiliates and accounts over which the retiring Servicer or any of its Affiliates exercise discretionary voting authority other than HFP) has nominated two or more successor Servicers that have been objected to pursuant to clause (a) above or has otherwise failed to appoint a successor Servicer that is not objected to pursuant to clause (C) of the preceding sentence within 30 days of the date of notice of such removal, termination or resignation of the Servicer (or, if later, within 30 days of the last failure to successfully appoint a successor Servicer), then a Majority of the Controlling Class may appoint a successor Servicer, which shall be the successor Servicer if, (A) such successor has agreed in writing to assume all of the Servicer's duties and obligations pursuant to the Servicing Agreement and the Indenture and (B) such successor Servicer is not objected to within 45 days after notice of such succession by either (x) the Majority of the Preferred Shares (excluding any Preferred Shares held by the retiring Servicer or any of its Affiliates and accounts over which the retiring Servicer or any of its Affiliates exercise discretionary voting authority other than HFP or any subsidiary of HFP) or (y) a Majority in Aggregate Outstanding Amount of the Notes (voting as a single Class (excluding any Notes held by the retiring Servicer or any of its Affiliates and accounts over which the retiring Portfolio or any of its Affiliates exercise discretionary voting authority, other than HFP up to the Original HFP Share Amount)).

If the Majority of the Controlling Class fails to appoint a successor Servicer pursuant to clause I(b) or clause II(b) above, or its appointee is objected to as therein provided, within 90 days of the date of notice of such removal, termination or resignation of the Servicer, the Majority of the Controlling Class may petition a court of competent authority to appoint a successor Servicer.

008440

In addition, any successor Servicer must be an established institution which (i) has demonstrated an ability to professionally and competently perform duties similar to those imposed upon the Servicer under the Servicing Agreement, (ii) is legally qualified and has the capacity to act as Servicer under the Servicing Agreement, as successor to the Servicer under the Servicing Agreement in the assumption of all of the responsibilities, duties and obligations of the Servicer under the Servicing Agreement and under the applicable terms of the Indenture, (iii) shall not cause the Issuer or the pool of Collateral to become required to register under the provisions of the Investment Company Act, (iv) shall perform its duties as Servicer under the Servicing Agreement and the Indenture without causing the Issuer or any Holder of Preferred Shares to become subject to tax in any jurisdiction where such successor Servicer is established as doing business and (v) each Rating Agency has confirmed that the appointment of such successor Servicer shall not cause its then-current rating of any Class of Notes to be reduced or withdrawn. No compensation payable to a successor from payments on the Collateral shall be greater than that paid to the Servicer without the prior written consent of a Majority of the Controlling Class of Notes, a Majority of the Notes (voting collectively) and a Majority of the Preferred Shares (voting collectively).

If there is no appointment of a successor Servicer within 90 days after the resignation or termination of the Servicer, any sales or disposition of Portfolio Collateral shall be limited to Credit Risk Portfolio Collateral, Defaulted Portfolio Collateral and Equity Portfolio Collateral; *provided that* such restriction on the sale or disposition of Portfolio Collateral shall not apply if the Portfolio Collateral is being liquidated in whole or in part in connection with an acceleration or early termination of the Notes.

Delegation

The Servicing Agreement, and any obligations or duties of the Servicer under the Servicing Agreement, cannot be delegated by the Servicer, in whole or in part, except to any entity that is both (i) controlled by any of James Dondero, Mark Okada and Todd Travers and (ii) one in which any of James Dondero, Mark Okada and Todd Travers is involved in the day to day management and operations (and in such case pursuant to an instrument of delegation in form and substance satisfactory to the Issuer), without the prior written consent of the Issuer, a Majority of the Controlling Class of Notes and a Majority of the Preferred Shares (excluding Preferred Shares held by the Servicer or any of its Affiliates), and, notwithstanding any such consent, no delegation of obligations or duties by the Servicer (including, without limitation, to an entity described above) shall relieve the Servicer from any liability under the Servicing Agreement.

## CERTAIN LEGAL MATTERS

The validity of the Notes and certain other legal matters, including certain matters relating to certain United States federal tax consequences of the ownership of the Notes, will be passed upon for the Issuer and the Initial Purchaser by Orrick, Herrington & Sutcliffe LLP, New York, New York. Certain legal matters will be passed upon for the Servicer by Orrick, Herrington & Sutcliffe LLP, Los Angeles, California. Certain legal matters relating to Cayman Islands law will be passed on for the Issuer by Maples and Calder. As to all matters of Cayman Islands law, Orrick, Herrington & Sutcliffe LLP will rely on the opinions of Maples and Calder.

008441

ANNEX A

## GLOSSARY OF CERTAIN DEFINED TERMS

Set forth below are definitions of certain defined terms used in this Confidential Offering Circular.

"Account Income":  Any interest or other earnings on funds in the Collection Account, the Initial Deposit Account, the Loan Funding Account or the Expense Reimbursement Account.

"Accounts":  The Collection Account, the Initial Deposit Account, the Loan Funding Account, the Expense Reimbursement Account, the Closing Expense Account, the Reserve Account, the Default Swap Collateral Account and the Default Swap  Issuer Account, as described in "Security for the Notes—Accounts."

"Accrued Interest on Sale":  Interest accrued on an item of Portfolio Collateral at the time of sale or other disposition to the extent paid to the Issuer as part of the sale or other disposition price of such item of Portfolio Collateral after deducting amounts representing Purchased Accrued Interest of such item of Portfolio Collateral.

"Additional Collateral Deposit Requirement":  As described under "Description of the Notes—Additional Collateral Deposit Requirement."

"Additional Fee Amount":  With respect to each Due Period, an amount equal to 0.35% per annum of the Quarterly Collateral Amount, calculated on the basis of a 360-day year and the actual number of days elapsed.

"Additional Issuance":  As defined under "Description of the Notes—Additional Issuance."

"Additional Portfolio Collateral":  Any Portfolio Collateral purchased with Collections (other than Collateral Disposition Proceeds) in accordance with the terms of the Indenture.

"Additional Preferred Shares":  Any additional Preferred Shares issued after the Closing Date as described in, and in accordance with the applicable terms of, the Indenture.

"Additional Servicing Fee":  For any Payment Date, an amount equal to the sum of (a) product of (i) the Additional Fee Amount for such Payment Date and (ii) the Servicing Fee Portion for such Payment Date plus (b) on any Payment Date that any part of the Base Servicing Fee was not paid on the preceding Payment Date, interest on such unpaid amount in an amount equal to the product of (i) LIBOR for the applicable period plus 3.0% per annum and (ii) the actual number of days in such Due Period, divided by 360 plus (c) on any Payment Date that any part of the Additional Servicing Fee was not paid on the preceding Payment Date, such unpaid Additional Servicing Fee and  interest thereon in an amount equal to the product of (i) LIBOR for the applicable period plus 3.0% per annum and (ii) the actual number of days in such Due Period divided by 360; *provided* that in the event that the Servicer is removed or resigns, the amount of such fee accrued to the effective date of such removal or resignation will be payable to the Servicer on the next succeeding Payment Date or Payment Dates on which such amount may be paid, in accordance with the Priority of Payments (provided that the payment of any fee payable pursuant to this proviso will be *pari passu* with the payment of any servicing fees to the then-current servicer).

"Adjusted Collateral Collections":  With respect to any Payment Date, the sum of (i) the Adjusted Collateral Interest Collections collected during the applicable Due Period, (ii) the Adjusted Collateral Principal Collections collected during the applicable Due Period and (iii) the available funds in the Expense Reimbursement Account, as each is determined as of the Calculation Date relating to such Payment Date.

"Adjusted Collateral Interest Collections":  As defined under "Description of the Notes—Payments on the Notes; Priority of Distributions—Adjusted Collateral Collections."

"Adjusted Collateral Principal Collections":  As defined under "Description of the Notes—Payments on the Notes; Priority of Distributions—Adjusted Collateral Collections."

008442

"Administration Agreement":  The Administration Agreement, dated as of May 10, 2006, between the Issuer and the Administrator.

"Administrator":  Maples Finance Limited, or any successor appointed by the Issuer.

"Affiliate": With respect to any specified Person, any other Person controlling or controlled by or under common control with such specified Person.  For the purposes of this definition, "control," when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing; *provided* that (for the avoidance of doubt) the only Affiliate of the Issuer shall be the Co-Issuer and the only Affiliate of the Co-Issuer shall be the Issuer.

"Aggregate Base Fees and Expenses": As defined under "Description of the Notes—Payments on the Notes; Priority of Distributions—Adjusted Collateral Collections."

"Aggregate Par Amount":  With respect to any date of determination, the Aggregate Principal Amount of the Portfolio Collateral in the Trust Estate, including cash and Eligible Investments representing Collateral Principal Collections on deposit in the Collection Account and the Initial Deposit Account.

"Aggregate Principal Amount":  With respect to any date of determination, when used with respect to the Portfolio Collateral, the aggregate Principal Balances of such items of Portfolio Collateral on such date of determination.  With respect to any date of determination, when used with respect to any Eligible Investments, the Balance of such Eligible Investments on such date of determination.  When used with respect to any Note or Class of Notes, as of any date of determination, the original principal amount of such Note or Class of Notes, as applicable, reduced by all prior payments, if any, made with respect to principal of such Notes, including Class X Principal Payments, in the case of the Class X Notes.  When used with respect to the Notes in the aggregate, the sum of the Aggregate Principal Amount of each Class of Outstanding Notes.

"Amendment Buy-Out":  As described under "Legal Structure—The Indenture; Amendment Buy-Out."

"Amendment Buy-Out Option":  As described under "Legal Structure—The Indenture; Amendment Buy-Out."

"Amendment Buy-Out Purchase Price":  Shall mean the price payable by the Amendment Buy-Out Purchaser for Notes or Preferred Shares purchased in an Amendment Buy-Out in an amount equal to (i) in the case of Notes, the Aggregate Principal Amount thereof, plus accrued and unpaid interest to the date of purchase payable to the Non-Consenting Holder (giving effect to all amounts paid to such Holder on such date) and plus any unpaid Extension Bonus Payment, and (ii) in the case of the Preferred Shares, an amount that, when taken together with all payments and distributions made in respect of such Preferred Shares since the Closing Date (and any amounts payable, if any to such Holder on the next succeeding Payment Date) would cause such Preferred Shares to have received (as of the date of purchase thereof) an Internal Rate of Return of 12.0% (assuming such date was a Payment Date under the Indenture); *provided that*, after the date on which any Holder of Preferred Shares has received an Internal Rate of Return equal to or in excess of 12.0%, the Amendment Buy-Out Purchase Price for such Preferred Shares shall be equal to zero.

"Amendment Buy-Out Purchaser": Shall mean the Servicer (or any of its affiliates acting as principal or agent); *provided that* in the event that the Servicer elects not to purchase Notes or Preferred Shares from Holders pursuant to the Amendment Buy-Out, "Amendment Buy-Out Purchaser" shall mean one or more qualifying purchasers (which may include the Initial Purchaser) or any of its affiliates acting as principal or agent) designated by the Servicer; *provided, howeve*r, none of the Servicer, the Initial Purchaser or any of their respective affiliates shall have any duty to act as an Amendment Buy-Out Purchaser.

"Amortization Period":  The period beginning on the day after the end of the Revolving Period and ending on the Payment Date upon which the Aggregate Principal Amount of the Notes is paid in full.

"<u>Applicable Periodic Rate</u>":  With respect to each Class of Notes and for each Periodic Interest Accrual Period as described under "Description of the Notes—Payments on the Notes; Priority of Distributions—General."

"<u>Applicable Percentage</u>":  Shall mean the lesser of the Moody's Priority Category Recovery Rate and the S&P Priority Category Recovery Rate applicable to such item of Portfolio Collateral, set forth in the Indenture.

"<u>Approved Pricing Service</u>":  Any pricing service (including any of its successors and assigns) listed as an Approved Pricing Service on a schedule to the Indenture or otherwise disclosed in writing by the Issuer to the Trustee and the Holders of the Notes and not objected to by the Requisite Noteholders within 15 days of such disclosure, *provided* that the Rating Condition has been satisfied with respect to any pricing service not included on the schedule to the Indenture.

"<u>Asset Backed Security</u>":  Any obligation that is either (i) a security that is primarily serviced by the cash flows of a discrete pool of receivables or other financial assets, either fixed or revolving, and that, by its terms converts into cash within a finite time period, *plus* any rights or other assets designed to assure the servicing or timely distribution of proceeds to the Holders thereof or (ii) an "asset-backed security" as such term may be defined from time to time in the "General Instructions to Form S-3 Registration Statement" promulgated under the Securities Act, including collateralized bond obligations and collateralized loan obligations.

"<u>Assignment</u>": An arrangement whereby a creditor assigns an interest in a loan to the Issuer.

"<u>Available Funds</u>":  With respect to any Payment Date, the amount of any positive balance in the Collection Account as of the Calculation Date relating to such Payment Date.

"<u>Average Life</u>":  As described under "Security for the Notes—Weighted Average Life Requirement."

"<u>Balance</u>":  On any date, with respect to cash or Eligible Investments in the Collection Account, the Initial Deposit Account, the Loan Funding Account or the Expense Reimbursement Account, the aggregate (i) face amount or current balance, as the case may be, of cash, demand deposits, time deposits, certificates of deposit, bankers' acceptances, federal funds and commercial bank money market accounts; (ii) outstanding principal amounts of interest-bearing government and corporate securities, and (iii) purchase price of non-interest-bearing government and corporate securities, commercial paper and repurchase obligations.

"<u>Base Fee Amount</u>": With respect to each Due Period, an amount equal to 0.20% per annum of the Quarterly Collateral Amount, calculated on the basis of a 360-day year and the actual number of days elapsed.

"<u>Base Servicing Fee</u>":  For any Payment Date, an amount equal to the product of (a) the Base Fee Amount for such Payment Date and (b) the Servicing Fee Portion for such Payment Date; *provided* that in the event that the Servicer is removed or resigns, the amount of such fee accrued to the effective date of such removal or resignation will be payable to the Servicer on the next succeeding Payment Date or Payment Dates on which such amount may be paid, in accordance with the Priority of Payments (provided that the payment of any fee payable pursuant to this proviso will be *pari passu* with the payment of any servicing fees to the then-current servicer).

"<u>B Rating Category</u>":  Having a Moody's Rating of "B1" or below or an S&P Rating of "B+" or below.

"<u>BB Rating Category</u>":  Having a Moody's Rating of "Ba1" or below or an S&P Rating of "BB+" or below.

"<u>Bear Stearns</u>":  Bear, Stearns & Co. Inc.

"<u>Benefit Plan Investor</u>":  As defined in United States Department of Labor Regulation Section 2510.3-101(f)(2).

"<u>Business Day</u>":  Any day that is not a Saturday, Sunday or other day on which commercial banking institutions in the City of New York, the state of New York, or in the city in which the Trustee's corporate trust office is located or, to the extent action is required  of a Paying Agent, including the Trustee, in the city of the place

of payment, are authorized or obligated by law or executive order to be closed. To the extent action is required of the Irish Paying Agent, Dublin, Ireland shall be considered in determining "Business Day" for purposes of determining when such Irish Paying Agent action is required.

"Calculation Agent": Initially, JPMorgan Chase Bank, National Association.

"Calculation Date": The last day of each Due Period.

"CCC/Caa Portfolio Collateral": Portfolio Collateral (excluding Defaulted Portfolio Collateral) that has a Moody's Rating below "B3" or an S&P Rating below "B-".

"CCC Rating Category": Having a Moody's Rating of "Caa1" or below or an S&P Rating of "CCC+" or below.

"Class": The Class X Notes, the Class A-1LA Notes, the Class A-1LB Notes, the Class A-2L Notes, the Class A-3L Notes, the Class A-4L Notes and the Class B-1L Notes, as the case may be.

"Class A Notes": The Class A-1LA Notes, the Class A-1LB Notes, the Class A-2L Notes, the Class A-3L Notes and the Class A-4L Notes.

"Class A Overcollateralization Percentage": The overcollateralization percentage applicable to the Notes set forth under "Description of the Notes—Overcollateralization Tests."

"Class A Overcollateralization Test": As described in "Description of the Notes—Overcollateralization Tests."

"Class A Overcollateralization Ratio": As described under "Description of the Notes—Overcollateralization Tests."

"Class A-1LA Notes": The U.S.$538,000,000 Class A-1LA Floating Rate Extendable Notes due August 2021.

"Class A-1LB Notes": The U.S.$96,000,000 Class A-1LB Floating Rate Extendable Notes due August 2021.

"Class A-2L Notes": The U.S.$76,000,000 Class A-2L Floating Rate Extendable Notes due August 2021.

"Class A-3L Notes": The U.S.$36,500,000 Class A-3L Floating Rate Extendable Notes due August 2021.

"Class A-4L Notes": The U.S.$10,000,000 Class A-4L Floating Rate Extendable Notes due August 2021.

"Class B-1L Notes": The U.S.$21,000,000 Class B-1L Floating Rate Extendable Notes due August 2021.

"Class B-1L Overcollateralization Percentage": The overcollateralization percentage applicable to the Class B-1L Notes set forth under "Description of the Notes—Overcollateralization Tests".

"Class B-1L Overcollateralization Ratio": As described under "Description of the Notes—Overcollateralization Tests".

"Class I Preferred Shares": The Class I Preferred Shares, par value $0.001 per share, issued by the Issuer; *provided* that any transfer of Class I Preferred Shares to HFP from any third party shall require the exchange and conversion of such Class I Preferred Shares into Class II Preferred Shares.

"Class II Preferred Shares": The Class II Preferred Shares, par value $0.001 per share, issued by the Issuer and held by HFP; *provided* that any transfer of Class II Preferred Shares by HFP to any third party shall require that

008445

such Class II Preferred Shares be redeemed by the Issuer and a corresponding amount of Class I Preferred Shares be issued to Investor Corp. which will in turn issue its preferred shares to such investor.

"Class II Preferred Share Additional Dividend":  For any Payment Date, an amount equal to the sum of (a) the product of (i) the Additional Fee Amount for such Payment Date and (ii) the Class II Preferred Share Portion for such Payment Date plus (b) on any Payment Date that any part of the Class II Preferred Share Base Dividend was not paid on the preceding Payment Date, interest on such unpaid amount in an amount equal to the product of (i) LIBOR for the applicable period and (ii) the actual number of days in such Due Period, divided by 360 plus (c) on any Payment Date that any part of the Class II Preferred Share Additional Dividend was not paid on the preceding Payment Date, such unpaid Class II Preferred Share Additional Dividend and interest thereon in an amount equal to the product of (i) LIBOR for the applicable period and (ii) the actual number of days in such Due Period divided by 360.

"Class II Preferred Share Base Dividend":  For any Payment Date, an amount equal to the product of (a) the Base Fee Amount for such Payment Date and (b) the Class II Preferred Share Portion for such Payment Date.

"Class II Preferred Share Dividend":  Class II Preferred Share Base Dividend, Class II Preferred Share Additional Dividend and Class II Preferred Share Supplemental Dividend.

"Class II Preferred Share Percentage":  For any Payment Date, a fraction, expressed as a percentage, the numerator of which is the number of Outstanding Class II Preferred Shares on the Calculation Date related to such Payment Date and the denominator of which is the total number of Outstanding Preferred Shares on such Calculation Date.

"Class II Preferred Share Portion":  For any Payment Date, 100% minus the Servicing Fee Portion for such Payment Date.

"Class II Preferred Share Supplemental Dividend":  For any Payment Date, an amount equal to the product of (a) the Supplemental Fee Amount for such Payment Date and (b) the Class II Preferred Share Portion for such Payment Date.

"Class X Interest Payment":  The Periodic Interest Amount with respect to the Class X Notes.

"Class X Notes":  The U.S.$14,000,000 Class X Floating Rate Notes Due August 2013.

"Class X Payment":  With respect to each Payment Date; the Class X Interest Payment and the Class X Principal Payment; *provided*, such amount may be reduced in connection with a redemption of the Class X Notes, as set forth in the Indenture.

"Class X Principal Payment":  With respect to the Class X Notes and any Payment Date, beginning on the November 1, 2007 Payment Date, in accordance with the amortization schedule provided in the Indenture.

"Class X Shortfall Amount":  With respect to the Class X Notes and any Payment Date, any shortfall or shortfalls in the payment of the Class X Payment with respect to any preceding Payment Date or Payment Dates together with interest accrued thereon at the Periodic Interest Rate relating to the Class X Notes (net of all Class X Shortfall Amounts, if any, paid with respect to the Class X Notes prior to such Payment Date).

"Clearstream":  Clearstream Banking, société anonyme.

"Closing Date":  May 10, 2006.

"Closing Expense Account":  An account maintained by the Issuer with the Trustee into which an amount necessary to pay closing expenses will be deposited on the Closing Date.

A-5

008446

"CLO Security":   A U.S. dollar-denominated collateralized loan obligation or a similar obligation that entitles the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the CLO Securities) on the credit exposure to, or cash flow from, a portfolio of collateral of which at least 75% consists of commercial loans (including eligible synthetic securities whose reference obligations consist of commercial loans); *provided* that not more than 25% of the Aggregate Principal Amount of any CLO Security may be comprised of Synthetic Securities; and *provided* further that each CLO Security must have a public or an estimated rating from each of the Rating Agencies.

"Code":  The United States Internal Revenue Code of 1986, as amended from time to time.

"Co-Issuer": Rockwall CDO (Delaware) Corp., a Delaware corporation.

"Co-Issuers":  The Issuer and the Co-Issuer.

"Collateral":  All money, instruments and other property and rights subject or intended to be subject to the lien of the Indenture including all proceeds thereof, including the Portfolio Collateral, the Collection Account, the Initial Deposit Account, the Reserve Account, the Expense Reimbursement Account, the Loan Funding Account, the Closing Expense Account, the Default Swap Collateral Account (subject to the rights of the related Default Swap Counterparty) and the Default Swap Issuer Account (subject to the rights of the related Default Swap Counterparty).

"Collateral Disposition Proceeds": All proceeds (including, to the extent so determined by the Servicer, any payments received in connection with a consent or similar solicitation and including amounts received in connection with an item of Defaulted Portfolio Collateral up to an amount equal to, in the aggregate, the Principal Balance of such item of Defaulted Portfolio Collateral) received during a Due Period from the sale or other disposition of any Portfolio Collateral included in the Trust Estate, net of any reasonable amounts expended by the Trustee in connection with such sale or other disposition (including without limitation disposition proceeds from liquidation of the Trust Estate).  Accrued interest may be treated as Collateral Disposition Proceeds (y) to the extent necessary to pay for the principal amount of or accrued interest on Substitute Portfolio Collateral if the item of sold Portfolio Collateral paid interest before, and in the same Due Period as, the date of sale or (z) to the extent such amounts are Purchased Accrued Interest treated as Collateral Principal Collections hereunder.  Amounts received with respect to Equity Portfolio Collateral or in connection with a consent or similar solicitation shall be treated as Collateral Interest Collections to the extent such proceeds are in excess of the Principal Balance (determined immediately prior to such Portfolio Collateral becoming Equity Portfolio Collateral) of the Portfolio Collateral disposed of.

"Collateral Interest Collections":  With respect to any Payment Date, the sum of (i) all payments of interest with respect to any Portfolio Collateral (excluding accrued interest classified as Collateral Disposition Proceeds but including any other receipts of accrued interest (including Accrued Interest on Sale) and, to the extent so determined by the Servicer, any payments (other than principal) received pursuant to a consent or similar solicitation, fees received in connection with an amendment (but only to the extent such amendment does not result in diminishing the principal money terms of such item of Portfolio Collateral) and including any commitment, standby or similar fees with respect to the unfunded portion of the Issuer's commitment to make or otherwise fund advances with respect to a Delayed Drawdown Loan or a Revolving Loan which are received during the applicable Due Period, less any Retained Accrued Interest, (ii) the Account Income, if any, in the Collection Account, the Initial Deposit Account and the Loan Funding Account which is received during the applicable Due Period, as each is determined as of the Calculation Date relating to such Payment Date (including, without limitation, Account Income on funds on deposit in the Initial Deposit Account transferred to the Collection Account on the Effective Date pursuant to the Indenture), (iii) any amount transferred from the Initial Deposit Account at the discretion of the Servicer as described under "Security for the Notes—Accounts" and (iv) income on Eligible Investments in and/or the securities credited to the Default Swap Collateral Account (to the extent the Issuer is entitled to receive such income pursuant to the Indenture).

"Collateral LIBOR": With respect to any item of Portfolio Collateral, the London interbank offered rate for U.S. dollar deposits as set forth in the applicable Underlying Instrument.

"Collateral Principal Collections": With respect to any Payment Date, all payments of any principal with respect to any Portfolio Collateral including (i) any remaining Deposit (other than Account Income thereon and

008447

amounts described in clause (iii) of the definition of "Collateral Interest Collections" herein) not applied to purchase Original Portfolio Collateral or to effect an Initial Deposit Redemption, (ii) any payment of Premium, (iii) to the extent so determined by the Servicer, including any payments received in connection with a consent or similar solicitation, fees received in connection with an amendment and including principal received in connection with or any payments received with respect to an item of Credit Risk Portfolio Collateral in connection with a consent or similar solicitation, (iv) all proceeds received from the sale of any warrant (whether sold as part of a Unit or separately), (v) any Collateral Disposition Proceeds which are received during the applicable Due Period, as determined as of the Calculation Date relating to such Payment Date, (vi) amounts representing Purchased Accrued Interest, (vii) amounts transferred from the Loan Funding Account upon the sale or disposition of Delayed Drawdown Loans or Revolving Loans or upon the expiration of a drawdown period or revolving period. Collateral Principal Collections shall include any other amounts not included in Collateral Interest Collections or Adjusted Collateral Interest Collections, including any payments received with respect to an item of Defaulted Portfolio Collateral up to, in the aggregate, the Principal Balance of such item of Defaulted Portfolio Collateral, (viii) funds (other than income thereon) transferred from a Default Swap Collateral Account to the Collection Account, (ix) any amounts received by the Issuer that do not qualify as Collateral Interest Collections (other than those standing to the credit of any Default Swap Collateral Account or Default Swap Issuer Account) and (x) on or after the Effective Date, any funds in the Initial Deposit Account not considered Collateral Interest Collections). Notwithstanding the foregoing, Collateral Principal Collections shall include (A) any other amounts not included in Collateral Interest Collections or Adjusted Collateral Interest Collections, (B) any payments received with respect to an item of Defaulted Portfolio Collateral up to, in the aggregate, the Principal Balance of such item of Defaulted Portfolio Collateral and (C) any amounts recharacterized as Collateral Principal Collections in connection with any distribution of Payment Date Equity Securities.

"Collateral Quality Formula": As such term is defined in the Indenture.

"Collateral Quality Matrix": As described under "Security for the Notes—Criteria for Purchase and Substitution of Collateral—Collateral Quality Matrix Tests."

"Collection Account": The account established with the Trustee for use in connection with the collection and disbursement of Collections.

"Collections": With respect to any Payment Date, the sum of (i) the Collateral Interest Collections collected during the applicable Due Period and (ii) the Collateral Principal Collections collected during the applicable Due Period, as each is determined as of the Calculation Date relating to such Payment Date.

"Controlling Class": Shall mean the Class A-1LA Notes and the Class X Notes, so long as any Class A-1LA Notes or Class X Notes are Outstanding, then the Class A-1LB Notes, so long as any Class A-1LB Notes are Outstanding, then the Class A-2L Notes, so long as any Class A-2L Notes are Outstanding, then the Class A-3L Notes, so long as any Class A-3L Notes are Outstanding, then the Class A-4L Notes, as long as any Class A-4L Notes are Outstanding, then the Class B-1L Notes, so long as any Class B-1L Notes are Outstanding.

"Coupon Adjustment": A proportional reduction of the required Weighted Average Coupon of the Fixed Rate Collateral or the required Weighted Average Margin of the Floating Rate Collateral, as determined in accordance with the Indenture, to the extent that either the actual Weighted Average Margin of the Floating Rate Collateral or the actual Weighted Average Coupon of the Fixed Rate Collateral, respectively, exceeds the required amount specified in the Indenture, in each case without regard to any Coupon Adjustment.

"Credit Event": As defined under "Special Considerations—Nature of Collateral Pledged to Secure the Notes; Ability to Obtain Additional Portfolio Collateral; Availability of Funds for Subordinate Payments."

"Credit Improved Criteria": Shall mean with respect to any item of Portfolio Collateral, in the Servicer's reasonable judgment, such item of Portfolio Collateral has significantly improved in credit quality, and:

(a)      Moody's, S&P or Fitch has placed such item of Portfolio Collateral or any other class of security issued together with such item of Portfolio Collateral (or, if such item of Portfolio Collateral is not rated, the issuer

008448

thereof) on its credit watch list (or similar list) with the potential for developing positive credit implications since the date the Issuer first acquired such item of Portfolio Collateral (and for so long as such item of Portfolio Collateral or issuer, as applicable, remains on such list) or there has been an upgrade in the rating of such item of Portfolio Collateral, issuer or other class of security issued together with such item of Portfolio Collateral, as applicable, by Moody's, S&P or Fitch by one or more subcategories from the rating of such item of Portfolio Collateral or issuer, as applicable, by Moody's, S&P or Fitch, as applicable, in effect on the date the Issuer first acquired such item of Portfolio Collateral;

(b)      with respect to a Portfolio Loan, since the date on which such Portfolio Loan was first acquired by the Issuer, has increased in price to 101.5% or more of its original purchase price or the spread of which over the related reference rate has been reduced, in each case, in accordance with its Underlying Instruments since the date on which such item of Portfolio Collateral was first acquired by the Issuer by 0.25% or more (in the case of an item of Portfolio Collateral with a spread over the related reference rate less than or equal to 2.00% at the time such item of Portfolio Collateral was first acquired by the Issuer) or 0.50% or more (in the case of an item of Portfolio Collateral with a spread over the related reference rate greater than 2.00% at the time such item of Portfolio Collateral was first acquired by the Issuer) for reasons primarily due to an improvement in the related borrower's financial ratios or financial results and not as a result of general market conditions; or

(c)      with respect to any item of Portfolio Collateral which is not a Portfolio Loan, an increase in the market price (expressed as a percentage of par value) since the date of purchase of such item of Portfolio Collateral which, compared to the change in the average market price of a representative sample (as determined by the Servicer) of other debt securities with similar terms and credit characteristics and that would be eligible to be pledged as Portfolio Collateral, is greater than 3.00% of the par value or more relative to such representative sample; or a decrease since the date of purchase of such item of Portfolio Collateral of more than 10.0% in the difference between the yield to worst call on such item of Portfolio Collateral compared to the yield on the relevant United States Treasury security;

*provided, however*, that the criteria in (b) and (c) above may be used only as corroboration of other bases for the Servicer's Judgment.

"Credit Improved Portfolio Collateral":  Any item of Portfolio Collateral which, (a) in the Servicer's commercially reasonable judgment consistent with the standard of care set forth in the Servicing Agreement (*provided*, that in forming such judgment a decrease in credit spread or an increase in Market Value of such item of Portfolio Collateral may only by utilized as corroboration of other bases of such judgment), has improved in credit quality or otherwise satisfies the Credit Improved Criteria or (b) is sold pursuant to a Credit Improvement Exchange; *provided* that the Aggregate Principal Amount of any such Portfolio Collateral sold pursuant to clause (b) shall not exceed, during any twelve-month period, 20% (or such lower amount as determined by the Servicer) of the Aggregate Par Amount as of the first day of such period.

"Credit Protection Payment":  As defined under "Special Considerations—Nature of Collateral Pledged to Secure the Notes; Ability to Obtain Additional Portfolio Collateral; Availability of Funds for Subordinate Payments.

"Credit Risk Criteria": Shall mean with respect to any item of Portfolio Collateral:

(a)      Moody's, Fitch or S&P has placed such item of Portfolio Collateral or any other class of security issued together with such item of Portfolio Collateral (or, if such item of Portfolio Collateral is not rated, the issuer thereof) on its credit watch list with the potential for developing negative credit implications (or similar list) since the date the Issuer first acquired such item of Portfolio Collateral (and for so long as such item of Portfolio Collateral or issuer, as applicable, remains on such list) or there has been a reduction in the rating of such item of Portfolio Collateral, issuer or other class of security issued together with such item of Portfolio Collateral, as applicable, by Moody's, Fitch or S&P, as applicable, by one or more subcategories from the rating of such item of Portfolio Collateral or issuer, as applicable, by Moody's, Fitch or S&P, as applicable, in effect on the date the Issuer first acquired such item of Portfolio Collateral;

(b)      which is a Portfolio Loan, the spread over the applicable reference rate has been increased in accordance with the related Underlying Instruments since the date on which such Portfolio Loan was first acquired by the Issuer by 0.50% or more (in the case of a Portfolio Loan with a spread over the applicable reference rate at the time such Portfolio Loan was first acquired by the Issuer less than or equal to 2.00%) or 0.75% or more (in the case of a Portfolio Loan with a spread over the applicable reference rate at the time such Portfolio Loan was first acquired by the Issuer greater than 2.00%) primarily due to a deterioration in the related borrower's financial ratios or financial results and not as a result of general market conditions; provided, however, that the criteria in this paragraph (b) may be used only as corroboration of other bases for the Servicer's judgment;

(c)      which is a CLO Security, a decline in the par amount of underlying collateral such that the aggregate par amount of the entire class of securities to which such item of Portfolio Collateral belongs and all other securities secured by the same pool of collateral and that rank senior in priority of payment to such class of securities exceeds the aggregate par amount of all collateral (excluding defaulted collateral) securing such securities; or

(d) it is a Deferred Interest PIK Bond or a partial Deferred Interest PIK Bond.

"Credit Risk Portfolio Collateral": Any item of Portfolio Collateral (other than an item of Defaulted Portfolio Collateral) which, in the Servicer's commercially reasonable judgment consistent with the standard of care set forth in the Servicing Agreement (which judgment shall not be questioned as a result of subsequent events; *provided* that in forming such judgment an increase in credit spread or a decrease in Market Value of such item of Portfolio Collateral may only be initialized as corroboration of other bases of such judgment), (i) is likely to decline in credit quality and, with the passage of time, become Defaulted Portfolio Collateral and (ii) if a Sales Restriction Condition has occurred, otherwise satisfies the Credit Risk Criteria.

"Cumulative Class X Payment":  With respect to any Payment Date and the Class X Notes, the Class X Payment with respect to such Payment Date and the Class X Shortfall Amount, if any, with respect to such Payment Date.

"Cumulative Interest Amount":  With respect to a Payment Date and a Class of Notes, the applicable Periodic Interest Amount with respect to such Payment Date and the applicable Periodic Rate Shortfall Amount, if any, with respect to such Payment Date.

"Current Pay Obligation":  An item of Portfolio Collateral that would otherwise be an item of Defaulted Portfolio Collateral but as to which (i) no interest payments (including deferred interest) or scheduled principal payments are due and payable that are unpaid and the Servicer reasonably expects that the issuer or obligor of such item of Portfolio Collateral will continue to make scheduled payments in cash of interest or principal thereon and will pay the principal thereof by maturity, (ii) if the issuer or obligor of such item of Portfolio Collateral is subject to a bankruptcy proceeding, a bankruptcy court has authorized the payment of interest due and payable on such item of Portfolio Collateral, and (iii) either (a) the Market Value of such item of Portfolio Collateral is equal to or greater than 80% of par and the Moody's Rating of such item of Portfolio Collateral is at least "Caa1" or (b) the Market Value of such item of Portfolio Collateral is equal to or greater than 85% of par and the Moody's Rating of such item of Portfolio Collateral is at least "Caa2" (or, if the Moody's Rating has been withdrawn, the Moody's Rating of such item of Portfolio Collateral was at least "Caa2" prior to withdrawal) or (c) if the Moody's Rating of such item of Portfolio Collateral is less than "Caa2" or is "Caa2" and on credit watch with negative implications, but greater than or equal to "Caa3" without credit watch with negative implications, the Market Value of the such item of Portfolio Collateral is at least equal to 90% of its Principal Balance; provided that if the Moody's Rating of the item of Portfolio Collateral has been withdrawn but the obligation had a Moody's rating of at least "Caa3" without credit watch with negative implications at the time of default, such item of Portfolio Collateral may be treated as a Current Pay Obligation if its Market Value is at least equal to 90% of its Principal Balance.

"Current Portfolio":  As described under "Security for the Notes—S&P CDO Monitor Test."

"Debt Security": Each Structured Finance Investment and interests in corporate and other debt securities (including senior secured rate floating notes) included in the Portfolio Collateral (other than Eligible Investments,

008450

CLO Securities and Portfolio Loans) and, for the avoidance of doubt, Portfolio Loans shall not be considered Debt Securities.

"Default":  Any event or condition the occurrence or existence of which would, with the giving of notice or lapse of time or both become, an Event of Default.

"Defaulted Portfolio Collateral": Any item of Portfolio Collateral (other than an item of Portfolio Collateral which is a DIP Loan, unless such item of Portfolio Collateral itself is in default since acquisition), including with respect to a Synthetic Security, the related Reference Obligation, with respect to which:

(i) the issuer thereof has defaulted in the payment of principal or interest (in respect of Portfolio Loans only, beyond five Business Days, *provided* the Servicer certifies in writing to the Trustee that it believes, in its reasonable business judgment, that such delay is not credit related), unless, in the case of a failure of such issuer to make required interest payments, such issuer has resumed current cash payments of interest and paid in full any accrued interest due and payable thereon;

(ii) such item of Portfolio Collateral is *pari passu* with or subordinated to other material indebtedness for borrowed money owing by the issuer thereof ("Other Indebtedness") and such issuer has defaulted in the payment of principal or interest (beyond any applicable grace or notice period and without regard to any waiver of such default) on such Other Indebtedness, unless, in the case of a failure of such issuer to make required interest payments, such issuer has resumed current cash payments of interest and has paid in full any accrued interest due and payable thereon;

(iii) certain bankruptcy or insolvency events have occurred;

(iv) the Servicer has knowledge (or such rating information has been published) that the issuer thereof is rated "D" or "SD" (or S&P has withdrawn its rating which prior to such withdrawal was rated "D" or "SD");

(v) there has been proposed or effected any distressed exchange or other distressed debt restructuring where the issuer of such Portfolio Collateral has offered the debt holders a new security or package of securities that, in the commercially reasonable judgment of the Servicer amounts to a diminished financial obligation;

(vi) such item of Portfolio Collateral is declared to be an item of Defaulted Portfolio Collateral by the Servicer, but only so long as it remains so designated by the Servicer in its sole discretion; or

(vii) such item of Portfolio Collateral is a CLO Security which is rated "CC" or below by S&P (or S&P has withdrawn its rating which prior to such withdrawal was rated "CC"), or rated "C" or "Ca" or below by Moody's;

*provided* that any item of Portfolio Collateral that is classified as an item of "Defaulted Portfolio Collateral" will cease to be so classified if such item of Portfolio Collateral, at any date thereafter, (a) would not otherwise be classified as an item of Defaulted Portfolio Collateral in accordance with the definition of such term and (b) otherwise meets the collateral criteria described herein as of such date.

"Default Swap":  Any U.S. dollar denominated "pay as you go" credit default swap or total return swap with respect to a Reference Obligation, which the Issuer (directly or indirectly) purchased from or entered into with a Default Swap Counterparty, which contains equivalent probability of default, recovery upon default (or a specific percentage thereof), expected loss, maturity, interest rate and other non-credit characteristics as those of the related Reference Obligation (without taking account of such considerations as they relate to the Default Swap Counterparty); *provided that* (i) the Reference Obligation is a CLO Security, (ii) such Default Swap will not cause the Issuer to be treated as engaged in a trade or business in the United States for U.S. Federal income tax purposes or otherwise subject the Issuer to U.S. Federal income tax on a net income tax basis, (iii) either (a) amounts receivable by the Issuer are not expected to (based on the Servicer's determination, which may include consultation with counsel to the Issuer) be subject to U.S. or foreign withholding tax in respect of the Default Swap or (b) the Default Swap Counterparty is required to make "gross-up" payments pursuant to the related Underlying Instruments that cover the full amount of any such withholding tax on an after-tax basis (including any tax on such additional

008451

payments), (iv) the Issuer has caused to be deposited in a Default Swap Collateral Account an amount in cash at least equal to the aggregate of (or the amount required under the terms of the Synthetic Security to provide for) all further payments (contingent or otherwise) that the Issuer is or may be required to make to the Default Swap Counterparty under the Default Swap; (v) the agreement relating to such Default Swap contains "non-petition" provisions with respect to the Issuer and "limited recourse" provisions limiting the Default Swap Counterparty's rights in respect of the Default Swap Collateral to the funds and other property credited to the Default Swap Collateral Account related to such Default Swap; (vi) the notional amount of such Default Swap is equal to the principal amount of the Reference Obligation; (vii) the agreement relating to such Default Swap Collateral contains provisions to the effect that upon the occurrence of an "Event of Default" or "Termination Event" (other than an "Illegality" or "Tax Event"), if any, where the Default Swap Counterparty is the sole "Defaulting Party" or the sole "Affected Party" ("Event of Default," "Termination Event," "Illegality," "Tax Event," "Defaulting Party" or "Affected Party," as applicable, as such terms are defined in the ISDA Master Agreement relating to such Default Swap), (a) the Issuer may terminate its obligations under such Default Swap and upon such termination and payment of any termination amount payable under the Default Swap, any lien in favor of the Default Swap Counterparty over its related Default Swap Collateral Account will be terminated and (b) upon payment of any termination amount payable under the Default Swap, the Issuer will no longer be obligated to make any payments to the Default Swap Counterparty with respect to such Default Swap, (viii) any Default Swap shall be positively indexed to the related Reference Obligation on no more than a one-to-one basis, (ix) if any Reference Obligation delivered pursuant to any Default Swap does not constitute Portfolio Collateral and it would cause any collateral quality test or concentration limitation not to be satisfied, such Reference Obligation shall be deemed Equity Portfolio Collateral, and (x) (a) such Default Swap shall be documented with a standard ISDA form master agreement, as modified by appropriate schedules and confirmations and (b) (1) such Default Swap is a Form-Approved Synthetic Security or (2) the Rating Condition has been satisfied with respect to the purchase of or entry into such Default Swap.

"Default Swap Collateral": Means cash, securities or other collateral purchased or posted by the Issuer for the benefit of the Default Swap Counterparty in connection with the purchase of a Default Swap, including without limitation a payment of cash or delivery of securities by the Issuer.

"Default Swap Collateral Account": The account established by the Trustee under the Indenture with respect to Default Swap Collateral, which account will be held in the name of the Trustee in trust for the benefit of the related Default Swap Counterparty.

"Default Swap Counterparty": Any entity, whose long term senior unsecured debt or derivatives counterparty rating shall be at least "A2" by Moody's and a long term rating of at least "A" or a short term rating of at least "A-1" by S&P, required to make payments on Synthetic Portfolio Collateral pursuant to the terms of such Default Swap or any guarantee thereof to the extent that a Reference Obligor makes payments on a related Reference Obligation.

"Default Swap Counterparty Termination Payment": An amount payable by the Issuer to a Default Swap Counterparty that is due following the designation of an "Early Termination Date" (as defined in the related credit default swap) (other than in respect of "Illegality" or a "Tax Event" (each as defined in the related credit default swap)), as to which the Default Swap Counterparty is the sole "Defaulting Party" or the sole "Affected Party" (as each such term is defined in the ISDA Master Agreement related to such Synthetic Security).

"Default Swap Issuer Account": The account established by the Trustee under the Indenture with respect to any Synthetic Security if the terms of such Default Swap require the Default Swap Counterparty to secure its obligations with respect to such Default Swap, which account will be held in the name of the Trustee in trust for the benefit of the Noteholders and the other secured parties under the Indenture.

"Deferred Interest PIK Bond": As of any date of determination, any PIK Bond that is not an item of Defaulted Portfolio Collateral that has, in accordance with its terms, deferred or paid "in-kind" any amount of interest for a period equal to:

(a)    in the case of an item of Portfolio Collateral that has a Moody's Rating below "Baa3" (or, if rated "Baa3," is on credit watch for possible downgrade) or, if rated by S&P, a rating by S&P below "BBB-" (or, if rated "BBB-," is on credit watch for possible downgrade), the shorter of one accrual period or six months; and

(b)      in all other cases, the shorter of two accrual periods or twelve months;

and has not, as of such date of determination, resumed timely payment of current interest in cash and repaid all outstanding deferred or capitalized interest in cash. For the avoidance of doubt, an item of Portfolio Collateral will not constitute a Deferred Interest PIK Bond if it resumes timely payment of current interest in cash and repays all outstanding deferred or capitalized interest in cash on the Payment Date immediately succeeding the end of the interest accrual period(s) set forth above.

"Definitive Notes": With respect to any Class, the definitive fully registered Notes of each Class sold in the United States to Qualified Institutional Buyers who are U.S. Persons or issued in lieu of a Regulation S Global Note under the circumstances described herein.

"Delayed Drawdown Loan": A Portfolio Loan that, pursuant to the related Underlying Instrument or Underlying Loan and Security Agreement and lender or lenders, would obligate the Issuer, if the Issuer were to become a lender thereunder by purchasing such Portfolio Loan for inclusion in the Trust Estate, to make or otherwise fund one or more future advances to the related borrower and meeting the criteria described under "Security for the Notes—Criteria for Purchase and Substitution of Collateral"; provided that, if a Delayed Drawdown Loan has been drawn in full and there are no future advance obligations to the related borrower, such Portfolio Loan will no longer be considered a Delayed Drawdown Loan.

"Deposit": The cash deposited in the Initial Deposit Account on the Closing Date, including any reimbursement for amounts withdrawn therefrom as described under "Security for the Notes—Accounts" (excluding any Account Income thereon), which amount shall include certain amounts related to interest received on Portfolio Collateral as specified in the Indenture.

"DIP Loan": Any interest in a loan or financing facility (a) which at the time of purchase is an obligation of a debtor-in-possession pursuant to Section 364 of United States the Bankruptcy Code, (b) the terms of which have been approved by an order of a United States Bankruptcy Court, a United States District Court, or any other court of competent jurisdiction, the enforceability of which order is not subject to any pending contested matter or proceeding (as such terms are defined in the Federal Rules of Bankruptcy Procedure), (c) which has the priority allowed by either Section 364(c) or 364(d) of the Bankruptcy Code, (d) which pays interest in cash on a current basis and (e) as to which the obligor has paid its most recent scheduled interest and principal payments (if any) and the Servicer reasonably expects that such obligor will continue to pay interest and principal payments. For purposes hereof, a DIP Loan shall not be considered a Current Pay Obligation. Any DIP Loan added as an item of Portfolio Collateral must be assigned a formal or estimated rating by each of the Rating Agencies.

"Discount Portfolio Collateral": (a) Any Portfolio Loan which had a Moody's Rating of at least "B3" at the time of purchase and which was purchased at a price less than 85% of the Principal Balance thereof, (b) any Portfolio Loan which had a Moody's Rating below "B3" at the time of purchase and which was purchased at a price less than 90% of the Principal Balance thereof, (c) any item of Portfolio Collateral which is not a Portfolio Loan and which had a Moody's Rating of at least "B3" at the time of purchase and which was purchased at a price less than 80% of the Principal Balance thereof, (d) any item of Portfolio Collateral which is not a Portfolio Loan and which had a Moody's Rating below "B3" at the time of purchase and which was purchased at a price less than 85% of the Principal Balance thereof and (e) any CLO Security which had a Moody's Rating of "Aa3" or greater at the time of purchase or originally rated "Aa3" or greater by Moody's which was purchased at a price less than 92% of the Principal Balance thereof and the provisions outlined herein will not be applicable to these CLO Securities with a Moody's Rating of at least "Aa3"; provided that, (i) any item of Portfolio Collateral that would otherwise be considered Discount Portfolio Collateral, but that has a Market Value above 90% of its Principal Balance for 22 consecutive Business Days if it is a Portfolio Loan or above 85% of its Principal Balance for 60 consecutive days if it is a CLO Security, after being purchased by the Issuer, will no longer be considered Discount Portfolio Collateral and (ii) any item of Portfolio Collateral that would otherwise be considered Discount Portfolio Collateral, but that is purchased with the proceeds of sale of an item of Portfolio Collateral that was not an item of Discount Portfolio Collateral at the time of its purchase, so long as such item of Portfolio Collateral (a) was purchased or committed to be purchased within five Business Days of such sale, (b) was purchased at a price (as a percentage of par) equal to or greater than the sale price of the sold item of Portfolio Collateral, (c) was purchased at a purchase price not less than 65% of the Principal Balance thereof and (d) had a rating equal to or greater than the rating of the sold item of

008453

Portfolio Collateral, will not be considered Discount Portfolio Collateral. Notwithstanding the foregoing, at no time during the period commencing on the Closing Date through the Final Maturity Date, shall the Aggregate Principal Amount of all items of Discount Portfolio Collateral purchased pursuant to clause (ii) exceed in the aggregate 10% of the Required Portfolio Collateral Amount; *provided* that no more than 3% of the Required Portfolio Collateral Amount of such 10% cumulative limitation may consist of CLO Securities; *provided* that if a Portfolio Loan purchased pursuant to clause (ii) above is repaid in full, is sold for a price equal to at least 97.5% of its unpaid Principal Balance or has a Market Value above 90% of its Principal Balance for at least 22 consecutive Business Days after being purchased, such Portfolio Loan shall not be taken into account for purposes of clause (ii) above; *provided* further that, as of any date of determination, the Aggregate Principal Amount of items of Portfolio Collateral in the Trust Estate purchased pursuant to clause (ii) above, may not exceed (x) 5% of the Aggregate Par Amount or (y) if the weighted average purchase price of Portfolio Collateral purchased pursuant to clause (b) above is less than 75% as of such date of determination, 2.5% of the Aggregate Par Amount.

"Distributable Equity Securities": Any and all Equity Portfolio Collateral, which cannot be sold by the Servicer as a result of the regulatory, market or other restrictions, as determined in good faith by the Servicer, and shall have the value as determined by an independent third party with relevant experience in making such valuation.

"DTC": The Depository Trust Company or any successor thereto.

"Due Period": With respect to any Payment Date, the period beginning on the day following the last day of the immediately preceding Due Period (or, in the case of the Due Period that is applicable to the first Payment Date beginning on the Closing Date) and ending at the close of business on the seventh Business Day preceding such Payment Date.

"Effective Date": The earlier of (i) the first date on which the Deposit has been applied to the purchase (or committed to the purchase), of Original Portfolio Collateral such that the Aggregate Principal Amount of the Portfolio Collateral (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to any of the Original Portfolio Collateral on or before the Effective Date) is at least equal to the Required Portfolio Collateral Amount or (ii) September 10, 2006.

"Eligible Investments": Any U.S. dollar denominated investment that is one or more of the following (including security entitlements thereto):

(a) direct registered obligations of, and registered obligations fully guaranteed by, the United States of America or any agency or instrumentality of the United States of America the obligations of which are backed by the full faith and credit of the United States of America or United States Security Entitlements (as defined in the Indenture) other than obligations or security entitlements of the Federal Home Loan Mortgage Corporation; *provided, however,* that, in the case of obligations or United States Security Entitlements that are rated, each such obligation shall, at the time of its inclusion in the Trust Estate, have a credit rating of "AA-" or better or "A-1+" or better, as applicable, by S&P (except that Eligible Investments in an amount up to 20% of the Aggregate Principal Amount of the Notes Outstanding may be rated "A-1") and "Aa3" or better (if such obligation has a long-term rating) or "P-1" or better by Moody's, and, in each case, is not put on credit watch (with negative implications);

(b) demand and time deposits in, trust accounts with, and certificates of deposit of, any depository institution or trust company (including the Trustee) incorporated under the laws of the United States of America or any state thereof and subject to the supervision and examination by federal and/or state banking authorities so long as the commercial paper and/or debt obligations of such depository institution or trust company (or, in the case of the principal depository institution in a holding company system, the commercial paper or debt obligations of such holding company) at the time of purchase or contractual commitment providing for such purchase have a credit rating of "AA-" or better, in the case of debt obligations, or "A-1+" or better, in the case of commercial paper, by S&P (except that Eligible Investments in an amount up to 20% of the Aggregate Principal Amount of the Notes Outstanding may be

008454

rated "A-1") and "Aa3" or better (if such obligation has a long-term rating) or "P-1" or better by Moody's, and, in each case, is not put on credit watch (with negative implications);

(c) registered securities bearing interest or sold at a discount issued by any corporation incorporated under the laws of the United States of America or any state thereof that have a credit rating of "AA-" or better by S&P and "Aa3" or better (if such obligation has a long-term rating) or "P-1" or better by Moody's at the time of such purchase or contractual commitment providing for such purchase, and, in each case, is not put on credit watch (with negative implications);

(d) repurchase obligations with respect to any security described in clause (a) above, entered into with a depository institution or trust company (acting as principal) described in clause (b) above (including the Trustee) or entered into with a corporation (acting as principal) whose short-term debt has a credit rating of "A-1+" (except that Eligible Investments in an amount up to 20% of the Aggregate Principal Amount of the Notes Outstanding may be rated "A-1") or better by S&P and "Aa3" or better (if such obligation has a long-term rating) or "P-1" or better by Moody's at the time of purchase in the case of any repurchase obligation for a security having a maturity not more than 183 days from the date of its issuance or whose long-term debt has a credit rating of "AA-" or better by S&P and "Aa3" or better (if such obligation has a long-term rating) by Moody's at the time of purchase in the case of any repurchase obligation for a security having a maturity more than 183 days from its date of its issuance and, in each case, is not put on credit watch (with negative implications);

(e) commercial paper having at the time of purchase a credit rating of "A-1+" (except that an amount up to 20% of the Aggregate Principal Amount of the Notes Outstanding may be rated "A-1") or better by S&P and "Aa3" or better (if such obligation has a long-term rating) or "P-1" or better by Moody's and that has a maturity of not more than 183 days from its date of issuance; *provided, however,* that in the case of commercial paper with a maturity of longer than 91 days, the issuer of such commercial paper (or, in the case of a principal depository institution in a holding company system, the holding company of such system), if rated by S&P, must have at the time of purchase a long-term credit rating of "AA-" or better by S&P and "Aa3" or better (if such obligation has a long-term rating) by Moody's and, in each case, is not put on credit watch (with negative implications);

(f) off-shore money market funds, which funds have, at all times, the highest credit rating assigned to such investment category by S&P and Moody's; and

(g) such other Eligible Investments acceptable to the Rating Agencies.

*provided, however,* that: (i) Eligible Investments purchased with funds in the Collection Account shall be held until maturity (or sold only for an amount at least equal to the par amount of such Eligible Investment) and shall include only such obligations or securities as mature no later than the Business Day prior to the next Payment Date and Eligible Investments purchased with funds in the Initial Deposit Account shall be held until maturity (or sold only for an amount at least equal to the par amount of such Eligible Investment) and shall include only such obligations or securities as mature no later than the Business Day prior to the date expected to be used and in any event prior to the Initial Deposit Redemption Date; (ii) none of the foregoing obligations or securities shall constitute Eligible Investments if all, or substantially all, of the remaining amounts payable thereunder shall consist of interest and not principal payments; (iii) none of the S&P ratings required above shall have a subscript of "r", "t", "p", "pi" or "q"; (iv) none of the foregoing obligations or securities shall constitute Eligible Investments if such obligations or securities are mortgage-backed securities; (v) no such obligation may be margin stock, securities which have a mandatory or optional conversion to equity or securities which are subject to an Offer; (vi) no such obligation may have coupons or other payments that are subject to U.S. withholding tax or are subject to foreign withholding under the terms of the underlying instruments where the issuer is not required to make "gross-up" payments sufficient to cause the net amount to be received on the debt obligations to equal the amount that would have been paid had no such withholding tax applied; and (vii) any such Eligible Investment purchased on the basis of S&P's short-term rating of "A-1" shall mature not later than thirty (30) days after the date of purchase. Eligible Investments may include those Eligible Investments with respect to which the Trustee or its Affiliates provide services.

008455

"Equity Portfolio Collateral": Any security (or any other right, interest or property or securities entitlement) which does not entitle the holder thereof to receive periodic payments of interest no less frequently than semiannually and one or more installments of principal, in cash and sufficient to retire in full the stated principal amount thereof on the stated maturity date therefor; *provided, however,* that such definition will not include warrants, profit participations or similar equity-based rights that are a component of a Unit to the extent that the Aggregate Principal Amount of Portfolio Collateral in the Trust Estate with a warrant, profit participation or similar equity-based right attached thereto as a component of a Unit does not exceed 10% of the Aggregate Principal Amount of all Pledged Securities in the Trust Estate.

"ERISA": The United States Employee Retirement Income Security Act of 1974, as amended from time to time.

"Euroclear": Euroclear Bank S.A./N.V., as operator of The Euroclear System, and any successor thereto.

"Event of Default": The meaning specified herein under "Legal Structure—The Indenture—Events of Default."

"Exchange Act": The United States Securities Exchange Act of 1934, as amended.

"Exchange Date": As defined under "Description of the Notes—Form, Transfer and Transfer Restrictions."

"Exchange Offer": With respect to any item of Portfolio Collateral, (i) an offer by the issuer of such item of Portfolio Collateral or by any other Person made to all holders of such item of Portfolio Collateral to exchange such item of Portfolio Collateral held by them for an item of Equity Portfolio Collateral or other debt instruments that do not otherwise satisfy the definition of Portfolio Collateral or (ii) any solicitation by such issuer or other Person to amend, modify or waive any provision of such item of Portfolio Collateral or of the related Underlying Instrument, the effect of which would be to convert such item of Portfolio Collateral into an item of Equity Portfolio Collateral or other debt instruments that do not otherwise satisfy the definition of Portfolio Collateral.

"Expected Maturity Date": With respect to the Class X Notes, the Payment Date occurring in August 2013.

"Expense Reimbursement Account": An account maintained by the Trustee on behalf of the Issuer into which U.S. $50,000 will be deposited on the Closing Date for the purpose of paying Issuer Base Administrative Expenses which are paid between Payment Dates when they are due and payable during such time.

"Extended Final Maturity Date": Shall mean, if a Maturity Extension has occurred, the sixteenth Payment Date after the then current Extended Final Maturity Date (or, in the case of the First Extended Final Maturity Date, the Payment Date in August 2025).

"Extended Revolving Period End Date": As defined under "Confidential Offering Circular Summary—Extension of the Revolving Period and the Final Maturity Date."

"Extended Weighted Average Life Date": As defined under "Confidential Offering Circular Summary—Extension of the Revolving Period and the Final Maturity Date."

"Extension": Shall mean an extension of the Revolving Period, the Stated Maturity of the Notes and the Weighted Average Life Test in accordance with the Indenture.

"Extension Bonus Payment": Shall mean, with respect to each Maturity Extension, a single payment to each applicable Noteholder set forth in "Description of the Notes— Extension of the Revolving Period and the Final Maturity Date" in an amount equal to (1) in the case of the Class A-1LA Notes, 0.25% of the Aggregate Principal Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, (2) in the case of the Class A-1LB Notes, 0.25% of the Aggregate Principal Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, (3) in the case of the Class A-2L Notes, 0.25% of the Aggregate Principal Amount thereof held by such beneficial owner as of the applicable Extension Date, (4) in the case of the Class A-3L Notes, 0.50% of the Aggregate Principal Amount thereof held by such beneficial owner as of the applicable

Extension Effective Date, (5) in the case of the Class A-4L Notes, 0.50% of the Aggregate Principal Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, and (6) in the case of the Class B-1L Notes, 0.50% of the Aggregate Principal Amount thereof held by such beneficial owner as of the applicable Extension Effective Date.

"Extension Bonus Eligibility Certification": Shall mean, with respect to each Maturity Extension and each beneficial owner of Notes other than Extension Sale Securities, the written certification by such beneficial owner acceptable to the Issuer to the effect that it held Notes other than Extension Sale Securities on the applicable Extension Effective Date, including the Aggregate Principal Amount thereof and wire transfer instructions for the Extension Bonus Payment and any required documentation thereunder.

"Extension Conditions": As defined under "Description of the Notes—Extension of the Revolving Period and the Final Maturity Date."

"Extension Determination Date": Shall mean the 8th Business Day prior to each Extension Effective Date.

"Extension Effective Date": As defined under "Confidential Offering Circular Summary—Extension of the Revolving Period and the Final Maturity Date."

"Extension Notice": As defined under "Description of the Notes—Extension of the Revolving Period and the Final Maturity Date."

"Extension Purchase Price": Shall mean the purchase price payable by the Extension Qualifying Purchasers for Extension Sale Securities in connection with each Maturity Extension, if any, in an amount equal to (i) in the case of the Notes, the Aggregate Principal Amount thereof, plus accrued and unpaid interest as of the applicable Extension Effective Date (giving effect to any amounts paid to the Holder on such date), (ii) in the case of the Preferred Shares, an amount that, when taken together with all payments and distributions made in respect of such Preferred Shares since the Closing Date would cause such Preferred Shares to have received (as of the date of purchase thereof) an Internal Rate of Return of 12.0% (assuming such purchase date was a "Payment Date" under the Indenture); *provided, however, that* if the applicable Extension Effective Date is on or after the date on which such Holders have received an Internal Rate of Return equal to or in excess of 12.0%, the applicable Extension Purchase Price for such Preferred Shares shall be zero.

"Extension Qualifying Purchasers": Shall mean the Servicer (or any of its Affiliates acting as principal or agent); provided that in the event the Servicer elects not to purchase Securities from Holders pursuant to the Extension Conditions set forth in "Description of the Notes—Extension of the Revolving Period and the Final Maturity Date"; "Extension Qualifying Purchasers" shall mean one or more qualifying purchasers (which may include the Initial Purchaser or any of its Affiliates acting as principal or agent) designated by the Servicer; *provided, however*, none of the Servicer, the Initial Purchaser, or any of their respective Affiliates shall have any duty to act as an Extension Qualifying Purchaser.

"Extension Sale Notice": As defined under "Description of the Notes—Extension of the Revolving Period and the Final Maturity Date."

"Extension Sale Notice Period": As defined under "Description of the Notes—Extension of the Revolving Period and the Final Maturity Date."

"Extension Sale Securities": As defined under "Description of the Notes—Extension of the Revolving Period and the Final Maturity Date."

"Final Maturity Date": With respect to the Notes (other than the Class X Notes) the Payment Date occurring in August 2021 and with respect to the Class X Notes, the Payment Date occurring in August 2013 or such earlier date on which the Aggregate Principal Amount of each Class of Notes, is paid in full, including in connection with an Optional Redemption; *provided that* the "Final Maturity Date" with respect to the Notes (other than the Class X Notes) will be extended to the applicable Extended Final Maturity Date upon the occurrence of a Maturity Extension.

"Fitch": Fitch Ratings or any successor thereto.

"Fixed Rate Collateral": An item of Portfolio Collateral that bears interest at a fixed rate.

"Floating Rate Collateral": An item of Portfolio Collateral that bears interest at a floating rate.

"Form-Approved Synthetic Security": A Synthetic Security (a)(i) the Reference Obligation of which would be eligible for purchase by the Issuer as an item of Portfolio Collateral without any required action by the Rating Agencies or for which each of the Rating Agencies has confirmed in writing that the use of which would not result in a reduction or withdrawal of the then-current rating of any Class of Notes or (ii) the Reference Obligation of which would satisfy clause (i) but for the currency in which it is payable and such Synthetic Security is payable in U.S. dollars, does not provide for physical settlement and does not expose the Issuer to currency risk, (b) the documentation of which conforms (but for the amount and timing of periodic payments, the name of the Reference Obligation, the notional amount, the effective date, the termination date and other similarly necessary changes) to a form in respect of which each of the Rating Agencies has confirmed in writing that the use of which would not result in a reduction or withdrawal of the then-current rating of any Class of Notes was previously obtained, (c) which provides that any "credit event" thereunder shall not include restructuring (other than modified restructuring as defined in the 2003 ISDA Credit Derivative Definitions), repudiation, moratorium, obligation default or obligation acceleration unless such Synthetic Security may be settled only through a physical settlement of a deliverable obligation to the Issuer and not in cash, (d) which has been certified in writing by the Servicer to the Trustee and the Issuer as meeting the requirements of this definition and (e) for which the Issuer has provided S&P and Moody's notice of the purchase of such Synthetic Security no less than five Business Days prior to such purchase; *provided* that Moody's or S&P may revoke its consent to a Form-Approved Synthetic Security upon 30 days' written notice to the Trustee and the Issuer.

"Global Note": Rule 144A Global Notes, together with Regulation S Global Notes.

"Group A Country": Australia, Canada, the United Kingdom, the Federal Republic of Germany or The Netherlands (so long as the U.S. dollar denominated sovereign debt obligations of such jurisdiction are rated at least "Aa2" by Moody's and the foreign currency issuer credit rating assigned by S&P to such jurisdiction is at least "AA" and, in each case, is not put on credit watch (with negative implications)).

"Group B Country": Austria, Belgium, Bermuda, Denmark, Finland, France, Ireland, Italy, Liechtenstein, Luxembourg, New Zealand, Norway, Portugal, Spain, Sweden or Switzerland or any other member state of the European Union (as of the Closing Date) identified from time to time by the Servicer and subject to the satisfaction of the Rating Condition with respect to each Rating Agency with respect thereto (so long as the U.S. dollar denominated sovereign debt obligations of such jurisdiction are rated at least "Aa2" by Moody's and the foreign currency issuer credit rating assigned by S&P to such jurisdiction is at least "AA" and, in each case, is not put on credit watch (with negative implications)).

"HFP": Highland Financial Partners, L.P., or an affiliate or subsidiary thereof, in each case, an affiliate of the Servicer.

"HFP Shares": Preferred Shares beneficially owned or controlled by HFP.

"Highland": Highland Capital Management, L.P.

"Holder" and "Noteholder": The Person in whose name a Note is registered in the Note Register or in whose name a Preferred Share is registered in the Preferred Share Register.

"Indenture": The Indenture to be dated as of May 10, 2006 among the Issuer, the Co-Issuer and JPMorgan Chase Bank, National Association, as trustee and as securities intermediary, pursuant to which the Notes will be issued, as it may be amended or supplemented from time to time.

"Initial Consent Period": Shall mean the period of 15 Business Days from but excluding the date on which the Trustee provided notice of a proposed supplemental indenture pursuant to the Indenture to the Holders of any Notes or Preferred Shares.

008458

"Initial Deposit Account":  An account maintained by the Trustee on behalf of the Issuer into which the cash constituting the Deposit will be deposited on the Closing Date pending use to purchase additional Original Portfolio Collateral.

"Initial Deposit Redemption":  A redemption of the Class X Notes and the Class A-1LA Notes as described under "Description of the Notes—Initial Deposit Redemption."

"Initial Deposit Redemption Date":  The November 2006 Payment Date.

"Initial Portfolio Collateral" : The Portfolio Collateral that, in the case of CLO Securities, will be purchased on or prior to the Closing Date and, in the case of Portfolio Loans, will be purchased on or before the Closing Date or identified by the Issuer and for which commitments will be entered into on or prior to the Closing Date for purchase on or as soon as practicable after (not scheduled to exceed sixty (60) days after) the Closing Date with the net proceeds from the sale of the Notes and the net proceeds from the sale of the Preferred Shares on the Closing Date, which Initial Portfolio Collateral is set forth in the Indenture.

"Initial Portfolio Collateral Amount":  U.S.$765,000,000 (or such larger Aggregate Principal Amount of Portfolio Collateral as may be purchased on or before the Closing Date by the Issuer).

"Initial Purchaser":  Bear, Stearns & Co. Inc.

"Insured Notes":  As described under "Description of the Notes—Option to Acquire Bond Insurance."

"Interest Coverage Ratio":  As described under "Description of the Notes—Interest Coverage Test".

"Interest Coverage Test":  A test which is applicable on each Payment Date after the second Payment Date and will be satisfied as of such determination date if the Interest Coverage Ratio will be at least 1.5%.

"Internal Rate of Return":  With respect to any Payment Date, the annualized discount rate at which the sum of the discounted values of the following cashflows is equal to zero, assuming discounting on a quarterly basis as of each Payment Date: (1) the Notional Amount of the Preferred Shares (which amount will be deemed to be negative for purposes of this calculation), (2) each distribution of Collateral Interest Collections made to the holders of the Preferred Shares on any prior Payment Date and, to the extent necessary to reach the applicable Internal Rate of Return, such Payment Date and (3) each distribution of Collateral Principal Collections made to the holders of the Preferred Shares on any prior Payment Date and, to the extent necessary to reach the applicable Internal Rate of Return, such Payment Date.

"Investment Company Act":  The United States Investment Company Act of 1940, as amended from time to time.

"Investor Corp.":  Rockwall Investors Corp., a Cayman Islands limited liability company, which will hold all of the Class I Preferred Shares, and which will issue its preferred shares to third party investors.

"Irish Paying Agent":  RSM Robson Rhodes LLP, or any successors thereto.

"Issuer":  Rockwall CDO Ltd., an exempted company incorporated with limited liability under the laws of the Cayman Islands.

"Issuer Base Administrative Expenses":  With respect to any Payment Date, the administrative expenses paid or payable by the Issuer during the applicable Due Period, including, without limitation, taxes, government fees, indemnities, registered office fees and expenses for third party loan pricing services and accountants, if any, in the following order: (i) *pro rata*, taxes of the Co-Issuers, surveillance fees, shadow rating fees and credit estimate fees, if any, of the Rating Agencies; fees due to any Listing and Paying Agent; fees due to any stock exchange on which any Class of the Notes or the Preferred Shares are listed; governmental fees, registered office fees and any other fees which are deemed necessary by the Servicer for administration of the Trust Estate, and (ii) *pro rata*

008459

reimbursement of expenses (including indemnities) of the Servicer required to be paid pursuant to the Servicing Agreement; and all expenses of the Administrator, the Listing and Paying Agent, the Securities Intermediary (if not the same person as the Trustee), the accountants, any fiscal agent retained in connection with the issuance of income notes, if any, in which the primary collateral for such income notes are obligations of the Issuer, any expenses of Investor Corp. and all other administrative expenses of the Co-Issuers, each as determined as of the Calculation Date relating to such Payment Date and as set forth in the related Note Valuation Report.

"Issuer Excess Administrative Expenses": With respect to any Payment Date, (i) the administrative expenses (including indemnities) or other amounts paid or payable by the Issuer during the applicable Due Period, as determined as of the Calculation Date relating to such Payment Date and as set forth in the related Note Valuation Report, in excess of the amount of the Issuer Base Administrative Expenses for the corresponding period, (ii) the Trustee's administrative expenses for the Due Period relating to such Payment Date in excess of the amount provided for in the definition of Trustee Administrative Expenses and (iii) Preferred Shares Administrative Expenses for the Due Period relating to such Payment Date in excess of the amount provided for in clause (B) under "Description of the Notes—Adjusted Collateral Collections."

"LIBOR": For any Periodic Interest Accrual Period, the London interbank offered rate for three-month U.S. dollar deposits as determined by the Calculation Agent as described under "Description of the Notes—Payments on the Notes; Priority of Distributions" herein. LIBOR for the initial Periodic Interest Accrual Period will be determined through the use of straight-line interpolation by reference to two rates calculated in accordance with the provisions above, one of which shall be for five-month U.S. dollar deposits and the other of which shall be for six-month U.S. dollar deposits.

"LIBOR Determination Date": The second London Business Day prior to the commencement of a Periodic Interest Accrual Period.

"Loan Funding Account": An account maintained by the Trustee on behalf of the Issuer into which the Issuer will be required to remit the full amount of the Issuer's commitment to make or otherwise fund draws related to any Delayed Drawdown Loans and Revolving Loans in the Portfolio Collateral.

"London Business Day": Any day on which dealings in deposits in U.S. dollars are transacted in the London interbank market.

"Majority": With respect to the Notes, the Holders of more than 50% of the Aggregate Principal Amount of the Outstanding Notes, voting as a single class; provided that upon the occurrence of a Default or an Event of Default under the Indenture, "Majority" shall mean the Holders of more than 50% of the Controlling Class, voting together as a single class. With respect to the Preferred Shares, the Holders of more than 50% of the Preferred Shares.

"Mandatory Redemption": An O/C Redemption or a Rating Confirmation Failure Redemption.

"Market Value": On any date of determination with respect to an item of Portfolio Collateral, any of:

(a) the average of the bid-side prices for the purchase of such item of Portfolio Collateral determined by an Approved Pricing Service that derives valuations by polling broker-dealers (independent from the Servicer); or

(b) the arithmetic average of bid-side quotations for the purchase of such item of Portfolio Collateral obtained by the Servicer from three or more broker-dealers (provided if upon reasonable efforts of the Servicer, quotations from three broker-dealers are not available, the lower of the quotations from two broker-dealers may be used), in each case, independent from the Servicer, in the relevant market; provided that one such bid must be from a broker-dealer other than Bear Stearns or an Affiliate of Bear Stearns and any bid received from Bear Stearns or an Affiliate of Bear Stearns hereunder cannot be more than 10% higher than the next highest bid; and

008460

(c)      if the determinations of the broker-dealers specified in the foregoing clauses (a) or (b) are not available (as reasonably determined by the Servicer) and so long as the Servicer is subject to the Investment Advisors Act of 1940, as amended, the bid-side market value of such item of Portfolio Collateral as certified by the Servicer as consistent with reasonable and customary market practice; *provided*, that, as of any date of determination (x) no more than 5.0% of the Aggregate Principal Amount of Portfolio Collateral may have market values determined in the manner provided in this clause (c) and (y) if the item of Portfolio Collateral constitutes collateral for any other issuer or account managed by the Servicer or its Affiliates, the Market Value of such item of Portfolio Collateral determined pursuant to this clause (c) shall be consistent with the market value applied by the Servicer or its Affiliates for such item of Portfolio Collateral for such for such other issuers or accounts; and

(d)      if the market value cannot be determined in the manner described in clause (a), (b) or (c) above, an amount equal to the Principal Balance of the Portfolio Collateral as of such date multiplied by the Applicable Percentage for such item of Portfolio Collateral; *provided,* that if the market value cannot be determined in the manner described in clause (a), (b) or (c) above for more than thirty (30) Business Days immediately following any date such market value is determined pursuant to this clause (d), then the market value of such item of Portfolio Collateral shall be automatically deemed to be zero following such thirty (30) Business Day period until the market value can be determined in the manner described in clause (a), (b) or (c) above as of any date of determination;

*provided* that (A) for purposes of determining Market Value, but subject to clause (b) hereof, Bear Stearns will be deemed to be independent from the Servicer (*provided* that any quotes received from such entity will be on an arm's-length basis); (B) the Market Value of any item of Portfolio Collateral with respect to which the Issuer has entered into a commitment to sell but has not settled will be deemed to be the agreed sales price therefor (determined exclusive of accrued interest); and (c) the Market Value is determined only for purposes of compliance with covenants, coverage tests, overcollateralization tests, or any other requirements or tests set forth herein, or the determination of redemption prices.

"<u>Maturity Extension</u>":  As defined under "Confidential Offering Circular Summary—Extension of the Revolving Period and the Final Maturity Date."

"<u>Minimum Average Recovery Rate</u>":  As described under "Security for the Notes—Criteria for Purchase and Substitution of Collateral—Collateral Quality Matrix Tests."

"<u>Minimum Average Recovery Rate Test</u>":  As described under "Security for the Notes—Criteria for Purchase and Substitution of Collateral—Minimum Average Recovery Rate Test."

"<u>Moody's</u>":  Moody's Investors Service, Inc. or any successor thereto.

"<u>Moody's Asset Correlation Test</u>" or "<u>MAC Test</u>":  As described under "Security for the Notes—Criteria for Purchase and Substitution of Collateral—Moody's Asset Correlation Test and Weighted Average Rating Test."

"<u>Moody's Rating</u>":  The rating determined in accordance with the methodology described in the Indenture.

"<u>Non-Call Period</u>":  The period beginning on the Closing Date and ending on August 1, 2010.

"<u>Non-Consenting Holder</u>":  With respect to any supplemental indenture proposed pursuant to the Indenture that requires the consent of one or more Holders of the Notes or the Preferred Shares, any such Holder, or, in the case of Notes or Preferred Shares in global form, any beneficial owner, that either (i) has declared in writing that it will not consent to such supplemental indenture or (ii) has not consented to such supplemental indenture within 15 Business Days from the date on which the Trustee provided notice of such proposed supplemental indenture pursuant to the Indenture to such Holder or beneficial owner; *provided*, that in the case of the Non-Call Period, "Non-Consenting Holder" shall exclude any Holder of Class A-1LA Notes (unless such Holder has consented in writing to be designated as a Non-Consenting Holder) and the Amendment Buy-Out Option shall not be applicable to such Class A-1LA Notes.

008461

"Non-U.S. Obligor": An issuer of or obligor on an item of Portfolio Collateral that is located outside the United States and is not a Permitted Non-U.S. Obligor.

"Note Valuation Report": With respect to each Payment Date, the report prepared by or on behalf of the Issuer in accordance with the Indenture reflecting, among other things, the Collections made during the applicable Due Period and the distributions to be made on such Payment Date.

"Notes": The Class X Notes, the A-1LA Notes, the Class A-1LB Notes, the Class A-2L Notes, the Class A-3L Notes, the Class A-4L Notes and the Class B-1L Notes.

"Notional Amount": When used with respect to the Preferred Shares as of any date of determination, $1.00 per Preferred Share.

"O/C Redemption": The redemption of a Class or Classes of the Notes other than the Class X Notes (including, with respect to the Class B-1L Notes, the applicable Periodic Rate Shortfall Amount, as described herein) to the extent necessary such that both the Overcollateralization Tests and the Interest Coverage Test are satisfied.

"Offer": With respect to any security, (a) any offer by the issuer of such security or by any other Person made to all of the holders of such class of security to purchase or otherwise acquire all such securities (other than pursuant to any redemption in accordance with the terms of the related Underlying Instruments) or to exchange such securities for any other security or other property or (b) any solicitation by the issuer of such security or any other Person to amend, modify or waive any provision of such security or any related Underlying Instrument.

"Optional Redemption": The redemption of the Notes, in whole or in part, at the direction of a specified amount of Preferred Shares, on any Optional Redemption Date and in accordance with the terms specified herein.

"Optional Redemption Date": The Payment Date fixed by the Issuer for an Optional Redemption which shall be no earlier than the first Payment Date occurring in August 1, 2010.

"Optional Redemption Price": With respect to each Class of Notes, an amount equal to the aggregate of (i) the Aggregate Principal Amount of such Class of Notes as of the Optional Redemption Date, (ii) the applicable Cumulative Interest Amount with respect to the Optional Redemption Date and (iii) any unpaid Extension Bonus Payments in respect of such Notes.

For any Partial Optional Redemption, the Optional Redemption Price shall be equal to the applicable Partial Redemption Percentage of the Optional Redemption Price that would have applied for a Total Optional Redemption occurring on the applicable Optional Redemption Date.

"Original HFP Share Amount": The amount of HFP Shares acquired by the Servicer Entities on the Closing Date.

"Original Portfolio Collateral": The Portfolio Collateral, including the Initial Portfolio Collateral, purchased by the Issuer with the Deposit on or before the Effective Date and, in the case of Portfolio Loans, which will be identified by the Issuer and for which commitments will be entered into on or prior to the Effective Date for purchase on or as soon as practicable thereafter (but not scheduled to exceed sixty (60) days thereafter).

"Outstanding": With respect to the Notes, as of the date of determination, "Outstanding" refers to all Notes theretofore authenticated and delivered under the Indenture except:

       (i)     Notes theretofore canceled by the Registrar or delivered (or to be delivered pursuant to the Indenture) to the Registrar for cancellation;

       (ii)     Notes or portions thereof for whose payment or redemption money in the necessary amount has been theretofore irrevocably deposited with the Trustee or any Paying Agent in trust for the Holders of such Notes; *provided* that, if such Notes or

008462

portions thereof are to be redeemed, notice of such redemption has been duly given pursuant to the Indenture or provision therefor satisfactory to the Trustee has been made;

(iii)     Notes in exchange for or in lieu of which other Notes have been authenticated and delivered pursuant to the Indenture, unless proof satisfactory to the Trustee is presented that any such Notes are held by a protected purchaser; and

(iv)     Notes alleged to have been mutilated, destroyed, lost or stolen for which replacement Notes have been issued as provided in the Indenture;

*provided* that, in determining whether the Holders of the requisite Aggregate Principal Amount have given any request, demand, authorization, direction, notice, consent or waiver under the Indenture, Notes owned by or pledged to the Issuer, the Trustee or any other obligor upon the Notes or any Affiliate of the Issuer, the Trustee or of such other obligor, and solely for purposes of termination of the Servicer, the Servicer and any Affiliate thereof, shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Notes that a responsible officer of the Trustee has actual knowledge to be so owned or pledged shall be so disregarded.

With respect to the Preferred Shares, as of the date of determination, "Outstanding" refers to the total aggregate amount of all Class I Preferred Shares and Class II Preferred Shares issued and outstanding as indicated in the share register of the Issuer.

"Overcollateralization Haircut Amount": With respect to any date of determination, an amount equal to the sum of:

(A)     the greatest of the following:

(a) the product of (i) the applicable Overcollateralization Haircut Percentage multiplied by (ii) the Aggregate Principal Amount of all CLO Securities (other than Deferred Interest PIK Bonds and Defaulted Portfolio Collateral) on such date of determination that have an S&P Rating or a Moody's Rating within the CCC Rating Category;

(b) the product of (i) the applicable Overcollateralization Haircut Percentage multiplied by (ii) the excess, if any, of (x) the Aggregate Principal Amount of all CLO Securities included in the pledged Portfolio Collateral (other than Deferred Interest PIK Bonds and Defaulted Portfolio Collateral) on such date of determination that have an S&P Rating or a Moody's Rating within the B Rating Category or an S&P Rating or a Moody's Rating within the CCC Category over (y) 5.0% of the Aggregate Par Amount as of the date of the applicable Overcollateralization Test; *provided* that at no time during the period commencing on the Closing Date through the Final Maturity Date, shall the Aggregate Principal Amount of all CLO Securities exempt from haircut based on subclause (y) above exceed in the aggregate 5% of the Required Overcollateralization Amount; and

(c) the product of (i) the applicable Overcollateralization Haircut Percentage multiplied by (ii) the excess, if any, of (x) the Aggregate Principal Amount of all CLO Securities included in the pledged Portfolio Collateral (other than Deferred Interest PIK Bonds and Defaulted Portfolio Collateral) on such date of determination that have an S&P Rating or a Moody's Rating within the BB Rating Category, the B Rating Category or the CCC Rating Category over (y) 10.25% of the Aggregate Par Amount as of the date of the applicable Overcollateralization Test; *provided* that if at the date of measurement, Portfolio Loans within the CCC Rating Category is less than 6.25% of the Aggregate Par Amount, then 10.25% will be increased by the difference between 6.25% and percentage of the Aggregate Par Amount representing Portfolio Loans in the CCC Rating Category;

*provided that* for the avoidance of doubt, for purposes of clauses (a), (b) and (c) above, the applicable Overcollateralization Haircut Percentage shall always be applied first to the lowest rated Portfolio Collateral that falls within such clause, then to the next lowest rated Portfolio Collateral, etc., so that the maximum applicable haircut shall be applied to the Portfolio Collateral;

plus

008463

(B)    the product of (i) the applicable Overcollateralization Haircut Percentage multiplied by (ii) the excess, if any, of (x) the Aggregate Principal Amount of all Portfolio Loans included in the pledged Portfolio Collateral (other than Deferred Interest PIK Bonds and Defaulted Portfolio Collateral) on such date of determination that have an S&P Rating or a Moody's Rating within the CCC Rating Category over (y) 6.25% of the Aggregate Par Amount as of the applicable Overcollateralization Test.

"Overcollateralization Haircut Percentage": (i) With respect to CLO Securities with an S&P Rating or a Moody's Rating falling within the BB Rating Category, 10%, (ii) with respect to CLO Securities with an S&P Rating or a Moody's Rating falling within the B Rating Category, 20%, (iii) with respect to Portfolio Loans with an S&P Rating or a Moody's Rating falling within the CCC Rating Category, the greater of (x) 30% and (y) one minus the weighted average Market Value of all Portfolio Loans with an S&P Rating or a Moody's Rating falling within the CCC Rating Category and (iv) with respect to CLO Securities with an S&P Rating or a Moody's Rating falling within the CCC Rating Category, 50%.

"Overcollateralization Ratio": The Class A Overcollateralization Ratio or the Class B-1L Overcollateralization Ratio, as the context may require.

"Overcollateralization Ratio Adjustment": As described under "Description of the Notes—Overcollateralization Tests."

"Overcollateralization Tests": With respect to any date of determination, tests met when the Class A Overcollateralization Ratio is at least equal to the Class A Overcollateralization Percentage and the Class B-1L Overcollateralization Ratio is at least equal to the Class B-1L Overcollateralization Percentage, each relating to such date of determination.

"Partial Deferred Interest Bonds": Any debt obligation, with respect to which a portion of the interest thereon can be partially deferred without causing a payment default of such debt obligation under its underlying documents. For purposes of calculating the Weighted Average Coupon, the portion of interest that is deferrable with respect to any Partial Deferred Interest Bond will be assumed to be zero.

"Partial Optional Redemption": An Optional Redemption in part, in accordance with the terms specified herein.

"Participation": With respect to a Portfolio Loan, a participation interest in a commercial loan purchased from a Selling Institution which does not entitle the holder thereof to direct rights against the obligor.

"Paying Agent": The Trustee, the Irish Paying Agent or any other depository institution or trust company authorized by the Co-Issuers pursuant to the Indenture to pay principal of or any interest that may become payable on any Class of Notes on behalf of the Co-Issuers.

"Paying and Transfer Agency Agreement": The Paying and Transfer Agency Agreement dated as of May 10, 2006, relating to the Preferred Shares.

"Paying and Transfer Agent": JPMorgan Chase Bank, National Association, as Paying and Transfer Agent with respect to (i) the Preferred Shares and (ii) the preferred shares issued by Investor Corp.

"Payment Date": November 1, February 1, May 1 and August 1 of each year, commencing November 1, 2006 (or if any such date is not a Business Day, the next succeeding Business Day).

"Payment Date Equity Securities": With respect to any Payment Date, Distributable Equity Securities that the Issuer, in its sole discretion but on the advice of the Servicer, elects to distribute in lieu of cash on such Payment Date to the Holders of Preferred Shares in accordance with the terms hereof.

"Periodic Interest": With respect to each Class of Notes, interest on such Class payable on each Payment Date and accruing during each Periodic Interest Accrual Period at the Applicable Periodic Rate.

"<u>Periodic Interest Accrual Period</u>": With respect to any Payment Date, the period commencing on the prior Payment Date (or the Closing Date in the case of the first Payment Date) and ending on the day preceding such Payment Date.

"<u>Periodic Interest Amount</u>": With respect to the Class A-1LA Notes, the Class A-1LB and the Class X Notes and any Payment Date, the aggregate amount of interest accrued at the Applicable Periodic Rate during the related Periodic Interest Accrual Period on (i) with respect to the first Payment Date, the daily average Aggregate Principal Amount of such Class of Notes during such Periodic Interest Accrual Period, and (ii) thereafter, the Aggregate Principal Amount of such Class of Notes on the first day of such Periodic Interest Accrual Period (after giving effect to any payment of principal of such Class of Notes on such day). With respect to each other Class of Notes and any Payment Date, the aggregate amount of interest accrued at the Applicable Periodic Rate during the related Periodic Interest Accrual Period on the Aggregate Principal Amount of such Class on the first day of such Periodic Interest Accrual Period (after giving effect to any payment of principal of such Class of Notes on such date, including in connection with a redemption of a Class of Notes on any date during the related Periodic Interest Accrual Period).

"<u>Periodic Rate Shortfall Amount</u>": With respect to each Class of Notes and any Payment Date, any shortfall or shortfalls in the payment of the Periodic Interest Amount on such Class of Notes with respect to any preceding Payment Date or Payment Dates together with interest accrued thereon at the Applicable Periodic Rate (net of all Periodic Rate Shortfall Amounts, if any, paid with respect to such Class of Notes prior to such Payment Date).

"<u>Periodic Reserve Amount</u>": As of any date of determination, an amount equal to the sum of (i) the Trustee Administrative Expenses and Preferred Shares Administrative Expenses payable on the next succeeding Payment Date; (ii) without duplication of amounts payable pursuant to clause (i) hereof, the Issuer Base Administrative Expenses payable on the next succeeding Payment Date; (iii) the Base Fee Amount payable on the next succeeding Payment Date; (iv) the Cumulative Interest Amount for the Class A-1LA Notes, the Class A-1LB, the Class A-2L Notes, the Class A-3L and the Class A-4L Notes and the Periodic Interest Amount for the Class B-1L Notes due on the next succeeding Payment Date; and (v) the Cumulative Class X Payment due on the next succeeding Payment Date.

"<u>Permanent Regulation S Global Note</u>": With respect to any Class, the permanent global note issued to non-U.S. Persons in exchange for the Temporary Regulation S Global Note of such Class after the Distribution Compliance Period.

"<u>Permitted Non-U.S. Obligor</u>": An issuer of or obligor on an item of Portfolio Collateral that is located in (a) a Group A Country or (b)(i) a Group B Country, (ii) any tax advantaged jurisdiction (including the Cayman Islands, Netherlands Antilles, Bermuda, Ireland, Luxembourg and the Channel Islands) or (iii) any tax advantaged jurisdiction or any tax neutral or other jurisdiction subject to Moody's and S&P confirming to the Issuer, the Trustee and the Servicer that an immediate withdrawal, reduction or other adverse action with respect to any then current rating (including any private or confidential rating) of any Class of Notes will not occur as a result of such obligor being a Permitted Non-U.S. Obligor; *provided* that, with respect to the obligors of an item of Portfolio Collateral qualifying as Permitted Non-U.S. Obligors under this clause (b)(ii), at least 80% of such obligor's underlying assets must be domiciled in the United States or another Permitted Non-U.S. Obligor jurisdiction to so qualify as a Permitted Non-U.S. Obligor. For purposes of this definition, the Servicer may specify the location of a Permitted Non-U.S. Obligor to be the country in which at least 80% of such obligor's underlying assets are domiciled, if such assets are domiciled in the United States or another Permitted Non-U.S. Obligor jurisdiction; *provided* that the Aggregate Principal Amount of the Portfolio Collateral as to which the Servicer so specifies the location of a Permitted Non-U.S. Obligor may not exceed 5% of the Aggregate Par Amount. If the location of a Permitted Non-U.S. Obligor is specified by the Servicer to be in a country other than where it is domiciled in accordance with the foregoing sentence, for purposes of the concentration limitations and collateral quality tests described herein, such item of Portfolio Collateral will be considered to be domiciled in the country so specified.

"<u>Person</u>": Any individual, corporation, partnership, limited liability company, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization or government or any agency or political subdivision thereof.

008465

"PIK Bond": Any item of Portfolio Collateral that, pursuant to the terms of the related Underlying Instruments, permits the payment of interest thereon to be deferred and capitalized or otherwise provides that interest will accrue on such deferred interest or that issues identical securities in place of payments of interest in cash.

"Pledged Securities": On any date of determination, the Portfolio Collateral and the Eligible Investments in the Trust Estate.

"Portfolio Collateral": As described under "Security for the Notes—Portfolio Collateral—General."

"Portfolio Improvement Exchange": The disposition, during the Revolving Period, of an item of Portfolio Collateral and corresponding acquisition of one or more items of Substitute Portfolio Collateral which in the aggregate will result in (i) the collateral quality tests, the Interest Coverage Test, the Overcollateralization Tests and the other collateral criteria herein being satisfied (or bring the total Portfolio Collateral closer to compliance with any such test or limitation) or if one or more of such collateral quality tests, Interest Coverage Test, Overcollateralization Tests or collateral criteria is not satisfied, the degree of compliance therewith would be improved and (ii) improving, on a net basis, the quality of the Portfolio Collateral as measured by such collateral quality tests, Interest Coverage Test, Overcollateralization Tests and collateral criteria, and (iii) in the case of each of clause (i) and (ii) not causing any other collateral quality tests, Interest Coverage Test, Overcollateralization Tests or collateral criteria, to be violated or significantly increase the likelihood of such violation in the future.

"Portfolio Loan": Interests in commercial loans included in the Portfolio Collateral.

"Preferred Shares": The 33,200,000 Class I Preferred Shares of the Issuer, par value U.S.$0.001 per share, and the 45,000,000 Class II Preferred Shares of the Issuer, par value U.S.$0.001 per share, that will be issued on the Closing Date pursuant to the Issuer's Memorandum of Association and Articles of Association and any other Preferred Shares issued from time to time by the Issuer.

"Preferred Shares Administrative Expenses": With respect to any Payment Date (including without limitation the Final Maturity Date), the Paying and Transfer Agent's administrative expenses for the Due Period relating to such Payment Date.

"Premium": With respect to any item of Portfolio Collateral sold pursuant to the terms of the Indenture or called pursuant to the terms thereof, the excess of (a) the sale or call price of such item of Portfolio Collateral less any accrued interest with respect to such item of Portfolio Collateral over (b) the Aggregate Principal Amount of such item of Portfolio Collateral.

"Principal Balance": With respect to any Pledged Security, as of any date of determination, the outstanding principal amount of such Pledged Security, *provided* that (i) unless otherwise stated herein or in the Indenture, the "Principal Balance" of any Delayed Drawdown Loan or Revolving Loan shall refer to the sum of the outstanding aggregate principal amount of such Delayed Drawdown Loan or Revolving Loan *plus* the amount of the unfunded portion of the Issuer's commitment to make or otherwise fund advances related thereto (to the extent, and without duplication, of amounts on deposit in the Loan Funding Account available to fund such advances), (ii) the "Principal Balance" of any Synthetic Security shall be equal to (a) in the case of any Synthetic Security other than a Default Swap, the outstanding principal amount of the Reference Obligation or the notional amount of the Synthetic Security related thereto and (b) in the case of any Default Swap, the cash and the principal amount of the securities in the related Default Swap Collateral Account reduced by the amount of any payments due and payable to the Default Swap Counterparty by reason of the occurrence of one or more "credit events" or other similar circumstances to the extent such payments have not yet been made; and (iii) with respect to any item of Equity Portfolio Collateral, the "Principal Balance" shall equal zero.

"Priority of Payments": The priority of payments described under "Description of the Notes—Payments on the Notes; Priority of Distributions" in this Confidential Offering Circular.

008466

"Proposed Portfolio":  As described under "Security for the Notes—S&P CDO Monitor Test."

"Purchase Agreement":  The Purchase Agreement, dated the Closing Date, between the Issuer and the purchaser of the Notes identified therein.

"Purchased Accrued Interest":  Interest accrued on or purchased with respect to an item of Portfolio Collateral as part of the price paid by the Issuer to acquire such item of Portfolio Collateral less any amount of Collateral Interest Collections applied by the Issuer to acquire such accrued interest at the time of purchase; *provided* that for the purchase of certain CLO Securities as of the Closing Date, such accrued interest purchased in connection therewith will not be considered Purchased Accrued Interest as set forth in the Indenture.

"Qualified Institutional Buyer":  A "qualified institutional buyer" as defined in Rule 144A(a)(1) promulgated under the Securities Act.

"Qualified Purchaser":  A "qualified purchaser" as defined in Section 3(c)(7) of the Investment Company Act.

"Quarterly Collateral Amount":  Shall mean, with respect to any Due Period, the average of (i) the Aggregate Principal Amount of Portfolio Collateral on the first day of such Due Period and (ii) the Aggregate Principal Amount of Portfolio Collateral on the last day of such Due Period.  For purposes of such amounts, Equity Portfolio Collateral and Defaulted Portfolio Collateral shall be excluded in calculating the Aggregate Principal Amount of the Portfolio Collateral.

"Rating Agencies":  S&P and Moody's, collectively.

"Rating Condition":  With respect to any Rating Agency and any action proposed to be taken under the Indenture, a condition that is satisfied when such Rating Agency has confirmed in writing to the Issuer, the Trustee and the Servicer that no withdrawal, reduction or suspension with respect to any then current rating, if any, by such Rating Agency (including any private or confidential rating) of any Class of Notes will occur as a result of such proposed action.

"Rating Confirmation":  Written confirmation from each of the Rating Agencies that it has not reduced or withdrawn (and not restored) the rating assigned by it on the Closing Date to any Class of Notes.

"Rating Confirmation Failure":  A failure to obtain Rating Confirmation by the 35th day after the Effective Date (or if such day is not a Business Day, the succeeding Business Day).

"Rating Confirmation Failure Redemption":  The redemption of a Class or Classes of Notes, as a result of a Rating Confirmation Failure.

"Record Date":  With respect to any Payment Date, the Business Day immediately preceding such Payment Date; *provided, however*¸ that if any Definitive Notes are issued, the Record Date for such Definitive Notes shall be the fifteenth day of the calendar month preceding the month in which such Payment Date occurs.

"Reference Banks":  Four major banks in the London interbank market selected by the Calculation Agent (after consultation with the Servicer).

"Reference Obligation":  A security or other debt obligation that satisfies the definition of Portfolio Collateral other than as to payment terms; *provided that* notwithstanding the definition thereof, a Reference Obligation may be a loan (but not a participation interest in a loan, except as permitted in the Indenture).

"Reference Obligor":  The obligor under a Reference Obligation.

"Registrar":  The Trustee.

008467

"Regulation S Global Notes": Temporary Regulation S Global Notes, together with the Permanent Regulation S Global Notes.

"Relevant Date": As used in the Indenture, when referring to Initial Portfolio Collateral pledged to the Trustee on the Closing Date, the Closing Date and when referring to Portfolio Collateral pledged after the Closing Date, the date of such pledge.

"Required Portfolio Collateral Amount": U.S.$850,000,000.

"Requisite Noteholders": The Holders of at least 60% of the Aggregate Principal Amount of the Outstanding Notes (voting as a single class); *provided* that following the occurrence of a Default or an Event of Default under the Indenture, "Requisite Noteholders" shall mean 60% of the Aggregate Principal Amount of the Controlling Class, voting together as a single class. If the Person that is acting as Trustee under the Indenture is a Holder of any Note for its own account, such Person shall be excluded as a Holder for purposes of this definition in connection with the consent or approval by Noteholders of any supplemental indenture affecting the provisions thereof relating to the Trustee.

"Reserve Account": An account maintained by the Trustee for the benefit of the Noteholders and the other secured parties under the Indenture, over which the Trustee shall have exclusive control and the sole right of withdrawal at the direction of the Servicer.

"Reserve Amount": A portion of the proceeds from the sale of the Notes in an amount equal to US$1,600,000 to fund a portion of the payments to be made on any Payment Date in accordance with the Priority of Payments, or to otherwise fund any payments of interest or principal on the Notes at the direction and the sole discretion of the Servicer.

"Reset Debt Security": An item of Portfolio Collateral bearing a rate of interest that varies periodically (including, without limitation, daily) which at the time of its inclusion in the Trust Estate has a minimum rate of interest of at least 5.0% *per annum* with respect to Fixed Rate Collateral or Collateral LIBOR with respect to Floating Rate Collateral, and which minimum interest rate is not subject to adjustment on and after its inclusion in the Trust Estate, pursuant to the terms of the related Underlying Instrument, to a rate of interest which is lower than the rate of interest borne by such item of Portfolio Collateral on the date that such item of Portfolio Collateral was included in the Trust Estate.

"Retained Accrued Interest": Any accrued and unpaid interest with respect to any Portfolio Collateral which was not included in the purchase price for such collateral at the time of purchase.

"Revolving Loan": A Portfolio Loan that, pursuant to the Underlying Instrument or Underlying Loan and Security Agreement that governs the rights and obligations of the parties thereto, would obligate the Issuer, if the Issuer were to purchase such Portfolio Loan for inclusion in the Trust Estate, to make or otherwise fund one or more future advances to the related borrower and meets the criteria described under "Security for the Notes—Criteria for Purchase and Substitution of Collateral."

"Revolving Period": The period beginning on the Closing Date and ending on the earliest of (i) August 1, 2011 for Portfolio Loans or August 1, 2009 for CLO Securities or, in the case of an Extension, the Extended Revolving Period End Date; *provided* that Portfolio Loans and CLO Securities may be purchased for the full period of any such Extension, and (ii) the occurrence and continuance of an Event of Default; *provided* that in no event shall such date of termination of the Revolving Period be determined on the basis of the Market Value of the Portfolio Collateral.

"Rule 144A Global Note": With respect to any Class, the permanent global note issued to U.S. Persons.

"Rule 3a-7": Rule 3a-7 under the Investment Company Act.

"S&P": Standard & Poor's Ratings Services, a division of The McGraw Hill Companies, Inc. or any successor thereto.

"S&P Break-Even Default Rate": As described under "Security for the Notes—S&P CDO Monitor Test."

"S&P CDO Monitor": As described under "Security for the Notes—S&P CDO Monitor Test."

"S&P CDO Monitor Test": As described under "Security for the Notes—S&P CDO Monitor Test."

"S&P Loss Differential": As described under "Security for the Notes—S&P CDO Monitor Test."

"S&P Rating": The rating determined in accordance with the methodology described in the Indenture.

"S&P Scenario Default Rate": As described under "Security for the Notes—S&P CDO Monitor Test."

"Sale Restriction Condition": As defined under "Security for the Notes—Changes in Composition of Portfolio Collateral."

"Scheduled Distribution": With respect to any Pledged Security, for each due date after the date of determination, the scheduled payment of principal and/or interest due on such due date with respect to such Pledged Security, determined in accordance with the assumptions set forth in the Indenture.

"Securities": The Notes and the Preferred Shares, collectively.

"Securities Act": The United States Securities Act of 1933, as amended.

"Selling Institution": The seller of a Participation or, if applicable, its guarantor, which has a long-term senior unsecured debt rating of at least "A2" by Moody's and at least "A" by S&P at the time such Participation is committed to be acquired by the Issuer.

"Senior Class A Notes": The Class A-1LA Notes, the Class A-1LB and the Class A-2L Notes.

"Senior Class A Overcollateralization Ratio": With respect to a determination made as of any date of calculation, the ratio (expressed as a percentage) obtained by dividing (a) the sum of (1) the Aggregate Principal Amount of the Portfolio Collateral in the Trust Estate (other than items of Equity Portfolio Collateral, which shall not be included as Portfolio Collateral) as of such date, *plus* (2) the sum of the Balance of Eligible Investments and cash in the Collection Account representing Collateral Principal Collections *plus* the Balance of Eligible Investments and cash in the Initial Deposit Account *plus* unpaid Purchased Accrued Interest, each as of such date by (b) the sum of the Aggregate Principal Amount of the Senior Class A-1L Notes (including for this purpose any Periodic Rate Shortfall Amounts with respect to such Class of Notes not paid when due, until such amounts, if any, are paid in full) as of such date.

"Senior Secured Loan": A loan that (i) is not (and by its terms is not permitted to become) subordinate in right of payment to any other debt for borrowed money incurred by the obligor under such loan and (ii) is secured by a valid first priority perfected security interest or lien on specified collateral securing the obligor's obligations under such Senior Secured Loan, which security interest or lien is not subordinate to the security interest or lien securing any other debt for borrowed money.

"Servicer": Highland Capital Management, L.P., until a successor Person becomes the manager pursuant to the provisions of the Servicing Agreement, and thereafter "Servicer" shall mean such successor Person.

"Servicer Entities": Collectively, the Servicer, entities affiliated with the Servicer or clients of the Servicer.

"Servicing Agreement": The Servicing Agreement, dated as of the Closing Date, between the Issuer and the Servicer, and if amended as permitted therein and in the Indenture, as so amended.

008469

"<u>Servicing Fee Portion</u>":  100% minus (a) for any Payment Date prior to the two-year anniversary of the Closing Date, the Class II Preferred Share Percentage for such Payment Date and (b) for any other Payment Date, a percentage selected by the Servicer in its sole discretion.

"<u>Special Redemption</u>":  As described under "Description of the Notes—Special Redemption."

"<u>Substitute Portfolio Collateral</u>":  An item of Portfolio Collateral that is purchased by the Trustee as security for the Notes as described herein with the proceeds of the sale of other Portfolio Collateral.

"<u>Supplemental Fee Amount</u>":  As described under "The Servicing Agreement—Compensation."

"<u>Supplemental Servicing Fee</u>":  For any Payment Date, an amount equal to the product of (a) the Supplemental Fee Amount for such Payment Date and (b) the Servicing Fee Portion for such Payment Date.

"<u>Suspension Trigger Event</u>":  As of any date of determination, (I) the ratio (expressed as a percentage) obtained by dividing (a) the sum of (1) the Aggregate Principal Amount of the Portfolio Collateral in the Trust Estate as of such date, calculated in accordance with the Overcollateralization Ratio Adjustment less the Overcollateralization Haircut Amount, if any, plus (2) the sum of the Balance of Eligible Investments and cash in the Collection Account, representing Collateral Principal Collections plus the Balance of Eligible Investments and cash in the Initial Deposit Account plus unpaid Purchased Accrued Interest, each as of such date by (b) the sum of the Aggregate Principal Amount of the Class A-1L Notes (including for this purpose any unpaid Periodic Rate Shortfall Amounts with respect to such Classes of Notes not paid when due, until such amounts, if any, are paid in full) as of such date, is than (II) 110%.

"<u>Synthetic Security</u>":  Any (I) U.S. dollar denominated swap transaction, security issued by a trust or similar vehicle or other asset purchased from or entered into by the Issuer with a Synthetic Security Counterparty the returns on which (as determined by the Servicer) are linked to the credit performance of a Reference Obligation, but which may provide for a different maturity, payment dates or interest rate or interest rate basis than such Reference Obligation; *provided* that, either (A) (i) such Synthetic Security will not require the Issuer to make any payment to the Synthetic Security Counterparty after the initial purchase thereof by the Issuer, (ii) the ownership of such Synthetic Security, based on the Servicer's determination (which may include consultation with counsel to the Issuer), is not expected to subject the Issuer to withholding tax, (iii) such Synthetic Security terminates on or prior to the redemption or repayment in full of the Reference Obligation, (iv) the principal amount of such Synthetic Security is equal to the principal amount of the Reference Obligation, (v) all scheduled payments made pursuant to the terms of such Synthetic Security are at a fixed or floating interest rate based on an interest rate used for borrowings or financings in domestic or international markets or are linked to the payments on one or more Reference Obligations (which payments are themselves at a fixed interest rate or such floating rate), (vi) the minimum coupon on such Synthetic Security is 6.0%, if such Synthetic Security is fixed rate, (vii) the minimum margin on such Synthetic Security is 0.60%, if such Synthetic Security is floating rate, (viii) the terms of such Synthetic Security provide that upon maturity, acceleration or any early termination of such Synthetic Security, the Synthetic Security Counterparty of such Synthetic Security must deliver the Reference Obligation or an amount greater than or equal to the then par amount of the Reference Obligation, except (a) the Issuer may accept an amount equal to the fair market value of the Reference Obligation if the Servicer chooses to terminate such Synthetic Security in connection with the sale of such Synthetic Security as Credit Risk Portfolio Collateral, Credit Improved Portfolio Collateral, Defaulted Portfolio Collateral or Equity Portfolio Collateral or pursuant to the right of the Issuer to sell Portfolio Collateral which is not Credit Improved Portfolio Collateral, Credit Risk Portfolio Collateral, Defaulted Portfolio Collateral or Equity Portfolio Collateral or (b) following a credit event with respect to the Reference Obligation, the Issuer may accept an amount equal to the fair market value of such Reference Obligation; provided, however, that this clause (viii) shall not apply to an acceleration or early termination upon the exercise of any put or call provision of the Synthetic Security or any Reference Obligation, (ix) upon the exercise of any put or call provision of the Synthetic Security or any Reference Obligation, the holder of such Synthetic Security will receive a Reference Obligation or an amount greater than or equal to the par amount of such Reference Obligation, plus, if the Reference Obligation is a bond, accrued interest, (x) such Synthetic Security will not constitute a commodity option, leverage transaction or futures contract that is subject to the jurisdiction of the U.S. Commodity Futures Trading Commission, (xi) the acquisition of such Synthetic Security would not cause the Issuer to be "engaged in a U.S. trade or business" for Federal income tax purposes or otherwise to become subject to U.S.

corporate net income tax, (xii) the Underlying Instrument with respect to such Synthetic Security is governed by the laws of the State of New York, contains a non-petition clause and a limited recourse clause, each as against the Issuer, and is documented with a standard ISDA form master agreement, as modified by appropriate schedules and confirmations and (xiii) total payments including termination payments may not exceed the notional amount of such Synthetic Security; *provided* that if any Reference Obligation delivered pursuant to any Synthetic Security does not constitute Portfolio Collateral and would cause a breach of any concentration limitation, such Reference Obligation shall be deemed Equity Portfolio Collateral, and (B) (i) such Synthetic Security is a Form-Approved Synthetic Security or (ii) the Rating Condition has been satisfied with respect to the purchase of such Synthetic Security; *provided* further, that any Synthetic Security shall be positively indexed to the related Reference Obligation on no more than a one-to-one basis and (II) any Default Swap.

"Synthetic Security Counterparty": An entity which is required to make payments to the Issuer on a Synthetic Security to the extent that the issuer of the related Reference Obligation makes payments thereon pursuant to the terms of such Synthetic Security and any Default Swap Counterparty.

"Tax Event Redemption": As defined under "Description of the Notes—Tax Event Redemption."

"Tax Event Redemption Price": With respect to each Class of Notes an amount equal to the aggregate of (i) the Aggregate Principal Amount of each Class of Notes as of the Tax Event Redemption Date and (ii) the applicable Cumulative Interest Amount with respect to each Class of Notes as of the Tax Event Redemption Date.

"Temporary Regulation S Global Note": With respect to any Class, the temporary global note issued to non-U.S. Persons in Offshore Transactions (as defined in Regulation S) in reliance on Regulation S.

"Total Optional Redemption": An Optional Redemption in whole, in accordance with the terms specified herein.

"Trust Estate": All money, instruments and other property and rights subject or intended to be subject to the lien of the Indenture including all proceeds thereof, including the Portfolio Collateral and the Accounts (subject to the prior lien of the related Default Swap Counterparty to each Default Swap Collateral Account and subject to the rights of the Default Swap Counterparty in the Default Swap Issuer Account).

"Trustee": JPMorgan Chase Bank, National Association, as trustee under the Indenture.

"Trustee Administrative Expenses": With respect to any Payment Date (including without limitation the Final Maturity Date), fees, expenses or other amounts due or accrued and payable to the Trustee pursuant to the Indenture, including fees and expenses pursuant to duties performed as collateral administrator and Paying and Transfer Agent and as paying and transfer agent of Investor Corp., *provided* such payment shall not exceed on such Payment Date one-quarter of 0.0275% of the Aggregate Par Amount as of the Calculation Date relating to such Payment Date (such amount subject to a minimum of $74,000 *per annum*), *plus* $7,500 *per annum* for payments of expenses and certain other amounts specified in the Indenture.

"Underlying Instrument": With respect to any item of Portfolio Collateral, any loan participation agreement, loan assignment agreement, indenture, pooling and servicing agreement, trust agreement, instrument, or other agreement pursuant to which such item of Portfolio Collateral has been created or issued or of which the holders of such item of Portfolio Collateral are the beneficiaries, and any instrument evidencing or constituting such item of Portfolio Collateral (in the case of Portfolio Collateral evidenced by or in the form of instruments).

"Underlying Loan and Security Agreement": Any agreement (other than an Underlying Instrument) which governs the terms of or guarantees or secures the obligations represented by any Portfolio Collateral or of which the holders of such Portfolio Collateral are the beneficiaries (which in the case of a Portfolio Loan which is a Participation shall include the loan and security documentation with respect to the underlying loan).

"Unit": An item of Portfolio Collateral with a warrant, profit participation or other equity-based feature (including but not limited to convertible bonds) included as a component thereof which otherwise meets the

008471

requirements for Portfolio Collateral; *provided* that (i) the value of such warrant, profit participation or other equity-based feature at the time of purchase, as determined by the Servicer in good faith, is less than 2% of the purchase price of such item of Portfolio Collateral and (ii) such warrant, profit participation or other equity-like feature at the time of purchase shall not, relate to or be exchangeable for, margin stock.

"USA PATRIOT Act":  The Uniting and Strengthening America By Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001.

"Weighted Average Coupon":  As described under "Security for the Notes—Weighted Average Coupon Test."

"Weighted Average Coupon Test":  As described under "Security for the Notes—Weighted Average Coupon Test."

"Weighted Average Life":  As described under "Security for the Notes—Weighted Average Life Requirement."

"Weighted Average Life Requirement":  As described under "Security for the Notes—Weighted Average Life Requirement."

"Weighted Average Margin":  As described under "Security for the Notes—Weighted Average Margin Test."

"Weighted Average Margin Test":  As described under "Security for the Notes—Weighted Average Margin Test."

"Weighted Average Rating Test":  As described under "Security for the Notes—Collateral Quality Matrix Tests."

008472

No securities dealer, salesperson or other person has been authorized to give any information or to make any representation not contained in this Confidential Offering Circular and, if given or made, such information or representation must not be relied upon as been authorized by the Co-Issuers or the Initial Purchaser. This Confidential Offering Circular does not constitute an offer to sell or a solicitation of an offer to buy any of the securities offered hereby in any jurisdiction to any person to whom it is unlawful to make such offer in such jurisdiction. Neither the delivery of this Confidential Offering Circular nor any sale made hereunder shall, under any circumstances, create any implication that the information herein is correct as of any time subsequent to the date hereof or that there has been no change in the affairs of the Co-Issuers or the Portfolio Collateral.

---

TABLE OF CONTENTS

Page

Notices to Purchasers..................................................iii
Available Information..................................................vi
Confidential Offering Circular Summary .................1
Special Considerations ...........................................16
The Issuer and the Co-Issuer ...................................30
Description of the Notes ..........................................32
Security for the Notes .............................................56
Maturity and Prepayment Considerations...............70
Legal Structure .......................................................72
Delivery of the Notes; Transfer Restrictions;
    Settlement ..........................................................78
Certain Tax Considerations .....................................80
Cayman Islands Tax Consequences.........................84
Certain ERISA Considerations ...............................85
Certain Legal Investment Considerations................87
Ratings....................................................................87
Use of Proceeds......................................................88
Plan of Distribution ...............................................88
The Servicer............................................................89
The Servicing Agreement ........................................92
Certain Legal Matters .............................................96
Glossary of Certain Defined Terms.......................A-1

ROCKWALL CDO LTD.

ROCKWALL CDO (DELAWARE) CORP.

U.S.$538,000,000 Class A-1LA Floating Rate Extendable Notes Due August 2021

U.S.$96,000,000 Class A-1LB Floating Rate Extendable Notes Due August 2021

U.S.$76,000,000 Class A-2L Floating Rate Extendable Notes Due August 2021

U.S.$36,500,000 Class A-3L Floating Rate Extendable Notes Due August 2021

U.S.$10,000,000 Class A-4L Floating Rate Extendable Notes Due August 2021

U.S.$21,000,000 Class B-1L Floating Rate Extendable Notes Due August 2021

U.S.$14,000,000 Class X Floating Rate Notes Due August 2013

CONFIDENTIAL OFFERING CIRCULAR

Bear, Stearns & Co. Inc.

May 8, 2006

[THIS PAGE INTENTIONALLY LEFT BLANK]