**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | |
|---|---|---|
| **In Re:** Highland Capital Management, L.P | § | Case No. 19-34054-SGJ-11 |
| Highland Capital Management Fund Advisors, L.P. | | |
| et al | § | |
| Appellant | § | |
| vs. | § | |
| Highland Capital Management, L.P., | | |
| | § | 3:21-CV-00538-N |
| Appellee | § | |

[1943] **Order confirming the fifth amended chapter 11 plan,** Entered on 2/22/2021.

# APPELLANT RECORD
# VOLUME 32

MUNSCH HARDT KOPF & HARR, P.C.
Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
3800 Ross Tower
500 N. Akard Street
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

ATTORNEYS FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P. AND
NEXPOINT ADVISORS, L.P.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | ) | Case No. 19-34054 (SGJ11) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

$\mathcal{I} \, \mathcal{N} \mathcal{D} \mathcal{E} \mathcal{X}$

## AMENDED DESIGNATION BY NEXPOINT ADVISORS, L.P. AND HIGHLAND
## CAPITAL MANAGEMENT FUND ADVISORS, L.P.
## OF ITEMS FOR THE RECORD ON APPEAL

COME NOW Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors,

L.P. (the "Appellants"), creditors and parties-in-interest in the above styled and numbered

bankruptcy case (the "Bankruptcy Case") of Highland Capital Management, L.P. (the "Debtor"),

and, with respect to their *Notice of Appeal* [docket no. 1957], hereby file their *Amended*

*Designation of Items for the Record on Appeal* (the "Designation") as follows:

| Item | Bankruptcy Docket Number | Description |
|---|---|---|
| | | **Pleadings and Items on Docket** |
| 1 | 1957 | Notice of Appeal |
| 2 | 1943 | Order (i) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief |
| 3 | | Docket Sheet of Bankruptcy Case No. 19-34054 |
| 4 | 1606 | Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 5 | 1648 | Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| 6 | 1656 | Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 7 | 1670 | Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 8 | 1719 | Second Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| 9 | 1749 | Third Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| 10 | 1772 | Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 11 | 1791 | Notice of Withdrawal of Certain Executory Contracts and Unexpired Leases from List of Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan |
| 12 | 1807 | Debtor's Omnibus Reply to Objections to Confirmation of the Fifth Amended Chapter 11 Plan of Reorganization of Highland Capital Management |
| 13 | 1808 | Debtor's Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) |
| 14 | 1811 | Notice of Filing Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (with Technical Modifications) |
| 15 | 1814 | Debtor's Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |

Handwritten marginalia:
Vol. 1
000001
000165
000326
Vol. 2
000639
000666
000675
000820
000870
Vol. 3
000880
000886
000901
000906
001031
Vol. 4
001097
Vol 5
001346

AMENDED DESIGNATION BY NEXPOINT ADVISORS, L.P. AND HIGHLAND CAPITAL MANAGEMENT
FUND ADVISORS, L.P. OF ITEMS FOR THE RECORD ON APPEAL—Page 2

| | | | |
|---|---|---|---|
| *Vol 5*<br>*001414* | 16 | 1847 | Fourth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| *001421* | 17 | 1873 | Fifth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| *001427* | 18 | 1875 | Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland of Highland Capital Management, L.P. (As Modified) |
| *001475* | 19 | 1887 | Supplemental Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| *001482* | 20 | 1671 | United States Trustee's Limited Objection to Confirmation of Debtors' Fifth Amended Plan of Reorganization |
| | | **Evidence and Transcripts** | |
| *001488*<br>*001783* | 21 | 1894 | Transcript of February 2, 2021 Confirmation Hearing |
| *002040* | 22 | 1905 | Transcript of February 3, 2021 Confirmation Hearing |
| | 23 | 1917 | Transcript of February 8, 2021 Bench Ruling |
| *002091*<br>*002188*<br>*vol 12 - 002931*<br>*vol 50 - 013295*<br>*- 013297*<br>*Vol. 51 - 013373*<br>*vol. 54 - 014182*<br>*vol 55 - 014506* | 24 | 1794<br>1795<br>1822 *✗*<br>1863<br>1866<br>1877<br>1895<br>1915 | All exhibits admitted into evidence during February 2 and February 3, 2021 Confirmation Hearing |

*✗ 1822 - Vol. 12 — 50 ( 39 Volumes)*

RESPECTFULLY SUBMITTED this 22d day of March, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina

Davor Rukavina, Esq.
Texas Bar No. 24030781
3800 Ross Tower
500 N. Akard Street
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584
Email:   drukavina@munsch.com

**ATTORNEYS FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P. AND
NEXPOINT ADVISORS, L.P.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 22d day of March, 2021, true and correct copies of this document were electronically served by the Court's ECF system on parties entitled to notice thereof, including on counsel for the Debtor.

By: /s/ Davor Rukavina

Davor Rukavina, Esq.

# EXHIBIT VV

008475

*EXECUTION COPY*

---

**ROCKWALL CDO LTD.,**
**Issuer**


**ROCKWALL CDO (DELAWARE) CORP.,**
**Co-Issuer**


**and**


**JPMORGAN CHASE BANK, NATIONAL ASSOCIATION**
**as Trustee and as Securities Intermediary**

---

**INDENTURE**

---

**Dated as of May 10, 2006**

US_EAST:6212215.13

008476

INDENTURE, dated as of May 10, 2006, among ROCKWALL CDO LTD., an exempted limited liability company incorporated under the laws of the Cayman Islands (the "Company" and, together with its permitted successors and assigns, the "Issuer"), ROCKWALL CDO (DELAWARE) CORP., a Delaware corporation (the "Co-Issuer" and, together with the Issuer, the "Co-Issuers") and JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, as trustee (together with its permitted successors in the trusts hereunder, the "Trustee") and as Securities Intermediary.

## PRELIMINARY STATEMENT

The Co-Issuers are duly authorized to execute and deliver this Indenture to provide for the Notes issuable as provided in this Indenture. All representations, warranties, covenants and agreements made by the Co-Issuers herein are for the benefit and security of the Noteholders and the Trustee. The Co-Issuers are entering into this Indenture, and the Trustee is accepting the trusts created hereby, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

It is a condition of issuance of the Notes that the Class A-1LA Notes be rated "AAA" by Standard & Poor's and "Aaa" by Moody's, the Class X Notes be rated "AAA" by Standard & Poor's and "Aaa" by Moody's, the Class A-1LB Notes be rated "AAA" by Standard & Poor's and "Aaa" by Moody's, the Class A-2L Notes be rated at least "AA" by Standard & Poor's and at least "Aa2" by Moody's, the Class A-3L Notes be rated at least "A" by Standard & Poor's and at least "A2" by Moody's, the Class A-4L Notes be rated at least "A-" by Standard & Poor's and at least "A3" by Moody's and the Class B-1L Notes be rated at least "BBB" by Standard & Poor's and at least "Baa2" by Moody's. With respect to the Notes, such ratings by Standard & Poor's address solely the likelihood of the timely payment of the Periodic Interest Amount (which consists of interest accrued on the Aggregate Principal Amount of each applicable Class of Notes at the Applicable Periodic Rate) and the ultimate payment of the Aggregate Principal Amount in the case of the Class A-1LA Notes, the Class A-1LB Notes and the Class A-2L Notes, timely payment of Class X Payments and the ultimate payment of the Cumulative Interest Amount and the Aggregate Principal Amount in the case of the Class A-3L Notes, the Class A-4L Notes and the Class B-1L Notes. Such ratings by Moody's address the ultimate cash receipt of all required payments as provided by the governing documents, and are based on the expected loss to the Noteholders of each Class relative to the promise of receiving the present value of such payments. Notwithstanding the foregoing, the obligation to make any Extension Bonus Payment will not be rated by the Rating Agencies.

All things necessary to make this Indenture a valid agreement of the Co-Issuers in accordance with its terms have been done.

## GRANTING CLAUSES

The Issuer hereby Grants to the Trustee, for the benefit and security of the Holders of the Notes, the Trustee, the Paying and Transfer Agent, the Default Swap Counterparties, the Servicer, the Collateral Administrator and the Securities Intermediary (collectively, the "Secured Parties"), all of its right, title and interest, whether now owned or

008477

hereafter acquired, in, to and under the following: (a) the Initial Portfolio Collateral listed in Schedule A to this Indenture, all payments thereon or with respect thereto, all Portfolio Collateral (including all Original Portfolio Collateral, all Additional Portfolio Collateral and all Substitute Portfolio Collateral, whether or not any of the same may become at any time or times Defaulted Portfolio Collateral, Credit Risk Portfolio Collateral, Equity Portfolio Collateral or Credit Improved Portfolio Collateral) which may be delivered to the Trustee in the future and all payments thereon or with respect thereto, (b) the Issuer's rights, remedies, powers, privileges and claims under or with respect to the Servicing Agreement as set forth in Article XIV hereof, (c) the Collection Account, the Collateral Account, the Reserve Account, the Expense Reimbursement Account, the Closing Expense Account, the Initial Deposit Account, the Loan Funding Account, each Default Swap Collateral Account, each Default Swap Issuer Account, each Securities Lending Account, and all investment property, money, instruments and other property credited to or carried in such Accounts including, without limitation, the Eligible Investments, (d) the Default Swap Collateral, the Securities Lending Collateral, and the trust accounts described in Section 11.4 hereof, (e) all other assets of the Issuer (other than the Preferred Shares Collection Account and all funds deposited therein or credited thereto, the Issuer's share capital on account of its ordinary issued shares and any transaction fee for issuing the Notes and the Preferred Shares, each held in its account in the Cayman Islands and any interest thereon) and all other property delivered to the Trustee, (f) all accounts, general intangibles, chattel paper, instruments, documents, money, deposit accounts, goods, letters of credit, letter-of-credit rights, oil, gas, and other minerals, and investment property, consisting of, arising from, or relating to any of the foregoing, and (g) all proceeds, profits, rents, products, earnings, interest, dividends (whether in the form of cash, securities, instruments or other property) and distributions (whether of rights, options, stock, warrants, securities or other property) of or with respect to any of the foregoing; *provided that* such Grant shall not extend to any property, cash or other amounts specifically released from the lien of this Indenture or otherwise paid to the Issuer in accordance with the terms hereof; *and provided further that* the rights of each Default Swap Counterparty as a Secured Party shall be limited to only the related Default Swap Collateral, the related Default Swap Collateral Account, and the property credited thereto. The collateral described in the preceding sentence is referred to as the "Trust Estate." Such Grant is made, however, in trust, to secure the Notes equally and ratably without prejudice, priority or distinction, except as expressly provided in this Indenture, between any Note and any other Note by reason of difference in time of issuance or otherwise, and to secure in accordance with the priorities set forth in this Indenture (i) the payment of all amounts due on the Notes in accordance with their terms, (ii) the payment of all other sums payable under this Indenture and all amounts payable to the Servicer under the Servicing Agreement, and (iii) compliance with the provisions of this Indenture and the Servicing Agreement, all as provided in this Indenture.

The Trustee acknowledges such Grant, accepts the trusts hereunder and agrees to perform the duties herein in accordance with the provisions hereof.

008478

ARTICLE I

DEFINITIONS

Section 1.1.    Definitions

Except as otherwise specified herein or as the context may otherwise require, the following terms have the respective meanings set forth below for all purposes of this Indenture, and the definitions of such terms are equally applicable both to the singular and plural forms of such terms and, where applicable, to the masculine, feminine and neuter genders of such terms. Whenever any reference is made to an amount the determination of which is governed by Section 1.3 hereof, the provisions of Section 1.3 hereof shall be applicable to such determination or calculation, whether or not reference is specifically made to Section 1.3 hereof, unless some other method of calculation or determination is expressly specified in the particular provisions.

"Account Income":  Any interest or other earnings on funds in the Collection Account, the Initial Deposit Account, the Loan Funding Account or the Expense Reimbursement Account.

"Accounts": The meaning specified in Section 10.2 hereof.

"Accrued Interest on Sale": Interest accrued on an item of Portfolio Collateral at the time of sale or other disposition to the extent paid to the Issuer as part of the sale or other disposition price of such item of Portfolio Collateral after deducting amounts representing Purchased Accrued Interest on such item of Portfolio Collateral.

"Accountants' Certificate":  A certificate of a firm of Independent certified public accountants of national reputation in the United States of America appointed by the Issuer pursuant to Section 10.6(a) hereof.

"Additional Collateral Deposit Requirement":  With respect to each Payment Date after the second Payment Date, the amount necessary such that (a) the sum of: (i) the Aggregate Principal Amount of the Portfolio Collateral in the Trust Estate as of the Calculation Date relating to such Payment Date, plus (ii) the sum of the Balance of Eligible Investments and cash in the Collection Account representing Collateral Principal Collections *plus* the Balance of Eligible Investments and cash in the Initial Deposit Account *plus* unpaid Purchased Accrued Interest as of such date, less (iii) the Overcollateralization Haircut Amount (if any), equals or exceeds: (b) 107.00% of the amount necessary, after giving effect to the amount applied to any O/C Redemption of the Notes  (other than the Class X Notes) to satisfy the Overcollateralization Tests and the Interest Coverage Test (if applicable) on such Payment Date, to repay the Aggregate Principal Amount of the Note (other that the Class X Notes), including any Periodic Rate Shortfall Amounts.   Notwithstanding the foregoing, if Additional Collateral Deposit Requirement is a positive number that is more than the amount available therefore in the priority of distributions set forth in Section 11.1, then the amount distributed with respect to the Additional Collateral Deposit Requirements shall be such lesser amount available.

For purposes of the Additional Collateral Deposit Requirement, no item of Equity Portfolio Collateral shall be included as Portfolio Collateral.  In addition for purposes of this

requirement, (i) with respect to Defaulted Portfolio Collateral as to which there has occurred a payment default or an event of bankruptcy, only the portion equal to the lesser of (a) the Market Value of such item of Defaulted Portfolio Collateral and (b) the Applicable Percentage multiplied by the Principal Balance of such item of Portfolio Collateral, shall be included as Portfolio Collateral and (ii) with respect to items of Discount Portfolio Collateral, only an amount equal to the original purchase price of such item of Discount Portfolio Collateral shall be included as Portfolio Collateral. For purposes of calculating the Additional Collateral Deposit Requirement, to the extent an item of Portfolio Collateral is considered Defaulted Portfolio Collateral, Discount Portfolio Collateral and/or is included in the Overcollateralization Haircut Amount, such item of Portfolio Collateral will not be discounted multiple times, but will be treated in the category that results in the largest discount to the par amount of the Portfolio Collateral.

"Additional Fee Amount":  With respect to each Due Period, an amount equal to 0.35% per annum of the Quarterly Collateral Amount, calculated on the basis of a 360-day year and the actual number of days elapsed.

"Additional Issuance":  The issuance and sale of Additional Preferred Shares by the Issuer at any time during the Revolving Period, the proceeds of which (net of any fees and expenses incurred in connection with the issuance thereof, including, without limitation, compensation payable to the Initial Purchaser or any placement agent for any services provided in connection therewith) are used to purchase additional eligible Portfolio Collateral (which may include eligible Portfolio Collateral purchased from any Servicer Entity on an arms-length transaction basis); *provided* that (a) such Additional Issuance will be for an Additional Issuance Percentage; (b) such Additional Preferred Shares must be issued for a cash sales price (the net sale proceeds to be used to purchase eligible Portfolio Collateral (or, pending such application, deposited into the Collection Account and held in Eligible Investments)); (c) the terms (other than the date of issuance, the issue price, the date from which dividends will accrue and similar matters) of such Preferred Shares must be identical to the terms of the applicable Class of Preferred Shares; (d) the Holders of Preferred Shares must be notified in writing 30 days prior to such issuance; (e) the Servicer must consent to such Additional Issuance; and (f) Initial Purchaser must be notified in writing at least 30 days prior to such issuance.

"Additional Issuance Percentage":  With respect to any Additional Issuance, a percentage specified by the Servicer of the original issue price of the Preferred Shares issued and Outstanding on the date of such Additional Issuance.

"Additional Portfolio Collateral":  Any and all items of Portfolio Collateral which are purchased pursuant to Section 11.3 hereof with Collections (other than Collateral Disposition Proceeds).

"Additional Preferred Shares": Any additional Preferred Shares issued after the Closing Date in accordance with the applicable terms hereof and the Paying and Transfer Agency Agreement.

"Additional Servicing Fee":  For any Payment Date, an amount equal to the sum of (a) product of (i) the Additional Fee Amount for such Payment Date and (ii) the Servicing Fee

Portion for such Payment Date plus (b) on any Payment Date that any part of the Base Servicing Fee was not paid on the preceding Payment Date, interest on such unpaid amount in an amount equal to the product of (i) LIBOR for the applicable period plus 3.0% per annum and (ii) the actual number of days in such Due Period, divided by 360 plus (c) on any Payment Date that any part of the Additional Servicing Fee was not paid on the preceding Payment Date, such unpaid Additional Servicing Fee and interest on such unpaid amount in an amount equal to the product of (i) LIBOR for the applicable period plus 3.0% per annum and (ii) the actual number of days in such Due Period divided by 360; *provided* that in the event that the Servicer is removed or resigns, the amount of such fee accrued to the effective date of such removal or resignation will be payable to the Servicer on the next succeeding Payment Date or Payment Dates on which such amount may be paid, in accordance with Section 11.1 (provided that the payment of any fee payable pursuant to this proviso will be *pari passu* with the payment of any servicing fees to the then-current servicer).

"Adjusted Collections":  With respect to any Payment Date, the sum of (i) the Adjusted Collateral Interest Collections collected during the applicable Due Period, (ii) the Adjusted Collateral Principal Collections collected during the applicable Due Period and (iii) the available funds in the Expense Reimbursement Account, as each is determined as of the Calculation Date relating to such Payment Date.

"Adjusted Collateral Interest Collections":  With respect to any Payment Date, the Collateral Interest Collections collected during the applicable Due Period, as determined as of the Calculation Date relating to such Payment Date, *less* the sum of (i) the amount of the Collateral Interest Collections paid to the Trustee and the Paying and Transfer Agent pursuant to Section 11.1(b) hereof with respect to such Payment Date, (ii) the amount of the Collateral Interest Collections paid to the Issuer or deposited in the Expense Reimbursement Account pursuant to Section 11.1(b) hereof with respect to such Payment Date, (iii) the amount of the Collateral Interest Collections paid to the Servicer pursuant to Section 11.1(b) hereof with respect to such Payment Date and (iv) during any time prior to the Final Maturity Date, any Collateral Interest Collections attributable to the Collateral Purchase Amount held in the Collection Account pending application to purchase Portfolio Collateral.

"Adjusted Collateral Principal Collections":  With respect to any Payment Date, the Collateral Principal Collections collected during the applicable Due Period, as determined as of the Calculation Date relating to such Payment Date, *less* the sum of (i) the amount of the Collateral Principal Collections paid to the Trustee and the Paying and Transfer Agent pursuant to Section 11.1(b) hereof with respect to such Payment Date, (ii) the amount of Collateral Principal Collections paid to the Issuer or deposited in the Expense Reimbursement Account pursuant to Section 11.1(b) hereof with respect to such Payment Date, (iii) the amount of Collateral Principal Collections paid to the Servicer pursuant to Section 11.1(b) hereof with respect to such Payment Date, (iv) any Collateral Disposition Proceeds released from the Collection Account for the purchase of Portfolio Collateral during the applicable Due Period pursuant to Section 10.2(e) hereof, and (v) during any time prior to the Final Maturity Date, any amount attributable to the Collateral Purchase Amount held in the Collection Account pending application to purchase Portfolio Collateral.

008481

"Administration Agreement": The Administration Agreement, dated as of May 10, 2006, between the Issuer and the Administrator.

"Administrator": Maples Finance Limited, or any successor thereto appointed by the Issuer.

"Affiliate": With respect to any specified Person, any other Person controlling or controlled by or under common control with such specified Person. For the purposes of this definition, "control," when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing; *provided that* (for the avoidance of doubt) the only Affiliate of the Issuer shall be the Co-Issuer and the only Affiliate of the Co-Issuer shall be the Issuer.

"Aggregate Base Fees and Expenses": For any Payment Date, the total aggregate amount of fees and expenses payable pursuant to Section 11.1(b).

"Aggregate Par Amount": With respect to any date of determination, the Aggregate Principal Amount of the Portfolio Collateral in the Trust Estate, including cash and Eligible Investments representing Collateral Principal Collections on deposit in the Collection Account and the Initial Deposit Account.

"Aggregate Principal Amount": With respect to any date of determination, when used with respect to the Portfolio Collateral, the aggregate Principal Balances of such items of Portfolio Collateral on such date of determination. With respect to any date of determination, when used with respect to any Eligible Investments, the Balance of such Eligible Investments on such date of determination. When used with respect to any Note or Class of Notes, as of any date of determination, the original principal amount of such Note or Class of Notes, as applicable, reduced by all prior payments, if any, made with respect to principal of such Note. When used with respect to the Notes in the aggregate, the sum of the Aggregate Principal Amount of each Class of the Outstanding Notes.

"Ambac": Ambac Assurance Corporation.

"Amendment Buy-Out": The purchase of all Notes and Preferred Shares of Non-Consenting Holders by the Amendment Buy-Out Purchaser pursuant to the exercise of the Amendment Buy-Out Option.

"Amendment Buy-Out Option": In the case of any supplemental indenture that requires the consent of one or more Holders of the Notes or Preferred Shares, the right (but not the obligation) of an Amendment Buy-Out Purchaser to purchase from Non-Consenting Holders all Notes and Preferred Shares held by such Holder whose consent was solicited with respect to such supplemental indenture, regardless of the applicable percentage of the Aggregate Principal Amount of the Notes or Preferred Shares the consent of whose Holders is required for such supplemental indenture.

008482

"Amendment Buy-Out Purchase Price":  The price payable by the Amendment Buy-Out Purchaser for Notes or Preferred Shares purchased in an Amendment Buy-Out in an amount equal to (i) in the case of Notes, the Aggregate Principal Amount thereof, plus accrued and unpaid interest to the date of purchase payable to the Non-Consenting Holder (giving effect to all amounts paid to such Holder on such date) and plus any unpaid Extension Bonus Payment, and (ii) in the case of the Preferred Shares, an amount that, when taken together with all payments and distributions made in respect of such Preferred Shares since the Closing Date (and any amounts payable, if any to such Holder on the next succeeding Payment Date) would cause such Preferred Shares to have received (as of the date of purchase thereof) an Internal Rate of Return of 12.0% (assuming such date was a Payment Date under the Indenture); *provided that*, after the date on which any Holder of Preferred Shares has received an Internal Rate of Return equal to or in excess of 12.0%, the Amendment Buy-Out Purchase Price for such Preferred Shares shall be equal to zero.

"Amendment Buy-Out Purchaser":  The Servicer (or any of its affiliates acting as principal or agent); *provided that* in the event that the Servicer elects not to purchase Notes or Preferred Shares from Holders pursuant to the Amendment Buy-Out, "Amendment Buy-Out Purchaser" shall mean one or more qualifying purchasers (which may include the Initial Purchaser or any of its affiliates acting as principal or agent) designated by the Servicer; *provided, however*, none of the Servicer, the Initial Purchaser or any of their respective affiliates shall have any duty to act as an Amendment Buy-Out Purchaser.

"Amortization Period":  The period beginning on the day following the end of the Revolving Period and ending on the Payment Date upon which the Aggregate Principal Amount of the Notes is paid in full.

"Applicable Percentage":  The lesser of the Moody's Priority Category Recovery Rate and the S&P Priority Category Recovery Rate applicable to such item of Portfolio Collateral as specified in the tables below and in Schedule C hereto:

| Moody's Priority Category* | Moody's Priority Category Recovery Rate |
|---|---|
| Senior Secured Loans: | |
| +2 or more Rating Subcategories Difference | 60% |
| +1 Rating Subcategories Difference | 50% |
| 0 Rating Subcategories Difference | 45% |
| -1 Rating Subcategories Difference | 40% |
| -2 Rating Subcategories Difference | 30% |
| -3 or less Rating Subcategories Difference | 20% |
| DIP Loan (senior secured) | 50% |

008483

| Moody's Priority Category* | Moody's Priority Category Recovery Rate |
|---|---|
| Non-Senior Secured Loans: | |
| +2 or more Rating Subcategories Difference | 45% |
| +1 Rating Subcategories Difference | 42.5% |
| 0 Rating Subcategories Difference | 40% |
| -1 Rating Subcategories Difference | 30% |
| -2 Rating Subcategories Difference | 15% |
| -3 or less Rating Subcategories Difference | 10% |
| Debt Securities | |
| +2 or more Rating Subcategories Difference | 40% |
| +1 Rating Subcategories Difference | 35% |
| 0 Rating Subcategories Difference | 30% |
| -1 Rating Subcategories Difference | 15% |
| -2 Rating Subcategories Difference | 10% |
| -3 or less Rating Subcategories Difference | 2% |
| Synthetic Securities | In the case of (i) any Synthetic Security under clause (A) or clause (B) of the definition thereof, the "Moody's Priority Category Recovery Rate" referred to in this clause for the related Reference Obligation (or deliverable obligation to the extent such deliverable obligation is not the Reference Obligation), (ii) any Synthetic Security under clause (C) of the definition thereof, the "Moody's Priority Category Recovery Rate" given by Moody's to such Synthetic Security at the time of acquisition of such Synthetic Security, and (iii) any Synthetic Security which has the ability to vary the nature of the deliverable obligation from the time of the initial acquisition, the "Moody's Priority Category Recovery Rate" given by Moody's to such Synthetic Security at such time. |
| CLO Securities: | |

008484

| Moody's Priority Category* Percentage of Total Capitalization | Moody's Priority Category Recovery Rate Moody's Default Probability Rating | | | | | |
|---|---|---|---|---|---|---|
| | Aaa | Aa | A | Baa | Ba | B |
| Greater than 70% | 85.0% | 80.0% | 65.0% | 55.0% | 45.0% | 30.0% |
| Less than or equal to 70%, but greater than 10% | 75.0% | 70.0% | 60.0% | 50.0% | 40.0% | 25.0% |
| Less than or equal to 10%, but greater than 5% | 65.0% | 55.0% | 50.0% | 40.0% | 30.0% | 20.0% |
| Less than or equal to 5%, but greater than 2% | 55.0% | 45.0% | 40.0% | 35.0% | 25.0% | 10.0% |
| Less than or equal to 2% | 45.0% | 35.0% | 30.0% | 25.0% | 10.0% | 5.0% |

*   For purposes of the Moody's Priority Category, the classification of a Portfolio Loan shall be determined as of each date of determination.

| S&P Priority Category | S&P Priority Category Recovery Rate |
|---|---|
| Senior secured Portfolio Loans | 55% |
| Second lien Portfolio Loans | 37.5% |
| Senior unsecured Portfolio Loans | 37.5% |
| Subordinated Portfolio Loans | 21.5% |
| DIP Loan | To be determined on a case-by-case basis by S&P |
| Synthetic Securities | The "S&P Priority Category Recovery Rate" given by Standard & Poor's to such Synthetic Security at the time of acquisition of such Synthetic Security. |
| Debt Securities | |
| Senior secured Debt Securities | 44.0% |
| Senior unsecured Debt Securities | 30.0% |
| Subordinated Debt Securities | 18.0% |

008485

"Applicable Periodic Rate":  With respect to the Class A-1LA Notes and for each Periodic Interest Accrual Period, a *per annum* rate equal to 0.30% above LIBOR for such Periodic Interest Accrual Period.  With respect to the Class A-1LB Notes and for each Periodic Interest Accrual Period, a *per annum* rate equal to 0.50% above LIBOR for such Periodic Interest Accrual Period.  With respect to the Class A-2L Notes and for each Periodic Interest Accrual Period, a *per annum* rate equal to 0.65% above LIBOR for such Periodic Interest Accrual Period.  With respect to the Class A-3L Notes and for each Periodic Interest Accrual Period, a *per annum* rate equal to 1.40% above LIBOR for such Periodic Interest Accrual Period.  With respect to the Class A-4L Notes and for each Periodic Interest Accrual Period, a *per annum* rate equal to 1.70% above LIBOR for such Periodic Interest Accrual Period.  With respect to the Class B-1L Notes and for each Periodic Interest Accrual Period, a *per annum* rate equal to 2.25% above LIBOR for such Periodic Interest Accrual Period.  With respect to the Class X Notes and for each Periodic Interest Accrual Period, a *per annum* rate equal to 0.36% above LIBOR for such Periodic Interest Accrual Period.

"Applicable Procedures":  The meaning specified in Section 2.5(b) hereof.

"Approved Pricing Service":  Any pricing service (including any of its successors and assigns) listed as an Approved Pricing Service in Schedule J or otherwise disclosed in writing by the Issuer to the Trustee and the Holders of the Notes, and not objected to by the Requisite Noteholders within 15 days of such disclosure, *provided that* the Rating Condition has been satisfied with respect to any pricing service not included on Schedule J.

"Ask-Side Market Value":  As of any Measurement Date, the market value determined by the Servicer and reported to the Trustee as an amount rather than as a percentage or fraction of par (expressed in Dollars) of any lent item of Portfolio Collateral based upon the Servicer's commercially reasonable judgment and based upon the following order of priority: (i) the average of the ask-side market prices obtained by the Servicer from three Independent broker-dealers active in the trading of such obligations or (ii) if the foregoing set of prices were not obtained, the higher of the ask-side market prices obtained by the Servicer from two Independent broker-dealers active in the trading of such obligations or (iii) if the foregoing sets of prices were not obtained, the average of the ask-side prices for the purchase of such item of Portfolio Collateral determined by an Approved Pricing Service (Independent from the Servicer) that derives valuations by polling broker-dealers (Independent from the Servicer); *provided* that if the Ask-Side Market Value of any lent item of Portfolio Collateral cannot be so determined then such item of Portfolio Collateral shall be deemed to have a Market Value equal to the outstanding principal balance thereof.

"Asset Backed Security":  Any obligation that is either (i) a security that is primarily serviced by the cash flows of a discrete pool of receivables or other financial assets, either fixed or revolving, and that, by its terms converts into cash within a finite time period, plus any rights or other assets designed to assure the servicing or timely distribution of proceeds to the holders thereof or (ii) an "asset-backed security" as such term may be defined from time to time in the "General Instructions to Form S-3 Registration Statement" promulgated under the Securities Act, including collateralized bond obligations and collateralized loan obligations. Notwithstanding the foregoing, a Synthetic Security shall not be considered an Asset Backed

008486

Security for purposes of this Indenture unless the related Reference Obligation is an Asset Backed Security.

"Assumed Interest Rate": A rate equal to LIBOR as of the most recent LIBOR Determination Date minus 0.25%, but not less than zero.

"Authenticating Agent": An agent of the Trustee appointed by the Trustee pursuant to Section 2.4 to authenticate the Notes.

"Authorized Officer": With respect to either of the Co-Issuers, any chairman, deputy chairman, president, vice president, managing director, secretary, director, treasurer or other officer thereof or any chairman, deputy chairman, president, vice president, secretary, director, treasurer or other officer of any duly appointed agent thereof who is authorized to act for the Issuer or the Co-Issuer, as the case may be, in matters relating to, and binding upon, such Issuer or the Co-Issuer. With respect to the Servicer, any member, manager, officer, employee or agent of the Servicer, as applicable, who is authorized to act for the Servicer, in matters relating to, and binding upon, the Servicer, with respect to the subject matter of the request, certificate or order in question. With respect to the Trustee or any other bank or trust company acting as trustee of any express trust or as custodian, a Responsible Officer. Each party may receive and accept a certification of the authority of any other party as conclusive evidence of the authority of any person to act, and such certification may be considered as in full force and effect until receipt by such other party of written notice to the contrary.

"Balance": On any date, with respect to cash or Eligible Investments in the Collection Account, the Initial Deposit Account, the Loan Funding Account or the Expense Reimbursement Account, the aggregate (i) face amount or current balance, as the case may be, of cash, demand deposits, time deposits, certificates of deposit, bankers' acceptances, federal funds and commercial bank money market accounts; (ii) outstanding principal amount of interest-bearing government and corporate securities; and (iii) purchase price of non-interest-bearing government and corporate securities, commercial paper and repurchase obligations.

"Bankruptcy Code": Title 11 of the United States Code (11 U.S.C. §§ 101 et seq.), as amended, and any successor statute and/or any bankruptcy, insolvency, reorganization or similar law enacted under the laws of the Cayman Islands.

"Base Fee Amount": With respect to each Due Period, an amount equal to 0.20% per annum of the Quarterly Collateral Amount, calculated on the basis of a 360-day year and the actual number of days elapsed.

"Base Servicing Fee": For any Payment Date, an amount equal to the product of (a) the Base Fee Amount for such Payment Date and (b) the Servicing Fee Portion for such Payment Date; *provided* that in the event that the Servicer is removed or resigns, the amount of such fee accrued to the effective date of such removal or resignation will be payable to the Servicer on the next succeeding Payment Date or Payment Dates on which such amount may be paid, in accordance with the priority of payments set forth in Section 11.1 (provided that the payment of any fee payable pursuant to this proviso will be *pari passu* with the payment of any servicing fees to the then-current servicer).

008487

"B Rating Category":  Having a Moody's Rating of "B1" or below or an S&P Rating of "B+" or below.

"BB Rating Category":  Having a Moody's Rating of "Ba1" or below or an S&P Rating of "BB+" or below.

"Bear Notes": Notes of any Class, if any, initially issued to Bear Stearns or an Affiliate of Bear Stearns on the Closing Date.

"Bear Stearns":  Bear, Stearns & Co. Inc., a Delaware corporation.

"Beneficial Owners":  The meaning specified in the Investment Company Act and the rules and regulations promulgated thereunder.

"Business Day":  Any day that is not a Saturday, Sunday or other day on which commercial banking institutions in the City of New York, the State of New York, or in the city in which the Corporate Trust Office is located, or, to the extent action is required of a Paying Agent or the Paying and Transfer Agent, including the Trustee, in the city of the place of payment, are authorized or obligated by law or executive order to be closed. To the extent action is required of the Irish Paying Agent, Dublin, Ireland shall be considered in determining "Business Day" for purposes of determining when such Irish Paying Agent action is required.

"Calculation Agent":  The meaning specified in Section 2.11(a) hereof.

"Calculation Date":  The last day of each Due Period.

"CCC/Caa Portfolio Collateral":  Portfolio Collateral (excluding Defaulted Portfolio Collateral) that has a Moody's Rating below "B3" or an S&P Rating below "B-".

"CCC Rating Category":  Having a Moody's Rating of "Caa1" or below or an S&P Rating of "CCC+" or below.

"CIFG":  CIFG Services, Inc.

"Class":  Any of the Class A-1LA Notes, the Class A-1LB Notes, the Class A-2L Notes, the Class A-3L Notes, the Class A-4L Notes, the Class B-1L Notes and the Class X Notes.

"Class A Notes":  The Class A-1LA Notes, the Class A-1LB Notes, the Class A-2L Notes, the Class A-3L Notes and the Class A-4L Notes.

"Class A Overcollateralization Percentage": 107.00% (for purposes of the Class A Overcollateralization Test).

"Class A Overcollateralization Ratio":  As of any date of determination, the ratio (expressed as a percentage) obtained by dividing (a) the sum of (1) the Aggregate Principal Amount of the Portfolio Collateral in the Trust Estate as of such date, calculated in accordance with the Overcollateralization Ratio Adjustment, plus (2) the sum of the Balance of Eligible

008488

Investments and cash in the Collection Account, representing Collateral Principal Collections plus the Balance of Eligible Investments and cash in the Initial Deposit Account plus unpaid Purchased Accrued Interest, each as of such date by (b) the sum of the Aggregate Principal Amount of the Class A Notes (including for this purpose any unpaid Periodic Rate Shortfall Amounts with respect to such Classes of Notes not paid when due, until such amounts, if any, are paid in full) as of such date.

"Class A Overcollateralization Test":  A test that will be satisfied on any date of determination if the Class A Overcollateralization Ratio is at least equal to the Class A Overcollateralization Percentage.

"Class A-1L Notes":  The Class A-1LA Notes and the Class A-1LB Notes.

"Class A-1LA Notes":  The U.S. $538,000,000 Class A-1LA Floating Rate Extendable Notes due August 2021 issued hereunder by the Co-Issuers and having the terms described herein.

"Class A-1LB Notes":  The U.S. $96,000,000 Class A-1LB Floating Rate Extendable Notes due August 2021 issued hereunder by the Co-Issuers and having the terms described herein

"Class A-2L Notes":  The U.S. $76,000,000 Class A-2L Floating Rate Extendable Notes due August 2021 issued hereunder by the Co-Issuers and having the terms described herein.

"Class A-3L Notes":  The U.S. $36,500,000 Class A-3L Floating Rate Extendable Notes due August 2021 issued hereunder by the Co-Issuers and having the terms described herein.

"Class A-4L Notes":  The U.S. $10,000,000 Class A-4L Floating Rate Extendable Notes due August 2021 issued hereunder by the Co-Issuers and having the terms described herein.

"Class B-1L Notes":  The U.S. $21,000,000 Class B-1L Floating Rate Extendable Notes due August 2021 issued hereunder by the Co-Issuers and having the terms described herein.

"Class B-1L Overcollateralization Percentage":  106.00% (for purposes of the Class B-1L Overcollateralization Test).

"Class B-1L Overcollateralization Ratio": As of any date of determination, the ratio (expressed as a percentage) obtained by dividing (a) the sum of (1) the Aggregate Principal Amount of the Portfolio Collateral in the Trust Estate as of such date, calculated in accordance with the Overcollateralization Ratio Adjustment less the Overcollateralization Haircut Amount, if any, plus (2) the sum of the Balance of Eligible Investments and cash in the Collection Account, representing Collateral Principal Collections plus the Balance of Eligible Investments and cash in the Initial Deposit Account plus unpaid Purchased Accrued Interest, each as of such date by (b) the sum of the Aggregate Principal Amounts of the Class A Notes and the Class B-1L

008489

Notes (including for this purpose any unpaid Periodic Rate Shortfall Amounts with respect to such Classes of Notes not paid when due, until such amounts, if any, are paid in full) as of such date.

If an item of Portfolio Collateral is both eligible to be included in the Overcollateralization Haircut Amount and is subject to an Overcollateralization Ratio Adjustment, for purposes of calculating the Class B-1L Overcollateralization Ratio, such item of Portfolio Collateral will not be discounted multiple times, but will be treated in the category that results in the largest discount to the par amount of such item of Portfolio Collateral.

"Class B-1L Overcollateralization Test": A test that will be satisfied as of any date of determination if the Class B-1L Overcollateralization Ratio is at least equal to the Class B-1L Overcollateralization Percentage.

"Class I Preferred Shares": The Class I Preferred Shares, par value $0.001 per share, issued by the Issuer; *provided* that any transfer of Class I Preferred Shares to HFP from any third party shall require the exchange and conversion of such Class I Preferred Shares into Class II Preferred Shares.

"Class II Preferred Share Dividend": Class II Preferred Share Base Dividend, Class II Preferred Share Additional Dividend and Class II Preferred Share Supplemental Dividend.

"Class II Preferred Share Additional Dividend": For any Payment Date, an amount equal to the sum of (a) the product of (i) the Additional Fee Amount for such Payment Date and (ii) the Class II Preferred Share Portion for such Payment Date plus (b) on any Payment Date that any part of the Class II Preferred Share Base Dividend was not paid on the preceding Payment Date, interest on such unpaid amount in an amount equal to the product of (i) LIBOR for the applicable period and (ii) the actual number of days in such Due Period, divided by 360 plus (c) on any Payment Date that any part of the Class II Preferred Share Additional Dividend was not paid on the preceding Payment Date, such unpaid Class II Preferred Share Additional Dividend and interest thereon in an amount equal to the product of (i) LIBOR for the applicable period and (ii) the actual number of days in such Due Period divided by 360.

"Class II Preferred Share Base Dividend": For any Payment Date, an amount equal to the product of (a) the Base Fee Amount for such Payment Date and (b) the Class II Preferred Share Portion for such Payment Date.

"Class II Preferred Share Supplemental Dividend": For any Payment Date, an amount equal to the product of (a) the Supplemental Fee Amount for such Payment Date and (b) the Class II Preferred Share Portion for such Payment Date.

"Class II Preferred Share Percentage": For any Payment Date, a fraction, expressed as a percentage, the numerator of which is the number of Outstanding Class II Preferred Shares on the Calculation Date related to such Payment Date and the denominator of which is the total number of Outstanding Preferred Shares on such Calculation Date.

008490

"Class II Preferred Share Portion": For any Payment Date, 100% minus the Servicing Fee Portion for such Payment Date.

"Class II Preferred Shares": The Class II Preferred Shares, par value $0.001 per share, issued by the Issuer and held by HFP; *provided* that any transfer of Class II Preferred Shares by HFP to any third party shall require the exchange and conversion of such shares into Class I Preferred Shares.

"Class X Interest Payment": The Periodic Interest Amount with respect to the Class X Notes.

"Class X Notes": The U.S.$14,000,000 Class X Floating Rate Notes Due August 2013.

"Class X Payment": With respect to each Payment Date; the Class X Interest Payment and the Class X Principal Payment; *provided*, such amount may be reduced in connection with a redemption of the Class X Notes, as set forth in the Indenture.

"Class X Principal Payment": With respect to the Class X Notes and any Payment Date, an amount equal to the Class X Principal Payment for such Payment Date beginning on the Payment Date in November 2007, in accordance with the amortization schedule set forth in Schedule K.

"Class X Shortfall Amount": With respect to the Class X Notes and any Payment Date, any shortfall or shortfalls in the payment of the Class X Payment with respect to any preceding Payment Date or Payment Dates together with interest accrued thereon at the Periodic Interest Rate relating to the Class X Notes (net of all Class X Shortfall Amounts, if any, paid with respect to the Class X Notes prior to such Payment Date).

"Clearance System": The Euroclear System or Clearstream or both.

"Clearstream": Clearstream Banking, *société anonyme*.

"CLO Security": A U.S. dollar-denominated collateralized loan obligation or a similar obligation that entitles the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the CLO Securities) on the credit exposure to, or cash flow from, a portfolio of collateral of which at least 75% consists of commercial loans (including eligible synthetic securities whose reference obligations consist of commercial loans); *provided* that not more than 25% of the Aggregate Principal Amount of any CLO Security may be comprised of Synthetic Securities; and *provided further* that each CLO Security must have a public or an estimated rating from each of the Rating Agencies.

"Closing Date": May 10, 2006.

"Closing Expense Account": The meaning specified in Section 10.2 hereof.

008491

"Closing Expense Deposit":  The cash credited to the Closing Expense Account on the Closing Date pursuant to Section 3.2(f) hereof.

"Closing Expenses":  The meaning specified in Section 11.1(a) hereof.

"Code":  The United States Internal Revenue Code of 1986, as amended.

"Co-Issuer":  As defined in the first sentence of this Indenture.

"Co-Issuers":  The Issuer and the Co-Issuer.

"Collateral":  The Trust Estate.

"Collateral Account":  The meaning specified in Section 10.2 hereof.

"Collateral Administration Agreement":  The meaning specified in Section 10.5(g) hereof.

"Collateral Administrator":  The collateral administrator under the Collateral Administration Agreement, initially JPMorgan Chase Bank, National Association.

"Collateral Agent":  The meaning specified in the Paying and Transfer Agency Agreement.

"Collateral Disposition Proceeds":  All proceeds (including, to the extent so determined by the Servicer, any payments received in connection with a consent or similar solicitation and including any amounts received in connection with an item of Defaulted Portfolio Collateral up to an amount equal to, in the aggregate, the Principal Balance of such item of Defaulted Portfolio Collateral) received during a Due Period from the sale or other disposition of any Portfolio Collateral included in the Trust Estate, net of any reasonable amounts expended by the Trustee in connection with such sale or other disposition (including without limitation disposition proceeds from liquidation of the Trust Estate pursuant to Section 9.11).  Accrued interest may also be treated as Collateral Disposition Proceeds (y) to the extent necessary to pay for the principal amount of or accrued interest on Substitute Portfolio Collateral if the item of sold Portfolio Collateral paid interest before, and in the same Due Period as, the date of sale or (z) to the extent such amounts are Purchased Accrued Interest treated as Collateral Principal Collections hereunder.  Amounts received with respect to Equity Portfolio Collateral or in connection with a consent or similar solicitation shall be treated as Collateral Interest Collections to the extent such proceeds are in excess of the Principal Balance (determined immediately prior to such Portfolio Collateral becoming Equity Portfolio Collateral) of the Portfolio Collateral disposed of.

"Collateral Interest Collections":  With respect to any Payment Date, the sum of (i) all payments of interest with respect to any Portfolio Collateral (excluding accrued interest classified as Collateral Disposition Proceeds but including any other receipts of accrued interest (including Accrued Interest on Sale)  and, to the extent so determined by the Servicer, any payments (other than principal) received in connection with a consent or similar solicitation, fees received in connection with an amendment (but only to the extent such amendment does not

008492

result in diminishing the principal money terms of such item of Portfolio Collateral) and including any commitment, standby or similar fees with respect to the unfunded portion of the Issuer's commitment to make or otherwise fund advances with respect to a Delayed Drawdown Loan or a Revolving Loan which are received during the applicable Due Period, less any Retained Accrued Interest, (ii) the Account Income, if any, in the Collection Account, the Initial Deposit Account and the Loan Funding Account which is received during the applicable Due Period, as each is determined as of the Calculation Date relating to such Payment Date (including, without limitation, Account Income on funds on deposit in the Initial Deposit Account transferred to the Collection Account on the Effective Date pursuant to Section 3.3(a) hereof), (iii) on or after the Effective Date, any funds transferred by the Trustee from the Initial Deposit Account pursuant to Section 10.2(f) hereof and (iv) income on Eligible Investments in and/or the securities credited to the Default Swap Collateral Account (to the extent the Issuer is entitled to receive such income pursuant to the terms hereof).

"Collateral LIBOR":  With respect to any item of Portfolio Collateral, the London interbank offered rate for U.S. dollar deposits as determined under the terms of the related Underlying Instrument.

"Collateral Principal Collections":  With respect to any Payment Date, all payments of principal of any Portfolio Collateral (including (i) any remaining Deposit (but excluding any Account Income thereon and subject to Section 3.4(d) hereof) not applied to purchase Original Portfolio Collateral or to effect an Initial Deposit Redemption, (ii) any payment of Premium, (iii) to the extent so determined by the Servicer, any payments received in connection with a consent or similar solicitation, fees received in connection with an amendment and including principal received in connection with or any payments received with respect to an item of Credit Risk Portfolio Collateral in connection with any consent or solicitation, (iv) all proceeds received from the sale of any warrant (whether sold as part of a Unit or separately), (v) any Collateral Disposition Proceeds which are received during the applicable Due Period, as determined as of the Calculation Date relating to such Payment Date, (vi) amounts representing Purchased Accrued Interest and (vii) amounts transferred from the Loan Funding Account upon the sale or disposition of Delayed Drawdown Loans or Revolving Loans or upon the expiration of a drawdown or revolving period, (viii) funds (other than income thereon) transferred from a Default Swap Collateral Account to the Collection Account, (ix) any amounts received by the Issuer that do not qualify as Collateral Interest Collections (other than those standing to the credit of any Default Swap Collateral Account or Default Swap Issuer Account) and (x) on or after the Effective Date, any funds in the Initial Deposit Account not considered Collateral Interest Collections pursuant to Section 10.2(f) hereof).  Notwithstanding the foregoing, Collateral Principal Collections shall include (A) any other amounts not included in Collateral Interest Collections or Adjusted Collateral Interest Collections, (B) any payments received with respect to an item of Defaulted Portfolio Collateral up to, in the aggregate, the Principal Balance of such item of Defaulted Portfolio Collateral and (C) any amounts recharacterized as Collateral Principal Collections in connection with any distribution of Payment Date Equity Securities.

"Collateral Purchase Amount":  With respect to any Payment Date, the aggregate amount of funds deposited into the Collection Account on such Payment Date pursuant to clause NINTH of Section 11.1(c)(i) and clause THIRD of Section 11.1(c)(ii).

008493

"Collateral Quality Formula": The formula set forth in Annex D to be used to interpolate between values or rows of the criteria set forth in the Collateral Quality Matrix. For purposes of such calculation, (i) the Moody's Asset Correlation Test requirement in the applicable row of the Collateral Quality Matrix must be equal to or less than 4.0% and greater than or equal to 3.0%, (ii) the Moody's Minimum Average Recovery Rate requirement in the applicable row of the Collateral Quality Matrix must be less than or equal to 45.5% and greater than or equal to 40.0%, (iii) the Moody's Weighted Average Rating Test requirement in the applicable row of the Collateral Quality Matrix must be equal to or greater than 1500 and less than or equal to 2500 and (iv) the Weighted Average Margin requirement in the applicable row of the Collateral Quality Matrix must be equal to or greater than 1.5% and less than or equal to 3.0%.

"Collateral Quality Matrix": For any date of determination, the row of the table set forth in Annex D that has been selected by the Servicer (in accordance with the procedures described in the next sentence) for use in determining the scores that are required to satisfy the Moody's Asset Correlation Test, the Minimum Average Recovery Rate Test with respect to Moody's, the Moody's Weighted Average Rating Test, the Weighted Average Coupon Test and the Weighted Average Margin Test. The Servicer may elect to (i) have a different row of the table set forth in Annex D apply and (ii) add additional rows to the table set forth in Annex D by interpolating using the Collateral Quality Formula (which may or may not include a combination of existing values), in each case upon providing written notice to the Issuer and the Trustee, so long as, immediately after giving effect to the change in rows, each of the Moody's Correlation Factor Test, the Minimum Average Recovery Rate Test with respect to Moody's, the Moody's Weighted Average Rating Test, the Weighted Average Coupon Test and the Weighted Average Margin Test will be satisfied according to the scores that are prescribed by the newly selected row and the Standard & Poor's CDO Monitor Test would have been satisfied as of the date of the most recent purchase or sale of an item of Portfolio Collateral had such test been calculated using the Current Portfolio, the Proposed Portfolio, and the S&P Scenario Loss Rate that was in effect immediately prior to such purchase or sale, but using the S&P Break-Even Loss Rate applicable to the Notes that would have been applicable after giving effect to the change in combinations; it being agreed that the Servicer shall be under no obligation to elect to change the Collateral Quality Matrix In determining whether the criteria set forth in the Collateral Quality Matrix are satisfied, the Servicer may use the Collateral Quality Formula to interpolate between values of such criteria or may use any other method that is agreed by the Issuer and Moody's with written notice to the Trustee. If a new Standard & Poor's CDO Monitor is required in connection with selecting a new row of the matrix, the Servicer will give notice to S&P and the Trustee at least two weeks prior to the selection of such new row.

"Collateral Quality Tests": The Moody's Correlation Factor Test, the Minimum Average Recovery Rate Test, the Moody's Weighted Average Rating Test, the Weighted Average Coupon Test, the Weighted Average Margin Test, the Weighted Average Life Requirement and the Standard & Poor's CDO Monitor Test.

"Collection Account": The meaning specified in Section 10.2 hereof.

008494

"Collections": With respect to any Payment Date, the sum of (i) the Collateral Interest Collections collected during the applicable Due Period and (ii) the Collateral Principal Collections collected during the applicable Due Period, as each is determined as of the Calculation Date relating to such Payment Date.

"Controlling Class": Shall mean the Class A-1LA Notes and the Class X Notes, so long as any Class A-1LA Notes and Class X Notes are Outstanding, then the Class A-1LB Notes, so long as any Class A-1LB Notes are Outstanding, then the Class A-2L Notes, so long as any Class A-2L Notes are Outstanding, then the Class A-3L Notes, so long as any Class A-3L Notes are Outstanding, then the Class A-4L Notes, so long as any Class A-4L Notes are Outstanding and then the Class B-1L Notes, so long as any Class B-1L Notes are Outstanding.

"Corporate Trust Office": The principal corporate trust office of the Trustee currently located at 600 Travis Street, 50th Floor, Houston, Texas 77002, Attention: Worldwide Securities Services-ROCKWALL CDO, or at such other address as the Trustee may designate by notice to the Noteholders, the Servicer, the Issuer and the Rating Agencies or the principal corporate trust office in the United States of any successor Trustee.

"Coupon Adjustment": To the extent the Weighted Average Coupon of the Fixed Rate Portfolio Collateral exceeds the percentage specified in the row of the Collateral Quality Matrix then in effect for such Weighted Average Coupon, then the Weighted Average Margin Test (as specified in the row of the Collateral Quality Matrix then in effect), will be reduced by a per annum percentage equal to the product of (x) the amount by which the Weighted Average Coupon of the Fixed Rate Portfolio Collateral exceeds the percentage specified in the row of the Collateral Quality Matrix then in effect for such Weighted Average Coupon, times (y) a fraction, the numerator of which is the Aggregate Principal Amount of the Fixed Rate Portfolio Collateral and the denominator of which is the Aggregate Principal Amount of the Floating Rate Portfolio Collateral, times (z) 360/365.

To the extent the Weighted Average Margin of the Floating Rate Portfolio Collateral exceeds the percentage specified in the row of the Collateral Quality Matrix then in effect for such Weighted Average Margin, then the Weighted Average Coupon Test (as specified in the row of the Collateral Quality Matrix then in effect) will be reduced by a per annum percentage equal to the product of (x) the amount by which the Weighted Average Margin exceeds the percentage specified in the current row of the Collateral Quality Matrix, times (y) a fraction, the numerator of which is the Aggregate Principal Amount of the Floating Rate Portfolio Collateral and the denominator of which is the Aggregate Principal Amount of the Fixed Rate Portfolio Collateral, times (z) 365/360.

"Credit Improved Criteria": Shall mean with respect to any item of Portfolio Collateral, in the Servicer's reasonable judgment, such item of Portfolio Collateral has significantly improved in credit quality, and:

(a) Moody's, S&P or Fitch has placed such item of Portfolio Collateral or any other class of security issued together with such item of Portfolio Collateral (or, if such item of Portfolio Collateral is not rated, the issuer thereof) on its credit watch list (or similar list) with the potential for developing positive credit implications since the date the Issuer first acquired such

item of Portfolio Collateral (and for so long as such item of Portfolio Collateral or issuer, as applicable, remains on such list) or there has been an upgrade in the rating of such item of Portfolio Collateral, issuer or other class of security issued together with such item of Portfolio Collateral, as applicable, by Moody's, S&P or Fitch by one or more subcategories from the rating of such item of Portfolio Collateral or issuer, as applicable, by Moody's, S&P or Fitch, as applicable, in effect on the date the Issuer first acquired such item of Portfolio Collateral;

(b) with respect to a Portfolio Loan, since the date on which such Portfolio Loan was first acquired by the Issuer, has increased in price to 101.5% or more of its original purchase price or the spread of which over the related reference rate has been reduced, in each case, in accordance with its Underlying Instruments since the date on which such item of Portfolio Collateral was first acquired by the Issuer by 0.25% or more (in the case of an item of Portfolio Collateral with a spread over the related reference rate less than or equal to 2.00% at the time such item of Portfolio Collateral was first acquired by the Issuer) or 0.50% or more (in the case of an item of Portfolio Collateral with a spread over the related reference rate greater than 2.00% at the time such item of Portfolio Collateral was first acquired by the Issuer) for reasons primarily due to an improvement in the related borrower's financial ratios or financial results and not as a result of general market conditions; or

(c) with respect to any item of Portfolio Collateral which is not a Portfolio Loan, an increase in the market price (expressed as a percentage of par value) since the date of purchase of such item of Portfolio Collateral which, compared to the change in the average market price of a representative sample (as determined by the Servicer) of other debt securities with similar terms and credit characteristics and that would be eligible to be pledged as Portfolio Collateral, is greater than 3.00% of the par value or more relative to such representative sample; or a decrease since the date of purchase of such item of Portfolio Collateral of more than 10.0% in the difference between the yield to worst call on such item of Portfolio Collateral compared to the yield on the relevant United States Treasury security;

*provided, however*, that the criteria in (b) and (c) above may be used only as corroboration of other bases for the Servicer's Judgment.

"Credit Improved Portfolio Collateral":  Any item of Portfolio Collateral which, (a) in the Servicer's commercially reasonable judgment consistent with the standard of care set forth in the Servicing Agreement (provided, that in forming such judgment a decrease in credit spread or an increase in Market Value of such item of Portfolio Collateral may only be utilized as corroboration of other bases of such judgment), has improved in credit quality or otherwise satisfies the Credit Improved Criteria or (b) is sold pursuant to a Portfolio Improvement Exchange; *provided* that the Aggregate Principal Amount of any such Portfolio Collateral sold pursuant to clause (b) shall not exceed, during any twelve-month period, 20% (or such lower amount as determined by the Servicer) of the Aggregate Par Amount as of the first day of such period.

"Credit Risk Criteria":  With respect to any item of Portfolio Collateral:

(a) Moody's, Fitch or S&P has placed such item of Portfolio Collateral or any other class of security issued together with such item of Portfolio Collateral (or, if such item of

008496

Portfolio Collateral is not rated, the issuer thereof) on its credit watch list with the potential for developing negative credit implications (or similar list) since the date the Issuer first acquired such item of Portfolio Collateral (and for so long as such item of Portfolio Collateral or issuer, as applicable, remains on such list) or there has been a reduction in the rating of such item of Portfolio Collateral, issuer or other class of security issued together with such item of Portfolio Collateral, as applicable, by Moody's, Fitch or S&P, as applicable, by one or more subcategories from the rating of such item of Portfolio Collateral or issuer, as applicable, by Moody's, Fitch or S&P, as applicable, in effect on the date the Issuer first acquired such item of Portfolio Collateral;

(b) which is a Portfolio Loan, the spread over the applicable reference rate has been increased in accordance with the related Underlying Instruments since the date on which such Portfolio Loan was first acquired by the Issuer by 0.50% or more (in the case of a Portfolio Loan with a spread over the applicable reference rate at the time such Portfolio Loan was first acquired by the Issuer less than or equal to 2.00%) or 0.75% or more (in the case of a Portfolio Loan with a spread over the applicable reference rate at the time such Portfolio Loan was first acquired by the Issuer greater than 2.00%) primarily due to a deterioration in the related borrower's financial ratios or financial results and not as a result of general market conditions; *provided, however*, that the criteria in this paragraph (b) may be used only as corroboration of other bases for the Servicer's judgment;

(c) which is a CLO Security, a decline in the par amount of underlying collateral such that the aggregate par amount of the entire class of securities to which such item of Portfolio Collateral belongs and all other securities secured by the same pool of collateral and that rank senior in priority of payment to such class of securities exceeds the aggregate par amount of all collateral (excluding defaulted collateral) securing such securities; or

(d) it is a Deferred Interest PIK Bond or a partial Deferred Interest PIK Bond.

"Credit Risk Portfolio Collateral": Any item of Portfolio Collateral (other than an item of Defaulted Portfolio Collateral) which, in the Servicer's commercially reasonable business judgment consistent with the standard of care set forth in the Servicing Agreement (which judgment shall not be questioned as a result of subsequent events; *provided*, that in forming such judgment an increase in credit spread or a decrease in Market Value of such item of Portfolio Collateral may only be utilized as corroboration of other bases of such judgment), (i) is likely to decline in credit quality and, with the passage of time, become Defaulted Portfolio Collateral, and (ii) if a Sales Restriction Condition has occurred, otherwise satisfies the Credit Risk Criteria.

"Cumulative Class X Payment": With respect to any Payment Date and the Class X Notes, the Class X Payment with respect to such Payment Date and the Class X Shortfall Amount, if any, with respect to such Payment Date.

"Cumulative Interest Amount": With respect to a Payment Date and any Class of Notes the applicable Periodic Interest Amount with respect to such Payment Date and the applicable Periodic Rate Shortfall Amount, if any, with respect to such Payment Date.

"Current Pay Obligation": An item of Portfolio Collateral that would otherwise be an item of Defaulted Portfolio Collateral but as to which (i) no interest payments (including deferred interest) or scheduled principal payments are due and payable that are unpaid and the Servicer reasonably expects that the issuer or obligor of such item of Portfolio Collateral will continue to make scheduled payments in cash of interest or principal thereon and will pay the principal thereof by maturity, (ii) if the issuer or obligor of such item of Portfolio Collateral is subject to a bankruptcy proceeding, a bankruptcy court has authorized the payment of interest due and payable on such item of Portfolio Collateral, and (iii) either (a) the Market Value of such item of Portfolio Collateral is equal to or greater than 80% of par and the Moody's Rating of such item of Portfolio Collateral is at least "Caa1" or (b) the Market Value of such item of Portfolio Collateral is equal to or greater than 85% of par and the Moody's Rating of such item of Portfolio Collateral is at least "Caa2" (or, if the Moody's Rating has been withdrawn, the Moody's Rating of such item of Portfolio Collateral was at least "Caa2" prior to withdrawal) or (c) if the Moody's Rating of such item of Portfolio Collateral is less than "Caa2" or is "Caa2" and on credit watch with negative implications, but greater than or equal to "Caa3" without credit watch with negative implications, the Market Value of the such item of Portfolio Collateral is at least equal to 90% of its Principal Balance; *provided* that if the Moody's Rating of the item of Portfolio Collateral has been withdrawn but the obligation had a Moody's rating of at least "Caa3" without credit watch with negative implications at the time of default, such item of Portfolio Collateral may be treated as a Current Pay Obligation if its Market Value is at least equal to 90% of its Principal Balance.

"Current Portfolio": Pledged Securities in the Trust Estate immediately prior to the sale, maturity or the other disposition of an item of Portfolio Collateral or immediately prior to the purchase of an item of Portfolio Collateral, as the case may be.

"Custodian": As such term is defined in Section 2.1(b) hereof.

"Debt Security": Each Structured Finance Investment and interests in corporate and other debt securities (including senior secured floating notes) included in the Portfolio Collateral (other than Eligible Investments, CLO Securities and Portfolio Loans) and, for the avoidance of doubt, Portfolio Loans shall not be considered Debt Securities.

"Default": Any event or condition the occurrence or existence of which, with the giving of notice or lapse of time or both, would become an Event of Default.

"Defaulted Portfolio Collateral": Any item of Portfolio Collateral (other than an item of Portfolio Collateral which is a DIP Loan, unless such item of Portfolio Collateral itself is in default since acquisition), including with respect to a Synthetic Security, the related Reference Obligation, with respect to which:

    (i)    the issuer thereof has defaulted in the payment of principal or interest (in respect of Portfolio Loans only, beyond five Business Days, *provided* the Servicer certifies in writing to the Trustee that it believes, in its reasonable business judgment, that such delay is not credit related), unless, in the case of a failure of such issuer to make required interest payments, such issuer has resumed current cash payments of interest and paid in full all accrued and unpaid interest;

008498

(ii)     such item of Portfolio Collateral is *pari passu* with or subordinated to other material indebtedness for borrowed money owing by the issuer thereof ("Other Indebtedness") and such issuer has defaulted in the payment of principal or interest (beyond any applicable grace or notice period and without regard to any waiver of such default) on such Other Indebtedness, unless, in the case of a failure of such issuer to make required interest payments, such issuer has resumed current cash payments of interest and has paid in full any accrued interest due and payable thereon;

(iii)     an Insolvency Event has occurred with respect to the issuer thereof;

(iv)     the Servicer has knowledge (or such rating information has been published) that the issuer thereof is rated "D" or "SD" by S&P (calculated in accordance with Schedule D) (or S&P has withdrawn its rating which prior to such withdrawal was "D" or "SD");

(v)     there has been proposed or effected any distressed exchange or other distressed debt restructuring where the issuer of such Portfolio Collateral has offered the debt holders a new security or package of securities that, in the commercially reasonable judgment of the Servicer amounts to a diminished financial obligation;

(vi)     such item of Portfolio Collateral is declared to be an item of Defaulted Portfolio Collateral by the Servicer, but only so long as it remains so designated by the Servicer in its sole discretion; or

(vii)     such item of Portfolio Collateral is a CLO Security which is rated "CC" or below by S&P (or S&P has withdrawn its rating which prior to such withdrawal was rated "CC") or rated "Ca" or "C" or below by Moody's;

*provided* that any item of Portfolio Collateral that is classified as an item of "Defaulted Portfolio Collateral" will cease to be so classified if such item of Portfolio Collateral, at any date thereafter, (a) would not otherwise be classified as an item of Defaulted Portfolio Collateral in accordance with the definition of such term and (b) otherwise meets the collateral criteria described herein as of such date.

"Default Swap":  Any U.S. dollar denominated "pay as you go" credit default swap or total return swap with respect to a Reference Obligation, which the Issuer (directly or indirectly) purchased from or entered into with a Default Swap Counterparty, which contains equivalent probability of default, recovery upon default (or a specific percentage thereof), expected loss, maturity, interest rate and other non-credit characteristics as those of the related Reference Obligation (without taking account of such considerations as they relate to the Default Swap Counterparty); *provided* that (i) the Reference Obligation is a CLO Security, (ii) such Default Swap will not cause the Issuer to be treated as engaged in a trade or business in the United States for U.S. Federal income tax purposes or otherwise subject the Issuer (or the beneficial owners thereof) to U.S. Federal income tax on a net income tax basis, (iii) either (a) amounts receivable by the Issuer are not expected to (based on the Servicer's determination, which may include consultation with counsel to the Issuer) be subject to U.S. or foreign withholding tax in respect of the Default Swap or (b) the Default Swap Counterparty is required

008499

to make "gross-up" payments pursuant to the related Underlying Instruments that cover the full amount of any such withholding tax on an after-tax basis (including any tax on such additional payments), (iv) the Issuer has caused to be deposited in a Default Swap Collateral Account an amount in cash at least equal to the aggregate of (or the amount required under the terms of the Synthetic Security to provide for) all further payments (contingent or otherwise) that the Issuer is or may be required to make to the Default Swap Counterparty under the Default Swap; (v) the agreement relating to such Default Swap contains "non-petition" provisions with respect to the Issuer and "limited recourse" provisions limiting the Default Swap Counterparty's rights in respect of the Default Swap Collateral to the funds and other property credited to the Default Swap Collateral Account related to such Default Swap; (vi) the notional amount of such Default Swap is equal to the principal amount of the Reference Obligation; (vii) the agreement relating to such Default Swap Collateral contains provisions to the effect that upon the occurrence of an "Event of Default" or "Termination Event" (other than an "Illegality" or "Tax Event"), if any, where the Default Swap Counterparty is the sole "Defaulting Party" or the sole "Affected Party" ("Event of Default," "Termination Event," "Illegality," "Tax Event," "Defaulting Party" or "Affected Party," as applicable, as such terms are defined in the ISDA Master Agreement relating to such Default Swap), (a) the Issuer may terminate its obligations under such Default Swap and upon such termination and payment of any termination amount payable under the Default Swap, any lien in favor of the Default Swap Counterparty over its related Default Swap Collateral Account will be terminated and (b) upon payment of any termination amount payable under the Default Swap, the Issuer will no longer be obligated to make any payments to the Default Swap Counterparty with respect to such Default Swap, (viii) any Default Swap shall be positively indexed to the related Reference Obligation on no more than a one-to-one basis, (ix) if any Reference Obligation delivered pursuant to any Default Swap does not constitute Portfolio Collateral and it would cause any collateral quality test or concentration limitation not to be satisfied, such Reference Obligation shall be deemed Equity Portfolio Collateral, and (x) (a) such Default Swap shall be documented with a standard ISDA form master agreement, as modified by appropriate schedules and confirmations and (b) (1) such Default Swap is a Form-Approved Synthetic Security or (2) the Rating Condition has been satisfied with respect to the purchase of or entry into such Default Swap.

"Default Swap Collateral": Cash, securities or other collateral purchased or posted by the Issuer in connection with the purchase of a Default Swap, including without limitation a payment of cash or delivery of securities by the Issuer.

"Default Swap Collateral Account": The account established pursuant to Section 10.2 hereof with the Securities Intermediary in the name of the Trustee.

"Default Swap Counterparty": Any entity, whose long term senior unsecured debt or derivatives counterparty rating shall be at least "A2" by Moody's and a long term rating of at least "A" or a short term rating of at least "A-1" by S&P, required to make payments on Synthetic Portfolio Collateral pursuant to the terms of such Default Swap or any guarantee thereof to the extent that a Reference Obligor makes payments on a related Reference Obligation.

"Default Swap Counterparty Termination Payment": An amount payable by the Issuer to a Default Swap Counterparty that is due following the designation of an "Early

Termination Date" (as defined in the related credit default swap) (other than in respect of "Illegality" or a "Tax Event" (each as defined in the related credit default swap)), as to which the Default Swap Counterparty is the sole "Defaulting Party" or the sole "Affected Party" (as each such term is defined in the ISDA Master Agreement related to such Synthetic Security).

"Default Swap Issuer Account": The account established pursuant to Section 10.2 hereof with the Securities Intermediary in the name of the Trustee.

"Deferred Interest PIK Bond": As of any date of determination, any PIK Bond that is not an item of Defaulted Portfolio Collateral that has, in accordance with its terms, deferred or paid "in-kind" any amount of interest for a period equal to:

(a) in the case of an item of Portfolio Collateral that has a Moody's Rating below "Baa3" (or, if rated "Baa3," is on credit watch for possible downgrade) or, if rated by S&P, a rating by S&P below "BBB-" (or, if rated "BBB-," is on credit watch for possible downgrade), the shorter of one accrual period or six months; and

(b) in all other cases, the shorter of two accrual periods or twelve months;

and has not, as of such date of determination, resumed timely payment of current interest in cash and repaid all outstanding deferred or capitalized interest in cash. For the avoidance of doubt, an item of Portfolio Collateral will not constitute a Deferred Interest PIK Bond if it resumes timely payment of current interest in cash and repays all outstanding deferred or capitalized interest in cash on the Payment Date immediately succeeding the end of the interest accrual period(s) set forth above.

"Definitive Notes": Registered definitive notes in substantially the form set forth in Exhibits A-1L-4, A-2L-4, A-3L-4 and B-1L-4.

"Delayed Drawdown Loan": A Portfolio Loan that, pursuant to the related Underlying Instrument or Underlying Loan and Security Agreement and lender or lenders, would obligate the Issuer, if the Issuer were to become a lender thereunder by purchasing such Portfolio Loan for inclusion in the Trust Estate, to make or otherwise fund one or more future advances to the related borrower and meeting the criteria described in Section 3.4; *provided* that, if a Delayed Drawdown Loan has been drawn in full and there are no future advance obligations to the related borrower, such Portfolio Loan will no longer be considered a Delayed Drawdown Loan.

"Deliver" or "Delivery": The taking of the following steps by the Issuer:

(a) with respect to such of the Trust Estate as constitutes an instrument, causing the Trustee to take possession in the State of New York of such instrument, indorsed to the Trustee or in blank by an effective indorsement;

(b) with respect to such of the Trust Estate as constitutes tangible chattel paper, goods, a negotiable document, or money, causing the Trustee to take possession in the State of New York of such tangible chattel paper, goods, negotiable document, or money;

008501

(c) with respect to such of the Trust Estate as constitutes a certificated security in bearer form, causing the Trustee to acquire possession in the State of New York of the related security certificate;

(d) with respect to such of the Trust Estate as constitutes a certificated security in registered form, causing the Trustee to acquire possession in the State of New York of the related security certificate, indorsed to the Trustee or in blank by an effective indorsement, or registered in the name of the Trustee, upon original issue or registration of transfer by the issuer of such certificated security;

(e) with respect to such of the Trust Estate as constitutes an uncertificated security, causing the issuer of such uncertificated security to register the Trustee as the registered owner of such uncertificated security;

(f) with respect to such of the Trust Estate as constitutes a security entitlement, causing the Securities Intermediary to indicate by book entry that the financial asset relating to such security entitlement has been credited to the appropriate Account;

(g) with respect to such of the Trust Estate as constitutes an account or a general intangible, (i) causing the account debtor for such account or general intangible to be notified of the grant to the Trustee of a security interest in such account or general intangible, (ii) causing to be taken any steps necessary to perfect a security interest in such account or general intangible under the laws of the Cayman Islands, and (iii) causing to be filed with the District of Columbia Recorder of Deeds a properly completed UCC financing statement that names the Issuer as debtor and the Trustee as secured party and that covers such account or general intangible;

(h) with respect to such of the Trust Estate as constitutes a deposit account, causing such deposit account to be maintained in the name of the Trustee and causing the bank with which such deposit account is maintained to agree in writing with the Trustee and the Issuer that (i) such bank will comply with instructions originated by the Trustee directing disposition of the funds in such deposit account without further consent of any other person or entity, (ii) such bank will not agree with any person or entity other than the Trustee to comply with instructions originated by any person or entity other than the Trustee, (iii) such deposit account and the property deposited therein will not be subject to any lien, security interest, encumbrance, or right of set-off in favor of such bank or anyone claiming through it (other than the Trustee), (iv) such agreement will be governed by the laws of the State of New York, and (v) the State of New York will be the bank's jurisdiction of such bank for purposes of Article 9 of the UCC; or

(i) in the case of each of paragraphs (a) through (h) above, such additional or alternative procedures as may hereafter become appropriate to grant and perfect a security interest in such items of the Trust Estate in favor of the Trustee, consistent with applicable law or regulations.

In each case of Delivery contemplated herein, the Trustee shall make appropriate notations on its records indicating that such item of the Trust Estate is held by the Trustee pursuant to and as provided herein.

008502

Effective upon Delivery of any item of the Trust Estate, the Trustee shall be deemed to have (i) represented that its purchase of such item of the Trust Estate is made in good faith, and without notice of any adverse claim thereto appearing on the face of such item (if in physical form) or otherwise known to a Responsible Officer of the Trustee; *provided that* such representation shall not impose any other affirmative duty or obligation upon the Trustee with regard to inquiry or investigation of, or constructive notice of, adverse claims; and (ii) acknowledged that it holds such item of the Trust Estate as Trustee hereunder for the benefit of the Holders of the Notes and the other Secured Parties. Any additional or alternative procedures for accomplishing "Delivery" for purposes of paragraph (i) of this definition shall be permitted only upon delivery to the Trustee of an Opinion of Counsel to the effect that such procedures are appropriate to grant and perfect a security interest in the applicable type of collateral in favor of the Trustee.

"Deposit": The cash credited to the Initial Deposit Account on the Closing Date (or with respect to the Post-Closing Sale Collateral, within 10 days of the Closing Date) in accordance with Section 3.2(e) hereof, including any reimbursement for amounts withdrawn from the Initial Deposit Account pursuant to Section 10.2(f), and including the first interest payment received on each Portfolio Loan and on CLO Securities (other than certain CLO Securities, as indicated on Schedule A) purchased on the Closing Date.

"Deposit Account": The meaning specified in Section 10.2 hereof.

"Depository": With respect to the Regulation S Global Notes and the Rule 144A Global Notes, DTC, its nominees, and their respective successors.

"DIP Loan": Any interest in a loan or financing facility (a) which at the time of purchase is an obligation of a debtor-in-possession pursuant to Section 364 of United States the Bankruptcy Code, (b) the terms of which have been approved by an order of a United States Bankruptcy Court, a United States District Court, or any other court of competent jurisdiction, the enforceability of which order is not subject to any pending contested matter or proceeding (as such terms are defined in the Federal Rules of Bankruptcy Procedure), (c) which has the priority allowed by either Section 364(c) or 364(d) of the Bankruptcy Code, (d) which pays interest in cash on a current basis, and (e) as to which the obligor has paid its most recent scheduled interest and principal payments (if any) and the Servicer reasonably expects that such obligor will continue to pay interest and principal payments. For purposes hereof, a DIP Loan shall not be considered a Current Pay Obligation. Any DIP Loan added as an item of Portfolio Collateral must be assigned a formal or estimated rating by Moody's and S&P.

"Discount Portfolio Collateral": (a) Any Portfolio Loan which had a Moody's Rating of at least "B3" at the time of purchase and which was purchased at a price less than 85% of the Principal Balance thereof, (b) any Portfolio Loan which had a Moody's Rating below "B3" at the time of purchase and which was purchased at a price less than 90% of the Principal Balance thereof, (c) any item of Portfolio Collateral which is not a Portfolio Loan and which had a Moody's Rating of at least "B3" at the time of purchase and which was purchased at a price less than 80% of the Principal Balance thereof, (d) any item of Portfolio Collateral which is not a Portfolio Loan and which had a Moody's Rating below "B3" at the time of purchase and which was purchased at a price less than 85% of the Principal Balance thereof and (e) any CLO

008503

Security which had a Moody's Rating of "Aa3" or greater at the time of purchase or originally rated "Aa3" or greater by Moody's which was purchased at a price less than 92% of the Principal Balance thereof and the provisions of this definition set forth below will not be applicable to these CLO Securities; *provided* that, (i) any item of Portfolio Collateral that would otherwise be considered Discount Portfolio Collateral, but that has a Market Value above 90% of its Principal Balance for 22 consecutive Business Days if it is a Portfolio Loan or above 85% of its Principal Balance for 60 consecutive days if it is a CLO Security, after being purchased by the Issuer, will no longer be considered Discount Portfolio Collateral and (ii) any item of Portfolio Collateral that would otherwise be considered Discount Portfolio Collateral, but that is purchased with the proceeds of sale of an item of Portfolio Collateral that was not an item of Discount Portfolio Collateral at the time of its purchase, so long as such item of Portfolio Collateral (a) was purchased or committed to be purchased within five Business Days of such sale, (b) was purchased at a price (as a percentage of par) equal to or greater than the sale price of the sold item of Portfolio Collateral, (c) was purchased at a purchase price not less than 65% of the Principal Balance thereof and (d) had a rating equal to or greater than the rating of the sold item of Portfolio Collateral, will not be considered Discount Portfolio Collateral. Notwithstanding the foregoing, at no time during the period commencing on the Closing Date through the Final Maturity Date, shall the Aggregate Principal Amount of all items of Discount Portfolio Collateral purchased pursuant to clause (ii) exceed in the aggregate 10% of the Required Portfolio Collateral Amount; *provided* that no more than 3% of the Required Portfolio Collateral Amount of such 10% cumulative limitation may consist of CLO Securities; *provided* that if a Portfolio Loan purchased pursuant to clause (ii) above is repaid in full, is sold for a price equal to at least 97.5% of its unpaid Principal Balance or has a Market Value above 90% of its Principal Balance for at least 22 consecutive Business Days after being purchased, such Portfolio Loan shall not be taken into account for purposes of clause (ii) above; *provided further* that, as of any date of determination, the Aggregate Principal Amount of items of Portfolio Collateral in the Trust Estate purchased pursuant to clause (ii) above, may not exceed (x) 5% of the Aggregate Par Amount or (y) if the weighted average purchase price of Portfolio Collateral purchased pursuant to clause (b) above is less than 75% as of such date of determination, 2.5% of the Aggregate Par Amount.

"Distributable Equity Securities" Any and all Equity Portfolio Collateral, which cannot be sold by the Servicer as a result of the regulatory, market or other restrictions, as determined in good faith by the Servicer, and shall have the value as determined by an independent third party with relevant experience in making such valuation.

"Distribution Compliance Period": The period ending on the 40th day after the later of the conclusion of the offering of the Notes and the Closing Date.

"DTC": The Depository Trust Company, a New York corporation, or any successor thereto.

"Due Date": Each date on which a distribution or payment is due on a Pledged Security (which includes any Eligible Investment).

"Due Period": With respect to any Payment Date, the period beginning on the day following the last day of the immediately preceding Due Period (or, in the case of the Due

Period that is applicable to the first Payment Date beginning on the Closing Date) and ending at the close of business on the seventh Business Day preceding such Payment Date.

"Effective Date":  The earlier of (i) the first date on which the Deposit has been applied to the purchase (or committed to the purchase) of Original Portfolio Collateral such that the Aggregate Principal Amount of the Portfolio Collateral (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to any of the Original Portfolio Collateral on or before the Effective Date) is at least equal to the Required Portfolio Collateral Amount or (ii) September 10, 2006.

"Eligible Investments":  Any U.S. dollar denominated investment that is one or more of the following (including security entitlements with respect thereto):

(a) direct registered obligations of, and registered obligations fully guaranteed by, the United States of America or any agency or instrumentality of the United States of America the obligations of which are backed by the full faith and credit of the United States of America or United States Security Entitlements (as defined in the Indenture) other than obligations or security entitlements of the Federal Home Loan Mortgage Corporation; *provided, however,* that, in the case of obligations or United States Security Entitlements that are rated, each such obligation shall, at the time of its inclusion in the Trust Estate, have a credit rating of "AA-" or better or "A-1+" or better, as applicable, by S&P (except that Eligible Investments in an amount up to 20% of the Aggregate Principal Amount of the Notes Outstanding may be rated "A-1") and "Aa3" or better (if such obligation has a long-term rating) or "P-1" or better by Moody's, and, in each case, is not put on credit watch (with negative implications);

(b) demand and time deposits in, trust accounts with, and certificates of deposit of, any depository institution or trust company (including the Trustee) incorporated under the laws of the United States of America or any state thereof and subject to the supervision and examination by federal and/or state banking authorities so long as the commercial paper and/or debt obligations of such depository institution or trust company (or, in the case of the principal depository institution in a holding company system, the commercial paper or debt obligations of such holding company) at the time of purchase or contractual commitment providing for such purchase have a credit rating of "AA-" or better, in the case of debt obligations, or "A-1+" or better, in the case of commercial paper, by S&P (except that Eligible Investments in an amount up to 20% of the Aggregate Principal Amount of the Notes Outstanding may be rated "A-1") and "Aa3" or better (if such obligation has a long-term rating) or "P-1" or better by Moody's, and, in each case, is not put on credit watch (with negative implications)**;**

(c) registered securities bearing interest or sold at a discount issued by any corporation incorporated under the laws of the United States of America or any state thereof that have a credit rating of  "AA-" or better by S&P and "Aa3" or better (if such obligation has a long-term rating) or "P-1" or better by Moody's at the time of purchase or contractual commitment providing for such purchase, and, in each case, is not put on credit watch (with negative implications);

008505

(d) repurchase obligations with respect to any security described in clause (a) above, entered into with a depository institution or trust company (acting as principal) described in clause (b) above (including the Trustee) or entered into with a corporation (acting as principal) whose short-term debt has a credit rating of "A-1+" (except that Eligible Investments in an amount up to 20% of the Aggregate Principal Amount of the Notes Outstanding may be rated "A-1") or better by S&P and "Aa3" or better (if such obligation has a long-term rating) or "P-1" or better by Moody's at the time of purchase in the case of any repurchase obligation for a security having a maturity not more than 183 days from the date of its issuance or whose long-term debt has a credit rating of "AA-"- or better by S&P and "Aa3" or better (if such obligation has a long-term rating) by Moody's at the time of purchase in the case of any repurchase obligation for a security having a maturity more than 183 days from the date of its issuance and, in each case, is not put on credit watch (with negative implications);

(e) commercial paper having at the time of purchase a credit rating of "A-l+" (except that an amount up to 20% of the Aggregate Principal Amount of the Notes Outstanding may be rated "A-1") or better by S&P and "Aa3" or better (if such obligation has a long-term rating) or "P-1" or better by Moody's and that has a maturity of not more than 183 days from its date of issuance; *provided, however,* that in the case of commercial paper with a maturity of longer than 91 days, the issuer of such commercial paper (or, in the case of a principal depository institution in a holding company system, the holding company of such system), if rated by S&P, must have at the time of purchase a long-term credit rating of "AA-" or better by S&P and "Aa3" or better (if such obligation has a long-term rating) by Moody's and, in each case, is not put on credit watch (with negative implications);

(f) off-shore money market funds, which funds have, at all times, the highest credit rating assigned to such investment category by S&P and Moody's; and

(g) such other Eligible Investments acceptable to the Rating Agencies;

*provided, however,* that: (i) Eligible Investments purchased with funds in the Collection Account shall be held until maturity (or sold only for an amount at least equal to the par amount of such Eligible Investment) and shall include only such obligations or securities as mature no later than the Business Day prior to the next Payment Date and Eligible Investments purchased with funds in the Initial Deposit Account shall be held until maturity (or sold only for an amount at least equal to the par amount of such Eligible Investment) and shall include only such obligations or securities as mature no later than the Business Day prior to the date expected to be used and in any event prior to the Initial Deposit Redemption Date; (ii) none of the foregoing obligations or securities shall constitute Eligible Investments if all, or substantially all, of the remaining amounts payable thereunder shall consist of interest and not principal payments; (iii) none of the S&P ratings required above shall have a subscript of "r", "t", "p", "pi" or "q"; (iv) none of the foregoing obligations or securities shall constitute Eligible Investments if such obligations or securities are mortgage-backed securities; (v) no such obligation may be margin stock, securities which have a mandatory or optional conversion to equity or securities which are subject to an Offer; (vi) no such obligation may have coupons or other payments that are subject to U.S. withholding tax or are subject to foreign withholding under the terms of the underlying instruments where the issuer is not required to make "gross-up" payments sufficient to cause the net amount to be received on the debt obligations to equal the amount that would have been paid

008506

had no such withholding tax applied; and (vii) any such Eligible Investment purchased on the basis of S&P's short-term rating of "A-1" shall mature not later than thirty (30) days after the date of purchase. Eligible Investments may include those Eligible Investments with respect to which the Trustee or its Affiliates provide services.

"Equity Portfolio Collateral": Any security (or any other right, interest or property or security entitlement) which does not entitle the holder thereof to receive periodic payments of interest no less frequently than semiannually and one or more installments of principal, in cash and sufficient to retire in full the stated principal amount thereof on the stated maturity date therefor; *provided, however,* that such definition will not include warrants, profit participations or similar equity-based rights that are a component of a Unit to the extent that the Aggregate Principal Amount of Portfolio Collateral in the Trust Estate with a warrant, profit participation or similar equity-based right attached thereto as a component of a Unit does not exceed 10% of the Aggregate Principal Amount of all Pledged Securities in the Trust Estate.

"ERISA": The United States Employee Retirement Income Security Act of 1974, as amended.

"Euroclear Operator": Euroclear Bank S.A./N.V., as operator of the Euroclear System, and any successor thereto.

"Event of Default": The meaning specified in Section 5.1 hereof.

"Exchange Act": The United States Securities Exchange Act of 1934, as amended.

"Exchange Certificate": The certification delivered in the form of Exhibit F hereto.

"Exchange Offer": With respect to any item of Portfolio Collateral, (i) an offer by the issuer of such item of Portfolio Collateral or by any other Person made to all holders of such item of Portfolio Collateral to exchange such item of Portfolio Collateral held by them for an item of Equity Portfolio Collateral or other debt instruments that do not otherwise satisfy the definition of Portfolio Collateral or (ii) any solicitation by such issuer or other Person to amend, modify or waive any provision of such item of Portfolio Collateral or of the related Underlying Instrument, the effect of which would be to convert such item of Portfolio Collateral into an item of Equity Portfolio Collateral or other debt instruments that do not otherwise satisfy the definition of Portfolio Collateral.

"Excluded Accrued Interest": With respect to any item of Initial Portfolio Collateral, any accrued and unpaid interest thereon (i) which was not included in the purchase price thereof that the Issuer paid on the Closing Date, and (ii) which will be paid by the Trustee from the Trust Estate, as instructed by Bear Stearns, in accordance with the terms of the Indenture.

"Expected Maturity Date": With respect to the Class X Notes, the Payment Date occurring in August 2013.

008507

"Expense Reimbursement Account":   The meaning specified in Section 10.2 hereof.

"Extended Final Maturity Date"   If a Maturity Extension has occurred, the sixteenth Payment Date after the then current Extended Final Maturity Date (or, in the case of the first Extended Final Maturity Date, the Payment Date in August 2025).

"Extended Revolving Period End Date":   If an Extension has occurred, the sixteenth Payment Date after the then current Extended Revolving Period End Date (or, in the case of the first Extension, the Payment Date in August 2015).

"Extended Weighted Average Life Date": If a Maturity Extension has occurred, the sixteenth Payment Date after the then current Extended Weighted Average Life Date (or, in the case of the first Extended Weighted Average Life Date, May 1, 2019).

"Extension": An extension of the Revolving Period, the Final Maturity Date of the Notes and the Weighted Average Life Test in accordance with the Indenture.

"Extension Bonus Payment": With respect to each Maturity Extension, a single payment to each applicable Noteholder as set forth in Sections 11.1(c) and (d) in an amount equal to (1) in the case of the Class A-1LA Notes, 0.25% of the Aggregate Principal Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, (2) in the case of the Class A-1LB Notes, 0.25% of the Aggregate Principal Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, (3) in the case of the Class A-2L Notes, 0.25% of the Aggregate Principal Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, (4) in the case of the Class A-3L Notes, 0.50% of the Aggregate Principal Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, (5) in the case of the Class A-4L Notes, 0.50% of the Aggregate Principal Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, and (6) in the case of the Class B-1L Notes, 0.50% of the Aggregate Principal Amount thereof held by such beneficial owner as of the applicable Extension Effective Date.

"Extension Bonus Eligibility Certification": With respect to each Maturity Extension and each beneficial owner of Notes other than Extension Sale Securities, the written certification by such beneficial owner acceptable to the Issuer to the effect that it held Notes other than Extension Sale Securities on the applicable Extension Effective Date, including the Aggregate Principal Amount thereof and wire transfer instructions for the Extension Bonus Payment and any required documentation thereunder.

"Extension Conditions":  As defined under Section 2.3(d).

"Extension Determination Date":  The 8th Business Day prior to each Extension Effective Date.

"Extension Effective Date":  If an Extension has occurred, the sixteenth Payment Date after the then current Extension Effective Date (or, in the case of the first Extension Effective Date, the Payment Date in August 2011).

008508

"Extension Notice": The notice given by the Issuer of its election to extend the Revolving Period substantially in the form of Exhibit I.

"Extension Purchase Price": The purchase price payable by the Extension Qualifying Purchasers for Extension Sale Securities in connection with each Maturity Extension, if any, in an amount equal to (i) in the case of the Notes, the Aggregate Principal Amount thereof, plus accrued and unpaid interest as of the applicable Extension Effective Date (giving effect to any amounts paid to the Holder on such date), (ii) in the case of the Preferred Shares, an amount that, when taken together with all payments and distributions made in respect of such Preferred Shares since the Closing Date would cause such Preferred Shares to have received (as of the date of purchase thereof) an Internal Rate of Return of 12.0% (assuming such purchase date was a "Payment Date" under the Indenture); *provided, however, that* if the applicable Extension Effective Date is on or after the date on which such Holders have received an Internal Rate of Return equal to or in excess of 12.0%, the applicable Extension Purchase Price for such Preferred Shares shall be zero.

"Extension Qualifying Purchasers": The Servicer (or any of its Affiliates acting as principal or agent); *provided* that in the event the Servicer elects not to purchase Securities from Holders pursuant to the Extension Conditions set forth in Section 2.3(d); "Extension Qualifying Purchasers" shall mean one or more qualifying purchasers (which may include the Initial Purchaser or any of its Affiliates acting as principal or agent) designated by the Servicer; *provided, however*, none of the Servicer, the Initial Purchaser, or any of their respective Affiliates shall have any duty to act as an Extension Qualifying Purchaser.

"Extension Sale Notice": Irrevocable notice given by any Holder of Notes (other than the Class X Notes) and Preferred Shares of its intention to sell its Notes or Preferred Shares to an Extension Qualifying Purchaser in the case of a Maturity Extension substantially in the form of Enclosure B to Exhibit I.

"Extension Sale Notice Period": Within 30 days after the Issuer has delivered the Extension Notice.

"Extension Sale Securities": Notes or Preferred Shares as to which an Extension Sale Notice has been duly given.

"Final Maturity Date": With respect to each Class of Notes (other than the Class X Notes) the Payment Date occurring in August 2021 and with respect to the Class X Notes, the Payment Date occurring in August 2013 or such earlier date on which the Aggregate Principal Amount of each Class of Notes is paid in full, including in connection with an Optional Redemption; *provided that* the "Final Maturity Date" with respect to the Notes (other than the Class X Notes) will be extended to the applicable Extended Final Maturity Date upon the occurrence of a Maturity Extension.

"Fitch": Fitch Ratings or any successor thereto.

"Fixed Rate Portfolio Collateral": An item of Portfolio Collateral that bears interest at a fixed rate.

008509

"Floating Rate Portfolio Collateral": An item of Portfolio Collateral that bears interest at a floating rate.

"Foreign Intermediaries": The meaning specified in Section 3.5 hereof.

"Form-Approved Synthetic Security": A Synthetic Security (a)(i) the Reference Obligation of which would be eligible for purchase by the Issuer as an item of Portfolio Collateral without any required action by the Rating Agencies or for which the Rating Condition has been satisfied or (ii) the Reference Obligation of which would satisfy clause (i) but for the currency in which it is payable and such Synthetic Security is payable in U.S. Dollars, does not provide for physical settlement and does not expose the Issuer to currency risk, (b) the documentation of which conforms (but for the amount and timing of periodic payments, the name of the Reference Obligation, the notional amount, the effective date, the termination date and other similarly necessary changes) to a form in respect of which the Rating Condition has been satisfied for use in this transaction, (c) which provides that any "credit event" thereunder shall not include restructuring (other than modified restructuring as defined in the 2003 ISDA Credit Derivatives Definitions), repudiation, moratorium, obligation default or obligation acceleration unless such Synthetic Security may be settled only through a physical settlement of a deliverable obligation to the Issuer and not in cash, (d) which has been certified in writing by the Servicer to the Trustee and the Issuer as meeting the requirements of this definition and (e) for which the Issuer has provided the Rating Agencies notice of the purchase of such Synthetic Security no less than five Business Days prior to such purchase; *provided that* each Rating Agency may revoke its consent to a Form-Approved Synthetic Security upon 30 days' written notice to the Trustee and the Issuer.

"Global Note": A Temporary Regulation S Global Note, a Permanent Regulation S Global Note or a Rule 144A Global Note.

"Grant": To grant, bargain, sell, warrant, alienate, remise, demise, release, convey, assign, transfer, mortgage, pledge, create and grant a security interest in and right of set-off against, deposit, set over and confirm. A Grant of any item of the Trust Estate shall include all rights, powers and options (but none of the obligations) of the granting party thereunder, including without limitation the immediate and continuing right to claim for, collect, receive and receipt for principal and interest payments in respect of such item of the Trust Estate, and all other monies payable thereunder, to give and receive notices and other communications, to make waivers or other agreements, to exercise all rights and options, to bring Proceedings in the name of the granting party or otherwise, and generally to do and receive anything that the granting party is or may be entitled to do or receive thereunder or with respect thereto.

"Group A Country": Australia, Canada, the United Kingdom, the Federal Republic of Germany or The Netherlands (so long as the U.S. dollar denominated sovereign debt obligations of such jurisdiction are rated at least "Aa2" by Moody's and the foreign currency issuer credit rating assigned by S&P to such jurisdiction is at least "AA" and, in each case, is not put on credit watch (with negative implications)).

"Group B Country": Austria, Belgium, Bermuda, Denmark, Finland, France, Ireland, Italy, Liechtenstein, Luxembourg, New Zealand, Norway, Portugal, Spain, Sweden or

008510

Switzerland or any other member state of the European Union (as of the Closing Date) identified from time to time by the Servicer and subject to the satisfaction of the Rating Condition with respect to each Rating Agency with respect thereto (so long as the U.S. dollar denominated sovereign debt obligations of such jurisdiction are rated at least "Aa2" by Moody's and the foreign currency issuer credit rating assigned by S&P to such jurisdiction is at least "AA" and, in each case, is not put on credit watch (with negative implications)).

"HFP Shares": Preferred Shares beneficially owned or controlled by Highland Financial Partners, L.P., an affiliate of the Servicer.

"Holder" and "Noteholder": The Person in whose name a Note is registered in the Note Register.

"Indenture": This Indenture, as supplemented or amended in accordance with the terms hereof.

"Independent": When used with respect to any specified Person means such a Person who (a) is in fact independent of the Issuer and any other obligor upon the Notes and the Servicer or any Affiliate of the Issuer or such other obligor or the Servicer, (b) does not have any direct financial interest or any material indirect financial interest in the Issuer or in any such other obligor or the Servicer or in an Affiliate of the Issuer or such other obligor or the Servicer, and (c) is not connected with the Issuer or any such other obligor or the Servicer or any Affiliate of the Issuer or such other obligor or the Servicer as an officer, employee, promoter, underwriter, trustee, partner, director or Person performing similar functions. "Independent" when used with respect to any accountant may include an accountant who audits the books of such Person if in addition to satisfying the criteria set forth above the accountant is independent with respect to such Person within the meaning of Rule 101 of the Code of Ethics of the American Institute of Certified Public Accountants. Whenever it is provided herein that any Independent Person's opinion or certificate shall be furnished to the Trustee, such Person shall be appointed by Issuer Order and such opinion or certificate shall state that the signer has read this definition and that the signer is independent within the meaning thereof. Notwithstanding anything herein to the contrary, Bear Stearns shall be "Independent" for all purposes hereof.

"Initial Consent Period": The period of 15 Business Days from but excluding the date on which the Trustee provided notice of a proposed supplemental indenture pursuant to Section 82 hereof to the Holders of any Notes or Preferred Shares.

"Initial Deposit Redemption": A redemption of the Class X Notes and the Class A-1LA Notes pursuant to Section 3.3 hereof.

"Initial Deposit Redemption Amount": The meaning specified in Section 3.3.

"Initial Deposit Redemption Date": The November 2006 Payment Date.

"Initial Portfolio Collateral": The Portfolio Collateral that, in the case of CLO Securities, will be purchased on or prior to the Closing Date and, in the case of Portfolio Loans, will be purchased on or before the Closing Date or identified by the Issuer and for which commitments will be entered into on or prior to the Closing Date for purchase on or as soon as

008511

practicable after (not scheduled to exceed sixty (60) days after) the Closing Date with the net proceeds from the sale of the Notes and the net proceeds from the sale of the Preferred Shares on the Closing Date, which Initial Portfolio Collateral is set forth on <u>Schedule A</u> hereto.

"<u>Initial Portfolio Collateral Amount</u>": U.S. $765,000,000 (or such larger Aggregate Principal Amount of Portfolio Collateral as may be purchased on the Closing Date by the Issuer).

"<u>Insolvency Event</u>": With respect to any Person, means that:

(i)      an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (a) liquidation, reorganization or other relief in respect of such Person or its debts, or of all or substantially all of its assets, under any bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (b) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for such Person or for all or substantially all of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 30 days; or an order or decree approving or ordering any of the foregoing shall be entered; or

(ii)      such Person shall (a) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (b) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (i) above, (c) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator or conservator or for all or substantially all of its assets, (d) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (e) make a general assignment for the benefit of creditors or (f) take any action for the purpose of effecting any of the foregoing.

"<u>Institutional Investor</u>": Any one of the following persons: (i) any bank, trust company or national banking association, acting for its own account or in a fiduciary capacity, (ii) any charitable foundation or eleemosynary institution, (iii) any insurance company, (iv) any pension or retirement trust or fund for which any bank, trust company, national banking association or investment adviser registered under the Investment Advisers Act of 1940, as amended from time to time, is acting as trustee or agent, or that manages its own assets, having funds of at least $5,000,000, (v) any investment company, as defined in the Investment Company Act, (vi) any college or university, (vii) any government or public employees' pension or retirement system, or any other governmental agency supervising the investment of public funds, or (viii) any corporation, limited liability company, business trust or partnership having total assets in excess of $5,000,000.

"<u>Interest Coverage Ratio</u>": with respect to any Payment Date after the second Payment Date, a number (expressed as a percentage) calculated by dividing (a) four times the amount by which (i) the Collateral Interest Collections received or scheduled to be received during the Due Period in which such calculation occurs (other than Collateral Interest Collections (including deferred interest thereon) scheduled to be received on any item of Portfolio Collateral that is not paying or expected to pay current interest), exceeds (ii) the

008512

Periodic Reserve Amount (excluding amounts payable on the Class B-1L Notes) as of such Payment Date, by (b) the Aggregate Principal Amount of Class A Notes with respect to such Payment Date, as adjusted, to take into account any O/C Redemption to occur on the Payment Date related to such Due Period pursuant the Indenture pursuant to Section 11.2 hereof.

For purposes of calculating the Interest Coverage Ratio, any item of Portfolio Collateral as to which any interest or other payment thereon is subject to withholding tax or other deductions on account of tax of any jurisdiction, each such payment of interest or other payment thereon will be deemed to be payable net of such withholding tax or other deductions on account of tax unless, in the case of a withholding tax, the issuer thereof or obligor thereon is required to make additional payments to fully compensate the Issuer for such withholding taxes (including in respect of any such additional payments) and on any date of determination, the amount of any scheduled payment due on any future date will be assumed to be made net of any such uncompensated withholding tax or other deductions on account of tax based upon withholding or other applicable tax rates in effect on such date of determination.

"Interest Coverage Test":  A test which is applicable on each Payment Date after the second Payment Date and will be satisfied as of such determination date if the Interest Coverage Ratio will be at least 1.5%.

"Internal Rate of Return":  With respect to any Payment Date, the annualized discount rate at which the sum of the discounted values of the following cashflows is equal to zero, assuming discounting on a quarterly basis as of each Payment Date: (1) the Notional Amount of the Preferred Shares (which amount will be deemed to be negative for purposes of this calculation), (2) each distribution of Collateral Interest Collections made to the holders of the Preferred Shares on any prior Payment Date and, to the extent necessary to reach the applicable Internal Rate of Return, such Payment Date and (3) each distribution of Collateral Principal Collections made to the holders of the Preferred Shares on any prior Payment Date and, to the extent necessary to reach the applicable Internal Rate of Return, such Payment Date.

"Investment Company Act":  The United States Investment Company Act of 1940, as amended.

"Investor Corp.":  Rockwall Investors Corp., a Cayman Islands limited liability company, which will hold all of the Class I Preferred Shares, and which will issue its preferred shares to third party investors.

"Investor Representation Letter":  A certificate delivered by a prospective transferee of a Note in the form of Exhibit C hereto.

"Irish Paying Agent":  RSM Robson Rhodes LLP, or any successors thereto.

"Issuer":  The meaning specified in the first sentence of this Indenture.

"Issuer Base Administrative Expenses":  With respect to any Payment Date, the administrative expenses paid or payable by the Issuer during the applicable Due Period, including, without limitation, taxes, government fees, indemnities, registered office fees and expenses for third party loan pricing services and accountants, if any, in the following order: (i)

008513

*pro rata*, taxes of the Co-Issuers, surveillance fees, shadow rating fees and credit estimate fees, if any, of the Rating Agencies; fees due to any Listing and Paying Agent; fees due to any stock exchange on which any Class of the Notes or the Preferred Shares are listed; governmental fees, registered office fees and any other fees which are deemed necessary by the Servicer for administration of the Trust Estate, and (ii) *pro rata* reimbursement of expenses (including indemnities) of the Servicer required to be paid pursuant to the Servicing Agreement; and all expenses of the Administrator, the Listing and Paying Agent, the Securities Intermediary (if not the same person as the Trustee), the accountants and any fiscal agent retained in connection with the issuance of income notes, if any, in which the primary collateral for such income notes are obligations of the Issuer, any expenses of Investor Corp. and all other administrative expenses of the Co-Issuers, each as determined as of the Calculation Date relating to such Payment Date and as set forth in the related Note Valuation Report.

"Issuer Excess Administrative Expenses": With respect to any Payment Date, (i) the Trustee Administrative Expenses for the Due Period relating to such Payment Date in excess of the amount paid pursuant to Clause FIRST of Section 11.1(b) for the corresponding period, (ii) the Preferred Shares Administrative Expenses for the Due Period relating to such Payment Date in excess of the amount paid pursuant to clause FIRST of Section 11.1(b) for the corresponding period and (iii) the administrative expenses or other amounts (including indemnities) paid or payable by the Issuer during the applicable Due Period, as determined as of the Calculation Date relating to such Payment Date and as set forth in the related Note Valuation Report, in excess of the amount of the Issuer Base Administrative Expenses paid pursuant to Clause SECOND of Section 11.1(b).

"Issuer Order" and "Issuer Request": A written order or request dated and signed in the name of the Issuer by an Authorized Officer of the Issuer or a Person designated in writing by an Authorized Officer of the Issuer.

"LIBOR": For any Periodic Interest Accrual Period, the London interbank offered rate for three-month (or, for the period from the Closing Date to the November 2006 Payment Date, as described in Section 2.11 hereof) U.S. dollar deposits, as determined by the Calculation Agent in accordance with the provisions of Section 2.11 hereof.

"LIBOR Determination Date": The second London Business Day prior to the commencement of a Periodic Interest Accrual Period.

"Loan Funding Account": The account specified in Section 10.2 as that maintained by the Trustee into which the Issuer shall remit the full amount of the Issuer's commitment to make or otherwise fund draws related to any Delayed Drawdown Loans or Revolving Loans in the Portfolio Collateral.

"London Business Day": Any day on which dealings in deposits in U.S. dollars are transacted in the London interbank market.

"Majority Noteholders": The Holders of more than 50% of the Aggregate Principal Amount of the Outstanding Notes, voting as a single class; *provided that* upon the occurrence of a Default or an Event of Default pursuant to Section 5.1 hereof, "Majority

Noteholders" shall mean the Holders of more than 50% of the Controlling Class, voting together as a single class.

"Majority Preferred Shareholders":  The Holders of more than 50% of the outstanding Preferred Shares.

"Mandatory Redemption":  An O/C Redemption or a Rating Confirmation Failure Redemption.

"Mandatory Redemption Date":  Any Payment Date on which an O/C Redemption or a Rating Confirmation Failure Redemption is required.

"Mandatory Redemption Price":  When used with respect to an O/C Redemption or a Rating Confirmation Failure Redemption, an amount equal to the principal amount of the Notes being redeemed (or, in the case of the Class A-3L Notes, the Class A-4L Notes and the Class B-1L Notes, first to pay any Periodic Rate Shortfall Amount with respect to such Notes and then to pay principal).

"Market Value":  On any date of determination with respect to an item of Portfolio Collateral, any of:

(a) the average of the bid-side prices for the purchase of such item of Portfolio Collateral determined by an Approved Pricing Service that derives valuations by polling broker-dealers (Independent from the Servicer); or

(b) the arithmetic average of bid-side quotations for the purchase of such item of Portfolio Collateral obtained by the Servicer from three or more broker-dealers (*provided* if upon reasonable efforts of the Servicer, quotations from three broker-dealers are not available, the lower of the quotations from two broker-dealers may be used), in each case, Independent from the Servicer, in the relevant market; *provided* that one such bid must be from a broker-dealer other than Bear Stearns or an Affiliate of Bear Stearns and any bid received from Bear Stearns or an Affiliate of Bear Stearns hereunder cannot be more than 10% higher than the next highest bid; and

(c) if the determinations of the broker-dealers specified in the foregoing clauses (a) or (b) are not available (as reasonably determined by the Servicer) and so long as the Servicer is subject to the Investment Advisors Act of 1940, as amended, the bid-side market value of such item of Portfolio Collateral as certified by the Servicer as consistent with reasonable and customary market practice; *provided*, that, as of any date of determination (x) no more than 5.0% of the Aggregate Principal Amount of Portfolio Collateral may have market values determined in the manner provided in this clause (c) and (y) if the item of Portfolio Collateral constitutes collateral for any other issuer or account managed or serviced by the Servicer or its Affiliates, the Market Value of such item of Portfolio Collateral determined pursuant to this clause (c) shall be consistent with the market value applied by the Servicer or its Affiliates for such item of Portfolio Collateral for such for such other issuers or accounts; and

(d) if the market value cannot be determined in the manner described in clause (a), (b) or (c) above, an amount equal to the Principal Balance of the Portfolio Collateral as of

008515

such date multiplied by the Applicable Percentage for such item of Portfolio Collateral; *provided,* that if the market value cannot be determined in the manner described in clauses (a), (b) or (c) above for more than thirty (30) Business Days immediately following any date such market value is determined pursuant to this clause (d), then the market value of such item of Portfolio Collateral shall be automatically deemed to be zero following such 30-Business-Day period until the market value can be determined in the manner described in clause (a), (b) or (c) above as of any date of determination;

*provided that* (A) for purposes of determining Market Value, but subject to clause (b) hereof, Bear Stearns will be deemed to be Independent from the Servicer (*provided that* any quotes received from such entity will be on an arm's-length basis); (B) the Market Value of any item of Portfolio Collateral with respect to which the Issuer has entered into a commitment to sell but has not settled will be deemed to be the agreed sales price therefor (determined exclusive of accrued interest); and (C) the Market Value is determined only for purposes of compliance with covenants, coverage tests, overcollateralization tests, or any other requirements or tests set forth herein, or the determination of redemption prices.

"Maturity":  With respect to any Note, the date on which the Aggregate Principal Amount of such Note becomes due and payable as therein and herein provided, whether at the Final Maturity Date or by declaration of acceleration or otherwise.

"Maturity Extension":  As defined in Section 2.3(b) hereof.

"Minimum Average Recovery Rate Test": A test that will be satisfied with respect to Moody's, by application of the Collateral Quality Matrix and with respect to S&P, if the S&P Minimum Average Recovery Rate is greater than or equal to the S&P Weighted Average Recovery Rate then applicable in table set forth in the definition of S&P Break-Even Loss Rate.

"Monthly Report":  The meaning specified in Section 10.5(a) hereof.

"Moody's":  Moody's Investors Service, Inc. or any successor thereto.

"Moody's Default Probability Rating":  For a Portfolio Loan which is (i) a Senior Secured Loan, the Moody's corporate family rating for the obligor of such Portfolio Loan and, if any such obligor does not have a Moody's corporate family rating, such rating will be determined in accordance with the methodology described in Schedule F or (ii) a Non-Senior Secured Loan, the Moody's senior unsecured rating for the obligor of such Portfolio Loan and, if any such obligor does not have a Moody's senior unsecured rating, such rating will be determined by reference to the Moody's long-term issuer rating of the obligor of such Portfolio loan and, if such obligor does not have a Moody's senior unsecured rating or a Moody's long-term issuer rating, such rating will be determined in accordance with the methodology described in Schedule F.

"Moody's Asset Correlation Test" or "MAC Test":  A test satisfied on each Measurement Date if the Moody's Correlation Factor on such Measurement Date (rounded up to the nearest whole number) is equal to or less than the designated Moody's Correlation Factor determined by application of the Collateral Quality Matrix.

008516

"Moody's Correlation Factor": a single number determined by the Servicer in accordance with the correlation methodology provided to the Servicer and the Collateral Administrator by Moody's, and for which the number of assets represented by (N) on the calculation shall always equal 100.

"Moody's Minimum Average Recovery Rate": The number obtained by summing the products obtained by multiplying the Principal Balance of each item of Portfolio Collateral (excluding Defaulted Portfolio Collateral) by the Applicable Percentage (according to the Moody's Priority Category) applicable to such item of Portfolio Collateral as set forth in the definition above, dividing such sum by the Aggregate Principal Amount of all Portfolio Collateral, and rounding up to the fourth decimal place.

"Moody's Priority Category": Senior Secured Loans, Non-Senior Secured Loans, DIP Loans and/or Synthetic Securities.

"Moody's Priority Category Recovery Rate": For any item of Portfolio Collateral, the percentage specified in the definition of the term "Applicable Percentage" opposite the Moody's Priority Category of such item of Portfolio Collateral, taking into account the Rating Subcategories Difference applicable to such item of Portfolio Collateral.

"Moody's Rating": The rating determined in accordance with the methodology described in Schedule F.

"Moody's Weighted Average Rating": Shall have the meaning set forth in Schedule F.

"Moody's Weighted Average Rating Test": A test that will be satisfied by application of the Collateral Quality Matrix.

"Non-Senior Secured Loan": A Portfolio Loan that is not a Senior Secured Loan.

"Non-Call Period": The period beginning on the Closing Date and ending on August 1, 2010.

"Non-Consenting Holder": With respect to any supplemental indenture proposed pursuant to the Indenture that requires the consent of one or more Holders of the Notes or the Preferred Shares, any such Holder, or, in the case of Notes or Preferred Shares in global form, any beneficial owner, that either (i) has declared in writing that it will not consent to such supplemental indenture or (ii) has not consented to such supplemental indenture within 15 Business Days from the date on which the Trustee provided notice of such proposed supplemental indenture pursuant to the Indenture to such Holder or beneficial owner; *provided*, that in the case of the Non-Call Period, "Non-Consenting Holder" shall exclude any Holder of Class A-1LA Notes (unless such Holder has consented in writing to be designated as a Non-Consenting Holder) and the Amendment Buy-Out Option shall not be applicable to such Class A-1LA Notes.

"Non-U.S. Obligor": An issuer of or obligor on an item of Portfolio Collateral that is located outside the United States and is not a Permitted Non-U.S. Obligor.

008517

"Non-U.S. Person":  A Person who is not a U.S. Person.

"Non-U.S. Person Certificate":  A certificate substantially in the form of Exhibit G hereto.

"Noteholder" and "Holder":  The Person in whose name a Note is registered in the Note Register.

"Noteholder Report":  The meaning specified in Section 10.5(c) hereof.

"Note Register" and "Note Registrar":  The respective meanings specified in Section 2.5 hereof.

"Note Valuation Report":  The meaning specified in Section 10.5(b) hereof.

"Notes":  The Class X Notes, the A-1LA Notes, the Class A-1LB Notes, the Class A-2L Notes, the Class A-3L Notes, the Class A-4L Notes and the Class B-1L Notes.

"Notice":  The meaning specified in Section 13.3 hereof.

"Notional Amount":  When used with respect to the Preferred Shares, as of any date of determination, $1.00 per Preferred Share.

"O/C Redemption": The redemption of a Class or Classes of Notes other than the Class X Notes (including, with respect to the Class B-1L Notes, the applicable Periodic Rate Shortfall Amount, as set forth herein), to the extent necessary such that the Overcollateralization Tests and the Interest Coverage Test are satisfied, such tests to be calculated according to the method prescribed by Annex A and Annex B, respectively.

"Offer":  With respect to any security, (a) any offer by the issuer of such security or by any other Person made to all of the holders of such class of security to purchase or otherwise acquire all such securities (other than pursuant to any redemption in accordance with the terms of the related Underlying Instruments) or to exchange such securities for any other security or other property or (b) any solicitation by the issuer of such security or any other Person to amend, modify or waive any provision of such security or any related Underlying Instrument.

"Officer":  With respect to any corporation or company other than the corporation or company acting as Trustee, the Chief Executive Officer, the President, any Vice President, the Secretary or the Treasurer of such corporation or any other officer duly authorized by the Board of Directors; and with respect to the Trustee (and any other bank or trust company acting as trustee of an express trust or as custodian), any Responsible Officer thereof.

"Officer's Certificate":  A certificate signed on behalf of the Issuer, the Co-Issuer or the Servicer by an Authorized Officer of the Issuer, the Co-Issuer or the Servicer, as the case may be.

008518

"Opinion of Counsel": A written opinion, addressed to the Trustee (or on which the Trustee may rely) and in form and substance reasonably satisfactory to the Trustee, of an attorney at law admitted to practice before the highest court of any state of the United States or the District of Columbia or, with respect to matters relating to the laws of the Cayman Islands, the Cayman Islands, which attorney or attorneys may, except as otherwise expressly provided in this Indenture, be counsel for the Issuer, the Servicer or the Trustee and who shall be reasonably satisfactory to the Trustee.

"Optional Redemption": A redemption of the Notes in whole pursuant to Section 9.1 hereof.

"Optional Redemption Date": The Payment Date fixed by the Issuer for an Optional Redemption, which shall be no earlier than the first Payment Date occurring in August 2010.

"Optional Redemption Price": With respect to each Class of Notes, an amount equal to the aggregate of (i) the Aggregate Principal Amount of such Class of Notes as of the Optional Redemption Date, (ii) the applicable Cumulative Interest Amount with respect to the Optional Redemption Date and (iii) any unpaid Extension Bonus Payments in respect of such Notes.

For any Partial Optional Redemption, the Optional Redemption Price shall be equal to the applicable Partial Redemption Percentage of the Optional Redemption Price that would have applied for a Total Optional Redemption occurring on the applicable Optional Redemption Date.

"Original HFP Share Amount": The amount of HFP Shares acquired by the Servicer Entities on the Closing Date.

"Original Portfolio Collateral": The Portfolio Collateral, including the Initial Portfolio Collateral, purchased by the Issuer with the Deposit on or before the Effective Date and, in the case of Portfolio Loans, which will be identified by the Issuer and for which commitments will be entered into on or prior to the Effective Date for purchase on or as soon as practicable thereafter (but not scheduled to exceed sixty (60) days thereafter) pursuant to Section 3.4 hereof.

"Original Portfolio Collateral Criteria": The requirements for the acquisition of Original Portfolio Collateral prior to the Effective Date, as set forth in Section 3.4 hereof.

"Outstanding": With respect to the Preferred Shares, as of the date of determination and subject to the proviso below, "Outstanding" refers to all Preferred Shares issued and indicated in the Share Register as outstanding. With respect to the Notes, as of the date of determination, "Outstanding" refers to all Notes theretofore authenticated and delivered under this Indenture except:

(i) Notes theretofore canceled by the Note Registrar or delivered (or to be delivered pursuant to Sections 2.9 or 9.8 hereof) to the Note Registrar for cancellation;

008519

(ii)    Notes or portions thereof for whose payment or redemption money in the necessary amount has been theretofore irrevocably deposited with the Trustee or any Paying Agent in trust for the Holders of such Notes; *provided that*, if such Notes or portions thereof are to be redeemed, notice of such redemption has been duly given pursuant to this Indenture or provision therefor satisfactory to the Trustee has been made;

(iii)    Notes in exchange for or in lieu of which other Notes have been authenticated and delivered pursuant to this Indenture, unless proof satisfactory to the Trustee is presented that any such Notes are held by a protected purchaser; and

(iv)    Notes alleged to have been mutilated, destroyed, lost or stolen for which replacement Notes have been issued as provided in Section 2.6 hereof;

*provided that*, in determining whether the Holders of the requisite Aggregate Principal Amount have given any request, demand, authorization, direction, notice, consent or waiver hereunder, Notes owned by or pledged to the Issuer, the Trustee or any other obligor upon the Notes or any Affiliate of the Issuer, the Trustee or of such other obligor, and solely for purposes of termination of the Servicer, the Servicer and any Affiliate thereof, shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Notes that a Responsible Officer of the Trustee has actual knowledge to be so owned or pledged shall be so disregarded.

"Overcollateralization Haircut Amount": With respect to any date of determination, an amount equal to the sum of:

(A)    the greatest of the following:

(a) the product of (i) the applicable Overcollateralization Haircut Percentage multiplied by (ii) the Aggregate Principal Amount of all CLO Securities (other than Deferred Interest PIK Bonds and Defaulted Portfolio Collateral) on such date of determination that have an S&P Rating or a Moody's Rating within the CCC Rating Category;

(b) the product of (i) the applicable Overcollateralization Haircut Percentage multiplied by (ii) the excess, if any, of (x) the Aggregate Principal Amount of all CLO Securities included in the pledged Portfolio Collateral (other than Deferred Interest PIK Bonds and Defaulted Portfolio Collateral) on such date of determination that have an S&P Rating or a Moody's Rating within the B Rating Category or an S&P Rating or a Moody's Rating within the CCC Category over (y) 5.0% of the Aggregate Par Amount as of the date of the applicable Overcollateralization Test; *provided* that at no time during the period commencing on the Closing Date through the Final Maturity Date, shall the Aggregate Principal Amount of all CLO Securities exempt from haircut based on subclause (y) above exceed in the aggregate 5.0% of the Required Portfolio Collateral Amount; and

(c) the product of (i) the applicable Overcollateralization Haircut Percentage multiplied by (ii) the excess, if any, of (x) the Aggregate Principal Amount of all CLO Securities included in the pledged Portfolio Collateral (other than Deferred Interest PIK Bonds and Defaulted Portfolio Collateral) on such date of determination that have an S&P Rating or a

008520

Moody's Rating within the BB Rating Category, the B Rating Category or the CCC Rating Category over (y) 10.25% of the Aggregate Par Amount as of the date of the applicable Overcollateralization Test; *provided* that if at the date of measurement, Portfolio Loans within the CCC Rating Category is less than 6.25% of the Aggregate Par Amount, then 10.25% will be increased by the difference between 6.25% and percentage of the Aggregate Par Amount representing Portfolio Loans in the CCC Rating Category; *provided* that in no event shall such percentage increase to greater than 15%;

*provided that* for the avoidance of doubt, for purposes of clauses (a), (b) and (c) above, the applicable Overcollateralization Haircut Percentage shall always be applied first to the lowest rated Portfolio Collateral that falls within such clause, then to the next lowest rated Portfolio Collateral, etc., so that the maximum applicable haircut shall be applied to the Portfolio Collateral;

plus

(B) the product of (i) the applicable Overcollateralization Haircut Percentage multiplied by (ii) the excess, if any, of (x) the Aggregate Principal Amount of all Portfolio Loans included in the pledged Portfolio Collateral (other than Deferred Interest PIK Bonds and Defaulted Portfolio Collateral) on such date of determination that have an S&P Rating or a Moody's Rating within the CCC Rating Category over (y) 6.25% of the Aggregate Par Amount as of the applicable Overcollateralization Test.

"Overcollateralization Haircut Percentage": (i) With respect to CLO Securities with an S&P Rating or a Moody's Rating falling within the BB Rating Category, 10%, (ii) with respect to CLO Securities with an S&P Rating or a Moody's Rating falling within the B Rating Category, 20%, (iii) with respect to Portfolio Loans with an S&P Rating or a Moody's Rating falling within the CCC Rating Category, the greater of (x) 30% and (y) one minus the weighted average Market Value of all Portfolio Loans with an S&P Rating or a Moody's Rating falling within the CCC Rating Category and (iv) with respect to CLO Securities with an S&P Rating or a Moody's Rating falling within the CCC Rating Category, 50%.

"Overcollateralization Ratio": The Class A Overcollateralization Ratio or the Class B-1L Overcollateralization Ratio, as the context may require.

"Overcollateralization Ratio Adjustment": For purposes of calculating the Overcollateralization Ratios (i) items of Equity Portfolio Collateral shall not be included as Portfolio Collateral, (ii) items of Deferred Interest PIK Bonds and Defaulted Portfolio Collateral shall be included at the lesser of (a) the Market Value of such item of Deferred Interest PIK Bonds, Defaulted Portfolio Collateral and (b) the Applicable Percentage for such item of Deferred Interest PIK Bonds and Defaulted Portfolio Collateral multiplied by its Principal Balance; *provided* that any Portfolio Loan that has been an item of Defaulted Portfolio Collateral for four years shall not be included as Portfolio Collateral and any CLO Security that has been an item of Defaulted Portfolio Collateral for three years shall not be included as Portfolio Collateral, (iii) with respect to items of Discount Portfolio Collateral, an amount equal to the original purchase price of such item of Discount Portfolio Collateral shall be included as Portfolio

008521

Collateral and (iv) to the extent the Aggregate Principal Amount of Current Pay Obligations exceeds 7.5% of the Aggregate Par Amount, such excess shall be included as Defaulted Portfolio Collateral. If an item of Portfolio Collateral could be classified in more than one of the categories set forth in clauses (i) through (iv), such item of Portfolio Collateral will not be discounted multiple times but will be treated in the applicable category that results in the largest discount to the par amount of such item of Portfolio Collateral. Notwithstanding the foregoing, there may be included as Portfolio Collateral (with respect to items (i) through (iv) above) such greater amount as confirmed by the Rating Agencies which will not result in a reduction or withdrawal of the then-current ratings assigned by them to any Class of the Notes.

"Overcollateralization Tests": With respect to any date of determination, tests met when the Class A Overcollateralization Ratio is at least equal to the Class A Overcollateralization Percentage and the Class B-1L Overcollateralization Ratio is at least equal to the Class B-1L Overcollateralization Percentage, each relating to such date of determination.

"Partial Deferred Interest Bonds": Any debt obligation, with respect to which a portion of the interest thereon can be partially deferred without causing a payment default of such debt obligation under its underlying documents. For purposes of calculating the Weighted Average Coupon, the portion of interest that is deferrable with respect to any Partial Deferred Interest Bond will be assumed to be zero.

"Partial Optional Redemption": An Optional Redemption in part, in accordance with the terms specified herein.

"Partial Redemption Percentage": The percentage of Notes that will be subject to redemption *pro rata.*

"Participation": With respect to any Portfolio Loan, a participation interest in a commercial loan purchased from a Selling Institution that does not entitle the holder thereof to direct rights against the obligor.

"Paying Agent": The Trustee, the Irish Paying Agent or any other depository institution or trust company authorized by the Co-Issuers pursuant hereto to pay principal of or any interest that may become payable on any Class of Notes on behalf of the Co-Issuers.

"Paying and Transfer Agency Agreement": The agreement dated as of the Closing Date between the Issuer and the Paying and Transfer Agent with respect to the Preferred Shares.

"Paying and Transfer Agent": JPMorgan Chase Bank, National Association, as Paying and Transfer Agent with respect to (i) the Preferred Shares and (ii) the preferred shares issued by Investor Corp.

"Payment Date": November 1, February 1, May 1 and August 1 of each year, commencing November 1, 2006 (or if any such date is not a Business Day, the next succeeding Business Day).

008522

"Payment Date Equity Securities" shall mean, with respect to any Payment Date, Distributable Equity Securities that the Issuer, in its sole discretion but on the advice of the Servicer, elects to distribute in lieu of cash on such Payment Date to the Holders of Preferred Shares in accordance with the terms hereof.

"Periodic Interest Accrual Period":  With respect to any Payment Date, the period commencing on the prior Payment Date (or the Closing Date in the case of the first Payment Date) and ending on the day preceding such Payment Date.

"Periodic Interest Amount":  With respect to the Class A-1LA Notes, the Class A-1LB Notes and the Class X Notes on any Payment Date, the aggregate amount of interest accrued at the Applicable Periodic Rate during the related Periodic Interest Accrual Period on (i) with respect to the first Payment Date, the average daily Aggregate Principal Amount of such Class of Notes during such Periodic Interest Accrual Period, and (ii) thereafter, the Aggregate Principal Amount of such Class of Notes on the first day of such Periodic Interest Accrual Period (after giving effect to any payment of principal of such Class of Notes on such day). With respect to each other Class of Notes and any Payment Date, the aggregate amount of interest accrued at the Applicable Periodic Rate during the related Periodic Interest Accrual Period on the Aggregate Principal Amount of such Class on the first day of such Periodic Interest Accrual Period (after giving effect to any payment of principal of such Class of Notes on such date, including in connection with a redemption of a Class of Notes on any date during the related Periodic Interest Accrual Period).

"Periodic Rate Shortfall Amount":  With respect to each Class of Notes and any Payment Date, any shortfall or shortfalls in the payment of the Periodic Interest Amount on such Class of Notes with respect to any preceding Payment Date or Payment Dates, together with interest accrued thereon at the Applicable Periodic Rate (net of all Periodic Rate Shortfall Amounts, if any, paid with respect to such Class of Notes prior to such Payment Date).

"Periodic Reserve Amount": As of any date of determination, an amount equal to the sum of (i) the Trustee Administrative Expenses and Preferred Shares Administrative Expenses payable on the next succeeding Payment Date; (ii) without duplication of amounts payable pursuant to clause (i) hereof, the Issuer Base Administrative Expenses payable on the next succeeding Payment Date; (iii) the Base Fee Amount payable on the next succeeding Payment Date; (iv) the Cumulative Interest Amount for the Class A-1LA Notes, the Class A-1LB Notes, the Class A-2L Notes, the Class A-3L Notes, the Class A-4L Notes and the Periodic Interest Amount for the Class B-1L Notes due on the next succeeding Payment Date; and (v) the Cumulative Class X Payment due on the next succeeding Payment Date.

"Permanent Global Note":  The Rule 144A Global Notes and the Permanent Regulation S Global Notes.

"Permanent Regulation S Global Note":  With respect to any Class, the permanent global note issued to Non-U.S. Persons in exchange for the Temporary Regulation S Global Note of such Class after the Distribution Compliance Period, the permanent global note substantially in the form attached hereto as Exhibits A-1L-2, A-2L-2, A-3L-2 and B-1L-2.

008523

"<u>Permitted Non-U.S. Obligor</u>": An issuer of or obligor on an item of Portfolio Collateral that is located in (a) a Group A Country or (b)(i) a Group B Country, (ii) any tax advantaged jurisdiction (including the Cayman Islands, Netherlands Antilles, Bermuda, Ireland, Luxembourg and the Channel Islands) or (iii) any tax advantaged jurisdiction or any tax neutral or other jurisdiction subject to Moody's and S&P confirming to the Issuer, the Trustee and the Servicer that an immediate withdrawal, reduction or other adverse action with respect to any then current rating (including any private or confidential rating) of any Class of Notes will not occur as a result of such obligor being a Permitted Non-U.S. Obligor); *provided* that, with respect to the obligors of an item of Portfolio Collateral qualifying as Permitted Non-U.S. Obligors under this clause (b)(ii), at least 80% of such obligor's underlying assets must be domicile in the United States or another Permitted Non-U.S. Obligor jurisdiction to so qualify as a Permitted Non-U.S. Obligor. For purposes of this definition, the Servicer may specify the location of a Permitted Non-U.S. Obligor to be the country in which at least 80% of such obligor's underlying assets are domiciled, if such assets are domiciled in the United States or another Permitted Non-U.S. Obligor jurisdiction; *provided* that the Aggregate Principal Amount of the Portfolio Collateral as to which the Servicer so specifies the location of a Permitted Non-U.S. Obligor may not exceed 5% of the Aggregate Par Amount. If the location of a Permitted Non-U.S. Obligor is specified by the Servicer to be in a country other than where it is domiciled in accordance with the foregoing sentence, for purposes of the concentration limitations and collateral quality tests described herein, such item of Portfolio Collateral will be considered to be domiciled in the country so specified.

"<u>Person</u>": Any individual, corporation, partnership, limited liability company, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization, government or any agency or political subdivision thereof.

"<u>PIK Bond</u>": Any item of Portfolio Collateral that, pursuant to the terms of the related Underlying Instruments, permits the payment of interest thereon to be deferred and capitalized or otherwise provides that interest will accrue on such deferred interest or that issues identical securities in place of payments of interest in cash.

"<u>Pledged Securities</u>": On any date of determination, the Portfolio Collateral and the Eligible Investments in the Trust Estate.

"<u>Portfolio Collateral</u>": (I) Any United States dollar denominated commercial loan, including participation or assignment interests therein, in Registered form or Registered debt obligation (other than Eligible Investments) of any corporation, limited liability company, partnership, trust or other entity or of the United States government or any agency or instrumentality thereof or of any state or political subdivision or any agency or instrumentality thereof or of any sovereign issuer (including any security entitlement with respect thereto) and any United States Security Entitlement, which obligation, security entitlement or United States Security Entitlement, when Granted to the Trustee or committed to be purchased by the Issuer (with written notice to the Trustee):

(a) is an "eligible asset" as defined in Rule 3a-7;

008524

(b) except as permitted under Section 12.10(b), provides for periodic payments of interest thereon in cash no less frequently than semiannually, or, in the case of Portfolio Loans, quarterly;

(c) provides for a fixed amount of principal to be payable according to a fixed schedule or at maturity;

(d) is not an item of Defaulted Portfolio Collateral, an item of Equity Portfolio Collateral or a margin stock, or, except as permitted under Section 12.4, an item of Credit Risk Portfolio Collateral;

(e) is not a zero-coupon bond, a bond that provides for a combination of no coupon and a fixed coupon, a step-up bond (except for step-up bonds providing for the payment of current interest at a rate no less than 5% *per annum* or Collateral LIBOR, if floating rate), other than with respect to the Initial Portfolio Collateral on the Closing Date, a Partial Deferred Interest Bond (except for such bonds providing for the payment of current interest at a rate no less than 5% *per annum* or Collateral LIBOR, if floating rate);

(f) is not currently the subject of an Offer that would result in (i) the Issuer owning a security not meeting the requirements of Portfolio Collateral, not paying current interest, or, in the reasonable judgment of the Servicer, not expected to pay in full at maturity, or (ii) the Issuer receiving Eligible Investments or cash in a par amount less than that of the original security or the subject of an Exchange Offer;

(g) does not provide for conversion or exchange into equity capital at any time over its life (other than the exercise of any warrant, profit participation or other equity-like interest which is a component of a Unit);

(h) with respect to Portfolio Collateral which consists of Floating Rate Portfolio Collateral, has an interest rate which adjusts periodically in accordance with changes in one or more established indices at least one of which is the London interbank offered rate for one-, two-, three- or six-month U.S. dollar deposits and which adjusts at least semiannually or, with respect to items of Fixed Rate Portfolio Collateral, has an interest rate that remains constant until the maturity of such obligations or is a Reset Debt Security; *provided* that not more than 5.0% of the Aggregate Principal Amount of the Portfolio Collateral included in the Trust Estate may include items of Portfolio Collateral the interest rate on which adjusts in accordance with one or more indices that do not include the London interbank offered rate for one-, two-, three-, or six-month U.S. Dollar deposits;

(i) has coupon or other payments that are not subject to U.S. withholding tax and are not at time of purchase subject to foreign withholding tax unless the issuer of the security is required to make "gross-up" payments sufficient to cause the net amount to be received on the debt obligations to equal the amount that would have been paid had no such withholding tax applied;

(j) matures on or before August 1, 2021, or, if a Maturity Extension as occurred, the then applicable Extended Final Maturity Date, except that up to 5.0% of the Aggregate Par Amount may mature after such date but before 5 years after such date; *provided that*, with

008525

respect to Portfolio Loans, no more than 3.0% of the Aggregate Par Amount may mature after August 1, 2021, or, if a Maturity Extension as occurred, the then applicable Extended Final Maturity Date, but before two years after such date and no Portfolio Loans may mature after two years after such date;

(k) the terms of which do not, unless it is a Delayed Drawdown Loan or Revolving Loan, require the Holder to assume or otherwise undertake any funding obligations or liabilities (of a contingent nature or otherwise);

(l) is payable only in United States dollars;

(m) is not a Current Pay Obligation;

(n) is not a Debt Security;

(o) the S&P Rating of which does not include a subscript of "r", "t", "p", "pi" or "q" unless otherwise agreed to by Standard & Poor's in writing and a Moody's Rating that addresses the full amount of principal or interest indicated would be paid;

(p) any, during the Revolving Period, CLO Security has a Moody's Rating of "Ba2" or higher and an S&P Rating of "BB" or higher and, after the Revolving Period, are not CLO Securities;

(q) is not a PIK Bond which is currently deferring interest payments or receiving payments in-kind pursuant to the terms of the Underlying Instrument; and

(r) satisfies, together with the other Portfolio Collateral to be concurrently included in the Trust Estate, the other applicable criteria set forth in this Indenture, including the ratings guidelines and guidelines concerning issuer concentration and industry concentration; or

(II) a Synthetic Security; *provided* that the Servicer concludes, based on advice of counsel, that the Synthetic Security is an "eligible asset" for purposes of Rule 3a-7.

"Portfolio Improvement Exchange": The disposition, during the Revolving Period, of an item of Portfolio Collateral and corresponding acquisition of one or more items of Substitute Portfolio Collateral which in the aggregate will result in (i) the Collateral Quality Tests, the Interest Coverage Test, the Overcollateralization Tests and the other collateral criteria set forth in Section 12.2 being satisfied (or bring the total Portfolio Collateral closer to compliance with any such test or limitation) or if one or more of such Collateral Quality Tests, Interest Coverage Test, Overcollateralization Tests or collateral criteria set forth in Section 12.2 is not satisfied, the degree of compliance therewith would be improved and (ii) improving, on a net basis, the quality of the Portfolio Collateral as measured by such Collateral Quality Tests, Interest Coverage Test, Overcollateralization Tests and collateral criteria set forth in Section 12.2, and (iii) in the case of each of clause (i) and (ii) not causing any other Collateral Quality Tests, Interest Coverage Test, Overcollateralization Tests or collateral criteria set forth in Section 12.2, to be violated or significantly increase the likelihood of such violation in the future.

"Portfolio Loan":  Interests in commercial loans included in the Portfolio Collateral.

"Post-Closing Sale Collateral":  An asset acquired by the Issuer which as of the Closing Date has a commitment to be sold by the Issuer within 10 days of the Closing Date.

"Preferred Shares":  The 33,200,000 Class I Preferred Shares of the Issuer, par value U.S.$0.001 per share, and the 45,000,000 Class II Preferred Shares of the Issuer, par value U.S.$0.001 per share, that will be issued on the Closing Date pursuant to the Issuer's Memorandum of Association and Articles of Association and any further Preferred Shares issued from time to time by the Issuer.

"Preferred Shares Administrative Expenses": With respect to any Payment Date (including without limitation the Final Maturity Date), the Paying and Transfer Agent's administrative expenses for each of the Issuer and Investor Corp. for the Due Period relating to such Payment Date.

"Preferred Shares Collection Account":  The meaning set forth in the Paying and Transfer Agency Agreement.

"Premium":  With respect to any item of Portfolio Collateral sold pursuant to the terms hereof or called pursuant to the terms thereof, the excess, if any, of (a) the sale or call price of such item of Portfolio Collateral less any accrued interest with respect to such item of Portfolio Collateral over (b) the Aggregate Principal Amount of such item of Portfolio Collateral.

"Principal Balance":  With respect to any Pledged Security, as of any date of determination, the outstanding principal amount of such Pledged Security, *provided* that (i) unless otherwise stated herein or in the Indenture, the "Principal Balance" of any Delayed Drawdown Loan or Revolving Loan shall refer to the sum of the outstanding aggregate principal amount of such Delayed Drawdown Loan or Revolving Loan *plus* the amount of the unfunded portion of the Issuer's commitment to make or otherwise fund advances related thereto (to the extent, and without duplication, of amounts on deposit in the Loan Funding Account available to fund such advances), (ii) the "Principal Balance" of any Synthetic Security shall be equal to (a) in the case of any Synthetic Security other than a Default Swap, the outstanding principal amount of the Reference Obligation or the notional amount of the Synthetic Security related thereto and (b) in the case of any Default Swap, the cash and the principal amount of the securities in the related Default Swap Collateral Account reduced by the amount of any payments due and payable to the Default Swap Counterparty by reason of the occurrence of one or more "credit events" or other similar circumstances to the extent such payments have not yet been made; and (iii) with respect to any item of Equity Portfolio Collateral, the "Principal Balance" shall equal zero.

"Proceedings":  Any suit in equity, action at law or other judicial or administrative proceeding.

"Proposed Portfolio": The Aggregate Par Amount resulting from the sale, maturity or other disposition of an item of Portfolio Collateral or a proposed purchase of an item of Portfolio Collateral, as the case may be.

008527

"Purchased Accrued Interest": Interest accrued on or purchased with respect to an item of Portfolio Collateral as part of the price paid by the Issuer to acquire such item of Portfolio Collateral less any amount of Collateral Interest Collections applied by the Issuer to acquire such; *provided* that accrued interest on certain CLO Securities as indicated on Schedule A shall not constitute Purchased Accrued Interest.

"Qualified Institutional Buyer": A "qualified institutional buyer" within the meaning of Rule 144A.

"Qualified Purchaser": A "qualified purchaser" within the meaning of Section 3(c)(7) of the Investment Company Act.

"Quarterly Collateral Amount": With respect to any Due Period, the average of (i) the Aggregate Principal Amount of Portfolio Collateral on the first day of such Due Period and (ii) the Aggregate Principal Amount of Portfolio Collateral on the last day of such Due Period. For purposes of such amounts, Equity Portfolio Collateral and Defaulted Portfolio Collateral shall be excluded in calculating the Aggregate Principal Amount of the Portfolio Collateral.

"Rating Agencies": Standard & Poor's and Moody's, collectively.

"Rating Condition": With respect to any Rating Agency and any action proposed to be taken under this Indenture, a condition that is satisfied when such Rating Agency has confirmed in writing to the Issuer, the Trustee and the Servicer that no withdrawal, reduction or suspension (and not restored) with respect to any then current rating, if any, by such Rating Agency (including any private or confidential rating) of any Class of Notes will occur as a result of such proposed action.

"Rating Confirmation": Written confirmation from each of the Rating Agencies that it has not reduced or withdrawn (and not restored) the rating assigned by it on the Closing Date to any Class of Notes.

"Rating Confirmation Failure": A failure to obtain Rating Confirmation by the 35th day after the Effective Date (or if such day is not a Business Day, the succeeding Business Day).

"Rating Confirmation Failure Redemption": The redemption of a Class or Classes of Notes, as a result of a Rating Confirmation Failure pursuant to Section 9.2.

"Rating Subcategories Difference": The number of ratings subcategories difference between the rating by Moody's or, if not actually rated by Moody's, the Moody's Rating, of an item of Portfolio Collateral and the Moody's Default Probability Rating of such item of Portfolio Collateral.

"Record Date": With respect to any Payment Date, the Business Day immediately preceding such Payment Date; *provided however*, that if any Definitive Notes are issued, the Record Date for such Definitive Notes shall be fifteen calendar days preceding such Payment Date.

008528

"Redemption Date Statement":  The meaning specified in Section 10.5(e) hereof.

"Redemption Record Date":  With respect to an Optional Redemption Date, a Special Redemption Date, a Tax Event Redemption Date or a Mandatory Redemption Date, the Business Day preceding such Optional Redemption Date, Special Redemption Date, Tax Event Redemption Date or Mandatory Redemption Date, and with respect to an Initial Deposit Redemption, the last day of the calendar month preceding the month in which the Initial Deposit Redemption Date occurs.

"Reference Banks":  Four major banks in the London interbank market selected by the Calculation Agent (after consultation with the Servicer).

"Reference Obligation":  A security or other debt obligation that satisfies the definition of Portfolio Collateral other than as to payment terms; *provided that* notwithstanding the definition thereof, a Reference Obligation may be a loan (but not a participation interest in a loan, except as permitted in the Indenture).

"Reference Obligor":  The obligor under a Reference Obligation.

"Registered":  When used with respect to any Portfolio Collateral or Eligible Investment, an instrument issued after July 18, 1984, that is in registered form for purposes of the Code.

"Regulation S":  Regulation S promulgated under the Securities Act.

"Regulation S Global Note":  Temporary Regulation S Global Notes, together with the Permanent Regulation S Global Notes.

"Regulation S Transferor Certificate":  A certificate substantially in the form of Exhibit E hereto.

"Relevant Date":  The Final Maturity Date, except that if the full amount payable on the Notes has not been duly received by the Trustee or Paying Agent on or prior to the Final Maturity Date, the "Relevant Date" shall be the date on which such monies have been so received.

"Repository":  Shall mean the internet-based password protected electronic repository of transaction documents relating to privately offered and sold collateralized debt obligation securities located at "www.cdolibrary.com".

"Required Portfolio Collateral Amount":  U.S. $850,000,000.

"Requisite Noteholders":  The Holders of at least 60% of the Aggregate Principal Amount of the Outstanding Notes (voting as a single class); *provided that* (i) upon the occurrence of a Default or an Event of Default under this Indenture, "Requisite Noteholders" shall mean the Holders of at least 60% of the Aggregate Principal Amount of the Controlling Class.  If the Person that is acting as Trustee hereunder is a Holder of any Note for its own account, such Person shall be excluded as a Holder for purposes of this definition in connection

008529

with the consent or approval by Noteholders of any supplemental indenture affecting the provisions hereof relating to the Trustee.

"<u>Reserve Account</u>": The meaning specified in Section 10.2 hereof.

"<u>Reserve Amount</u>": A portion of the proceeds from the sale of the Notes in an amount equal to US$1,600,000 to fund a portion of the payments to be made on any Payment Date in accordance with the Priority of Payments, or to otherwise fund any payments of interest or principal on the Notes at the direction and the sole discretion of the Servicer.

"<u>Reset Debt Security</u>": An item of Portfolio Collateral bearing a rate of interest that varies periodically (including, without limitation, daily), which at the time of its inclusion in the Trust Estate has a minimum rate of interest of at least 5.0% *per annum* with respect to Fixed Rate Portfolio Collateral or Collateral LIBOR with respect to Floating Rate Portfolio Collateral, and which minimum interest rate is not subject to adjustment on or after its inclusion in the Trust Estate, pursuant to the terms of the related Underlying Instrument to a rate of interest which is lower than the rate of interest borne by such item of Portfolio Collateral on the date that such item of Portfolio Collateral was included in the Trust Estate.

"<u>Responsible Officer</u>": When used with respect to the Trustee, any officer within the Corporate Trust Office (or any successor group of the Trustee) including any vice president, assistant vice president, assistant treasurer, assistant secretary, trust officer or any other officer of the Trustee customarily performing functions similar to those performed by the persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred within the Corporate Trust Office because of his or her knowledge of and familiarity with the particular subject.

"<u>Retained Accrued Interest</u>" Any accrued and unpaid interest with respect to any Portfolio Collateral which was not included in the purchase price for such collateral at the time of purchase.

"<u>Revolving Loan</u>": A Portfolio Loan that, pursuant to the agreement or instrument that governs the rights and obligations of the parties thereto, would obligate the Issuer, if the Issuer were to purchase such Portfolio Loan for inclusion in the Trust Estate, to make or otherwise fund one or more future advances to the related borrower.

"<u>Revolving Period</u>": The period beginning on the Closing Date and ending on the earliest of (i) August 1, 2011 for Portfolio Loans or August 1, 2009 for CLO Securities or, in the case of an Extension, the Extended Revolving Period End Date; *provided* that Portfolio Loans and CLO Securities may be purchased for the period of any such Extension, and (ii) the occurrence and continuance of an Event of Default; *provided* that in no event shall date of termination of the Revolving Period be determined on the basis of the Market Value of the Portfolio Collateral.

"<u>Rule 144A</u>": Rule 144A promulgated under the Securities Act.

"<u>Rule 144A Global Note</u>": With respect to any Class, the permanent global note issued to U.S. Persons.

008530

"Rule 144A Transferor Certificate":  A certificate substantially in the form of Exhibit D hereto.

"Rule 3a-7":  Rule 3a-7 under the Investment Company Act.

"Sale":  The meaning specified in Section 5.18 hereof.

"Sale Restriction Condition":  Shall mean (x) with respect to sales of Credit Risk Portfolio Collateral, if the rating of the Class A-1LA Notes, the Class A-1LB or the Class A-2L Notes has been downgraded at least one rating sub-category below the original rating by Moody's (and such original rating has not been restored to the original rating) or the original rating of the Class A-3L Notes, the Class A-4L Notes or the Class B-1L Notes has been downgraded at least two rating sub-categories by Moody's (and has not been restored to a rating no more than one rating sub-category below the original rating of such Class of Notes), or if the Class A Overcollateralization Ratio is less than 90% of the Class A Overcollateralization Percentage or (y) with respect to sales of Credit Improved Portfolio Collateral, if the original rating of the Class A-1LA Notes, the Class A-1LB Notes or the Class A-2L Notes has been downgraded at least one rating sub-category by Moody's (and such original rating has not been restored) or the original rating of the Class A-3L Notes, the Class A-4L Notes or the Class B-1L Notes has been downgraded at least two rating sub-categories by Moody's (and has not been restored to a rating no more than one rating sub-category below the original rating of such Class of Notes).

"Schedule of Portfolio Collateral":  The Initial Portfolio Collateral listed on Schedule A hereto, as amended from time to time to reflect Portfolio Collateral in the Trust Estate, including the inclusion of Portfolio Collateral purchased pursuant to Section 3.4(a) hereof, the inclusion of Additional Portfolio Collateral as provided in Section 11.3 hereof, the release of Portfolio Collateral pursuant to Article X hereof, and the inclusion of Substitute Portfolio Collateral as provided in Section 12.4 hereof.

"Scheduled Distribution":  With respect to any Pledged Security, for each Due Date after the date of determination, the scheduled payment of principal and/or interest due on such Due Date with respect to such Pledged Security, determined in accordance with the assumptions specified in Section 1.3 hereof.

"Secured Parties":  The meaning specified in the Granting Clauses hereof.

"Securities Act":  The United States Securities Act of 1933, as amended.

"Securities Intermediary":  The meaning specified in Section 6.15 hereof.

"Securities Lending Agreements": The meaning specified in Section 7.19 hereof.

"Securities Lending Collateral": The meaning specified in Section 7.19 hereof.

"Securities Lending Counterparty": The meaning specified in Section 7.19 hereof.

008531

"Selling Institution": The seller of a Participation or, if applicable, its guarantor, which has a long-term senior unsecured debt rating of at least "A2" by Moody's and at least "A" by S&P at the time such Participation is committed to be acquired by the Issuer.

"Senior Class A Notes":  The Class A-1LA Notes, the Class A-1LB Notes and the Class A-2L Notes.

"Senior Class Overcollateralization Ratio" With respect to a determination made as of any date of calculation, the ratio (expressed as a percentage) obtained by dividing (a) the sum of (1) the Aggregate Principal Amount of the Portfolio Collateral in the Trust Estate (other than items of Equity Portfolio Collateral, which shall not be included as Portfolio Collateral) as of such date, *plus* (2) the sum of the Balance of Eligible Investments and cash in the Collection Account representing Collateral Principal Collections plus the Balance of Eligible Investments and cash in the Initial Deposit Account plus unpaid Purchased Accrued Interest, each as of such date by (b) the sum of the Aggregate Principal Amount of the Senior Class A Notes (including for this purpose any Periodic Rate Shortfall Amounts with respect to such Class of Notes not paid when due, until such amounts, if any, are paid in full) as of such date.

"Senior Secured Loan":  A loan that (i) is not (and by its terms is not permitted to become) subordinate in right of payment to any other debt for borrowed money incurred by the obligor under such loan and (ii) is secured by a valid first priority perfected security interest or lien on specified collateral securing the obligor's obligations under such Senior Secured Loan, which security interest or lien is not subordinate to the security interest or lien securing any other debt for borrowed money.  For the avoidance of doubt, any second lien Portfolio Loan which has a Moody's obligation rating at least equal to the Moody's corporate family implied rating of such issuer, will be treated as Senior Secured Loan for the purposes of determining Moody's Priority Category Recovery Rate.

"Servicer": Highland Capital Management, L.P., unless and until a successor Person becomes the servicer pursuant to the provisions of the Servicing Agreement, and thereafter "Servicer" shall mean such successor Person.

"Servicer Entities": Collectively, the Servicer, entities affiliated with the Servicer or clients of the Servicer.

"Servicer Order" and "Servicer Request":  A written order or request dated and signed in the name of the Servicer by an Authorized Officer of the Servicer.

"Servicing Agreement":  The Servicing Agreement, dated as of the Closing Date, between the Issuer and the Servicer, and if amended as permitted therein and in Section 14.1(f), as so amended.

"Servicing Fee Portion":  100% minus (a) for any Payment Date prior to the two-year anniversary of the Closing Date, the Class II Preferred Share Percentage for such Payment Date and (b) for any other Payment Date, a percentage selected by the Servicer in its sole discretion.

008532

"Share Register": The register maintained under the Paying and Transfer Agency Agreement for the Preferred Shares and any other shares of the Issuer.

"Share Registrar": Maples Finance Limited or any successor thereto appointed by the Issuer.

"Special Redemption": A redemption of the Notes pursuant to Section 9.4 hereof.

"Special Redemption Date": The Payment Date during the Revolving Period fixed by the Issuer for a Special Redemption.

"Special Redemption Price": When used with respect to a Special Redemption, an amount equal to the principal amount of the Notes being redeemed (or, in the case of the Class A-3L Notes, the Class A-4L Notes and the Class B-1L Notes, first to pay any Periodic Rate Shortfall Amount with respect to such Notes and then to pay principal).

"Standard & Poor's" or "S&P": Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., or any successor thereto.

"Standard & Poor's CDO Monitor": The dynamic, analytical computer model developed by Standard & Poor's and used to estimate default risk of Portfolio Collateral and provided to the Servicer, the Issuer and the Trustee on or before the Effective Date, as it may be modified by Standard & Poor's in connection with its confirmation of the ratings of the Notes following the Closing Date.

"Standard & Poor's CDO Monitor Test": A test that is satisfied if, after giving effect to the sale of an item of Portfolio Collateral or the purchase of an item of Portfolio Collateral (or both), as the case may be (i) the S&P Loss Differential of the Proposed Portfolio is positive or (ii) the S&P Loss Differential of the Proposed Portfolio is greater than the S&P Loss Differential of the Current Portfolio.

"Standard & Poor's Industry Category": When used with respect to an item of Portfolio Collateral, any of the industry categories established by Standard & Poor's set forth in Schedule B hereto, and any additional categories that may be subsequently established by Standard & Poor's.

"Standard & Poor's Preferred Format": A Microsoft Excel file (or such other format agreed by Standard & Poor's) of the Standard & Poor's CDO Monitor input file and, with respect to each item of Portfolio Collateral, the name of each obligor thereon, the CUSIP number thereof (if applicable) and the Standard & Poor's Industry Category thereof.

"Standard & Poor's Rating": The rating determined in accordance with the methodology described in Schedule D.

"S&P Break-Even Loss Rate": At any time, the maximum percentage of defaults which the Current Portfolio or the Proposed Portfolio, as applicable, can sustain, as determined by S&P through application of the Standard & Poor's CDO Monitor, which, after giving effect to S&P's assumptions on recoveries and timing and to the priority of payments, will result in

008533

sufficient funds remaining for the principal repayment of the Notes in full and the timely payment, as applicable, of interest on each Class of Notes. The Issuer shall cause the relevant version of the Standard & Poor's CDO Monitor Test provided by S&P to be run to determine the appropriate S&P Break-Even Loss Rate.

| Standard & Poor's CDO Monitor | Weighted Average Spread | S&P Minimum Average Recovery Rate | | | |
|---|---|---|---|---|---|
| | | AAA | AA | A | BBB |
| 1 | 255 | 46.48% | 47.69% | 48.98% | 51.21% |
| 2 | 255 | 45.80% | 47.01% | 48.30% | 50.53% |
| 3 | 255 | 47.90% | 48.91% | 49.98% | 51.84% |
| 4 | 245 | 45.80% | 47.01% | 48.30% | 50.53% |
| 5 | 245 | 46.48% | 47.69% | 48.98% | 51.21% |
| 6 | 265 | 45.80% | 47.01% | 48.30% | 50.53% |
| 7 | 265 | 45.50% | 46.71% | 48.00% | 50.24% |

"S&P Loss Differential": At any time, the rate calculated by subtracting the S&P Scenario Loss Rate from the S&P Break-Even Loss Rate at such time.

"S&P Minimum Average Recovery Rate": The number obtained by summing the products obtained by multiplying the Principal Balance of each item of Portfolio Collateral (excluding Defaulted Portfolio Collateral) by the Applicable Percentage (according to the S&P Priority Category) applicable to such item of Portfolio Collateral as set forth in the definition above, dividing such sum by the Aggregate Principal Amount of all Portfolio Collateral (excluding Defaulted Portfolio Collateral), and rounding up to the fourth decimal place.

"S&P Priority Category": Senior secured Portfolio Loans and Debt Securities, second lien Portfolio Loans, senior unsecured Portfolio Loans and Debt Securities, subordinated Portfolio Loans and Debt Securities, DIP Loans and Synthetic Securities.

"S&P Priority Category Recovery Rate": For any item of Portfolio Collateral, the percentage specified in the definition of the term "Applicable Percentage" opposite the S&P Priority Category of item of Portfolio Collateral.

"S&P Scenario Loss Rate": At any time, an estimate of the cumulative default rate for the Current Portfolio or the Proposed Portfolio, as applicable, consistent with a "AAA" rating of the Class A-1LA Notes, the Class A-1LB Notes and the Class X Notes, a "AA" rating of the Class A-2L Notes, a "A" rating of the Class A-3L Notes, a "A-" rating of the Class A-4L Notes and a "BBB" rating of the Class B-1L Notes, in each case by Standard & Poor's, determined by application of the Standard & Poor's CDO Monitor at such time.

008534

"Subsequent Delivery Date": A date fixed by the Issuer for the delivery of an item of Portfolio Collateral to be included in the Trust Estate after the Effective Date.

"Substitute Portfolio Collateral": An item of Portfolio Collateral that is Delivered to the Trustee under this Indenture as security for the Notes in accordance with Section 12.4 hereof.

"Supplemental Fee Amount": The amount used to pay the Supplemental Servicing Fee pursuant to clause FOURTEENTH(a) of Section 11.1(c)(i) and clause FOURTEENTH(a) of Section 11.(d).

"Supplemental Servicing Fee": For any Payment Date, an amount equal to the product of (a) the Supplemental Fee Amount for such Payment Date and (b) the Servicing Fee Portion for such Payment Date.

"Suspension Trigger Event": As of any date of determination, (I) the ratio (expressed as a percentage) obtained by dividing (a) the sum of (1) the Aggregate Principal Amount of the Portfolio Collateral in the Trust Estate as of such date, calculated in accordance with the Overcollateralization Ratio Adjustment less the Overcollateralization Haircut Amount, if any, plus (2) the sum of the Balance of Eligible Investments and cash in the Collection Account, representing Collateral Principal Collections plus the Balance of Eligible Investments and cash in the Initial Deposit Account plus unpaid Purchased Accrued Interest, each as of such date by (b) the sum of the Aggregate Principal Amount of the Class A-1L Notes (including for this purpose any unpaid Periodic Rate Shortfall Amounts with respect to such Classes of Notes not paid when due, until such amounts, if any, are paid in full) as of such date, is than (II) 110%.

"Synthetic Security": Any (I) U.S. dollar denominated swap transaction, security issued by a trust or similar vehicle or other asset purchased from or entered into by the Issuer with a Synthetic Security Counterparty the returns on which (as determined by the Servicer) are linked to the credit performance of a Reference Obligation, but which may provide for a different maturity, payment dates or interest rate or interest rate basis than such Reference Obligation; *provided* that, either (A) (i) such Synthetic Security will not require the Issuer to make any payment to the Synthetic Security Counterparty after the initial purchase thereof by the Issuer, (ii) the ownership of such Synthetic Security, based on the Servicer's determination (which may include consultation with counsel to the Issuer), is not expected to subject the Issuer to withholding tax, (iii) such Synthetic Security terminates on or prior to the redemption or repayment in full of the Reference Obligation, (iv) the principal amount of such Synthetic Security is equal to the principal amount of the Reference Obligation, (v) all scheduled payments made pursuant to the terms of such Synthetic Security are at a fixed or floating interest rate based on an interest rate used for borrowings or financings in domestic or international markets or are linked to the payments on one or more Reference Obligations (which payments are themselves at a fixed interest rate or such floating rate), (vi) the minimum coupon on such Synthetic Security is 6.0%, if such Synthetic Security is fixed rate, (vii) the minimum margin on such Synthetic Security is 0.60%, if such Synthetic Security is floating rate, (viii) the terms of such Synthetic Security provide that upon maturity, acceleration or any early termination of such Synthetic Security, the Synthetic Security Counterparty of such Synthetic Security must deliver the Reference Obligation or an amount greater than or equal to the then par amount of the Reference

008535

Obligation, except (a) the Issuer may accept an amount equal to the fair market value of the Reference Obligation if the Servicer chooses to terminate such Synthetic Security in connection with the sale of such Synthetic Security as Credit Risk Portfolio Collateral, Credit Improved Portfolio Collateral, Defaulted Portfolio Collateral or Equity Portfolio Collateral or pursuant to the right of the Issuer to sell Portfolio Collateral which is not Credit Improved Portfolio Collateral, Credit Risk Portfolio Collateral, Defaulted Portfolio Collateral or Equity Portfolio Collateral or (b) following a credit event with respect to the Reference Obligation, the Issuer may accept an amount equal to the fair market value of such Reference Obligation; *provided, however*, that this clause (viii) shall not apply to an acceleration or early termination upon the exercise of any put or call provision of the Synthetic Security or any Reference Obligation, (ix) upon the exercise of any put or call provision of the Synthetic Security or any Reference Obligation, the holder of such Synthetic Security will receive a Reference Obligation or an amount greater than or equal to the par amount of such Reference Obligation, plus, if the Reference Obligation is a bond, accrued interest, (x) such Synthetic Security will not constitute a commodity option, leverage transaction or futures contract that is subject to the jurisdiction of the U.S. Commodity Futures Trading Commission, (xi) the acquisition of such Synthetic Security would not cause the Issuer to be "engaged in a U.S. trade or business" for Federal income tax purposes or otherwise cause the Issuer (or the beneficial owners thereof) to become subject to U.S. net income tax, (xii) the Underlying Instrument with respect to such Synthetic Security is governed by the laws of the State of New York, contains a non-petition clause and a limited recourse clause, each as against the Issuer, and is documented with a standard ISDA form master agreement, as modified by appropriate schedules and confirmations and (xiii) total payments including termination payments may not exceed the notional amount of such Synthetic Security; *provided* that if any Reference Obligation delivered pursuant to any Synthetic Security does not constitute Portfolio Collateral and would cause a breach of any concentration limitation, such Reference Obligation shall be deemed Equity Portfolio Collateral, and (B) (i) such Synthetic Security is a Form-Approved Synthetic Security or (ii) the Rating Condition has been satisfied with respect to the purchase of such Synthetic Security; *provided further*, that any Synthetic Security shall be positively indexed to the related Reference Obligation on no more than a one-to-one basis and (II) any Default Swap.

"Synthetic Security Counterparty":  An entity which is required to make payments to the Issuer on a Synthetic Security to the extent that the issuer of the related Reference Obligation makes payments thereon pursuant to the terms of such Synthetic Security and any Default Swap Counterparty.

"Tax Event Redemption": A redemption of the Notes in whole pursuant to Section 9.5 hereof.

"Tax Event Redemption Date": The Payment Date fixed by the Issuer for a Tax Event Redemption.

"Tax Event Redemption Price": An amount equal to the aggregate of (i) the Aggregate Principal Amount of each Class of Notes as of the Tax Event Redemption Date and (ii) the applicable Cumulative Interest Amount with respect to each Class of Notes as of the Tax Event Redemption Date.

008536

"Temporary Regulation S Global Notes":  With respect to any Notes issued to Non-U.S. Persons that will be represented by a temporary global note, the temporary global note substantially in the form attached hereto as Exhibits A-1L-1, A-2L-1, A-3L-1 and B-1L-1.

"Total Optional Redemption":  An Optional Redemption in whole, in accordance with the terms specified herein.

"Transaction Documents":  This Indenture, the Paying and Transfer Agency Agreement, the Servicing Agreement and the Collateral Administration Agreement.

"Transfer Agent":  Any transfer agent appointed by the Issuer.

"Transferor Certificates":  Collectively, the Regulation S Transferor Certificate and the Rule 144A Transferor Certificate.

"Trust Estate":  The meaning specified in the Granting Clauses of this Indenture.

"Trust Termination Date":  The date on which the obligations of the Issuer hereunder are terminated as set forth in Section 4.1 or Section 9.11 hereof.

"Trustee":  As defined in the first sentence of this Indenture.

"Trustee Administrative Expenses":  With respect to any Payment Date (including without limitation the Final Maturity Date), fees, expenses or other amounts due or accrued and payable to the Trustee for the Due Period relating to such Payment Date, including, but not limited to, all amounts payable to the Trustee under Section 6.7 hereof and all fees and expenses pursuant to duties performed as Collateral Administrator and Paying and Transfer Agent, and as paying and transfer agent of Investor Corp., *provided* such payment pursuant to clause FIRST of Section 11.1(b) shall not exceed on such Payment Date one-quarter of 0.0275% of the Aggregate Par Amount as of the Calculation Date relating to such Payment Date (such amount subject to a minimum of U.S.$74,000 per annum), plus U.S.$7,500 per annum for payments of expenses and certain other amounts under Section 6.7, if any.

"Trustee Fee Letter Agreement":  The Trustee fee letter agreement, dated as of May 1, 2006.

"Trustee Payment-Related Event of Default":  An Event of Default caused solely by and based solely upon a failure to pay any amounts owing to the Trustee or the Paying and Transfer Agent pursuant to Section 6.7 hereof or to the Paying and Transfer Agent pursuant to Section 11 of the Paying and Transfer Agency Agreement (other than the amount payable to the Trustee as its fee (but not expenses) under the Trustee Fee Letter Agreement).

"UCC":  The New York Uniform Commercial Code.

"Underlying Instrument":  With respect to any item of Portfolio Collateral, any loan participation agreement, loan assignment agreement, indenture, pooling and servicing agreement, trust agreement, instrument, or other agreement pursuant to which such item of Portfolio Collateral has been created or issued or of which the holders of such item of Portfolio

008537

Collateral are the beneficiaries, and any instrument evidencing or constituting such item of Portfolio Collateral (in the case of Portfolio Collateral evidenced by or in the form of instruments).

"Underlying Loan and Security Agreement": Any agreement (other than an Underlying Instrument) which governs the terms of or guarantees or secures the obligations represented by any Portfolio Collateral or of which the holders of such Portfolio Collateral are the beneficiaries (which in the case of a Portfolio Loan which is a Participation shall include the loan and security documentation with respect to the underlying loan).

"Unit": An item of Portfolio Collateral with a warrant, profit participation or other equity-based feature (including but not limited to convertible bonds) included as a component thereof which otherwise meets the requirements for Portfolio Collateral; *provided* that (i) the value of such warrant, profit participation or other equity-based feature at the time of purchase, as determined by the Servicer in good faith, is less than 2% of the purchase price of such item of Portfolio Collateral and (ii) such warrant, profit participation or other equity-like feature at the time of purchase shall not, relate to or be exchangeable for, margin stock.

"United States Regulations": 31 C.F.R. Part 357, Subpart B; 12 C.F.R. Part 615, Subparts O, R and S; 12 C.F.R. Part 987; 12 C.F.R. Part 1511; 24 C.F.R. Part 81, Subpart H; 31 C.F.R. Part 354; 18 C.F.R. Part 1314; and 24 C.F.R. Part 350.

"United States Security Entitlement": A Security Entitlement as defined in a United States Regulation.

"Unregistered Securities": The meaning specified in Section 5.18(c) hereof.

"Unscheduled Principal Proceeds": Collateral Principal Collections received by the Issuer from an unscheduled prepayment, in whole or in part, by the obligor of an item of Portfolio Collateral prior to the stated maturity date of such item of Portfolio Collateral, including without limitation, any Collateral Disposition Proceeds received from the sale of any item of Portfolio Collateral received in an Offer, Exchange Offer or similar tender, whether such tender required action on the part of the Issuer or otherwise.

"USA PATRIOT Act": The Uniting and Strengthening America By Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001.

"U.S. Person":

(i) (a) a citizen of the United States;

(b) a natural person who is a resident of the United States or a resident alien of the United States as defined by section 7701(b) of the Code;

(c) any partnership (unless otherwise provided in the regulations), corporation or other entity created, organized or incorporated in or under the laws of the United States, its states, territories or possessions, or the District of Columbia;

008538

     (d)  any estate or trust as defined by section 7701(a)(30)(D) and (E) of the Code, respectively; or

     (ii)  as defined in Regulation S, as the context may require.

"<u>Weighted Average Coupon</u>": The amount (rounded up to the nearest 0.001%) determined by summing the products obtained by multiplying, for each item of Fixed Rate Portfolio Collateral then included in the Trust Estate (other than items of Defaulted Portfolio Collateral), the Principal Balance of such item of Portfolio Collateral and the stated rate of interest of such item of Portfolio Collateral and then dividing such sum by the Aggregate Principal Amount of all of the Fixed Rate Portfolio Collateral included in the Trust Estate (other than items of Defaulted Portfolio Collateral) as of such date of determination.

"<u>Weighted Average Coupon Test</u>": A test that will be satisfied by application of the Collateral Quality Matrix, after giving effect to any Coupon Adjustment.

"<u>Weighted Average Life</u>": As of any date of determination, the amount determined by summing the products obtained by multiplying, for each item of Portfolio Collateral (other than items of Defaulted Portfolio Collateral) then included in the Trust Estate, the Principal Balance of such item of Portfolio Collateral and the Average Life (as such term is defined below) of such item of Portfolio Collateral as of such date of determination and then dividing such sum by the Aggregate Principal Amount of all of the Portfolio Collateral included in the Trust Estate as of such date of determination. For any item of Portfolio Collateral (other than items of Defaulted Portfolio Collateral), the "Average Life" shall be equal to the number of years obtained by dividing (a) the Principal Balance of such item of Portfolio Collateral into (b) the sum of the products obtained by multiplying (i) the amount of each of the remaining, required principal payments on such item of Portfolio Collateral by (ii) the number of years (calculated to the nearest one-twelfth) that will have elapsed between such date of determination and the making of such payment.

"<u>Weighted Average Life Requirement</u>": A test that will be satisfied on any date of determination if the Weighted Average Life on such date of all items of Portfolio Collateral (other than items of Defaulted Portfolio Collateral) is equal to or less than the number of years set forth in <u>Schedule I</u> hereto opposite the period set forth in <u>Schedule I</u> hereto in which such test is being measured. Notwithstanding the foregoing, the Weighted Average Life may vary from the restrictions set forth above, if the Rating Agencies have confirmed such variance would not result in a withdrawal or downgrade of any of the then current ratings assigned by them to the Notes.

"<u>Weighted Average Margin</u>": The amount (rounded up to the nearest 0.001%) equal to (i) the sum of the products obtained by multiplying the margin over Collateral LIBOR on each item of Floating Rate Collateral (other than items of Defaulted Portfolio Collateral) as of the date of calculation (which will be determined for items of Floating Rate Collateral that do not bear interest based on Collateral LIBOR by expressing the current interest rate on such Floating Rate Collateral as a margin above or below three-month LIBOR on the date of determination, which margin will be expressed as a negative number if such current interest rate is lower than three-month LIBOR) by the Principal Balance of such item of Floating Rate Collateral (other

008539

than items of Defaulted Portfolio Collateral) as of such date, divided by (ii) the Aggregate Principal Amount of all such Floating Rate Collateral (other than items of Defaulted Portfolio Collateral) on such date. For purposes of calculating the Weighted Average Margin for any Delayed Drawdown Loan or Revolving Loan, the principal balance representing the funded portion will be multiplied by the margin above Collateral LIBOR and the principal balance representing the unfunded portion will be multiplied by the commitment fee related thereto. If an item of Floating Rate Portfolio Collateral does not provide for Collateral LIBOR, the margin for this purpose shall be equal to the then applicable interest rate minus then current LIBOR. If an item of Floating Rate Portfolio Collateral has a Collateral LIBOR floor, the excess of such floor rate over Collateral LIBOR will be added to the margin above Collateral LIBOR for purposes of calculating the Weighted Average Margin of such item of Floating Rate Portfolio Collateral.

"Weighted Average Margin Test": A test that will be satisfied by application of the Collateral Quality Matrix, after giving effect to any Coupon Adjustment.

Section 1.2.    Other Definitional Provisions.

All references in this instrument to designated "Annexes," "Articles," "Sections," "Subsections" and other subdivisions are to the designated Annexes, Articles, Sections, Subsections and other subdivisions of this instrument as originally executed. The words "herein," "hereof," "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular Annex, Article, Section, Subsection or other subdivision. Unless the context otherwise requires, terms defined in the UCC and not otherwise defined in this Indenture shall have the meanings set forth in the UCC.

Any reference herein to a "beneficial interest" in a security also shall mean, unless the context otherwise requires, a security entitlement with respect to such security, and any reference herein to a "beneficial owner" or "beneficial holder" of a security also shall mean, unless the context otherwise requires, the holder of a security entitlement with respect to such security.

Section 1.3.    Assumptions as to Portfolio Collateral and Trust Estate.

Except as otherwise expressly set forth herein, in connection with all calculations required to be made pursuant to this Indenture with respect to Scheduled Distributions on any Pledged Security, or any payments on any other assets included in the Trust Estate, and with respect to the income that can be earned on Scheduled Distributions on such Pledged Securities and on any other amounts that may be received for deposit in the Collection Account, the provisions set forth in this Section 1.3 shall apply.

All calculations with respect to Scheduled Distributions on the Pledged Securities shall be made on the basis of information as to the terms of each such Pledged Security and upon accounting of payments, if any, received on such Pledged Security that are furnished by or on behalf of the issuer of such Pledged Security and such information or report may be conclusively relied upon in making such calculations.

008540

For each Due Period, the Scheduled Distributions on any Pledged Security (excluding any item of Defaulted Portfolio Collateral and Equity Portfolio Collateral, as to which Scheduled Distributions shall be assumed to be zero) shall be the amount required to be paid (including coupon payments, accrued interest, scheduled principal payments, if any, by way of sinking fund payments which are assumed to be on a *pro rata* basis or other scheduled amortization of principal (excluding any optional redemption), return of principal, and redemption premium, if any) that, if paid as scheduled, will be available in the Collection Account at the end of such Due Period. For purposes of calculating interest on Pledged Securities that have a rate of interest which varies with an objective index, the interest to be received thereon shall be assumed to be equal to the interest that would be received on such Pledged Security if the rate of interest accruing on such Pledged Security on the date of determination were to remain constant for each succeeding Due Period.

Each Scheduled Distribution with respect to a Pledged Security shall be assumed to be received on the applicable Due Date, and each such Scheduled Distribution shall be assumed to be immediately deposited in the Collection Account and to earn interest at the Assumed Interest Rate. All funds assumed to earn interest as provided herein shall be assumed to continue to earn interest at the applicable rate until the date on which they are required to be available in the Collection Account for application, in accordance with the terms hereof, to payment of principal of or interest on the Notes or other amounts payable or otherwise for application in accordance with the terms of this Indenture.

Notwithstanding anything to the contrary contained in this Indenture if the Trustee receives an Issuer Order or Issuer Request and also receives a Servicer Order or Servicer Request with respect to the same subject matter, the Issuer Order or Issuer Request, as the case may be, shall supersede any such Servicer Order or Servicer Request and be the controlling order or request hereunder.

## ARTICLE II

### THE NOTES

Section 2.1.   Forms Generally.

(a) The Notes and the Trustee's certificate of authentication thereon shall be in substantially the forms required by this article with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture, and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon, as may, consistently herewith, be determined by the Authorized Officer of the Issuer executing such Notes as evidenced by such Authorized Officer's execution of such Notes. Any portion of the text of any Note may be set forth on the reverse thereof, with an appropriate reference thereto on the face of the Note.

(b) Regulation S Notes. The Class A-1L Notes, the Class A-2L Notes, the Class A-3L Notes, the Class A-4L Notes, the Class B-1L Notes and the Class X Notes initially sold to Non-U.S. Persons in "offshore transactions" (within the meaning of Regulation S) shall be represented initially by single global notes (the "Temporary Regulation S Global Notes") in fully

008541

registered form without coupons, authenticated and delivered in substantially the forms attached hereto as Exhibit A-1L-1, Exhibit A-2L-1, Exhibit A-3L-1, Exhibit B-1L-1 and [Exhibit X-1], respectively. The Issuer shall deposit such Notes on behalf of the subscribers for such Notes with the Trustee as custodian (in such capacity, the "Custodian") for the Depository, registered in the name of a nominee of the Depository for the accounts of each of the Clearance Systems, for credit by the Clearance Systems to the respective accounts designated by the subscribers of such Notes (or to such other accounts as they may direct) at each of the Clearance Systems. The Temporary Regulation S Global Notes shall be exchanged for interests in the Permanent Regulation S Global Notes as set forth below. The Permanent Regulation S Global Notes shall be substantially in the form set forth as Exhibit A-1L-2, Exhibit A-2L-2, Exhibit A-3L-2, Exhibit B-1L-2 and [Exhibit X].

After the expiration of the Distribution Compliance Period beneficial interests in the Temporary Regulation S Global Note of each Class shall be exchanged for a Permanent Regulation S Global Note for such Class pursuant to and as provided below.

Without unnecessary delay but in any event prior to the termination of the Distribution Compliance Period, the Issuer shall deliver to the Trustee or the Authenticating Agent the Permanent Regulation S Global Notes executed by the Co-Issuers. Upon the termination of the Distribution Compliance Period, any Classes of Temporary Regulation S Global Notes shall be surrendered by the Custodian to the Trustee, in each case as the Issuer's agent for such purpose (or, at the Authenticating Agent's option, the Custodian shall be instructed by the Authenticating Agent or the Trustee to endorse each such Temporary Regulation S Global Note to reduce the principal amount thereof), to be exchanged, in whole or from time to time in part, for a Permanent Regulation S Global Note without charge and the Authenticating Agent shall authenticate and deliver to the Custodian for delivery in exchange for each such Temporary Regulation S Global Note or the portions thereof to be exchanged, an equal aggregate principal amount of a Permanent Regulation S Global Note, as shall be specified by the Custodian; *provided that*, upon such presentation by the Custodian: (i) the Trustee receives a certificate substantially in the form set forth in Exhibit F attached hereto, and signed by the respective Clearance System as to the portions of each Temporary Regulation S Global Note held for the respective accounts of such Clearance System, that it has received from each beneficial owner of the portion of each Temporary Regulation S Global Note then to be exchanged, written certification substantially to the effect set forth in Exhibit G attached hereto, with such changes therein as shall be approved by the Issuer, (ii) none of the Trustee or any Paying Agent have actual knowledge, nor have they received notification from the Issuer with respect to the original issuance and distribution of the Global Notes that such Person has actual knowledge, that such certificate is false, and (iii) the Trustee and any Paying Agent do not have a United States address as the address for payment to any Holder of the Permanent Regulation S Global Note issuable upon such exchange. Notwithstanding the foregoing, in the event of redemption in whole or acceleration of all or any part of the Notes prior to the termination of the Distribution Compliance Period, the Permanent Regulation S Global Notes will not be issuable in respect of the Temporary Regulation S Global Note or portion thereof, and payment thereon will be made as provided in the Temporary Regulation S Global Note. Any Class of Note in the form of a Temporary Regulation S Global Note presented to the Trustee for a Permanent Regulation S Global Note shall be endorsed by the Trustee to reduce the principal amount

008542

thereof by the amount so exchanged, and shall then be returned to the Custodian, pending exchange of the remaining balance thereof pursuant to the terms hereof.

On each Payment Date, if any, that falls on or prior to the date on which all Temporary Regulation S Global Notes shall have been exchanged for Permanent Regulation S Global Notes (the "Exchange Date"), interest, if any, and principal on the Temporary Regulation S Global Notes shall be paid to the Custodian acting on behalf of the Clearance System for the benefit of persons for whom the Clearance System holds the Temporary Regulation S Global Notes on each such Payment Date to the extent the Clearance System has delivered a certificate or certificates, appropriately completed and signed, in substantially the form set forth in Exhibit F attached hereto, which certificate or certificates shall be dated the relevant Payment Date and shall be delivered to the Custodian.

The Issuer will obtain from each Clearance System an agreement that it will credit principal and interest, if any, as of each Payment Date that falls on or prior to the termination of the Distribution Compliance Period, received in respect of each Temporary Regulation S Global Note to the respective accounts of the persons for whom the Clearance System holds a Temporary Regulation S Global Note on each such Payment Date, upon, and only upon, receipt of certificates from such account holders in substantially the form set forth in Exhibit G attached hereto to be dated on or before each relevant Payment Date (copies of such form being available from the offices of Clearstream at 67, Boulevard Grande-Duchesse Charlotte, Luxembourg, the offices of Euroclear at 1 Boulevard du Roi Albert II, B-1210 Brussels, Belgium, and each other Paying Agent of the Issuer).

Upon any such exchange of a portion of any Temporary Regulation S Global Note for a Permanent Regulation S Global Note, the Custodian shall endorse (or, as provided above, the Trustee shall instruct the Custodian) such Temporary Regulation S Global Note to reflect the reduction of the principal amount evidenced thereby.

(c) Rule 144A Global Notes. The Class A-1LA Notes, the Class A-1LB Notes, the Class A-2L Notes, the Class A-3L Notes, the Class A-4L Notes, the Class B-1L Notes and the Class X Notes initially sold to U.S. Persons (within the meaning of Rule 144A) shall be represented by single global notes (the "Rule 144A Global Notes") in fully registered form without coupons, authenticated and delivered in substantially the forms attached hereto as Exhibit A-1L-3, Exhibit A-2L-3, Exhibit A-3L-3, Exhibit B-1L-3 and [Exhibit X-1] respectively, which the Issuer shall deposit on behalf of the subscribers for such Notes with the Custodian for the Depository and registered in the name of Cede & Co., the nominee of DTC. The Aggregate Principal Amount of each Rule 144A Global Note may from time to time be increased or decreased by adjustments made on the records of the Custodian for DTC or its nominees, as the case may be.

(d) Book-Entry Provisions. This Section 2.1(d) shall apply only to Regulation S Global Notes or Rule 144A Global Notes ("Global Notes") deposited with or on behalf of the Depository. On or prior to the Closing Date, the Issuer shall provide to the Trustee or Authenticating Agent (as applicable) an Issuer Order setting forth the amount of Notes (if any) to be issued on the Closing Date in the form of Temporary Regulation S Global Notes and Rule 144A Global Notes for each Class. With respect to the Notes, a Temporary Regulation S Global

008543

Note may be initially issued for each Class with an outstanding principal balance of zero (and the same may be reduced to zero at any time during the Distribution Compliance Period without cancellation).

(e) <u>Definitive Notes</u>.  If at any time (including without limitation during the Distribution Compliance Period) (i) the Temporary Regulation S Global Notes or the Permanent Regulation S Global Notes or any of them become immediately due and repayable pursuant to Article Five hereof or (ii) any of DTC, Euroclear or Clearstream (A) is closed for business for a continuous period of 14 days (other than by reason of holiday, statutory or otherwise) or (B) announces an intention permanently to cease business and no alternative clearance system satisfactory to the Issuer is available or (iii) as a result of any amendment to, or change in, the laws or regulations of the Cayman Islands or of any authority therein or thereof having power to tax or in the interpretation or administration of such laws or regulations which becomes effective on or after the Closing Date, the Issuer or any Paying Agent is or will be required to make any deduction or withholding from any payment in respect of the Notes which would not be required were the Notes in definitive registered form or (iv) the Issuer so elects by notice to the Noteholders and Euroclear or Clearstream, as the case may be, does not object (as determined by the Issuer), then the Issuer will issue Definitive Notes in exchange for and to the extent of such Global Notes within 30 days of the occurrence of the relevant event set forth in (i), (ii), (iii) or (iv) above.

If at any time (i) the Notes or any of them become immediately due and payable following an Event of Default hereunder or (ii) DTC notifies the Issuer or the Trustee in writing that it is unwilling or unable to discharge properly its responsibilities as a depository with respect to the Rule 144A Global Notes or it ceases to be a "clearing agency" registered under the Exchange Act, and the Issuer is unable to locate a qualified successor within 90 days after such notice, then the Issuer will issue Definitive Notes in exchange for and to the extent of such Rule 144A Global Notes within 30 days of the occurrence of the relevant event set forth in (i) or (ii) above.

The Issuer shall notify the Trustee forthwith upon the occurrence of any of the events referred to in the two immediately preceding paragraphs and the Issuer shall, unless the Trustee agrees otherwise, promptly give notice thereof and of its obligation to issue Definitive Notes to the Noteholders.  Upon giving such notice, the Issuer promptly shall cause the Custodian, as the case may be, to present forthwith for exchange and surrender such Global Note to the Trustee for cancellation, together with appropriate exchange, registration, payment and delivery instructions (identifying according to its records the beneficial holders to whom, and in the amounts, the Definitive Notes are to be registered and delivered), upon which the Trustee shall be entitled to rely conclusively.  The Issuer shall prepare, execute and deliver to the Trustee at its specified office a sufficient number of duly executed Definitive Notes not later than the 20th day following the date of such notice, and the Trustee shall then promptly authenticate and deliver the appropriate number and amount of such Definitive Notes in accordance with the instructions received from the Custodian.

(f) <u>Form of Notes</u>.  The Notes shall be typed, printed, lithographed or engraved or produced by any combination of these methods or may be produced in any other manner, all as

008544

determined by the Authorized Officers of the Co-Issuers, as applicable, executing such Notes, as evidenced by the Authorized Officers' execution of such Notes.

Section 2.2.     Authorized Amount.

The aggregate principal amount of Class A-1LA Notes, the Class A-1LB Notes, Class A-2L Notes, Class A-3L Notes, Class A-4L Notes, Class B-1L Notes and Class X Notes that may be authenticated and delivered under this Indenture is limited to $538,000,000, $96,000,000, $76,000,000, $36,500,000, $10,000,000, $21,000,000 and $14,000,000, respectively, except for Notes authenticated and delivered upon registration of transfer of, or in exchange for, or in lieu of, other Notes pursuant to Section 2.5, 2.6 or 8.5 hereof.

Section 2.3.     Denominations; Extension of Revolving Period and Final Maturity.

(a) Each Class of the Notes shall be issuable on the Closing Date in the forms set forth herein, without coupons, in minimum denominations of $200,000 and integral multiples of $1 in excess thereof (in each case expressed in terms of the stated or principal amounts thereof, as the case may be, at the Closing Date).

(b) The Issuer, if directed by the Board Resolution of the Issuer at the request of the Servicer, shall be entitled on each Extension Effective Date to extend the Revolving Period to the applicable Extended Revolving Period End Date up to a maximum of four times (so that the Notes can only be extended to 2037) if (i) in the case of an Extension Effective Date occurring after the first Extension Effective Date, the Issuer has previously effected a Maturity Extension for each preceding Extension Effective Date in accordance with this Section 2.3, (ii) the Extension Conditions set forth in Section 2.3(d) are satisfied, (iii) the Issuer has given written notice to the Trustee of its election to extend the Revolving Period no later than 60 days and no earlier than 90 days prior to such Extension Effective Date and (iv) no Event of Default has occurred and is continuing. If the Extension Conditions are satisfied, the Final Maturity Date of the Notes (other than the Class X Notes) shall be automatically extended to the related Extended Final Maturity Date and the Weighted Average Life Test shall be automatically extended to the related Extended Weighted Average Life Date, without any requirement for approval or consent of any Holders of Notes or Preferred Shares (other than as may be required pursuant to the Extension Conditions) or amendment or supplement to this Indenture or the Paying and Transfer Agency Agreement (the "Maturity Extension"); *provided* that the Issuer will not be permitted to effect more than four Maturity Extensions. The Final Maturity Date of the Class X Notes is not subject to extension.

(c) In the case of a Maturity Extension, any Holder or Beneficial Owner of Notes (other than Class X Notes) or Preferred Shares wishing to sell such Notes or Preferred Shares to an Extension Qualifying Purchaser pursuant to the Extension Conditions must provide the applicable Extension Sale Notice within the Extension Sale Notice Period pursuant to Section 2.3(d) (such Notes and Preferred Shares as to which an Extension Sale Notice has been duly given, "Extension Sale Securities"). The Class X Notes are not subject to sale in connection with a Maturity Extension and the maturity of the Class X Notes is not subject to extension. Notwithstanding anything to the contrary herein, each Holder providing an Extension Sale Notice shall be deemed to agree that no Extension Sale Securities of any Holder shall be

008545

purchased unless all Extension Sale Securities of all Holders are purchased and settled at the applicable Extension Purchase Price on the applicable Extension Effective Date and the other Extension Conditions are satisfied as of such date.

(d) The Maturity Extension shall be effective only if the following conditions (the "Extension Conditions") are satisfied:

(i)    the purchase of all Extension Sale Securities has been settled by the designated Extension Qualifying Purchasers at the applicable Extension Purchase Price as of the applicable Extension Effective Date;

(ii)    all such purchases of Extension Sale Securities individually and in the aggregate comply with the applicable transfer restrictions herein, in the Indenture and the Preferred Share Paying and Transfer Agency Agreement immediately after such purchase and the legends on such Notes and Preferred Shares and all applicable law, rules and regulations (including, without limitation, rules, regulations and procedures of any applicable securities exchange, self-regulatory organization or clearing agency);

(iii)    the Rating Condition has been satisfied with respect to S&P (so long as any Notes are then rated by S&P) and (b) either (A) the Class B-1L Overcollateralization Ratio is at least 107.5% and the Collateral Quality Tests are satisfied as of the related Extension Determination Date and the Interest Coverage Test was satisfied on the immediately preceding Payment Date, the rating of each Class of Notes by Moody's has not been downgraded, withdrawn or qualified from that in effect on the Closing Date (unless it subsequently has been reinstated to the rating assigned on the Closing Date) or (B) the Rating Condition has been satisfied with respect to Moody's (so long as any Notes are then rated by Moody's); and

(iv)    (A) the Holders of 100% of the Outstanding Aggregate Principal Amount of the Class A-1LA Notes have delivered the Extension Sale Notice in the Extension Sale Notice Period or (B) if the Holders of 100% of the Aggregate Outstanding Amount of the Class A-1LA Notes fail to deliver an Extension Sale Notice pursuant to the preceding clause (A), either (x) the Issuer, acting through the Servicer, notifies the Holders of the Class A-1LA Notes in writing not later than the last day of the Extension Sale Notice Period that such Class A-1LA Notes shall constitute "Extension Sale Securities" (as a result of which such Class A-1LA Notes must be purchased by an Extension Qualifying Purchaser) or (y) the Holders of 100% of the Aggregate Outstanding Amount of the Class A-1LA Notes have consented in writing to the Maturity Extension not later than the last day of the Extension Sale Notice Period.

The Issuer, the Trustee and, by its acceptance of the Notes or Preferred Shares, each Holder or Beneficial Owner of Notes or Preferred Shares agrees that the Placement Agent shall not be responsible for causing the Extension Conditions to be satisfied and shall not be liable to any such person or Holder of Notes or Preferred Shares (whether or not such Holder gave an Extension Sale Notice with respect to its Notes or Preferred Shares) or to any other person if the Extension Conditions are not satisfied.  Failure of the Extension Conditions to be satisfied shall not constitute a Default or Event of Default under this Indenture.

008546

(e) The following procedure shall apply to effect any extension of the Revolving Period or the Maturity Date, pursuant to Section 2.3:

(i)     No later than three Business Days following receipt by the Trustee of the notice given by the Issuer of its election to extend the Revolving Period (the "Extension Notice"), at the cost of the Issuer the Trustee shall deliver the Extension Notice to all Holders of Notes (other than the Class X Notes) and the Preferred Shares Paying and Transfer Agent (for forwarding to the Holders of the Preferred Shares) and each Rating Agency (so long as any rated Notes are Outstanding), in the form set out in the Indenture, and shall request the Rating Condition for the Maturity Extension from S&P, if applicable. Such Extension Notice shall include a statement to the effect that (i) no Extension Sale Notice delivered after the end of the Extension Sale Notice Period shall be effective and (ii) only the Class A-1LA Notes for which an Extension Sale Notice has been delivered may be treated as Extension Sale Securities pursuant to the Extension Conditions (with the result that the Class A-1LA Notes must be purchased by an Extension Qualifying Purchaser).

(ii)     Any Holder of Notes (other than the Class X Notes) or Preferred Shares may give irrevocable notice (an "Extension Sale Notice") within 30 days after the Trustee has delivered the Extension Notice (the "Extension Sale Notice Period") of its intention to sell its Notes or Preferred Shares to an Extension Qualifying Purchaser in the case of a Maturity Extension. Any Extension Sale Notice received by the Trustee after the Extension Sale Notice Period shall be disregarded and deemed not to have been given. No Holder of Notes or Preferred Shares that has not given such an Extension Sale Notice within the Extension Sale Notice Period shall be entitled to sell its Notes or Preferred Shares to an Extension Qualifying Purchaser in connection with the Maturity Extension.

(iii)     If the Holders of 100% of the Outstanding Aggregate Principal Amount of the Class A-1LA Notes have not delivered the Extension Sale Notice to the Trustee by the 20th calendar day after the date of the Extension Notice, the Trustee shall notify the Holders of the Class A-1LA Notes of the date on which the Extension Sale Notice Period shall end and include a statement to the effect that (A) no Extension Sale Notice delivered after the end of the Extension Sale Notice Period shall be effective and (B) the Class A-1LA Notes for which no Extension Sale Notice has been delivered may be treated as Extension Sale Securities pursuant to clause (iv) of the Extension Conditions (as a result of which the Class A-1LA Notes must be purchased by an Extension Qualifying Purchaser).

(iv)     On the applicable Extension Determination Date, the Issuer (or its agent) shall confirm (A) whether or not Extension Qualifying Purchasers for all Extension Sale Securities have been designated to purchase such Notes or Preferred Shares in compliance with all transfer restrictions in the Indenture and the legends on such Notes or Preferred Shares and all applicable laws, rules and regulations (including, without limitation, any rules, regulations and procedures of any securities exchange, self-regulatory organization or clearing agency), (B) whether the requirements of clause (iii) of the Extension Conditions are satisfied as of the applicable Extension Determination

008547

Date and (C) whether all other Extension Conditions can be satisfied as of the applicable Extension Effective Date.

(v)     On each Extension Effective Date, the Maturity Extension shall become effective under the terms of the Indenture; *provided* that all Extension Conditions set forth above are satisfied. No later than two Business Days after each Extension Effective Date, the Trustee based on a determination made by the Issuer, at the expense of the Co-Issuers, shall deliver a notice to all Holders of Notes and the Preferred Shares Paying and Transfer Agent (for forwarding to the Holders of Preferred Shares), the Servicer, the Initial Purchaser, each Rating Agency (so long as any rated Notes are Outstanding) and the Irish Stock Exchange (if and for so long as any Class of Notes is listed thereon) confirming whether or not the Maturity Extension became effective. If the Maturity Extension became effective, the Issuer shall make any required notifications thereof to the Depositary for any Notes subject to the Maturity Extension. None of the Initial Purchaser, the Servicer or any of their respective Affiliates shall have any duty to act as an Extension Qualifying Purchaser.

(vi)     In the case of a Maturity Extension, each Holder of Notes (other than Extension Sale Securities) shall be entitled to receive an amount equal to the applicable Extension Bonus Payment to the extent of available funds and as provided in Section 11.1. Holders of the Preferred Shares shall not be entitled to receive any Extension Bonus Payment. The obligation to make any Extension Bonus Payment shall not be rated by Rating Agencies.

(f) The Extension Bonus Payment shall be payable to any applicable qualifying Beneficial Owners who have provided the Trustee with an Extension Bonus Eligibility Certification on or before the 5th Business Day prior to the first Payment Date from and including each Extension Effective Date on which funds are available to be used for such purposes in accordance with Priority of Payments, but in any event, no later than the earlier of the Final Maturity Date and the date of redemption of the Notes (other than the Class X Notes). Extension Bonus Payments which are not available to be paid on a Payment Date in accordance with the Priority of Payments on a Payment Date shall not be considered "due and payable" hereunder but are due and payable on the next Payment Date on which funds are due and payable. The failure to pay any such Extension Bonus Payment on such date shall not be an Event of Default, unless the Issuer shall fail to pay in full such Extension Bonus Payment on the earlier of the Final Maturity Date and the date of redemption in full of the relevant Notes (other than the Class X Notes). Unpaid Extension Bonus Payments shall not accrue interest. Such amounts shall be paid, in the case of the Notes (other than the Class X Notes), to the accounts designated in the applicable Extension Bonus Eligibility Certification or, to the extent otherwise required by the rules of any applicable securities exchange or clearing agency, in a manner determined by the Issuer.

Section 2.4.     Execution, Authentication, Delivery and Dating.

The Class A-1LA Notes, the Class A-1LB Notes, the Class A-2L Notes, the Class A-3L Notes, the Class A-4L Notes, the Class B-1L Notes and the Class X Notes shall be executed on behalf of the Issuer, by an Authorized Officer of each of the Issuer or the Co-Issuer,

008548

as applicable. The signature of such Authorized Officers on the Notes may be manual or facsimile.

Notes bearing the manual or facsimile signature of an individual who was at any time the Authorized Officer of the Co-Issuers (as applicable) shall bind the applicable Co-Issuer, notwithstanding the fact that such individual has ceased to hold such office prior to the authentication and delivery of such Notes or did not hold such office at the date of issuance of such Notes.

At any time and from time to time after the execution and delivery of this Indenture, the Co-Issuers may deliver the Class A-1LA Notes, the Class A-1LB Notes, the Class A-2L Notes, the Class A-3L Notes, the Class A-4L Notes, the Class B-1L Notes and the Class X Notes to the Trustee for authentication and the Trustee (or an Authenticating Agent on its behalf), upon Issuer Order, shall authenticate and deliver such Notes as provided in this Indenture and not otherwise.

Each Note authenticated and delivered by the Trustee (or the Authenticating Agent) to or upon Issuer Order on the Closing Date shall be dated as of the Closing Date. All other Notes that are authenticated after the Closing Date for any other purpose hereunder shall be dated the date of their authentication.

Notes issued upon transfer, exchange or replacement of other Notes shall be issued in authorized denominations reflecting the original aggregate stated or principal amount of the Notes so transferred, exchanged or replaced, but shall represent only the stated or principal amount of the Notes so transferred, exchanged or replaced. If any Note is divided into more than one Note in accordance with this Article II, the stated or original principal amount of such Note shall be proportionately divided among the Notes delivered in exchange therefor and shall be deemed to be the aggregate stated or original principal amount of such subsequently issued Notes.

No Note shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose, unless there appears on such Note a certificate of authentication, substantially in the form provided for herein, executed by the Trustee (or Authenticating Agent, as provided below) by the manual signature of one of its Authorized Officers, and such certificate upon any Note shall be conclusive evidence, and the only evidence, that such Note has been duly authenticated and delivered hereunder.

Upon the request of the Issuer, the Trustee shall and, at the election of the Trustee, the Trustee may, appoint one or more Authenticating Agents with power to act on its behalf and subject to its direction in the authentication of Notes in connection with transfers and exchanges thereof hereunder as fully to all intents and purposes as though each such Authenticating Agent had been expressly authorized by this Indenture to authenticate the Notes; *provided that* any such appointment shall be upon terms and conditions reasonably acceptable to the Trustee (with respect to which the Trustee may require, among other things, appropriate indemnification for any damages, losses or reasonable costs arising from acts or omissions of such Authenticating Agent). For all purposes of this Indenture, the authentication of Notes by an Authenticating

008549

Agent pursuant to this Section shall be deemed to be an authentication of such Notes "by the Trustee."

JPMorgan Chase Bank, National Association, is hereby appointed, at the request of the Issuer, as Authenticating Agent for purposes of authenticating Definitive Notes issued in exchange for beneficial interests in the Global Notes.

RSM Robson Rhodes LLP is hereby appointed, at the request of the Issuer, as the initial Irish Paying Agent with respect to the Notes.

Any corporation into which any Paying Agent, Transfer Agent or Authenticating Agent may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, consolidation or conversion to which any Paying Agent, Transfer Agent or Authenticating Agent shall be a party, or any corporation succeeding to the corporate trust business of any Paying Agent, Transfer Agent or Authenticating Agent, shall be the successor of such Paying Agent, Transfer Agent or Authenticating Agent hereunder, without the execution or filing of any further act on the part of the parties hereto or such Paying Agent, Transfer Agent or Authenticating Agent or such successor corporation.

Any Paying Agent, Transfer Agent or Authenticating Agent may at any time resign by giving written notice of resignation to the Trustee and the Issuer. The Trustee may at any time terminate the agency of any Paying Agent, Transfer Agent or Authenticating Agent by giving written notice of termination to such Paying Agent, Transfer Agent or Authenticating Agent and the Issuer.

The Trustee shall pay to any Paying Agent, Transfer Agent or Authenticating Agent reasonable compensation and shall reimburse each Paying Agent, Transfer Agent or Authenticating Agent for expenses reasonably incurred by such Paying Agent, Transfer Agent or Authenticating Agent in the performance of its duties as a Paying Agent, Transfer Agent or Authenticating Agent, in each case as and to the extent agreed upon between the Trustee and such Paying Agent, Transfer Agent or Authenticating Agent; *provided that* if the appointment of such Paying Agent, Transfer Agent or Authenticating Agent is at the election or request of the Issuer, the Trustee's obligation to make such payments shall be limited to amounts for which it is entitled to be reimbursed pursuant to Section 6.7(b) or (c). The provisions of Section 6.5 shall be applicable to any Paying Agent, Transfer Agent or Authenticating Agent.

Section 2.5.    Registration, Registration of Transfer and Exchange.

(a) The Issuer shall cause to be kept a register (the "Note Register") in which, subject to such reasonable procedures as it may prescribe, the Issuer shall provide for the registration of the Notes and the registration of transfers of the Notes. The Trustee is hereby appointed "Note Registrar" for the purpose of registering and transferring the Notes as herein provided. The Note Registrar shall supply all relevant documents to the Share Registrar necessary for the Share Registrar to maintain the Share Register accordingly and the Share Registrar shall be able to rely upon such information provided by the Note Registrar without any liability on its part. The Issuer will notify the Trustee of any Notes owned by or pledged to the Issuer or any of its Affiliates promptly upon the acquisition thereof or the creation of such

pledge. So long as an Event of Default shall be continuing, the Note Registrar shall promptly, upon the written request of a Noteholder or holder of a Preferred Share, but in no event later than five Business Days following such request, furnish such Noteholder or holder of a Preferred Share with a list of all other Noteholders, holders of Preferred Shares (as applicable); *provided that* the Note Registrar shall have no liability to any person for furnishing the Note Register to any Noteholder or holder of a Preferred Share. The Note Registrar shall, upon request, furnish a copy of the Note Register to the Trustee and the Servicer.

Subject to the provisions of paragraphs (b), (c), (d), (e), (f) and (k) of this Section 2.5, upon surrender for registration of transfer of any Note, the Issuer and the Co-Issuer (as applicable) shall execute, and the Trustee or the Authenticating Agent shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Notes of the same Class, of any authorized denomination and of a like aggregate principal amount.

Subject to the provisions of paragraphs (b), (c), (d), (e), (f) and (k) of this Section 2.5, at the option of the Holder, Notes may be exchanged for other Notes of the same Class, in any authorized denominations and of a like aggregate stated or principal amount, upon surrender of the Notes to be exchanged at the office of the Trustee. Whenever any Notes are so surrendered for exchange, the Issuer and the Co-Issuer (as applicable) shall execute, and the Trustee or the Authenticating Agent shall authenticate and deliver, the Notes that the Holder making the exchange is entitled to receive.

All Notes issued upon any registration of transfer or exchange of Notes shall be the valid obligations of the Co-Issuers, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Notes, as applicable, surrendered upon such registration of transfer or exchange.

Every Note presented or surrendered for registration of transfer or exchange shall be duly endorsed, or be accompanied by a written instrument of transfer in form satisfactory to the Co-Issuers (as applicable) and the Trustee duly executed by the Holder thereof or his attorney duly authorized in writing.

No service charge shall be made to a Holder for any registration of transfer or exchange of Notes, but the Co-Issuers or the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer or exchange of Notes.

(b) No Note may be sold or transferred (including, without limitation by pledge or hypothecation) unless such sale or transfer is exempt from the registration requirements of the Securities Act and is exempt under applicable state securities laws. No purported transfer of any interest in any Note or any portion thereof that is not made in accordance with this Section 2.5 shall be given effect to or be binding upon the Trustee or the Co-Issuers (as applicable) and any such purported transfer shall be null and void *ab initio* and vest in the transferee no rights against the Trustee, the Co-Issuers (as applicable) or the Trust Estate.

By its acceptance of a Note or a beneficial interest in a Note, each owner thereof will be deemed to have represented and agreed that transfer thereof is restricted and agrees that it

008551

shall transfer such Note or beneficial interest in such Note, only in accordance with the terms of this Indenture and such Note and in compliance with applicable law.

The applicable rules, regulations and procedures utilized or imposed by any Clearance System or DTC (collectively, "Applicable Procedures") shall be applicable to the Global Notes insofar as and to the extent beneficial interests in such Global Notes are held by the agent members of or participants in Euroclear, Clearstream or DTC, respectively. Account holders or agent members of or participants in Euroclear, Clearstream and DTC shall have no rights under this Indenture with respect to such Global Notes, and DTC (or its nominee) as registered Holder of any Global Notes may be treated by the Co-Issuers, the Trustee, the Note Registrar, the Authenticating Agent and any other Paying Agent (and any agent of any of the foregoing) as the owner of such Global Notes for all purposes whatsoever. Notwithstanding the foregoing, nothing herein shall prevent the Co-Issuers, the Trustee, the Note Registrar, the Authenticating Agent or any Paying Agent from giving effect to any written certification, proxy or other authorization furnished by DTC or any Clearance System or impair, as between DTC, the Clearance System and its agent members or participants, the operation of customary practices governing the exercise of the rights of a Holder of any Notes. Requests or directions from, or votes of, DTC or any Clearance System with respect to any matter shall not be deemed inconsistent if made with respect to (or in separate proportions corresponding to) different beneficial owners. None of the Trustee, the Transfer Agent, the Note Registrar, the Authenticating Agent, nor the Paying Agent shall have any duty to monitor, maintain records concerning (or determine compliance with any of the restrictions on transfer set forth herein with respect to) owners of beneficial interests in the Global Notes. None of the Trustee, the Transfer Agent, the Note Registrar, the Authenticating Agent, nor the Paying Agent shall have any liability for the accuracy of the records of DTC or any Clearance System, or any actions or omissions of DTC or any Clearance System (or of the agent members of or participants in any Clearance System).

A Noteholder may transfer a Note or its beneficial interest in a Note only in accordance with the following provisions:

(i) _Definitive Note to Temporary Regulation S Global Note_. To the extent permitted by the Applicable Procedures and subject to the provisions of Section 2.5, if a Holder of a Definitive Note of any Class wishes at any time to transfer its beneficial interest in such Definitive Note to a Non-U.S. Person during the Distribution Compliance Period, such Holder shall, subject to the provisions of this Section 2.5, transfer its interest in such Definitive Note for an equivalent beneficial interest in the Temporary Regulation S Global Note of the same Class. Upon (A) the surrender to the Trustee for cancellation of the Definitive Notes representing the beneficial interest to be so transferred and (B) the receipt by the Trustee and the Co-Issuers of (1) an Investor Representation Letter from such Noteholder's transferee, (2) a Regulation S Transferor Certificate from such Noteholder, and (3) a written order in accordance with the Applicable Procedures containing information regarding the Euroclear or Clearstream account to be credited with the increase in the Regulation S Global Note and the name of such account, the Trustee shall cancel such Definitive Note and, concurrently with such cancellation, instruct the Euro Transfer Agent to adjust the Common Depository's position in the Temporary Regulation S Global Note of the same Class to reflect an increase of the

008552

Aggregate Principal Amount thereof by the same amount and to credit or cause to be credited to the account of the transferee a beneficial interest in such Temporary Regulation S Global Note equal to the Aggregate Principal Amount of the Definitive Note so cancelled.  In the event of any partial transfer of an interest in a Definitive Note to a Temporary Regulation S Global Note, the Co-Issuers shall execute and provide to the Trustee, and the Trustee shall authenticate and return to the Holder, a Definitive Note evidencing the remaining balance thereof.  After the Distribution Compliance Period, interests in any Definitive Notes may not be transferred or exchanged for interests in a Temporary Regulation S Global Note.

(ii)     <u>Definitive Note to Permanent Regulation S Global Note</u>. If a Holder of a Definitive Note wishes at any time after the Distribution Compliance Period to transfer its interest in such Definitive Note to a Non-U.S. Person, such Holder shall, subject to the provisions of this Section 2.5, transfer its interest in such Definitive Note for an equivalent beneficial interest in such Permanent Regulation S Global Note of the same Class.  Upon (A) the surrender to the Euro Transfer Agent located in London in the case of the Class B-2L Notes, and the Trustee in the case of any other Class of Notes, of the Definitive Note representing the interest to be so transferred, for cancellation and (B) the receipt by the Trustee and the Co-Issuers of (1) an Investor Representation Letter from such Noteholder's transferee, (2) a Regulation S Transferor Certificate from such Noteholder and (3) a written order in accordance with the Applicable Procedures containing information regarding the Euroclear or Clearstream account to be credited with the increase in the Regulation S Global Note and the name of such account, the Trustee shall cancel such Definitive Note, and, concurrently with such cancellation, in the case of the Class B-2L Notes, instruct the Common Depository and in the case of any other Class of Notes, instruct the Custodian to endorse the Permanent Regulation S Global Note to reflect an increase of the Aggregate Principal Amount thereof by the same amount and to credit or cause to be credited to the account of the transferee a beneficial interest in such Permanent Regulation S Global Note equal to the Aggregate Principal Amount of the Definitive Note so cancelled.  In the event of any partial transfer of an interest in a Definitive Note to a Permanent Regulation S Global Note, the Co-Issuers or the Issuer, as applicable, shall execute and provide to the Trustee (or the Euro Transfer Agent located in London), and the Trustee (or the Euro Transfer Agent located in London) shall authenticate and return to the Holder, a Definitive Note evidencing the remaining balance thereof (which Definitive Note shall be so mailed or otherwise delivered from a location outside the United States).

(iii)     <u>Temporary Regulation S Global Note to Definitive Note or Rule 144A Global Note</u>. To the extent permitted by DTC and subject to the provisions of Section 2.5(k), if a Holder of a beneficial interest in the Temporary Regulation S Global Note of a particular Class wishes at any time during the Distribution Compliance Period to transfer its beneficial interest in such Temporary Regulation S Global Note to a U.S. Person, such holder shall, subject to the provisions of this Section 2.5, transfer its beneficial interest in such Temporary Regulation S Global Note for an equivalent interest in a Rule 144A Global Note.  Upon receipt by the Trustee of (A) a certificate substantially in the form of Exhibit G hereto and (B) a written order given in accordance with the Applicable Procedures, the Trustee shall instruct the Custodian to adjust the Depository's position in

the Temporary Regulation S Global Note to reflect a reduction of the Aggregate Principal Amount thereof by the Aggregate Principal Amount of the beneficial interest thereof to be so transferred and concurrently with such reduction, in the case of a Rule 144A Global Note, instruct the Custodian to adjust the Depository's position in the Rule 144A Global Note of the same Class to reflect an increase of the Aggregate Principal Amount thereof by the same amount and to credit or cause to be credited to the account of the transferee a beneficial interest in such Rule 144A Global Note equal to the Aggregate Principal Amount of the Temporary Regulation S Global Note so reduced, and, in the case of a Definitive Note, the Co-Issuers shall execute and furnish to the Trustee, and the Trustee or the Authenticating Agent shall authenticate and deliver to such Holder, a Definitive Note in a principal amount equal to the amount of the reduction in the Aggregate Principal Amount of the Temporary Regulation S Global Note of such Class.

(iv)     <u>Transfer of Interests in a Definitive Note</u>. A Holder of a Definitive Note may at any time transfer its interest in such Definitive Note in accordance with this Section 2.5(b)(iv). Any transfer of an interest in a Definitive Note to a Non-U.S. Person during the Distribution Compliance Period shall be made only pursuant to Section 2.5(b)(iii) above. Otherwise, the Trustee shall require, prior to any such transfer of a Definitive Note, receipt by the Trustee and the Co-Issuers of (A) an Investor Representation Letter from such Noteholder's transferee and (B) a Transferor Certificate from such Noteholder (which shall only be a Regulation S Transferor Certificate for transfers to Non-U.S. Persons during the Distribution Compliance Period). Upon receipt of such letter and certificate, and surrender to the Trustee the Definitive Note representing the interest to be so transferred, the Trustee shall cancel such Definitive Note and the Co-Issuers shall execute and provide to the Trustee, and the Trustee or the Authenticating Agent shall authenticate and deliver, a Definitive Note to such transferee (and, in the event of a partial transfer, the Co-Issuers shall execute and provide to the Trustee, and the Trustee or the Authenticating Agent shall authenticate and deliver, a Definitive Note evidencing the remaining balance to the transferring Holder).

(v)     <u>Transfer of Interests in the Temporary Regulation S Global Note</u>. Transfers of beneficial interests in the Temporary Regulation S Global Note may only be made (A) in accordance with Section 2.5(b)(i) above or (B) by book-entry transfer of beneficial interests in the Temporary Regulation S Global Note within the Clearance System (and subject to the Applicable Procedures) to Non-U.S. Persons in accordance with Regulation S in "offshore transactions" (as defined in Regulation S).

(vi)     <u>Transfer of Interests in a Permanent Regulation S Global Note</u>. If a Holder of a beneficial interest in the Permanent Regulation S Global Note wishes at any time to transfer its beneficial interest in such Permanent Regulation S Global Note to a U.S. Person, such Holder shall, subject to the provisions of this Section 2.5 and the Applicable Procedures, transfer its beneficial interest in such Permanent Regulation S Global Note for an equivalent interest in a Rule 144A Global Note. Upon receipt by the Trustee of (A) a certificate substantially in the form of Exhibit G hereto and (B) a written order given in accordance with the Applicable Procedures, the Trustee shall instruct the Custodian to adjust the Depository's position in the Permanent Regulation S Global Note to reflect a reduction of the Aggregate Principal Amount thereof by the Aggregate

008554

Principal Amount of the beneficial interest thereof to be so transferred and concurrently with such reduction, in the case of a Rule 144A Global Note, instruct the Custodian to adjust the Depository's position in the Rule 144A Global Note of the same Class to reflect an increase of the Aggregate Principal Amount thereof by the same amount and to credit or cause to be credited to the account of the transferee a beneficial interest in such Rule 144A Global Note equal to the Aggregate Amount Principal amount of the Permanent Regulation S Global Note so reduced, and, in the case of a Definitive Note, the Issuer shall execute and furnish to the Trustee (or Paying Agent, as directed by the Trustee) and the Trustee shall authenticate and deliver to such Holder a Definitive Note in the Aggregate Principal Amount equal to the amount of the reduction in the Aggregate Principal Amount of the Permanent Regulation S Global Note (which Definitive Note shall be mailed or otherwise delivered to such Holder from a location outside the United States). Interests in any Permanent Regulation S Global Note shall not be exchanged for or transferred to a Definitive Note (except pursuant to the preceding sentence or Section 2.1, if applicable).

(vii)     <u>Transfer of Interest in a Rule 144A Global Note</u>. Subject to the provisions of Section 2.5(k), transfers of beneficial interests in a Rule 144A Global Note may only be made (A) in accordance with the provisions of this Section 2.5(b)(iv) or (B) by book-entry transfer of beneficial interests in a Rule 144A Global Note within DTC (and subject to the Applicable Procedures) and in accordance with the transfer restrictions contained in the legend on such Rule 144A Global Note. If a Holder of a beneficial interest in a Rule 144A Global Note wishes to transfer its beneficial interest in such Rule 144A Global Note to a Non-U.S. Person, such holder shall, subject to the provisions of this Section 2.5 and the Applicable Procedures, transfer its beneficial interest in such Rule 144A Global Note for an equivalent interest in a Temporary Regulation S Global Note or a Permanent Regulation S Global Note, *provided* such transfer occurs after the Distribution Compliance Period. Upon receipt by the Trustee of (A) a Regulation S Transferor Certificate from such Noteholder and (B) a written order given in accordance with the DTC's Applicable Procedures, the Trustee shall instruct the Custodian to adjust the Depository's position in the Rule 144A Global Note to reflect a reduction of the Aggregate Principal Amount thereof by the Aggregate Principal Amount of the beneficial interest thereof to be so transferred and concurrently with such reduction, instruct the Custodian to adjust the Depository's position in such Temporary Regulation S Global Note or the Permanent Regulation S Global Note of the same Class to reflect an increase of the Aggregate Principal Amount thereof by the same amount and to credit or cause to be credited to the account of the transferee a beneficial interest in such Temporary Regulation S Global Note or Permanent Regulation S Global Note equal to the Aggregate Principal Amount of the Rule 144A Global Note so reduced.

(viii)     <u>Initial Sale of Notes</u>. Notwithstanding anything in clauses (i) through (v) of this Section 2.5(b) to the contrary, in connection with any sale of Bear Notes by Bear Stearns, no delivery of an Investor Representation Letter or a Transferor Certificate shall be required so long as each purchaser of Notes executes and delivers a transferee certificate acceptable to Bear Stearns (which certificate shall, in the case of any transfer of Definitive Notes, identify each transferee, including name, address, payment

008555

instructions, Taxpayer information and such other information as the Trustee may reasonably require), which transferee certificate shall be delivered to the Trustee.

(ix)    Securities Act. No transfer of any Note or any beneficial interest in any Note shall be made unless such transfer (a) is made pursuant to an effective registration statement under the Securities Act and registration or qualification under applicable state securities laws or (b) is exempt from such registration or qualification requirements.

The Investor Representation Letters (and any alternative certification acceptable to Bear Stearns pursuant to clause (vi) above) and the Transferor Certificates furnished pursuant to this Section may be relied on conclusively by the Trustee in determining whether the provisions of this Section have been complied with. None of the Issuer, the Co-Issuer, the Trustee or any other person shall be required to register the Notes under the Securities Act or any state securities laws.

(c) Unless a prospective Holder of a Note (and each beneficial owner of an interest in a Global Note) otherwise provides another representation acceptable to each of the Trustee, the Servicer and the Issuer, each Holder of a Note (other than each beneficial owner of an interest in a Global Note), by its purchase thereof, shall be deemed to have represented to the Issuer, the Servicer and the Trustee that (a) in the case of the Class A-1LA Notes, the Class A-1LB Notes, the Class A-2L Notes, the Class A-3L Notes, the Class A-4L Notes or the Class X Notes, either no part of the funds being used to pay the purchase price for such Notes constitutes an asset of any "employee benefit plan" (as defined in Section 3(3) of ERISA) or "plan" (as defined in Section 4975(e)(1) of the Code) that is subject to Title I of ERISA or Section 4975 of the Code (each a "Plan"), including assets held in an insurance company general account, or (b) if the funds being used to pay the purchase price for such Notes include assets of any Plan, an exemption to the prohibited transaction rules applies to the purchase and holding of such Notes, and (b) in the case of the Class B-1L Notes, either (i) such Holder (or such beneficial owner) is not a Plan and is not acquiring the Class B-1L Notes with the assets of the Plan, (ii) such Holder (or beneficial owner) is an insurance company and the funds being used to pay the purchase price for such Notes includes only assets of its general account and its acquisition and holding of such Notes are eligible for exemptive relief under Section I of U.S. Department of Labor Prohibited Transaction Class Exemption ("PTCE") 95-60, or (iii) the acquisition and holding of such Notes by such Holder (or beneficial owner) are eligible for the exemptive relief under PTCE 96-23, 91-38, 90-1 or 84-14.

(d) No Note shall be sold or transferred (including, without limitation, by pledge or hypothecation), except to Non-U.S. Persons in "offshore transactions" in accordance with Regulation S under the Securities Act, unless the purchaser or transferee is a Qualified Purchaser. Notwithstanding anything to the contrary in this Indenture, no transfer of a Note may be made if such transfer would require registration of the Issuer or Co-Issuer under the Investment Company Act (subject, as regards the Trustee's duties, to Section 2.5(f) below).

(e) At any time when the Issuer is not subject to Section 13 or 15(d) of the United States Securities Exchange Act of 1934, as amended, upon the request of any Noteholder, the Issuer shall promptly furnish to such Noteholder or to a prospective purchaser of any Note designated by such Noteholder, as the case may be, the information which the Issuer determines

008556

to be required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act ("Rule 144A Information") in order to permit compliance by such Noteholder with Rule 144A in connection with the resale of such Note by such Noteholder; *provided that* the Issuer shall not be required to provide audited financial statements more than once a year or to furnish Rule 144A Information in connection with any request made on or after the date that is three years from the later of (i) the date such Note (or any predecessor Note) was acquired from the Issuer or (ii) the date such Note (or any predecessor Note) was last acquired from an "affiliate" of the Issuer within the meaning of Rule 144A, in each case as determined by the Issuer.  Upon request by the Issuer, the Trustee shall cooperate with the Issuer in mailing or otherwise distributing (at the Issuer's expense) to such Noteholders or prospective purchasers, at and pursuant to the Issuer's written direction, the foregoing materials prepared and provided by the Issuer; *provided that* the Trustee shall be entitled to affix thereto or enclose therewith such disclaimers as the Trustee shall deem reasonably appropriate, at its discretion (such as, for example, a disclaimer that such Rule 144A Information was assembled by the Issuer and not by the Trustee, that the Trustee has not reviewed or verified the accuracy thereof, and that it makes no representation as to the sufficiency of such information under Rule 144A or for any other purpose).

(f)  The Trustee shall not be responsible for ascertaining whether any transfer complies with, or otherwise to monitor or determine compliance with, the requirements or terms of the Securities Act, applicable state securities laws, ERISA, the Code or the Investment Company Act; except that if a certificate is specifically required by the terms of this Section to be provided to the Trustee by a prospective transferee, transferor or the Issuer, the Trustee shall be under a duty to receive and examine the same to determine whether it conforms substantially on its face to the applicable requirements of this Section.

(g)  If a Responsible Officer of the Trustee becomes aware that (i) a transfer or attempted or purported transfer of any Note or interest therein was consummated in compliance with the provisions of this Section 2.5 on the basis of a materially incorrect certification from the transferor or purported transferee, (ii) a transferee failed to deliver to the Trustee any certificate required to be delivered hereunder or (iii) the Holder of any Note or interest therein is in material breach of any representation or agreement set forth in any certificate or any deemed representation or agreement of such Holder, the Trustee will direct the Note Registrar not to register such attempted or purported transfer and if a transfer has been registered, such transfer shall be absolutely null and void *ab initio* and shall vest no rights in the purported transferee (such purported transferee, a "Disqualified Transferee") and the last preceding Holder of such Note that was not a Disqualified Transferee shall be restored to all rights as a Holder thereof retroactively to the date of transfer of such Note by such Holder.

(h)  For so long as one or more Global Notes are Outstanding:

(i)     the Trustee and its directors, officers, employees and agents may deal with the Depository for all purposes (including the making of distributions on, and the giving of notices with respect to, the Global Notes);

(ii)    unless otherwise provided herein, the rights of beneficial owner in a Global Note shall be exercised only through the respective Depository and shall be

008557

limited to those established by law and agreements between such beneficial owners and the respective Depository;

(iii)    for purposes of determining the identity of and Aggregate Principal Amount of Notes beneficially owned by a Holder, the records of the Depository shall be conclusive evidence of such identity and Aggregate Principal Amount and the Trustee may conclusively rely on such records when acting hereunder;

(iv)    the Depository will make book-entry transfers among the Depository participants of the Depository and will receive and transmit distributions of principal of and interest on the Global Notes to such Depository participants; and

(v)    the Depository participants of the Depository shall have no rights under this Indenture under or with respect to any of the Global Notes held on their behalf by the Depository, and the Depository may be treated by the Trustee and its agents, employees, officers and directors as the absolute owner of the Global Notes for all purposes whatsoever.

(i) Each transferee of a Note (except with respect to a transfer pursuant to Regulation S) will be deemed to represent at time of transfer that the transferee is a Qualified Institutional Buyer and that (i) it is a Qualified Purchaser, (ii) it is not formed for the purpose of investing in the Notes, unless each of its beneficial owners is a Qualified Purchaser, (iii) it is not a dealer described in paragraph (a)(1)(ii) of Rule 144A unless such transferee owns and invests on a discretionary basis at least U.S.$25 million in securities of issuers that are not affiliated persons of such dealer, (iv) it is not a plan referred to in paragraph (a)(1)(i)(D) or (E) of Rule 144A or a trust fund referred to in paragraph (a)(1)(i)(F) of Rule 144A that holds the assets of such plan, unless investment decisions are made solely by the fiduciary, trustee or sponsor of such plan, (v) it and each account for which it is purchasing is purchasing Notes in at least the minimum denomination and (vi) it will provide written notice of the foregoing and any other applicable transfer restrictions to any transferee.

(j)  Any Note issued upon the transfer, exchange or replacement of Notes shall bear such applicable legend set forth in the relevant Exhibit hereto unless there is delivered to the Trustee, Note Registrar and the Issuer such satisfactory evidence, which may include an Opinion of Counsel, as may be reasonably required by any of the Trustee, Note Registrar and the Issuer to the effect that (i) neither such applicable legend nor the restrictions on transfer set forth therein are required to ensure that transfers thereof comply with the provisions of Rule 144A and to ensure that neither the Co-Issuers nor the Portfolio Collateral becomes an investment company required to be registered under the Investment Company Act, and (ii) the Co-Issuers and the Portfolio Collateral are exempt from registration under the Investment Company Act other than by reason of Section 3(c)(7) thereof.  Upon provision of such satisfactory evidence, the Trustee, at the direction of the Issuer, shall authenticate and deliver Notes that do not bear such applicable legend.

(k) If, notwithstanding the restrictions set forth in this Section 2.5, either of the Co-Issuers determines that any beneficial owner or Holder of a Rule 144A Global Note (i) is a U.S. Person and (ii) is not (A) a Qualified Purchaser or (B) a company beneficially owned

008558

exclusively by Qualified Purchasers, the Co-Issuers may require, by notice to such beneficial owner or Holder, as the case may be, that such beneficial owner or Holder sell all of its right, title and interest to such Note (or interest therein) to a Person that is both (1) a Qualified Institutional Buyer and (2) a Qualified Purchaser or a company beneficially owned exclusively by Qualified Purchasers, with such sale to be effected within 30 days after notice of such sale requirement is given. If such beneficial owner or Holder fails to effect the transfer required within such 30-day period, (x) upon written direction from the Issuer, the Trustee shall, and is hereby irrevocably authorized by such beneficial owner or Holder, as the case may be, to cause its interest in such Note to be transferred in a commercially reasonable sale (conducted by the Trustee or by an investment banking firm selected by the Trustee and approved by the Issuer (whose fees are to be paid exclusively from the proceeds of such sale)), in accordance with Section 9-504(3) of the UCC as applied to securities that are sold on a recognized market or that may decline speedily in value) to a Person that certifies to the Trustee and the Co-Issuers, in connection with such transfer, that such Person is both (1) a Qualified Institutional Buyer and (2) a Qualified Purchaser or a company beneficially owned exclusively by one or more Qualified Purchasers and (y) pending such transfer, no further payments will be made in respect of such Note (or beneficial interest therein) held by such Holder or beneficial owner.

Section 2.6. Mutilated, Destroyed, Lost or Stolen Notes.

If (i) any mutilated Note is surrendered to the Trustee or the Issuer or the Trustee and the Issuer receive evidence to their reasonable satisfaction of the destruction, loss or theft of any Note, and (ii) in the case of a destroyed, lost, or stolen Note, there is delivered to the Issuer and the Trustee such security or indemnity as may be required by them to save each of them harmless (an unsecured indemnity agreement of an Institutional Investor organized under the laws of the United States or any State in the United States with a net worth at least equal to twice the amount of the security or indemnity being deemed sufficient to satisfy such security or indemnity requirement), then, in the absence of notice to the Co-Issuers or the Trustee that such Note has been acquired by a protected purchaser, the Co-Issuers shall execute and, upon a written request therefor by the Issuer, the Trustee shall authenticate and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Note, a new Note of the same Class, tenor and principal amount, bearing a number not contemporaneously outstanding. If, after the delivery of such new Note, a protected purchaser of the original Note in lieu of which such new Note was issued presents such original Note for payment, the Issuer and the Trustee shall be entitled to recover such new Note from the Person to whom it was delivered or any Person taking title therefrom, except a protected purchaser, and the Issuer and the Trustee shall be entitled to recover upon the security or indemnity provided therefor to the extent of any loss, damage, cost or expense incurred by the Co-Issuers, or the Trustee, in connection therewith. If any such mutilated, destroyed, lost or stolen Note shall have become or shall be about to become due and payable in full, or shall have been called for redemption in full, instead of issuing a new Note, the Co-Issuers may pay such Note without surrender thereof, except that any mutilated Note shall be surrendered.

Upon the issuance of any new Note under this Section 2.6, the Issuer or the Trustee may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed or any other reasonable expense in relation thereto.

008559

Every new Note issued pursuant to this Section in lieu of any mutilated, destroyed, lost or stolen Note shall constitute an original additional contractual obligation of the Issuer, whether or not the mutilated, destroyed, lost or stolen Note shall be at any time enforceable by anyone, and shall be entitled to all the benefits of this Indenture equally and proportionately with any and all other Notes of the same Class duly issued hereunder.

The provisions of this Section are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Notes.

Section 2.7.  Payments on the Notes.

(a)  No principal will be payable in respect of the Class A-1L Notes (and principal collections on the Portfolio Collateral will be applied as described herein) during the Revolving Period, except in the event of an Initial Deposit Redemption, an Optional Redemption, a Special Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class A-1L Notes as described herein.  On each Payment Date with respect to the Amortization Period, the principal of the Class A-1L Notes will be payable (to the extent of funds available therefor and in the order of priority described herein) first to the Class A-1LA Notes and then to the Class A-1LB Notes, until the Payment Date on which the Aggregate Principal Amount of such Class A-1L Notes have been paid in full.  The unpaid principal amount of the Class A-1L Notes shall accrue interest at the Applicable Periodic Rate for such Class from the Closing Date until such unpaid principal amount is paid in full and such accrued interest shall be payable on each Payment Date. To the extent there is any shortfall in the payment of accrued interest at the Applicable Periodic Rate on any Payment Date with respect to any of the Class A-1L Notes, the Periodic Rate Shortfall Amount will be paid (to the extent of available funds therefor and as described herein) on one or more subsequent Payment Dates after payment of the Periodic Interest Amount with respect to the Class A-1L Notes, unless earlier paid upon an Initial Deposit Redemption, an Optional Redemption, a Special Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class A-1L Notes as described herein.  In addition, all payments of principal on the Class A-1LA Notes that are made in connection with an Initial Deposit Redemption, a Rating Confirmation Failure, a Tax Event Redemption or an Optional Redemption and all payments of interest will be paid on a *pro rata* basis with the Class X Notes as described herein.  All outstanding principal of the Class A-1L Notes, together with the other amounts described herein, will be due and payable on the Final Maturity Date.

(b)  No principal will be payable in respect of the Class A-2L Notes (and principal collections on the Portfolio Collateral will be applied as described herein) during the Revolving Period, except in the event of a Special Redemption, an Optional Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class A-2L Notes, but only after the Aggregate Principal Amount of the Class A-1L Notes (other than with respect to a Special Redemption or an O/C Redemption) and the Class X Notes have been paid in full.  The unpaid principal amount of the Class A-2L Notes shall accrue interest at the Applicable Periodic Rate for such Class from the Closing Date until such unpaid principal amount is paid in full and such accrued interest shall be payable on each Payment Date.  To the extent there is any shortfall in the payment of accrued interest at the Applicable Periodic Rate on any Payment Date with respect to the Class A-2L Notes, the Periodic Rate Shortfall Amount will be paid (to the extent of

008560

available funds therefor and as described herein) on one or more subsequent Payment Dates after payment of the Periodic Interest Amount with respect to the Class A-2L Notes, unless earlier paid upon an Initial Deposit Redemption, an Optional Redemption, a Special Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class A-2L Notes as described herein. All outstanding principal of the Class A-2L Notes, together with the other amounts described herein, will be due and payable on the Final Maturity Date.

(c) No principal will be payable in respect of the Class A-3L Notes (and principal collections on the Portfolio Collateral will be applied as described herein) during the Revolving Period, except in the event of a Special Redemption, an Optional Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class A-3L Notes, but only after the Aggregate Principal Amount of the Class A-1L Notes, the Class A-2L Notes (other than with respect to a Special Redemption or an O/C Redemption) and the Class X Notes have been paid in full. The unpaid principal amount of the Class A-3L Notes shall accrue interest at the Applicable Periodic Rate for such Class from the Closing Date until such unpaid principal amount is paid in full and such accrued interest shall be payable on each Payment Date. To the extent there is any shortfall in the payment of accrued interest at the Applicable Periodic Rate on any Payment Date with respect to the Class A-3L Notes, the Periodic Rate Shortfall Amount will be paid (to the extent of available funds therefor and as described herein) on one or more subsequent Payment Dates after payment of the Periodic Interest Amount with respect to the Class A-3L Notes, unless earlier paid upon an Initial Deposit Redemption, an Optional Redemption, a Special Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class A-3L Notes as described herein. All outstanding principal of the Class A-3L Notes, together with the other amounts described herein, will be due and payable on the Final Maturity Date.

(d) No principal will be payable in respect of the Class A-4L Notes (and principal collections on the Portfolio Collateral will be applied as described herein) during the Revolving Period, except in the event of a Special Redemption, an Optional Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class A-4L Notes, but only after the Aggregate Principal Amount of the Class A-1L Notes, the Class A-2L Notes, the Class A-3L Notes (other than with respect to a Special Redemption or an O/C Redemption) and the Class X Notes have been paid in full. The unpaid principal amount of the Class A-4L Notes shall accrue interest at the Applicable Periodic Rate for such Class from the Closing Date until such unpaid principal amount is paid in full and such accrued interest shall be payable on each Payment Date. To the extent there is any shortfall in the payment of accrued interest at the Applicable Periodic Rate on any Payment Date with respect to the Class A-4L Notes, the Periodic Rate Shortfall Amount will be paid (to the extent of available funds therefor and as described herein) on one or more subsequent Payment Dates after payment of the Periodic Interest Amount with respect to the Class A-4L Notes, unless earlier paid upon an Initial Deposit Redemption, an Optional Redemption, a Special Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class A-4L Notes as described herein. All outstanding principal of the Class A-4L Notes, together with the other amounts described herein, will be due and payable on the Final Maturity Date.

(e) Except in connection with the application of the Additional Collateral Deposit Requirement as described herein, no principal will be payable in respect of the Class B-1L Notes during the Revolving Period, except in the event of a Special Redemption, an Optional

008561

Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class B-1L Notes. The principal amount of the Class B-1L Notes shall be due and payable (to the extent of funds available therefore and in the order of priority as described herein) on each Payment Date during the Amortization Period, but only after the Aggregate Principal Amount of the Class A-1L Notes, the Class A-2L Notes, the Class A-3L, the Class A-4L (other than with respect to a Special Redemption or an O/C Redemption) and the Class X Notes have been paid in full. The unpaid principal amount of the Class B-1L Notes shall accrue interest at the Applicable Periodic Rate for such Class from the Closing Date until such unpaid principal amount is paid in full and such accrued interest shall be payable on each Payment Date. To the extent there is any shortfall in the payment of accrued interest at the Applicable Periodic Rate on any Payment Date with respect to the Class B-1L Notes, the Periodic Rate Shortfall Amount will be paid (to the extent of available funds therefor and as described herein) on one or more subsequent Payment Dates after payment of the Periodic Interest Amount with respect to the Class B-1L Notes, unless earlier paid upon an Initial Deposit Redemption, an Optional Redemption, a Special Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class B-1L Notes as described herein. All outstanding principal of the Class B-1L Notes, together with the other amounts described herein, will be due and payable on the Final Maturity Date.

(f) The Class X Notes will provide for the Class X Payment (to the extent funds are available therefore as described herein) on each Payment Date, commencing on the November 2006 Payment Date through and including the August 2013 Payment Date. The Aggregate Principal Amount of the Class X Notes will be due and payable on the Final Maturity Date of the Class X Notes. To the extent the Class X Payment will not be paid on any Payment Date, the resulting Class X Shortfall Amount will be paid (as described herein) on one or more subsequent Payment Dates after payment of the Class X Payment with respect to such Class X Notes.

(g) Holders of the Notes of each Class as of the Record Date in respect of a Payment Date or as of the Redemption Record Date with respect to the Initial Deposit Redemption Date, an Optional Redemption Date, a Special Redemption Date, a Tax Event Redemption Date or a Mandatory Redemption Date, shall be entitled, to the extent provided for herein, to the interest accrued and payable and principal payable (or Initial Deposit Redemption Price, an Optional Redemption Price, a Special Redemption Price, a Tax Event Redemption Price or a Mandatory Redemption Price payable, as applicable) on such Payment Date or Record Date with respect to the Initial Deposit Redemption Date, an Optional Redemption Date, a Special Redemption Date, a Tax Event Redemption Date or a Mandatory Redemption Date. Payments of principal to Holders entitled thereto shall be made in the proportion that the Aggregate Principal Amount of the Notes of such Class registered in the name of each such Holder on such Record Date or Redemption Record Date with respect to the Initial Deposit Redemption Date, an Optional Redemption Date, a Special Redemption Date, a Tax Event Redemption Date or a Mandatory Redemption Date.

(h) Interest accrued with respect to any Class of Notes shall be computed on the basis of a 360-day year and the actual number of days elapsed during each Periodic Interest Accrual Period.

008562

(i) Notwithstanding any other provision of this Indenture, the obligations of the Co-Issuers' under this Indenture and the payment of principal of, interest on and all other amounts payable on or in respect of the Class A-1L Notes, the Class A-2L Notes, the Class A-3L Notes, Class A-4L Notes, the Class B-1L Notes and the Class X Notes will constitute nonrecourse obligations of the Co-Issuers, payable solely from the Trust Estate. Having realized the Collateral and distributed the net proceeds thereof, in each case in accordance with this Indenture, neither the Trustee nor any holders of Notes may take any further steps against the Co-Issuers to recover any sum still unpaid in respect of any claims under this Indenture or the Notes issued under this Indenture and all claims against the Co-Issuers in respect of any such sum due but still unpaid shall be extinguished and shall not revive. Neither of the Co-Issuers, nor any of their respective agents, partners, beneficiaries, officers, directors, employees or any Affiliate of any of them or any of their respective successors or assigns shall be personally liable for any amounts payable, or performance due, under the Notes or this Indenture. It is understood that the foregoing provisions of this paragraph shall not (A) prevent recourse to the Trust Estate for the sums due or to become due under any security, instrument or agreement which is part of the Trust Estate or (B) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by the Notes or secured by this Indenture, but the same shall continue until paid or discharged or (C) constitute a waiver of an otherwise valid cause of action with respect to the performance of the Servicer's obligations as set forth in the Servicing Agreement or (D) constitute a waiver of any otherwise valid cause of action against the Co-Issuers wherein the loss complained of is directly attributable to the willful misconduct or fraud of the Co-Issuers in making their respective representations or warranties or the performance of their respective obligations under this Indenture or (E) limit the right of any person to name the Co-Issuers as parties defendant in any action, suit or in the exercise of any other remedy under the Notes or in this Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against any such person or entity.

Section 2.8. Persons Deemed Owners.

The Co-Issuers, the Trustee, the Note Registrar and the Servicer, and any agent of the Co-Issuers, the Trustee, the Note Registrar and the Servicer shall treat the Person in whose name any Note is registered as it appears on the Note Register as the owner of such Note for the purpose of receiving payments on such Note, and for all other purposes whatsoever (whether or not such Note is overdue), and none of the Issuer, the Trustee, the Note Registrar or the Servicer, nor any agent of any of them, shall be affected by notice to the contrary.

Section 2.9. Cancellation.

All Notes surrendered for payment, registration of transfer, exchange or redemption, or deemed destroyed, lost or stolen, shall, if surrendered to any Person other than the Trustee, be delivered to the Trustee and shall be promptly cancelled by it. No Notes shall be authenticated in lieu of or in exchange for any Notes cancelled as provided in this Section 2.9, except as expressly permitted by this Indenture. All cancelled Notes held by the Trustee shall be destroyed or held by the Trustee in accordance with its standard retention policy unless the Issuer shall direct by an Issuer Order that they be returned to the Issuer.

008563

Section 2.10.  Tax Purposes.

Each of the Co-Issuers shall, and each Holder by acceptance of its Note shall be deemed to have agreed to, treat the Notes as debt solely of the Issuer for United States federal income tax purposes.

Section 2.11.  Calculation Agent; Determination of LIBOR.

(a) The Issuer hereby agrees that for so long as any of the Notes remain Outstanding, there will at all times be an agent appointed to calculate LIBOR in respect of each Periodic Interest Accrual Period in accordance with the terms of the Notes.  The Issuer has initially appointed JPMorgan Chase Bank, National Association, as agent with respect to the determination of LIBOR (in such capacity, the "Calculation Agent").  The Calculation Agent may be removed by the Issuer at any time.  If the Calculation Agent is unable or unwilling to act as such or is removed by the Issuer, or if the Calculation Agent fails to determine LIBOR for a Periodic Interest Accrual Period, the Issuer will promptly appoint as a replacement Calculation Agent a leading bank which is engaged in transactions in U.S. dollar deposits in the international U.S. dollar market and which does not control or is not controlled by or under common control with the Co-Issuers or their Affiliates.  The Calculation Agent may not resign or be removed from its respective duties without a successor having been duly appointed.

(b) The Calculation Agent shall determine LIBOR for each Periodic Interest Accrual Period in accordance with the following provisions:

On each LIBOR Determination Date, LIBOR shall equal the rate, as obtained by the Calculation Agent, for three-month U.S. dollar deposits which appears on Telerate Page 3750 (as reported by Bloomberg Financial Markets Commodities News) or such other page as may replace such Page 3750, as of 11:00 a.m. (London time) on such LIBOR Determination Date.  Notwithstanding the foregoing, LIBOR for the initial Periodic Interest Accrual Period shall be determined through the use of straight-line interpolation by reference to two rates calculated in accordance with the provisions above, one of which shall be for five-month U.S. dollar deposits and the other of which shall be for six-month U.S. dollar deposits.

If, on any LIBOR Determination Date, such rate does not appear on Telerate Page 3750 (as reported by Bloomberg Financial Markets Commodities News) or such other page as may replace such Page 3750, the Calculation Agent shall determine the arithmetic mean of the offered quotations of the Reference Banks (as defined below) to leading banks in the London interbank market for three-month (or five-month or six-month, as applicable) U.S. dollar deposits in an amount determined by the Calculation Agent by reference to requests for quotations as of approximately 11:00 a.m. (London time) on the LIBOR Determination Date made by the Calculation Agent to the Reference Banks.  If, on any LIBOR Determination Date, at least two of the Reference Banks provide such quotations, LIBOR shall equal such arithmetic mean of such quotations.  If, on any LIBOR Determination Date, only one or none of the Reference Banks provide such quotations, LIBOR shall be deemed to be the arithmetic mean of the offered quotations that leading banks in The City of New York selected by the Calculation Agent (after consultation with the Servicer) are quoting on the relevant LIBOR Determination Date for three-month (or five-month or six-month, as applicable) U.S. dollar deposits in an

008564

amount determined by the Calculation Agent that is representative of a single transaction in such market at such time by reference to the principal London offices of leading banks in the London interbank market; *provided that,* if the Calculation Agent is required but is unable to determine a rate in accordance with at least one of the procedures provided above, LIBOR shall be LIBOR as determined on the previous LIBOR Determination Date. As used herein, "Reference Banks" means four major banks in the London interbank market selected by the Calculation Agent (after consultation with the Servicer).

For purposes of any calculations referred to in this paragraph (b), all percentages resulting from such calculations will be rounded, if necessary, to the nearest one hundred-thousandth of a percentage point.

(c) As soon as possible after 11:00 a.m. (New York time) on each LIBOR Determination Date, but in no event later than 11:00 a.m. (New York time) on the Business Day immediately following each LIBOR Determination Date, the Calculation Agent will notify the Issuer, the Trustee, the Irish Paying Agent (as long as any of the Notes are listed on the Irish Stock Exchange) and the Servicer of LIBOR for the next Periodic Interest Accrual Period. The Calculation Agent will also specify to the Issuer the quotations upon which LIBOR is based, and in any event the Calculation Agent shall notify the Issuer before 5:00 p.m. (New York time) on each LIBOR Determination Date that either: (i) it has determined or is in the process of determining LIBOR or (ii) it has not determined and is not in the process of determining LIBOR together with its reasons therefor.

(d) Upon receipt of notice of LIBOR for each Periodic Interest Accrual Period from the Calculation Agent pursuant to subsection (c) of this Section 2.11, the Trustee shall determine the Applicable Periodic Rate with respect to the Notes for such Periodic Interest Accrual Period and notify the Irish Stock Exchange of the Applicable Periodic Rate for each Class of Note (as long as any of the Notes are listed on the Irish Stock Exchange).

(e) The determination of LIBOR by the Calculation Agent and the Applicable Periodic Rate with respect to the Notes by the Trustee (in the absence of manifest error) shall be final and binding upon all parties.

Section 2.12. Option to Acquire Credit Enhancement.

Holders of any Class of Notes may elect to acquire bond insurance, a surety bond or similar credit enhancement supporting the payment of principal and/or interest on such Class of Notes, on terms and conditions acceptable to such Holders and at the sole expense of such Holders. Any Class of Notes subject to such enhancement will be designated pursuant to a supplemental indenture adopted pursuant to Section 8.1 as "Insured Notes" of such Class. Premiums for any such enhancement (together with any other amounts payable to the issuer of such bond insurance policy, surety bond or similar credit enhancement, including, without limitation, amounts payable to any such issuer to reimburse it for draws thereunder, together with interest thereon), and costs incurred by the Co-Issuers in connection with such enhancement will be payable from amounts otherwise payable to such Class of Insured Notes, or in such other manner chosen by such Holder (*provided that* any such payment does not adversely affect any other Noteholder or holder of a Preferred Share). Any Insured Notes for substantially all other

008565

purposes will be treated as Notes of such Class, except that the issuer of the bond insurance policy, surety bond or other such credit enhancement will generally be deemed to be the Holder of the Notes of such Class, enhanced by such entity and will in such capacity be entitled to exercise the rights otherwise exercisable by Holders of such Notes.

Section 2.13.    Prescription.

Payment in respect of any Note will cease to be due if not paid to the Holder of such Note due to insufficient payment instructions from such Holder to the Trustee or the Paying Agent for a period of twenty years from the Relevant Date.

ARTICLE III

AUTHENTICATION AND DELIVERY OF NOTES

Section 3.1.    General Provisions.

On the Closing Date, the Notes shall be executed by the Co-Issuers and delivered to the Trustee for authentication and thereupon the same shall be authenticated and delivered by the Trustee upon the Issuer's written request and upon compliance with the conditions of Section 3.2 hereof, and upon receipt by the Trustee of the following:

(a) an Officers' Certificate of the Co-Issuers evidencing the authorization of the execution, authentication and delivery of the Transaction Documents, the Notes and the Preferred Shares and specifying the Final Maturity Dates, the applicable principal or stated amounts and the interest rates and yields of each Class of the Notes to be authenticated and delivered;

(b) an Opinion or Opinions of Counsel, dated the Closing Date, substantially in the form or forms attached hereto as Schedule G.

(c) an Officer's Certificate or Certificates of the Co-Issuers stating that all representations and warranties of the Co-Issuers set forth in the Transaction Documents are true and correct and neither of the Co-Issuers is in Default under this Indenture and that the issuance of the Notes and the Preferred Shares then applied for will not result in a breach of any of the terms, conditions or provisions of, or constitute a default under, any indenture or other agreement or instrument to which the Issuer or the Co-Issuer, as applicable, is a party or by which the Issuer or the Co-Issuer, as applicable, is bound, or any order of any court or administrative agency entered in any proceeding to which the Issuer or the Co-Issuer, as applicable, is a party or by which the Issuer or the Co-Issuer, as applicable, is bound or to which the Issuer or the Co-Issuer, as applicable, is subject; and that all conditions precedent (other than the deposit of cash by the Trustee in the appropriate accounts as provided in Section 3.2(e), (f) and (g) hereof) provided in this Section 3.1 and all requirements under Section 3.2 hereof and all conditions precedent otherwise provided in this Indenture relating to the authentication and delivery of the Notes applied for have been complied with;

(d) an Accountants' Certificate in form and substance acceptable to the Issuer and the Co-Issuer confirming that the Notes of each Class will be retired by their Final Maturity

008566

Dates in accordance with the assumptions set forth in Section 1.3 hereof and specifying the procedures undertaken by them to review data and computations relating to the foregoing;

(e) an executed counterpart of the Servicing Agreement, the Paying and Transfer Agency Agreement and the Collateral Administration Agreement;

(f) the Initial Portfolio Collateral as provided in Section 3.2(a) hereof;

(g) an Issuer Request directing the Trustee to authenticate the Notes in the amounts set forth therein, registered in the name(s) set forth therein or as otherwise provided to the Trustee by the Issuer or at its direction, and to make delivery thereof to the Issuer or as it may otherwise direct therein;

(h) an Officer's Certificate from the Servicer (i) confirming that Schedule A attached to this Indenture correctly lists the Initial Portfolio Collateral to be granted to the Trustee on the Closing Date (in the case of items of Debt Securities) or scheduled to be granted to the Trustee on or not later than thirty (30) days after the Closing Date (in the case of Portfolio Loans) pursuant to Section 3.2(a) hereof and (ii) confirming such information with respect to each item of Initial Portfolio Collateral as the Issuer reasonably deems necessary to confirm that such item of Initial Portfolio Collateral, individually and in the aggregate, meets the requirements specified in this Indenture; and

(i) such other documents as the Trustee may reasonably require.

Section 3.2.    Security for Notes.

On the Closing Date, the following conditions shall have been satisfied:

(a) Delivery of Initial Portfolio Collateral.  The Initial Portfolio Collateral to be Granted to the Trustee on such Closing Date, in an amount at least equal to the Initial Portfolio Collateral Amount, shall have been Delivered to the Trustee (or, with respect to Portfolio Loans, trade confirmations, commitment letters, assignment documents or other documents evidencing a commitment to purchase by the Issuer of the Initial Portfolio Collateral on or not later than thirty (30) days after the Closing Date shall have been delivered to the Trustee).

(b) Certificate of the Issuer.  A certificate of an Authorized Officer of the Issuer, dated as of the Closing Date, shall have been delivered to the Trustee to the effect, in the case of each item of Portfolio Collateral and the Deposit included in the Trust Estate on the Closing Date, that as of the Closing Date:

(i)    the Issuer is the owner of such item of Portfolio Collateral and the Deposit free and clear of any liens, claims (including any adverse claims) or encumbrances of any nature whatsoever, except for those granted or expressly permitted pursuant to this Indenture and due bills, if any, with respect to interest, or a portion thereof, accrued on such Portfolio Collateral prior to the first payment date and owed by the Issuer to the seller of such Portfolio Collateral;

008567

(ii)     the Issuer has acquired its ownership in such item of Portfolio Collateral and the Deposit in good faith without notice of any adverse claim, except as described in paragraph (b)(i) above;

(iii)     the Issuer has Delivered such item of Portfolio Collateral to the Trustee and has not assigned, pledged or otherwise encumbered any interest in such Portfolio Collateral or the Deposit other than interests granted or expressly permitted pursuant to this Indenture;

(iv)     the Issuer has full right to Grant and does hereby Grant such item of Portfolio Collateral and the Deposit to the Trustee;

(v)     the information set forth with respect to such item of Portfolio Collateral in Schedule A hereto is correct;

(vi)     such item of Portfolio Collateral satisfies the requirements of the definition of Portfolio Collateral; and

(vii)     no such item of Portfolio Collateral is Discount Portfolio Collateral.

(c)     Rating Letters.  The Trustee shall have received written evidence that the Class X Notes have been rated "AAA" by Standard & Poor's and "Aaa" by Moody's,  the Class A-1LA Notes have been rated "AAA" by Standard & Poor's and "Aaa" by Moody's, the Class A-1LB Notes have been rated "AAA" by Standard & Poor's and "Aaa" by Moody's, the Class A-2L Notes have been rated at least "AA" by Standard & Poor's and at least "Aa2" by Moody's, the Class A-3L Notes have been rated at least "A" by Standard & Poor's and at least "A2" by Moody's, the Class A-4L Notes have been rated "A-" by Standard & Poor's and "A3" by Moody's and that the Class B-1L Notes have been rated "BBB" by Standard & Poor's and "Baa2" by Moody's.

(d)     Accounts.  The Collection Account, the Collateral Account, the Initial Deposit Account, the Reserve Account, the Expense Reimbursement Account, the Closing Expense Account, the Loan Funding Account, the Default Swap Collateral Account, the Default Swap Issuer Account and the Preferred Shares Collection Account shall have been established.

(e)     Initial Deposit Account.  The Issuer shall have delivered to the Trustee on the Closing Date cash in the amount of $125,678,543.30 representing the Deposit for inclusion in the Trust Estate and the Trustee shall have credited such cash to the Initial Deposit Account.

(f)     Expense Reimbursement Account; Closing Expense Deposit.  The Issuer shall have delivered to the Trustee on the Closing Date cash in the amount of at least $50,000 for inclusion in the Trust Estate and the Trustee shall have credited such cash to the Expense Reimbursement Account.  The Issuer shall have delivered to the Trustee on the Closing Date cash in the amount of $2,512,500 for inclusion in the Trust Estate, and the Trustee shall have credited such cash to the Closing Expense Account (the "Closing Expense Deposit") which, after payment of all closing expenses (according to the list delivered to the Trustee), shall be transferred to the Initial Deposit Account or the Collection Account and applied as set forth in Section 10.2(h).

008568

(g) <u>Loan Funding Account</u>. The Issuer shall have delivered to the Trustee on the Closing Date cash in the amount of $5,784,684.17 which is equal to the Issuer's commitment to make or otherwise fund draws related to any Delayed Drawdown Loans or Revolving Loans in the Initial Portfolio Collateral and the Trustee shall have credited such cash to the Loan Funding Account.

Section 3.3. <u>Initial Deposit Redemption.</u>

(a) The Issuer shall use reasonable efforts to use on or prior to the Effective Date the available funds and Eligible Investments in the Initial Deposit Account (other than Account Income on funds on deposit in the Initial Deposit Account) to purchase additional Original Portfolio Collateral as permitted pursuant to Section 3.4 hereof taking into account the Initial Portfolio Collateral and Original Portfolio Collateral already purchased by the Issuer in the Trust Estate (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to any of the Original Portfolio Collateral on or before the Effective Date). If the remaining Deposit in the Initial Deposit Account as of the Effective Date equals or exceeds $2,000,000 and the Aggregate Principal Amount of the Original Portfolio Collateral (determined in accordance with the foregoing sentence) acquired or committed to be acquired by the Issuer is less than the Required Portfolio Collateral Amount (subject to the second paragraph of Section 3.4(a)), the Issuer shall cause an Initial Deposit Redemption to occur on the Initial Deposit Redemption Date by redeeming the Class A-1LA Notes and the Class X Notes in an aggregate amount equal to the excess of the Required Portfolio Collateral Amount over the par amount of Original Portfolio Collateral; *provided that* the amount applied to such Initial Deposit Redemption shall not exceed the remaining amount of the Deposit (the "<u>Initial Deposit Redemption Amount</u>"). No interest or other amount in excess of the Initial Deposit Redemption Amount, other than the Periodic Interest Amount with respect to the Class A-1LA Notes and the Class X Notes through the Initial Deposit Redemption Date due on the next succeeding Payment Date, shall be payable on or in respect of the Class A-1LA or the Class Notes X Notes redeemed in an Initial Deposit Redemption. If there is a Deposit in the Initial Deposit Account on the Effective Date but no Initial Deposit Redemption is required pursuant to the terms of this Section 3.3(a), the remaining Deposit in the Initial Deposit Account shall be transferred to the Collection Account on the Effective Date and shall, subject to Section 3.4(d), constitute Collateral Principal Collections. Account Income in the Initial Deposit Account shall be transferred to the Collection Account on the Effective Date and shall constitute Collateral Interest Collections.

(b) If an Initial Deposit Redemption is required, the Issuer, not later than the third Business Day immediately following the Effective Date, shall notify the Trustee and each Rating Agency in writing that an Initial Deposit Redemption is required pursuant to Section 3.3(a) hereof and the amount of the Class A-1LA Notes and the Class X Notes required to be redeemed pursuant thereto.

(c) Notice of an Initial Deposit Redemption shall be given by the Trustee by first-class mail, postage prepaid, mailed not less than ten calendar days prior to the Initial Deposit Redemption Date, to each Holder of the Class A-1LA Notes and the Class X Notes to be redeemed at the address for such Holder in the Note Register and so long as any Notes are listed on the Irish Stock Exchange, to the Irish Paying Agent. All notices of Initial Deposit

008569

Redemption shall state the Initial Deposit Redemption Date, the Redemption Record Date with respect thereto, the Aggregate Principal Amount of the Class A-1LA Notes and the Class X Notes to be redeemed, and that no interest or other amount in excess of the Initial Deposit Redemption Amount shall be payable on the amount of the Class A-1LA Notes and the Class X Notes to be redeemed.

(d) If an Initial Deposit Redemption is required, all Eligible Investments in the Initial Deposit Account representing the Deposit not applied to the purchase of Portfolio Collateral on or before the Effective Date shall be liquidated on the Business Day immediately preceding the Initial Deposit Redemption Date and the proceeds thereof shall be held in the Initial Deposit Account. On the Initial Deposit Redemption Date, the Trustee shall withdraw from the Initial Deposit Account all funds therein and apply such funds to the payment of Holders of the Notes in an amount equal to the Initial Deposit Redemption Amount or to a deposit in the Collection Account, as applicable.

Section 3.4. Purchase of Portfolio Collateral between the Closing Date and the Effective Date; Effective Date Conditions.

(a) The Issuer may (i) purchase Original Portfolio Collateral on any Business Day during the period from and including the Closing Date to and including the Effective Date or (ii) enter into a commitment to purchase Original Portfolio Collateral on any Business Day during the period from and including the Closing Date to and including the Effective Date for purchase on or as soon as practicable thereafter (*provided that* the agreed to settlement date shall not be more than thirty (30) days after the Effective Date), in each case, for inclusion in the Trust Estate in an aggregate amount equal to the Deposit in the Initial Deposit Account. Upon receipt of a Servicer Order requesting the purchase of Original Portfolio Collateral the Trustee shall pay out of the Initial Deposit Account, during the period commencing on the Closing Date and ending on the Effective Date, all or a portion of the funds available therein for the purpose of purchasing Original Portfolio Collateral.

No Original Portfolio Collateral may be purchased prior to the Effective Date unless immediately following the purchase of such item of Portfolio Collateral (as certified by Servicer Order), the remaining Deposit in the Initial Deposit Account, after giving effect to such purchase, is sufficient as of the date of determination to purchase Original Portfolio Collateral in an Aggregate Principal Amount at least equal to the Required Portfolio Collateral Amount for delivery into the Trust Estate (taking into account the Initial Portfolio Collateral and Original Portfolio Collateral already in the Trust Estate (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to any of the Original Portfolio Collateral on or before the Effective Date)).

Notwithstanding the foregoing, or any other provision hereof, if the Issuer has previously entered into a commitment to purchase an item of Portfolio Collateral to be included in the Trust Estate, such commitment not to exceed thirty (30) days, and at the time of such commitment such an item of Portfolio Collateral complied with the definition of Portfolio Collateral and this Section 3.4(a), then the Issuer may consummate the purchase of such an item

008570

of Portfolio Collateral notwithstanding that such an item of Portfolio Collateral fails to comply with the definition of Portfolio Collateral and such criteria on the date of settlement.

(b) The Servicer shall cause to be delivered to the Trustee on the Effective Date an amended Schedule A to this Indenture listing all Original Portfolio Collateral (including the Initial Portfolio Collateral then in the Trust Estate) and all commitments to purchase Original Portfolio Collateral, which schedule shall supersede any prior Schedule A delivered to the Trustee.

(c) The Issuer will use its commercially reasonable efforts to purchase, or to enter into binding agreements to purchase, Original Portfolio Collateral by the Effective Date, that, including the Initial Portfolio Collateral, will satisfy, as of the Effective Date, the Collateral Quality Tests, the criteria set forth in Section 12.2 and the Overcollateralization Tests. Within 5 Business Days after the Effective Date, the Issuer or the Servicer (on behalf of the Issuer) shall request a Rating Confirmation on behalf of the Issuer and shall provide a report to the Rating Agencies identifying the Original Portfolio Collateral and the Issuer shall obtain and deliver to the Trustee and the Rating Agencies, together with the delivery of a report (and an electronic file of the Original Portfolio Collateral to S&P) substantially in the form of a Monthly Report as of the Effective Date, an Accountants' Certificate (a) confirming the maturity date, rating, spread, coupon and recovery rate for each item of Original Portfolio Collateral as of the Effective Date and the information provided by the Issuer with respect to every other asset included or to be included in the Trust Estate, by reference to such sources as shall be specified therein, (b) confirming that as of the Effective Date (1) each Overcollateralization Test is met; (2) the Aggregate Principal Amount of the Original Portfolio Collateral that the Issuer owned or committed to purchase as of the Effective Date is at least equal to the Required Portfolio Collateral Amount and (3) the Portfolio Collateral complies with all of the requirements of the Collateral Quality Tests and the criteria set forth in Section 12.2 and (c) specifying the procedures undertaken by them to review data and computations relating to the foregoing statements. If a Rating Confirmation Failure should occur, the Notes will be redeemed pursuant to Section 9.2 hereof.

(d) Notwithstanding any provision in this Indenture to the contrary, if, on the Effective Date, the Aggregate Principal Amount of the Portfolio Collateral (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to the Original Portfolio Collateral on or prior to such time) exceeds the Required Portfolio Collateral Amount and there are funds remaining from the Deposit held in the Initial Deposit Account, the Servicer may direct the Trustee to transfer up to the least of (i) 25% of such funds and (iii) $1,000,000, to the Collection Account as additional Collateral Interest Collections; *provided* that the Overcollateralization Tests and the collateral criteria described herein are satisfied and the Interest Coverage Test for the most recent Payment Date was satisfied. The remainder of the Deposit shall be transferred by the Trustee to the Collection Account to be applied as Collateral Principal Collections on the Payment Date immediately following the date of determination.

008571

Section 3.5.    Intermediaries.

(a) Notwithstanding anything herein to the contrary, to the extent any items of Portfolio Collateral issued by an issuer that is not the United States of America, an agency or instrumentality thereof, or some other U.S. Person (collectively, "Non-U.S. Portfolio Securities") are Granted to the Trustee, such Non-U.S. Portfolio Securities may be delivered to and held by the Trustee through one or more Foreign Sub-custodians or Foreign Clearance Systems (as those terms are defined in the Section below; collectively, "Foreign Intermediaries") if such Non-U.S. Portfolio Securities cannot be Delivered to the Trustee.

(b) The Trustee, for the purpose of receiving and holding any Non-U.S. Portfolio Securities (as defined in Section 3.5(a)), may appoint one or more banking or securities institutions located outside the United States (each a "Foreign Sub-custodian") and/or clearing agencies or systems located outside the United States (each, a "Foreign Clearance System"), including without limitation Euroclear and Clearstream. With respect to Non-U.S. Portfolio Securities (and related cash) held through Foreign Intermediaries, such Foreign Intermediaries may be authorized to hold Non-U.S. Portfolio Securities in central securities depositories or clearing agencies in which such Foreign Intermediaries participate.

(c) The Trustee's responsibility with respect to the selection or appointment of Foreign Intermediaries shall be limited to a duty to exercise reasonable care in the selection or retention of such Foreign Intermediaries in light of prevailing settlement and securities handling practices, procedures and controls in the relevant market and subject to Section 6.3 hereof; *provided that* the appointment of Euroclear or Clearstream to act as Foreign Intermediary shall be deemed to have been made in the exercise of due care. With respect to any costs, expenses, damages, liabilities, or claims (including, without limitation, attorneys' and accountants' fees) incurred by the Issuer as a result of the acts or the failure to act by any Foreign Intermediaries, the Trustee shall take reasonable action to recover such costs, expenses, damages, liabilities, or claims from such Foreign Intermediaries; *provided that* the Trustee's sole liability in that regard shall be limited to amounts actually received by it from such Foreign Intermediaries (exclusive of related costs and expenses incurred by the Trustee). The Trustee shall not be responsible or liable for any failure or delay in the performance of its obligations under this Indenture arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including without limitation, acts of God; earthquakes or fires; floods, wars, civil or military disturbances; sabotage; epidemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communication service; accidents; labor disputes; acts of civil or military authority; governmental actions; or inability to obtain labor, material, equipment or transportation.

ARTICLE IV

SATISFACTION AND DISCHARGE

Section 4.1.    Satisfaction and Discharge of Indenture.

Provided no Event of Default has occurred and is continuing hereunder, this Indenture shall cease to be of further effect with respect to the Notes except as to (i) rights of registration of transfer and exchange, (ii) substitution of mutilated, destroyed, lost or stolen

008572

Notes, (iii) rights of Noteholders to receive payments of principal thereof and interest thereon, as applicable, and any other amounts payable in respect thereof, (iv) the rights, obligations and immunities of the Trustee hereunder and (v) the rights of Noteholders as beneficiaries hereof with respect to the property deposited with the Trustee and payable to all or any of them and the Trustee, on demand of and at the expense of the Issuer, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture when:

(1) Either

(a) all Notes theretofore authenticated and delivered (other than (i) Notes which have been destroyed, lost or stolen and which have been paid or replaced as provided in Section 2.6 hereof and (ii) Notes for whose payment money has theretofore been deposited in trust and thereafter repaid to the Issuer or discharged from such trust, as provided in Section 7.3 hereof) have been delivered to the Trustee for cancellation; or

(b) all Notes not theretofore delivered to the Trustee for cancellation (i) have become due and payable, or (ii) will become due and payable at their Final Maturity Dates within one year;

and the Issuer, in the case of (b)(i) or (ii) above, has (x) irrevocably deposited or caused to be deposited with the Trustee in trust for such purpose, cash or Eligible Investments (any security satisfying the definition of Eligible Investments but for the maturity of such security shall for this purpose be deemed an Eligible Investment), the amount of cash and the Scheduled Distributions on any Eligible Investments being in an amount sufficient to pay and discharge the amount that equals the sum of the Cumulative Interest Amount on each Class of Notes to the date of such deposit or to the Final Maturity Date, as the case may be, and the Aggregate Principal Amount of each Class of Notes not theretofore delivered to the Trustee for cancellation, in each case to the extent not previously paid and (y) delivered an Accountants' Certificate to the Trustee confirming such calculations; *provided that* subsection (b) hereof shall not apply if an election to act in accordance with the provisions of Section 5.5 hereof shall have been made and not rescinded (except that the deposit of cash that would otherwise apply in the case of such subsection (b) shall nevertheless be required); *provided further* that any Eligible Investments deposited hereunder shall at the date of such deposit be rated no lower than the highest rating assigned to any of the Notes then outstanding;

(2) the Issuer has paid or caused to be paid all other sums payable hereunder by the Issuer; and

(3) the Issuer has delivered to the Trustee an Officer's Certificate and an Opinion of Counsel each stating that all conditions precedent herein provided for relating to the satisfaction and discharge of this Indenture with respect to the Notes have been complied with.

Section 4.2. Application of Trust Money.

All monies deposited with the Trustee pursuant to Section 4.1 hereof shall be held in trust by the Trustee and applied by it, in accordance with the provisions of the Notes and this Indenture, to the payment to the Person entitled thereto of the principal and interest in

008573

accordance with Section 11.1 hereof for whose payment such money has been deposited with the Trustee, and such money shall be held in a non-interest bearing segregated trust account identified as being held in trust for the benefit of the Noteholders. Except as specifically provided herein, the Trustee shall not be responsible for payment of interest upon any monies deposited with it.

ARTICLE V

REMEDIES

Section 5.1. Events of Default.

"Event of Default" means any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a) (i) default for a period of four Business Days or more (or, in the case of a default in payment due to an administrative error or omission by the Trustee, any Paying Agent or the Note Registrar, for a period of seven Business Days or more, *provided that* the Trustee has notified each Rating Agency in writing of any such administrative error or omission) in the payment of any amount payable in respect of any Note when due when funds in such amount are available for payment as provided herein, or (ii) the failure to apply funds which are available for payment in accordance with the priority of distribution set forth in Article XI hereof, which failure shall continue for a period of four Business Days (or, in the case of a default in payment due solely to an administrative error or omission by the Trustee, any Paying Agent or the Note Registrar, for a period of seven Business Days or more, *provided that* the Trustee has notified each Rating Agency in writing of any such administrative error or omission), or (iii) default for a period of four Business Days or more (or, in the case of a default in payment due to an administrative error or omission by the Trustee, any Paying Agent or the Note Registrar, for a period of seven Business Days or more, *provided that* the Trustee has notified each Rating Agency in writing of any such administrative error or omission) in the payment of the Periodic Interest Amount due on any Class of Senior Class A Notes or Class X Payment, or, after the Senior Class A Notes and the Class X Notes are paid in full, the Periodic Interest Amount due on any Class A-3L Notes, or after the Senior Class A Notes, the Class X Notes and the Class A-3L Notes are paid in full, the Periodic Interest Amount due on any Class A-4L Notes, or after the Class A Notes and the Class X Notes are paid in full, the Class B-1L Notes, on any Payment Date, or (iv) default in the payment of the Aggregate Principal Amount and the Cumulative Interest Amount, due on any Class of Notes on the Final Maturity Date; or

(b) default in the performance or breach of any covenant, representation, warranty or other agreement of the Co-Issuers (or either one of them), other than compliance with the Overcollateralization Tests, the Interest Coverage Test or the criteria set forth in Section 12.2 hereof or a default in the performance or breach of a covenant, representation, warranty or other agreement which is specifically dealt with elsewhere in this Section or in Article VII hereof, or the failure of any representation or warranty of the Co-Issuers (or either one of them) made in this Indenture or in any certificate or other writing delivered pursuant hereto or in connection

008574

herewith to be correct in all material respects when the same shall have been made, in either case which materially and adversely affects the rights of any Class of Noteholders and continuance of such default, breach or failure for a period of 30 days after written notice thereof shall have been given to the Co-Issuers or the Servicer by the Trustee or to the Co-Issuers, the Servicer and the Trustee by the Majority Noteholders, specifying such default, breach or failure and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder; or

(c) the entry of a decree or order by a court having jurisdiction in the premises adjudging either of the Co-Issuers as bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of either of the Co-Issuers under the Bankruptcy Code or any other applicable law, or appointing a receiver, liquidator, assignee, or sequestrator (or other similar official) of either of the Co-Issuers or of any substantial part of their respective property, or ordering the winding up or liquidation of their respective affairs, and the continuance of any such decree, order, case or proceeding not dismissed, discharged or stayed and in effect for a period of 60 consecutive days; or

(d) the institution by either of the Co-Issuers of proceedings to be adjudicated as bankrupt or insolvent, or the consent by either of them to the institution of bankruptcy or insolvency proceedings against either of them, or the filing by either of them of a petition or answer or consent seeking reorganization or relief under the Bankruptcy Code or any other similar applicable law, or the consent by either of the Co-Issuers to the filing of any such petition or to the appointment of a receiver, liquidator, assignee, trustee or sequestrator (or other similar official) of either of the Co-Issuers or of any substantial part of their respective property, or to the ordering of the winding up or liquidation of their respective affairs, or the making by either of them of an assignment for the benefit of creditors, or the admission by either of them in writing of its inability to pay its debts generally as they become due, or the taking of any action by either of the Co-Issuers in furtherance of any such action; or

(e) either of the Co-Issuers or the pool of assets constituting the Trust Estate becomes required to register as an "investment company" under the Investment Company Act; or

(f) the failure to maintain on any Calculation Date a Senior Class A Overcollateralization Ratio greater than or equal to 100%.

Section 5.2. Acceleration of Maturity; Rescission and Annulment.

(a) If an Event of Default (other than an Event of Default specified in Section 5.1(c) or (d)) with respect to the Notes occurs and is continuing, the Trustee may, with the consent of the Requisite Noteholders, and shall, at the direction of the Requisite Noteholders, declare the principal of the Notes to be immediately due and payable, by a notice in writing to the Issuer and the Servicer. If an Event of Default as specified in Section 5.1(c) or (d) occurs and is continuing, the principal of the Notes shall be and become immediately due and payable without the necessity of notice or any other action of any Person. If the Notes are declared to be immediately due and payable or if an Event of Default specified in Section 5.1(c) or (d) hereof occurs, the Holders of each Class of Notes shall be entitled to receive, as applicable, and in the order of priority set forth in Section 11.1(d), the Cumulative Interest Amount and the Aggregate Principal Amount with respect thereto (in each case as calculated and accrued through the date of

payment in full of the Aggregate Principal Amount of each Class of Notes), and the Servicer shall be entitled to receive the amounts payable to the Servicer under and in the order of priority set forth in Sections 11.1(b) and 11.1(d).

(b) At any time after such a declaration of acceleration of maturity has been made and before a judgment or decree for payment of the money due has been obtained by the Trustee as provided in this Article, the Requisite Noteholders, by written notice to the Trustee and the Co-Issuers, may rescind and annul such declaration and its consequences if:

(i) the Issuer has paid or deposited with the Trustee a sum sufficient to pay:

(A) all overdue amounts payable on or in respect of the Notes (other than amounts due solely as a result of the acceleration);

(B) to the extent that payment of interest on such amount is lawful, interest on such overdue amounts at the Applicable Periodic Rate; and

(C) all unpaid Trustee Administrative Expenses, Preferred Shares Administrative Expenses, Issuer Base Administrative Expenses, Issuer Excess Administrative Expenses, and other sums paid or advanced by the Trustee and the Paying and Transfer Agent hereunder and under the Paying and Transfer Agency Agreement and the reasonable compensation, expenses, disbursements and advances of the Trustee and the Paying and Transfer Agent, their agents and counsel.

(ii) the Trustee has (A) received written evidence that the sum paid or deposited with the Trustee by the Issuer pursuant to clause (i) above is sufficient, and (B) determined that all Events of Default, other than the nonpayment of such amount that has become due solely by such acceleration, have been (1) cured, and the Requisite Noteholders by written notice to the Trustee have agreed with such determination (which agreement shall not unreasonably be withheld), or (2) waived as provided in Section 5.15 hereof.

Section 5.3. Proceedings.

If an Event of Default has occurred and is continuing and the Notes have been declared due and payable and such declaration and its consequences have not been rescinded and annulled, or at any time on or after the Final Maturity Date, the Trustee may in its discretion proceed to protect and enforce its rights and the rights of the Noteholders by such appropriate Proceedings, in its own name and as trustee of an express trust, as the Trustee shall deem most effective or as the Trustee may be directed by the Requisite Noteholders to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein, or for collection of sums due and unpaid, or to enforce any other proper remedy or legal or equitable right vested in the Trustee by this Indenture or by law, but subject, however, to the terms of Section 5.4 hereof. The reasonable compensation, costs, expenses, disbursements and advances incurred or paid by the Trustee, and its agents and counsel, in connection with any such Proceeding, including, without limitation, the exercise of any remedies pursuant to Section 5.4 hereof, shall be reimbursed to the Trustee pursuant to Section 6.7 hereof.

US_EAST:6212215.13

Section 5.4.  Remedies.

(a)      If the Notes have been declared due and payable and such declaration and its consequences have not been rescinded or annulled, or at any time on or after the Final Maturity Date, the Trustee may, after written notice to the Noteholders, and, so long as any Class of Notes is listed on the Irish Stock Exchange, the Irish Paying Agent, and shall, upon direction by the Requisite Noteholders, to the extent permitted by applicable law, do one or more of the following:

(i)      institute Proceedings for the collection of all amounts then payable on the Notes or under this Indenture, whether by declaration or otherwise, enforce any judgment obtained, and collect from the Trust Estate securing the Notes monies adjudged due;

(ii)      institute Proceedings for the complete or partial foreclosure of this Indenture with respect to the Trust Estate securing the Notes;

(iii)      exercise any remedies of a secured party under the UCC including the sale or liquidation of the Trust Estate in accordance with Section 5.18 hereof and take any other appropriate action to protect and enforce the rights and remedies of the Trustee or the Holders of the Notes hereunder; or

(iv)      exercise any other rights and remedies that may be available at law or in equity;

*provided that* the Trustee may not sell or liquidate the Trust Estate, or any portion thereof, or any rights or interest therein, unless (x) in the case of an acceleration resulting from an Event of Default set forth in Section 5.1(a) hereof, or a sale or liquidation of any portion of the Trust Estate at or greater than its par value (*provided that* Defaulted Portfolio Collateral may be liquidated without reference to, or inclusion in the calculation of, such limitation), the Requisite Noteholders have so directed the Trustee in writing to sell or liquidate the Trust Estate or any portion thereof or (y) in the case of any other Event of Default or resulting sale or liquidation, 100% of the Noteholders have so directed the Trustee in writing to sell or liquidate the Trust Estate or any portion thereof; *provided further* that no Default Swap or Synthetic Security may be terminated so long as a declaration of acceleration may be resending or annulled pursuant to Section 5.2(b).  The Trustee shall send written notice to each of the Noteholders, with a copy to the Rating Agencies and so long as any Class of Notes is listed on the Irish Stock Exchange, the Irish Paying Agent, of any proposed sale or liquidation of the Trust Estate together with a brief description thereof and such written notice shall be accompanied by an Accountant's Certificate (i) confirming the information with respect to such sale or liquidation (to the extent such accountants shall be able and willing to confirm such information) and (ii) specifying the procedures, if any, undertaken by them to review the data and computations relating to such sale or liquidation.  The cost of such Accountant's Certificate shall be reimbursed to the Trustee pursuant to Section 6.7 hereof.  If the applicable Noteholders direct any sale or liquidation of the Trust Estate, or any portion thereof, the Trustee shall sell or liquidate the Trust Estate, or portion, thereof, in accordance with Section 5.18 hereof at one or more public or private sales conducted in any manner permitted by law.

008577

(b) If an Event of Default as described in Section 5.1(b) hereof has occurred and is continuing, the Trustee may, after written notice to the Noteholders, with a copy to the Rating Agencies, and so long as any Class of Notes is listed on the Irish Stock Exchange, the Irish Paying Agent, and shall, upon direction of the Requisite Noteholders, institute a Proceeding to compel performance of the covenant or to cure the representation or warranty, the breach of which gave rise to the Event of Default under such Section and enforce any decree or order arising from such Proceeding.

(c) If an Event of Default described in Sections 5.1(a)(iii) or 5.1(a)(iv) hereof has occurred and is continuing, the Trustee shall, upon written direction of the Requisite Noteholders, terminate the services of the Servicer in accordance with the terms of the Servicing Agreement.

Section 5.5.    Preservation of Trust Estate.

(a) If an Event of Default has occurred and is continuing or if the Final Maturity Date has occurred and subject to Section 5.4 hereof, the Trustee shall retain the Trust Estate securing the Notes intact, collect and cause the collection of the proceeds thereof and make and apply all payments and deposits and maintain all accounts in respect of the Notes in accordance with the provisions of Sections 10.1, 10.2(a), 10.2(b) and 11.1 hereof (unless and until the Notes have been declared due and payable and the applicable Noteholders have directed the Trustee pursuant to Section 5.4(a) hereof to sell or liquidate the Trust Estate or any portion thereof). The Trustee shall give written notice of the retention of the Trust Estate to the Issuer. If the Notes have been declared due and payable pursuant to Section 5.2 hereof or if the Final Maturity Date has occurred, any such retention pursuant to this Section 5.5(a) may be rescinded at any time by written notice to the Trustee and the Co-Issuers from the applicable Noteholders directing the Trustee to sell or liquidate the Trust Estate or any portion thereof.

(b) Nothing contained in Section 5.5(a) hereof shall be construed to require the Trustee to preserve the Trust Estate securing the Notes if prohibited by applicable law.

Section 5.6.    Trustee May File Proofs of Claim.

In case there shall be pending Proceedings relative to the Issuer or any other obligor upon the Notes under the Bankruptcy Code or any other applicable bankruptcy, insolvency or other similar law, or in case a receiver, assignee or trustee in bankruptcy or reorganization, liquidator, sequestrator or similar official shall have been appointed for or taken possession of the Issuer or its property or such other obligor or its property, or in case of any other comparable Proceedings relative to the Issuer or other obligor, or in case of any voluntary dissolution, liquidation or winding-up of the Issuer, regardless of whether the principal of any Notes shall then be due and payable as therein expressed or by declaration or otherwise and regardless of whether the Trustee shall have made any demand pursuant to the provisions of Section 5.3 hereof, the Trustee is hereby entitled and empowered to, and may and at the direction of the Requisite Noteholders, shall, by intervention in such Proceedings or otherwise:

(i)      file and prove a claim or claims for the whole amount of principal and interest owing and unpaid in respect of the Notes, and to file such other papers or

008578

documents and take such other action, including participating as a member, voting or otherwise, of any committee of creditors, as may be necessary or advisable in order to have the claims of the Trustee (including any claim for reasonable compensation to the Trustee and each predecessor Trustee, and their respective agents, attorneys and counsel, and for reimbursement of all expenses and liabilities incurred, and all advances made by the Trustee and each predecessor Trustee or any Noteholder, except as a result of negligence or bad faith) and of the Noteholders allowed in any Proceedings relative to the Issuer or other obligor upon the Notes or this Indenture or to the creditors or property of the Issuer or such other obligor;

(ii)    unless prohibited by applicable law and regulations, upon direction of the Requisite Noteholders vote on behalf of the Holders of the Notes in any election of a trustee or a standby trustee in arrangement, reorganization, liquidation or other bankruptcy or insolvency Proceedings (or person performing similar functions in comparable Proceedings); and

(iii)    collect and receive any monies or other property payable to or deliverable on any such claims, and distribute in accordance with Section 5.8 hereof all amounts received with respect to the claims of the Noteholders and the Trustee on their behalf; and any trustee, receiver or liquidator, custodian or other similar official is hereby authorized by each of the Noteholders to make payments to the Trustee, and, in the event that the Trustee shall consent to the making of payments directly to the Noteholders, to pay to the Trustee such amounts as shall be sufficient to cover reasonable compensation to the Trustee, each predecessor Trustee and their respective agents, attorneys and counsel, and all other expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee or any Noteholder except as a result of negligence or bad faith.

Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or vote for or accept or adopt on behalf of any Noteholder any plan of reorganization, arrangement, adjustment or compromise affecting the Notes or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Noteholder in any such Proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy (or person performing similar functions in comparable Proceedings) or to participate as a member of any committee of creditors.

In any Proceedings brought by the Trustee (and also any Proceedings involving the interpretation of any provision of this Indenture to which the Trustee shall be a party) the Trustee shall be held to represent all the Holders of the Notes subject to the provisions of this Indenture, and it shall not be necessary to make any Holders of the Notes parties to any such Proceedings.

Section 5.7.    Trustee May Enforce Claims Without Possession of Notes.

All rights of action and claims under this Indenture or the Notes may be prosecuted and enforced by the Trustee without the possession of any of the Notes or the production thereof in any Proceeding relating thereto, and any such Proceeding instituted by the

Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment shall be applied as set forth in Section 5.8 hereof.

Section 5.8. Application of Money Collected.

Any money collected by or on behalf of the Trustee with respect to the Notes pursuant to this Article V (including all collections from, and proceeds of the sale or liquidation of, the Trust Estate) shall be applied at the date or dates fixed by the Trustee and in the same order as specified in Sections 11.1(b) and 11.1(d) hereof.

Section 5.9. Limitation on Suits.

Except as otherwise provided in Section 5.10 hereof, no Holder of any Note shall have any right to institute any Proceedings, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless:

(a) such Holder has previously given written notice to the Trustee of a continuing Event of Default;

(b) the Requisite Noteholders shall have made written request to the Trustee to institute Proceedings in respect of such Event of Default in its own name as Trustee hereunder;

(c) such Holder or Holders have offered to the Trustee indemnity reasonably satisfactory to the Trustee against the costs, expenses and liabilities to be incurred by the Trustee in compliance with such request;

(d) the Trustee for 30 days after its receipt of such notice, request and offer of such indemnity has failed to institute any such Proceedings; and

(e) no direction inconsistent with such written request has been given to the Trustee during such 30-day period by the Requisite Noteholders;

it being understood and intended that no one or more Holders of Notes shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other Holders of Notes of the same Class or to obtain or to seek to obtain priority or preference over any other Holders of Notes of the same Class or to enforce any right under this Indenture, except in the manner herein provided and for the equal and ratable benefit of all the Holders of Notes of the same Class.

Section 5.10. Unconditional Rights of Noteholders to Receive Principal and Interest.

Notwithstanding any other provision in this Indenture, but subject to the provisions of Sections 2.7 and 11.1 hereof, (a) the Holders of the Class A-1LA Notes shall have the right, which is absolute and unconditional, to receive an aggregate amount equal to the unpaid Periodic Rate Shortfall Amount, if any, the Aggregate Principal Amount of the Class A-1LA Notes and the Class X Notes, as applicable, and accrued and unpaid interest thereon at the Applicable Periodic Rate, as any such amounts become due and payable, (b) the

008580

Holders of the Class A-1LB Notes shall have the right, which is absolute and unconditional, to receive an aggregate amount equal to the unpaid Periodic Rate Shortfall Amount, if any, the Aggregate Principal Amount of the Class A-1LB Notes and accrued and unpaid interest thereon at the Applicable Periodic Rate, as any such amounts become due and payable, (c) the Holders of the Class A-2L Notes shall have the right, which is absolute and unconditional, to receive an aggregate amount equal to the unpaid Periodic Rate Shortfall Amount, if any, the Aggregate Principal Amount of the Class A-2L Notes and accrued and unpaid interest thereon at the Applicable Periodic Rate, as any such amounts become due and payable, (d) the Holders of the Class A-3L Notes shall have the right, which is absolute and unconditional, to receive an aggregate amount equal to the unpaid Periodic Rate Shortfall Amount, if any, the Aggregate Principal Amount of the Class A-3L Notes and accrued and unpaid interest thereon at the Applicable Periodic Rate, as any such amounts become due and payable, (e) the Holders of the Class A-4L Notes shall have the right, which is absolute and unconditional, to receive an aggregate amount equal to the unpaid Periodic Rate Shortfall Amount, if any, the Aggregate Principal Amount of the Class A-4L Notes and accrued and unpaid interest thereon at the Applicable Periodic Rate, as any such amounts become due and payable, and (f) the Holders of the Class B-1L Notes shall have the right, which is absolute and unconditional, to receive an aggregate amount equal to the unpaid Periodic Rate Shortfall Amount, if any, the Aggregate Principal Amount of the Class B-1L Notes and the accrued and unpaid interest thereon at the Applicable Periodic Rate as any such amounts become due and payable. Furthermore, the Holder of any Note shall have the right, which is absolute and unconditional, to institute Proceedings for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder. Notwithstanding any other provision in this Section 5.10 or otherwise in this Indenture to the contrary, (i) Holders of the Class A-3L Notes shall have no right to institute Proceedings for the enforcement of any such payment until such time as no Senior Class A Notes remain Outstanding, (ii) Holders of the Class A-4L Notes shall have no right to institute Proceedings for the enforcement of any such payment until such time as no Senior Class A Notes remain Outstanding, and (iii) Holders of the Class B-1L Notes shall have no right to institute Proceedings for the enforcement of any such payment until such time as no Class A Notes remain Outstanding, and, in each case, any such right to institute Proceedings shall be subject to the provisions of Section 5.9 hereof.

Section 5.11.  Restoration of Rights and Remedies.

If the Trustee or any Noteholder has instituted any Proceeding to enforce any right or remedy under this Indenture and such Proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to such Noteholder, then and in every such case the Issuer, the Trustee and the Noteholder shall, subject to any determination in such Proceeding, be restored severally and respectively to their former positions hereunder, and thereafter all rights and remedies of the Trustee and the Noteholders shall continue as though no such Proceeding had been instituted.

Section 5.12.  Rights and Remedies Cumulative.

No right or remedy herein conferred upon or reserved to the Trustee or to the Holders of the Notes is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right

008581

and remedy given hereunder or now or hereafter existing by law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

Section 5.13. Delay or Omission Not Waiver.

No delay or omission of the Trustee or of any Holder of any Note to exercise any right or remedy occurring upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein. Every right and remedy given by this Article V or by law to the Trustee or to the Noteholders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Noteholders, as the case may be.

Section 5.14. Control by Noteholders.

Notwithstanding any other provision of this Indenture, the Requisite Noteholders, on behalf of the Holders of all the Notes, shall have the right (a) to cause the institution of and direct the time, method and place of conducting any Proceeding for any remedy available to the Trustee or (b) subject to Section 6.3(e) hereof, to direct the Trustee with respect to its exercise of any right, remedy, trust or power conferred on the Trustee; *provided that*:

(i) such direction shall not be in conflict with any rule of law or with any express provision of this Indenture (including, without limitation, any provision hereof providing express personal protection to the Trustee or a limitation on the liability of the Co-Issuers as set forth in Section 2.7(i) hereof), and

(ii) the Trustee may take any other action deemed proper by the Trustee that is not inconsistent with such direction; *provided that,* subject to Section 6.1 hereof, the Trustee need not take any action that it reasonably determines might involve it in liability.

Section 5.15. Waiver of Past Defaults.

Prior to the time a judgment or decree for payment of the money due has been obtained by the Trustee, the Requisite Noteholders may on behalf of the Holders of all the Notes waive any past Default and its consequences, with notice to the Rating Agencies, except a Default:

(a) in the payment of the principal of or interest on any Note, or

(b) in respect of a covenant or provision hereof that under Section 8.2 hereof cannot be modified or amended without the consent of the Holder of each Outstanding Note affected.

In the case of any such waiver, the Issuer, the Trustee and the Holders of the Notes shall be restored to their former positions and rights hereunder, respectively; but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereto. Upon such waiver, such Default shall cease to exist, and any Event of Default arising therefrom

008582

shall be deemed to have been cured, for every purpose of this Indenture; but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereon.

Section 5.16.  Undertaking for Costs.

All parties to this Indenture agree, and each Holder of any Note by his acceptance thereof shall be deemed to have agreed, that any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Trustee for any action taken, or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this Section 5.16 shall not apply to any suit instituted by the Trustee, to any suit instituted by any Noteholder, or group of Noteholders, holding in the aggregate more than 10% in Aggregate Principal Amount of the Notes, or to any suit instituted by any Noteholder for the enforcement of the payment of the principal of or interest on any Note on or after the Final Maturity Date expressed in such Note.

Section 5.17.  Waiver of Stay or Execution Laws.

Each of the Co-Issuers covenants (to the extent that it may lawfully do so) that it will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or execution law wherever enacted, including, but not limited to, filing a voluntary petition under the Bankruptcy Code now or at any time hereafter in force, which may affect the covenants or the performance of or the exercise of any remedies under this Indenture; and each of the Co-Issuers (to the extent that they may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it will not hinder, delay or impede the execution of any power herein granted to the Trustee or any Noteholder, but will suffer and permit the execution of every such power as though no such law had been enacted.

Section 5.18.  Sale of Trust Estate.

(a) The power to effect any sale (a "Sale") of any portion of the Trust Estate pursuant to Section 5.4 and Section 5.5 hereof shall not be exhausted by any one or more Sales as to any portion of such Trust Estate remaining unsold, but shall continue unimpaired until the entire Trust Estate securing the Notes shall have been sold or all amounts payable on the Notes under this Indenture with respect thereto shall have been paid.  The costs of any such sale of the Trust Estate shall be reimbursable to the Trustee pursuant to Section 6.7 hereof.  The Trustee may, upon notice to the Noteholders, and so long as any Class of Notes is listed on the Irish Stock Exchange, the Irish Paying Agent, and shall, upon direction of the Requisite Noteholders, postpone any Sale by public announcement made at the time of and place of such Sale.  The Trustee hereby expressly waives its right to any amount fixed by law as compensation for any Sale.

(b) The Trustee may bid for and acquire any portion of the Trust Estate in connection with a Sale thereof on an arm's length basis to the extent not prohibited by applicable law, and may pay all or part of the purchase price by crediting against amounts owing on the

008583

Notes or other amounts secured by this Indenture, all or part of the net proceeds of such Sale after deducting the reasonable costs, charges and expenses incurred by the Trustee in connection with such Sale notwithstanding the provisions of Section 6.7 hereof. The Notes need not be produced in order to complete any such Sale, or in order for the net proceeds of such Sale to be credited against amounts owing on the Notes. The Trustee may hold, lease, operate, manage or otherwise deal with any property so acquired in any manner permitted by law in accordance with this Indenture.

(c) If any portion of the Trust Estate consists of securities issued without registration under the Securities Act ("Unregistered Securities"), the Trustee may seek an Opinion of Counsel, or, if no such Opinion of Counsel can be obtained and with the consent of the Requisite Noteholders, seek a no-action position from the Securities and Exchange Commission or any other relevant Federal or state regulatory authorities, regarding the legality of a public or private sale of such Unregistered Securities (the costs of which in each case, shall be reimbursable to the Trustee pursuant to Section 6.7 hereof).

(d) The Trustee shall execute and deliver an appropriate instrument of conveyance transferring its interest in any portion of the Trust Estate in connection with a Sale thereof. In addition, the Trustee is hereby irrevocably appointed the agent and attorney-in-fact of the Issuer to transfer and convey its interest in any portion of the Trust Estate in connection with a Sale thereof and to take all action necessary to effect such Sale. No purchaser or transferee at such a Sale shall be bound to ascertain the Trustee's authority, inquire into the satisfaction of any conditions precedent or see to the application of any monies.

Section 5.19.  Action on Notes.

The Trustee's right to seek and recover judgment on the Notes or under this Indenture shall not be affected by the seeking or obtaining of or application for any other relief under or with respect to this Indenture. Neither the lien of this Indenture nor any rights or remedies of the Trustee or the Noteholders hereunder shall be impaired by the recovery of any judgment by the Trustee.

ARTICLE VI

THE TRUSTEE

Section 6.1.  Certain Duties and Responsibilities.

(a) Except during the continuance of an Event of Default (other than a Trustee Payment-Related Event of Default):

(1) the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(2) in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the

008584

requirements of this Indenture; *provided that* in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they conform on their face to the requirements of this Indenture and shall promptly notify the party delivering the same if such certificate or opinion does not so conform. If a corrected certificate or opinion shall not have been delivered to the Trustee within 15 days after such notice from the Trustee, the Trustee shall so notify the Noteholders.

(b) In case an Event of Default (other than a Trustee Payment-Related Event of Default) of which the Trustee has actual knowledge has occurred and is continuing, the Trustee shall, prior to the receipt of directions, if any, from the Requisite Noteholders, exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(c) No provision of this Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(1) this subsection shall not be construed to limit the effect of subsection (a) of this Section;

(2) the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer, unless it shall be proven that the Trustee was negligent in ascertaining the pertinent facts;

(3) the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Issuer or the Co-Issuer in accordance with this Indenture and/or the Requisite Noteholders (or Holders with such larger percentage as may be required by the terms hereof) relating to the time, method and place of conducting any Proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture;

(4) no provision of this Indenture shall require the Trustee to expend or risk its own funds or incur any extraordinary financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to it against such risk or liability is not reasonably assured to it (provided that the unsecured agreement of any Noteholder that is an Institutional Investor organized under the laws of the United States or any State in the United States shall constitute adequate assurance with respect to repayment and indemnity; *provided that* the aggregate net worth of the Institutional Investors providing such unsecured agreements shall be not less than $200,000,000); *provided that* the reasonable costs of performing its ordinary services under this Indenture shall not be deemed an "extraordinary financial liability" for purposes hereof; and

(5) the Trustee shall not be liable to the Noteholders for any action taken or omitted by it at the direction of the Issuer, the Servicer and/or the Holders of the

008585

Notes under circumstances in which such direction is required or permitted by the terms of this Indenture.

(d) Whether or not therein expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section 6.1 and Section 6.3 hereof.

(e) The Trustee, promptly after receipt by a Responsible Officer, shall transmit by first class mail all Holders of Notes, as their names and addresses appear on the Note Register, all written communications that are required hereunder to be delivered to the Trustee and are received from or on behalf of the Issuer or the Servicer (excluding in the case of the Holders (i) information provided by the Trustee to the Issuer pursuant to Section 10.4 hereof, (ii) so long as no Event of Default (other than a Trustee Payment-Related Event of Default) has occurred and is continuing, Servicer Orders received by the Trustee pursuant to Sections 10.2, 11.3 and 12.4 hereof, and (iii) Monthly Reports received pursuant to Section 10.5(a) hereof, unless, in any such case, requested by any Holder) and any notification or other communication received from any of the Rating Agencies stating that the rating of any Class of Notes has been, or will be, changed or withdrawn.

Section 6.2.    Notice of Default.

Promptly (and in no event later than 5 Business Days) after the occurrence of any Default or Event of Default of which a Responsible Officer of the Trustee has actual knowledge or after any declaration of acceleration has been made by or delivered to the Trustee pursuant to Section 5.2 hereof, the Trustee shall transmit by mail to the Rating Agencies, to all Holders of Notes, as their names and addresses appear on the Note Register, and to the Issuer and the Servicer, notice of all Defaults or Events of Default hereunder of which a Responsible Officer of the Trustee has actual knowledge, unless such Default or Event of Default shall have been cured or waived.

Section 6.3.    Certain Rights of Trustee.

Except as otherwise provided in Section 6.1 hereof:

(a) the Trustee may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, note or other paper or document (including but not limited to any reports prepared and delivered under Article X hereunder) believed by it in good faith to be genuine and to have been signed or presented by the proper party or parties;

(b) any request or direction of the Servicer mentioned herein shall be sufficiently evidenced by a Servicer Request or Servicer Order, as the context may require;

(c) whenever in the administration of this Indenture the Trustee shall (i) deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Trustee (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, rely upon an Officer's Certificate or (ii) be required to determine the value of any Collateral or funds hereunder or the cash flows projected to be received

therefrom, the Trustee may, in the absence of bad faith on its part, rely on reports of nationally recognized accounting firms or other persons qualified to provide the information required to make such determination including nationally recognized dealers in securities of the type being valued and securities quotation services;

(d) as a condition to the taking or omitting of any action by it hereunder, the Trustee may consult with counsel and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted by it hereunder in good faith and in reliance thereon;

(e) the Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the Noteholders pursuant to this Indenture unless such Noteholders shall have offered to the Trustee security reasonably satisfactory to it or indemnity against all costs, expenses and liabilities which might reasonably be incurred by it in compliance with such request or direction (an unsecured indemnity agreement of an Institutional Investor organized under the laws of the United States or any state in the United States shall be deemed sufficient; *provided that* the aggregate net worth of the Institutional Investors providing such unsecured agreements shall not be less than $200,000,000);

(f) the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, note or other paper or documents received by it, but the Trustee, in its discretion, may and, upon written direction of the Majority Noteholders shall, make such further inquiry or investigation into such facts or matters as it may see fit or as it shall be directed, and the Trustee and any Noteholder (acting solely through the Trustee and at the expense of such Noteholder) shall be entitled, on reasonable prior request (which request shall include a statement of the purpose therefor) made in advance to the Issuer, the Trustee and the Servicer, to examine the books and records of the Issuer and the Servicer relating to the Trust Estate, personally or by agent or attorney during the Issuer's or the Servicer's normal business hours; *provided that* the Trustee or any such Noteholder shall, and shall cause its agents, to hold in confidence all such information, except (i) to the extent disclosure may be required by law, by any regulatory authority, the Transaction Documents or by the National Association of Insurance Commissioners, (ii) a Noteholder may disclose such information to any prospective transferee and to such Noteholder's and transferee's accountants, consultants, attorneys and similar agents; *provided that* all such persons agree in writing to hold such information as confidential and (iii) except to the extent that the Trustee, in its sole judgment, may determine that such disclosure is consistent with its obligations hereunder;

(g) the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys and the Trustee shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by it hereunder;

(h) to the extent permitted by applicable law, the Trustee shall not be required to give any bond or surety in respect of the execution of this Indenture or otherwise;

008587

(i) the Trustee shall not be deemed to have notice or knowledge of any matter unless a Responsible Officer within the Corporate Trust Office has actual knowledge thereof or unless written notice thereof is received by the Trustee at the Corporate Trust Office and such notice references the Notes generally, the Issuer or this Indenture. Whenever reference is made in this Indenture to a Default or an Event of Default such reference shall, insofar as determining any liability on the part of the Trustee is concerned, be construed to refer only to a Default or an Event of Default of which the Trustee is deemed to have knowledge in accordance with this paragraph;

(j) the permissive right of the Trustee to take or refrain from taking any actions enumerated in this Indenture shall not be construed as a duty;

(k) the Trustee shall not be liable for any action it takes, or omits to take, in good faith that it reasonably believes to be authorized or within its rights or powers hereunder;

(l) the rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and to each Paying Agent, Paying and Transfer Agent, Authenticating Agent, Transfer Agent and Note Registrar;

(m) the Trustee shall not be responsible for the accuracy of the books or records of, or acts or omissions of, the Depository, any Transfer Agent (other than the Trustee itself acting in that capacity), Clearstream, Euroclear, any Calculation Agent (other than the Trustee itself acting in that capacity) or any Paying Agent (other than the Trustee itself acting in that capacity); *provided*, the Trustee will make reasonable efforts to correct any errors they become aware of or to notify the appropriate parties of any errors they become aware of; and

(n) the Trustee will not be liable for the actions or omissions of the Servicer, and without limiting the foregoing, the Trustee will not be under any obligation to monitor, evaluate or verify compliance by the Servicer with the terms hereof or the Servicing Agreement, or to verify or independently determine the accuracy of the information received by it from the Servicer (or from any selling institution, agent, bank, trustee or similar source) with respect to the Portfolio Collateral.

Section 6.4.    Not Responsible for Recitals or Issuance of Notes.

The recitals contained herein and in the Notes, other than the certificate of authentication thereon, shall be taken as the statements of the Issuer, and the Trustee assumes no responsibility for their correctness. The Trustee makes no representation as to the validity or sufficiency of this Indenture, of the Trust Estate, or of the Notes. The Trustee shall not be accountable for the use or application by the Issuer of the Notes or Preferred Shares or the proceeds thereof.

Section 6.5.    May Hold Notes.

(a) JPMorgan Chase Bank, National Association, or any other Person that becomes Trustee hereunder, in any capacity, may become the owner or pledgee of Notes, and

008588

may otherwise deal with the Issuer or any Affiliate thereof with the same rights it would have if it were not Trustee.

(b) The Trustee and its Affiliates may invest in for their own account obligations or securities that would be appropriate for inclusion in the assets as Portfolio Collateral, and the Trustee in making those investments has no duty to act in a way that is favorable to the Issuer or the Holders of the Notes or the Preferred Shares. The Trustee's Affiliates currently serve, and may in the future serve as investment advisor for other issuers of collateralized debt obligations.

(c) The Trustee and its Affiliates are permitted to receive additional compensation that could be deemed to be in the Trustee's economic self interest for (i) serving as investment advisor, administrator, shareholder, servicing agent, custodian or sub-custodian with respect to certain Eligible Investments, (ii) using Affiliates to effect transactions in certain Eligible Investments selected by the Servicer and (iii) effecting transactions in certain Eligible Investments. Such compensation shall not be an amount that is reimbursable or payable pursuant to this Indenture. All purchases of Eligible Investments shall be made in accordance with Section 10.2(b).

Section 6.6.    Money Held in Trust.

Money held by the Trustee in trust hereunder need not be segregated from other funds held by the Trustee in trust hereunder except to the extent required herein or required by law. The Trustee shall be under no liability for interest on any money received by it hereunder except as otherwise agreed upon with the Issuer and except to the extent of income or other gain on Eligible Investments which are deposits in or certificates of deposit of the Trustee in its commercial capacity and income or other gain actually received by the Trustee on Eligible Investments. Under no circumstances shall the Trustee be responsible for any losses on investments made in accordance with an Issuer Order or Servicer Order, unless such investment is made in an obligation of the Trustee in its corporate capacity.

Section 6.7.    Compensation and Reimbursement.

The Issuer agrees:

(a) to pay the Trustee on each Payment Date (in accordance with the priority of payment provisions set forth in Section 11.1 hereof) compensation for all services rendered by it hereunder (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust) in accordance with the Trustee Fee Letter Agreement;

(b) except as otherwise expressly provided herein, to reimburse the Trustee (in accordance with the priority of payment provisions set forth in Section 11.1 hereof) in a timely manner upon its request for all reasonable expenses, disbursements and advances incurred or made by the Trustee (as such or as Securities Intermediary) in accordance with any provision of this Indenture or in the enforcement of any provision hereof (including the reasonable compensation and the expenses and disbursements of its agents and counsel) and expenses related to the maintenance and administration of the Collateral; *provided that* any securities transaction charges to the extent included above shall, in the case of certain Eligible Investments

US_EAST:6212215.13

113

specified by the Servicer, be waived in the event that any amounts are received by the Trustee during a Due Period from a financial institution in consideration of purchasing such Eligible Investments, except any such expense, disbursement or advance as may be attributable to the Trustee's negligence, willful misconduct or bad faith;

(c) to reimburse the Trustee (in accordance with the priority of payment provisions set forth in Section 11.1 hereof) for its payment of the fees and expenses of any accounting firm or investment banking firm employed by the Trustee to perform the accounting required pursuant to Section 5.4, Section 5.5, Section 6.3(c) or Section 10.6 hereof and for its payment of the fees and expenses of the Irish Paying Agent, Paying Agents or Authenticating Agents appointed by it at the request of the Issuer pursuant to Section 2.4;

(d) to indemnify the Trustee, its directors, officers, employees and agents (in accordance with the priority of payment provisions set forth in Section 11.1 hereof) for, and to hold it harmless against, any loss, liability or expense (including without limitation reasonable attorney's fees and expenses) incurred without negligence, willful misconduct or bad faith arising out of or in connection with the acceptance or administration of this trust and the Transaction Documents, including the costs and expenses of defense against any claim or liability in connection with the exercise or performance of any of its powers or duties hereunder (including as Securities Intermediary); and

(e) to pay the Trustee (in accordance with the priority of payment provisions set forth in Section 11.1 hereof) reasonable additional compensation together with its expenses (including reasonable attorneys' fees) for any collection action taken pursuant to Section 6.12 hereof.

Section 6.8.    Corporate Trustee Required; Eligibility.

There shall at all times be a Trustee hereunder which shall be a bank organized and doing business under the laws of the United States of America or of any State, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least \$200,000,000, having a long-term unsecured debt rating of "BBB" or better by Standard & Poor's and "Baa1" or better by Moody's, and subject to supervision or examination by Federal or state authority.  If such corporation publishes reports of condition at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section 6.8, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. In addition, the Trustee shall not be "affiliated" (as that term is defined in Rule 405 of the Securities Act) with the Co-Issuers or with any person involved in the organization or operation of the Co-Issuers and shall not offer or provide credit or credit enhancement to the Co-Issuers (as provided per Rule 3a-7).  If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section 6.8, it shall resign immediately in the manner and with the effect hereinafter specified in this Article VI.

008590

Section 6.9.    Resignation and Removal; Appointment of Successor.

(a) No resignation or removal of the Trustee and no appointment of a successor Trustee pursuant to this Article VI shall become effective until the acceptance of appointment by the successor Trustee under Section 6.10 hereof.  The indemnifications in favor of the Trustee in Section 6.7 hereof shall survive any resignation or removal (to the extent of any indemnified liabilities, costs, expenses and other amounts arising or incurred prior to, or arising out of actions or omissions occurring prior to, such resignation or removal).

(b) The Trustee may resign at any time by giving written notice thereof to the Issuer, the Rating Agencies, the Noteholders and the Servicer and, so long as any Class of Notes is listed on the Irish Stock Exchange, the Irish Paying Agent.  Upon receiving such notice of resignation, the Issuer shall at the direction of its board of directors (with the written consent of the Servicer, not to be unreasonably withheld) promptly appoint a successor trustee or trustees by written instrument, in duplicate, executed by an Authorized Officer of the Issuer on behalf of the Issuer, one original copy of which shall be delivered to the Trustee so resigning and one original copy to the successor trustee or trustees, together with a copy to each Noteholder.  If no successor trustee shall have been appointed and an instrument of acceptance by a successor Trustee shall not have been delivered to the Trustee within 30 days after the giving of such notice of resignation, the resigning Trustee, or any Holder of a Note, may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Trustee.

(c) Subject to Section 6.9(a) hereof, the Trustee may be removed at any time at the direction the Holders of more than 50% of the Aggregate Principal Amount of the Controlling Class.

(d) The Issuer, at the direction of its board of directors, by Issuer Order, may remove the Trustee petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee, if at any time:

(i)    the Trustee shall cease to be eligible under Section 6.8 hereof and shall fail to resign after written request therefor by the Issuer or by the Requisite Noteholders, or

(ii)    the Trustee shall become incapable of acting or shall be adjudged bankrupt or insolvent or a receiver or liquidator of the Trustee or of its property shall be appointed or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation.

(e) If the Trustee shall resign, be removed or become incapable of acting, or if a vacancy shall occur in the office of the Trustee for any cause, the Issuer, at the direction of its board of directors, by Issuer Order, shall (with the written consent of the Servicer, not to be unreasonably withheld) promptly appoint a successor Trustee.  If no successor Trustee shall have been so appointed by the Issuer and shall have accepted appointment in the manner hereinabove provided, any Noteholder may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Trustee.

(f) The Issuer shall give prompt notice of each resignation and each removal of the Trustee and each appointment of a successor Trustee by giving facsimile notice of such event, confirmed by first-class mail, postage prepaid, to each Rating Agency, Bear Stearns, the Servicer and to the Holders of the Notes as their names and addresses appear in the Note Register. Each notice shall include the name of the successor Trustee and the address of its Corporate Trust Office.

Section 6.10.   Acceptance of Appointment by Successor.

Every successor Trustee appointed hereunder shall be required to meet the eligibility requirements set forth in Section 6.8 hereof and shall execute, acknowledge and deliver to the Issuer and the retiring Trustee an instrument accepting such appointment, and thereupon the resignation or removal of the retiring Trustee shall become effective and such successor Trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, trusts, duties and obligations of the retiring Trustee; but, on request of the Issuer, the successor Trustee or the Requisite Noteholders, such retiring Trustee shall, upon payment of its fees, expenses and indemnities then unpaid, execute and deliver an instrument transferring to such successor Trustee all the rights, powers and trusts of the retiring Trustee, and shall duly assign, transfer and deliver to such successor Trustee all property and money held by such retiring Trustee hereunder, subject nevertheless to its lien, if any; provided for in Section 6.13 hereof. Upon request of any such successor Trustee, the Issuer shall execute any and all instruments for more fully and certainly vesting in and confirming to such successor Trustee all such rights, powers and trusts.

No appointment of a successor Trustee shall become effective until the date ten days after notice of such appointment has been given to each Noteholder, and, so long as any Class of Notes is listed on the Irish Stock Exchange, the Irish Paying Agent.

Section 6.11.   Merger, Conversion, Consolidation or Succession to Business of Trustee.

Any corporation into which the Trustee may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any corporation succeeding to all or substantially all of the corporate trust business of the Trustee, shall be the successor of the Trustee hereunder; *provided* such corporation shall be otherwise qualified and eligible under this Article, without the execution or filing of any paper or any further act on the part of any of the parties hereto. In case any Notes have been authenticated, but not delivered, by the Trustee then in office, any successor by merger, conversion or consolidation to such authenticating Trustee may adopt such authentication and deliver the Notes so authenticated with the same effect as if such successor Trustee had itself authenticated such Notes.

Section 6.12.   Certain Duties of Trustee Related to Delayed Payment of Proceeds.

If in any month the Trustee shall not have received a payment with respect to any Pledged Security on its Due Date, (a) the Trustee shall promptly notify the Issuer and the Servicer in writing and, (b) unless within three Business Days after such notice such payment

008592

shall have been received by the Trustee, or the Issuer shall have made provision for such payment satisfactory to the Trustee in accordance with Section 10.2(a) hereof, the Trustee shall request the issuer of such Pledged Security, the trustee under the related Underlying Instrument or paying agent designated by either of them, as the case may be, to make such payment as soon as practicable after such request but in no event later than three Business Days after the date of such request. If such payment is not made within such time period, the Trustee shall take such action as the Servicer shall direct in writing; *provided that* any expenses incurred or to be incurred in taking any such action shall be deemed to be an "extraordinary financial liability" under clause (4) of Section 6.1(c) hereof. Any such action shall be without prejudice to any right to claim a Default or Event of Default under this Indenture. In the event that the Issuer or the Servicer requests a release of a Pledged Security and/or delivers Substitute Portfolio Collateral in connection with any such action under the Servicing Agreement, such release and/or substitution shall be subject to Section 10.3 hereof and Article XII of this Indenture as the case may be. Notwithstanding any other provision hereof the Trustee shall deliver to the Issuer or its designee any payment with respect to any Pledged Security received after the Due Date thereof to the extent the Issuer previously made provisions for such payment satisfactory to the Trustee in accordance with this Section 6.12 and such payment shall not be deemed part of the Trust Estate.

Section 6.13. Non-Petition.

None of the Trustee, the Secured Parties, the Noteholders or the Paying and Transfer Agent, shall cause or join in the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for any reason, including for the nonpayment to any such party of any amounts due hereunder or under the Paying and Transfer Agency Agreement or under the Notes, as applicable, until the expiration of the period which is one year and one day (or such longer preference period as may be in effect) after the final payment on the Notes; *provided, however,* nothing herein shall be deemed to prohibit the Trustee from filing proofs of claim for itself and on behalf of the Noteholders.

Section 6.14. Withholding.

(a) If any withholding tax is imposed on the Co-Issuers' payment (or allocations of income) to any Noteholder, such tax shall reduce the amount otherwise distributable to such Noteholder. The Trustee is hereby authorized and directed to retain from amounts otherwise distributable to any Noteholder sufficient funds for the payment of any tax that is legally owed by the Trust Estate or the Co-Issuers (as directed to it in writing by the Co-Issuers) (but such authorization shall not prevent the Trustee from contesting any such tax in appropriate Proceedings and withholding payment of such tax, if permitted by law, pending the outcome of such Proceedings), or that the Trustee may otherwise determine it is obligated to withhold under applicable law or regulation. The amount of any withholding tax imposed with respect to any Noteholder shall be treated as cash distributed to such Noteholder at the time it is withheld by the Trustee and remitted to the appropriate taxing authority. If there is a possibility that withholding tax is payable with respect to a distribution, the Trustee may in its sole discretion withhold such amounts in accordance with this Section 6.14 (a). If any Noteholder wishes to apply for a refund of any such withholding tax, the Trustee shall reasonably cooperate with such Noteholder in making such claim so long as such Noteholder agrees to reimburse the Trustee for any out-of-pocket expenses incurred. Nothing in this Section 6.14 shall be construed to impose upon the

008593

Trustee any obligation or duty to determine the tax liability or responsibilities of the Co-Issuers or the Trust Estate other than the duties required under applicable law, or otherwise to perform any related tax administration or return preparation or filing responsibilities, or to impose upon the Trustee any duty or obligation to commence Proceedings to contest any tax.

(b) In order to receive payments on its Note free of U.S. federal withholding and backup withholding tax, each Holder shall timely furnish the Issuer or its agents any U.S. federal income tax form or certification (such as Internal Revenue Service ("IRS") Form W-8BEN (Certification of Foreign Status), Form W-8IMY (Certification of Foreign Intermediary Status), Form W-9 (Request for Taxpayer Identification Number and Certification) or Form W-8ECI (Certification of Foreign Person's Claim for Exemption from Withholding on Income Effectively Connected with Conduct of a U.S. Trade or Business) or any successors to such IRS forms) that the Issuer or its agents may reasonably request and shall update or replace such form or certification in accordance with its terms or its subsequent amendments.

Section 6.15.    The Securities Intermediary.

(a) There shall at all times be one or more securities intermediaries appointed for purposes of this Indenture (the "Securities Intermediary").  JPMorgan Chase Bank, National Association, is hereby appointed as the initial Securities Intermediary hereunder (in such capacity, "JPMorgan Chase"), and JPMorgan Chase accepts such appointment.

(b) The Securities Intermediary shall be, and JPMorgan Chase as initial Securities Intermediary hereby represents and warrants that it is as of the date hereof and shall be, for so long as it is the Securities Intermediary hereunder, a corporation or national bank that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity hereunder.  The Securities Intermediary shall, and JPMorgan Chase as initial Securities Intermediary does, agree with the parties hereto that each Account shall be an account to which financial assets may be credited and undertake to treat the Trustee as entitled to exercise the rights that comprise such financial assets.  The Securities Intermediary shall, and JPMorgan Chase as initial Securities Intermediary does, agree with the parties hereto that each item of property credited to each Account shall be treated as a financial asset.  The Securities Intermediary shall, and JPMorgan Chase as initial Securities Intermediary does, agree with the parties hereto that, for purposes of the UCC and the United States Regulations, the securities intermediary's jurisdiction of the Securities Intermediary with respect to the Trust Estate shall be the State of New York.  The Securities Intermediary shall, and JPMorgan Chase as initial Securities Intermediary does, represent and covenant that it is not and will not be (as long as it is the Securities Intermediary hereunder) a party to any agreement that is inconsistent with the provisions of this Indenture.  The Securities Intermediary shall, and JPMorgan Chase as initial Securities Intermediary does, covenant that it will not take any action inconsistent with the provisions of this Indenture applicable to it.  The Securities Intermediary shall, and JPMorgan Chase as initial Securities Intermediary does, agree that any item of property credited to any Account shall not be subject to any security interest, lien, encumbrance or right of setoff in favor of the Securities Intermediary or anyone claiming through the Securities Intermediary (other than the Trustee).

(c) It is the intent of the Trustee and the Co-Issuers that each Account shall be a securities account of the Trustee and not an account of the Co-Issuers. Nonetheless, the Securities Intermediary shall agree to comply with entitlement orders originated by the Trustee without further consent by the Co-Issuers or any other person or entity, and JPMorgan Chase as initial Securities Intermediary agrees that, for so long as it is the Securities Intermediary hereunder, it will comply with entitlement orders originated by the Trustee without further consent by the Co-Issuers or any other person or entity. The Securities Intermediary shall covenant that it will not agree with any person or entity other than the Trustee that it will comply with entitlement orders originated by any person or entity other than the Trustee, and JPMorgan Chase as initial Securities Intermediary hereby covenants that, for so long as it is the Securities Intermediary hereunder, it will not agree with any person or entity other than the Trustee that it will comply with entitlement orders originated by any person or entity other than the Trustee.

(d) Nothing herein shall imply or impose upon the Securities Intermediary any duties or obligations other than those expressly set forth herein and those applicable to a securities intermediary under the UCC and the United States Regulations (and the Securities Intermediary shall be entitled to all of the protections available to a securities intermediary under the UCC and the United States Regulations). Without limiting the foregoing, nothing herein shall imply or impose upon the Securities Intermediary any duties of a fiduciary nature (such as, without limitation, the fiduciary duties of the Trustee hereunder).

(e) The Securities Intermediary may at any time resign by notice to the Trustee and may at any time be removed by notice from the Trustee; *provided however* that it shall be the responsibility of the Trustee to appoint a successor Securities Intermediary and to cause the Accounts to be established and maintained with such successor Securities Intermediary in accordance with the terms hereof; and the responsibilities and duties of the retiring Securities Intermediary hereunder shall remain in effect until all of the Trust Estate credited to the Accounts held by such retiring Securities Intermediary have been transferred to such successor. Any corporation into which the Securities Intermediary may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, consolidation or conversion to which the Securities Intermediary shall be a party, shall be the successor of the Securities Intermediary hereunder, without the execution or filing of any further act on the part of the parties hereto or such Securities Intermediary or such successor corporation.

Section 6.16.  Eligible Investments.

Eligible Investments acquired with available funds in an Account shall be credited by the Trustee to such Account.

Section 6.17.  Fiduciary For Noteholders; Agent for the Other Secured Parties.

With respect to the security interest created hereunder, the Delivery of any item of Collateral to the Trustee is to the Trustee as representative of the Noteholders and agent for the other Secured Parties. In furtherance of the foregoing, the possession by the Trustee of any item of Collateral, the indorsement to or registration in the name of the Trustee of any item of Collateral and the status of the Trustee as entitlement holder with respect to the Accounts are all undertaken by the Trustee in its capacity as representative of the Noteholders and agent for the

008595

other Secured Parties. The Trustee shall not by reason of this Indenture be deemed to be acting as a fiduciary for the Secured Parties other than the Noteholders; *provided that* the foregoing shall not limit any of the express obligations of the Trustee under this Indenture.

## ARTICLE VII

### COVENANTS

Section 7.1.    Payment of Principal and Interest.

The Co-Issuers (as applicable) will duly and punctually pay the principal of, interest on and all other amounts payable on or in respect of the Notes in accordance with the terms of the Notes and this Indenture.

Section 7.2.    Maintenance of Office or Agency.

The Trustee will maintain an office or agency in the Borough of Manhattan, the City of New York, the State of New York, where Notes may be presented or surrendered for payment. The Trustee hereby initially appoints the office of JPMorgan Chase Bank, National Association (the "New York Presenting Agent"), currently located at JPMorgan Chase Bank, 4 New York Plaza, ground floor, New York, New York 10004, Attention: WSS Window – WSS (Houston)—Rockwall CDO, as such office or agency. The Trustee shall give prompt written notice to the Co-Issuers and the Noteholders of any change in the location of the New York Presenting Agent. If the location of the New York Presenting Agent changes and such notice is not given or the Trustee fails to maintain any such office or agency, presentations and surrenders of the Notes may be made or served at the Corporate Trust Office.

Section 7.3.    Money for Note Payments to Be Held in Trust.

All payments of amounts due and payable with respect to any Notes that are to be made from amounts withdrawn from the Collection Account shall be made on behalf of the Issuer by the Trustee.

Section 7.4.    Existence of Co-Issuers; Corporate Formalities.

(a) Each of the Co-Issuers will, to the maximum extent permitted by applicable law, maintain in full force and effect its existence, rights and franchises as a company or corporation incorporated or organized under the laws of the jurisdiction of its incorporation or organization, as the case may be, and will obtain and preserve its qualification to do business as a foreign corporation in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Indenture, the Notes or any of the Pledged Securities or other property included in the Trust Estate. Each of the Co-Issuers shall comply with its charter documents and shall not amend its charter documents without the consent of the Requisite Noteholders if such amendment would have a material adverse effect on the rights of the Noteholders and, for so long as any Notes are then rated, shall notify the Rating Agencies of any amendment and shall not amend its charter document in any material way without satisfaction of the Rating Condition.

008596

(b) The Issuer shall ensure that all corporate or other formalities regarding its existence (including, to the extent required, holding, to the extent required, regular meetings of the board of directors and shareholders) are followed. The Issuer shall not take any action, or conduct its affairs in a manner, that is likely to result in its separate existence being ignored or its assets and liabilities being substantively consolidated with any other Person in a bankruptcy, reorganization or other insolvency proceeding. Without limiting the foregoing, (i) the Issuer shall not have any subsidiaries except the Co-Issuer, and (ii) the Issuer shall not (A) have any employees (other than its directors), (B) engage in any transaction with any shareholder that would constitute a conflict of interest, *provided, however, that* the entry into the Administration Agreement and the Paying and Transfer Agency Agreement with Maples Finance Limited shall not be deemed a conflict of interest or (C) pay dividends other than in accordance with the terms of this Indenture, its organizational documents, and with regard to its Preferred Shares, in accordance with the terms of the Paying and Transfer Agency Agreement.

Section 7.5. Protection of Trust Estate.

(a) The Issuer shall authorize, execute, deliver and file all such supplements and amendments hereto and all such financing statements, amendments of financing statements, continuation statements, instruments of further assurance and other instruments and shall take such other action as may be necessary or advisable to:

(i) Grant more effectively all or any portion of the Trust Estate;

(ii) maintain or preserve the lien of this Indenture or to carry out more effectively the purposes hereof;

(iii) perfect, publish notice of, or protect the validity of any Grant made or to be made by this Indenture;

(iv) enforce any of the Pledged Securities or other instruments or property included in the Trust Estate;

(v) preserve and defend title to the Trust Estate and the rights therein of the Secured Parties against the claims of all other Persons; and

(vi) pay any and all taxes levied or assessed upon all or any part of the Trust Estate.

The Issuer hereby authorizes the filing of financing statements (and amendments of financing statements and continuation statements) that name the Issuer as debtor and the Trustee as secured party and that cover all personal property of the Issuer. The Issuer also hereby ratifies the filing of any such financing statements (or amendments of financing statements or continuation statements) that were filed prior to the execution hereof. The Issuer hereby designates the Trustee its agent and attorney-in-fact to take any action or authorize or execute any financing statement, amendment of financing statement, continuation statement or other instrument required pursuant to this Section 7.5; *provided that* such appointment shall not impose upon the Trustee any of the Issuer's obligations under this Section 7.5.

008597

The Trustee shall give written notice to the Issuer, the Servicer and the legal counsel who rendered the most recent Opinion of Counsel received by the Trustee under Section 7.6(a) of the pending expiration of the financing statement filed in connection with the closing of the transaction contemplated herein and any continuation statement relating thereto, no earlier than six months prior to the scheduled expiration date of such financing statement or continuation statement, as applicable, and no later than two months prior to such scheduled expiration date.

(b) The Trustee shall not, except in accordance with the provisions of this Indenture, release any portion of the Trust Estate from the security interest and lien hereunder or remove any portion of the Trust Estate from the jurisdictions indicated in Section 10.3(a) hereof; *provided that* the Trustee shall be entitled to remove the Trust Estate or any portion thereof to a jurisdiction other than the applicable jurisdiction or jurisdictions indicated in Section 10.3(a) hereof if the Trustee shall have first obtained an Opinion of Counsel, at its own expense, to the effect that the lien and security interest created by this Indenture with respect to such property, including the perfection and priority thereof, will continue to be maintained after giving effect to such action, and *provided further that* the Trustee shall thereafter (for so long as such property continues to be so located in such other jurisdiction) obtain at its own expense an annual Opinion of Counsel, on or before the date specified in Section 7.6(a) hereof, confirming the matters required by such Section to the extent governed by the law of such other jurisdiction.

(c) The Issuer shall pay or cause to be paid taxes, if any, levied on account of the beneficial ownership by the Issuer of any Pledged Securities.

(d) The Issuer hereby represents and warrants that its registered office is, and always has been, in the Cayman Islands; it has never had any offices in the United States of America, and the only offices of any type it has ever had have been in the Cayman Islands.

Section 7.6.    Opinions and Tax Certificates.

(a) On or before May 31 in each calendar year, commencing in 2007, the Issuer shall cause to be delivered to the Trustee an Opinion of Counsel (and the Trustee shall deliver copies of such to the Servicer and the Rating Agencies), stating that, in the opinion of such counsel, as of the date of such opinion, the Indenture creates in favor of the Trustee a security interest in the Trust Estate and that such security interest is perfected.

(b) If required to prevent the withholding and imposition of United States income tax, the Issuer shall deliver or cause to be delivered (as applicable) a United States Internal Revenue Service Form W-8BEN or W-8IMY (with applicable supporting documentation), or any successor forms thereto, to each issuer of any Portfolio Collateral and each issuer of an Eligible Investment in the Trust Estate at the time such Portfolio Collateral or Eligible Investment is purchased by the Issuer and annually thereafter.

(c) The Issuer will elect to be treated as a partnership for U.S. federal income tax purposes. In the event that the Issuer is treated as a corporation, the Issuer will take all actions necessary in order to permit any holder of a Preferred Share, any holder of equity in the Issuer or any Holder of a Note or other security that is or may reasonably be characterized as an equity

interest in the Issuer for United States federal income tax purposes to make a "qualified electing fund" election for United States federal income tax purposes and to satisfy the ongoing requirements with respect to such an election. Further, in such event, the Issuer will provide, upon the reasonable request of any holder of a Preferred Share, any holder of equity in the Issuer or any such Holder of a Note, any information the Issuer has available to it that assists such holders with regard to filing requirements such holders may have as a result of the controlled foreign corporation rules under the Code.

(d) The Issuer will not take the position that it is engaged in a United States trade or business for federal income tax purposes.

Section 7.7.    Performance of Obligations.

(a) The Co-Issuers shall not take any action, and, where applicable, will not consent to any action proposed to be taken by others, that would release any Person from any of such Person's covenants or obligations under any instrument included in the Trust Estate, except in the case of enforcement action taken with respect to any Defaulted Portfolio Collateral in accordance with the provisions hereof and as otherwise required hereby.

(b) The Co-Issuers may contract with other Persons, including JPMorgan Chase Bank, National Association, and the Servicer, for the performance by such Persons of the Issuer's obligations hereunder and under the Servicing Agreement. Notwithstanding any such arrangement, the Issuer shall remain primarily liable with respect thereto. With respect to any such contract, the performance of such obligations by such Persons shall be deemed to be performance of such obligations by the Issuer.

Section 7.8.    Negative Covenants.

(a) The Issuer will not:

(1)    sell, transfer, exchange or otherwise dispose of, or pledge, mortgage, hypothecate or otherwise encumber (or permit such to occur or suffer such to exist), any part of the Trust Estate, except as expressly permitted by this Indenture and the Servicing Agreement;

(2)    claim any credit on, or make any deduction from, the amount payable with respect to the Notes other than amounts withheld pursuant to Section 6.14 hereof, or assert any claim against any present or future Noteholder, by reason of the payment of any taxes levied or assessed upon any part of the Trust Estate;

(3)    incur or assume any indebtedness other than pursuant to this Indenture or the Paying and Transfer Agency Agreement, or incur, assume or guaranty the indebtedness of any Person, issue any additional class of securities or issue any additional shares, shares of stock or membership interests;

(4)    (A) permit the validity or effectiveness of this Indenture or any Grant hereunder to be impaired, or permit the lien of this Indenture to be amended, hypothecated, subordinated, terminated or discharged, or permit any Person to be released from

008599

any covenants or obligations with respect to this Indenture or the Notes, except, in each case, as may be expressly permitted hereby, thereby, or by the Servicing Agreement, (B) permit any lien, charge, adverse claim, security interest, mortgage or other encumbrance (other than the lien of this Indenture) to be created on or extend to or otherwise arise upon or burden the Trust Estate or any part thereof, any interest therein or the proceeds thereof except as may be expressly permitted hereby, or (C) take any action that would permit the lien of this Indenture not to constitute a valid first priority perfected security interest in the Trust Estate except as may be expressly permitted hereby;

(5)     act as agent, negotiator or structurer with respect to any Portfolio Collateral, act as a participant in negotiating the terms of a primary loan agreement, except to the extent provided in the Servicing Agreement, enter into a binding commitment to purchase any Portfolio Collateral prior to the issuance of such Portfolio Collateral or engage in any transaction or activity that would cause the Issuer to be treated as engaged in a trade or business in the United States within the meaning of section 864 of the Code;

(6)     change its name or its type or jurisdiction of organization unless it has first (i) made all filings and taken all actions in all relevant jurisdictions under the applicable Uniform Commercial Code and other applicable law as are necessary to continue and maintain the priority and perfection of the security interest of the Trustee in the Trust Estate, and (ii) delivered to the Trustee an Opinion of Counsel to the effect that all necessary filings have been made under the applicable Uniform Commercial Code in all relevant jurisdictions as are necessary to continue and maintain the priority and perfection of the security interest of the Trustee in the Trust Estate;

(7)     enter into any agreements or amendments thereto unless such agreements and any amendments thereto contain "non-petition" and "limited recourse" provisions, except with respect to any agreements involving the purchase and sale of Portfolio Collateral having customary purchase or sale terms and documented with customary trading documentation;

(8)     enter into any agreements or amendments to the Transaction Documents with respect to the "non-petition" or "limited recourse" provisions without satisfying the Rating Condition; or

(9)     commingle any of the Collateral with the assets of any other Person, except as expressly permitted by this Indenture and the Servicing Agreement.

(b) The Co-Issuer will not enter into any agreement, contract or indenture other than this Indenture and shall not incur or assume any indebtedness other than pursuant to or as may be expressly permitted by this Indenture, or incur, assume or guaranty the indebtedness of any Person.

(c) The Trustee shall not sell, transfer, exchange or otherwise dispose of, or enter into or engage in any business with respect to, any part of the Trust Estate, except as expressly permitted by this Indenture or the Servicing Agreement.

008600

(d) Neither of the Co-Issuers shall to the maximum extent permitted by applicable law (i) commence any case, proceeding or other action under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have any order for relief entered with respect to it, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (ii) seek appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its assets, or make a general assignment for the benefit of its creditors; neither of the Co-Issuers shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth above; and each of the Co-Issuers shall generally pay debts as they become due and not admit in writing its inability to pay its debts as they become due.

(e) Except as permitted by Section 8.2 hereof, the Issuer shall not waive nor permit the amendment of Section 19 or Section 20 of the Servicing Agreement or Section 20 of the Paying and Transfer Agency Agreement.

Section 7.9.  Statement as to Compliance.

On or before July 31 following each calendar year, beginning in 2007, or immediately if there has been a Default under this Indenture, the Issuer shall deliver to the Trustee, and the Trustee in turn shall deliver a copy to the Rating Agencies (and any Noteholder upon receipt by the Trustee of a certificate in the form of Exhibit H), an Officer's Certificate of the Issuer stating that:

(1)  a review of the activities of the Issuer during such year and of the Issuer's performance under this Indenture has been made under his or her supervision; and

(2)  to the best of his or her knowledge, based on such review, the Issuer has fulfilled all of its obligations under this Indenture throughout such year, or, if there has been a Default hereunder, specifying each such Default known to him or her and the nature and status thereof, including any actions taken to remedy the same.

Section 7.10.  Issuer and Co-Issuer May Not Consolidate or Merge.

Neither the Issuer nor the Co-Issuer shall consolidate or merge with or into any other Person.

Section 7.11.  No Other Business.

Neither the Issuer nor the Co-Issuer shall engage in any business or activity other than (i) the issuance and redemption of the Notes and the Preferred Shares, the issuance and redemption of its ordinary shares, and acquiring, owning, managing, holding and pledging the Pledged Securities and any other instrument or property included in the Trust Estate and (ii) engaging in any other activities that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith.

008601

Section 7.12.    Purchase of Notes.

Notwithstanding anything contained in this Indenture to the contrary, the Issuer may acquire Notes in open market or privately negotiated transactions or otherwise (and the Issuer shall give prompt written notice thereof to the Trustee): *provided that* so long as any Class A Notes are Outstanding, the Issuer shall not acquire any Class B-1L Notes.  Any Notes acquired by the Issuer shall be delivered to the Trustee for cancellation.

Section 7.13.    Notice of Rating.

(a) The Issuer shall use reasonable efforts to cause the payment of the Periodic Interest Amount and the Aggregate Principal Amount of the Class A-1LA Notes, the Class A-1LB Notes, the Class A-2L Notes and the Class X Notes to be rated by Standard & Poor's and Moody's (as applicable) and the ultimate payment of the Cumulative Interest Amount and the Aggregate Principal Amount of the Class A-3L Notes, the Class A-4L Notes and the Class B-1L Notes to be rated by Standard & Poor's and Moody's.  Notwithstanding anything to the contrary contained herein, the failure by the Issuer to maintain a rating of each Class of the Class A Notes and the Class B-1L Notes shall not constitute a Default or an Event of Default.

(b) The Issuer shall promptly notify the Trustee in writing (and the Trustee shall promptly notify the Noteholders and the Servicer) if at any time the rating of any Class of Notes has been, or the Issuer knows will be, changed or withdrawn.

Section 7.14.    Process Agent.

The Issuer irrevocably designates and appoints CT Corporation, 111 Eighth Avenue, New York, New York 10011, as its agent (the "Process Agent") for service of all process served in connection with this Indenture, such service being hereby acknowledged to be effective and binding service upon the Issuer in every respect.

Section 7.15.    Additional Covenants.

(a) Each of the Co-Issuers shall comply with all applicable laws, rules, regulations, orders, writs, judgments, injunctions, decrees, determinations and awards (including, without limitation, any fiscal and accounting rules and regulations and any foreign or domestic law, rule or regulation), including, without limitation, in connection with the issuance, offer and sale of the Notes.

(b) The Issuer shall give prompt notice in writing to the Trustee, the Servicer and the Rating Agencies, upon becoming aware of the occurrence of any Event of Default hereunder.

(c) Each of the Co-Issuers shall take all reasonable actions necessary so as to be exempt from registration under the Investment Company Act.

(d) The Co-Issuers shall take all reasonable actions necessary so as to exempt from registration the sale of Notes under the Securities Act or under any applicable United States state securities or "blue sky" laws.

008602

(e) Each of the Co-Issuers shall maintain all licenses, permits, charters and registrations which are material to the conduct of its business.

(f) The Issuer shall maintain its corporate records and books of account outside of the United States separate from any other Person, including, without limitation, any Person which owns more than 50% of its equity securities.

(g) Each of the Co-Issuers shall use its best efforts to minimize taxes and any other costs arising in connection with its activities.

(h) Each of the Co-Issuers shall treat the purchase of Portfolio Collateral as a purchase for tax, accounting and reporting purposes.

(i) Each of the Co-Issuers shall maintain at least one director who is Independent of the Issuer, the Co-Issuer, the Servicer and Bear Stearns.

(j) Each of the Co-Issuers shall only conduct business in its own name as set forth in its organizational documents.

(k) The Issuer shall cause each item of Collateral to be Delivered to the Trustee.

(l) The Issuer shall cause the Schedule of Portfolio Collateral to at all times correctly list all Portfolio Collateral that is included in the Trust Estate, including all Initial Portfolio Collateral, all Original Portfolio Collateral, all Additional Portfolio Collateral, all Substitute Portfolio Collateral, all Defaulted Portfolio Collateral, all Credit Risk Portfolio Collateral, all Equity Portfolio Collateral and all Credit Improved Portfolio Collateral. The Issuer shall cause Schedule A to be amended to reflect the inclusion of Portfolio Collateral purchased pursuant to Section 3.4(a) hereof, the inclusion of Additional Portfolio Collateral as provided in Section 11.3 hereof, the release of Portfolio Collateral pursuant to Article X hereof, and the inclusion of Substitute Portfolio Collateral as provided in Section 12.4 hereof.

Section 7.16.   Representations and Warranties of the Co-Issuers.

Each of the Co-Issuers represents and warrants to the Trustee with respect to itself, as of the Closing Date that:

(a) Such Co-Issuer is a corporation duly incorporated or organized, as the case may be, validly existing and in good standing under the laws of the jurisdiction of its incorporation and in each jurisdiction where the conduct of its business requires such license, qualification or good standing, except where the failure to be so licensed or qualified or in good standing would not adversely affect the validity or enforceability of this Indenture or the other Transaction Documents to which it is a party, or the ability of such Co-Issuer to perform its obligations hereunder or thereunder.

(b) Such Co-Issuer has the power and authority to execute and deliver the Transaction Documents and all other documents and agreements contemplated hereby and thereby to which it is a party, as well as to carry out the terms hereof and thereof.

008603

(c) Such Co-Issuer has taken all necessary action, including but not limited to all requisite corporate action, to authorize the execution, delivery and performance of the Transaction Documents and all other documents and agreements contemplated hereby and thereby to which it is a party. When executed and delivered by such Co-Issuer and the other parties thereto, each of the Transaction Documents will constitute the legal, valid and binding obligation of such Co-Issuer enforceable in accordance with its terms subject, as to enforcement, to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect affecting the enforcement of creditors' rights in general, and except as such enforceability may be limited by general principles of equity (whether considered in a suit at law or in equity) and to the payment of stamp duty.

(d) All authorizations, licenses, permits, certificates, franchises, consents, approvals and undertakings which are required to be obtained by such Co-Issuer under any applicable law which are material to (i) the conduct of its business, (ii) the ownership, use, operation or maintenance of its properties and (iii) the performance by such Co-Issuer of its obligations under or in connection with the Transaction Documents, the Notes and the Preferred Shares have been received and all such authorizations, licenses, permits, certificates, franchises, consents, approvals and undertakings are in full force and effect.

(e) The execution, issuance and delivery of, and performance by such Co-Issuer of its respective obligations under the Transaction Documents and any and all instruments or documents required to be executed or delivered pursuant to or in connection herewith or therewith were and are within the powers of such Co-Issuer and will not violate any provision of any law, regulation, decree or governmental authorization applicable to such Co-Issuer, or its charter or by-laws or other organizational documents and will not violate or cause a default under any provision of any contract, agreement, mortgage, indenture or other undertaking to which such Co-Issuer is a party or which is binding upon such Co-Issuer or any of its property or assets, and will not result in the imposition or creation of any lien, charge, or encumbrance upon any of its properties or assets of such Co-Issuer pursuant to the provisions of any such contract, agreement, mortgage, indenture or undertaking, other than as specifically set forth herein.

(f) There are no legal, governmental or regulatory Proceedings pending to which such Co-Issuer is a party or of which any of its property is the subject, which if determined adversely to such Co-Issuer would individually or in the aggregate have a material adverse effect on the performance by such Co-Issuer of the Transaction Documents or the consummation of the transactions contemplated hereunder or thereunder; and to the best of its knowledge, no such Proceedings are threatened or contemplated.

(g) Neither the Notes nor the Preferred Shares are required to be registered pursuant to the Securities Act, such Co-Issuer is not required to be registered as an investment company pursuant to the Investment Company Act, and the Indenture is not required to be qualified under the Trust Indenture Act of 1939, as amended.

(h) Except with respect to amounts owed under the Notes and the Preferred Shares and liabilities incurred in connection with the issuance of the Notes, the Preferred Shares and the Transaction Documents, such Co-Issuer has not incurred any indebtedness for borrowed money or any other material liabilities.

008604

(i) The Issuer has no subsidiaries other than the Co-Issuer.

(j) The Issuer is not a securities intermediary, broker, or commodity intermediary as defined in the UCC, or a Participant as defined in the United States Regulations.

Section 7.17. Representations Relating to the Security Interests in the Collateral.

(a) The Issuer hereby represents that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and, with respect to Collateral Delivered after the Closing Date, be deemed to be repeated on the date on which such Collateral is Delivered as if made at and as of that time), with respect to the then existing Collateral:

(i) The Issuer owns and has good and marketable title to such Collateral free and clear of any lien, claim or encumbrance of any person, other than such as are created under, or expressly permitted by, this Indenture.

(ii) Other than the security interest granted to the Trustee pursuant to this Indenture and conveyances permitted by this Indenture, the Issuer has not pledged, assigned, sold, granted a security interest in, or otherwise conveyed such Collateral. The Issuer has not authorized the filing of and is not aware of any financing statements against the Issuer that include a description of collateral covering such Collateral other than any financing statement relating to the security interest granted to the Trustee hereunder or that has been terminated. The Issuer is not aware of any judgment, Pension Benefit Guaranty Corporation or tax lien filings against the Issuer.

(iii) Such Collateral is comprised of "instruments", "security entitlements", "general intangibles", "tangible chattel paper", "deposit accounts", "accounts", "certificated securities", "uncertificated securities" or "securities accounts" (each as defined in the applicable Uniform Commercial Code).

(iv) All Accounts constitute "securities accounts" as defined in the applicable Uniform Commercial Code.

(v) This Indenture creates a valid and continuing security interest (as defined in the applicable Uniform Commercial Code) in such Collateral in favor of the Trustee, which security interest is prior to all other liens and is enforceable as such against creditors of and purchasers from the Issuer except as expressly permitted under this Indenture.

(vi) The Issuer has received all consents and approvals required by the terms of such Collateral to the transfer to the Trustee of its interest and rights in such Collateral hereunder.

(b) The Issuer hereby represents that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and, with respect to Collateral Delivered after the Closing Date, be deemed to be repeated on the date on which such Collateral is Delivered as if made at and as of that time), with respect to the then existing

Collateral that constitutes "securities accounts", the Indenture creates a valid and continuing security interest (as defined in the applicable Uniform Commercial Code) in the Accounts in favor of the Trustee, which security interest is perfected by control (as defined in the applicable Uniform Commercial Code) because the Trustee has control of each security entitlement carried in each Account.

(c) The Issuer hereby represents that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and, with respect to Collateral Delivered after the Closing Date, be deemed to be repeated on the date on which such Collateral is Delivered as if made at and as of that time), with respect to the then existing Collateral that constitute "instruments":

(i) All original executed copies of each promissory note or mortgage note that constitutes or evidences such instruments have been delivered to the Trustee and (ii) none of the promissory notes or the mortgage notes that constitute or evidence such instruments has any marks or notations indicating that it has been pledged, assigned or otherwise conveyed to any person other than the Trustee.

(d) The Issuer hereby represents that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and, with respect to Collateral Delivered after the Closing Date, be deemed to be repeated on the date on which such Collateral is Delivered as if made at and as of that time), with respect to the then existing Collateral that constitute "security entitlements":

(i) All of such security entitlements have been credited to one of the Accounts. The securities intermediary for each Account has agreed to treat all assets credited to such Account as "financial assets" within the meaning of the applicable Uniform Commercial Code.

(ii) The Issuer has taken all steps necessary to cause the securities intermediary to identify in its records the Trustee as the person having a security entitlement against the securities intermediary in each of the Accounts.

(iii) The Accounts are not in the name of any person other than the Trustee. The Issuer has not consented to the securities intermediary of any Account to comply with the entitlement order of any person other than the Trustee.

(e) The Issuer hereby represents that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and, with respect to Collateral Delivered after the Closing Date, be deemed to be repeated on the date on which such Collateral is Delivered as if made at and as of that time), with respect to the then existing Collateral that constitutes "general intangibles" or "accounts":

(i) The Issuer has caused or will have caused, within ten days after the Closing Date, the filing of all appropriate financing statements in the proper filing office in the appropriate jurisdictions under applicable law in order to perfect the security interest in such general intangibles or accounts granted to the Trustee hereunder.

US_EAST:6212215.13

130

008606

(f) The Issuer hereby represents that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and, with respect to Collateral Delivered after the Closing Date, be deemed to be repeated on the date on which such Collateral is Delivered as if made at and as of that time), with respect to the then existing Collateral that constitutes "tangible chattel paper":

(i) (A) All original executed copies of each agreement that constitutes or evidences such tangible chattel paper have been delivered to the Trustee and (B) none of the agreements that constitute or evidence such tangible chattel paper has any marks or notations indicating that it has been pledged, assigned or otherwise conveyed to any person other than the Trustee.

(ii) The Issuer has taken all steps necessary to perfect the security interest against the account debtor in the property securing the agreements that constitute such tangible chattel paper.

(g) The Issuer hereby represents that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and, with respect to Collateral Delivered after the Closing Date, be deemed to be repeated on the date on which such Collateral is Delivered as if made at and as of that time), with respect to the then existing Collateral that constitutes "deposit accounts":

(i) The Issuer has taken all steps necessary to cause the Trustee to become the account holder of such deposit accounts.

(ii) Such deposit accounts are not in the name of any person other than the Trustee. The Issuer has not consented to the bank maintaining any such deposit account to comply with the instructions of any person other than the Trustee.

(h) The Issuer hereby represents that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and, with respect to Collateral Delivered after the Closing Date, be deemed to be repeated on the date on which such Collateral is Delivered as if made at and as of that time), with respect to the then existing Collateral that constitutes a certificated security, such certificated security has been delivered to the Trustee and, if in registered form, has been indorsed to the Trustee or in blank by an effective indorsement or has been registered in the name of the Trustee upon original issue or registration of transfer by the issuer of such certificated security.

(i) The Issuer hereby represents that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and, with respect to Collateral Delivered after the Closing Date, be deemed to be repeated on the date on which such Collateral is Delivered as if made at and as of that time), with respect to the then existing Collateral that constitutes an uncertificated security, the issuer of such uncertificated security has registered the Trustee as the registered owner of such uncertificated security.

(j) None of the provisions of this Section 7.17 shall be waived without the prior written confirmation from S&P that such waiver shall not result in a reduction or withdrawal of the then-current rating of any Class of Notes.

008607

Section 7.18.   No "Gross-up" Amounts.

The Co-Issuers shall not be required to pay any "gross-up" or other additional amounts to the Holders of any Class of Notes because taxes or related amounts are required to be withheld from payments on the Notes or any payments to either of the Co-Issuers on any item of Portfolio Collateral or other assets of the Co-Issuers.

Section 7.19.   Securities Lending.

(a) So long as no Event of Default is continuing and if after the completion of the transaction the limit in subsection 12.2(u) would be satisfied, the Servicer may cause Portfolio Collateral that are not Defaulted Portfolio Collateral to be lent for a term of 90 days or less to banks, broker-dealers, and other financial institutions (other than insurance companies) having long-term and short-term senior unsecured debt ratings or guarantors with ratings of at least "A1" (and not "A1" but on credit watch with negative implications) and "P-1" (and not on credit watch for possible downgrade) from Moody's and a long-term senior unsecured debt rating of at least "A+" from S&P (each, a "Securities Lending Counterparty") pursuant to one or more agreements (each, a "Securities Lending Agreement"); *provided* that Portfolio Collateral whose Market Value cannot be determined under clauses (a), (b) or (c) of that definition may not be lent pursuant to a Securities Lending Agreement; *provided, further*, that the gross income from all such transactions during any fiscal year shall not exceed 15% of the gross income of the Issuer for such fiscal year.  Upon receipt of an Issuer Order, the Trustee shall release any lent Portfolio Collateral to a Securities Lending Counterparty as directed by the Servicer. The Securities Lending Counterparties may be Affiliates of the Placement Agent or Affiliates of the Servicer. The duration of any Securities Lending Agreement shall not exceed the Final Maturity Date of the Notes.

(b) Each Securities Lending Agreement shall be on market terms as determined by the Servicer (except as may be required below) and shall:

(i)      require that the Securities Lending Counterparty return to the Trustee debt obligations that are identical (in terms of issue and class) to the lent items of Portfolio Collateral;

(ii)     require that the Securities Lending Counterparty pay to the Trustee amounts equivalent to all interest and other payments that the owner of the lent items of Portfolio Collateral is entitled to for the period during which the Portfolio Collateral is lent and require that any such payments not be subject to withholding tax imposed by any jurisdiction unless the Securities Lending Counterparty is required under the Securities Lending Agreement to make "gross-up" payments to the Issuer that cover the full amount of the withholding tax on an after-tax basis;

(iii)    require that the Rating Condition with respect to each Rating Agency shall be satisfied with respect to the execution of the Securities Lending Agreement;

(iv)     satisfy any other requirements of Section 1058 of the Code and the Treasury Regulations promulgated under it;

008608

(v)     be governed by the laws of New York;

(vi)     permit the Issuer to assign its rights under the Securities Lending Agreement to the Trustee pursuant to this Indenture;

(vii)     provide for early termination and the delivery of any lent item of Portfolio Collateral from the Issuer with no penalty if the Portfolio Collateral becomes Credit Risk Portfolio Collateral or is subject to redemption in accordance with its terms;

(viii)     provide for early termination and the delivery of any lent item of Portfolio Collateral with no penalty upon any redemption of the Notes in whole;

(ix)     require the Securities Lending Counterparty to post with the Trustee collateral consisting of Cash or direct registered debt obligations of the United States of America that have a maturity date no later than the Business Day preceding the stated termination date of the Securities Lending Agreement (the "Securities Lending Collateral") to secure its obligation to return the Portfolio Collateral;

(x)     provide that the Securities Lending Collateral shall be maintained at all times in an amount equal to at least 102% of the current Ask-Side Market Value (determined daily and monitored by the Servicer) of the lent Portfolio Collateral and if securities are delivered to the Trustee as security for the obligations of the Securities Lending Counterparty under the related Securities Lending Agreement, the Servicer on behalf of the Issuer will negotiate with the Securities Lending Counterparty a rate for the loan fee to be paid to the Issuer for lending the lent Collateral Obligations;

(xi)     the lent Portfolio Collateral shall be marked-to-market on a daily basis by the Servicer on the basis of their Market Value;

(xii)     the Collateral will include the Issuer's rights under the related Securities Lending Agreement rather than the lent Portfolio Collateral;

(xiii)     provide for early termination within 10 days at the option of the Issuer and the delivery of any lent Portfolio Collateral from the Issuer with no penalty if the Securities Lending Counterparty is no longer in compliance with the requirements relating to the credit ratings of the Securities Lending Counterparty and the noncompliance is not cured as provided in this Indenture; and

(xiv)     contain appropriate limited recourse and non-petition provisions that survive the termination of the agreement (to the extent the Issuer has contractual payment obligations to the Securities Lending Counterparty) equivalent (*mutatis mutandis*) to those in this Indenture.

(c)     If either Moody's or S&P downgrades a Securities Lending Counterparty such that the Securities Lending Agreements to which the Securities Lending Counterparty is a party are no longer in compliance with the requirements relating to the credit ratings of the Securities Lending Counterparty, then the Servicer on behalf of the Issuer, within 10 days of the downgrade, shall

008609

(i) terminate its Securities Lending Agreements with the Securities Lending Counterparty unless a guarantor for the Securities Lending Counterparty's obligations under the Securities Lending Agreements has been obtained; or

(ii) reduce the percentage of the Aggregate Principal Balance of the Portfolio Collateral lent to the downgraded Securities Lending Counterparty so that the Securities Lending Agreements to which the Securities Lending Counterparty is a party, together with all other Securities Lending Agreements, are in compliance with the requirements relating to the credit ratings of Securities Lending Counterparties; or

(iii) take any other steps Moody's or S&P may require to cause the Securities Lending Counterparty's obligations under the Securities Lending Agreements to which the Securities Lending Counterparty is a party to be treated by Moody's or S&P, as the case may be, as if the obligations were owed by a counterparty having a rating at least equivalent to the rating that was assigned by Moody's or S&P, as the case may be, to the downgraded Securities Lending Counterparty before its being downgraded.

(d) In connection with any such direction by the Servicer to enter into a Securities Lending Agreement, the Trustee may receive and rely on an Issuer Order to the effect that the Securities Lending Agreement, and its Securities Lending Counterparty, is each in compliance with the requirements of this Indenture (including the definition of "Securities Lending Counterparty"). The Issuer and the Trustee may enter into any Securities Lending Agreement at the instruction of the Servicer, and deliver and accept delivery and return of any Portfolio Collateral pursuant to the Securities Lending Agreement, or pursuant to instructions from the Servicer in connection with the Securities Lending Agreement. The Trustee may take any actions and exercise any rights and remedies under any Securities Lending Agreement that the Servicer instructs. The Trustee need not enter into any Securities Lending Agreement that would in its judgment, subject it to any liability, whether financial or otherwise, or cause it to incur or subject it to risk of any cost or disbursement for which it is not, in its judgment, adequately indemnified, or that would impose on it any obligations or administrative burdens that are unacceptable to it. The Servicer shall instruct the Trustee in writing with respect to the administration of any Securities Lending Agreement (including with respect to any default and the exercise of rights under it). The Trustee shall not have any responsibility for evaluating the sufficiency, validity, or acceptability of any Securities Lending Agreement or for the qualifications or eligibility of any Securities Lending Counterparty. Nothing in this Indenture shall be construed to cause the Trustee to have any fiduciary duties to any Securities Lending Counterparty.

So long as any Portfolio Collateral is on loan pursuant to a Securities Lending Agreement, (a) the Trustee shall have no liability for any failure or inability on its part to receive any information or take any action with respect to the Portfolio Collateral because of its being on loan (including any failure to take action with respect to a notice of redemption, consent solicitation, exchange or tender offer, or similar corporate action), and (b) the lent Portfolio Collateral shall not be disqualified for return to the Trustee as an item of Portfolio Collateral by any change in circumstance or status during the time while on loan (including any change that would cause the Portfolio Collateral to be ineligible for purchase by the Issuer under this Indenture if applied to a proposed purchase of it in the open market at the time of its return from loan).

008610

## ARTICLE VIII

## SUPPLEMENTAL INDENTURES

Section 8.1.     Supplemental Indentures Without Consent of Noteholders.

Without the consent of the Holders of any Notes, but with the consent of the Servicer, the Co-Issuers and the Trustee, at any time, may enter into one or more indentures supplemental hereto, in form satisfactory to the Trustee, for any of the following purposes:

(1)     to correct or amplify the description of any property at any time subject to the lien of this Indenture, or better to assure, convey and confirm unto the Trustee any property subject or required to be subjected to the lien of this Indenture, or to subject to the lien of this Indenture additional property;

(2)     to evidence the succession of another Person to the Issuer or the Co-Issuer, and the assumption by any such successor of the covenants of the Issuer or the Co-Issuer contained herein and in the Notes;

(3)     to add to the covenants of the Issuer, the Co-Issuer or the Trustee, for the benefit of the Holders of the Notes, or to surrender any right or power herein conferred upon the Issuer or the Co-Issuer;

(4)     to Grant any property to the Trustee;

(5)     to evidence and provide for the acceptance of appointment hereunder by a successor Trustee and to add to or change any of the provisions of this Indenture as shall be necessary to facilitate the administration of the Trust Estate by more than one Trustee, pursuant to the requirements of Section 6.9 or 6.10 hereof;

(6)     to cure any ambiguity, or to correct, modify or supplement any provision which is defective or inconsistent with any other provision herein;

(7)     to take any action necessary or helpful to prevent the Issuer or the Trustee from becoming subject to any withholding or other taxes or assessments or to reduce the risk that the Issuer will be engaged in a United States trade or business or that the Issuer (or the beneficial owners thereof) will be subject to United States income tax on a net income basis;

(8)     to correct any manifest error in any provision hereof upon receipt by the Trustee of written direction from the Issuer or Co-Issuer (as to which the Trustee may rely) describing in reasonable detail such error and the modification necessary to correct such error; or

(9)     to effectuate the provisions of Section 2.12 hereof *provided that* such amendment shall not, as evidenced by an Officer's Certificate of the Issuer, adversely affect in any material respect the interests of any Noteholder; or

008611

(10)    to facilitate the delivery and maintenance of the Notes in accordance with the requirements of DTC, Euroclear or Clearstream;

(11)    to authorize the appointment of any listing agent, Transfer Agent, Paying Agent or additional registrar for any Class of Notes required or advisable in connection with the listing of the Notes on the Irish Stock Exchange or any other stock exchange and otherwise to amend this Indenture to incorporate any changes required or requested by any governmental authority, stock exchange authority, listing agent, Transfer Agent, Paying Agent or additional registrar for such Notes in connection therewith;

(12)    to modify the restrictions on and procedures for resale and other transfer of the Notes in accordance with any change in any applicable law or regulation (or the interpretation thereof) or to enable the Co-Issuers to rely upon any less restrictive exemption from registration under the Securities Act or the Investment Company Act or to remove restrictions on resale and transfer to the extent not required thereunder;

(13)    evidence the addition of an additional issuer or of a wholly owned subsidiary of the Issuer that, in either case, will acquire securities from the Issuer and pledge its assets to secure the obligations of the Issuer secured by the Trust Estate, to the extent necessary to permit the Issuer to comply with the Bank Holding Company Act of 1956, as amended, and the rules and regulation s thereunder or any other statute, rule or regulation applicable to the Issuer, and the assumption by any such additional issuer or subsidiary of the covenants and obligations of the Issuer in this Indenture; or

(14)    prevent the Issuer from becoming an "investment company" as defined in the Investment Company Act or better assure compliance with the requirements of Rule 3a-7 thereunder; *provided* that, as a condition to the effectiveness of any such supplemental indenture, each of the Issuer, the Trustee and the Initial Purchaser shall have received (A) a Rating Condition with respect to such supplemental indenture and (B) a customary, unqualified opinion of counsel from a nationally recognized law firm (which may be supported as to factual matters by any relevant certificates or other documents necessary or advisable in the judgment of counsel delivering such opinion) providing that, after giving effect to such supplemental indenture, the Issuer is exempt from registration as an "investment company" under the Investment Company Act;

*provided further* that (A) such amendment for any matters described in clauses (1) through (13) shall not, as evidenced by an Opinion of Counsel (which may be supported as to factual matters by any relevant certificates or other documents necessary or advisable in the judgment of counsel delivering such opinion), adversely affect in any material respect the interests of any Noteholder and (B) no amendment shall be made that would cause the Issuer to register as an "investment company" under the Investment Company Act.

The Trustee is hereby authorized to join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations that may be therein contained.  At the cost of the Issuer, the Trustee shall provide to the Servicer and for so long as any Notes are then rated, each Rating Agency then rating any Notes a copy of any proposed supplemental indenture at least 10 days prior to the execution thereof by the Trustee

008612

and request written confirmation that the entering into of such supplemental indenture satisfies the Rating Condition. The Trustee shall not enter into any such supplemental indenture if such supplemental indenture does not satisfy the Rating Condition, and, as soon as practicable after the execution by the Trustee and the Issuer of any such supplemental indenture, the Issuer or the Trustee at the request of the Issuer shall provide to the Servicer and each Rating Agency then rating any Notes a copy of the executed supplemental indenture.

Section 8.2.    Supplemental Indentures with Consent of Noteholders.

With the consent of the Requisite Noteholders, the Servicer and the Holders of the Preferred Shares, to the extent described in the Paying and Transfer Agency Agreement, the Co-Issuers and the Trustee may enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, this Indenture or of modifying in any manner the rights of the Holders of the Notes under this Indenture; *provided that*, notwithstanding any Amendment Buy-Out Option described in Section 9.4(b), no such supplemental indenture shall, without the consent of each Noteholder of each Class adversely affected thereby:

(1)    change the Final Maturity Date or Payment Date of any Note, or reduce the principal amount, notional principal amount or stated amount thereof, as the case may be, or the means of determining the Applicable Periodic Rate, the Optional Redemption Price, the Special Redemption Price, the Tax Event Redemption Price or the Mandatory Redemption Price, as applicable, with respect thereto, change the provisions of this Indenture relating to the application of proceeds of the Trust Estate to the payment of the Notes or change the jurisdiction where any Note is payable, or the coin or currency in which, any Note or any amount thereunder is payable, or impair the right to institute suit for the enforcement of any such payment on or after the maturity thereof;

(2)    reduce the percentage in Aggregate Principal Amount, the consent of the Holders of which is required for the execution of any such supplemental indenture, or the consent of the Holders of which is required for any waiver of compliance with certain provisions of this Indenture or certain Events of Default hereunder and their consequences provided for in this Indenture;

(3)    impair or adversely affect the Trust Estate except as otherwise permitted herein;

(4)    permit the creation of any lien ranking prior to or on a parity with the lien of this Indenture with respect to any part of the Trust Estate or terminate the lien of this Indenture on any property at any time subject hereto (other than pursuant to the terms of this Indenture) or deprive the Holder of any Note or any other party expressly secured hereby of the security afforded by the lien of this Indenture;

(5)    reduce the percentage of the Aggregate Principal Amount of the Notes whose Holders must direct the Trustee to preserve the Trust Estate or must consent before any request is made to rescind the Trustee's election to preserve the Trust Estate pursuant to Section 5.5 hereof, or to sell or liquidate the Trust Estate pursuant to Section 5.4, 5.5 or 9.7

008613

hereof or modify the requirement for consent of any other party to which the right to consent is expressly granted hereby;

(6) modify any of the provisions of this Section or Section 5.15 hereof, except to increase any such percentage or to provide that certain other provisions of this Indenture cannot be modified or waived without the consent of the Holder of each Outstanding Note affected thereby;

(7) modify the provisions of Article XI hereof or the definition of the term "Holder," "Noteholder," "Majority Noteholders," "Majority Preferred Shareholders," "Requisite Noteholders" or of the term "Outstanding";

(8) amend any provision of this Indenture relating to the institution of proceedings for the Issuer or the Co-Issuer to be adjudicated as bankrupt or insolvent, or the consent by the Issuer or the Co-Issuer to the institution of bankruptcy or insolvency proceedings against it, or the filing with respect to the Issuer or the Co-Issuer of a petition or answer or consent seeking reorganization or relief under the Bankruptcy Code or any other similar applicable law, or the consent by the Issuer or the Co-Issuer to the filing of any such petition as to the appointment of a receiver, liquidator, assignee, trustee or sequestrator (or other similar official) of the Issuer or the Co-Issuer or of any substantial part of its property, respectively;

(9) amend any provision of this Indenture or other such document that provides that the obligations of the Co-Issuer or the Issuer, as the case may be, are non-recourse obligations of the Co-Issuer or the Issuer, respectively, payable solely from the Collateral in accordance with the terms hereof; or

(10) modify any of the provisions of this Indenture in such a manner as to affect the calculation of the amount or timing of any payment of interest or principal due on any Note on any Payment Date (including the calculation of any of the individual components of such calculation) or to affect the rights of the Holders of Notes to the benefit of any provisions for the redemption of such Notes contained herein.

With respect to any action that requires consent from 100% of the Noteholders, if any Noteholder has notified the Trustee in writing that pursuant to such Noteholder's organizational documents or other documents governing such Noteholder's actions, the Noteholder is not permitted to take any affirmative action approving, rejecting or otherwise acting upon any Issuer request under the Indenture, the failure by such Noteholder to consent to or reject any such requested action will be deemed a consent by such Noteholder to the requested action.

Not later than 15 Business Days prior to the execution of any proposed supplemental indenture pursuant to this Section, the Trustee shall mail to the Servicer and, so long as any Notes are then rated by any Rating Agency, to each such Rating Agency, a copy of such supplemental indenture and, if any Notes are then rated, prior to the execution of the proposed supplemental indenture, the Rating Condition must be satisfied with respect to such supplemental indenture.

008614

It shall not be necessary in connection with any consent of Noteholders under this Section for the Noteholders to approve the specific form of any proposed supplemental indenture, but it shall be sufficient if such consent shall approve the substance thereof.

In the event that any supplemental indenture is consented to by the Issuer, the Co-Issuer and 100% of the Aggregate Outstanding Amount of each Class of Notes and the Rating Condition is satisfied or is specifically waived by all consenting parties, all conditions precedent to the execution of such supplemental indenture shall be deemed satisfied, the execution of such supplemental indenture shall be authorized or permitted by this Indenture, and the Trustee shall execute and accept the additional trusts created by such supplemental indenture pursuant to this Article VIII or modification thereby of the trusts created by this Indenture without obtaining an Opinion of Counsel.

Promptly after the execution by the Co-Issuers and the Trustee of any supplemental indenture pursuant to this Section 8.2, the Issuer or the Trustee at the request of the Issuer shall deliver to the Holders of the Notes, the Servicer, each Rating Agency then rating any Notes and the Repository (for posting on the Repository in the manner described in Section 13.17), a copy thereof.

Section 8.3.    Execution of Supplemental Indentures.

In executing or accepting the additional trusts created by any supplemental indenture permitted by this Article VIII or the modifications thereby of the trusts created by this Indenture, the Trustee shall be entitled to receive, and (subject to Section 6.3(d) hereof) shall be fully protected in relying upon, an Opinion of Counsel stating that the execution of such supplemental indenture is authorized or permitted by this Indenture, and that all conditions precedent applicable thereto under this Indenture have been satisfied. The Trustee may, but shall not be obligated to, enter into any such supplemental indenture which affects the Trustee's own rights, duties or immunities under this Indenture or otherwise.

Section 8.4.    Effect of Supplemental Indentures.

Upon the execution of any supplemental indenture under this Article VIII, this Indenture shall be modified in accordance therewith, and such supplemental indenture shall form a part of this Indenture for all purposes; and every Holder of Notes theretofore and thereafter authenticated and delivered hereunder shall be bound thereby.

Section 8.5.    Reference in Notes to Supplemental Indentures.

Notes authenticated and delivered after the execution of any supplemental pursuant to this Article VIII may, and if required by the Trustee shall, bear a notation in form approved by the Trustee as to any matter provided for in such supplemental indenture. If the Issuer shall so determine, new Notes, so modified as to conform in the opinion of the Trustee and the Issuer to any such supplemental indenture, may be prepared and executed by the Issuer and authenticated and delivered by the Trustee in exchange for Outstanding Notes.

## ARTICLE IX

### REDEMPTION; TERMINATION OF TRUST

Section 9.1. <u>Optional Redemption.</u> On the Optional Redemption Date, which date shall be considered the Final Maturity Date in the case of a Total Optional Redemption, subject to satisfaction of certain conditions described herein, the Notes will be redeemed, in whole or in part, by the Co-Issuers or the Issuer, as applicable, in accordance with the priority of distributions described herein, if such redemption is directed by the holders of Preferred Shares in the amounts described below.

(a) In the case of a Total Optional Redemption:

(i) the Holders of at least 75% of the outstanding Preferred Shares eligible to vote direct the Co-Issuer or the Issuer to redeem the Notes; *provided* that any Preferred Shares beneficially owned or controlled by the Servicer, entities affiliated with the Servicer Entities in excess of the Original HFP Share Amount, shall be excluded from, and be deemed ineligible to participate in, any such vote to direct any Total Optional Redemption;

(ii) sufficient liquidation proceeds from the Portfolio Collateral must exist to effect the redemption of all Notes in full at their Redemption Price in accordance with the priority of distributions described herein; and

(b) in the case of a Partial Optional Redemption:

(i) the Holders of at least 10% of the outstanding Preferred Shares eligible to vote direct the Co-Issuer or the Issuer to redeem the Notes in part; *provided* that any Preferred Shares beneficially owned or controlled by the Servicer Entities, including any HFP Shares, shall be excluded from, and be deemed ineligible to participate in, any such vote to direct any Partial Optional Redemption;

(ii) the Holders of Preferred Shares directing such Partial Optional Redemption shall specify the Partial Redemption Percentage; *provided* that the Partial Redemption Percentage must be the percentage equivalent to at least 10% of the aggregate outstanding principal amount of the Notes as of the Closing Date; and

(iii) the following conditions must be satisfied:

(1) the Partial Redemption Percentage of the Notes must be redeemed *pro rata* at their respective Optional Redemption Price,

(2) the Collateral Quality Matrix tests, Overcollateralization Tests, Interest Coverage Tests and any other eligibility criteria with respect to the Portfolio Collateral must be satisfied before and after giving effect to such redemption; *provided* that the degree of compliance with the Moody's Weighted Average Rating Test and the Weighted Average Margin Test shall not be diminished after giving effect to such redemption,

008616

(3) any applicable Default Swaps of the Issuer must be modified or terminated in a manner consistent with the economic effect of such redemption and in consideration of the Portfolio Collateral and Eligible Investments that will be owned by the Issuer after giving effect to such redemption, and any net termination payments payable by the Issuer must be paid,

(4) the Rating Condition must be satisfied with respect to each Rating Agency,

(5) not more than three (3) prior Partial Optional Redemptions may have occurred, and

(6) no claims may be pending against the Issuer or the Co-Issuer and no judgments may have been rendered against the Issuer or the Co-Issuer which exceed, or reasonably could be expected to result in liabilities that exceed, in the aggregate, $100,000, unless adequate funds have been reserved or set aside for the payment thereof.

In connection with any Optional Redemption, the Issuer may use all funds credited to the Collection Account to provide for payment of the Optional Redemption Price. If there are not sufficient funds in the Collection Account as of the date the notice of redemption is given to pay the Optional Redemption Price on the Optional Redemption Date and all such payments, fees and expenses (including any termination payments with respect to any Synthetic Securities and any Default Swaps), the Servicer is required to give the Trustee written direction to sell Portfolio Collateral in an amount sufficient to provide funds to pay the Optional Redemption Price in full. The Trustee will give notice of an Optional Redemption to the Company Announcements Office of the Irish Stock Exchange if any Class of Notes is then listed on the Irish Stock Exchange.

The Servicer shall have the right to purchase the Preferred Shares held by any Holder that directs the Issuer to effect a Partial Optional Redemption at a price equal to the liquidation value of such Preferred Shares.

(c) The election of the Issuer to redeem any Notes pursuant to this Section 9.1 shall be set forth in an Issuer Order, given to the Trustee in accordance with Section 9.5 hereof, directing the Trustee to make the payment of the Optional Redemption Price for all the Notes, from funds in the Collection Account and/or from monies deposited with the Trustee by the Issuer pursuant to Section 9.8 hereof.

(d) The Issuer shall, simultaneously with electing to redeem Notes under this Section 9.1, set the Optional Redemption Date and the Redemption Record Date for any redemption pursuant to this Section and give notice thereof to the Trustee pursuant to Section 9.6 hereof.

(e) The Issuer shall have the option to withdraw the notice of redemption until the earlier of the fifth Business Day prior to the proposed Optional Redemption Date and the date on which a forward purchase contract is entered into pursuant to Section 9.8 by written notice to the Trustee and the Servicer on or prior to such earlier day.

(f) On the Optional Redemption Date, the Optional Redemption Price shall be distributed pursuant to Section 11.1(d) after payment of all amounts required to be paid pursuant to Section 11.1(b).

Section 9.2.    Mandatory Redemption.

If either the Interest Coverage Test or the Overcollateralization Tests are not satisfied as of any applicable Calculation Date or a Rating Confirmation Failure occurs, all or a portion of the Notes shall be redeemed (or, in the case of the Class A-3L Notes, the Class A-4L Notes and the Class B-1L Notes, any Periodic Rate Shortfall Amounts shall be paid and then the Notes shall be redeemed) by the Issuer, in the order set forth in Section 11.1 hereof, on the Payment Date immediately following such Calculation Date at the Mandatory Redemption Price (pursuant to the applicable provisions of Sections 11.1 and 11.2 hereof) in an amount sufficient such that the Interest Coverage Test and Overcollateralization Tests are satisfied or a Rating Confirmation is received, as applicable. The amount of any Mandatory Redemption hereunder shall be determined in accordance with the provisions of Section 11.2 hereof.

Section 9.3.    Additional Collateral Deposit Requirement.

On each Payment Date after the second Payment Date, the Additional Collateral Deposit Requirement shall be applied by the Issuer in the order set forth in Section 11.1 hereof.

Section 9.4.    Special Redemption; Amendment Buy-Out

(a) The Notes (other than Class X) shall be redeemable in part on any Payment Date during the Revolving Period at the option of the Issuer, as directed by and at the discretion of the Servicer, to the extent more than U.S. $2,000,000 of Collateral Principal Collections held in the Collection Account are not applied to the purchase of Additional Portfolio Collateral satisfying the criteria contained in Section 11.3 hereof by the earlier of the last day of the next succeeding Due Period or the last day of the Revolving Period, in the order and priority set forth in Section 11.1 hereof.

(b) In the case of any supplemental indenture pursuant to Section 8.2 that requires the consent of one or more Holders of Notes or Preferred Shares, the Amendment Buy-Out Purchaser shall have the right, but not the obligation, to purchase from Non-Consenting Holders all Notes (other than the Class A-1LA Notes) or Preferred Shares held by such Holders of the Class of Notes or Preferred Shares whose consent was solicited with respect to such supplemental indenture (the "Amendment Buy-Out Option") for the applicable Amendment Buy-Out Purchase Price; *provided, however*, that the Amendment Buy-Out Purchaser may not exercise the Amendment Buy-Out Option during the Non-Call Period in connection with a proposed amendment to reduce the rate of interest on any Security, as applicable, or to change the earliest date on which Notes of any Class or Preferred Shares may be redeemed at the option of the Issuer; *provided further*, that notwithstanding the definition of Non-Consenting Holder, any Holder of Notes (other than the Class A-1LA Notes) or Preferred Shares who fails to respond to any such consent solicitation shall be deemed to have consented to any such supplemental indenture. Notwithstanding the foregoing, during the Non-Call Period, "Non-Consenting Holder" shall exclude any Holder of Class A-1LA Notes (unless such Holder has

008618

consented in writing to be designated as a Non-Consenting Holder) and the Amendment Buy-Out Option shall not be applicable to such Class A-1LA Notes. If the Amendment Buy-Out Option is exercised, the Amendment Buy-Out Purchaser must purchase all such Notes or Preferred Shares of Non-Consenting Holders, regardless of the applicable percentage of the Aggregate Outstanding Amount of the Notes or Preferred Shares the consent of whose Holders is required for such supplemental indenture (an ″Amendment Buy-Out″). By its acceptance of its Securities or Preferred Shares hereunder, each Holder of Notes or Preferred Shares agrees that if the Amendment Buy-Out Option is exercised, any Non-Consenting Holder will be required to sell its applicable Notes or Preferred Shares to the Amendment Buy-Out Purchaser. For the avoidance of doubt, nothing described above shall in any way limit or restrict the rights of Holders of the Class A-1LA Notes to consent or withhold their consent to a supplemental indenture or otherwise vote their interest both during and after the Non-Call Period. Neither the Amendment Buy-Out Purchaser nor any other Person shall have any liability to any Holder or Beneficial Owner of Securities or Preferred Shares as a result of an election by the Amendment Buy-Out Purchaser not to exercise the Amendment Buy-Out Option. For the avoidance of doubt, (i) nothing described above or in the Indenture shall in any way limit or restrict the rights of the Holders of the Class A-1LA Notes to consent or withhold their consent to a supplemental indenture or to otherwise vote their interest both during and after the Non-Call Period and (ii) the Trustee shall have no responsibility for overseeing the Servicer's compliance with the Amendment Buy-Out provisions herein.

(c) All purchases made pursuant to an Amendment Buy-Out Option individually and in the aggregate must comply with the applicable transfer restrictions for the relevant Securities or Preferred Shares set forth herein and all applicable laws, rules and regulations (including, without limitation, any rules, regulations and procedures of any securities exchange, self-regulatory organization or clearing agency).

Section 9.5. Tax Event Redemption.

(a) The Notes shall be redeemable, in whole but not in part, by the Issuer at the direction of 66-2/3% of the Preferred Shares or a majority of the Controlling Class (but only if the Aggregate Principal Balance of Portfolio Collateral is less than 100% of the Class A-1L Notes) on any Payment Date at the Tax Event Redemption Price, if as a result of (i) change in tax law, rule or regulation or the interpretation thereof, the payments to be received on the Portfolio Collateral are reduced as a result of the imposition of withholding tax, (ii) the Issuer is otherwise subjected to tax such that the income of the Issuer is reduced in an amount determined by such holders of Preferred Shares to be material, (iii) (A) one or more items of Portfolio Collateral that were not subject to withholding tax when the Issuer committed to purchase them have become subject to withholding tax or the rate of withholding has increased on one or more items of Portfolio Collateral that were subject to withholding tax when the Issuer committed to purchase them and (B) in any Due Period the aggregate of the payments subject to withholding tax on new withholding tax obligations and the increase in payments subject to withholding tax on increased rate withholding tax obligations, in each case to the extent not "grossed-up" (on an after-tax basis) by the related obligor, represent 5% or more of Interest Proceeds for the Due Period, or (iv) taxes, fees, assessments or other similar charges are imposed on the Issuer or the Co-Issuer in an aggregate amount in any 12-month period in excess of $2,000,000, other than liabilities for withholding taxes included in clause (iii) above. No redemption pursuant to this Section 9.5

008619

shall occur unless all Outstanding Notes are redeemed and unless all payments, fees and expenses are paid in full on the date of such redemption.

(b) The election of the Issuer to redeem any Notes pursuant to this Section 9.5 shall be set forth in an Issuer Order, given to the Trustee in accordance with Section 9.6 hereof, directing the Trustee to make the payment of the Tax Event Redemption Price from funds in the Collection Account and/or from monies deposited with the Trustee by the Issuer pursuant to Section 9.8 hereof.

(c) The Issuer shall, simultaneously with electing to redeem Notes under this Section 9.5, set the Tax Event Redemption Date and the Redemption Record Date for any redemption pursuant to this Section 9.5 and give notice thereof to the Trustee pursuant to Section 9.6 hereof.

(d) The Issuer shall have the option to withdraw the notice of redemption until the earlier of the fifth Business Day prior to the proposed Tax Event Redemption Date and the date on which a forward purchase contract is entered into pursuant to Section 9.8(b) hereof by written notice to the Trustee and the Servicer on or prior to such earlier day.

(e) On the Tax Redemption Date, the Tax Event Redemption Price shall be distributed pursuant to Section 11.1(d) hereof after payment of all amounts required to be paid pursuant to Section 11.1(b) hereof.

Section 9.6.    Notice to Trustee, Rating Agencies and the Servicer.

(a) The Issuer shall by Issuer Order, in connection with an Optional Redemption pursuant to Section 9.1 or a Tax Event Redemption pursuant to Section 9.5, not later than the twentieth Business Day immediately preceding the proposed Optional Redemption Date or Tax Event Redemption Date, as applicable, notify in writing the Trustee, each Rating Agency then rating any Class of Notes and the Servicer of such proposed Optional Redemption Date or Tax Event Redemption Date, as applicable, and the proposed Redemption Record Date and Optional Redemption Price for each Class of Notes.

(b) If any Mandatory Redemption is required pursuant to Section 9.2 hereof, the Issuer shall, not later than the third Business Day after the related Calculation Date, notify in writing the Trustee, each Rating Agency then rating any Class of Notes, the Servicer and, so long as any Class of Notes is listed on the Irish Stock Exchange, the Irish Paying Agent that such redemption is required and the amount of the Notes of each Class required to be redeemed pursuant to the provisions of Section 11.2 hereof.

(c) If any Special Redemption is required pursuant to Section 9.4 hereof, the Issuer shall, not later than twentieth Business Day preceding the proposed Special Redemption Date, notify in writing the Trustee, each Rating Agency then rating any Class of Notes, the Servicer and, so long as any Class of Notes is listed on the Irish Stock Exchange, the Irish Paying Agent that such proposed redemption is required and the amount of the Notes of each Class to be redeemed.

Section 9.7.    Notice of Optional Redemption and Tax Event Redemption by the Issuer.

(a) If notice thereof has been received by the Trustee from the Issuer pursuant to Section 9.6 hereof, notice of an Optional Redemption shall be given by the Trustee by first-class mail, postage prepaid, mailed not less than twenty calendar days prior to the proposed Redemption Record Date, to each Holder of Notes to be redeemed at the address in the Note Register (with a copy to the Rating Agencies at the addresses specified in Section 10.7 hereof), and, so long as any Class of Notes is listed on the Irish Stock Exchange, the Irish Paying Agent.

All notices of Optional Redemption shall state:    the proposed Optional Redemption Date; the proposed Redemption Record Date; and that on such proposed Optional Redemption Date, all Outstanding Notes are to be redeemed and paid in full and that applicable interest thereon shall cease to accrue on the date specified in the notice and the place where such Notes may be surrendered for payment of the Optional Redemption Price, which shall be the agency of the Trustee to be maintained as provided in Section 7.2 hereof; and that the Issuer may withdraw such election at any time on or prior to the earlier of the Business Day prior to such proposed Optional Redemption Date and the date before which a forward purchase contract is entered into pursuant to Section 9.8(a) hereof.

At the cost of the Issuer, the Trustee shall give notice of any withdrawal of the notice of redemption pursuant to Section 9.1(d) hereof (to the extent feasible) by overnight courier guaranteeing next day delivery, sent not later than the third Business Day prior to the previously proposed Optional Redemption Date, to each Holder of Notes to be redeemed at the address in the Note Register, and, so long as any Class of Notes is listed on the Irish Stock Exchange, the Irish Paying Agent.

Notice of Optional Redemption of the Notes shall be given by the Issuer or, at the Issuer's request, by the Trustee in the name of the Issuer and at the expense of the Issuer.  Failure to give notice of redemption or notice of withdrawal, or any defect therein, to any Holder of any Note shall not impair or affect the validity of the redemption of the Notes or give rise to any claim based upon such failure or defect.

(b) If notice thereof has been received by the Trustee from the Issuer pursuant to Section 9.6 hereof, notice of a Tax Event Redemption shall be given by the Trustee by first-class mail, postage prepaid, mailed not less than twenty calendar days prior to the proposed Redemption Record Date, to each Holder of Notes to be redeemed at the address in the Note Register (with a copy to the Rating Agencies at the addresses specified in Section 10.7 hereof), and, so long as any Class of Notes is listed on the Irish Stock Exchange, the Irish Paying Agent.

All notices of a Tax Event Redemption shall state: the proposed Tax Event Redemption Date; the proposed Redemption Record Date; and that on such proposed Tax Event Redemption Date, all of the Notes (to the extent of the Aggregate Principal Amount) are to be redeemed and paid in full and that interest thereon shall cease to accrue on the date specified in the notice and the place where such Notes may be surrendered for payment of the Tax Event Redemption Price, which shall be the agency of the Trustee to be maintained as provided in Section 7.2 hereof; and that the Issuer may withdraw such election at any time on or prior to the

earlier of the fifth Business Day prior to such proposed Tax Event Redemption Date and the date before which a forward purchase contract is entered into pursuant to Section 9.8(b) hereof.

At the cost of the Issuer, the Trustee shall give notice of any withdrawal of the notice of redemption pursuant to Section 9.5 hereof (to the extent feasible) by overnight courier guaranteeing next day delivery, sent not later than the third Business Day prior to the previously proposed Tax Event Redemption Date, to each Holder of Notes to be redeemed at the address in the Note Register (with a copy to the Rating Agencies at the addresses specified in Section 10.7 hereof), and, so long as any Class of Notes is listed on the Irish Stock Exchange, the Irish Paying Agent.

Notice of Tax Event Redemption of the Notes shall be given by the Issuer or, at the Issuer's request, by the Trustee in the name of the Issuer and at the expense of the Issuer. Failure to give notice of redemption or notice of withdrawal, or any defect therein, to any Holder of any Note shall not impair or affect the validity of the redemption of the Notes or the withdrawal thereof or give rise to any claim based upon such failure or defect.

Section 9.8.    Deposit of Optional Redemption Price and Tax Event Redemption Price.

(a) In the case of an Optional Redemption, on or before the fifth Business Day preceding the proposed Optional Redemption Date contained in the notice of redemption as provided in Section 9.6 hereof, the Issuer shall deposit with the Trustee cash or Eligible Investments maturing no later than the Business Day prior to the Optional Redemption Date (unless such Eligible Investments are issued by the Person acting as Trustee, in which event they may mature on the Optional Redemption Date), or any combination thereof, in an amount sufficient to provide for payment of the Optional Redemption Price with respect to the Outstanding Notes and all amounts due under Sections 11.1(b) and 11.1(d) hereof. The Issuer may use all available funds in the Collection Account to provide for payment of the Optional Redemption Price in accordance with Section 11.1 hereof. In the event that there are not sufficient available funds in the Collection Account as of the date the notice of redemption is sent out pursuant to Section 9.6 hereof to pay the Optional Redemption Price on the Optional Redemption Date in accordance with Sections 11.1(b) and 11.1(d) hereof, the Servicer shall give the Trustee written direction to sell Portfolio Collateral in an amount sufficient to provide available funds to pay the Optional Redemption Price in full pursuant to Sections 11.1(b) and 11.1(d) hereof, and shall give the Issuer written direction to enter into, as of a date which is not later than five (5) Business Days prior to the Optional Redemption Date, forward contracts (each of which shall provide for "payment versus delivery" and shall direct that payment be made to the Trustee) with a financial institution rated "A-1+" by Standard & Poor's and "P-1" by Moody's to sell such Portfolio Collateral for settlement at least three Business Days prior to the Optional Redemption Date, and shall provide a copy of such contract to the Trustee prior to such Business Day preceding such redemption date; and pursuant to such instruction, the Trustee shall release and sell such Portfolio Collateral for purposes of such redemption. In determining whether the proceeds of any Optional Redemption will be sufficient to pay the Optional Redemption Price on the Optional Redemption Date, the Issuer and the Trustee may rely on the Market Value of the Portfolio Collateral when entering into any forward purchase agreements.

(b) In the case of a Tax Event Redemption, on or before the fifth Business Day preceding the proposed Tax Event Redemption Date contained in the notice of redemption as provided in Section 9.6 hereof, the Issuer shall deposit with the Trustee cash or Eligible Investments maturing no later than the Business Day prior to the Tax Event Redemption Date (unless such Eligible Investments are issued by the Person acting as Trustee, in which event they may mature on the Tax Event Redemption Date), or any combination thereof, in an amount sufficient to provide for payment of the Tax Event Redemption Price with respect to the Outstanding Notes and all amounts due under Sections 11.1(b) and 11.1(d) hereof. The Issuer may use all available funds in the Collection Account to provide for payment of the Tax Event Redemption Price in accordance with Section 11.1 hereof. In the event that there are not sufficient available funds in the Collection Account as of the date the notice of redemption is sent out pursuant to Section 9.6 hereof to pay the Tax Event Redemption Price on the Tax Event Redemption Date in accordance with Sections 11.1(b) and 11.1(d) hereof, the Servicer shall give the Trustee written direction to sell Portfolio Collateral in an amount sufficient to provide available funds to pay the Tax Event Redemption Price in full pursuant to Sections 11.1(b) and 11.1(d) hereof, and shall give the Issuer written direction to enter into, as of a date which is not later than five Business Days prior to the Tax Event Redemption Date, forward contracts (each of which shall provide for "payment versus delivery" and shall direct that payment be made to the Trustee) with a financial institution rated "A-1+" by Standard & Poor's and "P-1" by Moody's to sell such Portfolio Collateral for settlement at least three Business Days prior to the Tax Event Redemption Date, and shall provide a copy of such contract to the Trustee prior to such third Business Day preceding such redemption date; and pursuant to such instruction, the Trustee shall release and sell such Portfolio Collateral for purposes of such redemption.

Section 9.9.    Notes Payable on Optional Redemption Date.

In the event that notice of Optional Redemption pursuant to Section 9.1 hereof has been given as provided in Section 9.6 hereof and not withdrawn, all Outstanding Notes shall on the Optional Redemption Date become due and payable at the Optional Redemption Price, and (unless the Issuer shall default in the payment of the Optional Redemption Price) all Outstanding Notes shall cease to bear interest on the Optional Redemption Date. Each Holder shall present and surrender its Note at the place specified in the notice of Optional Redemption on or prior to such Optional Redemption Date; *provided that* if there is delivered to the Issuer and the Trustee such security or indemnity as may be required by them to save each of them harmless (an unsecured indemnity agreement of an Institutional Investor organized under the laws of the United States or any state in the United States with a net worth at least twice the amount of the security or indemnity being deemed sufficient to satisfy such security or indemnity requirement) and an undertaking thereafter to surrender such Note, then, in the absence of notice to the Issuer or the Trustee that the applicable Note has been acquired by a protected purchaser, such payment shall be made without presentation or surrender.

If any Note called for redemption shall not be so paid upon surrender thereof for Optional Redemption (or the delivery of the indemnity pursuant to the preceding paragraph), the principal shall, until paid, bear interest from the Optional Redemption Date at the Applicable Periodic Rate.

008623

Section 9.10.    Notes Payable on Mandatory Redemption Date.

In the event of a Mandatory Redemption pursuant to Section 9.2 hereof, principal of the Notes (or, in the case of the Class A-3L Notes, Class A-4L Notes and the Class B-1L Notes, any Periodic Rate Shortfall Amount and then any principal) in an amount determined pursuant to Section 11.2 hereof shall on the Mandatory Redemption Date become due and payable, and (unless the Issuer shall default in the payment of the Mandatory Redemption Price) such amounts shall cease to bear interest on the Mandatory Redemption Date.

Section 9.11.    Notes Payable on Tax Event Redemption.

In the event that notice of a Tax Event Redemption pursuant to Section 9.5 hereof has been given as provided in Section 9.6 hereof and not withdrawn, all Outstanding Notes shall on the Tax Event Redemption Date become due and payable at the Tax Event Redemption Price, and (unless the Issuer shall default in the payment of the Tax Event Redemption Price) all Outstanding Notes shall cease to bear interest on the Tax Event Redemption Date.  Each Holder shall present and surrender its Note at the place specified in the notice of redemption on or prior to such Tax Event Redemption Date; *provided that* if there is delivered to the Issuer and the Trustee such security or indemnity as may be required by them to save each of them harmless (an unsecured indemnity agreement of an Institutional Investor organized under the laws of the United States or any state in the United States with a net worth at least twice the amount of the security or indemnity being deemed sufficient to satisfy such security or indemnity requirement) and an undertaking thereafter to surrender such Note, then, in the absence of notice to the Issuer or the Trustee that the applicable Note has been acquired by a bona fide purchaser, such payment shall be made without presentation or surrender.

If any Note called for a Tax Event Redemption shall not be so paid upon surrender thereof for a Tax Event Redemption (or the delivery of the indemnity pursuant to the preceding paragraph), the principal shall, until paid, bear interest from the Tax Event Redemption Date at the Applicable Periodic Rate.

Section 9.12.    Initial Deposit Redemption.

The Class A-1LA Notes and the Class X Notes shall be subject to Initial Deposit Redemption pursuant to the terms of Section 3.3 hereof.

Section 9.13.    Reserved.

Section 9.14.    Notes Payable on Special Redemption Date.

In the event of a Special Redemption pursuant to Section 9.4 hereof, principal of the Notes (or, in the case of the Class A-3L Notes, the Class A-4L Notes and the Class B-1L Notes, any Periodic Rate Shortfall Amount and then any principal) in an amount determined pursuant to Section 11.1 hereof shall on the Special Redemption Date become due and payable and (unless the Issuer shall default in the payment of the Special Redemption Price) such amounts shall cease to bear interest on the Special Redemption Date.

008624

ARTICLE X

ACCOUNTS, ACCOUNTINGS AND RELEASES

Section 10.1.  Collection of Money.

Except as otherwise expressly provided herein, the Trustee may demand payment or delivery of, and shall receive and collect, directly and without intervention or assistance of any fiscal agent or other intermediary, all money and other property payable to or receivable by the Trustee pursuant to this Indenture, including all payments due on the Pledged Securities included in the Trust Estate, in accordance with the terms and conditions of such Pledged Securities.  The Trustee shall segregate and hold all such money and property received by it in trust for the Holders of the Notes and shall apply it as provided in this Indenture.

Section 10.2.  Accounts.

(a) The Trustee shall, on or prior to the Closing Date, establish ten non-interest bearing segregated trust accounts (collectively, the "Accounts") which shall be designated as the "Collection Account," the "Collateral Account," the "Reserve Account," the "Initial Deposit Account," the "Expense Reimbursement Account," the "Loan Funding Account," the "Closing Expense Account," the "Securities Lending Account," the "Default Swap Collateral Account," and the "Default Swap Issuer Account," respectively, identified as held in trust for the benefit of the Noteholders and the applicable Secured Parties or, in the case of the Default Swap Collateral Account, as held in trust for the benefit of the related Default Swap Counterparty and, to the extent provided in this Indenture, the other Secured Parties. The Trustee may establish any number of sub-accounts to the Collection Account for its convenience in administering the Accounts and Trust Estate.

Each Account (including any sub account) shall be a securities account established with the Securities Intermediary in the name of the Trustee in accordance with Section 6.15.

A Default Swap Collateral Account shall be established for each Default Swap. The Trustee shall credit to each such Default Swap Collateral Account on the Closing Date or on the date any such Default Swap is entered into, as applicable, the amount required to secure the obligations of the Issuer in accordance with the terms of the related Default Swap, as directed by the Servicer, which amount shall be at least equal to the amount referred to in paragraph (iv) of the definition of Default Swap.

Amounts credited to a Default Swap Collateral Account shall be maintained in accordance with the terms and provisions of the related Default Swap.  Amounts and property credited to a Default Swap Collateral Account shall be withdrawn by the Trustee and applied to the payment of any amounts payable by, or to the delivery of investment property deliverable by, the Issuer to the related Default Swap Counterparty, as directed by the Servicer, in accordance with the terms of such Default Swap.  Income received on amounts credited to a Default Swap Collateral Account will be applied in accordance with the terms of the applicable Default Swap to the payment of any periodic amounts owed by the Issuer to the applicable Default Swap

008625

Counterparty on the date such amounts are due. After application of such amounts, any income then contained in such Default Swap Collateral Account will be withdrawn from such Account and credited to the Collection Account for distribution as Collateral Interest Collections. After payment of all amounts owing by the Issuer to a Default Swap Counterparty in accordance with the terms of the related Default Swap (other than any Default Swap Counterparty Termination Payment) the Trustee shall be directed by the Servicer to withdraw all funds and other property credited to the Default Swap Collateral Account related to such Default Swap and credit such funds and other property to the Collection Account, as Collateral Principal Collections (in the case of cash and Eligible Investments) and the Collateral Account (in the case of Portfolio Collateral and other financial assets) for application as Collateral Principal Collections (other than any income thereon which will be Collateral Interest Collections) in accordance with the terms of the Indenture. Any Default Swap Counterparty Termination Payments owed by the Issuer to the Default Swap Counterparty shall be paid solely from amounts available therefor under the priority of payment provisions described herein.

Except for interest on securities credited to a Default Swap Collateral Account payable to the Issuer as described pursuant to the preceding paragraph, funds and other property standing to the credit of a Default Swap Collateral Account will not be considered to be an asset of the Issuer for purposes of the Interest Coverage Test or the Overcollateralization Tests; *provided, however that* the Default Swap that relates to such Default Swap Collateral Account will be considered an asset of the Issuer for such purposes.

If the terms of any Default Swap require the Default Swap Counterparty to secure its obligations with respect to such Default Swap, the Trustee will cause to be established a Default Swap Issuer Account in respect of such Default Swap. The Trustee shall credit to any such Default Swap Issuer Account all funds and other property received from the applicable Default Swap Counterparty to secure the obligations of such Default Swap Counterparty in accordance with the terms of such Default Swap.

Funds and other property standing to the credit of any Default Swap Issuer Account will not be considered to be an asset of the Issuer for purposes of the Interest Coverage Test or the Overcollateralization Tests; *provided, however that* the Default Swap that relates to such Default Swap Issuer Account will be considered an asset of the Issuer for such purposes.

In accordance with the terms of the applicable Default Swap, funds and other property standing to the credit of the related Default Swap Issuer Account will be withdrawn by the Trustee, as directed by the Servicer, and applied to the payment of any amount owing by the related Default Swap Counterparty to the Issuer. After payment of all amounts owing by the Default Swap Counterparty to the Issuer in accordance with the terms of the related Default Swap, all funds and other property standing to the credit of the related Default Swap Issuer Account will be withdrawn from such Default Swap Issuer Account and paid or transferred to the related Default Swap Counterparty in accordance with the applicable Default Swap.

The Collection Account shall be a segregated trust account (or, at the Trustee's option, may be comprised of two separate, segregated trust accounts, designated for the collection of Collateral Interest Collections and Collateral Principal Collections, respectively), to which money required to be credited to the Collection Account (and Eligible Investments in

which such money may be held from time to time, which Eligible Investments shall be acquired and held pursuant to the terms of Section 6.16 hereof) shall be credited.

All Portfolio Collateral Delivered to the Trustee shall be credited to the Collateral Account.

On or before the date on which the Issuer enters into a Securities Lending Agreement and delivers a copy of it to the Trustee, the Trustee shall create a segregated trust account designated as the Securities Lending Account with respect to any such Securities Lending Agreement. All Securities Lending Collateral posted by any Securities Lending Counterparty in support of its respective obligation under a Securities Lending Agreement shall be immediately credited to the Securities Lending Account and posted to a sub-account related to the Securities Lending Account. The only permitted withdrawal from or application of funds credited to the Securities Lending Account shall be: (i) for application to obligations of the relevant Securities Lending Counterparty to the Issuer under a Securities Lending Agreement if the Securities Lending Agreement becomes subject to early termination or in the exercise of remedies under the related Securities Lending Agreement upon any "event of default" under and as defined in the related Securities Lending Agreement, including liquidating the related Securities Lending Collateral, or (ii) to return the Securities Lending Collateral to the relevant Securities Lending Counterparty when and as required by the relevant Securities Lending Agreement, in each case as directed by the Servicer.

Amounts credited to the Securities Lending Account shall be applied pursuant to this Section 10.2. To the extent provided in a Securities Lending Agreement, earnings on amounts credited to the Securities Lending Account shall be payable by the Issuer to the related Securities Lending Counterparty.

Amounts credited to the Securities Lending Account shall not be considered an asset of the Issuer for the purposes of the Coverage Tests, but the loaned security or asset that relates to the Securities Lending Account shall be so considered an asset of the Issuer.

The Trustee shall credit to the Collection Account (i) all Collections and (ii) all amounts required to be credited thereto pursuant to this Indenture, including but not limited to, Section 10.3(e)(i) hereof.

The Trustee shall credit to the Initial Deposit Account (i) the Deposit received on the Closing Date for credit to the Initial Deposit Account pursuant to Section 3.2(e) hereof, (ii) all amounts required to be credited thereto pursuant to this Indenture, including but not limited to, Sections 3.2(e), 10.3(e)(ii) and 11.3 hereof and (iii) all proceeds received with respect to the sale of the Post-Closing Sale Collateral, notwithstanding anything to the contrary herein.

Upon the purchase of any item of Portfolio Collateral that is a Delayed Drawdown Loan or a Revolving Loan, the Trustee (as instructed by the Servicer) shall credit Collateral Principal Collections to the Loan Funding Account in an amount equal to the Issuer's maximum future funding obligations under the terms of such Delayed Drawdown Loan or a Revolving Loan and the Collateral Principal Collections so credited shall be considered part of the purchase price of such Delayed Drawdown Loan or Revolving Loan for purposes of Article

008627

XII hereof. When Collateral Principal Collections are received by the Trustee with respect to a Delayed Drawdown Loan or a Revolving Loan, the amount of such Collateral Principal Collections that may thereafter be re-borrowed under the terms of the Delayed Drawdown Loan or the Revolving Loan shall be credited to the Loan Funding Account.

The Trustee shall credit to the Expense Reimbursement Account (i) on the Closing Date the $50,000 received on the Closing Date for credit to the Expense Reimbursement Account pursuant to Section 3.2(f) hereof, (ii) all amounts required to be credited thereto from available amounts in the Collection Account pursuant to Section 11.1 hereof and (iii) all amounts required to be credited thereto pursuant to Section 10.3(e)(iii) hereof.

The Trustee shall credit to the Closing Expense Account on the Closing Date the amount specified pursuant to Section 3.2(f) hereof.

In addition, the Issuer may, but under no circumstances shall be required to, credit such monies to the Collection Account as it deems, in its sole discretion, to be advisable in the event that, but for such action, an Event of Default would occur.

All monies, instruments, investment property and other property credited to the Collection Account, the Initial Deposit Account, the Expense Reimbursement Account, the Loan Funding Account, the Closing Expense Account and the Reserve Account pursuant to this Indenture, and all Portfolio Collateral and other property credited to the Collateral Account, shall be held by the Trustee as part of the Trust Estate and shall be applied in the manner set forth herein.

The Trustee shall pay free and clear of the lien of the Indenture, upon receipt (or withdrawal from the Collection Account if previously credited thereto), all Retained Accrued Interest, as directed by Bear Stearns.

(b) Upon Servicer Order (which may be in the form of standing instructions) or, after the occurrence of an Event of Default upon written direction of the Requisite Noteholders, any portion of the monies in the Collection Account, the Initial Deposit Account, the Loan Funding Account, the Expense Reimbursement Account, Reserve Account and the Closing Expense Account in excess of $10,000 (in the aggregate) shall be applied by the Trustee as directed in such Servicer Order (or written direction of Requisite Noteholders, as the case may be) to purchase one or more Eligible Investments, *provided that* Eligible Investments in the Loan Funding Account are to mature no later than one Business Day after the date of such purchase. If the amount in such Accounts is equal to or less than $10,000, such amount shall remain on deposit therein and shall not be held in Eligible Investments. The Servicer and Issuer acknowledge that the selection of Eligible Investments by the Servicer pursuant to the preceding sentence shall be subject to the availability of such Eligible Investment at the depositary institution at which such Account is held. If, prior to the occurrence of an Event of Default, the Servicer shall not have given directions pursuant to this Section 10.2(b) with respect to any amounts in excess of $10,000 for one Business Day, the Trustee, unless otherwise directed by the Issuer within one Business Day, shall apply such monies to purchase Eligible Investments described in paragraph (b) of the definition of Eligible Investments (which, in the case of Eligible Investments in the Loan Funding Account, are to mature no later than one Business Day

008628

after the date of such purchase). If, after the occurrence of an Event of Default, the Requisite Noteholders shall not have given directions pursuant to this Section 10.2(b) with respect to any amounts in excess of $10,000 for one Business Day, the Trustee shall apply such moneys as fully as practicable to purchase Eligible Investments described in paragraph (b) of the definition of Eligible Investments and maturing not later than the earlier of (i) 30 days after the date of such purchase or (ii) the Business Day prior to the next Payment Date (or, in the case of Eligible Investments in the Initial Deposit Account, the Business Day prior to the Effective Date and in the case of Eligible Investments in the Loan Funding Account, one Business Day after the date of such purchase). All income or other gain from such Eligible Investments shall be credited to the Collection Account, the Initial Deposit Account, the Loan Funding Account, the Expense Reimbursement Account, the Reserve Account or the Closing Expense Account, as the case may be (for which the related purchase was made) and any loss resulting from such Eligible Investments shall be charged to the Collection Account, the Initial Deposit Account, the Loan Funding Account, the Expense Reimbursement Account, the Reserve Account or the Closing Expense Account, as the case may be (for which the related purchase was made). The Trustee shall not in any way be held liable by reason of any insufficiency in the Collection Account, the Initial Deposit Account, the Expense Reimbursement Account, the Loan Funding Account or the Closing Expense Account resulting from any loss on any Eligible Investment.

(c) Upon Servicer Order and subject to the provisions of Section 11.3 hereof, on any Business Day, the applicable portion of Collateral Interest Collections shall be released from the Collection Account as specified in such Servicer Order and applied by the Trustee in accordance with such Servicer Order in payment of one or more specified items of Additional Portfolio Collateral purchased in accordance with the provisions of Section 11.3 hereof.

(d) Upon Servicer Order and subject to the provisions of Section 11.3 hereof on any Business Day all or a portion of the Collateral Principal Collections (other than Collateral Disposition Proceeds) shall be released from the Collection Account as specified in such Servicer Order and applied by the Trustee in accordance with such Servicer Order in payment of one or more specified items of Additional Portfolio Collateral purchased in accordance with the provisions of Section 11.3 hereof.

(e) Upon Servicer Order and subject to the provisions of Section 12.4 hereof, on any Business Day all or a portion of the Collateral Disposition Proceeds shall be released from the Collection Account and applied by the Trustee in accordance with such Servicer Order in payment of one or more specified items of Substitute Portfolio Collateral purchased in accordance with the provisions of Section 12.4 hereof.

(f) Upon Servicer Order and subject to the requirements of Section 3.4 hereof, between the Closing Date and the close of business on the Effective Date only, all or a portion of the Deposit available in the Initial Deposit Account shall be released from the Initial Deposit Account and applied by the Trustee in accordance with such Servicer Order in payment for Original Portfolio Collateral purchased in accordance with Section 3.4 hereof. Upon Servicer Order, on the Effective Date and pursuant to Section 3.4(d), all Account Income credited to the Initial Deposit Account shall be released from the Initial Deposit Account and credited to the Collection Account to be applied as Collateral Interest Collections on the next Payment Date and the remainder of such funds shall be considered Collateral Principal Collections.

008629

(g) Upon Servicer Order on behalf of the Issuer, all or a portion of the funds available in the Expense Reimbursement Account shall be released from the Expense Reimbursement Account and applied by the Trustee to the payment to the Issuer for the purpose of paying on or prior to the next Payment Date following the date of delivery of such Servicer Order the Issuer Base Administrative Expenses, as specified therein, which are payable during the Due Period relating to such Payment Date.

(h) On or before the first Payment Date, any remaining portion of the Closing Expense Deposit after the closing expenses have been paid in full (including any Account Income thereon) shall be transferred (i) upon receipt by the Trustee of a Servicer Order to the Initial Deposit Account (and be deemed to be part of the Deposit) or, after the Effective Date, to the Collection Account to be applied as Collateral Interest Collections or (ii) if no such Servicer Order has been received on the Business Day prior to the second Payment Date, to the Collection Account to be applied as Collateral Interest Collections.

(i) Upon Servicer Order on behalf of the Issuer, all or a portion of the funds available in the Loan Funding Account shall be released from the Loan Funding Account and applied by the Trustee to fund amounts drawn under any Delayed Drawdown Loan or Revolving Loan and only funds in the Loan Funding Account shall be used for such purpose. In addition, upon Servicer Order on behalf of the Issuer, all or a portion of the funds available in the Loan Funding Account at any time in excess of the aggregate principal amount of commitments which may be drawn upon all Delayed Drawdown Loans and Revolving Loans in the Portfolio Collateral will be released from the Loan Funding Account and applied by the Trustee to the Collection Account to be applied as Collateral Principal Collections.

(j) On or before the Closing Date, the Trustee shall establish a single, segregated non-interest bearing trust account that shall be designated as the Reserve Account, that shall be held in trust in the name of the Trustee for the benefit of the applicable Secured Parties, and over which the Trustee shall have exclusive control and the sole right of withdrawal. On the Closing Date, the Trustee, at the direction of the Issuer, shall credit to the Reserve Account approximately U.S.$1,600,000 from the net proceeds of the Offering. Amounts credited to the Reserve Account shall be applied pursuant to subclause (b) of this Section 10.2.

Section 10.3. Custody and Release of Portfolio Collateral.

(a) The Issuer shall cause each item of the Trust Estate to be Delivered, and the Trustee shall hold each item of the Trust Estate as Delivered, separate and apart from all other property held by the Trustee. To the extent that such of the Trust Estate as constitutes a deposit account is maintained with JPMorgan Chase, JPMorgan Chase hereby makes the agreements required under the UCC in order for such deposit account to be Delivered. Notwithstanding any other provision of this Indenture, the Trustee shall not hold any part of the Trust Estate through an agent or nominee except as expressly permitted by this Section 10.3(a). Each of the preceding requirements of this Section 10.3(a) is subject to the right of the Trustee to relocate the Trust Estate to another jurisdiction pursuant to and upon compliance with Section 7.5(b) hereof.

(b) If no Event of Default has occurred and is continuing, the Servicer, by a Servicer Order delivered to the Trustee on or before the settlement date for any sale of an item of

Portfolio Collateral, certifying that (i) it has determined that such Portfolio Collateral has become an item of Credit Risk Portfolio Collateral, an item of Credit Improved Portfolio Collateral, an item of Defaulted Portfolio Collateral, an item of Equity Portfolio Collateral or an item of Portfolio Collateral to be sold pursuant to Section 12.1(d) hereof and, in each case, the sale of such Portfolio Collateral is in compliance with Section 12.1 hereof or (ii) based upon receipt of an Issuer Order, on or after the Payment Date occurring in June 2010, the Collections from the sale of such Portfolio Collateral shall be used to effect an Optional Redemption in accordance with Section 9.1 hereof or (iii) based on receipt of an Issuer Order, the Collections from the sale of such Portfolio Collateral shall be used to effect a Tax Event Redemption in accordance with Section 9.5 hereof or (iv) it has determined that such Portfolio Collateral has become subject to withholding or similar tax and its sale is in compliance with Section 12.1 hereof, may direct the Trustee to release from the lien of this Indenture and deliver the Portfolio Collateral specified in such Servicer Order and, upon receipt of such Servicer Order, the Trustee shall release such Portfolio Collateral from such lien and deliver such Portfolio Collateral in accordance with the Servicer Order, in each case against receipt of sale proceeds therefor.

(c) The Trustee on behalf of the Issuer shall notify the Servicer of any Portfolio Collateral that is being redeemed or paid in full. The Trustee, upon Servicer Order, shall release from the lien of this Indenture such Portfolio Collateral and shall deliver such Portfolio Collateral in accordance with the terms of the redemption or payment in full, in each case against receipt of the proceeds of the redemption price therefor or payment in full thereof.

(d) The Trustee on behalf of the Issuer shall notify the Servicer of any Portfolio Collateral that is subject to an Offer. If no Event of Default has occurred and is continuing and subject to the provisions of Article XII hereof, the Servicer shall, by Servicer Order delivered to the Trustee on or before the date set for an exchange, tender or sale of such Portfolio Collateral, set forth in reasonable detail the procedure for response to such Offer and direct the Trustee to release from the lien of this Indenture such Portfolio Collateral in accordance with the terms of the Offer in each case against receipt of payment therefor.

(e) (i)The Trustee shall credit all proceeds received by it from the disposition of Portfolio Collateral to the Collection Account unless simultaneously applied to purchase in Substitute Portfolio Collateral (as directed by the Servicer). The Trustee shall also credit to the Collection Account (A) all Account Income with respect to the Collection Account, (B) all proceeds received by it from the disposition of an Eligible Investment in the Collection Account, (C) any portion of the Deposit remaining in the Initial Deposit Account on the Effective Date if an Initial Deposit Redemption is not required on such date, which shall be deemed Collateral Principal Collections; *provided that*, at the direction of the Servicer, up to 25% of such remaining Deposit may be deemed to be Collateral Interest Collections, pursuant to Section 3.4(d) hereof, and (D) upon Servicer Order pursuant to Section 10.2(f) hereof, all Account Income in the Initial Deposit Account on the Effective Date.

(ii) The Trustee shall credit to the Initial Deposit Account all proceeds received by it from the disposition of an Eligible Investment in the Initial Deposit Account (subject, however, to the terms of Section 10.2(f) regarding the transfer of such Account Income to the Collection Account on the Effective Date).

008631

(iii) The Trustee shall credit to the Expense Reimbursement Account all Account Income with respect to the Expense Reimbursement Account and all proceeds received by it from the disposition of an Eligible Investment in the Expense Reimbursement Account.

(f) The Trustee shall, at such time as there are no Notes Outstanding and all obligations of the Issuer under or pursuant to this Indenture have been satisfied, upon receipt of written notice from the Servicer that all amounts owing to the Servicer have been paid, release the Trust Estate from the lien of this Indenture.

Section 10.4. Reports of Trustee.

Upon written request, the Trustee shall supply to the Issuer and the Servicer at least three (3) Business Days prior to the date required hereunder for delivery of each Note Valuation Report and each Monthly Report, all information that it has received hereunder with respect to the Pledged Securities which is reasonably required for the preparation of the Note Valuation Report and Monthly Report. The Trustee shall supply in a timely fashion to the Issuer, Bear Stearns and the Servicer any other information that the Issuer or the Servicer may reasonably request from time to time that is in the possession of the Trustee and required to be provided by Section 10.5 hereof. The Trustee shall promptly forward to the Issuer, Bear Stearns, and the Servicer copies of notices and other writings received by it from the issuer of any Pledged Security or from any clearing agency with respect to any Pledged Security advising the holders of such security of any rights that the holders might have with respect thereto (including, without limitation, notices of calls and redemptions) as well as all periodic financial reports received from such issuers and clearing agencies with respect to such issuers. Nothing in this Section 10.4 hereof shall be construed to impose upon the Trustee, in such capacity, any duty to prepare any report or statement which the Issuer is required to prepare or provide under Section 10.5 hereof or to calculate, recalculate or verify any information required to be set forth in any such report or statement (other than information regularly maintained by the Trustee by reason of its acting as Trustee hereunder) prepared or required to be prepared by the Issuer or the Servicer. Nothing herein shall be construed to obligate the Trustee to disclose any information concerning its business or its operations which it reasonably considers confidential in nature.

On the date each Monthly Report is delivered or two Business Days prior to the Payment Date if with respect to a Note Valuation Report delivered in a month in which such Payment Date occurs, the Issuer shall cause to be promptly delivered to Standard & Poor's the Standard & Poor's CDO Monitor input file in the Standard & Poor's Preferred Format (provided that the specific parameters identified by Standard & Poor's have been delivered to the Issuer and the Trustee prior to the Closing Date and are limited to the scope herein stated) containing the Current Portfolio as of the date of determination and used to determine the S&P Scenario Loss Rate and the Schedule of Portfolio Collateral to Moody's in electronic format. In addition, the Issuer may provide any such reports in electronic form on a password-protected internet site or such other electronic format as the Issuer deems desirable.

008632

Section 10.5.  Accountings.

(a) Monthly.  Not later than the (i) the first day of each month (or if such day is not a Business Day on the next succeeding Business Day) for months where no Payment Date occurs or (ii) the related Payment Date, for months in which a Payment Date occurs, commencing in July 2006, the Issuer shall compile and provide, or procure the provision, to the Trustee, the Paying and Transfer Agent, each Noteholder or Beneficial Owner (upon receipt by the Trustee of a certificate in the form of Exhibit H and to any Servicer of such Noteholder or Beneficial Owner to whom such Noteholder or Beneficial Owner has in writing directed the Trustee to send a copy of such report), Bear Stearns, the Servicer, the Repository and each Rating Agency (but only so long as any Class of Notes is rated) a monthly report (the "Monthly Report"), which shall contain the following information and instructions with respect to the Pledged Securities included in the Trust Estate, determined as of the seventh Business Day preceding either (i) the first day of such month (or if such day is not a Business Day on the next succeeding Business Day) or (ii) the Payment Date in months in which a Payment Date occurs (based in part on information provided by the Servicer):

(1)  the Aggregate Principal Amount of the Portfolio Collateral, the Principal Balance of each item of Portfolio Collateral, and the annual interest rate, maturity date, the designated seniority, and the LIN, or, with respect to Loan X Inc., the applicable ID (if either is used by the Servicer) or CUSIP Number of each item of Portfolio Collateral in the Trust Estate, as well as the rating by Standard & Poor's and the rating by Moody's (provided that any private confidential credit assessments, including estimated or shadow ratings, shall not be disclosed in any report issued and/or published to any party other than the Issuer, the Trustee and the Servicer) of such item of Portfolio Collateral determined according to the methods prescribed by Schedules D and F, respectively, and the Moody's corporate family rating, senior unsecured rating or long-term issuer rating, as applicable, the Moody's Default Probability Rating and the notch difference, if any, of each item of Portfolio Collateral;

(2)  the Balance of the Eligible Investments in the Collection Account, the annual interest rate, maturity date, Principal Balance and issuer of each Eligible Investment in the Trust Estate, as well as the rating by Standard & Poor's and the rating by Moody's of such Eligible Investment;

(3)  the nature, source and amount of any Collections in the Collection Account, including the Collateral Interest Collections and Collateral Principal Collections received since the date of determination of the last Monthly Report (or since the Closing Date, in the case of the first such report);

(4)  the amount and identity of each item of Portfolio Collateral that was released for sale indicating the reason for such sale; and the amount and identity of each item of Portfolio Collateral that was Granted, since the date of determination of the last Monthly Report (or since the Closing Date, in the case of the first such report);

(5)  the identity, principal amount of and Market Value (segregating the Market Value determinations made by the Serving Entities) of each item of Portfolio Collateral in the Trust Estate which is an item of Defaulted Portfolio Collateral and

008633

Deferred Interest PIK Bond and the identity and principal amount of each item of Portfolio Collateral that became an item of Defaulted Portfolio Collateral, Deferred Interest PIK Bond or Equity Portfolio Collateral since the date of determination of the last Monthly Report (or since the Closing Date, in the case of the first such report);

(6) the purchase price of each Pledged Security Granted and the purchase price and sale price of each Pledged Security subject to a sale since the date of determination of the last Monthly Report (or since the Closing Date, in the case of the first such report); whether such Pledged Security is Portfolio Collateral or an Eligible Investment in the Collection Account;

(7) (i) the identity, principal amount, Market Value, purchase price and percentage of the Aggregate Par Amount of each item of Portfolio Collateral included in the Trust Estate which is an item of Discount Portfolio Collateral, since the date of determination of the last Monthly Report (or since the Closing Date, in the case of the first such report) and (ii) the number of consecutive Business Days such item of Discount Portfolio Collateral has traded above (i) 90% of its Principal Balance with respect to Portfolio Loans and (ii) 85% of its Principal Balance with respect to Debt Securities;

(8) after the Effective Date, the calculation of the Class A Overcollateralization Ratio, the Class B-1L Overcollateralization Ratio and the Interest Coverage Ratio and the amount of any Additional Collateral Deposit Requirement and prior to the Effective Date and with respect to the Interest Coverage Ratio and the amount of any Additional Collateral Deposit Requirement, prior to the second Payment Date, listing such information as "not applicable" and with respect to the Interest Coverage Ratio, in months other than months in which a Payment Date occurs, calculated in accordance with the second paragraph of the definition of the Interest Coverage Ratio and listing such results but marking them as "not applicable";

(9) information with respect to the Portfolio Collateral Granted to the Trustee since the date of determination of the last Monthly Report (or since the Closing Date, in the case of the first such report) reasonably necessary to determine whether the eligibility criteria set forth in Section 12.2 were satisfied (at the time of such grant);

(10) the percentage of the Aggregate Par Amount comprised of non-U.S. Portfolio Collateral and the rating of the sovereign country in which the issuer of such non-U.S. Portfolio Collateral is domiciled;

(11) the identity of and the Market Value of each item of Portfolio Collateral which is a Current Pay Obligation and the percentage of the Aggregate par Amount comprised of Current Pay Obligations;

(12) the percentage of Portfolio Loans for which a Facility Rating has been withdrawn by Moody's due to a restructuring of such Portfolio Loan;

(13) the Weighted Average Life, the Moody's Weighted Average Rating (determined in accordance with the procedures set forth in Schedule F), the Weighted Average Coupon of the Fixed Rate Portfolio Collateral and the Weighted Average

008634

Margin of the Floating Rate Portfolio Collateral, the S&P Minimum Average Recovery Rate and the Moody's Minimum Average Recovery Rate of the Portfolio Collateral, the Moody's Correlation Factor of the Portfolio Collateral, the Aggregate Principal Amount and percentage of the Aggregate Par Amount of Portfolio Collateral which consists of DIP Loans, Delayed Drawdown Loans, Revolving Loans and which has a Moody's Rating or Standard & Poor's Rating of "Caa1" or below or "CCC+" or below, respectively, other than Defaulted Portfolio Collateral, and the Applicable Percentage of each item of Portfolio Collateral;

(14)     (a) the percentage of the Aggregate Par Amount consisting of obligations of issuers domiciled in a Group A Country, (b) the percentage of the Aggregate Par Amount consisting of obligations of issuers domiciled in a Group B Country and (c) the percentage of the Aggregate Par Amount consisting of obligations of issuers domiciled in any country other than the United States of America, a Group A Country or a Group B Country;

(15)     the percentage of the Aggregate Par Amount consisting of Synthetic Securities including the identity of the Synthetic Security Obligors and the Reference Obligation and their rating, and the percentage of the Aggregate Par Amount consisting of Strip Securities;

(16)     the Aggregate Principal Amount of the Portfolio Collateral and the percentage of the Aggregate Principal Amount of the Portfolio Collateral consisting of obligations maturing after August 1, 2021;

(17)     the par amount of all Portfolio Collateral included in the Trust Estate as of the Effective Date;

(18)     the results of the Standard & Poor's CDO Monitor determined in accordance with Schedule D hereto, whether the Standard & Poor's CDO Monitor Test is passed or failed and the S&P Break-Even Loss Rate and the S&P Scenario Loss Rate for each Class;

(19)     the Aggregate Principal Amount consisting of CLO Securities, including the Aggregate Principal Amount of each CLO Security with a Moody's Rating below "Baa3" or a Standard & Poor's Rating below "BBB-" and (b) the percentage of the Aggregate Par Amount of CLO Securities managed by any Servicer Entities; and

(20)     such other information as the Trustee or the Servicer may reasonably request.

Upon receipt of each Monthly Report, the Servicer shall compare the information contained therein and described in clauses (1) through (19) above to the information contained in its records with respect to the Collateral and shall, within three Business Days after receipt of each such Monthly Report, notify the Issuer, the Collateral Administrator (if different from the Trustee) and the Trustee in writing of any discrepancies between the information contained in the Monthly Report and the information maintained by the Servicer with respect to the Collateral. If any discrepancy exists, the Issuer and the Servicer shall attempt to resolve the discrepancy. If such discrepancy cannot be promptly resolved, the Trustee shall cause the Independent Accountants appointed by the Issuer pursuant to Section 10.6 hereof to review such Monthly

008635

Report and the Trustee's records to determine the cause of such discrepancy. If such review reveals an error in the Monthly Report or the Issuer's records, the Monthly Report or the Issuer's records shall be revised accordingly and, as so revised, shall be utilized in making all calculations pursuant to this Indenture. Each Rating Agency (in each case only so long as any Class of Notes is rated by it), Bear Stearns and the Servicer shall be notified in writing of any such revisions by the Trustee on behalf of the Issuer.

After the end of the Revolving Period, the Monthly Report shall also contain a statement to the effect that it is not unusual for the eligibility criteria set forth in Section 12.2 hereof not to be satisfied following the Revolving Period as the Portfolio Collateral matures or is otherwise disposed of and principal on the Notes is paid down.

Each of the Issuer, Bear Stearns and the Servicer acknowledges and agrees that each Monthly Report shall be forwarded to the Repository for posting in the manner provided by the Repository.

(b) <u>Payment Date Accounting</u>. With respect to each Calculation Date, the Issuer shall render or cause to be rendered an accounting (the "<u>Note Valuation Report</u>"), determined as of such Calculation Date, and delivered to the Trustee, the Paying and Transfer Agent, Bear Stearns, the Servicer, the Repository, the Collateral Administrator and each Rating Agency (but only so long as any Class of Notes is rated by it), not later than the Business Day prior to the Payment Date related to such Calculation Date. Upon receipt by the Trustee of a certificate in the form of Exhibit H, the Trustee shall make available the Note Valuation Report to the requesting Noteholder or Beneficial Owner. The Note Valuation Report shall contain the following information (based in part on information provided by the Servicer):

(1) The Aggregate Principal Amount of the Portfolio Collateral as of the close of business on such Calculation Date, after giving effect to Collateral Principal Collections received during the related Due Period and applied to purchase Additional Portfolio Collateral or Substitute Portfolio Collateral in accordance with the provisions of this Indenture, the sale or other disposition of each item of Portfolio Collateral during such Due Period and the Grant in favor of the Trustee of each item of Substitute Portfolio Collateral and Additional Portfolio Collateral during such Due Period.

(2) The Aggregate Principal Amount of the Class A-1LA Notes as of the Calculation Date and such Aggregate Principal Amount expressed as a percentage of the original Aggregate Principal Amount of the Class A-1LA Notes, and the amount of principal payments to be made on the Class A-1LA Notes on the Payment Date relating to such Calculation Date and the Aggregate Principal Amount of the Class A-1LA Notes after giving effect to such principal payments and expressed as a percentage of the original Aggregate Principal Amount of the Class A-1LA Notes.

(3) The Aggregate Principal Amount of the Class A-1LB Notes as of the Calculation Date and such Aggregate Principal Amount expressed as a percentage of the original Aggregate Principal Amount of the Class A-1LB Notes, and the amount of principal payments to be made on the Class A-1LB Notes on the Payment Date relating to such Calculation Date and the Aggregate Principal Amount of the Class A-1LB Notes after giving

008636

effect to such principal payments and expressed as a percentage of the original Aggregate Principal Amount of the Class A-1LB Notes

The Aggregate Principal Amount of the Class A-2L Notes as of the Calculation Date and such Aggregate Principal Amount expressed as a percentage of the original Aggregate Principal Amount of the Class A-2L Notes, and the amount of principal payments to be made on the Class A-2L Notes on the Payment Date relating to such Calculation Date and the Aggregate Principal Amount of the Class A-2L Notes after giving effect to such principal payments and expressed as a percentage of the original Aggregate Principal Amount of the Class A-2L Notes.

(4) The Aggregate Principal Amount of the Class A-3L Notes as of the Calculation Date and such Aggregate Principal Amount expressed as a percentage of the original Aggregate Principal Amount of the Class A-3L Notes, and the amount of principal payments to be made on the Class A-3L Notes on the Payment Date relating to such Calculation Date and the Aggregate Principal Amount of the Class A-3L Notes after giving effect to such principal payments and expressed as a percentage of the original Aggregate Principal Amount of the Class A-3L Notes.

(5) The Aggregate Principal Amount of the Class A-4L Notes as of the Calculation Date and such Aggregate Principal Amount expressed as a percentage of the original Aggregate Principal Amount of the Class A-4L Notes, and the amount of principal payments to be made on the Class A-4L Notes on the Payment Date relating to such Calculation Date and the Aggregate Principal Amount of the Class A-4L Notes after giving effect to such principal payments and expressed as a percentage of the original Aggregate Principal Amount of the Class A-3L Notes.

(6) The Aggregate Principal Amount of the Class B-1L Notes as of the Calculation Date and such Aggregate Principal Amount expressed as a percentage of the original Aggregate Principal Amount of the Class B-1L Notes, and the amount of principal payments to be made on the Class B-1L Notes on the Payment Date relating to such Calculation Date and the Aggregate Principal Amount of the Class B-1L Notes after giving effect to such principal payments and expressed as a percentage of the original Aggregate Principal Amount of the Class B-1L Notes.

(7) The Aggregate Principal Amount of the Class X Notes as of the Calculation Date and such Aggregate Principal Amount expressed as a percentage of the original Aggregate Principal Amount of the Class X Notes, and the amount of principal payments to be made on the Class X Notes on the Payment Date relating to such Calculation Date and the Aggregate Principal Amount of the Class X Notes after giving effect to such principal payments and expressed as a percentage of the original Aggregate Principal Amount of the Class X Notes

(8) The Base Servicing Fee, the Additional Servicing Fee, the Supplemental Servicing Fee (if any), the Trustee Administrative Expenses, the Preferred Shares Administrative Expenses, the Issuer Base Administrative Expenses, any replenishment of the Expense Reimbursement Account and the Issuer Excess Administrative Expenses, in each case

008637

including any amount with respect to any previous Payment Date that was not paid on a previous Payment Date relating to such Calculation Date on an itemized basis.

(9) For the Collection Account:

(a) the Balance in the Collection Account as of such Calculation Date;

(b) the amounts payable from the Collection Account pursuant to Article XI hereof on the Payment Date relating to such Calculation Date (in the aggregate and under each Section and subsection of Article XI hereof); and

(c) the Balance remaining in the Collection Account immediately after giving effect to all payments to be made on the Payment Date relating to such Calculation Date.

(10) For the Loan Funding Account, the Balance in the Loan Funding Account as of such Calculation Date, the amounts, if any, payable from the Loan Funding Account to fund amounts drawn under any Delayed Drawdown Loan or Revolving Loan with respect to such Calculation Date and the amount, if any, transferred from the Loan Funding Account to the Collection Account as Collateral Principal Collections with respect to such Calculation Date.

(11) (A) The Overcollateralization Ratios and the Interest Coverage Ratio (including a break-down of the components of such ratios) and the results of the Overcollateralization Tests, the Interest Coverage Test and the amount of any Additional Collateral Deposit Requirement (which shall not be reported on a pass/fail basis) as of the close of business on such Calculation Date (after giving effect to any payments to be made on the Payment Date relating to such Calculation Date, other than payments of the Mandatory Redemption Price with respect to an O/C Redemption, if any, made pursuant to Section 9.2 hereof and Section 11.2 hereof), (B) if the Interest Coverage Test or any Overcollateralization Test is not met, the amount of O/C Redemption of each Class of Notes on the related Payment Date pursuant to Section 9.2 hereof that would be necessary on the related Payment Date in order to cause the Interest Coverage Test or such Overcollateralization Test to be met (after giving effect to all payments to be made on such Payment Date), (C) the results of the Interest Coverage Test and the Overcollateralization Tests after giving effect to such O/C Redemptions pursuant to Section 9.2 hereof and the other payments, if any, to be made on such Payment Date, (D) if a Rating Confirmation Failure has occurred, the amount of Rating Confirmation Failure Redemption of each Class of Notes on the related Payment Date pursuant to Section 9.2 hereof that would be necessary on the related Payment Date in order to receive a Rating Confirmation (after giving effect to all payments to be made on such Payment Date), and (E) if the Additional Collateral Deposit Requirement is not met, the amount of cash that would be necessary on the related Payment Date to be applied in accordance with Section 11.1 in order to cause the Additional Collateral Deposit Requirement to be met (after giving effect to all payments to be made on such Payment Date); *provided that* the Note Valuation Report need not contain information relating to the Interest Coverage Test or the Additional Collateral Deposit Requirement with respect to the first Calculation Date.

008638

(c) <u>Noteholder Report</u>. With respect to each Calculation Date, the Issuer shall render or cause to be rendered an accounting (the "<u>Noteholder Report</u>"), determined as of such Calculation Date, and completed not later than the Business Day preceding the Payment Date relating to such Calculation Date. The Issuer shall deliver to the Trustee, each Noteholder or Beneficial Owner (upon receipt by the Trustee of a certificate in the form of Exhibit H), each Rating Agency (but only so long as any Class of Notes is rated by such Rating Agency), the Paying and Transfer Agent and the Servicer, a copy of the Noteholder Report promptly after such completion no later than the tenth day after such Calculation Date. The Noteholder Report shall contain the information contained in Section 10.5(b)(1) through (9) and Section 10.5(a)(1) through (19).

Each Noteholder Report shall contain the following statement: "Each holder of a Note (other than those issued pursuant to Regulation S) or any interest therein is required at all times to be "Qualified Institutional Buyer" within the meaning of Rule 144A ("<u>Rule 144A</u>") under the U.S. Securities Act of 1933, as amended (the "<u>Securities Act</u>") who is also a "Qualified Purchaser" within the meaning of Section 3(c)(7) of the U.S. Investment Company Act of 1940, as amended (the "<u>Investment Company Act</u>") and each such holder (i) is not formed for the purpose of investing in the Notes (unless all of its beneficial owners are Qualified Purchasers), (ii) is not a dealer described in paragraph (a)(1)(ii) of Rule 144A (unless such holder owns and invests on a discretionary basis at least U.S. \$25 million in securities of issuers that are not affiliated persons of such dealer), (iii) is not a plan referred to in paragraph (a)(1)(i)(D) or (E) of Rule 144A or a trust fund referred to in paragraph (a)(1)(i)(F) of Rule 144A that holds the assets of such plan (unless investment decisions are made solely by the fiduciary, trustee or sponsor of such plan), (iv) each account for which it is holds Notes is holding Notes in at least the minimum denomination set forth in the Indenture and (v) will provide written notice of the foregoing and any other applicable transfer restrictions to any transferee of a Note or any interest therein. The Notes (other than those issued pursuant to Regulation S) and any interest therein may only be transferred to a transferee that can make the foregoing representations and the Co-Issuers have the right, at any time, to force any holder of a Note who is not a Qualified Institutional Buyer and a Qualified Purchaser to sell or redeem its Notes."

After the end of the Revolving Period, the Noteholder Report shall also contain a statement to the effect that it is not unusual for the eligibility criteria set forth in Section 12.2 hereof not to be satisfied following the Revolving Period as the Portfolio Collateral matures or is otherwise disposed of and principal on the Notes is paid down.

(d) <u>Payment Date Instructions</u>. The Note Valuation Report referred to in subsection (b) of this Section 10.5 shall constitute instructions to the Trustee to withdraw on the Payment Date relating to such Note Valuation Report the available funds from the Collection Account and make the payments set forth in the Note Valuation Report in the manner specified, and in accordance with the priorities established, in Article XI hereof.

(e) <u>Optional Redemption Instructions</u>. Not less than three Business Days after an Issuer Order electing an Optional Redemption of the Notes pursuant to Section 9.1 has been delivered to the Trustee, the Issuer shall compute the following information and provide such information in a statement (the "<u>Redemption Date Statement</u>") delivered to the Trustee, the Servicer and the Rating Agencies:

008639

(1)   the amounts payable to the Trustee, the Paying and Transfer Agent, the Issuer and the Servicer pursuant to Sections 11.1(b) and (d);

(2)   the amount in the Collection Account available for payment of the Optional Redemption Price; and

(3)   the Optional Redemption Price.

(f) <u>Tax Event Redemption Instructions</u>.  Not later than three Business Days after an Issuer Order electing a Tax Event Redemption of the Notes Pursuant to Section 9.5 has been delivered to the Trustee, the Issuer shall compute the following information and provide such information in a statement (also, a "<u>Redemption Date Statement</u>") delivered to the Trustee, the Servicer and the Rating Agencies.

(1)   the amounts payable to the Trustee, the Issuer, the Paying and Transfer Agent and the Servicer pursuant to Sections 11.1(b) and (d);

(2)   the amount in the Collection Account available for payment of the Tax Event Redemption Price; and

(3)  the Tax Event Redemption Price.

(g) <u>Appointment of Agent</u>.  The Issuer may appoint an administrator or other agent to perform its obligations to provide reports pursuant to this Article X and certain calculations pursuant to Article XII.  Pursuant and subject to the terms of a collateral administration agreement (the "<u>Collateral Administration Agreement</u>") entered into or to be entered into among the Issuer, the Servicer and JPMorgan Chase Bank, National Association, the Issuer has appointed or shall appoint JPMorgan Chase Bank, National Association, as its initial agent for such purposes and JPMorgan Chase Bank, National Association, has accepted or shall accept such appointment and has agreed or shall agree to perform such obligations, as provided therein.

Section 10.6.   <u>Reports by Independent Accountants.</u>

(a) The Issuer will appoint prior to the Effective Date, a nationally recognized firm of accountants as the firm or firms of Independent certified public accountants to prepare and deliver the reports or certificates of such accountants required by this Indenture.  Upon any resignation by, or removal of, such firm, the Issuer shall promptly appoint a successor thereto that shall also be a firm of Independent certified public accountants of recognized national reputation in the United States and for so long as any Notes are then rated, provide notice of such successor to each Rating Agency then rating any Notes.  If the Issuer shall not have appointed a successor within 30 days of any firm resigning from the position of Independent certified public accountants to the Issuer, the Trustee shall promptly appoint a successor firm of Independent certified public accountants of recognized national reputation in the United States and for so long as any Notes are then rated, provide notice of such successor to each Rating Agency then rating any Notes.  The fees of such Independent certified public accountants and its successor shall be payable by the Issuer.

008640

(b) On or before May 31 in 2007 and on or before May 31 in each year thereafter through 2011, the Issuer shall cause to be delivered to the Trustee, the Servicer and each Rating Agency, if any, then rating any Class of Notes a certificate (the "Accountants' Certificate") from the firm of Independent certified public accountants appointed by the Issuer indicating (i) that such firm has reviewed the Note Valuation Reports and Redemption Date Statements relating to the Payment Dates in such period, (ii) that the calculations within such Note Valuation Reports and Redemption Date Statements have been performed in accordance with the applicable provisions of this Indenture (except as otherwise noted in a statement), (iii) the Aggregate Principal Amount of the Portfolio Collateral securing the Notes as of the Calculation Date relating to such Payment Dates and (iv) the procedures undertaken by such accountants to perform such calculations. In the event such firm requires the Trustee to agree to the procedures performed by such firm, the Servicer shall direct the Trustee in writing to so agree; it being understood and agreed that the Trustee will deliver such letter agreement in conclusive reliance upon the direction of the Servicer, and the Trustee makes no independent inquiry or investigation as to, and shall have no obligation or liability in respect of the sufficiency, validity or correctness of such procedures. Upon receipt by the Trustee of a certificate in the form of Exhibit H, the Trustee shall make available a copy of the Accountant's Certificate to the requesting Noteholder.

(c) Beginning with the year 2007, on or before (i) January 31 of each year or, (ii) if later, on or before any date in each year on which any of the information described below is required to be delivered to the Noteholders under the Code or any other applicable law, but, in any case, not later than March 1 of each year, the Issuer shall cause each Paying Agent in the United States to prepare and deliver a Form 1099 to each Noteholder and the Issuer shall provide or cause to be provided such other information as is requested by a Noteholder, which is necessary to permit such Holder to prepare and file any applicable U.S. income tax returns related to the most recently ended calendar year.

Section 10.7.  Reports to Rating Agencies.

For so long as any Class of Notes is rated by a Rating Agency, the Issuer shall provide or cause to be provided to each Rating Agency then rating such Notes with a copy of each Monthly Report, each Note Valuation Report, each Noteholder Report, each Accountants' Certificate and any other notification delivered to any Noteholder pursuant to the provisions of this Indenture and with such additional information as such Rating Agency may from time to time reasonably request and the Issuer determines in its sole discretion may be obtained and provided without unreasonable burden or expense. In addition, upon receipt of actual knowledge thereof, the Trustee shall send to each Rating Agency notice of any Default set forth in Section 5.1 hereof. The Trustee will also give notice to the Rating Agencies, of any removal of the Servicer pursuant to Section 5.4(c). In addition, the Servicer shall provide to the Rating Agencies those notices related to the Issuer's purchase of Synthetic Securities that are contemplated by Section 12.10 (which notices, in the case of notices provided by the Servicer to Moody's, shall be sent to the attention of a "Managing Director" of Moody's CBO/CLO Group); and, if Standard & Poor's or Moody's so requests and if such requesting party did not rate the related Synthetic Securities, the Servicer shall also provide to such requesting party a copy of the transaction documents in its possession, relating to all Synthetic Securities. The Servicer shall also notify Standard & Poor's if more than 10% of the Aggregate Principal Amount of Portfolio Collateral are obligations of issuers domiciled outside the United States. The address of

008641

Standard & Poor's for purposes of notices and reports hereunder shall be as follows:  55 Water Street, New York, New York 10041-0003, (email: cdo_surveillance@sandp.com), Attention: Structured Finance Ratings, or such other address of which the Issuer is notified in writing by Standard & Poor's. The address of Moody's for purposes of notices and reports hereunder shall be as follows:  99 Church Street, New York, New York 10007, email: cdomonitoring@moodys.com, Attention: CBO Monitoring Group or such other address of which the Issuer is notified in writing by Moody's.

ARTICLE XI

APPLICATION OF MONIES

Section 11.1.   Disbursements of Monies from Collection Account.

Except as otherwise set forth in Section 10.2 hereof, disbursements of monies from the Closing Expense Account and the Collection Account shall be made at the following times and in the following order of priority:

(a) On the Closing Date, the Trustee shall pay, from the funds deposited in the Closing Expense Account, the fees, commissions and expenses associated with the Closing (collectively, "Closing Expenses") as set forth in an Issuer Order delivered to the Trustee on the Closing Date; *provided that* any such Closing Expenses may in the alternative be paid on any date after the Closing Date and prior to the Payment Date in November 2006 from the Closing Expense Deposit in the Closing Expense Account pursuant to an Issuer Order delivered to the Trustee (which shall state that the amounts called for to be paid therein are Closing Expenses). All payments pursuant to Section 11.1 hereof may be made from the United States.  The Issuer may appoint an agent or agents for purposes of making payment of expenses, fees and commissions to be paid on its behalf from outside the United States pursuant hereto and (each such person shall be considered, a "Paying Agent" hereunder).   The Issuer hereby initially appoints JPMorgan Chase Bank, National Association, as such Paying Agent for such limited purpose.

(b) On each Payment Date (including the Final Maturity Date and if funds become available after the Final Maturity Date, on any date after the Final Maturity Date) and in accordance with the Note Valuation Report for the Calculation Date immediately preceding such Payment Date, the Trustee shall withdraw from the Collection Account (to the extent of the available funds therein excluding therefrom (I) during the Revolving Period, any Collateral Disposition Proceeds received during the Due Period relating to such Calculation Date to be applied by the Trustee during the related Due Period or the immediately succeeding Due Period as set forth in Section 12.4 hereof and (II) during the Revolving Period or Amortization Period, Collateral Principal Collections in an aggregate amount equal to the agreed purchase prices for Additional Portfolio Collateral with respect to which the Issuer has entered into a commitment (as set forth in the notice from the Servicer to the Trustee) prior to the end of such Due Period for the purchase thereof, but has not settled such purchase by the end of such Due Period, as set forth in Section 11.3 hereof) an amount up to the Collateral Interest Collections and, to the extent the amount of the Collateral Interest Collections is not sufficient, an amount up to the Collateral Principal Collections, and shall make a disbursement in the following order of priority:

008642

FIRST: To the Trustee for the payment in full of the Trustee Administrative Expenses for the related Due Period and any Trustee Administrative Expenses with respect to any previous Payment Date that were not paid on any previous Payment Date, and then to the Paying and Transfer Agent for the payment in full of the Preferred Shares Administrative Expenses for the related Due Period and any Preferred Shares Administrative Expenses with respect to any previous Payment Date that were not paid on any previous Payment Date;

SECOND: To the Issuer for the payment of Issuer Base Administrative Expenses with respect to the related Due Period and any Issuer Base Administrative Expenses with respect to a previous Payment Date that were not paid on a previous Payment Date;

THIRD: For the replenishment of the Expense Reimbursement Account up to an amount equal to U.S. $50,000 to the extent any amount therein has paid the Issuer Base Administrative Expenses for the related Due Period and to the extent any amount so paid for any prior Due Period has not been so replenished; *provided however*, notwithstanding anything to the contrary herein, the amounts set forth in clauses FIRST through this clause THIRD shall not exceed (i) $250,000 per annum plus (ii) the greater of $75,000 per annum and 0.0275% per annum of the Aggregate Par Amount on the related Calculation Date.

FOURTH: To the Servicer for the payment of the Base Servicing Fee with respect to such Payment Date and any Base Servicing Fee with respect to any previous Payment Date that was not paid on a previous Payment Date, and to the Holders of the Class II Preferred Shares in accordance with the Paying and Transfer Agency Agreement, the Class II Preferred Share Base Dividend then due and any Class II Preferred Share Base Dividend with respect to any previous Payment Date that was not paid on a previous Payment Date.

Notwithstanding anything herein to the contrary, any amounts to be paid to the Paying and Transfer Agent in its capacity as paying and transfer agent for the Preferred Shares pursuant to the Indenture will be delivered by the Trustee to the Paying and Transfer Agent for deposit in the Preferred Shares Collection Account in accordance with the Paying and Transfer Agency Agreement.

(c) On each Payment Date with respect to the **Revolving Period** and the **Amortization Period** in accordance with the Note Valuation Report for the Calculation Date immediately preceding such Payment Date, the Trustee shall withdraw from the Collection Account (to the extent of the available funds therein, excluding therefrom (I) during the Revolving Period, any Collateral Disposition Proceeds received during the Due Period relating to such Calculation Date to be applied by the Trustee during the related Due Period or the immediately succeeding Due Period as set forth in Section 12.4 hereof and (II) during the Revolving Period, Collateral Principal Collections in an aggregate amount equal to the agreed purchase prices for Additional Portfolio Collateral with respect to which the Issuer has entered into a commitment (as set forth in the notice from the Servicer to the Trustee) prior to the end of such Due Period for the purchase thereof, but has not settled such purchase by the end of such Due Period, as set forth in Section 11.3 hereof) an amount equal to the Adjusted Collections and shall make the following disbursements:

008643

(i) The Trustee shall apply such amounts constituting Adjusted Collateral Interest Collections (to the extent of available funds therefor) in the following order of priority:

FIRST: To the payment, *pari passu*, to (i) the Holders of the Class A-1LA Notes and the Class A-1LB Notes of an amount equal to the applicable Cumulative Interest Amount and, on each Payment Date and (ii) on each Payment Date through the August 1, 2013 Payment Date, the Cumulative Class X Payment with respect to the Class X Notes;

SECOND: To the payment to the Holders of the Class A-2L Notes of an amount equal to the applicable Cumulative Interest Amount;

THIRD: To the payment to the Holders of the Class A-3L Notes of an amount equal to the applicable Cumulative Interest Amount;

FOURTH: To the payment to the Holders of the Class A-4L Notes of an amount equal to the applicable Cumulative Interest Amount;

FIFTH: To the payment of principal in the amount, if any, required to be paid in order to satisfy the Class A Overcollateralization Test and, on each Payment Date after the second Payment Date, the Interest Coverage Test, such amount to be paid first, to the Class A-1LA Notes; second, to the Class A-1LB Notes; third, to the Class A-2L Notes, fourth, to any Periodic Rate Shortfall Amount with respect to the Class A-3L Notes, and then to principal of the Class A-3L Notes; and fifth, to any Periodic Rate Shortfall Amount with respect to the Class A-4L Notes, and then to principal of the A-4L Notes, in that order, until each such Class is paid in full, to the extent required to satisfy the Class A Overcollateralization Test and the Interest Coverage Test;

SIXTH: To the payment of the Periodic Interest Amount with respect to the Class B-1L Notes and such Payment Date;

SEVENTH: To the payment of principal as an O/C Redemption or a Rating Confirmation Failure Redemption in the amount, if any, required to be paid in order to satisfy the Class B-1L Overcollateralization Test or in order to receive a Rating Confirmation, as applicable, such amount to be paid first, *pro rata*, to the Class X Notes, only in connection with a Rating Confirmation Failure Redemption, and to the Class A-1LA Notes; second, to the Class A-1LB Notes; third, to the Class A-2L Notes; fourth, to any Periodic Rate Shortfall Amount with respect to the Class A-3L Notes and then to principal of the Class A-3L Notes; fifth, to any Periodic Rate Shortfall Amount with respect to the Class A-4L Notes and then to principal of the Class A-4L Notes; and sixth, to principal of the Class B-1L Notes, in that order, until each such Class is paid in full, to the extent required to satisfy the Class B-1L Overcollateralization Test or in order to receive a Rating Confirmation, as applicable;

EIGHTH: To the payment to the Holders of the Class B-1L Notes of an amount equal to the Cumulative Interest Amount for the Class B-1L Notes and such Payment Date to the extent not paid to the Holders of the Class B-1L Notes pursuant to clauses SIXTH OR SEVENTH of this Section 11.1(c)(i);

008644

NINTH: (I) During the Revolving Period, on each Payment Date after the second Payment Date to the extent of available funds, *pro rata*, an amount equal to 35% of the funds available up to the Additional Collateral Deposit Requirement to be deposited into the Collection Account and applied to pay principal of the Class B-1L Notes until such Class is paid in full and an amount equal to 65% (or, after the Class B-1L Notes are paid in full, 100%) of the funds available up to the Additional Collateral Deposit Requirement for the purchase of Additional Portfolio Collateral (other than CLO Securities), as directed by the Servicer or the Issuer, pursuant to Section 11.3 hereof during the immediately succeeding Due Period and (II) during the Amortization Period to the extent of available funds, *pro rata*, an amount equal to 35% of the funds available up to the Additional Collateral Deposit Requirement to be deposited into the Collection Account and applied to pay principal of the Class B-1L Notes until such Class is paid in full and an amount equal to 65% (or, after the Class B-1L Notes are paid in full, 100%) of the funds available up to the Additional Collateral Deposit Requirement to the payment of principal of the Notes in the order of priority described in clause SEVENTH above;

TENTH: To the payment to the Default Swap Counterparty any Default Swap Counterparty Termination Payment;

ELEVENTH: To the payment, *first* (a) to the Servicer the Additional Servicing Fee with respect to such Payment Date, and (b) to the Holders of the Class II Preferred Shares in accordance with the Paying and Transfer Agency Agreement, the Class II Preferred Share Additional Dividend then due and unpaid, and *second*, to the Holders of the Notes any due and unpaid Extension Bonus Payment;

TWELFTH: To the payment to the Issuer of Issuer Excess Administrative Expenses with respect to such Payment Date and any Issuer Excess Administrative Expenses with respect to any previous Payment Date that were not paid on a previous Payment Date; and

THIRTEENTH: If the Internal Rate of Return of the Preferred Shares as of such Payment Date is less than 12%, to the payment to the Holders of the Preferred Shares, but only up to an amount that would cause the Internal Rate of Return of the Preferred Shares to equal 12%; and

FOURTEENTH: Any remaining amounts, (a) 20% to (x) the payment of the Supplemental Servicing Fee for such Payment Date, and (y) the Holders of the Class II Preferred Shares in accordance with the Paying and Transfer Agency Agreement, the Class II Preferred Share Supplemental Dividend then due and unpaid, and (b) 80% to the Holders of the Preferred Shares in accordance with the Paying and Transfer Agency Agreement, as a dividend thereon or as a redemption payment on the Redemption Date, as applicable.

(ii) During the **Revolving Period**, the Trustee shall apply the Adjusted Collateral Principal Collections (to the extent of available funds therefor) in the following order of priority:

FIRST: To the payment of the amounts described in clauses FIRST through SEVENTH of Section 11.1(c)(i) hereof with respect to Collateral Interest Collections

008645

and the Revolving Period, in the order described therein, in each case to the extent such amounts have not been paid from Adjusted Collateral Interest Collections with respect to such Payment Date; *provided however* that, with respect to the payment described in clause THIRD of Section 11.1(c)(i) hereof, so long as any Class X Notes, Class A-1L Notes or Class A-2L are Outstanding, the Class A-3L Notes shall only be entitled to receive an amount sufficient to pay the Periodic Interest Amount (or, after the Class A-2L Notes are paid in full, the Cumulative Interest Amount) due to the Class A-3L Notes for such Payment Date from Collateral Principal Collections, but only to the extent this payment will not cause the failure of the Class B-1L Overcollateralization Test, with respect to clause FOURTH of Section 11.1(c)(i) above, so long as any Class X Notes, Class A-1L Notes, Class A-2L Notes or Class A-3L Notes are Outstanding, the Class A-4L Notes shall only be entitled to receive an amount sufficient to pay the Periodic Interest Amount (or, after the Class A-3L Notes are paid in full, the Cumulative Interest Amount) due to the Class A-4L Notes for such Payment Date from Collateral Principal Collections, and with respect to the payment described in clause SIXTH of Section 11.1(c)(i) hereof, so long as any Class X Notes, Class A-1L Notes, Class A-2L Notes, the Class A-3L Notes or the Class A-4L Notes are Outstanding, the Class B-1L Notes shall only be entitled to receive an amount sufficient to pay the Periodic Interest Amount due to the Class B-1L Notes for such Payment Date from Collateral Principal Collections, but only to the extent this payment will not cause the failure of the Class B-1L Overcollateralization Test; and *provided further*, so long as any Class A-1L Notes or Class A-2L Notes are not Outstanding, the Class A-3L Notes shall be entitled to receive an amount sufficient to pay the Cumulative Interest Amount due to the Class A-3L Notes for such Payment Date from Collateral Principal Collections and, so long as any Class A-1L Notes, Class A-2L Notes or Class A-3L Notes are not Outstanding, the Class A-4L Notes shall be entitled to receive an amount sufficient to pay the Cumulative Interest Amount due to the Class A-4L Notes for such Payment Date from Collateral Principal Collections, and then any remaining amounts shall be distributed pursuant to clauses FIFTH through SEVENTH of Section 11.1(c)(i) hereof, in the order described therein;

SECOND: To pay principal of the Notes in a Special Redemption, such amount to be paid first, (A) to the Class A-1LA Notes; second, to the Class A-1LB Notes; third, to the Class A-2L Notes; fourth, to any Periodic Rate Shortfall Amount with respect to the Class A-3L Notes; fifth, to principal of the Class A-3L Notes; sixth, to any Periodic Rate Shortfall Amount with respect to the Class A-4L Notes; seventh, to principal of the Class A-4L Notes; and eighth, to the Class B-1L Notes, in that order, until each such Class is paid in full; and

THIRD: As directed by the Servicer or the Issuer (or deposited by the Trustee in the Collection Account), to the purchase of Additional Portfolio Collateral meeting the specified requirements no later than the last day of the Due Period relating to the Payment Date next following such Payment Date, such amounts to be applied in the manner described herein.

(iii) During the **Amortization Period**, the Trustee shall apply the Adjusted Collateral Principal Collections (to the extent of available funds therefor and including for purposes of this Section 11.1(c)(iii) any Collateral Disposition Proceeds (other than Collateral Disposition Proceeds received in connection with the sale of an item of Credit Improved Portfolio Collateral to be reinvested pursuant to Section 12.4(a)) received

008646

during the Due Period relating to such Calculation Date to be applied by the Trustee as set forth in this Section 11.1(c)(iii)) in the following order of priority:

FIRST: To the payment of the amounts described in clauses FIRST through SEVENTH of Section 11.1(c)(i) hereof with respect to Collateral Interest Collections and the Amortization Period, in the order described therein, in each case to the extent such amounts have not been paid from Adjusted Collateral Interest Collections with respect to such Payment Date; *provided however* that, with respect to the payment described in clause THIRD of Section 11.1(c)(i) hereof, so long as any Class X Notes, Class A-1L Notes or Class A-2L Notes are Outstanding, the Class A-3L Notes shall only be entitled to receive an amount sufficient to pay the Periodic Interest Amount (or, after the Class A-2L Notes are paid in full, the Cumulative Interest Amount) due to the Class A-3L Notes for such Payment Date from Collateral Principal Collections, but only to the extent this payment will not cause the failure of the Class B-1L Overcollateralization Test, and with respect to clause FOURTH of Section 11.1(c)(i) above, so long as any Class X Notes, Class A-1L Notes, Class A-2L Notes or Class A-3L Notes are Outstanding, the Class A-4L Notes shall only be entitled to receive an amount sufficient to pay the Periodic Interest Amount (or, after the Class A-3L Notes are paid in full, the Cumulative Interest Amount) due to the Class A-4L Notes for such Payment Date from Collateral Principal Collections, but only to the extent this payment will not cause the failure of the Class B-1L Overcollateralization Test, and with respect to clause SIXTH of Section 11.1(c)(i) above, so long as any Class X Notes, Class A-1L Notes, Class A-2L Notes, Class A-3L Notes or Class A-4L Notes are Outstanding, the Class B-1L Notes shall only be entitled to receive an amount sufficient to pay the Periodic Interest Amount due to the Class B-1L Notes for such Payment Date from Collateral Principal Collections but only to the extent this payment will not cause the failure of the Class B-1L Overcollateralization Test, and then any remaining amounts shall be distributed pursuant to clauses FIFTH and SEVENTH of Section 11.1(c)(i) hereof, in the order described therein; and *provided further*, so long as any Class A-1L Notes or Class A-2L Notes are not Outstanding, the Class A-3L Notes shall be entitled to receive an amount sufficient to pay the Cumulative Interest Amount due to the Class A-3L Notes for such Payment Date from Collateral Principal Collections and, so long as any Class A-1L Notes, Class A-2L Notes or Class A-3L Notes are not Outstanding, the Class A-4L Notes shall be entitled to receive an amount sufficient to pay the Cumulative Interest Amount due to the Class A-4L Notes for such Payment Date from Collateral Principal Collections, and then any remaining amounts shall be distributed pursuant to clauses FIFTH through SEVENTH of Section 11.1(c)(i) hereof, in the order described therein;

SECOND:  So long as no Event of Default has occurred and is continuing and as directed by the Servicer or the Issuer (or deposited by the Trustee in the Collection Account), to the purchase of Additional Portfolio Collateral from the proceeds of Collateral Principal Collections from any unscheduled prepayment or to the purchase of Substitute Portfolio Collateral from the sales proceeds of Credit Improved Portfolio Collateral, meeting the specified requirements with respect to the Amortization Period no later than ninety days after receipt of such amounts, to be applied in the manner described herein; and

THIRD:  To pay the Notes as follows: first, to the Class A-1LA Notes until the Aggregate Principal Amount thereof has been paid in full; second, to the Class A-1LB Notes until the Aggregate Principal Amount thereof has been paid in full; third, to the Class

008647

A-2L Notes until the Aggregate Principal Amount thereof has been paid in full; fourth, to any Periodic Rate Shortfall Amount with respect to the Class A-3L Notes and then to principal of the Class A-3L Notes until the Aggregate Principal Amount thereof has been paid in full; fifth, to any Periodic Rate Shortfall Amount with respect to the Class A-4L Notes and then to principal of the Class A-4L Notes until the Aggregate Principal Amount thereof has been paid in full; and sixth, to any Periodic Rate Shortfall Amount with respect to Class B-1L Notes and then to principal of the Class B-1L Notes until the Aggregate Principal Amount thereof has been paid in full.

(d) On the **Final Maturity Date** (including the Optional Redemption Date, the Tax Event Redemption Date or any other Payment Date on which the Aggregate Principal Amounts of the Notes is paid in full) and, if funds become available after the Final Maturity Date, on any other date after the Final Maturity Date, and in accordance with the Note Valuation Report for the Calculation Date immediately preceding such Payment Date (or in the case of an Optional Redemption or a Tax Event Redemption, in accordance with the related Redemption Date Statement), the Trustee shall withdraw from the Collection Account an amount equal to the Adjusted Collateral Collections (including Collateral Disposition Proceeds) and from the Expense Reimbursement Account and the Loan Funding Account any amount on deposit therein and shall make the following disbursements in the following order of priority:

FIRST: To the payment, *pari passu*, to the Holders of the Class A-1LA Notes of an amount equal to the applicable Cumulative Interest Amount, to the Holders of the Class A-1LB Notes of an amount equal to the applicable Cumulative Interest Amount and to the Holders of the Class X Notes an amount equal to the Class X Shortfall Amount plus the Periodic Interest Amount for the Class X Note;

SECOND: To the payment of principal of the Class A-1LA Notes and the Class X Notes in amounts not to exceed the Aggregate Principal Amounts of the Class A-1LA Notes and the Class X Notes, respectively, and then to the payment of principal of the Class A-1LB Notes in an amount not to exceed the Aggregate Principal Amount of the Class A-1LB Notes;

THIRD: To the payment to the Holders of the Class A-2L Notes of an amount equal to the applicable Cumulative Interest Amount;

FOURTH: To the payment of principal of the Class A-2L Notes in an amount not to exceed the Aggregate Principal Amount of the Class A-2L Notes;

FIFTH: To the payment to the Holders of the Class A-3L Notes of an amount equal to the applicable Cumulative Interest Amount;

SIXTH: To the payment of principal of the Class A-3L Notes in an amount not to exceed the Aggregate Principal Amount of the Class A-3L Notes;

SEVENTH: To the payment to the Holders of the Class A-4L Notes of an amount equal to the applicable Cumulative Interest Amount;

008648

EIGHTH:  To the payment of principal of the Class A-4L Notes in an amount not to exceed the Aggregate Principal Amount of the Class A-4L Notes.

NINTH:  To the payment of the Holders of the Class B-1L Notes of an amount equal to the applicable Cumulative Interest Amount;

TENTH:  To the payment of principal of the Class B-1L Notes in an amount not to exceed the Aggregate Principal Amount of the Class B-1L Notes;

ELEVENTH:  To the payment of principal of any Default Swap Counterparty Termination Payments to the Default Swap Counterparty;

TWELFTH:  *First,* (a) to the Servicer the Additional Servicing Fee with respect to such Payment Date and (b) to the Holders of the Class II Preferred Shares in accordance with the Paying and Transfer Agency Agreement, the Class II Preferred Share Additional Dividend then due and unpaid and, *second,* to the Holders of the Notes any due and unpaid Extension Bonus Payment;

THIRTEENTH:  To the payment to the Issuer of amounts due the Issuer for Issuer Excess Administrative Expenses and any such amounts that were due on any prior Payment Date but remain unpaid;

FOURTEENTH: If the Internal Rate of Return of the Preferred Shares as of such Payment Date is less than 12%, to the payment to the Holders of the Preferred Shares, but only up to an amount that would cause the Internal Rate of Return of the Preferred Shares to equal 12%; and

FIFTEENTH:  Any remaining amounts, (a) 20% to (x) the payment of the Supplemental Servicing Fee for such Payment Date, and (y) the Holders of the Class II Preferred Shares in accordance with the Paying and Transfer Agency Agreement, the Class II Preferred Share Supplemental Dividend then due and unpaid, and (b) 80% to the Holders of the Preferred Shares in accordance with the Paying and Transfer Agency Agreement, as a dividend thereon or as a redemption payment on the Redemption Date, as applicable.

The obligation to pay the foregoing amounts on the Final Maturity Date is absolute and unconditional, but recourse therefor will be limited to the Trust Estate.

(e) Notwithstanding anything in this Indenture to the contrary, with respect to Adjusted Collateral Collections held in the Collection Account in Eligible Investments pending application to purchase Portfolio Collateral, any such amounts not used to purchase Portfolio Collateral by the last day of the Due Period next succeeding the Due Period in which such amounts were collected may be used to purchase Portfolio Collateral in subsequent Due Periods in accordance with Section 11.3 hereof (until otherwise applied pursuant to this Section 11.1).

(f) Notwithstanding anything to the contrary in this Section 11.1, upon the direction of the Servicer (and in the time and manner directed by the Servicer), Payment Date Equity Securities may be distributed on any Payment Date, in lieu of cash on any Payment Date as follows:

008649

(i)     Payment Date Equity Securities will be paid as Collateral Interest Collections in accordance with Section 11.1 with respect to the Preferred Shares, and upon such payment, the aggregate amount of Collateral Interest distributable to the Holders of the Preferred Shares on such Payment Date will be reduced by the value of such Payment Date Equity Securities.  Payment Date Equity Securities distributed on any Payment Date shall be distributed to the Holders of the Preferred Shares in the same manner as Collateral Interest Collections would be distributable to such Holders of Preferred Shares on such Payment Date and subject to the same restriction as to payment set out in the Paying and Transfer Agency Agreement.

(ii)     In calculating the amounts of Collateral Interest Collections and Collateral Principal Collections for such Payment Date, Collateral Interest in an amount equal to the value of Payment Date Equity Securities distributed to the Holders of the Preferred Shares shall be recharacterized as Collateral Principal Collections and disbursed in accordance with Sections 11.1(b) and 11.1(c) of the Indenture.

Section 11.2.   Mandatory Redemption With Respect to Overcollateralization Tests, Interest Coverage Test and Rating Confirmation Failure

On any applicable Payment Date with respect to which an Overcollateralization Test or the Interest Coverage Test (as calculated in the Note Valuation Report for the Calculation Date immediately preceding such Payment Date), would not be met (but for this Section 11.2) or, during the Revolving Period, a Rating Confirmation Failure has occurred and is continuing, the Issuer shall redeem the Notes (or, in the case of the Class A-3L Notes, the Class A-4L Notes and the Class B-1L Notes, pay any Periodic Rate Shortfall Amounts and then redeem the Notes pursuant to Section 9.2 hereof), and the Trustee shall pay to the Holders thereof (to be applied against the principal amount thereof) pursuant to the applicable provisions of Section 11.1 hereof, an aggregate amount necessary to cause each of the Overcollateralization Tests to be met as of such Calculation Date, in the case of the Interest Coverage Test, to cause such test to have been met as of such Calculation Date had such redemption been made on the immediately preceding Payment Date or to cause a Rating Confirmation to be received by the Issuer, as applicable.

Section 11.3.   Purchase of Additional Portfolio Collateral

(a) The Issuer may purchase Additional Portfolio Collateral on any Business Day during the Revolving Period for inclusion in the Trust Estate in an amount permitted pursuant to the applicable subsection of Section 11.1 hereof subject to the conditions set forth in this Section 11.3.  Upon receipt by the Trustee of a Servicer Order with respect thereto, Collateral Principal Collections (or Collateral Interest Collections deposited to the Collection Account pursuant to clause NINTH of Section 11.1(c)(i)), collected during a Due Period (other than Collateral Disposition Proceeds) may be paid out of the Collection Account by the Trustee on any Business Day during such Due Period or the immediately succeeding Due Period for the purpose of purchasing such Additional Portfolio Collateral specified in such Servicer Order; *provided that* as of such date the following conditions shall have been satisfied:

(i)      the Balance of the Collection Account remaining after giving effect to any such purchase of Additional Portfolio Collateral shall equal or exceed the Periodic Reserve Amount with respect to the Payment Date relating to such Due Period as shown on the Note Valuation Report for the prior Payment Date;

(ii)      (1) each Overcollateralization Test and the Interest Coverage Test are satisfied and (2) the Collateral Quality Tests and the criteria set forth in Section 12.2 hereof are satisfied or if any of the Collateral Quality Tests or the criteria set forth in Section 12.2 is not satisfied, the degree of compliance with such criteria would not be diminished; *provided however*, with respect to Additional Portfolio Collateral purchased with Unscheduled Principal Proceeds, if any of the Overcollateralization Tests or the Interest Coverage Test is not satisfied as set forth in clause (1), the degree of compliance with such tests would not be diminished;

(iii)      the Trustee shall have received (i) a certificate of the Servicer dated as of the date of the purchase and the Grant of such Additional Portfolio Collateral to the effect that such purchase is in compliance with the requirements of this Section 11.3 and Section 12.5(a) hereof and (ii) the certificate required pursuant to Section 12.2 hereof.

(b) For purposes of calculating the Collections for this Section 11.3 (and the Balance in the Collection Account for purposes of subsection (a) hereof), Collections shall be deemed to include, as of any date of determination, the sum of 100% of all cash collections actually received in respect of the Portfolio Collateral during such Due Period as of such date of determination and 100% of all Scheduled Distributions to be received (including those which are reasonably expected to be received) in respect of the Portfolio Collateral during such Due Period (excluding, however, any Scheduled Distributions to be received with respect to an item of Defaulted Portfolio Collateral or an item of Equity Portfolio Collateral during such Due Period).

Section 11.4.   Trust Account

All monies held by the Trustee in the Collection Account, the Initial Deposit Account, the Closing Expense Account, the Loan Funding Account or the Expense Reimbursement Account pursuant to the provisions of this Indenture, and not used to purchase Portfolio Collateral or Eligible Investments as herein provided, shall be deposited in one or more trust accounts, established in the name of the Trustee, as trustee of the trust created pursuant hereto for the benefit of the Holders of Notes and other Secured Parties hereunder; *provided that* to the extent funds deposited in such accounts exceed the amounts insured by the Federal Deposit Insurance Corporation, such excess shall be used to purchase Eligible Investments (pursuant to and as provided in Section 10.2 hereof). All monies held in the trust accounts described in the first sentence of this Section 11.4 shall be held as part of the Trust Estate subject to the provisions of this Indenture.

008651

ARTICLE XII

SALE OF PORTFOLIO COLLATERAL; SUBSTITUTION

Section 12.1.    Sale of Portfolio Collateral

(a) Provided that no Event of Default has occurred and is continuing and subject to the satisfaction of the conditions specified in Section 10.3 hereof and the restrictions in this Article, the Servicer may direct the Trustee, by Servicer Order, to sell, and the Trustee shall release (or cause to be released) from the lien of this Indenture and sell in the manner directed by the Servicer, any Defaulted Portfolio Collateral, Equity Portfolio Collateral, Credit Risk Portfolio Collateral or Credit Improved Portfolio Collateral (as described in such direction) so long as, with respect to an item of Credit Improved Portfolio Collateral or Credit Risk Portfolio Collateral, the Servicer certifies to the Trustee, as applicable, that:

(i)    in the case of an item of Credit Improved Portfolio Collateral (including in connection with a Portfolio Improvement Exchange), in writing before the sale, that the Servicer has identified one or more specific manners in which it will be able, in compliance with the criteria set forth in Section 12.2 and the other requirements of Article XII (and in connection with a Portfolio Improvement Exchange, the requirements set forth in the definition of such term), to cause the Issuer to purchase with the applicable Collateral Disposition Proceeds net of accrued interest and costs, no later than the end of the immediately succeeding Due Period (it being understood that such identification shall not be considered either a requirement or an assurance that any specified purchase will be consummated), one or more items of Substitute Portfolio Collateral having an Aggregate Principal Balance equal to or greater than the Principal Balance of such Credit Improved Portfolio Collateral; and

(ii)    in the case of an item of Credit Improved Portfolio Collateral, after giving effect to such sale and the subsequent purchase described in (a) above, the Servicer is required to certify that it reasonably believes that (x) either the Collateral Quality Tests and the criteria set forth in Section 12.2 hereof are satisfied or if one or more of such Collateral Quality Tests or criteria is not satisfied, the degree of compliance therewith would not be diminished and (y) either the Overcollateralization Tests and the Interest Coverage Test are satisfied or if any Overcollateralization Test or the Interest Coverage Test is not satisfied, the degree of compliance with such tests would not be diminished.

(b) An item of Credit Risk Portfolio Collateral may be sold at any time, subject to the Sale Restriction Condition as set forth below.

(c) Notwithstanding any term hereof to the contrary and *provided that* no Event of Default has occurred and is continuing and subject to compliance with the conditions specified in Section 10.3 hereof, any Portfolio Collateral may be sold upon delivery to the Trustee of a certificate of the Servicer to the effect that it has reasonably determined, which may be based upon the advice of an opinion of counsel (a copy of which opinion shall be included with such certificate), that such Portfolio Collateral is, or may become, subject to a withholding or other similar tax (or to an increased rate of withholding or other similar tax). Further, notwithstanding

176

008652

anything to the contrary stated herein, the Servicer may direct the sale of an item of Portfolio Collateral that was CCC/Caa Portfolio Collateral or Discount Portfolio Collateral at the time of purchase only if it constitutes Credit Risk Portfolio Collateral or Defaulted Portfolio Collateral, is sold in connection with the Optional Redemption of Notes in whole or if the Servicer reasonably expects that the sale and any related purchase of Substitute Portfolio Collateral will restore compliance with any of the Interest Coverage Test, the criteria set forth in Section 12.2 or the Overcollateralization Tests that would be failed or not satisfied in the absence of such sale and purchase.

(d) During any period after the first Due Period if a Sale Restriction Condition occurs, the Issuer shall send a notice to the Trustee and the Holders of the Notes to the effect that, for so long as the applicable Sale Restriction Condition exists, unless the Holders of at least 60% in Aggregate Principal Amount of the Notes elect to retain the guidelines in effect on the Closing Date for sales of an item of Credit Risk Portfolio Collateral or Credit Improved Portfolio Collateral, as applicable, (i) no item of Credit Risk Portfolio Collateral may be sold unless (A) the rating of the obligor or of any debt or securities issued by the obligor under such an item of Credit Risk Portfolio Collateral has been lowered, withdrawn or put on any "credit watch" list for possible downgrade (or similar list) with negative implications by S&P, Moody's or Fitch or (B) such an item of Credit Risk Portfolio Collateral satisfies the Credit Risk Criteria and is not objected to by the Holders of more than 60% in Aggregate Principal Amount of the Notes within forty-five (45) days of the date of such notice, or such later date as extended by the Trustee at the direction of the Servicer *provided* that in making such determination to sell an item of Credit Risk Portfolio Collateral, an increase in credit spread or a decrease in Market Value of such item of Credit Risk Portfolio Collateral may only be used as corroboration of other bases for such determination or (ii) no item of Credit Improved Portfolio Collateral may be sold unless such item of Credit Improved Portfolio Collateral satisfies the Credit Improved Criteria and is not objected to by the Holders of more than 60% in Aggregate Principal Amount of the Notes within forty-five (45) days of the date of such notice, or such later date as extended by the Trustee at the direction of the Servicer *provided*, that in making such determination to sell such item of Credit Improved Portfolio Collateral, a reduction in credit spread or an increase in Market Value of such item of Credit Improved Portfolio Collateral may only be utilized as corroboration or other bases for such judgment.

(e) Notwithstanding anything to the contrary set forth above, the Servicer may at any time direct the Trustee to sell any item of Portfolio Collateral that (i) was obtained as a result of any reorganization or restructuring of any Credit Risk Portfolio Collateral or other Portfolio Collateral of an issuer under financial distress, or (ii) does not comply with the criteria set forth in Section 12.2.

Notwithstanding anything in this Indenture to the contrary, no acquisition or disposition of Portfolio Collateral or other eligible asset (as defined in Rule 3a-7) shall be effected by or on behalf of the Issuer for the primary purpose of recognizing gains or decreasing losses resulting from market value changes.

Notwithstanding the forgoing, if there is no appointment of a successor Servicer with 90 days after the resignation or termination of the Servicer, any sales or disposition of Portfolio Collateral shall be limited to Credit Risk Portfolio Collateral and Defaulted Portfolio

008653

Collateral and Equity Portfolio Collateral; *provided* that such restriction on the sale or disposition of Portfolio Collateral shall not apply if the Portfolio Collateral is being liquidated in whole or in part in connection with an acceleration or early termination of the Notes.

Section 12.2. <u>Eligibility Criteria and Replacement Restrictions</u>

Subject to Section 3.4 (with respect to Original Portfolio Collateral) in connection with dates occurring prior to the Effective Date, a security to be Granted to the Trustee after the Closing Date for inclusion in the Trust Estate as an item of Portfolio Collateral will be eligible for purchase by the Issuer and inclusion in the Trust Estate only if, as of the date of such Grant of such security the following conditions are met, as certified to the Trustee by Servicer Order, the Overcollateralization Tests, the Interest Coverage Test and the criteria set forth below in this Section 12.2 hereof are satisfied or if one of such tests or criteria is not satisfied, the degree of compliance with such tests or criteria would not be diminished except as otherwise required by Sections 11.3 and 12.4. In addition, if a Suspension Trigger Event is in effect, a majority of the Controlling Class may deliver notice to the Issuer directing the Issuer to suspend any purchases of additional items for inclusion in the Trust Estate as an item of Portfolio Collateral. Such suspension shall automatically terminate once a Suspension Trigger Event is no longer in effect.

(a) <u>Standard & Poor's CDO Monitor</u>. The Standard & Poor's CDO Monitor Test is satisfied. For purposes of the Standard & Poor's CDO Monitor Test, the "Standard & Poor's Rating" of any item of Portfolio Collateral or Eligible Investment shall be as set forth in <u>Schedule D</u> hereto. The Standard & Poor's CDO Monitor Test is not applicable and does not have to be satisfied or maintained when reinvesting the proceeds of Defaulted Portfolio Collateral or Credit Risk Portfolio Collateral.

(b) <u>Minimum Average Recovery Rate Test</u>. The Minimum Average Recovery Rate Test is satisfied.

(c) <u>Moody's Asset Correlation Test and Moody's Weighted Average Rating Test</u>. The Moody's Asset Correlation Test and the Moody's Weighted Average Rating Test are satisfied.

(d) Weighted Average Coupon Test; Weighted Average Margin Test; Weighted Average Life Requirement.

(i) The Weighted Average Coupon Test is satisfied.

(ii) The Weighted Average Margin Test is satisfied.

(iii) The Weighted Average Life Requirement is satisfied.

(e) <u>Limitation on Non-U.S. Debt</u>. After giving effect to the proposed purchase of such Portfolio Collateral:

(i) not more than 10% of the Aggregate Par Amount may consist of items of Portfolio Loans that are obligations of Permitted Non-U.S. Obligors;

(ii) not more than 10% of the Aggregate Par Amount may consist of items of Portfolio Loans that are obligations of Permitted Non-U.S. Obligors in any single Group A Country;

(iii) not more than 5% of the Aggregate Par Amount may consist of items of Portfolio Loans that are obligations of Permitted Non-U.S. Obligors in all Group B Countries;

(iv) not more than 2% of the Aggregate Par Amount may consist of items of Portfolio Loans that are obligations of Permitted Non-U.S. Obligors in any single Group B Country;

(v) not more than 2.5% of the Aggregate Par Amount may consist of items of Portfolio Loans that are obligations of Permitted Non-U.S. Obligors in all jurisdictions that are not Group A Countries or Group B Countries;

(vi) not more than 1% of the Aggregate Par Amount may consist of items of Portfolio Loans that are obligations of Permitted Non-U.S. Obligors in any single jurisdiction that is not a Group A Country or Group B Country; and

(vii) no Portfolio Collateral may consist of CLO Securities that are obligations of Non-U.S. Obligors.

(f) Rating. After giving effect to the proposed purchase of any Portfolio Collateral: (i) at least 90% of the Aggregate Principal Amount of the Portfolio Collateral included in the Trust Estate must be obligations of issuers having at least one class of indebtedness actually rated by Moody's (either publicly or privately) and (ii) at least 90% of the Aggregate Principal Amount of the Portfolio Collateral in the Trust Estate must be obligations of issuers having at least one class of indebtedness actually rated by S&P (either publicly or privately).

(g) CCC/Caa Portfolio Collateral Limitation. The proposed purchase of any Portfolio Collateral may not increase the Aggregate Principal Amount of CCC/Caa Portfolio Collateral in the Trust Estate to more than 5.0% of the Aggregate Par Amount; *provided* that the Issuer may purchase CCC/Caa Portfolio Collateral which would increase the Aggregate Principal Amount of CCC/Caa Portfolio Collateral in the Trust Estate above 5.0% of the Aggregate Par Amount with the proceeds of CCC/Caa Portfolio Collateral; and *provided further* that no CLO Securities may be included in the determination of this CCC/Caa Portfolio Collateral Limitation.

(h) Limitation on CLO Securities. After giving effect to the proposed purchase of any Portfolio Collateral, (i) not more than 30% of the Aggregate Par Amount may be CLO Securities; (ii) not more than 10% of the Aggregate Par Amount may consist of CLO Securities that have a Moody's Rating below "Baa3" or an S&P Rating below "BBB-"; *provided* that not more than 2.0% of the Aggregate Par Amount may consist of a single CLO Security with such ratings; (iii) not more than 4.0% of the Aggregate Par Amount may consist of CLO Securities of a single manager which shall not be any of the Servicer Entities, and (iv) not more than 5.0% of the Aggregate Par Amount may consist of CLO Securities managed by any of the Servicer Entities; *provided* that not more than 1.5% of the Aggregate Par Amount may consist of CLO

008655

Securities of a single issuer serviced or managed by the Servicer, and *provided further*, that no CLO Securities may be purchased after August 1, 2009 and after the expiration of the Revolving Period, unless an Extension shall occur in which case CLO Securities may be purchased during the full period of such Extension in accordance with all the criteria and restrictions provided herein that are applicable during the Revolving Period.

(i) <u>Limitation on Semiannual Portfolio Collateral</u>.  After the Effective Date, after giving effect to the proposed purchase of any Portfolio Collateral, no more than 5% of the Aggregate Par Amount may include items of Portfolio Collateral that provide for the periodic payment in cash of interest less frequently than quarterly, but not less frequently than semiannually.

(j) <u>Limitation on Participations, Synthetic Securities and Non-U.S. Portfolio Loans</u>. After giving effect to the proposed purchase of any Substitute Portfolio Collateral or Additional Portfolio Collateral, no more than 20% of the Aggregate Par Amount may be Participations, Synthetic Securities, Securities Lending Agreements or Portfolio Loans that are obligations of non-U.S. entities which are not in a Group A Country.  Further, no Participation may be purchased from any Selling Institution (including for this purpose the seller of any participation and the seller of any sub-participation) rated below "A" by S&P or "A2" by Moody's. In addition, the table below generally describes limitations on (i) the percentage of the Aggregate Par Amount which consist of Synthetic Securities related to the long-term debt rating of the Synthetic Security Counterparty, (ii) the percentage of the Aggregate Par Amount which consists of Participations related to the long-term debt rating of the related Selling Institution, and (iii) the limitations on the percentage of the Aggregate Par Amount which consists of Participations and Synthetic Securities in the aggregate related to the long-term debt rating of the Selling Institution or Synthetic Security Counterparty, as the case may be:

| Rating (S&P/Moody's) | Individual Synthetic Security Counterparty Limit | Individual Participation Selling Institution Limit | Aggregate Synthetic Security Counterparty and Participation Selling Institution Limit |
|---|---|---|---|
| AAA/Aaa | 20.0% | 20.0% | 20.0% |
| AA+/Aa1 | 10.0% | 10.0% | 20.0% |
| AA/Aa2 | 10.0% | 10.0% | 17.5% |
| AA-/Aa3 | 10.0% | 10.0% | 15.0% |
| A+/A1 | 5.0% | 5.0% | 10.0% |
| A/A2 | 5.0% | 5.0% | 7.5% |

*provided*, that no more than 3% of the Aggregate Par Amount may be Synthetic Securities consisting of Default Swaps.  For purposes of the foregoing, the limitations shall be calculated separately for each of Standard & Poor's and Moody's and each such limitation must be satisfied.

(k) <u>Limitation on Fixed Rate Portfolio Collateral</u>.  No more than 5% of the Aggregate Par Amount may be Fixed Rate Portfolio Collateral.

(l) <u>Portfolio Loans</u>.  After giving effect to the proposed purchase of any Portfolio Collateral, (i) at least 70% of the Aggregate Principal Amount of the Portfolio Collateral included in the Trust Estate must be Portfolio Loans (including Synthetic Securities, the

008656

Reference Obligations of which are loans); and (ii) not more than 10% of the Aggregate Principal Amount of the Portfolio Collateral included in the Trust Estate may be Portfolio Loans that are not Senior Secured Loans (including Synthetic Securities, the Reference Obligations of which are loans).

(m) No Event of Default. No Event of Default shall have occurred and be continuing.

(n) Industry Category Concentration. (i) No more than 8% of the Aggregate Par Amount is in any one Standard & Poor's Industry Category; *provided however*, in the case of three (3) Standard & Poor's Industry Categories, up to 12% of the Aggregate Par Amount may consist of items of Portfolio Collateral that are obligations of obligors in any one Standard & Poor's Industry Category, and (ii) no more than 32% of the Aggregate Par Amount may consist of items of Portfolio Collateral that are obligations of obligors in any three Standard & Poor's Industry Categories.

(o) Original Issue Size. After giving effect to the proposed purchase of any Portfolio Collateral, at least 80% of the Aggregate Principal Amount of the Portfolio Collateral included in the Trust Estate will be Portfolio Loans that are part of a senior credit facility whose aggregate original principal amount (whether or not funded and including all tranches thereunder) is not less than U.S.$100,000,000. No item of Portfolio Collateral included in the Trust Estate will be CLO Securities that are part of an issuer's aggregate issuance whose aggregate original principal amount (including all tranches thereunder) is less than U.S.$100,000,000. No item of Portfolio Collateral included in the Trust Estate will be Portfolio Loans that are part of a senior credit facility whose aggregate original principal amount (whether or not funded and including all tranches thereunder) is less than $50,000,000.

(p) Issuer Concentration. (i) After giving effect to the proposed purchase of any Portfolio Loan, no more than 1.50% of the Aggregate Par Amount may represent obligations of any single obligor, *provided* that obligations of not more than five obligors of Portfolio Loans may represent no more than 2.00% of the Aggregate Par Amount and (ii) after giving effect to the proposed purchase of any CLO Security, no more than 2.75% of the Aggregate Par Amount may represent obligations of any single obligor.

(q) Limitations on Step-Up Bonds. No more than 5.0% of the Aggregate Par Amount may include step-up bonds.

(r) Delayed Drawdown Loans and Revolving Loans. After giving effect to the proposed purchase of any Portfolio Collateral, no more than 5% of the Aggregate Par Amount may consist of Delayed Drawdown Loans and no more than 7.5% of the Aggregate Par Amount may consist of Revolving Loans; *provided* that no more than 10% of the Aggregate Par Amount may consist of Delayed Drawdown Loans and Revolving Loans in the aggregate.

(s) DIP Loans. No more than 5.0% of the Aggregate Par Amount may consist of DIP Loans. Each DIP Loan must be assigned a formal or estimated rating by Moody's and S&P.

    (t) <u>Collateral Obligations Loaned under Securities Lending Agreements</u>. No more than 15% of the Aggregate Par Amount may include Portfolio Collateral subject to any Securities Lending Agreement pursuant to Section 7.19.

    (u) <u>PIK Bonds</u>. No more than 30% of the Aggregate Par Amount may consist of PIK Bonds.

    Notwithstanding anything to the contrary set forth in this Section 12.2, if the Portfolio Collateral to be purchased is to be purchased with the Collateral Disposition Proceeds of the disposition of one or more assets that is not an item of Credit Risk Portfolio Collateral, Defaulted Portfolio Collateral, Portfolio Collateral sold pursuant to a Portfolio Improvement Exchange or Portfolio Collateral that has become subject to withholding tax, the purchase of the proposed item of Portfolio Collateral must (i) restore compliance with a Collateral Quality Test, Interest Coverage Test, Overcollateralization Test or a concentration limitation set forth in this Section 12.2 (or bring the Portfolio Collateral closer to compliance with any such test or limitation) not then satisfied or (ii) on a net basis improve the quality of the Portfolio Collateral as measured by such Collateral Quality Tests, Interest Coverage Tests, Overcollateralization Tests and concentration limitations and (iii) in the case of each of clause (i) and clause (ii) without causing any other Collateral Quality Test, Interest Coverage Test, Overcollateralization Test or concentration limitation to be violated or significantly increasing the likelihood of such a violation in the future.

    Notwithstanding the foregoing provisions of this Section 12.2 and Section 11.3, if the Issuer or the Servicer has previously entered into a commitment to purchase an item of Portfolio Collateral to be included in the Trust Estate and at the time of such commitment such item of Portfolio Collateral complied with the definition of Portfolio Collateral and each of the foregoing criteria in this Section 12.2, then the Issuer may consummate the purchase of such item of Portfolio Collateral notwithstanding that such item of Portfolio Collateral fails to comply with the definition of Portfolio Collateral and such criteria on the date of settlement, *provided that* the agreed to settlement date shall not be more than thirty (30) days after the commitment to acquire such item of Portfolio Collateral or, if settlement occurs more than 30 days following the commitment, such item of Portfolio Collateral satisfies the criteria of this Section 12.2 as of the date of settlement.

    Notwithstanding the foregoing provisions of this Section 12.2 and Section 11.3, the Issuer or the Servicer on behalf of the Issuer shall be deemed to have purchased or sold (as the case may be) any Portfolio Collateral as of the date on which the Issuer delivers to the Trustee a commitment to purchase or sell (as the case may be) such items of Portfolio Collateral, in each case entitling the Issuer (or the Trustee as assignee thereof) to receive or sell (as the case may be), and requiring the purchaser to purchase (in the case of a sale), such Portfolio Collateral and, in such event, the Issuer shall be deemed to have purchased or sold (as the case may be) such Portfolio Collateral on such date. Under the circumstances described in the immediately preceding sentence, if the transaction contemplated by the commitment referred to therein does not settle on or before the thirtieth (30th) day following the scheduled settlement date, the deemed purchase or sale shall be deemed not to have occurred.

008658

Further, notwithstanding the foregoing provisions of this Section 12.2 and Section 11.3, any certifications or other documents required to be delivered by the Servicer or the Issuer in connection with the purchase or sale of any item of Portfolio Collateral during the Revolving Period may be delivered by the Issuer or the Servicer on the settlement date for such item of Portfolio Collateral even if such date occurs after the Revolving Period.

Section 12.3.    Sale of Portfolio Collateral Subject to Offer or Call

(a) The Servicer may only direct the Trustee to sell an item of Portfolio Collateral that is the subject of an Offer or call for redemption, if together with its direction to sell such security, the Servicer certifies to the Trustee that the sales price for such Security is equal to or greater than 1% less than the price available pursuant to such Offer or call and such sale will be treated as if the Offer or call were consummated for purposes of determining the Collections for the Due Period relating to the date on which such sale occurs.

(b) If an item of Portfolio Collateral becomes subject to an Exchange Offer after it has been purchased by the Issuer, the Servicer will be permitted to take such action with respect to the Underlying Instrument or the issuer thereof as may be required to convert such item of Portfolio Collateral into an item of Equity Portfolio Collateral.

Section 12.4.    Purchase of Substitute Portfolio Collateral

(a) Upon receipt by the Trustee of a Servicer Order with respect thereto, the Collateral Disposition Proceeds received during any Due Period during the Revolving Period may be paid out of the Collection Account, on any Business Day during such Due Period or the immediately succeeding Due Period, for the purpose of purchasing one or more items of Substitute Portfolio Collateral for inclusion in the Trust Estate in an amount not to exceed the amount of such proceeds and specified in such Servicer Order; *provided that* the Trustee shall have received (i) a certificate of the Servicer dated as of the date of the purchase and the Grant of such Substitute Portfolio Collateral to the effect that such purchase is in compliance with the requirements of this Section 12.4 and Section 12.5(a) hereof and (ii) the certificate required pursuant to Section 12.2 hereof.

(b) In addition to the requirements set forth in 12.4(a), in connection with Substitute Portfolio Collateral purchased with Collateral Disposition Proceeds from the sale of Defaulted Portfolio Collateral, each of the Overcollateralization Tests and the Interest Coverage Test are satisfied, in each case both before and after giving effect to such purchase.

(c) In connection with a sale of an item of Credit Improved Portfolio Collateral after the Revolving Period or the receipt of Collateral Principal Collections due to an unscheduled prepayment after the Revolving Period, the Servicer may enter into commitments to apply such Collateral Disposition Proceeds or such unscheduled prepayments (net of accrued interest and costs) to the purchase of Portfolio Loans as either Additional Portfolio Collateral or Substitute Portfolio Collateral having an Aggregate Principal Amount equal to or greater than the Principal Balance of the original item of Portfolio Collateral within 90 days of receipt of such proceeds, so long as the Servicer certifies as of the date of purchase that it reasonably believes at the time of such commitment that, after giving effect to such sale and subsequent purchase, (A)

008659

each of the Overcollateralization Tests and the other collateral criteria described herein would be satisfied and the Interest Coverage Test was satisfied for the most recent Payment Date, (B) such Portfolio Loan to be purchased has a Moody's Rating equal to or higher than the Moody's Rating of the original item of Portfolio Collateral, (C) such Portfolio Loan to be purchased has an S&P Rating equal to or higher than the S&P Rating of the original item of Portfolio Collateral, (D) such Portfolio Loan to be purchased has a stated maturity on or prior to the final maturity of such original item of Portfolio Collateral and (E) neither Rating Agency has reduced or withdrawn (and not restored) the rating assigned by it on the Closing Date to any Class of Notes.

Section 12.5. <u>Conditions Applicable to all Transactions Involving Purchases of Portfolio Collateral</u>

(a) Any transaction effected under this Article or under Sections 3.4, 10.2, 10.3, 11.3 or 12.4 hereof involving the Servicer and one or more Affiliates of the Servicer shall be conducted on an arm's-length basis. Any such transaction effected with an Affiliate of the Servicer, the Issuer or the Trustee, shall be effected on terms as favorable to the Noteholders as would be the case if such Person were not so affiliated; *provided that* the Trustee shall have no responsibility to oversee compliance with this clause by the Issuer or Servicer.

(b) Upon any purchase or substitution pursuant to this Article or Sections 11.3, 12.3(b) or 12.4 hereof, each such Pledged Security shall be Delivered to the Trustee.

(c) The Issuer hereby represents and warrants and will certify to the Trustee in an Officer's Certificate as of the date of each purchase and Grant to the Trustee of each Portfolio Collateral pursuant to Section 11.3, Section 12.3(b) and Section 12.4 hereof:

(i) the Issuer is the owner of such item of Portfolio Collateral and the Deposit free and clear of any liens, claims (including any adverse claims) or encumbrances of any nature whatsoever, except for those granted or expressly permitted pursuant to this Indenture and due bills, if any, with respect to interest, or a portion thereof, accrued on such Portfolio Collateral prior to the first payment date and owed by the Issuer to the seller of such Portfolio Collateral;

(ii) the Issuer has acquired its ownership in such item of Portfolio Collateral and the Deposit in good faith without notice of any adverse claim, except as described in paragraph (i) above;

(iii) the Issuer has Delivered such item of Portfolio Collateral to the Trustee and has not assigned, pledged or otherwise encumbered any interest in such Portfolio Collateral or the Deposit other than interests granted or expressly permitted pursuant to this Indenture;

(iv) the Issuer has full right to Grant and does hereby Grant such item of Portfolio Collateral and the Deposit to the Trustee;

(v) the information set forth with respect to such item of Portfolio Collateral in <u>Schedule A</u> hereto is correct; and

(vi)    such item of Portfolio Collateral satisfies the requirements of the definition of Portfolio Collateral.

Section 12.6.   Sale of Warrants

The Servicer may direct the Trustee in writing to sell, and the Trustee shall release from the lien of this Indenture and sell in the manner directed by the Servicer, any warrant that is part of a Unit at any time after such warrant becomes separately tradable.

Section 12.7.   Underlying Instruments

(a) With respect to each Portfolio Loan acquired by a Participation, the Issuer shall cause the Trustee to hold at its office in the State of New York an original executed Underlying Instrument entered into between the Issuer and the Selling Institution which, except in the case of a Portfolio Loan evidenced by an instrument (the original of which shall be delivered to the Trustee), may be a copy thereof, which may be sent by telecopier, certified by the Servicer or the Issuer as a true and accurate copy (which in the case of a Participation shall include the loan and security documentation with respect to the underlying loan) as provided to it by the Servicer, and, *provided that* the Trustee has sufficient advance notice of such transaction, the Trustee shall send a notice to the Selling Institution and the underlying obligor of such Floating Rate Portfolio Collateral on or prior to the Business Day on which such Floating Rate Portfolio Collateral is to be included in the Trust Estate.

(b) The Issuer (upon Servicer Order) may enter into any amendment of or supplement to any Underlying Instrument with respect to any item of Portfolio Collateral, without notice to or consent of any Noteholder, but with prior written notice to the Trustee, if the amendment or supplement is required (a) by the provisions of the Underlying Instrument or this Indenture, (b) to cure any ambiguity, inconsistency or formal defect or omission, (c) in connection with any authorized amendment of or supplement to this Indenture, or (d) to make any other change deemed necessary or beneficial by the Issuer (upon Servicer Order); *provided that*, unless such Portfolio Loan is in default, or default is reasonably foreseeable, after giving effect to such amendment or supplement, such item of Portfolio Collateral satisfies the definition of Portfolio Collateral hereunder.  The Issuer shall be under no obligation to enter into any such amendment or supplement, and the Servicer and the Issuer shall be under no obligation to provide any Person with any information related thereto (other than to confirm to the Trustee compliance with this Section), to the extent that the Servicer or the Issuer, as the case may be, believes in good faith that any action so taken is necessary in order not to violate any law, regulation or contractual arrangement.  The Servicer shall retain any appropriate records of such amendments.

(c) If an amendment of or supplement to any Underlying Instrument without any consent of Noteholders is not permitted by subsection (b), the Issuer may enter into, and the Trustee shall, as directed by the Issuer, accept, or if necessary consent to, such amendment or supplement, with at least 10 days' prior written notice to the Trustee and the Holders of the Notes, unless the Trustee and the Issuer have received notification by the more than 33-1/3% of the Aggregate Principal Amount of the Notes objecting to such amendment or supplement within 10 days of such notice.

008661

(d) If the Servicer determines that any amendment to the Underlying Instrument of a DIP Loan materially affects the credit quality of such DIP Loan, the Servicer shall promptly notify the Rating Agencies of such amendment, prior to execution of such amendment.

Section 12.8.   Reserved

Section 12.9.   Reserved

Section 12.10.  Synthetic Securities; Strip Securities

For purposes of the eligibility criteria and related tests herein, a Synthetic Security will generally be included as an item of Portfolio Collateral having the maturity, interest rate and other payment characteristics of the Synthetic Security and not of the Reference Obligation (including characterization as either an item of Fixed Rate Portfolio Collateral or Floating Rate Portfolio Collateral) and, with respect to all other characteristics, will be included as an item of Portfolio Collateral having the relevant characteristics of the related Reference Obligation and not of the Synthetic Security. The Servicer will notify Moody's and Standard & Poor's in writing or electronically with respect to each purchase of a Synthetic Security not later than the trade date for such Synthetic Security; except that, if, at any time, the rating by Moody's on any Class of Notes then rated by Moody's has been downgraded at least one rating sub-category (and has not been restored) or is put on credit watch (with negative implications), no Synthetic Security will be purchased by the Issuer for inclusion in the Trust Estate unless Moody's has received notice of such purchase and any information necessary to evaluate such purchase, receipt of which shall be acknowledged by a Vice President or more senior member of Moody's CDO Group, in writing or electronically, and after such receipt is acknowledged, either Moody's shall inform the Servicer that such purchase will not cause Moody's to withdraw or further downgrade any of the then-current ratings assigned by Moody's to any of the Notes within 10 Business Days, or after 10 Business Days the Servicer may assume that such purchase will not cause Moody's to withdraw or further downgrade any of the then-current ratings assigned by Moody's to any of the Notes. If after the trade date for any Synthetic Security, there is any modification to the terms of such Synthetic Security, the Servicer will provide notice of such modification to Moody's and Standard & Poor's. Further, unless otherwise agreed by Moody's or as otherwise contemplated in the definition of Synthetic Security in Section 1.1 hereof, upon maturity, acceleration or early termination of a Synthetic Security or the related Reference Obligation, the Issuer will accept only the Reference Obligation or the par amount thereof unless the Reference Obligation would be characterized as Credit Risk Portfolio Collateral, Defaulted Portfolio Collateral or Credit Improved Portfolio Collateral, in which case the Issuer may accept the current fair market value thereof, except in the event of the exercise of any put or call provision of the Synthetic Security or Reference Obligation, in which case the Issuer shall only accept the Reference Obligation or an amount greater than or equal to the par amount thereof, and the Issuer will take all commercially reasonable actions under the Synthetic Security to accomplish the foregoing. Notwithstanding anything in this Indenture to the contrary, in connection with the acquisition of a Synthetic Security and in lieu of all or a portion of the purchase price for such Synthetic Security, the Issuer may grant the related Synthetic Security a first priority security interest in cash and Eligible Investments designated by the Issuer and the proceeds thereof, which may be released from the lien of the Indenture and deposited with such Synthetic Security Obligor (or an intermediary or agent therefor) and invested as provided by the

008662

terms of such Synthetic Security, and the proceeds of which may be applied to make periodic payments under such Synthetic Security. For purposes of this Indenture, the grant of such security interest shall be treated as the payment of a purchase price equal to the value of the cash and Eligible Investments granted, and the Issuer's obligation to make periodic payments under such Synthetic Security shall be disregarded.

Section 12.11. Delayed Drawdown Loans and Revolving Loans

A Delayed Drawdown Loan will not be eligible for purchase by the Issuer for inclusion in the Trust Estate unless the related Underlying Instrument provides (i) that advances may be made for a period not to exceed one (1) year from the date of origination of the Delayed Drawdown Loan and in any event before the end of the Revolving Period; (ii) for a maximum amount that can be borrowed from the Issuer on one or more specified borrowing dates; (iii) that funds borrowed from the Issuer and subsequently repaid may not be reborrowed; and (iv) that the borrower is entitled to such additional advances only upon the achievement of financial performance or other objective criteria established at origination and set forth in such credit agreement.

In addition, simultaneously with the Issuer's purchase of any Delayed Drawdown Loan or Revolving Loan, the Issuer is required to deposit into the Loan Funding Account the full amount of any advances or delayed draws that may be required of the Issuer thereunder and principal repaid under any Revolving Loan is required to be deposited in the Loan Funding Account to the extent the Issuer's obligation to fund any future advances has not been irrevocably reduced.

ARTICLE XIII

MISCELLANEOUS

Section 13.1. Form of Documents Delivered to Trustee

In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate or opinion of an Authorized Officer of the Issuer or the Servicer may be based, insofar as it relates to legal matters, upon an Opinion of Counsel or a certificate of or representations by such legal counsel, unless such Authorized Officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which his certificate or opinion is based are erroneous. Any such certificate of an Authorized Officer of the Issuer or the Servicer, or Opinion of Counsel or certificate of or representations by such legal counsel may be based, insofar as it relates to factual matters, upon a certificate of opinion of, or representations by the Issuer, the Servicer or any other Person, stating that the information with respect to such factual matters is in the

possession of the Issuer, the Servicer or such other Person, unless such Authorized Officer of the Issuer or the Servicer or counsel knows that the certificate or opinion or representations with respect to such matters are erroneous.  Any Opinion of Counsel may also be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an Authorized Officer of the Issuer or the Servicer, stating that the information with respect to such matters is in the possession of the Issuer or the Servicer, unless such counsel knows that the certificate or opinion or representations with respect to such matters are erroneous.

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Section 13.2.    Acts of Noteholders

(a)  Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Noteholders may be embodied in and evidenced by one or more instruments (which may be an electronic document, including but not limited to in the form of e-mail, to the extent permitted by applicable law) of substantially similar tenor signed by such Noteholders in person or by an agent or proxy duly appointed in writing (*provided* that no signature shall be required on electronic documents, including but not limited to in the form of e-mail); and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Trustee, and, where it is hereby expressly required, to the Issuer.  Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and conclusive in favor of the Trustee and the Issuer, if made in the manner provided in this Section.

(b)  The fact and date of the execution by any Person of any such instrument or writing may be proved in any manner which the Trustee deems sufficient.

(c)  The ownership of Notes shall be proved by the Note Register.

(d)  Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any Notes shall bind the Holder (and any transferee thereof) of every Note issued upon the registration thereof or in exchange therefor or in lieu thereof, in respect of anything done, omitted or suffered to be done by the Trustee or the Issuer in reliance thereon, whether or not notation of such action is made upon such Note.

Section 13.3.    Notices, etc., to the Trustee, Issuer, Servicer, the Irish Paying Agent and Bear Stearns

Any request, demand, authorization, direction, notice, consent, waiver or other documents provided or permitted by this Indenture to be made upon, given or furnished to, or filed with the Trustee, the Issuer, the Servicer, Bear Stearns, the Irish Paying Agent or the Paying and Transfer Agent shall be sufficient for every purpose hereunder if in writing and mailed by first class mail, sent by overnight courier guaranteeing next day delivery or sent by facsimile transmission in legible form to the Trustee, the Issuer, the Servicer or Bear Stearns, as applicable, at the following addresses:

008664

(1)     to the Trustee at its Corporate Trust Office or at any other address furnished in writing to the Issuer or the Noteholders by the Trustee (any request, direction, notice or other communication from the Servicer to the Trustee under Article XII hereof (other than required certification) may be by electronic mail, which shall be deemed to be in writing);

(2)     to the Issuer at the offices of Maples Finance Limited, P.O. Box 1093 GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands, Attention:  Directors, or at any other address previously furnished in writing to the Trustee by the Issuer;

(3)     to the Co-Issuer at c/o Donald J. Puglisi, 850 Library Avenue, Suite 204, City of Newark, County of New Castle, Delaware 19711, or at any other address previously furnished in writing to the Noteholders, the Trustee or the Issuer by the Co-Issuer;

(4)     to the Servicer at the offices of Highland Capital Management, LP, Two Galleria Tower, 13455 Noel Road, Suite 1300, Dallas, Texas 75240, Attention: [_____], or at any other address previously furnished in writing to the Noteholders, the Trustee or the Issuer by the Servicer;

(5)     to Bear Stearns at the offices of Bear, Stearns & Co. Inc., 383 Madison Avenue, 7th Floor, New York, New York 10179, Attention: CDO Group, or at any other address previously furnished in writing to the Trustee by Bear Stearns;

(6)     to the Irish Paying Agent at the offices of 3 George's Dock, International Financial Services Centre, Dublin, Ireland or at any other address previously furnished in writing to the Trustee by the Irish Paying Agent;

(7)     to the Paying and Transfer Agent at the offices of JPMorgan Chase Bank, National Association, at the Trustee's Corporate Trust Office;

(8)     to the Rating Agencies as described in Section 10.7 hereof; or

(9)     to the Repository at CDO Library c/o The Bond Market Association, 360 Madison Avenue (18th Floor), New York, NY 10017, Electronic mail address: admin@cdolibrary.com or at any other address previously furnished in writing to the Trustee by the operator of the Repository.

The Issuer hereby directs the Trustee and the Trustee agrees that, until it receives written notification from Ambac Assurance Corporation ("Ambac") or CIFG Services, Inc. ("CIFG"), as applicable, it shall deliver, or cause to be delivered, to Ambac and CIFG, at their respective addresses set forth below, a copy of each Monthly Report, Note Valuation Report, other report, accounting, request, demand, authorization, direction, order, notice, consent waiver or other action (each, a "Notice") delivered or required to be delivered to any Holder or any Rating Agency pursuant to this Indenture.  Any Notice shall be delivered to Ambac at One State Street Plaza, New York, New York 10004; Attention Portfolio Risk Management, facsimile

008665

(212) 208-3509, e-mail sfcdsurv@ambac.com, or at any other address previously furnished to the Trustee by Ambac, not later than the first day on which such Notice is delivered to any Holder or Rating Agency. Any Notice shall be delivered to CIFG at 825 Third Avenue, 6th Floor, New York, New York 10022; Attention: Paul Kwiatkoski – Head of Surveillance, facsimile 212-909-3958, e-mail "surveillance@cifg.com" and "general.counsel@cifg.com", or at any other address previously furnished to the Trustee by CIFG, not later than the first day on which such Notice is delivered to any Holder or Rating Agency. Any document required to be delivered or made available to Ambac or CIFG may be made available by providing Ambac or CIFG, respectively, with access to a website containing such report in a format that permits the user to download the document as a pdf file.

Section 13.4.    Notices to Noteholders; Waiver

Where this Indenture provides for giving a copy of any report or notice to Noteholders (such report or notice a "notice") of any event, such notice shall be sufficiently given (unless otherwise herein expressly provided) if in writing and mailed, first-class postage prepaid, to each Noteholder affected by such event, at its address as it appears on the Note Register, not later than the latest date, and not earlier than the earliest date, prescribed for the giving of such notice and so long as any Class of Notes is listed on the Irish Stock Exchange, the Irish Paying Agent. In any case where notice to Noteholders is given by mail, neither the failure to mail such notice, nor any defect in any notice so mailed, to any particular Noteholder shall affect the sufficiency of such notice with respect to other Noteholders, and any notice which is mailed in the manner herein provided shall conclusively be presumed to have been duly given whether or not received. The Trustee shall provide notices directly to any beneficial holder of a Note that so identifies itself and requests receipt of such notices in writing to the Trustee.

Where this Indenture provides for notice in any manner, any such notice may be waived in writing by any Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice. Waivers of notice by Noteholders shall be filed with the Trustee but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

In the event that, by reason of the suspension of the regular mail service as a result of a strike, work stoppage or similar activity it shall be impractical to mail notice of any event to Noteholders when such notice is required to be given pursuant to any provision of this Indenture, then any manner of giving such notice as shall be satisfactory to the Trustee shall be deemed to be a sufficient giving of such notice.

Section 13.5.    Effect of Headings and Table of Contents

The Article and Section headings herein and the Table of Contents are for convenience only and shall not affect the construction hereof.

Section 13.6.    Successors and Assigns

All covenants and agreements in this Indenture by the Co-Issuers shall bind its respective successors and assigns, whether so expressed or not.

008666

Section 13.7.   Severability

In case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 13.8.   Benefits of Indenture

Nothing in this Indenture or in the Notes, expressed or implied, shall give to any Person, other than the parties hereto and their successors hereunder, the Servicer and the Noteholders, any benefit or any legal or equitable right, remedy or claim under this Indenture.

The Servicer and its respective successors and assigns, shall each be third-party beneficiaries of the provisions of this Indenture, and shall be entitled to rely upon this Indenture and directly to enforce such provisions of this Indenture.

Section 13.9.   Reserved

Section 13.10. Governing Law; Submission to Jurisdiction; Waiver of Trial by Jury

(a) This Indenture, each indenture supplemental hereto and each Note shall be construed in accordance with and governed by the laws of the State of New York applicable to agreements made and to be performed therein.  The State of New York shall be the securities intermediary's jurisdiction of the Securities Intermediary for purposes of the UCC and the United States Regulations.

(b) Each of the Co-Issuers and the Trustee hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to the Notes or this Indenture, or for recognition or enforcement of any judgment, and each of the Co-Issuers and the Trustee hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the Co-Issuers and the Trustee hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.  Each of the Co-Issuers and the Trustee irrevocably consents to the service of any and all process in any action or proceeding by the mailing or delivery of copies of such process to it at the office of its agent set forth in Section 13.3.  Each of the Co-Issuers and the Trustee agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(c) EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS INDENTURE, ANY OTHER TRANSACTION DOCUMENTS OR ANY INSTRUMENT OR DOCUMENT DELIVERED HEREUNDER OR THEREUNDER.

008667

Section 13.11. Counterparts

This instrument may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

Section 13.12. No Issuer Office Within the United States

The Issuer (or the Servicer acting in the name or on behalf of the Issuer) shall not maintain an office located within the United States; *provided that* neither the performance by JPMorgan Chase Bank, National Association, as appointed agent for the Issuer of the Issuer's obligation to prepare reports under or pursuant to Article X hereof (and other services rendered by JPMorgan Chase Bank, National Association, pursuant to the Collateral Administration Agreement as described in Section 10.5(f) hereof) at and through the offices of JPMorgan Chase Bank, National Association in the United States nor the services rendered by the Servicer pursuant to the Servicing Agreement at its offices in the United States shall be a violation of this Section 13.12.

Section 13.13. Subordination

(a) Notwithstanding anything in this Indenture to the contrary, the Issuer and the Holders of the Notes agree:

(i)     for the benefit of the Holders of the Class A-1LA Notes, the Class X Notes and the Trustee that the Class A-1LB Notes, Class A-2L Notes, the Class A-3L Notes, the Class A-4L Notes, the Class B-1L Notes and the Issuer's rights in and to the Trust Estate (with respect to the Class A-1LA Notes, the "Senior Class A Subordinate Interests") shall be subordinate and junior to the Class A-1LA Notes and the Class X Notes and the Trustee to the extent and in the manner set forth herein, including but not limited to payment of principal of, and interest on, the Senior Class A Subordinate Interests, and that the lien of the Trustee with respect to the Senior Class A Subordinate Interests is subordinate to any lien of the Trustee in favor of the holders of Class A-1LA Notes; and

(ii)     for the benefit of the Holders of the Class A-1LB Notes and the Trustee that the Class A-3L Notes, the Class A-4L Notes, the Class B-1L Notes and the Issuer's rights in and to the Trust Estate (with respect to the Class A-1LB Notes, the "Class A-1LB Subordinate Interests") shall be subordinate and junior to the Class A-1LB Notes and the Trustee to the extent and in the manner set forth herein, including but not limited to payment of principal of, and interest on, the Class A-1LB Subordinate Interests, and that the lien of the Trustee with respect to the Class A-1LB Subordinate Interests is subordinate to any lien of the Trustee in favor of the holders of Class A-1LB Notes

(iii)     for the benefit of the Holders of the Class A-2L Notes and the Trustee that the Class A-3L Notes, the Class A-4L Notes, the Class B-1L Notes and the Issuer's rights in and to the Trust Estate (with respect to the Class A-2L Notes, the "Class A-2L Subordinate Interests") shall be subordinate and junior to the Class A-2L Notes and the Trustee to the extent and in the manner set forth herein, including but not limited to

008668

payment of principal of, and interest on, the Class A-2L Subordinate Interests, and that the lien of the Trustee with respect to the Class A-2L Subordinate Interests is subordinate to any lien of the Trustee in favor of the holders of Class A-2L Notes; and

(iv)    for the benefit of the Holders of the Class A-3L Notes and the Trustee that the Class A-4L Notes and the Class B-1L Notes and the Issuer's rights in and to the Trust Estate (with respect to the Class A-3L Notes, the "Class A-3L Subordinate Interests") shall be subordinate and junior to the Class A-3L Notes and the Trustee to the extent and in the manner set forth herein, including but not limited to payment of principal of the Class A-3L Subordinate Interests, and that the lien of the Trustee with respect to the Class A-3L Subordinate Interests is subordinate to any lien of the Trustee in favor of the holders of Class A-3L Notes.

(v)     for the benefit of the Holders of the Class A-4L Notes and the Trustee that the Class B-1L Notes and the Issuer's rights in and to the Trust Estate (with respect to the Class A-4L Notes, the "Class A-4L Subordinate Interests") shall be subordinate and junior to the Class A-4L Notes and the Trustee to the extent and in the manner set forth herein, including but not limited to payment of principal of the Class A-4L Subordinate Interests, and that the lien of the Trustee with respect to the Class A-4L Subordinate Interests is subordinate to any lien of the Trustee in favor of the holders of Class A-4L Notes.

If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article V, the Notes shall be paid in the priority set forth in Section 11.1(d) hereof.

In addition to the foregoing:

(i)     the Holders of the Class A-1LB Notes agree, for the benefit of the Holders of the Class A-1LA Notes and the Class X Notes, not to cause the filing of a petition in bankruptcy against the Issuer for failure to pay amounts due under the Class A-1LB Notes or hereunder until the payment in full of the Class A-1LA Notes and the Class X Notes

(ii)    the Holders of the Class A-2L Notes agree, for the benefit of the Holders of the Class A-1LA Notes, the Class A-1LB Notes and the Class X Notes, not to cause the filing of a petition in bankruptcy against the Issuer for failure to pay amounts due under the Class A-2L Notes or hereunder until the payment in full of the Class A-1LA Notes, the Class A-1LB Notes and the Class X Notes;

(iii)   the Holders of the Class A-3L Notes agree, for the benefit of the Holders of the Senior Class A Notes, not to cause the filing of a petition in bankruptcy against the Issuer for failure to pay amounts due under the Class A-3L Notes or hereunder until the payment in full of the Senior Class A Notes; and

(iv)    the Holders of the Class A-4L Notes agree, for the benefit of the Holders of the Senior Class A Notes and the Class A-3L Notes, not to cause the filing of a petition

008669

in bankruptcy against the Issuer for failure to pay amounts due under the Class A-4L Notes or hereunder until the payment in full of the Senior Class A Notes; (iv)

(v) the Holders of the Class B-1L Notes agree, for the benefit of the Holders of the Class A Notes, not to cause the filing of a petition in bankruptcy against the Issuer for failure to pay amounts due under the Class B-1L Notes or hereunder until the payment in full of the Class A Notes;

in each case, not before one year and one day, or, if longer, the applicable preference period then in effect, have elapsed since such payment.

If notwithstanding the provisions of this Indenture, any Holder of the Class B-1L Notes shall have received any payment or distribution in respect of the Class B-1L Notes contrary to the provisions of this Indenture, then unless and until the Class A Notes shall have been paid in full in accordance with this Indenture, such payment or distribution shall be received and held in trust for the benefit of, and shall immediately be paid over and delivered to, the Trustee, which shall pay and deliver the same to the Holders of the Class A Notes, in accordance with this Indenture.

(b) Each Holder of Class B-1L Notes agrees that such Holder shall not demand, accept, or receive any payment or distribution in respect of such Notes in violation of the provisions of this Indenture. Nothing in this Section shall affect the obligation of the Issuer to pay Holders of such Notes amounts owing in respect thereof.

(c) So long as any Class A Notes remain Outstanding to the extent it may lawfully do so, each Class B-1L Noteholder by its acceptance of a Class B-1L Note:

(i) agrees that it will not step up, plead, claim or in any manner whatsoever take advantage of, any appraisement, valuation, stay, extension or redemption laws, now or hereafter in force in any jurisdiction, which may delay, prevent or otherwise hinder (A) the performance, enforcement or foreclosure of this Indenture, (B) the sale of any of the Trust Estate, or (C) the putting of the purchaser or purchasers thereof into possession of such property immediately after the sale thereof;

(ii) waives all benefit or advantage of any such laws;

(iii) waives and releases all rights to have the Trust Estate marshaled upon any foreclosure, sale or other enforcement of this Indenture; and

(iv) consents and agrees that, subject to the terms of this Indenture, all the Collateral may at any such sale be sold by the Trustee as an entirety.

Section 13.14. Survival of Provisions

Notwithstanding the satisfaction and discharge of this Indenture, the rights and obligations of either Co-Issuer, the Trustee, the Noteholders and other secured parties hereunder under Sections 2.7(h), 2.10, 4.2, 5.19, 6.7, 6.13, 7.3, 7.6, 7.16, 11.1 and 13.15 hereof shall otherwise survive termination of the rights of the parties hereunder.

008670

Section 13.15. Liability of Co-Issuers.

Notwithstanding any other terms of this Indenture, the Notes or any other agreement entered into between, inter alia, the Co-Issuers or otherwise, neither of the Co-Issuers shall have any liability whatsoever to the other Co-Issuer under this Indenture, the Notes, any such agreement or otherwise and, without prejudice to the generality of the foregoing, neither of the Co-Issuers shall be entitled to take any steps to enforce, or bring any action or proceeding, in respect of this Indenture, the Notes, any such agreement or otherwise against the other Co-Issuer. In particular, neither of the Co-Issuers shall be entitled to petition or take any other steps for the winding up or bankruptcy of the other Co-Issuer or shall have any claim in respect of any assets of the other Co-Issuer.

Section 13.16. Escheat.

In the absence of a written request from the Co-Issuers to return unclaimed funds to the Co-Issuers, the Trustee shall from time to time deliver all unclaimed funds to or as directed by applicable escheat authorities, as determined by the Trustee in its sole discretion, in accordance with the customary practices and procedures of the Trustee.  Any unclaimed funds held by the Trustee pursuant to this section shall be held uninvested and without any liability for interest.

Section 13.17. Posting of Documents on Repository

Any document or report required to be delivered to the Repository or to be made available to the operator of the Repository pursuant to this Indenture shall be made available by providing the operator of the Repository with access to a website containing such document or report in a format that permits the user to download the document as a pdf file.

Section 13.18. Consent to Posting of Documents on Repository

The Issuer hereby consents to (a) the posting of the offering circular related to the Notes and this Indenture and the periodic reports to be delivered pursuant to this Indenture and any amendments or other modifications thereto on the Repository for use in the manner provided in the Repository, and (b) the display of its name on the Repository in connection therewith.

ARTICLE XIV

ASSIGNMENT OF SERVICING AGREEMENT

Section 14.1.   Assignment of Servicing Agreement

(a) The Issuer, in furtherance of the covenants of this Indenture and as security for the Notes and the performance and observance of the provisions hereof, hereby assigns, transfers, conveys and sets over to the Trustee, for the benefit of the Noteholders and the other secured parties hereunder, all of the Issuer's estate, right, title and interest in, to and under the Servicing Agreement, including, without limitation, (i) the right to give all notices, consents and releases thereunder, (ii) the right to give all notices of termination and to take any legal action upon the breach of an obligation of the Servicer thereunder, including the commencement,

conduct and consummation of proceedings at law or in equity, (iii) the right to receive all notices, accountings, consents, releases and statements thereunder and (iv) the right to do any and all other things whatsoever that the Issuer is or may be entitled to do thereunder; *provided* so long as no Event of Default has occurred and is continuing hereunder, the Trustee hereby grants the Issuer a license to exercise all of the Issuer's rights pursuant to the Servicing Agreement without notice to or the consent of the Trustee (except as otherwise expressly required by this Indenture, including, without limitation, as set forth in paragraph (f) of this Section 14.1 hereof), which license shall be and is hereby deemed to be automatically revoked upon the occurrence of any Event of Default hereunder until such time, if any, as the Event of Default is cured or waived. The Trustee shall have no liability with respect to any act or failure to act by the Issuer under the Servicing Agreement (provided that this sentence shall not limit or relieve the Trustee from any responsibility it may have under this Indenture upon the occurrence of and during the continuance of any Event of Default).

(b) The assignment made hereby is executed as collateral security, and the execution and delivery hereby shall not in any way impair or diminish the obligations of the Issuer under the provisions of the Servicing Agreement, nor shall any of the obligations contained in the Servicing Agreement be imposed on the Trustee.

(c) Upon the retirement of the Notes and the release of the Trust Estate from the lien of this Indenture, this assignment and all rights herein assigned to the Trustee for the benefit of the Noteholders shall cease and terminate and all the estate, right, title and interest of the Trustee in, to and under the Servicing Agreement shall revert to the Issuer and no further instrument or act shall be necessary to evidence such termination and reversion.

(d) The Issuer represents that it has not executed any other assignment of the Servicing Agreement.

(e) The Issuer agrees that this assignment is irrevocable, and that it will not take any action which is inconsistent with this assignment or make any other assignment inconsistent herewith. The Issuer will, upon the request of the Trustee, execute all instruments of further assurance and all such supplemental instruments with respect to this assignment as the Trustee may specify.

(f) The Issuer hereby agrees, and hereby undertakes to obtain the agreement of the Servicer in the Servicing Agreement, to the following:

(1) The Servicer consents to, and agrees to perform, the provisions hereof applicable to the Servicer.

(2) The Servicer acknowledges that the Issuer is assigning all of its right, title and interest in, to and under the Servicing Agreement to the Trustee for the benefit of the Noteholders and the other Secured Parties hereunder.

(3) The Servicer shall deliver to the Trustee (at substantially the same time as delivered pursuant to the Servicing Agreement) duplicate original copies of all notices, statements, communications and instruments delivered or required to be delivered to the Issuer pursuant to the Servicing Agreement.

008672

(4) Except as set forth in the Servicing Agreement, neither the Issuer nor the Servicer will enter into any agreement amending, modifying or terminating the Servicing Agreement or selecting or consenting to a successor manager (other than an amendment or modification of the type that may be made to this Indenture without Holder consent), (a) without satisfying the Rating Condition and (b) so long as the Requisite Holders have not objected in writing to such amendment or modification within 30 days of notice thereof; and any such amendment, modification, termination, selection or consent (in each case, other than pursuant to the provisions of the Servicing Agreement) without confirmation by the Rating Agencies or if the Requisite Holders have objected shall be void; *provided that* the consent of Requisite Noteholders or confirmation by Moody's and S&P shall not be required for an amendment or modification to cure any ambiguity, to correct or supplement any provisions therein, to comply with any changes in law, or to make any other provisions with respect to matters or questions arising under the Servicing Agreement which shall not be inconsistent with the provisions thereof or of this Indenture, so long as such amendment or modification does not affect in any material respects the interests of any Noteholder (as evidenced by an Opinion of Counsel acceptable to the Trustee) and each of Moody's and S&P is notified in writing of such amendment or modification. Notwithstanding the foregoing, nothing in this subsection shall limit, in any way, any of the rights or remedies available to the Servicer pursuant to the Servicing Agreement.

(5) Except as set forth herein and in the Servicing Agreement, the Servicer shall continue to serve as Servicer under the Servicing Agreement notwithstanding that the Servicer shall not have received amounts due it under the Servicing Agreement because sufficient funds were not then available hereunder to pay such amounts in accordance with Article XI hereof, and agrees not to cause the filing of a petition in bankruptcy against the Issuer for any reason whatsoever, including without limitation the non-payment to the Servicer, until the payment in full of all Notes issued under this Indenture and the expiration of a period equal to one year and one day following all such payments; *provided that* nothing in this clause shall preclude, or be deemed to estop, the Servicer (A) from taking any action prior to the expiration of the aforementioned one year and one day period in (x) any case or proceeding voluntarily filed or commenced by the Issuer or the Co-Issuer, as the case may be, or (y) any involuntary insolvency proceeding filed or commenced against the Issuer or the Co-Issuer, as the case may be, by a Person other than the Servicer or its Affiliates, or (B) from commencing against the Issuer or the Co-Issuer or any properties of the Issuer or the Co-Issuer any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceeding. Notwithstanding the foregoing, nothing in this subsection shall limit, in any way, any of the rights or remedies available to the Servicer pursuant to the Servicing Agreement.

(6) The Servicer will perform its obligations with respect to any conflict of interest in accordance with the applicable requirements of the Investment Advisers Act of 1940.

008673

IN WITNESS WHEREOF, we have set our hands as of the 10th day of May, 2006.

EXECUTED AS A DEED BY
ROCKWALL CDO LTD., as Issuer

By: _____

Name: Wendy Ebanks

Title: Director

in the presence of:

_____
witness

ROCKWALL CDO (DELAWARE) CORP., as Co-
Issuer

By: _____

Name:

Title:

JPMORGAN CHASE BANK, NATIONAL
ASSOCIATION, as Trustee

By: _____

Name:

Title:

*Indenture*

008674

IN WITNESS WHEREOF, we have set our hands as of the 10th day of May, 2006.

EXECUTED AS A DEED BY
ROCKWALL CDO LTD., as Issuer


By: _____
   Name:
   Title:


in the presence of:


_____

  witness


ROCKWALL CDO (DELAWARE) CORP., as Co-
Issuer

By: _____
   Name:  Donald J. Puglisi
   Title: President


JPMORGAN CHASE BANK, NATIONAL
ASSOCIATION, as Trustee


By: _____
   Name:
   Title:


*Indenture*

008675

IN WITNESS WHEREOF, we have set our hands as of the 10th day of May, 2006.

EXECUTED AS A DEED BY
ROCKWALL CDO LTD., as Issuer


By: _____
    Name:
    Title:


in the presence of:


_____
    witness


ROCKWALL CDO (DELAWARE) CORP., as Co-
    Issuer


By: _____
    Name:
    Title:


JPMORGAN CHASE BANK, NATIONAL
    ASSOCIATION, as Trustee


By: _____
    Name: **BRUCE C. BOYD**
    Title: **VICE PRESIDENT**


*Indenture*

008676

JPMORGAN CHASE BANK, NATIONAL
ASSOCIATION, as Securities Intermediary

By: _____

Name:    **BRUCE C. BOYD**

Title:    **VICE PRESIDENT**

*Indenture*

008677

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

GRANTING CLAUSES ............................................................................................... 1

ARTICLE I      DEFINITIONS................................................................................ 2

    Section 1.1.    Definitions. ................................................................. 2
    Section 1.2.    Other Definitional Provisions. ..................................... 61
    Section 1.3.    Assumptions as to Portfolio Collateral and Trust Estate. ................. 61

ARTICLE II     THE NOTES................................................................................ 62

    Section 2.1.    Forms Generally........................................................... 62
    Section 2.2.    Authorized Amount. ..................................................... 66
    Section 2.3.    Denominations; Extension of Revolving Period and Final Maturity.......................................................................... 66
    Section 2.4.    Execution, Authentication, Delivery and Dating. .............. 70
    Section 2.5.    Registration, Registration of Transfer and Exchange. ...... 71
    Section 2.6.    Mutilated, Destroyed, Lost or Stolen Notes..................... 80
    Section 2.7.    Payments on the Notes. ................................................ 81
    Section 2.8.    Persons Deemed Owners. ............................................. 84
    Section 2.9.    Cancellation. ............................................................... 84
    Section 2.10.   Tax Purposes. .............................................................. 85
    Section 2.11.   Calculation Agent; Determination of LIBOR................... 85
    Section 2.12.   Option to Acquire Credit Enhancement........................... 86
    Section 2.13.   Prescription. ............................................................... 87

ARTICLE III    AUTHENTICATION AND DELIVERY OF NOTES................. 87

    Section 3.1.    General Provisions. ....................................................... 87
    Section 3.2.    Security for Notes. ....................................................... 88
    Section 3.3.    Initial Deposit Redemption........................................... 90
    Section 3.4.    Purchase of Portfolio Collateral between the Closing Date and the Effective Date; Effective Date Conditions.................... 91
    Section 3.5.    Intermediaries. ............................................................ 93

ARTICLE IV    SATISFACTION AND DISCHARGE......................................... 93

    Section 4.1.    Satisfaction and Discharge of Indenture. ......................... 93
    Section 4.2.    Application of Trust Money............................................ 94

ARTICLE V     REMEDIES................................................................................. 95

008678

| | | |
|---|---|---|
| Section 5.1. | Events of Default. | 95 |
| Section 5.2. | Acceleration of Maturity; Rescission and Annulment. | 96 |
| Section 5.3. | Proceedings. | 97 |
| Section 5.4. | Remedies. | 98 |
| Section 5.5. | Preservation of Trust Estate. | 99 |
| Section 5.6. | Trustee May File Proofs of Claim. | 99 |
| Section 5.7. | Trustee May Enforce Claims Without Possession of Notes. | 100 |
| Section 5.8. | Application of Money Collected. | 101 |
| Section 5.9. | Limitation on Suits. | 101 |
| Section 5.10. | Unconditional Rights of Noteholders to Receive Principal and Interest. | 101 |
| Section 5.11. | Restoration of Rights and Remedies. | 102 |
| Section 5.12. | Rights and Remedies Cumulative. | 102 |
| Section 5.13. | Delay or Omission Not Waiver. | 103 |
| Section 5.14. | Control by Noteholders. | 103 |
| Section 5.15. | Waiver of Past Defaults. | 103 |
| Section 5.16. | Undertaking for Costs. | 104 |
| Section 5.17. | Waiver of Stay or Execution Laws. | 104 |
| Section 5.18. | Sale of Trust Estate. | 104 |
| Section 5.19. | Action on Notes. | 105 |
| | | |
| ARTICLE VI | THE TRUSTEE | 105 |
| | | |
| Section 6.1. | Certain Duties and Responsibilities. | 105 |
| Section 6.2. | Notice of Default. | 107 |
| Section 6.3. | Certain Rights of Trustee. | 107 |
| Section 6.4. | Not Responsible for Recitals or Issuance of Notes. | 109 |
| Section 6.5. | May Hold Notes. | 109 |
| Section 6.6. | Money Held in Trust. | 110 |
| Section 6.7. | Compensation and Reimbursement. | 110 |
| Section 6.8. | Corporate Trustee Required; Eligibility. | 111 |
| Section 6.9. | Resignation and Removal; Appointment of Successor. | 112 |
| Section 6.10. | Acceptance of Appointment by Successor. | 113 |
| Section 6.11. | Merger, Conversion, Consolidation or Succession to Business of Trustee. | 113 |
| Section 6.12. | Certain Duties of Trustee Related to Delayed Payment of Proceeds. | 113 |
| Section 6.13. | Non-Petition. | 114 |
| Section 6.14. | Withholding. | 114 |
| Section 6.15. | The Securities Intermediary. | 115 |
| Section 6.16. | Eligible Investments. | 116 |
| Section 6.17. | Fiduciary For Noteholders; Agent for the Paying and Transfer Agent and the Servicer. | 116 |
| | | |
| ARTICLE VII | COVENANTS | 117 |
| | | |
| Section 7.1. | Payment of Principal and Interest. | 117 |

| | | |
|---|---|---|
| Section 7.2. | Maintenance of Office or Agency | 117 |
| Section 7.3. | Money for Note Payments to Be Held in Trust. | 117 |
| Section 7.4. | Existence of Co-Issuers; Corporate Formalities. | 117 |
| Section 7.5. | Protection of Trust Estate | 118 |
| Section 7.6. | Opinions and Tax Certificates. | 119 |
| Section 7.7. | Performance of Obligations. | 120 |
| Section 7.8. | Negative Covenants. | 120 |
| Section 7.9. | Statement as to Compliance. | 122 |
| Section 7.10. | Issuer and Co-Issuer May Not Consolidate or Merge. | 122 |
| Section 7.11. | No Other Business. | 122 |
| Section 7.12. | Purchase of Notes. | 122 |
| Section 7.13. | Notice of Rating. | 123 |
| Section 7.14. | Process Agent. | 123 |
| Section 7.15. | Additional Covenants. | 123 |
| Section 7.16. | Representations and Warranties of the Co-Issuers. | 124 |
| Section 7.17. | Representations Relating to the Security Interests in the Collateral. | 126 |
| Section 7.18. | No "Gross-up" Amounts. | 128 |
| Section 7.19. | Securities Lending. | 128 |
| | | |
| ARTICLE VIII | SUPPLEMENTAL INDENTURES | 131 |
| | | |
| Section 8.1. | Supplemental Indentures Without Consent of Noteholders | 131 |
| Section 8.2. | Supplemental Indentures with Consent of Noteholders | 133 |
| Section 8.3. | Execution of Supplemental Indentures. | 136 |
| Section 8.4. | Effect of Supplemental Indentures. | 136 |
| Section 8.5. | Reference in Notes to Supplemental Indentures. | 136 |
| | | |
| ARTICLE IX | REDEMPTION; TERMINATION OF TRUST | 136 |
| | | |
| Section 9.1. | Optional Redemption. | 136 |
| Section 9.2. | Mandatory Redemption. | 138 |
| Section 9.3. | Additional Collateral Deposit Requirement. | 139 |
| Section 9.4. | Special Redemption; Amendment Buy-Out | 139 |
| Section 9.5. | Tax Event Redemption. | 140 |
| Section 9.6. | Notice to Trustee, Rating Agencies and the Servicer. | 140 |
| Section 9.7. | Notice of Optional Redemption and Tax Event Redemption by the Issuer. | 141 |
| Section 9.8. | Deposit of Optional Redemption Price and Tax Event Redemption Price. | 142 |
| Section 9.9. | Notes Payable on Optional Redemption Date. | 143 |
| Section 9.10. | Notes Payable on Mandatory Redemption Date. | 144 |
| Section 9.11. | Notes Payable on Tax Event Redemption. | 144 |
| Section 9.12. | Initial Deposit Redemption. | 144 |
| Section 9.13. | Reserved. | 144 |
| Section 9.14. | Notes Payable on Special Redemption Date. | 146 |

US_EAST:6212215.13

008680

ARTICLE X        ACCOUNTS, ACCOUNTINGS AND RELEASES ................................... 146

    Section 10.1.        Collection of Money. ....................................................... 146
    Section 10.2.        Accounts. ......................................................................... 146
    Section 10.3.        Custody and Release of Portfolio Collateral ..................... 152
    Section 10.4.        Reports of Trustee. .......................................................... 153
    Section 10.5.        Accountings. .................................................................... 154
    Section 10.6.        Reports by Independent Accountants. .............................. 162
    Section 10.7.        Reports to Rating Agencies. ............................................ 163

ARTICLE XI       APPLICATION OF MONIES ......................................................... 164

    Section 11.1.        Disbursements of Monies from Collection Account. ...................... 164
    Section 11.2.        Mandatory Redemption With Respect to Overcollateralization
                         Tests, Interest Coverage Test and Rating Confirmation Failure ...... 171
    Section 11.3.        Purchase of Additional Portfolio Collateral ..................... 172
    Section 11.4.        Trust Account .................................................................. 173

ARTICLE XII      SALE OF PORTFOLIO COLLATERAL; SUBSTITUTION ................... 173

    Section 12.1.        Sale of Portfolio Collateral .............................................. 173
    Section 12.2.        Eligibility Criteria and Replacement Restrictions ........... 175
    Section 12.3.        Sale of Portfolio Collateral Subject to Offer or Call ...................... 180
    Section 12.4.        Purchase of Substitute Portfolio Collateral ..................... 180
    Section 12.5.        Conditions Applicable to all Transactions Involving Purchases
                         of Portfolio Collateral .................................................... 181
    Section 12.6.        Sale of Warrants ............................................................. 182
    Section 12.7.        Underlying Instruments ................................................... 182
    Section 12.8.        Reserved ......................................................................... 183
    Section 12.9.        Reserved ......................................................................... 183
    Section 12.10.       Synthetic Securities; Strip Securities .............................. 183
    Section 12.11.       Delayed Drawdown Loans and Revolving Loans .......................... 184

ARTICLE XIII     MISCELLANEOUS ........................................................................ 185

    Section 13.1.        Form of Documents Delivered to Trustee ........................ 185
    Section 13.2.        Acts of Noteholders ........................................................ 185
    Section 13.3.        Notices, etc., to the Trustee, Issuer, Servicer, the Irish Paying
                         Agent and Bear Stearns .................................................. 186
    Section 13.4.        Notices to Noteholders; Waiver ....................................... 187
    Section 13.5.        Effect of Headings and Table of Contents ....................... 187
    Section 13.6.        Successors and Assigns .................................................... 188
    Section 13.7.        Severability ..................................................................... 188
    Section 13.8.        Benefits of Indenture ...................................................... 188
    Section 13.9.        Reserved ......................................................................... 188
    Section 13.10.       Governing Law; Submission to Jurisdiction; Waiver of Trial by
                         Jury ................................................................................. 188
    Section 13.11.       Counterparts .................................................................... 189

Section 13.12.    No Issuer Office Within the United States ..................................... 189
Section 13.13.    Subordination ................................................................................ 189
Section 13.14.    Survival of Provisions ................................................................... 192
Section 13.15.    Liability of Co-Issuers .................................................................. 192
Section 13.16.    Escheat .......................................................................................... 192
Section 13.17.    Posting of Documents on Repository ............................................ 192
Section 13.18.    Consent to Posting of Documents on Repository .......................... 192

ARTICLE XIV    ASSIGNMENT OF SERVICING AGREEMENT ..................................... 193

Section 14.1.    Assignment of Servicing Agreement ............................................... 193

**ANNEXES**

**Annex A**    **Methodology for Calculating the Amount of an O/C Redemption**

**Annex B**    **Methodology for Calculating the Interest Coverage Test Redemption**

**Annex C**    **Methodology for Calculating the Amount Required to Satisfy the Additional Collateral Deposit Requirement**

**Annex D**    **Collateral Quality Formula**

**EXHIBITS**

**Exhibit A – Notes**

Exhibit A-1LA-1    Class A-1LA Temporary Regulation S Global Note

Exhibit A-1LB-1    Class A-1LB Temporary Regulation S Global Note

Exhibit A-2L-1    Class A-2L Temporary Regulation S Global Note

Exhibit A-3L-1    Class A-3L Temporary Regulation S Global Note

Exhibit A-4L-1    Class A-3L Temporary Regulation S Global Note

Exhibit A-1LA-2    Class A-1LA Permanent Regulation S Global Note

Exhibit A-1LB-2    Class A-1LB Permanent Regulation S Global Note

Exhibit A-2L-2    Class A-2L Permanent Regulation S Global Note

Exhibit A-3L-2    Class A-3L Permanent Regulation S Global Note

Exhibit A-4L-2    Class A-3L Permanent Regulation S Global Note

Exhibit A-1LA-3    Class A-1LA Rule 144A Global Note

Exhibit A-1LB-3    Class A-1LB Rule 144A Global Note

008682

|  |  |
|---|---|
| Exhibit A-2L-3 | Class A-2L Rule 144A Global Note |
| Exhibit A-3L-3 | Class A-3L Rule 144A Global Note |
| Exhibit A-4L-3 | Class A-3L Rule 144A Global Note |
| Exhibit A-1LA-4 | Class A-1LA Definitive Note |
| Exhibit A-1LB-4 | Class A-1LB Definitive Note |
| Exhibit A-2L-4 | Class A-2L Definitive Note |
| Exhibit A-3L-4 | Class A-3L Definitive Note |
| Exhibit A-4L-4 | Class A-3L Definitive Note |

**Exhibit B**     **Class B Notes**

|  |  |
|---|---|
| Exhibit B-1L-1 | Class B-1L Temporary Regulation S Global Note |
| Exhibit B-1L-2 | Class B-1L Permanent Regulation S Global Note |
| Exhibit B-1L-3 | Class B-1L Rule 144A Global Note |
| Exhibit B-1L-4 | Class B-1L Definitive Note |

**Exhibit C**     **Form of Investor Representation Letters**

**Exhibit D**     **Form of Rule 144A Transfer Certificate**

**Exhibit E**     **Form of Regulation S Transfer Certificate**

**Exhibit F**     **Form of Exchange Certificate**

**Exhibit G**     **Form of Non-U.S. Person Certificate**

**Exhibit H**     **Form of Beneficial Owner Certificate**

**Exhibit I**     **Form of Extension Notice**

**SCHEDULES**

| | |
|---|---|
| **Schedule A** | **Initial Portfolio Collateral** |
| **Schedule B** | **Standard & Poor's Industry Classification** |
| **Schedule C** | **S&P Minimum Average Recovery Rate** |
| **Schedule D** | **Rating Methodology for Standard & Poor's Rating** |
| **Schedule E** | **Moody's Correlation Factor Procedures** |
| **Schedule F** | **Moody's Weighted Average Rating Test Procedures** |
| **Schedule G** | **Forms of Opinions** |
| **Schedule H** | **Moody's Suggested Industry Classification** |
| **Schedule I** | **Weighted Average Life Table** |
| **Schedule J** | **Approved Pricing Services** |
| **Schedule K** | **Class X Amortization Schedule** |

US_EAST:6212215.13

008684

**<u>Schedule A</u>**

<u>Initial Portfolio Collateral</u>

008685

**Schedule B**

Standard & Poor's Industry Classification

Corporate Obligations

| Asset Code | Asset Description | LOCAL | REGIONAL | GLOBAL |
|---|---|---|---|---|
| 0 | Zero Default Risk | | | X |
| 1 | Aerospace & Defense | | X | |
| 2 | Air transport | | | X |
| 3 | Automotive | | | X |
| 4 | Beverage & Tobacco | | X | |
| 5 | Radio & Television | | X | |
| 6 | Brokers, Dealers & Investment houses | X | | |
| 7 | Building & Development | X | | |
| 8 | Business equipment & services | | X | |
| 9 | Cable & satellite television | | X | |
| 10 | Chemicals & plastics | | | X |
| 11 | Clothing/textiles | | X | |
| 12 | Conglomerates | | | X |
| 13 | Containers & glass products | | X | |
| 14 | Cosmetics/toiletries | X | | |
| 15 | Drugs | | | X |
| 16 | Ecological services & equipment | | X | |
| 17 | Electronics/electrical | | | X |
| 18 | Equipment leasing | | X | |
| 19 | Farming/agriculture | X | | |
| 20 | Financial intermediaries | | X | |
| 21 | Food/drug retailers | X | | |
| 22 | Food products | | X | |
| 23 | Food service | | X | |
| 24 | Forest products | | | X |
| 25 | Health care | | X | |
| 26 | Home furnishings | X | | |
| 27 | Lodging & casinos | | X | |
| 28 | Industrial equipment | | X | |
| 29 | Insurance | X | | |
| 30 | Leisure goods/activities/movies | X | | |
| 31 | Nonferrous metals/minerals | | | X |
| 32 | Oil & gas | | | X |
| 33 | Publishing | X | | |
| 34 | Rail industries | | X | |
| 35 | Retailers (except food & drug) | X | | |
| 36 | Steel | | | X |
| 37 | Surface transport | X | | |

008686

| 38 | Telecommunications | | | X |
|----|--------------------|--|--|---|
| 39 | Utilities | | X | |

## Corporate Structured Obligations

| Asset Code | Asset Description | LOCAL | REGIONAL | GLOBAL |
|------------|-------------------|-------|----------|--------|
| 50 | CDOs | | X | |

## Structured Obligations

| Asset Code | Asset Description |
|------------|-------------------|
| 51 | ABS Consumer |
| 52 | ABS Commercial |
| 53 | CMBS Diversified (Conduit and CTL) |
| 54 | CMBS (Large Loan, Single Borrower, and Single Property) |
| 55 | REITs and REOCs |
| 56 | RMBS A |
| 57 | RMBS B&C, HELs, HELOCs, and Tax Lien |
| 58 | Manufactured Housing |
| 59 | U.S. Agency (Explicitly Guaranteed) |
| 60 | Monoline/FER Guaranteed |
| 61 | Non-FER Company Guaranteed |
| 62 | FFELP Student Loans (Over 70% FFELP) |
| 63 | CLO of SME's |

**Schedule C**

S&P Weighted Average Recovery Rate

With respect to the CLO Securities, if the Portfolio Collateral is a Synthetic Security, the S&P Weighted Average Recovery Rate will be based on the Reference Obligation of such Synthetic Security.

With respect to the CLO Securities, if the Portfolio Collateral or Reference Obligation (other than an item of Portfolio Collateral guaranteed by a corporate guarantor or a monoline financial insurance company) is the senior-most tranche of securities issued by the issuer of such Portfolio Collateral:

| S&P Rating of Assets [*] | S&P Rating of Liabilities [**] | | | | | | |
|---|---|---|---|---|---|---|---|
| | AAA | AA | A | BBB | BB | B | CCC |
| "AAA" | 80.0% | 85.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| "AA-," "AA" or "AA+" | 70.0% | 75.0% | 85.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| "A-," "A" or "A+" | 60.0% | 65.0% | 75.0% | 85.0% | 90.0% | 90.0% | 90.0% |
| "BBB-," "BBB" or "BBB+" | 50.0% | 55.0% | 65.0% | 75.0% | 85.0% | 85.0% | 85.0% |

With respect to the CLO Securities, if the Portfolio Collateral or Reference Obligation (other than an item of Portfolio Collateral guaranteed by a corporate guarantor or a monoline financial insurance company) is not the senior-most tranche of securities issued by the issuer of such Portfolio Collateral:

| S&P Rating of Assets [*] | S&P Rating of Liabilities (%) [**] | | | | | | |
|---|---|---|---|---|---|---|---|
| | AAA | AA | A | BBB | BB | B | CCC |
| "AA-," "AA" or "AA+" | 55.0% | 65.0% | 75.0% | 80.0% | 80.0% | 80.0% | 80.0% |
| "A-," "A" or "A+" | 40.0% | 45.0% | 55.0% | 65.0% | 80.0% | 80.0% | 80.0% |
| "BBB-," "BBB" or "BBB+" | 30.0% | 35.0% | 40.0% | 45.0% | 50.0% | 60.0% | 70.0% |
| "BB-," "BB" or "BB+" | 10.0% | 10.0% | 10.0% | 25.0% | 35.0% | 40.0% | 50.0% |

---

[*]      Rating upon issuance of such item of Portfolio Collateral.
[**]     Current rating of the applicable Class of Notes.

008688

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| "B-," "B" or "B+" | 2.5% | 5.0% | 5.0% | 10.0% | 10.0% | 20.0% | 25.0% |
| "CCC+" and below | 0.0% | 0.0% | 0.0% | 0.0% | 2.5% | 5.0% | 5.0% |

**Schedule D**

<u>Rating Methodology for the Standard & Poor's Rating</u>

**S&P RATING**

The S&P Rating of an item of Portfolio Collateral as of any date of determination shall be determined in accordance with the following methodology:

(i) If there is an issuer credit rating of the borrower of the item of Portfolio Collateral (the "Borrower"), or the guarantor who unconditionally and irrevocably guarantees the item of Portfolio Collateral (the "Guarantor") by S&P, the most current issuer credit rating for such Borrower or Guarantor;

(ii) (a) if there is not an issuer credit rating of the Borrower or its Guarantor by S&P, but there is a rating by S&P on a senior secured obligation of the Borrower or its Guarantor, then the S&P Rating of the item of Portfolio Collateral will be one subcategory below such rating; (b) if there is not a rating by S&P on a senior secured obligation of the Borrower or its Guarantor, but there is a rating by S&P on a senior unsecured obligation of the Borrower or its Guarantor, then the S&P Rating will be such rating; and (c) if there is not a rating by S&P on a senior obligation of the Borrower or its Guarantor, but there is a rating by S&P on a subordinated obligation of the Borrower or its Guarantor, then the S&P Rating will be two subcategories above such rating if such rating is "BBB-" or higher and will be one subcategory above such rating if such rating is "BB+" or lower;

(iii) if there is neither an issuer credit rating of the Borrower or its Guarantor by S&P nor a rating by S&P on an obligation of the Borrower or its Guarantor, then the S&P Rating may be determined using any one of the methods below:

(A) if an obligation of the Borrower or its Guarantor is publicly rated by Moody's, then the S&P Rating will be determined in accordance with the methodologies for establishing the Moody's Default Probability Rating, except that the S&P Rating of such obligation will be (1) one subcategory below the S&P equivalent of the rating assigned by Moody's if such security is rated "Baa3" or higher by Moody's and (2) two subcategories below the S&P equivalent of the rating assigned by Moody's if such security is rated "Ba1" or lower by Moody's; provided that item of Portfolio Collateral constituting no more than 5% of the Maximum Investment Amount (which concentration may be increased to 10% upon satisfaction of the Rating Condition with respect to S&P) may be given a S&P Rating based on a rating given by Moody's as provided in this subclause (a) (after giving effect to the addition of the relevant item of Portfolio Collateral, if applicable);

(B) if no other security or obligation of the Borrower or its Guarantor is rated by S&P or Moody's, then the Servicer may apply to S&P for a S&P credit rating estimate, which will be its S&P Rating; or

008690

(C) (1) if such item of Portfolio Collateral (other than a Current-Pay Obligation) is not rated by Moody's or S&P, no other security or obligation of the Borrower or its Guarantor is rated by S&P or Moody's and if the Servicer determines in its sole discretion based on information available to it after reasonable inquiry that such Borrower (x) is not subject to any bankruptcy or reorganization proceedings nor in default on any of its obligations (unless the subject of a good faith business dispute), (y) is a legally constituted corporate entity having the minimum legal, financial and operational infrastructure to carry on a definable business, deliver and sell a product or service and report its results in generally accepted accounting terms as verified by a reputable audit firm and (z) is not so vulnerable to adverse business, financial and economic conditions that default in its financial or other obligations is foreseeable in the near term if current operating trends continue, then the S&P Rating will be "B-"; provided that the Servicer must apply to S&P for a S&P credit rating on such Borrower within 30 days after the addition of the relevant item of Portfolio Collateral; provided, further, that items of Portfolio Collateral constituting no more than 5% of the Maximum Investment Amount may be given an S&P Rating based on this subclause (C) (after giving effect to the addition of the relevant item of Portfolio Collateral, if applicable) or (2) if such item of Portfolio Collateral is a Current-Pay Obligation and is not rated by Moody's or S&P and no other security or obligation of the Borrower or its Guarantor is rated by S&P or Moody's, then the S&P Rating will be "CCC-"; or

(iv)    if the item of Portfolio Collateral is a CLO Security (a) if the CLO Security has an S&P credit rating, then the S&P Rating shall be such credit rating; otherwise, (b) the S&P Rating shall be the written credit estimate issued by S&P for that item of Portfolio Collateral;

provided that if (i) the relevant Borrower or Guarantor or obligation is placed on any positive "credit watch" list by S&P, such rating will be increased by one rating subcategory or (ii) the relevant Borrower or Guarantor or obligation is placed on any negative "credit watch" list by S&P, such rating will be decreased by one rating subcategory.

Notwithstanding the foregoing, in the case of an item of Portfolio Collateral that is a DIP Loan, the S&P Rating shall be (A) the rating assigned thereto by S&P if the rating is public, (B) the rating assigned by S&P if the rating is confidential, but only if all appropriate parties have provided written consent to its disclosure and use, (C) the rating assigned by S&P thereto through an estimated rating or (D) the rating assigned thereto by S&P in connection with the acquisition thereof upon the request of the Servicer. In the case of an item of Portfolio Collateral that is a PIK Security, Structured Finance Obligation or Synthetic Securities, the S&P Rating may not be determined pursuant to clause (iii)(A) above.

S&P Ratings for entities or obligations relevant hereunder other than Borrowers and items of Portfolio Collateral shall be determined in a corresponding manner.

008691

**Schedule E**


Correlation Factor Procedures


The formula used to calculate the Correlation Factor shall be the formula delivered to the Servicer and the Trustee by Moody's.

008692

**Schedule F**

Moody's Weighted Average Rating Factor Test Procedures

008693

## CALCULATION OF WEIGHTED AVERAGE RATING

The "Weighted Average Rating" is determined by summing the products obtained by *multiplying* the principal amount of each item of Portfolio Collateral (excluding Defaulted Portfolio Collateral, but including Current Pay Obligations), *by* its Moody's Rating Factor, *dividing* such sum *by* the aggregate principal amount of all such securities (excluding Defaulted Portfolio Collateral, but including Current Pay Obligations) and rounding the result up to the nearest whole number. The "Moody's Rating Factor" relating to any Portfolio Collateral is the number set forth in the table below opposite the Rating of such Portfolio Collateral.

| Moody's Rating | Moody's Rating Factor | Moody's Rating | Moody's Rating Factor |
|---|---|---|---|
| Aaa | 1 | Ba1 | 940 |
| Aa1 | 10 | Ba2 | 1,350 |
| Aa2 | 20 | Ba3 | 1,766 |
| Aa3 | 40 | B1 | 2,220 |
| A1 | 70 | B2 | 2,720 |
| A2 | 120 | B3 | 3,490 |
| A3 | 180 | Caa1 | 4,770 |
| Baa1 | 260 | Caa2 | 6,500 |
| Baa2 | 360 | Caa3 | 8,070 |
| Baa3 | 610 | Ca | 10,000 |
| | | C | 10,000 |

For purposes of the Weighted Average Rating Test, any item of Portfolio Collateral issued or guaranteed by the United States government or any agency or instrumentality thereof is assigned a Moody's Rating Factor of 1. Short-term securities rated "P-1" will be assigned a Moody's Rating Factor equivalent to that of the senior unsecured rating of the issuer. Short-term securities rated "P-1" of an issuer that does not have such a senior unsecured rating will be assigned a Moody's Rating Factor of 120. For purposes of calculating the Weighted Average Rating and the Weighted Average Rating Test, no item of Defaulted Portfolio Collateral will be taken into account in either the denominator or numerator of such test.

008694

The "Moody's Rating" of any item of Portfolio Collateral shall be determined pursuant to the following method:

(a)    Reserved.

(b)    With respect to any Portfolio Collateral that is a Moody's Senior-Secured Loan, the following:

(i)    if the borrower of such Portfolio Collateral, or a guarantor that unconditionally and irrevocably provides a guarantee solely for such Portfolio Collateral, has a Moody's corporate family rating, such rating (regardless of whether there is a published rating by Moody's on the Portfolio Collateral of such borrower held by the Issuer);

(ii)    if the borrower of such Portfolio Collateral does not have a Moody's corporate family rating, then the Moody's Rating of such Portfolio Collateral shall be deemed to be the rating thereof as may be assigned by Moody's upon the request of the Issuer or the Servicer;

(iii)    if the borrower of such Portfolio Collateral does not have a Moody's corporate family rating, but another security or obligation of the borrower is rated by Moody's and Moody's has not assigned a rating pursuant to subclause (ii) above, then the Moody's Rating of such Portfolio Collateral shall be determined in the following order: (a) if there is a rating on a senior unsecured obligation of the borrower, then the Moody's Rating of such Portfolio Collateral shall equal such rating; (b) if there is a rating on a senior secured obligation of the borrower, then the Moody's Rating of such Portfolio Collateral shall be one subcategory below such rating; or (c) if there is a rating on a subordinated obligation of the borrower, then the Moody's Rating of such Portfolio Collateral shall be one subcategory above such rating; or

(iv)    if such Portfolio Collateral is not rated by Moody's, and no other security or obligation of the borrower is rated by Moody's and neither the Issuer nor the Servicer obtains a Moody's Rating for such Portfolio Collateral pursuant to subclause (ii) above, then the Moody's Rating of such Portfolio Collateral may be determined using any one of the methods provided below (provided that no more than 5% of the Aggregate Principal Amount may have a Moody's Rating determined pursuant to subclauses (B), (C), (D) and (E) below):

(A)    (1)    if there is an issuer rating of the borrower by S&P (excluding a corporate credit estimate), then the Moody's Rating of such Portfolio Collateral shall be (a) one (1) subcategory below Moody's equivalent of such rating assigned by S&P if such rating is "BBB-" or higher by S&P and (b) two (2) subcategories below the Moody's equivalent of the rating assigned by S&P if such rating is "BB+" or lower by S&P; provided that no more than 10% of the Aggregate Principal Amount may be assigned a Moody's Rating as provided in this subclause (A) and clause (b)(iii);

(2)     if there is not an issuer rating of the borrower by S&P but a security or obligation of the borrower is rated by S&P (excluding a corporate credit estimate) (a "<u>parallel security</u>"), then the rating of such parallel security shall be determined in accordance with the methodology set forth in subclause (A)(1) above, and the Moody's Rating of such Portfolio Collateral shall be determined in accordance with the methodology set forth in clause (iii) above (for such purposes treating the parallel security as if it were rated by Moody's at the rating determined pursuant to this subclause (A)(2));

(B)     if the borrower of such Portfolio Collateral is a U.S. borrower and such Portfolio Collateral is a obligation of the borrower and (1) neither the borrower nor any of its Affiliates is subject to reorganization or bankruptcy proceedings, (2) no debt securities or obligations of the borrower are in default, (3) neither the borrower nor any of its Affiliates have defaulted on any debt during the past two (2) years, (4) the borrower has been in existence for the past five (5) years, (5) the borrower is current on any cumulative dividends, (6) the fixed-charge coverage ratio for the borrower exceeds 125% for each of the past two (2) fiscal years and for the most recent quarter, (7) the borrower had a net profit before tax in the past fiscal year and the most recent quarter, and (8) the annual financial statements of the borrower are unqualified and certified by a firm of independent accountants of international reputation, and quarterly statements are unaudited but signed by a corporate officer, the Moody's Rating of such Portfolio Collateral shall be "B3";

(C)     if the borrower of such Portfolio Collateral is a U.S. borrower and such Portfolio Collateral is a obligation of the borrower and (1) neither the borrower nor any of its Affiliates is subject to reorganization or bankruptcy proceedings and (2) no debt security or obligation of the borrower has been in default during the past two (2) years, the Moody's Rating of such Portfolio Collateral shall be "Caa2"; or

(D)     if any debt security or obligation of the borrower of such Portfolio Collateral has been in default during the past two (2) years, the Moody's Rating of such Portfolio Collateral shall be "Ca";

(c)     With respect to any Portfolio Collateral that is a Non Senior Secured Portfolio Loan, the following:

(i)     if such Portfolio Collateral is rated by Moody's, such rating;

(ii)     with respect to Portfolio Collateral issued by U.S. issuers if such Portfolio Collateral is not rated by Moody's but another security or obligation of the issuer is rated by Moody's, then the Moody's Rating of such Portfolio Collateral shall be determined as follows:

(A)     if there is a rating of an obligation of the issuer of the same priority, then the Moody's Rating of such Portfolio Collateral shall be such rating;

(B)    if the rating is on a senior unsecured obligation of the issuer, then,

(1)    if such Portfolio Collateral is a senior secured obligation of the issuer, then the Moody's Rating of such Portfolio Collateral shall be one subcategory above such rating, with a rating of "Aaa" remaining the same;

(2)    if such rating is "B1" or higher and if such Portfolio Collateral is a subordinated obligation of the issuer, then the Moody's Rating of such Portfolio Collateral shall be two subcategories below such rating;

(3)    if such rating is between "B2" and "Ca", inclusive, and if such Portfolio Collateral is a subordinated obligation of the issuer, then the Moody's Rating of such Portfolio Collateral shall be one subcategory below such rating; and

(4)    if such rating is lower than "Ca" the Moody's Rating of such Portfolio Collateral shall be "C", if such Portfolio Collateral is a subordinated obligation of the issuer;

(C)    if the rating is on a subordinated obligation of the issuer and if such Portfolio Collateral is a senior secured obligation of the issuer, then

(1)    if the rating is "Baa3" or higher, the Moody's Rating of such Portfolio Collateral shall be one subcategory above such rating;

(2)    if such rating is "B2" or higher but lower than "Baa3", the Moody's Rating of such Portfolio Collateral shall be two subcategories above such rating;

(3)    if such rating is "B3", the Moody's Rating of such Portfolio Collateral shall be one subcategory above such rating; and

(4)    if such rating is lower than "B3", the Moody's Rating of such Portfolio Collateral shall equal such rating;

(D)    if there is a rating on a subordinated obligation of the issuer and if such Portfolio Collateral is a senior unsecured obligation of the issuer, then

(1)    if such rating is "B3" or higher, the Moody's Rating of such Portfolio Collateral shall be one subcategory above such rating; and

(2)    if such rating is lower than "B3", the Moody's Rating of such Portfolio Collateral shall equal such rating;

(E)    if the rating is on a senior secured obligation of the issuer, then,

(1)    if such rating is "Ca" or higher and such Portfolio Collateral is a senior unsecured obligation of the issuer, the Moody's Rating of such Portfolio Collateral shall be one subcategory below such rating;

008697

(2)     if such rating is "Caa2" or higher and such Portfolio Collateral is a subordinated obligation of the issuer, the Moody's Rating of such Portfolio Collateral shall be two subcategories below such rating, and

(3)     if such rating is lower than "Caa2", the Moody's Rating of such Portfolio Collateral shall be "C";

(iii)     if such Portfolio Collateral is not rated by Moody's, and no other security or obligation of the issuer is rated by Moody's, then the Moody's Rating of such Portfolio Collateral may be determined using any one of the methods below:

(A)     (1)     if such Portfolio Collateral is rated by S&P (excluding a corporate credit estimate), then (a) if such rating is "BBB-" or higher, the Moody's Rating of such Portfolio Collateral shall be one subcategory below the Moody's equivalent of such rating assigned by S&P; and (b) if such rating is "BB+" or lower, the Moody's Rating of such Portfolio Collateral shall be two subcategories below the Moody's equivalent of such rating assigned by S&P; and

(2)     if such Portfolio Collateral is not rated by S&P but another security or obligation of the issuer is rated by S&P (excluding a corporate credit estimate) (a "parallel security"), then the Issuer or the Servicer on behalf of the Issuer may elect (a) first to establish the Moody's equivalent of the rating of such parallel security determined in accordance with the methodology set forth in clause (iii)(A)(1) above, in which case the Moody's Rating of the Portfolio Collateral shall be determined in accordance with the methodology set forth in clause (ii) above, treating the parallel security as if it were rated by Moody's at the rating determined pursuant to this subclause (2) or (b) to present such Portfolio Collateral to Moody's for an estimate of such Portfolio Collateral's rating factor as provided in clause (B) below;

(B)     if such Portfolio Collateral is not rated by Moody's and (x) no other security or obligation of the issuer is rated by Moody's or S&P, or (y) another security or obligation of the issuer is rated by S&P (excluding a corporate credit estimate) and the Issuer or the Servicer on behalf of the Issuer so elects as provided in clause (A)(2)(b) above, then the Issuer or the Servicer on behalf of the Issuer, may, within three (3) Business Days after the later of (a) the date on which the Issuer commits to purchase such Portfolio Collateral and (b) the date on which the Issuer is allocated a commitment to purchase such Portfolio Collateral, present such Portfolio Collateral to Moody's for an estimate of such Portfolio Collateral's rating factor, from which its corresponding Moody's Rating may be determined; provided that after such presentation and pending receipt from Moody's of such estimate, if the Servicer certifies to the Trustee that the Servicer believes that such estimate shall be at least "B3", then such Portfolio Collateral shall have a Moody's Rating of "B3"; and

(iv)     with respect to Portfolio Collateral that are Synthetic Securities, the Moody's Rating assigned in connection with the acquisition of such Synthetic Security.

008698

   (d) Any item of Portfolio Collateral (other than CLO Securities) that is on any "credit watch" list with positive or negative implications by Moody's shall be deemed to have a rating one sub-category above or below, as the case may be, the actual rating of such item of Portfolio Collateral. Any CLO Security with a Moody's rating of "Aaa" that is on any "credit watch" list with negative implications by Moody's shall be deemed to have a rating two sub-categories below the actual rating of such item of Portfolio Collateral. Any CLO Security with a Moody's rating lower than "Aaa" that is on any "credit watch" list with positive or negative implications by Moody's shall be deemed to have a rating two sub-categories above or below, as the case may be, the actual rating of such item of Portfolio Collateral.

   (e) Any item of Portfolio Collateral that is a DIP Loan, shall be deemed to have a rating one sub-category below the actual rating of such item of Portfolio Collateral.

   For the avoidance of doubt, all references to "obligor" or "borrower" in this Schedule F shall include such obligor or borrower and any guarantor of the obligations of such obligor or borrower under the applicable underlying instruments, and, for the purposes of determining the Moody's Rating of any item of Portfolio Collateral, the applicable Moody's Rating for such obligor or borrower shall be the rating of such obligor or borrower or of any guarantor of such obligor or borrower, whichever is higher.

008699

**Schedule G**

Forms of Opinions

US_EAST:6221071.7

008700

<u>**Schedule H**</u>

Moody's Suggested Industry Classification

| Idx | Industry |
|-----|----------|
| 1 | Aerospace & Defense |
| 2 | Automobile |
| 3 | Banking |
| 4 | Beverage, Food & Tobacco |
| 5 | Buildings & Real Estate |
| 6 | Chemicals, Plastics & Rubber |
| 7 | Containers, Packaging & Glass |
| 8 | Personal & Non-durable Consumer Projects (Manufacturing Only) |
| 9 | Diversified/Conglomerate Manufacturing |
| 10 | Diversified/Conglomerate Service |
| 11 | Diversified Natural Resources, Precious Metals & Minerals |
| 12 | Ecological |
| 13 | Electronics |
| 14 | Finance |
| 15 | Farming & Agriculture |
| 16 | Grocery |
| 17 | Healthcare, Education & Childcare |
| 18 | Home & Office Furnishings, Housewares & Durable Consumer Products |
| 19 | Hotels, Motels, Inns and Gaming |
| 20 | Insurance |
| 21 | Leisure, Amusement, Motion Pictures, Entertainment |
| 22 | Machinery (Non-agriculture, Non-construction, Non-electronic) |
| 23 | Mining, Steel, Iron & Non-precious Metals |
| 24 | Oil & Gas |
| 25 | Personal, Food & Misc. Services |
| 26 | Printing & Publishing |
| 27 | Cargo Transport |
| 28 | Retail Stores |
| 29 | Telecommunications |
| 30 | Textiles & Leather |
| 31 | Personal Transportation |
| 32 | Utilities |
| 33 | Broadcasting & Entertainment |

US_EAST:6221071.7

008701

<u>**Schedule I**</u>

<u>Weighted Average Life Table</u>

| <u>**Due Period from Closing Date**</u> | <u>**Due Period from each Extension Effective Date**</u> | <u>**Maximum Weighted Average Life**</u> |
|---|---|---|
| First | not applicable | 8.00 years |
| Second | not applicable | 8.00 years |
| Third | not applicable | 8.00 years |
| Fourth | not applicable | 8.00 years |
| Fifth | First | 7.75 years |
| Sixth | Second | 7.50 years |
| Seventh | Third | 7.25 years |
| Eighth | Fourth | 7.00 years |
| Ninth | Fifth | 6.75 years |
| Tenth | Sixth | 6.50 years |
| Eleventh | Seventh | 6.25 years |
| Twelfth | Eighth | 6.00 years |
| Thirteenth | Ninth | 5.75 years |
| Fourteenth | Tenth | 5.50 years |
| Fifteenth | Eleventh | 5.25 years |
| Sixteenth | Twelfth | 5.00 years |
| Seventeenth | Thirteenth | 4.75 years |
| Eighteenth | Fourteenth | 4.50 years |
| Nineteenth | Fifteenth | 4.25 years |
| Twentieth and Thereafter | Sixteenth and Thereafter | 4.00 years |

US_EAST:6221071.7

008702

**Schedule J**

Approved Pricing Services

**With Respect to Portfolio Loans:**

Loan Pricing Corporation
135 West 50th Street
New York, NY 10020
Tel: (212) 489-5455
http://www.loanpricing.com

Mark-it Partners
7 Times Square
Suite 2503
New York, NY 10036
Tel: (212) 931-4900
http://www.markit.com

US_EAST:6221071.7

008703

**Schedule K**

Class X Amortization Schedule

| Payment Date | Class X Principal Payment | Remaining Balance |
|---|---|---|
| 11/1/2006 | 0 | 14,000,000 |
| 2/1/2007 | 0 | 14,000,000 |
| 5/1/2007 | 0 | 14,000,000 |
| 8/1/2007 | 0 | 14,000,000 |
| 11/1/2007 | 583,333 | 13,416,667 |
| 2/1/2008 | 583,333 | 12,833,333 |
| 5/1/2008 | 583,333 | 12,250,000 |
| 8/1/2008 | 583,333 | 11,666,667 |
| 11/1/2008 | 583,333 | 11,083,333 |
| 2/1/2009 | 583,333 | 10,500,000 |
| 5/1/2009 | 583,333 | 9,916,667 |
| 8/1/2009 | 583,333 | 9,333,333 |
| 11/1/2009 | 583,333 | 8,750,000 |
| 2/1/2010 | 583,333 | 8,166,667 |
| 5/1/2010 | 583,333 | 7,583,333 |
| 8/1/2010 | 583,333 | 7,000,000 |
| 11/1/2010 | 583,333 | 6,416,667 |
| 2/1/2011 | 583,333 | 5,833,333 |
| 5/1/2011 | 583,333 | 5,250,000 |
| 8/1/2011 | 583,333 | 4,666,667 |
| 11/1/2011 | 583,333 | 4,083,333 |
| 2/1/2012 | 583,333 | 3,500,000 |
| 5/1/2012 | 583,333 | 2,916,667 |
| 8/1/2012 | 583,333 | 2,333,333 |
| 11/1/2012 | 583,333 | 1,750,000 |
| 2/1/2013 | 583,333 | 1,166,667 |
| 5/1/2013 | 583,333 | 583,333 |
| 8/1/2013 | 583,333 | 0 |

US_EAST:6221071.7

008704

## Annex A
### Methodology for Calculating the Amount of an O/C Redemption

For any Payment Date with respect to which one or more of the Overcollateralization Tests are not satisfied, the amount (the "O/C Redemption Amount") of Available Adjusted Collateral Interest Collections or Available Adjusted Collateral Principal Collections (as applicable) to be applied to the payment of principal of the Class A Notes and the Class B-1L Notes as an O/C Redemption (pursuant to the relevant clause of Section 11.2) in order to satisfy such Overcollateralization Test(s) shall be calculated by the Issuer according to the following formula:

$$\text{If } I >= ((L \times R) - A) / (R); \text{ then}$$

$$\text{O/C Redemption Amount} = ((L \times R) - A) / (R); \text{ otherwise}$$

$$\text{O/C Redemption Amount} = I + (((L-I) \times R) - A) / (R - 1)$$

On any Payment Date with respect to which more than one of the Overcollateralization Tests is not satisfied:

(a) the O/C Redemption Amount required to satisfy the Overcollateralization Test relating to the Class A Notes on such Payment Date shall be reduced by the amount of cash in the Collection Account that was applied to the making of an O/C Redemption that results from the failure of the Overcollateralization Test relating to the Class A Notes with respect to such Payment Date; and

(b) the O/C Redemption Amount required to satisfy the Overcollateralization Test relating to the Class B-1L Notes on such Payment Date shall be reduced by the amount of cash in the Collection Account that was applied to the making of an O/C Redemption that results from the failure of the Overcollateralization Test or Tests relating to the Class A Notes with respect to such Payment Date.

For purposes of applying the foregoing formula:

(a) Class A Note O/C Test Redemptions. In connection with an O/C Redemption required to satisfy the Overcollateralization Test relating to the Class A Notes:

"L" (for "liabilities") shall be the Aggregate Principal Amount of the Class A Notes (including for this purpose any unpaid Periodic Rate Shortfall Amounts with respect to the Class A Notes) as of the related date of calculation;

"R" shall be the required Class A Overcollateralization Percentage;

"A" (for "assets") shall be the Aggregate Par Amount plus unpaid Purchased Accrued Interest as of the related date of calculation; and

"I" (for "interest collections") shall be the amount of Collateral Interest Collections available to cure the Class A Overcollateralization Test.

(b) Class B-1L Note O/C Test Redemptions. In connection with an O/C Redemption required to satisfy the Overcollateralization Test relating to the Class B-1L Notes:

"L" (for "liabilities") shall be the Aggregate Principal Amount of the Class A Notes and the Class B-1L Notes (including for this purpose any unpaid Periodic Rate Shortfall Amounts with respect to the Class A Notes and the Class B-1L Notes) as of the related Calculation Date;

"R" shall be the required Class B-1L Overcollateralization Percentage;

"A" (for "assets") shall be the Aggregate Par Amount *plus* unpaid Purchased Accrued Interest *less* the Overcollateralization Haircut Amount as of the related date of calculation; and

"I" (for "interest collections") shall be the amount of Collateral Interest Collections available to cure the Class B-1L Overcollateralization Test.

For purposes of making each of the foregoing calculations, the provisions in the Overcollateralization Ratio Adjustment definition shall apply.

## Annex B
### Methodology for Calculating the Interest Coverage Test Redemption

For any Payment Date with respect to which the Interest Coverage Test is not satisfied, the amount (the "O/C Redemption Amount") of Available Adjusted Collateral Interest Collections or Available Adjusted Collateral Principal Collections (as applicable) to be applied to the payment of principal of the Class A Notes as an O/C Redemption (pursuant to the relevant clause of Section 11.2) in order to satisfy such Interest Coverage Test shall be calculated by the Issuer according to the following formula:

$$O/C \text{ Redemption Amount} = [L - 4 \text{ x } (I - PRA) / (R)]$$

For purposes of applying the foregoing formula:

(a)    <u>I/C Test Redemptions</u>. In connection with an O/C Redemption required to satisfy the Interest Coverage Test:

"<u>L</u>" (for "liabilities") shall be the Aggregate Principal Amount of the Class A Notes (including for this purpose any unpaid Periodic Rate Shortfall Amounts with respect to the Class A Notes) as of the related Calculation Date;

"<u>R</u>" shall be the required Interest Coverage Ratio;

"<u>PRA</u>" – shall be the Periodic Reserve Amount (but not including amounts payable to the Class B-1L Notes);

"<u>I</u>" (for "interest collections") shall be the amount of Collateral Interest Collections as of any date plus Scheduled Distributions representing Collateral Interest Collections to be received during the next Due Period (plus, if the amount of Collateral Interest Collections is not calculated on a Calculation Date, Scheduled Distributions for the remainder of the then current Due Period) other than Collateral Interest Collections (including deferred interest thereon) scheduled to be received on any Pledged Security that is not paying or expected to pay current interest with respect to such Due Period, divided by two.

**Annex C**
**Methodology for Calculating the Amount Required**
**to Satisfy the Additional Collateral Deposit Requirement**

For any Payment Date with respect to which the Additional Collateral Deposit Requirement is a positive number, the amount (the "<u>Additional Coverage Amount</u>") of Available Adjusted Collateral Interest Collections to be applied in accordance with the Indenture shall be calculated by the Issuer according to the following formula:

$$\text{Additional Coverage Amount} = (L \times R) - A$$

For purposes of applying the foregoing formula:

"<u>L</u>" (for "liabilities") shall be, as of the related Calculation Date, the Aggregate Principal Amount of the Class A Notes and the Class B-1L Notes plus any unpaid Periodic Rate Shortfall Amounts plus, if the amount determined under clause (2) under "Assets" below is a negative number, such amount (after giving effect to the amount to be applied to any O/C Redemption of the Class A Notes and the Class B-1L Notes to satisfy the Overcollateralization Tests and the Interest Coverage Test (if applicable) on the related Payment Date);

"<u>R</u>" shall be the percentage described in clause (b) of the definition of the Additional Collateral Deposit Requirement; and

"<u>A</u>" (for "assets") shall be the sum of:

(1) the Aggregate Principal Amount of the Portfolio Collateral in the Trust Estate as of the related Calculation Date; *plus*

(2) the sum of the Balance of Eligible Investments and cash in the Collection Account representing Collateral Principal Collections plus the Balance of Eligible Investments and cash in the Initial Deposit Account, if any, plus unpaid Purchased Accrued Interest as of such date; *less*

(3) the Overcollateralization Haircut Amount (if any).

For purposes of making the foregoing calculations, no item of Equity Portfolio Collateral shall be included as Portfolio Collateral. In addition for purposes of this requirement, (i) with respect to Defaulted Portfolio Collateral as to which there has occurred a payment default or an event of bankruptcy, only the portion equal to the lesser of (a) the Market Value of such item of Defaulted Portfolio Collateral and (b) the Applicable Percentage multiplied by the Principal Balance of such item of Portfolio Collateral, shall be included as Portfolio Collateral and (ii) with respect to items of Discount Portfolio Collateral, only an amount equal to the original purchase price of such item of Discount Portfolio Collateral shall be included as Portfolio Collateral. For purposes of calculating the Additional Collateral Deposit Requirement, to the extent an item of Portfolio Collateral is considered Defaulted Portfolio Collateral, Discount Portfolio Collateral and/or is included in the Overcollateralization Haircut Amount, such item of Portfolio Collateral will not be discounted multiple times, but will be treated in the category that results in the largest discount to the par amount of the Portfolio Collateral.

## Annex D
### Collateral Quality Formula and Matrix

For purposes of calculating the Collateral Quality Formula, (i) the Moody's Asset Correlation Test will be the lesser of 4.0% and the Moody's Correlation Factor provided that it is a number greater than or equal to 3.0%, (ii) the Minimum Average Recovery Rate Test with respect to Moody's will be the lesser of 45.5% and Moody's Minimum Average Recovery Rate provided that it is a number greater than or equal to 40.0%, (iii) the Moody's Weighted Average Rating Test will be the greater of 1,500 and Moody's Weighted Average Rating provided that it is a number less than or equal to 2,500 and (iv) the Weighted Average Margin Test will be the greater of 1.50% and an amount equal to: ((a) 205.1213 *plus* (b) 1800.774 *times C plus* (c) 0.145185 *times* W *plus* (d) -733.949 *times* R where:

W = Moody's Weighted Average Rating
R = Moody's Minimum Average Recovery Rate
C = Moody's Correlation Factor

| Row | Maximum Moody's Correlation Factor | Maximum Moody's Weighted Average Rating | Minimum Weighted Average Margin | Moody's Minimum Average Recovery Rate |
|---|---|---|---|---|
| 1 | 3.00% | 1500 | 150 | 45.50% |
| 2 | 3.00% | 1500 | 175 | 40.90% |
| 3 | 3.25% | 1500 | 175 | 41.50% |
| 4 | 3.50% | 1500 | 175 | 42.15% |
| 5 | 3.75% | 1500 | 175 | 42.65% |
| 6 | 4.00% | 1500 | 175 | 43.15% |
| 7 | 3.00% | 1500 | 180 | 40.00% |
| 8 | 3.25% | 1500 | 183 | 40.00% |
| 9 | 3.50% | 1500 | 187 | 40.00% |
| 10 | 3.75% | 1500 | 190 | 40.00% |
| 11 | 4.00% | 1500 | 193 | 40.00% |
| 12 | 4.00% | 1545 | 200 | 40.00% |
| 13 | 4.00% | 1700 | 225 | 40.00% |
| 14 | 3.00% | 1750 | 217 | 40.00% |
| 15 | 3.25% | 1750 | 220 | 40.00% |
| 16 | 3.50% | 1750 | 225 | 40.00% |
| 17 | 3.75% | 1750 | 230 | 40.00% |
| 18 | 4.00% | 1750 | 233 | 40.00% |
| 19 | 4.00% | 1840 | 240 | 40.90% |
| 20 | 4.00% | 1855 | 250 | 40.00% |
| 21 | 4.00% | 1915 | 255 | 40.90% |
| 22 | 3.00% | 2000 | 215 | 45.50% |
| 23 | 3.00% | 2000 | 255 | 40.00% |
| 24 | 3.25% | 2000 | 260 | 40.00% |
| 25 | 3.50% | 2000 | 265 | 40.00% |
| 26 | 3.75% | 2000 | 270 | 40.00% |
| 27 | 4.00% | 2000 | 275 | 40.00% |
| 28 | 4.00% | 2000 | 275 | 40.00% |
| 29 | 3.15% | 2025 | 220 | 45.50% |

| | | | | |
|---|---|---|---|---|
| 30 | 3.00% | 2025 | 221 | 45.00% |
| 31 | 3.40% | 2025 | 232 | 44.50% |
| 32 | 3.25% | 2025 | 233 | 44.00% |
| 33 | 3.75% | 2030 | 235 | 45.00% |
| 34 | 4.00% | 2045 | 254 | 43.50% |
| 35 | 3.00% | 2050 | 221 | 45.50% |
| 36 | 3.25% | 2050 | 233 | 44.50% |
| 37 | 3.75% | 2050 | 234 | 45.50% |
| 38 | 3.00% | 2050 | 236 | 43.50% |
| 39 | 3.85% | 2050 | 240 | 45.00% |
| 40 | 3.00% | 2050 | 244 | 42.50% |
| 41 | 3.25% | 2050 | 249 | 42.50% |
| 42 | 3.50% | 2050 | 253 | 42.50% |
| 43 | 3.00% | 2075 | 225 | 45.45% |
| 44 | 3.25% | 2075 | 233 | 45.00% |
| 45 | 3.00% | 2075 | 238 | 43.75% |
| 46 | 3.90% | 2075 | 240 | 45.50% |
| 47 | 3.50% | 2075 | 262 | 42.00% |
| 48 | 3.75% | 2075 | 282 | 40.00% |
| 49 | 3.00% | 2100 | 228 | 45.50% |
| 50 | 3.50% | 2100 | 250 | 44.00% |
| 51 | 3.75% | 2100 | 254 | 44.00% |
| 52 | 3.25% | 2100 | 255 | 42.75% |
| 53 | 3.35% | 2100 | 255 | 42.90% |
| 54 | 3.00% | 2100 | 263 | 41.00% |
| 55 | 3.00% | 2120 | 252 | 42.15% |
| 56 | 3.25% | 2120 | 252 | 43.65% |
| 57 | 3.25% | 2120 | 260 | 41.50% |
| 58 | 3.50% | 2125 | 243 | 45.50% |
| 59 | 3.30% | 2125 | 245 | 44.50% |
| 60 | 3.65% | 2125 | 255 | 43.75% |
| 61 | 4.00% | 2125 | 255 | 44.75% |
| 62 | 3.00% | 2125 | 270 | 40.00% |
| 63 | 3.50% | 2125 | 270 | 41.25% |
| 64 | 3.00% | 2135 | 263 | 41.50% |
| 65 | 3.00% | 2135 | 273 | 40.00% |
| 66 | 3.20% | 2140 | 257 | 42.75% |
| 67 | 3.45% | 2145 | 247 | 45.00% |
| 68 | 3.00% | 2150 | 235 | 45.50% |
| 69 | 3.65% | 2150 | 250 | 44.95% |
| 70 | 3.50% | 2150 | 258 | 43.75% |
| 71 | 4.00% | 2150 | 278 | 42.00% |
| 72 | 3.50% | 2150 | 280 | 40.50% |
| 73 | 4.00% | 2150 | 300 | 40.00% |
| 74 | 3.35% | 2155 | 245 | 45.15% |
| 75 | 3.85% | 2155 | 261 | 43.85% |
| 76 | 3.20% | 2155 | 261 | 42.45% |
| 77 | 3.25% | 2160 | 245 | 45.00% |
| 78 | 3.75% | 2160 | 265 | 43.50% |
| 79 | 3.40% | 2160 | 271 | 41.65% |

008710

| | | | | |
|---|---|---|---|---|
| 80 | 3.15% | 2165 | 241 | 45.30% |
| 81 | 3.30% | 2165 | 257 | 43.45% |
| 82 | 3.90% | 2165 | 281 | 41.65% |
| 83 | 3.45% | 2170 | 246 | 45.45% |
| 84 | 3.35% | 2170 | 250 | 44.65% |
| 85 | 3.80% | 2170 | 270 | 42.95% |
| 86 | 3.20% | 2170 | 272 | 41.05% |
| 87 | 3.00% | 2175 | 240 | 45.50% |
| 88 | 3.75% | 2175 | 253 | 45.25% |
| 89 | 3.50% | 2175 | 265 | 43.25% |
| 90 | 3.00% | 2175 | 270 | 40.75% |
| 91 | 4.00% | 2175 | 295 | 40.00% |
| 92 | 3.35% | 2180 | 255 | 44.25% |
| 93 | 3.25% | 2180 | 257 | 43.65% |
| 94 | 3.85% | 2180 | 280 | 41.95% |
| 95 | 3.55% | 2180 | 283 | 40.75% |
| 96 | 3.25% | 2185 | 251 | 44.60% |
| 97 | 3.70% | 2185 | 267 | 43.45% |
| 98 | 3.25% | 2185 | 272 | 42.00% |
| 99 | 3.40% | 2185 | 281 | 40.80% |
| 100 | 3.15% | 2190 | 245 | 45.25% |
| 101 | 3.95% | 2190 | 261 | 45.00% |
| 102 | 3.75% | 2190 | 265 | 44.00% |
| 103 | 3.15% | 2190 | 275 | 41.00% |
| 104 | 3.20% | 2195 | 247 | 45.15% |
| 105 | 3.75% | 2195 | 260 | 44.75% |
| 106 | 3.20% | 2195 | 269 | 42.15% |
| 107 | 3.50% | 2195 | 276 | 41.85% |
| 108 | 3.00% | 2200 | 242 | 45.50% |
| 109 | 3.30% | 2200 | 250 | 44.85% |
| 110 | 3.00% | 2200 | 263 | 42.50% |
| 111 | 4.00% | 2200 | 300 | 40.00% |
| 112 | 3.50% | 2210 | 267 | 43.25% |
| 113 | 3.00% | 2225 | 252 | 44.45% |
| 114 | 3.75% | 2225 | 258 | 45.50% |
| 115 | 3.00% | 2225 | 265 | 42.75% |
| 116 | 4.00% | 2230 | 293 | 41.45% |
| 117 | 3.20% | 2235 | 262 | 43.65% |
| 118 | 3.75% | 2240 | 265 | 45.15% |
| 119 | 3.00% | 2250 | 250 | 45.50% |
| 120 | 3.50% | 2250 | 258 | 45.50% |
| 121 | 3.15% | 2250 | 273 | 42.15% |
| 122 | 3.80% | 2250 | 273 | 44.20% |
| 123 | 3.00% | 2250 | 295 | 40.00% |
| 124 | 3.45% | 2250 | 295 | 40.00% |
| 125 | 3.25% | 2250 | 300 | 40.00% |
| 126 | 3.50% | 2250 | 300 | 40.75% |
| 127 | 3.75% | 2250 | 300 | 41.25% |
| 128 | 4.00% | 2250 | 300 | 42.00% |
| 129 | 3.00% | 2270 | 250 | 45.50% |

008711

| 130 | 4.00% | 2275 | 268 | 45.50% |
| 131 | 3.25% | 2275 | 269 | 43.85% |
| 132 | 3.50% | 2275 | 292 | 41.25% |
| 133 | 3.65% | 2280 | 270 | 44.70% |
| 134 | 3.45% | 2285 | 280 | 42.95% |
| 135 | 3.85% | 2290 | 271 | 45.25% |
| 136 | 3.15% | 2295 | 258 | 45.25% |
| 137 | 3.00% | 2300 | 263 | 44.25% |
| 138 | 3.50% | 2300 | 271 | 44.50% |
| 139 | 3.35% | 2300 | 286 | 42.05% |
| 140 | 4.00% | 2300 | 289 | 43.25% |
| 141 | 3.70% | 2300 | 295 | 41.75% |
| 142 | 3.35% | 2325 | 272 | 44.35% |
| 143 | 3.50% | 2325 | 294 | 41.75% |
| 144 | 3.25% | 2350 | 275 | 44.25% |
| 145 | 4.00% | 2350 | 289 | 44.25% |
| 146 | 3.50% | 2375 | 274 | 45.50% |
| 147 | 3.25% | 2375 | 283 | 43.50% |
| 148 | 3.50% | 2400 | 278 | 45.35% |
| 149 | 3.00% | 2400 | 297 | 41.50% |
| 150 | 3.00% | 2425 | 275 | 45.00% |
| 151 | 4.00% | 2450 | 300 | 45.50% |
| 152 | 3.50% | 2450 | 300 | 43.20% |
| 153 | 3.25% | 2475 | 281 | 45.50% |
| 154 | 3.75% | 2475 | 300 | 45.50% |
| 155 | 3.00% | 2500 | 300 | 44.00% |
| 156 | 3.25% | 2500 | 300 | 44.50% |
| 157 | 3.50% | 2500 | 300 | 45.25% |

008712