**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | |
|---|---|---|
| **In Re:** Highland Capital Management, L.P | § | Case No. 19-34054-SGJ-11 |
| Highland Capital Management Fund Advisors, L.P. | | |
| et al | § | |
| Appellant | § | |
| vs. | § | |
| Highland Capital Management, L.P., | | |
| | § | 3:21-CV-00538-N |
| Appellee | § | |

[1943] **Order confirming the fifth amended chapter 11 plan,** Entered on 2/22/2021.

# APPELLANT RECORD
# VOLUME 35

MUNSCH HARDT KOPF & HARR, P.C.
Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
3800 Ross Tower
500 N. Akard Street
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

ATTORNEYS FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P. AND
NEXPOINT ADVISORS, L.P.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | ) | Case No. 19-34054 (SGJ11) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

*I N D E X*

## AMENDED DESIGNATION BY NEXPOINT ADVISORS, L.P. AND HIGHLAND
## CAPITAL MANAGEMENT FUND ADVISORS, L.P.
## OF ITEMS FOR THE RECORD ON APPEAL

COME NOW Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors,

L.P. (the "Appellants"), creditors and parties-in-interest in the above styled and numbered

bankruptcy case (the "Bankruptcy Case") of Highland Capital Management, L.P. (the "Debtor"),

and, with respect to their *Notice of Appeal* [docket no. 1957], hereby file their *Amended*

*Designation of Items for the Record on Appeal* (the "Designation") as follows:

| | Item | Bankruptcy Docket Number | Description |
|---|---|---|---|
| | | | **Pleadings and Items on Docket** |
| *Vol. 1* 000001 | 1 | 1957 | Notice of Appeal |
| 000165 000326 | 2 | 1943 | Order (i) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief |
| | 3 | | Docket Sheet of Bankruptcy Case No. 19-34054 |
| *Vol. 2* 000639 | 4 | 1606 | Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 000666 | 5 | 1648 | Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| 000675 | 6 | 1656 | Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 000820 | 7 | 1670 | Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 000870 | 8 | 1719 | Second Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| *Vol. 3* 000880 | 9 | 1749 | Third Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| 000886 | 10 | 1772 | Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 000901 | 11 | 1791 | Notice of Withdrawal of Certain Executory Contracts and Unexpired Leases from List of Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan |
| 000906 | 12 | 1807 | Debtor's Omnibus Reply to Objections to Confirmation of the Fifth Amended Chapter 11 Plan of Reorganization of Highland Capital Management |
| 001031 | 13 | 1808 | Debtor's Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) |
| *Vol. 4* 001097 | 14 | 1811 | Notice of Filing Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (with Technical Modifications) |
| *Vol. 5* 001346 | 15 | 1814 | Debtor's Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |

| | 16 | 1847 | Fourth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
|---|---|---|---|
| | 17 | 1873 | Fifth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| | 18 | 1875 | Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland of Highland Capital Management, L.P. (As Modified) |
| | 19 | 1887 | Supplemental Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| | 20 | 1671 | United States Trustee's Limited Objection to Confirmation of Debtors' Fifth Amended Plan of Reorganization |
| | **Evidence and Transcripts** | | |
| | 21 | 1894 | Transcript of February 2, 2021 Confirmation Hearing |
| | 22 | 1905 | Transcript of February 3, 2021 Confirmation Hearing |
| | 23 | 1917 | Transcript of February 8, 2021 Bench Ruling |
| | 24 | 1794 | All exhibits admitted into evidence during February 2 and February 3, 2021 Confirmation Hearing |
| | | 1795 | |
| | | 1822 | |
| | | 1863 | |
| | | 1866 | |
| | | 1877 | |
| | | 1895 | |
| | | 1915 | |

*Handwritten annotations in left margin:*

Vol 5
00 1414
00 1421
00 1427
00 1475
00 1482
00 1488
081783
002040
082091
002188
vol 12 - 002931
vol 50 - 013295
- 013297
Vol. 51 - 013373
vol. 54 - 014182
vol 55 - 014506

*Handwritten note below table:*

✕ 1822 - Vol. 12 — 50 (39 Volumes)

RESPECTFULLY SUBMITTED this 22d day of March, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina

Davor Rukavina, Esq.
Texas Bar No. 24030781
3800 Ross Tower
500 N. Akard Street
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584
Email:    drukavina@munsch.com

**ATTORNEYS FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P. AND
NEXPOINT ADVISORS, L.P.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 22d day of March, 2021, true and correct copies of this document were electronically served by the Court's ECF system on parties entitled to notice thereof, including on counsel for the Debtor.

By: /s/ Davor Rukavina

Davor Rukavina, Esq.

# EXHIBIT EEE

## SERVICING AGREEMENT

This Servicing Agreement, dated as of May 9, 2007 is entered into by and among ROCKWALL CDO II LTD., an exempted company incorporated under the laws of the Cayman Islands, with its registered office located at the offices of Maples Finance Limited, P.O. Box 1093GT, Queensgate House, South Church Street, George Town, Grand Cayman, KY1-1108, Cayman Islands (together with successors and assigns permitted hereunder, the "Issuer"), and HIGHLAND CAPITAL MANAGEMENT, L.P., a Delaware limited partnership, with its principal offices located at Two Galleria Tower, 13455 Noel Road, Suite 1300, Dallas, Texas 75240, as servicer ("Highland" or, in such capacity, the "Servicer").

WITNESSETH:

WHEREAS, the Issuer and ROCKWALL CDO II (DELAWARE) CORP. (the "Co-Issuer" and together with the Issuer, the "Co-Issuers") intend to issue U.S.$635,000,000 of their Class A-1LA Floating Rate Extendable Notes due August 2024 (the "Class A-1LA Notes"), U.S.$115,000,000 of their Class A-1LB Floating Rate Extendable Notes due August 2024 (the "Class A-1LB Notes"), U.S.$76,000,000 of their Class A-2L Floating Rate Extendable Notes due August 2024 (the "Class A-2L Notes"), U.S.$48,000,000 of their Class A-3L Floating Rate Extendable Notes due August 2024 (the "Class A-3L Notes"), U.S.$36,000,000 of their Class B-1L Floating Rate Extendable Notes due August 2024 (the "Class B-1L Notes"), U.S.$26,000,000 of their Class B-2L Floating Rate Extendable Notes due August 2024 (the "Class B-2L Notes" and together with the Class A-1LA Notes, Class A-1LB Notes, Class A-2L Notes, Class A-3L Notes and Class B-1L Notes, the "Notes") pursuant to the Indenture dated as of May 9, 2007 (the "Indenture"), among the Co-Issuers and JPMorgan Chase Bank, National Association, as trustee (the "Trustee") and 42,200,000 Class I Preferred Shares, $0.001 par value (the "Class I Preferred Shares") and 44,000,000 Class II Preferred Shares, $0.001 par value (the "Class II Preferred Shares" and, together with the Class I Preferred Shares, the "Preferred Shares" and, together with the Notes, the "Securities");

WHEREAS, the Issuer intends to pledge certain Portfolio Collateral, Eligible Investments and Cash (all as defined in the Indenture) and certain other assets (all as set forth in the Indenture) (collectively, the "Collateral") to the Trustee as security for the Notes;

WHEREAS, the Issuer wishes to enter into this Servicing Agreement, pursuant to which the Servicer agrees to perform, on behalf of the Issuer, certain duties with respect to the Collateral in the manner and on the terms set forth herein; and

WHEREAS, the Servicer has the capacity to provide the services required hereby and in the applicable provisions of the other Transaction Documents and is prepared to perform such services upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual agreements herein set forth, the parties hereto agree as follows:

1.    Definitions.

Terms used herein and not defined below shall have the meanings set forth in the Indenture.

"Agreement" shall mean this Servicing Agreement, as amended from time to time.

"Governing Instruments" shall mean the memorandum, articles or certificate of incorporation or association and by-laws, if applicable, in the case of a corporation; the certificate of formation, if applicable, or the partnership agreement, in the case of a partnership; or the certificate of formation, if applicable, or the limited liability company agreement, in the case of a limited liability company.

"HFP" shall mean Highland Financial Partners, L.P. (which includes, for the avoidance of doubt, any subsidiary thereof).

"Offering Circular" shall mean the Offering Circular of the Issuer dated May 8, 2007 prepared in connection with the offering of the Securities.

"Redemption Date" shall mean any Optional Redemption Date, Special Redemption Date, Tax Event Redemption Date or Mandatory Redemption Date, as applicable.

"Servicer Breaches" shall have the meaning specified in Section 10(a).

"Servicing Fee" shall mean, collectively, the Base Servicing Fee, the Additional Servicing Fee and the Supplemental Servicing Fee.

2.    General Duties of the Servicer.

(a)    The Servicer shall provide services to the Issuer as follows:

(i)    Subject to and in accordance with the terms this Agreement and the other Transaction Documents, the Servicer shall supervise and direct the administration, acquisition and disposition of the Collateral, and shall perform on behalf of the Issuer those duties and obligations of the Servicer required by the Indenture and the other Transaction Documents, and including the furnishing of Orders, Requests and officer's certificates, and such certifications as are required of the Servicer under the Indenture with respect to permitted purchases and sales of the Portfolio Collateral, Eligible Investments and other assets, and other matters, and, to the extent necessary or appropriate to perform such duties, the Servicer shall have the power to execute and deliver all necessary and appropriate documents and instruments on behalf of the Issuer with respect thereto.  The Servicer shall, subject to the terms and conditions of this Agreement and the other Transaction Documents, perform its obligations hereunder and thereunder with reasonable care, using a degree of skill and attention no less than that which the Servicer exercises with respect to comparable assets that it services or manages for others having similar objectives and restrictions, and in a manner consistent with practices and procedures followed by institutional servicers or managers of national standing relating to assets of the nature and character of the Collateral for clients having similar objectives and restrictions, except as expressly provided otherwise in this Agreement and/or the other Transaction Documents.  To the extent not inconsistent with the foregoing, the Servicer shall follow its customary standards, policies and procedures in performing its duties under the Indenture and hereunder.  The Servicer shall comply with all terms and conditions of the other Transaction Documents affecting the duties and functions to be performed hereunder. The Servicer shall not be bound to follow any amendment to any Transaction Document until it has received written notice thereof and until it has received a copy of the amendment from the Issuer or the Trustee; provided, however, that the Servicer shall not be bound by any amendment to any Transaction Document that affects the rights, powers, obligations or duties of the Servicer unless the

Servicer shall have consented thereto in writing. The Issuer agrees that it shall not permit any amendment to the Indenture that (x) affects the rights, powers, obligations or duties of the Servicer or (y) affects the amount or priority of any fees payable to the Servicer to become effective unless the Servicer has been given prior written notice of such amendment and consented thereto in writing;

(ii) the Servicer shall select any Collateral which shall be acquired by the Issuer pursuant to the Indenture in accordance with the Collateral criteria set forth herein and in the Indenture;

(iii) the Servicer shall monitor the Collateral on an ongoing basis and provide to the Issuer all reports, certificates, schedules and other data with respect to the Collateral which the Issuer is required to prepare and deliver under the Indenture, in the form and containing all information required thereby and in reasonable time for the Issuer to review such required reports, certificates, schedules and data and to deliver them to the parties entitled thereto under the Indenture; the Servicer shall undertake to determine to the extent reasonably practicable whether a Portfolio Collateral has become a Defaulted Portfolio Collateral;

(iv) the Servicer, subject to and in accordance with the provisions of the Indenture may, at any time permitted under the Indenture, and shall, when required by the Indenture, direct the Trustee (x) to dispose of a Portfolio Collateral, Equity Security or Eligible Investment or other securities received in respect thereof in the open market or otherwise, (y) to acquire, as security for the Notes in substitution for or in addition to any one or more Portfolio Collateral or Eligible Investments included in the Collateral, one or more substitute Portfolio Collateral or Eligible Investments, or (z) direct the Trustee to take the following actions with respect to a Portfolio Collateral or Eligible Investment:

(1) retain such Portfolio Collateral or Eligible Investment; or

(2) dispose of such Portfolio Collateral or Eligible Investment in the open market or otherwise; or

(3) if applicable, tender such Portfolio Collateral or Eligible Investment pursuant to an Offer; or

(4) if applicable, consent to any proposed amendment, modification or waiver pursuant to an Offer; or

(5) retain or dispose of any securities or other property (if other than cash) received pursuant to an Offer; or

(6) waive any default with respect to any Defaulted Portfolio Collateral; or

(7) vote to accelerate the maturity of any Defaulted Portfolio Collateral; or

(8) exercise any other rights or remedies with respect to such Portfolio Collateral or Eligible Investment as provided in the related

009301

Underlying Instruments, including in connection with any workout situations, or take any other action consistent with the terms of the Indenture which is in the best interests of the Holders of the Securities; and

(v) the Servicer shall (a) on or prior to any day which is a Redemption Date, direct the Trustee to enter into contracts to dispose of the Portfolio Collateral and any other Collateral pursuant to the Indenture and otherwise comply with all redemption procedures and certification requirements in the Indenture in order to allow the Trustee to effect such redemption and (b) conduct Auctions in accordance with the terms of the Indenture.

(b) In performing its duties hereunder, the Servicer shall seek to preserve the value of the Collateral for the benefit of the Holders of the Securities taking into account the Collateral criteria and limitations set forth herein and in the Indenture and the Servicer shall use reasonable efforts to select and service the Collateral in such a way that will permit a timely performance of all payment obligations by the Issuer under the Indenture; provided, that the Servicer shall not be responsible if such objectives are not achieved so long as the Servicer performs its duties under this Agreement in the manner provided for herein, and provided, further, that there shall be no recourse to the Servicer with respect to the Notes or the Preferred Shares. The Servicer and the Issuer shall take such other action, and furnish such certificates, opinions and other documents, as may be reasonably requested by the other party hereto in order to effectuate the purposes of this Agreement and to facilitate compliance with applicable laws and regulations and the terms of this Agreement.

(c) The Servicer hereby agrees to the following:

(i) The Servicer agrees not to institute against, or join any other Person in instituting against, the Issuer or the Co-Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings or other proceedings under federal or state bankruptcy or similar laws of any jurisdiction until at least one year and one day (or if longer, any applicable preference period plus one day) after the payment in full of all Notes issued under the Indenture; provided, however, that nothing in this clause (i) shall preclude, or be deemed to estop, the Servicer (A) from taking any action prior to the expiration of such period in (x) any case or proceeding voluntarily filed or commenced by the Issuer or the Co-Issuer, as the case may be, or (y) any involuntary insolvency proceeding filed or commenced against the Issuer or the Co-Issuer, as the case may be, by a Person other than the Servicer, or (B) from commencing against the Issuer or the Co-Issuer or any properties of the Issuer or the Co-Issuer any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium, liquidation or similar proceeding. The provisions of this Section 2(c)(i) shall survive termination of this Agreement.

(ii) The Servicer shall cause each sale or purchase of any Portfolio Collateral or Eligible Investment to be conducted on an arm's-length basis.

(d) The Servicer shall not act for the Issuer in any capacity except as provided in this Section 2. In providing services hereunder, the Servicer may employ third parties, including its Affiliates, to render advice (including advice with respect to the servicing of the Collateral) and assistance; provided, however, that the Servicer shall not be relieved of any of its duties or liabilities hereunder regardless of the performance of any services by third parties. Notwithstanding any other provision of this Agreement, the Servicer shall not be required to take any action required of it pursuant to this Agreement or the Indenture if such action would constitute a violation of any law.

009302

(e)     Notwithstanding any other provision of this Agreement or the Indenture, (i) any granted signatory powers or authority granted to the Servicer on behalf of the Issuer with respect to the Special Procedures Obligations shall be conditioned upon the prior written approval of the Independent Advisor and (ii) neither the Servicer nor any Affiliate of the Servicer shall have any authority to enter into agreements, or take any action, on behalf of the Issuer with respect to the Special Procedures Obligations without the prior written approval of the Independent Advisor.

3.     <u>Brokerage</u>.

The Servicer shall seek to obtain the best prices and execution for all orders placed with respect to the Collateral, considering all reasonable circumstances. Subject to the objective of obtaining best prices and execution, the Servicer may take into consideration research and other brokerage services furnished to the Servicer or its Affiliates by brokers and dealers which are not Affiliates of the Servicer. Such services may be used by the Servicer or its Affiliates in connection with its other servicing or advisory activities or operations. The Servicer may aggregate sales and purchase orders of securities placed with respect to the Collateral with similar orders being made simultaneously for other accounts serviced or managed by Servicer or with accounts of the Affiliates of the Servicer, if in the Servicer's reasonable judgment such aggregation shall result in an overall economic benefit to the Issuer, taking into consideration the advantageous selling or purchase price, brokerage commission and other expenses. In the event that a sale or purchase of a Portfolio Collateral or Eligible Investment (in accordance with the terms of the Indenture) occurs as part of any aggregate sales or purchase orders, the objective of the Servicer (and any of its Affiliates involved in such transactions) shall be to allocate the executions among the accounts in an equitable manner and consistent with its obligations hereunder and under applicable law.

In addition to the foregoing and subject to the provisions of Section 2 and the limitations of Section 5, the objective of obtaining best prices and execution and to the extent permitted by applicable law, the Servicer may, on behalf of the Issuer, direct the Trustee to acquire any and all of the Eligible Investments or other Collateral from, or sell Portfolio Collateral or other Collateral to, the Initial Purchaser, the Trustee or any of their respective Affiliates, or any other firm.

4.     <u>Additional Activities of the Servicer</u>.

Nothing herein shall prevent the Servicer or any of its Affiliates from engaging in other businesses, or from rendering services of any kind to the Trustee, the Holders of the Securities, or any other Person or entity to the extent permitted by applicable law. Without prejudice to the generality of the foregoing, the Servicer and partners, directors, officers, employees and agents of the Servicer or its Affiliates may, among other things, and subject to any limits specified in the Indenture:

(a)     serve as directors (whether supervisory or managing), officers, partners, employees, agents, nominees or signatories for any issuer of any obligations included in the Collateral or their respective Affiliates, to the extent permitted by their Governing Instruments, as from time to time amended, or by any resolutions duly adopted by the Issuer, its Affiliates or any issuer of any obligations included in the Collateral or their respective Affiliates, pursuant to their respective Governing Instruments; <u>provided</u>, that in the reasonable judgment of the Servicer, such activity shall not have a material adverse effect on the enforceability of Collateral or the ability of the Issuer to comply with each Overcollateralization Ratio and the Interest Coverage Test; <u>provided</u>, <u>further</u>, that nothing in this paragraph shall be deemed to limit the duties of the Servicer set forth in Section 2 hereof;

(b)     receive fees for services of any nature rendered to the issuer of any obligations included in the Collateral or their respective Affiliates; <u>provided</u>, that in the reasonable

009303

judgment of the Servicer, such activity shall not have a material adverse effect on the enforceability of Collateral or the ability of the Issuer to comply with each Overcollateralization Ratio and the Interest Coverage Test; and provided, further that if any portion of such services are related to the purchase by the Issuer of any obligations included in the Collateral, the portion of such fees relating to such obligations shall be applied to the purchase price of such obligations; and

(c)     be a secured or unsecured creditor of, or hold an equity interest in, the Issuer, its Affiliates or any issuer of any obligation included in the Collateral; provided, that in the reasonable judgment of the Servicer, such activity shall not have a material adverse effect on the enforceability of Collateral or the ability of the Issuer to comply with each Overcollateralization Ratio and the Interest Coverage Test; provided, further, that nothing in this paragraph shall be deemed to limit the duties of the Servicer set forth in Section 2 hereof.

It is understood that the Servicer and any of its Affiliates may engage in any other business and furnish servicing, investment management and advisory services to others, including Persons which may have policies similar to those followed by the Servicer with respect to the Collateral and which may own securities of the same class, or which are the same type, as the Portfolio Collateral or other securities of the issuers of Portfolio Collateral. The Servicer shall be free, in its sole discretion, to make recommendations to others, or effect transactions on behalf of itself or for others, which may be the same as or different from those effected with respect to the Collateral.

Unless the Servicer determines in its reasonable judgment that such purchase or sale is appropriate, the Servicer may refrain from directing the purchase or sale hereunder of securities issued by (i) Persons of which the Servicer, its Affiliates or any of its or their officers, directors or employees are directors or officers, (ii) Persons for which the Servicer or its Affiliate act as financial adviser or underwriter or (iii) Persons about which the Servicer or any of its Affiliates have information which the Servicer deems confidential or non-public or otherwise might prohibit it from trading such securities in accordance with applicable law. The Servicer shall not be obligated to have or pursue any particular strategy or opportunity with respect to the Collateral.

5.     Conflicts of Interest.

(a)     The Servicer shall not direct the Trustee to acquire an obligation to be included in the Collateral from the Servicer or any of its Affiliates as principal or to sell an obligation to the Servicer or any of its Affiliates as principal unless (i) the Issuer shall have received from the Servicer such information relating to such acquisition or sale as it may reasonably require and shall have approved such acquisition, which approval shall not be unreasonably withheld, (ii) in the judgment of the Servicer, such transaction is on terms no less favorable than would be obtained in a transaction conducted on an arm's length basis between third parties unaffiliated with each other and (iii) such transaction is permitted by the Investment Advisers Act.

(b)     The Servicer shall not direct the Trustee to acquire an obligation to be included in the Collateral directly from any account or portfolio for which the Servicer serves as servicer or investment adviser, or direct the Trustee to sell an obligation directly to any account or portfolio for which the Servicer serves as servicer or investment adviser unless such acquisition or sale is (i) in the judgment of the Servicer, on terms no less favorable than would be obtained in a transaction conducted on an arm's length basis between third parties unaffiliated with each other and (ii) permitted by the Investment Advisers Act.

009304

(c)     In addition, the Servicer shall not undertake any transaction described in this Section 5 unless such transaction is exempt from the prohibited transaction rules of ERISA and the Code.

6.     Records; Confidentiality.

The Servicer shall maintain appropriate books of account and records relating to services performed hereunder, and such books of account and records shall be accessible for inspection by a representative of the Issuer, the Trustee, the Collateral Administrator, the Holders of the Securities and the Independent accountants appointed by the Issuer pursuant to the Indenture at a mutually agreed time during normal business hours and upon not less than three Business Days' prior notice. At no time shall the Servicer make a public announcement concerning the issuance of the Notes or the Preferred Shares, the Servicer's role hereunder or any other aspect of the transactions contemplated by this Agreement and the other Transaction Documents. The Servicer shall keep confidential any and all information obtained in connection with the services rendered hereunder and shall not disclose any such information to non-affiliated third parties except (i) with the prior written consent of the Issuer, (ii) such information as either Rating Agency shall reasonably request in connection with the rating of any class of Securities, (iii) as required by law, regulation, court order or the rules or regulations of any self regulating organization, body or official having jurisdiction over the Servicer, (iv) to its professional advisers, (v) such information as shall have been publicly disclosed other than in violation of this Agreement, or (vi) such information that was or is obtained by the Servicer on a non-confidential basis, provided, that the Servicer does not know or have reason to know of any breach by such source of any confidentiality obligations with respect thereto. For purposes of this Section 6, the Trustee, the Collateral Administrator and the Holders of the Securities shall in no event be considered "non-affiliated third parties."

Notwithstanding anything in this Agreement or the Indenture to the contrary, the Servicer, the Co-Issuers, the Trustee and the Holders of the Securities (and the beneficial owners thereof) (and each of their respective employees, representatives or other agents) may disclose to any and all Persons, without limitation of any kind, the U.S. tax treatment and U.S. tax structure of the transactions contemplated by this Agreement and all materials of any kind (including opinions or other tax analyses) that are provided to them relating to such U.S. tax treatment and U.S. tax structure, as such terms are defined under U.S. federal, state or local tax law.

7.     Obligations of Servicer.

Unless otherwise specifically required by any provision of the Indenture or this Agreement or by applicable law, the Servicer shall use its best reasonable efforts to ensure that no action is taken by it, and shall not intentionally or with reckless disregard take any action, which would (a) materially adversely affect the Issuer or the Co-Issuer for purposes of Cayman Islands law, United States federal or state law or any other law known to the Servicer to be applicable to the Issuer or the Co-Issuer, (b) not be permitted under the Issuer's Amended and Restated Memorandum and Articles of Association or the Co-Issuer's Certificate of Incorporation or By-Laws, (c) violate any law, rule or regulation of any governmental body or agency having jurisdiction over the Issuer or the Co-Issuer including, without limitation, any Cayman Islands or United States federal, state or other applicable securities law the violation of which has or could reasonably be expected to have a material adverse effect on the Issuer, the Co-Issuer or any of the Collateral, (d) require registration of the Issuer, the Co-Issuer or the pool of Collateral as an "investment company" under the Investment Company Act, (e) cause the Issuer or the Co-Issuer to violate the terms of the Indenture, including, without limitation, any representations made by the Issuer or Co-Issuer therein, or any other agreement contemplated by the Indenture or (f) not be permitted by Annex 1 hereto and would subject the Issuer to U.S. federal or state income or franchise taxation or cause the Issuer to be engaged in a trade or business in the United States

009305

for U.S. federal income tax purposes.  The Servicer covenants that it shall comply in all material respects with all laws and regulations applicable to it in connection with the performance of its duties under this Agreement and the Indenture. Notwithstanding anything in this Agreement to the contrary, the Servicer shall not be required to take any action under this Agreement or the Indenture if such action would violate any applicable law, rule, regulation or court order.

        8.     <u>Compensation</u>.

        (a)     The Issuer shall pay to the Servicer, for services rendered and performance of its obligations under this Agreement, the Servicing Fee, which shall be payable in such amounts and at such times as set forth in the Indenture.  The provisions of the Indenture which relate to the amount and payment of the Servicing Fee shall not be amended without the written consent of the Servicer.  If on any Payment Date there are insufficient funds to pay the Servicing Fee (and/or any other amounts due and payable to the Servicer) in full, the amount not so paid shall be deferred and shall be payable on such later Payment Date on which funds are available therefor as provided in the Indenture.

        The Servicer hereby agrees to waive the Class II Preference Share Portion of the Servicing Fees which would otherwise be payable to the Servicer as Servicing Fees, on each Payment Date until February 3, 2008. After February 3, 2008, the Servicer may, in its sole discretion, at any time waive the Class II Preference Share Portion of its Servicing Fees then due and payable.  All waived amounts will be paid to the Class II Preferred Shares as Class II Preferred Share Dividends pursuant to the Indenture. For purposes of any calculation under this Agreement and the Indenture, the Servicer shall be deemed to have received the Servicing Fee in an amount equal to the sum of the Servicing Fee actually paid to the Servicer and the amount distributed to the Holders of the Class II Preferred Shares as Class II Preference Share Dividends.

        In addition, notwithstanding anything set out above, the Servicer may, in its sole discretion waive all or any portion of the Additional Servicing Fee or Supplemental Servicing Fee, any funds representing the waived Additional Servicing Fees and Supplemental Servicing Fees to be retained in the Collection Account for distribution as either Interest Proceeds or Principal Proceeds (as determined by the Servicer) pursuant to the Priority of Payments.

        (b)     The Servicer shall be responsible for the ordinary expenses incurred in the performance of its obligations under this Agreement, the Indenture and the other Transaction Documents; <u>provided</u>, <u>however</u>, that any extraordinary expenses incurred by the Servicer in the performance of such obligations (including, but not limited to, any fees, expenses or other amounts payable to the Rating Agencies, the Collateral Administrator, the Trustee and the accountants appointed by the Issuer, the reasonable expenses incurred by the Servicer to employ outside lawyers or consultants reasonably necessary in connection with the evaluation, transfer or restructuring of any Portfolio Collateral or other unusual matters arising in the performance of its duties under this Agreement and the Indenture, any reasonable expenses incurred by the Servicer in obtaining advice from outside counsel with respect to its obligations under this Agreement, brokerage commissions, transfer fees, registration costs, taxes and other similar costs and transaction related expenses and fees arising out of transactions effected for the Issuer's account and the portion allocated to the Issuer of any other fees and expenses that the Servicer customarily allocates among all of the funds or portfolios that it services or manages, including reasonable expenses incurred with respect to any compliance requirements, including, but not limited to, compliance with the requirements of the Sarbanes-Oxley Act, related solely to the ownership or holding of any Securities by HFP or its Affiliates) shall be reimbursed by the Issuer to the extent funds are available therefor in accordance with and subject to the limitations contained in the Indenture.

009306

(c)     If this Agreement is terminated pursuant to Section 12, Section 14 or otherwise, the fees payable to the Servicer shall be prorated for any partial periods between Payment Dates during which this Agreement was in effect and shall be due and payable on the first Payment Date following the date of such termination and on any subsequent Payment Dates to the extent remaining unpaid and in accordance with, and to the extent provided in, the Indenture.

9.     <u>Benefit of the Agreement</u>.

The Servicer agrees that its obligations hereunder shall be enforceable at the instance of the Issuer, the Trustee, on behalf of the Noteholders, or the requisite percentage of Noteholders or the Holders of the Preferred Shares, as applicable, as provided in the Indenture.

10.     <u>Limits of Servicer Responsibility; Indemnification</u>.

(a)     The Servicer assumes no responsibility under this Agreement other than to render the services called for hereunder and under the terms of the other Transaction Documents made applicable to it pursuant to the terms of this Agreement in good faith and, subject to the standard of liability described in the next sentence, shall not be responsible for any action of the Issuer or the Trustee in following or declining to follow any advice, recommendation or direction of the Servicer. The Servicer, its directors, officers, stockholders, partners, agents and employees, and its Affiliates and their directors, officers, stockholders, partners, agents and employees, shall not be liable to the Issuer, the Co-Issuer, the Trustee, the Holders of the Securities or any other person, for any losses, claims, damages, judgments, assessments, costs or other liabilities (collectively, "<u>Liabilities</u>") incurred by the Issuer, the Co-Issuer, the Trustee, the Holders of the Securities or any other person, that arise out of or in connection with the performance by the Servicer of its duties under this Agreement and under the terms of the other Transaction Documents made applicable to it pursuant to the terms of this Agreement, except by reason of (i) acts or omissions constituting bad faith, willful misconduct, gross negligence or breach of fiduciary duty in the performance, or reckless disregard, of the obligations of the Servicer hereunder and under the terms of the other Transaction Documents made applicable to it pursuant to the terms of this Agreement or (ii) with respect to any information included in the Offering Circular in the section entitled "The Servicer" that contains any untrue statement of material fact or omits to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading (the preceding clauses (i) and (ii) collectively being the "<u>Servicer Breaches</u>"). For the avoidance of doubt, the Servicer shall have no duty to independently investigate any laws not otherwise known to it in connection with its obligations under this Agreement, the Indenture and the other Transaction Documents. The Servicer shall be deemed to have satisfied the requirements of the Indenture and this Agreement relating to not causing the Issuer to be treated as engaged in a trade or business in the United States for U.S. federal income tax purposes (including as those requirements relate to the acquisition (including manner of acquisition), ownership, enforcement, and disposition of Collateral) to the extent the Servicer complies with the requirements set forth in Annex 1 hereto (unless the Servicer knows that as a result of a change in law the investment restrictions set forth in Annex 1 may no longer be relied upon).

(b)     The Issuer shall indemnify and hold harmless (the Issuer in such case, the "<u>Indemnifying Party</u>") the Servicer, its directors, officers, stockholders, partners, agents and employees (such parties collectively in such case, the "<u>Indemnified Parties</u>") from and against any and all Liabilities, and shall reimburse each such Indemnified Party for all reasonable fees and expenses (including reasonable fees and expenses of counsel) (collectively, the "<u>Expenses</u>") as such Expenses are incurred in investigating, preparing, pursuing or defending any claim, action, proceeding or investigation with respect to any pending or threatened litigation (collectively, the "<u>Actions</u>"), caused by, or arising out of or in connection with, the issuance of the Securities, the transactions contemplated by the Offering

009307

Circular, the Indenture or this Agreement, and/or any action taken by, or any failure to act by, such Indemnified Party; provided, however, that no Indemnified Party shall be indemnified for any Liabilities or Expenses it incurs as a result of any acts or omissions by any Indemnified Party constituting Servicer Breaches. Notwithstanding anything contained herein to the contrary, the obligations of the Issuer under this Section 10 shall be payable solely out of the Collateral in accordance with the priorities set forth in the Indenture and shall survive termination of this Agreement.

(c)　With respect to any claim made or threatened against an Indemnified Party, or compulsory process or request or other notice of any loss, claim, damage or liability served upon an Indemnified Party, for which such Indemnified Party is or may be entitled to indemnification under this Section 10, such Indemnified Party shall (or with respect to Indemnified Parties that are directors, officers, stockholders, agents or employees of the Servicer, the Servicer shall cause such Indemnified Party to):

(i)　give written notice to the Indemnifying Party of such claim within ten (10) days after such Indemnified Party's receipt of actual notice that such claim is made or threatened, which notice to the Indemnifying Party shall specify in reasonable detail the nature of the claim and the amount (or an estimate of the amount) of the claim; provided, however, that the failure of any Indemnified Party to provide such notice to the Indemnifying Party shall not relieve the Indemnifying Party of its obligations under this Section 10 unless the Indemnifying Party is materially prejudiced or otherwise forfeits rights or defenses by reason of such failure;

(ii)　at the Indemnifying Party's expense, provide the Indemnifying Party such information and cooperation with respect to such claim as the Indemnifying Party may reasonably require, including, but not limited to, making appropriate personnel available to the Indemnifying Party at such reasonable times as the Indemnifying Party may request;

(iii)　at the Indemnifying Party's expense, cooperate and take all such steps as the Indemnifying Party may reasonably request to preserve and protect any defense to such claim;

(iv)　in the event suit is brought with respect to such claim, upon reasonable prior notice, afford to the Indemnifying Party the right, which the Indemnifying Party may exercise in its sole discretion and at its expense, to participate in the investigation, defense and settlement of such claim;

(v)　neither incur any material expense to defend against nor release or settle any such claim or make any admission with respect thereto (other than routine or incontestable admissions or factual admissions the failure to make which would expose such Indemnified Party to unindemnified liability) nor permit a default or consent to the entry of any judgment in respect thereof, in each case without the prior written consent of the Indemnifying Party; and

(vi)　upon reasonable prior notice, afford to the Indemnifying Party the right, in its sole discretion and at its sole expense, to assume the defense of such claim, including, but not limited to, the right to designate counsel reasonably acceptable to the Indemnified Party and to control all negotiations, litigation, arbitration, settlements, compromises and appeals of such claim; provided, that if the Indemnifying Party assumes the defense of such claim, it shall not be liable for any fees and expenses of counsel for

009308

any Indemnified Party incurred thereafter in connection with such claim except that if such Indemnified Party reasonably determines that counsel designated by the Indemnifying Party has a conflict of interest in connection with its representation of such Indemnified Party, such Indemnifying Party shall pay the reasonable fees and disbursements of one counsel (in addition to any local counsel) separate from its own counsel for all Indemnified Parties in connection with any one action or separate but similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances; provided, further, that prior to entering into any final settlement or compromise, such Indemnifying Party shall seek the consent of the Indemnified Party and use its commercially reasonable efforts in the light of the then prevailing circumstances (including, without limitation, any express or implied time constraint on any pending settlement offer) to obtain the consent of such Indemnified Party as to the terms of settlement or compromise. If an Indemnified Party does not consent to the settlement or compromise within a reasonable time under the circumstances, the Indemnifying Party shall not thereafter be obligated to indemnify the Indemnified Party for any amount in excess of such proposed settlement or compromise.

(d)     In the event that any Indemnified Party waives its right to indemnification hereunder, the Indemnifying Party shall not be entitled to appoint counsel to represent such Indemnified Party nor shall the Indemnifying Party reimburse such Indemnified Party for any costs of counsel to such Indemnified Party.

(e)     The U.S. federal securities laws impose liabilities under certain circumstances on persons who act in good faith; accordingly, notwithstanding any other provision of this Agreement, nothing herein shall in any way constitute a waiver or limitation of any rights which the Issuer or the Holders of the Securities may have under any U.S. federal securities laws.

11.     <u>No Partnership or Joint Venture</u>.

The Issuer and the Servicer are not partners or joint venturers with each other and nothing herein shall be construed to make them such partners or joint venturers or impose any liability as such on either of them. The Servicer's relation to the Issuer shall be deemed to be that of an independent contractor.

12.     <u>Term; Termination</u>.

(a)     This Agreement shall commence as of the date first set forth above and shall continue in force and effect until the first of the following occurs: (i) the payment in full of the Notes, the termination of the Indenture in accordance with its terms and the redemption in full of the Preferred Shares; (ii) the liquidation of the Collateral and the final distribution of the proceeds of such liquidation to the Securityholders; or (iii) the termination of this Agreement in accordance with subsection (b), (c), (d) or (e) of this Section 12 or Section 14 of this Agreement.

(b)     Subject to Section 12(e) below, the Servicer may resign, upon 90 days' written notice to the Issuer (or such shorter notice as is acceptable to the Issuer). If the Servicer resigns, the Issuer agrees to appoint a successor Servicer to assume such duties and obligations in accordance with Section 12(e).

(c)     This Agreement shall be automatically terminated in the event that the Issuer determines in good faith that the Issuer or the pool of Collateral has become required to be

009309

registered under the provisions of the Investment Company Act, and the Issuer notifies the Servicer thereof.

(d)     If this Agreement is terminated pursuant to this Section 12, neither party shall have any further liability or obligation to the other, except as provided in Sections 2(c)(i), 8, 10 and 15 of this Agreement.

(e)     No removal or resignation of the Servicer shall be effective unless:

I.     if the Class A-1LA Notes are Outstanding and (i) the sum of (A) the Aggregate Par Amount of Portfolio Collateral other than any Equity Portfolio Collateral and (B) the Market Value of all Equity Portfolio Collateral (as determined by the Servicer in a commercially reasonable manner), if any, is less than (ii) the sum of (A) the Aggregate Principal Amount of the Outstanding Notes other than the Class B-1L Notes plus any accrued and unpaid interest thereon and (B) 50% of the Aggregate Principal Amount of the Class B-1L Notes plus any accrued and unpaid interest thereon (a "Preferred Share Event"), then:

(i)     (A) the Issuer appoints a successor Servicer at the written direction of a Majority in Aggregate Outstanding Amount of the Notes (voting as a single class and excluding any Notes held by the retiring Servicer or any of its Affiliates and accounts over which the retiring Servicer or any of its Affiliates exercise discretionary voting authority other than HFP), (B) such successor Servicer has agreed in writing to assume all of the Servicer's duties and obligations pursuant to this Agreement and the Indenture and (C) such successor Servicer is not objected to within 30 days after notice of such succession by a Majority of the Controlling Class of Notes); or

(ii)     if a Majority in Aggregate Outstanding Amount of the Notes (voting as a single class and excluding any Notes held by the retiring Servicer or any of its Affiliates and accounts over which the retiring Servicer or any of its Affiliates exercise discretionary voting authority other than HFP) has nominated two or more possible successor Servicers that have been objected to pursuant to the preceding clause (i)(C) or has otherwise failed to appoint a successor Servicer that has not been objected to pursuant to the preceding clause (i)(C) within 30 days of the date of notice of such removal or resignation of the Servicer (or, if later, within 30 days of the last failure to successfully appoint a successor Servicer), then (A) the Issuer appoints a successor Servicer at the written direction of a Majority of the Controlling Class of Notes, (B) such successor Servicer has agreed in writing to assume all of the Servicer's duties and obligations pursuant to this Agreement and the Indenture and (C) such successor Servicer is not objected to within 30 days after notice of such succession by a Majority in Aggregate Outstanding Amount of the Notes (voting as a single class and excluding any Notes held by the retiring Servicer or any of its Affiliates and accounts over which the retiring Servicer or any of its Affiliates exercise discretionary voting authority other than HFP); or

(iii)     if the Issuer fails to appoint a successor Servicer pursuant to the preceding clauses (i) and (ii) within 90 days of any notice of resignation or removal of the Servicer, (A) a Majority of the Controlling Class of Notes may petition a court of competent authority to appoint a successor Servicer, (B) such court appoints a successor Servicer and (C) such successor Servicer has agreed in writing to assume all of the Servicer's duties and obligations pursuant to this Agreement and the Indenture.

009310

II.      if there is no Preferred Share Event in effect, then:

(i)    (A) the Issuer appoints a successor Servicer at the written direction of a Majority of the Preferred Shares (excluding any Preferred Shares held by the retiring Servicer or any of its Affiliates and accounts over which the retiring Servicer or any of its Affiliates exercise discretionary voting authority, other than HFP which may exercise its vote with respect to Preferred Shares it owns, up to the Original HFP Share Amount), (B) such successor Servicer has agreed in writing to assume all of the Servicer's duties and obligations pursuant to this Agreement and the Indenture and (C) such successor Servicer is not objected to within 30 days after notice of such succession by either (x) a Majority of the Controlling Class of Notes or (y) a Majority in Aggregate Outstanding Amount of the Notes (voting as a single class and excluding any Notes held by the retiring Servicer or any of its Affiliates and accounts over which the retiring Servicer or any of its Affiliates exercise discretionary voting authority other than HFP); or

(ii)    if a Majority of the Preferred Shares (excluding any Preferred Shares held by the retiring Servicer or any of its Affiliates and accounts over which the retiring Servicer or any of its Affiliates exercise discretionary voting authority other than HFP) has nominated two or more possible successor Servicers that have been objected to pursuant to the preceding clause (i)(C) or has otherwise failed to appoint a successor Servicer that has not been objected to pursuant to the preceding clause (i)(C) within 30 days of the date of notice of such removal or resignation of the Servicer (or, if later, within 30 days of the last failure to successfully appoint a successor Servicer), then (A) the Issuer appoints a successor Servicer at the written direction of a Majority of the Controlling Class of Notes, (B) such successor Servicer has agreed in writing to assume all of the Servicer's duties and obligations pursuant to this Agreement and the Indenture and (C) such successor Servicer is not objected to within 45 days after notice of such succession by either of (x) a Majority of the Preferred Shares (excluding any Preferred Shares held by the retiring Servicer or any of its Affiliates and accounts over which the retiring Servicer or any of its Affiliates exercise discretionary voting authority other than HFP which may exercise its vote with respect to Preferred Shares it owns, up to the Original HFP Share Amount) or (y) a Majority in Aggregate Outstanding Amount of the Notes (voting as a single class and excluding any Notes held by the retiring Servicer or any of its Affiliates and accounts over which the retiring Servicer or any of its Affiliates exercise discretionary voting authority other than HFP); or

(iii)    if the Issuer fails to appoint a successor Servicer pursuant to the preceding clauses (i) and (ii) within 90 days of any notice of resignation or removal of the Servicer, (A) a Majority of the Controlling Class of Notes may petition a court of competent authority to appoint a successor Servicer, (B) such court appoints a successor Servicer and (C) such successor Servicer has agreed in writing to assume all of the Servicer's duties and obligations pursuant to this Agreement and the Indenture.

In addition, any successor Servicer must be an established institution which (i) has demonstrated an ability to professionally and competently perform duties similar to those imposed upon the Servicer hereunder, (ii) is legally qualified and has the capacity to act as Servicer hereunder, as successor to the Servicer under this Agreement in the assumption of all of the responsibilities, duties and obligations of the Servicer hereunder and under the applicable terms of the Indenture, (iii) shall not cause the Issuer or the pool of Collateral to become required to register under the provisions of the Investment Company Act, (iv) shall perform its duties as Servicer under this Agreement and the Indenture without

causing the Issuer, the Co Issuer or any Holder of Preferred Shares to become subject to tax in any jurisdiction where such successor Servicer is established as doing business and (v) each Rating Agency has confirmed that the appointment of such successor Servicer shall not cause its then current rating of any Class of Notes to be reduced or withdrawn. No compensation payable to a successor Servicer from payments on the Collateral shall be greater than that paid to the Servicer without the prior written consent of a Majority of the Controlling Class, Majority of the Noteholders and a Majority of the Preferred Shares. The Issuer, the Trustee and the successor Servicer shall take such action (or cause the retiring Servicer to take such action) consistent with this Agreement and the terms of the Indenture applicable to the Servicer, as shall be necessary to effectuate any such succession.

If there has been no appointment of a successor Servicer within 90 days following the resignation or termination of the Servicer, until a successor Servicer has been appointed and has assumed its duties hereunder, any sales or disposition of Portfolio Collateral shall be limited to Credit Risk Portfolio Collateral, Defaulted Portfolio Collateral and Equity Portfolio Collateral; provided, that, such restriction on the sale or disposition of Portfolio Collateral shall not apply if the Portfolio Collateral is being liquidated in whole or in part in connection with an acceleration or early termination of the Notes.

(f) In the event of removal of the Servicer pursuant to this Agreement, the Issuer shall have all of the rights and remedies available with respect thereto at law or equity, and, without limiting the foregoing, the Issuer or, to the extent so provided in the Indenture, the Trustee may by notice in writing to the Servicer as provided under this Agreement terminate all the rights and obligations of the Servicer under this Agreement (except those that survive termination pursuant to Section 12(d) above). Upon expiration of the applicable notice period with respect to termination specified in this Section 12 or Section 14 of this Agreement, as applicable, all authority and power of the Servicer under this Agreement, whether with respect to the Collateral or otherwise, shall automatically and without further action by any person or entity pass to and be vested in the successor Servicer upon the appointment thereof.

13. <u>Delegation; Assignments.</u>

This Agreement, and any obligations or duties of the Servicer hereunder, shall not be delegated by the Servicer, in whole or in part, except to any entity that (i) is controlled by any of James Dondero, Mark Okada and Todd Travers and (ii) is one in which any of James Dondero, Mark Okada and Todd Travers is involved in the day to day management and operations (and in any such case pursuant to an instrument of delegation in form and substance satisfactory to the Issuer), without the prior written consent of the Issuer, a Majority of the Noteholders and a Majority of the Preferred Shares (excluding Notes and Preferred Shares held by the Servicer or any of its Affiliates) and, notwithstanding any such consent, no delegation of obligations or duties by the Servicer (including, without limitation, to an entity described above) shall relieve the Servicer from any liability hereunder.

Subject to Section 12, any assignment of this Agreement to any Person, in whole or in part, by the Servicer shall be deemed null and void unless (i) such assignment is consented to in writing by the Issuer, the Requisite Noteholders and the Holders of a Majority of the Preferred Shares (excluding Notes and Preferred Shares held by the Servicer or any of its Affiliates other than HFP) and (ii) the Rating Agency Confirmation is satisfied with respect to any such assignment. Any assignment consented to by the Issuer, the Requisite Noteholders and the Holders of Preferred Shares shall bind the assignee hereunder in the same manner as the Servicer is bound. In addition, the assignee shall execute and deliver to the Issuer and the Trustee a counterpart of this Agreement naming such assignee as Servicer. Upon the execution and delivery of such a counterpart by the assignee and consent thereto by the Issuer, the Requisite Noteholders and the Holders of the Preferred Shares, the Servicer shall be released from further obligations pursuant to this Agreement, except with respect to its obligations arising under Section 10 of this Agreement prior to such assignment and except with respect to its obligations under Sections 2(c)(i)

009312

and 15 hereof. This Agreement shall not be assigned by the Issuer without the prior written consent of the Servicer and the Trustee, except in the case of assignment by the Issuer to (i) an entity which is a successor to the Issuer permitted under the Indenture, in which case such successor organization shall be bound hereunder and by the terms of said assignment in the same manner as the Issuer is bound thereunder or (ii) the Trustee as contemplated by the Indenture. In the event of any assignment by the Issuer, the Issuer shall cause its successor to execute and deliver to the Servicer such documents as the Servicer shall consider reasonably necessary to effect fully such assignment. The Servicer hereby consents to the matters set forth in Article 15 of the Indenture.

14. <u>Termination by the Issuer for Cause</u>.

Subject to Section 12(e) above, this Agreement shall be terminated and the Servicer shall be removed by the Issuer for cause upon 10 days' prior written notice to the Servicer and upon written notice to the Holders of the Securities as set forth below, but only if directed to do so by (1) a Majority of the Controlling Class of Notes or (2) the Holders of at least 66-2/3% of the Preferred Shares (excluding any Preferred Shares held by the Servicer or any of its Affiliates and accounts over which the Servicer or any of its Affiliates exercise discretionary voting authority, other than HFP which may exercise its vote with respect to Preferred Shares it owns, up to the Original HFP Share Amount). For purposes of determining "cause" with respect to any such termination of this Agreement, such term shall mean any one of the following events:

(a) the Servicer willfully breaches in any respect, or takes any action that it knows violates in any respect, any provision of this Agreement or any terms of the Indenture applicable to it;

(b) the Servicer breaches in any material respect any provision of this Agreement or any terms of the Indenture or the Collateral Administration Agreement applicable to it, or any representation, warranty, certification or statement given in writing by the Servicer shall prove to have been incorrect in any material respect when made or given, and the Servicer fails to cure such breach or take such action so that the facts (after giving effect to such action) conform in all material respects to such representation, warranty, certificate or statement, in each case within 30 days of becoming aware of, or receiving notice from, the Trustee of, such breach or materially incorrect representation, warranty, certificate or statement;

(c) the Servicer is wound up or dissolved (other than a dissolution in which the remaining members elect to continue the business of the Servicer in accordance with its Governing Instruments) or there is appointed over it or a substantial portion of its assets a receiver, administrator, administrative receiver, trustee or similar officer, or the Servicer (i) ceases to be able to, or admits in writing its inability to, pay its debts as they become due and payable, or makes a general assignment for the benefit of or enters into any composition or arrangement with, its creditors generally; (ii) applies for or consents (by admission of material allegations of a petition or otherwise) to the appointment of a receiver, trustee, assignee, custodian, liquidator or sequestrator (or other similar official) of the Servicer or of any substantial part of its properties or assets, or authorizes such an application or consent, or proceedings seeking such appointment are commenced without such authorization, consent or application against the Servicer and continue undismissed for 60 days; (iii) authorizes or files a voluntary petition in bankruptcy, or applies for or consents (by admission of material allegations of a petition or otherwise) to the application of any bankruptcy, reorganization, arrangement, readjustment of debt, insolvency or dissolution, or authorizes such application or consent, or proceedings to such end are instituted against the Servicer without such authorization, application or consent and are approved as properly instituted and remain undismissed for 60 days or result in adjudication of bankruptcy or insolvency; or (iv) permits or

009313

suffers all or any substantial part of its properties or assets to be sequestered or attached by court order and the order remains undismissed for 60 days;

(d) the occurrence of any Event of Default under the Indenture that results from any breach by the Servicer of its duties under the Indenture or this Agreement, which breach or default is not cured within any applicable cure period; or

(e) (x) the occurrence of an act by the Servicer related to its activities in any servicing, securities, financial advisory or other investment business that constitutes fraud, (y) the Servicer being indicted, or any of its principals being convicted, of a felony criminal offense related to its activities in any servicing, securities, financial advisory or other investment business or (z) the Servicer being indicted for, adjudged liable in a civil suit for, or convicted of a violation of the Securities Act or any other United States Federal securities law or any rules or regulations thereunder.

If any of the events specified in this Section 14 shall occur, the Servicer shall give prompt written notice thereof to the Issuer, the Trustee and the Holders of all outstanding Notes and Preferred Shares upon the Servicer's becoming aware of the occurrence of such event.

15. <u>Action Upon Termination</u>.

(a) From and after the effective date of termination of this Agreement, the Servicer shall not be entitled to compensation for further services hereunder, but shall be paid all compensation accrued to the date of termination, as provided in Section 8 hereof, and shall be entitled to receive any amounts owing under Section 10 hereof.  Upon the effective date of termination of this Agreement, the Servicer shall as soon as practicable:

(i) deliver to the Issuer all property and documents of the Trustee or the Issuer or otherwise relating to the Collateral then in the custody of the Servicer; and

(ii) deliver to the Trustee and the Fiscal Agent an accounting with respect to the books and records delivered to the Trustee and the Fiscal Agent or the successor Servicer appointed pursuant to Section 12(e) hereof.

Notwithstanding such termination, the Servicer shall remain liable to the extent set forth herein (but subject to Section 10 hereof) for its acts or omissions hereunder arising prior to termination and for any expenses, losses, damages, liabilities, demands, charges and claims (including reasonable attorneys' fees) in respect of or arising out of a breach of the representations and warranties made by the Servicer in Section 16(b) hereof or from any failure of the Servicer to comply with the provisions of this Section 15.

(b) The Servicer agrees that, notwithstanding any termination of this Agreement, it shall reasonably cooperate in any Proceeding arising in connection with this Agreement, the Indenture or any of the Collateral (excluding any such Proceeding in which claims are asserted against the Servicer or any Affiliate of the Servicer) upon receipt of appropriate indemnification and expense reimbursement.

009314

16. <u>Representations and Warranties</u>.

(a)    The Issuer hereby represents and warrants to the Servicer as follows:

(i)    The Issuer has been duly registered and is validly existing under the laws of the Cayman Islands, has full power and authority to own its assets and the securities proposed to be owned by it and included in the Collateral and to transact the business in which it is presently engaged and is duly qualified under the laws of each jurisdiction where its ownership or lease of property or the conduct of its business requires, or the performance of its obligations under this Agreement, the Indenture or the Securities would require, such qualification, except for failures to be so qualified, authorized or licensed that would not in the aggregate have a material adverse effect on the business, operations, assets or financial condition of the Issuer.

(ii)    The Issuer has full power and authority to execute, deliver and perform this Agreement, the other Transaction Documents and the Securities and all obligations required hereunder and thereunder and has taken all necessary action to authorize this Agreement, the other Transaction Documents and the Securities on the terms and conditions hereof and thereof and the execution by the Issuer, delivery and performance of this Agreement, the other Transaction Documents and the Securities and the performance of all obligations imposed upon it hereunder and thereunder.  No consent of any other person including, without limitation, shareholders and creditors of the Issuer, and no license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority, other than those that may be required under state securities or "blue sky" laws and those that have been or shall be obtained in connection with the other Transaction Documents and the Securities is required by the Issuer in connection with this Agreement, the other Transaction Documents and the Securities or the execution, delivery, performance, validity or enforceability of this Agreement, the other Transaction Documents and the Securities or the obligations imposed upon it hereunder or thereunder. This Agreement constitutes, and each instrument or document required hereunder, when executed and delivered hereunder, shall constitute, the legally valid and binding obligation of the Issuer enforceable against the Issuer in accordance with its terms, subject to (a) the effect of bankruptcy, insolvency or similar laws affecting generally the enforcement of creditors' rights and (b) general equitable principles.

(iii)    The execution by the Issuer, delivery and performance of this Agreement and the documents and instruments required hereunder shall not violate any provision of any existing law or regulation binding on the Issuer, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on the Issuer, or the Governing Instruments of, or any securities issued by, the Issuer or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which the Issuer is a party or by which the Issuer or any of its assets may be bound, the violation of which would have a material adverse effect on the business, operations, assets or financial condition of the Issuer, and shall not result in or require the creation or imposition of any lien on any of its property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking (other than the lien of the Indenture).

(iv)    The Issuer is not in violation of its Governing Instruments or in breach or violation of or in default under the Indenture or any contract or agreement to

009315

which it is a party or by which it or any of its assets may be bound, or any applicable statute or any rule, regulation or order of any court, government agency or body having jurisdiction over the Issuer or its properties, the breach or violation of which or default under which would have a material adverse effect on the validity or enforceability of this Agreement or the performance by the Issuer of its duties hereunder.

        (v)    True and complete copies of the Indenture and the Issuer's Governing Instruments have been delivered to the Servicer.

The Issuer agrees to deliver a true and complete copy of each amendment to the documents referred to in Section 16(a)(v) above to the Servicer as promptly as practicable after its adoption or execution.

        (b)    The Servicer hereby represents and warrants to the Issuer as follows:

        (i)    The Servicer is a limited partnership duly organized and validly existing and in good standing under the laws of the State of Delaware, has full power and authority to own its assets and to transact the business in which it is currently engaged and is duly qualified and in good standing under the laws of each jurisdiction where its ownership or lease of property or the conduct of its business requires, or the performance of this Agreement would require such qualification, except for those jurisdictions in which the failure to be so qualified, authorized or licensed would not have a material adverse effect on the business, operations, assets or financial condition of the Servicer or on the ability of the Servicer to perform its obligations under, or on the validity or enforceability of, this Agreement and the provisions of the other Transaction Documents applicable to the Servicer.

        (ii)    The Servicer has full power and authority to execute, deliver and perform this Agreement and all obligations required hereunder and under the provisions of the other Transaction Documents applicable to the Servicer, and has taken all necessary action to authorize this Agreement on the terms and conditions hereof and the execution, delivery and performance of this Agreement and all obligations required hereunder and under the terms of the other Transaction Documents applicable to the Servicer. No consent of any other person, including, without limitation, creditors of the Servicer, and no license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority is required by the Servicer in connection with this Agreement or the execution, delivery, performance, validity or enforceability of this Agreement or the obligations required hereunder or under the terms of the other Transaction Documents applicable to the Servicer. This Agreement has been, and each instrument and document required hereunder or under the terms of the other Transaction Documents applicable to the Servicer shall be, executed and delivered by a duly authorized partner of the Servicer, and this Agreement constitutes, and each instrument and document required hereunder or under the terms of the other Transaction Documents applicable to the Servicer when executed and delivered by the Servicer hereunder or under the terms of the other Transaction Documents applicable to the Servicer shall constitute, the valid and legally binding obligations of the Servicer enforceable against the Servicer in accordance with their terms, subject to (a) the effect of bankruptcy, insolvency or similar laws affecting generally the enforcement of creditors' rights and (b) general equitable principles.

009316

(iii)     The execution, delivery and performance of this Agreement and the terms of the other Transaction Documents applicable to the Servicer and the documents and instruments required hereunder or under the terms of the other Transaction Documents applicable to the Servicer shall not violate or conflict with any provision of any existing law or regulation binding on or applicable to the Servicer, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on the Servicer, or the Governing Instruments of, or any securities issued by the Servicer or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which the Servicer is a party or by which the Servicer or any of its assets may be bound, the violation of which would have a material adverse effect on the business, operations, assets or financial condition of the Servicer or its ability to perform its obligations under this Agreement and the provisions of the other Transaction Documents applicable to the Servicer, and shall not result in or require the creation or imposition of any lien on any of its material property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking.

(iv)     There is no charge, investigation, action, suit or proceeding before or by any court pending or, to the best knowledge of the Servicer, threatened that, if determined adversely to the Servicer, would have a material adverse effect upon the performance by the Servicer of its duties under, or on the validity or enforceability of, this Agreement and the provisions of the other Transaction Documents applicable to the Servicer.

(v)     The Servicer is a registered investment adviser under the Investment Advisers Act.

(vi)     The Servicer is not in violation of its Governing Instruments or in breach or violation of or in default under any contract or agreement to which it is a party or by which it or any of its property may be bound, or any applicable statute or any rule, regulation or order of any court, government agency or body having jurisdiction over the Servicer or its properties, the breach or violation of which or default under which would have a material adverse effect on the validity or enforceability of this Agreement or the provisions of the other Transaction Documents applicable to the Servicer, or the performance by the Servicer of its duties hereunder.

17.     Notices.

Unless expressly provided otherwise herein, all notices, requests, demands and other communications required or permitted under this Agreement shall be in writing (including by telecopy) and shall be deemed to have been duly given, made and received when delivered against receipt or upon actual receipt of registered or certified mail, postage prepaid, return receipt requested, or, in the case of telecopy notice, when received in legible form, addressed as set forth below:

009317

(a) If to the Issuer:

Rockwall CDO II Ltd.
c/o Maples Finance Limited
P.O. Box 1093GT
Queensgate House
South Church Street
George Town, Grand Cayman, KY1-1108, Cayman Islands
Telephone: (345) 945-7099
Telecopy: (345) 945-7100
Attention: The Directors

(b) If to the Servicer:

Highland Capital Management, L.P.
Two Galleria Tower
13455 Noel Road, Suite 1300
Dallas, Texas 75240
Telephone: (972) 628-4100
Telecopy: (972) 628-4147
Attention: James Dondero

(c) If to the Trustee:

Investors Bank & Trust Company
200 Claredon Street
Mailcode: EUC-108
Boston, Massachusetts 02116
Telecopy: (617) 351-4358
Attention: CDO Services Group

(d) If to the Noteholders:

In accordance with Section 14.3 of the Indenture, at their respective addresses set forth on the Note Register.

(e) If to the Holders of the Preferred Shares:

In accordance with Section 14.3 of the Indenture, to the Paying and Transfer Agent at the address identified therein.

(f) if to the Rating Agencies:

In accordance with Section 14.3 of the Indenture, to the rating Agencies at the address identified therein.

Any party may alter the address or telecopy number to which communications or copies are to be sent by giving notice of such change of address in conformity with the provisions of this Section 17 for the giving of notice.

009318

18. <u>Binding Nature of Agreement; Successors and Assigns</u>.

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and permitted assigns as provided herein. The Servicer hereby consents to the collateral assignment of this Agreement as provided in the Indenture and further agrees that the Trustee may enforce the Servicer's obligations hereunder.

19. <u>Entire Agreement</u>.

This Agreement contains the entire agreement and understanding among the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, understandings, inducements and conditions, express or implied, oral or written, of any nature whatsoever with respect to the subject matter hereof. The express terms hereof control and supersede any course of performance and/or usage of the trade inconsistent with any of the terms hereof. This Agreement may not be modified or amended other than by an agreement in writing executed by the parties hereto and in accordance with the terms of Section 14.1(f)(4) of the Indenture.

20. <u>Conflict with the Indenture</u>.

Subject to the last two sentences of Section 2(a)(i), in the event that this Agreement requires any action to be taken with respect to any matter and the Indenture requires that a different action be taken with respect to such matter, and such actions are mutually exclusive, the provisions of the Indenture in respect thereof shall control.

21. <u>Priority of Payments</u>.

The Servicer agrees that the payment of all amounts to which it is entitled pursuant to this Agreement and the Indenture shall be due and payable only in accordance with the priorities set forth in the Indenture and only to the extent funds are available for such payments in accordance with such priorities.

22. <u>Governing Law</u>.

**THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS PROVISIONS THAT WOULD RESULT IN THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.**

23. <u>Indulgences Not Waivers</u>.

Neither the failure nor any delay on the part of any party hereto to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege preclude any other or further exercise of the same or of any other right, remedy, power or privilege, nor shall any waiver of any right, remedy, power or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence. No waiver shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver.

009319

24.     <u>Costs and Expenses</u>.

Except as may otherwise be agreed in writing, the costs and expenses (including the fees and disbursements of counsel and accountants) incurred by each party in connection with the negotiation and preparation of and the execution of this Agreement, and all matters incident thereto, shall be borne by such party.

25.     <u>Titles Not to Affect Interpretation</u>.

The titles of paragraphs and subparagraphs contained in this Agreement are for convenience only, and they neither form a part of this Agreement nor are they to be used in the construction or interpretation hereof.

26.     <u>Execution in Counterparts</u>.

This Agreement may be executed in any number of counterparts by facsimile or other written form of communication, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

27.     <u>Provisions Separable</u>.

In case any provision in this Agreement shall be invalid, illegal or unenforceable as written, such provision shall be construed in the manner most closely resembling the apparent intent of the parties with respect to such provision so as to be valid, legal and enforceable; <u>provided</u>, <u>however</u>, that if there is no basis for such a construction, such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability and, unless the ineffectiveness of such provision destroys the basis of the bargain for one of the parties to this Agreement, the validity, legality and enforceability of the remaining provisions hereof or thereof shall not in any way be affected or impaired thereby.

28.     <u>Number and Gender</u>.

Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context requires.

29.     <u>Written Disclosure Statement</u>.

The Issuer and the Trustee acknowledge receipt of Part II of the Servicer's Form ADV filed with the Securities and Exchange Commission, as required by Rule 204-3 under the Investment Advisers Act, more than 48 hours prior to the date of execution of this Agreement.

30.     <u>Miscellaneous</u>.

(a)     In the event that any vote is solicited with respect to any Portfolio Collateral, the Servicer, on behalf of the Issuer, shall vote or refrain from voting any such security in any manner permitted by the Indenture that the Servicer has determined in its reasonable judgment shall be in the best interests of the Holders of the Securities.  In addition, with respect to any Defaulted Portfolio Collateral, the Servicer, on behalf of the Issuer, may instruct the trustee for such Defaulted Portfolio Collateral to enforce the Issuer's rights under the Underlying Instruments governing such Defaulted

009320

Portfolio Collateral and any applicable law, rule or regulation in any manner permitted under the Indenture that the Servicer has determined in its reasonable judgment shall be in the best interests of the Holders of the Securities. In the event any Offer is made with respect to any Portfolio Collateral, the Servicer, on behalf of the Issuer, may take such action as is permitted by the Indenture and that the Servicer has determined in its reasonable judgment shall be in the best interests of the Holders of the Securities.

(b) In connection with taking or omitting any action under the Indenture or this Agreement, the Servicer may consult with counsel and may rely in good faith on the advice of such counsel or any opinion of counsel.

Any corporation, partnership or limited liability company into which the Servicer may be merged or converted or with which it may be consolidated, or any corporation, partnership or limited liability company resulting from any merger, conversion or consolidation to which the Servicer shall be a party, or any corporation, partnership or limited liability company succeeding to all or substantially all of the asset servicing and collateral management business of the Servicer, shall be the successor to the Servicer without any further action by the Servicer, the Co-Issuers, the Trustee, the Noteholders or any other person or entity.

31. <u>Limitation of Liabilities</u>.

The Issuer's obligations hereunder are solely the corporate obligations of the Issuer and the Servicer shall not have any recourse to any of the directors, officers, shareholders, members or incorporators of the Issuer with respect to any claims, losses, damages, liabilities, indemnities or other obligations in connection with any transactions contemplated hereby. The obligations of the Issuer hereunder shall be limited to the net proceeds of the Collateral, if any, and following realization of the Collateral and its application in accordance with the Indenture, any outstanding obligations of the Issuer hereunder shall be extinguished and shall not thereafter revive. The provisions of this section shall survive termination of this Agreement.

32. <u>Consent to Posting of Documents on Repository</u>.

The Servicer hereby consents to (i) the posting of the final Offering Circular and the Indenture (collectively, the "<u>Documents</u>") and the periodic reports to be delivered pursuant to the Documents and any amendments or other modifications thereto on the Repository (as such term is defined in the Indenture) for use in the manner provided in the Repository; and (ii) the display of its name on the Repository in connection therewith.

009321

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P.,
    as Servicer

BY: STRAND ADVISORS, INC.,
    as General Partner

By: _____
Name:
Title: **James D. Dondero, President**
        **Strand Advisors, Inc., General Partner of**
        Highland Capital Management, L.P.

ROCKWALL CDO II LTD.,
    as Issuer

By: _____
Name:
Title:

Servicing Agreement

009322

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P.,
   as Servicer

BY: STRAND ADVISORS, INC.,
   as General Partner

By:_____
Name:
Title:

ROCKWALL CDO II LTD.,
   as Issuer

By:_____
Name:
Title:     **Chris Marett**
       Director

009323

**ANNEX 1**

Certain Tax Provisions

Unless otherwise noted, references to the Issuer in this Annex 1 include the Servicer and any other person acting on the Issuer's behalf.  Capitalized terms used but not defined herein will have the meanings ascribed to them in the Indenture.

For purposes of this Annex 1,

"Affiliate" means, with respect to a specified Person, (a) any other Person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the specified Person and (b) any Person that is a member, director, officer or employee of (i) the specified Person or (ii) a Person described in clause (a) of this definition; and

"Person" means an individual, a corporation, a limited liability company, a partnership, an association, a trust or any other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

Section I.      General Restrictions.

As provided in this Annex 1, the Issuer shall only purchase debt securities, interests in loans and other assets (each a "Portfolio Collateral") only in secondary-market transactions and shall not engage in any lending or underwriting activities or otherwise participate in the structuring or origination of any Portfolio Collateral.

A.      Communications and Negotiations.

1.      The Issuer will not have any communications or negotiations with the obligor of a Portfolio Collateral or a Reference Obligation (directly or indirectly through an intermediary such as the seller of such Portfolio Collateral or the Synthetic Security) in connection with the issuance or funding of such Portfolio Collateral or Reference Obligation or commitments with respect thereto, except for communications of an immaterial nature or customary due diligence communications; provided, that the Servicer may provide comments as to mistakes or inconsistencies in loan documents (including with respect to any provisions that are inconsistent with the terms and conditions of purchase of the loan by the Issuer).

2.      By way of example, permitted due diligence activities may include, but are not limited to, (a) attendance at an obligor's general "roadshow" or other presentations to investment professionals, (b) direct private discussions with personnel of the obligor, arranged by a sponsor, lead bank or other arranger, and (c) other due diligence activities of the kind customarily performed by offerees of the type of Portfolio Collateral being offered, but may not include any negotiations with the obligor, employees or agents of the obligor of any terms or conditions of the Portfolio Collateral being offered.

3.      Negotiations between the Servicer and the underwriter, placement agent or broker of Portfolio Collateral are permitted solely to the extent that they are limited to responses to customary pre-offering period and offering period inquiries by the underwriter or placement agent (e.g., "If we offered you 10-year senior subordinated bonds of XYZ company, what spread

Annex 1-1

009324

would it require to interest you?" or "If you will not buy the bonds as offered, would you buy if we convinced the obligor to add a fixed charge coverage test?"). For purposes of this Section I.A., "negotiations" shall not include (i) commenting on offering documents to an unrelated underwriter or placement agent when the ability to comment was generally available to other investors, or (ii) communicating certain objective criteria (such as the minimum yield or maturity) the Issuer generally uses in purchasing the relevant type of Portfolio Collateral.

4.      The Issuer may consent or otherwise act with respect to amendments, supplements or other modifications of the terms of any Portfolio Collateral (other than a Subsidiary Obligation (as defined in Section III)) requiring consent or action after the date on which any such Portfolio Collateral is acquired by the Issuer if (a) such amendment, supplement or modification would not constitute a Significant Modification (as defined below), (b) (i) in the reasonable judgment of the Servicer, the obligor is in financial distress and such change in terms is desirable to protect the Issuer's interest in such Portfolio Collateral and (ii) the Portfolio Collateral is described in clause 5(b) of this Section I.A., (c) the amendment or modification would not be treated as the acquisition of a new Portfolio Collateral under paragraph 5 of this Section I.A., or (d) otherwise, if it has received advice of counsel that its involvement in such amendment, supplement or modification will not cause the Issuer to be treated as engaged in a trade or business within the United States.

A "Significant Modification" means any amendment, supplement or other modification that involves (a) a change in the stated maturity or a change in the timing of any material payment of any Portfolio Collateral (including deferral of an interest payment), that would materially alter the weighted average life of the Portfolio Collateral, (b) any change (whether positive or negative) in the yield on the Portfolio Collateral immediately prior to the modification in excess of the greater of (i) 25 basis points or (ii) 5 percent of such unmodified yield, (c) any change involving a material new extension of credit, (d) a change in the obligor of any Portfolio Collateral (as determined for purposes of section 1001 of the Code), or (e) a material change in the collateral or security for any Portfolio Collateral, including the addition or deletion of a co-obligor or guarantor that results in a material change in payment expectations.

5.      In the event the Issuer owns an interest in a Portfolio Collateral the terms of which are subsequently amended or modified, or in the case of a workout situation not described in Section III hereof, which Portfolio Collateral is subsequently exchanged for new obligations or other securities of the obligor of the Portfolio Collateral, such amendments or modifications or exchange will not be treated as the acquisition of an interest in a new Portfolio Collateral for purposes of this Annex 1, provided, that (a) the Issuer does not, directly or indirectly (through the Servicer or otherwise), seek the amendments or modifications or the exchange, or participate in negotiating the amendments or modifications or the exchange, and (b) at the time of original acquisition of the interest in the Portfolio Collateral, it was not reasonably anticipated that the terms of the Portfolio Collateral would, pursuant to a workout or other negotiation, subsequently be amended or modified.

B.      Fees. The Issuer will not earn or receive from any Person any fee or other compensation for services, however denominated, in connection with its purchase or sale of a Portfolio Collateral or entering into a Synthetic Security; the foregoing prohibition shall not be construed to preclude the Issuer from receiving (i) commitment fees or facility maintenance fees that are received by the Issuer in connection with revolving or delayed drawdown Loans; (ii) yield maintenance and prepayment penalty fees; (iii) fees on account of the Issuer's consenting to amendments, waivers or other modifications of the terms of any Portfolio Collateral; (iv) fees from permitted securities lending; or (v) upfront payments in lieu of periodic payments under a Synthetic Security. The Issuer will not provide services to any Person;

Annex 1-2

the foregoing prohibition shall not be construed to preclude the Issuer from activities relating to the receipt of income described in (i) through (v) of the preceding sentence.

Section II.     Loans and Forward Purchase Commitments.

A.     Any understanding or commitment to purchase a loan, a participation, a loan subparticipation or a collateralized loan obligation (collectively, "Loans") from a seller before completion of the closing and full funding of the Loan by such seller shall only be made pursuant to a forward sale agreement at an agreed price (stated as a dollar amount or as a percentage) (a "Forward Purchase Commitment"), unless such an understanding or commitment is not legally binding and neither the Issuer nor the Servicer is economically compelled (e.g., would otherwise be subject to a significant monetary penalty) to purchase the Loan following the completion of the closing and full funding of the Loan (i.e., the Servicer will make an independent decision whether to purchase such Loan on behalf of the Issuer after completion of the closing of the Loan) (a "Non-Binding Agreement").

B.     No Forward Purchase Commitment or Non-Binding Agreement shall be made until after the seller (or a transferor to such seller of such Loan) has made a legally binding commitment to fully fund such Loan to the obligor thereof (subject to customary conditions), which commitment cannot be conditioned on the Issuer's ultimate purchase of such Loan from such seller.

C.     In the event of any reduced or eliminated funding, the Issuer shall not receive any premium, fee, or other compensation in connection with having entered into the Forward Purchase Commitment or Non-Binding Agreement.

D.     The Issuer shall not close any purchase of a Loan subject to a Forward Purchase Commitment or a Non-Binding Agreement earlier than 48 hours after the time of the closing of the Loan (i.e., execution of definitive documentation), and, in the case of a Forward Purchase Commitment, the Issuer's obligation to purchase such Loan is subject to the condition that no material adverse change has occurred in the financial condition of the Loan's obligor or the relevant market on or before the relevant purchase date.

E.     The Issuer cannot have a contractual relationship with the borrower with respect to a Loan until the Issuer actually purchases the Loan.

F.     The Issuer cannot be a signatory on the original lending agreement, and cannot be obligated to fund an assignment of or a participation in a Loan, prior to the time specified in subsection D above.

G.     The Issuer will not purchase any Portfolio Collateral or enter into any Forward Purchase Commitment or Non-Binding Agreement as to which it knows that the seller or counterparty has acted or described itself as acting as the Issuer's agent in purchasing the Portfolio Collateral or in making or committing to make the loan to which the Forward Purchase Commitment or Non-Binding Agreement relates, and for the avoidance of doubt no such sale or agreement shall be entered into with the understanding that the seller or counterparty will disclose to the borrower the Issuer's intention to purchase the underlying Loan prior to execution of final legal documentation of the Loan.

H.     The Issuer shall not purchase an item of Portfolio Collateral unless the purchase occurs after 48 hours from the closing and execution of final documentation with respect to such item.

OHS West:260194483.5

Section III.       Distressed Debt Obligations.

A.       The Issuer may only purchase a Debt Instrument that is a Potential Workout Obligation to the extent permitted by this Section III.

B.       The Issuer shall not purchase a Subsidiary Obligation from any Issuer Subsidiary.

C.       Special Procedures for Subsidiary Obligations.

1.       Potential Workout Obligations.  On or prior to the date of acquisition, the Servicer on behalf of the Issuer shall identify each Portfolio Collateral that is a Potential Workout Obligation.

2.       Transfer of Subsidiary Obligations.  From and after the occurrence of a Workout Determination Date with respect to a Subsidiary Obligation, the Issuer shall not knowingly take any action in respect of such Subsidiary Obligation that may result in the Issuer being engaged, or deemed to be engaged, in a trade or business within the United States for United States federal income tax purposes.  As soon as practicable, but in any event within 30 calendar days following a Workout Determination Date, the Servicer shall cause the Issuer either (i) to sell or dispose of any Subsidiary Obligation identified on such Workout Determination Date to a Person that is not an Affiliate of the Issuer or Servicer or (ii) to assign any Subsidiary Obligation identified on such Workout Determination Date to an Issuer Subsidiary.

For purposes of this Annex 1, an "Issuer Subsidiary" means any wholly-owned corporate subsidiary of the Issuer to which a Special Workout Obligation may be transferred in accordance with this Annex 1.

3.       Consideration for Assignment of Subsidiary Obligations.  Consideration given by an Issuer Subsidiary for the assignment to it of Subsidiary Obligations may be in the form of cash or in the form of indebtedness of, or equity interests in, such Issuer Subsidiary.

4.       Classification of  Issuer Subsidiaries.  Each Issuer Subsidiary shall be an entity treated as a corporation for United States federal income tax purposes.

As used herein:

"Potential Workout Obligation" means any debt instrument (any such instrument, including an interest in a Loan, a "Debt Instrument") which, as of the date of acquisition by the Issuer or an Issuer Subsidiary, based on information specific to such Debt Instrument or the circumstances of the obligor thereof, is a Workout Obligation or, in the reasonable determination of the Servicer, has a materially higher likelihood of becoming a Workout Obligation as compared to debt obligations that par or other non-distressed debt purchasers or funds customarily purchase and expect to hold to maturity.

"Subsidiary Obligation" means any Potential Workout Obligation (a) as to which the Issuer on any Workout Determination Date either (i) owns more than 40% of the aggregate principal amount of such class of Potential Workout Obligation outstanding or (ii) is one of the two largest holders of any class of debt of the issuer of such Potential Workout Obligation (based on the outstanding principal amount of such class of debt owned by the Issuer as a percentage of the aggregate outstanding principal amount of such class of debt) unless not fewer than three other holders and the Issuer collectively own at least 65% of such class of debt and, if the Issuer

OHS West:260194483.5

is the largest holder of such class, the Issuer's percentage of such class does not exceed the percentage held by the next largest holder of the debt by more than 5% of such class or (b) that would, upon foreclosure or exercise of similar legal remedies, result in the Issuer directly owning assets (other than securities treated as debt, equity in a partnership not engaged in a trade or business within the United States, or corporate equity for United States federal income tax purposes, provided in the case of corporate equity that the corporation is not a "United States real property holding corporation" within the meaning of section 897 of the Code) which are "United States real property interests" within the meaning of section 897 of the Code or which the Servicer reasonably expects it would, on behalf of the Issuer, be required to actively manage to preserve the value of the Issuer's interest therein; provided that a Potential Workout Obligation shall not be treated as a Subsidiary Obligation if the Issuer obtains a Tax Opinion that, based on all the surrounding circumstances, the activities in which the Issuer intends to engage with respect to such Potential Workout Obligation will not cause the Issuer to be treated as engaged in a trade or business for United States federal income tax purposes.

"Workout Determination Date" means any date on which, in connection with the occurrence of any event described in clauses (a) through (c), inclusive, of the definition of Workout Obligation, either (a) any material action by the Issuer is required to be taken, (b) the Servicer receives written notice that such material action shall be required or (c) the Servicer reasonably determines that the taking of such material action is likely to be required.

"Workout Obligation" means any Debt Instrument as to which the Issuer (a) consents to a Significant Modification in connection with the workout of a defaulted Portfolio Collateral, (b) participates in an official or unofficial committee or similar official or unofficial body in connection with a bankruptcy, reorganization, restructuring or similar proceeding, or (c) exercises, or has exercised, rights of foreclosure or similar judicial remedies.

Section IV.    <u>Purchases from the Servicer or its Affiliates</u>.

A.    If the Servicer or an Affiliate of the Servicer acted as an underwriter, placement or other agent, arranger, negotiator or structuror, or received any fee for services (it being understood that receipts described in clauses (i) through (v) of Section I.B. are not construed as so treated), in connection with the issuance or origination of a Portfolio Collateral or was a member of the original lending syndicate with respect to the Portfolio Collateral (any such Portfolio Collateral, a "Special Procedures Obligation"), the Issuer will not acquire any interest in such Special Procedures Obligation (including entering into a commitment or agreement, whether or not legally binding or enforceable, to acquire such obligation directly or synthetically), from (x) the Servicer or (y) an Affiliate of the Servicer, or a fund managed by the Servicer, unless, in the case of (y) only, (i) the Special Procedures Obligation has been outstanding for at least 90 days, (ii) the holder of the Special Procedures Obligation did not identify the obligation or security as intended for sale to the Issuer within 90 days of its issuance, (iii) the price paid for such Special Procedures Obligation by the Issuer is its fair market value at the time of acquisition by the Issuer, and (iv) the transaction is proposed to, and the ultimate purchase is approved on behalf of the Issuer by, one or more Independent Advisors to the Issuer in accordance with the provisions of Section IV.B. below. The Issuer will not acquire any Special Procedures Obligation if, immediately following such acquisition, the fair market value of all Special Procedures Obligations owned by the Issuer would constitute more than 49% of the fair market value of all of the Issuer's assets at such time.

B.    An "Independent Advisor" is a Person who is not an Affiliate of the Issuer, the Servicer or any fund serviced or managed by the Servicer.

Annex 1-5

1.      The Issuer may not purchase or commit to enter into any such Special Procedures Obligation without prior approval by an Independent Advisor.   If the Independent Advisor declines to approve a proposed Special Procedures Obligation, at least three months must elapse before any proposal with respect to a purchase of debt or other obligations of the same obligor is proposed or considered.

2.      The Issuer shall engage the Independent Advisor in an agreement the terms of which shall in substantial form set forth:

(a) the representation of the Independent Advisor, which the Servicer shall not know to be incorrect, that it has significant financial and commercial expertise, including substantial expertise and knowledge in and of the loan market and related investment arenas;

(b) the agreement between the Independent Advisor, the Issuer and the Servicer generally to the effect that (i) the Independent Advisor will operate pursuant to procedures consistent with maintaining his or her independence from the Servicer and its Affiliates, (ii) the Independent Advisor will have the sole authority and discretion to approve or reject acquisition proposals made by the Servicer with respect to any Special Procedures Obligation, (iii) all proposals for the Issuer to acquire any Special Procedures Obligation will be first submitted to the Independent Advisor, (iii) the Servicer will prepare the materials it deems necessary to describe the Special Procedures Obligation to the Independent Advisor, (iv) the Investment Advisor will not be required to make any decision to accept or decline a Special Procedures Obligation at the price offered prior to its review of the materials prepared, plus any additional information requested by the Independent Advisor, and (v) no Independent Advisor may be proposed to be removed or replaced by the Servicer, unless for cause or in the event of a resignation of such Independent Advisor; and

(c) such other commercially reasonable terms and conditions, including terms and conditions to the effect that (i) the Independent Advisor will be paid a reasonable fee for its services plus reimbursement of any reasonable expenses incurred in performance of his or her responsibilities, (ii) the Independent Advisor may be removed or replaced only by a majority (whether by positive act or failure to object) of the probable equity owners (as determined for United States federal income tax purposes) of the Issuer, (iii) if at any time there is more than one Independent Advisor to the Issuer, a majority of such Independent Advisors must approve any Special Procedures Obligation subject to Independent Advisor approval, (iv) an Independent Advisor may not engage, directly or indirectly, in the negotiation of the terms of any Special Procedures Obligation to be acquired by the Issuer (provided however, that an Independent Advisor may negotiate with the Servicer or the seller with respect to the price and terms of the Issuer's purchase of the Special Procedures Obligation, provided further that the Independent Advisor will not make suggestions to the Servicer or any other person about alternative or modified terms of the underlying Special Procedures Obligation on which they might be willing to approve such a Special Procedures Obligation).

3.      Any servicing agreement or other document under which the Servicer is granted signatory powers or other authority on behalf of the Issuer will provide that such powers or authority with respect to Special Procedures Obligations are conditioned upon the prior written approval of the Independent Advisor

.

Annex 1-6

4.      No Special Procedures Obligation will be presented to an Independent Advisor until at least 90 days have elapsed since the later of (a) the execution of final documentation and (b) the funding in whole or part of the Special Procedures Obligation and there will have been no commitment or arrangement prior to that time that the Issuer will acquire any such Special Procedures Obligation; provided, further, that if the person from whom the Issuer will acquire the Special Procedures Obligation is an Affiliate of the Servicer, the 90 day period specified in this clause (4) will be extended by such number of days as the Affiliate does not enjoy substantially all of the benefits and burdens of ownership (for example, because it has hedged its credit exposure to the Special Procedures Obligation).

5.      The Issuer will have no obligation to, or understanding that it will refund, reimburse or indemnify any person (including an Affiliate of the Servicer), directly or indirectly, for "breakage" costs or other costs or expenses incurred by such person if the Independent Advisor determines that the Issuer should decline to purchase any Special Procedures Obligation.

6.      Neither the Servicer nor any Affiliate of the Servicer will have any authority to enter into agreements, or take any action, on behalf of the Issuer with respect to Special Procedures Obligations without the prior written approval of an Independent Advisor.  Except as may be conditioned upon such prior written approval, neither the Servicer nor any Affiliate of the Servicer may hold itself out as having signatory powers on behalf of the Issuer or authority to enter into agreements with respect to Special Procedures Obligations on behalf of the Issuer.

Section V.      <u>Synthetic Securities</u>.

A.      The Issuer shall not (i) acquire or enter into any Synthetic Security with respect to any Reference Obligation the direct acquisition of which would violate any provision of this Annex 1 or (ii) use Synthetic Securities as a means of making advances to the Synthetic Security Counterparty following the date on which the Synthetic Security is acquired or entered into (for the avoidance of doubt, the establishment of Synthetic Security collateral accounts and the payment of Synthetic Security Counterparties from the amounts on deposit therein, shall not constitute the making of advances).

B.      With respect to each Synthetic Security, the Issuer will not acquire or enter into any Synthetic Security which does not satisfy all of the following additional criteria unless the Servicer has first received advice of counsel that the ownership and disposition of such Synthetic Security would not cause the Issuer to be engaged in a trade or business within the United States for United States federal income tax purposes:

1.      the criteria used to determine whether to enter into any particular Synthetic Security was similar to the criteria used by the Servicer in making decisions to acquire debt securities;

2.      the Synthetic Security is acquired by or entered into by the Issuer for its own account and for investment purposes with the expectation of realizing a profit from income earned on the securities (and any potential rise in their value during the interval of time between their purchase and sale) or hedging purposes and not with an intention to trade or to sell for a short-term profit;

3.      the Issuer enters into the Synthetic Security with a counterparty that is not a special purpose vehicle and is a broker-dealer or that holds itself out as in the business of entering into such contracts;

OHS West:260194483.5

4.       neither the Issuer nor any Person acting on behalf of the Issuer advertises or publishes the Issuer's ability to enter into Synthetic Securities;

5.       except with respect to (x) credit-linked notes or similar Synthetic Securities and (y) any other Synthetic Securities where standard form ISDA documentation is not applicable, the Synthetic Security is written on standard form ISDA documentation;

6.       the net payment from the Issuer to the Synthetic Security Counterparty is not determined based on an actual loss incurred by the Synthetic Security Counterparty or any other designated person;

7.       there exists no agreement, arrangement or understanding that (i) the Synthetic Security Counterparty is required to own or hold the related Reference Obligation while the Synthetic Security remains in effect or (ii) the Synthetic Security Counterparty is economically or practically compelled to own or hold the related physical Reference Obligation while the Synthetic Security remains in effect;

8.       the Synthetic Security provides for (i) all cash settlement, (ii) all physical settlement or (iii) the option to either cash settle or physically settle; provided that, in the latter two cases, physical settlement provides the settling party the right to settle the Synthetic Security by delivering deliverable obligations which *may* include the Reference Obligation and the settling party must not be required to deliver the related Reference Obligation upon the settlement of such Synthetic Security.

Notwithstanding the preceding paragraph, a Synthetic Security providing for physical settlement may require a party to deliver the related Reference Obligation if either:

(i)       at the time the Issuer enters into such Synthetic Security, such Reference Obligation is readily available to purchasers generally in a liquid market; or

(ii)       the advice of both United States federal income tax and insurance counsel of nationally recognized standing in the United States experienced in such matters is that, under the relevant facts and circumstances with respect to such Synthetic Security, the acquisition of such Synthetic Security will not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for United States federal income tax purposes or otherwise to be subject to United States federal income tax on a net basis and should not cause the Issuer to be treated as writing insurance in the United States under the law of the state in which the Synthetic Security Counterparty is organized.

9.       the Synthetic Security is not treated by the Issuer as insurance or a financial guarantee sold by the Issuer for United States or Cayman Islands regulatory purposes.

As used herein:

"Reference Obligation" means a debt security or other obligation upon which a Synthetic Security is based.

"Synthetic Security" means any swap transaction or security, other than a participation interest in a Loan, that has payments associated with either payments of interest and/or principal on a Reference Obligation or the credit performance of a Reference Obligation.

Annex 1-8

009331

"Synthetic Security Counterparty" means an entity (other than the Issuer) required to make payments on a Synthetic Security (including any guarantor).

Section VI.     Other Types of Assets.

A.     Equity Restrictions.  The Issuer will not purchase any asset (directly or synthetically) that is:

1.     not treated for U.S. federal income tax purposes as debt if the issuing entity is a "partnership" (within the meaning of Section 7701(a)(2) of the Code) unless such entity is not engaged in a trade or business within the United States, or

2.     a "United States real property interest" as defined in section 897 of the Code and the Treasury Regulations promulgated thereunder.

The Issuer may cause an Issuer Subsidiary to acquire assets set forth in clause (i) or (ii) above (each, an "ETB/897 Asset") in connection with the workout of defaulted Portfolio Collateral, so long as the acquisition of ETB/897 Assets by such Issuer Subsidiary will not cause the stock of such Issuer Subsidiary to be deemed to be an ETB/897 Asset.

B.     Revolving Loans and Delayed Drawdown Loans.  All of the terms of any advance required to be made by the Issuer under any revolving or delayed drawdown Loan will be fixed as of the date of the Issuer's purchase thereof (or will be determinable under a formula that is fixed as of such date), and the Issuer and the Servicer will not have any discretion (except for consenting or withholding consent to amendments, waivers or other modifications or granting customary waivers upon default) as to whether to make advances under such revolving or delayed drawdown Loan.  Further, the Issuer shall not purchase any item of Portfolio Collateral that requires the Issuer in any manner whatsoever to acquire new Portfolio Collateral from the borrower or otherwise lend, advance or provide new funds to the borrower unless the addition of such Portfolio Collateral would not cause 10% or more of the aggregate principal amount of the Portfolio Collateral owned by the Issuer to be considered revolving or delayed drawdown loans.

C.     Securities Lending Agreements.  The Issuer will not purchase any Portfolio Collateral primarily for the purpose of entering into a securities lending agreement with respect thereto.

Section VII.    General Restrictions on the Issuer.  The Issuer itself shall not:

A.     hold itself out, through advertising or otherwise, as originating Loans, lending funds, or making a market in or dealing in Loans or other assets;

B.     register as, hold itself out as, or become subject to regulatory supervision or other legal requirements under the laws of any country or political subdivision thereof as, a broker-dealer, a bank, an insurance company, financial guarantor, a surety bond issuer, or a company engaged in Loan origination;

C.     knowingly take any action causing it to be treated as a bank, insurance company, or company engaged in Loan origination for purposes of any tax, securities law or other filing or submission made to any governmental authority;

D.     hold itself out, through advertising or otherwise, as originating, funding, guaranteeing or insuring debt obligations or as being willing and able to enter into transactions (either purchases or sales

of debt obligations or entries into, assignments or terminations of hedging or derivative instruments, including Synthetic Securities) at the request of others;

      E.      treat Synthetic Securities as insurance, reinsurance, indemnity bonds, guaranties, guaranty bonds or suretyship contracts for any purpose;

      F.      allow any non-U.S. bank or lending institution who is a holder of a Security to control or direct the Servicer's or Issuer's decision to acquire a particular asset except as otherwise allowed to such a holder, acting in that capacity, under the related indenture or acquire a Portfolio Collateral conditioned upon a particular person or entity holding Securities;

      G.      acquire any asset the holding or acquisition of which the Servicer knows would cause the Issuer to be subject to income tax on a net income basis;

      H.      hold any security as nominee for another person; or

      I.      buy securities with the intent to subdivide them and sell the components or to buy securities and sell them with different securities as a package or unit.

Section VIII.    <u>Tax Opinion; Amendments</u>.

      A.      In furtherance and not in limitation of this Annex 1, the Servicer shall comply with all of the provisions set forth in this Annex 1, unless, with respect to a particular transaction, the Servicer acting on behalf of the Issuer and the Trustee shall have received written advice of Orrick, Herrington & Sutcliffe LLP or an opinion of other counsel of nationally recognized standing in the United States experienced in such matters (a "Tax Opinion"), that, under the relevant facts and circumstances with respect to such transaction, the Servicer's failure to comply with one or more of such provisions will not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for United States federal income tax purposes or otherwise to be subject to United States federal income tax on a net basis.

      B.      The provisions set forth in the Annex 1 may be amended, eliminated or supplemented by the Servicer if the Issuer, the Servicer and the Trustee shall have received a Tax Opinion that the Servicer's compliance with such amended provisions or supplemental provisions or the failure to comply with such provisions proposed to be eliminated, as the case may be, will not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for United States federal income tax purposes or otherwise to be subject to United States federal income tax on a net basis.

OHS West:260194483.5

009333

# EXHIBIT FFF

009334

**IMPORTANT NOTICE**

THIS OFFERING IS AVAILABLE ONLY TO INVESTORS ("**ELIGIBLE INVESTORS**") THAT ARE EITHER (1)(I)(A) QUALIFIED INSTITUTIONAL BUYERS ("**QUALIFIED INSTITUTIONAL BUYERS**") (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) OR (B) SOLELY IN THE CASE OF THE COMPOSITE SECURITIES AND THE PREFERENCE SHARES, ACCREDITED INVESTORS (AS DEFINED IN RULE 501(a) UNDER THE SECURITIES ACT) ("**ACCREDITED INVESTORS**") IN TRANSACTIONS EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND (II)(A) QUALIFIED PURCHASERS ("**QUALIFIED PURCHASERS**") (FOR THE PURPOSES OF SECTION 3(C)(7) OF THE INVESTMENT COMPANY ACT), (B) SOLELY IN THE CASE OF THE PREFERENCE SHARES, KNOWLEDGEABLE EMPLOYEES ("**KNOWLEDGEABLE EMPLOYEES**") (AS DEFINED IN RULE 3c-5 UNDER THE INVESTMENT COMPANY ACT) OR (C) AN ENTITY OWNED EXCLUSIVELY BY QUALIFIED PURCHASERS AND/OR, SOLELY IN THE CASE OF THE PREFERENCE SHARES, KNOWLEDGEABLE EMPLOYEES OR (2) PERSONS THAT ARE NOT "U.S. PERSONS" ("**U.S. PERSONS**") (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) AND THAT ARE OUTSIDE THE UNITED STATES.

**IMPORTANT:  You must read the following before continuing.**  The following applies to the offering document (the "**Final Offering Circular**") following this page, and you are therefore advised to read this carefully before reading, accessing or making any other use of the Final Offering Circular.  In accessing the Final Offering Circular, you agree to be bound by the following terms and conditions, including any modifications to them any time you receive any information from us as a result of such access.

NOTHING IN THIS ELECTRONIC TRANSMISSION CONSTITUTES AN OFFER OF SECURITIES FOR SALE IN ANY JURISDICTION WHERE IT IS UNLAWFUL TO DO SO.  THE SECURITIES DESCRIBED HEREIN HAVE NOT BEEN, AND WILL NOT, BE REGISTERED UNDER THE SECURITIES ACT, OR THE SECURITIES LAWS OF ANY STATE OF THE U.S. OR OTHER JURISDICTION, AND THE CO-ISSUERS REFERRED TO HEREIN WILL NOT BE REGISTERED UNDER THE INVESTMENT COMPANY ACT.  THE SECURITIES DESCRIBED HEREIN MAY NOT BE OFFERED OR SOLD WITHIN THE U.S. OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS, EXCEPT PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND APPLICABLE STATE OR LOCAL SECURITIES LAWS.

THE FOLLOWING FINAL OFFERING CIRCULAR MAY NOT BE FORWARDED OR DISTRIBUTED TO ANY OTHER PERSON AND MAY NOT BE REPRODUCED IN ANY MANNER WHATSOEVER.  ANY FORWARDING, DISTRIBUTION OR REPRODUCTION OF THIS DOCUMENT IN WHOLE OR IN PART IS UNAUTHORIZED. FAILURE TO COMPLY WITH THIS DIRECTIVE MAY RESULT IN A VIOLATION OF THE SECURITIES ACT OR THE APPLICABLE LAWS OF OTHER JURISDICTIONS.

**Confirmation of your Representation:**  To be eligible to view the Final Offering Circular or make an investment decision with respect to the securities described herein, investors must be Eligible Investors (as defined above).  The Final Offering Circular is being sent at your request and by accepting this e-mail and accessing the Final Offering Circular, you shall be deemed to have represented to us that (i) you and any customers you represent are either (1) (I) (A) Qualified Institutional Buyers or (B), solely in the case of the Composite Securities and the Preference Shares, Accredited Investors and (II) (A) either Qualified Purchasers, (B) solely in the case of the Preference Shares, Knowledgeable Employees or (C) an entity owned exclusively by Qualified Purchasers and/or, solely in the case of the Preference Shares, Knowledgeable Employees or (2) not U.S. Persons and the electronic mail address that you gave us and to which this e-mail has been delivered is not located in the United States and (ii) you consent to delivery of the Final Offering Circular by electronic transmission.

You are reminded that the Final Offering Circular has been delivered to you on the basis that you are a person into whose possession the Final Offering Circular may be lawfully delivered in accordance with the laws of jurisdiction in which you are located and you may not, nor are you authorized to, deliver the Final Offering Circular to any other person.

The materials relating to the offering do not constitute, and may not be used in connection with, an offer or solicitation in any place where offers or solicitations are not permitted by law.  If a jurisdiction requires that the offering be made by or through a licensed broker or dealer and J.P. Morgan Securities Inc. ("**JPMorgan**") or any affiliate thereof is a licensed broker or dealer in such jurisdiction, the offering shall be deemed to be made by or through JPMorgan or such affiliate on behalf of the Co-Issuers in such jurisdiction.

*The Final Offering Circular has been sent to you in an electronic form.  You are reminded that documents transmitted via this medium may be altered or changed during the process of electronic transmission and consequently neither JPMorgan nor any person who controls JPMorgan nor any director, officer, employee nor agent of it or affiliate of any such person accepts any liability or responsibility whatsoever in respect of any difference between the Final Offering Circular distributed to you in electronic format and the hard copy version available to you on request from JPMorgan.*

**Offering Circular**

# Southfork CLO Ltd.
## Southfork CLO Corp.

U.S.$52,000,000 Class A-1a Floating Rate Senior Secured Extendable Notes Due 2017
U.S.$7,000,000 Class A-1b Fixed Rate Senior Secured Extendable Notes Due 2017
U.S.$400,000,000 Class A-1g Floating Rate Senior Secured Extendable Notes Due 2017
U.S.$42,500,000 Class A-2 Floating Rate Senior Secured Extendable Notes Due 2017
U.S.$23,500,000 Class A-3a Floating Rate Senior Secured Extendable Notes Due 2017
U.S.$2,500,000 Class A-3b Fixed Rate Senior Secured Extendable Notes Due 2017
U.S.$39,000,000 Class B Floating Rate Senior Secured Deferrable Interest Extendable Notes Due 2017
U.S.$36,300,000 Class C Floating Rate Senior Secured Deferrable Interest Extendable Notes Due 2017
82,200 Preference Shares
U.S.$6,000,000 Class 1 Extendable Composite Securities Due 2017

Southfork CLO Ltd. (the "**Issuer**") and Southfork CLO Corp. (the "**Co-Issuer**" and, together with the Issuer, the "**Co-Issuers**") will issue the Class A-1a Floating Rate Senior Secured Extendable Notes (the "**Class A-1a Notes**"), the Class A-1b Fixed Rate Senior Secured Extendable Notes (the "**Class A-1b Notes**"), the Class A-1g Floating Rate Senior Secured Extendable Notes (the "**Class A-1g Notes**" or the "**Insured Notes**" and, together with the Class A-1a Notes and the Class A-1b Notes, the "**Senior Class A Notes**"), the Class A-2 Floating Rate Senior Secured Extendable Notes (the "**Class A-2 Notes**"), the Class A-3a Floating Rate Senior Secured Extendable Notes (the "**Class A-3a Notes**"), the Class A-3b Fixed Rate Senior Secured Extendable Notes (the "**Class A-3b Notes**" and, together with the Class A-3a Notes, the "**Class A-3 Notes**" and, the A-3 Notes together with the Senior Class A Notes and the Class A-2 Notes, the "**Class A Notes**"), the Class B Floating Rate Senior Secured Deferrable Interest Extendable Notes (the "**Class B Notes**") and the Class C Floating Rate Senior Secured Deferrable Interest Extendable Notes (the "**Class C Notes**" and, together with the Class A Notes and the Class B Notes, the "**Notes**") and the Issuer will individually issue the Class 1 Extendable Composite Securities (the "**Class 1 Composite Securities**") consisting of (i) a component entitling its holders to rights in respect of 2,000 Preference Shares (the "**Preference Share Component**") and (ii) a component entitling its holders to rights to receive proceeds from a trust account initially holding a United States Treasury strip security maturing on November 15, 2016 with a principal amount at maturity of U.S.$6,000,000 (the "**Class 1 Component**" and, together with the Preference Share Component, the "**Components**"), and the Preference Shares, U.S.$0.01 par value per share (the "**Preference Shares**" and, together with the Notes and the Class 1 Composite Securities, the "**Securities**"), in each case in the aggregate principal amounts or number of Preference Shares as described above. The Notes and the Class 1 Composite Securities will be issued on or about March 15, 2005 (the "**Closing Date**") pursuant to an Indenture, dated as of March 15, 2005 (the "**Indenture**"), among the Co-Issuers, Assured Guaranty Corp., as Insurer (the "**Insurer**") and JPMorgan Chase Bank, National Association, as Trustee (the "**Trustee**"). The Preference Shares will be issued on or about the Closing Date pursuant to and subject to the terms of the Preference Share Documents. The Stated Maturity of the Notes and the Class 1 Composite Securities and the Scheduled Preference Shares Redemption Date of the Preference Shares are subject to multiple extensions to the applicable Extended Stated Maturity Date (in the case of the Notes and the Class 1 Composite Securities) and the applicable Extended Scheduled Preference Shares Redemption Date (in the case of the Preference Shares), if the Issuer provides timely notice and the Extension Conditions are satisfied as described herein.



The Insured Notes will be guaranteed as to the full and timely payment of the Insured Amounts that shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer, pursuant to the terms of a financial insurance guaranty policy to be issued by the Insurer (the "**Policy**"). No other Class of Securities are entitled to the benefits of the Policy. See "The Insurer and the Policy."

The net proceeds of the offering of the Securities will be applied by the Issuer to repurchase participation interests in certain Collateral Obligations sold to finance the purchase of such Collateral Obligations prior to the Closing Date and to purchase additional Collateral Obligations on and after the Closing Date, all of which will be pledged under the Indenture by the Issuer to the Trustee. See "Use of Proceeds." Highland Capital Management, L.P. will serve as portfolio manager for the Issuer's portfolio.

**For a discussion of certain factors regarding the Issuer and the Securities that, among other things, should be considered by prospective purchasers of the Securities, see "Risk Factors."**

THE SECURITIES HAVE NOT BEEN, AND WILL NOT BE, REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**") AND NEITHER THE ISSUER NOR THE CO-ISSUER WILL BE REGISTERED UNDER THE UNITED STATES INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "**INVESTMENT COMPANY ACT**"). THE SECURITIES WILL BE OFFERED AND SOLD TO NON-U.S. PERSONS (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT ("**REGULATION S**")) OUTSIDE THE UNITED STATES IN RELIANCE ON REGULATION S. THE SECURITIES MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS EXCEPT TO PERSONS THAT ARE (I)(A) QUALIFIED INSTITUTIONAL BUYERS ("**QUALIFIED INSTITUTIONAL BUYERS**") (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT ("**RULE 144A**")) IN RELIANCE ON THE EXEMPTION FROM THE REGISTRATION REQUIREMENTS PROVIDED BY RULE 144A OR (B) SOLELY IN THE CASE OF THE COMPOSITE SECURITIES AND THE PREFERENCE SHARES, "ACCREDITED INVESTORS" ("**ACCREDITED INVESTORS**") (WITHIN THE MEANING SPECIFIED IN RULE 501(a) OF REGULATION D UNDER THE SECURITIES ACT) IN TRANSACTIONS EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND (II)(A) QUALIFIED PURCHASERS ("**QUALIFIED PURCHASERS**") (FOR PURPOSES OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT), (B) SOLELY IN THE CASE OF THE PREFERENCE SHARES, KNOWLEDGEABLE EMPLOYEES ("**KNOWLEDGEABLE EMPLOYEES**") (AS DEFINED IN RULE 3c-5 OF THE INVESTMENT COMPANY ACT) OR (C) AN ENTITY OWNED EXCLUSIVELY BY QUALIFIED PURCHASERS AND/OR, SOLELY IN THE CASE OF THE PREFERENCE SHARES, KNOWLEDGEABLE EMPLOYEES, AND IN ACCORDANCE WITH ANY OTHER APPLICABLE LAW. THE SECURITIES ARE NOT TRANSFERABLE EXCEPT IN ACCORDANCE WITH THE RESTRICTIONS DESCRIBED UNDER "TRANSFER RESTRICTIONS."

The Notes, the Composite Securities and a portion of the Preference Shares (the "**Purchased Securities**") are being offered by J.P. Morgan Securities Inc. ("**JPMorgan**") as initial purchaser (in such capacity, the "**Initial Purchaser**"), when, as and if such Purchased Securities are received and accepted by the Initial Purchaser and subject to prior sale, withdrawal, cancellation or modification of the offer without notice, to the right of the Initial Purchaser to reject orders in whole or in part and to certain other conditions. The remaining Preference Shares will be offered and sold by the Issuer directly to the Portfolio Manager and/or its Affiliates and JPMorgan is not acting as a placement agent or initial purchaser with respect to the offering of such portion of Preference Shares.

## JPMorgan

March 9, 2005

009336

Payment of interest on, and principal of, the Notes will be made by the Issuer in U.S. Dollars on the first day of each February, May, August and November of each year (or if such day is not a Business Day, the next succeeding Business Day) (each such date a "**Payment Date**"), commencing August 1, 2005, to the extent of available cash flow in respect of the Collateral in accordance with the Priority of Payments. Each Class of Notes will bear interest at the per annum rates set forth under "Summary of Terms—Principal Terms of the Securities." The Preference Shares will receive as dividends certain amounts available for distribution to the Holders of the Preference Shares in accordance with the Priority of Payments. See "Description of the Securities—Priority of Payments."

The Notes will be subject to Optional Redemption in whole, but not in part, on any Payment Date upon the occurrence of a Tax Event or at any time after the Non-Call Period, in each case at the direction of the Holders of at least 63% of the Aggregate Outstanding Amount of the Preference Shares. The Notes will be subject to mandatory redemption on any Payment Date, to the extent that any of the Coverage Tests are not satisfied, as described herein. The Notes will be subject to Special Redemption, at the discretion of the Portfolio Manager, to the extent that at any time during the Reinvestment Period, the Portfolio Manager cannot identify satisfactory Collateral Obligations for investment of Collection Account funds. After redemption in full of the Notes, the Preference Shares will be subject to Optional Redemption in whole or in part on any Payment Date by the Issuer at the direction of the requisite percentage of the Preference Shares at the applicable Redemption Price pursuant to the Preference Share Documents, to the extent legally permitted; *provided*, *however*, that the Preference Shares must be redeemed on or prior to the Scheduled Preference Shares Redemption Date. Upon the occurrence of a redemption of the Preference Shares pursuant to the Indenture, in whole or in part, the Class 1 Components shall be redeemed by the Issuer, in whole but not in part, on the related Composite Securities Payment Date from the Class 1 Collateral available for that purpose in the Class 1 Component Account at the applicable Redemption Price. See "Description of the Securities—Optional Redemption," "—Mandatory Redemption of the Notes," "—Special Redemption of Notes If the Portfolio Manager Does Not Identify Investments as Contemplated by the Indenture" and "—Priority of Payments." The principal amount of the Notes and the Composite Securities will be payable at the Stated Maturity, unless redeemed or paid in full prior thereto. The Preference Shares are scheduled to be redeemed at their Redemption Price on the Scheduled Preference Shares Redemption Date, unless redeemed prior thereto.

Certain pledged assets of the Issuer are the sole source of payments on the Securities. The Securities do not represent an interest in or obligations of, and are not insured or guaranteed by, the Holders of the Preference Shares, the Portfolio Manager, the Trustee, any paying agent, the Preference Shares Paying Agent, JPMorgan, the Insurer (other than in respect of the Insured Notes), any Hedge Counterparty or any of their respective Affiliates.

**Application will be made to list the Securities (other than the Preference Shares) on the Irish Stock Exchange. However, there can be no assurance that the Irish Stock Exchange will in fact accept the listing of the such Securities.**

Except as otherwise specified herein or as the context may otherwise require or dictate or unless the Composite Securities are explicitly addressed in the same context, (A) all references in this Offering Circular to the "Preference Shares" include the "Preference Share Component" of the Class 1 Composite Securities and (B) all references in this Offering Circular to the rights of the Holders of the Preference Shares (including with respect to any payments, distributions, redemptions, votes or consents to be given by such Holders) include the rights of the Holders of the Class 1 Composite Securities to the extent of the Preference Share Component of the Class 1 Composite Securities.

It is a condition of the issuance of the Securities that (i) the Class A-1a Notes, the Class A-1b Notes and the Class A-2 Notes be rated at least "Aaa" by Moody's Investors Service, Inc. ("**Moody's**") and at least "AAA" by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("**S&P**" and, together with Moody's, the "**Rating Agencies**"), (ii) the Class A-1g Notes be rated (after giving effect to the Policy) at least "Aaa" by Moody's and at least "AAA" by S&P, (iii) the Class A-3

009337

Notes be rated at least "Aa2" by Moody's and at least "AA" by S&P, (iv) the Class B Notes be rated at least "A2" by Moody's and at least "A" by S&P, (v) the Class C Notes be rated at least "Baa2" by Moody's and at least "BBB" by S&P and (vi) the Class 1 Composite Securities be rated at least "Aaa" by Moody's. The Class 1 Composite Securities are rated only as to the ultimate payment of their Class 1 Composite Security Rated Balance. Each of the above ratings assume that no Maturity Extension occurs after the Closing Date. A credit rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning Rating Agency. The Preference Shares will not be rated by any credit rating agency.

No person has been authorized to make or provide any representation or information regarding the Co-Issuers or the Securities other than as contained in this Offering Circular. Any such representation or information should not be relied upon as having been authorized by the Co-Issuers or JPMorgan. The delivery of this Offering Circular at any time does not imply that the information contained in it is correct as of any time subsequent to the date of this Offering Circular. Unless otherwise indicated, all information in this Offering Circular is given as of the date of this Offering Circular.

This Offering Circular has been prepared by the Co-Issuers solely for use in connection with the listing of the Securities (other than the Preference Shares) and the offering of the Securities. Unless as otherwise provided herein, the Co-Issuers have taken reasonable care to ensure that facts stated in this Offering Circular are true and accurate in all material respects and that there have not been omitted material facts the omission of which would make misleading in any material respect any statements of fact or opinion herein. The Co-Issuers accept responsibility accordingly.

The information appearing in the section entitled "The Portfolio Manager" has been prepared by the Portfolio Manager and has not been independently verified by JPMorgan or the Co-Issuers. JPMorgan and the Co-Issuers do not assume any responsibility for the accuracy, completeness, or applicability of such information, except that the Co-Issuers assume responsibility for accurately reproducing such information in this Offering Circular.

The information appearing in the section entitled "The Insurer and the Policy—The Insurer" (including all information incorporated by reference therein) and in Exhibit A to this Offering Circular has been prepared by the Insurer and has not been independently verified by JPMorgan or the Co-Issuers. JPMorgan and the Co-Issuers do not assume any responsibility for the accuracy, completeness, or applicability of such information, except that the Co-Issuers assume responsibility for accurately reproducing such information in this Offering Circular.

None of JPMorgan, (except with respect to the section entitled "The Portfolio Manager") the Portfolio Manager, or (except with respect to the section entitled "The Insurer and the Policy—The Insurer" and Exhibit A to this Offering Circular) the Insurer, makes any representation or warranty, express or implied, as to the accuracy or completeness of the information in this Offering Circular. Each person receiving this Offering Circular acknowledges that such person has not relied on JPMorgan, (except with respect to the section entitled "The Portfolio Manager") the Portfolio Manager or (except with respect to the section entitled "The Insurer and the Policy—The Insurer" and Exhibit A to this Offering Circular) the Insurer or any person affiliated therewith, in connection with its investigation of the accuracy of such information or its investment decision. Each person contemplating making an investment in the Securities must make its own investigation and analysis of the creditworthiness of the Co-Issuers and its own determination of the suitability of any such investment, with particular reference to its own investment objectives and experience, and any other factors that may be relevant to it in connection with such investment.

THE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, AND NONE OF THE FOREGOING AUTHORITIES HAS CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS OFFERING CIRCULAR. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

009338

This Offering Circular contains summaries of certain documents. The summaries do not purport to be complete and are qualified in their entirety by reference to such documents. Each person receiving this Offering Circular acknowledges that such person has been afforded an opportunity to request from the Issuer and to review, and has received, all additional information considered by such person to be necessary to verify the accuracy and completeness of the information herein. Requests and inquiries regarding this Offering Circular or such documents should be directed to the Issuer, in care of J.P. Morgan Securities Inc., 270 Park Avenue, 8th Floor, New York, New York, 10017, Attention: Structured Credit Products. Such requests may also be made to the Listing Agent at the address set forth on the final page of this Offering Circular.

The Securities are a new issue of securities. There can be no assurance that a secondary market for any of the Securities will develop, or if a secondary market does develop, that it will provide the holders of such Securities with liquidity of investment or that it will continue. Accordingly, investors should be prepared to bear the risks of holding the Securities until final payment is made thereon.

THE CONTENTS OF THIS OFFERING CIRCULAR ARE NOT TO BE CONSTRUED AS LEGAL, BUSINESS OR TAX ADVICE. EACH PROSPECTIVE INVESTOR SHOULD CONSULT ITS OWN ATTORNEY, BUSINESS ADVISOR AND TAX ADVISOR AS TO LEGAL, BUSINESS AND TAX ADVICE.

This Offering Circular does not constitute an offer of, or an invitation by or on behalf of, the Co-Issuers (in respect of the Notes) or the Issuer (in respect of the Composite Securities and the Preference Shares) or JPMorgan to subscribe to or purchase any of the Securities in any jurisdiction in which it is unlawful to make such an offer or invitation. The distribution of this Offering Circular and the offering of the Securities in certain jurisdictions may be restricted by law. Persons into whose possession this Offering Circular comes are required by the Co-Issuers and JPMorgan to inform themselves about and to observe any such restrictions. For a description of certain further restrictions on offers and sales of Securities and distribution of this Offering Circular, see "Description of the Securities," "Plan of Distribution" and "Transfer Restrictions."

Neither the Issuer nor the Co-Issuer has been registered under the Investment Company Act. Each purchaser of Notes represented by an interest in a Rule 144A Global Note will be deemed to represent and agree that the purchaser is acquiring such Notes in a principal amount of not less than U.S.$250,000, and integral multiples of U.S.$1,000 in excess thereof for such purchaser and each account for which such purchaser is purchasing such Notes and that the purchaser and each such account is a Qualified Purchaser. Each purchaser of Preference Shares or Composite Securities that is a U.S. Person will be required to represent and agree that (i) the purchaser is (a) acquiring such Preference Shares in a number of not less than 100 Preference Shares and in integral multiples of one Preference Share in excess thereof for such purchaser or (b) acquiring such Composite Securities in a principal amount of not less than U.S.$100,000, and integral multiples of U.S.$1,000 in excess thereof for such purchaser and (ii) each account for which such purchaser is purchasing such Preference Shares or Composite Securities and that the purchaser and each such account is (a) a Qualified Purchaser, (b) solely in the case of the Preference Shares, a Knowledgeable Employee or (c) an entity owned exclusively by Qualified Purchasers and/or, solely in the case of the Preference Shares, Knowledgeable Employees. See "Transfer Restrictions."

No invitation to subscribe for the Securities may be made to the public in the Cayman Islands.

Prospective purchasers are hereby notified that a seller of the Securities may be relying on an exemption from the registration requirements of Section 5 of the Securities Act provided by Section 4(2) of, or Rule 144A under, the Securities Act.

In this Offering Circular references to "Dollars," "$" and "U.S.$" are dollars or other equivalent units in such coin or currency of the United States of America as at the time shall be legal tender for all debts, public and private.

009339

**NO ACTION WAS TAKEN OR IS BEING CONTEMPLATED BY THE CO-ISSUERS THAT WOULD PERMIT A PUBLIC OFFERING OF THE SECURITIES OR POSSESSION OR DISTRIBUTION OF THIS OFFERING CIRCULAR OR ANY AMENDMENT THEREOF, OR SUPPLEMENT THERETO OR ANY OTHER OFFERING MATERIAL RELATING TO THE SECURITIES IN ANY JURISDICTION (OTHER THAN IRELAND) WHERE, OR IN ANY OTHER CIRCUMSTANCES IN WHICH, ACTION FOR THOSE PURPOSES IS REQUIRED. NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO PURCHASE ANY SECURITIES IN ANY JURISDICTION WHERE IT IS UNLAWFUL TO DO SO ABSENT THE TAKING OF SUCH ACTION OR THE AVAILABILITY OF AN EXEMPTION THEREFROM.**

### NOTICE TO NEW HAMPSHIRE RESIDENTS

NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE REVISED STATUTES WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE OF NEW HAMPSHIRE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY, OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

### NOTICE TO FLORIDA RESIDENTS

THE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER SECTION 517.061 OF THE FLORIDA SECURITIES ACT AND HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF FLORIDA. ALL FLORIDA RESIDENTS WHO ARE NOT INSTITUTIONAL INVESTORS DESCRIBED IN SECTION 517.061(7) OF THE FLORIDA SECURITIES ACT HAVE THE RIGHT TO VOID THEIR PURCHASE OF THE SECURITIES, WITHOUT PENALTY, WITHIN THREE (3) DAYS AFTER THE FIRST TENDER OF CONSIDERATION.

### NOTICE TO GEORGIA RESIDENTS

THE SECURITIES WILL BE ISSUED OR SOLD IN RELIANCE ON PARAGRAPH (13) OF CODE SECTION 10-5-9 OF THE GEORGIA SECURITIES ACT OF 1973, AND MAY NOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER SUCH ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION UNDER SUCH ACT.

### NOTICE TO RESIDENTS OF AUSTRALIA

NO PROSPECTUS OR OTHER DISCLOSURE DOCUMENT IN RELATION TO THE SECURITIES HAS BEEN LODGED WITH THE AUSTRALIAN SECURITIES AND INVESTMENTS COMMISSION OR THE AUSTRALIAN STOCK EXCHANGE LIMITED. THE INITIAL PURCHASER WILL REPRESENT AND AGREE THAT IT:

        (A)    HAS NOT OFFERED OR INVITED APPLICATIONS, AND WILL NOT OFFER OR INVITE APPLICATIONS, FOR THE ISSUE, SALE OR PURCHASE OF THE

009340

SECURITIES IN AUSTRALIA (INCLUDING AN OFFER OR INVITATION WHICH IS RECEIVED BY A PERSON IN AUSTRALIA); AND

(B)      HAS NOT DISTRIBUTED OR PUBLISHED, AND WILL NOT DISTRIBUTE OR PUBLISH, THIS OFFERING CIRCULAR OR ANY OTHER OFFERING MATERIAL OR ADVERTISEMENT RELATING TO THE SECURITIES IN AUSTRALIA,

UNLESS (I) THE MINIMUM AGGREGATE CONSIDERATION PAYABLE BY EACH OFFEREE IS AT LEAST AU$500,000 (DISREGARDING MONEYS LENT BY THE OFFEROR OR ITS ASSOCIATES) OR THE OFFER OR INVITATION OTHERWISE DOES NOT REQUIRE DISCLOSURE TO INVESTORS IN ACCORDANCE WITH PART 6D.2 OF THE CORPORATIONS LAW, AND (II) SUCH ACTION COMPLIES WITH ALL APPLICABLE LAWS AND REGULATIONS.

### NOTICE TO RESIDENTS OF AUSTRIA

THE SECURITIES MAY ONLY BE OFFERED IN THE REPUBLIC OF AUSTRIA IN COMPLIANCE WITH THE PROVISIONS OF THE AUSTRIAN CAPITAL MARKET ACT AND OTHER LAWS APPLICABLE IN THE REPUBLIC OF AUSTRIA GOVERNING THE OFFER AND SALE OF THE NOTES IN THE REPUBLIC OF AUSTRIA. THE SECURITIES ARE NOT REGISTERED OR OTHERWISE AUTHORISED FOR PUBLIC OFFER EITHER UNDER THE CAPITAL MARKET ACT OR THE INVESTMENT FUND ACT. THE RECIPIENTS OF THIS OFFERING CIRCULAR AND OTHER SELLING MATERIAL IN RESPECT TO THE SECURITIES HAVE BEEN INDIVIDUALLY SELECTED AND ARE TARGETED EXCLUSIVELY ON THE BASIS OF A PRIVATE PLACEMENT. ACCORDINGLY, THE SECURITIES MAY NOT BE, AND ARE NOT BEING, OFFERED OR ADVERTISED PUBLICLY OR OFFERED SIMILARLY UNDER EITHER THE CAPITAL MARKET ACT OR THE INVESTMENT FUND ACT. THIS OFFER MAY NOT BE MADE TO ANY OTHER PERSONS THAN THE RECIPIENTS TO WHOM THIS DOCUMENT IS PERSONALLY ADDRESSED.

### NOTICE TO RESIDENTS OF BAHRAIN

PURCHASE OF THE SECURITIES IS BY INVITATION ONLY AND NO OFFER WILL BE MADE IN BAHRAIN TO THE PUBLIC TO PURCHASE THE SAME. THIS OFFERING CIRCULAR IS INTENDED TO BE READ ONLY BY THE ADDRESSEE.

### NOTICE TO RESIDENTS OF BELGIUM

THE ISSUER REPRESENTS AND AGREES THAT IT HAS NOT OFFERED OR SOLD AND WILL NOT OFFER OR SELL, DIRECTLY OR INDIRECTLY, AT THE TIME OF THE PLACING, ANY OF THE SECURITIES BY WAY OF A PUBLIC OFFERING IN BELGIUM AND/OR THAT THE SECURITIES WILL BE OFFERED ONLY TO PERSONS FALLING UNDER THE DEFINITION OF A PROFESSIONAL INVESTOR IN ACCORDANCE WITH THE ROYAL DECREE OF 7 JULY 1999.

### NOTICE TO RESIDENTS IN THE PROVINCES OF QUEBEC, ONTARIO AND BRITISH COLUMBIA IN CANADA

THIS OFFERING CIRCULAR IS NOT, AND UNDER NO CIRCUMSTANCES IS TO BE CONSTRUED AS, AN ADVERTISEMENT OR PUBLIC OFFERING OF THE SECURITIES DESCRIBED HEREIN. NO SECURITIES COMMISSION OR SIMILAR AUTHORITY IN CANADA HAS IN ANY WAY PASSED JUDGEMENT ON THE MERITS OF THE SECURITIES DESCRIBED HEREIN AND ANY REPRESENTATION TO THE CONTRARY IS AN OFFENCE. NO INVITATION MAY BE MADE TO THE PUBLIC IN THE PROVINCES OF QUEBEC, ONTARIO AND BRITISH COLUMBIA IN CANADA TO SUBSCRIBE FOR THE SECURITIES. NO

009341

PRELIMINARY OR FINAL OFFERING CIRCULAR IS BEING FILED WITH THE SECURITIES COMMISSIONS OF THE SAID PROVINCES IN CANADA WITH RESPECT TO THE OFFERING OF THE SECURITIES, WHICH IS BEING MADE SOLELY PURSUANT TO EXEMPTIONS FROM PROSPECTUS REQUIREMENTS UNDER SECURITIES LEGISLATION OF SAID PROVINCES IN CANADA. THE ISSUER DOES NOT INTEND TO FILE A PROSPECTUS OR OTHERWISE BECOME A 'REPORTING ISSUER' PURSUANT TO APPLICABLE CANADIAN SECURITIES LEGISLATION AND ACCORDINGLY IT IS NOT INTENDED THAT THE SECURITIES WILL EVER BECOME FREELY TRADABLE IN THE PROVINCES OF QUEBEC, ONTARIO AND BRITISH COLUMBIA. PURCHASERS OF SECURITIES WILL BE PERMITTED TO RESELL SUCH SECURITIES ONLY PURSUANT TO AVAILABLE EXEMPTIONS FROM THE PROSPECTUS REQUIREMENTS OF THE SECURITIES LAW OF THE SAID PROVINCES IN CANADA.

## NOTICE TO RESIDENTS IN THE PROVINCE OF QUEBEC IN CANADA

THE OFFERING AND SALE OF THE SECURITIES MUST BE TO EITHER "SOPHISTICATED PURCHASERS" WITHIN THE MEANING OF SECTIONS 43, 44 AND 45 OF THE SECURITIES ACT (QUEBEC) OR PURCHASERS PURCHASING AS PRINCIPAL FOR THEIR OWN ACCOUNT THE SECURITIES OF THE ISSUER HAVING A TOTAL COST OF SUBSCRIPTION OR PURCHASE IN EACH CASE OF AT LEAST CAD 150,000.

## NOTICE TO RESIDENTS IN THE PROVINCE OF ONTARIO, CANADA

THIS OFFERING OF THE SECURITIES IS BEING MADE PURSUANT TO EXEMPTIONS FROM THE PROSPECTUS REQUIREMENTS OF THE SECURITIES LAWS OF THE PROVINCE OF ONTARIO. PURCHASERS RESIDENT IN THE PROVINCE OF ONTARIO MUST BE PERSONS WHO ARE EXEMPT PURCHASERS UNDER SECTION 72(1) OF THE SECURITIES ACT (ONTARIO) OR WHO ACQUIRE THE SECURITIES OFFERED HEREBY AS PRINCIPAL AT AN AGGREGATE ACQUISITION COST TO THE PURCHASER OF NOT LESS THAN CAD 150,000. IF THIS OFFERING CIRCULAR, TOGETHER WITH ANY AMENDMENT THERETO, CONTAINS AN UNTRUE STATEMENT OF A MATERIAL FACT OR OMITS TO STATE A MATERIAL FACT THAT IS REQUIRED TO BE STATED OR IS NECESSARY IN ORDER TO MAKE ANY STATEMENT HEREIN NOT FALSE OR MISLEADING IN THE LIGHT OF THE CIRCUMSTANCES IN WHICH IT WAS MADE (A "**MISREPRESENTATION**") AND IT WAS A MISREPRESENTATION, ON THE DATE OF INVESTMENT, AN INVESTOR TO WHOM THIS OFFERING CIRCULAR WAS DELIVERED AND WHO PURCHASES THE SECURITIES OFFERED HEREUNDER SHALL HAVE, SUBJECT AS HEREINAFTER IN THIS PARAGRAPH PROVIDED, WHILE STILL THE OWNER OF ANY OF THE SECURITIES OFFERED HEREUNDER, A RIGHT OF ACTION, EXERCISABLE ON WRITTEN NOTICE GIVEN NOT MORE THAN 180 DAYS SUBSEQUENT TO THE DATE OF INITIAL INVESTMENT, EITHER FOR DAMAGES OR ALTERNATIVELY FOR RESCISSION AGAINST THE ISSUER PROVIDED THAT:

(A) THE ISSUER WILL NOT BE HELD LIABLE UNDER THIS PARAGRAPH IF THE INVESTOR PURCHASED THE SECURITIES WITH KNOWLEDGE OF THE MISREPRESENTATION;

(B) IN AN ACTION FOR DAMAGES, THE ISSUER WILL NOT BE LIABLE FOR ALL OR ANY PORTION OF SUCH DAMAGES THAT IT PROVES DO NOT REPRESENT THE DEPRECIATION IN VALUE OF THE SECURITIES OFFERED HEREBY AS A RESULT OF THE MISREPRESENTATION RELIED UPON;

(C) IN NO CASE WILL THE AMOUNT RECOVERABLE UNDER THIS PARAGRAPH EXCEED THE PRICE AT WHICH THE SECURITIES WERE SOLD TO AN INVESTOR; AND

009342

(D)     THE RIGHTS DESCRIBED ABOVE ARE IN ADDITION TO AND WITHOUT DEROGATION FROM ANY OTHER RIGHT OR REMEDY AVAILABLE AT LAW TO THE INVESTOR.

THE FOREGOING SUMMARY IS SUBJECT TO THE EXPRESS PROVISIONS OF THE SECURITIES ACT (ONTARIO) AND THE REGULATIONS THEREUNDER AND REFERENCE IS MADE THERETO FOR THE COMPLETE TEXT OF SUCH PROVISIONS.  THE ISSUER IS LOCATED OUTSIDE CANADA AND, ACCORDINGLY, IT MAY NOT BE POSSIBLE FOR PURCHASERS TO EFFECT SERVICE OF PROCESS WITHIN CANADA UPON THE ISSUER.  IN ADDITION, ALL OR SUBSTANTIALLY ALL OF THE ASSETS OF THE ISSUER WILL BE LOCATED OUTSIDE CANADA AND, AS A RESULT, IT MAY NOT BE POSSIBLE TO SATISFY A JUDGEMENT OBTAINED AGAINST THE ISSUER IN ONTARIO.  MOREOVER, IT MAY NOT BE POSSIBLE FOR PURCHASERS TO ENFORCE A JUDGEMENT OBTAINED IN CANADIAN COURTS AGAINST THE ISSUER IN THE JURISDICTION OF THE ISSUER.

### NOTICE TO RESIDENTS OF CAYMAN ISLANDS

NO INVITATION MAY BE MADE TO THE PUBLIC IN THE CAYMAN ISLANDS TO SUBSCRIBE FOR THE SECURITIES UNLESS AT THE TIME OF INVITATION THE CO-ISSUERS ARE LISTED ON THE CAYMAN ISLANDS STOCK EXCHANGE.  THE CO-ISSUERS ARE NOT OBLIGATED AND DO NOT INTEND TO BE LISTED.

### NOTICE TO RESIDENTS OF CZECH REPUBLIC

NO PERMIT FOR THE ISSUE OF THE SECURITIES HAS BEEN OBTAINED FROM THE SECURITIES COMMISSION OF THE CZECH REPUBLIC (THE **"SECURITIES COMMISSION"**) UNDER THE BONDS ACT OF THE CZECH REPUBLIC (NO. 530/1990 COLL., AS AMENDED).  NO ACTION HAS BEEN TAKEN (INCLUDING THE OBTAINING OF THE PROSPECTUS APPROVAL FROM THE SECURITIES COMMISSION AND THE ADMISSION TO TRADING ON A PUBLIC MARKET LICENSED BY THE SECURITIES COMMISSION) FOR THE PURPOSES OF THE SECURITIES TO QUALIFY AS LISTED SECURITIES WITHIN THE MEANING OF SECTION 71 ET SEQ. OF THE SECURITIES ACT OF THE CZECH REPUBLIC (NO. 591/1992 COLL., AS AMENDED).

THE SECURITIES HAVE NOT BEEN AND WILL NOT BE OFFERED OR SOLD IN THE CZECH REPUBLIC THROUGH A PUBLIC OFFERING.  THE TERM **"PUBLIC OFFERING"** IS DEFINED IN SECTION 78C(2) OF THE SECURITIES ACT OF THE CZECH REPUBLIC AS ANY CONDUCT BY WHICH AN OFFEROR COMMUNICATES TO A CONSIDERABLE GROUP OF PERSONS THE TERMS UNDER WHICH THEY MAY ACQUIRE SECURITIES AND (I) IF A CONTRACT LEADING TO THE ACQUISITION OF SUCH SECURITIES IS CONCLUDED BY SUCH PERSONS BY THE ACCEPTANCE OF SUCH TERMS, OR (II) IF ON THE BASIS OF SUCH TERMS, THE OFFEROR INVITES SUBMISSIONS OF OFFERS TO CONCLUDE A CONTRACT LEADING TO THE ACQUISITION OF SUCH SECURITIES.

ALL THE REQUIREMENTS OF THE SECURITIES ACT OF THE CZECH REPUBLIC AND THE BONDS ACT OF THE CZECH REPUBLIC HAVE BEEN COMPLIED WITH AND WILL BE COMPLIED WITH AND NO ACTION HAS BEEN TAKEN OR WILL BE TAKEN WHICH WOULD RESULT IN THE NOTES BEING DEEMED TO BE ISSUED IN THE CZECH REPUBLIC OR A PERMIT, REGISTRATION, FILING OR NOTIFICATION OF THE SECURITIES COMMISSION OR OTHER AUTHORITIES IN THE CZECH REPUBLIC BEING REQUIRED IN RESPECT OF THE NOTES IN ACCORDANCE WITH THE SECURITIES ACT OF THE CZECH REPUBLIC, THE BONDS ACT OF THE CZECH REPUBLIC OR THE PRACTICE OF THE SECURITIES COMMISSION.  NO INVESTMENT SERVICES ARE OR WILL BE PROVIDED IN THE CZECH REPUBLIC (WITHIN THE MEANING OF THE SECURITIES ACT OF THE CZECH REPUBLIC)

009343

AND NO OTHER SIMILAR BUSINESS IS OR WILL BE CONDUCTED IN THE CZECH REPUBLIC IN RESPECT OF THE SECURITIES. ALL THE LAWS OF THE CZECH REPUBLIC APPLICABLE TO THE CONDUCT OF BUSINESS IN THE CZECH REPUBLIC IN RESPECT OF THE NOTES HAVE BEEN, AND WILL BE, COMPLIED WITH.

### NOTICE TO RESIDENTS OF DENMARK

THIS OFFERING CIRCULAR HAS NOT BEEN FILED WITH OR APPROVED BY THE DANISH SECURITIES COUNCIL OR ANY OTHER REGULATORY AUTHORITY IN THE KINGDOM OF DENMARK.

THE SECURITIES HAVE NOT BEEN OFFERED OR SOLD AND MAY NOT BE OFFERED, SOLD OR DELIVERED DIRECTLY OR INDIRECTLY IN DENMARK, UNLESS IN COMPLIANCE WITH THE DANISH EXECUTIVE ORDER NO. 229 OF 20 APRIL 1998 ON THE FIRST PUBLIC OFFER OF CERTAIN SECURITIES ISSUED PURSUANT TO CHAPTER 12 OF THE DANISH ACT ON TRADING IN SECURITIES.

### NOTICE TO RESIDENTS OF FRANCE

THE SECURITIES ARE ISSUED BY A RESIDENT OF A NON-OECD STATE. ACCORDINGLY, PURSUANT TO THE PROVISIONS OF DECREE NO. 89-938 OF 29 DECEMBER 1989, THE SECURITIES MAY NOT BE OFFERED, INTRODUCED OR SOLD, DIRECTLY OR INDIRECTLY, IN FRANCE, WITHOUT THE PRIOR APPROVAL OF THE FRENCH MINISTRY OF FINANCE.

EACH OF THE ISSUER AND JPMORGAN REPRESENTS AND AGREES THAT IT HAS NOT OFFERED, INTRODUCED OR SOLD AND WILL NOT OFFER, INTRODUCE OR SELL, DIRECTLY OR INDIRECTLY, ANY OF THE SECURITIES IN FRANCE.

THIS OFFERING CIRCULAR IS FURNISHED TO YOU SOLELY FOR YOUR INFORMATION AND MAY NOT BE REPRODUCED OR REDISTRIBUTED TO ANY OTHER PERSON. IT IS STRICTLY CONFIDENTIAL AND IS SOLELY DESTINED FOR PERSONS OR INSTITUTIONS TO WHICH IT WAS INITIALLY SUPPLIED. THIS OFFERING CIRCULAR DOES NOT CONSTITUTE AN OFFER OR AN INVITATION TO SUBSCRIBE FOR OR TO PURCHASE ANY SECURITIES AND NEITHER THIS DOCUMENT NOR ANYTHING CONTAINED HEREIN SHALL FORM THE BASIS OF ANY CONTRACT OR COMMITMENT WHATSOEVER.

THIS OFFERING CIRCULAR MAY NOT BE DISTRIBUTED TO THE PUBLIC IN FRANCE OR USED IN CONNECTION WITH ANY OFFER FOR SUBSCRIPTION OR SALE OF SECURITIES IN FRANCE OTHER THAN IN ACCORDANCE WITH ARTICLE L-411-2 OF THE CODE MONÉTAIRE ET FINANCIER ET DÉCRET NO. 98-880 DATED 1ST OCTOBER 1998. THIS DOCUMENT HAS NOT BEEN SUBMITTED TO THE "COMMISSION DES OPÉRATIONS DE BOURSE" FOR APPROVAL AND DOES NOT CONSTITUTE AN OFFER FOR SALE OR SUBSCRIPTION OF SECURITIES.

### NOTICE TO RESIDENTS OF GERMANY

THE SECURITIES DESCRIBED IN THIS DOCUMENT MAY ONLY BE ACQUIRED IN GERMANY IN ACCORDANCE WITH THE GERMAN WERTPAPIERVERKAUF-SPROSPEKTGESETZ (SECURITIES SALES PROSPECTUS ACT). NO PROSPECTUS HAS BEEN FILED WITH THE GERMAN FEDERAL SECURITIES TRADING SUPERVISORY AUTHORITY OR PUBLISHED IN GERMANY. CONSEQUENTLY, THE SECURITIES ARE ONLY OFFERED ON A PRIVATE PLACEMENT BASIS TO INVESTORS WHO BUY AND SELL SECURITIES AS THEIR PROFESSION OR COMMERCE FOR THEIR OWN ACCOUNT.

009344

### NOTICE TO RESIDENTS OF GREECE

ALL INFORMATION REGARDING THE OFFERING DESCRIBED HEREIN, INCLUDING THIS OFFERING CIRCULAR, IS CONFIDENTIAL AND NOT FOR PUBLIC USE. AS REGARDS GREEK PARTICIPANTS, JPMORGAN HAS AGREED THAT THIS OFFERING CIRCULAR AND ALL RELATED MATERIAL ARE DIRECTED SOLELY AT PERSONS WHO QUALIFY AS INSTITUTIONAL INVESTORS. ACCORDING TO THE DECISION 9/201/10.10.00 OF THE GREEK CAPITAL MARKET COMMISSION, INSTITUTIONAL INVESTORS ARE MUTUAL FUNDS, PORTFOLIO INVESTMENT COMPANIES, COMPANIES FOR THE PROVISION OF INVESTMENT SERVICES WITH A SHARE CAPITAL ABOVE EURO 2,934,703 OR THE EQUIVALENT, CREDIT INSTITUTIONS, INSURANCE COMPANIES WITH TOTAL ASSETS OF OVER EURO 17,608,217 OR THE EQUIVALENT (IN ACCORDANCE WITH THEIR MOST RECENTLY PUBLISHED FINANCIAL ACCOUNTS) AND SOCIAL SECURITY FUNDS.

### NOTICE TO RESIDENTS OF HONG KONG

THE SECURITIES MAY NOT BE OFFERED OR SOLD IN HONG KONG BY MEANS OF THIS DOCUMENT (IN PROOF OR FINAL FORM) OR ANY OTHER DOCUMENT OTHER THAN TO PERSONS WHOSE ORDINARY BUSINESS IT IS TO BUY OR SELL SHARES OR DEBENTURES, WHETHER AS PRINCIPAL OR AGENT, OR IN CIRCUMSTANCES WHICH DO NOT CONSTITUTE AN OFFER TO THE PUBLIC WITHIN THE MEANING OF THE COMPANIES ORDINANCE (CAP. 32 OF THE LAWS OF HONG KONG). EXCEPT AS PERMITTED BY LAW, THERE MAY NOT IN OR FROM HONG KONG BE DISTRIBUTED OR ISSUED OR CAUSED TO BE DISTRIBUTED OR ISSUED ANY INVITATION OR DOCUMENT RELATING TO THE SECURITIES, THIS DOCUMENT OR ANY OTHER OFFERING MATERIAL RELATING TO THE SECURITIES AND THE PREFERENCE SHARES IN ANY CASE OTHER THAN TO PERSONS OUTSIDE HONG KONG OR TO PERSONS IN HONG KONG WHOSE BUSINESS INVOLVES THE ACQUISITION, DISPOSAL OR HOLDING OF SECURITIES, WHETHER AS PRINCIPAL OR AS AGENT.

### NOTICE TO RESIDENTS OF HUNGARY

THE SECURITIES MAY ONLY BE OFFERED FOR SUBSCRIPTION IN HUNGARY PURSUANT TO THE PROVISIONS OF ACT CXX OF 2001 ON THE CAPITAL MARKETS. THE SECURITIES MAY ONLY BE RE-SOLD TO PERSONS IN HUNGARY WHO HAVE AN EXISTING DIRECT PERSONAL OR COMMERCIAL RELATIONSHIP WITH THE SELLER OF THE SECURITIES.

### NOTICE TO RESIDENTS OF IRELAND

THE SECURITIES WILL NOT AND MAY NOT BE OFFERED, SOLD, TRANSFERRED OR DELIVERED WHETHER DIRECTLY OR INDIRECTLY OTHERWISE THAN IN CIRCUMSTANCES WHICH DO NOT CONSTITUTE AN OFFER TO THE PUBLIC WITHIN THE MEANING OF THE IRISH COMPANIES ACTS, 1963-1999 AND THE SECURITIES WILL NOT AND MAY NOT BE THE SUBJECT OF AN OFFER IN IRELAND TO WHICH THE EUROPEAN COMMUNITIES (TRANSFERABLE SECURITIES AND STOCK EXCHANGE) REGULATIONS, 1992 OF IRELAND WOULD APPLY. NO APPLICATION FORM HAS BEEN ISSUED OR WILL BE ISSUED IN THE REPUBLIC OF IRELAND IN RESPECT OF THE SECURITIES.

### NOTICE TO RESIDENTS OF ITALY

THE OFFERING OF THE SECURITIES HAS NOT BEEN REGISTERED WITH THE COMMISSIONE NAZIONALE PER LA SOCIETÀ E LA BORSA ("**CONSOB**") PURSUANT TO ITALIAN SECURITIES LEGISLATION AND JPMORGAN HAS REPRESENTED AND AGREED THAT SALES OF THE SECURITIES IN THE REPUBLIC OF ITALY SHALL BE EFFECTED IN

ACCORDANCE WITH ALL ITALIAN SECURITIES, TAX AND OTHER APPLICABLE LAWS AND REGULATIONS.

JPMORGAN HAS REPRESENTED THAT IT WILL NOT OFFER, SELL OR DELIVER ANY SECURITIES OR DISTRIBUTE COPIES OF THE OFFERING CIRCULAR OR ANY OTHER DOCUMENT RELATING TO THE SECURITIES IN THE REPUBLIC OF ITALY UNLESS SUCH OFFER, SALE OR DELIVERY OF SECURITIES OR DISTRIBUTION OF COPIES OF THE OFFERING CIRCULAR OR ANY OTHER DOCUMENT RELATING TO THE NOTES IN THE REPUBLIC OF ITALY IS:

    (A) MADE BY THE INVESTMENT FIRMS, BANK OR FINANCIAL INTERMEDIARY PERMITTED TO CONDUCT SUCH ACTIVITIES IN THE REPUBLIC OF ITALY IN ACCORDANCE WITH LEGISLATIVE DECREE NO. 385 OF 1 SEPTEMBER 1993 ("**DECREE NO. 385**"), LEGISLATIVE DECREE NO. 58 OF 24 FEBRUARY 1998, CONSOB REGULATION NO. 11971 OF 14 MAY 1999 AND ANY OTHER APPLICABLE LAWS AND REGULATION;

    (B) IN COMPLIANCE WITH ARTICLE 129 OF DECREE NO. 385 AND THE IMPLEMENTING INSTRUCTIONS OF THE BANK OF ITALY, PURSUANT TO WHICH THE ISSUE, TRADING OR PLACEMENT OF SECURITIES IN ITALY IS SUBJECT TO PRIOR NOTIFICATION TO THE BANK OF ITALY, UNLESS AN EXEMPTION APPLIES; AND

    (C) IN COMPLIANCE WITH ANY OTHER APPLICABLE NOTIFICATION REQUIREMENT OR LIMITATION WHICH MAY BE IMPOSED BY CONSOB OR THE BANK OF ITALY OR ANY OTHER ITALIAN REGULATORY AUTHORITY.

### NOTICE TO RESIDENTS OF JAPAN

THE SECURITIES HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES AND EXCHANGE LAW OF JAPAN (THE "**SECURITIES AND EXCHANGE LAW**"). ANY PERSON RESIDENT IN JAPAN, INCLUDING ANY CORPORATION OR OTHER ENTITY ORGANIZED UNDER THE LAWS OF JAPAN, AND, WITH RESPECT TO ANY ENTITY ORGANIZED UNDER THE LAWS OF A JURISDICTION OTHER THAN JAPAN, ITS BRANCHES OR OFFICES LOCATED IN JAPAN, MAY ONLY PURCHASE SECURITIES IN ACCORDANCE WITH AN EXEMPTION FROM THE REGISTRATION PROVISIONS OF THE SECURITIES AND EXCHANGE LAW AVAILABLE THEREUNDER AND IN COMPLIANCE WITH THE OTHER RELEVANT LAWS AND REGULATIONS OF JAPAN.

### NOTICE TO RESIDENTS OF JERSEY

NO PERSON MAY CIRCULATE IN THE ISLAND OF JERSEY THIS OFFERING CIRCULAR OR ANY OTHER OFFER FOR SALE OF ANY OF THE SECURITIES UNLESS SUCH OFFER DOES NOT, FOR THE PURPOSES OF ARTICLE 6 OF THE CONTROL OF BORROWING (JERSEY) ORDER 1958, AS AMENDED, CONSTITUTE AN OFFER TO THE PUBLIC.

### NOTICE TO RESIDENTS OF LATVIA

THE SECURITIES MAY BE OFFERED AND SOLD IN LATVIA IN ACCORDANCE WITH THE LAW ON SECURITIES OF 23 AUGUST 1995, PROVIDED THAT THE OFFER OR SALE OF THE SECURITIES CANNOT BE CONSTRUED AS CONDUCTING INTERMEDIARY ACTIVITIES IN LATVIA, AND PROVIDED THAT THE SECURITIES ARE NOT PUT IN PUBLIC CIRCULATION.

009346

### NOTICE TO RESIDENTS OF LUXEMBOURG

THE SECURITIES MAY NOT BE OFFERED TO THE PUBLIC IN LUXEMBOURG, UNLESS THE APPLICABLE LEGAL AND REGULATORY REQUIREMENTS, IN PARTICULAR THE RULES SET FORTH IN THE DECEMBER 28, 1990 GRAND DUCAL REGULATION (ON THE REQUIREMENTS FOR THE DRAWING-UP, SCRUTINY AND DISTRIBUTION OF THE PROSPECTUS TO BE PUBLISHED WHERE TRANSFERABLE SECURITIES ARE OFFERED TO THE PUBLIC OR OF LISTING PARTICULARS TO BE PUBLISHED FOR THE ADMISSION OF TRANSFERABLE SECURITIES TO OFFICIAL STOCK EXCHANGE LISTING), AS AMENDED, HAVE BEEN COMPLIED WITH.

### NOTICE TO RESIDENTS OF THE NETHERLANDS

THE SECURITIES MAY NOT BE OFFERED, AS PART OF THEIR INITIAL DISTRIBUTION OR AS PART OF ANY RE-OFFERING, IN THE NETHERLANDS, EXCEPT FOR NOTES HAVING A DENOMINATION OF AT LEAST EURO 45,379 (OR ITS EQUIVALENT), PROVIDED THAT IF ANY SUCH NOTES ARE ISSUED:

    (A)    AT A DISCOUNT, THEY MAY ONLY BE OFFERED IN THE NETHERLANDS IF THEIR ISSUE PRICE IS NO LESS THAN EURO 45,379 (OR ITS EQUIVALENT);

    (B)    ON A PARTLY-PAID BASIS, THEY MAY ONLY BE OFFERED IN THE NETHERLANDS IF PAID-UP AT LEAST TO AN AMOUNT OF EURO 45,379 (OR ITS EQUIVALENT);

    (C)    WITH A DENOMINATION OF PRECISELY EURO 45,379 (OR EQUIVALENT); THEY MAY ONLY BE OFFERED IN THE NETHERLANDS ON A FULLY-PAID BASIS AND AT PAR OR AT A PREMIUM.

### NOTICE TO RESIDENTS OF NORWAY

THE OFFERING OF THE SECURITIES WILL NOT BE A PUBLIC OFFER IN NORWAY AND THIS OFFERING CIRCULAR IS INTENDED TO BE READ BY THE ADDRESSEE ONLY.

### NOTICE TO RESIDENTS OF PANAMA

THE SECURITIES HAVE NOT BEEN AND WILL NOT BE REGISTERED WITH THE NATIONAL SECURITIES COMMISSION OF THE REPUBLIC OF PANAMA UNDER DECREE LAW N°1 OF JULY 8, 1999 (THE "PANAMANIAN SECURITIES ACT") AND MAY NOT BE PUBLICLY OFFERED OR SOLD WITHIN PANAMA, EXCEPT IN CERTAIN LIMITED TRANSACTIONS EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE PANAMANIAN SECURITIES ACT. THESE SECURITIES DO NOT BENEFIT FROM THE TAX INCENTIVES PROVIDED BY THE PANAMANIAN SECURITIES ACT AND ARE NOT SUBJECT TO REGULATION OR SUPERVISION BY THE NATIONAL SECURITIES COMMISSION OF THE REPUBLIC OF PANAMA.

### NOTICE TO RESIDENTS OF POLAND

NO PERMIT HAS BEEN OBTAINED FROM THE POLISH SECURITIES AND EXCHANGE COMMISSION IN RELATION TO THE ISSUE OF THE SECURITIES. ACCORDINGLY, THE SECURITIES MAY NOT BE OFFERED IN THE REPUBLIC OF POLAND ("**POLAND**") IN THE COURSE OF PUBLIC TRADING, DEFINED IN THE POLISH ACT ON PUBLIC TRADING IN SECURITIES DATED 21ST AUGUST 1997 AS OFFERING TO SELL OR PURCHASE OR SALES

009347

AND PURCHASES OF SECURITIES ISSUED IN A SERIES THROUGH USE OF MASS MEDIA OR OTHER MEANS IF THE OFFER IS DIRECTED AT MORE THAN 300 PEOPLE OR TO AN UNNAMED ADDRESSEE ("**PUBLIC TRADING**").  NO SUCH PERMIT HAS BEEN OBTAINED AND SECURITIES HAVE NOT BEEN OFFERED, SOLD OR DELIVERED AND WILL NOT BE OFFERED, SOLD OR DELIVERED IN POLAND IN THE COURSE OF PUBLIC TRADING AS PART OF THEIR INITIAL DISTRIBUTION OR OTHERWISE TO RESIDENTS OF POLAND.  THE ACQUISITION AND HOLDING OF THE SECURITIES BY RESIDENTS OF POLAND MAY BE SUBJECT TO RESTRICTIONS IMPOSED BY POLISH LAW (INCLUDING FOREIGN EXCHANGE REGULATIONS) AND THAT THE OFFER AND SALE OF THE SECURITIES TO POLISH RESIDENTS OR WITHIN POLAND IN SECONDARY TRADING MAY ALSO BE SUBJECT TO RESTRICTIONS.

### NOTICE TO RESIDENTS OF PORTUGAL

THE SECURITIES HAVE NOT BEEN OFFERED, ADVERTISED, SOLD OR DELIVERED AND WILL NOT BE DIRECTLY OR INDIRECTLY OFFERED, ADVERTISED, SOLD, RE-SOLD, RE-OFFERED OR DELIVERED IN CIRCUMSTANCES WHICH COULD QUALIFY AS A PUBLIC OFFER PURSUANT TO THE CÓDIGO DOS VALORES MOBILIÁRIOS OR IN CIRCUMSTANCES WHICH COULD QUALIFY THE ISSUE OF THE SECURITIES AS AN ISSUE IN THE PORTUGUESE MARKET.  THE SECURITIES HAVE NOT BEEN DIRECTLY OR INDIRECTLY DISTRIBUTED AND THIS OFFERING CIRCULAR, ANY OTHER DOCUMENT, CIRCULAR, ADVERTISEMENT OR ANY OFFERING MATERIAL WILL NOT BE DIRECTLY OR INDIRECTLY DISTRIBUTED EXCEPT IN ACCORDANCE WITH ALL APPLICABLE LAWS AND REGULATIONS.

### NOTICE TO RESIDENTS OF SINGAPORE

THIS OFFERING CIRCULAR HAS NOT BEEN REGISTERED AS A PROSPECTUS WITH THE MONETARY AUTHORITY OF SINGAPORE UNDER THE SECURITIES AND FUTURES ACT 2001 (ACT 42 OF 2001) OF SINGAPORE (THE "SECURITIES AND FUTURES ACT"). ACCORDINGLY, THE SECURITIES MAY NOT BE OFFERED OR SOLD OR MADE THE SUBJECT OF AN INVITATION FOR SUBSCRIPTION OR PURCHASE NOR MAY THIS OFFERING CIRCULAR OR ANY OTHER DOCUMENT OR MATERIAL IN CONNECTION WITH THE OFFER OR SALE, OR INVITATION FOR SUBSCRIPTION OR PURCHASE OF SUCH SECURITIES BE CIRCULATED OR DISTRIBUTED, WHETHER DIRECTLY OR INDIRECTLY, TO THE PUBLIC OR ANY MEMBER OF THE PUBLIC IN SINGAPORE OTHER THAN (1) TO AN INSTITUTIONAL INVESTOR OR OTHER PERSON FALLING WITHIN SECTION 274 OF THE SECURITIES AND FUTURES ACT, (2) TO A SOPHISTICATED INVESTOR (AS DEFINED IN SECTION 275 OF THE SECURITIES AND FUTURES ACT) AND IN ACCORDANCE WITH THE CONDITIONS SPECIFIED IN SECTION 275 OF THE SECURITIES AND FUTURES ACT OR (3) OTHERWISE THAN PURSUANT TO, AND IN ACCORDANCE WITH THE CONDITIONS OF, ANY OTHER APPLICABLE PROVISION OF THE SECURITIES AND FUTURES ACT.

### NOTICE TO RESIDENTS OF SLOVENIA

THIS OFFERING OF THE SECURITIES HAS NOT BEEN REGISTERED WITH OR NOTIFIED TO THE SECURITIES MARKET AGENCY OF THE REPUBLIC OF SLOVENIA AND NO APPROVAL BY THE MINISTRY OF FINANCE OF THE REPUBLIC OF SLOVENIA HAS BEEN SOUGHT OR WILL BE SOUGHT FOR THIS OFFERING.  THE SECURITIES WILL NOT AND MAY NOT BE ISSUED, OFFERED OR SOLD IN THE REPUBLIC OF SLOVENIA EXCEPT IN A MANNER CONSISTENT WITH ANY REGISTRATION, NOTIFICATION OR APPROVAL UNDER THE LAW ON SECURITIES MARKET (OFF. JOURNAL OF THE RS, NO. 56/1999) AND THE LAW ON FOREIGN EXCHANGE TRANSACTIONS (OFF. JOURNAL OF THE RS, NO. 23/1999). ACCORDINGLY, THE SECURITIES MAY NOT BE ISSUED, OFFERED, SOLD, TRANSFERRED

009348

OR DELIVERED TO THE PUBLIC NOR OFFERED NON-PUBLICLY WITHIN THE MEANING OF THE ARTICLE 50 OF THE LAW ON SECURITIES MARKET IN THE REPUBLIC OF SLOVENIA. SLOVENE RESIDENTS MAY ACQUIRE THE SECURITIES ABROAD ONLY IN ACCORDANCE WITH THE PROVISIONS OF THE LAW ON FOREIGN EXCHANGE TRANSACTIONS.

### NOTICE TO RESIDENTS OF SOUTH AFRICA

THE SECURITIES HAVE NOT AND WILL NOT BE OFFERED FOR SALE OR SUBSCRIPTION, DIRECTLY OR INDIRECTLY, WITHIN THE REPUBLIC OF SOUTH AFRICA OR TO ANY PERSON OR CORPORATE OR OTHER ENTITY RESIDENT IN THE REPUBLIC OF SOUTH AFRICA EXCEPT (I) IN ACCORDANCE WITH THE EXCHANGE CONTROL REGULATIONS OF THE REPUBLIC OF SOUTH AFRICA AND (II) TO ANY ENTITY RESIDENT OR WITHIN THE REPUBLIC OF SOUTH AFRICA IN ACCORDANCE WITH THE COMPANIES ACT, 1973 AND THE REGULATIONS TO THE BANKS ACT, 1990.

### NOTICE TO RESIDENTS OF SPAIN

THE SECURITIES MAY NOT BE OFFERED OR SOLD IN SPAIN EXCEPT IN ACCORDANCE WITH THE REQUIREMENTS OF THE SPANISH SECURITIES MARKET LAW (LEY 24/1988, DE 28 DE JULIO, DEL MERCADO DE VALORES), AS AMENDED AND RESTATED, AND ROYAL DECREE 291/1992, OF 27 MARCH, ON ISSUES AND PUBLIC OFFERINGS OF SECURITIES (REAL DECRETO 291/1992, DE 27 DE MARZO, SOBRE EMISIONES Y OFERTAS PÚBLICAS DE VENTA DE VALORES), AS AMENDED AND RESTATED, AND THE DECREES AND REGULATIONS MADE THEREUNDER. THE SECURITIES HAVE NOT AND WILL NOT BE SOLD, OFFERED OR DISTRIBUTED IN SPAIN EXCEPT IN CIRCUMSTANCES WHICH DO NOT CONSTITUTE AN OFFER OF SECURITIES IN SPAIN WITHIN THE MEANING OF SPANISH SECURITIES LAWS AND REGULATIONS. THE OFFERING CIRCULAR HAS NOT BEEN REGISTERED WITH THE SPANISH SECURITIES MARKET COMMISSION (COMISIÓN NACIONAL DEL MERCADO DE VALORES) AND THEREFORE IT IS NOT INTENDED FOR THE OFFERING OR SALE OF THE SECURITIES IN SPAIN.

### NOTICE TO RESIDENTS OF SWEDEN

THIS OFFERING CIRCULAR IS FOR THE RECIPIENT ONLY AND MAY NOT IN ANY WAY BE FORWARDED TO ANY OTHER PERSON OR TO THE PUBLIC IN SWEDEN.

### NOTICE TO RESIDENTS OF THE UNITED KINGDOM

JPMORGAN HAS REPRESENTED, WARRANTED AND AGREED THAT:

(I) IT HAS NOT OFFERED OR SOLD AND WILL NOT OFFER OR SELL ANY SECURITIES TO PERSONS IN THE UNITED KINGDOM PRIOR TO ADMISSION OF THE NOTES TO LISTING IN ACCORDANCE WITH PART VI OF THE FINANCIAL SERVICES AND MARKETS ACT 2000 (THE "**FSMA**"), EXCEPT TO PERSONS WHOSE ORDINARY ACTIVITIES INVOLVE THEM IN ACQUIRING, HOLDING, MANAGING OR DISPOSING OF INVESTMENTS (AS PRINCIPAL OR AGENT) FOR THE PURPOSES OF THEIR BUSINESSES OR OTHERWISE IN CIRCUMSTANCES WHICH HAVE NOT RESULTED AND WILL NOT RESULT IN AN OFFER TO THE PUBLIC IN THE UNITED KINGDOM WITHIN THE MEANING OF THE PUBLIC OFFERS OF SECURITIES REGULATIONS 1995 OR THE FSMA;

(II) IT HAS NOT OFFERED OR SOLD AND, PRIOR TO THE EXPIRY OF A PERIOD OF SIX MONTHS FROM THE ISSUE DATE OF THE SECURITIES, WILL NOT OFFER OR SELL ANY SECURITIES TO PERSONS IN THE UNITED KINGDOM EXCEPT

009349

TO PERSONS WHOSE ORDINARY ACTIVITIES INVOLVE THEM IN ACQUIRING, HOLDING, MANAGING OR DISPOSING OF INVESTMENTS (AS PRINCIPAL OR AGENT) FOR THE PURPOSES OF THEIR BUSINESSES OR OTHERWISE IN CIRCUMSTANCES WHICH HAVE NOT RESULTED AND WILL NOT RESULT IN AN OFFER TO THE PUBLIC IN THE UNITED KINGDOM WITHIN THE MEANING OF THE PUBLIC OFFERS OF SECURITIES REGULATIONS 1995;

(III)    IT HAS ONLY COMMUNICATED OR CAUSED TO BE COMMUNICATED AND WILL ONLY COMMUNICATE OR CAUSE TO BE COMMUNICATED ANY INVITATION OR INDUCEMENT TO ENGAGE IN INVESTMENT ACTIVITY (WITHIN THE MEANING OF SECTION 21 OF THE FSMA) RECEIVED BY IT IN CONNECTION WITH THE ISSUE OR SALE OF ANY SECURITIES IN CIRCUMSTANCES IN WHICH SECTION 21(1) OF THE FSMA DOES NOT APPLY TO THE ISSUER; AND

(IV)    IT HAS COMPLIED AND WILL COMPLY WITH ALL APPLICABLE PROVISIONS OF THE FSMA WITH RESPECT TO ANYTHING DONE BY IT IN RELATION TO THE SECURITIES IN, FROM OR OTHERWISE INVOLVING THE UNITED KINGDOM.

## AVAILABLE INFORMATION

To permit compliance with Rule 144A in connection with the sale of the Securities, the Issuer (and, solely in the case of the Notes, the Co-Issuers) under the Indenture referred to under "Description of the Securities" and the Preference Share Documents will be required to furnish upon request of a holder of a Security to such holder and a prospective purchaser designated by such holder the information required to be delivered under Rule 144A(d)(4) under the Securities Act if at the time of the request the Co-Issuers are not reporting companies under Section 13 or Section 15(d) of the United States Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), or exempt from reporting pursuant to Rule 12g3-2(b) under the Exchange Act.  Such information may be obtained directly from the Issuer or through the paying agent in Ireland at the address set forth on the final page of this Offering Circular.

## INFORMATION AS TO SALE WITHIN THE UNITED STATES

This Offering Circular is highly confidential and has been prepared by the Issuer solely for use in connection with this offering.  This Offering Circular is personal to each offeree to whom it has been delivered by the Co-Issuers, JPMorgan or affiliates thereof and does not constitute an offer to any other person or to the public generally to subscribe for or otherwise acquire the Securities.  Distribution of this Offering Circular to any persons other than the offeree and those persons, if any, retained to advise such offeree with respect thereto is unauthorized and any disclosure of any of its contents, without the prior written consent of the Issuer, is prohibited except as otherwise authorized under "Income Tax Considerations—Tax Return Disclosure and Investor List Requirements."  Each prospective purchaser in the United States, by accepting delivery of this Offering Circular, agrees to the foregoing and to make no copies of this Offering Circular or any documents related hereto and, if the offeree does not purchase Securities or the offering is terminated, to return this Offering Circular and all documents attached hereto to:  J.P. Morgan Securities Inc., 270 Park Avenue, 8th Floor, New York, New York 10017, Attention: Structured Credit Products.

NOTWITHSTANDING THE CONFIDENTIAL NATURE OF THIS OFFERING CIRCULAR, EACH PROSPECTIVE INVESTOR (AND EACH EMPLOYEE, REPRESENTATIVE, OR OTHER AGENT OF SUCH PROSPECTIVE INVESTOR) MAY DISCLOSE TO ANY AND ALL PERSONS, WITHOUT LIMITATIONS OF ANY KIND, THE TAX TREATMENT AND TAX STRUCTURE OF THE TRANSACTION AND ALL MATERIALS OF ANY KIND (INCLUDING OPINIONS OR OTHER TAX ANALYSES) THAT ARE PROVIDED TO THE PROSPECTIVE INVESTOR RELATING TO SUCH TAX TREATMENT AND TAX STRUCTURE.  ANY SUCH DISCLOSURE

009350

OF THE TAX TREATMENT, TAX STRUCTURE AND OTHER TAX-RELATED MATERIALS SHALL NOT BE MADE FOR THE PURPOSE OF OFFERING TO SELL THE SECURITIES OFFERED HEREBY OR SOLICITING AN OFFER TO PURCHASE ANY SUCH SECURITIES. FOR PURPOSES OF THIS PARAGRAPH, THE TERMS "TAX TREATMENT" AND "TAX STRUCTURE" HAVE THE MEANING GIVEN TO SUCH TERMS UNDER UNITED STATES TREASURY REGULATION SECTION 1.6011-4(C) AND ANY ANALOGOUS PROVISIONS UNDER UNITED STATES STATE AND LOCAL LAW. IN GENERAL, THE TAX TREATMENT OF A TRANSACTION IS THE PURPORTED OR CLAIMED U.S. TAX TREATMENT OF THE TRANSACTION, AND THE TAX STRUCTURE OF A TRANSACTION IS ANY FACT THAT MAY BE RELEVANT TO UNDERSTANDING THE PURPORTED OR CLAIMED U.S. TAX TREATMENT OF THE TRANSACTION.

009351

## TABLE OF CONTENTS

SUMMARY OF TERMS ................................................................................................................. 1

RISK FACTORS ........................................................................................................................... 29

DESCRIPTION OF THE SECURITIES ....................................................................................... 55

Status and Security.................................................................................................................. 55

Principal Payments on the Notes and Distributions on the Preference Shares from Principal
Proceeds ............................................................................................................................. 59

Legal Provisions Applicable to the Payments of Dividends from Interest Proceeds and
Dividends or Other Distributions from Principal Proceeds................................................ 59

Distributions on the Composite Securities.............................................................................. 60

Extension of the Reinvestment Period, the Stated Maturity and the Scheduled Preference
Shares Redemption Date .................................................................................................... 60

Optional Redemption .............................................................................................................. 63

Special Redemption of Notes If the Portfolio Manager Does Not Identify Investments as
Contemplated by the Indenture ......................................................................................... 66

Mandatory Redemption of the Notes ...................................................................................... 67

Redemption of the Preference Shares in Connection with Mandatory Redemption of the Notes .......... 68

Priority of Payments ............................................................................................................... 68

Termination of the Policy ....................................................................................................... 74

Form, Denomination, Registration and Transfer of the Notes................................................ 75

Form, Denomination, Registration and Transfer of the Composite Securities ....................... 77

Form, Denomination, Registration and Transfer of the Preference Shares ............................ 78

No Exchange of the Composite Securities .............................................................................. 79

The Indenture .......................................................................................................................... 79

Supplemental Indentures......................................................................................................... 84

Amendment Buy-Out .............................................................................................................. 89

Removal Buy-Out ................................................................................................................... 89

Voting Rights of the Preference Shares .................................................................................. 90

Notices .................................................................................................................................... 90

Certain Covenants ................................................................................................................... 90

Certain Additional Issues Relating to Listing of Securities ................................................... 90

Cancellation ............................................................................................................................ 90

No Gross-Up ........................................................................................................................... 90

Petitions for Bankruptcy ......................................................................................................... 90

Standard of Conduct ............................................................................................................... 91

Satisfaction and Discharge of Indenture ................................................................................ 91

Trustee .................................................................................................................................... 91

Governing Law ........................................................................................................................ 91

Method of Payments ............................................................................................................... 92

Preference Shares Paying Agency Agreement........................................................................ 93

The Issuer Charter ................................................................................................................... 93

USE OF PROCEEDS .................................................................................................................... 94

SECURITY FOR THE NOTES AND THE COMPOSITE SECURITIES ................................... 95

Purchase of Collateral Obligations ........................................................................................ 95

Eligibility Criteria .................................................................................................................. 96

The Collateral Quality Tests ................................................................................................... 98

The Coverage Tests................................................................................................................. 100

Ramp-Up................................................................................................................................. 103

Sale of Collateral Obligations; Reinvestment of Principal Proceeds and Reinvestment Criteria ........ 104

Certain Determinations Relating to Collateral Obligations .................................................... 107

The Accounts .......................................................................................................................... 107

009352

Hedge Agreements ................................................................................................. 112
Securities Lending ............................................................................................... 115
MATURITY AND PREPAYMENT CONSIDERATIONS ............................................ 117
THE PORTFOLIO MANAGER .................................................................................... 118
General .................................................................................................................. 118
Professionals of the Portfolio Manager .............................................................. 119
Traders .................................................................................................................. 120
Senior Portfolio Managers ................................................................................... 120
THE MANAGEMENT AGREEMENT ......................................................................... 122
THE INSURER AND THE POLICY ............................................................................. 127
The Insurer ........................................................................................................... 127
The Policy ............................................................................................................ 129
THE CO-ISSUERS ....................................................................................................... 134
General .................................................................................................................. 134
Capitalization ....................................................................................................... 135
Business ................................................................................................................ 135
Administration ..................................................................................................... 136
Directors ............................................................................................................... 137
THE LOAN MARKET ................................................................................................. 137
THE HIGH YIELD DEBT SECURITIES MARKET ................................................... 138
INCOME TAX CONSIDERATIONS ........................................................................... 138
General .................................................................................................................. 138
United States Federal Income Taxation .............................................................. 140
Tax Treatment of the Issuer ................................................................................. 140
Tax Treatment of U.S. Holders of the Notes ...................................................... 141
Tax Treatment of U.S. Holders of Preference Shares ........................................ 144
Tax Treatment of Tax-Exempt U.S. Holders ...................................................... 148
Transfer Reporting Requirements ....................................................................... 149
Tax Return Disclosure and Investor List Requirements ..................................... 149
Tax Treatment of Non-U.S. Holders of Securities ............................................. 150
Information Reporting and Backup Withholding ................................................ 150
Cayman Islands Tax Considerations ................................................................... 151
ERISA CONSIDERATIONS ........................................................................................ 152
PLAN OF DISTRIBUTION .......................................................................................... 156
SETTLEMENT AND CLEARING ............................................................................... 157
Book Entry Registration of the Global Securities .............................................. 157
Global Security Settlement Procedures ............................................................... 158
TRANSFER RESTRICTIONS ...................................................................................... 159
Transfer Restrictions Applicable to Rule 144A Global Notes ........................... 160
Transfer Restrictions Applicable to Regulation S Global Notes ........................ 165
Transfer Restrictions Applicable to Composite Securities ................................. 165
Transfer Restrictions Applicable to Preference Shares ...................................... 171
LISTING AND GENERAL INFORMATION .............................................................. 177
IDENTIFYING NUMBERS .......................................................................................... 179
LEGAL MATTERS ...................................................................................................... 180
GLOSSARY OF DEFINED TERMS ............................................................................ 181
INDEX OF DEFINED TERMS ..................................................................................... 228
EXHIBIT A: AUDITED FINANCIAL STATEMENTS OF ASSURED GUARANTY CORP. ............ A-1

009353

## SUMMARY OF TERMS

The following summary of terms does not purport to be complete and is qualified in its entirety by, and should be read in conjunction with, the more detailed information appearing elsewhere in this Offering Circular and the documents referred to in this Offering Circular. A Glossary and an Index of Defined Terms appear at the back of this Offering Circular. Except as otherwise specified herein or as the context may otherwise require or dictate or unless the Composite Securities are explicitly addressed in the same context, (A) all references in this Offering Circular to the "Preference Shares" include the "Preference Share Component" of the Class 1 Composite Securities and (B) all references in this Offering Circular to the rights of the Holders of the Preference Shares (including with respect to any payments, distributions, redemptions, votes or consents) include the rights of the Holders of the Class 1 Composite Securities to the extent of the Preference Share Component of the Class 1 Composite Securities.

### Principal Terms of the Securities

| | Class A-1a Notes | Class A-1b Notes | Class A-1g Notes | Class A-2 Notes | Class A-3a Notes | Class A-3b Notes | Class B Notes | Class C Notes | Class I Composite Securities[1] | Preference Shares |
|---|---|---|---|---|---|---|---|---|---|---|
| Type | Floating Rate Senior Secured Extendable | Fixed Rate Senior Secured Extendable | Floating Rate Senior Secured Extendable | Floating Rate Senior Secured Extendable | Floating Rate Senior Secured Extendable | Fixed Rate Senior Secured Extendable | Floating Rate Senior Secured Deferrable Interest Extendable | Floating Rate Senior Secured Deferrable Interest Extendable | Extendable | Extendable |
| Issuer(s) | Co-Issuers | Co-Issuers | Co-Issuers | Co-Issuers | Co-Issuers | Co-Issuers | Co-Issuers | Co-Issuers | Issuer | Issuer |
| Principal Amount / Face Amount (U.S.$) | $52,000,000 | $7,000,000 | $400,000,000 | $42,500,000 | $23,500,000 | $2,500,000 | $39,000,000 | $36,300,000 | $6,000,000[2] | $82,200,000[3] |
| Expected Moody's Initial Rating[4] | "Aaa" | "Aaa" | "Aaa" | "Aaa" | "Aa2" | "Aa2" | "A2" | "Baa2" | "Aaa"[5] | N/A |
| Expected S&P Initial Rating[4] | "AAA" | "AAA" | "AAA" | "AAA" | "AA" | "AA" | "A" | "BBB" | N/A | N/A |
| Note Interest Rate | LIBOR + 0.31% | 4.685% | LIBOR + 0.25%[6] | LIBOR + 0.50% | LIBOR + 0.60% | 5.068% | LIBOR + 1.05% | LIBOR + 2.10% | N/A | N/A |
| Stated Maturity / Scheduled Preference Shares Redemption Date[7] | February, 2017 Payment Date | February, 2017 Payment Date | February, 2017 Payment Date | February, 2017 Payment Date | February, 2017 Payment Date | February, 2017 Payment Date | February, 2017 Payment Date | February, 2017 Payment Date | February, 2017 Payment Date | February, 2017 Payment Date |
| Minimum Denominations (U.S.$) / Number (Integral Multiples) | $250,000 ($1,000) | $250,000 ($1,000) | $250,000 ($1,000) | $250,000 ($1,000) | $250,000 ($1,000) | $250,000 ($1,000) | $250,000 ($1,000) | $250,000 ($1,000) | $100,000 ($1,000) | 100 (1) |
| **Ranking of the Securities:** | | | | | | | | | | |
| Priority Class | None | None | None | Senior Class A | Senior Class A, A-2 | Senior Class A, A-2 | Senior Class A, A-2, A-3 | Senior Class A, A-2, A-3, B | N/A | Senior Class A, A-2, A-3, B, C |
| Junior Class | A-2, A-3, B, C, Preference Shares | A-2, A-3, B, C, Preference Shares | A-2, A-3, B, C, Preference Shares | A-3, B, C, Preference Shares | B, C, Preference Shares | B, C, Preference Shares | C, Preference Shares | Preference Shares | N/A | None |
| Deferred Interest Notes | No | No | No | No | No | No | Yes | Yes | N/A | N/A |

1   The Class I Composite Securities shall consist of the Preference Share Component and the Class I Component. The portions of the interest in the Treasury Strip and the Preference Shares that comprise the Class I Composite Securities are not separately transferable. On the Composite Security Payment Date, the Holders of the Class I Composite Securities will be entitled to receive the proceeds from the sale of the portion of the Treasury Strip with respect to such Composite Securities Payment Date and a *pro rata* share of the distribution on the Preference Shares on such date. No other payments will be made on the Class I Composite Securities.

2   The amount of the Class I Composite Securities shown also includes the Preference Share Component comprised of 2,000 Preference Shares.

3   The Preference Shares will be issued with a Face Amount of U.S.$1,000 per share.

4   The initial ratings assume no Maturity Extension occurs after the Closing Date. The "Expected Moody's Initial Rating" and the "Expected S&P Initial Rating" assigned to the Class A-1g Notes give effect to the Policy.

5   The Class I Composite Securities are rated only as to the ultimate payment of their Class I Composite Security Rated Balance.

6   Upon the termination of the Policy, the Note Interest Rate for the Class A-1g Notes shall be LIBOR + 0.25% + the Premium Rate (the "**Step-Up Note Interest Rate**"). See "Description of the Securities—Termination of the Policy."

7   The Stated Maturity of the Notes and the Composite Securities and the Scheduled Preference Shares Redemption Date of the Preference Shares are subject to multiple extensions to the applicable Extended Stated Maturity Date (in the case of the Notes and the Composite Securities) and the applicable Extended Scheduled Preference Shares Redemption Date (in the case of the Preference Shares), if the Issuer provides timely notice and the Extension Conditions are satisfied. See "Risk Factors—The Weighted Average Lives of the Notes May Vary," "—A Maturity Extension May Result in a Longer or Shorter Holding Period Than Expected," "Maturity and Prepayment Considerations" and "Description of the Securities—Extension of the Reinvestment Period, the Stated Maturity and the Scheduled Preference Shares Redemption Date."

009354

The Notes will be limited recourse obligations of the Co-Issuers and the Composite Securities will be limited recourse obligations of the Issuer. The Notes and the Composite Securities will be issued pursuant to the Indenture.

The Preference Shares will be part of the issued share capital of the Issuer and, accordingly, will not be secured obligations of the Issuer. JPMorgan Chase Bank, National Association will act as the Preference Shares Paying Agent for the Preference Shares and will perform various administrative services pursuant to a Preference Shares Paying Agency Agreement, dated as of the Closing Date (the "**Preference Shares Paying Agency Agreement**") by and between the Issuer and the Preference Shares Paying Agent, as amended from time to time in accordance with the terms thereof.

Payments to each Holder of the Notes of each Class shall be made ratably among the Holders of the Notes of that Class in proportion to the Aggregate Outstanding Amount of the Notes of such Class held by each Holder (treating the Class A-1a Notes, the Class A-1b Notes, the Class A-1g Notes, the Class A-2 Notes, the Class A-3a Notes and the Class A-3b Notes as separate Classes for this purpose). Payments to each Holder of the Preference Shares shall be made ratably among the Holders of the Preference Shares in proportion to the Aggregate Outstanding Amount of such Preference Shares held by each Holder.

Except as provided under "Description of the Securities— Priority of Payments," the Senior Class A Notes will be senior in right of interest and principal payments on each Payment Date to the Class A-2 Notes; the Class A-2 Notes will be senior in right of interest and principal payments on each Payment Date to the Class A-3 Notes; the Class A-3 Notes will be senior in right of interest and principal payments on each Payment Date to the Class B Notes; the Class B Notes will be senior in right of interest and principal payments on each Payment Date to the Class C Notes; and the Class C Notes will be senior in right of interest and principal payments on each Payment Date to the Preference Shares.

The Class 1 Composite Securities consist of (i) a Preference Share Component entitling its holders to rights in respect of 2,000 Preference Shares and (ii) a Class 1 Component entitling its holders to rights to receive proceeds from a trust account initially holding a United States Treasury strip security maturing on November 15, 2016 with a principal amount at maturity of U.S.$6,000,000.

The Securities and certain other obligations of the Co-Issuers will have the priorities of payment described under "Description of the Securities—Priority of Payments."

| | |
|---|---|
| **Co-Issuers** ........................................... | The Issuer has been incorporated and exists under the laws of the Cayman Islands. Pursuant to the Indenture, the Issuer's activities are limited to acquiring Collateral Obligations and Eligible Investments, entering into any Hedge Agreements, issuing the Securities and entering into certain related transactions. |
| | The Co-Issuer is organized under the laws of the State of Delaware for the sole purpose of co-issuing the Notes. |
| | The Issuer will not have any significant assets other than Collateral Obligations, Eligible Investments, any Hedge Agreement and certain other eligible assets. The Collateral Obligations, Eligible Investments, the rights of the Issuer under any Hedge Agreements and other collateral will be pledged to the Trustee as security for, among other things, the Issuer's obligations under the Notes and the Class 1 Collateral will be pledged to the Trustee as security solely for the benefit of the Holders of the Class 1 Composite Securities. |
| | The Co-Issuer is not expected to have any significant assets and will not pledge any assets to secure the Notes. The Co-Issuer will have no claim against the Issuer in respect of the Collateral Obligations or otherwise. |
| **Portfolio Manager** ............................... | Certain advisory and management functions with respect to the Collateral will be performed by Highland Capital Management, L.P., a Delaware limited partnership ("**Highland Capital**" or, in such capacity, the "**Portfolio Manager**"). On the Closing Date, the Portfolio Manager or its Affiliates are expected to purchase Preference Shares having an aggregate Face Amount equal to U.S.$13,200,000. Under the Portfolio Management Agreement, the Portfolio Manager or its Affiliates will maintain, in the aggregate, ownership of Preference Shares having an aggregate Face Amount of at least $10,000,000 until the earlier of such time as: |

(i)     none of the Notes are Outstanding; or

(ii)    Highland Capital is removed or resigns as Portfolio Manager and such removal or resignation has become effective in accordance with the Portfolio Management Agreement.

The Portfolio Manager or its Affiliates may also acquire Preference Shares upon the occurrence of (i) the Amendment Buy-Out Option and (ii) a proposed removal of the Portfolio Manager by the Directing Preference Shares. In addition, the Portfolio Manager or its Affiliates may acquire the Class A-1g Notes upon the occurrence of the Removal Buy-Out Option. In addition, the Portfolio Manager or its Affiliates may acquire all or any portion of any Extension Sale Securities in connection with a Maturity Extension. See "The Portfolio Manager," "Risk Factors—Relating to the Securities," "—Relating to the Portfolio

009356

Manager" and "—Relating to Certain Conflicts of Interest—The Issuer Will Be Subject to Various Conflicts of Interest Involving the Portfolio Manager," "Description of the Securities— Amendment Buy-Out," "—Removal Buy-Out," "Description of the Securities—Extension of the Reinvestment Period, the Stated Maturity and the Scheduled Preference Shares Redemption Date" and "The Management Agreement."

**Insurer** ................................................. As Insurer, Assured Guaranty Corp., a Maryland-domiciled insurance corporation ("**Assured Guaranty**"), will issue the Policy for the benefit of the Holders of the Insured Notes, pursuant to which it will irrevocably and unconditionally guarantee the Insured Amounts on the Insured Notes. No other Class of Securities will be entitled to the benefits of the Policy. See "The Insurer and the Policy."

The Indenture provides that, as the "Controlling Class," the Insurer, and not the Holders of the Insured Notes, will have certain voting rights under the Indenture at all times prior to the payment in full of the Class A-1g Notes and all amounts owing to the Insurer in accordance with the Insurance Agreement so long as no Insurer Default has occurred and is continuing. In addition, the Insurer will have certain other rights under the Insurance Agreement, including rights to declare events of default thereunder in certain circumstances, which events of default will constitute Events of Default under the Indenture. See "Risk Factors—Insurer as Controlling Class," "Description of the Securities—The Indenture—Events of Default" and "The Insurer and the Policy—The Policy."

**Use of Proceeds** ................................... The gross proceeds of the offering of the Securities received on the Closing Date are expected to equal approximately $689,000,000 and will be used by the Issuer to:

- purchase a portfolio of Collateral Obligations;

- fund a trust account for Revolving Loans (the "**Revolving Reserve Account**") and a trust account for Delayed Drawdown Loans (the "**Delayed Drawdown Reserve Account**") to cover any future draws on Revolving Loans and Delayed Drawdown Loans;

- enter into any Hedge Agreements, as applicable;

- enter into any Securities Lending Agreements (and correspondingly to fund the Securities Lending Account);

- enter into any Synthetic Security Agreements (and correspondingly to fund the related accounts);

009357

- repurchase and terminate Participations outstanding under the Warehouse Agreement (at a price reflecting the price originally paid by the Issuer to acquire the Warehoused Loans, *plus* the amount of extensions of credit in respect of certain Warehoused Loans, *minus* the aggregate amount of payments of principal received by the Warehouse Provider in respect of such Warehoused Loans (excluding the amount of any such payment that was required to be repaid or returned by the Warehouse Provider by claw-back or otherwise), *plus* all accrued and unpaid interest and fees on the Warehoused Loans;

- fund the Closing Date Expense Account and the Interest Reserve Account;

- purchase the Treasury Strip for deposit into the Class 1 Component Account;

- pay an arrangement and advisory fee to Sumitomo Trust & Banking Co., Ltd.; and

- undertake certain related activities.

See "Use of Proceeds."

**Payment Dates**..................................... Payment of interest on, and principal of, the Notes will be made by the Issuer in U.S. Dollars on the first day of each February, May, August and November of each year (or if such day is not a Business Day, the next succeeding Business Day), commencing August 1, 2005, to the extent of available cash flow in respect of the Collateral in accordance with the Priority of Payments.

**Interest Payments and Payments of Dividends from Interest Proceeds**............................................ The Notes will accrue interest from the Closing Date. Interest on the Notes will be payable, to the extent of funds available therefor, on each Payment Date.

So long as any Priority Classes are Outstanding with respect to any Class of Deferred Interest Notes, any payment of interest due on such Class of Deferred Interest Notes that is not available to be paid ("**Deferred Interest**") in accordance with the Priority of Payments on any Payment Date shall not be considered "payable" for the purposes of the Indenture (and the failure to pay the interest shall not be an Event of Default) until the Payment Date on which the interest is available to be paid in accordance with the Priority of Payments. Deferred Interest on any Class of Deferred Interest Notes shall be payable on the first Payment Date on which funds are available to be used for that purpose in accordance with the Priority of Payments. To the extent lawful and enforceable, interest on Deferred Interest with respect to any Class of Deferred Interest Notes shall accrue at the Note Interest Rate for the Class (and to the extent not paid as

009358

current interest on the Payment Date after the Interest Period in which it accrues, shall thereafter be additional Deferred Interest), until paid. See "Description of the Securities—Interest Payments on the Notes and Payments of Dividends on the Preference Shares from Interest Proceeds," "—Priority of Payments" and "—The Indenture—Events of Default."

On each Payment Date (or, with respect to the Preference Share Components, the Composite Securities Payment Date), the Issuer will make distributions to the Preference Shares Paying Agent for payment to the Holders of the Preference Shares as dividends on the Preference Shares pursuant to the Preference Share Documents, to the extent legally permitted, to the extent of available Interest Proceeds as described under clauses (18), (21) and (23) under "Description of the Securities—Priority of Payments—Interest Proceeds."

On each Payment Date on which distributions are made in respect of the Preference Shares, a portion of such payment will be allocated to the Class 1 Composite Securities in the proportion that the aggregate Face Amount of the Preference Share Component bears to the aggregate Face Amount of the Preference Shares. The payment of distributions, redemption amounts and any other payments on the Class 1 Composite Securities will be distributed in the same manner as the Preference Shares to which the Preference Share Component relates, except that such payment will be made on the Composite Securities Payment Date. See "Description of the Securities— Priority of Payments."

On each Composite Securities Payment Date, the Trustee will disburse (solely from amounts in the Class 1 Component Account attributable to the proceeds from the sale of the Treasury Strip as described in "Description of the Securities— Class 1 Component Distributions") to the Holders of the Class 1 Composite Securities, *pro rata* based on their share of the Class 1 Composite Security Rated Balance, the proceeds from the sale of the Treasury Strip relating to such Composite Securities Payment Date. See "Description of the Securities— Class 1 Component Distribution."

**Principal Payments and Distributions from Principal Proceeds**.............................................. The Notes and the Composite Securities will mature at par on the Payment Date in February, 2017 or, upon a Maturity Extension (if any), the applicable Extended Stated Maturity Date (the "**Stated Maturity**") and the Preference Shares are scheduled to be redeemed at the Redemption Price thereof by the Issuer on the Payment Date in February, 2017 or, upon a Maturity Extension (if any), the applicable Extended Scheduled Preference Shares Redemption Date (the "**Scheduled Preference Shares Redemption Date**"), in each case unless redeemed or (in the case of the Notes) repaid in full prior thereto. The average life of

009359

each Class of Notes is expected to be shorter than the number of years from issuance until Stated Maturity for such Notes. See "Risk Factors—Relating to the Securities—The Weighted Average Lives of the Notes May Vary," "—A Maturity Extension May Result in a Longer or Shorter Holding Period Than Expected" and "Maturity and Prepayment Considerations."

In general, principal payments will not be made on the Notes before the end of the Reinvestment Period, except in the following circumstances:

- in connection with an Optional Redemption;

- at the option of the Portfolio Manager, to effect a Special Redemption of the Notes;

- pursuant to a redemption made in connection with a Tax Event; or

- following a mandatory redemption of the Notes caused by a failure to meet any of the Coverage Tests or a Rating Confirmation Failure.

See "Description of the Securities—Priority of Payments," "—Optional Redemption," "—Special Redemption of the Notes If the Portfolio Manager Does Not Identify Investments as Contemplated by the Indenture," "—Mandatory Redemption of the Notes" and "Security for the Notes and the Composite Securities—Ramp-Up."

No payments of principal will be made on the Class A-2 Notes until the principal of the Senior Class A Notes has been paid in full. No payments of principal will be made on the Class A-3 Notes until the principal of the Senior Class A Notes and the Class A-2 Notes has been paid in full. No payments of principal will be made on the Class B Notes until the principal of the Class A Notes has been paid in full. No payments of principal will be made on the Class C Notes until the principal of the Class A Notes and the Class B Notes has been paid in full. However, Principal Proceeds may be used to pay Deferred Interest and other amounts before the payment of principal of the Notes. See "Description of the Securities—Priority of Payments."

No principal of any Class of Notes will be payable on any Payment Date other than in accordance with the Priority of Payments and to the extent funds are available therefor on that Payment Date for that purpose, except that the principal of each Class of Notes will be payable in full at the Stated Maturity, unless repaid before that.

On each Payment Date (or, with respect to the Preference Share Components, the Composite Securities Payment Date), the Issuer will make distributions to the Preference Shares Paying Agent

009360

for payment to the Holders of the Preference Shares as dividends on the Preference Shares pursuant to the Preference Share Documents, to the extent legally permitted, to the extent of available Principal Proceeds as described under clauses (6)(A), (9) and (10) under "Description of the Securities—Priority of Payments—Principal Proceeds."

On each Payment Date on which distributions are made in respect of the Preference Shares, a portion of such payment will be allocated to the Class 1 Composite Securities in the proportion that the aggregate Face Amount of the Preference Share Component bears to the aggregate Face Amount of the Preference Shares. The payment of distributions, redemption amounts and any other payments on the Class 1 Composite Securities will be distributed in the same manner as the Preference Shares to which the Preference Share Component relates, except that such payment will be made on the Composite Securities Payment Date. See "Description of the Securities—Priority of Payments."

For a description of the relative priority of payments and level of subordination of the Securities and certain fees, expenses and other liabilities of the Co-Issuers, see "Description of the Securities—Priority of Payments."

**Extension of the Reinvestment Period, the Stated Maturity and the Scheduled Preference Shares Redemption Date** .............................. The Issuer, if directed by the Portfolio Manager, shall be entitled on each Extension Effective Date to extend the Reinvestment Period to the applicable Extended Reinvestment Period End Date if (i) in the case of an Extension Effective Date occurring after the first Extension Effective Date, the Issuer has previously affected a Maturity Extension for each preceding Extension Effective Date and (ii) the Extension Conditions are satisfied and the Issuer has given written notice of its election to extend the Reinvestment Period no later than 60 days and no earlier than 90 days prior to such Extension Effective Date. For purposes of the foregoing, "**Extension Effective Date**" means if an Extension has occurred, the sixteenth Payment Date after the then current Extension Effective Date (or, in the case of the first Extension Effective Date, the Payment Date in May, 2010) and "**Extended Reinvestment Period End Date**" means, if an Extension has occurred, the sixteenth Payment Date after the then current Extended Reinvestment Period End Date (or, in the case of the first Extension, the Payment Date in May, 2016).

If the Extension Conditions are satisfied, the Stated Maturity of the Notes and the Composite Securities shall be automatically extended to the related Extended Stated Maturity Date and the Weighted Average Life Test shall be automatically extended to the related Extended Weighted Average Life Date, without any requirement for approval or consent of any Holders of Securities

009361

or amendment or supplement to the Indenture or the Preference Share Documents (the "**Maturity Extension**"). For purposes of the foregoing, "**Extended Stated Maturity Date**" means, if a Maturity Extension has occurred, the sixteenth Payment Date after the then current Extended Stated Maturity Date (or, in the case of the first Extended Stated Maturity Date, the Payment Date in February, 2021) and "**Extended Weighted Average Life Date**" means, if a Maturity Extension has occurred, the sixteenth Payment Date after the then current Extended Weighted Average Life Date (or, in the case of the first Extended Weighted Average Life Date, March 15, 2018).

As a condition to a Maturity Extension, any Holder of Notes, Composite Securities or Preference Shares will have the right to offer to sell their Notes, Composite Securities or Preference Shares to one or more Extension Qualifying Purchasers for purchase on the applicable Extension Effective Date.

If all Extension Conditions are satisfied and a Maturity Extension is effected, each Holder of a Note, other than Extension Sale Securities, and the Insurer (so long as the Policy has not been terminated) will be entitled to receive the applicable Extension Bonus Payment, in each case to the extent of available funds and as provided in the Priority of Payments. Holders of Composite Securities and Preference Shares will not be entitled to receive any Extension Bonus Payment.

If all Extension Conditions are satisfied, other than obtaining the consent of the Insurer to such Extension, and the Insurer has and continues to object to such Extension, so long as there are no Accrued Insurance Liabilities outstanding on the related Payment Date, the Policy may be terminated by the Holders of 100% of the Class A-1g Notes (after giving effect to the sale of any Insured Notes which are Extension Sale Securities in connection with the proposed Maturity Extension). Upon such termination of the Policy, the Note Interest Rate in respect of the Class A-1g Notes will be the Step-Up Note Interest Rate.

See "Risk Factors—Relating to the Securities—The Weighted Average Lives of the Notes May Vary," "—A Maturity Extension May Result in a Longer or Shorter Holding Period Than Expected," "Maturity and Prepayment Considerations," "Description of the Securities—Extension of the Reinvestment Period, the Stated Maturity and the Scheduled Preference Shares Redemption Date" and "Description of the Securities— Termination of the Policy."

**Security for the Notes and the Composite Securities** ........................ The Notes will be secured by a portfolio having an Aggregate Principal Balance following the Ramp-Up Period of approximately U.S.$663,000,000 (in principal amount) and consisting primarily of Collateral Obligations and certain other debt securities, in each case having the characteristics set forth

009362

herein. The Notes will also be secured by funds on deposit in the Issuer Accounts, the Issuer's rights under any Hedge Agreements, any Securities Lending Agreements, the Management Agreement, the Collateral Administration Agreement and, solely for the benefit of the Holders of the Class A-1g Notes only, the Insurance Documents. For the avoidance of any doubt, the Collateral shall not include the Class 1 Collateral or any Excluded Property. See "Security for the Notes and the Composite Securities."

The Holders of the Class 1 Composite Securities (solely to the extent of their Class 1 Component), will be secured by the Treasury Strip deposited in the Class 1 Component Account. See "Security for the Notes and the Composite Securities."

The Preference Shares are unsecured equity interests in the Issuer.

**Collateral Ramp-Up Period** ............. The Issuer expects that, as of the Closing Date, it will have purchased (or entered into commitments to purchase) Collateral Obligations to be included in the anticipated portfolio such that the Overcollateralization Ratio Numerator will be at least $663,000,000 as of the Ramp-Up Completion Date. The "**Ramp-Up Completion Date**" is the earlier of (i) the Business Day after the 179th day after the Closing Date, and (ii) the first day on which the following conditions are satisfied (x) either (A) the Aggregate Principal Balance of the Collateral Obligations owned by the Issuer equals at least $663,000,000 or (B) the Aggregate Principal Balance of the Collateral Obligations purchased (or committed to be purchased) by the Issuer with proceeds from the sale of the Securities (in each case in this clause (B), measured solely as of the date of purchase or commitment, as the case may be) equals at least $663,000,000 (for the avoidance of doubt, without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to any Collateral Obligations on or before the Ramp-Up Completion Date) and (y) the Overcollateralization Ratio Numerator is at least $663,000,000.

In anticipation of the issuance of the Securities, the Issuer, the Portfolio Manager and JPMorgan Chase Bank (as Warehouse Provider) entered into the Warehouse Agreement pursuant to which the Portfolio Manager has agreed to manage, on behalf of the Issuer, the Warehoused Loans to be acquired by the Issuer before the Closing Date and the Warehouse Provider has agreed to acquire a 100% participation in each Warehoused Loan concurrently with its acquisition by the Issuer, for a purchase price equal to the purchase price paid by the Issuer for the related Warehoused Loan. On the Closing Date, eligible Warehoused Loans will be repurchased by the Issuer with proceeds of the

009363

offering. See "Risk Factors—Relating to the Collateral Obligations—A Substantial Amount of Collateral Obligations

Was Acquired Before the Closing Date, and the Terms of the Acquisition May Adversely Affect the Issuer."

See "Security for the Notes and the Composite Securities—Ramp-Up."

**Reinvestment Period; Reinvestment in Collateral Obligations** ....................................... During the Reinvestment Period, the Issuer may generally (and subject to certain requirements) reinvest Principal Proceeds received with respect to the Collateral in additional or substitute Collateral Obligations in compliance with the Eligibility Criteria (which Eligibility Criteria includes a requirement that an item of Collateral purchased by the Issuer meet the definition of "Collateral Obligation" and that the portfolio of Collateral Obligations be in compliance with the Concentration Limitations to the extent provided in the Eligibility Criteria). See "—Collateral Obligations," "—Concentration Limitations" and "Security for the Notes and the Composite Securities—Eligibility Criteria."

The "**Reinvestment Period**" will be the period from the Closing Date through and including the first to occur of:

(i) the Payment Date after the date that the Portfolio Manager notifies the Trustee, each Rating Agency and the Administrator, in the sole discretion of the Portfolio Manager, that, in light of the composition of the Collateral, general market conditions, and other factors, investments in additional Collateral Obligations within the foreseeable future would either be impractical or not beneficial;

(ii) the Payment Date in May, 2012 or, in the case of an Extension, the Extended Reinvestment Period End Date;

(iii) the Payment Date on which all Notes are to be optionally redeemed or an earlier date after notice of an Optional Redemption chosen by the Portfolio Manager to facilitate the liquidation of the Collateral for the Optional Redemption; and

(iv) the date on which the Reinvestment Period terminates or is terminated as a result of an Event of Default (subject to the terms of the Indenture).

No investment will be made in Collateral Obligations after the termination of the Reinvestment Period, except that (x) Unscheduled Principal Payments and (y) Sale Proceeds from Credit Improved Obligations may be invested in Collateral

009364

Obligations after the Reinvestment Period subject to the limitations described under "Security for the Notes and the Composite Securities—Eligibility Criteria" and "—Sale of Collateral Obligations; Reinvestment of Principal Proceeds and Reinvestment Criteria." After the termination of the Reinvestment Period, all Principal Proceeds (other than Principal Proceeds constituting Unscheduled Principal Payments and Sale Proceeds from Credit Improved Obligations) must be applied in accordance with the Priority of Payments.

**Collateral Obligations ......................** Any obligation or security (a "**Collateral Obligation**") that, when the Issuer commits to purchase (or otherwise acquire) the obligation or security, is a Loan, High-Yield Bond, Structured Finance Obligation or Synthetic Security with a Reference Obligation that is a Loan, a Structured Finance Obligation or High-Yield Bond that is:

(i)    denominated and payable in U.S. Dollars and is not convertible by its obligor into any other currency;

(ii)    an obligation of an obligor Domiciled in an Eligible Country;

(iii)    an obligation that is eligible by its terms to be assigned to the Issuer and pledged by the Issuer to the Trustee for inclusion in the Collateral;

(iv)    not an exchangeable or convertible security that is exchangeable or convertible at the option of its issuer;

(v)    not an equity security or a component of an equity security or a security that has a component that is an equity security (other than for avoidance of doubt, a pass-through trust certificate in a trust holding Collateral Obligations);

(vi)    not an obligation or security that has been called for redemption and is not an obligation or security that is the subject of an Offer other than a Permitted Offer or an exchange offer in which a security that is not registered under the Securities Act is exchanged for (a) a security that has substantially identical terms (except for transfer restrictions) but is registered under the Securities Act or (b) a security that would otherwise qualify for purchase under the Eligibility Criteria;

(vii)    an obligation that (a) has a Moody's Rating (including any estimated or confidential rating which is in respect of the full obligation of the obligor and which is monitored) and (b) has an S&P Rating (including any confidential rating which is in respect of the full obligation of the obligor and which is monitored), which S&P Rating does not have a "p", "pi", "q", "r" or "t" subscript unless S&P otherwise authorizes in writing;

12

009365

(viii)    an obligation that is a Finance Lease (if it is a lease) and the Rating Condition has been satisfied with respect to the acquisition thereof;

(ix)    an obligation that is not a Current-Pay Obligation, Non-Performing Collateral Obligation or Credit Risk Obligation and in the case of a Collateral Obligation that has a Moody's Rating of "Caa1" or lower or an S&P Rating of "CCC+" or lower, an obligation for which the Portfolio Manager has certified in writing that such Collateral Obligation is not a Credit Risk Obligation;

(x)    an obligation that (unless it is a High-Yield Bond) is not subordinated by its terms to other indebtedness for borrowed money of the applicable issuer; provided that for the avoidance of doubt, this clause shall not prohibit the inclusion as Collateral Obligations of Subordinated Lien Loans;

(xi)    an obligation that (a) (unless it is a PIK Security) bears simple interest payable in cash no less frequently than annually at a fixed or floating rate that is paid on a periodic basis on an unleveraged basis and, in the case of a floating rate, computed on a benchmark interest rate plus or minus a spread, if any (which may vary under the terms of the obligation) and (b) provides for a fixed amount of principal payable in cash according to a fixed schedule (which may include optional call dates) or at maturity (or a fixed notional amount in the case of Synthetic Securities);

(xii)    an obligation the payment or repayment of the principal, if any, of which is not an amount determined by reference to any formula or index or subject to any contingency under the terms thereof;

(xiii)    in the case of a Loan, an obligation that is part of, or a Participation in, a syndicated loan facility that provides for a commitment by the lenders, in the aggregate, of at least U.S.$100 million;

(xiv)    an obligation the portion of which to be acquired (including through a Synthetic Security with respect to the Reference Obligation) does not represent, directly or indirectly, more than a 25% interest in the obligation;

(xv)    not an obligation with a maturity later than one year after the Stated Maturity of the Notes;

(xvi)    an obligation upon which no payments are subject to withholding tax imposed by any jurisdiction unless the obligor thereof or counterparty with respect thereto is required to make "gross-up" payments that cover the full amount of any such withholding tax on an after-tax basis

009366

(other than withholding taxes with respect to commitment fees associated with Collateral Obligations constituting Revolving Loans or Delayed Drawdown Loans);

(xvii) not a Loan or Synthetic Security that would require the Issuer after its purchase of the Loan or Synthetic Security to advance any funds to the related borrower or Synthetic Security Counterparty or permit the borrower or Synthetic Security Counterparty to require that any future advances be made except for:

(A) any Revolving Loan or Delayed Drawdown Loan if, simultaneously with its purchase of the Revolving Loan or Delayed Drawdown Loan, the Issuer deposits into the Revolving Reserve Account or the Delayed Drawdown Reserve Account, respectively, the maximum amount of any advances that may be required of the Issuer under the related Underlying Instrument (as provided in the Indenture); and

(B) any Synthetic Security if, simultaneously with its purchase of the Synthetic Security, the Issuer posts cash collateral with (or for the benefit of) the Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into the Synthetic Security in an amount not exceeding the amount of any future advances;

(xviii) if such obligation is a Structured Finance Obligation that is a collateralized loan obligation, such obligation:

(A) has been assigned a rating by both Moody's and S&P;

(B) has a Moody's Rating of "Ba3" or higher and an S&P Rating of "BB-" or higher; and

(C) has not been placed on the watch list for possible downgrade by Moody's or S&P;

(xix) not a Loan that is an obligation of a debtor in possession or a trustee for a debtor in an insolvency proceeding other than a DIP Loan;

(xx) with respect to an obligation that provides for the payment of interest at a floating rate, an obligation for which such floating rate is determined by reference to the U.S. Dollar prime rate or other base rate, London interbank offered rate or similar interbank offered rate, commercial deposit rate or any other index that the Rating

14

009367

Condition with respect to each Rating Agency is satisfied with respect thereto;

(xxi) in the case of a Synthetic Security, a Synthetic Security for which the counterparty or issuer, as the case may be, has a long-term senior unsecured rating by Moody's of at least "A3", and if rated "A3" by Moody's, such rating is not on watch for downgrade, and an issuer credit rating by S&P of at least "A-";

(xxii) not an obligation that constitutes Margin Stock;

(xxiii) not a Zero-Coupon Security;

(xxiv) not an obligation that is currently deferring interest or paying interest "in kind" or otherwise has an interest "in kind" balance outstanding at the time of purchase, which interest is otherwise payable in cash, unless the Rating Condition has been satisfied with respect to the acquisition thereof;

(xxv) not a security whose repayment is subject to substantial non-credit related risk as determined by the Portfolio Manager;

(xxvi) not an obligation the interest payments of which are scheduled to decrease (although interest payments may decrease due to unscheduled events such as a decrease if the index relating to a Floating Rate Obligation, the change from a default rate of interest to a non-default rate of interest or an improvement in the obligor's financial condition); and

(xxvii) not an obligation that will cause the Issuer, the Co-Issuer, or the pool of assets to be required to be registered as an investment company under the Investment Company Act.

The Treasury Strip shall not be a Collateral Obligation and it shall not be taken into account in any calculation involving Collateral Obligations.

Pursuant to the definition of "Synthetic Security", unless the Rating Condition is otherwise satisfied, any "deliverable obligation" that may be delivered to the Issuer as a result of the occurrence of any "credit event" must qualify (when the Issuer purchases the related Synthetic Security and when such "deliverable obligation" is delivered to the Issuer as a result of the occurrence of any "credit event") as a Collateral Obligation, except that such "deliverable obligation" may constitute a Defaulted Obligation when delivered upon a "credit event".

15

009368

See "Security for the Notes and the Composite Securities—Collateral Obligations" and "—Eligibility Criteria."

**Concentration Limitations**............... Upon a purchase of a Collateral Obligation, the Eligibility Criteria require that each of the limits set forth below with respect to a particular type of Investment Obligation (measured by Aggregate Principal Balance) as a percentage of the Maximum Investment Amount (the **"Concentration Limitations"**) is satisfied or, if any such limit is not satisfied, the extent of satisfaction is not reduced:

| | | Percentage of the Maximum Investment Amount |
|---|---|---|
| (1) | Senior Secured Loans and Eligible Investments | ≥ 92.5% |
| (2) | unsecured Loans | ≤ 3.0% |
| (3) | Subordinated Lien Loans | ≤ 5.0% |
| (4) | Revolving Loans and Delayed Drawdown Loans | ≤ 15.0% |
| (5) | DIP Loans | ≤ 5.0% |
| | (a) except that with a Rating Confirmation, DIP Loans may constitute up to the percentage of the Maximum Investment Amount specified in the right column | ≤ 7.5% |
| (6) | S&P Unrated DIP Loans | ≤ 2.5% |
| (7) | PIK Securities | ≤ 3.0% |
| (8) | High-Yield Bonds | ≤ 7.5% |
| (9) | Structured Finance Obligations | ≤ 7.5% |
| (10) | Structured Finance Obligations that are collateralized loan obligations | ≤ 2.5% |
| (11) | obligors Domiciled other than in the United States and Canada | ≤ 15.0% |
| (12) | obligors Domiciled in Canada or any single Moody's Group I Country | ≤ 10.0% |
| (13) | obligors Domiciled in any single Moody's Group II Country | ≤ 5.0% |
| (14) | obligors Domiciled in any single Moody's Group III Country | ≤ 2.5% |
| (15) | obligors organized in a Tax Advantaged Jurisdiction | ≤ 5.0% |
| (16) | same S&P Industry Classification | ≤ 8.0% |
| | (a) except that Investment Obligations belonging to two S&P Industry Classifications (not including Telecommunications) may each constitute up to the percentage of the Maximum Investment Amount specified in the right column | ≤ 10.0% |
| (17) | single issuer or any of its Affiliates (excluding Secondary Risk Counterparties) | ≤ 1.5% |
| | (a) except that up to each of five individual issuers (including any of their respective Affiliates but excluding issuers that the Portfolio Manager reasonably determines are Affiliated but are not dependent upon one another for credit support and are not dependent upon a Person by which they are commonly controlled for credit support) may each constitute up to the percentage of the Maximum Investment Amount specified in the right column | ≤ 2.0% |
| (18) | Fixed Rate Obligations | ≤ 7.5% |
| (19) | Pay interest less frequently than quarterly but no less frequently than annually | ≤ 7.5% |
| (20) | Synthetic Securities | ≤ 20.0% |

009369

| | | | |
|---|---|---|---|
| | (a) | except that Synthetic Securities that provide for settlement other than by physical delivery may not exceed the percentage of the Maximum Investment Amount specified in the right column | ≤ 5.0% |
| | (b) | except that Synthetic Securities that reference a senior secured index investment providing non-leveraged credit exposure to a basket of credit default swaps referencing a diversified group of Reference Obligations, with respect to which the principal or notional amount of the credit exposure to any single Reference Obligation does not increase over time may not exceed the percentage of the Maximum Investment Amount specified in the right column | ≤ 5.0% |
| (21) | | Participations (*provided*, that no Investment Obligations may be a Participation in a Participation) | ≤ 10.0% |
| (22) | | Investment Obligations of which are (i) obligors Domiciled other than in the United States, (ii) Collateral Obligations lent under Securities Lending Agreements, (iii) Participations and (iv) Synthetic Securities, in the aggregate may not exceed the percentage of the Maximum Investment Amount specified in the right column | ≤ 20.0% |
| (23) | | Investment Obligations of which are (i) obligors Domiciled other than in the United States, (ii) Collateral Obligations lent under Securities Lending Agreements, (iii) Participations and (iv) Synthetic Securities, entered into with, or issued by, a single Secondary Risk Counterparty | ≤ respective percentage in Secondary Risk Table under "Individual Counterparty Limit" for applicable rating* |
| (24) | | Investment Obligations of which are (i) obligors Domiciled other than in the United States, (ii) Collateral Obligations lent under Securities Lending Agreements, (iii) Participations and (iv) Synthetic Securities, entered into with, or issued by, all Secondary Risk Counterparties | ≤ respective percentage in Secondary Risk Table under "Aggregate Counterparty Limit" for applicable rating** |
| (25) | | Deep Discount Obligations | ≤ 5.0% |
| (26) | | CCC/Caa Collateral Obligations | ≤ 7.5% |
| (27) | | Long-Dated Collateral Obligations | ≤ 2.0% |
| (28) | | Collateral Obligations lent under Securities Lending Agreements | ≤ 15.0% |
| (29) | | Collateral Obligations providing for interest at a non-London interbank offered rate | ≤ 5.0% |

* Applicable long-term unsecured rating by Moody's or S&P of such Secondary Risk Counterparty (using the limit for the lower of such ratings if different).

** Long-term unsecured rating by Moody's or S&P at or below a level specified in the Secondary Risk Table (using the lower of such ratings for a Secondary Risk Counterparty, if different).

Subject to the rights in circumstances of the Portfolio Manager to determine otherwise as set out in the Indenture, solely for the purpose of determining whether the Concentration Limitations are met, Eligible Investments and Cash will be treated as Senior Secured Loans and Floating Rate Obligations.

See "Security For the Notes and the Composite Securities—Eligibility Criteria."

009370

| | |
|---|---|
| **Coverage Tests and the Reinvestment Overcollateralization Test**........................ | The "**Coverage Tests**" will consist of the Overcollateralization Tests and the Interest Coverage Tests. In addition, the Reinvestment Overcollateralization Test, which is not a Coverage Test, will apply as described herein. See "Security For the Notes and the Composite Securities—The Coverage Tests—The Overcollateralization Tests" and "—The Interest Coverage Tests" for the formulations of these tests, which are highly detailed. The ratios on which they are based are also described under such headings. The tests will be used to determine, among other things, whether (i) Notes will be redeemed in certain circumstances as described under "Description of the Securities—Priority of Payments" and (ii) in the case of the Coverage Tests, Collateral Obligations may be acquired as described under "Security for the Notes and the Composite Securities—Eligibility Criteria." |
| | There will not be any Coverage Test applicable to the Composite Securities or the Preference Shares. |
| *The Overcollateralization Tests*......... | The Overcollateralization Tests will consist of the "**Class A Overcollateralization Test**," the "**Class B Overcollateralization Test**" and the "**Class C Overcollateralization Test**." Each Overcollateralization Test will be satisfied with respect to any Class of Notes (treating the Senior Class A Notes, the Class A-2 Notes and the Class A-3 Notes as one Class for this purpose) if, as of any Measurement Date, the Overcollateralization Ratio for the Class is at least equal to the specified required level for the specified Class indicated in the table below: |

| Test | Required Level |
|---|---|
| Class A Overcollateralization Test | 113.40% |
| Class B Overcollateralization Test | 108.00% |
| Class C Overcollateralization Test | 106.30% |

| | |
|---|---|
| *The Interest Coverage Tests* .............. | The Interest Coverage Tests will consist of the "**Class A Interest Coverage Test**," the "**Class B Interest Coverage Test**" and the "**Class C Interest Coverage Test**." Each Interest Coverage Test will be satisfied with respect to any specified Class of Notes (treating the Senior Class A Notes, the Class A-2 Notes and the Class A-3 Notes as one Class for this purpose) if, as of the second Payment Date and any Measurement Date thereafter on which any Notes remain Outstanding, the Interest Coverage Ratio equals or exceeds the applicable required level specified in the table below for the specified Class: |

009371

| Test | Required Level |
|------|----------------|
| Class A Interest Coverage Test | 120.00% |
| Class B Interest Coverage Test | 115.00% |
| Class C Interest Coverage Test | 110.00% |

*Reinvestment Overcollateralization Test*.................................................... A test that will be satisfied as of any Measurement Date during the Reinvestment Period on which Class C Notes remain Outstanding, if the Reinvestment Overcollateralization Ratio as of such Measurement Date is at least equal to 107.30%.

**Collateral Quality Tests** ........................... The Collateral Quality Tests will be used primarily as criteria for purchasing Collateral Obligations. See "Security for the Notes and the Composite Securities—Eligibility Criteria." The **"Collateral Quality Tests"** will consist of the Diversity Test, the Weighted Average Life Test, the Weighted Average Moody's Recovery Rate Test, the Weighted Average S&P Recovery Rate Test, the Weighted Average Fixed Rate Coupon Test, the Weighted Average Spread Test, the Weighted Average Rating Factor Test and the S&P CDO Monitor Test, as described below.

*Diversity Test*....................................... The Diversity Test will be satisfied as of any Measurement Date, if the Diversity Score equals or exceeds the Minimum Diversity Score.

*S&P CDO Monitor Test*....................... The S&P CDO Monitor Test will be satisfied as of any Measurement Date if, after giving effect to the sale of a Collateral Obligation or the purchase of a Collateral Obligation, each Note Class Loss Differential of the Proposed Portfolio is positive.

*Weighted Average Fixed Rate Coupon Test*......................................... The Weighted Average Fixed Rate Coupon Test will be satisfied as of any Measurement Date if the Weighted Average Fixed Rate Coupon equals or exceeds 8.0%.

*Weighted Average Life Test* ................. The Weighted Average Life Test will be satisfied as of any Measurement Date if the Weighted Average Life on that date of all Collateral Obligations is equal to or less than the number of years (including any fraction of a year) between such Measurement Date and March 15, 2014 or, in the case of a Maturity Extension, the Extended Weighted Average Life Date.

*Weighted Average Moody's Recovery Rate Test*.............................. The Weighted Average Moody's Recovery Rate Test will be satisfied as of any Measurement Date if the Moody's Minimum Average Recovery Rate is greater than or equal to 44.5%.

19

009372

| | |
|---|---|
| *Weighted Average Rating Factor Test*......................................... | The Weighted Average Rating Factor Test will be satisfied as of any Measurement Date, if the Weighted Average Moody's Rating Factor of the Collateral Obligations (excluding Eligible Investments) as of such Measurement Date is less than or equal to the Maximum Weighted Average Moody's Rating Factor. |
| *Weighted Average S&P Recovery Rate Test* ............................. | The Weighted Average S&P Recovery Rate Test will be satisfied as of any Measurement Date if the S&P Minimum Average Recovery Rate is greater than or equal to 49.3%. |
| *Weighted Average Spread Test* ............ | The Weighted Average Spread Test will be satisfied as of any Measurement Date if the Weighted Average Spread as of the Measurement Date equals or exceeds the Minimum Weighted Average Spread. |
| | See "Security for the Notes and the Composite Securities—The Collateral Quality Tests." |
| **Mandatory Redemption of the Notes for Failure to Satisfy Coverage Tests** ...... | If any of the Coverage Tests are not satisfied on the last day of any Due Period (each, a **"Determination Date"**), funds will be used pursuant to the Priority of Payments to redeem the related Notes to the extent necessary for such failing Coverage Tests to be satisfied that would otherwise be used: |
| | (i) to purchase additional Collateral Obligations during the Reinvestment Period; or |
| | (ii) to make interest and principal payments on the Notes and to make dividend or redemption payments in respect of the Preference Shares. |
| | See "Description of the Securities—Mandatory Redemption of the Notes—Mandatory Redemption of the Notes for Failure to Satisfy Coverage Tests." |
| **Certain Consequences of Failure to Satisfy the Reinvestment Overcollateralization Test** ........................ | If during the Reinvestment Period, the Reinvestment Overcollateralization Test is not satisfied on any Determination Date, certain funds, as described under clause (16) under "Description of the Securities—Priority of Payments—Interest Proceeds," representing Interest Proceeds that would otherwise be used to make payments on the Preference Shares and certain subordinated expenses of the Issuer, will be deposited instead into the Collection Account as Principal Proceeds to the extent necessary to cause the Reinvestment Overcollateralization Test to be satisfied as of that Determination Date after application of |

009373

|  | Principal Proceeds as described under clause (1) under "Description of the Securities—Priority of Payments—Principal Proceeds." |
|---|---|
| **Mandatory Redemption of the Notes Upon Rating Confirmation Failure.........** | The Issuer will request S&P to confirm and Moody's to confirm in writing, by the Business Day after the 29th day after the Ramp-Up Completion Date, that it has not reduced, suspended or withdrawn the Initial Rating of each Class of Notes and Composite Securities and that it has not placed any Class of Notes or Composite Securities on credit watch with negative implications.  If the Trustee does not receive evidence of confirmation before the Payment Date following the 29-day period (such an event, a "**Rating Confirmation Failure**"), all Interest Proceeds remaining after payment of amounts referred to in clauses (1) and (3) through (12) of "Description of the Securities—Priority of Payments—Interest Proceeds" will be used to pay principal of the Senior Class A Notes, the Class A-2 Notes, the Class A-3 Notes, the Class B Notes and the Class C Notes sequentially in order of their priority on the next Payment Date and each Payment Date thereafter until the Initial Ratings are confirmed.  If necessary, after the foregoing payments are made out of Interest Proceeds, Principal Proceeds in accordance with clause (3) under "Description of the Securities—Priority of Payments—Principal Proceeds" will be used to pay principal of each Class of the Notes sequentially in order of their priority on each Payment Date until the Initial Ratings are confirmed.  See "Description of the Securities—Mandatory Redemption of the Notes—Mandatory Redemption of the Notes Upon Rating Confirmation Failure." |
| **Non-Call Period .........................................** | The period from the Closing Date to but not including the Payment Date in May, 2010 (the "**Non-Call Period**"). |
| **Optional Redemption ...............................** | Upon the occurrence of a Tax Event or at any time after the Non-Call Period, the Holders of at least 63% of the Aggregate Outstanding Amount of the Preference Shares may require the Issuer or Co-Issuers, as applicable, to redeem the Notes, in whole but not in part, from Principal Proceeds and all other funds available for that purpose in the Collection Account, the Payment Account, the Interest Reserve Account, the Closing Date Expense Account, the Revolving Reserve Account and the Delayed Drawdown Reserve Account in accordance with the redemption procedures described under "Description of the Securities—Optional Redemption." |
|  | Notes to be redeemed shall, on the Redemption Date, become payable at their Redemption Price.  From and after the Redemption Date the redeemed Notes will cease to bear interest. |

009374

The redemption price payable in connection with the Optional Redemption of any Class of Notes will be the sum of:

(i)    the outstanding principal amount of the portion of the Note being redeemed; *plus*

(ii)    accrued interest on the Note (including any Defaulted Interest and interest on Defaulted Interest); *plus*

(iii)    in the case of any Deferred Interest Note, the applicable Deferred Interest on the Note; *plus*

(iv)    in the case of the Fixed Rate Notes, the applicable Make-Whole Amount; *plus*

(v)    any unpaid Extension Bonus Payment in respect of the Note.

The redemption price payable in connection with the Optional Redemption of the Preference Shares will be (i) at the direction of a Majority of the Preference Shares, the entire remaining amount of available funds after all prior applications or (ii) as specified by the unanimous direction of the Holders of the Preference Shares, in each case, as described under "Description of the Securities—Optional Redemption."

With respect to any Class 1 Component and any Optional Redemption, "Redemption Price" means the distribution in kind of the Treasury Strip provided for in "Description of the Securities—Optional Redemption—Preference Shares."

| | |
|---|---|
| **Special Redemption** .................................. | The Notes will be subject to redemption in whole or in part by the Issuer or the Co-Issuer, as applicable, on Payment Dates during the Reinvestment Period if the Portfolio Manager elects (subject to the Management Agreement) to notify the Trustee and each Rating Agency that it has been unable, for 45 consecutive Business Days, to identify additional Collateral Obligations that are deemed appropriate by the Portfolio Manager in its sole discretion and meet the Eligibility Criteria in sufficient amounts to permit the investment or reinvestment of all or a portion of the funds then in the Collection Account available to be invested in additional Collateral Obligations (a "**Special Redemption**"). On the first Payment Date following the Due Period for which such notice is effective (a "**Special Redemption Date**"), the funds in the Collection Account or the Payment Account representing Principal Proceeds which cannot be reinvested in additional Collateral Obligations (the "**Special Redemption Amount**") will be available to be applied in accordance with the Priority of |

|  | Payments. See "Description of the Securities—Special Redemption of the Notes If the Portfolio Manager Does Not Identify Investments as Contemplated by the Indenture." |
|---|---|
| **The Policy** .................................................... | The Insured Notes will be entitled to the benefit of the Policy to be issued on the Closing Date by the Insurer pursuant to an insurance and indemnity agreement among the Issuer, the Co-Issuer and the Insurer (the "**Insurance Agreement**"). Pursuant to the Policy, the Insurer will irrevocably and unconditionally guarantee to the Holders of the Insured Notes payment of the Insured Amounts that shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer. |
|  | Payments on the Class A-1g Notes that become due on an accelerated basis as described under "Description of the Securities—The Indenture—Events of Default", in connection with a redemption prior to the Stated Maturity or otherwise will not constitute "Insured Amounts" unless the Insurer, in its sole discretion, elects to make such payments. |
|  | Any amounts paid by the Insurer under the Policy shall constitute Accrued Insurance Liabilities and shall be due and payable immediately by the Issuer. "**Accrued Insurance Liabilities**" consist of all amounts paid by the Insurer under the Policy for the benefit of the Class A-1g Notes, plus interest in respect of such amounts from the date incurred to the date of payment to or reimbursement of the Insurer at the Accrued Insurance Liabilities Interest Rate. See "The Insurer and the Policy." |
|  | The Policy may be terminated in certain circumstances as described in "Description of the Securities—Termination of the Policy." Upon such termination of the Policy, the Note Interest Rate in respect of the Class A-1g Notes will be the Step-Up Note Interest Rate. |
|  | See "Description of the Securities—Termination of the Policy." |
| **The Offering** ................................................ | The Securities are being offered (i) in reliance on Regulation S, to non-U.S. Persons in offshore transactions ("**Offshore Transactions**") as such term is defined in Regulation S and (ii) to purchasers that are U.S. persons ("**U.S. Persons**") as such term is defined in Regulation S, that are (x) Qualified Institutional Buyers or, with respect to the Composite Securities and the Preference Shares only, Accredited Investors and (y) (A) a Qualified Purchaser, (B) with respect to the Preference Shares only, a Knowledgeable Employee or (C) an entity owned exclusively by Qualified Purchasers and/or, with respect to |

009376

the Preference Shares only, Knowledgeable Employees. Subsequent transferees of the Securities must be (1) non-U.S. Persons that purchase the Securities in Offshore Transactions or (2)(a) Qualified Institutional Buyers or, with respect to the Composite Securities and the Preference Shares only, Accredited Investors, and (b) (A) a Qualified Purchaser, (B) with respect to the Preference Shares only, a Knowledgeable Employee or (C) an entity owned exclusively by Qualified Purchasers and/or with respect to the Preference Shares only, Knowledgeable Employees. See "Plan of Distribution" and "Transfer Restrictions."

| | |
|---|---|
| **Form, Registration and Transfer of the Notes**................................................... | Except as provided herein, the Notes sold in reliance on Rule 144A to Qualified Institutional Buyers and Qualified Purchasers will be represented by one or more permanent global notes in definitive, fully registered form without interest coupons (each, a "**Rule 144A Global Note**") deposited with the Trustee as custodian for, and registered in the name of, a nominee of the Depository. The Depository will credit the account of each of its participants with the principal amount of the Notes being purchased by or through the participant. Beneficial interests in a Rule 144A Global Note will be shown on, and transfers thereof will be effected only through, records maintained by the Depository and its direct and indirect participants. See "Description of the Securities—Form, Denomination, Registration and Transfer of the Notes." |

Except as provided herein, the Notes sold in Offshore Transactions to non-U.S. Persons in reliance on Regulation S will be represented by one or more permanent global securities in definitive, fully registered form without interest coupons (each, a "**Regulation S Global Note**") which will be deposited with the Trustee as custodian for, and registered in the name of, a nominee of the Depository for the respective accounts of the beneficial owners at Euroclear or Clearstream. Beneficial interests in a Regulation S Global Note may be held only through Euroclear or Clearstream at any time.

Except in the limited circumstances described herein, certificated Notes will not be issued in exchange for beneficial interests in Global Securities. See "Settlement and Clearing."

Transfers of interests in the Notes are subject to certain restrictions and must be made in accordance with the procedures and requirements set forth in the Indenture. See "Description of the Securities—Form, Denomination, Registration and Transfer of the Notes" and "Transfer Restrictions." Each purchaser of Notes in making its purchase will be required to make, or will be deemed to

009377

|  | have made, as the case may be, certain acknowledgments, representations and agreements. See "Transfer Restrictions." |
|---|---|
| **Form, Registration and Transfers of the Composite Securities**............................ | The Composite Securities sold in Offshore Transactions to non-U.S. Persons pursuant to Regulation S will be represented by one or more permanent global securities in definitive, fully registered form (each, a "**Regulation S Global Composite Security**") which will be deposited with the Trustee as custodian for, and registered in the name of, a nominee of the Depository for the respective accounts of the beneficial owners at Euroclear or Clearstream. Beneficial interests in a Regulation S Global Composite Security may be held only through Euroclear or Clearstream at any time.

The Composite Securities sold in non-Offshore Transactions or to U.S. Persons who purchase such Composite Securities for their own account or for the account of a Qualified Institutional Buyer or Accredited Investor who, in either case, is also (1) a Qualified Purchaser or (2) an entity owned exclusively by Qualified Purchasers, will be issued in the form of one or more certificated Composite Securities in definitive, fully registered form, registered in the name of the owner thereof (the "**Certificated Composite Securities** ").

Transfers of the Composite Securities are subject to certain restrictions and must be made in accordance with the procedures and requirements set forth in the Indenture. The Components of the Composite Securities are not separately transferable. See "Description of the Securities—Form, Denomination, Registration and Transfer of the Composite Securities" and "Transfer Restrictions." Each purchaser of Composite Securities in making its purchase will be required to make, or will be deemed to have made, as the case may be, certain acknowledgments, representations and agreements. See "Transfer Restrictions." |
| **Form, Registration and Transfers of the Preference Shares**.............................. | In addition to Certificated Preference Shares, the Preference Shares sold in Offshore Transactions to non-U.S. Persons pursuant to Regulation S may be represented by one or more permanent global securities in definitive, fully registered form (each, a "**Regulation S Global Preference Share**" and, together with the Rule 144A Global Notes, the Regulation S Global Notes and the Regulation S Global Composite Securities, the "**Global Securities**") which will be deposited with the Trustee as custodian for, and registered in the name of, a nominee of the Depository for the respective accounts of the beneficial owners at |

009378

Euroclear or Clearstream. Beneficial interests in a Regulation S Global Preference Share may be held only through Euroclear or Clearstream at any time.

The Preference Shares sold in (i) non-Offshore Transactions or to U.S. Persons who purchase such Preference Shares for their own account or for the account of a Qualified Institutional Buyer or Accredited Investor who, in either case, is also (1) a Qualified Purchaser, (2) a Knowledgeable Employee or (3) an entity owned exclusively by Qualified Purchasers and/or Knowledgeable Employees will be, or (ii) Offshore Transactions to non-U.S. Persons pursuant to Regulation S may be, issued in the form of one or more certificated Preference Shares in definitive, fully registered form, registered in the name of the owner thereof (the "**Certificated Preference Shares**").

Transfers of the Preference Shares are subject to certain restrictions and must be made in accordance with the procedures and requirements set forth in the Preference Share Documents. See "Description of the Securities— Form, Denomination, Registration and Transfer of the Preference Shares" and "Transfer Restrictions." Each purchaser of Preference Shares in making its purchase will be required to make, or will be deemed to have made, as the case may be, certain acknowledgments, representations and agreements. See "Transfer Restrictions."

**No Exchange of the Composite Securities** ........................................ A Holder of a Class 1 Composite Security may not exchange its Class 1 Composite Security for proportional interests in the underlying securities represented by the Components thereof. See "Description of the Securities— No Exchange of the Composite Securities."

**Ratings** ........................................ It is a condition of the issuance of the Securities that each Class of Notes and the Composite Securities are rated (in the case of the Insured Notes, after giving effect to the Policy) at least as indicated in the table under "—Principal Terms of the Securities " on the Closing Date.

The Class 1 Composite Securities are rated only as to the ultimate payment of their Class 1 Composite Security Rated Balance.

No rating of the Preference Shares has been sought or obtained in connection with the issuance thereof.

Each of the above ratings assume that no Maturity Extension occurs after the Closing Date.

A credit rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at

009379

any time by the assigning Rating Agency. See "Risk Factors—Relating to the Securities—Future Ratings of the Notes Are Not Assured and Limited in Scope; the Preference Shares are Not Rated."

**Listing** ........................................................ Application will be made to list each Class of the Securities (other than the Preference Shares) on the Irish Stock Exchange. There can be no assurance that such admission will be granted or maintained. See "Listing and General Information." In addition, there is currently no market for the Securities and there can be no assurance that a market will develop.

**Governing Law** ......................................... The terms and conditions of the Preference Shares (as set forth in the Issuer Charter and the Resolutions) will be governed by, and construed in accordance with, the law of the Cayman Islands. The Notes, the Composite Securities, the Indenture, any supplemental indenture, the Management Agreement, the Collateral Administration Agreement, the Preference Shares Paying Agency Agreement, the Policy, the Insurance Agreement and any Hedge Agreements will be governed by, and construed in accordance with, the law of the State of New York.

**Tax Status** ...................................................

> **The opinions expressed in this document were not written and are not intended by McKee Nelson LLP, special U.S. tax counsel to the Issuer, to be used and cannot be used by the Issuer or any holder of Notes for purposes of avoiding United States federal income tax penalties that may be imposed, the advice is written to support the promotion or marketing of the transactions, and each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.**

As more fully described in "Income Tax Considerations":

The Issuer and each Holder and beneficial owner of a Note, by acquiring such Note or an interest in such Note, will agree to treat such Note as debt for U.S. federal income tax purposes.

The Issuer expects the Issuer's permitted activities will not cause it to be engaged in a trade or business in the United States under the Code and, consequently, the Issuer will not be subject to U.S. federal income tax on a net income basis (or the branch profits tax described below).

27

009380

|  | Payments of interest on the Securities and the Collateral Obligations are not expected to be subject to the imposition of withholding tax. |
|  | See "Income Tax Considerations." |
| **ERISA Considerations**............................ | See "ERISA Considerations." |

009381

## RISK FACTORS

*An investment in the Securities involves certain risks. Prospective investors should carefully consider the following factors, in addition to the matters set forth elsewhere in this Offering Circular, prior to investing in any Class of Securities.*

### General; Priorities of Securities

The Issuer intends to invest in securities and other financial assets with certain risk characteristics as provided in the Indenture and the Management Agreement. See "Security for the Notes and the Composite Securities." There can be no assurance that the Issuer's investments will be successful, that its investment objectives will be achieved, that investors will receive their initial investments under the Securities or that they will receive any return (or avoid any loss, including total loss) on their investment in the Securities. Prospective investors are therefore advised to review this entire Offering Circular carefully and should consider, among other things, the following risk factors (along with, among other things, the inherent risks of investment activities) before deciding whether to invest in the Securities.

Except as is otherwise stated below, the risk factors are generally applicable to all the Securities, although the degree of risk associated with each Class of Securities may vary. In particular, the priorities of payment of the Notes are generally in the order of their alphabetic designation (and, in the case of the Class A Notes, their numeric designation) from Senior Class A Notes (the highest priority) to the Class C Notes (the lowest priority), the priorities of payment of the Notes are generally higher than priorities of payment of the Preference Shares.

### Relating to the Securities

*The Securities Will Have Limited Liquidity*

There is currently no market for the Securities. There can be no assurance that a secondary market for any Class of Securities will develop, or if a secondary market does develop, that it will provide the Holders of the applicable Class of Securities with liquidity of investment or that it will continue for the life of such Class of Securities. In addition, each Class of Securities is subject to certain transfer restrictions and can only be transferred to certain transferees as described under "Transfer Restrictions." The restrictions on the transfer of the Securities may further limit their liquidity. Consequently, an investor in the Securities must be prepared to hold such Securities until their Stated Maturity or, in the case of the Preference Shares, the Scheduled Preference Shares Redemption Date. In addition, the Securities will not be registered under the Securities Act or any state securities laws, and the Co-Issuers have no plans, and are under no obligation, to register the Securities under the Securities Act. Application will be made to admit each Class of the Securities (other than the Preference Shares) to the Daily Official List of the Irish Stock Exchange. There can be no assurance that any such admission will be granted or maintained.

*The Subordination of the Class A-2 Notes, the Class A-3 Notes, the Class B Notes, the Class C Notes and the Preference Shares Will Affect Their Right to Payment in Relation to the More Senior Securities*

The Class A-2 Notes are subordinated in right of payment of interest and principal to the Senior Class A Notes in the manner and to the extent described in this Offering Circular. Payments of interest on the Class A-2 Notes will not be made until due and unpaid interest on the Senior Class A Notes and certain other amounts (including certain management fees payable to the Portfolio Manager, certain amounts payable to the Insurer, certain hedging termination payments and certain administrative fees) have been paid. No payments of principal of the Class A-2 Notes will be made until principal of and due and unpaid interest on the Senior Class A Notes and certain other amounts have been paid in full.

The Class A-3 Notes are subordinated in right of payment of interest and principal to the Senior Class A Notes and the Class A-2 Notes in the manner and to the extent described in this Offering

009382

Circular. Payments of interest on the Class A-3 Notes will not be made until due and unpaid interest on the Senior Class A Notes, the Class A-2 Notes and certain other amounts (including certain management fees payable to the Portfolio Manager, certain amounts payable to the Insurer, certain hedging termination payments and certain administrative fees) have been paid. No payments of principal of the Class A-3 Notes will be made until principal of and due and unpaid interest on the Senior Class A Notes, the Class A-2 Notes and certain other amounts have been paid in full.

The Class B Notes are subordinated in right of payment of interest and principal to the Class A Notes in the manner and to the extent described in this Offering Circular. Payments of interest on the Class B Notes will not be made until due and unpaid interest on the Class A Notes and certain other amounts (including certain management fees payable to the Portfolio Manager, certain amounts payable to the Insurer, certain hedging termination payments and certain administrative fees) have been paid. No payments of principal of the Class B Notes will be made until principal of and due and unpaid interest on the Class A Notes and certain other amounts have been paid in full, except in connection with the payment of any Class B Deferred Interest.

The Class C Notes are subordinated in right of payment of interest and principal to the Class A Notes and the Class B Notes in the manner and to the extent described in this Offering Circular. Payments of interest on the Class C Notes will not be made until due and unpaid interest on the Class A Notes, the Class B Notes and certain other amounts (including certain management fees payable to the Portfolio Manager, certain amounts payable to the Insurer, certain hedging termination payments and certain administrative fees) have been paid. No payments of principal of the Class C Notes will be made until principal of and due and unpaid interest on the Class A Notes, the Class B Notes and certain other amounts have been paid in full, except in connection with the payment of any Class C Deferred Interest.

No payments will be made out of Interest Proceeds on the Preference Shares on any Payment Date (or, with respect to the Preference Share Components, the Composite Securities Payment Date), until due and unpaid interest on the Notes (including any Deferred Interest) and certain amounts (including certain amounts due under the Hedge Agreements, certain management fees payable to the Portfolio Manager, certain amounts payable to the Insurer, certain hedging termination payments and certain administrative fees) have been paid on the Payment Date in accordance with the Priority of Payments. No payments will be made out of Principal Proceeds on the Preference Shares until principal of each Class of Notes and certain other amounts payable out of Principal Proceeds on each Payment Date have been paid in full. In addition, the Preference Shares will not be redeemed until each Class of Notes and certain other amounts have been paid in full.

In addition, the Co-Issuers will have only nominal equity capitalization. Consequently, to the extent that any losses are suffered by any of the Holders of any Securities, the losses will be borne first by the Holders of the Preference Shares, and then by the Holders of each Class of Notes, serially in inverse order of their alphabetic (and, in the case of the Class A Notes, numeric) designations.

For purposes of subordination, the Composite Securities will not be treated as a separate Class, but the Preference Share Component of the Composite Securities will be treated as Preference Shares.

See "Description of the Securities."

*Interest Will Be Deferred on Deferred Interest Notes if There Are Insufficient Funds under the Priority of Payments for Payment of Interest*

So long as any Class A Notes are Outstanding, any interest due and accrued on the Class B Notes that remains unpaid on any Payment Date because insufficient funds are available to pay it in accordance with the Priority of Payments will be added to the Aggregate Outstanding Amount of the Class B Notes as Class B Deferred Interest and failure to pay that interest on the Payment Date when it originally became due will not be an Event of Default. Class B Deferred Interest will then be payable on subsequent

009383

Payment Dates in accordance with the Priority of Payments, pursuant to which it will remain subordinated to the payment of interest on the Class A Notes in the application of Interest Proceeds and to the payment in full of the principal of the Class A Notes in the application of Principal Proceeds.

So long as any Class A Notes or Class B Notes are Outstanding, any interest due and accrued on the Class C Notes that remains unpaid on any Payment Date because insufficient funds are available to pay it in accordance with the Priority of Payments will be added to the Aggregate Outstanding Amount of the Class C Notes as Class C Deferred Interest and failure to pay that interest on the Payment Date when it originally became due will not be an Event of Default. Class C Deferred Interest will then be payable on subsequent Payment Dates in accordance with the Priority of Payments, pursuant to which it will remain subordinated to the payment of interest on the Class A Notes and the Class B Notes in the application of Interest Proceeds and to the payment in full of the principal of the Class A Notes and the Class B Notes in the application of Principal Proceeds.

*Payments of Interest Proceeds on the Class A-1g Notes May Be Subordinated to Payments of Premium*

If on any Payment Date the amount of available Interest Proceeds is not sufficient for the payment in full of accrued and unpaid interest on the Senior Class A Notes, accrued and unpaid Premium and any accrued and unpaid Defaulted Interest on the Senior Class A Notes, the Class A-1g Notes shall be subordinated to the payment of accrued and unpaid Premium to the extent provided in clause (5)(A) under "Description of the Securities—Priority of Payments—Interest Proceeds."

*Interest Proceeds May Be Used to Reinvest in Priority to any Payments to Holders of Preference Shares*

During the Reinvestment Period, if the Reinvestment Overcollateralization Test is not met on any Determination Date, a portion of the Interest Proceeds that might otherwise have been paid to the Holders of the Preference Shares on the related Payment Date (or, with respect to the Preference Share Components, the Composite Securities Payment Date) will instead be deposited into the Collection Account as Principal Proceeds, as described under clause (16) under "Description of the Securities—Priority of Payments—Interest Proceeds."

*The Insured Notes May Be Subject to the Insurer's Ability to Make Payments of the Insured Amounts*

Pursuant to the Policy, the Insurer will guarantee the payment of Insured Amounts with respect to the Insured Notes. However, if the Insurer were to become bankrupt or insolvent or otherwise default on its obligations under the Policy, no other persons would be obligated to make any payments or make up any deficiencies in payment of the Insured Notes after the liquidation in full of the Collateral by the Trustee, on behalf of the Holders of the Notes.

*The Controlling Class Will Control Many Rights under the Indenture; However, Some Rights of the Controlling Class to Sell the Collateral in Connection with an Event of Default Are Limited*

Under the Indenture, many rights of the Holders of the Notes will be controlled by a Majority of the Controlling Class. As discussed below under "—The Insurer as Controlling Class Will Control Many Rights Under the Indenture," the Insurer will be the "Controlling Class" for so long as (i) the Class A-1g Notes are Outstanding, (ii) the Policy has not been terminated and (iii) there has not been an Insurer Default under the Policy. Remedies pursued by the Holders of the Controlling Class upon an Event of Default could be adverse to the interests of the Holders of Securities subordinated to the Controlling Class. After any realization on the Collateral, proceeds will be allocated in accordance with the Priority of Payments pursuant to which the Notes and certain other amounts owing by the Co-Issuers will be paid in full before any allocation to the Preference Shares, and each Class of Notes (along with certain other

009384

amounts owing by the Co-Issuers) will be paid serially in alphabetic order (or, with respect to the Class A Notes, in numeric order) until it is paid in full before any allocation is made to the next Class of Notes.

However, the ability of the Controlling Class to direct the sale and liquidation of the Collateral is subject to certain limitations. As described under "Description of the Securities—The Indenture—Events of Default," if an Event of Default occurs and is continuing, the Trustee must retain the Collateral intact and collect all payments in respect of the Collateral and continue making payments in accordance with the Priority of Payments and in accordance with the Indenture unless either (A) the Trustee determines that the anticipated net proceeds of a sale or liquidation of the Collateral would be sufficient to discharge in full the amounts then due and unpaid on the Notes for principal and interest (including Defaulted Interest and Deferred Interest and any interest on the Defaulted Interest and Deferred Interest), all Administrative Expenses, all other amounts (if any) then payable to the Hedge Counterparty by the Issuer (including any applicable termination payments) net of all amounts then payable to the Issuer by the Hedge Counterparty, all amounts owing by the Issuer to the Insurer under the Insurance Agreement, and all other amounts then payable under clause (3) under "Description of the Securities—Priority of Payments—Interest Proceeds," and a Majority of the Controlling Class agrees with that determination or (B) the Holders of a Super Majority of each of the Senior Class A Notes, the Class A-2 Notes, the Class A-3 Notes, the Class B Notes and the Class C Notes direct, subject to the provisions of the Indenture, the sale and liquidation of the Collateral; *provided*, *however*, if an Event of Default described in clause (d) under "Description of the Securities—Events of Default" occurs and if the Insurer is the Controlling Class, the Insurer shall have the sole right to direct, subject to the provisions of the Indenture, the sale and liquidation of the Collateral.

### The Insurer as Controlling Class Will Control Many Rights Under the Indenture

So long as (i) the Class A-1g Notes are Outstanding, (ii) the Policy has not been terminated and (iii) there has not been an Insurer Default under the Policy, most rights of the Holders of the Class A-1g Notes will be exercised by the Insurer. As a result, the Holders of the Class A-1g Notes, for example, generally will not have the right to accelerate the maturity of the Notes upon the occurrence of an Event of Default but instead will be entitled to continue to receive regularly scheduled payments of interest and payments of principal, if any, unless and until such maturity is accelerated by the Insurer. The exercise of the rights of the Controlling Class by the Insurer is not conditioned on, among other things, the Insurer's maintaining any specified credit ratings.

In addition, the Insurer has the right to declare an event of default under the Insurance Agreement in connection with breaches of covenants and misrepresentations by the Co-Issuers thereunder. See "The Insurer and the Policy—Insurance Agreement Events of Default." Any such event of default would also constitute an Event of Default under the Indenture, with respect to which the Insurer would have the rights described above. In certain circumstances, as described under "Description of the Securities—Termination of the Policy," the Policy may be terminated with the consent of 100% of the Holders of the Class A-1g Notes.

### The Issuer is Highly Leveraged, which Increases Risks to Investors

The Issuer will be substantially leveraged. Use of leverage is a speculative investment technique and involves certain risks to investors in the Securities. The leverage provided to the Issuer by the issuance of the Securities will result in interest expense and other costs incurred in connection with the borrowings that may not be covered by the net interest income, dividends and appreciation of the Collateral Obligations. The use of leverage generally magnifies the Issuer's risk of loss, particularly for the more subordinate Classes of Notes and the Preference Shares. In certain circumstances, such as in connection with the exercise of remedies following an Event of Default, the Controlling Class (which, for so long as (i) the Class A-1g Notes are Outstanding, (ii) the Policy has not been terminated and (iii) there has not been an Insurer Default under the Policy, will be the Insurer) may require the Issuer to dispose of some or all of the Collateral Obligations under unfavorable market conditions, thus causing the Issuer to recognize a loss that might not otherwise have occurred. In certain circumstances, the Controlling

009385

Class (which, for so long as (i) the Class A-1g Notes are Outstanding, (ii) the Policy has not been terminated and (iii) there has not been an Insurer Default under the Policy, will be the Insurer) are entitled to direct the sales of Collateral Obligations and may be expected to do so in their own interest, rather than in the interests of the more subordinate Classes of Securities.

> *The Issuer Is Newly Formed, Has No Significant Operating History, Has No Material Assets Other than the Collateral and Is Limited in its Permitted Activities*

The Issuer is a newly formed entity and has no significant operating history, other than in connection with the acquisition of the Collateral Obligations during the period up to the Ramp-Up Completion Date. The Issuer will have no material assets other than the Collateral and the Class 1 Collateral. The Indenture provides that the Issuer is not permitted to engage in any business activity other than the issuance of the Notes, the Composite Securities, the Preference Shares and the Issuer Ordinary Shares, the acquisition and disposition of and investment and reinvestment in Collateral Obligations, certain activities conducted in connection with the payment of amounts in respect of the Securities and the management of the Collateral and the Class 1 Collateral, and other activities incidental or related to the foregoing. Income derived from the Collateral and the Class 1 Collateral will be the Issuer's principal source of cash.

> *The Co-Issuer Is Newly Formed, Has No Significant Operating History, Has No Material Assets, and Is Limited in its Permitted Activities*

The Co-Issuer is a newly formed Delaware corporation and has no prior operating history. The Co-Issuer will have no material assets. The Indenture provides that the Co-Issuer is not permitted to engage in any business activity other than the co-issuance and sale of the Notes, the issuance of its share capital, and other activities incidental or related to the foregoing.

> *The Notes Are Non-Recourse Obligations; Investors Must Rely on Available Collections from the Collateral and Will Have No Other Source for Payment*

The Class A Notes, the Class B Notes and the Class C Notes are non-recourse debt obligations of the Co-Issuers. The Securities are payable solely from the Collateral pledged by the Issuer to secure the Notes. None of the security holders, members, officers, directors, partners, or incorporators of the Issuer, the Co-Issuer, the Portfolio Manager, the Initial Purchaser, the Insurer (other than in respect of the Class A-1g Notes), the Trustee, the Preference Shares Paying Agent, the Administrator, the Share Registrar, the Share Trustee, any of their respective affiliates, or any other person will be obligated to make payments on the Notes. The Issuer's ability to make interest payments and principal repayments on the Notes will be constrained by the terms of the Indenture. Holders of the Notes must rely solely on collections received on the Collateral pledged to secure the Notes and, solely in respect of the Class A-1g Notes, the Policy, as applicable, for the payment of interest and principal on the Notes, and there can be no assurance that those collections will be sufficient to pay all amounts due on the Notes. If the Insurer fails to make payments due pursuant to the Policy, Holders of the Insured Notes must rely solely on collections received on the Collateral pledged to secure the Notes for the payment of interest and principal on the Insured Notes, and there can be no assurance that those collections will be sufficient to pay all amounts due on the Insured Notes. If distributions on the Collateral are insufficient to make payments on the Notes, no other assets will be available for payment of the deficiency and, following liquidation of all of the Collateral, the Co-Issuers will not have any obligation to pay any deficiency, which shall be extinguished and shall not revive.

009386

*The Composite Securities Are Non-Recourse Obligations; Investors Must Rely on Available Collections from the Collateral and the Class 1 Collateral and Will Have No Other Source for Payment.*

The Composite Securities are non-recourse obligations of the Issuer. The Composite Securities are payable solely from the Collateral pledged by the Issuer to secure the Notes and from the Class 1 Collateral pledged by the Issuer to secure the Composite Securities. None of the security holders, members, officers, directors, partners, or incorporators of the Issuer, the Co-Issuer, the Portfolio Manager, the Initial Purchaser, the Insurer, the Trustee, the Preference Shares Paying Agent, the Administrator, the Share Registrar, the Share Trustee, any of their respective affiliates, or any other person will be obligated to make payments on the Composite Securities. The Issuer's ability to make payments on the Composite Securities will be constrained by the terms of the Indenture. Holders of the Composite Securities must rely solely on collections received on the Collateral pledged to secure the Notes and on the Class 1 Collateral pledged to secure the Composite Securities, and there can be no assurance that those collections will be sufficient to pay all amounts due on the Composite Securities. If distributions on the Collateral and the Class 1 Collateral are insufficient to make payments on the Composite Securities, no other assets will be available for payment of the deficiency and, following liquidation of all of the Collateral and the Class 1 Collateral, the Issuer will not have any obligation to pay any deficiency, which shall be extinguished and shall not revive.

*The Preference Shares are not Secured Obligations; Investors Must Rely on Available Collections from the Collateral and Will Have No Other Source for Payment*

The Preference Shares will be part of the issued share capital of the Issuer. The Preference Shares are equity in the Issuer and are not secured by the Collateral Obligations or other Collateral securing the Notes. As such, the Holders of Preference Shares will rank behind all creditors, whether secured or unsecured and known or unknown, of the Issuer, including, without limitation, the holders of the Notes and any Hedge Counterparties. Except with respect to the obligations of the Issuer to pay the amounts described under the "Description of the Securities—Priority of Payments—Interest Proceeds" and "—Principal Proceeds", the Issuer does not, however, expect to have any creditors though there can be no assurance that this will be the case. In addition, the Issuer is also subject to limitations with respect to the business that it may undertake. See "The Co-Issuers—Business." Payments in respect of the Preference Shares are subject to certain requirements imposed by Cayman Islands law. Any amounts paid by the Preference Shares Paying Agent as dividends on the Preference Shares will be payable only if the Issuer has sufficient distributable profits and/or balance in the Issuer's share premium account. In addition, dividends and the final payment upon redemption of the Preference Shares, will be payable only to the extent that the Issuer is and will remain solvent after such dividends or redemption payment is paid. Under Cayman Islands law, a company is generally deemed to be solvent if it is able to pay its debts as they come due.

The Issuer's obligation to pay dividends or to make other distributions to the Holders of the Preference Shares will therefore not be a secured obligation of the Issuer and will not be entitled to the benefits of the Indenture, nor will the Trustee have any obligation to act on behalf of the Holders of Preference Shares. Holders of the Preference Shares will only be entitled to receive amounts available for payment of dividends or other distributions after payment of all amounts payable on each Class of Notes and certain other amounts in accordance with the Priority of Payments and only to the extent of distributable profits of the Issuer and/or any balance in the Issuer's share premium account and (in each case) only to the extent that the Issuer is and will remain solvent following such distributions.

To the extent the requirements under Cayman Islands law described in the preceding paragraphs are not met, amounts otherwise payable to the Holders of the Preference Shares will be retained in the Preference Shares Distribution Account until, in the case of dividends, the next succeeding Payment Date on which the Issuer notifies the Preference Shares Paying Agent such requirements are met and, in the case of any payment on redemption of the Preference Shares, the next succeeding Business Day on which

009387

the Issuer notifies the Preference Shares Paying Agent such requirements are met. Amounts on deposit in the Preference Shares Distribution Account will not be available to pay amounts due to the Holders of the Notes, the Trustee, the Insurer, the Collateral Administrator, the Portfolio Manager, any Hedge Counterparty or any other creditor of the Issuer whose claim is limited in recourse to the Collateral. However, amounts on deposit in the Preference Shares Distribution Account may be subject to the claims of creditors of the Issuer that have not contractually limited their recourse to the Collateral. The Indenture and the Preference Share Documents will limit the Issuer's activities to the issuance and sale of the Securities, the acquisition and disposition of, and investment and reinvestment in, the Collateral Obligations and Eligible Investments and the other activities related to the issuance and sale of the Securities described under the "The Co-Issuers." The Issuer therefore does not expect to have any significant full recourse liabilities that would be payable out of amounts on deposit in the Preference Shares Distribution Account.

*The Issuer May Not Be Able to Invest and Reinvest Available Funds in Appropriate Collateral*

The amount of Collateral Obligations purchased on the Closing Date, the amount and timing of the purchase of additional Collateral Obligations before the Ramp-Up Completion Date, and the subsequent reinvestment of Principal Proceeds, will affect the cash flows available to make payments on, and the return to the Holders of, the Securities. Reduced liquidity and relatively lower volumes of trading in certain Collateral Obligations, in addition to restrictions on investment represented by the Eligibility Criteria, could result in periods during which the Issuer is not able to fully invest its available cash in Collateral Obligations, and it is unlikely that the Issuer's available cash will be fully invested in Collateral Obligations at any time. The longer the period before reinvestment of cash or cash-equivalents in Collateral Obligations and the larger the amount of uninvested cash or cash equivalents, the greater the adverse impact may be on aggregate interest collected and distributed by the Issuer, thereby resulting in lower yield than could have been obtained if the net proceeds associated with the offering of the Securities and all Principal Proceeds were immediately and fully reinvested. The associated reinvestment risk on the Collateral Obligations will be borne first by the Holders of the Preference Shares and second by the Holders of the Notes (beginning with the most subordinated Class of Notes). Although the Portfolio Manager may mitigate this risk to some degree during the Reinvestment Period by declaring a Special Redemption, the Portfolio Manager is not required to do so, and any Special Redemption may result in a lower yield on the Issuer's assets than could have been obtained if the net proceeds from the offering of the Securities and all Principal Proceeds were immediately and fully reinvested and no Special Redemption had taken place.

Generally, Principal Proceeds (together with Interest Proceeds, but only to the extent used to pay for accrued interest on Collateral Obligations, and Sale Proceeds received on the Collateral Obligations) will be reinvested during the Reinvestment Period (and, Principal Proceeds constituting Unscheduled Principal Payments and Sale Proceeds from Credit Improved Obligations, may be invested on any date after the Reinvestment Period, at the discretion of the Portfolio Manager) in substitute Collateral Obligations or temporarily reinvested in the Eligible Investments pending reinvestment in substitute Collateral Obligations in accordance with the Priority of Payments. The earnings with respect to substitute Collateral Obligations will depend, among other factors, on reinvestment rates available in the marketplace at the time and on the availability of investments acceptable to the Portfolio Manager that satisfy the criteria under "Security for the Notes and the Composite Securities—Eligibility Criteria." The need to satisfy the criteria and identify acceptable investments may require the purchase of substitute Collateral Obligations having lower yields than those initially acquired or require that Principal Proceeds be held temporarily in cash or Eligible Investments, which will reduce the yield earned by the Issuer. Further, issuers of Collateral Obligations may be more likely to exercise any rights they may have to redeem them when interest rates or spreads are declining. Any decrease in the yield on the Collateral Obligations will reduce the amounts available to make payments of principal and interest on the Notes and payments on the Preference Shares.

009388

The Issuer expects that, as of the Closing Date, it will have purchased (or entered into commitments to purchase) at least $497,250,000 in Aggregate Principal Balance of the Collateral Obligations to be included in the anticipated portfolio as of the Ramp-Up Completion Date.

*Changes in Tax Law Could Result in the Imposition of Withholding Taxes with Respect to Payments on the Securities, and the Issuer Will Not Gross-Up Payments to Holders*

Although no withholding tax is currently imposed by the United States or the Cayman Islands on payments on the Securities, there can be no assurance that, as a result of any change in any applicable law, treaty, rule, regulation, or interpretation thereof, the payments with respect to the Securities would not in the future become subject to withholding taxes. If any withholding tax is imposed on payments on any Securities, the Issuer will not "gross up" payments to their Holders.

*The Securities Are Subject to Substantial Transfer Restrictions*

The Securities have not been registered under the Securities Act, under any U.S. state securities or "Blue Sky" laws, or under the securities laws of any other jurisdiction and are being issued and sold in reliance upon exemptions from registration provided by those laws. No Securities may be sold or transferred unless: the sale or transfer is exempt from the registration requirements of the Securities Act (for example, in reliance on exemptions provided by Rule 144A or Regulation S) and applicable state securities laws; and the sale or transfer does not cause either of the Co-Issuers or the pool of Collateral to become subject to the registration requirements of the Investment Company Act. See "Transfer Restrictions" and "ERISA Considerations."

*Non-Compliance with Restrictions on Ownership of the Securities under the United States Investment Company Act of 1940 Could Adversely Affect the Issuer*

Neither of the Co-Issuers has registered with the United States Securities and Exchange Commission (the "**SEC**") as an investment company pursuant to the Investment Company Act. The Issuer has not so registered in reliance on an exclusion from the definition of "investment company" for companies organized under the laws of a jurisdiction other than the United States or any of its states: (i) whose investors residing in the United States are solely "qualified purchasers" (within the meaning given to such term in the Investment Company Act and related SEC regulations); and (ii) that do not make a public offering of their securities in the United States. No opinion or no-action position with respect to the registration of either of the Co-Issuers or the pool of Collateral under the Investment Company Act has been requested of, or received from, the SEC.

If the SEC or a court of competent jurisdiction were to find that the Issuer or the Co-Issuer is required, but in violation of the Investment Company Act had failed, to register as an investment company, possible consequences include the following: (i) the SEC could apply to a district court to enjoin the violation; (ii) investors in the Issuer or the Co-Issuer could sue the Issuer or the Co-Issuer, as the case may be, and recover any damages caused by the violation; and (iii) any contract to which the Issuer or the Co-Issuer, as the case may be, is party whose performance involves a violation of the Investment Company Act would be unenforceable by any party to the contract unless a court were to find that under the circumstances enforcement would produce a more equitable result than non-enforcement and would not be inconsistent with the purposes of the Investment Company Act.

In addition, the Issuer's being required to register as an investment company would result in an Event of Default. See "Description of the Securities—The Indenture—Events of Default." Should the Issuer or the Co-Issuer be subjected to any or all of the foregoing, the Issuer or the Co-Issuer, as the case may be, would be materially and adversely affected.

009389

*The Weighted Average Lives of the Notes May Vary*

The Stated Maturity of the Notes is the Payment Date in February, 2017 or, upon a Maturity Extension (if any), the applicable Extended Stated Maturity Date. The weighted average life of each Class of Notes is expected to be shorter than the number of years until their Stated Maturity. See "Description of the Securities." The weighted average life of a Class of Notes will be affected by the amount and timing of payments of principal of the Notes and the amount and timing of payments received on the Collateral Obligations. The amount and timing of payments of principal on the Notes will be affected by, among other things, any Optional Redemption of the Notes, a failure of any Coverage Test, a Rating Confirmation Failure, any failure by the Portfolio Manager to invest or reinvest uninvested proceeds of the offering of the Securities in Collateral Obligations, a redemption of the Securities made in connection with a Tax Event, any Special Redemption of one or more Classes of Notes, and an Event of Default by the Issuer in the payment of the Notes and an acceleration of the principal of the Notes in connection with an Event of Default. The occurrence of any of the foregoing unscheduled principal repayments of the Notes is, in turn, determined by the amount and timing of payments on the Collateral, which will be dependent on, among other things, the financial condition of the obligors on or issuers of the Collateral and the characteristics of the Collateral Obligations, including the existence and frequency of exercise of any prepayment, optional redemption, or sinking fund features, the prevailing level of interest rates, the redemption price, the actual default rate and the actual level of recoveries on any Defaulted Collateral Obligations, the frequency of tender or exchange offers for the Collateral Obligations and any sales of Collateral Obligations, dividends or other distributions received on any obligations that at the time of acquisition, conversion, or exchange do not satisfy the requirements of a Collateral Obligation, as well as the risks unique to investments in obligations of foreign issuers. See "Security for the Notes and the Composite Securities."

*A Maturity Extension May Result in a Longer or Shorter Holding Period Than Expected.*

Under the Indenture, the Issuer, if directed by the Portfolio Manager, shall be entitled to, on each Extension Effective Date, to extend the Reinvestment Period to the applicable Extended Reinvestment Period End Date if (i) in the case of an Extension Effective Date occurring after the first Extension Effective Date, the Issuer has previously affected a Maturity Extension for each preceding Extension Effective Date and (ii) the Extension Conditions are satisfied and the Issuer has given written notice of its election to extend the Reinvestment Period no later than 60 days and no earlier than 90 days prior to such Extension Effective Date. Under the Indenture, if the Reinvestment Period is so extended, the Stated Maturity of the Notes and the Composite Securities (or, in the case of the Preference Shares, the Scheduled Preference Shares Redemption Date) will be equally extended and the Weighted Average Life Test shall be automatically extended without the requirement for any approval or consent of any Holders of Securities. Holders of Securities will not be able to prevent or prohibit the extension of the Stated Maturity of the Notes and the Composite Securities (or, in the case of the Preference Shares, the Scheduled Preference Shares Redemption Date) so long as the Extension Conditions are satisfied, which include the ability of Holders of Securities to sell their Securities at the designated purchase price to a designated purchaser under the Indenture. However, in the case of the Preference Shares, the Indenture provides that Holders of Preference Shares that have received a Preference Share Internal Rate of Return equal to or in excess of 12.0% as of the Extension Effective Date will not receive any payment in exchange for their Preference Shares sold in connection with a Maturity Extension.

As a consequence, if the Portfolio Manager elects to extend the Reinvestment Period and the Extension Conditions are satisfied, the Holders of the Securities may either be required to hold their Securities for a significantly longer period of time or be forced to sell their Securities for the applicable purchase price under the Indenture, resulting in a shorter holding period than expected at the time of investment in the Securities.

009390

*An Amendment Buy-Out May Result in a Shorter Holding Period Than Expected.*

Any Non-Consenting Holder of Securities with respect to an amendment of the Indenture (which includes Holders that fail to respond to a consent solicitation within the applicable period) may be forced to sell its applicable Securities to the Amendment Buy-Out Purchaser at the Amendment Buy-Out Purchase Price, resulting in a shorter holding period than expected at the time of investment in the Securities. However, in the case of the Preference Shares, the Indenture provides that the Amendment Buy-Out Purchase Price will be zero for Non-Consenting Holders that have received a Preference Share Internal Rate of Return equal to or in excess of 12.0% as of the Amendment Buy-Out Date. See "Description of the Securities—Amendment Buy-Out." A Holder's ability to vote against an amendment or affect or influence the amendment process with respect to the Indenture may thus be limited. The Amendment Buy-Out Option may also increase the ability of the Portfolio Manager to affect or influence the amendment process.

*A Removal Buy-Out May Result in a Shorter Holding Period Than Expected.*

Under the Management Agreement, upon the occurrence of an Event of Default described in clause (d) under "Description of the Securities—Events of Default" and so long as the Policy has not been terminated and delivered for cancellation as described in "Description of the Securities—Termination of the Policy," a Majority of the Controlling Class may terminate the Management Agreement and cause the Issuer to remove the Portfolio Manager; *provided*, *however*, that the Portfolio Manager shall have the right to avoid such removal if, in accordance with the terms described in "The Management Agreement," the Removal Buy-Out Purchaser purchases not less than all of the Class A-1g Notes at the Removal Buy-Out Purchase Price prior to the proposed removal date and terminates the Policy upon the effectiveness of such purchase. Upon the occurrence of such Removal Buy-Out Option, any Holder of Class A-1g Notes will be forced to sell its applicable Class A-1g Notes to the Removal Buy-Out Purchaser at the Removal Buy-Out Purchase Price, resulting in a shorter holding period than expected at the time of investment in the Class A-1g Notes. See "Description of the Securities—Removal Buy-Out." A Holder's ability to vote to terminate the Management Agreement and remove the Portfolio Manager upon the occurrence of an Event of Default described in clause (d) under "Description of the Securities—Events of Default" may thus be limited.

*The Indenture Requires Mandatory Redemption of the Notes for Failure to Satisfy Coverage Tests*

If any of the Coverage Tests are not satisfied on any Determination Date on which the Notes of the relevant Class are Outstanding, Interest Proceeds available on the related Payment Date in accordance with the Priority of Payments (and, to the extent Interest Proceeds are insufficient, Principal Proceeds available on the Payment Date in accordance with the Priority of Payments) are required to be applied to pay principal of the relevant Class of Notes (and any Classes senior to it) to the extent necessary for the relevant Coverage Test to be satisfied. The application of Interest Proceeds and Principal Proceeds to pay principal of the Notes to the extent necessary to restore the Coverage Tests to certain minimum required levels could result in an elimination, deferral or reduction in the amounts available to make distributions on the Preference Shares and interest and principal payments on one or more classes of Notes, which would adversely affect the returns to the Holders of the Securities.

*The Indenture Requires Mandatory Redemption of the Notes Upon Rating Confirmation Failure*

If any rating of any Class of Notes is reduced or withdrawn or placed on credit watch with negative implications by the Business Day after the 29th day after the Ramp-Up Completion Date by either Rating Agency, Interest Proceeds and, if Interest Proceeds are insufficient, Principal Proceeds, are required to be diverted in accordance with the Priority of Payments and used to pay the principal of the Notes sequentially in order of their relative priority on the next Payment Date and each Payment Date after that until each rating is reinstated. The application of Interest Proceeds and Principal Proceeds to pay principal of the Notes to the extent necessary for one or more ratings to be reinstated could result in

009391

an elimination, deferral, or reduction in one or more payments or distributions on one or more Classes of Securities, which would adversely affect the returns to the Holders of those Classes of Securities.

*The Indenture Permits Special Redemption of Notes Based on the Portfolio Manager's Inability to Identify Investments*

The Portfolio Manager is permitted under the Indenture to elect to have all or a portion of the funds then in the Collection Account available to be invested in additional Collateral Obligations applied to a Special Redemption of the Notes, in whole or in part, on one or more Payment Dates during the Reinvestment Period because it has been unable, for a period of at least 45 consecutive Business Days, to identify additional Collateral Obligations that are deemed appropriate by the Portfolio Manager in its sole discretion and meet the Eligibility Criteria in sufficient amounts to permit the investment or reinvestment of all or a portion of the funds then in the Collection Account available to be invested in additional Collateral Obligations. On the Special Redemption Date, in accordance with the Indenture, the Special Redemption Amount will be applied in accordance with "Description of the Securities—Priority of Payments—Principal Proceeds," to the extent available (which includes for this purpose uninvested proceeds specified by the Portfolio Manager), to pay the principal of the Notes. The application of funds in that manner could result in an elimination, deferral, or reduction of amounts available to make payments on Securities subordinate in priority to the Securities being amortized. See "Description of the Securities—Special Redemption of Notes If the Portfolio Manager Does Not Identify Investments as Contemplated by the Indenture."

*The Notes Are Subject to Optional Redemption*

Subject to satisfaction of certain conditions, on any Payment Date upon the occurrence of a Tax Event or at any time after the Non-Call Period, the Holders of at least 63% of the Aggregate Outstanding Amount of the Preference Shares may require that the Notes be redeemed as described under "Description of the Securities—Optional Redemption." In the case of an Optional Redemption of the Notes, the Portfolio Manager may be required to aggregate Collateral Obligations to be sold together in one block transaction, thereby possibly resulting in a lower realized value for the Collateral Obligations sold. There can be no assurance that the market value of the Collateral will be sufficient for the Holders of the Preference Shares to direct an Optional Redemption of the Notes. A decrease in the market value of the Collateral would adversely affect the Sale Proceeds from their sale. Consequently, the conditions precedent to the exercise of an Optional Redemption may not be met. Moreover, the Holders of the Notes may not be able to invest the proceeds of the redemption of the Notes in investments providing a return equal to or greater than the Holders of the Notes expected to obtain from their investment in the Notes.

*Future Ratings of the Notes and the Composite Securities Are Not Assured and Limited in Scope; the Preference Shares Are Not Rated*

It is a condition to the issuance of the Notes and the Composite Securities that they be rated as provided under "Summary of Terms—Principal Terms of the Securities." A credit rating is not a recommendation to buy, sell or hold securities and is subject to revision or withdrawal at any time. There is no assurance that a rating will remain for any given period or that a rating will not be lowered or withdrawn entirely by each Rating Agency if in its judgment circumstances in the future so warrant. Any such action could have an adverse effect on the Holders of the relevant Class of Securities. If a rating initially assigned to a Class of Notes or Composite Securities is subsequently lowered for any reason, no person is obligated to provide any additional credit support or credit enhancement.

No rating of the Preference Shares will be sought or obtained in connection with their issuance.

009392

*Events Outside the Control of the Co-Issuers and the Portfolio Manager Can Affect the Securities*

Various acts of God, force majeure, and certain other events beyond the control of the Co-Issuers, the Trustee, the Portfolio Manager, the Insurer, the Collateral Administrator, the Indenture Registrar, the Preference Shares Paying Agent and the Administrator could affect the ability of financial institutions to process payments and transfer funds and could impair the financial records and record-keeping practices of financial institutions and others (including the Trustee, the Portfolio Manager, the Insurer, the Collateral Administrator, the Indenture Registrar, the Preference Shares Paying Agent and the Administrator). In addition, the existence of those circumstances could cause lenders and other creditors more readily to agree to restructure debt obligations (including payment terms) than they would in the absence of those circumstances. The existence of those circumstances could adversely affect the ability of the Issuer or the Co-Issuer, as applicable, to make timely payments on the Securities.

*Anti-Money Laundering Provisions*

The Uniting and Strengthening America By Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "**USA PATRIOT Act**"), signed into law and effective as of October 26, 2001, imposes anti-money laundering obligations on different types of financial institutions, including banks, broker-dealers and investment companies. The USA PATRIOT Act requires the Secretary of the United States Department of the Treasury (the "**Treasury**") to prescribe regulations to define the types of investment companies subject to the USA PATRIOT Act and the related anti-money laundering obligations. It is not clear whether Treasury will require entities such as the Issuer to enact anti-money laundering policies. It is possible that Treasury will promulgate regulations requiring the Co-Issuers or the Portfolio Manager or other service providers to the Co-Issuers, in connection with the establishment of anti-money laundering procedures, to share information with governmental authorities with respect to investors in the Securities. Such legislation and/or regulations could require the Co-Issuers to implement additional restrictions on the transfer of the Securities. As may be required, the Issuer reserves the right to request such information and take such actions as are necessary to enable it to comply with the USA PATRIOT Act.

The Issuer and the Administrator are also subject to anti-money laundering laws and regulations in the Cayman Islands which impose specific requirements with respect to the obligation "to know your client". Except in relation to certain categories of institutional investors, the Issuer will require a detailed verification of each initial investor's identity and the source of the payment used by such initial investor for purchasing the Securities in a manner similar to the obligations imposed under the laws of other major financial centers. If the Cayman Islands government determined the Issuer was in violation of the anti-money laundering provisions, the Issuer could be subject to substantial criminal penalties. Payment of any such penalties could materially adversely affect the timing and amount of payments to Holders of Securities.

**Relating to the Portfolio Manager**

*The Issuer Will Depend on the Managerial Expertise Available to the Portfolio Manager and its Key Personnel*

The performance of the Issuer's investment portfolio depends heavily on the skills of the Portfolio Manager in analyzing, selecting and managing the Collateral Obligations. As a result, the Issuer will be highly dependent on the financial and managerial experience of certain investment professionals associated with the Portfolio Manager, none of whom is under a contractual obligation to the Issuer to continue to be associated with the Portfolio Manager for the term of this transaction. The loss of one or more of these individuals could have a material adverse effect on the performance of the Co-Issuers. Furthermore, the Portfolio Manager has informed the Issuer that these investment professionals are also actively involved in other investment activities and will not be able to devote all of their time to the Issuer's business and affairs. In addition, individuals not currently associated with the Portfolio Manager

009393

may become associated with the Portfolio Manager and the performance of the Collateral Obligations may also depend on the financial and managerial experience of such individuals. See "The Management Agreement" and "The Portfolio Manager."

*The Portfolio Manager Will Have Limited Control of the Administration and Amendment of Collateral Obligations*

The Portfolio Manager will cause the Issuer to exercise or enforce, or refrain from exercising or enforcing, its rights in connection with the Collateral Obligations or any related documents or will refuse amendments or waivers of the terms of any Collateral Obligation and related documents in accordance with its ordinary business practices as if the Portfolio Manager were administering the Collateral Obligations for its own account. The authority of the Portfolio Manager to cause the Issuer to change the terms of the Collateral Obligations will generally not be restricted by the Indenture or the Management Agreement. As a result, the Issuer will be relying on the Portfolio Manager's ordinary business practices with respect to the servicing of the Collateral Obligations. The Holders of the Securities and the Issuer will not have any right to compel the Issuer or the Portfolio Manager to take or refrain from taking any actions other than in accordance with its ordinary business practices.

In addition, when the Issuer holds a Participation, the Issuer generally will have no right to enforce compliance by the borrower with the loan or credit agreement or other instrument evidencing the related loan obligation, no rights of set-off against the borrower, no direct interest in the collateral supporting the loan obligation, and no right to vote with respect to amendments of, or waivers of defaults under, the loan obligation. However, most participation agreements relating to Participations in loans provide that the Participating Institution may not vote in favor of any amendment, modification, or waiver that forgives principal, interest, or fees; reduces principal, interest, or fees that are payable; postpones any payment of principal (whether a scheduled payment or a mandatory prepayment), interest or fees; or releases any material guarantee or security without the consent of the participant (at least to the extent the participant would be affected by the amendment, modification, or waiver). A Participating Institution voting in connection with a potential waiver of a default by an obligor may have interests different from those of the Issuer, and the Participating Institution might not consider the interests of the Issuer in connection with its vote. In addition, many participation agreements relating to Participations in loans that do provide voting rights to the participant further provide that if the participant does not vote in favor of amendments, modifications, or waivers, the Participating Institution may repurchase the Participation at par. In the event of the insolvency of the Participating Institution, the Issuer may be treated as a general creditor of the Participating Institution with respect to a Participation and may not benefit from any set-off between the Participating Institution and the borrower and may not be able to proceed against the collateral supporting the loan obligation. As a result, the Issuer is subject to the credit risk of both the borrower and the Participating Institution. An investment by the Issuer in a Synthetic Security related to a Loan involves many of the same considerations relevant to Participations. See "—Relating to the Collateral Obligations—Investing in Loans Involves Particular Risks" and "—Investing in Synthetic Securities Involves Particular Risks" below.

A modification that would increase the commitment of a lender, reduce the interest rate, or postpone the final maturity of an obligation under a participation agreement, or release all of the collateral for an obligation, generally requires the affirmative vote of the participating lender for a loan in which the Issuer owns a Participation, or of the Issuer for a Loan purchased by assignment, for the increase, reduction, or postponement to be binding. The exercise of remedies may also be subject to the vote of a specified percentage of the lenders under the loan obligation. The Portfolio Manager will have the authority to cause the Issuer to consent to certain amendments, waivers, or modifications to the Collateral Obligations requested by obligors or the lead agents for participation agreements relating to Participations (subject to operating procedures intended to reduce the risk that the Issuer would be deemed to be engaged in a trade or business in the United States for United States federal income tax purposes). The Portfolio Manager may, subject to the transaction documents, cause the Issuer to extend or defer the maturity, adjust the outstanding balance of any Collateral Obligation, reduce or forgive interest or fees,

009394

release material collateral or guarantees, or otherwise amend, modify, or waive the terms of any related loan agreement, including its payment terms. The Portfolio Manager will make determinations in accordance with its servicing standards under the Management Agreement. Any amendment, waiver, or modification of a Collateral Obligation could postpone the expected maturity of the Notes or the expected redemption date of the Preference Shares, or reduce the likelihood of timely and complete payment of interest or principal under the Notes or a full return of an investment in the Preference Shares.

*Performance History of the Portfolio Manager May Not Be Indicative of Future Results*

Any prior investment results of the Portfolio Manager, and the persons associated with it or any other entity may not be indicative of the Issuer's future investment results. The nature of, and risks associated with, the Issuer's future investments may differ substantially from those investments and strategies undertaken historically by the Portfolio Manager, and the persons associated with it or any other entity. There can be no assurance that the Issuer's investments will perform as well as the past investments of the Portfolio Manager, and the persons associated with it or any other entity. Moreover, since the investment criteria that govern investments in the Collateral Obligations do not govern the Portfolio Manager's investments and investment strategies generally, investments in the Collateral Obligations conducted in accordance with the investment criteria that govern investments in the Collateral Obligations, and the results they yield, may differ substantially from other investments undertaken by the Portfolio Manager.

Notwithstanding the inapplicability of the results obtained and expected to be obtained from the past investments of the Portfolio Manager, a period of increased volatility in market conditions, including interest rate environments, can have an adverse effect on the realized and unrealized returns to investors in the past investments of the Portfolio Manager. There can be no assurance that current economic conditions and the effects of increased interest rate and corresponding price volatility will not adversely impact the investment returns ultimately realized by investors or continued compliance with, among other things, applicable coverage requirements described in this Offering Circular.

*Right of Portfolio Manager to Avoid Removal Without Cause May Result in a Shorter Holding Period of the Preference Shares Than Expected.*

The Portfolio Manager may be removed without cause upon 90 days' prior written notice by the Issuer, at the direction of the Holders of at least 63% of the Aggregate Outstanding Amount of the Preference Shares (excluding Preference Shares held by the Portfolio Manager, its Affiliates or any account for which the Portfolio Manager or its Affiliates have discretionary voting authority at the time of such vote); *provided, however*, that the Portfolio Manager shall have the right to avoid such removal if, in accordance with the terms described in "The Management Agreement," the Removal Buy-Out Purchaser purchases not less than all of the Directing Preference Shares and all of the Composite Securities relating to the Preference Share Component which constitute a part of the Directing Preference Shares. Upon the occurrence of such purchase by the Removal Buy-Out Purchaser of all of the Directing Preference Shares and all of the Composite Securities relating to the Preference Share Component which constitute a part of the Directing Preference Shares, the Holders of such Directing Preference Shares or Composite Securities, as the case may be, will be forced to sell its Preference Shares or Composite Securities, as the case may be, to the Portfolio Manager at the Buy-Out Amount, resulting in a shorter holding period than expected at the time of investment in the Preference Shares or the Composite Securities, as the case may be,. However, the Management Agreement provides that the Buy-Out Amount will be zero for Directing Preference Shares that have received a Preference Share Internal Rate of Return equal to or in excess of 12.0% as of the purchase date. See "The Management Agreement." The ability of a Holder of Preference Shares to remove the Portfolio Manager or affect or influence the removal of the Portfolio Manager may thus be limited.

009395

**Relating to the Collateral Obligations**

*In General, the Collateral Obligations Are Subject to Various Risks*

The Collateral Obligations are subject to credit, liquidity, and interest rate risks, among others. The Eligibility Criteria and the Collateral Quality Tests have been established to address certain assumed deficiencies in payment occasioned by defaults with respect to the Collateral Obligations. If any deficiencies exceed certain modeled scenarios, however, payments or distributions on the Securities could be adversely affected. To the extent that a default occurs with respect to any Collateral Obligation securing the Notes and the Issuer (on the advice of the Portfolio Manager) sells or otherwise disposes of the Collateral Obligation, it is not likely that the proceeds of the sale or other disposition will be equal to the amount of principal and interest owing to the Issuer on of the Collateral Obligation.

The value of the Collateral Obligations generally will fluctuate with, among other things, the financial condition of the obligors on or issuers of the Collateral Obligations and, with respect to Synthetic Securities, both the financial condition of the related Synthetic Security counterparties and the obligors on or issuers of the Reference Obligations, general economic conditions, the condition of certain financial markets, political events, developments or trends in any particular industry, and changes in prevailing interest rates.

The ability of the Issuer to sell Collateral Obligations before their maturity is subject to certain restrictions under the Indenture including those described under "Security for the Notes and the Composite Securities—Sale of Collateral Obligations; Reinvestment of Principal Proceeds and Reinvestment Criteria."

*Investing in Loans Involves Particular Risks*

The Collateral Obligations will consist primarily of Dollar-denominated senior secured and senior unsecured loans, which are required by the Indenture to be obligations of corporations, partnerships, or other entities organized under the laws of the United States (or any of its states) or of foreign obligors meeting specified criteria, or Synthetic Securities the Reference Obligations of which are such loans. See "Security for the Notes and the Composite Securities—Collateral Obligations."

Loans may become non-performing for a variety of reasons. Non-performing loans may require substantial workout negotiations or restructuring that may entail, among other things, a substantial reduction in the interest rate or a substantial write-down of the principal of a loan. In addition, because of the unique and customized nature of a loan agreement and the private syndication of a loan, loans typically may not be purchased or sold as easily as publicly traded securities, and historically the trading volume in the bank term loan market has been small relative to the corporate bond market. Loans may encounter trading delays due to their unique and customized nature, and transfers may require the consent of an agent bank or borrower.

Investments in loans are also subject to interest rate risk and reinvestment risk. Prepayments of loans in the Issuer's portfolio are likely to be made during any period of declining interest rates. Prepayments would force the Issuer to replace the loans with lower-yielding investments.

The Issuer may acquire interests in loans either directly (by assignment) or indirectly (by Participation or through Synthetic Securities). The Issuer may not originate any loans. The purchaser of an assignment of a loan obligation typically succeeds to all the rights and obligations of the selling institution and becomes a lender under the loan or credit agreement with respect to the debt obligation. In contrast, a Participation acquired by the Issuer in a portion of a loan obligation held by a Participating Institution or a security or other debt obligation typically results in a contractual relationship only with the Participating Institution, not with the borrower. The Issuer would have the right to receive payments of principal, interest, and any fees to which it is entitled under a Participation only from the Participating

009396

Institution and only upon receipt by the Participating Institution of those payments from the borrower. The Issuer will be subject to restrictions on the amount of Participations that may be acquired for inclusion in the Collateral. See "Security for the Notes and the Composite Securities—Eligibility Criteria."

Certain of the loans in the Issuer's portfolio may be unsecured or secured by collateral worth less than the outstanding balance of the loan. In addition to the general risks associated with loans described above, unsecured loans will not be secured by substantial collateral or any collateral and secured loans may be substantially under-secured. Without collateral and with materially inadequate collateral, the ability of the holder of the loan to recover amounts due from the borrower may be substantially limited.

*Investing in Below Investment-Grade Obligations Involves Particular Risks, as Does Investing in Investment-Grade Obligations*

A substantial amount of the Collateral Obligations will consist of loans, bonds and other obligations that are below investment grade, including high-yield loans and securities. Those Collateral Obligations will have greater credit and liquidity risk than investment grade obligations. They are also often unsecured and may be subordinated to certain other obligations of their issuer. The lower rating of those Collateral Obligations reflects a greater possibility that adverse changes in the financial condition of an issuer or in general economic conditions or both may impair the ability of their issuer to make payments of principal or interest. These Collateral Obligations may be speculative.

Risks of below investment-grade Collateral Obligations may include (among others):

(i)     limited liquidity and secondary market support;

(ii)    in the case of fixed-rate high-yield debt securities, substantial market place volatility resulting from changes in prevailing interest rates;

(iii)   subordination to the prior claims of senior lenders and creditors;

(iv)    the operation of mandatory sinking fund or call and redemption provisions during periods of declining interest rates that could cause the Issuer to reinvest premature redemption proceeds in lower-yielding debt obligations;

(v)     the possibility that earnings of the below investment-grade issuer may be insufficient to meet its debt service; and

(vi)    the declining creditworthiness and potential for insolvency of a below investment-grade issuer during periods of rising interest rates and economic downturn.

An economic downturn or an increase in interest rates could severely disrupt the market for below investment-grade obligations and could adversely affect the value of outstanding below investment-grade obligations and the ability of their issuers to repay principal and interest.

Issuers that are below investment grade may be highly leveraged and may not have available to them more traditional methods of financing. The risk associated with obligations of below investment-grade issuers is generally greater than is the case with investment grade issuers. For example, during an economic downturn or a sustained period of rising interest rates, below investment-grade issuers may be more likely to experience financial stress, especially if they are highly leveraged. During those periods, timely service of debt obligations may also be adversely affected by specific issuer developments, or the issuer's inability to meet specific projected business forecasts or the unavailability of additional financing. The risk of loss from default by the issuer is significantly greater for the holders of below investment-grade obligations because those obligations may be unsecured and may be subordinated to obligations

009397

owed to other creditors of the issuer. In addition, the Issuer may incur additional expenses to the extent it is required to seek recovery upon a default on such an obligation or participate in its restructuring.

As a result of the limited liquidity of below investment-grade obligations, their prices have at times experienced significant and rapid decline when a substantial number of holders decided to sell. In addition, the Issuer may have difficulty disposing of certain below investment-grade obligations because there may be a thin trading market for them. To the extent that a secondary trading market for below investment-grade obligations does exist, it is generally not as liquid as the secondary market for highly rated obligations. Reduced secondary market liquidity may have an adverse impact on the Issuer's ability to dispose of particular Collateral Obligations in response to a specific economic event, such as a deterioration in the creditworthiness of the issuer of the Collateral Obligation.

In addition, a portion of the Collateral Obligations may consist of Dollar-denominated investment-grade debt obligations. Those Collateral Obligations have higher ratings than high-yield debt securities, but they are subject to many risks similar to the foregoing, in varying degrees depending on the circumstances.

*Investing in Structured Finance Obligations Involves Particular Risks*

A portion of the Collateral Obligations may consist of Structured Finance Obligations and Synthetic Securities the Reference Obligations of which are Loans, Structured Finance Obligations or High-Yield Bonds. Structured Finance Obligations may present risks similar to those of the other types of Collateral Obligations in which the Issuer may invest and, in fact, the risks may be of greater significance in the case of Structured Finance Obligations. Moreover, investing in Structured Finance Obligations may entail a variety of unique risks. Among other risks, Structured Finance Obligations may be subject to prepayment risk, credit risk, liquidity risk, market risk, structural risk, legal risk and interest rate risk (which may be exacerbated if the interest rate payable on a Structured Finance Obligation changes based on multiples of changes in interest rates or inversely to changes in interest rates). In addition, certain Structured Finance Obligations (particularly subordinated collateralized bond obligations) may provide that non-payment of interest is not an event of default in certain circumstances and the holders of the securities will therefore not have available to them any associated default remedies. During the period of non-payment, unpaid interest will generally be capitalized and added to the outstanding principal balance of the related security. Furthermore, the performance of a Structured Finance Obligation will be affected by a variety of factors, including its priority in the capital structure of its issuer the availability of any credit enhancement, the level and timing of payments and recoveries on and the characteristics of the underlying receivables, loans, or other assets that are being securitized, bankruptcy remoteness of those assets from the originator or transferor, the adequacy of and ability to realize on any related collateral, and the skill of the manager of the Structured Finance Obligation in managing securitized assets. The price of a Structured Finance Obligation, if required to be sold, may be subject to certain market and liquidity risks for securities of its type at the time of sale. In addition, Structured Finance Obligations may involve initial and ongoing expenses above the costs associated with the related direct investments.

*Investing in Synthetic Securities Involves Particular Risks*

As described above, a portion of the Collateral Obligations may consist of Synthetic Securities the Reference Obligations of which are Loans, Structured Finance Obligations, or High-Yield Bonds. Investments in these types of assets through the purchase of Synthetic Securities present risks in addition to those inherently associated with direct purchases of such assets. With respect to Synthetic Securities, the Issuer will usually have a contractual relationship only with the counterparty of the Synthetic Security, and not the reference obligor on the Reference Obligation. The Issuer will have no right to enforce compliance by the reference obligor with the Reference Obligation nor any rights of set-off against the reference obligor, nor have any voting or other consensual rights of ownership with respect to the Reference Obligation. The Issuer will not directly benefit from any collateral supporting the Reference

009398

Obligation and will not have the benefit of the remedies that would normally be available to a holder of the Reference Obligation.

In addition, in the event of the insolvency of the Synthetic Security Counterparty, the Issuer will be treated as a general creditor of the counterparty and will not have any claim of title with respect to the Reference Obligation. Consequently, the Issuer will be subject to the credit risk of the counterparty as well as that of the reference obligor and concentrations of Synthetic Securities entered into with any one counterparty will subject the Securities to an additional degree of risk with respect to defaults by that counterparty. One or more affiliates of the Initial Purchaser may act as counterparty with respect to all or a portion of the Synthetic Securities, which relationship may create certain conflicts of interest. See "—Relating to Certain Conflicts of Interest—The Issuer Will Be Subject to Various Conflicts of Interest Involving the Initial Purchaser" below. In addition, Synthetic Securities may involve initial and ongoing expenses above the costs associated with the related direct investments. The Issuer will be subject to restrictions on the amount of Synthetic Securities it may own at any one time.

### Many of the Collateral Obligations Will Be Illiquid

Many of the Collateral Obligations purchased by the Issuer will have no, or only a limited, trading market. The Issuer's investment in illiquid Collateral Obligations may restrict its ability to dispose of investments in a timely fashion and for a fair price, as well as its ability to take advantage of market opportunities, although the Issuer is generally prohibited by the Indenture from selling Collateral Obligations except under certain limited circumstances described under "Security for the Notes and the Composite Securities—Sale of Collateral Obligations; Reinvestment of Principal Proceeds and Reinvestment Criteria." Illiquid Collateral Obligations may trade at a discount from comparable, more liquid investments. In addition, the Issuer may invest in privately placed Collateral Obligations that may or may not be freely transferable under the laws of the applicable jurisdiction or due to contractual restrictions on resale, and even if those privately placed Collateral Obligations are transferable, the prices realized from their sale could be less than those originally paid by the Issuer or less than what may be considered their fair value.

### Insolvency Considerations With Respect to Issuers of Collateral Obligations May Affect the Issuer's Rights

Various laws enacted for the protection of creditors may apply to the Collateral Obligations. If, in a lawsuit brought by a creditor or representative of creditors of an obligor under a Collateral Obligation (such as a trustee in bankruptcy), a court were to find that the obligor did not receive fair consideration or reasonably equivalent value for incurring the indebtedness evidenced by the Collateral Obligation and, after giving effect to the indebtedness and the use of the proceeds thereof, the obligor (i) was insolvent, (ii) was engaged in a business for which the remaining assets of the obligor constituted unreasonably small capital or (iii) intended to incur, or believed that it would incur, debts beyond its ability to pay them as they mature, the court could determine to invalidate, in whole or in part, the indebtedness as a fraudulent conveyance, to subordinate the indebtedness to existing or future creditors of the obligor, or to recover amounts previously paid by the obligor in satisfaction of the indebtedness. There can be no assurance as to what standard a court would apply to determine whether the obligor was "insolvent" or that, regardless of the method of valuation, a court would not determine that the obligor was "insolvent," in each case, after giving effect to the incurrence of the Collateral Obligation and the use of its proceeds. In addition, in the event of the insolvency of an obligor under a Collateral Obligation, payments made on the Collateral Obligation may be subject to avoidance as a "preference" if made within a certain period before insolvency (which may be as long as approximately one year).

In general, if payments on a Collateral Obligation are avoidable, whether as fraudulent conveyances or preferences, the payments can be recaptured either from the initial recipient (such as the Issuer) or from subsequent transferees of the payments (such as the Holders of the Securities). To the extent that any payments are recaptured from the Issuer, the resulting reduction in payments on the

009399

Securities will be borne by the Holders of the applicable Class of Securities (except in the case of the Insured Notes, to the extent not paid from the Policy). A court in a bankruptcy or insolvency proceeding would be able to direct the recapture of any payment from a Holder of the Securities to the extent that the court has jurisdiction over the Holder or its assets. Since there is no judicial precedent relating to structured securities such as the Securities, there can be no assurance that a Holder of Securities will be able to avoid recapture on this basis.

The preceding discussion is based on principles of United States federal and state laws. Insofar as Collateral Obligations that are obligations of non-United States obligors are concerned, the laws of certain foreign jurisdictions may provide for avoidance remedies under factual circumstances similar to, or broader or narrower than, those described above, with consequences that may or may not be analogous to those described above under United States federal and state laws.

*International Investing Involves Particular Risks*

A portion of the Collateral Obligations may consist of obligations of obligors Domiciled outside the United States. Investing outside the United States may involve greater risks than investing in the United States. These risks may include: less publicly available information; varying levels of governmental regulation and supervision; and the difficulty of enforcing legal rights in a foreign jurisdiction and uncertainties as to the status, interpretation and application of laws. Moreover, foreign companies may be subject to accounting, auditing, and financial reporting standards, practices, and requirements different from those applicable to U.S. companies.

There generally is less governmental supervision and regulation of exchanges, brokers and issuers in foreign countries than there is in the United States. For example, there may be no comparable provisions under certain foreign laws with respect to insider trading and similar investor protection securities laws that apply with respect to securities transactions consummated in the United States.

Foreign markets also have different clearance and settlement procedures, and in certain markets there have been times when settlements have failed to keep pace with the volume of securities transactions, making it difficult to conduct transactions. Delays in settlement could result in periods when assets of the Issuer are uninvested and no return is earned on them. The inability of the Issuer to make intended purchases of Collateral Obligations due to settlement problems or the risk of intermediary counterparty failures could cause the Issuer to miss investment opportunities. The inability to dispose of a Collateral Obligation due to settlement problems could result either in losses to the Issuer due to subsequent declines in the value of the Collateral Obligation or, if the Issuer has entered into a contract to sell the security, could result in possible liability to the purchaser. Transaction costs of buying and selling foreign securities, including brokerage, tax, and custody costs, also are generally higher than those involved in domestic transactions. Furthermore, foreign financial markets, while generally growing in volume, have, for the most part, substantially less volume than U.S. markets, and securities of many foreign companies are less liquid and their prices more volatile than securities of comparable domestic companies.

In certain foreign countries there is the possibility of expropriation, nationalization, or confiscatory taxation; limitations on the convertibility of currency or the removal of securities, property, or other assets of the Issuer; political, economic, or social instability; or adverse diplomatic developments, each of which could have an adverse effect on the Issuer's investments in the foreign countries (which may make it more difficult to pay Dollar-denominated obligations such as the Collateral Obligations). The economies of individual non-U.S. countries may also differ favorably or unfavorably from the U.S. economy in such respects as growth of gross domestic product, rate of inflation, volatility of currency exchange rates, depreciation, capital reinvestment, resource self-sufficiency and balance of payments position.

009400

*Lender Liability Considerations and Equitable Subordination Can Affect the Issuer's Rights with Respect to Collateral Obligations*

In recent years, a number of judicial decisions in the United States have upheld the right of borrowers to sue lenders and bondholders on the basis of various evolving legal theories (collectively termed "**lender liability**"). Generally, lender liability is founded on the premise that a lender has violated a duty (whether implied or contractual) of good faith and fair dealing owed to the debtor or has assumed a degree of control over the debtor resulting in the creation of a fiduciary duty owed to the debtor or its other creditors or shareholders. Because of the nature of the Collateral Obligations, the Issuer may be subject to allegations of lender liability. In addition, under common law principles that in some cases form the basis for lender liability claims, a court may elect to subordinate the claim of the offending lender to the claims of the disadvantaged creditors, a remedy called "equitable subordination," if a lender: (i) intentionally takes an action that results in the undercapitalization of a borrower to the detriment of other creditors of the borrower; (ii) engages in other inequitable conduct to the detriment of the other creditors; (iii) engages in fraud with respect to, or makes misrepresentations to, the other creditors; or (iv) uses its influence as a lender to dominate or control a borrower to the detriment of other creditors of the borrower.

Because the Collateral Obligations are primarily Loans, the Issuer may be subject to claims from creditors of an obligor that Collateral Obligations issued by the obligor that are held by the Issuer should be equitably subordinated. However, the Portfolio Manager does not intend to engage in conduct that would form the basis for a successful cause of action based on lender liability or the equitable subordination doctrine. Nonetheless, no assurances can be given that actions taken in good faith by the Portfolio Manager will not result in losses to issuers of Collateral Obligations, and that the Issuer will not be liable for any such losses. Furthermore, the Issuer and the Portfolio Manager may be unable to control the conduct of lenders under a loan syndication agreement requiring less than a unanimous vote, yet the Issuer may be subject to lender liability or equitable subordination for such conduct.

The preceding discussion is based on principles of United States federal and state laws. Insofar as Collateral Obligations that are obligations of non-United States obligors are concerned, the laws of certain foreign jurisdictions may impose liability on lenders or bondholders under factual circumstances similar to, or broader or narrower than, those described above, with consequences that may or may not be analogous to those described above under United States federal and state laws.

*Securities May Be Affected by Interest Rate Risks, Including Mismatches Between the Notes and the Collateral Obligations*

The Notes (other than the Fixed Rate Notes) bear interest at a rate based on LIBOR as determined on the second Business Day prior to the first day of the relevant Interest Period and the Fixed Rate Notes bear interest at a fixed rate. The Collateral Obligations will consist primarily of obligations that bear interest at floating rates, which floating rates may be different than the floating rates on the Floating Rate Notes. Accordingly, the Notes are subject to interest rate risk to the extent that there is a fixed/floating interest rate mismatch between the rates at which interest accrues on the Notes and the rates at which interest accrues on the Collateral. In addition, there may be a timing mismatch between the Floating Rate Notes and the Floating Rate Obligations as the interest on the Floating Rate Obligations may adjust more or less frequently, on different dates and based on different indices than the interest rates on the Floating Rate Notes. Furthermore, any payments of principal of or interest on Collateral received during a Due Period will (except to a limited extent specified in the Indenture) be reinvested in Eligible Investments maturing not later than the Business Day immediately preceding the next Payment Date. There is no requirement that Eligible Investments bear interest at LIBOR or a similar rate, and the interest rates available for Eligible Investments are inherently uncertain. As a result of these mismatches, an increase or decrease in LIBOR for the relevant maturity could adversely affect the ability of the Issuer to make interest payments on the Notes (including due to a rise or a decline in the value of previously issued Collateral Obligations or other Collateral that bear interest at a fixed rate as LIBOR decreases or

009401

increases, as applicable) and to make distributions or final distributions on the Preference Shares. To mitigate a portion of the interest rate mismatch, the Issuer may enter into Hedge Agreements that are (in the case of Hedge Agreements entered into after the Closing Date) subject to a Rating Confirmation. However, there can be no assurance that the Collateral Obligations and Eligible Investments, together with the Hedge Agreements, will in all circumstances generate sufficient Interest Proceeds to make timely payments of interest on the Notes. Moreover, the benefits of any Hedge Agreements may not be achieved in the event of the early termination of the Hedge Agreements, including termination upon the failure of the related Hedge Counterparty to perform its obligations under the Hedge Agreement. See "Security for the Notes and the Composite Securities—Hedge Agreements."

The Portfolio Manager may direct the Issuer to reduce the notional amount of, or otherwise adjust the terms of, any Hedge Agreement outstanding at any time, subject, in the case of any reduction or adjustment made on or after the Ramp-Up Completion Date, to obtaining a Rating Confirmation.

*Changes in Tax Law Could Result in the Imposition of Withholding Taxes with Respect to Payments on the Collateral Obligations, and the Obligors on the Collateral Obligations Will Not Gross-Up Payments to the Issuers*

A Collateral Obligation will be eligible for purchase by the Issuer if, at the time it is purchased, either no payments of principal, premium, if any, or interest thereon are subject to withholding taxes imposed by any jurisdiction or the obligor is required to make "gross-up" payments that cover the full amount of any such withholding taxes on an after-tax basis. In the case of Collateral Obligations issued by U.S. obligors after July 18, 1984, payments thereon generally are exempt under current United States federal income tax law from the imposition of United States federal withholding tax. See "Income Tax Considerations—Tax Treatment of the Issuer—United States Withholding Taxes." However, there can be no assurance that, as a result of any change in any applicable law, treaty, rule or regulation or interpretation thereof, the payments on the Collateral Obligations would not in the future become subject to withholding taxes imposed by the United States or another jurisdiction. In that event, if the obligors of such Collateral Obligations were not then required to make "gross-up" payments that cover the full amount of any such withholding taxes, the amounts available to make payments on the Securities would accordingly be reduced. There can be no assurance that remaining payments on the Collateral would be sufficient to make timely payments of interest on and payment of principal at the Stated Maturity of each Class of the Notes and payment of dividends or other distributions to the Holders of the Preference Shares.

Upon the occurrence of a Tax Event, the Notes shall be redeemable at the applicable Redemption Price, in whole, but not in part, by the Issuer at the written direction of the Holders of at least 63% of the Aggregate Outstanding Amount of the Preference Shares, as described under "Description of the Securities—Optional Redemption."

*The Issuer Has the Right to Engage in Securities Lending, which Involves Counterparty Risks and Other Risks*

The Collateral Obligations may be loaned for a term of 90 days or less to banks, broker-dealers, and other financial institutions (other than insurance companies) that have, or are guaranteed by entities that have, long-term and short-term senior unsecured debt ratings or a guarantor with those ratings at the time of the loan, of at least "A1" (and not "A1" but on credit watch with negative implications) and "P-1" (and not on credit watch for possible downgrade) from Moody's and a long-term senior unsecured debt rating of at least "A" from S&P. See "Security for the Notes and the Composite Securities—Securities Lending." The loans must be secured by cash or direct registered debt obligations of the United States of America, in an amount at least equal to 102% of the current Ask-Side Market Value of the loaned Collateral Obligations, determined on a daily basis. However, if the borrower of a loaned Collateral Obligation defaults on its obligation to return the loaned Collateral Obligation because of insolvency or otherwise, the Issuer could experience delays and costs in gaining access to the collateral posted by the

009402

borrower (and in extreme circumstances could be restricted from selling the collateral). If the borrower defaults, the Issuer could suffer a loss to the extent that the realized value of the cash or securities securing the obligation of the borrower to return a loaned Collateral Obligation (less expenses) is less than the amount required to purchase the Collateral Obligation in the open market. This shortfall could be due to, among other factors, discrepancies between the mark-to-market and actual transaction prices for the

loaned Collateral Obligations arising from limited liquidity or availability of the loaned Collateral Obligations and, in extreme circumstances, the loaned Collateral Obligations being unavailable at any price.

The Rating Agencies may downgrade any of the Notes or Composite Securities if a borrower of a Collateral Obligation or, if applicable, the entity guaranteeing the performance of the borrower has been downgraded by one of the Rating Agencies such that the Issuer is not in compliance with the Securities Lending Counterparty rating requirements. The Securities Lending Counterparties may be Affiliates of the Initial Purchaser or Affiliates of the Portfolio Manager, which may create certain conflicts of interest. See "—Relating to Certain Conflicts of Interest—The Issuer Will Be Subject to Various Conflicts of Interest Involving the Portfolio Manager" and—The Issuer Will Be Subject to Various Conflicts of Interest Involving the Initial Purchaser" below.

### *There Is Limited Disclosure About the Collateral Obligations in this Offering Circular*

A substantial portion of the initial portfolio of Collateral Obligations to be acquired before the Ramp-Up Completion Date has been identified by the Portfolio Manager but, for reasons of confidentiality, is not identified in this Offering Circular. Investors that regard the identity of the portfolio in whole or in part necessary or desirable for their investment decision need to consider the availability of that information other than through this Offering Circular.

The Issuer and the Portfolio Manager will not be required to provide the Holders of the Securities or the Trustee with financial or other information (which may include material non-public information) it receives pursuant to the Collateral Obligations and related documents. The Portfolio Manager also will not disclose to any of these parties the contents of any notice it receives pursuant to the Collateral Obligations or related documents. In particular, the Portfolio Manager will not have any obligation to keep any of these parties informed as to matters arising in relation to any Collateral Obligations, except with respect to: (i) the receipt or non-receipt, on an aggregate basis, of principal, interest, or other amounts of collections or recoveries; (ii) the cancellation of any Collateral Obligations; (iii) default amounts in respect of the Collateral Obligations; and (iv) certain other information required to be reported under the Management Agreement and the Indenture.

The Holders of the Securities and the Trustee will not have any right to inspect any records relating to the Collateral Obligations, and the Portfolio Manager will not be obligated to disclose any further information or evidence regarding the existence or terms of, or the identity of any obligor on, any Collateral Obligations, unless specifically required by the Management Agreement. Furthermore, the Portfolio Manager and the Trustee may demand that any persons requesting that information execute confidentiality agreements before being provided with the information.

### *A Substantial Amount of Collateral Obligations Was Acquired Before the Closing Date, and the Terms of the Acquisition May Adversely Affect the Issuer*

In anticipation of the issuance of the Securities, the Issuer, the Portfolio Manager, and JPMorgan Chase Bank, National Association (in that capacity, the **"Warehouse Provider"**) entered into an agreement (the **"Warehouse Agreement"**) pursuant to which:

009403

(i)  the Portfolio Manager has agreed to manage, on behalf of the Issuer, the selection of certain Loans and other obligations to be acquired by the Issuer before the Closing Date (the "**Warehoused Loans**");

(ii)  the Warehouse Provider has agreed to acquire a 100% participation in each Warehoused Loan concurrently with its acquisition by the Issuer, for a purchase price equal to the purchase price paid by the Issuer for the related Warehoused Loan; and

(iii)  the Portfolio Manager and the Warehouse Provider have agreed to share the economic return on, and assume certain risks (including risks associated with defaults affecting the Warehoused Loans) in respect of, the Warehoused Loans for the period prior to the Closing Date in the specified percentages set forth in the Warehouse Agreement.

On the Closing Date, the Issuer and the Warehouse Provider will terminate the participations in the Warehoused Loans (with any Warehoused Loans that would not satisfy the "Warehousing Eligibility Criteria" applicable at the Closing Date being sold by the Issuer). Generally, the price to be paid by the Issuer to the Warehouse Provider in connection with the termination of the participation in a Warehoused Loan will reflect the price originally paid by the Issuer to acquire the Warehoused Loan (although that price may not reflect the market value of the Warehoused Loan on the Closing Date), *plus* the amount of extensions of credit in respect of certain Warehoused Loans, *minus* the aggregate amount of payments of principal received by the Warehouse Provider in respect of such Warehoused Loans (excluding the amount of any such payment that was required to be repaid or returned by the Warehouse Provider by claw-back or otherwise), *plus* all accrued and unpaid interest and fees on the Warehoused Loan.

**Relating to Certain Conflicts of Interest**

*In General, the Transaction Will Involve Various Potential and Actual Conflicts of Interest*

Various potential and actual conflicts of interest may arise from the overall advisory, investment, and other activities of the Portfolio Manager and its Affiliates and from the conduct by the Initial Purchaser and its respective Affiliates of other transactions with the Issuer, including acting as counterparty with respect to Hedge Agreements, Securities Lending Agreements, and Synthetic Securities. The following briefly summarizes some of these conflicts, but is not intended to be an exhaustive list of all such conflicts.

*The Issuer Will Be Subject to Various Conflicts of Interest Involving the Portfolio Manager*

Various potential and actual conflicts of interest may arise for the Portfolio Manager with respect to its obligations to the Issuer from the overall investment activities of the Portfolio Manager and its Affiliates, for the accounts of its other clients. For example, the Portfolio Manager, its Affiliates and their respective clients may invest in loans, securities, and other obligations that would be appropriate for inclusion in the Issuer's portfolio of Collateral Obligations, as well as in loans, securities, and other obligations that are senior to, or have interests different from or adverse to, the loans and or other investments that are pledged to secure the Notes. Furthermore, Affiliates of the Portfolio Manager may serve as general partners or managers of special-purpose entities organized to issue other collateralized loan obligations ("**CLOs**") secured primarily by corporate loans and collateralized debt obligations ("**CDOs**") secured by corporate debt obligations. The Portfolio Manager and its Affiliates may also have ongoing relationships with, render services to, or engage in transactions with, companies whose loan obligations or securities are pledged to secure the Notes and may now or in the future own (as portfolio investments or otherwise) loan obligations or equity or debt securities issued by issuers of or obligors on, Collateral Obligations or other Collateral.

The Portfolio Manager and its Affiliates may possess information relating to issuers of Collateral Obligations or other Collateral that (i) may constrain the Issuer's investments as a consequence of the

009404

Portfolio Manager's inability to use such information for advisory purposes or otherwise to take actions that would be in the best of interests of the Issuer or (ii) is not known to the employees of the Portfolio Manager responsible for monitoring the Collateral and performing the other obligations of the Portfolio Manager under the Management Agreement. The Portfolio Manager, its Affiliates and their respective clients may at certain times be simultaneously seeking to purchase or dispose of investments for the respective accounts of the Issuer, any similar entity for which it serves as manager or advisor, and for its clients or Affiliates.

Neither the Portfolio Manager nor any of its Affiliates has any affirmative obligation to offer any investments to the Issuer or to inform the Issuer of any investments before offering any investments to other funds or accounts that the Portfolio Manager or any of its Affiliates manage or advise. Furthermore, the Portfolio Manager may be bound by affirmative obligations in the future, whereby the Portfolio Manager is obligated to offer certain investments to funds or accounts that it manages or advises before or without the Portfolio Manager offering those investments to the Issuer.

The Portfolio Manager will endeavor to resolve conflicts with respect to investment opportunities in a manner that it deems equitable to the extent possible under the prevailing facts and circumstances. Further, the Portfolio Manager will be prohibited under the Management Agreement from directing the acquisition of Collateral Obligations from, or the disposition of Collateral Obligations to, its Affiliates or any other account managed by the Portfolio Manager except in a transaction conducted on an arm's-length basis for fair market value and if the Portfolio Manager has complied with its policies and procedures with respect to the acquisition or disposition and the acquisition or disposition otherwise complies with the requirements of the United States Investment Advisers Act of 1940.

The Portfolio Manager currently serves as the portfolio manager for a number of special purpose vehicles that have issued securities secured by or referencing collateral consisting of assets similar to the Collateral Obligations, which may create conflicts in allocating its time and services among the Issuer and the Portfolio Manager's other accounts.

Upon the removal or resignation of the Portfolio Manager, the Issuer, at the written direction of a Majority of the Preference Shares, may appoint a replacement Portfolio Manager if a Majority of the Aggregate Outstanding Amount of the Notes (voting as a single Class (excluding any Notes held by the retiring Portfolio Manager or any of its Affiliates)) each Class of the Notes do not object to the replacement Portfolio Manager. See "The Management Agreement." Securities held by the Portfolio Manager or any of its Affiliates will have no voting rights with respect to any vote in connection with removal of the Portfolio Manager for "cause" and will be deemed not to be outstanding in connection with any vote to remove the Portfolio Manager for "cause." Securities held by the Portfolio Manager or any of its Affiliates will have voting rights with respect to all other matters as to which the Holders of the Securities are entitled to vote, including any vote to direct an Optional Redemption and any vote to appoint a replacement Portfolio Manager in accordance with the Management Agreement. See "The Management Agreement" and "Description of the Securities—Optional Redemption." The Portfolio Manager and its Affiliates may own equity or other securities of issuers of or obligors on Collateral Obligations or other Collateral and may have provided and may provide in the future, advisory and other services to issuers of Collateral.

The Issuer expects to acquire substantially all of the Collateral Obligations to be acquired by the Closing Date during an accumulation period before the Closing Date (the "**Accumulation Period**") and will finance those purchases with financing provided by the Warehouse Provider, which is an affiliate of the Initial Purchaser. The Issuer will be required to repurchase the participations providing that financing by the Closing Date with the proceeds of the issuance of the Securities. The Collateral Obligations purchased before the Closing Date will be chosen by the Portfolio Manager on behalf of the Issuer, subject to certain rights of the Warehouse Provider. Any interest accrued on Collateral Obligations purchased by the Issuer before the Closing Date will be paid to the Warehouse Provider and the Portfolio Manager in the specified percentages provided in the Warehouse Agreement. As a result, investors in the

009405

Securities will be assuming the risk of market value and credit quality changes in the Collateral Obligations from the date the Collateral Obligations are acquired during the Accumulation Period but will not receive the benefit of interest earned on the Collateral Obligations during that period.

On the Closing Date, the Portfolio Manager or its Affiliates are expected to purchase Preference Shares having an aggregate Face Amount equal to U.S.$13,200,000. The Portfolio Manager will be entitled to receive the Senior Management Fee, the Subordinated Management Fee and the Incentive Management Fee, as further described herein. The structure of such fees may cause the Portfolio Manager to direct the Issuer to make more speculative investments in Collateral Obligations than it would otherwise make in the absence of such performance based compensation. The Portfolio Manager expects to borrow funds from a JPMorgan Company for a portion of the purchase price of the Preference Shares acquired by it and will pledge all such Preference Shares (including rights to the distributions thereon) as well as the Portfolio Manager's right to the Senior Management Fee and Subordinated Management Fee as collateral for such loan. The reliance by the Portfolio Manager on distributions on the Preference Shares for repayment of such loan from such JPMorgan Company could create a conflict of interest with respect to the performance of the Portfolio Manager's obligations. In addition, as agreed in the Portfolio Management Agreement, Highland Capital and its Affiliates will, so long as Highland Capital or any of its Affiliates is acting as Portfolio Manager, maintain, in the aggregate, ownership of the aggregate Face Amount of Preference Shares described in "Summary of Terms—The Portfolio Manager." See "The Portfolio Management Agreement."

In addition, the Portfolio Manager and its Affiliates may act as the Securities Lending Counterparty under any Securities Lending Agreement entered into by the Issuer.

*The Issuer Will Be Subject to Various Conflicts of Interest Involving the Initial Purchaser*

Various potential and actual conflicts of interest may arise as a result of the investment banking, commercial banking, asset management, financing and financial advisory services and products provided by J.P. Morgan Chase & Co. and its Affiliates (including JPMorgan, JPMCB and their Affiliates, (each, a "**JPMorgan Company**" and together the "**JPMorgan Companies**")), to the Issuer, the Portfolio Manager, the issuers of the Collateral Obligations and others, as well as in connection with the investment, trading and brokerage activities of the JPMorgan Companies. The following briefly summarizes some of these conflicts, but is not intended to be an exhaustive list of all such conflicts.

JPMorgan will serve as Initial Purchaser for the Notes, the Composite Securities and a portion of the Preference Shares and will be paid fees and commissions for such service by the Issuer from the proceeds of the issuance of the Securities. One or more of the JPMorgan Companies may from time to time hold Securities for investment, trading or other purposes. JPMCB will serve as Trustee, Collateral Administrator, securities intermediary and Preference Shares Paying Agent and a JPMorgan Company will serve as the Irish listing and paying agent and both will be entitled to fees and expenses senior in payment on each Payment Date to payments on the Notes. The Issuer's purchase of Collateral Obligations that are loans prior to the Closing Date was financed through the sale of participation interests therein to JPMCB pursuant to the Warehousing Agreement. A portion of the proceeds of the offering of the Securities will be paid to JPMCB to repurchase such participation interests. The Issuer may have purchased and sold prior to the Closing Date, and may purchase or sell after the Closing Date, Collateral Obligations from, to or through, and purchase Synthetic Securities and enter into Hedge Agreements with, one or more of the JPMorgan Companies. Certain Eligible Investments may be issued, managed or underwritten by one or more of the JPMorgan Companies. One or more of the JPMorgan Companies may provide investment banking, commercial banking, asset management, financing and financial advisory services and products to the Portfolio Manager, its Affiliates, and funds managed by the Portfolio Manager and its Affiliates, and purchase, hold and sell, both for their respective accounts or for the account of their respective clients, on a principal or agency basis, loans, securities, and other obligations and financial instruments of the Portfolio Manager, its Affiliates, and funds managed by the Portfolio Manager and its Affiliates. As a result of such transactions or arrangements, one or more of the

009406

JPMorgan Companies may have interests adverse to those of the Issuer and Holders of the Notes, Composite Securities and Preference Shares.

One or more of the JPMorgan Companies may:

- have placed or underwritten, or acted as a financial arranger, structuring agent or advisor in connection with the original issuance of, or may act as a broker or dealer with respect to, certain of the Collateral Obligations;

- act as trustee, paying agent and in other capacities in connection with certain of the Collateral Obligations or other classes of securities issued by an issuer of a Collateral Obligation or an Affiliate thereof;

- be a counterparty to issuers of certain of the Collateral Obligations under swap or other derivative agreements;

- lend to certain of the issuers of Collateral Obligations or their respective Affiliates or receive guarantees from the issuers of those Collateral Obligations or their respective Affiliates;

- provide other investment banking, asset management, commercial banking, financing or financial advisory services to the issuers of Collateral Obligations or their respective Affiliates; or

- have an equity interest, which may be a substantial equity interest, in certain issuers of the Collateral Obligations or their respective Affiliates.

When acting as a trustee, paying agent or in other service capacities with respect to a Collateral Obligation, the JPMorgan Companies will be entitled to fees and expenses senior in priority to payments to such Collateral Obligation. When acting as a trustee for other classes of securities issued by the issuer of a Collateral Obligation or an Affiliate thereof, the JPMorgan Companies will owe fiduciary duties to the holders of such other classes of securities, which classes of securities may have differing interests from the holders of the class of securities of which the Collateral Obligation is a part, and may take actions that are adverse to the holders (including the Issuer) of the class of securities of which the Collateral Obligation is a part. As a counterparty under swaps and other derivative agreements, the JPMorgan Companies might take actions adverse to the interests of the Issuer, including, but not limited to, demanding collateralization of its exposure under such agreements (if provided for thereunder) or terminating such swaps or agreements in accordance with the terms thereof. In making and administering loans and other obligations, the JPMorgan Companies might take actions including, but not limited to, restructuring a loan, foreclosing on or exercising other remedies with respect to a loan, requiring additional collateral or other credit enhancement, charging significant fees and interest, placing the obligor in bankruptcy or demanding payment on a loan guarantee or under other credit enhancement. The Issuer's purchase, holding and sale of Collateral Obligations may enhance the profitability or value of investments made by the JPMorgan Companies in the issuers thereof. As a result of all such transactions or arrangements between the JPMorgan Companies and issuers of Collateral Obligations or their respective Affiliates, J.P. Morgan Chase & Co. may have interests that are contrary to the interests of the Issuer and the Holders of the Notes and Preference Shares.

As part of their regular business, the JPMorgan Companies may also provide investment banking, commercial banking, asset management, financing and financial advisory services and products to, and purchase, hold and sell, both for their respective accounts or for the account of their respective clients, on a principal or agency basis, loans, securities, and other obligations and financial instruments and engage in private equity investment activities. The JPMorgan Companies will not be restricted in their performance of any such services or in the types of debt or equity investments, which they may make. In

009407

conducting the foregoing activities, the JPMorgan Companies will be acting for their own account or the account of their customers and will have no obligation to act in the interest of the Issuer.

The JPMorgan Companies may, by virtue of the relationships described above or otherwise, at the date hereof or at any time hereafter, be in possession of information regarding certain of the issuers of Collateral Obligations and their respective Affiliates, that is or may be material in the context of the Securities and that is or may not be known to the general public. None of the JPMorgan Companies has any obligation, and the offering of the Securities will not create any obligation on their part, to disclose to any purchaser of the Securities any such relationship or information, whether or not confidential.

## DESCRIPTION OF THE SECURITIES

The Notes and the Composite Securities will be issued pursuant to the Indenture. The terms of the Preference Shares are contained in the Issuer Charter and in certain resolutions adopted by the Issuer's Board of Directors on or before the Closing Date authorizing and approving the issuance of the Securities, as reflected in the minutes thereof (the "**Resolutions**" and, together with the Issuer Charter and the Preference Shares Paying Agency Agreement, the "**Preference Share Documents**"). The following summary describes certain provisions of the Notes, the Composite Securities, the Preference Shares, the Indenture and the Preference Share Documents. The summary does not purport to be complete and is subject to, and qualified in its entirety by reference to, the provisions of the Indenture and the Preference Share Documents. Copies of the Indenture may be obtained by prospective purchasers upon request in writing to the Trustee at the Corporate Trust Office, 600 Travis Street, 50th Floor, Houston, Texas 77002, Attention: Institutional Trust Services—Southfork CLO Ltd., and will be available at the office of JP Morgan Bank (Ireland) PLC (in such capacity, the "**Irish Paying and Listing Agent**") in the City of Dublin. Copies of the Preference Share Documents may be obtained upon request in writing to the Administrator at P.O. Box 1093 GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands, Attention: Southfork CLO Ltd.

### Status and Security

The Notes are non-recourse debt obligations of the Co-Issuers. The Composite Securities are limited recourse obligations of the Issuer, secured as described in this Offering Circular. Each Note within a Class will rank *pari passu* with all other Notes of that Class (with the Senior Class A Notes, the Class A-2 Notes and the Class A-3 Notes being treated as separate Classes). Under the Indenture, the Issuer will grant to the Trustee a first-priority security interest in the Collateral to secure the Issuer's obligations under the Indenture, the Notes, the Composite Securities, the Insurance Documents, the Hedge Agreements and the Management Agreement (collectively, the "**Secured Obligations**"). The Notes are payable solely from amounts received in respect of the Collateral pledged by the Issuer to secure the Notes which includes, solely for the benefit of the Class A-1g Notes, amounts available under the Policy with respect to Insured Amounts. The Composite Securities are payable solely from amounts received in respect of the Collateral and the Class 1 Collateral, pledged by the Issuer to secure the Notes and the Composite Securities. If the amounts received in respect of the Collateral and the Class 1 Collateral (net of certain expenses) are insufficient to make payments on the Secured Obligations and, solely in the case of the Class 1 Collateral, the Composite Securities, in accordance with the Priority of Payments, no other assets will be available for payment of the deficiency and, following liquidation of all the Collateral and the Class 1 Collateral, the obligations of the Issuer or the Co-Issuer, as the case may be, to pay the deficiency will be extinguished.

The Preference Shares are entitled only to proceeds of the Collateral to the extent that any Sales Proceeds are remaining on any Payment Date after payment of all interest and principal payable on each Class of Notes on that Payment Date and the satisfaction of certain other amounts payable in accordance with the Priority of Payments (*provided* that payments in respect of the Preference Share Components will be made on the Composite Securities Payment Date).

009408

In furtherance of the priorities of payments among the Classes of Notes and the Preference Shares, the Indenture contains express subordination provisions pursuant to which the Holders of each Class of Notes that is a Junior Class as described below agree for the benefit of the Holders of the Notes of each Priority Class and (in the case of the Class A-1g Notes) the Insurer with respect to the Junior Class that the Junior Class shall be subordinate and junior to the Notes of each Priority Class to the extent and in the manner provided in the Indenture.

If any Event of Default has not been cured or waived and acceleration occurs under and in accordance with the Indenture, each Priority Class of Notes and all amounts owed by the Issuer to the Insurer under the Indenture or the Insurance Agreement shall be paid in full in cash (without giving effect to payments on the Policy) or, to the extent a Majority of the Class consents, other than in cash, before any further payment or distribution is made on account of any Junior Class of Notes with respect to the Priority Class. The Holders of each Junior Class of Notes agree, for the benefit of the Holders of the Notes of each Priority Class and (in the case of the Class A-1g Notes) the Insurer in respect of the Junior Class, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due to the Junior Class, of the Notes or each Class of Notes, as the case may be, or under the Indenture until the payment in full of the Priority Classes or all the Classes, as the case may be, and all amounts owed by the Issuer to the Insurer under the Indenture or the Insurance Agreement, and not before one year and a day, or if longer, the applicable preference period then in effect, has elapsed since the payment.

For purposes of this provision, with respect to each Class of Notes, the Classes of Notes that are Priority Classes and Junior Classes are as follows:

| Class | Junior Classes | Priority Classes |
|---|---|---|
| Senior Class A | A-2, A-3, B, C, Preference Shares | None |
| A-2 | A-3, B, C, Preference Shares | Senior Class A |
| A-3 | B, C, Preference Shares | Senior Class A, A-2 |
| B | C, Preference Shares | Senior Class A, A-2, A-3 |
| C | Preference Shares | Senior Class A, A-2, A-3, B |
| Preference Shares | None* | Senior Class A, A-2, A-3, B, C |

*The Preference Shares will be entitled to certain residual cashflow after payment of senior obligations in accordance with the Priority of Payments.

If, notwithstanding the provisions of the Indenture, any Holder of Notes of any Junior Class has received any payment or distribution in respect of the Notes contrary to the provisions of the Indenture, then, until each Priority Class with respect to the Junior Class of Notes or each Class of Notes, as the case may be, and the Insurer has been paid in full in cash or, to the extent a Majority of the Priority Class or the Class, as the case may be, consents, other than in cash in accordance with the Indenture, the payment or distribution shall be received and held in trust for the benefit of, and shall forthwith be paid over and delivered to, the Trustee, which shall pay and deliver the same to the Holders of the applicable Priority Classes of Notes or the Holders of all Classes of Notes, as the case may be, and the Insurer in accordance with the Indenture. If any such payment or distribution is made other than in cash, it shall be held by the Trustee as part of the Collateral and subject in all respects to the Indenture.

Each Holder of Notes of any Junior Class agrees with all Holders of the applicable Priority Classes and the Insurer that the Holder of Junior Class Notes shall not demand, accept, or receive any

009409

payment or distribution in respect of the Notes in violation of the Indenture. After a Priority Class and the Insurer has been paid in full, the Holders of the related Junior Class or Classes shall be fully subrogated to the rights of the Holders of the Priority Class and the Insurer. Nothing in these provisions shall affect the obligation of the Issuer to pay Holders of any Junior Class of Notes.

Distributions to Holders of the Preference Shares are subordinate to distributions on the Notes and Preference Shares as described in the Priority of Payments.

The Management Fees shall have priority only to the extent provided in the Priority of Payments.

For purposes of subordination, the Composite Securities shall not be treated as a separate Class, but the Preference Share Component shall be treated as forming a part of the Preference Shares.

**Interest Payments on the Notes and Payments of Dividends on the Preference Shares from Interest Proceeds**

The Notes of each Class will accrue interest during each Interest Period on their Aggregate Outstanding Amount (determined as of the first day of the Interest Period and after giving effect to any redemption or other payment of principal occurring on that day) at the applicable per annum interest rates for each such Class (the "**Note Interest Rate**") equal to (i) in the case of the Notes (other than the Fixed Rate Notes), LIBOR for Eurodollar deposits for the applicable Interest Period *plus* the spread, as specified above under "Summary of Terms—Principal Terms of the Securities" and (ii) in the case of the Fixed Rate Notes, as specified above under "Summary of Terms—Principal Terms of the Securities." Interest shall be payable in arrears on each Payment Date. Interest accrued shall be calculated (i) in the case of the Notes (other than the Fixed Rate Notes) on the basis of the actual number of days elapsed in the applicable Interest Period *divided by* 360 and (ii) in the case of the Fixed Rate Notes on the basis of a 360-day year consisting of twelve 30-day months. Payment of interest on each Class of Notes shall be subordinated to the payments of interest on the related Priority Classes and other amounts in accordance with the Priority of Payments. If on any Payment Date the amount of available Interest Proceeds is not sufficient for the payment in full of accrued and unpaid interest on the Senior Class A Notes, accrued and unpaid Premium and any accrued and unpaid Defaulted Interest on the Senior Class A Notes, the Class A-1g Notes shall be subordinated to the payments of Premium to the extent provided in clause (5)(A) under "Description of the Securities—Priority of Payments—Interest Proceeds."

So long as any Priority Classes are Outstanding with respect to any Class of Deferred Interest Notes, any payment of Deferred Interest in accordance with the Priority of Payments on any Payment Date shall not be considered "payable" for the purposes of the Indenture (and the failure to pay the interest shall not be an Event of Default) until the Payment Date on which the interest is available to be paid in accordance with the Priority of Payments. Deferred Interest on any Class of Deferred Interest Notes shall be payable on the first Payment Date on which funds are available to be used for that purpose in accordance with the Priority of Payments. To the extent lawful and enforceable, interest on Deferred Interest with respect to any Class of Deferred Interest Notes shall accrue at the Note Interest Rate for the Class (and to the extent not paid as current interest on the Payment Date after the Interest Period in which it accrues, shall thereafter be additional Deferred Interest), until paid.

Interest shall cease to accrue on each Note, or in the case of a partial repayment, on the part repaid, from the date of repayment or the respective Stated Maturity unless payment of principal is improperly withheld or unless there is some other default with respect to the payments of principal.

On each Payment Date (or, with respect to the Preference Share Components, the Composite Securities Payment Date), the Issuer will make distributions to the Preference Shares Paying Agent for payment to the Holders of the Preference Shares as dividends on the Preference Shares pursuant to the Preference Share Documents, to the extent legally permitted, to the extent of available Interest Proceeds

009410

as described under clauses (18), (21) and (23) under "Description of the Securities—Priority of Payments—Interest Proceeds."

For purposes of calculating interest on each Class of Notes, the Issuer will initially appoint the Trustee as calculation agent (the Trustee in that capacity, and each successor calculation agent, the "**Calculation Agent**").

As soon as possible after 11:00 a.m. (London time) on the second Business Day before the first day of each Interest Period, but in no event later than 11:00 a.m. (London time) on the next Business Day, the Calculation Agent will calculate the Note Interest Rate for each Class of Floating Rate Notes for the related Interest Period and the amount of interest for the Interest Period payable in respect of each $100,000 in principal amount of each Class of Floating Rate Notes (in each case rounded to the nearest cent, with half a cent being rounded upward) on the related Payment Date and will communicate the Note Interest Rate for each Class of Floating Rate Notes and the date of the next Payment Date to the Trustee, the Initial Purchaser, each paying agent, Euroclear, Clearstream, the Depository, and (as long as the Securities (other than the Preference Shares) are listed on the Irish Stock Exchange) the Irish Stock Exchange.

The Calculation Agent may be removed by the Co-Issuers at any time. If the Calculation Agent is unable or unwilling to act as such or is removed by the Co-Issuers or if the Calculation Agent fails to determine the Note Interest Rate for each Class of Floating Rate Notes or the amount of interest payable in respect of each Class of Floating Rate Notes for any Interest Period, the Issuer will promptly appoint as a replacement Calculation Agent a leading bank which is engaged in transactions in U.S. Dollar deposits in the international U.S. Dollar market and which does not control and is not controlled by or under common control with the Co-Issuers or any of their respective affiliates. The Calculation Agent may not resign its duties without a successor having been duly appointed. The determination of the Note Interest Rate with respect to each Class of Floating Rate Notes for each Interest Period by the Calculation Agent shall (in the absence of manifest error) be final and binding upon all parties.

"**LIBOR**," determined by the Calculation Agent for any Interest Period, means the offered rate, as determined by the Calculation Agent, for three month Dollar deposits that appears on Moneyline Telerate Page 3750 as reported on Bloomberg Financial Markets Commodities News (or a page that replaces Moneyline Telerate Page 3750 for the purpose of displaying comparable rates), as of 11:00 a.m. (London time) on the second Business Day before the first day of the relevant Interest Period.

If, on the second Business Day before the first day of any relevant Interest Period, that rate does not appear on Moneyline Telerate Page 3750 as reported on Bloomberg Financial Market Commodities News (or a page that replaces Moneyline Telerate Page 3750 for the purpose of displaying comparable rates), the Calculation Agent shall determine the arithmetic mean of the offered quotations of the Reference Banks to prime banks in the London interbank market for three month Dollar deposits in Europe, by reference to requests by the Calculation Agent to four major banks in the London interbank market selected by the Calculation Agent (after consultation with the Portfolio Manager) (the "**Reference Banks**") for quotations as of approximately 11:00 A.M. (London time) on the second Business Day before the first day of the Interest Period. If at least two of the Reference Banks provide quotations as requested, LIBOR shall equal such arithmetic mean. If fewer than two Reference Banks provide quotations, LIBOR shall be the arithmetic mean of the offered quotations that leading banks in New York City selected by the Calculation Agent (after consultation with the Portfolio Manager) are quoting to the principal London offices of leading banks in the London interbank market on the second Business Day before the first day of the relevant Interest Period for three month Dollar deposits.

If the Calculation Agent is unable to determine a rate in accordance with any of the above procedures, LIBOR for the Interest Period shall be calculated on the last day of the Interest Period and shall be the arithmetic mean of the rate of interest for each day during the Interest Period determined by the Calculation Agent as being the rate of interest most recently announced by the Bank at its New York

009411

office as its base rate, prime rate, reference rate, or similar rate for Dollar loans (or if the Bank ceases to exist or is not quoting a base rate, prime rate, reference rate, or similar rate for Dollar loans, another major money center commercial bank in New York City selected by the Calculation Agent (after consultation with the Portfolio Manager)).

For the first Interest Period, LIBOR shall be determined based on the actual number of days in the Interest Period using straight-line interpolation of two rates calculated in accordance with the above procedure, except that instead of using three month deposits, one rate shall be determined using the period for which rates are obtainable next shorter than the Interest Period and the other rate shall be determined using the period for which rates are obtainable next longer than the Interest Period. All calculations shall be calculated to at least four decimal places and rounded to four decimal places.

**Principal Payments on the Notes and Distributions on the Preference Shares from Principal Proceeds**

The principal of each Note of each Class matures at par and is payable on the Payment Date that is the Stated Maturity for the Class of Notes, unless the unpaid principal of the Note becomes payable at an earlier date by declaration of acceleration, call for redemption, or otherwise. The Preference Shares are scheduled to be redeemed on the Scheduled Preference Shares Redemption Date, unless redeemed or repaid in full prior thereto. The average life of each Class of Notes is expected to be shorter than the number of years from issuance until Stated Maturity for such Notes. See "Risk Factors—Relating to the Securities—The Weighted Average Lives of the Notes Interests May Vary" and "Maturity and Prepayment Considerations." Notwithstanding the foregoing, the payment of principal of each Class of Notes: (i) may only occur after principal on each Class of Notes that is a Priority Class with respect to the Class has been paid in full and (ii) is subordinated to the payment on each Payment Date of the principal and interest payable on the Priority Classes, and other amounts in accordance with the Priority of Payments. However, Principal Proceeds may be used to pay Deferred Interest and other amounts before the payment of principal of the Notes. See "Description of the Securities—Priority of Payments."

In general, principal payments will not be made on the Notes before the end of the Reinvestment Period, except in the following circumstances: (i) in connection with an Optional Redemption, (ii) at the option of the Portfolio Manager, to effect a Special Redemption of the Notes, (iii) pursuant to a redemption made in connection with a Tax Event or (iv) following a mandatory redemption of the Notes caused by a failure to meet any of the Coverage Tests or a Rating Confirmation Failure. After the Reinvestment Period, Principal Proceeds will be applied on each Payment Date in accordance with the Priority of Payments to pay principal of each Class of Notes (except for Principal Proceeds constituting Unscheduled Principal Payments and Sale Proceeds from Credit Improved Obligations which may be reinvested as described herein). No principal of any Class of Notes will be payable on any Payment Date other than in accordance with the Priority of Payments and to the extent funds are available therefor on that Payment Date for that purpose, except that the principal of each Class of Notes will be payable in full at the Stated Maturity, unless repaid before that.

On each Payment Date (or, with respect to the Preference Share Components, the Composite Securities Payment Date), the Issuer will make distributions to the Preference Shares Paying Agent for payment to the Holders of the Preference Shares as dividends on the Preference Shares pursuant to the Preference Share Documents, to the extent legally permitted, to the extent of available Principal Proceeds as described under clauses (6)(A), (9) and (10) under "Description of the Securities—Priority of Payments—Principal Proceeds."

**Legal Provisions Applicable to the Payments of Dividends from Interest Proceeds and Dividends or Other Distributions from Principal Proceeds**

Interest Proceeds and Principal Proceeds paid to the Preference Shares Paying Agent for payment of dividends on, or the payment of the Redemption Price in respect of, the Preference Shares, will be distributable to the Holders of the Preference Shares only if the Issuer is and will remain solvent

009412

following such distribution and Interest Proceeds and Principal Proceeds paid to the Preference Shares Paying Agent for payment of dividends in respect of the Preference Shares will be distributable to the Holders of the Preference Shares only if the Issuer has sufficient distributable profits and/or share premium and if the Issuer is and will remain solvent following such distribution. Payments will be paid by the Trustee to the Preference Shares Paying Agent, on behalf of the Issuer, for payment of dividends and other distributions to the Holders of the Preference Shares pursuant to the Preference Share Documents, to the extent legally permitted, on a *pro rata* basis according to the number of Preference Shares held by each Holder on the Record Date for such Payment Date.

**Distributions on the Composite Securities**

On each Payment Date on which distributions are made in respect of the Preference Shares, a portion of such payment will be allocated to the Class 1 Composite Securities in the proportion that the aggregate Face Amount of the Preference Share Component bears to the aggregate Face Amount of the Preference Shares. The payment of distributions, redemption amounts and any other payments on the Class 1 Composite Securities will be distributed in the same manner as the Preference Shares to which the Preference Share Component relates, except that such payment will be made on the Composite Securities Payment Date. See "—Priority of Payments."

On each Composite Securities Payment Date, the Trustee will disburse (solely from amounts in the Class 1 Component Account attributable to the proceeds from the sale of the Treasury Strip as described in "Description of the Securities—Class 1 Component Distributions") to the Holders of the Class 1 Composite Securities, *pro rata* based on their share of the Class 1 Composite Security Rated Balance, the proceeds from the sale of the Treasury Strip relating to such Composite Securities Payment Date. See "—Priority of Payments—Class 1 Component Distributions."

**Extension of the Reinvestment Period, the Stated Maturity and the Scheduled Preference Shares Redemption Date**

*General*

The Issuer, if directed by the Portfolio Manager, shall be entitled on each Extension Effective Date to extend the Reinvestment Period to the applicable Extended Reinvestment Period End Date if (i) in the case of an Extension Effective Date occurring after the first Extension Effective Date, the Issuer has previously affected a Maturity Extension for each preceding Extension Effective Date and (ii) the Extension Conditions are satisfied and the Issuer has given written notice of its election to extend the Reinvestment Period no later than 60 days and no earlier than 90 days prior to such Extension Effective Date. If the Extension Conditions are satisfied, the Stated Maturity of the Notes shall be automatically extended to the related Extended Stated Maturity Date and the Weighted Average Life Test shall be automatically extended to the related Extended Weighted Average Life Date, without any requirement for approval or consent of any Holders of Securities or Preference Shares or amendment or supplement to the Indenture or the Preference Share Documents.

In the case of a Maturity Extension, any Holder of Notes, Composite Securities or Preference Shares wishing to sell such Securities to an Extension Qualifying Purchaser pursuant to the Extension Conditions must provide the applicable Extension Sale Notice within the Extension Sale Notice Period pursuant to "—Extension Procedure" below (such Securities as to which an Extension Sale Notice has been duly given, "**Extension Sale Securities**"). Notwithstanding anything to the contrary herein, each Holder providing an Extension Sale Notice shall be deemed to agree that no Extension Sale Securities of any Holder shall be purchased unless all Extension Sale Securities of all Holders are purchased and settled at the applicable Extension Purchase Price on the applicable Extension Effective Date and the other Extension Conditions are satisfied as of such date.

009413

The Maturity Extension shall be effective only if the following conditions (the "**Extension Conditions**") are satisfied:

(i)     the purchase of all Extension Sale Securities has been settled by the designated Extension Qualifying Purchasers at the applicable Extension Purchase Price as of the applicable Extension Effective Date;

(ii)    all such purchases of Extension Sale Securities individually and in the aggregate comply with the applicable transfer restrictions herein, in the Indenture and the Preference Share Documents immediately after such purchase and the legends on such Securities and all applicable law, rules and regulations (including, without limitation, rules, regulations and procedures of any applicable securities exchange, self-regulatory organization or clearing agency);

(iii)   (a) the Rating Condition has been satisfied with respect to S&P (so long as any Notes are then rated by S&P) and (b) either (A) all Coverage Tests and the Selected Collateral Quality Tests are satisfied as of the related Extension Determination Date, the rating of each Class of Notes or Composite Securities by Moody's has not been downgraded, withdrawn or qualified from that in effect on the Closing Date (unless it subsequently has been reinstated to the rating assigned on the Closing Date) and the Overcollateralization Ratio Numerator is at least $663,000,000 or (B) the Rating Condition has been satisfied with respect to Moody's (so long as any Notes or Composite Securities are then rated by Moody's); and

(iv)    so long as the Insurer is the Controlling Class, the Portfolio Manager on behalf of the Issuer has obtained the Insurer's consent; *provided*, *however*, in the event that the Insurer does not consent to a Maturity Extension, the Holders of 100% of the Insured Notes (after giving effect to the sale of any Insured Notes which are Extension Sale Securities in connection with the proposed Maturity Extension) the Insured Notes may, pursuant to the Indenture and as described below under "—Termination of the Policy," terminate the Policy, upon which, so long as clauses (i) through (iii) above have been satisfied, the Maturity Extension shall be effective.

In the case of a Maturity Extension, each Holder of Notes other than Extension Sale Securities and the Insurer (so long as the Policy has not been terminated as described below under "—Termination of the Policy") shall be entitled to receive an amount equal to the applicable Extension Bonus Payment. Holders of Composite Securities and Preference Shares shall not be entitled to receive any Extension Bonus Payment.

The Extension Bonus Payment shall be payable to (i) any applicable qualifying beneficial owners who have provided the Trustee with an Extension Bonus Eligibility Certification and (ii) to the Insurer, on the first Payment Date from and including the Extension Effective Date on which funds are available to be used for such purposes in accordance with the Priority of Payments, but in any event, no later than the earlier of the Stated Maturity and the date of redemption of the Notes. Extension Bonus Payments which are not available to be paid on a Payment Date in accordance with the Priority of Payments on a Payment Date shall not be considered "due and payable" hereunder. The failure to pay any such Extension Bonus Payment on such date shall not be an Event of Default, unless the Issuer shall fail to pay in full such Extension Bonus Payment on the earlier of the Stated Maturity and the date of redemption in full of the relevant Securities. Unpaid Extension Bonus Payments shall not accrue interest. Such amounts shall be paid: (i) in the case of the Notes, to the accounts designated in the applicable Extension Bonus Eligibility Certification or, to the extent otherwise required by the rules of any applicable securities exchange or

009414

clearing agency, in a manner determined by the Issuer and (ii) in the case of the Insurer, to the account specified in the Premium Letter or as otherwise directed by the Insurer in writing.

If all Extension Conditions are satisfied, other than obtaining the consent of the Insurer to such Extension, and the Insurer has and continues to object to such Extension, so long as there are no Accrued Insurance Liabilities outstanding on the related Payment Date, the Policy may be terminated by the Holders of 100% of the Class A-1g Notes (after giving effect to the sale of any Insured Notes which are Extension Sale Securities in connection with the proposed Maturity Extension). Upon such termination of the Policy, the Note Interest Rate in respect of the Class A-1g Notes will be the Step-Up Note Interest Rate. See "—Termination of the Policy."

*Extension Procedure*

No later than three Business Days following receipt by the Trustee of the notice given by the Issuer's election to extend the Reinvestment Period (the "**Extension Notice**"), the Trustee shall mail the Extension Notice to all Holders of Securities and the Preference Shares Paying Agent (for forwarding to the Holders of the Preference Shares) and each Rating Agency (so long as any rated Notes or Composite Securities are Outstanding), in the form set out in the Indenture, and shall request the Rating Condition for the Maturity Extension from S&P, if applicable.

Any Holder of Securities may give irrevocable notice (an "**Extension Sale Notice**") within 30 days after the Trustee has mailed the Extension Notice (the "**Extension Sale Notice Period**") of its intention to sell its Securities to an Extension Qualifying Purchaser in the case of a Maturity Extension. Any Extension Sale Notice received by the Trustee after the Extension Sale Notice Period shall be disregarded and deemed not to have been given. No Holder of Securities that has not given such an Extension Sale Notice within the Extension Sale Notice Period shall be entitled to sell its Securities to an Extension Qualifying Purchaser in connection with the Maturity Extension.

If clause (iii)(b)(A) of the Extension Conditions is not satisfied as of the applicable Extension Determination Date as determined by the Issuer (or its agent), the Trustee shall request the Rating Condition to be satisfied with respect to Moody's.

On the applicable Extension Determination Date, the Issuer (or its agent) shall confirm (i) whether or not Extension Qualifying Purchasers for all Extension Sale Securities have been designated to purchase such Securities in compliance with all transfer restrictions in the Indenture and the legends on such Securities and all applicable laws, rules and regulations (including, without limitation, any rules, regulations and procedures of any securities exchange, self-regulatory organization or clearing agency), (ii) whether the requirements of clause (iii) of the Extension Conditions are satisfied as of the applicable Extension Determination Date and (iii) whether all other Extension Conditions can be satisfied as of the applicable Extension Effective Date.

On each Extension Effective Date, the Maturity Extension shall automatically become effective under the terms of the Indenture; *provided* that all Extension Conditions set forth above are satisfied. No later than two Business Days after each Extension Effective Date, the Trustee based on a determination made by the Issuer, at the expense of the Co-Issuers, shall mail a notice to all Holders of Notes and Composite Securities, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the Portfolio Manager, the Initial Purchaser, each Rating Agency (so long as any rated Notes are Outstanding) and the Irish Stock Exchange (if and for so long as any Class of Notes or Composite Securities is listed thereon) confirming whether or not the Maturity Extension became effective. If the Maturity Extension became effective, the Issuer shall make any required notifications thereof to the Depositary for any Securities subject to the Maturity Extension.

None of the Initial Purchaser, the Portfolio Manager or any of their respective Affiliates shall have any duty to act as an Extension Qualifying Purchaser.

009415

**Optional Redemption**

*Notes*. The Holders of at least 63% of the Aggregate Outstanding Amount of the Preference Shares may give written notice to the Preference Shares Paying Agent, the Trustee, the Issuer, the Insurer and the Portfolio Manager directing an optional redemption of the Notes (with respect to the Notes, an **"Optional Redemption"**) upon the occurrence of a Tax Event or at any time after the Non-Call Period. Such notice must be given not later than 45 days before the Payment Date on which the redemption is to be made. Upon receipt of the written notice directing an Optional Redemption of the Notes, the Issuers are required by the Indenture to redeem the Notes (in whole but not in part) from amounts available therefor in accordance with "—Redemption Procedures" described below. Any Optional Redemption of the Notes shall be made at the applicable Redemption Price. Upon an Optional Redemption of the Notes, the Reinvestment Period will terminate in accordance with the definition of that term. The Issuer shall, at least 30 days before the Redemption Date (unless the Trustee shall agree to a shorter notice period), notify the Trustee, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the Insurer and each Rating Agency of the Redemption Date, the applicable Record Date, the principal amount of Notes to be redeemed on the Redemption Date and the applicable Redemption Prices.

*Preference Shares*. On any Payment Date on or after payment in full of the Notes, all administrative and other fees (without regard to any payment limitations) payable under the Priority of Payments (including the Senior Management Fee and the Subordinated Management Fee), all amounts owing under the Indenture and the Insurance Documents to the Insurer, and all amounts owing under the Indenture and any Hedge Agreement to any Hedge Counterparty have been discharged:

(i) at the direction of a Majority of the Preference Shares, the Issuer shall cause the Trustee to make payments in redemption of all of the Preference Shares, in an aggregate amount equal to all of the proceeds from the sale or other disposition of all of the remaining Collateral less any fees and expenses owed by the Issuer (including the Redemption Price of any Notes being simultaneously redeemed), the aggregate amount to be distributed to the Preference Shares Paying Agent for distribution to the Holders of the Preference Shares pro rata in accordance with their respective holdings; or

(ii) at the unanimous direction of the Holders of the Preference Shares, voting as a single Class or group the Issuer shall cause the Trustee to make payments in redemption of all or a directed portion (representing less than all) of the Preference Shares to the Preference Shares Paying Agent for distribution to the Holders of the Preference Shares based upon such direction,

(with respect to the Preference Shares and each of clauses (i) and (ii) above, an "Optional Redemption").

Upon a distribution pursuant to clause (i) above, the Portfolio Manager will (subject to the standard of care specified in the Management Agreement), on behalf of the Issuer (and subject to clause (ii) above), direct the sale of all remaining Collateral Obligations. Upon a distribution pursuant to clause (ii) above, the Portfolio Manager will effect the sale of Collateral Obligations in accordance with the unanimous direction of the Holders of the Preference Shares.

Upon receipt of the written notice directing an Optional Redemption of the Preference Shares, the Issuer is required by the Preference Shares Paying Agency Agreement to redeem the Preference Shares in accordance with "—Redemption Procedures" described below. Any Optional Redemption of the Preference Shares shall be made at the applicable Redemption Price.

In connection with a redemption of the Preference Shares, a portion of the payments paid in respect of the Preference Shares will be allocated to the Composite Securities in the proportion that the aggregate Face Amount of the Preference Share Components bears to the aggregate Face Amount of the Preference Shares as a whole (including the related Preference Share Component and any other applicable Preference Share Component) (and such payment will be made on the Composite Securities Payment

009416

Date).  Other than as set forth below, no other payments will be made on the Composite Securities in connection with a redemption of the Preference Shares.

Upon the occurrence of a redemption of the Preference Shares pursuant to the Indenture, in whole or in part, the Class 1 Components shall be redeemed by the Issuer, in whole but not in part, on the Composite Securities Payment Date from Class 1 Collateral available for that purpose in the Class 1 Component Account at the applicable Redemption Price.   All Class 1 Components must be simultaneously redeemed.  Upon any redemption of the Class 1 Components, the Holders of Class 1 Composite Securities shall receive the Redemption Price as a distribution in kind of a *pro rata* share (based on the Class 1 Composite Security Rated Balance) of each item of the Class 1 Collateral.

*Redemption Procedures*.  Notice of a redemption shall be given by first-class mail, postage prepaid, mailed not later than 10 Business Days and not earlier than 30 days before the applicable Redemption Date, to (i) the Insurer, each Holder of Notes to be redeemed, at the Holder's address in the Indenture Register or otherwise in accordance with the rules and procedures of the Depository, Euroclear and Clearstream, as applicable, to the Holders of the Composite Securities and to the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) and (ii) in the case of an Optional Redemption of the Notes, to each Rating Agency.  In addition, for so long as any Securities (other than the Preference Shares) are listed on the Irish Stock Exchange and so long as the rules of the exchange so require, notice of an Optional Redemption of Notes shall also be given to the Company Announcements Office of the Irish Stock Exchange.

Notice of redemption having been given as provided above, the Notes to be redeemed shall, on the Redemption Date, become payable at the Redemption Price therein specified and from and after the Redemption Date (unless the Issuer shall default in the payment of the Redemption Price and accrued interest) the Notes shall cease to bear interest on the Redemption Date.

Upon final payment on a Note to be so redeemed, the Holder shall present and surrender the Note at the place specified in the notice of redemption to receive the applicable Redemption Price unless the Holder provides an undertaking to surrender the Note thereafter.  If a Component is to be redeemed, the related Composite Security does not need to be surrendered at the office of any paying agent under the Indenture to receive the applicable Redemption Price.

The Notes may not be optionally redeemed unless either of the following conditions are satisfied:

(i)        at least ten Business Days before the Redemption Date, the Portfolio Manager shall have furnished to the Trustee evidence (in form reasonably satisfactory to the Trustee) that the Issuer has entered into a binding agreements (with a financial or other institution or entity whose short-term unsecured debt obligations (other than obligations whose rating is based on the credit of a person other than the institution) have a credit rating of at least "A-1" from S&P and of "P-1" (and not on credit watch for possible downgrade) from Moody's (or to any other institution or entity if the Rating Condition with respect to Moody's is satisfied with respect to the other entity)) to sell to the financial or other institutions, not later than the Business Day before the Redemption Date in immediately available funds, all or part of the Collateral (directly or by participation or other arrangement) at a Purchase Price at least equal to an amount sufficient (together with any Cash and other Eligible Investments not subject to the agreements and maturing on or before the Redemption Date and any payments to be received with respect to the Hedge Agreements on or before the Redemption Date) to pay all administrative and other fees and expenses payable under the Priority of Payments without regard to any payment limitations (including the Senior Management Fee and the Subordinated Management Fee), all amounts owing under the Indenture and the Insurance Agreement to the Insurer, all amounts owing under the Hedge Agreements to the Hedge Counterparties and to redeem the Notes on the Redemption Date at the applicable Redemption Prices; or

009417

(ii)     before entering into any binding agreement to sell all or a portion of the Collateral and selling or terminating any Hedge Agreement, the Portfolio Manager shall have certified that, in its commercially reasonable judgment, the settlement dates of the sales will be scheduled to occur on or before the Business Day before the Redemption Date and that the expected proceeds from the sales are to be delivered to the Trustee no later than the Business Day before the Redemption Date, in immediately available funds, in an amount (calculated as applicable in the manner provided below) sufficient (together with any Cash and other Eligible Investments not subject to the agreements and maturing on or before the Redemption Date and any payments to be received with respect to the Hedge Agreements on or before the Redemption Date) to pay all administrative and other fees and expenses payable under the Priority of Payments (including the Senior Management Fee and the Subordinated Management Fee), all amounts owing under the Indenture and the Insurance Documents to the Insurer, all amounts owing under the Hedge Agreements to the Hedge Counterparties and to redeem the Notes on the Redemption Date at the applicable Redemption Prices.  For purposes of this paragraph, the amount shall be calculated with respect to the classes of Collateral listed in the table below by multiplying the expected proceeds of sale of the Collateral by the indicated percentage in the table below.

|  |  | Number of Business Days Between Certification to the Trustee and Sale | | | |
| --- | --- | --- | --- | --- | --- |
|  |  | Same Day | 1 to 2 | 3 to 5 | 6 to 15 |
| 1. | Cash or other Eligible Investments | 100% | 100% | 100% | 100% |
| 2. | Loans (other than 5 below) | 100% | 93% | 92% | 88% |
| 3. | High-Yield Bonds (other than 5 below) and Structured Finance Obligations (in each case, other than 4 below) | 100% | 89% | 85% | 75% |
| 4. | High-Yield Bonds (other than 5 below) and Structured Finance Obligations, in each case with a Moody's Rating of "B3" and on credit watch with negative implications or below "B3" | 100% | 75% | 65% | 55% |
| 5. | Synthetic Securities | 100% | 65% | 55% | 35% |

Any certification delivered by the Portfolio Manager shall include (A) the prices of, and expected proceeds from, the sale of any Collateral Obligations, Eligible Investments or Hedge Agreements and (B) all calculations required by the Indenture.

Any notice of redemption may be withdrawn by the Issuer up to the fourth Business Day before the scheduled Redemption Date by written notice to the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the Trustee, the Insurer and the Portfolio Manager only if:

(i)     in the case of an Optional Redemption of Notes, the Portfolio Manager does not deliver the sale agreement or certifications required under the Indenture, as the case may be, in form satisfactory to the Trustee;

(ii)     in the case of an Optional Redemption in whole of either the Notes or the Preference Shares as described above in "—Optional Redemption—Notes" and clause (i) of the first paragraph under "—Optional Redemption—Preference Shares," the Issuer receives the written direction of the Preference Shares to withdraw the notice of redemption delivered by the percentage of the Preference Shares requesting redemption under "—Optional Redemption—Notes"  or clause (i) of the first paragraph under "—Optional Redemption—Preference Shares,", as applicable; and

009418

(iii) in the case of an Optional Redemption of Preference Shares as described in clause (ii) of the first paragraph under "Optional Redemption—Preference Shares," the Issuer receives the unanimous written direction of the Holders of the Preference Shares to withdraw the notice of redemption (and the Issuer hereby agrees for the benefit of the directing person to withdraw the applicable notice of redemption if it receives the written direction referred to in the preceding clause (ii) or this clause (iii)).

Notice of any withdrawal shall be sent, not later than the third Business Day before the scheduled Redemption Date (assuming that the Trustee has received timely written notice from the Issuer as provided above), by the Trustee, to each Holder of Notes scheduled to be redeemed at the Holder's address in the Indenture Register by overnight courier guaranteeing next day delivery (or, to the extent the address contained in the Indenture Register is not sufficient for that purpose, by first-class mail), the Holders of Composite Securities and the Preference Shares Paying Agent (for forwarding to each Holder of Preference Shares). If the Issuer so withdraws any notice of redemption or is otherwise unable to complete any redemption of the Notes, the Sale Proceeds received from the sale of any Collateral Obligations sold in accordance with the Indenture may, during the Reinvestment Period (and, in respect of Sale Proceeds from Credit Improved Obligations, after the Reinvestment Period) at the Portfolio Manager's discretion, be reinvested in accordance with the Eligibility Criteria.

Notice of redemption shall be given by the Co-Issuers or, upon an Issuer Order, by the Trustee in the name and at the expense of the Co-Issuers. Failure to give notice of redemption, or any defect therein, to any Holder of any Note selected for redemption, to each Holder of Composite Securities or the Preference Shares Paying Agent (for forwarding to each Holder of Preference Shares) shall not impair or affect the validity of the redemption of any other Securities.

## Special Redemption of Notes If the Portfolio Manager Does Not Identify Investments as Contemplated by the Indenture

Principal payments on the Notes shall be made in whole or in part, at par, in accordance with the Priority of Payments if, at any time during the Reinvestment Period, the Portfolio Manager elects (subject to the Management Agreement) to notify the Trustee and each Rating Agency that it has been unable, for 45 consecutive Business Days, to identify additional Collateral Obligations that are deemed appropriate by the Portfolio Manager in its sole discretion and meet the Eligibility Criteria in sufficient amounts to permit the investment or reinvestment of all or a portion of the funds then in the Collection Account available to be invested in additional Collateral Obligations.

On the Special Redemption Date, the Special Redemption Amount will be available to be applied in accordance with "—Priority of Payments—Principal Proceeds" to the extent of available Principal Proceeds. Notice of payment of the Special Redemption Amount shall be given by first-class mail, postage prepaid, mailed not later than three Business Days before the applicable Special Redemption Date, to the Insurer and each Holder of Notes to be redeemed, at the Holder's address in the Indenture Register or otherwise in accordance with the rules and procedures of the Depository. In addition, for so long as any Securities (other than the Preference Shares) are listed on the Irish Stock Exchange and so long as the rules of the exchange so require, notice of a Special Redemption of the Notes shall also be given to the Company Announcements Office of the Irish Stock Exchange.

In connection with a Special Redemption, the principal of the Notes will be paid from Principal Proceeds in an aggregate amount equal to the Special Redemption Amount (first to any Senior Class A Notes to be redeemed, then to any Class A-2 Notes to be redeemed, then to any Class A-3 Notes to be redeemed, then to any Class B Notes to be redeemed and then to any Class C Notes to be redeemed, in each case until paid in full) in accordance with the Priority of Payments. See "Description of the Securities—Priority of Payments—Principal Proceeds."

009419

**Mandatory Redemption of the Notes**

*General*

In the event of a Rating Confirmation Failure or a failure to meet any Coverage Test on any Determination Date, a mandatory redemption of one or more Classes of Notes in whole or in part will be required. Any mandatory redemption could result in an elimination, deferral or reduction in interest or principal payments to one or more Classes of Securities, which would adversely affect the returns to the Holders of the Class or Classes of Securities. See "Risk Factors—Relating to the Securities—The Indenture Requires Mandatory Redemption of the Interests for Failure to Satisfy Coverage Tests" and "—The Indenture Requires Mandatory Redemption of the Notes Upon Rating Confirmation Failure."

*Mandatory Redemption of the Notes for Failure to Satisfy Coverage Tests*

Except with respect to payments made pursuant to an Optional Redemption or a redemption made in connection with a Tax Event as described under "—Optional Redemption," on any Payment Date with respect to which any Coverage Test (as described under "Security for the Notes and the Composite Securities—The Coverage Tests") is not met on any Determination Date, principal payments on the Notes will be made as described under "—Priority of Payments."

*Mandatory Redemption of the Notes Upon Rating Confirmation Failure*

Upon the event of a Rating Confirmation Failure, all Interest Proceeds remaining after payment of amounts referred to in clauses (1) and (3) through (12) of "—Priority of Payments—Interest Proceeds" will be used to pay principal of the Senior Class A Notes, the Class A-2 Notes, the Class A-3 Notes, the Class B Notes and the Class C Notes sequentially in order of their priority on the next Payment Date and each Payment Date thereafter until the Initial Ratings are confirmed. If necessary, after the foregoing payments are made out of Interest Proceeds, Principal Proceeds in accordance with clause (3) "—Priority of Payments—Principal Proceeds" will be used to pay principal of each Class of the Notes sequentially in order of their priority on each Payment Date until the Initial Ratings are confirmed.

Upon receipt of notice of a Rating Confirmation Failure and if available Interest Proceeds and Principal Proceeds are insufficient to effect the redemption of the Notes, at par on any subsequent Payment Date in accordance with the Priority of Payments as and to the extent necessary for each of Moody's and S&P to confirm in writing the Initial Ratings assigned by it on the Closing Date to the Notes, then at the direction and in accordance with the instructions of the Portfolio Manager the Trustee shall sell Collateral Obligations so that the proceeds from the sale and all other funds available for the purpose in the Collection Account will be used to redeem the Notes (but only to the extent necessary for each of Moody's and S&P to confirm in writing the Initial Ratings assigned by it on the Closing Date to the Notes) and to pay all administrative and other fees, expenses and obligations payable under the Priority of Payments. Any sale under these provisions shall be conducted in such a manner that:

     (i)     after giving effect to the sale each Overcollateralization Test is satisfied or, if any Overcollateralization Test is not satisfied, the extent of compliance with the Overcollateralization Test is not reduced;

     (ii)     if the sale occurs on or after the second Payment Date, after giving effect to the sale each Interest Coverage Test is satisfied or, if any Interest Coverage Test is not satisfied, the extent of compliance with the Interest Coverage Test is not reduced; and

     (iii)     after giving effect to the sale each Collateral Quality Test is satisfied or, if any Collateral Quality Test is not satisfied, the extent of compliance with the Collateral Quality Test is not reduced.

009420

**Redemption of the Preference Shares in Connection with Mandatory Redemption of the Notes**

The Preference Shares will be redeemed in whole in accordance with the Priority of Payments and the Preference Share Documents on any Payment Date (or, with respect to the Preference Share Components, the Composite Securities Payment Date) on which a mandatory redemption of the Notes described under "—Mandatory Redemption of the Notes" results in the payment in full of the Aggregate Outstanding Amount of each Class of Notes.

**Priority of Payments**

Collections received on the Collateral during the related Due Period will be segregated into Interest Proceeds and Principal Proceeds and applied on each Payment Date in the priority below under "—Interest Proceeds" and "—Principal Proceeds," respectively (collectively, the "**Priority of Payments**").

*Interest Proceeds*

On each Payment Date, Interest Proceeds with respect to the related Due Period (other than Interest Proceeds previously used during such Due Period to purchase accrued interest in respect of Collateral Obligations or otherwise used as permitted under the Indenture) will be distributed in the following order of priority:

(1)     to the payment of any taxes and registration and filing fees owed by the Co-Issuers (without limit) and then to the payment of Administrative Expenses up to the Administrative Expense Cap as follows:

FIRST, in the following order of priority:

(i)      fees, expenses and indemnities of the Trustee; and then

(ii)     fees, expenses and indemnities of the Collateral Administrator; and then

(iii)    fees, expenses and indemnities of the Preference Shares Paying Agent; and

SECOND, in the following order of priority;

(x)      fees and expenses of the Administrator; and then;

(y)      fees and expenses of the Co-Issuers (including fees and expenses of counsel and surveillance, credit estimate, and other fees owing to the Rating Agencies) and any other person (except the Portfolio Manager) if specifically provided for in the Indenture, and to the expenses (but not fees) of the Portfolio Manager if payable under the Management Agreement and to the fees, expenses and indemnities of the Insurer;

(2)     the excess, if any, of the Administrative Expense Cap over the amounts paid pursuant to clause (1) above to deposit into the Expense Reimbursement Account;

(3)     to the payment to the Portfolio Manager of any accrued and unpaid Senior Management Fee then payable;

009421

(4)    to the payment of all amounts due to the Hedge Counterparties under the Hedge Agreements other than any Defaulted Hedge Termination Payments;

(5)

    (A)    first, *pro rata* to the payment of accrued and unpaid interest on the Senior Class A Notes, accrued and unpaid Premium and any accrued and unpaid Defaulted Interest on, and any Defaulted Interest Charge with respect to, the Senior Class A Notes; *provided, however*, if the amounts available pursuant to this clause (A) are insufficient to pay the foregoing amounts in full, the amount available for distribution under this clause (A) shall be distributed *pro rata* based on the amounts owing to the Class A-1a Notes and the Class A-1b Notes, on the one hand, and to the amounts owing to the Class A-1g Notes and in respect of the Premium, on the other hand, with the amounts distributed to the Insurer and the Holders of the Class A-1g Notes being paid first to the Insurer in respect of the Premium until paid in full and then in respect of amounts owing to the Class A-1g Notes; *provided, further*, that distributions in respect of the Class A-1a Notes and the Class A-1b Notes pursuant to this clause (5)(A) shall be made to the Holders thereof *pro rata* based upon the amount of accrued and unpaid interest and accrued and unpaid Defaulted Interest owing in respect of the Class A-1a Notes and the Class A-1b Notes;

    (B)    second, to the payment of Accrued Insurance Liabilities then payable under the Insurance Agreement;

(6)    to the payment of accrued and unpaid interest on the Class A-2 Notes and any accrued and unpaid Defaulted Interest on, and any Defaulted Interest Charge with respect to, the Class A-2 Notes;

(7)    to the payment of accrued and unpaid interest on the Class A-3 Notes and any accrued and unpaid Defaulted Interest on, and any Defaulted Interest Charge with respect to, the Class A-3 Notes (with distributions in respect of the Class A-3 Notes made to the Holders thereof *pro rata* based upon the amount of accrued and unpaid interest and accrued and unpaid Defaulted Interest owing in respect of the Class A-3a Notes and the Class A-3b Notes);

(8)    if the Class A Coverage Tests are not satisfied on the related Determination Date, to the payment of principal of the Senior Class A Notes, the Class A-2 Notes and the Class A-3 Notes in the Note Payment Sequence in the amount necessary so that all of the Class A Coverage Tests would be met on such Determination Date on a *pro forma* basis after giving effect to any payments in reduction of the principal of Notes made through this clause, or until paid in full (Interest Proceeds to be applied pursuant to this clause (8) before the application of any Principal Proceeds as described under "—Principal Proceeds" below on the current Payment Date);

(9)    to the payment of accrued and unpaid interest on the Class B Notes (excluding Class B Deferred Interest, but including interest accrued for the preceding Interest Period on Class B Deferred Interest);

(10)    if the Class B Coverage Tests are not satisfied on the related Determination Date, to the payment of principal of the Senior Class A Notes, the Class A-2 Notes, the Class A-3 Notes and the Class B Notes in the Note Payment Sequence and then to the payment of any Class B Deferred Interest, in each case in the amount necessary so that all of the Class B Coverage Tests would be met on such Determination Date on a *pro forma* basis after giving effect to any payments in reduction of the principal of Notes made through this clause, or until paid in full (Interest Proceeds to be applied pursuant to this clause

009422

(10) before the application of any Principal Proceeds as described under "—Principal Proceeds" below on the current Payment Date) (with each of the Senior Class A Notes and the Class A-3 Notes being redeemed *pro rata* based upon the outstanding principal amount of the Class A-1a Notes, the Class A-1b Notes and the Class A-1g Notes (in the case of a redemption of the Senior Class A Notes) and the outstanding principal amount of the Class A-3a Notes and the Class A-3b Notes (in the case of a redemption of the Class A-3 Notes));

(11)     to the payment of Class B Deferred Interest;

(12)     to the payment of accrued and unpaid interest on the Class C Notes (excluding Class C Deferred Interest but including interest accrued for the preceding Interest Period on Class C Deferred Interest);

(13)     if the Class C Coverage Tests are not satisfied on the related Determination Date or if a Rating Confirmation Failure exists on the Payment Date, to the payment of principal of the Notes in the Note Payment Sequence and then to the payment of the Class C Deferred Interest in the amount necessary so that all of the Class C Coverage Tests would be met on such Determination Date on a *pro forma* basis after giving effect to any payments in reduction of the principal of Notes made through this clause, or until paid in full (Interest Proceeds to be applied pursuant to this clause (13) before the application of any Principal Proceeds as described under "—Principal Proceeds" below on the current Payment Date, unless a Rating Confirmation is obtained) (with each of the Senior Class A Notes and the Class A-3 Notes being redeemed *pro rata* based upon the outstanding principal amount of the Class A-1a Notes, the Class A-1b Notes and the Class A-1g Notes (in the case of a redemption of the Senior Class A Notes) and the outstanding principal amount of the Class A-3a Notes and the Class A-3b Notes (in the case of a redemption of the Class A-3 Notes));

(14)     to the payment of Class C Deferred Interest;

(15)     to deposit in the Collection Account as Principal Proceeds amounts representing Principal Proceeds previously used to pay amounts referred to in clauses (1), (3) through (7), (9), (11), (12) and (14) above and not previously restored to the Collection Account or, if not restored to the Collection Account, used to purchase Collateral Obligations;

(16)     during the Reinvestment Period, if the Reinvestment Overcollateralization Test is not satisfied on the related Determination Date, for deposit to the Collection Account as Principal Proceeds the lesser of (i) 50% of the remaining Interest Proceeds available after the payments pursuant to clause (15) above and (ii) the amount necessary to cause the Reinvestment Overcollateralization Test to be satisfied as of such Determination Date, after application of Principal Proceeds as described under "—Principal Proceeds" below on the current Payment Date;

(17)     first, to the payment to the Insurer of any remaining Administrative Expenses payable thereto and not paid under clause (1) above, and second, to the payment of any remaining Administrative Expenses not paid under clause (1) above in the respective priorities specified in clause (1);

(18)     to the Preference Shares Paying Agent, on behalf of the Issuer, for deposit into the Preference Shares Distribution Account for payment to the Holders of the Preference Shares, an amount not to exceed the Preference Shares Distribution Amount;

009423

(19) to the payment (i) first to the Portfolio Manager of accrued and unpaid Subordinated Management Fee then due and payable and (ii) to the Insurer (if entitled thereto) and to each Holder of Securities entitled thereto, the applicable Extension Bonus Payment as described under "—Extension of the Reinvestment Period, the Stated Maturity and the Scheduled Preference Shares Redemption Date";

(20) to the payment of any Defaulted Hedge Termination Payments;

(21) to the Preference Shares Paying Agent, on behalf of the Issuer, for deposit into the Preference Shares Distribution Account for payment to the Holders of the Preference Shares until the Holders of the Preference Shares have realized a Preference Share Internal Rate of Return of 10.75%;

(22) to the payment to the Portfolio Manager of the Incentive Management Fee, if applicable; and

(23) any remaining Interest Proceeds, to the Preference Shares Paying Agent, on behalf of the Issuer, for deposit into the Preference Shares Distribution Account for payment to the Holders of the Preference Shares.

*Principal Proceeds*

On each Payment Date, Principal Proceeds with respect to the related Due Period other than:

(A) Principal Proceeds previously reinvested in Collateral Obligations (including any related deposit into the Revolving Reserve Account or the Delayed Drawdown Reserve Account or the posting by the Issuer of cash collateral with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security) or otherwise used as permitted under the Indenture;

(B) Principal Proceeds on deposit in the Revolving Reserve Account, the Delayed Drawdown Reserve Account, the Synthetic Security Collateral Account or the Securities Lending Account; and

(C) Principal Proceeds on deposit in the Collection Account in an aggregate amount equal to the agreed Purchase Prices for Collateral Obligations with respect to which the Issuer has entered into a commitment before the end of the Due Period for their purchase, but has not settled the purchase by the end of the Due Period;

shall be distributed in the following order of priority:

(1) (x) first, to the payment of the amounts referred to in clauses (1) and (3) through (7) under "—Interest Proceeds" above (and in the same manner and order of priority) to the extent not previously paid in full thereunder and (y) second, to the payment of amounts referred to in clause (8) under "—Interest Proceeds" above to the extent not previously paid in full thereunder and to the extent necessary to cause the Class A Overcollateralization Test to be met as of the related Determination Date on a pro forma basis after giving effect to any payments made through this clause (1);

(2) to the payment of the amounts referred to in clause (10) under "—Interest Proceeds" above to the extent not previously paid in full thereunder and to the extent necessary to cause the Class B Overcollateralization Test to be met as of the related Determination Date on a pro forma basis after giving effect to any payments made through this clause (2);

009424

(3)    to the payment of the amounts referred to in clause (13) under "—Interest Proceeds" above to the extent not previously paid in full thereunder and to the extent necessary to cause the Class C Overcollateralization Test to be met as of the related Determination Date on a pro forma basis after giving effect to any payments made through this clause (3);

(4)    to the payment of the amounts referred to in clauses (9) and (11) under "—Interest Proceeds" above (and in the same manner and order of priority) to the extent not previously paid in full thereunder, only to the extent that all of the Coverage Tests would be met on a pro forma basis after giving effect to any payments made through this clause (4);

(5)    to the payment of the amounts referred to in clauses (12) and (14) under "—Interest Proceeds" above (and in the same manner and order of priority) to the extent not previously paid in full thereunder, only to the extent that all of the Coverage Tests would be met on a pro forma basis after giving effect to any payments made through this clause (5);

(6)

    (A)    if the Payment Date is a Redemption Date in the following order of priority: (i) to the payment in the Note Payment Sequence of the Redemption Prices of all of the Notes to be redeemed (with each of the Senior Class A Notes and the Class A-3 Notes being redeemed pro rata based upon the outstanding principal amount of the Class A-1a Notes, the Class A-1b Notes and the Class A-1g Notes (in the case of a redemption of the Senior Class A Notes) and the outstanding principal amount of the Class A-3a Notes and the Class A-3b Notes (in the case of a redemption of the Class A-3 Notes)), (ii) to the payment of the amounts referred to in clauses (17) through (22) under "—Interest Proceeds" above (and in the same manner and order of priority) to the extent not previously paid in full thereunder and (iii) to the Preference Shares Paying Agent, on behalf of the Issuer, for deposit into the Preference Shares Distribution Account for payment to the Holders of the Preference Shares of the Redemption Price of any Preference Shares to be redeemed; and

    (B)    if the Payment Date is a Special Redemption Date, to the payment in the Note Payment Sequence of principal of the Notes in an aggregate amount equal to the Special Redemption Amount, in each case until paid in full (with each of the Senior Class A Notes and the Class A-3 Notes being redeemed pro rata based upon the outstanding principal amount of the Class A-1a Notes, the Class A-1b Notes and the Class A-1g Notes (in the case of a redemption of the Senior Class A Notes) and the outstanding principal amount of the Class A-3a Notes and the Class A-3b Notes (in the case of a redemption of the Class A-3 Notes));

(7)    during the Reinvestment Period, all remaining Principal Proceeds to the acquisition of additional Collateral Obligations in accordance with the Indenture (and, until so applied (including any related deposit into the Revolving Reserve Account or the Delayed Drawdown Reserve Account or the posting by the Issuer of cash collateral with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security), to be deposited in the Collection Account as Principal Proceeds);

(8)    after the Reinvestment Period, (i) first, at the discretion of the Portfolio Manager (with respect to Unscheduled Principal Payments and Sale Proceeds from the sale of Credit

Improved Obligations) to the purchase or funding of substitute Collateral Obligations in accordance with the Eligibility Criteria and the applicable provisions of the Indenture when appropriate Collateral Obligations are available, and until such time, to the Collection Account for the purchase of Eligible Investments; and (ii) second, to the payment in the Note Payment Sequence of principal of Notes until paid in full;

(9)     to the extent not previously paid in full under clause (6) above, after the Reinvestment Period, to the payment of the amounts referred to in clauses (17) through (22) under "—Interest Proceeds" above (and in the same manner and order of priority) to the extent not previously paid in full thereunder; and

(10)    after the Reinvestment Period to the Preference Shares Paying Agent, on behalf of the Issuer, for deposit into the Preference Shares Distribution Account for payment to the Holders of the Preference Shares.

Amounts referred to in clauses (9) and (12) under "—Interest Proceeds" above, to the extent not previously paid in full thereunder, will be added to deferred interest for purposes of calculating the Coverage Tests in clauses (1), (2) and (3) of this Principal Proceeds order of priority.

If on any Payment Date the amount available in the Payment Account is insufficient to make the full amount of the disbursements required by the Valuation Report, the Trustee shall make the disbursements called for in the order and according to the priority under "—Interest Proceeds" and "—Principal Proceeds," to the extent funds are available therefor.

The Trustee shall remit funds to pay Administrative Expenses of the Issuer or the Co-Issuer in accordance with the Priority of Payments under "—Interest Proceeds" and "—Principal Proceeds" above, to the extent available, to the Issuer, the Co-Issuer as directed and designated in an Issuer Order (which may be in the form of standing instructions) delivered to the Trustee no later than the Business Day before each Payment Date.

*Class 1 Component Distributions*

On the first Business Day after each Payment Date, the Trustee shall make commercially reasonable efforts to sell a portion or all of the Treasury Strip held in the Class 1 Component Account on the customary open markets in accordance with customary industry standards. The face amount of the Treasury Strip to be sold, if any, on the first Business Day after the relevant Payment Date shall be a calculated amount (rounded down to the nearest $1,000) equal to:

(1)     the sum of the distributions allocated to the Preference Share Component of the Class 1 Composite Securities under clauses (18), (21) and (23) under "—Interest Proceeds" above and clauses (6)(A), (9) and (10) under "—Principal Proceeds" above on such Payment Date; *divided* by

(2)     one *minus* the bid-side market price of the Treasury Strip on the first Business Day after such Payment Date, expressed as a percentage.

No portion of the Treasury Strip may be sold, if after its sale, the Class 1 Collateral Principal Balance would not be greater than or equal to the Class 1 Composite Security Rated Balance.

On each Composite Securities Payment Date, the Trustee shall disburse (solely from amounts in the Class 1 Component Account attributable to the proceeds from the sale of the Treasury Strip pursuant to the preceding paragraph) to the Holders of the Class 1 Composite Securities, *pro rata* based on their share of the Class 1 Composite Security Rated Balance, the proceeds from the sale of the Treasury Strip relating to such Composite Securities Payment Date pursuant to the preceding paragraph.

009426

On each Composite Securities Payment Date following a redemption pursuant to "Description of the Securities—Optional Redemption," the Trustee shall disburse (solely from Class 1 Collateral held in the Class 1 Component Account) to the Holders of the Class 1 Composite Securities, pro rata based on their share of the Class 1 Composite Security Rated Balance, the Redemption Price of the Class 1 Component as a distribution in kind of each item of the Class 1 Collateral.

## Termination of the Policy

The Policy may be terminated on any Payment Date if: (x) after giving effect to all payments to be made on such Payment Date, all Accrued Insurance Liabilities and all Administrative Expenses payable to the Insurer accrued through the date of termination have been paid and all Premium accrued through such Payment Date has been paid and (y) any of the following events has occurred and is continuing on such date:

      (i)     the Co-Issuers have elected to extend the Reinvestment Period as described under "—Extension of the Reinvestment Period, the Stated Maturity and the Scheduled Preference Shares Redemption Date" and have satisfied all of the requirements related thereto (including each of the Extension Conditions), other than obtaining the consent of the Insurer to such Extension, and the Insurer has and continues to object to such Extension, and the Holders of 100% of the Insured Notes (after giving effect to the sale of any Insured Notes which are Extension Sale Securities in connection with the proposed Maturity Extension) consent to such termination in accordance with the Indenture;

      (ii)    the Co-Issuers have proposed to enter into a supplemental indenture pursuant to the Indenture and have satisfied all of the requirements for the effectiveness thereof and the Insurer has and continues to object to such amendment and 100% of the Holders of the Insured Notes consent to such termination in accordance with the Indenture; or

      (iii)   the Removal Buy-Out Purchaser shall have purchased the Insured Notes for the applicable Removal Buy-Out Purchase Price as described in "—Removal Buy-Out."

If none of the conditions set forth in clause (i) through (iii) above are satisfied, the Policy may be terminated on any Business Day if 100% of the Holders of the Insured Notes consent to such termination in accordance with the Indenture.

Upon such termination of the Policy, the Note Interest Rate in respect of the Class A-1g Notes will be the Step-Up Note Interest Rate.

If the Issuer or the Holders of at least 25% of the Aggregate Outstanding Amount of the Insured Notes wish to solicit the vote of the Holders of the Insured Notes in connection with a proposed termination of the Policy pursuant to the Indenture, the Issuer or such Holders shall notify the Trustee at least 45 days prior to the proposed termination date (which in the case of a termination pursuant to the first paragraph above must be a Payment Date). If the conditions for termination specified above are satisfied as of the date of such notice (or are expected to be satisfied as of the proposed date of termination), as certified to the Trustee by an Issuer Order, the Trustee shall, promptly upon receipt thereof, notify the Issuer (in the case of notice to the Trustee by the requisite Holders of the Insured Notes), the Portfolio Manager, and the Insurer and shall send to all Holders of the Insured Notes (with a copy to the Issuer, the Portfolio Manager and the Insurer) a notice of proposed termination that shall state:

      1.     the notice is being sent at the request of the Issuer or certain Holders of the Insured Notes (as applicable) who wish to solicit the vote of the Holders of the Insured Notes in connection with a termination of the Policy pursuant to the Indenture;

009427

2.      a copy of the Issuer Order stating that the proposed termination is pursuant to the Indenture, and any conditions to such proposed termination have been satisfied;

3.      the proposed date of termination (which in the case of a termination pursuant to the Indenture must be a Payment Date);

4.      that from and after termination of the Policy, the Insured Notes will bear interest at a rate of LIBOR + 0.25% + the Premium Rate; and

5.      that if the Policy is terminated, the Insurer shall have no further liability for losses, claims, demands, damages, controversies, losses, costs and expenses of any nature whatsoever, known or unknown, suspected or unsuspected, fixed or contingent, under the Policy as of the date of such termination, whether such losses, claims, demands, damages, controversies, losses, costs and expenses occurred prior to or subsequent to the date of such termination, and whether in connection with an Avoided Payment or other amount that has been paid by the Issuer or the Insurer prior to or after the termination of the Policy and subsequently is required to be returned as a preference or otherwise.

Each Holder of the Insured Notes that wishes to terminate the Policy must notify the Issuer and Trustee in writing of such determination within 10 Business Days after delivery of the notice of proposed termination. If the Trustee and the Issuer have not received written notification from all of the Holders of the Insured Notes within 10 Business Days of delivery of notice of proposed termination, the solicitation of the vote of the Holders of the Notes will be deemed not to have succeeded. The Trustee shall promptly forward to the Issuer, the Portfolio Manager and the Insurer the solicitation of votes received from the Holders of the Insured Notes. If all Holders of the Insured Notes notify the Issuer and the Trustee that they wish to terminate the Policy, the Issuer shall issue an Issuer Order instructing the Trustee to:

1.      surrender the Policy to the Insurer for cancellation on the date of termination;

2.      promptly notify each Rating Agency of such termination; and

3.      execute, acknowledge and deliver (at the expense of Issuer) such other documents or instruments as the Insurer may reasonably request evidencing the termination of the Policy.

**Form, Denomination, Registration and Transfer of the Notes**

The Notes sold in Offshore Transactions may only be sold to non-U.S. Persons in reliance on Regulation S. Except as provided below, the Notes sold in reliance on Regulation S will be represented by one or more Regulation S Global Notes. The Regulation S Global Notes will be deposited with the Trustee as custodian for, and registered in the name of, a nominee of the Depository for the respective accounts of the beneficial owners at Euroclear and Clearstream. Beneficial interests in a Regulation S Global Note may be held only through Euroclear or Clearstream. Investors may hold their interests in a Regulation S Global Note directly through Euroclear or Clearstream, if they are participants in such systems, or indirectly through organizations that are participants in such systems. Beneficial interests in a Regulation S Global Note may not be held by a U.S. Person at any time. By acquisition of a beneficial interest in a Regulation S Global Note, the purchaser thereof will be deemed to represent that it is not a U.S. Person and that, if in the future it determines to transfer such beneficial interest, it will transfer such interest only to a person whom the seller reasonably believes to be a non-U.S. Person or to a person who takes delivery in the form of an interest in a Rule 144A Global Note.

The Notes sold in non-Offshore Transactions or to U.S. Persons may only be sold to (i) Qualified Institutional Buyers and (ii) (A) a Qualified Purchaser or (B) an entity owned exclusively by Qualified

009428

Purchasers.  Except as provided below, the Notes sold in reliance on Rule 144A to Qualified Institutional Buyers and Qualified Purchasers will be represented by one or more permanent Rule 144A Global Notes. Investors may hold their interests in the Rule 144A Global Notes directly through the Depository if they are the Depository participants, or indirectly through organizations that are the Depository participants. The Rule 144A Global Notes will be deposited with the Trustee as custodian for the Depository, and registered in the name of a nominee of the Depository.

Beneficial interests in Notes represented by Global Notes will be subject to certain restrictions on transfer set forth therein and in the Indenture and such Global Notes will bear the applicable legends regarding the restrictions set forth under "Transfer Restrictions."  A beneficial interest in a Regulation S Global Note may be transferred to a person who takes delivery in the form of an interest in a Rule 144A Global Note only upon receipt by the Trustee of a written certification from (A) the transferor (in the form provided in the Indenture) to the effect that the transfer is being made to a person whom the transferor reasonably believes is a Qualified Institutional Buyer who is also (i) a Qualified Purchaser or (ii) an entity owned exclusively by Qualified Purchasers and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction and (B) the transferee (in the form provided in the Indenture) to the effect that, among other things, the transferee is both a Qualified Institutional Buyer and a Qualified Purchaser.  Beneficial interests in the Rule 144A Global Notes may be transferred to a person who takes delivery in the form of an interest in a Regulation S Global Note only upon receipt by the Trustee of a written certification from (A) the transferor (in the form provided in the Indenture) to the effect that the transfer is being made to a non-U.S. Person in an Offshore Transaction in accordance with Regulation S and (B) the transferee (in the form provided in the Indenture) to the effect that, among other things, the transferee is a non-U.S. Person.

Any beneficial interest in a Regulation S Global Note that is transferred to a person who takes delivery in the form of an interest in a Rule 144A Global Note will, upon transfer, cease to be an interest in such Regulation S Global Note and become an interest in the Rule 144A Global Note and, accordingly, will thereafter be subject to all transfer restrictions and other procedures applicable to beneficial interests in a Rule 144A Global Note for as long as it remains such an interest.  Any beneficial interest in a Rule 144A Global Note that is transferred to a person who takes delivery in the form of an interest in a Regulation S Global Note will, upon transfer, cease to be an interest in the Rule 144A Global Note and become an interest in the Regulation S Global Note and, accordingly, will thereafter be subject to all transfer restrictions and other procedures applicable to beneficial interests in a Regulation S Global Note for as long as it remains such an interest.  No service charge will be made for any registration of transfer or exchange of Notes, but the Issuer or Co-Issuers, as the case may be, or the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

Except in the limited circumstances described in this paragraph, owners of beneficial interests in Notes held in the form of Global Notes will not be entitled to receive delivery of certificated Notes.  The Notes are not issuable in bearer form.  A Global Note deposited with the Depository pursuant to the Indenture shall be transferred to the beneficial owners thereof only if such transfer complies with the Indenture and either (i) the Depository notifies the Co-Issuers that it is unwilling or unable to continue as depository for a Global Note or ceases to be a "Clearing Agency" registered under the Exchange Act and a successor depository is not appointed by the Issuer within 90 days of such notice or (ii) as a result of any amendment to or change in, the laws or regulations of the Cayman Islands or of any authority therein or thereof having power to tax or in the interpretation or administration of such laws or regulations which become effective on or after the Closing Date, the Issuer or the Paying Agent becomes aware that it is or will be required to make any deduction or withholding from any payment in respect of the Notes which would not be required if the Notes were in definitive form.  In addition, the owner of a beneficial interest in a Global Note will be entitled to receive a certificated Note in exchange for such interest if an Event of Default has occurred and is continuing.  In the event that certificated Notes are not so issued by the Issuer to such beneficial owners of interests in Global Notes, the Issuer expressly acknowledges that such beneficial owners shall be entitled to pursue any remedy that the holders of a Global Note would be

009429

entitled to pursue in accordance with the Indenture (but only to the extent of such beneficial owner's interest in the Global Note) as if certificated Notes had been issued. Payments on such certificated Notes will be made by wire transfer in immediately available funds to a Dollar-denominated account maintained by the owner or, if a wire transfer cannot be effected, by a Dollar check delivered to the owner. See "Settlement and Clearing."

The Notes will be issued in minimum denominations of U.S.$250,000 and integral multiples of U.S.$1,000 in excess thereof for each Class of Notes.

### Form, Denomination, Registration and Transfer of the Composite Securities

Except as provided below, the Composite Securities sold in reliance on Regulation S will be represented by one or more Regulation S Global Composite Securities. The Regulation S Global Composite Securities will be deposited with the Trustee as custodian for, and registered in the name of, a nominee of the Depository for the respective accounts of the beneficial owners at Euroclear and Clearstream. Beneficial interests in a Regulation S Global Composite Security may be held only through Euroclear or Clearstream. Investors may hold their interests in a Regulation S Global Composite Security directly through Euroclear or Clearstream, if they are participants in such systems, or indirectly through organizations that are participants in such systems. Beneficial interests in a Regulation S Global Composite Security may not be held by a U.S. Person at any time. By acquisition of a beneficial interest in a Regulation S Global Composite Security, the purchaser thereof will be deemed to represent that it is not a U.S. Person and that, if in the future it determines to transfer such beneficial interest, it will transfer such interest only to a person whom the seller reasonably believes to be a non-U.S. Person or to a person who takes delivery in the form of an interest in a Regulation S Global Composite Security.

Composite Securities sold in non-Offshore Transactions or to U.S. Persons may only be sold to (i) a Qualified Institutional Buyer or an Accredited Investor who, in either case, is also (ii) (A) a Qualified Purchaser or (B) an entity owned exclusively by Qualified Purchasers, and will be issued in the form of one or more Certificated Composite Securities.

Beneficial interests in the Composite Securities will be subject to certain restrictions on transfer set forth therein and in the Indenture and the Composite Securities will bear the applicable legends regarding the restrictions set forth under "Transfer Restrictions." A beneficial interest in a Regulation S Global Composite Security may be transferred only upon (*inter alia*) receipt by the Trustee of a written certification from (A) the transferor (in the form provided in the Indenture) to the effect that the transfer is being made to a person whom the transferor reasonably believes is a Qualified Institutional Buyer or an Accredited Investor who is also either (i) a Qualified Purchaser or (ii) an entity owned exclusively by Qualified Purchasers and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction and (B) the transferee (in the form provided in the Indenture) to the effect that, among other things, the transferee is (a) a Qualified Institutional Buyer or an Accredited Investor who is also, in either case, (i) a Qualified Purchaser or (ii) an entity owned exclusively by Qualified Purchasers. Beneficial interests in the Certificated Composite Securities may be transferred to a person who takes delivery in the form of an interest in a Regulation S Global Composite Security only upon receipt by the Trustee of a written certification from (A) the transferor (in the form provided in the Indenture) to the effect that the transfer is being made to a non-U.S. Person in an Offshore Transaction in accordance with Regulation S and (B) the transferee (in the form provided in the Indenture) to the effect that, among other things, the transferee is a non-U.S. Person.

Except in the limited circumstances described in this paragraph, owners of beneficial interests in Composite Securities held in the form of Regulation S Global Composite Securities will not be entitled to receive delivery of certificated Composite Securities. A Regulation S Global Composite Security deposited with the Depository pursuant to the Indenture shall be transferred to the beneficial owners thereof only if such transfer complies with the Indenture and either (i) the Depository notifies the Co-Issuers that it is unwilling or unable to continue as depository for a Regulation S Global Composite

009430

Securities or ceases to be a "Clearing Agency" registered under the Exchange Act and a successor depository is not appointed by the Issuer within 90 days of such notice or (ii) as a result of any amendment to or change in, the laws or regulations of the Cayman Islands or of any authority therein or thereof having power to tax or in the interpretation or administration of such laws or regulations which become effective on or after the Closing Date, the Issuer or the Paying Agent becomes aware that it is or will be required to make any deduction or withholding from any payment in respect of the Composite Securities which would not be required if the Composite Securities were in definitive form.  Payments on such certificated Composite Securities will be made by wire transfer in immediately available funds to a Dollar-denominated account maintained by the owner or, if a wire transfer cannot be effected, by a Dollar check delivered to the owner.  See "Settlement and Clearing."

The Composite Securities will be issued in minimum denominations of U.S.$100,000 and integral multiples of U.S.$1,000 in excess thereof.

**Form, Denomination, Registration and Transfer of the Preference Shares**

In addition to Certificated Preference Shares and except as provided below, the Preference Shares sold in reliance on Regulation S may be represented by one or more Regulation S Global Preference Shares.  The Regulation S Global Preference Shares be deposited with the Trustee as custodian for, and registered in the name of, a nominee of the Depository for the respective accounts of the beneficial owners at Euroclear and Clearstream.  Beneficial interests in a Regulation S Global Preference Share may be held only through Euroclear or Clearstream.  Investors may hold their interests in a Regulation S Global Preference Share directly through Euroclear or Clearstream, if they are participants in such systems, or indirectly through organizations that are participants in such systems.  Beneficial interests in a Regulation S Global Preference Share may not be held by a U.S. Person at any time.  By acquisition of a beneficial interest in a Regulation S Global Preference Share, the purchaser thereof will be deemed to represent that it is not a U.S. Person and that, if in the future it determines to transfer such beneficial interest, it will transfer such interest only to a person whom the seller reasonably believes to be a non-U.S. Person or to a person who takes delivery in the form of an interest in a Regulation S Global Preference Share.

Preference Shares sold in non-Offshore Transactions or to U.S. Persons may only be sold to (i) a Qualified Institutional Buyer or an Accredited Investor who, in either case, is also (ii) (A) a Qualified Purchaser, (B) a Knowledgeable Employee or (C) an entity owned exclusively by Qualified Purchasers and/or Knowledge Employees, and will be issued in the form of one or more Certificated Preference Shares. In addition, Preference Shares sold to non-U.S. Persons in Offshore Transactions in reliance on Regulation S may also be issued in the form of one or more Certificated Preference Shares.

Beneficial interests in the Preference Shares will be subject to certain restrictions on transfer set forth therein and in the Preference Share Documents and the Preference Shares will bear the applicable legends regarding the restrictions set forth under "Transfer Restrictions."  Certificated Preference Shares may be transferred only upon (*inter alia*) receipt by the Preference Shares Paying Agent of a written certification (in the form provided in the Preference Share Documents) from the transferee to the effect that the transferee is (A) a Qualified Institutional Buyer or an Accredited Investor who is also, in either case, (i) a Qualified Purchaser, (ii) a Knowledgeable Employee or (iii) an entity owned exclusively by Qualified Purchasers and/or Knowledgeable Employees, and such transfer is being made in accordance with any applicable securities laws of any state of the United States or any other jurisdiction or (B) a non-U.S. Person and such transfer is being made in an Offshore Transaction in accordance with Regulation S. See "Transfer Restrictions."

Except in the limited circumstances described in this paragraph, owners of beneficial interests in Preference Shares held in the form of Regulation S Global Preference Shares will not be entitled to receive delivery of certificated Preference Shares.  A Regulation S Global Preference Share deposited with the Depository pursuant to the Preference Share Documents shall be transferred to the beneficial

009431

owners thereof only if such transfer complies with the Preference Share Documents and either (i) the Depository notifies the Co-Issuers that it is unwilling or unable to continue as depository for a Regulation S Global Preference Share or ceases to be a "Clearing Agency" registered under the Exchange Act and a successor depository is not appointed by the Issuer within 90 days of such notice or (ii) as a result of any amendment to or change in, the laws or regulations of the Cayman Islands or of any authority therein or thereof having power to tax or in the interpretation or administration of such laws or regulations which become effective on or after the Closing Date, the Issuer or the Paying Agent becomes aware that it is or will be required to make any deduction or withholding from any payment in respect of the Preference Shares which would not be required if the Preference Shares were in definitive form. Payments on such certificated Preference Shares will be made by wire transfer in immediately available funds to a Dollar-denominated account maintained by the owner or, if a wire transfer cannot be effected, by a Dollar check delivered to the owner. See "Settlement and Clearing."

Maples Finance Limited, has been appointed and will serve as the registrar with respect to the Preference Shares (the "**Share Registrar**") and will provide for (*inter alia*) the registration of the Preference Shares and the registration of transfers of the Preference Shares in accordance with the Preference Share Documents and the Administration Agreement in the register maintained by it. The Preference Shares will be issued in minimum numbers of 100 Preference Shares per investor and integral multiples of one Preference Share in excess thereof.

**No Exchange of the Composite Securities**

The Components of the Composite Securities are not separately transferable. For the avoidance of doubt, a Holder of a Class 1 Composite Security may not exchange its Class 1 Composite Security for proportional interests in the underlying securities represented by the Components thereof.

**The Indenture**

The following summary describes certain provisions of the Indenture. The summary does not purport to be complete and is subject to, and qualified in its entirety by reference to, the provisions of the Indenture.

*Events of Default*

"**Event of Default**" is defined in the Indenture as:

(a)     a default for four Business Days in the payment of any interest on any Class of Notes (determined without giving effect to any payments made under the Policy) that is currently part of the Controlling Class when it becomes payable (or in the case of a default in payment due to an administrative error or omission by the Trustee, the Irish Listing and Paying Agent or the Indenture Registrar, after seven Business Days);

(b)     a default in the payment of principal of any Note (and any Make-Whole Premium, if applicable) (determined without giving effect to any payments made under the Policy) or any distribution with respect to the Class 1 Component under "—Priority of Payments—Class 1 Component Distributions," when the same becomes payable, at its Stated Maturity or on the Redemption Date;

(c)     the failure on any Payment Date to disburse amounts available in the Payment Account in accordance with the Priority of Payments and the failure continues for 3 Business Days;

009432

(d)    on any Measurement Date for so long as any Senior Class A Notes or Class A-2 Notes are Outstanding, the Overcollateralization Ratio Numerator is less than 102% of the Aggregate Outstanding Amount of the Senior Class A Notes and the Class A-2 Notes;

(e)    either of the Co-Issuers or the pool of Collateral becomes an investment company under the 1940 Act;

(f)    breach of any other covenant or other agreement of the Issuer or the Co-Issuer under the Indenture (other than any failure to satisfy any of the Collateral Quality Tests, any of the Concentration Limitations, any of the Coverage Tests, the Reinvestment Overcollateralization Test, or other covenants or agreements for which a specific remedy has been provided under the Indenture) in any material respect, or the failure of any representation or warranty of the Issuer or the Co-Issuer made in the Indenture or in any certificate or other writing delivered pursuant thereto, or in connection therewith, to be correct in any material respect when made, and the breach or failure continues for 30 days after either of the Co-Issuers has actual knowledge of it or after notice to the Issuer, the Co-Issuer and the Portfolio Manager by the Trustee or to the Issuer, the Co-Issuer, the Portfolio Manager and the Trustee by the Holders of at least 25% of the Aggregate Outstanding Amount of the Controlling Class by registered or certified mail or overnight courier specifying the breach or failure and requiring it to be remedied and stating that the notice is a "Notice of Default" under the Indenture;

(g)    the entry of a decree or order by a court having competent jurisdiction adjudging the Issuer or the Co-Issuer as bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment, or composition of the Issuer or the Co-Issuer under the Bankruptcy Law or any other applicable law, or appointing a receiver, liquidator, assignee, or sequestrator (or other similar official) of the Issuer or the Co-Issuer or of any substantial part of its property, or ordering the winding up or liquidation of its affairs, and if the decree or order remains unstayed and in effect for 45 consecutive days;

(h)    the institution by the shareholders of the Issuer or the Co-Issuer of Proceedings to have the Issuer or Co-Issuer, as the case may be, adjudicated as bankrupt or insolvent, or the consent by the shareholders of the Issuer or the Co-Issuer to the institution of bankruptcy or insolvency Proceedings against the Issuer or Co-Issuer, or the filing by the Issuer or the Co-Issuer of a petition or answer or consent seeking reorganization or relief under the Bankruptcy Law or any other similar applicable law, or the consent by the Issuer or the Co-Issuer to the filing of any such petition or to the appointment of a receiver, liquidator, assignee, trustee, or sequestrator (or other similar official) of the Issuer or the Co-Issuer or of any substantial part of its property, or the making by the Issuer or the Co-Issuer of an assignment for the benefit of creditors, or the admission by the Issuer or the Co-Issuer in writing of its inability to pay its debts generally as they become due, or the taking of any action by the Issuer or the Co-Issuer in furtherance of any such action;

(i)    one or more final judgments is rendered against the Issuer or the Co-Issuer that exceed in the aggregate U.S.$2,000,000 (or any lesser amount specified by any Rating Agency) and that remain unstayed, undischarged, and unsatisfied for 30 days after the judgments become nonappealable, unless adequate funds have been reserved or set aside for their payment, and unless (except as otherwise specified in writing by each Rating Agency) the Rating Condition with respect to each Rating Agency is satisfied with respect thereon; or

(j)    the occurrence of an "Event of Default" under (and defined in) the Insurance Agreement.

If an Event of Default is continuing (other than (i) an Event of Default described in clauses (e), (g) or (h) under "—Events of Default" above or (ii) and Event of Default with respect to the Class 1

80

009433

Component under clause (b) above "—Events of Default"), the Trustee may, and upon the written direction of a Majority of the Controlling Class shall, declare the principal of all the Notes and the Class 1 Component to be immediately payable (and the Class 1 Composite Security Rated Balance shall become immediately payable) by notice to the Applicable Issuers, and upon that declaration the unpaid principal of all the Notes, together with all its accrued and unpaid interest (and any applicable Defaulted Interest Charge), and other amounts payable under the Indenture, shall become immediately payable. The Reinvestment Period shall terminate upon a declaration of acceleration (subject to re-commencement as described below). If an Event of Default described in clauses (e), (g) or (h) above under "—Events of Default" occurs, all unpaid principal, together with all its accrued and unpaid interest (and any applicable Defaulted Interest Charge), of all the Notes and the Class 1 Component, and other amounts payable under the Indenture, shall automatically become payable (and the Class 1 Composite Security Rated Balance shall become immediately payable) without any declaration or other act on the part of the Trustee or any Noteholder and the Reinvestment Period shall terminate automatically (subject to re-commencement as described below). If an Event of Default occurs with respect to the Class 1 Component under clause (b) above under "—Events of Default," a Majority of the Holders of the Class 1 Composite Securities may declare the Class 1 Component immediately payable by notice to the Issuer and the Class 1 Composite Security Rated Balance shall become immediately payable. Payment of the Class 1 Composite Security Rated Balance when made shall be made to the Holders of the Class 1 Components as a distribution in kind of a *pro rata* share (based on the Class 1 Composite Security Rated Balance) of each item of the Class 1 Collateral.

At any time after the declaration of acceleration of maturity has been made and before a judgment or decree for payment of the money due has been obtained by the Trustee, a Majority of the Controlling Class (or a Majority of the Holders of the Class 1 Composite Securities solely in respect of the acceleration of the Class 1 Component by the Majority of the Class 1 Component) by written notice to the Issuer, the Trustee and the Preference Shares Paying Agent, may rescind the declaration and its consequences if:

(i)     the Issuer or the Co-Issuer has paid or deposited with the Trustee a sum sufficient to pay:

(A)     all unpaid installments of interest and principal on the Notes then due or, in the case of acceleration of the Class 1 Component by the Majority of the Class 1 Component, all distributions with respect to the Class 1 Component under "—Priority of Payments—Class 1 Component Distributions" (other than as a result of the acceleration);

(B)     to the extent that payment of the interest is lawful, interest on any Deferred Interest and Defaulted Interest at the Applicable Note Interest Rate or Default Interest Rate, as applicable;

(C)     all unpaid Accrued Insurance Liabilities and unpaid Premium;

(D)     all Administrative Expenses of the Co-Issuers and other sums paid or advanced by the Trustee under the Indenture;

(E)     all unpaid Senior Management Fees; and

(F)     all amounts then payable to any Hedge Counterparty; and

009434

(ii)     the Trustee has determined that all Events of Default, other than the nonpayment of the interest on or principal of the Notes or nonpayment of distributions with respect to the Class 1 Component under "—Priority of Payments—Class 1 Component Distributions" that have become due solely by the acceleration, have been (A) cured, and a Majority of the Controlling Class (or a Majority of the Holders of the Class 1 Composite Securities solely in respect of the acceleration of the Class 1 Component) by written notice to the Trustee has agreed with that determination, or (B) waived as provided in the Indenture.

No rescission shall affect any subsequent Default or impair any right resulting from the Default.

If an Event of Default is continuing, the Trustee shall retain the Class 1 Collateral intact, collect, and cause the collection of the proceeds of the Class 1 Collateral and make and apply all payments and deposits and maintain all accounts in respect of the Class 1 Collateral and the Class 1 Components in accordance with "—Priority of Payments—Class 1 Component Distributions" and the Indenture and shall not sell the Class 1 Collateral in any circumstances unless so directed by all of the Holders of the Class 1 Composite Securities, in which case the Trustee shall sell the Class 1 Collateral to the Buyer identified by such Holders of the Class 1 Composite Securities.  If an Event of Default is continuing, the Trustee will retain the Collateral intact, collect, and cause the collection of the proceeds of the Collateral and make and apply all payments and deposits and maintain all accounts in respect of the Collateral and the Notes and any Hedge Agreements (other than amounts received under a Hedge Agreement that are used in putting a replacement hedge in place) in the manner described under "—Priority of Payments" and the Indenture unless either:

(i)     the Trustee determines (bid prices having been obtained with respect to each security contained in the Collateral from two nationally recognized dealers (or if there is only one dealer, that dealer and if there is no dealer, from a pricing service), selected and specified by the Portfolio Manager to the Trustee in writing, at the time making a market in those securities, and having computed the anticipated proceeds of sale or liquidation on the basis of the lower of the bid prices for each security) that the anticipated net proceeds of a sale or liquidation of the Collateral would (after deduction of the reasonable expenses of the sale or liquidation) be sufficient to discharge in full the amounts then due and unpaid on the Notes for principal and interest (including Defaulted Interest and Deferred Interest and any interest on the Defaulted Interest and the Deferred Interest), all Administrative Expenses, all other amounts (if any) then payable to the Hedge Counterparty by the Issuer (including any applicable termination payments) net of all amounts then payable to the Issuer by the Hedge Counterparty, all amounts owing by the Issuer to the Insurer under the Insurance Agreement, and all other amounts then payable under clause (3) under "—Priority of Payments—Interest Proceeds," and a Majority of the Controlling Class agrees with that determination; or

(ii)     the Holders of a Super Majority of each of the Senior Class A Notes, the Class A-2 Notes, the Class A-3 Notes, the Class B Notes and the Class C Notes direct the sale and liquidation of the Collateral; *provided*, *however*, if an Event of Default described in clause (d) under "Description of the Securities—Events of Default" occurs and if the Insurer is the Controlling Class, the Insurer shall have the sole right to direct the sale and liquidation of the Collateral under this clause (ii).

During the continuance of an Event of Default, a Majority of the Controlling Class or a Majority of the Class 1 Composite Securities, as applicable, may institute and direct the Trustee in the conduct of any proceedings for any remedy available to the Trustee or for the exercise of any right of the Trustee under the Indenture if the direction does not conflict with any rule of law or with any express provision of the Indenture and the Trustee has been indemnified to its reasonable satisfaction.  Any direction to the Trustee to undertake a sale of the Collateral or the Class 1 Collateral shall be by the Holders of Notes or the Class 1 Composite Securities representing the requisite percentage of the Aggregate Outstanding Amount of the Notes or Class 1 Composite Securities, as applicable, specified in the Indenture.  The

009435

Trustee need not take any action that it determines might involve it in liability unless it has received an indemnity reasonably satisfactory to it against the liability.

A Majority of the Controlling Class may on behalf of the Holders of all the Notes or all of the Holders of the Class 1 Composite Securities, as the case may be, before the time a judgment or decree for the payment of money due has been obtained by the Trustee, waive any past Event of Default or event that, with notice or the lapse of time or both, would become an Event of Default and its consequences, except such a default:

(i)     in the payment of principal or Redemption Price of any Note or the Class 1 Component, as the case may be, or in the payment of interest (including Defaulted Interest, Deferred Interest, and any interest on Defaulted Interest or Deferred Interest) on the Notes;

(ii)    with respect to a provision of the Indenture that cannot be modified or amended without the waiver or consent of the Holder of each Outstanding Note or Class 1 Composite Security adversely affected by the modification or amendment;

(iii)   in the payment of amounts due to the Portfolio Manager, the Trustee, the Insurer or the Hedge Counterparty, which may only be waived with the consent of the affected party; or

(iv)    arising as a result of an Event of Default described in clause (e), (g) or (h) under "—Events of Default."

No Holder of any Security may institute any proceeding with respect to the Indenture, or for the appointment of a receiver or trustee, or for any other remedy under the Indenture, unless:

(i)     the Holder has previously given to the Trustee written notice of an Event of Default;

(ii)    the Holders of not less than 25% of the Aggregate Outstanding Amount of the Controlling Class or, in the case of acceleration of the Class 1 Component by the Majority of the Class 1 Component, the Class 1 Components, of the Class 1 Composite Securities shall have made written request to the Trustee to institute Proceedings with respect to the Event of Default in its own name as Trustee under the Indenture and the Holders have offered to the Trustee indemnity satisfactory to it against the expenses and liabilities to be incurred in compliance with the request;

(iii)   the Trustee for 30 days after its receipt of the notice, request, and offer of indemnity has failed to institute a Proceeding; and

(iv)    no direction inconsistent with the written request has been given to the Trustee during the 30 day period by a Majority of the Controlling Class or, in the case of acceleration of the Class 1 Component by the Majority of the Class 1 Component, the Class 1 Components, of the Class 1 Composite Securities.

If the Trustee receives conflicting or inconsistent requests and indemnity from two or more groups of Holders of the Controlling Class, each representing less than a Majority of the Controlling Class, the Trustee shall take the action requested by the Holders of the largest percentage in Aggregate Outstanding Amount of the Controlling Class, notwithstanding any other provisions of the Indenture.

009436

**Supplemental Indentures**

*Without Consent of Holders*

Without the consent of the Holders of any Securities, but with the consent of the parties the consent of which is required as described in the following paragraph, the Co-Issuers, in each instance when authorized by resolutions of the respective Boards of Directors, and the Trustee, at any time and from time to time subject to the requirement provided below with respect to receipt of a Rating Confirmation, may, and the Insurer shall, if it is not materially and adversely affected thereby (and will be bound by a standard of good faith and fair dealing in making such determination) enter into one or more indentures supplemental to the Indenture, in form satisfactory to the Trustee, for any of the following purposes:

(1) to evidence the succession of another person to the Issuer or the Co-Issuer and the assumption by the successor person of the obligations of the Issuer or the Co-Issuer under the Indenture and in the Securities;

(2) to add to the covenants of the Co-Issuers or the Trustee for the benefit of the Holders of the Notes and the Composite Securities or to surrender any right in the Indenture conferred on the Co-Issuers;

(3) to convey, transfer, assign, mortgage, or pledge any property to the Trustee, or add to the conditions, limitations or restrictions on the authorized amount, terms and purposes of the issue, authentication and delivery of the Notes and the Composite Securities;

(4) evidence and provide for the acceptance of appointment under the Indenture by a successor Trustee and to add to or change any of the provisions of the Indenture necessary to facilitate the administration of the trusts under the Indenture by more than one Trustee, pursuant to the requirements of the Indenture;

(5) correct or amplify the description of any property at any time subject to the lien of the Indenture, or to better assure, convey, and confirm to the Trustee any property subject or required to be subject to the lien of the Indenture (including all actions appropriate as a result of changes in law) or to subject to the lien of the Indenture any additional property;

(6) modify the restrictions on and procedures for resales and other transfers of the Notes and the Composite Securities to reflect any changes in applicable law (or its interpretation) or to enable the Co-Issuers to rely on any less restrictive exemption from registration under the Securities Act or the 1940 Act or to remove restrictions on resale and transfer to the extent not required under the Indenture;

(7) with the consent of the Portfolio Manager, to modify the restrictions on the sales of Collateral Obligations described in "Security for the Notes and the Composite Securities—Sale of Collateral Obligations; Reinvestment of Principal Proceeds and Reinvestment Criteria" or the Eligibility Criteria described in "Security for the Notes and the Composite Securities—Eligibility Criteria" (and the related definitions) in a manner not materially adverse to the Holders of any Class of Securities as evidenced by an opinion of counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion) or a certificate of an officer of the Portfolio Manager to the effect that the modification would not be materially adverse to the Holders of any Class of Securities;

009437

(8)      make appropriate changes for any Class of Securities (other than the Preference Shares) to be listed on an exchange other than the Irish Stock Exchange;

(9)      otherwise to correct any inconsistency or cure any ambiguity or errors in the Indenture;

(10)     accommodate the issuance of the Notes or Composite Securities in book-entry form through the facilities of DTC or otherwise;

(11)     to take any appropriate action to prevent the Issuer, the Insurer, the Holders of Securities or the Trustee from becoming subject to withholding or other taxes, fees, or assessments or to prevent the Issuer from being treated as being engaged in a U.S. trade or business or otherwise being subject to U.S. federal, state, or local income tax on a net income basis, so long as the action will not cause the Insurer or the Holders of any Securities to be adversely affected to any material extent by any change to the timing, character, or source of the income from the Securities, as evidenced by an opinion of counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion);

(12)     to authorize the appointment of any listing agent, transfer agent, paying agent, or additional registrar for any Class of Notes or Composite Securities appropriate in connection with the listing of any Class of Securities (other than the Preference Shares) on the Irish Stock Exchange or any other stock exchange, and otherwise to amend the Indenture to incorporate any changes required or requested by any governmental authority, stock exchange authority, listing agent, transfer agent, paying agent, or additional registrar for any Class of Notes or Composite Securities in connection with its appointment, so long as the supplemental indenture would not materially and adversely affect any Holder of Notes or Composite Securities, as evidenced by an opinion of counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion) or a certificate of an Authorized Officer of the Portfolio Manager, to the effect that the modification would not be materially adverse to the Holders of any Class of Notes or Composite Securities;

(13)     to amend, modify, enter into, or accommodate the execution of any contract relating to a Synthetic Security (including posting collateral under a Synthetic Security Agreement);

(14)     to modify certain representations as to Collateral in the Indenture in order that it may be consistent with applicable laws or Rating Agency requirements;

(15)     to evidence any waiver by any Rating Agency as to any requirement or condition, as applicable, of the Rating Agency in the Indenture;

(16)     to facilitate the issuance of participation notes, combination notes, composite securities and other similar securities;

(17)     to facilitate hedging transactions;

(18)     to facilitate the ability of the Issuer to lend collateral pursuant to a Securities Lending Agreement;

(19)     to modify any provision to facilitate an exchange of one security for another security of the same issuers that has substantially identical terms except transfer restrictions, including to effect any serial designation relating to the exchange; or

009438

(20)     with the consent of the Portfolio Manager, to enter into any additional agreements not expressly prohibited by the Indenture as well as any amendment, modification, or waiver if the Issuer determines that the amendment, modification, or waiver would not, upon or after becoming effective, materially and adversely affect the rights or interest of the Holders of any Class of Securities, as evidenced by an opinion of counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion) or a certificate of an officer of the Portfolio Manager, to the effect that the modification would not be materially adverse to the Holders of any Class of Securities.

Without the consent of the Portfolio Manager, no supplemental indenture may be entered into that would reduce the rights, decrease the fees or other amounts payable to the Portfolio Manager under the Indenture or increase the duties or obligations of the Portfolio Manager. The Trustee is authorized to join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations that may be in the agreements, but the Trustee shall not be obligated to enter into any such supplemental indenture that affects the Trustee's own rights, duties, liabilities, or immunities under the Indenture or otherwise, except to the extent required by law. Unless notified by a Majority of any Class of Securities that the Class of Securities would be materially and adversely affected, the Trustee may rely on a certificate of the Portfolio Manager and an opinion of counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion) as to whether the interests of any Holder of Securities would be materially and adversely affected by any such supplemental indenture. The Trustee shall give at least 15 Business Days' notice of the proposed change to the Holders of the Notes and to the Preference Shares Paying Agent (for forwarding to the Holders of the Preference Shares).

If any Outstanding Notes or Composite Securities are rated by a Rating Agency, the Trustee shall enter into a supplemental indenture without the consent of Holders only if either (1) the Rating Condition with respect to each Rating Agency is satisfied with respect to the supplemental indenture or (2) the Portfolio Manager and the Holders of 100% in Aggregate Outstanding Amount of each Class of Notes and Composite Securities the ratings on which would be reduced or withdrawn consent to the supplemental indenture. Prior to the entry into any supplemental Indenture with respect to which a Rating Confirmation for one or more Classes of Notes is not expected to be delivered, the Trustee shall provide written notice to each Holder of each Outstanding Note and each Holder of each Outstanding Composite Security informing them of such fact.

For so long as any Notes or Composite Securities are Outstanding and rated by a Rating Agency, the Trustee shall provide to the Rating Agency, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) and each Hedge Counterparty a copy of any proposed supplemental indenture at least 15 Business Days before its execution by the Trustee.

*With Consent of Holders*

If the Rating Condition is satisfied with respect to each Rating Agency, with the consent of (a) the Portfolio Manager if the supplemental indenture would reduce the rights, decrease the fees or other amounts payable to it under the Indenture or increase the duties or obligations of the Portfolio Manager, (b) a Majority of each Class of Notes adversely affected thereby, by Act of the Holders of each such Class of Notes, (c) a Majority of the Composite Securities adversely affected thereby, by Act of the Holders of the Composite Securities and (d) a Majority of the Preference Shares adversely affected thereby, the Trustee, the Insurer and the Co-Issuers may enter into a supplemental indenture to add any provisions to, or change in any manner or eliminate any of the provisions of, the Indenture or modify in any manner the rights of the Holders of the Notes and the Composite Securities under the Indenture.

009439

Any proposed supplemental indenture that would also necessitate a change to the Issuer Charter may only be made after a Special Resolution (as defined in the Issuer Charter) has been passed to permit the Issuer's constitutional documents to be altered to conform them to the proposed change to the Indenture as certified to the Trustee by the Issuer.

Notwithstanding anything in the Indenture to the contrary, without the consent of the Holder of each Outstanding Note adversely affected thereby, the Holder of each Outstanding Composite Security adversely affected thereby and the Holder of each Outstanding Preference Share adversely affected thereby, no supplemental indenture shall:

(i) change the Stated Maturity of the principal of or the due date of any installment of interest on any Note or the Class 1 Component or of any payment to the Preference Shares Paying Agent for payment to the Holders of the Preference Shares Interests, reduce its principal amount or the rate of interest on it, or the Default Interest Rate or the Redemption Price with respect to any Note, the Class 1 Component or Preference Share, or change the earliest date on which Notes of any Class or Preference Share may be redeemed at the option of the Issuer, change the provisions of the Indenture relating to the application of proceeds of any Collateral to the payment of principal of or interest on Notes and the application of proceeds of any Class 1 Collateral or Preference Share Components corresponding to their related Components, or to payment to the Preference Shares Paying Agent for payment to the Holders of the Preference Shares, or change any place where, or the coin or currency in which, Notes or their principal or interest are paid or impair the right to institute suit for the enforcement of any such payment on or after their Stated Maturity (or, in the case of redemption, on or after the applicable Redemption Date);

(ii) reduce the percentage of the Aggregate Outstanding Amount of Holders of Notes of each Class or Composite Securities or Holders of Preference Shares whose consent is required for the authorization of any such supplemental indenture or for any waiver of compliance with certain provisions of the Indenture or certain defaults under the Indenture or their consequences provided for in the Indenture;

(iii) permit the creation of any lien ranking prior to or on a parity with the lien of the Indenture with respect to any part of the Collateral or the Class 1 Collateral or terminate the lien on any property at any time subject hereto or deprive the Holder of any Note or Composite Security of the security afforded by the lien of the Indenture;

(iv) reduce the percentage of the Aggregate Outstanding Amount of Holders of Notes of each Class whose consent is required to request the Trustee to preserve the Collateral or the percentage of the Aggregate Outstanding Amount of Holders of Class 1 Composite Securities whose consent is required to request the Trustee to preserve the Class 1 Collateral or rescind the Trustee's election to preserve the Collateral or the Class 1 Collateral, as the case may be, pursuant to the Indenture or to sell or liquidate the Collateral or the Class 1 Collateral, as the case may be, pursuant to the Indenture;

(v) modify any of the provisions of the Indenture with respect to supplemental indentures or to provide that certain other provisions of the Indenture cannot be modified or waived without the consent of the Holder of each Outstanding Note, Preference Share and Composite Security affected thereby;

(vi) modify the definition of "Outstanding," "Controlling Class," or "Majority," or the Priority of Payments in the Indenture; or

(vii) modify any of the provisions of the Indenture in such a manner as to affect the calculation of the amount of any payment of Redemption Price or of interest or principal on any

009440

Note or the Class 1 Component or any payment to the Preference Shares Paying Agent for the payment of dividends or other payments on the Preference Shares on any Payment Date (or, with respect to the Preference Share Components, the Composite Securities Payment Date) or to affect the rights of the Holders of Notes or Preference Shares or the Holders of the Class 1 Composite Securities to the benefit of any provisions for the redemption of the Notes, the Class 1 Component or the Preference Shares contained in the Indenture.

Not later than 15 Business Days prior to the execution of any proposed supplemental indenture pursuant to the above provision, the Trustee, at the expense of the Co-Issuers, shall mail to the Holders of the Notes and the Composite Securities, the Portfolio Manager, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) and each Rating Agency (so long as any rated Notes or Composite Securities are Outstanding) a copy of such supplemental indenture and shall request any required consent from the applicable Holders of Securities to be given within the Initial Consent Period. Any consent given to a proposed supplemental indenture by the Holder of any Securities shall be irrevocable and binding on all future Holders or beneficial owners of that Security, irrespective of the execution date of the supplemental indenture. If the Holders of less than the required percentage of the Aggregate Outstanding Amount of the relevant Securities consent to a proposed supplemental indenture within the Initial Consent Period, on the first Business Day after the Initial Consent Period, the Trustee shall notify the Issuer and the Portfolio Manager which Holders of Securities have consented to the proposed supplemental indenture and, which Holders (and, to the extent such information is reasonably available to the Trustee, which beneficial owners) have not consented to the proposed supplemental indenture. If it intends to exercise its Amendment Buy-Out Option, the Amendment Buy-Out Purchaser shall so notify the Trustee (which notice shall designate a date for the Amendment Buy-Out to occur no earlier than 10 Business Days after the date of such notice) no later than five (5) Business Days after so being notified by the Trustee and the Trustee shall mail such notice to all Holders of Notes and Composite Securities and the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares). Any Non-Consenting Holder may give consent to the related proposed supplemental indenture until the 5th Business Day prior to the date of the Amendment Buy-Out designated by the Amendment Buy-Out Purchaser, and in such case shall cease to be a Non-Consenting Holder for purposes of the Amendment Buy-Out. If the Amendment Buy-Out Purchaser exercises its Amendment Buy-Out Option and purchases the applicable Securities, the Amendment Buy-Out Purchaser, as Holder or beneficial owner of the applicable Securities, may consent to the related proposed supplemental indenture within five (5) Business Days of the Amendment Buy-Out. In the event that the Insurer does not consent to the related proposed supplemental indenture but all of the Holders of the Notes whose consent is required have consented to such proposed supplemental indenture, the Holders of the Insured Notes may, pursuant to the Indenture and as described in "—Termination of the Policy," terminate the Policy, upon which, the consent of the Insurer pursuant to this clause (c) shall no longer be required; *provided*, *however*, that no such amendment shall (i) affect the rights of the Insurer to be reimbursed for Accrued Insurance Liabilities, (ii) decrease the rights of the Insurer or (iii) increase the duties or obligations of the Insurer that survive the termination of the Policy.

It shall not be necessary for any Act of Holders of Notes or Composite Securities under the above provision to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if the Act or consent approves its substance.

At the cost of the Co-Issuers, for so long as any Notes or Composite Securities are Outstanding and rated by a Rating Agency, the Trustee will provide to the Rating Agency a copy of any proposed supplemental indenture at least 15 Business Days before its execution by the Trustee and a copy of the executed supplemental indenture will be mailed to the Holders of the Notes and the Composite Securities, the Portfolio Manager, the Preference Shares Paying Agent (for forwarding to the Holders of the Preference Shares) and each Rating Agency after its execution.

009441

**Amendment Buy-Out**

In the case of any supplemental indenture that requires the consent of one or more Holders of Securities, the Amendment Buy-Out Purchaser shall have the right, but not the obligation, to purchase from Non-Consenting Holders all Securities held by such Holders of the Class of Securities whose consent was solicited with respect to such supplemental indenture (the "**Amendment Buy-Out Option**") for the applicable Amendment Buy-Out Purchase Price. If such option is exercised, the Amendment Buy-Out Purchaser must purchase all such Securities of Non-Consenting Holders, regardless of the applicable percentage of the Aggregate Outstanding Amount of the Securities the consent of whose Holders is required for such supplemental indenture (an "**Amendment Buy-Out**"). By its acceptance of its Securities under the Indenture, each Holder of Securities agrees that if the Amendment Buy-Out Option is exercised, any Non-Consenting Holder will be required to sell its applicable Securities to the Amendment Buy-Out Purchaser; *provided* that, if the solicited consent to a supplemental indenture only applies to one Component of a Composite Security, the Non-Consenting Holder will be required to sell, at the Non-Consenting Holder's option, its Composite Security as a whole. Neither the Amendment Buy-Out Purchaser nor any other Person shall have any liability to any Holder or beneficial owner of Securities as a result of an election by the Amendment Buy-Out Purchaser not to exercise the Amendment Buy-Out Option.

All purchases made pursuant to an Amendment Buy-Out Option individually and in the aggregate must comply with the applicable transfer restrictions for the relevant Securities set forth in "Transfer Restrictions" and all applicable laws, rules and regulations (including, without limitation, any rules, regulations and procedures of any securities exchange, self-regulatory organization or clearing agency).

**Removal Buy-Out**

In the case of any proposed removal of the Portfolio Manager relating to the occurrence of an Event of Default described in clause (d) under "—Events of Default," pursuant to the Management Agreement and as described in "The Management Agreement," the Removal Buy-Out Purchaser shall have the right, but not the obligation, to purchase from the Holders of the Class A-1g Notes, all Class A-1g Notes (the "**Removal Buy-Out Option**") for the applicable Removal Buy-Out Purchase Price. If such option is exercised, the Removal Buy-Out Purchaser must purchase all such Class A-1g Notes, regardless of the applicable percentage of the Aggregate Outstanding Amount of the Controlling Class required to remove the Portfolio Manager pursuant to the Management Agreement and as described in "The Management Agreement" (a "**Removal Buy-Out**"). By its acceptance of the Class A-1g Notes under the Indenture, each Holder of Class A-1g Notes agrees that if the Removal Buy-Out Option is exercised, any Holder of Class A-1g Notes will be required to sell its applicable Class A-1g Notes to the Removal Buy-Out Purchaser. Neither the Removal Buy-Out Purchaser nor any other Person shall have any liability to any Holder or beneficial owner of Class A-1g Notes as a result of an election by the Removal Buy-Out Purchaser not to exercise the Removal Buy-Out Option.

All purchases made pursuant to a Removal Buy-Out Option individually and in the aggregate must comply with the applicable transfer restrictions for the Class A-1g Notes set forth in "Transfer Restrictions" herein and all applicable laws, rules and regulations (including, without limitation, any rules, regulations and procedures of any securities exchange, self-regulatory organization or clearing agency).

Upon the effectiveness of the Removal Buy-Out, the Removal Buy-Out Purchaser shall be deemed to have exercised its right, without any further action or notice to any Person, to terminate the Policy pursuant to the Indenture and as described in "—Termination of the Policy."

009442

**Voting Rights of the Preference Shares**

Holders of the Preference Shares will have no voting rights, either general or special, of the Issuer, except as set forth in the Preference Share Documents, as required by Cayman Islands law or as otherwise described herein.

**Notices**

Notices to the Holders of the Securities will be given by first-class mail, postage prepaid, to the registered Holders of the Securities at their respective addresses appearing in the Indenture Register and the Preference Shares Paying Agent (for forwarding to the Holders of the Preference Shares). If and for so long as any Class of Securities (other than the Preference Shares) is listed on the Irish Stock Exchange and the rules of the exchange so require, notice will also be given to the Company Announcements Office of the Irish Stock Exchange.

**Certain Covenants**

The Indenture contains certain covenants restricting the conduct of the Co-Issuers, including (i) restrictions on consolidations, mergers and transfers or conveyances of assets involving either Co-Issuer, (ii) restrictions on incurrence of debt other than the Notes and certain obligations incidental to the performance by each Co-Issuer of its obligations under the Indenture, (iii) restrictions on the ability of either Co-Issuer to conduct activities inconsistent with its special-purpose nature and (iv) certain restrictions on amendments of the Collateral Administration Agreement and the Management Agreement.

**Certain Additional Issues Relating to Listing of Securities**

Application will be made to admit each Class of Securities (other than the Preference Shares) to the Daily Official List of the Irish Stock Exchange. There can be no assurance that any such admission will be granted or maintained.

The Indenture provides that, so long as any Notes or the Composite Securities remain Outstanding, the Co-Issuers shall use all reasonable efforts to obtain and maintain the listing of the Securities (other than the Preference Shares) on the Irish Stock Exchange.

**Cancellation**

All Securities that are paid in full or redeemed and surrendered for cancellation will forthwith be canceled and may not be reissued or resold.

**No Gross-Up**

All payments made by the Issuer under the Securities will be made without any deduction or withholding for or on account of any tax unless the deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If the Issuer is so required to deduct or withhold, then the Issuer will not be obligated to pay any additional amounts in respect of the withholding or deduction.

**Petitions for Bankruptcy**

The Indenture provides that the Trustee, the Insurer, each Hedge Counterparty, the Portfolio Manager and the Holders of the Notes and the Composite Securities may not cause the Issuer or Co-Issuer to petition for bankruptcy before one year and one day have elapsed since the final payments to the Holders of all Notes or, if longer, the applicable preference period then in effect, including any period established pursuant to the laws of the Cayman Islands.

**Standard of Conduct**

The Indenture provides that, in exercising any of its or their voting rights, rights to direct and consent or any other rights as a Noteholder or Composite Securityholder under the Indenture, subject to the terms and conditions of the Indenture, a Noteholder or Composite Securityholder or the Insurer shall not have any obligation or duty to any Person or to consider or take into account the interests of any Person and shall not be liable to any Person for any action taken by it or them or at its or their direction or any failure by it or them to act or to direct that an action be taken, without regard to whether the action or inaction benefits or adversely affects any Noteholder or Composite Securityholder, the Issuer, or any other Person, except for any liability to which the Noteholder or Composite Securityholder or the Insurer may be subject to the extent the same results from the Noteholder's or Composite Securityholder's taking or directing an action, or failing to take or direct an action, in bad faith or in violation of the express terms of the Indenture.

**Satisfaction and Discharge of Indenture**

The Indenture will be discharged with respect to the Collateral and the Class 1 Collateral upon delivery to the Trustee for cancellation of all of the Notes and Composite Securities, or, within certain limitations (including the obligation to pay interest on or principal of the Notes and the obligation to make payments with respect to the Class 1 Component) upon deposit with the Trustee of funds sufficient for the payment or redemption thereof and the payment by the Co-Issuers or the Issuer, as applicable, of all other amounts due under the Indenture.

**Trustee**

JPMorgan Chase Bank, National Association, will be the Trustee under the Indenture. The Co-Issuers, the Portfolio Manager and their respective Affiliates may maintain other banking relationships in the ordinary course of business with the Trustee and its affiliates. The payment of the fees and expenses of the Trustee relating to the Notes and the Composite Securities is solely the obligation of the Issuer. The payment of the fees and expenses, which will be paid in accordance with the Priority of Payments, is secured by a lien on the Collateral which is senior to the lien of the Holders of the Notes and is secured by a lien on the Class 1 Collateral which is senior to the lien of the Holders of the Composite Securities (solely to the extent of their Class 1 Component). The Trustee and its affiliates may receive compensation in connection with the investment of trust assets in certain Eligible Investments as provided in the Indenture. Eligible Investments may include investments for which the Trustee or its affiliates provide services. The Indenture contains provisions for the indemnification of the Trustee for any loss, liability or expense incurred without negligence, willful misconduct or bad faith arising out of or in connection with the acceptance or administration of the Indenture.

Pursuant to the Indenture, as security for the payment by the Issuer of the compensation and expenses of the Trustee and any sums the Trustee may be entitled to receive as indemnification by the Issuer, the Issuer will grant the Trustee a senior lien on the Collateral, which is senior to the lien of the holders of the Secured Obligations on the Collateral.

Pursuant to the Indenture, the Trustee may resign at any time by providing 30 days' written notice and the Trustee may be removed at any time by an Act of a Majority of each Class of Notes, at any time when an Event of Default is continuing by a Majority of the Controlling Class, or by order of a court of competent jurisdiction. However, no resignation or removal of the Trustee will become effective until the acceptance of appointment by a successor Trustee pursuant to the terms of the Indenture.

**Governing Law**

The Notes, the Composite Securities, the Indenture, the Preference Shares Paying Agency Agreement, the Management Agreement, the Policy, the Insurance Agreement, the Collateral

009444

Administration Agreement, the Purchase Agreement, the Subscription Agreements, the Securities Lending Agreements, and the Hedge Agreements will be governed by the laws of the State of New York. The Administration Agreement and the Issuer Charter will be governed by the laws of the Cayman Islands.

**Method of Payments**

Payments of principal and interest on any Note or payments on or in respect of the Preference Shares (including any Redemption Price paid on the applicable Redemption Date) and of any payments on any Notes or Preference Shares will be made to the person in whose name the related Note or Preference Share is registered fifteen days before the applicable Payment Date (the "**Record Date**"). Payments will be made (i) in the case of a Global Security, to the Depository or its designee and to the Holder or its nominee with respect to a Certificated Composite Security or a Definitive Security, by wire transfer in immediately available funds to a United States dollar account maintained by the Depository or its nominee with respect to a Global Security and to the Holder or its designee with respect to a Certificated Composite Security or a Definitive Security if the Holder has provided written wiring instructions to the Trustee (or, in the case of the Preference Shares, the Preference Share Paying Agent) and, if the payment is to be made by the Irish Listing and Paying Agent, the Irish Listing and Paying Agent on or before the related Record Date or, (ii) if appropriate wiring instructions are not received by the related Record Date, by check drawn on a U.S. bank mailed to the address of the Holder in the Indenture Register (or, in the case of the Preference Shares, the Preference Share register). Final payments of principal of the Notes, Composite Securities or Preference Shares will be made against surrender of the related Notes, Composite Securities or Preference Shares at the office designated by the Trustee and the Preference Shares Paying Agent. None of the Issuer, the Co-Issuer, the Trustee, the Preference Shares Paying Agent, the Portfolio Manager, the Initial Purchaser, any paying agent, or any of their respective affiliates will have any responsibility or liability for any aspects of the records maintained by the Depository or its nominee or any of its direct or indirect participants (including Euroclear or Clearstream or any of their respective direct or indirect participants) relating to payments made on account of beneficial interests in a Global Security.

The Co-Issuers expect that the Depository or its nominee, upon receipt of any payment of principal or interest in respect of a Global Security held by the Depository or its nominee, will immediately credit participants' accounts with payments in amounts proportionate to their respective beneficial interests in the Global Security as shown on the records of the Depository or its nominee. The Co-Issuers also expect that payments by participants (i.e., direct participants) to owners of beneficial interests in a Global Security held through the participants (i.e., indirect participants) will be governed by standing instructions and customary practices, as is now the case with securities held for the accounts of customers registered in the names of nominees for the customers. The payments will be the responsibility of the participants.

For so long as any Securities (other than the Preference Shares) are listed on the Irish Stock Exchange and the rules of the exchange shall so require, the Issuer and the Co-Issuers, as applicable, will have the Irish Listing and Paying Agent for the Notes in Ireland and payments on the Notes may be effected through the Irish Listing and Paying Agent. If the Irish Listing and Paying Agent is replaced at any time during the period, notice of the appointment of any replacement will be given to the Company Announcements Office of the Irish Stock Exchange.

The full, complete and timely payment of (i) the Insured Amounts in respect of the Insured Notes on each Payment Date and (ii) any Insured Amount which subsequently is avoided in whole or in part as a preference payment under applicable law, will be irrevocably and unconditionally guaranteed pursuant to the Policy issued by the Insurer. See "The Insurer and the Policy."

009445

**Preference Shares Paying Agency Agreement**

Pursuant to the Preference Shares Paying Agency Agreement, the Preference Shares Paying Agent will perform various fiscal services with respect to the Preference Shares on behalf of the Issuer, including the maintenance of the Preference Shares Distribution Account and the making of distributions on the Preference Shares. The Preference Shares Paying Agent will deliver or request the Trustee to deliver all Monthly Reports and Valuation Reports prepared pursuant to the Indenture to the Holders of the Preference Shares, and the Preference Shares Paying Agent will deliver, or shall cause the Trustee or the Administrator to deliver, a copy of any other notice or information it receives from the Trustee under the Indenture to the Holders of the Preference Shares, in each case by first-class mail, postage prepaid, to each holder of a Preference Share at the address appearing in the Preference Share register. The payment of the fees and expenses of the Preference Shares Paying Agent is solely the obligation of the Issuer. The Preference Shares Paying Agency Agreement contains provisions for the indemnification of the Preference Shares Paying Agent for any loss, liability or expense incurred without gross negligence, willful misconduct or bad faith on its part, arising out of or in connection with the performance of its function under the Preference Shares Paying Agency Agreement.

On the Scheduled Preference Shares Redemption Date, the Issuer is scheduled to redeem the Preference Shares for a redemption price equal to all amounts distributable to the Preference Shares Paying Agent for distribution to the Holders of the Preference Shares as provided under "—Priority of Payments," unless the Preference Shares have been redeemed earlier through an optional redemption as described herein or otherwise.

The Preference Shares Paying Agency Agreement will be governed by, and construed in accordance with, the laws of the State of New York. The rights of the Holders of the Preference Shares will be governed by, and construed in accordance with, the laws of the Cayman Islands.

**The Issuer Charter**

The following summary describes certain provisions of the Issuer Charter relating to the Preference Shares that are not referred to elsewhere in this Offering Circular.

*Voting Rights*

Other than as provided below, only the holders of the Issuer Ordinary Shares shall have the right to receive notice of, attend at and vote as a shareholder of the Issuer at any general meeting of the Issuer. Every holder of an Issuer Ordinary Share present at any meeting shall, on a show of hands, be entitled to one vote and, on a poll, shall be entitled to one vote per Issuer Ordinary Share held by such holder.

The Holders of the Preference Shares shall have the right to receive notice of, attend at and vote as a shareholder of the Issuer at any general meeting of the Issuer only in respect of a resolution which relates to any circumstance or matter which under the Indenture, the Preference Share Documents or the Management Agreement can take place or occur only at the direction of the Holders of the Preference Shares (a "**Preference Share Vote**"). Every Holder of Preference Shares present shall, on a show of hands, be entitled to one vote and, on a poll, shall be entitled to one vote per Preference Share held by such Holder except that, in relation to a Preference Share Vote relating to certain matters (as set out in the Indenture) Preference Shares held by certain Holders (as set out in the Indenture), shall be ignored.

*Liquidation*

In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Issuer:

(i) the Holders of the Issuer Ordinary Shares at the time outstanding will be entitled to receive out of the assets of the Issuer available for distribution to shareholders, before any distribution of

assets is made to Holders of the Preference Shares, an amount equal to U.S.$2.00 in respect of each Issuer Ordinary Share held by each such holder; and

(ii) the Holders of the Preference Shares at the time Outstanding will be entitled to the balance of the assets of the Issuer available for distribution to shareholders, after distribution of amounts due to holders of Issuer Ordinary Shares under the above subparagraph, pro rata according to the number of Preference Shares held by each such holder.

If the assets available for distribution to holders of the Issuer Ordinary Shares are not sufficient to pay to such holders U.S.$2.00 in respect of each Issuer Ordinary Share, the available assets shall be distributed to holders of the Issuer Ordinary Shares *pro rata* according to the number of Issuer Ordinary Shares held by each such holder.

*Transfer*

The rights of a Holder of a Preference Share to transfer such Preference Share are subject to restrictions set out in the Preference Share Documents and as described in "Transfer Restrictions."

*Petitions for Bankruptcy*

Each Holder of a Preference Share will be required to agree (or be deemed to have agreed) not to cause the filing of a petition in bankruptcy or winding up against the Issuer before one year and one day have elapsed since the payment in full of the Notes or, if longer, the applicable preference period then in effect.

## USE OF PROCEEDS

The Securities will be issued and sold for Cash on the Closing Date. The gross proceeds from the issuance of such Securities on the Closing Date are expected to equal approximately U.S.$689,000,000 and will be used by the Issuer to:

- purchase a portfolio of Collateral Obligations;

- fund the Revolving Reserve Account and the Delayed Drawdown Reserve Account to cover any future draws on Revolving Loans and Delayed Drawdown Loans;

- enter into any Hedge Agreements, as applicable;

- enter into any Securities Lending Agreements (and correspondingly to fund the Securities Lending Account);

- enter into Synthetic Security Agreements (and correspondingly to fund the related accounts);

- repurchase and terminate Participations outstanding under the Warehouse Agreement (at a price reflecting the price originally paid by the Issuer to acquire the Warehoused Loan, *plus* the amount of extensions of credit in respect of certain Warehoused Loans, *minus* the aggregate amount of payments of principal received by the Warehouse Provider in respect of such Warehoused Loans (excluding the amount of any such payment that was required to be repaid or returned by the Warehouse Provider by claw-back or otherwise), *plus* all accrued and unpaid interest and fees on the Warehoused Loans;

- fund the Closing Date Expense Account and the Interest Reserve Account;

- purchase the Treasury Strip for deposit into the Class 1 Component Account;

009447

- pay an arrangement and advisory fee to Sumitomo Trust & Banking Co., Ltd.; and

- undertake certain related activities.

## SECURITY FOR THE NOTES AND THE COMPOSITE SECURITIES

The Notes, the Composite Securities and the Issuer's obligations under the Hedge Agreements, the Insurance Documents and the Management Agreement will be secured by the following:

(i) the Collateral Obligations and all Workout Assets;

(ii) the Custodial Account, the Collection Account, the Payment Account, the Revolving Reserve Account, the Delayed Drawdown Reserve Account, the Interest Reserve Account, the Synthetic Security Collateral Account, the Hedge Counterparty Collateral Account, the Closing Date Expense Account, the Expense Reimbursement Account and the Securities Lending Account (such accounts, collectively, the "Issuer Accounts"), Eligible Investments purchased with funds on deposit in the Issuer Accounts, and all income from the investment of funds in the Issuer Accounts;

(iii) the Synthetic Security Counterparty Account (and together with the Issuer Accounts, the "**Accounts**") and assets included therein, subject to the terms of the related Synthetic Security (*provided*, *however*, that any such rights in any Synthetic Security Counterparty Account shall be held in trust by the Trustee (or securities intermediary) first to secure the Issuer's payment obligations to the relevant Synthetic Security Counterparty and second for the benefit of the Secured Parties);

(iv) the Management Agreement, the Securities Lending Agreements, the Hedge Agreements as set forth in the Indenture, the Collateral Administration Agreement and, solely for the benefit of the Holders of the Class A-1g Notes only, the Insurance Documents to the extent of any rights of the Issuer therein;

(v) all Cash or money delivered to the Trustee (or its bailee); and

(vi) all proceeds with respect to the foregoing (collectively, the "**Collateral**").

For the avoidance of any doubt, Collateral will exclude (i) amounts released from the Trustee's lien in connection with certain Synthetic Securities, Hedge Agreements and Securities Lending Agreements in accordance with the Indenture, (ii) the Class 1 Collateral, and (iii) the Excluded Property.

The Class 1 Composite Securities (to the extent of the Class 1 Component) will be secured by the Class 1 Component Account and the Treasury Strip deposited into the Class 1 Component Account and all proceeds with respect to the foregoing (collectively, the "**Class 1 Collateral**").

### Purchase of Collateral Obligations

The Indenture will provide that the Portfolio Manager will use commercially reasonable efforts to cause the Issuer to purchase or enter into binding commitments to purchase Collateral Obligations that meet certain minimum amounts and characteristics. The composition of the portfolio of Collateral Obligations will be eligible for purchase by the Issuer if it meets the Eligibility Criteria and will be determined by the selections of the Portfolio Manager designed to meet the Collateral Quality Tests, the Coverage Tests and the Reinvestment Criteria. See "—Eligibility Criteria," "—The Collateral Quality Tests" and "—The Coverage Tests."

The Portfolio Manager expects that, by the end of the Ramp-Up Period, the Issuer will have purchased or committed to purchase Collateral Obligations having an Aggregate Principal Balance of

009448

approximately $663,000,000 (for the avoidance of doubt, without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to any Collateral Obligations on or before the Ramp-Up Completion Date).

**Eligibility Criteria**

On any date during the Reinvestment Period (and, in respect of Principal Proceeds constituting Unscheduled Principal Payments and Sale Proceeds from Credit Improved Obligations, on any date after the Reinvestment Period), so long as no Event of Default is continuing, at the direction of the Portfolio Manager, the Issuer may direct the Trustee to invest or reinvest Principal Proceeds (together with Interest Proceeds, but only to the extent used to pay for accrued interest on Collateral Obligations) in Collateral Obligations (including any related deposit into the Revolving Reserve Account or the Delayed Drawdown Reserve Account or the posting by the Issuer of cash collateral with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security) if the conditions specified in the Indenture are satisfied. No obligations may be purchased unless each of the conditions in the following clauses (1) through (12) (the "**Eligibility Criteria**") is satisfied as evidenced by a certificate of the Portfolio Manager as of the date the Issuer commits to make the purchase, in each case after giving effect to the purchase and all other purchases and sales previously or simultaneously committed to:

(1)     the obligation is a Collateral Obligation;

(2)     for any date occurring during the Reinvestment Period:

    (A)     each Overcollateralization Test is satisfied and, if the commitment is made on or after the second Payment Date, each Interest Coverage Test is satisfied; or

    (B)     if any such Coverage Test is not satisfied, both:

        (i)     the extent of satisfaction of the Coverage Test is not reduced; and

        (ii)     the Collateral Obligation is being purchased with Principal Proceeds other than:

            (x)     Principal Proceeds received in respect of a Defaulted Collateral Obligation; or

            (y)     Principal Proceeds received in respect of a Workout Asset that has been received in exchange for a Defaulted Collateral Obligation;

(3)     for any date occurring during the Reinvestment Period, the Diversity Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(4)     for any date occurring during the Reinvestment Period, the Weighted Average Rating Factor Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(5)     for any date occurring during the Reinvestment Period, each of the limits in the definition of "Concentration Limitations" is satisfied or, if any such limit is not satisfied, the extent of satisfaction is not reduced;

(6)     for any date occurring during the Reinvestment Period, the Weighted Average Spread Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

009449

(7)     for any date occurring during the Reinvestment Period, the Weighted Average Fixed Rate Coupon Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(8)     for any date occurring during the Reinvestment Period, the Weighted Average Life Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(9)     for any date occurring during the Reinvestment Period, the Weighted Average Moody's Recovery Rate Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(10)    for any date occurring during the Reinvestment Period, the Weighted Average S&P Recovery Rate Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(11)    for any date occurring during the Reinvestment Period, the S&P CDO Monitor Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced; provided, however, that this Eligibility Criterion (11) shall not apply either to reinvestment of the proceeds from the sale of a Credit Risk Obligation, Non-Performing Collateral Obligation or Workout Asset or to the reinvestment of Principal Proceeds in respect of Defaulted Collateral Obligations; and

(12)    for any date occurring after the Reinvestment Period:

    (A)    each Coverage Test is satisfied and the extent of satisfaction is not reduced;

    (B)    each Collateral Quality Test is maintained or improved;

    (C)    each Concentration Limitation is maintained or improved;

    (D)    the maturity date of such Collateral Obligation will occur prior to the Stated Maturity of the Notes; and

    (E)    the S&P Rating of such Collateral Obligation is at least equal to the S&P Rating of the Collateral Obligation being the source of the Unscheduled Principal Payments or of the Credit Improved Obligation being the source of Sale Proceeds, as applicable.

The Issuer may, at the direction of the Portfolio Manager, exchange a Collateral Obligation for another Collateral Obligation in an exchange of one security for another security of the same issuers that has substantially identical terms except transfer restrictions.

Cash on deposit in the Collection Account may be invested at any time in Eligible Investments in accordance with this "Eligibility Criteria" section pending investment in Collateral Obligations.

The Indenture provides that any sale or purchase by the Issuer of a Collateral Obligation shall be conducted on an arm's length basis and, if effected with the Portfolio Manager or a person Affiliated with the Portfolio Manager or any fund or account for which the Portfolio Manager or an Affiliate of the Portfolio Manager acts as investment adviser, shall be effected in accordance with the requirements the Management Agreement on terms no less favorable to the Issuer than would be the case if the person were not so Affiliated.

**The Collateral Quality Tests**

The Collateral Quality Tests will be used primarily as criteria for purchasing Collateral Obligations. See "—Eligibility Criteria" above and "—Sale of Collateral Obligations; Reinvestment of Principal Proceeds and Reinvestment Criteria" below. The Collateral Quality Tests are described below.

Measurement of the degree of compliance with the Collateral Quality Tests will be required on each Measurement Date on and after the Ramp-Up Completion Date.

*The Diversity Test*

The **"Diversity Test"** is a test that will be satisfied on any Measurement Date if the Diversity Score as of the Measurement Date equals or exceeds the Minimum Diversity Score.

*Weighted Average Life Test*

The **"Weighted Average Life Test"** is a that will be satisfied on any Measurement Date if the Weighted Average Life on that date of all Collateral Obligations is equal to or less than the number of years (including any fraction of a year) between such Measurement Date and March 15, 2014 or, in the case of a Maturity Extension, the Extended Weighted Average Life Date.

*Weighted Average Moody's Recovery Rate Test*

The **"Weighted Average Moody's Recovery Rate Test"** is a test that is satisfied as of any Measurement Date if the Moody's Minimum Average Recovery Rate is greater than or equal to 44.5%.

*Weighted Average S&P Recovery Rate Test*

The **"Weighted Average S&P Recovery Rate Test"** is a test that is satisfied as of any Measurement Date if the S&P Minimum Average Recovery Rate is greater than or equal to 49.3%.

**"S&P Minimum Average Recovery Rate"** is a rate, as of any Measurement Date, equal to the number obtained by:

(i)     summing the products obtained by multiplying the Principal Balance of each Collateral Obligation by its respective S&P Priority Category Recovery Rate;

(ii)     dividing the sum determined pursuant to clause (i) above by the sum of the Aggregate Principal Balance of all Collateral Obligations; and

(iii)     rounding up to the first decimal place.

*Weighted Average Fixed Rate Coupon Test*

The **"Weighted Average Fixed Rate Coupon Test"** is a test that is satisfied if, as of any Measurement Date, the Weighted Average Fixed Rate Coupon equals or exceeds 8.0 %.

009451

*Weighted Average Spread Test*

The **"Weighted Average Spread Test"** is a test that is satisfied as of any Measurement Date if the Weighted Average Spread as of the Measurement Date equals or exceeds the Minimum Weighted Average Spread.

*Weighted Average Rating Factor Test*

The **"Weighted Average Rating Factor Test"** is a test that is satisfied on any Measurement Date if the Weighted Average Moody's Rating Factor of the Collateral Obligations (excluding Eligible Investments) as of the Measurement Date is less than or equal to the Maximum Weighted Average Moody's Rating Factor.

*S&P CDO Monitor Test*

The **"S&P CDO Monitor Test"** is a test that will be satisfied on any Measurement Date if, after giving effect to the sale of a Collateral Obligation or the purchase of a Collateral Obligation, each Note Class Loss Differential of the Proposed Portfolio is positive. The S&P CDO Monitor Test shall be considered to be improved if each Note Class Loss Differential of the Proposed Portfolio is at least equal to the corresponding Note Class Loss Differential of the Current Portfolio. The S&P CDO Monitor Test is not required to be satisfied or improved upon the sale of a Credit Risk Obligation and the reinvestment of the related Sale Proceeds in additional Collateral Obligations. For purposes of the S&P CDO Monitor Test:

(i)     the S&P Rating of any S&P Unrated DIP Loan shall be "CCC-"; and

(ii)    the S&P Industry Classification for a Synthetic Security shall be that of the related Reference Obligation and not the Synthetic Security.

The **"Note Class Loss Differential"** with respect to any Measurement Date and any Class of Notes that is rated by S&P, the rate calculated by subtracting the Class Scenario Loss Rate for the Class from the then-applicable Note Break-Even Loss Rate for the Class of Notes.

The **"Note Break-Even Loss Rate"** with respect to each Class of Notes that is rated by S&P, the maximum percentage of defaults that the Current Portfolio or Proposed Portfolio can sustain and nevertheless sufficient funds will remain for the payment of principal of the Class of Notes in full by its Stated Maturity and the timely payment of interest on the Senior Class A Notes, the Class A-2 Notes and the Class A-3 Notes and the ultimate payment of interest on the Class B Notes and the Class C Notes using S&P's assumptions on recoveries, defaults, and timing, and taking into account the Priority of Payments and the adjusted Weighted Average Spread level specified in the applicable row of the table below. The adjusted Weighted Average Spread as of any Measurement Date is the Weighted Average Spread as of the Measurement Date *minus* the amount of any Spread Excess added to the Weighted Average Fixed Rate Coupon as of the Measurement Date.

009452

| Row | Adjusted Weighted Average Spread |
|-----|----------------------------------|
| 1 | Greater than or equal to 3.05 % |
| 2 | Greater than or equal to 2.95% but less than 3.05% |
| 3 | Greater than or equal to 2.85% but less than 2.95% |
| 4 | Greater than or equal to 2.75% but less than 2.85% |
| 5 | Greater than or equal to 2.65% but less than 2.75% |
| 6 | Greater than or equal to 2.55% but less than 2.65% |
| 7 | Greater than or equal to 2.45% but less than 2.55% |

**The Coverage Tests**

*General*

The Coverage Tests will be used to determine, among other things, whether Notes will be redeemed in certain circumstances as described under "Description of the Securities—Priority of Payments" and whether additional Collateral Obligations may be acquired as described under "—Eligibility Criteria." There will not be any Coverage Test applicable to the Composite Securities or the Preference Shares.

*The Overcollateralization Tests*

The "**Overcollateralization Tests**" will consist of the Class A Overcollateralization Test, the Class B Overcollateralization Test and the Class C Overcollateralization Test.

Each Overcollateralization Test will be satisfied with respect to any Class of Notes (treating the Senior Class A Notes, the Class A-2 Notes and the Class A-3 Notes as one Class for this purpose) on any Measurement Date if, as of such Measurement Date, the Overcollateralization Ratio for the Class is at least equal to the specified required level for the Class indicated in the table in "Summary of Terms—The Overcollateralization Tests."

The Overcollateralization Ratio, with respect to each Class of Notes (treating the Senior Class A Notes, the Class A-2 Notes and the Class A-3 Notes as one Class for this purpose) on any Measurement Date, is referred to as an "**Overcollateralization Ratio**," and is the ratio calculated by *dividing*:

(i)     the Overcollateralization Ratio Numerator; by

(ii)    the Aggregate Outstanding Amount of the Class of Notes and all Notes ranking senior to it together with any Deferred Interest on the Notes and all Notes ranking senior to it.

The "**Overcollateralization Ratio Numerator**" is, on any date, the sum of:

(1)     the Aggregate Principal Balance of all Collateral Obligations (other than any Excess CCC/Caa Collateral Obligations, any Non-Performing Collateral Obligations, any Deep Discount Obligations, and any Collateral Obligations loaned pursuant to a Securities Lending Agreement with respect to which an "event of default" (under and as defined in the Securities Lending Agreement) is continuing); *plus*

(2)     unpaid Accrued Interest Purchased With Principal (excluding any unpaid Accrued Interest Purchased With Principal in respect of Non-Performing Collateral Obligations); *plus*

009453

(3)    the Aggregate Principal Balance of any Eligible Investments that were purchased with Principal Proceeds and the amount of Principal Proceeds on deposit in the Collection Account; *plus*

(4)    the Aggregate Principal Balance of Eligible Investments on deposit in a Securities Lending Account that relate to a Securities Lending Agreement with respect to which an "event of default" (under and as defined in the Securities Lending Agreement) is continuing; *plus*

(5)    with respect Collateral Obligation that are Non-Performing Collateral Obligations, Deep Discount Obligations or Excess CCC/Caa Collateral Obligations, the amount determined by using one of the following methods applicable to such type of Collateral Obligation; *provided* that if a Collateral Obligation falls within more than one of such types, the Issuer will be required to use the method that results in the smallest amount:

    (A)    with respect to any Excess CCC/Caa Collateral Obligations, an amount equal to the product of (i) the lower of (1) 70% and (2) the weighted average Market Value of all CCC/Caa Collateral Obligations, expressed as a percentage of their outstanding principal balances *multiplied* by (ii) the Excess CCC/Caa Collateral Obligations

    (B)    with respect to any Non-Performing Collateral Obligations, the aggregate of the Applicable Collateral Obligation Amounts for all included Non-Performing Collateral Obligations (other than Defaulted Collateral Obligations that have been held by the Issuer for more than three years, which shall be deemed to be zero for purposes of this clause (B)); and

    (C)    with respect to any Deep Discount Obligations, the Aggregate Purchase Price Amount for all Deep Discount Obligations.

As used in this definition, "**Applicable Collateral Obligation Amount**" for any Non-Performing Collateral Obligation means:

(1)    the lesser of (x) the Market Value Percentage of the Non-Performing Collateral Obligation and (y) the Applicable Percentage for the Non-Performing Collateral Obligation *multiplied* by:

(2)    if the Non-Performing Collateral Obligation is:

    (A)    any Pledged Obligation other than those in clauses (B) through (D) below, the outstanding principal amount of the Pledged Obligation as of the relevant Measurement Date;

    (B)    a Synthetic Security, the notional amount specified in the Synthetic Security;

    (C)    any Revolving Loan or Delayed Drawdown Loan, its Principal Balance including any unfunded amount thereof (regardless of the nature of the contingency relating to the Issuer's obligation to fund the unfunded amount); and

    (D)    any PIK Security, its Principal Balance.

As used in the calculation of Market Value Percentage of the Non-Performing Collateral Obligation, the Principal Balance of any Defaulted Obligation shall be, if the Defaulted Obligation is:

009454

(i)      any Pledged Obligation other than those in clauses (ii) through (iv) below, the outstanding principal amount of the Pledged Obligation as of the relevant Measurement Date;

(ii)     a Synthetic Security, the notional amount specified in the Synthetic Security;

(iii)    any Revolving Loan or Delayed Drawdown Loan, its Principal Balance including any unfunded amount thereof (regardless of the nature of the contingency relating to the Issuer's obligation to fund the unfunded amount); and

(iv)    any PIK Security, its Principal Balance.

*The Interest Coverage Tests*

The Interest Coverage Test in respect of each Class of Notes (each an "**Interest Coverage Test**") is a test the first Measurement Date for which will be on the second Payment Date and that is satisfied with respect to any specified Class of Notes (treating the Senior Class A Notes, the Class A-2 Notes and the Class A-3 Notes as one Class for this purpose) if, as of the second Payment Date and any Measurement Date thereafter on which any Notes remain Outstanding, the Interest Coverage Ratio equals or exceeds the applicable required level specified in the table in "Summary of Terms— The Interest Coverage Tests."

The "**Interest Coverage Ratio**" with respect to any specified Class of Notes (treating the Senior Class A Notes, the Class A-2 Notes and the Class A-3 Notes as one Class for this purpose) on any Measurement Date, the ratio calculated by dividing:

(i)      the sum of:

    (A)    the Interest Proceeds received or scheduled to be received with respect to the Due Period in which the Measurement Date occurs; *minus*

    (B)    amounts payable under clauses (1), (2), (3) and (4) of "Description of the Securities—Priority of Payments—Interest Proceeds" on the related Payment Date; by

(ii)    the sum of:

    (A)    all accrued and unpaid interest on the specified Class of Notes and all Notes ranking senior to the Class (excluding any Deferred Interest) on the related Payment Date; *plus*

    (B)    any accrued and unpaid Premium on the related Payment Date.

For purposes of the Interest Coverage Ratio, only the amount of any interest payment (including any "gross up" payment) on any Collateral Obligation in excess of any withholding tax or other deductions on account of tax of any jurisdiction on any date of determination shall be included in Interest Proceeds.

*Reinvestment Overcollateralization Test*

The "**Reinvestment Overcollateralization Test**" is a test that is satisfied as of any Measurement Date during the Reinvestment Period on which Class C Notes remain Outstanding, if the Reinvestment Overcollateralization Ratio as of such Measurement Date is at least equal to 107.30%.

009455

**Ramp-Up**

In connection with the Ramp-Up Completion Date, the Issuer shall use its best efforts to purchase Collateral Obligations on any Business Day during the Ramp-Up Period or enter into commitments to purchase Collateral Obligations on any Business Day during the Ramp-Up Period for purchase on or as soon as practicable thereafter (not to exceed 60 days thereafter), in each case, for inclusion in the Collateral so that each of the Aggregate Principal Balance of the Collateral Obligations and the Overcollateralization Ratio Numerator is at least $663,000,000.

No Collateral Obligations may be purchased prior to the Ramp-Up Completion Date unless immediately following the purchase of any Collateral Obligation (as certified by the Portfolio Manager in writing), the remaining funds in the Collection Account, after giving effect to such purchase, are sufficient as of the date of determination to purchase Collateral Obligations for inclusion in the Collateral so that each of the Aggregate Principal Balance of the Collateral Obligations and the Overcollateralization Ratio Numerator is at least $663,000,000 (taking into account the Collateral Obligations already part of the Collateral (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to any Collateral Obligations on or before the Ramp-Up Completion Date)).

Notwithstanding the foregoing, or any other provision of the Indenture, if the Issuer has previously entered into a commitment to purchase a Collateral Obligation to be included in the Collateral, such commitment initially not to exceed 60 days, and at the time of the commitment the Collateral Obligation complied with the definition of "Collateral Obligation" and the requirements set forth under "—Ramp-Up," the Issuer may consummate the purchase of the Collateral Obligation notwithstanding that the Collateral Obligation fails to comply with the definition of "Collateral Obligation" and the requirements set out above on the date of settlement.

The Issuer will use commercially reasonable efforts to purchase, or to enter into binding agreements to purchase, Collateral Obligations by the Ramp-Up Completion Date, that, together with the Collateral Obligations purchased on or before the Closing Date and then held by the Issuer, will satisfy, as of the Ramp-Up Completion Date (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to any Collateral Obligations on or before the Ramp-Up Completion Date), the Collateral Quality Tests, the Concentration Limitations, the criteria set forth in the Indenture and the Overcollateralization Tests.

On or prior to July 1, 2005, so long as the Ramp-Up Completion Date has not already occurred, the Portfolio Manager shall certify by an order of the Portfolio Manager delivered to the Issuer, the Trustee and Moody's that, as of such date: (i)(A) the Aggregate Principal Balance of the Collateral Obligations owned by the Issuer equals at least $575,000,000, or (B) the Aggregate Principal Balance of the Collateral Obligations purchased (or committed to be purchased) by the Issuer with proceeds from the sale of the Securities (in each case in this clause (B), measured solely as of the date of purchase or commitment, as the case may be) equals at least $575,000,000 (for the avoidance of doubt, without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to any Collateral Obligations on or before the Ramp-Up Completion Date), (ii) the Diversity Score is equal to at least 45, (iii) the Weighted Average Rating Factor Test is satisfied and (iv) each of the Coverage Tests are satisfied. If the Portfolio Manager is not able to certify each of the foregoing items, an Interim Ramp-Up Completion Date Failure shall occur.

Within 5 Business Days after the Ramp-Up Completion Date, the Issuer or the Portfolio Manager (on behalf of the Issuer) shall request a Rating Confirmation on behalf of the Issuer and shall provide a report to the Rating Agencies identifying the Collateral Obligations then included in the Collateral and the Issuer shall obtain and deliver to the Trustee and the Rating Agencies, together with the delivery of a

009456

report (and an electronic file of the Collateral Obligations to S&P) substantially in the form of a Monthly Report as of the Ramp-Up Completion Date, an accountants' certificate:

(i)　　confirming the maturity date, rating, spread and recovery rate for each item of original Collateral Obligations owned by the Issuer as of the Ramp-Up Completion Date and the information provided by the Issuer with respect to every other asset included in the Collateral, by reference to such sources as shall be specified therein;

(ii)　　confirming that as of the Ramp-Up Completion Date:

(1)　　each of the Coverage Tests are satisfied;

(2)　　the Aggregate Principal Balance of Collateral Obligations that the Issuer owned or committed to purchase as of the Ramp-Up Completion Date is at least equal to the Maximum Investment Amount; and

(3)　　the Collateral Obligations comply with all of the requirements of the Collateral Quality Tests and the Concentration Limitations and the criteria set forth in "—Eligibility Criteria"; and

(iii)　　specifying the procedures undertaken by them to review data and computations relating to the foregoing statements.

If a Rating Confirmation Failure should occur, the Notes will be redeemed pursuant to the Indenture and as described in "Description of the Securities—Mandatory Redemption of the Notes—Mandatory Redemption of the Notes upon Rating Confirmation Failure."

**Sale of Collateral Obligations; Reinvestment of Principal Proceeds and Reinvestment Criteria**

Pursuant to the Indenture and so long as no Event of Default has occurred and is continuing, the Issuer may, at the direction of the Portfolio Manager, direct the Trustee to sell (and the Trustee will sell) any Collateral Obligation or Workout Asset if the sale meets the requirements in paragraphs (i) through (ix) below:

(i)　　*Credit Risk Securities*.　At the direction of the Portfolio Manager, the Issuer may direct the Trustee to sell any Credit Risk Obligation at any time during or after the Reinvestment Period without restriction and the Trustee shall sell the Credit Risk Obligation in accordance with such direction.　Following any sale of a Credit Risk Obligation pursuant to the Indenture, at the direction of the Portfolio Manager during the Reinvestment Period, the Issuer shall use commercially reasonable efforts to purchase additional Collateral Obligations (to the extent the purchase is in the best interest of the Issuer) with an Aggregate Principal Balance at least equal to the Sale Proceeds received by the Issuer with respect to the Collateral Obligation sold.　For this purpose, the Principal Balance of any Revolving Loan or Delayed Drawdown Loan shall only include its funded amount.

(ii)　　*Credit Improved Obligations*.　At the direction of the Portfolio Manager, the Issuer may direct the Trustee to sell any Credit Improved Obligation if either:

(1)　　during the Reinvestment Period, the Portfolio Manager believes before the sale that it will be able to cause the Issuer to reinvest its Sale Proceeds, in compliance with the Eligibility Criteria, in one or more additional Collateral Obligations with an Aggregate Principal Balance at least equal to the Investment Criteria Adjusted Balance of the Credit Improved Obligation by the end of the immediately

009457

succeeding Due Period (for this purpose, the Principal Balance of any Revolving Loan or Delayed Drawdown Loan shall only include its funded amount and Principal Balance shall include the principal balance of Collateral Obligations in which the Trustee does not have a first priority perfected security interest); or

(2) after the Reinvestment Period, the Sale Proceeds received in respect of the Credit Improved Obligation are at least equal to its Investment Criteria Adjusted Balance (for this purpose, the Principal Balance of any Revolving Loan or Delayed Drawdown Loan shall only include its funded amount and Principal Balance shall include the principal balance of Collateral Obligations in which the Trustee does not have a first priority perfected security interest);

and the Trustee shall sell the Credit Improved Obligation in accordance with such direction.

(iii) *Non-Performing Collateral Obligations and Current-Pay Obligations*. At the direction of the Portfolio Manager, the Issuer may direct the Trustee to sell any Non-Performing Collateral Obligation or Current-Pay Obligation at any time during or after the Reinvestment Period without restriction and the Trustee shall sell the Non-Performing Collateral Obligation or Current-Pay Obligation in accordance with such direction. Non-Performing Collateral Obligations may be sold regardless of price.

(iv) *Non-qualifying Collateral Obligations*. At the direction of the Portfolio Manager, the Issuer may direct the Trustee to sell any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation at any time during or after the Reinvestment Period without restriction and the Trustee shall sell that obligation in accordance with such direction.

(v) *Withholding Tax Sales*. At the direction of the Portfolio Manager, the Issuer may direct the Trustee to sell any Collateral Obligation subject to withholding tax at any time during or after the Reinvestment Period without restriction and the Trustee shall sell the Collateral Obligation in accordance with such direction.

(vi) *Optional Redemption*. After the Issuer has notified the Trustee of an Optional Redemption of the Notes, at the direction of the Portfolio Manager, the Issuer shall direct the Trustee to sell all or a portion of the Collateral Obligations as contemplated therein if (A) the requirements in respect of an Optional Redemption under the Indenture have been satisfied and (B) the independent certified public accountants appointed pursuant to the Indenture have confirmed the calculations contained in any required certificate furnished by the Portfolio Manager pursuant to the Indenture's Note redemption procedure provisions. After a Majority of the Preference Shares have directed an Optional Redemption of the Preference Shares in accordance with the Indenture, at the direction of the Portfolio Manager, the Issuer shall direct the Trustee to sell all of the remaining Collateral Obligations (in the case of an Optional Redemption pursuant to clause (i) under "Description of the Securities—Optional Redemption—Preference Shares") or a portion of the remaining Collateral Obligations in accordance with the unanimous directions of Holders of the Preference Shares (in the case of an Optional Redemption pursuant to clause (ii) under "Description of the Securities—Optional Redemption—Preference Shares) and the Trustee shall sell the remaining Collateral Obligations in accordance with such direction.

(vii) *Rating Confirmation Failure*. After the Portfolio Manager has received notice of a Rating Confirmation Failure and if available Interest Proceeds and Principal Proceeds are insufficient to effect the redemption of the Notes at par on any subsequent Payment Date

in accordance with the Priority of Payments as and to the extent necessary for each of Moody's and S&P to confirm the Initial Ratings assigned by it on the Closing Date to the Securities, the Issuer may, at the direction of the Portfolio Manager, direct the Trustee to sell Collateral Obligations as contemplated in the Indenture and the Trustee shall sell the Collateral Obligations in accordance with such direction.

(viii) *Discretionary Sales*. At the direction of the Portfolio Manager, the Issuer may direct the Trustee to sell any Collateral Obligation:

(1) at any time on or before the Ramp-Up Completion Date (without regard to any restriction specified in clause (2) below); and

(2) at any time after the Ramp-Up Completion Date if:

(A) after giving effect to the sale and the sale of any other Collateral Obligations whose sale is pending, the Aggregate Principal Balance of all Collateral Obligations sold under "—Discretionary Sales" (in each case determined as of the date the direction to sell is given) is not greater than 20% of the Maximum Investment Amount as of January 1 of such calendar year (or, for the first calendar year, as of the Ramp-Up Completion Date) (for the purpose of determining the percentage of Collateral Obligations sold during any such period, the amount of any Collateral Obligation sold shall be reduced (a) to the extent of any purchases of Collateral Obligations of the same obligor (which are *pari passu* with such sold Collateral Obligation) occurring within 30 Business Days of the sale (determined based on the date of any relevant trade confirmation or commitment letter) (but only for so long as (x) the Collateral Obligations purchased have not been downgraded by any of the Rating Agencies during the 30 Business Day period, (y) the Collateral Obligations have not been purchased from the Portfolio Manager or any of its Affiliates acting, in each case, as principal or from any funds or accounts advised or managed by the Portfolio Manager or any of its Affiliates, and (z) the purchase price of each such Collateral Obligation must not exceed the sale price of the sold Collateral Obligation) and (b) to the extent of any purchases of Collateral Obligations permitted pursuant to the second paragraph set forth under "—Eligibility Criteria"; and

(B) during the Reinvestment Period the Portfolio Manager believes before the sale that it will be able to cause the Issuer within 30 days thereafter to reinvest or commit to reinvest its Sale Proceeds, in compliance with the Eligibility Criteria, in one or more additional Collateral Obligations with an Aggregate Principal Balance at least equal to the Investment Criteria Adjusted Balance of the Collateral Obligation (for this purpose, the Principal Balance of any Revolving Loan or Delayed Drawdown Loan shall only include its funded amount and Principal Balance shall include the principal balance of Collateral Obligations in which the Trustee does not have a first priority perfected security interest);

and the Trustee shall sell the Collateral Obligations in accordance with such direction. However, if the rating by Moody's of any of the Senior Class A Notes (without giving effect to the Policy), the Class A-2 Notes or the Class A-3 Notes is one or more rating sub-categories below the Initial Rating of the Senior Class A Notes (without giving effect to the Policy), the Class A-2 Notes or the Class A-3 Notes or has been withdrawn or the

009459

rating by Moody's of the Class B Notes or the Class C Notes is two or more rating sub-categories below the Initial Rating of the Class B Notes or the Class C Notes or has been withdrawn, the Issuer shall not instruct the Trustee to sell any Collateral Obligations pursuant to "—Discretionary Sales." This restriction may be waived by written consent of a Majority of the Controlling Class. For the purposes of this clause (viii), any withdrawal or reduction in rating shall not restrict the sale of any Collateral Obligations pursuant to "—Discretionary Sales" if after the withdrawal or reduction Moody's has upgraded the reduced or withdrawn rating to at least the Initial Rating in the case of the Senior Class A Notes (without giving effect to the Policy), the Class A-2 Notes and the Class A-3 Notes, or to only one subcategory below their Initial Rating in the case of the Class B Notes and the Class C Notes.

(ix)   *Workout Assets.*   At the direction of the Portfolio Manager, the Issuer may direct the Trustee to sell any Workout Asset at any time during or after the Reinvestment Period without restriction and regardless of price and the Trustee shall sell the Workout Assets in accordance with such direction.

## Certain Determinations Relating to Collateral Obligations

The Indenture provides that, notwithstanding anything to the contrary contained therein, solely for the purpose of calculations in connection with the Eligibility Criteria, the Issuer or the Portfolio Manager on behalf of the Issuer shall be deemed to have purchased any Collateral Obligations as of the date on which the Issuer delivers to the Trustee a contract to purchase, a commitment letter, a confirmation or a due bill for such Collateral Obligation, in each case entitling the Issuer (or the Trustee as assignee thereof) to receive such Collateral Obligations and, in such event, the Issuer shall be deemed to have acquired, granted or delivered, as the case may be, such Collateral Obligations on such date.

The Indenture provides that, notwithstanding anything to the contrary contained therein, solely for the purpose of calculations in connection with the Eligibility Criteria, the Issuer or the Portfolio Manager on behalf of the Issuer shall be deemed to have sold any Collateral Obligations as of the date on which the Issuer delivers to the Trustee a contract to sell, a commitment letter, a confirmation or a due bill for such Collateral Obligation, in each case entitling the Issuer (or the Trustee as assignee thereof) to sell, and requiring the purchaser to purchase, such Collateral Obligations and, in such event, the Issuer shall be deemed to have sold such Collateral Obligations on such date.

Under the circumstances described in the two preceding paragraphs, if the transaction contemplated by the contract, commitment letter, confirmation or due bill referred to therein does not settle on or before the 60th day following the scheduled settlement date (the "**Deadline**"), the deemed purchase or sale shall be deemed not to have occurred; *provided*, *however*, that the Portfolio Manager shall have the right to extend the Deadline for an additional period (not to exceed an additional 60 days) by notice to the Trustee, which notice shall include the Portfolio Manager's certification to the effect that the Portfolio Manager believes that the settlement shall occur on or before the extended Deadline.

Scheduled distributions with respect to any Pledged Collateral Obligation shall be determined in accordance with the applicable provisions of the Indenture.

## The Accounts

The Indenture provides that the Trustee will establish separate segregated non-interest bearing trust accounts, which will be designated as the Collection Account, the Payment Account, the Custodial Account, the Revolving Reserve Account, the Delayed Drawdown Reserve Account, the Synthetic Security Collateral Account, the Hedge Counterparty Collateral Account, the Closing Date Expense Account, the Expense Reimbursement Account, the Interest Reserve Account, the Policy Payment

009460

Account and the Securities Lending Account. In addition, Synthetic Security Counterparty Accounts may also be established. Any account may contain any number of subaccounts.

*Collection Account*. The Trustee shall deposit into the "**Collection Account**":

(i)     any funds transferred from (1) the Closing Date Expense Account pursuant to the Indenture or (2) the Interest Reserve Account pursuant to the Indenture;

(ii)    all Principal Proceeds (unless (1) simultaneously reinvested in Collateral Obligations in accordance with the Indenture, (2) deposited into the Revolving Reserve Account or the Delayed Drawdown Reserve Account or (3) posted by the Issuer as cash collateral with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security or in Eligible Investments) received by the Trustee;

(iii)   all Interest Proceeds received by the Trustee (unless simultaneously reinvested in accrued interest in respect of Collateral Obligations in accordance with the Indenture or in Eligible Investments); and

(iv)    all other funds received by the Trustee and not excluded above.

The Issuer and the Portfolio Manager may, but will not be required to, jointly deposit from time to time any monies in the Collection Account it deems, in its sole discretion, to be advisable (and may designate any amounts so deposited as Principal Proceeds or Interest Proceeds in its discretion).

Any Principal Proceeds received during the Reinvestment Period, and Sale Proceeds from the sale of Credit Improved Obligations and Unscheduled Principal Payments received after the Reinvestment Period, which have not been reinvested in additional Collateral Obligations on the Business Day of receipt shall be deposited in the Collection Account and shall at the direction of the Portfolio Manager be applied to the purchase of additional Collateral Obligations in accordance with the Eligibility Criteria and the other requirements set forth in the Indenture or the purchase of Eligible Investments pending such investment or used to enter into additional Hedge Agreements or used in connection with a Special Redemption. Principal Proceeds (other than Sale Proceeds from the sale of Credit Improved Obligations and Unscheduled Principal Payments) received after the Reinvestment Period shall be deposited into the Collection Account and applied to the purchase of Eligible Investments.

The Collection Account shall be maintained for the benefit of the Noteholders, the Composite Securityholders, the Trustee, the Portfolio Manager and each Hedge Counterparty and amounts on deposit in the Collection Account will be available for application in the order of priority under "Description of the Securities—Priority of Payments" and for the acquisition of Collateral Obligations under the circumstances and pursuant to the requirements in the Indenture. Amounts received in the Collection Account during a Due Period and amounts received in prior Due Periods and retained in the Collection Account under the circumstances stated above in "Description of the Securities—Priority of Payments" will be invested in Eligible Investments with Stated Maturities no later than the Business Day before the next Payment Date as directed by the Portfolio Manager (which may be in the form of standing instructions). All proceeds deposited in the Collection Account will be retained therein unless used to purchase Collateral Obligations during the Reinvestment Period (or, in respect of Principal Proceeds constituting Unscheduled Principal Payments and Sale Proceeds from Credit Improved Obligations, after the Reinvestment Period) in accordance with the Eligibility Criteria, to honor commitments with respect thereto entered into during or after the Reinvestment Period, or used as otherwise permitted under the Indenture. See "—Eligibility Criteria."

009461

The Trustee shall transfer to the Payment Account from the Collection Account for application pursuant to the Priority of Payments, no later than the Business Day preceding each Payment Date, the amount set forth to be so transferred in the Valuation Report for the Payment Date.

At any time during or after the Reinvestment Period, at the direction of the Portfolio Manager, the Issuer may direct the Trustee to pay from amounts on deposit in the Collection Account on any Business Day during any Interest Period from Interest Proceeds only, any Administrative Expenses that require payment before the next Payment Date to the extent that the amount of the payments does not exceed the aggregate amount that may be paid on the next payment Date under, and at the level of priority specified by, "Description of the Securities—Priority of Payments—Interest Proceeds."

*Custodial Account.* The Trustee will from time to time deposit collateral into the "**Custodial Account**", over which the Trustee will have exclusive control and sole right of withdrawal, in accordance with the Indenture. All assets or securities at any time on deposit in or otherwise to the credit of the Custodial Account will be held in trust by the Trustee for the benefit of the Noteholders, the Composite Securityholders, the Trustee, the Portfolio Manager and each Hedge Counterparty.

*Revolving Reserve Account and Delayed Drawdown Reserve Account.* Upon the purchase of any Collateral Obligation that is a Revolving Loan or Delayed Drawdown Loan, at the direction of the Portfolio Manager, the Trustee shall deposit Principal Proceeds into the Revolving Reserve Account," in the case of a Revolving Loan, and the Delayed Drawdown Reserve Account," in the case of a Delayed Drawdown Loan, each equal to the unfunded commitment amount of the Revolving Loan or Delayed Drawdown Loan, respectively, and the Principal Proceeds so deposited shall be considered part of the Purchase Price of the Revolving Loan or Delayed Drawdown Loan for purposes of the Indenture. At the direction of the Portfolio Manager at any time during or after the Reinvestment Period, the Trustee shall withdraw funds from the Revolving Reserve Account or the Delayed Drawdown Reserve Account to fund extensions of credit pursuant to Revolving Loans or Delayed Drawdown Loans, respectively. In addition, to the extent that the Issuer receives proceeds of a repayment in respect of a Revolving Loan (except to the extent of any concurrent commitment reduction) at any time during or after the Reinvestment Period, the Trustee shall deposit the proceeds into the Revolving Reserve Account.

Upon the sale of a Revolving Loan or Delayed Drawdown Loan in whole or in part or the reduction in part or termination of the Issuer's commitment thereunder, an amount on deposit in the Revolving Reserve Account or the Delayed Drawdown Reserve Account, as the case may be, specified by the Portfolio Manager as being equal to (i) the unfunded amount of the commitment (in the case of a sale in whole or a termination of the commitment), (ii) the proportionate amount of the amount on deposit (in the case of a sale in part) or (iii) the amount by which the commitment is reduced (in the case of a reduction thereof in part), shall be transferred by the Trustee to the Collection Account as Principal Proceeds.

Amounts on deposit in the Revolving Reserve Account or the Delayed Drawdown Reserve Account will be invested in Eligible Investments with Stated Maturities as directed by the Portfolio Manager (which may be in the form of standing instructions) not later than the Business Day after the date of their purchase. All interest and other income from amounts in the Revolving Reserve Account and the Delayed Drawdown Reserve Account deposited to the Collection Account under the Indenture shall be considered Interest Proceeds in the Due Period in which they are so deposited.

*Synthetic Security Collateral Account.* On or before the date on which the Issuer enters into a Synthetic Security the Trustee shall create a sub-account of the non-interest bearing trust account established for Synthetic Security Collateral (the "**Synthetic Security Collateral Account**") with respect to the Synthetic Security. All Synthetic Security Collateral posted by any Synthetic Security Counterparty in support of its respective obligation under a Synthetic Security shall be immediately deposited into the Synthetic Security Collateral Account and posted to the sub-account related to the Synthetic Security. On each day on which amounts are payable to the Issuer out of Synthetic Security

009462

Collateral, the Issuer shall direct the Trustee to withdraw amounts on deposit in the Synthetic Security Collateral Account in an amount sufficient to make the payment (including any total or partial release of Synthetic Security Collateral). The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Synthetic Security Collateral Account shall be:

(i)     for application to obligations of the relevant Securities Lending Counterparty to the Issuer under a Securities Lending Agreement if the Securities Lending Agreement becomes subject to early termination or in the exercise of remedies under the related Securities Lending Agreement upon any "event of default" under and as defined in the related Securities Lending Agreement, including liquidating the related Securities Lending Collateral; or

(ii)    to return the Securities Lending Collateral to the relevant Securities Lending Counterparty when and as required by the relevant Securities Lending Agreement, in each case as directed by the Portfolio Manager.

Amounts on deposit in the Synthetic Security Collateral Account will be invested in Eligible Investments having Stated Maturities not later than one Business Day after their purchase, as directed by the Portfolio Manager (which may be in the form of standing instructions), and shall not be considered an asset of the Issuer for the purposes of the Coverage Tests.

*Hedge Counterparty Collateral Account.* The Trustee will deposit all collateral received from a Hedge Counterparty under any Hedge Agreement into the "**Hedge Counterparty Collateral Account**". The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Hedge Counterparty Collateral Account will be (i) for application to obligations of the relevant Hedge Counterparty to the Issuer under a Hedge Agreement if the Hedge Agreement becomes subject to early termination or (ii) to return collateral to the relevant Hedge Counterparty when and as required by the relevant Hedge Agreement, in each case as directed by the Portfolio Manager. Amounts on deposit in the Hedge Counterparty Collateral Account will be invested in Eligible Investments with Stated Maturities no later than the Business Day before the next Payment Date as directed by the Portfolio Manager (which may be in the form of standing instructions) and shall not be considered an asset of the Issuer for the purposes of the Coverage Tests.

*Closing Date Expense Account.* Amounts deposited in the "**Closing Date Expense Account**" on the Closing Date will be withdrawn to pay certain administrative expenses of the Co-Issuers. On the Payment Date in November 2005, the Trustee shall transfer all funds on deposit in the Closing Date Expense Account to the Collection Account as Principal Proceeds and close the Closing Date Expense Account. Amounts on deposit in the Closing Date Expense Account shall be invested in Eligible Investments with Stated Maturities no later than the Business Day before the second Payment Date as directed by the Portfolio Manager (which may be in the form of standing instructions) and shall not be considered an asset of the Issuer for the purposes of the Coverage Tests.

*Expense Reimbursement Account.* On any Payment Date and on any date between Payment Dates, the Trustee will apply amounts, if any, in the "**Expense Reimbursement Account**" to the payment of expenses and fees that must be paid between Payment Dates or that are due on that Payment Date under clause (1) of "Description of the Securities—Priority of Payments—Interest Proceeds" and the Trustee shall on any Payment Date transfer to the Expense Reimbursement Account an amount equal to the excess, if any of  the Administrative Expense Cap over the amounts due under clause (1) of "Description of the Securities—Priority of Payments—Interest Proceeds"  to the Expense Reimbursement Account in accordance with clause (2) of "Description of the Securities—Priority of Payments—Interest Proceeds." Amounts on deposit in the Expense Reimbursement Account shall be invested in Eligible Investments with Stated Maturities as directed by the Portfolio Manager (which may be in the form of standing instructions), no later than the Business Day before the next Payment Date.

009463

*Securities Lending Account.* The Trustee will deposit all Securities Lending Collateral posted by any Securities Lending Counterparty in support of its respective obligation under a Securities Lending Agreement in a non-interest bearing trust account (the "**Securities Lending Account**"). The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Securities Lending Account will be (i) for application to obligations of the relevant Securities Lending Counterparty to the Issuer under a Securities Lending Agreement if the Securities Lending Agreement becomes subject to early termination or in the exercise of remedies under the Securities Lending Agreement upon any "event of default" under and as defined in the Securities Lending Agreement, including liquidating the related Securities Lending Collateral or (ii) to return collateral to the Hedge Counterparty when and as required by a Hedge Agreement. Amounts on deposit in the Securities Lending Account shall be invested in Eligible Investments with Stated Maturities as directed by the Portfolio Manager (which may be in the form of standing instructions) no later than the Business Day before the next Payment Date. Amounts on deposit in the Securities Lending Account shall not be considered an asset of the Issuer for the purposes of the Coverage Tests, but the loaned security or asset that relates to the Securities Lending Account shall be so considered an asset of the Issuer.

*Payment Account.* The Trustee will deposit collateral into the "**Payment Account**", over which the Trustee will have exclusive control and sole right of withdrawal, in accordance with the Indenture. All assets or securities at any time on deposit in or otherwise to the credit of the Payment Account will be held in trust by the Trustee for the benefit of the Noteholders, the Composite Securityholders, the Trustee, the Portfolio Manager, and each Hedge Counterparty. The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Payment Account shall be to pay amounts due and payable on the Notes and to pay Administrative Expenses, Premium, Accrued Insurance Liabilities and other amounts specified in the Indenture, each in accordance with the Priority of Payments.

*Interest Reserve Account.* Amounts deposited in the "**Interest Reserve Account**", on the Closing Date will be withdrawn to pay amounts necessary such that the amounts referred to in clauses (1) through (14) of "Description of the Securities—Priority of Payments—Interest Proceeds" will be paid in full on each Payment Date occurring on or before the Payment Date in November 2005. On the Payment Date in November 2005, the Trustee shall transfer all funds on deposit in the Interest Reserve Account to the Collection Account as Principal Proceeds and close the Interest Reserve Account. Amounts on deposit in the Interest Reserve Account shall be invested in Eligible Investments with Stated Maturities as directed by the Portfolio Manager (which may be in the form of standing instructions), no later than the Business Day before the second Payment Date.

*Synthetic Security Counterparty Account.* To the extent that any Synthetic Security requires the Issuer to secure its obligations to the Synthetic Security Counterparty, the Issuer shall direct the Trustee and the Trustee shall establish a segregated non-interest bearing trust account (the "**Synthetic Security Counterparty Account**") for the Synthetic Security which shall be held in trust for the benefit of the related Synthetic Security Counterparty and over which the Trustee shall have exclusive control and the sole right of withdrawal in accordance with the applicable Synthetic Security and the Indenture. In the alternative, a Synthetic Security Counterparty Account may be established with a trustee designated by the Synthetic Security Counterparty that satisfies the requirements with respect to being a securities intermediary with respect to the posted collateral if that trustee would qualify to be a successor trustee under the Indenture and the account satisfies the other requirements of a Synthetic Security Counterparty Account under the Indenture.

As directed in writing by the Portfolio Manager, the Trustee shall deposit (or deliver for deposit) into each Synthetic Security Counterparty Account all amounts or securities that are required to secure the obligations of the Issuer in accordance with the related Synthetic Security, including the entire notional amount of any Synthetic Security in the form of a credit default swap or other similar transaction. The Portfolio Manager shall direct any such deposit only during the Reinvestment Period and only to the extent that monies are available for the purchase of Collateral Obligations pursuant to the Indenture. Any income received on amounts in the Synthetic Security Counterparty Account shall, after application in

009464

accordance with the relevant Synthetic Security, be withdrawn from the Synthetic Security Counterparty Account and deposited in the Collection Account for distribution as Interest Proceeds.

As directed by the Portfolio Manager in writing and in accordance with the applicable Synthetic Security and the Indenture, amounts on deposit in a Synthetic Security Counterparty Account shall be invested in Synthetic Security Collateral.

In connection with the occurrence of a credit event or an event of default or a termination event (each as defined in the applicable Synthetic Security) under the related Synthetic Security, amounts in any Synthetic Security Counterparty Account shall be withdrawn by the Trustee (or the Trustee shall request their withdrawal) and applied toward the payment of any amounts payable by the Issuer to the related Synthetic Security Counterparty in accordance with the Synthetic Security, as directed by the Portfolio Manager in writing. Any excess amounts held in a Synthetic Security Counterparty Account, or held directly by a Synthetic Security Counterparty, after payment of all amounts owing from the Issuer to the related Synthetic Security Counterparty in accordance with the related Synthetic Security shall be withdrawn from the Synthetic Security Counterparty Account and deposited in the Collection Account for distribution as Principal Proceeds.

Amounts on deposit in any Synthetic Security Counterparty Account shall not be considered an asset of the Issuer for the purposes of the Coverage Tests, but the Synthetic Security that relates to the Synthetic Security Counterparty Account shall be so considered an asset of the Issuer (with the notional amount as the Principal Balance unless a default exists under the applicable Synthetic Security).

*Class 1 Component Account.* Before the Closing Date, the Trustee shall establish a single, segregated non-interest bearing trust account (the "**Class 1 Component Account**") that shall be held in trust in the name of the Trustee for the benefit of the Holders of the Class 1 Composite Securities, over which the Trustee shall have exclusive control and the sole right of withdrawal, and into which the Trustee shall deposit the United States Treasury strip security maturing on November 15, 2016 paying a principal amount at maturity equal to the original principal amount of the Class 1 Composite Securities specified in "Summary of Terms—Principal Terms of the Securities" (the "**Treasury Strip**"), which Treasury Strip shall be delivered to the Trustee by the Issuer on the Closing Date. All assets or securities at any time on deposit in, or otherwise to the credit of, the Class 1 Component Account shall be held in trust by the Trustee for the benefit of the Holders of the Class 1 Composite Securities. The only permitted withdrawals from the Class 1 Component Account shall be in accordance with the Indenture. None of the Co-Issuers, the Noteholders, the Holders of Preference Shares (other than the Holders of the Class 1 Composite Securities, to the extent of their Preference Share Components) or any other Secured Party shall have any legal, equitable, or beneficial interest in the Class 1 Component Account.

*Policy Payment Account.* The Trustee shall deposit all amounts received from the Insurer under the Policy in the "**Policy Payment Account**", over which the Trustee will have exclusive control and sole right of withdrawal, in accordance with the Indenture. Amounts held in the Policy Payment Account shall not be invested, unless otherwise instructed in writing by the Insurer. The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Policy Payment Account shall be to make payments in respect of the amounts due on the Insured Notes on the related Payment Date in respect of which such funds are paid, to the extent such amounts are not paid pursuant to the Priority of Payments. Any monies held in the Policy Payment Account after the distributions made pursuant to the

Indenture on any Payment Date shall promptly be remitted (but in no event later than two Business Days after such Payment Date) to the Insurer.

**Hedge Agreements**

At any time and from time to time after the Closing Date, the Issuer, at the direction of the Portfolio Manager, shall enter into the Hedge Agreements and shall assign its rights (but none of its

009465

obligations) under the Hedge Agreements to the Trustee pursuant to the Indenture and the collateral assignment of Hedge Agreements. The Portfolio Manager, on behalf of the Issuer, shall obtain the approval of each new Hedge Agreement from each Hedge Counterparty to a then-existing Hedge Agreement. The Trustee shall, on behalf of the Issuer and in accordance with the Valuation Report, pay amounts due to the Hedge Counterparties under the Hedge Agreements on any Payment Date in accordance with the Priority of Payments.

Each Hedge Counterparty will be required to have (i) a debt rating by Moody's for long-term debt of "Aa3" (which rating of "Aa3" is not on credit watch for a possible downgrade) or higher if the Hedge Counterparty has only a long-term rating; or a debt rating by Moody's for long-term debt of "A1" (which rating of "A1" is not on credit watch for possible downgrade) or higher and a debt rating by Moody's for short-term debt of "P-1" (which rating of "P-1" is not on credit watch for possible downgrade) if the Hedge Counterparty has both long-term and short-term ratings and (ii) a short-term debt rating by S&P of not less than "A-1" or a long-term debt rating of not less than "A+" (the "**Required Rating**").

If at any time a Hedge Counterparty has:

(A)     no short-term Moody's rating and a long-term Moody's rating and that rating is below "Aa3" or is "Aa3" and has been placed on credit watch for possible downgrade by Moody's; or

(B)     both a short-term and long-term Moody's rating; and either:

(i)     the long-term Moody's rating is below "A1" or that rating is "A1" and has been placed on credit watch for possible downgrade by Moody's, or

(ii)     the short-term Moody's rating is below "P-1" or that rating is "P-1" and has been placed on credit watch for possible downgrade by Moody's;

then the Hedge Counterparty shall be required, at its sole expense, to, within 30 days, either:

(i)     post collateral with the Trustee to secure the Hedge Counterparty's obligations under the Hedge Agreement, in an amount and of the type sufficient to cause the Rating Condition with respect to Moody's to be satisfied;

(ii)     obtain a guarantor whose short-term and long-term debt ratings equal or exceed the above criteria;

(iii)     replace itself under the related or substantially equivalent Hedge Agreement with a substitute Hedge Counterparty whose short-term and long-term debt ratings equal or exceed the above criteria; or

(iv)     take other actions to satisfy the Rating Condition with respect to Moody's.

If at any time the Hedge Counterparty has:

(A)     no short-term Moody's rating and a long-term Moody's rating that is "A2" or below or has been suspended or withdrawn;

(B)     both a short-term and long-term Moody's rating; and either:

009466

> (i)      the long-term Moody's rating is "A3" or below or is suspended or withdrawn; or
>
> (ii)     the short-term Moody's rating is "P-2" or below; or

(C)     a short-term debt rating by S&P below "A-1" or, if the Hedge Counterparty has no short-term rating by S&P, a long-term rating by S&P below "A+" or that has been suspended or withdrawn;

then the Hedge Counterparty shall be required, at its sole expense, to, within 30 days, either:

> (i)      post collateral as required by the Hedge Agreement to secure the Hedge Counterparty's obligations under the Hedge Agreement in an amount and of the type sufficient to cause the Rating Condition with respect to Moody's and S&P to be satisfied; or
>
> (ii)     (x) obtain a guarantor that has a Required Rating and that will satisfy the Rating Condition with respect to S&P with respect to its appointment; (y) replace itself under the related or substantially equivalent Hedge Agreement with a substitute Hedge Counterparty that has a Required Rating and the appointment of which will satisfy the Rating Condition with respect to S&P; or (z) take such other actions to satisfy the Ratings Condition.

Any payments required to be made under the Hedge Agreements shall be made in accordance with the Priority of Payments. Hedge termination payments shall be subordinate to interest and principal payments on the Notes and any other payments required to be made by the Issuer under the Hedge Agreements, but senior distributions to Holders of the Preference Shares pursuant to the Indenture.

Unless the Rating Condition with respect to each Rating Agency is otherwise satisfied, following the early termination of a Hedge Agreement (other than on a Redemption Date) the Issuer, at the direction of the Portfolio Manager, shall promptly (but no later than 60 days after the early termination), at the expense of the Issuer and to the extent possible through Hedge Termination Receipts, enter into a replacement hedge, unless, in the exercise of the Portfolio Manager's commercially reasonable judgment, to do so would not be in the best interest of the Issuer and the Rating Condition with respect to each Rating Agency is satisfied with respect to not entering into a replacement hedge. In addition, a replacement hedge may not be entered into unless the Issuer provides the Rating Agencies with at least seven Business Days' prior written notice of its intention to enter into a replacement hedge, together with its form and the Rating Condition with respect to each Rating Agency is satisfied with respect to the replacement hedge. The Issuer shall use commercially reasonable efforts to cause the termination of a Hedge Agreement (other than a termination resulting from the bankruptcy, insolvency, or similar event with respect to the Hedge Counterparty) to become effective simultaneously with its entering into a replacement hedge. To the extent that (i) the Portfolio Manager determines not to replace the Hedge Agreement and the Rating Condition with respect to each Rating Agency is satisfied with respect to the determination; or (ii) termination is occurring on a Redemption Date, the Hedge Termination Receipts shall become part of Principal Proceeds and be distributed in accordance with the Priority of Payments on the next following Payment Date (or on the Redemption Date, if the Notes are redeemed on the Redemption Date).

The notional amounts of the Hedge Agreements outstanding at any time may be reduced or increased from time to time, by the Issuer, and the Hedge Agreements may be amended, modified, or terminated in accordance with the Hedge Agreements if the Rating Condition with respect to each Rating Agency is satisfied with respect to the reduction, increase, amendment, modification, or termination, as the case may be.

009467

Each Hedge Agreement may be terminated pursuant to its terms upon an Optional Redemption of the Notes or an acceleration of maturity of the Notes after an Event of Default. The Hedge Agreement will not be permitted to be terminated as the result of a Default or Event of Default unless any acceleration of maturity of the Notes resulting from the Event of Default is no longer permitted to be rescinded pursuant to the Indenture.

Except for Hedge Agreements entered into on or before the Closing Date, the Issuer shall not enter into any Hedge Agreement unless the Rating Condition with respect to each Rating Agency is satisfied.

**Securities Lending**

The Indenture permits the Issuer to engage in a limited number of securities lending transactions as described below.

The Portfolio Manager may instruct the Trustee to cause Collateral Obligations that are not Defaulted Collateral Obligations to be lent for a term of 90 days or less to banks, broker-dealers, and other financial institutions (other than insurance companies) having long-term and short-term senior unsecured debt ratings or guarantors with ratings of at least "A1" (and not "A1" but on credit watch with negative implications) and "P-1" (and not on credit watch for possible downgrade) from Moody's and a long-term senior unsecured debt rating of at least "A" from S&P (each, a "**Securities Lending Counterparty**") pursuant to one or more agreements (each, a "**Securities Lending Agreement**"); *provided* that Collateral Obligations the Market Value of which cannot be determined under clause (i), (ii) or (iii) of that definition may not be lent pursuant to a Securities Lending Agreement. Upon receipt of an Issuer Order, the Trustee shall release any lent Collateral Obligations to a Securities Lending Counterparty as directed by the Portfolio Manager. The Securities Lending Counterparties may be Affiliates of the Initial Purchaser or Affiliates of the Portfolio Manager. The duration of any Securities Lending Agreement shall not exceed the Stated Maturity of the Notes. Collateral Obligations representing no more than 15% (measured by Aggregate Principal Balance) of the Maximum Investment Amount may be loaned pursuant to Securities Lending Agreements at any time.

Each Securities Lending Agreement shall be on market terms as determined by the Portfolio Manager (except to the extent specified in the Indenture) and shall:

(i)     require that the Securities Lending Counterparty return to the Issuer debt obligations that are identical (in terms of issue and class) to the lent Collateral Obligations;

(ii)    require that the Securities Lending Counterparty pay to the Issuer amounts equivalent to all interest and other payments that the owner of the lent Collateral Obligation is entitled to for the period during which the Collateral Obligation is lent and require that any such payments not be subject to withholding tax imposed by any jurisdiction unless the Securities Lending Counterparty is required under the Securities Lending Agreement to make "gross-up" payments to the Issuer that cover the full amount of the withholding tax on an after-tax basis;

(iii)   require that the Rating Condition with respect to each Rating Agency shall be satisfied with respect to the execution of the Securities Lending Agreement;

(iv)    satisfy any other requirements of Section 1058 of the Code and the Treasury Regulations promulgated under it;

(v)     be governed by the laws of New York;

009468

(vi)     permit the Issuer to assign its rights under the Securities Lending Agreement to the Trustee pursuant to the Indenture;

(vii)    provide for early termination and the delivery of any lent Collateral Obligation with no penalty if the Collateral Obligation becomes a Credit Risk Obligation or is subject to redemption in accordance with its terms;

(viii)   provide for early termination and the delivery of any lent Collateral Obligation with no penalty upon any redemption of the Notes or Composite Securities in whole;

(ix)     require the Securities Lending Counterparty to post with the Trustee collateral consisting of cash or direct registered debt obligations of the United States of America that have a maturity date no later than the Business Day preceding the stated termination date of the Securities Lending Agreement to secure its obligation to return the Collateral Obligations or in the alternative post that collateral with a custodian for the benefit of the Issuer designated by the Securities Lending Counterparty that satisfies the requirements with respect to being a securities intermediary with respect to the posted collateral if that custodian would qualify to be a successor trustee under the Indenture;

(x)      provide that the Securities Lending Collateral shall be maintained at all times in an amount equal to at least 102% of the current Ask-Side Market Value (determined daily and monitored by the Portfolio Manager) of the lent Collateral Obligations and if securities are delivered to the Trustee as security for the obligations of the Securities Lending Counterparty under the related Securities Lending Agreement, the Portfolio Manager on behalf of the Issuer will negotiate with the Securities Lending Counterparty a rate for the loan fee to be paid to the Issuer for lending the lent Collateral Obligations;

(xi)     the lent Collateral Obligations shall be marked-to-market on a daily basis by the Portfolio Manager on the basis of their Market Value;

(xii)    the Collateral will include the Issuer's rights under the related Securities Lending Agreement rather than the loaned Collateral Obligation;

(xiii)   provide for early termination within 10 days at the option of the Issuer and the delivery of any lent Collateral Obligation with no penalty if the Securities Lending Counterparty is no longer in compliance with the requirements relating to the credit ratings of the Securities Lending Counterparty and the noncompliance is not cured as provided in the Indenture; and

(xiv)    contain appropriate limited recourse and non-petition provisions (to the extent the Issuer has contractual payment obligations to the Securities Lending Counterparty) equivalent (mutatis mutandis) to those in the Indenture.

009469

In addition, each Securities Lending Agreement must provide that if either Moody's or S&P downgrades a Securities Lending Counterparty such that the Securities Lending Agreements to which the Securities Lending Counterparty is a party are no longer in compliance with the requirements relating to the credit ratings of the Securities Lending Counterparty, then the Issuer, within 10 days of the downgrade, shall (i) terminate its Securities Lending Agreements with the Securities Lending Counterparty unless a guarantor for the Securities Lending Counterparty's obligations under the Securities Lending Agreements has been obtained; or (ii) reduce the percentage of the Aggregate Principal Balance of the Collateral Obligations lent to the downgraded Securities Lending Counterparty so that the Securities Lending Agreements to which the Securities Lending Counterparty is a party, together with all other Securities Lending Agreements, are in compliance with the requirements relating to the credit ratings of Securities Lending Counterparties; or (iii) take any other steps Moody's or S&P may require to cause the Securities Lending Counterparty's obligations under the Securities Lending Agreements to which the Securities Lending Counterparty is a party to be treated by Moody's or S&P, as the case may be, as if the obligations were owed by a counterparty having a rating at least equivalent to the rating that was assigned by Moody's or S&P, as the case may be, to the downgraded Securities Lending Counterparty before its being downgraded.

The Portfolio Manager shall instruct the Trustee in writing with respect to the administration of any Securities Lending Agreement (including with respect to any default and the exercise of rights under it). The Trustee shall not have any responsibility for evaluating the sufficiency, validity, or acceptability of any Securities Lending Agreement or for the qualifications or eligibility of any Securities Lending Counterparty. Nothing in the Indenture shall be construed to cause the Trustee to have any fiduciary duties to any Securities Lending Counterparty.

So long as any Collateral Obligation is on loan pursuant to a Securities Lending Agreement, (a) the Trustee shall have no liability for any failure or inability on its part to receive any information or take any action with respect to the Collateral Obligation because of its being on loan (including any failure to take action with respect to a notice of redemption, consent solicitation, exchange or tender offer, or similar corporate action) and (b) the loaned Collateral Obligations shall not be disqualified for return to the Trustee as a Collateral Obligation by any change in circumstance or status during the time while on loan (including any change that would cause the Collateral Obligation to be ineligible for purchase by the Issuer under the Indenture if applied to a proposed purchase of it in the open market at the time of its return from loan).

## MATURITY AND PREPAYMENT CONSIDERATIONS

The Stated Maturity of each Class of Notes and Composite Securities will be the Payment Date in February, 2017 or, upon a Maturity Extension (if any), the applicable Extended Stated Maturity Date; *however*, the principal of each Class of the Notes and Composite Securities is expected to be paid in full prior to its Stated Maturity (or Extended Stated Maturity Date, as applicable). Average life refers to the average amount of time that will elapse from the date of delivery of a security until each dollar of the principal of such security will be paid to the investor. The average lives of the Notes will be determined by the amount and frequency of principal payments, which are dependent upon, among other things, the amount of sinking fund payments and any other payments received at or in advance of the scheduled maturity of Collateral Obligations (whether through sale, maturity, redemption, default or other liquidation or disposition). The average lives of the Composite Securities will be dependent on the proceeds received on its Components.

The actual performance of the Securities will also be affected by the financial condition of the obligors on or issuers of the Collateral Obligations and the characteristics of the Collateral Obligations, including the interest rate or other rate of distribution, the actual default rate and actual losses sustained, the existence and frequency of exercise of any prepayment, optional redemption, or sinking fund features and any related premium, the prevailing level of interest rates, any sales of Collateral Obligations, and any unique risks of the Collateral Obligations. Any disposition of a Collateral Obligation may change the composition and characteristics of the portfolio of Collateral Obligations and their rate of payment, and,

117

accordingly, may affect the actual performance of each respective Class of Securities. The ability of the Issuer to reinvest any Interest Proceeds or Principal Proceeds in the manner described under "Security for the Notes and the Composite Securities " will also affect the performance of the Securities. Redemptions will also affect the performance of the Securities.

## THE PORTFOLIO MANAGER

*The information appearing in this section has been prepared by the Portfolio Manager and has not been independently verified by the Co-Issuers or JPMorgan. Accordingly, notwithstanding anything to the contrary herein, the Co-Issuers and JPMorgan do not assume any responsibility for the accuracy, completeness or applicability of such information.*

### General

Based in Dallas, Texas, Highland Capital is a registered investment adviser specializing in below investment grade credit and special situation investing. As of November 30, 2004, Highland Capital managed over $11 billion in leveraged loans, high yield bonds, structured products and other assets for banks, insurance companies, pension plans, foundations, and high net worth individuals.

As of November 30, 2004 , Highland Capital employed 35 investment professionals with over 800 credits owned and 900 credits followed. Portfolios as of November 30, 2004 include 14 structured investment vehicles (including 8 CLOs), 2 separate accounts and 5 hedge funds. Additionally, Highland Capital manages 4 closed-end registered investment companies listed on the NYSE.

*Investment Philosophy and Process*

Highland Capital's investment philosophy is based on a belief that fundamental research and disciplined asset acquisition/disposition produces superior long-term results. Highland Capital's investment approach seeks to generate superior performance with muted volatility. Highland Capital anticipates long-term secular trends and identifies those sectors and issues that it believes have the highest relative value characteristics. Highland Capital's process and philosophy have been consistent over time.

Highland Capital has a large range and depth of experience. It has expertise in syndicated loans, high yield bonds, and distressed investments. Highland Capital believes it is in a position to arbitrage disparities in the historical spread relationship between various below investment grade asset classes. Highland Capital believes that, historically, the most inefficient asset classes have demonstrated the best risk/return characteristics.

Highland Capital has invested over $200 million of firm capital in its funds, and expects that one of its Affiliates or funds will invest $13.2 million aggregate Face Amount in the Preference Shares of the Issuer. Additionally, Highland Capital believes that it strives to minimize operating expenses and hires the brightest and most talented professionals, insisting on a high degree of dedication and integrity.

Highland Capital believes that its disciplined investment process minimizes a portfolio's risk and that its strategy seeks to maximize current yield over capital appreciation while limiting downside risk. Portfolio managers actively follow each credit and several times each year the entire investment staff reviews all positions during multi-day monitoring meetings. Highland Capital diversifies its portfolios with set limits on exposure to any one given industry or issuer. Highland Capital believes that this philosophy and process has resulted in positive returns in 46 of the last 48 quarters on its underlying loan portfolio and consistent outperformance relative to its indices.

Highland Capital focuses on a "team" approach that it has used since the investment committee started in 1990. It is Highland Capital management's belief that this style creates the optimum environment for the exchange of information and the development of all investment professionals. All aspects of the investment process are coordinated through the committee's direct interaction. The

009471

investment committee meets every morning to discuss the market, investment strategy, and credits. In addition, the firm maintains an "informal" open door policy with regards to investment or personal issues. The committee is composed of senior management and portfolio managers/analysts. Collectively, the committee utilizes an investment process which is driven by fundamental credit research. Each portfolio manager/analyst makes specific credit recommendations based upon industry coverage. The investment proposal is then brought to the investment committee for consideration. Based upon the consensus decision, the portfolio manager with the recommendation will direct Highland traders to execute the trade. Highland Capital has also provided its investment committee with a strong commitment to technology. The firm developed Wall Street Office® which is a proprietary software system that allows Highland Capital to model, portfolio manage, and trade syndicated loans. This software has been licensed to more than 70 financial institutions that invest in syndicated loans.

**Professionals of the Portfolio Manager**

Set forth below is information regarding certain persons who are currently employed by the Portfolio Manager. Such persons may not necessarily continue to be so employed during the entire term of the Management Agreement.

### Senior Management

**James Dondero, CFA, CPA, CMA** – *President*

Mr. Dondero is a Founder and President of Highland Capital. Formerly, Mr. Dondero served as Chief Investment Officer of Protective Life's GIC subsidiary and helped grow the business from concept to over $2 billion between 1989 and 1993. His portfolio management experience includes mortgage-backed securities, investment grade corporates, leveraged bank loans, emerging markets, derivatives, preferred stocks and common stocks. From 1985 to 1989, he managed approximately $1 billion in fixed income funds for American Express. Mr. Dondero is a Beta Gamma Sigma graduate of the University of Virginia with degrees in Accounting and Finance. He completed financial training at Morgan Guaranty Trust Company. Mr. Dondero is a Certified Public Accountant, Chartered Financial Analyst and a Certified Management Accountant.

**Mark Okada, CFA** – *Chief Investment Officer*

Mr. Okada is a Founder and Chief Investment Officer of Highland Capital. He is responsible for overseeing Highland's investment activities for its various funds and has over 19 years of experience in the leveraged finance market. Formerly, Mr. Okada served as Manager of Fixed Income for Protective Life's GIC subsidiary from 1990 to 1993. He was primarily responsible for the bank loan portfolio and other risk assets. Protective was one of the first non-bank entrants into the syndicated loan market. From 1986 to 1990, he served as Vice President for Hibernia National Bank, managing over $1 billion of high yield bank loans. Mr. Okada is an honors graduate of the University of California Los Angeles with degrees in Economics and Psychology. He completed his credit training at Mitsui and is a Chartered Financial Analyst. Mr. Okada is also Chairman of the Board of Directors of Common Grace Ministries Inc.

**Todd Travers, CFA** – *Partner – Head of CDOs*

Mr. Travers is the primary portfolio manager for Highland Capital's par debt funds, a member of the Credit Committee, and heads a team that is responsible for structuring new transactions and implementing additional opportunities in Highland Capital's core businesses. Formerly, Mr. Travers served as Portfolio Manager/Portfolio Analyst from 1994 to 1998 for Highland Capital. In 1999, he was promoted to Senior Portfolio Manager and his duties were expanded beyond sector portfolio management to include the origination, structuring and issuance of new structured vehicles, including Highland Loan Funding V Ltd. and Restoration Funding Ltd. His prior responsibilities included managing a portion of

009472

Highland Capital's leveraged loan and high yield debt portfolios with an emphasis on technology and aviation transactions. Prior to joining Highland Capital, Mr. Travers was a Finance Manager at American Airlines. Mr. Travers is a graduate of Iowa State University with a BS in Industrial Engineering. He received his MBA with an emphasis in Finance from Southern Methodist University. Mr. Travers is a Chartered Financial Analyst.

### Jack Yang – *Head of Business Development*

Mr. Yang is responsible for new product development, fundraising, and investor relations, and heads the firm's New York Office. Prior to joining Highland Capital, he was Managing Director and Global Head of Leveraged Finance Products at Merrill Lynch. He joined Merrill Lynch in 1994 to establish the firm's syndicated loan activities and co-headed the firm's Global Leveraged Finance Division from 1999 to 2001. In addition to heading the syndicated loan activities of the firm, while at Merrill Lynch he had significant responsibility for establishing and managing the $1.5 billion ML Bridge Loan Fund, the $1.1 billion ML Mezzanine Fund, and the European Leveraged Finance Group. He was a senior member of the firm's Debt Markets Commitment Committee and Mezzanine Investment Committee. Prior to joining Merrill, he spent 11 years at Chemical Securities, Inc. and was a founding member of the Global Syndicated Finance Division. Mr. Yang is a member of the Board of Directors of The Loan Syndications and Trading Association, and is a member of the Governance and Public Relations Sub-Committees. He earned a BA from Cornell University and an MBA from Columbia University. He is a Registered Representative with Series 7, 63, and 24 licenses.

### Traders

### Brad Borud – *Senior Trader*

Mr. Borud is a Senior Trader of leveraged loans and high yield bonds. Prior to his current duties, Mr. Borud served as a Portfolio Analyst for Highland Capital from 1996 to 1998. From 1998 to 2003, Mr. Borud was a Portfolio Manager covering a wide range of industries, including Wireline Telecommunications, Wireless Telecommunications, Telecommunication Equipment Manufacturers, Multi-channel Video, and Media. Prior to joining Highland Capital, Mr. Borud worked as a Global Finance Analyst in the Corporate Finance Group at NationsBank from 1995 to 1996 where he was involved in the originating, structuring, modeling, and credit analysis of leveraged transactions for large corporate accounts in the Southwest portion of the United States. During 1994, Mr. Borud also served at Conseco Capital Management as an Analyst Intern in the Fixed Income Research Department following the Transportation and Energy sectors. He has a BS in Business Finance from Indiana University.

### Paul Kauffman, CFA, CPA – *Senior Trader*

Mr. Kauffman is a Senior Trader for loan and high yield credit products. Prior to his current duties, Mr. Kauffman served as a Portfolio Analyst from 1998 to 1999 and afterward as a Portfolio Manager covering a wide range of industries, including Paper and Packaging as well as General Industrials. Formerly, Mr. Kauffman was a Supervising Senior Accountant at KPMG Peat Marwick LLP from 1994 to 1996. Prior to this, he was a Staff Accountant at Pattillo, Brown & Hill CPAs from 1992 to 1994. He received a BBA in Accounting from Baylor University and an MBA from Duke University. Mr. Kauffman is a Chartered Financial Analyst.

### Senior Portfolio Managers

### Patrick H. Daugherty – *Senior Portfolio Manager & General Counsel*

Mr. Daugherty is co-head of the Distressed Group at Highland Capital and is responsible for managing the sourcing and monitoring process. Prior to joining Highland Capital in early 1998, Mr. Daugherty served as Vice President in the Corporate Finance Group at NationsBanc Capital Markets, Inc.

009473

(now Bank of America Capital Markets, Inc.) where he originated and structured leveraged transactions for a $2.5 billion portfolio of mid-cap companies located in the Southwest. Mr. Daugherty has over 15 years of experience in distressed, high yield and corporate restructuring. He has been involved in over 100 bankruptcy situations and held steering committee positions in over 35 cases. Prior to joining Bank of America, Mr. Daugherty was an Associate with the law firm of Baker, Brown, Sharman and Parker in Houston, Texas where he represented banks and financial institutions in the liquidation of various RTC portfolios. He received a BBA in Finance from The University of Texas at Austin and a Juris Doctorate from The University of Houston School of Law. Mr. Daugherty's professional certifications include membership in the Texas Bar Association and admittance to the American Bar Association in 1992.

### John Morgan, CFA – *Senior Portfolio Manager*

Mr. Morgan is a Senior Portfolio Manager covering the Retail, Food & Drug, and Steel sectors. Prior to joining Highland Capital, Mr. Morgan served as Portfolio Analyst for Falcon Fund Management, LTD from August 1995-February 2000. There he created comparables to assess the attractiveness of companies within industries and across the portfolio. He assisted the portfolio manager in the security selection process and management of the portfolio. Prior to Falcon, he was an Analyst for a Convertible Arbitrage Fund at Q Investments. His primary responsibility included analyzing financial statements and related corporate disclosures and performing analysis on potential investment opportunities. He received both a BS in Biological Sciences and an MBA from Southern Methodist University.

### Kurtis Plumer, CFA – *Senior Portfolio Manager: Energy & Food Processors*

Mr. Plumer is co-head of the Distressed Group at Highland Capital and is responsible for managing the sourcing and monitoring process. He has over 14 years of experience in distressed, high yield bond and leveraged loan products. Prior to joining Highland Capital in 1999, Mr. Plumer was a distressed high yield bond trader at Lehman Brothers in New York, where he managed a $250 million portfolio invested in global distressed securities. While at Lehman, he also traded emerging market sovereign bonds. Prior to joining Lehman Brothers, Mr. Plumer was a corporate finance banker at NationsBanc Capital Markets, Inc. (now Bank of America Capital Markets, Inc.) where he focused on M&A and financing transactions for the bank's clients. Mr. Plumer earned a BBA in Economics and Finance from Baylor University and an MBA in Strategy and Finance from the Kellogg School at Northwestern University. Mr. Plumer is a Chartered Financial Analyst.

### Dansby White, CFA – *Managing Director and Senior Portfolio Manager*

Mr. White is responsible for growing Highland Capital's structured finance and structured vehicles business. Prior to joining Highland Capital he was Managing Director and Head of Structured Finance in the Americas from June 2000 to September 2002 at Merrill Lynch. In this capacity, Mr. White was responsible for managing the Asset Backed Commercial Paper, Asset Backed Securities, Collateralized Debt Obligation and CMBS businesses. From March 1999 until June 2000 Mr. White was the Head of Merrill's Global CDO Group. Prior to joining Merrill Lynch Mr. White was a Principal in the Structured Finance Group at BT Alex Brown focusing on the CDO business. In the early 1980s, Mr. White worked in various capacities at GATX Leasing Corporation. Prior to joining BT Alex Brown, Mr. White spent eight years practicing general corporate law at Cahill Gordon and Reindel and White & Case. Mr. White holds a BA in Economics from Northwestern University, an MBA from the Kellogg School of Management at Northwestern University and a JD from Rutgers University School of Law in Newark where Mr. White was selected for the Law Review. After graduating from Law School, Mr. White served as Law Clerk to the Hon. Robert N. Wilentz, Chief Justice of the New Jersey Supreme Court for one year.

### David Walls, CFA – *Portfolio Manager: Distressed*

Mr. Walls is a Portfolio Manager covering the Cable, Building Materials and Equipment Rental sectors. Prior to joining Highland Capital, Mr. Walls worked at Lend Lease Real Estate Investments

009474

(LLREI) in their Asset Management unit where, as an Associate, he participated in the underwriting and acquisition of bulk portfolios of distressed Korean real estate and corporate debt. Before his international responsibilities at LLREI, Mr. Walls performed loan workouts on a domestic portfolio of sub- and non-performing real estate secured assets. Prior to joining Lend Lease, Mr. Walls worked at U.S. Trust Company of California as an Assistant Vice President, Junior Portfolio Manager in their Fixed Income Portfolio Management group. He holds a BA in Economics from Northwestern University and an MBA in Finance and Marketing from the Kellogg School of Management at Northwestern University. Mr. Walls is a member of AIMR and DAIA. Mr. Walls is a Chartered Financial Analyst.

### Joe Dougherty, CFA, CPA

Mr. Dougherty is a Senior Portfolio Manager. Additionally, Mr. Dougherty heads Highland Capital's retail funds business unit ("Highland Funds") and serves as Senior Vice President and Director of the Firm's two NYSE-listed bond funds, which invest in both investment grade and high yield debt. Additionally, Mr. Dougherty serves as Senior Vice President and Director of the Firm's two 1940 Act Registered floating rate funds, which primarily invest in senior secured floating rate loans. In this capacity, Mr. Dougherty oversees investment decisions for the retail funds, alongside several other Portfolio Managers, and manages the team dedicated to their day-to-day administration. Prior to his current duties, Mr. Dougherty served as Portfolio Analyst for Highland Capital from 1998 to 1999. As a Portfolio Analyst, Mr. Dougherty also helped follow companies within the Chemical, Retail, Supermarket and Restaurant sectors. Prior to joining Highland Capital, Mr. Dougherty served as an Investment Analyst with Sandera Capital Management from 1997 to 1998. Formerly, he was a Business Development Manager at Akzo Nobel from 1994 to 1996 and a Senior Accountant at Deloitte & Touche, LLP from 1992 to 1994. He received a BS in Accounting from Villanova University and an MBA from Southern Methodist University. Mr. Dougherty is a Chartered Financial Analyst and a Certified Public Accountant.

See "Risk Factors—Relating to the Portfolio Manager—The Issuer Will Depend on the Managerial Expertise Available to the Portfolio Manager and Its Key Personnel."

### THE MANAGEMENT AGREEMENT

The following summary describes certain provisions of the Management Agreement. The summary does not purport to be complete and is subject to, and qualified in its entirety by reference to, the Management Agreement.

Pursuant to the terms of the Management Agreement, and in accordance with the requirements set forth in the Indenture, the Portfolio Manager will select the portfolio of Collateral Obligations and will instruct the Trustee with respect to any acquisition, disposition or sale of a Collateral Obligation and an Eligible Investment. Neither the Initial Purchaser or any Affiliate thereof will select any of the Collateral Obligations.

Pursuant to the terms of the Management Agreement, the Portfolio Manager will monitor the Collateral Obligations and provide the Issuer with certain information received from the Collateral Administrator with respect to the composition and characteristics of the Collateral Obligations, any disposition or tender of a Collateral Obligation, the reinvestment of the proceeds of any such disposition in Eligible Investments and with respect to the retention of the proceeds of any such disposition or the application thereof toward the purchase of additional Collateral Obligations. The Portfolio Manager will, and will be authorized to, negotiate, on behalf of the Issuer, with respect to all actions to be taken by the Issuer under any Hedge Agreements.

009475

As compensation for the performance of its obligations as Portfolio Manager, the Portfolio Manager will be entitled to receive:

(i)       a fee (the "**Senior Management Fee**") that accrues from the Closing Date payable to the Portfolio Manager in arrears on each Payment Date equal to 0.30% per annum of the Maximum Investment Amount if and to the extent funds are available for that purpose in accordance with the Priority of Payments (with the Senior Management Fee being calculated on the basis of a 360-day year consisting of twelve 30-day months);

(ii)      an amount (the "**Subordinated Management Fee**") payable on each Payment Date equal to the sum of (a) a fee that accrues from the Closing Date payable to the Portfolio Manager in arrears on each Payment Date equal to 0.25% per annum of the Maximum Investment Amount if and to the extent funds are available for that purpose in accordance with the Priority of Payments, (b) on any Payment Date that any part of the Senior Management Fee was not paid on the preceding Payment Date, an amount equal to interest on such unpaid amount at a rate of LIBOR for the applicable period *plus* 3.00% per annum and (c) on any Payment Date that any part of the Subordinated Management Fee was not paid on the preceding Payment Date, an amount equal to interest on such unpaid amount at a rate of LIBOR for the applicable period *plus* 3.00% per annum (with the portion of the Subordinated Management Fee or Senior Management Fee, as applicable, in clauses (a) through (c) above, as applicable, being calculated on the basis of a 360-day year consisting of twelve 30-day months); and

(iii)     a fee (the "**Incentive Management Fee**" and together with the Senior Management Fee and the Subordinated Management Fee, the "**Management Fee**"), if any, payable on each Payment Date to the Portfolio Manager in an amount equal to: (i) 20% of the remaining Interest Proceeds, if any, available after making the distributions on such Payment Date pursuant to clause (21) under "Description of the Securities—Priority of Payments—Interest Proceeds" and (ii) 20% of the remaining Principal Proceeds, if any, available for payment in respect of the Incentive Management Fee pursuant to clause (6)(A) and, if applicable, clause (9), in each case pursuant to "Description of the Securities—Priority of Payments—Principal Proceeds."

The Portfolio Manager may, in its sole discretion: (i) waive all or any portion of the Management Fee, any funds representing the waived Management Fees to be retained in the Collection Account for distribution as either Interest Proceeds or Principal Proceeds (as determined by the Portfolio Manager) pursuant to the Priority of Payments; or (ii) defer all or any portion of the Management Fee, any funds representing the deferred Management Fees to be retained in the Collection Account, when they will become payable in the same manner and priority as their original characterization would have required unless deferred again.

The Portfolio Manager, its directors, officers, stockholders, partners, agents and employees, and its Affiliates and their directors, officers, stockholders, partners, agents and employees, shall not be liable to the Issuer, the Co-Issuer, the Trustee, the Noteholders, the Preference Share Paying Agent, the Holders of the Preference Shares or any other person for any losses, claims, damages, judgments, assessments, costs or other liabilities (collectively "**Liabilities**") incurred by the Issuer, the Co-Issuer, the Trustee, the Noteholders, the Preference Share Paying Agent, the Holders of the Preference Shares or any other person that arise out of or in connection with the performance by the Portfolio Manager of its duties under the Management Agreement and the Indenture, except by reason of (i) acts or omissions constituting bad faith, willful misconduct, gross negligence or breach of fiduciary duty in the performance, or reckless disregard, of the obligations of the Portfolio Manager under the Management Agreement and under the terms of the Indenture applicable to it or (ii) with respect to any information included in this Offering Circular in the sections entitled "The Portfolio Manager" and "Certain Conflicts of Interest—Conflicts of Interest Involving the Portfolio Manager" that contains any untrue statement of material fact or omits to

009476

state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading  (the preceding clauses (i) and (ii) collectively being the "**Portfolio Manager Breaches**").  The Portfolio Manager will be liable for any non-waivable breaches of applicable securities laws.

The Issuer will indemnify and hold harmless the Portfolio Manager, its directors, officers, stockholders, partners, agents and employees (such parties collectively in such case, the "**Indemnified Parties**") from and against any and all Liabilities, and shall reimburse each such Indemnified Party for all reasonable fees and expenses (including reasonable fees and expenses of counsel) (collectively, the "**Expenses**") as such Expenses are incurred in investigating, preparing, pursuing or defending any claim, action, proceeding or investigation with respect to any pending or threatened litigation (collectively, the "**Actions**"), caused by, or arising out of or in connection with, the issuance of the Securities, the transactions contemplated by the Offering Circular, the Indenture or the Management Agreement, and/or any action taken by, or any failure to act by, such Indemnified Party; *provided, however*, that no Indemnified Party shall be indemnified for any Liabilities or Expenses it incurs as a result of any acts or omissions by any Indemnified Party constituting Portfolio Manager Breaches.  Any such indemnification by the Issuer will be paid in accordance with, and subject to, the Priority of Payments.

Pursuant to the terms of the Portfolio Management Agreement, the Portfolio Manager will agree that on the Closing Date the Portfolio Manager or its Affiliates will purchase Preference Shares having an aggregate Face Amount equal to $13,200,000 and maintain, in the aggregate, ownership of Preference Shares having an aggregate Face Amount of at least $10,000,000 until such time as described in "Summary of Terms—The Portfolio Manager."

The Management Agreement may not be amended (i) without the consent of the Holders of Notes or Preference Shares that would be sufficient to meet the consent requirements for such an amendment if it were made to the Indenture and (ii) without the satisfying the Rating Condition with respect to each Rating Agency.

The Management Agreement provides that the Portfolio Manager will not direct the Trustee to acquire an obligation to be included in the Collateral from the Portfolio Manager or any of its Affiliates as principal or to sell an obligation to the Portfolio Manager or any of its Affiliates as principal unless (i) the Issuer shall have received from the Portfolio Manager such information relating to such acquisition or sale as it may reasonably require and shall have approved such acquisition, which approval shall not be unreasonably withheld, (ii) in the judgment of the Portfolio Manager, such transaction is on terms no less favorable than would be obtained in a transaction conducted on an arm's length basis between third parties unaffiliated with each other and (iii) such transaction is permitted by the Investment Adviser's Act of 1940.  The Management Agreement also provides that the Portfolio Manager will not direct the Trustee to acquire an obligation to be included in the Collateral directly from any account or portfolio for which the Portfolio Manager serves as investment advisor, or direct the Trustee to sell an obligation directly to any account or portfolio for which the Portfolio Manager serves as investment advisor unless such acquisition or sale is (i) in the judgment of the Portfolio Manager, on terms no less favorable than would be obtained in a transaction conducted on an arm's length basis between third parties unaffiliated with each other and (ii) permitted by the Investment Adviser's Act of 1940.

Subject to the provisions for a successor portfolio manager discussed below, the Portfolio Manager may resign, upon 90 days' written notice to the Issuer (or such shorter notice as is acceptable to the Issuer).

The Management Agreement provides that the Portfolio Manager may be removed without cause upon 90 days' prior written notice by the Issuer, at the direction of the Holders of at least 63% of the Aggregate Outstanding Amount of Preference Shares (excluding Preference Shares held by the Portfolio Manager, its Affiliates or any account for which the Portfolio Manager or its Affiliates have discretionary voting authority at the time of such vote); *provided*, *however*, that the Portfolio Manager shall have the

009477

right to avoid any such removal if, on or prior to the proposed removal date the following conditions are satisfied: (i) the Portfolio Manager provides written notice, not less than 20 Business Days prior to the proposed removal date, to the Holders of the Composite Securities, the Preference Shares Paying Agent (for forwarding to Holders of Preference Shares), the Issuer and the Trustee that the Portfolio Manager intends to purchase not less than all of the Preference Shares voting for such removal from the Holders thereof (the "**Directing Preference Shares**"), (ii) in the notice provided to the Holders of Composite Securities and the Preference Shares Paying Agent (for forwarding to Holders of Preference Shares) in the preceding clause (i), the Portfolio Manager includes a statement to the effect that each Holder of Preference Shares (including each Holder of a Composite Security in respect of the Preference Share Component) who did not vote for removal may provide written notice to the Portfolio Manager not later than 5 Business Days prior to the proposed removal date that the Preference Shares or Preference Share Components, as applicable, held by such Holder shall be deemed to be included in the Directing Preference Shares as provided in the preceding clause (i), and (iii) the Portfolio Manager effects the purchase of not less than all of the Directing Preference Shares and all of the Composite Securities relating to the Preference Share Components which form a part of the Directing Preference Shares at the Buy-out Amount. If all of the conditions set forth in the preceding sentence are satisfied on or prior to the proposed removal date, the Portfolio Manager shall continue as the Portfolio Manager under the Management Agreement.

The Management Agreement provides that if (i) an Event of Default described in clause (d) under "Description of the Securities—Events of Default" occurs, and (ii) the Policy has not been terminated and delivered for cancellation in accordance with the terms of the Indenture as described in "Description of the Securities—Termination of the Policy," the Management Agreement shall be terminated, and the Portfolio Manager shall be removed, by the Issuer, if directed by a Majority of the Controlling Class upon 10 days' prior written notice to the Portfolio Manager and upon written notice to the Noteholders and the Holders of the Preference Shares as set forth below; *provided*, *however*, that the Portfolio Manager shall have the right to avoid any such removal if, on or prior to the proposed removal date the Portfolio Manager provides written notice, not less than 2 Business Days prior to the proposed removal date, to the Controlling Class, the Issuer and the Trustee that the Removal Buy-Out Purchaser intends to (i) purchase not less than all of the Class A-1g Notes at the Removal Buy-Out Purchase Price pursuant to the Indenture and as described in "Description of the Securities—Removal Buy-Out" and (ii) terminate the Policy pursuant to the Indenture upon the effectiveness of such purchase, and the Removal Buy-Out Purchaser purchases not less than all of the Class A-1g Notes prior to the proposed removal date. If the conditions set forth in the preceding sentence are satisfied on or prior to the proposed removal date, the Portfolio Manager shall continue as the Portfolio Manager under the Management Agreement.

In addition, the Management Agreement will be terminated, and the Portfolio Manager will be removed, by the Issuer, if directed by the Trustee or the Controlling Class of Notes or by a Majority of the Holders of the Preference Shares (excluding any Preference Shares held by the Portfolio Manager or its Affiliates), in each case for "cause" upon 10 days' prior written notice to the Portfolio Manager and upon written notice to the Noteholders and the Holders of the Preference Shares as set forth below. For purposes of determining "cause" with respect to any such termination of the Management Agreement, such term shall mean any one of the following events:

(i) the Portfolio Manager willfully breaches in any respect, or takes any action that it knows violates in any respect, any provision of the Management Agreement or any terms of the Indenture applicable to it;

(ii) the Portfolio Manager breaches in any material respect any provision of the Management Agreement or any terms of the Indenture or the Collateral Administration Agreement applicable to it, or any representation, warranty, certification or statement given in writing by the Portfolio Manager shall prove to have been incorrect in any material respect when made or given, and the Portfolio Manager fails to cure such breach or take such action so that the facts (after giving effect to such action) conform in all material respects to such representation,

009478

warranty, certificate or statement, in each case within 30 days of becoming aware of, or receiving notice from, the Trustee of, such breach or materially incorrect representation, warranty, certificate or statement;

      (iii)    certain events of bankruptcy or insolvency occur with respect to the Portfolio;

      (iv)    the occurrence of any Event of Default under the Indenture that results from any breach by the Portfolio Manager of its duties under the Indenture or the Management Agreement, which breach or default is not cured within any applicable cure period;

      (v)    (x) the occurrence of an act by the Portfolio Manager related to its activities in any securities, financial advisory or other investment business that constitutes fraud, (y) the Portfolio Manager being indicted, or any of its principals being convicted, of a felony criminal offense related to its activities in any securities, financial advisory or other investment business or (z) the Portfolio Manager being indicted for, adjudged liable in a civil suit for, or convicted of a violation of the Securities Act or any other United States Federal securities law or any rules or regulations thereunder; or

      (vi)    a Change of Control shall occur with respect to the Portfolio Manager.

For purposes of clause (vi) above: (i) "**Change of Control**" means that two or more of James Dondero, Mark Okada and Todd Travers (or any Approved Replacement therefor) shall fail to be a partner, director, officer or management-level employee of Highland Capital and (ii) "**Approved Replacement**" means an individual who shall (x) be proposed by Highland Capital to replace James Dondero, Mark Okada or Todd Travers (or a prior Approved Replacement therefor) within 30 days after James Dondero, Mark Okada or Todd Travers (or a prior Approved Replacement therefor) fails to be a partner, director, officer or management-level employee of Highland Capital or, following any objection pursuant to the following clause (y) to the first proposed replacement, within 30 days after such objection and (y) not have been objected to by either (A) the Controlling Class of Notes or (B) a Majority of the Preference Shares (excluding any Preference Shares held by Highland Capital or any of its affiliates), within 30 days after written notice of such Approved Replacement has been given by the Portfolio Manager to the Controlling Class of Notes and the Holders of Preference Shares).

No removal, termination or resignation of the Portfolio Manager will be effective under the Management Agreement unless (i) at the written direction of a Majority of the Preference Shares, the Issuer appoints a successor Portfolio Manager has agreed in writing to assume all of the Portfolio Manager's duties and obligations pursuant to the Management Agreement and the Indenture and (ii) the successor Portfolio Manager is not objected to within 30 days after notice of such succession by either (x) the Controlling Class of Notes or (y) a Majority in Aggregate Outstanding Amount of the Notes (voting as a single Class (excluding any Notes held by the retiring Portfolio Manager or any of its Affiliates)); provided, that if a Majority of the Preference Shares has nominated two or more successor Portfolio Managers that have been objected to pursuant to clause (ii) of the preceding sentence or has otherwise failed to appoint a successor Portfolio Manager that is not objected to pursuant to clause (ii) of the preceding sentence within 60 days of the date of notice of such removal, termination or resignation of the Portfolio Manager, then the Controlling Class of Notes may petition a court of competent authority to appoint a successor Portfolio Manager. In addition, any successor Portfolio Manager must be an established institution which (i) has demonstrated an ability to professionally and competently perform duties similar to those imposed upon the Portfolio Manager under the Management Agreement, (ii) is legally qualified and has the capacity to act as Portfolio Manager under the Management Agreement, as successor to the Portfolio Manager under the Management Agreement in the assumption of all of the responsibilities, duties and obligations of the Portfolio Manager under the Management Agreement and under the applicable terms of the Indenture, (iii) shall not cause the Issuer or the pool of Collateral to become required to register under the provisions of the Investment Company Act, (iv) shall perform its duties as Portfolio Manager under the Management Agreement and the Indenture without causing the

009479

Issuer, the Co-Issuer or any Holder of Preference Shares to become subject to tax in any jurisdiction where such successor Portfolio Manager is established as doing business and (v) each Rating Agency has confirmed that the appointment of such successor Portfolio Manager shall not cause its then-current rating of any Class of Notes or Composite Securities to be reduced or withdrawn. No compensation payable to a successor from payments on the Collateral shall be greater than that paid to the Portfolio Manager without the prior written consent of the Controlling Class of Notes, a Majority of the Notes, a Majority of the Composite Securities and a Majority of the Preference Shares (voting collectively).

The Management Agreement, and any obligations or duties of the Portfolio Manager under the Management Agreement, cannot be delegated by the Portfolio Manager, in whole or in part, except to any entity that is both (i) controlled by all or any of James Dondero, Mark Okada and Todd Travers and (ii) one in which all of James Dondero, Mark Okada and Todd Travers (or any Approved Replacement thereof) is involved in the day to day management and operations (and in any such case pursuant to an instrument of delegation in form and substance satisfactory to the Issuer), without the prior written consent of the Issuer, the Controlling Class of Notes, a Majority of the Composite Securities and a Majority of the Preference Shares (excluding Preference Shares held by the Portfolio Manager or any of its Affiliates), and, notwithstanding any such consent, no delegation of obligations or duties by the Portfolio Manager (including, without limitation, to an entity described above) shall relieve the Portfolio Manager from any liability under the Management Agreement.

## THE INSURER AND THE POLICY

*The information appearing in this section under the heading "The Insurer and the Policy—The Insurer" has been prepared by the Insurer and has not been independently verified by the Co-Issuers or JPMorgan. Accordingly, notwithstanding anything to the contrary herein, the Co-Issuers and JPMorgan do not assume any responsibility for the accuracy, completeness or applicability of such information.*

**The Insurer**

Assured Guaranty is a Maryland-domiciled insurance company licensed as a financial guaranty insurance company in forty-seven states and the District of Columbia. Assured Guaranty was formed in 1985 and commenced operations in 1988. Assured Guaranty has license applications pending, or intends to file an application, in each of those states in which it is not currently licensed. Assured Guaranty is located at 1325 Avenue of the Americas, New York, New York 10019. Assured Guaranty is a wholly owned indirect subsidiary of Assured Guaranty Ltd., a Bermuda company whose shares are publicly held and are listed on the New York Stock Exchange under the symbol "AGO" ("**AGL**"). AGL files annual, quarterly and current reports, with the SEC. Copies of AGL's SEC filings are available over the SEC's website at www.sec.gov or over AGL's website at www.assuredguaranty.com. These websites do not form part of this document for the purpose of listing the Notes and the Composite Securities on the Irish Stock Exchange.

Assured Guaranty is subject to insurance laws and regulations in Maryland and in New York (among other limited states jurisdictions) that, among other things, (i) limit Assured Guaranty's business to financial guaranty insurance and related lines, (ii) prescribe minimum solvency requirements, including capital and surplus requirements, (iii) limit classes and concentrations of investments, (iv) regulate the amount of both the aggregate and individual risks that may be insured, (v) limit the payment of dividends by Assured Guaranty, (vi) require the maintenance of contingency reserves and (vii) govern changes in control and transactions among affiliates. Certain state laws to which Assured Guaranty is subject also require the approval of policy rates and forms.

Assured Guaranty's financial strength is rated "AAA" by S&P, and "Aa1" by Moody's. Assured Guaranty's ratings outlook from S&P is "negative." Each rating of Assured Guaranty should be evaluated independently. The ratings reflect the respective Rating Agency's current assessment of the creditworthiness of Assured Guaranty and its ability to pay claims on its policies of insurance. Any

009480

further explanation of the significance of the above ratings may be obtained from the applicable Rating Agency. The above ratings are not recommendations to buy, sell or hold any security, and such ratings may be subject to revision or withdrawal at any time by the Rating Agencies. Any downward revision or withdrawal of any of the above ratings may have an adverse effect on the market price of any security guaranteed by Assured Guaranty. Assured Guaranty does not guaranty the market price of the securities it guarantees, nor does it guaranty that the ratings on such securities will not be revised or withdrawn.

Assured Guaranty makes no representation regarding the Securities or the advisability of investing in the Securities. In addition, Assured Guaranty makes no representation regarding, nor does it accept any responsibility for the accuracy or completeness of this Offering Circular or any information or disclosure contained herein, or omitted herefrom, other than with respect to the accuracy of the information regarding Assured Guaranty supplied by Assured Guaranty and presented under the heading "The Insurer."

*Capitalization of Assured Guaranty*

As of December 31, 2003, Assured Guaranty has total admitted assets of $1,207,785,868, total liabilities of $952,203,218, total surplus of $255,582,650 and total statutory capital (surplus plus contingency reserves) of $655,582,596, determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities ("**SAP**"). Copies of the statutory quarterly and annual statements filed with Maryland Insurance Administration are available upon request by contacting Assured Guaranty at (212) 974-0100.

Attached to this Offering Circular as Exhibit A are the audited financial statements of Assured Guaranty for the years ended December 31, 2003, 2002 and 2001 and its unaudited financial statements for the nine months ended September 30, 2004 and 2003.

The following table sets forth the capitalization of Assured Guaranty as of the period ended December 2002 and 2003 and as of September 30, 2004 (unaudited), on the basis of accounting principles generally accepted in the United States of America:

|  | December 31, 2002 ($ in millions) | December 31, 2003 ($ in millions) | September 30, 2004 ($ in millions) |
|---|---|---|---|
| Unearned Premiums | 353 | 389 | 386 |
| Other Liabilities | 233 | 236 | 261 |
| Stockholder's Equity: |  |  |  |
| Common Stock | 15 | 15 | 15 |
| Additional Paid-in Capital | 345 | 351 | 386 |
| Unrealized Gain on Bonds, Net of Tax | 42 | 45 | 42 |
| Retained Earnings | 371 | 465 | 535 |
| Total Stockholder's Equity | 773 | 876 | 978 |
| Total Liabilities and Stockholder's Equity | 1,359 | 1,501 | 1,625 |

The New York State Insurance Department recognizes only statutory accounting practices for determining and reporting the financial condition and results of operations of an insurance company, for determining its solvency under the New York Insurance Law, and for determining whether its financial condition warrants the payment of a dividend to its stockholders. No consideration is given by the New York State Insurance Department to financial statements prepared in accordance with United States generally accepted accounting principles in making such determinations.

009481

**The Policy**

The following summary of the terms and conditions of the Policy does not purport to be complete and is qualified in its entirety by reference to the Policy and the Insurance Agreement.

Simultaneously with the issuance of the Insured Notes, the Insurer will deliver the Policy to the Beneficiary for the benefit of each Insured Noteholder. In consideration of the payment of the Premium and subject to the terms and conditions of the Policy, the Insurer will unconditionally and irrevocably agree to pay each and every Insured Amount which shall become Due for Payment, but shall be unpaid by reason of Nonpayment by the Issuer (as such terms are defined below).

"**Avoided Payment**" means any amount that is paid, credited, transferred or delivered to the Beneficiary under the terms of the Indenture in respect of any Insured Amount, which amount has been rescinded or recovered from or otherwise required to be returned or repaid by the Beneficiary as a result of Insolvency Proceedings by or against the Issuer.

"**Beneficiary**" means JPMorgan Chase Bank, National Association, as Trustee under the Indenture and any successor in such capacity, for the benefit of each Insured Noteholder.

"**Due for Payment**" with respect to an Insured Amount, means (i) scheduled interest on the Insured Notes when due and payable (after the expiration of any applicable or deemed grace period (after the satisfaction of any conditions precedent to the commencement of such grace period)) in accordance with the terms of the Indenture and (ii) final payment of principal of the Insured Notes on the Stated Maturity (in each of sub-clauses (i) and (ii), in accordance with the original terms of the Insured Notes when issued and without regard to any subsequent amendment or modification of the Insured Notes that has not been consented to in writing by the Insurer).

"**Insured Amount**" means the following amounts now owing or which may in the future be owing by the Issuer under the terms of the Indenture and the Insured Notes to the Beneficiary: (a) scheduled interest on the Insured Notes when due and payable (after the expiration of any applicable or deemed grace period (after the satisfaction of any conditions precedent to the commencement of such grace period)) in accordance with the terms of the Indenture and (b) final payment of principal of the Insured Notes on the Stated Maturity in a principal amount not to exceed $400,000,000. "Insured Amounts" will not include, nor will coverage be provided under the Policy in respect of:

(i) payments that become due on an accelerated basis as a result of the occurrence of (1) an Event of Default under the Indenture, (2) an Optional Redemption by the Issuers, (3) a failure to meet any Coverage Test as of any Determination Date, (4) the occurrence and continuance of a Rating Confirmation Failure or (5) any other cause;

(ii) any amounts due in respect of the Insured Notes attributable to any increase in interest rate, penalty or other sum payable by the Issuer by reason of any default under the Indenture or Event of Default in respect of the Insured Notes, or by reason of any deterioration of the creditworthiness of the Issuer;

(iii) any present or future taxes, withholding, deduction, assessment or other charge imposed by the United States, any other sovereign state, or any political subdivision or governmental or taxing authority thereof (including interest and penalties in respect of such taxes, withholding, deduction, assessment or other charge) with respect to any payment due under the Insured Notes;

(iv) any default, redemption or other make whole premium with respect to the Insured Notes;

009482

(v)      in the case of the election by 100% of the Holders of the Insured Notes to receive less than 100% of the portion of the Redemption Price that would otherwise be payable to such Holders in connection with any Optional Redemption, the amount by which the Redemption Price exceeds such lesser amount to be received by such Holders; or

(vi)     any Extension Bonus Payment with respect to the Insured Notes.

**"Nonpayment by the Issuer"** with respect to an Insured Amount at a time when such Insured Amount is Due for Payment, means that the funds, if any, remitted to the Beneficiary under the terms of the Indenture are insufficient for payment in full of such Insured Amount. In addition to and without limiting the foregoing, "Nonpayment by the Issuer" applies to any portion of any Insured Amount that has become an Avoided Payment.

In the event that the payment of any amount in respect of any Insured Amount is accelerated or must otherwise be paid by the Issuer in advance of the scheduled payment date therefore, nothing in the Policy shall be deemed to require the Insurer to make any payment thereunder in respect of any such Insured Amount prior to the date such Insured Amount otherwise would have been Due for Payment without giving effect to such acceleration, unless the Insurer in its sole discretion elects to make any prior payment, in whole or in part, with respect to any such Insured Amount.

The Policy will be non-cancelable for any reason, including without limitation the non-payment of Premium. The Policy and the obligations of the Insurer thereunder shall terminate upon the earlier of: (i) the date on which all Insured Amounts have been paid or shall be deemed to have been paid under the Insured Notes or (ii) the date on which the Policy has been terminated by the Beneficiary and delivered for cancellation as described under "Description of the Securities—Termination of the Policy"; provided, however, that in the event that any amount with respect to any Insured Amount paid to the Beneficiary under the terms of the Indenture during the term of the Policy becomes an Avoided Payment, the Insurer's obligations with respect thereto shall, unless the term of the Policy has expired pursuant to clause (ii) above, remain in effect or shall be reinstated, as applicable, until payment in full by the Insurer pursuant to the terms of the Policy. For the avoidance of doubt, if the term of the Policy has expired pursuant to clause (ii), the Insurer shall have no further liability under the Policy, including, without limitation, for any subsequent Avoided Payment.

Following receipt by the Insurer of a notice of claim in the form attached to, and delivered in the manner specified in, the Policy, the Insurer will pay any amounts payable under the Policy (other than an amount that constitutes an Avoided Payment, which is discussed below) to the Beneficiary on behalf of the Insured Noteholder on the later to occur of (i) the date on which such payment becomes Due for Payment or (ii) the third Business Day following receipt by the Insurer of such notice of claim.

In the event the Insurer is required under law to deduct or withhold any tax or similar charge from or in respect of any amount payable under or in respect of the Policy, the Insurer will make all such deductions and withholdings and pay the full amount deducted or withheld to the relevant taxation authority in accordance with law, but the Insurer will not "gross-up" or otherwise pay additional amounts in respect of such taxes, and the Insurer's payments to the Beneficiary, the bankruptcy trustee or the Insured Noteholders, as the case may be, will be amounts that are net of such deductions or withholdings.

Unless this Policy has been terminated by the Beneficiary and delivered by the Beneficiary for cancellation as described under "Description of the Securities—Termination of the Policy", if any amount or property paid to the Beneficiary under the terms of the Indenture becomes an Avoided Payment, the Insurer will pay the amount of such Avoided Payment when due to be paid pursuant to an applicable Order (referred to below), but in any event no earlier than the fourth Business Day following receipt (as specified in the Policy) by the Insurer from the Beneficiary of (i) a certified copy of such final, non-appealable order of the court or other body exercising jurisdiction in an insolvency proceeding by or against the Issuer to the effect that the Beneficiary is required to return or repay all or any portion of an

009483

Avoided Payment (the "**Order**"), (ii) a certificate by or on behalf of the Beneficiary that such Order has been entered and is not subject to any stay, (iii) an assignment in form and substance satisfactory to the Insurer, duly executed and delivered by the Beneficiary on behalf of the affected holders, irrevocably assigning to the Insurer all rights and claims of the Beneficiary on behalf of the affected holders against the estate of the Issuer or otherwise, which rights and claims relate to or arise under or with respect to the subject Avoided Payment, and (iv) a notice of claim, which notice is in the form specified in the Policy and appropriately completed and executed by the Beneficiary. Such payment shall be disbursed to the receiver, conservator, administrator, debtor-in-possession or trustee in bankruptcy named in the Order, and not to the Beneficiary directly, unless the Beneficiary has previously paid the Avoided Payment over to such court or receiver, conservator, administrator, debtor-in-possession or trustee in bankruptcy, in which case the Beneficiary shall pay the Beneficiary subject to the delivery of (a) the items referred to in clauses (i), (ii), (iii) and (iv) above to the Insurer, and (b) evidence satisfactory to the Insurer that payment has been made to such court or receiver, conservator, administrator, debtor-in-possession or trustee in bankruptcy named in such Order.

The Policy may not be assigned by the Beneficiary without the prior written consent of the Insurer.

The Insurer's obligation under the Policy in respect of Insured Amounts shall be discharged to the extent that funds are transferred to the Beneficiary as provided in the notice of claim, whether or not such funds are properly applied by the Beneficiary.

In addition to the rights provided to the Insurer in the Indenture and unless the Policy has been terminated by the Beneficiary and delivered by the Beneficiary for cancellation as described under "Description of the Securities—Termination of the Policy", the Insurer shall be subrogated to the rights of the Insured Noteholders to receive payments in respect of Insured Amounts to the extent of any payment by the Insurer under the Policy (subject to the Priority of Payments). Any payment made by or on behalf of the Issuer to or for the benefit of the Insured Noteholders in respect of any Insured Amount forming the basis of a claim under the Policy (which claim shall have been paid by the Insurer) shall be received and held in trust for the benefit of the Insurer and shall be paid over to the Insurer. The Beneficiary on behalf of the Insured Noteholders shall cooperate in all reasonable respects, and at the expense of the Insurer, with any request by the Insurer for action to preserve or enforce the Insurer's rights and remedies in respect of the Issuer under the Insured Notes, any related security arrangements or otherwise, including without limitation any request to (i) institute or participate in any suit, action or other proceeding, (ii) enforce any judgment obtained and collect from the Issuer any amounts adjudged due or (iii) transfer to the Insurer, via absolute legal assignment, the Beneficiary's rights on behalf of the Insured Noteholders in respect of any Insured Amount which may form the basis of a claim thereunder.

For a discussion of the rights and powers of the Insurer as the Controlling Class upon an Event of Default, see "Description of the Securities—The Indenture—Events of Default."

To the fullest extent permitted by applicable law, the Insurer will waive, for the benefit of the Beneficiary and each Insured Noteholder, all its rights (whether by counterclaim, setoff or otherwise) and all defenses of any kind (including the defense of fraud), whether acquired by subrogation, assignment or otherwise, to the extent that such rights and defenses may be available to the Insurer to avoid payment of its obligations under the Policy. Any rights of subrogation acquired by the Insurer as a result of any payment under the Policy will be subject to the Priority of Payments in accordance with the express provisions of the Policy. Notwithstanding the foregoing, the Insurer will reserve all rights to assert, subsequent to making payment to the Beneficiary of the Insured Amounts and payment in full of the Insured Notes in accordance with the Indenture, any claim it may have against the Beneficiary or any other Person (other than any Insured Noteholder) and none of the foregoing waivers shall prejudice any such claim the Insurer may have, whether directly or as a subrogee, subsequent to making such payment to the Beneficiary; *provided* that any such claim does not seek to impair payment by the Beneficiary to the Holders of Insured Notes of the proceeds of the Policy. The Insurer will acknowledge in the Policy

009484

that, with regard to the Insured Noteholders, the waivers contained in this paragraph are complete waivers and that there shall be no reserved rights to proceed against such parties subsequent to such payment.

**THE POLICY IS NOT COVERED BY THE NEW YORK PROPERTY/CASUALTY INSURANCE SECURITY FUND SPECIFIED IN ARTICLE 76 OF THE NEW YORK INSURANCE LAW.**

*Insurance Agreement*

The Issuer, the Co-Issuer and the Insurer will enter into an Insurance Agreement. Pursuant to the Insurance Agreement and the Indenture, the Issuer will agree to pay or reimburse the Insurer for:

(i)     all amounts paid by the Insurer under the Policy for the benefit of the Holders of the Insured Notes (unless such amounts have previously been repaid to the Insurer); and

(ii)     all reasonable out-of-pocket costs and expenses incurred by the Insurer in connection with the transactions contemplated by the related documents, as described in the Insurance Agreement;

and, in the case of clause (i) above, interest accrued on the foregoing amounts at the Accrued Insurance Liabilities Interest Rate for the period from the date the Insurer paid or advanced such amounts until the date such amounts are paid in full. In addition, the Issuer will agree to pay and to protect, indemnify and save harmless, the Insurer and its officers, directors, shareholders, employees, agents and each Person, if any, who controls the Insurer within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act from and against all losses incurred by reason of:

(i)     any actual or alleged statement, omission or action (other than of or by the Insurer) in connection with the offering, issuance, sale or delivery of the Securities;

(ii)     the actual or alleged negligence, willful misconduct, misfeasance, malfeasance or theft committed by any director, officer, employee, agent or advisor of the Issuer in connection with the transactions or relating to any related document to which it is a party;

(iii)     the actual or alleged violation by the Issuer of any domestic or foreign law, rule or regulation, including, but not limited to, any securities or banking law, rule or regulation in connection with any issuance, offer and sale of the Securities, or any judgment, order or decree applicable to it;

(iv)     (A) the actual or alleged breach by the Issuer of any representation, warranty or covenant under any of the related documents, or (B) any event of default under any related document or any event which, with the giving of notice or the lapse of time or both, would constitute an event of default thereunder; or

(v)     any untrue statement or alleged untrue statement of a material fact contained herein or any omission or alleged omission to state herein a material fact required to be stated herein or necessary to make the statements herein, in light of the circumstances under which they were made, not misleading, except insofar as such claims arise out of or are based upon any untrue statement or alleged untrue statement or omission or alleged omission in information included herein furnished by the Insurer expressly for use herein (all such information so furnished being referred to herein as "**Insurer Information**"), it being understood that the Insurer Information is limited solely to the information included under the caption "The Insurer and the Policy—The Insurer" (including all information incorporated by reference therein) and in Exhibit A to this Offering Circular and the documents filed by the Insurer with the Maryland Insurance Administration and by AGL with the SEC incorporated by reference herein.

009485

Pursuant to the Premium Letter, the Issuer will agree to pay to the Insurer on each Payment Date a premium (the "**Premium**") in accordance with the terms of the Insurance Agreement and the Indenture. All amounts owing by the Issuer under the Insurance Agreement will be payable in accordance with the Priority of Payments. See "Description of the Securities—Priority of Payments." The Premium payable to the Insurer will cease to accrue on any date on which the Policy is terminated or otherwise ceases to be outstanding and in full force and effect.

The occurrence of an Insurance Agreement Event of Default will constitute an Event of Default under the Indenture so long as the Insurer is the Controlling Party and will allow the Insurer, among other things, to direct the Trustee to declare the principal of and interest on the Notes immediately due and payable. See "Description of the Securities—The Indenture—Events of Default".

Pursuant to the Indenture, so long as it is the Controlling Class, the Insurer will have the right to exercise all the rights of the Holders of the Insured Notes under the Indenture and, except in certain limited circumstances, the Holders of the Insured Notes will not be permitted to exercise any such rights without the consent of the Insurer.

For information concerning the business, ratings and regulation of the Insurer, see "The Insurer and the Policy—The Insurer."

*Insurance Agreement Events of Default*

The occurrence of any of the following events shall constitute an "Event of Default" under the Insurance Agreement (each , an "**Insurance Agreement Event of Default**"):

(i)    any representation or warranty made by the Issuer or the Co-Issuer under the Insurance Agreement shall prove to have been untrue, inaccurate or incorrect in any material respect when made, and it shall fail to cure such breach of representation or warranty within 15 calendar days for any representation or warranty regarding the Collateral or within 30 calendar days, for any other representation or warranty, in each case after the date which is the earlier of (x) the date on which the it has actual knowledge of such breach or (y) the date on which notice thereof was given to it, and in each case, which breach or breaches (individually or collectively) has or can be reasonably be expected to have a material adverse effect on the Insurer; and

(ii)    the Issuer or the Co-Issuer shall fail to perform or observe in any material respect any covenant or agreement to be performed or observed by it under the Insurance Agreement and such failure shall continue for a period of 30 calendar days after the date which is the earlier of (x) the date on which it has actual knowledge of such failure or (y) the date on which written notice thereof was given to it; *provided, however*, that if such failure shall be of a nature that it cannot be cured within 30 calendar days, such failure shall not constitute an Insurance Agreement Event of Default if within such 30 calendar-day period it shall have given written notice to the Insurer of corrective action it proposes to take, which corrective action shall have been agreed in writing by the Insurer to be satisfactory and it shall thereafter pursue such corrective action diligently until such default is cured.

009486

### THE CO-ISSUERS

**General**

The Issuer was incorporated as an exempted limited liability company on October 21, 2004 in the Cayman Islands under registration number 140999 and the Issuer Charter was adopted by the holder of all the Issuer Ordinary Shares on February 4, 2005. The registered office of the Issuer is at the offices of Maples Finance Limited, P.O. Box 1093 GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands. The Issuer has no prior operating experience (other than in connection with the acquisition of the Collateral Obligations during the Accumulation Period) and will not have any material assets other than (i) the Collateral pledged to secure the Secured Obligations, and (ii) $500 (of which $250 represents the Issuer's ordinary share capital and $250 represents a fee for issuing the Securities).

The Co-Issuer was incorporated on January 19, 2005 in the State of Delaware under registration number 3914226 as a corporation and has a perpetual existence. The registered office of the Co-Issuer is at 850 Library Avenue, Suite 204, Newark, Delaware 19711. The Co-Issuer has no prior operating history and will not have any material assets. The Issuer will be the sole member of the Co-Issuer.

The Notes are limited recourse obligations of the Co-Issuers, the Composite Securities will be limited recourse obligations of the Issuer and the Preference Shares are equity interests only in the Issuer. The Securities are not obligations of the Trustee, the Preference Shares Paying Agent, the Portfolio Manager, JPMorgan, the Administrator, the Holders of the Preference Shares, Maples Finance Limited, as the share trustee (in such capacity, the "**Share Trustee**"), or any directors or officers of the Co-Issuers or any of their respective Affiliates.

At the Closing Date, the authorized and issued share capital of the Issuer consists of 250 ordinary shares, U.S.$1.00 par value per share (the "**Issuer Ordinary Shares**") and 82,200 Preference Shares, U.S.$0.01 par value per share, 100% of which will be issued on or about the Closing Date. The authorized common stock of the Co-Issuer consists of 1,000 shares of common stock, U.S.$0.01 par value (the "**Co-Issuer Common Stock**"), all of which shares will be issued on or about the Closing Date. All of the outstanding Issuer Ordinary Shares and all of the Co-Issuer Common Stock will be held by the Share Trustee. For so long as any of the Securities are Outstanding, no transfer of any Issuer Ordinary Shares or Co-Issuer Common Stock to a U.S. Person shall be registered.

009487

## Capitalization

The initial proposed capitalization of the Issuer as of the Closing Date after giving effect to the initial issuance of the Securities and the Issuer Ordinary Shares (before deducting expenses of the offering) is as set forth below.

|  | Amount (U.S.$) |
|---|---|
| Class A-1a Notes | 52,000,000 |
| Class A-1b Notes | 7,000,000 |
| Class A-1g Notes | 400,000,000 |
| Class A-2 Notes | 42,500,000 |
| Class A-3a Notes | 23,500,000 |
| Class A-3b Notes | 2,500,000 |
| Class B Notes | 39,000,000 |
| Class C Notes | 36,300,000 |
| Total Notes | 602,800,000 |
| Class 1 Composite Securities | 6,000,000[1] |
| Preference Shares | 82,200,000[2] |
| Issuer Ordinary Shares | 250 |
| Total Equity | 82,200,250 |
| Total Capitalization | 689,000,250[3] |

---

[1]. The capitalization relating to the Class 1 Composite Securities consisting of the Preference Share Component is also included in the initial aggregate Face Amount of the Preference Shares, but such amount is not included in the calculation of Total Capitalization of the Issuer.

[2]. Including the portion of the Preference Shares represented by the Class 1 Composite Securities.

[3]. Does not total because the Total Capitalization has excluded the capitalization relating to the $2,000,000 aggregate Face Amount of the Preference Shares underlying the Preference Share Component.

The Co-Issuer will be capitalized only to the extent of its common equity of U.S.$10, will have no assets other than its equity capital and will have no debt other than as Co-Issuer of the Notes.

## Business

*General*

Object 3 of the Issuer Charter provides that the objects for which the Issuer is established are unrestricted and the Issuer shall have full power and authority to carry out any object not prohibited by the Companies Law (2004 Revision) or as the same may be revised from time to time, or any other law of the Cayman Islands. Article III of the Co-Issuer's Certificate of Incorporation provides that the principal purpose of the Co-Issuer is the issuance of the Notes and to engage in any lawful act or activity and to exercise any powers permitted to corporations organized under Delaware Law and to engage in any and all activities necessary or incidental thereto.

009488

*The Issuer*

The Indenture provides that the activities of the Issuer are limited to the following:

(i)     acquisition and disposition of, and investment and reinvestment in, Collateral Obligations and Eligible Investments;

(ii)    entering into, and performing its obligations under, the Indenture, the Preference Share Documents, the Insurance Documents, any Hedge Agreements, the Securities Lending Agreements, the Management Agreement, the Collateral Administration Agreement, the Administration Agreement and the Purchase Agreement;

(iii)   the issuance and sale of the Securities and the Issuer Ordinary Shares;

(iv)    the pledge of the Collateral as security for its obligations in respect of the Notes and any Hedge Agreements;

(v)     the pledge of the Class 1 Collateral as security for its obligations in respect of the Class 1 Composite Securities (solely to the extent of the Class 1 Component);

(vi)    entering into certain pre-closing warehousing arrangements and the agreements relating thereto; and

(vii)   undertaking certain other activities incidental to the foregoing.

*The Co-Issuer*

The activities of the Co-Issuer are to be limited to the following:

(i)     the issuance of its common stock;

(ii)    the co-issuance and sale of the Notes; and

(iii)   undertaking certain other activities incidental to the foregoing and permitted by the Indenture.

## Administration

Maples Finance Limited (in such capacity, the "**Administrator**"), a Cayman Islands company, will act as the administrator of the Issuer, the Share Registrar and the Share Trustee. The office of the Administrator will serve as the principal office of the Issuer. Through this office and pursuant to the terms of an agreement by and between the Administrator and the Issuer (as amended, supplemented and modified from time to time) (the "**Administration Agreement**"), the Administrator will perform various management functions on behalf of the Issuer, including the provision of certain clerical, administrative and other services including acting as Share Registrar until termination of the Administration Agreement. In consideration of the foregoing, the Administrator will receive various fees and reimbursement of its expenses.

The activities of the Administrator under the Administration Agreement will be subject to the overview of the Issuer's Board of Directors. The Administration Agreement may be terminated by the Issuer upon 14 days' written notice following the happening of certain events or upon 90 days' written notice in all other cases. Upon the earlier of the termination of the Administration Agreement or the dissolution of the Issuer, the Administrator shall cease to serve in such capacity.

The Administrator's principal office is at P.O. Box 1093 GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands.

009489

**Directors**

The Issuer will have three directors, each of whom is an employee or officer of the Administrator. Below is information regarding the background and experience of certain persons who will be the Directors of the Board of the Issuer.

The Directors of the Issuer are Carrie Bunton, Chris Leslie and Phillip Hinds.

The directors of the Issuer serve as directors of, and provide services to, other special purpose entities that issue collateralized obligations and perform other duties for the Administrator. They may be contacted at the address of the Administrator.

The director of the Co-Issuer is Donald Puglisi. Mr. Puglisi is also the President, Secretary and Treasurer of the Co-Issuer. Mr. Puglisi is a Professor of Finance at the University of Delaware. Mr. Puglisi serves as a director of, and provides services to, a number of special purpose entities. He may be contacted at the address of the Co-Issuer.

## THE LOAN MARKET

A substantial portion, by principal amount, of the Collateral Obligations is expected to consist of corporate loans rated below investment grade extended to U.S. and other non-U.S. borrowers. Such loans are typically negotiated by one or more commercial banks or other financial institutions and syndicated among a group of commercial banks and financial institutions.

Corporate loans are typically at the most senior level of the capital structure, and are often secured by specific collateral, including but not limited to, trademarks, patents, accounts receivable, inventory, equipment, buildings, real estate, franchises and common and preferred stock of the obligor and its subsidiaries. Some loans may be unsecured, subordinated to other obligations of the obligor and may have greater credit and liquidity risk than is typically associated with senior secured corporate loans. The corporate loans expected to secure the Notes are of a type generally incurred by the borrowers thereunder in connection with a highly leveraged transaction, often to finance internal growth, acquisitions, mergers, stock purchases, or for other reasons. As a result of the additional debt incurred by the borrower in the course of the transactions, the borrower's creditworthiness is often judged by the rating agencies to be below investment grade. In order to induce the banks and institutional investors to invest in a borrower's loan facility, and to offer a favorable interest rate, the borrower often provides the banks and institutional investors with extensive information about its business, which is not generally available to the public. Because of the provision of confidential information, the unique and customized nature of a loan agreement, and the private syndication of the loan, loans are not as easily purchased or sold as a publicly traded security, and historically the trading volume in the loan market has been small relative to the high yield bond market.

Corporate loans often provide for restrictive covenants designed to limit the activities of the borrower in an effort to protect the right of lenders to receive timely payments of interest on and repayment of principal of the loans. Such covenants may include restrictions on dividend payments, specific mandatory minimum financial ratios, limits on total debt and other financial tests. A breach of covenant (after giving effect to any cure period) in a loan that is not waived by the lending syndicate normally is an event of acceleration that allows the syndicate to demand immediate repayment in full of the outstanding loan. Loans usually have shorter terms than more junior obligations and may require mandatory prepayments from excess cash flow, asset dispositions and offerings of debt and/or equity securities.

The majority of loans bear interest based on a floating rate index, e.g., LIBOR, the certificate of deposit rate, a prime or base rate (each as defined in the applicable loan agreement) or other index, which may reset daily (as most prime or base rate indices do) or offer the borrower a choice of one, two, three,

009490

six, nine or twelve month interest rate and rate reset periods. The purchaser of a loan may receive certain syndication or participation fees in connection with its purchase. Other fees payable in respect of a loan, which are separate from interest payments on such loan, may include facility, commitment, amendment and prepayment fees.

Purchases of loans are predominantly investment and commercial banks, which have applied their experience in high yield securities to the commercial and industrial loan market, acting as both principal and broker. The range of investors for loans has broadened to include money managers, insurance companies, arbitrageurs, bankruptcy investors and mutual funds seeking increased potential total returns and portfolio managers of trusts or special purpose companies issuing collateralized bond and loan obligations. As secondary market trading volumes increase, new loans are frequently adopting more standardized documentation to facilitate loan trading that should improve market liquidity. There can be no assurance, however, that future levels or supply and demand in loan trading will provide the degree of liquidity that currently exists in the market.

## THE HIGH YIELD DEBT SECURITIES MARKET

A portion of the Collateral Obligations securing the Notes will consist of high yield debt securities rated below investment grade and Synthetic Securities, the Reference Obligations of which are high yield debt securities rated below investment grade. High yield debt securities are generally unsecured, may be subordinated to other obligations of the obligor and generally have greater credit and liquidity risk than is typically associated with investment grade corporate obligations. The lower rating of high yield debt securities reflects a greater possibility that adverse changes in the financial condition of the obligor or in general economic conditions (including a sustained period of rising interest rates or an economic downturn) may adversely affect the obligor's ability to pay principal and interest on its debt. Many issuers of high yield debt obligations are highly leveraged, and specific developments affecting such issuers, including reduced cash flow from operations or inability to refinance at maturity, may also adversely affect such issuers' ability to meet their debt service obligations.

High yield debt securities are often issued in connection with leveraged acquisitions or recapitalizations in which the issuers incur a substantially higher amount of indebtedness than the level at which they had previously operated. High yield debt securities have historically experienced greater default rates than has been the case for investment grade securities. Although several studies have been made of historical default rates in the high yield market, such studies do not necessarily provide a basis for drawing definitive conclusions with respect to default rates and, in any event, do not necessarily provide a basis for predicting future default rates.

## INCOME TAX CONSIDERATIONS

### General

The following summary describes the principal U.S. federal income tax and Cayman Islands tax consequences of the purchase, ownership and disposition of the Notes and the Preference Shares to investors that acquire the Notes and the Preference Shares at original issuance and, in the case of the Notes, for an amount equal to the Issue Price of the relevant Class of Notes (for purposes of this section, with respect to each such Class of Notes, the first price at which a substantial amount of Notes of such Class are sold to investors (excluding bond houses, brokers, underwriters, placement agents and wholesalers) is referred to herein as the **"Issue Price"**). This summary does not purport to be a comprehensive description of all the tax considerations that may be relevant to a particular investor's decision to purchase the Notes and the Preference Shares. In addition, this summary does not describe any tax consequences arising under the laws of any state, locality or taxing jurisdiction other than the United States federal income tax laws and Cayman Islands tax laws. In general, the summary assumes that a Holder holds a Security as a capital asset and not as part of a hedge, straddle or conversion transaction, within the meaning of Section 1258 of the Code.

009491

> **The opinions expressed below were not written and are not intended by McKee Nelson LLP, special U.S. tax counsel to the Issuer, to be used and cannot be used by the Issuer or any Noteholder for purposes of avoiding United States federal income tax penalties that may be imposed, the advice is written to support the promotion or marketing of the transactions, and each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.**

This summary is based on the U.S. and Cayman Islands tax laws, regulations (final, temporary and proposed), administrative rulings and practice and judicial decisions in effect or available on the date of this Offering Circular.  All of the foregoing are subject to change or differing interpretation at any time, which change or interpretation may apply retroactively and could affect the continued validity of this summary.

This summary is included herein for general information only, and there can be no assurance that the U.S. Internal Revenue Service (the "**IRS**") will take a similar view of the U.S. federal income tax consequences of an investment in the Securities as described herein.  ACCORDINGLY, PROSPECTIVE PURCHASERS OF THE SECURITIES SHOULD CONSULT THEIR OWN TAX ADVISORS AS TO U.S. FEDERAL INCOME TAX AND CAYMAN ISLANDS TAX CONSEQUENCES OF THE PURCHASE, OWNERSHIP AND DISPOSITION OF THE SECURITIES, AND THE POSSIBLE APPLICATION OF STATE, LOCAL, FOREIGN OR OTHER TAX LAWS.

As used in this section, the term "**U.S. Holder**" includes a beneficial owner of a Security that is, for U.S. federal income tax purposes, a citizen or individual resident of the United States of America, an entity treated for United States federal income tax purposes as a corporation or a partnership created or organized in or under the laws of the United States of America or any state thereof or the District of Columbia, an estate the income of which is includable in gross income for U.S. federal income tax purposes regardless of its source, or a trust if, in general, a court within the United States of America is able to exercise primary supervision over its administration and one or more U.S. persons have the authority to control all substantial decisions of such trust, and certain eligible trusts that have elected to be treated as United States persons.  This summary also does not address the rules applicable to certain types of investors that are subject to special U.S. federal income tax rules, including but not limited to, dealers in securities or currencies, traders in securities, financial institutions, U.S. expatriates, tax-exempt entities (except with respect to specific issues discussed herein), charitable remainder trusts and their beneficiaries, insurance companies, persons or their qualified business units whose functional currency is not the U.S. Dollar, persons that own (directly or indirectly) equity interests in Holders of Securities and subsequent purchasers of the Securities.

In this summary, the treatment of each of the Class 1 Composite Securities either as a single unit or as its respective Components is uncertain because the Class 1 Composite Securities cannot be exchanged for its respective Components.  If treated as a single unit, each of the Class 1 Composite Securities will be treated as equity (and the analysis applicable to equity interests in the Issuer shall apply).  If treated as two separate Components, then a holder of a Class 1 Composite Security will be treated as directly holding the Preference Share constituting the Preference Share Component and the United States Treasury strip security constituting the Class 1 Component.  Holders of the Class 1 Composite Securities should refer to the discussion of the Preference Shares with respect to the Preference Share Component and should refer to their own tax advisers with respect to the Class 1 Component.

009492

**United States Federal Income Taxation**

**Tax Treatment of the Issuer**

The Code and the Treasury Regulations promulgated thereunder provide a specific exemption from U.S. federal income tax to non-U.S. corporations which restrict their activities in the United States to trading in stocks and securities (and any other activity closely related thereto) for their own account, whether such trading (or such other activity) is conducted by the corporation or its employees or through a resident broker, commission agent, custodian or other agent. This particular exemption does not apply to non-U.S. corporations that are engaged in activities in the United States other than trading in stocks and securities (and any other activity closely related thereto) for their own account or that are dealers in stocks and securities.

The Issuer intends to rely on the above exemption and does not intend to operate so as to be subject to U.S. federal income taxes on its net income. In this regard, on the Closing Date, the Issuer will receive an opinion from McKee Nelson LLP, special U.S. tax counsel to the Issuer ("**Special U.S. Tax Counsel**") to the effect that, although no activity comparable to that contemplated by the Issuer has been the subject of any Treasury Regulation, revenue ruling or judicial decision, under current law and assuming compliance with the Indenture, the Preference Share Documents, the Management Agreement, and other related documents (the "**Documents**") by all parties thereto, the Issuer's contemplated activities will not cause it to be engaged in a trade or business in the United States under the Code and, consequently, the Issuer's profits will not be subject to U.S. federal income tax on a net income basis (or the branch profits tax described below). The opinion of Special U.S. Tax Counsel will be based on the Code, the Treasury Regulations (final, temporary and proposed) thereunder, the existing authorities, and Special U.S. Tax Counsel's interpretation thereof, and on certain factual assumptions and representations as to the Issuer's contemplated activities. The Issuer intends to conduct its affairs in accordance with such assumptions and representations, and the remainder of this summary assumes such result. In addition, in interpreting and complying with the Documents and such assumptions and representations, the Issuer and the Portfolio Manager are entitled to rely upon the advice and/or opinions of their selected counsel, and the opinion of Special U.S. Tax Counsel will assume that any such advice and/or opinions are correct and complete. However, the opinion of Special U.S. Tax Counsel and any such other advice or opinions are not binding on the IRS or the courts, and no ruling will be sought from the IRS regarding this, or any other, aspect of the U.S. federal income tax treatment of the Issuer. Accordingly, in the absence of authority on point, the U.S. federal income tax treatment of the Issuer is not entirely free from doubt, and there can be no assurance that positions contrary to those stated in the opinion of Special U.S. Tax Counsel or any such other advice or opinions may not be asserted successfully by the IRS.

If, notwithstanding the aforementioned opinion of Special U.S. Tax Counsel, it were determined that the Issuer were engaged in a trade or business in the United States (as defined in the Code), and the Issuer had taxable income that was effectively connected with such U.S. trade or business, the Issuer would be subject under the Code to the regular U.S. corporate income tax on such effectively connected taxable income (and possibly to the 30% branch profits tax as well). The imposition of such taxes would materially affect the Issuer's financial ability to make payments with respect to the Securities and could materially affect the yield of the Notes and the return on the Preference Shares.

*United States Withholding Taxes.* Although, based on the foregoing, the Issuer is not expected to be subject to U.S. federal income tax on a net income basis, income derived by the Issuer may be subject to withholding taxes imposed by the United States or other countries. Generally, U.S. source interest income received by a foreign corporation not engaged in a trade or business within the United States is subject to U.S. withholding tax at the rate of 30% of the amount thereof. The Code provides an exemption (the "**portfolio interest exemption**") from such withholding tax for interest paid with respect to certain debt obligations issued after July 18, 1984, unless the interest constitutes a certain type of contingent interest or is paid to a 10% shareholder of the payor, to a controlled foreign corporation related

140

to the payor, or to a bank with respect to a loan entered into in the ordinary course of its business. In this regard, the Issuer is permitted to acquire a particular Collateral Obligation only if the payments thereon are exempt from U.S. withholding taxes at the time of purchase or the obligor is required to make "gross-up" payments that offset fully any such tax on any such payments. Accordingly, assuming compliance with the foregoing restrictions and subject to the foregoing qualifications, income derived by the Issuer will be free of or fully "grossed up" for any material amount of U.S. withholding tax. However, there can be no assurance that income derived by the Issuer will not generally become subject to U.S. withholding tax as a result of a change in U.S. tax law or administrative practice, procedure, or interpretations thereof. It is also anticipated that the Issuer will acquire Collateral Obligations that consist of obligations of non-U.S. issuers. In this regard, the Issuer may only acquire a particular Collateral Obligation if either the payments thereon are not subject to foreign withholding tax or the obligor of the Collateral Obligation is required to make "gross-up" payments.

Prospective investors should be aware that, under certain Treasury Regulations, the IRS may disregard the participation of an intermediary in a "conduit" financing arrangement and the conclusions reached in the immediately preceding paragraph assume that such Treasury Regulations do not apply. Those Treasury Regulations could require withholding of U.S. federal income tax from payments to the Issuer of interest on the Collateral. In order to prevent "conduit" classification, each holder and beneficial owner of a Preference Share (including a Preference Share Component of a Class 1 Composite Security) (other than a subsequent transferee of an interest in the Regulation S Global Preference Shares) that is not a "United States person" (as defined in Section 7701(a)(30) of the Code) will be required to provide to the Issuer and the Trustee written certification in a form of certification acceptable to the Issuer and the Trustee as to whether it is an Affected Bank. Each subsequent transferee (other than an initial transferee from the Initial Purchaser) of an interest in the Regulation S Global Preference Shares (including the Preference Share Components of the Class 1 Composite Securities) will be deemed to represent to the Issuer and to the Trustee that it is not an Affected Bank. No transfer of any Preference Share (including a Preference Share Component of a Class 1 Composite Security) to an Affected Bank will be effective, and the Trustee will not recognize any such transfer, unless such transfer is specifically authorized by the Issuer in writing; *provided*, *however*, that the Issuer shall authorize any such transfer if (x) such transfer would not cause more than 33 1/3% of the Aggregate Outstanding Amount of the Preference Shares (including the Preference Share Components of the Class 1 Composite Securities) to be owned by Affected Banks or (y) the transferor is an Affected Bank previously approved by the Issuer. In addition, each Holder and beneficial owner of a Preference Share (including a Preference Share Component of a Class 1 Composite Security) will be required to make the representations set forth under "Transfer Restrictions."

**Tax Treatment of U.S. Holders of the Notes**

*Treatment of the Notes*. In the opinion of Special U.S. Tax Counsel, the Notes will be treated as debt for U.S. federal income tax purposes when issued and this summary assumes such treatment. Further, the Issuer will treat, and each Holder and beneficial owner of a Note (by acquiring such Note or an interest in such Note) will agree to treat, such Note as debt for U.S. federal income tax purposes, except as otherwise required by law. With regard to the characterization for U.S. federal income tax purposes of the Notes issued after the Closing Date, prospective investors should note that the characterization of an instrument as debt or equity for U.S. federal income tax purposes is highly factual and must be based on the applicable law and the facts and circumstances existing at the time such instrument is issued and material changes from those existing on the Closing Date (e.g. a material decline in the value of the Issuer's assets, a material adverse change in the Issuer's ability to repay the Notes previously issued, and/or a material decline in the proportion of the Preference Shares) could affect the characterization of the Notes issued after (but not before) such changes. However, the opinion of Special U.S. Tax Counsel is based on current law and certain representations and assumptions and is not binding on the IRS or the courts, and no ruling will be sought from the IRS regarding this, or any other, aspect of the U.S. federal income tax treatment of the Notes. Accordingly, there can be no assurance that the IRS will not contend, and that a court will not ultimately hold, that for U.S. federal income tax purposes one

009494

or more Classes of the Notes (e.g., the Class C Notes as a result of the terms of these Notes and place in the Issuer's capital structure) are properly treated as equity in the Issuer. In that case, the U.S. federal income tax consequences to U.S. Holders of the Notes would be substantially the same as those set forth under "Tax Treatment of U.S Holders of Preference Shares" and there would be adverse U.S. federal income tax consequences to a U.S. Holder of Notes upon the sale, redemption, retirement or other disposition of, or the receipt of certain types of distributions on, the Notes. The following discussion assumes that the Notes will be treated as debt of the Issuer for U.S. federal income tax purposes.

*Interest or Discount on the Notes.* U.S. Holders of the Senior Class A Notes, the Class A-2 Notes and the Class A-3 Notes generally will include in gross income payments of stated interest as received in accordance with their usual method of tax accounting, as ordinary interest income from sources outside the United States.

If the Issue Price of a Class of Notes is less than the "stated redemption price at maturity" of such Class of Notes by more than a *de minimis* amount, U.S. Holders of Notes of such Class will be considered to have purchased such Notes with original issue discount ("**OID**"). The stated redemption price at maturity of a Class of Notes will be the sum of all payments to be received on Notes of such Class, other than payments of "**qualified stated interest**" (i.e., generally, stated interest which is unconditionally payable in money at least annually during the entire term of a debt instrument). Interest is unconditionally payable if reasonable remedies exist to compel payment as the or the terms of the instrument make late payment or non-payment remote. Prospective U.S. Holders of the Class B Notes and the Class C Notes should note that, because interest on these Notes may not qualify as unconditionally payable on each Payment Date (and, therefore, may not be "qualified stated interest"), all of the stated interest payments on one or both of these Notes classes may be included in the stated redemption prices at maturity, and required to be accrued by U.S. Holders pursuant to the OID rules described below. Such OID inclusion on such Notes generally will be treated as income from sources outside the United States.

A U.S. Holder of such Class of Notes issued with OID will be required to accrue and include in gross income the sum of the "daily portions" of total OID on such Notes for each day during the taxable year on which the U.S. Holder held such Notes, generally under a constant yield method, regardless of such U.S. Holder's usual method of accounting for U.S. federal income tax purposes. If a Note is issued at a discount from its stated principal balance and that discount is considered to represent only a *de minimis* amount of OID, such discount is not subject to accrual under the OID rules and should be included in gross income proportionately as stated principal payments are received. Such *de minimis* OID should be treated as gain from the sale or exchange of property and may be eligible as capital gain if the Note is a capital asset in the hands of the U.S. Holder.

In the case of such Class of Notes that provides for a floating rate of interest, the amount of OID to be accrued over the term of such Notes will be based initially on the assumption that the floating rate in effect for the first accrual period of such Notes will remain constant throughout their term. To the extent such rate varies with respect to any accrual period, such variation will be reflected in an increase or decrease of the amount of OID accrued for such period. Under the foregoing method, U.S. Holders of the Notes may be required to include in gross income increasingly greater amounts of OID and may be required to include OID in advance of the receipt of cash attributable to such income.

The Issuer intends to treat Classes of Notes issued with more than *de minimis* OID as being subject to rules prescribed by Section 1272(a)(6) of the Code using an assumption as to the prepayments on such Class of Notes, as discussed below under "—OID on the Notes." A prepayment assumption applies to debt instruments if payments under such debt instruments may be accelerated by reason of prepayments of other obligations securing such debt instruments.

*OID on the Notes.* The following discussion will apply to a Class of Notes if it is issued with more than *de minimis* OID. Because principal repayments on the Notes are subject to acceleration, the

009495

method by which OID on the Notes is required to be accrued is uncertain. For purposes of accruing OID on these Notes under such circumstances, the Issuer intends to treat these Notes as being subject to the "prepayment assumption method". These rules require that the amount and rate of accrual of OID be calculated based on a prepayment assumption and the anticipated reinvestment rate, if any, relating to the Notes and prescribe a method for adjusting the amount and rate of accrual of the discount where the actual prepayment rate differs from the prepayment assumption. Under the Code, the prepayment assumption must be determined in the manner prescribed by the Treasury Regulations, which have not yet been issued. The legislative history provides, however, that Congress intended the Treasury Regulations to require that the prepayment assumption be the prepayment assumption that is used in determining the initial offering price of the Notes. Solely for purposes of determining OID, market discount and bond premium, the Issuer intends to assume that the Collateral Obligations will either not prepay or any prepayments will be reinvested. No representation is made that the Notes will prepay at the prepayment assumption or at any other rate.

It is possible the IRS could contend that another method of accruing OID with respect to these Notes is appropriate that may result in adverse or more favorable U.S. federal income tax consequences to a U.S. Holder of such Notes. One such alternative method of accruing OID may be the noncontingent bond method that governs contingent payment debt obligations. Such method could affect the amount and character of the gain or loss recognized upon a disposition of a Note.

A purchaser of a Note issued with OID who purchases such Note at a cost greater than the adjusted issue price but less than the stated redemption price at maturity will also be required to include in gross income the sum of the daily portions of OID on such Note. In computing the daily portions of OID, however, the daily portion is equal to the amount that would be the daily portion for the day (computed in accordance with the rules set forth above) *multiplied by* a fraction, the numerator of which is the amount, if any, by which the price paid by the U.S. Holder for such Note exceeds the following amount:

- The sum of the Issue Price plus the aggregate amount of OID that would have been includible in the gross income of an original U.S. Holder (who purchased the Note at the Issue Price); *less*

- Any prior payments included in the stated redemption price at maturity,

and the denominator of which is the sum of the daily portions for such Note for all days beginning on the date after the purchase date and ending on the maturity date computed under the prepayment assumption.

A U.S. Holder who purchases a Note at a cost greater than its stated redemption price at maturity may elect to amortize such premium under a constant yield method over the life of such Note. The amortizable amount for any accrual period would offset the amount of interest that must be included in the gross income of a U.S. Holder in such accrual period. The U.S. Holder's basis in such Note would be reduced by the amount of amortization. It is not clear whether the prepayment assumption would be taken into account in determining the life of such Note for this purpose.

If the Holder acquires a Note at a discount to the adjusted issue price of such Note that is greater than a specified *de minimis* amount, such discount is treated as market discount. Absent an election to accrue into income currently, the amount of accrued market discount on a Note is included in income as ordinary income when principal payments are received or the Holder disposes of the Note. Market discount is included ratably unless a Holder elects to use a constant yield method for accrual. For this purpose, ratable may be the term of the Note, or a Holder may be permitted to accrue market discount in proportion to interest on Notes issued without OID or in proportion to OID on Notes issued with OID.

As a result of the complexity of the OID rules, each U.S. Holder of a Note should consult its own tax advisor regarding the impact of the OID rules on its investment in such Note.

009496

*Election to Treat All Interest as OID*. The OID rules permit a U.S. Holder of a Note to elect to accrue all interest, discount (including *de minimis* market or original issue discount) and premium in income, based on a constant yield method. If an election to treat all interest as OID were to be made with respect to a Note with market discount, the U.S. Holder of such Note would be deemed to have made an election to include in income currently market discount with respect to all other debt instruments having market discount that such U.S. Holder acquires during the taxable year of the election or thereafter. A U.S. Holder that makes this election for a Note that is acquired at a premium will be deemed to have made an election to amortize bond premium with respect to all debt instruments having amortizable bond premium that such U.S. Holder owns or acquires. The election to accrue interest, discount and premium on a constant yield method with respect to a Note cannot be revoked without the consent of the IRS.

*Disposition of the Notes*. In general, a U.S. Holder of a Note initially will have a basis in such Note equal to the cost of such Note to such U.S. Holder, (i) increased by any amount includable in income by such U.S. Holder as OID and by any accrued market discount the Holder previously included in income with respect to such Note, and (ii) reduced by any amortized premium and by payments on such Note, other than payments of qualified stated interest. Upon a sale, exchange, redemption, retirement or other taxable disposition of a Note, a U.S. Holder will generally recognize gain or loss equal to the difference between the amount realized on the disposition (other than amounts attributable to accrued qualified stated interest, which will be taxable as described above) and the U.S. Holder's tax basis in such Note. Except to the extent of any accrued interest or accrued market discount not previously included in income, gain or loss from the disposition of a Note generally will be long term capital gain or loss if the U.S. Holder held the Note for more than one year at the time of disposition, *provided* that such Note is held as a "capital asset" (generally, property held for investment) within the meaning of Section 1221 of the Code.

In certain circumstances, U.S. Holders that are individuals may be entitled to preferential treatment for net long-term capital gains; however, the ability of U.S. Holders to offset capital losses against ordinary income is limited.

Gain recognized by a U.S. Holder on the sale, exchange, redemption, retirement or other taxable disposition of a Note generally will be treated as from sources within the United States and loss so recognized generally will offset income from sources within the United States.

**Tax Treatment of U.S. Holders of Preference Shares**

*Investment in a Passive Foreign Investment Company*. The Issuer will constitute a "passive foreign investment company" ("**PFIC**") and the Preference Shares will be treated as equity in the Issuer. Accordingly, U.S. Holders of Preference Shares (other than certain U.S. Holders that are subject to the rules pertaining to a "controlled foreign corporation" with respect to the Issuer, described below) will be considered U.S. shareholders in a PFIC. In general, a U.S. Holder of a PFIC may desire to make an election to treat the Issuer as a "qualified electing fund" ("**QEF**") with respect to such U.S. Holder. Generally, a QEF election should be made with the filing of a U.S. Holder's federal income tax return for the first taxable year for which it held the Preference Shares. If a timely QEF election is made for the Issuer, an electing U.S. Holder will be required in each taxable year to include in gross income (i) as ordinary income, such holder's *pro rata* share of the Issuer's ordinary earnings and (ii) as long-term capital gain, such holder's *pro rata* share of the Issuer's net capital gain, whether or not distributed. A U.S. Holder will not be eligible for the dividends received deduction in respect of such income or gain. In addition, any losses of the Issuer in a taxable year will not be available to such U.S. Holder and may not be carried back or forward in computing the Issuer's ordinary earnings and net capital gain in other taxable years. An amount included in an electing U.S. Holder's gross income should be treated as income from sources outside the United States for U.S. foreign tax credit limitation purposes. However, if U.S. Holders collectively own (directly or constructively) 50% or more (measured by vote or value) of the Preference Shares, such amount will be treated as income from sources within the United States for such purposes to the extent that such amount is attributable to income of the Issuer from sources within the

009497

United States. If applicable to a U.S. Holder of Preference Shares, the rules pertaining to a "controlled foreign corporation", discussed below, generally override those pertaining to a PFIC with respect to which a QEF election is in effect.

In certain cases in which a QEF does not distribute all of its earnings in a taxable year, U.S. shareholders may also be permitted to elect to defer payment of some or all of the taxes on the QEF's undistributed income subject to an interest charge on the deferred amount. In this respect, prospective purchasers of Preference Shares should be aware that it is expected that the Collateral Obligations may be purchased by the Issuer with substantial OID the cash payment of which may be deferred, perhaps for a substantial period of time, and the Issuer may use interest and other income from the Collateral Obligations to purchase additional Collateral Obligations or to retire the Notes. As a result, the Issuer may have in any given year substantial amounts of earnings for U.S. federal income tax purposes that are not distributed on the Preference Shares. Thus, absent an election to defer payment of taxes, U.S. Holders that make a QEF election with respect to the Issuer may owe tax on significant "phantom" income.

In addition, it should be noted that if the Issuer invests in obligations that are not in registered form, a U.S. Holder making a QEF election (i) may not be permitted to take a deduction for any loss attributable to such obligations when calculating its share of the Issuer's earnings and (ii) may be required to treat income attributable to such obligations as ordinary income even though the income would otherwise constitute capital gains. It is possible that some portion of the investments of the Issuer will constitute obligations that are not in registered form.

The Issuer will provide, upon request, all information and documentation that a U.S. Holder making a QEF election is required to obtain for U.S. federal income tax purposes.

A U.S. Holder of Preference Shares (other than certain U.S. Holders that are subject to the rules pertaining to a "controlled foreign corporation," described below) that does not make a timely QEF election will be required to report any gain on disposition of any Preference Shares as if it were an excess distribution, rather than capital gain, and to compute the tax liability on such gain and other "excess distributions" received in respect of the Preference Shares as if such items had been earned ratably over each day in the U.S. Holder's holding period (or a certain portion thereof) for the Preference Shares. The U.S. Holder will be subject to tax on such items at the highest ordinary income tax rate for each taxable year, other than the current year of the U.S. Holder, in which the items were treated as having been earned, regardless of the rate otherwise applicable to the U.S. Holder. Further, such U.S. Holder will also be liable for an additional tax equal to interest on the tax liability attributable to income allocated to prior years as if such liability had been due with respect to each such prior year. For purposes of these rules, gifts, exchanges pursuant to corporate reorganizations and use of the Preference Shares as security for a loan may be treated as a taxable disposition of the Preference Shares. Very generally, an "excess distribution" is the amount by which distributions during a taxable year in respect of a Preference Share exceed 125 percent of the average amount of distributions in respect thereof during the three preceding taxable years (or, if shorter, the U.S. Holder's holding period for the Preference Share). In addition, a stepped-up basis in the Preference Share upon the death of an individual U.S. Holder may not be available.

In many cases, application of the tax on gain on disposition and receipt of excess distributions will be substantially more onerous than the treatment applicable if a timely QEF election is made. ACCORDINGLY, U.S. HOLDERS OF PREFERENCE SHARES SHOULD CONSIDER CAREFULLY WHETHER TO MAKE A QEF ELECTION WITH RESPECT TO THE PREFERENCE SHARES AND THE CONSEQUENCES OF NOT MAKING SUCH AN ELECTION.

*Investment in a Controlled Foreign Corporation*. The Issuer may be classified as a controlled foreign corporation ("**CFC**"). In general, a foreign corporation will be classified as a CFC if more than 50% of the shares of the corporation, measured by reference to combined voting power or value, is owned (actually or constructively) by "**U.S. Shareholders.**" A U.S. Shareholder, for this purpose, is in general

009498

any U.S. Holder that possesses (actually or constructively) 10% or more of the combined voting power (generally the right to vote for directors of the corporation) of all classes of shares of a corporation. Although the Preference Shares do not vote for directors of the Issuer, it is possible that the IRS would assert that the Preference Shares are de facto voting securities and that U.S. Holders possessing (actually or constructively) 10% or more of the total stated amount of Outstanding Preference Shares are U.S. Shareholders. If this argument were successful and more than 50% of the Preference Shares (determined with respect to aggregate value or vote) are owned (actually or constructively) by such U.S. Shareholders, the Issuer would be treated as a CFC.

If the Issuer were treated as a CFC, a U.S. Shareholder of the Issuer (at the end of the taxable year of the Issuer) would be treated, subject to certain exceptions, as receiving a deemed dividend in an amount equal to that person's *pro rata* share of the "subpart F income" of the Issuer. Such deemed dividend normally would be treated as income from sources within the United States for U.S. foreign tax credit limitation purposes to the extent that it is attributable to income of the Issuer from sources within the United States. Among other items, and subject to certain exceptions, "subpart F income" includes dividends, interest, annuities, gains from the sale of shares and securities, certain gains from commodities transactions, income from certain notional principal contracts, certain types of insurance income and income from certain transactions with related parties. It is likely that, if the Issuer were to constitute a CFC, all or most of its income would be subpart F income. In general, if the subpart F income exceeds 70% of the Issuer's gross income, the entire amount of the Issuer's income will be subpart F income. U.S. Holders should consult their tax advisors regarding these special rules.

If the Issuer were treated as a CFC, a U.S. Shareholder of the Issuer which made a QEF election with respect to the Issuer would be taxable on the subpart F income of the Issuer under rules described in the preceding paragraph and not under the QEF rules previously described. As a result, to the extent subpart F income of the Issuer includes net capital gains, such gains would be treated as ordinary income of the U.S. Shareholder under the CFC rules, notwithstanding the fact that the character of such gains generally would otherwise be preserved under the QEF rules.

Furthermore, if the Issuer were treated as a CFC and a U.S. Holder were treated as a U.S. Shareholder therein, the Issuer would not be treated as a PFIC or a QEF with respect to such U.S. Holder for the period during which the Issuer remained a CFC and such U.S. Holder remained a U.S. Shareholder therein (the "qualified portion" of the U.S. Holder's holding period for the Preference Shares). If the qualified portion of such U.S. Holder's holding period for the Preference Shares subsequently ceased (either because the Issuer ceased to be a CFC or the U.S. Holder ceased to be a U.S. Shareholder), then solely for purposes of the PFIC rules, such U.S. Holder's holding period for the Preference Shares would be treated as beginning on the first day following the end of such qualified portion, unless the U.S. Holder had owned any Preference Shares for any period of time prior to such qualified portion and had not made a QEF election with respect to the Issuer. In that case, the Issuer would again be treated as a PFIC which is not a QEF with respect to such U.S. Holder and the beginning of such U.S. Holder's holding period for the Preference Shares would continue to be the date upon which such U.S. Holder acquired the Preference Shares, unless the U.S. Holder made an election to recognize gain with respect to the Preference Shares and a QEF election with respect to the Issuer.

*Indirect Interests in PFICs and CFCs.* If the Issuer owns a Collateral Obligation or a Qualified Equity Security issued by a non-U.S. corporation that is treated as equity for U.S. federal income tax purposes, U.S. Holders of Preference Shares could be treated as owning an indirect equity interest in a PFIC or a CFC and could be subject to certain adverse tax consequences.

In particular, if the Issuer owns equity interests in PFICs ("**Lower-Tier PFICs**"), a U.S. Holder of Preference Shares would be treated as owning directly the U.S. Holder's proportionate amount (by value) of the Issuer's equity interests in the Lower-Tier PFICs. A U.S. Holder's QEF election with respect to the Issuer would not be effective with respect to such Lower-Tier PFICs. However, a U.S. Holder would be able to make QEF elections with respect to such Lower-Tier PFICs if the Lower-Tier PFICs

009499

provide certain information and documentation to the Issuer in accordance with applicable Treasury Regulations. However, there can be no assurance that the Issuer would be able to obtain such information and documentation from any Lower-Tier PFIC, and thus there can be no assurance that a U.S. Holder would be able to make or maintain a QEF election with respect to any Lower-Tier PFIC. If a U.S. Holder does not have a QEF election in effect with respect to a Lower-Tier PFIC, as a general matter, the U.S. Holder would be subject to the adverse consequences described above under "—Investment in a Passive Foreign Investment Company" with respect to any excess distributions made by such Lower-Tier PFIC to the Issuer, any gain on the disposition by the Issuer of its equity interest in such Lower-Tier PFIC treated as indirectly realized by such U.S. Holder, and any gain treated as indirectly realized by such U.S. Holder on the disposition of its equity in the Issuer (which may arise even if the U.S. Holder realizes a loss on such disposition). Such amount would not be reduced by expenses or losses of the Issuer, but any income recognized may increase a U.S. Holder's tax basis in its Preference Shares. Moreover, if the U.S. Holder has a QEF election in effect with respect to a Lower-Tier PFIC, the U.S. Holder would be required to include in income the U.S. Holder's *pro rata* share of the Lower-Tier PFIC's ordinary earnings and net capital gain as if the U.S. Holder's indirect equity interest in the Lower-Tier PFIC were directly owned, and it appears that the U.S. Holder would not be permitted to use any losses or other expenses of the Issuer to offset such ordinary earnings and/or net capital gains but recognition of such income may increase a U.S. Holder's tax basis in its Preference Shares.

Accordingly, if any of the Collateral Obligations or Qualified Equity Securities are treated as equity interests in a PFIC, such U.S. Holders could experience significant amounts of phantom income with respect to such interests. Other adverse tax consequences may arise for such U.S. Holders that are treated as owning indirect interests in CFCs. U.S. Holders should consult their own tax advisors regarding the tax issues associated with such investments in light of their own individual circumstances.

*Distributions on the Preference Shares.* The treatment of actual distributions of cash on the Preference Shares, in very general terms, will vary depending on whether a U.S. Holder has made a timely QEF election as described above. See "—Investment in a Passive Foreign Investment Company." If a timely QEF election has been made, distributions should be allocated first to amounts previously taxed pursuant to the QEF election (or pursuant to the CFC rules, if applicable) and to this extent will not be taxable to U.S. Holders. Distributions in excess of such previously taxed amounts pursuant to a QEF election (or pursuant to the CFC rules, if applicable) will be taxable to U.S. Holders as ordinary income upon receipt to the extent of any remaining amounts of untaxed current and accumulated earnings and profits of the Issuer. Distributions in excess of any current and accumulated earnings and profits will be treated first as a nontaxable reduction to the U.S. Holder's tax basis for the Preference Shares to the extent thereof and then as capital gain.

In the event that a U.S. Holder does not make a timely QEF election, then except to the extent that distributions may be attributable to amounts previously taxed pursuant to the CFC rules, some or all of any distributions with respect to the Preference Shares may constitute "excess distributions," taxable as previously described. See "—Investment in a Passive Foreign Investment Company." In that event, except to the extent that distributions may be attributable to amounts previously taxed to the U.S. Holder pursuant to the CFC rules or are treated as "excess distributions," distributions on the Preference Shares generally would be treated as dividends to the extent paid out of the Issuer's current or accumulated earnings and profits not allocated to any "excess distributions," then as a nontaxable reduction to the U.S. Holder's tax basis for the Preference Shares to the extent thereof and then as capital gain. Dividends received from a foreign corporation generally will be treated as income from sources outside the United States for U.S. foreign tax credit limitation purposes. However, if U.S. Holders collectively own (directly or constructively) 50% or more (measured by vote or value) of the Preference Shares, a percentage of the dividend income equal to the proportion of the Issuer's earnings and profits from sources within the United States generally will be treated as income from sources within the United States for such purposes.

009500

*Purchase or Disposition of the Preference Shares.* In general, a U.S. Holder of a Preference Share will recognize a gain or loss upon the sale, exchange, redemption or other taxable disposition of a Preference Share equal to the difference between the amount realized and such U.S. Holder's adjusted tax basis in the Preference Share. Except as discussed below, such gain or loss will be a capital gain or loss and will be a long-term capital gain or loss if the U.S. Holder held the Preference Shares for more than one year at the time of the disposition. In certain circumstances, U.S. Holders who are individuals may be entitled to preferential treatment for net long-term capital gains; however, the ability of U.S. Holders to offset capital losses against ordinary income is limited. Any gain recognized by a U.S. Holder on the sale, exchange, redemption or other taxable disposition of a Preference Share (other than, in the case of a U.S. Holder treated as a "U.S. Shareholder," any such gain characterized as a dividend, as discussed below) generally will be treated as from sources within the United States and loss so recognized generally will offset income from sources within the United States.

Initially, a U.S. Holder's tax basis for a Preference Share will equal the cost of such Preference Share to such U.S. Holder. Such basis will be increased by amounts taxable to such U.S. Holder by virtue of a QEF election, or by virtue of the CFC rules, as applicable, and decreased by actual distributions from the Issuer that are deemed to consist of such previously taxed amounts or are treated as a nontaxable reduction to the U.S. Holder's tax basis for the Preference Share (as described above).

If a U.S. Holder does not make a timely QEF election as described above, any gain realized on the sale, exchange, redemption or other taxable disposition of a Preference Share (or any gain deemed to accrue prior to the time a non-timely QEF election is made) will be taxed as ordinary income and subject to an additional tax reflecting a deemed interest charge under the special tax rules described above. See "—Investment in a Passive Foreign Investment Company."

If the Issuer were treated as a CFC and a U.S. Holder were treated as a "U.S. Shareholder" therein, then any gain realized by such U.S. Holder upon the disposition of Preference Shares, other than gain constituting an excess distribution under the PFIC rules, if applicable, would be treated as ordinary income to the extent of the U.S. Holder's share of the current or accumulated earnings and profits of the Issuer. In this regard, earnings and profits would not include any amounts previously taxed pursuant to a timely QEF election or pursuant to the CFC rules.

## Tax Treatment of Tax-Exempt U.S. Holders

U.S. Holders which are tax-exempt entities (**"Tax-Exempt U.S. Holders"**) will not be subject to the tax on unrelated business taxable income (**"UBTI"**) with respect to interest and capital gains income derived from an investment in the Notes. However, a Tax-Exempt U.S. Holder that also acquires the Preference Shares (or, any Note recharacterized as equity in the Issuer) should consider whether interest it receives in respect of the Notes may be treated as UBTI under rules governing certain payments received from controlled entities.

A Tax-Exempt U.S. Holder generally will not be subject to the tax on UBTI with respect to regular distributions or "excess distributions" (defined above under "Tax Treatment of U.S. Holders of Preference Shares - Investment in a Passive Foreign Investment Company") on the Preference Shares (or, any Note recharacterized as equity in the Issuer). A Tax-Exempt U.S. Holder which is not subject to tax on UBTI with respect to "excess distributions" may not make a QEF election. In addition, a Tax-Exempt U.S. Holder which is subject to the rules relating to "controlled foreign corporations" with respect to the Preference Shares (or, any Note recharacterized as equity in the Issuer) generally should not be subject to the tax on UBTI with respect to income from such Preference Shares (or, any Note recharacterized as equity in the Issuer).

Notwithstanding the discussion in the preceding two paragraphs, a Tax-Exempt U.S. Holder which incurs "acquisition indebtedness" (as defined in Section 514(c) of the Code) with respect to the Securities may be subject to the tax on UBTI with respect to income from the Securities to the extent that

009501

the Securities constitute "debt-financed property" (as defined in Section 514(b) of the Code) of the Tax-Exempt U.S. Holder. A Tax-Exempt U.S. Holder subject to the tax on UBTI with respect to income from the Preference Shares (or, and Note recharacterized as equity in the Issuer) will be taxed on "excess distributions" in the manner discussed above under "Tax Treatment of U.S. Holders of Preference Shares—Investment in a Passive Foreign Investment Company". Such a Tax-Exempt U.S. Holder will be permitted, and should consider whether, to make a QEF election with respect to the Issuer as discussed above.

Tax-Exempt U.S. Holders should consult their own tax advisors regarding an investment in the Securities.

**Transfer Reporting Requirements**

A U.S. Holder of Preference Shares (and, any Note recharacterized as equity in the Issuer) that owns (actually or constructively) at least 10% by vote or value of the Issuer (and each officer or director of the Issuer that is a U.S citizen or resident) may be required to file an information return on IRS Form 5471. A U.S. Holder of Preference Shares (and, any Note recharacterized as equity in the Issuer) generally is required to provide additional information regarding the Issuer annually on IRS Form 5471 if it owns (actually or constructively) more than 50% by vote or value of the Issuer. U.S. Holders should consult their own tax advisors regarding whether they are required to file IRS Form 5471.

A U.S. person (including a Tax-Exempt U.S. Holder) that purchases the Preference Shares for cash will be required to file a Form 926 or similar form with the IRS if (i) such person owned, directly or by attribution, immediately after the transfer at least 10% by vote or value of the Issuer or (ii) if the transfer, when aggregated with all transfers made by such person (or any related person) within the preceding 12 month period, exceeds $100,000. In the event a U.S. Holder fails to file any such required form, the U.S. Holder could be required to pay a penalty equal to 10% of the gross amount paid for such Preference Shares (subject to a maximum penalty of $100,000, except in cases involving intentional disregard). U.S. persons should consult their tax advisors with respect to this or any other reporting requirement which may apply with respect to their acquisition of the Preference Shares.

**Tax Return Disclosure and Investor List Requirements**

Any person that files a U.S. federal income tax return or U.S. federal information return and participates in a "reportable transaction" in a taxable year is required to disclose certain information on IRS Form 8886 (or its successor form) attached to such person's U.S. tax return for such taxable year (and also file a copy of such form with the IRS's Office of Tax Shelter Analysis) and to retain certain documents related to the transaction. In addition, under certain circumstances, certain organizers and sellers and advisors of a "reportable transaction" are required to file reports with the IRS and also will be required to maintain lists of participants in the transaction containing identifying information, retain certain documents related to the transaction, and furnish those lists and documents to the IRS upon request. Recently enacted legislation imposes significant penalties for failure to comply with these disclosure and list keeping requirements. The definition of "reportable transaction" is highly technical. However, in very general terms, a transaction may be a "reportable transaction" if, among other things, it is offered under conditions of confidentiality, it results in the claiming of a loss or losses for U.S. federal income tax purposes in excess of certain threshold amounts, or an item from the transaction is treated differently for U.S. federal income tax purposes and for book purposes (generally under U.S. generally accepted accounting principles).

In this regard, in order to prevent the investors' purchase of the Securities in this offering from being treated as offered under conditions of confidentiality, the Portfolio Manager, the Issuer and the Holders and beneficial owners of the Securities (and each of their respective employees, representatives or other agents) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transactions described herein (including the ownership and disposition of the

009502

Securities) and all materials of any kind (including opinions or other tax analyses) that are provided to them relating to such tax treatment and tax structure. For this purpose, the tax treatment of a transaction is the purported or claimed U.S. federal income or state and local tax treatment of the transaction, and the tax structure of a transaction is any fact that may be relevant to understanding the purported or claimed U.S. federal income tax treatment of the transaction.

In addition, under these Treasury Regulations, if the Issuer participates in a "reportable transaction", a U.S. Holder of Preference Shares that is a "reporting shareholder" of the Issuer will be treated as participating in the transaction and will be subject to the rules described above. Although most of the Issuer's activities generally are not expected to give rise to "reportable transactions", the Issuer nevertheless may participate in certain types of transactions that could be treated as "reportable transactions." A U.S. Holder of Preference Shares will be treated as a "reporting shareholder" of the Issuer if (i) such U.S. Holder owns 10% or more of the Preference Shares and makes a QEF election with respect to the Issuer or (ii) the Issuer is treated as a CFC and such U.S. Holder is a "U.S. Shareholder" (as defined above) of the Issuer. The Issuer will make reasonable efforts to make such information available.

Prospective investors in the Securities should consult their own tax advisors concerning any possible disclosure obligations under these Treasury Regulations with respect to their ownership or disposition of the Securities in light of their particular circumstances.

**Tax Treatment of Non-U.S. Holders of Securities**

In general, payments on the Securities to a Holder that is not, for U.S. federal income tax purposes, a U.S. Holder (a "**non-U.S. Holder**") and gain realized on the sale, exchange, redemption, retirement or other disposition of the Securities by a non-U.S. Holder, will not be subject to U.S. federal income or withholding tax, unless (i) such income is effectively connected with a trade or business conducted by such non-U.S. Holder in the United States, or (ii) in the case of gain, such non-U.S. Holder is a nonresident alien individual who holds the Securities as a capital asset and is present in the United States for more than 182 days in the taxable year of the sale, exchange, redemption, retirement or other disposition and certain other conditions are satisfied.

**Information Reporting and Backup Withholding**

Under certain circumstances, the Code requires "information reporting," and may require "backup withholding" with respect to certain payments made on the Securities and the payment of the proceeds from the disposition of the Securities. Backup withholding generally will not apply to corporations, tax-exempt organizations, qualified pension and profit sharing trusts, and individual retirement accounts. Backup withholding will apply to a U.S. Holder if the U.S. Holder fails to provide certain identifying information (such as the U.S. Holder's taxpayer identification number) or otherwise comply with the applicable requirements of the backup withholding rules. The application for exemption from backup withholding for a U.S. Holder is available by providing a properly completed IRS Form W-9.

A non-U.S. Holder of the Securities generally will not be subject to these information reporting requirements or backup withholding with respect to payments of interest or distributions on the Securities if (1) it certifies to the Trustee its status as a non-U.S. Holder under penalties of perjury on the appropriate IRS Form W-8, and (2) in the case of a non-U.S. Holder that is a "nonwithholding foreign partnership," "foreign simple trust" or "foreign grantor trust" as defined in the applicable Treasury Regulations, the beneficial owners of such non-U.S. Holder also certify to the Trustee their status as non-U.S. persons under penalties of perjury on the appropriate IRS Form W-8 or as U.S. persons under penalties of perjury on IRS Form W-9.

The payments of the proceeds from the disposition of a Security by a non-U.S. Holder to or through the U.S. office of a broker generally will not be subject to information reporting and backup withholding if the non-U.S. Holder certifies its status as a non-U.S. Holder (and, if applicable, its

009503

beneficial owners also certify their status as non-U.S. Holders) under penalties of perjury on the appropriate IRS Form W-8, satisfies certain documentary evidence requirements for establishing that it is a non-U.S. Holder or otherwise establishes an exemption. The payment of the proceeds from the disposition of a Security by a non-U.S. Holder to or through a non-U.S. office of a non-U.S. broker will not be subject to backup withholding or information reporting unless the non-U.S. broker has certain specific types of relationships to the United States, in which case the treatment of such payment for such purposes will be as described in the following sentence. The payment of proceeds from the disposition of a Security by a non-U.S. Holder to or through a non-U.S. office of a U.S. broker or to or through a non-U.S. broker with certain specific types of relationships to the United States generally will not be subject to backup withholding but will be subject to information reporting unless the non-U.S. Holder certifies its status as a non-U.S. Holder (and, if applicable, its beneficial owners also certify their status as non-U.S. Holders) under penalties of perjury or the broker has certain documentary evidence in its files as to the non-U.S. Holder's foreign status and the broker has no actual knowledge to the contrary.

Backup withholding is not an additional tax and may be refunded (or credited against the U.S. Holder's or non-U.S. Holder's U.S. federal income tax liability, if any); *provided* that certain required information is furnished to the U.S. Internal Revenue Service. The information reporting requirements may apply regardless of whether withholding is required.

**Cayman Islands Tax Considerations**

The following discussion of certain Cayman Islands income tax consequences of an investment in the Securities is based on the advice of Maples and Calder as to Cayman Islands law. The discussion is a general summary of present law, which is subject to prospective and retroactive change. It assumes that the Issuer will conduct its affairs in accordance with assumptions made by, and representations made to, counsel. It is not intended as tax advice, does not consider any investor's particular circumstances, and does not consider tax consequences other than those arising under Cayman Islands law.

Under existing Cayman Islands laws:

(i)        payments of principal and interest on the Notes and dividends and capital in respect of the Preference Shares will not be subject to taxation in the Cayman Islands and no withholding will be required on such payments to any Holder of a Security and gains derived from the sale of Securities will not be subject to Cayman Islands income or corporation tax. The Cayman Islands currently have no income, corporation or capital gains tax and no estate duty, inheritance tax or gift tax;

(ii)        no stamp duty is payable in respect of the issue or transfer of Securities although duty may be payable if Notes are executed in or brought into the Cayman Islands; and

(iii)        certificates evidencing Securities, in registered form, to which title is not transferable by delivery, should not attract Cayman Islands stamp duty. However, an instrument transferring title to a Note, if brought to or executed in the Cayman Islands, would be subject to Cayman Islands stamp duty.

The Issuer has been incorporated under the laws of the Cayman Islands as an exempted company and, as such, has applied for and obtained an undertaking from the Governor in Cabinet of the Cayman Islands in substantially the following form:

009504

"THE TAX CONCESSIONS LAW
(1999 REVISION)
UNDERTAKING AS TO TAX CONCESSIONS

In accordance with Section 6 of the Tax Concessions Law (1999 Revision) the Governor in Cabinet undertakes with:

Southfork CLO Ltd. "the Company"

(a)    that no Law which is hereafter enacted in the Islands imposing any tax to be levied on profits, income, gains or appreciations shall apply to the Company or its operations; and

(b)    in addition, that no tax to be levied on profits, income, gains or appreciations or which is in the nature of estate duty or inheritance tax shall be payable

(i)    on or in respect of the shares debentures or other obligations of the Company; or

(ii)    by way of the withholding in whole or in part of any relevant payment as defined in Section 6(3) of the Tax Concessions Law (1999 Revision).

These concessions shall be for a period of TWENTY years from the 16th day of November, 2004.

GOVERNOR IN CABINET"

The Cayman Islands does not have an income tax treaty arrangement with the U.S. or any other country.

THE PRECEDING DISCUSSION IS ONLY A SUMMARY OF CERTAIN OF THE TAX IMPLICATIONS OF AN INVESTMENT IN THE SECURITIES. PROSPECTIVE INVESTORS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS PRIOR TO INVESTING TO DETERMINE THE TAX IMPLICATIONS OF SUCH INVESTMENT IN LIGHT OF SUCH INVESTORS' CIRCUMSTANCES.

## ERISA CONSIDERATIONS

The U.S. Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), imposes fiduciary standards and certain other requirements on employee benefit plans and other retirement arrangements subject thereto, including collective investment funds, insurance company general and separate accounts whose underlying assets are treated as if they were assets of such plans pursuant to the U.S. Department of Labor's "plan assets" regulation, set forth at 29 C.F.R. Section 2510.3-101 (the "**Plan Assets Regulation**"), and on those persons who are fiduciaries with respect to such plans or arrangements. ERISA's general fiduciary requirements include the requirements of investment prudence and diversification and that investments be made in accordance with the governing plan documents. The prudence of a particular investment will be determined by the responsible fiduciary by taking into account the particular circumstances of the plan and all of the facts and circumstances of the investment including, but not limited to, the matters discussed above under "Risk Factors" and the fact that in the future there may be no market in which such fiduciary will be able to sell or otherwise dispose of an investment.

In addition, Section 406 of ERISA and Section 4975 of the Code prohibit certain transactions involving the assets of plans and arrangements subject to ERISA (as well as those that are not subject to ERISA but which are subject to Section 4975 of the Code (together "**Plans**")) and certain persons (referred to as "parties in interest" or "disqualified persons" (collectively, "**Parties in Interest**")) having certain relationships to such Plans, unless a statutory or administrative exemption applies to the transaction. In particular, a sale or exchange of property or an extension of credit between a Plan and a Party in Interest may constitute a prohibited transaction. In the case of indebtedness, the prohibited

009505

transaction provisions apply throughout the term of such indebtedness (and not only on the date of the initial borrowing). A Party in Interest who engages in a prohibited transaction may be subject to excise taxes or other liabilities under ERISA and the Code.

Governmental, church and non-U.S. plans, while not subject to the fiduciary responsibility provisions of ERISA or the provisions of Section 4975 of the Code, may nevertheless be subject to U.S. federal, state or local laws or non-U.S. laws that are substantially similar to the foregoing provisions of ERISA and the Code. Fiduciaries of any such plans should consult with their counsel before purchasing any Notes.

Under a "look-through rule" set forth in the Plan Assets Regulation, if a Plan invests in an "equity interest" of an entity such as the Issuer and no other exception applies, the Plan's assets include both the equity interest and an undivided interest in each of the entity's underlying assets. An equity interest does not include debt (as determined by applicable local law) which does not have any substantial equity features. Under the Plan Assets Regulation, if a Plan invests in an "equity interest" of an entity that is neither a "publicly-offered security" nor a security issued by an investment company registered under the Investment Company Act, the Plan's assets include both the equity interest and an undivided interest in each of the entity's underlying assets, unless it is established that the entity is an "operating company" or that equity participation in the entity by Benefit Plan Investors is not "significant." Equity participation in an entity by Benefit Plan Investors is "significant" if 25% or more of the value of any class of equity interest in the entity is held by Benefit Plan Investors, as calculated under the Plan Assets Regulation. The term "**Benefit Plan Investor**" includes (a) an employee benefit plan (as defined in Section 3(3) of ERISA whether or not subject to ERISA), (b) a plan (as defined in Section 4975(e)(1) of the Code whether or not subject to Section 4975) or (c) any entity whose underlying assets include "plan assets" by reason of any such plan's investment in the entity and thus would include most governmental, church and non-U.S. plans.

The Preference Shares and the Composite Securities would likely be considered to have substantial equity features under the Plan Assets Regulation, and the Issuer does not intend to limit the value of the interests held by Benefit Plan Investors in each class of Notes to below 25%. However, as (i) no employee benefit plan (as defined in Section 3(3) of ERISA which is subject to ERISA), (ii) no plan (as defined in Section 4975(e)(1) of the Code which is subject to Section 4975 of the Code) and (iii) no entity whose underlying assets include "plan assets" by reason of such plan's investment in the entity (collectively, "**ERISA Plans**") shall be permitted to acquire either Preference Shares or Composite Securities in the initial offering or thereafter, the fiduciary responsibility and prohibited transaction provisions of ERISA and Section 4975 of the Code will not be applicable to the Issuer or to any other Benefit Plan Investors who invest in the Preference Shares or the Composite Securities. Therefore, provided no ERISA Plans acquire either Preference Shares or Composite Securities, even if other types of Benefit Plan Investors hold 25% or more of the value of one or more classes of Preference Shares or Composite Securities, the assets of the Issuer should not be deemed "plan assets" under the Plan Asset Regulations for purposes of ERISA or Section 4975 of the Code.

In determining whether or not a Benefit Plan Investor is an ERISA Plan, life insurance company general accounts (both U.S. and non-U.S.) should consider the effect of the U.S. Supreme Court's decision in *John Hancock Life Insurance Co. v. Harris Trust and Savings Bank*, 510 U.S. 86 (1993), which held that those funds allocated to the general account of an insurance company pursuant to contracts which vary with the investment experience of the insurance company's general account and are attributable to ERISA Plans are considered to be "plan assets." Despite the presence of such contracts attributable to ERISA Plans invested in the general account, if the insurance company complies with certain regulations issued by the U.S. Department of Labor under Section 401(c) of ERISA, it will not be deemed to hold the plan assets of any ERISA Plans. However, any separate account funds held on behalf of an ERISA Plan by a life insurance company (whether held in or outside of the U.S.) would generally be considered to be "plan assets." Any Benefit Plan Investor, including a life insurance company general

009506

account, should consult with its counsel in determining whether or not it is an ERISA Plan prior to investing in the Preference Shares or the Composite Securities.

BY ITS PURCHASE OR HOLDING OF A PREFERENCE SHARE OR COMPOSITE SECURITY, OR ANY INTEREST THEREIN, THE PURCHASER AND/OR HOLDER THEREOF AND EACH TRANSFEREE WILL BE REQUIRED OR WILL BE DEEMED TO HAVE REPRESENTED AND WARRANTED THAT, AT THE TIME OF ITS ACQUISITION, AND THROUGHOUT THE PERIOD THAT IT HOLDS SUCH PREFERENCE SHARE, COMPOSITE SECURITY OR INTEREST THEREIN, THAT (1) IT IS NOT AN ERISA PLAN; AND IF AFTER ITS INITIAL ACQUISITION OF A PREFERENCE SHARE, A COMPOSITE SECURITY OR ANY INTEREST THEREIN, THE INVESTOR DETERMINES, IT IS DETERMINED BY ANOTHER PARTY, OR THE PREFERENCE SHARES PAYING AGENT BECOMES AWARE, THAT SUCH INVESTOR IS AN ERISA PLAN, THE INVESTOR WILL DISPOSE OF ALL OF ITS PREFERENCE SHARES AND COMPOSITE SECURITIES IN A MANNER CONSISTENT WITH THE RESTRICTIONS SET FORTH IN THE PREFERENCE SHARE DOCUMENTS OR INDENTURE, AS APPLICABLE, AND (2) IF IT IS A BENEFIT PLAN INVESTOR OTHER THAN AN ERISA PLAN, ITS PURCHASE, HOLDING AND DISPOSITION OF THE PREFERENCE SHARES OR COMPOSITE SECURITIES WILL NOT CAUSE A NON-EXEMPT VIOLATION OF ANY U.S. FEDERAL, STATE OR LOCAL LAW OR ANY NON-U.S. LAW WHICH IS SUBSTANTIALLY SIMILAR TO SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE AS A RESULT OF THE TRANSACTIONS CONTEMPLATED HEREIN AND (3) IT WILL NOT SELL OR OTHERWISE TRANSFER ANY SUCH PREFERENCE SHARE, COMPOSITE SECURITY OR INTEREST THEREIN, TO ANY PERSON WHO IS UNABLE TO SATISFY THE SAME FOREGOING REPRESENTATIONS AND WARRANTIES.

Based on the credit quality and the absence of rights to payment in excess of principal and stated interest, the Issuer believes that the Notes should not be considered "equity interests" for purposes of the Plan Assets Regulation. Nevertheless, prohibited transactions within the meaning of Section 406 of ERISA or Section 4975 of the Code may arise if the Notes are acquired by a Plan with respect to which the Issuer or the Portfolio Manager, or any of their respective affiliates, is a Party in Interest. Similarly, "prohibited transactions" within the meaning of Section 406 of ERISA or Section 4975 of the Code may arise if a person or entity which is a Party in Interest with respect to a Plan acquires or holds 50% or more of the aggregate equity interest in the Issuer. Certain exemptions from the prohibited transaction provisions of Section 406 of ERISA and Section 4975 of the Code may apply depending in part on the type of Plan fiduciary making the decision to acquire a Note and the circumstances under which such decision is made. Included among these exemptions are Prohibited Transaction Class Exemption ("**PTCE**") 84-14 (relating to transactions effected by a "qualified professional asset manager"), PTCE 90-1 (relating to investments by insurance company pooled separate accounts), PTCE 91-38 (relating to investments by bank collective investment funds), PTCE 95-60 (relating to investments by insurance company general accounts) and PTCE 96-23 (relating to transactions determined by an in-house asset manager). There can be no assurance that any of these class exemptions or any other exemption will be available with respect to any particular transaction involving the Notes. The purchase and holding of the Notes could also result in a violation of U.S. federal, state, local or non-U.S. law which is substantially similar to Section 406 of ERISA or Section 4975 of the Code.

BY ITS PURCHASE OR HOLDING OF ANY NOTES, OR ANY INTEREST THEREIN, THE PURCHASER AND/OR HOLDER THEREOF AND EACH TRANSFEREE WILL BE DEEMED TO HAVE REPRESENTED AND WARRANTED EITHER THAT (A) IT IS NOT AN EMPLOYEE BENEFIT PLAN (AS DEFINED IN SECTION 3(3) OF ERISA AND SUBJECT TO ERISA), OR A PLAN (AS DEFINED IN SECTION 4975(e)(1) OF THE CODE AND SUBJECT TO SECTION 4975 OF THE CODE), OR A GOVERNMENTAL, CHURCH, NON-U.S. OR OTHER PLAN WHICH IS SUBJECT TO ANY U.S. FEDERAL, STATE, LOCAL OR NON-U.S. LAW THAT IS SUBSTANTIALLY SIMILAR TO THE PROVISIONS OF SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE, OR AN ENTITY WHOSE ASSETS ARE TREATED AS ASSETS OF

009507

ANY SUCH PLAN OR (B) ITS PURCHASE, HOLDING AND DISPOSITION OF A NOTE, OR ANY INTEREST THEREIN, WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE AND WILL NOT CAUSE A NON-EXEMPT VIOLATION OF ANY U.S. FEDERAL, STATE, LOCAL OR NON-U.S. LAW WHICH IS SUBSTANTIALLY SIMILAR TO SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE.

### Other Fiduciary Considerations

Despite the prohibition upon, and the procedures employed to prevent, the acquisition of Preference Shares or Composite Securities by ERISA Plans, there can be no assurances that an ERISA Plan will not in fact acquire Preference Shares in violation of such restriction. In such an event, if the total value of the Preference Shares or Composite Securities in one or more classes held by Benefit Plan Investors (both ERISA Plans and non-ERISA plans) were to equal or exceed 25%, the assets of the Issuer could be deemed "plan assets."

If for any reason the assets of the Issuer are deemed to be "plan assets" of an ERISA Plan, certain transactions the Portfolio Manager might enter into, or may have entered into, on behalf of the Issuer in the ordinary course of its business might constitute non-exempt "prohibited transactions" under Section 406 of ERISA or Section 4975 of the Code and might have to be rescinded at significant cost to the Issuer. The Portfolio Manager may be deemed an ERISA fiduciary, and may therefore be prevented from engaging in certain investments (as not being deemed consistent with the ERISA prudent investment standards) or engaging in certain transactions or fee arrangements because they might be deemed to cause non-exempt prohibited transactions. It also is not clear that Section 403(a) of ERISA, which generally requires that all of the assets of an ERISA Plan be held in trust and limits delegation of investment management responsibilities by fiduciaries of ERISA Plans, would be satisfied. In addition, it is unclear whether Section 404(b) of ERISA, which generally provides that no fiduciary may maintain the indicia of ownership of any assets of a plan outside the jurisdiction of the district courts of the U.S., would be satisfied or any of the exceptions to the requirement set forth in 29 C.F.R. Section 2550.404b-1 would be available.

Any fiduciary that proposes to cause a Benefit Plan Investor to purchase any Securities should consult with its counsel to confirm that such investment will not constitute or result in a prohibited transaction or any other violation of an applicable requirement of ERISA or the Code or any substantially similar law.

The sale of any Securities to a Benefit Plan Investor is in no respect a representation by the Co-Issuers, the Initial Purchaser, the Trustee, the Preference Shares Paying Agent or the Portfolio Manager that such an investment meets all relevant legal requirements with respect to investments by Benefit Plan Investors generally or any particular Benefit Plan Investor, or that such an investment is appropriate for Benefit Plan Investors generally or any particular Benefit Plan Investor.

Investors whose investment activities are subject to regulation by federal, state or local law or governmental authorities should review the applicable laws and/or rules, policies and guidelines adopted from time to time by such authorities before purchasing any Securities. No representation is made as to the proper characterization of the Securities for legal investment or other purposes or as to the ability of particular investors to purchase any Securities under applicable law or other legal investment restrictions. Accordingly, all investors whose investment activities are subject to such laws and/or regulations, regulatory capital requirements or review by regulatory authorities should consult their own legal advisors in determining whether and to what extent the Securities constitute a legal investment or are subject to investment, capital or other restrictions.

009508

## PLAN OF DISTRIBUTION

Subject to the terms and conditions contained in a purchase agreement (the "**Purchase Agreement**") to be entered into among the Co-Issuers and JPMorgan, the Co-Issuers will agree to sell, and JPMorgan will agree to purchase, the Purchased Securities. The Issuer will agree to sell, and the Portfolio Manager and/or its Affiliates will agree to purchase, the Preference Shares not forming a part of the Purchased Securities in a privately negotiated transaction. JPMorgan is not acting as a placement agent or initial purchaser with respect to those Preference Shares sold directly by the Issuer to the Portfolio Manager and/or its Affiliates.

The Purchased Securities will be offered by the Initial Purchaser from time to time for sale to investors in negotiated transactions at varying prices to be determined in each case at the time of sale.

The Purchase Agreement provides that the obligations of the Initial Purchaser to pay for and accept delivery of the Purchased Securities thereunder are subject to certain conditions.

In the Purchase Agreement, each of the Issuer and the Co-Issuer will agree to indemnify the Initial Purchaser against certain liabilities under the Securities Act or to contribute to payments the Initial Purchaser may be required to make in respect thereof. In addition, the Issuer will agree to reimburse the Initial Purchaser for certain of its expenses incurred in connection with the closing of the transactions contemplated hereby.

The offering of the Securities has not been and will not be registered under the Securities Act and may not be offered or sold in non-Offshore Transactions except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act.

No action has been taken or is being contemplated by the Issuer that would permit a public offering of the Securities or possession or distribution of this Offering Circular or any amendment thereof, or supplement thereto or any other offering material relating to the Securities in any jurisdiction (other than Ireland) where, or in any other circumstances in which, action for those purposes is required. No offers, sales or deliveries of any Securities, or distribution of this Offering Circular or any other offering material relating to the Securities, may be made in or from any jurisdiction except in circumstances that will result in compliance with any applicable laws and regulations and will not impose any obligations on the Issuer or the Initial Purchaser. Because of the restrictions contained in the front of this Offering Circular, purchasers are advised to consult legal counsel prior to making any offer, resale, pledge or transfer of the Securities.

In the Purchase Agreement, the Initial Purchaser will agree that it or one or more of its Affiliates will sell the Notes, the Composite Securities and the Preference Shares only to or with, (a) purchasers it reasonably believes to be (i) Qualified Institutional Buyers, or with respect to the Composite Securities and the Preference Shares only, Accredited Investors and (ii)(1) Qualified Purchasers or, with respect to the Preference Shares only, Knowledgeable Employees or (2) entities owned exclusively by Qualified Purchasers or, with respect to the Preference Shares only, Knowledgeable Employees and (b) non-U.S. Persons in Offshore Transactions pursuant to Regulation S. In the Purchase Agreement, the Initial Purchaser will agree that it will send to each other dealer to which it sells Securities pursuant to Regulation S during the distribution compliance period a confirmation or other notice setting forth the restrictions on offers and sales of Securities in non-Offshore Transactions or to, or for the account or benefit of, U.S. Persons. Until 40 days (in the case of the Notes) or one year (in the case of the Composite Securities and the Preference Shares) after completion of the distribution by the Issuer, an offer or sale of Securities, in a non-Offshore Transaction by a dealer (whether or not participating in the Offering) may violate the registration requirements of the Securities Act if the offer or sale is made otherwise than pursuant to Rule 144A or, in the case of the Composite Securities and the Preference Shares, a transaction exempt from the registration requirements under the Securities Act. Resales of the Securities offered in reliance on Rule 144A or in a transaction exempt from the registration requirements

009509

under the Securities Act, as the case may be, are restricted as described under the "Transfer Restrictions." Beneficial interests in a Regulation S Global Note, Regulation S Global Composite Security or a Regulation S Global Preference Share may not be held by a U.S. Person at any time, and resales of the Securities offered in non-Offshore Transactions to non-U.S. Persons in reliance on Regulation S may be effected only in accordance with the transfer restrictions described herein. As used in this paragraph, the terms "United States" and "U.S." have the meanings given to them by Regulation S.

The Securities are a new issue of securities for which there is currently no market. The Initial Purchaser is not under any obligation to make a market in any class of Securities and any market making activity, if commenced, may be discontinued at any time. There can be no assurance that a secondary market for any class of Securities will develop, or if one does develop, that it will continue. Accordingly, no assurance can be given as to the liquidity of or trading market for the Securities.

In connection with the offering of the Securities, the Initial Purchaser may, as permitted by applicable law, overallot or effect transactions that stabilize or maintain the market price of the Securities at a level which might not otherwise prevail in the open market. The stabilizing, if commenced, may be discontinued at any time.

## SETTLEMENT AND CLEARING

### Book Entry Registration of the Global Securities

So long as the Depository, or its nominee, is the registered owner or Holder of a Global Security, the Depository or the nominee, as the case may be, will be considered the sole owner or Holder of the Note or Preference Share represented by a Global Security for all purposes under the Indenture, the Preference Share Paying Agency Agreement and the Global Securities, and members of, or participants in, the Depository as well as any other persons on whose behalf the participants may act (including Clearstream and Euroclear and account holders and participants therein) will have no rights under the Indenture, the Preference Share Paying Agency Agreement or a Global Security. Owners of beneficial interests in a Global Security will not be considered to be owners or Holders of the related Note or Preference Share under the Indenture or the Preference Share Paying Agency Agreement. Unless the Depository notifies the Co-Issuers (or, with respect to the Composite Securities or the Preference Shares, the Issuer) that it is unwilling or unable to continue as depositary for a Global Security or ceases to be a "clearing agency" registered under the Exchange Act, owners of a beneficial interest in a Global Security will not be entitled to have any portion of a Global Security registered in their names, will not receive or be entitled to receive physical delivery of Notes, Composite Securities or Preference Shares in certificated form and will not be considered to be the owners or Holders of any Notes, Composite Securities or Preference Shares under the Indenture or the Preference Share Paying Agency Agreement. In addition, no beneficial owner of an interest in a Global Security will be able to transfer that interest except in accordance with the Depository's applicable procedures (in addition to those under the Indenture, the Preference Share Paying Agency Agreement and, if applicable, those of Euroclear and Clearstream).

Investors may hold their interests in a Regulation S Global Note, Regulation S Global Composite Security or Regulation S Global Preference Share directly through Clearstream or Euroclear, if they are participants in Clearstream or Euroclear, or indirectly through organizations that are participants in Clearstream or Euroclear. Clearstream and Euroclear will hold interests in the Regulation S Global Notes, Regulation S Global Composite Securities and Regulation S Global Preference Shares on behalf of their participants through their respective depositories, which in turn will hold the interests in Regulation S Global Notes, Regulation S Global Composite Securities and Regulation S Global Notes in customers' securities accounts in the depositories' names on the books of the Depository. Investors may hold their interests in a Rule 144A Global Note directly through the Depository if they are participants in the Depository, or in directly through organizations that are participants in the Depository.

009510

Payments of principal of, or interest or other distributions on a Global Security will be made to the Depository or its nominee, as the registered owner thereof. The Co-Issuers, the Trustee, the Preference Shares Paying Agent, the paying agents, the Initial Purchaser, the Portfolio Manager and their respective affiliates will not have any responsibility or liability for any aspect of the records relating to or payments made on account of beneficial ownership interests in a Global Security or for maintaining, supervising or reviewing any records relating to the beneficial ownership interests.

The Co-Issuers expect that the Depository or its nominee, upon receipt of any payment of principal, interest, or other distributions in respect of a Global Security representing any Notes or Preference Shares, as the case may be, held by it or its nominee, will immediately credit participants' accounts with payments in amounts proportionate to their respective beneficial interests in the stated aggregate principal amount or number of a Global Security for the Notes, Composite Securities or Preference Shares, as the case may be, as shown on the records of the Depository or its nominee. The Co-Issuers also expect that payments by participants to owners of beneficial interests in a Global Security held through the participants will be governed by standing instructions and customary practices, as is now the case with securities held for the accounts of customers registered in the names of nominees for those customers. The payments will be the responsibility of the participants.

**Global Security Settlement Procedures**

Transfers between the participants in the Depository will be effected in the ordinary way in accordance with the Depository rules and will be settled in immediately available funds. The laws of some states require that certain persons take physical delivery of securities in definitive form. Consequently, the ability to transfer beneficial interests in a Global Security to these persons may be limited. Because the Depository can only act on behalf of participants, who in turn act on behalf of indirect participants and certain banks, the ability of a person holding a beneficial interest in a Global Security to pledge its interest to persons or entities that do not participate in the Depository system, or otherwise take actions in respect of its interest, may be affected by the lack of a physical certificate of the interest. Transfers between participants in Euroclear and Clearstream will be effected in the ordinary way in accordance with their respective rules and operating procedures.

Subject to compliance with the transfer restrictions applicable to the Securities described above and under "Transfer Restrictions," cross-market transfers between the Depository, on the one hand, and directly or indirectly through Euroclear or Clearstream participants, on the other, will be effected in the Depository in accordance with the Depository rules on behalf of Euroclear or Clearstream, as the case may be, by its respective depositary; *however*, the cross-market transactions will require delivery of instructions to Euroclear or Clearstream, as the case may be, by the counterparty in the system in accordance with its rules and procedures and within its established deadlines (Brussels time). Euroclear or Clearstream, as the case may be, will if the transaction meets its settlement requirements, deliver instructions to its respective depositary to take action to effect final settlement on its behalf by delivering or receiving interests in a Note, Composite Security or Preference Share, as the case may be, represented by a Regulation S Global Note, Regulation S Global Composite Security or Regulation S Global Preference Share in the Depository and making or receiving payment in accordance with normal procedures for same-day funds settlement applicable to the Depository. Clearstream participants and Euroclear participants may not deliver instructions directly to the depositories of Clearstream or Euroclear.

Because of time zone differences, cash received in Euroclear or Clearstream as a result of sales of interests in a Regulation S Global Note, Regulation S Global Composite Security or Regulation S Global Preference Share by or through a Euroclear or Clearstream participant to the Depository participant will be received with value on the Depository settlement date but will be available in the relevant Euroclear or Clearstream cash account only as of the business day following settlement in the Depository.

009511

The Depository has advised the Issuer that it will take any action permitted to be taken by a Holder of Securities (including the presentation of Securities for exchange as described above) only at the direction of one or more participants in the Depository to whose account with the Depository interests in the Securities are credited and only in respect of the portion of the Aggregate Outstanding Amount of the Securities as to which the participant or participants has or have given the direction. However, upon the occurrence of certain events, the Depository will exchange the Securities for Certificated Composite Securities, legended as appropriate, which it will distribute to its participants as set out in the Indenture.

The Depository has advised the Issuer as follows: The Depository is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the UCC and a "Clearing Agency" registered pursuant to the provisions of Section 17A of the Exchange Act. The Depository was created to hold securities for its participants and facilitate the clearance and settlement of securities transactions between participants through electronic book-entry changes in accounts of its participants, thereby eliminating the need for physical movement of certificates. Participants in the Depository include securities brokers and dealers, banks, trust companies, and clearing corporations and may include certain other organizations. Indirect access to the Depository system is available to others such as banks, brokers, dealers, and trust companies that clear through or maintain a custodial relationship with a participant, either directly or indirectly.

Although the Depository, Clearstream and Euroclear have agreed to the foregoing procedures to facilitate transfers of interests in Regulation S Global Notes, Regulation S Global Composite Securities and Regulation S Global Preference Shares among participants of the Depository, Clearstream and Euroclear, they are under no obligation to perform or continue to perform the procedures, and the procedures may be discontinued at any time. Neither the Co-Issuers nor the Trustee will have any responsibility for the performance by the Depository, Clearstream, or Euroclear or their respective participants or indirect participants of their respective obligations under the rules and procedures governing their operations.

### TRANSFER RESTRICTIONS

Because of the following restrictions, purchasers are advised to consult legal counsel prior to making any offer, resale, pledge or transfer of the Securities. Purchasers of Securities represented by an interest in a Regulation S Global Note, Regulation S Global Composite Security or a Regulation S Global Preference Share are advised that such interests are not transferable to U.S. Persons at any time except in accordance with the following restrictions.

Each prospective purchaser of Securities that is a U.S. Person or is purchasing the Securities in a non-Offshore Transaction (a "**U.S. Offeree**"), by accepting delivery of this Offering Circular, will be deemed to have represented and agreed as follows:

(1)     The U.S. Offeree acknowledges that this Offering Circular is personal to the U.S. Offeree and does not constitute an offer to any other person or to the public generally to subscribe for or otherwise acquire the Securities other than pursuant to transactions exempt from the registration requirements under the Securities Act or Rule 144A or in Offshore Transactions in accordance with Regulation S. Distribution of this Offering Circular to any person other than the U.S. Offeree and those persons, if any, retained to advise the U.S. Offeree with respect thereto, and other persons that are Accredited Investors, Qualified Institutional Buyers or non-U.S. Persons, is unauthorized and any disclosure of any of its contents, without the prior written consent of the Co-Issuers, is prohibited except as authorized under "Income Tax Considerations—Tax Return Disclosure and Investor List Requirements."

(2)     The U.S. Offeree agrees to make no photocopies of this Offering Circular or any documents referred to herein and, if the U.S. Offeree does not purchase the Securities or the

009512

Offering is terminated, to return this Offering Circular and all documents referred to herein to J.P. Morgan Securities Inc., 270 Park Avenue, 8th Floor, New York, New York 10017, Attention: Structured Credit Products.

Under the Indenture (with respect to the Co-Issuers) and the Preference Share Documents (with respect to the Issuer), the Co-Issuers or the Issuer will agree to comply with the requirements of Rule 144A relative to the dissemination of information to prospective purchasers in the secondary market. See "Available Information."

The Securities have not been registered under the Securities Act and may not be offered or sold in non-Offshore Transactions or to, or for the account or benefit of, U.S. Persons, except to (i) Qualified Institutional Buyers in reliance on the exemption from the registration requirements of the Securities Act provided by Rule 144A or (ii) solely in the case of the Composite Securities and the Preference Shares, to Accredited Investors in transactions exempt from the registration requirements of the Securities Act, who are in each case, also (x) Qualified Purchasers, (y) in the case of the Preference Shares only, Knowledgeable Employees or (z) entities owned exclusively by Qualified Purchasers and/or, in the case of the Preference Shares only, Knowledgeable Employees.

Any purported transfer of a Security not in accordance with this section shall be null and void and shall not be given effect for any purpose hereunder.

**Transfer Restrictions Applicable to Rule 144A Global Notes**

Each purchaser of a beneficial interest in Notes represented by a Rule 144A Global Note will be deemed to have acknowledged, represented and agreed as follows (terms used in this paragraph that are defined in Rule 144A or Regulation S are used herein as defined therein):

(1)    (A) The purchaser is a Qualified Institutional Buyer and a Qualified Purchaser, (B) the purchaser is purchasing the Notes for its own account or the account of another Qualified Purchaser that is also a Qualified Institutional Buyer as to which the purchaser exercises sole investment discretion, (C) the purchaser and any such account is acquiring the Notes as principal for its own account for investment and not for sale in connection with any distribution thereof, (D) the purchaser and any such account was not formed solely for the purpose of investing in the Notes (except when each beneficial owner of the purchaser or any such account is a Qualified Purchaser), (E) to the extent the purchaser (or any account for which it is purchasing the Notes) is a private investment company formed on or before April 30, 1996, the purchaser and each such account has received the necessary consent from its beneficial owners, (F) the purchaser is not a broker-dealer that owns and invests on a discretionary basis less than $25,000,000 in securities of unaffiliated issuers, (G) the purchaser is not a pension, profit-sharing or other retirement trust fund or plan in which the partners, beneficiaries or participants or affiliates may designate the particular investment to be made, (H) the purchaser agrees that it and each such account shall not hold such Notes for the benefit of any other Person and shall be the sole beneficial owner thereof for all purposes and that it shall not sell participation interests in the Notes or enter into any other arrangement pursuant to which any other Person shall be entitled to a beneficial interest in the distributions on the Notes (except when each beneficial owner of the purchaser or any such account is a Qualified Purchaser), (I) the Notes purchased directly or indirectly by the purchaser or any account for which it is purchasing the Notes constitute an investment of no more than 40% of the purchaser's and each such account's assets (except when each beneficial owner of the purchaser or any such account is a Qualified Purchaser), (J) the purchaser and each such account purchasing the Notes in a principal amount of not less than the minimum denomination requirement for the purchaser and each such account, (K) the purchaser will provide notice of the transfer restrictions set forth in the Indenture (including the exhibits thereto) to any transferee of its Notes, and (L) the purchaser understands and agrees that any purported transfer of the Notes to

009513

a purchaser that does not comply with the requirements of this paragraph (1) shall be null and void *ab initio*.

(2) The purchaser has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of its investment in Notes, and the purchaser, and any accounts for which it is acting, are each able to bear the economic risk of its investment.

(3) The purchaser understands that the Notes are being offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act, the Notes have not been and will not be registered under the Securities Act, and, if in the future the purchaser decides to offer, resell, pledge or otherwise transfer the Notes or any beneficial interest therein, such Notes or any beneficial interest therein may be offered, resold, pledged or otherwise transferred only in accordance with the applicable legend in respect of such Notes set forth in (6) below and the restrictions set forth in the Indenture. The purchaser acknowledges that no representation is made by the Co-Issuers or the Initial Purchaser as to the availability of any exemption under the Securities Act or other applicable laws of any other jurisdiction for resale of the Notes.

(4) The purchaser is not purchasing the Notes or any beneficial interest therein with a view to the resale, distribution or other disposition thereof in violation of the Securities Act. The purchaser understands that an investment in the Notes involves certain risks, including the risk of loss of its entire investment in the Notes under certain circumstances. The purchaser has had access to such financial and other information concerning the Co-Issuers and the Notes as it deemed necessary or appropriate in order to make an informed investment decision with respect to its purchase of the Notes or any beneficial interest therein, including an opportunity to ask questions of and request information from the Co-Issuers and the Initial Purchaser.

(5) In connection with the purchase of Notes or any beneficial interest therein (*provided* that no such representation is made with respect to the Portfolio Manager by any Affiliate of or account managed by the Portfolio Manager): (i) none of the Co-Issuers, the Initial Purchaser, any Hedge Counterparty, the Trustee, the Preference Share Paying Agent or the Portfolio Manager is acting as a fiduciary or financial or investment advisor for the purchaser, (ii) the purchaser is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral) of the Co-Issuers, the Initial Purchaser, any Hedge Counterparty, the Trustee, the Preference Share Paying Agent or the Portfolio Manager other than in a current offering circular for such Notes and any representations expressly set forth in a written agreement with such party; (iii) none of the Co-Issuers, the Initial Purchaser, any Hedge Counterparty, the Trustee, the Preference Share Paying Agent or the Portfolio Manager has given to the purchaser (directly or indirectly through any other person) any assurance, guarantee, or representation whatsoever as to the expected or projected success, profitability, return, performance result, effect, consequence, or benefit (including legal, regulatory, tax, financial, accounting, or otherwise) of an investment in the Notes; (iv) the purchaser has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisors to the extent it has deemed necessary, and it has made its own investment decisions (including decisions regarding the suitability of any transaction pursuant to the Indenture) based upon its own judgment and upon any advice from such advisors as it has deemed necessary and not upon any view expressed by the Co-Issuers, the Initial Purchaser, any Hedge Counterparty, the Trustee, the Preference Share Paying Agent or the Portfolio Manager; (v) the purchaser has determined that the rates, prices or amounts and other terms of the purchase and sale of the Notes or any beneficial interest therein reflect those in relevant market for similar transactions; (vi) the purchaser is purchasing the Notes or any beneficial interest therein with a full understanding of all of the terms, conditions and risks thereof (economic and otherwise), and

009514

it is capable of assuming and willing to assume (financially and otherwise) those risks; and (vii) the purchaser is a sophisticated investor.

(6)     The purchaser understands that the Notes offered to Qualified Institutional Buyers in reliance on the exemption from the registration requirements under the Securities Act provided by Rule 144A (a) will bear the legend set forth below unless the Co-Issuers determine otherwise in accordance with applicable law, (b) will be represented by one or more Rule 144A Global Notes, and (c) may not at any time be held by or on behalf of U.S. Persons that are not Qualified Institutional Buyers and either (i) Qualified Purchasers or (ii) entities owned exclusively by Qualified Purchasers.  Before any interest in a Rule 144A Global Note may be offered, resold, pledged or otherwise transferred to a Person who takes delivery in the form of an interest in a Regulation S Global Note, the transferor will be required to provide the Trustee with a written certification as to compliance with the transfer restrictions.

THIS NOTE OR ANY BENEFICIAL INTEREST HEREIN HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), AND THE CO-ISSUERS HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "**INVESTMENT COMPANY ACT**"). THE PURCHASER HEREOF, BY PURCHASING THIS NOTE, AGREES FOR THE BENEFIT OF THE CO-ISSUERS THAT THIS NOTE OR ANY BENEFICIAL INTEREST HEREIN MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED, ONLY (A)(1) TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER, IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A UNDER THE SECURITIES ACT SO LONG AS THIS NOTE IS ELIGIBLE FOR RESALE IN ACCORDANCE WITH RULE 144A, OR (2) TO A NON-U.S. PERSON IN AN OFFSHORE TRANSACTION COMPLYING WITH RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURITIES ACT AND, IN CASE OF CLAUSE (1), TO A PURCHASER THAT (W) IS A QUALIFIED PURCHASER WITHIN THE MEANING OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT THAT WAS NOT FORMED FOR THE PURPOSE OF INVESTING IN THE ISSUER (EXCEPT WITH EACH BENEFICIAL OWNER OF THE PURCHASER IS A QUALIFED PURCHASER), (X) TO THE EXTENT THE PURCHASER (OR ANY ACCOUNT FOR WHICH IT IS PURCHASING THE NOTES) IS A PRIVATE INVESTMENT COMPANY FORMED ON OR BEFORE APRIL 30, 1996, HAS RECEIVED THE NECESSARY CONSENT FROM ITS BENEFICIAL OWNERS, (Y) IS NOT A BROKER-DEALER THAT OWNS AND INVESTS ON A DISCRETIONARY BASIS LESS THAN $25,000,000 IN SECURITIES OF UNAFFILIATED ISSUERS, AND (Z) IS NOT A PENSION, PROFIT-SHARING OR OTHER RETIREMENT TRUST FUND OR PLAN IN WHICH THE PARTNERS, BENEFICIARIES OR PARTICIPANTS OR AFFILIATES MAY DESIGNATE THE PARTICULAR INVESTMENT TO BE MADE, (B) IN A PRINCIPAL AMOUNT OF NOT LESS THAN U.S.$250,000 FOR THE PURCHASER AND FOR EACH ACCOUNT FOR WHICH IT IS ACTING AND (C) IN ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF THE STATES OF THE UNITED STATES.  EACH TRANSFEROR OF THIS NOTE OR ANY BENEFICIAL INTEREST HEREIN WILL PROVIDE NOTICE OF THE TRANSFER RESTRICTIONS AS SET FORTH HEREIN TO ITS TRANSFEREE. EACH PURCHASER OF THIS NOTE OR ANY BENEFICIAL INTEREST HEREIN WILL BE DEEMED TO HAVE MADE THE APPLICABLE REPRESENTATIONS AND AGREEMENTS SET FORTH IN THE INDENTURE.  ANY TRANSFER IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE AND EFFECT AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE TRANSFEREE, NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE CO-ISSUERS, THE TRUSTEE OR ANY INTERMEDIARY.  IN ADDITION TO THE FOREGOING, THE CO-ISSUERS MAINTAIN THE RIGHT TO RESELL NOTES OR ANY BENEFICIAL INTEREST THEREIN PREVIOUSLY TRANSFERRED TO NON-PERMITTED U.S. HOLDERS (AS DEFINED

009515

IN THE INDENTURE) IN ACCORDANCE WITH AND SUBJECT TO THE TERMS OF THE INDENTURE.

UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY (DTC) TO THE INDENTURE REGISTRAR FOR REGISTRATION OF TRANSFER OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THE FAILURE TO PROVIDE THE ISSUER, THE TRUSTEE AND ANY PAYING AGENT WITH THE APPLICABLE U.S. FEDERAL INCOME TAX CERTIFICATIONS (GENERALLY, AN INTERNAL REVENUE SERVICE FORM W-9 (OR SUCCESSOR APPLICABLE FORM) IN THE CASE OF A PERSON THAT IS A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE") OR AN APPLICABLE INTERNAL REVENUE SERVICE FORM W-8 (OR SUCCESSOR APPLICABLE FORM) IN THE CASE OF A PERSON THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE) MAY RESULT IN U.S. FEDERAL BACK-UP WITHHOLDING FROM PAYMENTS TO THE HOLDER IN RESPECT OF THIS NOTE.

THE ACQUISITION OF THIS NOTE BY, OR ON BEHALF OF, OR WITH THE ASSETS OF ANY "EMPLOYEE BENEFIT PLAN" SUBJECT TO THE FIDUCIARY RESPONSIBILITY PROVISIONS OF THE UNITED STATES EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), OR ANY "PLAN" SUBJECT TO SECTION 4975 OF THE UNITED STATES INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), OR ANY ENTITY PART OR ALL OF THE ASSETS OF WHICH CONSTITUTE ASSETS OF ANY SUCH EMPLOYEE BENEFIT PLAN OR PLAN BY REASON OF UNITED STATES DEPARTMENT OF LABOR REGULATION SECTION 2510.3-101 OR OTHERWISE, OR ANY GOVERNMENTAL, CHURCH OR OTHER PLAN SUBJECT TO FEDERAL, STATE, LOCAL OR NON-U.S. LAW SUBSTANTIALLY SIMILAR TO THE FIDUCIARY RESPONSIBILITY PROVISIONS OF ERISA OR SECTION 4975 OF THE CODE IS PROHIBITED UNLESS SUCH PURCHASE, HOLDING AND SUBSEQUENT DISPOSITION WOULD NOT RESULT IN ANY NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF ERISA OR UNDER SECTION 4975 OF THE CODE AND WILL NOT CAUSE A NON-EXEMPT VIOLATION OF ANY U.S. FEDERAL, STATE, LOCAL OR NON-U.S. LAW WHICH IS SUBSTANTIALLY SIMILAR TO SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE.

(7)     The purchaser will provide notice to each person to whom it proposes to transfer any interest in the Notes of the transfer restrictions and representations set forth in the Indenture, including the exhibits referenced therein.

(8)     The purchaser understands that the Indenture permits the Issuer to compel any Holder of the Notes or any beneficial interest therein who is a U.S. Person and who is determined not to have been both (x) a Qualified Institutional Buyer and (y) either (i) a Qualified Purchaser or (ii) an entity owned exclusively by Qualified Purchasers at the time of acquisition of the Notes or any beneficial interest therein to sell such interest, or to sell such interest on behalf of such purchaser, to a person that is both (x) a Qualified Institutional Buyer and (y) either (i) a Qualified Purchaser or (ii) an entity owned exclusively by Qualified Purchasers, in a transaction meeting the requirements of Rule 144A or to a person that is a non-U.S. Person in an Offshore Transaction meeting the requirements of Regulation S.

009516

(9)     The purchaser understands that in the case of any supplemental indenture to the Indenture that requires consent of one or more Holders of the Notes, the Indenture permits the Amendment Buy-Out Purchaser to purchase the beneficial interest in the Notes from any Non-Consenting Holder thereof at the applicable Amendment Buy-Out Purchase Price; and such Non-Consenting Holder will be required to sell its beneficial interest in this Note to the Amendment Buy-Out Purchaser at such price.

(10)     The purchaser of the Class A-1g Notes understands that in the case of any Removal Buy-Out Option, the Indenture permits the Removal Buy-Out Purchaser to purchase the beneficial interest in the Class A-1g Notes from any Holder of such Class A-1g Notes at the applicable Removal Buy-Out Purchase Price; and such Holder of Class A-1g Notes will be required to sell its beneficial interest in such Note to the Removal Buy-Out Purchaser at such price.

(11)     The purchaser understands that the Stated Maturity of the Notes is subject to multiple extensions of four years each without consent of any Holders of Securities at the option of the Issuer, if directed by the Portfolio Manager, upon satisfaction of certain conditions.

(12)     The purchaser acknowledges that no action was taken or is being contemplated by the Co-Issuers that would permit a public offering of the Notes or possession or distribution of the offering circular with respect thereto or any amendment thereof or supplement thereto or any other offering material relating to the Notes in any jurisdiction (other than Ireland) where, or in any circumstances in which, action for those purposes is required.  Nothing contained in the offering circular relating to the Notes shall constitute an offer to sell or a solicitation of an offer to purchase any Notes in any jurisdiction where it is unlawful to do so absent the taking of such action or the availability of an exemption therefrom.

(13)     The purchaser will not, at any time, offer to buy or offer to sell the Notes or any beneficial interest therein by any form of general solicitation or advertising, including, but not limited to, any advertisement, article, notice or other communication published in any newspaper, magazine or similar medium or broadcast over television or radio or seminar or meeting whose attendees have been invited by general solicitations or advertising.

(14)     On each day the purchaser holds the Notes or any beneficial interest therein, either (1) the purchaser is not and will not be a Benefit Plan Investor or (2) the purchaser's purchase, holding and disposition of a Note or any beneficial interest therein (x) will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code and (y) in the case of a governmental, church or other plan, will not result in a non-exempt violation of any substantially similar U.S. federal, state, local or non-U.S. law.

(15)     The purchaser understands that the Indenture permits the Issuer to compel any purchaser of the Notes or any beneficial interest therein who has made an ERISA-related representation required by the Indenture that was at the time made, or has subsequently become, false or misleading to sell such interest, or to sell such interest on behalf of such purchaser, to a person able to make such ERISA-related representation.

(16)     The purchaser understands that the Co-Issuers may receive a list of participants holding positions in its securities from one or more book-entry depositories.

(17)     The purchaser acknowledges that the Co-Issuers, the Portfolio Manager, the Initial Purchaser and others will rely upon the truth and accuracy of the foregoing acknowledgments, representations and agreements and agrees that if any of the acknowledgments, representations or agreements deemed to have been made by it by its purchase of the Notes or any beneficial interest therein are no longer accurate, it shall promptly notify the

009517

Co-Issuers, the Portfolio Manager and the Initial Purchaser. If the purchaser is acquiring any Notes or any beneficial interest therein as a fiduciary or agent for one or more institutional accounts, it represents that it has sole investment discretion with respect to each such account and it has full power to make the foregoing acknowledgments, representations and agreements on behalf of such account.

## Transfer Restrictions Applicable to Regulation S Global Notes

Each purchaser of a beneficial interest in a Regulation S Global Note will be deemed to have made the representations set forth in paragraphs (4), (5) and (7) through (17) above in "—Transfer Restrictions Applicable to Rule 144A Global Notes" and to have further represented and agreed as follows:

The purchaser is aware that the Notes have not been and will not be registered under the Securities Act or any other applicable state securities law and the sale of such Notes or any beneficial interest therein to it is being made in reliance on the exemption from registration provided by Regulation S and understands that the Notes offered in reliance on Regulation S will bear the appropriate legend set forth in paragraph (6) above in "—Transfer Restrictions Applicable to Rule 144A Global Notes" and will be represented by one or more Regulation S Global Notes. The purchaser acknowledges that no representation is made by the Co-Issuers or the Initial Purchaser as to the availability of any exemption under the Securities Act or other applicable laws of any other jurisdiction for resale of the Notes. The purchaser and each beneficial owner of the Notes or any beneficial interest therein that it holds is not, and will not be, a U.S. Person as defined in Regulation S and its purchase of the Notes or any beneficial interest therein will comply with all applicable laws in any jurisdiction in which it resides or is located and will be in a principal amount of not less than U.S.$250,000. The purchaser has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of its investment in Notes or any beneficial interest therein, and it, and any accounts for which it is acting are each able to bear the economic risk of its investment. Before any interest in a Regulation S Global Note may be offered, resold, pledged or otherwise transferred to a person who takes delivery in the form of an interest in a Rule 144A Global Note, the transferor and the transferee will be required to provide the Trustee with written certifications as to compliance with the transfer restrictions.

## Transfer Restrictions Applicable to Composite Securities

Each purchaser of Certificated Composite Securities and each purchaser of Regulation S Global Composite Securities acquiring such Composite Securities from the Issuer in the initial offering will be required to acknowledge, represent and agree, and each subsequent purchaser of Regulation S Global Composite Securities will be deemed to have acknowledged, represented and agreed, in each case as follows (terms used in this paragraph that are defined in Rule 144A or Regulation S are used herein as defined therein):

(1) If the purchaser is:

(A) a U.S. Offeree, such purchaser is either (i) a Qualified Institutional Buyer and is aware that the sale of the Composite Securities to it is being made in reliance on an exemption from the registration requirements under the Securities Act and is acquiring the Composite Securities for its own account or for one or more accounts, each of which is a Qualified Institutional Buyer, and as to each of which the purchaser exercises sole investment discretion, and in an amount not less than the authorized denomination permitted by the Indenture, in each case for the purchaser and for each such account, or (ii) is an Accredited Investor and is aware that the sale of Composite Securities to it is being made in reliance on an exemption from the registration requirements under the Securities Act and is acquiring the Composite Securities for its own account in an amount not less than the authorized denomination permitted by the Indenture, or

009518

(B) a non-U.S. Person, such purchaser is purchasing the Composite Securities in an Offshore Transaction, is aware that the sale of Composite Securities to it is being made in reliance on the exemption from the registration requirements under the Securities Act provided by Regulation S and is acquiring the Composite Securities for its own account in an amount not less than the authorized denomination permitted by the Indenture.

In addition, the purchaser has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of its investment in Composite Securities, and the purchaser, and any accounts for which it is acting, are each able to bear the economic risk of the purchaser's or its investment.

(2) The purchaser understands that the Composite Securities are being offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act, the Composite Securities have not been and will not be registered under the Securities Act, and, if in the future the purchaser decides to offer, resell, pledge or otherwise transfer the Composite Securities, such Composite Securities may be offered, resold, pledged or otherwise transferred only in accordance with the legend in respect of such Composite Securities set forth in (5) below and the restrictions set forth in the Indenture. The purchaser acknowledges that no representation is made by the Issuer or the Initial Purchaser as to the availability of any exemption under the Securities Act or other applicable laws of any other jurisdiction for resale of the Composite Securities.

(3) In connection with the purchase of Composite Securities (*provided* that no such representation is made with respect to the Portfolio Manager by any Affiliate of or account managed by the Portfolio Manager): (i) none of the Issuer, the Initial Purchaser, any Hedge Counterparty, the Preference Shares Paying Agent, or the Portfolio Manager is acting as a fiduciary or financial or investment advisor for the purchaser, (ii) the purchaser is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral) of the Issuer, the Initial Purchaser, any Hedge Counterparty, the Preference Shares Paying Agent or the Portfolio Manager other than in a current offering circular for such Composite Securities and any representations expressly set forth in a written agreement with such party; (iii) none of the Issuer, the Initial Purchaser, any Hedge Counterparty, the Preference Shares Paying Agent or the Portfolio Manager has given to the purchaser (directly or indirectly through any other Person) any assurance, guarantee, or representation whatsoever as to the expected or projected success, profitability, return, performance result, effect, consequence, or benefit (including legal, regulatory, tax, financial, accounting, or otherwise) of an investment in the Composite Securities; (iv) the purchaser has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisors to the extent it has deemed necessary, and it has made its own investment decisions (including decisions regarding the suitability of any transaction pursuant to the documentation for the Composite Securities) based upon its own judgment and upon any advice from such advisors as it has deemed necessary and not upon any view expressed by the Issuer, the Initial Purchaser, any Hedge Counterparty, the Preference Shares Paying Agent or the Portfolio Manager; (v) the purchaser has determined that the rates, prices or amounts and other terms of the purchase and sale of the Composite Securities reflect those in relevant market for similar transactions; (vi) the purchaser is purchasing the Composite Securities with a full understanding of all of the terms, conditions and risks thereof (economic and otherwise), and it is capable of assuming and willing to assume (financially and otherwise) those risks; and (vii) the purchaser is a sophisticated investor.

(4) If the purchaser is acquiring the Composite Securities pursuant to paragraph (1)(A) above, (A) the purchaser and each account for which the purchaser is acquiring Composite Securities is (i) a Qualified Purchaser or (ii) an entity owned exclusively by Qualified Purchasers,

009519

(B) the purchaser (or if the purchaser is acquiring Composite Securities for any account, each such account) is acquiring the Composite Securities as principal for its own account for investment and not for sale in connection with any distribution thereof, (C) the purchaser (or if the purchaser is acquiring Composite Securities for any account, each such account) was not formed solely for the purpose of investing in the Composite Securities (except when each beneficial owner of the purchaser or any such account is a Qualified Purchaser), (D) to the extent the purchaser or any account for which the purchaser is acquiring Composite Securities is a private investment company formed before April 30, 1996, the purchaser or such account has received the necessary consent from its beneficial owners, (E) the purchaser (or if the purchaser is acquiring Composite Securities for any account, each such account) agrees that it shall not hold such Composite Securities for the benefit of any other Person and shall be the sole beneficial owner thereof for all purposes and that it shall not sell participation interests in the Composite Securities or enter into any other arrangement pursuant to which any other Person shall be entitled to a beneficial interest in the dividends or other distributions on the Composite Securities (except when each such person is a Qualified Purchaser) and (F) the purchaser understands and agrees that any purported transfer of the Composite Securities to a purchaser that does not comply with the requirements of this paragraph shall be null and void *ab initio*.

(5) The purchaser understands that the Composite Securities (A) will be represented by either one or more Certificated Composite Securities or Regulation S Global Composite Securities which will bear the legend set forth below unless the Issuer determines otherwise in accordance with applicable law, and (B) (i) in the case of Composite Securities represented by an interest in Certificated Composite Securities, may not at any time be held by or on behalf of U.S. Persons that are not either Qualified Institutional Buyers or Accredited Investors and either (A) Qualified Purchasers or (B) entities owned exclusively by Qualified Purchasers and (ii) in the case of Composite Securities represented by an interest in a Regulation S Global Composite Security, may not at any time be held by or on behalf of any person that is a U.S. Person. Before the Composite Securities represented by an interest in Certificated Composite Securities may be offered, resold, pledged or otherwise transferred, the transferor and the transferee will be required to provide the Trustee and the Issuer with written certifications as to compliance with the transfer restrictions.

THE COMPOSITE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), AND THE ISSUER HAS NOT BEEN REGISTERED UNDER THE UNITED STATES INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "**INVESTMENT COMPANY ACT**"). THE COMPOSITE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED, EXCEPT (A)(1) TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER, IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A SO LONG AS THE COMPOSITE SECURITIES ARE ELIGIBLE FOR RESALE IN ACCORDANCE WITH RULE 144A, (2) TO AN ACCREDITED INVESTOR (AS DEFINED IN RULE 501(a) UNDER THE SECURITIES ACT) IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT, OR (3) TO A NON-U.S. PERSON IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURITIES ACT AND, IN THE CASE OF CLAUSES (1) AND (2), TO A PURCHASER THAT (X) IS A QUALIFIED PURCHASER WITHIN THE MEANING OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT THAT WAS NOT FORMED FOR THE PURPOSE OF INVESTING IN THE ISSUER (EXCEPT WITH EACH BENEFICIAL OWNER OF THE PURCHASER IS A QUALIFIED PURCHASER), AND TO THE EXTENT THE PURCHASER (OR ANY ACCOUNT FOR WHICH IT IS PURCHASING THE COMPOSITE SECURITIES) IS A PRIVATE INVESTMENT COMPANY FORMED ON OR BEFORE APRIL 30, 1996, HAS RECEIVED THE NECESSARY

009520

CONSENT FROM ITS BENEFICIAL OWNERS OR (Y) IS AN ENTITY OWNED EXCLUSIVELY BY QUALIFIED PURCHASERS, (B) IN EACH CASE, IN A PRINCIPAL AMOUNT OF NOT LESS THAN U.S.$100,000 FOR THE PURCHASER AND FOR EACH SUCH ACCOUNT FOR WHICH IT IS ACTING, AND (C) IN ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES AND ANY OTHER APPLICABLE JURISDICTION. EACH TRANSFEROR OF THE COMPOSITE SECURITIES REPRESENTED HEREBY OR ANY BENEFICIAL INTEREST THEREIN WILL PROVIDE NOTICE OF THE TRANSFER RESTRICTIONS AS SET FORTH HEREIN TO ITS PURCHASER. EACH PURCHASER OF THE COMPOSITE SECURITIES REPRESENTED HEREBY WILL BE REQUIRED TO MAKE (OR WILL BE DEEMED TO MAKE) THE APPLICABLE REPRESENTATIONS AND AGREEMENTS SET FORTH IN THE INDENTURE. ANY TRANSFER IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE AND EFFECT, WILL BE VOID *AB INITIO*, AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE PURCHASER, NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE ISSUER, THE TRUSTEE OR ANY INTERMEDIARY. IN ADDITION TO THE FOREGOING, THE ISSUER MAINTAINS THE RIGHT TO RESELL ANY COMPOSITE SECURITIES PREVIOUSLY TRANSFERRED TO NON-PERMITTED U.S. HOLDERS (AS DEFINED IN THE INDENTURE) IN ACCORDANCE WITH AND SUBJECT TO THE TERMS OF THE INDENTURE.

BY ITS PURCHASE OR HOLDING OF THIS COMPOSITE SECURITY, OR ANY INTEREST THEREIN, EACH PURCHASER ACQUIRING SUCH COMPOSITE SECURITY FROM THE ISSUER IN THE INITIAL OFFERING AND EACH SUBSEQUENT PURCHASER THEREOF WILL BE REQUIRED TO REPRESENT AND WARRANT (OR, IN THE CASE OF A SUBSEQUENT PURCHASER OF A REGULATION S GLOBAL COMPOSITE SECURITY, WILL BE DEEMED TO HAVE REPRESENTED AND WARRANTED), AT THE TIME OF ITS ACQUISITION, AND THROUGHOUT THE PERIOD THAT IT HOLDS SUCH COMPOSITE SECURITY OR INTEREST THEREIN, THAT (1) IT IS NOT AN EMPLOYEE BENEFIT PLAN (AS DEFINED IN SECTION 3(3) OF THE UNITED STATES EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA")), WHICH IS SUBJECT TO ERISA, (II) A PLAN (AS DEFINED IN SECTION 4975(e)(1) OF THE UNITED STATES INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE")), WHICH IS SUBJECT TO SECTION 4975 OF THE CODE, OR (III) AN ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" BY REASON OF SUCH PLAN'S INVESTMENT IN THE ENTITY (AN "ERISA PLAN"), AND IF AFTER ITS INITIAL ACQUISITION OF A COMPOSITE SECURITY OR ANY INTEREST THEREIN, THE PURCHASER DETERMINES, IT IS DETERMINED BY ANOTHER PARTY, OR THE TRUSTEE BECOMES AWARE, THAT SUCH PURCHASER IS AN ERISA PLAN, SUCH PURCHASER WILL DISPOSE OF ALL OF ITS COMPOSITE SECURITIES IN A MANNER CONSISTENT WITH THE PROVISIONS SET FORTH IN THE INDENTURE, AND (2) IF IT IS A BENEFIT PLAN INVESTOR OTHER THAN AN ERISA PLAN, ITS PURCHASE, HOLDING AND DISPOSITION OF THIS COMPOSITE SECURITY WILL NOT CAUSE A NON-EXEMPT VIOLATION OF ANY U.S. FEDERAL, STATE OR LOCAL LAW OR ANY NON-U.S. LAW WHICH IS SUBSTANTIALLY SIMILAR TO SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE AS A RESULT OF THE TRANSACTIONS CONTEMPLATED HEREIN AND (3) IT WILL NOT SELL OR OTHERWISE TRANSFER ANY SUCH COMPOSITE SECURITY OR INTEREST THEREIN TO ANY PERSON WHO IS UNABLE TO SATISFY THE SAME FOREGOING REPRESENTATIONS AND WARRANTIES.

THE FAILURE TO PROVIDE THE ISSUER AND ANY PAYING AGENT, WHENEVER REQUESTED BY THE ISSUER OR THE PORTFOLIO MANAGER ON BEHALF OF THE ISSUER, WITH THE APPLICABLE U.S. FEDERAL INCOME TAX CERTIFICATIONS (GENERALLY, AN INTERNAL REVENUE SERVICE FORM W-9 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE OR AN APPROPRIATE INTERNAL REVENUE SERVICE FORM W-8 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE

009521

CODE) SHALL RESULT IN THE IMPOSITION OF U.S. FEDERAL BACK-UP WITHHOLDING FROM PAYMENTS TO THE HOLDER IN RESPECT OF THE COMPOSITE SECURITIES REPRESENTED HEREBY.

Each Regulation S Global Composite Security will bear the additional legend set forth below.

UNLESS THIS COMPOSITE SECURITY IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY ("**DTC**") TO THE INDENTURE REGISTRAR FOR REGISTRATION OF TRANSFER OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

(6)     The purchaser will provide notice to each Person to whom it proposes to transfer any interest in the Composite Securities of the transfer restrictions and representations set forth in the Indenture, including the exhibits referenced in the Indenture.

(7)     The purchaser understands that the Indenture permits the Issuer to compel any holder of the Composite Securities who is a U.S. Person and who is determined not to have been both (x) either a Qualified Institutional Buyer or Accredited Investor and (y) either (i) a Qualified Purchaser or (ii) an entity owned exclusively by Qualified Purchasers, at the time of acquisition of the Composite Securities to sell such Composite Securities, or to sell such Composite Securities on behalf of such purchaser, to a person that is both (x) either a Qualified Institutional Buyer or Accredited Investor and (y) either (i) a Qualified Purchaser or (ii) an entity owned exclusively by Qualified Purchasers, in a transaction exempt from the registration requirements under the Securities Act or to a person that is a non-U.S. Person in an Offshore Transaction meeting the requirements of Regulation S.

(8)     The purchaser acknowledges that no action was taken or is being contemplated by the Issuer that would permit a public offering of the Composite Securities or possession or distribution of the offering circular with respect thereto or any amendment thereof or supplement thereto or any other offering material relating to the Composite Securities in any jurisdiction (other than Ireland) where, or in any circumstances in which, action for those purposes is required. Nothing contained in the offering circular relating to the Composite Securities shall constitute an offer to sell or a solicitation of an offer to purchase any Composite Securities in any jurisdiction where it is unlawful to do so absent the taking of such action or the availability of an exemption therefrom.

(9)     The purchaser understands that in the case of any supplemental indenture to the Indenture that requires consent of one or more Holders of the Composite Securities, the Indenture permits the Amendment Buy-Out Purchaser to purchase the beneficial interest in the Composite Securities from any Non-Consenting Holder thereof at the applicable Amendment Buy-Out Purchase Price; and such Non-Consenting Holder will be required to sell its beneficial interest in this Composite Security to the Amendment Buy-Out Purchaser at such price.

(10)     The purchaser understands that the Stated Maturity of the Composite Securities is subject to multiple extensions of four years each without consent of any Holders of Securities at the option of the Issuer, if directed by the Portfolio Manager, upon satisfaction of certain conditions.

009522

(11)    The purchaser understands that in the case of any vote to remove the Portfolio Manager, the Management Agreement permits the Portfolio Manager to purchase the beneficial interest in the Composite Securities relating to those Preference Share Components which form a part of the Directing Preference Shares from any Holder of Composite Securities that voted to remove the Portfolio Manger at the applicable Buy-Out Amount; and such Holder of Composite Securities will be required to sell its beneficial interest in this Composite Security to the Portfolio Manager at such price.

(12)    The purchaser will not, at any time, offer to buy or offer to sell the Composite Securities by any form of general solicitation or advertising, including, but not limited to, any advertisement, article, notice or other communication published in any newspaper, magazine or similar medium or broadcast over television or radio or seminar or meeting whose attendees have been invited by general solicitations or advertising.

(13)    The purchaser agrees to treat the Composite Securities as equity of the Issuer for U.S. federal, state and local income tax purposes, if applicable.

(14)    On each day the purchaser holds the Composite Securities or any beneficial interest therein, (i) the purchaser, and any account on behalf of which the purchaser is purchasing the Composite Securities, is not and will not be an ERISA Plan, and if, after its initial acquisition of a Composite Securities, the purchaser determines, it is determined by another person, or the Trustee becomes aware that it or any such account is an ERISA Plan, such purchaser will dispose of its interest in the Composite Securities in a manner consistent with the requirements of the Indenture and (ii) if the purchaser is a Benefit Plan Investor that is not an ERISA Plan, the purchaser's purchase, holding and disposition of a Composite Security or any beneficial interest therein will not result in a non-exempt violation of any U.S. federal, state, local or non-U.S. law which is substantially similar to Section 406 of ERISA or Section 4975 of the Code.  The purchaser understands and agrees that any purported transfer of Composite Securities to a purchaser that does not comply with the requirements of clause (i) of this paragraph (14) shall not be recognized or effective and such purported purchaser or transferee shall acquire no rights thereby and that the Indenture permits the Issuer to require any purchaser of the Composite Securities or any beneficial interest therein who has made, or is deemed to have made, such ERISA-related representation that is subsequently shown to be false or misleading to sell such interest to a person able to make such ERISA-related representation.  The purchaser and any fiduciary causing the purchaser to purchase the Composite Securities agrees to indemnify and hold harmless the Issuer, the Portfolio Manager, the Preference Shares Paying Agent, the Initial Purchaser and the Trustee and their respective affiliates from any cost, damage, or loss incurred by them as a result of the purchaser being or being deemed to be an ERISA Plan.

(15)    The purchaser acknowledges that the Issuer, the Portfolio Manager, the Initial Purchaser and others will rely upon the truth and accuracy of the foregoing acknowledgments, representations and agreements and agrees that if any of the acknowledgments, representations or agreements deemed to have been made by it by its purchase of the Composite Securities are no longer accurate, it shall promptly notify the Issuer, the Portfolio Manager and the Initial Purchaser.  If it is acquiring any Composite Securities as a fiduciary or agent for one or more institutional accounts, it represents that it has sole investment discretion with respect to each such account and it has full power to make the foregoing acknowledgments, representations and agreements on behalf of such account.

(16)    Each purchaser or subsequent transferee (other than a subsequent transferee of Regulation S Global Composite Securities) of Composite Securities will be required to provide to the Issuer and the Trustee written certification in a form acceptable to the Issuer and the Trustee as to whether it is an Affected Bank and each subsequent transferee of Regulation S Global Composite Securities will be deemed to represent to the Issuer and to the Trustee that it is not an

009523

Affected Bank. No transfer of any Composite Security to an Affected Bank will be effective, and the Trustee will not recognize any such transfer, unless such transfer is specifically authorized by the Issuer in writing; *provided*, *however*, that the Issuer shall authorize any such transfer if (x) such transfer would not cause more than 33 1/3% of the aggregate outstanding amount of the Preference Shares (including the Preference Share Components of the Class 1 Composite Securities) to be owned by Affected Banks or (y) the transferor is an Affected Bank previously approved by the Issuer.

(17)     To the extent required by the Issuer, as determined by the Issuer or the Portfolio Manager on behalf of the Issuer, the Issuer may, upon notice to the Trustee and the Indenture Registrar, impose additional transfer restrictions on the Composite Securities to comply with the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the U.S. Patriot Act) and other similar laws or regulations, including, without limitation, requiring each transferee of a Composite Security to make representations to the Issuer in connection with such compliance.

(18)     The purchaser agrees to not cause the filing of a petition in bankruptcy or winding up against the Issuer before one year and one day have elapsed since the payment in full of the Notes or, if longer, the applicable preference period in effect.

(19)     The purchaser is not a member of the public in the Cayman Islands.

**Transfer Restrictions Applicable to Preference Shares**

Each purchaser of Certificated Preference Shares and each purchaser of Regulation S Global Preference Shares acquiring such Preference Shares from the Issuer in the initial offering will be required to acknowledge, represent and agree, and each subsequent purchaser of Regulation S Global Preference Shares will be deemed to have acknowledged, represented and agreed, in each case as follows (terms used in this paragraph that are defined in Rule 144A or Regulation S are used herein as defined therein):

(1)  If the purchaser is:

(A)     a U.S. Offeree, such purchaser is either (i) a Qualified Institutional Buyer and is aware that the sale of the Preference Shares to it is being made in reliance on an exemption from the registration requirements under the Securities Act and is acquiring the Preference Shares for its own account or for one or more accounts, each of which is a Qualified Institutional Buyer, and as to each of which the purchaser exercises sole investment discretion, and in a number not less than the minimum lot, in each case for the purchaser and for each such account, or (ii) is an Accredited Investor and is aware that the sale of Preference Shares to it is being made in reliance on an exemption from the registration requirements under the Securities Act and is acquiring the Preference Shares for its own account in a number not less than the minimum lot, or

(B)     a non-U.S. Person, such purchaser is purchasing the Preference Shares in an Offshore Transaction, is aware that the sale of Preference Shares to it is being made in reliance on the exemption from the registration requirements under the Securities Act provided by Regulation S and is acquiring the Preference Shares for its own account in a number not less than the minimum lot.

In addition, the purchaser has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of its investment in Preference Shares, and the purchaser, and any accounts for which it is acting, are each able to bear the economic risk of the purchaser's or its investment.

009524

(2)     The purchaser understands that the Preference Shares are being offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act, the Preference Shares have not been and will not be registered under the Securities Act, and, if in the future the purchaser decides to offer, resell, pledge or otherwise transfer the Preference Shares, such Preference Shares may be offered, resold, pledged or otherwise transferred only in accordance with the legend in respect of such Preference Shares set forth in (6) below and the restrictions set forth in the Preference Share Documents.   The purchaser acknowledges that no representation is made by the Issuer or the Initial Purchaser as to the availability of any exemption under the Securities Act or other applicable laws of any other jurisdiction for resale of the Preference Shares.

(3)     The purchaser is not purchasing the Preference Shares with a view to the resale, distribution or other disposition thereof in violation of the Securities Act.   The purchaser understands that the Preference Shares will be highly illiquid and are not suitable for short-term trading.  The Preference Shares are a leveraged investment in the Collateral Obligations that may expose the Preference Shares to disproportionately large changes in value.  Payments in respect of the Preference Shares are not guaranteed as they are dependent on the performance of the Issuer's portfolio of Collateral Obligations.  The purchaser understands that it is possible that, due to the structure of the transaction and the performance of the Issuer's portfolio of Collateral Obligations, dividends or other distributions in respect of the Preference Shares may be reduced or eliminated entirely.  Furthermore, the Preference Shares constitute equity in the Issuer, are not secured by the Collateral and will rank behind all creditors (secured and unsecured and whether known or unknown) of the Issuer, including, without limitation, the holders of the Notes, and any Hedge Counterparties.  The Issuer has assets limited to the Collateral for payment of all Classes of the Notes and dividends and other distributions on the Preference Shares, and the Preference Shares bear, pro rata, the first risk of loss.  The purchaser has had access to such financial and other information concerning the Issuer and the Preference Shares as it deemed necessary or appropriate in order to make an informed investment decision with respect to its purchase of the Preference Shares including an opportunity to ask questions of and request information from the Issuer and the Initial Purchaser.

(4)     In connection with the purchase of Preference Shares (*provided* that no such representation is made with respect to the Portfolio Manager by any Affiliate of or account managed by the Portfolio Manager): (i) none of the Issuer, the Initial Purchaser, any Hedge Counterparty, the Preference Shares Paying Agent, or the Portfolio Manager is acting as a fiduciary or financial or investment advisor for the purchaser, (ii) the purchaser is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral) of the Issuer, the Initial Purchaser, any Hedge Counterparty, the Preference Shares Paying Agent or the Portfolio Manager other than in a current offering circular for such Preference Shares and any representations expressly set forth in a written agreement with such party; (iii) none of the Issuer, the Initial Purchaser, any Hedge Counterparty, the Preference Shares Paying Agent or the Portfolio Manager has given to the purchaser (directly or indirectly through any other Person) any assurance, guarantee, or representation whatsoever as to the expected or projected success, profitability, return, performance result, effect, consequence, or benefit (including legal, regulatory, tax, financial, accounting, or otherwise) of an investment in the Preference Shares; (iv) the purchaser has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisors to the extent it has deemed necessary, and it has made its own investment decisions (including decisions regarding the suitability of any transaction pursuant to the documentation for the Preference Shares) based upon its own judgment and upon any advice from such advisors as it has deemed necessary and not upon any view expressed by the Issuer, the Initial Purchaser, any Hedge Counterparty, the Preference Shares Paying Agent or the Portfolio Manager; (v) the purchaser has determined that the rates, prices or amounts and other terms of the purchase and sale of the Preference Shares reflect those in relevant market for similar transactions; (vi) the

009525

purchaser is purchasing the Preference Shares with a full understanding of all of the terms, conditions and risks thereof (economic and otherwise), and it is capable of assuming and willing to assume (financially and otherwise) those risks; and (vii) the purchaser is a sophisticated investor.

(5)     If the purchaser is acquiring the Preference Shares pursuant to paragraph (1)(A) above, (A) the purchaser and each account for which the purchaser is acquiring Preference Shares is (i) a Qualified Purchaser, (ii) a Knowledgeable Employee or (iii) an entity owned exclusively by Qualified Purchasers and/or Knowledgeable Employees, (B) the purchaser (or if the purchaser is acquiring Preference Shares for any account, each such account) is acquiring the Preference Shares as principal for its own account for investment and not for sale in connection with any distribution thereof, (C) the purchaser (or if the purchaser is acquiring Preference Shares for any account, each such account) was not formed solely for the purpose of investing in the Preference Shares (except when each beneficial owner of the purchaser or any such account is (i) a Qualified Purchaser or (ii) a Knowledgeable Employee), (D) to the extent the purchaser or any account for which the purchaser is acquiring Preference Shares is a private investment company formed before April 30, 1996, the purchaser or such account has received the necessary consent from its beneficial owners, (E) the purchaser (or if the purchaser is acquiring Preference Shares for any account, each such account) agrees that it shall not hold such Preference Shares for the benefit of any other Person and shall be the sole beneficial owner thereof for all purposes and that it shall not sell participation interests in the Preference Shares or enter into any other arrangement pursuant to which any other Person shall be entitled to a beneficial interest in the dividends or other distributions on the Preference Shares (except when each person is (i) a Qualified Purchaser or (ii) a Knowledgeable Employee) and (F) the purchaser understands and agrees that any purported transfer of the Preference Shares to a purchaser that does not comply with the requirements of this paragraph shall be null and void *ab initio*.

(6)     The purchaser understands that the Preference Shares (A) will be represented by either one or more Certificated Preference Shares or Regulation S Global Preference Shares which will bear the legend set forth below unless the Issuer determines otherwise in accordance with applicable law, and (B) (i) in the case of Preference Shares represented by an interest in a Certificated Preference Share, may only be held by or on behalf of either (x) non-U.S. Persons or (y) U.S. Persons that are either Qualified Institutional Buyers or Accredited Investors and either (a) Qualified Purchasers, (b) Knowledgeable Employees or (c) entities owned exclusively by Qualified Purchasers and/or Knowledgeable Employees and (ii) in the case of Preference Shares represented by an interest in a Regulation S Global Preference Share, may not at any time be held by or on behalf of any person that is a U.S. Person. Before the Preference Shares represented by an interest in Certificated Preference Shares may be offered, resold, pledged or otherwise transferred, the transferee will be required to provide the Preference Shares Paying Agent and the Issuer with a written certification as to compliance with the transfer restrictions.

THE PREFERENCE SHARES REPRESENTED HEREBY HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), AND THE ISSUER HAS NOT BEEN REGISTERED UNDER THE UNITED STATES INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "**INVESTMENT COMPANY ACT**"). THE PREFERENCE SHARES REPRESENTED HEREBY HAVE NOT BEEN OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED, EXCEPT (A)(1) TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER, IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A SO LONG AS THE PREFERENCE SHARES ARE ELIGIBLE FOR RESALE IN ACCORDANCE WITH RULE 144A, (2) TO AN ACCREDITED INVESTOR (AS DEFINED IN RULE 501(a) UNDER THE SECURITIES ACT) IN A TRANSACTION EXEMPT FROM REGISTRATION

009526

UNDER THE SECURITIES ACT, OR (3) TO A NON-U.S. PERSON IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURITIES ACT AND, IN THE CASE OF CLAUSES (1) AND (2), TO A PURCHASER THAT (X) IS A QUALIFIED PURCHASER WITHIN THE MEANING OF SECTION 3(C)(7) OF THE INVESTMENT COMPANY ACT THAT WAS NOT FORMED FOR THE PURPOSE OF INVESTING IN THE ISSUER (EXCEPT WHEN EACH BENEFICIAL OWNER OF THE PURCHASER IS A QUALIFIED PURCHASER OR KNOWLEDGEABLE EMPLOYEE) THAT HAS RECEIVED THE NECESSARY CONSENT FROM ITS BENEFICIAL OWNERS WHEN THE PURCHASER IS A PRIVATE INVESTMENT COMPANY FORMED ON OR BEFORE APRIL 30, 1996, (Y) IS A KNOWLEDGEABLE EMPLOYEE (AS DEFINED IN RULE 3C-5 UNDER THE INVESTMENT COMPANY ACT) WITH RESPECT TO THE ISSUER OR (Z) IS AN ENTITY OWNED EXCLUSIVELY BY QUALIFIED PURCHASERS AND/OR KNOWLEDGEABLE EMPLOYEES, (B) IN EACH CASE, IN A NUMBER OF NOT LESS THAN 100 PREFERENCE SHARES FOR THE PURCHASER AND FOR EACH SUCH ACCOUNT FOR WHICH IT IS ACTING, AND (C) IN ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES AND ANY OTHER APPLICABLE JURISDICTION. EACH TRANSFEROR OF THE PREFERENCE SHARES REPRESENTED HEREBY OR ANY BENEFICIAL INTEREST THEREIN WILL PROVIDE NOTICE OF THE TRANSFER RESTRICTIONS AS SET FORTH HEREIN TO ITS PURCHASER. EACH PURCHASER OF THE PREFERENCE SHARES REPRESENTED HEREBY WILL BE REQUIRED TO MAKE (OR WILL BE DEEMED TO MAKE) THE APPLICABLE REPRESENTATIONS AND AGREEMENTS SET FORTH IN THE PREFERENCE SHARE DOCUMENTS. ANY TRANSFER IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE AND EFFECT, WILL BE VOID *AB INITIO*, AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE PURCHASER, NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE ISSUER, THE PREFERENCE SHARES PAYING AGENT OR ANY INTERMEDIARY. IN ADDITION TO THE FOREGOING, THE ISSUER MAINTAINS THE RIGHT TO RESELL ANY PREFERENCE SHARES PREVIOUSLY TRANSFERRED TO NON-PERMITTED U.S. HOLDERS (AS DEFINED IN THE PREFERENCE SHARE DOCUMENTS) IN ACCORDANCE WITH AND SUBJECT TO THE TERMS OF THE PREFERENCE SHARE DOCUMENTS.

BY ITS PURCHASE OR HOLDING OF THIS PREFERENCE SHARE, OR ANY INTEREST THEREIN, EACH PURCHASER ACQUIRING SUCH PREFERENCE SHARE FROM THE ISSUER IN THE INITIAL OFFERING AND EACH SUBSEQUENT PURCHASER THEREOF WILL BE REQUIRED TO REPRESENT AND WARRANT (OR, IN THE CASE OF A SUBSEQUENT PURCHASER OF A REGULATION S GLOBAL PREFERENCE SHARE, WILL BE DEEMED TO HAVE REPRESENTED AND WARRANTED), AT THE TIME OF ITS ACQUISITION, AND THROUGHOUT THE PERIOD THAT IT HOLDS SUCH PREFERENCE SHARE OR INTEREST THEREIN, THAT (1) IT IS NOT AN EMPLOYEE BENEFIT PLAN (AS DEFINED IN SECTION 3(3) OF THE UNITED STATES EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA")), WHICH IS SUBJECT TO ERISA, (II) A PLAN (AS DEFINED IN SECTION 4975(e)(1) OF THE UNITED STATES INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE")), WHICH IS SUBJECT TO SECTION 4975 OF THE CODE, OR (III) AN ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" BY REASON OF SUCH PLAN'S INVESTMENT IN THE ENTITY (AN "ERISA PLAN"); AND IF AFTER ITS INITIAL ACQUISITION OF A PREFERENCE SHARE OR ANY INTEREST THEREIN, THE INVESTOR DETERMINES, IT IS DETERMINED BY ANOTHER PARTY, OR THE PREFERENCE SHARES PAYING AGENT BECOMES AWARE, THAT THE INVESTOR IS AN ERISA PLAN, THE INVESTOR WILL DISPOSE OF ALL OF ITS PREFERENCE SHARES IN A MANNER CONSISTENT WITH THE PROVISIONS SET FORTH IN THE PREFERENCE SHARE DOCUMENTS, AND (2) IF IT IS A BENEFIT PLAN INVESTOR OTHER THAN AN ERISA PLAN, ITS PURCHASE, HOLDING AND DISPOSITION OF THIS PREFERENCE SHARE WILL NOT CAUSE A NON-EXEMPT VIOLATION OF ANY U.S. FEDERAL, STATE OR LOCAL LAW OR ANY NON-U.S. LAW WHICH IS SUBSTANTIALLY SIMILAR TO SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE AS A RESULT OF THE TRANSACTIONS CONTEMPLATED HEREIN AND (3) IT WILL NOT SELL

009527

OR OTHERWISE TRANSFER ANY SUCH PREFERENCE SHARE OR INTEREST THEREIN TO ANY PERSON WHO IS UNABLE TO SATISFY THE SAME FOREGOING REPRESENTATIONS AND WARRANTIES.

THE FAILURE TO PROVIDE THE ISSUER AND ANY PAYING AGENT, WHENEVER REQUESTED BY THE ISSUER OR THE PORTFOLIO MANAGER ON BEHALF OF THE ISSUER, WITH THE APPLICABLE U.S. FEDERAL INCOME TAX CERTIFICATIONS (GENERALLY, AN INTERNAL REVENUE SERVICE FORM W-9 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE OR AN APPROPRIATE INTERNAL REVENUE SERVICE FORM W-8 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE) SHALL RESULT IN THE IMPOSITION OF U.S. FEDERAL BACK-UP WITHHOLDING FROM PAYMENTS TO THE HOLDER IN RESPECT OF THE PREFERENCE SHARES REPRESENTED HEREBY.

Each Regulation S Global Preference Share will bear the additional legend set forth below.

UNLESS THIS PREFERENCE SHARE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY ("**DTC**") TO THE SHARE REGISTRAR FOR REGISTRATION OF TRANSFER OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

(7)     The purchaser will provide notice to each Person to whom it proposes to transfer any interest in the Preference Shares of the transfer restrictions and representations set forth in the Preference Share Documents, including the exhibits referenced in the Preference Share Documents.

(8)     The purchaser understands that the Preference Share Documents permit the Issuer to compel any holder of the Preference Shares who is a U.S. Person and who is determined not to have been both (x) either a Qualified Institutional Buyer or Accredited Investor and (y) either (i) a Qualified Purchaser, (ii) a Knowledgeable Employee or (iii) an entity owned exclusively by Qualified Purchasers and/or Knowledgeable Employees, at the time of acquisition of the Preference Shares to sell such Preference Shares, or to sell such Preference Shares on behalf of such purchaser, to a person that is both (x) either a Qualified Institutional Buyer or Accredited Investor and (y) either (i) a Qualified Purchaser, (ii) a Knowledgeable Employee or (iii) an entity owned exclusively by Qualified Purchasers and/or Knowledgeable Employees, in a transaction exempt from the registration requirements under the Securities Act or to a person that is a non-U.S. Person in an Offshore Transaction meeting the requirements of Regulation S.

(9)     The purchaser acknowledges that no action was taken or is being contemplated by the Issuer that would permit a public offering of the Preference Shares or possession or distribution of the offering circular with respect thereto or any amendment thereof or supplement thereto or any other offering material relating to the Preference Shares in any jurisdiction (other than Ireland) where, or in any circumstances in which, action for those purposes is required. Nothing contained in the offering circular relating to the Preference Shares shall constitute an offer to sell or a solicitation of an offer to purchase any Preference Shares in any jurisdiction where it is unlawful to do so absent the taking of such action or the availability of an exemption therefrom.

009528

(10)     The purchaser understands that in the case of any supplemental indenture to the Indenture that requires consent of one or more Holders of the Preference Shares, the Indenture permits the Amendment Buy-Out Purchaser to purchase the beneficial interest in the Preference Shares from any Non-Consenting Holder thereof at the applicable Amendment Buy-Out Purchase Price; and such Non-Consenting Holder will be required to sell its beneficial interest in this Preference Share to the Amendment Buy-Out Purchaser at such price.

(11)     The purchaser understands that the Scheduled Redemption Date of the Preference Shares is subject to multiple extensions of four years each without consent of any Holders of Securities at the option of the Issuer, if directed by the Portfolio Manager, upon satisfaction of certain conditions.

(12)     The purchaser understands that in the case of any vote to remove the Portfolio Manager, the Management Agreement permits the Portfolio Manager to purchase the beneficial interest in the Preference Shares from any Holder of Preference Shares that voted to remove the Portfolio Manger at the applicable Buy-Out Amount; and such Holder of Preference Shares will be required to sell its beneficial interest in this Preference Share to the Portfolio Manager at such price.

(13)     The purchaser will not, at any time, offer to buy or offer to sell the Preference Shares by any form of general solicitation or advertising, including, but not limited to, any advertisement, article, notice or other communication published in any newspaper, magazine or similar medium or broadcast over television or radio or seminar or meeting whose attendees have been invited by general solicitations or advertising.

(14)     The purchaser agrees to treat the Preference Shares as equity of the Issuer for U.S. federal, state and local income tax purposes, if applicable.

(15)     On each day the purchaser holds the Preference Shares or any beneficial interest therein, (i) the purchaser, and any account on behalf of which the purchaser is purchasing the Preference Shares, is not and will not be an ERISA Plan, and if, after its initial acquisition of a Preference Shares, the purchaser determines, it is determined by another person, or the Preference Shares Paying Agent becomes aware that it or any such account is an ERISA Plan, such purchaser will dispose of its interest in the Preference Shares in a manner consistent with the requirements of the Preference Share Documents and (ii) if the purchaser is a Benefit Plan Investor that is not an ERISA Plan, the purchaser's purchase, holding and disposition of a Preference Share or any beneficial interest therein will not result in a non-exempt violation of any U.S. federal, state, local or non-U.S. law which is substantially similar to Section 406 of ERISA or Section 4975 of the Code.  The purchaser understands and agrees that any purported transfer of Preference Shares to a purchaser that does not comply with the requirements of clause (i) of this paragraph (15) shall not be recognized or effective and such purported purchaser or transferee shall acquire no rights thereby and that the Preference Share Documents permit the Issuer to require any purchaser of the Preference Shares or any beneficial interest therein who has made, or is deemed to have made, such ERISA-related representation that is subsequently shown to be false or misleading to sell such interest to a person able to make such ERISA-related representation.  The purchaser and any fiduciary causing the purchaser to purchase the Preference Shares agrees to indemnify and hold harmless the Issuer, the Preference Shares Paying Agent, the Initial Purchaser and the Trustee and their respective affiliates from any cost, damage, or loss incurred by them as a result of the purchaser being or being deemed to be an ERISA Plan.

(16)     The purchaser acknowledges that the Issuer, the Portfolio Manager, the Initial Purchaser and others will rely upon the truth and accuracy of the foregoing acknowledgments, representations and agreements and agrees that if any of the acknowledgments, representations or

009529

agreements deemed to have been made by it by its purchase of the Preference Shares are no longer accurate, it shall promptly notify the Issuer, the Portfolio Manager and the Initial Purchaser. If it is acquiring any Preference Shares as a fiduciary or agent for one or more institutional accounts, it represents that it has sole investment discretion with respect to each such account and it has full power to make the foregoing acknowledgments, representations and agreements on behalf of such account.

(17)     Each purchaser or subsequent transferee (other than a subsequent transferee of Regulation S Global Preference Shares) of Preference Shares will be required to provide to the Issuer and the Trustee written certification in a form acceptable to the Issuer and the Trustee as to whether it is an Affected Bank and each subsequent transferee of Regulation S Global Preference Shares will be deemed to represent to the Issuer and to the Trustee that it is not an Affected Bank. No transfer of any Preference Share to an Affected Bank will be effective, and the Trustee will not recognize any such transfer, unless such transfer is specifically authorized by the Issuer in writing; provided, however, that the Issuer shall authorize any such transfer if (x) such transfer would not cause more than 33 1/3% of the aggregate outstanding amount of the Preference Shares (including the Preference Share Components of the Class 1 Composite Securities) to be owned by Affected Banks or (y) the transferor is an Affected Bank previously approved by the Issuer.

(18)     To the extent required by the Issuer, as determined by the Issuer or the Portfolio Manager on behalf of the Issuer, the Issuer may, upon notice to the Preference Shares Paying Agent and the Share Registrar, impose additional transfer restrictions on the Preference Shares to comply with the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the U.S. Patriot Act) and other similar laws or regulations, including, without limitation, requiring each transferee of a Preference Share to make representations to the Issuer in connection with such compliance.

(19)     The purchaser agrees to not cause the filing of a petition in bankruptcy or winding up against the Issuer before one year and one day have elapsed since the payment in full of the Notes or, if longer, the applicable preference period in effect.

(20)     The purchaser is not a member of the public in the Cayman Islands.

## LISTING AND GENERAL INFORMATION

1.     The Issuer and the Co-Issuer accept responsibility for the information contained in this document. To the best knowledge and belief of the Issuer and the Co-Issuer, the information contained in this document is in accordance with the facts and does not omit anything likely to affect the import of such information.

2.     Application will be made to list the Securities (other than the Preference Shares) on the Irish Stock Exchange. However, there can be no assurance that any admission will be granted or maintained. In connection with the listing of the Securities (other than the Preference Shares) on the Irish Stock Exchange, the listing particulars will be filed with the Registrar of Companies of Ireland, pursuant to Regulation 13 of the European Community (Stock Exchange) regulations, 1984 of Ireland. Prior to the listing, a legal notice relating to the issue of the Notes and the Composite Securities and copies of the Issuer Charter and the Certificate of Incorporation and By-laws of the Co-Issuer will be deposited with JP Morgan Bank (Ireland) PLC and at the principal office of the Issuer, where copies thereof may be obtained, free of charge, upon request.

3.     As long as any of the Notes or the Composite Securities are Outstanding and listed on the Irish Stock Exchange, copies of the Issuer Charter and the Certificate of Incorporation and By-laws of the Co-Issuer, the Administration Agreement, the Resolutions, the resolutions of the Board of Directors of the Co-Issuer authorizing the issuance of the Notes, the Indenture, the Management Agreement, the Collateral

009530

Administration Agreement, the Preference Shares Paying Agency Agreement, the Insurance Documents, any Hedge Agreement and the Monthly Report will be available for inspection at the offices of the Irish Paying and Listing Agent in the City of Dublin, where copies thereof may be obtained upon request.

4.     For fourteen days following the date of listing of the Notes and the Composite Securities on the Irish Stock Exchange, copies of the Issuer Charter and the Certificate of Incorporation and By-laws of the Co-Issuer, the Administration Agreement, the Resolutions, the resolutions of the Board of Directors of the Co-Issuer authorizing the issuance of the Notes, the Indenture, the Insurance Documents, the Management Agreement, the Collateral Administration Agreement, the Preference Shares Paying Agency Agreement and any Hedge Agreement will be available for inspection at the principal office of the Issuer and copies thereof may be obtained upon request.

5.     Copies of the Issuer Charter and the Certificate of Incorporation and By-laws of the Co-Issuer, the Administration Agreement, the Resolutions, the resolutions of the Board of Directors of the Co-Issuer authorizing the issuance of the Notes, the Indenture, the Insurance Documents, the Management Agreement, the Collateral Administration Agreement, the Preference Shares Paying Agency Agreement, any Hedge Agreement and the Monthly Report prepared by the Portfolio Manager on behalf of the Issuer containing information relating to the Collateral will be available for inspection so long as any of the Securities are Outstanding in the City of Houston, Texas at the office of the Trustee.

6.     Each of the Co-Issuers represents that as of the date of this Offering Circular, there has been no material adverse change in its financial position since its date of incorporation.  Since their date of incorporation, neither the Issuer nor the Co-Issuer has commenced operations, other than the Issuer purchasing certain Collateral Obligations and selling participation interests therein pursuant the Warehousing Agreement preparatory to the offering of the Securities, and no annual reports or accounts have been prepared as of the date of this Offering Circular.

7.     The Co-Issuers are not involved in any litigation or arbitration proceedings relating to claims on amounts that are material in the context of the issue of the Notes, as applicable, nor, so far either of the Co-Issuers are aware, is any such litigation or arbitration involving it pending or threatened.

8.     The Insurer is not involved in any litigation or arbitration proceeding (including any such proceedings which are pending or threatened of which the Insurer is aware) which may have or have had within the last twelve (12) months a significant effect on the Insurer's financial position.

9.     The issuance of the Securities was authorized and approved by the Board of Directors of the Issuer by the Resolutions.  The issuance of the Notes was authorized and approved by the Board of Directors of the Co-Issuer by resolutions passed on or before the Closing Date.

10.     Since the date of their incorporation, no financial statements of the Co-Issuers have been prepared.  The Issuer is not required by Cayman Islands law to publish financial statements, and does not intend to publish any financial statements.  The Issuer is required to provide written confirmation to the Trustee, on an annual basis, that no Event of Default or other matter that is required to be brought to the Trustee's attention has occurred.

11.     Other than the Securities, as of the Closing Date, the Issuer and the Co-Issuer will not have any loan capital (including term loans) outstanding or created but unissued, or any outstanding mortgages, charges or other borrowings or indebtedness in the nature of borrowing, including bank overdrafts and liabilities under acceptance credits, hire purchase agreement, guarantees or other contingent liabilities.

009531

## IDENTIFYING NUMBERS

The Notes sold in offshore transactions in reliance on Regulation S and represented by Regulation S Global Notes have been accepted for clearance under the Common Codes in the table below. The table also lists the CUSIP (CINS) Numbers, the International Securities Identification Numbers (ISIN) and the WKN numbers for each Class of Securities.

| Security | CUSIP | Common Code | ISIN | WKN |
|---|---|---|---|---|
| **Class A-1a Notes** | | | | |
| Rule 144A Global Notes | 844272AA2 | 021282227 | US844272AA26 | A0DYUB |
| Regulation S Global Notes | G82911AA9 | 021282120 | USG82911AA97 | A0DYUA |
| | | | | |
| **Class A-1b Notes** | | | | |
| Rule 144A Global Notes | 844272AS3 | 021282405 | US844272AS34 | A0DYUE |
| Regulation S Global Notes | G82911AJ0 | 021282260 | USG82911AJ07 | A0DYUD |
| | | | | |
| **Class A-1g Notes** | | | | |
| Rule 144A Global Notes | 844272AL8 | 021282529 | US844272AL80 | A0DYUH |
| Regulation S Global Notes | G82911AF8 | 021282464 | USG82911AF84 | A0DYUG |
| | | | | |
| **Class A-2 Notes** | | | | |
| Rule 144A Global Notes | 844272AB0 | 021282634 | US844272AB09 | A0DYUL |
| Regulation S Global Notes | G82911AB7 | 021282588 | USG82911AB70 | A0DYUK |
| | | | | |
| **Class A-3a Notes** | | | | |
| Rule 144A Global Notes | 844272AM6 | 021282812 | US844272AM63 | A0DYUP |
| Regulation S Global Notes | G82911AG6 | 021282766 | USG82911AG67 | A0DYUN |
| | | | | |
| **Class A-3b Notes** | | | | |
| Rule 144A Global Notes | 844272AN4 | 021282880 | US844272AN47 | A0DYUS |
| Regulation S Global Notes | G82911AH4 | 021282839 | USG82911AH41 | A0DYUR |
| | | | | |
| **Class B Notes** | | | | |
| Rule 144A Global Notes | 844272AC8 | 021283002 | US844272AC81 | A0DYUV |
| Regulation S Global Notes | G82911AC5 | 021282952 | USG82911AC53 | A0DYUU |
| | | | | |
| **Class C Notes** | | | | |
| Rule 144A Global Notes | 844272AD6 | 021261220 | US844272AD64 | A0DYUY |
| Regulation S Global Notes | G82911AD3 | 021283045 | USG82911AD37 | A0DYUX |
| | | | | |
| **Class 1 Composite Securities** | | | | |
| Certificated Composite Security (Rule 144A) | 844272AJ3 | 021445860 | US844272AJ35 | A0DYU1 |
| Certificated Composite Security (Regulation D) | 844272AK0 | N/A | US844272AK08 | A0DYU2 |
| Regulation S Global Composite Security | G82911AE1 | 021445932 | USG82911AE10 | A0DYU0 |
| | | | | |
| **Preference Shares** | | | | |
| Certificated Preference Shares (Rule 144A) | 84427P202 | 021449318 | KY84427P2029 | N/A |
| Certificated Preference Shares (Regulation D) | 84427P301 | N/A | KY84427P3019 | N/A |
| Regulation S Global Preference Shares | G82910103 | 021287644 | KYG829101032 | N/A |

009532

**LEGAL MATTERS**

Certain legal matters will be passed upon for the Co-Issuers and the Initial Purchaser by McKee Nelson LLP, New York, New York.  Certain matters with respect to Cayman Islands corporate law and tax law will be passed upon for the Issuer by Maples and Calder, George Town, Grand Cayman, Cayman Islands.  Certain legal matters will be passed upon for the Portfolio Manager by Orrick, Herrington & Sutcliffe LLP, Los Angeles, California.

009533

### GLOSSARY OF DEFINED TERMS

"**Accrued Insurance Liabilities Interest Rate**" means, as of any date of calculation, LIBOR (as in effect with respect to the Notes on such date of calculation) *plus* 0.75%. The Accrued Insurance Liabilities Interest Rate shall be computed on the basis of a 360-day year and the actual number of days elapsed. In no event shall the Accrued Insurance Liabilities Interest Rate exceed the maximum rate permissible under any applicable law limiting interest rates.

"**Accrued Interest On Sale**" means interest accrued on a Collateral Obligation at the time of sale or other disposition to the extent paid to the Issuer as part of the sale or other disposition price of the Collateral Obligation after deduction of any amount representing Accrued Interest Purchased With Principal of the Collateral Obligation.

"**Accrued Interest Purchased With Principal**" means (i) interest accrued on or purchased with a Collateral Obligation as part of the price paid by the Issuer to acquire the Collateral Obligation less any amount of Interest Proceeds (applied as Interest Proceeds) applied by the Issuer to acquire the accrued interest at the time of purchase and (ii) interest accrued on a Warehoused Loan as part of the price paid by the Issuer to repurchase and terminate the related participation under the Warehouse Agreement.

"**Act**" means any request, demand, authorization, direction, notice, consent, waiver or other action to be given or taken by Noteholders or Holders of Preference Shares under the Indenture embodied in and evidenced by one or more instruments of substantially similar tenor signed by Noteholders or Holders of Preference Shares in person or by agents duly appointed in writing. The instruments (and the action embodied in them) are referred to as the "**Act**" of the Noteholders or Holders of Preference Shares signing the instruments.

"**Administrative Expense Cap**" means, an amount on any Payment Date equal to the excess of:

(i) the sum of 0.05% of the Maximum Investment Amount on the related Determination Date plus $150,000; *over*

(ii) the sum of the amounts paid for Administrative Expenses in the twelve months preceding the current Payment Date.

"**Administrative Expenses**" means amounts due or accrued representing:

(i) tax preparation, filing, and registration fees or expenses and any other filing and registration fees owed by the Co-Issuers (including all filing, registration, and annual return fees payable to the Cayman Islands government and registered office fees);

(ii) fees, indemnities and expenses of the Trustee (including all amounts under Section 6.7 of the Indenture), the Administrator, the Preference Shares Paying Agent and the Collateral Administrator;

(iii) fees, indemnities and expenses of the Co-Issuers and of accountants, agents and counsel for either of the Co-Issuers;

(iv) fees and expenses of the Rating Agencies in connection with any rating of the Notes owed by either Co-Issuer (including fees and expenses for surveillance, credit estimates and other fees owing to the Rating Agencies);

(v) expenses and indemnities (but not Management Fees) of the Portfolio Manager if payable under the Management Agreement;

009534

(vi)     expenses and indemnities of the Insurer if payable under Section 4.2(a)(ii) and Section 4.3 of the Insurance Agreement;

(vii)    fees and expenses for third-party loan pricing services and accountants; and

(viii)   amounts due (other than indemnities) to any other person (except the Portfolio Manager) if specifically provided for in the Indenture, including fees or expenses in connection with any Securities Lending Agreement.

"**Affected Bank**" means a "bank" for purposes of Section 881 of the Code or an entity affiliated with such a bank that is neither (x) a "United States person" within the meaning of Section 7701(a)(30) of the Code (generally an entity created or organized in or under the laws of the United States or any state thereof or the District of Columbia) nor (y) entitled to the benefits of an income tax treaty with the United States under which withholding taxes on interest payments made by obligors resident in the United States to such bank are reduced to 0%.

"**Affiliate**" or "**Affiliated**" means with respect to a Person,

(i)      any other Person who, directly or indirectly, is in control of, or controlled by, or is under common control with, the Person; or

(ii)     any other Person who is a director, officer or employee (A) of the Person, (B) of any subsidiary or parent company of the Person or (C) of any Person described in clause (i) above.

For the purposes of this definition, control of a Person shall mean the power, direct or indirect:

(A)      to vote more than 50% of the securities having ordinary voting power for the election of directors of the Person; or

(B)      to direct the corporate management and corporate policies of the Person whether by contract or otherwise (this does not include the Management Agreement unless it is amended expressly to provide those services).

For the purpose of this definition, the Administrator and its Affiliates are neither Affiliates of nor Affiliated with the Co-Issuers and the Co-Issuers are neither Affiliates of nor Affiliated with the Administrator, or any of their Affiliates.

"**Aggregate Outstanding Amount**" means, when used with respect to any of the Notes as of any date, the aggregate principal amount of the Notes on that date.  When used with respect to the Preference Shares or the Preference Share Components as of any date, the number of such Preference Shares Outstanding on such date in respect of such Preference Shares or Preference Share Components.  When used with respect to any of the Class 1 Composite Securities, as of any date, the aggregate face amount of the Class 1 Composite Securities.

Except as otherwise provided herein:

(i)      the Aggregate Outstanding Amount of the Class A-1a Notes at any time shall include any Defaulted Interest in respect thereof and accrued interest on such Defaulted Interest;

(ii)     the Aggregate Outstanding Amount of the Class A-1b Notes at any time shall include any Defaulted Interest in respect thereof and (to the extent not included in any such Defaulted Interest) accrued interest on such Defaulted Interest;

009535

(iii)     the Aggregate Outstanding Amount of the Class A-1g Notes at any time shall include any Defaulted Interest in respect thereof and (to the extent not included in any such Defaulted Interest) accrued interest on such Defaulted Interest;

(iv)     the Aggregate Outstanding Amount of the Class A-2 Notes at any time shall include any Defaulted Interest in respect thereof and (to the extent not included in any such Defaulted Interest) accrued interest on such Defaulted Interest;

(v)     the Aggregate Outstanding Amount of the Class A-3a Notes at any time shall include any Defaulted Interest in respect thereof and (to the extent not included in any such Defaulted Interest) accrued interest on such Defaulted Interest;

(vi)     the Aggregate Outstanding Amount of the Class A-3b Notes at any time shall include any Defaulted Interest in respect thereof and (to the extent not included in any such Defaulted Interest) accrued interest on such Defaulted Interest;

(iii)     the Aggregate Outstanding Amount of the Class B Notes at any time shall include all Class B Deferred Interest attributed thereto; and

(iv)     the Aggregate Outstanding Amount of the Class C Notes at any time shall include all Class C Deferred Interest attributed thereto.

"**Aggregate Principal Balance**" means, when used with respect to the Pledged Obligations, the sum of the Principal Balances of all the Pledged Obligations.  When used with respect to a portion of the Pledged Obligations, the term Aggregate Principal Balance means the sum of the Principal Balances of that portion of the Pledged Obligations.

"**Aggregate Purchase Price Amount**" means, when used with respect to the Pledged Obligations, the sum of the Purchase Price Amounts of all the Pledged Obligations.  When used with respect to a portion of the Pledged Obligations, the term Aggregate Purchase Price Amount means the sum of the Purchase Price Amounts of that portion of the Pledged Obligations.

"**Allocable Principal Balance**" means, with respect to a Synthetic Security based upon or relating to a senior secured index investment providing non-leveraged credit exposure to a basket of credit default swaps referencing a diversified group of Reference Obligations, with respect to which the principal or notional amount of the credit exposure to any single Reference Obligation does not increase over time, the portion of the aggregate Principal Balance of such Synthetic Security that is allocable to each Reference Obligation comprising such index or indices based upon allocating the Principal Balance of such Synthetic Security among such Reference Obligations in the same proportion as each Reference Obligation bears to the aggregate Principal Balance of such Synthetic Security.

"**Amendment Buy-Out Purchase Price**" means the purchase price payable by the Amendment Buy-Out Purchaser for Securities purchased in an Amendment Buy-Out, if any, in an amount equal to (i) in the case of the Notes, the Aggregate Outstanding Amount thereof, *plus* accrued and unpaid interest (including Deferred Interest, if any) to the date of purchase payable to the Non-Consenting Holder (giving effect to any amounts paid to the Holder on such date), *plus* any unpaid Extension Bonus Payment *plus*, in the case of the Fixed Rate Notes, the applicable Make-Whole Premium, (ii) in the case of the Preference Shares, an amount that, when taken together with all payments and distributions made in respect of such Preference Shares since the Closing Date (and any amounts payable, if any, to the Non-Consenting Holder on the next succeeding Payment Date) would cause such Preference Shares to have received (as of the date of purchase thereof) a Preference Share Internal Rate of Return of 12.0% (assuming such purchase date was a "Payment Date" under the Indenture); *provided*, *however*, that in any Amendment Buy-Out from and after the date on which the Non-Consenting Holders of Preference Shares have received a Preference Share Internal Rate of Return equal to or in excess of 12.0%, the Amendment

183

Buy-Out Purchase Price for such Preference Shares shall be zero and (iii) in the case of the Class 1 Composite Securities, the sum of (x) the amount that would be payable pursuant to the preceding clause (ii) in respect of the Preference Shares underlying the Class 1 Composite Security Preference Share Component, (y) the Treasury Strip Market Value and (z) the Composite Security Make-Up Amount.

"**Amendment Buy-Out Purchaser**" means the Portfolio Manager (or any of its Affiliates acting as principal or agent); *provided* that in the event that the Portfolio Manager elects not to purchase Securities or Preference Shares from Holders pursuant to "Description of the Securities—Amendment Buy-Out", "Amendment Buy-Out Purchaser" shall mean one or more qualifying purchasers (which may include the Initial Purchaser) or any of its Affiliates acting as principal or agent) designated by the Portfolio Manager; *provided*, *however*, none of the Portfolio Manager, the Initial Purchaser or any of their respective Affiliates shall have any duty to act as an Amendment Buy-Out Purchaser.

"**Applicable Note Interest Rate**" means, with respect to the Notes of any Class, the Note Interest Rate with respect to such Class.

"**Applicable Percentage**" means the lesser of the Moody's Priority Category Recovery Rate and the S&P Priority Category Recovery Rate applicable to the Collateral Obligation as specified in the tables below. High-Yield Bonds do not include Structured Finance Obligations for this purpose.

| Moody's Priority Category | Moody's Priority Category Recovery Rate |
|---|---|
| Synthetic Securities............... | In the case of: |
| | (i) a Form-Approved Synthetic Security, the "Moody's Priority Category Recovery Rate" given by Moody's to the Form-Approved Synthetic Security at the time of approval of the Form-Approved Synthetic Security by Moody's; and |
| | (ii) any other Synthetic Security, the "Moody's Priority Category Recovery Rate" given by Moody's to the Synthetic Security at the time of acquisition of the Synthetic Security. |
| Structured Finance Obligations............................ | The Moody's Priority Category Recovery Rate determined in accordance with the Moody's Structured Finance Obligation Recovery Rates set forth in <u>Schedule 5</u> to the Indenture by reference to the type of asset and its then Moody's Rating (or, with respect to assets to which that schedule does not apply, on a case-by-case basis in connection with the grant of the relevant Collateral Obligation). |
| unsecured DIP Loans and any Collateral Obligations not covered above or below .. | As determined by Moody's on a case-by-case basis. |

For High-Yield Bonds, Moody's Senior Secured Loans and Moody's Non Senior Secured Loans, the relevant Moody's Priority Category Recovery Rate is the rate determined pursuant to the table below based on the number of rating subcategories difference between the High-Yield Bond's or Loan's Moody's Obligation Rating and its Moody's Default Probability Rating (for purposes of clarification, if the Moody's Obligation Rating is higher than the Moody's Default Probability Rating, the rating subcategories difference will be positive and if it is lower, negative):

009537

| Number of Moody's Rating Subcategories Difference Between the Moody's Obligation Rating and the Moody's Default Probability Rating | Moody's Senior Secured Loans | Moody's Non Senior Secured Loans | High-Yield Bonds |
|---|---|---|---|
| +2 or more | 60.0% | 45.0% | 40.0% |
| +1 | 50.0% | 42.5% | 35.0% |
| 0 | 45.0% | 40.0% | 30.0% |
| -1 | 40.0% | 30.0% | 15.0% |
| -2 | 30.0% | 15.0% | 10.0% |
| -3 or less | 20.0% | 10.0% | 2.0% |

If no Moody's Priority Category Recovery Rate has been specifically assigned with respect to a Loan pursuant to the above table, and the Loan is a secured DIP Loan, the relevant Moody's Priority Category Recovery Rate is 50.0%.

| S&P Priority Category | S&P Priority Category Recovery Rate |
|---|---|
| Secured Loans other than Subordinated Lien Loans or DIP Loans............................................ | 52.0% |
| Senior Unsecured Loans | 31.0% |
| Subordinated Lien Loans other than a DIP Loan....................................... | 18.0% |
| senior secured High-Yield Bonds (other than Structured Finance Obligations) .................................. | 44.0% |
| senior unsecured High-Yield Bonds (other than Structured Finance Obligations) .................................. | 30.0% |
| subordinated High-Yield Bonds (other than Structured Finance Obligations) .................................................... | 18.0% |
| Structured Finance Obligations..... | The S&P Priority Category Recovery Rate determined in accordance with the S&P Structured Finance Obligation Recovery Rates set forth in <u>Schedule 6</u> by reference to the type of asset and its then S&P Rating (or, with respect to assets to which that table does not apply, on a case by case basis in connection with the grant of the relevant Collateral Obligation). |
| Synthetic Securities....................... | As assigned by S&P on a case-by-case basis in connection with the grant of the relevant Collateral Obligation. |
| DIP Loans and any Collateral Obligation not covered above ....... | As assigned by S&P on a case-by-case basis. |

"**Approved Pricing Service**" means Loan Pricing Corporation, Mark-It-Partners, Inc. or any other nationally recognized loan pricing service approved in writing by S&P.

"**Ask-Side Market Value**" means, as of any Measurement Date, the market value determined by the Portfolio Manager and reported to the Trustee as an amount rather than as a percentage or fraction of par (expressed in Dollars) of any lent Collateral Obligation based upon the Portfolio Manager's commercially reasonable judgment and based upon the following order of priority: (i) the average of the ask-side market prices obtained by the Portfolio Manager from three Independent broker-dealers active in the trading of such obligations which are also Independent from the Portfolio Manager or (ii) if the

009538

foregoing set of prices could not be obtained, the higher of the ask-side market prices obtained by the Portfolio Manager from two Independent broker-dealers active in the trading of such obligations which are also Independent from the Portfolio Manager or (iii) if the foregoing sets of prices could not be obtained, the average of the ask-side prices for the purchase of such Collateral Obligation determined by an Approved Pricing Service (Independent from the Portfolio Manager) that derives valuations by polling broker-dealers (Independent from the Portfolio Manager); *provided* that if the Ask-Side Market Value of any lent Collateral Obligation cannot be so determined then such Collateral Obligation shall be deemed to have a Market Value equal to the outstanding principal balance thereof.

"**Assigned Moody's Rating**" means the monitored publicly available rating or the monitored estimated rating expressly assigned to a debt obligation (or facility) by Moody's that addresses the full amount of the principal and interest promised.

"**Authorized Officer**" means, with respect to the Issuer or the Co-Issuer, any Officer or agent who is authorized to act for the Issuer or the Co-Issuer, as applicable, in matters relating to, and binding on, the Issuer or the Co-Issuer. With respect to the Portfolio Manager, any managing member, Officer, manager, employee, partner or agent of the Portfolio Manager who is authorized to act for the Portfolio Manager in matters relating to, and binding on, the Portfolio Manager with respect to the subject matter of the request, certificate or order in question. With respect to the Trustee or any other bank or trust company acting as trustee of an express trust or as custodian, a Trust Officer. Each party may receive and accept a certification of the authority of any other party as conclusive evidence of the authority of any Person to act, and the certification may be considered as in full force and effect until receipt by the other party of written notice to the contrary.

"**Average Life**" means, as of any Measurement Date with respect to any Collateral Obligation (other than any Defaulted Collateral Obligation), the quotient obtained by dividing:

    (i)    the sum of the products of:

        (A)    the number of years (rounded to the nearest hundredth) from the Measurement Date to the respective dates of each successive scheduled payment of principal of the Collateral Obligation; and

        (B)    the respective amounts of the successive scheduled payments of principal of the Collateral Obligation; by

    (ii)    the sum of all successive scheduled payments of principal of the Collateral Obligation.

"**Bank**" means JPMorgan Chase Bank, National Association, in its individual capacity and not as Trustee.

"**Bankruptcy Code**" means the U.S. Bankruptcy Code, Title 11 of the United States Code.

"**Bankruptcy Law**" means the Bankruptcy Code, Part V of the Companies Law (2004 Revision) of the Cayman Islands and the Bankruptcy Law (1997 Revision) of the Cayman Islands.

"**Board of Directors**" means with respect to the Issuer, the directors of the Issuer duly appointed by a resolution of the holders of the Issuer Ordinary Shares or by resolution of the Board of Directors and, with respect to the Co-Issuer, the directors of the Co-Issuer duly appointed by the stockholders of the Co-Issuer.

"**Business Day**" means a day on which commercial banks and foreign exchange markets settle payments in New York City, and any other city in which the Corporate Trust Office of the Trustee is

009539

located and, in the case of the final payment of principal of any Note or the final payment in respect of any Composite Security, the place of presentation of the Note or Composite Security designated by the Trustee. To the extent action is required of the Irish Listing and Paying Agent, Dublin, Ireland shall be considered in determining "Business Day" for purposes of determining when action by the Irish Listing and Paying Agent is required.

"**Buy-out Amount**" means, with respect to (i) the Directing Preference Shares, an amount, when taken together with all payments and distributions made in respect of such Directing Preference Shares since the Closing Date, would cause the Directing Preference Shares to have received (as of the date of the Portfolio Manager's purchase thereof) a Preference Share Internal Rate of Return of 12.0% (assuming such purchase date was a "Payment Date" under the Indenture) and (ii) the Class 1 Composite Securities, the sum of (x) the amount that would be payable pursuant to the preceding clause (i) in respect of the Preference Shares underlying the Class 1 Composite Security Preference Share Component, (y) the Treasury Strip Market Value and (z) the Composite Security Make-Up Amount.

"**Cash**" means such coin or currency of the United States of America as at the time shall be legal tender for payment of all public and private debts.

"**CCC/Caa Collateral Obligations**" means the Collateral Obligations (excluding any Defaulted Collateral Obligations) that on the relevant date have (i) a Moody's Rating below "B3" and/or (ii) an S&P Rating below "B-".

"**Class**" means with all of the Notes and Composite Securities having the same priority and the same Stated Maturity and all of the Preference Shares. Unless otherwise expressly provided for herein: (i) the Class A-1a Notes, the Class A-1b Notes and the Class A-1g Notes shall be considered as being of the same Class and (ii) each of the Senior Class A Notes, the Class A-2 Notes and the A-3 Notes shall be separate Classes.

"**Class 1 Collateral Principal Balance**" means the face value of the Treasury Strip at its maturity date.

"**Class 1 Composite Security Rated Balance**" means with respect to the rating of the Class 1 Composite Securities by Moody's, on the Closing Date $6,000,000 and on any date of determination thereafter, the initial Class 1 Composite Security Rated Balance *minus* the aggregate amount of all distributions paid to the Holders of the Class 1 Composite Securities in respect of its related Components on all prior Payment Dates pursuant to "Description of the Securities—Priority of Payments" and "—Class 1 Component Distributions."

"**Class A Coverage Tests**" means the Overcollateralization Test and the Interest Coverage Test, each as applied with respect to the Class A Notes.

"**Class B Coverage Tests**" means the Overcollateralization Test and the Interest Coverage Test, each as applied with respect to the Class B Notes.

"**Class B Deferred Interest**" means Deferred Interest with respect to the Class B Notes.

"**Class C Coverage Tests**" means the Overcollateralization Test and the Interest Coverage Test, each as applied with respect to the Class C Notes.

"**Class C Deferred Interest**" means Deferred Interest with respect to the Class C Notes.

"**Class Scenario Loss Rate**" means, with respect to any Class of Notes rated by S&P, an estimate of the cumulative default rate for the Current Portfolio or the Proposed Portfolio, as applicable, consistent

009540

with S&P's rating of the Class of Notes on the Closing Date, determined by application of the S&P CDO Monitor.

"**Clearstream**" means Clearstream Banking, société anonyme, a corporation organized under the laws of the Duchy of Luxembourg.

"**Collateral Administration Agreement**" means the agreement dated as of the Closing Date among the Issuer, the Portfolio Manager and the Collateral Administrator, as modified, amended, and supplemented and in effect from time to time.

"**Collateral Administrator**" means the Bank in its capacity as collateral administrator under the Collateral Administration Agreement.

"**Composite Securities**" means the Class 1 Composite Securities.

"**Composite Securityholder**" means a Holder of Class 1 Composite Securities.

"**Composite Security Make-Up Amount**" means, in connection with determining the Amendment Buy-Out Purchase Price, the Extension Purchase Price or the Buy-Out Amount in respect of all or a portion of the Composite Securities, the greater of: (i) zero and (ii) the sum of (x) the initial principal amount of such Composite Securities as of the Closing Date *minus* (x) the aggregate of all payments and distributions made in respect of the Composite Securities since the Closing Date *minus* (y) any amount payable pursuant to clause (ii) of the definition of Amendment Buy-Out Purchase Price (for purposes of determining the Composite Security Make-Up Amount pursuant to clause (iii) of such definition), clause (ii) of the definition of Extension Purchase Price (for purposes of determining the Composite Security Make-Up Amount pursuant to clause (iii) of such definition) or clause (i) of the definition of Buy-Out Amount (for purposes of determining the Composite Security Make-Up Amount pursuant to clause (ii) of such definition) *less* (z) the Treasury Strip Market Value.

"**Composite Securities Payment Date**" means, the second Business Day after each Payment Date or, if such Payment Date coincides with the Stated Maturity, the Composite Securities Payment Date shall be such Payment Date.

"**Controlling Class**" means the Senior Class A Notes (voting together as a Class or group), so long as any Senior Class A Notes are Outstanding; then the Class A-2 Notes (voting together as a Class or group), so long as any Class A-2 Notes are Outstanding; then the Class A-3 Notes (voting together as a Class or group), so long as any Class A-3 Notes are Outstanding; then the Class B Notes (voting together as a Class or group), so long as any Class B Notes are Outstanding; and then the Class C Notes (voting together as a Class or group); *provided*, *however*, that notwithstanding the foregoing, so long as the Class A-1g Notes are Outstanding and the Policy has not been terminated in accordance with the terms of the Indenture or any Accrued Insurance Liabilities or Premium are due and owing to the Insurer, and no Insurer Default exists, then the "Controlling Class", the "Holders of not less than 25% of the Aggregate Outstanding Amount of the Controlling Class", the "Majority of the Controlling Class" or the "Super Majority of the Controlling Class" shall, for all purposes, be the Insurer, and the Insurer shall be entitled to exercise all of the rights of the Controlling Class, the Holders of not less than 25% of the Aggregate Outstanding Amount of the Controlling Class, the Majority of the Controlling Class or the Super Majority of the Controlling Class, as applicable, that are provided for herein. In addition to the foregoing, the Insurer's right to exercise all of the rights of the Controlling Class, the Holders of not less than 25% of the Aggregate Outstanding Amount of the Controlling Class, the Majority of the Controlling Class or the Super Majority of the Controlling Class, as applicable, shall be reinstated if a Preference Claim is made for so long as any such Preference Claim is pending during the applicable statutory preference period or, if the Insurer is required to pay the amount of any Avoided Payment, for so long as any Accrued Insurance Liabilities owing to the Insurer have not been paid in full.

009541

"**Corporate Trust Office**" means the corporate trust office of the Trustee at which the Trustee performs its duties under the Indenture, currently having an address of 600 Travis Street, 50th Floor, Houston, Texas 77002, telecopy no. (713) 216-2101, Attention: Institutional Trust Services—Southfork CLO Ltd. or any other address the Trustee designates from time to time by notice to the Noteholders, the Portfolio Manager, the Preference Shares Paying Agent, the Insurer, the Issuer and each Rating Agency or the principal corporate trust office of any successor Trustee

"**Credit Improved Obligation**" is any Collateral Obligation that in the commercially reasonable judgment of the Portfolio Manager, has improved in credit quality; *provided*, if a Credit Rating Event is in effect, such Collateral Obligation will be considered a Credit Improved Obligation only if:

(i) the Collateral Obligation has been upgraded or has been put on credit watch list with the potential for developing positive credit implications by either of the Rating Agencies since the date the Issuer first acquired the Collateral Obligation under the Indenture;

(ii) such Collateral Obligation has experienced a reduction in credit spread of (A) 0.25% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such decrease) less than or equal to 2.00%, (B) 0.375% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such decrease) greater than 2.00% but less than or equal to 4.00% or (C) 0.50% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such decrease) greater than 4.00%, in each case compared to the credit spread at the time such Collateral Obligation was acquired by the Issuer, determined by reference to an applicable index selected by the Portfolio Manager (such index selection subject to satisfaction of the Rating Condition with respect to Moody's);

(iii) (x) in the case of a Loan, the Market Value of such Collateral Obligation has increased by at least 1.00% from the Market Value of such Collateral Obligation as of its date of acquisition, as determined by the Portfolio Manager (*provided* that this subclause (iii)(x) will be deemed satisfied if Market Value increases to 101%), or (y) in the case of a Bond, the Market Value of such Collateral Obligation has changed since its date of acquisition by a percentage more positive than the percentage change in the Merrill Lynch US High Yield Master II Index, Bloomberg ticker H0A0, plus 3.00%, over the same period; or

(iv) a Super Majority of the Controlling Class have voted to suspend the limitations on a Collateral Obligation being a Credit Improved Obligation, and for each subsequent downgrade by Moody's after a vote to suspend the limitations pursuant to this clause (iv) has occurred, a Super Majority of the Controlling Class must again vote to suspend the limitations on the Collateral Obligation being a Credit Improved Obligation for this clause (iv) to remain applicable.

A Synthetic Security shall be considered a Credit Improved Obligation if:

(i) the Synthetic Security itself is a Credit Improved Obligation; or

(ii) the Reference Obligation of the Synthetic Security would, if it were a Collateral Obligation, be a Credit Improved Obligation.

"**Credit Rating Event**" means an event that is in effect if the rating by Moody's:

(i) of the Senior Class A Notes, the Class A-2 Notes or the Class A-3 Notes (without giving effect to the Policy) has been withdrawn or is one or more rating sub-categories below its Initial Rating; or

009542

(ii)     of the Class B Notes or the Class C Notes has been withdrawn or is two or more rating sub-categories below its respective Initial Rating.

For the purposes of this definition, any withdrawal or reduction in rating shall not be effective if after the withdrawal or reduction Moody's has upgraded the reduced or withdrawn rating to at least the Initial Rating in the case of the Senior Class A Notes, the Class A-2 Notes and the Class A-3 Notes (or the Initial Shadow Rating in the Class of the Class A-1g Notes), or to only one subcategory below their Initial Rating in the case of the Class B Notes and the Class C Notes.

"**Credit Risk Obligation**" means any Collateral Obligation (other than a Defaulted Collateral Obligation) that, in the commercially reasonable judgment of the Portfolio Manager, has a significant risk of declining in credit quality and, with a lapse of time, becoming a Defaulted Collateral Obligation.

So long as a Credit Rating Event is in effect, no Collateral Obligation shall be eligible to be a Credit Risk Obligation unless, as of the date of determination:

(i)     the Collateral Obligation has been downgraded or has been put on credit watch list with the potential for developing negative credit implications by either of the Rating Agencies since the date the Issuer first acquired the Collateral Obligation under the Indenture;

(ii)     such Collateral Obligation has experienced an increase in credit spread of (A) 0.25% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such increase) less than or equal to 2.00%, (B) 0.375% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such increase) greater than 2.00% but less than or equal to 4.00% or (C) 0.50% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such increase) greater than 4.00%, in each case compared to the credit spread at the time such Collateral Obligation was acquired by the Issuer, determined by reference to an applicable index selected by the Portfolio Manager (such index selection subject to satisfaction of the Rating Condition with respect to Moody's);

(iii)     (x) in the case of a Loan, the Market Value of such Collateral Obligation has decreased by at least 2.50% from the Market Value of such Collateral Obligation as of its date of acquisition, as determined by the Portfolio Manager, and (y) in the case of a Bond, the Market Value of such Collateral Obligation has changed since its date of acquisition by a percentage more negative, or less positive, as the case may be, than the percentage change in the Merrill Lynch US High Yield Master II Index, Bloomberg ticker H0A0, less 3.00%, over the same period; or

(iv)     a Super Majority of the Controlling Class have voted to suspend the limitations on a Collateral Obligation being a Credit Risk Obligation, and for each subsequent downgrade by Moody's after a vote to suspend the limitations pursuant to this clause (iv) has occurred, a Super Majority of the Controlling Class must again vote to suspend the limitations on the Collateral Obligation being a Credit Risk Obligation for this clause (iv) to remain applicable.

A Synthetic Security shall be considered a Credit Risk Obligation if:

(a)     the Synthetic Security itself is a Credit Risk Obligation; or

(b)     the Reference Obligation of the Synthetic Security would, if it were a Collateral Obligation, be a Credit Risk Obligation.

009543

"**Current-Pay Obligation**" means a Collateral Obligation as to which:

(i) an insolvency event has occurred with respect to its obligor or as to which its obligor is rated "D" or "SD" by S&P or its obligor has previously been rated "CCC-" by S&P and the rating has been withdrawn;

(ii) no default as to the payment of principal or interest with respect to the Collateral Obligation is then continuing and the Portfolio Manager has delivered to the Trustee an officer's certificate to the effect that the Portfolio Manager expects that the obligor will make payments on the Collateral Obligation as they become due;

(iii) (A) if the rating by Moody's of the Collateral Obligation is at least "Caa1" (and not on credit watch with negative implications) the Market Value of the Collateral Obligation is at least equal to 80% of its Principal Balance or (B) if the rating by Moody's of the Collateral Obligation is less than "Caa1" or is "Caa1" and on credit watch with negative implications, the Market Value of the Collateral Obligation is at least equal to 85% of its Principal Balance;

(iv) if an insolvency event has occurred with respect to the obligor of the Collateral Obligation, a bankruptcy court has authorized the payment of interest payable on the Collateral Obligation; and

(v) the Portfolio Manager has designated in writing to the Trustee the Collateral Obligation as a Current-Pay Obligation.

If the Aggregate Principal Balance of Collateral Obligations that would otherwise be Current-Pay Obligations exceeds 5% of the Maximum Investment Amount, all or a portion of one or more Collateral Obligations that would otherwise be Current-Pay Obligations with an Aggregate Principal Balance equal to the amount of the excess shall not be Current-Pay Obligations (and will therefore be Defaulted Collateral Obligations). The Portfolio Manager shall designate in writing to the Trustee the Collateral Obligations that shall not be Current-Pay Obligations pursuant to the preceding sentence as the Collateral Obligations (or portions thereof) that have the lowest Market Value on any applicable date of determination.

The Portfolio Manager may, by notice to the Issuer, the Trustee and the Collateral Administrator, change the definition of "Current-Pay Obligation" or how Current-Pay Obligations are treated in the Indenture, subject to the satisfaction of the Rating Condition with respect to each Rating Agency.

"**Current Portfolio**" means, at any time, the portfolio (measured by Aggregate Principal Balance) of Collateral Obligations, Principal Proceeds held as cash on deposit in the Collection Account, and other Eligible Investments purchased with Principal Proceeds on deposit in the Collection Account that exists before the sale, maturity, or other disposition of a Collateral Obligation or before the acquisition of a Collateral Obligation, as the case may be.

"**Deep Discount Obligation**" means, until the average Market Value Percentage of the Collateral Obligation, as determined daily for any period of 30 consecutive days, equals or exceeds 90%, any Collateral Obligation acquired by the Issuer for a Purchase Price less than 85% of its Principal Balance. For such purpose, the Market Value Percentage of a Collateral Obligation on a day that is not a Business Day shall be deemed to be the Market Value Percentage of the Collateral Obligation on the immediately preceding Business Day.

009544

"**Defaulted Collateral Obligation**" means any Collateral Obligation or other obligation included in the Collateral:

(i)      as to which a default in the payment of principal or interest is continuing beyond the lesser of three Business Days and any applicable grace or notice period, unless in the case of a failure of the obligor to make required interest payments, the obligor has resumed current Cash payments of interest previously scheduled and unpaid and has paid in full any accrued interest due and payable thereon, in which case the Collateral Obligation shall cease to be classified as a Defaulted Collateral Obligation;

(ii)     with respect to which there has been effected any distressed exchange or other debt restructuring where the obligor has offered the holders thereof a new security or instrument or package of securities or instruments that, in the commercially reasonable judgment of the Portfolio Manager, either (x) amounts to a diminished financial obligation or (y) has the sole purpose of enabling the obligor to avoid a default;

(iii)     (1) that is *pari passu* with or subordinated to other indebtedness for borrowed money owing by its obligor ("**Other Indebtedness**"), (2) the obligor has defaulted in the payment of principal or interest (without regard to any applicable grace or notice period and without regard to any waiver of the default) on the Other Indebtedness, unless, in the case of a failure of the obligor to make required interest payments, the obligor has resumed current Cash payments of interest previously scheduled and unpaid on the Other Indebtedness and has paid in full any accrued interest due and payable thereon, in which case the Collateral Obligation shall cease to be classified as a Defaulted Collateral Obligation and (3) the Portfolio Manager, *provided* that the related Collateral Obligation has not been downgraded after the default on such Other Indebtedness has occurred, determines (in its commercially reasonable judgment) that such Other Indebtedness is material;

(iv)     (other than a Current-Pay Obligation or a DIP Loan) as to which:

      (A)     an insolvency event has occurred with respect to its obligor; or

      (B)     the obligation is rated "D", "SD", "C" or "CC" by S&P or was so rated immediately prior to such rating being withdrawn, or has previously been rated "CCC-" or lower by S&P and the rating has been withdrawn;

(v)     if the Collateral Obligation is a Structured Finance Obligation, it is rated "CC" or below by S&P, or it was rated "C" or below by S&P but the rating has since been withdrawn, or it is rated "Ca" or below by Moody's, or it was rated "C" or below by Moody's but the rating has since been withdrawn;

(vi)     that is a Participation that would, if the underlying Loan were a Collateral Obligation, be a Defaulted Collateral Obligation under any of clauses (i) through (iv) above or with respect to which the Participating Institution has defaulted in the performance of any of its payment obligations under the Participation;

(vii)     that is a Synthetic Security referencing a Reference Obligation that would, if the Reference Obligation were a Collateral Obligation, be a Defaulted Collateral Obligation under any of clauses (i) through (v) above or with respect to which the Synthetic Security Counterparty has defaulted in the performance of any of its payment obligations under the Synthetic Security; *provided*, *however*, with respect to a Synthetic Security based upon or relating to a senior secured index investment providing non-leveraged credit exposure to a basket of credit default swaps referencing a diversified group of Reference Obligations, with respect to which the principal or notional amount of the credit exposure to any single Reference Obligation does not increase over

time: (x) a determination whether the Reference Obligations upon which such Synthetic Security is based would, if such Reference Obligations were Collateral Obligations, be a Defaulted Collateral Obligation, shall be determined by treating such Synthetic Security as a direct investment by the Issuer in each of the Reference Obligations on which such Synthetic Security is based in an amount equal to the Allocable Principal Balance of such Reference Obligation and (y) the "Defaulted Collateral Obligation" for purposes of this clause (vii) shall be limited to the Allocable Principal Balance of each Reference Obligation that would, if the Reference Obligation were a Collateral Obligation, be a Defaulted Collateral Obligation under any of clauses (i) through (v) above;

> (viii)   that is a Written-Down Obligation;

> (ix)   that is a DIP Loan as to which an order has been entered converting the debtor's chapter 11 case to a case under chapter 7 of the Bankruptcy Code; or

> (x)   that is declared to be a Defaulted Collateral Obligation by the Portfolio Manager.

Any Collateral Obligation that is classified as a Defaulted Collateral Obligation shall cease to be so classified if the Collateral Obligation, at any date thereafter,

> (1)   would not otherwise be classified as a Defaulted Collateral Obligation in accordance with this definition; and

> (2)   otherwise meets the Eligibility Criteria as of that date.

If any portion of a Collateral Obligation has a maturity later than one year after the Stated Maturity of the Notes due to a change in the payment schedule of the Collateral Obligation occurring after its acquisition by the Issuer, that portion of the Collateral Obligation shall be considered a Defaulted Collateral Obligation.

"**Defaulted Hedge Termination Payment**" means any termination payment required to be made by the Issuer to a Hedge Counterparty pursuant to a Hedge Agreement upon a termination of the Hedge Agreement in respect of which the Hedge Counterparty is the sole Defaulting Party or Affected Party (each as defined in the Hedge Agreements).

"**Defaulted Interest**" means any interest payable in respect of any Class of Notes that is not punctually paid or duly provided for on the applicable Payment Date or at Stated Maturity; *provided* that, any interest paid with the proceeds of the Policy shall not be treated for the purpose of this definition as paid or provided for.

"**Defaulted Interest Charge**" means to the extent lawful, interest on any Defaulted Interest at the Default Interest Rate.

"**Default Interest Rate**" means, with respect to any specified Class of Notes, the per annum interest rate equal to the Note Interest Rate payable on the Notes of the Class.

"**Deferred Interest Notes**" means the Class B Notes and the Class C Notes.

"**Delayed Drawdown Loan**" means a Loan or any Synthetic Security with a Reference Obligation that:

> (i)   requires the Issuer to make one or more future advances to the borrower under its Underlying Instruments;

009546

(ii)     specifies a maximum amount that can be borrowed on one or more fixed borrowing dates; and

(iii)     does not permit the re-borrowing of any amount previously repaid.

A Loan or Synthetic Security shall only be considered to be a Delayed Drawdown Loan for so long as its unused commitment amount is greater than zero.

"**Depository**" or "**DTC**" means The Depository Trust Company and its nominees.

"**DIP Loan**" means any Loan:

(i)     that has a rating assigned by Moody's (or if the Loan does not have a rating assigned by Moody's, the Portfolio Manager has commenced the process of having a rating assigned by Moody's within five Business Days of the date the Loan is acquired by the Issuer) and a rating assigned by S&P (or if the Loan does not have a rating assigned by S&P, the Portfolio Manager has commenced the process of having a rating assigned by S&P within two Business Days of the date the Loan is acquired by the Issuer);

(ii)     that is an obligation of a debtor in possession as described in Section 1107 of the Bankruptcy Code or a trustee (if appointment of a trustee has been ordered pursuant to Section 1104 of the Bankruptcy Code) (a "**Debtor**") organized under the laws of the United States or any state of the United States; and

(iii)     the terms of which have been approved by a final order of the United States Bankruptcy Court, United States District Court, or any other court of competent jurisdiction, the enforceability of which order is not subject to any pending contested matter or proceeding (as those terms are defined in the Federal Rules of Bankruptcy Procedure) and which order provides that:

(A)     the Loan is secured by liens on the Debtor's otherwise unencumbered assets pursuant to Section 364(c)(2) of the Bankruptcy Code;

(B)     the Loan is secured by liens of equal or senior priority on property of the Debtor's estate that is otherwise subject to a lien pursuant to Section 364(d) of the Bankruptcy Code;

(C)     the Loan is fully secured (based on a current valuation or appraisal report) by junior liens on the Debtor's encumbered assets; or

(D)     if any portion of the Loan is unsecured, the repayment of the Loan retains priority over all other administrative expenses pursuant to Section 364(c)(1) of the Bankruptcy Code (and in the case of this clause (D), before the acquisition of the Loan, the Rating Condition is satisfied with respect to each Rating Agency).

"**Diversity Score**" is a single number that indicates collateral concentration in terms of both issuer and industry concentration, calculated as set forth in Schedule 4 to the Indenture.

"**Domicile**" or "**Domiciled**" means, with respect to each Collateral Obligation, (i) the jurisdiction of incorporation, organization or creation of the related obligor or (ii) in the case of a Collateral Obligation that would otherwise be considered to be domiciled pursuant to clause (i) in a Tax Advantaged Jurisdiction, the jurisdiction in which, in the commercially reasonable judgment of the Portfolio Manager, the related obligor conducts substantially all of its business operations and in which the assets primarily responsible for generating its revenues are located.

009547

"**Due Period**" means, with respect to any Payment Date, for all purposes other than payments and receipts under Hedge Agreements, the period from the Business Day after the eighth Business Day before the previous Payment Date (or in the case of the first Payment Date, from the Closing Date) up to but excluding the Business Day after the eighth Business Day before the Payment Date (or in the case of the final Payment Date or any Payment Date that is a Redemption Date, through the Business Day before the Payment Date and for payments and receipts under Hedge Agreements the period from the day after the previous Payment Date (or in the case of the first Payment Date from the Closing Date) through the Payment Date).

"**Eligible Country**" means the United States, Canada and any country classified by Moody's as a Moody's Group I Country, Moody's Group II Country or Moody's Group III Country; *provided* that such country has not imposed currency exchange controls.

"**Eligible Investments**" means any Dollar-denominated investment that, when it is pledged by the Issuer to the Trustee under the Indenture, is one or more of the following:

    (i)     Cash;

    (ii)     direct Registered obligations of, and Registered obligations the timely payment of principal and interest on which is fully and expressly guaranteed by, the United States or any agency or instrumentality of the United States the obligations of which are expressly backed by the full faith and credit of the United States, which in each case are not zero coupon securities;

    (iii)     demand and time deposits in, trust accounts, certificates of deposit payable within 91 days of issuance of, bankers' acceptances payable within 91 days of issuance issued by, or Federal funds sold by any depositary institution or trust company incorporated under the laws of the United States or any state thereof and subject to supervision and examination by Federal and/or state banking authorities so long as the commercial paper and/or the debt obligations of such depositary institution or trust company (or, in the case of the principal depository institution in a holding company system, the commercial paper or debt obligations of such holding company), at the time of such investment or contractual commitment providing for such investment and throughout the term of the investment, have a credit rating of not less than "Aaa" by Moody's and "AAA" by S&P and in each case are not on watch for downgrade, or "P-1" by Moody's and "A-1+" by S&P in the case of commercial paper and short-term debt obligations; provided that in any case, the issuer thereof must have at the time of such investment a long-term credit rating of not less than "AA-" by S&P and "Aa3" by Moody's and a short-term rating of "A-1+" by S&P and "P-1" by Moody's, and if so rated, is not on watch for downgrade;

    (iv)     commercial paper or other short-term obligations with a maturity of not more than 183 days from the date of issuance and having at the time of such investment a credit rating of at least "P-1" by Moody's and "A-1+" by S&P, *provided*, that, in any case, the issuer thereof must have at the time of such investment a long-term credit rating of not less than "Aa2" by Moody's, and if so rated, such rating is not on watch for downgrade;

    (v)     unleveraged repurchase obligations with respect to any security described in clause (b) above entered into with a U.S. federal or state depository institution or trust company (acting as principal) described in clause (iii) above or entered into with a corporation (acting as principal) whose long-term credit rating is not less than "Aaa" by Moody's and "AAA" by S&P and in each case are not on watch for downgrade or whose short-term credit rating is "P-1" by Moody's and "A-1+" by S&P at the time of such investment and throughout the term of the investment; *provided*, that, if such repurchase obligation has a maturity of longer than 91 days, the counterparty thereto must also have at the time of such investment and throughout the term of the investment a long-term credit rating of not less than "Aa2" by Moody's and "AAA" by S&P, and if so rated, such rating is not on watch for downgrade;

009548

(vi)     any money market fund or similar investment vehicle having at the time of investment therein and throughout the term of the investment a credit rating of "MR1+" by Moody's and "AAAm" by S&P; including any fund for which the Trustee or an Affiliate of the Trustee serves as an investment advisor, administrator, shareholder servicing agent, custodian or subcustodian, notwithstanding that (A) the Trustee or an Affiliate of the Trustee charges and collects fees and expenses from such funds for services rendered (*provided* that such charges, fees and expenses are on terms consistent with terms negotiated at arm's length) and (B) the Trustee charges and collects fees and expenses for services rendered, pursuant to the Indenture;

(vii)     a guaranteed reinvestment agreement from a bank (if treated as a deposit by such bank), insurance company or other corporation or entity organized under the laws of the United States or any state thereof (if treated as debt by such insurance company or other corporation or entity), providing for periodic payments thereunder during each Due Period; provided that each such agreement provides that it is terminable by the purchaser, without premium or penalty, in the event that the rating assigned to such agreement by either Moody's or S&P is at any time lower than the then current ratings assigned to the Senior Class A Notes, the Class A-2 Notes, the Class A-3 Notes, the Class B Notes or the Class C Notes; provided, further, that, at the time of investment therein and throughout the term of the investment, the issuer of such agreement has a senior unsecured long-term debt rating, issuer rating or counterparty rating of at least "Aaa" by Moody's, a short-term debt rating of "P-1" by Moody's (and not on watch for downgrade), a short-term debt rating of at least "A-1+" by S&P and a long-term debt rating of at least "AAA" by S&P (and not on watch for downgrade); and

(viii)     such other investments for which Rating Confirmation has been received;

and, in each case, with a stated maturity (giving effect to any applicable grace period) no later than the Business Day before the Payment Date next succeeding the date of the investment.

Eligible Investments on deposit in the Revolving Reserve Account, the Delayed Drawdown Reserve Account, or the Synthetic Security Collateral Account must have a stated maturity no later than one Business Day after the date of their purchase.

Eligible Investments may not include:

(1)     any interest-only security, any security purchased at a price in excess of 100% of its par value, or any security whose repayment is subject to substantial non-credit related risk as determined in the commercially reasonable judgment of the Portfolio Manager;

(2)     any security whose rating assigned by S&P includes the subscript "r," "t," "p," "pi," or "q";

(3)     any floating rate security whose interest rate is inversely or otherwise not proportionately related to an interest rate index or is calculated as other than the sum of an interest rate index plus a spread (which spread may be zero);

(4)     any security that is subject to an exchange or tender offer; or

(5)     any security that has payments subject to foreign or United States withholding tax.

Eligible Investments may include Eligible Investments for which the Trustee or an Affiliate of the Trustee provides services.  Eligible Investments may not include obligations principally secured by real property.

196

009549

"**Emerging Market Security**" means a security or obligation issued by a sovereign or non-sovereign issuer located in a country (excluding the Cayman Islands, Bermuda, the British Virgin Islands, the Netherlands Antilles, and the Channel Islands):

      (i)      that is in Latin America, Asia, Africa, Eastern Europe, or the Caribbean; or

      (ii)      the long-term foreign currency debt obligations of which are rated below "Aa2" or "Aa2" and on credit watch with negative implications by Moody's or the foreign currency issuer credit rating of which is below "AA" by S&P.

"**Euroclear**" means Euroclear Bank S.A./N.V., as operator of the Euroclear system.

"**Excess CCC/Caa Collateral Obligations**" means the Principal Balance of all CCC/Caa Collateral Obligations in excess of 7.5% of the Maximum Investment Amount on the relevant Determination Date.

"**Excluded Property**" means U.S.$250 (attributable to the issue and allotment of the Issuer Ordinary Shares) and a U.S.$250 transaction fee paid to the Issuer, the bank account in which those amounts are credited in the Cayman Islands and any interest earned on those amounts

"**Extended Scheduled Preference Shares Redemption Date**" means, if a Maturity Extension has occurred, the sixteenth Payment Date after the then current Extended Scheduled Preference Shares Redemption Date (or, in the case of the first Extended Scheduled Preference Shares Redemption Date, the Payment Date in February, 2021).

"**Extension**" means an extension of the Reinvestment Period, the Stated Maturity of the Notes and the Weighted Average Life Test in accordance with the Indenture.

"**Extension Bonus Payment**" means, with respect to each Maturity Extension, a single payment to each applicable beneficial owner and the Insurer set forth in "Description of the Securities— Extension of the Reinvestment Period, the Stated Maturity and the Scheduled Preference Shares Redemption Date" in an amount equal to (1) in the case of the Senior Class A Notes (other than the Class A-1g Notes), 0.25% of the Aggregate Outstanding Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, (2) in the case of the Class A-1g Notes, 0.125% of the Aggregate Outstanding Amount thereof held by such beneficial owner as of the applicable Extension Date (*provided*, *however*, if the Policy has been terminated prior to or in connection with such Maturity Extension, each applicable beneficial owner of the Class A-1g Notes will instead receive an amount equal to 0.25% of the Aggregate Outstanding Amount thereof held by such beneficial owner as of the applicable Extension Date), (3) to the Insurer, 0.125% of the Aggregate Outstanding Amount of the Class A-1g Notes as of the applicable Extension Date (*provided*, *however*, if the Policy has been terminated prior to or in connection with such Maturity Extension, the Insurer shall not be entitled to an Extension Bonus Payment pursuant to this clause (3)), (4) in the case of the Class A-2 Notes, 0.25% of the Aggregate Outstanding Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, (5) in the case of the Class A-3 Notes, 0.25% of the Aggregate Outstanding Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, (6) in the case of the Class B Notes, 0.25% of the Aggregate Outstanding Amount thereof held by such beneficial owner as of the applicable Extension Effective Date and (7) in the case of the Class C Notes, 0.50% of the Aggregate Outstanding Amount thereof held by such beneficial owner as of the applicable Extension Effective Date.

"**Extension Bonus Eligibility Certification**" means, with respect to each Maturity Extension and each beneficial owner of Notes other than Extension Sale Securities, the written certification by such beneficial owner acceptable to the Issuer to the effect that it held Notes other than Extension Sale Securities on the applicable Extension Effective Date, including the Aggregate Outstanding Amount

009550

thereof and wire transfer instructions for the Extension Bonus Payment and any required documentation thereunder.

"**Extension Determination Date**" means the 8th Business Day prior to each Extension Effective Date.

"**Extension Purchase Price**" means the purchase price payable by the Extension Qualifying Purchasers for Extension Sale Securities in connection with each Maturity Extension, if any, in an amount equal to (i) in the case of the Notes, the Aggregate Outstanding Amount thereof, plus accrued and unpaid interest (including Deferred Interest, if any) as of the applicable Extension Effective Date (giving effect to any amounts paid to the Holder on such date) *plus*, in the case of the Fixed Rate Notes, the applicable Make-Whole Premium, (ii) in the case of the Preference Shares, an amount that, when taken together with all payments and distributions made in respect of such Preference Shares since the Closing Date would cause such Preference Shares to have received (as of the date of purchase thereof) a Preference Share Internal Rate of Return of 12.0% (assuming such purchase date was a "Payment Date" under the Indenture); *provided*, *however*, that if the applicable Extension Effective Date is on or after the date on which such Holders have received a Preference Share Internal Rate of Return equal to or in excess of 12.0%, the applicable Extension Purchase Price for such Preference Shares shall be zero and (iii) in the case of the Class 1 Composite Securities, the sum of (x) the amount that would be payable pursuant to the preceding clause (ii) in respect of the Preference Shares underlying the Class 1 Composite Security Preference Share Component, (y) the Treasury Strip Market Value and (z) the Composite Security Make-Up Amount.

"**Extension Qualifying Purchasers**" means Portfolio Manager (or any of its Affiliates acting as principal or agent); *provided* that in the event the Portfolio Manager elects not to purchase Securities from Holders pursuant to the Extension Conditions set forth in "Description of the Securities—Extension of the Reinvestment Period, the Stated Maturity and the Scheduled Preference Shares Redemption Date"; "Extension Qualifying Purchasers" shall mean one or more qualifying purchasers (which may include the Initial Purchaser or any of its Affiliates acting as principal or agent) designated by the Portfolio Manager; *provided*, *however*, none of the Portfolio Manager, the Initial Purchaser, or any of their respective Affiliates shall have any duty to act as an Extension Qualifying Purchaser.

"**Face Amount**" means, with respect to any Preference Share, the amount set forth therein as the "face amount", which "face amount" thereof shall be $1,000 per Preference Share.

"**Finance Lease**" means a lease agreement or other agreement entered into in connection with and evidencing a Leasing Finance Transaction.

"**Fixed Rate Excess**" means, as of any Measurement Date, a fraction whose numerator is the product of:

      (i) the greater of zero and the excess of the Weighted Average Fixed Rate Coupon for the Measurement Date over the minimum percentage specified to pass the Weighted Average Fixed Rate Coupon Test; and

      (ii) the Aggregate Principal Balance of all Fixed Rate Obligations (excluding any Non-Performing Collateral Obligations) held by the Issuer as of the Measurement Date;

and whose denominator is the Aggregate Principal Balance of all Floating Rate Obligations (excluding any Non-Performing Collateral Obligations) held by the Issuer as of the Measurement Date.

In computing the Fixed Rate Excess on any Measurement Date, the Weighted Average Fixed Rate Coupon for the Measurement Date will be computed as if the Spread Excess were equal to zero.

009551

"**Fixed Rate Notes**" means the Class A-1b Notes and the Class A-3b Notes.

"**Fixed Rate Obligation**" means any Collateral Obligation that bears interest at a fixed rate, including a Collateral Obligation that does not bear interest on a floating rate index and whose interest rate is scheduled to increase one or more times over the life of the Collateral Obligation.

"**Floating Rate Notes**" means the Class A-1a Notes, the Class A-1g Notes, the Class A-2 Notes, the Class A-3a Notes, the Class B Notes and the Class C Notes.

"**Floating Rate Obligation**" means any Collateral Obligation that bears interest based on a floating rate index.

"**Form-Approved Synthetic Security**" means a Synthetic Security:

      (i)    (A)    each of the Reference Obligations of which satisfy the definition of "Collateral Obligation" and could be purchased by the Issuer without any required action by the Rating Agencies, without satisfaction of the Rating Condition or which the Rating Agencies have otherwise approved; or

      (B)    each of the Reference Obligations of which would satisfy clause (A) above but for the currency in which the Reference Obligation is payable and the Synthetic Security is payable in Dollars, does not provide for physical settlement, and does not expose the Issuer to Dollar currency risk;

      (ii)    the Synthetic Security Agreement of which conforms (but for the amount and timing of periodic payments, the name of the Reference Obligation, the notional amount, the effective date, the termination date, and other similar necessary changes) to a form that has been expressly identified and approved in writing in connection with a request under the Indenture by Moody's and S&P; and

      (iii)    that is with a counterparty with respect to which the Rating Condition has been satisfied by each of Moody's and S&P prior to the acquisition of any such Form-Approved Synthetic Security, and such approval has not been withdrawn.

Moody's or S&P may at any time, by notice to the Portfolio Manager, withdraw its approval of any such form.  A withdrawal of approval shall have no effect on any Synthetic Security acquired, entered into, or committed to before the date on which the Portfolio Manager receives the notice of withdrawal.

"**Hedge Agreements**" means, collectively, all interest rate cap or interest rate swap agreements between the Issuer and any Hedge Counterparty, and any replacement agreement entered into pursuant to the Indenture.

"**Hedge Counterparty**" means JPMorgan Chase Bank, National Association currently having an address of 270 Park Avenue, New York, New York 10017, or any other counterparty, to the extent that when the Issuer enters into any Hedge Agreement with JPMorgan Chase Bank, National Association or the other counterparty, JPMorgan Chase Bank, National Association or the other counterparty satisfies the requirements of the Indenture, including, in the case of any other counterparty, to the satisfaction of the Rating Condition for each Rating Agency.

"**Hedge Termination Receipt**" means any termination payment paid by the Hedge Counterparty to the Issuer upon any early termination of a Hedge Agreement with respect to which the Hedge Counterparty is the sole Defaulting Party or Affected Party (each as defined in the Hedge Agreements).

009552

"**High-Yield Bond**" means any debt security other than a Loan, including any Structured Finance Obligation, that is either Registered or, if not Registered, (i) it is issued by an obligor that is not resident in the United States, (ii) the payments on it are not subject to United States withholding tax and (iii) it is held through a financial institution pursuant to the procedures described in Treasury Regulation section 1.165-12(c)(3).

"**Holder**" means, of any Note or Composite Security, the person whose name appears on the Indenture Register as the registered holder of the Note or Composite Security; and of any Preference Share (including any Preference Share underlying the Preference Share Component), the person whose name appears in the Preference Share register related thereto as the registered holder of such Preference Share.

"**Indemnification Agreement**" means Indemnification Agreement, dated as of the Closing Date, among the Issuer, the Insurer and J.P. Morgan Securities Inc., as modified, amended and supplemented and in effect from time to time.

"**Indenture Registrar**" means the Bank in its capacity as Indenture registrar as provided in the Indenture.

"**Indenture Register**" means the register caused to be kept by the Issuer  for the purpose of registering Notes and transfers of the Notes as provided in the Indenture.

"**Initial Consent Period**" means the period of 15 Business Days from but excluding the date on which the Trustee provided notice of a proposed supplemental indenture pursuant to the Indenture to the Holders of Securities.

"**Initial Rating**" means the ratings by Moody's and S&P with respect to each Class of Notes and Composite Securities provided in the table in "Summary of Terms—Principal Terms of the Securities."

"**Initial Shadow Rating**" means, with respect to the Class A-1g Notes, that rating or ratings which reflects the ratings assigned to the Class A-1g Notes by Moody's and S&P on the Closing Date without giving effect to the Policy.

"**Insurance Documents**" means the Policy, the Insurance Agreement, the Indemnification Agreement and the Premium Letter.

"**Insured Noteholder**" means a Holder of the Insured Notes.

"**Insurer Default**" means the occurrence and continuation of any one of the following events:

(i)      the Insurer fails to make a payment required under the Policy in accordance with its terms;

(ii)      the Insurer (A) files any petition or commences any case or Proceeding under any provision or chapter of the Bankruptcy Code or any other similar federal or state law relating to the insolvency, bankruptcy, rehabilitation, liquidation or reorganization, (B) makes a general assignment for the benefit of its creditors, or (C) has an order for relief entered against it under the Bankruptcy Code or any other similar federal or state law relating to insolvency, bankruptcy, rehabilitation, liquidation or reorganization which is final and nonappealable; or

(iii)      a court of competent jurisdiction, the New York Department of Insurance or other competent regulatory authority enters a final and nonappealable order, judgment or decree (A) appointing a custodian, trustee, agent or receiver for the Insurer or for all or any material portion of its property or (B) authorizing the taking of possession by a custodian, trustee, agent or

009553

receiver of the Insurer (or the taking of possession of all or any material portion of the property of the Insurer).

"**Interest Period**" means, initially, the period from and including the Closing Date to but excluding the first Payment Date, and, thereafter, each successive period from and including each Payment Date to but excluding the following Payment Date; *provided*, *however*, that the "Payment Date" solely for purposes of determining the Interest Period for the Fixed Rate Notes will be the 1st day of each February, May, August and November, regardless of whether such day is a Business Day.

"**Interest Proceeds**" means, with respect to any Due Period, the sum (without duplication) of all amounts received in Cash during the Due Period (or as otherwise specified below) by the Issuer with respect to the Collateral that are:

(i)     payments of interest, fees, and commissions (excluding (A) Accrued Interest Purchased With Principal, (B) interest and dividends on Workout Assets, (C) fees and commissions from Defaulted Collateral Obligations, and (D) syndication and other up-front fees and any up-front fixed payments received in connection with entering into a Synthetic Security);

(ii)     any portion of the Sale Proceeds of a Collateral Obligation (other than a Defaulted Collateral Obligation) representing Accrued Interest On Sale;

(iii)     all payments of principal on, or disposition proceeds from the sale of, Eligible Investments to the extent purchased with Interest Proceeds;

(iv)     payments with respect to the Hedge Agreements received on or before the related Payment Date (other than any amount payable thereunder because of any early termination or notional amount reduction), but not any Sale Proceeds from any of these instruments (except to the extent that they were purchased with Interest Proceeds);

(v)     all fees received pursuant to any Securities Lending Agreements;

(vi)     during the continuance of an "event of default" (under and as defined in the related Securities Lending Agreement), all interest received from the related Securities Lending Collateral;

(vii)     amounts in the Collection Account designated for distribution as Interest Proceeds pursuant to the Priority of Payments (including any amount transferred from the Interest Reserve Account);

(viii)     all earnings on amounts in the Delayed Drawdown Reserve Account and the Revolving Reserve Account deposited to the Collection Account in accordance with Section 10.3(b) of the Indenture;

(ix)     amounts in the Expense Reimbursement Account on the Payment Date for the relevant Due Period;

(x)     any recoveries (including interest) received on a Defaulted Collateral Obligation in excess of the principal balance of such Defaulted Collateral Obligation (as of the date the related Collateral Obligation became a Defaulted Collateral Obligation).

Interest Proceeds shall not include the Excluded Property and Interest Proceeds shall not include earnings on amounts on deposit in the Securities Lending Account to the extent the earnings are payable by the Issuer to a Securities Lending Counterparty.

009554

If an Interim Ramp-Up Completion Date Failure has occurred and is continuing on the first Payment Date, all Interest Proceeds remaining after application of Interest Proceeds pursuant to clauses (1) through (20) of "Description of the Securities—Priority of Payments—Interest Proceeds" shall be deemed to be Interest Proceeds received in the Due Period relating to the second Payment Date and not available for distribution on such first Payment Date.

Each reference in the definition of "Interest Proceeds" to a Collateral Obligation shall include a Collateral Obligation that has been loaned pursuant to a Securities Lending Agreement and Interest Proceeds shall include any amounts referred to in clauses (i) through (iii) above received by the Issuer in respect of the Collateral Obligation indirectly from the related Securities Lending Counterparty pursuant to the Securities Lending Agreement.

"**Interim Ramp-Up Completion Date Failure**" means, the failure of the Issuer to satisfy the criteria set forth in "Security for the Notes and the Composite Securities—Ramp-Up" on or before July 1, 2005; notwithstanding the foregoing, if the Issuer receives a Rating Confirmation after an Interim Ramp-Up Completion Date Failure but before the first Payment Date, such Interim Ramp-Up Completion Date Failure shall not be deemed to have occurred.

"**Investment Criteria Adjusted Balance**" means, for any Collateral Obligation other than Deep Discount Obligations, its Principal Balance; and for any Deep Discount Obligation its Purchase Price; *provided*, *however*, that if any Excess CCC/Caa Collateral Obligations exist, the Investment Criteria Adjusted Balance for the Excess CCC/Caa Collateral Obligations shall be the lower of (i) the weighted average Market Value of all CCC/Caa Collateral Obligations, expressed as a percentage of their outstanding principal balances and (ii) the product of (a) 70% and (b) their respective Principal Balance.

"**Investment Obligation**" means, for a Collateral Obligation that is a Synthetic Security, the Reference Obligation of the Synthetic Security, and otherwise the Collateral Obligation.

"**Issuer Charter**" means the Memorandum and Articles of Association of the Issuer, as amended and restated before the Closing Date or in accordance with the Indenture.

"**Issuer Order**" and "**Issuer Request**" means a written order or request dated and signed in the name of the Issuer or the Co-Issuer by an Authorized Officer of the Issuer or the Co-Issuer, as applicable, or by the Portfolio Manager by an Authorized Officer of the Portfolio Manager, on behalf of the Issuer or the Co-Issuer.

"**Junior Class**" means, with respect to a particular Class of Notes, each Class of Notes that is subordinated to that Class.

"**Leasing Finance Transaction**" means and transaction pursuant to which the obligations of the lessee to pay rent or other amounts on a triple net basis under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, are required to be classified and accounted for as a capital lease on a balance sheet of such lessee under generally accepted accounting principles in the United States of America; but only if (a) such lease or other transaction provides for the unconditional obligation of the lessee to pay a stated amount of principal no later than a stated maturity date, together with interest thereon, and the payment of such obligation is not subject to any material non-credit related risk as determined by the Portfolio Manager, (b) the obligations of the lessee in respect of such lease or other transaction are fully secured, directly or indirectly, by the property that is the subject of such lease and (c) the interest held by the Issuer in respect of such lease or other transaction is treated as debt for U.S. federal income tax purposes.

009555

"**Loan**" means any interest in a fully committed, senior secured, unsecured, or revolving loan (including loans involving credit linked deposits) that is acquired by assignment or by Participation (including any DIP Loan) that is either:

        (i)      Registered; or

        (ii)     issued by an obligor that is not resident in the United States;

                (A)     whose payments are not subject to United States withholding tax; and

                (B)     that is held through a financial institution pursuant to the procedures described in Treasury Regulation section 1.165-12(c)(3).

"**Long-Dated Collateral Obligation**" means any Collateral Obligation with a stated maturity later than the Stated Maturity of the Notes other than a Collateral Obligation with a stated maturity later than the Stated Maturities of the Notes that includes a "put" option to its obligor at a price of at least par payable on or before the Stated Maturity of the Notes.

"**Majority**" means, with respect to any Class or group of Notes or Composite Securities or Preference Shares, the Holders of more than 50% of the Aggregate Outstanding Amount of that Class or group of Notes or Composite Securities or Preference Shares, as the case may be (treating the Senior Class A Notes, the Class A-2 Notes and the Class A-3 Notes as separate Classes). When used with respect to the Class A-1g Notes, the Insurer if the Insurer is the Controlling Class. When used with respect to the Controlling Class, the Insurer if the Insurer is the Controlling Class, and if the Insurer is not the Controlling Class, the Holders of more than 50% of the Aggregate Outstanding Amount of the Controlling Class.

"**Make-Whole Premium**" means, with respect to the Fixed Rate Notes, the premium payable to the Holders of the Fixed Rate Notes in connection with (i) an Optional Redemption of such Notes (other than in connection with a Tax Event), (ii) the purchase of such Notes that are Extension Sale Securities in connection with the Maturity Extension, if any, or (iii) the purchase of such Notes in connection with an Amendment Buy-Out, as applicable, in each case in an amount equal to the excess, if any, of (x) the present value (discounted to the Redemption Date, Extension Effective Date or date of Amendment Buy-Out, as applicable, using the Reinvestment Yield as the discount rate on a semi-annual basis using a 360-day year of twelve 30-day months) of the remaining payments of interest and principal due on the Fixed Rate Notes, assuming that the entire outstanding principal amount of the applicable Fixed Rate Notes will be paid at the end of the Remaining Life Date and that each intervening payment of interest on the Fixed Rate Notes will be made on the related Payment Date in its entirety (and therefore there is no Deferred Interest on the Fixed Rate Notes) over (y) the Aggregate Outstanding Amount of the applicable Fixed Rate Notes on the Redemption Date, Extension Effective Date or date of Amendment Buy-Out, as applicable; *provided* that, in no event shall any Make-Whole Premium be less than zero.

"**Margin Stock**" means "Margin Stock" as defined under Regulation U issued by the Board of Governors of the Federal Reserve System, including any debt security that is by its terms convertible into Margin Stock, but does not include any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation received pursuant to an offer by an issuer of a Defaulted Collateral Obligation.

"**Management Agreement**" means the Portfolio Management Agreement, dated as of the Closing Date, between the Issuer and the Portfolio Manager, as modified, amended, and supplemented and in effect from time to time.

"**Market Value**" means, as of any Measurement Date, the market value determined by the Portfolio Manager and reported to the Trustee as an amount rather than as a percentage or fraction of par

009556

(expressed in Dollars) of any Collateral Obligation based upon the Portfolio Manager's commercially reasonable judgment and based upon the following order of priority: (i) the average of the bid-side market prices obtained by the Portfolio Manager from three Independent broker-dealers active in the trading of such obligations or (ii) if the foregoing set of prices were not obtained, the lower of the bid-side market prices obtained by the Portfolio Manager from two Independent broker-dealers active in the trading of such obligations or (iii) if the foregoing sets of prices were not obtained, the average of the bid-side prices for the purchase of the Collateral Obligation determined by an Approved Pricing Service (Independent from the Portfolio Manager) that derives valuations by polling broker-dealers (Independent from the Portfolio Manager); *provided* that if a Market Value of any Collateral Obligation cannot be so determined for a period of 30 consecutive days then such Collateral Obligation shall be deemed to have a Market Value of zero; *provided*, *further*, that during such 30 day period, such Collateral Obligation shall be deemed to have a Market Value equal to the lower of (i) (if any) the Market Value of such Collateral Obligation as most recently determined by the Portfolio Manager in accordance with the foregoing and (ii) the current market value of such Collateral Obligation as determined by the Portfolio Manager in its commercially reasonable judgment; *provided*, *further*, that the maximum amount of Collateral Obligations having a Market Value assigned pursuant to the immediately preceding proviso shall be limited to 5.0% of the Maximum Investment Amount (and any amount in excess of 5.0% of the Maximum Investment Amount shall be deemed to have a Market Value of zero).

"**Market Value Percentage**" means, for any Collateral Obligation, the ratio obtained by dividing:

      (i)      the Market Value of the Collateral Obligation; by

      (ii)     the Principal Balance of the Collateral Obligation.

"**Maximum Investment Amount**" means an amount equal to:

      (i)      on any Measurement Date during the Ramp-Up Period, U.S.$663,000,000; and

      (ii)     on any Measurement Date after the Ramp-Up Completion Date:

            (A)     the aggregate Principal Balance of all Collateral Obligations plus the aggregate outstanding principal amount of any Defaulted Collateral Obligations; *plus*

            (B)     cash representing Principal Proceeds on deposit in the Collection Account; *plus*

            (C)     Eligible Investments (other than cash) purchased by the Issuer with Principal Proceeds on deposit in the Collection Account.

"**Maximum Weighted Average Moody's Rating Factor**" means, as of any Measurement Date, a rate equal to the sum of (i) the number set forth in the column entitled "Maximum Weighted Average Moody's Rating Factor" in the Ratings Matrix based upon the applicable "row/column combination" chosen by the Portfolio Manager (or the interpolating between two adjacent rows and/or two adjacent columns, as applicable) *plus* (ii) the Recovery Rate Modifier.

"**Measurement Date**" means any date:

      (i)      on which the Issuer commits to acquire or dispose of any Collateral Obligation;

      (ii)     on which a Collateral Obligation becomes a Defaulted Collateral Obligation;

      (iii)    that is a Determination Date;

009557

(iv)    that is the Ramp-Up Completion Date; and

(v)    that is the date as of which the information in a Monthly Report is calculated pursuant to the Indenture.

"**Minimum Diversity Score**" means, as of any Measurement Date, a score equal to the number set forth in the column entitled "Minimum Diversity Score" in the Ratings Matrix based upon the applicable "row/column combination" chosen by the Portfolio Manager (or the interpolating between two adjacent rows and/or two adjacent columns, as applicable).

"**Minimum Weighted Average Spread**" means, as of any Measurement Date, the spread equal to the percentage set forth in the row entitled "Minimum Weighted Average Spread" in the Ratings Matrix based upon the applicable "row/column combination" chosen by the Portfolio Manager (or the interpolating between two adjacent rows and/or two adjacent columns, as applicable).

"**Monthly Report**" means a monthly report compiled and provided by the Issuer.

"**Moody's Default Probability Rating**" means with respect to any Collateral Obligation, as of any date of determination, the rating determined in accordance with the following, in the following order of priority:

(i)    with respect to a Moody's Senior Secured Loan:

(A)    if the Loan's obligor has a senior implied rating from Moody's, such senior implied rating; and

(B)    if the preceding clause does not apply, the Moody's Obligation Rating of such Loan;

(C)    if the preceding clauses do not apply, the rating that is one subcategory above the Moody's Equivalent Senior Unsecured Rating;

(ii)    with respect to a Moody's Non Senior Secured Loan or a Bond, the Moody's Equivalent Senior Unsecured Rating of such Collateral Obligation;

(iii)    with respect to a Collateral Obligation that is a DIP Loan, the rating that is one rating subcategory below the Assigned Moody's Rating thereof;

(iv)    with respect to a Structured Finance Obligation, the Assigned Moody's Rating thereof (or, if the obligation does not have an Assigned Moody's Rating but has a rating by S&P, the rating that is the number of rating subcategories specified by Moody's below such S&P rating); and

(v)    with respect to a Synthetic Security, the Assigned Moody's Rating thereof.

Notwithstanding the foregoing, if the Moody's rating or ratings used to determine the Moody's Default Probability Rating are on watch for downgrade or upgrade by Moody's, such rating or ratings will be adjusted down one subcategory (if on watch for downgrade) or up one subcategory (if on watch for upgrade).

"**Moody's Equivalent Senior Unsecured Rating**" means, with respect to any Collateral Obligation that is a Loan or bond and the obligor thereof, as of any date of determination, the rating determined in accordance with the following, in the following order of priority:

(i)    if the obligor has a senior unsecured obligation with an Assigned Moody's Rating, such Assigned Moody's Rating;

009558

(ii)      if the preceding clause does not apply, the Moody's "Issuer Rating" for the obligor;

(iii)     if the preceding clauses do not apply, but the obligor has a subordinated obligation with an Assigned Moody's Rating; then

(A)     if such Assigned Moody's Rating is at least "B3" (and, if rated "B3," not on watch for downgrade), the Moody's Equivalent Senior Unsecured Rating shall be the rating which is one rating subcategory higher than such Assigned Moody's Rating; or

(B)     if such Assigned Moody's Rating is less than "B3" (or rated "B3" and on watch for downgrade), the Moody's Equivalent Senior Unsecured Rating shall be such Assigned Moody's Rating;

(iv)     if the preceding clauses do not apply, but the obligor has a senior secured obligation with an Assigned Moody's Rating; then:

(A)     if such Assigned Moody's Rating is at least "Caa3" (and, if rated "Caa3," not on watch for downgrade), the Moody's Equivalent Senior Unsecured Rating shall be the rating which is one subcategory below such Assigned Moody's Rating; or

(B)     if such Assigned Moody's Rating is less than "Caa3" (or rated "Caa3" and on watch for downgrade), then the Moody's Equivalent Senior Unsecured Rating shall be "C";

(v)     if the preceding clauses do not apply, but such obligor has a senior implied rating from Moody's, the Moody's Equivalent Senior Unsecured Rating shall be one rating subcategory below such senior implied rating;

(vi)     if the preceding clauses do not apply, but the obligor has a senior unsecured obligation (other than a bank loan) with a monitored public rating from S&P (without any postscripts, asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), then the Moody's Equivalent Senior Unsecured Rating shall be:

(A)     one rating subcategory below the Moody's equivalent of such S&P rating if it is "BBB–" or higher;

(D)     two rating subcategories below the Moody's equivalent of such S&P rating if it is "BB+" or lower; or

(E)     "B3" until the Issuer or the Portfolio Manager obtains an estimated rating from Moody's of (a) the Portfolio Manager certifies to the Trustee that in its commercially reasonable judgment, it believes an estimated rating equivalent to a rating no lower than "B3" will be assigned by Moody's and the Issuer or the Portfolio Manager on its behalf applies for an estimated rating from Moody's within five Business Days of the date of the commitment to purchase the Loan or Bond, (b) the aggregate Principal Balance of Collateral Obligations having an Assigned Moody's Rating pursuant to either this clause (vi)(C), or clauses (vii)(C) or (viii)(C) does not exceed 5% of the Maximum Investment Amount, and (c) all the Coverage Tests and the Collateral Quality Tests are satisfied;

(vii)     if the preceding clauses do not apply, but the obligor has a subordinated obligation (other than a bank loan) with a monitored public rating from S&P (without any

009559

postscripts, asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), the Assigned Moody's Rating shall be deemed to be:

    (A)    one rating subcategory below the Moody's equivalent of such S&P rating if it is "BBB–" or higher;

    (B)    two rating subcategories below the Moody's equivalent of such S&P rating if it is "BB+" or lower, and the Moody's Equivalent Senior Unsecured Rating shall be determined pursuant to clause (iii) above; or

    (C)    "B3" until the Issuer or the Portfolio Manager obtains an estimated rating from Moody's if (a) the Portfolio Manager certifies to the Trustee that in its commercially reasonable judgment, it believes an estimated rating equivalent to a rating not lower than "B3" will be assigned by Moody's and the Issuer or the Portfolio Manager on its behalf applies for an estimated rating from Moody's within five Business Days of the date of the commitment to purchase the Loan or Bond, (b) the aggregate Principal Balance of Collateral Obligations having an Assigned Moody's Rating pursuant to either this clause (vii)(C), or clauses (vi)(C) or (viii)(C) does not exceed 5% of the Maximum Investment Amount, and (c) all the Coverage Tests and the Collateral Quality Tests are satisfied;

    (viii)    if the preceding clauses do not apply, but the obligor has a senior secured obligation with a monitored public rating from S&P (without any postscripts, asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), the Assigned Moody's Rating shall be deemed to be:

    (A)    one rating subcategory below the Moody's equivalent of such S&P rating if it is "BBB–" or higher;

    (B)    two rating subcategories below the Moody's equivalent of such S&P rating if it is "BB+" or lower, and the Moody's Equivalent Senior Unsecured Rating shall be determined pursuant to clause (iv) above; or

    (C)    "B3" until the Issuer or the Portfolio Manager obtains an estimated rating from Moody's if (a) the Portfolio Manager certifies to the Trustee that in its commercially reasonable judgment, it believes an estimated rating equivalent to a rating not lower than "B3" will be assigned by Moody's and the Issuer or the Portfolio Manager on its behalf applies for an estimated rating from Moody's within two Business Days of the date of the commitment to purchase the Loan or Bond, (b) the aggregate Principal Balance of Collateral Obligations having an Assigned Moody's Rating pursuant to either this clause (viii)(C), or clauses (vi)(C) or (vii)(C) does not exceed 5% of the Maximum Investment Amount, and (c) all the Coverage Tests and the Collateral Quality Tests are satisfied;

    (ix)    if the preceding clauses do not apply and each of the following clauses (A) through (H) do apply, the Moody's Equivalent Senior Unsecured Rating will be "Caa1":

    (A)    neither the obligor nor any of its Affiliates is subject to reorganization or bankruptcy proceedings;

    (B)    no debt securities or obligations of the obligor are in default;

    (C)    neither the obligor nor any of its Affiliates has defaulted on any debt during the preceding two years;

009560

(D)     the obligor has been in existence for the preceding five years;

(E)     the obligor is current on any cumulative dividends;

(F)     the fixed-charge ratio for the obligor exceeds 125% for each of the preceding two fiscal years and for the most recent quarter;

(G)     the obligor had a net profit before tax in the past fiscal year and the most recent quarter; and

(H)     the annual financial statements of such obligor are unqualified and certified by a firm of Independent accountants of international reputation, and quarterly statements are unaudited but signed by a corporate officer;

(x)     if the preceding clauses do not apply but each of the following clauses (A) and (B) do apply, the Moody's Equivalent Senior Unsecured Rating will be "Caa3":

(A)     neither the obligor nor any of its Affiliates is subject to reorganization or bankruptcy proceedings; and

(B)     no debt security or obligation of such obligor has been in default during the past two years; and

(xi)     if the preceding clauses do not apply and a debt security or obligation of the obligor has been in default during the past two years, the Moody's Equivalent Senior Unsecured Rating will be "Ca."

Notwithstanding the foregoing, not more than 10% of the Maximum Investment Amount may consist of Investment Obligations given a Moody's Equivalent Senior Unsecured Rating based on a rating given by S&P as provided in clauses (vi), (vii) and (viii) above.

"**Moody's Group I Country**" means any of the following countries: Australia, the Netherlands, the United Kingdom and any country subsequently determined by Moody's to be a Moody's Group I Country.

"**Moody's Group II Country**" means any of the following countries: Germany, Ireland, Sweden, Switzerland and any country subsequently determined by Moody's to be a Moody's Group II Country.

"**Moody's Group III Country**" means any of the following countries: Austria, Belgium, Denmark, Finland, France, Iceland, Liechtenstein, Luxembourg, Norway, Spain and any country subsequently determined by Moody's to be a Moody's Group III Country.

"**Moody's Minimum Average Recovery Rate**" means, as of any Measurement Date, a rate equal to the number obtained by (i) summing the products obtained by multiplying the Principal Balance of each Collateral Obligation by its respective Moody's Priority Category Recovery Rate, (ii) dividing the sum determined pursuant to clause (i) above by the sum of the Aggregate Principal Balance of all Collateral Obligations and (iii) rounding up to the first decimal place.

"**Moody's Non Senior Secured Loan**" means any Loan that is not a Moody's Senior Secured Loan.

009561

"**Moody's Obligation Rating**" means, with respect to any Collateral Obligation as of any date of determination, the rating determined in accordance with the following, in the following order of priority:

      (i)      With respect to a Moody's Senior Secured Loan:

           (A)      if it has an Assigned Moody's Rating, such Assigned Moody's Rating; or

           (B)      if the preceding clause does not apply, the rating that is one rating subcategory above the Moody's Equivalent Senior Unsecured Rating; and

      (ii)      With respect to a Moody's Non Senior Secured Loan or a Bond:

           (A)      if it has an Assigned Moody's Rating, such Assigned Moody's Rating; or

           (B)      if the preceding clause does not apply, the Moody's Equivalent Senior Unsecured Rating; and

      (iii)      With respect to a Synthetic Security or a DIP Loan, the Assigned Moody's Rating thereof.

Notwithstanding the foregoing, if the Moody's rating or ratings used to determine the Moody's Default Probability Rating are on watch for downgrade or upgrade by Moody's, such rating or ratings will be adjusted down one subcategory (if on watch for downgrade) or up one subcategory (if on watch for upgrade).

"**Moody's Priority Category**" means each type of Collateral Obligation specified in the definition of "Applicable Percentage" as a "Moody's Priority Category."

"**Moody's Priority Category Recovery Rate**" means for any Collateral Obligation, the percentage specified in the definition of "Applicable Percentage" opposite the Moody's Priority Category of the Collateral Obligation.

"**Moody's Rating**" means the Moody's Default Probability Rating; *provided* that, with respect to the Collateral Obligations generally, if at any time Moody's or any successor to it ceases to provide rating services, references to rating categories of Moody's in the Indenture shall be deemed instead to be references to the equivalent categories of any other nationally recognized investment rating agency selected by the Portfolio Manager, as of the most recent date on which such other rating agency and Moody's published ratings for the type of security in respect of which such alternative rating agency is used.

009562

"**Moody's Rating Factor**" means the number in the table below opposite the rating of the Collateral Obligation (excluding Synthetic Securities where an Assigned Moody's Rating is not available).

| Moody's Rating | Moody's Rating Factor | Moody's Rating | Moody's Rating Factor |
|---|---|---|---|
| Aaa | 1 | Ba1 | 940 |
| Aa1 | 10 | Ba2 | 1350 |
| Aa2 | 20 | Ba3 | 1766 |
| Aa3 | 40 | B1 | 2220 |
| A1 | 70 | B2 | 2720 |
| A2 | 120 | B3 | 3490 |
| A3 | 180 | Caa1 | 4770 |
| Baa1 | 260 | Caa2 | 6500 |
| Baa2 | 360 | Caa3 | 8070 |
| Baa3 | 610 | Ca or lower | 10000 |

The Moody's Rating Factor for Collateral Obligations that are Synthetic Securities shall be determined by Moody's and obtained by the Issuer or the Portfolio Manager on a case-by-case basis, unless there is an Assigned Moody's Rating available for such Collateral Obligation that is a Synthetic Security, in which case such Assigned Moody's Rating shall be used to compute the Moody's Rating Factor for such Collateral Obligation that is a Synthetic Security.

"**Moody's Senior Secured Loan**" means:

(i)      A Loan that:

(A)      is not (and cannot by its terms become) subordinate in right of payment to any other obligation of the obligor of the Loan;

(B)      is secured by a valid first priority perfected security interest or lien in, to or on specified collateral securing the obligor's obligations under the Loan; and

(C)      the value of the collateral securing the Loan together with other attributes of the obligor (including, without limitation, its general financial condition, ability to generate cash flow available for debt service and other demands for that cash flow) is adequate (in the commercially reasonable judgment of the Portfolio Manager) to repay the Loan in accordance with its terms and to repay all other loans of equal seniority secured by a first lien or security interest in the same collateral; or

009563

(ii)    a Loan that:

    (A)    is not (and cannot by its terms become) subordinate in right of payment to any other obligation of the obligor of the Loan, other than, with respect to a Loan described in clause (i) above, with respect to the liquidation of such obligor or the collateral for such loan;

    (B)    is secured by a valid second priority perfected security interest or lien in, to or on specified collateral securing the obligor's obligations under the Loan; and

    (C)    the value of the collateral securing the Loan together with other attributes of the obligor (including, without limitation, its general financial condition, ability to generate cash flow available for debt service and other demands for that cash flow) is adequate (in the commercially reasonable judgment of the Portfolio Manager) to repay the Loan in accordance with its terms and to repay all other loans of equal or higher seniority secured by a first or second lien or security interest in the same collateral;

    (iii)    the Loan is not: (A) a DIP Loan, (B) a Loan for which the security interest or lien (or the validity or effectiveness thereof) in substantially all of its collateral attaches, becomes effective, or otherwise "springs" into existence after the origination thereof, or (C) a type of loan that Moody's has identified as having unusual terms and with respect to which its Moody's Recovery Rate has been or is to be determined on a case-by-case basis; and

    (iv)    if the Loan has an Assigned Moody's Rating, such Assigned Moody's Rating is not lower that the senior implied Moody's rating of the related obligor.

**"Non-Consenting Holder"** means respect to any supplemental indenture pursuant to the Indenture that requires the consent of one or more Holders of Securities, any Holder or, in the case of Securities represented by Global Securities, any beneficial owner, that either (i) has declared in writing that it will not consent to such supplemental indenture or (ii) had not consented to such supplemental indenture within the applicable Initial Consent Period.

**"Non-Performing Collateral Obligation"** means any Defaulted Collateral Obligation and any PIK Security as to which its issuer or obligor has previously deferred or capitalized any interest due on it and all the interest so deferred or capitalized has not subsequently been paid in full in cash by:

    (i)    if the PIK Security has a Moody's Rating of "Baa3" (and not on credit watch with negative implications) or above or an S&P Rating of "BBB-" (and not on credit watch with negative implications) or above, the earlier of its second payment date or one year following the date of the initial deferral or capitalization of interest due on it; or

    (ii)    if the PIK Security has a Moody's Rating of "Baa3" and on credit watch with negative implications or below "Baa3," or an S&P Rating of "BBB-" and on credit watch with negative implications or below "BBB-," the earlier of its first payment date or six months following the date of the initial deferral or capitalization of interest due on it.

**"Noteholder"** means a Holder of the Senior Class A Notes, the Class A-2 Notes, the Class A-3 Notes, the Class B Notes or the Class C Notes.

**"Note Payment Sequence"** means the application of funds in the following order:

    (1)    to the Senior Class A Notes until the Senior Class A Notes have been fully redeemed (with each of the Senior Class A Notes being redeemed *pro rata* based upon the

009564

outstanding principal amount of the Class A-1 Notes, the Class A-1b Notes and the Class A-1g Notes);

(2)     to the Class A-2 Notes until the Class A-2 Notes have been fully redeemed;

(3)     to the Class A-3 Notes until the Class A-3 Notes have been fully redeemed (with each of the Class A-3 Notes being redeemed *pro rata* based upon the outstanding principal amount of the Class A-3a Notes and the Class A-3b Notes);

(4)     to the Class B Notes until the Class B Notes have been fully redeemed; and

(5)     to the Class C Notes until the Class C Notes have been fully redeemed.

"**Offer**" means any Collateral Obligation that is subject to a tender offer, voluntary redemption, exchange offer, conversion or other similar action.

"**Officer**" means, with respect to the Issuer and any corporation, any director, the Chairman of the board of directors, the President, any Vice President, the Secretary, an Assistant Secretary, the Treasurer, or an Assistant Treasurer of the entity; with respect to the Co-Issuer and any corporation, any director, the Chairman of the board of directors, the President, any Vice President, the Secretary, an Assistant Secretary, the Treasurer, or an Assistant Treasurer of the entity; with respect to any partnership, any of its general partners; and with respect to the Trustee, any Trust Officer.

"**Outstanding**" means, with respect to:

(i)     the Notes and the Composite Securities or any specified Class, as of any date of determination, all of the Notes, all of the Composite Securities or all of the Notes of the specified Class, as the case may be, theretofore authenticated and delivered under the Indenture, except with respect to Notes and Composite Securities:

(A)     Securities canceled by the Indenture Registrar or delivered to the Indenture Registrar for cancellation;

(B)     Notes for whose payment or redemption funds in the necessary amount have been theretofore irrevocably deposited with the Trustee or any Paying Agent in trust for their Holders pursuant to Section 4.1(a)(ii) of the Indenture and if the Notes are to be redeemed, notice of redemption has been duly given pursuant to the Indenture;

(C)     Notes in exchange for or in lieu of which other Notes have been authenticated and delivered pursuant to the Indenture and Composite Securities in exchange for or in lieu of which other Composite Securities have been authenticated and delivered pursuant to the Indenture; and

(D)     Securities alleged to have been destroyed, lost, or stolen for which replacement Securities have been issued as provided in Section 2.7 of the Indenture, unless proof satisfactory to the Trustee is presented that any such Securities are held by a protected purchaser;

(ii)     the Preference Shares, as of any date of determination, all of the Preference Shares theretofore issued under the Preference Share Documents and listed in the Preference Share register of the Issuer as outstanding;

009565

*provided* that, in determining whether the Holders of the requisite Aggregate Outstanding Amount of the Notes, the Preference Shares or the Composite Securities have given any request, demand, authorization, direction, notice, consent, or waiver under the Indenture:

(1) to the extent the Class A-1g Notes have been paid with proceeds of the Policy and subject to the Indenture, such Class A-1g Notes shall continue to remain Outstanding for purposes of the Indenture until the Insurer has been paid as subrogee hereunder and reimbursed pursuant to the Insurance Agreement, as evidenced by a written notice from the Insurer delivered to the Trustee, and the Insurer shall be deemed the Holder thereof, to the extent of any payments thereon made by the Insurer;

(2) Holders of Composite Securities, except to the extent otherwise expressly provided, will be entitled to vote with the Preference Shares to which the Preference Share Component of such Composite Securities relates, with a face amount equal to the aggregate Face Amount of the Preference Shares relating to such Preference Share Component; and

(3) Notes, Composite Securities or Preference Shares owned or beneficially owned by the Issuer, the Co-Issuer, any Affiliate of either of them and (only (x) with respect to any matter affecting its status as Portfolio Manager, or (y) in any matter respecting an acceleration of any Class of Notes or Composite Securities if the effect of the Portfolio Manager's action or inaction as a Holder of Notes, Composite Securities or Preference Shares would effectively prevent acceleration) the Portfolio Manager and its Affiliates shall be disregarded and not be Outstanding, except that, in determining whether the Trustee shall be protected in relying on any request, demand, authorization, direction, notice, consent, or waiver, only Notes, Composite Securities or Preference Shares that a Trust Officer of the Trustee has actual knowledge to be so owned or beneficially owned shall be so disregarded. Notes, Composite Securities or Preference Shares so owned or beneficially owned that have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right so to act with respect to the Notes, Composite Securities or Preference Shares and that the pledgee is not the Issuer, the Co-Issuer, the Portfolio Manager, the Preference Shares Paying Agent or any Affiliate of the Issuer or the Co-Issuer.

With respect to Components, as of any date of determination, all of the Components represented by Composite Securities that are Outstanding under the Indenture or the Preference Share Documents.

"**Participating Institution**" means an institution that creates a participation interest and that has a long-term senior unsecured rating by Moody's of at least "A3" (and if so rated by Moody's such rating is not on watch for possible downgrade) and an issuer credit rating by S&P of at least "A".

"**Participation**" means a Loan acquired as a participation interest created by a Participating Institution.

"**Permitted Offer**" means a tender offer, voluntary redemption, exchange offer, conversion, or other similar action pursuant to which the offeror offers to acquire a debt obligation (including a Collateral Obligation) in exchange solely for cash in an amount equal to or greater than the full face amount of the debt obligation plus any accrued and unpaid interest and as to which the Portfolio Manager has determined in its commercially reasonable judgment that the offeror has sufficient access to financing to consummate the tender offer, voluntary redemption, exchange offer, conversion, or other similar action.

"**PIK Security**" means any Collateral Obligation with respect to which its issuer or obligor may defer or capitalize interest due on the Collateral Obligation under the related underlying instruments.

009566

"**Pledged Obligations**" means, as of any date of determination, the Collateral Obligations, the Workout Assets, the Eligible Investments, and any other securities or obligations that have been granted to the Trustee that form part of the Collateral or the Class 1 Collateral.

"**Person**" is an individual, corporation (including a business trust), partnership, limited liability company, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated association or government or any agency or political subdivision thereof.

"**Preference Share Internal Rate of Return**" means, with respect to any Payment Date, the internal rate of return (computed using the "XIRR" function in Microsoft® Excel 2002 or an equivalent function in another software package), stated on a per annum basis, for the following cash flows, assuming all Preference Shares were purchased on the Closing Date at par:

    (i) each distribution of Interest Proceeds made to the Holders of the Preference Shares on any prior Payment Date and, to the extent necessary to reach the applicable Preference Share Internal Rate of Return, the current Payment Date; and

    (ii) each distribution of Principal Proceeds made to the Holders of the Preference Shares on any prior Payment Date and, to the extent necessary to reach the applicable Preference Share Internal Rate of Return, the current Payment Date.

For purposes of this definition, distributions in respect of the Preference Share Components shall be deemed to have been received by the Holders of the Composite Securities on the Payment Date preceding the related Composite Securities Payment Date.

"**Preference Shares Distribution Account**" means a separate segregated non-interest bearing trust account established by the Preference Shares Paying Agent pursuant to the Preference Shares Paying Agency Agreement into which the Preference Shares Paying Agent will deposit all amounts received from the Issuer and payable to the Holders of the Preference Shares under the Priority of Payments.

"**Preference Shares Distribution Amount**" means, with respect to each Payment Date, an amount equal to 7.0% per annum of the Preference Shares Notional Amount (such Preference Shares Notional Amount reduced by any distribution prior to such Payment Date pursuant to "Description of the Securities—Priority of Payments—Principal Proceeds" made in respect of the Preference Shares). The Preference Shares Distribution Amount shall be calculated on the basis of a 360-day year consisting of twelve 30-day months.

"**Preference Shares Notional Amount**" means, $82,200,000.

"**Preference Shares Paying Agent**" means JPMorgan Chase Bank, National Association, in its capacity as Preference Shares Paying Agent under the Preference Shares Paying Agency Agreement, unless a successor Person shall have become the preference shares paying agent pursuant to the applicable provisions of the Preference Shares Paying Agency Agreement, and thereafter "Preference Shares Paying Agent" shall mean such successor person.

"**Premium Letter**" means the letter agreement, dated as of the Closing Date, between the Issuer and the Insurer in respect of the Premium payable by the Issuer in consideration of the issuance of the Policy.

"**Premium Rate**" means a per annum rate equal to the per annum rate at which the Premium accrues pursuant to the Premium Letter.

009567

"**Principal Balance**" means, with respect to:

(i) any Pledged Obligation other than those specifically covered in this definition, the outstanding principal amount of the Pledged Obligation as of the relevant Measurement Date;

(ii) a Synthetic Security, the notional amount specified in the Synthetic Security;

(iii) any Pledged Obligation in which the Trustee does not have a first priority perfected security interest, zero, except as otherwise expressly specified in the Indenture;

(iv) any Defaulted Collateral Obligation, except as otherwise provided, zero;

(v) any Collateral Obligation that has been loaned, its Principal Balance shall be reduced by the excess of the amount of collateral required over the actual Market Value of the collateral;

(vi) any Revolving Loan or Delayed Drawdown Loan, its Principal Balance shall include any unfunded amount thereof (regardless of the nature of the contingency relating to the Issuer's obligation to fund the unfunded amount), except as otherwise expressly specified in the Indenture;

(vii) any PIK Security, its Principal Balance shall not include any principal amount of the PIK Security representing previously deferred or capitalized interest; and

(viii) any obligation or security that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation, zero.

"**Principal Proceeds**" means with respect to any Due Period, all amounts received in Cash during the Due Period by the Issuer with respect to the Collateral that are not Interest Proceeds.

Principal Proceeds shall include any funds transferred from the Closing Date Expense Account and the Interest Reserve Account into the Collection Account pursuant to Section 10.2 of the Indenture.

Principal Proceeds do not include the Excluded Property or earnings on amounts on deposit in the Securities Lending Account to the extent the earnings are payable by the Issuer to a Securities Lending Counterparty.

At any time when an "event of default" under a Securities Lending Agreement has occurred and is continuing, any payments received by the Issuer from the related Securities Lending Collateral shall be Principal Proceeds.

"**Priority Class**" means, with respect to any specified Class of Notes, each Class of Notes that ranks senior to that Class.

"**Proceeding**" means any suit in equity, action at law, or other judicial or administrative proceeding.

"**Proposed Portfolio**" means, as of any Measurement Date, the portfolio (measured by Aggregate Principal Balance) of Collateral Obligations and Principal Proceeds held as cash on deposit in the Collection Account and other Eligible Investments purchased with Principal Proceeds on deposit in the Collection Account resulting from the sale, maturity, or other disposition of a Collateral Obligation or a proposed reinvestment in a Collateral Obligation, as the case may be.

"**Purchase Price**" means, with respect to the purchase of any Collateral Obligation (other than any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of

009568

a Collateral Obligation), the net purchase price paid by the Issuer for the Collateral Obligation. The net purchase price is determined by subtracting from the purchase price the amount of any Accrued Interest Purchased With Principal and any syndication and other upfront fees paid to the Issuer and by adding the amount of any related transaction costs (including assignment fees) paid by the Issuer to the seller of the Collateral Obligation or its agent.

"**Purchase Price Amount**" means, respect to any Collateral Obligation on any date of determination, the product of (i) the Purchase Price (stated as a percentage) thereof and (ii) the Principal Balance thereof on such date.

"**Qualified Equity Security**" means any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation that is stock or evidence of an interest in or a right to buy stock, or any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation but whose acquisition otherwise is a transaction in stocks or securities within the meaning of Section 864(b)(2)(A)(ii) of the Code and the regulations under the Code. Qualified Equity Securities do not include any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation and that will cause the Issuer to be treated as engaged in or having income from a United States trade or business for United States federal income tax purposes by virtue of its ownership or disposition of the obligation (without regard to the Issuer's other activities).

"**Ramp-Up Period**" means the period from and including the Closing Date to and including the Ramp-Up Completion Date.

"**Rating Agency**" means, each of Moody's and S&P or, with respect to Pledged Obligations generally, if at any time Moody's or S&P ceases to provide rating services with respect to high yield debt securities, any other nationally recognized statistical rating organization selected by the Issuer and reasonably satisfactory to a Majority of each Class of Notes. If at any time Moody's ceases to be a Rating Agency, references to rating categories of Moody's in the Indenture shall instead be references to the equivalent categories of the replacement rating agency as of the most recent date on which the replacement rating agency and Moody's published ratings for the type of security in respect of which the replacement rating agency is used. If at any time S&P ceases to be a Rating Agency, references to rating categories of S&P in the Indenture shall instead be references to the equivalent categories of the replacement rating agency as of the most recent date on which the replacement rating agency and S&P published ratings for the type of security in respect of which the replacement rating agency is used.

"**Rating Condition**" means, with respect to any Rating Agency and any action taken or to be taken under the Indenture, a condition that is satisfied when the Rating Agency has confirmed to the Portfolio Manager (as agent for the Issuer) in writing that no withdrawal, reduction, suspension, or other adverse action with respect to any then current rating by it (including any private or confidential rating) of any Class of Notes (in the case of the Class A-1g Notes, without giving effect to the Policy) or Composite Securities will occur as a result of the action. The Rating Condition with respect to any Rating Agency shall be satisfied for all purposes of the Indenture at any time when no Outstanding Securities are rated by it.

"**Rating Confirmation**" means confirmation from each Rating Agency (and with respect to the Composite Securities, from Moody's only) that it has not reduced, suspended, or withdrawn the Initial Rating assigned by it to any Class of Notes or Composite Securities.

"**Ratings Matrix**" means the "row/column combination" of the table below selected by the Portfolio Manager on the Closing Date to apply initially for purposes of the Diversity Test, the Weighted Average Spread Test and the Weighted Average Rating Factor Test. Thereafter, on notice to the Trustee, the Portfolio Manager may select a different row of the Ratings Matrix to apply, or may interpolate

009569

between two adjacent rows and/or two adjacent columns, as applicable, on a straight-line basis and round the results to two decimal points.

| Minimum Weighted Average Spread | Minimum Diversity Score | | | | | | |
|---|---|---|---|---|---|---|---|
| | 50 | 55 | 60 | 65 | 70 | 75 | 80 |
| 2.45% | 2185 | 2220 | 2255 | 2290 | 2325 | 2360 | 2395 |
| 2.55% | 2245 | 2280 | 2315 | 2350 | 2385 | 2420 | 2455 |
| 2.65% | 2305 | 2340 | 2375 | 2410 | 2445 | 2480 | 2515 |
| 2.75% | 2365 | 2400 | 2435 | 2470 | 2505 | 2540 | 2575 |
| 2.85% | 2425 | 2460 | 2495 | 2530 | 2565 | 2600 | 2635 |
| 2.95% | 2485 | 2520 | 2555 | 2590 | 2625 | 2660 | 2695 |
| 3.05% | 2545 | 2580 | 2615 | 2650 | 2685 | 2720 | 2755 |
| Maximum Weighted Average Moody's Rating Factor | | | | | | | |

"**Recovery Rate Modifier**" means, as of any Measurement Date, the lesser of 60 and the product of:

(i)  (a) the Moody's Minimum Average Recovery Rate *minus* the minimum percentage specified to pass the Weighted Average Moody's Recovery Rate Test (but not less than zero) *multiplied* by (b) 100; and

(ii)  40.

"**Redemption Date**" means any Payment Date specified for an Optional Redemption under "Description of the Securities—Optional Redemption."

"**Redemption Price**" means, with respect to any Note and any Optional Redemption, an amount equal to:

(i)  the outstanding principal amount of the portion of the Note being redeemed; *plus*

(ii)  accrued interest on the Note (including any Defaulted Interest and interest on Defaulted Interest); *plus*

(iii)  in the case of any Deferred Interest Note, the applicable Deferred Interest on the Note; *plus*

(iv)  in the case of the Fixed Rate Notes, the applicable Make-Whole Amount; *plus*

(v)  any unpaid Extension Bonus Payment in respect of the Note.

With respect to any Preference Share and any Optional Redemption, "Redemption Price" means (i) at the direction of a Majority of the Preference Shares of the remaining amount of available funds after all prior applications pursuant to the Priority of Payments or (ii) as specified by the unanimous direction of the Holders of the Preference Shares, in each case as specified in "Description of the Securities—Optional Redemption—Preference Shares."

With respect to any Class 1 Component and any Optional Redemption, "Redemption Price" means the distribution in kind of the Treasury Strip provided for in "Description of the Securities—Optional Redemption—Preference Shares."

009570

"**Reference Obligation**" means an obligation that would otherwise satisfy the definition of "Collateral Obligation" and on which a Synthetic Security is based.

"**Registered**" means, with respect to a Collateral Obligation or Eligible Investment, means that it is issued after July 18, 1984 and is in registered form within the meaning of Section 881(c)(2)(B)(i) of the Code and the Treasury Regulations promulgated thereunder.

"**Regulation D**" means Regulation D under the Securities Act.

"**Reinvestment Overcollateralization Ratio**" means, as of any Measurement Date, the ratio obtained by dividing: (i) the Overcollateralization Ratio Numerator by (ii) the Aggregate Outstanding Amount of the Senior Class A Notes, the Class A-2 Notes, the Class A-3 Notes, the Class B Notes and the Class C Notes together with any Deferred Interest on any Class of Notes.

"**Reinvestment Yield**" means, with respect to the Class A-1b Notes and the Class A-3b Notes, the rate equal to the sum of (a) (i) for the Class A-1b Notes, 0.155% and (ii) for the Class A-3b Notes, 0.30% and (b) the applicable yield to maturity implied by (i) the yields reported, as of 10:00 a.m. (New York City time) on the tenth Business Day preceding the Redemption Date, Extension Effective Date or date of Amendment Buy-Out, as applicable, on "Notes/Bonds" section on the first page on the display designated as "Govt PX1" on Bloomberg Financial Markets Commodities News (or such other display as may replace such display) for actively traded U.S. Treasury securities (for the avoidance of doubt, excluding U.S. Treasury securities with option features, U.S. Treasury inflation securities and other markets) having a maturity as nearly as practicable equal to the Remaining Life Date or (ii) if such yields are not reported as of such time or the yields reported as of such time are not ascertainable, the Treasury Constant Maturity Series Yields reported, for the latest day for which such yields have been so reported as of the tenth Business Day preceding the Redemption Date, Extension Effective Date or date of Amendment Buy-Out, as applicable, in Federal Reserve Statistical Release H.15 (519) (or any comparable successor publication) for actively traded U.S. Treasury securities having a constant maturity as nearly as practicable equal to the Remaining Life Date; *provided*, *however*, if the maturity of the obligations used in the preceding clauses (i) and (ii) differ by more than one month from the Remaining Life Date, then the yield determined pursuant to the preceding clauses (i) and (ii) shall be determined by using linear interpolation between two maturities, one being the nearest maturity preceding the end of the Remaining Life Date and the other being the nearest maturity next succeeding the end of the Remaining Life Date.

"**Remaining Life Date**" means, with respect to the Class A-1b Notes, June 1, 2013 and with respect to the Class A-3b Notes September 1, 2015.

"**Removal Buy-Out Purchase Price**" means the purchase price payable by the Removal Buy-Out Purchaser for the Class A-1g Notes purchased in an Removal Buy-Out, if any, in an amount equal to the Aggregate Outstanding Amount of such Class A-1g Notes, *plus* accrued and unpaid interest to the date of purchase payable to the Holder of such Class A-1g Notes (giving effect to any amounts paid to the Holder on such date).

"**Removal Buy-Out Purchaser**" means the Portfolio Manager (or any of its Affiliates acting as principal or agent); *provided* that in the event that the Portfolio Manager elects not to purchase Class A-1g Notes from Holders pursuant the Indenture and as described in "Description of the Securities— Removal Buy-Out," "Removal Buy-Out Purchaser" shall mean one or more qualifying purchasers (which may include the Initial Purchaser) or any of its Affiliates acting as principal or agent) designated by the Portfolio Manager; *provided*, *however*, none of the Portfolio Manager, the Initial Purchaser or any of their respective Affiliates shall have any duty to act as an Removal Buy-Out Purchaser.

"**Repository**" means the internet-based password protected electronic repository of transaction documents relating to privately offered and sold collateralized debt obligation securities located at

009571

"www.cdolibrary.com" operated by The Bond Market Association. Information on this website is not considered part of this Offering Circular in any way.

"**Revolving Loan**" means a Loan or any Synthetic Security with a Reference Obligation (in each case excluding any Delayed Drawdown Loan) that requires the Issuer to make future advances to (or for the account of) the borrower under its underlying instruments (including any letter of credit for which the Issuer is required to reimburse the issuing bank for under it). A Loan or Synthetic Security shall only be considered to be a Revolving Loan for so long as its commitment amount is greater than zero.

"**S&P CDO Monitor**" means a dynamic, analytical computer model developed by S&P and provided to the Portfolio Manager and the Collateral Administrator to be used to calculate the default frequency in terms of the amount of debt assumed to default as a percentage of the original principal amount of the Collateral Obligations consistent with a specified benchmark rating level based on certain assumptions and S&P's proprietary corporate default studies. For the purpose (and only for the purpose) of applying the S&P CDO Monitor to a portfolio of obligations, for each obligation in the portfolio, the rating of the obligation shall be its S&P Rating.

"**S&P Industry Classification**" means the S&P Industry Classifications in Schedule 3 of the Indenture as modified, amended, and supplemented from time to time by S&P.

"**S&P Priority Category**" means each type of Collateral Obligation specified in the definition of "Applicable Percentage" as an "S&P Priority Category."

"**S&P Priority Category Recovery Rate**" means, for any Collateral Obligation, the percentage specified in the definition of "Applicable Percentage" opposite the S&P Priority Category of the Collateral Obligation.

"**S&P Rating**" means, with respect to any Collateral Obligation, as of any date of determination, the rating determined in accordance with the following methodology:

(i)     If there is an issuer credit rating of the borrower of the Collateral Obligation (the "Borrower"), or the guarantor who unconditionally and irrevocably guarantees the Collateral Obligation (the "Guarantor") by S&P, the most current issuer credit rating for such Borrower or Guarantor;

(ii)     (a) if there is not an issuer credit rating of the Borrower or its Guarantor by S&P, but there is a rating by S&P on a senior secured obligation of the Borrower or its Guarantor, then the S&P Rating of the Collateral Obligation will be one subcategory below such rating; (b) if there is not a rating by S&P on a senior secured obligation of the Borrower or its Guarantor, but there is a rating by S&P on a senior unsecured obligation of the Borrower or its Guarantor, then the S&P Rating will be such rating; and (c) if there is not a rating by S&P on a senior obligation of the Borrower or its Guarantor, but there is a rating by S&P on a subordinated obligation of the Borrower or its Guarantor, then the S&P Rating will be two subcategories above such rating if such rating is "BBB-" or higher and will be one subcategory above such rating if such rating is "BB+" or lower; or

(iii)     if there is neither an issuer credit rating of the Borrower or its Guarantor by S&P nor a rating by S&P on an obligation of the Borrower or its Guarantor, then the S&P Rating may be determined using any one of the methods below:

(A)     if an obligation of the Borrower or its Guarantor is publicly rated by Moody's, then the S&P Rating will be determined in accordance with the methodologies for establishing the Moody's Default Probability Rating, except that the S&P Rating of such obligation will be (1) one subcategory below the S&P equivalent of the rating

009572

assigned by Moody's if such security is rated "Baa3" or higher by Moody's and (2) two subcategories below the S&P equivalent of the rating assigned by Moody's if such security is rated "Ba1" or lower by Moody's; *provided* that Collateral Obligations constituting no more than 10% of the Maximum Investment Amount may be given a S&P Rating based on a rating given by Moody's as provided in this subclause (A) (after giving effect to the addition of the relevant Collateral Obligation, if applicable);

        (B)    if no other security or obligation of the Borrower or its Guarantor is rated by S&P or Moody's, then the Portfolio Manager may apply to S&P for a S&P credit rating estimate, which will be its S&P Rating; or

        (C)    if such Collateral Obligation is not rated by Moody's or S&P, no other security or obligation of the Borrower or its Guarantor is rated by S&P or Moody's and if the Portfolio Manager determines in its sole discretion based on information available to it after reasonable inquiry that such Borrower (x) is not subject to any bankruptcy or reorganization proceedings nor in default on any of its obligations (unless the subject of a good faith business dispute), (y) is a legally constituted corporate entity having the minimum legal, financial and operational infrastructure to carry on a definable business, deliver and sell a product or service and report its results in generally accepted accounting terms as verified by a reputable audit firm and (z) is not so vulnerable to adverse business, financial and economic conditions that default in its financial or other obligations is foreseeable in the near term if current operating trends continue, then the S&P Rating will be "CCC-"; *provided* that the Portfolio Manager must apply to S&P for a S&P credit rating on such Borrower within 30 days after the addition of the relevant Collateral Obligation; *provided*, *further*, that Collateral Obligations constituting no more than 5% of the Maximum Investment Amount may be given an S&P Rating based on this subclause (c) (after giving effect to the addition of the relevant Collateral Obligation, if applicable);

*provided* that, if (i) the relevant Borrower or Guarantor or obligation is placed on any positive "credit watch" list by S&P, such rating will be increased by one rating subcategory or (ii) the relevant Borrower or Guarantor or obligation is placed on any negative "credit watch" list by S&P, such rating will be decreased by one rating subcategory.

Notwithstanding the foregoing, in the case of a Collateral Obligation that is a DIP Loan, the S&P Rating shall be (A) the rating assigned thereto by S&P if the rating is public, (B) the rating assigned by S&P if the rating is confidential, but only if all appropriate parties have provided written consent to its disclosure and use, (C) the rating assigned by S&P thereto through an estimated rating or (D) the rating assigned thereto by S&P in connection with the acquisition thereof upon the request of the Portfolio Manager. In the case of a Collateral Obligation that is a PIK Security or Structured Finance Obligation, the S&P Rating may not be determined pursuant to clause (iii)(A) above.

S&P Ratings for entities or obligations relevant hereunder other than Borrowers and Collateral Obligations shall be determined in a corresponding manner.

Notwithstanding the foregoing, if and for so long as the Aggregate Principal Balance of Collateral Obligations consisting in the aggregate of (x) Participations and (y) Synthetic Securities exceeds 20% of the Maximum Investment Amount, then the S&P Rating for the Aggregate Principal Balance of Collateral Obligations representing that excess (determined assuming the excess is comprised of the Collateral Obligations having the lowest S&P Ratings that would otherwise be applicable as determined above) shall be the S&P Rating one sub-category below the S&P Rating of the Collateral Obligations that would otherwise be applicable as determined above.

009573

"**S&P Unrated DIP Loan**" means a DIP Loan acquired by the Issuer that does not have a rating assigned by S&P and for which the Portfolio Manager has commenced the process of having a rating assigned by S&P (as specified in the definition of "DIP Loan").

"**Sale Proceeds**" means all proceeds received (including any proceeds received with respect to any associated interest rate swap or security providing fixed annuity payments ) with respect to Collateral Obligations or other Pledged Obligations as a result of their sales or other dispositions less any reasonable expenses expended by the Portfolio Manager or the Trustee in connection with the sales or other dispositions, which shall be paid from such proceeds notwithstanding their characterization otherwise as Administrative Expenses.

"**Secondary Risk Counterparty**" means any obligor Domiciled other than in the United States, any Participating Institution, any Synthetic Security Counterparty and any Securities Lending Counterparty.

"**Secondary Risk Table**" means the table below:

| Long-Term Senior Unsecured Debt Rating of Secondary Risk Counterparty | | Individual Counterparty Limit | Aggregate Counterparty Limit |
|---|---|---|---|
| Moody's | S&P | | |
| Aaa | AAA | 20.0% | 20.0% |
| Aa1 | AA+ | 10.0% | 10.0% |
| Aa2 | AA | 10.0% | 10.0% |
| Aa3 | AA- | 10.0% | 10.0% |
| A1 | A+ | 5.0% | 10.0% |
| A2 or below | A or below | 0.0% | 0.0% |

If any Secondary Risk Counterparty's long-term senior unsecured debt rating or short-term rating is on credit watch for possible downgrade by Moody's or S&P, then for the purposes of the table above, its rating by the Rating Agency putting its rating on credit watch shall be one rating notch lower for that Rating Agency.

"**Secured Parties**" means the Noteholders, the Insurer, the Trustee, the Portfolio Manager and each Hedge Counterparty.

"**Securities Lending Collateral**" means Cash or direct registered debt obligations of the United States of America that have a maturity date no later than the Business Day preceding the stated termination date of the relevant Securities Lending Agreement and that are pledged by a Securities Lending Counterparty as collateral pursuant to a Securities Lending Agreement.

"**Selected Collateral Quality Tests**" means Weighted Average Moody's Recovery Rate Test, the Weighted Average Fixed Rate Coupon Test, the Weighted Average Spread Test, the Weighted Average Life Test (after taking into consideration any applicable Maturity Extension), the Weighted Average Rating Factor Test and the Diversity Test.

"**Senior Secured Loan**" means a Secured Loan that is not subordinated by its terms to indebtedness of the borrower for borrowed money, trade claims, capitalized leases, or other similar obligations, with a first priority security interest in collateral.

009574

"**Senior Unsecured Loan**" means a Loan that is not (i) subordinated by its terms to indebtedness of the borrower for borrowed money and (ii) secured by a valid and perfected security interest in collateral.

"**Spread Excess**" means, as of any Measurement Date, a fraction whose (i) numerator is the product of (A) the greater of zero and the excess of the Weighted Average Spread for the Measurement Date over the Minimum Weighted Average Spread specified in the applicable row of the Ratings Matrix and (B) the Aggregate Principal Balance of all Floating Rate Obligations (excluding any Non-Performing Collateral Obligations) held by the Issuer as of the Measurement Date and (ii) denominator is the Aggregate Principal Balance of all Fixed Rate Obligations (excluding any Non-Performing Collateral Obligations) held by the Issuer as of the Measurement Date. In computing the Spread Excess on any Measurement Date, the Weighted Average Spread for the Measurement Date will be computed as if the Fixed Rate Excess were equal to zero.

"**Structured Finance Obligation**" means any obligation:

(i) secured directly by, referenced to, or representing ownership of, a pool of receivables or other assets of U.S. obligors, or obligors organized or incorporated in Moody's Group I Countries, Moody's Group II Countries or Moody's Group III Countries, including portfolio credit default swaps, synthetic collateralized debt obligations, and collateralized debt obligations, but excludes:

(A) residential mortgage-backed securities;

(B) collateralized debt obligations backed by Emerging Market Securities;

(C) collateralized debt obligations primarily backed by asset-backed securities;

(D) market value collateralized debt obligations;

(E) securities backed by "future flow" receivables;

(F) net interest margin securitizations;

(G) collateralized debt obligations backed by other collateralized debt obligations; and

(H) collateralized debt obligations a significant portion of which are backed by bonds;

(ii) that has an S&P Rating and an S&P Priority Category Recovery Rate;

(iii) that has a rating and a Moody's Priority Category Recovery Rate assigned by Moody's; and

(iv) whose ownership or disposition (without regard to the Issuer's other activities) by the Issuer will not cause the Issuer to be treated as engaged in a U.S. trade or business for United States federal income tax purposes or otherwise subject the Issuer to net income taxes.

In connection with the purchase of a Structured Finance Obligation, the Portfolio Manager shall obtain from Moody's the applicable Moody's Priority Category Recovery Rate.

009575

For purposes of the Diversity Test, multiple Structured Finance Obligations from CDOs managed by the same Portfolio Manager or multiple Structured Finance Obligations issued by the same master trust will be considered to be obligations of one issuer.

"**Subordinated Lien Loan**" means a Secured Loan secured by a second (or lower) priority security interest in the relevant collateral.

"**Super Majority**" means, with respect to any Class or group of Notes or Composite Securities, the Holders of more than 66-2/3% of the Aggregate Outstanding Amount of that Class or group of Notes or Composite Securities, as the case may be.

"**Synthetic Security**" means any swap transaction, structured bond investment, credit linked note, or other derivative financial instrument relating to a debt instrument (but excluding any such instrument relating directly to a basket or portfolio of debt instruments) or an index or indices (such as the "SAMI" index published by Credit Suisse First Boston) in connection with a basket or portfolio of debt instruments or other similar instruments entered into by the Issuer with a Synthetic Security Counterparty that has in the Portfolio Manager's commercially reasonable judgment, equivalent expected loss characteristics (those characteristics, "**credit risk**") to those of the related Reference Obligations (taking account of those considerations as they relate to the Synthetic Security Counterparty), if (i) it is either a Form-Approved Synthetic Security or the Rating Condition for each Rating Agency is satisfied, and (ii) the Reference Obligations thereof have a weighted average Market Value of at least 80% at the time the Synthetic Security is entered into.

The maturity, interest rate, and other non-credit characteristics of a Synthetic Security may be different from the Reference Obligations to which the credit risk of the Synthetic Security relates.

No Synthetic Security shall require the Issuer to make any payment to the Synthetic Security Counterparty after its initial purchase other than any payments represented by the release of any cash collateral posted by the Issuer from the Collection Account to the Synthetic Security Counterparty Account simultaneously with the Issuer's purchase of or entry into the Synthetic Security in an amount not exceeding the amount of the posted cash collateral. Collateral may be posted only to a Synthetic Security Counterparty Account. No Synthetic Security shall result in the Issuer being a "buyer" of credit protection.

The term Synthetic Security shall not include any Structured Finance Obligation or any Participation, but the Reference Obligation of a Synthetic Security may be a Structured Finance Obligation.

Each Synthetic Security Agreement shall contain appropriate limited recourse and non-petition provisions (to the extent the Issuer has contractual payment obligations to the Synthetic Security Counterparty) equivalent (*mutatis mutandis*) to those contained in the Indenture.

The ownership or disposition of any Synthetic Security (without regard to the Issuer's other activities) must not cause the Issuer to be treated as engaged in a U.S. trade or business for United States federal income tax purposes or otherwise subject the Issuer to net income taxes.

Unless the Rating Condition is otherwise satisfied, any "deliverable obligation" that may be delivered to the Issuer as a result of the occurrence of any "credit event" under any proposed Synthetic Security must not provide that its transfer to the Issuer is subject to obtaining any consents and must qualify (when the Issuer purchases the related Synthetic Security and when such "deliverable obligation" is delivered to the Issuer as a result of the occurrence of any "credit event") as a Collateral Obligation and satisfy the Concentration Limitations under the Indenture, except that such "deliverable obligation" may constitute a Defaulted Obligation when delivered upon a "credit event and if the Reference Obligation of

the Synthetic Security is a Senior Secured Loan then the "deliverable obligation" under the Synthetic Security must also be a Senior Secured Loan.

Synthetic Securities that are credit default swaps, credit linked notes, or other similar instruments may not provide for "restructuring" as a "credit event".

For purposes of the Coverage Tests and the Reinvestment Overcollateralization Test, unless the Rating Condition for each Rating Agency is satisfied in respect of any proposed alternative treatment, a Synthetic Security shall be included as a Collateral Obligation having the characteristics of the Synthetic Security and not of the related Reference Obligations.

For purposes of the Collateral Quality Tests (other than the Diversity Test and the S&P Industry Classification with respect to the S&P CDO Monitor Test), a Synthetic Security shall be included as a Collateral Obligation having the characteristics of the Synthetic Security and not of the related Reference Obligations.

For purposes of calculating compliance with the Concentration Limitations other than limits relating to payment characteristics, and all related definitions, unless otherwise specified in the Indenture or by the Rating Agencies, a Synthetic Security shall be included as a Collateral Obligation having the characteristics of its Reference Obligations and not the Synthetic Security. For purposes of calculating compliance with the Concentration Limitations relating to payment characteristics, and all related definitions, unless otherwise specified in the Indenture or by the Rating Agencies, a Synthetic Security shall be included as a Collateral Obligation having the characteristics of the Synthetic Security and not its Reference Obligation.

With respect to a Synthetic Security based upon or relating to a senior secured index investment providing non-leveraged credit exposure to a basket of credit default swaps referencing a diversified group of Reference Obligations, with respect to which the principal or notional amount of the credit exposure to any single Reference Obligation does not increase over time, for purposes of: (i) calculating compliance with the Diversity Test, the S&P Industry Classification with respect to the S&P CDO Monitor Test, and the Concentration Limitations (other than limits relating to payment characteristics and except for clauses 17 and 17(a) of the definition of "Concentration Limitations"), and all related definitions, and (ii) any other provision or definition of the Indenture involving a determination with respect to a Reference Obligation, the characteristics of such Reference Obligations shall be determined by treating such Synthetic Security as a direct investment by the Issuer in each such Reference Obligation in an amount equal to the Allocable Principal Balance of such Reference Obligation. In addition, each Reference Obligation under such Synthetic Security shall be assigned a Moody's Rating Factor equal to the sum of the Moody's Rating Factor of (i) the related Reference Obligor, (ii) the Synthetic Security Counterparty of such Synthetic Security and (iii) the Synthetic Security Collateral of such Synthetic Security. In addition, the Moody's Priority Category Rate in respect of a Synthetic Security referencing multiple Reference Obligations pursuant to this paragraph shall be the Moody's Priority Category Rate as assigned by Moody's to each Reference Obligation underlying such Synthetic Security. For the avoidance of doubt, Reference Obligations upon which a Synthetic Security is based as described in this paragraph must meet the definition of "Collateral Obligation" to the extent provided in this definition.

If the Rating Condition must be satisfied to execute the purchase of any Synthetic Security, the Portfolio Manager, on behalf of the Issuer, shall give each applicable Rating Agency not less than 5 days' prior notice of the purchase of or entry into any Synthetic Security.

"**Synthetic Security Agreement**" means the documentation governing any Synthetic Security.

"**Synthetic Security Collateral**" means, respect to any Synthetic Security, amounts posted to the Synthetic Security Collateral Account by the Synthetic Security Counterparty in support of its obligations under the Synthetic Security, including (i) all Eligible Investments or (ii) investments that satisfy the

009577

Rating Condition with respect to Moody's, in each case that mature no later than the Stated Maturity, in the Synthetic Security Collateral Account that are purchased with Synthetic Security Collateral.

"**Synthetic Security Counterparty**" means any entity required to make payments on a Synthetic Security to the extent that a reference obligor makes payments on a related Reference Obligation.

"**Tax Advantaged Jurisdiction**" means one of the Cayman Islands, Bermuda, the Netherlands Antilles or the tax advantaged jurisdiction of the Channel Islands, or such other jurisdiction that the Rating Condition with respect to each Rating Agency is satisfied with respect thereto.

"**Tax Event**" means an event that occurs if either:

(i)     (A) one or more Collateral Obligations that were not subject to withholding tax when the Issuer committed to purchase them have become subject to withholding tax or the rate of withholding has increased on one or more Collateral Obligations that were subject to withholding tax when the Issuer committed to purchase them and (B) in any Due Period, the aggregate of the payments subject to withholding tax on new withholding tax obligations and the increase in payments subject to withholding tax on increased rate withholding tax obligations, in each case to the extent not "grossed-up" (on an after-tax basis) by the related obligor, represent 5% or more of Interest Proceeds for the Due Period; or

(ii)     taxes, fees, assessments, or other similar charges are imposed on the Issuer or the Co-Issuer in an aggregate amount in any twelve-month period in excess of U.S.$2,000,000, other than any deduction or withholding for or on account of any tax with respect to any payment owing in respect of any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation or Collateral Obligation.

"**Treasury Regulations**" means regulations, including proposed or temporary regulations, promulgated under the Code.  References herein to specific provisions of proposed or temporary regulations shall include analogous provisions of final Treasury Regulations or other successor Treasury Regulations.

"**Treasury Strip Market Value**" means on any date of determination, the market value of the Treasury Strip underlying the applicable portion of the Class 1 Component of the Class 1 Composite Securities on such date, as determined in a commercially reasonable manner by the Portfolio Manager.

"**UCC**" means the Uniform Commercial Code as in effect in the State of New York, and as amended from time to time.

"**Underlying Instrument**" means the loan agreement, indenture, credit agreement, or other agreement pursuant to which a Pledged Obligation has been issued or created and each other agreement that governs the terms of or secures the obligations represented by the Pledged Obligation or of which the holders of the Pledged Obligation are the beneficiaries.

"**Unscheduled Principal Payments**" means any principal payments received with respect to a Collateral Obligation as a result of optional redemptions, exchange offers, tender offers, other payments or prepayments made at the option of the issuer thereof or that are otherwise not scheduled to be made thereunder.

"**Valuation Report**" means the accounting report, determined as of the close of business on each Determination Date, rendered in accordance with the terms of the Indenture.

009578

"**Weighted Average Fixed Rate Coupon**" means, as of any Measurement Date, the rate obtained by:

      (i)     multiplying the Principal Balance of each Collateral Obligation that is a Fixed Rate Obligation held by the Issuer as of the Measurement Date by the current per annum rate at which it pays interest, using only the effective after-tax interest rate determined by the Portfolio Manager on any Fixed Rate Obligation after taking into account any withholding tax or other deductions on account of tax of any jurisdiction and any gross-up paid by the obligor);

      (ii)    summing the amounts determined pursuant to clause (i);

      (iii)   dividing the sum by the Aggregate Principal Balance of all Collateral Obligations that are Fixed Rate Obligations held by the Issuer as of the Measurement Date; and

      (iv)   if the result obtained in clause (iii) is less than the minimum percentage rate specified to satisfy the Weighted Average Fixed Rate Coupon Test, adding to the sum the amount of any Spread Excess as of the Measurement Date, but only to the extent required to satisfy the Weighted Average Fixed Rate Coupon Test.

"**Weighted Average Life**" means, as of any Measurement Date the number obtained by (i) summing the products obtained by multiplying (A) the Average Life at that time of each Collateral Obligation by (B) the Principal Balance at that time of the Collateral Obligation and (ii) dividing that sum by the Aggregate Principal Balance at that time of all Collateral Obligations.

"**Weighted Average Moody's Rating Factor**" means the summation of the products obtained by multiplying the Principal Balance of each Collateral Obligation (excluding Eligible Investments) by its respective Moody's Rating Factor, dividing that sum by the Aggregate Principal Balance of all Collateral Obligations (excluding Eligible Investments) and rounding the result up to the nearest whole number.

"**Weighted Average Spread**" means, as of any Measurement Date, a rate obtained by:

      (i)     multiplying the Principal Balance of each Collateral Obligation that is a Floating Rate Obligation held by the Issuer as of the Measurement Date by the current per annum overall rate at which it pays interest, determined with respect to any Floating Rate Obligation that does not bear interest based on a three month London interbank offered rate, by expressing the current interest rate on the Floating Rate Obligation as a spread above a three month London interbank offered rate calculated in a manner consistent with the calculation of LIBOR;

      (ii)    summing the amounts determined pursuant to clause (i);

      (iii)   dividing that sum by the Aggregate Principal Balance of all Floating Rate Obligations held by the Issuer as of the Measurement Date; and

      (iv)   if the result obtained in clause (iii) is less than the minimum percentage rate specified to pass the Weighted Average Spread Test, adding to that sum the amount of Fixed Rate Excess as of the Measurement Date.

For purposes of calculating the Weighted Average Spread, the Principal Balance of each Collateral Obligation that is a Revolving Loan or Delayed Drawdown Loan shall not include any of its unfunded amount.

009579

"**Workout Assets**" means a Loan, High-Yield Bond, or Qualified Equity Security acquired in connection with the workout or restructuring of any Collateral Obligation that the Issuer does not advance any funds to purchase that does not qualify as a Collateral Obligation.

"**Zero-Coupon Security**" means a security that, at the time of determination, does not make periodic payments of interest.  A Zero-Coupon Security shall not include a security that is a PIK Security.

009580

## INDEX OF DEFINED TERMS

Following is an index of defined terms used in this Offering Circular and the page number where each definition appears.

Accounts ...................................................95
Accredited Investor........................................ i
Accrued Insurance Liabilities .......................23
Accrued Insurance Liabilities Interest
    Rate ....................................................181
Accrued Interest on Sale .............................181
Accrued Interest Purchased With
    Principal ..............................................181
Accumulation Period ...................................52
Act...........................................................181
Actions ....................................................124
Administration Agreement...........................136
Administrative Expense Cap.......................181
Administrative Expenses .............................181
Administrator ...........................................136
Affected Bank ...........................................182
Affiliate ...................................................182
Affiliated .................................................182
Aggregate Outstanding Amount ..................182
Aggregate Principal Balance.......................183
Aggregate Purchase Price Amount .............183
AGL ........................................................127
Allocable Principal Balance........................183
Amendment Buy-Out....................................89
Amendment Buy-Out Option..........................89
Amendment Buy-Out Purchase Price .........183
Amendment Buy-Out Purchaser .................184
Applicable Collateral Obligation
    Amount ................................................101
Applicable Note Interest Rate ....................184
Applicable Percentage ...............................184
Approved Pricing Service ...........................185
Approved Replacement ...............................126
Ask-Side Market Value...............................185
Assigned Moody's Rating ...........................186
Assured Guaranty........................................4
Authorized Officer ....................................186
Average Life .............................................186
Avoided Payment ......................................129
Bank .......................................................186
Bankruptcy Code.......................................186
Bankruptcy Law........................................186
Beneficiary...............................................129
Benefit Plan Investor..................................153
Board of Directors.....................................186
Borrower..................................................219
Business Day.............................................186
Buy-Out Amount .......................................187
Calculation Agent .......................................58

Cash .......................................................187
CCC/Caa Collateral Obligations.................187
CDOs .......................................................51
Certificated Composite Securities ................25
Certificated Preference Shares.....................25
CFC..........................................................145
Change of Control .....................................126
Class .......................................................187
Class 1 Collateral........................................95
Class 1 Collateral Principal Balance...........187
Class 1 Component......................................i
Class 1 Component Account ......................112
Class 1 Composite Securities...........................i
Class 1 Composite Security Rated
    Balance ...............................................187
Class A Coverage Tests ..............................187
Class A Interest Coverage Test....................18
Class A Notes ..............................................i
Class A Overcollateralization Test ...............18
Class A-1a Notes ...........................................i
Class A-1b Notes ...........................................i
Class A-1g Notes ...........................................i
Class A-2 Notes ............................................i
Class A-3 Notes ............................................i
Class A-3a Notes ...........................................i
Class A-3b Notes ...........................................i
Class B Coverage Tests ..............................187
Class B Deferred Interest...........................187
Class B Interest Coverage Test....................18
Class B Notes................................................i
Class B Overcollateralization Test ...............18
Class C Coverage Tests ..............................187
Class C Deferred Interest...........................187
Class C Interest Coverage Test....................18
Class C Notes................................................i
Class C Overcollateralization Test ...............18
Class Scenario Loss Rate............................187
Clearstream...............................................188
CLOs ........................................................51
Closing Date .................................................i
Closing Date Expense Account ...................110
Co-Issuer......................................................i
Co-Issuer Common Stock...........................134
Co-Issuers....................................................i
Collateral...................................................95
Collateral Administration Agreement.........188
Collateral Administrator ............................188
Collateral Obligation ..................................12
Collateral Quality Tests .............................19

009581

Collection Account ......................................108
Components ....................................................i
Composite Securities ..................................188
Composite Securities Payment Date ...........188
Composite Security Make-Up Amount.......188
Composite Securityholder..........................188
Concentration Limitations ...........................16
CONSOB .........................................................x
Controlling Class ........................................188
Corporate Trust Office ...............................189
Coverage Tests.............................................18
Credit Improved Obligation .......................189
Credit Rating Event.....................................189
credit risk .................................................223
Credit Risk Obligation ...............................190
Current Portfolio ........................................191
Current-Pay Obligation...............................191
Custodial Account.......................................109
Deadline .....................................................107
Debtor ........................................................194
Decree No. 385 ............................................ xi
Deep Discount Obligation...........................191
Default Interest Rate ..................................193
Defaulted Collateral Obligation..................192
Defaulted Hedge Termination Payments ....193
Defaulted Interest.......................................193
Defaulted Interest Charge ..........................193
Deferred Interest............................................5
Deferred Interest Notes ..............................193
Delayed Drawdown Loan ...........................193
Delayed Drawdown Reserve Account ...........4
Depository ..................................................194
Determination Date.......................................20
DIP Loan ....................................................194
Directing Preference Shares........................125
Diversity Score............................................194
Diversity Test................................................98
Documents ..................................................140
Domicile......................................................194
Domiciled....................................................194
DTC ............................................................194
Due for Payment .........................................129
Due Period ..................................................195
Eligibility Criteria ........................................96
Eligible Country ..........................................195
Eligible Investments....................................195
Emerging Market Security ..........................197
ERISA .........................................................152
ERISA Plans ...............................................153
Euroclear.....................................................197
Event of Default............................................79
Excess CCC/Caa Collateral Obligations.....197
Exchange Act...............................................xv
Excluded Property.......................................197

Expected Moody's Initial Rating ....................1
Expected S&P Initial Rating...........................1
Expense Reimbursement Account..............110
Expenses .....................................................124
Extended Reinvestment Period End
    Date.........................................................8
Extended Scheduled Preference Shares
    Redemption Date ..................................197
Extended Stated Maturity Date.......................8
Extended Weighted Average Life Date .........8
Extension ....................................................197
Extension Bonus Eligibility
    Certification ..........................................197
Extension Bonus Payment ..........................197
Extension Conditions....................................61
Extension Determination Date....................198
Extension Effective Date ...............................8
Extension Notice...........................................62
Extension Purchase Price............................198
Extension Qualifying Purchasers................198
Extension Sale Securities..............................60
Extension Sales Notice..................................62
Extension Sales Notice Period......................62
Face Amount...............................................198
Financial Lease ...........................................198
Fixed Rate Excess.......................................198
Fixed Rate Notes ........................................199
Fixed Rate Obligation.................................199
Floating Rate Notes ....................................199
Floating Rate Obligation ............................199
Form-Approved Synthetic Security............199
FSMA ........................................................xiv
Global Securities.........................................25
Guarantor ...................................................219
Hedge Agreements ......................................199
Hedge Counterparty....................................199
Hedge Counterparty Collateral Account ....110
Hedge Termination Receipt........................199
Highland Capital............................................3
High-Yield Bond ........................................200
Holder.........................................................200
Incentive Management Fee..........................123
Indemnification Agreement.........................200
Indemnified Parties.....................................124
Indenture.........................................................i
Indenture Register.......................................200
Indenture Registrar .....................................200
Initial Consent Period .................................200
Initial Purchaser............................................ii
Initial Rating...............................................200
Initial Shadow Rating .................................200
Insurance Agreement.....................................23
Insurance Agreement Event of Default ......133
Insurance Documents ..................................200

009582

Insured Amount .....................................129
Insured Noteholder..............................200
Insured Notes ......................................... i
Insurer ..................................................... i
Insurer Default ....................................200
Insurer Information ............................132
Interest Coverage Ratio......................102
Interest Coverage Test ........................102
Interest Period ....................................201
Interest Proceeds ................................201
Interest Reserve Account ....................111
Investment Company Act ........................ i
Investment Criteria Adjusted Balance ........202
Investment Obligation........................202
Irish Paying and Listing Agent ..............55
IRS .......................................................139
Issue Price ...........................................138
Issuer ....................................................... i
Issuer Accounts.....................................95
Issuer Charter......................................202
Issuer Order.........................................202
Issuer Ordinary Shares.......................134
Issuer Request .....................................202
JPMorgan ............................................... ii
JPMorgan Companies ...........................53
JPMorgan Company..............................53
Junior Class..........................................202
Knowledgeable Employee ......................... i
Leasing Finance Transaction .............202
lender liability .......................................48
Liabilities .............................................123
LIBOR ....................................................58
Loan .....................................................203
Long-Dated Collateral Obligation ........203
Lower-Tier PFICs ................................146
Majority ...............................................203
Make-Whole Premium.........................203
Management Agreement......................203
Management Fee...................................123
Margin Stock........................................203
Market Value .......................................203
Market Value Percentage....................204
Maturity Extension.................................8
Maximum Investment Amount ...........204
Maximum Weighted Average Moody's
    Rating Factor ..................................204
Measurement Date ..............................204
Minimum Diversity Score...................205
Minimum Weighted Average Spread ........205
Misrepresentation.............................. vii
Monthly Report...................................205
Moody's................................................... ii
Moody's Default Probability Rating ..........205

Moody's Equivalent Senior Unsecured
    Rating ..............................................205
Moody's Group I Country.....................208
Moody's Group II Country ...................208
Moody's Group III Country ..................208
Moody's Minimum Average Recovery
    Rate ..................................................208
Moody's Non Senior Secured Loan ..........208
Moody's Obligation Rating...................209
Moody's Priority Category....................209
Moody's Priority Category Recovery
    Rate ..................................................209
Moody's Rating.....................................209
Moody's Rating Factor.........................210
Moody's Senior Secured Loan..............210
Non-Call Period .....................................21
Non-Consenting Holder........................211
Nonpayment by the Issuer ..................130
Non-Performing Collateral Obligations .....211
non-U.S. Holder....................................150
Note Break-Even Loss Rate.....................99
Note Class Loss Differential....................99
Note Interest Rate .................................57
Note Payment Sequence .......................211
Noteholder ...........................................211
Notes..........................................................i
Offer .....................................................212
Officer...................................................212
Offshore Transactions............................23
OID .......................................................142
Optional Redemption.............................63
Order .....................................................131
Other Indebtedness ..............................192
Outstanding..........................................212
Overcollateralization Ratio..................100
Overcollateralization Ratio Numerator......100
Overcollateralization Tests .................100
Participating Institution ......................213
Participation.........................................213
Parties in Interest ...............................152
Payment Account.....................................111
Payment Date............................................ii
Permitted Offer ....................................213
Person ...................................................214
PFIC ......................................................144
PIK Security .........................................213
Plan Asset Regulation...........................152
Plans .....................................................152
Pledged Obligations..............................214
Poland .....................................................xii
Policy..........................................................i
Policy Payment Account........................112
portfolio interest exemption......................140
Portfolio Manager..................................3

009583

Portfolio Manager Breaches ......................124
Preference Share Component..........................i
Preference Share Documents ........................55
Preference Share Internal Rate of Return ...214
Preference Share Vote..................................93
Preference Shares.........................................i
Preference Shares Distribution Account .....214
Preference Shares Distribution Amount ......214
Preference Shares Notional Amount...........214
Preference Shares Paying Agency
    Agreement ...............................................2
Preference Shares Paying Agent ................214
Premium......................................................133
Premium Letter..........................................214
Premium Rate.............................................214
Principal Balance .......................................215
Principal Proceeds......................................215
Priority Class..............................................215
Priority of Payments ...................................68
Proceeding .................................................215
Proposed Portfolio ....................................215
PTCE..........................................................154
public offering.............................................. viii
public trading .............................................. xiii
Purchase Agreement ..................................156
Purchase Price............................................215
Purchase Price Amount..............................216
Purchased Securities ..................................... ii
QEF............................................................144
Qualified Equity Security ..........................216
Qualified Institutional Buyer ........................i
Qualified Purchaser .......................................i
qualified stated interest ..............................142
Ramp-Up Completion Date .........................10
Ramp-Up Period ........................................216
Rating Agencies ............................................ ii
Rating Agency ............................................216
Rating Condition ........................................216
Rating Confirmation ..................................216
Rating Confirmation Failure ........................21
Ratings Matrix ...........................................216
Record Date .................................................92
Recovery Rate Modifier.............................217
Redemption Date ........................................217
Redemption Price.......................................217
Reference Banks ..........................................58
Reference Obligation .................................218
Registered ..................................................218
Regulation D ..............................................218
Regulation S..................................................i
Regulation S Global Composite Security .....25
Regulation S Global Note ............................24
Regulation S Global Preference Share ..........25

Reinvestment Overcollateralization
    Ratio......................................................218
Reinvestment Overcollateralization Test.... 102
Reinvestment Period....................................11
Reinvestment Yield ....................................218
Remaining Life Date ..................................218
Removal Buy-Out........................................89
Removal Buy-Out Option.............................89
Removal Buy-Out Purchase Price .............218
Removal Buy-Out Purchaser ......................218
Repository...................................................218
Required Rating..........................................113
Resolutions .................................................55
Revolving Loan ..........................................219
Revolving Reserve Account ...........................4
Rule 144A.......................................................i
Rule 144A Global Note ................................24
S&P.................................................................ii
S&P CDO Monitor ......................................219
S&P CDO Monitor Test ...............................99
S&P Industry Classification .......................219
S&P Minimum Average Recovery Rate.......98
S&P Priority Category.................................219
S&P Priority Category Recovery Rate .......219
S&P Rating .................................................219
S&P Unrated DIP Loan ..............................221
Sale Date......................................................73
Sale Proceeds ............................................221
SAP.............................................................128
Scheduled Preference Shares
    Redemption Date ........................................6
SEC...............................................................36
Secondary Risk Counterparty ....................221
Secondary Risk Table.................................221
Secured Obligations.....................................55
Secured Parties ..........................................221
Securities ........................................................i
Securities Act..................................................i
Securities and Exchange Law ......................xi
Securities and Futures Act..........................xiii
Securities Commission ...............................viii
Securities Lending Account........................111
Securities Lending Agreement ...................115
Securities Lending Collateral .....................221
Securities Lending Counterparty ...............115
Selected Collateral Quality Tests...............221
Senior Class A Notes......................................i
Senior Management Fee .............................123
Senior Secured Loan..................................221
Senior Unsecured Loan ..............................222
Share Registrar ............................................79
Share Trustee .............................................134
Special Redemption......................................22
Special Redemption Amount ........................22

009584

Special Redemption Date ............................ 22
Special U.S. Tax Counsel ......................... 140
Spread Excess ........................................... 222
Stated Maturity ............................................. 6
Step-Up Note Interest Rate ........................... 1
Structured Finance Obligation .................. 222
Subordinated Lien Loan ............................ 223
Subordinated Management Fee .................. 123
Super Majority .......................................... 223
Synthetic Security ..................................... 223
Synthetic Security Agreement ................... 224
Synthetic Security Collateral ..................... 224
Synthetic Security Collateral Account ........ 109
Synthetic Security Counterparty ................ 225
Synthetic Security Counterparty
    Account .................................................. 111
Tax Advantaged Jurisdiction ..................... 225
Tax Event .................................................. 225
Tax-Exempt U.S. Holder ........................... 148
Treasury ...................................................... 40
Treasury Regulations ................................ 225
Treasury Strip ........................................... 112
Trustee ........................................................... i
U.S. Holder ............................................... 139
U.S. Offeree .............................................. 159
U.S. Persons ................................................ 23

U.S. Shareholders ..................................... 145
UBTI ......................................................... 148
UCC ........................................................... 225
Underlying Instrument ............................... 225
Unscheduled Principal Payments .............. 225
USA PATRIOT Act ..................................... 40
Valuation Report ....................................... 225
Warehouse Agreement ................................ 50
Warehouse Provider .................................... 50
Warehoused Loans ...................................... 51
Weighted Average Fixed Rate Coupon ...... 226
Weighted Average Fixed Rate Coupon
    Test .......................................................... 98
Weighted Average Life .............................. 226
Weighted Average Life Test ........................ 98
Weighted Average Moody's Rating
    Factor .................................................... 226
Weighted Average Moody's Recovery
    Rate Test ................................................. 98
Weighted Average Rating Factor Test ......... 99
Weighted Average S&P Recovery Rate
    Test .......................................................... 98
Weighted Average Spread .......................... 226
Weighted Average Spread Test .................... 99
Workout Assets .......................................... 227
Zero-Coupon Security ............................... 227

009585

**EXHIBIT A: AUDITED FINANCIAL STATEMENTS OF ASSURED GUARANTY CORP.**

The New York State Insurance Department recognizes only statutory accounting practices for determining and reporting the financial condition and results of operations of an insurance company, for determining its solvency under the New York Insurance Law, and for determining whether its financial condition warrants the payment of a dividend to its stockholders. No consideration is given by the New York State Insurance Department to financial statements prepared in accordance with United States generally accepted accounting principles in making such determinations.

009586

**ASSURED GUARANTY CORP. CONSOLIDATED FINANCIAL STATEMENTS FOR THE YEARS ENDED DECEMBER 31, 2003, 2002 AND 2001, AND UNAUDITED CONSOLIDATED FINANCIAL STATEMENTS FOR THE NINE MONTHS ENDED SEPTEMBER 30, 2004 AND 2003**

Page

**Consolidated Financial Statements for the Years Ended December 31, 2003, 2002 and 2001**

Report of Independent Registered Public Accounting Firm ................................................................... A-3

Consolidated Balance Sheets ................................................................................................................... A-4

Consolidated Statements of Operations and Comprehensive Income ..................................................... A-5

Consolidated Statements of Stockholder's Equity .................................................................................. A-6

Consolidated Statements of Cash Flows.................................................................................................. A-7

Notes to Consolidated Financial Statements........................................................................................... A-8

**Unaudited Consolidated Financial Statements for the Nine Months Ended September 30, 2004 and 2003**

Consolidated Balance Sheets ................................................................................................................... A-33

Consolidated Statements of Operations ................................................................................................... A-34

009587

*PRICEWATERHOUSECOOPERS*

**PricewaterhouseCoopers LLP**
1177 Avenue of the Americas
New York NY 10036
Telephone (646) 471 4000
Facsimile (813) 286 6000

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Stockholder of
ACE Guaranty Corp.

In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of operations and comprehensive income, of stockholder's equity and of cash flows, present fairly, in all material respects, the financial position of ACE Guaranty Corp., (the "Company"), an indirect, wholly owned subsidiary of ACE Limited, at December 31, 2003 and 2002, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2003 in conformity with accounting principles generally accepted in the United States of America. These financial statement are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide reasonable basis for our opinion.

As discussed in Note 2 and Note 4 to the financial statements, the Company changed its method of accounting for goodwill and derivatives in 2002 and 2001, respectively.

/s/ PricewaterhouseCoopers LLP

New York, New York
June 25, 2004

A-3

009588

**ACE Guaranty Corp.**
**Consolidated Balance Sheets**
**December 31, 2003 and 2002**

*(dollars in the thousands, except share and per share data)*

|  | 2003 | 2002 |
|---|---|---|
| **Assets** | | |
| Fixed maturity securities available for sale, at fair value (amortized cost: $1,057,044 in 2003 and $896,375 in 2002) | $ 1,126,723 | $ 961,057 |
| Short-term investments, at cost, which approximates fair value | 55,078 | 52,384 |
| Total investments | 1,181,801 | 1,013,441 |
| Cash | 18,009 | 3,081 |
| Accrued investment income | 14,031 | 12,138 |
| Deferred acquisition costs | 146,926 | 135,884 |
| Prepaid reinsurance premiums | 7,254 | 51,926 |
| Reinsurance recoverable on ceded losses | - | 11,420 |
| Premiums receivable | 31,524 | 32,081 |
| Goodwill | 87,062 | 87,062 |
| Other assets | 14,946 | 12,341 |
| Total assets | $ 1,501,553 | $ 1,359,374 |
| | | |
| **Liabilities and stockholder's equity** | | |
| Liabilities | | |
| Unearned premium reserve | $ 389,027 | $ 352,551 |
| Reserve for losses and loss adjustment expenses | 110,259 | 75,961 |
| Deferred federal income taxes payable | 77,934 | 53,567 |
| Current federal income taxes payable | 6,389 | 8,517 |
| Unrealized losses on derivative financial instruments | 18,482 | 67,023 |
| Other liabilities | 22,732 | 28,318 |
| Total liabilities | 624,823 | 585,937 |
| | | |
| Commitments and contingencies (Note 13) | | |
| | | |
| Stockholder's equity | | |
| Common stock – $720 par value per share in 2003 and 2002: 200,000 authorized, 20,834 issued and outstanding in 2003 and 2002 | 15,000 | 15,000 |
| Additional paid-in capital | 351,231 | 345,561 |
| Unearned stock grant compensation | (2,849) | (2,056) |
| Retained earnings | 468,064 | 372,889 |
| Accumulated other comprehensive income | 45,284 | 42,043 |
| Total stockholder's equity | 876,730 | 773,437 |
| Total liabilities and stockholder's equity | $ 1,501,553 | $ 1,359,374 |

See accompanying notes to consolidated financial statements.

A-4

009589

**ACE Guaranty Corp.**
**Consolidated Statements of Operations and Comprehensive Income**
**Years Ended December 31, 2003, 2002 and 2001**

*(dollars in thousands)*

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| **Revenues** | | | |
| Gross written premiums | $ 219,923 | $ 155,079 | $ 120,796 |
| Ceded premiums | (36,623) | 31,367 | 31,798 |
| Net written premiums | 256,546 | 123,712 | 88,998 |
| Increase in unearned premium reserve | (81,148) | (12,199) | (11,336) |
| Net premiums earned | 175,398 | 111,513 | 77,662 |
| Net investment income | 47,156 | 46,730 | 46,487 |
| Net realized gains | 2,092 | 6,888 | 10,203 |
| Net realized gain (loss) on derivative financial instruments | 48,541 | (36,998) | 5,051 |
| Other income | 1,340 | 1,307 | 633 |
| Total revenues | 274,527 | 129,440 | 140,036 |
| **Expenses** | | | |
| Losses and loss adjustment expenses | 56,706 | 24,513 | 5,875 |
| Acquisition costs | 57,609 | 41,624 | 31,520 |
| Increase in deferred acquisition costs | (11,042) | (8,212) | (7,011) |
| Other operating expenses | 24,341 | 15,229 | 13,703 |
| Goodwill amortization | - | - | 3,785 |
| Foreign exchange (gains) losses | (865) | 216 | 3 |
| Total expenses | 126,749 | 73,370 | 47,875 |
| Income before provision for federal income taxes | 147,778 | 56,070 | 92,161 |
| **Provision (benefit) for federal income taxes** | | | |
| Current | 19,985 | 20,847 | 14,749 |
| Deferred | 22,618 | (10,420) | 11,036 |
| Total provision for federal income taxes | 42,603 | 10,427 | 25,785 |
| Net income before cumulative effect of new accounting standard | 105,175 | 45,643 | 66,376 |
| Cumulative effect of new accounting standard, net of tax | - | - | (22,800) |
| Net income | 105,175 | 45,643 | 43,576 |
| **Other comprehensive income, net of tax** | | | |
| Unrealized holding gains (losses) arising during the year | 1,881 | 23,087 | (16,788) |
| Reclassification adjustment for realized gains included in net income | 1,360 | 4,477 | 6,632 |
| Change in net unrealized gain (loss) on fixed maturity securities available for sale | 3,241 | 27,564 | (10,156) |
| Comprehensive income | $ 108,416 | $ 73,207 | $ 33,420 |

See accompanying notes to consolidated financial statements.

A-5

009590

**ACE Guaranty Corp.**
**Consolidated Statements of Stockholder's Equity**
**Years Ended December 31, 2003, 2002 and 2001**

*(dollars in thousands)*

| | Common Stock | Additional Paid-in Capital | Unearned Stock Grant Compensation | Retained Earnings | Accumulated Other Comprehensive Income | Total Stockholder's Equity |
|---|---|---|---|---|---|---|
| **Balance January 1, 2001** | $ 2,500 | $ 352,900 | $ - | $ 297,170 | $ 24,635 | $ 677,205 |
| Net income | | | | 43,576 | | 43,576 |
| Dividends | | | | (5,500) | | (5,500) |
| Change in Par Value | 12,500 | (12,500) | | | | - |
| Tax benefit for options exercised | | 1,629 | | | | 1,629 |
| Unrealized loss on fixed maturity securities, net of tax ($5,469) | | | | | (10,156) | (10,156) |
| Unearned stock grant compensation, net | | | (984) | | | (984) |
| **Balance, December 31, 2001** | $ 15,000 | $ 342,029 | $ (984) | $ 335,246 | $ 14,479 | $ 705,770 |
| Net income | | | | 45,643 | | 45,643 |
| Dividends | | | | (8,000) | | (8,000) |
| Tax benefit for options exercised | | 3,532 | | | | 3,532 |
| Unrealized gain on fixed maturity securities, net of tax ($14,842) | | | | | 27,564 | 27,564 |
| Unearned stock grant compensation, net | | | (1,072) | | | (1,072) |
| **Balance, December 31, 2002** | $ 15,000 | $ 345,561 | $ (2,056) | $ 372,889 | $ 42,043 | $ 773,437 |
| Net income | | | | 105,175 | | 105,175 |
| Dividends | | | | (10,000) | | (10,000) |
| Tax benefit for options exercised | | 5,670 | | | | 5,670 |
| Unrealized gain on fixed maturity securities, net of tax ($1,745) | | | | | 3,241 | 3,241 |
| Unearned stock grant compensation, net | | | (793) | | | (793) |
| **Balance, December 31, 2003** | $ 15,000 | $ 351,231 | $ (2,849) | $ 468,064 | $ 45,284 | $ 876,730 |

See accompanying notes to consolidated financial statements.

A-6

009591

**ACE Guaranty Corp.**
**Consolidated Statements of Cash Flows**
**Years Ended December 31, 2003, 2002 and 2001**

*(dollars in thousands)*

|  | 2003 | 2002 | 2001 |
|---|---|---|---|
| **Operating activities** | | | |
| Net income | $ 105,175 | $ 45,643 | $ 43,576 |
| Adjustments to reconcile net income to net cash provided by operating activities | | | |
|     Net amortization of security premiums | 6,682 | 3,605 | 1,289 |
|     Amortization of goodwill | - | - | 3,785 |
|     (Benefit) provision for deferred federal income taxes | 22,618 | (10,420) | 11,036 |
|     Net realized gains on investments | (2,092) | (6,888) | (10,203) |
|     Cumulative effect of adopting a new accounting standard, net | - | - | 22,800 |
|     Change in fair value of derivative financial instrument | (48,541) | 36,998 | (5,051) |
|     Change in deferred acquisition costs | (11,042) | (8,212) | (7,011) |
|     Change in accrued investment income | (1,893) | (548) | 916 |
|     Change in premiums receivable, net | 557 | (8,584) | (18,334) |
|     Change in prepaid reinsurance premiums | 44,672 | (16,401) | (18,997) |
|     Change in unearned premium reserves | 36,476 | 28,600 | 30,333 |
|     Change in reserve for losses and loss adjustment expenses | 45,718 | (1,513) | 9,848 |
|     Other | (7,601) | 9,472 | 1,646 |
|         Net cash provided by operating activities | 190,729 | 71,752 | 65,633 |
| **Investing activities** | | | |
| Fixed maturity securities available-for-sale: | | | |
|     Purchases | (408,660) | (667,060) | (876,701) |
|     Sales | 240,401 | 577,428 | 839,921 |
| (Purchases) sales of short-term investments, net | (2,694) | 19,709 | (8,571) |
| Other, net | 3,000 | 8,712 | (15,903) |
|         Net cash used in investing activities | (167,953) | (61,211) | (61,254) |
| **Financing activities** | | | |
| Dividends paid | (10,000) | (8,000) | (5,500) |
|         Net cash used in financing activities | (10,000) | (8,000) | (5,500) |
| Increase (decrease) in cash | 12,776 | 2,541 | (1,121) |
| Effect of exchange rate changes | 2,152 | 260 | (12) |
| Cash beginning of year | 3,081 | 280 | 1,413 |
| Cash end of year | $ 18,009 | $ 3,081 | $ 280 |
| **Supplementary cash flow information** | | | |
| Income taxes paid | $ 16,443 | $ 10,796 | $ 7,250 |

See accompanying notes to consolidated financial statements.

009592

**ACE Guaranty Corp.**
**Notes to Consolidated Financial Statements**
**December 31, 2003, 2002 and 2001**

1.    **Organization and Business**

ACE Guaranty Corp. (formerly known as ACE Guaranty Re Inc.), (the "Company") is a Maryland domiciled company, which commenced operations in January 1988 and provides insurance and reinsurance of investment grade financial guaranty exposures, including municipal and nonmunicipal reinsurance, credit default swap ("CDS") transactions as well as trade credit and related reinsurance. The Company has financial strength ratings of AAA and Aa2 as of December 31, 2003 from Standard & Poor's Rating Service ("S&P") and Moody's Investor Services, Inc. ("Moody's"), respectively, and is licensed in 30 jurisdictions. The Company owns 100% of ACE Risk Assurance Company, a Maryland domiciled company.

As of December 31, 2003, the Company was an indirect wholly-owned subsidiary of ACE Limited ("ACE"), a holding company incorporated with limited liability under Cayman Islands Companies Law. However, on April 28, 2004, subsidiaries of ACE completed an initial public offering ("IPO") of 49,000,000 common shares of their wholly owned subsidiary and parent of the Company, Assured Guaranty Ltd. ("Assured Guaranty"). Assured Guaranty's common shares are traded on the New York Stock Exchange under the symbol AGO. This offering raised approximately $840.1 million in net proceeds, all of which went to the selling shareholders. As a result of the IPO, we implemented a new underwriting strategy. As part of this strategy, we have exited certain lines of business, including trade credit. The Company was renamed Assured Guaranty Corp. upon completion of the IPO.

2.    **Significant Accounting Policies**

**Basis of Presentation**
The consolidated financial statements include the accounts of the Company and its wholly-owned subsidiary, ACE Risk Assurance Company, after elimination of inter-company accounts and transactions. Certain items in the prior years' financial statements have been reclassified to conform to the current year presentation.

The financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America ("GAAP"), which requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities as of the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

**Premium Revenue Recognition**
Premiums are received either upfront or in installments. Upfront premiums are earned in proportion to the expiration of the amount at risk. Each installment premium is earned ratably over its installment period, generally one year or less. For insured bonds for which the par value outstanding is declining during the insurance period, upfront premium earnings are greater in the earlier periods thus matching revenue recognition with the underlying risk. The premiums are allocated in accordance with the principal amortization schedule of the related bond issue and are earned ratably over the amortization period. When an insured issue is retired early, is called by the issuer, or is in substance paid in advance through a refunding accomplished by placing U.S. Government securities in escrow, the remaining unearned premium reserve is earned at that time. Unearned premium reserve represents the portion of premiums written that is applicable to the unexpired amount at risk of insured bonds.

009593

ACE Guaranty Corp.
**Notes to Consolidated Financial Statements**
**December 31, 2003, 2002 and 2001**

Due to the customary lag (ranging from 30 to 90 days) in reporting premium data by some of the ceding companies, the Company must estimate the ultimate written and earned premiums to be received from a ceding company as of each balance sheet date for the reinsurance business. Actual written premiums reported in the statements of operations are based upon reports received by ceding companies supplemented by the Company's own estimates of premium for which ceding company reports have not yet been received. Differences between such estimates and actual amounts are recorded in the period in which the actual amounts are determined. Based on historical write-off percentages, the Company has not established an allowance for doubtful accounts for its premiums receivable as of December 31, 2003 or 2002.

**Investments**
The Company accounts for its investments in fixed maturity securities in accordance with the Financial Accounting Standard Board's ("FASB") Statement of Financial Accounting Standards ("FAS") No. 115, "Accounting for Certain Investments in Debt and Equity Securities" ("FAS 115"). Management determines the appropriate classification of securities at the time of purchase. As of December 31, 2003 and 2002, all investments in fixed maturity securities were designated as available-for-sale and are carried at fair value. The fair values of all investments are calculated from independent market quotations.

The amortized cost of fixed maturity securities is adjusted for amortization of premiums and accretion of discount computed using the effective interest method. That amortization or accretion is included in net investment income. For mortgage-backed securities, and any other holdings for which there is prepayment risk, prepayment assumptions are evaluated and revised as necessary. Any necessary adjustments required due to the resulting change in effective yields and maturities are recognized prospectively in current income.

Realized gains and losses on sales of investments are determined using the specific identification method. Unrealized gains and losses on investments, net of applicable deferred income taxes, are included in accumulated other comprehensive income in stockholder's equity. The Company has a formal review process for all securities in its investment portfolio, including a review for impairment losses. Factors considered when assessing impairment include:

- a decline in the market value of a security by 20% or more below amortized cost for a continuous period of at least six months;

- a decline in the market value of a security for a continuous period of 12 months;

- recent credit downgrades of the applicable security or the issuer by rating agencies;

- the financial condition of the applicable issuer;

- whether scheduled interest payments are past due; and

- whether the Company has the ability and intent to hold the security for a sufficient period of time to allow for anticipated recoveries in fair value.

If the Company believes a decline in the value of a particular investment is temporary, the decline is recorded as an unrealized loss on the balance sheet in "accumulated other comprehensive income" in stockholders equity. If the Company believes the decline is "other

009594

**ACE Guaranty Corp.**
**Notes to Consolidated Financial Statements**
**December 31, 2003, 2002 and 2001**

than temporary," the Company will write down the carrying value of the investment and record a realized loss in the statement of operations. The assessment of a decline in value includes management's current assessment of the factors noted above. If that assessment changes in the future, the Company may ultimately record a loss after having originally concluded that the decline in value was temporary. The Company had no writedown of securities for other than temporary declines during 2003, 2002 or 2001.

Short-term investments are recorded at cost, which approximates fair value. Short-term investments are those with original maturities of greater than three months but less than one year from date of purchase.

**Cash and Cash Equivalents**
The Company classifies demand deposits as cash. Cash equivalents are short-term, highly liquid investments with original maturities of three months or less.

**Deferred Acquisition Costs**
Acquisition costs incurred, that vary with and are directly related to the production of new business, are deferred. These costs include direct and indirect expenses such as commissions, brokerage expenses and costs of underwriting and marketing personnel. The Company's management uses judgment in determining what types of costs should be deferred, as well as what percentage of these costs should be deferred. The Company periodically conducts a study to determine which operating costs vary with, and are directly related to, the acquisition of new business and qualify for deferral. Acquisition costs other than those associated with the credit derivative products are deferred and amortized in relation to earned premiums. Ceding commissions received on premiums ceded to other reinsurers reduce acquisition costs. Anticipated losses, loss adjustment expenses and the remaining costs of servicing the insured or reinsured business are considered in determining the recoverability of acquisition costs. The Company regularly conducts reviews for potential premium deficiencies. There were no premium deficiencies for any of the reported years as the sum of anticipated losses, loss adjustment expenses and the remaining costs of servicing the insured or reinsured did not exceed the related unearned premium. Acquisition costs associated with credit derivative products are expensed as incurred.

**Reserve for Losses and Loss Adjustment Expenses**
Reserve for loss and loss adjustment expenses ("LAE") includes case reserves, incurred but not reported reserves ("IBNR") and portfolio reserves.

Case reserves are established when specific insured obligations are in or near default. Case reserves represent the present value of expected future loss payments and LAE, net of estimated recoveries but before considering ceded reinsurance. Financial guaranty insurance and reinsurance case reserves are discounted at 6.0%, which is the approximate taxable equivalent yield on the investment portfolio in all periods presented.

IBNR is an estimate of the amount of losses when the insured event has occurred but the claim has not yet been reported to the Company. In establishing IBNR, the Company uses traditional actuarial methods to estimate the reporting lag of such claims based on historical experience, claim reviews and information reported by ceding companies.

In addition to IBNR, the Company records portfolio reserves for financial guaranty insurance and reinsurance, and credit derivative business. Portfolio reserves are established with respect to the portion of the Company's business for which case reserves have not been

009595

**ACE Guaranty Corp.**
**Notes to Consolidated Financial Statements**
**December 31, 2003, 2002 and 2001**

established. Portfolio reserves are established in an amount equal to the portion of actuarially estimated ultimate losses related to premiums earned to date as a percentage of total expected premiums for that in-force business. Actuarially estimated ultimate losses on financial guaranty exposures are developed considering the net par outstanding of each insured obligation, taking account of the probability of future default, the expected timing of the default and expected recovery following default. These factors vary by type of issue (for example, municipal, structured finance or corporate), current credit rating and remaining term of the underlying obligation and are principally based on historical data obtained from rating agencies. During an accounting period, portfolio reserves principally increase or decrease based on changes in the aggregate net amount at risk and the probability of default resulting from changes in credit quality of insured obligations, if any.

The Company updates its estimates of loss and LAE reserves quarterly. Loss assumptions used in computing losses and LAE reserves are periodically updated for emerging experience, and any resulting changes in reserves are recorded as a charge or credit to earnings in the period such estimates are changed. Due to the inherent uncertainties of estimating loss and LAE reserves, specifically for the high severity, low frequency financial guaranty business that the Company writes, actual experience may differ from the estimates reflected in our consolidated financial statements, and the differences may be material.

**Reinsurance**
In the ordinary course of business, the Company assumes and retrocedes business with other insurance and reinsurance companies. These agreements provide greater diversification of business and may minimize the net potential loss from large risks. Reinsurance contracts do not relieve the Company of its obligation to the reinsured. Reinsurance recoverable on ceded losses includes balances due from reinsurance companies for paid and unpaid losses and LAE that will be recovered from reinsurers, based on contracts in force, and is presented net of any provision for estimated uncollectible reinsurance. Any change in the provision for uncollectible reinsurance is included in loss and loss adjustment expenses. Prepaid reinsurance premiums represent the portion of premiums ceded to reinsurers relating to the unexpired terms of the reinsurance contracts in force.

Certain of the Company's assumed and ceded reinsurance contracts are funds held arrangements. In a funds held arrangement, the ceding company retains the premiums instead of paying them to the reinsurer and losses are offset against these funds in an experience account. Because the reinsurer is not in receipt of the funds, the reinsurer earns interest on the experience account balance at a predetermined credited rate of interest. The Company generally earns interest at fixed rates of between 4% and 6% on its assumed funds held arrangements and generally pays interest at fixed rates of between 4% and 6% on its ceded funds held arrangements. The interest earned or credited on funds held arrangements is included in net investment income. In addition, interest on funds held arrangements will continue to be earned or credited until the experience account is fully depleted, which can extend many years beyond the expiration of the coverage period.

**Goodwill**
Goodwill of $94.6 million arose from ACE's acquisition of the Company as of December 31, 1999 and was being amortized over a period of twenty-five years. Beginning January 1, 2002, goodwill is no longer amortized, but rather is evaluated for impairment at least annually. Management has determined that goodwill is not impaired at December 31, 2003.

009596

**ACE Guaranty Corp.**
**Notes to Consolidated Financial Statements**
**December 31, 2003, 2002 and 2001**

The following table reconciles reported net income to adjusted net income excluding goodwill amortization.

| (in thousands) | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
| | **2003** | **2002** | **2001** |
| Reported net income | $ 105,175 | $ 45,643 | $ 43,576 |
| Add back: goodwill amortization | - | - | 3,785 |
| Adjusted net income | $ 105,175 | $ 45,643 | $ 47,361 |

The following table details goodwill by segment as of December 31, 2003 and 2002:

| (in thousands) | |
| --- | --- |
| Financial guaranty direct | $ 14,748 |
| Financial guaranty reinsurance | 70,669 |
| Mortgage guaranty | - |
| Other | 1,645 |
| | $ 87,062 |

**Income Taxes**
In accordance with FAS No. 109, "Accounting for Income Taxes", deferred income taxes are provided for with respect to the temporary differences between the financial statement carrying amounts and tax bases of assets and liabilities, using enacted rates in effect for the year in which the differences are expected to reverse. Such temporary differences relate principally to deferred acquisition costs, reserve for losses and LAE, unearned premium reserve, unrealized gains and losses on investments, unrealized gains and losses on derivative financial instruments and statutory contingency reserve.

**Stock Based Compensation**
Stock based compensation is based on ACE stock. The Company accounts for stock-based compensation plans in accordance with APB No. 25. No compensation expense for options is reflected in net income, as all options granted under the plan had an exercise price equal to the market value of the underlying common stock on the date of the grant. Pro forma information regarding net income is required by FAS No. 123, "Accounting for Stock-Based Compensation." In December 2002, FASB issued FAS No. 148, "Accounting for Stock-Based Compensation—Transition and Disclosure." FAS 148 amends the disclosure requirements of FAS 123 to require prominent disclosure in financial statements regarding the method of accounting for stock-based compensation and the effect of the method used on reported results.

For restricted stock awards, the Company records the market value of the shares awarded at the time of the grant as unearned stock grant compensation and includes it as a separate component of stockholder's equity. The unearned stock grant compensation is amortized into income ratably over the vesting period.

The following table outlines the Company's net income for the years ended December 31, 2003, 2002 and 2001, had the compensation cost been determined in accordance with the fair value method recommended in FAS 123.

009597

**ACE Guaranty Corp.**
**Notes to Consolidated Financial Statements**
**December 31, 2003, 2002 and 2001**

|  | For the Years Ended December 31, | | |
|---|---|---|---|
| *(in thousands)* | **2003** | **2002** | **2001** |
| Net income as reported | $ 105,175 | $ 45,643 | $ 43,576 |
| Add: Stock-based compensation expense included in reported net income, net of income tax | 811 | 517 | 213 |
| Deduct: Compensation expense, net of income tax | 2,260 | 1,629 | 621 |
| Pro Forma | $ 103,726 | $ 44,531 | $ 43,168 |

The fair value of ACE options issued is estimated on the date of grant using the Black-Scholes option-pricing model, with the following weighted-average assumptions used for grants in 2003, 2002 and 2001, respectively: dividend yield of 2.4%, 1.43%, and 1.65%; expected volatility of 32.4%, 35.2%, and 42.8%; risk free interest rate of 2.4%, 4.01%, and 4.84% and an expected life of four years for each year.

3. **Recent Accounting Pronouncements**

In May 2003, Financial Accounting Standards Board ("FASB") issued FAS No. 150, "Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity" ("FAS 150"), which establishes standards for classifying and measuring certain financial instruments with characteristics of both liabilities and equity. FAS 150 requires the classification of a financial instrument that is within its scope as a liability (or an asset in some circumstances). FAS 150 is effective for financial instruments entered into or modified after May 31, 2003, and otherwise is effective at the beginning of the first interim period beginning after June 15, 2003. The adoption of FAS 150 had no impact on the consolidated financial statements.

In April 2003, the FASB issued FAS No. 149, "Amendment of FASB Statement No. 133 on Derivative Instruments and Hedging Activities." This statement amends and clarifies financial accounting and reporting for derivative instruments, including certain derivative instruments embedded in other contracts (collectively referred to as derivatives) and for hedging activities under FAS No. 133, "Accounting for Derivative Instruments and Hedging Activities." This statement improves financial reporting by requiring that contracts with comparable characteristics be accounted for similarly. For example, this statement requires that financial guaranty insurance, for which the underlying risk is linked to a derivative, be accounted for as a derivative. This statement is effective for contacts entered into or modified after June 30, 2002, except for the provisions of this Statement that relate to FAS No. 133 implementation issues that have been effective for fiscal quarters that began prior to June 15, 2003, and for hedging relationships designated after June 30, 2003. All provisions are to be applied prospectively, except for the provisions of this Statement that relate to FAS No. 133 implementation issues that have been effective for fiscal quarters that began prior to June 15, 2003. These provisions are to be applied in accordance with their respective effective dates. The adoption of FAS 149 did not have a material impact on the consolidated financial statements.

In January 2003, the FASB issued FAS Interpretation No. 46, "Consolidation of Variable Interest Entities" ("FIN 46"), as an interpretation of Accounting Research Bullet No. 51, "Consolidated Financial Statements." FIN 46 addresses consolidation of variable interest

009598

**ACE Guaranty Corp.**
**Notes to Consolidated Financial Statements**
**December 31, 2003, 2002 and 2001**

entities (VIEs) by business enterprises. An entity is considered a VIE subject to consolidation if the equity investment at risk is not sufficient to permit the entity to finance its activities without additional subordinated financial support or if the equity investors lack one of three characteristics of a controlling financial interest. First, the equity investors lack the ability to make decisions about the entity's activities through voting rights or similar rights. Second, they do not bear the obligation to absorb the expected losses of the entity if they occur. Lastly, they do not claim the right to receive expected returns of the entity if they occur, which are the compensation for the risk of absorbing the expected losses. FIN 46 requires that VIEs be consolidated by the entity that maintains the majority of the risks and rewards of ownership. This Interpretation applies immediately to VIEs created after January 31, 2003 and to VIEs in which an enterprise obtains an interest after that date. FASB deferred the effective date of FIN 46 until the end of the first interim or annual period ending after December 15, 2003 for VIEs created before February 1, 2003. The adoption of FIN 46 had no impact on the consolidated financial statements.

4.      **Derivatives**

The Company adopted FAS No. 133, "Accounting for Derivative Instruments and Hedging Activities" ("FAS 133"), which established accounting and reporting standards for derivative instruments, including certain derivative instruments embedded in other contracts (collectively referred to as derivatives), and for hedging activities as of January 1, 2001. FAS 133 requires that an entity recognize all derivatives as either assets or liabilities in the consolidated balance sheets and measure those instruments at fair value. If certain conditions are met, a derivative may be specifically designated as a fair value, cash flow or foreign currency hedge. The accounting for changes in the fair value of a derivative depends on the intended use of the derivative and the resulting designation. The Company had no derivatives that were designated as hedges during 2003, 2002 and 2001.

Certain products (principally credit protection oriented) issued by the Company have been deemed to meet the definition of a derivative under FAS 133. These products consist primarily of credit derivatives. In addition, the Company issued a few index-based derivative financial instruments. The Company uses derivative instruments primarily to offer credit protection to others. Effective January 1, 2001, the Company records these transactions at fair value. Where available; we use quoted market prices to fair value these insured credit derivatives. If quoted prices are not available, particularly for senior layer collateralized debt obligations ("CDO") and equity layer credit protection, the fair value is estimated using valuation models for each type of credit protection. These models may be developed by third parties, such as rating agency models, or may be developed internally, depending on the circumstances. These models and the related assumptions are continually reevaluated by management and enhanced, as appropriate, based upon improvements in modeling techniques and availability of more timely market information. The fair value of derivative financial instruments reflects the estimated cost to the Company to purchase protection on its outstanding exposures and is not an estimate of expected losses incurred. Due to the inherent uncertainties of the assumptions used in the valuation models to determine the fair value of these derivative products, actual experience may differ from the estimates reflected in our consolidated financial statements, and the differences may be material.

The Company records premiums received from the issuance of derivative instruments in gross written premiums and establishes unearned premium reserves and loss reserves. These loss reserves represent the Company's best estimate of the probable losses expected under these contracts. Unrealized gains and losses on derivative financial instruments are computed

**ACE Guaranty Corp.**
**Notes to Consolidated Financial Statements**
**December 31, 2003, 2002 and 2001**

as the difference between fair value and the total of the unearned premium reserves, losses and LAE reserve, premiums receivable, prepaid reinsurance premiums and reinsurance recoverable on ceded losses. Changes in unrealized gains and losses on derivative financial instruments are reflected in the statement of operations. Cumulative unrealized gains and losses are reflected as assets and liabilities, respectively, in the Company's balance sheets. Unrealized gains and losses resulting from changes in the fair value of derivatives occur because of changes in interest rates, credit spreads, recovery rates, the credit ratings of the referenced entities and other market factors. In the event that we terminate a derivative contract prior to maturity as a result of a decision to exit a line of business or for risk management purposes, the unrealized gain or loss will be realized through premiums earned and losses incurred.

As of January 1, 2001, the Company recorded an expense related to the cumulative effect of adopting FAS 133 of $22.8 million, net of applicable deferred income tax benefit of $12.3 million.

The Company recorded a pretax net unrealized gain on derivative financial instruments of $48.5 million for the year ended December 31, 2003, a pretax net unrealized loss on derivative financial instruments of $37.0 million for the year ended December 31, 2002 and a pretax net unrealized gain on derivative financial instruments of $5.1 million for the year ended December 31, 2001.

The following table summarizes activities related to derivative financial instruments (dollars in thousands of U.S. dollars):

| Balance sheets as of December 31, | 2003 | 2002 |
|---|---|---|
| **Assets** | | |
| Prepaid reinsurance premiums | $ 271 | $ 387 |
| **Liabilities** | | |
| Unearned premium reserve | 7,078 | 6,559 |
| Reserve for losses and LAE | 15,500 | 2,452 |
| Unrealized losses on derivative financial instruments | 18,482 | 67,023 |
| Net liability - fair value of derivative financial instruments | $ 40,789 | $ 75,647 |

| Statements of operations for the years ended December 31, | 2003 | 2002 | 2001 |
|---|---|---|---|
| Net written premiums | $ 39,573 | $ 13,714 | $ 3,981 |
| Net premiums earned | 38,936 | 10,820 | 1,959 |
| Loss and loss adjustment expenses | (11,714) | (131,162) | (2,355) |
| Unrealized gains (losses) on derivative financial instruments | 48,541 | (36,998) | 5,051 |
| Total impact of derivative financial instruments | $ 75,763 | $ (157,340) | $ 4,655 |

009600

**ACE Guaranty Corp.**
**Notes to Consolidated Financial Statements**
**December 31, 2003, 2002 and 2001**

5.  **Statutory Accounting Practices**

These financial statements are prepared on a GAAP basis, which differs in certain respects from accounting practices prescribed or permitted by the insurance regulatory authorities, including the Maryland Insurance Department.

Statutory capital and surplus as of December 31, 2003 and 2002 was $255.6 million and $287.0 million, respectively. Statutory net income for the years ended December 31, 2003, 2002 and 2001 was $66.7 million, $46.3 million and $45.0 million, respectively.

There are no permitted accounting practices on a statutory basis.

6.  **Insurance in Force – Financial Guaranty**

At December 31, 2003 and 2002, net financial guaranty par in force including insured credit default swaps ("CDS") was approximately $78.4 billion and $72.3 billion, respectively. The portfolio was broadly diversified by payment source, geographic location and maturity schedule, with no single risk representing more than 1.2% of the total net par in force. The composition by sector was as follows:

| Sectors | Net Par in Force December 31, | |
|---|---|---|
| | **2003** | **2002** |
| *(dollars in billions)* | | |
| **Municipal Exposure** | | |
| Tax-backed | $19.4 | $18.2 |
| Municipal utilities | 9.9 | 9.1 |
| Healthcare | 5.6 | 5.6 |
| Special revenue | 8.1 | 7.7 |
| Structured municipal | 2.5 | 2.6 |
| Other municipals | 2.2 | 2.1 |
| Total Municipal | $47.7 | $45.3 |
| | | |
| **Non-Municipal Exposure** | | |
| Collateralized debt obligations | $13.7 | $10.2 |
| Consumer receivables | 8.3 | 7.8 |
| Single name corporate CDS | 2.3 | 4.2 |
| Commercial receivables | 5.1 | 3.4 |
| Other structured finance | 1.3 | 1.4 |
| Total Non-Municipal | $ 30.7 | $ 27.0 |
| Total Exposure | $ 78.4 | $ 72.3 |

Maturities for municipal obligations range from 1 to 30 years, with the typical life in the 12 to 15 year range. Non-municipal transactions have legal maturities that range from 1 to 30 years with a typical life of 5 to 7 years. Maturities on single name corporate CDSs range from 1 to 5 years with an average remaining maturity of 1.7 years as of December 31, 2003.

009601

**ACE Guaranty Corp.**
**Notes to Consolidated Financial Statements**
**December 31, 2003, 2002 and 2001**

The portfolio contained exposures in each of the 50 states and abroad. The distribution of net financial guaranty par outstanding by geographic location is set forth in the following table:

|  | As of December 31, 2003 | | As of December 31, 2002 | |
|---|---|---|---|---|
|  | Net Par Outstanding | % | Net Par Outstanding | % |
| **Domestic** |  |  |  |  |
| California | $6.4 | 8.2% | $6.1 | 8.5% |
| New York | 4.8 | 6.1% | 4.6 | 6.3% |
| Texas | 3.1 | 4.0% | 3.0 | 4.2% |
| Illinois | 2.6 | 3.3% | 2.6 | 3.6% |
| Florida | 2.6 | 3.3% | 2.8 | 3.9% |
| New Jersey | 2.1 | 2.6% | 2.0 | 2.8% |
| Pennsylvania | 2.0 | 2.6% | 2.1 | 3.0% |
| Massachusetts | 1.8 | 2.3% | 1.8 | 2.5% |
| Puerto Rico | 1.7 | 2.2% | 1.4 | 1.9% |
| Washington | 1.4 | 1.8% | 1.3 | 1.8% |
| Ohio | 1.1 | 1.4% | 1.2 | 1.6% |
| Other - Muni | 16.1 | 20.6% | 14.4 | 20.0% |
| Other Non Muni | 27.1 | 34.5% | 25.1 | 34.7% |
| Total domestic expenses | 72.8 | 92.9% | 68.4 | 94.8% |
| **International** |  |  |  |  |
| United Kingdom | 2.4 | 3.1% | 1.5 | 2.1% |
| Italy | 0.4 | 0.5% | 0.2 | 0.2% |
| Australia | 0.4 | 0.5% | 0.1 | 0.1% |
| France | 0.3 | 0.4% | 0.3 | 0.4% |
| Brazil | 0.3 | 0.4% | 0.2 | 0.2% |
| Japan | 0.2 | 0.3% | 0.5 | 0.7% |
| Other | 1.6 | 1.9% | 1.1 | 1.5% |
| Total international exposures | 5.6 | 7.1% | 3.9 | 5.2% |
| Total exposures | $78.4 | 100.0% | $72.3 | 100.0% |

The following table sets forth the financial guaranty in-force portfolio by underwriting rating:

|  | As of December 31, 2003 | | As of December 31, 2002 | |
|---|---|---|---|---|
|  | Net Par Outstanding | % Total Net Par Outstanding | Net Par Outstanding | % Total Net Par Outstanding |
| **Ratings** |  |  |  |  |
| AAA | $22.2 | 28.4% | $16.1 | 22.3% |
| AA | 16.1 | 20.6% | 14.1 | 19.5% |
| A | 27.1 | 34.6% | 30.4 | 42.0% |
| BBB | 11.5 | 14.6% | 11.1 | 15.3% |
| Below investment grade | 1.5 | 1.8% | 0.6 | 0.9% |
| Total exposures | $78.4 | 100.0% | $72.3 | 100.0% |

As part of its financial guaranty business, the Company insures CDS transactions written by its affiliate AGR Financial Products, whereby one party pays a periodic fee in fixed basis points on a notional amount in return for a contingent payment by the other party in the event

009602

**ACE Guaranty Corp.**
**Notes to Consolidated Financial Statements**
**December 31, 2003, 2002 and 2001**

one or more defined credit events occurs with respect to one or more third party reference securities or loans. A credit event may be a nonpayment event such as a failure to pay, bankruptcy, or restructuring, as negotiated by the parties to the CDS transaction. The total notional amount of insured investment grade CDS exposure outstanding at December 31, 2003 and 2002 and included in the Company's financial guaranty exposure was $19.5 billion and $17.0 billion, respectively.

7. **Investments in Securities**

The following summarizes the Company's aggregate investment portfolio at December 31, 2003:

| | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Estimated Fair Value |
|---|---|---|---|---|
| *(dollars in thousands)* | | | | |
| Fixed maturity securities available for sale | | | | |
| U.S. Treasury securities and obligations of U.S. government agencies | $ 47,975 | $ 1,986 | $ - | $ 49,961 |
| Obligations of states and political subdivisions | 701,988 | 59,204 | 693 | 760,499 |
| Corporate Securities | 98,660 | 5,615 | 507 | 103,768 |
| Mortgage-backed securities | 192,258 | 4,191 | 649 | 195,800 |
| Asset-backed securities | 16,163 | 558 | 26 | 16,695 |
| Total available-for-sale | 1,057,044 | 71,554 | 1,875 | 1,126,723 |
| Short-term investments | 55,078 | | - | 55,078 |
| Total investments | $1,112,122 | $ 71,554 | $ 1,875 | $ 1,181,801 |

The following summarizes the Company's aggregate investment portfolio at December 31, 2002:

| | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Estimated Fair Value |
|---|---|---|---|---|
| *(dollars in thousands)* | | | | |
| Fixed maturity securities available for sale | | | | |
| U.S. Treasury securities and obligations of U.S. government agencies | $ 73,000 | $ 4,936 | $ - | $ 77,936 |
| Obligations of states and political subdivisions | 543,122 | 47,573 | 53 | 590,642 |
| Corporate securities | 69,426 | 6,247 | 1 | 75,672 |
| Mortgage-backed securities | 181,675 | 5,110 | 38 | 186,747 |
| Asset-backed securities | 29,152 | 919 | 11 | 30,060 |
| Total available-for-sale | 896,375 | 64,785 | 103 | 961,057 |
| Short-term investments | 52,384 | - | - | 52,384 |
| Total investments | $ 948,759 | $ 64,785 | $ 103 | $ 1,013,441 |

The amortized cost and estimated fair value of fixed maturity securities available-for-sale at December 31, 2003, by contractual maturity, are shown below. Expected maturities will differ from contractual maturities because borrowers may have the right to call or prepay obligations with or without call or prepayment penalties.

009603

**ACE Guaranty Corp.**
**Notes to Consolidated Financial Statements**
**December 31, 2003, 2002 and 2001**

| (dollars in thousands) | Amortized Cost | Estimated Fair Value |
|---|---|---|
| **Maturity** | | |
| Due within one year | $ 14,098 | $ 14,190 |
| Due in 2005-2008 | 100,587 | 103,394 |
| Due in 2009-2013 | 168,524 | 181,600 |
| Due after 2013 | 581,577 | 631,739 |
| Mortgage-backed securities | 192,258 | 195,800 |
| | $ 1,057,044 | $ 1,126,723 |

Realized gains and (losses) were as follows:

| | Years Ended December 31, | | |
|---|---|---|---|
| (dollars in thousands) | **2003** | **2002** | **2001** |
| **Fixed maturities** | | | |
| Gains | $ 2,791 | $ 7,915 | $20,335 |
| Losses | (699) | (1,027) | (10,132) |
| | 2,092 | 6,888 | 10,203 |
| Fair value adjustment on derivative financial instruments | 48,541 | (36,998) | 5,051 |
| Net realized (losses) gains | $50,633 | $(30,110) | $15,254 |

None of the realized losses in 2003, 2002 or 2001 were from other than temporary declines in a securities fair value.

Approximately 16.6% of the Company's total investment portfolio at December 31, 2003 was composed of mortgage-backed securities ("MBS"), including collateralized mortgage obligations and commercial mortgage–backed securities. Of the securities in the MBS portfolio, approximately 84.1% were backed by agencies or entities sponsored by the U.S. government. As of December 31, 2003, the weighted average credit quality of the Company's entire investment portfolio was AA+.

The following table summarizes, for all securities in an unrealized loss position at December 31, 2003, the aggregate fair value and gross unrealized loss by length of time the amounts have continuously been in an unrealized loss position.

| | Less than 12 Months | |
|---|---|---|
| (dollars in thousands) | Fair Value | Unrealized Loss |
| U.S. Treasury securities and obligations of U.S. government agencies | $ - | $ - |
| Obligations of states and political subdivisions | 50,337 | (699) |
| Corporate securities | 31,348 | (501) |
| Mortgage-backed securities | 55,832 | (649) |
| Asset-backed securities | 3,208 | (26) |
| Total | $ 140,725 | $ (1,875) |

Included above are 44 fixed maturity securities. The Company has considered factors such as sector credit ratings and industry analyst reports in evaluating the above securities for

009604

**ACE Guaranty Corp.**
**Notes to Consolidated Financial Statements**
**December 31, 2003, 2002 and 2001**

impairment and has concluded that these securities are not other than temporarily impaired as of December 31, 2003.  As of December 31, 2003, no investments were in a continuous unrealized loss position for greater than 12 months.

Net investment income is derived from the following sources:

|  | Years Ended December 31, | | |
|---|---|---|---|
| *(dollars in thousands)* | **2003** | **2002** | **2001** |
| Income from fixed maturity securities | $47,422 | $46,648 | $43,738 |
| Income from short-term investments | 906 | 865 | 3,515 |
| Total investment income | 48,328 | 47,513 | 47,253 |
| Less investment expenses | (1,172) | (783) | (766) |
| Net investment income | $47,156 | $46,730 | $46,487 |

Under agreements with its cedents and in accordance with statutory requirements, the Company maintains fixed maturity securities in trust accounts for the benefit of reinsured companies and for the protection of policyholders, generally in states in which the Company or its subsidiaries, as applicable, are not licensed or accredited.  The carrying amount of such restricted balances amounted to approximately $63.9 million and $62.4 million at December 31, 2003 and 2002, respectively.

As part of its insured CDS business, the Company is party to certain contractual agreements that require collateral to be posted for the benefit of either party depending on ratings of the parties to the agreement and mark-to-market movements relative to applicable specified thresholds of the insured swap transactions.  As of December 31, 2003, the Company was not required to post collateral for the benefit of CDS customers.

The Company is not exposed to significant concentrations of credit risk within its investment portfolio.

No material investments of the Company were non-income producing for the years ended December 31, 2003 and 2002.

**8.      Reserves for Unpaid Losses and Loss Adjustment Expenses**

The following table provides a reconciliation of the beginning and ending reserve balances for unpaid losses and LAE:

009605

**ACE Guaranty Corp.**
**Notes to Consolidated Financial Statements**
**December 31, 2003, 2002 and 2001**

| *(dollars in thousands)* | Years Ended December 31, | | |
|---|---|---|---|
| | **2003** | **2002** | **2001** |
| Reserves for unpaid losses and LAE, net of related reinsurance recoverables, at beginning of year | $ 63,736 | $ 70,076 | $ 64,833 |
| **Add** | | | |
| Provision for unpaid losses and LAE for claims occurring in the current year, net of reinsurance | 23,369 | 35,506 | 12,991 |
| Increase (decrease) in estimated losses and LAE for claims occurring in prior years, net of reinsurance | 33,337 | (10,993) | (7,116) |
| Incurred losses during the current year, net of reinsurance | 56,706 | 24,513 | 5,875 |
| **Deduct** | | | |
| Losses and LAE payments (net of recoverables) for claims occurring in the current year | 3,284 | 27,799 | 5,884 |
| Income (losses) and LAE payments (net of recoverables) for claims occurring in the prior year | 10,079 | 3,054 | (5,252) |
| | 13,363 | 30,853 | 632 |
| Reserve for unpaid losses and LAE, net of related reinsurance recoverables, at end of year | 107,079 | 63,736 | 70,076 |
| Unrealized foreign exchange (gain) loss on reserve revaluation | 3,180 | 805 | (143) |
| Reinsurance recoverable on unpaid losses and LAE, at end of year | – | 11,420 | 588 |
| Reserve for unpaid losses and LAE, gross of reinsurance recoverables on unpaid losses at end of year | $ 110,259 | $ 75,961 | $ 70,521 |

The prior year adverse development in 2003 of $33.3 million in the provision for losses and LAE is due primarily to an increase in case activity on the structured finance line of business due to credit deterioration in collateralized debt obligations assumed through reinsurance treaties.

In 2002, the favorable prior year development of $11.0 million in the provision for losses and LAE relates primarily to higher than previously estimated salvage on a non-municipal transaction and favorable development in the trade credit reinsurance line of business.

The favorable prior year development in 2001 of $7.1 million in the provision for losses and LAE relates primarily to the favorable development of $9.6 million in the credit derivative line of business.

9. **Income Taxes**

ACE Financial Services Inc. ("AFS"), the Company's direct parent and its direct and indirect U.S. subsidiaries, ACE Guaranty Corp, ACE Risk Assurance Company, ACE Asset Management, AGR Financial Products and AFP Transferor Inc. prepare a consolidated federal income tax return with ACE Prime Holding Inc., an immediate owner of the Corporation. Each company pays its proportionate share of the consolidated federal tax burden, the proportion determined by reference to the amount a company would have been liable to pay, had such company filed on a separate return basis with current credit for net losses to the extent such losses are utilizable on a separate company basis. The Company's effective federal tax rate for 2003 is 29%.

009606

**ACE Guaranty Corp.**
**Notes to Consolidated Financial Statements**
**December 31, 2003, 2002 and 2001**

Reconciliation from the tax provision calculated at the federal statutory rate of 35% in 2003, 2002 and 2001 to the total tax is as follows:

| (dollars in thousands) | Years Ended December 31, | | |
|---|---|---|---|
| | **2003** | **2002** | **2001** |
| Tax provision at statutory rate | $51,722 | $19,625 | $32,256 |
| Tax-exempt interest | (8,990) | (8,297) | (7,053) |
| Other | (129) | (901) | 582 |
| Total federal income tax provision | $42,603 | $10,427 | $25,785 |

The deferred federal income tax liability reflects the tax effect of the following temporary differences:

| (dollars in thousands) | Years Ended December 31, | |
|---|---|---|
| | **2003** | **2002** |
| **Deferred tax assets** | | |
| Portfolio reserves | $ 16,835 | $ 15,243 |
| Tax and loss bonds | 16,071 | 16,071 |
| Fair value of derivative financial instruments | 6,469 | 23,458 |
| Other | 689 | 582 |
| Total deferred tax assets | 40,064 | 55,354 |
| **Deferred tax liabilities** | | |
| Deferred acquisition costs | 51,424 | 47,559 |
| Contingency reserve | 28,124 | 28,124 |
| Unearned premium revenue | 14,063 | 10,600 |
| Unrealized gain on fixed maturity securities available for sale | 24,388 | 22,638 |
| Total deferred tax liabilities | 117,999 | 108,921 |
| Net deferred liability for federal income taxes | $ 77,935 | $ 53,567 |

Under the terms of the tax sharing agreement the Company's current income tax payable to AFS was $6.4 million and $8.5 million at December 31, 2003 and 2002, respectively. Income taxes paid in 2003, 2002 and 2001, were $16.4 million, $10.8 million and $7.3 million, respectively.

**10.    Reinsurance**

To limit its exposure on assumed risks, the Company enters into certain proportional and non-proportional retrocessional agreements with other insurance companies, primarily ACE subsidiaries, that cede a portion of the risk underwritten to other insurance companies. In the event that any or all of the reinsurers are unable to meet their obligations, the Company would be liable for such defaulted amounts. Direct, assumed, and ceded reinsurance amounts were as follows:

009607

**ACE Guaranty Corp.**
**Notes to Consolidated Financial Statements**
**December 31, 2003, 2002 and 2001**

| *(dollars in thousands)* | For the years ended December 31, | | |
|---|---|---|---|
| | **2003** | **2002** | **2001** |
| **Premiums written** | | | |
| Direct | $ 40,992 | $ 16,419 | $ 1,829 |
| Assumed | 178,931 | 138,660 | 118,967 |
| Ceded | 36,623 | (31,367) | (31,798) |
| Net | $ 256,546 | $ 123,712 | $ 88,998 |
| **Premiums earned** | | | |
| Direct | $38,921 | $11,922 | $554 |
| Assumed | 144,526 | 114,557 | 89,909 |
| Ceded | (8,049) | (14,966) | (12,801) |
| Net | $ 175,398 | $ 111,513 | $ 77,662 |
| **Loss and loss adjustment expenses** | | | |
| Direct | $14,464 | $18,398 | $2,355 |
| Assumed | 45,081 | 17,454 | 4,121 |
| Ceded | (2,839) | (11,339) | (601) |
| Net | $ 56,706 | $ 24,513 | $ 5,875 |

Reinsurance recoverable on ceded unpaid losses and LAE as of December 31, 2002 was $11.4 million. As of December 31, 2003 the Company had no reinsurance recoverable on ceded unpaid losses. See Note 12 for further information on ceded premiums.

11. **Insurance Regulations**

Under Maryland's 1993 revised insurance law, the amount of surplus available for distribution as dividends is subject to certain statutory provisions, which generally prohibit the payment of dividends in any twelve-month period in an aggregate amount exceeding the lesser of 10% of surplus or net investment income (at the preceding December 31) without prior approval of the Maryland Commissioner of Insurance. The amount available for distribution from the Company during 2004 with notice to, but without prior approval of, the Maryland Commissioner of Insurance under the Maryland insurance law is approximately $25.6 million. During the years ended December 31, 2003, 2002 and 2001, the Company paid $10.0 million, $8.0 million and $5.5 million, respectively, in dividends to ACE Financial.

Going forward the Company has committed to S&P and Moody's that it will not pay more than $10.0 million per year in dividends.

Under Maryland insurance regulations, the Company is required at all times to maintain a minimum surplus of $750,000.

12. **Intercompany Transactions**

**Expense Sharing Agreements**
Effective October 2000, and amended January 1, 2003, the Company entered into an agreement with ACE Capital Re Overseas Ltd. ("ACRO"), an affiliate of the Company under common ownership of ACE pursuant to which certain expenses for employee salaries and shared resources such as office space, office supplies and management information system services are allocated to each company according to annual predetermined percentages. The percentages are determined based on each company's weighted average salary expense. For the years ended December 31, 2003, 2002 and 2001, the Company was paid $9.6 million,

009608

**ACE Guaranty Corp.**
**Notes to Consolidated Financial Statements**
**December 31, 2003, 2002 and 2001**

$9.2 million and $6.2 million, respectively, under its expense sharing agreements. On January 1, 2003, the Company entered into a service agreement with ACE Asset Management Inc. ("AAM"). Under the agreement, AAM reimburses the Company for its direct expenses and a portion of office overhead expenses. In 2003, the Company was paid approximately $1.0 million under its expense sharing agreement with AAM.

The Company is also party to various inter-company service agreements whereby it provides support services (credit analysis, surveillance, accounting, MIS, legal and administrative services) to certain affiliates. Under these agreements, the Company received $1.3 million, $1.1 million and $0.3 million in service fee income for the years ended December 31, 2003, 2002 and 2001, respectively.

In addition to expense sharing agreements, the Company entered into an employee leasing agreement with ACE American Insurance Company ("ACE INA"), an affiliate. ACE INA is a Pennsylvania stock insurance company. Under the agreement, the Company provides staffing services to ACE INA. In return, the Company is reimbursed for compensation costs. For the years ended December 31, 2003, 2002 and 2001, the Company was paid approximately $11.2 million, $8.3 million and $6.8 million, respectively, under leasing agreements.

Included in other assets in the balance sheets are $4.5 million and $5.0 million as of December 31, 2003 and 2002, respectively, for intercompany receivables.

As of the IPO date, all of the above agreements have been terminated. New agreements are being finalized between the Company and other subsidiaries of Assured Guaranty that will become effective during 2004.

**Reinsurance Agreements**
In September 2001, the Company entered into an excess of loss reinsurance agreement with ACE Bermuda which was effective January 1, 2001. Under the terms of the agreement, the Company paid $52.5 million in premium in two installments of $27.5 million and $25.0 million in September 2001 and March 2002, respectively, for a 10-year cover with a $150.0 million limit. In June 2003, this agreement was canceled and the unearned premium of $39.8 million, loss reserves of $12.5 million and profit commission of $1.5 million were returned to the Company. This agreement was not replaced with a third party reinsurance contract. The Company ceded losses of $2.5 million and $10.0 million in 2003 and 2002, respectively, under this cover.

The Company cedes business to affiliated entities under certain reinsurance agreements. Amounts deducted from the premiums, losses and commissions in 2003, 2002 and 2001 for reinsurance ceded to affiliates are reflected in the table below.

| (dollars in thousands) | 2003 | 2002 | 2001 |
|---|---|---|---|
| **Ceded Activity** | | | |
| Written premium | $(38,409) | $28,327 | $29,982 |
| Earned premium | 4,715 | 9,111 | 8,227 |
| Losses and LAE incurred | 2,839 | 11,339 | 420 |
| Commissions incurred | 57 | 71 | 111 |
| Unearned premium reserve | 2,113 | 45,238 | 26,022 |
| Unpaid losses and LAE | – | 11,419 | 406 |

009609

**ACE Guaranty Corp.**
**Notes to Consolidated Financial Statements**
**December 31, 2003, 2002 and 2001**

The Company also writes business with affiliated entities under insurance and reinsurance agreements. The approximate amounts included in premiums, losses and commissions in 2003, 2002 and 2001 for business assumed from affiliates are reflected in the table below.

| (dollars in thousands) | 2003 | 2002 | 2001 |
|---|---|---|---|
| **Gross Activity** | | | |
| Written premium | $51,637 | $44,096 | $28,410 |
| Earned premium | 53,512 | 37,852 | 23,905 |
| Losses and LAE incurred | 701 | 22,449 | 4,139 |
| Commissions incurred | 1,340 | 626 | 35 |
| Unearned premium reserve | 9,920 | 11,796 | 4,376 |
| Unpaid losses and LAE | – | 10,849 | 5,651 |

## 13. Commitments and Contingencies

At December 31, 2003, future minimum rental payments under the terms of the Company's non-cancelable operating leases for office space are $3.3 million for years 2004-2005, $3.4 for the year 2006, $3.3 million for years 2007-2008 and $3.1 million in the aggregate thereafter. These payments are subject to escalations in building operating costs and real estate taxes. Rent expense amounted to approximately $3.2 million in 2003 and $2.5 million in 2002. Rent expense is shared with ACRO pursuant to the agreement discussed in Note 12.

Various lawsuits have arisen in the ordinary course of the Company's business. Contingent liabilities arising from litigation, income tax and other matters are not considered material in relation to the Company's financial position, results of operations or liquidity.

## 14. Concentrations

Of the Company's total gross premiums written for the year ended December 31, 2003, 27.7% and 16.0% came from Municipal Bond Investors Assurance Company and Financial Security Assurance, respectively, two of four monoline primary financial guaranty companies. The Company's client base includes all six monolines, many banks and several European insurance and reinsurance companies.

## 15. Credit Facilities

As of December 31, 2003, the Company had entered into the following credit facilities, which were available for general corporate purposes:

(i) A liquidity facility established for the benefit of ACE and certain of its subsidiaries. The overall facility was a 364-day credit agreement in the amount of $500.0 million with a syndicate of banks. The Company had a $50.0 million participation in the facility. Due to the IPO, as of April 2, 2004, this facility was replaced.

(ii) A 364-day credit agreement in the amount of $140.0 million with a syndicate of the banks. Under the terms of this liquidity facility the Company would have been required to pledge collateral to one of the syndicate banks, if the amount of collateral posted for the benefit of the Company's credit default swap counterparties exceeded 11% of the Company shareholders' equity. In such case an amount equal to that excess was to have been pledged for the benefit of the syndicate banks. As of

009610

**ACE Guaranty Corp.**
**Notes to Consolidated Financial Statements**
**December 31, 2003, 2002 and 2001**

December 31, 2003, the Company had not posted any collateral under this covenant. Due to the IPO, as of April 28, 2004 this facility was replaced.

(iii)    A $75.0 million line of credit facility and a $50.0 million line of credit facility from subsidiaries of ACE. Due to the IPO, as of April 28, 2004 this facility was replaced.

As of December 31, 2003, the Company has not drawn any amounts under these credit facilities.

To replace the general corporate purpose credit facilities, Assured Guaranty entered into a $250.0 million unsecured credit facility ("$250.0 million credit facility") on April 29, 2004, with a syndicate of banks, for which ABN AMRO Incorporated and Bank of America (an affiliate of Banc of America Securities LLC) acted as co-arrangers to which each of Assured Guaranty, the Company and Assured Guaranty (UK) Ltd., a subsidiary of Assured Guaranty organized under the laws of the United Kingdom, is a party, as borrower. The $250.0 million credit facility is a 364-day day facility and any amounts outstanding under the facility at its expiration will be due and payable one year following the facility's expiration. Under the $250.0 million credit facility, the Company can borrow up to $250.0 million, Assured Guaranty has a borrowing limit not to exceed $50.0 million, and Assured Guaranty (UK) Ltd. has a borrowing limit not to exceed $12.5 million.

As of December 31, 2003, the Company was party to a non-recourse credit facility with a syndicate of banks, which provided up to $175.0 million. This facility was specifically designed to provide rating agency qualified capital to further support the Company's claim paying resources. This agreement is due to expire November 2010. As of December 31, 2003, the Company had not drawn any amounts under this credit facility.

16.    **Fair Value of Financial Instruments**

The following methods and assumptions were used by the Company in estimating its fair value disclosure for financial instruments. These determinations were made based on available market information and appropriate valuation methodologies. Considerable judgment is required to interpret market date to develop the estimates and therefore, they may not necessarily be indicative of the amount the Company could realize in a current market exchange.

**Fixed Maturity Securities**
The fair value for fixed maturity securities shown in Note 7 is based on quoted market prices.

**Cash and Short-Term Investments**
The carrying amount reported in the balance sheet for these instruments is cost, which approximates fair value due to the short-term maturity of these instruments.

**Unearned Premium Reserve**
The fair value of the Company's unearned premium reserve is based on the estimated cost of entering into a cession of the entire portfolio with third party reinsurers under current market conditions. This figure was determined by using the statutory basis unearned premium reserve, net of deferred acquisition costs.

009611

**ACE Guaranty Corp.**
**Notes to Consolidated Financial Statements**
**December 31, 2003, 2002 and 2001**

**Financial Guaranty Installment Premiums**

The fair value is derived by calculating the present value of the estimated future cash flow stream discounted at 6.0%.

| | As of December 31, 2003 | | As of December 31, 2002 | |
|---|---|---|---|---|
| | Carrying Amount | Estimated Fair Value | Carrying Amount | Estimated Fair Value |
| *(In thousands of U.S. dollars)* | | | | |
| **Assets** | | | | |
| Fixed maturity securities | $1,126,723 | $1,126,723 | $961,057 | $961,057 |
| Cash and short-term investments | 73,087 | 73,087 | 55,465 | 55,465 |
| **Liabilities** | | | | |
| Unearned premium reserve | 389,027 | 347,178 | 352,551 | 259,237 |
| Off-Balance Sheet Instruments | | | | |
| Financial guaranty installment premiums | – | 293,339 | – | 220,417 |

## 17. Employee Benefit Plans

### Defined Contribution Plan

The Company maintains a savings incentive plan, which is qualified under Section 401K of the Internal Revenue Code. The savings incentive plan is available to all full-time employees with a minimum of six months of service. Eligible participants may contribute a percentage of their salary subject to a maximum of six months of service. Eligible participants may contribute at a rate of 100% up to 7% of the participant's compensation subject to certain limitations and vest at a rate of 33.3% per year starting with the second year of service. The Company contributed approximately $0.5 million in 2003, $0.4 million in 2002 and $0.3 million in 2001.

### Profit Sharing Plan

The Company maintains a profit sharing plan, which is available to all full-time employees with a minimum of six months of service. Annual contributions to the plan are at the discretion of the Board of Directors. The plan contains a qualified portion and a non-qualified portion. Total expense incurred under the plan amounted to approximately $0.7 million in 2003, $0.5 million in 2002, and $0.3 million in 2001.

## 18. Premiums Earned from Refunded and Called Bonds

Premiums earned include $18.6 million, $12.6 million and $4.3 million for 2003, 2002 and 2001, respectively, related to refunded and called bonds.

## 19. Segment Reporting

The Company has three principal business segments: (1) financial guaranty direct, which includes transactions whereby the Company provides an unconditional and irrevocable guaranty that indemnifies the holder of a financial obligation against non-payment of principal and interest when due, and includes credit support for credit default swaps; (2) financial guaranty reinsurance, which includes agreements whereby the Company is a reinsurer and agrees to indemnify a primary insurance company against part or all of the loss which the latter may sustain under a policy it has issued; and (3) other, which includes trade

009612

**ACE Guaranty Corp.**
**Notes to Consolidated Financial Statements**
**December 31, 2003, 2002 and 2001**

credit reinsurance which the Company is no longer active and the impact of affiliate reinsurance transactions that were purchased by management for the benefit of all the Company's reporting segments.

The Company's reportable business segments are strategic business units that offer different products and services. They are managed separately since each business requires different marketing strategies and underwriting skill sets.

The Company does not segregate certain assets and liabilities at a segment level since management reviews and controls these assets and liabilities on a consolidated basis. The Company allocates certain operating expenses to each segment by identifying expenses related to staff that either directly acquire or service the business. The remaining expenses are generally allocated based on the expense ratios produced by the directly allocated expenses of these segments. Management uses underwriting gains and losses as the primary measure of each segment's financial performance.

The following table summarizes the components of underwriting gain (loss) for each reporting segment:

| (dollars in millions) | Year ended December 31, 2003 | | | |
| --- | --- | --- | --- | --- |
| | Financial Guaranty Direct | Financial Guaranty Reinsurance | Other | Total |
| Gross written premiums | $ 52.4 | $ 122.8 | $ 44.7 | $ 219.9 |
| Net written premiums | 47.9 | 124.8 | 83.8 | 256.5 |
| Net earned premiums | 48.6 | 88.2 | 38.6 | 175.4 |
| Loss and loss adjustment expenses | 14.5 | 22.8 | 19.4 | 56.7 |
| Acquisition costs | 3.2 | 29.8 | 13.6 | 46.6 |
| Operating expenses | 14.3 | 8.6 | 1.4 | 24.3 |
| Underwriting gain | $ 16.6 | $ 27.0 | $ 4.2 | $ 47.8 |

| (dollars in millions) | Year ended December 31, 2002 | | | |
| --- | --- | --- | --- | --- |
| | Financial Guaranty Direct | Financial Guaranty Reinsurance | Other | Total |
| Gross written premiums | $ 38.0 | $ 84.2 | $ 32.9 | $ 155.1 |
| Net written premiums | 36.7 | 81.5 | 5.5 | 123.7 |
| Net premiums earned | 34.5 | 70.0 | 7.0 | 111.5 |
| Loss and loss adjustment expenses | 18.4 | 8.5 | (2.4) | 24.5 |
| Acquisition costs | 1.3 | 23.2 | 8.9 | 33.4 |
| Operating expenses | 10.8 | 9.0 | (4.6) | 15.2 |
| Underwriting gain | $ 4.0 | $ 29.3 | $ 5.1 | $ 38.4 |

009613

**ACE Guaranty Corp.**
**Notes to Consolidated Financial Statements**
**December 31, 2003, 2002 and 2001**

| (dollars in millions) | Year ended December 31, 2001 | | | |
| --- | --- | --- | --- | --- |
| | Financial Guaranty Direct | Financial Guaranty Reinsurance | Other | Total |
| Gross written premiums | $ 30.7 | $ 86.7 | $ 3.4 | $ 120.8 |
| Net written premiums | 30.1 | 83.3 | (24.4) | 89.0 |
| Net premiums earned | 24.8 | 55.0 | 2.1 | 77.7 |
| Loss and loss adjustment expenses | 2.4 | 2.8 | 0.7 | 5.9 |
| Acquisition costs | 0.3 | 17.6 | 6.6 | 24.5 |
| Operating expenses | 8.6 | 10.7 | (5.6) | 13.7 |
| Underwriting gain (loss) | $ 13.5 | $ 23.9 | $ (3.8) | $ 33.6 |

The following is a reconciliation of total underwriting gain to income before provision for income taxes for the years ended:

| (dollars in millions) | December 31, 2003 | | |
| --- | --- | --- | --- |
| | 2003 | 2002 | 2001 |
| Total underwriting gain | $ 47.8 | $ 38.4 | $ 33.6 |
| Net investment income | 47.2 | 46.7 | 46.5 |
| Net realized investment gains | 2.1 | 6.9 | 10.2 |
| Unrealized gains (loss) on derivative financial instruments | 48.5 | (37.0) | 5.1 |
| Other income | 1.3 | 1.3 | 0.6 |
| Goodwill amortization | – | – | (3.8) |
| Foreign exchange gains (losses) | 0.9 | (0.2) | – |
| Income before provision for income taxes | $ 147.8 | $ 56.1 | $ 92.2 |

The following table provides the lines of businesses from which each of the Company's three reporting segments derive their net earned premiums:

| (dollars in millions) | Years ended December 31, 2003 | | |
| --- | --- | --- | --- |
| | 2003 | 2002 | 2001 |
| **Financial guaranty direct** | | | |
| Financial guaranty direct | $ 48.6 | $ 34.5 | $ 24.8 |
| **Financial guaranty reinsurance** | | | |
| Municipal finance | 51.3 | 37.8 | 26.1 |
| Structured finance | 36.9 | 32.2 | 28.9 |
| Total | 88.2 | 70.0 | 55.0 |
| **Other segment** | | | |
| Trade credit reinsurance | 41.6 | 14.6 | 2.9 |
| Affiliate reinsurance | (3.0) | (7.6) | (5.0) |
| Total | $ 38.6 | $ 7.0 | $ (2.1) |

The following table summarizes the Company's gross written premium by geographic region. Allocations have been made on the basis of location of risk.

009614

**ACE Guaranty Corp.**
**Notes to Consolidated Financial Statements**
**December 31, 2003, 2002 and 2001**

| *(dollars in millions)* | Years ended December 31, 2003 | | | | | |
|---|---|---|---|---|---|---|
| | **2003** | | **2002** | | **2001** | |
| North America | $183.9 | 83.6% | $132.9 | 85.7% | $116.5 | 96.4% |
| United Kingdom | 9.2 | 4.2% | 7.2 | 4.6% | 1.1 | 0.9% |
| Europe | 26.2 | 11.9% | 13.8 | 8.9% | 2.9 | 2.4% |
| Australia | 0.6 | 0.3% | 1.2 | 0.8% | 0.3 | 0.3% |
| Total | $219.9 | 100.0% | $155.1 | 100.0% | $120.8 | 100.0% |

**20.    Subsequent Event**

Upon completion of the IPO, any unvested options to purchase ACE ordinary shares held by our officers or employees immediately vested and any unvested restricted ACE ordinaryshares were forfeited.  Our officers and employees have 90 days from the date of the IPO to exercise any vested options to acquire ACE ordinary shares.  The acceleration of vesting of options to purchase ordinary shares resulted in a pre-tax charge to us of approximately $1.4 million.  Based upon a price of $42.79 per ACE ordinary share, the Company incurred a pre-tax charge of $3.1 million and contributed cash in the same amount to fund a trust, with an independent trustee, for the value of the restricted ACE ordinary shares forfeited by all of our officers and employees.  These pre-tax charges took place during the second quarter of 2004.  The trust purchased common shares of Assured Guaranty and allocated to each such individual common shares having the approximate value of the ACE ordinary shares forfeited by such individual.  Based on Assured Guaranty's initial public offering price of $18.00 per common share, the trust purchased approximately $173,000 Assured Guaranty common shares on behalf of the Company.  The common shares will be deliverable to each individual on the 18-month anniversary of the IPO so long as during that 18-month period the individual was not employed, directly or indirectly, by any designated financial guaranty company.  Any forfeited common shares will be delivered to Assured Guaranty.  The independent trustee will not have any beneficial interest in the trust.  Since completion of the IPO, our officers and employees are no longer eligible to participate in the ACE long-term incentive plans.  In connection with these events, the Company received $2.5 million from ACE, for the book value of unrestricted compensation, which is recorded in unearned stock grant compensation, which is included in stockholder's equity.

009615

## Assured Guaranty Corp.

Consolidated GAAP Balance Sheets
September 30, 2004 (unaudited)

*(dollars in thousands, except share and per share amounts)*

| | As of | |
|---|---|---|
| | September 30, 2004 | December 31, 2003 |
| | (Unaudited) | |
| **Assets** | | |
| Fixed maturity securities available for sale, at fair value | $ 1,162,226 | $ 1,126,723 |
| Short-term investments, at cost, which approximates market | 47,100 | 55,078 |
| **Total investments** | **1,209,326** | **1,181,801** |
| | | |
| Cash | 3,069 | 18,009 |
| Accrued investment income | 15,246 | 14,031 |
| Deferred acquisition costs | 146,752 | 146,926 |
| Premium receivable | 63,844 | 31,524 |
| Prepaid reinsurance premiums | 45,064 | 7,254 |
| Reinsurance recoverable on ceded losses | 30,939 | - |
| Unrealized gains on derivative financial instruments | 15,417 | - |
| Goodwill | 85,417 | 87,062 |
| Other assets | 10,430 | 14,946 |
| **Total assets** | **$ 1,625,504** | **$ 1,501,553** |
| | | |
| **Liabilities** | | |
| Unearned premium reserve | $ 386,090 | $ 389,027 |
| Reserve for losses and loss adjustment expenses | 121,648 | 110,259 |
| Reinsurance balances payable | 61,392 | 10,237 |
| Deferred federal income taxes payable | 31,700 | 77,934 |
| Current federal income taxes payable | 12,600 | 6,389 |
| Unrealized losses on derivative financial instruments | - | 18,482 |
| Other liabilities | 33,189 | 12,495 |
| **Total liabilities** | **646,619** | **624,823** |
| | | |
| **Shareholder's equity** | | |
| Common stock - $720 par value per share in 2004 and 2003: | | |
| 200,000 authorized, 20,834 issued and outstanding in 2004 and 2003 | 15,000 | 15,000 |
| Additional paid-in capital | 386,403 | 351,231 |
| Accumulated other comprehensive income | 42,313 | 45,284 |
| Unearned stock grant compensation | (6,024) | (2,849) |
| Retained earnings | 541,193 | 468,064 |
| **Total shareholder's equity** | **978,885** | **876,730** |
| | | |
| **Total liabilities and shareholder's equity** | **$ 1,625,504** | **$ 1,501,553** |

009616

# Assured Guaranty Corp.

Consolidated Statements of Operations

Nine Months Ended September 30, 2004 (unaudited) and September 30, 2003 (unaudited)

*(dollars in thousands)*

|  | September 30, | |
| --- | --- | --- |
|  | **2004** | **2003** |
| **Revenues** | | |
| Gross written premiums | $ 131,847 | $ 170,865 |
| Ceded premiums | (88,819) | 36,806 |
| Net written premiums | 43,028 | 207,671 |
| Decrease (increase) in unearned premium reserve | 40,747 | (77,224) |
| Net premiums earned | 83,775 | 130,447 |
| Net investment income | 38,919 | 34,785 |
| Net realized gains | 419 | 2,213 |
| Net unrealized gain on derivative financial instruments | 33,899 | 17,831 |
| Other income | - | 1,024 |
| **Total revenues** | 157,012 | 186,300 |
| | | |
| **Expenses** | | |
| Loss and loss adjustment expenses | (1,217) | 38,269 |
| Acquisition costs | 24,392 | 47,827 |
| Decrease (increase) in deferred acquisition costs | 897 | (9,762) |
| Other operating expense | 30,072 | 14,760 |
| Goodwill impairment | 1,645 | - |
| Foreign exchange (gains) losses | (241) | (177) |
| **Total expenses** | 55,548 | 90,917 |
| | | |
| **Income before provision for federal income taxes** | 101,464 | 95,383 |
| | | |
| **Provision for federal income taxes** | | |
| Current income taxes | 20,419 | 14,830 |
| Deferred income taxes | 7,914 | 11,895 |
| Total provision for federal income taxes | 28,333 | 26,725 |
| | | |
| **Net income** | $ 73,131 | $ 68,658 |

009617

### PRINCIPAL OFFICES OF THE CO-ISSUERS

| | |
|---|---|
| **Southfork CLO Ltd.** | **Southfork CLO Corp.** |
| P.O. Box 1093 GT | 850 Library Avenue |
| Queensgate House, South Church Street, | Suite 204 |
| George Town, Grand Cayman, Cayman Islands | Newark, Delaware 19711 |

### PORTFOLIO MANAGER

**Highland Capital Management, L.P.**
Two Galleria Tower
13455 Noel Road, Suite 1300
Dallas, Texas 75240

### TRUSTEE, PRINCIPAL PAYING AGENT AND REGISTRAR

**JPMorgan Chase Bank, National Association**
Institutional Trust Services
600 Travis Street, 50th Floor
Houston, Texas 77002

| **TRANSFER AGENT** | **IRISH PAYING AND LISTING AGENT** |
|---|---|
| **JPMorgan Chase Bank, National Association** | **JP Morgan Bank (Ireland) PLC** |
| 4 New York Plaza | JP Morgan House |
| ITS Unit Window | IFSC |
| New York, New York 10004 | Dublin 1 |
| Attn: ITS (Houston) Institutional Trust Services— | Ireland |
| Southfork CLO Ltd. | Attn: Institutional Trust Services |

### LEGAL ADVISORS

| **To the Co-Issuers** | **To the Issuer** |
|---|---|
| As to *United States* Law | As to *Cayman Islands* Law |
| **McKee Nelson LLP** | **Maples and Calder** |
| 5 Times Square, 35th Floor | P.O. Box 309 GT |
| New York, New York 10036 | Ugland House, South Church Street, |
| | George Town, Grand Cayman, Cayman Islands |
| **To the Initial Purchaser** | **To the Portfolio Manager** |
| **McKee Nelson LLP** | **Orrick, Herrington & Sutcliffe LLP** |
| 5 Times Square, 35th Floor | 777 S. Figueroa St. |
| New York, New York 10036 | Los Angeles, California 90017 |

009618