**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | |
|---|---|---|
| **In Re:** Highland Capital Management, L.P | § | Case No. 19-34054-SGJ-11 |
| Highland Capital Management Fund Advisors, L.P. | | |
| et al | § | |
| Appellant | § | |
| vs. | § | |
| Highland Capital Management, L.P., | | |
| | § | 3:21-CV-00538-N |
| Appellee | § | |

[1943] **Order confirming the fifth amended chapter 11 plan,** Entered on 2/22/2021.

# APPELLANT RECORD
# VOLUME 39

MUNSCH HARDT KOPF & HARR, P.C.
Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
3800 Ross Tower
500 N. Akard Street
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

ATTORNEYS FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P. AND
NEXPOINT ADVISORS, L.P.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | ) | Case No. 19-34054 (SGJ11) |
| | ) | |
| Debtor. | ) | |
| | ) | |

$\mathcal{I} \, \mathcal{N} \mathcal{D} \mathcal{E} \mathcal{X}$

## AMENDED DESIGNATION BY NEXPOINT ADVISORS, L.P. AND HIGHLAND
## CAPITAL MANAGEMENT FUND ADVISORS, L.P.
## OF ITEMS FOR THE RECORD ON APPEAL

COME NOW Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors,

L.P. (the "Appellants"), creditors and parties-in-interest in the above styled and numbered

bankruptcy case (the "Bankruptcy Case") of Highland Capital Management, L.P. (the "Debtor"),

and, with respect to their *Notice of Appeal* [docket no. 1957], hereby file their *Amended*

*Designation of Items for the Record on Appeal* (the "Designation") as follows:

---

AMENDED DESIGNATION BY NEXPOINT ADVISORS, L.P. AND HIGHLAND CAPITAL MANAGEMENT
FUND ADVISORS, L.P. OF ITEMS FOR THE RECORD ON APPEAL—Page 1

| | Item | **Bankruptcy Docket Number** | **Description** |
|---|---|---|---|
| *Vol. 1* 000001 | | | **Pleadings and Items on Docket** |
| | 1 | 1957 | Notice of Appeal |
| 000165 000326 | 2 | 1943 | Order (i) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief |
| | 3 | | Docket Sheet of Bankruptcy Case No. 19-34054 |
| *Vol. 2* 000639 | 4 | 1606 | Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 000666 | 5 | 1648 | Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| 000675 | 6 | 1656 | Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 000820 | 7 | 1670 | Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 000870 | 8 | 1719 | Second Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| *Vol. 3* 000880 | 9 | 1749 | Third Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| 000886 | 10 | 1772 | Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 000901 | 11 | 1791 | Notice of Withdrawal of Certain Executory Contracts and Unexpired Leases from List of Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan |
| 000906 | 12 | 1807 | Debtor's Omnibus Reply to Objections to Confirmation of the Fifth Amended Chapter 11 Plan of Reorganization of Highland Capital Management |
| 001031 | 13 | 1808 | Debtor's Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) |
| *Vol. 4* 001097 | 14 | 1811 | Notice of Filing Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (with Technical Modifications) |
| *Vol. 5* 001346 | 15 | 1814 | Debtor's Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |

*Vol 5*

*00 1414*

*00 1421*

*00 1427*

*00 1475*

*00 1482*

*00 1488*
*081783*
*002040*
*082091*
*002188*
*Vol 12 - 002931*
*Vol 50 - 013295*
*- 013297*
*Vol. 51 - 013373*
*Vol. 54 - 014182*
*Vol 55 - 014506*

| | 16 | 1847 | Fourth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| | 17 | 1873 | Fifth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| | 18 | 1875 | Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland of Highland Capital Management, L.P. (As Modified) |
| | 19 | 1887 | Supplemental Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| | 20 | 1671 | United States Trustee's Limited Objection to Confirmation of Debtors' Fifth Amended Plan of Reorganization |
| | **Evidence and Transcripts** | | |
| | 21 | 1894 | Transcript of February 2, 2021 Confirmation Hearing |
| | 22 | 1905 | Transcript of February 3, 2021 Confirmation Hearing |
| | 23 | 1917 | Transcript of February 8, 2021 Bench Ruling |
| | 24 | 1794 | All exhibits admitted into evidence during February 2 and February 3, 2021 Confirmation Hearing |
| | | 1795 | |
| | | 1822* | |
| | | 1863 | |
| | | 1866 | |
| | | 1877 | |
| | | 1895 | |
| | | 1915 | |

*✳ 1822 - Vol. 12 — 50 ( 39 Volumes)*

RESPECTFULLY SUBMITTED this 22d day of March, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
 Davor Rukavina, Esq.
 Texas Bar No. 24030781
 3800 Ross Tower
 500 N. Akard Street
 Dallas, Texas 75201-6659
 Telephone: (214) 855-7500
 Facsimile: (214) 855-7584
 Email:  drukavina@munsch.com

**ATTORNEYS FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P. AND
NEXPOINT ADVISORS, L.P.**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on this the 22d day of March, 2021, true and correct
copies of this document were electronically served by the Court's ECF system on parties entitled
to notice thereof, including on counsel for the Debtor.

By: /s/ Davor Rukavina
 Davor Rukavina, Esq.

# EXHIBIT LLL

Execution Copy

**Dated as of October 25, 2007**

**STRATFORD CLO LTD.**
**as Issuer**

**STATE STREET BANK AND TRUST COMPANY**
**as Preference Shares Paying Agent**

**PREFERENCE SHARES PAYING AND AGENCY**
**AGREEMENT**


**FRESHFIELDS BRUCKHAUS DERINGER LLP**

010502

# CONTENTS

**SECTION**                                                                                           **PAGE**

PRELIMINARY STATEMENT ........................................................................................ 1

DEFINITIONS; RULES OF CONSTRUCTION ................................................... 2
    Rules of Construction ........................................................................................... 5

THE PREFERENCE SHARES ............................................................................. 6
    Form of Preference Shares Generally ................................................................ 6
    Authorized Number of Preference Shares; Minimum Purchase; Fractional
    Shares ............................................................................................................... 6
    Execution, Authentication, Delivery and Dating ................................................ 7
    Registration, Registration of Transfer and Exchange ........................................ 7
    Mutilated, Defaced, Destroyed, Lost or Stolen Preference Shares ................... 12
    Preference Share Accounts and any Distribution on Preference Shares .......... 13
    Persons Deemed Owners .................................................................................. 17
    Cancellation ...................................................................................................... 17
    Required Sale of a Preference Share by the Holder Upon the Occurrence
    of Certain Circumstances ................................................................................ 17
    Certain Duties and Responsibilities .................................................................. 18
    Certain Rights of Preference Shares Paying Agent .......................................... 20
    Not Responsible for Recitals or Issuance of Preference Shares ....................... 21
    May Hold Preference Shares ............................................................................ 22
    Money Held in Trust ........................................................................................ 22
    Compensation and Reimbursement .................................................................. 22
    Corporate Preference Shares Paying Agent Required; Eligibility .................... 23
    Resignation and Removal; Appointment of Successor ..................................... 23
    Acceptance of Appointment by Successor ....................................................... 25
    Merger, Conversion, Consolidation or Succession to Business of
    Preference Shares Paying Agent ..................................................................... 26
    Representations and Warranties of the Bank .................................................... 26
    Withholding ...................................................................................................... 27

DELIVERY OF THE PREFERENCE SHARE CERTIFICATES; OTHER
COVENANTS ...................................................................................................... 28
    Execution and Issuance of Preference Shares .................................................. 28
    Maintenance of Office or Agency .................................................................... 28
    Purchase of Preference Shares ......................................................................... 28
    Delivery of Copies of Issuer Charter and Preference Shares Paying Agent
    Agreement ....................................................................................................... 28

AMENDMENTS TO INDENTURE ................................................................... 28
    Supplemental Indentures .................................................................................. 28
    Reliance by Preference Shareholders ............................................................... 29

REDEMPTION OF PREFERENCE SHARES ...................................................... 29
    Redemption ......................................................................................................... 29
    Notice of Optional Redemption of Preference Shares by the Share Registrar ................................................................................................................ 30
    Notice of Optional Redemption of Preference Shares by the Issuer ............. 30
    Optional Redemption of Preference Shares on the Redemption Date ............ 30
    Redemption Following Liquidation ................................................................. 31

REPORTS AND NOTICES TO PREFERENCE SHAREHOLDERS ................. 31
    Reports; Rule 144A Information; Other Information ...................................... 31
    Notices to Preference Shareholders ................................................................ 32

MISCELLANEOUS ......................................................................................... 32
    Amendments ................................................................................................... 32
    Form of Documents Delivered to Preference Shares Paying Agent ............... 34
    Acts of Holders .............................................................................................. 34
    Notices ........................................................................................................... 35
    Notices to Preference Shareholders; Waiver .................................................. 36
    Effect of Headings and Table of Contents ..................................................... 37
    Successors and Assigns .................................................................................. 37
    Severability .................................................................................................... 37
    Benefits of Agreement .................................................................................... 37
    Governing Law ............................................................................................... 37
    Submission to Jurisdiction ............................................................................. 38
    Counterparts ................................................................................................... 38
    Termination .................................................................................................... 38
    Limitation on Liability ................................................................................... 38

| EXHIBIT A | Form of Certificated Preference Share |
| EXHIBIT B | Form of Preference Share Transfer Certificate |
| EXHIBIT C | Form of Preference Shareholder Certificate |

**PREFERENCE SHARES PAYING AGENCY AGREEMENT**, dated as of October 25, 2007 (as the same may be amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, this *Agreement*), between **STRATFORD CLO LTD.**, an exempted company with limited liability duly incorporated and validly existing under the law of the Cayman Islands (in such capacity, together with its permitted successors and assigns, the *Issuer*), **MAPLES FINANCE LIMITED**, a Cayman Islands company as Share Registrar (in such capacity, together with its permitted successors and assignees, the *Share Registrar*) and **STATE STREET BANK AND TRUST COMPANY** a Massachusetts trust company, as the Preference Shares Paying Agent hereunder (in such capacity, together with its permitted successors and assigns, the *Preference Shares Paying Agent*).

## PRELIMINARY STATEMENT

The Issuer, together with Stratford CLO LLC, a Delaware limited liability company, (the *Co-Issuer* and, together with the Issuer, the *Co-Issuers*) shall, pursuant to an Indenture dated as of the date hereof (as the same may be supplemented or otherwise modified from time to time in accordance with the terms thereof, the *Indenture*), between the Co-Issuers and State Street Bank and Trust Company as the trustee (in such capacity, together with its permitted successors and assigns in such capacity, the *Trustee*) thereunder, issue U.S.$417,200,000 Class A-1 Floating Rate Senior Secured Extendable Notes due 2021, U.S.$104,300,000 Class A-2 Floating Rate Senior Secured Extendable Notes due 2021, U.S.$41,300,000 Class B Floating Rate Senior Secured Extendable due 2021, U.S.$37,100,000 Class C Floating Rate Senior Secured Deferrable Interest Extendable Notes due 2021, U.S.$16,100,000 Class D Floating Rate Senior Secured Deferrable Interest Extendable Notes due 2021 and U.S.$21,000,000 Class E Floating Rate Senior Secured Deferrable Interest Extendable Notes due 2021 (collectively, the *Notes*).

As authorized by its memorandum and articles of association (as the same may be further amended, supplemented or otherwise modified from time to time, the *Issuer Charter*), the Issuer may issue up to U.S.$17,500,000 (in face amount) of Class I Preference Shares (17,500 shares at par value of U.S.$0.01 per share) (the *Class I Preference Shares*) and up to U.S.$45,500,000 (in aggregate face amount) of Class II Preference Shares (45,500 shares at par value of U.S.$0.01 per share) (the *Class II Preference Shares* and, together with the Class I Preference Shares, the *Preference Shares*) the dividends and any final distribution on which are payable in accordance with the Issuer Charter, the Indenture and this Agreement. The Notes and the Preference Shares are collectively referred to herein as the *Securities*.

The Issuer has entered into this Agreement to provide for the payment of such dividends and any final distribution on the Preference Shares, the maintenance of a register with respect thereto and for certain other matters relating to the Preference Shares and the rights of the registered holders thereof.

US269068

010505

**DEFINITIONS; RULES OF CONSTRUCTION**

1.1     Except as otherwise specified herein or as the context may otherwise require, the following terms have the respective meanings set forth below for all purposes of this Agreement.  All other capitalized terms used herein and not defined herein shall have the meanings assigned thereto in the Issuer Charter or the Indenture.

*Act* has the meaning specified in Section 8.3(a).

*Agreement* means this Agreement, as the same may be amended, supplemented or otherwise modified and in effect from time to time in accordance with the terms hereof.

*Authorized Officer* means (i) with respect to the Issuer, any Officer who is authorized to act for the Issuer in matters relating to, and binding upon, the Issuer, (ii) with respect to the Servicer, any Officer, employee or agent of the Servicer who is authorized to act for the Servicer in matters relating to, and binding upon, the Servicer with respect to the subject matter of the request, certificate or order in question and (iii) with respect to the Preference Shares Paying Agent, a Responsible Officer.  Each party may receive and accept a certification of the authority of any other party as conclusive evidence of the authority of any Person to act, and such certification may be considered as in full force and effect until receipt by such other party of written notice to the contrary.

*Bank* means State Street Bank and Trust Company, a Massachusetts trust company, in its individual capacity and not as Preference Shares Paying Agent.

*Beneficial Owner* means any Person owning an interest in a Global Preference Share as reflected on the books of the Depository or on the books of an Agent Member or on the books of an indirect participant for which an Agent Member acts as agent.

*Business Day* means a day on which commercial banks and foreign exchange markets settle payments in New York City and any other city in which the Corporate Trust Office of the Preference Shares Paying Agent is located and, in the case of the final distribution of any Preference Share, the place of presentation of the Preference Share designated by the Preference Shares Paying Agent; **provided**, **however**, that, for purposes of determining LIBOR, "Business Day" must also be a day on which dealings in deposits in Dollars are transacted in the London interbank market.

*Certificated Preference Shares* means the Preference Shares issued in the form of one or more certificated Preference Shares in definitive, fully registered form, registered in the name of the owner thereof.

*Code* means the U.S. Internal Revenue Code of 1986, as amended.

*Corporate Trust Office* means the corporate trust office of the Preference Shares Paying Agent at which the Preference Shares Paying Agent performs its duties under this Preference Shares Paying Agency Agreement, currently having an address of 200

Clarendon Street, Mail Code: EUC 108, Boston, MA 02116 telecopy no. (617) 351-4358, Attn: CDO Services Group, or any other address the Preference Shares Paying Agent designates from time to time by notice to the Preference Shareholders, the Servicer, the Trustee, the Issuer, and each Rating Agency or the principal corporate trust office of any successor Preference Shares Paying Agent.

*Depository* or *DTC* means The Depository Trust Company.

*Extended Scheduled Preference Shares Redemption Date* means, if a Maturity Extension has occurred, the sixteenth Payment Date after the then current Extended Scheduled Preference Shares Redemption Date (or, in the case of the first Extended Scheduled Preference Shares Redemption Date, November 1, 2025); **provided** that the "Extended Scheduled Preference Shares Redemption Date" will in no event be a date later than the Payment Date in November 2037.

*Face Amount* means with respect to any Preference Share, the amount set forth therein as the "face amount" thereof, which "face amount" shall be U.S.$1,000 per Preference Share.

*Holder* means a Preference Shareholder.

*Indenture* has the meaning specified in the recitals hereto.

*Initial Purchaser* means each of CALYON Corporate and Investment Bank and Calyon Securities (USA) Inc.

*Issuer Ordinary Shares* means the 1,000 ordinary shares, U.S.$1.00 par value per share, of the Issuer.

*New York Presenting Agent* has the meaning specified in Section 4.2.

*Opinion of Counsel* means a written opinion addressed to the Preference Share Paying Agent, or upon which the Preference Share Paying Agent is permitted to rely, and in form and substance reasonably satisfactory to the Preference Share Paying Agent, of an attorney at law (or law firm with one or more partners) reasonably satisfactory to the Preference Shares Paying Agent and admitted to practice before the highest court of any state of the United States or the District of Columbia (or the Cayman Islands, in the case of an opinion relating to the laws of the Cayman Islands), which attorney (or law firm) may, except as otherwise expressly provided in this Preference Shares Paying Agency Agreement, be counsel for the Servicer, the Issuer or the Co-Issuer. Whenever an Opinion of Counsel is required under this Preference Shares Paying Agency Agreement, the Opinion of Counsel may rely on opinions of other counsel who are so admitted and so satisfactory, which opinions of other counsel shall accompany the Opinion of Counsel and shall either be addressed to the Preference Shares Paying Agent or shall state that the Preference Shares Paying Agent may rely on it. An Opinion of Counsel may be supported as to factual (including financial and capital markets) matters by any relevant

certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion.

***Ordinary Shares Account*** means an account established by the Board of Directors of the Issuer in which the proceeds of the subscription and sale of the Ordinary Shares and the U.S.$1,000 transaction fee payable to the Issuer shall be deposited.

***Original Purchaser*** means a purchaser of a Preference Share on the Closing Date.

***Paying Agents*** means the Preference Shares Paying Agent and any other Person authorized by the Issuer from time to time to make payments on the Preference Shares and to deliver notices to the Preference Shareholders on behalf of the Issuer (each, a ***Paying Agent***).

***Preference Share Certificates*** means the permanent, physical certificate in definitive, fully registered form evidencing such Preference Share, which shall be substantially in the form of Exhibit A attached hereto.

***Preference Shares Distribution Account*** means a separate segregated securities account account, established by the Bank at the request of the Preference Shares Paying Agent, and held in the name of the Preference Shares Paying Agent for the benefit of the Preference Shareholders pursuant to Section 2.7, into which the Preference Shares Paying Agent will deposit all amounts received from the Issuer and payable to the Holders of the Preference Shares under the Priority of Payments.

***Preference Shareholder*** means, with respect to any Preference Share, the Person in whose name such Preference Share is registered in the Preference Share Register.

***Preference Shares Paying Agent*** means State Street Bank and Trust Company in its capacity as Preference Shares Paying Agent under this Agreement, unless a successor Person shall have become the Preference Shares Paying Agent pursuant to Section 3.8, and thereafter "Preference Shares Paying Agent" shall mean such successor person.

***Preference Shares*** means, as of any date of determination, the Preference Shares, par value U.S.$0.01 per share and having a Face Amount of U.S.$1,000 per share, issued by the Issuer pursuant to the Issuer Charter and paid for as of such date of determination.

***Record Date*** means the date on which the Preference Shareholders entitled to receive a payment on or in respect of the Preference Shares (including any Redemption Price paid on the applicable Redemption Date) and of any payments on any Preference Shares will be made to the person in whose name the related Preference Share is registered 15 days before the applicable Payment Date.

***Redemption Amount*** means, with respect to each Preference Share, an amount equal to (x) the proceeds of the liquidation of the assets of the Issuer **minus** the costs and expenses of such liquidation **minus** the amount required to establish adequate reserves

necessary to meet any and all contingent, unliquidated liabilities or obligations of the Issuer **multiplied by** (y) (i) the Aggregate Outstanding Amount of such Preference Share immediately prior to the redemption thereof **divided by** (ii) the Aggregate Outstanding Amount of all Preference Shares, as specified in the Issuer Order delivered pursuant to Section 2.4(b).

*Redemption Date* means the date on which the Preference Shares are redeemed or, if such date is not a Business Day, the next following Business Day.

*Responsible Officer* means, when used with respect to the Preference Shares Paying Agent, any Officer within the Corporate Trust Office (or any successor group of the Preference Shares Paying Agent) authorized to act for and on behalf of the Preference Shares Paying Agent, including any vice president, assistant vice president or other Officer of the Preference Shares Paying Agent customarily performing functions similar to those performed by the persons who at the time shall be such Officers, respectively, or to whom any corporate trust matter is referred at the Corporate Trust Office because of such person's knowledge of and familiarity with the particular subject and when used with respect to the Share Registrar, any Officer authorized to act on behalf of the Share Registrar and having direct responsibility for the administration of the Agreement.

*Scheduled Preference Shares Redemption Date* means the date the Preference Shares are scheduled to be redeemed at the Redemption Price thereof by the Issuer on the Payment Date in November 1, 2021 or, upon a Maturity Extension (if any), the applicable Extended Scheduled Preference Shares Redemption Date unless redeemed in full prior thereto.

*Share Registrar* has the meaning set forth in Section 2.5(a).

*Subscription Agreement* means a subscription agreement between a purchaser and the Issuer entered into on or before the Closing Date for the subscription of a specified number of Preference Shares.

*Transfer Certificate* has the meaning set forth in Section 2.5(b)(i)(A).

**Rules of Construction**

1.2     Unless the context otherwise clearly requires:

(a)     the definitions of terms herein shall apply equally to the singular and plural forms of the terms defined;

(b)     whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms;

(c)     the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation";

(d)    the word "will" shall be construed to have the same meaning and effect as the word "shall";

(e)    any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein);

(f)    any reference herein to any Person, or to any Person in a specified capacity, shall be construed to include such Person's successors and assigns or such Person's successors in such capacity, as the case may be; and

(g)    all references in this instrument to designated "Sections," "clauses" and other subdivisions are to the designated Sections, clauses and other subdivisions of this instrument as originally executed, and the words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Section, clause or other subdivision.

## THE PREFERENCE SHARES

### Form of Preference Shares Generally

2.1    The Preference Shares shall be represented by Preference Share Certificates in substantially the form required by this Section 2, with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Agreement, and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon, as may, consistently herewith, be determined by the Authorized Officers of the Issuer executing such Preference Share Certificate as evidenced by their execution of such Preference Share Certificate.  Any portion of the text of any Preference Share Certificate may be set forth on the reverse thereof, with an appropriate reference thereto on the face of the Preference Share Certificate.

### Form of Preference Share Certificates

2.2    The Preference Shares shall be represented by Preference Share Certificates in the form of, and with the legend set forth in, Exhibit A attached hereto.

### Authorized Number of Preference Shares; Minimum Purchase; Fractional Shares

2.3(a)    The aggregate number of Preference Shares that may be allotted, registered and delivered under this Agreement is limited to 17,500 Class I Preference Shares and 45,500 Class II Preference Shares, except for Class I Preference Shares or Class II Preference Shares delivered upon registration of transfer of, or in exchange for, or in lieu of, other Preference Shares pursuant to Sections 2.4 and 2.5.

(b)    The Preference Shares shall be sold and shall be transferable in a minimum trading lot of not less than 250 Preference Shares. After giving effect to any transfer of Preference Shares, the transferor thereof shall have retained a number of Preference Shares that is either (i) equal to zero or (ii) equal to or greater than 250 Preference Shares. Fractional Preference Shares may not be issued.

(c)    The Preference Share Certificates shall be numbered, lettered or otherwise distinguished in such manner as may be consistent herewith, determined by the Authorized Officer of the Issuer executing such Preference Share Certificates as evidenced by its execution of such Preference Share Certificates.

**Execution, Authentication, Delivery and Dating**

2.4(a) The Preference Share Certificates shall be executed on behalf of the Issuer by an Authorized Officer thereof.

(b)    At any time and from time to time after the execution and delivery of this Agreement, the Issuer may deliver Preference Share Certificates executed by the Issuer to the Share Registrar, and the Share Registrar, upon Issuer Order, if the Share Registrar is not the Issuer, shall register the Preference Shares in accordance with the Issuer Charter and deliver such Preference Share Certificates as provided in this Agreement and not otherwise.

(c)    Each of the Preference Share Certificates registered and delivered by the Share Registrar upon Issuer Order on the Closing Date shall be dated as of the Closing Date. All Preference Share Certificates that are registered and delivered on any other date for any other purpose under this Agreement shall be dated the date of their registration.

**Registration, Registration of Transfer and Exchange**

2.5(a) The Share Registrar shall maintain at its offices a register (the ***Preference Share Register***) in which it shall provide for the registration of Preference Shares and the registration of transfers of Preference Shares in accordance with the Issuer Charter. Such procedures shall at all times comply with the requirements of Cayman Islands law. The Preference Share Register shall, at minimum, contain:

    (i)    the names and addresses of the Preference Shareholders, and statements of (A) the Preference Shares held by each Preference Shareholder distinguishing each certificate representing Preference Shares by its number, and (B) the amount of the dividends and other distributions paid, or agreed to be considered as paid, on the Preference Shares;

    (ii)    a designation (based upon the representations contained in the related Subscription Agreement or Transfer Certificate) as to whether each Preference Shareholder who has purchased Preference Shares is a Benefit

Plan Investor (either directly or through an insurance company general account);

(iii) a designation (based upon the representations contained in the related Subscription Agreement or Transfer Certificate) as to whether each Preference Shareholder is a Controlling Person (either directly or through an insurance company general account);

(iv) the date on which the name of any Person was entered on the Share Register as a Preference Shareholder; and; and

(v) the date on which any Person ceased to be a Preference Shareholder.

The Issuer shall inform the Share Registrar of any such reasonable procedures it may prescribe; **provided** that such procedures are not in conflict with procedures established pursuant to this Agreement. The Share Registrar shall maintain at its offices such books and records as it may deem necessary or appropriate in respect of the performance of its function as Share Registrar. Maples Finance Limited is hereby initially appointed ***Share Registrar*** for the purpose of registering Preference Shares and transfers of such Preference Shares and keeping the Preference Share Register on behalf of the Issuer. Upon request at any time, the Share Registrar shall provide to the Trustee, the Preference Shares Paying Agent, the Servicer or the Board of Directors of the Issuer a current list of Preference Shareholders as reflected in the Preference Share Register. The Preference Shares Paying Agent shall maintain at the Corporate Trust Office a duplicate Preference Share register together with such books and records as it may deem necessary or appropriate in respect of the performance of its function as Preference Shares Paying Agent.

The Preference Shares Paying Agent shall have the right to inspect the Preference Share Register at all reasonable times and to obtain copies thereof and the Preference Shares Paying Agent shall have the right to rely upon a certificate executed on behalf of the Share Registrar by a Responsible Officer thereof as to the names and addresses of the Holders of the Preference Shares and the number of Preference Shares held by each such Holder.

Subject to the provisions of this Section 2.5, upon surrender for registration of transfer of any Preference Share to the Preference Shares Paying Agent at its Corporate Trust Office of any Preference Share Certificate representing Preference Shares to be transferred, at the request of the Preference Shares Paying Agent, the Issuer shall execute, and the Share Registrar shall register in the name of the designated transferee or transferees, the Preference Shares so transferred together with details of the one or more new Preference Share (s) to reflect such transfer and deliver such Preference Share Certificate(s) executed by the Issuer to the Preference Shares Paying Agent for delivery to the applicable Holder.

At the option of the Holder, Preference Share Certificates may be exchanged for Preference Share Certificates of like terms, in any authorized denominations, upon surrender of the Preference Share Certificates to be exchanged at the Corporate Trust Office of the Preference Shares Paying Agent. Whenever any Preference Share Certificate is surrendered for exchange, the Share Registrar shall execute, register and deliver to the Preference Shares Paying Agent, for delivery to the appropriate Holder, the Preference Share Certificates executed by the Issuer that the Holder of the Preference Shares making the exchange is entitled to receive.

Every Preference Share presented or surrendered for registration of transfer shall be accompanied by a written instrument of transfer in form satisfactory to the Issuer and duly executed by the Holder thereof as well as duly authorized in writing by the transferee or its attorney.

No service charge shall be made to a Preference Shareholder for any registration of transfer of Preference Shares or exchange of Preference Shares, but the Issuer and the Preference Shares Paying Agent may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

(b)(i)   Exchanges or transfers of beneficial interests in a Preference Share may be made only in accordance with the rules and regulations of the Depository and the transfer restrictions contained in the legend on such Preference Share (including the deemed representation that such transferee is not and that it shall not become a Benefit Plan Investor or a Controlling Person while it shall hold such Preference Share or interest therein) and exchanges or transfers of interests in a Preference Share may be made only in accordance with the following:

(A)   An owner of Preference Shares may transfer to a transferee who takes delivery in the form of Certificated Preference Shares upon provision to the Issuer and the Preference Shares Paying Agent of a written certificate in the form of Exhibit B executed by the Transferee and Transferor, as applicable, and delivered by the Transferor (a **_Transfer Certificate_**).

(B)   Subject to the restrictions on transfer and exchange set forth in this Section 2.4 and to any additional restrictions on transfer or exchange specified in the Preference Shares, the Holder of any Preference Shares may transfer or exchange the same (for Preference Shares represented by one or more Preference Share Certificates in definitive form) by surrendering the Preference Share Certificate in respect of such Preference Shares at the Corporate Trust Office of the Preference Shares Paying Agent together with (x) in the case of any transfer, an executed instrument of transfer and (y) in the case of any exchange, a written request for exchange. Following a proper request for transfer or exchange, the Issuer shall (**provided** it has available in

its possession an inventory of Preference Share Certificates with respect to Preference Shares), within ten Business Days of such request make available at the Corporate Trust Office of the Preference Shares Paying Agent to the transferee (in the case of a transfer) or Preference Shareholder (in the case of an exchange) or send by first class mail (at the risk of the transferee in the case of a transfer or Preference Shareholder in the case of exchange) to such address as the transferee or Preference Shareholder, as applicable, may request, one or more Preference Share Certificates in definitive form representing the Preference Shares so transferred or exchanged.

(c)     Upon request by and at the expense of the Issuer, the Preference Shares Paying Agent shall cooperate with the Issuer in mailing or otherwise distributing (at the Issuer's expense) to Preference Shareholders or prospective purchasers of Preference Shares, at and pursuant to the Issuer's direction, any Rule 144A Information prepared and provided by or on behalf of the Issuer; **provided** that the Preference Shares Paying Agent shall be entitled to affix thereto or enclose therewith such disclaimers as the Preference Shares Paying Agent shall deem reasonably appropriate, at its discretion (such as, for example, a disclaimer that such Rule 144A Information was assembled by the Issuer and not by the Preference Shares Paying Agent, that the Preference Shares Paying Agent has not reviewed or verified the accuracy thereof, and that it makes no representation as to the sufficiency of such information under Rule 144A or for any other purpose).

(d)     Upon the redemption of any Preference Share, the Holder thereof shall present and surrender the related Preference Share Certificate at the Corporate Trust Office of the Preference Shares Paying Agent on or prior to the Redemption Date; **provided** that, if there is delivered to the Issuer and the Preference Shares Paying Agent such security or indemnity as may be required by them to save each of them harmless and an undertaking thereafter to surrender such Preference Share, then, in the absence of notice to the Issuer or the Preference Shares Paying Agent that the applicable Preference Share has been acquired by a bona fide purchaser for value without notice, such final payment shall be made without presentation or surrender.

(e)     If a Holder wishes at any time to transfer Preference Shares to a transferee, such Holder may transfer or cause the transfer of such Preference Shares as provided herein; **provided** that if the Holder retains any Preference Shares, the remaining number of Preference Shares held by such Holder shall satisfy the authorized minimum lot size required by Section 2.3(b).

(f)     The Share Registrar shall not register any transfer of a beneficial interest in Preference Shares to any Person that has represented that it is a Benefit Plan Investor (either directly or through an insurance company general account) or a Controlling Person.  The Share Registrar will not recognize or register such purchase or transfer, if such purchase or transfer would result in Benefit Plan

Investors owning 25% or more of the Aggregate Outstanding Amount of Class I Preference Shares or Class II Preference Shares (determined pursuant to Section 3(42) of ERISA, 29 C.F.R. Section 2510.3-101, the Indenture and the Preference Share Documents) and the Preference Shares held by the Trustee, the Servicer, any of their respective Affiliates (as defined in 29 C.F.R. Section 2510.3-101(f)(3)) and any other persons that have represented that they are Controlling Persons will be disregarded and will not be treated as outstanding unless such person is also a Benefit Plan Investor.

(g)     Each Original Purchaser of Preference Shares (or a beneficial interest therein) in the initial placement of the Preference Shares shall be required to execute and deliver a Subscription Agreement. Each purchaser of Preference Shares, by its purchase of Preference Shares, will be required or deemed to have agreed not to institute against, or join any person in instituting against, the Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation or other proceedings under U.S. Federal or state bankruptcy or similar laws or the similar laws of the Cayman Islands or any other applicable jurisdiction until one year and one day (or, if longer, the applicable preference period then in effect) after the payment in full of the Notes and the Aggregate Outstanding Amount of the Preference Shares.

(h)     The Preference Shares Paying Agent shall not be responsible for ascertaining whether any transfer of the Preference Shares complies with, or otherwise for monitoring or determining compliance with, the requirements or terms of the Securities Act, applicable state securities laws, ERISA, the Code or the Investment Company Act; except that if a certificate or agreement is specifically required by the terms of this Section 2.5 to be provided to the Preference Shares Paying Agent by a transferee of the Preference Shares, a transferor of the Preference Shares, or the Issuer, the Preference Shares Paying Agent shall be under a duty to receive and examine the same to determine whether it conforms substantially on its face to the applicable requirements of this Section 2.5. To the extent applicable to the Issuer, the Issuer may impose additional transfer restrictions to comply with the USA PATRIOT Act and any other applicable anti-money laundering laws and regulations, and any such transfer restrictions shall be binding on each Preference Shareholder. The Issuer shall notify the Preference Shares Paying Agent and the Share Registrar of the imposition of any such transfer restrictions.

(i)     Any purported transfer of Preference Shares not in accordance with this Section 2.5 shall be treated as null and void *ab initio* and shall not be given effect for any purpose hereunder, and the Share Registrar shall not register any such purported transfer and shall not register or deliver such Preference Share Certificates. The Preference Shares Paying Agent shall not be held responsible for any losses that may be incurred as a result of any required transfer under this Section 2.5.

**Mutilated, Defaced, Destroyed, Lost or Stolen Preference Shares**

2.6     If (a) any mutilated or defaced Preference Share Certificate is surrendered to the Preference Shares Paying Agent, or if there shall be delivered to the Preference Shares Paying Agent and the Share Registrar evidence to their reasonable satisfaction of the destruction, loss or theft of any Preference Share Certificate, and (b) there is delivered to the Preference Shares Paying Agent, the Share Registrar and the Issuer such security or indemnity as may be required by them to save each of them and any of their agents harmless, then, in the absence of notice to the Preference Shares Paying Agent or the Share Registrar that such Preference Shares represented by such Preference Share Certificate have been acquired by a bona fide purchaser, the Issuer shall execute and, upon Issuer Order, the Share Registrar shall register and deliver, in lieu of any such mutilated, defaced, destroyed, lost or stolen Preference Share Certificate, a new Preference Share Certificate, registered in the same manner, dated the date of its registration and bearing a number not contemporaneously outstanding.

If, after delivery of such new Preference Share Certificate, a bona fide purchaser of the Preference Shares represented by the predecessor Preference Share Certificate presents for payment, transfer or exchange such predecessor Preference Share Certificate, the Issuer, the Preference Shares Paying Agent and the Share Registrar shall be entitled to recover such new Preference Share Certificate from the Person to whom it was delivered or any Person taking therefrom, and shall be entitled to recover upon the security or indemnity provided therefor to the extent of any loss, damage, cost or expense incurred by the Issuer, the Preference Shares Paying Agent and the Share Registrar in connection therewith.

In case the Preference Shares represented by any such mutilated, defaced, destroyed, lost or stolen Preference Share Certificate have become due and payable, the Issuer in its discretion may, instead of issuing a new Preference Share Certificate, pay the registered Holder of such Preference Shares represented by such Preference Share Certificate without requiring surrender of such Preference Share Certificate except that any mutilated or defaced Preference Share Certificate shall be surrendered.

Upon the issuance of any new Preference Share Certificate under this Section 2.6, the Issuer, the Preference Shares Paying Agent or Share Registrar may require the payment by the registered Holder thereof of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Preference Shares Paying Agent) connected therewith.

The provisions of this Section 2.6 with respect to the rights and remedies of the Issuer are exclusive and shall preclude (to the extent lawful) all other rights and

remedies with respect to the replacement or payment of mutilated, defaced, destroyed, lost or stolen Preference Shares.

**Preference Share Accounts and any Distribution on Preference Shares**

2.7(a)   (i)      **Establishment of Ordinary Shares Account.**  The Board of Directors of the Issuer shall establish the Ordinary Shares Account.  If invested, any and all funds on deposit in, or otherwise to the credit of, the Ordinary Shares Account shall be invested in Eligible Investments.

(ii)      **Establishment of Preference Shares Distribution Account**.  The Preference Shares Paying Agent shall, prior to the Closing Date, establish a single, segregated securities account (which may include any number of sub-accounts deemed necessary or advisable by the Preference Shares Paying Agent for the administration of such securities account), which may be maintained at the Corporate Trust Office, and which shall be designated as the Preference Shares Distribution Account, for the benefit of the Issuer.  On each Payment Date and the Redemption Date, the Trustee will be required to pay to the Preference Shares Paying Agent for deposit into the Preference Shares Distribution Account, an amount equal to all amounts payable by the Trustee to the Preference Shares Paying Agent for deposit to the Preference Shares Distribution Account pursuant to Sections 11.1(a)(i)(23), 11.1(a)(i)(25), 11.1(a)(ii)(11) and 11.1(a)(ii)(15) of the Indenture.  On the Redemption Date, the Trustee will be required to pay to the Preference Shares Paying Agent for deposit into the Preference Shares Distribution Account an amount equal to all remaining proceeds of the Collateral, after all deductions according to the Priority of Payments set forth in the Indenture.  Any and all funds at any time on deposit in, or otherwise to the credit of, the Preference Shares Distribution Account shall be invested at the written direction of the Servicer (or, if no Servicing Agreement or replacement therefor remains in effect, the Issuer) in Eligible Investments having stated maturities no later than the Business Day immediately preceding the next Payment Date in trust by the Preference Shares Paying Agent for the benefit of the Issuer and earnings thereon shall also be available for distribution on the Preference Shares. Payments shall be made from the Preference Shares Distribution Account only in accordance with the provisions set forth below.  The Preference Shares Paying Agent shall have no liability for investment losses on any such investment made pursuant to the direction of the Servicer, and in the absence of such direction the Preference Shares Paying Agent shall not be under any obligation to invest (or otherwise pay interest on) amounts held hereunder.

(b)      **Payment of Distributions to the Preference Shareholders**.  The Preference Shares are scheduled to be redeemed on the Scheduled Preference Shares Redemption Date, unless redeemed prior thereto.  On each Payment Date, the Issuer will make distributions to the Preference Shares Paying Agent for payment *pro rata* to the Holders of the Preference Shares as dividends on the Preference Shares, pursuant to the Preference Share Documents, to the extent legally

permitted, to the extent of available Principal Proceeds as described under Sections 11.1(a)(ii)(11)(A), 11.1(a)(ii)(14) and 11.1(a)(ii)(15).

Interest Proceeds and Principal Proceeds paid to the Preference Shares Paying Agent for payment of dividends on, or the payment of the Redemption Price in respect of, the Preference Shares, will be distributable to the Holders of the Preference Shares only if the Issuer is and will remain solvent following such distribution and Interest Proceeds and Principal Proceeds paid to the Preference Shares Paying Agent for payment of dividends in respect of the Preference Shares will be distributable to the Holders of the Preference Shares only if the Issuer has sufficient distributable profits and/or share premium and if the Issuer is and will remain solvent following such distribution. Payments will be paid by the Trustee to the Preference Shares Paying Agent, on behalf of the Issuer, for payment of dividends and other distributions to the Holders of the Preference Shares pursuant to the Preference Share Documents, to the extent legally permitted, on a pro rata basis according to the number of Preference Shares held by each Holder on the Record Date for such Payment Date.

(c) **Distribution of the Redemption Amount**. On the Redemption Date, the Preference Shares Paying Agent shall distribute or effect the redemption of Preference Shares and make payments to the Preference Shareholders, *pro rata* according to the number of Preference Shares held by each Preference Shareholder, of the Redemption Amount from amounts available in the Preference Shares Distribution Account. Notwithstanding the foregoing, the Redemption Amount shall be payable out of distributable profits and/or share premium and shall be subject to the Issuer being able to pay its debts as they become due in the ordinary course of business immediately prior to, and after giving effect to, such payment, as determined by the Issuer. For purposes of this subsection (c), a determination as to whether the Issuer is solvent on the Redemption Date shall be made (A) after giving effect to any payments to be made on the Redemption Date and (B) in light of the fact that the obligations of the Issuer to the Noteholders, the other Secured Parties and the other Persons subject to the Priority of Payments are limited in recourse to the Collateral, and not to amounts (i) in the Preference Shares Distribution Account, (ii) any other amounts released from the Collateral in accordance with the Indenture and held by or on behalf of the Issuer for the benefit of the Preference Shareholders or (iii) amounts on deposit in the Ordinary Shares Account (as notified to the Preference Shares Paying Agent by the Issuer), and that after the assets in the Collateral are exhausted, such parties will have no further claim against the Issuer. The Issuer shall notify the Preference Shares Paying Agent in writing if the condition set forth in the preceding sentence is not satisfied with respect to any portion of the Redemption Amount at least two Business Days prior to the Redemption Date, and following receipt of such notice such portion will not be paid on the Preference Shares until the first succeeding Business Day upon which the Issuer notifies the Preference Shares Paying Agent in writing that such

condition is again satisfied (such notice to be given by the Issuer to the Preference Shares Paying Agent as soon as the condition is satisfied) and the amounts so retained in the Preference Shares Distribution Account will be held for the benefit of the Issuer until such amounts are paid. Notwithstanding the above, the Preference Shares Paying Agent shall not be deemed to make any representation or determination regarding the permissibility or legality of any distribution to the Preference Shareholders, the responsibility for which shall remain with the Issuer.

Interest Proceeds and Principal Proceeds paid to the Preference Shares Paying Agent for payment of dividends on, or the payment of the Redemption Price in respect of, the Preference Shares, will be distributable to the Holders of the Preference Shares only if the Issuer is and will remain solvent following such distribution and Interest Proceeds and Principal Proceeds paid to the Preference Shares Paying Agent for payment of dividends in respect of the Preference Shares will be distributable to the Holders of the Preference Shares only if the Issuer has sufficient distributable profits and/or share premium and if the Issuer is and will remain solvent following such distribution, as determined by the Issuer. If the condition set forth in the preceding sentence is not satisfied with respect to any portion of any payment of dividends or Redemption Price in respect of the Preference Shares, the Issuer shall notify the Preference Shares Paying Agent thereof in writing at least two Business Days prior to the date such dividends or Redemption price are to be paid, and following receipt of such notice such portion shall not be paid until the first succeeding Business Day upon which the Issuer notifies the Preference Shares Paying Agent in writing that such condition is again satisfied (such notice to be given by the Issuer to the Preference Shares Paying Agent as soon as the condition is again satisfied), and the amounts so retained in the Preference Shares Distribution Account will be held for the benefit of the Issuer until such amounts are paid. Notwithstanding the above, the Preference Shares Paying Agent shall not be deemed to make any representation or determination regarding the permissibility or legality of any distribution to the Preference Shareholders, the responsibility of which shall remain with the Issuer. Payments will be paid by the Trustee to the Preference Shares Paying Agent, on behalf of the Issuer, for payment of dividends and other distributions to the Holders of the Preference Shares pursuant to the Preference Share Documents, to the extent legally permitted (as provided above), on a pro rata basis according to the number of Preference Shares held by each Holder on the Record Date for such Payment Date.

(d) **Payments upon Liquidation**. The Preference Shares Paying Agent, in accordance with the written direction of the Issuer, in connection with a liquidation of the Issuer's assets pursuant to the winding-up provisions of the Issuer Charter, shall distribute the balance in the Preference Shares Distribution Account to the Preference Shareholders.

(e) **Payments Pro Rata; No Payments From Ordinary Shares Account.**

Payments to the Holders of the Preference Shares shall be made on a *pro rata* basis according to the number of Preference Shares held by each Holder. Holders of the Preference Shares shall not be entitled to receive any distribution from funds deposited in the Ordinary Shares Account.

The Preference Shares Paying Agent agrees to give each of the Issuer and the Servicer prompt notice if it becomes aware that the Preference Shares Distribution Account or any funds on deposit therein, or otherwise to the credit of the Preference Shares Distribution Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. In addition, the Preference Shares Paying Agent shall provide notice to the Issuer and the Servicer in the event that any portion of the Preference Share Dividend Amount or Redemption Amount is not distributed to the Preference Shareholders. None of the Trustee, the Noteholders or the other Secured Parties shall have any legal, equitable or beneficial interest in the Preference Shares Distribution Account or any amounts on deposit therein, and amounts on deposit in the Preference Shares Distribution Account shall not be used to pay amounts owed to any Person, other than the Preference Shareholders, except as required by the laws of the Cayman Islands.

(f)  All payments of dividends and any final distribution or redemption of payment on the Preference Shares shall be made in Dollars, and, in the case of a redemption of the Preference Shares, shall be made only upon the surrender of the Preference Share Certificates representing the Preference Shares at the Corporate Trust Office of the Preference Shares Paying Agent. All of such payments shall be made by Dollar check drawn by the Preference Shares Paying Agent on an account maintained by it and shall be mailed by first-class mail, postage prepaid or, at the option of the relevant Preference Shareholder, by wire transfer in immediately available funds to a U.S. Dollar account maintained by the Holder thereof from an account maintained by the Preference Shares Paying Agent (subject to usual and necessary banking procedures regarding Dollar denominated accounts), subject in all cases to any tax, fiscal or other laws or regulations applicable in the place of payment. Any Preference Shareholder desiring to receive a wire transfer payment shall deliver a written request therefor to the Preference Shares Paying Agent setting forth the numbers of the Preference Shares held by it and for which it desires to receive payment by wire transfer and specifying the banking institution and Dollar account number (with any other appropriate information necessary to enable the Preference Shares Paying Agent to transmit such payment and to assure proper credit to such Holder's account) to which such payments are to be transferred. A record of each payment made shall be maintained by or on behalf of the Preference Shares Paying Agent in accordance with its customary procedures, and such record shall be *prima facie* evidence that the payment in question has been made. The Issuer and the Preference Shares Paying Agent shall be fully protected in relying upon any such request in making payments on the Preference Shares, and any payment

transmitted in accordance with such request shall be deemed to have been made upon transmission thereof to the banking institution identified in such request.

**Persons Deemed Owners**

2.8 The Issuer and the Preference Shares Paying Agent may deem and treat any registered Preference Shareholder as the absolute owner of such Preference Share, notwithstanding any notation of ownership or other writing on any Preference Share Certificate, for the purpose of receiving dividends thereon and the Redemption Amount thereof and for all other purposes, and neither the Issuer nor the Preference Shares Paying Agent shall be affected by any notice to the contrary. All such payments so made to such Preference Shareholder or upon such Preference Shareholder's order shall be valid and, to the extent of the sum or sums so paid, effectual to satisfy and discharge the liability for the monies payable upon any such Preference Share.

**Cancellation**

2.9 All Preference Share Certificates surrendered for redemption, registration of transfer or exchange or deemed lost or stolen, shall, if surrendered to any Person other than the Share Registrar, be delivered to the Share Registrar, but, in any case, shall be promptly canceled by the Share Registrar and may not be reissued or resold. All canceled Preference Share Certificates held by the Share Registrar shall be held by the Share Registrar in accordance with its standard retention policy unless the Issuer shall direct by an Issuer Order that they be returned to it. Upon redemption of any Preference Share Certificates, the name of the Holder thereof shall, in respect of such Preference Shares, be removed from the Preference Share Register, and such Preference Shareholder shall cease to be entitled to any rights in respect thereof, except the right to receive the Redemption Amount and any dividend which was due and payable prior to such redemption.

**Required Sale of a Preference Share by the Holder Upon the Occurrence of Certain Circumstances**

2.10 (a) If, notwithstanding the restrictions on transfer contained herein, the Issuer determines that any beneficial owner of a Preference Share was not both a Qualified Institutional Buyer and a Qualified Purchaser, at the time it acquired such Preference Share (or interest therein), then the Issuer may require, by notice to such beneficial owner, that such beneficial owner sell all of its right, title and interest in and to such Preference Share held by it to a Person that is both a Qualified Institutional Buyer and a Qualified Purchaser, with such sale to be effected within 30 days after notice of such sale requirement is given. If a Preference Shareholder fails to effect a sale of Preference Shares within 30 days, upon direction from the Servicer or the Issuer, the Preference Shares Paying Agent, on behalf of and at the expense of the Issuer, shall cause such Holder's Preference Share to be transferred in a commercially reasonable sale (conducted by an investment bank retained by the Preference Shares Paying Agent at the expense of the Issuer in accordance with Section 9-610 of the Uniform Commercial Code as in effect

in the State of New York as applied to securities that are sold on a recognized market or are the subject of widely distributed price quotations) to a Person that certifies to the Preference Shares Paying Agent, the Issuer and the Servicer that it is both a Qualified Institutional Buyer and a Qualified Purchaser and provides the other acknowledgments, representations and agreements set forth in the Transfer Certificate. No payments will be made on such Preference Shares from the date notice of the sale requirement is sent to the date on which such Preference Shares are sold.

(b)      If, notwithstanding the above, the Issuer or the Share Registrar determines that a Benefit Plan Investor has acquired Preference Shares in violation of Section 2.4(f), the Issuer shall require, by notice to such Benefit Plan Investor, that such Benefit Plan Investor sell all of its right, title and interest in or to such Preference Shares in accordance with this Agreement with such sale to be effected within 30 days after notice of such sale requirement is given. If such Benefit Plan Investor fails to effect the transfer or exchange required within such 30-day period, upon direction from the Servicer or the Issuer, the Preference Shares Paying Agent, on behalf of and at the expense of the Issuer, shall cause such Holder's Preference Share to be transferred in a transferred in a commercially reasonable sale (conducted by an investment bank retained by the Preference Shares Paying Agent at the expense of the Issuer in accordance with Section 9-610 of the Uniform Commercial Code as in effect in the State of New York as applied to securities that are sold on a recognized market or are the subject of widely distributed price quotations) to a Person that qualifies as a purchaser of such Preference Shares pursuant to this Agreement and provides the other acknowledgments, representations and agreements set forth in the Transfer Certificate. No payments will be made on such Preference Shares from the date notice of the sale requirement is sent to the date on which such Preference Shares are sold.

**THE PREFERENCE SHARES PAYING AGENT**

**Certain Duties and Responsibilities**

3.1(a)   The Preference Shares Paying Agent undertakes to perform such duties and only such duties as are specifically set forth in this Agreement, and no implied covenants or obligations shall be read into this Agreement against the Preference Shares Paying Agent.

(b)      In the absence of bad faith on its part, the Preference Shares Paying Agent may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Preference Shares Paying Agent and conforming to the requirements of this Agreement; **provided** that, in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Preference Shares Paying Agent, the Preference Shares Paying Agent shall be under a duty to examine the same to determine whether or not they substantially conform on their face to the requirements of this Agreement and shall promptly, but in any event within three Business Days in the case of an Officer's certificate furnished by the

Issuer, notify the party delivering the same if such certificate or opinion does not conform. If a corrected form shall not have been delivered to the Preference Shares Paying Agent within 15 days after such notice from the Preference Shares Paying Agent, the Preference Shares Paying Agent shall so notify the Preference Shareholders.

(c)     No provision of this Agreement shall be construed to relieve the Preference Shares Paying Agent from liability for its own grossly negligent action, its own grossly negligent failure to act, bad faith or its own willful misconduct, except that:

  (i)     this subclause (c) shall not be construed to limit the effect of subclause (a) of this Section 3.1;

  (ii)     the Preference Shares Paying Agent shall not be liable for any error of judgment made in good faith by a Responsible Officer, unless it shall be proven that the Preference Shares Paying Agent was grossly negligent in ascertaining the pertinent facts;

  (iii)     the Preference Shares Paying Agent shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Issuer, the Servicer, the Share Registrar and/or the Preference Shareholders to the Preference Shares Paying Agent in accordance with this Agreement under circumstances in which such direction is required or permitted by the terms of this Agreement;

  (iv)     no provision of this Agreement shall require the Preference Shares Paying Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers contemplated hereunder, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it unless such risk or liability relates to performance of its ordinary services under this Agreement; and

  (v)     notwithstanding any other provision herein, in no event shall the Preference Shares Paying Agent be liable for special, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Preference Shares Paying Agent has been advised of such loss or damage regardless of the form of action.

(d)     Whether or not therein expressly so provided, every provision of this Agreement relating to the conduct or affecting the liability of or affording protection to the Preference Shares Paying Agent shall be subject to the provisions of this Section 3.1.

(e)     The Preference Shares Paying Agent shall, upon reasonable prior written notice (but no less than two Business Days) to the Preference Shares Paying Agent substantially in the form of Exhibit C hereto, permit any representative of a Preference Shareholder, during the Preference Shares Paying Agent's normal business hours, to examine all books of account, records, reports and other papers of the Preference Shares Paying Agent relating to the Preference Shares, to make copies and extracts therefrom (the reasonable out-of-pocket expenses incurred in making any such copies or extracts to be reimbursed to the Preference Shares Paying Agent by such Holder) and to discuss the Preference Shares Paying Agent's actions, as such actions relate to the Preference Shares Paying Agent's duties with respect to the Preference Shares, with the Preference Shares Paying Agent's officers and employees responsible for carrying out the Preference Shares Paying Agent's duties with respect to the Preference Shares.

**Certain Rights of Preference Shares Paying Agent**

3.2     Except as otherwise provided in Section 3.1:

(a)     the Preference Shares Paying Agent may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, note or other paper or document reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties;

(b)     any request or direction of the Issuer mentioned herein shall be sufficiently evidenced by an Issuer Order;

(c)     whenever in the administration of this Agreement the Preference Shares Paying Agent shall deem it desirable that a matter be proved or established prior to taking, suffering, determining or omitting any action hereunder, the Preference Shares Paying Agent (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, rely upon an Officer's certificate;

(d)     as a condition to the taking, determining or omitting of any action by it hereunder, the Preference Shares Paying Agent may consult with counsel and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted by it hereunder in good faith and in reliance thereon;

(e)     the Preference Shares Paying Agent shall be under no obligation to exercise or to honor any of the rights or powers vested in it by this Agreement at the request or direction of any of the Preference Shareholders pursuant to this Agreement unless such Preference Shareholders shall have offered to the Preference Shares Paying Agent reasonable security or indemnity against the costs, expenses and liabilities which might reasonably be incurred by it in compliance with such request or direction;

(f)    the Preference Shares Paying Agent shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, note or other paper documents, but the Preference Shares Paying Agent, in its discretion, may, and, upon the written direction of a Majority of Preference Shareholders, shall, make such further inquiry or investigation into such facts or matters as it may see fit or as it shall be directed, and the Preference Shares Paying Agent shall be entitled, on reasonable prior notice to the Issuer and the Servicer, to examine the books and records of the Issuer and the Servicer relating to the Preference Shares and the Collateral, personally or by agent or attorney at a time acceptable to the Issuer or the Servicer in their reasonable judgment during normal business hours; **provided** that the Preference Shares Paying Agent shall, and shall cause its agents to, hold in confidence all such information, except (i) to the extent disclosure may be required by law, by any regulatory authority or by the documents delivered pursuant to or in connection with this Agreement and the Preference Shares and (ii) to the extent that the Preference Shares Paying Agent, in its sole judgment, may determine that such disclosure is consistent with its obligations hereunder;

(g)    the Preference Shares Paying Agent may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys; **provided** that the Preference Shares Paying Agent shall not be responsible for any misconduct or negligence on the part of any agent (other than any Affiliate of the Preference Shares Paying Agent) appointed and supervised, or attorney appointed, with due care by it hereunder;

(h)    the Preference Shares Paying Agent shall not be liable for any action it takes or omits to take in good faith that it reasonably believes to be authorized or within its rights or powers hereunder;

(i)    to the extent permitted by law, the Preference Shares Paying Agent shall not be required to give any bond or surety in respect of the execution of this Agreement or otherwise; and

(j)    the permissive right of the Preference Shares Paying Agent to take or refrain from taking any actions enumerated in this Agreement shall not be construed as a duty.

**Not Responsible for Recitals or Issuance of Preference Shares**

3.3    The recitals contained herein and in the Preference Shares shall be taken as the statements of the Issuer, and the Preference Shares Paying Agent does not assume responsibility for their correctness. The Preference Shares Paying Agent does not make any representation as to the validity or sufficiency of this Agreement (except as may be made with respect to the validity of its obligations hereunder) or the Preference Shares. The Preference Shares Paying Agent shall not be accountable for the use or application by the Issuer of the Preference Shares or the proceeds thereof or any Money paid to the Preference Shares pursuant to the provisions hereof.

**May Hold Preference Shares**

3.4     The Preference Shares Paying Agent, the Share Registrar or any other agent of the Issuer, in its individual or any other capacity, may become the owner or pledgee of Preference Shares, and may otherwise deal with the Issuer or any of its Affiliates, with the same rights it would have if it were not the Preference Shares Paying Agent, Share Registrar or such other agent.

**Money Held in Trust**

3.5     The Preference Shares Paying Agent shall be under no liability for interest on any Money received by it hereunder except as otherwise agreed upon with the Issuer and except to the extent of income or other gain on investments which are deposits in or certificates of deposit of the Preference Shares Paying Agent in its commercial capacity and income or other gain actually received by the Preference Shares Paying Agent on amounts on deposit in the Preference Shares Distribution Account.

**Compensation and Reimbursement**

3.6(a)  The Issuer agrees, subject to the Priority of Payments under the Indenture:

    (i) to pay the Preference Shares Paying Agent on each Payment Date reasonable compensation for all services rendered by it hereunder in accordance with a separate written agreement between the Issuer and the Preference Shares Paying Agent;

    (ii) except as otherwise expressly provided herein, to reimburse the Preference Shares Paying Agent (subject to any written agreement between the Issuer and the Preference Shares Paying Agent) in a timely manner upon its request for all reasonable expenses, disbursements and advances incurred or made by the Preference Shares Paying Agent in accordance with any provision of this Agreement or in the enforcement of any provision hereof; and

    (iii) to indemnify the Preference Shares Paying Agent and its Officers, directors, employees and agents for, and to hold them harmless against, any loss, liability or expense (including reasonable counsel fees)  arising out of or in connection with the performance of its obligations hereunder, including the costs and expenses of defending themselves against any claim or liability in connection with the exercise or performance of any of their powers or duties hereunder except to the extent of any such loss, liability or expense caused by the gross negligence, willful misconduct or bad faith of the Preference Shares Paying Agent or any of its Officers, directors, employees or agents.

(b)     The Issuer shall remit payment for such fees and expenses to the Preference Shares Paying Agent in accordance with the Priority of Payments or, upon satisfaction and discharge of the Indenture, the Preference Shares Paying Agent may from time to time deduct payment of its fees and expenses hereunder from Moneys on deposit in the Preference Shares Distribution Account.

(c)     The Preference Shares Paying Agent hereby agrees not to cause the filing of a petition in bankruptcy against the Issuer for the non-payment to the Preference Shares Paying Agent of any amounts provided by this Section 3.6 until at least one year and one day, or, if longer, the applicable preference period then in effect (including any period established pursuant to the laws of the Cayman Islands) (plus one day), after the payment in full of all Notes issued under the Indenture and of the Aggregate Outstanding Amount of the Preference Shares. The indemnifications in favor of the Preference Shares Paying Agent in this Section 3.6 shall survive any resignation or removal of any Person acting as Preference Shares Paying Agent (to the extent of any indemnified liabilities, costs, expenses and other amounts arising or incurred prior to, or arising out of actions or omissions occurring prior to, such resignation or removal). The provisions of this Section 3.6(c) shall survive the termination of this Agreement.

**Corporate Preference Shares Paying Agent Required; Eligibility**

3.7     There shall at all times be a Preference Shares Paying Agent under this Agreement which shall be a corporation, association or trust company organized and doing business under the laws of the United States or of any State thereof, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least U.S.$200,000,000, subject to supervision or examination by federal or state authority, having a rating of at least "Baa1" by Moody's and "BBB+" by Standard and Poor's and having an office within the United States. If such corporation publishes reports of condition at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then, for the purposes of this Section 3.7, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. If at any time the Preference Shares Paying Agent shall cease to be eligible in accordance with the provisions of this Section 3.7, it shall resign immediately in the manner and with the effect hereinafter specified in this Section 3.

**Resignation and Removal; Appointment of Successor**

3.8(a)  No resignation or removal of the Preference Shares Paying Agent and no appointment of a successor Preference Shares Paying Agent pursuant to this Section 3 shall become effective until the acceptance of appointment by the successor Preference Shares Paying Agent under Section 3.9.

(b)     Any provision of this Agreement to the contrary notwithstanding, the Preference Shares Paying Agent may resign at any time by giving written notice thereof to

the Issuer, the Trustee, the Preference Shareholders and the Servicer. Upon receiving such notice of resignation, the Issuer shall promptly appoint a successor Preference Shares Paying Agent, by written instrument, in duplicate, executed by an Authorized Officer of the Issuer, one copy of which shall be delivered to the Preference Shares Paying Agent so resigning and one copy to the successor Preference Shares Paying Agent, together with a copy to each Preference Shareholder; **provided** that such successor Preference Shares Paying Agent shall be appointed by the Issuer only upon the written consent of a Majority of Preference Shareholders. If no successor Preference Shares Paying Agent shall have been appointed and an instrument of acceptance by a successor Preference Shares Paying Agent shall not have been delivered to the Preference Shares Paying Agent within 60 days after the giving of such notice of resignation, the resigning Preference Shares Paying Agent or any Holder of a Preference Share, on behalf of itself and all others similarly situated, may petition any court of competent jurisdiction for the appointment of a successor Preference Shares Paying Agent.

(c)    The Preference Shares Paying Agent may be removed at any time by the Issuer at the direction of a Majority of Preference Shareholders delivered to the Preference Shares Paying Agent and to the Issuer.

(d)    If at any time:

    (i)    the Preference Shares Paying Agent shall cease to be eligible under Section 3.7 and shall fail to resign after written request therefor by the Issuer or by any Preference Shareholder; or

    (ii)    the Preference Shares Paying Agent shall become incapable of acting or shall be adjudged as bankrupt or insolvent or a receiver or liquidator of the Preference Shares Paying Agent or of its property shall be appointed or any public officer shall take charge or control of the Preference Shares Paying Agent or of its property or affairs for the purpose of rehabilitation, conservation or liquidation,

then, in any such case, (A) the Issuer, by Issuer Order, may remove the Preference Shares Paying Agent or (B) subject to Section 3.8(a), any Preference Shareholder may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Preference Shares Paying Agent and the appointment of a successor Preference Shares Paying Agent.

(e)    If the Preference Shares Paying Agent shall resign, be removed or become incapable of acting, or if a vacancy shall occur in the office of the Preference Shares Paying Agent for any reason, the Issuer, by Issuer Order, shall promptly appoint a successor Preference Shares Paying Agent. The successor Preference Shares Paying Agent so appointed shall, forthwith upon its acceptance of such appointment, become the successor Preference Shares Paying Agent. If no

successor Preference Shares Paying Agent shall have been so appointed at the direction of such Preference Shareholders or shall not have accepted appointment in the manner hereinafter provided, any Preference Shareholder may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Preference Shares Paying Agent.

(f)     The Issuer shall give prompt notice of each resignation and each removal of the Preference Shares Paying Agent and each appointment of a successor Preference Shares Paying Agent by mailing written notice of such event by first-class mail, postage prepaid, to the Trustee, the Servicer and to the Preference Shareholders as their names and addresses appear in the Preference Share Register. Each notice shall include the name of the successor Preference Shares Paying Agent and the address of its Corporate Trust Office. If the Issuer fails to mail such notice within ten days after acceptance of appointment by the successor Preference Shares Paying Agent, the successor Preference Shares Paying Agent shall cause such notice to be given at the expense of the Issuer.

**Acceptance of Appointment by Successor**

3.9     Every successor Preference Shares Paying Agent appointed hereunder shall execute, acknowledge and deliver to the Issuer and the retiring Preference Shares Paying Agent an instrument accepting such appointment. Upon delivery of the required instruments, the resignation or removal of the retiring Preference Shares Paying Agent shall become effective and such successor Preference Shares Paying Agent, without any other act, deed or conveyance, shall become vested with all the rights, powers, trusts, duties and obligations of the retiring Preference Shares Paying Agent; but, on request of the Issuer or a Majority of Preference Shareholders or the successor Preference Shares Paying Agent, such retiring Preference Shares Paying Agent shall, upon payment of its charges, fees, indemnities and expenses then unpaid, execute and deliver an instrument transferring to such successor Preference Shares Paying Agent all the rights, powers and trusts of the retiring Preference Shares Paying Agent, and shall duly assign, transfer and deliver to such successor Preference Shares Paying Agent all property and Money held by such retiring Preference Shares Paying Agent hereunder. Upon request of any such successor Preference Shares Paying Agent, the Issuer shall execute any and all instruments for more fully and certainly vesting in and confirming to such successor Preference Shares Paying Agent all such rights, powers and trusts.

No successor Preference Shares Paying Agent shall accept its appointment unless at the time of such acceptance such successor shall (a) have long term debt rated at least "Baa1" by Moody's, (b) be qualified and eligible under this Section 3 and (c) be located in a jurisdiction that will not subject payments on the Preference Shares to withholding tax as a result of the successor Preference Shares Paying Agent being located therein. No appointment of a successor Preference Shares Paying Agent shall become effective if a Majority of Preference Shareholders objects to such appointment and no appointment of a successor shall become effective until the date ten days after notice of such appointment has been given to each Preference Shareholder.

**Merger, Conversion, Consolidation or Succession to Business of Preference Shares Paying Agent**

3.10    Any Person into which the Preference Shares Paying Agent may be merged or converted or with which it may be consolidated, or any Person resulting from any merger, conversion or consolidation to which the Preference Shares Paying Agent shall be a party, or any Person succeeding to all or substantially all of the corporate trust business of the Preference Shares Paying Agent, shall be the successor of the Preference Shares Paying Agent hereunder; **provided** such Person shall be otherwise qualified and eligible under this Section 3, without the execution or filing of any paper or any further act on the part of any of the parties hereto.

**Representations and Warranties of the Bank**

3.11(a) **Organization**.  The Bank has been duly organized and is duly incorporated and validly existing as a trust company under the laws of the Commonwealth of Massachusetts and has the power to conduct its business and affairs as the Preference Shares Paying Agent.

(b)    **Authorization; Binding Obligations**.  The Bank has the corporate power and authority to perform the duties and obligations of Preference Shares Paying Agent under this Agreement.  The Bank has taken all necessary corporate action to authorize the execution, delivery and performance of this Agreement, and all of the documents required to be executed by the Bank pursuant hereto.  This Agreement has been duly executed and delivered by the Bank.  Upon execution and delivery by the Issuer, this Agreement will constitute the legal, valid and binding obligation of the Bank enforceable in accordance with its terms.

(c)    **Eligibility**.  The Bank is eligible under Section 3.7 to serve as Preference Shares Paying Agent hereunder.

(d)    **No Conflict**.  Neither the execution, delivery and performance of this Agreement, nor the consummation of the transactions contemplated by this Agreement, (i) is prohibited by, or requires the Bank to obtain any consent, authorization, approval or registration under, any law, statute, rule, regulation, judgment, order, writ, injunction or decree that is binding upon the Bank or any of its properties or assets, or (ii) will violate any provision of, result in any default or acceleration of any obligations under, result in the creation or imposition of any lien pursuant to, or require any consent under, any agreement to which the Bank is a party or by which it or any of its property is bound.

(e)    **No Proceedings**.  There are no proceedings pending, or to the best knowledge of the Bank, threatened, against the Bank before any federal, state or other governmental agency, authority, administrator or regulatory body, arbitrator, court or other tribunal, foreign or domestic, that could have a material adverse effect on the ability of the Bank to perform its duties under this Agreement.

**Withholding**

3.12    If any withholding tax is imposed on the Issuer's payment (or allocations of income) under the Preference Shares  to any Preference Shareholder or beneficial owner, such tax shall reduce the amount otherwise distributable to such Preference Shareholder or beneficial owner.  The Preference Shares Paying Agent is hereby authorized and directed to retain from amounts otherwise distributable to any Preference Shareholder sufficient funds for the payment of any tax that is legally owed or required to be withheld by the Issuer or the Preference Shares Paying Agent (but such authorization shall not prevent the Preference Shares Paying Agent from contesting any such tax in appropriate proceedings and withholding payment of such tax, if permitted by law, pending the outcome of such proceedings) and to remit such amounts to the appropriate taxing authority.  The amount of any withholding tax imposed with respect to the amount paid (or allocated to) any Preference Shareholder or beneficial owner shall be treated as cash distributed to such Preference Shareholder at the time it is withheld by the Preference Shares Paying Agent.  If there is a possibility that withholding tax is payable with respect to a distribution, the Preference Shares Paying Agent may in its sole discretion withhold such amounts in accordance with this Section 3.12.  If any Preference Shareholder wishes to apply for a refund of any such withholding tax, the Preference Shares Paying Agent shall provide to the Preference Shareholder readily available information so long as such Preference Shareholder agrees to reimburse the Preference Shares Paying Agent for any out of pocket expenses incurred.

As a condition to the payment of any distribution or other amount on any Preference Share without the imposition of withholding tax, the Preference Shares Paying Agent shall require the delivery of properly completed and signed applicable tax certifications (generally, in the case of U.S. federal income tax, an Internal Revenue Service Form W-9 (or applicable successor form) in the case of a person that is a "United States person" within the meaning of Section 7701(a)(30) of the Code or the applicable Internal Revenue Service Form W-8 (or applicable successor form) in the case of a person that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code) and such other certification acceptable to it to enable the Issuer and the Preference Shares Paying Agent to determine their duties and liabilities with respect to any taxes or other charges that they may be required to pay, deduct or withhold in respect of such Preference Share or the Holder or beneficial owner of such Preference Share under any present or future law or regulation of the Cayman Islands, the United States or any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirements under any such law or regulation.

The Preference Shares Paying Agent hereby provides notice to each Preference Shareholder and beneficial owner that the failure of such Preference Shareholder and beneficial owner to provide the Preference Shares Paying Agent with appropriate tax certifications may result in amounts being withheld from payments to such Preference Shareholder under this Agreement (and that amounts withheld pursuant to applicable tax laws shall be considered as having been paid by the Issuer as provided above).

Nothing herein shall impose an obligation on the part of the Preference Shares Paying Agent beyond any obligation so imposed under applicable law to determine the amount of any tax or withholding obligation on the part of the Issuer or in respect of the Preference Shares. The Preference Shares Paying Agent shall give prompt notice of any such withholding to each Preference Shareholder.

## DELIVERY OF THE PREFERENCE SHARE CERTIFICATES; OTHER COVENANTS

### Execution and Issuance of Preference Shares

4.1    Preference Share Certificates shall be executed on behalf of the Issuer by an Authorized Officer and delivered to the Share Registrar, and thereupon the same shall be allotted, registered and delivered by the Share Registrar upon Issuer Order.

### Maintenance of Office or Agency

4.2    The Preference Shares Paying Agent shall maintain an office or agency in Boston, Massachusetts, where Preference Shares  may be presented or surrendered for payment. The Preference Shares Paying Agent hereby initially appoints its office in Boston, currently located at 200 Clarendon Street, Mail Code: EUC 108, Boston, MA 02116 as such office or agency.  The Preference Shares Paying Agent will give prompt written notice to the Issuer and the Preference Shareholders of any change in this location.  If at any time the Preference Shares Paying Agent shall fail to maintain any such office or agency, presentations and surrenders may be made or served at the Corporate Trust Office.

### Purchase of Preference Shares

4.3    Notwithstanding anything contained in this Agreement to the contrary, the Issuer shall not acquire Preference Shares in the open market, in privately negotiated transactions or otherwise.

### Delivery of Copies of Issuer Charter and Preference Shares Paying Agent Agreement

4.4    The Preference Shares Paying Agent shall deliver to each Holder of Preference Shares a copy of the Issuer Charter and, upon request of any such Holder, a copy of this Agreement.

## AMENDMENTS TO INDENTURE

### Supplemental Indentures

5.1    The Preference Shares Paying Agent shall send by fax/overnight courier to each Preference Shareholder a copy of any proposed supplemental indenture promptly following receipt by the Preference Shares Paying Agent of such proposed supplemental

indenture from the Trustee pursuant to Section 8.1 or Section 8.2 of the Indenture. Unless notified by the Issuer acting at the direction of a Majority of Preference Shareholders that the Preference Shares shall be materially and adversely affected, the Preference Shares Paying Agent may rely on the written advice of counsel as to whether or not the rights of the Preference Shareholders would be materially and adversely affected by such change (after giving notice of such change to the Preference Shareholders). Such determination shall be conclusive and binding on all present and future Preference Shareholders. The Preference Shares Paying Agent shall not be liable for relying in good faith upon an Opinion of Counsel delivered to the Preference Shares Paying Agent.

It shall not be necessary for a Majority of Preference Shareholders under this Section 5.1 to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if a Majority of Preference Shareholders shall approve the substance thereof.

Promptly after the receipt by the Preference Shares Paying Agent of any supplemental indenture executed by the Issuer pursuant to Section 8.1 or Section 8.2 of the Indenture, the Preference Shares Paying Agent shall, at the expense of the Issuer, mail to the Preference Shareholders a copy thereof. Any failure of the Preference Shares Paying Agent to mail such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such supplemental indenture.

**Reliance by Preference Shareholders**

5.2    Without limiting the generality of Section 5.1, the Issuer and the Preference Shares Paying Agent acknowledge and agree that (a) the agreements and obligations of the Issuer and the Preference Shares Paying Agent under this Section 5 shall be deemed made for the benefit of the Preference Shareholders and (b) the Preference Shareholders are intended third-party beneficiaries of such agreements and obligations.

**REDEMPTION OF PREFERENCE SHARES**

**Redemption**

6.1    On any Payment Date on or after the Payment Date on which the Notes have been paid in full, a Majority of Preference Shareholders may direct the Issuer to redeem the Preference Shares at a redemption price equal to the Redemption Amount. Such Redemption Amount shall be paid by the Trustee, on behalf of the Issuer, to the Preference Share Paying Agent for deposit into the Preference Shares Distribution Account, and shall be distributed, together with any other amounts on deposit in the Preference Shares Distribution Account, to the Preference Shareholders, subject to the provisions of Section 2.7(c) and the laws of the Cayman Islands.

The Issuer shall (i) give notice to all Preference Shareholders upon the payment in full of the Notes, (ii) give notice of the Scheduled Preference Share Redemption Date and (iii) set the Redemption Date and the applicable Record Date for an optional redemption of

the Preference Shares and give notice thereof to the Preference Share Paying Agent pursuant to Section 6.2.

The Preference Shares shall be redeemed (in whole but not in part) on the Scheduled Preference Share Redemption Date (if not redeemed earlier) after payment in full of the Notes and after payment of all amounts payable under the Priority of Payments prior to the payment of the Preference Shares, at a redemption price equal to the Redemption Amount.

**Notice of Optional Redemption of Preference Shares by the Share Registrar**

6.2     In the event of any optional redemption of the Preference Shares pursuant to Section 6.1, the Share Registrar will communicate any distributions and payments made to the Issuer and the Preference Shares Paying Agent.

**Notice of Optional Redemption of Preference Shares  by the Issuer**

6.3     The Preference Shares Paying Agent, on behalf of the Issuer, shall provide notice of an optional redemption of the Preference Shares  pursuant to Section 6.1 by first-class mail, postage prepaid, mailed not less than 10 Business Days and not earlier than 30 days prior to the Redemption Date to each Preference Shareholder.

All notices of redemption or maturity shall state:

> (i)   the Redemption Date; and

> (ii)  the place or places where such Preference Shares  to be redeemed are to be surrendered for the payment of the redemption price thereof, which shall be the office or agency of the Preference Shares Paying Agent or the New York Presenting Agent.

At the cost of the Issuer, the Preference Shares Paying Agent shall give notice of any withdrawal of a redemption of the Preference Shares  by overnight courier guaranteeing next day delivery, sent not later than the third Business Day prior to the scheduled Redemption Date, to each Holder of a Preference Share to be redeemed at such Preference Shareholder's address in the Preference Share Register.

Notice of redemption of the Preference Shares shall be given by the Issuer or, at the Issuer's request, by the Preference Shares Paying Agent in the name and at the expense of the Issuer.  Failure to give notice of redemption, or any defect therein, to any Preference Shareholder selected for redemption shall not impair or affect the validity of the redemption of any other Security.

**Optional Redemption of Preference Shares  on the Redemption Date**

6.4     Upon the redemption of a Preference Share, the Holder thereof shall present and surrender such Preference Share at the place specified in the notice of redemption on or

prior to the applicable Redemption Date; **provided** that if there is delivered to the Issuer and the Preference Shares Paying Agent such security or indemnity as may be required by them to save each of them harmless and an undertaking thereafter to surrender such Preference Share, then, in the absence of notice to the Issuer or the Preference Shares Paying Agent that the applicable Preference Share has been acquired by a bona fide purchaser, such final payment shall be made without presentation or surrender.

**Redemption Following Liquidation**

6.5     Following the liquidation of the Issuer's assets pursuant to the Issuer Charter, the Preference Shares shall be redeemed (whether or not the Preference Shareholders thereof receive any payments in respect of such redemption) at the Redemption Amount.

**REPORTS AND NOTICES TO PREFERENCE SHAREHOLDERS**

**Reports; Rule 144A Information; Other Information**

7.1(a)   The Preference Shares Paying Agent shall deliver or make available on its website to each Preference Shareholder, promptly upon receipt from the Issuer, each Noteholder Report, each Monthly Report, each Accountant's Report and each other report or notice that is required to be delivered to all of the Noteholders pursuant to the Indenture.  In addition, the Preference Shares Paying Agent shall mail to each Preference Shareholder that delivers to the Preference Shares Paying Agent a written request therefor substantially in the form of Exhibit C hereto, a copy of the information relating to the Issuer requested therein, promptly following receipt of such information from the Issuer.

(b)     Upon the written request by the Issuer, the Preference Shares Paying Agent shall promptly mail to each Preference Shareholder or prospective purchaser of Preference Shares that has been designated by a Preference Shareholder any Rule 144A Information requested by such Preference Shareholder and delivered by the Issuer to the Preference Shares Paying Agent.

(c)     The Issuer and each Holder and beneficial owner of a Preference Share shall treat the Preference Shares as equity in the Issuer and the Notes as debt of the Issuer only, in each case for U.S. federal, and to the extent permitted by law, state and local income and franchise tax purposes, and further agrees to report all income (or loss) in accordance with such treatment and not to take any action inconsistent with such treatment unless otherwise required by any relevant taxing authority. Each Holder and beneficial owner of a Preference Share shall be deemed to have agreed to treat the Preference Shares  as equity for U.S. federal, and to the extent permitted by law, state and local income and franchise tax purposes.

(d)     The Issuer shall provide to any Preference Shareholder or beneficial owner in a timely manner, (i) all information that a person making a "qualified electing fund" election (as defined in the Code) is required to obtain for U.S. federal income tax

purposes, (ii) a "PFIC Annual Information Statement" as described in U.S. Treasury Regulations Section 1.1295-1(g)(1) (or any U.S. successor Internal Revenue Service release or U.S. Treasury Regulation), including all representations and statements required by such statement, and will take any other steps necessary to facilitate such election by a Preference Shareholder or beneficial owner, (iii) information required by a Preference Shareholder or beneficial owner to satisfy its obligations, if any, under U.S. Treasury Regulations Section 1.6011-4 with respect to transactions undertaken by the Issuer and (iv) a U.S. Internal Revenue Service Form 5471 (or successor form) and any other information that such Person reasonably requests to assist such Person with regard to any information return filing requirements the Person may have under the Code as a result of owning Preference Shares.

(e)     The Issuer will not elect to be treated as other than an association taxable as a corporation for U.S. federal income tax purposes.

(f)     The Issuer will treat each purchase of Collateral Obligations as a "purchase" for tax, accounting and reporting purposes.

(g)     The Issuer and Co-Issuer shall file, or cause to be filed, any tax returns, including information returns, required by any governmental authority.

**Notices to Preference Shareholders**

7.2     The Preference Shares Paying Agent shall provide to the Preference Shareholders promptly after receipt thereof all other notices provided to the Preference Shares Paying Agent pursuant to the terms of the Indenture, including notice of any Event of Default under the Indenture, notice of resignation or removal of the Trustee, notice of a downgrade of any Class of Notes by either Rating Agency (as defined in the Indenture) and notice of any proposed or executed supplemental indenture, in each case in accordance with Section 8.5.

**MISCELLANEOUS**

**Amendments**

8.1(a)     This Agreement may be amended by the Issuer and the Preference Shares Paying Agent without the consent of any of the Preference Shareholders for the purpose of curing any ambiguity, or of curing, correcting or supplementing any defective provision contained therein, or in regard to matters or questions arising herein as the Issuer and the Preference Shares Paying Agent may deem necessary or desirable and which shall not materially adversely affect the interests of Holders of the Preference Shares. In addition, this Agreement may be amended without the consent of any Holders of the Preference Shares and without regard to whether or not such amendment adversely affects the interest of the Holders of the Preference Shares in order to prevent the Issuer from becoming an "investment company" as defined in the Investment Company Act or to

better assure compliance with the requirements of Rule 3a-7 and/or to remove transfer restrictions and other requirements relating to Section 3(c)(7); **provided** that, as a condition to the effectiveness of any such amendment, each of the Issuer, the Trustee, the Preference Shares Paying Agent and the Servicer shall have received a customary Opinion of Counsel (which may be supported as to factual matters by any relevant certificates or other documents necessary or advisable in the judgment of counsel delivering such opinion) from a nationally recognized law firm providing that, after giving effect to such amendment, the Issuer is exempt from registration as an "investment company" under the Investment Company Act in reliance on the exemption provided by Rule 3a-7.

(b)    Subject to Section 8.1(a) above, this Agreement may also be amended from time to time by the Issuer and the Preference Shares Paying Agent with the consent of a Majority of Preference Shareholders materially and adversely affected thereby. Any amendment to the Preference Shares Paying Agency Agreement must be in writing, executed by each party thereto. The Preference Shares Paying Agent is entitled to receive, and (subject to the terms of this Agreement) shall be fully protected in relying upon, an Opinion of Counsel, consent or certificate of the Issuer in determining whether or not any proposed amendment is permitted under this Agreement.

Any amendment to the Preference Shares Paying Agency Agreement that would also necessitate a change to the Issuer Charter may only be made after a Special Resolution (as defined in the Issuer Charter) has been passed to permit the Issuer Charter to be altered to conform with such proposed amendment.

(c)    Promptly after the execution of any amendment or consent pursuant to this Section 8.1, the Preference Shares Paying Agent shall furnish written notification of the substance of such amendment or consent to each Preference Shareholder.  It shall not be necessary for the consent of Preference Shareholders pursuant to this Section 8.1 to approve the particular form of any proposed amendment or consent, but it shall be sufficient if such consent shall approve the substance thereof.  The manner of obtaining such consents (and any other consents of Preference Shareholders under this Agreement) and of evidencing the authorization of the execution thereof by Preference Shareholders shall be subject to such reasonable requirements as the Preference Shares Paying Agent may prescribe.

(d)    Prior to the execution of any amendment to this Agreement, the Preference Shares Paying Agent shall be entitled to receive and rely upon (i) an Opinion of Counsel stating that the execution of such amendment is authorized or permitted by this Agreement and (ii) an Officer's Certificate of the Issuer that all conditions precedent to the execution of such amendment have been complied with.

(e)    Written notice of any amendment shall be promptly provided by the Issuer to the Rating Agencies.

**Form of Documents Delivered to Preference Shares Paying Agent**

8.2    In any case where several matters are required to be certified by any specified Person, it is not necessary that all such matters be certified by only one such Person, or that they be so certified by only one document, but one such Person may certify with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify as to such matters in one or several documents.

Any certificate of an Authorized Officer of the Issuer may be based, insofar as it relates to legal matters, upon a certificate of or opinion of, or representations by, counsel, unless such Authorized Officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which his certificate is based are erroneous.  Any such certificate of an Authorized Officer of the Issuer or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, the Issuer, the Servicer or any other Person, stating that the information with respect to such factual matters is in the possession of the Issuer, the Servicer or such other Person, unless such Authorized Officer of the Issuer or such counsel knows that the certificate or opinion or representations with respect to such matters are erroneous.  Any Opinion of Counsel may also be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an Authorized Officer of the Issuer, stating that the information with respect to such matters is in the possession of the Issuer, unless such counsel knows that the certificate or opinion or representations with respect to such matters are erroneous.

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Agreement, they may, but need not, be consolidated and form one instrument.

**Acts of Holders**

8.3(a)  Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Agreement to be given or taken by Preference Shareholders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Preference Shareholders in person or by a proxy duly appointed in writing and, except as otherwise expressly provided herein, such action shall become effective when such instrument or instruments are delivered to the Preference Shares Paying Agent, and, where it is hereby expressly required, to the Issuer.  Such instrument or instruments (and the action or actions embodied therein and evidenced thereby are herein sometimes referred to as the *Act* of the Preference Shareholders signing such instrument or instruments).  Proof of execution of any such instrument or of a writing appointing any such proxy shall be sufficient for any purpose of this Agreement and conclusive in favor of the Preference Shares Paying Agent and the Issuer, if made in the manner provided in this Section 8.3.

(b)    The fact and date of the execution by any Person of any such instrument or writing may be proved in any manner which the Preference Shares Paying Agent deems sufficient.

(c)    The registered numbers of Preference Shares held by any Person, and the date of such Person's holding the same, shall be proved by the Preference Share Register.

(d)    Any request, demand, authorization, direction, notice, consent, waiver or other action by any Preference Shareholders shall bind such Preference Shareholder (and any transferee of its Preference Shares ) and of every Preference Share issued upon the registration thereof or in exchange therefor or in lieu thereof, in respect of anything done, omitted or suffered to be done by the Preference Shares Paying Agent or the Issuer in reliance thereon, whether or not notation of such action is made upon the Preference Share Certificate representing such Preference Share.

**Notices**

8.4    Any request, demand, authorization, direction, notice, consent, waiver or other documents provided or permitted by this Agreement to be made upon, given or furnished to, or filed with:

(a)    the Preference Shares Paying Agent by any Preference Shareholder, the Issuer, the Trustee or the Servicer shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to and mailed, by certified mail, return receipt requested, or sent by overnight courier guaranteeing next day delivery, or sent by confirmed facsimile transmission to the Preference Shares Paying Agent addressed to the Preference Shares Paying Agent at its Corporate Trust Office, or at any other address previously furnished in writing to the Preference Shareholders, the Issuer, the Trustee and the Servicer by the Preference Shares Paying Agent; or

(b)    the Issuer or the Share Registrar by the Preference Shares Paying Agent or by any Preference Shareholder shall be sufficient for every purpose hereunder if in writing and mailed by certified mail, return receipt requested, or sent by overnight courier guaranteeing next day delivery, or sent by confirmed facsimile transmission with simultaneous mailing of the original on the same day by first-class mail, postage prepaid, to the Issuer addressed to the Issuer at c/o Maples Finance Limited, P.O. Box 1093 GT, Boundary Hall, Cricket Square, George Town, Grand Cayman, Cayman Islands, telecopy no. (345) 945-7100, or at any other address furnished in writing to the Preference Shares Paying Agent and the Preference Shareholders by the Issuer; or

(c)    the Servicer by any Preference Shareholder, the Preference Shares Paying Agent or the Issuer if in writing and mailed, by certified mail, return receipt requested, or sent by overnight courier guaranteeing next day delivery, or sent by confirmed

facsimile transmission with simultaneous mailing of the original on the same day by first-class mail, postage prepaid, to the Servicer addressed to the Servicer at Two Galleria Tower, 13455 Noel Road, Suite 1300, Dallas, Texas 75240, telephone: (972) 628-4100, or at any other address furnished in writing to the Preference Shareholders, the Preference Shares Paying Agent and the Issuer by the Servicer.

(d)     the Rating Agencies by the Preference Shares Paying Agent if in writing and mailed, first-class postage prepaid, hand delivered, sent by overnight courier service, or by telecopy in legible form, to each Rating Agency addressed to it at Moody's Investors Service, Inc., 99 Church Street, New York, New York, 10007, Telecopy No. (212) 553-4170, cdomonitoring@moodys.com, Attention: CBO/CLO Monitoring and Standard & Poor's, 55 Water Street, 41st Floor, New York, New York 10041-0003, telecopy no. (212) 438-2664, Attention: Asset Backed-CBO/CLO Surveillance and each Monthly Report and Valuation Report, together with the Excel Default Model Input File in each case, shall also be sent to S&P electronically to CDO_Surveillance@standardandpoors.com;.

**Notices to Preference Shareholders; Waiver**

8.5     Except as otherwise expressly provided herein, where this Agreement provides for a report to Preference Shareholders or for a notice to Preference Shareholders of any event,

(a)     such report or notice shall be sufficiently given to Preference Shareholders if in writing and mailed, first class postage prepaid, to each Preference Shareholder affected by such event, at the address of such Preference Shareholder as it appears in the Preference Share Register, not earlier than the earliest date and not later than the latest date, prescribed for the giving of such report or notice; and

(b)     such report or notice shall be in the English language.

Such reports and notices will be deemed to have been given on the date of such mailing.

The Preference Shares Paying Agent will deliver to any Preference Shareholder shown on the Preference Share Register any readily available information or notice requested to be so delivered, at the expense of the Issuer.

Neither the failure to mail any notice, nor any defect in any notice so mailed, to any particular Preference Shareholder shall affect the sufficiency of such notice with respect to other Preference Shareholders.

Where this Agreement provides for notice in any manner, such notice may be waived in writing by any Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice. Waivers of notice by Preference Shareholders shall be filed with the Preference Shares Paying Agent but such filing shall

not be a condition precedent to the validity of any action taken in reliance upon such waiver.

In the event that, by reason of the suspension of the regular mail service as a result of a strike, work stoppage or similar activity, it shall be impractical to mail notice of any event to Preference Shareholders when such notice is required to be given pursuant to any provision of this Agreement, then any manner of giving such notice as shall be satisfactory to the Preference Shareholder shall be deemed to be a sufficient giving of such notice.

**Effect of Headings and Table of Contents**

8.6     The Section headings herein and the Table of Contents are for convenience only and shall not affect the construction hereof.

**Successors and Assigns**

8.7     All covenants and agreements in this Agreement by the Issuer shall bind its successors and assigns, whether so expressed or not.

**Severability**

8.8     In case any provision in this Agreement shall be invalid, illegal or unenforceable as written, such provision shall be construed in the manner most closely resembling the apparent intent of the parties with respect to such provision so as to be valid, legal and enforceable; **provided** that if there is no basis for such a construction, such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability and, unless the ineffectiveness of such provision substantially impairs the basis of the bargain for one of the parties to this Agreement, the validity, legality and enforceability of the remaining provisions hereof or thereof shall not in any way be affected or impaired thereby.

**Benefits of Agreement**

8.9     Nothing in this Agreement, expressed or implied, shall give to any Person, other than the parties hereto and their successors hereunder and the Preference Shareholders of any benefit or any legal or equitable right, remedy or claim under this Agreement.

**Governing Law**

8.10    This Agreement shall be construed in accordance with, and this Agreement and all matters arising out of or relating in any manner to this Agreement (whether in contract, tort or otherwise) shall be governed by, the law of the State of New York.

**Submission to Jurisdiction**

8.11     The Co-Issuers, the Preference Shares Paying Agent and the Share Registrar
hereby irrevocably submit to the non-exclusive jurisdiction of any New York State or
federal court sitting in the Borough of Manhattan in The City of New York in any action
or proceeding arising out of or relating to the Securities or this Indenture, and the Co-
Issuers, the Preference Shares Paying Agent and the Share Registrar hereby irrevocably
agree that all claims in respect of the action or proceeding may be heard and determined
in the New York State or federal court.  The Co-Issuers, the Preference Shares Paying
Agent and the Share Registrar hereby irrevocably waive, to the fullest extent that they
may legally do so, the defense of an inconvenient forum to the maintenance of the action
or proceeding.   The Co-Issuers, the Preference Shares Paying Agent and the Share
Registrar irrevocably consent to the service of all process in any action or proceeding by
the mailing or delivery of copies of the process to each such party at the address specified
in Section 8.4 hereof.  The Co-Issuers, the Preference Shares Paying Agent and the Share
Registrar agree that a final judgment in any such action or proceeding shall be conclusive
and may be enforced in other jurisdictions by suit on the judgment or in any other manner
provided by law.

**Counterparts**

8.12     This Agreement may be executed in any number of counterparts, each of which so
executed shall be deemed to be an original, but all such counterparts shall together
constitute but one and the same instrument.

**Termination**

8.13     This Agreement shall terminate after the Preference Shares  have been redeemed
in full or the assets of the Issuer have been liquidated and the Preference Shares Paying
Agent has distributed all amounts remaining in the Preference Shares Distribution
Account.  Notwithstanding the foregoing, the rights and obligations of the Preference
Shares Paying Agent and the Issuer under Section 3.6 shall survive.

**Limitation on Liability**

8.14     None of the respective shareholders, Officers, members or directors of the Issuer
shall be liable for any of the obligations or agreements or breach thereof or any covenant,
representation or warranty of the Issuer under this Agreement, and no recourse or action
may be taken, directly or indirectly, with respect to any of the obligations or agreements
or breach thereof of or any covenant, representation or warranty of the Issuer under this
Agreement against any of the respective shareholders, Officers, members or directors of
the Issuer, except that the foregoing will not relieve any person or entity from (x) any
liability for any unpaid consideration for stock, any unpaid capital contribution or any
unpaid capital call or other similar obligation or (y) any obligation, agreement or liability
under any agreement or instrument other than this Agreement and that the foregoing will
not limit service of process on the Issuer by delivery of notice on its behalf to the Issuer.

The Preference Shares Paying Agent hereby waives, releases and agrees not to sue upon any claim it may have and howsoever arising against any shareholder, member, director or officer of the Issuer, and the rights of the Preference Shares Paying Agent shall be satisfied solely from the Collateral in accordance with the provisions of the Indenture (including Section 11.1 thereof) and following realization of the Collateral, any claims shall be extinguished and shall not thereafter revive.

**IN WITNESS WHEREOF,** the undersigned have caused this Agreement to be duly executed by their respective duly authorized officers as of the date first above written.

**STRATFORD CLO LTD.,**
as Issuer

By: _____
Name:  Hugh Thompson
Title:  DIRECTOR


**STATE STREET BANK AND TRUST COMPANY,**
as Preference Shares Paying Agent


By: _____
Name:
Title:


**MAPLES FINANCE LIMITED,**
as Share Registrar

By: _____
Name: Phillip Hinds
Title:  SENIOR VICE PRESIDENT

**IN WITNESS WHEREOF,** the undersigned have caused this Agreement to be duly executed by their respective duly authorized officers as of the date first above written.

**STRATFORD CLO LTD.,**
as Issuer


By: _____
Name:
Title:



**STATE STREET BANK AND TRUST COMPANY,**
as Preference Shares Paying Agent

By: _____
Name: SCOTT BERRY
Title: DIRECTOR



**MAPLES FINANCE LIMITED,**
as Share Registrar


By: _____
Name:
Title:

010545

EXHIBIT A

STRATFORD CLO LTD.

THE PREFERENCE SHARES REPRESENTED HEREBY HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND THE ISSUER HAS NOT BEEN REGISTERED UNDER THE UNITED STATES INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE *INVESTMENT COMPANY ACT*). THE PREFERENCE SHARES REPRESENTED HEREBY HAVE NOT BEEN OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED, EXCEPT (A) TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER (*QUALIFIED INSTITUTIONAL BUYER*) WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT PURCHASING FOR ITS OWN ACCOUNT (IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A SO LONG AS THE PREFERENCE SHARES ARE ELIGIBLE FOR RESALE IN ACCORDANCE WITH RULE 144A) WHO IS ALSO A QUALIFIED PURCHASER (*QUALIFIED PURCHASER*) WITHIN THE MEANING OF SECTION 3(e)(7) OF THE INVESTMENT COMPANY ACT THAT WAS NOT FORMED FOR THE PURPOSE OF INVESTING IN THE ISSUER (EXCEPT WHEN EACH BENEFICIAL OWNER OF THE PURCHASER IS A QUALIFIED PURCHASER) AND THAT (1) IF SUCH PERSON IS AN ENTITY THAT WOULD BE AN INVESTMENT COMPANY BUT FOR THE EXCEPTION PROVIDED FOR IN SECTION 3(C)(1) OR SECTION 3(C)(7) OF THE INVESTMENT COMPANY ACT (ANY SUCH ENTITY, AN *EXCEPTED INVESTMENT COMPANY*) HAS RECEIVED CONSENT TO SUCH ENTITY'S TREATMENT AS A QUALIFIED PURCHASER IN ACCORDANCE WITH THE INVESTMENT COMPANY ACT FROM (A) ALL OF THE BENEFICIAL OWNERS OF OUTSTANDING SECURITIES (OTHER THAN SHORT TERM PAPER) OF SUCH ENTITY (SUCH BENEFICIAL OWNERS DETERMINED IN ACCORDANCE WITH SECTION 3(C)(1)(A) OF THE INVESTMENT COMPANY ACT) THAT ACQUIRED SUCH SECURITIES ON OR BEFORE APRIL 30, 1996 (*PRE-AMENDMENT BENEFICIAL OWNERS*) AND (B) ALL PRE AMENDMENT BENEFICIAL OWNERS OF THE OUTSTANDING SECURITIES (OTHER THAN SHORT TERM PAPER) OF ANY EXCEPTED INVESTMENT COMPANY THAT, DIRECTLY OR INDIRECTLY, OWNS ANY OUTSTANDING SECURITIES OF SUCH ENTITY, (2) IS NOT A BROKER-DEALER THAT OWNS AND INVESTS ON A DISCRETIONARY BASIS LESS THAN $25,000,000 IN SECURITIES OF UNAFFILIATED ISSUERS AND (3) IS NOT A PENSION, PROFIT-SHARING OR OTHER RETIREMENT TRUST FUND OR PLAN IN WHICH THE PARTNERS, BENEFICIARIES OR PARTICIPANTS OR AFFILIATES MAY DESIGNATE THE PARTICULAR INVESTMENT TO BE MADE, (B) IN EACH CASE, IN A NUMBER OF NOT LESS THAN 250 PREFERENCE SHARES FOR THE PURCHASER AND (C) IN ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES AND ANY OTHER APPLICABLE JURISDICTION. EACH TRANSFEROR OF THE PREFERENCE SHARES REPRESENTED HEREBY OR ANY BENEFICIAL INTEREST THEREIN WILL PROVIDE NOTICE OF THE TRANSFER RESTRICTIONS AS SET FORTH HEREIN TO ITS PURCHASER. EACH PURCHASER OF THE PREFERENCE SHARES REPRESENTED HEREBY WILL BE REQUIRED TO MAKE THE APPLICABLE REPRESENTATIONS AND AGREEMENTS SET FORTH IN THE PREFERENCE SHARE DOCUMENTS. THE PREFERENCE SHARES REPRESENTED HEREBY MAY BE PURCHASED BY OR TRANSFERRED TO A BENEFIT PLAN INVESTOR OR CONTROLLING PERSON (EACH AS DEFINED IN THE PREFERENCE SHARE DOCUMENTS) ONLY UPON THE SATISFACTION OF CERTAIN CONDITIONS SET FORTH IN THE PREFERENCE SHARE DOCUMENTS. ANY TRANSFER IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE AND EFFECT, WILL BE VOID AB INITIO, AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE TRANSFEREE, NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE ISSUER, THE PREFERENCE SHARES PAYING AGENT OR ANY INTERMEDIARY. IN ADDITION TO THE FOREGOING, THE ISSUER MAINTAINS THE RIGHT TO RESELL ANY

010546

PREFERENCE SHARES PREVIOUSLY TRANSFERRED TO NON-PERMITTED HOLDERS OR NON-PERMITTED BENEFIT PLAN INVESTORS (AS DEFINED IN THE PREFERENCE SHARE DOCUMENTS) IN ACCORDANCE WITH AND SUBJECT TO THE TERMS OF THE PREFERENCE SHARE DOCUMENTS.

THE PREFERENCE SHARES REPRESENTED HEREBY MAY NOT BE ACQUIRED OR HELD BY (I) ANY "EMPLOYEE BENEFIT PLAN" WITHIN THE MEANING OF SECTION 3(3) OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED (*ERISA*), THAT IS SUBJECT TO TITLE I OF ERISA, (II) ANY "PLAN" DESCRIBED BY SECTION 4975(e)(1) OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE *CODE*), THAT IS SUBJECT TO SECTION 4975 OF THE CODE, OR (III) ANY ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" OF ANY PLAN DESCRIBED IN (I) OR (II) BY REASON OF A PLAN'S INVESTMENT IN SUCH ENTITY (EACH OF (I), (II) AND (III), A *BENEFIT PLAN INVESTOR*), EXCEPT IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE PREFERENCE SHARE DOCUMENTS.

EACH TRANSFEREE WILL BE REQUIRED TO DELIVER A TRANSFEREE CERTIFICATE IN A FORM PRESCRIBED IN THE PREFERENCE SHARE DOCUMENTS.

010547

**STRATFORD CLO LTD.**

CUSIP No.: [86280C202] / [86280C301]

Certificate No. R-[___]

[___] Preference Shares

Incorporated under the laws of the Cayman Islands U.S.$1,630 share capital divided into 1,000 Ordinary Shares of a par value of U.S.$1.00 each and 17,500 Class I Preference Shares of a par value of U.S.$0.01 and 45,500 Class II Preference Shares of a par value of U.S.$0.01

**THIS IS TO CERTIFY THAT** [_____] is the registered holder of [___] Class [I][II] Preference Shares in Stratford CLO Ltd. (the *Issuer*), subject to the Memorandum and Articles of Association thereof (as the same may be amended, supplemented or otherwise modified from time to time, the *Issuer Charter*). The payment of dividends and any final distribution on the Class [I][II] Preference Shares, and transfers and exchanges of the Class [I][II] Preference Shares, shall be in the manner provided in the Issuer Charter and the Preference Shares Paying Agency Agreement, dated as of October 25, 2007 (as the same may be amended, supplemented or otherwise modified from time to time, the *Preference Shares Paying Agency Agreement*), between the Issuer, Maples Finance Limited, as the Share Registrar and State Street Bank and Trust Company, as the Preference Shares Paying Agent.

**IN WITNESS WHEREOF,** the Issuer has caused this Preference Share Certificate to be duly executed.

**STRATFORD CLO LTD.**

By: _____     By: _____
        Director                                   Director

Date: [●]

010548

## ASSIGNMENT FORM

For value received _____ hereby sells, assigns and transfers unto

Please insert social security or other identifying number of assignee _____

Please print or type name and address, including zip code, of assignee: the within Preference Shares and does hereby irrevocably constitute and appoint _____ Attorney to transfer the Preference Shares on the books of the Issuer with full power of substitution in the premises.

Date: _____

Executed as a Deed by _____

Signature _____

In the presence of: _____

Name of witness: _____

Occupation of witness: _____

010549

**EXHIBIT B**

**FORM OF PREFERENCE SHARE TRANSFER CERTIFICATE**

Stratford CLO Ltd.
c/o Maples Finance Limited
P.O. Box 1093 GT
Queensgate House
South Church Street
George Town
Grand Cayman, Cayman Islands

State Street Bank and Trust Company
  as Preference Shares Paying Agent
200 Clarendon Street, Mail Code: EUC 108
Boston, MA 02116
Attention: CDO Trust Services Group—Stratford CLO Ltd.,

Re:  Class [I][II] Preference Shares, par value U.S.$0.01 per share, of Stratford CLO
Ltd. (the *Class [I][II] Preference Shares*)

Reference is hereby made to the Memorandum and Articles of Association of Stratford
CLO Ltd. (the *Issuer*) and the Preference Shares Paying Agency Agreement dated as of
October 25, 2007 (the *Preference Shares Paying Agency Agreement*) between the
Issuer, Maples Finance Limited, as the Share Registrar and State Street Bank and Trust
Company, as Preference Shares Paying Agent. Capitalized terms used but not defined
herein shall have the meanings given to them in the Issuer Charter and if not defined
therein, in the Preference Shares Paying Agency Agreement.

[NOTE: COMPLETE FOR A TRANSFER OF A PREFERENCE SHARE TO A
TRANSFEREE THAT TAKES DELIVERY IN THE FORM OF A PREFERENCE
SHARE]

This letter relates to _____ Class [I][II] Preference Shares that are
Certificated Preference Shares (CUSIP No. _____) that are held in
the name of _____ (the *Transferor*). The Transferor has
requested a transfer of the Class [I][II] Certificated Preference Shares for Class
[I][II] Certificated Preference Shares (CUSIP No. _____) in the name
of _____ (the *Transferee*). Delivered herewith is a
Transferee Certification completed by the Transferee.

In connection with such request, and in respect of such Preference Shares, the Transferor
does hereby certify that such Preference Shares are being transferred in accordance with
the transfer restrictions set forth in the Issuer Charter and the Preference Share Agency
Agreement and pursuant to and in accordance with [check one]:

☐      Rule 144A (*Rule 144A*) under the U.S. Securities Act of 1933, as amended (the ***Securities Act***) to a Transferee that the Transferor reasonably believes that the Transferee is a "qualified institutional buyer" within the meaning of Rule 144A and either (a) a "qualified purchaser" within the meaning of the U.S. Investment Company Act of 1940, as amended and the Rules thereunder, (b) a company beneficially owned exclusively by one or more "qualified purchasers", purchasing the Preference Shares for its own account and such Transferee is aware that the sale of the Preference Shares to it is being made in reliance upon Rule 144A, in each case in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction;

☐      another exemption available under the Securities Act to a Transferee that is an "accredited investor" within the meaning of Rule 501 under the Securities Act (subject to the delivery of such certifications, legal opinions or other information as the Issuer may reasonably require to confirm that such transfer is being made pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act) and either (a) a "qualified purchaser" within the meaning of the U.S. Investment Company Act of 1940, as amended and the Rules thereunder, or (b) a company beneficially owned exclusively by one or more "qualified purchasers";

This certificate and the statements contained herein are made for your benefit.

_____
(Name of Transferor)


By:_____
  Name:
  Title:
Date: _____

010551

## TRANSFEREE CERTIFICATION

Stratford CLO Ltd.
P.O. Box 1093GT
Boundary Hall, Cricket Square
George Town, Grand Cayman
Cayman Islands

State Street Bank and Trust Company,
as Preference Shares Paying Agent
200 Clarendon Street
Mail Code: EUC 108
Boston, MA 02116.

Re:  Class [I][II] Preference Shares, par value U.S.$0.01 per share, of Stratford CLO Ltd.

The undersigned (the ***Transferee***) intends to purchase _____ Class [I][II]
Preference Shares, par value U.S.$0.01 per share, of Stratford CLO Ltd. (the ***Issuer***) from
the Transferor named in the Transfer Certificate to which this Transferee Certification is
attached.  In connection with the registration of the transfer of such Preference Shares,
the Transferee hereby executes and delivers to each of you this "Transferee Certification"
in which the Transferee certifies to each of you the information set forth herein.
Capitalized terms used but not defined herein shall have the meanings given to them in
the Issuer Charter and if not defined therein, in the Preference Shares Paying Agency
Agreement.

A.    General Information

1.    Print Full Name of Transferee:     _____

2.    If delivery is taken in the form of     _____
      Definitive    Preference    Shares,     _____
      name in which Preference Shares     _____
      should be registered:     _____

3.    Address  and  Contact  Person  for     _____
      Notices:     _____
            _____
            _____

4.    Telephone Number:     _____

5.    Fax Number:     _____

6.      Permanent Address (if different than above):

     _____
     _____
     _____
     _____

7.      U.S. Taxpayer Identification or Social Security Number (if any):

     _____

8.      Payment Instructions:

     _____

9.      Instructions for delivery (if not completed, Preference Shares will be sent by courier to address and attention party set forth in item 3 above):

     _____
     _____
     _____
     _____

10.  The Transferee (i) certifies under penalties of perjury that the Transferee's name, taxpayer identification number or social security number and address provided in the Transferee Certification are correct and (ii) is either (x) providing with this certificate a duly completed U.S. Internal Revenue Service Form W-9 (Request for Taxpayer Identification Number and Certification) or applicable successor form in the case of a person that is a "United States person" within the meaning of Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended (the *Code*) or (y) exempt from U.S. withholding tax on payments on the Preference Shares and is providing with this certificate the appropriate duly completed U.S. Internal Revenue Service Form W-8 or applicable successor form certifying its entitlement to such exemption in the case of a person that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code. The Transferee agrees to, in a timely manner, complete (accurately and in a manner reasonably satisfactory to the Issuer and the Preference Shares Paying Agent), execute, arrange for any required certification of, and deliver to the Issuer and the Preference Shares Paying Agent or such governmental or taxing authority as the Issuer or the Preference Shares Paying Agent directs any form, document or certificate that may be required or reasonably requested by the Issuer and the Preference Shares Paying Agent. The Transferee further agrees to promptly inform the Issuer and the Preference Shares Paying Agent of any change in any such information provided to the Issuer or the Preference Shares Paying Agent and to execute a new form or other document with the correct information.

B.      Status

1.      (A) The Transferee is (i) a Qualified Institutional Buyer and (ii) a Qualified Purchaser, (B) the purchaser is acquiring the Preference Shares as principal for its own account for investment and not for sale in connection with any distribution thereof, (C) the purchaser was not formed solely for the purpose of investing in the Preference Shares (except when each beneficial owner of the purchaser is a Qualified Purchaser), (D) if the purchaser is an entity that would be an investment company but for the exception provided for in Section 3(c)(1) or Section 3(c)(7) of the Investment Company Act (any such entity, an "excepted investment company") (a) all of the beneficial owners of outstanding securities (other than short term paper) of such entity (such beneficial owners determined in accordance with Section 3(c)(1)(A) of the Investment Company Act) that acquired such securities on or before April 30, 1996 ("pre amendment beneficial owners") and (b) all pre amendment beneficial owners of the outstanding securities (other than short term paper) of any excepted investment company that, directly or indirectly, owns any outstanding securities of such entity, have consented to such entity's treatment as a Qualified Purchaser in accordance with the Investment Company Act, (E) the purchaser is not a broker-dealer that owns and invests on a discretionary basis less than $25,000,000 in securities of unaffiliated issuers, (F) the purchaser is not a pension, profit-sharing or other retirement trust fund or plan in which the partners, beneficiaries or participants or affiliates may designate the particular investment to be made, (G) the purchaser agrees that it shall not hold such Preference Shares for the benefit of any other Person and shall be the sole beneficial owner thereof for all purposes and that it shall not sell participation interests in the Preference Shares or enter into any other arrangement pursuant to which any other Person shall be entitled to a beneficial interest in the dividends or other distributions on the Preference Shares (except when each such other Person is (a) a Qualified Institutional Buyer and (b) a Qualified Purchaser) and (H) the purchaser understands and agrees that any purported transfer of the Preference Shares to a purchaser that does not comply with the requirements of this paragraph shall be null and void ab initio.

2.      The Transferee understands that the Preference Shares are being offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act, the Preference Shares have not been and will not be registered under the Securities Act, and, if in the future the purchaser decides to offer, resell, pledge or otherwise transfer the Preference Shares, such Preference Shares may be offered, resold, pledged or otherwise transferred only in accordance with the legend in respect of such Preference Shares set forth in (4) below and the restrictions set forth in the Preference Share Documents.  The purchaser acknowledges that no representation is made by the Issuer, the Servicer or the Initial Purchasers or any of their respective Affiliates as to the availability of any exemption under the Securities Act or other applicable laws of any jurisdiction for resale of the Preference Shares.

3.      The Transferee understands that, prior to any sale or other transfer of any interest in Preference Shares, it (or the transferee, as applicable) will be required to provide to the

Issuer and the Preference Shares Paying Agent a duly executed transfer certificate substantially in the form provided in the Preference Share Documents and such other certificates and other information as they may reasonably require to confirm that the proposed transfer complies with the restrictions in the legend placed on each certificate representing the Preference Shares and in the Preference Share Documents.

4.      The Transferee agrees that it will not offer or sell, transfer, assign, or otherwise dispose of the Preference Shares or any interest therein except (i) pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and any applicable state securities laws or the applicable laws of any other jurisdiction and (ii) in accordance with the Preference Share Documents, to which provisions the purchaser agrees it is subject.  The Transferee further understands that the Preference Shares (A) will be represented by either one or more Preference Share Certificates which will bear the legend substantially in the form set forth below unless the Issuer determines otherwise in accordance with applicable law, and (B) may only be resold, pledged or transferred to Qualified Institutional Buyers who are also Qualified Purchasers.  The purchaser understands that before the Preference Shares may be offered, resold, pledged or otherwise transferred, the transferee will be required to provide the Preference Shares Paying Agent and the Issuer with a written certification as to compliance with the transfer restrictions.

5.      The Transferee is not purchasing the Preference Shares with a view to the resale, distribution or other disposition thereof in violation of the Securities Act.  The Transferee understands that the Preference Shares will be highly illiquid and are not suitable for short-term trading.  The Preference Shares are a leveraged investment in the Collateral Obligations that may expose the Preference Shares to disproportionately large changes in value.  Payments in respect of the Preference Shares are not guaranteed as they are dependent on the performance of the Issuer's portfolio of Collateral Obligations.  The purchaser understands that it is possible that, due to the structure of the transaction and the performance of the Issuer's portfolio of Collateral Obligations, dividends or other distributions in respect of the Preference Shares may be reduced or eliminated entirely.  Furthermore, the Preference Shares constitute equity in the Issuer, are not secured by the Collateral and will rank behind all creditors (secured and unsecured and whether known or unknown) of the Issuer, including, without limitation, the Holders of the Notes, any Synthetic Security Counterparty and any Hedge Counterparties.  The Issuer has assets limited to the Collateral for payment of all Classes of the Notes and dividends and other distributions on the Preference Shares, and the Preference Shares bear, *pro rata*, the first risk of loss. The purchaser understands that an investment in the Preference Shares involves certain risks, including the risk of loss of all or a substantial part of its investment.  The purchaser has had access to such financial and other information concerning the Issuer, the Preference Shares and the Collateral as it deemed necessary or appropriate in order to make an informed investment decision with respect to its purchase of the Preference Shares, including an opportunity to ask questions of and request information from the Issuer and the Initial Purchasers.

010555

6.      The Transferee understands and agrees that no purchase or transfer of the Preference Shares to (i) a purchaser or transferee that has represented that it is a Benefit Plan Investor (as defined in Section 3(42) of the Employee Retirement Income Security Act of 1974, as amended (***ERISA***), or a Controlling Person (as defined under the Indenture) will be effective, and the Issuer or the Share Registrar will not recognize or register such purchase or transfer, if such purchase or transfer would result in Benefit Plan Investors owning 25% or more of the aggregate outstanding amount of Class I Preference Shares or Class II Preference Shares (determined pursuant to Section 3(42) of ERISA, 29 C.F.R. Section 2510.3-101, the Indenture and the Preference Share Documents) or (ii) will be permitted if such purchase or transfer will result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code") (or, in the case of a governmental, foreign or church plan, a violation of any substantially similar federal, state, foreign or local law).  In this regard, 100% of Preference Shares held by an entity that is a Benefit Plan Investor (including an insurance company whose general account assets are treated as "plan assets") will be treated as Preference Shares held by a Benefit Plan Investor.  The purchaser or transferee further understands and agrees that any transfer in violation of the applicable provisions of the Preference Share Documents will be null and void ab initio.  For purposes of the determination described in the first sentence of this paragraph (6), the Preference Shares held by the Trustee, the Servicer, any of their respective affiliates (as defined in 29 C.F.R. Section 2510.3-101(f)(3)) and any other persons that have represented that they are Controlling Persons will be disregarded and will not be treated as outstanding unless such person is also a Benefit Plan Investor. The Transferee's acquisition, holding and disposition of the Preference Shares will not result in a prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental, foreign or church plan, any violation of substantially similar federal, state, foreign or local law), because such purchase, holding and disposition either (a) is not, and will not become, subject to such laws or (b) is covered by an exemption from all applicable prohibited transactions, all conditions of which are and will be been satisfied throughout its holding and disposition of such Preference Shares.  The purchaser and any fiduciary or Person causing it to acquire the Preference Shares agree, to the fullest extent permissible under applicable law, to indemnify and hold harmless the Issuer, the Co-Issuer, the Trustee, the Servicer, the Initial Purchasers, the Preference Shares Paying Agent and their respective Affiliates from any cost, damage, or loss incurred by them as a result of a breach of the representations set forth in this paragraph (6)(A) and paragraph 6(B).

7.      The funds that the purchaser is using or will use to purchase the Preference Shares are___ / are not___ (check one) assets of a person who is or at any time while the Preference Shares are held by the purchaser will be (x) an "employee benefit plan" as defined in Section 3(3) of ERISA, that is subject to Title I of ERISA, (y) a "plan" described in Section 4975(e)(1) of the Code that is subject to Section 4975 of the Code or (z) an entity whose underlying assets include "plan assets" of either of the foregoing by reason of the investment by an employee benefit plan or other plan in the entity within the meaning of the Plan Asset Regulation, as modified by Section 3(42) of ERISA.

010556

8.      The purchaser is___ / is not___ (check one) the Co-Issuer, the Servicer or any other person (other than a Benefit Plan Investor) that has discretionary authority or control with respect to the assets of the Issuer or a person who provides investment advice for a fee (direct or indirect) with respect to the assets of the Issuer, or any "affiliate" (as defined in 29 C.F.R. Section 2510.3-101(f)(3)) of any such person.

9.      The purchaser is___ / is not___ (check one) Highland Financial Partners, L.P. or any of its subsidiaries.

10.     The Transferee is a Qualified Institutional Buyer and is aware that the sale of Preference Shares to it is being made in reliance on an exemption from the registration requirements provided by Section 4(2) and is acquiring the Preference Shares for its own account (and not for the account of any family or other trust, any family member or any other person).  In addition, the purchaser has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of its investment in Preference Shares, and the purchaser is able to bear the economic risk of its investment.

11.     The Transferee is not a member of the public in the Cayman Islands.

12.     The Transferee and each beneficial owner acknowledges that it is its intent and that it understands it is the intent of the Issuer that for accounting, financial reporting and U.S. federal and, to the extent permitted by law, state and local income and franchise tax purposes, the Issuer will be treated as a corporation, the Notes will be treated as debt of the Issuer only and not of the Co-Issuer, and the Preference Shares will be treated as equity in the Issuer; it agrees to such treatment, to report all income (or loss) in accordance with such treatment and to take no action inconsistent with such treatment unless otherwise required by any relevant taxing authority under applicable law..

13.     The Transferee understands and agrees that a legend in substantially the following form will be placed on each certificate representing Preference Shares:

THE PREFERENCE SHARES REPRESENTED HEREBY HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND THE ISSUER HAS NOT BEEN REGISTERED UNDER THE UNITED STATES INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "INVESTMENT COMPANY ACT").  THE PREFERENCE SHARES REPRESENTED HEREBY HAVE NOT BEEN OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED, EXCEPT (A) TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER ("QUALIFIED INSTITUTIONAL BUYER") WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT PURCHASING FOR ITS OWN ACCOUNT (IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A SO LONG AS THE PREFERENCE SHARES ARE ELIGIBLE FOR RESALE IN ACCORDANCE WITH RULE 144A) WHO IS ALSO A QUALIFIED PURCHASER ("QUALIFIED PURCHASER") WITHIN THE MEANING OF

8

SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT THAT WAS NOT
FORMED FOR THE PURPOSE OF INVESTING IN THE ISSUER (EXCEPT WHEN
EACH BENEFICIAL OWNER OF THE PURCHASER IS A QUALIFIED
PURCHASER) AND THAT (1) IF SUCH PERSON IS AN ENTITY THAT WOULD
BE AN INVESTMENT COMPANY BUT FOR THE EXCEPTION PROVIDED FOR
IN SECTION 3(C)(1) OR SECTION 3(C)(7) OF THE INVESTMENT COMPANY ACT
(ANY SUCH ENTITY, AN "EXCEPTED INVESTMENT COMPANY") HAS
RECEIVED CONSENT TO SUCH ENTITY'S TREATMENT AS A QUALIFIED
PURCHASER IN ACCORDANCE WITH THE INVESTMENT COMPANY ACT
FROM (A) ALL OF THE BENEFICIAL OWNERS OF OUTSTANDING SECURITIES
(OTHER THAN SHORT TERM PAPER) OF SUCH ENTITY (SUCH BENEFICIAL
OWNERS DETERMINED IN ACCORDANCE WITH SECTION 3(C)(1)(A) OF THE
INVESTMENT COMPANY ACT) THAT ACQUIRED SUCH SECURITIES ON OR
BEFORE APRIL 30, 1996 ("PRE AMENDMENT BENEFICIAL OWNERS") AND (B)
ALL PRE AMENDMENT BENEFICIAL OWNERS OF THE OUTSTANDING
SECURITIES (OTHER THAN SHORT TERM PAPER) OF ANY EXCEPTED
INVESTMENT COMPANY THAT, DIRECTLY OR INDIRECTLY, OWNS ANY
OUTSTANDING SECURITIES OF SUCH ENTITY, (2) IS NOT A BROKER-
DEALER THAT OWNS AND INVESTS ON A DISCRETIONARY BASIS LESS
THAN $25,000,000 IN SECURITIES OF UNAFFILIATED ISSUERS AND (3) IS NOT
A PENSION, PROFIT-SHARING OR OTHER RETIREMENT TRUST FUND OR
PLAN IN WHICH THE PARTNERS, BENEFICIARIES OR PARTICIPANTS OR
AFFILIATES MAY DESIGNATE THE PARTICULAR INVESTMENT TO BE MADE,
(B) IN EACH CASE, IN A NUMBER OF NOT LESS THAN 250 PREFERENCE
SHARES FOR THE PURCHASER AND (C) IN ACCORDANCE WITH ALL
APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES
AND ANY OTHER APPLICABLE JURISDICTION. EACH TRANSFEROR OF THE
PREFERENCE SHARES REPRESENTED HEREBY OR ANY BENEFICIAL
INTEREST THEREIN WILL PROVIDE NOTICE OF THE TRANSFER
RESTRICTIONS AS SET FORTH HEREIN TO ITS PURCHASER. EACH
PURCHASER OF THE PREFERENCE SHARES REPRESENTED HEREBY WILL BE
REQUIRED TO MAKE THE APPLICABLE REPRESENTATIONS AND
AGREEMENTS SET FORTH IN THE PREFERENCE SHARE DOCUMENTS. THE
PREFERENCE SHARES REPRESENTED HEREBY MAY BE PURCHASED BY OR
TRANSFERRED TO A BENEFIT PLAN INVESTOR OR CONTROLLING PERSON
(EACH AS DEFINED IN THE PREFERENCE SHARE DOCUMENTS) ONLY UPON
THE SATISFACTION OF CERTAIN CONDITIONS SET FORTH IN THE
PREFERENCE SHARE DOCUMENTS. ANY TRANSFER IN VIOLATION OF THE
FOREGOING WILL BE OF NO FORCE AND EFFECT, WILL BE VOID AB INITIO,
AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE TRANSFEREE,
NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE
ISSUER, THE PREFERENCE SHARES PAYING AGENT OR ANY
INTERMEDIARY. IN ADDITION TO THE FOREGOING, THE ISSUER
MAINTAINS THE RIGHT TO RESELL ANY PREFERENCE SHARES
PREVIOUSLY TRANSFERRED TO NON-PERMITTED HOLDERS OR NON-

010558

PERMITTED BENEFIT PLAN INVESTORS (AS DEFINED IN THE PREFERENCE SHARE DOCUMENTS) IN ACCORDANCE WITH AND SUBJECT TO THE TERMS OF THE PREFERENCE SHARE DOCUMENTS.

THE PREFERENCE SHARES REPRESENTED HEREBY MAY NOT BE ACQUIRED OR HELD BY (I) ANY "EMPLOYEE BENEFIT PLAN" WITHIN THE MEANING OF SECTION 3(3) OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), THAT IS SUBJECT TO TITLE I OF ERISA, (II) ANY "PLAN" DESCRIBED BY SECTION 4975(e)(1) OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), THAT IS SUBJECT TO SECTION 4975 OF THE CODE, OR (III) ANY ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" OF ANY PLAN DESCRIBED IN (I) OR (II) BY REASON OF A PLAN'S INVESTMENT IN SUCH ENTITY (EACH OF (I), (II) AND (III), A "BENEFIT PLAN INVESTOR"), EXCEPT IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE PREFERENCE SHARE DOCUMENTS.

EACH TRANSFEREE WILL BE REQUIRED TO DELIVER A TRANSFEREE CERTIFICATE IN A FORM PRESCRIBED IN THE PREFERENCE SHARE DOCUMENTS.

14.    The Transferee agrees not to cause the filing of a petition in bankruptcy or winding up against the Issuer before one year and one day have elapsed since the payment in full of the Notes or, if longer, the applicable preference period in effect.

15.    The Transferee understands that the Issuer may enter into amendments or modifications to the Servicing Agreement without the consent of any Holders of the Securities and without regard to whether or not such amendment adversely affects the interest of the Holders of the Securities.

16.    The beneficial owner, if it is not a "U.S. person" as defined in Section 7701(a)(30) of the Code, is not acquiring any Preference Share as part of a plan to reduce, avoid or evade U.S. federal income taxes owed, owing or potentially owed or owing.

17.    In connection with the purchase of Preference Shares (provided that no such representation is made with respect to the Servicer by any Affiliate of or account serviced by the Servicer): (i) none of the Co-Issuers, the Trustee, the Initial Purchasers, any Synthetic Security Counterparty, any Hedge Counterparty, the Preference Shares Paying Agent, the Collateral Administrator or the Servicer is acting as a fiduciary or financial or investment adviser for the purchaser; (ii) the Transferee is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral) of the Co-Issuers, the Trustee, the Initial Purchasers, any Synthetic Security Counterparty, any Hedge Counterparty, the Preference Shares Paying Agent, the Collateral Administrator or the Servicer or any of their respective Affiliates other than in the Preliminary Offering Memorandum for such Preference Shares and any representations expressly set forth in a written agreement with such party; (iii) none of the Co-Issuers, the Trustee, the Initial Purchasers, any Synthetic

Security Counterparty, any Hedge Counterparty, the Preference Shares Paying Agent, the Collateral Administrator or the Servicer or any of their respective Affiliates has given to the purchaser (directly or indirectly through any other Person or documentation for the Preference Shares) any assurance, guarantee, or representation whatsoever as to the expected or projected success, profitability, return, performance result, effect, consequence, or benefit (including legal, regulatory, tax, financial, accounting, or otherwise) of the Preference Shares or an investment therein; (iv) the Transferee has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisors to the extent it has deemed necessary, and it has made its own investment decisions (including decisions regarding the suitability of any transaction pursuant to the documentation for the Preference Shares) based upon its own judgment and upon any advice from such advisors as it has deemed necessary and not upon any view expressed by the Co-Issuers, the Trustee, the Initial Purchasers, any Synthetic Security Counterparty, any Hedge Counterparty, the Preference Shares Paying Agent, the Collateral Administrator or the Servicer or any of their respective Affiliates; (v) the Transferee has determined that the rates, prices or amounts and other terms of the purchase and sale of the Preference Shares reflect those in relevant market for similar transactions; (vi) the Transferee is purchasing the Preference Shares with a full understanding of all of the terms, conditions and risks thereof (economic and otherwise), and it is capable of assuming and willing to assume (financially and otherwise) those risks; and (vii) the Transferee is a sophisticated investor.

18.     The Transferee will provide notice to each Person to whom it proposes to transfer any interest in the Preference Shares of the transfer restrictions and representations set forth in the Preference Share Documents, including the exhibits referenced in the Preference Share Documents.

19.     The Transferee understands that the Preference Share Documents permit the Issuer to compel any Holder of the Preference Shares who is determined not to have been (x) a Qualified Institutional Buyer and (y) a Qualified Purchaser, at the time of acquisition of the Preference Shares to sell such Preference Shares, or to sell such Preference Shares on behalf of such purchaser, to a Person that is both (x) a Qualified Institutional Buyer and (y) a Qualified Purchaser, in a transaction exempt from the registration requirements under the Securities Act.

20.     The Transferee acknowledges that no action was taken or is being contemplated by the Issuer that would permit a public offering of the Preference Shares. The Transferee further acknowledges that no action was taken or is being contemplated by the Issuer that would permit possession or distribution of the Offering Memorandum or any amendment thereof or supplement thereto or any other offering material relating to the Securities in any jurisdiction (other than Ireland) where, or in any circumstances in which, action for those purposes is required. Nothing contained in the offering memorandum relating to the Preference Shares shall constitute an offer to sell or a solicitation of an offer to purchase any Preference Shares in any jurisdiction where it is unlawful to do so absent the taking of such action or the availability of an exemption therefrom.

11

010560

21. The Transferee understands that in the case of any supplemental indenture to the Indenture that requires consent of one or more Holders of the Preference Shares, the Indenture permits the Amendment Buy-Out Purchaser to purchase Preference Shares from any Non-Consenting Holder thereof at the applicable Amendment Buy-Out Purchase Price; and such Non-Consenting Holder will be required to sell such Preference Shares to the Amendment Buy-Out Purchaser at such price.

22. The Transferee understands that the Scheduled Preference Shares Redemption Date of the Preference Shares is subject to multiple extensions of four years each without consent of any Holders of Securities at the option of the Issuer, if directed by the Servicer, upon satisfaction of certain conditions.

23. The Transferee will not, at any time, offer to buy or offer to sell the Preference Shares by any form of general solicitation or advertising, including, but not limited to, any advertisement, article, notice or other communication published in any newspaper, magazine or similar medium or broadcast over television or radio or seminar or meeting whose attendees have been invited by general solicitations or advertising.

24. The Transferee understands that, to the extent required, as determined by the Co-Issuers, the Co-Issuers may amend the Indenture and, with respect to the Issuer only, the Preference Share Documents without the consent of any Holders of the Securities and without regard to whether or not such amendment adversely affects the interest of the Holders of the Securities to (i) remove any restrictions and limitations imposed on the Co-Issuers or the Holders of the Securities that solely relate to compliance with Section 3(c)(7) and (ii) add any requirements that are necessary for compliance with Rule 3a-7 if, at any time following the Closing Date, the Co-Issuers elect to rely on exclusion from the definition of "investment company" under Rule 3a-7 in lieu of the exclusion under Section 3(c)(7).

25. This certificate shall be construed in accordance with, and this certificate and all matters arising out of or relating in any way whatsoever to this certificate (whether in contract, tort or otherwise) shall be governed by, the law of the State of New York.

26. The Transferee acknowledges that the Issuer, the Servicer, the Trustee, the Initial Purchasers, the Preference Shares Paying Agent, the Share Registrar and others will rely upon the truth and accuracy of the foregoing acknowledgments, representations and agreements and agrees that if any of the acknowledgments, representations or agreements deemed to have been made by it by its purchase of the Preference Shares are no longer accurate, it shall promptly notify the Issuer, the Servicer, the Trustee and the Initial Purchasers

010561

Signatures:

PARTNERSHIP, CORPORATION, TRUST,
CUSTODIAL ACCOUNT OR OTHER ENTITY:

_____
(Name of Entity)

By: _____
        (Signature)

_____
(Print Name and Title)

Date:

**EXHIBIT C**

**FORM OF PREFERENCE SHAREHOLDER CERTIFICATE**

Stratford CLO Ltd.
P.O. Box 1093GT
Boundary Hall, Cricket Square
George Town, Grand Cayman
Cayman Islands

State Street Bank and Trust Company,
as Preference Shares Paying Agent
200 Clarendon Street
Mail Code: EUC 108
Boston, MA 02116

Ladies and Gentlemen:

The undersigned (the ***Preference Shareholder***) hereby certifies that it is the beneficial owner of [_____] Class [I][II] Preference Shares of Stratford CLO Ltd. (the ***Issuer***). The Preference Shareholder hereby requests the [Issuer to provide to it a copy of the [Monthly Report specified in Section 10.6(a) of the Indenture] [Valuation Report specified in Section 10.6(b) of the Indenture] [any information supplied to the Issuer and the Servicer pursuant to Section 10.6 of the Indenture]] [the Preference Shares Paying Agent permit its representative to examine the books of account, records, reports and other papers of the Preference Shares Paying Agent relating to the Preference Shares] (the ***Information***) at the following address:

> Name:
> Address:

In consideration of the execution and delivery hereof by the Preference Shareholder, the Issuer, the Preference Shares Paying Agent, the Servicer, or their respective agents may from time to time communicate or transmit to the Preference Shareholder (a) information upon the request of the Preference Shareholder and (b) other information or communications marked or otherwise identified as confidential (collectively, ***Confidential Information***). Confidential Information relating to the Issuer shall not include, however, any information that (i) through no fault or action by the Preference Shareholder or any of its affiliates is a matter of general public knowledge or has been or is hereafter published in any source generally available to the public or (ii) has been or is hereafter received by the Preference Shareholder or any of its affiliates from a third party that is not prohibited from disclosing such information by a contractual, legal or fiduciary obligation to the Issuer or the Preference Shares Paying Agent or the Servicer.

The Preference Shareholder agrees that the Preference Shareholder (a) will not use Confidential Information for any purpose other than to monitor and administer the financial condition of the Issuer, (b) will keep confidential all Confidential Information and will not communicate or transmit any Confidential Information to any person other than Officers or employees of the Preference Shareholder who need to know the same in order to monitor and administer the financial condition of the Issuer and (c) will maintain Chinese walls or other similar procedures to ensure that no Confidential Information is made available to directors, Officers or employees of the Preference Shareholder or any of its affiliates who are involved in trading or other similar activities with respect to securities of the type owned by the Issuer; except that Confidential Information may be disclosed by the Preference Shareholder (i) by reason of the exercise of any supervisory or examining authority of any governmental agency having jurisdiction over the Preference Shareholder, (ii) to the extent required by laws or regulations applicable to the Preference Shareholder or pursuant to any subpoena or similar legal process served on the Preference Shareholder, (iii) in connection with any suit, action or proceeding brought by the Preference Shareholder to enforce any of its rights under the Issuer Charter or (iv) with the consent of the Issuer or the Servicer.

Delivery of an executed counterpart hereof by facsimile shall constitute effective delivery hereof.  This Certificate and the agreements contained herein shall be construed in accordance with, and this Certificate and the agreements contained herein and all matters arising out of or relating in any way whatsoever to this Certificate (whether in contract, tort or otherwise) shall be governed by, the law of the State of New York.

010564

Please indicate your agreement to the foregoing by signing the enclosed copy hereof and returning the same by fax to the Trustee at (617) 351-4358.

Very truly yours,

[NAME OF SHAREHOLDER]

By:_____
Authorized Signature

AGREED AS AFORESAID:

STATE STREET BANK AND TRUST COMPANY,
as Preference Shares Paying Agent

By:_____
  Name:
  Title:

STRATFORD CLO LTD.

By:_____
  Name:
  Title:

# EXHIBIT MMM

Case 19-34054-sgj11 Doc 1822-65 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 2 of
Case 3:21-cv-00538-N Document 26-39 Filed 06/09/21 Page 72 of 303 PageID 13454

EXECUTION COPY

## SERVICING AGREEMENT

This Servicing Agreement, dated as of October 25, 2007 is entered into by and among STRATFORD CLO LTD., an exempted company incorporated under the laws of the Cayman Islands, with its registered office located at the offices of Maples Finance Limited, P.O. Box 1093GT, Queensgate House, South Church Street, George Town, Grand Cayman, KY1-1108, Cayman Islands (together with successors and assigns permitted hereunder, the "Issuer"), and HIGHLAND CAPITAL MANAGEMENT, L.P., a Delaware limited partnership, with its principal offices located at Two Galleria Tower, 13455 Noel Road, Suite 1300, Dallas, Texas 75240, as servicer ("Highland" or, in such capacity, the "Servicer").

WITNESSETH:

WHEREAS, the Issuer and STRATFORD CLO LLC (the "Co-Issuer" and together with the Issuer, the "Co-Issuers") intend to issue U.S.$417,200,000 of their Class A-1 Floating Rate Senior Secured Extendable Notes due November 2021 (the "Class A-1 Notes"), U.S.$104,300,000 of their Class A-2 Floating Rate Senior Secured Extendable Variable Funding Notes due November 2021 (the "Class A-2 Notes"), U.S.$41,300,000 of their Class B Floating Rate Senior Secured Extendable Notes due November 2021 (the "Class B Notes"), U.S.$37,100,000 of their Class C Floating Rate Senior Secured Deferrable Interest Extendable Notes due November 2021 (the "Class C Notes"), U.S.$16,100,000 of their Class D Floating Rate Senior Secured Deferrable Interest Extendable Notes due November 2021 (the "Class D Notes"), U.S.$21,000,000 of their Class E Floating Rate Senior Secured Deferrable Interest Extendable Notes due November 2021 (the "Class E Notes" and together with the Class A-1 Notes, Class A-2 Notes, Class B Notes, Class C Notes and Class D Notes, the "Notes") pursuant to the Indenture dated as of October 25, 2007 (the "Indenture"), among the Co-Issuers and State Street Bank and Trust Company, as trustee (the "Trustee") and 17,500 Class I Preference Shares, $0.01 par value (the "Class I Preference Shares") and 45,500 Class II Preference Shares, $0.01 par value (the "Class II Preference Shares" and, together with the Class I Preference Shares, the "Preference Shares" and, together with the Notes, the "Securities");

WHEREAS, the Issuer intends to pledge the Collateral to the Trustee as security for the Notes;

WHEREAS, the Issuer wishes to enter into this Servicing Agreement, pursuant to which the Servicer agrees to perform, on behalf of the Issuer, certain duties with respect to the Collateral in the manner and on the terms set forth herein; and

WHEREAS, the Servicer has the capacity to provide the services required hereby and in the applicable provisions of the other Transaction Documents and is prepared to perform such services upon the terms and conditions set forth herein.

010567

NOW, THEREFORE, in consideration of the mutual agreements herein set forth, the parties hereto agree as follows:

1.    <u>Definitions</u>.

Terms used herein and not defined below shall have the meanings set forth in the Indenture.

"<u>Agreement</u>" shall mean this Servicing Agreement, as amended from time to time.

"<u>Governing Instruments</u>" shall mean the memorandum, articles or certificate of incorporation or association and by-laws, if applicable, in the case of a corporation; the certificate of formation, if applicable, or the partnership agreement, in the case of a partnership; or the certificate of formation, if applicable, or the limited liability company agreement, in the case of a limited liability company.

"<u>HFP</u>" shall mean Highland Financial Partners, L.P. (which includes, for the avoidance of doubt, any subsidiary thereof).

"<u>Offering Memorandum</u>" shall mean the Offering Memorandum of the Issuer dated October 22, 2007 prepared in connection with the offering of the Securities.

"<u>Redemption Date</u>" shall mean any Optional Redemption Date, Special Redemption Date, Tax Event Redemption Date or Mandatory Redemption Date, as applicable.

"<u>Servicer Breaches</u>" shall have the meaning specified in Section 10(a).

"<u>Servicing Fee</u>" shall mean, collectively, the Senior Servicing Fee, the Subordinate Servicing Fee and the Supplemental Servicing Fee.

"<u>Transaction Documents</u>" shall mean, this Agreement, the Indenture, the Collateral Administrator Agreement, the Preference Shares Paying Agency Agreement, any Hedge Agreement and any Synthetic Security Agreement.

2.    <u>General Duties of the Servicer</u>.

(a)    The Servicer shall provide services to the Issuer as follows:

(i)    Subject to and in accordance with the terms this Agreement and the other Transaction Documents, the Servicer shall supervise and direct the administration, acquisition and disposition of the Collateral, and shall perform on behalf of the Issuer those duties and obligations of the Servicer required by the Indenture and the other Transaction Documents, and including the furnishing of Issuer Orders, Issuer Requests and officer's certificates, and such certifications as are required of the Servicer under the Indenture with respect to permitted purchases and sales of the Collateral Obligation, Eligible Investments and other assets, and other matters, and, to the extent necessary or appropriate to perform such duties, the Servicer shall have the power to execute and deliver all necessary and appropriate documents and instruments on behalf of the Issuer with respect thereto. The Servicer shall, subject to the terms and conditions of this Agreement and the other Transaction Documents, perform its obligations hereunder and thereunder with reasonable care, using a degree of skill and attention no less than that

010568

which the Servicer exercises with respect to comparable assets that it services or manages for others having similar objectives and restrictions, and in a manner consistent with practices and procedures followed by institutional servicers or managers of national standing relating to assets of the nature and character of the Collateral for clients having similar objectives and restrictions, except as expressly provided otherwise in this Agreement and/or the other Transaction Documents. To the extent not inconsistent with the foregoing, the Servicer shall follow its customary standards, policies and procedures in performing its duties under the Indenture and hereunder. The Servicer shall comply with all terms and conditions of the other Transaction Documents affecting the duties and functions to be performed hereunder. The Servicer shall not be bound to follow any amendment to any Transaction Document until it has received written notice thereof and until it has received a copy of the amendment from the Issuer or the Trustee; provided, however, that the Servicer shall not be bound by any amendment to any Transaction Document that affects the rights, powers, obligations or duties of the Servicer unless the Servicer shall have consented thereto in writing. The Issuer agrees that it shall not permit any amendment to the Indenture that (x) affects the rights, powers, obligations or duties of the Servicer or (y) affects the amount or priority of any fees payable to the Servicer to become effective unless the Servicer has been given prior written notice of such amendment and consented thereto in writing;

(ii)       the Servicer shall select any Collateral which shall be acquired by the Issuer pursuant to the Indenture in accordance with the Collateral criteria set forth herein and in the Indenture;

(iii)       the Servicer shall monitor the Collateral on an ongoing basis and provide to the Issuer all reports, certificates, schedules and other data with respect to the Collateral which the Issuer is required to prepare and deliver under the Indenture, in the form and containing all information required thereby and in reasonable time for the Issuer to review such required reports, certificates, schedules and data and to deliver them to the parties entitled thereto under the Indenture; the Servicer shall undertake to determine to the extent reasonably practicable whether a Collateral Obligation has become a Defaulted Collateral Obligation;

(iv)       the Servicer, subject to and in accordance with the provisions of the Indenture may, at any time permitted under the Indenture, and shall, when required by the Indenture, direct the Trustee (x) to dispose of a Collateral Obligation, Eligible Equity Security, Qualified Equity Security or Eligible Investment or other securities received in respect thereof in the open market or otherwise, (y) to acquire, as security for the Notes in substitution for or in addition to any one or more Collateral Obligation or Eligible Investments included in the Collateral, one or more substitute Collateral Obligation or Eligible Investments, or (z) direct the Trustee to take the following actions with respect to a Collateral Obligation or Eligible Investment:

(1)       retain such Collateral Obligation or Eligible Investment; or

(2)       dispose of such Collateral Obligation or Eligible Investment in the open market or otherwise; or

(3)       if applicable, tender such Collateral Obligation or Eligible Investment pursuant to an Offer; or

010569

(4) if applicable, consent to any proposed amendment, modification or waiver pursuant to an Offer; or

(5) retain or dispose of any securities or other property (if other than cash) received pursuant to an Offer; or

(6) waive any default with respect to any Defaulted Collateral Obligation; or

(7) vote to accelerate the maturity of any Defaulted Collateral Obligation; or

(8) exercise any other rights or remedies with respect to such Collateral Obligation or Eligible Investment as provided in the related Underlying Instruments, including in connection with any workout situations, or take any other action consistent with the terms of the Indenture which is in the best interests of the Holders of the Securities; and

(v) the Servicer shall (a) on or prior to any day which is a Redemption Date, direct the Trustee to enter into contracts to dispose of the Collateral Obligation and any other Collateral pursuant to the Indenture and otherwise comply with all redemption procedures and certification requirements in the Indenture in order to allow the Trustee to effect such redemption and (b) conduct Auctions in accordance with the terms of the Indenture.

(b) In performing its duties hereunder, the Servicer shall seek to preserve the value of the Collateral for the benefit of the Holders of the Securities taking into account the Collateral criteria and limitations set forth herein and in the Indenture and the Servicer shall use reasonable efforts to select and service the Collateral in such a way that will permit a timely performance of all payment obligations by the Issuer under the Indenture; provided, that the Servicer shall not be responsible if such objectives are not achieved so long as the Servicer performs its duties under this Agreement in the manner provided for herein, and provided, further, that there shall be no recourse to the Servicer with respect to the Notes or the Preference Shares. The Servicer and the Issuer shall take such other action, and furnish such certificates, opinions and other documents, as may be reasonably requested by the other party hereto in order to effectuate the purposes of this Agreement and to facilitate compliance with applicable laws and regulations and the terms of this Agreement.

(c) The Servicer hereby agrees to the following:

(i) The Servicer agrees not to institute against, or join any other Person in instituting against, the Issuer or the Co-Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings or other proceedings under federal or state bankruptcy or similar laws of any jurisdiction until at least one year and one day (or if longer, any applicable preference period plus one day) after the payment in full of all Notes issued under the Indenture; provided, however, that nothing in this clause (i) shall preclude, or be deemed to estop, the Servicer (A) from taking any action prior to the expiration of such period in (x) any case or proceeding voluntarily filed or commenced by the Issuer or the Co-Issuer, as the case may be, or (y) any involuntary insolvency proceeding filed or commenced against the Issuer or the Co-Issuer, as the case may be, by a Person other than the Servicer, or (B) from commencing against the Issuer or the Co-Issuer or any properties of the Issuer or the

010570

Co-Issuer any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium, liquidation or similar proceeding. The provisions of this Section 2(c)(i) shall survive termination of this Agreement.

(ii) The Servicer shall cause each sale or purchase of any Collateral Obligation or Eligible Investment to be conducted on an arm's-length basis.

(iii) The Servicer shall, on behalf of the Issuer and at the Issuer's expense, retain a firm of independent certified public accountants of recognized national reputation (the Accountants) to (i) prepare on behalf of (and at the expense of) the Issuer and Co-Issuer any income tax or information returns that the Issuer or Co-Issuer may from time to time be required to file under applicable law (each, a Tax Return), (ii) deliver, reasonably prior to any applicable time limit, each Tax Return, properly completed, to the Administrator for signature by an Authorized Officer of the Issuer or the Co-Issuer, as applicable, (iii) file or deliver such Tax Return on behalf of the Issuer or Co-Issuer within any applicable time limit with any authority or Person as required under applicable law, (iv) prepare and file any elections, as needed, to preserve the status of the Issuer as a corporation for United States Federal tax purposes due to a change in United States Federal tax laws, and (v) prepare (alone or with the assistance of the Collateral Administrator) and deliver on an annual basis in a timely manner to the Preference Share Paying Agent for delivery to each Preference Shareholder the information required by Section 7.1(d) and (g) of the Preference Share Paying Agency Agreement including (A) any Internal Revenue Service Form 5471 (or successor or form), and any other information required under Sections 6038, 6038B or 6046 of the Code of (or successor provisions), (B) all information that a U.S. shareholder making a "qualified electing fund" election with respect to the Issuer is required to obtain for United States Federal income tax purposes, (C) a "PFIC Annual Information Statement" as described in Treasury Regulation Section 1.1295 1(g) (or any successor guidance), including all representations and statements required by such statement and (D) information required by a Preference Shareholder to satisfy its obligations, if any, under Treasury Regulations Section 1.6011-4 (or successor provisions) with respect to transactions undertaken by the Issuer.

(iv) The Servicer shall, on behalf of the Issuer and at the Issuer's expense (i) provide (or cause to be provided) to each issuer or paying agent of (or counterparty or paying agent with respect to) an item included in the Collateral (or, as appropriate, provide or cause to be provided to the relevant tax authority or tax authorities) any tax forms or certifications that the Issuer is able to provide as necessary to avoid or minimize withholding or imposition of income or withholding tax or as reasonably required or requested by each issuer (or counterparty or paying agent) and (ii) take any steps reasonably necessary to obtain a refund of withholding taxes imposed on any item included in the Collateral.

(d) The Servicer shall not act for the Issuer in any capacity except as provided in this Section 2. In providing services hereunder, the Servicer may employ third parties, including its Affiliates, to render advice (including advice with respect to the servicing of the Collateral) and assistance; provided, however, that the Servicer shall not be relieved of any of its duties or liabilities hereunder regardless of the performance of any services by third parties and provided further that such assignee must perform its duties without causing the Issuer to become subject to net income tax in any jurisdiction outside the Issuer's jurisdiction of incorporation or otherwise cause adverse tax consequences to the Issuer or Co-Issuer. Notwithstanding any other provision of this Agreement, the Servicer shall not

010571

be required to take any action required of it pursuant to this Agreement or the Indenture if such action would constitute a violation of any law.

(e)     Notwithstanding any other provision of this Agreement or the Indenture, (i) any granted signatory powers or authority granted to the Servicer on behalf of the Issuer with respect to the Special Procedures Obligations shall be conditioned upon the prior written approval of the Independent Advisor and (ii) neither the Servicer nor any Affiliate of the Servicer shall have any authority to enter into agreements, or take any action, on behalf of the Issuer with respect to the Special Procedures Obligations without the prior written approval of the Independent Advisor.

3.     <u>Brokerage</u>.

The Servicer shall seek to obtain the best prices and execution for all orders placed with respect to the Collateral, considering all reasonable circumstances. Subject to the objective of obtaining best prices and execution, the Servicer may take into consideration research and other brokerage services furnished to the Servicer or its Affiliates by brokers and dealers which are not Affiliates of the Servicer. Such services may be used by the Servicer or its Affiliates in connection with its other servicing or advisory activities or operations. The Servicer may aggregate sales and purchase orders of securities placed with respect to the Collateral with similar orders being made simultaneously for other accounts serviced or managed by Servicer or with accounts of the Affiliates of the Servicer, if in the Servicer's reasonable judgment such aggregation shall result in an overall economic benefit to the Issuer, taking into consideration the advantageous selling or purchase price, brokerage commission and other expenses. In the event that a sale or purchase of a Collateral Obligation or Eligible Investment (in accordance with the terms of the Indenture) occurs as part of any aggregate sales or purchase orders, the objective of the Servicer (and any of its Affiliates involved in such transactions) shall be to allocate the executions among the accounts in an equitable manner and consistent with its obligations hereunder and under applicable law.

In addition to the foregoing and subject to the provisions of Section 2 and the limitations of Section 5, the objective of obtaining best prices and execution and to the extent permitted by applicable law, the Servicer may, on behalf of the Issuer, direct the Trustee to acquire any and all of the Eligible Investments or other Collateral from, or sell Collateral Obligation or other Collateral to, the Initial Purchaser, the Trustee or any of their respective Affiliates, or any other firm.

4.     <u>Additional Activities of the Servicer</u>.

Nothing herein shall prevent the Servicer or any of its Affiliates from engaging in other businesses, or from rendering services of any kind to the Trustee, the Holders of the Securities, or any other Person or entity to the extent permitted by applicable law. Without prejudice to the generality of the foregoing, the Servicer and partners, directors, officers, employees and agents of the Servicer or its Affiliates may, among other things, and subject to any limits specified in the Indenture:

(a)     serve as directors (whether supervisory or managing), officers, partners, employees, agents, nominees or signatories for any issuer of any obligations included in the Collateral or their respective Affiliates, to the extent permitted by their Governing Instruments, as from time to time amended, or by any resolutions duly adopted by the Issuer, its Affiliates or any issuer of any obligations included in the Collateral or their respective Affiliates, pursuant to their respective Governing Instruments; <u>provided</u>, that in the reasonable judgment of the Servicer, such activity shall not have a material adverse effect on the enforceability of Collateral or the ability of the Issuer to comply with each Coverage Test or Collateral Quality Test; <u>provided</u>, <u>further</u>, that nothing in this paragraph shall be deemed to limit the duties of the Servicer set forth in Section 2 hereof;

010572

(b)      receive fees for services of any nature rendered to the issuer of any obligations included in the Collateral or their respective Affiliates; provided, that in the reasonable judgment of the Servicer, such activity shall not have a material adverse effect on the enforceability of Collateral or the ability of the Issuer to comply with each Coverage Test or Collateral Quality Test; and provided, further that if any portion of such services are related to the purchase by the Issuer of any obligations included in the Collateral, the portion of such fees relating to such obligations shall be applied to the purchase price of such obligations; and

(c)      be a secured or unsecured creditor of, or hold an equity interest in, the Issuer, its Affiliates or any issuer of any obligation included in the Collateral; provided, that in the reasonable judgment of the Servicer, such activity shall not have a material adverse effect on the enforceability of Collateral or the ability of the Issuer to comply with each Coverage Test or Collateral Quality Test; provided, further, that nothing in this paragraph shall be deemed to limit the duties of the Servicer set forth in Section 2 hereof.

It is understood that the Servicer and any of its Affiliates may engage in any other business and furnish servicing, investment management and advisory services to others, including Persons which may have policies similar to those followed by the Servicer with respect to the Collateral and which may own securities of the same class, or which are the same type, as the Collateral Obligation or other securities of the issuers of Collateral Obligation. The Servicer shall be free, in its sole discretion, to make recommendations to others, or effect transactions on behalf of itself or for others, which may be the same as or different from those effected with respect to the Collateral.

Unless the Servicer determines in its reasonable judgment that such purchase or sale is appropriate, the Servicer may refrain from directing the purchase or sale hereunder of securities issued by (i) Persons of which the Servicer, its Affiliates or any of its or their officers, directors or employees are directors or officers, (ii) Persons for which the Servicer or its Affiliate act as financial adviser or underwriter or (iii) Persons about which the Servicer or any of its Affiliates have information which the Servicer deems confidential or non-public or otherwise might prohibit it from trading such securities in accordance with applicable law. The Servicer shall not be obligated to have or pursue any particular strategy or opportunity with respect to the Collateral.

5.      Conflicts of Interest.

(a)      The Servicer shall not direct the Trustee to acquire an obligation to be included in the Collateral from the Servicer or any of its Affiliates as principal or to sell an obligation to the Servicer or any of its Affiliates as principal unless (i) the Issuer shall have received from the Servicer such information relating to such acquisition or sale as it may reasonably require and shall have approved such acquisition, which approval shall not be unreasonably withheld, (ii) in the judgment of the Servicer, such transaction is on terms no less favorable than would be obtained in a transaction conducted on an arm's length basis between third parties unaffiliated with each other and (iii) such transaction is permitted by the Investment Advisers Act.

(b)      The Servicer shall not direct the Trustee to acquire an obligation to be included in the Collateral directly from any account or portfolio for which the Servicer serves as servicer or investment adviser, or direct the Trustee to sell an obligation directly to any account or portfolio for which the Servicer serves as servicer or investment adviser unless such acquisition or sale is (i) in the judgment of the Servicer, on terms no less favorable than would be obtained in a transaction conducted on an arm's length basis between third parties unaffiliated with each other and (ii) permitted by the Investment Advisers Act.

010573

(c)    In addition, the Servicer shall not undertake any transaction described in this Section 5 unless such transaction is exempt from the prohibited transaction rules of ERISA and the Code.

6.    Records; Confidentiality.

The Servicer shall maintain appropriate books of account and records relating to services performed hereunder, and such books of account and records shall be accessible for inspection by a representative of the Issuer, the Trustee, the Collateral Administrator, the Holders of the Securities and the Independent accountants appointed by the Issuer pursuant to the Indenture at a mutually agreed time during normal business hours and upon not less than three Business Days' prior notice.  At no time shall the Servicer make a public announcement concerning the issuance of the Notes or the Preference Shares, the Servicer's role hereunder or any other aspect of the transactions contemplated by this Agreement and the other Transaction Documents. The Servicer shall keep confidential any and all information obtained in connection with the services rendered hereunder and shall not disclose any such information to non-affiliated third parties except (i) with the prior written consent of the Issuer, (ii) such information as either Rating Agency shall reasonably request in connection with the rating of any class of Securities, (iii) as required by law, regulation, court order or the rules or regulations of any self regulating organization, body or official having jurisdiction over the Servicer, (iv) to its professional advisers, (v) such information as shall have been publicly disclosed other than in violation of this Agreement, or (vi) such information that was or is obtained by the Servicer on a non-confidential basis, provided, that the Servicer does not know or have reason to know of any breach by such source of any confidentiality obligations with respect thereto.  For purposes of this Section 6, the Trustee, the Collateral Administrator and the Holders of the Securities shall in no event be considered "non-affiliated third parties."

Notwithstanding anything in this Agreement or the Indenture to the contrary, the Servicer, the Co-Issuers, the Trustee and the Holders of the Securities (and the beneficial owners thereof) (and each of their respective employees, representatives or other agents) may disclose to any and all Persons, without limitation of any kind, the U.S. tax treatment and U.S. tax structure of the transactions contemplated by this Agreement and all materials of any kind (including opinions or other tax analyses) that are provided to them relating to such U.S. tax treatment and U.S. tax structure, as such terms are defined under U.S. federal, state or local tax law.

7.    Obligations of Servicer.

Unless otherwise specifically required by any provision of the Indenture or this Agreement or by applicable law, the Servicer shall use its best reasonable efforts to ensure that no action is taken by it, and shall not intentionally or with reckless disregard take any action, which would (a) materially adversely affect the Issuer or the Co-Issuer for purposes of Cayman Islands law, United States federal or state law or any other law known to the Servicer to be applicable to the Issuer or the Co-Issuer, (b) not be permitted under the Issuer's Memorandum and Articles of Association or the Co-Issuer's certificate of formation or limited liability company agreement, (c) violate any law, rule or regulation of any governmental body or agency having jurisdiction over the Issuer or the Co-Issuer including, without limitation, any Cayman Islands or United States federal, state or other applicable securities law the violation of which has or could reasonably be expected to have a material adverse effect on the Issuer, the Co-Issuer or any of the Collateral, (d) require registration of the Issuer, the Co-Issuer or the pool of Collateral as an "investment company" under the Investment Company Act, (e) cause the Issuer or the Co-Issuer to violate the terms of the Indenture, including, without limitation, any representations made by the Issuer or Co-Issuer therein, or any other agreement contemplated by the Indenture or (f) not be permitted by Annex 1 hereto and would subject the Issuer to U.S. federal or state income or franchise taxation, cause the Issuer to be engaged in a trade or business in the United States for

U.S. federal income tax purposes or cause the Issuer to be subject to tax on a net income basis outside the Issuer's jurisdiction of incorporation or otherwise cause adverse tax consequences to the Issuer or Co-Issuer. The Servicer covenants that it shall comply in all material respects with all laws and regulations applicable to it in connection with the performance of its duties under this Agreement and the Indenture. Notwithstanding anything in this Agreement to the contrary, the Servicer shall not be required to take any action under this Agreement or the Indenture if such action would violate any applicable law, rule, regulation or court order.

8. <u>Compensation</u>.

(a) The Issuer shall pay to the Servicer, for services rendered and performance of its obligations under this Agreement, the Servicing Fee, which shall be payable in such amounts and at such times as set forth in the Indenture. The provisions of the Indenture which relate to the amount and payment of the Servicing Fee shall not be amended without the written consent of the Servicer. If on any Payment Date there are insufficient funds to pay the Servicing Fee (and/or any other amounts due and payable to the Servicer) in full, the amount not so paid shall be deferred and shall be payable on such later Payment Date on which funds are available therefor as provided in the Indenture.

With respect to any Payment Date, the Servicer may, in its sole discretion, at any time waive a portion (or all) of its Servicing Fees then due and payable. All waived amounts will be paid to the Class II Preference Shares as Class II Preference Share Dividends pursuant to the Indenture; provided that with respect to the Payment Date in May 2008, such Class II Preference Share Special Payments will, at a minimum, include amounts that otherwise constitute a portion (representing the Class II Preference Share Percentage) of the Servicing Fees that have accrued from the Closing Date through February 3, 2008. For purposes of any calculation under this Agreement and the Indenture, the Servicer shall be deemed to have received the Servicing Fee in an amount equal to the sum of the Servicing Fee actually paid to the Servicer and the amount distributed to the Holders of the Class II Preference Shares as Class II Preference Share Dividends.

In addition, notwithstanding anything set out above, the Servicer may, in its sole discretion waive all or any portion of the Subordinated Servicing Fee or Supplemental Servicing Fee, any funds representing the waived Subordinated Servicing Fees and Supplemental Servicing Fees to be retained in the Collection Account for distribution as either Interest Proceeds or Principal Proceeds (as determined by the Servicer) pursuant to the Priority of Payments.

(b) The Servicer shall be responsible for the ordinary expenses incurred in the performance of its obligations under this Agreement, the Indenture and the other Transaction Documents; <u>provided</u>, <u>however</u>, that any extraordinary expenses incurred by the Servicer in the performance of such obligations (including, but not limited to, any fees, expenses or other amounts payable to the Rating Agencies, the Collateral Administrator, the Trustee and the accountants appointed by the Issuer, the reasonable expenses incurred by the Servicer to employ outside lawyers or consultants reasonably necessary in connection with the evaluation, transfer or restructuring of any Collateral Obligation or other unusual matters arising in the performance of its duties under this Agreement and the Indenture, any reasonable expenses incurred by the Servicer in obtaining advice from outside counsel with respect to its obligations under this Agreement, brokerage commissions, transfer fees, registration costs, taxes and other similar costs and transaction related expenses and fees arising out of transactions effected for the Issuer's account and the portion allocated to the Issuer of any other fees and expenses that the Servicer customarily allocates among all of the funds or portfolios that it services or manages, including reasonable expenses incurred with respect to any compliance requirements, including, but not limited to, compliance with the requirements of the Sarbanes-Oxley Act, related solely to the ownership

010575

or holding of any Securities by HFP or its Affiliates) shall be reimbursed by the Issuer to the extent funds are available therefor in accordance with and subject to the limitations contained in the Indenture.

(c)     If this Agreement is terminated pursuant to Section 12, Section 14 or otherwise, the fees payable to the Servicer shall be prorated for any partial periods between Payment Dates during which this Agreement was in effect and shall be due and payable on the first Payment Date following the date of such termination and on any subsequent Payment Dates to the extent remaining unpaid and in accordance with, and to the extent provided in, the Indenture.

9.     Benefit of the Agreement.

The Servicer agrees that its obligations hereunder shall be enforceable at the instance of the Issuer, the Trustee, on behalf of the Noteholders, or the requisite percentage of Noteholders or the Holders of the Preference Shares, as applicable, as provided in the Indenture.

10.     Limits of Servicer Responsibility; Indemnification.

(a)     The Servicer assumes no responsibility under this Agreement other than to render the services called for hereunder and under the terms of the other Transaction Documents made applicable to it pursuant to the terms of this Agreement in good faith and, subject to the standard of liability described in the next sentence, shall not be responsible for any action of the Issuer or the Trustee in following or declining to follow any advice, recommendation or direction of the Servicer. The Servicer, its directors, officers, stockholders, partners, agents and employees, and its Affiliates and their directors, officers, stockholders, partners, agents and employees, shall not be liable to the Issuer, the Co-Issuer, the Trustee, the Holders of the Securities or any other person, for any losses, claims, damages, judgments, assessments, costs or other liabilities (collectively, "Liabilities") incurred by the Issuer, the Co-Issuer, the Trustee, the Holders of the Securities or any other person, that arise out of or in connection with the performance by the Servicer of its duties under this Agreement and under the terms of the other Transaction Documents made applicable to it pursuant to the terms of this Agreement, except by reason of (i) acts or omissions constituting bad faith, willful misconduct, gross negligence or breach of fiduciary duty in the performance, or reckless disregard, of the obligations of the Servicer hereunder and under the terms of the other Transaction Documents made applicable to it pursuant to the terms of this Agreement or (ii) with respect to any information included in the Offering Memorandum in the section entitled "The Servicer" and paragraphs 1, 2, 3, 4, 5, 7 and 11 in the section entitled "Risk Factors–Certain Conflicts of Interest–Conflicts of Interest Involving the Servicer" of that contains any untrue statement of material fact or omits to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading (the preceding clauses (i) and (ii) collectively being the "Servicer Breaches"). For the avoidance of doubt, the Servicer shall have no duty to independently investigate any laws not otherwise known to it in connection with its obligations under this Agreement, the Indenture and the other Transaction Documents. The Servicer shall be deemed to have satisfied the requirements of the Indenture and this Agreement relating to not causing the Issuer to be treated as engaged in a trade or business in the United States for U.S. federal income tax purposes (including as those requirements relate to the acquisition (including manner of acquisition), ownership, enforcement, and disposition of Collateral) to the extent the Servicer complies with the requirements set forth in Annex 1 hereto (unless the Servicer knows that as a result of a change in law the investment restrictions set forth in Annex 1 may no longer be relied upon).

(b)     The Issuer shall indemnify and hold harmless (the Issuer in such case, the "Indemnifying Party") the Servicer, its directors, officers, stockholders, partners, agents and employees (such parties collectively in such case, the "Indemnified Parties") from and against any and all Liabilities, and shall reimburse each such Indemnified Party for all reasonable fees and expenses

010576

(including reasonable fees and expenses of counsel) (collectively, the "Expenses") as such Expenses are incurred in investigating, preparing, pursuing or defending any claim, action, proceeding or investigation with respect to any pending or threatened litigation (collectively, the "Actions"), caused by, or arising out of or in connection with, the issuance of the Securities, the transactions contemplated by the Offering Memorandum, the Indenture or this Agreement, and/or any action taken by, or any failure to act by, such Indemnified Party; provided, however, that no Indemnified Party shall be indemnified for any Liabilities or Expenses it incurs as a result of any acts or omissions by any Indemnified Party constituting Servicer Breaches. Notwithstanding anything contained herein to the contrary, the obligations of the Issuer under this Section 10 shall be payable solely out of the Collateral in accordance with the priorities set forth in the Indenture and shall survive termination of this Agreement.

(c) With respect to any claim made or threatened against an Indemnified Party, or compulsory process or request or other notice of any loss, claim, damage or liability served upon an Indemnified Party, for which such Indemnified Party is or may be entitled to indemnification under this Section 10, such Indemnified Party shall (or with respect to Indemnified Parties that are directors, officers, stockholders, agents or employees of the Servicer, the Servicer shall cause such Indemnified Party to):

(i) give written notice to the Indemnifying Party of such claim within ten (10) days after such Indemnified Party's receipt of actual notice that such claim is made or threatened, which notice to the Indemnifying Party shall specify in reasonable detail the nature of the claim and the amount (or an estimate of the amount) of the claim; provided, however, that the failure of any Indemnified Party to provide such notice to the Indemnifying Party shall not relieve the Indemnifying Party of its obligations under this Section 10 unless the Indemnifying Party is materially prejudiced or otherwise forfeits rights or defenses by reason of such failure;

(ii) at the Indemnifying Party's expense, provide the Indemnifying Party such information and cooperation with respect to such claim as the Indemnifying Party may reasonably require, including, but not limited to, making appropriate personnel available to the Indemnifying Party at such reasonable times as the Indemnifying Party may request;

(iii) at the Indemnifying Party's expense, cooperate and take all such steps as the Indemnifying Party may reasonably request to preserve and protect any defense to such claim;

(iv) in the event suit is brought with respect to such claim, upon reasonable prior notice, afford to the Indemnifying Party the right, which the Indemnifying Party may exercise in its sole discretion and at its expense, to participate in the investigation, defense and settlement of such claim;

(v) neither incur any material expense to defend against nor release or settle any such claim or make any admission with respect thereto (other than routine or incontestable admissions or factual admissions the failure to make which would expose such Indemnified Party to unindemnified liability) nor permit a default or consent to the entry of any judgment in respect thereof, in each case without the prior written consent of the Indemnifying Party; and

(vi) upon reasonable prior notice, afford to the Indemnifying Party the right, in its sole discretion and at its sole expense, to assume the defense of such

010577

claim, including, but not limited to, the right to designate counsel reasonably acceptable to the Indemnified Party and to control all negotiations, litigation, arbitration, settlements, compromises and appeals of such claim; provided, that if the Indemnifying Party assumes the defense of such claim, it shall not be liable for any fees and expenses of counsel for any Indemnified Party incurred thereafter in connection with such claim except that if such Indemnified Party reasonably determines that counsel designated by the Indemnifying Party has a conflict of interest in connection with its representation of such Indemnified Party, such Indemnifying Party shall pay the reasonable fees and disbursements of one counsel (in addition to any local counsel) separate from its own counsel for all Indemnified Parties in connection with any one action or separate but similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances; provided, further, that prior to entering into any final settlement or compromise, such Indemnifying Party shall seek the consent of the Indemnified Party and use its commercially reasonable efforts in the light of the then prevailing circumstances (including, without limitation, any express or implied time constraint on any pending settlement offer) to obtain the consent of such Indemnified Party as to the terms of settlement or compromise. If an Indemnified Party does not consent to the settlement or compromise within a reasonable time under the circumstances, the Indemnifying Party shall not thereafter be obligated to indemnify the Indemnified Party for any amount in excess of such proposed settlement or compromise.

(d)     In the event that any Indemnified Party waives its right to indemnification hereunder, the Indemnifying Party shall not be entitled to appoint counsel to represent such Indemnified Party nor shall the Indemnifying Party reimburse such Indemnified Party for any costs of counsel to such Indemnified Party.

(e)     The U.S. federal securities laws impose liabilities under certain circumstances on persons who act in good faith; accordingly, notwithstanding any other provision of this Agreement, nothing herein shall in any way constitute a waiver or limitation of any rights which the Issuer or the Holders of the Securities may have under any U.S. federal securities laws.

11.     No Partnership or Joint Venture.

The Issuer and the Servicer are not partners or joint venturers with each other and nothing herein shall be construed to make them such partners or joint venturers or impose any liability as such on either of them. The Servicer's relation to the Issuer shall be deemed to be that of an independent contractor.

12.     Term; Termination.

(a)     This Agreement shall commence as of the date first set forth above and shall continue in force and effect until the first of the following occurs: (i) the payment in full of the Notes, the termination of the Indenture in accordance with its terms and the redemption in full of the Preference Shares; (ii) the liquidation of the Collateral and the final distribution of the proceeds of such liquidation to the Holders of Securities; or (iii) the termination of this Agreement in accordance with subsection (b), (c), (d) or (e) of this Section 12 or Section 14 of this Agreement.

(b)     Subject to Section 12(e) below, the Servicer may resign, upon 90 days' written notice to the Issuer (or such shorter notice as is acceptable to the Issuer). If the Servicer resigns, the Issuer agrees to appoint a successor Servicer to assume such duties and obligations in accordance with Section 12(e).

010578

(c)     This Agreement shall be automatically terminated in the event that the Issuer determines in good faith that the Issuer or the pool of Collateral has become required to be registered under the provisions of the Investment Company Act, and the Issuer notifies the Servicer thereof.

(d)     If this Agreement is terminated pursuant to this Section 12, neither party shall have any further liability or obligation to the other, except as provided in Sections 2(c)(i), 8, 10 and 15 of this Agreement.

(e)     No removal or resignation of the Servicer shall be effective unless:

(i)     (A) the Issuer appoints a successor Servicer at the written direction of a Majority of the Preference Shares (excluding any Preference Shares held by the retiring Servicer or any of its Affiliates and accounts over which the retiring Servicer or any of its Affiliates exercise discretionary voting authority, other than HFP which may exercise its vote with respect to Preference Shares it owns, up to the Original HFP Share Amount (each such non-excluded Preference Share, a "Voting Preference Share")), (B) such successor Servicer has assumed in writing all of the Servicer's duties and obligations pursuant to this Agreement and the Indenture and (C) such successor Servicer is not objected to within 30 days after notice of such succession by either (x) a Super Majority of the Controlling Class of Notes or (y) a Majority in Aggregate Outstanding Amount of the Notes (voting as a single class and excluding any Notes held by the retiring Servicer or any of its Affiliates and accounts over which the retiring Servicer or any of its Affiliates exercise discretionary voting authority other than HFP (each such non-excluded Note, a "Voting Note")); or

(ii)     if a Majority of the Preference Shares (excluding any Preference Shares held by the retiring Servicer or any of its Affiliates and accounts over which the retiring Servicer or any of its Affiliates exercise discretionary voting authority other than HFP) has nominated two or more possible successor Servicers that have been objected to pursuant to the preceding clause (i)(C) or has otherwise failed to appoint a successor Servicer that has not been objected to pursuant to the preceding clause (i)(C) within 30 days of the date of notice of such removal or resignation of the Servicer (or, if later, within 30 days of the last failure to successfully appoint a successor Servicer), then (A) the Issuer appoints a successor Servicer at the written direction of a Super Majority of the Controlling Class of Notes, (B) such successor Servicer has agreed in writing to assume all of the Servicer's duties and obligations pursuant to this Agreement and the Indenture and (C) such successor Servicer is not objected to within 45 days after notice of such succession by either of (x) a Majority of the Preference Shares (excluding any Preference Shares held by the retiring Servicer or any of its Affiliates and accounts over which the retiring Servicer or any of its Affiliates exercise discretionary voting authority other than HFP which may exercise its vote with respect to Preference Shares it owns, up to the Original HFP Share Amount) or (y) a Majority in Aggregate Outstanding Amount of the Notes (voting as a single class and excluding any Notes held by the retiring Servicer or any of its Affiliates and accounts over which the retiring Servicer or any of its Affiliates exercise discretionary voting authority other than HFP); or

(iii)     if the Issuer fails to appoint a successor Servicer pursuant to the preceding clauses (i) and (ii) within 90 days of any notice of resignation or removal of the

010579

Servicer, (A) any Holder of the Controlling Class of Notes (excluding any Notes that are not Voting Notes or any Holder of Voting Preference Shares) may petition a court of competent authority to appoint a successor Servicer, (B) such court appoints a successor Servicer and (C) such successor Servicer has agreed in writing to assume all of the Servicer's duties and obligations pursuant to this Agreement and the Indenture.

In addition, any successor Servicer must be an established institution which (i) has demonstrated an ability to professionally and competently perform duties similar to those imposed upon the Servicer hereunder, (ii) is legally qualified and has the capacity to act as Servicer hereunder, as successor to the Servicer under this Agreement in the assumption of all of the responsibilities, duties and obligations of the Servicer hereunder and under the applicable terms of the Indenture, (iii) shall not cause the Issuer or the pool of Collateral to become required to register under the provisions of the Investment Company Act, (iv) shall perform its duties as Servicer under this Agreement and the Indenture without causing the Issuer, the Co-Issuer or any Holder of any Securities to become subject to tax in any jurisdiction outside of the Issuer's jurisdiction of incorporation and (v) each Rating Agency has confirmed that the appointment of such successor Servicer shall not cause its then current rating of any Class of Notes to be reduced or withdrawn. No compensation payable to a successor Servicer from payments on the Collateral shall be greater than that paid to the Servicer without the prior written consent of a Super Majority of the Controlling Class, Majority of the Noteholders and a Majority of the Preference Shares. The Issuer, the Trustee and the successor Servicer shall take such action (or cause the retiring Servicer to take such action) consistent with this Agreement and the terms of the Indenture applicable to the Servicer, as shall be necessary to effectuate any such succession.

If there has been no appointment of a successor Servicer within 90 days following the resignation or termination of the Servicer, until a successor Servicer has been appointed and has assumed its duties hereunder, any sales or disposition of Collateral Obligation shall be limited to Credit Risk Obligation, Credit Improved Obligation, Defaulted Collateral Obligation, Eligible Equity Securities or Qualified Equity Securities; provided, that, such restriction on the sale or disposition of Collateral Obligation shall not apply if the Collateral Obligation is being liquidated in whole or in part in connection with an acceleration or early termination of the Notes.

(f)     In the event of removal of the Servicer pursuant to this Agreement, the Issuer shall have all of the rights and remedies available with respect thereto at law or equity, and, without limiting the foregoing, the Issuer or, to the extent so provided in the Indenture, the Trustee may by notice in writing to the Servicer as provided under this Agreement terminate all the rights and obligations of the Servicer under this Agreement (except those that survive termination pursuant to Section 12(d) above). Upon expiration of the applicable notice period with respect to termination specified in this Section 12 or Section 14 of this Agreement, as applicable, all authority and power of the Servicer under this Agreement, whether with respect to the Collateral or otherwise, shall automatically and without further action by any person or entity pass to and be vested in the successor Servicer upon the appointment thereof.

13.     Delegation; Assignments.

This Agreement, and any obligations or duties of the Servicer hereunder, shall not be delegated by the Servicer, in whole or in part, except to any entity that (i) is controlled by any of James Dondero, Mark Okada and Todd Travers and (ii) is one in which any of James Dondero, Mark Okada and Todd Travers is involved in the day to day management and operations (and in any such case pursuant to an instrument of delegation in form and substance satisfactory to the Issuer), without the prior written consent of the Issuer, a Super Majority of the Controlling Class and a Majority of the Preference Shares (excluding Notes and Preference Shares held by the Servicer or any of its Affiliates) and, notwithstanding any such consent, no delegation of obligations or duties by the Servicer (including, without limitation, to

010580

an entity described above) shall relieve the Servicer from any liability hereunder; provided that such delegate or assignee must perform its duties without causing the Issuer to become subject to net income tax in any jurisdiction outside the Issuer's jurisdiction of incorporation or otherwise cause adverse tax consequences to the Issuer or Co-Issuer.

Subject to Section 12, any assignment of this Agreement to any Person, in whole or in part, by the Servicer shall be deemed null and void unless (i) such assignment is consented to in writing by the Issuer, a Majority of the Controlling Class and the Holders of a Majority of the Preference Shares (excluding Notes and Preference Shares held by the Servicer or any of its Affiliates other than HFP) and (ii) the Rating Condition is satisfied with respect to any such assignment. Any assignment consented to by the Issuer, a Majority of the Controlling Class and the Holders of a Majority of the Preference Shares shall bind the assignee hereunder in the same manner as the Servicer is bound. In addition, the assignee shall execute and deliver to the Issuer and the Trustee a counterpart of this Agreement naming such assignee as Servicer. Upon the execution and delivery of such a counterpart by the assignee and consent thereto by the Issuer, a Majority of the Controlling Class and the Holders of a Majority of the Preference Shares, the Servicer shall be released from further obligations pursuant to this Agreement, except with respect to its obligations arising under Section 10 of this Agreement prior to such assignment and except with respect to its obligations under Sections 2(c)(i) and 15 hereof. This Agreement shall not be assigned by the Issuer without the prior written consent of the Servicer and the Trustee, except in the case of assignment by the Issuer to (i) an entity which is a successor to the Issuer permitted under the Indenture, in which case such successor organization shall be bound hereunder and by the terms of said assignment in the same manner as the Issuer is bound thereunder or (ii) the Trustee as contemplated by the Indenture. In the event of any assignment by the Issuer, the Issuer shall cause its successor to execute and deliver to the Servicer such documents as the Servicer shall consider reasonably necessary to effect fully such assignment. The Servicer hereby consents to the matters set forth in Article 15 of the Indenture.

14.     Termination by the Issuer for Cause.

Subject to Section 12(e) above, this Agreement shall be terminated and the Servicer shall be removed by the Issuer for cause upon 10 days' prior written notice to the Servicer and upon written notice to the Holders of the Securities as set forth below, but only if directed to do so by (1) a Super Majority of the Controlling Class of Notes or (2) the Holders of at least 66-2/3% of the Preference Shares (excluding any Preference Shares or other Notes held by the Servicer or any of its Affiliates and accounts over which the Servicer or any of its Affiliates exercise discretionary voting authority, other than HFP which may exercise its vote with respect to Preference Shares it owns, up to the Original HFP Share Amount). For purposes of determining "cause" with respect to any such termination of this Agreement, such term shall mean any one of the following events:

(a)     the Servicer willfully breaches in any respect, or takes any action that it knows violates in any respect, any provision of this Agreement or any terms of the Indenture applicable to it;

(b)     the Servicer breaches in any material respect any provision of this Agreement or any terms of the Indenture or the Collateral Administration Agreement applicable to it, or any representation, warranty, certification or statement given in writing by the Servicer shall prove to have been incorrect in any material respect when made or given, and the Servicer fails to cure such breach or take such action so that the facts (after giving effect to such action) conform in all material respects to such representation, warranty, certificate or statement, in each case within 30 days of becoming aware of, or receiving notice from, the Trustee of, such breach or materially incorrect representation, warranty, certificate or statement;

010581

(c)  the Servicer is wound up or dissolved (other than a dissolution in which the remaining members elect to continue the business of the Servicer in accordance with its Governing Instruments) or there is appointed over it or a substantial portion of its assets a receiver, administrator, administrative receiver, trustee or similar officer, or the Servicer (i) ceases to be able to, or admits in writing its inability to, pay its debts as they become due and payable, or makes a general assignment for the benefit of or enters into any composition or arrangement with, its creditors generally; (ii) applies for or consents (by admission of material allegations of a petition or otherwise) to the appointment of a receiver, trustee, assignee, custodian, liquidator or sequestrator (or other similar official) of the Servicer or of any substantial part of its properties or assets, or authorizes such an application or consent, or proceedings seeking such appointment are commenced without such authorization, consent or application against the Servicer and continue undismissed for 60 days; (iii) authorizes or files a voluntary petition in bankruptcy, or applies for or consents (by admission of material allegations of a petition or otherwise) to the application of any bankruptcy, reorganization, arrangement, readjustment of debt, insolvency or dissolution, or authorizes such application or consent, or proceedings to such end are instituted against the Servicer without such authorization, application or consent and are approved as properly instituted and remain undismissed for 60 days or result in adjudication of bankruptcy or insolvency; or (iv) permits or suffers all or any substantial part of its properties or assets to be sequestered or attached by court order and the order remains undismissed for 60 days;

(d)  the occurrence of any Event of Default under the Indenture that results from any breach by the Servicer of its duties under the Indenture or this Agreement, which breach or default is not cured within any applicable cure period; or

(e)  (x) the occurrence of an act by the Servicer related to its activities in any servicing, securities, financial advisory or other investment business that constitutes fraud, (y) the Servicer being indicted, or any of its principals being convicted, of a felony criminal offense related to its activities in any servicing, securities, financial advisory or other investment business or (z) the Servicer being indicted for, adjudged liable in a civil suit for, or convicted of a violation of the Securities Act or any other United States Federal securities law or any rules or regulations thereunder.

If any of the events specified in this Section 14 shall occur, the Servicer shall give prompt written notice thereof to the Issuer, S&P, the Trustee and the Holders of all outstanding Notes and Preference Shares upon the Servicer's becoming aware of the occurrence of such event.

15.  Action Upon Termination.

(a)  From and after the effective date of termination of this Agreement, the Servicer shall not be entitled to compensation for further services hereunder, but shall be paid all compensation accrued to the date of termination, as provided in Section 8 hereof, and shall be entitled to receive any amounts owing under Section 10 hereof.  Upon the effective date of termination of this Agreement, the Servicer shall as soon as practicable:

(i)  deliver to the Issuer all property and documents of the Trustee or the Issuer or otherwise relating to the Collateral then in the custody of the Servicer; and

(ii)  deliver to the Trustee and the Preference Shares Paying Agent an accounting with respect to the books and records delivered to the Trustee and the Preference Shares Paying Agent or the successor Servicer appointed pursuant to Section 12(e) hereof.

010582

Notwithstanding such termination, the Servicer shall remain liable to the extent set forth herein (but subject to Section 10 hereof) for its acts or omissions hereunder arising prior to termination and for any expenses, losses, damages, liabilities, demands, charges and claims (including reasonable attorneys' fees) in respect of or arising out of a breach of the representations and warranties made by the Servicer in Section 16(b) hereof or from any failure of the Servicer to comply with the provisions of this Section 15.

(b) The Servicer agrees that, notwithstanding any termination of this Agreement, it shall reasonably cooperate in any Proceeding arising in connection with this Agreement, the Indenture or any of the Collateral (excluding any such Proceeding in which claims are asserted against the Servicer or any Affiliate of the Servicer) upon receipt of appropriate indemnification and expense reimbursement.

16. <u>Representations and Warranties</u>.

(a) The Issuer hereby represents and warrants to the Servicer as follows:

(i) The Issuer has been duly registered and is validly existing under the laws of the Cayman Islands, has full power and authority to own its assets and the securities proposed to be owned by it and included in the Collateral and to transact the business in which it is presently engaged and is duly qualified under the laws of each jurisdiction where its ownership or lease of property or the conduct of its business requires, or the performance of its obligations under this Agreement, the Indenture or the Securities would require, such qualification, except for failures to be so qualified, authorized or licensed that would not in the aggregate have a material adverse effect on the business, operations, assets or financial condition of the Issuer.

(ii) The Issuer has full power and authority to execute, deliver and perform this Agreement, the other Transaction Documents and the Securities and all obligations required hereunder and thereunder and has taken all necessary action to authorize this Agreement, the other Transaction Documents and the Securities on the terms and conditions hereof and thereof and the execution by the Issuer, delivery and performance of this Agreement, the other Transaction Documents and the Securities and the performance of all obligations imposed upon it hereunder and thereunder. No consent of any other person including, without limitation, shareholders and creditors of the Issuer, and no license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority, other than those that may be required under state securities or "blue sky" laws and those that have been or shall be obtained in connection with the other Transaction Documents and the Securities is required by the Issuer in connection with this Agreement, the other Transaction Documents and the Securities or the execution, delivery, performance, validity or enforceability of this Agreement, the other Transaction Documents and the Securities or the obligations imposed upon it hereunder or thereunder. This Agreement constitutes, and each instrument or document required hereunder, when executed and delivered hereunder, shall constitute, the legally valid and binding obligation of the Issuer enforceable against the Issuer in accordance with its terms, subject to (a) the effect of bankruptcy, insolvency or similar laws affecting generally the enforcement of creditors' rights and (b) general equitable principles.

(iii) The execution by the Issuer, delivery and performance of this Agreement and the documents and instruments required hereunder shall not violate any

010583

provision of any existing law or regulation binding on the Issuer, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on the Issuer, or the Governing Instruments of, or any securities issued by, the Issuer or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which the Issuer is a party or by which the Issuer or any of its assets may be bound, the violation of which would have a material adverse effect on the business, operations, assets or financial condition of the Issuer, and shall not result in or require the creation or imposition of any lien on any of its property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking (other than the lien of the Indenture).

(iv)    The Issuer is not in violation of its Governing Instruments or in breach or violation of or in default under the Indenture or any contract or agreement to which it is a party or by which it or any of its assets may be bound, or any applicable statute or any rule, regulation or order of any court, government agency or body having jurisdiction over the Issuer or its properties, the breach or violation of which or default under which would have a material adverse effect on the validity or enforceability of this Agreement or the performance by the Issuer of its duties hereunder.

(v)    True and complete copies of the Indenture and the Issuer's Governing Instruments have been delivered to the Servicer.

The Issuer agrees to deliver a true and complete copy of each amendment to the documents referred to in Section 16(a)(v) above to the Servicer as promptly as practicable after its adoption or execution.

(b)    The Servicer hereby represents and warrants to the Issuer as follows:

(i)    The Servicer is a limited partnership duly organized and validly existing and in good standing under the laws of the State of Delaware, has full power and authority to own its assets and to transact the business in which it is currently engaged and is duly qualified and in good standing under the laws of each jurisdiction where its ownership or lease of property or the conduct of its business requires, or the performance of this Agreement would require such qualification, except for those jurisdictions in which the failure to be so qualified, authorized or licensed would not have a material adverse effect on the business, operations, assets or financial condition of the Servicer or on the ability of the Servicer to perform its obligations under, or on the validity or enforceability of, this Agreement and the provisions of the other Transaction Documents applicable to the Servicer.

(ii)    The Servicer has full power and authority to execute, deliver and perform this Agreement and all obligations required hereunder and under the provisions of the other Transaction Documents applicable to the Servicer, and has taken all necessary action to authorize this Agreement on the terms and conditions hereof and the execution, delivery and performance of this Agreement and all obligations required hereunder and under the terms of the other Transaction Documents applicable to the Servicer.  No consent of any other person, including, without limitation, creditors of the Servicer, and no license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority is required by the Servicer in connection with this Agreement or the execution, delivery, performance, validity or enforceability of this Agreement or the obligations required

010584

hereunder or under the terms of the other Transaction Documents applicable to the Servicer. This Agreement has been, and each instrument and document required hereunder or under the terms of the other Transaction Documents applicable to the Servicer shall be, executed and delivered by a duly authorized partner of the Servicer, and this Agreement constitutes, and each instrument and document required hereunder or under the terms of the other Transaction Documents applicable to the Servicer when executed and delivered by the Servicer hereunder or under the terms of the other Transaction Documents applicable to the Servicer shall constitute, the valid and legally binding obligations of the Servicer enforceable against the Servicer in accordance with their terms, subject to (a) the effect of bankruptcy, insolvency or similar laws affecting generally the enforcement of creditors' rights and (b) general equitable principles.

(iii) The execution, delivery and performance of this Agreement and the terms of the other Transaction Documents applicable to the Servicer and the documents and instruments required hereunder or under the terms of the other Transaction Documents applicable to the Servicer shall not violate or conflict with any provision of any existing law or regulation binding on or applicable to the Servicer, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on the Servicer, or the Governing Instruments of, or any securities issued by the Servicer or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which the Servicer is a party or by which the Servicer or any of its assets may be bound, the violation of which would have a material adverse effect on the business, operations, assets or financial condition of the Servicer or its ability to perform its obligations under this Agreement and the provisions of the other Transaction Documents applicable to the Servicer, and shall not result in or require the creation or imposition of any lien on any of its material property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking.

(iv) There is no charge, investigation, action, suit or proceeding before or by any court pending or, to the best knowledge of the Servicer, threatened that, if determined adversely to the Servicer, would have a material adverse effect upon the performance by the Servicer of its duties under, or on the validity or enforceability of, this Agreement and the provisions of the other Transaction Documents applicable to the Servicer.

(v) The Servicer is a registered investment adviser under the Investment Advisers Act.

(vi) The Servicer is not in violation of its Governing Instruments or in breach or violation of or in default under any contract or agreement to which it is a party or by which it or any of its property may be bound, or any applicable statute or any rule, regulation or order of any court, government agency or body having jurisdiction over the Servicer or its properties, the breach or violation of which or default under which would have a material adverse effect on the validity or enforceability of this Agreement or the provisions of the other Transaction Documents applicable to the Servicer, or the performance by the Servicer of its duties hereunder.

(vii) All Collateral Obligations and Eligible Investments purchased on behalf of the Issuer on the Closing Date satisfy paragraphs (15), (28) and (29) of the definition of "Collateral Obligation" in the case of a Collateral Obligation or, in the case

010585

of Eligible Investments, are not described in clause (5) of the exclusions to the definition of "Eligible Investment", as of the date of purchase or commitment to purchase (if earlier) thereof; provided that a Collateral Obligation will be deemed to satisfy paragraph (29) of the definition of "Collateral Obligation" and an Eligible Investment will be deemed not to be described in clause (5) of the exclusions to the definition of "Eligible Investment" if it is acquired in accordance with the requirements of Annex 1.

17.    Notices.

Unless expressly provided otherwise herein, all notices, requests, demands and other communications required or permitted under this Agreement shall be in writing (including by telecopy) and shall be deemed to have been duly given, made and received when delivered against receipt or upon actual receipt of registered or certified mail, postage prepaid, return receipt requested, or, in the case of telecopy notice, when received in legible form, addressed as set forth below:

(a) If to the Issuer:

Stratford CLO Ltd.
c/o Maples Finance Limited
P.O. Box 1093GT
Queensgate House, South Church Street
George Town, Grand Cayman, KY1-1108, Cayman Islands
Telephone: (345) 945-7099
Telecopy: (345) 945-7100
Attention: The Directors

(b) If to the Servicer:

Highland Capital Management, L.P.
Two Galleria Tower
13455 Noel Road, Suite 1300
Dallas, Texas 75240
Telephone: (972) 628-4100
Telecopy: (972) 628-4147
Attention: James Dondero

(c) If to the Trustee:

State Street Bank and Trust Company
200 Clarendon Street
Mailcode: EUC-108
Boston, Massachusetts 02116
Telecopy: (617) 351-4358
Attention: CDO Services Group

(d) If to the Noteholders:

In accordance with Section 14.3 of the Indenture, at their respective addresses set forth on the Note Register.

010586

(e) If to the Holders of the Preference Shares:

In accordance with Section 14.3 of the Indenture, to the Preference Shares Paying Agent at the address identified therein.

(f) if to the Rating Agencies:

In accordance with Section 14.3 of the Indenture, to the rating Agencies at the address identified therein.

Any party may alter the address or telecopy number to which communications or copies are to be sent by giving notice of such change of address in conformity with the provisions of this Section 17 for the giving of notice.

18.     <u>Binding Nature of Agreement; Successors and Assigns</u>.

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and permitted assigns as provided herein. The Servicer hereby consents to the collateral assignment of this Agreement as provided in the Indenture and further agrees that the Trustee may enforce the Servicer's obligations hereunder.

19.     <u>Entire Agreement</u>.

This Agreement contains the entire agreement and understanding among the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, understandings, inducements and conditions, express or implied, oral or written, of any nature whatsoever with respect to the subject matter hereof. The express terms hereof control and supersede any course of performance and/or usage of the trade inconsistent with any of the terms hereof. This Agreement may not be modified or amended other than by an agreement in writing executed by the parties hereto and in accordance with the terms of Section 15.1(h) of the Indenture.

20.     <u>Conflict with the Indenture</u>.

Subject to the last two sentences of Section 2(a)(i), in the event that this Agreement requires any action to be taken with respect to any matter and the Indenture requires that a different action be taken with respect to such matter, and such actions are mutually exclusive, the provisions of the Indenture in respect thereof shall control.

21.     <u>Priority of Payments</u>.

The Servicer agrees that the payment of all amounts to which it is entitled pursuant to this Agreement and the Indenture shall be due and payable only in accordance with the priorities set forth in the Indenture and only to the extent funds are available for such payments in accordance with such priorities.

22.     <u>Governing Law</u>.

**THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS PROVISIONS THAT WOULD RESULT IN THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.**

010587

23. <u>Indulgences Not Waivers</u>.

Neither the failure nor any delay on the part of any party hereto to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege preclude any other or further exercise of the same or of any other right, remedy, power or privilege, nor shall any waiver of any right, remedy, power or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence. No waiver shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver.

24. <u>Costs and Expenses</u>.

Except as may otherwise be agreed in writing, the costs and expenses (including the fees and disbursements of counsel and accountants) incurred by each party in connection with the negotiation and preparation of and the execution of this Agreement, and all matters incident thereto, shall be borne by such party.

25. <u>Titles Not to Affect Interpretation</u>.

The titles of paragraphs and subparagraphs contained in this Agreement are for convenience only, and they neither form a part of this Agreement nor are they to be used in the construction or interpretation hereof.

26. <u>Execution in Counterparts</u>.

This Agreement may be executed in any number of counterparts by facsimile or other written form of communication, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

27. <u>Provisions Separable</u>.

In case any provision in this Agreement shall be invalid, illegal or unenforceable as written, such provision shall be construed in the manner most closely resembling the apparent intent of the parties with respect to such provision so as to be valid, legal and enforceable; <u>provided</u>, <u>however</u>, that if there is no basis for such a construction, such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability and, unless the ineffectiveness of such provision destroys the basis of the bargain for one of the parties to this Agreement, the validity, legality and enforceability of the remaining provisions hereof or thereof shall not in any way be affected or impaired thereby.

28. <u>Number and Gender</u>.

Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context requires.

010588

29.    Written Disclosure Statement.

The Issuer and the Trustee acknowledge receipt of Part II of the Servicer's Form ADV filed with the Securities and Exchange Commission, as required by Rule 204-3 under the Investment Advisers Act, more than 48 hours prior to the date of execution of this Agreement.

30.    Miscellaneous.

(a)    In the event that any vote is solicited with respect to any Collateral Obligation, the Servicer, on behalf of the Issuer, shall vote or refrain from voting any such security in any manner permitted by the Indenture that the Servicer has determined in its reasonable judgment shall be in the best interests of the Holders of the Securities.  In addition, with respect to any Defaulted Collateral Obligation, the Servicer, on behalf of the Issuer, may instruct the trustee for such Defaulted Collateral Obligation to enforce the Issuer's rights under the Underlying Instruments governing such Defaulted Collateral Obligation and any applicable law, rule or regulation in any manner permitted under the Indenture that the Servicer has determined in its reasonable judgment shall be in the best interests of the Holders of the Securities.  In the event any Offer is made with respect to any Collateral Obligation, the Servicer, on behalf of the Issuer, may take such action as is permitted by the Indenture and that the Servicer has determined in its reasonable judgment shall be in the best interests of the Holders of the Securities.

(b)    In connection with taking or omitting any action under the Indenture or this Agreement, the Servicer may consult with counsel and may rely in good faith on the advice of such counsel or any opinion of counsel.

Any corporation, partnership or limited liability company into which the Servicer may be merged or converted or with which it may be consolidated, or any corporation, partnership or limited liability company resulting from any merger, conversion or consolidation to which the Servicer shall be a party, or any corporation, partnership or limited liability company succeeding to all or substantially all of the asset servicing and collateral management business of the Servicer, shall be the successor to the Servicer without any further action by the Servicer, the Co-Issuers, the Trustee, the Noteholders or any other person or entity.

31.    Limitation of Liabilities.

The Issuer's obligations hereunder are solely the corporate obligations of the Issuer and the Servicer shall not have any recourse to any of the directors, officers, shareholders, members or incorporators of the Issuer with respect to any claims, losses, damages, liabilities, indemnities or other obligations in connection with any transactions contemplated hereby.  Notwithstanding anything to the contrary, the obligations of the Issuer hereunder shall be limited to the net proceeds of the Collateral, if any, and following realization of the Collateral and its application in accordance with the Indenture, any outstanding obligations of the Issuer hereunder shall be extinguished and shall not thereafter revive.  The provisions of this section shall survive termination of this Agreement.

32.    Waiver of Jury Trial Right.

EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING. EACH PARTY HEREBY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE OTHER WOULD NOT, IN THE EVENT OF A PROCEEDING, SEEK TO ENFORCE

010589

THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS PARAGRAPH.

010590

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P.,
   as Servicer

BY: STRAND ADVISORS, INC.,
   as General Partner

By:_____

Name: Todd Travers, Assisant Secretar

Title: Strand Advisors, Inc., General Partner of Highland Capital Management, L.P.

STRATFORD CLO LTD.,
   as Issuer

By:_____

Name:

Title:

Servicing Agreement

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P.,
   as Servicer

BY: STRAND ADVISORS, INC.,
   as General Partner

By:_____
Name:
Title:

STRATFORD CLO LTD.,
   as Issuer

By:_____
Name: Hugh Thompson
Title: DIRECTOR

010592

**ANNEX 1**

<u>Certain Asset Acquisition Provisions</u>

Unless otherwise noted, references to the Issuer in this Annex 1 include the Servicer and any other person acting on the Issuer's behalf. Capitalized terms used but not defined herein will have the meanings ascribed to them in the Indenture.

For purposes of this Annex 1,

"Affiliate" means, with respect to a specified Person, (a) any other Person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the specified Person, (b) any Person that is a member, director, officer or employee of (i) the specified Person or (ii) a Person described in clause (a) of this definition and (c) any fund or account which is managed by (i) the specified Person or (ii) a Person described in clause (a) of this definition; and

"Person" means an individual, a corporation, a limited liability company, a partnership, an association, a trust or any other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

Section I. <u>General Investment Restrictions</u>.

Except as otherwise provided in Section VI.D. of this Annex 1, the Issuer (and the Servicer acting on the Issuer's behalf) shall purchase debt securities, interests in loans and other assets (each a "Portfolio Obligation") only in secondary-market transactions and it shall not engage in any lending or underwriting activities or otherwise participate in the structuring or origination of any Portfolio Obligation.

A. <u>Communications and Negotiations</u>.

1. The Issuer will not have any communications or negotiations with the obligor of a Portfolio Obligation or a Reference Obligation (directly or indirectly through an intermediary such as the seller of such Portfolio Obligation or the Synthetic Security) in connection with the issuance or funding of such Portfolio Obligation or Reference Obligation or commitments with respect thereto, except for communications of an immaterial nature or customary due diligence communications; <u>provided</u>, that the Servicer may provide comments as to mistakes or inconsistencies in loan documents (including with respect to any provisions that are inconsistent with the terms and conditions of purchase of the loan by the Issuer).

2. By way of example, permitted due diligence activities may include, but are not limited to, (a) attendance at an obligor's general "roadshow" or other presentations to investment professionals, (b) direct private discussions with personnel of the obligor, arranged by a sponsor, lead bank or other arranger, and (c) other due diligence activities of the kind customarily performed by offerees of the type of Portfolio Obligation being offered, but may not include any negotiations with the obligor, employees or agents of the obligor of any terms or conditions of the Portfolio Obligation being offered.

3. Negotiations between the Servicer and the underwriter, placement agent or broker of a Portfolio Obligation are permitted solely to the extent that they are limited to

Annex 1-1

responses to customary pre-offering period and offering period inquiries by the underwriter or placement agent (e.g., "If we offered you 10-year senior subordinated bonds of XYZ company, what spread would it require to interest you?"). For purposes of this Section I.A., "negotiations" shall not include (i) commenting on offering documents to an unrelated underwriter or placement agent when the ability to comment was generally available to other offerees, or (ii) communicating certain objective criteria (such as the minimum yield or maturity) the Issuer generally uses in purchasing the relevant type of Portfolio Obligation.

4. The Issuer may consent or otherwise act with respect to amendments, supplements or other modifications of the terms of any Portfolio Obligation (other than a Subsidiary Obligation (as defined in Section III)) requiring consent or action after the date on which any such Portfolio Obligation is acquired by the Issuer if (a) such amendment, supplement or modification would not constitute a Significant Modification (as defined below), (b) (i) in the reasonable judgment of the Servicer, the obligor is in financial distress and such change in terms is desirable to protect the Issuer's interest and (ii) the Portfolio Obligation is described in clause 5(b) of this Section I.A., (c) the amendment or modification would not be treated as the acquisition of a new Portfolio Obligation under paragraph 5 of this Section I.A., or (d) otherwise, if it has received written advice of counsel, which takes into account all the facts and circumstances, including the Issuer's other activities that its involvement in such amendment, supplement or modification will not cause the Issuer to be treated as engaged in a trade or business within the United States.

A "Significant Modification" means any amendment, supplement or other modification that involves (a) a change in the stated maturity or a change in the timing of any material payment of any Portfolio Obligation (including deferral of an interest payment), that would materially alter the weighted average life of the Portfolio Obligation, (b) any change (whether positive or negative) in the yield on the Portfolio Obligation (calculated taking into account any fee in consideration for such modification) immediately prior to the modification in excess of the greater of (i) 25 basis points or (ii) 5 percent of such unmodified yield, (c) any change involving a material new extension of credit, (d) a change in the obligor of any Portfolio Obligation (as determined for purposes of section 1001 of the Code), or (e) a material change in the collateral or security for any Portfolio Obligation, including the addition or deletion of a co-obligor or guarantor that results in a material change in payment expectations.

5. In the event the Issuer owns an interest in a Portfolio Obligation the terms of which are subsequently amended or modified, or in the case of a workout situation not described in Section III hereof, which Portfolio Obligation is subsequently exchanged for new obligations or other securities of the obligor of the Portfolio Obligation, such amendments or modifications or exchange will not be treated as the acquisition of an interest in a new Portfolio Obligation for purposes of this Annex 1, provided, that (a) the Issuer does not, directly or indirectly (through the Servicer or otherwise), seek the amendments or modifications or the exchange, or participate in negotiating the amendments or modifications or the exchange, and (b) at the time of original acquisition of the interest in the Portfolio Obligation, it was not reasonably anticipated that the terms of the Portfolio Obligation would, pursuant to a workout or other negotiation, subsequently be amended or modified.

B. Fees. The Issuer will not earn or receive from any Person any fee or other compensation for services, however denominated, in connection with its purchase or sale of a Portfolio Obligation or entering into a Synthetic Security; the foregoing prohibition shall not be construed to preclude the Issuer from receiving (i) commitment fees, facility maintenance fees or other similar fees that are received by the Issuer in connection with revolving or delayed drawdown Loans or synthetic or pre-funded letter of

OHS West:260268297.9

credit Loans; (ii) yield maintenance and prepayment penalty fees; (iii) fees on account of the Issuer's consenting to amendments, waivers or other modifications of the terms of any Portfolio Obligations (provided in the case of amendments, waivers and other modifications described in clause 4(b) of this Section I.A., but not in clauses 4(a), (c) or (d), such fees are generally available to all holders on the same terms); (iv) fees from permitted securities lending; or (v) upfront payments in lieu of periodic payments under a Synthetic Security. The Issuer will not provide services to any Person; the foregoing prohibition shall not be construed to preclude the Issuer from activities relating to the receipt of income described in (i) through (v) of the preceding sentence.

Section II.     Loans and Forward Purchase Commitments.

A.     Any understanding or commitment to purchase a loan, a participation or a loan subparticipation (collectively, "Loans") from a seller before completion of the closing and full funding of the Loan by such seller shall only be made pursuant to a forward sale agreement at an agreed price (stated as a dollar amount or as a percentage) (a "Forward Purchase Commitment"), unless such an understanding or commitment is not legally binding and neither the Issuer nor the Servicer is economically compelled (e.g., would otherwise be subject to a significant monetary penalty) to purchase the Loan following the completion of the closing and full funding of the Loan (i.e., the Servicer will make an independent decision whether to purchase such Loan on behalf of the Issuer after completion of the closing of the Loan) (a "Non-Binding Agreement").

B.     No Forward Purchase Commitment or Non-Binding Agreement shall be made until after the seller (or a transferor to such seller of such Loan) has made a legally binding commitment to fully fund such Loan to the obligor thereof (subject to customary conditions), which commitment cannot be conditioned on the Issuer's ultimate purchase of such Loan from such seller.

C.     In the event of any reduced or eliminated funding, the Issuer shall not receive any premium, fee, or other compensation in connection with having entered into the Forward Purchase Commitment or Non-Binding Agreement.

D.     The Issuer shall not close any purchase of a Loan subject to a Forward Purchase Commitment or a Non-Binding Agreement earlier than 48 hours after the time of the closing of the Loan (i.e., execution of definitive documentation), and, in the case of a Forward Purchase Commitment, the Issuer's obligation to purchase such Loan is subject to the condition that no material adverse change has occurred in the financial condition of the Loan's obligor or the relevant market on or before the relevant purchase date.

E.     The Issuer cannot have a contractual relationship with the obligor with respect to a Loan until the Issuer actually purchases the Loan.

F.     The Issuer cannot be a signatory on the original lending agreement, and cannot be obligated to fund an assignment of or a participation in a Loan, prior to the time specified in subsection D above.

G.     In addition to the restrictions otherwise applicable to Loans, the Issuer shall not acquire any synthetic or pre-funded letter of credit Loan unless (1) the cash collateral deposit with respect to such Loan was fully funded by a predecessor in interest with respect to such Loan; (2) the Loan is part of a credit facility that includes another Loan (other than a synthetic or pre-funded letter of credit Loan) to the same obligor, and is being acquired in connection with the acquisition of such other Loan and from the same seller as such other Loan, with the intent to hold both parts and with the amount of the other Loan held by the Issuer being at least two times as large as the amount of the synthetic or pre-funded letter of

Annex 1-3

credit Loan held by the Issuer with the Issuer holding no less than the same percentage interest in the other Loan as in the synthetic or pre-funded letter of credit Loan; (3) such synthetic or pre-funded letter of credit Loan satisfies the requirements set forth in Section VI.B., treating the synthetic of pre-funded letter of credit Loan, for this purpose, as though it were a delayed drawdown or revolving Loan; and (4) at no time may the Issuer have entered into more than ten currently outstanding synthetic or pre-funded letter of credit Loans or may more than 5% of the aggregate principal amount of Portfolio Obligations consist of synthetic or pre-funded letter of credit Loans.

Section III.     Distressed Debt.

A.     The Issuer may only purchase a Debt Instrument (as defined below) that is a Potential Workout Obligation to the extent permitted by this Section III.

B.     Neither the Issuer nor the Servicer on behalf of the Issuer shall purchase a Subsidiary Obligation from any Issuer Subsidiary.

C.     Special Procedures for Subsidiary Obligations.

1.     Potential Workout Obligations.  On or prior to the date of acquisition, the Servicer on behalf of the Issuer shall identify each Portfolio Obligation that is a Potential Workout Obligation.

2.     Transfer of Subsidiary Obligations.  From and after the occurrence of a Workout Determination Date with respect to a Subsidiary Obligation, neither the Issuer nor the Servicer on behalf of the Issuer shall knowingly take any action in respect of such Subsidiary Obligation that may result in the Issuer being engaged, or deemed to be engaged, in a trade or business within the United States for United States federal income tax purposes.  As soon as practicable, but in any event within 30 calendar days following a Workout Determination Date, the Servicer shall cause the Issuer either (i) to sell or dispose of any Subsidiary Obligation identified on such Workout Determination Date to a Person that is not an Affiliate of the Issuer or Servicer or (ii) to assign any Subsidiary Obligation identified on such Workout Determination Date to an Issuer Subsidiary.

For purposes of this Annex 1, an "Issuer Subsidiary" means any wholly-owned corporate subsidiary of the Issuer to which a Special Workout Obligation may be transferred in accordance with this Annex 1.

3.     Consideration for Assignment of Subsidiary Obligations.  Consideration given by an Issuer Subsidiary for the assignment to it of Subsidiary Obligations may be in the form of cash or in the form of indebtedness of, or equity interests in, such Issuer Subsidiary.

4.     Classification of  Issuer Subsidiaries.  Each Issuer Subsidiary shall be an entity treated as a corporation for United States federal income tax purposes.

As used herein:

"Potential Workout Obligation" means any debt instrument (any such instrument, including an interest in a Loan, a "Debt Instrument") which, as of the date of acquisition by the Issuer or an Issuer Subsidiary, based on information specific to such Debt Instrument or the circumstances of the obligor thereof, is a Workout Obligation or, in the reasonable determination of the Servicer, has a materially higher likelihood of becoming a Workout Obligation as

OHS West:260268297.9

compared to debt obligations that par or other non-distressed debt purchasers or funds relating to that asset type customarily purchase and expect to hold to maturity.

"Subsidiary Obligation" means any Potential Workout Obligation (a) as to which the Issuer on any Workout Determination Date either (i) owns more than 40% of the aggregate principal amount of such class of Potential Workout Obligation outstanding or (ii) is one of the two largest holders of any class of debt of the obligor of such Potential Workout Obligation (based on the outstanding principal amount of such class of debt owned by the Issuer as a percentage of the aggregate outstanding principal amount of such class of debt) unless not fewer than three other holders and the Issuer collectively own at least 65% of such class of debt and, if the Issuer is the largest holder of such class, the Issuer's percentage of such class does not exceed the percentage held by the next largest holder of the debt by more than 5% of such class or (b) that would, upon foreclosure or exercise of similar legal remedies, result in the Issuer directly owning assets (other than securities treated as debt, equity in a partnership not engaged in a trade or business within the United States, or corporate equity for United States federal income tax purposes, <u>provided</u> in the case of corporate equity that the corporation is not a "United States real property holding corporation" within the meaning of section 897 of the Code) which are "United States real property interests" within the meaning of section 897 of the Code or which the Servicer reasonably expects it would, on behalf of the Issuer, be required to actively manage to preserve the value of the Issuer's interest therein; <u>provided</u> that a Potential Workout Obligation shall not be treated as a Subsidiary Obligation if the Issuer obtains a Tax Opinion that, based on all the surrounding circumstances, the activities in which the Issuer intends to engage with respect to such Potential Workout Obligation will not cause the Issuer to be treated as engaged in a trade or business for United States federal income tax purposes.

"<u>Workout Determination Date</u>" means any date on which, in connection with the occurrence of any event described in clauses (a) through (c), inclusive, of the definition of Workout Obligation, either (a) any material action by the Issuer is required to be taken, (b) the Servicer receives written notice that such material action shall be required or (c) the Servicer reasonably determines that the taking of such material action is likely to be required.

"<u>Workout Obligation</u>" means any Debt Instrument as to which the Servicer on behalf of the Issuer (a) consents to a Significant Modification in connection with the workout of a defaulted Portfolio Obligation, (b) participates in an official or unofficial committee or similar official or unofficial body in connection with a bankruptcy, reorganization, restructuring or similar proceeding, or (c) exercises, or has exercised on its behalf, rights of foreclosure or similar judicial remedies.

Section IV.    <u>Purchases from the Servicer or its Affiliates</u>.

A.    If the Servicer or an Affiliate of the Servicer acted as an underwriter, placement or other agent, arranger, negotiator or structuror, or received any fee for services (it being understood that receipts described in clauses (i) through (v) of Section I.B. are not construed as so treated), in connection with the issuance or origination of a Portfolio Obligation or was a member of the original lending syndicate with respect to the Portfolio Obligation or the Portfolio Obligation could not have been purchased by the Issuer under Sections II and IV of these guidelines in the same circumstances as it was purchased by the Servicer or such Affiliates (any such Portfolio Obligation, a "<u>Special Procedures Obligation</u>"), the Issuer will not acquire any interest in such Special Procedures Obligation (including entering into a commitment or agreement, whether or not legally binding or enforceable, to acquire such obligation directly or synthetically), from the Servicer, an Affiliate of the Servicer, or a fund managed by the Servicer, <u>unless</u> (i) the Special Procedures Obligation has been outstanding for at least 90 days, (ii) the holder of the

Special Procedures Obligation did not identify the obligation or security as intended for sale to the Issuer within 90 days of its issuance, (iii) the price paid for such Special Procedures Obligation by the Issuer is its fair market value at the time of acquisition by the Issuer and (iv) the transaction is proposed to, and the ultimate purchase is approved on behalf of the Issuer by, one or more Independent Advisors to the Issuer in accordance with the provisions of Section IV.B. below. The Issuer will not acquire any Special Procedures Obligation if, immediately following such acquisition, the fair market value of all Special Procedures Obligations owned by the Issuer would constitute more than 49% of the fair market value of all of the Issuer's assets at such time.

B.    An "Independent Advisor" is a Person who is not an Affiliate of the Issuer, the Servicer or any fund managed by the Servicer.

1.    The Issuer may not purchase or commit to enter into any such Special Procedures Obligation without prior approval by an Independent Advisor. If the Independent Advisor declines to approve a proposed Special Procedures Obligation, at least three months must elapse before any proposal with respect to the acquisition of debt or other obligations of the same obligor are proposed or considered.

2.    The Issuer shall engage the Independent Advisor in an agreement the terms of which shall in substantial form set forth:

(a)    the representation of the Independent Advisor, which the Servicer shall not know to be incorrect, that it has significant financial and commercial expertise, including substantial expertise and knowledge in and of the loan market and related investment arenas;

(b)    the agreement between the Independent Advisor, the Issuer and the Servicer generally to the effect that (i) the Independent Advisor will operate pursuant to procedures consistent with maintaining his or her independence from the Servicer and its Affiliates, (ii) the Independent Advisor will have the sole authority and discretion to approve or reject purchase proposals made by the Servicer with respect to any Special Procedures Obligation, (iii) all proposals for the Issuer to acquire any Special Procedures Obligation will be first submitted to the Independent Advisor, (iii) the Servicer will prepare the materials it deems necessary to describe the Special Procedures Obligation to the Independent Advisor, (iv) the Investment Advisor will not be required to make any decision to accept or decline a Special Procedures Obligation at the price offered prior to its review of the materials prepared, plus any additional information requested by the Independent Advisor, and (v) no Independent Advisor may be proposed to be replaced by the Servicer, unless for cause or in the event of a resignation of such Independent Advisor; and

(c)    such other commercially reasonable terms and conditions, including terms and conditions to the effect that (i) the Independent Advisor will be paid a reasonable fee for its services plus reimbursement of any reasonable expenses incurred in performance of his or her responsibilities, (ii) the Independent Advisor may be removed or replaced only by a majority (whether by positive act or failure to object) of the probable equity owners (as determined for United States federal income tax purposes) of the Issuer, (iii) if at any time there is more than one Independent Advisor to the Issuer, a majority of such Independent Advisors must approve any Special Procedures Obligation subject to Independent Advisor approval, (iv) an Independent Advisor may not engage, directly or indirectly, in the negotiation of the terms of any Special Procedures Obligation to be

OHS West:260268297.9

010598

acquired by the Issuer (provided however, that an Independent Advisor may negotiate with the Servicer or the seller with respect to the price and terms of the Issuer's purchase of the Special Procedures Obligation, provided further that the Independent Advisor will not make suggestions to the Servicer or any other person about alternative or modified terms of the underlying Special Procedures Obligation on which they might be willing to approve such a Special Procedures Obligation).

3.      Any servicing agreement or other document under which the Servicer is granted signatory powers or other authority on behalf of the Issuer will provide that such powers or authority with respect to Special Procedures Obligations are conditioned upon the prior written approval of the Independent Advisor.

4.      No Special Procedures Obligation will be presented to an Independent Advisor until at least 90 days have elapsed since the later of (a) the execution of final documentation and (b) the funding in whole or part of the Special Procedures Obligation and there will have been no commitment or arrangement prior to that time that the Issuer will acquire any such Special Procedures Obligation; provided, further, that the Special Procedures Obligation will not be treated as outstanding for any day on which the Issuer enjoys the benefits and burdens of ownership (for example, because any Person has hedged its credit exposure to the Special Procedures Obligation with the Issuer).

5.      The Issuer will have no obligation to, or understanding that it will refund, reimburse or indemnify any person (including an Affiliate of the Servicer), directly or indirectly, for "breakage" costs or other costs or expenses incurred by such person if the Independent Advisor determines that the Issuer should decline to purchase any Special Procedures Obligation.

6.      Neither the Servicer nor any Affiliate of the Servicer will have any authority to enter into agreements, or take any action, on behalf of the Issuer with respect to Special Procedures Obligations without the prior written approval of an Independent Advisor.   Except as may be conditioned upon such prior written approval, neither the Servicer nor any Affiliate of the Servicer may hold itself out as having signatory powers on behalf of the Issuer or authority to enter into agreements with respect to Special Procedures Obligations on behalf of the Issuer.

Section V.      Synthetic Securities.

A.      The Issuer shall not (i) acquire or enter into any Synthetic Security with respect to any Reference Obligation the direct acquisition of which would violate any provision of this Annex 1 or (ii) use Synthetic Securities as a means of making advances to the Synthetic Security Counterparty following the date on which the Synthetic Security is acquired or entered into (for the avoidance of doubt, the establishment of Synthetic Security collateral accounts and the payment of Synthetic Security Counterparties from the amounts on deposit therein, shall not constitute the making of advances).

B.      With respect to each Synthetic Security, the Issuer will not acquire or enter into any Synthetic Security that does not satisfy all of the following additional criteria unless the Servicer has first received written advice of counsel that, taking into account all facts and circumstances, including the Issuer's other activities, the ownership and disposition of such Synthetic Security would not cause the Issuer to be engaged in a trade or business within the United States for United States federal income tax purposes:

OHS West:260268297.9

010599

1.      the criteria used to determine whether to enter into any particular Synthetic Security was similar to the criteria used by the Servicer in making purchase decisions with respect to debt securities;

2.      the Synthetic Security is acquired by or entered into by the Issuer for its own account and for investment purposes with the expectation of realizing a profit from income earned on the securities (and any potential rise in their value) during the interval of time between their purchase and sale or hedging purposes and not with an intention to trade or to sell for a short-term profit;

3.      the Issuer enters into the Synthetic Security with a counterparty that (x) is neither a special purpose vehicle nor an insurance company and (y) is a broker-dealer or that holds itself out as in the business of entering into such contracts;

4.      neither the Issuer nor any Person acting on behalf of the Issuer advertises or publishes the Issuer's ability to enter into Synthetic Securities;

5.      except with respect to (x) credit-linked notes or similar Synthetic Securities and (y) any other Synthetic Securities where standard form ISDA documentation is not applicable, the Synthetic Security is written on standard form ISDA documentation;

6.      the net payment from the Issuer to the Synthetic Security Counterparty is not determined based on an actual loss incurred by the Synthetic Security Counterparty or any other designated person;

7.      there exists no agreement, arrangement or understanding that (i) the Synthetic Security Counterparty is required to own or hold the related Reference Obligation while the Synthetic Security remains in effect or (ii) the Synthetic Security Counterparty is economically or practically compelled to own or hold the related physical Reference Obligation while the Synthetic Security remains in effect;

8.      the Synthetic Security provides for (i) all cash settlement, (ii) all physical settlement or (iii) the option to either cash settle or physically settle; provided that, in the latter two cases, physical settlement provides the settling party the right to settle the Synthetic Security by delivering deliverable obligations which *may* include the Reference Obligation and the settling party must not be required to deliver the related Reference Obligation upon the settlement of such Synthetic Security.

Notwithstanding the preceding paragraph, a Synthetic Security providing for physical settlement may require a party to deliver the related Reference Obligation if either:

(i)      at the time the Issuer enters into such Synthetic Security, such Reference Obligation is readily available to purchasers generally in a liquid market; or

(ii)      the written advice of both United States federal income tax and insurance counsel of nationally recognized standing in the United States experienced in such matters is that, taking into account all the relevant facts and circumstances with respect to such Synthetic Security and the Issuer's other activities, the acquisition of such Synthetic Security will not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for United States federal income tax purposes or otherwise to be subject to United States federal income tax on a net basis and should

OHS West:260268297.9

010600

not cause the Issuer to be treated as writing insurance in the United States under the law of the state in which the Synthetic Security Counterparty is organized.

9.       the Synthetic Security is not treated as insurance or a financial guarantee for regulatory purposes in the United States or Cayman Islands or any other jurisdiction where the Issuer could be subject to insurance regulation.

As used herein:

"<u>Reference Obligation</u>" means a debt security or other obligation upon which a Synthetic Security is based.

"<u>Synthetic Security</u>" means any swap transaction or security, other than a participation interest in a Loan, that has payments associated with either payments of interest and/or principal on a Reference Obligation or the credit performance of a Reference Obligation.

"<u>Synthetic Security Counterparty</u>" means an entity (other than the Issuer) required to make payments on a Synthetic Security (including any guarantor).

Section VI.    <u>Other Types of Assets</u>.

A.    <u>Equity Restrictions</u>.  The Issuer will not purchase any asset (directly or synthetically) that is:

1.       not treated for U.S. federal income tax purposes either as debt or as issued by an entity that is a corporation (within the meaning of Section 7701 of the Code), or

2.       a "United States real property interest" as defined in section 897 of the Code and the Treasury Regulations promulgated thereunder.

The Issuer may cause an Issuer Subsidiary to acquire assets set forth in clause (i) or (ii) above (each, an "<u>ETB/897 Asset</u>") in connection with the workout of defaulted Portfolio Obligations, so long as the acquisition of ETB/897 Assets by such Issuer Subsidiary will not cause the stock of such Issuer Subsidiary to be deemed to be an ETB/897 Asset.

B.    <u>Revolving Loans and Delayed Drawdown Loans</u>.  All of the terms of any advance required to be made by the Issuer under any revolving or delayed drawdown Loan will be fixed as of the date of the Issuer's purchase thereof (or will be determinable under a formula that is fixed as of such date), and the Issuer and the Servicer will not have any discretion (except for consenting or withholding consent to amendments, waivers or other modifications or granting customary waivers upon default) as to whether to make advances under such revolving or delayed drawdown Loan.

C.    <u>Securities Lending Agreements</u>.  The Issuer will not purchase any Portfolio Obligation primarily for the purpose of entering into a securities lending agreement with respect thereto.

D.    <u>Exception From Secondary Market Rule for Debt Securities</u>.  Any purchase of a Portfolio Obligation other than a Loan (a "<u>Debt Security</u>") pursuant to a commitment, arrangement or other understanding made before or contemporaneously with completion of the closing and funding of such Debt Security issuance shall be made only in connection with one of the following:

Annex 1-9

(i)      an underwriting of a registered public offering in which the seller has made a firm underwriting commitment to the issuer of such Debt Security where none of the Servicer or any Affiliate thereof acted as an underwriter or placement agent or participated in negotiating or structuring the terms of the Debt Security (other than to comment on offering documents to an unrelated underwriter or placement agent where the ability to comment was generally available to investors and to undertake due diligence of the kind customarily performed by investors in securities),

(ii)      a private placement to qualified investors (pursuant to Rule 144A or Section 4(2) under the Securities Act or other similar arrangement) in which such Debt Security was originally issued pursuant to an offering circular, private placement memorandum, or similar offering document and none of the Servicer or any Affiliate thereof acted as a placement agent or underwriter or participated in negotiating or structuring the terms of the Debt Security (other than to comment on offering documents to an unrelated underwriter or placement agent where the ability to comment was generally available to investors and to undertake due diligence of the kind customarily performed by investors in securities), or

(iii)      an acquisition of or entry into a Synthetic Obligation in accordance with Section V. above;

If an Affiliate of the Servicer is acting as an underwriter or placement agent or an Affiliate of the Servicer or an employee of an Affiliate of the Servicer participated in the structuring of an issuance otherwise described in clause (i) or clause (ii) of this paragraph D, one of the following additional conditions must be met:

(x)      the Servicer did not participate in negotiating or structuring the terms of the obligation or security (other than to comment on offering documents to an unrelated underwriter or placement agent where the ability to comment was generally available to investors and to undertake due diligence of the kind customarily performed by investors in securities) and the Issuer purchases no more than 33% of the aggregate principal amount of the tranche of securities (or other instruments) of which such Debt Security is a part and more than 50% of the aggregate principal amount of such tranche is substantially contemporaneously sold to one or more Persons unrelated to the Servicer (and who have not given the Servicer discretionary trading authority) on terms and conditions substantially the same as those on which the Issuer is to purchase,

(y)      the Servicer did not participate in negotiating or structuring the terms of the obligation or security (other than to comment on offering documents to an unrelated underwriter or placement agent where the ability to comment was generally available to investors and to undertake due diligence of the kind customarily performed by investors in securities) and the Issuer purchases less than 50% of the aggregate principal amount of all tranches issued as part of the transaction in which the Debt Security was issued and more than 50% of the aggregate principal amount of such tranches are substantially contemporaneously sold to one or more Persons unrelated to the Servicer (and who have not given the Servicer discretionary trading authority) on terms and conditions substantially the same as those on which the Issuer is to purchase, or

(z)      such security or obligation satisfies the requirements and procedures applicable to Special Procedures Obligations in Section IV as though it were a Loan;

provided, however, in either of (x) or (y), the Affiliate of the Servicer was (or the employees of the Affiliate of the Servicer were)  acting as an underwriter or placement agent (or otherwise participated in

OHS West:260268297.9

the structuring of such issuance) solely as, or solely as an employee of, a Permitted Affiliate (as defined below); and provided further, that for purposes of calculating the total principal amount sold to related parties under this paragraph D, purchases by Affiliates will be considered purchases by persons unrelated to the Servicer so long as the Servicer has no knowledge of such purchases and has no reason to know of such purchases.

"Permitted Affiliate" means any Affiliate (i) that is a separate legal entity that is operated independently of the Servicer, (ii) whose personnel are not managed by and who do not report to the personnel of the Servicer, and (iii) whose personnel are not compensated based upon the performance of the Servicer.

Section VII.    General Restrictions on the Issuer.  The Issuer itself shall not:

A.    hold itself out, through advertising or otherwise, as originating Loans, lending funds, or making a market in or dealing in Loans or other assets;

B.    register as, hold itself out as, or become subject to regulatory supervision or other legal requirements under the laws of any country or political subdivision thereof as, a broker-dealer, a bank, an insurance company, financial guarantor, a surety bond issuer, or a company engaged in Loan origination;

C.    take any action causing it to be treated as a bank, insurance company, or company engaged in Loan origination for purposes of any tax, securities law or other filing or submission made to any governmental authority;

D.    hold itself out, through advertising or otherwise, as originating, funding, guaranteeing or insuring debt obligations or as being willing and able to enter into transactions (either purchases or sales of debt obligations or entries into, assignments or terminations of hedging or derivative instruments, including Synthetic Securities) at the request of others;

E.    treat Synthetic Securities as insurance, reinsurance, indemnity bonds, guaranties, guaranty bonds or suretyship contracts for any purpose;

F.    allow any non-U.S. bank or lending institution who is a holder of a Security to control or direct the Servicer's or Issuer's decision to acquire a particular asset except as otherwise allowed to such a holder, acting in that capacity, under the related indenture or acquire a Portfolio Obligation conditioned upon a particular person or entity holding Securities;

G.    acquire any asset the holding or acquisition of which would cause the Issuer to be subject to income tax on a net income basis;

H.    hold any security as nominee for another person;

I.    buy securities with the intent to subdivide them and sell the components or to buy securities and sell them with different securities as a package or unit; or

J.    buy any Portfolio Obligation that the Servicer expects to default or for the purposes of restructuring the Portfolio Obligation or any obligation thereunder.

OHS West:260268297.9

Section VIII.     <u>Tax Opinion; Amendments</u>.

      A.      In furtherance and not in limitation of this Annex 1, the Servicer shall comply with all of the provisions set forth in this Annex 1, unless, with respect to a particular transaction or specific provision, the Servicer acting on behalf of the Issuer and the Trustee shall have received written advice of Skadden, Arps, Slate, Meagher & Flom LLP or Orrick, Herrington & Sutcliffe LLP or an opinion of other counsel of nationally recognized standing in the United States experienced in such matters (a "<u>Tax Opinion</u>"), that, taking into account all the relevant facts and circumstances with respect to such transaction or such specific provision and the Issuer's other activities, the Servicer's failure to comply with one or more of such provisions will not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for United States federal income tax purposes or otherwise to be subject to United States federal income tax on a net basis.

      B.      The provisions set forth in the Annex 1 may be amended, eliminated or supplemented by the Servicer if the Issuer, the Servicer and the Trustee shall have received a Tax Opinion that the Servicer's compliance with such amended provisions or supplemental provisions or the failure to comply with such provisions proposed to be eliminated, as the case may be, will not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for United States federal income tax purposes or otherwise to be subject to United States federal income tax on a net basis.

OHS West:260268297.9

010604

# EXHIBIT NNN

**IMPORTANT NOTICE**

Attached is an electronic copy of the Offering Circular (the "Offering Circular"), dated August 17, 2004, relating to the contemplated offering by (i) Valhalla CLO, Ltd. (the "Issuer") and Valhalla CLO, Inc. (the "Co-Issuer" and, together with the Issuer, the "Issuers") of Class A-1 Floating Rate Senior Extendable Notes, Class A-2 Floating Rate Senior Extendable Notes, Class B Floating Rate Deferrable Senior Subordinate Extendable Notes, Class C-1 Floating Rate Deferrable Senior Subordinate Extendable Notes and Class C-2 Fixed Rate Deferrable Senior Subordinate Extendable Notes and (ii) the Issuer, of Extendable Income Notes, Class Q-1 Extendable Securities, Class Q-2A Securities and Class Q-2B Securities.

No registration statement relating to these securities has been or will be filed with the U.S. Securities and Exchange Commission.  These securities will be offered pursuant to an exemption from the registration requirements of the U.S. Securities Act of 1933, as amended.  This Offering Circular does not constitute an offer to sell these securities or a solicitation of an offer to buy these securities, nor will there be any sale of these securities in any jurisdiction where such offer, solicitation or sale is not permitted.

Distribution of this electronic transmission of the Offering Circular to any person other than (a) the person receiving this electronic transmission from the initial purchaser and/or placement agent on behalf of the Issuer or the Issuers and (b) any person retained to advise the person receiving this electronic transmission with respect to the offering contemplated by this Offering Circular (each, an "Authorized Recipient") is unauthorized, provided that each recipient of this electronic transmission from the initial purchaser and/or placement agent (and each employee, representative, or other agent of the recipient) may disclose to any and all persons, without limitation of any kind, the U.S. federal income tax treatment and tax structure of the transaction and all materials of any kind (including opinions or other tax analyses) that are provided to the recipient relating to such tax treatment and tax structure.  Except as provided in the preceding sentence, any photocopying, disclosure or alteration of the contents of this Offering Circular, and any forwarding of a copy of this Offering Circular or any portion thereof by electronic mail or any other means to any person other than an Authorized Recipient, is prohibited.

By accepting delivery of this Offering Circular, each recipient hereof agrees to the foregoing.

010606

OFFERING CIRCULAR
Case 19-34054-sgj11 Doc 1822-66 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 3 of 194
Case 3:21-cv-00538-N Document 26-39 Filed 06/09/21 Page 112 of 303 PageID 13494

# Valhalla CLO, Ltd.
# Valhalla CLO, Inc.

U.S. $62,000,000 Class A-1 Floating Rate Senior Extendable Notes
U.S. $56,000,000 Class A-2 Floating Rate Senior Extendable Notes
U.S. $39,500,000 Class B Floating Rate Deferrable Senior Subordinate Extendable Notes
U.S. $21,000,000 Class C-1 Floating Rate Deferrable Senior Subordinate Extendable Notes
U.S. $5,000,000 Class C-2 Fixed Rate Deferrable Senior Subordinate Extendable Notes
U.S. $82,000,000 Extendable Income Notes

U.S. $10,000,000 Class Q-1 Extendable Securities*
U.S. $7,200,000 Class Q-2A Securities*
U.S. $40,000,000 Class Q-2B Securities*

*The Class Q-1 Securities consist of the Class Q-1 Senior Note Component representing U.S. $5,000,000 aggregate principal amount of Class C-2 Notes and the Class Q-1 Income Note Component representing U.S. $5,000,000 aggregate principal amount of Income Notes. The Class Q-2 Securities are secured by the Class Q-2 Collateral Assets as described herein, including U.S. $25,000,000 aggregate principal amount of Income Notes. The aggregate principal amount of the Income Notes represented by the Class Q-2 Collateral Assets and the aggregate principal amount of the Class Q-1 Income Notes and Class C-2 Notes to which the Class Q-1 Income Note Component and the Class Q-1 Senior Note Component relate are included in (and are not in addition to) the aggregate principal amount of the relevant Class of Senior Notes or Income Notes.

The Senior Notes, the Income Notes and the Class Q Securities (together, the "Securities") are being issued by Valhalla CLO, Ltd., a newly formed exempted company incorporated with limited liability under the laws of the Cayman Islands (the "Issuer"). The Senior Notes, Income Notes and Class Q Securities will constitute limited recourse debt obligations of the Issuer. The Senior Notes will be co-issued on a non-recourse basis by Valhalla CLO, Inc., a newly formed Delaware corporation (the "Co-Issuer," and together with the Issuer, the "Issuers"). The Class Q-1 Securities represent Class C-2 Notes and Income Notes as described herein. Payments on the Securities will be made in accordance with the Indenture quarterly on the first day of each February, May, August and November beginning on and including February 1, 2005 (or if any such day is not a Business Day, the first Business Day thereafter). The Notes and the Class Q-1 Securities are scheduled to mature on August 1, 2016, unless the maturity is extended. The maturity of the Notes and the Class Q-1 Securities is subject to an extension of four years to August 1, 2020 if the Swap Agreement is extended at the option of the Swap Counterparty and certain conditions are satisfied. As a condition to the extension, holders of Notes and Class Q-1 Securities will be able to sell their Securities to a designated purchaser as described herein. The Class Q-2 Securities are scheduled to mature on April 28, 2034. See "Description of the Securities—Maturity of the Notes and Class Q-1 Securities and Extension of Maturity of the Notes and Class Q-1 Securities." Notes and Class Q-1 Securities may be subject to purchase by an affiliate of the Swap Counterparty or a designee thereof in certain circumstances in the case of an amendment to the Indenture or the Swap Agreement. See "Description of the Securities—Amendment Buy-Out." The assets of the Issuer that will be pledged to secure the Notes will comprise solely (i) Eligible Investments acquired with the net proceeds from the issuance of the Notes and the Class Q-1 Securities and from time to time thereafter with other amounts received by the Issuer, (ii) the rights of the Issuer under a portfolio swap agreement (the "Swap Agreement") between the Issuer and Citigroup Financial Products Inc. (the "Swap Counterparty") with respect to a portfolio of reference obligations and a guarantee (the "Swap Guarantee") of the Swap Counterparty's obligations thereunder by Citigroup Global Markets Holdings Inc. (the "Swap Guarantor"), (iii) funds on deposit in certain accounts, (iv) the rights of the Issuer under the Collateral Administration Agreement and (v) certain payments or distributions received in respect of the Eligible Investments and the Swap Agreement (collectively, the "Trust Estate"). The Trust Estate will also secure the obligations of the Issuer to the Swap Counterparty, the Trustee and the Collateral Administrator. The Issuer will also own the Class Q-2 Securities Collateral, which will be pledged to secure the Class Q-2 Securities.

The Swap Agreement will relate to the performance of a portfolio of up to U.S. $895,500,000 in Aggregate Reference Value comprised of Reference Obligations (including term loans, revolving loans, credit linked notes, credit swaps and bonds) satisfying certain criteria. By reason of their investment in the Notes, the Holders of the Notes will bear the risk of first loss on the portfolio of Reference Obligations, in accordance with the subordination provisions relating to each Class of Notes as described herein. Highland Capital Management, L.P. will act on behalf of the Swap Counterparty as reference portfolio manager (the "Reference Portfolio Manager") in selecting and managing the portfolio of Reference Obligations under the Swap Agreement.

The Senior Notes will be initially offered at the prices specified in the "Summary."

It is a condition to the issuance of the Securities that the Class A-1 Notes be rated "Aaa" by Moody's Investors Service, Inc. ("Moody's") and "AAA" by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("Standard & Poor's"), the Class A-2 Notes be rated at least "Aa2" by Moody's and at least "AA" by Standard & Poor's, the Class B Notes be rated at least "A2" by Moody's and at least "A" by Standard & Poor's and the Class C-1 Notes and the Class C-2 Notes be rated at least "Baa2" by Moody's and at least "BBB" by Standard & Poor's. In addition, it is a condition to the issuance of the Securities that the Class Q-1 Securities be rated at least "Baa2" by Moody's, subject to the limitations on such rating described herein. The Income Notes will not be rated by Moody's, Standard & Poor's or any other rating agency.

Application will be made to list the Securities on the Irish Stock Exchange. There can be no assurance that any such listing will be obtained. The issuance and settlement of the Securities on the Closing Date will not be conditioned on the listing of the Securities on the Irish Stock Exchange.

---

## Investing in the Securities involves risks. See "Risk Factors" beginning on page 14.

---

The Securities do not represent an interest in or obligations of, and are not insured or guaranteed by, the Swap Counterparty, the Swap Guarantor, the Reference Portfolio Manager, the Initial Purchaser, the Placement Agent, the Trustee, the Collateral Administrator, the Share Trustee, the Amendment Buy-Out Purchaser, the Administrator or any of their respective Affiliates or any Affiliates of the Issuers.

The Securities have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), or any state securities laws and the Issuers have not registered under the Investment Company Act of 1940, as amended (the "Investment Company Act"). In the United States, the Senior Notes, the Class Q-1 Securities and the Class Q-2A Securities are being offered only to "Qualified Institutional Buyers" (as defined in Rule 144A under the Securities Act ("Rule 144A")) and the Income Notes are being offered only to "Qualified Institutional Buyers" or "Accredited Investors" (as defined in Rule 501(a) under the Securities Act), in each case which are also "Qualified Purchasers" for purposes of Section 3(c)(7) of the Investment Company Act. The Class Q-2B Securities are not being offered in the United States. The Securities are being offered outside the United States to non-U.S. persons in accordance with Regulation S under the Securities Act. For a description of certain restrictions on transfers of the Securities, see "Purchase and Transfer Restrictions."

Citigroup Global Markets Inc., as Initial Purchaser of the Senior Notes, the Class Q-1 Securities and the Class Q-2A Securities and as Placement Agent for the Income Notes and Class Q-2B Securities, expects to deliver the Securities to purchasers on or about August 18, 2004.

---

## Citigroup

010608

You should rely only on the information contained in this Offering Circular. We have not authorized anyone to provide you with different information. We are not, and the Initial Purchaser and Placement Agent are not, making an offer of these Securities in any jurisdiction where the offer is not permitted. You should not assume that the information contained in this Offering Circular is accurate as of any date other than the date on the front of this Offering Circular.

## TABLE OF CONTENTS

SUMMARY .......................................................................................................................... 2

RISK FACTORS .................................................................................................................. 14

THE ISSUER AND THE CO-ISSUER ............................................................................... 31
    The Issuer ..................................................................................................................... 31
    The Co-Issuer ............................................................................................................... 32
    Capitalization of the Issuer .......................................................................................... 32
    Capitalization of the Co-Issuer .................................................................................... 33
    The Administrator ........................................................................................................ 33

DESCRIPTION OF THE SECURITIES .............................................................................. 34
    General ......................................................................................................................... 34
    Payments ...................................................................................................................... 34
    Priority of Payments .................................................................................................... 38
    Maturity of the Notes and Class Q-1 Securities and Extension of Maturity of the Notes and Class Q-1
        Securities ................................................................................................................. 42
    The Coverage Tests ..................................................................................................... 45
    The Diversion Test ....................................................................................................... 46
    The Class Q-1 Securities ............................................................................................. 46
    The Class Q-2 Securities ............................................................................................. 48
    Form, Denomination and Registration ......................................................................... 52
    The Indenture and the Collateral Administration Agreement ....................................... 57
    The Investment Agreement ........................................................................................... 65

DESCRIPTION OF THE SWAP AGREEMENT ................................................................. 68
    General ......................................................................................................................... 68
    Selection and Modification of the Reference Portfolio .................................................. 68
    Additions ...................................................................................................................... 68
    Removals ...................................................................................................................... 69
    Amortization of Reference Obligations ........................................................................ 70
    Restructuring, Conversion or Exchange of Reference Obligations ................................ 70
    Valuation of Reference Obligations ............................................................................. 71
    Payments Under the Swap Agreement .......................................................................... 73
    Swap Notional Amount ................................................................................................ 73
    Defaulted Reference Obligations .................................................................................. 74
    Termination of the Swap Agreement ............................................................................ 74
    Early Termination of the Swap Agreement ................................................................... 74
    Extension of the Swap Agreement ................................................................................ 76
    Modification of Swap Agreement ................................................................................. 76
    Documentation ............................................................................................................. 76
    Governing Law ............................................................................................................ 76

THE REFERENCE PORTFOLIO ....................................................................................... 77
    Eligible Reference Obligations .................................................................................... 77

**TABLE OF CONTENTS**
(continued)

                                                                                    **Page**

Reference Portfolio Criteria.................................................................................82

THE SWAP COUNTERPARTY AND SWAP GUARANTOR ...............................................85
   The Swap Counterparty........................................................................................85
   The Swap Guarantor.............................................................................................85

THE REFERENCE PORTFOLIO MANAGER AND THE REFERENCE PORTFOLIO MANAGEMENT
   AGREEMENT ...................................................................................................87
   The Reference Portfolio Manager .........................................................................87
   The Reference Portfolio Management Agreement ...................................................90

PURCHASE AND TRANSFER RESTRICTIONS ......................................................93
   Senior Notes.......................................................................................................93
   Transferees of Interests in Rule 144A Global Notes .............................................94
   Transferees of Interests in Temporary Regulation S Global Notes and Regulation S Global Notes.................97
   Income Notes......................................................................................................98
   Transferees of Certificated Income Notes .............................................................99
   Class Q-1 Securities ...........................................................................................103
   Transferees of Certificated Class Q-1 Securities....................................................104
   Initial Purchasers of Interests in Class Q-1 Temp Reg S Global Securities ..............108
   Class Q-2 Securities ...........................................................................................109
   Transferees of Certificated Class Q-2 Securities....................................................110
   Reliance on Section 3(c)(7) of the Investment Company Act ..................................114
   Additional Income Note Restrictions ...................................................................114

RATINGS...................................................................................................................115

PLAN OF DISTRIBUTION..........................................................................................115

CERTAIN ERISA CONSIDERATIONS.........................................................................117

CERTAIN INCOME TAX CONSIDERATIONS...............................................................119
   General ..............................................................................................................119
   Certain United States Tax Considerations..............................................................119
   Tax Treatment of the Issuer.................................................................................120
   Tax Treatment of U.S. Holders of Senior Notes....................................................121
   Tax Treatment of Income Notes ...........................................................................122
   Tax Treatment of Tax-Exempt U.S. Holders..........................................................125
   Information Reporting and Backup Withholding .....................................................125
   Reporting Requirements ......................................................................................126
   Tax Treatment of Non-U.S. Holders .....................................................................126
   Class Q Securities...............................................................................................127
   Cayman Islands Tax Considerations .....................................................................127

LISTING AND GENERAL INFORMATION...................................................................129

CERTAIN LEGAL MATTERS......................................................................................130

GLOSSARY OF CERTAIN DEFINED TERMS...............................................................131

# NOTICES TO PURCHASERS

### NOTICE TO RESIDENTS OF THE UNITED KINGDOM

EACH OF THE INITIAL PURCHASER AND THE PLACEMENT AGENT HAS REPRESENTED, WARRANTED AND AGREED THAT IT HAS NOT OFFERED OR SOLD AND, PRIOR TO THE EXPIRY OF A PERIOD OF SIX MONTHS FROM THE CLOSING DATE, WILL NOT OFFER OR SELL ANY SECURITIES TO PERSONS IN THE UNITED KINGDOM EXCEPT TO PERSONS WHOSE ORDINARY ACTIVITIES INVOLVE THEM IN ACQUIRING, HOLDING, MANAGING OR DISPOSING OF INVESTMENTS (AS PRINCIPAL OR AGENT) FOR THE PURPOSES OF THEIR BUSINESSES OR OTHERWISE IN CIRCUMSTANCES WHICH HAVE NOT RESULTED AND WILL NOT RESULT IN AN OFFER TO THE PUBLIC IN THE UNITED KINGDOM WITHIN THE MEANING OF THE PUBLIC OFFERS OF SECURITIES REGULATIONS 1995;  IT HAS ONLY COMMUNICATED OR CAUSED TO BE COMMUNICATED AND WILL ONLY COMMUNICATE OR CAUSE TO BE COMMUNICATED ANY INVITATION OR INDUCEMENT TO ENGAGE IN INVESTMENT ACTIVITY (WITHIN THE MEANING OF SECTION 21 OF THE FINANCIAL SERVICES AND MARKETS ACT 2000 ("FSMA")) RECEIVED BY IT IN CONNECTION WITH THE ISSUE OR SALE OF ANY SECURITIES IN CIRCUMSTANCES IN WHICH SECTION 21(1) OF THE FSMA DOES NOT APPLY TO THE ISSUERS; AND IT HAS COMPLIED AND WILL COMPLY WITH ALL APPLICABLE PROVISIONS OF THE FSMA WITH RESPECT TO ANYTHING DONE BY IT IN RELATION TO THE SECURITIES IN, FROM OR OTHERWISE INVOLVING THE UNITED KINGDOM. THIS DOCUMENT IS ONLY BEING DISTRIBUTED TO AND IS ONLY DIRECTED AT (I) PERSONS WHO ARE OUTSIDE THE UNITED KINGDOM OR (II) TO INVESTMENT PROFESSIONALS FALLING WITHIN ARTICLE 19(5) OF THE FSMA (FINANCIAL PROMOTION) ORDER 2001 (THE "ORDER") OR (III) HIGH NET WORTH ENTITIES, AND OTHER PERSONS TO WHOM IT MAY LAWFULLY BE COMMUNICATED, FALLING WITHIN ARTICLE 49(2) OF THE ORDER (ALL SUCH PERSONS TOGETHER BEING REFERRED TO AS "RELEVANT PERSONS").  THE SECURITIES ARE ONLY AVAILABLE TO, AND ANY INVITATION, OFFER OR AGREEMENT TO SUBSCRIBE, PURCHASE OR OTHERWISE ACQUIRE SUCH SECURITIES WILL BE ENGAGED IN ONLY WITH, RELEVANT PERSONS.  ANY PERSON WHO IS NOT A RELEVANT PERSON SHOULD NOT ACT OR RELY ON THIS DOCUMENT OR ANY OF ITS CONTENTS.

### NOTICE TO RESIDENTS OF FRANCE

THE SECURITIES HAVE NOT BEEN OFFERED OR SOLD AND MAY NOT BE OFFERED OR SOLD, DIRECTLY OR INDIRECTLY, TO THE PUBLIC IN THE REPUBLIC OF FRANCE.  ANY OFFERS OF THE SECURITIES IN THE REPUBLIC OF FRANCE WILL BE MADE ONLY IN ACCORDANCE WITH ARTICLE 6 OF THE ORDINANCE DATED 28TH SEPTEMBER 1967, AS AMENDED, AND DECREE NO. 98-880, DATED 1ST OCTOBER 1998, RELATING TO OFFERS TO A LIMITED NUMBER OF INVESTORS.

### NOTICE TO RESIDENTS OF GERMANY

THE SECURITIES MAY ONLY BE ACQUIRED IN ACCORDANCE WITH THE GERMAN WERTPAPIERVERKAUFSPROSPEKTGESETZ (THE "SECURITIES SELLING PROSPECTUS ACT") AND THE AUSLANDSINVESTMENTGESETZ (THE "ACT ON FOREIGN INVESTMENT FUNDS").  THE SECURITIES ARE NOT REGISTERED OR AUTHORIZED FOR DISTRIBUTION UNDER THE ACT ON FOREIGN INVESTMENT FUNDS AND ACCORDINGLY MAY NOT BE, AND ARE NOT BEING, OFFERED OR ADVERTISED PUBLICLY OR OFFERED SIMILARLY UNDER § 1 OF THE ACT ON FOREIGN INVESTMENT FUNDS OR THE SECURITIES SELLING PROSPECTUS ACT.  THEREFORE, THIS OFFER IS ONLY BEING MADE TO RECIPIENTS TO WHOM THIS DOCUMENT IS PERSONALLY ADDRESSED AND DOES NOT CONSTITUTE AN OFFER OR ADVERTISEMENT TO THE PUBLIC.  THE SECURITIES CAN ONLY BE ACQUIRED FOR A MINIMUM PURCHASE PRICE OF AT LEAST €40,000 EXCLUDING COMMISSION AND OTHER FEES PER PERSON.

### NOTICE TO RESIDENTS OF JAPAN

THE SECURITIES HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES AND EXCHANGE LAW OF JAPAN (THE "SECURITIES AND EXCHANGE LAW") AND EACH OF THE INITIAL PURCHASER AND THE PLACEMENT AGENT HAS AGREED THAT IT WILL NOT OFFER OR SELL ANY SECURITIES, DIRECTLY OR INDIRECTLY, IN JAPAN OR TO, OR FOR THE

010611

BENEFIT OF, ANY RESIDENT OF JAPAN (WHICH TERM AS USED HEREIN MEANS ANY PERSON RESIDENT IN JAPAN, INCLUDING ANY CORPORATION OR OTHER ENTITY ORGANIZED UNDER THE LAWS OF JAPAN) OR TO OTHERS FOR RE-OFFERING OR RESALE, DIRECTLY OR INDIRECTLY, IN JAPAN OR TO A RESIDENT OF JAPAN AND THAT THEREAFTER IT WILL NOT OFFER OR SELL SUCH SECURITIES IN JAPAN OR TO A RESIDENT OF JAPAN EXCEPT PURSUANT TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF, AND OTHERWISE IN COMPLIANCE WITH, THE SECURITIES AND EXCHANGE LAW AND ANY RELEVANT LAWS, REGULATIONS AND MINISTERIAL GUIDELINES OF JAPAN.

## NOTICE TO THE PUBLIC IN THE CAYMAN ISLANDS

NO INVITATION, WHETHER DIRECTLY OR INDIRECTLY, MAY BE MADE TO THE PUBLIC IN THE CAYMAN ISLANDS TO SUBSCRIBE FOR THE SECURITIES. SECTION 194 OF THE COMPANIES LAW (2004 REVISION) OF THE CAYMAN ISLANDS PROVIDES THAT AN EXEMPTED COMPANY (SUCH AS THE ISSUER) THAT IS NOT LISTED ON THE CAYMAN ISLAND STOCK EXCHANGE IS PROHIBITED FROM MAKING ANY INVITATION OF THE PUBLIC IN THE CAYMAN ISLANDS TO SUBSCRIBE FOR ANY OF ITS SECURITIES. EACH PURCHASER OF THE SECURITIES AGREES THAT NO INVITATION MAY BE MADE TO THE PUBLIC IN THE CAYMAN ISLANDS TO SUBSCRIBE FOR THE SECURITIES.

## NOTICE TO NEW HAMPSHIRE RESIDENTS

NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE UNIFORM SECURITIES ACT, AS AMENDED, WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER RSA 421-B OF THE NEW HAMPSHIRE UNIFORM SECURITIES ACT IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

## NOTICE TO FLORIDA RESIDENTS

THE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER SECTION 517.061 OF THE FLORIDA SECURITIES ACT (THE "FLORIDA ACT") AND HAVE NOT BEEN REGISTERED UNDER THE FLORIDA ACT IN THE STATE OF FLORIDA. FLORIDA RESIDENTS WHO ARE NOT "INSTITUTIONAL INVESTORS" DESCRIBED IN SECTION 517.061(7) OF THE FLORIDA ACT HAVE THE RIGHT TO VOID THEIR PURCHASES OF THE SECURITIES WITHOUT PENALTY WITHIN THREE DAYS AFTER THE FIRST TENDER OF CONSIDERATION.

## NOTICE TO GEORGIA RESIDENTS

THE SECURITIES HAVE BEEN ISSUED OR SOLD IN RELIANCE ON CODE SECTIONS 10-5-7 AND 10-5-9 OF THE GEORGIA SECURITIES ACT OF 1973, AND MAY NOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER SUCH ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION UNDER SUCH ACT.

010612

# IMPORTANT INFORMATION

THE SECURITIES HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT, THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR THE SECURITIES LAWS OF ANY OTHER RELEVANT JURISDICTION AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED UNLESS AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS AND THE LAWS OF ANY OTHER RELEVANT JURISDICTION IS AVAILABLE. EACH PURCHASER OF THE SENIOR NOTES WILL BE DEEMED TO MAKE AND EACH PURCHASER OF CLASS Q SECURITIES OR INCOME NOTES WILL BE REQUIRED TO MAKE THE APPROPRIATE PURCHASER REPRESENTATIONS AS DESCRIBED UNDER *"PURCHASE AND TRANSFER RESTRICTIONS."* IN ADDITION, THE SECURITIES WILL BEAR RESTRICTIVE LEGENDS AND WILL BE SUBJECT TO RESTRICTIONS ON TRANSFER AS DESCRIBED HEREIN, INCLUDING THE REQUIREMENT THAT TRANSFERORS OR TRANSFEREES OF SUCH SECURITIES BE DEEMED TO MAKE CERTAIN REPRESENTATIONS OR IN CERTAIN CASES FURNISH REPRESENTATION LETTERS, IN THE FORMS PRESCRIBED BY THE INDENTURE. ANY RESALE OR OTHER TRANSFER, OR ATTEMPTED RESALE OR ATTEMPTED OTHER TRANSFER, OF SECURITIES THAT IS NOT MADE IN COMPLIANCE WITH THE APPLICABLE TRANSFER RESTRICTIONS WILL BE TREATED BY THE ISSUERS AND THE TRUSTEE AS NULL AND VOID *AB INITIO*. *SEE "PURCHASE AND TRANSFER RESTRICTIONS."*

THE NOTES AND THE CLASS Q SECURITIES WILL BE LIMITED RECOURSE DEBT OBLIGATIONS OF THE ISSUER AND THE SENIOR NOTES WILL BE NON-RECOURSE DEBT OBLIGATIONS OF THE CO-ISSUER. PAYMENTS ON THE NOTES AND THE CLASS Q-1 SECURITIES WILL BE MADE SOLELY FROM AND TO THE EXTENT OF THE AVAILABLE PROCEEDS OF THE TRUST ESTATE (NET OF AMOUNTS PAYABLE TO THE SWAP COUNTERPARTY AND CERTAIN OTHER AMOUNTS), WHICH WILL BE THE ONLY SOURCE OF PAYMENTS ON THE SECURITIES. PAYMENTS ON THE CLASS Q-2 SECURITIES WILL BE MADE SOLELY FROM AND TO THE EXTENT OF THE AVAILABLE PROCEEDS OF THE CLASS Q-2 SECURITIES COLLATERAL, WHICH WILL BE THE ONLY SOURCE OF PAYMENTS ON THE CLASS Q-2 SECURITIES. THE SECURITIES DO NOT REPRESENT AN INTEREST IN OR OBLIGATIONS OF, AND ARE NOT INSURED OR GUARANTEED BY, THE INITIAL PURCHASER, THE PLACEMENT AGENT, THE SWAP COUNTERPARTY, THE SWAP GUARANTOR, THE REFERENCE PORTFOLIO MANAGER, THE TRUSTEE, THE COLLATERAL ADMINISTRATOR, THE SHARE TRUSTEE, THE ADMINISTRATOR, THE AMENDMENT BUY-OUT PURCHASER OR ANY OF THEIR RESPECTIVE AFFILIATES OR ANY AFFILIATES OF THE ISSUERS.

THIS OFFERING CIRCULAR RELATES ONLY TO THE SECURITIES OFFERED HEREBY (INCLUDING TO THE INCOME NOTES REPRESENTED BY THE CLASS Q-2 COLLATERAL ASSET A) BUT IS NOT AN OFFERING DOCUMENT FOR THE CLASS Q-2 COLLATERAL ASSET B. IT IS INTENDED SOLELY TO IDENTIFY THE CLASS Q-2 COLLATERAL ASSET B AND DOES NOT PURPORT TO SUMMARIZE OR PROVIDE DETAILED INFORMATION WITH RESPECT TO THE CLASS Q-2 COLLATERAL ASSET B OR THE TERMS AND CONDITIONS THEREOF. ALL INFORMATION CONTAINED HEREIN WITH RESPECT TO CLASS Q-2 COLLATERAL ASSET B IS DERIVED SOLELY FROM THE OFFERING MEMORANDUM DATED MARCH 25, 2004 AND PRICING SUPPLEMENT DATED APRIL 28, 2004 WITH RESPECT THERETO (THE "CLASS Q-2 COLLATERAL ASSET B OFFERING DOCUMENTS"). ANY INFORMATION REGARDING THE CLASS Q-2 COLLATERAL ASSET B CONTAINED HEREIN DOES NOT PURPORT TO BE COMPLETE AND IS QUALIFIED IN ITS ENTIRETY BY, AND SHOULD BE READ IN CONJUNCTION WITH, THE CLASS Q-2 COLLATERAL ASSET B OFFERING DOCUMENTS. THE ISSUER DID NOT PARTICIPATE IN THE PREPARATION OF THE CLASS Q-2 COLLATERAL ASSET B OFFERING DOCUMENTS, AND THE ISSUER HAS NOT MADE ANY DUE DILIGENCE INQUIRY WITH RESPECT TO THE INFORMATION PROVIDED THEREIN NOR HAS IT VERIFIED THE ACCURACY OR COMPLETENESS OF SUCH DOCUMENTS. IN ADDITION, THE ISSUER HAS MADE NO INVESTIGATION REGARDING THE FINANCIAL CONDITION OR CREDITWORTHINESS OF THE ISSUER OF THE CLASS Q-2 COLLATERAL ASSET B. INFORMATION CONTAINED IN THE CLASS Q-2 COLLATERAL ASSET B OFFERING DOCUMENTS IS AS OF THE RESPECTIVE DATES STATED THEREIN, AND COMPARABLE INFORMATION, IF GIVEN AS OF THE DATE HEREOF, MAY BE DIFFERENT. THERE CAN BE NO ASSURANCE THAT EVENTS AFFECTING THE CLASS Q-2 COLLATERAL ASSET B HAVE NOT OCCURRED, WHETHER OR NOT DISCLOSED, WHICH WOULD

010613

AFFECT THE ACCURACY OR COMPLETENESS OF THE CLASS Q-2 COLLATERAL ASSET B OFFERING DOCUMENTS.

AN INVESTMENT IN THE SECURITIES IS NOT SUITABLE FOR ALL INVESTORS AND WILL BE APPROPRIATE ONLY FOR FINANCIALLY SOPHISTICATED INVESTORS CAPABLE OF (I) ANALYZING AND ASSESSING THE RISKS ASSOCIATED WITH SYNTHETIC COLLATERALIZED DEBT OBLIGATIONS WHERE THE INVESTOR IS TAKING THE CREDIT RISK AND MARKET RISK WITH RESPECT TO A PORTFOLIO OF REFERENCE OBLIGATIONS AND (II) BEARING SUCH RISKS AND THE FINANCIAL CONSEQUENCES THEREOF AS THEY RELATE TO AN INVESTMENT IN THE SECURITIES. AN INVESTOR IN THE SECURITIES SHOULD HAVE NO NEED FOR LIQUIDITY WITH RESPECT TO ITS INVESTMENT IN THE SECURITIES AND NO NEED TO DISPOSE OF ITS SECURITIES OR ANY PORTION THEREOF TO SATISFY ANY EXISTING OR CONTEMPLATED INDEBTEDNESS OR OBLIGATION OR FOR ANY OTHER PURPOSE.

THE ISSUERS ACCEPT RESPONSIBILITY FOR THE INFORMATION CONTAINED IN THIS OFFERING CIRCULAR OTHER THAN INFORMATION PROVIDED IN *"DESCRIPTION OF THE SECURITIES—THE INVESTMENT AGREEMENT—THE INVESTMENT AGREEMENT COUNTERPARTY," "DESCRIPTION OF THE SECURITIES—THE INVESTMENT AGREEMENT—THE INVESTMENT AGREEMENT GUARANTOR," "THE SWAP COUNTERPARTY AND SWAP GUARANTOR,"* AND *"THE REFERENCE PORTFOLIO MANAGER AND THE REFERENCE PORTFOLIO MANAGEMENT AGREEMENT—THE REFERENCE PORTFOLIO MANAGER."* TO THE BEST OF THE KNOWLEDGE AND THE BELIEF OF THE ISSUERS, THE INFORMATION CONTAINED IN THIS OFFERING CIRCULAR IS IN ACCORDANCE WITH THE FACTS AND DOES NOT OMIT ANYTHING LIKELY TO AFFECT THE IMPORT OF SUCH INFORMATION.

NONE OF THE INITIAL PURCHASER, THE PLACEMENT AGENT, THE SWAP COUNTERPARTY, THE SWAP GUARANTOR, THE REFERENCE PORTFOLIO MANAGER, THE TRUSTEE, THE COLLATERAL ADMINISTRATOR, THE SHARE TRUSTEE, THE ADMINISTRATOR, THE INVESTMENT AGREEMENT COUNTERPARTY, THE INVESTMENT AGREEMENT GUARANTOR, THE AMENDMENT BUY-OUT PURCHASER OR ANY OF THEIR RESPECTIVE AFFILIATES OR ANY AFFILIATES OF THE ISSUER, HAS SEPARATELY VERIFIED THE INFORMATION CONTAINED IN THIS OFFERING CIRCULAR, EXCEPT, (I) IN THE CASE OF THE REFERENCE PORTFOLIO MANAGER, FOR THE SECTION ENTITLED *"THE REFERENCE PORTFOLIO MANAGER AND THE REFERENCE PORTFOLIO MANAGEMENT AGREEMENT—THE REFERENCE PORTFOLIO MANAGER,"* (II) IN THE CASE OF THE SWAP COUNTERPARTY, FOR THE SECTION ENTITLED *"THE SWAP COUNTERPARTY AND SWAP GUARANTOR—THE SWAP COUNTERPARTY,"* (III) IN THE CASE OF THE SWAP GUARANTOR, FOR THE SECTION ENTITLED *"THE SWAP COUNTERPARTY AND SWAP GUARANTOR—THE SWAP GUARANTOR,"* (IV) IN THE CASE OF THE INITIAL PURCHASER AND PLACEMENT AGENT, FOR THE SECTION ENTITLED *"PLAN OF DISTRIBUTION,"* (V) IN THE CASE OF THE INVESTMENT AGREEMENT COUNTERPARTY, FOR THE SECTION ENTITLED *"DESCRIPTION OF THE SECURITIES—THE INVESTMENT AGREEMENT—THE INVESTMENT AGREEMENT COUNTERPARTY,"* AND (VI) IN THE CASE OF THE INVESTMENT AGREEMENT GUARANTOR, FOR THE SECTION ENTITLED *"DESCRIPTION OF THE SECURITIES—THE INVESTMENT AGREEMENT—THE INVESTMENT AGREEMENT GUARANTOR."* ACCORDINGLY, NO REPRESENTATION, WARRANTY, OR UNDERTAKING, EXPRESS OR IMPLIED, IS MADE, AND NO RESPONSIBILITY OR LIABILITY IS ACCEPTED, BY THE INITIAL PURCHASER, THE PLACEMENT AGENT, THE SWAP COUNTERPARTY, THE SWAP GUARANTOR, THE REFERENCE PORTFOLIO MANAGER, THE TRUSTEE, THE COLLATERAL ADMINISTRATOR, THE SHARE TRUSTEE, THE INVESTMENT AGREEMENT COUNTERPARTY, THE INVESTMENT AGREEMENT GUARANTOR, THE ADMINISTRATOR OR THE AMENDMENT BUY-OUT PURCHASER OR ANY OF THEIR RESPECTIVE AFFILIATES OR ANY AFFILIATES OF THE ISSUERS AS TO THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS OFFERING CIRCULAR, EXCEPT AS PROVIDED ABOVE. EACH PERSON RECEIVING THIS OFFERING CIRCULAR ACKNOWLEDGES THAT SUCH PERSON HAS NOT RELIED ON THE INITIAL PURCHASER, THE PLACEMENT AGENT, THE SWAP COUNTERPARTY, THE SWAP GUARANTOR, THE TRUSTEE, THE REFERENCE PORTFOLIO MANAGER, THE SHARE TRUSTEE, THE ADMINISTRATOR OR THE AMENDMENT BUY-OUT PURCHASER OR ANY OF THEIR RESPECTIVE AFFILIATES IN CONNECTION WITH THE ACCURACY OF SUCH INFORMATION OR ITS INVESTMENT DECISION.

010614

THE SECURITIES ARE BEING OFFERED ONLY TO A LIMITED NUMBER OF INDIVIDUALS AND INSTITUTIONAL INVESTORS THAT ARE WILLING AND ABLE TO CONDUCT AN INDEPENDENT ANALYSIS OF THE CHARACTERISTICS OF THE SECURITIES AND RISKS OF OWNERSHIP OF THE SECURITIES. IT IS EXPECTED THAT PROSPECTIVE PURCHASERS INTERESTED IN PURCHASING SECURITIES IN THIS OFFERING ARE WILLING AND ABLE TO CONDUCT AN INDEPENDENT INVESTIGATION OF THE RISKS POSED BY AN INVESTMENT IN THE SECURITIES. REPRESENTATIVES OF THE INITIAL PURCHASER AND THE PLACEMENT AGENT WILL BE AVAILABLE TO ANSWER QUESTIONS CONCERNING THE ISSUERS, THE SECURITIES AND THE TRUST ESTATE AND WILL, UPON REQUEST, MAKE AVAILABLE SUCH OTHER INFORMATION AS PROSPECTIVE PURCHASERS MAY REASONABLY REQUEST.

THIS OFFERING CIRCULAR IS NOT INTENDED TO FURNISH LEGAL, REGULATORY, TAX, ACCOUNTING, INVESTMENT OR OTHER ADVICE TO ANY PROSPECTIVE PURCHASER OF THE SECURITIES. THIS OFFERING CIRCULAR SHOULD BE REVIEWED BY EACH PROSPECTIVE PURCHASER AND ITS LEGAL, REGULATORY, TAX, ACCOUNTING, INVESTMENT AND OTHER ADVISORS. PROSPECTIVE PURCHASERS WHOSE INVESTMENT AUTHORITY IS SUBJECT TO LEGAL OR OTHER RESTRICTIONS SHOULD CONSULT THEIR LEGAL ADVISORS TO DETERMINE WHETHER AND TO WHAT EXTENT THE SECURITIES CONSTITUTE PERMISSIBLE INVESTMENTS FOR THEM.

NO PERSON IS AUTHORIZED IN CONNECTION WITH ANY OFFERING MADE HEREBY TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS OFFERING CIRCULAR AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE ISSUERS, THE INITIAL PURCHASER, THE PLACEMENT AGENT, THE SWAP COUNTERPARTY, THE SWAP GUARANTOR, THE REFERENCE PORTFOLIO MANAGER, THE TRUSTEE, THE COLLATERAL ADMINISTRATOR, THE SHARE TRUSTEE, THE ADMINISTRATOR OR AMENDMENT BUY-OUT PURCHASER OR ANY AFFILIATES OF THE ISSUERS. THE DELIVERY OF THIS OFFERING CIRCULAR AT ANY TIME DOES NOT IMPLY THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO ITS DATE. EXCEPT TO THE EXTENT REQUIRED BY THE LISTING RULES OF THE IRISH STOCK EXCHANGE, THE ISSUERS DISCLAIM ANY OBLIGATION TO UPDATE SUCH INFORMATION.

NO ACTION IS BEING TAKEN OR IS CONTEMPLATED BY THE ISSUERS, THE INITIAL PURCHASER OR THE PLACEMENT AGENT THAT WOULD PERMIT A PUBLIC OFFERING OF THE SECURITIES OR POSSESSION OR DISTRIBUTION OF THIS OFFERING CIRCULAR OR ANY AMENDMENT THEREOF OR SUPPLEMENT THERETO OR ANY OTHER OFFERING MATERIAL RELATING TO THE ISSUERS OR THE SECURITIES IN ANY JURISDICTION WHERE, OR IN ANY OTHER CIRCUMSTANCES IN WHICH, ACTION FOR THOSE PURPOSES IS REQUIRED. THE DISTRIBUTION OF THIS OFFERING CIRCULAR AND THE OFFERING OF THE SECURITIES MAY ALSO BE RESTRICTED BY LAW IN CERTAIN JURISDICTIONS. CONSEQUENTLY, NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER TO SELL, OR A SOLICITATION OF AN OFFER TO BUY, (I) ANY SECURITIES OTHER THAN THE SECURITIES OFFERED HEREBY OR (II) ANY SECURITIES IN ANY JURISDICTION IN WHICH IT IS UNLAWFUL FOR SUCH PERSON TO MAKE SUCH AN OFFER OR SOLICITATION. PERSONS INTO WHOSE POSSESSION THIS OFFERING CIRCULAR COMES ARE REQUIRED BY THE ISSUERS, THE INITIAL PURCHASER AND THE PLACEMENT AGENT TO INFORM THEMSELVES ABOUT, AND TO OBSERVE, ANY SUCH RESTRICTIONS. NONE OF THE U.S. SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES REGULATORY AUTHORITY OR ANY OTHER U.S. REGULATORY AUTHORITY HAS APPROVED OR DISAPPROVED THE SECURITIES OR PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING CIRCULAR. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

NEITHER THE INITIAL PURCHASER NOR THE PLACEMENT AGENT ASSUMES ANY RESPONSIBILITY FOR THE PERFORMANCE OF ANY OBLIGATIONS OF THE ISSUERS OR ANY OTHER PERSON DESCRIBED IN THIS OFFERING CIRCULAR OR FOR THE DUE EXECUTION, VALIDITY OR ENFORCEABILITY OF THE SECURITIES, THE INSTRUMENTS OR DOCUMENTS DELIVERED IN CONNECTION WITH THE SECURITIES OR FOR THE VALUE OR VALIDITY OF ANY COLLATERAL OR SECURITY INTERESTS PLEDGED IN CONNECTION THEREWITH.

EXCEPT AS MAY REASONABLY BE NECESSARY TO COMPLY WITH APPLICABLE SECURITIES LAWS, EACH RECIPIENT HEREOF (AND EACH EMPLOYEE, REPRESENTATIVE, OR OTHER AGENT OF THE RECIPIENT) MAY DISCLOSE TO ANY AND ALL PERSONS, WITHOUT LIMITATION OF ANY KIND, THE U.S. FEDERAL INCOME AND STATE AND LOCAL INCOME AND FRANCHISE TAX TREATMENT AND TAX STRUCTURE OF THE TRANSACTION AND ALL MATERIALS OF ANY KIND (INCLUDING OPINIONS OR OTHER TAX ANALYSES) THAT ARE PROVIDED TO THE RECIPIENT RELATING TO SUCH TAX TREATMENT AND TAX STRUCTURE. FOR THIS PURPOSE "TAX STRUCTURE" IS LIMITED TO FACTS RELEVANT TO THE U.S. FEDERAL INCOME AND STATE AND LOCAL INCOME AND FRANCHISE TAX TREATMENT OF THE OFFERING AND DOES NOT INCLUDE INFORMATION RELATING TO THE IDENTITY OF THE ISSUERS, THE INITIAL PURCHASER, THE PLACEMENT AGENT, THE REFERENCE PORTFOLIO MANAGER OR ANY INVESTOR IN THE SECURITIES.

ALL REFERENCES HEREIN TO "U.S. $," "$" OR DOLLARS ARE TO UNITED STATES DOLLARS.

## AVAILABLE INFORMATION

The Issuers will deliver to the Holders of the Securities, and make available to prospective purchasers designated by a Holder of Securities, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act. *See "Description of the Securities—The Indenture and the Collateral Administration Agreement—Reports."* If and for so long as any Class of Securities is listed on the Irish Stock Exchange and for so long as the rules of such stock exchange so require, any information requested under this section by the Holders of the Securities and prospective purchasers will be made available at the offices of NCB Stockbrokers as the Paying Agent in Ireland ("Paying Agent in Ireland").

Copies of the Indenture and the Issuer's Memorandum of Association and Articles of Association may be obtained by the Holders of the Securities upon request in writing to the Trustee. Copies of the Indenture will be available at the office of the Paying Agent in Ireland, for so long as any Class of the Securities is listed on the Irish Stock Exchange.

## FORWARD LOOKING STATEMENTS

Any projections, forecasts and estimates contained herein are forward looking statements and are based upon certain assumptions that the Issuers consider reasonable. Projections are necessarily speculative in nature, and it can be expected that some or all of the assumptions underlying the projections will not materialize or will vary significantly from actual results. Accordingly, the projections are only an estimate. Actual results may vary from the projections, and the variations may be material.

Some important factors that could cause actual results to differ materially from those in any forward looking statements include, among others, changes in interest rates, credit spreads, market, financial or legal uncertainties, differences in the actual allocation of the Reference Entities among categories from those assumed, the timing and the number of Credit Events occurring under the Swap Agreement and of modifications to the Reference Portfolio and differences in the levels of the market value of Reference Obligations assumed for purposes of determining Obligation Value Increase Amounts or Obligation Value Reduction Amounts. Consequently, the inclusion of projections herein should not be regarded as a representation by the Issuers, the Initial Purchaser, the Placement Agent, the Trustee, the Swap Counterparty, the Swap Guarantor, the Reference Portfolio Manager, the Collateral Administrator, the Share Trustee, the Administrator, the Amendment Buy-Out Purchaser or any of their respective Affiliates or any other Person of the results that will actually be achieved by the Issuers.

None of the Issuers, the Initial Purchaser, the Placement Agent, the Swap Counterparty, the Swap Guarantor, the Reference Portfolio Manager, the Trustee, the Collateral Administrator, the Share Trustee, the Administrator, the Amendment Buy-Out Purchaser or their respective Affiliates or any other Person has any obligation to update or otherwise revise any projections, including any revisions to reflect changes in economic conditions or other circumstances arising after the date hereof, or to reflect the occurrence of unanticipated events, even if the underlying assumptions do not come to fruition.

010616

## CERTAIN LEGAL INVESTMENT CONSIDERATIONS

Institutions whose investment activities are subject to legal investment laws and regulations or to review by certain regulatory authorities may be subject to restrictions on investments in the Securities. Any such institution should consult its legal advisers in determining whether and to what extent there may be restrictions on its ability to invest in the Securities. Without limiting the foregoing, any financial institution that is subject to the jurisdiction of the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of Thrift Supervision, the National Credit Union Administration, any state insurance commission, or any other federal or state agencies with similar authority should review any applicable rules, guidelines and regulations prior to purchasing the Securities. Depository institutions should review and consider the applicability of the Federal Financial Institutions Examination Council Supervisory Policy Statement on Securities Activities, which has been adopted by the respective federal regulators.

None of the Issuers, the Initial Purchaser, the Placement Agent, the Swap Counterparty, the Swap Guarantor, the Reference Portfolio Manager, the Trustee, the Collateral Administrator, the Share Trustee, the Administrator, the Amendment Buy-Out Purchaser or any of their respective Affiliates makes any representation as to the proper characterization of the Securities for legal investment or other purposes, or as to the ability of particular purchasers to purchase the Securities under applicable investment restrictions. The uncertainties described above (and any unfavorable future determinations concerning legal investment or applicable regulatory characteristics of the Securities) may affect the liquidity of the Securities. Accordingly, all institutions whose activities are subject to legal investment laws and regulations, regulatory capital requirements or review by regulatory authorities should consult their own legal advisers in determining whether and to what extent the Securities are, or the institution by purchasing Securities would be, subject to investment, capital or other restrictions.

## CERTAIN CONSIDERATIONS RELATING TO THE CAYMAN ISLANDS

The Issuer is an exempted company incorporated with limited liability under the laws of the Cayman Islands. As a result, it may not be possible for purchasers of the Securities to effect service of process upon the Issuer within the United States or to enforce against the Issuer in United States courts judgments predicated upon the civil liability provisions of the securities laws of the United States. The Issuer has been advised by Walkers, its legal advisor in the Cayman Islands, that the United States and the Cayman Islands do not currently have a treaty providing for reciprocal recognition and enforcement of judgments in civil and commercial matters and that a final judgment for the payment of money rendered by any federal or state court in the United States based on civil liability, whether or not predicated solely upon United States securities laws, would therefore not be automatically enforceable in the Cayman Islands, and that there is doubt as to the enforceability in the Cayman Islands, in original actions or in actions for the enforcement of judgments of the United States courts, of liabilities predicated solely upon United States securities laws. The Issuer will appoint Corporation Service Company, 1133 Avenue of the Americas, Suite 3100, New York, NY 10036 as its agent in New York for service of process.

010617

This page intentionally left blank.

## Transaction Summary Diagram



# SUMMARY

*The following summary does not purport to be complete and is qualified in its entirety by reference to (i) the detailed information appearing elsewhere in this Offering Circular and (ii) the terms and provisions of the related documents and agreements referred to herein. Certain capitalized terms used but not defined in the following summary are defined elsewhere in this Offering Circular.*

Transaction Overview

On the Closing Date, the Issuer and Co-Issuer will issue the Senior Notes and the Issuer will issue the Income Notes, the Class Q-1 Securities and the Class Q-2 Securities, pursuant to the Indenture. The Securities may be sold at varying prices in negotiated transactions. The net proceeds from the issuance of the Notes (including Income Notes represented by the Class Q-2 Collateral Asset A) and the Class Q-1 Securities, after payment of certain offering expenses and funding of the Expense Reserve Account, will be invested, together with certain other amounts received by the Issuer from time to time, in Eligible Investments. Such Eligible Investments may be sold or liquidated from time to time to obtain funds to make payments to the Swap Counterparty pursuant to the Swap Agreement and in respect of the Notes in accordance with the Priority of Payments, as described below.

On the Closing Date, the Issuer and the Swap Counterparty will enter into the Swap Agreement. Under the Swap Agreement, the Reference Portfolio Manager will designate a portfolio of Reference Obligations (the "Reference Portfolio") and will manage the Reference Portfolio during the term of the transaction by adding and removing Reference Obligations from time to time under the terms and conditions described under *"Description of the Swap Agreement—Selection and Modification of the Reference Portfolio."* In performing these functions, the Reference Portfolio Manager will act on behalf of the Swap Counterparty (and not on behalf of the Issuer). *See "Risk Factors—Role of the Reference Portfolio Manager."*

Pursuant to the Swap Agreement, the Swap Counterparty will be required to make quarterly payments to the Issuer in an amount based on the aggregate amount of interest, commitment fees and other amounts payable (other than in respect of principal) with respect to the Reference Obligations included in the Reference Portfolio during that quarter, together with, for any Reference Obligations removed from the Reference Portfolio during that quarter, (i) the applicable portion of such amounts accrued for the part of the quarter in which the obligations were included in the Reference Portfolio and (ii) any increase or decrease in the value of those obligations during the period they were included in the Reference Portfolio, less certain amounts described in more detail below (or, if such net amount is negative, the Issuer will be required to pay the absolute value of such net amount to the Swap Counterparty). *See "Description of the Swap Agreement—Payments under the Swap Agreement."* Amounts payable by the Issuer to the Swap Counterparty may be paid from the proceeds of the sale or liquidation of Eligible Investments in the Trust Estate, thereby reducing the amounts otherwise available to the Issuer for payment of its other obligations, including principal on the Senior Notes, and for distributions in respect of the Income Notes.

On each Payment Date, payments in respect of each Class of Securities will be made only after payments are made in respect of the Class or Classes of Securities to which such Class is subordinate in right of

010620

payment (subject to an exception in connection with the Diversion Test) and in respect of other amounts ranking senior pursuant to the applicable priority of payments. Distributions in respect of the Income Notes will only be made after all payments then due are made on the Senior Notes and all other amounts that are then due by the Issuers have been paid. Accordingly, any shortfall in amounts available for such payments will first reduce distributions to the Holders of the Income Notes; second, reduce payments to the Holders of the Class C Notes; third, reduce payments to the Holders of the Class B Notes; fourth, reduce payments to the Holders of the Class A-2 Notes; and finally, reduce payments to the Holders of the Class A-1 Notes. Distributions in respect of the Class Q-2B Securities (other than the Class Q-2B Target Amount) will only be made after all payments then due are made on the Class Q-2A Securities. *See "Risk Factors—Subordination of Payment and Control."*

<table>
<tr>
<td><u>The Reference Portfolio Manager</u></td>
<td>Highland Capital Management, L.P. ("Highland Capital"), as Reference Portfolio Manager, will manage the selection and modification of the Reference Portfolio on behalf of the Swap Counterparty under the Swap Agreement pursuant to a Reference Portfolio Management Agreement between the Reference Portfolio Manager and the Swap Counterparty (the "Reference Portfolio Management Agreement"). <em>See "Risk Factors—Conflicts of Interest Involving the Reference Portfolio Manager"</em> and <em>"The Reference Portfolio Manager and the Reference Portfolio Management Agreement."</em> The Reference Portfolio Manager will act solely on behalf of the Swap Counterparty and will not act or be deemed to act on behalf of the Issuer or the Holders of Securities. Neither the Issuer nor the Holders of Securities will have any rights, as third party beneficiary or otherwise, against the Reference Portfolio Manager under the Swap Agreement or the Reference Portfolio Management Agreement, and the Reference Portfolio Manager will have no liability to the Issuer or the Holders of Securities thereunder. The Issuer and the Holders of Securities will have no direct recourse against the Reference Portfolio Manager as a result of action or inaction by the Reference Portfolio Manager thereunder. <em>See "Risk Factors—Role of the Reference Portfolio Manager."</em> The Reference Portfolio Manager is a registered investment adviser under the U.S. Investment Advisers Act of 1940, as amended (the "Advisers Act").</td>
</tr>
<tr>
<td><u>The Issuers</u></td>
<td>The activities of the Issuer will be limited to (i) issuance of its Ordinary Shares (not offered hereby), (ii) issuance of the Notes, (iii) issuance of the Class Q-1 Securities and the Class Q-2 Securities, (iv) entering into the Swap Agreement and exercising its rights and performing its obligations thereunder and under the Swap Guarantee, (v) acquiring and disposing of Eligible Investments, including the Investment Agreement, and the Class Q-2 Securities Collateral, (vi) entering into the Indenture and the Collateral Administration Agreement and exercising its rights and performing its obligations thereunder and (vii) engaging in other activities incidental to the foregoing and permitted by the Indenture.

The activities of the Co-Issuer will be limited to (i) issuance of its common stock (not offered hereby) and (ii) issuance of the Senior Notes. The Co-Issuer will have no assets (other than its equity capital), will not be a party to the Swap Agreement or any other agreement other than the Indenture, and will not pledge any assets to secure the Notes.</td>
</tr>
</table>

010621

| | |
|---|---|
| The Senior Notes | The Issuer and Co-Issuer will jointly issue the following Securities: |

U.S. $62,000,000 Class A-1 Floating Rate Senior Extendable Notes (the "Class A-1 Notes");

U.S. $56,000,000 Class A-2 Floating Rate Senior Extendable Notes (the "Class A-2 Notes");

U.S. $39,500,000 Class B Floating Rate Deferrable Senior Subordinate Extendable Notes (the "Class B Notes");

U.S. $21,000,000 Class C-1 Floating Rate Deferrable Senior Subordinate Extendable Notes (the "Class C-1 Notes"); and

U.S. $5,000,000 Class C-2 Fixed Rate Deferrable Senior Subordinate Extendable Notes (the "Class C-2 Notes");

each pursuant to an Indenture, dated as of the Closing Date (the "Indenture"), among the Issuer, the Co-Issuer and JPMorgan Chase Bank, as Trustee (the "Trustee").

| | |
|---|---|
| The Income Notes | The Issuer will also issue U.S. $82,000,000 Extendable Income Notes (the "Income Notes") pursuant to the Indenture. The Income Notes will not bear interest at a stated rate and are not entitled to a return of a stated principal amount, but Holders of Income Notes will be entitled to a pro rata share of all proceeds remaining after payment of the Senior Notes and all other expenses of, and satisfaction of creditors' claims against, the Issuers. The Aggregate Principal Amount of the Income Notes includes the U.S. $25,000,000 Aggregate Principal Amount of Income Notes delivered to the Class Q-2 Securities Collateral Account on the Closing Date, which will be deemed to have been issued for all purposes of the Indenture. *See "The Class Q-2 Securities" below."* |

| | |
|---|---|
| The Class Q-1 Securities | The Issuer will also issue on the Closing Date U.S. $10,000,000 Class Q-1 Extendable Securities (the "Class Q-1 Securities") pursuant to the Indenture. The Class Q-1 Securities will consist of the Class Q-1 Senior Note Component and the Class Q-1 Income Note Component. The Class Q-1 Senior Note Component will represent an initial Aggregate Principal Amount of U.S. $5,000,000 of Class C-2 Notes. The Class Q-1 Income Note Component will represent an Aggregate Principal Amount of U.S. $5,000,000 of Income Notes. |

The initial Aggregate Principal Amount of the Class C-2 Notes and the Income Notes to which the Class Q-1 Senior Note Component and the Class Q-1 Income Note Component relate are included in (and are not in addition to) the initial Aggregate Principal Amount of the Class C-2 Notes or Income Notes in the aggregate. Each Class Q-1 Security represents an undivided beneficial ownership interest in the cash flows on the Class Q-1 Senior Note Component and the Class Q-1 Income Note Component.

Pursuant to the Indenture, a Holder of a beneficial interest in a Class Q-1 Security may exchange all or a proportionate amount of such interest for the underlying Class C-2 Notes and Income Notes, subject to the minimum denomination requirements, applicable transfer restrictions and in the manner described in the Indenture. *See "Description of the Securities— The Class Q-1 Securities."*

010622

| | |
|---|---|
| The Class Q-2 Securities | In addition, the Issuer will issue on the Closing Date U.S. $7,200,000 Class Q-2A Securities Due 2034 (the "Class Q-2A Securities") and U.S. $40,000,000 Class Q-2B Securities Due 2034 (the "Class Q-2B Securities") pursuant to the Indenture. |
| | The Class Q-2 Securities will be secured by the Class Q-2 Securities Collateral. Payments in respect of the Class Q-2 Securities will be made solely from, and recourse will be limited to, the assets of the Class Q-2 Securities Collateral available in accordance with the Class Q-2 Priority of Payments. |
| | Pursuant to the Indenture, after the redemption or repayment in full of the Class Q-2A Securities, a Holder of Class Q-2B Securities may exchange its interest for a proportionate amount of the Income Notes represented by the Class Q-2 Collateral Asset A and of the other Class Q-2 Securities Collateral (subject to the minimum denomination requirements and in the manner described in the Indenture). |
| | The Class Q-2 Securities are scheduled to mature on April 28, 2034 and are not subject to an extension of maturity. The Class Q-2 Securities are not subject to an Amendment Buy-Out, other than with respect to the Income Notes represented by the Class Q-2 Collateral Asset A. *See "Description of the Securities—The Class Q-2 Securities."* |
| Ratings of the Securities | It is a condition to the issuance of the Securities that the Class A-1 Notes be rated "Aaa" by Moody's and "AAA" by Standard & Poor's, the Class A-2 Notes be rated at least "Aa2" by Moody's and at least "AA" by Standard & Poor's, the Class B Notes be rated at least "A2" by Moody's and at least "A" by Standard & Poor's and the Class C-1 Notes and the Class C-2 Notes be rated at least "Baa2" by Moody's and at least "BBB" by Standard & Poor's. |
| | In addition, it is a condition to the issuance of the Securities that the Class Q-1 Securities be rated at least "Baa2" by Moody's (which rating addresses solely the return of the Class Q-1 Rated Principal). *See "Ratings."* |
| | The Income Notes will not be rated by Moody's, Standard & Poor's or any other rating agency. |
| | The Issuer will request that each Rating Agency confirm its ratings of the Senior Notes and the Class Q-1 Securities within 30 days after the Ramp-up End Date. |
| Maturity and Extension of Maturity | The Notes and the Class Q-1 Securities are scheduled to mature on August 1, 2016, unless the maturity is extended. The maturity of the Notes and the Class Q-1 Securities is subject to an extension of four years to August 1, 2020, if the term of the Swap Agreement is extended. |
| | Under the Swap Agreement, the Swap Counterparty may, at its option, on the Payment Date that is two years before the end of the Portfolio Modification Period (the "Extension Effective Date") extend the Portfolio Modification Period for four years to August 1, 2015 and correspondingly extend the term of the Swap Agreement for four years to August 1, 2020, subject to the satisfaction of the Extension Conditions (as defined below). *See "The Swap Agreement—Extension of Swap Agreement" below.* |

010623

Under the Indenture, if the term of the Swap Agreement is so extended, the maturity of the Notes and the Class Q-1 Securities will automatically be equally extended without any requirement for approval or consent of any holders of Securities or amendment or supplement to the Indenture (the "Maturity Extension").

As a condition to the extension of maturity, holders will be able to offer to sell their Notes and Class Q-1 Securities to one or more qualifying purchasers (which may include the Swap Counterparty and any of its affiliates acting as principal or agent) designated by the Swap Counterparty (or its affiliate) for purchase on the Extension Effective Date (Notes and Class Q-1 Securities so offered for sale by their holders, "Extension Sale Securities"). The purchase price for any Extension Sale Securities will be (1) in the case of the Senior Notes, the Aggregate Principal Amount thereof plus accrued and unpaid interest (including Deferred Interest, if any) as of the Extension Effective Date (giving effect to any amounts paid to the holder on such date), plus, in the case of the Class C-2 Notes, the applicable Make-whole Premium, (2) in the case of the Income Notes, an amount that together with any amounts paid to the Holders with respect to those Income Notes from the Closing Date to and including the Extension Effective Date results in an internal rate of return with respect to those Income Notes of 18% per annum and (3) in the case of the Class Q-1 Securities, a purchase price determined based on the respective purchase prices for the Class Q-1 Senior Note Component and the Class Q-1 Income Note Component thereof. If the Extension Effective Date is on or after the date on which the holders of Income Notes have received an internal rate of return equal to or in excess of 18% per annum (determined as in clause (2) above), the purchase price for Income Notes that are Extension Sale Securities will be zero.

The extension of the Portfolio Modification Period, the term of the Swap Agreement and the maturity of the Notes and Class Q-1 Securities will be conditioned on satisfaction of the Extension Conditions.

No Extension Sale Securities will be purchased unless all Extension Sale Securities are purchased and settled at the applicable purchase price as of the Extension Effective Date and the other Extension Conditions are satisfied. Pursuant to the Extension Conditions, if not all Extension Sale Securities are so purchased and settled, none of the Portfolio Modification Period, the term of the Swap Agreement or the maturity of the Notes and Class Q-1 Securities will be extended.

If all Extension Conditions are satisfied and a Maturity Extension is effected, each holder of Senior Notes (including in the form of the Class Q-1 Senior Note Component) other than Extension Sale Securities will be entitled to receive the applicable Extension Bonus Payment, in each case to the extent of available funds and as provided in the Priority of Payments. Holders of Income Notes will not be entitled to receive any Extension Bonus Payment.

The Class Q-2 Securities are scheduled to mature on April 28, 2034 and are not subject to an extension of maturity.

010624

| | |
|---|---|
| <u>Amendment Buy-Out</u> | In the case of any amendment to the Indenture or the Swap Agreement that requires the consent of one or more holders of Notes and/or Class Q-1 Securities, the Amendment Buy-Out Purchaser will have the right (but will not be obligated) to purchase the applicable Security of any holder that either (i) has declared in writing that it will not consent to such amendment or (ii) had not consented to such amendment by the last day on which consent could be given in accordance with the request therefor (each a "Non-consenting Holder") at the applicable Amendment Buy-Out Purchase Price. |

The Class Q-2 Securities themselves are not subject to an Amendment Buy-Out, but the Indenture permits the Amendment Buy-Out Purchaser to purchase the Income Notes represented by the Class Q-2 Collateral Asset A at the applicable purchase price, if the Holders of Class Q-2B Securities who pursuant to the Indenture have voting rights with respect to the Income Notes represented by the Class Q-2 Collateral Asset A would be deemed to be a Non-consenting Holder with respect to such Income Notes.

If this option is exercised, the Amendment Buy-Out Purchaser must purchase all applicable Notes or Class Q-1 Securities from all Non-consenting Holders (an "Amendment Buy-Out"), regardless of the applicable percentage of aggregate principal amount of the Securities the consent of whose holders is required for the amendment. If the solicited consent only affects one Component of the Class Q-1 Securities, the Amendment Buy-Out Purchaser must purchase, at the Non-consenting Holder's option, its Class Q-1 Security as a whole or solely the affected Component.

All purchases made pursuant to an Amendment Buy-Out individually and in the aggregate must comply with the applicable transfer restrictions in the Indenture and the legends on the applicable Notes and Class Q-1 Securities and all applicable law and rules and procedures of any securities exchange, self-regulatory organization or applicable clearing agency.

The Reference Portfolio Manager may (but is not obligated to) request the Swap Counterparty to elect to effect an Amendment Buy-Out. The Swap Counterparty has agreed to follow such a request subject to certain conditions. No person will have any obligation to elect or effect an Amendment Buy-Out and no person other than the Swap Counterparty will have the right to elect to effect an Amendment Buy-Out.

| | |
|---|---|
| <u>Use of Proceeds</u> | The proceeds of the issuance of the Notes (including Income Notes represented by the Class Q-2 Collateral Asset A) and Class Q-1 Securities, net of any issued discount and after paying or providing for the payment of organizational expenses and the expenses of the issuance of the Securities by funding the Expense Reserve Account, will be approximately U.S. $247,500,000. Such proceeds will be applied by the Issuer to purchase approximately U.S. $247,500,000 in face amount of Eligible Investments to secure the Issuer's obligations under the Swap Agreement, the Notes and the Class Q-1 Securities. The proceeds of the issuance of the Class Q-2 Securities will constitute, and be applied to purchase, as applicable, the Class Q-2 Securities Collateral. |

| The Offering | The Securities are being offered only (i) in the case of the Senior Notes, Class Q-1 Securities and Class Q-2A Securities, in the United States, to (a) "qualified institutional buyers" as defined in Rule 144A under the Securities Act ("Qualified Institutional Buyers") or (b) in the case of the Income Notes, Qualified Institutional Buyers or "accredited investors" as defined in Rule 501(a) under the Securities Act ("Accredited Investors"), in each case, that are also "qualified purchasers" as defined for purposes of Section 3(c)(7) of the Investment Company Act ("Qualified Purchasers") and (ii) outside the United States, to "non-U.S. Persons" (as defined in Regulation S under the Securities Act) in offshore transactions in reliance on Regulation S under the Securities Act. Certain additional offering restrictions may also apply. *See "Purchase and Transfer Restrictions."* |
| --- | --- |

Transfer of the Securities — Transfers of interests in the Securities will be subject to certain restrictions. *See "Purchase and Transfer Restrictions."*

Payments on the Securities — Each Class of Senior Notes will accrue interest at the per annum rate set forth for such Class in the following table:

|  | Class A-1 Notes | Class A-2 Notes | Class B Notes | Class C-1 Notes | Class C-2 Notes |
| --- | --- | --- | --- | --- | --- |
| Interest Rate: | LIBOR[1] plus 0.70% | LIBOR[1] plus 0.80% | LIBOR[1] plus 1.40% | LIBOR[1] plus 2.60% | 7.53% |

[1] LIBOR with respect to the first Periodic Interest Accrual Period will be 1.88230% per annum.

The Income Notes will not bear a stated rate of interest but will be entitled to receive distributions on each Payment Date if and to the extent funds are available for such purpose in accordance with the Priority of Payments. Such distributions will be payable to the Holders of the Income Notes only after payment in full of all of the liabilities of the Issuers that rank ahead of the Income Notes pursuant to the Priority of Payments. *See "Description of the Securities—Priority of Payments."* Accordingly, to the extent that payments received in respect of the Swap Agreement, Eligible Investments and other assets that are part of the Trust Estate are not sufficient to pay distributions with respect to the Income Notes, the Issuer will have no obligation to make any such distribution.

Interest on the floating rate Notes and the Class Q-2A Securities will be calculated on the basis of a 360-day year and the actual number of days elapsed in the applicable Periodic Interest Accrual Period. Interest on the fixed rate Notes will be computed on the basis of a 360-day year consisting of twelve 30-day months.

Subject to the availability of funds and the Priority of Payments, interest payments on the Senior Notes and distributions on the Income Notes shall be payable quarterly in arrears on the first day of each February, May, August and November commencing on and including February 1, 2005 (or if any such day is not a Business Day, the first Business Day thereafter), and ending on and including the earlier of the final redemption date for such Notes and the Maturity Date (each, a "Payment Date"). *See "Description of the Securities—Payments."*

010626

The Class Q-1 Securities are entitled to receive only the payments associated with the related Components. The rating on the Class Q-1 Securities applies only to return of the Class Q-1 Rated Principal. All distributions made with respect to the Class Q-1 Securities will reduce the outstanding Class Q-1 Rated Principal until it is reduced to U.S. $1 and thereafter will constitute additional income.

Solely for certain calculation purposes, the Class Q-1 Securities are deemed to have a Class Q-1 Nominal Rate of 2.00% per annum. The Class Q-1 Nominal Rate does not limit the entitlement of Holders of Class Q-1 Securities to receive any applicable Class Q-1 Excess Distributions.

To the extent any Coverage Test is not satisfied on any Determination Date related to a Payment Date following the Ramp-up End Date or to the extent necessary to cause the Rating Agencies to confirm the initial ratings of the Senior Notes as of the 30th day after the Ramp-up End Date, amounts available at the applicable level of the Priority of Payments will be used to redeem the Senior Notes on such Payment Date commencing with the most senior Class of Senior Notes outstanding, thereby reducing the amounts available for payment at lower levels of the Priority of Payments. Notes will also be redeemed on each Payment Date using the principal proceeds of Eligible Investments in the Trust Estate to the extent of the applicable Note Redemption Amount, if any, for such date, in accordance with the Principal Priority of Payments, commencing with the most senior Class of Notes outstanding. The Notes also may be redeemed at the direction of the Holders of a majority in Aggregate Principal Amount of the Income Notes, with the consent of the Swap Counterparty, in the case of certain tax events with respect to the Issuer.

If the Diversion Test is not satisfied as of any Determination Date related to a Payment Date after the Ramp-up End Date, 50% of the amounts that would otherwise be used to pay Administrative Expenses in excess of the Expense Cap Amount, Subordinated Administrative Expenses, Extension Bonus Payments, if any, and a Net Income Note Periodic Return Amount to the Holders of the Income Notes will be used first to pay, on a pro rata basis, Deferred Interest, if any, on the Class B Notes and Class C Notes and then to redeem, on a pro rata basis, the Class B Notes and Class C Notes at par in accordance with the Payment Date Priority of Payments.

In addition, beginning five and a half years after the Closing Date, the Notes may be redeemed at the direction of the Holders of at least 66 2/3% in Aggregate Principal Amount of the Income Notes provided that certain conditions are satisfied. Unless previously redeemed, the outstanding principal amount of the Senior Notes, and the final distribution, if any, on the Income Notes will be payable on the Maturity Date of August 1, 2016, or, in the case of a Maturity Extension, August 1, 2020, in accordance with the Principal Priority of Payments. *See "Description of the Securities—Payments" and "—Maturity of the Notes and Class Q-1 Securities and Extension of Maturity of the Notes and Class Q-1 Securities."*

The Class Q-2 Securities are entitled to receive only payments from the proceeds of the Class Q-2 Securities Collateral in accordance with the Class Q-2 Priority of Payments. The Class Q-2A Securities will accrue interest at a rate of LIBOR plus 0.50% per annum (the "Class Q-2A Interest Rate"). The Class Q-2B Securities will not accrue interest at a stated rate. Subject to the availability of funds and the Class Q-2 Priority

010627

of Payments, interest payments on the Class Q-2A Securities and distributions on the Class Q-2B Securities shall be payable quarterly in arrears on each Payment Date.

If the Class Q-2A Coverage Test is not satisfied as of any date of determination following the Closing Date, at the unanimous direction of the Holders of the Class Q-2A Securities, the Trustee will liquidate the Class Q-2 Collateral Asset A and deposit the proceeds thereof in the Class Q-2 Securities Collateral Account for distribution in accordance with the Class Q-2 Priority of Payments upon receipt of such proceeds as though the date of receipt thereof were a Payment Date.

|  |  |
|---|---|
| The Coverage Tests | The Coverage Tests are comprised of an overcollateralization test and an interest coverage test (i) for the Class A-1 Notes and the Class A-2 Notes (treated as a single class for this purpose), (ii) for the Class B Notes and (iii) for the Class C-1 Notes and the Class C-2 Notes (treated as a single class for this purpose). If a Coverage Test for any such Class is not satisfied as of any Determination Date related to a Payment Date following the Ramp-up End Date, the amounts available in accordance with the Priority of Payments at the level of the Priority of Payments at which the Coverage Test is applied will be used on such Payment Date to redeem the Senior Notes commencing with the most senior Class, to the extent necessary to satisfy such Coverage Tests, thereby reducing amounts available for payments at lower levels of the Priority of Payments. *See "Description of the Securities—The Coverage Tests."* In addition, following the Ramp-up End Date the Reference Portfolio Manager's ability to add or remove Reference Obligations may be restricted if the Coverage Tests are not satisfied. *See "Description of the Swap Agreement—Selection and Modification of the Reference Portfolio."* The failure of the Issuer to satisfy a Coverage Test will not be a default or an Event of Default under the Indenture. |
| The Trust Estate | All assets of the Issuer (except the Excluded Property and the Class Q-2 Securities Collateral) (the "Trust Estate") will be pledged to secure the obligations of the Issuer to the Swap Counterparty, the Trustee and the Collateral Administrator and to secure the obligations of the Issuer under the Notes and the Class Q-1 Securities. Payments in respect of the Notes and the Class Q-1 Securities will be made solely from, and recourse will be limited to, the assets of the Trust Estate available in accordance with the Priority of Payments. *See "Description of the Securities—Priority of Payments."* |

The Trust Estate will comprise solely (i) Eligible Investments acquired with the net proceeds from the issuance of the Notes (including Income Notes represented by the Class Q-2 Collateral Asset A) and Class Q-1 Securities and from time to time thereafter with amounts received by the Issuer, (ii) the rights of the Issuer under the Swap Agreement and Swap Guarantee, (iii) funds on deposit in certain accounts, (iv) the rights of the Issuer under the Collateral Administration Agreement and (v) certain payments or distributions received in respect of such Eligible Investments and the Swap Agreement.

010628

| The Eligible Investments | All moneys (other than the Excluded Property and the Class Q-2 Securities Collateral) held by or on behalf of the Issuer will be invested in Eligible Investments at the direction of the Swap Counterparty (or the Reference Portfolio Manager on its behalf) unless the Swap Agreement has been terminated and all amounts owed to the Swap Counterparty thereunder have been paid in full or a Swap Event of Default as to which the Swap Counterparty is the defaulting party or a Swap Additional Termination Event has occurred and is continuing, or otherwise in accordance with the Indenture. Eligible Investments may generally include U.S. dollar cash, U.S. government obligations, deposits of U.S. commercial banks and trust companies satisfying certain rating criteria, certain guaranteed investment contracts of a U.S. insurance company, bank or corporation satisfying certain rating criteria, qualifying money market funds, qualifying unleveraged repurchase obligations, commercial paper or similar short-term obligations satisfying certain rating criteria, the Investment Agreement and other investments acceptable to the applicable Rating Agencies. The net proceeds from the issuance of the Notes (including the Income Notes represented by the Class Q-2 Collateral Asset A) and the Class Q-1 Securities, as well as certain other amounts deposited in the Collateral Account from time to time, are expected to be invested in the Investment Agreement. *See* the definition of *"Eligible Investments"* in the *"Glossary of Certain Defined Terms."* |
|---|---|
| The Swap Agreement | On the Closing Date, the Issuer will enter into the Swap Agreement with the Swap Counterparty, which will be Citigroup Financial Products Inc. ("CFPI"). The obligations of the Swap Counterparty under the Swap Agreement will be guaranteed by the Swap Guarantor, which will be Citigroup Global Markets Holdings Inc. ("CGMHI"). |
| *The Reference Portfolio* | Payments under the Swap Agreement will be determined by reference to the Reference Portfolio as constituted from time to time. The Reference Portfolio will be selected and modified from time to time by the Reference Portfolio Manager on behalf of the Swap Counterparty pursuant to the Reference Portfolio Management Agreement. The Initial Reference Obligations to be included in the Reference Portfolio on the Closing Date will be specified in the Swap Agreement. The Reference Portfolio Manager is expected to designate on behalf of the Swap Counterparty additional Reference Obligations to be included in the Reference Portfolio (and the Reference Obligation Calculation Amounts for such Reference Obligations) during the six-month period following the Closing Date (the "Ramp-up Period"), subject to certain individual obligation and aggregate portfolio criteria. *See "The Reference Portfolio—Eligible Reference Obligations"* and *"—Reference Portfolio Criteria."* As of the Ramp-up End Date, the Issuer expects that the Reference Portfolio will be comprised of Reference Obligations with an Aggregate Reference Obligation Calculation Amount of approximately U.S. $900 million.

From time to time following the Ramp-up End Date, the Reference Portfolio Manager may add new Reference Obligations to the Reference Portfolio and/or remove existing Reference Obligations from the Reference Portfolio, provided that certain conditions are satisfied. *See "Description of the Swap Agreement—Selection and Modification of the Reference Portfolio."* |

010629

| | |
|---|---|
| *Amortization of Reference Obligations* | The Reference Obligation Calculation Amount (and, correspondingly, the Reference Value) for any Reference Obligation will be reduced to reflect any permanent prepayment, repayment, amortization, redemption, termination, cancellation or reduction of commitment or similar permanent reduction of principal or notional amount thereof (an "Amortization"). A reduction in the outstanding balance of a Reference Obligation that is a Revolving Loan as a result of a repayment will not be considered an Amortization to the extent that the facility can subsequently be redrawn in accordance with its terms. |
| *Valuation of Reference Obligations* | Upon the removal of a Reference Obligation from the Reference Portfolio at the direction of the Reference Portfolio Manager, upon an Amortization of a Reference Obligation (other than a Reference Swap) and for each Reference Obligation on the 45th Business Day prior to the Swap Termination Date, the Swap Counterparty (or the Reference Portfolio Manager on its behalf) will determine the Obligation Value Increase Amount or Obligation Value Reduction Amount for such obligation, which will generally reflect the increase or decrease, respectively, in the market value of such Reference Obligation during the period of its inclusion in the Reference Portfolio, determined as provided in more detail herein. *See "Description of the Swap Agreement—Valuation of Reference Obligations."* |
| *Swap Agreement Payments* | Under the Swap Agreement, the Swap Counterparty will be required to pay to the Issuer for each Payment Date the applicable Adjusted Reference Portfolio Return Amount described herein; *provided* that if the Adjusted Reference Portfolio Return Amount is negative, the Issuer will be required to pay to the Swap Counterparty the absolute value of the Adjusted Reference Portfolio Return Amount. The Issuer will be required to pay to the Swap Counterparty the applicable Fixed Amount on each Payment Date. The amounts described above payable by the Issuer and the Swap Counterparty for any Payment Date will be netted into a single payment by the Swap Counterparty or the Issuer to the other, as applicable. If such net amount for any Payment Date is payable by the Swap Counterparty, the Swap Counterparty will be required to make such payment one Business Day prior to the Payment Date. *See "Description of the Swap Agreement— Payments Under the Swap Agreement."* |
| *Swap Notional Amount* | The Swap Notional Amount will initially equal U.S. $895,500,000. |
| | On each Payment Date prior to the end of the Portfolio Modification Period, the Swap Notional Amount will be increased by the Quarterly Aggregate Increase Amount, if any, for that date or reduced by the Quarterly Aggregate Reduction Amount, if any, for that date. |
| | The Swap Notional Amount will be reduced on each Payment Date following the end of the Portfolio Modification Period by the Swap Reduction Amount, if any, for that Payment Date. *See "Description of the Swap Agreement—Swap Notional Amount."* |
| *Swap Termination* | Under certain circumstances specified in the Swap Agreement, the Issuer or the Swap Counterparty may terminate the Swap Agreement, in which event the Issuer or the Swap Counterparty may be required to make a Swap Termination Payment. *See "Description of the Swap Agreement— Early Termination of the Swap Agreement"* for a description of the events that may give rise to an early termination of the Swap Agreement and the method for calculating the Swap Termination Payment. Depending upon existing market conditions and other factors at the time of any such early termination, a Swap Termination Payment could be owed by the Issuer to |

010630

the Swap Counterparty or by the Swap Counterparty to the Issuer. If the Issuer is required to make such a Swap Termination Payment and is unable to enter into an offsetting replacement swap that pays a corresponding amount, the amount available for payment to the Holders of the Securities will be reduced. *See "Risk Factors—Termination of the Swap Agreement."*

| | |
|---|---|
| *Extension of Swap Agreement* | Under the Swap Agreement, the Swap Counterparty may, at its option, on the Extension Effective Date extend the Portfolio Modification Period for four years to August 1, 2015 and correspondingly extend the term of the Swap Agreement and the maturity of the Notes and Class Q-1 Securities to August 1, 2020, subject to the satisfaction of the Extension Conditions. *See "Maturity and Extension of Maturity" above.* |

The Reference Portfolio Manager may direct the Swap Counterparty to extend the Portfolio Modification Period and term of the Swap Agreement, and the Swap Counterparty has agreed to follow that direction subject to the satisfaction of the Extension Conditions.

| | |
|---|---|
| <u>Tax Considerations</u> | The Issuer, as a foreign corporation, will be subject to U.S. federal income tax on its net income only if it is treated as engaged in a trade or business within the United States. Counsel to the Issuer will provide an opinion that, while not free from doubt, the Issuer should not be considered to be engaged in a trade or business within the United States as a result of its contemplated activities. For U.S. federal income tax purposes, the Class A-1 Notes, the Class A-2 Notes, the Class B Notes and the Class C Notes will be treated as debt of the Issuer. Investors will be obligated to treat Income Notes as equity interests in the Issuer. For U.S. federal income tax purposes, a holder of Class Q-1 Securities will be treated as if it directly owned the related Components. For U.S. federal income tax purposes, the Class Q-2A Securities will be treated as debt. *See "Certain Income Tax Considerations—Tax Treatment of Non-U.S. Holders"* for the tax consequences to Non-U.S. Holders of holding the Class Q-2B Securities. It is anticipated that the Issuer will be a passive foreign investment company ("PFIC") for U.S. federal income tax purposes. *See "Certain Income Tax Considerations."* Prospective purchasers should also consult their own tax advisors. |
| <u>ERISA Considerations</u> | *See "Certain ERISA Considerations" herein.* |
| <u>Trustee and Collateral Administrator</u> | JPMorgan Chase Bank. |

13

010631

## RISK FACTORS

*Prospective purchasers of the Securities should consider, among other things, the following factors in connection with a purchase of the Securities. Prospective purchasers of the Class Q-1 Securities should consider, in addition to the matters set forth elsewhere in this Offering Circular, the risks applicable to the Components. More specifically, unless otherwise indicated or the context otherwise requires, all statements in these "Risk Factors" and elsewhere herein concerning the Senior Notes in general or the Class C-2 Notes or the Class C Notes in particular also relate to the applicable Class Q-1 Senior Note Component, and all such statements concerning the Income Notes also relate to the Class Q-1 Income Note Component. Prospective purchasers of the Class Q-2 Securities should consider, in addition to the matters set forth elsewhere in this Offering Circular, the risks applicable to the Class Q-2 Collateral Asset A. More specifically, unless otherwise indicated or the context otherwise requires, all statements in these "Risk Factors" and elsewhere herein concerning the Income Notes also relate to the Income Notes represented by the Class Q-2 Collateral Asset A.*

**Limited Assets to Make Payments on the Notes and Class Q-1 Securities**. The Senior Notes will be limited recourse debt obligations of the Issuer and will be non-recourse debt obligations of the Co-Issuer. The Class Q-1 Securities will be limited recourse debt obligations of the Issuer to the extent of the related Components. The Income Notes will be limited recourse debt obligations of the Issuer. The Notes will be payable solely from and to the extent of the available proceeds from the Trust Estate, and no person or entity other than the Issuer will be obligated to make any payments with respect to the Notes. The Issuer, as a special purpose company, will have no significant assets other than the Trust Estate and the Class Q-2 Securities Collateral pledged to secure the Class Q-2 Securities. The Co-Issuer will have no significant assets. Consequently, the Holders of the Senior Notes must rely for payment of the debt service on the Senior Notes solely upon the net payments received by the Issuer under the Swap Agreement, the outstanding Eligible Investments in the Trust Estate and amounts on deposit in the Trust Accounts, and any proceeds thereof. Any payment made by the Issuer to the Swap Counterparty under the Swap Agreement, including a Fixed Amount, Adjusted Reference Portfolio Return Amount, or Swap Termination Payment, and any reduction in any Adjusted Reference Portfolio Return Amount payable by the Swap Counterparty to the Issuer, may adversely affect the ability of the Issuers to make payments on the Notes. Holders of each Class of Notes will only be entitled to receive amounts available for distributions after payment of all amounts payable prior to such Class in accordance with the Priority of Payments set forth in the Indenture. *See "Description of the Securities—Priority of Payments."* After the disposition of the Trust Estate, if the proceeds thereof are insufficient to pay the Senior Notes, no other assets will be available for payment of any deficiency, and none of the Issuers, the Reference Portfolio Manager, the Placement Agent, the Initial Purchaser, the Swap Counterparty, the Swap Guarantor, the Administrator, the Share Trustee, the Trustee, the Amendment Buy-Out Purchaser or any of their respective Affiliates or any other Person will be obligated to pay any such deficiency, and all outstanding claims against the Issuers will be extinguished and may not be revived thereafter.

**Subordination of Income Notes**. The Holders of the Income Notes will be subordinate in payment to the creditors of the Issuer ranking higher in the Priority of Payments, including, without limitation, the Swap Counterparty, the Holders of the Senior Notes, the Trustee, the Collateral Administrator and the Administrator. Except with respect to the obligations of the Issuer to make payments pursuant to the Swap Agreement, the Indenture, the Collateral Administration Agreement and the Administration Agreement, the Issuer does not expect to have any significant creditors.

Distributions with respect to the Income Notes will be payable solely from and to the extent of the available proceeds from the Trust Estate pursuant to the Priority of Payments. Consequently, the Holders of the Income Notes must rely solely upon the net payments received by the Issuer under the Swap Agreement, the outstanding Eligible Investments in the Trust Estate and amounts on deposit in the Trust Accounts, and any proceeds thereof. Because of the subordination of the Income Notes, distributions will be made with respect thereto only after all other payments and distributions due on a Payment Date from the Trust Estate have been made. Income Noteholders are not entitled to a return of a stated principal amount or to receive distributions at a stated rate.

**Return Considerations.** The return to each Holder of the Income Notes will be a function of the purchase price paid by such Holder for the Income Notes and the timing and amount of distributions made in respect of its Income Notes during the term of the transaction. Each prospective purchaser of Income Notes should make its own evaluation of the return that it expects to receive on the Income Notes. Prospective purchasers should be aware that

010632

the timing and amount of distributions will be affected by, among other things, the timing and number of Credit Events and modifications to the Reference Portfolio (including the removal of Defaulted Reference Obligations), the timing and amount of Amortizations and the aggregate amount of Quarterly Aggregate Reduction Amounts, Quarterly Aggregate Increase Amounts and Quarterly Amortization Increase Amounts as a result thereof, which will depend in turn on the market value of Reference Obligations at the time of their removal from the Reference Portfolio. Each prospective purchaser should consider the risk that a more frequent occurrence of removals of Reference Obligations from the Reference Portfolio (including as a result of Credit Events) or lower market values upon such removals than that which may be anticipated by the purchaser will result in lower payments with respect to the Income Notes than that anticipated by the purchaser. The return on the Income Notes could also be adversely affected by market changes reducing the return on the Eligible Investments in the Trust Estate and the Adjusted Reference Portfolio Return Amounts (which depend on the interest and other amounts notionally generated by the Reference Portfolio). In particular, Interest Return may be reduced for Defaulted Reference Obligations, which in turn will reduce the Adjusted Reference Portfolio Return Amount payable to the Issuer. In addition, if the Issuer fails any Coverage Test as of any Determination Date for a Payment Date after the Ramp-up End Date, amounts that might otherwise be distributed to the Holders of the Income Notes on the related Payment Date will be used to redeem Senior Notes and will not be paid to such Holders. *See "Description of the Securities—Priority of Payments."* Each prospective purchaser should consider that any such adverse developments could result in its failure to recover its initial investment in the Income Notes.

The amounts available to pay the interest on, and the principal of, the Senior Notes may also be adversely affected by the factors described in the preceding paragraph, including the timing and number of Credit Events and removals of Reference Obligations, the aggregate amount of Quarterly Aggregate Reduction Amounts, Quarterly Aggregate Increase Amounts and Quarterly Amortization Increase Amounts and market changes or other factors reducing the return on the Eligible Investments and the Adjusted Reference Portfolio Return Amounts. Although reductions in the Adjusted Reference Portfolio Return Amount payable to the Issuer may reduce the amounts available to make payments on the Senior Notes, there will be no corresponding reduction in the accrual of interest on the Senior Notes. *See "—Subordination of Payment and Control"* and *"Description of the Securities—The Indenture and the Collateral Administration Agreement—Events of Default"* for the discussions therein of the limited remedies available to the beneficial owners of the Senior Notes upon the occurrence of a payment default with respect thereto.

**Subordination of Payment and Control.** *Subordination of Payment.* Payments on the Notes will be subordinate to payments due to the Swap Counterparty under the Swap Agreement (except in limited cases) and the payment of certain expenses of the Issuers. Among the Notes, payments on the Class C-1 Notes and the Class C-2 Notes will rank *pari passu,* payments on the Class C Notes (except in certain cases where the Diversion Test is not satisfied) will be subordinate to payments on the Class A-1 Notes, the Class A-2 Notes and the Class B Notes, payments on the Class B Notes (except in certain cases where the Diversion Test is not satisfied) will be subordinate to payments on the Class A-1 Notes and the Class A-2 Notes, and payments on the Class A-2 Notes will be subordinate to payments on the Class A-1 Notes. Distributions on the Income Notes will be subordinate to all payments on the Senior Notes. If the Diversion Test is not satisfied, Payment Date Proceeds will be used pursuant to the Payment Date Priority of Payments to pay first, on a pro rata basis, Deferred Interest, if any, on the Class B Notes and Class C Notes, and then, on a pro rata basis, the Aggregate Principal Amount of the Class B Notes and Class C Notes, regardless of whether any Class A-1 Notes or Class A-2 Notes are then outstanding.

*Control.* If a payment default in respect of the Class A-1 Notes or Class A-2 Notes or any other Event of Default occurs under the Indenture, the Requisite Noteholders or, unless the Swap Agreement has been terminated and all amounts owed to the Swap Counterparty have been paid in full or a Swap Event of Default as to which the Swap Counterparty is the defaulting party has occurred and is continuing while any Senior Notes are Outstanding, the Swap Counterparty will be entitled to direct the Trustee to declare the principal of, and the accrued interest on, the Notes to be immediately due and payable. The Requisite Noteholders, however, will not have the right (except in certain limited circumstances) to direct the Trustee to sell or liquidate the Eligible Investments in the Trust Estate. The Requisite Noteholders will therefore have only limited, or no, recourse upon a payment default with respect thereto or the occurrence of other Events of Default under the Indenture so long as the Swap Agreement is in effect and the Swap Counterparty is performing its obligations thereunder. The actions taken by (or the inaction of) the Swap Counterparty could have adverse consequences for the Holders of the Securities.

010633

In addition, under the Indenture, amendments of provisions of the Indenture and certain consents or waivers with respect thereto may generally only be made with the consent of the Swap Counterparty.

If an Event of Default occurs under the Indenture, the Swap Agreement has been terminated and all amounts due to the Swap Counterparty thereunder have been paid or if a Swap Event of Default has occurred and is continuing as to which the Swap Counterparty is the defaulting party, as long as any Class of Senior Notes is Outstanding, the Requisite Noteholders will be entitled to determine the remedies to be exercised under the Indenture without obtaining the consent of the Holders of any Class of subordinate Notes. Remedies pursued by the Requisite Noteholders could be adverse to the interests of the Holders of more junior Classes of Notes. Except in limited circumstances, none of the Holders of the Class A-2 Notes, the Class B Notes or the Class C Notes will have any right to determine the remedies to be exercised under the Indenture upon the occurrence of an Event of Default until in each case the Class or Classes of Notes senior to such Class have been paid in full, and the Holders of the Income Notes will have no rights to declare an Event of Default or to exercise any remedies upon an Event of Default under the Indenture, unless the Senior Notes have been redeemed in full and the Swap Agreement has been terminated and all amounts owed to the Swap Counterparty have been paid. *See "Description of the Securities—The Indenture and the Collateral Administration Agreement—Events of Default."*

**The Class Q-2 Securities**

Limited Assets to Make Payments on the Class Q-2 Securities**.** The Class Q-2 Securities will be limited recourse debt obligations of the Issuer. The Class Q-2 Securities will be payable solely from and to the extent of the available proceeds from the Class Q-2 Securities Collateral, and no person or entity other than the Issuer will be obligated to make any payments with respect to the Class Q-2 Securities. The Holders of the Class Q-2 Securities must rely for payments on the Class Q-2 Securities solely upon distributions, if any, made on the Class Q-2 Collateral Asset A and any other amounts on deposit in the Class Q-2 Securities Collateral Account, and any proceeds thereof. Any events adversely affecting the distributions on the Income Notes (including, without limitation, those described in *"Limited Assets to Make Payments on the Notes and Class Q-1 Securities"* and *"Return Considerations"* above and *"Effect of Credit Events on Performance of the Securities"* below) will adversely affect the ability of the Issuer to make payments on the Class Q-2 Securities. In addition, any events adversely affecting the value of the CGMHI Notes constituting the Class Q-2 Collateral Asset B will adversely affect the ability of the Issuer to make payments on the Class Q-2 Securities. After the disposition of the Class Q-2 Securities Collateral, if the proceeds thereof are insufficient to pay the Class Q-2 Securities, no other assets will be available for payment of any deficiency, and none of the Issuer, the Reference Portfolio Manager, the Placement Agent, the Initial Purchaser, the Swap Counterparty, the Swap Guarantor, the Administrator, the Share Trustee, the Trustee, the Amendment Buy-Out Purchaser or any of their respective Affiliates or any other Person will be obligated to pay any such deficiency, and all outstanding claims against the Issuer will be extinguished and may not be revived thereafter. Following the redemption of the Notes and the liquidation of the Trust Estate, Holders of Class Q-2B Securities that do not exchange such Class Q-2B Securities for the Class Q-2 Securities Collateral may be required to make or provide for certain payments to the Issuer in respect of administrative expenses.

Subordination of Class Q-2B Securities. *Subordination of Payment.* Among the Class Q-2 Securities, payments on the Class Q-2B Securities (other than payment of the Class Q-2B Target Amount) will be subordinate to payments on the Class Q-2A Securities. Holders of Class Q-2B Securities will only be entitled to receive amounts available for distributions after payment of all amounts payable prior to such Class in accordance with the Class Q-2 Priority of Payments set forth in the Indenture. *See "Description of the Securities—Class Q-2 Securities."*

*Control.* If a payment default in respect of the Class Q-2A Securities or any other Class Q-2 Event of Default occurs under the Indenture, so long as any Class Q-2A Securities are Outstanding, Holders of 66-2/3% in Aggregate Principal Amount of the Class Q-2A Securities will be entitled to direct the Trustee to declare the principal of, and the accrued interest on, the Class Q-2A Securities to be immediately due and payable and will be entitled to determine the remedies to be exercised under the Indenture. Remedies in the case of a Class Q-2 Event of Default are subject to certain limitations under the Indenture. Remedies pursued by the Holders of the Class Q-2A Securities could be adverse to the interests of the Holders of the Class Q-2B Securities. Except in limited circumstances, no Holder of Class Q-2B Securities will have any right to determine the remedies to be exercised under the Indenture upon the occurrence of a Class Q-2 Event of Default until the Class Q-2A Securities have been paid in full. *See "Description of the Securities—The Class Q-2 Securities."* Upon such a default, Holders of Class

16

010634

Q-2 Securities will have no rights to determine remedies to be exercised with respect to the Trust Estate, except to the extent of any right of the Class Q-2 Collateral Asset A.

Class Q-2 Collateral Asset B. This Offering Circular relates only to the Securities offered hereby (including to the Income Notes represented by the Class Q-2 Collateral Asset A) but is not an offering document for the Class Q-2 Collateral Asset B. It is intended solely to identify the Class Q-2 Collateral Asset B and does not purport to summarize or provide detailed information with respect to the Class Q-2 Collateral Asset B or the terms and conditions thereof. All information contained herein with respect to Class Q-2 Collateral Asset B is derived solely from the offering memorandum dated March 25, 2004 and pricing supplement dated April 28, 2004 with respect thereto (the "Class Q-2 Collateral Asset B Offering Documents"). Any information regarding the Class Q-2 Collateral Asset B contained herein does not purport to be complete and is qualified in its entirety by, and should be read in conjunction with, the Class Q-2 Collateral Asset B Offering Documents. The Issuer did not participate in the preparation of the Class Q-2 Collateral Asset B Offering Documents, and the Issuer has not made any due diligence inquiry with respect to the information provided therein nor has it verified the accuracy or completeness of such documents. In addition, the Issuer has made no investigation regarding the financial condition or creditworthiness of the issuer of the Class Q-2 Collateral Asset B. Information contained in the Class Q-2 Collateral Asset B Offering Documents is as of the respective dates stated therein, and comparable information, if given as of the date hereof, may be different. There can be no assurance that events affecting the Class Q-2 Collateral Asset B have not occurred, whether or not disclosed, which would affect the accuracy or completeness of the Class Q-2 Collateral Asset B Offering Documents.

**Effects of Leverage**. The Aggregate Reference Value of the Reference Portfolio on the Ramp-up End Date, determined based on the Reference Prices and the Reference Obligation Calculation Amounts (which include the undrawn portion of any revolving loan included in the Reference Obligations), is expected to be approximately equal to U.S. $895.5 million and therefore will be approximately 10.9 times greater than the initial purchase price for the Income Notes. This leverage will increase the cash flow available in respect of the amount invested by the Holders of the Income Notes as compared with the cash flow that would be available in respect of a comparable investment in a non-leveraged transaction. Such increased cash flow will directly affect the return on the Income Notes. *See "—Return Considerations."* However, the use of leverage also creates risk for the Holders of the Income Notes because it increases their exposure to losses on a leveraged basis as a result of Credit Events and removals of Reference Obligations.

Due to the existence of the leverage, changes in the market value of the Income Notes could be greater than the changes in the value of the underlying Reference Portfolio, which itself is subject to, among other things, credit and liquidity risk. As a result, the occurrence of Credit Events with respect to only a small portion of the Reference Obligations could result in the complete loss of the investment of the Holders of the Income Notes. Purchasers of the Income Notes must consider with particular care the risks of leverage because, although the use of leverage creates an opportunity for substantial returns on the Income Notes, it increases substantially the likelihood that the Holders of Income Notes could lose their entire investment if the Trust Estate is adversely affected by the removal of Reference Obligations upon the occurrence of Credit Events or otherwise.

**Interest Rate Risk.** The Class A-1 Notes, the Class A-2 Notes, the Class B Notes and the Class C-1 Notes will bear interest at floating rates based on LIBOR, as determined on each LIBOR Determination Date. The Class C-2 Notes will bear interest at a fixed rate. The funds that the Issuers will use to make interest payments on the Notes will consist of payments from the Swap Counterparty in respect of Reference Obligations and income from Eligible Investments and amounts on deposit in the Trust Accounts. Although the Reference Obligations and Eligible Investments are expected to be comprised primarily of floating rate obligations or provide for floating rate payments with payment dates, maturities or interest rate resets occurring at least quarterly, some Reference Obligations or Eligible Investments may bear interest at fixed rates or at floating rates based on indices other than LIBOR, or if LIBOR is applicable, LIBOR for the instrument may reset on dates other than the reset dates for the Notes. *See* the definition of *"Eligible Investments"* in the *"Glossary of Certain Defined Terms."* Consequently, there may be a mismatch between the interest payment obligations of the Issuers under the Senior Notes, on the one hand, and the cash flows paid to the Issuer under the Swap Agreement (which depend in part on the interest rates of the Reference Obligations) and Eligible Investments in the Trust Estate, on the other hand. As a result of such a mismatch, an increase or decrease in LIBOR (or other relevant floating rate) for the relevant maturity could adversely affect the ability of the Issuer to make payments on the Notes.

010635

**Role of the Reference Portfolio Manager**. The Reference Portfolio Manager will act solely on behalf of the Swap Counterparty, whose interests may be different from or adverse to interests of the Issuer and the Holder of Securities. *See "—Conflicts of Interest Involving the Swap Counterparty and its Affiliates."* The Reference Portfolio Manager will not act or be deemed to act on behalf of the Issuer or the Holders of Securities. Actions or functions taken or performed by or which the Reference Portfolio Manager is entitled to take or perform under the Swap Agreement or the Reference Portfolio Management Agreement will be taken or performed solely in the Reference Portfolio Manager's capacity as agent for the Swap Counterparty pursuant to the Reference Portfolio Management Agreement. Such actions include for example, the decision to add or remove a Reference Obligation, the determination of the Reference Price and/or Final Price for a Reference Obligation, and the calculation of Obligation Value Increase Amounts and Obligation Value Reduction Amounts. Neither the Issuer nor the Holders of the Securities will have any rights, as a third party beneficiary or otherwise, against the Reference Portfolio Manager under the Swap Agreement or the Reference Portfolio Management Agreement, and the Reference Portfolio Manager will have no liability to the Issuer or the Holders of Securities thereunder. The Issuer and the Holders of Securities will have no direct recourse against the Reference Portfolio Manager as a result of action or inaction by the Reference Portfolio Manager thereunder. In addition, neither the Issuer nor the Holders of the Securities will have any right to remove the Reference Portfolio Manager. *See "—Removal of the Reference Portfolio Manager."* Although the Reference Portfolio Manager is expected to manage the Eligible Investments in the Trust Estate (other than the initial Investment Agreement) on behalf of the Swap Counterparty, it will cease to do so if a Swap Event of Default occurs with respect to the Swap Counterparty or a Swap Additional Termination Event occurs. If the Swap Agreement is terminated for any reason, Highland Capital may, but will have no obligation to, assist the Issuer in securing a replacement Swap Agreement, and if the Issuer enters into a replacement Swap Agreement, there can be no assurance that Highland Capital will be the reference portfolio manager thereunder.

The disclosure with respect to the Reference Portfolio Manager herein is included solely for the purpose of allowing prospective investors to understand the effect that actions taken or functions performed by the Reference Portfolio Manager (on behalf of the Swap Counterparty) may have on the Securities.

**Effect of Decisions of the Reference Portfolio Manager on the Securities**. The ability of the Issuer to pay scheduled principal and interest on the Senior Notes and to make distributions in respect of the Income Notes will be highly dependent on the performance of the Swap Agreement, which in turn will depend on decisions made by the Reference Portfolio Manager in accordance with the terms of the Swap Agreement and the Reference Portfolio Management Agreement. As described under *"—Role of the Reference Portfolio Manager"* and *"—Conflicts of Interest Involving the Reference Portfolio Manager,"* the Reference Portfolio Manager is acting as the agent of the Swap Counterparty, not the Issuer. As described below under *"—Removal of the Reference Portfolio Manager,"* the Issuer and the Holders of Securities will have no right to remove the Reference Portfolio Manager.

The Reference Portfolio Manager is expected to actively manage the Reference Portfolio during the term of the transaction with the objective that the Adjusted Reference Portfolio Return Amount be sufficient to permit the Issuer, in accordance with the Priority of Payments, (i) on each Payment Date, to pay scheduled interest and principal on the Senior Notes in a timely manner and (ii) subject to clause (i), to provide for returns to the Holders of the Income Notes; *provided, however* that the Reference Portfolio Manager will not be responsible if such objectives are not achieved so long as the Reference Portfolio Manager performs its duties under the Reference Portfolio Management Agreement; and, *provided, further* that Holders of Securities will have no recourse to the Reference Portfolio Manager with respect to payment under the Securities. Unless the Swap Agreement has been terminated and all amounts owed to the Swap Counterparty thereunder have been paid in full or a Swap Event of Default as to which the Swap Counterparty is the defaulting party or Swap Additional Termination Event has occurred and is continuing, the Swap Counterparty or the Reference Portfolio Manager on its behalf will select the Eligible Investments in the Trust Accounts (other than the initial Eligible Investment) and manage the Eligible Investments in the Trust Accounts in accordance with the requirements of the Indenture.

There can be no assurance that the Reference Portfolio Manager will be able to manage the Reference Portfolio in a way that produces the economic results under the Swap Agreement desired by the Issuer (or, in turn, the beneficial owners of the Securities). The achievement of the desired results will require a high level of analytical sophistication, and there can be no assurance that the Reference Portfolio Manager will correctly judge the nature and magnitude of the many factors that could affect the prospects of creating such a Reference Portfolio. While the Reference Portfolio Manager has experience in selecting credits, managing debt portfolios, including

010636

collateralized debt obligations (some of which include, or are permitted to include, in their collateral, synthetic securities in the form of credit default swaps), and in recovery workouts upon credit defaults, the skill set required for such activities is not necessarily the same as that required for managing a portfolio of reference credits in a synthetic transaction, such as the Reference Portfolio in this transaction. In any case, there can be no assurance that the past performance of the Reference Portfolio Manager in managing debt portfolios or other assets will be indicative of its performance in managing the Reference Portfolio.

The ability of the Reference Portfolio Manager on behalf of the Swap Counterparty to manage the Reference Portfolio will be constrained by certain limitations, including the requirements that any Reference Obligation to be added to the Reference Portfolio satisfy certain criteria and the Reference Portfolio as a whole satisfy certain criteria. In addition, the right of the Reference Portfolio Manager to modify the Reference Portfolio will be limited during any period in which any Coverage Test is not satisfied. *See "The Reference Portfolio—Reference Portfolio Criteria"* and *"Description of the Swap Agreement—Selection and Modification of the Reference Portfolio."* Accordingly, during certain periods or in certain circumstances, the Reference Portfolio Manager may be unable as a result of such limitations to add to, remove from or otherwise modify the Reference Portfolio or take other actions that it might consider to be desirable under the Swap Agreement.

Because the Issuer may be required to make payments to the Swap Counterparty as a result of an Obligation Value Reduction Amount in connection with the removal of a Reference Obligation from the Reference Portfolio (or amounts otherwise payable by the Swap Counterparty to the Issuer may be reduced as a result thereof), removing Reference Obligations to restrict losses may result in certain costs to the Issuer. In addition, there can be no assurance that the Reference Portfolio Manager will become aware of the credit deterioration of a Reference Obligation in sufficient time to remove it from the Reference Portfolio to avoid or mitigate potential loss.

The management of the Reference Portfolio by the Reference Portfolio Manager during the term of the transaction will expose the Issuer (and, consequently, the Holders of Securities) through the Swap Agreement to changes in market conditions. As a result, if Reference Obligations are removed, the Reference Portfolio Manager may not be able to add Reference Obligations that will result in Adjusted Reference Portfolio Return Amounts at comparable levels to those prevailing while the removed Reference Obligations were part of the Reference Portfolio. Any such difference may adversely impact the ability of the Issuers to pay the principal of and interest on the Senior Notes and may reduce the return on the Income Notes. *See "—Return Considerations."*

In addition, under certain circumstances, the Reference Portfolio Management Agreement could be terminated or the Reference Portfolio Manager may resign as described under *"The Reference Portfolio Manager and the Reference Portfolio Management Agreement."* In such case, there can be no assurance as to the nature of the subsequent management of the Reference Portfolio.

Because the composition of the Reference Portfolio will vary over time, the performance of the Reference Portfolio depends heavily on the skills of the Reference Portfolio Manager in analyzing, selecting and managing the Reference Obligations. As a result, the Issuer, through the Swap Agreement, will be highly dependent on the financial and managerial experience of certain individuals associated with the Reference Portfolio Manager. The loss of key personnel could thus have a material adverse effect on the performance of the transaction and the interests of the beneficial owners of the Securities.

**Exposure to Reference Obligations and Eligible Investments**. The market value of Reference Obligations generally will fluctuate with, among other things, the financial condition of the relevant Reference Entity and the terms of such Reference Obligations, changes in prevailing interest rates, general economic conditions, the condition of certain financial markets (particularly the markets for corporate debt obligations and credit facilities), domestic and international political events and developments or trends in any particular industry. In addition, the return to the Holders will depend on the rate of prepayments of Reference Obligations and the Reference Prices at which the Reference Portfolio Manager, on behalf of the Swap Counterparty, is able to add Reference Obligations to the Reference Portfolio. To the extent that prepayments occur at a different rate than expected or Reference Prices reflect less of a discount to par than expected, returns to the Holders may be reduced. The occurrence of a Credit Event will likely result in a decrease in the market value of the related Reference Obligation. If a Reference Obligation is removed from the Reference Portfolio at a time when a Credit Event has occurred and is continuing, the market value of the Reference Obligation may be less than would otherwise prevail in the absence of such circumstances.

010637

The Issuer is also exposed to credit risk and market risk of the issuers of any Eligible Investments that it holds. The net proceeds of the issuance of the Notes (including the Income Notes represented by the Class Q-2 Collateral Asset A) and the Class Q-1 Securities are expected to be invested in the Investment Agreement as described in more detail herein. Insolvency of, or default by, the counterparty to such agreement (or its guarantor) would adversely affect the ability of the Issuer to make payments and distributions with respect to the Securities. In addition, such insolvency or default, or qualification, downgrade or withdrawal of the credit rating of such counterparty (or its guarantor), could result in the qualification, downgrade or withdrawal of the ratings of the Senior Notes or Class Q-1 Securities. *See "Description of the Securities—The Investment Agreement."* Other Eligible Investments acquired from time to time by the Issuer will be required to satisfy certain criteria as discussed herein.

**Revolving Loan Risk.** A significant portion of the Reference Portfolio is expected to consist of revolving loan facilities. When a revolving loan facility is included in the Reference Portfolio, the Reference Obligation Calculation Amount will measure the maximum amount of the portion of the loan included in the Reference Obligation that could be outstanding under that facility. The Reference Portfolio Proceeds in respect of such a Reference Obligation will depend on the actual amount of loans outstanding, which will change from time to time as the borrower draws, repays and redraws amounts under the facility. Although the borrower under a revolving facility typically pays commitment fees on the undrawn credit line under that facility (which commitment fees will be taken into account in calculating the Interest Return), the Interest Return, and accordingly, the Adjusted Reference Portfolio Return Amounts, will be lower to the extent the revolving facilities are undrawn. If draws under such facilities are, on average, lower than expected, the Adjusted Reference Portfolio Return Amounts will be correspondingly reduced. In that case, the ability of the Issuer to make distributions on the Income Notes and pay interest on the Senior Notes may be impaired.

**Ramp-up Risk**. The Reference Portfolio on the Closing Date is expected to have an Aggregate Reference Obligation Calculation Amount of approximately U.S. $770 million. During the Ramp-up Period, the Reference Portfolio Manager on behalf of the Swap Counterparty is expected to add Reference Obligations to the Reference Portfolio until the Aggregate Reference Obligation Calculation Amount of the Reference Obligations is equal to approximately U.S. $900 million in accordance with certain criteria. After the Ramp-up Period, the Aggregate Reference Obligation Calculation Amount may still increase or decrease as a result of removal and addition of Reference Obligations.

The Reference Portfolio Manager's ability to add Reference Obligations at suitable Reference Prices will depend on a number of factors, including the conditions in certain financial markets, general economic conditions and U.S. and international political events. There can be no assurance that the Reference Portfolio will reach the target levels during the Ramp-up Period or at all. A smaller Reference Portfolio may result in smaller Adjusted Reference Portfolio Return Amounts and could adversely affect returns on the Income Notes or the ability of the Issuer to make required payments on the Senior Notes. The Issuers will request each Rating Agency to confirm, within 30 days after the Ramp-up End Date, the ratings assigned on the Closing Date to the Senior Notes and the Class Q-1 Securities. If any of such ratings on the Senior Notes are not confirmed, on the next and succeeding Payment Dates the Senior Notes will be redeemed, beginning with the most senior Class outstanding, in accordance with the Priority of Payments until such ratings are confirmed.

**No Legal or Beneficial Interest in Reference Obligations**. Under the Swap Agreement, the Issuer will have a contractual relationship only with the Swap Counterparty, and not with any Reference Entity. Consequently, the addition of a Reference Obligation to the Reference Portfolio will not constitute a purchase or other acquisition or assignment of any interest in the Reference Obligation or any other obligation of the related Reference Entity. The Swap Counterparty is not obligated to, and may choose not to, own any or all of the Reference Obligations. Moreover, the Swap Counterparty will not grant the Issuer or the Trustee any security interest in any such obligation. The Issuer and the Trustee will therefore have rights solely against the Swap Counterparty in accordance with the Swap Agreement. The Issuer will have no right to (i) enforce directly compliance by the Reference Entity with the terms of any specific obligation of the Reference Obligation, (ii) exercise rights of setoff against the Reference Entity or voting or other consensual rights of ownership with respect to any such obligation, (iii) benefit directly from any collateral supporting any such obligation or (iv) avail itself of any remedies that would normally be available to a holder of any such obligation. Under the Swap Agreement, none of the Issuers, the Trustee, the beneficial owners of the Securities or any other entity will have any rights to acquire from the Swap Counterparty (or to require the Swap Counterparty to purchase, transfer, assign or otherwise dispose of) any interest in any Reference Obligation.

010638

**Limited Provision of Information about Reference Entities**.  Except for the limited information contained in the periodic reports furnished by the Issuer or its agent, the beneficial owners of the Securities will not have the right to obtain from the Issuers, the Swap Counterparty, the Swap Guarantor, the Reference Portfolio Manager, the Trustee, the Collateral Administrator, the Share Trustee, the Administrator, the Amendment Buy-Out Purchaser or any of their respective Affiliates any additional information about the Reference Portfolio or the Reference Entities.  *See "Description of the Securities—The Indenture and the Collateral Administration Agreement—Reports."*  The Swap Counterparty will have no obligation to keep the Issuers, the Trustee or the beneficial owners of the Securities informed as to matters arising in relation to any Reference Entity or Reference Obligation, including whether or not circumstances exist under which there is a possibility of the occurrence of a Credit Event.

None of the Issuers, the Trustee or the beneficial owners of the Securities will have the right to inspect any records of the Swap Counterparty or the Reference Entities, and the Swap Counterparty will be under no obligation to disclose any further information regarding the existence or terms of any obligation of any Reference Entity, any guarantor or any other person.

**Effect of Credit Events on Performance of the Securities**.  The Issuer is not aware of a central source for relevant data or a standardized method for measuring the likelihood of the occurrence of Credit Events. Furthermore, the historical experience of obligors comparable to the Reference Entities is not necessarily indicative of the risk of Credit Events occurring with respect to the Reference Obligations in the Reference Portfolio.  The occurrence of Credit Events and the removal of the relevant Reference Obligations from the Reference Portfolio will generally reduce the amounts that would otherwise be available for payments on the Senior Notes and distributions on the Income Notes.  Any such reduction will first affect the Income Notes before affecting the Senior Notes and among the Senior Notes, the beneficial owners of the Class C Notes will be directly affected before the beneficial owners of the Class B Notes, the beneficial owners of the Class B Notes will be directly affected before the beneficial owners of the Class A-2 Notes, and the beneficial owners of the Class A-2 Notes will be directly affected before the beneficial owners of the Class A-1 Notes.  Prospective purchasers of the Securities should consider for themselves, among other things, the likely level and timing of Credit Events and the amount of any resulting Obligation Value Reduction Amounts.  The return to the beneficial owners of the Securities will be directly affected by the performance of the Reference Portfolio in comparison to the levels of such factors anticipated by such beneficial owners.  *See "—Return Considerations"* for a description of certain other developments that could adversely affect the return on the Securities.

**Termination of the Swap Agreement**.  In certain circumstances specified in the Swap Agreement, the Issuer or the Swap Counterparty may terminate the Swap Agreement.  For example, the Issuer or the Swap Counterparty will each have the right to terminate the Swap Agreement upon the occurrence of a payment default under the Swap Agreement by the other party.  *See "Description of the Swap Agreement—Early Termination of the Swap Agreement."*  In the event that the Swap Agreement is terminated, the Issuer will no longer receive payments from the Swap Counterparty and may not have sufficient funds to make payments when due on the Securities.

In addition, upon an early termination of the Swap Agreement, the Issuer or the Swap Counterparty may be required to make a Swap Termination Payment to the other party.  Such Swap Termination Payment will be calculated on the basis of the "Close-out Amount" as defined in the ISDA Master Agreement, and will generally serve to compensate the party that is "in-the-money" (which may be the defaulting party or the affected party) for the replacement cost of the terminated Swap Agreement.  If the Issuer is required to make a Swap Termination Payment in such circumstances and does not enter into a replacement swap agreement under which it receives an offsetting payment, any such payment would reduce the amount available to the Issuers to make payments to the Holders of the Securities.  *See "Description of the Swap Agreement—Early Termination of the Swap Agreement."*

**Extension of Portfolio Modification Period, Swap Agreement and Maturity of Notes and Class Q-1 Securities**.  Under the Swap Agreement, the Swap Counterparty may, at its option, on the Extension Effective Date extend the Portfolio Modification Period for four years to August 1, 2015 and correspondingly extend the term of the Swap Agreement for four years to August 1, 2020, if the Extension Conditions are satisfied. Under the Indenture, if the term of the Swap Agreement is so extended, the maturity of the Notes and the Class Q-1 Securities will be equally extended without the requirement for any approval or consent of any holders of Securities.  Holders of Securities will not be able to prevent or prohibit the extension of the maturity of the Notes and Class Q-1 Securities so long as the Extension Conditions are satisfied, which include the ability of holders of Notes and Class

Q-1 Securities to sell their Notes and Class Q-1 Securities at the applicable purchase price to a designated purchaser under the Indenture. However, the Indenture provides that holders of Income Notes that have received an internal rate of return equal to or in excess of 18% per annum as of the Extension Effective Date will not receive any payment in exchange for their Income Notes sold in connection with a Maturity Extension.

As a consequence, if the Swap Counterparty elects to extend the Swap Agreement and the Extension Conditions are satisfied, holders of Notes and Class Q-1 Securities may either be required to hold their Notes and Class Q-1 Securities for a significantly longer period of time or be forced to sell their Notes and Class Q-1 Securities for the applicable purchase price under the Indenture, resulting in a shorter holding period than expected at the time of investment in the Notes and Class Q-1 Securities.

In addition, the extension of the Portfolio Modification Period may affect the management of the Reference Portfolio over time and accordingly may affect the return to holders of Securities. *See – "Effect of Decisions of the Reference Portfolio Manager on the Securities."*

The Class Q-2 Securities are scheduled to mature on April 28, 2034 and are not themselves subject to any extension of maturity. However, the Income Notes represented by the Class Q-2 Collateral Asset A are subject to an extension of maturity (and may be sold in connection therewith upon the direction of the applicable Holders of Class Q-2B Securities who pursuant to the Indenture have voting rights with respect to the Income Notes represented by the Class Q-2 Collateral Asset A) as described herein.

**Amendment Buy-Out**. Any Non-consenting Holder of Notes or Class Q-1 Securities with respect to an amendment of the Indenture or the Swap Agreement (which includes holders that fail to respond to a consent solicitation within the applicable period) may be forced to sell its applicable Securities to the Amendment Buy-Out Purchaser at the applicable Amendment Buy-Out Purchase Price, resulting in a shorter holding period than expected at the time of investment in the Securities. However, in the case of Income Notes, the Indenture provides that the Amendment Buy-Out Purchase Price will be zero for Non-consenting Holders that have received an internal rate of return equal to or in excess of 18% per annum as of the Amendment Buy-Out date. *See "Description of the Securities—Amendment Buy-Out."* A holder's ability to vote against an amendment or affect or influence the amendment process with respect to the Indenture and the Swap Agreement may thus be limited. The Amendment Buy-Out Option may also increase the ability of the Swap Counterparty or the Reference Portfolio Manager to affect or influence the amendment process.

The Class Q-2 Securities themselves are not subject to an Amendment Buy-Out, but the Indenture permits the Amendment Buy-Out Purchaser to purchase at the applicable Amendment Buy-Out Purchase Price the Income Notes represented by the Class Q-2 Collateral Asset A, if the Holders of Class Q-2B Securities who pursuant to the Indenture have voting rights with respect to the Income Notes represented by the Class Q-2 Collateral Asset A would be deemed to be a Non-consenting Holder with respect to such Income Notes and such amendment pursuant to the provisions of the Indenture. Such purchase may result in the early repayment of the Class Q-2A Securities pursuant to the Indenture.

**Reliance on Creditworthiness of the Swap Counterparty and Swap Guarantor**. The ability of the Issuers to pay amounts due on the Senior Notes and the Issuer to make distributions on the Income Notes will be dependent, in part, on the receipt of payments by the Issuer from the Swap Counterparty under the Swap Agreement (or from the Swap Guarantor under the Swap Guarantee). Consequently, the Issuers will not only be relying on the creditworthiness of the Reference Entities in order to avoid the occurrence of Credit Events, but also on the creditworthiness of the Swap Counterparty (or the Swap Guarantor) to perform its obligations in respect of the Swap Agreement. The insolvency of the Swap Counterparty or Swap Guarantor or a default by it under the Swap Agreement or Swap Guarantee, respectively, would adversely affect the ability of the Issuers to make the payments due on the Senior Notes and distributions on the Income Notes, could result in the qualification, withdrawal or downgrading of the rating on the Senior Notes or the Class Q-1 Securities and potentially could lead to the early termination of the Swap Agreement. *See "The Swap Counterparty and Swap Guarantor."*

The rating of the Securities may also be affected by a qualification, downgrade or withdrawal of the Swap Counterparty's or the Swap Guarantor's ratings. If the Swap Counterparty or the Swap Guarantor fails to meet the applicable rating requirements under the Swap Agreement, the Swap Counterparty will be required to post collateral, and in some cases, take certain additional actions. There can be no assurance, however, that the Swap Counterparty's posting of collateral or taking such actions will prevent a qualification, downgrade or withdrawal of the ratings of any Class of Senior Notes or Class Q-1 Securities.

010640

Upon any early termination of the Swap Agreement, as long as the Notes have not been accelerated pursuant to the Indenture, the Issuer will attempt, subject to the Indenture and to approval by the Holders of the Notes as described herein, to arrange to replace the Swap Agreement with a new swap agreement with an acceptable counterparty. In such event, the Reference Portfolio Manager may, in its discretion, assist the Issuer in its efforts to arrange for a replacement swap agreement, with itself as Reference Portfolio Manager. There can be no assurance that the Issuer or the Reference Portfolio Manager will be able to arrange for a substitute swap agreement in the event of the termination of the Swap Agreement, that the terms of any such replacement swap agreement would be as favorable to the Issuer or the Holders of the Securities as the terms of the Swap Agreement or that Highland Capital will be the reference portfolio manager under such a replacement swap agreement.

**Concentration Risk**. Payments on the Securities could be affected by the concentration of the Reference Portfolio in the Reference Obligations of any one country, industry or Reference Entity. In addition, Defaulted Reference Obligations may be highly correlated with particular geographic regions or industries represented in the Reference Portfolio. The Swap Agreement will contain limitations on the concentration of the Reference Obligations in the obligations of any one Reference Entity and will also include diversity requirements intended to achieve diversity across countries and industries.

**International Investing**. Up to 15% of the Portfolio Calculation Amount may consist of Reference Obligations of Reference Entities having a Domicile in an Eligible Country other than the United States or Canada. Transactions in Reference Obligations of non-U.S. Reference Entities may involve greater risks than transactions in Reference Obligations of only U.S. Reference Entities. These risks may include (i) less publicly available information, (ii) varying levels of governmental regulation and supervision, (iii) the difficulty of enforcing legal rights in a foreign jurisdiction and uncertainties as to the status, interpretation and application of laws, (iv) risks of economic dislocations in the host country, (v) less data on historic default and recovery rates, (vi) higher transaction costs, (vii) delays and other problems in the clearance and settlement of transactions and (viii) impacts of currency conversion rate changes on Reference Entities (although all of the Reference Obligations will be denominated and payable in U.S. dollars). Moreover, non-U.S. Reference Entities may not be subject to accounting, auditing and financial reporting standards, practices and requirements comparable to those applicable to U.S. Reference Entities. Although the Issuer will not directly own any Reference Obligations, all of the foregoing factors may adversely affect the market value of any Reference Obligation of a non-U.S. Reference Entity, which may result in a larger Obligation Value Reduction Amount or smaller Obligation Value Increase Amount upon its removal from the Reference Portfolio.

**Credit Ratings**. Credit ratings of Reference Entities and Reference Obligations represent the opinions of the rating agencies regarding the likelihood of payment of certain obligations when due and the ultimate payment of other obligations (such as principal payments) of the Reference Entities, but are not a guarantee of the creditworthiness of such Reference Entities. While the market imposes a certain amount of discipline on the rating agencies' rating processes, the rating agencies themselves do not assume responsibility for their rating actions in any legally cognizable sense, and investors cannot expect to have recourse to rating agencies for ratings actions taken or not taken. While rating methodologies generally attempt to evaluate all risks capable of rational analysis, not all risks are susceptible of analysis and certain market risks are explicitly excluded from rating analyses. Therefore, the ratings assigned to a Reference Entity or its Reference Obligations by the Rating Agencies may not fully reflect the true risks of adding a Reference Obligation to the Reference Portfolio. In addition, rating agencies may fail to make timely changes in credit ratings in response to subsequent events, so that the current financial condition of a Reference Entity at any given time may be better or worse than what the current rating indicates. Consequently, credit ratings of the Reference Entities and Reference Obligations included in the Reference Portfolio cannot be definitive indicators of investment quality. *See also "Ratings"* for a discussion of the ratings of the Senior Notes and the Class Q-1 Securities.

**Conflicts of Interest Involving the Swap Counterparty and Its Affiliates.** The Swap Counterparty and its Affiliates are acting in a number of capacities in connection with the transaction described herein. Citigroup Global Markets Inc., an Affiliate of the Swap Counterparty, will serve as Initial Purchaser and Placement Agent with respect to the Securities and may be the Amendment Buy-Out Purchaser. The Swap Counterparty or another affiliate may act as, or designate, another Amendment Buy-Out Purchaser. The Swap Guarantor is the issuer of the Class Q-2 Collateral Asset B. The Swap Counterparty and each of its Affiliates acting in such capacities will have only the duties and responsibilities expressly agreed to by such entity in the relevant capacity and will not, by reason of its or any of its Affiliates' acting in any other capacity, be deemed to have other duties or responsibilities or be deemed to be held to a standard of care other than as expressly provided with respect to each such capacity. In no

010641

event shall the Swap Counterparty or any of its Affiliates be deemed to have any fiduciary obligations to the Holders of the Securities or any other Person by reason of its or any of its Affiliates acting in any capacity. The Swap Counterparty may take actions under the Swap Agreement or otherwise that may be inconsistent with or adverse to the interests of the Holders of the Securities.

The Swap Counterparty will not be obligated to take any action to minimize Obligation Value Reduction Amounts, or maximize Obligation Value Increase Amounts, with respect to any Reference Obligation. The Swap Counterparty or one of its Affiliates may act as a dealer for purposes of obtaining quotations with respect to a Reference Obligation. In the case of the occurrence of an Event of Default under the Indenture, the Swap Counterparty will, except in limited circumstances, be entitled to direct the Trustee to take certain actions with respect to the Trust Estate until the obligations of the Issuer to the Swap Counterparty under the Swap Agreement are paid in full, and such directions may be inconsistent with or adverse to the interests of the Holders of the Securities. The Swap Counterparty will be entitled to extend the Portfolio Modification Period and correspondingly extend the term of the Swap Agreement and the maturity of the Notes and the Class Q-1 Securities, subject to the Extension Conditions.

The Swap Counterparty and its Affiliates may purchase, acquire, hold, sell and make loans secured by Securities from time to time subject to certain limitations discussed below. The Swap Counterparty and its Affiliates may be entitled or become obligated to acquire Securities under certain circumstances and in such case would have the rights of Holders of such Securities as described herein.

The Swap Counterparty and its Affiliates may (but are not required to) hold any Reference Obligations or other obligations or securities of any Reference Entity (including to hedge its obligations under the Swap Agreement), may deal in any such obligations or securities, may enter into other credit derivatives involving reference entities or reference obligations that may include the Reference Entities or Reference Obligations (including credit derivatives to hedge its obligations under the Swap Agreement), may accept deposits from, make loans or otherwise extend credit to, and generally engage in any kind of commercial or investment banking or other business with, any Reference Entity, any Affiliate of any Reference Entity or any other Person or other entity having obligations relating to any Reference Entity, and may act with respect to such business in the same manner as if the Swap Agreement did not exist, regardless of whether any such relationship or action might have an adverse effect on any Reference Entity (including, without limitation, any action which might constitute or give rise to a Credit Event), or on the position of the Issuer or any other party to the transactions described herein or otherwise. Reference Obligations may include loans or loan facilities extended by the Swap Counterparty or any of its Affiliates to Reference Entities. In addition, the Swap Counterparty and/or its Affiliates may from time to time possess interests in the Reference Entities and/or Reference Obligations allowing the Swap Counterparty or its Affiliates, as applicable (or any investment manager or adviser acting on its or their behalf), to exercise voting or consent rights with respect thereto, and such rights may be exercised in a manner that may be adverse to the interests of the Holders or that may affect the market value of Reference Obligations and/or the amounts payable thereunder. The Swap Counterparty and its Affiliates may maintain other banking and investment advisory relationships with the Reference Portfolio Manager and its Affiliates. The Swap Counterparty and its Affiliates may, whether by reason of the types of relationships described herein or otherwise, at the date hereof or any time hereafter, be in possession of information in relation to any Reference Entity that is or may be material in the context of the Swap Agreement and the other transaction documents and that may or may not be publicly available or known to the other parties to the transaction documents and which information the Swap Counterparty or such Affiliates may be prohibited from using for the benefit of the Issuer. Although the Swap Counterparty or its Affiliates may be prohibited from acting on the basis of such information in connection with the Swap Agreement, the possession of such information will not otherwise prevent the Swap Counterparty or its Affiliates from taking actions under the Swap Agreement.

The Swap Counterparty and its Affiliates currently act as administrative agent, swap counterparty, underwriter, initial purchaser or placement agent or in a similar capacity for entities having investment objectives similar to those of the Issuer, and the Swap Counterparty and its Affiliates may act as administrative agent, swap counterparty, underwriter, initial purchaser or placement agent for such entities and other similar entities in the future. The Swap Counterparty (or an Affiliate) may be advising or distributing securities on behalf of an issuer or providing banking or other services to an issuer at the same time at which the Reference Portfolio Manager is determining whether to add or remove the issuer as a Reference Entity under the Swap Agreement. The Swap Counterparty has no duty to inform the Reference Portfolio Manager of any such relationship or activity.

010642

Employees of the Swap Counterparty and its Affiliates may also serve as directors of other entities having investment objectives similar to those of the Issuer.

The Issuer may invest in Eligible Investments that are purchased from or sold to the Swap Counterparty or its Affiliates. The Swap Counterparty, as secured party under the Indenture, or the Reference Portfolio Manager on its behalf, will be entitled to direct the Issuer's investments in Eligible Investments in the Trust Estate unless a Swap Event of Default as to which the Swap Counterparty is the defaulting party or a Swap Additional Termination Event has occurred and is continuing or the Swap Agreement has been terminated and all amounts owed to the Swap Counterparty thereunder have been paid.

The Swap Counterparty and its Affiliates may hold or deal in obligations of, or interests in, and may generally engage in any kind of commercial or investment banking or other business with, issuers of Eligible Investments.

**Conflicts of Interest Involving the Reference Portfolio Manager**. As described herein, the Reference Portfolio Manager will act solely on behalf of the Swap Counterparty (and not on behalf of the Issuer). The disclosure with respect to the Reference Portfolio Manager herein is included solely for the purpose of allowing prospective investors to understand the effect that the actions or omissions of the Reference Portfolio Manager under the Swap Agreement and Reference Portfolio Management Agreement may have on the Securities. Various potential and actual conflicts of interest may arise from the overall advisory, investment and other activities of the Reference Portfolio Manager and any of its Affiliates and their respective clients. The following briefly summarizes some of these conflicts, but is not intended to be an exhaustive list of all such conflicts.

Although the Reference Portfolio Manager's fees are, in part, based on the performance of the Reference Portfolio, under the Reference Portfolio Management Agreement, the Reference Portfolio Manager is acting on behalf of the Swap Counterparty as its agent (and not as the agent of the Issuer or agent of the Holders of Securities) under the Swap Agreement. *See "—Role of the Reference Portfolio Manager."*

The Swap Counterparty is not the Reference Portfolio Manager's exclusive client. The Reference Portfolio Manager may invest and has, and in the future may have, Affiliates and other clients, which invest, directly or indirectly, in the securities or financial instruments of issuers that are the same or similar to the Reference Entities included in the Reference Portfolio or that would be appropriate for inclusion in the Reference Portfolio, and the Reference Portfolio Manager and its Affiliates and other clients in making such investments have no duty to take into account the interests of the Swap Counterparty, the Issuer or the Holders of Securities. Such investment decisions may be different from decisions to add or remove Reference Obligations under the Swap Agreement. The Reference Portfolio Manager and its principals, officers and employees will conduct businesses other than that with respect to the Swap Agreement, including providing investment management and advisory services to its Affiliates and other clients. There is no limitation or restriction on the Reference Portfolio Manager (or its Affiliates) with regard to acting as portfolio manager (or in a similar role) to other parties or persons. Although the principals, officers and employees of the Reference Portfolio Manager will devote as much time to the Swap Agreement as the Reference Portfolio Manager deems appropriate to accomplish the objectives of the transaction, the principals, officers and employees of the Reference Portfolio Manager may have conflicts allocating their time and services among the Swap Counterparty and the Affiliates and other clients of the Reference Portfolio Manager. The Reference Portfolio Manager may from time to time engage in transactions or perform services for the Swap Counterparty and its Affiliates other than those provided for in the Reference Portfolio Management Agreement and the Swap Agreement.

The Reference Portfolio Manager will be reimbursed by the Swap Counterparty for certain expenses and other amounts incurred in connection with the Reference Portfolio Management Agreement and the Swap Agreement, to the extent the Swap Counterparty receives payment for such expenses from the Issuer in accordance with the Priority of Payments or from the proceeds of the issuance of the Notes and the Class Q-1 Securities. Such expenses may therefore affect the return to Holders of Securities.

Since a portion of the fees payable to the Reference Portfolio Manager corresponding to the Subordinate Amount and the Incentive Amount will only be payable to the extent the Income Notes have received specified returns (*See "The Reference Portfolio Manager and the Reference Portfolio Management Agreement"*), those fees may be viewed as creating an incentive for the Reference Portfolio Manager to make more speculative decisions

with respect to the addition and removal of Reference Obligations or other management of the Reference Portfolio than it would otherwise have made in absence of such fee arrangements.

The Reference Portfolio Manager or any of its Affiliates may be a Holder of Securities. In particular, it is expected that on the Closing Date an Affiliate or fund of the Reference Portfolio Manager will invest U.S. $20 million in Income Notes of the Issuer. As a Holder of Income Notes, the Reference Portfolio Manager and its Affiliates or funds will, among other things, be eligible to vote for or against an Optional Redemption of the Notes. The holding of Income Notes by the Reference Portfolio Manager or any of its Affiliates could therefore affect the ability of the other Holders of the Income Notes to effect an Optional Redemption. Regardless of any such investment or holdings, the interests and incentives of the Reference Portfolio Manager will not necessarily be aligned with those of the other Holders of the Securities (or of the Holders of any particular Class of Securities). Each of the Reference Portfolio Manager, its Affiliates and their respective employees may in its discretion purchase any of the Securities for its own account or for any account for which it serves as investment adviser.

The Reference Portfolio Manager and its Affiliates may enter into, for their own account or for other accounts for which they have investment discretion, swap agreements relating to reference entities that may be the same as Reference Entities for Reference Obligations included in the Reference Portfolio or that may be appropriate for inclusion as a Reference Obligation in the Reference Portfolio. Such swap agreements may contain terms similar to or different from those contained in the Swap Agreement, and may be entered into with the Swap Counterparty or other swap counterparties. The Reference Portfolio Manager and its Affiliates and clients may also have equity and other investments in and may be lenders to, and may have other ongoing relationships with, the Reference Entities that may include, without limitation, serving as credit risk manager for, investing in, lending to, or being affiliated with, Reference Entities and other trusts and pooled investment vehicles that acquire interests in, provide financing to, or otherwise deal with Reference Entities the obligations of which would be suitable for addition to the Reference Portfolio. In addition, Affiliates and clients of the Reference Portfolio Manager may invest in securities (or make loans) that are included among, *pari passu* with or senior to Reference Obligations, or have interests different from or adverse to those of the Swap Counterparty or the Issuer with respect to Reference Entities or Reference Obligations. The Reference Portfolio Manager may at certain times be simultaneously adding or removing a Reference Obligation or Reference Obligations to or from, as applicable, the Reference Portfolio and arranging for other similar entities for which it serves as investment adviser, or for its clients or Affiliates, to purchase or sell the same Reference Obligation or Reference Obligations or to add or remove the same Reference Obligation or Reference Obligations to or from, as applicable, the reference portfolio under comparable swap agreements or other cash portfolios. The Reference Portfolio Manager will be free, in its sole discretion, to make recommendations to others, or effect transactions on behalf of itself or for others, that may be the same as or different from those effected on behalf of the Swap Counterparty.

No provision in the Reference Portfolio Management Agreement prevents the Reference Portfolio Manager or any of its Affiliates from rendering services of any kind to a Reference Entity (or an issuer of any Eligible Investment included in the Trust Estate) or the Issuers, the Swap Counterparty, the Swap Guarantor, the Trustee, the Collateral Administrator, the Amendment Buy-Out Purchaser, the Holders of the Securities or any other Person or entity. As a result, officers or Affiliates of the Reference Portfolio Manager may possess information related to the Reference Entities which is not known to the officers or employees of the Reference Portfolio Manager responsible for managing the Reference Portfolio and performing the other obligations of the Reference Portfolio Manager under the Reference Portfolio Management Agreement. Without prejudice to the generality of the foregoing, the Reference Portfolio Manager, its Affiliates and the directors, officers, employees and agents of the Reference Portfolio Manager and its Affiliates may, among other things: (i) serve as portfolio manager or advisor or subadvisor, directors, partners, officers, employees, agents, nominees or signatories for any Reference Entity or other issuers who invest in assets of a similar nature to the Reference Obligations; (ii) receive fees for services rendered to a Reference Entity or any Affiliates thereof or any such issuer; (iii) be a secured or unsecured creditor of, or hold an equity interest in, any Reference Entity or any such issuer; (iv) make a market in any Reference Obligation; and (v) serve as a member of any "creditors' board" with respect to any Reference Entity. These and other present and future activities of the Reference Portfolio Manager and/or its Affiliates may give rise to additional conflicts of interest.

010644

The Reference Portfolio Manager and its Affiliates currently provide and will continue to provide advisory and other services to clients that are Reference Entities or their Affiliates or issuers of securities similar to or the same as the Reference Obligations under the Swap Agreement. In the course of managing the Reference Portfolio, the Reference Portfolio Manager may consider its relationships with other clients (including Reference Entities) and their Affiliates. The Reference Portfolio Manager may determine not to add a Reference Entity to the Reference Portfolio in view of such relationships. In providing services to other clients, the Reference Portfolio Manager and its Affiliates may recommend activities that would compete with or otherwise adversely affect the Swap Counterparty or the Issuer and the Holders of the Securities. In connection with the foregoing activities, the Reference Portfolio Manager and its Affiliates may from time to time come into possession of information that limits the ability of the Reference Portfolio Manager to designate that a Reference Entity be added to or removed from the Reference Portfolio, and the ability to perform some of its duties as Reference Portfolio Manager may be constrained as a consequence of its inability to use such information for advisory purposes or otherwise to take actions that would be in the best interest of the Swap Counterparty or the Issuer and the Holders of the Securities.

Unless the Reference Portfolio Manager determines in its reasonable judgment that a transaction is on terms and conditions no less favorable than would be obtained in a transaction conducted on an arm's-length basis between third-parties unaffiliated with each other and subject to any limitations imposed on the Reference Portfolio Manager by applicable law, the Reference Portfolio Manager will be required to refrain from adding or removing Reference Obligations issued by (i) persons of which the Reference Portfolio Manager, its Affiliates or any of its or their officers, directors or employees are directors or officers, (ii) persons for which the Reference Portfolio Manager or its Affiliates act as financial adviser or underwriter or (iii) persons with whom the Reference Portfolio Manager or its Affiliates otherwise maintain a client relationship. Furthermore, the Reference Portfolio Manager may, in its sole discretion, refrain from adding or removing Reference Obligations issued by any of the persons described in (i), (ii) or (iii) above or about which the Reference Portfolio Manager or any of its Affiliates have information that the Reference Portfolio Manager deems confidential or nonpublic or that otherwise might prohibit it from trading (or referencing) such obligations in accordance with applicable law. The Reference Portfolio Manager will not be obligated to utilize any particular investment opportunity or strategy that may arise with respect to the Reference Obligations. In the course of managing the Reference Portfolio, the Reference Portfolio Manager may consider its relationships with other clients (including Reference Entities) and their affiliates and may, in its sole discretion, determine not to add a Reference Obligation to the Reference Portfolio in view of such relationships.

Neither the Reference Portfolio Manager nor any of its Affiliates is under any obligation (affirmative or otherwise) to offer investment opportunities of which it becomes aware to the Swap Counterparty or the Issuer or to account to the Swap Counterparty or the Issuer for (or share with the Swap Counterparty or the Issuer or inform the Swap Counterparty or the Issuer of) any such opportunity or any benefit received by it from any such opportunity before offering any investments to other funds or accounts that the Reference Portfolio Manager and/or its Affiliates manage or advise or before engaging in any investments for themselves. Furthermore, the Reference Portfolio Manager and/or any of its Affiliates may make an investment on behalf of any account it manages or advises without offering the opportunity to add such investment, or adding such investment, to the Reference Portfolio. Affirmative obligations may exist or may arise in the future, whereby the Reference Portfolio Manager and/or any of its Affiliates is obligated to offer certain investments to funds or accounts that it manages or advises before or without offering those investment opportunities to the Swap Counterparty or the Issuer. The Reference Portfolio Manager will endeavor to resolve conflicts with respect to investment opportunities in a manner which it deems equitable to the extent possible under the prevailing facts and circumstances and subject to applicable law.

**Removal of the Reference Portfolio Manager**. The Issuer and the Holders of Securities will have no right to remove the Reference Portfolio Manager and no right to participate in the selection of a replacement Reference Portfolio Manager. However, the Issuer may request that the Swap Counterparty remove the Reference Portfolio Manager upon not less than 90 days' prior written notice without cause upon a vote to that effect by at least 66 2/3% (in Aggregate Principal Amount) of the Income Notes and at least 66 2/3% (in Aggregate Principal Amount) of each Class of Senior Notes. The Issuer may also request that the Swap Counterparty remove the Reference Portfolio Manager for cause upon a vote to that effect by at least 66 2/3% (in Aggregate Principal Amount) of the Income Notes and at least 66 2/3% (in Aggregate Principal Amount) of each Class of Senior Notes. Upon receipt of such a request, the Swap Counterparty may, but is not obligated to, remove the Reference Portfolio Manager. In addition, the Swap Counterparty, without the consent or participation of the Issuer or the Holders of Securities, may remove the Reference Portfolio Manager for cause at any time. In connection with any such

010645

appointment of a replacement Reference Portfolio Manager, the Swap Counterparty may (but is not obligated to) consult with the Issuer, and if it so consults, is not required to follow the recommendation of the Issuer. If the Swap Counterparty chooses to consult with the Issuer, the Issuer will consult and follow the direction of Holders of a majority in Aggregate Principal Amount of the Income Notes in making any recommendation; *provided* that the Issuer shall not follow such direction if the Holders of at least 66 2/3% in Aggregate Principal Amount of each Class of Senior Notes object to such direction. *See "Description of the Swap Agreement—Early Termination of the Swap Agreement.*"

In addition, the Reference Portfolio Manager may terminate the Reference Portfolio Management Agreement at any time upon not less than 90 days' written notice to the Issuer, the Swap Counterparty, the Trustee and each Rating Agency.

No resignation of the Reference Portfolio Manager will be effective until a successor Reference Portfolio Manager has been appointed in accordance with the Reference Portfolio Management Agreement and the Rating Agencies confirm in writing that such an appointment will not adversely affect the then current rating on the Securities. If within 90 days following a notice of resignation or a notice of removal no replacement Reference Portfolio Manager has been appointed and accepted such appointment, the Reference Portfolio Manager may petition a court of competent jurisdiction for the appointment of a replacement Reference Portfolio Manager.

*See "—Role of the Reference Portfolio Manager" above and "The Reference Portfolio Manager and the Reference Portfolio Management Agreement—The Reference Portfolio Management Agreement."*

**The Issuers**. The Issuer and Co-Issuer are a recently incorporated Cayman Islands exempted company and a recently incorporated Delaware corporation, respectively, and have no prior operating history or prior business experience. The Issuer will have no significant assets other than the Trust Accounts and Eligible Investments therein, its rights under the Swap Agreement and the Swap Guarantee and proceeds thereof, all of which will be pledged to the Trustee to secure the Issuer's obligations to the Swap Counterparty and the Holders of the Notes, and the Class Q-2 Securities Collateral, which will be pledged to the Trustee to secure the Issuer's obligations to the Holders of the Class Q-2 Securities. The Issuer has no employees. The Co-Issuer will not have any significant assets and will not pledge any assets under the Indenture. The Issuer will not engage in any business activity other than the issuance of the Securities as described herein, the acquisition and disposition of Eligible Investments and the Class Q-2 Securities Collateral and investment and reinvestment in Eligible Investments as described herein, certain activities conducted in connection with the payment of amounts in respect of the Securities, entering into the Swap Agreement and exercising its rights and performing its obligations thereunder and under the Swap Guarantee and the management of the Trust Estate and other activities incidental to the foregoing and permitted by the Indenture. The Co-Issuer will not engage in any business activity other than the co-issuance of the Senior Notes as described herein and other activities incidental to the foregoing and permitted by the Indenture.

**Limited Liquidity**. There is currently no active trading market for any of the Securities being offered hereby, and the Securities are subject to restrictions on transfer. Citigroup Global Markets Inc. and its Affiliates will not be obligated to make a market in the Securities or otherwise to buy and sell the Securities following the Closing Date. The Securities are expected to be owned by a relatively small number of investors and it is highly unlikely that an active secondary market for the Securities will develop. Purchasers of the Securities may find it difficult or uneconomic to liquidate their investment at any particular time, and it may be difficult for the Holders of the Securities to determine the value of the Securities at any particular time. Consequently, a purchaser must be prepared to hold the Securities until the Maturity Date. *See "Purchase and Transfer Restrictions." See also "Certain ERISA Considerations"* regarding certain restrictions on transfers to investors subject to ERISA or Section 4975 of the Code.

**Tax Considerations**. The Issuer, as a foreign corporation, will be subject to U.S. federal income tax on its net income if it is treated as engaged in a trade or business within the United States. Counsel to the Issuer will provide an opinion that, while not free from doubt, the Issuer should not be considered to be engaged in a trade or business within the United States as a result of its contemplated activities. No activity closely comparable to that of the Issuer has been the subject of any Treasury regulation, revenue ruling or judicial decision, however, and the opinion of counsel to the Issuer is not binding upon the Internal Revenue Service (the "IRS"). If the IRS were successfully to characterize the Issuer as being engaged in a trade or business in the United States, among other

010646

consequences, the Issuer would be subject to U.S. tax obligations that could materially adversely affect the Issuer's financial ability to comply with its obligations with respect to the Senior Notes and to make distributions on the Income Notes. *See "Certain Income Tax Considerations—Certain United States Tax Considerations"* and "*—Tax Treatment of the Issuer—United States Federal Income Taxes.*" Prospective investors should consult their own tax advisors with respect to the possibility that the Issuer would be treated as engaged in a trade or business within the United States.

The Issuer is expected to be a passive foreign investment company, and a U.S. person holding Income Notes, other than a person treated as a U.S. Shareholder in a controlled foreign corporation, therefore may be subject to additional taxes unless it elects to treat the Issuer as a qualified electing fund and to recognize currently its proportionate share of the Issuer's income. A Holder that is required to include subpart F income or that makes a qualified electing fund election may recognize income in amounts significantly greater than the distributions received from the Issuer. Income may exceed distributions when, for example, the Issuer uses earnings to repay principal on the Senior Notes or accrues income on the Swap Agreement or on Eligible Investments prior to the receipt of cash or retains in the Collateral Account amounts attributable to payments received. A Holder that makes the qualified electing fund election will be required to include in income currently its pro rata share of such earnings, income or amounts whether or not the Issuer actually makes distributions. The Issuer also may become a foreign personal holding company, in which case U.S. persons holding Income Notes could be subject to different tax treatment. See *"Certain Income Tax Considerations—Certain United States Tax Considerations—Tax Treatment of Income Notes."*

Under current tax law of the United States and other jurisdictions, payments on the Eligible Investments are not expected to be subject to the imposition of U.S. federal or other withholding tax unless the obligor of the Eligible Investment is required to make gross-up payments for the full amount of such tax. There can be no assurance, however, that as a result of a change in any applicable law, treaty, rule or regulation or interpretation thereof, the payments on the Eligible Investments might not in the future become subject to withholding tax. In the event that any withholding tax should become applicable to payments on the Eligible Investments and the obligor thereon were not then required to make "gross-up" payments that cover the full amount of any such withholding taxes, such tax would reduce the amounts available to make payments on the Securities. Payments under the Swap Agreement will be subject to "gross-up" by the Swap Counterparty with respect to Indemnifiable Taxes, which include all U.S. withholding taxes currently applied to payments to non-U.S. persons. In the event that U.S. taxes that do not qualify as Indemnifiable Taxes are imposed in the future on payments by the Swap Counterparty, such taxes would also reduce the amounts available to make payments on Securities.

**Investment Company Act Considerations**. The Issuer has not registered with the Commission as an investment company pursuant to the Investment Company Act in reliance on Section 3(c)(7) thereof. The Co-Issuer also has not registered with the Commission as an investment company, based on the fact that the Co-Issuer has no assets that could be construed as the holding of "securities" under the Investment Company Act. In general terms, Section 3(c)(7) excepts from the provisions of the Investment Company Act those issuers (i) whose investors residing in the United States are Qualified Purchasers and (ii) which do not make a public offering of their securities in the United States.

To rely on Section 3(c)(7), the Issuer must have a "reasonable belief" that all purchasers of the Securities which reside in the United States (including initial purchasers and subsequent transferees of Securities sold to initial purchasers pursuant to Rule 144A) are Qualified Purchasers. Because transfers of beneficial interests in the Senior Notes will be generally effected only through DTC and its participants and indirect participants without delivery of written transferee certifications to the Issuers, the Issuers will establish such a reasonable belief by means of the deemed representations, warranties and agreements described under *"Purchase and Transfer Restrictions,"* the agreements of the initial purchasers relating to Rule 144A and Regulation S referred to under *"Purchase and Transfer Restrictions"* and by taking certain other actions pursuant to the Indenture. Although the Commission has stated that it is possible for an issuer of securities to satisfy the reasonable belief standard referred to above by establishing procedures to provide a means by which such issuer can make a reasonable determination as to the status of its holders of securities as Qualified Purchasers, the Commission has not approved—and has stated that it will not approve—any particular set of procedures, including the Section 3(c)(7) Procedures referred to herein. Accordingly, there can be no assurance that the Issuer will satisfy the reasonable belief standard referred to above.

If the Commission or a court of competent jurisdiction were to find that the Issuer or the Co-Issuer is required, but failed, to register as an investment company in violation of the Investment Company Act, possible consequences include, but are not limited to, the following: (i) the Commission could apply to a district court to enjoin the violation; (ii) investors in the Issuer or the Co-Issuer could sue the Issuer or the Co-Issuer, as applicable, and recover any damages caused by the violation; (iii) any agreement to which the Issuer or the Co-Issuer, as applicable, is a party that is made in, or whose performance involves a violation of, the Investment Company Act would be unenforceable by any party to the agreement unless a court were to find that under the circumstances enforcement would produce a more equitable result than non-enforcement and would not be inconsistent with the purposes of the Investment Company Act and (iv) the Swap Agreement may terminate. Should the Issuer or the Co-Issuer be subjected to any or all of the foregoing, the Issuer or the Co-Issuer, as applicable, and the Holders of the Securities would be materially and adversely affected.

**Money Laundering Prevention**. The Issuer and the Administrator are subject to anti-money laundering legislation in the Cayman Islands pursuant to the Proceeds of Criminal Conduct Law (2001 Revision) (the "PCCL"). Pursuant to the PCCL the Cayman Islands government enacted The Money Laundering Regulations (2003 Revision), which impose specific requirements with respect to the obligation "to know your client." Except in relation to certain categories of institutional investors, the Issuer will require a detailed verification of each investor's identity and the source of the payment used by such investor for purchasing the Securities in a manner similar to the obligations imposed under the laws of other major financial centers. In addition, if any person who is resident in the Cayman Islands knows or has a suspicion that a payment to the Issuer (by way of investment or otherwise) contains the proceeds of criminal conduct, that person must report such suspicion to the Cayman Islands authorities pursuant to the PCCL. If the Issuer were determined by the Cayman Islands government to be in violation of the PCCL or The Money Laundering Regulations (2003 Revision), the Issuer could be subject to substantial criminal penalties. Such a violation could materially adversely affect the timing and amount of payments by the Issuer to the Holders of the Securities.

**Emerging Requirements of the European Community.** As part of the harmonization of securities markets in Europe, the European Commission has adopted a directive known as the Prospectus Directive (which must be implemented by Member States by July 1, 2005) that will regulate offers of securities to the public and admissions to trading to E.U regulated markets. The European Commission is scheduled to adopt a directive known as the Transparency Directive towards the end of 2004 (which is expected to be implemented by Member States in 2006) that will among other things, impose continuing financial reporting obligations on issuers that have certain types of securities admitted to trading on an E.U. regulated market. In addition, the Market Abuse Directive (which must be implemented by Member States by October 12, 2004) harmonizes the rules on insider trading and market manipulation in respect of securities admitted to trading on an E.U. regulated market and requires issuers of such securities to disclose any non-public price-sensitive information as soon as possible, subject to certain limited exemptions. The listing of Securities on the Irish Stock Exchange would subject the Issuer to regulation under these directives, although the requirements applicable to the Issuer are not yet fully clarified. The Indenture will not require the Issuer to maintain a listing for any Class of Securities on an E.U. stock exchange if compliance with these directives (or other requirements adopted by the European Commission or a relevant Member State) becomes burdensome in the sole judgment of the Swap Counterparty.

010648

## THE ISSUER AND THE CO-ISSUER

**The Issuer**

Valhalla CLO, Ltd. was incorporated on June 9, 2004 under the Companies Law (2004 Revision) of the Cayman Islands with the registered number 136687 and has an indefinite existence. The registered office of the Issuer is at the offices of Walkers SPV Limited, P.O. Box 908GT, Walker House, Mary Street, George Town, Grand Cayman, Cayman Islands.

The Issuer has no prior operating history, prior business experience or employees. Clause 2 of the Issuer's Memorandum of Association sets out the objects of the Issuer, which include the business to be carried out by the Issuer in connection with the issuance of the Securities. The activities of the Issuer will be limited to (i) issuance of its Ordinary Shares (not offered hereby), (ii) issuance of the Notes and the Class Q-1 Securities, which will be secured by the Issuer's rights under the Swap Agreement and certain other assets pledged by the Issuer under the Indenture, (iii) issuance of the Class Q-2 Securities, which will be secured by the Class Q-2 Securities Collateral, (iv) entering into the Swap Agreement and exercising its rights and performing its obligations thereunder and under the Swap Guarantee, (v) entering into the Indenture and the Collateral Administration Agreement, and exercising its rights and performing its obligations thereunder, (vi) the acquisition and disposition of Eligible Investments, including the Investment Agreement, and the Class Q-2 Securities Collateral and (vii) engaging in other activities incidental to the foregoing and permitted by the Indenture. Cash flow derived from the Swap Agreement and other assets included in the Trust Estate will be the Issuer's only source of funds to make payments on the Notes and the Class Q-1 Securities. Assets included in the Class Q-2 Securities Collateral will be the Issuer's only source of funds to make payments on the Class Q-2 Securities. The Issuer has no indebtedness for borrowed money other than indebtedness incurred pursuant to the Indenture and described herein. The Issuer may incur debt in the future only in compliance with and pursuant to the terms of the Indenture.

The authorized share capital of the Issuer consists of the aggregate of 1,000 voting Ordinary Shares, par value U.S. $1.00 per share (the "Ordinary Shares").

All of the Issuer's Ordinary Shares are issued and will be legally owned by the Share Trustee and will be held in charitable trust for the benefit of one or more charitable organizations located in the Cayman Islands under the terms of a declaration of trust. Under the terms of such declaration of trust, the Share Trustee will, among other things, generally agree not to dispose of or otherwise deal with such Ordinary Shares. The Share Trustee will have no beneficial interest in and derive no benefit, other than fees, from its holding of the Ordinary Shares.

The Issuer's Articles of Association provide that the Board of Directors of the Issuer will consist of not more than ten Directors. A majority of the Directors are required by the Articles of Association to be persons who are not citizens or residents of the United States. The Directors of the Issuer are expected to be as follows:

| Name | Address | Occupation |
|---|---|---|
| David Egglishaw | Walkers SPV Limited<br>P.O. Box 908GT<br>Walker House, Mary Street<br>George Town<br>Grand Cayman, Cayman Islands | Employee of Walkers SPV Limited |
| John Cullinane | Walkers SPV Limited<br>P.O. Box 908GT<br>Walker House, Mary Street<br>George Town<br>Grand Cayman, Cayman Islands | Employee of Walkers SPV Limited |
| Derrie Boggess | Walkers SPV Limited<br>P.O. Box 908GT<br>Walker House, Mary Street<br>George Town<br>Grand Cayman, Cayman Islands | Employee of Walkers SPV Limited |

010649

**The Co-Issuer**

Valhalla CLO, Inc. (the "Co-Issuer") was incorporated on June 9, 2004 under the laws of the State of Delaware with the filing number 3813950 and its registered office is at Puglisi & Associates, 850 Library Avenue, Suite 204, Newark, Delaware 19711. Article 3 of the Co-Issuer's Certificate of Incorporation sets out the objective of the Co-Issuer which is principally the business to be carried out by the Co-Issuer in connection with the issuance of the Senior Notes. The Co-Issuer will not have any substantial assets and will not pledge any assets to secure the Notes.

The Co-Issuer has no prior operating history, prior business experience or employees. The activities of the Co-Issuer will be limited to (i) issuance of its common stock, (ii) co-issuance of the Senior Notes and (iii) other activities incidental to the foregoing and permitted by the Indenture.

The sole director of the Co-Issuer is Donald J. Puglisi. Mr. Puglisi is also the President, Secretary and Treasurer of the Co-Issuer. Mr. Puglisi may be contacted at the address of the Co-Issuer.

**Capitalization of the Issuer**

The Issuer's expected initial capitalization and indebtedness on the Closing Date, after giving effect to the issuance of the Securities and the Ordinary Shares (before deducting certain expenses of the offering and the issuance thereof) is set forth below:

| Type | Amount (U.S.$) |
|------|----------------|
| Class A-1 Notes | U.S. $ 62,000,000 |
| Class A-2 Notes | U.S. $ 56,000,000 |
| Class B Notes | U.S. $ 39,500,000 |
| Class C-1 Notes | U.S. $ 21,000,000 |
| Class C-2 Notes | U.S. $ 5,000,000[1] |
| Income Notes | U.S. $ 82,000,000[2] |
| Total Notes Debt | U.S. $ 265,500,000 |
| | |
| Ordinary Shares | U.S. $ 1,000 |
| Total Notes and Ordinary Shares Capitalization | U.S. $ 265,501,000 |
| | |
| | |
| Class Q-1 Securities | U.S. $ 10,000,000[3] |
| Class Q-2A Securities | U.S. $ 7,200,000[4] |
| Class Q-2B Securities | U.S. $ 40,000,000[4] |

1 Including U.S. $5,000,000 initial Aggregate Principal Amount of Class C-2 Notes represented by the Class Q-1 Senior Note Component of the Class Q-1 Securities.

2 Including U.S. $5,000,000 Aggregate Principal Amount of the Income Notes represented by the Class Q-1 Income Note Component of the Class Q-1 Securities and U.S. $25,000,000 Aggregate Principal Amount of Income Notes represented by the Class Q-2 Collateral Asset A.

3 Including U.S. $5,000,000 initial Aggregate Principal Amount of Class C-2 Notes represented by the Class Q-1 Senior Note Component of the Class Q-1 Securities and U.S. $5,000,000 Aggregate Principal Amount of the Income Notes represented by the Class Q-1 Income Note Component of the Class Q-1 Securities.

4 Secured by the Class Q-2 Securities Collateral, including U.S. $25,000,000 Aggregate Principal Amount of the Income Notes represented by the Class Q-2 Collateral Asset A.

010650

**Capitalization of the Co-Issuer**

The Co-Issuer will be capitalized only to the extent of its common equity of U.S. $100 which will be held in charitable trust by the Share Trustee, together with the Issuer's Ordinary Shares under the terms of the declaration of trust described above. *See "—The Issuer."* The Co-Issuer will have no assets other than its equity capital and will have no debt other than as Co-Issuer of the Senior Notes. The Co-Issuer has no indebtedness for borrowed money other than indebtedness incurred pursuant to the Indenture and described herein. The Co-Issuer may incur debt in the future only in compliance with and pursuant to the terms of the Indenture.

**The Administrator**

Certain administrative functions in the Cayman Islands will be performed on behalf of the Issuer by Walkers SPV Limited, the Administrator. Such functions include communications with holders of the Ordinary Shares and the general public and other services. The Administrator provides similar services to various other Cayman Islands entities. In consideration of the foregoing, the Administrator will receive various fees payable by the Issuer. The Administrator's address is Walkers SPV Limited, P.O. Box 908GT, Walker House, Mary Street, George Town, Grand Cayman, Cayman Islands.

The Administrator may resign or be terminated upon 30 days' prior written notice to the Issuer, in the case of resignation, or to the Administrator, in the case of termination. Upon the occurrence of either such event, the Issuer will promptly appoint a successor Administrator.

010651

**DESCRIPTION OF THE SECURITIES**

*The following summaries generally describe certain provisions of the Securities, the Indenture, the Collateral Administration Agreement and the Investment Agreement. The summaries do not purport to be complete and are subject to, and are qualified in their entirety by reference to, the provisions of the Securities, the Indenture, the Collateral Administration Agreement and the Investment Agreement, each of which is incorporated herein by reference.*

**General**

The Notes will be issued pursuant to the Indenture. The Indenture limits the principal amount of Notes that can be issued thereunder to (i) U.S. $62,000,000 aggregate principal amount of the Class A-1 Notes, (ii) U.S. $56,000,000 aggregate principal amount of the Class A-2 Notes, (iii) U.S. $39,500,000 aggregate principal amount of the Class B Notes, (iv) U.S. $21,000,000 aggregate principal amount of the Class C-1 Notes, (v) U.S. $5,000,000 aggregate principal amount of the Class C-2 Notes and (vi) U.S. $82,000,000 aggregate principal amount of Income Notes.

**Payments**

The Senior Notes will accrue interest on the outstanding principal amount thereof from the Closing Date at the rates described under *"—The Senior Notes,"* which will, subject to the availability of funds and to the Priority of Payments, be payable quarterly on the first day of each February, May, August and November of each year beginning on and including February 1, 2005 and ending on the earlier of the date of redemption or repayment in full and the Maturity Date, or if any such date is not a Business Day, then on the next succeeding Business Day (each such date, a "Payment Date"). The Income Notes will not bear a stated rate of interest but will be entitled to receive distributions on each Payment Date if and to the extent funds are available for such purpose after all interest and other payments due on the Senior Notes and all other payments and expenses of the Issuers have been paid, in each case pursuant to the Priority of Payments. *See "—The Income Notes."*

Except as provided below, no principal will be payable in respect of any Class of Senior Notes until the Maturity Date. Following the end of the Portfolio Modification Period, on each Payment Date principal proceeds of Eligible Investments in the Trust Estate in an amount equal to any Note Redemption Amount for that Payment Date will be used to redeem the Senior Notes and make certain other payments in accordance with the Principal Priority of Payments.

In addition, the principal amount of each Class of Senior Notes, starting with the most senior Class, will be redeemed on each Payment Date following the Ramp-up End Date in accordance with the Priority of Payments in the event any Coverage Test is not satisfied as of the related Determination Date, to the extent necessary to satisfy such test, or if the rating of any Class of Senior Notes as of the Closing Date has not been confirmed as of the 30th day following the Ramp-up End Date, until such rating is confirmed. Furthermore, the principal amount of the Class B Notes and Class C Notes will be redeemed if the Diversion Test is not satisfied as of the Determination Date related to any Payment Date after the Ramp-up End Date in accordance with the Priority of Payments. Such redemption will be made from amounts available at the applicable level of the Priority of Payments, reducing the amounts available for payment at lower levels of the Priority of Payments.

In addition, after the date which is five and a half years following the Closing Date, the Holders of at least 66 2/3% in Aggregate Principal Amount of the Income Notes may vote to cause the redemption (an "Optional Redemption") of all Outstanding Notes (and in connection therewith to cause the Trustee to liquidate the Eligible Investments in the Trust Estate), in which case the Swap Agreement will also terminate; *provided* that the proceeds of such liquidation would be sufficient to permit the payment of all Administrative Expenses and Subordinated Administrative Expenses and all amounts due to the Swap Counterparty (calculated taking into account all accrued and deferred Base Amounts, Subordinate Amounts and Incentive Amounts, to the extent provided in the Swap Agreement) and the repayment in full of the principal amount of all Classes of Senior Notes then Outstanding and all accrued and unpaid interest (including any Deferred Interest) with respect thereto to the Optional Redemption Date and any applicable unpaid Extension Bonus Payments, if any, in accordance with the Priority of Payments together with, in the case of the Class C-2 Notes, the applicable Make-whole Premium.

34

Holders of the Income Notes will not be entitled to a return of a stated principal amount or to receive distributions at a stated rate on any Payment Date. Only funds remaining after payment of all amounts payable under the Priority of Payments listed in *"—Priority of Payments"* prior to payments on the Income Notes will be paid to the Holders of the Income Notes on each Payment Date (including the Maturity Date) as described herein.

The principal of and interest on the Senior Notes, and the distributions on the Income Notes, will be payable in U.S. dollars. The Record Date for each Payment Date will be the close of business on the fifteenth day prior to such Payment Date (or, if such day is not a Business Day, the close of business on the next Business Day). Except as otherwise provided herein, payments of principal of and interest on and any other amount payable on or in respect of the Senior Notes (other than the Class C-2 Notes represented by the Class Q-1 Senior Note Component) and Class Q-1 Reg S Global Securities will be made on each Payment Date by wire transfer to DTC or its nominees as the registered owner thereof in accordance with wiring instructions provided to the appropriate Paying Agent. All payments on Certificated Securities will be made by wire transfer in immediately available funds to a U.S. dollar account maintained by the Holder of a Certificated Security or its nominee or, if a wire transfer cannot be effected for whatever reason, by a U.S. dollar check delivered to such Holder or its nominee by mail.

The remaining principal amount, if any, of and interest on the Senior Notes and any final distribution, if any, on the Income Notes will be paid at maturity upon surrender of such Notes at the office of any Paying Agent designated for such purpose under the Indenture. The interest payable at maturity on the Senior Notes will be paid to the Person to whom the principal of such Note will be paid.

Payments of the principal of and interest on a Rule 144A Global Note, Temporary Regulation S Global Note or Regulation S Global Note (including Class Q-1 Reg S Global Securities) will be made to DTC or its nominee, as the registered owner thereof. The Issuers, the Trustee and any Paying Agent will not have any responsibility or liability for any aspect of the records relating to or payments made on account of beneficial ownership interests in a Global Note (including Class Q-1 Reg S Global Securities) or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests.

<u>The Senior Notes</u>

The Class A-1 Notes will accrue interest at the Class A-1 Interest Rate, the Class A-2 Notes will accrue interest at the Class A-2 Interest Rate, the Class B Notes will accrue interest at the Class B Interest Rate, the Class C-1 Notes will accrue interest at the Class C-1 Interest Rate and the Class C-2 Notes will accrue interest at the Class C-2 Interest Rate.

The Senior Notes will provide for the payment of the applicable Interest Amount on each Payment Date. Interest on the Senior Notes will accrue from and including the Closing Date and will be payable quarterly in arrears on each Payment Date to the Holders of the Senior Notes as of the related Record Date. Interest on the Class A-1 Notes, the Class A-2 Notes, the Class B Notes and the Class C-1 Notes will be computed for each Periodic Interest Accrual Period on the basis of a 360-day year and the actual number of days in the applicable Periodic Interest Accrual Period. Interest on the Class C-2 Notes will be computed for each Periodic Interest Accrual Period on the basis of a 360-day year consisting of twelve 30-day months.

Interest on the Class B Notes and Class C Notes (including interest on Deferred Interest (as defined below) on such Notes) will only be due and payable to the extent that funds are available for such payment in accordance with the operation of the Priority of Payments as described herein, and (except on the Maturity Date or the date of redemption in full of the Class B Notes or Class C Notes) the failure to pay any such interest because such funds are not available will not be an Event of Default under the Indenture so long as any more senior Class of Notes is then outstanding. Instead, the amount of any interest that is not paid on the Notes of either such Class on any Payment Date will be deferred, and such amounts ("Deferred Interest") will bear interest at the interest rate for the Notes of such Class. Interest accrued on Deferred Interest for any such Class of Notes for any Periodic Interest Accrual Period will be payable as current interest on the Notes of such Class on the related Payment Date and, to the extent not paid on such Payment Date, will constitute additional Deferred Interest in respect of such Class. Deferred Interest on the Notes of any such Class will be due and payable on the earlier of (i) the first Payment Date on which funds are available and permitted to be used for such purpose in accordance with the Priority of Payments and (ii) the Maturity Date of the Notes of such Class (or, if earlier, the date of redemption in full of the Notes of such

010653

Class). *See "—The Indenture and the Collateral Administration Agreement—Events of Default"* for a description of when such non-payment constitutes an Event of Default under the Indenture and the available remedies.

Subject to the availability of funds and to the Priority of Payments, the Senior Notes, unless previously redeemed, will provide for the payment of outstanding principal, if any, on the Maturity Date. *See "—Maturity of the Notes and Class Q-1 Securities and Extension of Maturity of the Notes and Class Q-1 Securities."*

The Class A-2 Notes are subordinate to the Class A-1 Notes in right of payment of interest and principal. No interest will be payable in respect of the Class A-2 Notes on any Payment Date unless the full amount of interest due in respect of the Class A-1 Notes has been paid on such Payment Date and no principal will be payable in respect of the Class A-2 Notes unless the Aggregate Principal Amount of the Class A-1 Notes has been paid in full. The Class B Notes are subordinate to the Class A-1 Notes and the Class A-2 Notes in right of payment of interest and principal. No interest will be payable in respect of the Class B Notes on any Payment Date unless the full amount of interest due in respect of the Class A-1 Notes and Class A-2 Notes has been paid on such Payment Date and, except where the Diversion Test is not satisfied, no principal will be payable in respect of the Class B Notes unless the Aggregate Principal Amount of the Class A-1 Notes and the Class A-2 Notes has been paid in full. The Class C Notes are subordinate to the Class A-1 Notes, the Class A-2 Notes and the Class B Notes in right of payment of interest and principal. No interest will be payable in respect of the Class C Notes on any Payment Date unless the full amount of interest due in respect of the Class A-1 Notes, the Class A-2 Notes and the Class B Notes (except in the case of certain Deferred Interest on the Class B Notes) has been paid on such Payment Date and, except where the Diversion Test is not satisfied, no principal will be payable in respect of the Class C Notes unless the Aggregate Principal Amount of the Class A-1 Notes, the Class A-2 Notes and the Class B Notes has been paid in full. The Class C-1 Notes and the Class C-2 Notes rank *pari passu* in right of payment of interest and principal. If the Diversion Test is not satisfied, first Deferred Interest, if any, on the Class B Notes and Class C Notes will be payable on a pro rata basis and then principal of the Class B Notes and Class C Notes will be payable on a pro rata basis in accordance with the Payment Date Priority of Payments, whether or not the Aggregate Principal Amount of the Class A-1 Notes and Class A-2 Notes has been paid in full.

If a Coverage Test for any Class of Senior Notes is not satisfied as of the Determination Date related to a Payment Date following the Ramp-up End Date, amounts available at the level of the Priority of Payments at which such Coverage Test is applied will be used to redeem Senior Notes on such Payment Date in accordance with the Priority of Payments to the extent necessary to satisfy such Coverage Tests, thereby reducing amounts available for payments at lower levels of the Priority of Payments. *See "—Priority of Payments" and "—The Coverage Tests."*

<u>Determination of LIBOR</u>

For purposes of determining the Class A-1 Interest Rate, the Class A-2 Interest Rate, the Class B Interest Rate, the Class C-1 Interest Rate and the Class Q-2A Interest Rate, the Issuers will appoint the Trustee as calculation agent (in such capacity, the "Indenture Calculation Agent"). For each Periodic Interest Accrual Period (other than the first Periodic Interest Accrual Period), LIBOR shall be determined by the Indenture Calculation Agent in accordance with the following provisions:

(1) On the second Business Day on which commercial banks are open for dealings in deposits in U.S. Dollars in the London interbank market (a "London Business Day") prior to the commencement of a Periodic Interest Accrual Period (each such day, a "LIBOR Determination Date"), LIBOR shall equal the rate, as obtained by the Indenture Calculation Agent for three-month U.S. dollar deposits in Europe, which appears on Telerate Page 3750 (as defined in the Annex to the 2000 ISDA Definitions) as reported by Bloomberg Financial Markets Commodities News, or such page as may replace such Telerate Page 3750, as of 11:00 a.m. (London time) on such LIBOR Determination Date.

(2) If, on any LIBOR Determination Date, such rate does not appear on Telerate Page 3750, or such page as may replace such Telerate Page 3750, the Indenture Calculation Agent shall determine the arithmetic mean of the offered quotations of the Reference Banks to leading banks in the London interbank market for three-month U.S. dollar deposits in Europe in an amount determined by the Indenture Calculation Agent by reference to requests for quotations as of approximately 11:00 a.m. (London time) on such LIBOR Determination Date. If, on any LIBOR Determination Date, at least two of the Reference Banks provide such quotations, LIBOR shall equal such arithmetic mean of such quotations. If, on any

010654

LIBOR Determination Date, only one or none of the Reference Banks provides such quotations, LIBOR shall be deemed to be the arithmetic mean of the offered quotations that leading banks in New York City selected by the Indenture Calculation Agent are quoting on the relevant LIBOR Determination Date for three-month U.S. Dollar deposits in Europe in an amount determined by the Indenture Calculation Agent by reference to the principal London offices of leading banks in the London interbank market; *provided*, *however*, that if the Indenture Calculation Agent is required but is unable to determine a rate in accordance with at least one of the procedures provided above, LIBOR shall be determined by the Indenture Calculation Agent in a commercially reasonable manner.

As soon as reasonably possible after 11:00 a.m. (London time) on each LIBOR Determination Date, but in no event later than 11:00 a.m. (London time) on the Business Day immediately following each LIBOR Determination Date, the Indenture Calculation Agent will cause the Class A-1 Interest Rate, the Class A-2 Interest Rate, the Class B Interest Rate, the Class C-1 Interest Rate and the Class Q-2A Interest Rate for the related Periodic Interest Accrual Period, and the amount of interest for such Periodic Interest Accrual Period payable in respect of each U.S. $100,000 by Aggregate Principal Amount of each such Class of Securities (rounded to the nearest cent, with half a cent being rounded upward) on such related Payment Date to be provided to the Issuers, the Reference Portfolio Manager, the Trustee, the Paying Agents, the Irish Stock Exchange (if and for so long as any Class of Securities is listed thereon), and, if applicable, Euroclear and Clearstream. The Indenture Calculation Agent will also specify to the Issuers the quotations upon which the Class A-1 Interest Rate, the Class A-2 Interest Rate, the Class B Interest Rate, the Class C-1 Interest Rate and the Class Q-2A Interest Rate are based, and in any event, the Indenture Calculation Agent shall notify the Issuers before 5:00 p.m. (London time) on each LIBOR Determination Date that either: (i) it has determined or is in the process of determining the Class A-1 Interest Rate, the Class A-2 Interest Rate, the Class B Interest Rate, the Class C-1 Interest Rate and the Class Q-2A Interest Rate and the Interest Amount for each such Class of Notes, or (ii) it has not determined and is not in the process of determining the Class A-1 Interest Rate, the Class A-2 Interest Rate, the Class B Interest Rate, the Class C-1 Interest Rate and the Class Q-2A Interest Rate and the Interest Amount for each such Class of Securities, together with its reasons therefor. The determination of the Class A-1 Interest Rate, the Class A-2 Interest Rate, the Class B Interest Rate, the Class C-1 Interest Rate and the Class Q-2A Interest Rate by the Indenture Calculation Agent shall (in the absence of manifest error) be final and binding upon all parties.

LIBOR with respect to the Periodic Interest Accrual Period beginning on the Closing Date will be 1.88230% per annum.

<u>The Income Notes</u>

The Income Notes will not be entitled to a return of a stated principal amount or to receive distributions at a stated rate. The Holders of the Income Notes will be entitled to distributions only to the extent that there are funds available under the Indenture in accordance with the Priority of Payments.

The Income Notes are subordinated to the Senior Notes and other creditors of the Issuers as provided in the Priority of Payments. No Net Income Note Periodic Return Amount will be payable in respect of the Income Notes unless the full amount of interest due and all other payments with respect to all Senior Notes and all other payments and expenses of the Issuers have been paid on such Payment Date pursuant to the Payment Date Priority of Payments and no Income Note Principal Distribution Amount or Final Income Note Distribution Amount, as applicable, will be payable in respect of the Income Notes unless the full amount of interest due on all Senior Notes and the Aggregate Principal Amount of all Senior Notes has been paid in full and all other payments and expenses of the Issuers have been paid on such Payment Date pursuant to the Principal Priority of Payments.

On each Payment Date, Holders of the Income Notes will receive the Net Income Note Periodic Return Amount, if any. Following the redemption in full of the Senior Notes, Holders of Income Notes will receive payments on each Payment Date (other than the Maturity Date, the Optional Redemption Date or the Indenture Tax Redemption Date) in accordance with the Principal Priority of Payments in an amount not exceeding the Note Redemption Amount for that Payment Date (an "Income Note Principal Distribution Amount").

On the Maturity Date (or, if applicable, the Optional Redemption Date or the Indenture Tax Redemption Date), Holders of the Income Notes will receive the Final Income Note Distribution Amount, if any, as described under Principal Priority of Payments below.

Indenture Tax Event

Upon the occurrence and during the continuance of an Indenture Tax Event, the Issuer, at the direction of the Holders of a majority in Aggregate Principal Amount of the Income Notes, will on the next Payment Date (or, if such direction is received less than 45 Business Days prior to a Payment Date, on the next Payment Date thereafter) (the "Indenture Tax Redemption Date") redeem (an "Indenture Tax Redemption") the Outstanding Notes, in whole but not in part, in the case of the Senior Notes, at a price of par plus any accrued and unpaid interest thereon (including any Deferred Interest) to the Indenture Tax Redemption Date; *provided*, that the Swap Counterparty has consented to such redemption in its sole discretion and that the proceeds of such liquidation would be sufficient to permit the payment of all Accrued Swap Liabilities, the repayment of the principal amount of all Classes of Senior Notes then Outstanding and all accrued and unpaid interest (including any Deferred Interest) with respect thereto to the Indenture Tax Redemption Date in accordance with the Priority of Payments and all other amounts ranking senior to the Income Notes payable pursuant to the Priority of Payments.

**Priority of Payments**

Payment Date Priority of Payments

On each Payment Date, the Trustee will use the total of (i) the net amount, if any, paid by the Swap Counterparty in respect of the Adjusted Reference Portfolio Return Amount and the Fixed Amount for such Payment Date, (ii) interest and dividends received with respect to Eligible Investments in the Trust Accounts (including interest and dividends received on amounts on deposit in the Collateral Account) during the related Periodic Interest Accrual Period, (iii) on the first Payment Date only, all amounts deposited into the Collection Account from the Expense Reserve Account pursuant to the Indenture, and (iv) principal proceeds of Eligible Investments and other amounts on deposit in the Collateral Account, but in the case of this clause (iv) only (A) to the extent of the Quarterly Aggregate Reduction Amount, if any, for that date, and (B) without duplication of clause (A), to the extent other funds are not otherwise available (but in the case of (B) solely for purposes of making payments pursuant to clauses (2) and (13) below (*provided* that no amount pursuant to this clause (iv) will be used to make payments as provided in clause (13) below unless all of the Senior Notes have been retired)) (collectively, "Payment Date Proceeds") to make the following payments in the following order of priority (the "Payment Date Priority of Payments"):

1. to the payment of any accrued and unpaid Administrative Expenses (in the order set forth in the definition thereof) up to the Expense Cap Amount;

2. (a) to the Swap Counterparty, the net amount, if any, payable to the Swap Counterparty under the Swap Agreement on such date in respect of the Adjusted Reference Portfolio Return Amount, the Fixed Amount and any Swap Termination Payment due to the Swap Counterparty (except any Swap Termination Payment due to the Swap Counterparty upon the early termination of the Swap Agreement as a result of a Swap Event of Default as to which the Swap Counterparty is the defaulting party or as a result of a Swap Additional Termination Event, and excluding any Swap Termination Payment previously paid in accordance with the Indenture), and any such net amounts not paid from prior Payment Dates and (b) to the Collateral Account, an amount equal to the Quarterly Aggregate Increase Amount, if any, for such Payment Date.

3. to the Holders of Class A-1 Notes, the Class A-1 Interest Amount;

4. to the Holders of Class A-2 Notes, the Class A-2 Interest Amount;

5. following the Ramp-up End Date, if any Class A-1 Notes or Class A-2 Notes are then Outstanding and if either the Class A OC Test or the Class A Interest Coverage Test is not satisfied as of the related Determination Date, to the Holders of the Class A-1 Notes, the Aggregate Principal Amount of the Class A-1 Notes, and following the redemption of all Class A-1 Notes, to the Holders of the Class A-2 Notes, the Aggregate Principal Amount of the Class A-2 Notes, such that such tests are satisfied as of the related Determination Date;

6.        to the Holders of the Class B Notes, the Class B Interest Amount;

7.        following the Ramp-up End Date, if any Class A-1 Notes, Class A-2 Notes or Class B Notes are then Outstanding and if either the Class B OC Test or the Class B Interest Coverage Test is not satisfied as of the related Determination Date, to the Holders of the Class A-1 Notes, the Aggregate Principal Amount of the Class A-1 Notes, and following the redemption of all Class A-1 Notes, to the Holders of the Class A-2 Notes, the Aggregate Principal Amount of the Class A-2 Notes, and following the redemption of all Class A-2 Notes, to the Holders of the Class B Notes, first, all accrued and unpaid Deferred Interest with respect to the Class B Notes and then, the Aggregate Principal Amount of the Class B Notes, such that such tests are satisfied as of the related Determination Date;

8.        to the Holders of the Class B Notes, all accrued and unpaid Deferred Interest with respect to the Class B Notes;

9.        on a pro rata basis, to the Holders of the Class C-1 Notes, the Class C-1 Interest Amount and to the Holders of the Class C-2 Notes, the Class C-2 Interest Amount;

10.        following the Ramp-up End Date, if any Class A-1 Notes, Class A-2 Notes, Class B Notes or Class C Notes are then Outstanding and if either the Class C OC Test or the Class C Interest Coverage Test is not satisfied as of the related Determination Date, to the Holders of the Class A-1 Notes, the Aggregate Principal Amount of the Class A-1 Notes, and following the redemption of all Class A-1 Notes, to the Holders of the Class A-2 Notes, the Aggregate Principal Amount of the Class A-2 Notes, and following the redemption of all Class A-2 Notes, to the Holders of the Class B Notes, first, all accrued and unpaid Deferred Interest with respect to the Class B Notes and then, the Aggregate Principal Amount of the Class B Notes, and following the redemption of all Class B Notes, first, on a pro rata basis, to the Holders of the Class C-1 Notes, all accrued and unpaid Deferred Interest with respect to the Class C-1 Notes and to the Holders of the Class C-2 Notes, all accrued and unpaid Deferred Interest with respect to the Class C-2 Notes and then, on a pro rata basis, to the Holders of the Class C-1 Notes, the Aggregate Principal Amount of the Class C-1 Notes and to the Holders of the Class C-2 Notes, the Aggregate Principal Amount of the Class C-2 Notes, such that such tests are satisfied as of the related Determination Date;

11.        on a pro rata basis, to the Holders of the Class C-1 Notes, all accrued and unpaid Deferred Interest with respect to the Class C-1 Notes and to the Holders of the Class C-2 Notes, all accrued and unpaid Deferred Interest with respect to the Class C-2 Notes;

12.        in the event that either Rating Agency has not confirmed in writing its rating in effect on the Closing Date on each Class of Senior Notes as of the 30th day following the Ramp-up End Date, to the Holders of the Class A-1 Notes, the Aggregate Principal Amount of the Class A-1 Notes and, following the redemption of all Class A-1 Notes, to the Holders of the Class A-2 Notes, the Aggregate Principal Amount of the Class A-2 Notes and, following the redemption of all Class A-2 Notes, to the Holders of the Class B Notes, first, all accrued and unpaid Deferred Interest with respect to the Class B Notes and then, the Aggregate Principal Amount of the Class B Notes, and following the redemption of all Class B Notes, first, on a pro rata basis, to the Holders of the Class C-1 Notes, all accrued and unpaid Deferred Interest with respect to the Class C-1 Notes and to the Holders of the Class C-2 Notes, all accrued and unpaid Deferred Interest with respect to the Class C-2 Notes and then, on a pro rata basis, to the Holders of the Class C-1 Notes, the Aggregate Principal Amount of the Class C-1 Notes and to the Holders of the Class C-2 Notes, the Aggregate Principal Amount of the Class C-2 Notes, until each such rating is confirmed;

13.        to the Swap Counterparty, any Swap Termination Payment due to it upon the early termination of the Swap Agreement as a result of a Swap Event of Default as to which the Swap Counterparty is the defaulting party or as a result of a Swap Additional Termination Event, and excluding any Swap Termination Payment previously paid in accordance with the Indenture;

010657

14. following the Ramp-up End Date, if any Class B Notes or Class C Notes are then Outstanding and if the Diversion Test is not satisfied as of the related Determination Date, an amount equal to 50% of the remaining Payment Date Proceeds, (i) first, on a pro rata basis, to the Holders of the Class B Notes, all accrued and unpaid Deferred Interest with respect to the Class B Notes, to the Holders of the Class C-1 Notes, all accrued and unpaid Deferred Interest with respect to the Class C-1 Notes and to the Holders of the Class C-2 Notes, all accrued and unpaid Deferred Interest with respect to the Class C-2 Notes, and (ii) then, on a pro rata basis, to the Holders of the Class B Notes, the Aggregate Principal Amount of the Class B Notes, to the Holders of the Class C-1 Notes, the Aggregate Principal Amount of the Class C-1 Notes and to the Holders of the Class C-2 Notes, the Aggregate Principal Amount of the Class C-2 Notes;

15. to the payment first of any accrued and unpaid Administrative Expenses (in the order set forth in the definition thereof) to the extent not paid pursuant to clause (1) above and then, to the payment of any accrued and unpaid Subordinated Administrative Expenses;

16. to the payment of any unpaid Extension Bonus Payments (i) first, to the applicable Holders of Class A-1 Notes, (ii) then, to the applicable Holders of Class A-2 Notes, (iii) then, to the applicable Holders of Class B Notes, and (iv) then, on a pro rata basis, to the applicable Holders of Class C-1 Notes and the applicable Holders of Class C-2 Notes; and

17. the remainder, to the Holders of the Income Notes (the "Net Income Note Periodic Return Amount").

The Adjusted Reference Portfolio Return Amount and Fixed Amount will be as described in "*Description of the Swap Agreement—Payments Under the Swap Agreement*." As described above, if the net amount payable under the Swap Agreement in respect of the Adjusted Reference Portfolio Return Amount and Fixed Amount for any Payment Date is payable by the Swap Counterparty, the proceeds thereof will be used to make payments in accordance with the Payment Date Priority of Payments (and no amount will be paid to the Swap Counterparty pursuant to clause 2 of the Payment Date Priority of Payments on that Payment Date). If such net amount is payable by the Issuer to the Swap Counterparty, it will be paid pursuant to clause 2 of the Priority of Payments.

<u>Principal Priority of Payments</u>

On (A) the Maturity Date, the Optional Redemption Date or the Indenture Tax Redemption Date and (B) each other Payment Date on which Senior Notes are to be redeemed or, after all Senior Notes are redeemed, an Income Note Principal Distribution Amount is to be paid on the Income Notes, the Trustee will distribute the principal proceeds of Eligible Investments in the Trust Accounts (after payment of any amounts payable therefrom pursuant to the Payment Date Priority of Payments as described above, and in the case of a partial redemption of Senior Notes or Income Note Principal Distribution Amounts pursuant to this clause (B), using principal proceeds in an amount not to exceed the Note Redemption Amount for such date), and in the case of the Maturity Date, the Optional Redemption Date or the Indenture Tax Redemption Date, any other amounts on deposit in the Trust Accounts to make the following payments in the following order of priority (the "Principal Priority of Payments"):

1. to the payment of any accrued and unpaid Administrative Expenses (in the order set forth in the definition thereof) up to the Expense Cap Amount, to the extent not paid pursuant to the Payment Date Priority of Payments;

2. to the Swap Counterparty, the net amount, if any, payable to the Swap Counterparty under the Swap Agreement on such date in respect of the Adjusted Reference Portfolio Return Amount, the Fixed Amount and any Swap Termination Payment due to the Swap Counterparty (except any Swap Termination Payment due to the Swap Counterparty upon the early termination of the Swap Agreement as a result of a Swap Event of Default as to which the Swap Counterparty is the defaulting party or as a result of a Swap Additional Termination Event), and any such net amounts not paid from prior Payment Dates, in any case to the extent not paid pursuant to the Payment Date Priority of Payments or otherwise previously paid in accordance with the Indenture;

010658

3.      to the Holders of the Class A-1 Notes, any accrued and unpaid Class A-1 Interest Amount, to the extent not paid pursuant to the Payment Date Priority of Payments;

4.      to the Holders of the Class A-2 Notes, any accrued and unpaid Class A-2 Interest Amount, to the extent not paid pursuant to the Payment Date Priority of Payments;

5.      following the Ramp-up End Date, if any Class A-1 Notes or Class A-2 Notes are then Outstanding and if either the Class A OC Test or the Class A Interest Coverage Test is not satisfied as of the related Determination Date, to the Holders of the Class A-1 Notes, the Aggregate Principal Amount of the Class A-1 Notes, and, following the redemption of all Class A-1 Notes, to the Holders of the Class A-2 Notes, the Aggregate Principal Amount of the Class A-2 Notes, such that such tests are satisfied as of the related Determination Date;

6.      to the Holders of the Class B Notes, any accrued and unpaid Class B Interest Amount, to the extent not paid pursuant to the Payment Date Priority of Payments;

7.      following the Ramp-up End Date, if any Class A-1 Notes, Class A-2 Notes or Class B Notes are then Outstanding and if either the Class B OC Test or the Class B Interest Coverage Test is not satisfied as of the related Determination Date, to the Holders of the Class A-1 Notes, the Aggregate Principal Amount of the Class A-1 Notes, and following the redemption of all Class A-1 Notes, to the Holders of the Class A-2 Notes, the Aggregate Principal Amount of the Class A-2 Notes, and following the redemption of all Class A-2 Notes, to the Holders of the Class B Notes, first, all accrued and unpaid Deferred Interest with respect to the Class B Notes and then, the Aggregate Principal Amount of the Class B Notes, such that such tests are satisfied as of the related Determination Date;

8.      on a pro rata basis, to the Holders of the Class C-1 Notes, the accrued and unpaid Class C-1 Interest Amount and to the Holders of the Class C-2 Notes, the accrued and unpaid Class C-2 Interest Amount, to the extent not paid pursuant to the Payment Date Priority of Payments;

9.      following the Ramp-up End Date, if any Class A-1 Notes, Class A-2 Notes, Class B Notes or Class C Notes are then Outstanding and if either the Class C OC Test or the Class C Interest Coverage Test is not satisfied as of the related Determination Date, to the Holders of the Class A-1 Notes, the Aggregate Principal Amount of the Class A-1 Notes, and following the redemption of all Class A-1 Notes, to the Holders of the Class A-2 Notes, the Aggregate Principal Amount of the Class A-2 Notes, and following the redemption of all Class A-2 Notes, to the Holders of the Class B Notes, first, all accrued and unpaid Deferred Interest with respect to the Class B Notes and then, the Aggregate Principal Amount of the Class B Notes, and following the redemption of all Class B Notes, first, on a pro rata basis, to the Holders of the Class C-1 Notes, all accrued and unpaid Deferred Interest with respect to the Class C-1 Notes and to the Holders of the Class C-2 Notes, all accrued and unpaid Deferred Interest with respect to the Class C-2 Notes and then, on a pro rata basis, to the Holders of the Class C-1 Notes, the Aggregate Principal Amount of the Class C-1 Notes and to the Holders of the Class C-2 Notes, the Aggregate Principal Amount of the Class C-2 Notes, such that such tests are satisfied as of the related Determination Date;

10.     to the Holders of the Class A-1 Notes, the Aggregate Principal Amount of the Class A-1 Notes;

11.     to the Holders of the Class A-2 Notes, the Aggregate Principal Amount of the Class A-2 Notes;

12.     to the Holders of the Class B Notes, any accrued and unpaid Deferred Interest with respect to the Class B Notes, to the extent not paid pursuant to the Payment Date Priority of Payments;

13.     to the Holders of the Class B Notes, the Aggregate Principal Amount of the Class B Notes;

14.     on a pro rata basis, to the Holders of the Class C-1 Notes, any accrued and unpaid Deferred Interest with respect to the Class C-1 Notes and to the Holders of the Class C-2 Notes, any accrued and unpaid Deferred Interest with respect to the Class C-2 Notes, to the extent not paid pursuant to the Payment Date Priority of Payments;

010659

15.     on a pro rata basis, to the Holders of the Class C-1 Notes, the Aggregate Principal Amount of the Class C-1 Notes and to the Holders of the Class C-2 Notes, the Aggregate Principal Amount of the Class C-2 Notes, and, in the case of the Optional Redemption Date, the Make-whole Premium in respect of the Class C-2 Notes;

16.     to the Swap Counterparty, any Swap Termination Payment due to it upon the early termination of the Swap Agreement as a result of a Swap Event of Default as to which the Swap Counterparty is the defaulting party or as a result of a Swap Additional Termination Event, to the extent not paid pursuant to the Payment Date Priority of Payments or otherwise previously paid in accordance with the Indenture;

17.     to the payment first of accrued and unpaid Administrative Expenses (in the order set forth in the definition thereof) to the extent not paid pursuant to clause (1) above or pursuant to the Payment Date Priority of Payments and then, to the payment of accrued and unpaid Subordinated Administrative Expenses to the extent not paid pursuant to the Payment Date Priority of Payments;

18.     to the payment of any unpaid Extension Bonus Payments (i) first, to the applicable Holders of Class A-1 Notes, (ii) then, to the qualifying Holders of Class A-2 Notes, (iii) then, to the qualifying Holders of Class B Notes, and (iv) then, on a pro rata basis, to the qualifying Holders of Class C-1 Notes and the applicable Holders of Class C-2 Notes, to the extent not paid pursuant to the Payment Date Priority of Payments; and

19.     to the Holders of the Income Notes, (a) on any Payment Date (other than the Maturity Date, the Optional Redemption Date or Indenture Tax Redemption Date), the remainder as an Income Note Principal Distribution Amount (the "Income Note Principal Distribution Amount") or (b) on the Maturity Date, Optional Redemption Date or Indenture Tax Redemption Date, the remainder as the "Final Income Note Distribution Amount."

Pro rata payments of principal among *pari passu* Notes will be based upon the principal amount of such Notes outstanding on the date of payment, and pro rata payments of interest (and any Extension Bonus Payments) among *pari passu* Classes of Notes shall be based upon the amount of interest (or Extension Bonus Payments, as applicable) payable on such Notes on the date of payment. Determinations to be made within the Priority of Payments will be made giving effect to the payment of all amounts to be paid prior to the clause that requires the determination, and all payments made pursuant to the Payment Date Priority of Payments on any Payment Date will be deemed to be made prior to all payments, if any, to be made on such Payment Date pursuant to the Principal Priority of Payments. Payments with respect to any Class of Notes will be made to all Holders of Notes of such Class on a pro rata basis based on each Holder's holding of such Notes.

**Maturity of the Notes and Class Q-1 Securities and Extension of Maturity of the Notes and Class Q-1 Securities**

Unless previously redeemed or extended as described below, the Aggregate Principal Amount of the Senior Notes is scheduled to be repaid, and the final distribution on the Income Notes is scheduled to be made, on August 1, 2016, in accordance with the Principal Priority of Payments. On the Maturity Date, the Trustee will combine all of the moneys in the Trust Accounts and distribute such moneys in accordance with the Priority of Payments.

<u>Extension of Maturity of the Notes and Class Q-1 Securities</u>

Under the Indenture, if the term of the Swap Agreement is extended (which requires the Extension Conditions to be satisfied), the maturity of the Notes and Class Q-1 Securities will automatically be equally extended without any requirement for approval or consent of any holders of Securities or amendment or supplement to the Indenture (the "Maturity Extension").

Under the Swap Agreement, the Swap Counterparty may, at its option, on the Payment Date in August 2009 (the "Extension Effective Date") extend the Portfolio Modification Period for four years to August 1, 2015 and correspondingly extend the term of the Swap Agreement for four years to August 1, 2020, subject to the satisfaction of the Extension Conditions. *See "Description of the Swap Agreement—Extension of the Swap Agreement."*

010660

As a condition to a Maturity Extension, any holder of Notes or Class Q-1 Securities wishing to sell such Securities ("Extension Sale Securities") to one or more qualifying purchasers (which may include the Swap Counterparty or any of its affiliates acting as principal or agent) designated by the Swap Counterparty (or its affiliate) (each an "Extension Qualifying Purchaser") on the Extension Effective Date at the applicable Extension Purchase Price pursuant to the Extension Conditions must provide an Extension Sale Notice within the Extension Sale Notice Period.

The extension of the Portfolio Modification Period, the term of the Swap Agreement and the maturity of the Notes and the Class Q-1 Securities will be conditioned on satisfaction of the following requirements ("Extension Conditions"): (i) the purchase of all Extension Sale Securities has been settled by the designated Extension Qualifying Purchasers at the applicable Extension Purchase Price as of the Extension Effective Date, (ii) all such purchases of Extension Sale Securities individually and in the aggregate comply with the applicable transfer restrictions in the Indenture and the legends on such Extension Sale Securities and all applicable law, rules and regulations (including, without limitation, rules, regulations and procedures of any applicable securities exchange, self-regulatory organization or clearing agency), (iii) (x) Rating Confirmation has been obtained from S&P (so long as any Securities are then rated by S&P) (which confirmation shall be based on S&P's applicable rating criteria and models pursuant to which the applicable Securities were rated by S&P as of the Closing Date) and (y) either (A) all Coverage Tests and clauses 17, 18 and 22 of the Reference Portfolio Criteria are satisfied as of the Extension Determination Date and the rating of each Class of Senior Notes by Moody's has not been downgraded, withdrawn or qualified from that in effect on the Closing Date (unless it subsequently has been reinstated to the rating assigned on the Closing Date) or (B) Rating Confirmation has been obtained from Moody's (so long as any Securities are then rated by Moody's).

No Extension Sale Securities will be purchased unless all Extension Sale Securities are purchased and settled at the applicable Extension Purchase Price as of the Extension Effective Date and the other Extension Conditions are satisfied. Pursuant to the Extension Conditions, if not all Extension Sale Securities are so purchased and settled, none of the Portfolio Modification Period, the term of the Swap Agreement or the maturity of the Notes and the Class Q-1 Securities will be extended. The Swap Counterparty will not be responsible for causing the Extension Conditions to be satisfied and will not be liable to any holder of Securities (whether or not such holder gave an Extension Sale Notice with respect to its Notes or Class Q-1 Securities) or to any other Person if the Extension Conditions are not satisfied. Failure of the Extension Conditions to be satisfied will not constitute a default or Event of Default under the Indenture or a Swap Event of Default.

If all Extension Conditions are satisfied and a Maturity Extension with respect to the Notes and Class Q-1 Securities is effected, each beneficial owner of Senior Notes held (including in the form of the Class Q-1 Senior Note Component) other than Extension Sale Securities will be entitled to receive a single payment in an amount equal to (1) in the case of the Class A-1 Notes, 0.25% of the Aggregate Principal Amount thereof held by that beneficial owner as of the Extension Effective Date, (2) in the case of the Class A-2 Notes, 0.25% of the Aggregate Principal Amount thereof held by that beneficial owner as of the Extension Effective Date, (3) in the case of the Class B Notes, 0.25% of the Aggregate Principal Amount thereof held by that beneficial owner and (4) in the case of the Class C Notes, 0.50% of the Aggregate Principal Amount thereof held by that beneficial owner as of the Extension Effective Date (each an "Extension Bonus Payment"). Holders of Income Notes will not be entitled to receive any Extension Bonus Payment. The Extension Bonus Payment will be payable on the first Payment Date from and including the Extension Effective Date on which funds are available for that purpose in accordance with the Priority of Payments, but in any event, no later than the Maturity Date and the date of redemption of such Notes. Extension Bonus Payments which are not available to be paid on a Payment Date in accordance with the Priority of Payments on a Payment Date will not be considered due and payable. The failure to pay Extension Bonus Payments will not be an Event of Default under the Indenture, unless the Issuer fails to pay in full the Extension Bonus Payment on the earlier of the Maturity Date and the date of redemption in full of the relevant Securities. Payment of Extension Bonus Payments will be made on any Payment Date solely to qualifying beneficial owners who have provided to the Trustee an Extension Bonus Eligibility Certification, to the accounts designated in the applicable Extension Bonus Eligibility Certifications or, to the extent otherwise required by the rules of any applicable securities exchange or clearing agency, in a manner determined by the Issuer.

010661

<u>Extension and Extension Sale Procedure</u>

The Swap Counterparty will be required to give notice of its election to extend the Portfolio Modification Period and the Swap Termination Date (the "Extension Notice") to the Issuer and the Trustee no later than 60 days and no earlier than 90 days prior to the Extension Effective Date.

No later than 3 Business Days following receipt of the Extension Notice, the Trustee will forward the Extension Notice to all holders of Securities.

Any holder of Notes and Class Q-1 Securities may give irrevocable notice (an "Extension Sale Notice") within 30 days after the Trustee has sent the Extension Notice (the "Extension Sale Notice Period") of its intention to sell its Securities to an Extension Qualifying Purchaser in the case of a Maturity Extension. No holder of Notes and Class Q-1 Securities that has not given an Extension Sale Note within the Extension Sale Notice Period will be entitled to sell its Securities to an Extension Qualifying Purchaser in connection with the Maturity Extension.

On the 8th Business Day prior to the Extension Effective Date (the "Extension Determination Date"), the Swap Counterparty and the Issuer (or its agent) will confirm (i) whether or not Extension Qualifying Purchasers for all Extension Sale Securities have been designated to purchase the Extension Sale Securities in compliance with all transfer restrictions in the Indenture and the legends on such Securities and all applicable laws, rules and regulations (including, without limitation, any rules, regulations and procedures of any securities exchange, self-regulatory organization or clearing agency), (ii) whether the requirements of clause (iii) of the Extension Conditions are satisfied as of the Extension Determination Date and (iii) whether all other Extension Conditions can be satisfied as of the Extension Effective Date.

On the Extension Effective Date, it is expected that Extension Sale Securities will be purchased by the designated Extension Qualifying Purchasers for the applicable Extension Purchase Price. If all Extension Conditions are satisfied, on the Extension Effective Date, the Maturity Extension will become effective under the terms of the Indenture. No Extension Sale Securities of any holder will be purchased unless all Extension Sale Securities are purchased and settled at the applicable Extension Purchase Price on the Extension Effective Date and the other Extension Conditions are satisfied. If not all Extension Sale Securities are so purchased and settled or any other Extension Condition is not satisfied, none of the Portfolio Modification Period, the term of the Swap Agreement or the maturity of the Notes and the Class Q-1 Securities will be extended.

**Amendment Buy-Out**

In the case of any amendment to the Indenture or the Swap Agreement that requires the consent of one or more holders of Notes or Class Q-1 Securities, the Amendment Buy-Out Purchaser will have the right, but not the obligation, to purchase from Non-consenting Holders all Notes and Class Q-1 Securities held by such holders of the Class of Securities whose consent was solicited with respect to such amendment to the Indenture or Swap Agreement, as applicable (the "Amendment Buy-Out Option").

The purchase price for such Notes and Class Q-1 Securities will be (1) in the case of the Senior Notes, the Aggregate Principal Amount thereof, <u>plus</u> accrued interest (including Deferred Interest, if any) to the date of purchase which is not otherwise paid or payable to the Non-consenting Holder, <u>plus</u>, any unpaid Extension Bonus Payment, if any, <u>plus</u>, in the case of the Class C-2 Notes, the applicable Make-whole Premium, (2) in the case of the Income Notes, an amount that, together with any amounts paid to the Non-consenting Holder with respect to those Income Notes from the Closing Date to and including the purchase date (and any amounts payable, if any, to the Non-consenting Holder on the next succeeding Payment Date) results in an internal rate of return with respect to those Income Notes of 18% per annum and (3) in the case of the Class Q-1 Securities, based on the respective purchase prices for the Class Q-1 Senior Note Component and the Class Q-1 Income Note Component thereof, (the "Amendment Buy-Out Purchase Price"). In any Amendment Buy-Out from and after the date on which the Non-consenting Holders of Income Notes have received (or would be expected to receive) an internal rate of return equal to or in excess of 18% per annum (determined as in clause (2) above), the Amendment Buy-Out Purchase Price for Income Notes will be zero.

If the Amendment Buy-Out Option is exercised, the Amendment Buy-Out Purchaser must purchase all applicable Notes and Class Q-1 Securities from all Non-consenting Holders, regardless of the applicable percentage of aggregate principal amount of the applicable Securities the consent of whose holders is required for the

010662

amendment. If the solicited consent only affects one Component of a Class Q-1 Security, the Amendment Buy-Out Purchaser must purchase, at the Non-consenting Holder's option, its Class Q-1 Security as a whole or solely the affected Component.

The Class Q-2 Securities themselves are not subject to an Amendment Buy-Out, but the Indenture permits the Amendment Buy-Out Purchaser to purchase the Income Notes represented by the Class Q-2 Collateral Asset A at the applicable purchase price, if the Holders of Class Q-2B Securities who pursuant to the Indenture have voting rights with respect to the Income Notes represented by the Class Q-2 Collateral Asset A would be deemed to be a Non-consenting Holder with respect to such Income Notes.

All purchases made pursuant to an Amendment Buy-Out individually and in the aggregate must comply with the applicable transfer restrictions in the Indenture and the legends on such Securities and all applicable laws, rules and regulations (including, without limitation, any rules, regulations and procedures of any securities exchange, self-regulatory organization or clearing agency).

Under the Reference Portfolio Management Agreement, the Reference Portfolio Manager may request the Swap Counterparty to elect to effect an Amendment Buy-Out. The Swap Counterparty has agreed to follow such a request, subject to certain conditions.

**The Coverage Tests**

The Coverage Tests are comprised of an Overcollateralization Test and an Interest Coverage Test for each Class of Senior Notes (with, for this purpose, the Class A-1 Notes and the Class A-2 Notes treated as single Class and the Class C-1 Notes and the Class C-2 Notes treated as a single Class). The Overcollateralization Tests will be satisfied if:

1.  as of any Measurement Date on which any of the Class A-1 Notes or Class A-2 Notes are Outstanding, the Class A Overcollateralization Ratio equals or exceeds 157%, where the "Class A Overcollateralization Ratio" will equal the quotient obtained by dividing (a) the aggregate principal amount of all Eligible Investments in the Collateral Account (other than those representing an investment of interest proceeds of Eligible Investments) as of such date plus the Accrued Increase/Reduction Amount as of such date minus the sum of (1) an amount equal to the aggregate of the Default Adjustments for all Defaulted Reference Obligations and Deferring PIK Obligations as of such date and (2) the Outstanding Premium as of such date (the "OC Base Amount") by (b) the sum of the Aggregate Principal Amounts of the Class A-1 Notes and the Class A-2 Notes as of such date (the "Class A OC Test");

2.  as of any Measurement Date on which any Class A-1 Notes, Class A-2 Notes or Class B Notes are Outstanding, the Class B Overcollateralization Ratio equals or exceeds 133%, where the "Class B Overcollateralization Ratio" will equal the quotient obtained by dividing (a) the OC Base Amount as of such date by (b) the sum of the Aggregate Principal Amounts of the Class A-1 Notes, Class A-2 Notes and Class B Notes (together with any Deferred Interest with respect to the Class B Notes) as of such date (the "Class B OC Test"); and

3.  as of any Measurement Date on which any Class A-1 Notes, Class A-2 Notes, Class B Notes, Class C-1 Notes or Class C-2 Notes are Outstanding, the Class C Overcollateralization Ratio equals or exceeds 116%, where the "Class C Overcollateralization Ratio" will equal the quotient obtained by dividing (a) the OC Base Amount as of such date by (b) the sum of the Aggregate Principal Amounts of the Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C-1 Notes and the Class C-2 Notes (together with any Deferred Interest with respect to the Class B Notes and Class C Notes) as of such date (the "Class C OC Test").

The Interest Coverage Tests will be satisfied if:

1.  as of any Measurement Date on which any Class A-1 Notes or Class A-2 Notes are Outstanding, the Class A Interest Coverage Ratio equals or exceeds 110%, where the "Class A Interest Coverage Ratio" will equal (x) the greater of (a) zero and (b) Net Interest Coverage Proceeds for

such date, divided by (y) the sum of the Class A-1 Interest Amount and the Class A-2 Interest Amount for the next following Payment Date (the "Class A Interest Coverage Test");

2.      as of any Measurement Date on which any Class A-1 Notes, Class A-2 Notes or Class B Notes are Outstanding, the Class B Interest Coverage Ratio equals or exceeds 105%, where the "Class B Interest Coverage Ratio" will equal (x) the greater of (a) zero and (b) the Net Interest Coverage Proceeds for such date, divided by (y) the sum of the Class A-1 Interest Amount, the Class A-2 Interest Amount and the Class B Interest Amount for the next following Payment Date (the "Class B Interest Coverage Test"); and

3.      as of any Measurement Date on which any Class A-1 Notes, Class A-2 Notes, Class B Notes or Class C Notes are Outstanding, the Class C Interest Coverage Ratio equals or exceeds 100%, where the "Class C Interest Coverage Ratio" will equal (x) the greater of (a) zero and (b) the Net Interest Coverage Proceeds for such date, divided by (y) the sum of the Class A-1 Interest Amount, the Class A-2 Interest Amount, the Class B Interest Amount, the Class C-1 Interest Amount and the Class C-2 Interest Amount for the next following Payment Date (the "Class C Interest Coverage Test").

For purposes of these tests, the addition or removal of a Reference Obligation will be effective if the relevant Addition Date or Removal Date has occurred on or prior to the Measurement Date.

If any Coverage Test is not satisfied as of any Determination Date related to a Payment Date following the Ramp-up End Date, amounts available in accordance with the Priority of Payments at that level of the Priority of Payments at which the Coverage Test is applied will be used on such Payment Date for the payment of the outstanding principal amount of the Senior Notes (and any Deferred Interest with respect thereto), starting with the most senior Class, to the extent necessary to satisfy all such Coverage Tests, and to that extent reduce the amount available for payments at lower levels in the Priority of Payments. Noncompliance with the Coverage Tests may also restrict the ability of the Reference Portfolio Manager to add or remove Reference Obligations under certain circumstances. *See "Description of the Swap Agreement—Selection and Modification of the Reference Portfolio."* The failure of the Issuer to satisfy a Coverage Test will not be a default or an Event of Default under the Indenture.

**The Diversion Test**

The "Diversion Test" will be satisfied as of the Determination Date related to any Payment Date following the Ramp-up End Date, if the Class C OC Test is satisfied as of such date, measured for this purpose as of the applicable Determination Date without giving effect to any payments made on the related Payment Date (including those made pursuant to any clause of the Priority of Payments ranking prior to the clause that provides for payments if the Diversion Test is not satisfied). If the Diversion Test is not satisfied on the Determination Date related to any such Payment Date, 50% of any amounts, if any, that would otherwise be used to pay Administrative Expenses in excess of the Expense Cap Amount, Subordinated Administrative Expenses, Extension Bonus Payments, if any, and a Net Income Note Periodic Return Amount to the Holders of the Income Notes will be used on such Payment Date in accordance with the Payment Date Priority of Payments for the payment of, first, on a pro rata basis, Deferred Interest, if any, with respect to the Class B Notes and the Class C Notes and then, on a pro rata basis, the Aggregate Principal Amount of the Class B Notes and the Aggregate Principal Amount of the Class C Notes (whether or not any Class A-1 Notes or Class A-2 Notes are then outstanding).

**The Class Q-1 Securities**

The Class Q-1 Securities will be issued pursuant to the Indenture. The Class Q-1 Securities will consist of the Class Q-1 Senior Note Component and the Class Q-1 Income Note Component. The Class Q-1 Senior Note Component will represent an initial Aggregate Principal Amount of U.S. $5,000,000 of Class C-2 Notes. The Class Q-1 Income Note Component will represent an Aggregate Principal Amount of U.S. $5,000,000 of Income Notes. Each Class Q-1 Security is a single security, the Components of which are not separately transferable. However, a Holder may exchange its Class Q-1 Security with the Trustee for the corresponding interests in the related Components, as described below.

The initial Aggregate Principal Amounts of the Class C-2 Notes and Income Notes to which the Class Q-1 Senior Note Component and the Class Q-1 Income Note Component relate are included in (and are not in addition

010664

to) the initial Aggregate Principal Amounts of the Class C-2 Notes and Income Notes. Each Class Q-1 Security represents an undivided beneficial ownership interest in the cash flows on the Class Q-1 Senior Note Component and the Class Q-1 Income Note Component.

The Class Q-1 Securities are scheduled to mature on August 1, 2016, unless the maturity is extended. *See "Maturity of the Notes and Class Q-1 Securities and Extension of Maturity of the Notes and Class Q-1 Securities" above.*

Except as described herein or unless the context otherwise requires, references herein to the Class C-2 Notes, Class C Notes or Senior Notes (or the Holders thereof) include the Class Q-1 Senior Note Component (or the Holders of the Class Q-1 Securities to the extent thereof), whether or not explicitly mentioned, and references to the Income Notes (or the Holders thereof) include the Class Q-1 Income Note Components (or the Holders of the Class Q-1 Securities to the extent thereof), whether or not explicitly mentioned.

On each Payment Date on which payments, whether of principal or interest, are made on the Class C-2 Notes or any distributions are made on the Income Notes, a portion of such payment will be allocated to the Class Q-1 Securities in the proportion that the principal amount of Notes comprising such Component bears to the principal amount of such Class of Notes as a whole (including all related Components). No other payments will be made on the Class Q-1 Securities.

The rating by Moody's on the Class Q-1 Securities applies only to the return of the Class Q-1 Rated Principal. The Class Q-1 Nominal Rate does not limit the entitlement of Holders of Class Q-1 Securities to receive any applicable Class Q-1 Excess Distributions. All distributions made with respect to the Class Q-1 Securities will reduce the outstanding Class Q-1 Rated Principal until it is reduced to U.S. $1.

The Holders of Class Q-1 Securities will be entitled to voting rights in each Class of Notes that is a Component, in the proportion that such Component bears to the principal amount of such Class of Notes as a whole (including such Component). The Holders of the Class Q-1 Securities will not be entitled to voting rights as a separate class, except in limited circumstances described in the Indenture.

Investors considering purchasing Class Q-1 Securities should consider carefully the discussions in this Offering Circular of the Class C-2 Notes and the Income Notes represented by the Class Q-1 Senior Note Component and the Class Q-1 Income Note Component, as applicable, including the risk factors applicable thereto.

<u>Exchange of Class Q-1 Securities</u>

Pursuant to the Indenture, a Holder of a Class Q-1 Security may exchange all or a proportionate amount of each Component of such Class Q-1 Security for proportional interests in the Class C-2 Notes, in the form of a Rule 144A Global Note or a Regulation S Global Note (in the case of the Class Q-1 Senior Note Component) and a Certificated Income Note (in the case of the Class Q-1 Income Note Component), subject to the minimum denomination requirements applicable to the underlying Notes and any remaining portion of Class Q-1 Securities and in the manner described in the Indenture. Thereafter, the Holder of a beneficial interest in a Class Q-1 Security exchanged will be the Holder of the applicable Class C-2 Notes and the Income Notes, in each case received upon such exchange. No Holder of Class C-2 Notes or Income Notes (including a Holder that received such Class C-2 Notes or Income Notes upon an exchange of a Class Q-1 Security) will have the right to exchange such Class C-2 Notes and/or Income Notes for a Class Q-1 Security. No service charge will be made for any such exchange of Class Q-1 Securities, but the Issuer or the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection with such exchange. Following any such exchange, the rating of the exchanged Class Q-1 Securities by any Rating Agency may not apply to the Securities received in such exchange.

In an Amendment Buy-Out that affects only one Component of a Class Q-1 Security, the Non-Consenting Holder, at its option, may require the Amendment Buy-Out Purchaser to purchase its Class Q-1 Security as a whole or may exchange its Class Q-1 Security into its Components and require the Amendment Buy-Out Purchaser to purchase solely the affected Component. *See "Amendment Buy-Out" above.*

010665

Case 19-34054-sgj11 Doc 1822-66 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 62 of
Case 3:21-cv-00538-N Document 26-39 Filed 06/09/21 Page 171 of 303 PageID 13553
104

**The Class Q-2 Securities**

The Class Q-2 Securities will be issued pursuant to the Indenture. The Indenture limits the principal amount of the Class Q-2 Securities to (i) U.S. $7,200,000 aggregate principal amount of the Class Q-2A Securities and (ii) U.S. $40,000,000 aggregate principal amount of the Class Q-2B Securities. Payments on the Class Q-2 Securities will be made solely from the Class Q-2 Securities Collateral.

The Class Q-2A Securities will accrue interest at the Class Q-2A Interest Rate. The Class Q-2A Securities will provide for the payment of the Class Q-2A Interest Amount on each Payment Date. Interest on the Class Q-2A Securities will accrue from and including the Closing Date and will be payable quarterly in arrears on each Payment Date to the Holders of the Class Q-2A Securities as of the related Record Date. Interest on the Class Q-2A Securities will be computed for each Periodic Interest Accrual Period on the basis of a 360-day year and the actual number of days in the applicable Periodic Interest Accrual Period.

Interest on the Class Q-2A Securities (including interest on Class Q-2A Deferred Interest (as defined below) on such Q-2A Securities) will only be due and payable to the extent that funds are available for such payment in accordance with the operation of the Class Q-2 Priority of Payments as described herein, and the failure to pay any such interest because such funds are not available will not be a Class Q-2 Event of Default under the Indenture. Instead, the amount of any interest that is not paid on the Class Q-2A Securities on any Payment Date will be deferred, and such amounts ("Class Q-2A Deferred Interest") will bear interest at the Class Q-2A Interest Rate. Interest accrued on Class Q-2A Deferred Interest for any Periodic Interest Accrual Period will be payable as current interest on the Class Q-2A Securities on the related Payment Date and, to the extent not paid on such Payment Date, will constitute additional Class Q-2A Deferred Interest. Class Q-2A Deferred Interest will be due and payable on the first Payment Date on which funds are available and permitted to be used for such purpose in accordance with the Class Q-2A Priority of Payments. *See—"Class Q-2 Events of Default"* for a description of when such non-payment constitutes a Class Q-2 Event of Default under the Indenture and the available remedies. Subject to the availability of funds and to the Class Q-2 Priority of Payments, the Class Q-2A Securities, unless previously redeemed, will provide for the payment of outstanding principal on the Class Q-2 Maturity Date.

Holders of Class Q-2B Securities will not be entitled to receive distributions at a stated rate but on each Payment Date will be entitled to distributions (including the Class Q-2B Target Amount) solely to the extent of available funds therefor pursuant to the Class Q-2 Priority of Payments.

The remaining principal amount, if any, of and interest on the Class Q-2A Securities and any final distribution, if any, on the Class Q-2B Securities will be paid on the Class Q-2 Maturity Date upon surrender of such Securities at the office of any Paying Agent designated for such purpose under the Indenture. The interest payable at maturity on the Class Q-2A Securities will be paid to the Person to whom principal of such Security will be paid.

The Class Q-2B Securities are subordinate (except with respect to the Class Q-2B Target Amount) to the Class Q-2A Securities as provided in the Class Q-2 Priority of Payments.

Class Q-2 Priority of Payments

*Class Q-2 Payment Date Priority of Payments*

On each Payment Date, the Trustee will distribute the Class Q-2 Payment Date Proceeds in the Class Q-2 Securities Collateral Account to make the following payments in the following order of priority (the "Class Q-2 Payment Date Priority of Payments"):

1. to the Holders of the Class Q-2A Securities, the Class Q-2A Interest Amount;

2. to the Holders of the Class Q-2A Securities, any Class Q-2A Deferred Interest;

3. to the Holders of the Class Q-2A Securities, the Aggregate Principal Amount of the Class Q-2A Securities; and

010666

    4.    the remainder to the Holders of the Class Q-2B Securities (the "Net Class Q-2B Periodic Return Amount")

In addition, on each Payment Date, the Trustee will distribute from Class Q-2 Gross Proceeds other than the Class Q-2 Payment Date Proceeds, to the Holders of Class Q-2B Securities, the Class Q-2B Target Amount, if any, for such date.

*Class Q-2 Maturity Date Priority of Payments*

On the Class Q-2 Maturity Date, the Trustee will distribute any Class Q-2 Collateral Asset B Proceeds and any other amounts on deposit in the Class Q-2 Securities Collateral Account to make the following payments in the following order of priority (the "Class Q-2 Maturity Date Priority of Payments"):

    1.    to the Holders of the Class Q-2A Securities, the Aggregate Principal Amount of the Class Q-2A Securities, any accrued and unpaid Class Q-2A Interest Amount and any Class Q-2A Deferred Interest; provided that no more than $7,200,000 shall be payable pursuant to this clause (A) from Class Q-2 Collateral Asset B Proceeds; and;

    2.    the remainder to the Holders of the Class Q-2B Securities (the "Final Class Q-2B Distribution Amount").

<u>Class Q-2A Coverage Test</u>

If the Class Q-2A Coverage Test is not satisfied as of any date of determination following the Closing Date, at the unanimous direction of the Holders of the Class Q-2A Securities, the Trustee will liquidate the Class Q-2 Collateral Asset A and credit the proceeds thereof to the Class Q-2 Securities Collateral Account for distribution in accordance with the Class Q-2 Priority of Payments upon receipt of such proceeds as though the date of receipt thereof were a Payment Date.

<u>Rights with respect to the Class Q-2 Collateral Asset A</u>

With respect to any matter under the Indenture as to which the Holders of Income Notes are entitled to vote or give any consent or direction, the Trustee will follow the direction of the Holders of a majority of the Aggregate Principal Amount of the Class Q-2B Securities for purposes of voting or giving such consent or direction for the Income Notes represented by the Class Q-2 Collateral Asset A. If as a result of such vote the Holder of the Income Notes represented by the Class Q-2 Collateral Asset A would constitute a Non-consenting Holder, the Amendment Buy-Out Purchaser will be entitled to purchase the Income Notes represented by the Class Q-2 Collateral Asset A if it elects to exercise its Amendment Buy-Out Option, and the proceeds of such purchase will be credited to the Class Q-2 Securities Collateral Account and distributed in accordance with the Class Q-2 Priority of Payments on the next following Payment Date. The Class Q-2 Securities themselves will not be subject to an Amendment Buy-Out.

In the case of the Maturity Extension, if any, the Holders of a majority of the Aggregate Principal Amount of the Class Q-2B Securities will be entitled to direct the Trustee to provide an Extension Sale Notice with respect to the Income Notes represented by the Class Q-2 Collateral Asset A. Any proceeds from an Extension Sale with respect to the Income Notes represented by the Class Q-2 Collateral Asset A will be credited to the Class Q-2 Securities Collateral Account and distributed in accordance with the Class Q-2 Priority of Payments on the applicable Payment Date.

The Holders of Class Q-2 Securities will not be entitled to direct the Trustee with respect to the Trust Estate pursuant to the Indenture other than by way of the rights of Class Q-2 Collateral Asset A.

<u>The Class Q-2 Securities Collateral Account</u>

On or prior to the Closing Date, the Trustee will establish a segregated trust account in the name of the Trustee for the benefit of the Holders of the Class Q-2 Securities (the "Class Q-2 Securities Collateral Account"), which is required at all times to be an Eligible Account at an Eligible Institution (which initially shall be JPMorgan Chase Bank).

010667

On the Closing Date, the Class Q-2 Collateral Asset A and the Class Q-2 Collateral Asset B will be deposited in the Class Q-2 Securities Collateral Account. In addition, the Trustee will deposit into the Class Q-2 Securities Collateral Account all proceeds from the Class Q-2 Collateral Asset A, including, without limitation, distributions on the Class Q-2 Collateral Asset A and any proceeds from the sale, redemption or maturity of all or portions of the Class Q-2 Collateral Assets. All moneys deposited in the Class Q-2 Securities Collateral Account shall be invested in Eligible Investments required to mature on or before the Business Day prior to the next Payment Date.

<u>Exchange of Class Q-2 Securities</u>

Pursuant to the Indenture, on and after the date on which the Class Q-2A Securities are redeemed or repaid in full, any Holder of a Class Q-2B Security may exchange all but not less than all of its Class Q-2B Securities for its proportional share of the Class Q-2 Collateral Asset A, in the form of Certificated Income Notes (subject to the minimum denomination requirements applicable to the Income Notes and in the manner described in the Indenture) and any proceeds thereof, and the Class Q-2 Collateral Asset B and any proceeds thereof in the Class Q-2 Securities Collateral Account.  The Trustee, upon surrender of a Class Q-2B Certificated Security by a Holder for an exchange, will simultaneously convert the applicable portion of the Class Q-2 Collateral Asset A into Certificated Income Notes and transfer the applicable portion of the Class Q-2 Collateral Asset B to that Holder in accordance with standard settlement procedures for assets of that type and so effect the exchange.  Thereafter, the Holder of the Class Q-2B Security so exchanged will be the Holder of the Income Notes received upon the exchange for purposes of the Indenture.  No Holder of Income Notes (including a Holder that received such Income Notes upon an exchange of a Class Q-2B Security) or CGMHI Notes will be entitled to exchange any such notes for a Class Q-2B Security.  No service charge shall be made for any such exchange of Class Q-2B Securities, but the Issuer or the Trustee may require payment of a sum sufficient to cover any tax or governmental charge payable in connection with such exchange.

<u>Class Q-2 Administrative Expenses</u>

Following the redemption in full of the Notes and Class Q-1 Securities and the liquidation and distribution of the Trust Estate, if the Class Q-2B Securities are then Outstanding, the Holders of Class Q-2B Securities will be required either (i) to exchange such Class Q-2B Securities into the applicable proportionate amount of the Class Q-2 Securities Collateral or (ii) to enter into an arrangement with the Issuer satisfactory to the Issuer for the payment of Class Q-2 Administrative Expenses (and will be deemed to have elected clause (i) if an arrangement pursuant to clause (ii) has not been entered into within a reasonable time of such redemption, liquidation and distribution).

<u>Class Q-2 Events of Default</u>

A Class Q-2 event of default ("Class Q-2 Event of Default") is defined in the Indenture as being:

1.  a default in the payment, when due and payable, of any Interest Amount on the Class Q-2A Securities, which default shall continue for a period of five days (*provided* that the failure to pay Interest Amounts on the Class Q-2A Securities because insufficient funds are available in accordance with the Class Q-2 Priority of Payments will not constitute a Class Q-2 Event of Default);

2.  a default in the payment of principal of any Class Q-2 Security on the Class Q-2 Maturity Date; *provided* that, in the case of a default in such payment due solely to an administrative error or omission by the Trustee or any Paying Agent, such default continues for a period of five days;

3.  a failure to apply, within five days following any Payment Date or the Class Q-2 Maturity Date, available amounts in accordance with the Class Q-2 Priority of Payments, or a default in payment solely due to an administrative error or omission by the Trustee, which default continues for a period of five days;

4.  either of the Issuers or the Class Q-2 Securities Collateral becomes an investment company required to be registered under the Investment Company Act;

5.  except as otherwise provided in this definition of "Class Q-2 Event of Default," a default in any respect in the performance, or a breach of any covenant, warranty or other agreement of the

010668

Issuers in the Indenture, or the failure of any representation or warranty of the Issuers made in the Indenture or in any certificate or other writing delivered pursuant to or in connection with the Indenture to be correct in all respects when the same shall have been made, which default, breach or failure would have a material adverse effect on the Holders of the Class Q-2 Securities and continuance of such default, breach or failure for a period of 30 calendar days after written notice shall have been given as provided in the Indenture to the Issuers by the Trustee or to the Issuers and the Trustee by the Class Q-2 Requisite Securityholder specifying such default, breach or failure and requiring it to be remedied and stating that such notice is a "Notice of Class Q-2 Default" under the Indenture; or

6.      certain events of bankruptcy, insolvency, receivership or reorganization of either of the Issuers (as set forth in the Indenture).

If a Class Q-2 Event of Default under the Indenture (other than a Class Q-2 Event of Default of the type described in clause (4) or clause (6) above) occurs and is continuing, the Trustee shall at the written direction of the Class Q-2 Requisite Securityholders declare the principal of and any accrued interest on the Class Q-2A Securities to be immediately due and payable. If a Class Q-2 Event of Default of the type described in clause (4) or clause (6) above occurs, the principal of and interest on the Class Q-2A Securities automatically shall become immediately due and payable without any action of the Trustee or any other Person. The Class Q-2 Requisite Securityholders may rescind a declaration of acceleration if the Class Q-2 Event of Default has been cured and certain other conditions are satisfied.

Subject to the next succeeding paragraphs, upon any acceleration of the Class Q-2A Securities, the Class Q-2 Requisite Securityholders shall have the right to direct the Trustee to exercise the remedies with respect to the Class Q-2 Securities Collateral provided for in the Indenture.

Notwithstanding the foregoing, the Trustee may not sell or liquidate the Class Q-2 Securities Collateral unless the Class Q-2A Securities have been declared or have become due and payable as described above and one of the following conditions exists:

(i)     The Trustee determines that the anticipated net proceeds of a sale or liquidation of the Class Q-2 Securities Collateral would be sufficient to pay (a) to the appropriate Persons any accrued and unpaid Class Q-2 Administrative Expenses (unless otherwise provided for) and (b) to the Holders of the Class Q-2A Securities the principal of and interest accrued on the Class Q-2A Securities to the date of acceleration. The Trustee shall make or cause to be made the calculation required by this paragraph promptly after the acceleration of the Class Q-2A Securities and on each monthly anniversary thereafter. In the event that the conditions of clause (i) are satisfied, the Trustee shall promptly effect the sale or liquidation of the Class Q-2 Securities Collateral and apply the proceeds as described below; or

(ii)    the Class Q-2 Requisite Securityholders direct the Trustee at any time following the acceleration of the Class Q-2A Securities to sell or liquidate the Class Q-2 Securities Collateral.

During any period following a Class Q-2 Event of Default but prior to the liquidation of the Class Q-2 Securities Collateral, the Trustee will retain the Class Q-2 Securities Collateral intact, collect and cause the collection of the proceeds thereof and make and apply all payments and deposits and maintain all amounts in respect of the Class Q-2 Securities Collateral and Class Q-2 Securities in accordance with the terms of the Indenture (including reinvestment of amounts in Eligible Investments in the Class Q-2 Securities Collateral Account). Any such proceeds realized after the acceleration of the Class Q-2 Securities Collateral will be distributed in accordance with the Class Q-2 Priority of Payments.

Upon the acceleration of the Class Q-2A Securities, if the Class Q-2 Securities Collateral has not been sold or liquidated, the funds in the Class Q-2 Securities Collateral Account, if any, will be applied in accordance with the Class Q-2 Priority of Payments on each Payment Date. If the Class Q-2 Securities Collateral is sold or liquidated, a final distribution will be made pursuant thereto on the first Business Day following the last day on which an item of the Class Q-2 Securities Collateral is sold or liquidated (and no interim distributions will be made on any date (including on any Payment Date) during the sale or liquidation process).

Notwithstanding anything to the contrary, no Holder of Class Q-2 Securities will be entitled to direct the Trustee or exercise any right or remedy, bring any proceeding or take any action under the Indenture with respect to

010669

the Trust Estate, other than through and solely to the extent of the rights pertaining to the Class Q-2 Collateral Asset A. While any Notes are Outstanding, no Holder of Class Q-2 Securities may bring any proceeding against the Issuer other than solely in respect of the Class Q-2 Securities Collateral and any such proceeding by the Holders of Class Q-2 Securities may not include any bankruptcy or similar proceedings. The costs of any proceedings by Holders of Class Q-2 Securities and the costs and expenses incurred by the Trustee in connection with any sale or liquidation of the Class Q-2 Securities Collateral will not be payable from the Trust Estate (except to the extent included in the Class Q-2 Securities Collateral pursuant to the definition thereof). No Holder of Class Q-2B Securities shall be entitled to institute proceedings or to seek any other remedy under the Indenture unless all of the Class Q-2A Securities have been redeemed in full.

**Form, Denomination and Registration**

General

Each Class of Notes, whether issued in definitive or global form, and the Class Q-2A Securities will be issued and transferable in minimum denominations of U.S. $500,000 and integral multiples of U.S. $1,000 in excess thereof. The Class Q-1 Securities will be issued and transferable in minimum denominations in which each Component thereof satisfies the applicable minimum denomination requirement. The Class Q-2B Securities will be issued and transferable in minimum denominations of U.S. $1,000,000 and integral multiples of U.S. $1,000 in excess thereof.

Rule 144A Global Notes

The Senior Notes initially sold in the United States or to U.S. Persons (as defined in Regulation S under the Securities Act) pursuant to Rule 144A under the Securities Act will be represented by one or more permanent global notes in definitive, fully registered form without interest coupons (the "Rule 144A Global Notes"). The Rule 144A Global Notes will be deposited with the Trustee as custodian for The Depository Trust Company ("DTC") and will be registered in the name of Cede & Co. ("Cede"), as nominee of DTC.

All or a portion of an interest in a Rule 144A Global Note may be transferred to a Person taking delivery in the form of an interest in a Rule 144A Global Note in accordance with the applicable procedures of DTC (in addition to the requirements set forth in the Indenture); *provided* that any remaining principal amount of the transferor's interest in the Rule 144A Global Note shall either equal zero or meet the required minimum denomination. In addition, all or a portion of an interest in a Rule 144A Global Note may be transferred to a person taking delivery in the form of an interest in a Temporary Regulation S Global Note or a Regulation S Global Note, as applicable, or exchanged for an interest in a Temporary Regulation S Global Note or a Regulation S Global Note, as applicable, in accordance with the applicable procedures of DTC, Clearstream and Euroclear (in addition to the requirements set forth in the Indenture); *provided* that the transferor (in the case of a transfer) or the Holder of a Note (in the case of an exchange) will represent that, among other things, the transfer or exchange is being made to a non-U.S. Person in an offshore transaction in accordance with Regulation S and only in a denomination greater than or equal to the required minimum denomination; *provided, further* that any remaining principal amount of the transferor's interest in the Rule 144A Global Note shall either equal zero or meet the required minimum denomination.

Any interest in a Rule 144A Global Note that is transferred to a person taking delivery in the form of an interest in a Temporary Regulation S Global Note or a Regulation S Global Note will, upon transfer, cease to be an interest in such Rule 144A Global Note and become an interest in the Temporary Regulation S Global Note or the Regulation S Global Note, as applicable, and, accordingly, will thereafter be subject to all transfer restrictions and other procedures applicable to interests in a Temporary Regulation S Global Note or a Regulation S Global Note, as applicable. No service charge will be made for any registration of transfer or exchange of an interest in a Rule 144A Global Note, but the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

Transfers of interests in the Rule 144A Global Notes are subject to certain additional restrictions. In particular, each transferee of an interest in a Rule 144A Global Note will also be deemed to have made certain additional acknowledgments, representations and warranties as provided in the Indenture. *See "Purchase and Transfer Restrictions."*

010670

Regulation S Global Notes

The Senior Notes initially sold to non-U.S. Persons (as defined in Regulation S under the Securities Act) in offshore transactions in reliance on Regulation S under the Securities Act will be initially represented by one or more temporary global notes in definitive, fully registered form without interest coupons attached (the "Temporary Regulation S Global Notes"). The Class Q-1 Securities initially sold to non-U.S. Persons (as defined in Regulation S under the Securities Act) in offshore transactions in reliance on Regulation S under the Securities Act will be initially represented by a Temporary Regulation S Global Note (the "Class Q-1 Temp Reg S Global Security"). The Temporary Regulation S Global Notes will be deposited with the Trustee acting as custodian for DTC and will be registered in the name of Cede, as nominee of DTC, for credit to DTC participants holding such position on behalf of Euroclear and Clearstream, for further credit to the respective accounts of Euroclear and Clearstream.

On or after the first Business Day following the 40th day after the later of the Closing Date and the commencement of the offering of the Notes (the "Exchange Date"), interests in a Temporary Regulation S Global Note (including a Class Q-1 Temp Reg S Global Security) will be exchangeable for interests in one or more permanent global notes of the same Class in definitive, fully registered form without interest coupons attached (the "Regulation S Global Notes" (or, in the case of an exchange of Class Q-1 Temp Reg S Global Securities, the "Class Q-1 Reg S Global Securities") and, together with the Rule 144A Global Notes and the Temporary Regulation S Global Notes, as applicable, the "Global Notes") upon certification that the beneficial interests in such Temporary Regulation S Global Note are owned by Persons who are not U.S. Persons (as defined in Regulation S).

Interests in the Global Notes (except for the Rule 144A Global Notes) may be held only through Euroclear or Clearstream.

All or a portion of an interest in a Temporary Regulation S Global Note (other than Class Q-1 Temp Reg S Global Securities) or a Regulation S Global Note (other than Class Q-1 Reg S Global Securities) may be transferred to a Person taking delivery in the form of an interest in a Temporary Regulation S Global Note or a Regulation S Global Note as applicable, in accordance with the applicable procedures of DTC, Clearstream or Euroclear (in addition to the requirements set forth in the Indenture), *provided* that any remaining principal amount of the transferor's interest in the Temporary Regulation S Global Notes or the Regulation S Global Notes, as applicable, shall either equal zero or meet the required minimum denominations.

In addition, all or a portion of an interest in a Temporary Regulation S Global Note (other than Class Q-1 Temp Reg S Global Securities) or a Regulation S Global Note (other than Class Q-1 Reg S Global Securities) may be transferred to a Person taking delivery in the form of an interest in a Rule 144A Global Note or exchanged for an interest in a Rule 144A Global Note in accordance with the applicable procedures of DTC, Clearstream or Euroclear (in addition to the requirements set forth in the Indenture) upon receipt by the Trustee of a certificate from the transferor (in the case of a transfer) or the Holder of a Note (in the case of an exchange) in the form provided in the Indenture to the effect that, among other things, the transfer or exchange is to a Person that is both (i) a Qualified Institutional Buyer and (ii) a Qualified Purchaser, and only in a denomination greater than or equal to the required minimum denominations, *provided* that any remaining principal amount of the transferor's interest in the Temporary Regulation S Global Note or the Regulation S Global Note, as applicable, shall either equal zero or meet the required minimum denominations.

Any interest in a Temporary Regulation S Global Note (other than a Class Q-1 Temp Reg S Global Security) or a Regulation S Global Note (other than a Class Q-1 Reg S Global Security) that is transferred to a Person taking delivery in the form of a Rule 144A Global Note will, upon transfer, cease to be an interest in such Temporary Regulation S Global Note or Regulation S Global Note and become an interest in the Rule 144A Global Note and, accordingly, will thereafter be subject to all transfer restrictions and other procedures applicable to interests in a Rule 144A Global Note for as long as it remains such an interest. No service charge will be made for any registration of transfer or exchange of an interest in a Temporary Regulation S Global Note or a Regulation S Global Note, but the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

Transfers of interests in the Temporary Regulation S Global Notes or the Regulation S Global Notes will be subject to certain additional restrictions. In particular, each transferee of an interest in a Temporary Regulation S Global Note or a Regulation S Global Note will also be deemed to have made certain additional acknowledgments, representations and warranties as provided in the Indenture. *See "Purchase and Transfer Restrictions."*

53

010671

Interests in a Class Q-1 Temp Reg S Global Security or a Class Q-1 Reg S Global Security may only be transferred to a Person taking delivery in the form of a Certificated Class Q-1 Security, upon receipt by the Trustee of a transferee certificate substantially in the form provided in the Indenture. *See also "—Certificated Securities"* below.

To enforce the restrictions on transfers of interests in the Securities, the Indenture permits the Issuer to demand that the purchaser of an interest in a Rule 144A Global Note who is determined not to be a Qualified Institutional Buyer and a Qualified Purchaser sell its interest in such Rule 144A Global Note to a permitted purchaser under the Indenture, and, if the purchaser does not comply with such demand within 30 days thereof, the Issuer may sell or cause such purchaser to sell its interest in the Note, on such terms as the Issuer may choose. In addition, the Indenture also permits the Issuer to demand that the purchaser of an interest in a Temporary Regulation S Global Note or a Regulation S Global Note who is determined not to have acquired such beneficial interest in compliance with the requirements of the Indenture sell its interest in such Temporary Regulation S Global Note or Regulation S Global Note to a permitted purchaser under the Indenture, and, if such purchaser does not comply with such demand within 30 days thereof, the Issuer may sell or cause such purchaser to sell its interest in the Temporary Regulation S Global Note or the Regulation S Global Note, as applicable, on such terms as the Issuer may choose.

Book Entry Registration of the Global Notes

The registered owner of the relevant Global Note will be the only Person entitled to receive payments in respect of the Securities represented by such Global Note, and the obligation of the Issuers to make payments or distributions in respect of such Securities will be discharged by payment to, or to the order of, the registered owner of such Global Note in respect of each amount so paid. No Person other than the registered owner of the relevant Global Note shall have any claim against the Issuers in respect of any payment due on that Global Note. Members of, or participants in, DTC as well as any other Persons on whose behalf such participants may act (including Euroclear and Clearstream and account holders and participants therein) will have no rights under the Indenture with respect to such Global Notes held on their behalf by the Trustee, as custodian for DTC, and DTC may be treated by the Issuers or the Trustee and any agent of the Issuers or the Trustee as the Holder of such Global Notes for all purposes whatsoever. Except in the limited circumstances described in the next paragraph and with respect to the transfer of Class Q-1 Temp Reg S Global Securities and Class Q-1 Reg S Global Securities, owners of beneficial interests in the Global Notes will not be entitled to have such Securities registered in their names, will not receive or be entitled to receive definitive physical securities and will not be considered Holders of such Securities under the Indenture.

If (i) DTC notifies the Trustee that it is unwilling or unable to continue as depository for the Global Notes or DTC, Euroclear or Clearstream ceases to be a "Clearing Agency" (as defined in the Exchange Act) registered under the Exchange Act, and a successor depository or clearing agency is not appointed by the Trustee within 90 days after receiving such notice, (ii) as a result of any amendment to or change in the laws or regulations of the Cayman Islands, or of any authority therein or thereof having power to tax, or in the interpretation or administration of such laws or regulations which become effective on or after the Closing Date, the Issuers, the Trustee, or the Paying Agent becomes aware that it is or will be required to make any deduction or withholding from any payment in respect of the Global Notes which would not be required if such Global Notes were not represented by a global note or (iii) an Event of Default under the Indenture has occurred and is continuing and has not been waived, the Issuers will issue or cause to be issued notes in registered form and in the form of definitive physical notes in exchange for the applicable Global Notes to the beneficial owners of such Global Notes in the manner set forth in the Indenture.

Investors may hold their interests in a Rule 144A Global Note directly through DTC if they are participants in DTC, or indirectly through organizations which are participants in DTC. Investors may hold their interests in a Temporary Regulation S Global Note or a Regulation S Global Note directly through Clearstream or Euroclear, if they are participants in Clearstream or Euroclear, or indirectly through organizations which are participants in Clearstream or Euroclear. Clearstream and Euroclear will hold interests in the Temporary Regulation S Global Notes and the Regulation S Global Notes on behalf of their participants through their respective depositories, which in turn will hold the interests in such Global Notes in customers' securities accounts in the depositories' names on the books of DTC.

010672

Payments of principal of and interest on a Global Note will be made to DTC or its nominee, as the registered owner thereof. The Issuers, the Trustee, the Paying Agent, the Initial Purchaser, the Placement Agent, the Swap Counterparty, the Reference Portfolio Manager and any of their respective Affiliates will not have any responsibility or liability for any aspect of the records relating to or payments made on account of beneficial ownership interests in a Global Note or for maintaining, supervising or reviewing any records relating to the beneficial ownership interests.

The Issuers expect that DTC or its nominee, upon receipt of any payment of principal or interest in respect of a Global Note representing a Note held by DTC or its nominee, will immediately credit participants' accounts with payments in amounts proportionate to their respective beneficial interests in the stated principal amount of such Note as shown on the records of DTC or its nominee. The Issuers also expect that payments by participants to owners of beneficial interests in a Global Note held through the participants will be governed by standing instructions and customary practices, as is now the case with securities held for the accounts of customers registered in the names of nominees for such customers. The payments will be the responsibility of the participants.

Transfers between participants in DTC will be effected in the ordinary way in accordance with DTC rules and will be settled in immediately available funds. If the laws of a jurisdiction require that certain persons take physical delivery of securities in definitive form, the ability to transfer beneficial interests in a Global Note to such persons may be limited. Because DTC can only act on behalf of participants, who in turn act on behalf of indirect participants and certain banks, the ability of a Person holding a beneficial interest in a Global Note to pledge its interest to a Person or entity that does not participate in the DTC system, or otherwise take actions in respect of its interest, may be affected by the lack of a physical security. Transfers between participants in Euroclear and Clearstream will be effected in the ordinary way in accordance with their respective rules and operating procedures.

Subject to compliance with the transfer restrictions applicable to the Securities described above and under *"Purchase and Transfer Restrictions,"* cross-market transfers between DTC, on the one hand, and, directly or indirectly through Euroclear or Clearstream participants, on the other, will be effected through DTC in accordance with DTC rules on behalf of Euroclear or Clearstream, as applicable, by its respective depositary; however, these cross-market transactions will require delivery of instructions to Euroclear or Clearstream, as applicable, by the counterparty in the system in accordance with its rules and procedures and within its established deadlines (Brussels time for Euroclear and Luxembourg time for Clearstream). Euroclear or Clearstream, as applicable, will, if the transaction meets its settlement requirements, deliver instructions to its respective depositary to take action to effect final settlement on its behalf by delivering or receiving interests in a Regulation S Global Note, and making or receiving payment in accordance with normal procedures for immediately available funds settlement applicable to DTC. Clearstream participants and Euroclear participants may not deliver instructions directly to the depositaries for Clearstream or Euroclear.

Because of time zone differences, the securities account of a Euroclear or Clearstream participant purchasing an interest in a Global Note from a DTC participant will be credited during the securities settlement processing day (which must be a business day for Euroclear and Clearstream) immediately following the DTC settlement date and the credit of any transactions in interests in a Global Note settled during the processing day will be reported to the relevant Euroclear or Clearstream participant on that day. Cash received in Euroclear or Clearstream as a result of sales of interests in a Global Note by or through a Euroclear or Clearstream participant to a DTC participant will be received with value on the DTC settlement date but will be available in the relevant Euroclear or Clearstream cash account only as of the Business Day following settlement through DTC.

DTC has advised the Issuers that it will take any action permitted to be taken by Holders of the Securities only at the direction of one or more participants to whose account with DTC an interest in a Global Note is credited and only in respect of that portion of the principal balance of the applicable Notes as to which the participant or participants has or have given direction.

DTC is a limited purpose trust company organized under the laws of the State of New York, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code and a Clearing Agency registered pursuant to the provisions of Section 17A of the Exchange Act. DTC was created to hold securities for its participants and facilitate the clearance and settlement of securities transactions between participants through electronic book-entry changes in accounts of its participants, thereby eliminating the

010673

need for physical movement of certificates. Participants include securities brokers and dealers, banks, trust companies and clearing corporations and may include certain other organizations. Indirect access to the DTC system is also available to others such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a participant, either directly or indirectly.

Although DTC, Clearstream and Euroclear have agreed to the foregoing procedures in order to facilitate transfers of interests in the Global Notes among participants of DTC, Clearstream and Euroclear, they are under no obligation to perform or continue to perform these procedures, and the procedures may be discontinued at any time. None of the Issuers, the Trustee or any Paying Agent will have any responsibility for the performance by DTC, Clearstream, Euroclear or their respective participants or indirect participants of their respective obligations under the rules and procedures governing their operations.

Any purported transfer of a Note not in accordance with the Indenture shall be null and void *ab initio* and shall not be given effect for any purpose whatsoever. However, without prejudice to the rights of the Issuer against any beneficial owner or purported beneficial owner of Securities, nothing in the Indenture, or the Notes, as applicable, shall be interpreted to confer on the Issuer, the Trustee, or any Paying Agent any right against Euroclear to require that Euroclear reverse or rescind any trade completed in accordance with the rules of Euroclear.

<u>Certificated Securities</u>

All Income Notes, all Class Q-2 Securities and the Class Q-1 Securities initially sold in the United States or to U.S. persons pursuant to Rule 144A under the Securities Act or upon the transfer of an interest in a Class Q-1 Temp Reg S Global Security or Class Q-1 Reg S Global Security, will be issued in the form of definitive, physical certificates in fully registered form (a "Certificated Income Note", "Certificated Class Q-2 Security," or Certificated Class Q-1 Security," as applicable, and each, a "Certificated Security"). The Certificated Income Notes and the Certificated Class Q-2 Securities will initially be offered only (i) except in the case of the Class Q-2B Securities, in the United States to Qualified Purchasers that are also either Qualified Institutional Buyers or, in the case of the Income Notes only, Accredited Investors, in each case in reliance on an exemption from registration under the Securities Act, and (ii) outside the United States, to non-U.S. Persons in offshore transactions in reliance on Regulation S under the Securities Act. The Certificated Class Q-1 Securities will initially be offered only in the United States to Qualified Purchasers that are also Qualified Institutional Buyers. The Certificated Income Notes, the Certificated Class Q-2 Securities, the Certificated Class Q-1 Securities, may be transferred only in the form of a Certificated Security and only (1) except in the case of the Class Q-2B Securities, to Qualified Purchasers that are either (a) Qualified Institutional Buyers, in reliance on an exemption from registration provided by Rule 144A thereunder or (b) in the case of the Income Notes only, Accredited Investors, in reliance on an exemption from registration under the Securities Act (*provided* that in the case of any transfer to an Accredited Investor pursuant to subclause (b) and if requested by the Trustee or the Issuer, the transferor or the transferee will be required to provide an opinion of counsel to each of the Trustee and the Issuer to the effect that such transfer may be made pursuant to an exemption from registration under the Securities Act and any applicable state securities laws) or (2) to non-U.S. Persons in offshore transactions in reliance on Regulation S. Interests in the Class Q-1 Temp Reg S Global Security and the Class Q-1 Reg S Global Security may be transferred only in the form of a Certificated Security and only (1) to Qualified Purchasers that are Qualified Institutional Buyers, in reliance on an exemption from registration provided by Rule 144A thereunder or (2) to non-U.S. Persons in offshore transactions in reliance on Regulation S. Transfers of Certificated Securities may only be effected in accordance with the Indenture by delivery to the Trustee and the Issuer of the required written certifications from the transferee regarding compliance with applicable transfer restrictions. *See "Purchase and Transfer Restrictions."*

Subject to the restrictions on transfer set forth in the Indenture, the Holder of a Certificated Security may transfer or exchange such Certificated Security in whole or in part by surrendering such Certificated Security at the designated office of the Trustee, together with an executed instrument of assignment and a transferee certificate substantially in the form attached to the Indenture. With respect to any Certificated Security properly presented for transfer with all necessary accompanying documentation, the Trustee will deliver to the transferee a Certificated Security of the like kind in the principal or stated amount as may be requested. The presentation for transfer of any Certificated Security will not be valid unless made at the designated office of the Trustee or at the office of a transfer agent by the registered Holder of the Certificated Security in person, or by a duly authorized attorney-in-fact. The Holder of a Certificated Security will not be required to bear the costs and expenses of effecting any transfer or registration of transfer, except that the relevant Holder of a Certificated Security will be required to bear (i) the

010674

expenses of delivery by other than regular mail (if any) and (ii) if the Issuer or the Trustee so requires, the payment of a sum sufficient to cover any duty, stamp tax or governmental charge or insurance charges that may be imposed in relation thereto.

**The Indenture and the Collateral Administration Agreement**

<u>Accounts</u>

On or prior to the Closing Date, the Trustee will establish three separate accounts: the Collateral Account, the Expense Reserve Account and the Collection Account (collectively, the "Trust Accounts"). Each of the Trust Accounts is required at all times to be an Eligible Account at an Eligible Institution (which initially shall be JPMorgan Chase Bank).

Investments of amounts in Eligible Investments in the Collateral Account and Collection Account (other than the initial Eligible Investments), and sales or liquidations of such Eligible Investments in order to make payments under the Indenture, will be made at the direction of the Swap Counterparty as secured party under the Indenture (or by the Reference Portfolio Manager on its behalf), unless a Swap Event of Default as to which the Swap Counterparty is the defaulting party or a Swap Additional Termination Event has occurred and is continuing or the Swap Agreement has been terminated and all amounts owed to the Swap Counterparty thereunder have been paid, in which case the Requisite Noteholders will be entitled to give such direction.

*The Collateral Account.* On the Closing Date, the net proceeds of the issuance of the Securities after payment of certain fees and expenses of the issuance and offering of the Securities and the funding of the Expense Reserve Account (approximately U.S. $247,500,000) will be deposited into the Collateral Account (the "Collateral Account"). In addition, on each Payment Date an amount equal to the Quarterly Aggregate Increase Amount, if any, for such date, will be deposited in the Collateral Account in accordance with the Payment Date Priority of Payments. Amounts received by the Issuer in respect of the termination of the Swap Agreement in excess of the amount required to enter into a replacement therefor will also be deposited in the Collateral Account. All moneys deposited into the Collateral Account shall be invested in Eligible Investments. The Eligible Investments in the Collateral Account (except the Investment Agreement) shall be required to mature on or before the Business Day prior to the next Payment Date. The net proceeds of the issuance of the Securities deposited in the Collateral Account on the Closing Date and other amounts deposited in the Collateral Account from time to time are expected to be invested in the Investment Agreement.

On each Payment Date (other than a Maturity Date, Optional Redemption Date or an Indenture Tax Redemption Date), the Trustee will transfer any applicable amounts credited to the Collateral Account, including any interest and dividends received in respect of Eligible Investments therein, into the Collection Account for distribution in accordance with the Payment Date Priority of Payments or, as applicable, the Principal Priority of Payments. On the Maturity Date (or Optional Redemption Date or an Indenture Tax Redemption Date), the Trustee will transfer all amounts in the Collateral Account following the sale or liquidation of all Eligible Investments into the Collection Account and distribute such moneys, together with the other moneys in the Collection Account, in accordance with the Priority of Payments. *See "—Priority of Payments" and "—Maturity of the Notes and Class Q-1 Securities and Extension of Maturity of the Notes and Class Q-1 Securities."* The Investment Agreement permits withdrawals for the purpose of making payments under the Indenture and in certain other limited circumstances.

Amounts on deposit in the Collateral Account will also be used to pay any Swap Termination Payment owed by the Issuer to the Swap Counterparty upon an early termination of the Swap Agreement; *provided* that in the case of a termination as a result of a Swap Event of Default as to which the Swap Counterparty is the defaulting party or a Swap Additional Termination Event has occurred and is continuing, such payment will be made on the next Payment Date in accordance with the Priority of Payments.

*The Collection Account.* The Trustee shall deposit into the Collection Account (the "Collection Account"), promptly upon receipt from time to time, (i) the net amount, if any, paid by the Swap Counterparty for any Payment Date in respect of the Adjusted Reference Portfolio Return Amount and the Fixed Amount, (ii) except as noted above, any Swap Termination Payment paid by the Swap Counterparty in connection with the termination of the Swap Agreement and (iii) all amounts transferred to it from the Collateral Account and the Expense Reserve Account.

010675

On each Payment Date, the Trustee shall distribute the applicable Payment Date Proceeds in the Collection Account in accordance with the Payment Date Priority of Payments. On the Maturity Date, Optional Redemption Date or Indenture Tax Redemption Date and on any date on which Senior Notes are to be redeemed or an Income Note Principal Distribution Amount is to be paid, the Trustee shall also distribute the applicable moneys therein in accordance with the Principal Priority of Payments.

The Eligible Investments in the Collection Account at any time will be required to mature on or before the Business Day prior to the next Payment Date.

*The Expense Reserve Account*. On the Closing Date, the Issuer will deposit approximately U.S. $17,376,625 from the proceeds of the offering of the Securities in the Expense Reserve Account (the "Expense Reserve Account"). On any Business Day from and including the Closing Date to but excluding the last Business Day prior to the first Payment Date the Trustee will apply funds from the Expense Reserve Account to pay expenses of the Issuers incurred in connection with the establishment of the Issuers, the structuring and consummation of the offering and the transactions contemplated thereby and the issuance of the Securities. Any funds remaining in the Expense Reserve Account on the last Business Day prior to the first Payment Date will be deposited on such day in the Collection Account for distribution on the first Payment Date in accordance with the Payment Date Priority of Payments and the Expense Reserve Account will be closed.

Reports

*Monthly Reports*. Commencing in November 2004, pursuant to the Indenture, the Issuer or its agent will compile and provide to the Trustee, the Swap Counterparty, the Reference Portfolio Manager, the Rating Agencies and the Holders of the Securities a monthly report (other than for a month in which a Payment Date occurs) containing certain information regarding sources and uses of funds, the Coverage Tests, Eligible Investments and the Reference Portfolio.

*Payment Date Valuation Reports*. For each Payment Date (including the Maturity Date), pursuant to the Indenture, the Issuer or its agent will provide to the Trustee, the Swap Counterparty, the Reference Portfolio Manager, the Rating Agencies and the Holders of the Securities an accounting with respect to the Trust Estate and the Reference Portfolio, including calculations of the Overcollateralization Ratios, Interest Coverage Ratios and Interest Rates for each Class of Senior Notes for such Payment Date.

Closing Date Statement by Independent Accountants

Independent certified public accountants of recognized national reputation selected by the Issuer (with the approval of the Swap Counterparty) will be required to deliver as of the Closing Date a statement in form and substance acceptable to the Issuer and the Swap Counterparty with a copy to the Trustee and the Reference Portfolio Manager (i) confirming the information with respect to each Initial Reference Obligation set forth in the Swap Agreement and (ii) providing calculations of each of the Reference Portfolio Criteria and of each Overcollateralization Test and specifying the procedures undertaken by them to review data and computations relating to the foregoing (s*ee "The Reference Portfolio—Reference Portfolio Criteria")*.

Modification of Indenture

The Issuers and the Trustee may enter into supplemental indentures with the consent of the Swap Counterparty, but without obtaining the consent of any Holders of the Notes, in order to:

(i)      evidence the succession of any Person to either the Issuer or Co-Issuer and the assumption by any such successor of the covenants of the Issuer or Co-Issuer in the Securities and the Indenture or to change the name of either of the Issuers;

(ii)      provide for definitive Notes as contemplated by the Indenture;

(iii)      add to the covenants of the Issuers for the benefit of the Holders of the Securities or the Swap Counterparty;

(iv)      pledge any additional property to or with the Trustee;

010676

(v)      evidence and provide for the acceptance of appointment by a successor trustee and to add to or change any of the provisions of the Indenture as shall be necessary to facilitate the administration of the Trust Estate or the Class Q-2 Securities Collateral by more than one trustee;

(vi)      correct or amplify the description of any property at any time subject to the lien of the Indenture;

(vii)      cure any ambiguity, or correct, modify or supplement any provision which is defective or inconsistent with any other provision in the Indenture or this Offering Circular;

(viii)      make any change required by the Irish Stock Exchange (so long as any of the Securities are listed thereon) or any other stock exchange on which any Class of Securities is listed in order to permit or maintain the listing of the Securities thereon;

(ix)      modify transfer restrictions on any Securities, so long as any such modifications comply with the Securities Act, the Investment Company Act, ERISA and other applicable laws and any additional transfer restrictions imposed are reasonably necessary to comply with such laws (or any applicable exemption therefrom);

(x)      take any action necessary or helpful to prevent the Issuer or the Trustee from becoming subject to any withholding or other taxes or assessments or to reduce the risk that the Issuer will be engaged in a United States trade or business or otherwise subject to United States federal income tax on a net income basis;

(xi)      provide for additional or modified reports to Holders of Securities; or

(xii)      amend, modify or change any test or requirement of any Rating Agency in the Indenture where such amendment, modification or change has been specified or authorized by such Rating Agency (and notice thereof has been provided to the Trustee, Swap Counterparty and Reference Portfolio Manager);

*provided* that, in each case, the Trustee shall have received Rating Confirmation for that supplemental indenture; *provided further* that the Trustee may, with the consent of the Holders of 100% of the Aggregate Principal Amount of each Class of Senior Notes and Class Q-1 Securities affected thereby and with the consent of the Swap Counterparty, enter into any such supplemental indenture notwithstanding any qualification, downgrade or withdrawal of the ratings of any such Class of Senior Notes or Class Q-1 Securities.

In addition, with the consent of the Swap Counterparty and the Holders of a majority in Aggregate Principal Amount of each Class of Notes adversely affected thereby, and receipt of a Rating Confirmation, the Issuers and the Trustee may execute a supplemental indenture to add any provisions to, or change in any manner or eliminate any provisions of, the Indenture or modify in any manner the rights of the Holders of the Notes under the Indenture; *provided* that the Trustee may, with the consent of the Holders of 100% of the Aggregate Principal Amount of each Class of Senior Notes and Class Q-1 Securities affected thereby, enter into any such supplemental indenture notwithstanding that either Rating Agency has stated that such supplemental indenture will result in a qualification, downgrade or withdrawal of its then-current ratings of such Class of Securities. However, without the consent of the Swap Counterparty if adversely affected thereby and the Holders of each Outstanding Security adversely affected thereby and without receipt of a Rating Confirmation or a waiver of such Rating Confirmation by the Holders whose consent is required for such supplemental indenture, no supplemental indenture may:

(i)      change the maturity of any Security or the principal of, or the interest on any Senior Note or Class Q-2A Security or reduce the principal amount thereof or the rate of interest thereon or change the time or amount of any other amount payable in respect of any Security;

(ii)      reduce the percentage of the Aggregate Principal Amount of Securities, the consent of the Holders of which is required for the authorization of any supplemental indenture or for any waiver of compliance with certain provisions of the Indenture;

010677

(iii)     permit the creation of any lien ranking prior to or on parity with the lien of the Indenture with respect to any part of the Trust Estate or Class Q-2 Securities Collateral or terminate the lien of the Indenture except as otherwise permitted by the Indenture;

(iv)     reduce the percentage of the Aggregate Principal Amount of Notes or Class Q-2 Securities, as applicable, held by the Holders of the Notes or Class Q-2 Securities, as applicable, whose consent is required to direct the Trustee to liquidate the Trust Estate (or modify the provisions of the Indenture relating to the Swap Counterparty's authority with respect to any such liquidation), or the Class Q-2 Securities Collateral, as applicable;

(v)     modify any of the provisions of the Indenture with respect to supplemental indentures or waiver of Events of Default or Class Q-2 Events of Default and their consequences except to increase the percentage of the Aggregate Principal Amount of Notes or Class Q-2 Securities, as applicable, the consent of the Holders of which is required for any such action or to provide that other provisions of the Indenture cannot be modified or waived without the consent of the Holders of each Outstanding Note (or each Outstanding Class Q-2 Security, as applicable) affected thereby;

(vi)     modify the provisions of the Priority of Payments, the Class Q-2 Priority of Payments or the definitions of the terms "Holder" or "Outstanding;" or

(vii)     modify any of the provisions of the Indenture in such a manner as to affect the calculation of the amount of any payment of principal of or interest on or other amount payable in respect of any Security or to affect the right of the Holders of the Securities to the benefit of any provisions for the payment of such Securities contained therein.

No supplemental indenture may modify the terms of the Class Q-1 Securities, the Class Q-2A Securities or the Class Q-2B Securities as such in a manner that would adversely affect the Class Q-1 Securities, the Class Q-2A Securities or the Class Q-2B Securities without the prior written consent of a majority of the stated amount of the Class Q-1 Securities, the aggregate principal amount of the Class Q-2A Securities or Class Q-2B Securities, as applicable or the consent of the Holders of each Outstanding Class Q Security adversely affected thereby as set forth above. Except for any proposed such supplement that would affect the terms of the Class Q-1 Securities, the Class Q-2A Securities or the Class Q-2B Securities as such and except as set forth above, Holders of Class Q-1 Securities, Class Q-2A Securities and Class Q-2B Securities shall be entitled to vote with respect to any supplemental indenture only (i) in the case of the Class Q-1 Securities, as Holders of the respective related Components and (ii) in the case of the Class Q-2B Securities to the extent the Holders of Class Q-2B Securities may exercise voting rights with respect to the Income Notes represented by the Class Q-2 Collateral Asset A. *See "The Class Q-2 Securities—Rights with respect to the Class Q-2 Collateral Asset A.*

In the case of any modification of the Indenture that requires the consent of one or more holders of Securities, the Amendment Buy-Out Purchaser will have the right to purchase the applicable Securities of any Non-consenting Holder (other than Class Q-2 Securities). *See "Amendment Buy-Out" above.*

Any such supplemental indenture that in the good faith determination of the Swap Counterparty adversely affects its rights or duties or creates, supplements, modifies, limits or eliminates any provision of the Indenture affecting the discretion, judgment, conduct, care or role of the Reference Portfolio Manager, including the Coverage Tests and provisions relating to calculations with respect to the Reference Portfolio, the Swap Counterparty's or the Reference Portfolio Manager's obligations or liabilities, fees or expenses payable by or reimbursable to it or the Reference Portfolio Manager, or otherwise adversely affects it or the Reference Portfolio Manager, will be deemed to adversely affect the Swap Counterparty and therefore will not be effective without the prior consent of the Swap Counterparty. Pursuant to the Reference Portfolio Management Agreement, the Swap Counterparty has agreed to withhold its consent, upon the request of the Reference Portfolio Manager, to any supplemental indenture that in the reasonable determination of the Reference Portfolio Manager so adversely affects the Reference Portfolio Manager. Under the Investment Agreement, the Issuer has agreed not to enter into certain modifications to the Indenture without the consent of the Investment Agreement Counterparty or Investment Agreement Guarantor.

010678

Events of Default

An event of default ("Event of Default") is defined in the Indenture as being:

1.     a default in the payment, when due and payable, of the Interest Amount on any Class of Senior Notes, which default in each case shall continue for a period of five days; *provided* that (except on the Maturity Date or date of redemption in full of the Class B Notes or Class C Notes) the failure to pay the Interest Amount on any of the Class B Notes, Class C-1 Notes or Class C-2 Notes, as the case may be, because insufficient funds are available in accordance with the Priority of Payments will not constitute an Event of Default, so long as any more senior Class of Notes then remains Outstanding;

2.     a default in the payment of principal of any Senior Note (and any Make-whole Premium, if applicable) on the Maturity Date, Optional Redemption Date or Indenture Tax Redemption Date; *provided* that, in the case of a default in such payment due solely to an administrative error or omission by the Trustee or any paying agent, such default continues for a period of five days;

3.     a default in the payment of any net amounts owed by the Issuer to the Swap Counterparty under the Swap Agreement, which default shall continue for a period of two Business Days; *provided* that the failure to pay any amount payable to the Swap Counterparty pursuant to clause 13 or 15 of the Payment Date Priority of Payments or clause 16 or 17 of the Principal Priority of Payments because insufficient funds are available in accordance with such Priority of Payments will not constitute an Event of Default, so long as any Senior Notes are then Outstanding;

4.     a failure to apply, within five days following any Payment Date or Maturity Date, Optional Redemption Date or Indenture Tax Redemption Date, available amounts in accordance with the Payment Date Priority of Payments or Principal Priority of Payments, as applicable, or a default in payment solely due to an administrative error or omission by the Trustee, which default continues for a period of five days;

5.     the early termination of the Swap Agreement and the failure by the Issuer to enter into a replacement Swap Agreement within 60 days of such termination;

6.     either of the Issuers or the Trust Estate becomes an investment company required to be registered under the Investment Company Act;

7.     except as otherwise provided in this definition of "Event of Default," a default in any respect in the performance, or a breach of any covenant, warranty or other agreement of the Issuers in the Indenture, or the failure of any representation or warranty of the Issuers made in the Indenture or in any certificate or other writing delivered pursuant to or in connection with the Indenture to be correct in all respects when the same shall have been made, which default, breach or failure would have a material adverse effect on the Holders or beneficial owners of the Notes and continuance of such default, breach or failure for a period of 30 calendar days after written notice shall have been given as provided in the Indenture to the Issuers and the Swap Counterparty by the Trustee or to the Issuers, the Swap Counterparty and the Trustee by the Holders of more than 25% of the Aggregate Principal Amount of the Senior Notes specifying such default, breach or failure and requiring it to be remedied and stating that such notice is a "Notice of Default" under the Indenture; or

8.     certain events of bankruptcy, insolvency, receivership or reorganization of either of the Issuers (as set forth in the Indenture).

An event of insolvency (and, therefore, an Event of Default of the type described in clause (8) above) could result if a decree or order is entered adjudging either the Issuer or the Co-Issuer as bankrupt or insolvent, or approving a petition seeking reorganization, arrangement, adjustment or composition of either of the Issuers and such order or decree were not dismissed or stayed within 60 days. The filing of a petition against either of the Issuers under applicable bankruptcy law could adversely affect the rights of the Holders of the Securities to receive timely payments in respect of the Securities. Each of the other parties to the transaction, however, will covenant that it shall not, prior to the date that is one year and one day following the termination of the Indenture, take any action to have either of the Issuers placed into bankruptcy.

010679

If an Event of Default under the Indenture (other than an Event of Default of the type described in clause (6) or clause (8) above) occurs and is continuing, the Trustee shall at the written direction of the Requisite Noteholders or the Swap Counterparty (unless the Swap Agreement has been terminated and all amounts owed to the Swap Counterparty thereunder have been paid in full or a Swap Event of Default as to which the Swap Counterparty is the defaulting party has occurred and is continuing while any Senior Notes are Outstanding) declare the principal of and any accrued interest on the Notes to be immediately due and payable. If an Event of Default of the type described in clause (6) or clause (8) above occurs, the principal of and accrued interest on the Notes automatically shall become immediately due and payable without any action of the Trustee or any other Person. The Requisite Noteholders, with the consent of the Swap Counterparty, may rescind a declaration of acceleration if the Event of Default has been cured and certain other conditions are satisfied.

Subject to the next succeeding paragraphs, upon any acceleration of the Notes, the Requisite Noteholders shall have the right to direct the Trustee to exercise the remedies provided for in the Indenture.

Notwithstanding the foregoing, the Trustee may not sell or liquidate the Eligible Investments in the Trust Accounts unless the Notes have been declared or have become due and payable as described above and one of the following conditions exists:

(i)     The Trustee determines that the anticipated net proceeds of a sale or liquidation of the Trust Estate would be sufficient to pay (a) to the appropriate Persons any accrued and unpaid Administrative Expenses, (b) to the Swap Counterparty all Accrued Swap Liabilities and (c) to the Holders of the Senior Notes the principal of and interest accrued on the Senior Notes to the date of acceleration. The Trustee shall make or cause to be made the calculation required by this paragraph promptly after the acceleration of the Notes and on each monthly anniversary thereafter. In the event that the conditions of clause (i) are satisfied, the Trustee shall promptly effect the sale or liquidation of the Trust Estate and apply the proceeds as described below;

(ii)    Unless the Swap Agreement has been terminated and the Swap Counterparty has been paid in full the amount owed to it thereunder or unless a Swap Event of Default as to which the Swap Counterparty is the defaulting party has occurred and is continuing while any Senior Notes are Outstanding, the Swap Counterparty at any time following the acceleration of the Notes directs the Trustee to sell or liquidate the Trust Estate; or

(iii)   If the Swap Agreement has been terminated and the Swap Counterparty has been paid in full the amount owed to it thereunder or if a Swap Event of Default as to which the Swap Counterparty is the defaulting party has occurred and is continuing while any Senior Notes are Outstanding, the Requisite Noteholders direct the Trustee at any time following the acceleration of the Notes to sell or liquidate the Trust Estate.

For purposes of clauses (i) and (iii) above, the amounts due and payable under the Swap Agreement will be calculated taking into account the amount of any accrued and unpaid Base Amount, Subordinate Amount and Incentive Amount, in each case as provided in the Swap Agreement.

If the Trustee commences or is required to commence the sale or liquidation of the Trust Estate substantially in its entirety (including at the direction of the Swap Counterparty or the Requisite Noteholders) following the acceleration of the Notes, the Swap Counterparty will be entitled to terminate the Swap Agreement, and the termination date for the Swap Agreement shall be the date on which the Trustee is so required to commence the sale or liquidation of the Trust Estate.

During any period following an Event of Default but prior to the liquidation of the Trust Estate, the Trustee will retain the Trust Estate intact, collect and cause the collection of the proceeds thereof and make and apply all payments and deposits and maintain all amounts in respect of the Trust Estate and Notes in accordance with the terms of the Indenture (including paying all amounts owed by the Issuer under the Swap Agreement and reinvestment of amounts in Eligible Investments in the Trust Accounts). Any such proceeds realized after the acceleration of the Notes will be distributed in accordance with the priority of payment provisions described in the succeeding paragraph.

Upon the acceleration of the Notes (whether or not the Trustee sells or liquidates the Trust Estate), the moneys in the Collection Account (and the moneys in all of the Trust Accounts in the case of a complete liquidation

010680

of the Trust Estate) will thereafter be applied in the following order of priority, with each priority being fully paid prior to such proceeds being used to pay any lower priority:

(1)     to the payment of any accrued and unpaid Administrative Expenses (in the order set forth in the definition thereof) in an amount not exceeding the Expense Cap Amount;

(2)     to the Swap Counterparty, any accrued and unpaid Accrued Swap Liabilities except any Swap Termination Payment due to the Swap Counterparty upon the early termination of the Swap Agreement as a result of a Swap Event of Default as to which the Swap Counterparty is the defaulting party or as a result of a Swap Additional Termination Event;

(3)     after acceleration of the Notes but before the sale or liquidation of the Trust Estate, to the Collateral Account, to the extent required to maintain the same ratio between the Aggregate Reference Value and the sum of (i) Eligible Investments in the Collateral Account and (ii) moneys credited to the Collateral Account as the ratio in effect on the Closing Date between the Swap Notional Amount and the net proceeds realized from the sale of the Securities that were deposited into the Collateral Account;

(4)     to the Holders of the Class A-1 Notes, first accrued and unpaid interest on the Class A-1 Notes to the date of acceleration and then the Aggregate Principal Amount of the Class A-1 Notes;

(5)     to the Holders of the Class A-2 Notes, first accrued and unpaid interest on the Class A-2 Notes to the date of acceleration and then the Aggregate Principal Amount of the Class A-2 Notes;

(6)     to the Holders of the Class B Notes, first, accrued and unpaid interest (including Deferred Interest) on the Class B Notes to the date of acceleration and then, the Aggregate Principal Amount of the Class B Notes;

(7)     first, on a pro rata basis, to the Holders of the Class C-1 Notes, accrued and unpaid interest (including Deferred Interest) on the Class C-1 Notes and to the Holders of the Class C-2 Notes, accrued and unpaid interest (including Deferred Interest) on the Class C-2 Notes, to the date of acceleration and then, on a pro rata basis, to the Holders of the Class C-1 Notes, the Aggregate Principal Amount of the Class C-1 Notes and to the Holders of the Class C-2 Notes, the Aggregate Principal Amount of the Class C-2 Notes;

(8)     to the Swap Counterparty, any Swap Termination Payment due to the Swap Counterparty, to the extent not paid pursuant to clause (2) above;

(9)     to the payment first, of any accrued and unpaid Administrative Expenses (in the order set forth in the definition thereof) to the extent not paid pursuant to clause (1) above and then, any accrued and unpaid Subordinated Administrative Expenses;

(10)     to the payment of any unpaid Extension Bonus Payments (i) first, to the applicable Holders of Class A-1 Notes, (ii) then, to the applicable Holders of Class A-2 Notes, (iii) then, to the applicable Holders of Class B Notes, and (iv) then, on a pro rata basis, to the applicable Holders of Class C-1 Notes and the applicable Holders of Class C-2 Notes; and

(11)     to the Holders of the Income Notes, any remaining funds.

Upon the acceleration of the Notes, if the Trust Estate has not been sold or liquidated, the funds in the Collection Account, if any, will be applied in accordance with the above priority of payments on each Payment Date.  If the Trust Estate is sold or liquidated, a final distribution will be made pursuant thereto on the first Business Day following the last day on which an item of the Trust Estate is sold or liquidated (and no interim distributions will be made on any date (including on any Payment Date) during the sale or liquidation process).

Notwithstanding anything to the contrary in the Indenture, no Holder of Income Notes shall be entitled to institute proceedings or to seek any other remedy under the Indenture unless all of the Senior Notes have been redeemed in full and the Swap Agreement has been terminated and any amounts owed to the Swap Counterparty thereunder have been paid in full.

010681

Rights Under the Indenture

Except as provided herein in the case of the Requisite Noteholders, no Holder of any Note will have any right to institute any proceedings (judicial or otherwise) with respect to the Indenture or seek any remedy thereunder unless: (i) such Holder previously has given to the Trustee written notice of a continuing Event of Default, (ii) the Holders of at least 25% of the Aggregate Principal Amount of the most senior Class of Notes then Outstanding have made written request to the Trustee to institute such proceedings in respect of such Event of Default in its own name as Trustee, (iii) such Holder or Holders have offered the Trustee indemnity or security reasonably satisfactory to the Trustee in form and substance against the costs, expenses and liabilities to be incurred in complying with such request as provided in the Indenture, (iv) the Trustee has for 30 days after its receipt of such notice, request and offer of indemnity or security, failed to institute such proceedings and (v) if Holders of 50% or less of the Aggregate Principal Amount of the most senior Class of Notes have requested initiation of proceedings, no written direction inconsistent with such written request has been given to the Trustee during such 30-day period by the Holders of at least 25% of the Aggregate Principal Amount of the most senior Class of Notes then Outstanding. Any such proceedings will be subject to the limitations on the liquidation of the Trust Estate described above.

References to the most "senior" Class of Notes shall refer first to the Class A-1 Notes, so long as any Class A-1 Notes remain Outstanding, then to the Class A-2 Notes, so long as any Class A-2 Notes remain Outstanding, and then to the Class B Notes, so long as any Class B Notes remain Outstanding and then to the Class C-1 Notes and the Class C-2 Notes (voting as a single Class), so long as any Class C Notes remain Outstanding.

No Holder of Income Notes shall be entitled to institute proceedings or to seek any other remedy under the Indenture unless all of the Senior Notes have been redeemed in full and the Swap Agreement has been terminated and any amounts owed to the Swap Counterparty thereunder have been paid in full.

Notwithstanding anything to the contrary, Holders of Class Q-2 Securities shall have no right to take any action or exercise any remedy under the Indenture with respect to the Trust Estate, except to the extent of the rights of a holder of Class Q-2 Collateral Asset A.

Satisfaction and Discharge of the Indenture

Subject to certain limitations, the Indenture will be discharged (i) with respect to the obligations of the Issuers under the Notes and the Class Q-1 Securities and the Trust Estate and (ii) with respect to the obligations of the Issuer under the Class Q-2 Securities and the Class Q-2 Securities Collateral, when all Securities have been delivered to the Trustee for cancellation (with certain limitations), the Swap Agreement has been terminated, the Issuer has paid or caused to be paid all amounts payable under the Indenture (including amounts payable pursuant to the Swap Agreement and the Collateral Administration Agreement) and no other amount will become due and payable by the Issuers, and certain other requirements have been fulfilled.

Trustee and Collateral Administrator

JPMorgan Chase Bank will be the Trustee under the Indenture for the Securities and the Collateral Administrator under the Collateral Administration Agreement. The Issuer, the Initial Purchaser, the Placement Agent, the Swap Counterparty, the Swap Guarantor, the Reference Portfolio Manager and their respective Affiliates may maintain other banking relationships in the ordinary course of business with the Trustee and the Collateral Administrator. The Trustee, the Collateral Administrator and/or its Affiliates may receive compensation in connection with the Trustee's or Collateral Administrator's investment of assets in certain Eligible Investments as provided in the Indenture or the Collateral Administration Agreement. *See "Risk Factors—Conflicts of Interest Involving the Swap Counterparty and Its Affiliates."* Pursuant to the Collateral Administration Agreement with the Issuer (the "Collateral Administration Agreement"), JPMorgan Chase Bank, as Collateral Administrator will perform various functions including the compilation and delivery of reports described under "*—Reports.*" In compiling such reports and calculations, the Collateral Administrator will be assisted by the Swap Counterparty or the Reference Portfolio Manager on behalf of the Swap Counterparty, and will rely upon certain data and information provided by the Swap Counterparty or by the Reference Portfolio Manager on its behalf and will not independently verify such data or information so provided.

010682

As compensation for the performance of its obligations under the Indenture, the Trustee will receive a fee (the "Trustee Fee") and as compensation for the performance of its obligations under the Collateral Administration Agreement, the Collateral Administrator will receive a fee (the "Collateral Administrator Fee") each payable on each Payment Date, and to the extent there are not sufficient funds available therefor on any Payment Date, on a subsequent Payment Date. The Trustee Fee and the Collateral Administrator Fee will accrue if unpaid (but without the accrual of any interest thereon) and be payable on the next Payment Date on which funds are available therefor in accordance with the Priority of Payments. The Trustee will also receive reimbursement for expenses incurred by it in any Collection Period, other than those included within the Trustee Fee, in carrying out the provisions of the Indenture (the "Trustee Expenses"). The Collateral Administrator will also receive reimbursement for expenses incurred by it in any Collection Period, other than those included within the Collateral Administrator Fee, in carrying out the provisions of the Collateral Administration Agreement (the "Collateral Administrator Expenses"). Trustee Expenses and the Collateral Administrator Expenses will be payable on the Payment Date related to each such Collection Period, and to the extent there are not sufficient funds available therefor on any Payment Date, on a subsequent Payment Date in accordance with the Priority of Payments.

The Trustee Fees, Trustee Expenses, Collateral Administrator Fees and Collateral Administrator Expenses are included in Administrative Expenses under the Priority of Payments (*see "—Priority of Payments"*).

The Trustee may resign at any time upon providing 30 days' prior written notice to the Issuer, the Holders of the Securities, the Swap Counterparty, the Reference Portfolio Manager and each Rating Agency. The Trustee may be removed at any time by the Requisite Noteholders, with the consent of the Swap Counterparty (such consent not to be unreasonably withheld), (or, following the Maturity Date and distribution of the Trust Estate, the Class Q-2 Requisite Securityholders) or, as more fully set forth in the Indenture, by the Issuer in the event of certain bankruptcy or insolvency events with respect to the Trustee, or if the Trustee shall become incapable of acting. No resignation or removal of the Trustee shall become effective until the acceptance of appointment by a successor Trustee. In certain circumstances specified in the Indenture, if a successor Trustee has not been appointed by the Issuer, the retiring Trustee, the Swap Counterparty or any Holder of a Note may petition any court of competent jurisdiction for the appointment of a successor Trustee. In addition, the Indenture contains provisions for the indemnification of the Trustee for any loss, liability or expense incurred without negligence, willful misconduct or bad faith on its part, arising out of or in connection with its duties under the Indenture.

<u>Governing Law</u>

The Indenture and the Securities will be governed by, and construed in accordance with, the laws of the State of New York.

**The Investment Agreement**

As discussed herein, the Issuer is expected to invest the net proceeds of the issuance of the Securities, as well as certain other amounts deposited in the Collateral Account from time to time, in the Investment Agreement.

On or before the Closing Date, the Issuer and the Trustee will enter into an investment agreement (the "Investment Agreement") among FSA Capital Management Services LLC (the "Investment Agreement Counterparty"), the Issuer and the Trustee. The obligations of the Investment Agreement Counterparty will be guaranteed pursuant to a financial guarantee insurance policy issued by Financial Security Assurance Inc. (the "Investment Agreement Guarantor"). Pursuant to the Investment Agreement, the Issuer will invest with the Investment Agreement Counterparty the net proceeds of the issuance of the Securities and will earn interest on this investment at the rate of LIBOR for each Periodic Interest Accrual Period, provided that for the first Periodic Interest Accrual Period, the rate will be 1.88230% per annum. The Issuer will also invest pursuant to the Investment Agreement other amounts deposited in the Collateral Account from time to time, subject to certain limitations provided in the Investment Agreement. The Trustee will be entitled to withdraw amounts invested under the Investment Agreement in order to make payments in accordance with the Indenture and under certain other circumstances set forth in the Investment Agreement. The Investment Agreement will terminate, and the remaining investment will be required to be repaid, on the earlier of the Maturity Date or the occurrence of certain events set forth in the Investment Agreement, including the downgrade of the long-term debt rating of the Investment Agreement Guarantor (or any successor guarantor) below specified levels (discussed below) and a subsequent

010683

failure of the Investment Agreement Counterparty to either post collateral, transfer its rights and obligations under the Investment Agreement to another party with the specified long-term debt rating or deliver a replacement guarantee by a guarantor in the manner set forth below. The Issuer may be required to pay, as Administrative Expenses and subject to the Priority of Payments, certain losses or costs in the event the Issuer fails to invest certain amounts in the Investment Agreement after giving notice that it intends to make such investments.

If the Investment Agreement Guarantor (or any successor guarantor) does not maintain, so long as the Investment Agreement is in effect, long-term senior unsecured debt obligation ratings of at least "AA-" by S&P and "Aa3" by Moody's, the Investment Agreement Counterparty will be required to post collateral, transfer the Investment Agreement to a party with such ratings or deliver a replacement guarantee by a guarantor with such ratings. If the Investment Agreement Counterparty fails to take any of such actions within a specified period, the Trustee may terminate the Investment Agreement.

The Investment Agreement memorializes an obligation solely between the Issuer, the Trustee and the Investment Agreement Counterparty. Holders of the Notes must rely solely upon the Trust Estate for payment of principal and interest thereon. Holders of the Securities shall have no direct right of recourse and shall have no direct right to assert a claim of any nature whatsoever against the Investment Agreement Counterparty (or any entity that provides to the Investment Agreement Counterparty credit enhancement or the benefit of a liquidity facility) or the Investment Agreement Guarantor or under the Investment Agreement.

<u>The Investment Agreement Counterparty</u>

FSA Capital Management Services LLC is a Delaware limited liability company formed to issue investment agreements and similar contracts (such as the Investment Agreement) to trustees and other parties. The Investment Agreement Counterparty's offices are located at 350 Park Avenue, New York, New York 10022, and its telephone number at that location is (212) 893-2700.

<u>The Investment Agreement Guarantor</u>

*General.* Financial Security Assurance Inc. ("FSA") is a monoline insurance company incorporated in 1984 under the laws of the State of New York. FSA is licensed to engage in financial guaranty insurance business in all 50 states, the District of Columbia, Puerto Rico, the U.S. Virgin Islands and Guam.

FSA and its subsidiaries are engaged in the business of writing financial guaranty insurance, principally in respect of securities offered in domestic and foreign markets and obligations under credit default swaps. Financial guaranty insurance provides a guaranty of scheduled payments on an issuer's obligations – thereby enhancing the credit rating of those obligations – in consideration for the payment of a premium to the insurer. FSA and its subsidiaries principally insure asset-backed, collateralized and municipal obligations. Asset-backed obligations are typically supported by residential mortgage loans, consumer or trade receivables, securities or other assets having an ascertainable cash flow or market value. Collateralized obligations include public utility first mortgage bonds and sale/leaseback obligation bonds. Municipal obligations include general obligation bonds, special revenue bonds and other special obligations of state and local governments. Obligations may be insured on a funded basis through insurance of bonds or other securities or on an unfunded basis through insurance of credit default swaps referencing one or more bonds or other obligations (with or without a deductible or other provision for loss reduction). FSA insures both newly issued securities sold in the primary market and outstanding securities sold in the secondary market that satisfy FSA's underwriting criteria.

FSA and the Investment Agreement Counterparty are wholly owned subsidiaries of Financial Security Assurance Holdings Ltd. ("Holdings"). Holdings is an indirect subsidiary of Dexia S.A., a publicly held Belgian corporation. Dexia S.A., through its bank subsidiaries, is primarily engaged in the business of public finance, banking and asset management in France, Belgium and other European countries. No shareholder of Holdings or FSA is obligated to pay any debt of FSA or any claim under any insurance policy issued by FSA or to make any additional contribution to the capital of FSA.

The principal executive offices of FSA are located at 350 Park Avenue, New York, New York 10022, and its telephone number at that location is (212) 826-0100.

010684

*Reinsurance*. Under an intercompany agreement, liabilities on financial guaranty insurance written or reinsured from third parties by FSA or its domestic or Bermuda operating insurance company subsidiaries are generally reinsured among such companies on an agreed-upon percentage substantially proportional to their respective capital, surplus and reserves, subject to applicable statutory risk limitations. In addition, FSA reinsures a portion of its liabilities under certain of its financial guaranty insurance policies with other reinsurers under various treaties and on a transaction-by-transaction basis. This reinsurance is used by FSA as a risk management device and to comply with statutory and rating agency requirements; it does not alter or limit FSA's obligations under any financial guaranty insurance policy.

*Rating*. FSA's financial strength is rated "triple-A" by Moody's, Standard & Poor's, Fitch Ratings and Rating and Investment Information, Inc. These ratings reflect only the views of the respective rating agencies, are not recommendations to buy, sell, or hold securities and are subject to revision or withdrawal at any time by those rating agencies.

For further information concerning FSA, see the Consolidated Financial Statements of FSA and Subsidiaries, and the notes thereto. FSA's financial statements are included as exhibits to the Annual Report on Form 10-K and Quarterly Reports on Form 10-Q filed with the Securities and Exchange Commission by Holdings and may be reviewed at the EDGAR web site maintained by the Securities and Exchange Commission and at Holdings's website, http://www.FSA.com, which website does not form part of this document. Copies of the statutory quarterly and annual statements filed with the State of New York Insurance Department by FSA are available upon request to the State of New York Insurance Department.

*Insurance Regulation*. FSA is licensed and subject to regulation as a financial guaranty insurance corporation under the laws of the State of New York, its state of domicile. In addition, FSA and its insurance subsidiaries are subject to regulation by insurance laws of the various other jurisdictions in which they are licensed to do business. As a financial guaranty insurance corporation licensed to do business in the State of New York, FSA is subject to Article 69 of the New York Insurance Law which, among other things, limits the business of a financial guaranty insurer to writing financial guaranty insurance and related business lines, requires each financial guaranty insurer to maintain a minimum surplus to policyholders, establishes contingency, loss and unearned premium reserve requirements for each financial guaranty insurer, and limits the size of individual transactions and the volume of transactions that may be underwritten by each financial guaranty insurer. Other provisions of the New York Insurance Law, applicable to non-life insurance companies such as FSA, regulate, among other things, permitted investments, payment of dividends, transactions with affiliates, mergers, consolidations, acquisitions or sales of assets and incurrence of liability for borrowings.

010685

## DESCRIPTION OF THE SWAP AGREEMENT

*The following summary generally describes certain provisions of the Swap Agreement. The summary does not purport to be complete and is subject to, and is qualified in its entirety by reference to, the provisions of the Swap Agreement, which is incorporated herein by reference.*

### General

On the Closing Date, the Issuer and the Swap Counterparty will enter into the Swap Agreement. All assets of the Issuer (except the Excluded Property and the Class Q-2 Securities Collateral) will be pledged to secure the obligations of the Issuer to the Swap Counterparty, and the Issuer's rights under the Swap Agreement will be pledged to secure the obligations of the Issuer with respect to the Notes.

The Swap Agreement will reference a portfolio of Reference Obligations, with each individual Reference Obligation consisting of or relating to a qualifying obligation of a Reference Entity and a related Reference Obligation Calculation Amount and Reference Price, as described in *"—Selection and Modification of the Reference Portfolio."* The Reference Obligation Calculation Amount of each Reference Obligation (which will include both the drawn and undrawn portion of a revolving Reference Obligation) will be designated (subject to specified criteria) by the Reference Portfolio Manager on behalf of the Swap Counterparty upon its inclusion in the Reference Portfolio. The Reference Price will be determined as specified below.

As described below, the Issuer will be subject under the Swap Agreement to the credit risk of each Reference Entity. *See "Risk Factors—Exposure to Reference Obligations and Eligible Investments."* The Issuer will also be subject to the credit risk of the Swap Counterparty because of the obligation of the Swap Counterparty to pay to the Issuer for each Payment Date the Adjusted Reference Portfolio Return Amount, if applicable. *See "—Selection and Modification of the Reference Portfolio"* and *"—Payments Under the Swap Agreement."*

### Selection and Modification of the Reference Portfolio

The Reference Obligations to be included in the Reference Portfolio on the Closing Date, and their related Reference Obligation Calculation Amounts and Reference Prices, will be specified in the Swap Agreement. The Reference Portfolio, as constituted on the Closing Date, will be required to satisfy the Reference Portfolio Criteria.

The Reference Portfolio Manager, as agent for the Swap Counterparty, will select additional Reference Obligations to be included in the Reference Portfolio (and the Reference Obligation Calculation Amounts for those Reference Obligations) during the six-month Ramp-up Period. The Ramp-up Requirements must be satisfied following any such addition. The Issuer expects that by the date that is 90 days following the Closing Date, the Aggregate Reference Obligation Calculation Amount will be approximately U.S. $800 million (not giving effect to any Amortizations of Reference Obligations prior to the Ramp-up End Date that have not been replaced with additional Reference Obligations). As of the Ramp-up End Date, the Issuer expects that (subject to market conditions) the Reference Portfolio will be comprised of Reference Obligations with an Aggregate Reference Obligation Calculation Amount of approximately U.S. $900 million and that the Reference Portfolio as a whole will satisfy the Reference Portfolio Criteria. Except as otherwise noted herein, addition or removal of a Reference Obligation will be effective for all purposes of the Swap Agreement upon its Addition Date (which, in the case of Reference Obligations (other than Reference Swaps) added after the Closing Date, will be the date of determination of its Reference Price as described below) or its Removal Date (which will generally be the relevant Valuation Date for purposes of determining its Final Price), as the case may be.

### Additions

The Reference Portfolio Manager may on any Business Day during the Portfolio Modification Period add new Reference Obligations to the Reference Portfolio, subject to the satisfaction of the Portfolio Addition Criteria.

In addition, the Reference Portfolio Manager may, on any Business Day after the end of the Portfolio Modification Period and before the 45th Business Day prior to the Swap Termination Date, add new Reference Obligations to the Reference Portfolio solely for the purpose of replacing Reference Obligations for which an

010686

unscheduled Amortization has occurred or which are Credit Improved Obligations, subject to (i) the satisfaction of the Portfolio Addition Criteria and (ii) each such additional Reference Obligation having a Rating by each Rating Agency at least equal to that of the replaced Reference Obligation at the time of the replacement and a maturity or final termination date no later than that of the replaced Reference Obligation; *provided* that any such addition occurs within 30 calendar days of the related Amortization or removal of a Credit Improved Obligation.

The "Portfolio Addition Criteria" are as follows:

(1)     The new Reference Obligation must satisfy the Reference Obligation Eligibility Criteria as of its Addition Date;

(2)     Immediately following such addition, the Reference Portfolio must satisfy the Reference Portfolio Criteria (or if any criterion was not satisfied immediately prior to such addition, such criterion must be no further from compliance immediately following such addition; *provided* that after the end of the Portfolio Modification Period, clauses 2 and 17-23 of the Reference Portfolio Criteria must be satisfied immediately following any addition);

(3)     Immediately following such addition, each of the Coverage Tests must be satisfied (or, solely in the case of an addition during the Portfolio Modification Period, if any such test was not satisfied immediately prior to such addition, such test must be no further from compliance immediately following such addition);

(4)     The Aggregate Reference Value of the Reference Portfolio immediately following such addition must not exceed the Swap Notional Amount as of such date; and

(5)     The S&P CDO Monitor Test is satisfied immediately following such addition (or, if the test was not satisfied immediately prior to such addition, such test must be no further from compliance immediately following such addition).

**Removals**

The Reference Portfolio Manager may on any Business Day during the Ramp-up Period or the Portfolio Modification Period remove existing Reference Obligations from the Reference Portfolio, in whole or in part; *provided* that (a) the resulting Obligation Value Reduction Amount would be zero; and (b) the Reference Portfolio Manager reasonably believes as of the proposed Removal Date (and so notifies the Swap Counterparty) that it will be able within 30 calendar days of the proposed Removal Date to add one or more replacement Reference Obligations that meet the following conditions:

(1)     Such replacement Reference Obligations would satisfy clause (1) of the Portfolio Addition Criteria and immediately following the addition of such replacement Reference Obligations, clauses (4) and (5) of the Portfolio Addition Criteria would be satisfied;

(2)     Immediately following the addition of such replacement Reference Obligations, the Reference Portfolio would satisfy the Reference Portfolio Criteria (or if any criterion was not satisfied immediately prior to the proposed removal, such criterion would be no further from compliance immediately following the addition of such replacement Reference Obligations); and

(3)     Immediately following the addition of such replacement Reference Obligations, the Coverage Tests would be satisfied (or if any such test was not satisfied immediately prior to the proposed removal, such criterion would be no further from compliance immediately following the addition of such replacement Reference Obligations).

Following the end of the Portfolio Modification Period, the Reference Portfolio Manager may remove a Reference Obligation only if the resulting Obligation Value Reduction Amount would be zero.

In addition to the above requirements, the aggregate Reference Obligation Calculation Amount of Reference Obligations removed from the Reference Portfolio that are not Credit Improved Obligations, Credit Risk

69

010687

Obligations, Defaulted Reference Obligations or Equity Securities in any one-year period may not exceed 30% of the Portfolio Calculation Amount as of the beginning of such period; *provided* that if at any time the rating of any Class of Senior Notes has been qualified, downgraded or withdrawn from that in effect on the Closing Date (and not reinstated), the Reference Portfolio Manager will not be entitled to remove from the Reference Portfolio Reference Obligations other than Credit Improved Obligations, Credit Risk Obligations, Current Pay Obligations, Equity Securities or Defaulted Reference Obligations.

The Reference Portfolio Manager shall be entitled, without regard to the foregoing restrictions, to remove on any Business Day any Reference Obligation that has become a Credit Risk Obligation or Defaulted Reference Obligation since its Addition Date, that was not eligible to be included in the Reference Portfolio as of its Addition Date or that is an Equity Security.

**Amortization of Reference Obligations**

The Reference Obligation Calculation Amount (and, correspondingly, the Reference Value) for any Reference Obligation will be reduced to reflect any Amortization (without duplication of any other removal of a Reference Obligation). Amounts repaid under a Revolving Loan will not be considered Amortizations to the extent that the facility can subsequently be redrawn pursuant to its terms. With respect to a Defaulted Reference Obligation, all amounts actually paid to holders thereof (and only such amounts) will constitute an Amortization until the related Reference Obligation Calculation Amount is reduced to zero, following which such amounts shall constitute Interest Return; *provided* that with respect to a Defaulted Reference Obligation that is a Revolving Loan, any cancellation or reduction of commitment as a result of becoming a Defaulted Reference Obligation will also constitute an Amortization.

**Restructuring, Conversion or Exchange of Reference Obligations**

In the event that prior to the earlier of the applicable Removal Date and the 45th Business Day prior to the Swap Termination Date, a Reference Obligation is restructured or converted or exchanged into or for any securities, obligations or assets (such resulting securities, obligations or assets, "Exchange Consideration") (other than in accordance with the terms of such Reference Obligation in effect as of its Addition Date, but including without limitation as a result of a workout or restructuring of such obligation), the Reference Portfolio Manager will be entitled to replace such Reference Obligation in the Reference Portfolio with the applicable portion of such Exchange Consideration, which will thereupon constitute a Reference Obligation (regardless of whether it would otherwise satisfy the Reference Obligation Eligibility Criteria or the Portfolio Addition Criteria; *provided* that for purposes of the Coverage Tests and the Reference Portfolio Criteria, only such portion of the Exchange Consideration that would otherwise satisfy the Reference Obligation Eligibility Criteria will constitute a Reference Obligation). Such replacement will constitute a removal of the restructured, converted or exchanged Reference Obligation, and accordingly an Obligation Value Reduction Amount or Obligation Value Increase Amount for such obligation will be determined upon such restructuring, conversion or exchange (with the Final Price being determined with respect to the relevant Exchange Consideration and taking into account any difference in Reference Obligation Calculation Amount). If any Exchange Consideration is an Equity Security, the Reference Portfolio Manager will use commercially reasonable efforts to remove such Equity Security from the Reference Portfolio no later than the fifth anniversary of its inclusion in the Reference Portfolio (unless the Swap Counterparty otherwise consents in writing) and upon such removal determine the Obligation Value Increase Amount or Obligation Value Reduction Amount, as applicable; *provided* that if such Equity Security is "margin stock" as defined in Regulation U of the Federal Reserve Board, the Reference Portfolio Manager will use commercially reasonable efforts to remove such Equity Security from the Reference Portfolio within 45 days of its inclusion in the Reference Portfolio or the date on which it becomes margin stock, whichever is later; *provided*, *further*, that if at any time the value of such Equity Security or Securities received as Exchange Consideration equals or exceeds the Obligation Value Reduction Amount for the Reference Obligation in respect of which the Exchange Consideration was received, the Reference Portfolio Manager will use commercially reasonable efforts to remove at such time such Equity Security or Securities from the Reference Portfolio. In addition, if the issuer of such an Equity Security declares a dividend with respect thereto, the Reference Portfolio Manager will use commercially reasonable efforts to remove such Equity Security from the Reference Portfolio prior to the "ex-dividend" date thereof. In the event the Reference Portfolio Manager, using its commercially reasonable efforts, is unable to remove any obligation in the required time frame as described in this paragraph, the Swap Counterparty may remove such obligation and determine the Final Price in connection therewith.

010688

**Valuation of Reference Obligations**

Upon the removal of all or a portion of a Reference Obligation from the Reference Portfolio by the Reference Portfolio Manager, upon an Amortization of a Reference Obligation (other than a Reference Swap), for each Reference Obligation included in the Reference Portfolio on the 45th Business Day prior to the Swap Termination Date and for each Reference Swap that terminates in accordance with its terms prior to its scheduled maturity date (including as a result of a default thereunder), the Swap Counterparty, or the Reference Portfolio Manager acting on its behalf, will determine the Obligation Value Increase Amount or Obligation Value Reduction Amount for that Reference Obligation. The "Obligation Value Increase Amount" or "Obligation Value Reduction Amount" will generally equal the increase or decrease, as the case may be, of the market value of the Reference Obligation during the period in which it was included in the Reference Portfolio, and specifically will be determined as follows:

1.      In the case of (x) a Reference Obligation (other than a Reference Swap) removed from the Reference Portfolio by the Reference Portfolio Manager or (y) a Reference Obligation (other than a Reference Swap) included in the Reference Portfolio as of the 45th Business Day prior to the Swap Termination Date, the Obligation Value Increase Amount will be equal to (A) the relevant Reference Obligation Calculation Amount (or the applicable portion thereof) multiplied by (B) the applicable Final Price minus the applicable Reference Price. If such amount would be negative, the Obligation Value Increase Amount will be zero, and the absolute value of such amount will be the Obligation Value Reduction Amount.

2.      In the case of a Reference Obligation (other than a Reference Swap) for which an Amortization has occurred, the Obligation Value Increase Amount will be equal to (1) 100% (or, if the amount receivable in respect of the Amortization reflects a premium to par (including, without limitation, as a result of a make-whole amount), a percentage reflecting such premium) minus the applicable Reference Price multiplied by (2) the amount of the reduction in the Reference Obligation Calculation Amount as a result of the Amortization. If such amount would be negative, the Obligation Value Increase Amount will be zero, and the absolute value of such amount will be the Obligation Value Reduction Amount.

3.      In the case of a Reference Obligation that is a Reference Swap that (1) is removed from the Reference Portfolio by the Reference Portfolio Manager (except in the case of a settlement thereunder as described below), (2) is included in the Reference Portfolio as of the 45th Business Day prior to the Swap Termination Date or (3) is terminated in accordance with its terms prior to its scheduled termination date (including, without limitation, as a result of an event of default thereunder) and not replaced by a substantially equivalent Reference Swap, the amount, if any, as determined by the Swap Counterparty, that would be payable by the protection buyer (or total return payer) to the protection seller (or total return receiver) in respect to the termination of such Reference Swap (or the applicable portion thereof) under the terms of the ISDA Master Agreement will be the Obligation Value Increase Amount, or if such an amount would be payable by the protection seller (or total return receiver) to the protection buyer (or total return payer), such amount will be the Obligation Value Reduction Amount. For purposes of this determination the Swap Counterparty will attempt to obtain quotations of such amount from at least two Dealers.

The Reference Prices of the Reference Obligations included in the Reference Portfolio on the Closing Date will be set forth in the Swap Agreement. The "Reference Price" of any Reference Obligation (other than a Reference Swap) that is added to the Reference Portfolio after the Closing Date will be the price thereof (expressed as a percentage) determined by the Reference Portfolio Manager in respect of its Addition Date based on the lowest Quotation obtained on the relevant day for a portion of the Reference Obligation corresponding to the Reference Obligation Calculation Amount. The Reference Portfolio Manager will attempt to obtain such Quotations from at least two Dealers (or, if the Swap Counterparty or one of its Affiliates is a Dealer, at least three Dealers) on the same Business Day beginning on the proposed Addition Date. If only one such Quotation is obtained (or, if the Swap Counterparty or one of its Affiliates is a Dealer, only two such Quotations are obtained) on any such day, such Quotation (or if the Swap Counterparty or one of its Affiliates is a Dealer and two Quotations are obtained, the lower such Quotation) will be the Reference Price only if such Quotation is equal to or lower than the relevant price quotation for such Reference Obligation quoted on the Pricing Source as of that day.

The "Final Price" for a Reference Obligation will be the price thereof (expressed as a percentage) determined by the Reference Portfolio Manager in respect of its Valuation Date based on the highest Quotation obtained on the relevant day for a portion of the Reference Obligation corresponding to the Reference Obligation

010689

Calculation Amount. The Reference Portfolio Manager will attempt to obtain such Quotations with respect to the Valuation Date from at least two Dealers (or, if the Swap Counterparty or one of its Affiliates is a Dealer, at least three Dealers) on the same Business Day. If the Reference Portfolio Manager obtains only one such Quotation (or, if the Swap Counterparty or one of its Affiliates is a Dealer, only two such Quotations) on such Business Day, such Quotation (or, if the Swap Counterparty or one of its Affiliate is a Dealer and two Quotations are obtained, the higher such Quotation) will be the Final Price only if it is equal to or higher than the relevant price quotation for such Reference Obligation quoted on the Pricing Source as of that day. If the Reference Portfolio Manager is unable to obtain at least two Quotations (or, if the Swap Counterparty or its Affiliate is a Dealer, at least three Quotations) on the same Business Day (or a Quotation described in the preceding sentence) on or prior to the tenth consecutive Business Day following the Valuation Date, then the Final Price will be the price determined by the Reference Portfolio Manager with the consent of the Swap Counterparty.

The "Valuation Date" for purposes of determining the Final Price will generally be the applicable Removal Date, or, in the case of Reference Obligations included in the Reference Portfolio as of the 45th Business Day prior to the Swap Termination Date, such day. In the case of a Reference Obligation included in the Reference Portfolio as of the 45th Business Day prior to the Swap Termination Date, such obligation will be deemed removed from the Reference Portfolio when its Obligation Value Reduction Amount or Obligation Value Increase Amount has been determined. If the Swap Counterparty provides notice that the highest Quotation with respect to a Reference Obligation is not *bona fide* because of the insolvency of the bidder or the inability, failure or refusal of the bidder to settle transactions in the relevant market or perform its obligations generally, then a new Valuation Date with respect to such Reference Obligation will be scheduled by the Swap Counterparty.

As more fully set forth in the Swap Agreement, a "Quotation" for purposes of determining a Reference Price or Final Price will be a firm offer quotation (in the case of the Reference Price) or firm bid quotation (in the case of the Final Price), in each case expressed as a percentage, obtained from a Dealer at a time designated by the Reference Portfolio Manager with an outstanding principal amount (or, in the case of a Reference Obligation that is or contains an Unfunded Commitment, a Commitment Amount) equal to or greater than the relevant Reference Obligation Calculation Amount. In the case of a loan, Quotations will be solicited on a "trades flat" basis under which the buyer of the Reference Obligation will be entitled to all accrued and unpaid interest and commitment, facility, letter of credit and other similar fees with respect to the Reference Obligation accruing after the applicable trade date. In the case of a Bond or Reference CLN, Quotations will exclude accrued interest. Quotations will exclude any Assignment Fees in respect of the relevant Reference Obligation.

As described above, upon the early termination of a Reference Obligation that is a Reference Swap in accordance with its terms (including as a result of an event of default thereunder by the protection buyer or total return payer), an Obligation Value Increase Amount or Obligation Value Reduction Amount will be determined as in the case of the removal of a Reference Swap. The Issuer will not be subject to the credit risk of a default by the protection buyer (or total return payer) under a Reference Swap with respect to such termination. For purposes of a Reference Obligation that is a Reference Swap or Reference CLN, the determination of whether a Credit Event has occurred will be made, among other categories, with respect to the Underlying Obligation for such Reference Swap or Reference CLN (as provided in the definition of "Credit Event"). If a Reference Swap or Reference CLN provides for a cash settlement or a physical settlement under the terms thereof with respect to an Underlying Obligation (including as a result of such a Credit Event with respect thereto), such Reference Swap or Reference CLN will be deemed removed from the Reference Portfolio with a Removal Date of the valuation date or delivery date under such Reference Swap or Reference CLN, and the Obligation Value Reduction Amount or Obligation Value Increase Amount will be calculated with respect to such Underlying Obligation as though it were the Reference Obligation being removed (with the Reference Price being the applicable reference price or initial price for that obligation under the Reference Swap or Reference CLN). If such a Reference Swap or Reference CLN has multiple Underlying Obligations, an Obligation Value Reduction Amount or Obligation Value Increase Amount will be determined separately for each Underlying Obligation for which such a cash settlement or physical settlement occurs, and the Reference Swap or Reference CLN will remain in effect with respect to the other Underlying Obligations.

In the case of a PIK Obligation for which interest has been capitalized or deferred, for purposes of the calculation of an Obligation Value Increase Amount or Obligation Value Reduction Amount, the Reference Price will be recalculated as a percentage of the Reference Obligation Calculation Amount as of the time of removal or

010690

Amortization. In the case of a Structured Finance Obligation with respect to which there has been a Principal Write-Down, a portion of such Structured Finance Obligation with a Reference Obligation Calculation Amount corresponding to the amount of the reduction in principal amount will be deemed removed from the Reference Portfolio as of the date of such Principal Write-Down with a Final Price of zero and an Obligation Value Reduction Amount will be calculated in respect thereof pursuant to clause (1) under the *"Valuation of Reference Obligations"* section. For purposes of determining an Obligation Value Reduction Amount or Obligation Value Increase Amount, the Reference Portfolio Manager will be entitled to deem multiple Reference Obligations that consist of the same Loan or Bond to be a single Reference Obligation, with a Reference Obligation Calculation Amount equal to the sum of the Reference Obligation Calculation Amounts of such multiple Reference Obligations, and a Reference Price equal to the weighted average of the Reference Prices of such multiple Reference Obligations.

In taking any or all of the actions described above, the Reference Portfolio Manager will act solely on behalf of the Swap Counterparty (and not on behalf of the Issuer). *See "Risk Factors—Role of the Reference Portfolio Manager."*

**Payments Under the Swap Agreement**

Under the terms of the Swap Agreement, for each Payment Date during the term thereof, the Swap Counterparty will be required to pay the Adjusted Reference Portfolio Return Amount to the Issuer (or, if such amount is negative, the Issuer will be required to pay the absolute value of such amount to the Swap Counterparty). In addition, on each Payment Date the Issuer will be obligated to pay to the Swap Counterparty the Fixed Amount.

The Adjusted Reference Portfolio Return Amount and the Fixed Amount for any Payment Date will be combined into a single net payment to be made by either the Swap Counterparty or the Issuer to the other. If such net amount for any Payment Date is payable by the Swap Counterparty, it will be payable on the Business Day prior to the applicable Payment Date.

The net amount paid by the Swap Counterparty, if any, in respect of these amounts for a Payment Date will be credited to the Collection Account and distributed by the Trustee in accordance with the Indenture. Net payments of such amounts by the Issuer to the Swap Counterparty may be paid from proceeds of the liquidation of Eligible Investments in the Trust Estate. *See "Description of the Securities—Priority of Payments."* Pursuant to the Indenture, an amount equal to the Quarterly Aggregate Increase Amount, if any, for any Payment Date will be deposited in the Collateral Account.

If any payment made by the Swap Counterparty is subject to any deduction or withholding for or on account of an Indemnifiable Tax, the Swap Counterparty will be obligated to gross-up such payment for any such deduction or withholding. Conversely, if any payment made by the Issuer under the Swap Agreement is subject to any deduction or withholding for or on account of an Indemnifiable Tax, the Issuer will be obligated to gross-up such payment for any such deduction or withholding.

**Swap Notional Amount**

The "Swap Notional Amount" will initially equal U.S. $895,500,000. On each Payment Date prior to the end of the Portfolio Modification Period, the Swap Notional Amount will be increased by the Quarterly Aggregate Increase Amount, if any, for such date or reduced by the Quarterly Aggregate Reduction Amount, if any, for such date. After the end of the Portfolio Modification Period, the Swap Notional Amount will be reduced on each Payment Date by the Swap Reduction Amount, if any, for that date. With respect to a Payment Date following the end of the Portfolio Modification Period, the following amounts will constitute a "Swap Reduction Amount":

(i)    On the first Payment Date following the end of the Portfolio Modification Period, an amount equal to the Swap Notional Amount as of the end of the Portfolio Modification Period <u>minus</u> the Aggregate Reference Value as of the end of the Portfolio Modification Period; and

(ii)    On any subsequent Payment Date (without duplication of any Swap Reduction Amount pursuant to clause (i)), the aggregate of (A) for a Reference Obligation for which an Amortization occurs during the related Collection Period, the amount of the reduction in the Reference Value of such Reference Obligation as a result of such Amortization and (B) for a Reference Obligation that is removed from the

010691

Reference Portfolio with an Accrual Date during the related Collection Period, the amount of the Reference Value of such Reference Obligation so removed, in either case as any such Reference Value may be offset by the Reference Value of any replacement Reference Obligation.

**Defaulted Reference Obligations**

A Reference Obligation will constitute a "Defaulted Reference Obligation" if (i) a Credit Event has occurred and is continuing with respect thereto, (ii) there has been effected any distressed exchange or other debt restructuring where the Reference Entity of the Reference Obligation has offered the holders thereof a new security or instrument or package of securities or instruments that, in the reasonable business judgment of the Reference Portfolio Manager, either (x) amounts to a diminished financial obligation or (y) has the sole purpose of enabling the Reference Entity to avoid a default, (iii) it is rated "D", "SD", "C" or "CC" by S&P or was so rated immediately prior to such rating being withdrawn, (iv) in the case of a Structured Finance Obligation, it is rated "Ca" or "C" by Moody's or (v) in the case of a Structured Finance Obligation, there is a reduction in payments made to holders thereof from those required or scheduled to be made thereunder or there is a permanent reduction in the stated principal amount thereof without a corresponding payment being made to the holder thereof (a "Principal Write-Down"). Neither a DIP Loan nor a Current Pay Obligation will be considered a Defaulted Reference Obligation solely because a Bankruptcy has occurred with respect to the Reference Entity. As specified in the Swap Agreement, a "Credit Event" means the occurrence of one or more of the following events with respect to a Reference Entity or a Reference Obligation: (i) a Failure to Pay or (ii) a Bankruptcy; *provided* that in the case of a Reference Swap or Reference CLN, a Credit Event will be deemed to occur if (a) a credit event occurs under the terms thereof with respect to an Underlying Obligation or a Reference Entity, (b) a Bankruptcy occurs with respect to the counterparty thereto or issuer thereof or (c) a Failure to Pay occurs with respect to such Reference Swap or Reference CLN itself.

If an occurrence would otherwise constitute a Credit Event, such occurrence will constitute a Credit Event whether or not such occurrence arises directly or indirectly from (i) any lack or alleged lack of authority or capacity of a Reference Entity to enter into any Reference Obligation, (ii) any actual or alleged unenforceability, illegality, impossibility or invalidity with respect to any Reference Obligation, however described, (iii) any applicable law, order, regulation, decree or notice however described, or the promulgation of, or any change in, the interpretation by any court, tribunal, regulatory authority or similar administrative or judicial body with competent or apparent jurisdiction of any applicable law, order, regulation, decree or notice, however described, or (iv) the imposition of or any change in any exchange controls, capital restrictions or any other similar restrictions imposed by any monetary or other authority, however described.

The Reference Portfolio Manager will not be obligated to remove Defaulted Reference Obligations from the Reference Portfolio. The presence of Defaulted Reference Obligations in the Reference Portfolio will, however, generally reduce the Overcollateralization Ratios. *See "Description of the Securities—The Coverage Tests."*

**Termination of the Swap Agreement**

The Swap Agreement will terminate in accordance with its terms, with no further obligations (other than certain indemnification and expense reimbursement obligations) of either party to the other, upon the earlier of (i) the date as of which the Swap Notional Amount is reduced to zero and (ii) the Swap Termination Date. In the case of an Optional Redemption or Indenture Tax Redemption, the Swap Termination Date will be accelerated to the Optional Redemption Date or Indenture Tax Redemption Date, as the case may be.

**Early Termination of the Swap Agreement**

The Swap Agreement will be subject to early termination by the Issuer upon, among others, any of the following events: (i) a payment default by the Swap Counterparty lasting a period of at least one Business Day after notice thereof is given to the Swap Counterparty, (ii) merger without assumption by the surviving entity of the obligations of the Swap Counterparty under the Swap Agreement, (iii) bankruptcy-related events applicable to the Swap Counterparty, (iv) upon the downgrade of its rating below certain levels described below, the failure of the Swap Counterparty to deliver collateral or take other permitted remedial actions, (v) illegality of the Swap Agreement, (vi) tax event upon merger or (vii) certain withholding tax events under the Swap Agreement.

010692

The Swap Agreement will be subject to early termination by the Swap Counterparty upon, among others, any of the following events: (i) a payment default by the Issuer lasting a period of at least one Business Day after notice thereof is given to the Issuer, (ii) merger without assumption by the surviving entity of the obligations of the Issuer under the Swap Agreement, (iii) bankruptcy-related events applicable to the Issuer, (iv) illegality of the Swap Agreement, (v) tax event upon merger or certain withholding tax events under the Swap Agreement, (vi) commencement of the sale or liquidation of the Trust Estate substantially in its entirety under the Indenture or (vii) any amendments to the Indenture without the prior written consent of the Swap Counterparty (where such consent was required).

Upon an early termination of the Swap Agreement, the Issuer or the Swap Counterparty may be required to make a termination payment (a "Swap Termination Payment") to the other party. Such a Swap Termination Payment will be calculated on the basis of the "Close-out Amount" as defined in the ISDA Master Agreement, and will serve to compensate the party that is "in-the-money" (which may be the defaulting or affected party, as applicable) for the replacement cost of the terminated Swap Agreement. "Close-out Amount" generally means, with respect to a party, the amount that the party reasonably determines in good faith to be its total losses and costs in replacing the terminated swap agreement. Depending on current market conditions at the time of such early termination, substantial termination payments could be owed by the Issuer to the Swap Counterparty, thereby reducing funds in the Collateral Account. Accordingly, if the Issuer is not able to enter into a replacement swap agreement that provides an offsetting payment, amounts available for payments to Holders of Securities may be reduced.

The Swap Agreement will provide that if Moody's downgrades the Swap Counterparty (or its guarantor, if applicable) below the Moody's Required Ratings, then the Swap Counterparty shall, within five Business Days of notice thereof from the Trustee on behalf of the Issuer, post, solely at the expense of the Swap Counterparty, collateral pursuant to a Credit Support Annex in an amount equal to either (i) the greater of (A) the mark-to-market value of the transaction, (B) the amount due by the Swap Counterparty under the transaction on the next Payment Date or (C) one percent of the Swap Notional Amount or (ii) such lesser amount as Moody's confirms will not result in a qualification, downgrade or withdrawal of the then-current ratings of any Class of Securities of the Issuer then rated by Moody's. The Swap Agreement will also provide that if the Swap Counterparty (or such guarantor) has a short-term and a long-term rating from Moody's and the short-term rating of the Swap Counterparty (or such guarantor) from Moody's is "P-2" or lower or the long-term rating of the Swap Counterparty (or such guarantor) from Moody's is withdrawn, suspended or downgraded below "A3", or, if the Swap Counterparty (or such guarantor) has only a long-term rating from Moody's, the long-term rating of the Swap Counterparty (or such guarantor) from Moody's is withdrawn, suspended or downgraded below "A2", then the Swap Counterparty shall, in addition to posting collateral, arrange within 30 days after notice thereof from the Trustee on behalf of the Issuer, (x) to assign or transfer its rights and obligations with respect to the Swap Agreement to another swap counterparty that has (or is guaranteed by a person that has) the Moody's Required Ratings and is acceptable to the Issuer or (y) undertake any other action (other than posting additional collateral) as Moody's confirms will not result in a qualification, downgrade or withdrawal of the then-current ratings of any Class of Securities of the Issuer then rated by such Rating Agency. The Swap Agreement will also provide that if the short-term rating of the Swap Counterparty (or such guarantor) from S&P is withdrawn, suspended or downgraded below "A-1+" (the "S&P Required Rating"), then the Swap Counterparty will be required, within 30 days after notice thereof from the Trustee on behalf of the Issuer, to (x) post collateral pursuant to a Credit Support Annex in an amount equal to 133% of the amount due by the Swap Counterparty under the transaction on the next Payment Date or such lesser amount as S&P confirms will not result in a qualification, downgrade or withdrawal of its then-current rating on any Class of Securities then rated by S&P, (y) obtain a guarantor of its obligations under the Swap Agreement that has, or assign or transfer its rights and obligations with respect to the Swap Agreement to another swap counterparty that has (or whose obligations will be guaranteed by a party that has) the S&P Required Rating and is acceptable to the Issuer and which S&P confirms will not result in a qualification, downgrade or withdrawal of the then-current ratings of any Class of Securities of the Issuer then rated by S&P or (z) undertake any other action (other than posting additional collateral) as S&P confirms will not result in a qualification, downgrade or withdrawal of the then-current ratings of any Class of Securities of the Issuer then rated by S&P. Certain expenses of the Swap Counterparty in connection with the assignment or transfer of the Swap Agreement or certain other remedial actions in these circumstances will be reimbursed as Administrative Expenses. Failure to take these actions within the applicable time periods following such downgrading will constitute a "Termination Event" under the Swap Agreement for which the Swap Counterparty will be the sole affected party.

010693

Upon the early termination of the Swap Agreement as a result of a Swap Event of Default with respect to the Swap Counterparty or Swap Additional Termination Event, and so long as the Notes have not been accelerated, the Issuer will, subject to the Indenture, attempt to arrange to replace the Swap Agreement. In such event, the Reference Portfolio Manager may, in its discretion, assist the Issuer in its efforts to arrange for a replacement swap agreement, with itself as Reference Portfolio Manager. Any replacement swap agreement must be approved by both (i) the holders of a majority of the Aggregate Principal Amount of the Senior Notes (voting together as a single class) and (ii) the holders of a majority of the Aggregate Principal Amount of the Income Notes.

**Extension of the Swap Agreement**

The Swap Counterparty may, at its option, on the Extension Effective Date extend the Portfolio Modification Period for four years to August 1, 2015 and correspondingly extend the term of the Swap Agreement for four years to August 1, 2020, subject to the satisfaction of the Extension Conditions. The Swap Counterparty will give notice of its election to extend the Portfolio Modification Period and the term of the Swap Agreement to the Trustee no later than 60 days and no earlier than 90 days prior to the Extension Effective Date.

The extension of the Portfolio Modification Period and the term of the Swap Agreement will be conditioned on satisfaction of the Extension Conditions.

An extension of the term of the Swap Agreement causes an automatic corresponding extension of the maturity of the Securities. *See "Description of the Securities—Maturity of the Notes and Class Q-1 Securities and Extension of Maturity of the Notes and Class Q-1 Securities."*

**Modification of Swap Agreement**

Pursuant to the Indenture, the Issuer will not generally be permitted to enter into an amendment to the Swap Agreement without the consent of the Holders of a majority of the Aggregate Principal Amount of each Class of Notes; *provided* that, without the consent of any Holders of the Notes, the Issuer may agree to amend the Swap Agreement in order to:

(i)     cure any ambiguity, or correct, modify or supplement any provision thereof which is defective or inconsistent with any other provision therein or of this Offering Circular;

(ii)    take any action necessary or helpful to prevent the Issuer from becoming subject to any withholding or other taxes or assessments or to reduce the risk that the Issuer will be engaged in a United States trade or business or otherwise subject to United States federal income tax on a net income basis; or

(iii)   amend, modify or change any test or requirement of any Rating Agency under the Swap Agreement where such amendment, modification or change has been specified or authorized by such Rating Agency (and notice thereof has been provided to the Trustee, Swap Counterparty and Reference Portfolio Manager).

In the case of any modification of the Swap Agreement that requires the consent of one or more holders of Securities, the Amendment Buy-Out Purchaser will have the right to purchase the applicable Securities of any Non-consenting Holder. *See "Description of the Securities—Amendment Buy-Out" above.*

Under the Investment Agreement, the Issuer has agreed not to make certain modifications to the Swap Agreement without the consent of the Investment Agreement Counterparty or Investment Agreement Guarantor.

**Documentation**

The Swap Agreement will be documented under an ISDA Master Agreement between the Issuer and the Swap Counterparty, together with a schedule thereto and a confirmation thereunder.

**Governing Law**

The Swap Agreement will be governed by, and construed in accordance with, the laws of the State of New York.

010694

## THE REFERENCE PORTFOLIO

The Reference Portfolio will be selected and modified from time to time by the Reference Portfolio Manager on behalf of the Swap Counterparty (and not on behalf of the Issuer) pursuant to the Reference Portfolio Management Agreement. *See "Description of the Swap Agreement—Selection and Modification of the Reference Portfolio."* The Reference Portfolio will consist primarily of Reference Obligations that are Term Loans and Term Loan/Revolving Loan combinations acquired at or about the same time as part of the same investment decision, Bonds and/or credit-linked instruments based on such obligations. On the Closing Date, the Issuer expects the Aggregate Reference Obligation Calculation Amount to be approximately U.S. $770 million. As of the Ramp-up End Date, the Issuer expects (subject to market conditions) that the Reference Portfolio will be comprised of Reference Obligations with an Aggregate Reference Value approximately equal to U.S. $895 million (but in no event greater than the initial Swap Notional Amount).

**Eligible Reference Obligations**

An obligation will be eligible for inclusion in the Reference Portfolio as a Reference Obligation if, as of its Addition Date (or for Reference Obligations included in the Reference Portfolio as of the Closing Date, at the Closing Date) it is one of the following: (i) a Term Loan or a participation in a Term Loan, (ii) a Revolving Loan or a participation in a Revolving Loan, (iii) a Bond (including a Structured Finance Obligation), (iv) a Reference Swap or (v) a Reference CLN; *provided* that in the case of (i), (ii) or (iii), such obligation, or in the case of (iv) or (v), each relevant Underlying Obligation (and, where expressly noted below, such Reference Swap or Reference CLN itself, as the case may be) must also satisfy the following criteria (the "Reference Obligation Eligibility Criteria"):

1. The obligation is denominated and payable only in U.S. $.

2. The terms of the obligation do not provide for such obligation to be converted or exchanged at any time into any Equity Security or any other security or asset.

3. The obligation (a) has a Moody's Rating (including any estimated or confidential rating which is in respect of the full obligation of the obligor and which is monitored) and (b) has an S&P Rating (including any confidential rating which is in respect of the full obligation of the obligor and which is monitored), which S&P Rating does not have a "p", "pi", "q", "r" or "t" subscript unless S&P otherwise authorizes in writing.

4. The obligation is not a Defaulted Reference Obligation, Current Pay Obligation or Credit Risk Obligation and in the case of a Reference Obligation that has a Moody's Rating of "Caa1" or lower or an S&P Rating of "CCC+" or lower, the Reference Portfolio Manager has certified in writing that such Reference Obligation is not a Credit Risk Obligation.

5. The related Reference Entity is the borrower, issuer or guarantor in respect of such obligation.

6. The obligation constitutes a legal, valid and binding obligation of the applicable Reference Entity (and, in the case of a Reference Swap or Reference CLN, such Reference Swap or Reference CLN constitutes a legal, valid and binding obligation of the applicable protection buyer, total return payer or issuer, as the case may be), enforceable against such person in accordance with its terms.

7. The obligation (unless it is a Bond) is not subordinated by its terms to other indebtedness for borrowed money of the applicable Reference Entity (and, in the case of a Reference Swap or Reference CLN, such Reference Swap or Reference CLN is not subordinated by its terms to other indebtedness for borrowed money of the applicable protection buyer, total return payer or issuer, as the case may be); *provided* that, for the avoidance of doubt, this clause will not prohibit the inclusion in the Reference Portfolio of Subordinated Lien Loans.

8. The obligation (unless it is a PIK Obligation) bears simple interest payable in cash no less frequently than annually at a fixed or floating rate that is paid on a periodic basis on an unleveraged basis and, in the case of a floating rate, computed on a benchmark interest rate plus or minus a spread, if any (which may vary under the terms of the obligation).

010695

9.  The payment or repayment of the principal, if any, of the obligation is not an amount determined by reference to any formula or index or subject to any contingency under the terms thereof.

10. The obligation is not subject to an outstanding offer to be acquired, exchanged or tendered.

11. The obligation provides for payment of a fixed amount of principal payable in cash according to a fixed schedule (which may include optional call dates) and at stated maturity thereof.

12. In the case of a Term Loan or Revolving Loan, as of its Addition Date, the obligation is part of, or a participation in, a syndicated loan facility (consisting of Term Loans or Term Loans and Revolving Loans) that provides for a commitment by the lenders, in the aggregate, of at least U.S. $100 million.

13. The portion of the obligation to be included in the Reference Portfolio (including through a Reference Swap or Reference CLN) does not represent, directly or indirectly, more than a 25% interest in the obligation.

14. With respect to a Revolving Loan, the obligation of a holder to advance funds thereunder is subject only to certain conditions precedent and is not subject to the exercise of discretion by the holder; *provided* that in no event shall the determination of whether a customary representation, warranty, covenant, agreement or condition precedent (including, without limitation, a condition precedent relating to the absence of a material adverse change in the borrower's financial condition or a similar condition precedent) has been satisfied constitute the exercise of discretion by the holder for this purpose.

15. The obligation was funded (or, in the case of a Revolving Loan, the commitment to fund became effective) at least two Business Days prior to its Addition Date (or, if earlier, at least two Business Days prior to the date of any commitment or decision to add such obligation to the Reference Portfolio).

16. The Issuer has not (and no one acting for the account of the Issuer has) directly or indirectly, negotiated the terms of, participated in the structuring of, or influenced the terms of such obligation; *provided* that neither the Reference Portfolio Manager nor the Swap Counterparty will be considered to act for the account of the Issuer.

17. The Issuer has not (and no one acting for the account of the Issuer has) provided services in connection with the origination, structuring, marketing or placement of the obligation, and no fees for such services are or will be payable to the Issuer with respect to the obligation; *provided* that neither the Reference Portfolio Manager nor the Swap Counterparty will be considered to act for the account of the Issuer.

18. None of (x) the Swap Counterparty or any Affiliate thereof or (y) the Reference Portfolio Manager or any Affiliate thereof, has (directly or indirectly) negotiated the terms of, participated in the structuring of, or influenced the terms of, the obligation unless (a) within ten consecutive Business Days before the proposed Addition Date the Reference Portfolio Manager has attempted to obtain firm offer quotations for valuing the obligation from at least two Dealers on the same date and has obtained at least one quotation, and if only one such quotation is obtained, such quotation is equal to or lower than the relevant price quotation for such obligation quoted by the Pricing Source, (b) either: (i) the obligation was originated and funded prior to the Closing Date and not in anticipation of inclusion in the Reference Portfolio, or (ii) the obligation is added to the Reference Portfolio at least two Business Days after the original issuance of the obligation (and no commitment or agreement to add the obligation is entered into before such date) and (c) the Reference Price of such obligation is equal to or lower than the price at which such obligation is sold or made available for sale to other unaffiliated persons on or about the proposed Addition Date (but in no event earlier than the second Business Day after the original issuance of the obligation); *provided* that the aggregate Reference Value of all Reference Obligations of which the Swap Counterparty, the Reference Portfolio Manager or any of their respective Affiliates has (directly or indirectly) negotiated the terms, participated in the structuring or influenced the terms does not exceed 25% of the Aggregate Reference Value.

010696

19.     The obligation (and, in the case of a Reference CLN, such Reference CLN) is not a limited partnership interest, limited liability company membership interest, trust certificate or other asset that is treated as an equity interest in a partnership or a trust for U.S. federal income tax purposes, unless (a) the Reference Portfolio Manager has obtained an opinion of nationally recognized counsel to the effect that such interest, if held by a foreign corporation, would not cause such foreign corporation to be treated as engaged in the conduct of a U.S. trade or business for U.S. federal income tax purposes, (b) the instrument has tax disclosure that states that a non-U.S. holder thereof will not be subject to U.S. net income tax or will not be treated as engaged in the conduct of a U.S. trade or business for U.S. federal income tax purposes solely as a result of acquiring or investing in such instrument, or (c) the partnership or trust (1) is organized outside the United States, (2) is owned solely by non-U.S. persons, (3) effects all transactions, performs all services and carries out all other activities solely outside of the United States and with or for non-U.S. persons and (4) holds financial instruments, if any, that are directly or indirectly issued by or entered into with solely non-U.S. persons.

20.     The obligation is not treated as an interest, other than as a creditor, in a "United States real property holding corporation" as defined by Section 897 of the Code.

21.     The obligation is in registered form for purposes of the Code.

22.     The payments on the obligation (and, in the case of a Reference Swap or Reference CLN, on such Reference Swap or Reference CLN) will not be subject to withholding tax in any non-U.S. jurisdiction unless the obligor (and the guarantor, if any) of the obligation (and such Reference Swap or Reference CLN) is required under the terms of the documentation thereof to make "gross-up" payments that cover the full amount of any such withholding tax; *provided*, that the Reference Portfolio Manager shall be permitted to rely conclusively on advice of tax counsel that such obligation (and such Reference Swap or Reference CLN) will not be so subject.

23.     The payments on the obligation (and, in the case of a Reference Swap or Reference CLN, such Reference Swap or Reference CLN) would not be subject to U.S. withholding tax, assuming that the obligation were held by the Issuer and that the Issuer provided any relevant U.S. tax forms to the issuer of the obligation (and to the protection buyer or total return payer under such Reference Swap or to the issuer of such Reference CLN); *provided*, that the Reference Portfolio Manager shall be permitted to rely conclusively on advice of tax counsel that such obligation (and such Reference Swap or Reference CLN) would not be so subject.

24.     In the case of a Reference Swap, either (a) such Reference Swap is a derivatives contract (i) documented under an ISDA Master Agreement and/or a Confirmation that references such an agreement and incorporates the Credit Definitions, (ii) providing for one or more payments by the protection buyer to the protection seller determined by reference to a specified rate or index multiplied by a fixed or amortizing notional amount and providing for, upon the occurrence of a specified credit event under the Credit Definitions with regard to a Reference Entity and the satisfaction of certain conditions to settlement, (A) one or more cash payments by the protection seller to the protection buyer determined by reference to the change in the value ascribed to one or more valuation obligations based on the applicable Valuation Method under the terms thereof (and not by reference to any actual loss incurred by the protection buyer) or (B) delivery by the protection buyer to the protection seller of one or more deliverable obligations in exchange for a specified payment, (iii) that permits the selection, with respect to the Reference Entity, of multiple deliverable obligations, in the case of physical settlement, or multiple valuation obligations, in the case of cash settlement, in each case satisfying certain criteria, (iv) in which the protection buyer is a dealer in swaps and other derivative financial instruments that regularly holds itself out as being willing and able to enter into either side of a credit default swap, (v) where the Reference Portfolio Manager reasonably believes that at least one potential valuation obligation or deliverable obligation is an obligation for which, on the Addition Date, firm offer price quotations can be obtained from at least two Dealers (or, if only one such quotation can be obtained, a relevant price quotation can also be obtained from the Pricing Source), (vi) under which (A) the Reference Entity is a person that is not an Affiliate of the Issuer, the Swap Counterparty, the Reference Portfolio

010697

Manager, the protection buyer or the protection seller, (B) neither the protection buyer nor the protection seller is required to own or hold any reference obligation, (C) the protection seller will not have any ongoing payment rights or obligations under the contract in respect of any portion of the contract that has been cash settled or physically settled and (D) each party agrees not to treat the transaction as an insurance or guarantee contract for any relevant purpose, including, without limitation, for regulatory, tax or accounting purposes, and (vii) that is added to the Reference Portfolio for purposes of taking on exposure to the underlying Reference Entity and profiting from the amounts payable to the protection seller in respect of such Reference Swap, and for which the decision relating to its addition to the Reference Portfolio is made in the same manner as decisions relating to the addition of Reference Obligations other than Reference Swaps or Reference CLNs, or (b) the Reference Portfolio Manager has received a written opinion of nationally recognized tax counsel experienced in such matters that the acquisition, ownership or disposition of the Reference Swap should not cause the Issuer to be treated as engaged in the conduct of a U.S. trade or business for U.S. federal income tax purposes, assuming that the Reference Swap were acquired, owned or disposed of by the Issuer and considering such acquisition, ownership or disposition in the light of all other activities of the Issuer.

25.    In the case of a Reference CLN, either (a) such Reference CLN is a note (i) providing for periodic payments by the issuer thereof calculated at a stated interest rate or based on a stated spread over a benchmark interest rate or interest rate index on a stated principal amount, (ii) providing for, upon the occurrence of a specified credit event (as defined under the Credit Definitions or in a substantially similar manner) with respect to one or more Reference Entities and the satisfaction of certain conditions to settlement, an adjustment to the stated principal amount payable at maturity calculated by reference to the change in value ascribed to one or more valuation obligations based on the applicable valuation method under the terms thereof (and not by reference to any actual loss incurred by the issuer) or for the delivery of one or more deliverable obligations in lieu of all or a portion of the principal amount, (iii) providing for, if no such specified credit event has occurred by the stated maturity of such Reference CLN, repayment in full at or prior to maturity of the originally stated principal amount, (iv) that permits the selection, with respect to each such Reference Entity, of multiple deliverable obligations, in the case of physical settlement, or multiple valuation obligations, in the case of cash settlement, in each case satisfying certain criteria, (v) where the Reference Portfolio Manager reasonably believes that at least one potential valuation obligation or deliverable obligation for each such Reference Entity is an obligation for which, on the Addition Date, firm offer price quotations can be obtained from at least two Dealers (or, if only one such quotation can be obtained, a relevant price quotation can also be obtained from the Pricing Source), (vi) in which (A) each Reference Entity is a person that is not an Affiliate of the Issuer, the Reference Portfolio Manager, the Swap Counterparty, the issuer of such Reference CLN or the holder of such Reference CLN, (B) neither the issuer nor the holder of the Reference CLN is required to own or hold any reference obligation, (C) the holder will not have any ongoing payment rights or obligations in respect of the portion of the security that has been settled as a result of a credit event and (D) the issuer and holder each agree not to treat the security as an insurance or guarantee contract for any relevant purpose, including, without limitation, for regulatory, tax or accounting purposes, and (vii) that is added to the Reference Portfolio for the purpose of taking on exposure to the underlying Reference Entity(ies) and profiting from the amounts payable to the holder in respect of such Reference CLN, and for which the decision relating to its addition is made in the same manner as decisions relating to the addition of Reference Obligations other than Reference Swaps or Reference CLNs; (b) such Reference CLN (i) is an interest in a trust or other entity taxed on a pass-through basis that holds solely instruments treated as indebtedness for U.S. federal income tax purposes and instruments treated as options or notional principal contracts for U.S. federal income tax purposes, (ii) satisfies the requirements of subclauses (i)-(iv) and (vii) of clause (a) hereof, (iii) is an instrument as to which firm offer price quotations can be obtained from at least two Dealers, and (iv) satisfies the requirements of subclause (vi) of clause (a) hereof, treating the "holder" as the entity and the "issuer" as the counterparty to any option or notional principal contract; or (c) the Reference Portfolio Manager has received a written opinion of nationally recognized tax counsel experienced in such matters that the acquisition, ownership or disposition of the Reference CLN should not cause the Issuer to be treated as engaged in the conduct of a U.S. trade or business for U.S. federal

010698

income tax purposes, assuming that the Reference CLN were acquired, owned or disposed of by the Issuer and considering such acquisition, ownership or disposition in the light of all other activities of the Issuer.

26.    The Reference Entity is Domiciled in an Eligible Country.

27.    The Reference Portfolio Manager has exercised its independent judgment in determining whether to include the obligation in the Reference Portfolio, and that judgment has not been influenced by whether a particular person or entity holds an interest in the Reference Portfolio Manager or in Securities issued by the Issuer or whether the Swap Counterparty or affiliates thereof originated the Reference Obligation, and has not consulted with any person or entity holding an interest in the Reference Portfolio Manager or Securities issued by the Issuer in determining whether to include any Reference Obligation in the Reference Portfolio.

28.    The obligation is not a loan that is an obligation of a debtor in possession or a trustee for a debtor in an insolvency proceeding other than a DIP Loan.

29.    The Reference Obligation (including for this purpose, in the case of a Reference Swap, such Reference Swap) has a maturity or final termination date no later than the Maturity Date; *provided* that Reference Obligations that bear interest at a fixed rate have a maturity or final termination date no later than 45 Business Days prior to the Maturity Date.

30.    With respect to an obligation that provides for the payment of interest at a floating rate, such floating rate is determined by reference to the U.S. dollar prime rate or other base rate, London interbank offered rate or similar interbank offered rate, commercial deposit rate or any other index acceptable to the Swap Counterparty and which each Rating Agency confirms in writing will not result in a qualification, downgrade or withdrawal of its then-current rating of any Class of Securities.

31.    The obligation (unless it is a PIK Obligation) does not by its terms permit the deferral of the payment of interest in cash thereon, including without limitation, by providing for the payment of interest through the issuance of additional debt securities identical to such debt security or through additions to the principal amount thereof for a specified period in the future or for the remainder of its life or by capitalizing interest due on such debt security as principal.

32.    In the case of a Reference Obligation that is a participation in a Term Loan or Revolving Loan, the participation seller has a long-term senior unsecured rating by Moody's of at least "A3" and an issuer credit rating by S&P of at least "A-".

33.    In the case of a Reference Swap or Reference CLN, the counterparty or issuer, as the case may be, has a long-term senior unsecured rating by Moody's of at least "A3" and an issuer credit rating by S&P of at least "A-".

34.    The obligation does not constitute "margin stock" as defined in Regulation U of the U.S. Board of Governors of the Federal Reserve System.

35.    The obligation is not a Discount Obligation.

36.    In the case of a Bond, the obligation is treated for U.S. federal income tax purposes as indebtedness, or in the case of an interest in a trust or other entity taxed on a pass-through basis, (a) such interest is treated as indebtedness for U.S. federal income tax purposes or represents an undivided beneficial ownership interest in assets consisting solely of cash and instruments treated as indebtedness for U.S. federal income tax purposes, (b) such interest has tax disclosure that states that a non-U.S. holder thereof will not be subject to U.S. net income tax or will not be treated as engaged in the conduct of a U.S. trade or business for U.S. federal income tax purposes solely as a result of acquiring or investing in such interest, or (c) the Reference Portfolio Manager has obtained an opinion of nationally recognized counsel to the effect that such interest, if held by a foreign corporation, would not cause such foreign corporation to be treated as engaged in the conduct of a U.S. trade or business for U.S. federal income tax purposes.

**Reference Portfolio Criteria**

The following requirements will constitute the "Reference Portfolio Criteria":

1.      The Aggregate Reference Value of the Reference Obligations may not exceed the Swap Notional Amount.

2.      (a) The aggregate of the Reference Obligation Calculation Amounts of Reference Obligations of Reference Entities with a Moody's Rating of less than "B3" may not exceed 7.5% of the Portfolio Calculation Amount; and (b) the aggregate of the Reference Obligation Calculation Amounts of Reference Obligations of Reference Entities with an S&P Rating of less than "B-" may not exceed 7.5% of the Portfolio Calculation Amount (provided that for purposes of this clause (b), Underlying Obligations with an S&P Rating of less than "B-" for an Index CLN shall not be counted toward such limit).

3.      The Reference Obligation Calculation Amount of any single Reference Obligation may not exceed 1.5% of the Portfolio Calculation Amount; *provided*, that the Reference Obligation Calculation Amount of each of up to five Reference Obligations may be up to 2.0% of the Portfolio Calculation Amount.

4.      The aggregate Reference Obligation Calculation Amount of Reference Obligations with Reference Entities with a Domicile other than in the United States or Canada may not exceed 15% of the Portfolio Calculation Amount.

5.      The aggregate Reference Obligation Calculation Amount of Reference Obligations with Reference Entities with a Domicile in (i) Canada or any single country that is a Moody's Group I Country may not exceed 10% of the Portfolio Calculation Amount, (ii) any single country that is a Moody's Group II Country may not exceed 5.0% of the Portfolio Calculation Amount or (iii) any single country that is a Moody's Group III Country may not exceed 2.5% of the Portfolio Calculation Amount.

6.      The aggregate Reference Obligation Calculation Amount of Reference Obligations with Reference Entities that are organized in a Tax Advantaged Jurisdiction may not exceed 5.0% of the Portfolio Calculation Amount.

7.      The aggregate of the Reference Obligation Calculation Amount of Reference Obligations that are not Term Loans or Bonds may not exceed 50% of the Portfolio Calculation Amount.

8.      The aggregate of the Reference Obligation Calculation Amounts of Reference Obligations that are Term Loans or Revolving Loans that are not Secured Loans may not exceed 3.0% of the Portfolio Calculation Amount.

9.      The aggregate of the Reference Obligation Calculation Amounts of Reference Obligations that bear interest at a fixed rate may not exceed 7.5% of the Portfolio Calculation Amount.

10.     The aggregate of the Reference Obligation Calculation Amounts of Reference Obligations that are Bonds may not exceed 7.5% of the Portfolio Calculation Amount.

11.     The aggregate of the Reference Obligation Calculation Amounts of Reference Obligations that are Structured Finance Obligations may not exceed 5.0% of the Portfolio Calculation Amount.

12.     The aggregate of the Reference Obligation Calculation Amounts of Reference Obligations that are Reference Swaps, Reference CLNs, loan participations and Reference Obligations of Reference Entities that are Domiciled in a country with a long-term foreign issuer credit rating below "AA" by S&P may not exceed 20.0% of the Portfolio Calculation Amount, and the aggregate of the Reference Obligation Calculation Amounts of Reference Obligations that are Index CLNs may not exceed 5.0% of the Portfolio Calculation Amount.

13.     The aggregate of the Reference Obligation Calculation Amounts of Reference Swaps, Reference CLNs or loan participations with a particular Reference Swap counterparty, Reference CLN

010700

issuer, or participation seller, as the case may be, may not exceed the respective percentage of the Portfolio Calculation Amount specified below under "Single Counterparty Limit" for the applicable long-term senior unsecured rating by Moody's or S&P Rating of such counterparty or participation seller (using the limit for the lower of such ratings, if different), and the aggregate of the Reference Obligation Calculation Amounts of all Reference Swaps, Reference CLNs and participations with all counterparties, issuers or participation sellers, as the case may be, with a long-term senior unsecured rating by Moody's or S&P Rating at or below a level specified in the table below (using the lower of such ratings for a counterparty, issuer or participation seller, if different) shall not exceed the percentage of the Portfolio Calculation Amount specified below under "Aggregate Counterparty Limit" for such rating:

| Moody's Rating | S&P Rating | Single Counterparty Limit | Aggregate Counterparty Limit |
|---|---|---|---|
| Aaa | AAA | 10% | 20% |
| Aa1 | AA+ | 10% | 20% |
| Aa2 | AA | 10% | 17.5% |
| Aa3 | AA- | 10% | 10% |
| A1 | A+ | 5% | 5% |
| A2 | A | 3% | 3% |
| A3 | A- | 2% | 2% |

14.     The aggregate of the Reference Obligation Calculation Amounts of (i) Reference Obligations that do not pay interest at least as frequently as quarterly and Reference Obligations that are PIK Obligations may not exceed 7.5% of the Portfolio Calculation Amount, (ii) Reference Obligations that do not pay interest at least as frequently as semi-annually and Reference Obligations that are PIK Obligations may not exceed 7.5% of the Portfolio Calculation Amount and (iii) Reference Obligations that are PIK Obligations may not exceed 3.0% of the Portfolio Calculation Amount.

15.     The aggregate of the Reference Obligation Calculation Amounts of Reference Obligations that are DIP Loans may not exceed 5.0% of the Portfolio Calculation Amount; *provided*, that with Rating Confirmation the aggregate Reference Obligation Calculation Amount of Reference Obligations that are DIP Loans may be up to 7.5% of the Portfolio Calculation Amount.

16.     The aggregate of the Reference Obligation Calculation Amounts of Reference Obligations that are Subordinated Lien Loans may not exceed 5.0% of the Portfolio Calculation Amount.

17.     The Reference Portfolio has a Weighted Average Rating no greater than, a Weighted Average LIBOR Spread at least equal to, and a Diversity Score at least equal to the respective levels set forth in the applicable row of the grid specified below. As of the Closing Date, the Reference Portfolio Manager will elect which row of the grid below will apply. Thereafter, on notice to the Swap Counterparty, the Reference Portfolio Manager may elect a different row of the applicable grid to apply, provided that after giving effect to such new election, the Reference Portfolio will satisfy the maximum Weighted Average Rating, minimum Weighted Average LIBOR Spread and minimum Diversity Score for such row.

| Maximum Weighted Average Rating | Minimum Weighted Average LIBOR Spread (%) | Minimum Diversity Score |
|---|---|---|
| 2300 | 2.75% | 50 |
| 2375 | 2.90% | 50 |
| 2450 | 3.05% | 50 |
| 2225 | 2.50% | 55 |
| 2275 | 2.60% | 55 |
| 2350 | 2.75% | 55 |
| 2425 | 2.90% | 55 |

010701

| Maximum Weighted Average Rating | Minimum Weighted Average LIBOR Spread (%) | Minimum Diversity Score |
|---|---|---|
| 2500 | 3.05% | 55 |
| 2275 | 2.50% | 60 |
| 2325 | 2.60% | 60 |
| 2400 | 2.75% | 60 |
| 2475 | 2.90% | 60 |
| 2550 | 3.05% | 60 |
| 2325 | 2.50% | 65 |
| 2375 | 2.60% | 65 |
| 2450 | 2.75% | 65 |
| 2525 | 2.90% | 65 |
| 2600 | 3.05% | 65 |
| 2375 | 2.50% | 70 |
| 2425 | 2.60% | 70 |
| 2500 | 2.75% | 70 |
| 2575 | 2.90% | 70 |
| 2650 | 3.05% | 70 |
| 2425 | 2.50% | 75 |
| 2475 | 2.60% | 75 |
| 2550 | 2.75% | 75 |
| 2625 | 2.90% | 75 |
| 2700 | 3.05% | 75 |
| 2475 | 2.50% | 80 |
| 2525 | 2.60% | 80 |
| 2600 | 2.75% | 80 |
| 2675 | 2.90% | 80 |
| 2750 | 3.05% | 80 |

18. The Reference Portfolio has a Moody's Weighted Average Recovery Rate at least equal to 44.8%.

19. The Weighted Average Life Test is satisfied.

20. The Reference Portfolio has an S&P Weighted Average Recovery Rate at least equal to 49.3%.

21. The Weighted Average Undrawn Spread of the Reference Portfolio is at least 0.40%.

22. The Reference Portfolio has a Weighted Average Fixed Rate Coupon of at least 8.25%.

23. The Reference Portfolio has a Weighted Average LIBOR Spread of at least 2.50%.

The criteria in clauses 2-16 above are referred to herein as the "Concentration Limits." For purposes of the calculations in the Reference Portfolio Criteria, Defaulted Reference Obligations shall be deemed to be excluded from the Reference Portfolio.

010702

## THE SWAP COUNTERPARTY AND SWAP GUARANTOR

The Swap Counterparty will be Citigroup Financial Products Inc. or an affiliate thereof.  The obligations of the Swap Counterparty under the Swap Agreement will be guaranteed by CGMHI as the Swap Guarantor.

**The Swap Counterparty**

Citigroup Financial Products Inc. is a Delaware corporation with its principal address at 388 Greenwich Street, New York, New York.  CFPI is a direct, wholly-owned subsidiary of CGMHI, which is a direct wholly-owned subsidiary of Citigroup Inc. ("Citigroup").  CFPI and its subsidiaries provide investment banking, asset management, brokerage, securities trading, advisory and other financial services to customers, and engage in proprietary trading activities for their own account.

See "Risk Factors—Conflicts of Interest Involving the Swap Counterparty and Its Affiliates."  The Swap Counterparty will have certain rights under the Indenture and with respect to the Trust Estate which may be exercised without regard to the interests of the Noteholders.  See "Risk Factors—Subordination of Payment and Control."

**The Swap Guarantor**

CGMHI and its subsidiaries are a global, full-service investment banking and securities brokerage firm.  CGMHI provides a full range of financial advisory, research and capital raising services to corporations, governments and individuals.

CGMHI operates through its subsidiaries in three business segments: (i) Investment Services, (ii) Private Client Services and (iii) Asset Management.  CGMHI provides investment banking, securities and commodities trading, capital raising, asset management, advisory, research, brokerage and other financial services to its customers and executes proprietary trading strategies on its own behalf.  As used in this section, unless the context otherwise requires, CGMHI refers to Citigroup Global Markets Holdings Inc. and its consolidated subsidiaries.

Citigroup, CGMHI's parent, is a diversified holding company whose businesses provide a broad range of financial services to consumer and corporate customers around the world.  Citigroup's activities are conducted through the Global Consumer, Global Corporate and Investment Bank, Private Client Services, Global Investment Management and Proprietary Investment Activities business segments.

CGMHI's global investment banking services encompass a full range of capital market activities, including the underwriting and distribution of debt and equity securities for United States and foreign corporations and for state, local and other governmental and government sponsored authorities.  CGMHI frequently acts as an underwriter or private placement agent in corporate and public securities offerings and provides alternative financing options.  It also provides financial advice to investment banking clients on a wide variety of transactions including mergers and acquisitions, divestitures, leveraged buyouts, financial restructurings and a variety of cross-border transactions.

Private Client Services provides investment advice, financial planning and brokerage services to affluent individuals, small and mid-size companies, and non-profit and large corporations primarily through the network of Smith Barney Financial Consultants.  In addition, Private Client Services provides independent client-focused research to individuals and institutions around the world.

The portion of Citigroup's Asset Management segment housed within CGMHI is comprised primarily of two asset management business platforms: Salomon Brothers Asset Management and Smith Barney Asset Management (the "Asset Management Group") .  These platforms offer a broad range of asset management products and services from global investment centers, including mutual funds, closed-end funds and managed accounts.  In addition, the Asset Management Group offers a broad range of unit investment trusts.

CGMHI is subject to the informational requirements of the Exchange Act and in accordance therewith files reports and other information with the Commission.  Reports and other information filed by CGMHI with the Commission pursuant to the informational requirements of the Exchange Act can be inspected and copied at the public reference facilities maintained by the Commission at Room 1024, Judiciary Plaza, 450 Fifth Street, N.W., Washington,

010703

D.C. 20549.  Copies of such material can also be maintained upon written request addressed to the Commission, Public Reference Section, Room 1024, 450 Fifth Street, N.W., Washington, D.C. 20549, at prescribed rates.  The Commission maintains a web site on the internet at http://www.sec.gov containing reports, proxy statements and other information regarding registrants that file electronically with the Commission.

The principal offices of CGMHI are located at 388 Greenwich Street, New York, New York 10013, telephone number (212) 816-6000.  CGMHI was incorporated in New York in 1977.

010704

## THE REFERENCE PORTFOLIO MANAGER AND THE REFERENCE PORTFOLIO MANAGEMENT AGREEMENT

As described herein, the Reference Portfolio Manager will act solely on behalf of the Swap Counterparty and will not act or be deemed to act on behalf of the Issuer or Holders of Securities. Neither the Issuer nor the Holders of Securities will have any rights, as third party beneficiary or otherwise, against the Reference Portfolio Manager under the Swap Agreement or the Reference Portfolio Management Agreement, and the Reference Portfolio Manager will have no liability to the Issuer or the Holders of Securities thereunder. The Issuer and the Holders of Securities will have no direct recourse against the Reference Portfolio Manager as a result of action or inaction by the Reference Portfolio Manager thereunder. Actions taken by the Reference Portfolio Manager (on behalf of the Swap Counterparty) may, through the Swap Agreement, have an effect on the Securities. The disclosure with respect to the Reference Portfolio Manager is included solely for the purpose of allowing prospective investors to understand such effects. *See "Risk Factors—Role of the Reference Portfolio Manager."*

**The Reference Portfolio Manager**

Based in Dallas, Texas, Highland Capital Management, L.P. ("Highland Capital") is a registered investment adviser specializing in below investment grade credit and special situation investing. As of March 31, 2004, Highland Capital managed over $9.0 billion in leveraged loans, high yield bonds, structured products and other assets for banks, insurance companies, pension plans, foundations, and high net worth individuals.

As of March 31, 2004, Highland Capital employed 32 investment professionals covering 44 industries with over 600 credits owned and 750 credits followed. Portfolios as of March 31, 2004 include 12 structured investment vehicles (including 7 CLOs), separate accounts, and 5 hedge funds. Additionally, Highland Capital manages two closed-end registered investment companies listed on the NYSE.

Investment Philosophy and Process

Highland Capital's investment philosophy is based on the belief that fundamental research and disciplined asset acquisition/disposition produce superior long-term results. Highland Capital's investment approach seeks to generate superior performance with muted volatility. The investment approach is a top-down approach as advocated by the Institute for Chartered Financial Analysts. Highland Capital anticipates long-term secular trends and identifies those sectors and issues that have the highest relative value characteristics. Highland Capital's process and philosophy have been consistent over time.

Highland Capital has a large range and depth of experience. It has expertise in syndicated loans, high yield bonds, and distressed investments. Highland Capital believes it is in a position to arbitrage disparities in the historical spread relationship between various below investment grade asset classes. Highland Capital believes that, historically, the most inefficient asset classes have demonstrated the best risk/return characteristics.

Highland Capital has invested over $140 million of firm capital in its funds, and expects that one of its Affiliates or funds will invest $20 million in the Income Notes of the Issuer. Additionally, Highland Capital believes that it strives to minimize operating expenses and hires the brightest and most talented professionals, insisting on a high degree of dedication and integrity.

Highland Capital believes that its disciplined investment process minimizes a portfolio's risk and that its strategy seeks to maximize current yield over capital appreciation while limiting downside risk. Portfolio managers actively follow each credit and several times each year the entire investment staff reviews all positions during multi-day Monitoring Meetings. We will look to sell a security or remove a reference obligation if it is fully valued or if a significant fundamental change occurs. Highland Capital diversifies its portfolios with set limits on exposure to any one given industry or issuer. Highland Capital believes that this philosophy and process has resulted in positive returns in 43 of the last 45 quarters on its underlying loan portfolio and consistent outperformance relative to its indices.

Highland Capital focuses on a "team" approach that it has used since the investment team started in 1990. It is Highland Capital management's belief that this style creates the optimum environment for the exchange of information and the development of all investment professionals. All aspects of the investment process are coordinated through the team's direct interaction. The investment team meets every morning to discuss the market,

010705

investment strategy, and credits. In addition, the firm maintains an "informal" open door policy with regards to investment or personal issues. The team is composed of senior management and portfolio managers/analysts. Collectively, the team utilizes an investment process which is driven by fundamental credit research. Each portfolio manager/analyst makes specific credit recommendations based upon industry coverage. The investment proposal is then brought to the investment team for consideration. Based upon the consensus decision, the portfolio manager with the recommendation will execute the trade.

Highland Capital has also provided its investment team with a strong commitment to technology. The firm developed Wall Street Office® which is a proprietary software system that allows Highland Capital to model, portfolio manage, and trade syndicated loans. This software has been licensed to more than 70 financial institutions that invest in syndicated loans.

Biographies of Certain Key Individuals

Set forth below is information regarding certain persons who are currently employed by the Reference Portfolio Manager. Such persons may not necessarily continue to be so employed during the entire term of the Reference Portfolio Management Agreement.

**James Dondero, CFA, CPA, CMA** - *President*
Mr. Dondero is a Founder and President of Highland Capital Management, L.P. He serves on the boards of several corporations including Genesis Health Ventures, Audio Visual Services, and Leap Wireless. Formerly, Mr. Dondero served as Chief Investment Officer of Protective Life's GIC subsidiary and helped grow the business from concept to over $2 billion between 1989 and 1993. His portfolio management experience includes mortgage-backed securities, investment grade corporates, leveraged bank loans, emerging markets, derivatives, preferred stocks and common stocks. From 1985 to 1989, he managed approximately $1 billion in fixed income funds for American Express. Mr. Dondero is a Beta Gamma Sigma graduate of the University of Virginia with degrees in Accounting and Finance. He completed financial training at Morgan Guaranty Trust Company. Mr. Dondero is a Certified Public Accountant, Chartered Financial Analyst and a Certified Management Accountant.

**Mark Okada, CFA** - *Chief Investment Officer*
Mr. Okada has over 19 years of experience in the leveraged finance market. He is responsible for overseeing Highland Capital's investment activities for its various funds. Formerly, Mr. Okada served as Manager of Fixed Income for Protective Life's GIC subsidiary from 1990 to 1993. He was primarily responsible for the bank loan portfolio and other risk assets. Protective was one of the first non-bank entrants into the syndicated loan market. From 1986 to 1990, he served as Vice-President, managing over $1 billion of high yield bank loans, for Hibernia National Bank. Mr. Okada is an honors graduate of the University of California Los Angeles with degrees in Economics and Psychology. He completed his credit training at Mitsui and is a Chartered Financial Analyst. Mr. Okada is also Chairman of the Board of Directors of Common Grace Ministries Inc.

**Jack Yang** - *Head of Business Development*
Mr. Yang is responsible for new product development, fundraising, and investor relations, and heads the firm's New York office. Prior to joining Highland Capital, he was Managing Director and Global Head of Leveraged Finance Products at Merrill Lynch. He joined Merrill Lynch in 1994 to establish the firm's syndicated loan activities and co-headed the firm's Global Leveraged Finance Division from 1999 to 2001. In addition to heading the syndicated loan activities of the firm, while at Merrill Lynch he had significant responsibility for establishing and managing the $1.5 billion ML Bridge Loan Fund, the $1.1 billion ML Mezzanine Fund, and the European Leveraged Finance Group. He was a senior member of the firm's Debt Markets Commitment Committee and Mezzanine Investment Committee. Prior to joining Merrill, he spent 11 years at Chemical Securities, Inc. and was a founding member of the Global Syndicated Finance Division. He earned a BA from Cornell University and an MBA from Columbia University. He is a Registered Representative with Series 7, 63, and 24 licenses.

**Todd Travers, CFA** – *Partner - Senior Portfolio Manager*
Mr. Travers is the primary portfolio manager for Highland's par debt funds, a member of the Credit Committee, and heads a team that is responsible for structuring new transactions and implementing additional opportunities in Highland's core businesses. Formerly, Mr. Travers served as Portfolio Manager/Portfolio Analyst from 1994 to 1998 for Highland. In 1999, he was promoted to Senior Portfolio Manager and his duties were expanded beyond sector portfolio management to include the origination, structuring and issuance of new structured vehicles, including Highland Loan Funding V Ltd. and Restoration Funding Ltd. His prior responsibilities included

managing a portion of Highland's leveraged loan and high yield debt portfolios with an emphasis on technology and aviation transactions. Prior to joining Highland, Mr. Travers was a Finance Manager at American Airlines. Mr. Travers is a graduate of Iowa State University with a BS in Industrial Engineering. He received his MBA with an emphasis in Finance from Southern Methodist University. Mr. Travers is a Chartered Financial Analyst.

**Brad Borud** - *Senior Trader*

Mr. Borud is a Senior Trader for loan and high yield credit products. Prior to his current duties, Mr. Borud served as a Portfolio Analyst for Highland Capital from 1996 to 1998 and afterward as a Portfolio Manager covering a wide range of industries, including Wireline Telecommunications, Wireless Telecommunications, Telecommunication Equipment Manufacturers, Multi-channel Video, and Media. Prior to joining Highland Capital, Mr. Borud worked as a Global Finance Analyst in the Corporate Finance Group at NationsBank from 1995 to 1996 where he was involved in the originating, structuring, modeling, and credit analysis of leveraged transactions for large corporate accounts in the Southwest portion of the United States. Formerly, Mr. Borud served at Conseco Capital Management in the Fixed Income Research Department following the Transportation and Energy sectors. He has a BS in Business Finance from Indiana University and is a CFA Level III Candidate.

**David Walls, CFA** - *Portfolio Manager, Distressed*

Mr. Walls is a Portfolio Manager covering the Cable, Building Materials and Equipment Rental sectors. Prior to joining Highland, Mr. Walls worked at Lend Lease Real Estate Investments (LLREI) in their Asset Management unit where, as an Associate, he participated in the underwriting and acquisition of bulk portfolios of distressed Korean real estate and corporate debt. Before his international responsibilities at LLREI, Mr. Walls performed loan workouts on a domestic portfolio of sub- and non-performing real estate secured assets. Prior to joining Lend Lease, Mr. Walls worked at U.S. Trust Company of California as an Assistant Vice President, Junior Portfolio Manager in their Fixed Income Portfolio Management group. He holds a BA in Economics from Northwestern University and an MBA in Finance and Marketing from the Kellogg School of Management at Northwestern University. Mr. Walls is a member of AIMR and DAIA. Mr. Walls is a Chartered Financial Analyst.

**John Morgan, CFA** - *Senior Portfolio Manager*

Mr. Morgan is a Senior Portfolio Manager covering the Retail, Food & Drug, and Steel sectors. Prior to joining Highland, Mr. Morgan served as Portfolio Analyst for Falcon Fund Management, LTD from August 1995-February 2000. There he created comparables to assess the attractiveness of companies within industries and across the portfolio. He assisted the portfolio manager in the security selection process and management of the portfolio. Prior to Falcon, he was an Analyst for a Convertible Arbitrage Fund at Q Investments. His primary responsibility included analyzing financial statements and related corporate disclosures and performing analysis on potential investment opportunities. He received both a BS in Biological Sciences and an MBA from Southern Methodist University.

**Joe Dougherty, CFA, CPA** - *Senior Portfolio Manager: Chemicals*

Mr. Dougherty served as Portfolio Analyst from 1998 to 1999 at Highland Capital. From 1997-1998, he served as an Investment Analyst with Sandera Capital Management. Prior to this, he was a summer associate at Enron Capital and Trade Resources in their Corporate Development Department. Mr. Dougherty also worked as a Business Development Manager at Akzo Nobel from 1994 to 1996 and a Senior Accountant at Deloitte & Touche, LLP from 1992 to 1994. He received a BS in Accounting from Villanova University and an MBA from Southern Methodist University.

**Kurtis Plumer, CFA** - *Senior Portfolio Manager: Energy & Food Processors*

From 1996-1999, Mr. Plumer served as a High Yield Trader for Lehman Brothers in New York. His primary responsibilities were to analyze and trade high yield corporate bonds from Latin America and Asia. He traded securities issued by companies in a wide variety of industries, particularly focusing on media/telecom, energy and utility/project finance. From 1990-1994, Mr. Plumer was employed as a Corporate Finance Associate at NationsBanc Capital Markets (now Bank of America Securities) where he analyzed, structured and executed mergers, and acquisitions and finance transactions. Mr. Plumer is a graduate of Baylor University with a BBA in Economics and Finance. He received his MBA in Management/Strategy and Finance from Northwestern University.

**Patrick H. Daugherty** - *Senior Portfolio Manager & General Counsel*

Mr. Daugherty served as a Portfolio Analyst from 1998 to 1999 for Highland Capital. Prior to joining Highland Capital, Mr. Daugherty served as Vice President in the Corporate Finance Group at NationsBanc Capital Markets, Inc. (now Bank of America) from 1993 to 1998. There he originated and structured leveraged transactions for a

portfolio of mid-cap companies located in the Southwest. Prior to joining Bank of America, he was an Associate with the law firm of Baker, Brown, Sharman and Parker in Houston, Texas. He received a BBA in Finance from the University of Texas at Austin and a Jurist Doctorate from the University of Houston School of Law. Professional certifications include membership in the Texas Bar Association and admittance to the American Bar Association in 1992. He is a CFA Level II Candidate.

**Paul Kauffman, CFA, CPA** - *Senior Trader*

Mr. Kauffman is a Senior Trader for loan and high yield credit products. Additionally, Mr. Kauffman oversees the investment activities of Highland Capital's long/short equity fund. Prior to his current duties, Mr. Kauffman served as a Portfolio Analyst from 1998 to 1999 and afterward as a Portfolio Manager covering a wide range of industries, including Paper and Packaging as well as General Industrials. Formerly, Mr. Kauffman was a Supervising Senior Accountant at KPMG Peat Marwick LLP from 1994 to 1996. Prior to this, he was a Staff Accountant at Pattillo, Brown & Hill CPAs from 1992 to 1994. He received a BBA in Accounting from Baylor University and an MBA from Duke University. Mr. Kauffman is a Chartered Financial Analyst and a Certified Public Accountant.

*See "Risk Factors—Effect of Decisions of the Reference Portfolio Manager on the Securities."*

**The Reference Portfolio Management Agreement**

*The following summary generally describes certain provisions of the Reference Portfolio Management Agreement. The summary does not purport to be complete and is subject to, and is qualified in its entirety by reference to, the provisions of the Reference Portfolio Management Agreement, which is incorporated herein by reference.*

Subject to the terms of the Reference Portfolio Management Agreement, the Reference Portfolio Manager will select the initial Reference Portfolio, make decisions to remove and add Reference Obligations under the Swap Agreement (including, in the case of an addition, the determination of the Reference Price and with respect to a removal, the determination of the Final Price and the related Obligation Value Reduction Amount or Obligation Value Increase Amount), provide to the Collateral Administrator on behalf of the Swap Counterparty certain information specified in the Collateral Administration Agreement and review the reports prepared pursuant to the Indenture and the Collateral Administration Agreement. *See "Description of the Securities—The Indenture and the Collateral Administration Agreement—Reports."* The Reference Portfolio Manager will act under the Reference Portfolio Management Agreement as the agent of and on behalf of the Swap Counterparty and not on behalf of the Issuer. Any actions directed by the Reference Portfolio Manager may change the composition and characteristics of the Reference Portfolio and the rate of payment thereon and, accordingly, may affect, through the Swap Agreement, the return to the Holders of the Securities. *See "Risk Factors—Conflicts of Interest Involving the Reference Portfolio Manager" and "—Role of the Reference Portfolio Manager."*

The Reference Portfolio Manager may engage in other business and furnish investment management, advisory and other types of services to its Affiliates and other clients whose investment policies differ from, or are the same as, those followed by the Reference Portfolio Manager on behalf of the Swap Counterparty, as required by the Reference Portfolio Management Agreement and the Swap Agreement. The Reference Portfolio Manager may make recommendations to or effect transactions for such Affiliates and other clients which may differ from those effected with respect to the Swap Agreement. *See "Risk Factors—Conflicts of Interest Involving the Reference Portfolio Manager."*

As compensation for the performance of its obligations under the Reference Portfolio Management Agreement, the Swap Counterparty will be obligated, as provided in the Reference Portfolio Management Agreement, to pay to the Reference Portfolio Manager on each Payment Date fees in an amount equal to the sum of the Base Amount, the Subordinate Amount, if any, and the Incentive Amount, if any, for such date. Such amounts will accrue if unpaid and be payable on the next Payment Date on which funds are available therefor as described in the definitions thereof. The Base Amount and the Subordinate Amount will accrue interest at a rate of LIBOR plus 3.0% per annum if deferred.

The Swap Counterparty has agreed to reimburse the Reference Portfolio Manager for certain expenses and other amounts to the extent and only to the extent the Swap Counterparty receives compensation for such amounts from the Issuer as Administrative Expenses. The Reference Portfolio Manager will be responsible for its ordinary

010708

expenses incurred in the course of performing its obligations under the Reference Portfolio Management Agreement; *provided, however*, that in no event shall the Reference Portfolio Manager be liable for the fees, expenses and costs of legal advisers, rating agencies, accountants, auditors, recordkeepers and other professionals retained by the Swap Counterparty.

The Reference Portfolio Manager will not be liable for any loss incurred as a result of the actions taken or recommended by the Reference Portfolio Manager under the Reference Portfolio Management Agreement or the Swap Agreement, or for any other act or omission by the Reference Portfolio Manager in the performance of its obligations under the Reference Portfolio Management Agreement and the Swap Agreement or otherwise in any event whatsoever, except by reason of acts or omissions constituting bad faith, fraud, willful misconduct, gross negligence or breach of fiduciary duty in the performance of, or reckless disregard of, its duties and obligations thereunder and under the provisions of the Swap Agreement applicable to it. Neither the Issuer nor the Holders of the Securities will have any rights, as third party beneficiaries or otherwise, against the Reference Portfolio Manager under the Swap Agreement or the Reference Portfolio Management Agreement and the Reference Portfolio Manager will have no liability to the Issuer or the Holders of the Securities under either such agreement. The Issuer and the Holders of Securities will have no direct recourse against the Reference Portfolio Manager as a result of action or inaction by the Reference Portfolio Manager under the Reference Portfolio Management Agreement or the Swap Agreement. The Swap Counterparty and its agents and each of their respective shareholders, officers, directors, employees or agents will be entitled to indemnification (or, in certain cases, contribution) by the Issuer from and against any and all loss, liability, claim, damage and expense of any kind incurred by any of them in connection with the Swap Agreement or the Reference Portfolio Manager's engagement under the Reference Portfolio Management Agreement or as a result of the Reference Portfolio Manager's performance of its obligations and duties under the Reference Portfolio Management Agreement or under the Swap Agreement, except as may result from the Reference Portfolio Manager's bad faith, fraud, willful misconduct, gross negligence or breach of fiduciary duty in the performance, or reckless disregard, of its duties, under the Reference Portfolio Management Agreement. These amounts will be Administrative Expenses, which will be paid in accordance with the Priority of Payments. The Swap Counterparty has agreed to reimburse the Reference Portfolio Manager for certain such losses, liabilities, claims, damages and expenses to the extent the Swap Counterparty receives such amounts from the Issuer.

Subject to the following provisions regarding removal or resignation of the Reference Portfolio Manager, the Reference Portfolio Management Agreement will be entered into on the Closing Date for a term until the termination date of the Swap Agreement unless sooner terminated. The Reference Portfolio Manager may be removed under the following circumstances:

(1)     The Issuer may request the Swap Counterparty to remove the Reference Portfolio Manager without cause, upon not less than 90 days' prior written notice to the Reference Portfolio Manager, upon the vote of at least 66 2/3% (in Aggregate Principal Amount) of the Income Notes and at least 66 2/3% (in Aggregate Principal Amount) of each Class of Senior Notes. Upon receipt of such a request, the Swap Counterparty, in its sole discretion, may, but will not be obligated to, remove the Reference Portfolio Manager.

(2)     The Swap Counterparty will have the right in its sole discretion to remove the Reference Portfolio Manager for cause at any time, as specifically set forth in the Reference Portfolio Management Agreement (including the bankruptcy or insolvency of the Reference Portfolio Manager or fraud or criminal violation by the Reference Portfolio Manager). The Issuer may request the Swap Counterparty to remove the Reference Portfolio Manager for cause at any time, upon the vote of at least 66 2/3% (in Aggregate Principal Amount) of each Class of Senior Notes and at least 66 2/3% (in Aggregate Principal Amount) of the Income Notes. Upon receipt of such a request, the Swap Counterparty may, but will not be obligated to, remove the Reference Portfolio Manager.

The Reference Portfolio Manager may terminate the Reference Portfolio Management Agreement at any time upon not less than 90 days' written notice to the Swap Counterparty and each Rating Agency. No resignation or removal of the Reference Portfolio Manager will be effective until a successor Reference Portfolio Manager has been appointed in accordance with the Reference Portfolio Management Agreement and such successor reference portfolio manager accepts such appointment. The Swap Counterparty may, but is not obligated to, consult with the

010709

Issuer when selecting a replacement Reference Portfolio Manager. If so consulted, the Issuer will follow the instructions of the Holders of a majority (in Aggregate Principal Amount) of Income Notes; *provided* that the Issuer shall not follow such direction as to any replacement Reference Portfolio Manager if the Holders of at least 66 2/3% of the Aggregate Principal Amount of each Class of Senior Notes object to such replacement Reference Portfolio Manager. Securities beneficially owned (whether acquired on the Closing Date or at any time subsequent thereto) by the Reference Portfolio Manager or any of its Affiliates or by an account or fund for which the Reference Portfolio Manager or an Affiliate acts as the investment advisor with discretionary authority shall be disregarded and deemed not to be Outstanding and may not be voted with respect to any such vote as to the removal or replacement of the Reference Portfolio Manager. If within 90 days following a notice of resignation or a notice of removal no replacement Reference Portfolio Manager has been appointed and accepted such appointment, the Reference Portfolio Manager may petition a court of competent jurisdiction for the appointment of a replacement Reference Portfolio Manager.

The Reference Portfolio Manager may direct the Swap Counterparty to extend the Portfolio Modification Period and the term of the Swap Agreement in accordance with the provisions of the Swap Agreement, and the Swap Counterparty has agreed to follow that direction, subject to the satisfaction of the Extension Conditions. *See "Description of the Swap Agreement—Extension of the Swap Agreement" and "Description of the Securities— Maturity of the Notes and Class Q-1 Securities and Extension of Maturity of the Notes and Class Q-1 Securities.*

The Reference Portfolio Manager may request the Swap Counterparty to elect to effect an Amendment Buy-Out. The Swap Counterparty has agreed to follow such a request subject to certain conditions. *See "Description of the Securities—Amendment Buy-Out."*

010710

**PURCHASE AND TRANSFER RESTRICTIONS**

The Securities have not been and will not be registered under the Securities Act or any state "Blue Sky" laws or the securities laws of any other jurisdiction and, accordingly, may not be reoffered, resold, pledged or otherwise transferred except in accordance with the restrictions set forth in the Indenture and described under *"Notices to Purchasers"* and below.

Without limiting the foregoing, by holding a Security, each Holder of Securities will acknowledge and agree, among other things, that such Holder of Securities understands that neither of the Issuers is registered as an investment company under the Investment Company Act, but that the Issuer claims exemption from registration as such by virtue of Section 3(c)(7) of the Investment Company Act. In general terms, Section 3(c)(7) excepts from the provisions of the Investment Company Act those non-U.S. issuers (i) whose investors residing in the United States are Qualified Purchasers and (ii) which do not make a public offering of their securities in the United States. In general terms, Qualified Purchaser is defined to mean, among other things, (i) natural persons who own not less than U.S. $5,000,000 in "investments"; (ii) a company that owns not less than U.S. $5,000,000 in "investments" and that is owned directly or indirectly by or for two or more natural persons who are related as siblings or spouses (including former spouses), or direct lineal descendants by birth or adoption, spouses of such persons, the estates of such persons, or foundations, charitable organizations, or trusts established by or for the benefit of such persons; (iii) certain trusts that were not formed for the specific purposes of acquiring the securities offered, as to which the trustee or other person authorized to make decisions with respect to the trust, and each settlor or other person who has contributed assets to the trust, is a qualified purchaser (other than certain trusts); and (iv) any person, acting for its own account or the accounts of other qualified purchasers, who in the aggregate owns and invests on a discretionary basis, not less than U.S. $25,000,000 in "investments." For purposes of the definition of "qualified purchaser," "investments" has the meaning given such term in Rule 270.2a51-1 under the Investment Company Act. *See "Risk Factors—Investment Company Act Considerations."*

**Senior Notes**

<u>Legend</u>

Unless determined otherwise by the Issuers in accordance with applicable law and so long as any Class of Senior Notes is outstanding, the Senior Notes will bear a legend substantially as set forth below:

"THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), ANY STATE SECURITIES LAWS IN THE UNITED STATES OR THE SECURITIES LAWS OF ANY OTHER JURISDICTION AND THE ISSUERS HAVE NOT REGISTERED UNDER THE U.S. INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "INVESTMENT COMPANY ACT"). THE HOLDER HEREOF, BY ITS ACCEPTANCE OF THIS NOTE, REPRESENTS THAT IT HAS OBTAINED THIS NOTE IN A TRANSACTION IN COMPLIANCE WITH THE SECURITIES ACT, THE INVESTMENT COMPANY ACT AND ALL OTHER APPLICABLE LAWS OF THE UNITED STATES OR ANY OTHER JURISDICTION, AND THE RESTRICTIONS ON SALE AND TRANSFER SET FORTH IN THE INDENTURE. THE HOLDER HEREOF, BY ITS ACCEPTANCE OF THIS NOTE, FURTHER REPRESENTS, ACKNOWLEDGES AND AGREES THAT IT WILL NOT REOFFER, RESELL, PLEDGE OR OTHERWISE TRANSFER THIS NOTE (OR ANY INTEREST HEREIN) EXCEPT IN COMPLIANCE WITH THE SECURITIES ACT, THE INVESTMENT COMPANY ACT AND ALL OTHER APPLICABLE LAWS OF ANY JURISDICTION AND IN ACCORDANCE WITH THE CERTIFICATIONS AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN (A) TO A TRANSFEREE (1) THAT IS A "QUALIFIED PURCHASER" WITHIN THE MEANING OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT, (2) THAT (i) WAS NOT FORMED FOR THE PURPOSE OF INVESTING IN THE NOTES, (ii) HAS RECEIVED THE NECESSARY CONSENT FROM ITS BENEFICIAL OWNERS IF THE PURCHASER IS A PRIVATE INVESTMENT COMPANY FORMED BEFORE APRIL 30, 1996, (iii) IS NOT A BROKER-DEALER THAT OWNS AND INVESTS ON A DISCRETIONARY BASIS LESS THAN U.S. $25,000,000 IN SECURITIES OF UNAFFILIATED ISSUERS, (iv) IS NOT A PARTNERSHIP, COMMON TRUST FUND, SPECIAL TRUST, PENSION, PROFIT SHARING OR OTHER RETIREMENT TRUST FUND

010711

OR PLAN IN WHICH THE PARTNERS, BENEFICIARIES OR PARTICIPANTS, AS APPLICABLE, MAY DESIGNATE THE PARTICULAR INVESTMENTS TO BE MADE, (v) IS ACQUIRING ITS NOTES IN A TRANSACTION THAT MAY BE EFFECTED WITHOUT LOSS OF ANY APPLICABLE INVESTMENT COMPANY ACT EXEMPTION AND (vi) AGREES TO PROVIDE NOTICE TO ANY SUBSEQUENT TRANSFEREE OF THE TRANSFER RESTRICTIONS APPLICABLE TO THIS NOTE PROVIDED IN THIS LEGEND AND THE INDENTURE AND (3) THAT IS A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A "QUALIFIED INSTITUTIONAL BUYER" IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, OR (B) TO A TRANSFEREE THAT IS NOT A U.S. PERSON (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) AND IS ACQUIRING THIS NOTE IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURITIES ACT, AND, IN THE CASE OF BOTH CLAUSES (A) AND (B), IN A PRINCIPAL AMOUNT OF NOT LESS THAN THE APPLICABLE MINIMUM DENOMINATION.

EACH PURCHASER OR TRANSFEREE OF THIS NOTE WILL BE DEEMED TO HAVE MADE THE REPRESENTATIONS AND AGREEMENTS SET FORTH IN THE INDENTURE OR AN EXHIBIT THERETO.

THIS NOTE IS TRANSFERABLE ONLY IN ACCORDANCE WITH THE RESTRICTIONS DESCRIBED HEREIN. ANY SALE OR TRANSFER IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE AND EFFECT, WILL BE VOID *AB INITIO*, AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE TRANSFEREE, NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE ISSUERS, THE TRUSTEE OR ANY INTERMEDIARY. EACH TRANSFEROR OF THIS NOTE AGREES TO PROVIDE NOTICE OF THE TRANSFER RESTRICTIONS SET FORTH HEREIN AND IN THE INDENTURE TO THE TRANSFEREE. IN ADDITION TO THE FOREGOING, THE ISSUER MAINTAINS THE RIGHT TO COMPEL THE RESALE OF ANY INTEREST IN THIS NOTE PREVIOUSLY TRANSFERRED TO OR HELD BY ANY NON-PERMITTED HOLDER IN ACCORDANCE WITH AND SUBJECT TO THE TERMS OF THE INDENTURE.

IN ADDITION, A HOLDER MAY BE REQUIRED TO SELL ITS INTEREST IN THIS NOTE AS PROVIDED IN THE INDENTURE IF IT DOES NOT CONSENT TO AMENDMENTS TO THE INDENTURE OR THE SWAP AGREEMENT.

FURTHER, NO SALE OR TRANSFER OF THIS NOTE (OR ANY INTEREST HEREIN) MAY BE MADE UNLESS SUCH SALE OR TRANSFER WILL NOT CONSTITUTE OR RESULT IN A PROHIBITED TRANSACTION UNDER SECTION 406 OF THE U.S. EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), OR SECTION 4975 OF THE U.S. INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE") (OR, IN THE CASE OF A GOVERNMENTAL PLAN, ANY SUBSTANTIALLY SIMILAR FEDERAL, STATE OR LOCAL LAW) FOR WHICH AN EXEMPTION IS NOT AVAILABLE, ALL OF THE CONDITIONS OF WHICH ARE SATISFIED."

**Transferees of Interests in Rule 144A Global Notes**

Each initial purchaser and subsequent transferee who is purchasing an interest in a Rule 144A Global Note will be deemed to have represented and agreed as follows:

1.  It (a) is a Qualified Institutional Buyer and is acquiring the Notes in reliance on the exemption from Securities Act registration provided by Rule 144A thereunder, (b) is a Qualified Purchaser and (c) understands the Notes will bear the legend set forth above and be represented by one or more Rule 144A Global Notes. In addition, it represents and warrants that it (i) was not formed for the purpose of investing in the Notes, (ii) has received the necessary consent from its beneficial owners if the purchaser is a private investment company formed before April 30, 1996, (iii) is not a broker-dealer that owns and invests on a discretionary basis less than U.S. $25,000,000 in

010712

securities of unaffiliated issuers, (iv) is not a partnership, common trust fund, special trust, pension, profit sharing or other retirement trust fund or plan in which the partners, beneficiaries or participants, as applicable, may designate the particular investments to be made, (v) is acquiring its Notes in a transaction that may be effected without loss of any applicable Investment Company Act exemption, (vi) will provide notice to any subsequent transferee of the transfer restrictions applicable to such Notes under the Indenture or provided in the legend of such Notes, (vii) will hold and transfer its beneficial interest in any Note only in a principal amount of not less than the applicable minimum denomination and (viii) will provide the Issuer from time to time such information as it may reasonably request in order to ascertain compliance with this paragraph 1.

2.      The Notes are being purchased or transferred in accordance with the transfer restrictions set forth in the Indenture and pursuant to an exemption from Securities Act registration, and in accordance with applicable state securities laws or securities laws of any other relevant jurisdiction. It understands that the Notes have been offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act, the Notes have not been and will not be registered under the Securities Act or the securities laws of any states, and, if in the future it decides to offer, resell, pledge or otherwise transfer the Notes, such Notes may be offered, resold, pledged or otherwise transferred only in accordance with an exemption from registration under such laws and pursuant to the provisions of the Indenture and the legend on such Notes. In particular, it understands that interests in the Notes may be transferred only to (a) a Qualified Purchaser that is a Qualified Institutional Buyer or (b) a person that is not a "U.S. person" as defined in Regulation S under the Securities Act. Purchasers and transferees who reside in certain states or jurisdictions may be subject to additional suitability standards and/or specific holding periods before the Notes may be resold or otherwise transferred. It acknowledges that no representation is made as to the availability of any exemption under the Securities Act or any state or other securities laws for resale of the Notes.

3.      In connection with the purchase of the Notes (*provided* that no such representations in clauses (a), (b) or (c) below are made with respect to the Reference Portfolio Manager or its Affiliates by the Reference Portfolio Manager or any Affiliate of the Reference Portfolio Manager or by any account managed or advised by the Reference Portfolio Manager or any Affiliate of the Reference Portfolio Manager): (a) it understands that none of the Issuers, the Reference Portfolio Manager, the Swap Counterparty, the Swap Guarantor, the Initial Purchaser, the Placement Agent, the Collateral Administrator, the Amendment Buy-Out Purchaser or any of their respective Affiliates is acting as a fiduciary or financial or investment adviser for such beneficial owner; (b) such beneficial owner is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral) of the Issuers, the Reference Portfolio Manager, the Swap Counterparty, the Swap Guarantor, the Initial Purchaser, the Placement Agent, the Trustee, the Collateral Administrator, the Amendment Buy-Out Purchaser or any of their respective Affiliates or agents and independent contractors in their capacities as such other than statements, if any, of such person in a current offering circular for the Notes; (c) such beneficial owner has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisers to the extent it has deemed necessary and has made its own investment decisions based upon its own judgment and upon any advice from such advisers as it has deemed necessary and not upon any view expressed by the Issuers, the Reference Portfolio Manager, the Swap Counterparty, the Swap Guarantor, the Initial Purchaser, the Placement Agent, the Trustee, the Collateral Administrator, the Amendment Buy-Out Purchaser or any of their respective Affiliates or agents and independent contractors in their capacities as such; (d) such beneficial owner's purchase of the Notes will comply with all applicable laws in any jurisdiction in which it resides or is located; (e) such beneficial owner is acquiring the Notes as principal solely for its own account for investment and not with a view to the resale, distribution or other disposition thereof in violation of the Securities Act; (f) such beneficial owner has made investments prior to the date hereof and was not formed solely for the purpose of investing in the Notes; (g) such beneficial owner shall not hold any Notes for the benefit of any other person, it shall at all times be the sole beneficial owner thereof for purposes of the Investment Company Act and all other purposes and it shall not sell participation interests in the Notes or enter into any other arrangement pursuant to which any other person shall be entitled to a beneficial interest in the

010713

distributions on the Notes; (h) all Notes (together with any other securities of the Issuers) purchased and held directly or indirectly by such beneficial owner constitute in the aggregate an investment of no more than 40% of its assets or capital and (i) it is a sophisticated investor and is purchasing the Notes with a full understanding of all of the terms, conditions and risks thereof, and it is capable of assuming and willing to assume those risks.

4.      On each day from the date on which such beneficial owner acquires its interest in the Notes through and including the date on which such beneficial owner disposes of its interest in such Notes, either (A) such beneficial owner is not a Plan (as defined herein), an entity whose underlying assets include the assets of any Plan by reason of Department of Labor regulation Section 2510.3-101 or otherwise, or a governmental plan that is subject to any federal, state or local law which is substantially similar to the provisions of Section 406 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code") or (B) such beneficial owner's purchase, holding and disposition of such Notes (or interest therein) will not constitute or result in a prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental plan, any substantially similar federal, state or local law) for which an exemption is not available, all of the conditions of which are satisfied.

5.      The purchaser understands that the Indenture permits the Issuer to demand that any holder of a beneficial interest in a Rule 144A Global Note who is determined not to be both a Qualified Institutional Buyer and a Qualified Purchaser sell the Notes (a) to a person who is both a Qualified Institutional Buyer and a Qualified Purchaser in a transaction meeting the requirements of Rule 144A or (b) to a Person who will take delivery of the holder's interest in the Rule 144A Global Note in the form of an interest in a Temporary Regulation S Global Note or Regulation S Global Note, as applicable, and who is not a U.S. Person in a transaction meeting the requirements of Regulation S and, if the holder does not comply with such demand within 30 days thereof, the Issuer may cause such holder of the beneficial interest to sell its interest in the Note on such terms as the Issuer may choose.

6.      The purchaser understands that in the case of any amendment to the Indenture or the Swap Agreement that requires consent of one or more holders of this Notes, the Indenture permits the Amendment Buy-Out Purchaser to purchase at a purchase price determined pursuant to the Indenture the beneficial interest in this Notes from any holder thereof that either (i) has declared in writing that it will not consent to such amendment or (ii) had not consented to such amendment by the last day on which consent could be given in accordance with the request therefor; and such holder will be required to sell its beneficial interest in this Notes to the Amendment Buy-Out Purchaser at the applicable purchase price.

7.      The purchaser understands that the maturity of this Note is subject to an extension of four years to August 1, 2020 without consent of any holders of Securities at the option of the Swap Counterparty if certain conditions are satisfied.

8.      The purchaser acknowledges that it is its intent and that it understands it is the intent of the Issuer that, for purposes of U.S. federal income, state and local income and franchise tax and any other income taxes, the Issuer will be treated as a corporation, the Senior Notes will be treated as indebtedness of the Issuer, and the Income Notes (in the absence of an administrative determination or judicial ruling to the contrary) will be treated as equity in the Issuer; the purchaser agrees to such treatment and agrees to take no action inconsistent with such treatment.

9.      The purchaser is not purchasing the Notes in order to reduce any United States federal income tax liability or pursuant to a tax avoidance plan. In the case of a purchaser that is a bank (as defined in Section 881(c)(3)(a) of the Code) or an affiliate of such a bank, the purchaser (a) is acquiring the Notes as a capital markets investment and will not for any purpose treat the assets of the Issuer as loans acquired in its banking business, and (b) has not proposed or identified, and will not propose or identify, any security or loan for inclusion in the Reference Portfolio.

10.    In the case of any purchaser that is not a United States person (as defined in Section 7701(a)(30) of the Code), the purchaser is not a bank (as defined in Section 881(c)(3)(a) of the Code) or an affiliate of such a bank, unless the purchaser is a person that is eligible for benefits under an income tax treaty with the United States that eliminates United States federal income taxation of United States source interest not attributable to a permanent establishment in the United States.

11.    It acknowledges that the Reference Portfolio Manager will act solely on behalf of the Swap Counterparty and will not act or be deemed to act on behalf of, or have any contractual relationship with, the Issuer or the Holder of Securities.

12.    It is aware that, except as otherwise provided in the Indenture, the Notes being sold to it will be represented by one or more Global Notes, and that beneficial interests therein may be held only through DTC.

13.    It acknowledges that no governmental agency has passed upon the Notes or made any finding or determination as to the fairness of an investment in the Notes.

14.    It acknowledges that certain persons or organizations will perform services on behalf of the Issuers and will receive fees and/or compensation for performing such services as described in this Offering Circular and the Indenture.

15.    It acknowledges that the Notes do not represent deposits with or other liabilities or obligations of, and are not guaranteed or endorsed by, the Swap Counterparty, the Swap Guarantor, the Placement Agent, the Initial Purchaser, the Reference Portfolio Manager, the Trustee, the Collateral Administrator, the Amendment Buy-Out Purchaser or any of their respective affiliates or any entity related to any of them or any other holder of Notes. It acknowledges that none of such persons will, in any way, be responsible for or stand behind the value or the performance of the Notes. It acknowledges that purchase of Notes involves investment risks including possible delay in payment of distributions and loss of income and principal invested.

16.    It understands that the Issuers, the Trustee, the Swap Counterparty, the Swap Guarantor, the Reference Portfolio Manager, the Initial Purchaser, the Placement Agent, the Collateral Administrator, the Amendment Buy-Out Purchaser and their respective counsel will rely upon the accuracy and truth of the foregoing representations, and it hereby consents to such reliance.

**Transferees of Interests in Temporary Regulation S Global Notes and Regulation S Global Notes**

Each initial purchaser and subsequent transferee of Senior Notes who is purchasing an interest in a Temporary Regulation S Global Note or a Regulation S Global Note will be deemed to have made the representations set forth in paragraphs (2), (3), (4), (6), (7), (8), (9), (10), (11), (13), (14) and (15) above and in addition to have further represented and agreed as follows:

1.    It is aware that the sale of Notes to it is being made in reliance on the exemption from registration provided by Regulation S and understands that the Notes offered in reliance on Regulation S will bear the legend set forth above. It and each beneficial owner of its Notes is not, and will not be, a U.S. Person as defined in Regulation S under the Securities Act, and its purchase of the Notes will comply with all applicable laws in any jurisdiction in which it resides or is located. In addition, it represents and warrants that it will (i) provide notice to any subsequent transferee of the transfer restrictions provided in such legend and in the Indenture, (ii) hold and transfer its beneficial interest in any Note only in a principal amount of not less than the applicable minimum denomination and (iii) provide the Issuer from time to time such information as it may reasonably request in order to ascertain compliance with this paragraph 1.

2.    It understands that the Indenture permits the Issuer to demand that any holder of a beneficial interest in a Temporary Regulation S Global Note or Regulation S Global Note who is determined not to have acquired such beneficial interest in compliance with the requirements of Regulation S or who is a U.S. Person sell such beneficial interest (a) to a Person who is not a U.S. Person in a

010715

transaction meeting the requirements of Regulation S or (b) to a Person who will take delivery of the holder's interest in the Temporary Regulation S Global Notes or Regulation S Global Notes in the form of an interest in a Rule 144A Global Note, who is both a Qualified Institutional Buyer and a Qualified Purchaser in a transaction meeting the requirements of Rule 144A, and, if the holder does not comply with such demand within 30 days thereof, the Issuer may cause the holder to sell its beneficial interest on such terms as the Issuer may choose.

3.     Such beneficial owner is aware that, except as otherwise provided in the Indenture, the Notes being sold to it will be represented (a) initially, by one or more Temporary Regulation S Global Notes and (b) after the Exchange Date, by one or more Regulation S Global Notes, and that beneficial interests therein may be held only through Euroclear or Clearstream.

4.     A holder of a beneficial interest in a Temporary Regulation S Global Note must provide Euroclear or Clearstream or the participant organization through which it holds such interest, as applicable, with a certificate certifying that the beneficial owner of the interest in the Temporary Regulation S Global Note is a non-U.S. Person and Euroclear or Clearstream, as applicable, must provide to the Trustee a certificate to such effect, prior to (a) the payment of interest or principal with respect to such holder's beneficial interest in the Temporary Regulation S Global Note and (b) any exchange of such beneficial interest for a beneficial interest in a Regulation S Global Note.

5.     It understands that any resale or other transfer of beneficial interests in a Temporary Regulation S Global Note or Regulation S Global Note to U.S. Persons shall not be permitted.

6.     It understands that the Issuers, the Trustee, the Swap Counterparty, the Swap Guarantor, the Reference Portfolio Manager, the Initial Purchaser, the Placement Agent, the Collateral Administrator, the Amendment Buy-Out Purchaser and their respective counsel will rely upon the accuracy and truth of the foregoing representations, and it hereby consents to such reliance.

**Income Notes**

Legend

Unless determined otherwise by the Issuer in accordance with applicable law and so long as the Income Notes are outstanding, the Income Notes will bear a legend substantially as set forth below:

"THESE INCOME NOTES HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), ANY STATE SECURITIES LAWS IN THE UNITED STATES OR THE SECURITIES LAWS OF ANY OTHER JURISDICTION AND THE ISSUER HAS NOT REGISTERED UNDER THE U.S. INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "INVESTMENT COMPANY ACT"). THE HOLDER HEREOF, BY ITS ACCEPTANCE OF THESE INCOME NOTES, REPRESENTS THAT IT HAS OBTAINED THESE INCOME NOTES IN A TRANSACTION IN COMPLIANCE WITH THE SECURITIES ACT, THE INVESTMENT COMPANY ACT AND ALL OTHER APPLICABLE LAWS OF THE UNITED STATES OR ANY OTHER APPLICABLE JURISDICTION, AND THE RESTRICTIONS ON SALE AND TRANSFER SET FORTH IN THE INDENTURE. THE HOLDER HEREOF, BY ITS ACCEPTANCE OF THESE INCOME NOTES, FURTHER REPRESENTS, ACKNOWLEDGES AND AGREES THAT IT WILL NOT REOFFER, RESELL, PLEDGE OR OTHERWISE TRANSFER THESE INCOME NOTES (OR ANY INTEREST HEREIN) EXCEPT IN COMPLIANCE WITH THE SECURITIES ACT, THE INVESTMENT COMPANY ACT AND ALL OTHER APPLICABLE LAWS OF ANY JURISDICTION AND IN ACCORDANCE WITH THE CERTIFICATIONS AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN (A) TO A TRANSFEREE (1) THAT IS A "QUALIFIED PURCHASER" WITHIN THE MEANING OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT, (2) THAT (i) WAS NOT FORMED FOR THE PURPOSE OF INVESTING IN THE ISSUER, (ii) HAS RECEIVED THE NECESSARY CONSENT FROM ITS BENEFICIAL OWNERS IF THE PURCHASER IS A PRIVATE INVESTMENT COMPANY FORMED BEFORE APRIL 30, 1996, (iii) IS NOT A BROKER-DEALER THAT OWNS AND INVESTS ON A DISCRETIONARY BASIS

010716

LESS THAN U.S. $25,000,000 IN SECURITIES OF UNAFFILIATED ISSUERS, (iv) IS NOT A PARTNERSHIP, COMMON TRUST FUND, SPECIAL TRUST, PENSION, PROFIT SHARING OR OTHER RETIREMENT TRUST FUND OR PLAN IN WHICH THE PARTNERS, BENEFICIARIES OR PARTICIPANTS, AS APPLICABLE, MAY DESIGNATE THE PARTICULAR INVESTMENTS TO BE MADE, (v) IS ACQUIRING ITS INCOME NOTES IN A TRANSACTION THAT MAY BE EFFECTED WITHOUT LOSS OF ANY APPLICABLE INVESTMENT COMPANY ACT EXEMPTION AND (vi) AGREES TO PROVIDE NOTICE TO ANY SUBSEQUENT TRANSFEREE OF THE TRANSFER RESTRICTIONS PROVIDED IN THIS LEGEND AND THE INDENTURE AND (3) THAT (i) IS A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A "QUALIFIED INSTITUTIONAL BUYER" IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT OR (ii) IS AN "ACCREDITED INVESTOR" AS DEFINED IN RULE 501(A) UNDER THE SECURITIES ACT (PROVIDED THAT IN THE CASE OF ANY TRANSFER TO A PERSON WHO IS AN "ACCREDITED INVESTOR" PURSUANT TO THIS SUBCLAUSE (ii) AND IF REQUESTED BY THE TRUSTEE OR THE ISSUER, THE TRANSFEROR OR THE TRANSFEREE HAS PROVIDED AN OPINION OF COUNSEL TO EACH OF THE TRUSTEE AND THE ISSUER THAT SUCH TRANSFER MAY BE MADE PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAW), OR (B) TO A TRANSFEREE THAT IS NOT A U.S. PERSON (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) AND IS ACQUIRING THESE INCOME NOTES IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURITIES ACT, AND IN THE CASE OF BOTH CLAUSES (A) AND (B), IN A PRINCIPAL AMOUNT OF NOT LESS THAN THE APPLICABLE MINIMUM AUTHORIZED DENOMINATIONS. EACH PURCHASER OR TRANSFEREE OF THESE INCOME NOTES WILL BE REQUIRED TO MAKE THE REPRESENTATIONS AND AGREEMENTS SUBSTANTIALLY IN THE FORM SET FORTH IN THE INDENTURE OR AN EXHIBIT THERETO.

THESE INCOME NOTES ARE TRANSFERABLE ONLY IN ACCORDANCE WITH THE RESTRICTIONS DESCRIBED HEREIN. ANY SALE OR TRANSFER IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE AND EFFECT, WILL BE VOID *AB INITIO*, AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE TRANSFEREE, NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE ISSUER, THE TRUSTEE OR ANY INTERMEDIARY. EACH TRANSFEROR OF THESE INCOME NOTES AGREES TO PROVIDE NOTICE OF THE TRANSFER RESTRICTIONS SET FORTH HEREIN AND IN THE INDENTURE TO THE TRANSFEREE. IN ADDITION TO THE FOREGOING, THE ISSUER MAINTAINS THE RIGHT TO COMPEL THE RESALE OF ANY INTEREST IN THESE INCOME NOTES PREVIOUSLY TRANSFERRED TO OR HELD BY NON-PERMITTED HOLDERS OF INCOME NOTES IN ACCORDANCE WITH AND SUBJECT TO THE TERMS OF THE INDENTURE.

IN ADDITION, A HOLDER MAY BE REQUIRED TO SELL ITS INTEREST IN THIS INCOME NOTE AS PROVIDED IN THE INDENTURE IF IT DOES NOT CONSENT TO AMENDMENTS TO THE INDENTURE OR THE SWAP AGREEMENT.

THESE INCOME NOTES MAY BE BENEFICIALLY OWNED ONLY BY PERSONS THAT CAN CONTINUE TO MAKE, ON EACH DAY SUCH BENEFICIAL OWNER OWNS THESE INCOME NOTES, THE REPRESENTATIONS AND AGREEMENTS WITH RESPECT TO THE U.S. EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED, AND RELATED MATTERS SET FORTH IN THE REPRESENTATION LETTER DELIVERED UPON PURCHASE."

**Transferees of Certificated Income Notes**

Each initial purchaser and subsequent transferee of Certificated Income Notes will be required to provide to the Issuer and the Trustee a written certification in substantially the form provided in the Indenture, containing representations substantially to the following effect (among other requirements of the Indenture) (with such modifications as may be acceptable to the Issuer):

1. It (1)(a)(i) is a Qualified Institutional Buyer or (ii) is an Accredited Investor, and is acquiring the Income Notes in reliance on an exemption from Securities Act registration (*provided* that in the

010717

case of any transfer to an Accredited Investor pursuant to this clause (ii) and if requested by the Issuer or the Trustee, the transferor or the transferee has provided an opinion of counsel to each of the Trustee and the Issuer that such transfer may be made pursuant to an exemption from registration under the Securities Act and any applicable state securities law) and (b) is a Qualified Purchaser or (2) it is not a U.S. Person (as defined in Regulation S under the Securities Act) and is acquiring the Income Notes in an offshore transaction in compliance with Rule 903 or Rule 904 of Regulation S under the Securities Act, as applicable, and in the case of both (1) and (2) understands the Income Notes will bear the legend set forth above. In addition, if it is acquiring pursuant to clause (1), it represents and warrants that it (i) was not formed for the purpose of investing in the Income Notes, (ii) has received the necessary consent from its beneficial owners if the purchaser is a private investment company formed before April 30, 1996, (iii) is not a broker-dealer that owns and invests on a discretionary basis less than U.S. $25,000,000 in securities of unaffiliated issuers, (iv) is not a partnership, common trust fund, special trust, pension, profit sharing or other retirement trust fund or plan in which the partners, beneficiaries or participants, as applicable, may designate the particular investments to be made, and (v) is acquiring its Income Notes in a transaction that may be effected without loss of any applicable Investment Company Act exemption. In addition, it represents and warrants that it will hold and transfer its interest in any Income Note only in a principal amount of not less than the applicable authorized minimum denominations.

2.      The Income Notes are being purchased or transferred in accordance with the transfer restrictions set forth in the Indenture and pursuant to an exemption from Securities Act registration, and in accordance with applicable state securities laws or securities laws of any other relevant jurisdiction. It understands that the Income Notes have been offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act, the Income Notes have not been and will not be registered under the Securities Act or the securities laws of any states, and, if in the future it decides to offer, resell, pledge or otherwise transfer the Income Notes, such Income Notes may be offered, resold, pledged or otherwise transferred only in accordance with an exemption from registration under such laws and pursuant to the provisions of the Indenture and the legend on such Income Notes. In particular, it understands that the Income Notes may be transferred only to (a) a Qualified Purchaser that is either (i) a Qualified Institutional Buyer or (ii) an Accredited Investor or (b) a person that is not a "U.S. person" as defined in Regulation S under the Securities Act. Purchasers and transferees who reside in certain states or jurisdictions may be subject to additional suitability standards and/or specific holding periods before the Income Notes may be resold or otherwise transferred. It acknowledges that no representation is made as to the availability of any exemption under the Securities Act or any state or other securities laws for resale of the Income Notes.

3.      In connection with the purchase of the Income Notes (*provided* that no such representations in clauses (a), (b) or (c) below are made with respect to the Reference Portfolio Manager or its Affiliates by the Reference Portfolio Manager or any Affiliate of the Reference Portfolio Manager or by any account managed or advised by the Reference Portfolio Manager or any Affiliate of the Reference Portfolio Manager): (a) it understands that none of the Issuers, the Reference Portfolio Manager, the Swap Counterparty, the Swap Guarantor, the Initial Purchaser, the Placement Agent, the Collateral Administrator, the Amendment Buy-Out Purchaser or any of their respective Affiliates is acting as a fiduciary or financial or investment adviser for such beneficial owner; (b) it is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral) of the Issuers, Reference Portfolio Manager, the Swap Counterparty, the Swap Guarantor, the Initial Purchaser, the Placement Agent, the Trustee, the Collateral Administrator, the Amendment Buy-Out Purchaser or any of their respective Affiliates or agents and independent contractors in their capacities as such other than any statements, if any, of such person in a current offering circular for the Income Notes; (c) it has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisers to the extent it has deemed necessary and has made its own investment decisions based upon its own judgment and upon any advice from such advisers as it has deemed necessary and not upon any view expressed by the Issuer, the Swap Counterparty, the Swap Guarantor, the Initial Purchaser, the Placement Agent, the Reference Portfolio Manager, the Trustee, the Collateral

010718

Administrator, the Amendment Buy-Out Purchaser or any of their respective Affiliates or agents and independent contractors in their capacities as such; (d) its purchase of the Income Notes will comply with all applicable laws in any jurisdiction in which it resides or is located; (e) it is acquiring the Income Notes as principal solely for its own account for investment and not with a view to the resale, distribution or other disposition thereof in violation of the Securities Act; (f) it has made investments prior to the date hereof and was not formed solely for the purpose of investing in the Income Notes; (g) it will not hold any Income Notes for the benefit of any other person, it will at all times be the sole beneficial owner thereof for purposes of the Investment Company Act and all other purposes and it will not sell participation interests in the Income Notes or enter into any other arrangement pursuant to which any other person shall be entitled to a beneficial interest in the distributions on the Income Notes; (h) all Income Notes (together with any other securities of the Issuers) purchased and held directly or indirectly by it constitute in the aggregate an investment of no more than 40% of its assets or capital and (i) it is a sophisticated investor and is purchasing the Income Notes with a full understanding of all of the terms, conditions and risks thereof, and it is capable of assuming and willing to assume those risks.

4.      It is (or is not, as applicable) using funds to purchase the Income Notes that are assets of (i) an employee benefit plan as defined in Section 3(3) of ERISA, whether or not such plan is subject to Title I of ERISA, including, without limitation, U.S. federal, state or local governmental plans, foreign pension plans and church plans, (ii) a plan described in Section 4975(e)(1) of the Code, whether or not subject to Section 4975 of the Code, including without limitation, individual retirement accounts and Keogh plans or (iii) an entity whose underlying assets include "plan assets" by reason of the investment by an employee benefit plan or other plan in such entity, including without limitation, as applicable, an insurance company general account (the plans and entities described in clauses (i), (ii) and (iii) being referred to as "Benefit Plan Investors").  Its purchase, holding and disposition of such Income Notes will not result in a prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental plan, any substantially similar federal, state or local law) for which an exemption is not available, all the conditions of which are satisfied.  It is (or is not, as applicable) the Issuer, the Co-Issuer, the Trustee, the Initial Purchaser, the Placement Agent, the Swap Counterparty, the Swap Guarantor, the Reference Portfolio Manager, the Amendment Buy-Out Purchaser or any other person (other than a Benefit Plan Investor) that has discretionary authority or control with respect to the assets of the Issuers or a person who provides investment advice for a fee (direct or indirect) with respect to such assets or any "affiliate" (as defined in 29 C.F.R. Section 2510.3-101(f)(3)) of any such person (a "Controlling Person").  Furthermore, it, and any of its fiduciaries causing it to acquire the Income Notes, agree to indemnify and hold harmless the Issuers, the Trustee, the Initial Purchaser, the Placement Agent, the Swap Counterparty, the Swap Guarantor, the Reference Portfolio Manager, the Amendment Buy-Out Purchaser and their respective affiliates from any losses, liabilities, expenses, damages, claims, proceedings and excise taxes incurred by them as a result of any of the foregoing representations made by it being or becoming false.  It acknowledges and agrees that a purchase or proposed transfer will not be permitted, and the Issuer and the Trustee will not register any such purchase by or proposed transfer to any Person, if Persons that are Benefit Plan Investors would own 25% or more of the outstanding Income Notes (excluding (i) Income Notes represented by the Class Q-1 Income Note Component of the Class Q-1 Securities and Income Notes represented by the Class Q-2 Collateral Asset A and (ii) Income Notes held by Controlling Persons) immediately after such purchase or proposed transfer (determined in accordance with the Plan Asset Regulation and the Indenture).  It understands that the Issuer may require any holder of the Income Notes that has made a false representation with respect to the foregoing matters to sell the Income Notes and, if such holder does not comply with such demand within 30 days thereof, the Issuer may sell such holder's interest in the Income Notes.  It understands that any transfer effected in connection with such a representation that was false will be of no force and effect, will be void *ab initio*, and will not operate to transfer any rights to the transferee, notwithstanding any instructions to the contrary to the Issuer, the Trustee or any intermediary.

5.      The purchaser understands that the Indenture permits the Issuer to demand that (1) any U.S. Person that is a Holder of a Certificated Income Note who is determined not to be a Qualified

010719

Purchaser and a Qualified Institutional Buyer or Accredited Investor and (2) any non-U.S. Person who is determined not to have acquired the Income Notes in compliance with the requirements of Regulation S, sell the Certificated Income Note (a) to a Person who is both (i) a Qualified Institutional Buyer or an Accredited Investor (*provided* that in the case of any transfer to an Accredited Investor and if requested by the Trustee or the Issuer, the transferor or the transferee has provided an opinion of counsel to each of the Trustee and the Issuer that such transfer may be made pursuant to an exemption from registration under the Securities Act and any applicable state securities laws) and (ii) a Qualified Purchaser, in a transaction meeting the requirements of Rule 144A of the Securities Act or another applicable exemption from the Securities Act (in the case of a transferee who is an Accredited Investor) or (b) to a Person who is not a U.S. Person in a transaction meeting the requirements of Regulation S, and, if the Holder does not comply with such demand within 30 days thereof, the Issuer may cause such Holder to sell its Certificated Income Notes on such terms as the Issuer may choose.

6. The purchaser understands that in the case of any amendment to the Indenture or the Swap Agreement that requires consent of one or more holders of Income Notes, the Indenture permits the Amendment Buy-Out Purchaser to purchase at a purchase price determined pursuant to the Indenture the Income Notes from any Holder thereof that either (i) has declared in writing that it will not consent to such amendment or (ii) had not consented to such amendment by the last day on which consent could be given in accordance with the request therefor; and such Holder will be required to sell its Income Notes to the Amendment Buy-Out Purchaser at the applicable purchase price.

7. The purchaser understands that the maturity of the Income Notes is subject to an extension of four years to August 1, 2020 without consent of any holders of Securities at the option of the Swap Counterparty if certain conditions are satisfied.

8. The purchaser acknowledges that it is its intent and that it understands it is the intent of the Issuer that, for purposes of U.S. federal income, state and local income and franchise tax and any other income taxes, the Issuer will be treated as a corporation, the Senior Notes will be treated as indebtedness of the Issuer, and the Income Notes (in the absence of an administrative determination or judicial ruling to the contrary) will be treated as equity in the Issuer; the purchaser agrees to such treatment and agrees to take no action inconsistent with such treatment.

9. The purchaser acknowledges that the Issuer is not authorized to engage in activities that could cause it to constitute a finance or lending business for federal income tax purposes and agrees that it will report its investment in the Income Notes in a manner consistent with such limitation, and in particular will not treat the Issuer as an "eligible controlled foreign corporation" for purposes of Section 954(h) of the Code or as deriving income described in Section 1297(b)(2) of the Code.

10. It has provided the Trustee on or immediately prior to its purchase of the Income Notes with a properly completed Form W-9 if it is a "U.S. person" for purposes of the Code that is not exempt from such requirement, and a properly completed Form W-8BEN if it is not a "U.S. person."

11. The purchaser is not purchasing the Income Notes in order to reduce any United States federal income tax liability or pursuant to a tax avoidance plan. In the case of a purchaser that is a bank (as defined in Section 881(c)(3)(a) of the Code) or an affiliate of such a bank, the purchaser (a) is acquiring the Income Notes as a capital markets investment and will not for any purpose treat the assets of the Issuer as loans acquired in its banking business, and (b) has not proposed or identified, and will not propose or identify, any security or loan for inclusion in the Reference Portfolio.

12. In the case of any purchaser that is not a United States person (as defined in Section 7701(a)(30) of the Code), the purchaser is not a bank (as defined in Section 881(c)(3)(a) of the Code) or an affiliate of such a bank, unless the purchaser is a person that is eligible for benefits under an income tax treaty with the United States that eliminates United States federal income taxation of United States source interest not attributable to a permanent establishment in the United States.

010720

13.   It acknowledges that the Reference Portfolio Manager will act solely on behalf of the Swap Counterparty and will not act or be deemed to act on behalf of, or have any contractual relationship with, the Issuer or any Holder of Securities.

14.   The purchaser agrees to notify subsequent transferees of all transfer restrictions applicable to holders of Income Notes set forth in the Indenture or described in this Offering Circular.

15.   The purchaser acknowledges that no governmental agency has passed upon the Income Notes or made any finding or determination as to the fairness of an investment in the Income Notes.

16.   The purchaser acknowledges that certain persons or organizations will perform services on behalf of the Issuers and will receive fees and/or compensation for performing such services as described in this Offering Circular and the Indenture.

17.   Within five days after receipt of a written request therefor from the Issuer or the Trustee, the purchaser agrees to provide any information and to execute and deliver such documents that may reasonably be necessary to comply with the laws and ordinances to which the Issuer is subject by reason of the offering of the Income Notes and the involvement of the purchaser therewith.

18.   The purchaser acknowledges that the Income Notes do not represent deposits with or other liabilities or obligations of, and are not guaranteed or endorsed by, the Swap Counterparty, the Swap Guarantor, the Placement Agent, the Initial Purchaser, the Reference Portfolio Manager, the Trustee, the Collateral Administrator, the Amendment Buy-Out Purchaser or any of their respective affiliates or any entity related to any of them or any other holder of Income Notes. It acknowledges that none of such persons will, in any way, be responsible for or stand behind the value or the performance of the Income Notes. It acknowledges that purchase of Income Notes involves investment risks including possible delay in payment of distributions and loss of income and principal invested.

19.   The purchaser understands that the Issuers, the Swap Counterparty, the Swap Guarantor, the Trustee, the Initial Purchaser, the Placement Agent, the Reference Portfolio Manager, the Collateral Administrator, the Amendment Buy-Out Purchaser and their respective counsel will rely upon the accuracy and truth of the foregoing representations, and it hereby consents to such reliance.

**Class Q-1 Securities**

Legend

Unless determined otherwise by the Issuers in accordance with applicable law and so long as any Class Q-1 Security is outstanding, the Class Q-1 Securities will bear a legend substantially as set forth below.

"THIS SECURITY HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), ANY STATE SECURITIES LAWS IN THE UNITED STATES OR THE SECURITIES LAWS OF ANY OTHER JURISDICTION AND THE ISSUER HAS NOT BEEN REGISTERED UNDER THE U.S. INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "INVESTMENT COMPANY ACT"). THE HOLDER HEREOF, BY ITS ACCEPTANCE OF THIS SECURITY, REPRESENTS THAT IT HAS OBTAINED THIS SECURITY IN A TRANSACTION IN COMPLIANCE WITH THE SECURITIES ACT, THE INVESTMENT COMPANY ACT AND ALL OTHER APPLICABLE LAWS OF THE UNITED STATES OR ANY OTHER JURISDICTION, AND THE RESTRICTIONS ON SALE AND TRANSFER SET FORTH IN THE INDENTURE. THE HOLDER HEREOF, BY ITS ACCEPTANCE OF THIS SECURITY, FURTHER REPRESENTS, ACKNOWLEDGES AND AGREES THAT IT WILL NOT REOFFER, RESELL, PLEDGE OR OTHERWISE TRANSFER THIS SECURITY (OR ANY INTEREST HEREIN) EXCEPT IN COMPLIANCE WITH THE SECURITIES ACT, THE INVESTMENT COMPANY ACT AND ALL OTHER APPLICABLE LAWS OF ANY JURISDICTION AND IN

010721

ACCORDANCE WITH THE CERTIFICATIONS AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN (A) TO A TRANSFEREE (1) THAT IS A "QUALIFIED PURCHASER" WITHIN THE MEANING OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT, (2) THAT (i) WAS NOT FORMED FOR THE PURPOSE OF INVESTING IN THE SECURITIES, (ii) HAS RECEIVED THE NECESSARY CONSENT FROM ITS BENEFICIAL OWNERS IF THE PURCHASER IS A PRIVATE INVESTMENT COMPANY FORMED BEFORE APRIL 30, 1996, (iii) IS NOT A BROKER-DEALER THAT OWNS AND INVESTS ON A DISCRETIONARY BASIS LESS THAN U.S. $25,000,000 IN SECURITIES OF UNAFFILIATED ISSUERS, (iv) IS NOT A PARTNERSHIP, COMMON TRUST FUND, SPECIAL TRUST, PENSION, PROFIT SHARING OR OTHER RETIREMENT TRUST FUND OR PLAN IN WHICH THE PARTNERS, BENEFICIARIES OR PARTICIPANTS, AS APPLICABLE, MAY DESIGNATE THE PARTICULAR INVESTMENTS TO BE MADE, (v) IS ACQUIRING ITS SECURITIES IN A TRANSACTION THAT MAY BE EFFECTED WITHOUT LOSS OF ANY APPLICABLE INVESTMENT COMPANY ACT EXEMPTION AND (vi) AGREES TO PROVIDE NOTICE TO ANY SUBSEQUENT TRANSFEREE OF THE TRANSFER RESTRICTIONS PROVIDED IN THIS LEGEND AND THE INDENTURE AND (3) THAT IS A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A "QUALIFIED INSTITUTIONAL BUYER" IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, OR (B) TO A TRANSFEREE THAT IS NOT A U.S. PERSON (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) AND IS ACQUIRING THIS SECURITY IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURITIES ACT, AND, IN THE CASE OF BOTH CLAUSES (A) AND (B), IN THE APPLICABLE MINIMUM AUTHORIZED DENOMINATIONS.

EACH PURCHASER OR TRANSFEREE OF THIS SECURITY WILL BE REQUIRED TO MAKE THE REPRESENTATIONS AND AGREEMENTS SUBSTANTIALLY IN THE FORM SET FORTH IN THE INDENTURE OR AN EXHIBIT THERETO.

THIS SECURITY IS TRANSFERABLE ONLY IN ACCORDANCE WITH THE RESTRICTIONS DESCRIBED HEREIN. ANY SALE OR TRANSFER IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE AND EFFECT, WILL BE VOID *AB INITIO*, AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE TRANSFEREE, NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE ISSUER, THE TRUSTEE OR ANY INTERMEDIARY. EACH TRANSFEROR OF THIS SECURITY AGREES TO PROVIDE NOTICE OF THE TRANSFER RESTRICTIONS SET FORTH HEREIN AND IN THE INDENTURE TO THE TRANSFEREE. IN ADDITION TO THE FOREGOING, THE ISSUER MAINTAINS THE RIGHT TO COMPEL THE RESALE OF ANY INTEREST IN THIS SECURITY PREVIOUSLY TRANSFERRED TO OR HELD BY ANY NON-PERMITTED HOLDER IN ACCORDANCE WITH AND SUBJECT TO THE TERMS OF THE INDENTURE.

IN ADDITION, A HOLDER MAY BE REQUIRED TO SELL ITS INTEREST IN THIS SECURITY (OR COMPONENT THEREOF) AS PROVIDED IN THE INDENTURE IF IT DOES NOT CONSENT TO AMENDMENTS TO THE INDENTURE OR THE SWAP AGREEMENT.

THIS SECURITY MAY BE BENEFICIALLY OWNED ONLY BY PERSONS THAT CAN CONTINUE TO MAKE, ON EACH DAY SUCH BENEFICIAL OWNER OWNS THIS SECURITY, THE REPRESENTATIONS AND AGREEMENTS WITH RESPECT TO THE U.S. EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED, AND RELATED MATTERS SET FORTH IN THE REPRESENTATION LETTER DELIVERED UPON PURCHASE."

**Transferees of Certificated Class Q-1 Securities**

Each initial purchaser of Certificated Class Q-1 Securities and each subsequent transferee of Certificated Class Q-1 Securities or interests in Class Q-1 Temp Reg S Global Securities or Class Q-1 Reg S Global Securities will be required to provide to the Issuer and the Trustee a written certification in substantially the form provided in

010722

the Indenture, containing representations substantially to the following effect (among other requirements of the Indenture) (with such modifications as may be acceptable to the Issuer):

1. It (1)(a) is a Qualified Institutional Buyer and is acquiring the Class Q-1 Securities in reliance on an exemption from Securities Act registration and (b) is a Qualified Purchaser or (2) it is not a U.S. Person (as defined in Regulation S under the Securities Act) and is acquiring the Class Q-1 Securities in an offshore transaction in compliance with Rule 903 or Rule 904 of Regulation S under the Securities Act, as applicable, and in the case of both (1) and (2) understands the Class Q-1 Securities will bear the legend set forth above. In addition, if it is acquiring pursuant to clause (1), it represents and warrants that it (i) was not formed for the purpose of investing in the Class Q-1 Securities, (ii) has received the necessary consent from its beneficial owners if the purchaser is a private investment company formed before April 30, 1996, (iii) is not a broker-dealer that owns and invests on a discretionary basis less than U.S. $25,000,000 in securities of unaffiliated issuers, (iv) is not a partnership, common trust fund, special trust, pension, profit sharing or other retirement trust fund or plan in which the partners, beneficiaries or participants, as applicable, may designate the particular investments to be made, and (v) is acquiring its Class Q-1 Securities in a transaction that may be effected without loss of any applicable Investment Company Act exemption. In addition, it represents and warrants that it will hold and transfer its interest in any Class Q-1 Security only in the applicable minimum denomination.

2. The Class Q-1 Securities are being purchased or transferred in accordance with the transfer restrictions set forth in the Indenture and pursuant to an exemption from Securities Act registration, and in accordance with applicable state securities laws or securities laws of any other relevant jurisdiction. It understands that the Class Q-1 Securities have been offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act, the Class Q-1 Securities have not been and will not be registered under the Securities Act or the securities laws of any states, and, if in the future it decides to offer, resell, pledge or otherwise transfer the Class Q-1 Securities, such Class Q-1 Securities may be offered, resold, pledged or otherwise transferred only in accordance with an exemption from registration under such laws and pursuant to the provisions of the Indenture and the legend on such Class Q-1 Securities. In particular, it understands that the Class Q-1 Securities may be transferred only to (a) a Qualified Purchaser that is also a Qualified Institutional Buyer or (b) a person that is not a "U.S. person" as defined in Regulation S under the Securities Act, and in either case only to a Person who takes delivery in the form of a Class Q-1 Certificated Security. Purchasers and transferees who reside in certain states or jurisdictions may be subject to additional suitability standards and/or specific holding periods before the Class Q-1 Securities may be resold or otherwise transferred. It acknowledges that no representation is made as to the availability of any exemption under the Securities Act or any state securities laws for resale of the Class Q-1 Securities. It acknowledges that the Class Q-1 Securities may be purchased or transferred only in minimum denominations in which each Component thereof satisfies the applicable minimum denomination requirement.

3. In connection with the purchase of the Class Q-1 Securities (*provided* that no such representations in clauses (a), (b) or (c) below are made with respect to the Reference Portfolio Manager or its Affiliates by the Reference Portfolio Manager or any Affiliate of the Reference Portfolio Manager or by any account managed or advised by the Reference Portfolio Manager or any Affiliate of the Reference Portfolio Manager): (a) it understands that none of the Issuers, the Reference Portfolio Manager, the Swap Counterparty, the Swap Guarantor, the Placement Agent, the Initial Purchaser, the Collateral Administrator, the Amendment Buy-Out Purchaser or any of their respective Affiliates is acting as a fiduciary or financial or investment adviser for it; (b) it is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral) of the Issuers, the Reference Portfolio Manager, the Swap Counterparty, the Swap Guarantor, the Placement Agent, the Initial Purchaser, the Trustee, the Collateral Administrator, the Amendment Buy-Out Purchaser or any of their respective Affiliates or agents and independent contractors in their capacities as such other than any statements, if any, of such person in a current offering circular for the Class Q-1 Securities; (c) it has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisers to the extent

010723

it has deemed necessary and has made its own investment decisions based upon its own judgment and upon any advice from such advisers as it has deemed necessary and not upon any view expressed by the Issuer, the Reference Portfolio Manager, the Swap Counterparty, the Swap Guarantor, the Placement Agent, the Initial Purchaser, the Trustee, the Collateral Administrator, the Amendment Buy-Out Purchaser or any of their respective Affiliates or agents and independent contractors in their capacities as such; (d) its purchase of the Class Q-1 Securities will comply with all applicable laws in any jurisdiction in which it resides or is located; (e) it is acquiring the Class Q-1 Securities as principal solely for its own account for investment and not with a view to the resale, distribution or other disposition thereof in violation of the Securities Act; (f) it has made investments prior to the date hereof and was not formed solely for the purpose of investing in the Class Q-1 Securities; (g) it will not hold any Class Q-1 Securities for the benefit of any other person, it will at all times be the sole beneficial owner thereof for purposes of the Investment Company Act and all other purposes and it will not sell participation interests in the Class Q-1 Securities or enter into any other arrangement pursuant to which any other person shall be entitled to a beneficial interest in the distributions on the Class Q-1 Securities; (h) all Class Q-1 Securities (together with any other securities of the Issuers) purchased and held directly or indirectly by it constitute in the aggregate an investment of no more than 40% of its assets or capital and (i) it is a sophisticated investor and is purchasing the Class Q-1 Securities with a full understanding of all of the terms, conditions and risks thereof, and it is capable of assuming and willing to assume those risks.

4. It is not using funds to purchase the Class Q-1 Securities that are assets of (i) an employee benefit plan as defined in Section 3(3) of ERISA, whether or not such plan is subject to Title I of ERISA, including, without limitation, U.S. federal, state or local governmental plans, foreign pension plans and church plans, (ii) a plan described in Section 4975(e)(1) of the Code, whether or not subject to Section 4975 of the Code, including without limitation, individual retirement accounts and Keogh plans or (iii) an entity whose underlying assets include "plan assets" by reason of the investment by an employee benefit plan or other plan in such entity, including without limitation, as applicable, an insurance company general account (the plans and entities described in clauses (i), (ii) and (iii) being referred to as "Benefit Plan Investors"). Furthermore, it, and any of its fiduciaries causing it to acquire the Class Q-1 Securities, agree to indemnify and hold harmless the Issuers, the Trustee, the Initial Purchaser, the Placement Agent, the Swap Counterparty, the Swap Guarantor, the Reference Portfolio Manager, the Amendment Buy-Out Purchaser and their respective affiliates from any losses, liabilities, expenses, damages, claims, proceedings and excise taxes incurred by them as a result of any of the foregoing representations made by it being or becoming false. It acknowledges and agrees that a purchase or proposed transfer will not be permitted, and the Issuer and the Trustee will not register any such purchase by or proposed transfer to a Person that has represented that it is a Benefit Plan Investor. It understands that the Issuer may require any holder of the Class Q-1 Securities that has made a false representation with respect to the foregoing matters to sell the Class Q-1 Securities and, if such holder does not comply with such demand within 30 days thereof, the Issuer may sell such holder's interest in the Class Q-1 Securities. It understands that any transfer effected in connection with such a representation that was false will be of no force and effect, will be void *ab initio*, and will not operate to transfer any rights to the transferee, notwithstanding any instructions to the contrary to the Issuer, the Trustee or any intermediary.

5. The purchaser understands that the Indenture permits the Issuer to demand that (1) any U.S. Person that is a Holder of a Certificated Class Q-1 Security who is determined not to be a Qualified Purchaser and a Qualified Institutional Buyer or (2) any non-U.S. Person that is a Holder of a Certificated Class Q-1 Security determined not to have acquired the Class Q-1 Securities in compliance with the requirements of Regulation S, sell the Class Q-1 Securities (a) to a Person who is both a Qualified Institutional Buyer and a Qualified Purchaser in a transaction meeting the requirements of Rule 144A of the Securities Act or (b) to a Person who is not a U.S. Person in a transaction meeting the requirements of Regulation S, in either case to a Person who will take delivery in the form of a Class Q-1 Certificated Security and, if the Holder does not comply with such demand within 30 days thereof, the Issuer may cause it to sell its Class Q-1 Securities on such terms as the Issuer may choose.

010724

6.      The purchaser understands that in the case of any amendment to the Indenture or the Swap Agreement that requires consent of one or more holders of Class Q-1 Securities (or holders of any Class of Notes that constitutes a Component thereof), the Indenture permits the Amendment Buy-Out Purchaser to purchase at a purchase price determined pursuant to the Indenture the Class Q-1 Securities (or the affected Component thereof) from any holder thereof that either (i) has declared in writing that it will not consent to such amendment or (ii) had not consented to such amendment by the last day on which consent could be given in accordance with the request therefor; and such holder will be required to sell either its Class Q-1 Securities or the affected Component thereof (at the holder's option) to the Amendment Buy-Out Purchaser at the applicable purchase price.

7.      The purchaser understands that the maturity of the Class Q-1 Securities is subject to an extension of four years to August 1, 2020 without consent of any holders of Securities at the option of the Swap Counterparty if certain conditions are satisfied.

8.      The purchaser acknowledges that it is its intent and that it understands it is the intent of the Issuer that, for purposes of U.S. federal income, state and local income and franchise tax and any other income taxes, the Issuer will be treated as a corporation, the Senior Notes will be treated as indebtedness of the Issuer, and the Income Notes (in the absence of an administrative determination or judicial ruling to the contrary) will be treated as equity in the Issuer; the purchaser agrees to such treatment and agrees to take no action inconsistent with such treatment.

9.      The purchaser acknowledges that the Issuer is not authorized to engage in activities that could cause it to constitute a finance or lending business for federal income tax purposes and agrees that it will report its investment in the Class Q-1 Securities in a manner consistent with such limitation, and in particular will not treat the Issuer as an "eligible controlled foreign corporation" for purposes of Section 954(h) of the Code or as deriving income described in Section 1297(b)(2) of the Code.

10.     It has provided the Trustee on or immediately prior to its purchase of the Class Q-1 Securities with a properly completed Form W-9 if it is a "U.S. person" for purposes of the Code that is not exempt from such requirement, and a properly completed Form W-8BEN if it is not a "U.S. person."

11.     The purchaser is not purchasing the Class Q-1 Securities in order to reduce any United States federal income tax liability or pursuant to a tax avoidance plan.  In the case of a purchaser that is a bank (as defined in Section 881(c)(3)(a) of the Code) or an affiliate of such a bank, the purchaser (a) is acquiring the Class Q-1 Securities as a capital markets investment and will not for any purpose treat the assets of the Issuer as loans acquired in its banking business, and (b) has not proposed or identified, and will not propose or identify, any security or loan for inclusion in the Reference Portfolio.

12.     In the case of any purchaser that is not a United States person (as defined in Section 7701(a)(30) of the Code), the purchaser is not a bank (as defined in Section 881(c)(3)(a) of the Code) or an affiliate of such a bank, unless the purchaser is a person that is eligible for benefits under an income tax treaty with the United States that eliminates United States federal income taxation of United States source interest not attributable to a permanent establishment in the United States.

13.     It acknowledges that the Reference Portfolio Manager will act solely on behalf of the Swap Counterparty and will not act or be deemed to act on behalf of, or have any contractual relationship with, the Issuer or any Holder of Securities.

14.     The purchaser agrees to notify subsequent transferees of all transfer restrictions applicable to holders of Class Q-1 Securities set forth in the Indenture or described in this Offering Circular.

15.     The purchaser acknowledges that no governmental agency has passed upon the Class Q-1 Securities or made any finding or determination as to the fairness of an investment in the Class Q-1 Securities.

16. The purchaser acknowledges that certain persons or organizations will perform services on behalf of the Issuers and will receive fees and/or compensation for performing such services as described in this Offering Circular and the Indenture.

17. Within five days after receipt of a written request therefor from the Issuer or the Trustee, the purchaser agrees to provide any information and to execute and deliver such documents that may reasonably be necessary to comply with the laws and ordinances to which the Issuer is subject by reason of the offering of the Class Q-1 Securities and the involvement of the purchaser therewith.

18. The purchaser acknowledges that the Class Q-1 Securities do not represent deposits with or other liabilities or obligations of, and are not guaranteed or endorsed by, the Swap Counterparty, the Swap Guarantor, the Placement Agent, the Initial Purchaser, the Reference Portfolio Manager, the Trustee, the Collateral Administrator, the Amendment Buy-Out Purchaser or any of their respective affiliates or any entity related to any of them or any other holder of Class Q-1 Securities. It acknowledges that none of such persons will, in any way, be responsible for or stand behind the value or the performance of the Class Q-1 Securities. It acknowledges that purchase of Class Q-1 Securities involves investment risks including possible delay in payment of distributions and loss of income and principal invested.

19. It understands that the Issuers, the Swap Counterparty, the Swap Guarantor, the Trustee, the Initial Purchaser, the Placement Agent, the Reference Portfolio Manager, the Collateral Administrator, the Amendment Buy-Out Purchaser and their respective counsel will rely upon the accuracy and truth of the foregoing representations, and it hereby consents to such reliance.

**Initial purchasers of Interests in Class Q-1 Temp Reg S Global Securities**

Each initial purchaser of Class Q-1 Securities who is purchasing an interest in a Class Q-1 Temp Reg S Global Security will be required to provide the Issuer and the Trustee a written certificate in substantially the form provided in the Indenture, containing representations substantially to the effect as the representations set forth in paragraphs (2), (3), (4), (6), (7), (8), (9), (10), (11), (12), (13), (14), (15), (16), (17) and (18) above and in addition containing representations substantially to the following effect (with such modifications as may be acceptable to the Issuer):

1. It is aware that the sale of Class Q-1 Securities to it is being made in reliance on the exemption from registration provided by Regulation S and understands that the Class Q-1 Securities offered in reliance on Regulation S will bear the legend set forth above. It and each beneficial owner of its Class Q-1 Securities is not, and will not be, a U.S. Person as defined in Regulation S under the Securities Act, and its purchase of the Class Q-1 Securities will comply with all applicable laws in any jurisdiction in which it resides or is located. In addition, it represents and warrants that it will (i) provide notice to any subsequent transferee of the transfer restrictions provided in such legend and in the Indenture, (ii) hold and transfer its beneficial interest in any Class Q-1 Securities only in a principal amount of not less than the applicable minimum denomination and (iii) provide the Issuer from time to time such information as it may reasonably request in order to ascertain compliance with this paragraph 1.

2. It understands and agrees that no resale or other transfer of beneficial interests in a Class Q-1 Temp Reg S Global Security or Class Q-1 Reg S Global Security will be permitted and any transferee of Class Q-1 Securities must take delivery in the form of a Certificated Class Q-1 Security.

3. It understands that the Indenture permits the Issuer to demand that any holder of a beneficial interest in a Class Q-1 Temp Reg S Global Security or Class Q-1 Reg S Global Security who is determined not to have acquired such beneficial interest in compliance with the requirements of Regulation S or who is a U.S. Person sell such beneficial interest (a) to a Person who is not a U.S. Person in a transaction meeting the requirements of Regulation S or (b) to a Person who is both a Qualified Institutional Buyer and a Qualified Purchaser in a transaction meeting the requirements of Rule 144A, in either case to a Person who takes delivery in the form of a Certificated Class Q-1

010726

Security and, and, if the holder does not comply with such demand within 30 days thereof, the Issuer may cause the holder to sell its beneficial interest on such terms as the Issuer may choose.

4.  Such beneficial owner is aware that, except as otherwise provided in the Indenture, the Class Q-1 Securities being sold to it will be represented (a) initially, by one or more Class Q-1 Temp Reg S Global Securities and (b) after the Exchange Date, by one or more Class Q-1 Reg S Global Securities, and that beneficial interests therein may be held only through Euroclear or Clearstream.

5.  A holder of a beneficial interest in a Class Q-1 Temp Reg S Global Security must provide Euroclear or Clearstream or the participant organization through which it holds such interest, as applicable, with a certificate certifying that the beneficial owner of the interest in the Class Q-1 Temp Reg S Global Security is a non-U.S. Person and Euroclear or Clearstream, as applicable, must provide to the Trustee a certificate to such effect, prior to (a) the payment of interest or principal with respect to such beneficial owner's beneficial interest in the Class Q-1 Temp Reg S Global Security and (b) any exchange of such beneficial interest for a beneficial interest in a Class Q-1 Reg S Global Security.

6.  It understands that the Issuers, the Trustee, the Swap Counterparty, the Swap Guarantor, the Reference Portfolio Manager, the Initial Purchaser, the Placement Agent, the Collateral Administrator, the Amendment Buy-Out Purchaser and their respective counsel will rely upon the accuracy and truth of the foregoing representations, and it hereby consents to such reliance.

## Class Q-2 Securities

### Legend

Unless determined otherwise by the Issuers in accordance with applicable law and so long as any Class Q-2 Security is outstanding, the Class Q-2 Securities will bear a legend substantially as set forth below.

"THIS SECURITY HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), ANY STATE SECURITIES LAWS IN THE UNITED STATES OR THE SECURITIES LAWS OF ANY OTHER JURISDICTION AND THE ISSUER HAS NOT BEEN REGISTERED UNDER THE U.S. INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "INVESTMENT COMPANY ACT"). THE HOLDER HEREOF, BY ITS ACCEPTANCE OF THIS SECURITY, REPRESENTS THAT IT HAS OBTAINED THIS SECURITY IN A TRANSACTION IN COMPLIANCE WITH THE SECURITIES ACT, THE INVESTMENT COMPANY ACT AND ALL OTHER APPLICABLE LAWS OF THE UNITED STATES OR ANY OTHER JURISDICTION, AND THE RESTRICTIONS ON SALE AND TRANSFER SET FORTH IN THE INDENTURE. THE HOLDER HEREOF, BY ITS ACCEPTANCE OF THIS SECURITY, FURTHER REPRESENTS, ACKNOWLEDGES AND AGREES THAT IT WILL NOT REOFFER, RESELL, PLEDGE OR OTHERWISE TRANSFER THIS SECURITY (OR ANY INTEREST HEREIN) EXCEPT IN COMPLIANCE WITH THE SECURITIES ACT, THE INVESTMENT COMPANY ACT AND ALL OTHER APPLICABLE LAWS OF ANY JURISDICTION AND IN ACCORDANCE WITH THE CERTIFICATIONS AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN (A) IN THE CASE OF CLASS Q-2A SECURITIES ONLY, TO A TRANSFEREE (1) THAT IS A "QUALIFIED PURCHASER" WITHIN THE MEANING OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT, (2) THAT (i) WAS NOT FORMED FOR THE PURPOSE OF INVESTING IN THE SECURITIES, (ii) HAS RECEIVED THE NECESSARY CONSENT FROM ITS BENEFICIAL OWNERS IF THE PURCHASER IS A PRIVATE INVESTMENT COMPANY FORMED BEFORE APRIL 30, 1996, (iii) IS NOT A BROKER-DEALER THAT OWNS AND INVESTS ON A DISCRETIONARY BASIS LESS THAN U.S. $25,000,000 IN SECURITIES OF UNAFFILIATED ISSUERS, (iv) IS NOT A PARTNERSHIP, COMMON TRUST FUND, SPECIAL TRUST, PENSION, PROFIT SHARING OR OTHER RETIREMENT TRUST FUND OR PLAN IN WHICH THE PARTNERS, BENEFICIARIES OR PARTICIPANTS, AS APPLICABLE, MAY DESIGNATE THE PARTICULAR INVESTMENTS TO BE MADE, (v) IS ACQUIRING ITS SECURITIES IN A TRANSACTION THAT MAY BE EFFECTED WITHOUT LOSS OF ANY

010727

APPLICABLE INVESTMENT COMPANY ACT EXEMPTION AND (vi) AGREES TO PROVIDE NOTICE TO ANY SUBSEQUENT TRANSFEREE OF THE TRANSFER RESTRICTIONS PROVIDED IN THIS LEGEND AND THE INDENTURE AND (3) THAT IS A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A "QUALIFIED INSTITUTIONAL BUYER" IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, OR (B) TO A TRANSFEREE THAT IS NOT A U.S. PERSON (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) AND IS ACQUIRING THIS SECURITY IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURITIES ACT (AND, IN THE CASE OF A CLASS Q-2B SECURITY ONLY, IS AN ELIGIBLE CONTRACT PARTICIPANT AS DEFINED IN SECTION 1A(12) OF THE U.S. COMMODITY EXCHANGE ACT), AND, IN THE CASE OF BOTH CLAUSES (A) AND (B), IN THE APPLICABLE MINIMUM AUTHORIZED DENOMINATIONS.

EACH PURCHASER OR TRANSFEREE OF THIS SECURITY WILL BE REQUIRED TO MAKE THE REPRESENTATIONS AND AGREEMENTS SUBSTANTIALLY IN THE FORM SET FORTH IN THE INDENTURE OR AN EXHIBIT THERETO.

THIS SECURITY IS TRANSFERABLE ONLY IN ACCORDANCE WITH THE RESTRICTIONS DESCRIBED HEREIN. ANY SALE OR TRANSFER IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE AND EFFECT, WILL BE VOID *AB INITIO*, AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE TRANSFEREE, NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE ISSUER, THE TRUSTEE OR ANY INTERMEDIARY. EACH TRANSFEROR OF THIS SECURITY AGREES TO PROVIDE NOTICE OF THE TRANSFER RESTRICTIONS SET FORTH HEREIN AND IN THE INDENTURE TO THE TRANSFEREE. IN ADDITION TO THE FOREGOING, THE ISSUER MAINTAINS THE RIGHT TO COMPEL THE RESALE OF ANY INTEREST IN THIS SECURITY PREVIOUSLY TRANSFERRED TO OR HELD BY ANY NON-PERMITTED HOLDER IN ACCORDANCE WITH AND SUBJECT TO THE TERMS OF THE INDENTURE.

THIS SECURITY MAY BE BENEFICIALLY OWNED ONLY BY PERSONS THAT CAN CONTINUE TO MAKE, ON EACH DAY SUCH BENEFICIAL OWNER OWNS THIS SECURITY, THE REPRESENTATIONS AND AGREEMENTS WITH RESPECT TO THE U.S. EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED, AND RELATED MATTERS SET FORTH IN THE REPRESENTATION LETTER DELIVERED UPON PURCHASE."

**Transferees of Certificated Class Q-2 Securities**

Each initial purchaser and subsequent transferee of Certificated Class Q-2 Securities will be required to provide to the Issuer and the Trustee a written certification in substantially the form provided in the Indenture, containing representations substantially to the following effect (among other requirements of the Indenture) ( with such modifications as may be acceptable to the Issuer):

1.     It (1) it is not a U.S. Person (as defined in Regulation S under the Securities Act) and is acquiring the Class Q-2 Securities in an offshore transaction in compliance with Rule 903 or Rule 904 of Regulation S under the Securities Act (and, in the case of the Class Q-2B Securities only, is an eligible contract participant as defined in Section 1a(12) of the U.S. Commodity Exchange Act), or (2) in the case of the Class Q-2A Securities only, (a) is a Qualified Institutional Buyer and is acquiring the Class Q-2 Securities in reliance on an exemption from Securities Act registration and (b) is a Qualified Purchaser, as applicable, and in the case of both (1) and (2) understands the Class Q-2  Securities will bear the legend set forth above.  In addition, if it is acquiring Class Q-2A Securities pursuant to clause (2), it represents and warrants that it (i) was not formed for the purpose of investing in the Class Q-2A Securities, (ii) has received the necessary consent from its beneficial owners if the purchaser is a private investment company formed before April 30, 1996, (iii) is not a broker-dealer that owns and invests on a discretionary basis less than U.S. $25,000,000 in securities of unaffiliated issuers, (iv) is not a partnership, common trust fund, special trust, pension, profit sharing or other retirement trust fund or plan in which the partners,

010728

beneficiaries or participants, as applicable, may designate the particular investments to be made, and (v) is acquiring its Class Q-2A Securities in a transaction that may be effected without loss of any applicable Investment Company Act exemption. In addition, it represents and warrants that it will hold and transfer its interest in any Class Q-2 Security only in the applicable minimum denomination.

2. The Class Q-2 Securities are being purchased or transferred in accordance with the transfer restrictions set forth in the Indenture and pursuant to an exemption from Securities Act registration, and in accordance with applicable state securities laws or securities laws of any other relevant jurisdiction. It understands that the Class Q-2 Securities have been offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act, the Class Q-2 Securities have not been and will not be registered under the Securities Act or the securities laws of any states, and, if in the future it decides to offer, resell, pledge or otherwise transfer the Class Q-2 Securities, such Class Q-2 Securities may be offered, resold, pledged or otherwise transferred only in accordance with an exemption from registration under such laws and pursuant to the provisions of the Indenture and the legend on such Class Q-2 Securities. In particular, it understands that the Class Q-2 Securities may be transferred only to (a) a person that is not a "U.S. person" as defined in Regulation S under the Securities Act (and, in the case of the Class Q-2B Securities only, is an eligible contract participant as defined in the U.S. Commodity Exchange Act), or (b) in the case of the Class Q-2A Securities only, a Qualified Purchaser that is also a Qualified Institutional Buyer. Purchasers and transferees who reside in certain states or jurisdictions may be subject to additional suitability standards and/or specific holding periods before the Class Q-2 Securities may be resold or otherwise transferred. It acknowledges that no representation is made as to the availability of any exemption under the Securities Act or any state securities laws for resale of the Class Q-2 Securities.

3. In connection with the purchase of the Class Q-2 Securities (*provided* that no such representations in clauses (a), (b) or (c) below are made with respect to the Reference Portfolio Manager or its Affiliates by the Reference Portfolio Manager or any Affiliate of the Reference Portfolio Manager or by any account managed or advised by the Reference Portfolio Manager or any Affiliate of the Reference Portfolio Manager): (a) it understands that none of the Issuers, the Reference Portfolio Manager, the Swap Counterparty, the Swap Guarantor, the Placement Agent, the Initial Purchaser, the Collateral Administrator, the Amendment Buy-Out Purchaser or any of their respective Affiliates is acting as a fiduciary or financial or investment adviser for such beneficial owner; (b) it is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral) of the Issuers, the Reference Portfolio Manager, the Swap Counterparty, the Swap Guarantor, the Placement Agent, the Initial Purchaser, the Trustee, the Collateral Administrator, the Amendment Buy-Out Purchaser or any of their respective Affiliates or agents and independent contractors in their capacities as such other than any statements, if any, of such person in a current offering circular for the Class Q-2 Securities; (c) it has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisers to the extent it has deemed necessary and has made its own investment decisions based upon its own judgment and upon any advice from such advisers as it has deemed necessary and not upon any view expressed by the Issuer, the Reference Portfolio Manager, the Swap Counterparty, the Swap Guarantor, the Placement Agent, the Initial Purchaser, the Trustee, the Collateral Administrator, the Amendment Buy-Out Purchaser or any of their respective Affiliates or agents and independent contractors in their capacities as such; (d) its purchase of the Class Q-2 Securities will comply with all applicable laws in any jurisdiction in which it resides or is located; (e) it is acquiring the Class Q-2 Securities as principal solely for its own account for investment and not with a view to the resale, distribution or other disposition thereof in violation of the Securities Act; (f) it has made investments prior to the date hereof and was not formed solely for the purpose of investing in the Class Q-2 Securities; (g) it will not hold any Class Q-2 Securities for the benefit of any other person, it will at all times be the sole beneficial owner thereof for purposes of the Investment Company Act and all other purposes and it will not sell participation interests in the Class Q-2 Securities or enter into any other arrangement pursuant to which any other person shall be entitled to a beneficial interest in the distributions on the Class Q-2 Securities; (h) all Class Q-2 Securities (together with any other securities of the Issuers) purchased

010729

and held directly or indirectly by it constitute in the aggregate an investment of no more than 40% of its assets or capital and (i) it is a sophisticated investor and is purchasing the Class Q-2 Securities with a full understanding of all of the terms, conditions and risks thereof, and it is capable of assuming and willing to assume those risks.

4.     (A) In the case of the Class Q-2A Securities, on each day from the date on which purchaser acquires the Class Q-2A Securities through and including the date on which the purchaser disposes of its Class Q-2A Securities, either (i) the purchaser is not an "employee benefit plan" (as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")) subject to the provisions of Title I of ERISA, a "plan" (as defined in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended (the "Code") subject to the provisions of Section 4975 of the Code, an entity whose underlying assets include "plan assets" by reason of Department of Labor regulation Section 2510.3-101 or otherwise, or a governmental plan that is subject to any federal, state or local law which is substantially similar to the provisions of Section 406 of ERISA, or Section 4975 of the Code or (ii) the Purchaser's purchase, holding and disposition of the Class Q-2A Securities will not constitute or result in a prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental plan, any substantially similar federal, state or local law) for which an exemption is not available, all of the conditions of which are satisfied; or

(B) In the case of the Class Q-2B Securities, it is not using funds to purchase the Class Q-2B Securities that are assets of (i) an employee benefit plan as defined in Section 3(3) of ERISA, whether or not such plan is subject to Title I of ERISA, including, without limitation, U.S. federal, state or local governmental plans, foreign pension plans and church plans, (ii) a plan described in Section 4975(e)(1) of the Code, whether or not subject to Section 4975 of the Code, including without limitation, individual retirement accounts and Keogh plans or (iii) an entity whose underlying assets include "plan assets" by reason of the investment by an employee benefit plan or other plan in such entity, including without limitation, as applicable, an insurance company general account (the plans and entities described in clauses (i), (ii) and (iii) being referred to as "Benefit Plan Investors"). Furthermore, it, and any of its fiduciaries causing it to acquire the Class Q-2B Securities, agree to indemnify and hold harmless the Issuers, the Trustee, the Initial Purchaser, the Placement Agent, the Swap Counterparty, the Swap Guarantor, the Reference Portfolio Manager and their respective affiliates from any losses, liabilities, expenses, damages, claims, proceedings and excise taxes incurred by them as a result of any of the foregoing representations made by it being or becoming false. It acknowledges and agrees that a purchase or proposed transfer will not be permitted, and the Issuer and the Trustee will not register any such purchase by or proposed transfer to a Person that has represented that it is a Benefit Plan Investor. It understands that the Issuer may require any holder of the Class Q-2B Securities that has made a false representation with respect to the foregoing matters to sell the Class Q-2B Securities and, if such holder does not comply with such demand within 30 days thereof, the Issuer may sell such holder's interest in the Class Q-2B Securities. It understands that any transfer effected in connection with such a representation that was false will be of no force and effect, will be void *ab initio*, and will not operate to transfer any rights to the transferee, notwithstanding any instructions to the contrary to the Issuer, the Trustee or any intermediary.

5.     The purchaser understands that the Indenture permits the Issuer to demand that (1) any U.S. Person that is a Holder of a Certificated Class Q-2B Security, (2) any U.S. Person that is a Holder of Certificated Class Q-2A Security who is determined not to be a Qualified Purchaser and a Qualified Institutional Buyer or (3) any non-U.S. Person that is a Holder of a Certificated Class Q-2 Security determined not to have acquired the Class Q-2 Securities in compliance with the requirements of Regulation S, sell the Class Q-2 Securities (a) to a Person who is not a U.S. Person in a transaction meeting the requirements of Regulation S, or (2) in the case of the Class Q-2A Securities only, to a Person who is both a Qualified Institutional Buyer and a Qualified Purchaser, and if the Holder does not comply with such demand within 30 days thereof, the Issuer may cause such Holder to sell its Class Q-2 Securities on such terms as the Issuer may choose.

6.     The purchaser understands that in the case of any amendment to the Indenture or the Swap Agreement that requires consent of one or more holders of Income Notes, the Indenture permits

010730

the Amendment Buy-Out Purchaser to purchase at a purchase price determined pursuant to the Indenture the Income Notes represented by the Class Q-2 Collateral Asset A, if the Holders of Class Q-2 Securities who pursuant to the Indenture have voting rights with respect to the Income Notes represented by the Class Q-2 Collateral Asset A would be deemed to be a Non-consenting Holder with respect to such Income Notes and such amendment pursuant to the provisions of the Indenture.

7. The purchaser understands that the maturity of the Income Notes represented by the Class Q-2 Collateral Asset A is subject to an extension of four years to August 1, 2020 without consent of any holders of Securities at the option of the Swap Counterparty if certain conditions are satisfied.

8. The purchaser acknowledges that it is its intent and that it understands it is the intent of the Issuer that, for purposes of U.S. federal income, state and local income and franchise tax and any other income taxes, the Issuer will be treated as a corporation, the Senior Notes will be treated as indebtedness of the Issuer, and the Income Notes (in the absence of an administrative determination or judicial ruling to the contrary) (including the Income Notes represented by the Class Q-2 Collateral Asset A) will be treated as equity in the Issuer; and the purchaser agrees to such treatment and agrees to take no action inconsistent with such treatment.

9. In the case of a purchaser of the Class Q-2B Securities, the purchaser acknowledges that the Issuer is not authorized to engage in activities that could cause it to constitute a finance or lending business for federal income tax purposes and agrees that it will report its investment in the Class Q-2B Securities in a manner consistent with such limitation, and in particular will not treat the Issuer as an "eligible controlled foreign corporation" for purposes of Section 954(h) of the Code or as deriving income described in Section 1297(b)(2) of the Code.

10. In the case of a purchaser of the Class Q-2A Securities, the purchaser has provided the Trustee on or immediately prior to its purchase of the Class Q-2A Securities with a properly completed Form W-9 if it is a "U.S. person" for purposes of the Code that is not exempt from such requirement, and a properly completed Form W-8BEN if it is not a "U.S. person."

11. In the case of a purchaser of the Class Q-2B Securities, it is not a United States person (as defined in Section 7701(a)(30) of the Code) and is not subject to U.S. federal income tax with respect to its investment in the Class Q-2B Securities and has provided the Trustee on or immediately prior to its purchase of the Class Q-2B Securities with a properly completed Form W-8BEN.

12. The purchaser is not purchasing the Class Q-2 Securities in order to reduce any United States federal income tax liability or pursuant to a tax avoidance plan. In the case of a purchaser that is a bank (as defined in Section 881(c)(3)(a) of the Code) or an affiliate of such a bank, the purchaser (a) is acquiring the Class Q-2 Securities as a capital markets investment and will not for any purpose treat the assets of the Issuer as loans acquired in its banking business, and (b) has not proposed or identified, and will not propose or identify, any security or loan for inclusion in the Reference Portfolio.

13. In the case of any purchaser that is not a United States person (as defined in Section 7701(a)(30) of the Code), the purchaser is not a bank (as defined in Section 881(c)(3)(a) of the Code) or an affiliate of such a bank, unless the purchaser is a person that is eligible for benefits under an income tax treaty with the United States that eliminates United States federal income taxation of United States source interest not attributable to a permanent establishment in the United States.

14. It acknowledges that the Reference Portfolio Manager will act solely on behalf of the Swap Counterparty and will not act or be deemed to act on behalf of, or have any contractual relationship with, the Issuer or any Holder of Securities.

15. The purchaser agrees to notify subsequent transferees of all transfer restrictions applicable to holders of Class Q-2 Securities set forth in the Indenture or described in this Offering Circular.

010731

16.    The purchaser acknowledges that no governmental agency has passed upon the Class Q-2 Securities or made any finding or determination as to the fairness of an investment in the Class Q-2 Securities.

17.    The purchaser acknowledges that certain persons or organizations will perform services on behalf of the Issuers and will receive fees and/or compensation for performing such services as described in this Offering Circular and the Indenture.

18.    Within five days after receipt of a written request therefor from the Issuer or the Trustee, the purchaser agrees to provide any information and to execute and deliver such documents that may reasonably be necessary to comply with the laws and ordinances to which the Issuer is subject by reason of the offering of the Class Q-2 Securities and the involvement of the purchaser therewith.

19.    The purchaser acknowledges that the Class Q-2 Securities do not represent deposits with or other liabilities or obligations of, and are not guaranteed or endorsed by, the Swap Counterparty, the Swap Guarantor, the Placement Agent, the Initial Purchaser, the Reference Portfolio Manager, the Trustee, the Collateral Administrator, the Amendment Buy-Out Purchaser or any of their respective affiliates or any entity related to any of them or any other holder of Class Q-2 Securities. It acknowledges that none of such persons will, in any way, be responsible for or stand behind the value or the performance of the Class Q-2 Securities. It acknowledges that purchase of Class Q-2 Securities involves investment risks including possible delay in payment of distributions and loss of income and principal invested.

20.    It understands that the Issuers, the Swap Counterparty, the Swap Guarantor, the Trustee, the Initial Purchaser, the Placement Agent, the Reference Portfolio Manager, the Collateral Administrator, the Amendment Buy-Out Purchaser and their respective counsel will rely upon the accuracy and truth of the foregoing representations, and it hereby consents to such reliance.

**Reliance on Section 3(c)(7) of the Investment Company Act**

Neither the Issuer nor the Co-Issuer has registered with the Commission as an investment company pursuant to the Investment Company Act, the Issuer in reliance on Section 3(c)(7) thereof, and the Co-Issuer, in reliance on the fact that it holds no "securities." To rely on Section 3(c)(7), the Issuer must have a "reasonable belief" that all purchasers of the Rule 144A Global Notes and all U.S. purchasers of Certificated Securities (including initial purchasers and subsequent transferees) are Qualified Purchasers and that all purchasers of Temporary Regulation S Global Notes and Regulation S Global Notes (including the initial purchasers and subsequent transferees) are non-U.S. Persons. The Issuer will establish such a reasonable belief by means of the representations, warranties and agreements made, or deemed made, by the purchasers of Securities under *"Purchase and Transfer Restrictions"* above, the agreements of the Initial Purchaser and the Placement Agent made in the note purchase agreement and placement agency agreement (the "Placement Agency Agreement"), as applicable, and certain Issuer covenants and undertakings pursuant to the Indenture (collectively, the "Section 3(c)(7) Procedures").

**Additional Income Note Restrictions**

Under the Swap Agreement, the Swap Counterparty will agree that neither it nor any of its Affiliates will purchase, acquire or own any Income Notes, *provided* that the Swap Counterparty or an Affiliate may purchase, acquire or own Income Notes if it is acting in its capacity as a broker or dealer and is purchasing, acquiring or owning the Income Notes solely in order to hold the Income Notes for sale to customers in the ordinary course of its business as a broker or dealer in such securities; *provided, further,* that the Swap Counterparty or an Affiliate may purchase, acquire or own Income Notes for other purposes if the Swap Counterparty has received and provided to the Issuer a written opinion of nationally recognized tax counsel experienced in such matters that for U.S. federal income tax purposes, (a) taking such purchase, acquisition or ownership into account, while not free from doubt the Issuer should not be treated as engaged in the conduct of a trade or business within the United States (or the Issuer should not or will not be treated as so engaged) and (b) such purchase, acquisition or ownership will not otherwise adversely affect the Issuer or investors therein.

010732

## RATINGS

It is a condition to the issuance of the Securities that the Class A-1 Notes be rated "Aaa" by Moody's and "AAA" by Standard & Poor's, that the Class A-2 Notes be rated at least "Aa2" by Moody's and at least "AA" by Standard & Poor's, that the Class B Notes be rated at least "A2" by Moody's and at least "A" by Standard & Poor's and that the Class C-1 Notes and the Class C-2 Notes be rated at least "Baa2" by Moody's and "BBB" by Standard & Poor's. Such ratings represent a Rating Agency's view as to the likelihood of timely payment of interest and ultimate payment of principal by the Maturity Date.

In addition, it is a condition to the issuance of the Securities that the Class Q-1 Securities be rated at least "Baa2" by Moody's. The rating of the Class Q-1 Securities by Moody's addresses solely the return of the Class Q-1 Rated Principal.

The Income Notes will not be rated by Standard & Poor's or Moody's or any other rating agency.

The Issuers will request that each Rating Agency confirm its ratings on the Senior Notes and on the Class Q-1 Securities within 30 days after the Ramp-up End Date.

A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning Rating Agency. In the event that a rating initially assigned to any Class of Securities is subsequently lowered for any reason, no person or entity is obligated to provide any additional support or credit enhancement with respect to the Securities.

So long as any of the Senior Notes or Class Q-1 Securities remain Outstanding, the Issuers shall pay for continuous rating surveillance by S&P of the Senior Notes rated by S&P and by Moody's of the Senior Notes and the Class Q-1 Securities rated by Moody's. The failure of Moody's or Standard & Poor's to review or if requested, to confirm a rating or the withdrawal of a rating does not constitute an Event of Default under the Indenture.

The Issuer will notify the Irish Stock Exchange, so long as any Securities are listed thereon, if the ratings assigned to any Class of Securities are reduced or withdrawn.

## PLAN OF DISTRIBUTION

The Senior Notes, the Class Q-1 Securities and the Class Q-2A Securities are being offered by Citigroup Global Markets Inc. (in such capacity, the "Initial Purchaser") pursuant to a purchase agreement with the Issuers, and the Income Notes and the Class Q-2B Securities are being offered by the Issuer through Citigroup Global Markets Inc. (in such capacity, the "Placement Agent") pursuant to the Placement Agency Agreement to prospective purchasers from time to time in individually negotiated transactions at varying prices to be determined in each case at the time of sale. Securities will be offered (i) except in the case of the Class Q-2B Securities, within the United States to Qualified Purchasers that are also (A) Qualified Institutional Buyers or (B) in the case of the Income Notes only, Accredited Investors, and (ii) outside the United States in reliance on Regulation S. *See "Purchase and Transfer Restrictions."*

The purchase agreement provides that the obligation of the Initial Purchaser to purchase the Senior Notes, the Class Q-1 Securities and the Class Q-2A Securities is subject to approval of legal matters by counsel and to other conditions. The Initial Purchaser must purchase all the Senior Notes, Class Q-1 Securities and Class Q-2A Securities if it purchases any of such Securities.

In connection with sales outside the United States, with respect to the Senior Notes, Class Q-1 Securities and Class Q-2A Securities, the Initial Purchaser, and with respect to the Income Notes and the Class Q-2B Securities, the Placement Agent, have agreed that, except as permitted by the purchase agreement or the Placement Agency Agreement, as the case may be, they will not offer or sell the Notes and the Class Q Securities within the United States or to, or for the account or benefit of, U.S. persons (i) as part of its distribution at any time or (ii) otherwise (a) with respect to the Senior Notes, until 40 days after the later of the commencement of the offering and the Closing Date, and it will have sent to each dealer to which it sells Senior Notes during the 40-day restricted period, (b) with respect to the Income Notes, the Class Q-1 Securities and the Class Q-2A Securities, until one year after the later of the commencement of the offering and the Closing Date, and it will have sent to each dealer to which it sells Income Notes, Class Q-1 Securities and Class Q-2A Securities during the one year restricted period, and (c) with respect to the Class Q-2B Securities, at any time, and it will have sent to each dealer to which it sells Class Q-2B Securities, in each case, a confirmation or other notice setting forth the restrictions on offers and sales of

010733

the Notes and Class Q Securities within the United States or to, or for the account or benefit of, U.S. Persons. In addition, until 40 days (with respect to the Senior Notes) and one year (with respect to the Income Notes, the Class Q-1 Securities and the Class Q-2A Securities) after the commencement of this offering, an offer or sale of Senior Notes or the Income Notes, Class Q-1 Securities or Class Q-2A Securities, as applicable, within the United States by a dealer that is not participating in this offering may violate the registration requirements of the Securities Act if that offer or sale is made otherwise than in accordance with Rule 144A (or, in the case of the Income Notes, another exemption from registration under the Securities Act). Class Q-2B Securities will not be offered or sold within the United States.

No action is being taken or is contemplated by the Issuers that would permit a public offering of the Securities or possession or distribution of this Offering Circular or any amendment thereof, any supplement thereto or any other offering material relating to the Issuers or the Securities in any jurisdiction where, or in any other circumstances in which, action for those purposes is required.

The Initial Purchaser and the Placement Agent or their respective Affiliates may have had in the past and may in the future have business relationships and dealings with one or more Reference Entities and their Affiliates and may own equity or debt securities issued by such entities or their Affiliates. The Initial Purchaser and the Placement Agent or their respective Affiliates may have provided and may in the future provide investment banking services to a Reference Entity or its Affiliates and may have received or may receive compensation for such services.

The Issuer has agreed to indemnify the Initial Purchaser and the Placement Agent against certain liabilities, including liabilities under the Securities Act, and has agreed to contribute to payments that the Initial Purchaser and the Placement Agent may be required to make in respect thereof.

The Securities are offered when, as and if issued, subject to prior sale or withdrawal, cancellation or modification of the offer without notice and subject to approval of certain legal matters by counsel and certain other conditions.

The Securities will constitute new classes of securities with no established trading market. Such a market may or may not develop, but the Initial Purchaser and the Placement Agent are not under any obligation to make such a market, and if they do make such a market they may discontinue any market-making activities with respect to the Securities at any time without notice. In addition, market-making activity will be subject to the limits imposed by the Securities Act and the Exchange Act. Accordingly, no assurances can be made as to the liquidity of or the trading market for the Securities.

Citigroup Global Markets Inc. may be contacted at 390 Greenwich Street, New York, New York 10013, Attention: Global Structured Credit Product Group.

010734

## CERTAIN ERISA CONSIDERATIONS

ERISA imposes certain requirements on "employee benefit plans" (as defined in Section 3(3) of ERISA) subject to ERISA, including entities such as collective investment funds and separate accounts whose underlying assets include the assets of such plans (collectively, "ERISA Plans ") and on those persons who are fiduciaries with respect to ERISA Plans. Investments by ERISA Plans are subject to ERISA's general fiduciary requirements, including the requirement of investment prudence and diversification and the requirement that an ERISA Plan's investments be made in accordance with the documents governing the ERISA Plan. The prudence of a particular investment must be determined by the responsible fiduciary of an ERISA Plan by taking into account the ERISA Plan's particular circumstances and all of the facts and circumstances of the investment including, but not limited to, the matters discussed above under "Risk Factors" and the fact that in the future there may be no market in which such fiduciary will be able to sell or otherwise dispose of any Securities it may purchase.

Section 406 of ERISA and Section 4975 of the Code prohibit certain transactions involving the assets of an ERISA Plan (as well as those plans that are not subject to ERISA but which are subject to Section 4975 of the Code, such as individual retirement accounts, including entities whose underlying assets include the assets of such plans (together with ERISA Plans, "Plans")) and certain persons (referred to as "parties in interest" or "disqualified persons") having certain relationships to such Plans, unless a statutory or administrative exemption is applicable to the transaction. A party in interest or disqualified person who engages in a prohibited transaction may be subject to excise taxes and other penalties and liabilities under ERISA and the Code.

The U.S. Department of Labor has promulgated a regulation, 29 CFR Section 2510.3-101 (the "Plan Asset Regulation"), describing what constitutes the assets of a Plan with respect to the Plan's investment in an entity for purposes of certain provisions of ERISA, including the fiduciary responsibility provisions of Title I of ERISA, and Section 4975 of the Code. Under the Plan Asset Regulation, if a Plan invests in an "equity interest" of an entity that is neither a "publicly-offered security" nor a security issued by an investment company registered under the Investment Company Act, the Plan's assets include both the equity interest and an undivided interest in each of the entity's underlying assets, unless it is established that the entity is an "operating company" or that equity participation in the entity by Benefit Plan Investors is not "significant." The term "Benefit Plan Investor" is defined in the Plan Asset Regulation as (a) any employee benefit plan (as defined in Section 3(3) of ERISA), whether or not it is subject to the provisions of Title I of ERISA, (b) any plan described in Section 4975(e)(1) of the Code and (c) any entity whose underlying assets include plan assets by reason of a plan's investment in the entity.

The Senior Notes and the Class Q-2A Securities should not be considered to be "equity interests" in the Issuers. However, the Income Notes, the Class Q-1 Securities and the Class Q-2B Securities may constitute "equity interests" in the Issuer for purposes of the Plan Asset Regulation, and such Income Notes, Class Q-1 Securities and Class Q-2B Securities will not constitute "publicly-offered securities" for purposes of the Plan Asset Regulation. In addition, the Issuer will not be registered under the Investment Company Act and it is not likely that the Issuer will qualify as an "operating company" for purposes of the Plan Asset Regulation. Therefore, if equity participation in the Issuer by Benefit Plan Investors is "significant" within the meaning of the Plan Asset Regulation, the assets of the Issuer could be considered to be the assets of any Plans that purchase or hold Income Notes, Class Q-1 Securities or Class Q-2B Securities. In such circumstances, in addition to considering the applicability of ERISA and the Code to the Income Notes, Class Q-1 Securities and Class Q-2B Securities, a Plan fiduciary considering an investment in the Income Notes, Class Q-1 Securities or Class Q-2B Securities would have to consider the applicability of ERISA and the Code to transactions involving the Issuers, Swap Counterparty, Swap Guarantor, Reference Portfolio Manager, Trustee, Collateral Administrator, Investment Agreement Counterparty, Investment Agreement Guarantor, Placement Agent, Initial Purchaser or Amendment Buy-Out Purchaser and their respective Affiliates, including whether such transactions might constitute a prohibited transaction under ERISA or Section 4975 of the Code or otherwise may result in a breach of fiduciary duty under ERISA.

Under the Plan Asset Regulation, equity participation in an entity (including the Issuer) by Benefit Plan Investors is "significant" on any date if, immediately after the most recent acquisition of any equity interest in the entity, 25% or more of the value of any class of equity interests in the entity is held by Benefit Plan Investors. For purposes of this determination, the value of equity interests held by a person (other than a Benefit Plan Investor) that has discretionary authority or control with respect to the assets of the entity or that provides investment advice for a

fee (direct or indirect) with respect to such assets (or any "affiliate" of such a person (as defined in the Plan Asset Regulation)) is disregarded (any such person with respect to the Issuers, a "Controlling Person").

The Issuer intends to limit investment in the Income Notes by Benefit Plan Investors to less than 25% of the Income Notes (excluding (i) Income Notes represented by the Class Q-1 Income Note Component, (ii) Income Notes represented by the Class Q-2 Collateral Asset A and (iii) Income Notes held by Controlling Persons) and to prohibit investment in the Class Q-1 Securities and the Class Q-2B Securities by Benefit Plan Investors entirely. In order to effect these limitations, each prospective purchaser of Income Notes in the initial offering thereof will be required to represent, as to whether such purchaser is a Benefit Plan Investor or Controlling Person and each prospective purchaser of Class Q-1 Securities and Class Q-2B Securities in the initial offering thereof will be required to represent that such purchaser is not a Benefit Plan Investor. No Income Notes will be sold to any person if Benefit Plan Investors would own 25% or more of the Income Notes (excluding (i) Income Notes represented by the Class Q-1 Income Note Component, (ii) Income Notes represented by the Class Q-2 Collateral Asset A and (iii) Income Notes held by Controlling Persons) immediately after such sale and no Class Q-1 Securities or Class Q-2B Securities will be sold to purchasers that have represented that they are Benefit Plan Investors. In addition, as a condition to the transfer of Income Notes after the initial offering thereof, each prospective transferee will be required to represent as to whether such transferee is a Benefit Plan Investor or Controlling Person, and the Trustee will not register the transfer of such Income Notes to any person if Benefit Plan Investors would own 25% or more of the Income Notes (excluding (i) Income Notes represented by the Class Q-1 Income Note Component, (ii) Income Notes represented by the Class Q-2 Collateral Asset A and (iii) Income Notes owned by Controlling Persons) immediately after such transfer. In addition, as a condition to the transfer of Class Q-1 Securities and of Class Q-2B Securities after the initial offering thereof, each prospective transferee will be required to represent that such transferee is not a Benefit Plan Investor, and the Trustee will not register the transfer of such Class Q-1 Securities and Class Q-2B Securities to persons that have represented that they are Benefit Plan Investors.

There can be no assurance that there will not be circumstances in which transfers of the Income Notes, Class Q-1 Securities and Class Q-2B Securities will be required to be restricted in order to comply with the aforementioned transfer limitations. Moreover, there can be no assurance that, despite the restrictions relating to purchases by or proposed transfers to Benefit Plan Investors and Controlling Persons, the assets of the Issuer would not be deemed to constitute assets of any Plans that purchase or hold the Income Notes, Class Q-1 Securities or Class Q-2 Securities.

Additionally, prohibited transactions within the meaning of Section 406 of ERISA or Section 4975 of the Code may arise if Securities are acquired by a Plan with respect to which the Issuers, Swap Counterparty, Reference Portfolio Manager, Trustee, Collateral Administrator, Investment Agreement Counterparty, Investment Agreement Guarantor, Placement Agent, Initial Purchaser or Amendment Buy-Out Purchaser, or any of their respective Affiliates, is a party in interest or a disqualified person. Certain exemptions from the prohibited transaction provisions of Section 406 of ERISA and Section 4975 of the Code may be applicable, however, depending in part on the type of Plan fiduciary making the decision to acquire an interest in a Security and the circumstances under which such decision is made. Included among these exemptions are Prohibited Transaction Class Exemption ("PTCE") 96-23 (relating to transactions directed by an in-house professional asset manager); PTCE 95-60 (relating to transactions involving insurance company general accounts); PTCE 91-38 (relating to investments by bank collective investment funds); PTCE 84-14 (relating to transactions effected by a qualified professional asset manager); and PTCE 90-1 (relating to investments by insurance company pooled separate accounts). There can be no assurance that any of these class exemptions or any other exemption will be available with respect to any particular transaction involving the Securities.

BY ITS PURCHASE OF ANY NOTE IN THE FORM OF A GLOBAL NOTE, THE PURCHASER THEREOF WILL BE DEEMED TO HAVE REPRESENTED AND WARRANTED, AND PURCHASERS OF INCOME NOTES AND CLASS Q-2A SECURITIES WILL BE REQUIRED TO REPRESENT AND WARRANT, ON EACH DAY FROM THE DATE ON WHICH THE PURCHASER ACQUIRES ITS INTEREST IN SUCH SECURITY THROUGH AND INCLUDING THE DATE ON WHICH THE PURCHASER DISPOSES OF ITS INTEREST IN SUCH SECURITY, EITHER THAT (A) IT IS NOT A PLAN, AN ENTITY WHOSE UNDERLYING ASSETS INCLUDE THE ASSETS OF A PLAN BY REASON OF DEPARTMENT OF LABOR REGULATION SECTION 2510.3-101 OR OTHERWISE, OR A GOVERNMENTAL PLAN WHICH IS SUBJECT TO ANY FEDERAL, STATE OR LOCAL LAW THAT IS SUBSTANTIALLY SIMILAR TO THE

010736

PROVISIONS OF SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE OR (B) ITS PURCHASE, HOLDING AND DISPOSITION OF SUCH SECURITY WILL NOT RESULT IN A PROHIBITED TRANSACTION UNDER SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE (OR, IN THE CASE OF A GOVERNMENTAL PLAN, ANY SUBSTANTIALLY SIMILAR FEDERAL, STATE OR LOCAL LAW) FOR WHICH AN EXEMPTION IS NOT AVAILABLE, ALL THE CONDITIONS OF WHICH ARE SATISFIED.

Governmental plans and certain church plans, while not subject to the fiduciary responsibility provisions of ERISA or the provisions of Section 4975 of the Code, may nevertheless be subject to local, state or other federal laws that are substantially similar to the foregoing provisions of ERISA and the Code. Fiduciaries of any such plans should consult with their counsel before purchasing any Securities.

Any Plan fiduciary that proposes to cause a Plan to purchase an interest in any Securities should consult with its counsel regarding the applicability of the fiduciary responsibility and prohibited transaction provisions of ERISA and Section 4975 of the Code to such an investment, and to confirm that such investment will not constitute or result in a prohibited transaction or any other violation of an applicable requirement of ERISA, the Code or other applicable law.

The sale of interests in any Securities to a Plan is in no respect a representation by the Issuers, Initial Purchaser, Placement Agent, Swap Counterparty, Reference Portfolio Manager, Trustee, Collateral Administrator or Amendment Buy-Out Purchaser that such an investment meets all relevant legal requirements with respect to investments by Plans generally or any particular Plan, or that such an investment is appropriate for Plans generally or any Plan.

## CERTAIN INCOME TAX CONSIDERATIONS

### General

The following summary describes the principal U.S. federal income tax and Cayman Islands tax consequences of the purchase, ownership and disposition of the Securities. It does not purport to be a comprehensive description of all the tax considerations that may be relevant to a decision to purchase Securities. In particular, special tax considerations that may apply to certain types of taxpayers, including securities dealers, banks and insurance companies, and to subsequent purchasers of Securities, are not addressed. In addition, this summary does not describe any tax consequences arising under the laws of any taxing jurisdiction other than the United States federal government and the Cayman Islands. In general, the summary assumes that a holder acquires a Security at original issuance and holds such Security as a capital asset and not as part of a hedge, straddle, or conversion transaction, within the meaning of section 1258 of the United States Internal Revenue Code of 1986, as amended (the "Code").

This summary is based on the U.S. and Cayman Islands tax laws, regulations, rulings and decisions in effect or available on the date of this Offering Circular, as well as the expected Cayman Islands undertaking described in "—*Cayman Islands Tax Considerations*." All of the foregoing are subject to change, and any change may apply retroactively and could affect the continued validity of this summary, although it is expected that no changes will apply in the Cayman Islands due to the undertaking.

This summary is included herein for general information only, and there can be no assurance that the U.S. Internal Revenue Service (the "IRS") will take a similar view of the U.S. federal income tax consequences of an investment in the Securities as described herein. Accordingly, prospective purchasers of the Securities should consult their own tax advisors as to U.S. federal income tax and Cayman Islands tax consequences of the purchase, ownership and disposition of such Securities, including the possible application of state, local, non-U.S. or other tax laws.

### Certain United States Tax Considerations

As used in this section, the term "U.S. holder" means a beneficial owner of a Security who is a citizen or resident of the United States, a U.S. domestic corporation or partnership, any estate the income of which is subject to U.S. federal income tax regardless of the source of its income or any trust if a court within the United States is able

010737

to exercise primary supervision over the administration of the trust and one or more U.S. persons have the authority to control all substantial decisions of the trust. The term "non-U.S. holder" means a beneficial owner of a Security who is not a U.S. holder.

**Tax Treatment of the Issuer**

*Classification of the Issuer.* Under Treasury regulations governing the U.S. federal income tax treatment of entities organized under non-U.S. laws, a Cayman Islands limited liability company is generally classified as an association taxable as a corporation unless it affirmatively elects other treatment. The Issuer does not intend to make any such election, and its governing documents preclude its making such an election. By acquiring a Security, a U.S. holder acknowledges that it is the holder's intent and that the holder understands it is the intent of the Issuer that, for purposes of U.S. federal income, state and local income and franchise tax and any other income taxes, the Issuer will be treated as a corporation, and that the holder agrees to such treatment and agrees to take no action inconsistent with such treatment. The discussion in this Offering Circular assumes that the Issuer will be treated as a corporation for U.S. federal income tax purposes.

*United States Federal Income Taxes.* The Issuer, as a foreign corporation, will be subject to U.S. federal income tax on its net income only if it is treated as engaged in a trade or business within the United States. The Issuer intends to operate so as not to be subject to U.S. federal income taxes on its net income. On the Closing Date the Issuer will receive an opinion from Cleary, Gottlieb, Steen & Hamilton to the effect that, under current law and assuming compliance with the Issuer's Memorandum and Articles, the Indenture, the Swap Agreement, the Reference Portfolio Management Agreement, the certifications by purchasers of the Securities in accordance with the Indenture and other related documents, while not free from doubt, the Issuer's contemplated activities should not cause it to be engaged in a trade or business in the United States.

Prospective investors should be aware that there can be no assurance that the IRS will not seek to treat the Issuer as being engaged in a trade or business in the United States. The Issuer will rely in part upon Treasury regulations, and upon proposed Treasury regulations with proposed elective retroactive effect, providing in general that non-U.S. persons that trade or invest for their own account in U.S. securities and in derivative financial instruments with U.S. counterparties will not be treated as engaged in a trade or business within the United States. The use of a single swap agreement to transfer to the Issuer a portion of the credit and market risks of a reference portfolio that may consist primarily of Term Loans and Revolving Loans, which reference portfolio is managed by a Reference Portfolio Manager on behalf of the Swap Counterparty, and as to which the underlying instruments may be owned in whole or part by the Swap Counterparty or affiliates thereof, is an unusual structure, however, and no activity closely comparable to that of the Issuer has been the subject of any Treasury regulation, revenue ruling or judicial decision. If the IRS were successfully to characterize the Issuer as being engaged in a trade or business in the United States, among other consequences, the Issuer would be subject to net income taxation in the United States on income that is effectively connected to such trade or business, which could materially adversely affect the Issuer's financial ability to comply with its obligations with respect to the Senior Notes and to make distributions on the Income Notes. In addition, if the Issuer were held to be engaged in a trade or business in the United States, it could lose its right to claim deductions for U.S. federal income tax purposes unless it has filed a U.S. federal income tax return and could also be subject to the branch profits tax. The remainder of this summary assumes that the Issuer will not be treated as engaged in a U.S. trade or business.

*Withholding Taxes.* Although the Issuer does not intend to be subject to U.S. federal income tax with respect to its net income, income derived by the Issuer may be subject to withholding taxes imposed by the United States or other countries. In this regard, the Issuer is prohibited from purchasing an Eligible Investment that is subject to withholding tax at the time of acquisition unless the obligor thereof is required to make "gross-up" payments. The Issuer will not, however, make any independent investigation of the circumstances surrounding the issuance of the individual assets comprising the Eligible Investments and there can therefore be no assurance that in every case payments will be received free of withholding tax. Moreover, there can be no assurance that as a result of a change in any applicable law, treaty, rule or regulation or interpretation thereof, the payments on the Eligible Investments might not in the future become subject to withholding tax. Under the Swap Agreement, all payments will be made by the Issuer or the Swap Counterparty free and clear of withholding taxes currently applicable to payments made to non-resident foreign persons.

010738

*Issuance of the Notes*. For U.S. federal income tax purposes, the Issuer, and not the Co-Issuer, will be treated as the obligor of the Senior Notes and as the issuer of the Income Notes.

## Tax Treatment of U.S. Holders of Senior Notes

*Classification of the Senior Notes as Debt*. The Class A Notes, Class B Notes and Class C Notes will be treated as debt for U.S. federal income tax purposes. By acquiring a Security, a U.S. holder acknowledges that it is the holder's intent and that the holder understands it is the intent of the Issuer that, for purposes of U.S. federal income, state and local income and franchise tax and any other income taxes, the Senior Notes will be treated as indebtedness of the Issuer, and the holder agrees to such treatment and agrees to take no action inconsistent with such treatment.

*Interest and Discount on the Class A Notes*. U.S. holders of Class A Notes will treat stated interest on such Class A Notes as ordinary interest when received or accrued, in accordance with their tax method of accounting. In general, if the "issue price" of a Class A Note (the first price at which a substantial amount of such class of Class A Notes is sold to investors) is less than its principal amount by more than a *de minimis* amount, such Note will be considered to have original issue discount ("OID"). Because the Issuer expects that the Class A Notes will be issued with no more than a de minimis amount of OID, a U.S. holder of a Class A Note should not be required to accrue OID over the life of such Senior Note. If, however, a U.S. holder acquires a Class A Note with OID, then regardless of such holder's method of accounting, the holder will be required to include such OID in income as it accrues under a constant yield method. Accruals of OID should be based on the projected weighted average life of a Class A Note (as adjusted in the event of a Maturity Extension) rather than its stated maturity. Accruals of OID, if any, should be calculated by assuming that interest will be paid over the life of the Class A Note based on the value of LIBOR used in setting interest for the first interest accrual period, and then adjusting the income for each subsequent interest accrual period for any difference between the actual value of LIBOR used in setting interest for that subsequent interest accrual period and the assumed rate.

*Interest and Discount on the Class B Notes and Class C Notes*. Because payments of stated interest on the Class B Notes and Class C Notes are contingent on available funds and subject to deferral, the Class B Notes and Class C Notes will be treated for U.S. federal income tax purposes as having OID. The total amount of such discount with respect to a Class B Note or Class C Note will equal the sum of all payments to be received under such Note less its issue price (the price at which a substantial amount of Notes of the same Class were sold to investors). A U.S. holder of Class B Notes and Class C Notes will be required to include OID in income as it accrues. The amount of OID accruing in any interest accrual period will generally equal the stated interest accruing in that period (whether or not currently payable) plus any additional amount representing the accrual under a constant yield method of any additional OID represented by the excess of the principal amount of the Class B Notes and Class C Notes over their issue price. Accruals of any such additional OID should be based on the weighted average life of the Class B Notes and Class C Notes (as adjusted in the event of a Maturity Extension) rather than their stated maturity. In the case of floating rate notes, accruals of OID should be calculated by assuming that interest will be paid over the life of such Notes based on the value of LIBOR used in setting interest for the first interest accrual period, and then adjusting the income for each subsequent interest accrual period for any difference between the actual value of LIBOR used in setting interest for that subsequent interest accrual period and the assumed rate.

*Sale and Retirement of Senior Notes*. In general, a U.S. holder of a Senior Note will have a basis in such Senior Note equal to the cost of the Senior Note to such holder, increased by any amount includible in income by such holder as OID and reduced by any payments thereon other than payments of qualified stated interest. Upon a sale or exchange of the Senior Note, including the retirement of a Senior Note, a U.S. holder will generally recognize gain or loss equal to the difference between the amount realized (less any accrued interest, which would be taxable as such) and the holder's tax basis in the Senior Note. An extension of the term of the Swap Agreement and the Senior Notes, as described under *"The Swap Agreement—Extension of the Swap Agreement"* and *"Description of the Securities—Maturity of the Notes and Class Q-1 Securities and Extension of Maturity of the Notes and Class Q-1 Securities—Extension of Maturity,"* respectively, should not cause a deemed exchange of the Senior Notes. The existence or exercise of the buy-out right described under *"Description of the Securities— Amendment Buy-Out"* may increase the likelihood that an amendment to the Swap Agreement or the Indenture could cause a deemed exchange of the Senior Notes for U.S. federal income tax purposes upon which capital gain or

010739

loss would be realized. If a deemed exchange were treated as a recapitalization, holders generally would not recognize gain or loss, but holders who purchased Senior Notes at a discount could be required to accrue such discount as interest income on a current basis as OID.

Such gain or loss will be long-term capital gain or loss if the U.S. holder has held the Senior Note for more than one year at the time of disposition. In certain circumstances, U.S. holders that are individuals may be entitled to preferential treatment for net long-term capital gains. The ability of U.S. holders to offset capital losses against ordinary income is limited. A U.S. holder may also recognize gain upon receipt of a principal payment equal to the difference between the amount received and the portion of its basis that is considered to be allocable to such payment. Such gain may be ordinary income. A U.S. holder should consult its own tax advisor regarding the U.S. federal income tax consequences of an extension of the term of the Swap Agreement and Maturity of the Notes and any amendment to the Swap Agreement or Indenture.

**Tax Treatment of Income Notes**

*Classification of Income Notes as Equity.* For purposes of Cayman Islands law, the Income Notes will be characterized as debt of the Issuer. A strong likelihood exists, however, that the Income Notes will be treated as equity of the Issuer for U.S. federal income tax purposes. In general, the characterization of an instrument for U.S. federal income tax purposes as debt or equity by its issuer as of the time of issuance is binding on a holder (but not the IRS), unless the holder takes an inconsistent position and discloses such position in its tax return. The Issuer and each holder, upon making an investment in the Income Notes, will be obligated to treat the Income Notes as equity of the Issuer for such purposes. Except where otherwise indicated, this summary also assumes such treatment. No assurance can be given, however, that the IRS will respect this position in light of the Income Notes' status as debt for purposes of Cayman Islands law.

In general, the timing and character of income on the Income Notes may differ substantially depending on whether the Income Notes are treated for federal income tax purposes as debt instruments or as equity of the Issuer. Investors should consider the tax consequences of an investment in the Income Notes under either possible characterization.

*Investment in a Passive Foreign Investment Company.* The Issuer will meet the income and asset tests so as to qualify as a passive foreign investment company ("PFIC"). In general, to avoid certain adverse tax rules described below that apply to deferred income from a PFIC, a U.S. holder of Income Notes may want to make an election to treat the Issuer as a "qualified electing fund" ("QEF") with respect to such holder. Generally, a QEF election should be made on or before the due date for filing such a U.S. holder's U.S. federal income tax return for the first taxable year in which it holds Income Notes. If a timely QEF election is made, an electing U.S. holder will be required to include in its ordinary income such holder's pro rata share of the Issuer's ordinary earnings and to include in its long-term capital gain income such holder's pro rata share of the Issuer's net capital gain, whether or not distributed, assuming that the Issuer is not a "controlled foreign corporation" or a "foreign personal holding company" as discussed below. In certain cases in which a QEF does not distribute all of its earnings in a taxable year, its U.S. shareholders may also be permitted to elect to defer payment of some or all of the taxes on the QEF's income but will then be subject to an interest charge on the deferred amount.

Prospective purchasers of Income Notes should be aware that under a number of circumstances the Issuer may have ordinary income or earnings prior to the receipt of cash. Under certain circumstances, net payments received under the Swap Agreement, which generally will represent ordinary earnings, may be used to pay principal of the Senior Notes, but such principal payments generally will not result in a corresponding decrease in ordinary earnings. Moreover, net payments receivable under the Swap Agreement but not yet due may be required to be included in ordinary earnings as periodic payments on a notional principal contract or as accruals of nonperiodic payments on a notional principal contract with respect to fixed amounts payable at a future date (such as payments on a Reference Obligation that is a PIK Obligation). The Issuer intends to report any such amounts as accruing in this manner. By purchasing the Income Notes a U.S. holder agrees to treat the Swap Agreement as a notional principal contract and to treat such amounts as accruing in this manner. In addition, Eligible Investments may be purchased by the Issuer with original issue discount, which also could give rise to ordinary earnings prior to the receipt of cash attributable to such earnings. Furthermore, due to the amounts that may be required to be retained in the Collateral Account and other restrictions on the Issuer's obligation to make distributions on the Income Notes,

010740

the cash distributions to a U.S. holder could in some taxable years be less than the taxable income that it will be required to include as a result of the QEF election. In addition, in the event that there is an extension of the term of the Swap Agreement as described under *"The Swap Agreement—Extension of the Swap Agreement,"* it is likely for U.S. federal income tax purposes that this extension will cause a deemed exchange of the Swap Agreement upon which capital gain or loss is realized. The Issuer intends to treat an extension as such a deemed exchange and report any resulting gain or loss as such for U.S. federal income tax purposes, and by purchasing the Income Notes each U.S. holder agrees to such treatment. The existence or exercise of the buy-out right described under *"Description of the Securities—Amendment Buy-Out"* may increase the likelihood that an amendment to the Swap Agreement could cause a deemed exchange of the Swap Agreement for U.S. federal income tax purposes. As a result of any such deemed exchange, U.S. holders of Income Notes may recognize gain with respect to the deemed exchange without a related receipt of cash. Thus, absent an election to defer the payment of taxes, U.S. holders of Income Notes that make a QEF election may owe tax on a significant amount of "phantom" income. Moreover, where the Issuer realizes a net loss for a taxable year, this loss will not be deductible by (or otherwise result in a tax benefit to) either the U.S. holder or the Issuer in any subsequent taxable year (whereas if no QEF election is made, losses will reduce future distributions and "excess distributions" as described in the second paragraph below). A U.S. holder should consult its own tax advisor regarding the U.S. federal income tax consequences of any amendment to the Swap Agreement.

The IRS and U.S. Treasury Department recently issued proposed regulations that require current accrual of income and expense with respect to contingent nonperiodic payments made under certain notional principal contracts. The regulations are proposed to apply only to contracts entered into after the regulations are issued in final form, and therefore will not apply to the Swap Agreement if they are finalized in the form proposed. The preamble to the regulations, however, states that taxpayers that do not already have a method of tax accounting for notional principal contracts providing for contingent nonperiodic payments generally must take such payments into account over the life of such a contract under a reasonable amortization method. Because the Swap Agreement provides for quarterly payments based on a specified index and notional principal amount, payments under the Swap Agreement should be treated as periodic rather than nonperiodic payments. Accordingly, the IRS position stated in the preamble to the proposed regulations should have no effect on the U.S. federal income tax treatment of the Swap Agreement.

The Issuer will provide, upon request, all information that a U.S. holder making a QEF election is required to obtain for U.S. federal income tax purposes (*e.g.*, the U.S. holder's pro rata share of ordinary income and net capital gain) and a "PFIC Annual Information Statement" as described in Treasury Regulation Section 1.1295-1 (or in any successor IRS release or Treasury regulation), including all representations and statements required by such statement, and will take any other steps it reasonably can to facilitate such election. The Issuer will also elect to calculate and report the amount and category of each type of long-term capital gain as provided in section 1(h) of the Code that was recognized by the Issuer with respect to each taxable year of the Issuer.

If a U.S. holder does not make a timely QEF election for the year in which it acquired its Income Notes and the PFIC rules are otherwise applicable, such holder will be subject to a special tax at ordinary income tax rates on so-called "excess distributions," including both certain distributions from the Issuer and gain on the sale of Income Notes. The amount of income tax on excess distributions will be increased by an interest charge to compensate for tax deferral, calculated as if excess distributions were earned ratably over the period the taxpayer held its Income Notes. In many cases, the tax on excess distributions will be more onerous than the taxes that would apply if a timely QEF election were made. Classification as a PFIC may also have other adverse tax consequences, including in the case of individuals, the denial of a "step up" in the basis of the Income Notes at death.

Where a QEF election is not timely made by a U.S. holder for the year in which it acquired its Income Notes, but is made for a later year, the excess distribution rules can be avoided by making an election to recognize gain from a deemed sale of the Income Notes at the time when the QEF election becomes effective. A U.S. holder should consult its own tax advisor regarding the U.S. federal income tax consequences of investing in a PFIC and the desirability of making the QEF election.

**U.S. HOLDERS OF INCOME NOTES SHOULD CONSIDER CAREFULLY WHETHER TO MAKE A QEF ELECTION WITH RESPECT TO THE INCOME NOTES AND THE CONSEQUENCES OF NOT MAKING SUCH AN ELECTION.**

010741

*Investment in a Controlled Foreign Corporation.* Depending on the degree of ownership of the Income Notes by U.S. Shareholders (as defined below), the Issuer may be considered a controlled foreign corporation ("CFC"). In general, a foreign corporation will be a CFC if more than 50% of the shares of the corporation, measured by combined voting power or value, are held, directly or indirectly, by U.S. Shareholders. A "U.S. Shareholder" for this purpose is any U.S. person who owns 10% or more of the combined voting power of all classes of shares of a corporation. Ownership attribution rules are used in applying this test. It is possible that the IRS could assert that the Income Notes are voting securities and that U.S. holders owning 10% or more of the Income Notes are U.S. Shareholders. If this argument were successful and more than 50% of the Income Notes were held by such U.S. Shareholders, the Issuer would be treated as a CFC.

If the Issuer were a CFC, subject to certain exceptions, a U.S. Shareholder of the Issuer at the end of a taxable year of the Issuer would be required to recognize ordinary income in an amount equal to that person's pro rata share of the "subpart F income" of the Issuer for the year. Among other items, and subject to certain exceptions, "subpart F income" includes interest, gains from the sale of securities and income from certain notional principal contracts including swaps (determined in the case of the Swap Agreement in the manner described above under "—*Tax Treatment of Income Notes—Investment in a Passive Foreign Investment Company*"). It is likely that, if the Issuer were a CFC, substantially all of its income would be subpart F income. If more than 70% of the Issuer's income is subpart F income, then 100% of its income will be so treated.

If the Issuer were a CFC, a U.S. Shareholder of the Issuer would be taxable on the subpart F income of the Issuer under the CFC regime and not under the PFIC rules previously described. As a result, to the extent subpart F income of the Issuer includes net capital gains, such gains would be treated as ordinary income of the U.S. Shareholder, notwithstanding the fact that generally the character of such gains otherwise would be preserved under the PFIC rules if a QEF election were made. Also, the PFIC rule permitting the deferral of tax on undistributed earnings would not apply.

A U.S. holder that is a U.S. Shareholder of the Issuer subject to the CFC rules for only a portion of the time in which it holds Income Notes should consult its own tax advisors regarding the interaction of the PFIC and CFC rules.

*Investment in a Foreign Personal Holding Company.* If more than 50% of the Income Notes are owned directly or indirectly by five or fewer individuals who are U.S. citizens or residents, the Issuer will be considered a foreign personal holding company ("FPHC"). Ownership attribution rules are used in applying the 50% ownership test, including a rule that treats an individual as owning stock owned directly or indirectly by the individual's partners and a rule that treats an individual with an option to acquire stock as owning the related stock. Thus, for example, if a partnership with one U.S. individual partner purchased more than 50% of the Income Notes, the individual would be treated as owning more than 50% of the stock of the Issuer and the Issuer would be a FPHC.

If the Issuer were treated as a FPHC, a U.S. holder would be treated as receiving a dividend at the end of the taxable year of the Issuer in an amount equal to such holder's pro rata share of the Issuer's taxable "foreign personal holding company income" ("FPHCI"). Very generally, FPHCI includes all of an entity's taxable income less a deduction for dividends paid. Amounts of FPHCI included in income increase the U.S. holder's basis in the Income Notes and reduce the FPHC's accumulated earnings and profits as of the end of the year.

In the event the Issuer is treated as both a CFC and a FPHC, the FPHCI of the Issuer is reduced by the amount of subpart F income deemed distributed under the CFC rules. In the event the Issuer is treated as both a FPHC and a PFIC, the FPHC rules apply first. As a result, to the extent FPHCI of the Issuer includes net capital gains, such gains will be treated as ordinary income to the U.S. holder under the FPHC rules, notwithstanding the fact that the character of such gains otherwise generally would be preserved (subject to the CFC rules discussed above) under the PFIC rules if a QEF election were made.

*Distributions on Income Notes.* The treatment of actual cash distributions on the Income Notes, in very general terms, will vary depending on whether a U.S. holder has made a timely QEF election as described above. See "—*Tax Treatment of Income Notes—Investment in a Passive Foreign Investment Company.*" If a timely QEF election has been made, dividends (which are distributions up to the amount of current and accumulated earnings and profits of the Issuer) allocable to amounts previously taxed pursuant to the QEF election will not be taxable to

010742

U.S. holders. Similarly, if the Issuer is a CFC of which the U.S. holder is a U.S. Shareholder, dividends will be allocated first to amounts previously taxed pursuant to the CFC rules and to that extent will not be taxable to U.S. holders. Dividends in excess of such previously taxed amounts will be taxable to U.S. holders as ordinary income upon receipt, and will not be eligible for the dividends-received deduction (in the case of corporate U.S. holders) or the reduced rates of tax applicable to dividends from certain qualified foreign corporations (in the case of individual U.S. holders). Distributions in excess of any current and accumulated earnings and profits will be treated first as a nontaxable return of capital, to the extent of the holder's tax basis in the Income Notes, and then as capital gain. Because cash received by the Issuer from payments on the Swap Agreement and from Eligible Investments generally will be treated as giving rise to earnings and profits to the Issuer, distributions from the Issuer prior to the end of Portfolio Modification Period and for some period thereafter generally will be treated as made out of such earnings and profits rather than as a return of capital.

In the event that a U.S. holder does not make a timely QEF election, then except to the extent that distributions may be attributable to amounts previously taxed pursuant to the CFC or FPHC rules, some or all of any dividends distributed with respect to the Income Notes may be considered excess distributions, taxable as previously described. *See "—Tax Treatment of Income Notes—Investment in a Passive Foreign Investment Company."*

*Sale, Redemption or other Disposition of the Income Notes.* In general, a U.S. holder will recognize gain or loss (which will be capital gain or loss, except as discussed below) upon the sale or exchange of Income Notes equal to the difference between the amount realized and such holder's adjusted tax basis in the Income Notes. A U.S. holder's tax basis in Income Notes will generally equal the amount it paid for the Income Notes, increased by amounts taxable to such holder by virtue of a QEF election, or under the CFC or FPHC rules, and decreased by actual distributions from the Issuer that are deemed to consist of such previously taxed amounts or represent a return of capital.

If a U.S. holder does not make a timely QEF election as described above and the PFIC rules are otherwise applicable, any gain realized on the sale or exchange of Income Notes will be treated as an excess distribution and effectively taxed as ordinary income with an interest charge under the special tax rules described above. *See "—Tax Treatment of Income Notes—Investment in a Passive Foreign Investment Company."*

If the Issuer were treated as a CFC and a U.S. holder were treated as a U.S. Shareholder therein, then any gain realized by such holder upon the disposition of Income Notes, other than gain constituting an excess distribution under the PFIC rules, would be treated as ordinary income to the extent of the U.S. holder's share of the current and accumulated earnings and profits of the Issuer. In this respect, earnings and profits would not include any amounts previously taxed pursuant to a QEF election or pursuant to the CFC or FPHC rules.

The pledge of stock of a PFIC may in some circumstances be treated as a disposition of such stock.

**Tax Treatment of Tax-Exempt U.S. Holders**

A tax-exempt U.S. holder of a Security will not be subject to tax on unrelated business taxable income ("UBTI") with respect to income from the Security, except to the extent that the Security is debt-financed property (as defined in the Code) of that entity. A tax-exempt holder that owns more than fifty percent of the outstanding Income Notes and also owns Senior Notes should consider the possible application of the special UBTI rules for amounts received from controlled entities.

A tax-exempt entity may not make a QEF election if the tax-exempt entity would not otherwise be subject to tax on income from the Income Notes.

**Information Reporting and Backup Withholding**

Information reporting to the IRS generally will be required with respect to payments on the Securities and payments of proceeds of the sale of such Securities to U.S. holders other than corporations and other exempt recipients. A "backup" withholding tax will apply to those payments that are subject to information reporting if the holder fails to provide certain identifying information (such as the holder's taxpayer identification number) to the

010743

payor. Non-U.S. holders will be required to comply with applicable certification procedures to establish that they are not U.S. holders in order to avoid information reporting and backup withholding.

As a condition to the payment of principal of and interest on any Note without U.S. backup withholding, the Issuers will require the delivery of properly completed and signed U.S. federal income tax certifications (generally, an IRS Form W-9 (or applicable successor form) in the case of a U.S. holder or an IRS Form W-8BEN (or applicable successor form) in the case of a non-U.S. holder.

**Reporting Requirements**

Treasury regulations require reporting for certain transfers of property (including cash) to a foreign corporation by U.S. persons. In general, U.S. holders who acquire Income Notes are required to file a Form 926 with the IRS and to supply certain information to the IRS. If a U.S. holder fails to comply with the reporting requirements, the U.S. holder may be subject to a penalty equal to 10% of the gross amount paid for the Income Notes, subject to a maximum penalty of U.S. $100,000 (except in cases involving intentional disregard). Purchasers of Income Notes are urged to consult their tax advisors regarding these reporting requirements.

In addition, the Code and related Treasury regulations require that any U.S. holder that directly or indirectly owns a significant portion of the voting power or value of the Issuer's equity (generally 10 percent, but in some cases 50 percent) must comply with certain reporting requirements. While it is unclear how the voting power of the Income Notes would be measured for this purpose, a U.S. Holder that owns less than 10 percent (or 50 percent, as applicable) of the Income Notes should not be required to file this return. In general, such holders of the applicable percentage of the voting power or value of the Issuer's equity are required to file a Form 5471 with the IRS and to supply certain information with the IRS, including with respect to the activities and assets of the Issuer and other holders of the Income Notes. If a U.S. holder fails to comply with the reporting requirements, the U.S. holder may be subject to a penalty, depending on the circumstances, equal to (a) U.S. $1,000 for each failure to comply or (b) U.S. $10,000 for each failure to comply, subject to a maximum of U.S. $60,000. Purchasers of Income Notes are urged to consult their tax advisors regarding these reporting requirements.

**Tax Treatment of Non-U.S. Holders**

A non-U.S. holder of a Security will be exempt from any U.S. federal income or withholding taxes with respect to gain derived from the sale, exchange, or redemption of, or any distributions received in respect of, the Security, unless:

(a) such gain or distributions are effectively connected with a U.S. trade or business of such holder,

(b) with respect to distributions on the Class Q-2B Securities (i) the holder actually or constructively own 10 percent or more of the combined voting power of all classes of stock of CGMHI (the issuer of the Class Q-2 Collateral Asset B) or is a controlled foreign corporation related to CGMHI through stock ownership or (ii) the beneficial owner fails to provide a statement signed under penalties of perjury that includes its name and address and certifies that it is a non-U.S. Holder in compliance with applicable requirements (or satisfies certain documentary evidence requirements for establishing that it is a non-U.S. Holder), or,

(c) in the case of gain, such holder is a nonresident alien individual who holds the Security as a capital asset and who is present in the United States more than 182 days in the taxable year of the sale and certain other conditions are met.

A non-U.S. holder will not be considered to be engaged in a U.S. trade or business solely by reason of holding a Security. "Non-effectively connected" gain or distributions received by a non-U.S. holder will not be subject to U.S. information reporting requirements or U.S. backup withholding, although such holders will be required to furnish a certificate to the paying agent of the Issuer attesting to their status as non-U.S. holders. *See "—Information Reporting and Backup Withholding."*

126

010744

**Class Q Securities**

*Class Q-1 Securities*. Each Component of a Class Q-1 Security will be treated separately for U.S. federal income tax purposes. A Holder of Class Q-1 Securities will be treated as if it directly owned the related Components. A Holder of a Class Q-1 Security should review the applicable portions of this summary to determine the tax consequences of holding the related Components. In calculating its basis in each of the Components, a Holder will be required to allocate the purchase price paid for its Class Q-1 Security among the related Components in proportion to their relative fair market values at the time of purchase. A similar principle would apply in determining the amount allocable to each Component upon a sale. The exchange of a Class Q-1 Security for the separate Senior Notes or Income Notes corresponding to each Component will not be a taxable event.

*Class Q-2A Securities*. The Class Q-2A Securities will be treated as debt for U.S. federal income tax purposes. The Class Q-2A Securities should be taxed in a manner similar to the Class B Notes and Class C Notes. See the discussion under "Tax Treatment of U.S. Holders of Senior Notes" applicable to the Class B Notes and Class C Notes for the tax consequences to U.S. holders of holding the Class Q-2A Securities. See the discussion under "Tax Treatment of Non-U.S. Holders" for the tax consequences to Non-U.S. holders of holding the Class Q-2A Securities.

*Class Q-2B Securities*. See the discussion under "*Tax Treatment of Non-U.S. Holders*" for the tax consequences to Non-U.S. holders of holding the Class Q-2B Securities.

**Cayman Islands Tax Considerations**

Prospective investors should consult their professional advisors on the possible tax consequences of buying, holding or selling any Notes or Income Notes under the laws of their country of citizenship, residence or domicile.

<u>Cayman Islands Taxation</u>

The following is a discussion on certain Cayman Islands income tax consequences of an investment in the Notes or the Income Notes. The discussion is a general summary of present law, which is subject to prospective and retroactive change. It is not intended as tax advice, does not consider any investor's particular circumstances, and does not consider tax consequences other than those arising under Cayman Islands law.

*Under existing Cayman Islands Laws:*

1.       Payments in respect of the Notes will not be subject to taxation in the Cayman Islands and no withholding will be required on such payments to any holder of a Note, nor will gains derived from the disposal of the Notes be subject to Cayman Islands income or corporation tax. The Cayman Islands currently have no income, corporation or capital gains tax and no estate duty, inheritance tax or gift tax;

2.       No stamp duty is payable in respect of the issue or transfer of the Notes although duty may be payable if Notes are executed in or brought into the Cayman Islands; and

3.       Certificates evidencing the Notes, in registered form, to which title is not transferable by delivery, should not attract Cayman Islands stamp duty. However, an instrument transferring title to a Note, if brought to or executed in the Cayman Islands, would be subject to Cayman Islands stamp duty.

The Issuer has been incorporated under the laws of the Cayman Islands as an exempted company and, as such, has applied for and expects to obtain an undertaking from the Governor in Cabinet of the Cayman Islands in the following form:

010745

"**The Tax Concessions Law**
**(1999 Revision)**
**Undertaking as to Tax Concessions**

In accordance with the provision of Section 6 of The Tax Concessions Law (1999 Revision), the Governor in Cabinet undertakes with Valhalla CLO, Ltd. "the Company:"

1      That no law which is hereafter enacted in the Islands imposing any tax to be levied on profits, income, gains or appreciations shall apply to the Company or its operations; and

2      In addition, that no tax to be levied on profits, income, gains or appreciations or which is in the nature of estate duty or inheritance tax shall be payable:

      2.1      On or in respect of the shares, debentures or other obligations of the Company; or

      2.2      by way of the withholding in whole or part, on any relevant payment as defined in Section 6(3) of the Tax Concessions Law (1999 Revision).

These concessions shall be for a period of thirty years from the date hereof."

The Cayman Islands does not have any income tax treaty with the U.S. or any other country. The Cayman Islands has entered into an information exchange agreement with the United States.

010746

## LISTING AND GENERAL INFORMATION

Application will be made to the Irish Stock Exchange for the Securities to be admitted to the Daily Official List. No assurances can be given that any such listing will be obtained with respect to the Securities. The issuance and settlement of the Securities on the Closing Date are not conditioned on the listing of any Securities on the Irish Stock Exchange. As part of the harmonization of securities markets in Europe, the European Commission has adopted a directive known as the Prospectus Directive (which must be implemented by Member States by July 1, 2005) that will regulate offers of securities to the public and admissions to trading to E.U regulated markets. The European Commission is scheduled to adopt a directive known as the Transparency Directive towards the end of 2004 (which is expected to be implemented by Member States in 2006) that will among other things, impose continuing financial reporting obligations on issuers that have certain types of securities admitted to trading on an E.U. regulated market. In addition, the Market Abuse Directive (which must be implemented by Member States by October 12, 2004) harmonizes the rules on insider trading and market manipulation in respect of securities admitted to trading on an E.U. regulated market and requires issuers of such securities to disclose any non-public price-sensitive information as soon as possible, subject to certain limited exemptions. The listing of Securities on the Irish Stock Exchange would subject the Issuer to regulation under these directives, although the requirements applicable to the Issuer are not yet fully clarified. The Indenture will not require the Issuer to maintain a listing for any Class of Securities on an E.U. stock exchange if compliance with these directives (or other requirements adopted by the European Commission or a relevant Member State) becomes burdensome in the sole judgment of the Swap Counterparty.

If and for so long as any Class of Securities is listed on the Irish Stock Exchange, copies of the Articles of the Issuer, the Certificate of Incorporation and By-laws of the Co-Issuer and the resolutions of the Board of Directors of the Issuers authorizing, as applicable, the issuance of the Securities and the Indenture, will be available for inspection at the office of the Trustee. The Issuer is not required by Cayman Islands law, and the Issuer does not intend, to publish annual reports and accounts. The Co-Issuer is not required by Delaware law, and the Co-Issuer does not intend, to publish annual reports and accounts. The Indenture, however, requires the Issuer to provide the Trustee with written confirmation, on an annual basis, that to the best of its knowledge following review of the activities of the prior year, no Event of Default, Class Q-2 Event of Default, Swap Event of Default or other matter required to be brought to the Trustee's attention has occurred or, if one has, specifying the same.

Each of the Issuers represents that, as of the date of this Offering Circular, there has been no material adverse change in its financial position since the date of its creation. Neither of the Issuers is involved, or has been involved since incorporation, in any litigation or arbitration proceedings relating to claims on amounts which may have or have had a material effect on the Issuers in the context of the issue of the Securities, nor, so far as such Co-Issuer is aware, is any such litigation or arbitration involving it pending or threatened.

The issuance of the Securities will be authorized by the Board of Directors of the Issuer by resolutions passed on or about the Closing Date. The issuance of the Senior Notes was authorized by the Board of Directors of the Co-Issuer by resolutions passed on or about the Closing Date. Since incorporation, neither the Issuer nor the Co-Issuer has commenced trading, established any accounts or declared any dividends, except for the transactions described herein relating to the issuance of the Securities.

In connection with the listing of the Securities on the Daily Official List of the Irish Stock Exchange, this Offering Circular will be filed with the Registrar of Companies of Ireland pursuant to Regulation 13 of the European Communities (Stock Exchange) Regulations, 1984 of Ireland.

010747

The Regulation S Global Notes sold in offshore transactions in reliance on Regulation S and represented by the Regulation S Global Notes have been accepted for clearance through Euroclear and Clearstream with the following identification numbers:

Regulation S Global Notes

| Class | CUSIP Number | Common Code | ISIN Number |
|-------|-------------|-------------|-------------|
| A-1 | G93164 AA2 | 019948463 | USG93164 AA23 |
| A-2 | G93164 AB0 | 019948544 | USG93164 AB06 |
| B | G93164 AC8 | 019948404 | USG93164 AC88 |
| C-1 | G93164 AE4 | 019948587 | USG93164 AE45 |
| C-2 | G93164 AF1 | 019948633 | USG93164 AF10 |
| Q-1 | G93163 AD8 | 019949427 | USG93163 AD88 |

The Rule 144A Notes represented by the Rule 144A Global Notes have been accepted for clearance through DTC with the following identification numbers:

Rule 144A Global Notes

| Class | CUSIP Number |
|-------|-------------|
| A-1 | 91914R AA2 |
| A-2 | 91914R AB0 |
| B | 91914R AC8 |
| C-1 | 91914R AE4 |
| C-2 | 91914R AF1 |

Certificated Class Q Securities/Income Notes

| | CUSIP Number |
|--|-------------|
| Q-1 Rule 144A | 91914Q AG1 |
| Q-1 Regulation S | G93163 AD8 |
| Q-2A Rule 144A | 91914Q AB2 |
| Q-2A Regulation S | G93163 AB2 |
| Q-2B Regulation S | G93163 AC0 |
| Q-2B Rule 144A | Not offered in the U.S. |
| Income Note Rule 144A | 91914Q AA4 |
| Income Note Regulation S | G93163 AA4 |
| Income Note Accredited Investor | 91914Q AF3 |

## CERTAIN LEGAL MATTERS

The validity of the Notes and certain other legal matters will be passed upon for the Issuer and Citigroup Global Markets Inc., as Initial Purchaser and as Placement Agent, by Cleary, Gottlieb, Steen & Hamilton. Certain legal matters relating to Cayman Islands law will be passed on for the Issuer by Walkers. Certain legal matters will be passed upon for the Reference Portfolio Manager by Orrick, Herrington & Sutcliffe LLP.

010748

## GLOSSARY OF CERTAIN DEFINED TERMS

Set forth below are definitions of certain defined terms used in this Offering Circular.

"Accredited Investors":  "Accredited investors" as defined in Rule 501(a) under the Securities Act.

"Accrual Date":  With respect to a Reference Obligation (i) in the case of an Obligation Value Increase Amount or Obligation Value Reduction Amount determined pursuant to clause (1) or (3) of "*Description of the Swap Agreement—Valuation of Reference Obligations,*" the date that is the standard settlement cycle for such Reference Obligation after the date on which such amount is determined, and (ii) otherwise, the date on which the applicable Obligation Value Increase Amount or Obligation Value Reduction Amount therefor is determined (provided that in no event will the Accrual Date for a Reference Obligation occur later than the Business Day prior to the Swap Termination Date).

"Accrued Increase/Reduction Amount":  For a Measurement Date, an amount (which may be negative) equal to (a) the sum of all Obligation Value Increase Amounts (other than as a result of Amortizations) for Reference Obligations for which the Accrual Date occurred on or prior to such date and on or following the preceding Determination Date minus (b) the sum of all Obligation Value Reduction Amounts (including as a result of Amortizations) for Reference Obligations for which the Accrual Date occurred on or prior to such date and on or following the preceding Determination Date.

"Accrued Swap Liabilities":  With respect to any date of determination, the sum of (i) all amounts payable to the Swap Counterparty under the Swap Agreement as of such date of determination and (ii) all amounts payable to the Swap Counterparty under the Swap Agreement on any prior date and unpaid as of such date of determination, in each case other than amounts that constitute Administrative Expenses.

"Act on Foreign Investment Funds":  As defined in *"Notices to Purchasers—Notice to Residents of Germany."*

"Addition Date":  (i) With respect to an Initial Reference Obligation, the Closing Date and (ii) with respect to a Reference Obligation added after the Closing Date, the Business Day of its addition to the Reference Portfolio, which, in the case of a Reference Obligation other than a Reference Swap, will be the date the Reference Price thereof is determined.

"Adjusted Reference Portfolio Return Amount":  For any Payment Date, an amount (which may be negative) equal to the Reference Portfolio Proceeds for such Payment Date minus the following (subtracted in the following order):

(1)    the Retained Amount for such Payment Date;

(2)    the Base Amount, if any, for such Payment Date;

(3)    the Subordinate Amount, if any, for such Payment Date;

(4)    the Incentive Amount, if any, for such Payment Date;

(5)    the Quarterly Aggregate Reduction Amount, if any, for such Payment Date.

"Administrative Expenses":  Amounts due from or accrued for the account of the Issuers with respect to any Payment Date (and, to the extent not paid, from prior Payment Dates) to, in the following order of priority, (i) any Person in respect of any governmental fee, charge or tax (including all filing, registration and annual return fees payable to the Cayman Islands' government and registered office fees); (ii) the Trustee for the Trustee Fee and Trustee Expenses; (iii) the Collateral Administrator for the Collateral Administrator Fee and Collateral Administrator Expenses; (iv) the Administrator as provided in the Administration Agreement; and (v) on a *pari passu* basis, (A) the independent accountants, agents and counsel of the Issuers for fees and expenses (including, without limitation, tax reports); (B) any other Person in respect of any other expenses permitted under the Indenture and the documents delivered pursuant to or in connection with the Indenture, the Collateral Administration Agreement and the Securities; (C) any other Person in respect of any other expenses of the Issuers including,

010749

without limitation, fees, expenses or amounts for which the Swap Counterparty is entitled to indemnification from the Issuer under the Swap Agreement, (D) the Rating Agencies for any fees (including on-going monitoring fees and credit estimates) due and payable with respect to their respective rating of the Securities; (E) expenses and other amounts for which the Swap Counterparty is obligated to reimburse or pay the Reference Portfolio Manager under the Reference Portfolio Management Agreement; and (F) expenses for which the Swap Counterparty is entitled to reimbursement in connection with the transfer of its rights and obligations to a replacement swap counterparty or certain other actions upon a downgrade of it or the Swap Guarantor when required to do so under the Swap Agreement, in the case of this clause (F) in an amount not to exceed U.S. $50,000 in any calendar year; *provided*, *however*, that Administrative Expenses shall not include any amounts due or accrued with respect to actions taken on or prior to the Closing Date, which amounts will be payable only from the Expense Reserve Account.

"Administrator":  Walkers SPV Limited.

"Advisers Act":  The U.S. Investment Advisers Act of 1940, as amended.

"Affiliate":  With respect to any specified Person, any other Person controlling or controlled by or under common control with such specified Person.  For the purposes of this definition, "control," when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.  For purposes of this definition, (i) the management of an account by one Person for the benefit of any other Person shall not constitute "control" of such other Person and (ii) with respect to the Issuer, "Affiliate" does not include Walkers SPV Limited or any entities which Walkers SPV Limited controls or administers.

"Aggregate Principal Amount":  With respect to any date of determination, (i) when used with respect to any Class or Classes of Notes as a whole (or any specified Notes or Components of any such Class), the original principal amount of such Class or Classes (or of such specified Notes or Component, as applicable) reduced, in the case of the Senior Notes only, by all prior payments, if any, made with respect to the principal of such Class or Classes (or such Senior Notes or Class Q-1 Senior Note Component, as applicable), (ii) when used with respect to all of the Senior Notes, the sum of (a) the Aggregate Principal Amount of the Class A-1 Notes, (b) the Aggregate Principal Amount of the Class A-2 Notes, (c) the Aggregate Principal Amount of the Class B Notes, (d) the Aggregate Principal Amount of the Class C-1 Notes and (e) the Aggregate Principal Amount of the Class C-2 Notes, (iii) when used with respect to all of the Notes, the sum of (a) the Aggregate Principal Amount of the Senior Notes and (b) the Aggregate Principal Amount of the Income Notes, (iv) when used with respect to the Class Q-2A Securities (or any specified Class Q-2A Securities), the original principal amount of the Class Q-2A Securities (or of such specified Class Q-2A Securities) reduced by all prior payments, if any, made with respect to the principal of the Class Q-2A Securities (or of such specified Class Q-2A Securities) and (v) when used with respect to the Class Q-2B Securities (or any specified Class Q-2B Securities), the original principal amount of the Class Q-2B Securities (or of such specified Class Q-2B Securities).

"Aggregate Reference Obligation Calculation Amount":  As of any date of determination, the aggregate of the Reference Obligation Calculation Amounts for each Reference Obligation in the Reference Portfolio as of such date.

"Aggregate Reference Value":  As of any date of determination, the aggregate of the Reference Values for each Reference Obligation in the Reference Portfolio as of such date.

"Aggregate Unfunded Amount":  For a Collection Period, (i) the Swap Notional Amount immediately prior to the related Payment Date minus (ii) the average of the Daily Aggregate Funded Amount on each day of such period.

"Amendment Buy-Out": As defined in "*Summary—Amendment Buy-Out*."

"Amendment Buy-Out Option": As defined in "*Description of the Securities—Amendment Buy-Out*."

"Amendment Buy-Out Purchaser":  Citigroup Global Markets Inc., or an Affiliate thereof designated by the Swap Counterparty, or a Person designated by Citigroup Global Markets Inc. or such Affiliate.

"Amendment Buy-Out Purchase Price": As defined in "*Description of the Securities—Amendment Buy-Out*."

010750

"Amortization":  Any permanent prepayment, repayment, amortization, redemption, termination, cancellation or reduction of commitment or similar permanent reduction of principal or notional amount of the Reference Obligation Calculation Amount for any Reference Obligation.  A reduction in the outstanding balance of a Revolving Loan as a result of a repayment will not be considered an Amortization to the extent that the facility can subsequently be redrawn in accordance with its terms.  With respect to a Defaulted Reference Obligation, all amounts actually paid to holders thereof (and only such amounts) will constitute Amortizations until the related Reference Obligation Calculation Amount is reduced to zero, following which such amounts shall constitute Interest Return; *provided* that with respect to a Defaulted Reference Obligation that is a Revolving Loan, any cancellation or reduction of commitment as a result of becoming a Defaulted Reference Obligation will also constitute an Amortization.

"Assigned Moody's Rating":  The monitored publicly available rating or the monitored estimated rating expressly assigned to a debt obligation (or facility) by Moody's that addresses the full amount of the principal and interest promised.

"Articles":  The Issuer's Memorandum of Association, as amended and Articles of Association, as amended and restated from time to time.

"Assignment Fee": With respect to a Reference Obligation, any transfer or assignment fee imposed under the terms of the Reference Obligation or otherwise generally imposed on assignments or transfers thereof by any applicable administrative or similar agent, borrower or obligor with respect thereto.

"Bankruptcy":  A Reference Entity (or other relevant person) to the knowledge of the Reference Portfolio Manager (i) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (ii) becomes insolvent or is unable to pay its debts or fails or admits in writing in a judicial, regulatory or administrative proceeding or filing of its inability generally to pay its debts as they become due; (iii) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (iv) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (a) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (b) is not dismissed, discharged, stayed or restrained in each case within 30 calendar days of the institution or presentation thereof; (v) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (vi) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (vii) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 calendar days thereafter or (viii) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an effect analogous to any of the events specified in clauses (i) to (vii) (inclusive).

"Base Amount":  For any Payment Date an amount equal to (i) 0.30% per annum on the Portfolio Calculation Amount as of the related Determination Date (calculated for the related Collection Period on the basis of a 360-day year consisting of twelve 30-day months) plus (ii) the aggregate Deferred Base Amount, if any, from the prior Payment Date; *provided* that (except in the case of the Swap Termination Date) if such amount exceeds the amount of Reference Portfolio Proceeds for such Payment Date minus the sum of the Retained Amount and Fixed Amount for such date (the "Maximum Base Amount"), the Base Amount for such date will be the Maximum Base Amount and the excess will be deferred (a "Deferred Base Amount") until the next Payment Date (but subject to this proviso); *provided, further,* that in the case of the Swap Termination Date (except in the case of an Optional Redemption), such amount will not be payable to the extent the Payment Date Proceeds and other applicable amounts for such date would be insufficient to permit the Issuer to pay all amounts payable on that Payment Date under the Indenture pursuant to clauses 1 and 2 of the Payment Date Priority of Payments and clauses 1 and 2 of the Principal Priority of Payments.  Deferred Base Amounts will accrue notional interest until paid (together with such interest) at a rate of LIBOR plus 3.0% per annum for the relevant period.

133

010751

"Benefit Plan Investor":  A "benefit plan investor" within the meaning of 29 C.F.R. Section 2510.3-101(f)(2).

"Bond":  A debt obligation that is in the form of, or represented by, a bond, note (other than notes delivered pursuant to loans) or other debt security.

"Business Day":  Any day that is not a Saturday, Sunday or other day on which commercial banking institutions in New York, New York, Cayman Islands, Dublin, Ireland or the city in which the corporate trust office of the Trustee is located, are authorized or obligated by law or executive order to be closed.

"Calculation Agent":  The Swap Counterparty, as calculation agent under the Swap Agreement.

"Cede":  Cede & Co.

"Certificated Class Q Security":  Each of the Class Q Securities issued in the form of definitive, physical certificates in fully registered form.

"Certificated Class Q-1 Security":  As defined in *Description of the Securities—Form, Denomination and Registration*."

"Certificated Class Q-2 Security":  As defined in *Description of the Securities—Form, Denomination and Registration*."

"Certificated Class Q-2A Security":  Each of the Class Q-2A Securities issued in the form of definitive, physical certificates in fully registered form.

"Certificated Class Q-2B Security":  Each of the Class Q-2B Securities issued in the form of definitive, physical certificates in fully registered form.

"Certificated Income Note":  Each of the Income Notes issued in the form of definitive, physical certificates in fully registered form.

"Certificated Security":  As defined in *Description of the Securities—Form, Denomination and Registration—Certificated Securities*."

"CGMHI Notes": The U.S. $40,000,000 0% EMTNs Due 2034 issued by Citigroup Global Markets Holdings Inc. constituting the Class Q-2 Collateral Asset B.

"Citigroup":  Citigroup Inc., a Delaware corporation.

"Class":  When referring to the Notes, Class A-1 Notes, Class A-2 Notes, Class B Notes, Class C-1 Notes, Class C-2 Notes and/or Income Notes, as appropriate.  When referring to the Class Q Securities, the Class Q-1 Securities, the Class Q-2A Securities and/or the Class Q-2B Securities, as applicable. When referring to the Securities, any Class of Notes or Class Q Securities, as appropriate.

"Class A Interest Coverage Ratio":  As defined in *Description of the Securities—The Coverage Tests*."

"Class A Interest Coverage Test":  As defined in *Description of the Securities—The Coverage Tests*."

"Class A Notes":  The Class A-1 Notes and Class A-2 Notes, collectively.

"Class A OC Test":  As defined in *Description of the Securities—The Coverage Tests*."

"Class A Overcollateralization Ratio":  As defined in *Description of the Securities—The Coverage Tests*."

"Class A-1 Interest Amount":  With respect to a Payment Date, (a) the product of (i) the Aggregate Principal Amount of the Class A-1 Notes as of the beginning of the relevant Periodic Interest Accrual Period plus the amount of any unpaid Class A-1 Interest Amount after the prior Payment Date, (ii) the Class A-1 Interest Rate

010752

for such period, (iii) the actual number of days in such period and (iv) 1/360 <u>plus</u> (b) the amount of any unpaid Class A-1 Interest Amount after the prior Payment Date.

"Class A-1 Interest Rate": The annual interest rate accruing on the Class A-1 Notes equal to LIBOR plus 0.70%.

"Class A-1 Notes": U.S. $62,000,000 Class A-1 Floating Rate Senior Extendable Notes.

"Class A-2 Interest Amount": With respect to a Payment Date, (a) the product of (i) the Aggregate Principal Amount of the Class A-2 Notes as of the beginning of the relevant Periodic Interest Accrual Period <u>plus</u> the amount of any unpaid Class A-2 Interest Amount after the prior Payment Date, (ii) the Class A-2 Interest Rate for such period, (iii) the actual number of days in such period and (iv) 1/360 <u>plus</u> (b) the amount of any unpaid Class A-2 Interest Amount after the prior Payment Date.

"Class A-2 Interest Rate": The annual interest rate accruing on the Class A-2 Notes equal to LIBOR plus 0.80%.

"Class A-2 Notes": U.S. $56,000,000 Class A-2 Floating Rate Senior Extendable Notes.

"Class B Interest Amount": With respect to a Payment Date, the product of (i) the Aggregate Principal Amount of the Class B Notes as of the beginning of the relevant Periodic Interest Accrual Period <u>plus</u> the aggregate Deferred Interest with respect to the Class B Notes after the preceding Payment Date, (ii) the Class B Interest Rate for such period, (iii) the actual number of days in such period and (iv) 1/360.

"Class B Interest Coverage Ratio": As defined in "*Description of the Securities—The Coverage Tests*."

"Class B Interest Coverage Test": As defined in "*Description of the Securities—The Coverage Tests*."

"Class B Interest Rate": The annual interest rate accruing on the Class B Notes equal to LIBOR plus 1.40%.

"Class B OC Test": As defined in "*Description of the Securities—The Coverage Tests*."

"Class B Overcollateralization Ratio": As defined in "*Description of the Securities—The Coverage Tests*."

"Class B Notes": U.S. $39,500,000 Class B Floating Rate Deferrable Senior Subordinate Extendable Notes.

"Class C Interest Coverage Ratio": As defined in "*Description of the Securities—The Coverage Tests*."

"Class C Interest Coverage Test": As defined in "*Description of the Securities—The Coverage Tests*."

"Class C Notes": The Class C-1 Notes and the Class C-2 Notes, collectively.

"Class C OC Test": As defined in "*Description of the Securities—The Coverage Tests*."

"Class C Overcollateralization Ratio": As defined in "*Description of the Securities—The Coverage Tests*."

"Class C-1 Interest Amount": With respect to a Payment Date, the product of (i) the Aggregate Principal Amount of the Class C-1 Notes as of the beginning of the relevant Periodic Interest Accrual Period <u>plus</u> the aggregate Deferred Interest with respect to the Class C-1 Notes after the preceding Payment Date, (ii) the Class C-1 Interest Rate for such period, (iii) the actual number of days in such period and (iv) 1/360.

"Class C-1 Interest Rate": The annual interest rate accruing on the Class C-1 Notes equal to LIBOR plus 2.60%.

010753

"Class C-1 Notes":  U.S. $21,000,000 Class C-1 Floating Rate Deferrable Senior Subordinate Extendable Notes.

"Class C-2 Interest Amount":  With respect to a Payment Date, interest accrued for the relevant Periodic Interest Accrual Period on an amount equal to Aggregate Principal Amount of the Class C-2 Notes as of the beginning of the relevant Periodic Interest Accrual Period plus the aggregate Deferred Interest with respect to the Class C-2 Notes after the preceding Payment Date, at a rate equal to the Class C-2 Interest Rate for such period, calculated on the basis of a 360-day year consisting of twelve 30-day months.

"Class C-2 Interest Rate":  The annual interest rate accruing on the Class C-2 Notes equal to 7.53%.

"Class C-2 Notes":  U.S. $5,000,000 Class C-2 Fixed Rate Deferrable Senior Subordinate Extendable Notes.

"Class Q Securities":  The Class Q-1 Securities and Class Q-2 Securities, collectively.

"Class Q-1 Excess Distribution":  For any Payment Date, an amount equal to the excess, if any, of any amounts paid or distributed with respect to the Class Q-1 Securities over the amount of Class Q-1 Nominal Interest for the related Periodic Interest Accrual Period.

"Class Q-1 Income Note Component":  The U.S. $5,000,000 Aggregate Principal Amount of Income Notes comprising the Income Note Component of the Class Q-1 Securities.

"Class Q-1 Nominal Interest":  For a Periodic Interest Accrual Period, interest accrued on the Class Q-1 Nominal Principal for such period at the Class Q-1 Nominal Rate calculated on the basis of a 360-day year consisting of twelve 30-day months.

"Class Q-1 Nominal Principal":  For the first Periodic Interest Accrual Period, U.S. $10,000,000, and for any Periodic Interest Accrual Period thereafter, the Class Q-1 Nominal Principal for the prior Periodic Interest Accrual Period minus the amount of the Class Q-1 Excess Distribution, if any, for the Payment Date occurring at the beginning of such current Periodic Interest Accrual Period, but in no event shall the Class Q-1 Nominal Principal be less than U.S. $1,000.

"Class Q-1 Nominal Rate":  2.00% per annum.

"Class Q-1 Rated Principal":  For the first Periodic Interest Accrual Period, U.S. $10,000,000, and for any Periodic Interest Accrual Period thereafter, the Class Q-1 Rated Principal for the prior Periodic Interest Accrual Period minus any amount paid or distributed with respect to the Class Q-1 Securities for the Payment Date occurring at the beginning of such current Periodic Interest Accrual Period, but in no event shall the Class Q-1 Rated Principal be less than U.S. $1.

"Class Q-1 Reg S Global Securities": As defined in "*Description of the Securities—Form, Denomination and Registration—Regulation S Global Securities*."

"Class Q-1 Securities":  The U.S. $10,000,000 Class Q-1 Extendable Securities comprised of the Class Q-1 Senior Note Component and the Class Q-1 Income Note Component.

"Class Q-1 Senior Note Component":  The U.S. $5,000,000 initial Aggregate Principal Amount of Class C-2 Notes comprising the Class Q-1 Senior Note Component of the Class Q-1 Securities.

"Class Q-1 Temp Reg S Global Security": As defined in "*Description of the Securities—Form, Denomination and Registration—Regulation S Global Securities*."

"Class Q-2 Administrative Expenses": Any Administrative Expenses accrued while any Class Q-2 Securities are Outstanding but after the redemption in full of all Senior Notes, Class Q-1 Securities and Income Notes and liquidation and distribution of the Trust Estate.

010754

"Class Q-2 Collateral Asset A": U.S.$25,000,000 Aggregate Principal Amount of Income Notes delivered to the Class Q-2 Securities Collateral Account on the Closing Date.

"Class Q-2 Collateral Asset A Proceeds": With respect to any Payment Date, the sum of (i) all amounts distributed with respect to the Income Notes represented by the Class Q-2 Collateral Asset A for such date and (ii) any amounts received by the Trustee with respect to the sale or redemption of the Class Q-2 Collateral Asset A hereunder, in each case from and after the preceding Payment Date and on or prior to such date.

"Class Q-2 Collateral Asset B": U.S. $40,000,000 0% EMTNs Due 2034 issued by Citigroup Global Markets Holdings Inc. ("CGMHI Notes") delivered to the Class Q-2 Securities Collateral Account on the Closing Date.

"Class Q-2 Collateral Asset B Proceeds": Any sales proceeds, conversion or exchange proceeds or maturity proceeds of the Class Q-2 Collateral Asset B.

"Class Q-2 Collateral Asset B Offering Documents": As defined in "*Notice to Purchasers—Important Information*."

"Class Q-2 Collateral Assets": Collectively, the Class Q-2 Collateral Asset A and the Class Q-2 Collateral Asset B.

"Class Q-2 Event of Default": As defined in "*Description of the Securities—The Class Q-2 Securities.*"

"Class Q-2 Gross Proceeds": As defined in the definition of "Class Q-2 Payment Date Proceeds."

"Class Q-2 Maturity Date": April 28, 2034.

"Class Q-2 Maturity Date Priority of Payments": As defined in "*Description of the Securities—The Class Q-2 Securities.*"

"Class Q-2 Payment Date Priority of Payments": As defined in "*Description of the Securities—The Class Q-2 Securities.*"

"Class Q-2 Payment Date Proceeds": With respect to any Payment Date, (i) the sum of (a) the Class Q-2 Collateral Asset A Proceeds for such Payment Date and (b) interest and dividends received with respect to Eligible Investments on deposit in the Class Q-2 Securities Collateral Account (collectively, "Class Q-2 Gross Proceeds") minus (ii) the Class Q-2B Target Amount for such Payment Date.

"Class Q-2 Priority of Payments": Collectively, the Class Q-2 Payment Date Priority of Payments, the Class Q-2 Maturity Date Priority of Payments and the requirement to pay the Class Q-2B Target Amount.

"Class Q-2 Requisite Securityholders": The Holders of at least 66 2/3% of the Aggregate Principal Amount of (a) the Class Q-2A Securities so long as any Class Q-2A Securities are Outstanding, and (b) thereafter the Class Q-2B Securities.

"Class Q-2 Securities": The Class Q-2A Securities and the Class Q-2B Securities, collectively.

"Class Q-2 Securities Collateral": Collectively, (i) Class Q-2 Collateral Asset A, (ii) Class Q-2 Collateral Asset B, (iii) the portion of the Trust Estate that in accordance with the provisions in the Indenture is required to be applied to payment of the Income Notes represented by the Class Q-2 Collateral Asset A, at any time on and after such property is required to be applied to the payment of the Income Notes represented thereby, (iv) the Class Q-2 Securities Collateral Account, any subaccounts thereof and all financial assets credited to, and amounts on deposit or credit balances carried in, the Class Q-2 Securities Collateral Account from time to time, (v) all Eligible Investments purchased with funds on deposit in the Class Q-2 Securities Collateral Account and all income and other proceeds from the investment of funds therein; and (vi) all proceeds, accessions, profits, income, benefits, substitutions and replacements, whether voluntary or involuntary, of and to any of the property described in the preceding clauses.

010755

"Class Q-2 Securities Collateral Account": As defined in *"Description of the Securities—The Class Q-2 Securities."*

"Class Q-2A Coverage Ratio": With respect to any date of determination, the quotient obtained by dividing (a) the market value of Class Q-2 Collateral Asset A as of such date by (b) sum of the Aggregate Principal Amount of the Class Q-2A Securities plus Class Q-2A Deferred Interest, if any, as of such date.

"Class Q-2A Coverage Test": A test which will be deemed satisfied as of any date of determination on which any Class Q-2A Securities are Outstanding, if the Class Q-2A Coverage Ratio for such date equals or exceeds 2.25.

"Class Q-2A Deferred Interest": As defined in *"Description of the Securities—The Class Q-2 Securities."*

"Class Q-2A Interest Amount": With respect to a Payment Date, the product of (i) the Aggregate Principal Amount of the Class Q-2A Securities as of the beginning of the relevant Periodic Interest Accrual Period, plus the aggregate Class Q-2 Deferred Interest after the preceding Payment Date, (ii) the Class Q-2A Interest Rate for such period, (iii) the actual number of days in such period and (iv) 1/360.

"Class Q-2A Interest Rate": As defined in *"Summary—The Class Q-2 Securities."*

"Class Q-2A Securities": The U.S.$7,200,000 Class Q-2A Securities Due 2034.

"Class Q-2B Certificated Security": As defined in *"Description of the Securities—The Class Q-2 Securities."*

"Class Q-2B Securities": The U.S.$40,000,000 Class Q-2B Securities Due 2034.

"Class Q-2B Target Amount": With respect to any Payment Date, an amount equal to the lesser of (i) the Class Q-2 Gross Proceeds for such date and (ii) the product of (a) the Aggregate Principal Amount of the Class Q-2B Securities and (b) 1% per annum for the related Periodic Interest Accrual Period, calculated on the basis of a 360-day year consisting of twelve 30-day months.

"Clearing Agency": A "Clearing Agency" as defined in the Exchange Act.

"Clearstream": Clearstream Banking, société anonyme, a corporation organized under the laws of the Grand Duchy of Luxembourg, or any successor thereto.

"Closing Date": On or about August 18, 2004.

"Code": The United States Internal Revenue Code of 1986, as amended.

"Co-Issuer": Valhalla CLO, Inc., a newly formed Delaware corporation.

"Collateral Account": The collateral account established under the Indenture.

"Collateral Administration Agreement": As defined in *"Description of the Securities—The Indenture and the Collateral Administration Agreement—Trustee and Collateral Administrator."*

"Collateral Administrator": JPMorgan Chase Bank, as collateral administrator under the Collateral Administration Agreement and its permitted successors.

"Collateral Administrator Expenses": As defined in *"Description of the Securities—The Indenture and the Collateral Administration Agreement—Trustee and Collateral Administrator."*

"Collateral Administrator Fee": As defined in *"Description of the Securities—The Indenture and the Collateral Administration Agreement—Trustee and Collateral Administrator."*

010756

"Collection Account":  The collection account established under the Indenture.

"Collection Period":  (i) For the first Payment Date, the period from and including the Closing Date to and including the Determination Date related to such Payment Date, and (ii) for each Payment Date thereafter, the period from but excluding the Determination Date related to the prior Payment Date to and including the Determination Date related to such Payment Date (*provided, however,* that the final Collection Period shall end on and include the Business Day immediately prior to the Maturity Date (or, if applicable, the Optional Redemption Date or Indenture Tax Redemption Date)).

"Commission":  The United States Securities and Exchange Commission.

"Commitment Amount":  As of any date of determination, with respect to a Revolving Loan, (i) the outstanding funded principal amount thereof (excluding accrued but unpaid interest) plus (ii) with respect to the related Unfunded Commitment, the amount available to be borrowed or drawn thereunder, assuming compliance with all applicable conditions to borrowing or drawing.

"Components": The Class Q-1 Senior Note Component and the Class Q-1 Income Note Component.

"Concentration Limits":  Clauses 2 through 16 of the Reference Portfolio Criteria.

"Controlling Person":  A person (other than a Benefit Plan Investor) that has discretionary authority or control with respect to the assets of the Issuers or that provides investment advice for a fee (direct or indirect) with respect to such assets (or any "affiliate" of such a person (as defined in the Plan Asset Regulation)).

"Coverage Tests":  The Interest Coverage Tests and the Overcollateralization Tests.

"Credit Definitions":  The 2003 ISDA Credit Derivatives Definitions, as supplemented from time to time.

"Credit Event":  The occurrence of one or more of the following events with respect to a Reference Entity or a Reference Obligation: (i) a Bankruptcy or (ii) a Failure to Pay; *provided* that in the case of a Reference Swap or Reference CLN, a Credit Event will be deemed to occur if (a) a credit event occurs under the terms thereof with respect to an Underlying Obligation or a Reference Entity, (b) a Bankruptcy occurs with respect to the counterparty thereto or issuer thereof or (c) a Failure to Pay occurs with respect to such Reference Swap or Reference CLN itself.

"Credit Improved Obligation":  A Reference Obligation that, in the reasonable business judgment of the Reference Portfolio Manager, has improved in credit quality; *provided*, *however*, that (i) if the rating of the Class A-1 Notes or the Class A-2 Notes has been reduced by one or more rating subcategories from that in effect on the Closing Date or withdrawn by Moody's (unless it subsequently has been reinstated to the rating assigned on the Closing Date) or (ii) if the rating of any other Class of Senior Notes has been reduced by two or more rating subcategories from that in effect on the Closing Date or withdrawn by Moody's (unless it subsequently has been reinstated or upgraded to at least one rating subcategory below the rating assigned on the Closing Date), then such Reference Obligation will be considered a Credit Improved Obligation only if (x) such Reference Obligation has been upgraded by Moody's by one or more rating subcategories since it was added to the Reference Portfolio by the Reference Portfolio Manager or has been placed on and is remaining, as of the date of the proposed removal from the Reference Portfolio thereof, on a watchlist for possible upgrade by Moody's since it was added to the Reference Portfolio by the Reference Portfolio Manager, (y) such Reference Obligation has experienced a reduction in credit spread of 0.25% or more (on an absolute rather than a relative basis) compared to the credit spread at the time such Reference Obligation was added to the Reference Portfolio by the Reference Portfolio Manager, determined by reference to an applicable index selected by the Reference Portfolio Manager (subject to receipt of confirmation to the effect that such selection will not cause a qualification, downgrade or withdrawal of the rating of the Class A-1 Notes or the Class A-2 Notes by Moody's) or (z) (1) in the case of a loan, the Market Value of such Reference Obligation has increased by at least 1.00% from the Market Value of such Reference Obligation as of its Addition Date, as determined by the Reference Portfolio Manager; *provided* that subclause (z)(1) will be deemed satisfied if the Market Value increases to 101%, and (2) in the case of a Bond, the Market Value of such Reference Obligation has changed since its Addition Date by a percentage more positive than the percentage change in the Merrill Lynch High Yield Index, Bloomberg ticker J0A0, plus 3.00%, over the same period.

"Credit Risk Obligation": A Reference Obligation that, in the reasonable business judgment of the Reference Portfolio Manager, has a significant risk of declining in credit quality and, with a lapse of time, becoming a Defaulted Reference Obligation; *provided*, *however*, that (i) if the rating of the Class A-1 Notes or the Class A-2 Notes has been reduced by one or more rating subcategories from that in effect on the Closing Date or withdrawn by Moody's (unless it subsequently has been reinstated to the rating assigned on the Closing Date) or (ii) if the rating of any other Class of Senior Notes has been reduced by two or more rating subcategories from that in effect on the Closing Date or withdrawn by Moody's (unless it subsequently has been reinstated or upgraded to at least one rating subcategory below the rating assigned on the Closing Date), then such Reference Obligation will be considered a Credit Risk Obligation only if (x) such Reference Obligation has been downgraded by Moody's by one or more rating subcategories since it was added to the Reference Portfolio by the Reference Portfolio Manager or has been placed on and is remaining, as of the date of the proposed removal from the Reference Portfolio thereof, on a watchlist for possible downgrade by Moody's since it was added to the Reference Portfolio by the Reference Portfolio Manager, (y) such Reference Obligation has experienced an increase in credit spread of 0.50% or more (on an absolute rather than a relative basis) compared to the credit spread at the time such Reference Obligation was added to the Reference Portfolio by the Reference Portfolio Manager, determined by reference to an applicable index selected by the Reference Portfolio Manager (subject to receipt of confirmation to the effect that such selection will not cause a qualification, downgrade or withdrawal of the rating of the Class A-1 Notes or the Class A-2 Notes by Moody's) or (z) (1) in the case of a loan, the Market Value of such Reference Obligation has decreased by at least 2.50% from the Market Value of such Reference Obligation as of its Addition Date, as determined by the Reference Portfolio Manager and (2) in the case of a Bond, the Market Value of such Reference Obligation has changed since its Addition Date by a percentage either more negative, or less positive, as the case may be, than the percentage change in the Merrill Lynch High Yield Index, Bloomberg ticker J0A0, less 3.00%, over the same period.

"Current Pay Obligation": A Reference Obligation (other than a Reference Swap) with respect to which the Reference Portfolio Manager certifies in writing that (i) a Bankruptcy has occurred, (ii) no default as to the payment of principal or interest is then continuing, (iii) no interest has been deferred or capitalized under the terms thereof, (iv) if the Moody's rating (including an estimated or private rating, and subject to adjustment as provided in "Moody's Rating" (or the definitions referenced therein) for obligations on "watchlist" for upgrade or downgrade) of such obligation is at least "Caa1", the Market Value of the obligation as determined by the Reference Portfolio Manager is at least equal to 80% of the principal balance thereof, (v) if the Moody's rating (including an estimated or private rating, and subject to adjustment as provided in "Moody's Rating" for obligations on "watchlist" for upgrade or downgrade) of such obligation is at least "Caa2", the Market Value of the obligation as determined by the Reference Portfolio Manager is at least equal to 85% of the principal balance thereof (and, for the avoidance of doubt, if such Moody's rating is less than "Caa2", the obligation may not be treated as a Current Pay Obligation), (vi) the Market Value of the obligation as determined by the Reference Portfolio Manager is at least equal to 80% of the principal balance thereof (or such lower percentage as S&P confirms in writing will not result in a qualification, downgrade or withdrawal of its then-current rating of any Class of Securities), (vii) a bankruptcy court has authorized the payment of interest due and payable on such obligation and (viii) the Reference Portfolio Manager believes, in its reasonable business judgment, that the obligor on such Reference Obligation will continue to make scheduled payments of interest and principal thereunder; *provided* that the aggregate Reference Obligation Calculation Amount of Reference Obligations certified by the Reference Portfolio Manager as Current Pay Obligations at any time may not exceed 5.0% of the Portfolio Calculation Amount and any obligation satisfying the requirements above but which the Reference Portfolio Manager has not certified in writing as a Current Pay Obligation will be a Defaulted Reference Obligation.

"Daily Aggregate Funded Amount": For any date of determination, the aggregate Daily Funded Amount for all Reference Obligations as of that day.

"Daily Funded Amount": For a Reference Obligation (other than a Reference Swap) on any date of determination, the greater of (i) zero and (ii) the Initial Funded Amount plus the aggregate par amount of all advances thereunder following its Funding Start Date and on or prior to such date of determination minus the aggregate par amount of all repayments thereunder following its Funding Start Date and on or prior to such date of determination minus on the first interest payment date thereunder following the Funding Start Date, the amount of any accrued interest included in the Initial Funded Amount. For a Reference Swap on any date of determination, the aggregate of all payments made by the protection seller (or total return receiver) thereunder on or prior to such date

of determination. The Daily Funded Amount for a Reference Obligation will be deemed to be zero for any day prior to its Funding Start Date or after the Accrual Date for its removal from the Reference Portfolio.

"Daily Rate":  For any date of determination, a rate equal to the Floating Rate for such day (determined pursuant to the 2000 ISDA Definitions using a Floating Rate Option of USD-LIBOR-BBA, a Reset Date of such date and a Designated Maturity of one month; *provided* that if such date is not a Business Day, the rate for such date shall be the rate determined using the next preceding Business Day) plus 0.35% per annum.

"Dealers":  Leading dealers in obligations substantially similar to the applicable Reference Obligation, as selected by the Reference Portfolio Manager from a list agreed to by the Swap Counterparty and the Reference Portfolio Manager (which list may be amended from time to time by agreement of the Reference Portfolio Manager and the Swap Counterparty (whose agreement shall not be unreasonably withheld) without the consent of the Issuer).

"Default":  Any event or condition the occurrence or existence of which would, with the giving of notice or lapse of time or both, become an Event of Default.

"Default Adjustment":  (a)  On any date of determination with respect to any Defaulted Reference Obligation or any Deferring PIK Obligation that has been a Defaulted Reference Obligation or Deferring PIK Obligation, as applicable, for no more than one month as of such date of determination:  (1) the Reference Value of such Defaulted Reference Obligation or Deferring PIK Obligation *minus* (2) the product of (x) the lesser of (i) the Moody's Recovery Rate for such Defaulted Reference Obligation or Deferring PIK Obligation (or such lower recovery rate that the Reference Portfolio Manager determines is appropriate during such month) and (ii) the S&P Recovery Rate for such Defaulted Reference Obligation or Deferring PIK Obligation and (y) the Reference Obligation Calculation Amount of such Defaulted Reference Obligation or Deferring PIK Obligation.  On any date of determination with respect to any Defaulted Reference Obligation or Deferring PIK Obligation that has been a Defaulted Reference Obligation or Deferring PIK Obligation for longer than one month but less than three years as of such date of determination:  (1) the Reference Value of such Defaulted Reference Obligation or Deferring PIK Obligation *minus* (2) the lesser of (A) the Market Value of such Defaulted Reference Obligation or Deferring PIK Obligation, as determined by the Reference Portfolio Manager and (B) the product of (x) the lesser of (i) the Moody's Recovery Rate for such Defaulted Reference Obligation or Deferring PIK Obligation and (ii) the S&P Recovery Rate for such Defaulted Reference Obligation or Deferring PIK Obligation and (y) the Reference Obligation Calculation Amount of such Defaulted Reference Obligation or Deferring PIK Obligation.  On any date of determination with respect to any Defaulted Reference Obligation or Deferring PIK Obligation that has been a Defaulted Reference Obligation or Deferring PIK Obligation for three years or more as of such date of determination, the Reference Value thereof;

(b)     To the extent a Defaulted Reference Obligation or Deferring PIK Obligation is converted or exchanged into an Equity Security, for so long as such Equity Security remains part of the Reference Portfolio, the Default Adjustment will equal the applicable Reference Value; and

(c)     In no event will the Default Adjustment be less than zero.

"Defaulted Reference Obligation":  As defined in "*Description of the Swap Agreement—Defaulted Reference Obligations."*

"Deferred Base Amount":  As defined in the definition of "Base Amount."

"Deferred Incentive Amount":  As defined in the definition of "Incentive Amount."

"Deferred Interest":  As defined in "*Description of the Securities—Payments—The Senior Notes."*

"Deferred Subordinate Amount":  As defined in the definition of "Subordinate Amount."

"Deferring PIK Obligation": (i) Any Reference Obligation (other than a Structured Finance Obligation) that is a PIK Obligation in respect of which interest has been deferred or capitalized (and not subsequently paid) and (ii) any Reference Obligation that is a Structured Finance Obligation and a PIK Obligation (a) rated "Baa3" or

010759

higher by Moody's, in respect of which interest has been deferred or capitalized for at least two or more full interest periods or one year, whichever is less (and not subsequently paid) or (b) rated lower than "Baa3" by Moody's, in respect of which interest has been deferred or capitalized for one or more full interest periods or six months, whichever is less (and not subsequently paid).

"Determination Date": With respect to a Payment Date, the eighth Business Day preceding such Payment Date; *provided* that the final Determination Date will be the last day of the final Collection Period.

"DIP Loan": A loan that is an obligation of a debtor in possession or a trustee (the "Debtor") organized under the laws of the United States or any state thereof (a) in respect of which no default as to the payment of interest is then continuing, and no interest has been deferred or capitalized under the terms thereof, and (b) the terms of which have been approved by an order of a U.S. Bankruptcy Court, U.S. District Court or other court of competent jurisdiction, which order provides that (i) such loan is secured by liens on the Debtor's otherwise unencumbered assets, (ii) such loan is secured by liens of equal or senior priority on property of the Debtor's estate that is otherwise subject to a lien, (iii) such loan is secured by junior liens on the Debtor's encumbered assets (based on a current valuation or appraisal report) or (iv) if such loan or any portion thereof is not secured, the repayment of such loan retains priority over all other administrative expenses; *provided* that such loan has a public rating or estimated rating from Moody's and S&P and has an S&P Recovery Rate assigned by S&P; and *provided, further*, that in the case of a DIP Loan described in clause (iv) above, each Rating Agency has confirmed in writing that such inclusion will not result in the qualification, downgrade or withdrawal of the rating of any Class of Securities then rated by such Rating Agency.

"Discount Obligation": Any obligation with a Reference Price of less than 85% of par, *provided*, that such an obligation will not constitute a Discount Obligation if (x) it is added to the Reference Portfolio in replacement of a removed Reference Obligation, (y) the Reference Price (expressed as percentage of par) of such obligation was not more than 5.0% lower (on an absolute rather than a relative basis) than the Final Price of the removed Reference Obligation and (z) such obligation has a higher S&P Rating than the removed Reference Obligation at the time of removal.

"Diversion Test": As defined in "*Description of the Securities—The Diversion Test.*"

"Diversity Score": As of any date of determination, the Diversity Score for the Reference Obligations in the Reference Portfolio is the sum of the Diversity Scores for all Moody's Industry Classification Groups represented in the applicable Reference Obligations, calculated in the following manner.

(i) For purposes of calculating the Diversity Score, Reference Entities that are Affiliates of one another will be considered a single Reference Entity.

(ii) For the purposes of calculating the Diversity Score:

(a) The "Issuer Notional Amount" for each Reference Entity of a Reference Obligation represented in the Reference Portfolio is the sum of the Reference Obligation Calculation Amounts of all Reference Obligations in the Reference Portfolio relating to such Reference Entity.

(b) An "Average Notional Amount" is calculated by summing the Issuer Notional Amounts and dividing such amount by the number of Reference Entities in the Reference Portfolio.

(c) The "Equivalent Unit Score" for each Reference Entity of a Reference Obligation is the lesser of (1) one and (2) the Issuer Notional Amount for such Reference Entity divided by the Average Notional Amount.

(d) The "Aggregate Equivalent Unit Score" for each Moody's Industry Classification Group is the sum of the Equivalent Unit Scores for all Reference Entities in such group.

(e) The "Diversity Score" for each Moody's Industry Classification Group is the Diversity Score corresponding to the Aggregate Equivalent Unit Score for such Group, as set out in the Diversity Score Table, *provided* that if any such Aggregate Equivalent Unit Score falls between any two entries in the Diversity Score Table, then the Diversity Score will be the one corresponding to the lesser of the two entries.

010760

"Diversity Score Table":

| Aggregate Equivalent Unit Score | Diversity Score | Aggregate Equivalent Unit Score | Diversity Score | Aggregate Equivalent Unit Score | Diversity Score | Aggregate Equivalent Unit Score | Diversity Score |
|---|---|---|---|---|---|---|---|
| 0.0000 | 0.0000 | 5.0500 | 2.7000 | 10.1500 | 4.0200 | 15.2500 | 4.5300 |
| 0.0500 | 0.1000 | 5.1500 | 2.7333 | 10.2500 | 4.0300 | 15.3500 | 4.5400 |
| 0.1500 | 0.2000 | 5.2500 | 2.7667 | 10.3500 | 4.0400 | 15.4500 | 4.5500 |
| 0.2500 | 0.3000 | 5.3500 | 2.8000 | 10.4500 | 4.0500 | 15.5500 | 4.5600 |
| 0.3500 | 0.4000 | 5.4500 | 2.8333 | 10.5500 | 4.0600 | 15.6500 | 4.5700 |
| 0.4500 | 0.5000 | 5.5500 | 2.8667 | 10.6500 | 4.0700 | 15.7500 | 4.5800 |
| 0.5500 | 0.6000 | 5.6500 | 2.9000 | 10.7500 | 4.0800 | 15.8500 | 4.5900 |
| 0.6500 | 0.7000 | 5.7500 | 2.9333 | 10.8500 | 4.0900 | 15.9500 | 4.6000 |
| 0.7500 | 0.8000 | 5.8500 | 2.9667 | 10.9500 | 4.1000 | 16.0500 | 4.6100 |
| 0.8500 | 0.9000 | 5.9500 | 3.0000 | 11.0500 | 4.1100 | 16.1500 | 4.6200 |
| 0.9500 | 1.0000 | 6.0500 | 3.0250 | 11.1500 | 4.1200 | 16.2500 | 4.6300 |
| 1.0500 | 1.0500 | 6.1500 | 3.0500 | 11.2500 | 4.1300 | 16.3500 | 4.6400 |
| 1.1500 | 1.1000 | 6.2500 | 3.0750 | 11.3500 | 4.1400 | 16.4500 | 4.6500 |
| 1.2500 | 1.1500 | 6.3500 | 3.1000 | 11.4500 | 4.1500 | 16.5500 | 4.6600 |
| 1.3500 | 1.2000 | 6.4500 | 3.1250 | 11.5500 | 4.1600 | 16.6500 | 4.6700 |
| 1.4500 | 1.2500 | 6.5500 | 3.1500 | 11.6500 | 4.1700 | 16.7500 | 4.6800 |
| 1.5500 | 1.3000 | 6.6500 | 3.1750 | 11.7500 | 4.1800 | 16.8500 | 4.6900 |
| 1.6500 | 1.3500 | 6.7500 | 3.2000 | 11.8500 | 4.1900 | 16.9500 | 4.7000 |
| 1.7500 | 1.4000 | 6.8500 | 3.2250 | 11.9500 | 4.2000 | 17.0500 | 4.7100 |
| 1.8500 | 1.4500 | 6.9500 | 3.2500 | 12.0500 | 4.2100 | 17.1500 | 4.7200 |
| 1.9500 | 1.5000 | 7.0500 | 3.2750 | 12.1500 | 4.2200 | 17.2500 | 4.7300 |
| 2.0500 | 1.5500 | 7.1500 | 3.3000 | 12.2500 | 4.2300 | 17.3500 | 4.7400 |
| 2.1500 | 1.6000 | 7.2500 | 3.3250 | 12.3500 | 4.2400 | 17.4500 | 4.7500 |
| 2.2500 | 1.6500 | 7.3500 | 3.3500 | 12.4500 | 4.2500 | 17.5500 | 4.7600 |
| 2.3500 | 1.7000 | 7.4500 | 3.3750 | 12.5500 | 4.2600 | 17.6500 | 4.7700 |
| 2.4500 | 1.7500 | 7.5500 | 3.4000 | 12.6500 | 4.2700 | 17.7500 | 4.7800 |
| 2.5500 | 1.8000 | 7.6500 | 3.4250 | 12.7500 | 4.2800 | 17.8500 | 4.7900 |
| 2.6500 | 1.8500 | 7.7500 | 3.4500 | 12.8500 | 4.2900 | 17.9500 | 4.8000 |
| 2.7500 | 1.9000 | 7.8500 | 3.4750 | 12.9500 | 4.3000 | 18.0500 | 4.8100 |
| 2.8500 | 1.9500 | 7.9500 | 3.5000 | 13.0500 | 4.3100 | 18.1500 | 4.8200 |
| 2.9500 | 2.0000 | 8.0500 | 3.5250 | 13.1500 | 4.3200 | 18.2500 | 4.8300 |
| 3.0500 | 2.0333 | 8.1500 | 3.5500 | 13.2500 | 4.3300 | 18.3500 | 4.8400 |
| 3.1500 | 2.0667 | 8.2500 | 3.5750 | 13.3500 | 4.3400 | 18.4500 | 4.8500 |
| 3.2500 | 2.1000 | 8.3500 | 3.6000 | 13.4500 | 4.3500 | 18.5500 | 4.8600 |
| 3.3500 | 2.1333 | 8.4500 | 3.6250 | 13.5500 | 4.3600 | 18.6500 | 4.8700 |
| 3.4500 | 2.1667 | 8.5500 | 3.6500 | 13.6500 | 4.3700 | 18.7500 | 4.8800 |
| 3.5500 | 2.2000 | 8.6500 | 3.6750 | 13.7500 | 4.3800 | 18.8500 | 4.8900 |
| 3.6500 | 2.2333 | 8.7500 | 3.7000 | 13.8500 | 4.3900 | 18.9500 | 4.9000 |
| 3.7500 | 2.2667 | 8.8500 | 3.7250 | 13.9500 | 4.4000 | 19.0500 | 4.9100 |
| 3.8500 | 2.3000 | 8.9500 | 3.7500 | 14.0500 | 4.4100 | 19.1500 | 4.9200 |
| 3.9500 | 2.3333 | 9.0500 | 3.7750 | 14.1500 | 4.4200 | 19.2500 | 4.9300 |
| 4.0500 | 2.3667 | 9.1500 | 3.8000 | 14.2500 | 4.4300 | 19.3500 | 4.9400 |
| 4.1500 | 2.4000 | 9.2500 | 3.8250 | 14.3500 | 4.4400 | 19.4500 | 4.9500 |
| 4.2500 | 2.4333 | 9.3500 | 3.8500 | 14.4500 | 4.4500 | 19.5500 | 4.9600 |
| 4.3500 | 2.4667 | 9.4500 | 3.8750 | 14.5500 | 4.4600 | 19.6500 | 4.9700 |
| 4.4500 | 2.5000 | 9.5500 | 3.9000 | 14.6500 | 4.4700 | 19.7500 | 4.9800 |
| 4.5500 | 2.5333 | 9.6500 | 3.9250 | 14.7500 | 4.4800 | 19.8500 | 4.9900 |
| 4.6500 | 2.5667 | 9.7500 | 3.9500 | 14.8500 | 4.4900 | 19.9500 | 5.0000 |
| 4.7500 | 2.6000 | 9.8500 | 3.9750 | 14.9500 | 4.5000 | | |
| 4.8500 | 2.6333 | 9.9500 | 4.0000 | 15.0500 | 4.5100 | | |
| 4.9500 | 2.6667 | 10.0500 | 4.0100 | 15.1500 | 4.5200 | | |

010761

"Domicile":  With respect to each Reference Obligation, (i) the jurisdiction of incorporation, organization or creation of the related Reference Entity or (ii) in the case of a Reference Obligation that would otherwise be considered to be domiciled pursuant to clause (i) in a Tax Advantaged Jurisdiction, the jurisdiction in which, in the reasonable business judgment of the Reference Portfolio Manager, the related Reference Entity conducts substantially all of its business operations and in which the assets primarily responsible for generating its revenues are located.

"DTC":  The Depository Trust Company.

"Eligible Account":  Either (i) a domestic segregated account with an Eligible Institution or (ii) a domestic segregated trust account with the corporate trust department of a depository institution organized under the laws of the United States of America or any one of the states thereof or the District of Columbia (or any domestic branch of a foreign bank), having corporate trust powers and acting as trustee for funds deposited in such account, so long as any of the securities of such depository institution shall have a credit rating from a nationally recognized statistical rating organization in one of its generic rating categories which signifies investment grade (e.g., in the case of S&P, "BBB-" or higher).

"Eligible Country":  The United States, Canada and any country classified by Moody's as a Moody's Group I Country, Moody's Group II Country or Moody's Group III Country; *provided* that such country has not imposed currency exchange controls.

"Eligible Institution":  A depository institution organized under the laws of the United States of America or any one of the states thereof or the District of Columbia (or any domestic branch of a foreign bank), including the Trustee, (a) which has either (1) a long-term unsecured debt rating of "AA-", "Aa3" or its equivalent from a nationally recognized statistical rating organization or (2) a certificate of deposit rating of at least "A-1", "P-1" or its equivalent from a nationally recognized statistical rating organization or any other long-term, short-term or certificate of deposit rating acceptable to the Requisite Noteholders and the Swap Counterparty, (b) whose deposits are insured by the Federal Deposit Insurance Corporation and (iii) whose combined capital and surplus is at least U.S. $200,000,000.

"Eligible Investments":  Any U.S. Dollar-denominated investment (other than obligations of the Swap Counterparty or any of its Affiliates) that is one or more of the following (and may include investments for which the Swap Counterparty, the Trustee and/or their respective Affiliates provide services but may not include investments for which the Reference Portfolio Manager provides services):

(i)     cash;

(ii)    direct registered obligations of, and registered obligations the timely payment of principal and interest on which is fully and expressly guaranteed by, the United States or any agency or instrumentality of the United States the obligations of which are expressly backed by the full faith and credit of the United States, which in each case are not zero coupon securities;

(iii)   demand and time deposits in, trust accounts, certificates of deposit payable within 91 days of issuance of, bankers' acceptances payable within 91 days of issuance issued by, or Federal funds sold by any depositary institution or trust company incorporated under the laws of the United States or any state thereof and subject to supervision and examination by Federal and/or state banking authorities so long as the commercial paper and/or the debt obligations of such depository institution or trust company (or, in the case of the principal depository institution in a holding company system, the commercial paper or debt obligations of such holding company), at the time of such investment or contractual commitment providing for such investment and throughout the term of the investment, have a credit rating of not less than "Aaa" by Moody's and "AAA" by Standard & Poor's and in each case are not on watch for downgrade, or "P-1" by Moody's and "A-1+" by Standard & Poor's in the case of commercial paper and short-term debt obligations; *provided* that in any case, the issuer thereof must have at the time of such investment a long-term credit rating of not less than "AA-" by Standard & Poor's and "Aa3" by Moody's and a short-term rating of "A-1+" by Standard & Poor's and "P-1" by Moody's, and if so rated, is not on watch for downgrade;

010762

(iv)     commercial paper or other short-term obligations with a maturity of not more than 91 days from the date of issuance and having at the time of such investment a credit rating of at least "P-1" by Moody's and "A-1+" by Standard & Poor's; *provided* that in any case, the issuer thereof must have at the time of such investment a long-term credit rating of not less than "Aa2" by Moody's, and if so rated, such rating is not on watch for downgrade;

(v)     unleveraged repurchase obligations with respect to any security described in clause (ii) above entered into with a U.S. federal or state depository institution or trust company (acting as principal) described in clause (iii) above or entered into with a corporation (acting as principal) whose long-term credit rating is not less than "Aaa" by Moody's and "AAA" by Standard & Poor's and in each case are not on watch for downgrade or whose short-term credit rating is "P-1" by Moody's and "A-1+" by Standard & Poor's, at the time of such investment and throughout the term of the investment; *provided* that, if such repurchase obligation has a maturity of longer than 91 days, the counterparty thereto must also have at the time of such investment and throughout the term of the investment a long-term credit rating of not less than "Aa2" by Moody's and "AAA" by Standard & Poor's, and if so rated, such rating is not on watch for downgrade;

(vi)     any money market fund or similar investment vehicle having at the time of investment therein and throughout the term of the investment a credit rating of "MR1+" by Moody's and "AAAm" by Standard & Poor's; including any fund for which the Trustee or an Affiliate of the Trustee serves as an investment advisor, administrator, shareholder servicing agent, custodian or subcustodian, notwithstanding that (A) the Trustee or an Affiliate of the Trustee charges and collects fees and expenses from such funds for services rendered (*provided* that such charges, fees and expenses are on terms consistent with terms negotiated at arm's length) and (B) the Trustee charges and collects fees and expenses for services rendered, pursuant to the Indenture;

(vii)     a guaranteed reinvestment agreement from a bank (if treated as a deposit by such bank), insurance company or other corporation or entity organized under the laws of the United States or any state thereof (if treated as debt by such insurance company or other corporation or entity), providing for periodic payments thereunder during each Collection Period; *provided* that each such agreement provides that it is terminable by the purchaser, without premium or penalty, in the event that the rating assigned to such agreement by either Moody's or Standard & Poor's is at any time lower than the then current ratings assigned to any Class of Senior Notes; *provided, further*, that, at the time of investment therein and throughout the term of the investment, the issuer of such agreement has a senior unsecured long-term debt rating, issuer rating or counterparty rating of at least "Aaa" by Moody's, a short-term debt rating of "P-1" by Moody's (and not on watch for downgrade), a short-term debt rating of at least "A-1+" by Standard & Poor's and a long-term debt rating of at least "AAA" by Standard & Poor's (and not on watch for downgrade);

(viii)     the Investment Agreement (together with any guaranty in respect thereof); and

(ix)     such other investments for which Rating Agency Confirmation has been received.

*provided* that the Eligible Investments in the Collateral Account (except the Investment Agreement) shall be required to mature on or before the Business Day prior to the next Payment Date, and Eligible Investments in the Collection Account shall be required to mature on or before the Business Day prior to the next Payment Date; *provided further*, that each Eligible Investment must bear a stated rate of interest and any floating rate of interest must reset on or prior to the next Payment Date of the Notes; *provided, further* that each Eligible Investment provides, at the time of purchase, solely for payments that will not be subject to withholding tax unless the issuer or obligor (and the guarantor, if any) of the security or obligation is required to make "gross-up" payments that cover the full amount of any such withholding tax (or return the invested amount at par); *provided, further* that ownership of such Eligible Investments will not subject the Issuer or Co-Issuer to net income tax in any jurisdiction where it would not otherwise be subject to tax; *provided, further* that Eligible Investments may not include (a) any interest-only security, any security purchased at a price in excess of 100% of the par value thereof, any security the repayment of which is subject to substantial non-credit related risk as determined in the business judgment of the Swap Counterparty (or the Reference Portfolio Manager on its behalf), or any security that has a rating assigned by

010763

S&P that contains an "r", "t", "p", "pi" or "q" subscript, (b) any floating rate security the interest rate with respect to which is inversely or otherwise not proportionately related to an interest rate index or is calculated as other than the sum of an interest rate index plus a spread or (c) any security subject to a tender offer, voluntary redemption, exchange offer, conversion or other similar action.

"Equity Security": Any security that by its terms does not provide for periodic payments of interest at a stated coupon rate and repayment of principal in one or more installments.

"ERISA": The U.S. Employee Retirement Income Security Act of 1974, as amended, and any successor statute thereto.

"ERISA Plans": "Employee benefit plans" (as defined in Section 3(3) of ERISA) subject to ERISA, including entities such as collective investment funds and separate accounts whose underlying assets include the assets of such plans.

"Euroclear": Euroclear Bank S.A/N.V., as operator of the Euroclear System, or any successor thereto.

"Event of Default": An event of default as defined in the Indenture and as described under "*Description of the Securities—The Indenture and the Collateral Administration Agreement—Events of Default.*"

"Exchange Act": The U.S. Securities Exchange Act of 1934, as amended.

"Exchange Consideration": As defined in "*Description of the Swap Agreement—Restructuring, Conversion or Exchange of Reference Obligations.*"

"Exchange Date": The first Business Day following the 40th day after the later of the Closing Date and the commencement of the offering of the Notes.

"Excluded Property ": Collectively, U.S. $1,000 the Issuer received in connection with the issuance of the Ordinary Shares of the Issuer and U.S. $1,000 the Issuer received as a fee for issuing the Securities, and the income thereon and the bank account in which such monies are held.

"Expense Cap Amount": With respect to any Payment Date, an amount not to exceed: (a) with respect to Administrative Expenses specified in clause (v)(F) of the definition of "Administrative Expenses" herein, U.S. $50,000 per annum (pro rated for the related Periodic Interest Accrual Period), minus the amount of Administrative Expenses specified in clause (v)(F) paid during the Periodic Interest Accrual Period immediately preceding such Payment Date and (b) with respect to all other Administrative Expenses in the aggregate, 0.04% of the Swap Notional Amount plus $150,000 per annum (pro rated for the related Periodic Interest Accrual Period), minus the amount of Administrative Expenses (other than those specified in clause (v)(F) thereof) paid during the Periodic Interest Accrual Period immediately preceding such Payment Date.

"Expense Reserve Account": The expense reserve account established under the Indenture.

"Extension Bonus Eligibility Certification": With respect to a Maturity Extension and each beneficial owner of Senior Notes (including in the form of the Class Q-1 Senior Note Component) other than Extension Sale Securities, the written certification by such beneficial owner acceptable to the Trustee to the effect that it held Senior Notes (including in the form of the Class Q-1 Senior Note Component) other than Extension Sale Securities on the Extension Effective Date, including the Aggregate Principal Amount thereof and wire transfer instructions for the Extension Bonus Payment and any required documentation thereunder.

"Extension Bonus Payment": As defined in "*Description of the Securities—Maturity of the Notes and Class Q-1 Securities and Extension of Maturity of the Notes and Class Q-1 Securities.*"

"Extension Conditions": As defined in "*Description of the Securities—Maturity of the Notes and Class Q-1 Securities and Extension of Maturity of the Notes and Class Q-1 Securities.*"

010764

"Extension Determination Date": As defined in "*Description of the Securities—Maturity of the Notes and Class Q-1 Securities and Extension of Maturity of the Notes and Class Q-1 Securities.*"

"Extension Effective Date": As defined in "*Description of the Securities—Maturity of the Notes and Class Q-1 Securities and Extension of Maturity of the Notes and Class Q-1 Securities.*"

"Extension Notice": As defined in "*Description of the Securities—Maturity of the Notes and Class Q-1 Securities and Extension of Maturity of the Notes and Class Q-1 Securities.*"

"Extension Qualifying Purchaser": As defined in "*Description of the Securities—Maturity of the Notes and Class Q-1 Securities and Extension of Maturity of the Notes and Class Q-1 Securities.*"

"Extension Purchase Price": The purchase price payable by the Extension Qualifying Purchasers for Extension Sale Securities in connection with the Maturity Extension, if any, in an amount equal to (1) in the case of the Senior Notes, the Aggregate Principal Amount thereof, plus accrued and unpaid interest (including Deferred Interest, if any) as of the Extension Effective Date (giving effect to any amounts paid to the holder on such date), plus, in the case of the Class C-2 Notes, the applicable Make-whole Premium, (2) in the case of the Income Notes, an amount that together with any amounts paid to the Holders with respect to those Income Notes from the Closing Date to and including the Extension Effective Date, results in an internal rate of return with respect to those Income Notes of 18% per annum and (3) in the case of the Class Q-1 Securities, an amount determined based on the respective Extension Purchase Prices for the relevant Class Q-1 Senior Note Component and the Class Q-1 Income Note Component thereof. If the Extension Effective Date is on or after the date on which the Holders of Income Notes have received an internal rate of return equal to or in excess of 18% per annum (determined as in clause (2) above), the Extension Purchase Price for Extension Sale Securities that are Income Notes will be zero.

"Extension Sale Notice": As defined in "*Description of the Securities—Maturity of the Notes and Class Q-1 Securities and Extension of Maturity of the Notes and Class Q-1 Securities.*"

"Extension Sale Notice Period": As defined in "*Description of the Securities—Maturity of the Notes and Class Q-1 Securities and Extension of Maturity of the Notes and Class Q-1 Securities.*"

"Extension Sale Securities": As defined in "*Description of the Securities—Maturity of the Notes and Class Q-1 Securities and Extension of Maturity of the Notes and Class Q-1 Securities.*"

"Failure to Pay": The failure by a Reference Entity to make, when and where due or scheduled (or, in the case of a payment default by a Reference Entity due solely to an administrative error and not related to the credit quality of the Reference Entity, within three Business Days of the date due or scheduled) any payments in an aggregate amount of not less than the Payment Requirement under the Reference Obligation or applicable Underlying Obligation, in accordance with the terms of such Reference Obligation or applicable Underlying Obligation at the time of such failure, without regard to any applicable grace period.

"Federal Reserve Board": The United States Board of Governors of the Federal Reserve System.

"Final Class Q-2B Distribution Amount": As defined in "*Description of the Securities—The Class Q-2 Securities.*"

"Final Income Note Distribution Amount": As defined in "*Description of the Securities—Priority of Payments—Principal Priority of Payments.*"

"Final Price": As defined in "*Description of the Swap Agreement—Valuation of Reference Obligations.*"

"Fixed Amount": For any Payment Date, an amount equal to the sum of (i) the Funded Portion Fixed Amount for the related Collection Period and (ii) the product of (a) the Aggregate Unfunded Amount for such Collection Period, (b) 0.18%, (c) the actual number of calendar days in such Collection Period and (d) 1/360.

"Florida Act": The Florida Securities Act.

"Funded Portion Fixed Amount": (i) For a Collection Period (or portion thereof) occurring during the Ramp-up Period or following the end of the Portfolio Modification Period, an amount equal to the sum of, for each day in such period, the product of (a) the Daily Aggregate Funded Amount for such day, (b) the Daily Rate for such day and (c) 1/360; and (ii) for a Collection Period (or portion thereof) occurring during the Portfolio Modification Period, the sum of, for each day in such period (a) the product of (1) the lesser of U.S. $450 million and the Daily Aggregate Funded Amount for such day, (2) the Quarterly Period Rate for such day and (3) 1/360, plus (b) the product of (1) the lesser of U.S. $150 million and the excess, if any, of the Daily Aggregate Funded Amount for such day over U.S. $450 million, (2) the Monthly Period Rate for such day and (3) 1/360, plus (c) the product of (1) the excess, if any, of the Daily Aggregate Funded Amount for such day over U.S. $600 million, (2) the Daily Rate for such day and (3) 1/360.

"Funding Start Date": (i) For a Reference Obligation included in the Reference Portfolio on the Closing Date, the Closing Date, and (ii) for any other Reference Obligation, the date that is the standard settlement cycle for such obligation after its Addition Date.

"Global Notes": The Regulation S Global Notes, the Rule 144A Global Notes and the Temporary Regulation S Global Notes.

"Gross Excess Coupon": As of any date of determination, an amount equal to the product of (a) the excess, if any, of the Weighted Average Fixed Rate Coupon for such date over the applicable minimum Weighted Average Fixed Rate Coupon specified in clause (22) of the Reference Portfolio Criteria and (b) the aggregate of the Reference Obligation Calculation Amounts of all Reference Obligations that bear interest at a fixed rate and any Reference Swaps with a periodic amount payable to the protection seller or total return receiver based on a fixed rate.

"Gross Excess Spread": As of any date of determination, an amount equal to the product of (a) the excess, if any, of the Weighted Average LIBOR Spread for such date over the applicable minimum Weighted Average LIBOR Spread specified in clause (17) of the Reference Portfolio Criteria and (b) the aggregate of the Reference Obligation Calculation Amounts of all Reference Obligations that bear interest at a floating rate and any Reference Swaps with a periodic amount payable to the protection seller or total return receiver based on a floating rate.

"Holder": With respect to any Note or Class Q Security, the Person in whose name such Note or Class Q Security is registered in the Securities Register. "Noteholder" and "Securityholder" has a corresponding meaning.

"Incentive Amount": For any Payment Date an amount equal to (i) 0.125% per annum on the Portfolio Calculation Amount as of the related Determination Date (calculated for the related Collection Period on the basis of a 360 day year consisting of twelve 30-day months) plus (ii) the aggregate Deferred Incentive Amount, if any, from the prior Payment Date; *provided* that such amount will be deferred (a "Deferred Incentive Amount") (or, in the case of the Swap Termination Date, will not be payable) on any Payment Date to the extent that (a) amounts paid to the Holders of the Income Notes on or prior to such date result in an internal rate of return of less than 15% per annum, (b) the Incentive Amount would exceed the amount of Reference Portfolio Proceeds for such Payment Date minus the sum of (1) the Base Amount for such date, (2) the Retained Amount for such date, (3) the Fixed Amount for such date and (4) the Subordinate Amount for such date or (c) the Payment Date Proceeds and other applicable amounts for such date would be insufficient to permit the Issuer to pay all amounts payable on that Payment Date pursuant to clauses 1 through 16 of the Payment Date Priority of Payments and clauses 1 through 18 of the Principal Priority of Payments.

"Income Note Principal Distribution Amount": As defined in "*Description of the Securities—Payments.*"

"Income Notes": As defined in "*Summary—The Income Notes.*"

"Indemnifiable Tax": The meaning assigned to such term in the ISDA Master Agreement.

"Indenture": The indenture, dated as of the Closing Date, among the Issuer, the Co-Issuer and JPMorgan Chase Bank, as Trustee.

"Indenture Calculation Agent": The Trustee (or any successor Indenture Calculation Agent).

010766

"Indenture Tax Event":  Either (i) the adoption of, or a change in, any tax statute (including the Code), treaty, regulation (whether temporary or final), rule, ruling, practice, procedure or judicial decision or interpretation which results or will result in withholding tax payments in an amount in excess of 10% of the net income of the Issuer during the Collection Period as a result of the imposition of withholding tax on payments to the Issuer with respect to which the obligors are not required to make gross-up payments that cover the full amount of such withholding taxes on an after-tax basis or (ii) a final determination by the Internal Revenue Service or a court of competent jurisdiction or an opinion of nationally recognized tax counsel experienced in such matters acceptable to the Swap Counterparty and the Reference Portfolio Manager to the effect that the Issuer is or has become subject to taxation in an amount in excess of 10% of the net income of the Issuer during the Collection Period, whether as a result of being deemed to be engaged in the conduct of a trade or business within the United States for U.S. federal income tax purposes or otherwise.

"Indenture Tax Redemption":  As defined in "*Description of the Securities—Payments—Indenture Tax Event*."

"Indenture Tax Redemption Date":  As defined in "*Description of the Securities—Payments—Indenture Tax Event*."

"Index CLN":  An unleveraged Reference CLN related to an index of Reference Entities or Reference Obligations; provided that an Index CLN may not be included as a Reference Obligation unless it has an S&P Rating and a Moody's Rating, an S&P Recovery Rate and Moody's Recovery Rate have been assigned to it and all Underlying Obligations are taken into account for purposes of determining compliance with the S&P CDO Monitor Test, the Concentration Limits and the minimum Diversity Score requirement of clause (17) of the Reference Portfolio Criteria.

"Initial Funded Amount":  For a Reference Obligation, the greater of (i) zero and (ii)(a) the Reference Price multiplied by the funded portion of the Reference Obligation Calculation Amount as of the Funding Start Date minus (b)(1) 100% minus the Reference Price multiplied by (2) the unfunded portion of the Reference Obligation Calculation Amount as of such date plus (c) in the case of a Bond or Reference CLN, any accrued interest in respect thereof to which a seller of the relevant Reference Obligation would be entitled on purchase thereof in accordance with market practice.

"Initial Purchaser":  With respect to the Senior Notes, the Class Q-1 Securities and Class Q-2A Securities, Citigroup Global Markets Inc.  The term "initial purchaser" (lower case) refers to the initial purchasers of the Notes or Class Q Securities from the Initial Purchaser or through the Placement Agent, as applicable.

"Initial Reference Obligations":  The Reference Obligations included in the Reference Portfolio under the Swap Agreement as of the Closing Date.

"Interest Amounts":  The Class A-1 Interest Amount, the Class A-2 Interest Amount, the Class B Interest Amount, the Class C-1 Interest Amount, the Class C-2 Interest Amount and the Class Q-2A Interest Amount, as the context may require.

"Interest Coverage Ratios":  The Class A Interest Coverage Ratio, the Class B Interest Coverage Ratio and the Class C Interest Coverage Ratio.

"Interest Coverage Tests":  The Class A Interest Coverage Test, the Class B Interest Coverage Test and the Class C Interest Coverage Test.

"Interest Rate":  The Class A-1 Interest Rate, the Class A-2 Interest Rate, the Class B Interest Rate, the Class C-1 Interest Rate and the Class C-2 Interest Rate, as the context requires.

"Interest Return":  For a Reference Obligation and a Collection Period, the sum (without duplication) of (a) all payments of interest in respect of such Reference Obligation receivable during such period (or, in the case of a Reference Swap, periodic fixed or floating amounts payable to the protection seller or total return receiver during such period) plus applicable Deemed Interest (as defined below) thereon and (b) all consent payments, amendment

and waiver fees, all late payment fees, all commitment fees (including commitment fees received on Unfunded Commitments, but excluding any commitment fees treated as a discount from par and taken into account as such in the Reference Price), all utilization fees, all facility fees and all other fees and commissions receivable (in each case other than in respect of principal or make-whole amounts and other than for services in connection with the origination, structuring, marketing or placement of the obligation or in connection with the restructuring, workout or enforcement of a Defaulted Reference Obligation) during such period plus applicable Deemed Interest thereon, in each case with respect to a portion of the Reference Obligation corresponding to the applicable Reference Obligation Calculation Amount (*provided* that in the case of a Defaulted Reference Obligation, the Interest Return will equal such amounts actually paid to holders of such portion of the Reference Obligation during such period plus applicable Deemed Interest thereon (with all amounts paid with respect to such Defaulted Reference Obligation deemed to be in respect of principal until the Reference Obligation Calculation Amount for such obligation is reduced to zero pursuant to the procedures with respect to an Amortization); *provided further* that, with respect to any Reference Obligation added to or removed from the Reference Portfolio during a Collection Period, the applicable Interest Return will be determined in accordance with market practice with respect to the treatment of accrued interest for transactions in such Reference Obligation under the applicable quotation methodology used in determining the Reference Price or the Final Price, as applicable, under the Swap Agreement; *provided, further*, that in the case of an addition of a Reference Obligation, any Assignment Fee in respect thereof shall be deducted from the applicable Interest Return for such obligation and in the case of the removal of a Reference Obligation, any Assignment Fee in respect thereof shall constitute Interest Return for that obligation).  "Deemed Interest" shall mean, with respect to any amount and any period, deemed interest on such amount from and including the date such amount is receivable or payable to but excluding the end of such period, at the applicable overnight federal funds rate (or such other prevailing market rate agreed to from time to time by the Swap Counterparty and the Reference Portfolio Manager).  Notwithstanding anything to the contrary herein, in the case of the Initial Reference Obligations, amounts described pursuant to clauses (a) and (b) above that accrued prior to the Closing Date will not constitute Interest Return.

"Investment Agreement":  As defined in "*Description of the Securities—The Investment Agreement*."

"Investment Agreement Counterparty": As defined in "*Description of the Securities—The Investment Agreement*."

"Investment Agreement Guarantor": As defined in "*Description of the Securities—The Investment Agreement*."

"Investment Company Act":  The U.S. Investment Company Act of 1940, as amended.

"IRS":  The Internal Revenue Service.

"ISDA Master Agreement":  The form of the 2002 ISDA Master Agreement published by the International Swaps and Derivatives Association, Inc.

"Issuer":  Valhalla CLO, Ltd., a recently formed exempted company incorporated with limited liability under the laws of the Cayman Islands.

"Issuers":  The Issuer and the Co-Issuer.

"LIBOR":  The London Interbank Offered Rate, as determined (unless the context otherwise requires) pursuant to "*Description of the Securities—Payments.*"

"LIBOR Determination Date":  The second London Business Day prior to the commencement of a Periodic Interest Accrual Period.

"London Business Day":  Any Business Day on which commercial banks are open for dealings in deposits in U.S. Dollars in the London interbank market.

010768

"Make-whole Premium": With respect to the Class C-2 Notes, the premium payable to the Holders of the Class C-2 Notes in connection with (i) an Optional Redemption of such Notes, (ii) the purchase of such Notes that are Extension Sale Securities in connection with the Maturity Extension, if any, or (iii) the purchase of such Notes in connection with an Amendment Buy-Out, as applicable, in each case in an amount equal to the excess, if any, of (x) the present value (discounted to the Optional Redemption Date, Extension Effective Date or date of Amendment Buy-Out, as applicable, using the Reinvestment Yield as the discount rate on a semi-annual basis using a 360-day year of twelve 30-day months) of the remaining payments of interest and principal due on the applicable Class C-2 Notes, assuming that the entire outstanding principal amount of the Class C-2 Notes will be paid on the Payment Date occurring in November 2013 and that each intervening payment of interest on the Class C-2 Notes will be made on the related Payment Date in its entirety (and therefore there is no Deferred Interest on the Class C-2 Notes) over (y) the Aggregate Principal Amount of the applicable Class C-2 Notes on the Optional Redemption Date, the Extension Effective Date or date of Amendment Buy-Out, as applicable; provided that in no event shall any Make-whole Premium be less than zero.

"Market Value": With respect to a Reference Obligation and any date of determination, the price thereof (expressed as a percentage) based on the relevant price quotation for such Reference Obligation quoted on the Pricing Source as of such date or, if no such quotation is available on such date, the unweighted average of two or more bid quotations for such Reference Obligation obtained on such date from dealers (which shall not be Affiliates of each other) in the relevant market selected by the Reference Portfolio Manager for an amount of such Reference Obligation as close as practicable to its Reference Obligation Calculation Amount (or, if the Swap Counterparty or one of its Affiliates is one of such dealers and only two bid quotations are obtained the lower of such quotations), or if two or more such quotations are not available on such date, the Reference Portfolio Manager shall attempt to obtain the price quotation for such Reference Obligation on another recognized pricing source or service for the relevant market selected by the Reference Portfolio Manager. If the Reference Portfolio Manager is unable to determine the Market Value with respect to a Reference Obligation pursuant to the preceding sentence, the Market Value of such Reference Obligation shall be deemed to be zero for that date of determination.

"Maturity Date": August 1, 2016, or in the case of a Maturity Extension, August 1, 2020.

"Maturity Extension": As defined in *"Description of the Securities— Maturity of the Notes and Class Q-1 Securities and Extension of Maturity of the Notes and Class Q-1 Securities."*

"Maximum Base Amount": As defined in the definition of "Base Amount."

"Measurement Date": Any of (i) the date of any addition or removal of a Reference Obligation under the Swap Agreement, (ii) each Determination Date, (iii) each Monthly Report Determination Date and (iv) with reasonable prior written notice to the Issuer, the Reference Portfolio Manager and the Trustee, any Business Day that a Rating Agency or the Swap Counterparty requests to be a "Measurement Date;" *provided* that, if any such date would otherwise fall on a day that is not a Business Day, the relevant Measurement Date will be the immediately following Business Day.

"Monthly Period Rate": For any date of determination, a rate equal to the Floating Rate (determined pursuant to the 2000 ISDA Definitions using a Floating Rate Option of USD-LIBOR-BBA, a Reset Date of the most recent Monthly Reset Date and a Designated Maturity of one month) plus 0.35% per annum. "Monthly Reset Date" means, for each Periodic Interest Accrual Period, the first day of such Periodic Interest Accrual Period and the dates that are one calendar month and two calendar months thereafter (or if any such date is not a Business Day, the next preceding Business Day).

"Monthly Report Determination Date": The 15th day of each calendar month (other than the month immediately preceding the month in which a Payment Date occurs).

"Moody's": Moody's Investors Service, Inc. or any successor thereto.

010769

"Moody's Default Probability Rating": With respect to any Reference Obligation or Underlying Obligation, as of any date of determination, the rating determined in accordance with the following, in the following order of priority:

(i) with respect to a Moody's Senior Secured Loan:

(a) if the Loan's Obligor has a senior implied rating from Moody's, such senior implied rating;

(b) if the preceding clause does not apply, the Moody's Obligation Rating of such Loan; and

(ii) with respect to a Moody's Non Senior Secured Loan or a Bond, the Moody's Obligation Rating of such Reference Obligation;

(iii) with respect to a Reference Swap or Reference CLN, the Moody's Obligation Rating thereof;

(iv) with respect to a Reference Obligation that is a DIP Loan, the rating that is one rating subcategory below the Moody's Obligation Rating thereof; and

(v) with respect to a Structured Finance Obligation, the assigned Moody's rating thereof (or, if the obligation does not have an assigned Moody's rating but has a rating by S&P, the rating that is the number of rating subcategories specified by Moody's below such S&P rating).

Notwithstanding the foregoing, if the Moody's rating or ratings used to determine the Moody's Default Probability Rating are on watch for downgrade or upgrade by Moody's, such rating or ratings will be adjusted down one subcategory (if on watch for downgrade) or up one subcategory (if on watch for upgrade).

"Moody's Equivalent Senior Unsecured Rating": With respect to any Reference Obligation or Underlying Obligation that is a Loan or Bond and the Obligor thereof, as of any date of determination, the rating determined in accordance with the following, in the following order of priority:

(i) if the Obligor has a senior unsecured obligation with an Assigned Moody's Rating, such Assigned Moody's Rating;

(ii) if the preceding clause does not apply, the Moody's "Issuer Rating" for the Obligor;

(iii) if the preceding clauses do not apply, but the Obligor has a subordinated obligation with an Assigned Moody's Rating, then

(a) if such Assigned Moody's Rating is at least "B3" (and, if rated "B3," not on watch for downgrade), the Moody's Equivalent Senior Unsecured Rating shall be the rating which is one rating subcategory higher than such Assigned Moody's Rating, or

(b) if such Assigned Moody's Rating is less than "B3" (or rated "B3" and on watch for downgrade), the Moody's Equivalent Senior Unsecured Rating shall be such Assigned Moody's Rating;

(iv) if the preceding clauses do not apply, but the Obligor has a senior secured obligation with an Assigned Moody's Rating, then:

(a) if such Assigned Moody's Rating is at least "Caa3" (and, if rated "Caa3," not on watch for downgrade), the Moody's Equivalent Senior Unsecured Rating shall be the rating which is one subcategory below such Assigned Moody's Rating, or

(b) if such Assigned Moody's Rating is less than "Caa3" (or rated "Caa3" and on watch for downgrade), then the Moody's Equivalent Senior Unsecured Rating shall be "C";

(v) if the preceding clauses do not apply, but such Obligor has a senior implied rating from Moody's, the Moody's Equivalent Senior Unsecured Rating shall be one rating subcategory below such senior implied rating;

(vi) if the preceding clauses do not apply, but the Obligor has a senior unsecured obligation (other than a bank loan) with a monitored public rating from S&P (without any postscripts, asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), then the Moody's Equivalent Senior Unsecured Rating shall be:

(a) one rating subcategory below the Moody's equivalent of such S&P rating if it is "BBB–" or higher, or

(b) two rating subcategories below the Moody's equivalent of such S&P rating if it is "BB+" or lower;

(vii) if the preceding clauses do not apply, but the Obligor has a subordinated obligation (other than a bank loan) with a monitored public rating from S&P (without any postscripts, asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), the Assigned Moody's Rating shall be deemed to be:

(a) one rating subcategory below the Moody's equivalent of such S&P rating if it is "BBB–" or higher; or

(b) two rating subcategories below the Moody's equivalent of such S&P rating if it is "BB+" or lower,

and the Moody's Equivalent Senior Unsecured Rating shall be determined pursuant to clause (iii) above;

(viii) if the preceding clauses do not apply, but the Obligor has a senior secured obligation with a monitored public rating from S&P (without any postscripts, asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), the Assigned Moody's Rating shall be deemed to be:

(a) one rating subcategory below the Moody's equivalent of such S&P rating if it is "BBB–" or higher; or

(b) two rating subcategories below the Moody's equivalent of such S&P rating if it is "BB+" or lower,

and the Moody's Equivalent Senior Unsecured Rating shall be determined pursuant to clause (iv) above;

(ix) if the preceding clauses do not apply and each of the following clauses (a) through (h) do apply, the Moody's Equivalent Senior Unsecured Rating will be "Caa1":

(a) neither the Obligor nor any of its Affiliates is subject to reorganization or bankruptcy proceedings,

(b) no debt securities or obligations of the Obligor are in default,

(c) neither the Obligor nor any of its Affiliates has defaulted on any debt during the preceding two years,

(d) the Obligor has been in existence for the preceding five years,

(e) the Obligor is current on any cumulative dividends,

(f) the fixed-charge ratio for the Obligor exceeds 125% for each of the preceding two fiscal years and for the most recent quarter,

010771

(g) the Obligor had a net profit before tax in the past fiscal year and the most recent quarter, and

(h) the annual financial statements of such Obligor are unqualified and certified by a firm of Independent accountants of international reputation, and quarterly statements are unaudited but signed by a corporate officer;

(x) if the preceding clauses do not apply but each of the following clause (a) and (b) do apply, the Moody's Equivalent Senior Unsecured Rating will be "Caa3":

(a) neither the Obligor nor any of its Affiliates is subject to reorganization or bankruptcy proceedings; and

(b) no debt security or obligation of such Obligor has been in default during the past two years; and

(xi) if the preceding clauses do not apply and a debt security or obligation of the Obligor has been in default during the past two years, the Moody's Equivalent Senior Unsecured Rating will be "Ca."

Notwithstanding the foregoing, no more than 10% of Aggregate Reference Obligation Calculation Amount may be given a Moody's Equivalent Senior Unsecured Rating based on a rating given by S&P as provided in clauses (vi), (vii) and (viii) above.

"Moody's Group I Country":  Any of the following countries:  Australia, the Netherlands, the United Kingdom and any country subsequently determined by Moody's to be a Moody's Group I Country.

"Moody's Group II Country":  Any of the following countries:  Germany, Ireland, Sweden, Switzerland and any country subsequently determined by Moody's to be a Moody's Group II Country.

"Moody's Group III Country":  Any of the following countries:  Austria, Belgium, Denmark, Finland, France, Iceland, Liechtenstein, Luxembourg, Norway, Spain and any country subsequently determined by Moody's to be a Moody's Group III Country.

"Moody's Industry Classification Group":  Any of the Moody's industrial classification groups, any additional classification groups established by Moody's with respect to the Initial Reference Obligations, and any other classification groups that may be subsequently established by Moody's with respect to new Reference Obligations that are added to the Reference Portfolio and provided, in each case, by the Reference Portfolio Manager or Moody's to the Trustee and the Swap Counterparty.

"Moody's Non Senior Secured Loan":  Any Loan that is not (i) a Moody's Senior Secured Loan nor (ii) a loan described in subclauses (a)-(c) of clause (iv) of the definition of Moody's Senior Secured Loan.

"Moody's Obligation Rating":  With respect to any Reference Obligation or Underlying Obligation as of any date of determination, the rating determined in accordance with the following, in the following order of priority:

(i) With respect to a Moody's Senior Secured Loan:

(a) if it has an Assigned Moody's Rating, such Assigned Moody's Rating; or

(b) if the preceding clause does not apply, the rating that is one rating subcategory above the Moody's Equivalent Senior Unsecured Rating; and

(ii) With respect to a Moody's Non Senior Secured Loan or a Bond:

(a) if it has an Assigned Moody's Rating, such Assigned Moody's Rating; or

(b) if the preceding clause does not apply, the Moody's Equivalent Senior Unsecured Rating; and

(iii) With respect to a Reference Swap, Reference CLN or a DIP Loan, the Assigned Moody's Rating thereof.

010772

Notwithstanding the foregoing, if the Moody's rating or ratings used to determine the Moody's Default Probability Rating are on watch for downgrade or upgrade by Moody's, such rating or ratings will be adjusted down one subcategory (if on watch for downgrade) or up one subcategory (if on watch for upgrade).

"Moody's Rating": The Moody's Default Probability Rating; *provided*, that, with respect to the Reference Obligations generally, if at any time Moody's or any successor to it ceases to provide rating services, references to rating categories of Moody's in the Swap Agreement will be deemed instead to be references to the equivalent categories of any other nationally recognized investment rating agency selected by the Swap Counterparty (with written notice to the Issuer), as of the most recent date on which such other rating agency and Moody's published ratings for the type of security in respect of which such alternative rating agency is used.

"Moody's Recovery Rate": With respect to a Reference Obligation that is a Loan or Bond (other than a Structured Finance Obligation), as of any date of determination, the recovery rate determined in accordance with the following, in the following order of priority:

(i) if the Loan or Bond has been specifically assigned a recovery rate by Moody's (for example, in connection with the assignment by Moody's of an estimated rating), such recovery rate;

(ii) if the preceding clause does not apply to the Bond or Loan and the Loan is a Moody's Senior Secured Loan or a Moody's Non Senior Secured Loan, the rate determined pursuant to the table below based on the number of rating subcategories difference between the Bond's or Loan's Moody's Obligation Rating and its Moody's Default Probability Rating (for purposes of clarification, if the Moody's Obligation Rating is higher than the Moody's Default Probability Rating, the rating subcategories difference will be positive and if it is lower, negative):

| Number of Moody's Ratings Subcategories Difference Between the Moody's Obligation Rating and the Moody's Default Probability Rating | Moody's Senior Secured Loans | Moody's Non Senior Secured Loans | Bonds |
|---|---|---|---|
| +2 or more | 60.0% | 45.0% | 40.0% |
| +1 | 50.0% | 42.5% | 35.0% |
| 0 | 45.0% | 40.0% | 30.0% |
| -1 | 40.0% | 30.0% | 15.0% |
| -2 | 30.0% | 15.0% | 10.0% |
| -3 or less | 20.0% | 10.0% | 2.0% |

or

(iii) if no recovery rate has been specifically assigned with respect to a Loan pursuant to clauses (i) or (ii) above, and the Loan is a DIP Loan, 50%.

With respect to a Reference Obligation that is a Structured Finance Obligation as of any date of determination, the percentage set forth in the definition of "Moody's Structured Finance Recovery Rates" (based on the applicable Moody's Rating thereof). With respect to a Reference Swap or Reference CLN as of any date of determination, the percentage specified by Moody's on a case-by-case basis.

"Moody's Required Ratings": If the applicable counterparty has a short-term and a long-term rating from Moody's, a short-term rating from Moody's of at least "P-1" (and if "P-1", not on credit watch with negative implications), and a long-term rating from Moody's of at least "A1" (and if "A1", not on credit watch with negative implications), and, if the applicable counterparty has only a long-term rating from Moody's, a long-term rating from Moody's of at least "Aa3" (including "Aa3" on credit watch with negative implications).

"Moody's Senior Secured Loan": (i) A Loan that:

(a) is not (and cannot by its terms become) subordinate in right of payment to any other obligation of the Obligor of the Loan,

(b) is secured by a valid first priority perfected security interest or lien in, to or on specified collateral securing the Obligor's obligations under the Loan, and

010773

(c) the value of the collateral securing the Loan together with other attributes of the Obligor (including, without limitation, its general financial condition, ability to generate cash flow available for debt service and other demands for that cash flow) is adequate (in the commercially reasonable judgment of the Reference Portfolio Manager) to repay the Loan in accordance with its terms and to repay all other loans of equal seniority secured by a first lien or security interest in the same collateral), or

(ii)      a Loan that:

(a) is not (and cannot by its terms become) subordinate in right of payment to any other obligation of the Obligor of the Loan, other than, with respect to a Loan described in clause (i) above, with respect to the liquidation of such obligor or the collateral for such loan,

(b) is secured by a valid second priority perfected security interest or lien in, to or on specified collateral securing the Obligor's obligations under the Loan, and

(c) the value of the collateral securing the Loan together with other attributes of the Obligor (including, without limitation, its general financial condition, ability to generate cash flow available for debt service and other demands for that cash flow) is adequate (in the commercially reasonable judgment of the Reference Portfolio Manager) to repay the Loan in accordance with its terms and to repay all other loans of equal or higher seniority secured by a first or second lien or security interest in the same collateral), and

(iii) the Loan is not:

(a) a DIP Loan,

(b) a Loan for which the security interest or lien (or the validity or effectiveness thereof) in substantially all of its collateral attaches, becomes effective, or otherwise "springs" into existence after the origination thereof, or

(c) a type of loan that Moody's has identified as having unusual terms and with respect to which its Moody's Priority Category Recovery Rate has been or is to be determined on a case-by-case basis.

"Moody's Structured Finance Recovery Rates": The Moody's Recovery Rate for a Structured Finance Obligation will be the applicable rate set forth below based on the appropriate sector as categorized by Moody's:

"Diversified Securities" primarily include (1) Automobile Securities; (2) Car Rental Receivable Securities; (3) Credit Card Securities; (4) Student Loan Securities

"Residential Securities" primarily include (1) Home Equity Loan Securities; (2) Manufactured Housing Securities; (3) Residential A Mortgage Securities; (4) Residential B/C Mortgage Securities

"Undiversified Securities" primarily include (1) CMBS Conduit; (2) CMBS Credit Tenant Lease; (3) CMBS Large Loan; (4) Those ABS Sectors not included in Diversified Securities "Collateralized Debt Obligations" include (1) High-diversity CDOs (Diversity Score in excess of 20); (2) Low-Diversity CDOs (Diversity Score of 20 or less)

<u>Diversified Securities</u>

| % of Underlying Capital Structure(1) | Initial Rating of Structured Finance Obligation | | | | | |
|---|---|---|---|---|---|---|
| | Aaa | Aa | A | Baa | Ba | B |
| >70% | 85% | 80% | 70% | 60% | 50% | 40% |
| <=70%, >10% | 75% | 70% | 60% | 50% | 40% | 30% |
| <=10% | 70% | 65% | 55% | 45% | 35% | 25% |

010774

Residential Securities

| % of Underlying Capital Structure(1) | Initial Rating of Structured Finance Obligation | | | | | |
|---|---|---|---|---|---|---|
| | Aaa | Aa | A | Baa | Ba | B |
| >70% | 85% | 80% | 65% | 55% | 45% | 30% |
| <=70%, >10% | 75% | 70% | 55% | 45% | 35% | 25% |
| <=10%, >5% | 65% | 55% | 45% | 40% | 30% | 20% |
| <=5%, >2% | 55% | 45% | 40% | 35% | 25% | 15% |
| <=2% | 45% | 35% | 30% | 25% | 15% | 10% |

Undiversified Securities

| % of Underlying Capital Structure(1) | Initial Rating of Structured Finance Obligation | | | | | |
|---|---|---|---|---|---|---|
| | Aaa | Aa | A | Baa | Ba | B |
| >70% | 85% | 80% | 65% | 55% | 45% | 30% |
| <=70%, >10% | 75% | 70% | 55% | 45% | 35% | 25% |
| <=10%, >5% | 65% | 55% | 45% | 35% | 25% | 15% |
| <=5%, >2% | 55% | 45% | 35% | 30% | 20% | 10% |
| <=2% | 45% | 35% | 25% | 20% | 10% | 5% |

High Diversity Collateralized Debt Obligations

| % of Underlying Capital Structure(1) | Initial Rating of Underlying Asset | | | | | |
|---|---|---|---|---|---|---|
| | Aaa | Aa | A | Baa | Ba | B |
| >70% | 85% | 80% | 65% | 55% | 45% | 30% |
| <=70%, >10% | 75% | 70% | 60% | 50% | 40% | 25% |
| <=10%, >5% | 65% | 55% | 50% | 40% | 30% | 20% |
| <=5%, >2% | 55% | 45% | 40% | 35% | 25% | 10% |
| <=2% | 45% | 35% | 30% | 25% | 10% | 5% |

Low Diversity Collateralized Debt Obligations

| % of Underlying Capital Structure(1) | Initial Rating of Underlying Asset | | | | | |
|---|---|---|---|---|---|---|
| | Aaa | Aa | A | Baa | Ba | B |
| >70% | 80% | 75% | 60% | 50% | 45% | 30% |
| <=70%, >10% | 70% | 60% | 55% | 45% | 35% | 25% |
| <=10%, >5% | 60% | 50% | 45% | 35% | 25% | 15% |
| <=5%, >2% | 50% | 40% | 35% | 30% | 20% | 10% |
| <=2% | 30% | 25% | 20% | 15% | 7% | 4% |

(1) Initial par amount of tranche to which Structured Finance Obligation relates divided by initial par amount of total securities issued by Structured Finance Obligation issuer.

"Moody's Weighted Average Recovery Rate": As of any date of determination, the number obtained by (a) multiplying the applicable Moody's Recovery Rate as of such date of each Reference Obligation in the Reference Portfolio (excluding any Defaulted Reference Obligations) by its Reference Obligation Calculation Amount; (b) summing the amount obtained in clause (a) on such date and (c) dividing the sum obtained in clause (b) by the Aggregate Reference Obligation Calculation Amount of all Reference Obligations in the Reference Portfolio (excluding any Defaulted Reference Obligations).

010775

"Net Class Q-2B Periodic Return Amount": As defined in *"Description of the Securities—The Class Q-2 Securities."*

"Net Income Note Periodic Return Amount":  As defined in *"Description of the Securities—Priority of Payments—Payment Date Priority of Payments".*

"Net Interest Coverage Proceeds":  With respect to any Measurement Date, (i) the amount of Payment Date Proceeds for the next following Payment Date plus (ii) the sum of the Subordinate Amount and the Incentive Amount, if any, for such Payment Date minus (iii) the amounts payable under clauses 1 and 2 of the Payment Date Priority of Payments for such Payment Date.  For purposes of calculating Net Interest Coverage Proceeds on a Measurement Date other than a Determination Date, the amounts described above will be determined assuming that the composition of the Reference Portfolio and Eligible Investments in the Trust Estate will not change prior to the next Determination Date, that there will be no unscheduled Administrative Expenses after such Measurement Date and prior to the next Determination Date and that no interest will be payable on any Reference Obligation that is a Defaulted Reference Obligation or Deferring PIK Obligation.

"Non-consenting Holder":  As defined in *"Summary—Amendment Buy-Out."*

"Note Redemption Amount": With respect to a Payment Date after the end of the Portfolio Modification Period, the Swap Reduction Amount under the Swap Agreement (plus any Quarterly Aggregate Increase Amount, but minus any Quarterly Aggregate Reduction Amount) for such date (but only to the extent the aggregate of such amounts for such Payment Date and prior Payment Dates exceeds U.S. $648,000,000).

"Notes":  The Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C-1 Notes, the Class C-2 Notes and the Income Notes, collectively.

"Notice of Class Q-2 Default":  As defined in *"Description of the Securities—The Class Q-2 Securities."*

"Notice of Default":  A "Notice of Default" under the Indenture.

"Obligation Value Increase Amount":  As set forth in *"Description of the Swap Agreement—Valuation of Reference Obligations."*

"Obligation Value Reduction Amount":  As set forth in *"Description of the Swap Agreement—Valuation of Reference Obligations."*

"Obligor":  The issuer of a Bond or the obligor under a Loan, as the case may be.

"OC Base Amount":  As defined in *"Description of the Securities—The Coverage Tests."*

"OID":  Original Issue Discount.

"Optional Redemption":  As defined in *"Description of the Securities—Payments."*

"Optional Redemption Date":  The Payment Date on which an Optional Redemption occurs.

"Ordinary Shares":  1,000 voting Ordinary Shares, par value U.S. $1.00 per share, of the Issuer.

"Outstanding":  (i) With respect to the Notes, as of any date of determination, "Outstanding" refers to all Notes theretofore authenticated and delivered under the Indenture other than Notes cancelled, redeemed, exchanged or replaced in accordance with the terms of the Indenture and (ii) with respect to the Class Q Securities, as of any date of determination, "Outstanding" refers to any and all Class Q Securities theretofore issued and paid for under the Indenture other than the Class Q Securities cancelled, redeemed, exchanged or replaced in accordance with the terms of the Indenture.

"Outstanding Premium":  As of any Measurement Date, an amount equal to the aggregate of, for each Reference Obligation included in the Reference Portfolio as of such date for which the Reference Price exceeds 100%, the amount of such excess multiplied by the then Reference Obligation Calculation Amount for such Reference Obligation.

010776

"Overcollateralization Ratios": The Class A Overcollateralization Ratio, the Class B Overcollateralization Ratio and the Class C Overcollateralization Ratio, collectively.

"Overcollateralization Tests": The Class A OC Test, the Class B OC Test and the Class C OC Test.

"Paying Agent": The Trustee or any other Person appointed under the Indenture that meets the eligibility standards for the Trustee specified in the Indenture and is authorized by the Issuer and the Co-Issuer to make payments of amounts on the Notes on behalf of the Issuer.

"Paying Agent in Ireland": As defined on page v under "*Available Information*."

"Payment Date": As defined in "*Summary—Payments on the Securities*."

"Payment Date Priority of Payments": As defined in "*Description of the Securities—Priority of Payments—Payment Date Priority of Payments*."

"Payment Date Proceeds": As defined in "*Description of the Securities—Priority of Payments—Payment Date Priority of Payments.*"

"Payment Requirement": U.S. $1, or, in each case its equivalent in the currency in which the relevant Reference Obligation is denominated as of the occurrence of the relevant event, *provided* that a different Payment Requirement may apply to any Reference Obligation if such Payment Requirement is approved in writing by each Rating Agency.

"PCCL": The Cayman Islands' Proceeds of Criminal Conduct Law (2001 Revision).

"Periodic Interest Accrual Period": (i) With respect to the initial Payment Date, the period from and including the Closing Date to but excluding the initial Payment Date, and (ii) with respect to each Payment Date thereafter, the period from and including the preceding Payment Date to but excluding such Payment Date; *provided* that in the case of the Class C-2 Notes, the Periodic Interest Accrual Period will not be adjusted in the event a scheduled Payment Date would otherwise occur on a day that is not a Business Day.

"Person": Any individual, corporation, partnership, limited liability partnership, limited liability company, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization or government or any agency or political subdivision thereof.

"PIK Obligation": An obligation that permits deferral and/or capitalization of interest or other periodic distribution otherwise due. The Reference Obligation Calculation Amount of any PIK Obligation will be adjusted to reflect any such deferral or capitalization.

"Placement Agency Agreement": As defined in "*Purchase and Transfer Restrictions—Reliance on Section 3(c)(7) of the Investment Company Act.*"

"Placement Agent": With respect to the Income Notes and the Class Q-2B Securities, Citigroup Global Markets Inc.

"Plan Asset Regulation": The regulation, 29 CFR Section 2510.3-101, promulgated by the U.S. Department of Labor.

"Plans": ERISA Plans as well as those plans that are not subject to ERISA but which are subject to Section 4975 of the Code, such as individual retirement accounts, including entities whose underlying assets include the assets of such plans.

"Portfolio Addition Criteria": As defined in "*Description of the Swap Agreement—Additions*."

010777

"Portfolio Calculation Amount": As of any date of determination, the sum of (a) the Aggregate Reference Obligation Calculation Amount as of such date and (b) (1) the Swap Notional Amount as of such date <u>minus</u> (2) the Aggregate Reference Value as of such date.

"Portfolio Modification Period": The period from and including the Ramp-up End Date to but excluding the Payment Date occurring in (1) August 2011, or (2) if extended at the option of the Swap Counterparty in accordance with the Swap Agreement, August 2015.

"Pricing Source": Loan Pricing Corporation, LoanX, Inc. or a similar pricing service designated by the Reference Portfolio Manager with the consent of the Swap Counterparty (*provided* that notice of such designation has been provided to each Rating Agency and S&P has confirmed in writing that such designation will not result in the qualification, downgrade or withdrawal of the rating of any Class of Securities then rated by S&P).

"Principal Priority of Payments": As defined in "*Description of the Securities—Priority of Payments—Principal Priority of Payments*."

"Principal Write-Down": As defined in the definition of "Defaulted Reference Obligation."

"Priority of Payments": The Payment Date Priority of Payments and the Principal Priority of Payments.

"PTCE": A Prohibited Transaction Class Exemption.

"QEF": As defined in "*Certain Income Tax Considerations—Tax Treatment of Income Notes.*"

"Qualified Institutional Buyers": "qualified institutional buyers" as defined in Rule 144A(a)(1) under the Securities Act.

"Qualified Purchasers": "Qualified purchasers" as defined for purposes of Section 3(c)(7) of the Investment Company Act. See "*Purchase and Transfer Restrictions*" for a general description of this definition.

"Quarterly Aggregate Increase Amount" and "Quarterly Aggregate Reduction Amount": For a Payment Date, (i) the sum of all Obligation Value Increase Amounts (other than as a result of Amortizations) for Reference Obligations for which the related Accrual Date occurred during the related Collection Period <u>minus</u> (ii) the sum of all Obligation Value Reduction Amounts (including, without limitation, as a result of Amortizations) for Reference Obligations for which the related Accrual Date occurred during the related Collection Period. If such net amount is positive for a Payment Date, such amount will be the Quarterly Aggregate Increase Amount for such date and the Quarterly Aggregate Reduction Amount for such date will be zero, and if such net amount is negative, the Quarterly Aggregate Increase Amount for such date will be zero, and the absolute value of such net amount will be the Quarterly Aggregate Reduction Amount for such date.

"Quarterly Amortization Increase Amount": For a Payment Date, the sum of all Obligation Value Increase Amounts as a result of Amortizations for Reference Obligations for which the related Accrual Date occurred during the related Collection Period.

"Quarterly Period Rate": For any date of determination, a rate equal to the Floating Rate for the Periodic Interest Accrual Period in which such date occurs (determined pursuant to the 2000 ISDA Definitions using a Floating Rate Option of USD-LIBOR-BBA, a Reset Date of first day of such Periodic Interest Accrual Period and a Designated Maturity of three months) plus 0.35% per annum.

"Quotation": As defined under "*Description of the Swap Agreement—Valuation of Reference Obligations.*"

"Ramp-up End Date": The last day of the Ramp-up Period.

"Ramp-up Period": The six-month period following the Closing Date.

010778

"Ramp-up Requirements":  (i) each Reference Obligation added to the Reference Portfolio during the Ramp-up Period satisfies the Reference Obligation Eligibility Criteria as of its Addition Date; and (ii) following any addition of a Reference Obligation during the Ramp-up Period, the Reference Portfolio Criteria must be satisfied (or, if any criterion was not satisfied immediately prior to such addition, such criterion must be no further from compliance as a result of such addition).

"Rating":  With respect to a Reference Obligation, the S&P or Moody's Rating thereof, as the case may be (and with the correlative meaning "Rated").

"Rating Agency":  Either of Moody's or Standard & Poor's; "Rating Agencies" shall mean Moody's and Standard & Poor's, collectively.

"Rating Confirmation":  With respect to any specified action is the written confirmation from both Rating Agencies, or, if expressly stated, by a specified Rating Agency, that such Rating Agency will not qualify, downgrade or withdraw its then current ratings of any Class of Securities solely as a result of that action.

"Rating Factor":  For purposes of computing the Weighted Average Rating, the number assigned to the applicable Moody's Rating of each Reference Entity, as follows:

| Moody's Rating | Rating Factor |
| --- | --- |
| Aaa | 1 |
| Aa1 | 10 |
| Aa2 | 20 |
| Aa3 | 40 |
| A1 | 70 |
| A2 | 120 |
| A3 | 180 |
| Baa1 | 260 |
| Baa2 | 360 |
| Baa3 | 610 |
| Ba1 | 940 |
| Ba2 | 1,350 |
| Ba3 | 1,766 |
| B1 | 2,220 |
| B2 | 2,720 |
| B3 | 3,490 |
| Caa1 | 4,770 |
| Caa2 | 6,500 |
| Caa3 | 8,070 |
| Ca or below | 10,000 |

"Record Date":  With respect to a Payment Date or Maturity Date, the close of business on the fifteenth day prior to such date, or if such day is not a Business Day, the close of business on the next Business Day.

"Reference Banks":  With respect to the determination of LIBOR by the Indenture Calculation Agent, any four major banks in the London interbank market selected by the Indenture Calculation Agent for such purpose.

"Reference CLN":  A security, the payments with respect to which are subject to reduction or adjustment upon the occurrence of one or more specified credit-related events or circumstances, with one or more Underlying Obligations, each of which is either a Term Loan, a Revolving Loan or a Bond. A Reference CLN may not be included as a Reference Obligation unless each Rating Agency has confirmed in writing that such inclusion will not result in a qualification, downgrade or withdrawal of its then-current rating of any Class of Securities.

"Reference Entity":  With respect to a Reference Obligation (other than a Reference Swap or Reference CLN) or an Underlying Obligation, the issuer thereof, borrower thereunder, or guarantor thereof (which in any case is a corporation, company, partnership or trust).

010779

"Reference Obligation": Each of the reference obligations that are included in the Reference Portfolio.

"Reference Obligation Calculation Amount": For each Reference Obligation (except as otherwise provided herein), a U.S. dollar amount representing the portion of (i) in the case of a Revolving Loan, the Commitment Amount thereof, (ii) in the case of a funded Term Loan, Bond or Reference CLN, the principal amount thereof, or (iii) in the case of a Reference Swap, the notional amount thereof, in each case included in the Reference Portfolio.

"Reference Obligation Eligibility Criteria": The criteria described in "*The Reference Portfolio—Eligible Reference Obligations*."

"Reference Portfolio": The portfolio of Reference Obligations as selected by the Reference Portfolio Manager on behalf of the Swap Counterparty from time to time.

"Reference Portfolio Criteria": The criteria described in "*The Reference Portfolio—Reference Portfolio Criteria*."

"Reference Portfolio Management Agreement": The Reference Portfolio Management Agreement, dated as of the Closing Date, between the Reference Portfolio Manager and the Swap Counterparty.

"Reference Portfolio Manager": Highland Capital Management, L.P., and its approved successors and assigns.

"Reference Portfolio Proceeds": For a Payment Date, an amount equal to (i) the aggregate of, for each Reference Obligation, the Interest Return for such Reference Obligation during the related Collection Period plus (ii) the Quarterly Aggregate Increase Amount, if any, for such date plus (iii) the Quarterly Amortization Increase Amount, if any, for such date. In the event any amount paid to holders of a Reference Obligation and included in Reference Portfolio Proceeds for any date is rescinded or required to be returned to the payor in accordance with applicable law, the Calculation Agent shall make an appropriate reduction to Reference Portfolio Proceeds for a subsequent Payment Date.

"Reference Price": As defined in "*Description of the Swap Agreement—Valuation of Reference Obligations*."

"Reference Swap": A credit default swap or total return swap with one or more Underlying Obligations, each of which is either a Term Loan, a Revolving Loan or a Bond and pursuant to which the Issuer will be in the economic position of protection seller or total return receiver. A Reference Swap may not be included as a Reference Obligation unless each Rating Agency has confirmed in writing that such inclusion will not result in a qualification, downgrade or withdrawal of its then-current rating of any Class of Securities.

"Reference Value": With respect to a Reference Obligation other than a Reference Swap as of any date of determination, the applicable Reference Price multiplied by the Reference Obligation Calculation Amount for such Reference Obligation as of such date. With respect to a Reference Swap, as of any date of determination, the Reference Obligation Calculation Amount thereof as of such date.

"Regulation S": Regulation S promulgated under the Securities Act.

"Regulation S Global Notes": One or more permanent global notes in definitive, fully registered form without interest coupons attached.

"Reinvestment Yield": With respect to the Class C-2 Notes, the rate equal to the sum of (a) 1.30% and (b) the applicable yield to maturity implied by (i) the yields reported, as of 10:00 a.m. (New York City time) on the tenth Business Day preceding the Optional Redemption Date, Extension Effective Date or date of Amendment Buy-Out, as applicable, on the display designated as "Govt PX1" on Bloomberg Financial Markets Commodities News (or such other display as may replace such display) for actively traded U.S. Treasury securities having a maturity as nearly as practicable equal to the Payment Date occurring in November 2013 or (ii) if such yields are not reported as of such time or the yields reported as of such time are not ascertainable, the Treasury Constant Maturity Series Yields reported, for the latest day for which such yields have been so reported as of the tenth Business Day preceding the Optional Redemption Date, Extension Effective Date or date of Amendment Buy-Out, as applicable, in Federal Reserve Statistical Release H.15 (519) (or any comparable successor publication) for actively traded U.S.

010780

Treasury securities having a constant maturity as nearly as practicable equal to the Payment Date occurring in November 2013.

"Removal Date":  With respect to a Reference Obligation, the Business Day of its removal from the Reference Portfolio.

"Requisite Noteholders":  The holders of 66 2/3% or more of the Aggregate Principal Amount of (i) the Class A-1 Notes, so long as any Class A-1 Notes remain Outstanding, (ii) thereafter, the Class A-2 Notes, so long as any Class A-2 Notes remain Outstanding, (iii) thereafter, the Class B Notes, so long as any Class B Notes remain Outstanding, (iv) thereafter, the Class C-1 Notes and the Class C-2 Notes (voting as a single class), so long as any Class C Notes remain Outstanding and (v) thereafter, the Income Notes, so long as any Income Notes remain Outstanding.

"Retained Amount":  For a Payment Date, an amount equal to the product of (i) 0.10%, (ii) the Retained Calculation Amount immediately prior to such Payment Date, (iii) the actual number of calendar days in the period from and including the immediately preceding Payment Date (or, in the case of the first Payment Date, the Closing Date) to but excluding such date and (iv) 1/360.

"Retained Calculation Amount":  Initially, U.S. $648,000,000, which will be reduced on each Payment Date after the end of the Portfolio Modification Period (but not below zero) by an amount equal to the greater of (A) zero and (B) (i) any Swap Reduction Amount for such date, plus (ii) any Quarterly Aggregate Increase Amount for such date, minus (iii) any Quarterly Aggregate Reduction Amount for such date.

"Revolving Loan":  A loan that (i) provides the borrower with a line of credit against which one or more borrowings (or drawings under a letter of credit for the account of the borrower) may be made and that provides that such borrowed (or drawn) amounts may be repaid and reborrowed from time to time or (ii) is a delayed funding term loan (unless such loan is fully drawn).

"Rule 144A":  Rule 144A under the Securities Act.

"Rule 144A Global Notes":  The Senior Notes initially sold in the United States or to U.S. Persons (as defined in Regulation S under the Securities Act) pursuant to Rule 144A under the Securities Act which are represented by one or more permanent global notes in definitive, fully registered form without interest coupons.

"S&P CDO Monitor Test":  A test that will be satisfied as of any date of determination if the Loss Differential for each Class of Senior Notes of the Reference Portfolio after giving effect to any addition or removal of a Reference Obligation (the "Proposed Portfolio") is positive or is greater than or equal to the Loss Differential for such Class of Senior Notes of the Reference Portfolio immediately prior to such addition or removal (the "Current Portfolio").  For purposes of the S&P CDO Monitor Test, the Class C-1 Notes and the Class C-2 Notes will be deemed a single Class of Notes.

For purposes of the S&P CDO Monitor Test:

"Break-Even Loss Rate" means, for any Class of Senior Notes as of any time, the maximum aggregate Reference Value of Reference Obligations with respect to which a Credit Event may occur (expressed as a percentage of the Aggregate Reference Value) which the Current Portfolio or the Proposed Portfolio, as applicable, can sustain, as determined by S&P through application of the S&P CDO Monitor, which, after giving effect to S&P's assumptions on recoveries and timing and the Priority of Payments, will result in sufficient funds remaining for the payment of such Class of Senior Notes in full and the timely payment of interest on such Class of Senior Notes.

"Loss Differential" means, for any Class of Senior Notes as of any time, the percentage calculated by subtracting the Scenario Loss Rate for such class at such time from the Break-Even Loss Rate for such class at such time.

"Scenario Loss Rate" means, for any Class of Senior Notes as of any time, an estimate of the cumulative default rate percentage for the Current Portfolio or Proposed Portfolio, as applicable,

010781

consistent with the S&P Rating of such Class of Senior Notes as of the Closing Date, determined by application of the S&P CDO Monitor at such time; *provided* that for purposes of this determination, if such Class of Senior Notes is on negative credit watch, the S&P Rating shall be deemed to be reduced by one subcategory; and *provided further* that if such Class of Senior Notes is on positive credit watch, such S&P Ratings shall be deemed to be increased by one subcategory.

"S&P CDO Monitor" means a dynamic, analytical computer program developed by S&P and run by the Issuer or the Collateral Administrator on its behalf which is used to estimate default risk of the Reference Obligations in the Reference Portfolio.

"S&P Recovery Rate":  With respect to a Reference Obligation that is a (i) Secured Loan other than a Subordinated Lien Loan or DIP Loan, 52%, (ii) Subordinated Lien Loan or any other loan other than a Secured Loan or DIP Loan, 31%, (iii) senior secured Bond (other than a Structured Finance Obligation), 44%, (iv) senior unsecured Bond (other than a Structured Finance Obligation), 30% (v) subordinated Bond (other than a Structured Finance Obligation), 18%, (vi) a Structured Finance Obligation, the percentage set forth in the definition of "S&P Structured Finance Recovery Rates" and (vii) a Reference Swap, Reference CLN, or DIP Loan, the percentage specified by S&P on a case-by-case basis (provided that with respect to an Index CLN, the S&P Recovery Rate shall be determined on the basis of the S&P Recovery Rates of the Underlying Obligations).

"S&P Required Ratings": As defined under *"Description of the Swap Agreement—Early Termination of the Swap Agreement."*

"S&P Structured Finance Recovery Rates": The S&P Recovery Rate for a Structured Finance Obligation will be the applicable rate set forth below based on the appropriate asset class and liability rating as categorized by S&P:

Senior Asset Class

| | Liability rating | | | | | | |
|---|---|---|---|---|---|---|---|
| | AAA | AA | A | BBB | BB | B | CCC |
| AAA | 80.0% | 85.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| AA | 70.0% | 75.0% | 85.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| A | 60.0% | 65.0% | 75.0% | 85.0% | 90.0% | 90.0% | 90.0% |
| BBB | 50.0% | 55.0% | 65.0% | 75.0% | 85.0% | 85.0% | 85.0% |

Junior Asset Class

| | Liability rating | | | | | | |
|---|---|---|---|---|---|---|---|
| | AAA | AA | A | BBB | BB | B | CCC |
| AAA | 55.0% | 65.0% | 75.0% | 80.0% | 80.0% | 80.0% | 80.0% |
| AA | 40.0% | 45.0% | 55.0% | 65.0% | 80.0% | 80.0% | 80.0% |
| A | 30.0% | 35.0% | 40.0% | 45.0% | 50.0% | 60.0% | 70.0% |
| BBB | 10.0% | 10.0% | 10.0% | 25.0% | 35.0% | 40.0% | 50.0% |
| B | 2.5% | 5.0% | 5.0% | 10.0% | 10.0% | 20.0% | 25.0% |
| CCC | 0.0% | 0.0% | 0.0% | 0.0% | 2.5% | 5.0% | 5.0% |

"S&P Weighted Average Recovery Rate":  As of any date of determination, the percentage obtained by (a) calculating the S&P Recovery Amount of each Reference Obligation (excluding any Defaulted Reference Obligations) in the Reference Portfolio; (b) summing the amounts obtained in clause (a) on such date and (c) dividing the sum obtained in clause (b) by the Aggregate Reference Obligation Calculation Amount of all Reference Obligations in the Reference Portfolio as of such date (excluding any Defaulted Reference Obligations).  For purposes of determining the S&P Weighted Average Recovery Rate, the "S&P Recovery Amount" for any Reference Obligation of a given category will be the product of (x) the applicable S&P Recovery Rate and (y) the Reference Obligation Calculation Amount of such Reference Obligation.

010782

"Section 3(c)(7) Procedures":  As defined under "*Purchase and Transfer Restrictions—Reliance on Section 3(c)(7) of the Investment Company Act.*"

"Secured Loan":  A loan that (i) is not subordinated by its terms to other indebtedness of the borrower for borrowed money and (ii) is secured by a valid and perfected security interest in specified collateral.

"Securities":  The Notes, the Class Q-1 Securities, and the Class Q-2 Securities, collectively.

"Securities Act":  The U.S. Securities Act of 1933, as amended.

"Securities and Exchange Law":  The Securities and Exchange Law of Japan.

"Securities Register":  The securities register maintained by the Trustee under the Indenture.

"Securities Selling Prospectus Act":  As defined in "*Notices to Purchasers—Notices to Residents of Germany.*"

"Senior Notes":  The Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C-1 Notes and the Class C-2 Notes, collectively.

"Share Trustee":  Walkers SPV Limited and its permitted successors.

"Standard & Poor's" or "S&P":  Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., or any successor thereto.

"Standard & Poor's Rating" or "S&P Rating":  With respect to a Reference Obligation or Underlying Obligation:

     (i)     if there is an issuer credit rating of the related Reference Entity or its guarantor by S&P, the most current issuer credit rating for such Reference Entity or its guarantor;

     (ii)     (a) if there is not an issuer credit rating of the Reference Entity or its guarantor by S&P, but there is a rating by S&P on a senior secured obligation of the Reference Entity or its guarantor, then the S&P Rating of the Reference Obligation or Underlying Obligation will be one subcategory below such rating; (b) if there is not a rating by S&P on a senior secured obligation of the Reference Entity or its guarantor, but there is a rating by S&P on a senior unsecured obligation of the Reference Entity or its guarantor, then the S&P Rating will be such rating; and (c) if there is not a rating by S&P on a senior obligation of the Reference Entity or its guarantor, but there is a rating by S&P on a subordinated obligation of the Reference Entity or its guarantor, then the S&P Rating will be two subcategories above such rating if such rating is "BBB-" or higher and will be one subcategory above such rating if such rating is "BB+" or lower; or

     (iii)     if there is neither an issuer credit rating of the Reference Entity or its guarantor by S&P nor a rating by S&P on an obligation of the Reference Entity or its guarantor, then the S&P Rating may be determined using any one of the methods below:

     (A)     if an obligation of the Reference Entity or its guarantor is publicly rated by Moody's, then the S&P Rating will be determined in accordance with the methodologies for establishing the Moody's Rating set forth above, except that the S&P Rating of such obligation will be (1) one subcategory below the S&P equivalent of the rating assigned by Moody's if such security is rated "Baa3" or higher by Moody's and (2) two subcategories below the S&P equivalent of the rating assigned by Moody's if such security is rated "Ba1" or lower by Moody's; *provided* that Reference Obligations constituting no more than 10% of the Aggregate Reference Obligation Calculation Amount may be given a S&P Rating based on a rating given by Moody's as provided in this subclause (A) (after giving effect to the addition of the relevant Reference Obligation or Underlying Obligation, if applicable);

165

010783

(B)     if no other security or obligation of the Reference Entity or its guarantor is rated by S&P or Moody's, then the Reference Portfolio Manager may apply to S&P for a S&P credit rating estimate, which will be its S&P Rating; or

(C)     if such Reference Obligation or Underlying Obligation is not rated by Moody's or S&P, no other security or obligation of the Reference Entity or its guarantor is rated by S&P or Moody's and if the Reference Portfolio Manager determines in its sole discretion based on information available to it after reasonable inquiry that such Reference Entity (x) is not subject to any bankruptcy or reorganization proceedings nor in default on any of its obligations (unless the subject of a good faith business dispute), (y) is a legally constituted corporate entity having the minimum legal, financial and operational infrastructure to carry on a definable business, deliver and sell a product or service and report its results in generally accepted accounting terms as verified by a reputable audit firm and (z) is not so vulnerable to adverse business, financial and economic conditions that default in its financial or other obligations is foreseeable in the near term if current operating trends continue, then the S&P Rating will be "CCC-"; *provided* that the Reference Portfolio Manager must apply to S&P for a S&P credit rating on such Reference Entity within 30 days after the addition of the relevant Reference Obligation or Underlying Obligation; *provided, further*, that Reference Obligations constituting no more than 5% of the Aggregate Reference Obligation Calculation Amount may be given an S&P Rating based on this subclause (C) (after giving effect to the addition of the relevant Reference Obligation or Underlying Obligation, if applicable);

*provided* that if (i) the relevant Reference Entity or guarantor or obligation is placed on any positive "credit watch" list by S&P, such rating will be increased by one rating subcategory or (ii) the relevant obligor or obligation is placed on any negative "credit watch" list by S&P, such rating will be decreased by one rating subcategory.

Notwithstanding the foregoing, in the case of a Reference Obligation that is a DIP Loan, the S&P Rating shall be (A) the rating assigned thereto by S&P if the rating is public, (B) the rating assigned by S&P if the rating is confidential, but only if all appropriate parties have provided written consent to its disclosure and use, (C) the rating assigned by S&P thereto through an estimated rating or (D) the rating assigned thereto by S&P in connection with the addition thereof to the Reference Portfolio upon the request of the Reference Portfolio Manager.

In the case of a Reference Obligation that is a PIK Obligation or Structured Finance Obligation, the S&P Rating may not be determined pursuant to clause (iii)(A) above.

The S&P Ratings for entities or obligations relevant hereunder other than Reference Entities and Reference Obligations shall be determined in a corresponding manner. With respect to an Index CLN, the S&P Rating shall be determined on the basis of the S&P Ratings of the Underlying Obligations.

"Structured Finance Obligation": A Bond that is issued by a special purpose vehicle and secured by all or a portion of the assets thereof, including, without limitation, a project finance security, an asset-backed security, a collateralized debt obligation security, an enhanced equipment trust certificate, a commercial or residential mortgage-backed security or a future flow security; *provided* that a Structured Finance Obligation with respect to which the Reference Portfolio Manager or one of its Affiliates act as collateral or portfolio manager or in a similar capacity may not be included in the Reference Portfolio.

"Subordinate Amount": For any Payment Date, an amount equal to (i) 0.20% per annum on the Portfolio Calculation Amount as of the related Determination Date (calculated for the related Collection Period on the basis of a 360-day year consisting of twelve 30-day months) plus (ii) the aggregate Deferred Subordinate Amount, if any, from the prior Payment Date; *provided* that such amount will be deferred (a "Deferred Subordinate Amount") (or, in the case of the Swap Termination Date, will not be payable) on any Payment Date to the extent that if paid in accordance with the Priority of Payments, the Net Income Note Periodic Return Amount (expressed as percentage of

010784

the Aggregate Principal Amount of the Income Notes) for such Payment Date if annualized would be less than 12.0% per annum. Notwithstanding anything to the contrary herein, the Reference Portfolio Manager will be entitled to elect, on notice to the Swap Counterparty and the Issuer, that all or a portion of the Subordinate Amount for any Payment Date shall be deferred as a Deferred Subordinate Amount. Deferred Subordinate Amounts will accrue notional interest until paid at a rate of LIBOR plus 3.0% per annum for the relevant period.

"Subordinated Administrative Expenses": Technology expenses of the Swap Counterparty and its Affiliates in connection with transactions contemplated by the Indenture and by the Swap Agreement not to exceed U.S. $50,000 in any calendar year; *provided, however*, that Subordinated Administrative Expenses shall not include any amounts due or accrued with respect to actions taken on or prior to the Closing Date, which amounts shall be payable only from the Expense Reserve Account.

"Subordinated Lien Loan": A Secured Loan secured by a second (or lower) priority security interest in the relevant collateral.

"Swap Additional Termination Event": An "Additional Termination Event" or a "Tax Event Upon Merger" under the Swap Agreement as to which the Swap Counterparty is the affected party.

"Swap Agreement": The portfolio swap agreement entered into by the Issuer with the Swap Counterparty, dated as of the Closing Date, which will be documented on an ISDA Master Agreement, as supplemented by the schedule thereto and related documents, and a confirmation for the portfolio swap transaction thereunder, including annexes thereto evidencing the Reference Portfolio, as amended or supplemented from time to time.

"Swap Counterparty": Citigroup Financial Products Inc., or any successor thereto.

"Swap Event of Default": An "Event of Default" under the Swap Agreement.

"Swap Guarantee": As defined on the Cover hereof.

"Swap Guarantor": Citigroup Global Markets Holdings Inc., or any successor thereto.

"Swap Notional Amount": As defined in "*Description of the Swap Agreement—Swap Notional Amount*."

"Swap Reduction Amount": As is described in "*Description of the Swap Agreement—Swap Notional Amount*."

"Swap Termination Date": August 1, 2016, or, if extended at the option of the Swap Counterparty in accordance with the Swap Agreement, August 1, 2020; *provided* that in the case of an Optional Redemption or Indenture Tax Redemption, the Swap Termination Date will occur on the Optional Redemption Date or Indenture Tax Redemption Date, as the case may be.

"Swap Termination Payment": The amount, if any, payable by the Issuer or the Swap Counterparty to the other party in respect of an Early Termination Date under the Swap Agreement (as defined therein).

"Tax Advantaged Jurisdiction": One of the Cayman Islands, Bermuda, the Netherlands Antilles or the tax advantaged jurisdiction of the Channel Islands, or such other jurisdiction that each Rating Agency has confirmed in writing will not result in a qualification, downgrade or withdrawal of its then-current rating of any Class of Securities.

"Temporary Regulation S Global Notes": The Senior Notes and the Class Q-1 Securities initially sold to non-U.S. Persons (as defined in Regulation S under the Securities Act) in offshore transactions in reliance on Regulation S under the Securities Act, which will be initially represented by one or more temporary global notes in definitive, fully registered form without interest coupons attached.

"Term Loan": A loan that is a funded term loan (including a fully funded delayed-funding term loan).

010785

"Trust Accounts":  Collectively, the Collection Account, the Collateral Account and the Expense Reserve Account.

"Trust Estate":  All assets of the Issuer (except the Excluded Property and the Class Q-2 Securities Collateral).

"Trustee":  JPMorgan Chase Bank, as trustee under the Indenture, and any successor trustee.

"Trustee Expenses":  As defined in "*Description of the Securities—The Indenture and the Collateral Administration Agreement—Trustee and Collateral Administrator*."

"Trustee Fee":  As defined in "*Description of the Securities—The Indenture and the Collateral Administration Agreement—Trustee and Collateral Administrator*."

"U.S. person":  The meaning assigned to such term in Regulation S under the Securities Act.

"UBTI":  As defined in "*Certain Income Tax Considerations—Tax Treatment of Tax-Exempt U.S. Holders*."

"Underlying Obligation":  With respect to a Reference Swap or Reference CLN, an underlying obligation to which such Reference Swap or Reference CLN relates.

"Unfunded Commitment":  With respect to a Revolving Loan, the obligation of the lenders thereunder to extend credit to or for the account of the applicable borrower(s) thereunder.

"Unfunded Portion":  With respect to an Unfunded Commitment, the amount available to be borrowed or drawn thereunder, assuming compliance with all applicable conditions to borrowing or drawing.

"Valuation Date":  With respect to a Reference Obligation removed from the Reference Portfolio, the applicable Removal Date, and with respect to a Reference Obligation that is included in the Reference Portfolio as of the 45th Business Day prior to the Swap Termination Date, such day.

"Weighted Average Fixed Rate Coupon":  On any date of determination, with respect to any Reference Obligations that bear interest at a fixed rate (and any Reference Swaps with a periodic amount payable to the protection seller or total return receiver based on a fixed rate) other than Defaulted Reference Obligations and Equity Securities, the weighted average coupon (expressed as a percentage) thereof obtained by (i) multiplying the Reference Obligation Calculation Amount of each such Reference Obligation by the current interest rate of such Reference Obligation (or, in the case of a Reference Swap, the rate on which such periodic fixed amount is based), as of such date (which, for PIK Obligations for which interest has been deferred or capitalized, will be deemed to be zero), (ii) summing the amounts determined pursuant to clause (i), (iii) dividing such sum by the aggregate Reference Obligation Calculation Amount for all such Reference Obligations and (iv) if the fraction calculated in clause (iii) is less than the minimum Weighted Average Fixed Rate Coupon specified in clause 22 of the Reference Portfolio Criteria, adding to such percentage, the fraction (expressed as percentage) obtained by dividing (a) the Gross Excess Spread, if any as of such date by (b) the aggregate Reference Obligation Calculation Amount for all such Reference Obligations.

"Weighted Average LIBOR Spread":  On any date of determination, with respect to any Reference Obligations that bear interest at a floating rate (and any Reference Swaps with a periodic amount payable to the protection seller or total return receiver based on a floating rate) other than Defaulted Reference Obligations and Equity Securities, the weighted average spread (expressed as a percentage) thereof obtained by (i) multiplying the Reference Obligation Calculation Amount of each such Reference Obligation by (x) with respect to each such Reference Obligation which bears interest at a rate based on LIBOR (or, in the case of a Reference Swap, for which such periodic floating amount is based on LIBOR), the spread to LIBOR for such Reference Obligation as of such date, (y) with respect to each such Reference Obligation which does not bear interest at a rate based on LIBOR (or, in the case of a Reference Swap, for which such periodic floating amount is not based on LIBOR) as of the relevant date, the current interest rate on such Reference Obligation (or, in the case of a Reference Swap, the current rate on which such periodic floating amount is based) minus the LIBOR rate in effect as of such date (or, if the documentation for such Reference Obligation specifies a designated spread to LIBOR and such spread is less than

168

such difference, such spread) or (z) in the case of PIK Obligations for which interest has been deferred or capitalized, zero, (ii) summing the amounts determined pursuant to clause (i), (iii) dividing such sum by the aggregate Reference Obligation Calculation Amount for all such Reference Obligations and (iv) if the percentage calculated in clause (iii) is less than the minimum Weighted Average LIBOR Spread specified in clause (17) of the Reference Portfolio Criteria, adding to such percentage the fraction (expressed as a percentage) obtained by dividing (a) the Gross Excess Coupon, if any, as of such date by (b) the aggregate Reference Obligation Calculation Amount for all such Reference Obligations.  With respect to each Reference Obligation that is a Revolving Loan, the applicable spread will be calculated as described in (i) or (ii) above for the funded portion of such Reference Obligation only.

"Weighted Average Life Test":  A test that will be deemed satisfied as of any date of determination if the remaining weighted average life of the Reference Obligations (other than Defaulted Reference Obligations) in the Reference Portfolio as of such date is less than or equal to the number of years (including any fraction of a year) between such date and March 1, 2013, or, in the case of a Maturity Extension, March 1, 2017.

"Weighted Average Rating":  As of any date of determination, the number obtained by (i) multiplying the Reference Obligation Calculation Amount of each Reference Obligation (other than Defaulted Reference Obligations) by the applicable Rating Factor for the related Reference Entity; (ii) summing the product obtained in clause (i) for all such Reference Obligations and (iii) dividing the sum obtained in clause (ii) by the aggregate Reference Obligation Calculation Amount of all Reference Obligations (other than Defaulted Reference Obligations).

"Weighted Average Undrawn Spread":  As of any date of determination with respect to each Reference Obligation (other than a Defaulted Reference Obligation) with an Unfunded Commitment, the weighted average of the commitment fees (expressed as a percentage) on the applicable Unfunded Portions thereof payable by the borrower.

010787

This page intentionally left blank.

010788

## INDEX OF DEFINED TERMS

Accredited Investors ......................................................................................................7, 131
Accrual Date ..............................................................................................................131
Accrued Increase/Reduction Amount ..............................................................................131
Accrued Swap Liabilities ..............................................................................................131
Act on Foreign Investment Funds ..............................................................................i, 131
Addition Date ..............................................................................................................131
Adjusted Reference Portfolio Return Amount ..................................................................131
Administrative Expenses ................................................................................................131
Administrator ..............................................................................................................132
Advisers Act ..............................................................................................................3, 132
Affiliate ....................................................................................................................132
Aggregate Principal Amount ..........................................................................................132
Aggregate Reference Obligation Calculation Amount ........................................................132
Aggregate Reference Value ............................................................................................132
Aggregate Unfunded Amount ........................................................................................132
Amendment Buy-Out ....................................................................................................6, 132
Amendment Buy-Out Option ......................................................................................44, 132
Amendment Buy-Out Purchase Price ..........................................................................44, 132
Amendment Buy-Out Purchaser ......................................................................................132
Amortization ..........................................................................................................11, 133
Articles ......................................................................................................................133
Asset Management Group ..............................................................................................85
Assigned Moody's Rating ..............................................................................................133
Assignment Fee ..........................................................................................................133
Bankruptcy ................................................................................................................133
Base Amount ..............................................................................................................133
Benefit Plan Investor ..............................................................................................117, 134
Bond ........................................................................................................................134
Business Day ..............................................................................................................134
Cede ......................................................................................................................52, 134
Certificated Class Q Security ........................................................................................134
Certificated Class Q-1 Security ..................................................................................56, 134
Certificated Class Q-2 Security ..................................................................................56, 134
Certificated Class Q-2A Security ....................................................................................134
Certificated Class Q-2B Security ....................................................................................134
Certificated Income Note ..........................................................................................56, 134
Certificated Security ..............................................................................................56, 134
CFC ........................................................................................................................124
CFPI ..........................................................................................................................11
CGMHI ......................................................................................................................11
CGMHI Notes ......................................................................................................134, 137
Citigroup ..................................................................................................................134
Class ........................................................................................................................134
Class A Interest Coverage Ratio ................................................................................45, 134
Class A Interest Coverage Test ..................................................................................46, 134
Class A Notes ............................................................................................................134
Class A OC Test ....................................................................................................45, 134
Class A Overcollateralization Ratio ............................................................................45, 134
Class A-1 Interest Amount ............................................................................................134
Class A-1 Interest Rate ................................................................................................135
Class A-1 Notes ....................................................................................................4, 135
Class A-2 Interest Amount ............................................................................................135
Class A-2 Interest Rate ................................................................................................135
Class A-2 Notes ....................................................................................................4, 135
Class B Interest Coverage Ratio ................................................................................46, 135

010789

Class B Interest Coverage Test ...................................................................................46, 135
Class B Interest Rate ...........................................................................................................135
Class B Notes ...................................................................................................................4, 135
Class B OC Test ............................................................................................................45, 135
Class B Overcollateralization Ratio ............................................................................45, 135
Class B Interest Amount ......................................................................................................135
Class C Interest Coverage Ratio ..................................................................................46, 135
Class C Interest Coverage Test ....................................................................................46, 135
Class C Notes ........................................................................................................................135
Class C OC Test ............................................................................................................45, 135
Class C Overcollateralization Ratio ............................................................................45, 135
Class C-1 Interest Amount ..................................................................................................135
Class C-1 Interest Rate .......................................................................................................135
Class C-1 Notes ................................................................................................................4, 136
Class C-2 Interest Amount ..................................................................................................136
Class C-2 Interest Rate .......................................................................................................136
Class C-2 Notes ................................................................................................................4, 136
Class Q Securities ................................................................................................................136
Class Q-1 Excess Distribution ............................................................................................136
Class Q-1 Income Note Component ...................................................................................136
Class Q-1 Nominal Interest ................................................................................................136
Class Q-1 Nominal Principal ..............................................................................................136
Class Q-1 Nominal Rate ......................................................................................................136
Class Q-1 Rated Principal ...................................................................................................136
Class Q-1 Reg S Global Securities ..............................................................................53, 136
Class Q-1 Securities ........................................................................................................4, 136
Class Q-1 Senior Note Component .....................................................................................136
Class Q-1 Temp Reg S Global Securities ..........................................................................136
Class Q-1 Temp Reg S Global Security ...............................................................................53
Class Q-2 Administrative Expenses ...................................................................................136
Class Q-2 Collateral Asset A ..............................................................................................137
Class Q-2 Collateral Asset A Proceeds .............................................................................137
Class Q-2 Collateral Asset B ..............................................................................................137
Class Q-2 Collateral Asset B Offering Documents ..........................................................137
Class Q-2 Collateral Asset B Proceeds ..............................................................................137
Class Q-2 Collateral Assets ................................................................................................137
Class Q-2 Event of Default ...........................................................................................50, 137
Class Q-2 Gross Proceeds ...................................................................................................137
Class Q-2 Maturity Date ......................................................................................................137
Class Q-2 Maturity Date Priority of Payments ...........................................................48, 49
Class Q-2 Payment Date Priority of Payments .................................................................137
Class Q-2 Payment Date Proceeds .....................................................................................137
Class Q-2 Priority of Payments ..........................................................................................137
Class Q-2 Requisite Securityholders ..................................................................................137
Class Q-2 Securities .............................................................................................................137
Class Q-2 Securities Collateral ..........................................................................................137
Class Q-2 Securities Collateral Account ....................................................................49, 138
Class Q-2A Coverage Ratio .................................................................................................138
Class Q-2A Coverage Test ...................................................................................................138
Class Q-2A Deferred Interest .......................................................................................48, 138
Class Q-2A Interest Amount ...............................................................................................138
Class Q-2A Interest Rate ................................................................................................9, 138
Class Q-2A Securities ......................................................................................................5, 138
Class Q-2B Certificated Security .......................................................................................138
Class Q-2B Collateral Asset B Offering Documents ...................................................iii, 17
Class Q-2B Securities ......................................................................................................5, 138
Class Q-2B Target Amount .................................................................................................138

010790

Clearing Agency .................................................................................54, 138
Clearstream ...............................................................................................138
Closing Date ..............................................................................................138
Code ..........................................................................................96, 119, 138
Co-Issuer ............................................................................Cover, 32, 138
Collateral Account ...............................................................................57, 138
Collateral Administration Agreement .................................................64, 138
Collateral Administrator ...........................................................................138
Collateral Administrator Expenses .....................................................65, 138
Collateral Administrator Fee ...............................................................65, 138
Collection Account ...............................................................................57, 139
Collection Period .......................................................................................139
Commission ...............................................................................................139
Commitment Amount ................................................................................139
Components ...............................................................................................139
Concentration Limits ...........................................................................84, 139
Controlling Person ..............................................................................118, 139
Coverage Tests ..........................................................................................139
Credit Definitions ......................................................................................139
Credit Event .........................................................................................74, 139
Credit Improved Obligation ......................................................................139
Credit Risk Obligation ..............................................................................140
Current Pay Obligation .............................................................................140
Daily Aggregate Funded Amount ..............................................................140
Daily Funded Amount ...............................................................................140
Daily Rate ..................................................................................................141
Dealers .......................................................................................................141
Debtor ........................................................................................................142
Default .......................................................................................................141
Default Adjustment ...................................................................................141
Defaulted Reference Obligation ..........................................................74, 141
Deferred Base Amount ........................................................................133, 141
Deferred Incentive Amount ................................................................141, 148
Deferred Interest ..................................................................................35, 141
Deferred Subordinate Amount ...........................................................141, 166
Deferring PIK Obligation .........................................................................141
Determination Date ...................................................................................142
DIP Loan ...................................................................................................142
Discount Obligation ..................................................................................142
Diversion Test ......................................................................................46, 142
Diversity Score ..........................................................................................142
Diversity Score Table ................................................................................143
Domicile ....................................................................................................144
DTC .....................................................................................................52, 144
Eligible Account ........................................................................................144
Eligible Country ........................................................................................144
Eligible Institution ....................................................................................144
Eligible Investments ..................................................................................144
Equity Security ..........................................................................................146
ERISA ..................................................................................................96, 146
ERISA Plans ........................................................................................117, 146
Euroclear ...................................................................................................146
Event of Default ...................................................................................61, 146
Exchange Act .............................................................................................146
Exchange Consideration .......................................................................70, 146
Exchange Date ......................................................................................53, 146
Excluded Property .....................................................................................146

010791

Expense Cap Amount ...................................................................146
Expense Reserve Account ........................................................58, 146
Extension Bonus Eligibility Certification .......................................146
Extension Bonus Payment ......................................................43, 146
Extension Conditions ..............................................................43, 146
Extension Determination Date .................................................44, 147
Extension Effective Date .....................................................5, 42, 147
Extension Notice .....................................................................44, 147
Extension Purchase Price ............................................................147
Extension Qualifying Purchaser ..............................................43, 147
Extension Sale Notice .............................................................44, 147
Extension Sale Notice Period ..................................................44, 147
Extension Sale Securities .....................................................5, 43, 147
Failure to Pay .............................................................................147
Federal Reserve Board ...............................................................147
Final Class Q-2B Distribution Amount .......................................49, 147
Final Income Note Distribution Amount .....................................42, 147
Final Price ............................................................................71, 147
Fixed Amount .............................................................................147
Florida Act .............................................................................ii, 147
FPHC ..........................................................................................124
FPHCI ........................................................................................124
FSA ..............................................................................................66
Funded Portion Fixed Amount ......................................................148
Funding Start Date .....................................................................148
Global Notes .........................................................................53, 148
Gross Excess Coupon .................................................................148
Gross Excess Spread ..................................................................148
Highland Capital .......................................................................3, 87
Holder ........................................................................................148
Holdings .......................................................................................66
Incentive Amount ........................................................................148
Income Note Principal Distribution Amount .......................37, 42, 148
Income Notes ............................................................................4, 148
Indemnifiable Tax .......................................................................148
Indenture ..................................................................................4, 148
Indenture Calculation Agent ...................................................36, 148
Indenture Tax Event ....................................................................149
Indenture Tax Redemption ......................................................38, 149
Indenture Tax Redemption Date ...............................................38, 149
Index CLN ..................................................................................149
Initial Funded Amount .................................................................149
Initial Purchaser ...................................................................115, 149
Initial Reference Obligations ........................................................149
Interest Amounts ........................................................................149
Interest Coverage Ratios ............................................................149
Interest Coverage Tests ..............................................................149
Interest Rate ..............................................................................149
Interest Return ...........................................................................149
Investment Agreement .........................................................65, 150
Investment Agreement Counterparty .......................................65, 150
Investment Agreement Guarantor ............................................65, 150
Investment Company Act .....................................................Cover, 150
IRS .....................................................................................119, 150
ISDA Master Agreement ..............................................................150
Issuer ................................................................................Cover, 150
Issuers .................................................................................1, 150

010792

LIBOR .......................................................................................................................150
LIBOR Determination Date ....................................................................................36, 150
London Business Day ..............................................................................................36, 150
Make-whole Premium ....................................................................................................151
Market Value ..................................................................................................................151
Maturity Date .................................................................................................................151
Maturity Extension ...............................................................................................5, 42, 151
Maximum Base Amount .........................................................................................133, 151
Measurement Date ..........................................................................................................151
Monthly Period Rate .......................................................................................................151
Monthly Report Determination Date ..............................................................................151
Moody's ..............................................................................................................Cover, 151
Moody's Default Probability Rating ...............................................................................152
Moody's Equivalent Senior Unsecured Rating ...............................................................152
Moody's Group I Country ...............................................................................................154
Moody's Group II Country ..............................................................................................154
Moody's Group III Country .............................................................................................154
Moody's Industry Classification Group ..........................................................................154
Moody's Non Senior Secured Loan .................................................................................154
Moody's Obligation Rating .............................................................................................154
Moody's Rating ...............................................................................................................155
Moody's Recovery Rate ..................................................................................................155
Moody's Required Ratings ..............................................................................................155
Moody's Senior Secured Loan ........................................................................................155
Moody's Structured Finance Recovery Rates .................................................................156
Moody's Weighted Average Recovery Rate ...................................................................157
Net Class Q-2B Periodic Return Amount ................................................................49, 158
Net Income Note Periodic Return Amount ..............................................................40, 158
Net Interest Coverage Proceeds ......................................................................................158
Non-consenting Holder .............................................................................................6, 158
Note Redemption Amount ...............................................................................................158
Notes ...............................................................................................................................158
Notice of Class Q-2 Default ....................................................................................51, 158
Notice of Default .....................................................................................................61, 158
Obligation Value Increase Amount ..........................................................................71, 158
Obligation Value Reduction Amount .......................................................................71, 158
Obligor ...........................................................................................................................158
OC Base Amount ....................................................................................................45, 158
OID ........................................................................................................................121, 158
Optional Redemption ..............................................................................................34, 158
Optional Redemption Date ..............................................................................................158
Ordinary Shares ......................................................................................................31, 158
Outstanding .....................................................................................................................158
Outstanding Premium ......................................................................................................158
Overcollateralization Ratios ...........................................................................................159
Overcollateralization Tests .............................................................................................159
Paying Agent ...................................................................................................................159
Paying Agent in Ireland ..............................................................................................vi, 159
Payment Date ..................................................................................................8, 34, 159
Payment Date Priority of Payments .........................................................................38, 159
Payment Date Proceeds ...........................................................................................38, 159
Payment Requirement .....................................................................................................159
PCCL .......................................................................................................................30, 159
Periodic Interest Accrual Period .....................................................................................159
Person .............................................................................................................................159
PFIC ........................................................................................................................13, 122
PIK Obligation ...............................................................................................................159

010793

Placement Agency Agreement ........................................................................................................159
Placement Agent ...........................................................................................................................159
Plan Asset Regulation ............................................................................................................117, 159
Plans ......................................................................................................................................117, 159
Portfolio Addition Criteria ......................................................................................................69, 159
Portfolio Calculation Amount .........................................................................................................160
Portfolio Modification Period .........................................................................................................160
Pricing Source ...............................................................................................................................160
Principal Priority of Payments ................................................................................................40, 160
Principal Write-Down ..............................................................................................................74, 160
Priority of Payments .......................................................................................................................160
PTCE ..................................................................................................................................118, 160
QEF .....................................................................................................................................122, 160
Qualified Institutional Buyers ....................................................................................................7, 160
Qualified Purchasers ..................................................................................................................7, 160
Quarterly Aggregate Increase Amount ...........................................................................................160
Quarterly Aggregate Reduction Amount ........................................................................................160
Quarterly Amortization Increase Amount .......................................................................................160
Quarterly Period Rate .....................................................................................................................160
Quotation ...............................................................................................................................72, 160
Ramp-up End Date ..........................................................................................................................160
Ramp-up Period .......................................................................................................................11, 160
Ramp-up Requirements ...................................................................................................................161
Rating ............................................................................................................................................161
Rating Agency ................................................................................................................................161
Rating Confirmation .......................................................................................................................161
Rating Factor ..................................................................................................................................161
Record Date ....................................................................................................................................161
Reference Banks .............................................................................................................................161
Reference CLN ...............................................................................................................................161
Reference Entity .............................................................................................................................161
Reference Obligation ......................................................................................................................162
Reference Obligation Calculation Amount......................................................................................162
Reference Obligation Eligibility Criteria ..................................................................................77, 162
Reference Portfolio ....................................................................................................................2, 162
Reference Portfolio Criteria ......................................................................................................82, 162
Reference Portfolio Management Agreement .............................................................................3, 162
Reference Portfolio Manager ...............................................................................................Cover, 162
Reference Portfolio Proceeds .........................................................................................................162
Reference Price .........................................................................................................................71, 162
Reference Swap ..............................................................................................................................162
Reference Value ..............................................................................................................................162
Regulation S ...................................................................................................................................162
Regulation S Global Notes ........................................................................................................53, 162
Reinvestment Yield .........................................................................................................................162
Removal Date ..................................................................................................................................163
Requisite Noteholders .....................................................................................................................163
Retained Amount ............................................................................................................................163
Retained Calculation Amount .........................................................................................................163
Revolving Loan ..............................................................................................................................163
Rule 144A ............................................................................................................................Cover, 163
Rule 144A Global Notes ............................................................................................................52, 163
S&P CDO Monitor Test ..................................................................................................................163
S&P Recovery Rate ........................................................................................................................164
S&P Required Ratings .....................................................................................................................164
S&P Structured Finance Recovery Rates ........................................................................................164
S&P Weighted Average Recovery Rate ...........................................................................................164

Section 3(c)(7) Procedures ............................................................................................114, 165
Secured Loan ................................................................................................................165
Securities ......................................................................................................................165
Securities Act ........................................................................................................Cover, 165
Securities and Exchange Law .....................................................................................i, 165
Securities Register ......................................................................................................165
Securities Selling Prospectus Act ..............................................................................i, 165
Senior Notes .................................................................................................................165
Share Trustee ...............................................................................................................165
Standard & Poor's or S&P ....................................................................................Cover, 165
Standard & Poor's Rating or S&P Rating ..................................................................165
Structured Finance Obligation ...................................................................................166
Subordinate Amount ....................................................................................................166
Subordinated Administrative Expenses .....................................................................167
Subordinated Lien Loan .............................................................................................167
Swap Additional Termination Event ..........................................................................167
Swap Agreement ...................................................................................................Cover, 167
Swap Counterparty ...............................................................................................Cover, 167
Swap Event of Default ................................................................................................167
Swap Guarantee ....................................................................................................Cover, 167
Swap Guarantor ....................................................................................................Cover, 167
Swap Notional Amount ...........................................................................................73, 167
Swap Reduction Amount .........................................................................................73, 167
Swap Termination Date ...............................................................................................167
Swap Termination Payment .....................................................................................75, 167
Tax Advantaged Jurisdiction ......................................................................................167
Temporary Regulation S Global Notes ....................................................................53, 167
Term Loan ....................................................................................................................167
Trust Accounts .......................................................................................................57, 168
Trust Estate .............................................................................................................10, 168
Trustee ......................................................................................................................4, 168
Trustee Expenses ....................................................................................................65, 168
Trustee Fee ..............................................................................................................65, 168
U.S. holder ...................................................................................................................119
U.S. person ..................................................................................................................168
UBTI .......................................................................................................................125, 168
Underlying Obligation ................................................................................................168
Unfunded Commitment ...............................................................................................168
Unfunded Portion ........................................................................................................168
Valuation Date ........................................................................................................72, 168
Weighted Average Fixed Rate Coupon ......................................................................168
Weighted Average LIBOR Spread ..............................................................................168
Weighted Average Life Test ........................................................................................169
Weighted Average Rating ............................................................................................169
Weighted Average Undrawn Spread ...........................................................................169

010795

This page intentionally left blank.

## PRINCIPAL OFFICES OF THE ISSUERS

| **Valhalla CLO, Ltd.** | **Valhalla CLO, Inc.** |
|---|---|
| c/o Walkers SPV Limited | c/o Puglisi & Associates |
| P.O. Box 908GT | 850 Library Avenue |
| Walker House | Suite 204 |
| Mary Street | Newark, DE 19711 |
| George Town | |
| Grand Cayman, Cayman Islands | |

## TRUSTEE, PAYING AGENT AND TRANSFER AGENT

### JPMorgan Chase Bank

Institutional Trust Services – Valhalla CLO

600 Travis Street, JPMorgan Chase Tower, 50th Floor

Houston, Texas 77002

## IRISH PAYING AND IRISH LISTING AGENT

NCB Stockbrokers Limited
3 George's Dock
Dublin 1, Ireland

## LEGAL ADVISORS

| **To the Issuers** | **To the Initial Purchaser and Placement Agent** |
|---|---|
| As to United States law | **Cleary, Gottlieb, Steen & Hamilton** |
| | One Liberty Plaza |
| **Cleary, Gottlieb, Steen & Hamilton** | New York, NY 10006 |
| One Liberty Plaza | |
| New York, NY 10006 | |
| **To the Issuer** | **To the Reference Portfolio Manager** |
| As to Cayman Islands law | **Orrick, Herrington & Sutcliffe LLP** |
| | 777 S. Figueroa St. |
| **Walkers** | Los Angeles, CA 90017 |
| P.O. Box 265GT | |
| Walker House | |
| Mary Street | |
| George Town | |
| Grand Cayman | |
| Cayman Islands | |

010797

# Valhalla CLO, Ltd.
# Valhalla CLO, Inc.

### U.S. $62,000,000 Class A-1 Floating Rate Senior Extendable Notes
### U.S. $56,000,000 Class A-2 Floating Rate Senior Extendable Notes
### U.S. $39,500,000 Class B Floating Rate Deferrable Senior Subordinate Extendable Notes
### U.S. $21,000,000 Class C-1 Floating Rate Deferrable Senior Subordinate Extendable Notes
### U.S. $5,000,000 Class C-2 Fixed Rate Deferrable Senior Subordinate Extendable Notes
### U.S. $82,000,000 Extendable Income Notes

---

### U.S. $10,000,000 Class Q-1 Extendable Securities*
### U.S. $7,200,000 Class Q-2A Securities*
### U.S. $40,000,000 Class Q-2B Securities*

*The Class Q-1 Securities consist of the Class Q-1 Senior Note Component representing U.S. $5,000,000 aggregate principal amount of Class C-2 Notes and the Class Q-1 Income Note Component representing U.S. $5,000,000 aggregate principal amount of Income Notes. The Class Q-2 Securities are secured by the Class Q-2 Collateral Assets as described herein, including U.S. $25,000,000 aggregate principal amount of Income Notes. The aggregate principal amount of the Income Notes represented by the Class Q-2 Collateral Assets and the aggregate principal amount of Income Notes and Class C-2 Notes to which the Class Q-1 Income Note Component and the Class Q-1 Senior Note Component relate are included in (and are not in addition to) the aggregate principal amount of the relevant Class of Senior Notes or Income Notes.

---

## OFFERING CIRCULAR

## AUGUST 17, 2004

---

# Citigroup