**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | |
|---|---|---|
| **In Re:** Highland Capital Management, L.P | § | Case No. 19-34054-SGJ-11 |
| Highland Capital Management Fund Advisors, L.P. | | |
| et al | § | |
| Appellant | § | |
| vs. | § | |
| Highland Capital Management, L.P., | | |
| | § | 3:21-CV-00538-N |
| Appellee | § | |

[1943] **Order confirming the fifth amended chapter 11 plan,** Entered on 2/22/2021.

# APPELLANT RECORD
# VOLUME 40

MUNSCH HARDT KOPF & HARR, P.C.
Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
3800 Ross Tower
500 N. Akard Street
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

ATTORNEYS FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P. AND
NEXPOINT ADVISORS, L.P.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | Case No. 19-34054 (SGJ11) |
| Debtor. | |

$I\,N\!D\!E\!X$

## AMENDED DESIGNATION BY NEXPOINT ADVISORS, L.P. AND HIGHLAND
## CAPITAL MANAGEMENT FUND ADVISORS, L.P.
## OF ITEMS FOR THE RECORD ON APPEAL

COME NOW Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors,

L.P. (the "Appellants"), creditors and parties-in-interest in the above styled and numbered

bankruptcy case (the "Bankruptcy Case") of Highland Capital Management, L.P. (the "Debtor"),

and, with respect to their *Notice of Appeal* [docket no. 1957], hereby file their *Amended*

*Designation of Items for the Record on Appeal* (the "Designation") as follows:

| Item | Bankruptcy Docket Number | Description |
|---|---|---|
| | | **Pleadings and Items on Docket** |
| 1 | 1957 | Notice of Appeal |
| 2 | 1943 | Order (i) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief |
| 3 | | Docket Sheet of Bankruptcy Case No. 19-34054 |
| 4 | 1606 | Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 5 | 1648 | Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| 6 | 1656 | Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 7 | 1670 | Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 8 | 1719 | Second Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| 9 | 1749 | Third Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| 10 | 1772 | Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 11 | 1791 | Notice of Withdrawal of Certain Executory Contracts and Unexpired Leases from List of Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan |
| 12 | 1807 | Debtor's Omnibus Reply to Objections to Confirmation of the Fifth Amended Chapter 11 Plan of Reorganization of Highland Capital Management |
| 13 | 1808 | Debtor's Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) |
| 14 | 1811 | Notice of Filing Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (with Technical Modifications) |
| 15 | 1814 | Debtor's Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |

*Handwritten annotations in left margin:*

Vol. 1
000001
000165
000326
Vol. 2
000639
000666
000675
000820
000870
Vol. 3
000880
000886
000901
000906
001031
Vol. 4
001097
Vol 5
001346

---

AMENDED DESIGNATION BY NEXPOINT ADVISORS, L.P. AND HIGHLAND CAPITAL MANAGEMENT
FUND ADVISORS, L.P. OF ITEMS FOR THE RECORD ON APPEAL—Page 2

| Vol 5<br>001414 | 16 | 1847 | Fourth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| 001421 | 17 | 1873 | Fifth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| 001427 | 18 | 1875 | Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland of Highland Capital Management, L.P. (As Modified) |
| 001475 | 19 | 1887 | Supplemental Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 001482 | 20 | 1671 | United States Trustee's Limited Objection to Confirmation of Debtors' Fifth Amended Plan of Reorganization |
| | **Evidence and Transcripts** | | |
| 001488 081783 | 21 | 1894 | Transcript of February 2, 2021 Confirmation Hearing |
| 002040 | 22 | 1905 | Transcript of February 3, 2021 Confirmation Hearing |
| | 23 | 1917 | Transcript of February 8, 2021 Bench Ruling |
| 082091 002188 vol 12 - 002931 vol 50 - 013295 - 013297 vol. 51 - 013373 vol. 54 - 014182 vol 55 - 014506 | 24 | 1794<br>1795<br>1822✻<br>1863<br>1866<br>1877<br>1895<br>1915 | All exhibits admitted into evidence during February 2 and February 3, 2021 Confirmation Hearing |

✻1822 - Vol. 12 - 50 (39 Volumes)

RESPECTFULLY SUBMITTED this 22d day of March, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    3800 Ross Tower
    500 N. Akard Street
    Dallas, Texas 75201-6659
    Telephone: (214) 855-7500
    Facsimile: (214) 855-7584
    Email:   drukavina@munsch.com

**ATTORNEYS FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P. AND
NEXPOINT ADVISORS, L.P.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 22d day of March, 2021, true and correct copies of this document were electronically served by the Court's ECF system on parties entitled to notice thereof, including on counsel for the Debtor.

By: /s/ Davor Rukavina
    Davor Rukavina, Esq.

# EXHIBIT OOO

*EXECUTION VERSION*
*1295285 v14*

VALHALLA CLO, LTD.,

Issuer

VALHALLA CLO, INC.,

Co-Issuer

and

JPMORGAN CHASE BANK,

Trustee and Securities Intermediary

INDENTURE

Dated as of

August 18, 2004

010800

Table of Contents

Page

ARTICLE I
DEFINITIONS; INTERPRETATION AND ASSUMPTION

SECTION 1.1 Definitions ........................................................................ 3

SECTION 1.2 Interpretation ..................................................................... 3

SECTION 1.3 Assumptions as to Eligible Investments and the Swap
Agreement ........................................................................ 4

ARTICLE II
THE NOTES

SECTION 2.1 Forms Generally ................................................................ 5

SECTION 2.2 Form of Notes and Certificate of Authentication ............... 5

SECTION 2.3 Authorized Amount; Maturity Date; Classification and Priority
of Notes; Interest Rate; and Denomination .......................... 7

SECTION 2.4 Issuance of Securities ......................................................... 8

SECTION 2.5 Book-Entry Securities ......................................................... 9

SECTION 2.6 Registration of Transfer and Exchange of Securities;
Restriction on Transfer ...................................................... 12

SECTION 2.7 Mutilated, Destroyed, Lost or Stolen Notes ...................... 25

SECTION 2.8 Payments on the Notes ..................................................... 26

SECTION 2.9 Persons Deemed Owners ................................................... 29

SECTION 2.10 Cancellation of Notes ........................................................ 29

SECTION 2.11 Swap Counterparty, Reference Portfolio Manager and Initial
Purchaser as Noteholders .................................................... 29

SECTION 2.12 Treatment of Senior Notes ................................................ 29

SECTION 2.13 No Gross Up .................................................................... 30

SECTION 2.14 Redemption of Notes ........................................................ 30

SECTION 2.15 Maturity; Extension of Maturity ....................................... 31

SECTION 2.16 Class Q-1 Securities ......................................................... 33

SECTION 2.17 Class Q-2 Securities ......................................................... 37

ARTICLE III
CONDITIONS PRECEDENT TO THE ISSUANCE OF SECURITIES

SECTION 3.1 Conditions Precedent ........................................................ 47

SECTION 3.2 Security for the Notes ........................................................ 49

SECTION 3.3 Custodianship; Delivery of Eligible Investments ............... 50

SECTION 3.4 The Swap Agreement ........................................................ 51

010801

Page

ARTICLE IV
SATISFACTION AND DISCHARGE

SECTION 4.1    Satisfaction and Discharge of Indenture ........................................... 52

SECTION 4.2    Application of Trust Funds ................................................................ 52

ARTICLE V
DEFAULT AND REMEDIES

SECTION 5.1    Events of Default .............................................................................. 53

SECTION 5.2    Rights of Swap Counterparty upon Event of Default ....................... 55

SECTION 5.3    Acceleration of Maturity; Rescission and Annulment ...................... 55

SECTION 5.4    Remedies ........................................................................................... 56

SECTION 5.5    Retention of Trust Estate .................................................................. 56

SECTION 5.6    Trustee May File Proofs of Claim ..................................................... 58

SECTION 5.7    Trustee May Enforce Claims Without Possession of Notes ............. 59

SECTION 5.8    Priority of Payment on Acceleration.................................................. 59

SECTION 5.9    Limitation of Suits ............................................................................ 60

SECTION 5.10   Rights of Noteholders to Receive Principal and Interest ................. 61

SECTION 5.11   Restoration of Rights and Remedies.................................................. 62

SECTION 5.12   Rights and Remedies Cumulative ..................................................... 62

SECTION 5.13   Delay or Omission Not a Waiver....................................................... 62

SECTION 5.14   Control by Noteholders..................................................................... 62

SECTION 5.15   Waiver of Past Defaults .................................................................... 63

SECTION 5.16   Undertaking for Costs ....................................................................... 63

SECTION 5.17   Waiver of Stay or Extension Laws ................................................... 64

SECTION 5.18   Action on Notes ................................................................................ 64

SECTION 5.19   Performance and Enforcement of Certain Obligations..................... 64

SECTION 5.20   Sale of Trust Estate ........................................................................... 65

ARTICLE VI
THE TRUSTEE

SECTION 6.1    Duties of Trustee............................................................................... 66

SECTION 6.2    Rights of Trustee............................................................................... 67

SECTION 6.3    Trustee May Own Notes ................................................................... 70

SECTION 6.4    Trustee's Disclaimer ......................................................................... 70

SECTION 6.5    Notice of Defaults; Events of Default and Acceleration .................. 71

010802

Page

SECTION 6.6   Compensation; Reimbursement; Indemnity ..................................... 71

SECTION 6.7   Resignation and Removal of Trustee; Appointment of Successor.................................................................................... 72

SECTION 6.8   Merger or Consolidation of Trustee................................................... 74

SECTION 6.9   Appointment of Co-Trustee or Separate Trustee .............................. 74

SECTION 6.10   Eligibility; Disqualification ................................................................ 76

SECTION 6.11   Representations and Warranties of Trustee ........................................ 76

SECTION 6.12   Certain Duties of Trustee Related to Delayed Payment of Proceeds ............................................................................................ 76

SECTION 6.13   Withholding; Tax Forms.................................................................... 77

SECTION 6.14   Fiduciary for Noteholders Only; Agent for Other Secured Parties................................................................................................. 77

SECTION 6.15   Assignment of Rights; Not Assumption of Duties ............................ 78

ARTICLE VII
COVENANTS

SECTION 7.1   Payments on Securities ...................................................................... 78

SECTION 7.2   Maintenance of Office or Agency...................................................... 78

SECTION 7.3   Money for Payments to Be Held in Trust .......................................... 78

SECTION 7.4   Existence of Issuers........................................................................... 79

SECTION 7.5   Protection of Trust Estate.................................................................. 80

SECTION 7.6   Opinions as to Trust Estate and Tax Certificates.............................. 82

SECTION 7.7   Performance of Obligations ............................................................... 82

SECTION 7.8   Negative Covenants ........................................................................... 82

SECTION 7.9   Statement as to Compliance............................................................... 85

SECTION 7.10   Consolidation of Issuers.................................................................... 85

SECTION 7.11   Successor Substituted......................................................................... 87

SECTION 7.12   No Other Business ............................................................................. 87

SECTION 7.13   Purchase of Notes and Class Q Securities ........................................ 88

SECTION 7.14   Additional Covenants........................................................................ 88

SECTION 7.15   Representations and Warranties of the Issuers .................................. 89

SECTION 7.16   Certain Tax Matters .......................................................................... 90

SECTION 7.17   DTC Actions ..................................................................................... 91

SECTION 7.18   Bloomberg Screens, Etc.................................................................... 91

SECTION 7.19   CUSIP ............................................................................................... 92

010803

                                                                                            Page

SECTION 7.20    Legends ................................................................................... 92

SECTION 7.21    Regulation S Transfers........................................................... 92

SECTION 7.22    Listing Agent ......................................................................... 93

SECTION 7.23    Security Interest Representations and Warranties ............ 93

SECTION 7.24    Financing Statements; Registration .................................... 95

SECTION 7.25    Reaffirmation of Rating; Annual Rating Review ................ 95

SECTION 7.26    Amendment of the Swap Agreement ................................... 95

ARTICLE VIII
TRUST ACCOUNTS; DISTRIBUTIONS

SECTION 8.1     Collection of Money ............................................................. 97

SECTION 8.2     Collection Account and Expense Reserve Account ........... 97

SECTION 8.3     Collateral Account ................................................................ 98

SECTION 8.4     Investment of Moneys.......................................................... 99

SECTION 8.5     Status of Account; Securities Intermediary ..................... 100

SECTION 8.6     Priority of Payments .......................................................... 102

SECTION 8.7     Monthly Reports ................................................................. 107

SECTION 8.8     Payment Date Valuation Reports....................................... 111

SECTION 8.9     Reports by Independent Accountants ............................... 114

SECTION 8.10    Posting of Reports on Repository at Option of the Initial
                Purchaser............................................................................. 115

SECTION 8.11    Notices to Rating Agencies................................................ 115

ARTICLE IX
SUPPLEMENTAL INDENTURES

SECTION 9.1     Supplemental Indentures Without Consent of Noteholders............. 115

SECTION 9.2     Supplemental Indentures With Consent of Noteholders.................. 116

SECTION 9.3     Execution of Supplemental Indentures ............................. 119

SECTION 9.4     Effect of Supplemental Indentures.................................... 119

SECTION 9.5     Reference in Notes to Supplemental Indentures............... 119

SECTION 9.6     Amendment Buy-Out........................................................... 120

ARTICLE X
OTHER AGENTS

SECTION 10.1    Paying Agents ..................................................................... 121

SECTION 10.2    Irish Transfer Agent ........................................................... 122

SECTION 10.3    Indenture Calculation Agent.............................................. 122

iv

010804

|  |  | Page |
|---|---|---|
| SECTION 10.4 | Other Capacities | 123 |
| SECTION 10.5 | Certain Actions with Respect to the Reference Portfolio Manager | 123 |
| SECTION 10.6 | Process Agents | 124 |

ARTICLE XI<br>MISCELLANEOUS

| SECTION 11.1 | Form of Documents Delivered to Trustee | 124 |
|---|---|---|
| SECTION 11.2 | Acts of Securityholders | 125 |
| SECTION 11.3 | Notices, etc., to Trustee, Issuers and Rating Agencies | 125 |
| SECTION 11.4 | Notices to Holders of the Notes; Waiver | 127 |
| SECTION 11.5 | Consent to Posting of Documents on Repository at the Option of Initial Purchaser | 127 |
| SECTION 11.6 | Posting of Documents on Repository | 127 |
| SECTION 11.7 | Effect of Headings and Table of Contents | 127 |
| SECTION 11.8 | Successors and Assigns | 128 |
| SECTION 11.9 | Separability | 128 |
| SECTION 11.10 | Benefits of Indenture | 128 |
| SECTION 11.11 | Governing Law | 128 |
| SECTION 11.12 | Submission to Jurisdiction; Waiver of Jury Trial | 128 |
| SECTION 11.13 | Counterparts | 129 |
| SECTION 11.14 | Recording of Indenture | 129 |
| SECTION 11.15 | No Recourse | 129 |
| SECTION 11.16 | No Petition | 130 |
| SECTION 11.17 | Priority of Payments | 130 |
| SECTION 11.18 | Beneficiaries | 130 |
| Schedule A | Definitions | |
| Exhibits | | |

010805

INDENTURE, dated as of August 18, 2004 (as amended, supplemented or modified from time to time, this "Indenture"), among VALHALLA CLO, LTD., an exempted company incorporated with limited liability under the laws of the Cayman Islands (the "Issuer"), VALHALLA CLO, INC., a Delaware corporation (the "Co-Issuer" and, together with the Issuer, the "Issuers") and JPMORGAN CHASE BANK, a banking corporation organized under the laws of New York (the "Trustee").

Each party agrees as follows for the benefit of the other parties and for the benefit of the Noteholders and the Swap Counterparty.

PRELIMINARY STATEMENT

The Issuers are duly authorized to execute and deliver this Indenture to provide for the issuance of the Notes, the Class Q-1 Securities and the Class Q-2 Securities, in each case as provided in this Indenture. All covenants and agreements made by the Issuers herein are for the benefit and security of the Noteholders, the Swap Counterparty, the Collateral Administrator and the Trustee (collectively, the "Secured Parties"). The Issuers are entering into this Indenture, and the Trustee is accepting the trusts created hereby, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

All things necessary to make this Indenture a valid agreement of the Issuers in accordance with its terms have been done.

GRANT OF SECURITY INTEREST

The Issuer hereby grants to the Trustee, for the benefit and security of the Secured Parties, a first priority security interest in all of its right, title and interest in, to and under, in each case, whether now owned or hereafter acquired or arising, all property (other than Excluded Property and the Class Q-2 Securities Collateral (except such described in clause (iii) of the definition thereof at any time prior to the time at which such property is required to be applied to the payment of the Income Notes represented by the Class Q-2 Collateral Asset A)) of any type or nature owned by it or in which the Issuer has an interest, including all accounts, chattel paper, deposit accounts, financial assets, general intangibles, instruments, investment property, letter-of-credit rights and other supporting obligations, and specifically including: (i) each of the Collateral Account, the Collection Account, the Expense Reserve Account, any subaccounts thereof and all financial assets credited to, and amounts on deposit or credit balances carried in, each of them from time to time; (ii) all rights of the Issuer under the Swap Agreement and the Swap Guarantee, including payments made by the Swap Counterparty or the Swap Guarantor thereunder; (iii) all rights of the Issuer under the Collateral Administration Agreement; (iv) all Eligible Investments purchased with funds on deposit in any Trust Account and all income or other proceeds from the investment of funds therein; (v) all cash and Money delivered to the Trustee (directly or through the Securities Intermediary); and (vi) all proceeds, accessions, profits, income, benefits, substitutions and replacements, whether voluntary or involuntary, of and to any of the property of the Issuer described in the preceding clauses (collectively, the "Trust Estate").

010806

Such aforementioned grants are made, however, in trust, to secure, in accordance with the priorities set forth in the Priority of Payments, the Notes equally and ratably without prejudice, priority or distinction, except as expressly otherwise provided in this Indenture, between any Note and any other Note by reason of difference in time of issuance or otherwise, and to secure, in accordance with the priorities set forth in the Priority of Payments, (i) the payment of all amounts payable by the Issuer under the Swap Agreement, (ii) the payment of all amounts due on the Notes in accordance with their terms and (iii) the payment of all amounts payable by the Issuers under this Indenture and compliance by the Issuers with the other provisions hereof, all as provided in this Indenture.

In addition, the Issuer hereby grants to the Trustee, solely for the benefit and security of the Holders of the Class Q-2 Securities, a first priority security interest in all of its right, title and interest in, to and under, in each case whether now owned or hereafter acquired or arising, the Class Q-2 Securities Collateral. Such grants are made, however, in trust, to secure, in accordance with the priorities set forth in the Class Q-2 Priority of Payments, the Class Q-2 Securities equally and ratably without prejudice, priority or distinction, except as expressly otherwise provided in this Indenture, between any Class Q-2 Security and any other Class Q-2 Security by reason of difference in time of issuance or otherwise, and to secure, in accordance with the priorities set forth in the Class Q-2 Priority of Payments, the payment of all amounts due on the Class Q-2 Securities in accordance with their terms.

Except to the extent otherwise provided in this Indenture, this Indenture shall constitute a security agreement under the laws of the State of New York applicable to agreements made and to be performed therein. Upon the occurrence of any Event of Default with respect to the Notes or the occurrence of any Class Q-2 Event of Default with respect to the Class Q-2 Securities, and in addition to any other rights available under this Indenture or any other instruments included in the Trust Estate held for the benefit and security of the Secured Parties, or included in the Class Q-2 Securities Collateral held for the benefit and security of the Holders of Class Q-2 Securities, or otherwise available at law or in equity, the Trustee, for the benefit of the Secured Parties or for the benefit of the Holders of Class Q-2 Securities, as applicable, shall have all rights and remedies of a secured party on default under the laws of the State of New York and other applicable law to enforce the assignments and security interests contained herein and, in addition, shall have the right, subject to compliance with any mandatory requirements of applicable law, to sell or apply any rights and other interests assigned or pledged hereby in accordance with the terms hereof at public or private sale.

It is expressly agreed that, anything herein contained to the contrary notwithstanding, the Issuer shall remain liable under any instruments included in the Trust Estate or the Class Q-2 Securities Collateral to perform all the obligations assumed by it thereunder, all in accordance with and pursuant to the terms and provisions thereof, and, except as otherwise expressly provided herein or agreed by the Trustee, the Trustee shall not have any obligations or liabilities under such instruments by reason of or arising out of this Indenture, nor shall the Trustee be required or obligated in any manner to perform or fulfill any obligation of the Issuer under or pursuant to such instruments or to make any payment, to make any inquiry as to the nature or sufficiency of any payment received by it, to present or file any claim or to take any action to collect or enforce the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times, except as provided herein.

2

010807

The Trustee acknowledges the grants of the security interests provided above, accepts the trusts hereunder in accordance with the provisions hereof and agrees to perform the duties herein pursuant to and in accordance with the terms of this Indenture.

ARTICLE I

DEFINITIONS; INTERPRETATION AND ASSUMPTION

SECTION 1.1     Definitions.

Capitalized terms not otherwise defined herein (including in the Preliminary Statement and granting clauses hereof) have the respective meanings set forth in the Schedule of Definitions attached hereto as Schedule A, unless otherwise noted.  Unless otherwise defined herein, terms (whether or not capitalized) defined in the UCC are used herein (including in the granting clauses hereof) as therein defined.  Capitalized terms used in Sections 8.7, 8.8 and 8.9 and in Schedule A that are not defined herein have the meanings specified in the Swap Agreement.

SECTION 1.2     Interpretation.

Unless otherwise indicated in this Indenture:

(a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein);

(b) all references to an "Article," "Section," "Schedule" or "Exhibit" are to an Article or Section hereof or to a Schedule or an Exhibit attached hereto;

(c) defined terms in the singular shall include the plural and vice versa, and the masculine, feminine or neuter gender shall include all genders;

(d) the words "hereof," "herein" and "hereunder" and other words of similar import when used in this Indenture shall refer to this Indenture as a whole and not to any particular provision of this Indenture;

(e) the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation;"

(f) all time references used herein shall refer to Eastern Standard Time or Eastern Daylight Savings Time, whichever is then in effect;

(g) the word "dollar" and the symbols "US$" and "$" shall mean the lawful currency from time to time of the United States of America; and

010808

(h) for purposes of any calculation or determination hereunder, the result of which is expressed as a percentage, such result shall be rounded to the nearest .00001%, unless otherwise specified herein.

SECTION 1.3    Assumptions as to Eligible Investments and the Swap Agreement.

Except as otherwise expressly set forth herein, the provisions set forth in this Section 1.3 shall be applied in connection with all calculations required to be made pursuant to this Indenture with respect to distributions on any Eligible Investment, or any payments under the Swap Agreement or on any other assets included in the Trust Estate or the Class Q-2 Securities Collateral, and with respect to the income that may be earned on distributions on such Eligible Investments and on any other amounts that may be received for deposit in the Trust Accounts or the Class Q-2 Securities Collateral Account.

(a) All calculations with respect to distributions in respect of the Eligible Investments and payments with respect to the Securities shall be made by the Issuer or its agent, based upon the assumptions that (i) no Eligible Investment will default or be sold and the Swap Counterparty will make the payments required to be made by it under the Swap Agreement in accordance with its terms and (ii) no optional redemption of any Eligible Investment will occur except for those that have actually occurred or as to which irrevocable notice from the obligor of the Eligible Investment to the Issuer thereof shall have been given.

(b) For each Periodic Interest Accrual Period, the distributions on any Eligible Investment shall be the sum of (i) the total amount of payments and collections in respect of such Eligible Investment at the current interest rate and other terms applicable thereto, that, if paid as scheduled, will be available in the Trust Accounts at the end of such period for distribution in accordance with Section 8.6 (or will be available in the Class Q-2 Securities Collateral Account at the end of such period for distribution in accordance with Section 2.17(d), as applicable), plus (ii) any such amounts received in prior such periods that were not disbursed on a previous Payment Date.

(c) With respect to any Eligible Investment as to which any interest or other payment thereon is subject to any withholding tax, each distribution thereon shall, for purposes of the Coverage Tests (for Eligible Investments in the Trust Accounts) or the Class Q-2A Coverage Test (for Eligible Investment in the Class Q-2 Securities Collateral Account), be deemed to be payable net of such withholding tax unless the issuer thereof or obligor thereon is required to make additional payments to fully compensate the Issuers for such withholding taxes (including in respect of any such additional payments). On any date of determination, the amount of any scheduled distribution on the Eligible Investments due on any future date shall be assumed to be made net of any such uncompensated withholding tax based upon applicable withholding tax rates in effect on such date of determination.

ARTICLE II

THE NOTES

SECTION 2.1    Forms Generally.

The Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C-1 Notes, the Class C-2 Notes, the Income Notes, the Class Q-1 Securities, the Class Q-2A Securities and the Class Q-2B Securities and the Trustee's certificate of authentication thereon (the "Certificate of Authentication") shall be substantially in the forms required by this Article II, with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon as may, consistently herewith, be determined and authorized by the Authorized Officers executing and authenticating such Notes, Class Q-1 Securities or Class Q-2 Securities, as evidenced by their execution and authentication thereof. Any portion of the text of any Note, Class Q-1 Security or Class Q-2 Security may be set forth on the reverse thereof, with an appropriate reference thereto on the face of the Note, Class Q-1 Security or Class Q-2 Security.

SECTION 2.2    Form of Notes and Certificate of Authentication.

(a) The Senior Notes shall be issued initially as global notes and the form of the Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C-1 Notes and the Class C-2 Notes issued as Temporary Regulation S Global Notes, Regulation S Global Notes or Rule 144A Global Notes, including the Certificate of Authentication, shall be as set forth respectively as Exhibits A1-1, A1-2, A1-3, A2-1, A2-2, A2-3, B-1, B-2, B-3, C1-1, C1-2, C1-3, C2-1, C2-2, and C2-3 hereto.

(b)    (i)    Temporary Regulation S Global Notes and Regulation S Global Notes. The Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C-1 Notes and the Class C-2 Notes initially sold to non-U.S. Persons (as defined in Regulation S) in offshore transactions in reliance on Regulation S shall be initially issued in the form of one or more temporary global notes in definitive, fully registered form without interest coupons with the applicable legends substantially as set forth in the form of Exhibits A1-1, A2-1, B-1, C1-1 and C2-1, hereto, respectively (each, a "Temporary Regulation S Global Note"), and, on or after the Exchange Date, upon certification in accordance with Rule 903(b)(3)(ii)(B) from the Depositary, Euroclear and Clearstream that the beneficial interests in such Temporary Regulation S Global Notes are owned by Persons who are non-U.S. Persons, shall be exchangeable for interests in one or more permanent global notes of the same Class in definitive, fully registered form without interest coupons with the applicable legends substantially as set forth in the form of Exhibits A1-2, A2-2, B-2, C1-2 and C2-2, hereto, respectively (each, a "Regulation S Global Note"), which Temporary Regulation S Global Notes and Regulation S Global Notes shall be deposited on behalf of the subscribers for such Notes represented thereby with the Trustee as custodian for DTC, the initial Depositary, and registered in the name of Cede & Co., as nominee of DTC, for the respective accounts of Euroclear and Clearstream, duly executed by the Issuers and authenticated by the Trustee as hereinafter

5

provided. The Aggregate Principal Amount of the Temporary Regulation S Global Notes and the Regulation S Global Notes may from time to time be increased or decreased by adjustments made on the records of the Trustee or the Depositary or its nominee, as the case may be, as hereinafter provided.

(ii)     <u>Rule 144A Global Notes</u>.  The Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C-1 Notes and the Class C-2 Notes initially sold in the United States or to U.S. Persons pursuant to Rule 144A under the Securities Act shall be issued in the form of one or more permanent global notes in definitive, fully registered form without interest coupons with the applicable legends substantially as set forth in the form of <u>Exhibits</u> <u>A1-3</u>, <u>A2-3</u>, <u>B-3</u>, <u>C1-3</u>, and <u>C2-3</u>, respectively (each, a "Rule 144A Global Note"), which shall be deposited with the Trustee as custodian for DTC and registered in the name of Cede & Co., as nominee of DTC, duly executed by the Issuers and authenticated by the Trustee as hereinafter provided.  The Aggregate Principal Amount of the Rule 144A Global Notes may from time to time be increased or decreased by adjustments made on the records of the Trustee or the Depositary or its nominee, as the case may be, as hereinafter provided.

(c)     All Income Notes shall be issued in the form of certificated Notes in definitive, physical certificates in fully registered form without interest coupons with the applicable legends substantially as set forth in the form of <u>Exhibit IN-Certificated</u> (each a "<u>Certificated Income Note</u>"), which shall be registered in the name of the beneficial owner or a nominee thereof, duly executed by the Issuer and authenticated by the Trustee as hereinafter provided.

(d)     The terms and provisions contained in the Securities shall constitute, and are hereby expressly made, a part of this Indenture, and the Issuers and the Trustee, by their execution and delivery of this Indenture, and the Holders of Securities, by their acceptance of the Securities, expressly agree to such terms and provisions and to be bound thereby.  To the extent any provision of any Security conflicts with the express provisions of this Indenture, the provisions of this Indenture shall govern and be controlling.

(e)     The Certificated Income Notes, the Certificated Class Q-1 Securities, the Certificated Class Q-2 Securities, the Global Notes (including the Class Q-1 Temp Reg S Global Securities and the Class Q-1 Reg S Global Securities) or any definitive notes issued in accordance with Section 2.5(d) and (e) shall be typewritten on bond paper or safety paper, printed, lithographed, engraved or produced by any combinations of these methods, with or without steel engraved borders.

(f)     Except as provided in Sections 2.5(d) and (e), owners of beneficial interests in Global Notes will not be entitled to receive physical delivery of definitive Notes; <u>provided</u>, that transferees of Class Q-1 Reg S Global Securities will receive physical delivery of definitive Securities as provided in Section 2.16(c)(iii).

010811

SECTION 2.3    Authorized Amount; Maturity Date; Classification and Priority of Notes; Interest Rate; and Denomination.

(a) The maximum Aggregate Principal Amount of the Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C-1 Notes, the Class C-2 Notes and the Income Notes that may be authenticated and delivered under this Indenture is limited to U.S. $62,000,000, U.S. $56,000,000, U.S. $39,500,000, U.S. $21,000,000, U.S. $5,000,000 and U.S. $82,000,000 respectively, except for Notes authenticated and delivered upon registration of transfer of, in exchange for, or in lieu of other Notes pursuant to Sections 2.5, 2.6, 2.7, 9.5 or 9.6.   The Maturity Date for each Class of Notes is August 1, 2016, or, if the maturity is extended pursuant to Section 2.15 hereof, August 1, 2020. Notwithstanding anything to the contrary herein, the Aggregate Principal Amount of the Income Notes includes the U.S. 25,000,000 Aggregate Principal Amount of Income Notes Delivered to the Class Q-2 Securities Collateral Account on the Closing Date, which shall be deemed to have been issued for all purposes of this Indenture.

(b) The Notes will be issued in Classes, denominated as Class A-1 Floating Rate Senior Extendable Notes (the "Class A-1 Notes"), Class A-2 Floating Rate Senior Extendable Notes (the "Class A-2 Notes"), Class B Floating Rate Deferrable Senior Subordinate Extendable Notes (the "Class B Notes"), Class C-1 Floating Rate Deferrable Senior Subordinate Extendable Notes (the "Class C-1 Notes"), Class C-2 Fixed Rate Deferrable Senior Subordinate Extendable Notes (the "Class C-2 Notes") and Extendable Income Notes (the "Income Notes").  The Income Notes will be subordinate in payment priority hereunder to the Senior Notes. The Class C-1 Notes and the Class C-2 Notes will rank pari passu with each other and (except in certain cases where the Diversion Test is not satisfied) will be subordinate in payment priority hereunder to the Class B Notes, and  to the Class A-2 Notes and to the Class A-1 Notes.  The Class B Notes will be subordinate in payment priority hereunder (except in certain cases where the Diversion Test is not satisfied) to the Class A-2 Notes and to the Class A-1 Notes.  The Class A-2 Notes will be subordinate in payment priority hereunder to the Class A-1 Notes.

(c) The Senior Notes will accrue interest at the following rates:

| Class of Notes | Interest Rate |
| --- | --- |
| Class A-1 Notes | LIBOR + 0.70% per annum |
| Class A-2 Notes | LIBOR + 0.80% per annum |
| Class B Notes | LIBOR + 1.40% per annum |
| Class C-1 Notes | LIBOR + 2.60% per annum |
| Class C-2 Notes | 7.53% per annum |

(d) Each Class of Notes, whether issued in definitive or global form, shall be issuable and transferable in minimum denominations of U.S. $500,000 and integral multiples of U.S. $1,000 in excess thereof.  The denominations of the Notes authorized to be issued under this Section 2.4(d) are referred to herein in each case as "Authorized Denominations" and are expressed in terms of the principal amounts thereof at the date of issuance.  After issuance, any

010812

Note may fail to be in an Authorized Denomination due to the repayment of principal thereof in accordance with the Priority of Payments or any other applicable provision hereof, and after such repayment the "Authorized Denomination" of any such Note, for purposes of this Indenture, shall mean the original Authorized Denomination reduced by any such repayment.

(e) The Notes will be subject to redemption prior to the Maturity Date solely as provided in Section 2.14.

SECTION 2.4    Issuance of Securities.

(a) The Securities shall be executed on behalf of the Issuer and, in the case of the Senior Notes only, the Co-Issuer by Authorized Officers thereof. The signature of any such Authorized Officers on the Securities may be manual or facsimile.

(b) Securities bearing the manual or facsimile signature of individuals who were Authorized Officers at the time when such signatures shall have been affixed shall bind the Issuer and the Co-Issuer, as applicable, notwithstanding that such individuals or any of them shall have ceased to hold such office prior to the authentication and delivery of such Securities or did not hold such office at the date of issuance of such Securities.

(c) On the Closing Date and from time to time after the execution and delivery of this Indenture, the applicable Issuers shall deliver the Securities executed by such Issuers to the Trustee for authentication; and the Trustee shall authenticate and deliver such Securities as provided in this Indenture and not otherwise.

Each Security authenticated and delivered by the Trustee on the Closing Date shall be dated as of the Closing Date. All other Securities that are authenticated after the Closing Date for any other purpose under this Indenture shall be dated the date of their authentication.

(d) Subject to the second sentence hereof, Securities issued upon transfer, exchange or replacement of other Securities shall be issued in Authorized Denominations reflecting the original Aggregate Principal Amount of the Securities so transferred, exchanged or replaced, but shall represent only the Outstanding Aggregate Principal Amount of the Securities so transferred. If any Security is divided into more than one Security in accordance with this Article II, the original Aggregate Principal Amount of such Security shall be appropriately divided among the Securities delivered in exchange therefor in denominations specified by the Holders thereof; provided, that each Security is in an Authorized Denomination and the Aggregate Principal Amount of each Security is in the aggregate equal to the original Aggregate Principal Amount of such divided Security.

No Security shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose, unless there appears on such Security a Certificate of Authentication, substantially in the form provided for herein, executed by the Trustee by the manual signature of one of its Responsible Officers, and such certificate upon any Security shall be conclusive evidence, and the only evidence, that such Security has been duly authenticated and delivered hereunder.

010813

SECTION 2.5    Book-Entry Securities.

(a) In the case of the Senior Notes, Class Q-1 Temp Reg S Global Securities and Class Q-1 Reg S Global Securities, unless and until definitive Securities have been issued in accordance with Section 2.5(d) and (e) (i) such Securities, upon original issuance, shall be book-entry Securities ("Book-Entry Securities"), (ii) the Depositary with respect to such Book-Entry Securities shall be DTC or such successor Depositary named in accordance with Section 2.5(c) below and (iii) such Book-Entry Securities shall be maintained on the book-entry deposit system of the Depositary in accordance with the procedures established by the Depositary. Each Class of the Book-Entry Securities shall be represented by a Global Note or Global Notes, which shall at all times be registered on the records of the Trustee and the Registrar in name of the Depositary or its nominee. With respect to the Book-Entry Securities:

(i)    the provisions of this Section 2.5(a) shall be in full force and effect and with respect to the Senior Notes represented by Global Notes, to the extent that the provisions of this Section 2.5(a) conflict with any other provisions of this Indenture, the provisions of this Section 2.5(a) shall control;

(ii)    the beneficial ownership of such Book-Entry Securities will be evidenced solely through the book-entry record system maintained by the Depositary (by book-entries made in the records of the Depositary, or the records of a Person or entity maintaining an account with the Depositary (either as a Participant or as an Indirect Participant, in accordance with the rules of the Depositary)) and the holdings of Book-Entry Securities of customers (including Indirect Participants) of Participants will not be known to the Trustee, the Issuer, the Co-Issuer or the Depositary;

(iii)    the beneficial owners of such Book-Entry Securities will not be recognized by the Trustee or by the Issuers as "Holders of the Securities" or "Securityholders" as such terms are used herein and beneficial owners will only be able to exercise the rights of the Holders of the Securities indirectly through the Depositary and its Participants and Indirect Participants and shall be subject to any agreements between such beneficial owners and the Depositary and/or its Participants and/or Indirect Participants; provided, that the registered Holder of a Global Note may grant proxies and otherwise authorize any person, including agent members and Persons that may hold interests through agent members, to take any action that a Holder is entitled to take under this Indenture or the Securities;

(iv)    with respect to Senior Notes represented by Global Notes only, transfers of beneficial ownership of such Book-Entry Securities shall be made on the books and records of the Depositary and/or its Participants and/or Indirect Participants;

(v)    beneficial ownership and with respect to Senior Notes represented by Global Notes only transfers of beneficial ownership of such Book-Entry Securities shall be governed by the rules of the Depositary;

(vi)    the Issuers and the Trustee may deal with the Depositary as the sole holder of record of such Book-Entry Securities for all purposes, including exercising

010814

the rights of the Holders of the Securities under this Indenture, and requests and directions for and votes of the Depositary (or its Participants) will not be deemed inconsistent if they are made with respect to different beneficial owners; all references in this Indenture to actions taken by the Holders of the Securities refer to actions taken by the Depositary upon instructions of its Participants and/or Indirect Participants;

(vii)    neither the Issuers nor the Trustee will have responsibility or liability for any aspect of the records of the Depositary, any Participant or any Indirect Participant relating to the beneficial ownership of the Book-Entry Securities;

(viii)    the Issuers and the Trustee may rely and shall be fully protected in relying upon information furnished by the Depositary with respect to its Participants and by Participants with respect to the beneficial owners of the Securities;

(ix)    all payments due on account of or with respect to such Book-Entry Securities shall be made to the Depositary as provided herein, and neither the Issuer, the Co-Issuer, the Trustee nor any agent of any of them shall have any responsibility or liability for the disbursement of such payments by the Depositary or any Participant or Indirect Participant to beneficial owners of Securities;

(x)    such Book-Entry Securities may not be exchanged for definitive Notes except under circumstances set forth in Sections 2.5(d) and (e), provided that upon transfers of Class Q-1 Temp Reg S Global Securities and Class Q-1 Reg S Global Securities physical definitive Securities will be delivered to the transferee as provided in Section 2.16(c)(iii); and

(xi)    insofar as interests in the Global Notes are held by the agent members of Euroclear or Clearstream, the provisions of the "Operating Procedures of the Euroclear System" and the "Terms and Conditions Governing Use of Participants" of Euroclear and Clearstream, respectively, or any successors thereto shall be applicable. Account holders or participants in Euroclear and Clearstream shall have no rights under this Indenture with respect to such Book-Entry Securities, and the registered nominee of the Depositary will be treated by the Trustee and any agent of the Trustee as the owner of the Global Note or Notes for all purposes whatsoever. Notwithstanding the foregoing, nothing herein shall prevent the Trustee or any agent of the Trustee from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as between the Depositary and Euroclear, Clearstream and their respective agent members, the operation of customary practices governing the exercise of the rights of a Holder of any Note.

(b) The Issuers shall execute and deliver initially the Global Notes registered in the name of DTC or Cede & Co., as DTC's nominee, and the Trustee shall hold such Global Notes as custodian for DTC or pursuant to DTC's instructions, if any.

Notwithstanding anything in this Indenture to the contrary, members of, or Participants in, the Depositary as well as any other Persons on whose behalf such Participants may act (including Euroclear and Clearstream and account holders and participants therein) shall

010815

have no rights under this Indenture with respect to any Global Note held on their behalf or for their benefit by the Depositary, and the Depositary may be treated by the Issuers or the Trustee and any agent of the Issuers or the Trustee as the absolute owner of such Global Note or Global Notes for all purposes whatsoever. Upon the issuance of any Global Note, the Registrar or its duly appointed agent shall record the Depositary's nominee as the registered holder of such Global Note on the Securities Register.

(c) The Issuers may from time to time select a new entity to act as Depositary with respect to the Book-Entry Securities, and if such selection is made, the Issuers shall promptly give the Trustee notice to such effect identifying the new Depositary and the Issuers shall cause the Global Notes to be delivered to the Trustee for cancellation and immediately thereupon, in accordance with Sections 2.4 and 2.6, the Issuers shall execute and deliver to the Trustee and the Trustee shall authenticate, register and deliver to the successor Depositary, or retain as custodian for the successor Depositary, one or more successor Global Notes. Appropriate changes may be made in the form of such Global Notes to reflect the selection of the new Depositary.

(d) Notwithstanding anything to the contrary in paragraphs (a) and (c) above, if, with respect to the Book-Entry Securities, (i)(A) the Depositary notifies the Trustee in writing that it is unwilling or unable to continue as Depositary for the Notes or the Depositary, Euroclear or Clearstream ceases to be a "clearing agency" (as defined in the Exchange Act) registered under the Exchange Act and (B) a successor depository or clearing agency is not appointed by the Trustee within 90 days after receiving such notice; (ii) as a result of any amendment to or change in the laws or regulations of the Cayman Islands, or of any authority therein having power to tax, or in the interpretation or administration of such laws or regulations that become effective on or after the Closing Date, the Issuer, the Trustee, or any Paying Agent is required to make any deduction or withholding from any payment in respect of the Global Notes which would not be required if such Notes were not represented by a global note; or (iii) any Event of Default (as defined in Section 5.1) has occurred and is continuing (and has not been waived); the Trustee shall execute an agreement with the Issuers amending this Indenture pursuant to Section 9.1 for the purpose of terminating the book entry deposit system and substituting definitive Notes for the Global Notes. Such agreement shall provide for the form and terms of such definitive Notes and the place and manner in which a Noteholder may obtain possession of such definitive Notes; provided, that in no event may holders of beneficial interests in the Temporary Regulation S Global Notes or Class Q-1 Temp Reg S Global Securities receive definitive Notes pursuant to this provision prior to the Exchange Date and each such holder must certify to the Issuers and the Trustee that it is a non-U.S. Person. Such agreement shall also provide the procedures for registration of transfer or exchange of such definitive Notes, as well as such other provisions as the Issuer, the Co-Issuer and the Trustee may agree shall be necessary or appropriate to effect the substitution of definitive Notes for Global Notes and to modify the provisions of this Indenture to provide for the use of definitive Notes in lieu of a book-entry deposit system.

(e) Upon the occurrence of any of the events described in paragraph (d) above, the Trustee shall notify all Holders of the Global Notes and shall advise such Holders of the Global Notes of the procedure by which the Global Notes shall be exchanged for definitive Notes. Each beneficial owner of Global Notes shall be entitled, at no cost to it, to have registered in the name of the beneficial owner of Global Notes one or more definitive Notes

010816

representing the same aggregate principal amount of Notes of the relevant Class as its beneficial interest in the related Global Note. Upon the occurrence of any such event, (i) the Trustee at the expense of the Issuer shall obtain from the Depositary a listing of the Participants then holding Book-Entry Securities on the records of the Depositary and (ii) upon surrender by the Depositary to the Trustee of the Global Notes for each Class, the Trustee shall cancel such Global Notes and the Issuers shall execute and deliver to such Participants definitive Notes representing in the aggregate the identical Aggregate Principal Amount of beneficial interests in the Global Notes held by such Participants on the records of the Depositary, registered in such names as such Participants shall have provided to the Trustee; provided, however, that the Trustee shall not register any such definitive Note or deliver any such definitive Note to a Participant unless and until such Participant shall have provided to the Trustee a certification acceptable to the Trustee that such registration instructions were given, and delivery of such definitive Note will be made, in accordance with the directions of the beneficial owners of Notes represented by such Participant. Neither the Issuers nor the Trustee shall be liable for any delay in delivery of such registration instructions by any Participant and each of them may conclusively rely on, and shall be protected in relying on, (i) information contained in the Participant listing provided by the Depositary regarding the names of the Participants holding beneficial interests in the Global Notes and the Aggregate Principal Amount of Notes represented by the beneficial interests in the Global Notes held by each such Participant, and (ii) the foregoing registration instructions and certifications provided by each such Participant with respect to definitive Notes representing the same Aggregate Principal Amounts of definitive Notes as the beneficial interests in the Global Notes stated to be held by such Participant in such Participant listing. If definitive Notes are issued, the Issuer will publish in the Republic of Ireland thereafter information explaining the payment, transfer and exchange procedures for the definitive Notes. The Trustee shall recognize the registered holders of the definitive Notes as Holders of the Notes hereunder. The Registrar shall reflect on its records the issuance of definitive Notes in exchange for the Global Notes.

(f) In the event that definitive Notes are not issued to each beneficial owner promptly after an event described in Section 2.5(d), the Issuers expressly acknowledge, with respect to the rights of any Holder of the Notes to pursue a remedy pursuant to Article V hereof, the right of any beneficial owner of Notes to pursue such remedy with respect to the portion of the Global Notes that represents such beneficial owner's Notes as if such definitive notes had been issued.

SECTION 2.6    Registration of Transfer and Exchange of Securities; Restriction on Transfer.

(a) The Issuers shall cause to be kept a securities register (the "Securities Register") for the Securities in which, subject to such reasonable regulations as they may prescribe, the Issuers shall provide for the registration of the Holders of the Securities and the registration of transfers of the Securities. The Trustee is hereby appointed to be the initial securities registrar (in such capacity, the "Registrar") for the purpose of registering the Securities and the registration of transfers and exchanges of Securities. Upon the resignation of any Registrar, the Issuers shall promptly appoint a successor thereto. The Trustee may prescribe reasonable procedures for carrying out its function as Registrar that do not conflict with the procedures established by the Issuer. In all events, the Trustee shall be entitled to maintain at its Corporate Trust Office within the United States such books and records as it may deem

010817

necessary or appropriate in respect of the performance of its function as Registrar. In the event that the Trustee is no longer acting in the capacity of the Registrar, the Trustee shall promptly inform any such successor Registrar of any transfer of record ownership of a Security so that the successor Registrar may register the same in the Securities Register; and upon request at any time the Registrar shall provide to the Trustee or the Issuers a current list of the Holders of the Securities as reflected in the Securities Register. The Issuer shall notify the Trustee of any Securities owned by or pledged to the Issuer or any of its Affiliates promptly upon the acquisition thereof or the creation of such pledge.

Subject to the provisions of this Section 2.6, at the option of a Holder, Securities may be exchanged for other Securities of the same Class, in any Authorized Denominations and of a like Aggregate Principal Amount, upon surrender of the Securities to be exchanged at the Corporate Trust Office of the Trustee. Whenever any Securities are so surrendered for exchange, the applicable Issuer shall execute, and the Trustee shall authenticate and deliver, the Securities that the Holder of Securities making the exchange is entitled to receive. Notwithstanding the foregoing, an interest in a Global Note may be transferred or exchanged for an interest in another Global Note or in definitive Notes only in the limited circumstances set forth in this Section or in Section 2.5(c), 2.5(d), 2.5(e) and 2.16 hereof.

No service charge shall be made for any registration of transfer or exchange of Securities or beneficial interest therein, but the Issuers, the Trustee or the Registrar may require payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with any transfer or exchange of Securities or any beneficial interest therein, other than exchanges not involving any transfer.

All Securities issued and authenticated upon any registration of transfer or exchange shall be the valid obligations of the applicable Issuers, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Securities surrendered upon such registration of transfer or exchange.

Every Security presented or surrendered for registration of transfer or exchange shall be duly endorsed or be accompanied by a written instrument of transfer or exchange substantially in the form of Exhibit D hereto in form satisfactory to the applicable Issuers and the Trustee duly executed by the Holder thereof or its attorney duly authorized in writing.

The preceding provisions of this Section 2.6 notwithstanding, the Issuers shall not be required to transfer or make exchanges, and the Registrar need not register transfers or exchanges, of Securities that are due for repayment within fifteen (15) days of submission to the Trustee for transfer or exchange.

(b) No Security may be sold or transferred (including, without limitation, by mortgage, charge, pledge or hypothecation) unless such sale or transfer is exempt from or not subject to the registration requirements of the Securities Act, would not require the registration of the Issuers under the Investment Company Act, is exempt under applicable state or foreign securities laws and is in compliance with the terms of this Indenture. No Security may be offered, sold or delivered at any time within the United States or to, or for the benefit of, U.S. Persons except in accordance with (i) Rule 144A under the Securities Act, to Persons who are

010818

both Qualified Institutional Buyers and Qualified Purchasers (or, solely in the case of Income Notes, in accordance with an exemption from registration under the Securities Act to Persons who are both Accredited Investors and Qualified Purchasers) and (ii) the provisions of this Article II. In addition, no Security or any beneficial interest therein may be offered, sold or delivered at any time within the United States or to, or for the benefit of, U.S. Persons unless such person (A) was not formed for the purpose of investing in the Securities, (B) has received the necessary consent from its beneficial owners if the purchaser is a private investment company formed before April 30, 1996, (C) is not a broker-dealer that owns and invests on a discretionary basis less than $25,000,000 in securities of unaffiliated issuers, (D) is not a partnership, common trust fund, special trust, pension, profit sharing or other retirement trust fund or plan in which the partners, beneficiaries or participants, as applicable, may designate the particular investments to be made, (E) is acquiring its Securities in a transaction that may be affected without loss of any applicable Investment Company Act exemption, (F) will provide notice to any subsequent transferee of the transfer restrictions applicable to such Securities under the Indenture or provided in the legend set forth on such Securities, (G) will hold and transfer its beneficial interest only in a principal amount of not less than the applicable Authorized Denomination and (H) will provide the Issuer from time to time such information as it may reasonably request in order to ascertain compliance with this paragraph (b). The Securities may be sold in offshore transactions to non-U.S. Persons in reliance on Regulation S under the Securities Act. None of the Issuers, the Trustee or any other Person may register the Securities under the Securities Act or any state or foreign securities laws.

(c) Upon the request of any Holder of a Security (or beneficial owner of a Security), the Issuers shall promptly furnish to such Holder (or beneficial owner of a Security) or to a prospective purchaser of any Security designated by such Holder (or beneficial owner of a Security), as the case may be, the information which the Issuers determine to be required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act ("Rule 144A Information"), in order to permit compliance by such Holder with Rule 144A in connection with the resale of such Security by such Securityholder. Upon request by the applicable Issuers, the Trustee shall cooperate with such Issuers in mailing or otherwise distributing (at the expense of the Issuers) to such Holders of the Securities (or beneficial owners of Securities) or prospective purchasers, at and pursuant to the written direction of such Issuers, the foregoing materials prepared and provided by the Issuers; provided, however, that the Trustee shall be entitled to affix thereto or enclose therewith such disclaimers as the Trustee shall deem reasonably appropriate, at its discretion (such as, for example, a disclaimer to the effect that such Rule 144A Information was assembled by the Issuers and not by the Trustee, that the Trustee has not reviewed or verified the accuracy thereof, and that it makes no representation as to the sufficiency of such information under Rule 144A or for any other purpose).

(d) The Trustee shall not be responsible for ascertaining whether any transfer complies with, or for otherwise monitoring or determining compliance with, the requirements or terms of the Securities Act, Investment Company Act, applicable state securities laws, ERISA or the Code; except that if a Transfer Letter or a Transferee Certificate or other letter or certificate is specifically required by the terms of this Section 2.6, Section 2.16 or 2.17 to be provided to the Trustee (including in its capacity as Registrar) by a transferor or prospective transferee, as applicable, the Trustee shall be under a duty to receive and examine the same to determine whether it conforms substantially on its face to the applicable requirements of such Section.

010819

(e) For so long as any of the Securities are Outstanding, the Issuer shall not issue or permit the transfer of any Ordinary Shares of the Issuer to U.S. Persons.

(f) So long as any Global Note remains Outstanding and is held by or on behalf of the Depositary, transfers of a beneficial interest in a Global Note in whole or in part, shall only be made in accordance with this Section 2.6(f).

(i) Transfer of Interest in Rule 144A Global Note for Interest in Temporary Regulation S Global Note or Regulation S Global Note. Subject to the provisions of this Section 2.6 and the Applicable Procedures, a holder of a beneficial interest in a Rule 144A Global Note may at any time transfer all or a portion of its beneficial interest in such Rule 144A Global Note to a Person who wishes to take delivery thereof in the form of an equivalent interest in a corresponding Temporary Regulation S Global Note or Regulation S Global Note of the same Class in an offshore transaction in accordance with Rule 903 or 904 of Regulation S; *provided* that the remaining principal amount of the beneficial interest of such holder in the Rule 144A Global Note shall either equal zero or be in an Authorized Denomination. Upon the receipt by the Trustee of (A) instructions given in accordance with the Applicable Procedures from a Participant directing the Registrar to credit or cause to be credited a beneficial interest in the corresponding Temporary Regulation S Global Note or Regulation S Global Note in an amount equal to the beneficial interest in such Rule 144A Global Note, in an Authorized Denomination, to be exchanged or transferred, such instructions to contain information regarding the Euroclear or Clearstream account to be credited with such increase and (B) a Transfer Letter substantially in the form of Exhibit E-1 attached hereto given by the transferor of such beneficial interest stating, among other things, that the exchange or transfer of such interest has been made in compliance with the transfer restrictions applicable to the Global Notes, including that the transferee is not a U.S. Person, and pursuant to and in accordance with Regulation S, then the Registrar shall instruct the Depositary to reduce the principal amount of such Rule 144A Global Note by the Aggregate Principal Amount of the beneficial interest in the Rule 144A Global Note to be transferred, record the transfer in the Securities Register in accordance with Section 2.5(a) and instruct the Depositary concurrently with such reduction to increase the Aggregate Principal Amount of the Temporary Regulation S Global Note or the Regulation S Global Note, as the case may be, by the Aggregate Principal Amount of the beneficial interest in the Rule 144A Global Note to be transferred, and to credit or cause to be credited to the account of the Person specified in such instructions a beneficial interest in the corresponding Temporary Regulation S Global Note or the Regulation S Global Note equal to the reduction in the Aggregate Principal Amount of the Rule 144A Global Note. In no event shall Persons hold interests in the Temporary Regulation S Notes or Regulation S Global Notes through Participants of DTC other than such Participants maintaining positions on behalf of Euroclear or Clearstream.

(ii) Transfer of Interest in Temporary Regulation S Global Note or Regulation S Global Note for Interest in Rule 144A Global Note. Subject to the provisions of this Section 2.6 and the Applicable Procedures, a holder of a beneficial interest in a Temporary Regulation S Global Note or Regulation S Global Note may

010820

transfer at any time all or a portion of its beneficial interest in such Temporary Regulation S Global Note or Regulation S Global Note in accordance with Rule 144A under the Securities Act to a Person who takes delivery thereof in the form of an interest in the corresponding Rule 144A Global Note; provided, that the remaining principal amount of such holder's beneficial interest in the Temporary Regulation S Global Note or Regulation S Global Note shall either equal zero or be in an Authorized Denomination. Upon receipt by the Trustee of (A) instructions from Euroclear, Clearstream or the Depositary, as the case may be, directing the Registrar to cause to be credited a beneficial interest in the corresponding Rule 144A Global Note in an amount equal to the beneficial interest in such Temporary Regulation S Global Note or Regulation S Global Note, but not less than an Authorized Denomination, to be exchanged or transferred, such instructions to contain information regarding the participant account with the Depositary to be credited with such increase and (B) a Transfer Letter substantially in the form of Exhibit E-2 attached hereto given by the transferor of such beneficial interest stating, among other things, that such holder reasonably believes that the proposed transferee is both (i) a Qualified Institutional Buyer and (ii) a Qualified Purchaser, then Euroclear, Clearstream or the Registrar, as the case may be, shall instruct the Depositary to reduce such Temporary Regulation S Global Note or Regulation S Global Note by the Aggregate Principal Amount of the beneficial interest in the Temporary Regulation S Global Note or Regulation S Global Note to be transferred, and the Registrar shall record the transfer in the Securities Register in accordance with Section 2.5(a) and the Registrar shall then instruct the Depositary concurrently with such reduction, to increase the Aggregate Principal Amount of the Rule 144A Global Note by the Aggregate Principal Amount of the beneficial interest in the Regulation S Global Note or Temporary Regulation S Global Note, as the case may be, to be transferred, and to credit or cause to be credited to the account of the Person specified in such instructions, a beneficial interest in the Rule 144A Global Note equal to the reduction in the Aggregate Principal Amount of the Temporary Regulation S Global Note or Regulation S Global Note.

(iii) Transfer of Interest in Rule 144A Global Note for Interest in Rule 144A Global Note. Transfers of interests in a Rule 144A Global Note to transferees maintaining a beneficial interest in such Global Note may only be made in accordance with the provisions of this Indenture, will be effected by book-entry transfer of beneficial interests effected on the records of the Depositary and may be made only to a Person whom the transferor reasonably believes is a Qualified Institutional Buyer and a Qualified Purchaser in a transaction exempt under Rule 144A from the registration requirements of the Securities Act and in accordance with any applicable securities laws of any state of the United States. Each transferee of a Rule 144A Global Note or beneficial interest therein will be deemed to have made the representations and agreements set forth in Section 2.6(g).

(iv) Transfer of Interest in Temporary Regulation S Global Note or Regulation S Global Note for Interest in Temporary Regulation S Global Note or Regulation S Global Note. Transfers of interests in a Temporary Regulation S Global Note or Regulation S Global Note to transferees maintaining a beneficial interest in such Global Note may only be made in accordance with the provisions of this Indenture, will be effected by book-entry transfer of beneficial interests within the Clearance Systems

16

(and subject to the Applicable Procedures) and may be made only to non-U.S. Persons who acquire the interests in offshore transactions in compliance with Regulation S. In no event shall Persons hold an interest in Temporary Regulation S Global Notes or Regulation S Global Notes through Participants of DTC other than such Participants maintaining positions on behalf of Euroclear or Clearstream. Each transferee of Temporary Regulation S Global Notes or Regulation S Global Notes or beneficial interest therein will be deemed to have made the representations and agreements set forth in Section 2.6(h).

(g) Each transferee of a Rule 144A Global Note or beneficial interest therein will be deemed to have represented and agreed as follows:

(i) It (A) is a Qualified Institutional Buyer and is acquiring the Notes in reliance on the exemption from Securities Act registration provided by Rule 144A thereunder, (B) is a Qualified Purchaser and (C) understands the Notes will bear the legend set forth in the Indenture and be represented by one or more Rule 144A Global Notes. In addition, it represents and warrants that it (1) was not formed for the purpose of investing in the Notes, (2) has received the necessary consent from its beneficial owners if the purchaser is a private investment company formed before April 30, 1996, (3) is not a broker-dealer that owns and invests on a discretionary basis less than $25,000,000 in securities of unaffiliated issuers, (4) is not a partnership, common trust fund, or special trust, pension, profit sharing or other retirement trust fund or plan in which the partners, beneficiaries or participants, as applicable, may designate the particular investments to be made, (5) is acquiring its Notes in a transaction that may be effected without loss of any applicable Investment Company Act exemption, (6) will provide notice to any subsequent transferee of the transfer restrictions applicable to such Notes under the Indenture or provided in such legend, (7) will hold and transfer its beneficial interest only in a principal amount of not less than the applicable Authorized Denomination, and (8) will provide the Issuer from time to time such information as it may reasonably request in order to ascertain compliance with this paragraph (i).

(ii) The Notes are being purchased or transferred in accordance with the transfer restrictions set forth in this Indenture and pursuant to an exemption from Securities Act registration, and in accordance with applicable state securities laws or securities laws of any other relevant jurisdiction. It understands that the Notes have been offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act, the Notes have not been and will not be registered under the Securities Act or any state securities laws, and, if in the future it decides to offer, resell, pledge or otherwise transfer the Notes, such Notes may be offered, resold, pledged or otherwise transferred only in accordance with an exemption from registration under such laws and pursuant to the provisions of the Indenture and the legend on such Notes. In particular, it understands that interests in the Notes may be transferred only to (a) a Qualified Purchaser that is a Qualified Institutional Buyer or (b) a person that is not a "U.S. person" as defined in Regulation S under the Securities Act. Transferees who reside in certain states or jurisdictions may be subject to additional suitability standards and/or specific holding periods before the Notes may be resold or otherwise transferred.

010822

It acknowledges that no representation is made as to the availability of any exemption under the Securities Act or any state securities laws for resale of the Notes.

(iii)    In connection with the purchase of the Notes (*provided* that no such representations in clauses (A), (B) or (C) below are made with respect to the Reference Portfolio Manager or its Affiliates by the Reference Portfolio Manager or any Affiliate of the Reference Portfolio Manager or by any account managed or advised by the Reference Portfolio Manager or any such Affiliate of the Reference Portfolio Manager: (A) it understands that none of the Issuers, the Reference Portfolio Manager, the Swap Counterparty, the Swap Guarantor, the Initial Purchaser, the Placement Agent, the Collateral Administrator or any of their respective Affiliates is acting as a fiduciary or financial or investment adviser for such beneficial owner; (B) such beneficial owner is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral) of the Issuers, the Reference Portfolio Manager, the Swap Counterparty, the Swap Guarantor, the Initial Purchaser, the Placement Agent, the Trustee, the Collateral Administrator or any of their respective Affiliates, agents and independent contractors in their capacities as such other than any statements, if any, of such person in a current offering circular for the Notes; (C) such beneficial owner has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisers to the extent it has deemed necessary and has made its own investment decisions based upon its own judgment and upon any advice from such advisers as it has deemed necessary and not upon any view expressed by the Issuers, the Reference Portfolio Manager, the Swap Counterparty, the Swap Guarantor, the Initial Purchaser, the Placement Agent, the Trustee, the Collateral Administrator or any of their respective Affiliates, agents and independent contractors in their capacities as such; (D) such beneficial owner's purchase of the Notes will comply with all applicable laws in any jurisdiction in which it resides or is located; (E) such beneficial owner is acquiring the Notes as principal solely for its own account for investment and not with a view to the resale, distribution or other disposition thereof in violation of the Securities Act; (F) such beneficial owner has made investments prior to the date hereof and was not formed solely for the purpose of investing in the Notes; (G) such beneficial owner shall not hold any Notes for the benefit of any other person, it shall at all times be the sole beneficial owner thereof for purposes of the Investment Company Act and all other purposes and it shall not sell participation interests in the Notes or enter into any other arrangement pursuant to which any other Person shall be entitled to a beneficial interest in the distributions on the Notes; (H) all Securities (together with any other securities of the Issuers) purchased and held directly or indirectly by such beneficial owner constitute in the aggregate an investment of no more than 40% of its assets or capital; and (I) it is a sophisticated investor and is purchasing the Notes with a full understanding of all of the terms, conditions and risks thereof, and it is capable of assuming and willing to assume those risks.

(iv)    On each day from the date on which such beneficial owner acquires its interest in the Notes through and including the date on which such beneficial owner disposes of its interest in such Notes, either (A) such beneficial owner is not a Plan, an entity whose underlying assets include the assets of any Plan by reason of Department of Labor regulation Section 2510.3-101 or otherwise, or a governmental plan

010823

that is subject to any federal, state or local law which is substantially similar to the provisions of Section 406 of ERISA or Section 4975 of the Code or (B) such beneficial owner's purchase, holding and disposition of such Notes (or interest therein) will not constitute or result in a prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental plan, any substantially similar federal, state or local law) for which an exemption is not available, all of the conditions of which are satisfied.

(v)     It understands that the Indenture permits the Issuer to demand that any holder of a beneficial interest in a Rule 144A Global Note who is determined not to be a Qualified Institutional Buyer and a Qualified Purchaser sell the Notes (A) to a person who is both a Qualified Institutional Buyer and a Qualified Purchaser in a transaction meeting the requirements of Rule 144A or (B) to a Person who will take delivery of the holder's interest in the Rule 144A Global Note in the form of an interest in a Temporary Regulation S Global Note or Regulation S Global Note, as applicable, and who is not a U.S. Person in a transaction meeting the requirements of Regulation S and, if such holder does not comply with such demand within 30 days thereof, the Issuer may cause such holder of the beneficial interest to sell such holder's interest in the Note on such terms as the Issuer may choose.

(vi)     It understands that in the case of any supplemental indenture to this Indenture or Swap Agreement Amendment that requires consent of one or more Holders of the Notes, this Indenture permits the Amendment Buy-Out Purchaser to purchase the beneficial interest in the Notes from any Non-consenting Holder thereof at the applicable Amendment Buy-Out Purchase Price; and such Non-consenting Holder will be required to sell its beneficial interest in this Notes to the Amendment Buy-Out Purchaser at such price.

(vii)     It understands that the maturity of the Notes is subject to an extension of four years to August 1, 2020 without consent of any holders of Securities at the option of the Swap Counterparty if certain conditions are satisfied.

(viii)     It acknowledges that it is its intent and that it understands it is the intent of the Issuer that, for purposes of U.S. federal income, state and local income and franchise tax and any other income taxes, the Issuer will be treated as a corporation, the Senior Notes will be treated as indebtedness of the Issuer, and the Income Notes will be treated as equity in the Issuer; it agrees to such treatment and agrees to take no action inconsistent with such treatment.

(ix)     It is not purchasing the Notes in order to reduce any United States federal income tax liability or pursuant to a tax avoidance plan. In the case of a transferee that is a bank (as defined in Section 881(c)(3)(a) of the Code) or an Affiliate of such a bank, the transferee (a) is acquiring the Notes as a capital markets investment and will not for any purpose treat the assets of the Issuer as loans acquired in its banking business, and (b) has not proposed or identified, and will not propose or identify, any security or loan for inclusion in the Reference Portfolio.

(x)     In the case of any transferee that is not a United States person (as defined in Section 7701(a)(30) of the Code), the transferee is not a bank (as defined in Section 881(c)(3)(a) of the Code) or an Affiliate of such a bank, unless the transferee is a person that is eligible for benefits under an income tax treaty with the United States that eliminates United States federal income taxation of United States source interest not attributable to a permanent establishment in the United States.

(xi)     It acknowledges that the Reference Portfolio Manager will act solely on behalf of the Swap Counterparty and will not act or be deemed to act on behalf of, or have any contractual relationship with, the Issuer or the Holder of Securities.

(xii)     It is aware that, except as otherwise provided in the Indenture, the Notes being sold to it will be represented by one or more Global Notes, and that beneficial interests therein may be held only through the Depositary.

(xiii)     It acknowledges that no governmental agency has passed upon the Notes or made any finding or determination as to the fairness of an investment in the Notes.

(xiv)     It acknowledges that certain persons or organizations will perform services on behalf of the Issuers and will receive fees and/or compensation for performing such services as described in the Offering Circular and Indenture.

(xv)     It acknowledges that the Notes do not represent deposits with or other liabilities or obligations of, and are not guaranteed or endorsed by, the Swap Counterparty, the Swap Guarantor, the Placement Agent, the Initial Purchaser, the Reference Portfolio Manager, the Trustee, the Collateral Administrator or any of their respective affiliates or any entity related to any of them or any other holder of Notes. It acknowledges that none of such persons will, in any way, be responsible for or stand behind the value or the performance of the Notes or the assets held by the Issuer. It acknowledges that purchase of Notes involves investment risks including possible delay in payment of distributions and loss of income and principal invested.

(xvi)     It understands that the Issuers, the Trustee, the Swap Counterparty, the Swap Guarantor, the Reference Portfolio Manager, the Initial Purchaser, the Collateral Administrator, and their respective counsel will rely upon the accuracy and truth of the foregoing representations, and it hereby consents to such reliance.

(h) Each transferee of a Temporary Regulation S Global Note or a Regulation S Global Note or a beneficial interest therein will be deemed to have made the representations set forth in Sections 2.6(g)(ii), (iii), (iv), (vi), (vii), (viii), (ix), (xi), (xii), (xiii), (xiv), and (xv), and in addition to have represented and agreed that:

(i)     It is aware that the sale of Notes to it is being made in reliance on the exemption from registration provided by Regulation S and understands that the Notes offered in reliance on Regulation S will bear the legend set forth on Exhibits A1-1, A2-1, B1-1, B2-1, C1-1 and C2-1 or A1-2, A2-2, B-2, C1-2 and C2-2 as the case may be, to this Indenture. It and each beneficial owner of its Notes is not, and will not be, a U.S. Person

010825

as defined in Regulation S under the Securities Act, and its purchase of the Notes will comply with all applicable laws in any jurisdiction in which it resides or is located. In addition, it represents and warrants that it will provide notice to any subsequent transferee of the transfer restrictions provided in such legend and in the Indenture and will provide the Issuer from time to time such information as it may reasonably request in order to ascertain compliance with this subclause (i).

(ii)     It understands that the Indenture permits the Issuer to demand that any holder of a beneficial interest in a Temporary Regulation S Global Note or Regulation S Global Note who is determined not to have acquired such beneficial interest in compliance with the requirements of Regulation S or who is a U.S Person sell such beneficial interest (A) to a Person who is not a U.S. Person in a transaction meeting the requirements of Regulation S or (B) to a Person who will take delivery of the beneficial interest of such holder in the Temporary Regulation S Global Notes or Regulation S Global Notes in the form of an interest in a Rule 144A Global Note, who is both a Qualified Institutional Buyer and a Qualified Purchaser in a transaction meeting the requirements of Rule 144A and, if the holder does not comply with such demand within 30 days thereof, the Issuer may cause the holder to sell its beneficial interest on such terms as the Issuer may choose.

(iii)     Such beneficial owner is aware that, except as otherwise provided in the Indenture, the Notes being sold to it will be represented (A) initially, by one or more Temporary Regulation S Global Notes and (B) after the Exchange Date, by one or more Regulation S Global Notes, and that beneficial interests therein may be held only through Euroclear or Clearstream.

(iv)     A holder of a beneficial interest in a Temporary Regulation S Global Note must provide Euroclear or Clearstream or the participant organization through which it holds such interest, as applicable, with a certificate certifying that the beneficial owner of the interest in the Temporary Regulation S Global Note is a non-U.S. Person, and Euroclear or Clearstream, as applicable, must provide to the Trustee a certificate to such effect, prior to (A) the payment of interest or principal with respect to the beneficial interest of such holder in the Temporary Regulation S Global Note and (B) any exchange of such beneficial interest for a beneficial interest in a Regulation S Global Note.

(v)     It understands that any resale or other transfer of beneficial interests in a Temporary Regulation S Global Note or Regulation S Global Note to U.S. Persons shall not be permitted.

(vi)     It will hold and transfer its beneficial interest in any Note only in the applicable Authorized Denomination.

(vii)     It understands that the Issuers, the Trustee, the Swap Counterparty, the Reference Portfolio Manager, the Initial Purchaser, the Placement Agent, the Collateral Administrator and their respective counsel will rely upon the accuracy and truth of the foregoing representations, and it hereby consents to such reliance.

010826

(i) Transfers and exchanges of Certificated Income Notes, in whole or in part, shall only be made in accordance with this Section 2.6(i).

(i) Each initial purchaser and, after the Closing Date, each Person that becomes a Holder of Income Notes shall be required to deliver to the Trustee a Transferee Certificate (with appropriate modifications acceptable to the Issuer and the Trustee, including in the case of a transfer that is a mortgage, charge, pledge or hypothecation) in which it shall represent, warrant and agree as set forth therein.

(ii) If a Holder of an Income Note wishes at any time to transfer such Income Note, such Holder may transfer or cause the transfer of such Income Notes represented by one or more Certificated Income Notes as provided below. Upon receipt by the Trustee of (A) such Holder's Certificated Income Note properly endorsed for assignment to the transferee, (B) a Transferee Certificate provided by the transferee of such Certificated Income Note and (C) in the case of a transfer to an Accredited Investor that is not a Qualified Institutional Buyer, if requested by the Issuer, an Opinion of Counsel addressed to the Issuer and the Trustee to the effect that such transfer may be made pursuant to an exemption from registration under the Securities Act and any applicable state securities laws, then the Trustee shall cancel such Certificated Income Note in accordance with Section 2.10, cause the Registrar to record the transfer in the Securities Register in accordance with Section 2.6(a) and upon execution by the Issuer authenticate and deliver one or more Certificated Income Notes registered in the names specified in the assignment described in clause (A) above, in principal amounts designated by the transferee (the aggregate of such principal amounts being equal to the aggregate principal of the Certificated Income Notes transferred by the transferor), and in Authorized Denominations. After giving effect to such transfer, the Trustee shall deliver Certificated Income Notes to the transferor representing the principal amount of the Income Notes represented by the cancelled Certificated Income Note(s) (prior to such transfer) that was retained by such transferor. Any purported transfer of a Certificated Income Note not in accordance with this Section 2.6(i) and Section 2.6(n) shall be null and void ab initio and shall not be given effect for any purpose hereunder.

(iii) If a Holder of one or more Certificated Income Notes wishes at any time to exchange any or all such Certificated Income Notes for one or more Certificated Income Notes representing in the aggregate the same principal amount of Income Notes as are represented by the Certificated Income Notes to be exchanged, such Holder may exchange or cause the exchange of such Certificated Income Note(s) as provided below. Upon receipt by the Trustee of (A) such Holder's Certificated Income Notes properly endorsed for such exchange and (B) written instructions from such Holder designating the number and principal amounts of the Certificated Income Notes to be issued (the aggregate of such principal amounts being equal to the aggregate principal amount of the Certificated Income Notes surrendered for exchange), then the Trustee shall cancel such Certificated Income Notes in accordance with Section 2.10, cause the Registrar to record the exchange in the Securities Register in accordance with Section 2.6(a) and upon execution by the Issuer authenticate and deliver one or more Certificated Income Notes, registered in the same names as the Certificated Income Notes surrendered by such

010827

Holder, in the principal amounts designated by such Holder, and in Authorized Denominations.

(j) The Trustee, the Registrar and the Issuers may (absent actual knowledge to the contrary) conclusively rely on, and assume the continuing accuracy of, the certifications contained in a Transfer Letter, Transferee Certificate, Class Q-1 Certificated Transfer Letter, Class Q-2A Certificated Transfer Letter or Class Q-2B Certificated Transfer Letter or other applicable letter delivered (or, if applicable, the representations set forth in Sections 2.6(g) and (h) and deemed to have made by the transferee) in connection with the purchase or transfer, as applicable, of any Securities or beneficial interests in any Securities and shall have no obligation to investigate the truth and correctness thereof or to verify that any transfer satisfies the requirements of this Section 2.6, Section 2.16(c) or Section 2.17(j), as applicable. In every instance, the Registrar shall also be entitled (but is not under a duty) to require an Opinion of Counsel from any prospective transferee to the effect that such proposed transfer is in compliance with this Section 2.6, Section 2.16(c) or Section 2.17(j), as applicable.

(k) If Securities are issued upon the transfer, exchange or replacement of Securities bearing the applicable legends set forth in the Exhibits hereto, and if a request is made to remove such applicable legend on such Securities, the Securities so issued shall bear such applicable legend, or such applicable legend shall not be removed, as the case may be, unless there is delivered to the Trustee and the Issuers such satisfactory evidence, which may include an Opinion of Counsel acceptable to them, as may be reasonably required by the Issuers (and which shall by its terms permit reliance by the Trustee), to the effect that neither such applicable legend nor the restrictions on transfer set forth therein are required to ensure that transfers thereof comply with the provisions of the Securities Act, the Investment Company Act, ERISA, the Code or other applicable law. Upon provision of such satisfactory evidence, the Trustee, at the written direction of the Issuers shall, after due execution by the Issuers, authenticate and deliver Securities that do not bear such applicable legend.

(l) So long as a Temporary Regulation S Global Note or Regulation S Global Note remains Outstanding, transfers of beneficial interests therein shall only be made in accordance with this Section 2.6. On or after the Exchange Date, interests in a Temporary Regulation S Global Note or Class Q-1 Temp Reg S Global Security may be exchanged for interests in the corresponding Regulation S Global Note or Class Q-1 Reg S Global Security, as the case may be, in the form of Exhibit A1-2, A2-2, B1-2, B2-2, C1-2, C2-2 or Q1-2 hereto, as the case may be. Any such Regulation S Global Note or Class Q-1 Reg S Global Security shall be so issued and delivered in exchange for only that portion of the Temporary Regulation S Global Note or Class Q-1 Temp Reg S Global Security, as the case may be, in respect of which there shall have been presented to the Depositary by Euroclear or Clearstream through its agent members, as the case may be, a certification to the effect that it has received from or in respect of Persons entitled to an interest (as shown by its records) therein, a certification that the beneficial interests in such Temporary Regulation S Global Note or Class Q-1 Temp Reg S Global Security, as the case may be, are owned by Persons who are non-U.S. Persons.

(m) Invalid Transfers. If a Responsible Officer of the Trustee has actual knowledge that (i) a transfer or attempted or purported transfer of any beneficial interest in any Note was consummated in violation of the provisions of this Indenture or on the basis of a

010828

materially incorrect certification from the transferor or purported transferor or transferee or purported transferee, (ii) the holder of a beneficial interest in such Note failed to deliver to the Trustee the Transfer Letter or Transferee Certificate, if applicable, required to be delivered hereunder or (iii) the holder of any beneficial interest in a Note is in material breach of any representation or agreement set forth in the Transfer Letter or Transferee Certificate, if applicable, or any deemed representation or agreement of such holder of any beneficial interest in a Note, the Trustee will not register such attempted or purported transfer. If any such transfer has been registered, such transfer shall be absolutely null and void *ab initio* and shall vest no rights in the purported transferee (such purported transferee, a "Disqualified Transferee") and the last preceding beneficial owner that was not a Disqualified Transferee shall be restored to all rights as a beneficial owner thereof retroactively to the date of purported transfer of such Note by such beneficial owner (unless any applicable provisions of the rules of the Irish Stock Exchange provide otherwise); provided, however, that this provision shall not be interpreted to confer on any of the Issuer, the Co-Issuer, the Trustee or any Paying Agent any rights against Euroclear or Clearstream to require that Euroclear or Clearstream reverse or rescind any trade completed in accordance with the rules of Euroclear or Clearstream. In furtherance of the foregoing, (a) either of the Issuers shall be entitled to demand that a transferee of a beneficial interest in the Senior Notes that (i) acquired an interest in a Rule 144A Global Note but is not a Qualified Purchaser and a Qualified Institutional Buyer, or (ii) acquired an interest in a Temporary Regulation S Global Note or a Regulation S Global Note but is determined not to have acquired such interest in compliance with Regulation S or is a U.S. Person sell such Notes to a purchaser qualified under this Indenture to purchase such beneficial interest in the Notes and if the transferee does not comply with such demand within 30 days thereof, the Issuer or the Co-Issuer, may sell or cause such transferee to sell such interest of the transferee in the Note to a permitted transferee under this Indenture on such terms as the Issuer or Co-Issuer may choose; and (b) the Issuer shall be entitled to demand that a transferee of a Certificated Income Note that (i) is not both (A) a Qualified Purchaser and (B) a Qualified Institutional Buyer or an Accredited Investor or (ii) is determined not to have acquired such Certificated Income Notes in compliance with Regulation S sell such Certificated Income Notes to a purchaser qualified under this Section 2.6 to purchase such Certificated Income Notes and if the transferee does not comply with such demand within 30 days thereof, the Issuer may sell or cause such transferee to sell such interest of the transferee in the Note to a permitted transferee under this Indenture on such terms as the Issuer may choose.

(n)     Notwithstanding anything to the contrary herein, no purchase by or proposed transfer to any person of Income Notes will be permitted, and the Trustee shall not register or permit the registration of any such purchase or transfer, if Holders of the Income Notes that have represented that they are Benefit Plan Investors would own 25% or more of the Aggregate Principal Amount of the Income Notes (excluding Income Notes in the form of the Class Q-1 Income Note Component, Income Notes represented by the Class Q-2 Collateral Asset A and Income Notes held by Controlling Persons) immediately after such purchase or transfer. Notwithstanding anything to the contrary herein, no purchase by or proposed transfer to any person of Class Q-1 Securities or Class Q-2B Securities will be permitted, if such person has represented that it is a Benefit Plan Investor, and the Trustee shall not register or permit the registration of any such purchase or transfer to a Person that has represented that it is a Benefit Plan Investor.

010829

(o)    If any Person shall become the beneficial owner of an interest in any ERISA Restricted Note who has made an ERISA-related representation required by this Indenture that is subsequently shown to be false or misleading (any such person a "Non-Permitted ERISA Holder"), the Issuer shall, promptly after discovery that such person is a Non-Permitted ERISA Holder by the Issuer or the Trustee (and notice by the Trustee or the Co-Issuer to the Issuer, if either of them makes the discovery), send notice to such Non-Permitted ERISA Holder demanding that such Non-Permitted ERISA Holder transfer all or any portion of ERISA Restricted Note held by such Person to a Person that is not a Non-Permitted ERISA Holder within 30 days of the date of such notice.  If such Non-Permitted ERISA Holder fails to so transfer such ERISA Restricted Note the Issuer shall have the right, without further notice to the Non-Permitted ERISA Holder, to sell such ERISA Restricted Note or interest in such ERISA Restricted Note to a purchaser selected by the Issuer that is not a Non-Permitted ERISA Holder on such terms as the Issuer may choose. The Holder of each ERISA Restricted Note, the Non-Permitted ERISA Holder and each other Person in the chain of title from the Holder to the Non-Permitted ERISA Holder, by its acceptance of an interest in the ERISA Restricted Notes agrees to cooperate with the Issuer and the Trustee to effect such transfers.  The proceeds of such sale, net of any commissions, expenses and taxes due in connection with such sale shall be remitted to the Non-Permitted ERISA Holder.  The terms and conditions of any sale under this subsection shall be determined in the sole discretion of the Issuer, and the Issuer shall not be liable to any Person having an interest in the ERISA Restricted Notes sold as a result of any such sale or the exercise of such discretion.

SECTION 2.7    Mutilated, Destroyed, Lost or Stolen Notes.

(a)    If (i) any mutilated Note is surrendered to the Trustee, or the Trustee receives evidence to its satisfaction of the destruction, loss or theft of any Note, and (ii) there is delivered to the Trustee and the Issuers such security or indemnity as may be reasonably required by the Trustee and the Issuers to hold the Issuers and the Trustee harmless, then, in the absence of notice to the Issuers, the Registrar or the Trustee that such Note has been acquired by a protected purchaser, the Issuers shall execute and the Trustee shall authenticate and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Note, a replacement Note of the same Class of a like Aggregate Principal Amount, registered in the same manner, dated the date of its authentication, bearing interest from the date to which interest has been paid on the mutilated, defaced, destroyed, lost or stolen Note and bearing a number not contemporaneously outstanding; provided, however, that if any such destroyed, lost or stolen Note, but not a mutilated Note, shall have become or within seven (7) days shall be due and payable, instead of issuing a replacement Note, the Issuers may pay to the Holder of such destroyed, lost or stolen Note the amount payable thereunder when so due or payable without surrender thereof.

(b) If, after the delivery of a replacement Note or payment in respect of a destroyed, lost or stolen Note pursuant to subsection (a), a protected purchaser of the original Note in lieu of which such replacement Note was issued presents for payment, transfer or exchange such original Note, the Issuers and the Trustee shall be entitled to recover such replacement Note (or such payment) from (i) any Person to which it was delivered; (ii) the Person taking such replacement Note from the Person to which such replacement Note was delivered; or (iii) any assignee of such Person, except a protected purchaser, and the Issuers and the Trustee shall be entitled to recover upon the security or indemnity provided therefor to the

010830

extent of any loss, damage, cost or expense incurred by the Issuers or the Trustee in connection therewith.

(c) In connection with the issuance of any replacement Note under this Section 2.7, the Issuers may require the payment by the Holder of such Note of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other reasonable expenses (including all fees and expenses of the Trustee) connected therewith.

(d) Any duplicate Note issued pursuant to this Section 2.7 in replacement for any mutilated, destroyed, lost or stolen Note shall constitute an original additional contractual obligation of the Issuers, whether or not the mutilated, destroyed, lost or stolen Note shall be found at any time or be enforced by any Person, and shall be entitled to all the benefits of this Indenture equally and proportionately with any and all other Notes of the applicable Class duly issued hereunder.

(e) The provisions of this Section 2.7 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Notes.

SECTION 2.8     Payments on the Notes.

(a) Each Class of Senior Notes shall accrue interest on the Aggregate Principal Amount thereof during each Periodic Interest Accrual Period at the applicable Interest Rate specified in Section 2.3. Subject to the availability of funds in the Trust Estate and to Section 8.6, payments of Periodic Interest shall be paid on each Class of Senior Notes on each Payment Date through the Maturity Date (or, if earlier, the date of redemption or repayment in full of such Class of Notes). In the event that the principal of any of the Senior Notes is not paid in full on the Maturity Date, no interest will accrue on the unpaid principal amount of any Senior Note subsequent to the Maturity Date. So long as any more senior Class of Notes is then Outstanding, any payment of interest due on Class B Notes, Class C-1 Notes or Class C-2 Notes which is not available to be paid ("Deferred Interest" with respect to such Notes) in accordance with Section 8.6 on any Payment Date shall not be considered "due and payable" hereunder (and so long as any more senior Class of Notes is then Outstanding, the failure to pay such interest shall not be an Event of Default unless the Issuer shall fail to pay in full such interest on the earlier of the Maturity Date and the date of redemption in full of the relevant Notes). Deferred Interest on any such Class of Notes shall be payable on the first Payment Date on which funds are available to be used for such purposes in accordance with Section 8.6, but in any event, no later than the earlier of the Maturity Date and such date of redemption. To the extent lawful and enforceable, interest on Deferred Interest with respect to any such Class of Notes shall accrue at the applicable Interest Rate for such Class until paid as provided herein. The Income Notes shall not accrue interest at a stated rate but on each Payment Date shall be entitled to distributions solely to the extent of available funds therefor pursuant to Section 8.6.

(b) The principal amount of the Notes of each Class shall be due and payable in accordance with Section 8.6 on the Maturity Date unless the unpaid principal of the Notes becomes due and payable at an earlier date upon a declaration of acceleration in accordance with Section 5.3, redemption in accordance with Section 2.14 or otherwise. If the unpaid principal

010831

amount of the Notes shall become due and payable upon a declaration of acceleration, the Trustee shall make payments in respect of the principal and interest of the Notes as provided in Section 5.8.

(c) The Issuers shall require any certification from Holders necessary to permit the Issuer, the Trustee or any Paying Agent (A) to make payments to the Holders or others, or to receive payments on Eligible Investments or from the Swap Counterparty or others, without, or at a reduced rate of, withholding, (B) to determine their duties and liabilities with respect to any taxes or other charges that they may be required to deduct or withhold from payments made by or on behalf of the Issuer under any present or future law, rule, regulation or interpretation of the United States or the Cayman Islands or of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirement under any such law or regulation and (C) to comply with any filing, reporting or other requirement under any present or future law, rule, regulation or interpretation of any taxing authority or any political subdivision thereof to avoid the imposition of withholding or deduction of taxes or other charges on payments received by or on behalf of the Issuer, including (i) with respect to a Holder that is a U.S. person for U.S. federal income tax purposes, either a taxpayer identification number or proof of exemption from backup withholding (which shall be deemed satisfied by the delivery of a properly completed and signed Internal Revenue Service Form W-9 (or applicable successor form)) or (ii) with respect to a Holder that is not a U.S. person for U.S. federal income tax purposes, the delivery of a properly completed and signed Internal Revenue Service Form W-8BEN or W-8IMY with appropriate attachments (or in either case the applicable successor form).

(d) Except as otherwise provided herein, payments in respect of interest on and principal of and any other amounts payable, if any, on or in respect of any Note shall be payable by wire transfer in immediately available funds to a United States dollar account maintained at a bank by the Depositary or its nominee with respect to any Global Note and to the Holder or its designee with respect to a definitive Note or a Certificated Income Note shall be payable in accordance with wiring instructions provided to the Trustee or any Paying Agent; provided, that if appropriate instructions for any such wire transfer are not received at least fifteen (15) Business Days prior to the relevant Payment Date, then such payment shall be made by check drawn on a United States bank mailed to the address of the Holder specified in the Securities Register as of the Record Date applicable to such Payment Date. Upon final payment due on the Maturity Date of a Note, the Holder thereof shall present and surrender such Note at the Corporate Trust Office or as otherwise designated by the Trustee for such purpose on or prior to such date; provided, however, that if the Issuers and the Trustee shall have been furnished such security or indemnity as may be required by them to save each of them harmless and an undertaking thereafter to surrender such Note, then, in the absence of notice to the Issuers or the Trustee that the applicable Note has been acquired by a protected purchaser, such final payment shall be made without presentation or surrender. None of the Issuers, the Trustee, any Paying Agent, the Initial Purchaser, the Placement Agent, the Swap Counterparty, the Reference Portfolio Manager or any of their respective Affiliates will have any responsibility or liability for any aspects of the records maintained by Euroclear, Clearstream, the Depositary or any of the Participants or Indirect Participants or their respective participants relating to or for payments made thereby on account of beneficial interests in a Global Note.

010832

(e) Except as otherwise provided herein, interest, principal and other amounts, if any, payable in respect of the Securities of any Class on any Payment Date or the Maturity Date or Class Q-2 Maturity Date, as applicable, shall be paid to the Holders of the Securities of such Class as of the related Record Date.

(f) Interest on the Class A-1 Notes, Class A-2 Notes, Class B Notes, the Class C-1 Notes and the Class Q-2A Securities shall be computed for each Periodic Interest Accrual Period on the basis of a 360-day year and the actual number of days in such Periodic Interest Accrual Period. Interest on the Class C-2 Notes shall be computed for each Periodic Interest Accrual Period on the basis of a 360-day year consisting of twelve 30-day months.

(g) If any Payment Date or the Maturity Date or the Class Q-2 Maturity Date, as applicable, or any other date for the payment of the principal of, or interest on, or any other amount payable on or in respect of, any Security is not a Business Day, then payment need not be made on such date, but shall be made on the next succeeding Business Day with the same force and effect as if made on the nominal date of any such Payment Date or Maturity Date or the Class Q-2 Maturity Date, as applicable, or any other date for the payment of the principal of, or interest on, or any other amount payable on or in respect of, any Security, as the case may be. In the case of the Class A-1 Notes, Class A-2 Notes, Class B Notes and Class C-1 Notes and the Class Q-2A Securities, interest shall accrue on such payment for the period from or after any such nominal date to the next succeeding Business Day and be payable on such Business Day as provided in the definitions of Periodic Interest for such Classes, and in the case of the Class C-2 Notes, no interest shall accrue on such payment for the period from and after any such nominal date to the next succeeding Business Day.

(h) Principal of, interest on and all other amounts payable on or in respect of the Notes or pursuant to this Indenture (other than amounts payable on Class Q-2 Securities, which shall be subject to the limited recourse provision in Section 2.17(i)) shall constitute limited recourse obligations of the Issuer and, in the case of the Senior Notes, non-recourse obligations of the Co-Issuer, payable solely from and to the extent of the Trust Estate, and following the liquidation of the Trust Estate and the application of the proceeds thereof as provided herein, all obligations of each of the Issuers and any claims against either of the Issuers shall be extinguished and shall not thereafter revive. Neither of the Issuers, the Swap Counterparty, the Reference Portfolio Manager, the Trustee, the Collateral Administrator, nor any of their respective agents, partners, beneficiaries, officers, directors, employees or any Affiliate of any of them or any of their respective successors or assigns shall be personally liable for any amounts payable, or performance due, under the Notes or this Indenture. It is understood that the foregoing provisions of this paragraph shall not (i) prevent recourse to the Trust Estate for the sums due or to become due under any security, instrument or agreement for which the Trust Estate is security, or (ii) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by the Notes or secured by this Indenture until all items in the Trust Estate have been liquidated and applied to the payment of the obligations, whereupon any outstanding indebtedness or obligation shall be extinguished. It is further understood that the foregoing provisions of this paragraph shall not limit the right of any Person to name the Issuers as parties defendant in any action or suit or in the exercise of any other remedy under the Notes or in this Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal

010833

liability shall be asked for or (if obtained) enforced against any such Person or entity. The provisions of this Section 2.8(h) shall survive the termination of this Indenture.

(i) For so long as any of the Securities are listed on any stock exchange, to the extent required by the rules of such stock exchange, either of the Issuers or the Trustee shall notify such stock exchange in the event that the Securities do not receive scheduled payments of principal or interest on any Payment Date or the Maturity Date.

(j) Subject to the foregoing provisions of this Section 2.8 and the provisions of Sections 2.6, 2.7, 2.16 and 2.17, as applicable, each Security delivered under this Indenture and upon registration of transfer of or in exchange for or in lieu of any other Security shall carry the rights of unpaid interest, principal and other applicable amounts that were carried by such other Security.

SECTION 2.9    Persons Deemed Owners.

Except as may be otherwise expressly agreed, prior to due presentment for registration of transfer of any Note, the Issuers and the Trustee, and any agent of the Issuers or the Trustee, shall treat the Person in whose name any Note is registered as it appears on the Securities Register (with respect to payments only, as of the applicable Record Date) as the owner of such Note for the purpose of receiving payments of principal, interest and distributions on such Note and for all other purposes whatsoever (whether or not such Note is overdue), and none of the Issuer, the Co-Issuer, the Trustee, or any agent of any of them, shall be affected by notice to the contrary. The Depositary shall be deemed the owner of the Global Notes, and owners of beneficial interests in Global Notes shall not be considered the owners of any Notes for the purpose of receiving notices.

SECTION 2.10    Cancellation of Notes.

All Notes surrendered for payment, exchange or registration of transfer shall, if surrendered to any Person other than the Trustee, be delivered to the Trustee and shall be promptly canceled by the Trustee. Either of the Issuers may at any time deliver to the Trustee for cancellation any Notes previously authenticated and delivered hereunder which the Issuer or Co-Issuer, as applicable, may have acquired in any manner whatsoever, and all Notes so delivered shall be promptly canceled by the Trustee. No Notes shall be authenticated in lieu of or in exchange for any Notes canceled as provided in this Section 2.10, except as expressly permitted by this Indenture. All canceled Notes may be held or disposed of by the Trustee in accordance with its standard retention or disposal policy as in effect at the time unless the Issuer shall direct the Trustee that they be returned to the Issuers; provided, however, that such direction is timely and the Notes have not been previously disposed of by the Trustee.

SECTION 2.11    Swap Counterparty, Reference Portfolio Manager and Initial Purchaser as Holders.

Without limiting provisions hereof relating to the purchase of any Securities in connection with an Amendment Buy-Out pursuant to Section 9.6 or a Maturity Extension pursuant to Section 2.15 of this Indenture, each of the Swap Counterparty, the Reference Portfolio Manager and the Initial Purchaser and their respective Affiliates, in its individual or

010834

any other capacity, may become an owner of the Securities (provided that such transactions are conducted on an arm's-length basis) and may otherwise deal with the Issuers or their respective Affiliates with the same rights that it would have if it were not the Swap Counterparty, the Reference Portfolio Manager, the Initial Purchaser or such an Affiliate.

SECTION 2.12    Treatment of Senior Notes.

The Issuer and each Holder of a Senior Note or beneficial owner of an interest in a Senior Note, by acquiring any Senior Note or interest therein, (i) expresses its intention that the Senior Notes be treated as evidencing indebtedness, which indebtedness is solely of the Issuer and (ii) unless otherwise required in a final determination by appropriate taxing authorities, agrees to treat the Senior Notes as indebtedness solely of the Issuer, in each case for the purpose of United States federal income taxes, state and local income and franchise taxes and any other taxes imposed upon, measured by or based upon gross or net income.

SECTION 2.13    No Gross Up.

The Issuers shall not be obligated to pay any additional amounts to the Holders or the beneficial owners of the Notes as a result of any withholding or deduction for, or on account of, any present or future taxes, duties, assessments or government charges with respect to the Notes.

SECTION 2.14    Redemption of Notes.

(a) On each Payment Date following the Ramp-up End Date for which a Coverage Test was not met as of the related Determination Date, principal payments on the Senior Notes will be made in accordance with the Priority of Payments.

(b) On each Payment Date, principal payments on the Senior Notes will be made in accordance with the Principal Priority of Payments to the extent of any Note Redemption Amounts for such Payment Date.

(c) In the event that any Rating Agency has not confirmed in writing the rating in effect on the Closing Date of any Class of Notes as of the 30th day following the Ramp-up End Date, principal payments on the Senior Notes will be made on subsequent Payment Dates in accordance with the Priority of Payments until each such rating is confirmed.

(d) If an Indenture Tax Event has occurred and is continuing, at the direction of Holders of a majority of the Aggregate Principal Amount of the Income Notes, the Issuers shall redeem (a "Tax Redemption") the Outstanding Notes on the Payment Date next following receipt of such direction (or, if such direction is received less than 45 Business Days prior to a Payment Date, on the next Payment Date thereafter) by the Trustee (the "Tax Redemption Date"), in the case of the Senior Notes at a price of par plus any accrued and unpaid interest thereon (including any Deferred Interest) to the redemption date; provided that the Swap Counterparty has consented to such redemption in its sole discretion and the Issuers have sufficient funds, after liquidation of Eligible Investments in the Trust Accounts pursuant to Section 8.3, to permit the payment of all Administrative Expenses and Subordinated Administrative Expenses and all Accrued Swap Liabilities as of the Tax Redemption Date and

010835

the repayment in full of the Aggregate Principal Amount of all Classes of Senior Notes then Outstanding and all accrued and unpaid interest (including any Deferred Interest) with respect thereto in accordance with the Priority of Payments and all other amounts ranking senior to the Income Notes payable pursuant to the Priority of Payments. The Issuer shall provide the Rating Agencies and the Investment Agreement Counterparty prior notice of any redemption pursuant to this Section 2.14(d).

(e) After the date that is five and a half years following the Closing Date, at the direction of Holders of at least 66-2/3% in Aggregate Principal Amount of the Income Notes, the Issuers shall redeem (an "Optional Redemption") the Aggregate Principal Amount of all Outstanding Notes, in the case of the Senior Notes at par plus any accrued and unpaid interest (including any Deferred Interest) thereon to the redemption date plus, in the case of the Class C-2 Notes, the applicable Make-whole Premium on the Payment Date next following receipt of such direction by the Trustee (or, if such direction is received less than 45 Business Days prior to a Payment Date, on the next Payment Date thereafter) (the "Optional Redemption Date"); provided that the Issuers shall not so redeem the Notes unless the Issuers will have sufficient funds, after liquidation of Eligible Investments in the Trust Accounts pursuant to Section 8.3, to permit the payment of all Administrative Expenses and Subordinated Administrative Expenses and all Accrued Swap Liabilities as of the Optional Redemption Date (calculated taking into account all accrued and unpaid Base Amount, Subordinate Amount and Incentive Amount for such Optional Redemption Date to the extent provided in the Swap Agreement) and the repayment in full of the Aggregate Principal Amount of all Classes of Senior Notes then Outstanding and all accrued and unpaid interest (including any Deferred Interest) and any applicable Make-whole Premium with respect thereto in accordance with the Priority of Payments. The Issuer shall provide the Rating Agencies and the Investment Agreement Counterparty prior notice of any redemption pursuant to this Section 2.14(e).

SECTION 2.15    Maturity; Extension of Maturity.

The Maturity Date for each Class of Notes and the Class Q-1 Securities is August 1, 2016, unless extended in accordance with this Section 2.15.

(a) If the Swap Termination Date is extended pursuant to the Swap Agreement, on the Extension Effective Date, the Maturity Date of the Notes and the Class Q-1 Securities shall be automatically extended for four years, to August 1, 2020, without any requirement for approval or consent of any Holders of Securities or amendment or supplement to this Indenture; provided that the Extension Conditions are satisfied (the "Maturity Extension").

(b) In the case of a Maturity Extension, any Holder of Notes or Class Q-1 Securities wishing to sell such Securities to an Extension Qualifying Purchaser pursuant to the Extension Conditions must provide the applicable Extension Sale Notice within the Extension Sale Notice Period pursuant to subsection (e) below (such Securities as to which an Extension Sale Notice has been duly given, "Extension Sale Securities"). Notwithstanding anything to the contrary herein, each Holder providing an Extension Sale Notice shall be deemed to agree that no Extension Sale Securities of any Holder shall be purchased unless all Extension Sale Securities of all Holders are purchased and settled at the applicable Extension Purchase Price on the Extension Effective Date and the other Extension Conditions are satisfied as of such date.

010836

(c) <u>Extension Conditions</u>. The Maturity Extension shall be effective only if the following conditions (the "<u>Extension Conditions</u>") are satisfied:

(i)     The purchase of all Extension Sale Securities has been settled by the designated Extension Qualifying Purchasers at the applicable Extension Purchase Price as of the Extension Effective Date;

(ii)    All such purchases of Extension Sale Securities individually and in the aggregate comply with the applicable transfer restrictions in this Indenture (including, without limitation, the restriction that such Securities may not be purchased (x) in the case of the Class Q-1 Securities by any Person that is a Benefit Plan Investor and (y) in the case of the Income Notes, if Holders of the Income Notes that have represented that they are Benefit Plan Investors would own 25% or more of the Aggregate Principal Amount of the Income Notes (excluding Income Notes in the form of the Class Q-1 Income Note Component, Income Notes represented by the Class Q-2 Collateral Asset A and Income Notes held by Controlling Persons) immediately after such purchase and the legends on such Securities and all applicable law, rules and regulations (including, without limitation, rules, regulations and procedures of any applicable securities exchange, self-regulatory organization or clearing agency); and

(iii)   (a) Rating Confirmation has been obtained from S&P (so long as any Securities are then rated by S&P) (which confirmation shall be based on S&P's applicable rating criteria and models pursuant to which the applicable Securities were rated by S&P as of the Closing Date) and (b) either (i) all Coverage Tests and clauses 17, 18 and 22 of the Reference Portfolio Criteria are satisfied as of the Extension Determination Date and the rating of each Class of Senior Notes by Moody's has not been downgraded, withdrawn or qualified from that in effect on the Closing Date (unless it subsequently has been reinstated to the rating assigned on the Closing Date) or (ii) Rating Confirmation has been obtained from Moody's (so long as any Securities are then rated by Moody's).

The Issuer, the Trustee and, by its acceptance of the Securities, each Holder of Securities agrees that the Swap Counterparty shall not be responsible for causing the Extension Conditions to be satisfied and shall not be liable to any Person or Holder of Securities (whether or not such Holder gave an Extension Sale Notice with respect to its Securities) or to any other Person if the Extension Conditions are not satisfied. Failure of the Extension Conditions to be satisfied shall not constitute a Default or Event of Default under this Indenture or a Swap Event of Default.

(d) <u>Extension Procedure</u>.

(i)     No later than three (3) Business Days following receipt by the Trustee of the notice given by the Swap Counterparty of the Swap Counterparty's election to extend the Swap Termination Date (the "<u>Extension Notice</u>"), the Trustee shall mail the Extension Notice to all Holders of Securities and each Rating Agency (so long as any rated Securities are Outstanding), in the form of <u>Exhibit N</u>, and shall request Rating Confirmation for the Maturity Extension from S&P, if applicable;

010837

(ii)     Any Holder of Securities may give irrevocable notice (an "Extension Sale Notice") within 30 days after the Trustee has mailed the Extension Notice (the "Extension Sale Notice Period") of its intention to sell its Securities to an Extension Qualifying Purchaser in the case of a Maturity Extension. Any Extension Sale Notice received by the Trustee after the Extension Sale Notice Period shall be disregarded and deemed not to have been given. No Holder of Securities that has not given such an Extension Sale Notice within the Extension Sale Notice Period shall be entitled to sell its Securities to an Extension Qualifying Purchaser in connection with the Maturity Extension; and

(iii)     If clause (iii)(b)(i) of the Extension Conditions is not satisfied as of the Extension Determination Date as determined by the Issuer (or its agent), the Trustee shall request Rating Confirmation from Moody's, if applicable.

(e) On the Extension Determination Date, the Issuer (or its agent) shall confirm (i) whether or not Extension Qualifying Purchasers for all Extension Sale Securities have been designated to purchase such Securities in compliance with all transfer restrictions in this Indenture and the legends on such Securities and all applicable laws, rules and regulations (including, without limitation, any rules, regulations and procedures of any securities exchange, self-regulatory organization or clearing agency), (ii) whether the requirements of clause (c)(iii) of the Extension Conditions are satisfied as of the Extension Determination Date and (iii) whether all other Extension Conditions can be satisfied as of the Extension Effective Date.

(f) On the Extension Effective Date, the Maturity Extension shall automatically become effective under the terms of this Indenture, provided that all Extension Conditions set forth in clause (c) above are satisfied.  No later than 2 Business Days after the Extension Effective Date, the Trustee, at the expense of the Issuers, shall mail a notice to all Holders of Securities, the Swap Counterparty, the Reference Portfolio Manager, the Investment Agreement Counterparty, each Rating Agency (so long as any rated Securities are Outstanding) and the Irish Stock Exchange (if and for so long as any Class of Securities is listed thereon) confirming whether or not the Maturity Extension became effective.  If the Maturity Extension became effective, the Issuer shall make any required notifications thereof to the  Depositary for any Securities subject to the Maturity Extension.

(g) In the case of a Maturity Extension, each Holder of Senior Notes (including in the form of the Class Q-1 Senior Note Component) other than Extension Sale Securities shall be entitled to receive an amount equal to the applicable Extension Bonus Payment. Holders of Income Notes shall not be entitled to receive any Extension Bonus Payment.

The Extension Bonus Payment on any such Class of Senior Notes shall be payable to any applicable qualifying beneficial owners who have provided the Trustee with an Extension Bonus Eligibility Certification, on the first Payment Date from and including the Extension Effective Date on which funds are available to be used for such purposes in accordance with Section 8.6, but in any event, no later than the earlier of the Maturity Date and the date of redemption of such Notes. Extension Bonus Payments which are not available to be paid on a Payment Date in accordance with Section 8.6 on a Payment Date shall not be considered "due and payable" hereunder.  The failure to pay any such Extension Bonus Payment

010838

on such date shall not be an Event of Default, unless the Issuer shall fail to pay in full such Extension Bonus Payment on the earlier of the Maturity Date and the date of redemption in full of the relevant Securities. Unpaid Extension Bonus Payments shall not accrue interest. Such amounts shall be paid to the accounts designated in the applicable Extension Bonus Eligibility Certification or, to the extent otherwise required by the rules of any applicable securities exchange or clearing agency, in a manner determined by the Issuer.

SECTION 2.16    Class Q-1 Securities.

The provisions of this Section 2.16 shall apply only to the Class Q-1 Securities and shall override any contrary or inconsistent provisions of this Indenture. Subject to the foregoing sentence, the other provisions of Article II shall apply to the Class Q-1 Securities to the same extent as the Notes.

(a)    In addition to the Classes of Notes set forth in Section 2.3, the Issuer will issue the Class Q-1 Extendable Securities (the "Class Q-1 Securities"). The maximum initial stated amount of the Class Q-1 Securities that may be executed and delivered under this Indenture is limited to U.S.$ 10,000,000. The Aggregate Principal Amounts of the Components of the Class Q-1 Securities are included in, and are not in addition to, the Aggregate Principal Amounts of the Class C-2 Notes and the Income Notes as set forth in Section 2.3.

(b)    All Class Q-1 Securities initially sold in the United States or to U.S. Persons pursuant to Rule 144A under the Securities Act will be issued and may be transferred in the form of certificates (each a "Certificated Class Q-1 Security") in definitive, physical certificates in fully registered form, registered in the name of the beneficial owner thereof or its nominee and in the form of Exhibit Q-1 Certificated hereto. All Class Q-1 Securities initially sold to non-U.S. Persons (as defined in Regulation S) in offshore transactions in reliance on Regulation S will be issued in the form of a temporary global security (the "Class Q-1 Temp Reg S Global Security") in the form of Exhibit Q-1 Temp Reg S, and on or after the Exchange Date, shall be exchangeable for interests in a permanent global security (a "Class Q-1 Reg S Global Security") in the form of Exhibit Q-1 Reg S, subject to the provisions of Sections 2.2, 2.5 and 2.6 to the same extent as other Temporary Regulation S Global Notes and Regulation S Global Notes (but subject to clause (c) below with respect to transfers of any interest therein). Class Q-1 Securities shall only be issued and held in minimum denominations (an "Authorized Class Q-1 Denomination") such that the Class Q-1 Senior Note Component and the Class Q-1 Income Note Component thereof is in an Authorized Denomination, which shall mean that the Authorized Class Q-1 Denomination shall be $1,000,000 in stated amount (consisting of $500,000 Aggregate Principal Amount of the Class Q-1 Senior Note Component and $500,000 Aggregate Principal Amount of the Class Q-1 Income Note Component).

(c)    No transfer of a Class Q-1 Security will be permitted to a person that would not be permitted to acquire the Class C-2 Notes and Income Notes comprising the Components of the Class Q-1 Security under this Indenture.

(i)    Certificated Class Q-1 Security to Certificated Class Q-1 Security. Each purchaser or transferee of a Certificated Class Q-1 Security will be required to provide to the Trustee a properly completed certificate in the form of Exhibit Q-1

010839

Certificated Transfer Letter. If a Holder of a Certificated Class Q-1 Security wishes at any time to transfer such Certificated Class Q-1 Security, such Holder may transfer or cause the transfer of such Certificated Class Q-1 Security as follows: Upon receipt by the Registrar of (A) such Holder's Certificated Class Q-1 Security properly endorsed for assignment to the transferee and (B) a properly completed certificate by the transferee in the form of Exhibit Q-1 Certificated Transfer Letter, and any other documentation as may be required thereunder, the Trustee will cancel such Certificated Class Q-1 Security in accordance with this Indenture, cause the Registrar to record the transfer in the Securities Register and, upon execution by the Issuer, deliver to the transferee one or more Certificated Class Q-1 Securities in the aggregate stated amount transferred and in the Authorized Class Q-1 Denomination. Notwithstanding anything to the contrary herein, no purchase or proposed transfer of Class Q-1 Securities will be permitted, and the Trustee shall not register or permit the registration of any such purchase or transfer, to a Person that has represented that it is a Benefit Plan Investor. Any purported transfer in violation of this provision shall be null and void *ab initio*.

(ii)    Class Q-1 Reg S Global Security to Certificated Class Q-1 Security. If a holder of a beneficial interest in Class Q-1 Securities in the form of a Class Q-1 Temp Reg S Global Security or Class Q-1 Reg S Global Security wishes at any time to transfer its interest in such Security, the transferee must take delivery thereof in the form of a Certificated Class Q-1 Security. Such Holder may, subject to the rules and procedures of the Depositary, transfer or cause the transfer of such interest for an equivalent interest in one or more such Certificated Class Q-1 Securities as described below. Upon receipt by the Registrar of (A) instructions given in accordance with the Applicable Procedures from a Participant, directing the Registrar to deliver one or more such Certificated Class Q-1 Securities, designating the registered name or names, address, payment instructions, and the number and stated amount (and Aggregate Principal Amount of the related Components) of such Certificated Class Q-1 Securities to be executed and delivered (the aggregate stated amount of such Certificated Class Q-1 Notes being equal to the aggregate stated amount of the interest in the Class Q-1 Temp Reg S Global Security or Class Q-1 Reg S Global Security to be transferred), in Authorized Class Q-1 Denominations and (B) a properly completed certificate by the transferee in the form of Exhibit Q-1 Certificated Transfer Letter, and any other documentation as may be required thereunder, then the Registrar will instruct the Depositary to reduce, or cause to be reduced, the applicable Class Q-1 Temp Reg S Global Security or Class Q-1 Reg S Global Security by the aggregate stated amount of the beneficial interest in such Class Q-1 Temp Reg S Global Security or Class Q-1 Reg S Global Security to be transferred and the Registrar shall record the transfer in the Securities Register and authenticate and deliver one or more Certificated Class Q-1 Securities registered in the names specified in the certificate described in clause (B) above in the stated amount designated by the transferee (the aggregate of such stated amount being equal to the beneficial interest in the Class Q-1 Temp Reg S Global Securities or Class Q-1 Reg S Global Securities to be transferred) and in the applicable Authorized Class Q-1 Denomination. Any purported transfer in violation of this provision shall be null and void *ab initio*.

010840

(iii)   No Transfer to Class Q-1 Reg S Global Security. Certificated Class Q-1 Securities may not be transferred or exchanged for Class Q-1 Securities in the form of Class Q-1 Temp Reg S Global Securities or Class Q-1 Reg S Global Securities.

(d)   Except as otherwise provided herein, the rights and obligations of Holders of the Class Q-1 Securities shall consist solely of the rights and obligations of Holders of the applicable Components.  References herein to the rights and obligations of the Holders of Class C-2 Notes, Class C Notes or Income Notes include the rights and obligations of the Holders of Class Q-1 Securities to the extent of the applicable Components.

(i)   On each date on which payments are made with respect to the Class C-2 Notes or Income Notes, a portion of such payment or distribution shall be allocated to the Class Q-1 Securities in the proportion that the Aggregate Principal Amount of Notes comprising the applicable Component thereof bears to the Aggregate Principal Amount of the related Class of Notes as a whole (including the related Components) and in accordance with the applicable terms and conditions hereof.  No other amounts shall be payable in respect of the Class Q-1 Securities.

(ii)   The Holders of Class Q-1 Securities will be entitled to voting rights based on the voting rights of the respective underlying Class C-2 Notes or Income Notes related to any applicable Component in the proportion that the Aggregate Principal Amount of such Class C-2 Notes or Income Notes bears to the Aggregate Principal Amount of all Class C-2 Notes or Income Notes (including such Component), as applicable.  Except as expressly provided herein, the Holders of the Class Q-1 Securities shall not be entitled to voting rights as a separate class.  Additionally, the Holders of Class Q-1 Securities shall not be entitled to direct the Trustee pursuant to this Indenture except in the capacity as Holders of Class C-2 Notes or Income Notes to the extent of their interest in any applicable Component.

(e)   A Holder of a Class Q-1 Security may exchange all or a proportionate amount of each Component for proportionate interests in the Class C-2 Notes and Income Notes, as applicable, that comprise such Components, subject to the Authorized Denominations for the Notes and the Authorized Class Q-1 Denomination and, in the manner provided in Sections 2.2, 2.5 and 2.6 hereof, in the case of the Class Q-1 Senior Note Component, for transfer of beneficial interests to a Rule 144A Global Note, Regulation S Global Note or Temporary Regulation S Global Note, and in the case of the Class Q-1 Income Note Component, for transfer of a Certificated Income Note.  The Trustee, upon surrender of a Certificated Class Q-1 Security for such an exchange, shall simultaneously convert the constituent Components into the Class C-2 Notes and Income Notes comprising such Components, as applicable, and effect such exchange. Thereafter, the Holder of the Class Q-1 Security so exchanged will be the Holder of an interest in the Class C-2 Notes and the Income Notes received upon such an exchange.  No Holder of Class C-2 Notes or Income Notes (including following such an exchange) will be entitled to exchange such Notes for a Class Q-1 Security.  No service charge shall be made for any such exchange of Class Q-1 Securities, but the Issuer or the Trustee may require payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with such exchange. Each Holder of a Class Q-1 Security, by its acceptance thereof, acknowledges that upon any such exchange, the rating of such Class Q-1 Security by any Rating Agency may not apply to the

010841

Securities received in such exchange. Upon the exchange of all outstanding Class Q-1 Securities pursuant to this provision, the Issuer will notify each Rating Agency then rating the Class Q-1 Securities.

        (f)      The Class Q-1 Nominal Rate is the rate per annum at which interest is stated to be payable on the Class Q-1 Securities solely for purposes of calculating the Class Q-1 Nominal Principal, and does not limit the entitlement of Holders of the Class Q-2 Securities to receive Class Q-1 Excess Distributions.

        Each Holder of a Class Q-1 Security, by its acquisition thereof, acknowledges that the rating of the Class Q-1 Securities by Moody's addresses solely the return of the Class Q-1 Rated Principal.

        (g)      For purposes of Section 2.12, references to "Senior Notes" shall, with respect to the Class Q-1 Securities, be deemed to refer only to the Class Q-1 Senior Note Component.

        (h)      If a Responsible Officer of the Trustee has actual knowledge that (i) a transfer or attempted or purported transfer of any interest in any Class Q-1 Security was consummated in violation of this Indenture or on the basis of a materially incorrect certification from the transferee or purported transferee, (ii) the transferee or the purported transferee failed to deliver to the Trustee the certificate in the form of <u>Exhibit Q-1 Certificated Transfer Letter</u> or other purchaser letter or certificate or any other documentation required to be delivered thereunder or hereunder or (iii) the transferee or purported transferee is in material breach of any representation or agreement set forth in the certificate in the form of <u>Exhibit Q-1 Certificated Transfer Letter</u> or other purchaser letter or certificate or in this Indenture, the Trustee will not register such attempted or purported transfer. If any such transfer has been registered, such transfer shall be absolutely null and void *ab initio* and shall vest no rights in the purported transferee (such purported transferee, a "<u>Disqualified Transferee</u>") and the last preceding owner that was not a Disqualified Transferee shall be restored to all rights as a owner thereof retroactively to the date of purported transfer of such Class Q-1 Security by such owner. In furtherance of the foregoing, the Issuer shall be entitled to demand that a transferee of a Class Q-1 Security that (i) acquired an interest in a Class Q-1 Security in reliance on Rule 144A but is not a Qualified Purchaser and a Qualified Institutional Buyer, or (ii) acquired an interest in a Class Q-1 Security in reliance on Regulation S but is determined not to have acquired such interest in compliance with Regulation S or is a U.S. Person sell such Class Q-1 Securities to a purchaser qualified under this Indenture to purchase such Class Q-1 Securities and if the transferee does not comply with such demand within 30 days thereof, the Issuer may sell or cause such transferee to sell such interest of the transferee in the Class Q-1 Security to a permitted transferee under this Indenture on such terms as the Issuer may choose.

    SECTION 2.17    <u>Class Q-2 Securities</u>.

        The provisions of this Section 2.17 shall apply only to the Class Q-2 Securities and shall override any contrary or inconsistent provisions of this Indenture. Subject to the foregoing sentence, the other provisions of Article II shall apply to the Class Q-2 Securities to the same extent as the Notes.

37

    (a) <u>Authorized Amount; Maturity Date; Denomination</u>.

    In addition to the Classes of Notes set forth in Section 2.3 and the Class Q-1 Securities set forth in Section 2.16, the Issuer will issue Class Q-2A Securities and Class Q-2B Securities (collectively, the "<u>Class Q-2 Securities</u>"). The maximum Aggregate Principal Amount of the Class Q-2A Securities and the Class Q-2B Securities that may be executed, authenticated and delivered under this Indenture is limited to U.S. $7,200,000 and U.S. $40,000,000, respectively. The maturity date for the Class Q-2 Securities (the "<u>Class Q-2 Maturity Date</u>") is April 28, 2034. The Class Q-2A Securities will be issuable and transferable in minimum denominations of U.S.$500,000 and integral multiples of U.S. $1,000 in excess thereof. The Class Q-2B Securities will be issuable and transferable in minimum denominations of U.S.$1,000,000 and integral multiples of U.S. $1,000 in excess thereof.

    (b) <u>Form of Class Q-2 Securities</u>.

    All Class Q-2 Securities shall be issued in the form of certificated securities (each a "<u>Certificated Class Q-2 Security</u>") in definitive, physical certificates in fully registered form without interest coupons with the applicable legends set forth in the form of <u>Exhibit Certificated Class Q-2A</u> and <u>Exhibit Certificated Class Q-2B</u> hereto, as appropriate, which shall be registered in the name of the beneficial owner or a nominee thereof, duly executed by the Issuer and authenticated by the Trustee as provided in Article II of this Indenture.

    (c) <u>Payments on the Class Q-2 Securities</u>.

    (i)    The Class Q-2A Securities shall accrue interest on the Aggregate Principal Amount thereof during each Periodic Interest Accrual Period at a rate equal to LIBOR plus 0.50% per annum (the "<u>Class Q-2A Interest Rate</u>"). Subject to the availability of funds in the Class Q-2 Securities Collateral Account and to clause (d) below, payments of interest shall be paid on the Class Q-2A Securities on each Payment Date through and including the Class Q-2 Maturity Date (or, if earlier, the date of redemption or repayment in full of the Class Q-2A Securities). In the event that the principal of the Class Q-2A Securities is not paid in full on the Class Q-2 Maturity Date, no interest will accrue on the unpaid principal amount thereof subsequent to the Class Q-2 Maturity Date. Any payment of interest due on Class Q-2A Securities which is not available to be paid ("<u>Class Q-2A Deferred Interest</u>") in accordance with clause (d) on any Payment Date shall not be considered "due and payable" hereunder and the failure to pay such interest shall not be a Class Q-2 Event of Default. Class Q-2A Deferred Interest shall be payable on the first Payment Date on which funds are available to be used for such purposes in accordance with clause (d) below. To the extent lawful and enforceable, interest on Class Q-2A Deferred Interest shall accrue at the applicable Class Q-2A Interest Rate until paid as provided herein.

    (ii)    The Class Q-2B Securities shall not accrue interest at a stated rate but on each Payment Date shall be entitled to distributions solely to the extent of available funds therefor pursuant to clause (d) below.

010843

(iii)     The Aggregate Principal Amount of the Class Q-2A Securities shall be due and payable in accordance with clause (d) below on the Class Q-2 Maturity Date unless paid earlier as provided pursuant to clause (d) below.

(d)     Class Q-2 Priority of Payments.

(i)     Class Q-2 Payment Date Priority of Payments. On each Payment Date, the Trustee shall distribute the Class Q-2 Payment Date Proceeds in the Class Q-2 Securities Collateral Account to make the following payments in the following order of priority (the "Class Q-2 Payment Date Priority of Payments"):

(A)     to the Holders of the Class Q-2A Securities, the Class Q-2A Interest Amount;

(B)     to the Holders of the Class Q-2A Securities, any Class Q-2A Deferred Interest;

(C)     to the Holders of the Class Q-2A Securities, the Aggregate Principal Amount of the Class Q-2A Securities; and

(D)     the remainder to the Holders of the Class Q-2B Securities (the "Net Class Q-2B Periodic Return Amount").

(ii)     Class Q-2B Target Amount.  On each Payment Date, the Trustee shall distribute from Class Q-2 Gross Proceeds other than the Class Q-2 Payment Date Proceeds to the Holder of Class Q-2B Securities the Class Q-2B Target Amount, if any, for such date.

(iii)     Class Q-2 Maturity Date Priority of Payments. On the Class Q-2 Maturity Date, the Trustee will distribute any Class Q-2 Collateral Asset B Proceeds and any other amounts on deposit in the Class Q-2 Securities Collateral Account to make the following payments in the following order of priority (the "Class Q-2 Maturity Date Priority of Payments"):

(A)     to the Holders of the Class Q-2A Securities, the Aggregate Principal Amount of the Class Q-2A Securities, any accrued and unpaid Class Q-2A Interest Amount and any Class Q-2A Deferred Interest; provided that no more than $7,200,000 shall be payable pursuant to this clause (A) from Class Q-2 Collateral Asset B Proceeds; and

(B)     the remainder to the Holders of the Class Q-2B Securities (the "Final Class Q-2B Distribution Amount").

(e) Class Q-2 Securities Collateral Account.

(i)     The Trustee shall, on or prior to the Closing Date, establish a segregated trust account in the name of the Trustee for the benefit of the Holders of Class Q-2 Securities, which shall be designated as the Valhalla CLO, Ltd. – Class Q-2

010844

Securities Collateral Account (the "Class Q-2 Securities Collateral Account"). All moneys credited from time to time to the Class Q-2 Securities Collateral Account shall be held by the Trustee as part of the Class Q-2 Securities Collateral and shall be applied for the purposes provided herein.

(ii)     On the Closing Date, the Issuer shall cause to be Delivered to the Class Q-2 Securities Collateral Account (i) the Class Q-2 Collateral Asset A and (ii) the Class Q-2 Collateral Asset B.

(iii)    Except as otherwise expressly provided in this Indenture, the Trustee shall deposit into the Class Q-2 Securities Collateral Account promptly upon receipt from time to time, all proceeds from the Class Q-2 Collateral Assets, including, without limitation, distributions on the Class Q-2 Collateral Asset A and any proceeds from the sale, redemption or maturity of all or portions of the Class Q-2 Collateral Assets.

(iv)    The Trustee shall have the right to establish such subaccounts within the Class Q-2 Securities Collateral Account as the Trustee may deem necessary or appropriate for convenience in administering the Class Q-2 Securities Collateral.

(v)     The Trustee shall invest moneys held from time to time in the Class Q-2 Securities Collateral Account in one or more Eligible Investments pursuant to the following sentence, if the Class Q-2A Securities are then Outstanding, and otherwise pursuant to the unanimous written direction of the Holders of the Class Q-2B Securities (which may be in the form of standing instructions). If the Class Q-2A Securities are then Outstanding, or if the Trustee does not receive such written directions within three days of receipt of uninvested moneys (whether by reason of a new deposit of moneys or payments in respect of, or realized upon the maturity of, existing Eligible Investments), the Trustee shall invest such moneys in the JPMorgan Fleming US Dollar Liquidity Fund 6052, provided such fund then meets the requirements of the definition of Eligible Investments, and if such fund then does not meet such requirement, an Eligible Investment that meets the requirements of clause (a) of the definition of Eligible Investments; provided further, that any Eligible Investment in the Class Q-2 Securities Collateral Account shall be required to mature on or before the Business Day prior to the next Payment Date. Each Eligible Investment (other than any Eligible Investment constituting a general intangible, a deposit account or an account) made using money credited to the Class Q-2 Securities Collateral Account shall be credited to the Class Q-2 Securities Collateral Account, and any income or other gain therefrom shall be credited to, and any loss resulting therefrom shall be charged to, the same Class Q-2 Securities Collateral Account. Any Eligible Investments constituting general intangibles, deposit accounts and accounts shall be Delivered to the Trustee. The Trustee shall not be liable by reason of any investment loss realized in connection with any Eligible Investment.

(vi)    Section 8.5 shall be applicable to the Class Q-2 Securities Collateral Account with references to a "Trust Account" thereunder being deemed to refer to the Class Q-2 Securities Collateral Account.

010845

(f)  Rights with respect to the Class Q-2 Collateral Asset A.

(i)  With respect to any matter under this Indenture as to which the Holders of Income Notes are entitled to vote or give any consent or direction, the Trustee shall follow the direction of the Holders of a majority of the Aggregate Principal Amount of the Class Q-2B Securities for purposes of voting or giving such consent or direction for the Income Notes represented by the Class Q-2 Collateral Asset A.  The Holders of Class Q-2 Securities shall not otherwise be entitled to direct the Trustee with respect to the Trust Estate pursuant to this Indenture.

(ii)  If as a result of any action pursuant to clause (i) the Holder of the Income Notes represented by the Class Q-2 Collateral Asset A would constitute a Non-consenting Holder, the Amendment Buy-Out Purchaser will be entitled to purchase the Income Notes represented by the Class Q-2 Collateral Asset A in accordance with Section 9.6 hereof, and the proceeds of such purchase shall be credited to the Class Q-2 Securities Collateral Account for distribution on the next succeeding Payment Date pursuant to subsection (d) above. The Class Q-2 Securities themselves shall not be subject to an Amendment Buy-Out pursuant to Section 9.6.

(iii)  Without limiting clause (i), in the case of the Maturity Extension, if any, pursuant to Section 2.15, the Holders of a majority of the Aggregate Principal Amount of the Class Q-2B Securities shall be entitled to direct the Trustee to provide an Extension Sale Notice with respect to the Income Notes represented by the Class Q-2 Collateral Asset A.  Any proceeds from an Extension Sale with respect to the Income Notes represented by the Class Q-2 Collateral Asset A shall be credited to the Class Q-2 Securities Collateral Account for distribution on the applicable Payment Date pursuant to subsection (d) above.

(g)  Liquidation of Class Q-2 Collateral Asset A.

If the Class Q-2A Coverage Test is not satisfied on any date of determination (as determined by the Trustee in consultation with the Swap Counterparty or an affiliate of the Swap Counterparty designated by the Swap Counterparty) following the Closing Date, at the unanimous direction of the Holders of the Class Q-2A Securities, the Issuer shall cause the Trustee to liquidate the Class Q-2 Collateral Asset A and credit the proceeds thereof to the Class Q-2 Securities Collateral Account for distribution in accordance with clause (d) above upon receipt of such proceeds as though the date of receipt thereof were a Payment Date.

(h)  Exchange of Class Q-2B Securities.

On any Business Day on and after the date on which the Class Q-2A Securities are redeemed or repaid in full, any Holder of a Class Q-2B Security may exchange all but not less than all of its Class Q-2B Securities for its applicable pro rata share of the Class Q-2 Collateral Asset A (subject to the provisions of 2.6(i)(A) regarding acquiring Income Notes in the form of a Certificated Income Note) and the Class Q-2 Collateral Asset B (subject to any restrictions on transfer with respect thereto) and any proceeds thereof in the Class Q-2 Securities Collateral Account.  The Trustee, upon surrender of a Certificated Class Q-2B Security by a

41

Holder for such an exchange, shall simultaneously convert the applicable portion of the Class Q-2 Collateral Asset A into Certificated Income Notes and transfer the applicable portion of the Class Q-2 Collateral Asset B to such Holder in accordance with standard settlement procedures for assets of that type and effect such exchange. Thereafter, the Holder of the Class Q-2B Security so exchanged will be the Holder of the Income Notes received upon such an exchange for purposes of this Indenture. No Holder of Income Notes (including following such an exchange) or CGMHI Notes will be entitled to exchange any such notes for a Class Q-2B Security. No service charge shall be made for any such exchange of Class Q-2B Securities, but the Issuer or the Trustee may require payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with such exchange.

(i)     Limited Recourse.

Principal of, interest on and all other amounts payable on or in respect of the Class Q-2 Securities shall constitute limited recourse obligations of the Issuer and be payable solely from and to the extent of the Class Q-2 Securities Collateral, and following the liquidation of the Class Q-2 Securities Collateral and the application of the proceeds thereof as provided herein, all obligations of the Issuer and any claims against the Issuer shall be extinguished and shall not thereafter revive. Neither of the Issuers, the Swap Counterparty, the Reference Portfolio Manager, the Trustee, the Collateral Administrator, nor any of their respective agents, partners, beneficiaries, officers, directors, employees or any Affiliate of any of them or any of their respective successors or assigns shall be personally liable for any amounts payable, or performance due, under the Class Q-2 Securities or this Indenture. It is understood that the foregoing provisions of this paragraph shall not (i) prevent recourse to the Class Q-2 Securities Collateral for the sums due or to become due under any security, instrument or agreement for which the Class Q-2 Securities Collateral is security, or (ii) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by the Class Q-2 Securities or secured by this Indenture until all items in the Class Q-2 Securities Collateral have been liquidated and applied to the payment of the obligations, whereupon any outstanding indebtedness or obligation shall be extinguished. It is further understood that the foregoing provisions of this paragraph shall not limit the right of any Person to name the Issuers as parties defendant in any action or suit or in the exercise of any other remedy under the Class Q-2 Securities or in this Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against any such Person or entity. The provisions of this Section 2.17(i) shall survive the termination of this Indenture.

(j)     Transfer of Class Q-2 Securities.

(i)     Each purchaser or transferee of a Certificated Class Q-2 Security will be required to provide to the Trustee a properly completed certificate in the form of Exhibit Q-2A Certificated Transferee Letter or in the form of Exhibit Q-2B Certificated Transferee Letter, as applicable. Certificated Class Q-2B Securities may only be purchased by or transferred to a Person that is not a U.S. Person in a transaction meeting the requirements of Regulation S and that is an "eligible contract participant" as defined in Section 1a(12) of the U.S. Commodity Exchange Act.

010847

(ii)     If a Holder of a Certificated Class Q-2 Security wishes at any time to transfer such Certificated Class Q-2 Security, such Holder may transfer or cause the transfer of such Certificated Class Q-2 Security as follows:  Upon receipt by the Registrar of (A) such Holder's Certificated Class Q-2 Security properly endorsed for assignment to the transferee and (B) a properly completed certificate by the transferee in the form of Exhibit Q-2A Certificated Transferee Letter or Exhibit Q-2B Certificated Transferee Letter, as applicable, and any other documentation as may be required thereunder, the Trustee will cancel such Certificated Class Q-2 Security in accordance with this Indenture, cause the Registrar to record the transfer in the Securities Register and, upon execution by the Issuer, deliver to the transferee one or more Certificated Class Q-2 Securities in the aggregate stated amount transferred and in the applicable authorized denomination.  Notwithstanding anything to the contrary herein, no purchase or proposed transfer of Class Q-2B Securities will be permitted, and the Trustee shall not register or permit the registration of any such purchase or transfer, to a Person that has represented that it is a Benefit Plan Investor.  Any purported transfer in violation of this provision shall be null and void *ab initio.*

(iii)     No transfer of a Class Q-2B Security will be permitted to a person that would not be permitted to acquire the Income Notes represented by the Class Q-2 Collateral Asset A under this Indenture.

(iv)     If a Responsible Officer of the Trustee has actual knowledge that (i) a transfer or attempted or purported transfer of any interest in any Class Q-2 Security was consummated in violation of this Indenture or on the basis of a materially incorrect certification from the transferee or purported transferee, (ii) the transferee or the purported transferee failed to deliver to the Trustee the certificate in the form of Exhibit Q-2A Certificated Transferee Letter or Exhibit Q-2B Certificated Transferee Letter, as applicable, or any other documentation required to be delivered thereunder or hereunder or (iii) the transferee or purported transferee is in material breach of any representation or agreement set forth in the certificate in the form of Exhibit Q-2 Certificated Transferee Letter or Exhibit Q-2 Certificated Transferee Letter, as applicable, or in this Indenture, the Trustee will not register such attempted or purported transfer.  If any such transfer has been registered, such transfer shall be absolutely null and void *ab initio* and shall vest no rights in the purported transferee (such purported transferee, a "Disqualified Transferee") and the last preceding owner that was not a Disqualified Transferee shall be restored to all rights as a owner thereof retroactively to the date of purported transfer of such Class Q-2 Security by such  owner.   In furtherance of the foregoing, the Issuer shall be entitled to demand that (i) a transferee of a Class Q-2A Security that acquired an interest in a Class Q-2A Security in reliance on Rule 144A but is not a Qualified Purchaser and a Qualified Institutional Buyer, or (ii) a transferee of a Class Q-2A Security or Class Q-2B Security that acquired an interest in such Class Q-2 Security in reliance on Regulation S but is determined not to have acquired such interest in compliance with Regulation S or is a U.S. Person sell such Class Q-2 Securities to a purchaser qualified under this Indenture to purchase such Class Q-2 Securities and if the transferee does not comply with such demand within 30 days thereof, the Issuer may sell or cause such transferee to sell such interest of the transferee in the Class Q-2 Security to a permitted transferee under this Indenture on such terms as the Issuer may choose.

010848

(k)     Prior to the issuance of the Class Q-2 Securities pursuant to this Indenture, the Trustee shall, in addition to the other conditions precedent set forth in this Indenture, have received:

(i)     The Grant pursuant to the granting clause hereof of all of the Issuer's right, title and interest in and to the Class Q-2 Securities Collateral securing the Class Q-2 Securities and delivery of such Class Q-2 Securities Collateral to the Trustee or its nominee, which, if any Class Q-2 Collateral is held through an intermediary shall be deemed to have occurred upon receipt of evidence satisfactory to the Trustee that on or before the Closing Date, the Issuer shall have purchased or entered into agreements to purchase such Class Q-2 Securities Collateral and that such Class Q-2 Securities Collateral has been credited by the Securities Intermediary to the Class Q-2 Securities Collateral Account.

(ii)     A certificate of an Authorized Officer of the Issuer, dated as of the Closing Date, to the effect of Section 3.2(b) with respect to each Class Q-2 Collateral Asset pledged to the Trustee for inclusion in the Class Q-2 Securities Collateral.

(l)     Section 3.3 shall be applicable to the Class Q-2 Securities Collateral (including Eligible Investments on deposit in the Class Q-2 Securities Collateral Account) and the Class Q-2 Securities Collateral Account; provided, that references to (x) Pledged Securities shall be to the Class Q-2 Securities Collateral other than the Class Q-2 Securities Collateral Account and (y) Trust Account shall be to the Class Q-2 Securities Collateral Account.

(m)     Class Q-2 Events of Default.

(i)     For the purposes of this Indenture, a "Class Q-2 Event of Default" wherever used herein, means any one of the following events (whatever the reason for such Class Q-2 Event of Default, and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(A)     a default in the payment, when due and payable, of any Periodic Interest on the Class Q-2A Securities, which default shall continue for a period of five days (provided that the failure to pay Periodic Interest on the Class Q-2A Securities because insufficient funds are available in accordance with the Class Q-2 Priority of Payments will not constitute a Class Q-2 Event of Default);

(B)     a default in the payment of principal of any Class Q-2 Security on the Maturity Date; provided that, in the case of a default in such payment due solely to an administrative error or omission by the Trustee or any Paying Agent, such default continues for a period of five days;

(C)     a failure to apply, within five days following any Payment Date or Class Q-2 Maturity Date, available amounts in accordance with Section 2.17(d) or a default in payment solely due to an administrative error or omission by the Trustee, which default continues for a period of five days;

010849

(D)     either of the Issuers or the Class Q-2 Securities Collateral becomes an investment company required to be registered under the Investment Company Act;

(E)     except as otherwise provided in this Section 2.17(m), a default in any respect in the performance, or a breach of any covenant, warranty or other agreement of the Issuers in this Indenture, or the failure of any representation or warranty of the Issuers made in this Indenture or in any certificate or other writing delivered pursuant hereto or in connection herewith to be correct in all respects when the same shall have been made, which default, breach or failure would have a material adverse effect on the Holders of the Class Q-2 Securities and continuance of such default, breach or failure for a period of 30 calendar days after written notice shall have been given to the Issuers by the Trustee or to the Issuers and the Trustee by the Class Q-2 Requisite Securityholders specifying such default, breach or failure and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder; and

(F)     an Event of Default pursuant to 5.1(h) or (i) has occurred.

(ii)     <u>Acceleration of Maturity; Rescission and Annulment</u>.

(A)     If a Class Q-2 Event of Default (other than a Class Q-2 Event of Default specified in clause (i)(D) or (F) hereof) occurs and is continuing, the Trustee shall, at the written direction of Class Q-2 Requisite Securityholders, declare the principal of and any accrued interest on the Class Q-2A Securities to be immediately due and payable, by a notice in writing to the Issuers and the Swap Counterparty, with a copy to the Rating Agencies, and the Reference Portfolio Manager.  In the absence of any such written direction, the Trustee shall take no action.  If a Class Q-2 Event of Default of the type described in clause (i)(D) or (F) occurs, the principal of and accrued interest on the Class Q-2A Securities automatically shall become immediately due and payable without any action of the Trustee or any other Person.

(B)     At any time after such a declaration of acceleration of maturity has been made and before a judgment or decree for payment of the amounts due has been obtained by the Trustee as provided in this clause (m), the Class Q-2 Requisite Securityholders, may rescind and annul such declaration and its consequences by written notice to the Trustee and the Issuers, if (a) the Issuer has paid or deposited with the Trustee a sum sufficient to pay (x) all overdue amounts payable on or in respect of the Class Q-2 Securities (other than amounts due solely as a result of the acceleration); (y) to the extent that payment of interest on such amount is lawful, interest on such overdue amounts at the Class Q-2A Interest Rate (in the case of the Class Q-2A Securities); and (z) (i) the reasonable compensation, expenses, disbursement and advances of the Trustee, its agents and counsel in connection with such Class Q-2 Event of Default and (ii) unpaid Class Q-2 Administrative Expenses, and (b) the Trustee has determined that all Class Q-2 Events of Default, other than the nonpayment of such amount that has become due solely by such acceleration, have been cured, and the Class Q-2 Requisite Securityholders by written notice to the Trustee have agreed with such determination (which agreement shall not unreasonably be withheld), or waived as provided in Section 5.15.

010850

(C)     No such rescission shall affect any subsequent Class Q-2 Event of Default or impair any rights consequent thereon.

(iii)     <u>Priority of Payment on Acceleration</u>

Upon the acceleration of the Class Q-2A Securities (whether or not the Trustee sells or liquidates the Class Q-2 Securities Collateral), the moneys in the Class Q-2 Securities Collateral Account will thereafter be applied in accordance with the Class Q-2 Priority of Payments pursuant to Section 2.17(d).

Upon the acceleration of the Class Q-2A Securities, if the Class Q-2 Securities Collateral has not been sold or liquidated, the funds in the Class Q-2 Securities Collateral Account, if any, will be applied in accordance with the Class Q-2 Priority of Payments  pursuant to Section 2.17(d) on each Payment Date.  If the Class Q-2 Securities Collateral is sold or liquidated, a final distribution will be made pursuant thereto on the first Business Day following the last day on which an item of the Class Q-2 Securities Collateral is sold or liquidated (and no interim distributions will be made on any date (including on any Payment Date) during the sale or liquidation process).

The Trustee may fix a record date and payment date for any payment to Holders of Class Q-2 Securities pursuant to this Section 2.17(m)(iii).  At least fifteen (15) days before such record date, the Trustee shall mail to each Holder of a Class Q-2 Security a notice that states the record date, the payment date and the amount to be paid.

(iv)     <u>Remedies</u>. The provision of Sections 5.4, 5.5, 5.6, 5.7, 5.9, 5.10, 5.11, 5.12, 5.13, 5.14, 5.15, 5.16, 5.17, 5.18 and 5.20 with the following modifications shall be applicable solely with respect to the Class Q-2 Securities Collateral and the Class Q-2 Securities: (A) references to (1) the Trust Estate shall be to the Class Q-2 Securities Collateral, (2) Event of Default shall be to Class Q-2 Event of Default, (3) the Collection Account shall be to cash in the Class Q-2 Securities Collateral Account; (4) Sections 5.8 and 8.6 with respect to a Class Q-2 Event of Default shall be to Section 2.17(d), (5) Secured Parties shall be to the Holders of Class Q-2 Securities, (6) Requisite Noteholders shall be to Class Q-2 Requisite Securityholders; and the most senior Class of Notes shall be to the Class Q-2A Securities so long as any Class Q-2A Securities are Outstanding and thereafter to the Class Q-2B Securities, (7) the Notes shall be to the Class Q-2 Securities, (8) Noteholders shall be to the Holders of Class Q-2 Securities, (9) the Maturity Date shall be to the Class Q-2 Maturity Date, (10) the Senior Notes shall be to the Class Q-2A Securities, (11) the Income Notes shall be to the Class Q-2B Securities and (12) the Swap Counterparty (except in Section 5.20(b)), Swap Agreement, Accrued Swap Liabilities, Swap Event of Default, Base Amount and Subordinate Amount shall be disregarded and "other Secured Party" shall be disregarded; (B) (1) the reference in Section 5.5(a)(i) to Administrative Expenses shall be to Class Q-2 Administrative Expense, (2) Section 5.5(a)(ii) shall not be applicable, and (3) Section 5.5(a)(iii) shall be replaced with "the Class Q-2 Requisite Securityholders direct the Trustee at any time following the acceleration of the Class Q-2 Securities to sell or liquidate the Class Q-2 Securities Collateral"; and (C)  the second sentence of Section 5.5(c) shall not be applicable.

46

Nothing in this provision shall affect the rights of the Holders of Notes pursuant to Article V of this Indenture. Notwithstanding anything to the contrary herein, no Holder of Class Q-2 Securities will be entitled (i) to direct the Trustee or exercise any right or remedy or bring any proceeding with respect to the Trust Estate pursuant to this Indenture other than through and solely to the extent of the rights pertaining to the Class Q-2 Collateral Asset A under this Indenture or (ii) while the Notes are Outstanding, to bring any Proceeding against the Issuer other than solely in respect of the Class Q-2 Securities Collateral. For the avoidance of doubt, so long as the Notes are Outstanding, any such Proceeding with respect to the Class Q-2 Securities Collateral shall not include any bankruptcy or similar proceedings. The costs of any Proceedings by Holders of Class Q-2 Securities and the costs, charges and expenses incurred by the Trustee in connection with any sale or liquidation of the Class Q-2 Securities Collateral pursuant to this provision shall not be payable from the Trust Estate (except to the extent included in the Class Q-2 Securities Collateral pursuant to the definition thereof).

    (n)    <u>Rights of Trustee with respect to Class Q-2 Securities Collateral</u>.

Except as provided in Section 6.1, with respect to the security interests created in the Class Q-2 Securities Collateral hereunder, the pledge of any item of property of the Class Q-2 Securities Collateral to the Trustee is to the Trustee as representative of the Holders of the Class Q-2 Securities. In furtherance of the foregoing, the possession by the Trustee of any item of property of the Class Q-2 Securities Collateral and the endorsement to or registration in the name of the Trustee of any item of property of the Class Q-2 Securities Collateral (including without limitation as entitlement holder of the Class Q-2 Securities Collateral Account) are all undertaken by the Trustee in its capacity as representative of the Holders of the Class Q-2 Securities. With respect to the security interest created in the Class Q-2 Securities Collateral hereunder, the Delivery of any part of the Class Q-2 Securities Collateral to the Trustee is to the Trustee as fiduciary of the Holders of Class Q-2 Securities; in furtherance of the foregoing, the possession by the Trustee of any part of the Class Q-2 Securities Collateral and the endorsement to or registration in the name of the Trustee of any part of the Class Q-2 Securities Collateral (including without limitation as entitlement holder of the Class Q-2 Securities Collateral Account) are all undertaken by the Trustee in its capacity as fiduciary of the Holders of the Class Q-2 Securities.

    (o)    <u>Protection of Class Q-2 Securities Collateral</u>.

The provisions of Sections 7.5, 7.6 and 7.7 shall be applicable to the Class Q-2 Securities Collateral and the rights therein of the Holders of Class Q-2 Securities with the following modifications: references to (1) the Trust Estate shall be to the Class Q-2 Securities Collateral, (2) the Trust Accounts shall be to Class Q-2 Securities Collateral Account; (3) Article VII shall be to Section 2.17(d) and Section 5.8 shall be to Section 2.17(m)(iii), (4) the Secured Parties shall be to the Holders of Class Q-2 Securities, (5) the Notes shall be to the Class Q-2 Securities, (6) the Pledged Securities shall be to the Eligible Investments credited to the Class Q-2 Securities Collateral Account and (7) the Swap Counterparty shall be disregarded.

    (p)    <u>Class Q-2 Administrative Expenses</u>.

010852

Following the redemption in full of the Notes and Class Q-1 Securities and the liquidation and distribution of the Trust Estate, if the Class Q-2B Securities are then Outstanding, the Holders of Class Q-2B Securities shall either (i) exchange such Class Q-2B Securities pursuant to subsection (h) above or (ii) enter into an arrangement with the Issuer satisfactory to the Issuer for the payment of Class Q-2 Administrative Expenses (and shall be deemed to have elected clause (i) if an arrangement pursuant to clause (ii) has not been entered into within a reasonable time of such redemption, liquidation and distribution).

ARTICLE III

CONDITIONS PRECEDENT TO THE ISSUANCE OF SECURITIES

SECTION 3.1    Conditions Precedent.

On the Closing Date, the appropriate Global Notes, Certificated Income Notes, Certificated Class Q-1 Securities, Class Q-1 Reg S Global Securities and Certificated Class Q-2 Securities shall be executed by the applicable Issuers and delivered to the Trustee for authentication on behalf of the applicable Issuers, and thereupon the same shall be authenticated and delivered by the Trustee upon receipt by the Trustee of the following:

(a) an Officer's Certificate of each of the Issuers (i) evidencing the authorization of the execution and delivery of this Indenture, the Purchase Agreement and the Senior Notes, and specifying the original Aggregate Principal Amount and applicable Interest Rate of each Class of Senior Notes to be authenticated and delivered, (ii) evidencing the authorization of the execution and delivery, in the case of the Issuer, of the Swap Agreement, the Collateral Administration Agreement, the Investment Agreement, the Income Notes (specifying the Aggregate Principal Amount thereof to be authenticated and delivered), the Class Q-1 Securities (specifying the initial stated amount to be authenticated and delivered and nominal rate thereof), the Class Q-2A Securities (specifying the original Aggregate Principal Amount to be authenticated and delivered and Class Q-2A Interest Rate) and the Class Q-2B Securities (specifying the Aggregate Principal Amount thereof to be authenticated and delivered) and (iii) certifying that (A) the attached copy of the resolutions of the board of directors of the Issuer or the Co-Issuer, as applicable, is a true and complete copy thereof, (B) such resolutions have not been rescinded and are in full force and effect on and as of the Closing Date and (C) the Authorized Officers authorized to execute and deliver such documents hold the offices and have the signatures indicated thereon;

(b) either (i) a certificate of each of the Issuer and the Co-Issuer or other official document evidencing the due authorization, approval or consent of any governmental body or bodies, at the time having jurisdiction in the premises and the approval of which is required for the valid issuance of the Securities issued by it, or to the effect that no authorization, approval or consent of any governmental body is required for the valid issuance of such Securities or (ii) an Opinion of Counsel satisfactory in form and substance to the Trustee to the effect that no such authorization, approval or consent of any governmental body is required for the valid issuance of the Securities, as appropriate;

010853

(c) opinions of Cleary, Gottlieb, Steen & Hamilton, special U.S. counsel to the Issuers, dated the Closing Date, substantially in the form of Exhibit F attached hereto;

(d) an opinion of Walkers, Cayman Islands counsel to the Issuer, dated the Closing Date, substantially in the form of Exhibit G attached hereto;

(e) an opinion of in-house counsel to the Swap Counterparty, dated the Closing Date, substantially in the form of Exhibit H attached hereto;

(f) an opinion of Gardere Wynne Sewell, counsel to the Trustee, dated the Closing Date, substantially in the form of Exhibit I hereto;

(g) an opinion of Orrick, Herrington & Sutcliffe LLP, counsel to the Reference Portfolio Manager, dated the Closing Date, substantially in the form of Exhibit J hereto;

(h) an Officer's Certificate or Certificates stating that neither of the Issuers is in Default and that the issuance of the Senior Notes and, in the case of the Issuer, the Income Notes, the Class Q-1 Securities and the Class Q-2 Securities, will not result in a breach of any of the terms, conditions or provisions of, or constitute a default under, the organizational documents and any indenture or other agreement or instrument to which the Issuer or the Co-Issuer, as applicable, is a party or by which the Issuer or the Co-Issuer, as applicable, is bound, or any order of any court or administrative agency entered in any Proceeding to which the Issuer or the Co-Issuer, as applicable, is a party or by which the Issuer or the Co-Issuer, as applicable, is bound or to which the Issuer or the Co-Issuer, as applicable, is subject; and that all conditions precedent provided in this Article III, and all conditions precedent otherwise provided in this Indenture relating to the issuance, authentication and delivery of the Notes, the Class Q-1 Securities and the Class Q-2 Securities have been complied with;

(i) a statement from the Independent Accountants in form and substance acceptable to the Issuer and the Swap Counterparty with a copy to the Trustee, the Reference Portfolio Manager and Moody's (i) confirming the information with respect to each Initial Reference Obligation set forth on Annex I to the Swap Agreement and (ii) providing calculations of each of the Reference Portfolio Criteria and of each Overcollateralization Test and specifying the procedures undertaken by them to review data and computations relating to the foregoing;

(j) fully executed counterparts of the Swap Agreement, the Swap Guarantee, the Reference Portfolio Management Agreement, the Collateral Administration Agreement, the Investment Agreement, the Investment Agreement Guaranty and the Administration Agreement;

(k) an Issuer Order to the Trustee directing it to authenticate the Notes, the Class Q-1 Securities and the Class Q-2 Securities, in the amounts set forth therein, and to register the Notes, the Class Q-1 Securities and the Class Q-2 Securities in the name(s) set forth therein or as otherwise provided therein, and to make delivery thereof to the Issuer or as it may otherwise direct therein;

(l) a letter signed by Moody's confirming that the Class A-1 Notes have been rated "Aaa" by Moody's, the Class A-2 Notes have been rated "Aa2" by Moody's, the Class B Notes have been rated "A2" by Moody's, the Class C-1 Notes and the Class C-2 Notes have been

49

010854

rated "Baa2" by Moody's, the Class Q-1 Securities have been rated "Baa2" by Moody's (subject to the limitations on such rating for the Class Q-1 Securities set forth in such letter) and that such ratings are in full force and effect on the Closing Date;

(m) a letter signed by Standard & Poor's confirming that the Class A-1 Notes have been rated "AAA" by Standard & Poor's, the Class A-2 Notes have been rated "AA" by Standard & Poor's, the Class B Notes have been rated "A" by Standard & Poor's, the Class C-1 Notes, the Class C-2 Notes have been rated "BBB" by Standard & Poor's, and that such ratings are in full force and effect on the Closing Date;

(n) evidence of the establishment of the Trust Accounts and the execution and delivery of the Account Agreement; and

(o) the delivery to the Trustee of a certificate, duly executed by an Authorized Officer of the Issuer, providing for the disposition of the proceeds of the issuance of the Notes, dated the Closing Date.

SECTION 3.2    Security for the Notes.

Prior to the issuance of the Notes pursuant to this Indenture, the Trustee shall, in addition to the other conditions precedent set forth herein, have received the following:

(a) Grant of Eligible Investments.  The Grant pursuant to the granting clause hereof of all of the Issuer's right, title and interest in and to the Eligible Investments securing the Notes and delivery of such Eligible Investments to the Trustee or its nominee, which, if any such Eligible Investments are held through an intermediary shall be deemed to have occurred upon receipt of evidence satisfactory to the Trustee that on or before the Closing Date, the Issuer shall have purchased or entered into agreements to purchase Eligible Investments having an aggregate principal balance equal to or greater than $247,500,000, and that such Eligible Investments have been credited by the Securities Intermediary to a Trust Account.

(b) Certificate of the Issuer.  A certificate of an Authorized Officer of the Issuer, dated as of the Closing Date, to the effect that, in the case of each Eligible Investment pledged to the Trustee for inclusion in the Trust Estate on the Closing Date and immediately prior to the delivery thereof on the Closing Date:

(i)    the Issuer is the owner of such Eligible Investment free and clear of any liens, claims or encumbrances of any nature whatsoever except for those which are being released on the Closing Date and except for those Granted pursuant to this Indenture;

(ii)    the Issuer has acquired its ownership in such Eligible Investment in good faith without notice of any adverse claim, except as described in paragraph (i) above;

(iii)    the Issuer has not assigned, pledged or otherwise encumbered any interest in such Eligible Investment (or, if any such interest has been assigned, pledged or

010855

otherwise encumbered, it has been released) other than interests Granted pursuant to this Indenture;

(iv)     the Issuer has full right to Grant a security interest in and assign and pledge such Eligible Investment to the Trustee;

(v)     the Eligible Investments included in the Trust Estate satisfy the requirements of the definition of Eligible Investment and of Section 3.2(a); and

(vi)     upon Grant by the Issuer, the Trustee has a first priority security interest in the Trust Estate.

SECTION 3.3     Custodianship; Delivery of Eligible Investments.

(a) Subject to the limited right to relocate Pledged Securities set forth in Section 7.5(b), the Trustee shall hold all Pledged Securities purchased in accordance with this Indenture in the relevant Trust Account established and maintained pursuant to Article VIII, as to which in each case the Trustee shall have entered into an Account Agreement, providing, *inter alia*, that the establishment and maintenance of such Trust Account will be governed by a law of a jurisdiction satisfactory to the Issuer and the Trustee and such jurisdiction will be the securities intermediary's jurisdiction for purposes of Articles 8 of the UCC and the bank's jurisdiction for purposes of Article 9 of the UCC.

(b) Each time that the Issuer shall direct or cause the acquisition of any Eligible Investment, the Issuer shall, if such Eligible Investment has not already been transferred to the relevant Trust Account, cause such Eligible Investment to be Delivered. The security interest of the Trustee in the funds or other property utilized in connection with such acquisition shall, immediately and without further action on the part of the Trustee, thereupon be released. The security interest of the Trustee shall nevertheless come into existence and continue in such Eligible Investment so acquired, including all rights of the Issuer in and to any contracts related to and proceeds of such Eligible Investment.

(c)     Notwithstanding any of the foregoing, any Delivery shall include the taking of such steps as are necessary to ensure that all payments with respect to any item of the Trust Estate shall be made directly to the Trustee for credit to a Trust Account.

SECTION 3.4     The Swap Agreement.

(a) On the Closing Date, the Issuer shall enter into the Swap Agreement with the Swap Counterparty. The Swap Agreement shall terminate, or may be terminated, in accordance with its terms, whether or not the Notes of any Class have been paid in full prior to such termination. If the Swap Agreement has been terminated early while any Class of Notes remains Outstanding, except as provided in paragraphs (b) and (c) below, the Issuer shall use its best efforts to enter into a substitute swap agreement on similar terms to the extent that the Issuer has adequate funds and is otherwise able to enter into such an agreement.

(b) If at any time the Swap Agreement becomes subject to early termination due to the occurrence of a Swap Event of Default with respect to the Swap Counterparty or a Swap

010856

Additional Termination Event with respect to which the Swap Counterparty is the affected party thereunder, the Issuer and the Trustee, upon written direction of the Requisite Noteholders, shall take such actions (following the expiration of any applicable grace period) to enforce the rights of the Issuer and the Trustee under the Swap Agreement and this Indenture as may be permitted by the terms of the Swap Agreement and consistent with the terms hereof. In such case, subject to paragraph (c) below, the Issuer shall apply the proceeds of any such actions (including, without limitation, the proceeds of the liquidation of any collateral pledged by the Swap Counterparty) to enter into a replacement swap agreement on substantially identical terms or on such other terms for which the Issuer receives Rating Confirmation (and with respect to which the Reference Portfolio Manager may, but is not obligated to, propose a replacement swap counterparty); provided that such replacement swap agreement has been approved by both (i) the Holders of a majority of the Aggregate Principal Amount of the Senior Notes (voting together as a single class), and (ii) the Holders of a majority of the Aggregate Principal Amount of the Income Notes. Any costs attributable to entering into a replacement swap agreement which exceed the amount of any termination payment received from the Swap Counterparty upon the termination of the Swap Agreement or to the extent not paid by the Swap Counterparty, shall be borne solely by the Issuer and shall constitute Administrative Expenses payable in accordance with Section 8.6. If any such termination payment received from the Swap Counterparty exceeds the costs attributable to entering into a replacement Swap Agreement, the excess amount will be deposited into the Collateral Account and applied in accordance with Section 8.6(b).

(c) Notwithstanding anything to the contrary herein, if the Swap Agreement has been terminated and the Notes have been accelerated in accordance with Section 5.3, no substitute Swap Agreement will be entered into, and any proceeds received from the Swap Counterparty upon termination of the Swap Agreement will be distributed in accordance with Section 5.8.

## ARTICLE IV

## SATISFACTION AND DISCHARGE

SECTION 4.1    Satisfaction and Discharge of Indenture.

This Indenture shall be discharged and shall cease to be of further effect (A) with respect to the obligations of the Issuers under the Securities and the Trust Estate securing the obligations of the Issuers under the Securities and (B) with respect to the obligations of the Issuer under the Class Q-2 Securities and the Class Q-2 Securities Collateral securing the obligations of the Issuer under the Class Q-2 Securities, in either case except as to (i) rights of registration of transfer and exchange of Securities, (ii) substitution or replacement of mutilated, destroyed, lost or stolen Securities, (iii) rights of the Swap Counterparty and the Holders and beneficial owners of the Securities to receive payment as provided herein (including as provided in Section 8.6), (iv) the rights, obligations and immunities of the Trustee hereunder, and the obligations of the Trustee with respect to any funds or obligations deposited with the Trustee and (v) the rights of Secured Parties as beneficiaries hereof with respect to the property deposited with the Trustee (other than the Class Q-2 Securities Collateral) and payable to all or any of them and the rights of the Holders of Class Q-2 Securities with respect to the Class Q-2 Securities Collateral; and the

010857

Trustee, on demand of and at the expense of the Issuer, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture, when:

(a) all Securities theretofore authenticated and delivered (other than (A) Securities that have been mutilated, destroyed, lost or stolen and that have been replaced or paid as provided in Section 2.7 hereof and (B) Securities for whose payment money has theretofore irrevocably been deposited in trust and thereafter repaid to the Issuer or discharged from such trust, as provided in Section 7.3(c)) have been delivered to the Trustee for cancellation;

(b) the Issuer has paid or caused to be paid all sums payable hereunder (including amounts payable pursuant to the Swap Agreement and the Collateral Administration Agreement) and no other amounts will become due and payable by the Issuers;

(c) the Issuers have delivered to the Trustee and the Swap Counterparty Officer's Certificates and an Opinion of Counsel, each stating that all conditions precedent herein provided for relating to the satisfaction and discharge of this Indenture have been complied with; and

(d) the Swap Agreement has been terminated.

Notwithstanding the satisfaction and discharge of this Indenture, the rights and obligations of the Issuers, the Trustee and, if applicable, the Holders of the Securities, as the case may be, under Articles 2 and 8 and under Sections 4.2, 5.10, 5.18, 6.1, 6.2, 6.6, 7.1, 7.3, and 11.16 shall continue.

SECTION 4.2     Application of Trust Funds.

All funds deposited with the Trustee pursuant to Section 4.1 hereof shall be held in trust by the Trustee and applied by it, in accordance with the provisions of the Securities and this Indenture, including Section 8.6 and Section 2.17(d), to the payment, either directly or through any Paying Agent as the Trustee may determine, to the Persons entitled thereto, and such funds shall be held (i) in a segregated trust account identified as being held in trust for the benefit of the Secured Parties and (ii) in a segregated trust account identified as being held in trust for the benefit of the Holders of the Class Q-2 Securities, as applicable.  Except as specifically provided herein, the Trustee shall not be responsible for payment of interest upon any funds deposited with it.

ARTICLE V

DEFAULT AND REMEDIES

SECTION 5.1     Events of Default.

For the purposes of this Indenture, "Event of Default" wherever used herein, means any one of the following events (whatever the reason for such Event of Default, and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

010858

(a) a default in the payment, when due and payable, of any Periodic Interest on any Class of Senior Notes, which default in each case shall continue for a period of five days; provided that (except on the Maturity Date and the date of redemption in full of the Class B Notes or Class C Notes), the failure to pay Periodic Interest on the Class B Notes, Class C-1 Notes or Class C-2 Notes, as the case may be, because insufficient funds are available in accordance with the Priority of Payments will not constitute an Event of Default so long as any more senior Class of Notes then remains Outstanding;

(b) a default in the payment of principal of any Senior Note (and any Make-whole Premium, if applicable) on the Maturity Date, Optional Redemption Date or Tax Redemption Date; provided that, in the case of a default in such payment due solely to an administrative error or omission by the Trustee or any Paying Agent, such default continues for a period of five days;

(c) a default in the payment of any net amounts owed by the Issuer to the Swap Counterparty under the Swap Agreement, which default shall continue for a period of two Business Days; provided that the failure to pay any amount payable to the Swap Counterparty pursuant to Section 8.6(a)(xiii) or (xv) or Section 8.6(b)(xvi) or (xvii) because insufficient funds are available in accordance with such Priority of Payments will not constitute an Event of Default, so long as any Senior Notes are then Outstanding;

(d) a failure to apply, within five days following any Payment Date or Maturity Date, Optional Redemption Date or Tax Redemption Date, available amounts in accordance with the Payment Date Priority of Payments or Principal Priority of Payments, as applicable, set forth under Section 8.6 or a default in payment solely due to an administrative error or omission by the Trustee, which default continues for a period of five days;

(e) the early termination of the Swap Agreement and the failure by the Issuer to enter into a replacement Swap Agreement within 60 days of such termination;

(f) either of the Issuers or the Trust Estate becomes an investment company required to be registered under the Investment Company Act;

(g) except as otherwise provided in this Section 5.1, a default in any respect in the performance, or a breach of any covenant, warranty or other agreement of the Issuers in this Indenture, or the failure of any representation or warranty of the Issuers made in this Indenture or in any certificate or other writing delivered pursuant hereto or in connection herewith to be correct in all respects when the same shall have been made, which default, breach or failure would have a material adverse effect on the Holders or beneficial owners of the Notes and continuance of such default, breach or failure for a period of 30 calendar days after written notice shall have been given to the Issuers and the Swap Counterparty by the Trustee or to the Issuers, the Swap Counterparty and the Trustee by the Holders of more than 25% of the Aggregate Principal Amount of the Senior Notes specifying such default, breach or failure and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder;

(h) the entry of a decree or order by a court having jurisdiction in the premises adjudging either the Issuer or the Co-Issuer as bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect

54

010859

of either the Issuer or the Co-Issuer under any applicable Bankruptcy Law, or appointing a receiver, liquidator, assignee, or sequestrator (or other similar official) of either the Issuer or the Co-Issuer or of any substantial part of their respective property, or ordering the winding up or liquidation of their affairs, and the continuance of any such decree or order unstayed and in effect for a period of 60 consecutive calendar days; or

(i) the institution by either the Issuer or the Co-Issuer of proceedings to be adjudicated as bankrupt or insolvent, or the consent by either the Issuer or the Co-Issuer to the institution of bankruptcy or insolvency proceedings against it, or the filing by either the Issuer or the Co-Issuer of a petition or answer or consent seeking reorganization or relief under any Bankruptcy Law, or the consent by either the Issuer or the Co-Issuer to the filing of any such petition or to the appointment of a receiver, liquidator, assignee, trustee or sequestrator (or other similar official) of either the Issuer or the Co-Issuer or of any substantial part of their respective property, or to the ordering of the winding up or liquidation of their affairs, or the making by either the Issuer or the Co-Issuer of an assignment for the benefit of creditors, or the admission by either the Issuer or the Co-Issuer in writing of its inability to pay its debts generally as they become due, or the taking of any action by either the Issuer or the Co-Issuer in furtherance of any such action.

SECTION 5.2    Rights of Swap Counterparty upon Event of Default.  Unless (a) the Swap Agreement has been terminated and all amounts owed to the Swap Counterparty have been paid in full, or (b) a Swap Event of Default has occurred and is continuing as to which the Swap Counterparty is the defaulting party while any Senior Notes are Outstanding, the Swap Counterparty shall have the rights set forth under Sections 5.3, 5.5 and 5.15 upon the occurrence of an Event of Default hereunder.

SECTION 5.3    Acceleration of Maturity; Rescission and Annulment.

(a) If an Event of Default (other than an Event of Default specified in Section 5.1(f), (h) or (i) hereof) occurs and is continuing, the Trustee shall, at the written direction of the Requisite Noteholders or the Swap Counterparty (unless the Swap Agreement has been terminated and all amounts owed to the Swap Counterparty thereunder have been paid in full or a Swap Event of Default as to which the Swap Counterparty is the defaulting party has occurred and is continuing while any Senior Notes are Outstanding), declare the principal of and any accrued interest on the Notes to be immediately due and payable, by a notice in writing to the Issuers and the Swap Counterparty (if the declaration was made at the direction of the Requisite Noteholders), with a copy to the Rating Agencies, the Investment Agreement Counterparty and the Reference Portfolio Manager.  In the absence of any such written direction, the Trustee shall take no action.  If an Event of Default of the type described in clause 5.1(f), (h) or (i) occurs, the principal of and accrued interest on the Notes automatically shall become immediately due and payable without any action of the Trustee or any other Person.

(b) At any time after such a declaration of acceleration of maturity has been made and before a judgment or decree for payment of the amounts due has been obtained by the Trustee as provided in this Article V, the Requisite Noteholders, with the written consent of the Swap Counterparty (unless the Swap Agreement has been terminated and all amounts owed to the Swap Counterparty thereunder have been paid in full or a Swap Event of Default as to which

010860

the Swap Counterparty is the defaulting party has occurred and is continuing while any Senior Notes are Outstanding), may rescind and annul such declaration and its consequences by written notice to the Trustee and the Issuers, if:

(i)     the Issuer has paid or deposited with the Trustee a sum sufficient to pay:

(A)     all overdue amounts payable on or in respect of the Notes (other than amounts due solely as a result of the acceleration) and the Swap Agreement;

(B)     to the extent that payment of interest on such amount is lawful, interest on such overdue amounts at the applicable Interest Rate (in the case of the Senior Notes) and the applicable default rate under the Swap Agreement (in the case of the Swap Agreement);

(C)     all unpaid Administrative Expenses and the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel; and

(ii)     the Trustee has determined that all Events of Default, other than the nonpayment of such amount that has become due solely by such acceleration, have been cured, and the Requisite Noteholders by written notice to the Trustee have agreed with such determination (which agreement shall not unreasonably be withheld), or waived as provided in Section 5.15.

(c) No such rescission shall affect any subsequent Event of Default or impair any rights consequent thereon.

SECTION 5.4     Remedies.

If an Event of Default shall have occurred and be continuing, and the Notes have been declared or have become due and payable and such declaration and its consequences have not been rescinded and annulled, or at any time on or after the Maturity Date, subject to the provisions of Section 5.5, and provided that adequate provision is made for the payment of any expenses incurred by the Trustee in accordance with Section 6.6, the Trustee shall, upon written direction by the Requisite Noteholders, do one or more of the following:

(a) institute Proceedings for the collection of all amounts then payable on the Notes or under this Indenture, whether by declaration or otherwise, enforce any judgment obtained and collect from the Trust Estate moneys adjudged due;

(b) sell all or a portion of the Trust Estate or rights of interest therein at one or more public or private sales called and conducted in any manner permitted by law and in accordance with Section 5.20;

(c) institute Proceedings from time to time for the complete or partial foreclosure of this Indenture with respect to the Trust Estate;

010861

(d) exercise any remedies of a secured party under the applicable UCC and take any other appropriate action to protect and enforce the rights and remedies of the Trustee or the Noteholders hereunder; or

(e) exercise any other rights and remedies that may be available at law or in equity.

SECTION 5.5    Retention of Trust Estate.

(a) If an Event of Default has occurred and is continuing, the Trustee shall retain the Trust Estate intact, collect and cause the collection of the proceeds thereof and make and apply all payments and deposits and maintain all amounts in respect of the Trust Estate and the Notes in accordance with the terms of this Indenture (including paying all amounts owed by the Issuer under the Swap Agreement); provided, that if the Notes have been declared or have become due and payable pursuant to Section 5.3, the Trustee shall apply any moneys in the Collection Account pursuant to Section 5.8. The Trustee shall not sell or liquidate the Trust Estate pursuant to Section 5.4 unless the Notes have been declared or have become due and payable pursuant to Section 5.3 or following the Maturity Date and one of the following conditions exists:

(i)    The Trustee determines that the anticipated net proceeds of a sale or liquidation of the Trust Estate would be sufficient to pay (a) to the appropriate Persons any accrued and unpaid Administrative Expenses, (b) to the Swap Counterparty all Accrued Swap Liabilities and (c) to the Holders of the Senior Notes the principal of and interest accrued on the Senior Notes to the date of acceleration. The Trustee shall make or cause to be made the calculation required by this paragraph promptly after the acceleration of the Notes and on each monthly anniversary thereafter. In the event that the conditions of this clause (i) are satisfied, the Trustee shall promptly effect the sale or liquidation of the Trust Estate and apply the proceeds as described in Section 5.8;

(ii)    Unless the Swap Agreement has been terminated and the Swap Counterparty has been paid in full the amount owed to it thereunder or unless a Swap Event of Default as to which the Swap Counterparty is the defaulting party has occurred and is continuing while any Senior Notes are Outstanding, the Swap Counterparty at any time following the acceleration of the Notes directs the Trustee to sell or liquidate the Trust Estate; or

(iii)    If the Swap Agreement has been terminated and the Swap Counterparty has been paid in full the amount owed to it thereunder or if a Swap Event of Default as to which the Swap Counterparty is the defaulting party has occurred and is continuing while any Senior Notes are Outstanding, the Requisite Noteholders direct the Trustee at any time following the acceleration of the Notes to sell or liquidate the Trust Estate.

For purposes of (i) and (iii), the amounts due and payable under the Swap Agreement will be calculated taking into account the amount of any accrued and unpaid Base Amount, Subordinate Amount and Incentive Amount, in each case as provided in the Swap Agreement.

(b) Nothing contained in Section 5.5(a) shall be construed to require the Trustee to preserve the Trust Estate securing the obligations of the Issuer under the Notes if prohibited by applicable law.

(c) In determining whether the condition specified in Section 5.5(a)(i) exists, the Trustee shall obtain bid prices with respect to each asset in the Trust Estate from two nationally recognized dealers at the time making a market in such assets or similar assets, specified by the Swap Counterparty in writing so long as the Swap Agreement has not been terminated and additional amounts payable to the Swap Counterparty thereunder have been paid in full and otherwise selected by the Requisite Noteholders, and shall compute the anticipated proceeds of sale or liquidation on the basis of the lower of such bid prices for each such asset. In the case of each calculation made by the Trustee pursuant to Section 5.5(a)(i), the Trustee shall obtain a letter of an independent certified public accountant of national standing confirming the accuracy of the computations of the Trustee and certifying their conformity to the requirements of this Indenture.

The Trustee shall deliver to the Noteholders (with a copy to the Swap Counterparty and the Reference Portfolio Manager) a report stating the results of any determination required pursuant to Section 5.5(a)(i) no later than ten (10) days after making such determination but in any case after such sale or liquidation.

SECTION 5.6    Trustee May File Proofs of Claim.

(a) In case there shall be pending Proceedings relative to the Issuer, the Co-Issuer or any other obligor upon the Notes under any Bankruptcy Law, or in case a receiver, assignee or trustee in bankruptcy or reorganization, liquidator, sequestrator or similar official shall have been appointed for or taken possession of the Issuer, the Co-Issuer or their respective property or such other obligor or its property, or in case of any other comparable Proceedings relative to the Issuer, the Co-Issuer or such other obligor, or in case of any voluntary dissolution, liquidation or winding up of the Issuer, the Co-Issuer or such other obligor, regardless of whether the principal of any Notes shall then be due and payable as therein expressed or by declaration or otherwise and regardless of whether the Trustee shall have made any demand pursuant to the provisions of Section 5.3, the Trustee shall be entitled and empowered to, by intervention in such Proceedings or otherwise:

(i)    file and prove a claim or claims for the whole amount of principal and interest owing and unpaid in respect of the Senior Notes and any distributions owed with respect to the Income Notes, and file such other papers or documents and take such other action, including participating as a member, voting or otherwise, of any committee of creditors, as may be necessary or advisable in order to have the claims of the Trustee (including any claim for reasonable compensation to the Trustee and each predecessor Trustee, and their respective agents, attorneys and counsel, and for reimbursement of all reasonable expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee or any Secured Party, except as a result of negligence or bad faith) and of the Secured Parties allowed in any Proceedings relative to the Issuer, the Co-Issuer or other obligor upon the Notes or to the creditors or property of the Issuer, the Co-Issuer or such other obligor;

58

010863

(ii) unless otherwise directed by the Requisite Noteholders, or prohibited by applicable law and regulations, vote on behalf of the Holders of the Notes in any election of a trustee or a standby trustee in arrangement, reorganization, liquidation or other bankruptcy or insolvency Proceedings or person performing similar functions in comparable Proceedings; and

(iii) collect and receive any moneys or other property payable to or deliverable on any such claims, and distribute in accordance with Section 5.8 all amounts received with respect to the claims of the Secured Parties and of the Trustee on their behalf; and any trustee, receiver, liquidator, custodian or other similar official is hereby authorized by each of the Holders of the Notes and the other Secured Parties to make payments to the Trustee, and, in the event that the Trustee shall consent to the making of payments directly to the Secured Parties, to pay to the Trustee such amounts as shall be sufficient to cover reasonable compensation to the Trustee, each predecessor Trustee and their respective agents and counsel, and all other reasonable expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee or any Holder of a Note or other Secured Party except as a result of negligence or bad faith of the Trustee.

(b) Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or vote for or accept or adopt on behalf of any Holder of a Note or any other Secured Party any plan of reorganization, arrangement, adjustment or compromise affecting the Notes or the rights of any Holder thereof or any other Secured Party, or to authorize the Trustee to vote in respect of the claim of any Holder of a Note or any other Secured Party in any such Proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar person or to participate as a member of any committee of creditors.

(c) In any Proceedings brought by the Trustee (and also any Proceedings involving the interpretation of any provision of this Indenture to which the Trustee shall be a party) the Trustee shall be held to represent all the Holders of the Notes and all other Secured Parties subject to the provisions of this Indenture, and it shall not be necessary to make any Holders of the Notes or any other Secured Party parties to any such Proceedings.

SECTION 5.7    Trustee May Enforce Claims Without Possession of Notes.

All rights of action and claims under this Indenture or the Notes may be prosecuted and enforced by the Trustee without the possession of any of the Notes or the production thereof in any Proceeding relating thereto, and any such Proceeding instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment shall be applied as set forth in Section 5.8 hereof.

SECTION 5.8    Priority of Payment on Acceleration.

Upon the acceleration of the Notes (whether or not the Trustee sells or liquidates the Trust Estate), the moneys in the Collection Account (and the moneys in all of the Trust Accounts, in the case of a complete liquidation of the Trust Estate) will thereafter be applied in

59

010864

the following order of priority, with each priority being fully paid prior to such proceeds being used to pay any lower priority (subject to Section 5.5):

(a) to the payment of any accrued and unpaid Administrative Expenses (in the order set forth in the definition thereof) in an amount not exceeding the Expense Cap Amount;

(b) to the Swap Counterparty, any accrued and unpaid Accrued Swap Liabilities, except any Swap Termination Payment due to the Swap Counterparty upon the early termination of the Swap Agreement as a result of a Swap Event of Default as to which the Swap Counterparty is the defaulting party or as a result of a Swap Additional Termination Event;

(c) after acceleration of the Notes but before the sale or liquidation of the Trust Estate, to the Collateral Account, to the extent required to maintain the same ratio between the Aggregate Reference Value and the sum of (i) Eligible Investments and (ii) moneys credited to the Collateral Account as the ratio in effect on the Closing Date between the Swap Notional Amount and the net proceeds realized from the sale of the Securities that were deposited into the Collateral Account;

(d) to the Holders of the Class A-1 Notes, first accrued and unpaid interest on the Class A-1 Notes to the date of acceleration and then the Aggregate Principal Amount of the Class A-1 Notes;

(e) to the Holders of the Class A-2 Notes, first accrued and unpaid interest on the Class A-2 Notes to the date of acceleration and then the Aggregate Principal Amount of the Class A-2 Notes;

(f) to the Holders of the Class B Notes, first, accrued and unpaid interest (including Deferred Interest) on the Class B Notes and then, the Aggregate Principal Amount of the Class B Notes;

(g) first, on a pro rata basis, to the Holders of the Class C-1 Notes, accrued and unpaid interest (including Deferred Interest) on the Class C-1 Notes and to the Holders of the Class C-2 Notes, accrued and unpaid interest (including Deferred Interest) on the Class C-2 Notes, to the date of acceleration and then, on a pro rata basis, to the Holders of the Class C-1 Notes, the Aggregate Principal Amount of the Class C-1 Notes and to the Holders of the Class C-2 Notes, the Aggregate Principal Amount of the Class C-2 Notes;

(h) to the Swap Counterparty, any Swap Termination Payment due to the Swap Counterparty, to the extent not paid pursuant to clause (b) above;

(i) to the payment first, of any accrued and unpaid Administrative Expenses (in the order set forth in the definition thereof) to the extent not paid pursuant to clause (a) above and then, any accrued and unpaid Subordinated Administrative Expenses;

(j) to the payment of any unpaid Extension Bonus Payments (i) first, to the applicable Holders of Class A-1 Notes, (ii) then, to the applicable Holders of Class A-2 Notes, (iii) then, to the applicable Holders of Class B Notes, and (iv) then, on a pro rata basis, to the applicable Holders of Class C-1 Notes and the applicable Holders of Class C-2 Notes; and

010865

(k) to the Holders of the Income Notes, any remaining funds.

Upon the acceleration of the Notes, if the Trust Estate has not been sold or liquidated, the funds in the Collection Account, if any, will be applied in accordance with the above priority of payments on each Payment Date. If the Trust Estate is sold or liquidated, a final distribution will be made pursuant thereto on the first Business Day following the last day on which an item of the Trust Estate is sold or liquidated (and no interim distributions will be made on any date (including on any Payment Date) during the sale or liquidation process).

The Trustee may fix a record date and payment date for any payment to Noteholders pursuant to this Section 5.8. At least fifteen (15) days before such record date, the Trustee shall mail to each Holder of a Note a notice that states the record date, the payment date and the amount to be paid.

SECTION 5.9    Limitation of Suits.

No Holder of any Note shall have any right to institute any Proceeding, judicial or otherwise, with respect to this Indenture, or to appoint a receiver or trustee, or to seek any other remedy hereunder, unless:

(a) such Holder has previously given written notice to the Trustee of a continuing Event of Default;

(b) the Holders of at least 25% of the Aggregate Principal Amount of the most senior Class of Notes then Outstanding have made written request to the Trustee to institute such Proceeding in respect of such Event of Default in its own name as Trustee hereunder;

(c) such Holder or Holders have offered to the Trustee indemnity or security reasonably satisfactory to the Trustee in form and substance against the costs, expenses and liabilities to be incurred in complying with such request;

(d) the Trustee, for 30 days after its receipt of such notice, request and offer of indemnity or security, has failed to institute such Proceedings; and

(e) if Holders of 50% or less of the Aggregate Principal Amount of the most senior Class of Notes have requested initiation of proceedings, no written direction inconsistent with such written request has been given to the Trustee during such 30-day period by the Holders of at least 25% of the Aggregate Principal Amount of the most senior Class of Notes then Outstanding;

it being understood and intended that no one or more Holders of the Notes shall have any right in any manner whatever by virtue of, or by availing itself of, any provision of this Indenture to affect, disturb or prejudice the rights of any other Holders of the same Class or to obtain or to seek to obtain priority or preference over any other such Holders of the same Class (except as otherwise contemplated by this Indenture) or to enforce any right under this Indenture, except in the manner herein provided and for the equal, ratable and common benefit of all such Holders of the same Class, and provided that any such Proceedings will be subject to the limitations on the liquidation of the Trust Estate described in Section 5.5. Subject to the provisions hereof, for the

61

010866

protection and enforcement of the provisions of this Section 5.9, each and every Holder shall be entitled to such relief as can be given either at law or in equity.

Notwithstanding any other provisions of this Indenture, if the Trustee shall receive conflicting or inconsistent requests and indemnity from two or more groups of Holders of the most senior Class of Notes then Outstanding under this Section 5.9, each representing 50% or less of the Aggregate Principal Amount of the Notes of that Class, the Trustee shall not take any action.

Notwithstanding anything to the contrary herein, no Holder of Income Notes shall be entitled to institute Proceedings or to seek any other remedy hereunder unless all of the Senior Notes have been redeemed in full and the Swap Agreement has been terminated and any amounts owed to the Swap Counterparty thereunder have been paid in full.

SECTION 5.10    Rights of Noteholders to Receive Principal and Interest.

(a) Notwithstanding any other provision in this Indenture, but subject to the provisions of Sections 2.3(b), 2.8, 5.2, 5.5, 5.8, and 8.6 hereof, the Holder of any Senior Note shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest on such Note as such principal and interest become due and payable in accordance with Sections 2.8, 5.8 and 8.6 and, subject to Sections 5.2, 5.5 and 5.9, to institute Proceedings for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder.

(b) If collections in respect of the Trust Estate are insufficient to make payments on the Notes, no other assets will be available for payment of the deficiency following realization on the Trust Estate, and the obligations of the Issuers to pay any deficiency shall be extinguished and shall not thereafter revive.

SECTION 5.11    Restoration of Rights and Remedies.

If the Trustee, any Holder of any Note or any other Secured Party has instituted any Proceeding to enforce any right or remedy under this Indenture and such Proceeding has been discontinued or abandoned for any reason or has been determined adversely to the Trustee, to such Holder of a Note or to such other Secured Party, then and in every such case the Issuer, the Co-Issuer, the Trustee, the Holders of the Notes and such other Secured Parties shall, subject to any determination in such Proceeding, be restored severally and respectively to their former positions hereunder, and thereafter all rights and remedies of the Trustee, the Holders of the Notes and such other Secured Parties shall continue as though no such Proceeding has been instituted.

SECTION 5.12    Rights and Remedies Cumulative.

No right or remedy herein conferred upon or reserved to the Swap Counterparty, the Trustee or to the Holders of the Notes is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or

010867

otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

SECTION 5.13    Delay or Omission Not a Waiver.

No delay or omission of the Swap Counterparty, the Trustee or any Holder of a Note to exercise any right or remedy accruing upon an Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein. Subject to Section 5.2, every right and remedy given by this Article V or by law to the Swap Counterparty, the Trustee or to the Holders of the Notes may be exercised from time to time, and as often as may be deemed expedient, by the Swap Counterparty, the Trustee or by the Holders of the Notes, as the case may be.

SECTION 5.14    Control by Noteholders.

Notwithstanding any other provision of this Indenture, but subject to Section 5.2 and Section 5.5, the Requisite Noteholders shall have the right (a) to cause the institution of and direct the time, method and place of conducting any Proceeding for any remedy available to the Trustee or (b) subject to Section 6.2(e), to direct the Trustee with respect to its exercise of any right, remedy, trust or power conferred on the Trustee; provided, that:

(a)  such direction shall not be in conflict with any rule of law or with any express provision of this Indenture (including without limitation, any provision hereof which expressly provides for a greater percentage of any Class of Notes or an additional Class of Notes to effect an action hereunder and any provision providing express personal protection to the Trustee or a limitation on the liability of the Issuer as set forth in Section 2.8(h) hereof); and

(b)  the Trustee may take any other action deemed proper by the Trustee that is not inconsistent with such direction; provided, however, that, subject to Section 6.1, the Trustee need not take any action that it reasonably determines might involve it in liability (unless the Trustee has received reasonably satisfactory indemnity or security against such liability as set forth herein).  During the continuance of an Event of Default that has not been cured, the Trustee shall, prior to the receipt of directions, if any, from the Swap Counterparty or Requisite Noteholders, as applicable, or any other relevant Noteholders, exercise such of the rights and powers expressly vested in it by this Indenture and use the same degree of care and skill in their exercise, with respect to such Event of Default, as is required by Section 6.1(f) hereof.

SECTION 5.15    Waiver of Past Defaults.

(a)  Prior to the declaration of the acceleration of the maturity of the Notes as provided in Section 5.3 and subject to the provisions of Section 5.2, the Requisite Noteholders and the Swap Counterparty may jointly waive any past Default or Event of Default and its consequences except a Default (or an Event of Default arising from such Default) (i) in the payment of principal of or interest on any of the Notes or (ii) in respect of a covenant or provision hereof which cannot be modified or amended without the consent of all of the affected Noteholders.  In the case of any such waiver, the Issuer, the Co-Issuer, the Trustee and the Noteholders shall be restored to their former positions and rights hereunder, respectively.

010868

(b) Upon any such waiver, such Default shall cease to exist and be deemed to have been cured and not to have occurred, and any Event of Default arising therefrom shall be deemed to have been cured and not have occurred, for every purpose of this Indenture; but no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereto. The Trustee shall promptly give written notice of any such waiver to the Swap Counterparty, the Reference Portfolio Manager, each Rating Agency and the Investment Agreement Counterparty.

SECTION 5.16    Undertaking for Costs.

All parties to this Indenture agree, and each Holder of any Note by such Holder's acceptance thereof shall be deemed to have agreed, that any court may in its discretion require, in any Proceeding for the enforcement of any right or remedy under this Indenture, or in any Proceeding against the Trustee for any action taken, suffered or omitted by it as Trustee, the filing by any party litigant in such Proceeding of an undertaking to pay the reasonable costs of such Proceeding and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such Proceeding, having due regard to the merits and good faith of the claims or defenses made by such party litigant; provided, that the provisions of this Section 5.16 shall not apply to:

(a) any Proceeding instituted by the Trustee;

(b) any Proceeding instituted by any Holder of a Note, or group of Holders of the Notes, in each case holding in the aggregate more than 10% of the Aggregate Principal Amount of the Notes; or

(c) any Proceeding instituted by any Holder of a Note for the enforcement of the payment of principal of or interest on any Note on or after the respective due dates expressed in such Note and in this Indenture.

SECTION 5.17    Waiver of Stay or Extension Laws.

Each of the Issuer and the Co-Issuer covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of or the exercise of any remedies under this Indenture. Each of the Issuer and the Co-Issuer (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it shall not hinder, delay or impede the execution of any power herein granted to the Trustee, any Noteholder or the Swap Counterparty, but shall suffer and permit the execution of every such power as though no such law had been enacted.

SECTION 5.18    Action on Notes.

The Trustee's right to seek and recover judgment on the Notes or under this Indenture shall not be affected by the seeking, obtaining or application of any other relief under or with respect to this Indenture. Neither the lien of this Indenture nor any rights or remedies of the Trustee, the Holders of the Notes or any other Secured Party shall be impaired by the

010869

recovery of any judgment by the Trustee against the Issuer, the Co-Issuer or the Swap Counterparty or by the levy of any execution under such judgment upon any portion of the assets of the Issuer, the Co-Issuer or the Swap Counterparty.

SECTION 5.19    Performance and Enforcement of Certain Obligations.

(a) Promptly following a request from the Trustee to do so, the Issuer agrees to take all such lawful action as the Trustee may request to compel or secure the performance and observance by the Swap Counterparty or Swap Guarantor of its obligations to the Issuer under or in connection with the Swap Agreement or Swap Guarantee, as applicable, in accordance with the terms thereof, and to exercise any and all rights, remedies, powers and privileges lawfully available to the Issuer under or in connection with the Swap Agreement or the Swap Guarantee to the extent and in the manner directed by the Trustee, including the transmission of notices of default on the part of the Swap Counterparty or Swap Guarantor thereunder, and the institution of Proceedings to compel or secure performance by the Swap Counterparty of its obligations under the Swap Agreement or Swap Guarantor, as applicable.

(b) If an Event of Default has occurred and is continuing, the Trustee may, and, at the direction (which direction shall be in writing) of the Holders of a majority of the Aggregate Principal Amount of the Senior Notes, voting together, shall, subject to the right of the Trustee to receive indemnity or security in accordance with Section 6.2(e) or otherwise hereunder against costs, expenses and liabilities in form and substance reasonably satisfactory to the Trustee and subject to Section 5.14, exercise all rights, remedies, powers, privileges and claims of the Issuer against the Swap Counterparty and the Swap Guarantor, under or in connection with the Swap Agreement or Swap Guarantee, as applicable, including the right or power to take any action to compel or secure performance or observance by the Swap Counterparty and the Swap Guarantor of its obligations to the Issuer (or to the Trustee) thereunder and to give any consent, request, notice, direction, approval, extension or waiver under the Swap Agreement or Swap Guarantee, as applicable, and any right of the Issuer to take such action shall be suspended.

SECTION 5.20    Sale of Trust Estate.

(a) In effecting any sale or liquidation of the Trust Estate pursuant to Section 5.4 or 5.5 (a "Sale"), the Trustee may retain an independent investment banking firm of national reputation to assist it in effecting such sale or liquidation. The power to effect any Sale of any portion of the Trust Estate pursuant to Section 5.4 and Section 5.5 hereof shall not be exhausted by any one or more Sales as to any portion of such Trust Estate remaining unsold, but shall continue unimpaired until the entire Trust Estate shall have been sold or all amounts payable on the Notes under this Indenture with respect thereto shall have been paid. The Trustee may, upon giving notice on behalf of the Issuer to the Holders of the Notes and the Swap Counterparty, and shall, upon written direction of the Requisite Noteholders (or the Swap Counterparty, if the sale was directed by the Swap Counterparty pursuant to Section 5.5(a)(ii)) from time to time, postpone any Sale by public announcement made at the time of and place of such Sale. The Trustee hereby expressly waives its right to any amount fixed by law as compensation for any Sale; provided, that the Trustee shall be authorized to deduct the reasonable costs, charges and expenses incurred by it (including any fees and expenses incurred in obtaining a letter under Section 5.5(c) hereof) in connection with any Sale from the proceeds thereof notwithstanding the

65

010870

provisions of Section 6.6 hereof, but without duplication of amounts payable as Administrative Expenses.

(b) The Trustee, the Swap Counterparty and the Reference Portfolio Manager and their respective Affiliates may bid for and acquire for cash any portion of the Trust Estate in connection with a Sale thereof to the extent not prohibited by applicable law, and may pay all or part of the purchase price by crediting against amounts owing on any Notes it holds or other amounts owed to it and secured by this Indenture, to the extent such amounts would have been owing on such obligations in accordance with Section 5.8 or Section 8.6, all or part of the net proceeds of such Sale after deducting the reasonable costs, charges and expenses incurred by the Trustee in connection with such Sale (including any fees and expenses incurred in obtaining a letter under Section 5.5(c) hereof). The Notes need not be produced in order to complete any such Sale, or in order for the net proceeds of such Sale to be credited against amounts owing on the Notes. The Trustee may hold, lease, operate, manage or otherwise deal with any property so acquired in any manner permitted by law in accordance with this Indenture.

(c) If any portion of the Trust Estate consists of securities issued without registration under the Securities Act ("Unregistered Securities"), the Trustee may seek an Opinion of Counsel, or, if no such Opinion of Counsel can be obtained and with the written consent of the Requisite Noteholders and the Swap Counterparty, seek a no-action position from the Securities and Exchange Commission or any other relevant federal or state regulatory authorities, regarding the legality of a public or private sale of such Unregistered Securities, the cost of which in each case shall be reimbursable to the Trustee in accordance with the terms of this Indenture.

(d) The Trustee shall execute and deliver an appropriate instrument of conveyance transferring its interest in any portion of the Trust Estate in connection with a Sale thereof. In addition, the Trustee is hereby irrevocably appointed the agent and attorney-in-fact of the Issuer to transfer and convey its interest in any portion of the Trust Estate in connection with a Sale thereof and to take all action necessary to effect such Sale. No purchaser or transferee at such a Sale shall be bound to ascertain the authority of the Trustee, inquire into the satisfaction of any conditions precedent or see to the application of any moneys.

ARTICLE VI

THE TRUSTEE

SECTION 6.1     Duties of Trustee.

(a) Subject to Section 6.1(f) below, the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture and no implied covenants or obligations shall be read into this Indenture against the Trustee.

(b) Subject to Section 6.1(f) below, in the absence of bad faith, willful misconduct, negligence or reckless disregard of obligations on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed

010871

therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; provided, however, that in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the certificates and opinions to determine whether or not they conform on their face to the requirements of this Indenture, and shall promptly, but in any event within three (3) Business Days in the case of a certificate delivered by the Swap Counterparty, notify the party delivering the same if such certificate or opinion does not so conform. If a corrected certificate or opinion shall not have been delivered to the Trustee within 15 days after such notice from the Trustee, the Trustee shall so notify the Holders of the Notes.

(c) No provision of this Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act or its own willful misconduct, except that:

(i) this Section 6.1(c) does not limit the effect of Section 6.1(a) or (b);

(ii) the Trustee shall not be liable for an error of judgment made in good faith by a Responsible Officer unless the Trustee was negligent in ascertaining the pertinent facts; and

(iii) the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with the direction of the Issuer, the Co-Issuer, the Requisite Noteholders (or Holders with such larger percentage, or other Class, as may be required by the terms hereof) or the Swap Counterparty pursuant to this Indenture or the Swap Agreement (or the Reference Portfolio Manager on behalf of the Swap Counterparty pursuant to the Swap Agreement), or in exercising any trust or power conferred upon the Trustee under this Indenture.

(d) No provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers, if it shall have reasonable grounds to believe that repayment of such funds or adequate indemnity or security against such risk or liability is not reasonably assured to it unless such risk or liability relates to the performance of its ordinary services, including under Article 5, under this Indenture. Anything in this Indenture to the contrary notwithstanding, in no event shall the Trustee be liable under this Indenture for special, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(e) The Trustee shall not be liable for interest on any money received by it.

(f) In case an Event of Default or Class Q-2 Event of Default known to a Responsible Officer of the Trustee has occurred and is continuing, the Trustee shall, prior to the receipt of written directions, if any, in the case of an Event of Default, from the Swap Counterparty or the Requisite Noteholders and in the case of a Class Q-2 Event of Default, from the Class Q-2 Requisite Securityholders, exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise as a prudent person would

010872

exercise or use under the circumstances in the conduct of its own affairs; provided, that, in the case of an Event of Default, so long as the Swap Agreement is in effect, the Trustee shall not take any action under this subsection prior to receipt of such directions with respect to an Event of Default (other than to provide notice thereof as provided in Section 6.5) without the prior consent of the Swap Counterparty.

(g) Whether or not therein expressly so provided, every provision of this Indenture relating to the Trustee shall be subject to the provisions of this Section 6.1 and Section 6.2.

SECTION 6.2    Rights of Trustee.

Except as otherwise provided in Section 6.1:

(a) the Trustee may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, note or other paper or document believed by it in good faith to be genuine and to have been signed or presented by the proper party or parties;

(b) any request, consent or direction of the Issuer mentioned herein shall be sufficiently evidenced by an Issuer Order, and any request, consent or direction from the Swap Counterparty mentioned herein shall be sufficiently evidenced by a written request or direction from, or consented to or approved by, an authorized officer of the Swap Counterparty;

(c) whenever in the administration of this Indenture the Trustee shall (i) deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Trustee (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, rely upon an Officer's Certificate or (ii) be required to determine the value of any asset of the Trust Estate or the Class Q-2 Securities Collateral or funds hereunder or the cash flows projected to be received therefrom, the Trustee may, in the absence of bad faith on its part and unless other evidence be herein specifically prescribed, rely on reports of nationally recognized accounting firms or other persons qualified to provide the information required to make such determination including nationally or internationally recognized dealers in securities of the type being valued and securities quotation services;

(d) as a condition to the taking or omitting of any action by it hereunder, the Trustee may consult with counsel and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted by it hereunder in good faith in reliance thereon; provided, however, that with respect to any payment required to be made to the Swap Counterparty hereunder or under the Swap Agreement, the Trustee shall act in accordance with the direction provided by the Swap Counterparty pursuant to Section 8.3, without first obtaining an Opinion of Counsel.  The Trustee shall have no liability for any action, or failure to act, in accordance with the direction provided by the Swap Counterparty pursuant to Section 8.3;

(e) the Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture or to honor the request or direction of any of the Holders of the Notes (or any request or direction of the Swap Counterparty, in the case of any provision hereof

010873

which entitles the Swap Counterparty to make such request or give such direction) pursuant to this Indenture unless such parties shall have offered to the Trustee reasonable security or indemnity against all costs, expenses and liabilities which might reasonably be incurred by it in compliance with such request or direction;

(f) the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, note or other paper documents, but the Trustee, in its discretion, may and, upon written direction of the Requisite Noteholders or the Swap Counterparty shall, make such further inquiry or investigation into such facts or matters as it may see fit or as it shall be directed at the sole expense of the Issuer and the Trustee shall incur no additional liability of any kind by reason of such inquiry or investigation. Upon the occurrence and continuation of an Event of Default or Class Q-2 Event of Default, as applicable, the Trustee, the Swap Counterparty (or its agent) and any Holder or beneficial owner of a Note or Class Q-1 Security (or Class Q-2 Security, as applicable) shall be entitled (but not obligated), on reasonable prior request (which request shall include a statement of the purpose therefor) made in advance to the Issuer to examine the books and records relating to the Trust Estate (or Class Q-2 Securities Collateral, as applicable) of the Issuer personally or by agent or attorney during normal business hours; provided, that the Trustee, the Swap Counterparty or any such Holder or beneficial owner shall, and shall cause its agents, to hold in confidence all such information, except as otherwise required pursuant to this Indenture or to the extent disclosure may be required by law or by any regulatory or judicial authority and, in the case of the Trustee, to the extent the Trustee, in its sole judgment, may determine that such disclosure is consistent with its obligations hereunder;

(g) the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys and the Trustee may employ or retain such accountants, appraisers or other experts or advisers as it may reasonably require for the purpose of determining and discharging its rights and duties hereunder; and the Trustee shall not be responsible for any misconduct or negligence on the part of any non-affiliated agent or adviser appointed or retained or any non-affiliated attorney appointed, with due care by it hereunder;

(h) the Trustee shall not be deemed to have notice or knowledge of any matter (other than an Event of Default described in Sections 5.1(a)-(d)) unless a Responsible Officer within the corporate trust department of the Trustee has actual knowledge thereof or unless written notice thereof is received by the Trustee at its Corporate Trust Office and such notice references the Notes generally, either of the Issuers or this Indenture. Whenever reference is made in this Indenture to an Event of Default or Class Q-2 Event of Default, such reference shall, insofar as determining any liability on the part of the Trustee is concerned, be construed to refer only to an Event of Default or a Class Q-2 Event of Default of which the Trustee is deemed to have knowledge in accordance with this paragraph;

(i) except as expressly set forth herein, the Trustee shall not be obligated to monitor, evaluate, verify or otherwise determine or compel compliance by the Swap Counterparty or any Paying Agent (to the extent the Trustee is not serving as the exclusive Paying Agent) with the requirements, terms or conditions of this Indenture or the Swap

Agreement, as applicable; provided, however, that the Trustee shall be obligated to ensure that all duties appointed to it by the Issuer shall be executed as set forth in this Indenture. The Trustee shall have no liability for the acts or omissions of the Swap Counterparty or any Paying Agent appointed under or pursuant to this Indenture, and shall be under no obligation to verify independently the accuracy of the information it receives from the Swap Counterparty or the Reference Portfolio Manager on behalf of the Swap Counterparty with respect to the Reference Portfolio;

(j) the Trustee shall have no obligation or responsibility for the accuracy of the records of the Depositary, any Clearing Corporation (including Euroclear or Clearstream) or any non-Affiliated Securities Intermediary and shall have no liability for the acts or omissions of the Depositary, any Clearing Corporation (including Euroclear or Clearstream) or any non-Affiliated Securities Intermediary;

(k) with respect to the security interests in the Trust Estate created hereunder, the pledge of any item of property of the Trust Estate to the Trustee is to the Trustee as representative of the Holders of the Notes and as agent for the other Secured Parties. In furtherance of the foregoing, the possession by the Trustee of any item of property of the Trust Estate and the endorsement to or registration in the name of the Trustee of any item of property of the Trust Estate (including without limitation as entitlement holder of the Collateral Account) are all undertaken by the Trustee in its capacity as representative of the Holders of the Notes and as agent for the other Secured Parties;

(l) the Trustee shall not be under any obligation or duty to become a party to, or to review or evaluate the terms of (or have responsibility for the sufficiency of) any agreement executed pursuant to this Indenture, including but not limited to the Swap Agreement and the Investment Agreement;

(m) the terms of the Swap Agreement shall expressly permit and acknowledge the collateral assignment and pledge by the Issuer of its rights and interests thereunder to the Trustee pursuant to the Indenture; and shall expressly provide that such assignment and pledge is made for collateral security only and shall not impose upon, or be deemed to transfer to (or constitute an assumption by) the Trustee, any liabilities or obligations of the Issuer to the Swap Counterparty;

(n) the Trustee shall not be liable for any action it takes or omits to take in good faith that it reasonably and, after the occurrence and during the continuance of a Default (subject to Section 6.1(f)), prudently believes to be authorized or within its discretion, rights or powers hereunder;

(o) to the extent any defined term hereunder, or any calculation required to be made or determined by the Trustee hereunder, is dependent upon or defined by reference to U.S. generally accepted accounting principles, the Trustee shall be entitled to request and receive (and conclusively rely upon) instruction from the Issuer or the Independent Accountants (and in the absence of its receipt of timely instruction therefrom, shall be entitled to obtain the same directly from an independent accountant at the expense of the Issuer) as to the application of U.S. generally accepted accounting principles in such connection, in any instance;

010875

(p) to the extent permitted by applicable law, the Trustee shall not be required to give any bond or surety in respect of the execution of this Indenture or otherwise; and

(q) the enumeration of any permissible right or power herein available to the Trustee shall not be construed to be the imposition of a duty.

SECTION 6.3    Trustee May Own Notes.

The Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Issuer and the Co-Issuer, the Swap Counterparty or any of their respective Affiliates with the same rights it would have if it were not Trustee. Any Paying Agent, Registrar, co-registrar or co-paying agent may do the same with like rights.

SECTION 6.4    Trustee's Disclaimer.

The Trustee shall not be responsible for and, except as set forth in Section 6.11, makes no representations as to the validity or adequacy of this Indenture, the other Basic Documents, the Notes or any related documents.  It shall not be accountable for the use by the Issuers of the proceeds from the Notes, it shall not be responsible for any statement of the Issuer in this Indenture or in any document issued in connection with the sale of the Notes or in the Notes other than the Certificate of Authentication of the Trustee and it shall in no event assume or incur any liability, duty or obligation to any Holder of a Note, other than as expressly provided in this Indenture or by law.  Under no circumstances shall the Trustee be liable for indebtedness evidenced by or arising under any of the Basic Documents, including the amounts payable on the Notes.

SECTION 6.5    Notice of Defaults; Events of Default and Acceleration.

Promptly (and in no event later than three (3) Business Days) after the occurrence of any Default or Event of Default  or any Class Q-2 Event of Default, in each case known to a Responsible Officer of the Trustee or after any declaration of acceleration has been made by or delivered to the Trustee pursuant to Sections 5.3 or 2.17(m)(ii) hereof, the Trustee shall mail to the Rating Agencies, the Reference Portfolio Manager, the Swap Counterparty, the Investment Agreement Counterparty and each Holder of a Security notice of the Default or Event of Default or Class Q-2 Event of Default, as applicable (unless such Default or Event of Default or Class Q-2 Event of Default shall have been cured or waived, in which case notice of the Default or Event of Default or Class Q-2 Event of Default, as applicable, and that it has been cured or waived shall be promptly provided to each such Person) or notice of any declaration of acceleration.  In addition, if and for so long as any Class of the Securities is listed on the Irish Stock Exchange and so long as the rules of such Stock Exchange so require, notices to the Holders of such Securities shall also be given by publication in the Irish Stock Exchange's Daily Official List.

010876

SECTION 6.6    Compensation; Reimbursement; Indemnity.

(a) The Issuer agrees:

(i)    to pay the Trustee on each Payment Date the Trustee Fee (which Trustee Fee shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust);

(ii)    except as otherwise expressly provided herein, to reimburse the Trustee in a timely manner upon its request for all reasonable expenses, disbursements and advances incurred or made by the Trustee in accordance with any provision of this Indenture or in the enforcement of any provision hereof (including securities transaction charges and the reasonable compensation and the expenses incurred by the Trustee including, without limitation, any legal counsel, investment banking firm, accounting firm or any other agent employed by the Trustee pursuant to this Indenture and reasonable disbursements of its agents and counsel, except any such expense, disbursement or advance as may be attributable to its negligence, willful misconduct or bad faith) and expenses related to the maintenance and administration of the Trust Estate;

(iii)    to pay or to reimburse the Trustee for its payment of the fees of any accounting firm or investment banking firm employed by the Trustee as provided herein;

(iv)    to indemnify fully and hold harmless each of the Trustee, its directors, officers, employees and agents for, and to hold each of them harmless against, any claims, loss, liability, damages, costs or expense (including without limitation reasonable counsel fees and expenses) incurred without negligence, willful misconduct or bad faith arising out of or in connection with the acceptance or administration of this trust, including the costs and expenses of defense against any claim or liability in connection with the exercise or performance of any of its powers or duties hereunder; and

(v)    to pay the Trustee reasonable additional compensation together with its expenses (including reasonable counsel fees) for any collection action taken pursuant to Section 6.12 hereof.

(b) If on any date when a fee or expense shall be payable to the Trustee pursuant to this Indenture insufficient funds are available for the payment thereof in accordance with Section 8.6, any portion of a fee or expense not so paid shall be deferred and payable on such later date on which a fee or expense shall be payable and sufficient funds are available therefor in accordance with Section 8.6 and the failure to pay such amount will not, by itself, constitute an Event of Default. Subject to Section 6.7 hereof, the Trustee shall continue to serve as Trustee under this Indenture regardless of whether it has received amounts due it hereunder, and the Trustee hereby agrees not to cause the filing of a petition in bankruptcy against the Issuer for the nonpayment to the Trustee of any amounts provided by this Section 6.6 until at least one year and one day (or, if longer, the applicable preference period then in effect as confirmed by an Opinion of Counsel provided to the Trustee), after the termination of this Indenture. No

010877

direction by any Holders of the Notes or the Swap Counterparty shall affect the right of the Trustee to collect amounts owed to it under this Indenture.

(c) When the Trustee incurs expenses or renders services in connection with an Event of Default specified in Section 5.1(h) or Section 5.1(i), the expenses (including the reasonable charges and expenses of its counsel) and the compensation for the services are intended to constitute expenses of administration under any applicable Bankruptcy Law.

SECTION 6.7    Resignation and Removal of Trustee; Appointment of Successor.

(a) No resignation or removal of the Trustee and no appointment of a successor Trustee pursuant to this Article VI shall become effective until the acceptance of appointment by the successor Trustee under this Section. The indemnifications in favor of the Trustee in Section 6.6 hereof shall survive any resignation or removal (to the extent of any indemnified liabilities, costs, expenses and other amounts arising or incurred prior to, or arising out of actions or omissions occurring prior to, the effectiveness of such resignation or removal) and the termination of this Indenture.

(b) The Trustee may resign at any time by giving 30 days' prior written notice thereof to the Issuers, the Holders of the Notes, the Swap Counterparty, the Reference Portfolio Manager and each Rating Agency.

(c) The Trustee may be removed at any time by the Requisite Noteholders, with the consent of the Swap Counterparty (such consent not to be unreasonably withheld) (or, following the Maturity Date and distribution of the Trust Estate, the Class Q-2 Requisite Securityholders), upon written notice thereof to the Trustee, the Issuers, each Rating Agency, the Reference Portfolio Manager and the Swap Counterparty.

(d) If at any time:

(i)    the Trustee shall cease to be eligible under Section 6.10 hereof and shall fail to resign after written request therefor by the Issuers or by the Requisite Noteholders;

(ii)    the Trustee shall become incapable of acting;

(iii)    a court having jurisdiction in the premises in respect of the Trustee in an involuntary case or proceeding under federal or state banking or bankruptcy laws, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency or other similar law, shall have entered a decree or order granting relief or appointing a receiver, liquidator, assignee, custodian, trustee, conservator, sequestrator or similar official for the Trustee or for any substantial part of the Trustee's property, or ordering the winding-up or liquidation of the Trustee's affairs, provided any such decree or order shall have continued unstayed and in effect for a period of 30 consecutive days; or

(iv)    the Trustee commences a voluntary case under any federal or state banking or bankruptcy laws, as now or hereafter constituted, or any other applicable

010878

federal or state bankruptcy, insolvency or other similar law, or consents to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee, conservator, sequestrator or other similar official for the Trustee or for any substantial part of the Trustee's property, or makes any assignment for the benefit of its creditors or fails generally to pay, or admits in writing its inability to pay, its debts as such debts become due or takes any corporate action in furtherance of any of the foregoing;

then, in any such case, (A) the Issuers, by an Issuer Order, may remove the Trustee, and the Trustee hereby agrees to resign immediately in the manner and with the effect provided in this Section 6.7, or (B) any Noteholder or the Swap Counterparty may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(e) If the Trustee shall resign, be removed or become incapable of acting, or if a vacancy shall occur in the office of the Trustee for any reason, the Issuers shall promptly appoint a successor Trustee by written instrument, in duplicate, executed by an Authorized Officer of each of the Issuers on behalf of the Issuers, one original copy of which shall be delivered to the Trustee so resigning and one original copy to the successor Trustee, together with a copy to each Noteholder, the Swap Counterparty, the Reference Portfolio Manager and the Rating Agencies; provided, that such successor Trustee shall be appointed, only upon the written consent of the Requisite Noteholders and the Swap Counterparty and provided, further, that the Issuer received Rating Confirmation for such appointment. If no successor Trustee shall have been appointed and an instrument of acceptance by a successor Trustee shall not have been delivered to the resigning Trustee within 30 days after the giving of such notice of resignation, the retiring or resigning Trustee, the Swap Counterparty or any Holder of a Note, may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Trustee.

(f) The Issuers shall give prompt notice of each resignation and each removal of the Trustee and each appointment of a successor Trustee by mailing written notice of such event by first-class mail, postage prepaid, to the Reference Portfolio Manager, the Swap Counterparty, each Rating Agency and to the Holders of the Notes as their names and addresses appear in the Securities Register. Each notice shall include the name of the successor Trustee and the address of its Corporate Trust Office.

(g) Every successor Trustee appointed hereunder shall be required to meet the eligibility requirements set forth in Section 6.10 and shall execute, acknowledge and deliver to the Issuers and the retiring Trustee an instrument accepting such appointment, and thereupon the resignation or removal of the retiring Trustee shall become effective and such successor Trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, trusts, duties and obligations of the retiring Trustee; but, on request of the Issuers, the successor Trustee, the Swap Counterparty or the Requisite Noteholders, such retiring Trustee shall, upon payment of its fees and expenses then unpaid, execute and deliver an instrument transferring to such successor Trustee all the rights, powers and trusts of the retiring Trustee, and shall duly assign, transfer and deliver to such successor Trustee all property and money held by such retiring Trustee hereunder.

(h) Upon request of any such successor Trustee, the Issuers shall execute any and all instruments for more fully and certainly vesting in and confirming to such successor Trustee all such rights, powers and trusts. Upon acceptance of appointment by a successor Trustee as provided in this Section, the Issuers shall mail notice thereof by first-class mail, postage prepaid, to the Holders of the Notes at their last addresses appearing upon the Securities Register, the Rating Agencies, the Swap Counterparty, the Reference Portfolio Manager and the Investment Agreement Counterparty. If the Issuers fail to mail such notice within ten days after acceptance of appointment by the successor Trustee, the successor Trustee shall cause such notice to be mailed at the expense of the Issuers.

SECTION 6.8    Merger or Consolidation of Trustee.

Any Person into which the Trustee may be merged or with which it may be consolidated, or any Person resulting from any merger or consolidation to which the Trustee shall be a party, or any Person succeeding to all or substantially all the corporate trust business of the Trustee, shall be the successor of the Trustee under this Indenture (provided, however, that such Person shall be eligible under the provisions of Section 6.10) without the execution or filing of any instrument or any further act on the part of any of the parties to this Indenture, anything in this Indenture to the contrary notwithstanding.

SECTION 6.9    Appointment of Co-Trustee or Separate Trustee.

(a) Notwithstanding any other provision of this Indenture, at any time, for the purpose of meeting any legal requirement of any jurisdiction in which any part of the Issuer's assets may at the time be located, the Trustee shall have the power and may execute and deliver all instruments to appoint one or more Persons to act as a co-trustee or co-trustees, or separate trustee or separate trustees, of all or any part of the Issuer's assets, and to vest in such Person or Persons in such capacity and for the benefit of the Noteholders and the other Secured Parties, such title to the Issuer's assets, or any part hereof, and, subject to the other provisions of this Section 6.9, such powers, duties, obligations, rights and trusts as the Trustee may consider necessary or desirable. No co-trustee or separate trustee hereunder shall be required to meet the terms of eligibility as a successor trustee under Section 6.10 and no notice to Noteholders of the appointment of any co-trustee or separate trustee shall be required under Section 6.7.

(b) Every separate trustee and co-trustee shall, to the extent permitted by law, be appointed and act subject to the following provisions and conditions:

(i)    all rights, powers, duties and obligations conferred or imposed upon the Trustee shall be conferred or imposed upon and exercised or performed by the Trustee and such separate trustee or co-trustee jointly (it being understood that such separate trustee or co-trustee is not authorized to act separately without the Trustee joining in such act), except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed the Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations (including the holding of title to the assets of the Issuer or any portion thereof in any such jurisdiction) shall be exercised and performed singly by such separate trustee or co-trustee but solely at the direction of the Trustee;

75

010880

(ii)    no trustee hereunder shall be personally liable by reason of any act or omission of any other trustee hereunder; and

(iii)    the Trustee may at any time accept the resignation of or remove any separate trustee or co-trustee.

(c) Any notice, request or other writing given to the Trustee shall be deemed to have been given to each of the separate trustees and co-trustees, as effectively as if given to each of them. Every instrument appointing any separate trustee or co-trustee shall refer to this Indenture and the conditions of this Article VI. Each separate trustee and co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Trustee or separately, as may be provided therein, subject to all the provisions of this Indenture, specifically including every provision of this Indenture relating to the conduct of, affecting the liability of, or affording protection to, the Trustee. Every such instrument shall be filed with the Trustee.

(d) Any separate trustee or co-trustee may at any time constitute the Trustee, its agent or attorney-in-fact with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Indenture on its behalf and in its name. If any separate trustee or co-trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Trustee, to the extent permitted by law, without the appointment of a new or successor trustee.

SECTION 6.10    Eligibility; Disqualification.

The Trustee shall (a) be a Person organized and doing business under the laws of the United States of America or of any state thereof, (b) be authorized under such laws to exercise corporate trust powers, (c) have an office in the United States, (d) have a combined capital and surplus of at least $200,000,000 and be subject to supervision or examination by federal or state authorities, and (e) have (or have a parent which has) a long-term unsecured debt or deposit rating of at least "Baa1" by Moody's and "BBB+" by Standard & Poor's. If such Person shall publish reports of condition at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purpose of this Section 6.10, the combined capital and surplus of such Person shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section 6.10, the Trustee shall resign immediately in the manner and with the effect specified in Section 6.7.

SECTION 6.11    Representations and Warranties of Trustee.

The Trustee, in its individual capacity, represents and warrants as of the Closing Date that:

(a) it is a banking corporation duly organized and validly existing under the laws of the State of New York;

(b) it has full corporate trust power, authority and legal right to execute, deliver and perform its obligations under this Indenture, and has taken all necessary action to authorize

76

010881

the execution, delivery and performance by it of this Indenture, the Account Agreement and the Investment Agreement;

(c) neither the execution, delivery and performance by it of this Indenture nor the consummation of the transactions contemplated by this Indenture shall violate any provision of its corporate charter or by-laws; and

(d) this Indenture has been duly executed and delivered by it and constitutes its legal, valid and binding agreement, enforceable against it in accordance with its terms, subject, as to enforcement, to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect affecting the enforcement of creditors' rights in general and except as such enforceability may be limited by general principles of equity (whether considered in a Proceeding at law or in equity).

SECTION 6.12  Certain Duties of Trustee Related to Delayed Payment of Proceeds.

In the event that in any month the Trustee shall not have received a payment under the Swap Agreement when due or with respect to any Pledged Security on its due date, the Trustee shall promptly notify the Swap Counterparty and the Reference Portfolio Manager in writing and, unless (a) such payment shall subsequently have been received by the Trustee or (b) the Issuers make or cause to be made provisions for such payment satisfactory to the Trustee within three Business Days after such notice, shall request the Swap Counterparty, in the case of the Swap Agreement, or the obligor or issuer of such Pledged Security, the agent or trustee under the related underlying instrument or paying agent designated by any of them, as applicable, to make such payment as soon as practicable after such request but in no event later than three Business Days after the date of such request.  In the event that such payment is not made within such time period, the Trustee shall take such action as the Requisite Noteholders (or, unless the Swap Agreement has been terminated and all amounts owed to the Swap Counterparty have been paid, the Swap Counterparty in the case of failure to receive payments in respect of the Pledged Securities) shall reasonably direct in writing (provided, however, that the Trustee shall not be obligated to take any action, including commencement of any legal proceeding, unless it shall have received reasonably satisfactory indemnification or security against expenses and liabilities that may be associated therewith).  Any such action shall be without prejudice to any right to claim a Default or Event of Default under this Indenture.  Notwithstanding any other provision hereof, the Trustee shall deliver to the Issuers or their designee any payment with respect to the Swap Agreement or any Pledged Security received after the due date thereof to the extent the Issuers previously made provisions for such payment satisfactory to the Trustee in accordance with this Section 6.12, and such payment shall not be deemed part of the Trust Estate.

SECTION 6.13  Withholding; Tax Forms.

(a) If any withholding tax is imposed on the payment (or allocations of income) under the Securities by the Issuers to any Holder of a Security, such tax shall reduce the amount otherwise distributable to such Holder.  The Trustee is hereby authorized and directed to retain from amounts otherwise distributable to any Holder of a Security sufficient moneys for the payment of any withholding tax that is legally owed by the Issuers (but such authorization shall not prevent the Trustee from contesting any such tax in appropriate Proceedings and withholding

010882

payment of such tax, if permitted by law, pending the outcome of such Proceedings). The amount of any withholding tax imposed with respect to any Holder of a Security shall be treated as cash distributed to such Holder at the time it is withheld by the Trustee and remitted to the appropriate taxing authority. If there is a possibility that withholding tax is payable with respect to a distribution, the Trustee may in its sole discretion withhold such amounts in accordance with this Section 6.13. If any Holder of a Security wishes to apply for a refund of any such withholding tax, the Trustee shall provide to such Holder any information with respect to such withholding tax reasonably available to the Trustee so long as such Holder agrees to reimburse the Trustee for any out-of-pocket expenses incurred. Nothing herein shall impose an obligation on the part of the Trustee to determine the amount of any tax or withholding obligation on the part of the Issuers.

(b)     The Issuer shall prepare and file or deliver, or cause to be prepared, filed and delivered, any income tax, franchise tax, information or withholding tax or other tax returns or forms that are required to be filed with or provided to any tax authority, to the Holders or with or to any other person by or on behalf of the Issuer or the Co-Issuer.

SECTION 6.14     Fiduciary for Noteholders Only; Agent for Other Secured Parties.

With respect to the security interest created in the Trust Estate hereunder, the Delivery of any part of the Trust Estate to the Trustee is to the Trustee as fiduciary of the Noteholders and as agent for the other Secured Parties; in furtherance of the foregoing, the possession by the Trustee of any part of the Trust Estate and the endorsement to or registration in the name of the Trustee of any part of the Trust Estate (including without limitation as entitlement holder of the Collateral Account) are all undertaken by the Trustee in its capacity as fiduciary of the Noteholders and agent for the other Secured Parties.

SECTION 6.15     Assignment of Rights; Not Assumption of Duties.

Anything herein contained to the contrary notwithstanding, (a) each of the Issuers shall remain liable under this Indenture and each of the documents contemplated herein and related hereto to which it is a party to the extent set forth therein to perform all of its duties and obligations thereunder to the same extent as if this Indenture had not been executed, (b) the exercise by the Trustee, any Noteholder or Noteholders or any other Secured Party of any of their rights, remedies or powers hereunder shall not release the Issuers from any of their duties or obligations under each of such documents to which they are parties and (c) neither the Noteholders nor the Trustee or any other Secured Parties shall have any obligation or liability under any of such documents to which one or both of the Issuers are parties by reason of or arising out of this Indenture, nor shall the Noteholders, the other Secured Parties or the Trustee be obligated to perform any of the obligations or duties of the Issuers thereunder or, except as expressly provided herein with respect to the Trustee, to take any action to collect or enforce any claim for payment assigned hereunder or otherwise.

010883

## ARTICLE VII

## COVENANTS

SECTION 7.1    Payments on Securities.

The Issuers will duly and punctually pay the principal of and interest on the Securities, and all other amounts payable on or in respect of the Securities, in accordance with the terms of the Securities and this Indenture.  Amounts properly withheld under the Code (or any successor statute), and under the laws of any State or other jurisdiction by any Person from a payment to any Holder of a Security of the principal of or interest on the Securities shall be considered as having been paid by the Issuers to the Holder of a Security for all purposes of this Indenture and the Securities.

SECTION 7.2    Maintenance of Office or Agency.

The Trustee will maintain an office or agency in the Borough of Manhattan, The City of New York, the State of New York, where Securities may be presented or surrendered for payment.  The Trustee hereby initially designates the Corporate Trust Office as such office or agency.  The Trustee will give prompt written notice to the Issuers and the Holders of the Securities of any change in the location of any such office or agency in New York City.

SECTION 7.3    Money for Payments to Be Held in Trust.

(a) All payments of amounts due and payable under this Indenture with respect to the Securities, and payments to be made hereunder with respect to the Swap Agreement, shall be made on behalf of the Issuer by the Trustee or another Paying Agent, in each case from amounts deposited with the Trustee or Paying Agent, as the case may be, by or on behalf of the Issuers for such purpose.

(b) The Issuers may at any time, for the purpose of obtaining the satisfaction and discharge of this Indenture or for any other purpose, by Issuer Order direct any Paying Agent to pay to the Trustee all sums held in trust by such Paying Agent, together with any instructions that accompanied the deposit of such sums, with such sums to be held by the Trustee upon the same terms as those upon which the sums were held by such Paying Agent; and upon such payment and delivery by any Paying Agent to the Trustee, such Paying Agent shall be released from all further liability with respect to such money.

(c) The Trustee shall give written notice to the Issuers of any money held by the Trustee or any Paying Agent for the payment of any amount due with respect to any Security and remaining unclaimed for two years after such amount has become due and payable and, subject to applicable abandoned property laws, upon written request of the Issuer such amount shall be deemed discharged from any trust and be paid to the Issuer; and the Holder of such Security shall thereafter look only to the Issuer for payment thereof (but only to the extent of the amounts so paid to the Issuer), and all liability of the Trustee or such Paying Agent with respect to such funds shall thereupon cease; provided, however, that the Trustee or such Paying Agent, before being required to make any such payment to the Issuer, shall (i) at the expense of the Issuer cause to be published once, in a newspaper published in the English language, customarily

published on each Business Day and of general circulation in New York City, and, in accordance with Section 11.4, in the Irish Stock Exchange's Daily Official List, notice that such money remains unclaimed and that, after a date specified therein, which shall not be less than thirty (30) days from the date of such publication, any unclaimed balance of such money then remaining shall be repaid to the Issuer and (ii) mail notice of such repayment to the Holders of the Securities whose right or interest in moneys due and payable but not claimed is determinable from the records of the Trustee or of any Paying Agent, at the last address of record for each such Holder.  The Trustee may also adopt and employ, at the expense of the Issuer, any other reasonable means of notification of such repayment.

(d) If and to the extent any funds shall be delivered to it from time to time pursuant to this Indenture for the purpose of making payments on or in respect of the Securities, the Trustee shall be entitled to establish a segregated account for the purpose of holding and disbursing such funds.  The Trustee shall have no obligation to invest or pay interest on any such funds held by it (except as and to the extent otherwise expressly provided herein).

SECTION 7.4    Existence of Issuers.

(a) Each of the Issuers will maintain in full force and effect its existence, rights and franchises as a company or corporation incorporated under the laws of the jurisdiction of its incorporation and will obtain and preserve its qualification to do business as a foreign corporation in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Indenture, the Securities or any of the Pledged Securities or other property included in the Trust Estate or in the Class Q-2 Securities Collateral; provided, however, that, subject to Cayman Islands law, the Issuer shall be entitled to change its jurisdiction of incorporation from the Cayman Islands to any other jurisdiction (other than the United States or any state or political subdivision thereof or therein) reasonably selected by the Issuer so long as (i) the Issuer determines such change is not disadvantageous in any material respect to the Issuer, the Holders of the Securities or any other Secured Party, (ii) written notice of such change shall have been given by the Issuer to the Trustee, the Reference Portfolio Manager, the Swap Counterparty, the Noteholders and the Rating Agencies at least thirty (30) Business Days prior to such change of jurisdiction, (iii) on or prior to the fifteenth Business Day following such notice the Trustee shall not have received written notice from the Holders of a majority of the Aggregate Principal Amount of each Class of Senior Notes, or the Holders of a majority of the Aggregate Principal Amount of the Income Notes, or the Swap Counterparty, objecting to such change, and (iv) such change shall not cause the Issuer to be in violation of United States or Cayman Islands law.  Each of the Issuers shall comply with its organizational documents and shall not amend its organizational documents in any manner that would have a material adverse effect on the rights of the Swap Counterparty or the Holders of any Class of Notes.  The Board of Directors of each of the Issuers will at all times have at least one member who is Independent of the Swap Counterparty and the Reference Portfolio Manager.  The Issuer shall be entitled to take any action required by this Indenture within the United States, notwithstanding any provision of this Indenture requiring the Issuer to take such action outside of the United States, so long as prior to taking any such action the Issuer receives a legal Opinion of Tax Counsel to the effect that it is not necessary to take such action outside the United States or any political subdivision thereof in order to prevent the Issuer from becoming subject to any United States federal, state or local income or withholding taxes.

80

(b) The Issuer and the Co-Issuer shall ensure that all corporate or other formalities regarding their respective existences (including holding regular meetings of the board of directors and shareholders, or other similar meetings) are followed. Neither the Issuer nor the Co-Issuer shall take any action, or conduct its affairs in a manner, that is likely to result in its separate existence being ignored or in its assets and liabilities being substantively consolidated with any other Person in a bankruptcy, reorganization or other insolvency proceedings. Without limiting the foregoing, (i) neither the Issuer nor the Co-Issuer shall have any subsidiaries and (ii) the Issuer and the Co-Issuer shall not (A) have any employees (other than their respective officers and directors) or (B) engage in any transaction with any shareholder that would constitute a conflict of interest (provided that the Administration Agreement shall not be deemed to be a transaction that would constitute such a conflict of interest).

(c) The Issuer shall notify the Rating Agencies of any amendment of any of the organizational documents of the Issuers and of any redemption in full of any Class of Notes.

SECTION 7.5    Protection of Trust Estate.

(a) The Issuer shall from time to time execute, deliver and file all such supplements and amendments hereto and all such financing statements, continuation statements, instruments of further assurance and other instruments and shall take such other action as may be necessary or advisable (including, without limitation, causing the registration of this Indenture in the Register of Mortgages of the Issuer at the Issuer's Registered Office in the Cayman Islands) to secure the rights and remedies of the Secured Parties, including to:

(i)    Grant more effectively all or any portion of the Trust Estate;

(ii)    maintain, preserve and perfect the validity of any Grant made or to be made by this Indenture or to carry out more effectively the purposes hereof;

(iii)    perfect, publish notice of, or protect the validity of any Grant made or to be made by this Indenture (including, without limitation, any and all actions necessary or desirable as a result of changes in law or regulation);

(iv)    enforce the Swap Agreement and any of the Pledged Securities or any other instruments or property included in the Trust Estate;

(v)    preserve and defend title to the Trust Estate and the rights therein of the Trustee, the Swap Counterparty, the Collateral Administrator and the Holders of the Notes in such Trust Estate against the claims of all other Persons; and

(vi)    pay or cause to be paid any and all taxes levied or assessed upon all or any part of the Trust Estate.

The Issuer hereby designates the Trustee its agent and attorney-in-fact to execute and file (i) a financing statement in connection with the Grant pursuant to this Indenture identifying as collateral "all assets in which the Issuer now or hereafter has rights," and (ii) any other financing statement, continuation statement or other instrument necessary or desirable under this section; provided, however, that the Trustee shall be under no obligation to prepare,

010886

execute or file any such financing statement, continuation statement or other instrument and that such appointment shall not impose upon the Trustee any of the Issuer's obligations under this Section 7.5.

(b) The Trustee shall not, except in accordance with Article VIII and Section 5.8, permit the removal of any portion of the Trust Estate or transfer any such property from a Trust Account to which it is credited, or cause or permit any change in the manner of Delivery of any Pledged Securities, if after giving effect thereto the jurisdiction governing the perfection of the Trustee's security interest in such Pledged Securities is different from the jurisdiction governing perfection at the time of delivery of the most recent Opinion of Counsel pursuant to Section 7.6(a) (or, if no Opinion of Counsel has yet been delivered pursuant to Section 7.6(a), the Opinion of Counsel delivered at the Closing Date pursuant to Section 3.1), unless the Trustee shall have received an Opinion of Counsel to the effect that the lien and security interest created by this Indenture with respect to such property will continue to be maintained after giving effect to such action or actions.

(c) The Issuer shall pay or cause to be paid taxes, if any, levied on account of the beneficial ownership by the Issuer of any Pledged Securities.

(d) Without at least thirty (30) days prior written notice to the Trustee, the Issuer shall not change its name, or the name under which it does business, from the name shown on the signature page hereof.

SECTION 7.6    Opinions as to Trust Estate and Tax Certificates.

(a) On or before July 31st in each calendar year commencing in 2005, the Issuer shall cause to be delivered to the Trustee (with a copy to each Rating Agency, the Swap Counterparty and the Reference Portfolio Manager) an Opinion of Counsel with respect to the laws of the State of New York, stating that, in the opinion of such counsel, as of the date of such opinion, (i) the security interest in the Trust Estate created by this Indenture is perfected and, with respect to certain portions of the Trust Estate, of the first priority (subject to reasonable assumptions and qualifications as applicable), and (ii) no further action (other than as specified in such opinion) is required to be taken (under the UCC and applicable federal regulation as in effect on such date) to ensure the continued perfection of such security interest during the succeeding year.

(b) If required to prevent the withholding and imposition of U.S. federal income tax, the Issuer shall deliver or cause to be delivered a United States Internal Revenue Service Form W-8BEN (or any successor thereto) to each issuer of a Pledged Security in the Trust Estate at the time such Pledged Security is purchased by the Issuer and as necessary thereafter. The Issuer similarly shall comply with any information reporting or certification procedures imposed by any state, local or non-U.S. tax law as a precondition to an exemption from, or reduction in the rate of, the withholding and imposition of any tax in respect of a Pledged Security in the Trust Estate.

010887

SECTION 7.7     Performance of Obligations.

(a) Each of the Issuers shall not take any action and shall not consent to any action proposed to be taken by others that would release any Person from any of such Person's covenants or obligations under any instrument or agreement included in the Trust Estate, except in accordance with the provisions hereof.

(b) Either or both Issuers may contract with other Persons, including the Collateral Administrator, for the performance by such Persons of the obligations of either or both Issuers hereunder. Notwithstanding any such arrangement, the Issuers shall remain primarily liable with respect thereto. With respect to any such contract, the performance of such obligations by such Persons shall be deemed to be performance of such obligations by the Issuer or Co-Issuer, as applicable, and the Issuer or Co-Issuer, as applicable, will perform punctually, and will use its best efforts to cause such Persons, to perform punctually their obligations hereunder.

SECTION 7.8     Negative Covenants.

(a) The Issuer will not, and with respect to clauses (ii), (iv), (vi), (vii), (x) and (xii), the Co-Issuer will not:

(i)     sell, transfer, exchange or otherwise dispose of, or pledge, mortgage, hypothecate or otherwise encumber (or permit such to occur or suffer such to exist), any part of the Trust Estate or the Class Q-2 Securities Collateral, except as expressly permitted by this Indenture and the Swap Agreement;

(ii)     claim any credit on, or make any deduction from or dispute the enforceability of, the amount payable with respect to the Securities other than amounts withheld in accordance with the Code or any applicable laws of the Cayman Islands, or assert any claim against any present or future Holder of the Securities, by reason of the payment of any taxes levied or assessed upon any part of the Trust Estate or the Class Q-2 Securities Collateral, as applicable;

(iii)     (A)     incur or assume any indebtedness other than pursuant to this Indenture (including trade debt incidental to the performance of the respective obligations of the Issuers hereunder), (B) incur, assume or guarantee the indebtedness of any other Person or (C) issue any additional shares other than the Ordinary Shares authorized to be issued as of the Closing Date;

(iv)     (A)     permit the validity or effectiveness of this Indenture or any grant hereunder to be impaired, or permit the lien of this Indenture to be amended, hypothecated, subordinated, terminated or discharged, or permit any Person to be released from any covenants or obligations with respect to this Indenture or the Securities, except, in each case, as may be expressly permitted hereby or thereby, (B) create, permit or suffer to exist any lien, charge, adverse claim, security interest, mortgage or other encumbrance (other than the lien of this Indenture) to be created on or extend to or otherwise arise upon or burden the Trust Estate or the Class Q-2 Securities Collateral, or any part thereof or any interest therein or the proceeds thereof, or (C) take

010888

any action that would permit the lien of this Indenture not to constitute a valid first priority perfected security interest in the Trust Estate or the Class Q-2 Securities Collateral;

(v)    directly or through any other Person, engage in any activity that could cause it to be a dealer in securities or to be deemed to be engaged in a finance or lending business for United States federal income tax purposes;

(vi)    (A) commence any case, proceeding or other action under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have any order for relief entered with respect to it, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seek appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its assets, or make a general assignment for the benefit of its creditors;

(vii)    amend the "non petition" or "limited recourse" provisions of any of the Basic Documents;

(viii)    enter into any agreement or contract with any Person unless such contract or agreement contains "limited recourse" provisions and such  Person agrees that, prior to the date that is one year and one day after all of the related obligations of the Issuer have been paid in full (or, if longer, the applicable preference period under applicable insolvency law), such Person shall not take any action or institute any proceeding against the Issuer under any insolvency law applicable to the Issuer or which would be reasonably likely to cause the Issuer to be subject to, or seek the protection of, any such insolvency law; provided, however, that such Person shall be permitted to become a party to and to participate in any Proceeding or action under any such insolvency law that is initiated by any Person other than one of its Affiliates;

(ix)    declare or pay dividends or other distributions in respect of, or redeem or otherwise purchase, any equity interest of the Issuer, other than as contemplated by this Indenture, or authorize, issue or sell any additional equity interest of the Issuer;

(x)    take any action that could cause the Issuer, the Co-Issuer, the Trust Estate or the Class Q-2 Securities Collateral to be required to (A) register as an "investment company" under the Investment Company Act or (B) register any of the issued and outstanding securities of the Issuer or Co-Issuer under the Securities Act or any United States or state securities law;

(xi)    designate an Early Termination Date (as defined in the Swap Agreement) other than by reason of a Swap Event of Default or amend the Swap Agreement in any material respect, unless the Issuer receives Rating Confirmation for such designation or amendment; or

(xii)    have any employees (except for officers and directors); or

84

010889

(xiii)   commingle its Cash with that of any other Person.

(b) The Issuers shall not enter into any agreement, contract or indenture other than the Basic Documents or in connection with the transactions contemplated by this Indenture; shall not incur or assume any indebtedness other than pursuant to this Indenture (including trade debt incidental to the performance of the respective obligations of the Issuers hereunder), or incur, assume or guarantee the indebtedness of any other Person; and shall not own any securities at any time, other than as contemplated by this Indenture and the Swap Agreement.  For purposes of this paragraph (b), "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security (including a certificate of deposit) or on any group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

(c) The Trustee shall not sell, transfer, exchange or otherwise dispose of, or enter into or engage in any business with respect to, any part of the Trust Estate or the Class Q-2 Securities Collateral, except as expressly permitted by this Indenture and except for administrative services performed for the Issuers relating to their administrative duties as contemplated herein.

SECTION 7.9    Statement as to Compliance.

On or before May 31st in each calendar year, beginning May 31st, 2005, or immediately if there has been a Default or Event of Default or Class Q-2 Event of Default under this Indenture, the Issuer shall deliver to the Trustee (who shall deliver a copy to the Swap Counterparty and the Reference Portfolio Manager) an Officer's Certificate stating, as to each signer thereof, that:

(a) a review of the activities of the Issuer during the preceding calendar year and of its performance under this Indenture has been made under his or her supervision; and

(b) to the best of such signer's knowledge, based on such review, there did not exist, as of a date no more than five days prior to the date of the certificate, nor had there existed at any time prior thereto since the date of the last certificate (or in the case of the first such certificate, since the Closing Date), any Event of Default or Class Q-2 Event of Default under this Indenture or any Swap Event of Default or Swap Termination Event with respect to the Issuer under the Swap Agreement or, if such event did then exist or had existed, specifying the same and the nature and the status thereof, including actions undertaken to remedy the same, and that the Issuer has complied with all of its obligations under this Indenture and the Swap Agreement since the date of the last certificate (or in the case of the first such certificate, since

010890

the Closing Date), or if such is not the case, specifying those obligations with which it has not complied.

SECTION 7.10    Consolidation of Issuers.

(a) The Issuer shall not consolidate or merge with or into any other Person or transfer or convey all or substantially all of its assets to any Person, unless permitted by Cayman Islands law and unless:

(i)    the Issuer shall be the surviving entity, or the Person (if other than the Issuer) formed by such consolidation or into which the Issuer is merged or to which all or substantially all of the assets of the Issuer are transferred or conveyed shall be an exempted company incorporated with limited liability and existing under the laws of the Cayman Islands or such other jurisdiction outside the United States as may be approved by the Holders of a majority of the Aggregate Principal Amount of each Class of Notes; provided, that no such approval shall be required in connection with any such transaction undertaken solely to effect a change in the jurisdiction of organization pursuant to Section 7.4 (any such jurisdiction or any jurisdictions approved pursuant to the preceding clause, "Permitted Other Jurisdictions"), and shall expressly assume, by an indenture supplemental hereto, executed and delivered to the Trustee, each Holder of a Note and the other Secured Parties, the due and punctual payment of the principal of and interest on all Notes and all payments under the Swap Agreement and the performance of every covenant of this Indenture on the part of the Issuer to be performed or observed, all as provided herein;

(ii)    each Rating Agency shall have received written notification of such consolidation, merger, transfer or conveyance and shall have given a Rating Confirmation with respect to such transaction;

(iii)    immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing;

(iv)    the Issuer shall have delivered to the Trustee, each Holder of a Note and the Swap Counterparty an Officer's Certificate and an Opinion of Tax Counsel each stating that such consolidation, merger, transfer or conveyance and such supplemental indenture comply with this Section 7.10, that all conditions precedent in this Section 7.10 relating to such transaction have been complied with and that (A) no gain or loss will be recognized for United States federal, Cayman Islands and the Permitted Other Jurisdiction, if any, income tax purposes by the Holders of the Securities or the Swap Counterparty solely as a result therefrom, (B) neither payments on the Swap Agreement nor the net income of the Issuer or the surviving entity shall become subject to United States federal income tax (whether imposed by withholding or otherwise) solely as a result therefrom, (C) no change in the characterization of the Notes as indebtedness for United States federal income tax purposes will result therefrom and (D) neither the Trust Estate, nor the Class Q-2 Securities Collateral, nor the surviving entity (if applicable) shall become subject to income taxes or other applicable taxes solely as a

010891

result therefrom that would reduce in any manner the payments on the Securities or the amount of funds available for such payment;

(v) the Issuer shall have delivered to the Trustee an Opinion of Counsel stating that after giving effect to such transaction, neither of the Issuers will be required to register as an investment company under the Investment Company Act; and

(vi) after giving effect to such transaction, no Ordinary Shares will be beneficially owned by U.S. Persons.

(b) The Co-Issuer shall not consolidate or merge with or into any other Person or transfer or convey all or substantially all of its assets to any Person, unless:

(i) the Co-Issuer shall be the surviving corporation, or the Person (if other than the Co-Issuer) formed by such consolidation or into which the Co-Issuer is merged or to which all or substantially all of the assets of the Co-Issuer are transferred or conveyed shall expressly assume, by an indenture supplemental hereto, executed and delivered to the Trustee, the due and punctual payment of the principal of and interest on all Notes and the performance of every covenant of this Indenture on the part of the Co-Issuer to be performed or observed, all as provided herein;

(ii) each Rating Agency shall have received written notification of such consolidation, merger, transfer or conveyance and shall have given a Rating Confirmation for such transaction;

(iii) immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing;

(iv) the Co-Issuer shall have delivered to the Trustee and each Holder of a Note an Officer's Certificate and an Opinion of Tax Counsel each stating that such consolidation, merger, transfer or conveyance and such supplemental indenture comply with this Section 7.10, that all conditions precedent in this Section 7.10 relating to such transaction have been complied with and that (A) no gain or loss will be recognized for United States federal, Cayman Islands and the Permitted Other Jurisdiction, if any, income tax purposes by the Holders of the Securities or the Swap Counterparty solely as a result therefrom, (B) neither payments on the Swap Agreement nor the net income of the Co-Issuer or the surviving entity shall become subject to United States federal income tax (whether imposed by withholding or otherwise) solely as a result therefrom, (C) no change in the characterization of the Notes as indebtedness for United States federal income tax purposes will result therefrom and (D) neither the Trust Estate, nor the Class Q-2 Securities Collateral, nor the surviving entity (if applicable) shall become subject to income taxes or other applicable taxes solely as a result therefrom that would reduce in any manner the payments on the Securities or the amount of funds available for such payment;

(v) the Co-Issuer shall have delivered to the Trustee an Opinion of Counsel stating that after giving effect to such transaction, neither of the Issuers will be required to register as an investment company under the Investment Company Act; and

010892

(vi) after giving effect to such transaction, none of its common stock will be beneficially owned by U.S. Persons.

SECTION 7.11 Successor Substituted.

Upon any consolidation or merger, or transfer or conveyance of all or substantially all of the assets of the Issuer, in accordance with Section 7.10, the Person formed by or surviving such consolidation or merger (if other than the Issuer or the Co-Issuer, as applicable), or the Person to which such transfer or conveyance is made, shall succeed to, and be substituted for, and may exercise every right and power of, and shall be bound by each obligation or covenant of, the Issuer or Co-Issuer, as applicable, under this Indenture with the same effect as if such Person had been named as the Issuer or Co-Issuer, as applicable, herein. In the event of any such consolidation, merger, transfer or conveyance, the Person named as the "Issuer" or "Co-Issuer", as applicable, in the first paragraph of this Indenture or any successor which shall theretofore have become such in the manner prescribed in this Article VII may be dissolved, wound-up and liquidated at any time thereafter, and such Person thereafter shall be released from its liabilities as obligor and maker on all the Notes and from its obligations under this Indenture.

SECTION 7.12 No Other Business.

(a) The Issuer shall not engage in any business or activity other than (i) issuing and selling its Ordinary Shares, (ii) issuing and selling the Notes, (iii) issuing and selling the Class Q-1 Securities and the Class Q-2 Securities, (iv) entering into the Swap Agreement and engaging in the activities permitted thereunder, (v) entering into the Collateral Administration Agreement, (vi) the acquisition and disposition of Eligible Investments and Class Q-2 Securities Collateral and (vii) engaging in other activities that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith. The Issuer shall provide prior written notice to each Rating Agency of any proposed amendment to its Articles and shall not amend its Articles unless it has received Rating Confirmation for such amendment.

(b) The Co-Issuer shall not engage in any business or activity other than issuing and redeeming its common stock, issuing the Senior Notes, and engaging in any other activities that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith. The Co-Issuer shall provide prior written notice to each Rating Agency of any proposed amendment to its Certificate of Incorporation or bylaws and shall not amend such documents unless it has received Rating Confirmation for such amendment.

SECTION 7.13 Purchase of Notes and Class Q Securities.

Notwithstanding anything contained in this Indenture to the contrary, the Issuer may acquire Securities in open market or privately negotiated transactions or otherwise (and the Issuer shall give prompt written notice thereof to the Trustee); provided, however, that it has received Rating Confirmation for such acquisition; provided, further that, the Issuer shall not acquire Notes of any Class if Notes of a more senior Class are then outstanding. Any Securities acquired by the Issuer shall be delivered to the Trustee for cancellation. Any Securities acquired in accordance with this Section 7.13 must be acquired at a price less than par.

SECTION 7.14    Additional Covenants.

(a) Each of the Issuers shall comply with all applicable laws, rules, regulations, orders, writs, judgments, injunctions, decrees, determinations and awards (including, without limitation, any fiscal and accounting rules and regulations and any foreign or domestic law, rule or regulation), including, without limitation, in connection with the issuance, offer and sale of the Notes.

(b) In addition to the notices to be provided under Section 8.11, the Issuers shall give prompt notice in writing to the Trustee, the Reference Portfolio Manager, the Swap Counterparty, the Investment Agreement Counterparty and each Rating Agency upon becoming aware of the occurrence of any Default or Event of Default under this Indenture (or waiver thereof) or any default under any other Basic Document or the Account Agreement (or waiver thereof).

(c) Each of the Issuers shall comply with the terms and conditions of the Basic Documents to which it is a party or by which it is bound.  Each of the Issuers shall take all actions as may be necessary to ensure that all of its representations and warranties made pursuant to the Basic Documents are true and correct as of the date hereof and thereof and continue to be true and correct for so long as any Notes are Outstanding.  Each of the Issuers further agrees not to authorize or otherwise to permit the Collateral Administrator to act in contravention of the representations, warranties and agreements of the Collateral Administrator under the Collateral Administration Agreement.

(d) To the extent it may lawfully do so, each of the Issuers on behalf of itself agrees it will not (i) commence any case, proceeding or other action under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have any order for relief entered with respect to it, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts; (ii) seek appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its assets, or make a general assignment for the benefit of its creditors; or (iii) take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth above; and each of the Issuers shall generally pay its debts as they become due and not admit in writing its inability to pay its debts as they become due.

(e) So long as any Class of Securities listed on the Irish Stock Exchange is Outstanding, the Issuers shall (i) use all reasonable efforts to maintain the listing of such Class of Securities on the Irish Stock Exchange; provided, however, that the Issuer will not be required to maintain a listing on the Irish Stock Exchange or any other E.U. stock exchange if compliance with requirements of the European Commission or a relevant Member State becomes burdensome in the sole judgment of the Swap Counterparty, (ii) notify the Irish Stock Exchange if the rating assigned to any Class of Securities has been qualified, downgraded or withdrawn; and (iii) make available for inspection at the office of the Trustee copies of their respective Articles, bylaws, and resolutions authorizing the issuance of the Notes and this Indenture.

010894

(f) Each Issuer shall only conduct business in its own name as set forth in its organizational documents.

SECTION 7.15 <u>Representations and Warranties of the Issuers</u>.

(a) Each of the Issuers represents and warrants as to itself that it is a company or corporation duly incorporated, validly existing and in good standing under the laws of the jurisdiction of its incorporation and in each jurisdiction where the conduct of its business requires such license, qualification or good standing, except where the failure to be so licensed or qualified or in good standing would not adversely affect the validity or enforceability of the Basic Documents to which it is a party, or the ability of the Issuer or Co-Issuer, as the case may be, to perform its obligations hereunder or thereunder.

(b) Each of the Issuers represents and warrants as to itself that it has the power and authority to execute and deliver the Basic Documents and all other documents and agreements contemplated hereby and thereby to which it is a party, as well as to carry out the terms hereof and thereof.

(c) Each of the Issuers represents and warrants as to itself that it has taken all necessary action, including but not limited to all requisite corporate action, to authorize the execution, delivery and performance of the Basic Documents and all other documents and agreements contemplated hereby and thereby to which it is a party. When executed and delivered by the Issuer or Co-Issuer, as the case may be, and in the case of the Securities, authenticated by the Trustee as provided herein, assuming due authorization, execution, delivery and/or authentication by each other party thereto, each of the Basic Documents to which it is a party will constitute the legal, valid and binding obligation of the Issuer or Co-Issuer, as the case may be, enforceable in accordance with its terms subject, as to enforcement, to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect affecting the enforcement of creditors' rights in general and except as such enforceability may be limited by general principles of equity (whether considered in a Proceeding at law or in equity).

(d) Each of the Issuers represents and warrants as to itself that all authorizations, licenses, permits, certificates, franchises, consents, approvals and undertakings which are required to be obtained by it under any applicable law which are material to (i) the conduct of its business, (ii) the ownership, use, operation or maintenance of its properties or (iii) the performance by the Issuer or Co-Issuer, as the case may be, of its obligations under or in connection with the Basic Documents to which it is a party, have been received and all such authorizations, licenses, permits, certificates, franchises, consents, approvals and undertakings are in full force and effect.

(e) Each of the Issuers represents and warrants as to itself that the execution, issuance and delivery of, and performance by it of its obligations under, the Basic Documents and any and all instruments or documents required to be executed or delivered pursuant hereto or thereto or in connection herewith or therewith to which it is a party were and are within its powers, and will not violate any provision of any law, regulation, decree or governmental authorization applicable to it, or its Articles, or Certificate of Incorporation and By-laws, as the

90

010895

case may be, and will not violate or cause a default under any provision of any contract, agreement, mortgage, indenture or other undertaking to which it is a party or which is binding upon it or any of its property or assets, and will not result in the imposition or creation of any lien, charge, or encumbrance upon any of its properties or assets, pursuant to the provisions of any such contract, agreement, mortgage, indenture or undertaking, other than as specifically set forth herein.

(f)  Each of the Issuers represents and warrants as to itself that there are no legal, governmental or regulatory proceedings pending to which it is a party or of which any of its property is the subject, which if determined adversely to it, would individually or in the aggregate have a material adverse effect on the performance by it, of the Basic Documents to which it is a party or the consummation of the transactions contemplated hereunder or thereunder, and to the best of its knowledge, no such proceedings are threatened or contemplated.

(g) Each of the Issuers represents and warrants as to itself that the Securities issued by it are not required to be registered pursuant to the Securities Act, it is not required to be registered as an investment company pursuant to the Investment Company Act and this Indenture is not required to be qualified under the Trust Indenture Act of 1939, as amended.

SECTION 7.16    Certain Tax Matters.

(a)  The Issuer shall not file, or cause to be filed, any income or franchise tax return in any state of the United States unless it shall have obtained an Opinion of Counsel prior to such filing that, under the laws of such jurisdiction, the Issuer is required to file such income or franchise tax return.

(b)  The Issuer will not file with the Internal Revenue Service an election to be treated as a partnership for U.S. federal income tax purposes.

(c)  The Issuer shall take reasonable steps so as to avoid the acquisition and ownership of "U.S. real property interests," within the meaning of section 897 of the Code, and interests in trusts or partnerships (or similar "pass-through entities") that are engaged in the conduct of a trade or business within the United States for United States federal income tax purposes.

(d)  The Issuers do not intend for this Indenture to represent an agreement to enter into a partnership, a joint venture or any other business entity for U.S. federal tax purposes.  The Issuers will not represent or otherwise hold themselves out to the Internal Revenue Service or other third parties as partners in a partnership or members of a joint venture or other business entity for U.S. federal tax purposes.

SECTION 7.17    DTC Actions.

The Issuers shall direct DTC to take the following steps in connection with the Global Notes:

010896

(a) The Issuers shall direct DTC to include the "3c7" marker in the DTC 20-character security descriptor and the 48-character additional descriptor for the Rule 144A Global Notes in order to indicate that sales are limited to Qualified Purchasers that are Qualified Institutional Buyers.

(b) The Issuers shall direct DTC to cause each physical DTC delivery order ticket delivered by DTC to purchasers to contain the 20-character security descriptor and shall direct DTC to cause each DTC delivery order ticket delivered by DTC to purchasers in electronic form to contain the "3c7" indicator and the related user manual for participants.

(c) On or prior to the Closing Date, the Issuers will instruct DTC to send the "Important Notice to DTC Participants," in substantially the form of Exhibit K hereto, to all Participants.

(d) The Issuers will request that DTC include the Rule 144A Global Notes in DTC's "Reference Directory" of Section 3(c)(7) offerings.

(e) Upon the request of the Trustee or the Swap Counterparty, the Issuer shall request DTC to deliver a list of all Participants holding an interest in the Rule 144A Global Notes.

SECTION 7.18    Bloomberg Screens, Etc.

The Issuers will from time to time request all applicable third-party vendors to include on screens maintained by such vendors appropriate legends regarding Rule 144A, Regulation S and Section 3(c)(7) restrictions on the Global Notes. Without limiting the foregoing, the Issuer will request that Bloomberg, L.P. include the following on each Bloomberg screen containing information about the Notes as applicable:

(a) The bottom of the "Security Display" pages describing the Rule 144A Global Notes should state: "Iss'd Under 144A/3c7."

(b) The bottom of the "Security Display" page describing the Regulation S Global Notes or Class Q-1 Reg S Global Securities should state: "Iss'd Under Reg S."

(c) The "Security Display" page should have a flashing red indicator stating "Additional Note Pg."

(d) Such indicator for the Rule 144A Global Notes should link to an "Additional Security Information" page, which should state that the Rule 144A Global Notes "are being offered in reliance on the exemption from registration under Rule 144A of the Securities Act to persons that are both (A) "Qualified Institutional Buyers" (as defined in Rule 144A under the Securities Act) and (B) "Qualified Purchasers" (as defined under Section 3(c)(7) of the Investment Company Act)."

(e) Such indicator for the Regulation S Global Notes or Class Q-1 Reg S Global Securities should link to an "Additional Security Information" page, which should state that the

010897

such securities "are being offered to non-U.S. Persons in reliance on the exemption from registration under Regulation S of the Securities Act in offshore transactions."

(f) The "Disclaimer" pages for the Notes should state that the Notes "will not be and have not been registered under the Securities Act, and neither the Issuer nor the Co-Issuer has been registered under the Investment Company Act and these securities may not be offered or sold in the United States absent registration or an applicable exemption from registration requirements and any such offer or sale of these securities must be in accordance with Section 3(c)(7) of the Investment Company Act."

SECTION 7.19    CUSIP.

The Issuers will cause each "CUSIP" or "CINS" number obtained for a Note to have an attached "fixed field" that contains "3c7" and "144A" or "Reg S" indicators, as applicable.

SECTION 7.20    Legends.

The Issuers will not remove the legends set forth on the Securities in the forms set forth in Exhibits A1-1, A2-1, B1-1, B2-1, C1-1, C2-1, A1-2, A2-2, B1-2, B2-2, C1-2, C2-2, A1-3, A2-3, B1-3 , B2-3, C1-3, C2-3, IN-1, Q1-A and Q-2A hereto at any time except as provided in Section 2.6(k).

SECTION 7.21    Regulation S Transfers.

The Issuers will not participate directly or through agents, and will direct the Initial Purchaser not to participate, in any sale or transfer of Temporary Regulation S Global Notes or Regulation S Global Notes (or a beneficial interest therein) to a U.S. Person unless such person is acquiring a beneficial interest in a Rule 144A Global Note.

SECTION 7.22    Listing Agent.

As long as any Securities are listed on the Irish Stock Exchange and the rules of such Exchange shall so require, the Issuers shall maintain a listing agent (a "Listing Agent"), a paying agent and a transfer agent with an office in Dublin, Ireland.  The Issuers hereby initially appoint the NCB Stockbrokers as listing agent for Securities listed on the Irish Stock Exchange and initially appoint an Irish paying agent and transfer agent for such Securities as provided in Sections 10.1 and 10.2, respectively, of this Indenture.  If the Issuers appoint a new Listing Agent, the Issuers will publish the change, with such publication expected to be made in the *Daily Official List* of the Irish Stock Exchange.

SECTION 7.23    Security Interest Representations and Warranties.

(a) The Issuer hereby represents and warrants as of the Closing Date as follows:

(i)    The Issuer owns the Trust Estate and the Class Q-2 Securities Collateral free and clear of any lien, claim or encumbrance of any person, other than such as are created under, this Indenture.

93

(ii)     Except as expressly permitted by this Indenture, other than the assignment and security interest granted to the Trustee pursuant to this Indenture, the Issuer has not pledged, assigned, sold, granted a security interest in, or otherwise conveyed any of the Trust Estate or the Class Q-2 Securities Collateral.  The Issuer has not authorized the filing of and is not aware of any financing statements against the Issuer that includes a description of the Trust Estate or Class Q-2 Securities Collateral or any portion thereof other than any financing statement relating to the security interest granted to the Trustee hereunder or that has been terminated.  The Issuer is not aware of any judgment, Pension Benefit Guaranty Corporation or tax lien filings against the Issuer.

(iii)     The Issuer has received all consents and approvals required by the terms of any item in the Trust Estate and the Class Q-2 Securities Collateral to transfer to the Trustee its interest and rights in such item in the Trust Estate or Class Q-2 Securities Collateral, as applicable, hereunder, except to the extent that any requirement for consent or approval is rendered ineffective under the applicable Uniform Commercial Code.

(iv)     This Indenture creates a valid and continuing security interest (as defined in the applicable Uniform Commercial Code) (x) in the Trust Estate in favor of the Trustee for the benefit of the Secured Parties, and (y) in the Class Q-2 Securities Collateral in favor of the Trustee for the benefit of the Holders of Class Q-2 Securities, which security interest in either case is prior to all other liens and is enforceable as such against creditors of and purchasers from the Issuer;

(v)     The Trust Estate and the Class Q-2 Securities Collateral is comprised of "instruments," "security entitlements," "general intangibles," "securities accounts," "certificated securities," "deposit accounts", "accounts", "chattel paper", financial assets", "letter of credit rights" and/or "uncertificated securities" (each as defined in the applicable Uniform Commercial Code).

(vi)     With respect to instruments contained in the Trust Estate or the Class Q-2 Securities Collateral (other than instruments evidencing obligations underlying participations), all original executed copies of each instrument that constitutes or evidences the instruments have been delivered to the Securities Intermediary to be held as a financial asset (within the meaning of the applicable Uniform Commercial Code). None of the instruments have any marks or notations indicating that they have been pledged, assigned or otherwise conveyed to any Person other than the Securities Intermediary.

(vii)     All Eligible Investments consisting of instruments, security entitlements, certificated securities and uncertificated securities owned by the Issuer and contained in the Trust Estate or the Class Q-2 Securities Collateral (other than instruments evidencing obligations underlying participations) have been credited to one of the Trust Accounts or the Class Q-2 Securities Collateral Account, as applicable.  The Securities Intermediary has agreed to treat all assets credited to the Trust Accounts or the Class Q-2 Securities Collateral Account as financial assets within the meaning of the applicable Uniform Commercial Code.

010899

(viii)   The Issuer has taken all steps necessary to cause the securities intermediary to identify in its records the Trustee as the person having the security entitlement against the securities intermediary in each of the Trust Accounts and the Class Q-2 Securities Collateral Account.  The Trust Accounts and the Class Q-2 Securities Collateral Account are not in the name of any person other than the Issuer or the Trustee.  The Issuer has not consented to the Securities Intermediary to comply with entitlement orders or other instructions of any person other than the Trustee.

(ix)   The Issuer has caused or will have caused, within ten Business Days of the Closing Date, the filing of all appropriate financing statements in the proper filing office in the appropriate jurisdictions under applicable law in order to perfect the security interest in the Trust Estate and the Class Q-2 Securities Collateral granted to the Trustee hereunder.

(x)   All certificated securities (other than a Clearing Corporation Security) have been delivered to the Securities Intermediary to be held as a financial asset and have been endorsed to the Securities Intermediary or in blank or have been registered in the name of the Securities Intermediary upon original issue or registration of transfer by the issuer of such certificated security.

(b) The representations and warranties set forth in this Section 7.23 shall survive the execution of this Indenture and shall be deemed to be repeated on each date on which any item of property is added to the Trust Estate or the Class Q-2 Securities Collateral, as applicable, as if made at and as of that time.  The representations and warranties set forth herein may not be waived without receipt of a written Rating Confirmation for such waiver (provided that in the case of the Class Q-2 Securities Collateral, Rating Confirmation shall only be required so long as any Class Q-2 Securities are rated and only from the Rating Agency then rating such Class Q-2 Securities) and, in the case of the Trust Estate only, consent by the Swap Counterparty.  This Section 7.23 may not be amended without the written consent of each of the Rating Agencies.

SECTION 7.24   Financing Statements; Registration.

The Issuer shall cause a financing statement describing the Trust Estate and the Class Q-2 Securities Collateral by use of the words "all assets in which the Debtor now or hereafter has rights" and naming the Issuer as "Debtor" and the Trustee as secured party to be filed by or on behalf of the Issuer in the applicable jurisdiction, which is the District of Columbia, within ten (10) days of the Closing Date.  The Issuer shall take all actions necessary to continue and maintain the effectiveness of such financing statement and shall notify the Rating Agencies and Trustee in writing 30 days prior to any change in the Issuer's name, identity, corporate structure, jurisdiction of incorporation or location of its chief executive office.  The Issuer shall not authorize the filing of any financing statements naming it as debtor other than financing statements in favor of the Trustee. The Issuer shall cause the registration of this Indenture in the Register of Mortgages of the Issuer at the Issuer's Registered Office in the Cayman Islands.

SECTION 7.25     Reaffirmation of Rating; Annual Rating Review.

(a)     On or before the Ramp-up End Date, the Issuers shall request each Rating Agency in writing to confirm its rating of each Class of Senior Notes and request Moody's to confirm its rating of the Class Q-1 Securities, in each case within 30 days after the end of the Ramp-up Period.

(b)     The Issuers shall pay for continuous rating surveillance by S&P of the Senior Notes rated by S&P and by Moody's of the Senior Notes and the Class Q-1 Securities rated by Moody's, so long as any of such Securities remain Outstanding. The Issuers shall promptly notify the Trustee in writing (which shall promptly notify the Securityholders, the Swap Counterparty, the Reference Portfolio Manager, the Collateral Administrator and the Investment Agreement Counterparty) if at any time the rating of any Class of Senior Notes or Class Q-1 Securities has been, or is known will be, qualified, downgraded or withdrawn.

SECTION 7.26     Amendment of the Swap Agreement.

The Issuer shall not enter into any amendment to the Swap Agreement (a "Swap Agreement Amendment") except in accordance with this Section 7.26.

(a)     Without the consent of the Holders of the Notes, the Issuer and the Swap Counterparty at any time and from time to time, may amend the Swap Agreement, in order to:

(i)     cure any ambiguity, or correct, modify or supplement any provision thereof which is defective or inconsistent with any other provision therein or of the Offering Circular;

(ii)     take any action necessary or helpful to prevent the Issuer from becoming subject to any withholding or other taxes or assessments or to reduce the risk that the Issuer will be engaged in a United States trade or business or otherwise subject to United States federal income tax on a net income basis; or

(iii)     amend, modify or change any test or requirement of any Rating Agency under the Swap Agreement where such amendment, modification or change has been specified or authorized by such Rating Agency (and notice thereof has been provided to the Trustee, the Swap Counterparty and Reference Portfolio Manager);

(b) Except as provided in subsection (a), the Issuer shall not enter into an amendment to the Swap Agreement without the consent of the Holders of a majority of the Aggregate Principal Amount of each Class of Notes.

(c) Not later than 15 Business Days prior to the execution of any proposed Swap Agreement Amendment, subject to subsection (b), the Issuer shall cause the Trustee to be provided, and the Trustee, at the expense of the Issuers, shall mail to the Holders of Securities, the Swap Counterparty, the Reference Portfolio Manager, the Investment Agreement Counterparty and each Rating Agency (so long as any rated Securities are Outstanding) a copy of such proposed Swap Agreement Amendment, and shall request any consent required pursuant to subsection (b) above from the applicable Holders of Securities to be given within the Initial

Consent Period. Any consent given to a proposed amendment to the Swap Agreement by the Holder of any Securities shall be irrevocable and binding on all future Holders and beneficial owners of that Security, irrespective of the execution date of the Swap Agreement Amendment. If Holders of less than the required percentage of the Aggregate Principal Amount of the relevant Securities consent to a proposed Swap Agreement Amendment within the Initial Consent Period, on the first Business Day after the Initial Consent Period, the Trustee shall notify the Issuer, the Swap Counterparty, the Amendment Buy-Out Purchaser and the Reference Portfolio Manager which Holders of Securities have consented to the proposed Swap Agreement Amendment, and which Holders and, to the extent such information is reasonably available to the Trustee, which beneficial owners have not consented to the proposed Swap Agreement Amendment. If it intends to exercise its Amendment Buy-Out Option pursuant to Section 9.6, the Amendment Buy-Out Purchaser shall so notify the Trustee (which notice shall designate a date for the Amendment Buy-Out to occur no earlier than ten Business Days after the date of such notice) no later than five (5) Business Days after so being notified by the Trustee and the Trustee shall mail such notice to all Holders of Securities. Any Non-consenting Holder may give consent to the related proposed Swap Agreement Amendment until the 5th Business Day prior to the date of the Amendment Buy-Out designated by the Amendment Buy-Out Purchaser, and in such case shall cease to be a Non-consenting Holder for purposes of the related Amendment Buy-Out. If the Amendment Buy-Out Purchaser exercises its Amendment Buy-Out Option and purchases the applicable Securities pursuant to Section 9.6 below, the Amendment Buy-Out Purchaser as Holder or beneficial owner of the applicable Securities may consent to the related proposed Swap Agreement Amendment within five (5) Business Days of the Amendment Buy-Out.

(d) It shall not be necessary in connection with any consent of the Holders of any Securities under this Section 7.26 for such Holders to approve the specific form of any proposed amendment, but it shall be sufficient if such consent shall approve the substance thereof.

(e) Promptly after the execution by the Issuer of any Swap Agreement Amendment in accordance with this Section 7.26, the Issuer shall cause to be provided to the Trustee, and the Trustee, at the expense of the Issuers, shall mail to the Holders of the Securities, the Reference Portfolio Manager, the Swap Counterparty, the Irish Stock Exchange (if and for so long as any Class of Securities is listed thereon), the Investment Agreement Counterparty and each Rating Agency (so long as any rated Securities are Outstanding) a copy thereof.

ARTICLE VIII

TRUST ACCOUNTS; DISTRIBUTIONS

SECTION 8.1    Collection of Money.

Except as otherwise expressly provided herein, the Trustee may demand payment or delivery of, and shall receive and (subject to the terms hereof) collect, directly and without intervention or assistance of any fiscal agent or other intermediary, all money and other property payable to or receivable by the Trustee pursuant to this Indenture, including all payments due in respect of the Swap Agreement and the Pledged Securities, in accordance with the terms and conditions hereof and of the Swap Agreement and the Pledged Securities, and the Trustee shall segregate and hold all such money and property received by it in trust for the benefit of the

010902

Secured Parties and shall apply it as provided in this Indenture. In determining the amount of moneys in any trust account at any time, the Trustee shall assume that all of the Eligible Investments are sold or liquidated at market value on the date of determination. The Trustee shall have the right to establish such subaccounts within the accounts described below as the Trustee may deem necessary or appropriate for convenience in administering the Trust Estate.

SECTION 8.2    Collection Account and Expense Reserve Account.

(a) The Trustee shall, on or prior to the Closing Date, establish a segregated trust account in the name of the Trustee for the benefit of the Secured Parties which shall be designated as the "Valhalla CLO, Ltd.–Collection Account" (the "Collection Account"). All moneys credited from time to time to the Collection Account pursuant to this Indenture shall be held by the Trustee as part of the Trust Estate and shall be applied for the purposes provided herein.

(b) Except as otherwise expressly provided in this Indenture, the Trustee shall deposit into the Collection Account promptly upon receipt from time to time, (i) the net amount, if any, paid by the Swap Counterparty for any Payment Date in respect of the Adjusted Reference Portfolio Return Amount and the Fixed Amount, (ii) except as provided in Section 8.3, any Swap Termination Payment paid by the Swap Counterparty in connection with the termination of the Swap Agreement, and (iii) all amounts transferred to the Collection Account pursuant to Section 8.3 and subsection (e) hereof.

(c) On each Payment Date, the Trustee shall distribute applicable Payment Date Proceeds in the Collection Account pursuant to the Payment Date Priority of Payments set forth in Section 8.6(a).

(d) On the Maturity Date and on any Payment Date on which Notes are redeemed pursuant to Section 2.14(b), (d) or (e) or an Income Note Principal Distribution Amount is to be paid, the Trustee, shall in addition to its obligations under clause (c), distribute applicable moneys in the Collection Account pursuant to the Principal Priority of Payments set forth in Section 8.6(b).

(e) The Trustee shall, on or prior to the Closing Date, establish a segregated trust account in the name of the Trustee for the benefit of the Secured Parties which shall be designated as the "Valhalla CLO, Ltd.–Expense Reserve Account" (the "Expense Reserve Account"). On the Closing Date, the Issuer will deposit $17,376,625 in the Expense Reserve Account. On any Business Day from and including the Closing Date to but excluding the last Business Day prior to the first Payment Date, the Trustee shall, upon the written direction of the Initial Purchaser, apply funds from the Expense Reserve Account to pay expenses of the Issuers incurred in connection with the establishment of the Issuers, the structuring and consummation of the offering and the transactions contemplated thereby and the issuance of the Securities. Any funds remaining in the Expense Reserve Account on the last Business Day prior to the first Payment Date will be deposited without further direction by or consent of any Person on such day in the Collection Account for distribution on the first Payment Date in accordance with the Payment Date Priority of Payments and the Expense Reserve Account will be closed. Amounts on deposit in the Expense Reserve Account will be invested in the JPMorgan Fleming US Dollar

Liquidity Fund 6052; provided that such fund then meets the requirements of the definition of Eligible Investment. Any income or other gain from Eligible Investments credited to the Expense Reserve Account shall be credited to, and any loss resulting therefrom shall be charged to, the same Expense Reserve Account.

SECTION 8.3    Collateral Account.

(a) The Trustee shall, on or prior to the Closing Date, establish a segregated trust account in the name of the Trustee for the benefit of the Secured Parties which shall be designated as the "Valhalla CLO, Ltd.–Collateral Account" (the "Collateral Account"). The Issuer shall deposit with the Trustee, and upon receipt the Trustee shall cause to be credited to the Collateral Account, the net proceeds of the Securities (excluding amounts deposited in the Expense Reserve Account pursuant to 8.2(e)). In addition, the Trustee shall deposit into the Collateral Account to the extent received from time to time (i) interest and dividends received in respect of Eligible Investments credited to the Collateral Account and (ii) amounts to be deposited in the Collateral Account pursuant to Section 3.4(b). In addition, on each Payment Date, an amount equal to the Quarterly Aggregate Increase Amount, if any, for such date, will be deposited in the Collateral Account in accordance with the Priority of Payments.

(b) On each Payment Date other than the Maturity Date, Optional Redemption Date or Tax Redemption Date, the Trustee shall transfer from the Collateral Account to the Collection Account (i) an amount equal to the investment income received on the Eligible Investments in the Collateral Account during the related Periodic Interest Accrual Period and (ii) other amounts in the Collateral Account that constitute Payment Date Proceeds for such Payment Date or that are to be disbursed in accordance with the Principal Priority of Payments on such Payment Date.

(c) On the Maturity Date, Optional Redemption Date or Tax Redemption Date, the Trustee shall transfer to the Collection Account all of the moneys in the Collateral Account following sale or liquidation of Eligible Investments pursuant to clause (e).

(d) In the event of the early termination of the Swap Agreement, the Trustee shall apply amounts in the Collateral Account to pay to the Swap Counterparty any Swap Termination Payment owed to it pursuant to the Swap Agreement on the applicable Early Termination Date (as defined in the Swap Agreement), provided that any Swap Termination Payment due to the Swap Counterparty as a result of a Swap Event of Default as to which the Swap Counterparty is the defaulting party or a Swap Additional Termination Event as to which the Swap Counterparty is the affected party will be paid on the next Payment Date in accordance with Section 8.6.

(e) The Trustee shall sell, liquidate or make withdrawals from Eligible Investments in the Trust Accounts to the extent necessary to make any of the payments set forth in paragraphs (b), (c) or (d) above. Any such sales or liquidation shall be made at the direction of the Swap Counterparty (or the direction of the Reference Portfolio Manager on behalf of the Swap Counterparty); provided that the Swap Counterparty (or the Reference Portfolio Manager on its behalf) shall not be entitled to give such direction if (i) a Swap Event of Default as to which the Swap Counterparty is the defaulting party has occurred and is continuing, (ii) a Swap Additional Termination Event has occurred and is continuing or (iii) the Swap Agreement has

010904

been terminated and all amounts owed to the Swap Counterparty thereunder have been paid in full, in each of which cases the Requisite Noteholders shall be entitled to give such direction.

SECTION 8.4    Investment of Moneys.

(a) Except as provided in Section 8.2(e), the Trustee shall invest moneys held from time to time in each Trust Account pursuant to (b) below in one or more Eligible Investments pursuant to the written direction of the Swap Counterparty as Secured Party (or the Reference Portfolio Manager on its behalf) (which may be in the form of standing instructions); provided, that the Swap Counterparty (or the Reference Portfolio Manager on its behalf) shall not be entitled to give such direction if (i) a Swap Event of Default as to which the Swap Counterparty is the defaulting party has occurred and is continuing, (ii) a Swap Additional Termination Event has occurred and is continuing or (iii) the Swap Agreement has been terminated and all amounts owed to the Swap Counterparty thereunder have been paid in full, in each of which cases the Requisite Noteholders shall be entitled to give such direction. If the Trustee does not receive such written directions within three days of receipt of uninvested moneys (whether by reason of a new deposit of moneys or payments in respect of, or realized upon the maturity of, existing Eligible Investments), the Trustee shall invest such moneys in Eligible Investments described in clause (a) of the definition thereof. If a written direction with respect to an investment is not received by the Trustee by 11:00 a.m. (New York City time) on any Business Day, the Trustee shall use its best efforts to effect the investment thereof on such date, but in no event later than the next Business Day. The Trustee shall not be obligated to pay interest on any uninvested moneys. Each Eligible Investment other than any Eligible Investment constituting a general intangible, a deposit account or an account shall be credited to the Trust Account to which the moneys used to make such Eligible Investment were credited, and any income or other gain therefrom shall be credited to, and any loss resulting therefrom shall be charged to, the same Trust Account. Any Eligible Investments constituting general intangibles, deposit accounts and accounts shall be Delivered to the Trustee. The Trustee shall not be liable by reason of any investment loss realized in connection with any Eligible Investment.

(b) The Eligible Investments in the Collateral Account and the Collection Account shall be required to mature and be payable as follows:

(i)    The Collateral Account. The Eligible Investments in the Collateral Account (other than the Investment Agreement) shall be required to mature on or before the Business Day prior to the next Payment Date. The initial Eligible Investments in the Collateral Account shall be the Investment Agreement which the Issuer and the Trustee, as requested and directed hereby by the Issuer, will enter into on the Closing Date. The Trustee shall not acquire any replacement Eligible Investments therefor unless the Trustee shall have received Rating Confirmation for any such replacement Eligible Investments. The Trustee shall notify each Rating Agency of any replacement guarantee under the Investment Agreement or any failure by the counterparty to the Investment Agreement to post collateral when required to do so thereunder. The Trustee will perform the functions assigned to the Trustee under the Investment Agreement; provided that the Trustee shall exercise remedies in the event of a default thereunder, or give or withhold (i) any consent of the Trustee to a replacement collateral agent under the Investment Agreement or (ii) approval to a transfer of the Investment Agreement or

100

withdrawal of the balance of the investment in the case of a downgrade of the Investment Agreement Counterparty, in each case as directed in writing by or on behalf of the Swap Counterparty as a Secured Party under this Indenture (unless the Swap Agreement has been terminated and all amounts owed thereunder to the Swap Counterparty have been paid in full, in which case as directed by the Requisite Noteholders). Additional amounts deposited in the Collateral Account from time to time (including the Quarterly Aggregate Increase Amounts, if any) shall be invested in the Investment Agreement to the extent permitted thereunder.

(ii)  <u>The Collection Account</u>.  The Eligible Investments in the Collection Account at any time shall be required to mature on or before the Business Day prior to the next Payment Date.

(c) During the term of the Investment Agreement, if there is a replacement of the guarantee or the guarantor pursuant thereto, the Trustee will request Rating Confirmation with respect to such change in guarantee or guarantor, as the case may be.

SECTION 8.5  <u>Status of Account; Securities Intermediary</u>.

(a) Each of the Collection Account, the Expense Reserve Account and the Collateral Account (collectively, the "Trust Accounts") shall be at all times an Eligible Account at an Eligible Institution established as a "securities account" with a "securities intermediary" (each of the foregoing terms in quotations is used as defined in the UCC (and, if different, the Uniform Commercial Code in the securities intermediary's jurisdiction as set forth in the Account Agreement) pursuant to an agreement or arrangement causing the institution with which such securities account is maintained to maintain such securities account in accordance with the Account Agreement. The Trustee is appointed as the initial Securities Intermediary hereunder and the Trustee accepts such appointment.

(b) The Securities Intermediary shall and JPMorgan Chase Bank as initial Securities Intermediary does represent and warrant that it is as of the date it accepts such appointment and shall be for so long as it is the Securities Intermediary hereunder, a corporation or bank that in the ordinary course of business maintains securities accounts for others and is acting in that capacity hereunder. The Trustee shall ensure that each Securities Intermediary with which a Trust Account is maintained, and JPMorgan Chase Bank as initial Securities Intermediary, does (i) agree with the parties hereto that each of the Trust Accounts shall be an account to which "financial assets" may be credited, (ii) undertake to treat the Trustee as the sole "entitlement holder" for each of the Trust Accounts, (iii) agree with the parties hereto that the cash balances in each Trust Account and all other property credited to each Trust Account shall constitute "financial assets" and (iv) agree with the parties hereto that the "Securities Intermediary's jurisdiction" shall be the State of New York (it being understood that each of the foregoing terms in quotations is used as defined in the UCC) and that the establishment and maintenance of each Trust Account will be governed by the law of the State of New York. Each of the accounts shall be a segregated account in the name of the Trustee, and all Eligible Investments shall be Delivered to the Securities Intermediary in accordance with the definition given to that term in this Indenture.

101

(c) The Securities Intermediary shall and JPMorgan Chase Bank as initial Securities Intermediary does:

(i) covenant that it will not take any action concerning the Trust Accounts that is inconsistent with the provisions of this Indenture;

(ii) represent and covenant that it is not and will not be as long as it is the Securities Intermediary hereunder a party to any agreement concerning a Trust Account that is inconsistent with the provisions of this Indenture; and

(iii) agree that any item of property credited to a Trust Account shall not be subject to any security interest, lien, or right of setoff in favor of the Securities Intermediary, or to the extent within the Securities Intermediary's control, anyone claiming through the Securities Intermediary (other than the Trustee) other than (A) amounts due to the Securities Intermediary in respect of customary fees and expenses for the routine maintenance and operation of the Trust Accounts, (B) the face amount of any checks which have been credited to the Trust Accounts but are subsequently returned unpaid because of uncollected or insufficient funds and (C) any overdraft or advance in respect of the settlement of investments acquired for credit to such account.

(d) The Securities Intermediary may at any time resign by notice to the Trustee, may at any time be removed by notice from the Trustee, and shall be removed by notice from the Trustee within 10 days after the Trustee has actual notice that any Trust Account is no longer an Eligible Account with such Securities Intermediary, that the Securities Intermediary is no longer an Eligible Institution, or that the Securities Intermediary no longer satisfies the requirements of this Indenture. Upon such resignation or removal, the Trustee shall appoint a successor Securities Intermediary satisfying the requirements of this Indenture and shall cause the Trust Accounts to be established and maintained with such successor Securities Intermediary in accordance with the terms hereof, and the responsibilities and duties of the retiring Securities Intermediary hereunder shall remain in effect until all of the Trust Estate credited to the Trust Accounts has been transferred to such successor.

SECTION 8.6    Priority of Payments.

(a) On each Payment Date, the Trustee shall distribute Payment Date Proceeds in the Collection Account in the following order of priority (the "Payment Date Priority of Payments"):

(i) to the payment of any accrued and unpaid Administrative Expenses (in the order set forth in the definition thereof) up to the Expense Cap Amount;

(ii) (x) to the Swap Counterparty, the net amount, if any, payable to the Swap Counterparty under the Swap Agreement on such date in respect of the Adjusted Reference Portfolio Return Amount, the Fixed Amount and any Swap Termination Payment due to the Swap Counterparty (except any Swap Termination Payment due to the Swap Counterparty upon the early termination of the Swap Agreement as a result of a Swap Event of Default as to which the Swap Counterparty is the defaulting party or as a result of a Swap Additional Termination Event, and excluding

102

any Swap Termination Payment previously paid pursuant to Section 8.3), and any such net amounts not paid from prior Payment Dates and (y) to the Collateral Account, an amount equal to the Quarterly Aggregate Increase Amount, if any, for such Payment Date;

(iii)     to the Holders of Class A-1 Notes, the Class A-1 Interest Amount;

(iv)     to the Holders of Class A-2 Notes, the Class A-2 Interest Amount;

(v)     following the Ramp-up End Date, if any Class A-1 Notes or Class A-2 Notes are then Outstanding and if either the Class A OC Test or the Class A Interest Coverage Test is not satisfied as of the related Determination Date, to the Holders of the Class A-1 Notes, the Aggregate Principal Amount of the Class A-1 Notes, and, following the redemption of all Class A-1 Notes, to the Holders of the Class A-2 Notes, the Aggregate Principal Amount of the Class A-2 Notes, such that such tests are satisfied as of the related Determination Date;

(vi)     to the Holders of the Class B Notes, the Class B Interest Amount;

(vii)     following the Ramp-up End Date, if any Class A-1 Notes, Class A-2 Notes or Class B Notes are then Outstanding and if either the Class B OC Test or the Class B Interest Coverage Test is not satisfied as of the related Determination Date, to the Holders of the Class A-1 Notes, the Aggregate Principal Amount of the Class A-1 Notes, and following the redemption of all Class A-1 Notes, to the Holders of the Class A-2 Notes, the Aggregate Principal Amount of the Class A-2 Notes, and following the redemption of all Class A-2 Notes, to the Holders of the Class B Notes, first, all accrued and unpaid Deferred Interest with respect to the Class B Notes and then, the Aggregate Principal Amount of the Class B Notes, such that such tests are satisfied as of the related Determination Date;

(viii)    to the Holders of the Class B Notes, all accrued and unpaid Deferred Interest with respect to the Class B Notes;

(ix)     on a pro rata basis, to the Holders of the Class C-1 Notes, the Class C-1 Interest Amount and to the Holders of the Class C-2 Notes, the Class C-2 Interest Amount;

(x)     following the Ramp-up End Date, if any Class A-1 Notes, Class A-2 Notes, Class B Notes or Class C Notes are then Outstanding and if either the Class C OC Test or the Class C Interest Coverage Test is not satisfied as of the related Determination Date, to the Holders of the Class A-1 Notes, the Aggregate Principal Amount of the Class A-1 Notes, and following the redemption of all Class A-1 Notes, to the Holders of the Class A-2 Notes, the Aggregate Principal Amount of the Class A-2 Notes, and following the redemption of all Class A-2 Notes, to the Holders of the Class B Notes, first, all accrued and unpaid Deferred Interest with respect to the Class B Notes and then, the Aggregate Principal Amount of the Class B Notes, and following the redemption of all Class B Notes, first, on a pro rata basis, to the Holders of the Class C-1 Notes, all accrued and unpaid Deferred Interest with respect to the Class C-1 Notes and to

the Holders of the Class C-2 Notes, all accrued and unpaid Deferred Interest with respect to the Class C-2 Notes and then, on a pro rata basis, to the Holders of the Class C-1 Notes, the Aggregate Principal Amount of the Class C-1 Notes and to the Holders of the Class C-2 Notes, the Aggregate Principal Amount of the Class C-2 Notes, such that such tests are satisfied as of the related Determination Date;

(xi)     on a pro rata basis, to the Holders of the Class C-1 Notes, all accrued and unpaid Deferred Interest with respect to the Class C-1 Notes and to the Holders of the Class C-2 Notes, all accrued and unpaid Deferred Interest with respect to the Class C-2 Notes;

(xii)     in the event that either Rating Agency has not confirmed in writing its rating in effect on the Closing Date on each Class of Senior Notes as of the 30th day following the Ramp-up End Date, to the Holders of the Class A-1 Notes, the Aggregate Principal Amount of the Class A-1 Notes and, following the redemption of all Class A-1 Notes, to the Holders of the Class A-2 Notes, the Aggregate Principal Amount of the Class A-2 Notes and, following the redemption of all Class A-2 Notes, to the Holders of the Class B Notes, first, all accrued and unpaid Deferred Interest with respect to the Class B Notes and then, the Aggregate Principal Amount of the Class B Notes, and following the redemption of all Class B Notes, first, on a pro rata basis, to the Holders of the Class C-1 Notes all accrued and unpaid Deferred Interest with respect to the Class C-1 Notes and to the Holders of the Class C-2 Notes all accrued and unpaid Deferred Interest with respect to the Class C-2 Notes and then, on a pro rata basis, to the Holders of the Class C-1 Notes, the Aggregate Principal Amount of the Class C-1 Notes and to the Holders of the Class C-2 Notes, the Aggregate Principal Amount of the Class C-2 Notes, until each such rating is confirmed;

(xiii)     to the Swap Counterparty, any Swap Termination Payment due to it upon the early termination of the Swap Agreement as a result of a Swap Event of Default as to which the Swap Counterparty is the defaulting party or as a result of a Swap Additional Termination Event, and excluding any Swap Termination Payment previously paid pursuant to Section 8.3;

(xiv)     following the Ramp-up End Date, if any Class B Notes or Class C Notes are then Outstanding and if the Diversion Test is not satisfied as of the related Determination Date, an amount equal to 50% of the remaining Payment Date Proceeds, (i) first, on a pro rata basis, to the Holders of the Class B Notes, all accrued and unpaid Deferred Interest with respect to the Class B Notes, to the Holders of the Class C-1 Notes, all accrued and unpaid Deferred Interest with respect to the Class C-1 Notes and to the Holders of the Class C-2 Notes, all accrued and unpaid Deferred Interest with respect to the Class C-2 Notes, and (ii) then, on a pro rata basis, to the Holders of the Class B Notes, the Aggregate Principal Amount of the Class B Notes, to the Holders of the Class C-1 Notes, the Aggregate Principal Amount of the Class C-1 Notes and to the Holders of the Class C-2 Notes, the Aggregate Principal Amount of the Class C-2 Notes;

(xv)     to the payment first of any accrued and unpaid Administrative Expenses (in the order set forth in the definition thereof) to the extent not paid pursuant to

010909

clause (i) above and then, to the payment of any accrued and unpaid Subordinated Administrative Expenses;

(xvi) to the payment of any unpaid Extension Bonus Payments (i) first, to the applicable Holders of Class A-1 Notes, (ii) then, to the applicable Holders of Class A-2 Notes, (iii) then, to the applicable Holders of Class B Notes, and (iv) then, on a pro rata basis, to the applicable Holders of Class C-1 Notes and the applicable Holders of Class C-2 Notes; and

(xvii) the remainder, to the Holders of the Income Notes (the "Net Income Note Periodic Return Amount").

(b) On (A) the Maturity Date, the Optional Redemption Date or the Tax Redemption Date and (B) each other Payment Date on which Senior Notes are to be redeemed pursuant to Section 2.14(b) or, after all Senior Notes are redeemed, an Income Note Principal Distribution Amount is to be paid on the Income Notes, the Trustee will distribute the principal proceeds of Eligible Investments (after payment of any amounts payable therefrom pursuant to the Payment Date Priority of Payments and, in the case of clause (B), using principal proceeds in an amount not to exceed the Note Redemption Amount for such date), and in the case of the Maturity Date, the Optional Redemption Date or the Tax Redemption Date, any other amounts on deposit in the Trust Accounts to make the following payments in the following order of priority (the "Principal Priority of Payments"):

(i) to the payment of any accrued and unpaid Administrative Expenses (in the order set forth in the definition thereof) up to the Expense Cap Amount, to the extent not paid pursuant to the Payment Date Priority of Payments;

(ii) to the Swap Counterparty, the net amount, if any, payable to the Swap Counterparty under the Swap Agreement on such date in respect of the Adjusted Reference Portfolio Return Amount, the Fixed Amount, and any Swap Termination Payment due to the Swap Counterparty (except any Swap Termination Payment due to the Swap Counterparty upon the early termination of the Swap Agreement as a result of a Swap Event of Default as to which the Swap Counterparty is the defaulting party or as a result of a Swap Additional Termination Event), and any such net amounts not paid from prior Payment Dates, in any case to the extent not paid pursuant to the Payment Date Priority of Payments or Section 8.3;

(iii) to the Holders of the Class A-1 Notes, any accrued and unpaid Class A-1 Interest Amount, to the extent not paid pursuant to the Payment Date Priority of Payments;

(iv) to the Holders of the Class A-2 Notes, any accrued and unpaid Class A-2 Interest Amount, to the extent not paid pursuant to the Payment Date Priority of Payments;

(v) following the Ramp-up End Date, if any Class A-1 Notes or Class A-2 Notes are then Outstanding and if either the Class A OC Test or the Class A Interest Coverage Test is not satisfied as of the related Determination Date, to the Holders of the

010910

Class A-1 Notes, the Aggregate Principal Amount of the Class A-1 Notes and, following the redemption of all Class A-1 Notes, to the Holders of the Class A-2 Notes, the Aggregate Principal Amount of the Class A-2 Notes, such that such tests are satisfied as of the related Determination Date;

(vi)     to the Holders of the Class B Notes, any accrued and unpaid Class B Interest Amount, to the extent not paid pursuant to the Payment Date Priority of Payments;

(vii)     following the Ramp-up End Date, if any Class A-1 Notes, Class A-2 Notes or Class B Notes are then Outstanding and if either the Class B OC Test or the Class B Interest Coverage Test is not satisfied as of the related Determination Date, to the Holders of the Class A-1 Notes, the Aggregate Principal Amount of the Class A-1 Notes, and following the redemption of all Class A-1 Notes, to the Holders of the Class A-2 Notes, the Aggregate Principal Amount of the Class A-2 Notes, and following the redemption of all Class A-2 Notes, to the Holders of the Class B Notes, first, all accrued and unpaid Deferred Interest with respect to the Class B Notes and then, the Aggregate Principal Amount of the Class B Notes, such that such tests are satisfied as of the related Determination Date;

(viii)     on a pro rata basis, to the Holders of the Class C-1 Notes, the accrued and unpaid Class C-1 Interest Amount and to the Holders of the Class C-2 Notes, the accrued and unpaid Class C-2 Interest Amount, to the extent not paid pursuant to the Payment Date Priority of Payments;

(ix)     following the Ramp-up End Date, if any Class A-1 Notes, Class A-2 Notes, Class B Notes or Class C Notes are then Outstanding and if either the Class C OC Test or the Class C Interest Coverage Test is not satisfied as of the related Determination Date, to the Holders of the Class A-1 Notes, the Aggregate Principal Amount of the Class A-1 Notes, and following the redemption of all Class A-1 Notes, to the Holders of the Class A-2 Notes, the Aggregate Principal Amount of the Class A-2 Notes, and following the redemption of all Class A-2 Notes, to the Holders of the Class B Notes, first, all accrued and unpaid Deferred Interest with respect to the Class B Notes and then, the Aggregate Principal Amount of the Class B Notes, and following the redemption of all Class B Notes, first, on a pro rata basis, to the Holders of the Class C-1 Notes all accrued and unpaid Deferred Interest with respect to the Class C-1 Notes and to the Holders of the Class C-2 Notes all accrued and unpaid Deferred Interest with respect to the Class C-2 Notes and then, on a pro rata basis, to the Holders of the Class C-1 Notes, the Aggregate Principal Amount of the Class C-1 Notes and to the Holders of the Class C-2 Notes, the Aggregate Principal Amount of the Class C-2 Notes, such that such tests are satisfied as of the related Determination Date;

(x)     to the Holders of the Class A-1 Notes, the Aggregate Principal Amount of the Class A-1 Notes;

(xi)     to the Holders of the Class A-2 Notes, the Aggregate Principal Amount of the Class A-2 Notes;

010911

(xii)   to the Holders of the Class B Notes, any accrued and unpaid Deferred Interest with respect to the Class B Notes, to the extent not paid pursuant to the Payment Date Priority of Payments;

(xiii)   to the Holders of the Class B Notes, the Aggregate Principal Amount of the Class B Notes;

(xiv)   on a pro rata basis, to the Holders of the Class C-1 Notes, any accrued and unpaid Deferred Interest with respect to the Class C-1 Notes and to the Holders of the Class C-2 Notes, any accrued and unpaid Deferred Interest with respect to the Class C-2 Notes, to the extent not paid pursuant to the Payment Date Priority of Payments;

(xv)   on a pro rata basis, to the Holders of the Class C-1 Notes, the Aggregate Principal Amount of the Class C-1 Notes and to the Holders of the Class C-2 Notes, the Aggregate Principal Amount of the Class C-2 Notes, and, in the case of the Optional Redemption Date, the Make-whole Premium in respect of the Class C-2 Notes;

(xvi)   to the Swap Counterparty, any Swap Termination Payment due to it upon the early termination of the Swap Agreement as a result of a Swap Event of Default as to which the Swap Counterparty is the defaulting party or as a result of a Swap Additional Termination Event, to the extent not paid pursuant to the Payment Date Priority of Payments or Section 8.3;

(xvii)   to the payment first of accrued and unpaid Administrative Expenses (in the order set forth in the definition thereof) to the extent not paid pursuant to clause (i) above or pursuant to the Payment Date Priority of Payments and then, to the payment of accrued and unpaid Subordinated Administrative Expenses to the extent not paid pursuant to the Payment Date Priority of Payments;

(xviii)   to the payment of any unpaid Extension Bonus Payments (i) first, to the applicable Holders of Class A-1 Notes, (ii) then, to the applicable Holders of Class A-2 Notes, (iii) then, to the applicable Holders of Class B Notes, and (iv) then, on a pro rata basis, to the applicable Holders of Class C-1 Notes and the applicable Holders of Class C-2 Notes, to the extent not paid pursuant to the Payment Date Priority of Payments; and

(xix)   to the Holders of the Income Notes, (a) on any Payment Date (other than the Maturity Date, the Optional Redemption Date or the Tax Redemption Date), the remainder, as an Income Note Principal Distribution Amount (the "Income Note Principal Distribution Amount") or (b) on the Maturity Date, the Optional Redemption Date or the Tax Redemption Date, the remainder (the "Final Income Note Distribution Amount").

(c) Anything in this Article VIII to the contrary notwithstanding, upon the occurrence of any Event of Default and the acceleration of the Notes pursuant to Article V hereof, moneys collected or received by the Trustee shall be distributed as provided in Section 5.8 hereof.

(d) For purposes of any paragraph of the Priority of Payments that requires funds to be applied if one or more specified Coverage Tests are not satisfied to the extent necessary to cause such Coverage Tests to be satisfied, satisfaction of such Coverage Tests will be determined as of the related Determination Date giving effect to all payments to be made on the applicable Payment Date prior to the payment of amounts under the applicable paragraph (and for this purpose, all payments made on any Payment Date pursuant to Section 8.6(a) will be deemed made prior to all payments, if any, made on such date pursuant to Section 8.6(b)). Pro rata payments of principal among pari passu Classes of Notes will be based upon the principal amount of such Notes outstanding on the date of payment, and pro rata payments of interest among pari passu Classes of Notes shall be based upon the amount of interest payable on such Notes on the date of payment. Payments with respect to any Class of Notes will be made to all Holders of Notes of such Class on a pro rata basis based on each Holder's holding of such Notes. Pro rata payments of Extension Bonus Payments among Holders of pari passu Classes of Notes shall be based upon the amount of Extension Bonus Payments payable to such Holders on the date of payment. Payments of Extension Bonus Payments will be made to the Holders to which they are payable on a pro rata basis based on each such Holder's holding of the applicable Notes with respect to which the Extension Bonus Payment is determined.

SECTION 8.7    Monthly Reports.

Not later than the 10th Business Day after the Monthly Report Determination Date, commencing in November 2004, the Issuer or its agent will compile and provide to the Trustee, the Swap Counterparty, the Reference Portfolio Manager, the Investment Agreement Counterparty, the Rating Agencies and the Holders of the Securities a report (the "Monthly Report"); provided, that no Monthly Report shall have to be delivered in any month in which a Payment Date Valuation Report is being delivered. Each Monthly Report shall contain the following information with respect to the calendar month in which the Monthly Report Determination Date falls:

(a) Sources and uses of funds during the calendar month:

(i)    earnings received on Eligible Investments;

(ii)    the Adjusted Reference Portfolio Return Amount payable from or to the Swap Counterparty, if any;

(iii)    a calculation in reasonable detail of the Fixed Amount; and

(iv)    any other payments made or received during such calendar month.

(b) Collection Account Information:

(i)    the amount of funds and Eligible Investments credited to the Collection Account as of the first day of the calendar month; and

(ii)    the amount of funds and Eligible Investments credited to the Collection Account as of the last day of the calendar month.

010913

(c) Expense Reserve Account Information:

(i) the amount of funds and investments credited to the Expense Reserve Account as of the first day of the calendar month; and

(ii) the amount of funds and investments credited to the Expense Reserve Account as of the last day of the calendar month.

(d) Collateral Account Information:

(i) the amount of funds and Eligible Investments credited to the Collateral Account as of the first day of the calendar month;

(ii) the amount of funds, if any, deposited into the Collateral Account during the calendar month;

(iii) the amount of funds, if any, withdrawn from the Collateral Account during the calendar month; and

(iv) the amount of funds and Eligible Investments credited to the Collateral Account as of the last day of the calendar month.

(e) Class Q-2 Securities Collateral Account Information:

(i) the amount of funds and Eligible Investments credited to the Class Q-2 Securities Collateral Account as of the first day of the calendar month;

(ii) the amount of funds, if any, deposited into the Class Q-2 Securities Collateral Account during the calendar month;

(iii) the amount of funds, if any, withdrawn from the Class Q-2 Securities Collateral Account during the calendar month; and

(iv) the amount of funds and Eligible Investments credited to the Class Q-2 Securities Collateral Account as of the last day of the calendar month.

(f) Coverage Tests:

(i) the Overcollateralization Ratios as of the last day of the preceding calendar month and as of the last day of the calendar month, and the components thereof;

(ii) the Interest Coverage Ratios as of the last day of the preceding calendar month and as of the last day of the calendar month, and the components thereof;

(iii) the Class Q-2A Coverage Ratio as of the last day of the preceding calendar month and as of the last day of the calendar month, and the components thereof; and

010914

(iv)    a statement as to whether each of the Coverage Tests and the Class Q-2A Coverage Test has been satisfied.

(g) Eligible Investments:  with respect to each Eligible Investment credited to the Collateral Account, as of the last day of the calendar month, its principal balance or maturity value, its interest rate, stated maturity, issuer, rating by Moody's and rating by Standard & Poor's (including whether such rating is on watch for downgrade or upgrade).

(h) Information regarding the Reference Portfolio (as of the Monthly Report Determination Date):

(i)    the identity of each Reference Entity and Reference Obligation;

(ii)    the Reference Obligation Calculation Amount and the Reference Value of each Reference Obligation in the Reference Portfolio, and the Aggregate Reference Obligation Calculation Amount and the Aggregate Reference Value;

(iii)    the current Moody's Rating and Standard & Poor's Rating of each Reference Obligation and Underlying Obligation;

(iv)    the Weighted Average Rating of the Reference Obligations in the Reference Portfolio and the maximum allowed by the Reference Portfolio Criteria;

(v)    the Diversity Score for the Reference Portfolio and the minimum allowed by the Reference Portfolio Criteria;

(vi)    whether any Reference Obligation is on watch for a rating upgrade or downgrade;

(vii)    the current spread payable for each Reference Obligation and the commitment fee on the undrawn portion thereof, if any;

(viii)    a reasonably detailed calculation of the Reference Portfolio Criteria, including the methodology used to calculate the Reference Portfolio Criteria, and evidence of compliance with the Reference Portfolio Criteria;

(ix)    a statement as to whether each of the Reference Portfolio Criteria has or has not been satisfied;

(x)    the level of funding of any Reference Obligations that are Revolving Loans;

(xi)    the weighted average Reference Price of all Reference Obligations;

(xii)    the weighted average credit spread of all Reference Obligations (including for funded and unfunded portions thereof); and

010915

(xiii) the five Moody's Industry Classification Groups representing the highest concentration of Reference Obligations by Reference Obligation Calculation Amount, and the portion of the Portfolio Calculation Amount represented by each such group.

(i) Defaulted Reference Obligations:

(i) the identity of each Defaulted Reference Obligation and the corresponding Reference Obligation Calculation Amount and Reference Price, as well as the aggregate Reference Obligation Calculation Amount for all Defaulted Reference Obligations;

(ii) the date of the Credit Event;

(iii) the type of Credit Event;

(iv) the Market Value of each Defaulted Reference Obligation; and

(v) the weighted average Reference Price of all Defaulted Reference Obligations.

(j) Modification Activity (during the calendar month):

(i) the identity of each Reference Obligation (and whether the obligation is a Credit Risk Obligation, Credit Improved Obligation or other) that was removed (including the Removal Date), or with respect to which an Amortization occurred, its corresponding Reference Obligation Calculation Amount, the relevant Final Price (in the case of a removal) and the related Obligation Value Increase Amount or Obligation Value Reduction Amount, as applicable;

(ii) the identity, Addition Date, Reference Entity, Reference Price, Reference Obligation Calculation Amount and Reference Value of each Reference Obligation added to the Reference Portfolio; and

(iii) the Accrued Increase/Reduction Amount.

At least four Business Days prior to the date on which such report must be delivered, the Issuer or its agent shall provide a copy of the proposed Monthly Report to the Trustee, the Swap Counterparty and the Reference Portfolio Manager. Upon receipt of such proposed Monthly Report, the Trustee and the Reference Portfolio Manager on behalf of the Swap Counterparty will compare the information contained therein to the information contained in their respective records with respect to the Trust Estate and the Class Q-2 Securities Collateral and the Reference Portfolio and shall, within three Business Days after receipt of such proposed Monthly Report, notify the Issuer or its agent and each other if the information contained in the proposed Monthly Report does not conform to the information maintained by such party with respect to the Trust Estate and the Class Q-2 Securities Collateral and the Reference Portfolio, and detail any discrepancies. In the event that any discrepancy exists, the Issuer or its agent, the Trustee, and the Reference Portfolio Manager shall attempt to promptly resolve the discrepancy.

010916

If such discrepancy cannot be promptly resolved on such third Business Day, the Trustee shall within two Business Days thereafter cause Independent Accountants to be appointed to review such proposed Monthly Report and the records of the Trustee and the Reference Portfolio Manager, as applicable, to determine the cause of such discrepancy. If such review reveals an error in the proposed Monthly Report or the Trustee's or Reference Portfolio Manager's records, the proposed Monthly Report or the Trustee's or Reference Portfolio Manager's records, as the case may be, shall be revised accordingly and, as so revised, shall be utilized in making all further calculations. Pursuant to the Reference Portfolio Management Agreement, the Reference Portfolio Manager has agreed to provide, or cause to be provided, on behalf of the Swap Counterparty, to the Collateral Administrator and/or the Independent Accountants access to all information in the possession of the Reference Portfolio Manager relating to the Reference Portfolio for purposes of compiling (or providing information required for) the Monthly Report.

SECTION 8.8    Payment Date Valuation Reports.

With respect to each Payment Date (and the Maturity Date) the Issuer or its agent shall render an accounting with respect to the Trust Estate, the Class Q-2 Securities Collateral and Reference Portfolio (each such accounting, a "Payment Date Valuation Report"), and provide such Payment Date Valuation Report no later than the related Payment Date (and the Maturity Date) to the Trustee, the Swap Counterparty, the Reference Portfolio Manager, the Investment Agreement Counterparty, the Independent Accountants, the Rating Agencies and the Holders of the Securities (and upon request to the Trustee by a beneficial owner of a Security, to such beneficial owner). The Payment Date Valuation Report shall contain the following information with respect to the related Payment Date determined as of the Determination Date:

(a) Calculation of certain amounts (including shortfalls from prior Payment Dates):

(i)    as of the Determination Date, a calculation in reasonable detail of the Overcollateralization Ratios and the Interest Coverage Ratios and a statement as to whether each Coverage Test has or has not been satisfied, and if any Coverage Test has not been satisfied, the amount required for the payment of the Aggregate Principal Amount of each relevant Class of Notes in order to achieve compliance for each such Coverage Test;

(ii)    the applicable interest rate in respect of each Class of Notes for such Payment Date and the amount of interest payable for each Class of Notes on such Payment Date;

(iii)    the amount of Administrative Expenses (in the categories set forth in the definition thereof) and the Expense Cap Amount for such Payment Date;

(iv)    the amount of any Accrued Swap Liabilities payable on such Payment Date;

(v)    the Base Amount, Subordinate Amount and Incentive Amount for such Payment Date;

010917

(vi)     the amount of any principal payable in respect of any Class of Notes and the Aggregate Principal Amount of each Class of Notes;

(vii)     with respect to the Class Q Securities, (A) the stated amount of the Class Q-1 Securities, (B) the Class Q-1 Nominal Principal (and, after the Class Q-1 Nominal Principal has been reduced to $1,000, any amount in excess of the Class Q-1 Nominal Interest, as "additional return on capital" with respect to the Class Q-1 Securities), (C) the Class Q-1 Rated Principal, (D) the Class Q-1 Nominal Interest, (E) the Class Q-1 Excess Distribution, (F) the applicable interest rate in respect of the Class Q-2A Securities and the amount of interest payable for the Class Q-2A Securities on such Payment Date, (G) the amount of any principal payable in respect of the Class Q-2A Securities and the Aggregate Principal Amount of the Class Q-2A Securities, (H) the distributions, if any, in respect of the Class Q-2B Securities for such Payment Date and for the preceding Payment Date, (I) as of the Determination Date, a calculation in reasonable detail of the Class Q-2A Coverage Ratio and a statement as to whether the Class Q-2A Coverage Test has been satisfied and the amount that would be required for the payment of the Aggregate Principal Amount of the Class Q-2A Securities in order to achieve compliance with the Class Q-2A Coverage Test, (J) amounts in the Class Q-2 Securities Collateral Account applied in accordance with the Class Q-2 Priority of Payments, and (K) the amount of funds available in the Class Q-2 Securities Collateral Account as of the first day of the preceding Collection Period and the balance therein remaining on the last day of such preceding Collection Period;

(viii)     the distributions, if any, in respect of the Income Notes for such Payment Date and for the preceding Payment Date; and

(viii)     the Outstanding Premium for that Payment Date.

(b) Application of amounts in the Collection Account in accordance with the Payment Date Priority of Payments:  the amount of funds available in the Collection Account as of the first day of the preceding Collection Period and the balance therein remaining on the last day of such preceding Collection Period.

(c) Application of amounts in the Expense Reserve Account

(d) Application of amounts in the Collateral Account:

(i)     the amount of funds and Eligible Investments credited to the Collateral Account as of the first day of the preceding Collection Period;

(ii)     the application of such funds during such Collection Period; and

(iii)     the balance of funds and Eligible Investments credited to the Collateral Account as of the last day of such Collection Period.

010918

(e) For the Reference Portfolio:

(i) the Aggregate Reference Obligation Calculation Amount and Aggregate Reference Value of the Reference Obligations in the Reference Portfolio as of the close of business on the related Determination Date, after giving effect to any removals or additions of Reference Obligations during such Collection Period;

(ii) the Reference Obligation Calculation Amounts of the Reference Obligations under the Swap Agreement;

(iii) the amount due and received under the Swap Agreement from the Swap Counterparty during the Collection Period;

(iv) the identity of each Defaulted Reference Obligation in the Reference Portfolio; and

(v) the Quarterly Aggregate Increase Amount, the Quarterly Aggregate Reduction Amount, and the Quarterly Amortization Increase Amount

(f) The information required to be contained in a Monthly Report pursuant to Section 8.7 determined as of the Determination Date.

At least four Business Days prior to the date on which such report must be delivered, the Issuer or its agent shall provide a copy of the proposed Payment Date Valuation Report to the Trustee, the Reference Portfolio Manager and the Swap Counterparty. Upon receipt of such proposed Payment Date Valuation Report, the Trustee and the Reference Portfolio Manager on behalf of the Swap Counterparty shall compare the information contained therein to the information contained in their respective records with respect to the Trust Estate and the Class Q-2 Securities Collateral and the Reference Portfolio and shall, within three Business Days after receipt of such Payment Date Valuation Report, notify the Issuer or its agent and each other if the information contained in the proposed Payment Date Valuation Report does not conform to the information maintained by such party with respect to the Trust Estate and the Class Q-2 Securities Collateral and the Reference Portfolio, and detail any discrepancies. In the event that any discrepancy exists, the Issuer or its agent, the Trustee and the Reference Portfolio Manager shall attempt to promptly resolve the discrepancy. If such discrepancy cannot be promptly resolved on such third Business Day, the Trustee shall within two Business Days thereafter cause the Independent Accountants to be appointed to review such proposed Payment Date Valuation Reports and the records of the Trustee and the Reference Portfolio Manager, as applicable, to determine the cause of such discrepancy. If such review reveals an error in the proposed Payment Date Valuation Report or the Trustee's or Reference Portfolio Manager's records, the proposed Payment Date Valuation Report or Trustee's or Reference Portfolio Manager's records, as the case may be, shall be revised accordingly and, as so revised, shall be utilized in making all further calculations. Pursuant to the Reference Portfolio Management Agreement, the Reference Portfolio Manager has agreed to provide, or cause to be provided, on behalf of the Swap Counterparty, to the Collateral Administrator and/or the Independent Accountants access to all information in the possession of the Reference Portfolio Manager

010919

relating to the Reference Portfolio for purposes of compiling (or providing information required for) the Payment Date Valuation Report.

In addition to the foregoing information, each Payment Date Valuation Report shall include a Reminder Notice substantially in the form set forth in Exhibit M hereto (a "Reminder Notice").

SECTION 8.9       Reports by Independent Accountants.

(a) On or before the Closing Date, the Issuer shall appoint a firm of independent certified public accountants of recognized national reputation approved as of such date by the Swap Counterparty (the "Independent Accountants"). Upon any resignation by such firm or removal of such firm, the Issuer shall promptly appoint a successor thereto (with the consent of the Swap Counterparty) that shall also be a firm of independent certified public accountants of recognized national reputation. If the Issuer shall fail to appoint a successor to the Independent Accountants upon their resignation or removal within 15 days after such resignation or removal, the Trustee shall promptly notify the Issuer and the Swap Counterparty of such failure in writing. If the Issuer shall not have appointed a successor within ten days thereafter, the Trustee shall promptly appoint (with the consent of the Swap Counterparty) a successor firm of independent certified public accountants of recognized national reputation with such fees and expenses to be paid as an Administrative Expense.

(b) No later than 30 calendar days following the Ramp-up End Date, the Issuer shall cause to be delivered to the Trustee, Swap Counterparty, Rating Agencies and Reference Portfolio Manager a statement from the Independent Accountants as to whether the Reference Portfolio complied with the Reference Portfolio Criteria as of the Ramp-up End Date (and if not, specifying the respects in which it did not).

SECTION 8.10       Posting of Reports on Repository at Option of the Initial Purchaser. The Issuer acknowledges and agrees that, to the extent requested by the Initial Purchaser, the Issuer shall post each Monthly Report and Payment Date Valuation Report to the Repository for use in the manner provided in the Repository. In connection therewith, the Issuer agrees, upon the request of the Initial Purchaser, to deliver or otherwise make available each Monthly Report and Payment Date Valuation Report to the Repository in the manner provided in Section 11.6 for posting on the Repository.

SECTION 8.11       Notices to Rating Agencies.

In addition to the information and reports specifically required to be provided to the Rating Agencies pursuant to the terms of this Indenture (including pursuant to Section 7.14, 8.7 and 8.8), the Issuer shall provide or cause to be provided to the Rating Agencies (i) written notice of any amendment, modification, termination or assignment of any Basic Document, the Administration Agreement, the Reference Portfolio Management Agreement or the Note Purchase Agreement and of resignation, termination or removal of any party thereto, (ii) notice of the redemption in full of any Class of Securities then rated by such Rating Agency, (iii) any report provided to the Holders of Securities pursuant to this Indenture and (iv) such additional information as the Rating Agencies may from time to time reasonably request in connection with

115

their ratings of the Senior Notes and the Class Q-1 Securities and the Issuer (or its agent) determines in its sole discretion may be obtained and provided without unreasonable burden or expense.

ARTICLE IX

SUPPLEMENTAL INDENTURES

SECTION 9.1    Supplemental Indentures Without Consent of Noteholders.

Without the consent of the Holders of the Notes but with the consent of the Swap Counterparty, the Issuers and the Trustee, at any time and from time to time, may enter into one or more indentures supplemental hereto, in form satisfactory to the Trustee, in order to:

(a) evidence the succession of any Person to either the Issuer or Co-Issuer and the assumption by any such successor of the covenants of the Issuer or Co-Issuer in the Securities and the Indenture or to change the name of either of the Issuers;

(b) provide for definitive Notes as contemplated by Section 2.5(d) and (e);

(c) add to the covenants of the Issuers for the benefit of the Holders of the Securities or the Swap Counterparty;

(d) pledge any additional property to or with the Trustee;

(e) evidence and provide for the acceptance of appointment by a successor trustee and to add to or change any of the provisions of this Indenture as shall be necessary to facilitate the administration of the Trust Estate or the Class Q-2 Securities Collateral by more than one trustee;

(f) correct or amplify the description of any property at any time subject to the lien of this Indenture;

(g) cure any ambiguity, or correct, modify or supplement any provision hereof which is defective or inconsistent with any other provision herein or in the Offering Circular;

(h) make any change required by the Irish Stock Exchange (so long as any of the Securities are listed thereon), or any other stock exchange on which any Class of Securities is listed in order to permit or maintain the listing of the Securities thereon;

(i) modify transfer restrictions on any Securities so long as any such modifications comply with the Securities Act, the Investment Company Act, ERISA and other applicable laws and any additional transfer restrictions imposed are reasonably necessary to comply with such laws (or any applicable exemption therefrom);

(j) take any action necessary or helpful to prevent the Issuer or the Trustee from becoming subject to any withholding or other taxes or assessments or to reduce the risk that the

010921

Issuer will be engaged in a United States trade or business or otherwise subject to United States federal income tax on a net income basis;

(k) provide for additional or modified reports to Holders of Securities; or

(l) amend, modify or change any test or requirement of any Rating Agency hereunder where such amendment, modification or change has been specified or authorized by such Rating Agency (and notice thereof has been provided to the Trustee, Swap Counterparty and Reference Portfolio Manager);

provided, that, in each case, the Trustee shall have received Rating Confirmation for such supplemental indenture; provided, further, that the Trustee may, with the consent of the Holders of 100% of the Aggregate Principal Amount of each Class of Senior Notes and Class Q-1 Securities affected thereby and with the consent of the Swap Counterparty, enter into any such supplemental indenture notwithstanding any qualification, downgrade or withdrawal of the then-current ratings of any such Class of Senior Notes or Class Q-1 Securities.

The Trustee is hereby authorized to join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations that may be contained therein.

SECTION 9.2    Supplemental Indentures With Consent of Noteholders.

(a) With the consent of the Holders of a majority of the Aggregate Principal Amount of each Class of Notes adversely affected thereby, and the consent of the Swap Counterparty and Rating Confirmation for such action, the Issuers and the Trustee may enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, this Indenture or of modifying in any manner the rights of the Holders of the Notes under this Indenture; provided, that the Issuers and the Trustee may, with the consent of Holders of 100% of the Aggregate Principal Amount of each Class of Senior Notes and the Class Q-1 Securities affected thereby, enter into any supplemental indenture notwithstanding that either Rating Agency has stated that such supplemental indenture will result in a qualification, withdrawal or downgrade of its then-current ratings of such Class of Senior Notes or Class Q-1 Securities.  However, without the consent of the Swap Counterparty if adversely affected thereby and the Holders of each Outstanding Security adversely affected thereby and without Rating Confirmation for such supplemental indenture or a waiver of such Rating Confirmation by the Holders whose consent is required for such supplemental indenture, no supplemental indenture may:

(i)    change the maturity of any Security or the principal of, or the interest on any Senior Note or Class Q-2A Security or reduce the principal amount thereof or the rate of interest thereon or change the time or amount of any other amount payable in respect of any Security;

(ii)    reduce the percentage of the Aggregate Principal Amount of Securities, the consent of the Holders of which is required for the authorization of any supplemental indenture or for any waiver of compliance with certain provisions of this Indenture;

117

(iii)    permit the creation of any lien ranking prior to or on parity with the lien of this Indenture with respect to any part of the Trust Estate or the Class Q-2 Securities Collateral or terminate the lien of this Indenture except as otherwise permitted by the Indenture;

(iv)    reduce the percentage of the Aggregate Principal Amount of Notes or Class Q-2 Securities, as applicable, held by the Holders of the Notes or Class Q-2 Securities, as applicable, whose consent is required to direct the Trustee to liquidate the Trust Estate (or modify the provisions of this Indenture relating to the Swap Counterparty's authority with respect to any such liquidation) or Class Q-2 Securities Collateral, as applicable;

(v)    modify any of the provisions of this Indenture with respect to supplemental indentures or waiver of Events of Default or Class Q-2 Events of Default and their consequences except to increase the percentage of the Aggregate Principal Amount of Notes or Class Q-2 Securities, as applicable, the consent of the Holders of which is required for any such action or to provide that other provisions of the Indenture cannot be modified or waived without the consent of the Holders of each Outstanding Note (or each Outstanding Class Q-2 Security, as applicable) affected thereby;

(vi)    modify the provisions of the Priority of Payments, the Class Q-2 Priority of Payments or the definitions of the terms "Holder" or "Outstanding;" or

(vii)    modify any of the provisions of the Indenture in such a manner as to affect the calculation of the amount of any payment of principal of or interest on or other amount payable in respect of any Security or to affect the right of the Holders of the Securities to the benefit of any provisions for the payment of such Securities contained therein.

(b) No supplemental indenture may modify the terms of the Class Q-1 Securities, the Class Q-2A Securities or the Class Q-2B Securities as such in a manner that would adversely affect the Class Q-1 Securities, the Class Q-2A Securities or the Class Q-2B Securities without the prior written consent of a majority of the stated amount of the Class Q-1 Securities, aggregate principal amount of the Class Q-2A Securities or Class Q-2B Securities, as applicable, or the consent of the Holders of each Outstanding Class Q-2 Security adversely affected thereby as set forth above. Except for any proposed such supplement that would affect the terms of the Class Q-1 Securities, Class Q-2A Securities or the Class Q-2B Securities as such or as provided in subsection (a) above, Holders of Class Q-1 Securities, Class Q-2A Securities and Class Q-2B Securities shall be entitled to vote under this Section 9.2 only (i) in the case of the Class Q-1 Securities, as Holders of the respective related Components and (ii) in the case of the Class Q-2 Securities, pursuant to Section 2.17(f) with respect to the Income Notes represented by the Class Q-2 Collateral Asset A.

(c) Any supplemental indenture that in the good faith determination of the Swap Counterparty materially adversely affects its rights or duties or creates, supplements, modifies, limits or eliminates any provision of the Indenture affecting the discretion, judgment, conduct, care or role of the Reference Portfolio Manager, including the Coverage Tests and provisions

010923

relating to calculations with respect to the Reference Portfolio, the Swap Counterparty's or the Reference Portfolio Manager's obligations or liabilities, fees or expenses payable by or reimbursable to it or the Reference Portfolio Manager, or otherwise adversely affects it or the Reference Portfolio Manager, will be deemed to adversely affect the Swap Counterparty and therefore will not be effective without the prior consent of the Swap Counterparty.

(d) Not later than 15 Business Days prior to the execution of any proposed supplemental indenture pursuant to this Section, the Trustee at the expense of the Issuers shall mail to the Holders of Securities, the Swap Counterparty, the Reference Portfolio Manager, the Investment Agreement Counterparty and each Rating Agency (so long as any rated Securities are Outstanding) a copy of such supplemental indenture and shall, (1) request Rating Confirmation from each Rating Agency, as applicable, and (2) request any required consent from the applicable Holders of Securities to be given within the Initial Consent Period. Any consent given to a proposed supplemental indenture by the Holder of any Securities shall be irrevocable and binding on all future Holders or beneficial owners of that Security, irrespective of the execution date of the supplemental indenture. If Holders of less than the required percentage of the Aggregate Principal Amount of the relevant Securities consent to a proposed supplemental indenture within the Initial Consent Period, on the first Business Day after the Initial Consent Period, the Trustee shall notify the Issuer, the Swap Counterparty and the Reference Portfolio Manager which Holders of Securities have consented to the proposed supplemental indenture, and, which Holders and, to the extent such information is reasonably available to the Trustee, which beneficial owners have not consented to the proposed supplemental indenture. If it intends to exercise its Amendment Buy-Out Option pursuant to Section 9.6, the Amendment Buy-Out Purchaser shall so notify the Trustee (which notice shall designate a date for the Amendment Buy-Out to occur no earlier than ten Business Days after the date of such notice) no later than five (5) Business Days after so being notified by the Trustee and the Trustee shall mail such notice to all Holders of Securities. Any Non-consenting Holder may give consent to the related proposed supplemental indenture until the 5th Business Day prior to the date of the Amendment Buy-Out designated by the Amendment Buy-Out Purchaser, and in such case shall cease to be a Non-consenting Holder for purposes of the related Amendment Buy-Out. If the Amendment Buy-Out Purchaser exercises its Amendment Buy-Out Option and purchases the applicable Securities pursuant to Section 9.6 below, the Amendment Buy-Out Purchaser as Holder or beneficial owner of the applicable Securities may consent to the related proposed indenture within five (5) Business Days of the Amendment Buy-Out.

(e) The Trustee may, consistent with an Opinion of Counsel, determine whether or not the Holders of any Notes would be adversely affected by any supplemental indenture. Such determination shall be conclusive and binding on all present and future Holders. The Trustee shall not be liable for any such determination made in good faith and in reliance in good faith upon an Opinion of Counsel delivered to the Trustee as described in Section 9.3 hereof.

(f) It shall not be necessary in connection with any consent of the Holders of the Securities under this Section 9.2 for such Holders to approve the specific form of any proposed supplemental indenture, but it shall be sufficient if such consent shall approve the substance thereof.

010924

(g) Promptly after the execution by the Issuers and the Trustee of any supplemental indenture pursuant to this Section 9.2, the Trustee, at the expense of the Issuers, shall mail to the Holders of the Securities, the Reference Portfolio Manager, the Swap Counterparty, the Irish Stock Exchange (if and for so long as any Class of Securities is listed thereon), the Investment Agreement Counterparty and each Rating Agency (so long as any rated Securities are Outstanding) a copy thereof.

SECTION 9.3     Execution of Supplemental Indentures.

In executing or accepting the additional trusts created by any supplemental indenture permitted by this Article IX or the modifications thereby of the trusts created by this Indenture, the Trustee shall be entitled to receive, and (subject to Sections 6.1 and 6.2) shall be fully protected in relying in good faith upon, an Opinion of Counsel stating that the execution of such supplemental indenture is authorized or permitted by this Indenture, and that all conditions precedent applicable thereto under this Indenture have been satisfied. The Trustee may, but shall not be obligated to, enter into any such supplemental indenture which affects the Trustee's own rights, duties or immunities under this Indenture or otherwise. If requested by the Initial Purchaser, following the execution of any supplemental indenture under this Article 9, the Issuer shall deliver a copy of such supplemental indenture to the Repository for posting on the Repository in the manner described in Section 11.6.

SECTION 9.4     Effect of Supplemental Indentures.

Upon the execution of any supplemental indenture under this Article IX, this Indenture shall be modified in accordance therewith, and such supplemental indenture shall form a part of this Indenture for all purposes; and every Holder of Securities theretofore and thereafter authenticated and delivered hereunder shall be bound thereby.

SECTION 9.5     Reference in Notes to Supplemental Indentures.

Securities executed, authenticated and delivered after the execution of any supplemental indenture pursuant to this Article IX may, and if required by the Trustee shall, bear a notation in form approved by the Trustee as to any matter provided for in such supplemental indenture. If the Issuers shall so determine, new Securities, so modified as to conform in the opinion of the Trustee and the Issuers to any such supplemental indenture, may be prepared and executed by the Issuers and authenticated and delivered by the Trustee in exchange for Outstanding Securities.

SECTION 9.6     Amendment Buy-Out.

(a) In the case of any supplemental indenture pursuant to Section 9.2 above or a Swap Agreement Amendment pursuant to Section 7.26(b) of this Indenture, in each case that requires the consent of one or more Holders of Notes or Class Q-1 Securities, the Amendment Buy-Out Purchaser shall have the right, but not the obligation, to purchase from Non-consenting Holders all Securities held by such Holders of the Class of Securities whose consent was solicited with respect to such supplemental indenture or Swap Agreement Amendment, as applicable (the "Amendment Buy-Out Option") for the applicable Amendment Buy-Out Purchase Price. If such option is exercised, the Amendment Buy-Out Purchaser must purchase

120

all such Securities of Non-consenting Holders, regardless of the applicable percentage of the Aggregate Principal Amount of the Securities the consent of whose Holders is required for such supplemental indenture or Swap Agreement Amendment, as applicable (an "Amendment Buy-Out"). By its acceptance of its Securities hereunder, each Holder of Securities agrees that if the Amendment Buy-Out Option is exercised, any Non-consenting Holder will be required to sell its applicable Securities to the Amendment Buy-Out Purchaser; provided that if the solicited consent to a supplemental indenture only applies to one Component of a Class Q-1 Security, the Non-consenting Holder will be required to sell, at the Non-consenting Holder's option, its Class Q-1 Security as a whole or solely the affected Component. The Class Q-2 Securities themselves shall not be subject to an Amendment Buy-Out; provided that the Income Notes represented by the Class Q-2 Collateral Asset A shall be subject to an Amendment Buy-Out as provided in Section 2.17(f)(iii). Neither the Swap Counterparty, nor the Amendment Buy-Out Purchaser nor any other Person shall have any liability to any Holder or beneficial owner of Securities as a result of an election by the Amendment Buy-Out Purchaser not to exercise the Amendment Buy-Out Option.

(b) All purchases made pursuant to an Amendment Buy-Out Option individually and in the aggregate must comply with the applicable transfer restrictions for the relevant Securities set forth herein (including, without limitation, the restriction that such Securities may not be purchased (x) in the case of the Class Q-1 Securities, by any Person that is a Benefit Plan Investor and (x) in the case of the Income Notes, if Holders of the Income Notes that have represented that they are Benefit Plan Investors would own 25% or more of the Aggregate Principal Amount of the Income Notes (excluding Income Notes in the form of the Class Q-1 Income Note Component, Income Notes represented by the Class Q-2 Collateral Asset A and Income Notes held by Controlling Persons) immediately after such purchase) and the legends on such Securities and all applicable laws, rules and regulations (including, without limitation, any rules, regulations and procedures of any securities exchange, self-regulatory organization or clearing agency).

ARTICLE X

OTHER AGENTS

SECTION 10.1    Paying Agents.

(a) The Issuers hereby appoint the Trustee and, solely with respect to any Securities listed on the Irish Stock Exchange, the Listing Agent, as Paying Agents.

(b) The Issuers may vary or terminate the appointment of any Paying Agent and/or appoint additional Paying Agents, including, without limitation, as may be required under the rules of the Irish Stock Exchange. Notice of any such variation, termination or appointment, and of any changes in the specified offices, shall be given by the Issuers to the Trustee, the Holders of the Securities, the Swap Counterparty and the Rating Agencies in the manner described in Sections 11.3 and 11.4.

(c) The Issuers will cause each Paying Agent (other than the Trustee and the Listing Agent to the extent the Securities (a) settle through DTC, Euroclear or Clearstream or (b)

010926

are not listed on the Irish Stock Exchange) to execute and deliver to the Trustee and the Issuers an instrument in which each such Paying Agent shall agree with the Issuers that such Paying Agent will:

(i)  pay to the Holders of the Securities all amounts due and payable to the extent sufficient funds have been provided therefor by the Issuers or the Trustee;

(ii)  hold all sums held by it for the payment of amounts due with respect to the Notes in trust for the benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as herein provided and pay such sums to such Persons as herein provided;

(iii)  maintain such records as may reasonably be requested by the Issuers or the Trustee, and furnish such copies thereof as the Trustee may require;

(iv)  abide by all provisions of this Indenture relating to the duties and responsibilities of the Paying Agent;

(v)  notify the Trustee, the Swap Counterparty and the Holders of the Notes of any default by the Issuers, and such Paying Agent shall be required to account to the Trustee on all disbursements made by such Paying Agent;

(vi)  immediately resign as a Paying Agent and pay to the Trustee all sums held by it in trust for the payment of Notes if at any time it ceases to meet the eligibility requirements required to be met by a Paying Agent in effect at the time of determination; and

(vii)  comply with all requirements of the Code applicable to it with respect to the withholding from any payments made by it on any Notes of any applicable withholding taxes imposed thereon, required to be withheld and with respect to any applicable reporting requirements imposed upon and applicable to it under the Code in connection therewith.

(d) The eligibility requirements for a Paying Agent shall be the same as those relating to the Trustee in Section 6.10.

(e) After an Event of Default, the Trustee may require that all funds held by Paying Agents be paid over to the Trustee.

SECTION 10.2   Irish Transfer Agent.

So long as any Securities are listed on the Irish Stock Exchange, the Issuers shall maintain a transfer agent with an office in Ireland, as an agent for the registration of transfers of such Notes (the "Irish Transfer Agent"). The Issuers hereby initially appoint the Listing Agent as the Irish Transfer Agent. If the Issuer appoints a new Transfer Agent, the Issuer will publish notice of the change in an Authorized Newspaper as promptly as practicable after such appointment.

SECTION 10.3    Indenture Calculation Agent.

(a) The Issuers hereby agree that for so long as any of the Class A-1 Notes, Class A-2 Notes, Class B Notes, Class C-1 Notes and Class Q-2A Notes remain Outstanding there will at all times be an agent appointed to calculate LIBOR in respect of each Periodic Interest Accrual Period in accordance with the terms of this Section 10.3 (the "Indenture Calculation Agent"). The Issuers hereby initially appoint the Trustee as Indenture Calculation Agent for purposes of determining LIBOR for each Periodic Interest Accrual Period, and the Trustee, by executing and delivering this Indenture, hereby acknowledges and accepts such appointment.  The Indenture Calculation Agent may be removed by the Issuer at any time.  If the Indenture Calculation Agent is unable or unwilling to act as such or is removed by the Issuer, or if the Indenture Calculation Agent fails to determine any applicable Interest Rate or the amount of interest payable on each such Class of Securities for any Periodic Interest Accrual Period, the Issuer will promptly appoint as a replacement Indenture Calculation Agent a leading bank which is engaged in transactions in U.S. Dollar deposits in the London interbank market and which is not an Affiliate of the Issuers.  The Indenture Calculation Agent may not resign its duties without a successor having been duly appointed.  If no successor Indenture Calculation Agent is appointed within thirty (30) days after giving notice of resignation, the resigning Indenture Calculation Agent, the Swap Counterparty, the Holders of a majority of the Aggregate Principal Amount of the Senior Notes or any Holder of a Senior Note or Class Q-2A Security, on behalf of itself and all others similarly situated, may petition a court of competent jurisdiction for the appointment of a successor Indenture Calculation Agent.  The Issuer shall notify the Rating Agencies of the appointment of any replacement Indenture Calculation Agent.

(b) As soon as reasonably possible after 11:00 a.m. (London time) on each LIBOR Determination Date, but in no event later than 11:00 a.m. (London time) on the Business Day immediately following each LIBOR Determination Date, the Indenture Calculation Agent will calculate the Class A-1 Interest Rate, the Class A-2 Interest Rate, the Class B Interest Rate, the Class C-1 Interest Rate and the Class Q-2A Interest Rate for the related Periodic Interest Accrual Period and the amount of interest for such Periodic Interest Accrual Period payable in respect of each U.S. $100,000 by Aggregate Principal Amount of each such Class of Securities (rounded to the nearest cent, with half a cent being rounded upward) on such related Payment Date and cause the same to be provided to the Issuers, the Swap Counterparty, the Reference Portfolio Manager, the Trustee, the Investment Agreement Counterparty, the Paying Agents, the Irish Stock Exchange (if and for so long as any Class of Securities is listed thereon), and, if applicable, Euroclear and Clearstream.  The Indenture Calculation Agent will also specify to the Issuers the quotations upon which the applicable Interest Rate for each such Class of Securities is based, and in any event, the Indenture Calculation Agent shall notify the Issuers before 5:00 p.m. (London time) on each LIBOR Determination Date that either: (i) it has determined or is in the process of determining the applicable Interest Rate and the Periodic Interest for each such Class of Securities, or (ii) it has not determined and is not in the process of determining the applicable Interest Rate and the Periodic Interest for each such Class of Securities, together with its reasons therefor.  The determination of the applicable Interest Rate for each such Class of Securities by the Indenture Calculation Agent shall (in the absence of manifest error) be final and binding upon all parties.

SECTION 10.4    Other Capacities.

To the extent that the Trustee is acting as Registrar, Paying Agent, Securities Intermediary or Indenture Calculation Agent or other capacity hereunder, the rights, privileges and indemnities set forth in Article VI shall also apply to the Trustee acting in each such capacity.

SECTION 10.5    Certain Actions with Respect to the Reference Portfolio Manager.

(a) At the direction of the Holders of at least 66 2/3% (in Aggregate Principal Amount) of the Income Notes and at least 66 2/3% (in Aggregate Principal Amount) of each Class of Senior Notes, the Issuer will request the Swap Counterparty under the Swap Agreement to remove the Reference Portfolio Manager without cause in accordance with the Reference Portfolio Management Agreement. The Issuer will request the Swap Counterparty under the Swap Agreement to remove the Reference Portfolio Manager for cause in accordance with the Reference Portfolio Management Agreement upon the vote of the Holders of at least $66^2/_3\%$ (in Aggregate Principal Amount) of each Class of Senior Notes and at least $66^2/_3\%$ (in Aggregate Principal Amount) of the Income Notes. The Issuer shall notify the Rating Agencies of any such request.

(b) If the Swap Counterparty consults with the Issuer as to the appointment of a replacement Reference Portfolio Manager under the Reference Portfolio Management Agreement, the Issuer shall follow the direction of the Holders of a majority in Aggregate Principal Amount of the Income Notes; provided that the Issuer shall not follow such direction as to any replacement Reference Portfolio Manager, if the Holders of at least $66^2/_3\%$ of the Aggregate Principal Amount of each Class of Senior Notes object to such replacement Reference Portfolio Manager.

(c) Notwithstanding Section 2.11, for purposes of voting under this Section 10.5 only, Securities beneficially owned by the Reference Portfolio Manager or any of its Affiliates or by an account or fund for which the Reference Portfolio Manager or its Affiliate acts as investment manager with discretionary authority shall be disregarded and deemed not to be Outstanding.

(d) The Issuer shall notify the holders of Securities of any resignation, removal or replacement of the Reference Portfolio Manager or any assignment of the Reference Portfolio Management Agreement, and if it receives notice from the Swap Counterparty of the occurrence of an event that constitutes cause for removing the Reference Portfolio Manager under the Reference Portfolio Management Agreement.

SECTION 10.6    Process Agents.

The Issuer shall designate and appoint Corporation Service Company as its agent (the "Process Agent") in New York for service of all process. The Process Agent may be served in any legal suit, action or Proceeding arising with respect to this Indenture, the Swap Agreement or the Notes or the transactions contemplated hereby or thereby, such service being hereby acknowledged to be effective and binding service in every respect.

124

010929

The Co-Issuer shall designate and appoint Corporation Service Company as its agent in New York for service of all process. The Process Agent may be served in any legal suit, action or Proceeding arising with respect to this Indenture or the Notes or the transactions contemplated hereby or thereby, such service being hereby acknowledged to be effective and binding service in every respect.

## ARTICLE XI

## MISCELLANEOUS

SECTION 11.1    Form of Documents Delivered to Trustee.

(a) In any case where several matters are required to be certified by, or covered by an opinion of any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

(b) Any certificate or opinion of an Authorized Officer of each of the Issuers may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by counsel, unless such officer knows, or in the exercise of reasonable care should know, that such certificate or opinion or representations with respect to the matters upon which this certificate or opinion is based are erroneous. Any certificate of an Authorized Officer or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an officer or officers of the Issuer, the Co-Issuer or any other Person, as the case may be, stating that the information with respect to such factual matters is in the possession of the Issuer, the Co-Issuer or such other Person, unless such Authorized Officer or counsel knows, or in the exercise of reasonable care should know, that such certificate or opinion or representations with respect to such matters are erroneous.

(c) Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

(d) Whenever in this Indenture, in connection with any application or certificate or report to the Trustee, it is provided that the Issuer or the Co-Issuer shall deliver any document as a condition of the granting of such application, or as evidence of compliance of the Issuer or the Co-Issuer with any term hereof, it is intended that the truth and accuracy at the time of the granting of such application or at the effective date of such certificate or report (as the case may be) of the facts and opinions stated in such document shall in such case be conditions precedent to the right of the Issuer or the Co-Issuer to have such application granted or to the sufficiency of such certificate or report. The foregoing shall not, however, be construed to affect the Trustee's right to rely upon the truth and accuracy of any statement or opinion contained in any such document as provided in Article VI.

010930

SECTION 11.2     Acts of Securityholders.

(a) Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by the Holders of the Securities may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders in person or by agents duly appointed in writing; and except as herein otherwise expressly provided such action shall become effective when such instrument or instruments are delivered to the Trustee, and, where it is hereby expressly required, to the Issuer. Such instrument or instruments (and the action embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of the Holders of the Securities signing such instrument or instruments. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and (subject to Section 6.1) conclusive in favor of the Trustee and the Issuer, if made in the manner provided in this Section 11.2.

(b) The fact and date of the execution by any person of any such instrument or writing may be proved in any manner that the Trustee deems sufficient.

(c) The ownership of Securities shall be proved by the Securities Register.

(d) Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any Securities shall bind the Holder (and any transferee thereof) of every Note issued upon the registration thereof or in exchange therefor or in lieu thereof, in respect of anything done, omitted or suffered to be done by the Trustee, the Issuer or the Co-Issuer in reliance thereon, whether or not notation of such action is made upon such Note.

SECTION 11.3     Notices, etc., to Trustee, Issuers and Rating Agencies.

Any request, demand, authorization, direction, notice, consent, waiver of any Person, or any Act of the Holders of the Securities or other documents provided or permitted by this Indenture to be made upon, given or furnished to or filed with:

(a) The Trustee by any Holder of the Securities, or by the Issuer or the Co-Issuer or other Person shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to or with the Trustee at its Corporate Trust Office, Attention:  Corporate Trust Administration; with such request, demand, authorization, direction, notice, consent, waiver or other communication or document to the Trustee to be deemed effective only upon actual receipt thereof at the Corporate Trust Office;

(b) The Issuer or the Co-Issuer by the Trustee or by any Holder of the Securities shall be sufficient for every purpose hereunder if in writing and either sent by electronic facsimile transmission (with hard copy to follow via first class mail) or mailed, by certified mail, return receipt requested to the Issuer, at: Valhalla CLO, Ltd., c/o Walkers SPV Limited, P.O. Box 908GT, Walker House, Mary Street, George Town, Grand Cayman, Cayman Islands, Attention: The Directors, facsimile:  (345) 945-4757, or to the Co-Issuer, at:  Valhalla CLO, Inc., c/o Puglisi & Associates, 850 Library Avenue, Suite 204, Newark, DE 19711, facsimile: (302) 738-7210, or at any other address previously furnished in writing to the Trustee by the Issuer or the Co-Issuer.  Each of the Issuer and the Co-Issuer shall promptly transmit any notice

received by it from the Noteholders to the Trustee, the Swap Counterparty and the Reference Portfolio Manager.

(c) Notices required to be given to the Rating Agencies by the Issuer, the Co-Issuer or the Trustee shall be in writing, personally delivered, sent by electronic facsimile transmission (with hard copy to follow via first class mail) or mailed by certified mail, return receipt requested to: (i) Moody's Investors Service, Inc., CDO Group, 99 Church Street, New York, New York, 10007, electronic copy to CDOmonitoring@moodys.com, facsimile: (212) 553-4170, Attention: CBO/CLO Monitoring, and (ii) Standard & Poor's, 55 Water Street, 40th Floor, New York, New York 10041-0003, electronic copy to CDO_surveillance@sandp.com, facsimile: (212) 438-2665, or at such other addresses as shall be designated by written notice to the other parties. Where this Indenture provides for notice to the Rating Agencies, failure to give such notice shall not affect any other rights or obligations created hereunder, and shall not under any circumstance constitute an Event of Default.

(d) Notices required to be given to the Trustee or the Holders of the Securities shall also be required to be given to the Administrator, the Swap Counterparty and the Reference Portfolio Manager.

(e) Notices required to be given to the Swap Counterparty shall be sent to: Citigroup Financial Products Inc., 390 Greenwich Street, 4th Floor, New York, New York 10013, Attention: Doug Warren, telephone: 212-723-6118, facsimile: 212-723-8578, with a copy to: Legal Department, 77 Water Street, 9th Floor, New York, New York 10004, Attention: Department Head, facsimile: (212) 657-1452.

(f) Notices required to be given to the Reference Portfolio Manager shall be sent to: Highland Capital Management, L.P., 13455 Noel Road, Suite 1300, Dallas, Texas 75240, Attention: Todd Travers, Telephone Number: 972-628-4100, Fax Number: 972-628-4147.

(g) Notices required to be given to the Investment Agreement Counterparty shall be sent to its address as set forth in, or pursuant to, the Investment Agreement and, if at any time the Investment Agreement Guarantor is not an affiliate of the Investment Agreement Counterparty, with a copy to the Investment Agreement Guarantor sent to its address as set forth in, or pursuant to, the Investment Agreement.

SECTION 11.4    Notices to Holders of the Notes; Waiver.

Where this Indenture provides for notice to the Holders of the Notes of any event, such notice shall be given through the Depositary or its nominee as the registered holder of the Notes by first class mail, postage prepaid, at the address appearing on the Securities Register. In addition, so long as any of the Securities are listed on the Irish Stock Exchange and so long as the rules of such Exchange so require, notice to the Holders of the Securities shall also be given by publication in the Irish Stock Exchange's Daily Official List. The Trustee shall forward all notices to the Listing Agent for publication.

Where this Indenture provides for notice in any manner, any such notice may be waived in writing by any Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice. Waivers of notice by Noteholders shall

127

010932

be filed with the Trustee, but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

SECTION 11.5    Consent to Posting of Documents on Repository at the Option of Initial Purchaser.

Each of the Issuers hereby consents, at the option of the Initial Purchaser, to (a) the posting of the Offering Circular, this Indenture (collectively, the "Transaction Documents") and the Monthly Reports and the Payment Date Valuation Reports to be delivered pursuant to the Transaction Documents and any amendments or other modifications thereto on the Repository for use in the manner provided in the Repository; and (b) the display of its name on the Repository in connection therewith.

SECTION 11.6    Posting of Documents on Repository.

Any document requested by the Initial Purchaser to be delivered to the Repository by the Issuer pursuant to this Indenture shall be delivered to the Repository by electronic mail as a pdf (portable document format) file to the following address (or such other address or such other manner as may be specified in writing from time to time by the operator of the Repository to the Issuer):

> CDO Library
> c/o The Bond Market Association
> 360 Madison Avenue (18th Floor)
> New York, NY 10017
> Electronic mail address: admin@cdolibrary.com

SECTION 11.7    Effect of Headings and Table of Contents.

The Article and Section headings herein and the Table of Contents are for convenience only and shall not affect the construction hereof.

SECTION 11.8    Successors and Assigns.

(a) All covenants and agreements in this Indenture and the Notes by the Issuer or the Co-Issuer shall bind its successors and assigns, whether so expressed or not.

(b) All covenants and agreements of the Trustee in this Indenture shall bind its successors and assigns, whether so expressed or not.

SECTION 11.9    Separability.

In case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired.

010933

SECTION 11.10    Benefits of Indenture.

Nothing in this Indenture or in the Notes, express or implied, shall give to any Person, other than the parties hereto and their successors hereunder, the Holders of the Notes and the Swap Counterparty and the parties specified in Section 11.18, any benefit or any legal or equitable right, remedy or claim under this Indenture.

SECTION 11.11    Governing Law.

THIS INDENTURE, EACH NOTE, EACH CLASS Q SECURITY AND EACH COMPONENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

SECTION 11.12    Submission to Jurisdiction; Waiver of Jury Trial.

THE PARTIES HERETO IRREVOCABLY SUBMIT TO THE EXCLUSIVE JURISDICTION OF ANY NEW YORK STATE OR FEDERAL COURT SITTING IN THE BOROUGH OF MANHATTAN IN THE CITY OF NEW YORK IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE NOTES, AND SUCH PARTIES HEREBY IRREVOCABLY AGREE THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE OR FEDERAL COURT.  THE PARTIES HERETO HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT THAT THEY MAY LEGALLY DO SO, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING AND IRREVOCABLY WAIVE ANY AND ALL RIGHTS TO TRIAL BY JURY IN ANY SUCH ACTION OR PROCEEDING.  THE PARTIES HERETO IRREVOCABLY CONSENT TO THE SERVICE OF ANY AND ALL PROCESS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OR DELIVERY OF COPIES OF SUCH PROCESS TO THE ADDRESS SPECIFIED FOR NOTICES IN THIS AGREEMENT.  THE PARTIES HERETO AGREE THAT A FINAL NON-APPEALABLE JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

To the extent that either of the Issuers has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution, or otherwise) with respect to its obligations hereunder, each waives such immunity to the extent permitted by applicable law.

SECTION 11.13    Counterparts.

This Indenture may be executed in counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

010934

SECTION 11.14  Recording of Indenture.

If this Indenture at any time becomes subject to recording in any appropriate public recording offices, such recording is to be effected by the Issuer and at its expense accompanied by an Opinion of Counsel to the effect that such recording is necessary either for the protection of any of the Secured Parties or Holders of Class Q-2 Securities or for the enforcement of any right or remedy granted to the Trustee under this Indenture.

SECTION 11.15  No Recourse.

No recourse may be taken, directly or indirectly, with respect to the obligations of the Issuer or the Co-Issuer, as applicable, in respect of the Securities or under this Indenture or any certificate or other writing delivered in connection herewith or therewith, against:

(a) the Trustee, the Securities Intermediary or the Collateral Administrator in their individual capacities;

(b) any shareholder or any incorporator or past or present officer or director of the Issuer or the Co-Issuer;

(c) any Holder of a Security;

(d) the Swap Counterparty;

(e) the Administrator;

(f) the Initial Purchaser;

(g) the Reference Portfolio Manager;

(h) the Indenture Calculation Agent

(i) the Investment Agreement Counterparty;

(j) the Investment Agreement Guarantor; or

(k) any Affiliate, partner, owner, beneficiary, agent, officer, director, employee or agent of the foregoing, or any holder of a beneficial interest in the Issuer, the Co-Issuer, the Administrator or the Trustee or of any successor or assign of the Administrator or the Trustee in its individual capacity, except that any such partner, owner or beneficiary shall be fully liable, to the extent provided by applicable law, for any unpaid consideration for stock, unpaid capital contribution or failure to pay any installment or call owing to such entity;

except in each case, as any such person may have expressly agreed (it being understood that the Administrator, the Trustee and the Securities Intermediary have no such obligations in their individual capacities other than JPMorgan Chase Bank with respect to any representations or warranties made in its individual capacity hereunder).

010935

SECTION 11.16    No Petition.

The Trustee, by entering into this Indenture, and each Holder of a Security by its acceptance of such Security, hereby covenants and agrees that each shall not, prior to the date which is one year (or the then applicable preference period in the relevant jurisdiction) and one day after the termination of this Indenture with respect to the Securities pursuant to Section 4.1, acquiesce, petition or otherwise invoke or cause the Issuer to invoke the process of any court or government authority for the purpose of commencing or sustaining a case against the Issuer or the Co-Issuer under any United States federal or state bankruptcy, insolvency or similar law (in any applicable jurisdiction) or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Issuer or any substantial part of its property, or making a general assignment for the benefit of creditors, or ordering the winding up or liquidation of the affairs of the Issuer or for the purpose of collecting any of the Trustee's fees and expenses.

SECTION 11.17    Priority of Payments.

Notwithstanding anything herein to the contrary, all payments to be made in accordance with the terms hereof, including without limitation all payments in respect of the Notes and the Class Q-1 Securities and the fees and expenses of the Trustee, shall be paid on the dates, and shall be subject to the priorities, prescribed in Article V and Article VIII of this Indenture or, in the case of payments on the Class Q-2 Securities, as provided in Section 2.17 of this Indenture.

SECTION 11.18    Beneficiaries.

The Holders of the Securities, the Swap Counterparty, the other Secured Parties and the Amendment Buy-Out Purchaser are third party beneficiaries hereunder.

010936

       IN WITNESS WHEREOF, the Issuer, the Co-Issuer and the Trustee have caused this Indenture to be duly executed by their respective officers, thereunto duly authorized, all as of the day and year first above written.

Executed as a Deed by:

VALHALLA CLO, LTD., as Issuer


By:_____
Name:
Title: Director


In the presence of:_____
Witness Name:


VALHALLA CLO, INC., as Co-Issuer


By:_____
Name:
Title:


JPMORGAN CHASE BANK,
as Trustee and Securities Intermediary


By:        _____
Name:
Title:

010937

Schedule A

SCHEDULE OF DEFINITIONS

Set forth below are definitions of certain defined terms used in this Indenture.

"<u>Account Agreement</u>":  An agreement substantially in the form set forth in <u>Exhibit L</u> hereto.

"<u>Accredited Investor</u>":  An "accredited investor" as defined in Rule 501(a) under the Securities Act.

"<u>Accrual Date</u>":  The meaning specified in the Swap Agreement.

"<u>Accrued Increase/Reduction Amount</u>": For a Measurement Date, an amount (which may be negative) equal to (a) the sum of all Obligation Value Increase Amounts (other than as a result of Amortizations) for Reference Obligations for which the Accrual Date occurred on or prior to such date and on or following the preceding Determination Date minus (b) the sum of all Obligation Value Reduction Amounts (including as a result of Amortizations) for Reference Obligations for which the Accrual Date occurred on or prior to such date and on or following the preceding Determination Date.

"<u>Accrued Swap Liabilities</u>":  With respect to any date of determination, the sum of (i) all amounts payable to the Swap Counterparty under the Swap Agreement as of such date of determination and (ii) all amounts payable to the Swap Counterparty under the Swap Agreement on any prior date and unpaid as of such date of determination, in each case other than amounts that constitute Administrative Expenses.

"<u>Adjusted Reference Portfolio Return Amount</u>":  The meaning specified in the Swap Agreement.

"<u>Administration Agreement</u>":  The Administration Agreement, dated as of the Closing Date, between the Administrator and the Issuer in respect of certain corporate and administrative services provided to the Issuer by the Administrator.

"<u>Administrative Expenses</u>":  Amounts due from or accrued for the account of the Issuers with respect to any Payment Date (and, to the extent not paid, from prior Payment Dates) to, in the following order of priority, (i) any Person in respect of any governmental fee, charge or tax (including all filing, registration and annual return fees payable to the Cayman Islands' government and registered office fees); (ii) the Trustee for the Trustee Fee and Trustee Expenses; (iii) the Collateral Administrator for the Collateral Administrator Fee and Collateral Administrator Expenses; (iv) the Administrator as provided in the Administration Agreement; and (v) on a *pari passu* basis, (A) the Independent Accountants, agents and counsel of the Issuers for fees and expenses (including, without limitation, tax reports); (B) any other Person in respect of any other expenses permitted under the Indenture and the documents delivered pursuant to or in connection with the Indenture, the Collateral Administration Agreement and the Securities; (C) any other Person in respect of any other expenses of the Issuers including, without limitation,

A-1

010938

fees, expenses or amounts for which the Swap Counterparty is entitled to indemnification from the Issuer under the Swap Agreement, (D) the Rating Agencies for any fees (including on-going monitoring fees and credit estimates) due and payable with respect to their respective rating of the Securities; (E) expenses and other amounts for which the Swap Counterparty is obligated to reimburse or pay the Reference Portfolio Manager under the Reference Portfolio Management Agreement; and (F) expenses for which the Swap Counterparty is entitled to reimbursement in connection with the transfer of its rights and obligations to a replacement swap counterparty or certain other actions upon a downgrade of it or the Swap Guarantor when required to do so under the Swap Agreement, in the case of this clause (F) in an amount not to exceed $50,000 in any calendar year; provided, however, that Administrative Expenses shall not include any amounts due or accrued with respect to actions taken on or prior to the Closing Date, which amounts shall be payable only from the Expense Reserve Account pursuant to Section 8.2(e).

"Administrator": Walkers SPV Limited or any successor appointed by the Issuer.

"Affiliate": With respect to any specified Person, any other Person controlling or controlled by or under common control with such specified Person. For the purposes of this definition, "control," when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing. For purposes of this definition, (a) the management of an account by one Person for the benefit of any other Person shall not constitute "control" of such other Person and (b) with respect to the Issuer, "Affiliate" does not include Walkers SPV Limited or any entities which Walkers SPV Limited controls or administers.

"Aggregate Principal Amount": With respect to any date of determination, (a) when used with respect to any Class or Classes of Notes as a whole (or any specified Notes or Components of any such Class), the original principal amount of such Class or Classes (or of such specified Notes or Component, as applicable) reduced, in the case of the Senior Notes only, by all prior payments, if any, made with respect to the principal of such Class or Classes (or such Senior Notes or Class Q-1 Senior Note Component, as applicable), (b) when used with respect to all of the Senior Notes, the sum of (i) the Aggregate Principal Amount of the Class A-1 Notes, (ii) the Aggregate Principal Amount of the Class A-2 Notes, (iii) the Aggregate Principal Amount of the Class B Notes, (iv) the Aggregate Principal Amount of the Class C-1 Notes and (v) the Aggregate Principal Amount of the Class C-2 Notes, (c) when used with respect to all of the Notes, the sum of (i) the Aggregate Principal Amount of the Senior Notes and (ii) the Aggregate Principal Amount of the Income Notes, (d) when used with respect to the Class Q-2A Securities (or any specified Class Q-2A Securities), the original principal amount of the Class Q-2A Securities (or of such specified Class Q-2A Securities) reduced by all prior payments, if any, made with respect to the principal of the Class Q-2A Securities (or of such specified Class Q-2A Securities) and (e) when used with respect to the Class Q-2B Securities (or any specified Class Q-2B Securities), the original principal amount of the Class Q-2B Securities (or of such specified Class Q-2B Securities).

"Aggregate Reference Obligation Calculation Amount": The meaning specified in the Swap Agreement.

"Aggregate Reference Value":  The meaning specified in the Swap Agreement.

"Amendment Buy-Out":  The meaning specified in Section 9.6(a).

"Amendment Buy-Out Option":  The meaning specified in Section 9.6(a).

"Amendment Buy-Out Purchase Price":  The purchase price payable by the Amendment Buy-Out Purchaser for Securities purchased in an Amendment Buy-Out, if any, in an amount equal to (i) in the case of the Senior Notes, the Aggregate Principal Amount thereof, plus accrued interest (including Deferred Interest, if any) to the date of purchase which is not otherwise paid or payable to the Non-consenting Holder, plus any unpaid Extension Bonus Payment, plus, in the case of the Class C-2 Notes, the applicable Make-whole Premium, (ii) in the case of the Income Notes, an amount that, together with any amounts paid to the Non-consenting Holder with respect to those Income Notes from the Closing Date to and including the purchase date (and any amounts payable, if any, to the Non-consenting Holder on the next succeeding Payment Date) shall result in an internal rate of return with respect to those Income Notes of 18% per annum, provided, however, that in any Amendment Buy-Out from and after the date on which the Non-consenting Holders of Income Notes have received an internal rate of return equal to or in excess of 18% per annum, the purchase price for Income Notes shall be zero and (iii) in the case of the Class Q-1 Securities, based on the respective purchase prices for the relevant Class Q-1 Senior Note Component and the Class Q-1 Income Note Component thereof.

"Amendment Buy-Out Purchaser":  Citigroup Global Markets Inc. ("CGMI"), or an Affiliate thereof designated by the Swap Counterparty, or a Person designated by CGMI or such Affiliate.

"Applicable Procedures":  The procedures of the Depositary, Euroclear and Clearstream applicable to the exchange or transfer of an interest in the Global Notes.

"Articles":  The Articles of Association and the Memorandum of Association of the Issuer, as each may be amended and restated from time to time.

"Authorized Class Q-1 Denomination": The meaning specified in Section 2.16(b).

"Authorized Denomination":  The meaning specified in Section 2.3(d) hereof.

"Authorized Newspaper":  A major newspaper in the official language of the country of publication customarily published at least once a day for at least five days in each calendar week.

"Authorized Officer":  With respect to the Issuer or the Co-Issuer, any director or officer thereof or of any other Person who is authorized, by power-of-attorney or otherwise, to act for the Issuer or Co-Issuer, as the case may be, in matters relating to the Issuer or Co-Issuer, as the case may be.

"Bankruptcy Law":  Title 11 of the United States Code (11 U.S.C. §§ 101 et seq.), as amended, any successor statute thereto, any federal or state bankruptcy, insolvency,

reorganization or similar law, or any bankruptcy, insolvency, reorganization or similar law enacted under the laws of the Cayman Islands or of any other applicable jurisdiction.

"Base Amount":  The meaning specified in the Swap Agreement.

"Basic Documents":  The Indenture, the Swap Agreement, the Collateral Administration Agreement and the Investment Agreement.

"Benefit Plan Investor": (i) An employee benefit plan as defined in Section 3(3) of ERISA, whether or not such plan is subject to Title I of ERISA, (ii) a plan described in Section 4975(e)(1) of the Code, whether or not subject to Section 4975 of the Code, or (iii) an entity whose underlying assets include "plan assets" by reason of U.S. Department of Labor regulation Section 2510.3-101 or otherwise.

"Book-Entry Securities":  The meaning specified in Section 2.5(a).

"Business Day":  Any day that is not a Saturday, Sunday or other day on which commercial banking institutions in New York, New York, Cayman Islands, Dublin, Ireland or the city in which the Corporate Trust Office of the Trustee is located, are authorized or obligated by law or executive order to be closed.

"Cede":  Cede & Co.

"Certificate of Authentication":  The meaning specified in Section 2.1.

"Certificated Class Q-1 Securities":  The meaning specified in Section 2.16(b).

"Certificated Class Q-2 Security": The meaning specified in Section 2.17(b).

"Certificated Class Q-2B Security": The meaning specified in Section 2.17(b).

"Certificated Income Note": The meaning specified in Section 2.2(c).

"CGMHI Notes":  U.S. $ 40,000,000 0% EMTNs Due 2034 issued by Citigroup Global Markets Holdings Inc. constituting the Class Q-2 Collateral Asset B.

"Class":  When referring to the Notes, Class A-1 Notes, Class A-2 Notes, Class B Notes, Class C-1 Notes, Class C-2 Notes and/or Income Notes, as appropriate. When referring to the Class Q Securities, the Class Q-1 Securities, the Class Q-2A Securities and/or the Class Q-2B Securities, as appropriate.  When referring to the Securities, any Class of Notes or Class Q Securities, as appropriate.

"Class A Interest Coverage Ratio":  With respect to a Measurement Date, (a) the greater of (i) zero and (ii) Net Interest Coverage Proceeds for such date, divided by (b) the sum of the Class A-1 Interest Amount and the Class A-2 Interest Amount for the next following Payment Date.

"Class A Interest Coverage Test":  A test which will be deemed satisfied as of any Measurement Date on which any of the Class A-1 Notes or Class A-2 Notes are Outstanding if the Class A Interest Coverage Ratio for such date equals or exceeds 110%.

"Class A OC Test":  A test which will be deemed satisfied as of any Measurement Date on which any of the Class A-1 Notes or Class A-2 Notes are Outstanding if the Class A Overcollateralization Ratio for such date equals or exceeds 157%.

"Class A Overcollateralization Ratio":  With respect to a Measurement Date, the quotient obtained by dividing (a) the OC Base Amount as of such date by (b) the sum of (x) the Aggregate Principal Amount of the Class A-1 Notes and (y) the Aggregate Principal Amount of the Class A-2 Notes as of such date.

"Class A-1 Interest Amount"  With respect to a Payment Date, (a) the product of (i) the Aggregate Principal Amount of the Class A-1 Notes as of the beginning of the relevant Periodic Interest Accrual Period plus the amount of any unpaid Class A-1 Interest Amount after the prior Payment Date, (ii) the Class A-1 Interest Rate for such period, (iii) the actual number of days in such period and (iv) 1/360 plus (b) the amount of any unpaid Class A-1 Interest Amount after the prior Payment Date.

"Class A-1 Interest Rate":  The interest rate specified for the Class A-1 Notes in Section 2.3(c).

"Class A-1 Notes":  The meaning specified in Section 2.3(b).

"Class A-2 Interest Amount"  With respect to a Payment Date, (a) the product of (i) the Aggregate Principal Amount of the Class A-2 Notes as of the beginning of the relevant Periodic Interest Accrual Period plus the amount of any unpaid Class A-2 Interest Amount after the prior Payment Date, (ii) the Class A-2 Interest Rate for such period, (iii) the actual number of days in such period and (iv) 1/360 plus (b) the amount of any unpaid Class A-2 Interest Amount after the prior Payment Date.

"Class A-2 Interest Rate":  The interest rate specified for the Class A-2 Notes in Section 2.3(c).

"Class A-2 Notes":  The meaning specified in Section 2.3(b).

"Class B Interest Amount":  With respect to a Payment Date, the product of (i) the Aggregate Principal Amount of the Class B Notes as of the beginning of the relevant Periodic Interest Accrual Period plus the aggregate Deferred Interest with respect to the Class B Notes after the preceding Payment Date, (ii) the Class B Interest Rate for such period, (iii) the actual number of days in such period and (iv) 1/360.

"Class B Interest Coverage Ratio":  With respect to a Measurement Date, (a) the greater of (i) zero and (ii) Net Interest Coverage Proceeds for such date, divided by (b) the sum of the Class A-1 Interest Amount, the Class A-2 Interest Amount and the Class B Interest Amount for the next following Payment Date.

010942

"Class B Interest Coverage Test": A test which will be deemed satisfied as of any Measurement Date on which any of the Class A-1 Notes, Class A-2 Notes or Class B Notes are Outstanding if the Class B Interest Coverage Ratio for such date equals or exceeds 105%.

"Class B Interest Rate": The interest rate specified for the Class B Notes in Section 2.3(c).

"Class B Notes": The meaning specified in Section 2.3(b).

"Class B OC Test": A test which will be deemed satisfied as of any Measurement Date on which any Class A-1 Notes, Class A-2 Notes or Class B Notes are Outstanding if the Class B Overcollateralization Ratio for such date equals or exceeds 133%.

"Class B Overcollateralization Ratio": With respect to a Measurement Date, the quotient obtained by dividing (a) the OC Base Amount as of such date by (b) the sum of the Aggregate Principal Amounts of the Class A-1 Notes, the Class A-2 Notes and the Class B Notes (together with any Deferred Interest with respect to the Class B Notes) as of such date.

"Class C Interest Coverage Ratio": With respect to a Measurement Date, (a) the greater of (i) zero and (ii) the Net Interest Coverage Proceeds for such date, divided by (b) the sum of the Class A-1 Interest Amount, the Class A-2 Interest Amount, the Class B Interest Amount, the Class C-1 Interest Amount and the Class C-2 Interest Amount for the next following Payment Date.

"Class C Interest Coverage Test": A test which will be deemed satisfied as of any Measurement Date on which any of the Class A-1 Notes, Class A-2 Notes, Class B Notes, Class C-1 Notes or Class C-2 Notes are Outstanding if the Class C Interest Coverage Ratio for such date equals or exceeds 100%.

"Class C OC Test": A test which will be deemed satisfied as of any Measurement Date on which any Class A-1 Notes, Class A-2 Notes, Class B Notes, Class C-1 Notes or Class C-2 Notes are Outstanding if the Class C Overcollateralization Ratio for such date equals or exceeds 116%.

"Class C Overcollateralization Ratio": With respect to a Measurement Date, the quotient obtained by dividing (a) the OC Base Amount as of such date by (b) the sum of the Aggregate Principal Amounts of the Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C-1 Notes and the Class C-2 Notes (together with any Deferred Interest with respect to the Class B Notes and the Class C Notes) as of such date.

"Class C Notes": The Class C-1 Notes and the Class C-2 Notes, collectively.

"Class C-1 Interest Amount": With respect to a Payment Date, the product of (i) the Aggregate Principal Amount of the Class C-1 Notes as of the beginning of the relevant Periodic Interest Accrual Period plus the aggregate Deferred Interest with respect to the Class C-1 Notes after the preceding Payment Date, (ii) the Class C-1 Interest Rate for such period, (iii) the actual number of days in such period and (iv) 1/360.

010943

"Class C-1 Interest Rate":  The interest rate specified for the Class C-1 Notes in Section 2.3(c).

"Class C-1 Notes":  The meaning specified in Section 2.3(b).

"Class C-2 Interest Amount":  With respect to a Payment Date, interest accrued for the relevant Periodic Interest Accrual Period on an amount equal to the Aggregate Principal Amount of the Class C-2 Notes as of the beginning of the relevant Periodic Interest Accrual Period plus the aggregate Deferred Interest with respect to the Class C-2 Notes after the preceding Payment Date, at a rate equal to the Class C-2 Interest Rate for such period, calculated on the basis of a 360-day year consisting of twelve 30-day months.

"Class C-2 Interest Rate":  The interest rate specified for the Class C-2 Notes in Section 2.3(c).

"Class C-2 Notes":  The meaning specified in Section 2.3(b).

"Class Q-1 Excess Distribution":  For any Payment Date, an amount equal to the excess, if any, of any amounts paid or distributed with respect to the Class Q-1 Securities over the amount of Q-1 Nominal Interest for the related Periodic Interest Accrual Period.

"Class Q-1 Income Note Component": The U.S. $5,000,000 Aggregate Principal Amount of Income Notes comprising the Income Note Component of the Class Q-1 Securities.

"Class Q-1 Nominal Interest":  For a Periodic Interest Accrual Period, interest accrued on the Class Q-1 Nominal Principal for such period at the Class Q-1 Nominal Rate calculated on the basis of a 360-day year consisting of twelve 30-day months.

"Class Q-1 Nominal Principal":  For the first Periodic Interest Accrual Period, $10,000,000, and for any Periodic Interest Accrual Period thereafter, the Class Q-1 Nominal Principal for the prior Periodic Interest Accrual Period minus the amount of the Class Q-1 Excess Distribution, if any, for the Payment Date occurring at the beginning of such current Periodic Interest Accrual Period, but in no event shall the Class Q-1 Nominal Principal be less than $1,000.

"Class Q-1 Nominal Rate":  2.00% per annum.

"Class Q-1 Rated Principal":  For the first Periodic Interest Accrual Period, $10,000,000, and for any Periodic Interest Accrual Period thereafter, the Class Q-1 Rated Principal for the prior Periodic Interest Accrual Period minus any amount paid or distributed with respect to the Class Q-1 Securities for the Payment Date occurring at the beginning of such current Periodic Interest Accrual Period, but in no event shall the Class Q-1 Rated Principal be less than $1.

"Class Q-1 Reg S Global Security":  The meaning specified in Section 2.16(b).

"Class Q-1 Securities":  The U.S.$ 10,000,000 Class Q-1 Extendable Securities comprised of the Class Q-1 Senior Note Component and the Class Q-1 Income Note Component.

"Class Q-1 Senior Note Component": The U.S. $5,000,000 initial Aggregate Principal Amount of Class C-2 Notes comprising the Senior Note Component of the Class Q-1 Securities.

"Class Q-1 Temp Reg S Global Security": The meaning specified in Section 2.16(b).

"Class Q-2 Administrative Expenses": Any Administrative Expenses accrued while any Class Q-2 Securities remain Outstanding but after the redemption in full of all Senior Notes, Class Q-1 Securities and Income Notes and liquidation and distribution of the Trust Estate.

"Class Q-2 Collateral Asset A": U.S.$ 25,000,000 Aggregate Principal Amount of Income Notes Delivered to the Class Q-2 Securities Collateral Account on the Closing Date.

"Class Q-2 Collateral Asset A Proceeds": With respect to any Payment Date, the sum of (i) all amounts distributed with respect to the Income Notes represented by the Class Q-2 Collateral Asset A for such date and (ii) any amounts received by the Trustee with respect to the sale or redemption of the Class Q-2 Collateral Asset A hereunder, in each case from and after the preceding Payment Date and on or prior to such date.

"Class Q-2 Collateral Asset B": U.S. $ 40,000,000 0% EMTNs Due 2034 issued by Citigroup Global Markets Holdings Inc. ("CGMHI Notes") Delivered to the Class Q-2 Securities Collateral Account on the Closing Date, and any conversion or exchange proceeds thereof.

"Class Q-2 Collateral Asset B Proceeds": Any sales proceeds, conversion or exchange proceeds or maturity proceeds of the Class Q-2 Collateral Asset B.

"Class Q-2 Collateral Assets": Collectively, the Class Q-2 Collateral Asset A and the Class Q-2 Collateral Asset B.

"Class Q-2 Gross Proceeds": As defined in the definition of "Class Q-2 Payment Date Proceeds."

"Class Q-2 Maturity Date": April 28, 2034.

"Class Q-2 Maturity Date Priority of Payments": The meaning specified in Section 2.17(d)(iii).

"Class Q-2 Payment Date Priority of Payments": The meaning specified in Section 2.17(d)(i).

"Class Q-2 Payment Date Proceeds": With respect to any Payment Date, (i) the sum of (a) the Class Q-2 Collateral Asset A Proceeds for such Payment Date and (b) interest and dividends received with respect to Eligible Investments on deposit in the Class Q-2 Securities Collateral Account (collectively, "Class Q-2 Gross Proceeds") minus (ii) the Class Q-2B Target Amount for such Payment Date.

A-8

"Class Q-2 Priority of Payments": Collectively, the payment priorities set forth in Section 2.17(d).

"Class Q-2 Requisite Securityholders": The Holders of at least 66 2/3% of the Aggregate Principal Amount of (a) the Class Q-2A Securities so long as any Class Q-2A Securities are Outstanding, and (b) thereafter the Class Q-2B Securities.

"Class Q-2 Securities": The Class Q-2A Securities and the Class Q-2B Securities, collectively.

"Class Q-2 Securities Collateral": Collectively, (i) Class Q-2 Collateral Asset A, (ii) Class Q-2 Collateral Asset B, (iii) the portion of the Trust Estate that in accordance with the provisions in this Indenture is required to be applied to payment of the Income Notes represented by the Class Q-2 Collateral Asset A, at any time on and after such property is required to be applied to the payment of the Income Notes represented thereby, (iv) the Class Q-2 Securities Collateral Account, any subaccounts thereof and all financial assets credited to, and amounts on deposit or credit balances carried in, the Class Q-2 Securities Collateral Account from time to time, (v) all Eligible Investments purchased with funds on deposit in the Class Q-2 Securities Collateral Account and all income and other proceeds from the investment of funds therein; and (vi) all proceeds, accessions, profits, income, benefits, substitutions and replacements, whether voluntary or involuntary, of and to any of the property described in the preceding clauses.

"Class Q-2 Securities Collateral Account": The meaning specified in Section 2.17(c).

"Class Q-2A Coverage Ratio": With respect to any date of determination, the quotient obtained by dividing (a) the market value of Class Q-2 Collateral Asset A as of such date by (b) sum of the Aggregate Principal Amount of the Class Q-2A Securities plus Class Q-2A Deferred Interest, if any, as of such date.

"Class Q-2A Coverage Test": A test which will be deemed satisfied as of any date of determination on which any Class Q-2A Securities are Outstanding, if the Class Q-2A Coverage Ratio for such date equals or exceeds 2.25.

"Class Q-2A Deferred Interest": The meaning specified in Section 2.17(c)(i).

"Class Q-2A Interest Amount": With respect to a Payment Date, the product of (i) the Aggregate Principal Amount of the Class Q-2A Securities as of the beginning of the relevant Periodic Interest Accrual Period, plus the aggregate Class Q-2 Deferred Interest after the preceding Payment Date, (ii) the Class Q-2A Interest Rate for such period, (iii) the actual number of days in such period and (iv) 1/360.

"Class Q-2A Interest Rate": The meaning specified in Section 2.17(c).

"Class Q-2A Securities": The U.S.$7,200,000 Class Q-2A Securities Due 2034.

"Class Q-2B Securities": The U.S.$40,000,000 Class Q-2B Securities Due 2034.

A-9

"Class Q-2B Target Amount": With respect to any Payment Date, an amount equal to the lesser of (i) the Class Q-2 Gross Proceeds for such date and (ii) the product of (a) the Aggregate Principal Amount of the Class Q-2B Securities and (b) 1% per annum for the related Periodic Interest Accrual Period, calculated on the basis of a 360-day year consisting of twelve 30-day months.

"Clearance Systems": Euroclear and Clearstream.

"Clearing Corporation": (i) Clearstream, (ii) DTC, (iii) Euroclear and (iv) any entity included within the meaning of "clearing corporation" under the UCC.

"Clearing Corporation Security": An Eligible Investment that is a Financial Asset that is (i) in bearer form or (ii) registered in the name of a Clearing Corporation or the nominee of such Clearing Corporation and, if a Certificated Security, is held in the custody of such Clearing Corporation.

"Clearstream": Clearstream Banking, société anonyme, a corporation organized under the laws of the Grand Duchy of Luxembourg, or any successor thereto.

"Closing Date": August 18, 2004.

"Code": The U.S. Internal Revenue Code of 1986, as amended, and any successor statute thereto.

"Co-Issuer": Valhalla CLO, Inc., a Delaware corporation.

"Collateral": The Trust Estate.

"Collateral Account": The account created and designated as the "Valhalla CLO, Ltd. – Collateral Account" under Section 8.3.

"Collateral Administration Agreement": The collateral administration agreement, dated as of the Closing Date, among the Issuer, the Collateral Administrator, the Swap Counterparty and the Reference Portfolio Manager.

"Collateral Administrator": JPMorgan Chase Bank, as collateral administrator under the Collateral Administration Agreement and its permitted successors.

"Collateral Administrator Expenses": With respect to any Payment Date (including the Maturity Date), an amount equal to the sum of all amounts incurred by or otherwise owing to the Collateral Administrator in the related Collection Period in accordance with the Collateral Administration Agreement other than the Collateral Administrator Fee.

"Collateral Administrator Fee": With respect to any Payment Date (including the Maturity Date), the amount set forth in or determined pursuant to the Collateral Administration Agreement.

010947

"Collection Account":  The account created and designated as the "Valhalla CLO, Ltd. – Collection Account" under Section 8.2(a).

"Collection Period":  The meaning specified in the Swap Agreement.

"Commission":  The United States Securities and Exchange Commission.

"Components": The Class Q-1 Senior Note Component and the Class Q-1 Income Note Component.

"Controlling Person":  A Person (other than a Benefit Plan Investor) that has discretionary authority or control with respect to the assets of the Issuers or that provides investment advice for a fee (direct or indirect) with respect to such assets (or any "affiliate" of such a Person (as defined in Department of Labor regulation Section 2510.3-101(f)(3))).

"Corporate Trust Office":  With respect to the Trustee means the principal office of the Trustee at which, at any particular time, its corporate trust business shall be principally administered, which office as of the date of the execution of this Indenture is located at 600 Travis Street, 50th Floor, Houston, Texas 77002, Attention: Institutional Trust Services – Valhalla CLO, Ltd., telephone number (713) 216-4181, or at such other address as the Trustee may designate in writing from time to time by notice to the Holders of Notes, the Swap Counterparty, the Issuer and the Investment Agreement Counterparty, or the principal office of any successor Trustee (the address of which the successor Trustee will notify the Holders of Notes, the Swap Counterparty, the Issuer and the Investment Agreement Counterparty in writing).

"Coverage Tests":  The Interest Coverage Tests and the Overcollateralization Tests.

"Credit Event":  The meaning specified in the Swap Agreement.

"Default":  Any event or condition the occurrence or existence of which would, with the giving of notice or lapse of time or both, become an Event of Default.

"Default Adjustment":  (a) On any date of determination with respect to any Defaulted Reference Obligation or any Deferring PIK Obligation that has been a Defaulted Reference Obligation or Deferring PIK Obligation, as applicable, for no more than one month as of such date of determination:  (1) the Reference Value of such Defaulted Reference Obligation or Deferring PIK Obligation, minus (2) the product of (x) the lesser of (i) the Moody's Recovery Rate for such Defaulted Reference Obligation or Deferring PIK Obligation (or such lower recovery rate that the Reference Portfolio Manager determines is appropriate during such month) and (ii) the S&P Recovery Rate for such Defaulted Reference Obligation or Deferring PIK Obligation and (y) the Reference Obligation Calculation Amount of such Defaulted Reference Obligation or Deferring PIK Obligation.  On any date of determination with respect to any Defaulted Reference Obligation or Deferring PIK Obligation that has been a Defaulted Reference Obligation or Deferring PIK Obligation for longer than one month but less than three years as of such date of determination:  (1) the Reference Value of such Defaulted Reference Obligation or Deferring PIK Obligation minus (2) the lesser of (A) the Market Value of such

010948

Defaulted Reference Obligation or Deferring PIK Obligation, as determined by the Reference Portfolio Manager and (B) the product of (x) the lesser of (i) the Moody's Recovery Rate for such Defaulted Reference Obligation or Deferring PIK Obligation and (ii) the S&P Recovery Rate for such Defaulted Reference Obligation or Deferring PIK Obligation and (y) the Reference Obligation Calculation Amount of such Defaulted Reference Obligation or Deferring PIK Obligation. On any date of determination with respect to any Defaulted Reference Obligation or Deferring PIK Obligation that has been a Defaulted Reference Obligation or Deferring PIK Obligation for three years or more as of such date of determination, the Reference Value thereof;

(b) To the extent a Defaulted Reference Obligation or Deferring PIK Obligation is converted or exchanged into an Equity Security, for so long as such Equity Security remains part of the Reference Portfolio, the Default Adjustment shall equal the applicable Reference Value; and

(c) In no event will the Default Adjustment be less than zero.

"Defaulted Reference Obligation":  The meaning specified in the Swap Agreement.

"Deferred Interest":  The amount of any interest that is not paid on the Class B Notes, Class C-1 Notes or Class C-2 Notes as a result of insufficient funds in accordance with the Priority of Payments.

 "Deferring PIK Obligation":  (i) Any Reference Obligation (other than a Structured Finance Obligation) that is a PIK Obligation in respect of which interest has been deferred or capitalized (and not subsequently paid) and (ii) any Reference Obligation that is a Structured Finance Obligation and a PIK Obligation (a) rated "Baa3" or higher by Moody's, in respect of which interest has been deferred or capitalized for at least two or more full interest periods or one year, whichever is less (and not subsequently paid) or (b) rated lower than "Baa3" by Moody's, in respect of which interest has been deferred or capitalized for one or more full interest periods or six months, whichever is less (and not subsequently paid).

"Deliver", "Delivered" or "Delivery":  When used with respect to the Trust Estate or the Class Q-2 Securities Collateral means the taking of the following steps by the Issuer:

(a)  in the case of each Certificated Security or Instrument (other than a Clearing Corporation Security or an Instrument referred to in clause (g) below), (A) causing the delivery of such Certificated Security or Instrument to the Securities Intermediary registered in the name of the Securities Intermediary or its affiliated nominee or endorsed to the Securities Intermediary or in blank, (B) causing the Securities Intermediary to continuously identify on its books and records that such Certificated Security or Instrument is credited to the relevant Trust Account or Class Q-2 Securities Collateral Account, as applicable, and (C) causing the Securities Intermediary to maintain continuous possession of such Certificated Security or Instrument;

(b)  in the case of each Uncertificated Security (other than a Clearing Corporation Security), (A) causing such Uncertificated Security to be continuously registered on the books of the obligor thereof to the Securities Intermediary and (B)

010949

causing the Securities Intermediary to continuously identify on its books and records that such Uncertificated Security is credited to the relevant Trust Account or Class Q-2 Securities Collateral Account, as applicable;

(c)      in the case of each Clearing Corporation Security, causing (A) the relevant Clearing Corporation to continuously credit such Clearing Corporation Security to the securities account of the Securities Intermediary at such Clearing Corporation and (B) the Securities Intermediary to continuously identify on its books and records that such Clearing Corporation Security is credited to the relevant Trust Account or Class Q-2 Securities Collateral Account, as applicable;

(d)      in the case of any Financial Asset that is maintained in book-entry form on the records of a FRB, causing (A) the continuous crediting of such Financial Asset to a securities account of the Securities Intermediary at any FRB and (B) the Securities Intermediary to continuously identify on its books and records that such Financial Asset is credited to the relevant Trust Account or Class Q-2 Securities Collateral Account, as applicable;

(e)      in the case of each Financial Asset not covered by the foregoing clauses (a) through (d), causing the transfer of such Financial Asset to the Securities Intermediary in accordance with applicable law and regulation and causing the Securities Intermediary to continuously credit such Financial Asset to the relevant Trust Account or Class Q-2 Securities Collateral Account, as applicable;

(f)      in the case of each general intangible (including any participation interest that is not, or the debt underlying which is not, evidenced by an Instrument or Certificated Security), notifying the obligor thereunder of the Grant to the Trustee (unless no applicable law requires such notice);

(g)      in the case of each participation interest in a loan as to which the underlying debt is represented by an Instrument, obtaining the acknowledgment of the Person in possession of such Instrument (which may not be the Issuer) that it holds the Issuer's interest in such Instrument solely on behalf and for the benefit of the Trustee;

(h)      in the case of any "deposit account" as defined in Article 9 of the UCC, causing the institution with which such deposit account is maintained to maintain such deposit account in accordance with the Account Agreement; and

(i)      in the case of any "securities account" causing the institution with which such securities account is maintained to maintain such securities account in accordance with the Account Agreement.

"Depositary":  The Depository Trust Company, its nominees and their respective successors, including any depository selected pursuant to Section 2.5.

"Determination Date":  With respect to a Payment Date, the eighth Business Day preceding such Payment Date; provided that the final Determination Date will be the last day of the final Collection Period.

"Diversion Test": A test which will be deemed satisfied as of any Determination Date related to any Payment Date following the Ramp-up End Date, if the Class C OC Test is satisfied as of such date, measured for this purpose as of the applicable Determination Date without giving effect to any payments made on the related Payment Date (including those made pursuant to any clause of the Priority of Payments ranking prior to the clause that provides for payments if the Diversion Test is not satisfied).

"Dollar" or "U.S. $" or "$":  a dollar of the United States of America.

"DTC":  The Depository Trust Company or its successor.

"Eligible Account":  Either (a) a domestic segregated account with an Eligible Institution or (b) a domestic segregated trust account with the corporate trust department of a depository institution organized under the laws of the United States of America or any one of the states thereof or the District of Columbia (or any domestic branch of a foreign bank), having corporate trust powers and acting as trustee for funds deposited in such account, so long as any of the securities of such depository institution shall have a credit rating from a nationally recognized statistical rating organization in one of its generic rating categories which signifies investment grade (e.g., in the case of S&P, "BBB-" or higher).

"Eligible Institution":  A depository institution organized under the laws of the United States of America or any one of the states thereof or the District of Columbia (or any domestic branch of a foreign bank), including the Trustee, (i) which has either (A) a long-term unsecured debt rating of "AA-," "Aa3" or its equivalent from a nationally recognized statistical rating organization or (B) a certificate of deposit rating of at least "A-1," "P-1" or its equivalent from a nationally recognized statistical rating organization or any other long-term, short-term or certificate of deposit rating acceptable to the Requisite Noteholders and the Swap Counterparty, (ii) whose deposits are insured by the Federal Deposit Insurance Corporation and (iii) whose combined capital and surplus is at least U.S. $200,000,000.

"Eligible Investments":  Any U.S. Dollar-denominated investment (other than obligations of the Swap Counterparty or any of its Affiliates) that is one or more of the following (and may include investments for which the Swap Counterparty, the Trustee and/or their respective Affiliates provide services but may not include investments for which the Reference Portfolio Manager provides services):

(a)  cash;

(b)  direct registered obligations of, and registered obligations the timely payment of principal and interest on which is fully and expressly guaranteed by, the United States or any agency or instrumentality of the United States the obligations of which are expressly backed by the full faith and credit of the United States, which in each case are not zero coupon securities;

(c)  demand and time deposits in, trust accounts, certificates of deposit payable within 91 days of issuance of, bankers' acceptances payable within 91 days of issuance issued by, or Federal funds sold by any depositary institution or trust company incorporated under the laws of the United States or any state thereof and subject to supervision and examination by Federal and/or state banking authorities so long as the commercial paper and/or the debt

010951

obligations of such depository institution or trust company (or, in the case of the principal depository institution in a holding company system, the commercial paper or debt obligations of such holding company), at the time of such investment or contractual commitment providing for such investment and throughout the term of the investment, have a credit rating of not less than "Aaa" by Moody's and "AAA" by Standard & Poor's and in each case are not on watch for downgrade, or "P-1" by Moody's and "A-1+" by Standard & Poor's in the case of commercial paper and short-term debt obligations; provided that in any case, the issuer thereof must have at the time of such investment a long-term credit rating of not less than "AA-" by Standard & Poor's and "Aa3" by Moody's and a short-term rating of "A-1+" by Standard & Poor's and "P-1" by Moody's, and if so rated, is not on watch for downgrade;

(d) commercial paper or other short-term obligations with a maturity of not more than 91 days from the date of issuance and having at the time of such investment a credit rating of at least "P-1" by Moody's and "A-1+" by Standard & Poor's, provided, that, in any case, the issuer thereof must have at the time of such investment a long-term credit rating of not less than "Aa2" by Moody's, and if so rated, such rating is not on watch for downgrade.

(e) unleveraged repurchase obligations with respect to any security described in clause (b) above entered into with a U.S. federal or state depository institution or trust company (acting as principal) described in clause (c) above or entered into with a corporation (acting as principal) whose long-term credit rating is not less than "Aaa" by Moody's and "AAA" by Standard & Poor's and in each case are not on watch for downgrade or whose short-term credit rating is "P-1" by Moody's and "A-1+" by Standard & Poor's at the time of such investment and throughout the term of the investment; provided, that, if such repurchase obligation has a maturity of longer than 91 days, the counterparty thereto must also have at the time of such investment and throughout the term of the investment a long-term credit rating of not less than "Aa2" by Moody's and "AAA" by Standard & Poor's, and if so rated, such rating is not on watch for downgrade;

(f) any money market fund or similar investment vehicle having at the time of investment therein and throughout the term of the investment a credit rating of "MR1+" by Moody's and "AAAm" by Standard & Poor's; including any fund for which the Trustee or an Affiliate of the Trustee serves as an investment advisor, administrator, shareholder servicing agent, custodian or subcustodian, notwithstanding that (A) the Trustee or an Affiliate of the Trustee charges and collects fees and expenses from such funds for services rendered (provided that such charges, fees and expenses are on terms consistent with terms negotiated at arm's length) and (B) the Trustee charges and collects fees and expenses for services rendered, pursuant to this Indenture;

(g) a guaranteed reinvestment agreement from a bank (if treated as a deposit by such bank), insurance company or other corporation or entity organized under the laws of the United States or any state thereof (if treated as debt by such insurance company or other corporation or entity), providing for periodic payments thereunder during each Collection Period; provided that each such agreement provides that it is terminable by the purchaser, without premium or penalty, in the event that the rating assigned to such agreement by either Moody's or Standard & Poor's is at any time lower than the then current ratings assigned to any Class of Senior Notes; provided, further, that, at the time of investment therein and throughout the term of

the investment, the issuer of such agreement has a senior unsecured long-term debt rating, issuer rating or counterparty rating of at least "Aaa" by Moody's, a short-term debt rating of "P-1" by Moody's (and not on watch for downgrade), a short-term debt rating of at least "A-1+" by Standard & Poor's and a long-term debt rating of at least "AAA" by Standard & Poor's (and not on watch for downgrade);

(h) the Investment Agreement (together with the Investment Agreement Guaranty or any other guaranty in respect thereof); and

(i) such other investments for which Rating Confirmation has been received;

*provided* that the Eligible Investments in the Collateral Account (except the Investment Agreement) shall be required to mature on or before the Business Day prior to the next Payment Date, and Eligible Investments in the Collection Account shall be required to mature on or before the Business Day prior to the next Payment Date; provided, further that each Eligible Investment must bear a stated rate of interest and any floating rate of interest must reset on or prior to the next Payment Date of the Notes; provided, further that each Eligible Investment provides, at the time of purchase, solely for payments that will not be subject to withholding tax unless the issuer or obligor (and the guarantor, if any) of the security or obligation is required to make "gross-up" payments that cover the full amount of any such withholding tax (or return the invested amount at par); provided, further that ownership of such Eligible Investments will not subject the Issuer or Co-Issuer to net income tax in any jurisdiction where it would not otherwise be subject to tax; provided, further that Eligible Investments may not include (a) any interest-only security, any security purchased at a price in excess of 100% of the par value thereof, any security the repayment of which is subject to substantial non-credit related risk as determined in the business judgment of the Swap Counterparty (or the Reference Portfolio Manager on its behalf) or any security that has a rating assigned by S&P that contains an "r", "t", "p", "pi" or "q" subscript, (b) any floating rate security the interest rate with respect to which is inversely or otherwise not proportionately related to an interest rate index or is calculated as other than the sum of an interest rate index plus a spread or (c) any security subject to a tender offer, voluntary redemption, exchange offer, conversion or other similar action.

"Equity Security": The meaning specified in the Swap Agreement.

"ERISA": The U.S. Employee Retirement Income Security Act of 1974, as amended, and any successor statute thereto.

"ERISA Restricted Notes": The Income Notes, the Class Q-1 Securities and the Class Q-2B Securities.

"Euroclear": Euroclear Bank S.A./N.V., as operator of the Euroclear System, or any successor thereto.

"Event of Default": The meaning specified in Section 5.1.

"Exchange Act": The U.S. Securities Exchange Act of 1934, as amended.

"Exchange Date": The first Business Day following the 40th day after the later of the Closing Date and the commencement of the offering of the Notes.

"Excluded Property": Collectively, $1,000 the Issuer received in connection with the issuance of the Ordinary Shares of the Issuer and $1,000 the Issuer received as a fee for issuing the Securities, and the income thereon and the bank account in which such monies are held.

"Expense Cap Amount": With respect to any Payment Date, an amount not to exceed: (a) with respect to Administrative Expenses specified in clause (v)(F) of the definition of "Administrative Expenses" herein, U.S. $50,000 per annum (pro rated for the related Periodic Interest Accrual Period), minus the amount of Administrative Expenses specified in clause (v)(F) paid during the Periodic Interest Accrual Period immediately preceding such Payment Date and (b) with respect to all other Administrative Expenses in the aggregate, 0.04% of the Swap Notional Amount plus $150,000 per annum (pro rated for the related Periodic Interest Accrual Period), minus the amount of Administrative Expenses (other than those specified in clause (v)(F) thereof) paid during the Periodic Interest Accrual Period immediately preceding such Payment Date.

"Expense Reserve Account": The account created and designated as the "Valhalla CLO, Ltd. – Expense Reserve Account" under Section 8.2(e).

"Extension Bonus Eligibility Certification": With respect to a Maturity Extension and each beneficial owner of Senior Notes (including in the form of the Class Q-1 Senior Note Component) other than Extension Sale Securities, the written certification by such beneficial owner acceptable to the Trustee to the effect that it held Senior Notes (including in the form of the Class Q-1 Senior Note Component) other than Extension Sale Securities on the Extension Effective Date, including the Aggregate Principal Amount thereof and wire transfer instructions for the Extension Bonus Payment and any required documentation thereunder.

"Extension Bonus Payment": With respect to a Maturity Extension, a single payment to each applicable beneficial owner set forth in Section 2.15(g) in an amount equal to (1) in the case of the Class A-1 Notes, 0.25% of the Aggregate Principal Amount thereof held by such beneficial owner as of the Extension Effective Date, (2) in the case of the Class A-2 Notes, 0.25% of the Aggregate Principal Amount thereof held by such beneficial owner as of the Extension Effective Date, (3) in the case of the Class B Notes, 0.25% of the Aggregate Principal Amount thereof held by such beneficial owner as of the Extension Effective Date and (4) in the case of the Class C Notes, 0.50% of the Aggregate Principal Amount thereof held by such beneficial owner as of the Extension Effective Date.

"Extension Conditions": The meaning specified in Section 2.15(c).

"Extension Determination Date": The 8th Business Day prior to the Extension Effective Date.

"Extension Effective Date": The Payment Date in August 2009.

"Extension Notice": The meaning specified in Section 2.15(d).

A-17

010954

"Extension Qualifying Purchasers":  One or more qualifying purchasers (which may include the Swap Counterparty or any of its Affiliates acting as principal or agent) designated by the Swap Counterparty (or its Affiliate) to purchase Securities from Holders pursuant to the Extension Conditions set forth in Section 2.15(c).

"Extension Purchase Price":  The purchase price payable by the Extension Qualifying Purchasers for Extension Sale Securities in connection with the Maturity Extension, if any, in an amount equal to (a) in the case of the Senior Notes, the Aggregate Principal Amount thereof, plus accrued and unpaid interest (including Deferred Interest, if any) as of the Extension Effective Date (giving effect to any amounts paid to the Holder on such date), plus, in the case of the Class C-2 Notes, the applicable Make-whole Premium, (b) in the case of the Income Notes, an amount that, together with any amounts paid to the Holders with respect to those Income Notes from the Closing Date to and including the Extension Effective Date, shall result in an internal rate of return with respect to those Income Notes of 18% per annum, provided, however, that if the Extension Effective Date is on or after the date on which such Holders have received an internal rate of return equal to or in excess of 18% per annum, the applicable Extension Purchase Price for Income Notes shall be zero and (c) in the case of the Class Q-1 Securities, an amount determined based on the respective purchase prices for the relevant Class Q-1 Senior Note Component and the Class Q-1 Income Note Component thereof.

"Extension Sale Notice":  The meaning specified in Section 2.15(d)(iii).

"Extension Sale Notice Period":  The meaning specified in Section 2.15(d)(iii).

"Extension Sale Securities": The meaning specified in Section 2.15(b).

"Final Class Q-2B Distribution Amount":  The meaning specified in Section 2.17(iii)(B).

"Final Income Note Distribution Amount":  The meaning specified in Section 8.6(b)(xix).

"Fixed Amount":  The meaning specified in the Swap Agreement.

"FRB":  Any Federal Reserve Bank.

"Global Notes":  The Regulation S Global Notes, the Rule 144A Global Notes and the Temporary Regulation S Global Notes (and, unless the context otherwise requires, the Class Q-1 Temp Reg S Global Securities and the Class Q-1 Reg S Global Securities).

"Grant":  means to grant, bargain, sell, warrant, alienate, remise, demise, release, convey, assign, transfer, mortgage, pledge, create and grant a security interest in and right of set-off against, deposit, set over and confirm.  A Grant shall include all rights, powers and options (but none of the obligations) of the granting party thereunder, including without limitation the immediate continuing right to claim for, collect and receive principal and interest payments in respect of the subject property, and all other Monies payable thereunder, to give and receive notices and other communications, to make waivers or other agreements, to exercise all rights and options, to bring Proceedings in the name of the granting party or otherwise, and generally to

A-18

010955

do and receive anything that the granting party is or may be entitled to do or receive thereunder or with respect thereto.

"Holder":  With respect to any Note, Class Q-1 Security or Class Q-2 Security, the Person in whose name such Note or Class Q Security is registered in the Securities Register. "Noteholder" and "Securityholder" will have corresponding meanings.

"Incentive Amount":  The meaning specified in the Swap Agreement.

"Income Note Principal Distribution Amount":  The meaning specified in Section 8.6(b)(xix).

"Income Notes":  The meaning specified in Section 2.3(b).

"Indenture Calculation Agent":  The meaning specified in Section 10.3.

"Indenture Tax Event":  Either (i) the adoption of, or a change in, any tax statute (including the Code), treaty, regulation (whether temporary or final), rule, ruling, practice, procedure or judicial decision or interpretation which results or will result in withholding tax payments in an amount in excess of 10% of the net income of the Issuer during the Collection Period as a result of the imposition of withholding tax on payments to the Issuer with respect to which the obligors are not required to make gross-up payments that cover the full amount of such withholding taxes on an after-tax basis or (ii) a final determination by the Internal Revenue Service or a court of competent jurisdiction or an opinion of nationally recognized tax counsel experienced in such matters acceptable to the Swap Counterparty and the Reference Portfolio Manager to the effect that the Issuer is or has become subject to taxation in an amount in excess of 10% of the net income of the Issuer during the Collection Period, whether as a result of being deemed to be engaged in the conduct of a trade or business within the United States for U.S. federal income tax purposes or otherwise.

"Independent":  As to any Person, any other Person (including, in the case of an accountant, or lawyer, a firm of accountants or lawyers and any member thereof) who (i) does not have and is not committed to acquire any material direct or any material indirect financial interest in such Person or in any Affiliate of such Person, and (ii) is not connected with such Person as an officer, employee, promoter, underwriter, voting trustee, partner, director or Person performing similar functions.

"Independent Accountants":  The meaning specified in Section 8.9.

"Indirect Participant":  A Person who holds an interest in a Global Note through a Participant.

"Initial Consent Period": The period of 15 Business Days from but excluding the date on which the Trustee mailed (i) a proposed supplemental indenture pursuant to Section 9.2(d) or (ii) a proposed amendment to the Swap Agreement pursuant to Section 7.26(c), as applicable, in either case to the Holders of Securities.

010956

"Initial Purchaser":  With respect to the Senior Notes, the Class Q-1 Securities and the Class Q-2A Securities, Citigroup Global Markets Inc.  The term "initial purchaser" (lower case) refers to the initial purchasers of the Notes, Class Q-1 Securities and Class Q-2 Securities from the Initial Purchaser or through the Placement Agent, as applicable.

"Initial Reference Obligations":  The Reference Obligations included in the Reference Portfolio under the Swap Agreement as of the Closing Date.

"Instrument": The meaning given to such term in the UCC.

"Interest Coverage Ratios":  The Class A Interest Coverage Ratio, the Class B Interest Coverage Ratio and the Class C Interest Coverage Ratio.

"Interest Coverage Tests":  The Class A Interest Coverage Test, the Class B Interest Coverage Test and the Class C Interest Coverage Test.

"Interest Rate":  The Class A-1 Interest Rate, the Class A-2 Interest Rate, the Class B Interest Rate, the Class C-1 Interest Rate and the Class C-2 Interest Rate, as the context requires.

"Investment Agreement":  The investment agreement (No. 000441) dated as of the Closing Date among the Investment Agreement Counterparty, the Issuer and the Trustee, as may be amended, supplemented and/or otherwise modified and in effect from time to time in accordance with the terms thereof.

"Investment Agreement Counterparty":  From time to time, the "Provider" specified in the Investment Agreement, which initially shall be FSA Capital Management Services LLC, a Delaware limited liability company.

"Investment Agreement Guarantor":  From time to time, the "Guarantor," if any, specified in the Investment Agreement, which initially shall be Financial Security Assurance Inc., a New York stock insurance company.

"Investment Agreement Guaranty": From time to time, the "Guaranty" in effect, if any, specified in the Investment Agreement, such instrument initially being the Financial Guaranty Insurance Policy, including Endorsement No. 1 thereto (Policy No. No. 90365-N), dated the Closing Date, issued by the initial Investment Agreement Guarantor.

"Investment Company Act":  The U.S. Investment Company Act of 1940, as amended.

"Irish Transfer Agent":  The meaning specified in Section 10.2.

"ISDA":  The International Swaps and Derivatives Association, Inc.

"Issuer":  Valhalla CLO, Ltd., an exempted company incorporated with limited liability under the laws of the Cayman Islands, and its permitted successors and assigns.

A-20

010957

"Issuer Order":  A written order signed in the name of the Issuer by any one of its Authorized Officers and delivered to the Trustee.

"Issuers":  The Issuer and the Co-Issuer.  References to "such Issuer," "the applicable Issuer" and the like shall be references to either the Issuer or the Co-Issuer, as the context requires.

"LIBOR":  As determined by the Indenture Calculation Agent with respect to each Periodic Interest Accrual Period other than the first Periodic Interest Accrual Period, the rate for three-month U.S. Dollar deposits in Europe which appears on Telerate Page 3750 (as defined in the Annex to the 2000 ISDA Definitions) as reported by Bloomberg Financial Markets Commodities News, or such page as may replace such Telerate Page 3750, as of 11:00 a.m. (London time) on the related LIBOR Determination Date; provided, that if, on any LIBOR Determination Date, such rate does not appear on Telerate Page 3750, or such page as may replace such Telerate Page 3750, the Indenture Calculation Agent shall determine the arithmetic mean of the offered quotations of the Reference Banks to leading banks in the London interbank market for three-month U.S. Dollar deposits in Europe in an amount determined by the Indenture Calculation Agent by reference to requests for quotations as of approximately 11:00 a.m. (London time) on the relevant LIBOR Determination Date.  If, on any LIBOR Determination Date, at least two of the Reference Banks provide such quotations, LIBOR shall equal such arithmetic mean of such quotations.  If, on any LIBOR Determination Date, only one or none of the Reference Banks provides such quotations, LIBOR shall be deemed to be the arithmetic mean of the offered quotations that leading banks in the City of New York selected by the Indenture Calculation Agent are quoting on the relevant LIBOR Determination Date for three-month U.S. Dollar deposits in Europe in an amount determined by the Indenture Calculation Agent by reference to the principal London offices of leading banks in the London interbank market; provided, however, that if the Indenture Calculation Agent is required but is unable to determine a rate in accordance with at least one of the procedures provided above, LIBOR shall be determined by the Indenture Calculation Agent in a commercially reasonable manner.

LIBOR for the Periodic Interest Accrual Period beginning on the Closing Date will be 1.88230% per annum.

"LIBOR Determination Date":  The second London Business Day prior to the commencement of a Periodic Interest Accrual Period.

"Listing Agent":  The meaning specified in Section 7.22.

"London Business Day":  Any Business Day on which commercial banks are open for dealings in deposits in U.S. Dollars in the London interbank market.

 "Make-whole Premium": With respect to the Class C-2 Notes, the premium payable to the Holders of the Class C-2 Notes in connection with (i) an Optional Redemption of such Notes, (ii) the purchase of such Notes that are Extension Sale Securities in connection with the Maturity Extension, if any, or (iii) the purchase of such Notes in connection with an Amendment Buy-Out, as applicable, in each case in an amount equal to the excess, if any, of (x) the present value (discounted to the Optional Redemption Date, Extension Effective Date or date

of Amendment Buy-Out, as applicable, using the Reinvestment Yield as the discount rate on a semi-annual basis using a 360-day year of twelve 30-day months) of the remaining payments of interest and principal due on the Class C-2 Notes, assuming that the entire outstanding principal amount of the applicable Class C-2 Notes will be paid on the Payment Date occurring in November 2013 and that each intervening payment of interest on the Class C-2 Notes will be made on the related Payment Date in its entirety (and therefore there is no Deferred Interest on the Class C-2 Notes) over (y) the Aggregate Principal Amount of the applicable Class C-2 Notes on the Optional Redemption Date, Extension Effective Date or date of Amendment Buy-Out, as applicable; provided that in no event shall any Make-whole Premium be less than zero.

"Market Value":  The meaning specified in the Swap Agreement.

"Maturity Date":  August 1, 2016, or, in the case of a Maturity Extension pursuant to Section 2.15, August 1, 2020.

"Maturity Extension":  The meaning specified in Section 2.15(a) hereof.

"Measurement Date":  Any of (a) the date of any addition or removal of a Reference Obligation under the Swap Agreement, (b) each Determination Date, (c) each Monthly Report Determination Date and (d) with reasonable prior written notice to the Issuer, the Reference Portfolio Manager and the Trustee, any Business Day that a Rating Agency or the Swap Counterparty requests to be a "Measurement Date;" provided that, if any such date would otherwise fall on a day that is not a Business Day, the relevant Measurement Date will be the immediately following Business Day.

"Money":  The meaning specified in Section 1-201(24) of the UCC.

"Monthly Report":  The meaning specified in Section 8.7.

"Monthly Report Determination Date":  The 15th day of each calendar month (other than the month immediately preceding the month in which a Payment Date occurs).

"Moody's":  Moody's Investors Service, Inc. or any successor thereto.

"Moody's Rating":  The meaning specified in the Swap Agreement.

"Moody's Recovery Rate":  The meaning specified in the Swap Agreement.

"Net Class Q-2B Periodic Return Amount":  The meaning specified in Section 2.17(d)(i)(D).

"Net Income Note Periodic Return Amount":  The meaning specified in Section 8.6(a)(xvii).

"Net Interest Coverage Proceeds":  With respect to any Measurement Date, (i) the amount of Payment Date Proceeds for the next following Payment Date plus (ii) the sum of the Subordinate Amount and the Incentive Amount, if any, for such Payment Date minus (iii) the amounts payable under Sections 8.6(a)(i) and (ii) for such Payment Date.  For purposes of

010959

calculating Net Interest Coverage Proceeds on a Measurement Date other than a Determination Date, the amounts described above will be determined assuming that the composition of the Reference Portfolio and Eligible Investments will not change prior to the next Determination Date, that there will be no unscheduled Administrative Expenses after such Measurement Date and prior to the next Determination Date and that no interest will be payable on any Reference Obligation that is a Defaulted Reference Obligation or Deferring PIK Obligation.

"Non-consenting Holder":  With respect to any supplemental indenture pursuant to Section 9.2 or amendment to the Swap Agreement pursuant to Section 7.26(a), in each case that requires the consent of one or more Holders of Securities, any Holder or, in the case of Securities represented by Global Notes, any beneficial owner, that either (i) has declared in writing that it will not consent to such supplemental indenture or amendment to the Swap Agreement, as applicable, or (ii) had not consented to such supplemental indenture or amendment to the Swap Agreement, as applicable, within the applicable Initial Consent Period.

"Non-Permitted ERISA Holder":  The meaning specified in Section 2.6(o).

"Note Purchase Agreement":  The agreement between the Initial Purchaser and the Issuers, dated as of the Business Day preceding the Closing Date.

"Note Redemption Amount":  With respect to a Payment Date after the end of the Portfolio Modification Period, the Swap Reduction Amount under the Swap Agreement (plus any Quarterly Aggregate Increase Amount, but minus any Quarterly Aggregate Reduction Amount) for such date (but only to the extent the aggregate of such amounts for such Payment Date and prior Payment Dates exceeds $648,000,000.

"Notes":  The Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C-1 Notes, the Class C-2 Notes and the Income Notes, collectively.

"Obligation Value Increase Amount":  The meaning specified in the Swap Agreement.

"Obligation Value Reduction Amount":  The meaning specified in the Swap Agreement.

"OC Base Amount":  As of any Measurement Date, the aggregate principal amount of all Eligible Investments in the Collateral Account (other than those representing an investment of interest proceeds of Eligible Investments) as of such date plus the Accrued Increase/Reduction Amount as of such date minus the sum of (1) an amount equal to the aggregate of the Default Adjustments for all Defaulted Reference Obligations and Deferring PIK Obligations as of such date and (2) the Outstanding Premium as of such date.

"Offering Circular":  The final offering circular, dated August 17, 2004, with respect to the offering of the Securities, as amended, supplemented or otherwise modified.

"Officer's Certificate":  A certificate signed on behalf of the Issuer or the Co-Issuer by any Authorized Officer and delivered to the Trustee.  Unless otherwise specified, any

010960

reference in this Indenture to an Officer's Certificate shall be to an Officer's Certificate signed by any Authorized Officer.

"Opinion of Counsel": A written opinion, unless otherwise specified herein addressed to the Trustee, the Swap Counterparty and each Rating Agency and in form and substance reasonably satisfactory to the Trustee, each Rating Agency and the Swap Counterparty, of an attorney at law admitted to practice before the highest court of any state of the United States or the District of Columbia (or the Cayman Islands or other relevant jurisdiction, in the case of an opinion relating to the laws of the Cayman Islands or such jurisdiction), which attorney may, except as otherwise expressly provided in the Indenture, be counsel for the Issuer or the Trustee.

"Opinion of Tax Counsel": An Opinion of Counsel of a nationally recognized tax law firm experienced in the matters addressed in the Opinion.

"Optional Redemption": The meaning specified in Section 2.14(e).

"Optional Redemption Date": The meaning specified in Section 2.14(e).

"Ordinary Shares": 1,000 voting ordinary shares, par value U.S. $1.00 per share, of the Issuer.

"Outstanding": (a) With respect to the Notes, as of any date of determination, "Outstanding" refers to all Notes theretofore authenticated and delivered under this Indenture other than Notes cancelled, redeemed, exchanged or replaced in accordance with the terms of this Indenture and (b) with respect to the Class Q Securities, as of any date of determination, "Outstanding" refers to any and all Class Q Securities theretofore issued and paid for under this Indenture other than the Class Q Securities cancelled, redeemed, exchanged or replaced in accordance with the terms of this Indenture.

"Outstanding Premium": The meaning specified in the Swap Agreement.

"Overcollateralization Ratios": The Class A Overcollateralization Ratio, the Class B Overcollateralization Ratio and the Class C Overcollateralization Ratio, collectively.

"Overcollateralization Tests": The Class A OC Test, the Class B OC Test and the Class C OC Test.

"Participant": With respect to the Depositary, Euroclear or Clearstream, a Person who has an account with the Depositary, Euroclear or Clearstream, respectively (and, with respect to DTC, shall include Participants holding securities positions on behalf of Euroclear and Clearstream).

"Paying Agent": The Trustee and, so long as any Securities are listed on the Irish Stock Exchange, the Listing Agent or any other Person appointed pursuant to Section 10.1 that meets the eligibility standards for the Trustee specified in Section 6.10 and is authorized by the Issuer and the Co-Issuer to make payments of amounts on the Notes on behalf of the Issuer.

"Payment Date": With respect to a Class of Notes, the 1ˢᵗ day of each February, May, August and November commencing on and including February 1, 2005 (or if any such day is not a Business Day, the first Business Day thereafter), and ending on and including the earlier of the final redemption date for such Class and the Maturity Date.

"Payment Date Priority of Payments": The meaning specified in Section 8.6(a).

"Payment Date Proceeds": With respect to a Payment Date, the total of (i) the net amount, if any, paid by the Swap Counterparty in respect of the Adjusted Reference Portfolio Return Amount and the Fixed Amount for such Payment Date, (ii) interest and dividends received with respect to Eligible Investments in the Trust Accounts (including interest and dividends received on amounts on deposit in the Collateral Account) during the related Periodic Interest Accrual Period, (iii) on the first Payment Date only, all amounts deposited into the Collection Account from the Expense Reserve Account pursuant to Section 8.2(e), and (iv) principal proceeds of Eligible Investments and other amounts on deposit in the Collateral Account, but in the case of this clause (iv) only (A) to the extent of the Quarterly Aggregate Reduction Amount, if any, for that date, and (B) without duplication of clause (A), to the extent other funds are not otherwise available (but in the case of  (B) solely for purposes of making payments pursuant to clauses (ii) and (xiii) of the Payment Date Priority of Payments (provided, that no amount pursuant to this clause (iv) will be used to make payments as provided in clause (xiii) of the Payment Date Priority of Payments unless all of the Senior Notes have been retired)).

"Payment Date Valuation Report": The meaning specified in Section 8.8.

"Periodic Interest": The Class A-1 Interest Amount, the Class A-2 Interest Amount, the Class B Interest Amount, the Class C-1 Interest Amount, the Class C-2 Interest Amount and the Class Q-2A Interest Amount, as the context may require.

"Periodic Interest Accrual Period": (a) With respect to the initial Payment Date, the period from and including the Closing Date to but excluding the initial Payment Date, and (b) with respect to each Payment Date thereafter, the period from and including the preceding Payment Date to but excluding such Payment Date; provided that in the case of the Class C-2 Notes, the Periodic Interest Accrual Period will not be adjusted in the event a scheduled Payment Date would otherwise occur on a day that is not a Business Day.

"Person": Any individual, corporation, partnership, limited liability partnership, limited liability company, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization or government or any agency or political subdivision thereof.

"PIK Obligation": The meaning specified in the Swap Agreement.

"Placement Agent": Citigroup Global Markets Inc.

"Plan": Any (a) "employee benefit plan" (as defined in Section 3(3) of ERISA) subject to the provisions of Title I of ERISA, (b) "plan" (as defined in Section 4975(e)(1) of the Code) subject to the provisions of Section 4975 of the Code or (c) entity whose underlying assets

include "plan assets" by reason of Department of Labor regulation Section 2510.3-101 or otherwise.

"Pledged Securities": As of any date, the Eligible Investments credited to any of the Trust Accounts.

"Portfolio Modification Period": The meaning specified in the Swap Agreement.

"Principal Priority of Payments": The meaning specified in Section 8.6(b).

"Priority of Payments": The Payment Date Priority of Payments and the Principal Priority of Payments.

"Proceeding": Any suit in equity, action at law or other judicial or administrative proceeding.

"Qualified Institutional Buyer": A "qualified institutional buyer" as defined in Rule 144A(a)(1) under the Securities Act.

"Qualified Purchaser": A "qualified purchaser" for purposes of Section 3(c)(7) of the Investment Company Act.

"Quarterly Aggregate Increase Amount": The meaning specified in the Swap Agreement.

"Quarterly Aggregate Reduction Amount": The meaning specified in the Swap Agreement.

"Quarterly Amortization Increase Amount": The meaning specified in the Swap Agreement.

"Ramp-up End Date": The meaning specified in the Swap Agreement.

"Ramp-up Period": The meaning specified in the Swap Agreement.

"Rating Agency": Either of Moody's or Standard & Poor's; "Rating Agencies" shall mean Moody's and Standard & Poor's, collectively.

"Rating Confirmation": With respect to any specified action, the written confirmation by both Rating Agencies, or if expressly stated, by a specified Rating Agency, that such Rating Agency will not qualify, downgrade or withdraw its then-current respective rating of any Class of Senior Notes or the Class Q-1 Securities solely as a result of such action.

"Record Date": With respect to a Payment Date or Maturity Date or the Class Q-2 Maturity Date, as applicable, the close of business on the fifteenth day prior to such date, or if such day is not a Business Day, the close of business on the next Business Day.

010963

"Reference Banks": With respect to the determination of LIBOR by the Indenture Calculation Agent, any four major banks in the London interbank market selected by the Indenture Calculation Agent for such purpose.

"Reference Obligation": The meaning specified in the Swap Agreement.

"Reference Obligation Calculation Amount": The meaning specified in the Swap Agreement.

"Reference Obligation Eligibility Criteria": The meaning specified in the Swap Agreement.

"Reference Portfolio": The meaning specified in the Swap Agreement.

"Reference Portfolio Criteria": The meaning specified in the Swap Agreement.

"Reference Portfolio Management Agreement": The Reference Portfolio Management Agreement, dated as of the Closing Date, between the Swap Counterparty and the Reference Portfolio Manager.

"Reference Portfolio Manager": Highland Capital Management, L.P. and its approved successors and assigns.

"Reference Value": The meaning specified in the Swap Agreement.

"Registrar": The meaning specified in Section 2.6(a).

"Regulation S": Regulation S promulgated under the Securities Act.

"Regulation S Global Note": The meaning set forth in Section 2.2(b)(i).

"Reinvestment Yield": With respect to the Class C-2 Notes, the rate equal to the sum of (a) 1.30% and (b) the applicable yield to maturity implied by (i) the yields reported, as of 10:00 a.m. (New York City time) on the tenth Business Day preceding the Optional Redemption Date, Extension Effective Date or date of Amendment Buy-Out, as applicable, on the display designated as "Govt PX1" on Bloomberg Financial Markets Commodities News (or such other display as may replace such display) for actively traded U.S. Treasury securities having a maturity as nearly as practicable equal to the Payment Date occurring in November 2013 or (ii) if such yields are not reported as of such time or the yields reported as of such time are not ascertainable, the Treasury Constant Maturity Series Yields reported, for the latest day for which such yields have been so reported as of the tenth Business Day preceding the Optional Redemption Date, Extension Effective Date or date of Amendment Buy-Out, as applicable, in Federal Reserve Statistical Release H.15 (519) (or any comparable successor publication) for actively traded U.S. Treasury securities having a constant maturity as nearly as practicable equal to the Payment Date occurring in November 2013.

"Reminder Notice": The meaning specified in Section 8.8.

"Repository":  The internet-based password protected electronic repository of transaction documents relating to privately offered and sold collateralized debt obligation securities located at www.cdolibrary.com. or successors thereto.

"Requisite Noteholders":  The holders of 66 2/3% or more of the Aggregate Principal Amount of (a) the Class A-1 Notes, so long as any Class A-1 Notes remain Outstanding, (b) thereafter the Class A-2 Notes, so long as any Class A-2 Notes remain Outstanding, (c) thereafter the Class B Notes, so long as any Class B Notes remain Outstanding, (d) thereafter the Class C-1 Notes and the Class C-2 Notes (voting as a single class), so long as any Class C Notes remain Outstanding, and (e) thereafter the Income Notes, so long as any Income Notes remain Outstanding.

"Responsible Officer":  With respect to the Trustee, any officer within the Corporate Trust Office of the Trustee who is responsible for the administration of this Indenture, including any Vice President, Assistant Vice President, Assistant Treasurer, Trust Officer, or any other officer of the Trustee customarily performing functions similar to those performed by any of the above designated officers and also, with respect to a particular matter, any other officer within the Corporate Trust Office to whom such matter is referred because of such officer's knowledge of and familiarity with the particular subject.

"Rule 144A":  Rule 144A under the Securities Act.

"Rule 144A Global Note":  The meaning specified in Section 2.2(b)(ii).

"Rule 144A Information":  The meaning specified in Section 2.6(c).

"Sale":  The meaning specified in Section 5.2.

"Secured Parties":  The meaning specified in the Preliminary Statement to this Indenture.

"Securities":  Collectively, the Notes, the Class Q-1 Securities and the Class Q-2 Securities.

"Securities Act":  The U.S. Securities Act of 1933, as amended.

"Securities Intermediary":  The entity maintaining a Trust Account pursuant to an Account Agreement.

"Securities Register":  The meaning specified in Section 2.6(a).

"Senior Notes":  The Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C-1 Notes and the Class C-2 Notes, collectively

"Share Trustee":  Walkers SPV Limited and its permitted successors.

"Standard & Poor's" or "S&P":  Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., or any successor thereto.

A-28

010965

"S&P Recovery Rate":  The meaning specified in the Swap Agreement.

"Structured Finance Obligation": The meaning specified in the Swap Agreement.

"Subordinate Amount":  The meaning specified in the Swap Agreement.

"Subordinated Administrative Expenses": Technology expenses of the Swap Counterparty and its Affiliates in connection with transactions contemplated hereby and by the Swap Agreement not to exceed $50,000 in any calendar year; provided, however, that Subordinated Administrative Expenses shall not include any amounts due or accrued with respect to actions taken on or prior to the Closing Date which amounts shall be payable only from the Expense Reserve Account pursuant to Section 8.2(e).

"Swap Additional Termination Event":  An "Additional Termination Event" or a "Tax Event Upon Merger" under the Swap Agreement as to which the Swap Counterparty is the affected party.

"Swap Agreement":  The portfolio swap agreement entered into by the Issuer with the Swap Counterparty, dated as of the Closing Date, which will be documented on the standard form of the 2002 ISDA Master Agreement published by ISDA, as supplemented by the schedule thereto and related documents, and a confirmation for the portfolio swap transaction thereunder, together with the annexes thereto evidencing the Reference Portfolio, as amended or supplemented from time to time.

"Swap Agreement Amendment":  The meaning specified in Section 7.26.

"Swap Counterparty":  Citigroup Financial Products Inc., or any successor thereto.

"Swap Event of Default":  An "Event of Default" under the Swap Agreement.

"Swap Guarantee": The Guarantee, dated as of the Closing Date by the Swap Guarantor in favor of the Issuer with respect to the Swap Agreement.

"Swap Guarantor": Citigroup Global Markets Holdings Inc. or any successor thereto.

"Swap Reduction Amount":  The meaning specified in the Swap Agreement.

"Swap Termination Date":  The meaning specified in the Swap Agreement.

"Swap Termination Event":  A "Termination Event" under the Swap Agreement.

"Swap Termination Payment":  The amount, if any, payable by the Issuer or the Swap Counterparty to the other party in respect of an Early Termination Date under the Swap Agreement (as defined therein).

"Tax Redemption":  The meaning specified in Section 2.14(d).

A-29

"Tax Redemption Date":  The meaning specified in Section 2.14(d).

"Temporary Regulation S Global Note":  The meaning specified in Section 2.2(b)(i).

"Transferee Certificate": The Transferee Certificate with respect to the Income Notes substantially in the form of Exhibit IN-2 hereto.

"Transfer Letter":  The Transfer Letter substantially in the form of Exhibit E-1 or Exhibit E-2 hereto, as applicable.

"Trust Accounts":  The Collection Account, the Expense Reserve Account and the Collateral Account, collectively.

"Trust Estate":  The meaning set forth under "Grant of Security Interest" on page 1 of this Indenture.

"Trustee":  JPMorgan Chase Bank, as trustee under this Indenture and its permitted successors.

"Trustee Expenses":  With respect to any Payment Date (including without limitation the Maturity Date), an amount equal to the sum of all amounts incurred by or otherwise owing to the Trustee hereunder in any Collection Period in accordance with the Indenture other than the Trustee Fee.

"Trustee Fee":  With respect to any Payment Date, the amount separately agreed to by the Issuer and the Trustee in that certain letter dated as of the Closing Date.

"UCC":  The Uniform Commercial Code as in effect from time to time in the State of New York.

"U.S. Person":  The meaning assigned to such term in Regulation S under the Securities Act.

A-30

010967

# EXHIBIT PPP

010968

EXECUTION COPY

# SUPPLEMENTAL INDENTURE

**VALHALLA CLO, LTD.,**
as Issuer

**VALHALLA CLO, INC.,**
as Co-Issuer

**THE BANK OF NEW YORK MELLON TRUST COMPANY, NATIONAL ASSOCIATION,**
as Trustee

**Dated as of July 25, 2016**

22053093.15.BUSINESS

010969

This **SUPPLEMENTAL INDENTURE** (this "Supplemental Indenture"), dated as of July 25, 2016, by and among VALHALLA CLO, LTD., an exempted company incorporated with limited liability under the laws of the Cayman Islands (the "Issuer"), VALHALLA CLO, INC., a Delaware corporation (the "Co-Issuer", and together with the Issuer, the "Co-Issuers"), and THE BANK OF NEW YORK MELLON TRUST COMPANY, NATIONAL ASSOCIATION, as trustee and securities intermediary (together with its permitted successors and assigns in the trusts hereunder, the "Trustee") and consented to by HIGHLAND CAPITAL MANAGEMENT, L.P. (the "Reference Portfolio Manager") and CITIGROUP FINANCIAL PRODUCTS INC., as swap counterparty (the "Swap Counterparty") hereby amends that certain Indenture, dated as of August 18, 2004 (the "Indenture"), by and among the Issuer, the Co-Issuer, and the Trustee.  Capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Indenture.

## PRELIMINARY STATEMENT

WHEREAS, the Co-Issuers desire to enter into a supplemental indenture pursuant to Section 9.2(a) of the Indenture to make such changes as shall be necessary or advisable in order for the Issuer to allow (i) participating Holders of Income Notes to extend the maturity with respect to their Income Notes past the Swap Termination Date, (ii) non-participating Holders of Income Notes to receive their final distribution on the existing Maturity Date (after which such Holders will not be entitled to any further distributions under the Indenture (in accordance with its terms as if un-amended by this Supplemental Indenture or the extension of participating Holders)) (iii) and to enable the Issuer (or subsidiaries) to hold assets from the Reference Portfolio after the Swap Termination Date;

WHEREAS, the Swap Counterparty has not extended the Portfolio Modification Agreement or the Swap Termination Date pursuant to the Indenture;

WHEREAS, the Co-Issuers have received the consent of a majority of the Holders of the Income Notes with respect to this Supplemental Indenture;

WHEREAS, the Co-Issuers have complied with all conditions precedent provided for in the Indenture relating to this Supplemental Indenture;

WHEREAS, the Co-Issuers have requested that the Trustee execute and deliver this Supplemental Indenture; and

NOW THEREFORE, in consideration of the foregoing, the parties hereto agree as follows:

A.    **AMENDMENTS.**

1.    The "Grant Of Security Interest" is hereby amended by adding the Custodial Account to clause (i) thereof as follows:

(i) each of the Custodial Account, the Collateral Account, the Collection Account, the Expense Reserve Account, any subaccounts thereof and all financial assets credited to, and amounts on deposit or credit balances carried in, each of them from time to time;

2.      Section 1.1 of the Indenture is hereby amended by amending the last sentence thereof as follows:

Capitalized terms used in Sections 8.7, 8.8 and 8.9 and in Schedule A that are not defined herein have the meanings specified in the Swap Agreement; provided that, to the extent used and not defined herein after the Swap Termination Date, such terms shall continue to have the meanings specified in the Swap Agreement and such meanings will survive notwithstanding the Swap Termination Date.

3.      Section 2.3(a) of the Indenture is hereby amended by amending the second sentence thereof as follows:

The Maturity Date for each Class of Notes is August 1, 2016, or, if the maturity is extended pursuant to Section 2.15 hereof, August 1, 2020, or, in the case of a Post Swap Maturity Extension pursuant to Section 2.15(h) with respect to the Post Swap Extending Income Notes, such maturity as extended by such Post Swap Maturity Extension.

4.      Section 2.15 of the Indenture is hereby amended by adding new Section 2.15(h) at the end thereof as follows:

(h)     Post Swap Maturity Extension.

(i)      Participating Holders of Income Notes (any such Holder, a "Post Swap Extending Holder") may request that the Maturity Date with respect to their Income Notes (such Income Notes, "Post Swap Extending Income Notes") be extended beyond the existing Maturity Date and beyond the Swap Termination Date until such Post Swap Extending Income Notes are redeemed pursuant to an Optional Redemption pursuant to Section 2.14(e) of this Indenture or the Reference Portfolio Manager has liquidated the transferred Reference Portfolio (such extension, the "Post Swap Maturity Extension"), so long as the Post Swap Maturity Extension Condition set forth below is satisfied.

(ii)     Each Income Noteholder wishing to participate as a Post Swap Extending Holder shall give irrevocable notice (a "Post Swap Maturity Extension Notice") to the Trustee no later than July 20, 2016 (or such later date that may be agreed to by the Reference Portfolio Manager) of its intention to participate in a Post Swap Maturity Extension (the "Post Swap Maturity Extension Notice Date"). The Post Swap Maturity Extension shall be conditioned upon (x) the consent of the Reference Portfolio Manager and (y) the Trustee's receipt of Post Swap Maturity Extension Notices from Holders of Income Notes representing at least $41,000,000 in Aggregate Outstanding Amount of Income Notes by the Post Swap Maturity Extension Notice Date (the "Post Swap Maturity Extension Condition"). Following receipt of an Issuer Order stating that the Post Swap Maturity Extension Condition is satisfied and the Post Swap Maturity Extension is effective with respect to the Post Swap Extending Income Notes, the Trustee, at the direction of the Issuer (or the Reference Portfolio Manager on its behalf) and at the expense of the Issuers, shall mail a notice to all Holders of Income Notes confirming whether or not the Post Swap Maturity Extension became effective no later than three (3) Business Days following receipt of such Issuer Order. The Reference

010971

Portfolio Manager and the Issuer shall use commercially reasonable efforts to obtain a separate CUSIP for the Post Swap Extending Notes in accordance with Section 7.19 and the Holders shall cooperate with the Trustee and the Issuer to effect the exchange of their Income Notes for new Income Notes with such separate CUSIP. For the avoidance of doubt, notwithstanding anything to the contrary set forth herein, the Post Swap Maturity Extension shall in no instance (a) affect the calculations of the amount of any payment of principal of or interest on or other amount payable in respect of any Income Note held by a Non-Participating Holder or the right of the Non-Participating Holders of the Income Notes to the benefit of any provisions for the payment of such Income Notes contained in the Indenture or (b) affect the calculations of any amounts under the Swap Agreement, including the Swap Reduction Amount, Quarterly Aggregate Increase Amounts, Quarterly Aggregate Reduction Amounts, Final Prices of the Reference Portfolio or the determination of any amounts required for the calculation thereof.

(iii)    Upon confirmation of the effectiveness of a Post Swap Maturity Extension, the Maturity Date with respect to all Post Swap Extending Income Notes of Post Swap Extending Holders shall be extended without any requirement for approval or consent of non-participating Holders (any such Holder, a "Non-Participating Holder") or amendment or supplement to this Indenture. After the Swap Termination Date, references to the Income Notes shall be deemed to refer to the Post Swap Extending Income Notes. The respective Net Income Note Periodic Return Amounts, Income Note Principal Distribution Amounts and/or Final Income Note Distribution Amounts due to the Post Swap Extending Holders on the Swap Termination Date, based on their *pro rata* share of the Aggregate Principal Amount of the Income Notes shall constitute the "Post Swap Extending Share" with respect to the Post Swap Extending Holders.    All Post Swap Extending Holders shall be deemed to have consented to the Issuer's retention and application (to the extent necessary) of a portion of their Post Swap Extending Share to the Issuer's purchase of the transferred Reference Portfolio from the Swap Counterparty pursuant to Section 3.4(d) hereto on the Swap Termination Date. Post Swap Extending Holders shall receive the remainder of their Post Swap Extending Share after the Issuer's application of such portion of the Post Swap Extending Share necessary for its purchase of the transferred Reference Portfolio on the Swap Termination Date in accordance with the Priority of Payments.

(iv)    The Maturity Date with respect to all Income Notes of Non-Participating Holders shall not be affected in any way by any Post Swap Maturity Extension. Non-Participating Holders shall receive their respective Net Income Note Periodic Return Amounts and Final Income Note Distribution Amounts on the Swap Termination Date based on their *pro rata* share of the Aggregate Principal Amount of the Income Notes (the "Non-Participating Share") in accordance with the Priority of Payments. After receipt of their respective Non-Participating Shares on their Maturity Date, Non-Participating Holders shall not be entitled to any further distributions under this Indenture (in accordance with its terms as if un-amended by any supplemental indentures or the Post Swap Maturity Extension).

010972

5.      Section 3.3(b) of the Indenture is hereby amended by replacing each reference to "Eligible Investment" with a corresponding reference to "Pledged Security" as follows:

(b)      Each time that the Issuer shall direct or cause the acquisition of any Pledged Security, the Issuer shall, if such Pledged Security has not already been transferred to the relevant Trust Account, cause such Pledged Security to be Delivered. The security interest of the Trustee in the funds or other property utilized in connection with such acquisition shall, immediately and without further action on the part of the Trustee, thereupon be released. The security interest of the Trustee shall nevertheless come into existence and continue in such Pledged Security so acquired, including all rights of the Issuer in and to any contracts related to and proceeds of such Pledged Security.

6.      Section 3.4 of the Indenture is hereby amended by:

(i)      amending the heading thereof to: "The Swap Agreement; Transfer and Disposition of Reference Portfolio".

(ii)      amending Section 3.4(a) thereof by adding the following sentences at the end thereof:

In connection with the termination of the Swap Agreement on the Swap Termination Date, the Issuer (or the Reference Portfolio Manager on its behalf) will purchase any remaining assets in the Reference Portfolio held by the Swap Counterparty as of the Swap Termination Date which shall be transferred to the Issuer or an Issuer Subsidiary, as directed by the Reference Portfolio Manager, and held by the Trustee as a part of the Trust Estate in the Custodial Account. The Issuer may net any amounts to be received from the Swap Counterparty on the Swap Termination Date constituting the Post Swap Extending Share with any amounts to be applied to the acquisition of the Reference Portfolio from the Swap Counterparty pursuant to the preceding sentence and shall deposit the net of amounts into the Collateral Account for application in accordance with Section 8.6. Each Post Swap Extending Holder hereby consents to the application of its Post Swap Extending Share to the Issuer's acquisition of the Reference Portfolio from the Swap Counterparty pursuant to the preceding sentences. Notwithstanding anything to the contrary set forth herein, following the Swap Termination Date, no notice to, or consent of, or direction by the Swap Counterparty will be required for any action under this Indenture and all such references shall be deemed to be amended to reference notice to, or consent of, or direction by the Issuer.

(iii)      adding new Section 3.4(d) at the end thereof as follows:

(d)      Following the Swap Termination Date:

(i)      The Reference Portfolio Manager (on behalf of the Issuer) may from time to time direct the Trustee in writing to sell, and the Trustee (on behalf of the Issuer) shall sell in the manner directed by the Reference Portfolio Manager, all assets in the Reference Portfolio held by the Trustee in the Trust Estate on behalf of the Issuer pursuant to Section 3.4(a) above. Any transaction effected under this Section 3.4(d) shall be conducted on an arm's-length basis and, if effected with a Person Affiliated with the Reference Portfolio Manager, shall be effected in accordance with the requirements of the Reference Portfolio Management Agreement on

terms no less favorable to the Issuer than would be the case if such Person were not so Affiliated, provided that the Trustee shall have no responsibility to oversee compliance with this clause (d) by the other parties.

(ii)　　The Issuer may, by Issuer Order or a trade confirmation or a written direction from an authorized officer of the Reference Portfolio Manager, delivered to the Trustee at least two Business Days prior to the settlement date for any sale of a security certifying that the sale of such security is being made in accordance with this Section 3.4(d), direct the Trustee to release or cause to be released such security from the lien of this Indenture and, upon receipt of such Issuer Order, trade confirmation or other direction, the Trustee shall deliver any such security, if in physical form, duly endorsed to the broker or purchaser designated in such Issuer Order, trade confirmation or other direction or, if such security is a Clearing Corporation Security, request an appropriate transfer thereof to be made, in each case against receipt of the sales price therefor as specified by the Reference Portfolio Manager in such Issuer Order, trade confirmation or other direction; *provided* that the Trustee may deliver any such security in physical form for examination in accordance with street delivery custom. Any Pledged Security or other Asset transferred to an Issuer Subsidiary to be held by such Issuer Subsidiary in exchange for the pledge of the equity interest in such Issuer Subsidiary shall be released from the lien of this Indenture.

(iii)　　Upon receiving actual written notice of any Offer (as defined below) or any request for a waiver, consent, amendment or other modification with respect to any Reference Obligation, the Trustee on behalf of the Issuer shall notify the Reference Portfolio Manager of any Reference Obligation that is subject to a tender offer, voluntary redemption, exchange offer, conversion or other similar action (an "Offer") or such request. The Reference Portfolio Manager may direct (x) the Trustee to accept or participate in or decline or refuse to participate in such Offer and, in the case of acceptance or participation, to release from the lien of this Indenture such Reference Obligation in accordance with the terms of the Offer against receipt of payment therefor or (y) the Issuer or the Trustee to agree to or otherwise act with respect to such consent, waiver, amendment or modification.

(iv)　　The Trustee shall, upon receipt of an Issuer Order, release from the lien of this Indenture any Reference Obligation or other Collateral being transferred to an Issuer Subsidiary pursuant to Section 3.4 hereof and deliver such Collateral to be held by the Issuer Subsidiary in exchange for the equity interest in such Issuer Subsidiary. Such Issuer Order shall be executed by an Authorized Officer of the Reference Portfolio Manager, request release of a Reference Obligation or other Collateral, certify that such release is permitted under this Indenture and request that the Trustee execute the agreements, releases or other documents releasing such Collateral as presented to it by the Reference Portfolio Manager.

(v)　　Notwithstanding anything contained in this Indenture to the contrary, pursuant to this Section 3.4, the Issuer may cause any Collateral or the Issuer's interest therein to be transferred to a Issuer Subsidiary in exchange for an equity interest in such Issuer Subsidiary in accordance with the terms of this Section 3.4. The transfer of a Reference Obligation or other Collateral from the Issuer to an Issuer Subsidiary, and from an Issuer Subsidiary to the Issuer or another Issuer Subsidiary, shall not be considered a sale, purchase or other disposition of such Reference Obligation or other Collateral under this Indenture.

010974

(vi) The parties hereto agree that any reports prepared by the Trustee, the Reference Portfolio Manager or Collateral Administrator with respect to the Reference Portfolio shall indicate that the related assets held by Issuer Subsidiaries are held by an Issuer Subsidiary, shall refer directly and solely to the related assets held by such Issuer Subsidiaries, and the Trustee shall not be obligated to refer to the equity interest in such Issuer Subsidiary. For purposes of calculations made under the Indenture, assets held by any Issuer Subsidiary shall be treated as Equity Securities owned by the Issuer (and the equity interest in such Issuer Subsidiary shall not be included in such calculation).

7. Section 7.4(a) of the Indenture is hereby amended by adding the following proviso to the first sentence thereof as follows:

; provided further that, after the Swap Termination Date, the Issuer, at the direction of the Reference Portfolio Manager, and with notice to the Trustee may direct the dissolution of the Co-Issuer and, upon the effectiveness of such dissolution, the Co-Issuer shall cease to be a party to the Indenture and all references to Issuers shall be deemed to refer to the Issuer.

8. Section 7.4(b) of the Indenture is hereby amended by amending clause (i) of the third sentence thereof as follows:

(i) neither the Issuer nor the Co-Issuer shall have any subsidiaries (other than, with respect to the Issuer, the Co-Issuer and any subsidiary that is formed for the sole purpose of holding any asset that could cause the Issuer to be engaged or deemed to be engaged in a trade or business in the United States (an "Issuer Subsidiary")) and

9. Section 7.8(b) of the Indenture is hereby amended by adding the words ", including the Reference Portfolio Management Agreement," after the words "the Basic Documents" and by adding the following proviso to the end of the first sentence thereof:

; provided that the Issuer may own the Reference Portfolio transferred to the Issuer in accordance with Section 3.4(a) of this Indenture and any assets received in connection with any insolvency, bankruptcy, reorganization, debt restructuring or workout of any asset included in the Reference Portfolio.

10. Section 7.12(a) of the Indenture is hereby amended by adding the words "and the Reference Portfolio Management Agreement" after the words "entering into the Collateral Administration Agreement" in clause (v) thereof and adding the words "the assets in the Reference Portfolio received from the Swap Counterparty" following the words "the acquisition and disposition of" in clause (vi) thereof.

11. Section 7.23(a) of the Indenture is hereby amended by amending clause (vii) thereof by replacing each reference to "Eligible Investments" with a corresponding reference to "Pledged Securities" as follows:

(vii) All Pledged Securities consisting of instruments, security entitlements, certificated securities and uncertificated securities owned by the Issuer and contained in the Trust Estate or the Class Q-2 Securities Collateral (other than instruments evidencing obligations

010975

underlying participations) have been credited to one of the Trust Accounts or the Class Q-2 Securities Collateral Account, as applicable. The Securities Intermediary has agreed to treat all assets credited to the Trust Accounts or the Class Q-2 Securities Collateral Account as financial assets within the meaning of the applicable Uniform Commercial Code.

    12.    Section 8.3 of the Indenture is hereby amended by:

    (i)    amending the heading thereof to: "Collateral Account and Custodial Account".

    (ii)    amending Section 8.3(a) of the Indenture by amending the third and fourth sentences thereof and adding the following new sentences thereto as follows:

    In addition, the Trustee shall deposit into the Collateral Account to the extent received from time to time (i) interest and dividends and all other amounts received in respect of Pledged Securities credited to the Collateral Account or the Custodial Account, as applicable, and (ii) amounts to be deposited in the Collateral Account pursuant to Section 3.4(b). In addition, on each Payment Date to and including the Swap Termination Date, an amount equal to the Quarterly Aggregate Increase Amount, if any, for such date, will be deposited in the Collateral Account in accordance with the Priority of Payments. The Trustee shall, on or prior to the Swap Termination Date, establish a segregated non-interest bearing trust account in the name "Valhalla CLO, Ltd.–Custodial Account" (the "Custodial Account"). The Issuer shall deliver or cause to be delivered to the Securities Intermediary, all Pledged Securities received as part of the transferred Reference Portfolio pursuant to Section 3.4(d) in accordance with the definition of "Deliver."

    (iii)    amending Section 8.3(b) of the Indenture as follows:

    (b)    On each Payment Date from the Closing Date to, but excluding, the Swap Termination Date, other than the Maturity Date, Optional Redemption Date or Tax Redemption Date, the Trustee shall transfer from the Collateral Account to the Collection Account (i) an amount equal to the investment income received on the Eligible Investments in the Collateral Account during the related Periodic Interest Accrual Period and (ii) other amounts in the Collateral Account that constitute Payment Date Proceeds for such Payment Date or that are to be disbursed in accordance with the Principal Priority of Payments on such Payment Date. On each Payment Date after the Swap Termination Date, the Trustee shall transfer from the Collateral Account to the Collection Account an amount equal to all amounts received with respect to the Pledged Securities in the Collateral Account and Custodial Account, as applicable, during the related Periodic Interest Accrual Period.

    (iv)    amending Section 8.3(c) of the Indenture as follows:

    (c)    On the Swap Termination Date, Maturity Date, Optional Redemption Date or Tax Redemption Date, the Trustee shall transfer to the Collection Account all of the moneys in the Collateral Account following sale or liquidation of Pledged Securities pursuant to clause (e).

    (v)    amending Section 8.3(e) of the Indenture as follows:

(e)     The Trustee shall sell, liquidate or make withdrawals from Pledged Securities in the Trust Accounts to the extent necessary to make any of the payments set forth in paragraphs (b), (c) or (d) above.  Any such sales or liquidation shall be made at the direction of, prior to the Swap Termination Date, the Swap Counterparty (or the direction of the Reference Portfolio Manager on behalf of the Swap Counterparty) and after the Swap Termination Date, the Issuer (or the direction of the Reference Portfolio Manager on behalf of the Issuer); *provided* that the Swap Counterparty, (or the Reference Portfolio Manager on its behalf) shall not be entitled to give such direction if (i) a Swap Event of Default as to which the Swap Counterparty is the defaulting party has occurred and is continuing, (ii) a Swap Additional Termination Event has occurred and is continuing or (iii) the Swap Agreement has been terminated and all amounts owed to the Swap Counterparty thereunder have been paid in full, in each of which cases the Requisite Noteholders shall be entitled to give such direction.

13.     Section 8.6 of the Indenture is hereby amended by:

amending the introductory language of Section 8.6(a) to add the words "from the Closing Date to and including the Swap Termination Date" as follows:

(a)     On each Payment Date from the Closing Date to, and including, the Swap Termination Date, the Trustee shall distribute Payment Date Proceeds in the Collection Account in the following order of priority (the "Payment Date Priority of Payments"):

(i)     amending Section 8.6(a)(xvii) as follows:

(xvii)   the remainder, to the Holders of the Income Notes (the "Net Income Note Periodic Return Amount"); *provided* that the Issuer shall retain a portion of the Post Swap Extending Share due to the Post Swap Extending Holders pursuant to this clause (xvii) (together with such amounts retained pursuant to Section 8.6(b)(xix)) on the Swap Termination Date in the amount necessary, as directed by the Reference Portfolio Manager, to be applied to the Issuer's purchase of the transferred Reference Portfolio from the Swap Counterparty pursuant to Section 3.4(a) hereof, and, after application of such amount to such purchase, shall distribute the remainder of the Post Swap Extending Share to the Post Swap Extending Holders.

amending the introductory language of Section 8.6(b) to add the words "from the Closing Date to and including the Swap Termination Date" as follows:

(b)     On (A) the Maturity Date, the Optional Redemption Date or the Tax Redemption Date and (B) each other Payment Date, in each case, from the Closing Date to, and including, the Swap Termination Date on which Senior Notes are to be redeemed pursuant to Section 2.14(b) or, after all Senior Notes are redeemed, an Income Note Principal Distribution Amount is to be paid on the Income Notes, the Trustee will distribute the principal proceeds of Eligible Investments (after payment of any amounts payable therefrom pursuant to the Payment Date Priority of Payments and, in the case of clause (B), using principal proceeds in an amount not to exceed the Note Redemption Amount for such date), and in the case of the Maturity Date, the Optional Redemption Date or the Tax Redemption Date, any other amounts on deposit in the Trust Accounts to make the following payments in the following order of priority (the "Principal Priority of Payments"):

010977

(ii)     amending Section 8.6(b)(xix) as follows:

(xix)   to the Holders of the Income Notes, (a) on any Payment Date (other than the Maturity Date, the Optional Redemption Date or the Tax Redemption Date), the remainder, as an Income Note Principal Distribution Amount (the "Income Note Principal Distribution Amount") or (b) on the Maturity Date, the Optional Redemption Date or the Tax Redemption Date, the remainder (the "Final Income Note Distribution Amount"); *provided* that the Issuer shall retain a portion of the Post Swap Extending Share due to the Post Swap Extending Holders pursuant to this clause (xix) (together with such amounts retained pursuant to Section 8.6(a)(xvii)) on the Swap Termination Date in the amount necessary, as directed by the Reference Portfolio Manager, to be applied to the Issuer's purchase of the transferred Reference Portfolio from the Swap Counterparty pursuant to Section 3.4(a) hereof, and, after application of such amount to such purchase, shall distribute the remainder of the Post Swap Extending Share to the Post Swap Extending Holders.

(iii)    adding the following new paragraph (e) to Section 8.6 at the end thereof:

(e)     After the Swap Termination Date, on each Payment Date and Optional Redemption Date with respect to the Post Swap Extending Income Notes held by Post Swap Extending Holders, the Trustee shall distribute amounts in the Collection Account in the following order of priority (the "Post Swap Priority of Payments"):

(i)      to the payment of any accrued and unpaid Administrative Expenses (in the order set forth in the definition thereof);

(ii)     to the payment of the Base Amount, the Subordinate Amount and any Incentive Amount due to the Reference Portfolio Manager; and

(iii)    the remainder, to the Post Swap Extending Holders of the Post Swap Extending Income Notes.

14.     Section 8.7 of the Indenture is hereby amended by

(i)      amending the second sentence thereof as follows:

Each Monthly Report shall contain the following information with respect to the calendar month in which the Monthly Report Determination Date falls (provided that after the Swap Termination Date, each Monthly Report shall contain only the information in (a)(i), (a)(iv), (b), (d), (g) and (k)):

(ii)     and adding new clause (k) as follows:

(k)     Information regarding the Reference Portfolio held by the Issuer after the Swap Termination Date (as of the Monthly Report Determination Date):

Information regarding the asset in the Reference Portfolio: (A) the identity of each asset in the Reference Portfolio and the obligor thereon; (B) the Aggregate Principal Balance and Market Value thereof and (C) the identity of each asset in the Reference Portfolio sold, prepaid or redeemed since the prior Monthly Report Determination Date.

10

15.     Section 8.8 of the Indenture is hereby amended:

(i)     by amending Section 8.8(a) thereof by:

adding the words "for each Payment Date to and including the Swap Termination Date," at the beginning of clauses (i), (ii), (iv), (vi) and (vii) and the second clause (viii) thereof; and

(ii)     amending the first clause (viii) thereof as follows:

(viii)     the distributions, if any, in respect of the Income Notes for such Payment Date and for the preceding Payment Date; *provided* that on the Swap Termination Date, the Payment Date Valuation Report shall show the respective amounts of the Post Swap Extending Share to be retained by the Issuer (as determined by the Reference Portfolio Manager) and distributed to Post Swap Extending Holders;

(iii)     by amending Section 8.8(b) thereof as follow:

(b)     Application of amounts in the Collection Account in accordance with, for each Payment Date to and including the Swap Termination Date, the Payment Date Priority of Payments and for each Payment Date after the Swap Termination Date, the Post Swap Priority of Payments: the amount of funds available in the Collection Account as of the first day of the preceding Collection Period and the balance therein remaining on the last day of such preceding Collection Period.

(iv)     by amending Section 8.8(c) thereof by adding the words "For each Payment Date to and including the Swap Termination Date," at the beginning thereof;

(v)     by amending Section 8.8(e) thereof by adding the words "For each Payment Date to and including the Swap Termination Date," at the beginning thereof;

(vi)     by amending Section 8.8(f) thereof by adding the words "For each Payment Date to and including the Swap Termination Date," at the beginning thereof

(vii)     by amending the penultimate paragraph of Section 8.8 as follows:

(A)     by adding the words ", prior to and including the Swap Termination Date," before the words "on behalf of the Swap Counterparty" in the second sentence thereof and adding the words ", and after the Swap Termination Date, on behalf of the Issuer," immediately after the same words; and

(B)     by adding the following sentence at the end thereof:

Following the Swap Termination Date, each Payment Date Valuation Report shall constitute instructions to the Trustee to withdraw funds from the Collection Account and pay or transfer such amounts set forth in such Payment Date Valuation Report in the manner specified and in accordance with the priorities established in Section 8.6.

16.     Section 9.2(a) is hereby amended by

11

010979

(i)     amending the second sentence thereof to add the words "from the Closing Date to and including the Swap Termination Date" to the introductory phrase thereof as follows:

However, from the Closing Date to and including the Swap Termination Date, without the consent of the Swap Counterparty if adversely affected thereby and the Holders of each Outstanding Security adversely affected thereby and without Rating Confirmation for such supplemental indenture or a waiver of such Rating Confirmation by the Holders whose consent is required for such supplemental indenture, no supplemental indenture may:

(ii)     amending the second sentence thereof to add the following proviso to the end thereof after clause (vii):

; *provided* that, after the Swap Termination Date, the Issuers and the Trustee may enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, this Indenture or of modifying in any manner the rights of the Holders of the Notes under this Indenture with the consent of the Holders of a majority of the Aggregate Principal Amount of the Post Swap Extending Income Notes.

17.     Section 10.5 of the Indenture is hereby amended by adding the following new clause (e) at the end thereof:

(e)     On the Swap Termination Date and upon termination of the original Reference Portfolio Management Agreement in accordance with its terms, the Issuer shall enter into a replacement Reference Portfolio Management Agreement with respect to the Trust Estate, including the Reference Portfolio assigned to the Issuer in accordance with Section 3.4(a) of this Indenture. The Post Swap Extending Holders hereby consent to the Issuer's entry into such replacement Reference Portfolio Management Agreement.

18.     Schedule A to the Indenture is hereby amended by:

(i)     amending the definition of "Administrative Expenses" by

(A)     amending clause (i) thereof as follows:

(i) any Person including any Issuer Subsidiary in respect of any governmental fee, charge or tax (including all filing, registration and annual return fees payable to the Cayman Islands' government and registered office fees);

(B)     amending clause (iv) thereof as follows:

(iv) the Administrator as provided in the Administration Agreement and for any administration fees payable in respect of any Issuer Subsidiary;

(C)     amending clause (E) thereof as follows:

(E) expenses and other amounts for which the Swap Counterparty is obligated to reimburse or pay the Reference Portfolio Manager under the Reference Portfolio Management Agreement and, after the Swap Termination Date, the fees, expenses (including indemnities) and

12

010980

other amounts due or accrued with respect to any Payment Date and payable to the Reference Portfolio Manager under the Indenture and the Reference Portfolio Management Agreement, including without limitation reasonable expenses of the Reference Portfolio Manager (including fees for its accountants, agents and counsel) incurred in connection with the purchase or sale of any Reference Obligations (including amounts owed to an independent review party), any other expenses incurred in connection with the Reference Portfolio and amounts payable pursuant to the Reference Portfolio Management Agreement;

(ii)    amending the definition of "Aggregate Principal Amount" by adding the following proviso to the end thereof:

; *provided* that, after the Swap Termination Date, the references to the "Aggregate Principal Amount" of the Income Notes shall refer to the original principal amount of the Post Swap Extending Income Notes and exclude the original principal amount of Income Notes maturing on August 1, 2016.

(iii)    adding the following definition of "Aggregate Principal Balance" in the appropriate alphabetical order:

"Aggregate Principal Balance": Prior to and on the Swap Termination Date, the meaning specified in the Swap Agreement and after the Swap Termination Date, for each asset in the Reference Portfolio, the outstanding principal amount thereof.

(iv)    amending the definition of "Base Amount" as follows:

"Base Amount": Prior to and on the Swap Termination Date, the meaning specified in the Swap Agreement and after the Swap Termination Date, a fee payable to the Reference Portfolio Manager in arrears on each Payment Date (prorated for the related Periodic Interest Accrual Period) pursuant to the Reference Portfolio Management Agreement and Section 8.6 in an amount equal to 0.30% per annum (calculated on the basis of a 360-day year consisting of twelve 30-day months) of the Fee Basis Amount as of the related Determination Date. To the extent any of the Base Amount is deferred on any Payment Date, such payment will accrue interest at LIBOR plus 3.0% per annum (as determined for the applicable Periodic Interest Accrual Period with respect to the Notes). Notwithstanding anything to the contrary herein, the Reference Portfolio Manager will be entitled to elect, on written notice to the Trustee delivered prior to the related Determination Date, that all or a portion of the Base Amount for any Payment Date shall be deferred.

(v)    amending the definition of "Basic Documents" as follows:

"Basic Documents": The Indenture, the Swap Agreement, the Collateral Administration Agreement, the Reference Portfolio Management Agreement and the Investment Agreement.

(vi)    amending the definition of "Collection Period" as follows:

"Collection Period": Prior to and on the Swap Termination Date, the meaning specified in the Swap Agreement, and after the Swap Termination Date, with respect to any

13

Payment Date, the period from but excluding the Determination Date related to the prior Payment Date to and including the Determination Date related to such Payment Date; *provided* that the final Collection Period shall end on and include the Business Day immediately prior to the Maturity Date or Redemption Date, as applicable.

(vii)     adding the following definition of "Custodial Account" in the appropriate alphabetical order:

"Custodial Account": The account created and designated as the "Valhalla CLO, Ltd. – Custodial Account" under Section 8.3.

(viii)     amending the definition of "Equity Security" as follows:

"Equity Security": Prior to and on the Swap Termination Date, the meaning specified in the Swap Agreement and, after the Swap Termination Date, each Equity Security under the Swap Agreement transferred to the Issuer from the Swap Counterparty in connection with the termination of the Swap Agreement and any other security that is not an Eligible Investment and by its terms does not provide for periodic payments of interest at a stated coupon rate and repayment of principal in one or more installments.

(ix)     amending the introductory phrase to the definition of "Expense Cap Amount" as follows:

"Expense Cap Amount": With respect to any Payment Date from the Closing Date to and including the Swap Termination Date, an amount not to exceed:

(x)     adding the definition of "Fee Basis Amount" in the appropriate alphabetical order:

"Fee Basis Amount":  As of any date of determination, the sum of (a) the Aggregate Principal Balance of the Pledged Securities (including all Pledged Securities held by Issuer Subsidiaries) and (b) without duplication, the amounts on deposit in the Trust Accounts (including Eligible Investments in such Accounts).

(xi)     amending the definition of "Incentive Amount" as follows:

"Incentive Amount": Prior to and on the Swap Termination Date, the meaning specified in the Swap Agreement and after the Swap Termination Date, (i) 0.125% *per annum* of the Fee Basis Amount as of the related Determination Date (calculated for the related Collection Period on the basis of a 360-day year consisting of twelve 30-day months) plus (ii) the aggregate Deferred Incentive Amount, if any, not paid on any previous Payment Date; provided that such amount will be deferred (a "Deferred Incentive Amount") on any Payment Date to the extent that (a) amounts paid to the Holders of the Income Notes on or prior to such date result in an internal rate of return of less than 15% per annum or (b) the available amounts for such date would be insufficient to permit the Issuer to pay all amounts payable on that Payment Date pursuant to clause (i) of the Post Swap Priority of Payments.

(xii)     Amending the definition of "Issuer Order" as follows"

010982

"Issuer Order":  A written order signed in the name of the Issuer by any one of its Authorized Officers or by the Reference Portfolio Manager on behalf of the Issuer and delivered to the Trustee.

(xiii)   amending the definition of "Market Value" as follows:

"Market Value": Prior to and on the Swap Termination Date, the meaning specified in the Swap Agreement and after the Swap Termination Date, with respect to a Reference Obligation and any date of determination, the price thereof (expressed as a percentage) based on the relevant price quotation for such Reference Obligation quoted on Loan Pricing Corporation, LoanX, Inc. or a similar pricing service designated by the Reference Portfolio Manager as of such date or, if no such quotation is available on such date, the unweighted average of two or more bid quotations for such Reference Obligation obtained on such date from dealers (which shall not be Affiliates of each other) in the relevant market selected by the Reference Portfolio Manager, or if two or more such quotations are not available on such date, the Reference Portfolio Manager shall attempt to obtain the price quotation for such Reference Obligation on another recognized pricing source or service for the relevant market selected by the Reference Portfolio Manager. If the Reference Portfolio Manager is unable to determine the Market Value with respect to a Reference Obligation pursuant to the preceding sentence, the Market Value of such Reference Obligation shall be deemed to be zero for that date of determination.

(xiv)   amending the definition of "Maturity Date" as follows:

"Maturity Date": August 1, 2016, or, in the case of a Maturity Extension pursuant to Section 2.15, August 1, 2020, or, in the case of the Post Swap Extending Income Notes in the event of a Post Swap Maturity Extension pursuant to Section 2.15(h), such maturity as extended by any Post Swap Maturity Extension.

(xv)   amending the definition of "Payment Date" as follows:

"Payment Date": With respect to a Class of Notes, the 1st day of each February, May, August and November commencing on and including February 1, 2005 (or if any such day is not a Business Day, the first Business Day thereafter), and ending on and including the earlier of the final redemption date for such Class and the Maturity Date; provided that, in the case of the Post Swap Extending Income Notes in the event of a Post Swap Maturity Extension pursuant to Section 2.15(h), the Payment Dates shall end upon the Optional Redemption Date of such Notes.

(xvi)   amending the definition of "Pledged Securities" as follows:

"Pledged Securities": As of any date prior to and on the Swap Termination Date, the Eligible Investments credited to any of the Trust Accounts and, as of any date after the Swap Termination Date, the Reference Obligations, Equity Securities and the Eligible Investments credited to any of the Trust Accounts.

(xvii)   amending the definition of "Rating Agency" as follows:

15

010983

"Rating Agency": Prior to the Swap Termination Date, either of Moody's or Standard & Poor's; "Rating Agencies" shall mean Moody's and Standard & Poor's, collectively and notwithstanding anything to the contrary set forth herein, following the Swap Termination Date, no notice to, or consent of, or direction by the Rating Agencies will be required for any action under this Indenture.

(xviii)   amending the definition of "Rating Agency Confirmation" as follows:

"Rating Confirmation": With respect to any specified action prior to the Swap Termination Date, the written confirmation by both Rating Agencies, or if expressly stated, by a specified Rating Agency, that such Rating Agency will not qualify, downgrade or withdraw its then-current respective rating of any Class of Senior Notes or the Class Q-1 Securities solely as a result of such action and, notwithstanding anything to the contrary set forth in this Indenture, following the Swap Termination Date, no Rating Confirmation will be required for any action under this Indenture.

(xix)   amending the definition of "Reference Obligation" as follows:

"Reference Obligation": Prior to and on the Swap Termination Date, the meaning specified in the Swap Agreement and, after the Swap Termination Date, each Reference Obligation under the Swap Agreement transferred to the Issuer from the Swap Counterparty in connection with the termination of the Swap Agreement.

(xx)   amending the definition of "Reference Portfolio" as follows:

"Reference Portfolio": Prior to and on the Swap Termination Date, the meaning specified in the Swap Agreement and, after the Swap Termination Date, the portfolio of assets under the Swap Agreement transferred to the Issuer from the Swap Counterparty in connection with the termination of the Swap Agreement and any assets received in connection with any insolvency, bankruptcy, reorganization, debt restructuring or workout of any asset included in the Reference Portfolio.

(xxi)   amending the definition of "Reference Portfolio Management Agreement" as follows:

"Reference Portfolio Management Agreement": Prior to and on the Swap Termination Date, the Reference Portfolio Management Agreement, dated as of the Closing Date, between the Swap Counterparty and the Reference Portfolio Manager and, after the Swap Termination Date, the Portfolio Management Agreement, dated as of August 1, 2016, between the Issuer and the Reference Portfolio Manager.

(xxii)   amending the definition of "Subordinate Amount" as follows:

"Subordinate Amount": Prior to and on the Swap Termination Date, the meaning specified in the Swap Agreement and after the Swap Termination Date, a fee payable to the Reference Portfolio Manager in arrears on each Payment Date (prorated for the related Periodic Interest Accrual Period) pursuant to the Reference Portfolio Management Agreement and Section 8.6 in an amount equal to 0.20% per annum (calculated on the basis of a 360-day year

consisting of twelve 30-day months) of the Fee Basis Amount as of the related Determination Date. To the extent any of the Subordinate Amount is deferred on any Payment Date, such payment will be and will accrue interest at LIBOR plus 3.0% per annum (as determined for the applicable Periodic Interest Accrual Period with respect to the Notes). Notwithstanding anything to the contrary herein, the Reference Portfolio Manager will be entitled to elect, on written notice to the Trustee delivered prior to the related Determination Date, that all or a portion of the Subordinate Amount for any Payment Date shall be deferred.

(xxiii) amending the definition of "Trust Account" as follows:

"Trust Account": The Collection Account, the Expense Reserve Account, the Collateral Account and the Custodial Account, collectively.

B. **MISCELLANEOUS.**

1. The Indenture, as amended by this Supplemental Indenture, is hereby ratified and confirmed and except as expressly modified or amended in this Supplemental Indenture, all of the terms, covenants, provisions, agreements and conditions of the Indenture shall remain unmodified and unchanged and shall continue in full force and effect. This Supplemental Indenture shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

2. The Co-Issuers, the Reference Portfolio Manager and the Swap Counterparty hereby agree that, notwithstanding anything to the contrary set forth in this Supplemental Indenture, in no instance shall the amendments contemplated by this Supplemental Indenture (a) affect the calculations of the amount of any payment of principal of or interest on or other amount payable in respect of any Income Note held by a Non-Participating Holder or the right of the Non-Participating Holders of the Income Notes to the benefit of any provisions for the payment of such Income Notes contained in the Indenture or (b) affect the calculations of any amounts under the Swap Agreement, including the Swap Reduction Amount, Quarterly Aggregate Increase Amounts, Quarterly Aggregate Reduction Amounts, Final Prices of the Reference Portfolio or the determination of any amounts required for the calculation thereof.

3. This Supplemental Indenture may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

4. The Trustee assumes no responsibility for the correctness of the recitals contained herein, which shall be taken as the statements of the Co-Issuers and the Trustee shall not be responsible or accountable in any way whatsoever for or with respect to the validity, execution or sufficiency of this Supplemental Indenture and makes no representation with respect thereto. In entering into this Supplemental Indenture, the Trustee shall be entitled to the benefit of every provision of the Indenture relating to the conduct of or affecting the liability of or affording protection to the Trustee.

5. The Issuer represents and warrants to the Trustee that this Supplemental Indenture has been duly and validly executed and delivered by the Issuer and constitutes its legal, valid and binding obligation, enforceable against the Issuer in accordance with its terms.

010985

6.      This Supplemental Indenture shall be construed in accordance with and governed by the law of the State of New York.

[Remainder of page intentionally left blank; signature pages follow]

18

010986

IN WITNESS WHEREOF, we have set our hands as of the date first set forth above.

EXECUTED AS A DEED BY:

**VALHALLA CLO, LTD.,**
as Issuer

By: _____

    Name:     Martin Couch
    Title:      Director

In the Presence of:

Witness: _____
    Name:     **Christopher Bryan**

**VALHALLA CLO, INC.,**
as Co-Issuer

By: _____

    Name:
    Title:

**THE BANK OF NEW YORK MELLON TRUST
COMPANY, NATIONAL ASSOCIATION,**
as Trustee

By: _____

    Name:
    Title:

22053093.BUSINESS

010987

IN WITNESS WHEREOF, we have set our hands as of the date first set forth above.

EXECUTED AS A DEED BY:

**VALHALLA CLO, LTD.,**
as Issuer

By: _____
      Name:
      Title:

In the Presence of:

Witness:_____
      Name:

**VALHALLA CLO, INC.,**
as Co-Issuer

By: _____
      Name:    Donald J. Puglisi
      Title:    President

**THE BANK OF NEW YORK MELLON TRUST
COMPANY, NATIONAL ASSOCIATION,**
as Trustee

By: _____
      Name:
      Title:

22053093.BUSINESS

010988

IN WITNESS WHEREOF, we have set our hands as of the date first set forth above.

EXECUTED AS A DEED BY:

**VALHALLA CLO, LTD.,**
as Issuer


By: _____
      Name:
      Title:


In the Presence of:

Witness:_____
      Name:


**VALHALLA CLO, INC.,**
as Co-Issuer


By: _____
      Name:
      Title:


**THE BANK OF NEW YORK MELLON TRUST
COMPANY, NATIONAL ASSOCIATION,**
as Trustee

By: _____
      Name:   MICHAEL CALIGIURI
      Title:    VICE PRESIDENT

22053093.BUSINESS

010989

CONSENTED TO BY:

**HIGHLAND CAPITAL MANAGEMENT, L.P.,**
as Reference Portfolio Manager

By: Strand Advisors, Inc., its general partner

By: _____

Name: James Dondero
Title:  President

CONSENTED TO BY:

**CITIGROUP FINANCIAL PRODUCTS INC.,**
as Swap Counterparty

By: _____
      Name:
      Title:

010991

# EXHIBIT QQQ

010992

**REFERENCE PORTFOLIO MANAGEMENT AGREEMENT**

This REFERENCE PORTFOLIO MANAGEMENT AGREEMENT, dated as of August 1, 2016 (this "Agreement"), is entered into by and between Highland Capital Management, L.P., a Delaware limited partnership ("Highland" and, in its capacity as reference portfolio manager hereunder, the "Reference Portfolio Manager") and Valhalla CLO, Ltd. (the "Issuer").

WHEREAS, the Issuer and Citigroup Financial Products Inc. ("CFPI") entered into a portfolio swap transaction documented pursuant to the ISDA Master Agreement and Confirmation thereunder, each dated as of August 18, 2004 (as amended, modified or supplemented from time to time, the "Swap Agreement") in connection with which CFPI and the Reference Portfolio Manager entered into a reference portfolio management agreement, dated as of August 18, 2004, (the "Initial Management Agreement");

WHEREAS, the Issuer wishes to enter into this Agreement, pursuant to which the Reference Portfolio Manager agrees to perform, on behalf of the Issuer, certain services with respect to the Reference Portfolio acquired by the Issuer in connection with the termination of the Swap Agreement on the terms set forth herein; and

WHEREAS, the Reference Portfolio Manager has the capacity to provide the services required hereby and is prepared to perform such services upon the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Defined Terms.

Capitalized terms used herein that are not otherwise defined herein shall have the respective meanings ascribed thereto in the indenture, dated as of August 18, 2004 (as amended, the "Indenture"), among the Issuer, Valhalla CLO, Inc. (the "Co-Issuer") and The Bank of New York Mellon Trust Company, National Association as successor to JPMorgan Chase Bank (the "Trustee").

2. General Duties of the Reference Portfolio Manager.

(a) The Reference Portfolio Manager shall provide the Issuer with the following services in a manner consistent with the provisions of the Indenture, and in each case subject to the terms and conditions thereof and hereof (and the Reference Portfolio Manager shall have no obligation to perform any other duties other than as specified herein or under the Indenture):

(i) selecting Reference Obligations to be removed from the Reference Portfolio, in whole or in part;

(ii) with respect to each Reference Obligation that is to be added to the Reference Portfolio, (A) designating the Reference Obligation Calculation Amount and Reference Entity with respect thereto and (B) determining the Reference Price for such Reference Obligation;

(iii) with respect to each Reference Obligation with respect to which an Amortization has occurred, calculating the related Obligation Value Reduction Amount or Obligation Value Increase Amount.

(iv) with respect to each Reference Obligation that is to be removed from the Reference Portfolio or is included in the Reference Portfolio as of the 45th Business Day prior to the Swap Termination Date, calculating the Final Price and the related Obligation Value Reduction Amount or Obligation Value Increase Amount for such obligation;

(v) determining (and if so required, certifying in writing) whether a specific Reference Obligation is a Deferring PIK Obligation, Equity Security, Credit Improved Obligation, Credit Risk Obligation, Current Pay Obligation or Defaulted Reference Obligation;

(vi) selecting Dealers for the purposes of obtaining Quotations with respect to Reference Obligations;

(vii) [reserved];

(viii) on behalf of the Issuer, directing the Trustee as to specific Eligible Investments to be purchased or sold by the Issuer as part of the Trust Estate under the Indenture, if any, other than the initial Eligible Investments and other amounts invested in the Investment Agreement pursuant to the terms thereof and the Indenture;

(ix) (a) monitoring the Reference Portfolio on an ongoing basis and providing or causing to be provided, on behalf of the Issuer, to the Collateral Administrator and/or the Independent Accountants all information, determinations, schedules and other data in possession of, or reasonably available to, the Reference Portfolio Manager and required or requested by the Collateral Administrator to generate (or provide information for) the reports described in Sections 8.7, 8.8, and 8.9 of the Indenture or the Independent Accountants to generate the statement described in Section 8.9(b) of the Indenture, substantially in the form and containing all information required thereby and in sufficient time for the Collateral Administrator and/or the Independent Accountants, as applicable, to review such information, schedules and data, generate such reports and to deliver them to the parties entitled thereto under the Indenture and (b) upon receipt from the Collateral Administrator of any such draft report, reviewing such report, verifying the information contained therein with the information contained in its records with respect to the Reference Portfolio, promptly (but in no event later than two Business Days after receipt of such report) notifying the Collateral Administrator of any discrepancies and cooperating with the Collateral Administrator and the Issuer in resolving any such discrepancies;

(x) providing or causing to be provided, on behalf of the Issuer, to the Trustee all information in the possession of or reasonably available to, the Reference Portfolio

010994

Manager relating to the Reference Portfolio and required or requested by the Trustee to provide to the Holders of Income Notes information necessary for the filing of tax returns required by any governmental authority;

(xi) complying with such other duties and responsibilities as may be required of the Reference Portfolio Manager as set forth in the Indenture, including providing such information to such persons as may be required by the Indenture; and

(xii) providing to the Issuer such information regarding the Reference Portfolio and the Reference Portfolio Manager's activities under this Agreement as the Issuer may request from time to time.

(b) In performing its services hereunder, the Reference Portfolio Manager shall comply with all the terms and conditions of the Indenture affecting the duties and functions that have been delegated to the Reference Portfolio Manager thereunder and hereunder.

(c) Unless otherwise specifically required by any provision of the Indenture or by applicable law, the Reference Portfolio Manager shall use all reasonable efforts to ensure that no action is taken or omitted to be taken by it, and shall not intentionally or with reckless disregard take or omit to take any action, which would (i) in the reasonable determination of the Issuer, materially adversely affect the Issuer (or the Issuer's ability to make payments on the Income Notes), for purposes of Cayman Islands law, United States federal or state law or any other law known to the Reference Portfolio Manager (or advised by the Issuer) to be applicable to the Issuer, as applicable; (ii) violate any law, rule, or regulation of any governmental body or agency having jurisdiction over the Issuer or the Co-Issuer, including, without limitation any Cayman Islands or United States federal, state or other applicable securities law the violation of which, in the reasonable determination of the Issuer, has or could reasonably be expected to have a material adverse affect on the Issuer, the Co-Issuer or the Reference Portfolio, (iii) require registration of the Issuer or the Co-Issuer or the pool as an "investment company" under the Investment Company Act, (iv) result in the Issuer or Co-Issuer violating any terms of the Indenture or would reasonably be expected to result in an Event of Default under the Indenture, or (v) be reasonably likely to cause the Issuer to be engaged in a United States trade or business for United States federal tax purposes.

(d) [reserved].

(e) The Issuer agrees that it will not consent to any amendment to the Indenture that in the reasonable determination of the Reference Portfolio Manager (as notified to the Issuer) adversely affects the rights or duties of the Reference Portfolio Manager or creates, supplements, modifies, limits or eliminates any provision of the Indenture affecting the discretion, judgment, conduct, care or role of the Reference Portfolio Manager (including without limitation, the provisions relating to calculations with respect to the Reference Portfolio) or the Reference Portfolio Manager's obligations or liabilities or fees or expenses payable or reimbursable to it, or that otherwise adversely affects the Reference Portfolio Manager unless the Reference Portfolio Manager has been given prior written notice of such amendment and has consented thereto in writing.

3.    <u>Standard of Care</u>.

(a)  The Reference Portfolio Manager shall perform its obligations hereunder and under the Indenture in good faith and with reasonable care, using a degree of skill and attention no less than that which the Reference Portfolio Manager exercises with respect to comparable assets or reference assets that it manages for itself and others with similar investment objectives and restrictions in a manner consistent with practices and procedures followed by institutional managers of national standing relating to comparable assets or reference assets. To the extent not inconsistent with the foregoing, the Reference Portfolio Manager shall follow its customary standards, policies and procedures in performing its duties hereunder and under the Indenture.

(b)  The Reference Portfolio Manager agrees, in performing its duties hereunder, that it shall use reasonable efforts to manage the Reference Portfolio with the objective to provide for returns to the Holders of the Income Notes; <u>provided</u>, that the Reference Portfolio Manager shall not be responsible if such objectives are not achieved so long as the Reference Portfolio Manager performs its duties under this Agreement as provided herein; and, <u>provided</u>, <u>further</u> that Holders of Income Notes shall have no recourse to the Reference Portfolio Manager with respect to payment under the Income Notes. Furthermore, notwithstanding anything to the contrary in this Agreement or the Indenture, the Reference Portfolio Manager shall not be required to take any action if such action would violate any applicable law, rule, regulation or court order. The Reference Portfolio Manager shall comply with all applicable laws and regulations relating to its performance under this Agreement.

4.    <u>Compensation; Fees and Expenses</u>.

(a)  As compensation for services rendered and the performance of its obligations as Reference Portfolio Manager under this Agreement, the Issuer will pay to the Reference Portfolio Manager on each Payment Date the Base Amount, the Subordinate Amount, if any, and the Incentive Amount, if any, for such date (collectively, the "<u>Management Fees</u>") as described in the Indenture and subject to the Priority of Payments set forth therein.

(b)  The Reference Portfolio Manager shall be responsible for its ordinary expenses incurred in the performance of its obligations under this Agreement; <u>provided</u>, <u>however</u>, that the Issuer shall reimburse the Reference Portfolio Manager for the following extraordinary expenses incurred by the Reference Portfolio Manager in the performance of such obligations: (i) reasonable fees and expenses of outside counsel, consultants, accountants and other professionals retained by the Reference Portfolio Manager in connection with negotiating this Agreement or as to unusual matters arising in the performance of its duties under this Agreement; (ii) fees and expenses of Rating Agencies incurred by the Reference Portfolio Manager, if any; and (iii) any fees payable by the Reference Portfolio Manager in connection with fees payable to the Pricing Source or any other nationally recognized pricing service for services rendered with respect to Reference Obligations. If any expenses or costs described in this paragraph (b) are allocable to one or more entities or accounts in addition to the Issuer for which the Reference Portfolio Manager provides advisory or management services, the Issuer shall be responsible (subject to the other provisions hereof) only for the portions of those expenses and costs fairly allocable to the Issuer in the Reference Portfolio Manager's good faith and commercially reasonable discretion.

5. <u>Additional Activities of the Reference Portfolio Manager</u>.

(a) The Reference Portfolio Manager and its Affiliates may invest, and may manage other funds and accounts ("<u>Other Highland Accounts</u>") that invest, in assets eligible for inclusion in the Reference Portfolio. The Reference Portfolio Manager and its Affiliates may make investment decisions for themselves or Other Highland Accounts that are different from decisions to add or remove Reference Obligations under the Indenture and in making such investments have no duty to take into account the interests of the Issuer or any holder of Income Notes. No provision in this Agreement shall prevent the Reference Portfolio Manager or any of its Affiliates from rendering services of any kind to a Reference Entity (or an issuer of any Eligible Investment included in the Trust Estate) or CFPI, the Trustee, the Collateral Administrator, the Holders of Income Notes or any other Person or entity to the extent permitted by law. Without prejudice to the generality of the foregoing, the Reference Portfolio Manager, its Affiliates and their respective directors, officers, employees, agents and representatives may, among other things:

(i) serve as portfolio manager, advisor or subadvisor or directors (whether supervisory or managing), partners, officers, employees, agents, nominees or signatories for any Reference Entity (or other issuers who invest in assets of a similar nature to the Reference Obligation) to the extent permitted by its governing instruments; <u>provided</u> that in the reasonable judgment of the Reference Portfolio Manager such activity is not likely to have a material adverse effect on any Reference Obligation or the Reference Portfolio as a whole;

(ii) receive fees for services of any nature rendered to any Reference Entity or any Affiliates thereof or any such issuer, except as otherwise provided by the Indenture or as would otherwise cause an Indenture Tax Event to occur under the Indenture and <u>provided</u> that in the reasonable judgment of the Reference Portfolio Manager such activity is not likely to have a material adverse effect on any Reference Obligation or the Reference Portfolio as a whole;

(iii) be a secured or unsecured creditor of, or hold an equity interest in, any Reference Entity or any such issuer, subject to applicable law and the terms of the relevant instrument;

(iv) make a market in any Reference Obligations;

(v) serve as a member of any "creditors' committee" with respect to any Reference Obligation which has or which may, in the reasonable opinion of the Reference Portfolio Manager, become a Defaulted Reference Obligation;

(vi) enter into swap agreements with swap counterparties relating to reference entities that may be the same as actual or potential Reference Entities;

(vii) be retained to provide services for the Issuer, the Co-Issuer, the Trustee or the Collateral Administrator that are unrelated to this Agreement, and be paid therefor; <u>provided</u> that in the reasonable judgment of the Reference Portfolio Manager such activity is not likely to have a material adverse effect on any Reference Obligation or the Reference Portfolio as a whole;

(b) Subject to the requirements of the Indenture, the Reference Portfolio Manager and its Affiliates, employees and associates are in no way prohibited from other businesses or activities, including, but not limited to, managing investments, advising or managing entities whose investment objectives are the same as or overlap with those of the Reference Portfolio, participating in the issuance or management of actual or potential Reference Obligations, providing consulting, merger and acquisition, structuring or financial advisory services, including with respect to actual, contemplated or potential Reference Obligations, or acting as a director, officer or creditors' committee member of, adviser to, or participant in any corporation, partnership, trust or other business entity. The Reference Portfolio Manager and its Affiliates and associates may, and expect to, receive fees or other compensation from third parties for any of these activities, which fees will be for the benefit of their own account and not the Issuer. These fees can relate to actual, contemplated or potential Reference Obligations and may be payable by actual or potential Reference Entities.

(c) To the extent permitted by applicable law, and without limiting the Reference Obligation Eligibility Criteria and Reference Portfolio Criteria set forth in the Indenture, the Reference Portfolio Manager, its Affiliates, and any officer, director, stockholder or employee of the Reference Portfolio Manager or any such Affiliates or any member of their families or an individual or entity advised by the Reference Portfolio Manager may have an interest in a particular transaction or in securities or obligations of the same kind or class, or securities or obligations of a different kind or class, as those of the Reference Obligations.

(d) Unless the Reference Portfolio Manager determines in its reasonable judgment that a transaction is on terms and conditions no less favorable than would be obtained in a transaction conducted on an arm's length basis between third parties unaffiliated with each other, the Reference Portfolio Manager shall be required to refrain from removing Reference Obligations issued by (i) persons of which the Reference Portfolio Manager, its Affiliates or any of its or their officers, directors or employees are directors or officers, (ii) persons for which the Reference Portfolio Manager or its Affiliates act as financial adviser or underwriter or (iii) persons with whom the Reference Portfolio Manager or its Affiliates otherwise maintain a client relationship. The Reference Portfolio Manager may, in its sole discretion, refrain from adding or removing a Reference Obligation issued by any of the persons described in (i), (ii) or (iii) of the preceding sentence or persons about which the Reference Portfolio Manager or any of its Affiliates have information that the Reference Portfolio Manager deems confidential or non-public or that otherwise might prohibit it from trading (or referencing) such obligations in accordance with applicable law. The Reference Portfolio Manager will not be obligated to utilize any particular investment opportunity or strategy that may arise with respect to the Reference Obligations.

(e) The investment policies, fee arrangements and other circumstances of the Reference Portfolio Manager's engagement under the Indenture may vary from those of Other Highland Accounts. The Reference Portfolio Manager may at certain times be simultaneously adding or removing a Reference Obligation or Reference Obligations to or from, as applicable, the Reference Portfolio and arranging for Other Highland Accounts or its Affiliates, to purchase or sell the same Reference Obligation or Reference Obligations or to add or remove the same Reference Obligation or Reference Obligations to or from, as applicable, the reference portfolio under comparable swap agreements or other cash portfolios. In doing so, the Reference Portfolio Manager shall be free, in its sole discretion, to make recommendations to others, or effect

010998

transactions on behalf of itself or for others, that may be the same as or different from those effected on behalf of the Issuer.

(f) Neither the Reference Portfolio Manager nor any of its Affiliates is under any obligation (affirmative or otherwise) to offer investment opportunities of which it becomes aware to the Issuer or to account to the Issuer for (or share with the Issuer or inform the Issuer of) any such opportunity or any benefit received by it from any such opportunity before offering any investments to Other Highland Accounts or before engaging in any investments for themselves. The Reference Portfolio Manager shall endeavor to resolve conflicts with respect to investment opportunities in a manner which it deems equitable to the extent possible under the prevailing facts and circumstances.

6.     Term.  This Agreement shall become effective on the date hereof and shall terminate upon the termination of the Indenture unless terminated as provided in Section 7.  If this Agreement terminates pursuant to this Section 6, such termination shall be without further liability or obligation of either party to the other, except as provided in Sections 8, 9, 10, 11 (b) and (c), 16 and 26 hereof.

7.     Termination; Removal; Resignation.

(a) The Issuer shall be entitled to (but shall not be obligated to) remove the Reference Portfolio Manager without cause at any time upon 90 days' prior written notice to the Reference Portfolio Manager upon the vote of at least $66^2/_3\%$ of the Aggregate Principal Amount of the Income Notes (in each case excluding any Income Notes beneficially owned by the Reference Portfolio Manager or any of its Affiliates or by an account or fund for which the Reference Portfolio Manager or its Affiliate acts as investment manager with discretionary authority) in accordance with the Indenture.

(b) The Issuer shall be entitled to (but shall not be obligated to) remove the Reference Portfolio Manager for cause at any time upon written notice to the Reference Portfolio Manager.  The Reference Portfolio Manager acknowledges that the Issuer may request such removal upon the vote of at least $66^2/_3\%$ of the Aggregate Principal Amount of the Income Notes (in each case excluding any Income Notes beneficially owned by the Reference Portfolio Manager or any of its Affiliates or by an account or fund for which the Reference Portfolio Manager or its Affiliate acts as investment manager with discretionary authority) in accordance with the Indenture, in which case the Issuer may, but shall not be obligated, to so remove the Reference Portfolio Manager.

For purposes of this Agreement, "cause" will mean (i) willful violation by the Reference Portfolio Manager of, or the taking of any action by the Reference Portfolio Manager that it knows breaches, any provision of this Agreement or the Indenture; (ii) breach or violation by the Reference Portfolio Manager of any provision of this Agreement or the Indenture and failure to cure such breach or violation within 30 days after becoming aware of, or its receiving notice from the Issuer of such breach or violation; (iii) the Reference Portfolio Manager (A) is wound up or dissolved or there is appointed over it or a substantial portion of its assets a receiver, administrator, administrative receiver, trustee or similar officer, (B) ceases to be able to, or admits in writing its inability to, pay its debts as they become due and payable, or makes a general assignment for the

010999

benefit of or enters into any composition or arrangement with, its creditors generally, (C) applies for or consents (by admission of material allegations of a petition or otherwise) to the appointment of a receiver, trustee, assignee, custodian, liquidator or sequestrator (or other similar official) of the Reference Portfolio Manager or of all or of any substantial part of its properties or assets, or authorizes such an application or consent, or proceedings seeking such appointment are commenced without such authorization, consent or application against the Reference Portfolio Manager and continue undismissed for 60 days, (D) authorizes or files a voluntary petition in bankruptcy, or applies for or consents (by admission of material allegations of a petition or otherwise) to the application of any bankruptcy, reorganization, arrangement, readjustment of debt, insolvency or dissolution, or authorizes such application or consent, or proceedings to such end are instituted against the Reference Portfolio Manager without such authorization, application or consent and are approved as properly instituted and remain undismissed for 60 days or result in adjudication of bankruptcy or insolvency or (E) permits or suffers all or any substantial part of its properties or assets to be sequestered or attached by court order and the order remains undismissed for 60 days; (iv) the occurrence of an act that constitutes fraud or criminal activity by the Reference Portfolio Manager or any director, officer or employee thereof in connection with the performance of the Reference Portfolio Manager's obligations under this Agreement; (v) the indictment of the Reference Portfolio Manager or any director, officer or employee thereof whose duties include work in fulfillment of the Reference Portfolio Manager's obligations under this Agreement or the Indenture of a criminal offense under the laws of the United States, or the laws of any other jurisdiction in which the Reference Portfolio Manager conducts business, materially related to the Reference Portfolio Manager's asset management businesses; (vi) the occurrence of an Event of Default under Section 5.1(a) under the Indenture; (vii) the persons owning and controlling voting securities of the Reference Portfolio Manager as of the date hereof failing to own and control, directly or indirectly, in the aggregate at least 50% of the outstanding voting securities of the Reference Portfolio Manager; and (viii) the failure of any representation or warranty by the Reference Portfolio Manager hereunder, or any certification or written statement made by or delivered by the Reference Portfolio Manager hereunder to be correct in any material respect when made where such failure has a material adverse effect on the Issuer or the Holders of Income Notes or the Issuer's rights under this Agreement and no correction is made for a period of 30 days after the Reference Portfolio Manager's becoming aware of, or receiving notice from the Issuer of, such failure.

If any of the events specified in this clause (b) shall occur, the Reference Portfolio Manager shall give prompt written notice thereof to the Issuer and the Trustee upon the Reference Portfolio Manager's becoming aware of the occurrence of such event.

(c) The Reference Portfolio Manager may resign upon not less than 90 days' written notice to the Issuer.

(d) This Agreement shall be automatically terminated in the event that the Internal Revenue Service has determined, in a final, non-appealable proceeding, that the Issuer or Co-Issuer has become engaged in the conduct of a trade or business in the United States for purposes of the Code.

(e) No termination, removal or resignation of the Reference Portfolio Manager shall be effective until the Issuer has appointed a successor Reference Portfolio Manager and such

011000

successor Reference Portfolio Manager shall have agreed in writing to assume all of the Reference Portfolio Manager's duties and obligations pursuant to this Agreement; provided, however, that if no successor Reference Portfolio Manager shall have been appointed and so confirmed, or if an instrument of acceptance by a successor Reference Portfolio Manager shall not have been delivered to the Issuer, in any case within 90 days of the initial notice to the Issuer or the Reference Portfolio Manager, as the case may be, relating to the termination, removal or resignation of the Reference Portfolio Manager, then the Reference Portfolio Manager may petition a court of competent jurisdiction to appoint any established institutional manager of national standing with experience managing comparable assets or reference assets as the successor to the Reference Portfolio Manager hereunder in the assumption of all or any part of the responsibilities, duties or liabilities of the Reference Portfolio Manager hereunder.

8. <u>Action Upon Termination, Removal or Resignation</u>. Upon the termination of this Agreement or the removal or resignation of the Reference Portfolio Manager:

(a) The Reference Portfolio Manager shall, as soon as practicable, deliver to the Issuer all property and documents relating to the Reference Obligations and Eligible Investments then in the custody of the Reference Portfolio Manager. The Reference Portfolio Manager shall also deliver to the Issuer an accounting with respect to the books and records delivered to the the Issuer or the successor Reference Portfolio Manager appointed pursuant to Section 7 above.

(b) The Reference Portfolio Manager shall be reimbursed for all reimbursable expenses incurred by the Reference Portfolio Manager prior to the date of termination, removal or resignation for which the Issuer is responsible hereunder to the extent and at such time as provided in Section 4 hereof.

(c) The Reference Portfolio Manager shall remain liable (subject to Section 9 hereof) for its acts and omissions in the performance of its duties hereunder prior to such termination or pursuant to this Section 8 and for any expenses, losses, damages, liabilities, demands, charges or claims of any nature whatsoever (including reasonable attorney's fees) arising therefrom or out of a breach of representations and warranties made by the Reference Portfolio Manager in Section 18 hereof.

(d) The Reference Portfolio Manager shall not be entitled to Management Fees or other compensation accruing after the effective date of the termination of this Agreement or the removal or resignation of the Reference Portfolio Manager hereunder, but shall be paid all Management Fees accrued and unpaid prior to such effective date to the extent and at such time as provided in Section 4 hereof and the Indenture.

(e) The Reference Portfolio Manager agrees that, notwithstanding any termination, it shall reasonably cooperate with the Issuer in any Proceeding arising in connection with this Agreement, the Reference Portfolio or the Indenture (excluding any such Proceeding in which claims are asserted against the Reference Portfolio Manager or any Affiliate thereof).

9. <u>Liability of the Reference Portfolio Manager; Delegation</u>.

(a) Except as otherwise required by law, the Reference Portfolio Manager, its Affiliates, directors, officers, employees, shareholders, assigns, representatives or agents shall not

011001

be liable to CFPI, the Issuer, the Trustee or the Holders of the Income Notes for any loss, liability, damage, settlement cost, or other expense (including attorneys' fees) incurred by reason of any act or omission by the Reference Portfolio Manager, its Affiliates, directors, officers, employees, shareholders, assigns, representatives or agents in the performance of the Reference Portfolio Manager's duties or obligations hereunder and under the Indenture, except by reason of acts or omissions (including, without limitation, acts or omissions of any persons employed in accordance with clause (c) below) constituting bad faith, fraud, willful misconduct, gross negligence or breach of fiduciary duty in the performance of, or reckless disregard of, such duties or obligations. The matters excluded by the preceding sentence are collectively referred to as "Reference Portfolio Manager Breaches".

(b) In connection with taking or omitting to take any action under this Agreement or the Indenture, the Reference Portfolio Manager may consult with nationally recognized counsel and may rely in good faith on the written advice or opinion of such counsel.

(c) Notwithstanding Section 15 hereof, in providing services hereunder, the Reference Portfolio Manager may employ third parties, including its Affiliates, to render advice (including investment advice) and assistance; provided, however, that the Reference Portfolio Manager shall not be relieved of any of its duties or obligations hereunder regardless of the performance of such services by third parties.

(d) The Reference Portfolio Manager assumes no responsibility under this Agreement other than to render the services called for hereunder and under the terms of the Indenture applicable to it, in good faith, and, absent a Reference Portfolio Manager Breach, shall not be responsible for any action of the Issuer in following or declining to follow any advice, recommendation or direction of the Reference Portfolio Manager. The Reference Portfolio Manager will not be liable to CFPI, the Issuer, the Trustee or the Holders of Income Notes for any loss incurred as a result of any omission or recommendation by, or any actions taken or recommended by, the Reference Portfolio Manager under this Agreement or the Indenture, except by reason of a Reference Portfolio Manager Breach.

10. Indemnification. (a) To the extent permitted by applicable law, the Reference Portfolio Manager and any of its Affiliates, directors, officers, employees, shareholders, assigns, representatives or agents, in each case other than in its capacity of as the holder or beneficial owner of any Security (each such person being an "Indemnified Party") shall be held harmless and be indemnified by the Issuer (solely to the extent provided herein) for any liability, loss (including amounts paid by such person in settlement in accordance with the provisions herein), damages or expenses (including reasonable attorneys' fees and expenses) (in the case of expenses in connection with defending any action, claim, investigation or proceeding, as such expenses are incurred (subject to an obligation to repay any such expenses if it is determined that the Indemnified Party is not entitled to be indemnified thereof hereunder)) (collectively, "Liabilities") suffered by virtue of any acts or omissions or alleged acts or omissions by such Indemnified Party, in the performance of the Reference Portfolio Manager's duties under this Agreement and the Indenture, except to the extent any such Liability arises as a result of a Reference Portfolio Manager Breach.

Notwithstanding anything to the contrary herein, the Issuer shall only be obligated to pay amounts pursuant to this Section 10 subject to the availability of funds under the Priority of Payments.

(b) With respect to any claim made or threatened against an Indemnified Party, or compulsory process or request or other notice of any loss, claim, damage or liability served upon an Indemnified Party, for which such Indemnified Party is or may be entitled to indemnification under this Section 10, such Indemnified Party shall (or with respect to Indemnified Parties that are the Reference Portfolio Manager's directors, officers, stockholders, partners, employees, Affiliates and agents, the Reference Portfolio Manager shall cause such Indemnified Party to):

(i) give written notice to the Issuer of such claim within ten (10) days after such claim is made or threatened, which notice shall specify in reasonable detail the nature of the claim and the amount (or an estimate of the amount) of the claim, provided that failure to so notify the Issuer shall not relieve the Issuer from its obligations under this Section 10 unless and to the extent such failure materially prejudices the Issuer or the Issuer otherwise forfeits rights or defenses by reason of such failure;

(ii) provide the Issuer such information and cooperation with respect to such claim as the Issuer may reasonably require, including, but not limited to, making appropriate personnel available to the Issuer at such reasonable times as the Issuer may request;

(iii) cooperate and take all such steps as the Issuer may reasonably request to preserve and protect any defense to such claim;

(iv) in the event suit is brought with respect to such claim, upon reasonable prior notice, afford to the Issuer the right, which the Issuer may exercise in its sole discretion and at its expense, to participate in the investigation, defense and settlement of such claim;

(v) neither incur any material expense to defend against nor release or settle any such claim or make any admission with respect thereto (other than routine or incontestable admissions or factual admissions the failure to make which would expose such Indemnified Party to unindemnified liability) nor permit a default or consent to the entry of any judgment in respect thereof without the prior written consent of the Issuer; and

(vi) upon reasonable prior notice, afford to the Issuer the right, in its sole discretion and at its sole expense, to assume the defense of such claim, including, but not limited to, the right to designate counsel and to control all negotiations, litigation, arbitration, settlements, compromises and appeals of such claim; provided, that if the Issuer assumes the defense of such claim, it shall not be liable for any fees and expenses of counsel for any Indemnified Party incurred thereafter in connection with such claim except that if such Indemnified Party reasonably determines that counsel designated by the Issuer has a conflict of interest, the Issuer shall pay the reasonable fees and disbursements of one counsel (in addition to any local counsel) separate from its own counsel for all Indemnified Parties in connection with any one action or separate but similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances; and

provided <u>further</u>, that prior to entering into any final settlement or compromise, the Issuer shall seek the consent of the Indemnified Party and use its best efforts in the light of the then prevailing circumstances (including, without limitation, any express or implied time constraint on any pending settlement offer) to obtain the consent of such Indemnified Party as to the terms of settlement or compromise. If an Indemnified Party does not consent to the settlement or compromise within a reasonable time under the then-prevailing circumstances, the Issuer shall not thereafter be obligated to indemnify the Indemnified Party for any amount in excess of such proposed settlement or compromise.

(c) No Indemnified Party shall, without the prior written consent of the Issuer, which consent shall not be unreasonably withheld or delayed, settle or compromise any claim giving rise to a claim for indemnity hereunder or permit a default or consent to the entry of any judgment in respect thereof, unless such settlement, compromise or consent includes, as an unconditional term thereof, the giving by the claimant to the Issuer of a release from liability substantially equivalent to the release given by the claimant to such Indemnified Party in respect of such claim.

(d) In the event that any Indemnified Party waives its right to indemnification hereunder, the Issuer shall not be entitled to appoint counsel to represent such Indemnified Party nor shall the Issuer reimburse such Indemnified Party for any costs of counsel to such Indemnified Party.

(e) Nothing herein shall in any way constitute a waiver or limitation of any rights which the Issuer may have under any U.S. federal securities laws.

11.    <u>Records; Confidentiality</u>.

(a) The Reference Portfolio Manager shall maintain appropriate books of account and records relating to services performed hereunder, and such books of account and records shall be accessible for inspection by a representative of the Issuer and the Trustee at any time during normal business hours and upon not less than three Business Days' prior notice.

(b) At no time shall the Reference Portfolio Manager make or permit any other person to make a public announcement concerning the issuance of the Income Notes, the structure of the transaction, the Reference Portfolio Manager's role hereunder or any other aspect to the transactions contemplated by this Agreement and the Indenture, without the prior consent of the Issuer. The Reference Portfolio Manager shall, and shall cause its affiliates to, keep confidential and not without the prior written consent of the Issuer use or disclose any and all information received in connection herewith except (a) as necessary to perform its obligations hereunder, (b) as required by law, regulation, court order or the rules or regulations of any self-regulatory organization, body or official having jurisdiction over the Reference Portfolio Manager, (c) to its professional advisers which are bound by confidentiality obligations, (d) such information as shall have been publicly disclosed other than in violation of this Agreement or the Indenture and (e) as otherwise expressly contemplated by the Indenture or this Agreement.

(c) Notwithstanding anything to the contrary herein, the Reference Portfolio Manager (and each employee, representative, or other agent of the Reference Portfolio Manager)

may disclose to any and all persons, without limitation of any kind, the U.S. federal income and state and local income and franchise tax treatment and tax structure of the transaction and all materials of any kind (including opinions or other tax analyses) that are provided to the Reference Portfolio Manager relating to such tax treatment and tax structure. For this purpose "tax structure" is limited to facts relevant to the U.S. federal income and state and local income and franchise tax treatment of the transaction and does not include information relating to the identity of the Issuer, the Co-Issuer, the Trustee, the Collateral Administrator, the Initial Purchaser, the Placement Agent, or any Holder.

12. <u>Certain Additional Requirements</u>. During the term of this Agreement, (i) the Issuer, at its own expense, shall be entitled to audit (either directly or through an independent auditor) the Reference Portfolio Manager with respect to the performance of its obligations under this Agreement and the Indenture (including, without limitation, as to internal controls, security programs and business continuity programs); (ii) the Reference Portfolio Manager shall notify the Issuer of any service disruptions, security breaches or other events which may materially impact the Reference Portfolio Manager's ability to perform its obligations under this Agreement; (iii) the Reference Portfolio Manager shall forward to the Issuer any complaints it receives from Holders of Income Notes in connection with the transactions contemplated by this Agreement and the Indenture, (iv) the Reference Portfolio Manager shall maintain an appropriate disaster recovery and business continuity plan providing for the continuation or resumption, as the case may be, of business functions in connection with its obligations under this Agreement and the Indenture, including in the case of system breakdown and natural or man-made disaster and (v) the Reference Portfolio Manager shall retain insurance and equity capital in such amounts as are reasonable and customary (as determined by the Reference Portfolio Manager in its reasonable judgment) for managers managing comparable assets or reference assets. The Reference Portfolio Manager acknowledges that the Issuer's retention of the Reference Portfolio Manager hereunder may be subject to examination oversight by applicable regulatory authorities, and agrees to reasonably cooperate with the Issuer in connection with any examination or inquiry by any such regulatory authority in connection with this Agreement and the Indenture.

13. <u>No Partnership or Joint Venture</u>. The Issuer and the Reference Portfolio Manager are not partners or joint venturers with each other, and nothing herein shall be construed to make them such partners or joint venturers or impose any liability as such on any of them. The Reference Portfolio Manager's relation to the Issuer shall be deemed to be that of an independent contractor, and all transactions between the Issuer and the Reference Portfolio Manager shall be on arm's-length terms.

14. <u>Notices</u>. Unless otherwise expressly provided herein, all notices, requests, demands and other communications required or permitted under, or otherwise in connection with, this Agreement shall be in writing and sent by answerback facsimile or addressed and delivered or mailed postage paid via registered mail with a return receipt request to the other party at the address specified below, or at such address as such other party may designate for the receipt of such notice.

011005

| | | |
|---|---|---|
| The Issuer: | | Valhalla CLO, Ltd.<br>c/o Intertrust SPV (Cayman) Limited<br>190 Elgin Avenue<br>George Town<br>Grand Cayman KY1-9005<br>Cayman Islands<br>Attn: The Directors<br>Fax: (345) 945-4757 |
| Reference | Portfolio | Highland Capital Management, L.P. |
| Manager: | | 300 Crescent Court, Suite 700<br>Dallas, Texas 75240<br>Attn: Hunter Covitz<br>Fax: (972) 628-4147 |

15.  <u>Successors and Assigns</u>.  This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of the parties hereto.  Any purported assignment of this Agreement to any Person, in whole or in part, by the Reference Portfolio Manager shall be deemed null and void unless such assignment is consented to in writing by the Issuer.  Any assignment so consented to shall bind the assignee hereunder in the same manner as the Reference Portfolio Manager is bound.  In addition, the assignee shall execute and deliver to the Issuer a counterpart of this Agreement naming such assignee as Reference Portfolio Manager.  Upon the execution and delivery of such a counterpart by the assignee, the Reference Portfolio Manager shall be released from further obligations pursuant to this Agreement, except with respect to its agreements in Section 16 and its obligations arising under Section 9 in respect of acts or omissions occurring before such assignment and except with respect to its obligations under Section 8.

This Agreement shall not be assigned by the Issuer without the prior written consent of the Reference Portfolio Manager.  In the event of any assignment by the Issuer of the Agreement to a successor, the Issuer shall use reasonable efforts to cause such successor to execute and deliver to the Reference Portfolio Manager such documents as the Reference Portfolio Manager shall consider reasonably necessary to effect fully such assignment.

Notwithstanding anything to the contrary in this Section 15, any successor to the Reference Portfolio Manager by way of transfer, merger, conversion, consolidation or acquisition of all or substantially all of the Reference Portfolio Manager's asset management business relating to debt securities and loans shall be the successor to the Reference Portfolio Manager under this Agreement without any further action by the Reference Portfolio Manager, the Issuer or any other person or entity.

The Reference Portfolio Manager shall notify the Issuer and the Trustee in writing (i) if it shall (x) consolidate or merge with or into any other unrelated third party entity or (y) sell, lease or otherwise transfer, directly or indirectly, in a single transaction or a series of related transactions all or any substantial part of its assets and its subsidiaries, taken as a whole, to any other unrelated third party entity, or (ii) if there is any material change in the limited partnership structure of the Reference Portfolio Manager, in any case as soon as practicable after the conclusion of such transactions or such change.

011006

16.     Bankruptcy Proceedings.  The Reference Portfolio Manager agrees that it will not (and will not join any other Person in order to) (i) institute against the Issuer or Co-Issuer any case, proceeding or other action under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have any order for relief entered with respect to it, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, (ii) seek appointment of a receiver, trustee, custodian or other similar official for the Issuer or Co-Issuer or for all or any substantial part of its assets or (iii) take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth above, until at least one year and one day (or, if longer, the applicable preference period then provided by law) after the payment in full of all Securities issued under the Indenture; provided that nothing in this Section 16 shall preclude, or be deemed to estop, the Reference Portfolio Manager (A) from taking any action before the expiration of such period in (x) any case or proceeding voluntarily filed or commenced by either the Issuer or the Co-Issuer or (y) any involuntary insolvency proceeding filed or commenced against either the Issuer or the Co-Issuer by a Person other than the Reference Portfolio Manager or (B) from commencing against the Issuer or the Co-Issuer or any properties of such party, any legal action that is not a bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceeding.  The provisions of this Section 16 shall survive the termination of this Agreement.

17.     Submission to Jurisdiction.  Each of the Reference Portfolio Manager and the Issuer:

(i)     irrevocably submits to the non-exclusive jurisdiction of the courts of the State of New York and the United States federal courts located in the Borough of Manhattan in The City of New York in any action or proceeding arising out of or relating to the Indenture or this Agreement;

(ii)     irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such New York state or federal court and further irrevocably waives the right to object, with respect to such proceedings, that such court does not have any jurisdiction over such party;

(iii)     to the fullest extent it may legally do so, irrevocably waives the defense of an inconvenient forum to the maintenance of such action or proceeding, including by irrevocably waiving any objection which it may have at any time to the laying of venue of any proceedings brought in any such court and irrevocably waiving any claim that such proceedings have been brought in an inconvenient forum; and

(iv)     agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

The Reference Portfolio Manager irrevocably consents to the service of any and all process in any action or proceeding by the mailing or delivery of copies of such process to it at its office as the address set forth in Section 14 hereof.

011007

18.    Representations and Warranties.

(a)  The Reference Portfolio Manager represents and warrants to the Issuer that:

(i)    the Reference Portfolio Manager has been duly organized as a limited partnership and is validly existing and in good standing under the laws of the State of Delaware, has full corporate power and authority to own its assets and transact the business in which it is currently engaged and proposes to be engaged and is duly qualified and in good standing as a limited partnership under the laws of each jurisdiction where its ownership or lease of property or the conduct of its business requires, or the performance of its obligations under this Agreement or the Indenture would require, such qualification, except for those jurisdictions in which the failure to be so qualified, authorized or licensed would not, individually or in the aggregate, have a material adverse effect on the business, operations, assets or financial condition of the Reference Portfolio Manager or on the ability of the Reference Portfolio Manager to perform its obligations under, or the validity or enforceability of, this Agreement or the Indenture;

(ii)    the Reference Portfolio Manager has full power and authority to execute, deliver and perform this Agreement and all obligations required hereunder and under the Indenture, and the Reference Portfolio Manager has taken all necessary action to authorize this Agreement and the execution, delivery and performance of this Agreement an all obligations required hereunder and under the Indenture.  This Agreement has been, and each instrument and document required hereunder or under the terms of the Indenture shall be, executed and delivered by a duly authorized officer of the Reference Portfolio Manager, and this Agreement constitutes a valid and binding agreement of the Reference Portfolio Manager, enforceable against the Reference Portfolio Manager in accordance with its terms, except that the enforceability thereof may be subject to (a) bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights and (b) general principles of equity (regardless of whether such enforcement is considered in a proceeding in equity or at law);

(iii)    the Reference Portfolio Manager is not in violation of any federal or state securities law or regulation promulgated thereunder and there is no charge, investigation, action, suit or proceeding before or by any court or regulatory agency pending or, to the best knowledge of the Reference Portfolio Manager, threatened that would have a material adverse effect upon the performance by the Reference Portfolio Manager of its duties under this Agreement or on the validity or enforceability of this Agreement or the provisions of the Indenture applicable to the Reference Portfolio Manager hereunder (the "Indenture Provisions");

(iv)    The Reference Portfolio Manager is not in violation of its governing instruments or in breach or violation of or in default under any contract or agreement to which it is a party or by which it or any of its property may be bound, or any applicable statute or any rule, regulation or order of any court, government agency or body having jurisdiction over the Reference Portfolio Manager or its properties, the breach or violation of which or default under which would have a material adverse effect on the validity or

011008

enforceability of this Agreement or the Indenture Provisions, or the performance by the Reference Portfolio Manager of its duties hereunder or thereunder;

(v) neither the execution and delivery of this Agreement, nor the fulfillment of the terms hereof, nor the fulfillment of the terms of the Indenture Provisions nor the documents and instruments required hereunder or under the Indenture Provisions, conflicts or results in a material breach or violation of any of the terms or provisions, or constitutes a default under, (a) the Reference Portfolio Manager's constitutive documents, (b) the terms of any indenture, contract, lease, mortgage, deed of trust, note agreement or other agreement, obligation, condition, covenant, instrument or undertaking to which the Reference Portfolio Manager is a party or by which the Reference Portfolio Manager or any of its assets is or may be bound, (c) any law or regulation binding on or applicable to the Reference Portfolio Manager or (d) any decree, order, judgment, award, rule or regulation binding on or applicable to the Reference Portfolio Manager of any court, arbitrator or regulatory, administrative or governmental agency, body or authority having or asserting jurisdiction over the Reference Portfolio Manager or its properties, and which individually or in the aggregate would have a material adverse effect upon the business, operations, assets or financial condition of the Reference Portfolio Manager or its ability to perform its duties under this Agreement or the Swap Provision, or shall result in or require the creation or imposition of any lien on its property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking;

(vi) no consent, approval, authorization, license, permit or order of or exemption by, notice or report to or declaration, registration or filing with, any government, governmental instrumentality or court or other person is required by the Reference Portfolio Manager in connection with this Agreement or the execution, delivery, validity or enforceability of this Agreement or the obligations required hereunder or under the Indenture or the performance thereof by the Reference Portfolio Manager, except such as have been duly made or obtained; and

(vii) the Reference Portfolio Manager is duly registered and in good standing as an investment advisor with the United States Securities and Exchange Commission under the U.S. Investment Advisers Act of 1940, as amended.

(b) The Issuer hereby represents and warrants to the Reference Portfolio Manager as follows:

(i) The Issuer has been duly incorporated and is validly existing as an exempted company with limited liability under the laws of the jurisdiction of its incorporation, has full power and authority to own its assets and to transact the business in which it is presently engaged and is duly qualified under the laws of each jurisdiction where its ownership or lease of property or the conduct of its business requires, or the performance of its obligations under this Agreement would require, such qualification, except for those jurisdictions in which the failure to be so qualified, authorized or licensed would not in the aggregate have a material adverse effect on the business, operations, assets or financial

condition of the Issuer or on the ability of the Issuer to perform its obligations under, or the validity or enforceability of, this Agreement;

(ii) The Issuer has full power and authority to execute, deliver and perform this Agreement and all obligations required hereunder and under the Indenture and has taken all necessary action to authorize this Agreement and the Indenture; and

(iii) This Agreement has been executed and delivered by a duly authorized officer of the Issuer and constitutes a valid and binding agreement of the Issuer, enforceable against the Issuer in accordance with its terms, except that the enforceability thereof may be subject to (a) bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights and (b) general principles of equity (regardless of whether such enforcement is considered in a proceeding in equity or at law).

19.    Governing Law.

THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

20.    Miscellaneous.

(a) The captions in this Agreement are included for convenience only and in no way define or limit any of the provisions hereof or otherwise affect their construction or effect.

(b) In the event any provision of this Agreement shall be held invalid or unenforceable by any court of competent jurisdiction, such holding shall not invalidate or render unenforceable any other provisions hereof.

(c) This Agreement may not be amended or modified except by an instrument in writing signed by the parties hereto.

(d) This Agreement constitutes the entire understanding and agreement between the parties and supersedes all other prior understandings and agreements, whether written or oral, between the parties concerning this subject matter.

(e) This Agreement may be executed in any number of counterparts, each of which so executed shall be deemed an original, but all such counterparts shall together constitute but one and the same instrument.

(f) Unless otherwise noted, use of the word "Section" refers to the relevant Section in this Agreement.

(g) Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context requires.

21. <u>Beneficiaries</u>. This Agreement is made solely for the benefit of the Issuer and the Reference Portfolio Manager, their successors and permitted assigns, and no other person shall have any right, benefit or interest under or because of this Agreement.

22. [Reserved].

23. <u>Indulgences Not Waivers</u>. Neither the failure nor any delay on the part of the Issuer or the Reference Portfolio Manager to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege preclude any other or further exercise of the same or of any other right, remedy, power or privilege, nor shall any waiver of any right, remedy, power or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence. No waiver shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver.

24. <u>Conflicts with Indenture</u>. Subject to Sections 2(d) and 5(d) hereof, in the event this Agreement requires action with respect to any matter and the terms of the Indenture expressly require that the Reference Portfolio Manager take a different action with respect to such matter, and such actions are mutually exclusive, the provisions of the Indenture in respect thereof shall control.

25. <u>Written Disclosure Statement</u>.

The Issuer acknowledges that it has received Part II of the Reference Portfolio Manager's Form ADV filed with the Securities and Exchange Commission, as required by Rule 204-3 under the Advisers Act, more than 48 hours prior to the date of execution of this Agreement. The Reference Portfolio Manager shall provide the Issuer with a copy of Part II of its Form ADV annually within seven days of receipt of a written request therefor from the Issuer.

26. <u>No Recourse</u>.

The Reference Portfolio Manager hereby acknowledges and agrees that the Issuer's obligations hereunder shall be solely the corporate obligations of the Issuer, and the Reference Portfolio Manager shall not have any recourse to any of the directors, officers, employees, shareholders or affiliates of the Issuer or the Co-Issuer with respect to any expenses, losses, damages, judgments, assessments, costs, demands, charges, claims, liabilities, indemnities or other obligations in connection with any transactions contemplated hereby. No recourse shall be had, whether by levy or execution or otherwise, against any affiliate of the Issuer, or the Co-Issuer or any shareholders, directors, officers, agents or employees of the Issuer or the Co-Issuer and its respective affiliate under any rule of law, statute or constitution, or by the enforcement of any assessment or penalty, or otherwise, nor shall any of such persons be personally liable for any such amounts or claims, or liable for any defenses or judgments based thereon or with respect thereto. Notwithstanding any other provision of this Agreement, obligations of the Issuer pursuant to this Agreement shall constitute limited recourse obligations of the Issuer payable solely from the Trust Estate in accordance with the Priority of Payments and following the liquidation of the Trust Estate and the application of the proceeds thereof in accordance with the Priority of Payments, all obligations of and claims against the Issuer under this Agreement shall be extinguished and shall

011011

not thereafter revive. The provisions of this Section 26 shall survive the termination of this Agreement.

[Signature pages follow.]

011012

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective authorized representatives on the day and year first above written.

VALHALLA CLO, LTD.

By: _____

Name:    Martin Couch
Title:    Director


HIGHLAND CAPITAL MANAGEMENT,
L.P., as Reference Portfolio Manager

By: STRAND ADVISORS, INC., as
General Partner


By: _____
Name:
Title:

011013

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective authorized representatives on the day and year first above written.

VALHALLA CLO, LTD.

By: _____
      Name:
      Title:

HIGHLAND CAPITAL MANAGEMENT,
L.P., as Reference Portfolio Manager

By: STRAND ADVISORS, INC., as
General Partner

By: _____
Name: James Dondero
Title: President

22392208  BUSINESS

21

011014