**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | |
|---|---|---|
| **In Re:** Highland Capital Management, L.P<br>Highland Capital Management Fund Advisors, L.P.<br>et al | § | Case No.  19-34054-SGJ-11 |
| Appellant | § | |
| vs. | § | |
| Highland Capital Management, L.P., | § | |
| | § | 3:21-CV-00538-N |
| Appellee | § | |

[1943] **Order confirming the fifth amended chapter 11 plan,** Entered on 2/22/2021.

**APPELLANT RECORD<br>VOLUME 46**

MUNSCH HARDT KOPF & HARR, P.C.
Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
3800 Ross Tower
500 N. Akard Street
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

ATTORNEYS FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P. AND
NEXPOINT ADVISORS, L.P.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

In re:

HIGHLAND CAPITAL MANAGEMENT, L.P.

Debtor.

Chapter 11

Case No. 19-34054 (SGJ11)

*I N D E X*

## AMENDED DESIGNATION BY NEXPOINT ADVISORS, L.P. AND HIGHLAND
## CAPITAL MANAGEMENT FUND ADVISORS, L.P.
## OF ITEMS FOR THE RECORD ON APPEAL

COME NOW Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors,

L.P. (the "Appellants"), creditors and parties-in-interest in the above styled and numbered

bankruptcy case (the "Bankruptcy Case") of Highland Capital Management, L.P. (the "Debtor"),

and, with respect to their *Notice of Appeal* [docket no. 1957], hereby file their *Amended

Designation of Items for the Record on Appeal* (the "Designation") as follows:

| | Item | Bankruptcy Docket Number | Description |
|---|---|---|---|
| | | | **Pleadings and Items on Docket** |
| *Vol. 1* 000001 | 1 | 1957 | Notice of Appeal |
| 000165 | 2 | 1943 | Order (i) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief |
| 000326 | 3 | | Docket Sheet of Bankruptcy Case No. 19-34054 |
| *Vol. 2* 000639 | 4 | 1606 | Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 000666 | 5 | 1648 | Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| 000675 | 6 | 1656 | Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 000820 | 7 | 1670 | Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 000870 | 8 | 1719 | Second Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| *Vol. 3* 000880 | 9 | 1749 | Third Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| 000886 | 10 | 1772 | Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 000901 | 11 | 1791 | Notice of Withdrawal of Certain Executory Contracts and Unexpired Leases from List of Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan |
| 000906 | 12 | 1807 | Debtor's Omnibus Reply to Objections to Confirmation of the Fifth Amended Chapter 11 Plan of Reorganization of Highland Capital Management |
| 001031 | 13 | 1808 | Debtor's Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) |
| *Vol. 4* 001097 | 14 | 1811 | Notice of Filing Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (with Technical Modifications) |
| *Vol. 5* 001346 | 15 | 1814 | Debtor's Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |

| | 16 | 1847 | Fourth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
|---|---|---|---|
| | 17 | 1873 | Fifth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| | 18 | 1875 | Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland of Highland Capital Management, L.P. (As Modified) |
| | 19 | 1887 | Supplemental Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| | 20 | 1671 | United States Trustee's Limited Objection to Confirmation of Debtors' Fifth Amended Plan of Reorganization |
| | **Evidence and Transcripts** | | |
| | 21 | 1894 | Transcript of February 2, 2021 Confirmation Hearing |
| | 22 | 1905 | Transcript of February 3, 2021 Confirmation Hearing |
| | 23 | 1917 | Transcript of February 8, 2021 Bench Ruling |
| | 24 | 1794 | All exhibits admitted into evidence during February 2 and February 3, 2021 Confirmation Hearing |
| | | 1795 | |
| | | 1822 | |
| | | 1863 | |
| | | 1866 | |
| | | 1877 | |
| | | 1895 | |
| | | 1915 | |

*Handwritten annotations in left margin: Vol 5, 001414, 001421, 001427, 001475, 001482, 001486, 001783, 002040, 002091, 002188, Vol 12 - 002931, Vol 50 - 013295, -013297, Vol. 51 - 013373, Vol 54 - 014182, Vol 55 - 014506*

*Handwritten note below table: ✳ 1822 - Vol. 12 — 50 (39 Volumes)*

RESPECTFULLY SUBMITTED this 22d day of March, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    3800 Ross Tower
    500 N. Akard Street
    Dallas, Texas 75201-6659
    Telephone: (214) 855-7500
    Facsimile: (214) 855-7584
    Email:   drukavina@munsch.com

**ATTORNEYS FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P. AND
NEXPOINT ADVISORS, L.P.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 22d day of March, 2021, true and correct copies of this document were electronically served by the Court's ECF system on parties entitled to notice thereof, including on counsel for the Debtor.

By: /s/ Davor Rukavina
    Davor Rukavina, Esq.

# EXHIBIT AAAAA

012276

**From:**       Brad Gianiny <bgianiny@jefferies.com>
**Sent:**       Friday, December 18, 2020 4:02 PM
**To:**         CEftekhari@highlandcapital.com; Christopher A Bianchi; James Colasanto; jpseeryjr@gmail.com; James Romey;
                JSowin@highlandcapital.com; Matt Pearson; NYMOI; Ronald Wong; r-settlement@highlandfunds.com
**Subject:**    Jefferies recap

SKY- sld 22k @ 32.2251
NHF- sld 10k @ 10.5461
AVVA- sld 6412 @ 19.7598

Brad Gianiny
Equity Sales Trader
Jefferies LLC
520 Madison Avenue, 2nd Floor
New York, NY 10022
W: 212-284-2291
C: 770-366-6253

http://www.jefferies.com/salesandtradingdisclaimer/
http://extwebdev.qa.jefco.com/europeandasiasalesandtradingdisclaimer/

Jefferies archives and monitors outgoing and incoming e-mail. The contents of this email, including any attachments, are confidential to the ordinary user of the email address to which it was addressed. If you are not the addressee this email you may not copy, forward, disclose or otherwise use it or any part of it in any form whatsoever. This email may be produced at the request of regulators or in connection with civil litigation. Jefferies accepts no liability for any errors or omissions arising as a result of transmission. Use by other than intended recipients is prohibited.

012277

# EXHIBIT BBBBB

012278

Case 19-34054-sgj11 Doc 1822-101 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 2 of 2

**From:** Brad Gianiny <bgianiny@jefferies.com>
**Sent:** Monday, December 21, 2020 4:22 PM
**To:** CEftekhari@highlandcapital.com; Christopher A Bianchi; James Colasanto; jpseeryjr@gmail.com; James Romey; JSowin@highlandcapital.com; Matt Pearson; NYMO1; Ronald Wong; r-settlement@highlandfunds.com
**Subject:** Jefferies recap

AVVA- sld 50k @ 19.4113
NHF- sld 20k @ 10.4678
SKY- sld 20k @ 31.0396

All from Jim S

Thanks

Brad Gianiny
Equity Sales Trader
Jefferies LLC
520 Madison Avenue, 2nd Floor
New York, NY 10022
W: 212-284-2291
C: 770-366-6253

http://www.jefferies.com/salesandtradingdisclaimer/
http://extwebdev.qa.jefco.com/europeandasiasalesandtradingdisclaimer/

Jefferies archives and monitors outgoing and incoming e-mail. The contents of this email, including any attachments, are confidential to the ordinary user of the email address to which it was addressed. If you are not the addressee of this email you may not copy, forward, disclose or otherwise use it or any part of it in any form whatsoever. This email may be produced at the request of regulators or in connection with civil litigation. Jefferies accepts no liability for any errors or omissions arising as a result of transmission. Use by other than intended recipients is prohibited.

012279

# EXHIBIT CCCCC

Case 19-34054-sgj11 Doc 1822-102 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 2 of
2

**From:** Brad Gianiny <bgianiny@jefferies.com>
**Sent:** Tuesday, December 22, 2020 4:03 PM
**To:** CEftekhari@highlandcapital.com; Christopher A Bianchi; James Colasanto; jpseeryjr@gmail.com; James Romey; JSowin@highlandcapital.com; Matt Pearson; NYMO1; Ronald Wong; r-settlement@highlandfunds.com
**Subject:** Jefferies recap

SKY- sld 39,834 @ 31.6177
NHF- sld 20k @ 10.4457
AVVA- sld 50k @ 19.5874

Thanks

Brad Gianiny
Equity Sales Trader
Jefferies LLC
520 Madison Avenue, 2nd Floor
New York, NY 10022
W: 212-284-2291
C: 770-366-6253

http://www.jefferies.com/salesandtradingdisclaimer/
http://extwebdev.qa.jefco.com/europeandasiasalesandtradingdisclaimer/

Jefferies archives and monitors outgoing and incoming e-mail. The contents of this email, including any attachments, are confidential to the ordinary user of the email address to which it was addressed. If you are not the addressee of this email you may not copy, forward, disclose or otherwise use it or any part of it in any form whatsoever. This email may be produced at the request of regulators or in connection with civil litigation. Jefferies accepts no liability for any errors or omissions arising as a result of transmission. Use by other than intended recipients is prohibited.

012281

1

# EXHIBIT DDDDD

Case 19-34054-sgj11 Doc 1822-103 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 2 of 2

**From:** Brad Gianiny <bgianiny@jefferies.com>
**Sent:** Wednesday, December 30, 2020 4:03 PM
**To:** CEftekhari@highlandcapital.com; Christopher A Bianchi; James Colasanto; jpseeryjr@gmail.com; James Romey; JSowin@highlandcapital.com; Matt Pearson; NYMOl; Ronald Wong; r-settlement@highlandfunds.com
**Subject:** Jefferies recap

SKY- sld 4100 @ 31.5382
AVYA- sld 9783 @ 19.12
NHF- sld 20k @ 10.5584

Brad Gianiny
Equity Sales Trader
Jefferies LLC
520 Madison Avenue, 2nd Floor
New York, NY 10022
W: 212-284-2291
C: 770-366-6253

http://www.jefferies.com/salesandtradingdisclaimer/
http://extwebdev.qa.jefco.com/europeandasiasalesandtradingdisclaimer/

Jefferies archives and monitors outgoing and incoming e-mail. The contents of this email, including any attachments, are confidential to the ordinary user of the email address to which it was addressed. If you are not the addressee of this email you may not copy, forward, disclose or otherwise use it or any part of it in any form whatsoever. This email may be produced at the request of regulators or in connection with civil litigation. Jefferies accepts no liability for any errors or omissions arising as a result of transmission. Use by other than intended recipients is prohibited.

1

012283

# EXHIBIT EEEEE

012284

Case 19-34054-sgj11 Doc 1822-104 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 2 of 2

**From:** Brad Gianiny <bgianiny@jefferies.com>
**Sent:** Thursday, December 31, 2020 4:04 PM
**To:** James Seery; CEftekhari@highlandcapital.com; Christopher A Bianchi; James Colasanto; James Romey; JSowin@highlandcapital.com; Matt Pearson; NYMO1; Ronald Wong; r-settlement@highlandfunds.com; Steven Haltom
**Subject:** Jefferies recap

SKY- sld 4300 @ 31.3515

AVVA- sld 20k @ 19.1442

NHF- sld 10k @ 10.5997

Brad Gianiny
Equity Sales Trader
Jefferies LLC
520 Madison Avenue, 2nd Floor
New York, NY 10022
W: 212-284-2291
C: 770-366-6253

http://www.jefferies.com/salesandtradingdisclaimer/
http://extwebdev.qa.jefco.com/europeandasiasalesandtradingdisclaimer/

Jefferies archives and monitors outgoing and incoming e-mail. The contents of this email, including any attachments, are confidential to the ordinary user of the email address to which it was addressed. If you are not the addressee of this email you may not copy, forward, disclose or otherwise use it or any part of it in any form whatsoever. This email may be produced at the request of regulators or in connection with civil litigation. Jefferies accepts no liability for any errors or omissions arising as a result of transmission. Use by other than intended recipients is prohibited.

1

012285

# EXHIBIT FFFFF

# BYLAWS

## OF

## STRAND ADVISORS, INC.

### ARTICLE I

#### Offices

Section 1. <u>Registered Office</u>.  The registered office of the corporation shall be in the City of Wilmington, County of New Castle, State of Delaware.

Section 2. <u>Other Offices</u>.  The corporation may also have offices at such other places, both within and without the State of Delaware, as the Board of Directors may from time to time determine or as the business of the corporation may require.

### ARTICLE II

#### Meetings of Stockholders

Section 1. <u>Place of Meetings</u>.  Meetings of stockholders may be held at such time and place, within or without the State of Delaware, as shall be stated in the notice of the meeting or in a duly executed waiver of notice thereof.

Section 2. <u>Annual Meetings</u>.  An annual meeting of stockholders shall be held on such day in each fiscal year of the corporation and at such time and place as may be fixed by the Board of Directors, at which meeting the stockholders shall elect a Board of Directors and transact such other business as may properly be brought before the meeting.

Section 3. <u>Notice of Annual Meeting</u>.  Written or printed notice of the annual meeting, stating the place, day and hour thereof, shall be given to each stockholder entitled to vote thereat at such address as appears on the books of the corporation, not less than ten days nor more than sixty days before the date of the meeting.

Section 4. <u>Special Meetings</u>.  Special meetings of the stockholders, for any purpose or purposes, unless otherwise prescribed by statute or the certificate of incorporation, may be called by the President, and shall be called by the President or the Secretary at the request in writing of a majority of the Board of Directors, or at the request in writing of stockholders of record owning at least one-tenth (1/10) of all shares issued and outstanding and entitled to vote at such meeting. Such request shall state the purpose or purposes of the proposed meeting.

-1-

10108.0001:0153604.01

Section 5. <u>Notice of Special Meetings</u>. Written or printed notice of a special meeting of stockholders, stating the place, day and hour and purpose or purposes thereof, shall be given to each stockholder entitled to vote thereat at such address as appears on the books of the corporation, not less than ten days nor more than sixty days before the date of the meeting.

Section 6. <u>Business at Special Meetings</u>. Business transacted at all special meetings of stockholders shall be confined to the purpose or purposes stated in the notice thereof.

Section 7. <u>Stockholder List</u>. At least ten days before each meeting of stockholders, a complete list of the stockholders entitled to vote at such meeting or any adjournment thereof, arranged in alphabetical order, with the address of and the number of voting shares held by each, shall be prepared by the Secretary. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours, for such ten day period, either at a place within the city where the meeting is to be held, which place shall be specified in the notice of the meeting, or, if not so specified, at the place where the meeting is to be held. Such list shall also be produced and kept open at the time and place of the meeting and shall be subject to the inspection of any stockholder during the meeting.

Section 8. <u>Quorum</u>. The holders of a majority of the votes attributed to the shares of capital stock issued and outstanding and entitled to vote thereat, represented in person or by proxy, shall constitute a quorum at all meetings of the stockholders for the transaction of business except as otherwise provided by statute, the certificate of incorporation or these bylaws. The stockholders present may adjourn the meeting despite the absence of a quorum. When a meeting is adjourned for less than thirty days in any one adjournment and a new record date is not fixed for the adjourned meeting, it shall not be necessary to give any notice of the adjourned meeting if the time and place to which the meeting is adjourned are announced at the meeting at which the adjournment is taken, and at the adjourned meeting any business may be transacted that might have been transacted on the original date of the meeting. When a meeting is adjourned for thirty days or more, or when after the adjournment a new record date is fixed for the adjourned meeting, notice of the adjourned meeting shall be given as in the case of an original meeting.

Section 9. <u>Majority Vote</u>. When a quorum is present at any meeting, the vote of the holders of a majority of the shares having voting power represented in person or by proxy shall decide any question brought before such meeting, unless the question is one upon which, by express provision of statute, the certificate of incorporation or these bylaws, a different vote is required, in which case such express provision shall govern and control the decision of such question.

Section 10. <u>Proxies</u>. (a) Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act for him by proxy, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period.

10108.0001:0153604.01

(b)    Without limiting the manner in which a stockholder may authorize another person or persons to act for him as proxy pursuant to subsection (a) of this Section, the following shall constitute a valid means by which a stockholder may grant such authority:

(i)    A stockholder may execute a writing authorizing another person or persons to act for him as proxy.  Execution may be accomplished by the stockholder or his authorized officer, director, employee or agent signing such writing or causing his or her signature to be affixed to such writing by any reasonable means including, but not limited to, by facsimile signature.

(ii)    A stockholder may authorize another person or persons to act for him as proxy by transmitting or authorizing the transmission of a telegram, cablegram, or other means of electronic transmission to the person who will be the holder of the proxy or to a proxy solicitation firm, proxy support service organization or like agent duly authorized by the person who will be the holder of the proxy to receive such transmission, provided that any such telegram, cablegram or other means of electronic transmission must either set forth or be submitted with information from which it can be determined that the telegram, cablegram or other electronic transmission was authorized by the stockholder.  If it is determined that such telegrams, cablegrams or other electronic transmissions are valid, the inspectors or, if there are no inspectors, such other persons making that determination shall specify the information upon which they relied.

(c)    Any copy, facsimile telecommunication or other reliable reproduction of the writing or transmission created pursuant to subsection (b) of this Section may be substituted or used in lieu of the original writing or transmission for any and all purposes for which the original writing or transmission could be used, provided that such copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or transmission.

(d)    Any copy, facsimile telecommunication or other reliable reproduction of the writing or transmission created pursuant to subsection (b) of this Section may be substituted or used in lieu of the original writing or transmission for any and all purposes for which the original writing or transmission could be used, provided that such copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or transmission.

Section 11.  Voting.  Unless otherwise provided by statute or the certificate of incorporation, each stockholder shall have one vote for each share of stock having voting power, registered in his name on the books of the corporation.

Section 12. Consent of Stockholders in Lieu of Meeting.  Any action required to be taken at any annual or special meeting of stockholders, or any action which may be taken at any annual or special meeting of stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled

-3-

10108.0001:0153604.01

to vote thereon were present and voted and such consent or consents are delivered to the corporation. Every written consent shall bear the date of signatures of each stockholder and no written consent shall be effective to take the corporate action referred to therein unless, within sixty days of the earliest dated consent, written consents signed by a sufficient number of holders to take action are delivered to the corporation. Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing.

Section 13. Inspectors. (a) The corporation may, in advance of any meeting of stockholders, appoint one or more inspectors to act at the meeting and make a written report thereof. The corporation may designate one or more persons as alternate inspectors to replace any inspector who fails to act. If no inspector or alternate is able to act at a meeting of stockholders, the chairman of the meeting shall appoint one or more inspectors to act at the meeting. Each inspector, before entering upon the discharge of his duties, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of his ability.

(b) The inspectors shall (i) ascertain the number of shares outstanding and the voting power of each, (ii) determine the shares represented at a meeting and the validity of proxies and ballots, (iii) count all votes and ballots, (iv) determine and retain for a reasonable period a record of the disposition of any challenges made to any determination by the inspectors, and (v) certify their determination of the number of shares represented at the meeting, and their count of all votes and ballots. The inspectors may appoint or retain other persons or entities to assist the inspectors in the performance of the duties of the inspectors.

(c) The date and time of the opening and the closing of the polls for each matter upon which the stockholders will vote at a meeting shall be announced at the meeting. No ballot, proxies or votes, nor any revocations thereof or changes thereto, shall be accepted by the inspectors after the closing of the polls unless the Delaware Court of Chancery, upon application by a stockholder, shall determine otherwise.

(d) In determining the validity and counting of proxies and ballots, the inspectors shall be limited to an examination of the proxies, any envelopes submitted with those proxies, any information provided in accordance with Article II, Section 10(b)(ii), ballots and the regular books and records of the corporation, except that the inspectors may consider other reliable information for the limited purpose of reconciling proxies and ballots submitted by or on behalf of banks, brokers, their nominees or similar persons that represent more votes than the holder of a proxy is authorized by the record owner to cast, or more votes than the stockholder holds of record. If the inspectors consider other reliable information for the limited purpose permitted herein, the inspectors at the time they make their certification pursuant to subsection (b)(v) of this Section shall specify the precise information considered by them including the person or persons from whom they obtained the information, when the information was obtained, the means by which the information was obtained and the basis for the inspector's belief that such information is accurate and reliable.

10108.0001:0153604.01

012290

## ARTICLE III

### Board of Directors

Section 1.  Powers.  The business and affairs of the corporation shall be managed by a Board of Directors.  The Board may exercise all such powers of the corporation and do all such lawful acts and things as are not by statute, by the certificate of incorporation or these bylaws directed or required to be exercised or done by the stockholders.

Section 2.  Number of Directors.  The number of directors which shall constitute the whole Board shall be fixed from time to time by resolution of the Board of Directors, provided that such number shall not be less than one (1) nor more than five (5).

Section 3.  Election and Term.  Except as provided in Section 4 of this Article III, directors shall be elected at the annual meeting of the stockholders, and each director shall be elected to serve until the next annual meeting and until his successor shall have been elected and shall qualify, or until his death, resignation or removal from office. Directors need not be stockholders of the corporation.

Section 4.  Vacancies and Newly Created Directorships.  If the office of any director or directors becomes vacant by reason of death, resignation, retirement, disqualification, removal from office, or otherwise, or the number of directors constituting the whole Board shall be increased, a majority of the remaining or existing directors, though less than a quorum, may choose a successor or successors, or the director or directors to fill the new directorship or directorships, who shall hold office for the unexpired term in respect to which such vacancy occurred or, in the case of a new directorship or directorships, until the next annual meeting of the stockholders.

Section 5.  Removal.  The stockholders may remove a director either for or without cause at any meeting of stockholders, provided notice of the intention to act upon such matter shall have been given in the notice calling such meeting.

## ARTICLE IV

### Meetings of the Board

Section 1.  First Meeting.  The first meeting of each newly elected Board of Directors shall be held at the location of and immediately following the annual meeting of stockholders, and no notice of such meeting shall be necessary to the newly elected directors in order legally to constitute the meeting, provided a quorum shall be present; or the Board may meet at such place and time as shall be fixed by the consent in writing of all the directors.  All meetings of the Board of Directors may be held at such place, either within or without the State of Delaware, as from time to time shall be determined by the Board of Directors.

10108.0001:0153604.01

012291

Section 2. <u>Regular Meetings</u>. Regular meetings of the Board may be held at such time and place and on such notice, if any, as shall be determined from time to time by the Board.

Section 3. <u>Special Meetings</u>. Special meetings of the Board may be called by the President or the Chairman of the Board on twenty-four hours' notice to each director, delivered either personally or by mail or by telegram or telecopier. Special meetings shall be called by the President or the Secretary in like manner and on like notice on the written request of one director.

Section 4. <u>Quorum and Voting</u>. At all meetings of the Board, a majority of the directors at the time in office shall be necessary and sufficient to constitute a quorum for the transaction of business; and the act of a majority of the directors present at any meeting at which there is a quorum shall be the act of the Board of Directors, except as may be otherwise specifically provided by statute, the certificate of incorporation or these bylaws. If a quorum shall not be present at any meeting of directors, the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

Section 5. <u>Telephone Meetings</u>. Directors may attend any meeting of the Board or any committee thereof by conference telephone, radio, television or similar means of communication by means of which all persons participating in the meeting can hear each other, and all members so attending shall be deemed present at the meeting for all purposes including the determination of whether a quorum is present.

Section 6. <u>Action by Written Consent</u>. Any action required or permitted to be taken by the Board or any committee thereof, under the applicable provisions of any statute, the certificate of incorporation, or these bylaws, may be taken without a meeting if a consent in writing, setting forth the action so taken, is signed by all the members of the Board or committee, as the case may be.

## ARTICLE V

### Committees

Section 1. <u>Executive Committee</u>. The Board of Directors, by resolution adopted by a majority of the whole Board, may designate one or more directors to constitute an Executive Committee, which Committee, to the extent provided in such resolution, shall have and may exercise all of the authority of the Board of Directors in the business and affairs of the corporation except where action by the Board of Directors is expressly required by statute. The Executive Committee shall keep regular minutes of its proceedings and report the same to the Board when required.

Section 2. <u>Other Committees</u>. The Board of Directors may similarly create other committees for such terms and with such powers and duties as the Board deems appropriate.

-6-

Section 3.  <u>Committee Rules; Quorum</u>.  Each committee may adopt rules governing the method of calling and time and place of holding its meetings.  Unless otherwise provided by the Board of Directors, a majority of any committee shall constitute a quorum for the transaction of business, and the act of a majority of the members of such committee present at a meeting at which a quorum is present shall be the act of such committee.

## ARTICLE VI

### Compensation of Directors

The Board of Directors shall have authority to determine, from time to time, the amount of compensation, if any, which shall be paid to its members for their services as directors and as members of committees.  The Board shall also have power in its discretion to provide for and to pay to directors rendering services to the corporation not ordinarily rendered by directors as such, special compensation appropriate to the value of such  services as determined by the Board from time to time.  Nothing herein contained shall be construed to preclude any director from serving the corporation in any other capacity and receiving compensation therefor.

## ARTICLE VII

### Notices

Section 1.  <u>Methods of Notice</u>.  Whenever any notice is required to be given to any stockholder, director or committee member under the provisions of any statute, the certificate of incorporation or these bylaws, such notice shall be delivered personally or shall be given in writing by mail addressed to such stockholder, director or committee member at such address as appears on the books of the corporation, and such notice shall be deemed to be given at the time when the same shall be deposited in the United States mail with postage thereon prepaid.  Notice to directors and committee members may also be given by telegram, which notice shall be deemed to be given at the time it is delivered to the telegraph office, or by telecopy, which notice shall be deemed to be given at the time it is transmitted or in person, which notice shall be deemed to be given when received.

Section 2.  <u>Waiver of Notice</u>.  Whenever any notice is required to be given to any stockholder, director or committee member under the provisions of any statute, the certificate of incorporation or these bylaws, a waiver thereof in writing signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.  Attendance at any meeting shall constitute a waiver of notice thereof except as otherwise provided by statute.

10108.0001:0153604.01

012293

## ARTICLE VIII

### Officers

Section 1. <u>Executive Officers</u>. The executive officers of the corporation shall consist of at least a President and a Secretary, each of whom shall be elected by the Board of Directors. The Board of Directors may also elect as officers of the corporation a Chairman of the Board, one or more Vice Presidents, one or more of whom may be designated Executive or Senior Vice Presidents and may also have such descriptive titles as the Board shall deem appropriate, and a Treasurer. Any two or more offices may be held by the same person.

Section 2. <u>Election and Qualification</u>. The Board of Directors at its first meeting after each annual meeting of stockholders shall elect the officers of the corporation.

Section 3. <u>Other Officers and Agents</u>. The Board may elect or appoint Assistant Vice Presidents, Assistant Secretaries and Assistant Treasurers, and such other officers and agents as it shall deem necessary, who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board of Directors.

Section 4. <u>Salaries</u>. The salaries of all officers of the corporation shall be fixed by the Board of Directors except as otherwise directed by the Board.

Section 5. <u>Term, Removal and Vacancies</u>. The officers of the corporation shall hold office until their successors are chosen and qualify. Any officer or agent of the corporation may be removed at any time by the affirmative vote of a majority of the Board of Directors, or by the President. Any vacancy occurring in any office of the corporation may be filled by the Board of Directors or otherwise as provided in this Article.

Section 6. <u>Execution of Instruments</u>. The Chairman of the Board and the President (and such other officers as are authorized thereunto by resolution of the Board of Directors) may execute in the name of the corporation bonds, notes, debentures and other evidences of indebtedness, stock certificates, deeds, mortgages, deeds of trust, indentures, contracts, leases, agreements and other instruments, requiring a seal under the seal of the corporation, and may execute such documents where not requiring a seal, except where such documents are required by law to be otherwise signed and executed, and except where the signing and execution thereof shall be exclusively delegated to some other officer or agent of the corporation.

Section 7. <u>Duties of Officers</u>. The duties and powers of the officers of the corporation shall be as provided in these bylaws, or as provided for pursuant to these bylaws, or (except to the extent inconsistent with these bylaws or with any provision made pursuant hereto) shall be those customarily exercised by corporate officers holding such offices.

Section 8. <u>Chairman of the Board</u>. The Chairman of the Board shall preside when present at all meetings of the Board of Directors. He shall advise and counsel the other officers of the corporation and shall exercise such powers and perform such duties as shall be assigned to

10108.0001:0153604.01

012294

or required of him from time to time by the Board of Directors. The Chairman of the Board may, if so designated by the Board of Directors, be the Chief Executive Officer of the corporation; in such event he shall have all of the powers granted by the bylaws to the President and from time to time may delegate all, or any, of his powers and duties to the President.

Section 9. President. The President shall preside at all meetings of the stockholders and shall be ex-officio a member of all standing committees, have general powers of oversight, supervision and management of the business and affairs of the corporation, and see that all orders and resolutions of the Board of Directors are carried into effect.

In the event another executive officer has been designated Chief Executive Officer of the corporation by the Board of Directors, then (i) such other executive officer shall have all of the powers granted by the bylaws to the President; and (ii) the President shall, subject to the powers of supervision and control thereby conferred upon the Chief Executive Officer, be the chief operating officer of the corporation and shall have all necessary powers to discharge such responsibility including general supervision of the affairs of the corporation and general and active control of all of its business.

The President shall perform all the duties and have all the powers of the Chairman of the Board in the absence of the Chairman of the Board.

Section 10. Vice Presidents. The Vice Presidents in the order determined by the Board of Directors shall, in the absence or disability of the President, perform the duties and exercise the powers of the President, and shall perform such other duties as the Board of Directors, the Chairman of the Board and the President may prescribe.

Section 11. Secretary. The Secretary shall attend all meetings of the Board of Directors and all meetings of the stockholders and record all votes and the minutes of all proceedings in a book to be kept for that purpose and shall perform like duties for the committees of the Board of Directors when required. Except as may be otherwise provided in these bylaws, he shall give, or cause to be given, notice of all meetings of the stockholders and special meetings of the Board of Directors, and shall perform such other duties as may be prescribed by the Board of Directors and the President. He shall keep in safe custody the seal of the corporation, if any, and shall have authority to affix the same to any instrument requiring it, and when so affixed it may be attested by his signature. The Board of Directors may give general authority to any other officer to affix the seal of the corporation and to attest the affixing by his signature. In the absence of the Treasurer and all Assistant Treasurers, the Secretary shall perform all the duties and have all the powers of the Treasurer.

Section 12. Assistant Secretaries. The Assistant Secretaries in the order determined by the Board of Directors shall, in the absence or disability of the Secretary, perform the duties and exercise the powers of the Secretary and shall perform such other duties as the Board of Directors, the Chairman of the Board and President may prescribe. Assistant secretaries may be appointed by the president without prior approval of the board of directors.

10108.0001:0153604.01

012295

Section 13. <u>Treasurer</u>. The Treasurer shall have the custody of the corporate funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the corporation and shall deposit all monies and other valuable effects in the name and to the credit of the corporation in such depositories as may be designated by the Board of Directors. He shall disburse the funds of the corporation as may be ordered by the Board, taking proper vouchers for such disbursements, and shall render to the Board of Directors, the Chairman of the Board and the President, whenever they may require it, an account of all of his transactions as Treasurer and of the financial condition of the corporation.

Section 14. <u>Assistant Treasurers</u>. The Assistant Treasurers in the order determined by the Board of Directors shall, in the absence or disability of the Treasurer, perform the duties and exercise the powers of the Treasurer and shall perform such other duties as the Board of Directors, the Chairman of the Board and the President may prescribe.

## ARTICLE IX

### Shares and Stockholders

Section 1. <u>Certificates Representing Shares</u>. Every holder of stock in the corporation shall be entitled to have a certificate, signed by, or in the name of the corporation by, the Chairman or Vice Chairman of the Board of Directors, or the President or a Vice President and the Treasurer or an Assistant Treasurer or the Secretary or an Assistant Secretary of the corporation, certifying the number of shares owned by him in the corporation. The signature of any such officer may be facsimile. In case any officer who has signed or whose facsimile signature has been placed upon such certificate shall have ceased to be such officer before such certificate is issued, it may be issued by the corporation with the same effect as if he were such officer at the date of its issuance. If the corporation shall be authorized to issue more than one class of stock or more than one series of any class, the powers, designations, preferences and relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights shall be set forth in full or summarized on the face or back of the certificate which the corporation shall issue to represent such class or series of stock, provided that, except as otherwise provided in Section 202 of the General Corporation Law of the State of Delaware, in lieu of the foregoing requirements, there may be set forth on the face or back of the certificate which the corporation shall issue to represent such class or series of stock a statement that the corporation will furnish without charge to each stockholder who so requests the designations, preferences and relative, participating, optional or other special rights of each class or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights.

Section 2. <u>Transfer of Shares</u>. Subject to valid transfer restrictions and to stop-transfer orders directed in good faith by the corporation to any transfer agent to prevent possible violations of federal or state securities laws, rules or regulations, or for any other lawful purpose, upon surrender to the corporation of a certificate for shares duly endorsed or accompanied by proper evidence of succession, assignment or authority to transfer, it shall be the duty of the

10108.0001:0153604.01

012296

corporation to issue a new certificate to the person entitled thereto, cancel the old certificate and record the transaction upon its books.

Section 3.  Fixing Record Date.

(a)     In order that the corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than sixty nor less than ten days before the date of such meeting.  If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the date on which notice is given, or, if notice is waived, at the close of business on the date next preceding the day on which the meeting is held.  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for the adjourned meeting.

(b)     In order that the corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which date shall not be more than ten days after the date upon which the resolution fixing the record date is adopted by the Board of Directors.  If no record date has been fixed by the Board of Directors, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board of Directors is required by this Section, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the corporation by delivery to its registered office in the State of Delaware, its principal place of business, or an officer or agent of the corporation having custody of the book in which proceedings of meetings of stockholders are recorded.  Delivery made to the corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.  If no record date has been fixed by the Board of Directors and prior action by the Board of Directors is required by statute, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action.

(c)     In order that the corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to receive any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than sixty days prior to such action.  If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

10108.0001:0153604.01

012297

Section 4. <u>Registered Stockholders</u>. The corporation shall be entitled to recognize the exclusive right of a person registered on its books as the owner of any share or shares to receive dividends, and to vote as such owner, and for all other purposes as such owner; and the corporation shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of the State of Delaware.

Section 5. <u>Lost Certificates</u>. The Board of Directors may direct a new certificate or certificates to be issued in place of any certificate or certificates theretofore issued by the corporation alleged to have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate of stock to be lost, stolen or destroyed. When authorizing such issue of a new certificate or certificates, the Board of Directors may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost, stolen or destroyed certificate or certificates, or his legal representative, to advertise the same in such manner as it shall require and/or give the corporation a bond in such sum as it may direct as indemnity against any claim that may be made against the corporation with respect to the certificate alleged to have been lost, stolen or destroyed.

## ARTICLE X

### Indemnification

(a)     The corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the corporation) by reason of the fact that he is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of <u>nolo contendere</u> or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his conduct was unlawful.

(b)     The corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the corporation to procure a judgment in its favor by reason of the fact that he is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against expenses (including attorneys' fees) actually and

-12-

10108.0001:0153604.01

reasonably incurred by him in connection with the defense or settlement of such action or suit if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the corporation and except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the corporation unless and only to the extent that the Court of Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

(c)     To the extent that a director, officer, employee or agent of the corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in subsections (a) and (b), or in defense of any claim, issue or matter therein, he shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by him in connection therewith.

(d)     Any indemnification under subsections (a) and (b) (unless ordered by a court) shall be made by the corporation only as authorized in the specific case upon a determination that indemnification of the director, officer, employee or agent is proper in the circumstances because he has met the applicable standard of conduct set forth in subsections (a) and (b).  Such determination shall be made (1) by the Board of Directors by a majority vote of a quorum consisting of directors who were not parties to such action, suit, or proceeding, or (2) if such a quorum is not obtainable, or, even if obtainable a quorum of disinterested directors so directs, by independent legal counsel in a written opinion, or (3) by the stockholders.

(e)     Expenses (including attorneys' fees) incurred by an officer or director in defending any civil, criminal, administrative or investigative action, suit or proceeding shall be paid by the corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of the director or officer to repay such amount if it shall ultimately be determined that he is not entitled to be indemnified by the corporation as authorized in this Article X. Such expenses incurred by other employees or agents may be so paid upon such terms and conditions, if any, as the Board of Directors deems appropriate.

(f)     The indemnification and advancement of expenses provided by, or granted pursuant to, the other subsections of this Article X shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under the Certificate of Incorporation, any agreement or vote of stockholders or disinterested directors or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office.

(g)     The corporation shall have the power to purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted  against him and incurred by him in any such capacity, or arising out of his status as

-13-

such, whether or not the corporation would have the power to indemnify him against such liability under the provisions of this Article X.

(h)     For purposes of this Article X, references to "the corporation" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, and employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under the provisions of this Article X with respect to the resulting or surviving corporation as he would have with respect to such constituent corporation if its separate existence had continued.

(i)     For purposes of this Article X, references to "other enterprises" shall include employee benefit plans; references to "fines" shall include any excise taxes assessed on a person with respect to any employee benefit plan; and references to "serving at the request of the corporation" shall include any service as a director, officer, employee or agent of the corporation which imposes duties on, or involves services by, such director, officer, employee, or agent with respect to an employee benefit plan, its participants or beneficiaries; and a person who acted in good faith and in a manner he reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interests of the corporation" as referred to in this Article X.

(j)     The indemnification and advancement of expenses provided by, or granted pursuant to, this Article X shall, unless otherwise provided when authorized or ratified, continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a person.

## ARTICLE XI

### General

Section 1. Dividends. Dividends upon the capital stock of the corporation, subject to the provisions of the certificate of incorporation, if any, or of the resolutions, if any, providing for any series of stock, may be declared by the Board of Directors at any meeting thereof, or by the Executive Committee at any meeting thereof. Dividends may be paid in cash, in property or in shares of the capital stock of the corporation, subject to the provisions of the certificate of incorporation or of the resolutions, if any, providing for any series of stock.

Section 2. Reserves. Before payment of any dividend, there may be set aside out of any funds of the corporation available for dividends such sum or sums as the directors from time to time, in their absolute discretion, deem proper as a reserve fund to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the corporation, or for such other purpose or purposes as the directors shall think conducive to the interests of the

-14-

corporation, and the directors may modify or abolish any such reserve in the manner in which it was created.

Section 3. Shares of Other Corporations. The Chairman of the Board, the President and any Vice President is authorized to vote, represent and exercise on behalf of the corporation all rights incident to any and all shares of any other corporation or other entity standing in the name of the corporation. The authority herein granted to said officer may be exercised either by said officer in person or by any person authorized so to do by proxy or power of attorney duly executed by said officer. Notwithstanding the above, however, the Board of Directors, in its discretion, may designate by resolution any additional person to vote or represent said shares of other corporations and other entities.

Section 4. Checks. All checks, drafts, bills of exchange or demands for money of the corporation shall be signed by such officer or officers or such other person or persons as the Board of Directors may from time to time designate.

Section 5. Corporate Records. The corporation shall keep at its registered office or principal place of business, or at the office of its transfer agent or registrar, a record of its stockholders giving the names and addresses of all stockholders and the number and class and series, if any, of shares held by each. All other books and records of the corporation may be kept at such place or places within or without the State of Delaware as the Board of Directors may from time to time determine.

Section 6. Fiscal Year. The fiscal year of the corporation shall be fixed by the Board of Directors; if not so fixed, it shall be the calendar year.

## ARTICLE XII

### Amendments

These bylaws may be altered, amended or repealed or new bylaws may be adopted at any annual meeting of the stockholders or at any special meeting of the stockholders at which a quorum is present or represented, by the affirmative vote of the holders of a majority of the shares entitled to vote at such meeting and present or represented thereat, or by the affirmative vote of a majority of the whole Board of Directors at any regular meeting of the Board or at any special meeting of the Board, provided notice of the proposed alteration, amendment or repeal or the adoption of new bylaws is set forth in the notice of such meeting.

10108.0001:0153604.01

012301

# EXHIBIT GGGGG

**First Amendment to Bylaws of**
**Strand Advisors, Inc.**

Strand Advisors, Inc. (the "Company"), a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware, does hereby certify that the Company's sole stockholder, acting by written consent without a meeting, resolved to amend the Company's Bylaws (the "Bylaws") as follows:

**1.** Article III, Section 2, of the Bylaws is hereby deleted in its entirety and replaced with the following:

Section 2. Number of Directors. The number of directors which shall constitute the whole Board shall be three (3).

**2.** Article III, Section 5, of the Bylaws is hereby deleted in its entirety and replaced with the following:

Section 5. Director Qualifications. Each director appointed to serve on the Board shall (A) (i) be an independent director, (ii) not be affiliated with the corporation's stockholders, and (iii) not be an officer of the corporation; and (B) have been (x) nominated by the official committee of unsecured creditors (the "Committee") appointed in the chapter 11 bankruptcy of Highland Capital Management, L.P. (the "Debtor") currently pending in the United States Bankruptcy Court for the Northern District of Texas (the "Court"), Case No. 19-34054-sgj11 and reasonably acceptable to the stockholders; (y) nominated by the stockholders and acceptable to the Committee; or (z) selected by the duly appointed independent directors.

**3.** The following shall be added as Section 6 to Article III of the Bylaws:

Section 6. Removal of Directors. Once appointed, the independent directors (i) cannot be removed without the Committee's written consent or Order of the Court, and (ii) may be removed and replaced at the Committee's direction upon approval of the Court (subject in all respects to the right of any party in interest, including the Debtor and the independent directors, to object to such removal and replacement).

Except as expressly amended hereby, the terms of the Company's Bylaws shall remain in full force and effect.

*[Signature Page Follows]*

DOCS_NY:39910.5 36027/002

012303

IN WITNESS WHEREOF, the Company has caused this amendment to be signed this 9th day of January, 2020.

STRAND ADVISORS, INC.

By: Scott Ellington
Its: Secretary

012304

# EXHIBIT HHHHH

012305

PAGE 1

*State of Delaware*

# Office of the Secretary of State

I, EDWARD J. FREEL, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF OWNERSHIP, WHICH MERGES:

"STRAND ADVISORS, INC.", A CALIFORNIA CORPORATION,

WITH AND INTO "STRAND ADVISORS, INC." UNDER THE NAME OF "STRAND ADVISORS, INC.", A CORPORATION ORGANIZED AND EXISTING UNDER THE LAWS OF THE STATE OF DELAWARE, AS RECEIVED AND FILED IN THIS OFFICE THE THIRTIETH DAY OF MAY, A.D. 1996, AT 9 O'CLOCK A.M.

A CERTIFIED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE NEW CASTLE COUNTY RECORDER OF DEEDS FOR RECORDING.



Edward J. Freel, Secretary of State

2625806  8100M

960157807

AUTHENTICATION:   7967852

DATE:   05-31-96

012306

**CERTIFICATE OF OWNERSHIP**
**OF**
**STRAND ADVISORS, INC.,**
a California corporation
**INTO**
**STRAND ADVISORS, INC.,**
a Delaware corporation

ENDORSED
FILED
In the office of the Secretary of State
of the State of California

OCT 1 1 1996

BILL JONES, Secretary of State

To the Secretary of State
State of California

Pursuant to the provisions of the General Corporation Law of the State of California, the undersigned officers of the domestic parent corporation hereinafter named do hereby certify as follows:

1.    The name of the subsidiary corporation, which is a business corporation of the State of Delaware, and which is to be the surviving corporation under the merger herein certified, is Strand Advisors, Inc., a Delaware corporation ("SAI-Delaware").

2.    The name of the parent corporation, which is a business corporation of the State of California, and which is to be the disappearing corporation under the merger herein certified, is Strand Advisors, Inc., a California corporation ("SAI-California").

3.    SAI-California owns 100% of the outstanding shares of SAI-Delaware. The sole shareholder of SAI-California has approved the merger of SAI-California into SAI-Delaware by Written Consent of the Sole Shareholder dated May 29, 1996.

4.    The following is a copy of the resolution to merge SAI-California into SAI-Delaware as adopted and approved by the Board of Directors of SAI-California (the "Company") and the Board of Directors of SAI-Delaware:

> **RESOLVED,** that the Company be merged with and into Strand Advisors, Inc., a Delaware corporation, pursuant to the plan of merger attached hereto as Exhibit A, which is hereby approved.
>
> **RESOLVED,** that the proposed plan of merger be submitted to the shareholders of the Company for their approval as required under the California Business Corporation Act and the Articles of Incorporation of the Company.
>
> **RESOLVED,** that the Company cause to be executed and filed all documents prescribed by the laws of the State of California and by the laws of any other appropriate jurisdiction and cause to be performed all

1

necessary acts within the State of California and within any other appropriate jurisdiction in connection with such merger.

**RESOLVED** that the officers of the Company are hereby authorized and directed, on behalf of the Company, to do and perform such acts and to execute and deliver such instruments and documents as may be necessary to carry out and comply with the terms and provisions of these resolutions.

On the date set forth below, in the City of Dallas, in the State of Texas, the undersigned does hereby declare under the penalty of perjury under the laws of the State of California that he signed the foregoing certificate in the official capacity set forth beneath his signature, and that the statements set forth in said certificate are true of his own knowledge.

Signed on May 29 , 1996.

James Dondero,
President and Secretary

10108.0001:0153618.01
012308



**State of California**

D528784

## SECRETARY OF STATE

### CORPORATION DIVISION

I, *BILL JONES*, Secretary of State of the State of California, hereby certify:

That the annexed transcript has been compared with the corporate record on file in this office, of which it purports to be a copy, and that same is full, true and correct.

*IN WITNESS WHEREOF,* I execute this certificate and affix the Great Seal of the State of California this

OCT 1 6 1996



Secretary of State

Sec/State Form CE-107 (rev 9/95)

012309

# EXHIBIT IIIII

**WRITTEN CONSENT OF SOLE STOCKHOLDER AND DIRECTOR**

**OF**

**STRAND ADVISORS, INC.**

**January 9, 2020**

---

Pursuant to the provisions of the General Corporation Law of the State of Delaware (the "DGCL") and consistent with the provisions of the Certificate of Incorporation (the "Certificate") and Bylaws (the "Bylaws") of Strand Advisors, Inc., a Delaware corporation (the "Company"), the undersigned, being the holder of all of the issued and outstanding shares of common stock, par value $0.01 per share, of the Company and the sole director of the Company (the "Stockholder"), acting by written consent without a meeting pursuant to Section 228 of the DGCL and Article IV, Section 6, and Article XII of the Bylaws, does hereby consent to the adoption of the following resolutions and to the taking of the actions contemplated thereby, in each case with the same force and effect as if presented to and adopted at a meeting of the stockholders:

**I.    AMENDMENT OF BYLAWS**

**WHEREAS**, it is acknowledged that the Board of Directors of the Company (the "Board") has heretofore been fixed at one (1) and that the Board currently consists of James Dondero;

**WHEREAS,** pursuant to Article XII of the Bylaws, the Stockholder wishes to amend the Bylaws in the manner set forth on **Appendix A** hereto (the "Bylaws Amendment") to increase the size of the Board from one (1) to three (3) directors, and to add certain provisions respecting director qualifications and the removal of directors; and

**NOW, THEREFORE, BE IT RESOLVED,** that the Bylaws Amendment is hereby authorized and approved, and the Board is increased from one (1) to three (3) directors;

**RESOLVED FURTHER,** that any officer of the Company is authorized to take any such actions as may be required to effectuate the Bylaws Amendment; and

**RESOLVED FURTHER,** that any action taken by any officer of the Company on or prior to the date hereof to effectuate such Bylaws Amendment is hereby authorized and affirmed.

**II.    ELECTION OF DIRECTORS**

**WHEREAS**, the Stockholder desires to appoint James Seery, John Dubel, and Russell Nelms to the Board and desires that such individuals constitute the whole Board;

**NOW, THEREFORE, BE IT RESOLVED,** that James Seery, John Dubel, and Russell Nelms, having consented to act as such, be, and each of them hereby is, appointed as a director, to serve as a director of the Company and to hold such office until such director's respective successor shall have been duly elected or appointed and shall qualify, or until such director's death, resignation or removal;

**RESOLVED FURTHER,** that any officer of the Company is authorized to take any such actions as

012311

may be required to effectuate the appointment of the foregoing directors, including executing an indemnification agreement in favor of such directors in substantially the form attached hereto as **Appendix B** (each, an "Indemnification Agreement");

**RESOLVED FURTHER,** that any action taken by any officer of the Company on or prior to the date hereof to effectuate the appointment of such directors, including the execution of an Indemnification Agreement, is hereby authorized and affirmed.

**RESOLVED FURTHER**, that James Dondero and any other directors of the Company are hereby removed as directors of the Company;

**RESOLVED FURTHER**, that the directors appointed pursuant to these resolutions shall, pursuant to the terms of the Bylaws, appoint a Chairman of the Board.

### III.    STIPULATION WITH THE BANKRUPTCY COURT

**WHEREAS**, on October 16, 2019, Highland Capital Management, L.P. ("HCMLP") filed for chapter 11 bankruptcy protection in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Bankruptcy Case");

**WHEREAS**, the Company is the general partner for HCMLP;

**WHEREAS**, the Bankruptcy Case was transferred to the Bankruptcy Court for the Northern District of Texas, Case No. 19-34054-sgj11 (the "Texas Court") by order of the Bankruptcy Court for the District of Delaware on December 4, 2019;

**WHEREAS**, the Company and the Stockholder wish to enter into a stipulation (the "Stipulation") with HCMLP and the Official Unsecured Creditors Committee appointed in the Bankruptcy Case (the "Committee"), such Stipulation to be approved by the Texas Court, whereby the Stockholder will agree (a) not to transfer or assign his shares in the Company or exercise the voting power of such shares to remove any member of the Board appointed pursuant to these resolutions or further change the authorized number of directors from three (3) directors; (b) to exercise the voting power of his shares so as to cause each member of the Board appointed by these resolutions to be re-elected upon the expiration of his or her term; (c) upon the death, disability, or resignation of a member of the Board, will exercise the voting power of such shares so as to cause the resulting vacancy to be filled by a successor that is both independent and (i) acceptable to the Stockholder and the Committee or (ii) selected by the remaining members of the Board; and (d) not take any action or exercise the voting power of such shares in any way that is inconsistent with the term sheet agreed to by HCMLP and the Committee and any order of the Texas Court approving such agreement and compromise between HCMLP and the Committee;

**WHEREAS,** for purposes of the Stipulation, "independent" would exclude the Stockholder, any affiliate of the Stockholder, and any member of management of the Company; and

**WHEREAS,** it is in the intent of the parties that the Stipulation will no longer be effective or bind the Company or the Stockholder following the termination of the Bankruptcy Case.

**NOW, THEREFORE, BE IT RESOLVED,** that the Company is authorized to take such actions as may be necessary to enter into and effectuate the Stipulation in the manner and on the terms set forth above, including, but not limited to, further amending the Certificate, Bylaws, or any other corporate governance documents; and

**RESOLVED FURTHER,** that Scott Ellington, as an officer of the Company, is authorized to take any such actions as may be required to enter into and effectuate the Stipulation in the manner set forth herein; and

**RESOLVED FURTHER,** that any action taken by Scott Ellington or any other officer of the Company on or prior to the date hereof to effectuate such Stipulation is hereby authorized and affirmed.

*[Signature pages follow.]*

012313

IN WITNESS WHEREOF, the undersigned has executed this Written Consent as of the respective date and year first appearing above.

STOCKHOLDER:

_____

James Dondero

*[Signature Page to Written Consent of Sole Stockholder of Strand Advisors, Inc.]*

DOCS_DE:227001.6 36027/002

012314

# EXHIBIT JJJJJ

012315



SHARES
1,000

NUMBER
01

Organized under the Laws of the State of Delaware

# STRAND ADVISORS, INC.

Common Stock

Authorized Shares 1,000 - Par Value $0.01 Per Share

**This Certifies that**    **James Dondero**

registered holder of    One Thousand (1,000)---------------- is the ----------- Shares

of the fully paid and non-assessable Common Stock of Strand Advisors, Inc.

transferable only on the books of the Corporation by the holder hereof in
person or by Attorney upon surrender of this Certificate properly endorsed.

In Witness Whereof, the said Corporation has caused this Certificate to be signed
by its duly authorized officers and its Corporate Seal to be hereunto affixed.

this   27th   day   of   May   A.D. 20 04

James Dondero, Secretary

James Dondero, President

012316

© GOES 1002
All Rights Reserved

# EXHIBIT KKKKK

<span style="color:red">TO BE TYPED ON CLIENT'S LETTERHEAD</span>

1/10/20

Aon

RE:  BROKER'S/AGENT'S LETTER OF AUTHORIZATION

To Whom It May Concern:

This is to advise that effective January 10, 2020, we have appointed Aon New York ("Aon") and the
Aon plc network of subsidiaries and correspondents as the exclusive Brokers/Agents of Record for
Strand Advisors, Inc. and its operations worldwide for Director and Officers Liability Insurance.

This appointment rescinds all previous appointments and the authorization contained herein shall
remain in full force and effect until cancelled in writing by us.

Aon is hereby authorized to negotiate directly with any interested company as respects changes in
existing and new insurance policies and in closing, changing, increasing, or canceling insurance carried
under temporary binders or covernotes. However, Aon shall not be responsible for any deficiencies in,
or any return premiums and/or commissions due on, or any taxes, fines, or penalties related to, any
insurance coverages not placed by Aon.

This letter also constitutes authorization to any underwriter to furnish Aon representatives with all
information pertaining to any and all insurance contracts, rates, rating schedules, surveys, reserves,
retention, or other data they may require as respects the Insurance. We request that you do not
communicate such information to anyone else.

It is hereby acknowledged and agreed that Aon has made no representation as to the availability of
insurance coverage, the reasonableness of the terms thereof or the financial solvency of any carrier.

This letter confirms that Stand Advisors Inc. agrees that Aon is authorized to use Stand Advisors' logo,
pictures and other publicly available information about Strand Advisors for communicating with
entities for the purpose of marketing Strand Advisors insurance needs under this Agreement.

Thank you for your courtesy and cooperation.
Sincerely yours,


[Click **here** and type client's (signatory's) name]
[Click **here** and type signatory's title]

012318

# EXHIBIT LLLLL

**STRAND ADVISORS, INC.**

January 9, 2020

Mr. James Seery

   Re:  Strand Advisors, Inc. – Director Agreement

Dear Mr. Seery:

On behalf of Strand Advisors, Inc. (the "Company"), I am pleased to have you join the Company's Board of Directors. This letter sets forth the terms of the Director Agreement (the "Agreement") that the Company is offering to you.

   **1.**  **APPOINTMENT TO THE BOARD OF DIRECTORS.**

     a.  Title, Term and Responsibilities.

       i.  Subject to terms set forth herein, the Company agrees to appoint you to serve as a Director on the Company's Board of Directors (the "Board"), and you hereby accept such appointment the date you sign this Agreement (the "Effective Date"). You will serve as a Director of the Board from the Effective Date until you voluntarily resign, are removed from the Board, or are not re-elected (the "Term"). Your rights, duties and obligations as a Director shall be governed by the Certificate of Incorporation and Bylaws of the Company, each as amended from time to time (collectively, the "Governing Documents"), except that where the Governing Documents conflict with this Agreement, this Agreement shall control.

       ii.  You acknowledge and understand that the Company is the general partner of Highland Capital Management, L.P. ("HCMLP") and that HCMLP is currently the debtor in possession in a chapter 11 bankruptcy proceeding (the "Bankruptcy") pending in the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court"). Your rights, duties, and obligations may in certain instances require your involvement, either directly or indirectly, in the Bankruptcy and such rights, duties, and obligations may be impacted in whole or in part by the Bankruptcy.

     b.  Mandatory Board Meeting Attendance. As a Director, you agree to apply all reasonable efforts to attend each regular meeting of the Board. You also agree to devote sufficient time to matters that may arise at the Company from time to time that require your attention as a Director.

     c.  Independent Contractor. Under this Agreement, your relationship with the Company will be that of an independent contractor as you will not be an employee of the Company nor eligible to participate in regular employee benefit and compensation plans of the Company.

     d.  Information Provided by the Company. The Company shall: (i) provide you with reasonable access to management and other representatives of the Company and HCMLP; and (ii) furnish all data, material, and other information concerning the business, assets, liabilities, operations, cash flows, properties, financial condition and prospects of the Company and HCMLP that you request in connection with the services to be provided to the Company. You will rely, without further independent verification, on the accuracy and completeness of all publicly available information and information that is furnished by or on behalf of the Company and otherwise reviewed by you in connection with the services performed for the Company. The Company acknowledges and agrees that you are not responsible for the

accuracy or completeness of such information and shall not be responsible for any inaccuracies or omissions therein, provided that if you become aware of material inaccuracies or errors in any such information you shall promptly notify the Board of such errors, inaccuracies or concerns.

**2.     COMPENSATION AND BENEFITS.**

a.     Retainer. The Company will pay you a retainer for each month you serve on the Board (the "Retainer") to be paid in monthly installments of (a) $60,000 for each of the first three months, (b) $50,000 for each of the next three months, and (c) $30,000 for each of the following six months. The parties will re-visit the Retainer after the sixth month. The Company's obligation to pay the Retainer will cease upon the termination of the Term.

b.     Expense Reimbursement. The Company will reimburse you for all reasonable travel or other expenses, including expenses of counsel, incurred by you in connection with your services hereunder, in accordance with the Company's expense reimbursement policy as in effect from time to time.

c.     Invoices; Payment.

i.     In order to receive the compensation and reimbursement set forth in this Section 2, you are required to send to the Company regular monthly invoices indicating your fees, costs, and expenses incurred. Payment of the Retainer will be due on the first business day of each month regardless of whether an invoice has been provided. Reimbursement of expenses will also occur on the first business day of each month, subject to the Company's receipt of appropriate documentation required by the Company's expenses reimbursement policy.

ii.     You further agree that the Company's obligation to pay the compensation and reimbursement set forth in this Section 2 is conditioned in all respects on the entry of a final order in the court overseeing the Bankruptcy that authorizes and requires HCMLP to reimburse the Company for all such payments to you.

d.     Indemnification; D&O Insurance. You will receive indemnification as a Director of the Company on the terms set forth in that certain Indemnification Agreement, dated January 9, 2020, a copy of which is attached hereto as **Appendix A** (the "Indemnification Agreement"). You will also be provided coverage under the Company's directors' and officers' insurance policy as set forth in the Indemnification Agreement.

e.     Tax Indemnification. You acknowledge that the Company will not be responsible for the payment of any federal or state taxes that might be assessed with respect to the Retainer and you agree to be responsible for all such taxes.

**3.     PROPRIETARY INFORMATION OBLIGATIONS.**

a.     Proprietary Information. You agree that during the Term and thereafter that you will take all steps reasonably necessary to hold all information of the Company, its affiliates, and related entities, which a reasonable person would believe to be confidential or proprietary information, in trust and confidence, and not disclose any such confidential or proprietary information to any third party without first obtaining the Company's express written consent on a case-by-case basis.

b.     Third Party Information. The Company has received and will in the future receive from third parties confidential or proprietary information ("Third Party Information") subject to a

012321

duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. You agree to hold such Third Party Information in confidence and not to disclose it to anyone (other than Company personnel who need to know such information in connection with their work for Company) or to use, except in connection with your services for Company under this Agreement, Third Party Information unless expressly authorized in writing by the Company.

      c.    <u>Return of Company Property</u>. Upon the end of the Term or upon the Company's earlier request, you agree to deliver to the Company any and all notes, materials and documents, together with any copies thereof, which contain or disclose any confidential or proprietary information or Third Party Information.

**4.    OUTSIDE ACTIVITIES.**

      a.    <u>Investments and Interests</u>. Except as permitted by Section 4(b), you agree not to participate in, directly or indirectly, any position or investment known by you to be materially adverse to the Company or any of its affiliates or related entities.

      b.    <u>Activities</u>. Except with the prior written consent of the Board, you will not during your tenure as a member of the Company's Board undertake or engage in any other directorship, employment or business enterprise in direct competition with the Company or any of its affiliates or related entities, other than ones in which you are a passive investor or other activities in which you were a participant prior to your appointment to the Board as disclosed to the Company.

      c.    <u>Other Agreements</u>. You agree that you will not disclose to the Company or use on behalf of the Company any confidential information governed by any agreement between you and any third party except in accordance with such agreement.

**5.    TERMINATION OF DIRECTORSHIP.**

      a.    <u>Voluntary Resignation, Removal Pursuant to Bylaws</u>. You may resign from the Board at any time with or without advance notice, with or without reason. Subject to any orders or agreements entered into in connection with the Bankruptcy, you may be removed from the Board at any time, for any reason, in any manner provided by the Governing Documents and applicable law.

      b.    <u>Continuation</u>. The provisions of this Agreement that give the parties rights or obligations beyond the termination of this Agreement will survive and continue to bind the parties.

      c.    <u>Payment of Fees; Reimbursement</u>. Following termination of this Agreement, any undisputed fees and expenses due to you will be remitted promptly following receipt by the Company of any outstanding invoices.

**6.    GENERAL PROVISIONS.**

      a.    <u>Severability</u>. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law. If any provision of this Agreement is held to be invalid, illegal or unenforceable such provision will be reformed, construed and enforced to render it valid, legal, and enforceable consistent with the intent of the parties insofar as possible.

      b.    <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between you and the Company with respect to your service as a Director and supersedes any prior agreement, promise,

012322

representation or statement written between you and the Company with regard to this subject matter. It is entered into without reliance on any promise, representation, statement or agreement other than those expressly contained or incorporated herein, and it cannot be modified or amended except in a writing signed by the party or parties affected by such modification or amendment.

        c.    <u>Successors and Assigns</u>. This Agreement is intended to bind and inure to the benefit of and be enforceable by you and the Company and our respective successors, assigns, heirs, executors and administrators, except that you may not assign any of your rights or duties hereunder.

        d.    <u>Governing Law</u>. This Agreement will be governed by the law of the State of Delaware as applied to contracts made and performed entirely within Delaware.

We are all delighted to be able to extend you this offer and look forward to working with you. To indicate your acceptance of the Company's offer, please sign and date this Agreement below.

Sincerely,

**STRAND ADVISORS, INC.**

By: Scott Ellington
Its: Secretary

*[Signature Page Follows]*

**ACCEPTED AND AGREED:**

JAMES SEERY
Date: ___1 - 9 - 20___

012324

## INDEMNIFICATION AND GUARANTY AGREEMENT

This Indemnification and Guaranty Agreement ("**Agreement**"), dated as of January 9, 2020, is by and between STRAND ADVISORS, INC., a Delaware corporation (the "**Company**"), HIGHLAND CAPITAL MANAGEMENT, L.P., a Delaware partnership (the "**Debtor**") (solely as to Section 29 hereunder), and James Seery (the "**Indemnitee**").

WHEREAS, the Company is the general partner of the Debtor and, in such capacity, manages the business affairs of the Debtor;

WHEREAS, Indemnitee has agreed to serve as a member of the Company's board of directors (the "**Board**") effective as of the date hereof;

WHEREAS, the Board has determined that enhancing the ability of the Company, on its own behalf and for the benefit of the Debtor, to retain and attract as directors the most capable Persons is in the best interests of the Company and the Debtor and that the Company and the Debtor therefore should seek to assure such Persons that indemnification and insurance coverage is available; and

WHEREAS, in recognition of the need to provide Indemnitee with protection against personal liability, in order to procure Indemnitee's service as a director of the Company, in order to enhance Indemnitee's ability to serve the Company in an effective manner and in order to provide such protection pursuant to express contract rights (intended to be enforceable irrespective of, among other things, any amendment to the Company's Bylaws (as may be amended further from time to time, the "**Bylaws**"), any change in the composition of the Board or any change in control, business combination or similar transaction relating to the Company), the Company wishes to provide in this Agreement for the indemnification of, and the advancement of Expenses (as defined in Section 1(g) below) to, Indemnitee as set forth in this Agreement and for the coverage of Indemnitee under the Company's directors' and officers' liability or similar insurance policies ("**D&O Insurance**").

NOW, THEREFORE, in consideration of the foregoing and the Indemnitee's agreement to provide services to the Company, the parties (including the Debtor solely as to Section 29 hereunder) agree as follows:

1.      Definitions. For purposes of this Agreement, the following terms shall have the following meanings:

(a)      "**Change in Control**" means the occurrence of any of the following: (i) the direct or indirect sale, lease, transfer, conveyance or other disposition, in one or a series of related transactions (including any merger or consolidation or whether by operation of law or otherwise), of all or substantially all of the properties or assets of the Company and its subsidiaries, to a third party purchaser (or group of affiliated third party purchasers) or (ii) the consummation of any transaction (including any merger or consolidation or whether by operation of law or otherwise), the result of which is that a third party purchaser (or group of affiliated third party purchasers) becomes the beneficial

owner, directly or indirectly, of more than fifty percent (50%) of the then outstanding Shares or of the surviving entity of any such merger or consolidation.

    (b)    "**Claim**" means:

        (i)    any threatened, pending or completed action, suit, claim, demand, arbitration, inquiry, hearing, proceeding or alternative dispute resolution mechanism, or any actual, threatened or completed proceeding, including any and all appeals, in each case, whether brought by or in the right of the Company or otherwise, whether civil, criminal, administrative, arbitrative, investigative or other, whether formal or informal, and whether made pursuant to federal, state, local, foreign or other law, and whether or not commenced prior to the date of this Agreement, in which Indemnitee was, is or will be involved as a party or otherwise, by reason of or relating to either (a) any action or alleged action taken by Indemnitee (or failure or alleged failure to act) or of any action or alleged action (or failure or alleged failure to act) on Indemnitee's part, while acting in his or her Corporate Status or (b) the fact that Indemnitee is or was serving at the request of the Company or any subsidiary of the Company as director, officer, employee, partner, member, manager, trustee, fiduciary or agent of another Enterprise, in each case, whether or not serving in such capacity at the time any Loss or Expense is paid or incurred for which indemnification or advancement of Expenses can be provided under this Agreement, except one initiated by Indemnitee to enforce his or her rights under this Agreement; or

        (ii)    any inquiry, hearing or investigation that the Indemnitee determines might lead to the institution of any such action, suit, proceeding or alternative dispute resolution mechanism.

    (c)    "**Controlled Entity**" means any corporation, limited liability company, partnership, joint venture, trust or other Enterprise, whether or not for profit, that is, directly or indirectly, controlled by the Company. For purposes of this definition, the term "control" means the possession, directly or indirectly, of the power to direct, or cause the direction of, the management or policies of an Enterprise, whether through the ownership of voting securities, through other voting rights, by contract or otherwise.

    (d)    "**Corporate Status**" means the status of a Person who is or was a director, officer, employee, partner, member, manager, trustee, fiduciary or agent of the Company or of any other Enterprise which such Person is or was serving at the request of the Company or any subsidiary of the Company. In addition to any service at the actual request of the Company, Indemnitee will be deemed, for purposes of this Agreement, to be serving or to have served at the request of the Company or any subsidiary of the Company as a director, officer, employee, partner, member, manager, trustee, fiduciary or agent of another Enterprise if Indemnitee is or was serving as a director, officer, employee, partner, member, manager, fiduciary, trustee or agent of such Enterprise and (i) such Enterprise is or at the time of such service was a Controlled Entity, (ii) such Enterprise is or at the time of such service was an employee benefit plan (or related trust) sponsored or maintained by the Company or a Controlled Entity or (iii) the Company or a

012326

Controlled Entity, directly or indirectly, caused Indemnitee to be nominated, elected, appointed, designated, employed, engaged or selected to serve in such capacity.

(e) "**Disinterested Director**" means a director of the Company who is not and was not a party to the Claim in respect of which indemnification is sought by Indemnitee. Under no circumstances will James Dondero be considered a Disinterested Director.

(f) "**Enterprise**" means the Company or any subsidiary of the Company or any other corporation, partnership, limited liability company, joint venture, employee benefit plan, trust or other entity or other enterprise of which Indemnitee is or was serving at the request of the Company or any subsidiary of the Company in a Corporate Status.

(g) "**Expenses**" means any and all expenses, fees, including attorneys', witnesses' and experts' fees, disbursements and retainers, court costs, transcript costs, travel expenses, duplicating, printing and binding costs, telephone charges, postage, fax transmission charges, secretarial services, delivery services fees, and all other fees, costs, disbursements and expenses paid or incurred in connection with investigating, defending, prosecuting, being a witness in or participating in (including on appeal), or preparing to defend, prosecute, be a witness or participate in, any Claim. Expenses also shall include (i) Expenses paid or incurred in connection with any appeal resulting from any Claim, including, without limitation, the premium, security for, and other costs relating to any cost bond, supersedeas bond, or other appeal bond or its equivalent, and (ii) for purposes of Section 4 only, Expenses incurred by Indemnitee in connection with the interpretation, enforcement or defense of Indemnitee's rights under this Agreement, by litigation or otherwise. Expenses, however, shall not include amounts paid in settlement by Indemnitee or the amount of judgments or fines against Indemnitee.

(h) "**Exchange Act**" means the Securities Exchange Act of 1934, as amended, or any successor statute thereto, and the rules and regulations of the United States Securities and Exchange Commission promulgated thereunder.

(i) "**Expense Advance**" means any payment of Expenses advanced to Indemnitee by the Company pursuant to Section 4 or Section 5 hereof.

(j) "**Indemnifiable Event**" means any event or occurrence, whether occurring before, on or after the date of this Agreement, related to the fact that Indemnitee is or was a manager, director, officer, employee or agent of the Company or any subsidiary of the Company, or is or was serving at the request of the Company or any subsidiary of the Company as a manager, director, officer, employee, member, manager, trustee or agent of any other Enterprise or by reason of an action or inaction by Indemnitee in any such capacity (whether or not serving in such capacity at the time any Loss is incurred for which indemnification can be provided under this Agreement).

(k) "**Independent Counsel**" means a law firm, or a member of a law firm, that is experienced in matters of corporation law and neither presently performs, nor in the past three (3) years has performed, services for any of: (i) James Dondero, (ii) the

012327

Company or Indemnitee (other than in connection with matters concerning Indemnitee under this Agreement or of other indemnitees under similar agreements), or (iii) any other party to the Claim giving rise to a claim for indemnification hereunder. Notwithstanding the foregoing, the term "Independent Counsel" shall not include any Person who, under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Company or Indemnitee in an action to determine Indemnitee's rights under this Agreement.

(l) **"Losses"** means any and all Expenses, damages, losses, liabilities, judgments, fines (including excise taxes and penalties assessed with respect to employee benefit plans and ERISA excise taxes), penalties (whether civil, criminal or other), amounts paid or payable in settlement, including any interest, assessments, any federal, state, local or foreign taxes imposed as a result of the actual or deemed receipt of any payments under this Agreement and all other charges paid or payable in connection with investigating, defending, being a witness in or participating in (including on appeal), or preparing to defend, be a witness or participate in, any Claim.

(m) **"Person"** means any individual, corporation, firm, partnership, joint venture, limited liability company, estate, trust, business association, organization, governmental entity or other entity and includes the meaning set forth in Sections 13(d) and 14(d) of the Exchange Act.

(n) **"Shares"** means an ownership interest of a member in the Company, including each of the common shares of the Company or any other class or series of Shares designated by the Board.

(o) References to "**serving at the request of the Company**" include any service as a director, manager, officer, employee, representative or agent of the Company which imposes duties on, or involves services by, such director, manager, officer, employee or agent, including but not limited to any employee benefit plan, its participants or beneficiaries; and a Person who acted in good faith and in a manner he or she reasonably believed to be in and not opposed to the best interests of the Company in Indemnitee's capacity as a director, manager, officer, employee, representative or agent of the Company, including but not limited to acting in the best interest of participants and beneficiaries of an employee benefit plan will be deemed to have acted in a manner "**not opposed to the best interests of the Company**" as referred to under applicable law or in this Agreement.

2. Indemnification.

(a) Subject to Section 9 and Section 10 of this Agreement, the Company shall indemnify and hold Indemnitee harmless, to the fullest extent permitted by the laws of the State of Delaware in effect on the date hereof, or as such laws may from time to time hereafter be amended to increase the scope of such permitted indemnification, against any and all Losses and Expenses if Indemnitee was or is or becomes a party to or participant in, or is threatened to be made a party to or participant in, any Claim by reason of or arising in part out of an Indemnifiable Event, including, without limitation, Claims

012328

brought by or in the right of the Company, Claims brought by third parties, and Claims in which the Indemnitee is solely a witness.

(b)     For the avoidance of doubt, the indemnification rights and obligations contained herein shall also extend to any Claim in which the Indemnitee was or is a party to, was or is threatened to be made a party to or was or is otherwise involved in any capacity in by reason of Indemnitee's Corporate Status as a fiduciary capacity with respect to an employee benefit plan. In connection therewith, if the Indemnitee has acted in good faith and in a manner which appeared to be consistent with the best interests of the participants and beneficiaries of an employee benefit plan and not opposed thereto, the Indemnitee shall be deemed to have acted in a manner not opposed to the best interests of the Company.

3.     <u>Contribution</u>.

(a)     Whether or not the indemnification provided in <u>Section 2</u> is available, if, for any reason, Indemnitee shall elect or be required to pay all or any portion of any judgment or settlement in any Claim in which the Company is jointly liable with Indemnitee (or would be if joined in such Claim), the Company shall contribute to the amount of Losses paid or payable by Indemnitee in proportion to the relative benefits received by the Company and all officers, directors, managers or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such Claim), on the one hand, and Indemnitee, on the other hand, from the transaction or events from which such Claim arose; provided, however, that the proportion determined on the basis of relative benefit may, to the extent necessary to conform to law, be further adjusted by reference to the relative fault of the Company and all officers, directors, managers or employees of the Company other than Indemnitee who are jointly liable with Indemnitee (or would be if joined in such Claim), on the one hand, and Indemnitee, on the other hand, in connection with the transaction or events that resulted in such Losses, as well as any other equitable considerations which applicable law may require to be considered. The relative fault of the Company and all officers, directors, managers or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such Claim), on the one hand, and Indemnitee, on the other hand, shall be determined by reference to, among other things, the degree to which their actions were motivated by intent to gain personal profit or advantage, the degree to which their liability is primary or secondary and the degree to which their conduct is active or passive.

(b)     The Company hereby agrees to fully indemnify and hold Indemnitee harmless from any claims of contribution which may be brought by officers, directors, managers or employees of the Company, other than Indemnitee, who may be jointly liable with Indemnitee.

(c)     To the fullest extent permissible under applicable law, if the indemnification provided for in this Agreement is unavailable to Indemnitee for any reason whatsoever, the Company, in lieu of indemnifying Indemnitee, shall contribute to the amount incurred by Indemnitee, whether for judgments, fines, penalties, excise taxes,

012329

amounts paid or to be paid in settlement and/or for Expenses, in connection with any Claim relating to an Indemnifiable Event under this Agreement, in such proportion as is deemed fair and reasonable in light of all of the circumstances of such Claim in order to reflect (i) the relative benefits received by the Company and Indemnitee as a result of the event(s) and/or transaction(s) giving cause to such Claim; and/or (ii) the relative fault of the Company (and its directors, managers, officers, employees and agents) and Indemnitee in connection with such event(s) and/or transaction(s).

4.       Advancement of Expenses. The Company shall, if requested by Indemnitee, advance, to the fullest extent permitted by law, to Indemnitee (an "**Expense Advance**") any and all Expenses actually and reasonably paid or incurred (even if unpaid) by Indemnitee in connection with any Claim arising out of an Indemnifiable Event (whether prior to or after its final disposition). Indemnitee's right to such advancement is not subject to the satisfaction of any standard of conduct. Without limiting the generality or effect of the foregoing, within thirty (30) business days after any request by Indemnitee, the Company shall, in accordance with such request, (a) pay such Expenses on behalf of Indemnitee, (b) advance to Indemnitee funds in an amount sufficient to pay such Expenses, or (c) reimburse Indemnitee for such Expenses. In connection with any request for Expense Advances, Indemnitee shall not be required to provide any documentation or information to the extent that the provision thereof would undermine or otherwise jeopardize attorney-client privilege. Execution and delivery to the Company of this Agreement by Indemnitee constitutes an undertaking by the Indemnitee to repay any amounts paid, advanced or reimbursed by the Company pursuant to this Section 4, the final sentence of Section 9(b), or Section 11(b) in respect of Expenses relating to, arising out of or resulting from any Claim in respect of which it shall be determined, pursuant to Section 9, following the final disposition of such Claim, that Indemnitee is not entitled to indemnification hereunder. No other form of undertaking shall be required other than the execution of this Agreement. Each Expense Advance will be unsecured and interest free and will be made by the Company without regard to Indemnitee's ability to repay the Expense Advance.

5.       Indemnification for Expenses in Enforcing Rights. To the fullest extent allowable under applicable law, the Company shall also indemnify against, and, if requested by Indemnitee, shall advance to Indemnitee subject to and in accordance with Section 4, any Expenses actually and reasonably paid or incurred (even if unpaid) by Indemnitee in connection with any action or proceeding by Indemnitee for (a) indemnification or reimbursement or advance payment of Expenses by the Company under any provision of this Agreement, or under any other agreement or provision of the Bylaws now or hereafter in effect relating to Claims relating to Indemnifiable Events, and/or (b) recovery under any D&O Insurance maintained by the Company, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification or insurance recovery, as the case may be. Indemnitee shall be required to reimburse the Company in the event that a final judicial determination is made that such action brought by Indemnitee was frivolous or not made in good faith.

6.       Partial Indemnity. If Indemnitee is entitled under any provision of this Agreement to indemnification by the Company for a portion of any Losses in respect of a Claim

012330

related to an Indemnifiable Event but not for the total amount thereof, the Company shall nevertheless indemnify Indemnitee for the portion thereof to which Indemnitee is entitled.

7.  Notification and Defense of Claims.

(a)  Notification of Claims. Indemnitee shall notify the Company in writing as soon as reasonably practicable of any Claim which could relate to an Indemnifiable Event or for which Indemnitee could seek Expense Advances, including a brief description (based upon information then available to Indemnitee) of the nature of, and the facts underlying, such Claim, to the extent then known. The failure by Indemnitee to timely notify the Company hereunder shall not relieve the Company from any liability hereunder except to the extent the Company's ability to participate in the defense of such claim was materially and adversely affected by such failure. If at the time of the receipt of such notice, the Company has D&O Insurance or any other insurance in effect under which coverage for Claims related to Indemnifiable Events is potentially available, the Company shall give prompt written notice to the applicable insurers in accordance with the procedures, provisions, and terms set forth in the applicable policies. The Company shall provide to Indemnitee a copy of such notice delivered to the applicable insurers, and copies of all subsequent correspondence between the Company and such insurers regarding the Claim, in each case substantially concurrently with the delivery or receipt thereof by the Company.

(b)  Defense of Claims. The Company shall be entitled to participate in the defense of any Claim relating to an Indemnifiable Event at its own expense and, except as otherwise provided below, to the extent the Company so wishes, it may assume the defense thereof with counsel reasonably satisfactory to Indemnitee. After notice from the Company to Indemnitee of its election to assume the defense of any such Claim, the Company shall not be liable to Indemnitee under this Agreement or otherwise for any Expenses subsequently directly incurred by Indemnitee in connection with Indemnitee's defense of such Claim other than reasonable costs of investigation or as otherwise provided below. Indemnitee shall have the right to employ its own legal counsel in such Claim, but all Expenses related to such counsel incurred after notice from the Company of its assumption of the defense shall be at Indemnitee's own expense; provided, however, that if (i) Indemnitee's employment of its own legal counsel has been authorized by the Company, (ii) Indemnitee has reasonably determined that there may be a conflict of interest between Indemnitee and the Company in the defense of such Claim, (iii) after a Change in Control, Indemnitee's employment of its own counsel has been approved by the Independent Counsel or (iv) the Company shall not in fact have employed counsel to assume the defense of such Claim, then Indemnitee shall be entitled to retain its own separate counsel (but not more than one law firm plus, if applicable, local counsel in respect of any such Claim) and all Expenses related to such separate counsel shall be borne by the Company.

8.  Procedure upon Application for Indemnification. In order to obtain indemnification pursuant to this Agreement, Indemnitee shall submit to the Company a written request therefor, including in such request such documentation and information as

012331

is reasonably available to Indemnitee and is reasonably necessary to determine whether and to what extent Indemnitee is entitled to indemnification following the final disposition of the Claim, provided that documentation and information need not be so provided to the extent that the provision thereof would undermine or otherwise jeopardize attorney-client privilege. Indemnification shall be made insofar as the Company determines Indemnitee is entitled to indemnification in accordance with <u>Section 9</u> below.

9.      <u>Determination of Right to Indemnification</u>.

     (a)      <u>Mandatory Indemnification; Indemnification as a Witness</u>.

        (i)      To the extent that Indemnitee shall have been successful on the merits or otherwise in defense of any Claim relating to an Indemnifiable Event or any portion thereof or in defense of any issue or matter therein, including without limitation dismissal without prejudice, Indemnitee shall be indemnified against all Losses relating to such Claim in accordance with <u>Section 2</u>, and no Standard of Conduct Determination (as defined in <u>Section 9(b)</u>) shall be required.

        (ii)      To the extent that Indemnitee's involvement in a Claim relating to an Indemnifiable Event is to prepare to serve and serve as a witness, and not as a party, the Indemnitee shall be indemnified against all Losses incurred in connection therewith to the fullest extent allowable by law and no Standard of Conduct Determination (as defined in <u>Section 9(b)</u>) shall be required.

     (b)      <u>Standard of Conduct</u>. To the extent that the provisions of <u>Section 9(a)</u> are inapplicable to a Claim related to an Indemnifiable Event that shall have been finally disposed of, any determination of whether Indemnitee has satisfied any applicable standard of conduct under Delaware law that is a legally required condition to indemnification of Indemnitee hereunder against Losses relating to such Claim and any determination that Expense Advances must be repaid to the Company (a "**Standard of Conduct Determination**") shall be made as follows:

        (i)      if no Change in Control has occurred, (A) by a majority vote of the Disinterested Directors, even if less than a quorum of the Board, (B) by a committee of Disinterested Directors designated by a majority vote of the Disinterested Directors, even though less than a quorum or (C) if there are no such Disinterested Directors, by Independent Counsel in a written opinion addressed to the Board, a copy of which shall be delivered to Indemnitee; and

        (ii)      if a Change in Control shall have occurred, (A) if the Indemnitee so requests in writing, by a majority vote of the Disinterested Directors, even if less than a quorum of the Board or (B) otherwise, by Independent Counsel in a written opinion addressed to the Board, a copy of which shall be delivered to Indemnitee.

Subject to Section 4, the Company shall indemnify and hold Indemnitee harmless against and, if requested by Indemnitee, shall reimburse Indemnitee for, or advance to Indemnitee, within thirty (30) business days of such request, any and all Expenses

012332

incurred by Indemnitee in cooperating with the Person or Persons making such Standard of Conduct Determination.

(c) <u>Making the Standard of Conduct Determination</u>. The Company shall use its reasonable best efforts to cause any Standard of Conduct Determination required under <u>Section 9(b)</u> to be made as promptly as practicable. If the Person or Persons designated to make the Standard of Conduct Determination under <u>Section 9(b)</u> shall not have made a determination within ninety (90) days after the later of (A) receipt by the Company of a written request from Indemnitee for indemnification pursuant to <u>Section 8</u> (the date of such receipt being the "**Notification Date**") and (B) the selection of an Independent Counsel, if such determination is to be made by Independent Counsel, then Indemnitee shall be deemed to have satisfied the applicable standard of conduct; provided that such 90-day period may be extended for a reasonable time, not to exceed an additional thirty (30) days, if the Person or Persons making such determination in good faith requires such additional time to obtain or evaluate information relating thereto. Notwithstanding anything in this Agreement to the contrary, no determination as to entitlement of Indemnitee to indemnification under this Agreement shall be required to be made prior to the final disposition of any Claim.

(d) <u>Payment of Indemnification</u>. If, in regard to any Losses:

(i) Indemnitee shall be entitled to indemnification pursuant to <u>Section 9(a)</u>;

(ii) no Standard of Conduct Determination is legally required as a condition to indemnification of Indemnitee hereunder; or

(iii) Indemnitee has been determined or deemed pursuant to <u>Section 9(b)</u> or <u>Section 9(c)</u> to have satisfied the Standard of Conduct Determination,

then the Company shall pay to Indemnitee, within thirty (30) business days after the later of (A) the Notification Date or (B) the earliest date on which the applicable criterion specified in clause (i), (ii) or (iii) is satisfied, an amount equal to such Losses.

(e) <u>Selection of Independent Counsel for Standard of Conduct Determination</u>. If a Standard of Conduct Determination is to be made by Independent Counsel pursuant to <u>Section 9(b)(i)</u>, the Independent Counsel shall be selected by the Board and the Company shall give written notice to Indemnitee advising him of the identity of the Independent Counsel so selected. If a Standard of Conduct Determination is to be made by Independent Counsel pursuant to <u>Section 9(b)(ii)</u>, the Independent Counsel shall be selected by Indemnitee, and Indemnitee shall give written notice to the Company advising it of the identity of the Independent Counsel so selected. In either case, Indemnitee or the Company, as applicable, may, within thirty (3) business days after receiving written notice of selection from the other, deliver to the other a written objection to such selection; provided, however, that such objection may be asserted only on the ground that the Independent Counsel so selected does not satisfy the criteria set forth in the definition of "Independent Counsel" in <u>Section 1(k)</u>, and the objection shall

012333

set forth with particularity the factual basis of such assertion. Absent a proper and timely objection, the Person or firm so selected shall act as Independent Counsel. If such written objection is properly and timely made and substantiated, (i) the Independent Counsel so selected may not serve as Independent Counsel unless and until such objection is withdrawn or a court has determined that such objection is without merit; and (ii) the non-objecting party may, at its option, select an alternative Independent Counsel and give written notice to the other party advising such other party of the identity of the alternative Independent Counsel so selected, in which case the provisions of the two immediately preceding sentences, the introductory clause of this sentence and numbered clause (i) of this sentence shall apply to such subsequent selection and notice. If applicable, the provisions of clause (ii) of the immediately preceding sentence shall apply to successive alternative selections. If no Independent Counsel that is permitted under the foregoing provisions of this Section 9(e) to make the Standard of Conduct Determination shall have been selected within twenty (20) days after the Company gives its initial notice pursuant to the first sentence of this Section 9(e) or Indemnitee gives its initial notice pursuant to the second sentence of this Section 9(e), as the case may be, either the Company or Indemnitee may petition the Court of Chancery of the State of Delaware ("**Delaware Court**") to resolve any objection which shall have been made by the Company or Indemnitee to the other's selection of Independent Counsel and/or to appoint as Independent Counsel a Person to be selected by the Court or such other Person as the Court shall designate, and the Person or firm with respect to whom all objections are so resolved or the Person or firm so appointed will act as Independent Counsel. In all events, the Company shall pay all of the reasonable fees and expenses of the Independent Counsel incurred in connection with the Independent Counsel's determination pursuant to Section 9(b).

      (f)    <u>Presumptions and Defenses</u>.

      (i)    <u>Indemnitee's Entitlement to Indemnification</u>. In making any Standard of Conduct Determination, the Person or Persons making such determination shall presume that Indemnitee has satisfied the applicable standard of conduct and is entitled to indemnification, and the Company shall have the burden of proof to overcome that presumption and establish that Indemnitee is not so entitled. Any Standard of Conduct Determination that is adverse to Indemnitee may be challenged by the Indemnitee in the Delaware Court. No determination by the Company (including by its Board or any Independent Counsel) that Indemnitee has not satisfied any applicable standard of conduct may be used as a defense to enforcement by Indemnitee of Indemnitee's rights of indemnification or reimbursement or advance of payment of Expenses by the Company hereunder or create a presumption that Indemnitee has not met any applicable standard of conduct.

      (ii)    <u>Reliance as a Safe Harbor</u>. For purposes of this Agreement, and without creating any presumption as to a lack of good faith if the following circumstances do not exist, Indemnitee shall be deemed to have acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Company if Indemnitee's actions or omissions to act are taken in good faith reliance upon the records of the Company, including its financial statements, or upon information, opinions, reports

012334

or statements furnished to Indemnitee by the officers or employees of the Company or any of its subsidiaries in the course of their duties, or by committees of the Board or by any other Person (including legal counsel, accountants and financial advisors) as to matters Indemnitee reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company. In addition, the knowledge and/or actions, or failures to act, of any director, manager, officer, agent or employee of the Company (other than Indemnitee) shall not be imputed to Indemnitee for purposes of determining the right to indemnity hereunder.

(iii)    <u>Defense to Indemnification and Burden of Proof</u>. It shall be a defense to any action brought by Indemnitee against the Company to enforce this Agreement (other than an action brought to enforce a claim for Losses incurred in defending against a Claim related to an Indemnifiable Event in advance of its final disposition) that it is not permissible under applicable law for the Company to indemnify Indemnitee for the amount claimed. In connection with any such action or any related Standard of Conduct Determination, the burden of proving such a defense or that the Indemnitee did not satisfy the applicable standard of conduct shall be on the Company.

10.    <u>Exclusions from Indemnification</u>. Notwithstanding anything in this Agreement to the contrary, the Company shall not be obligated to:

(a)    indemnify or advance funds to Indemnitee for Losses with respect to proceedings initiated by Indemnitee, including any proceedings against the Company or its managers, officers, employees or other indemnitees and not by way of defense, except:

(i)    proceedings referenced in <u>Section 4</u> above (unless a court of competent jurisdiction determines that each of the material assertions made by Indemnitee in such proceeding was not made in good faith or was frivolous); or

(ii)    where the Company has joined in or the Board has consented to the initiation of such proceedings.

(b)    indemnify Indemnitee if a final decision by a court of competent jurisdiction determines that such indemnification is prohibited by applicable law.

(c)    indemnify Indemnitee for the disgorgement of profits arising from the purchase or sale by Indemnitee of securities of the Company in violation of Section 16(b) of the Exchange Act, or any similar successor statute.

11.    <u>Remedies of Indemnitee</u>.

(a)    In the event that (i) a determination is made pursuant to <u>Section 9</u> that Indemnitee is not entitled to indemnification under this Agreement, (ii) an Expense Advance is not timely made pursuant to <u>Section 4</u>, (iii) no determination of entitlement to indemnification is made pursuant to <u>Section 9</u> within 90 days after receipt by the Company of the request for indemnification, or (iv) payment of indemnification is not made pursuant <u>Section 9(d)</u>, Indemnitee shall be entitled to an adjudication in a Delaware Court, or in any other court of competent jurisdiction, of Indemnitee's entitlement to such

11

012335

indemnification. Indemnitee shall commence such proceeding seeking an adjudication within 180 days following the date on which Indemnitee first has the right to commence such proceeding pursuant to this Section 11(a). The Company shall not oppose Indemnitee's right to seek any such adjudication.

(b)     In the event that Indemnitee, pursuant to this Section 11, seeks a judicial adjudication or arbitration of his or her rights under, or to recover damages for breach of, this Agreement, any other agreement for indemnification, payment of Expenses in advance or contribution hereunder or to recover under any director, manager, and officer liability insurance policies or any other insurance policies maintained by the Company, the Company will, to the fullest extent permitted by law and subject to Section 4, indemnify and hold harmless Indemnitee against any and all Expenses which are paid or incurred by Indemnitee in connection with such judicial adjudication or arbitration, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification, payment of Expenses in advance or contribution or insurance recovery. In addition, if requested by Indemnitee, subject to Section 4 the Company will (within thirty (30) days after receipt by the Company of the written request therefor), pay as an Expense Advance such Expenses, to the fullest extent permitted by law.

(c)     In the event that a determination shall have been made pursuant to Section 9 that Indemnitee is not entitled to indemnification, any judicial proceeding commenced pursuant to this Section 11 shall be conducted in all respects as a de novo trial on the merits, and Indemnitee shall not be prejudiced by reason of the adverse determination under Section 9.

(d)     If a determination shall have been made pursuant to Section 9 that Indemnitee is entitled to indemnification, the Company shall be bound by such determination in any judicial proceeding commenced pursuant to this Section 11, absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's misstatement not materially misleading in connection with the application for indemnification, or (ii) a prohibition of such indemnification under applicable law.

12.     Settlement of Claims. The Company shall not be liable to Indemnitee under this Agreement for any amounts paid in settlement of any threatened or pending Claim related to an Indemnifiable Event effected without the Company's prior written consent, which shall not be unreasonably withheld; provided, however, that if a Change in Control has occurred, the Company shall be liable for indemnification of the Indemnitee for amounts paid in settlement if an Independent Counsel (which, for purposes of this Section 12, shall be selected by the Company with the prior consent of the Indemnitee, such consent not to be unreasonably withheld or delayed) has approved the settlement. The Company shall not settle any Claim related to an Indemnifiable Event in any manner that would impose any Losses on the Indemnitee without the Indemnitee's prior written consent.

13.     Duration. All agreements and obligations of the Company contained herein shall continue during the period that Indemnitee is a manager of the Company (or is serving at the request of the Company as a director, manager, officer, employee, member, trustee or

012336

agent of another Enterprise) and shall continue thereafter (i) so long as Indemnitee may be subject to any possible Claim relating to an Indemnifiable Event (including any rights of appeal thereto) and (ii) throughout the pendency of any proceeding (including any rights of appeal thereto) commenced by Indemnitee to enforce or interpret his or her rights under this Agreement, even if, in either case, he or she may have ceased to serve in such capacity at the time of any such Claim or proceeding.

14.    <u>Other Indemnitors</u>. The Company hereby acknowledges that Indemnitee may have certain rights to indemnification, advancement of Expenses and/or insurance provided by certain private equity funds, hedge funds or other investment vehicles or management companies and/or certain of their affiliates and by personal policies (collectively, the "**Other Indemnitors**"). The Company hereby agrees (i) that it is the indemnitor of first resort (i.e., its obligations to Indemnitee are primary and any obligation of the Other Indemnitors to advance Expenses or to provide indemnification for the same Expenses or liabilities incurred by Indemnitee are secondary), (ii) that it shall be required to advance the full amount of Expenses incurred by Indemnitee and shall be liable for the full amount of all Expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by the terms of this Agreement and the Bylaws (or any other agreement between the Company and Indemnitee), without regard to any rights Indemnitee may have against the Other Indemnitors, and, (iii) that it irrevocably waives, relinquishes and releases the Other Indemnitors from any and all claims against the Other Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The Company further agrees that no advancement or payment by the Other Indemnitors on behalf of Indemnitee with respect to any claim for which Indemnitee has sought indemnification from the Company shall affect the foregoing and the Other Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of Indemnitee against the Company. The Company and Indemnitee agree that the Other Indemnitors are express third party beneficiaries of the terms of this <u>Section 14</u>.

15.    <u>Non-Exclusivity</u>. The rights of Indemnitee hereunder will be in addition to any other rights Indemnitee may have under the Bylaws, the General Corporation Law of the State of Delaware (as may be amended from time to time, the "**DGCL**"), any other contract, in law or in equity, and under the laws of any state, territory, or jurisdiction, or otherwise (collectively, "**Other Indemnity Provisions**"). The Company will not adopt any amendment to its Bylaws the effect of which would be to deny, diminish, encumber or limit Indemnitee's right to indemnification under this Agreement or any Other Indemnity Provision.

16.    <u>Liability Insurance</u>. For the duration of Indemnitee's service as a director of the Company, and thereafter for so long as Indemnitee shall be subject to any pending Claim relating to an Indemnifiable Event, the Company shall use best efforts to continue to maintain in effect policies of D&O Insurance providing coverage that is at least substantially comparable in scope and amount to that provided by similarly situated companies. In all policies of D&O Insurance maintained by the Company, Indemnitee shall be named as an insured in such a manner as to provide Indemnitee the same rights

13

012337

and benefits as are provided to the most favorably insured of the Company's directors. Upon request, the Company will provide to Indemnitee copies of all D&O Insurance applications, binders, policies, declarations, endorsements and other related materials.

17.   <u>No Duplication of Payments</u>. The Company shall not be liable under this Agreement to make any payment to Indemnitee in respect of any Losses to the extent Indemnitee has otherwise received payment under any insurance policy, any Other Indemnity Provisions or otherwise of the amounts otherwise indemnifiable by the Company hereunder.

18.   <u>Subrogation</u>. In the event of payment to Indemnitee under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee. Indemnitee shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents necessary to enable the Company effectively to bring suit to enforce such rights.

19.   <u>Indemnitee Consent.</u> The Company will not, without the prior written consent of Indemnitee, consent to the entry of any judgment against Indemnitee or enter into any settlement or compromise which (a) includes an admission of fault of Indemnitee, any non-monetary remedy imposed on Indemnitee or a Loss for which Indemnitee is not wholly indemnified hereunder or (b) with respect to any Claim with respect to which Indemnitee may be or is made a party or a participant or may be or is otherwise entitled to seek indemnification hereunder, does not include, as an unconditional term thereof, the full release of Indemnitee from all liability in respect of such Claim, which release will be in form and substance reasonably satisfactory to Indemnitee. Neither the Company nor Indemnitee will unreasonably withhold its consent to any proposed settlement; provided, however, Indemnitee may withhold consent to any settlement that does not provide a full and unconditional release of Indemnitee from all liability in respect of such Claim.

20.   <u>Amendments</u>. No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by both of the parties hereto. No waiver of any of the provisions of this Agreement shall be binding unless in the form of a writing signed by the party against whom enforcement of the waiver is sought, and no such waiver shall operate as a waiver of any other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver. Except as specifically provided herein, no failure to exercise or any delay in exercising any right or remedy hereunder shall constitute a waiver thereof.

21.   <u>Binding Effect</u>. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors (including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business and/or assets of the Company), assigns, spouses, heirs and personal and legal representatives. The Company shall require and cause any successor (whether direct or indirect by purchase, merger, consolidation or otherwise) to all, substantially all or a substantial part of the business and/or assets of the Company, by written agreement in form and substance satisfactory to Indemnitee, expressly to assume

012338

and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place.

22.     Severability. Each provision of this Agreement shall be considered severable and if for any reason any provision which is not essential to the effectuation of the basic purposes of this Agreement is determined by a court of competent jurisdiction to be invalid, unenforceable or contrary to the DGCL or existing or future applicable law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those provisions of this Agreement which are valid, enforceable and legal. In that case, this Agreement shall be construed so as to limit any term or provision so as to make it valid, enforceable and legal within the requirements of any applicable law, and in the event such term or provision cannot be so limited, this Agreement shall be construed to omit such invalid, unenforceable or illegal provisions.

23.     Notices. All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered by hand, against receipt, or mailed, by postage prepaid, certified or registered mail:

  (a)     if to Indemnitee, to the address set forth on the signature page hereto.

  (b)     if to the Company, to:

            Strand Advisors, Inc.
            Attention:     Isaac Leventon
            Address:       300 Crescent Court, Suite 700
                           Dallas, Texas 75201
            Email:         ileventon@highlandcapital.com

        Notice of change of address shall be effective only when given in accordance with this Section 23. All notices complying with this Section 23 shall be deemed to have been received on the date of hand delivery or on the third business day after mailing.

24.     Governing Law. THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF DELAWARE (OTHER THAN ITS RULES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY).

25.     Jurisdiction. The parties hereby agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort or otherwise, shall be brought in the United States District Court for the District of Delaware or in the Court of Chancery of the State of Delaware (or, if such court lacks subject matter jurisdiction, in the Superior Court of the State of Delaware), so long as one of such courts shall have subject-matter jurisdiction over such suit, action or proceeding, and that any case of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Delaware. Each of the parties hereby irrevocably

012339

consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum.

26.    <u>Enforcement</u>.

(a)    Without limiting <u>Section 15</u>, this Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral, written and implied, between the parties hereto with respect to the subject matter hereof.

(b)    The Company shall not seek from a court, or agree to, a "bar order" which would have the effect of prohibiting or limiting the Indemnitee's rights to receive advancement of Expenses under this Agreement other than in accordance with this Agreement.

27.    <u>Headings and Captions</u>. All headings and captions contained in this Agreement and the table of contents hereto are inserted for convenience only and shall not be deemed a part of this Agreement.

28.    <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall constitute an original and all of which, when taken together, shall constitute one and the same agreement. Facsimile counterpart signatures to this Agreement shall be binding and enforceable.

29.    <u>Guaranty By Debtor</u>. The Debtor guarantees to Indemnitee the performance of the obligations of the Company hereunder (the "**Guaranteed Obligations**"). If the Company does not satisfy any of the Guaranteed Obligations when due, Indemnitee may demand that the Debtor satisfy such obligations and the Debtor shall be required to do so by making payment to, or for the benefit of, Indemnitee. Indemnitee can make any number of demands upon the Debtor and such demands can be made for all or part of the Guaranteed Obligations. This guaranty by the Debtor is for the full amount of the Guaranteed Obligations. The Debtor's obligations under this Agreement are continuing. Even though Indemnitee receives payments from or makes arrangements with the Company or anyone else, the Debtor shall remain liable for the Guaranteed Obligations until satisfied in full. The guaranty hereunder is a guaranty of payment, and not merely of collectability, and may be enforced against the Debtor. The Debtor's liability under this <u>Section 29</u> is unconditional. It is not affected by anything that might release the Debtor from or limit all or part of its obligations.

012340

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

STRAND ADVISORS, INC.

By: _____
Name: Scott Ellington
Title: Secretary

HIGHLAND CAPITAL MANAGEMENT, L.P. (solely as to <u>Section 29</u> hereunder)

By: Strand Advisors, Inc., its General Partner

By: _____
Name: Scott Ellington
Title: Secretary

INDEMNITEE:

Name: JAMES SEERY

Address: 795 Columbus Ave. 124

New York, NY 10025

Email: jpseerysr@gmail.com

# EXHIBIT MMMMM

# STRAND ADVISORS, INC.

January 9, 2020

Mr. John Dubel

Re:    **Strand Advisors, Inc. – Director Agreement**

Dear Mr. Dubel:

On behalf of Strand Advisors, Inc. (the "Company"), I am pleased to have you join the Company's Board of Directors. This letter sets forth the terms of the Director Agreement (the "Agreement") that the Company is offering to you.

1.    **APPOINTMENT TO THE BOARD OF DIRECTORS.**

a.    <u>Title, Term and Responsibilities</u>.

i.    Subject to terms set forth herein, the Company agrees to appoint you to serve as a Director on the Company's Board of Directors (the "Board"), and you hereby accept such appointment the date you sign this Agreement (the "Effective Date"). You will serve as a Director of the Board from the Effective Date until you voluntarily resign, are removed from the Board, or are not re-elected (the "Term"). Your rights, duties and obligations as a Director shall be governed by the Certificate of Incorporation and Bylaws of the Company, each as amended from time to time (collectively, the "Governing Documents"), except that where the Governing Documents conflict with this Agreement, this Agreement shall control.

ii.    You acknowledge and understand that the Company is the general partner of Highland Capital Management, L.P. ("HCMLP") and that HCMLP is currently the debtor in possession in a chapter 11 bankruptcy proceeding (the "Bankruptcy") pending in the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court"). Your rights, duties, and obligations may in certain instances require your involvement, either directly or indirectly, in the Bankruptcy and such rights, duties, and obligations may be impacted in whole or in part by the Bankruptcy.

b.    <u>Mandatory Board Meeting Attendance</u>. As a Director, you agree to apply all reasonable efforts to attend each regular meeting of the Board. You also agree to devote sufficient time to matters that may arise at the Company from time to time that require your attention as a Director.

c.    <u>Independent Contractor</u>. Under this Agreement, your relationship with the Company will be that of an independent contractor as you will not be an employee of the Company nor eligible to participate in regular employee benefit and compensation plans of the Company.

d.    <u>Information Provided by the Company</u>. The Company shall: (i) provide you with reasonable access to management and other representatives of the Company and HCMLP; and (ii) furnish all data, material, and other information concerning the business, assets, liabilities, operations, cash flows, properties, financial condition and prospects of the Company and HCMLP that you request in connection with the services to be provided to the Company. You will rely, without further independent verification, on the accuracy and completeness of all publicly available information and information that is furnished by or on behalf of the Company and otherwise reviewed by you in connection with the services performed for the Company. The Company acknowledges and agrees that you are not responsible for the

012344

accuracy or completeness of such information and shall not be responsible for any inaccuracies or omissions therein, provided that if you become aware of material inaccuracies or errors in any such information you shall promptly notify the Board of such errors, inaccuracies or concerns.

2. **COMPENSATION AND BENEFITS.**

a. <u>Retainer</u>. The Company will pay you a retainer for each month you serve on the Board (the "<u>Retainer</u>") to be paid in monthly installments of (a) $60,000 for each of the first three months, (b) $50,000 for each of the next three months, and (c) $30,000 for each of the following six months. The parties will re-visit the Retainer after the sixth month. The Company's obligation to pay the Retainer will cease upon the termination of the Term.

b. <u>Expense Reimbursement</u>. The Company will reimburse you for all reasonable travel or other expenses, including expenses of counsel, incurred by you in connection with your services hereunder, in accordance with the Company's expense reimbursement policy as in effect from time to time.

c. <u>Invoices; Payment</u>.

i. In order to receive the compensation and reimbursement set forth in this Section 2, you are required to send to the Company regular monthly invoices indicating your fees, costs, and expenses incurred. Payment of the Retainer will be due on the first business day of each month regardless of whether an invoice has been provided. Reimbursement of expenses will also occur on the first business day of each month, subject to the Company's receipt of appropriate documentation required by the Company's expenses reimbursement policy.

ii. You further agree that the Company's obligation to pay the compensation and reimbursement set forth in this Section 2 is conditioned in all respects on the entry of a final order in the court overseeing the Bankruptcy that authorizes and requires HCMLP to reimburse the Company for all such payments to you.

d. <u>Indemnification; D&O Insurance</u>. You will receive indemnification as a Director of the Company on the terms set forth in that certain Indemnification Agreement, dated January 9, 2020, a copy of which is attached hereto as **Appendix A** (the "<u>Indemnification Agreement</u>"). You will also be provided coverage under the Company's directors' and officers' insurance policy as set forth in the Indemnification Agreement.

e. <u>Tax Indemnification</u>. You acknowledge that the Company will not be responsible for the payment of any federal or state taxes that might be assessed with respect to the Retainer and you agree to be responsible for all such taxes.

3. **PROPRIETARY INFORMATION OBLIGATIONS.**

a. <u>Proprietary Information</u>. You agree that during the Term and thereafter that you will take all steps reasonably necessary to hold all information of the Company, its affiliates, and related entities, which a reasonable person would believe to be confidential or proprietary information, in trust and confidence, and not disclose any such confidential or proprietary information to any third party without first obtaining the Company's express written consent on a case-by-case basis.

b. <u>Third Party Information</u>. The Company has received and will in the future receive from third parties confidential or proprietary information ("<u>Third Party Information</u>") subject to a

012345

duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. You agree to hold such Third Party Information in confidence and not to disclose it to anyone (other than Company personnel who need to know such information in connection with their work for Company) or to use, except in connection with your services for Company under this Agreement, Third Party Information unless expressly authorized in writing by the Company.

      c.    <u>Return of Company Property</u>. Upon the end of the Term or upon the Company's earlier request, you agree to deliver to the Company any and all notes, materials and documents, together with any copies thereof, which contain or disclose any confidential or proprietary information or Third Party Information.

## 4.    OUTSIDE ACTIVITIES.

      a.    <u>Investments and Interests</u>. Except as permitted by Section 4(b), you agree not to participate in, directly or indirectly, any position or investment known by you to be materially adverse to the Company or any of its affiliates or related entities.

      b.    <u>Activities</u>. Except with the prior written consent of the Board, you will not during your tenure as a member of the Company's Board undertake or engage in any other directorship, employment or business enterprise in direct competition with the Company or any of its affiliates or related entities, other than ones in which you are a passive investor or other activities in which you were a participant prior to your appointment to the Board as disclosed to the Company.

      c.    <u>Other Agreements</u>. You agree that you will not disclose to the Company or use on behalf of the Company any confidential information governed by any agreement between you and any third party except in accordance with such agreement.

## 5.    TERMINATION OF DIRECTORSHIP.

      a.    <u>Voluntary Resignation, Removal Pursuant to Bylaws</u>. You may resign from the Board at any time with or without advance notice, with or without reason. Subject to any orders or agreements entered into in connection with the Bankruptcy, you may be removed from the Board at any time, for any reason, in any manner provided by the Governing Documents and applicable law.

      b.    <u>Continuation</u>. The provisions of this Agreement that give the parties rights or obligations beyond the termination of this Agreement will survive and continue to bind the parties.

      c.    <u>Payment of Fees; Reimbursement</u>. Following termination of this Agreement, any undisputed fees and expenses due to you will be remitted promptly following receipt by the Company of any outstanding invoices.

## 6.    GENERAL PROVISIONS.

      a.    <u>Severability</u>. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law. If any provision of this Agreement is held to be invalid, illegal or unenforceable such provision will be reformed, construed and enforced to render it valid, legal, and enforceable consistent with the intent of the parties insofar as possible.

      b.    <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between you and the Company with respect to your service as a Director and supersedes any prior agreement, promise,

012346

representation or statement written between you and the Company with regard to this subject matter. It is entered into without reliance on any promise, representation, statement or agreement other than those expressly contained or incorporated herein, and it cannot be modified or amended except in a writing signed by the party or parties affected by such modification or amendment.

        c.    <u>Successors and Assigns</u>. This Agreement is intended to bind and inure to the benefit of and be enforceable by you and the Company and our respective successors, assigns, heirs, executors and administrators, except that you may not assign any of your rights or duties hereunder.

        d.    <u>Governing Law</u>. This Agreement will be governed by the law of the State of Delaware as applied to contracts made and performed entirely within Delaware.

We are all delighted to be able to extend you this offer and look forward to working with you. To indicate your acceptance of the Company's offer, please sign and date this Agreement below.

Sincerely,

**STRAND ADVISORS, INC.**

By: Scott Ellington
Its: Secretary

*[Signature Page Follows]*

012347

**ACCEPTED AND AGREED:**

JOHN DUBEL

Date: _January 9 2020_

012348

## INDEMNIFICATION AND GUARANTY AGREEMENT

This Indemnification and Guaranty Agreement ("**Agreement**"), dated as of January 9, 2020, is by and between STRAND ADVISORS, INC., a Delaware corporation (the "**Company**"), HIGHLAND CAPITAL MANAGEMENT, L.P., a Delaware partnership (the "**Debtor**") (solely as to <u>Section 29</u> hereunder), and John Dubel (the "**Indemnitee**").

WHEREAS, the Company is the general partner of the Debtor and, in such capacity, manages the business affairs of the Debtor;

WHEREAS, Indemnitee has agreed to serve as a member of the Company's board of directors (the "**Board**") effective as of the date hereof;

WHEREAS, the Board has determined that enhancing the ability of the Company, on its own behalf and for the benefit of the Debtor, to retain and attract as directors the most capable Persons is in the best interests of the Company and the Debtor and that the Company and the Debtor therefore should seek to assure such Persons that indemnification and insurance coverage is available; and

WHEREAS, in recognition of the need to provide Indemnitee with protection against personal liability, in order to procure Indemnitee's service as a director of the Company, in order to enhance Indemnitee's ability to serve the Company in an effective manner and in order to provide such protection pursuant to express contract rights (intended to be enforceable irrespective of, among other things, any amendment to the Company's Bylaws (as may be amended further from time to time, the "**Bylaws**"), any change in the composition of the Board or any change in control, business combination or similar transaction relating to the Company), the Company wishes to provide in this Agreement for the indemnification of, and the advancement of Expenses (as defined in <u>Section 1(g)</u> below) to, Indemnitee as set forth in this Agreement and for the coverage of Indemnitee under the Company's directors' and officers' liability or similar insurance policies ("**D&O Insurance**").

NOW, THEREFORE, in consideration of the foregoing and the Indemnitee's agreement to provide services to the Company, the parties (including the Debtor solely as to <u>Section 29</u> hereunder) agree as follows:

1.   <u>Definitions</u>. For purposes of this Agreement, the following terms shall have the following meanings:

(a)   "**Change in Control**" means the occurrence of any of the following: (i) the direct or indirect sale, lease, transfer, conveyance or other disposition, in one or a series of related transactions (including any merger or consolidation or whether by operation of law or otherwise), of all or substantially all of the properties or assets of the Company and its subsidiaries, to a third party purchaser (or group of affiliated third party purchasers) or (ii) the consummation of any transaction (including any merger or consolidation or whether by operation of law or otherwise), the result of which is that a third party purchaser (or group of affiliated third party purchasers) becomes the beneficial

owner, directly or indirectly, of more than fifty percent (50%) of the then outstanding
Shares or of the surviving entity of any such merger or consolidation.

     (b)    "**Claim**" means:

         (i)    any threatened, pending or completed action, suit, claim, demand,
arbitration, inquiry, hearing, proceeding or alternative dispute resolution mechanism, or
any actual, threatened or completed proceeding, including any and all appeals, in each
case, whether brought by or in the right of the Company or otherwise, whether civil,
criminal, administrative, arbitrative, investigative or other, whether formal or informal,
and whether made pursuant to federal, state, local, foreign or other law, and whether or
not commenced prior to the date of this Agreement, in which Indemnitee was, is or will
be involved as a party or otherwise, by reason of or relating to either (a) any action or
alleged action taken by Indemnitee (or failure or alleged failure to act) or of any action or
alleged action (or failure or alleged failure to act) on Indemnitee's part, while acting in
his or her Corporate Status or (b) the fact that Indemnitee is or was serving at the request
of the Company or any subsidiary of the Company as director, officer, employee, partner,
member, manager, trustee, fiduciary or agent of another Enterprise, in each case, whether
or not serving in such capacity at the time any Loss or Expense is paid or incurred for
which indemnification or advancement of Expenses can be provided under this
Agreement, except one initiated by Indemnitee to enforce his or her rights under this
Agreement; or

         (ii)    any inquiry, hearing or investigation that the Indemnitee
determines might lead to the institution of any such action, suit, proceeding or alternative
dispute resolution mechanism.

     (c)    "**Controlled Entity**" means any corporation, limited liability company,
partnership, joint venture, trust or other Enterprise, whether or not for profit, that is,
directly or indirectly, controlled by the Company. For purposes of this definition, the
term "control" means the possession, directly or indirectly, of the power to direct, or
cause the direction of, the management or policies of an Enterprise, whether through the
ownership of voting securities, through other voting rights, by contract or otherwise.

     (d)    "**Corporate Status**" means the status of a Person who is or was a director,
officer, employee, partner, member, manager, trustee, fiduciary or agent of the Company
or of any other Enterprise which such Person is or was serving at the request of the
Company or any subsidiary of the Company. In addition to any service at the actual
request of the Company, Indemnitee will be deemed, for purposes of this Agreement, to
be serving or to have served at the request of the Company or any subsidiary of the
Company as a director, officer, employee, partner, member, manager, trustee, fiduciary or
agent of another Enterprise if Indemnitee is or was serving as a director, officer,
employee, partner, member, manager, fiduciary, trustee or agent of such Enterprise and
(i) such Enterprise is or at the time of such service was a Controlled Entity, (ii) such
Enterprise is or at the time of such service was an employee benefit plan (or related trust)
sponsored or maintained by the Company or a Controlled Entity or (iii) the Company or a

012350

Controlled Entity, directly or indirectly, caused Indemnitee to be nominated, elected, appointed, designated, employed, engaged or selected to serve in such capacity.

(e) **"Disinterested Director"** means a director of the Company who is not and was not a party to the Claim in respect of which indemnification is sought by Indemnitee. Under no circumstances will James Dondero be considered a Disinterested Director.

(f) **"Enterprise"** means the Company or any subsidiary of the Company or any other corporation, partnership, limited liability company, joint venture, employee benefit plan, trust or other entity or other enterprise of which Indemnitee is or was serving at the request of the Company or any subsidiary of the Company in a Corporate Status.

(g) **"Expenses"** means any and all expenses, fees, including attorneys', witnesses' and experts' fees, disbursements and retainers, court costs, transcript costs, travel expenses, duplicating, printing and binding costs, telephone charges, postage, fax transmission charges, secretarial services, delivery services fees, and all other fees, costs, disbursements and expenses paid or incurred in connection with investigating, defending, prosecuting, being a witness in or participating in (including on appeal), or preparing to defend, prosecute, be a witness or participate in, any Claim. Expenses also shall include (i) Expenses paid or incurred in connection with any appeal resulting from any Claim, including, without limitation, the premium, security for, and other costs relating to any cost bond, supersedeas bond, or other appeal bond or its equivalent, and (ii) for purposes of Section 4 only, Expenses incurred by Indemnitee in connection with the interpretation, enforcement or defense of Indemnitee's rights under this Agreement, by litigation or otherwise. Expenses, however, shall not include amounts paid in settlement by Indemnitee or the amount of judgments or fines against Indemnitee.

(h) **"Exchange Act"** means the Securities Exchange Act of 1934, as amended, or any successor statute thereto, and the rules and regulations of the United States Securities and Exchange Commission promulgated thereunder.

(i) **"Expense Advance"** means any payment of Expenses advanced to Indemnitee by the Company pursuant to Section 4 or Section 5 hereof.

(j) **"Indemnifiable Event"** means any event or occurrence, whether occurring before, on or after the date of this Agreement, related to the fact that Indemnitee is or was a manager, director, officer, employee or agent of the Company or any subsidiary of the Company, or is or was serving at the request of the Company or any subsidiary of the Company as a manager, director, officer, employee, member, manager, trustee or agent of any other Enterprise or by reason of an action or inaction by Indemnitee in any such capacity (whether or not serving in such capacity at the time any Loss is incurred for which indemnification can be provided under this Agreement).

(k) **"Independent Counsel"** means a law firm, or a member of a law firm, that is experienced in matters of corporation law and neither presently performs, nor in the past three (3) years has performed, services for any of: (i) James Dondero, (ii) the

012351

Company or Indemnitee (other than in connection with matters concerning Indemnitee under this Agreement or of other indemnitees under similar agreements), or (iii) any other party to the Claim giving rise to a claim for indemnification hereunder. Notwithstanding the foregoing, the term "Independent Counsel" shall not include any Person who, under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Company or Indemnitee in an action to determine Indemnitee's rights under this Agreement.

(l) "**Losses**" means any and all Expenses, damages, losses, liabilities, judgments, fines (including excise taxes and penalties assessed with respect to employee benefit plans and ERISA excise taxes), penalties (whether civil, criminal or other), amounts paid or payable in settlement, including any interest, assessments, any federal, state, local or foreign taxes imposed as a result of the actual or deemed receipt of any payments under this Agreement and all other charges paid or payable in connection with investigating, defending, being a witness in or participating in (including on appeal), or preparing to defend, be a witness or participate in, any Claim.

(m) "**Person**" means any individual, corporation, firm, partnership, joint venture, limited liability company, estate, trust, business association, organization, governmental entity or other entity and includes the meaning set forth in Sections 13(d) and 14(d) of the Exchange Act.

(n) "**Shares**" means an ownership interest of a member in the Company, including each of the common shares of the Company or any other class or series of Shares designated by the Board.

(o) References to "**serving at the request of the Company**" include any service as a director, manager, officer, employee, representative or agent of the Company which imposes duties on, or involves services by, such director, manager, officer, employee or agent, including but not limited to any employee benefit plan, its participants or beneficiaries; and a Person who acted in good faith and in a manner he or she reasonably believed to be in and not opposed to the best interests of the Company in Indemnitee's capacity as a director, manager, officer, employee, representative or agent of the Company, including but not limited to acting in the best interest of participants and beneficiaries of an employee benefit plan will be deemed to have acted in a manner "**not opposed to the best interests of the Company**" as referred to under applicable law or in this Agreement.

2. <u>Indemnification</u>.

(a) Subject to <u>Section 9</u> and <u>Section 10</u> of this Agreement, the Company shall indemnify and hold Indemnitee harmless, to the fullest extent permitted by the laws of the State of Delaware in effect on the date hereof, or as such laws may from time to time hereafter be amended to increase the scope of such permitted indemnification, against any and all Losses and Expenses if Indemnitee was or is or becomes a party to or participant in, or is threatened to be made a party to or participant in, any Claim by reason of or arising in part out of an Indemnifiable Event, including, without limitation, Claims

brought by or in the right of the Company, Claims brought by third parties, and Claims in which the Indemnitee is solely a witness.

(b)     For the avoidance of doubt, the indemnification rights and obligations contained herein shall also extend to any Claim in which the Indemnitee was or is a party to, was or is threatened to be made a party to or was or is otherwise involved in any capacity in by reason of Indemnitee's Corporate Status as a fiduciary capacity with respect to an employee benefit plan. In connection therewith, if the Indemnitee has acted in good faith and in a manner which appeared to be consistent with the best interests of the participants and beneficiaries of an employee benefit plan and not opposed thereto, the Indemnitee shall be deemed to have acted in a manner not opposed to the best interests of the Company.

3.     Contribution.

(a)     Whether or not the indemnification provided in Section 2 is available, if, for any reason, Indemnitee shall elect or be required to pay all or any portion of any judgment or settlement in any Claim in which the Company is jointly liable with Indemnitee (or would be if joined in such Claim), the Company shall contribute to the amount of Losses paid or payable by Indemnitee in proportion to the relative benefits received by the Company and all officers, directors, managers or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such Claim), on the one hand, and Indemnitee, on the other hand, from the transaction or events from which such Claim arose; provided, however, that the proportion determined on the basis of relative benefit may, to the extent necessary to conform to law, be further adjusted by reference to the relative fault of the Company and all officers, directors, managers or employees of the Company other than Indemnitee who are jointly liable with Indemnitee (or would be if joined in such Claim), on the one hand, and Indemnitee, on the other hand, in connection with the transaction or events that resulted in such Losses, as well as any other equitable considerations which applicable law may require to be considered. The relative fault of the Company and all officers, directors, managers or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such Claim), on the one hand, and Indemnitee, on the other hand, shall be determined by reference to, among other things, the degree to which their actions were motivated by intent to gain personal profit or advantage, the degree to which their liability is primary or secondary and the degree to which their conduct is active or passive.

(b)     The Company hereby agrees to fully indemnify and hold Indemnitee harmless from any claims of contribution which may be brought by officers, directors, managers or employees of the Company, other than Indemnitee, who may be jointly liable with Indemnitee.

(c)     To the fullest extent permissible under applicable law, if the indemnification provided for in this Agreement is unavailable to Indemnitee for any reason whatsoever, the Company, in lieu of indemnifying Indemnitee, shall contribute to the amount incurred by Indemnitee, whether for judgments, fines, penalties, excise taxes,

012353

amounts paid or to be paid in settlement and/or for Expenses, in connection with any Claim relating to an Indemnifiable Event under this Agreement, in such proportion as is deemed fair and reasonable in light of all of the circumstances of such Claim in order to reflect (i) the relative benefits received by the Company and Indemnitee as a result of the event(s) and/or transaction(s) giving cause to such Claim; and/or (ii) the relative fault of the Company (and its directors, managers, officers, employees and agents) and Indemnitee in connection with such event(s) and/or transaction(s).

4. <u>Advancement of Expenses</u>. The Company shall, if requested by Indemnitee, advance, to the fullest extent permitted by law, to Indemnitee (an "**Expense Advance**") any and all Expenses actually and reasonably paid or incurred (even if unpaid) by Indemnitee in connection with any Claim arising out of an Indemnifiable Event (whether prior to or after its final disposition). Indemnitee's right to such advancement is not subject to the satisfaction of any standard of conduct. Without limiting the generality or effect of the foregoing, within thirty (30) business days after any request by Indemnitee, the Company shall, in accordance with such request, (a) pay such Expenses on behalf of Indemnitee, (b) advance to Indemnitee funds in an amount sufficient to pay such Expenses, or (c) reimburse Indemnitee for such Expenses. In connection with any request for Expense Advances, Indemnitee shall not be required to provide any documentation or information to the extent that the provision thereof would undermine or otherwise jeopardize attorney-client privilege. Execution and delivery to the Company of this Agreement by Indemnitee constitutes an undertaking by the Indemnitee to repay any amounts paid, advanced or reimbursed by the Company pursuant to this <u>Section 4</u>, the final sentence of <u>Section 9(b)</u>, or <u>Section 11(b)</u> in respect of Expenses relating to, arising out of or resulting from any Claim in respect of which it shall be determined, pursuant to <u>Section 9</u>, following the final disposition of such Claim, that Indemnitee is not entitled to indemnification hereunder. No other form of undertaking shall be required other than the execution of this Agreement. Each Expense Advance will be unsecured and interest free and will be made by the Company without regard to Indemnitee's ability to repay the Expense Advance.

5. <u>Indemnification for Expenses in Enforcing Rights</u>. To the fullest extent allowable under applicable law, the Company shall also indemnify against, and, if requested by Indemnitee, shall advance to Indemnitee subject to and in accordance with <u>Section 4</u>, any Expenses actually and reasonably paid or incurred (even if unpaid) by Indemnitee in connection with any action or proceeding by Indemnitee for (a) indemnification or reimbursement or advance payment of Expenses by the Company under any provision of this Agreement, or under any other agreement or provision of the Bylaws now or hereafter in effect relating to Claims relating to Indemnifiable Events, and/or (b) recovery under any D&O Insurance maintained by the Company, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification or insurance recovery, as the case may be. Indemnitee shall be required to reimburse the Company in the event that a final judicial determination is made that such action brought by Indemnitee was frivolous or not made in good faith.

6. <u>Partial Indemnity</u>. If Indemnitee is entitled under any provision of this Agreement to indemnification by the Company for a portion of any Losses in respect of a Claim

012354

related to an Indemnifiable Event but not for the total amount thereof, the Company shall nevertheless indemnify Indemnitee for the portion thereof to which Indemnitee is entitled.

7.    Notification and Defense of Claims.

(a)    Notification of Claims. Indemnitee shall notify the Company in writing as soon as reasonably practicable of any Claim which could relate to an Indemnifiable Event or for which Indemnitee could seek Expense Advances, including a brief description (based upon information then available to Indemnitee) of the nature of, and the facts underlying, such Claim, to the extent then known. The failure by Indemnitee to timely notify the Company hereunder shall not relieve the Company from any liability hereunder except to the extent the Company's ability to participate in the defense of such claim was materially and adversely affected by such failure. If at the time of the receipt of such notice, the Company has D&O Insurance or any other insurance in effect under which coverage for Claims related to Indemnifiable Events is potentially available, the Company shall give prompt written notice to the applicable insurers in accordance with the procedures, provisions, and terms set forth in the applicable policies. The Company shall provide to Indemnitee a copy of such notice delivered to the applicable insurers, and copies of all subsequent correspondence between the Company and such insurers regarding the Claim, in each case substantially concurrently with the delivery or receipt thereof by the Company.

(b)    Defense of Claims. The Company shall be entitled to participate in the defense of any Claim relating to an Indemnifiable Event at its own expense and, except as otherwise provided below, to the extent the Company so wishes, it may assume the defense thereof with counsel reasonably satisfactory to Indemnitee. After notice from the Company to Indemnitee of its election to assume the defense of any such Claim, the Company shall not be liable to Indemnitee under this Agreement or otherwise for any Expenses subsequently directly incurred by Indemnitee in connection with Indemnitee's defense of such Claim other than reasonable costs of investigation or as otherwise provided below. Indemnitee shall have the right to employ its own legal counsel in such Claim, but all Expenses related to such counsel incurred after notice from the Company of its assumption of the defense shall be at Indemnitee's own expense; provided, however, that if (i) Indemnitee's employment of its own legal counsel has been authorized by the Company, (ii) Indemnitee has reasonably determined that there may be a conflict of interest between Indemnitee and the Company in the defense of such Claim, (iii) after a Change in Control, Indemnitee's employment of its own counsel has been approved by the Independent Counsel or (iv) the Company shall not in fact have employed counsel to assume the defense of such Claim, then Indemnitee shall be entitled to retain its own separate counsel (but not more than one law firm plus, if applicable, local counsel in respect of any such Claim) and all Expenses related to such separate counsel shall be borne by the Company.

8.    Procedure upon Application for Indemnification. In order to obtain indemnification pursuant to this Agreement, Indemnitee shall submit to the Company a written request therefor, including in such request such documentation and information as

012355

is reasonably available to Indemnitee and is reasonably necessary to determine whether and to what extent Indemnitee is entitled to indemnification following the final disposition of the Claim, provided that documentation and information need not be so provided to the extent that the provision thereof would undermine or otherwise jeopardize attorney-client privilege. Indemnification shall be made insofar as the Company determines Indemnitee is entitled to indemnification in accordance with <u>Section 9</u> below.

9. <u>Determination of Right to Indemnification</u>.

(a) <u>Mandatory Indemnification; Indemnification as a Witness</u>.

(i) To the extent that Indemnitee shall have been successful on the merits or otherwise in defense of any Claim relating to an Indemnifiable Event or any portion thereof or in defense of any issue or matter therein, including without limitation dismissal without prejudice, Indemnitee shall be indemnified against all Losses relating to such Claim in accordance with <u>Section 2</u>, and no Standard of Conduct Determination (as defined in <u>Section 9(b)</u>) shall be required.

(ii) To the extent that Indemnitee's involvement in a Claim relating to an Indemnifiable Event is to prepare to serve and serve as a witness, and not as a party, the Indemnitee shall be indemnified against all Losses incurred in connection therewith to the fullest extent allowable by law and no Standard of Conduct Determination (as defined in <u>Section 9(b)</u>) shall be required.

(b) <u>Standard of Conduct</u>. To the extent that the provisions of <u>Section 9(a)</u> are inapplicable to a Claim related to an Indemnifiable Event that shall have been finally disposed of, any determination of whether Indemnitee has satisfied any applicable standard of conduct under Delaware law that is a legally required condition to indemnification of Indemnitee hereunder against such Claim and any determination that Expense Advances must be repaid to the Company (a "**Standard of Conduct Determination**") shall be made as follows:

(i) if no Change in Control has occurred, (A) by a majority vote of the Disinterested Directors, even if less than a quorum of the Board, (B) by a committee of Disinterested Directors designated by a majority vote of the Disinterested Directors, even though less than a quorum or (C) if there are no such Disinterested Directors, by Independent Counsel in a written opinion addressed to the Board, a copy of which shall be delivered to Indemnitee; and

(ii) if a Change in Control shall have occurred, (A) if the Indemnitee so requests in writing, by a majority vote of the Disinterested Directors, even if less than a quorum of the Board or (B) otherwise, by Independent Counsel in a written opinion addressed to the Board, a copy of which shall be delivered to Indemnitee.

Subject to Section 4, the Company shall indemnify and hold Indemnitee harmless against and, if requested by Indemnitee, shall reimburse Indemnitee for, or advance to Indemnitee, within thirty (30) business days of such request, any and all Expenses

012356

incurred by Indemnitee in cooperating with the Person or Persons making such Standard of Conduct Determination.

(c) <u>Making the Standard of Conduct Determination</u>. The Company shall use its reasonable best efforts to cause any Standard of Conduct Determination required under <u>Section 9(b)</u> to be made as promptly as practicable. If the Person or Persons designated to make the Standard of Conduct Determination under <u>Section 9(b)</u> shall not have made a determination within ninety (90) days after the later of (A) receipt by the Company of a written request from Indemnitee for indemnification pursuant to <u>Section 8</u> (the date of such receipt being the "**Notification Date**") and (B) the selection of an Independent Counsel, if such determination is to be made by Independent Counsel, then Indemnitee shall be deemed to have satisfied the applicable standard of conduct; provided that such 90-day period may be extended for a reasonable time, not to exceed an additional thirty (30) days, if the Person or Persons making such determination in good faith requires such additional time to obtain or evaluate information relating thereto. Notwithstanding anything in this Agreement to the contrary, no determination as to entitlement of Indemnitee to indemnification under this Agreement shall be required to be made prior to the final disposition of any Claim.

(d) <u>Payment of Indemnification</u>. If, in regard to any Losses:

(i) Indemnitee shall be entitled to indemnification pursuant to <u>Section 9(a)</u>;

(ii) no Standard of Conduct Determination is legally required as a condition to indemnification of Indemnitee hereunder; or

(iii) Indemnitee has been determined or deemed pursuant to <u>Section 9(b)</u> or <u>Section 9(c)</u> to have satisfied the Standard of Conduct Determination,

then the Company shall pay to Indemnitee, within thirty (30) business days after the later of (A) the Notification Date or (B) the earliest date on which the applicable criterion specified in clause (i), (ii) or (iii) is satisfied, an amount equal to such Losses.

(e) <u>Selection of Independent Counsel for Standard of Conduct Determination</u>. If a Standard of Conduct Determination is to be made by Independent Counsel pursuant to <u>Section 9(b)(i)</u>, the Independent Counsel shall be selected by the Board and the Company shall give written notice to Indemnitee advising him of the identity of the Independent Counsel so selected. If a Standard of Conduct Determination is to be made by Independent Counsel pursuant to <u>Section 9(b)(ii)</u>, the Independent Counsel shall be selected by Indemnitee, and Indemnitee shall give written notice to the Company advising it of the identity of the Independent Counsel so selected. In either case, Indemnitee or the Company, as applicable, may, within thirty (3) business days after receiving written notice of selection from the other, deliver to the other a written objection to such selection; provided, however, that such objection may be asserted only on the ground that the Independent Counsel so selected does not satisfy the criteria set forth in the definition of "Independent Counsel" in <u>Section 1(k)</u>, and the objection shall

012357

set forth with particularity the factual basis of such assertion. Absent a proper and timely objection, the Person or firm so selected shall act as Independent Counsel. If such written objection is properly and timely made and substantiated, (i) the Independent Counsel so selected may not serve as Independent Counsel unless and until such objection is withdrawn or a court has determined that such objection is without merit; and (ii) the non-objecting party may, at its option, select an alternative Independent Counsel and give written notice to the other party advising such other party of the identity of the alternative Independent Counsel so selected, in which case the provisions of the two immediately preceding sentences, the introductory clause of this sentence and numbered clause (i) of this sentence shall apply to such subsequent selection and notice. If applicable, the provisions of clause (ii) of the immediately preceding sentence shall apply to successive alternative selections. If no Independent Counsel that is permitted under the foregoing provisions of this Section 9(e) to make the Standard of Conduct Determination shall have been selected within twenty (20) days after the Company gives its initial notice pursuant to the first sentence of this Section 9(e) or Indemnitee gives its initial notice pursuant to the second sentence of this Section 9(e), as the case may be, either the Company or Indemnitee may petition the Court of Chancery of the State of Delaware ("**Delaware Court**") to resolve any objection which shall have been made by the Company or Indemnitee to the other's selection of Independent Counsel and/or to appoint as Independent Counsel a Person to be selected by the Court or such other Person as the Court shall designate, and the Person or firm with respect to whom all objections are so resolved or the Person or firm so appointed will act as Independent Counsel. In all events, the Company shall pay all of the reasonable fees and expenses of the Independent Counsel incurred in connection with the Independent Counsel's determination pursuant to Section 9(b).

(f)    Presumptions and Defenses.

(i)    Indemnitee's Entitlement to Indemnification. In making any Standard of Conduct Determination, the Person or Persons making such determination shall presume that Indemnitee has satisfied the applicable standard of conduct and is entitled to indemnification, and the Company shall have the burden of proof to overcome that presumption and establish that Indemnitee is not so entitled. Any Standard of Conduct Determination that is adverse to Indemnitee may be challenged by the Indemnitee in the Delaware Court. No determination by the Company (including by its Board or any Independent Counsel) that Indemnitee has not satisfied any applicable standard of conduct may be used as a defense to enforcement by Indemnitee of Indemnitee's rights of indemnification or reimbursement or advance of payment of Expenses by the Company hereunder or create a presumption that Indemnitee has not met any applicable standard of conduct.

(ii)    Reliance as a Safe Harbor. For purposes of this Agreement, and without creating any presumption as to a lack of good faith if the following circumstances do not exist, Indemnitee shall be deemed to have acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Company if Indemnitee's actions or omissions to act are taken in good faith reliance upon the records of the Company, including its financial statements, or upon information, opinions, reports

012358

or statements furnished to Indemnitee by the officers or employees of the Company or any of its subsidiaries in the course of their duties, or by committees of the Board or by any other Person (including legal counsel, accountants and financial advisors) as to matters Indemnitee reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company. In addition, the knowledge and/or actions, or failures to act, of any director, manager, officer, agent or employee of the Company (other than Indemnitee) shall not be imputed to Indemnitee for purposes of determining the right to indemnity hereunder.

(iii) <u>Defense to Indemnification and Burden of Proof</u>. It shall be a defense to any action brought by Indemnitee against the Company to enforce this Agreement (other than an action brought to enforce a claim for Losses incurred in defending against a Claim related to an Indemnifiable Event in advance of its final disposition) that it is not permissible under applicable law for the Company to indemnify Indemnitee for the amount claimed. In connection with any such action or any related Standard of Conduct Determination, the burden of proving such a defense or that the Indemnitee did not satisfy the applicable standard of conduct shall be on the Company.

10. <u>Exclusions from Indemnification</u>. Notwithstanding anything in this Agreement to the contrary, the Company shall not be obligated to:

(a) indemnify or advance funds to Indemnitee for Losses with respect to proceedings initiated by Indemnitee, including any proceedings against the Company or its managers, officers, employees or other indemnitees and not by way of defense, except:

(i) proceedings referenced in <u>Section 4</u> above (unless a court of competent jurisdiction determines that each of the material assertions made by Indemnitee in such proceeding was not made in good faith or was frivolous); or

(ii) where the Company has joined in or the Board has consented to the initiation of such proceedings.

(b) indemnify Indemnitee if a final decision by a court of competent jurisdiction determines that such indemnification is prohibited by applicable law.

(c) indemnify Indemnitee for the disgorgement of profits arising from the purchase or sale by Indemnitee of securities of the Company in violation of Section 16(b) of the Exchange Act, or any similar successor statute.

11. <u>Remedies of Indemnitee</u>.

(a) In the event that (i) a determination is made pursuant to <u>Section 9</u> that Indemnitee is not entitled to indemnification under this Agreement, (ii) an Expense Advance is not timely made pursuant to <u>Section 4</u>, (iii) no determination of entitlement to indemnification is made pursuant to <u>Section 9</u> within 90 days after receipt by the Company of the request for indemnification, or (iv) payment of indemnification is not made pursuant <u>Section 9(d)</u>, Indemnitee shall be entitled to an adjudication in a Delaware Court, or in any other court of competent jurisdiction, of Indemnitee's entitlement to such

012359

indemnification. Indemnitee shall commence such proceeding seeking an adjudication within 180 days following the date on which Indemnitee first has the right to commence such proceeding pursuant to this Section 11(a). The Company shall not oppose Indemnitee's right to seek any such adjudication.

(b)    In the event that Indemnitee, pursuant to this Section 11, seeks a judicial adjudication or arbitration of his or her rights under, or to recover damages for breach of, this Agreement, any other agreement for indemnification, payment of Expenses in advance or contribution hereunder or to recover under any director, manager, and officer liability insurance policies or any other insurance policies maintained by the Company, the Company will, to the fullest extent permitted by law and subject to Section 4, indemnify and hold harmless Indemnitee against any and all Expenses which are paid or incurred by Indemnitee in connection with such judicial adjudication or arbitration, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification, payment of Expenses in advance or contribution or insurance recovery. In addition, if requested by Indemnitee, subject to Section 4 the Company will (within thirty (30) days after receipt by the Company of the written request therefor), pay as an Expense Advance such Expenses, to the fullest extent permitted by law.

(c)    In the event that a determination shall have been made pursuant to Section 9 that Indemnitee is not entitled to indemnification, any judicial proceeding commenced pursuant to this Section 11 shall be conducted in all respects as a de novo trial on the merits, and Indemnitee shall not be prejudiced by reason of the adverse determination under Section 9.

(d)    If a determination shall have been made pursuant to Section 9 that Indemnitee is entitled to indemnification, the Company shall be bound by such determination in any judicial proceeding commenced pursuant to this Section 11, absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's misstatement not materially misleading in connection with the application for indemnification, or (ii) a prohibition of such indemnification under applicable law.

12.    Settlement of Claims. The Company shall not be liable to Indemnitee under this Agreement for any amounts paid in settlement of any threatened or pending Claim related to an Indemnifiable Event effected without the Company's prior written consent, which shall not be unreasonably withheld; provided, however, that if a Change in Control has occurred, the Company shall be liable for indemnification of the Indemnitee for amounts paid in settlement if an Independent Counsel (which, for purposes of this Section 12, shall be selected by the Company with the prior consent of the Indemnitee, such consent not to be unreasonably withheld or delayed) has approved the settlement. The Company shall not settle any Claim related to an Indemnifiable Event in any manner that would impose any Losses on the Indemnitee without the Indemnitee's prior written consent.

13.    Duration. All agreements and obligations of the Company contained herein shall continue during the period that Indemnitee is a manager of the Company (or is serving at the request of the Company as a director, manager, officer, employee, member, trustee or

012360

agent of another Enterprise) and shall continue thereafter (i) so long as Indemnitee may be subject to any possible Claim relating to an Indemnifiable Event (including any rights of appeal thereto) and (ii) throughout the pendency of any proceeding (including any rights of appeal thereto) commenced by Indemnitee to enforce or interpret his or her rights under this Agreement, even if, in either case, he or she may have ceased to serve in such capacity at the time of any such Claim or proceeding.

14.    <u>Other Indemnitors</u>. The Company hereby acknowledges that Indemnitee may have certain rights to indemnification, advancement of Expenses and/or insurance provided by certain private equity funds, hedge funds or other investment vehicles or management companies and/or certain of their affiliates and by personal policies (collectively, the "**Other Indemnitors**"). The Company hereby agrees (i) that it is the indemnitor of first resort (i.e., its obligations to Indemnitee are primary and any obligation of the Other Indemnitors to advance Expenses or to provide indemnification for the same Expenses or liabilities incurred by Indemnitee are secondary), (ii) that it shall be required to advance the full amount of Expenses incurred by Indemnitee and shall be liable for the full amount of all Expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by the terms of this Agreement and the Bylaws (or any other agreement between the Company and Indemnitee), without regard to any rights Indemnitee may have against the Other Indemnitors, and, (iii) that it irrevocably waives, relinquishes and releases the Other Indemnitors from any and all claims against the Other Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The Company further agrees that no advancement or payment by the Other Indemnitors on behalf of Indemnitee with respect to any claim for which Indemnitee has sought indemnification from the Company shall affect the foregoing and the Other Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of Indemnitee against the Company. The Company and Indemnitee agree that the Other Indemnitors are express third party beneficiaries of the terms of this <u>Section 14</u>.

15.    <u>Non-Exclusivity</u>. The rights of Indemnitee hereunder will be in addition to any other rights Indemnitee may have under the Bylaws, the General Corporation Law of the State of Delaware (as may be amended from time to time, the "**DGCL**"), any other contract, in law or in equity, and under the laws of any state, territory, or jurisdiction, or otherwise (collectively, "**Other Indemnity Provisions**"). The Company will not adopt any amendment to its Bylaws the effect of which would be to deny, diminish, encumber or limit Indemnitee's right to indemnification under this Agreement or any Other Indemnity Provision.

16.    <u>Liability Insurance</u>. For the duration of Indemnitee's service as a director of the Company, and thereafter for so long as Indemnitee shall be subject to any pending Claim relating to an Indemnifiable Event, the Company shall use best efforts to continue to maintain in effect policies of D&O Insurance providing coverage that is at least substantially comparable in scope and amount to that provided by similarly situated companies. In all policies of D&O Insurance maintained by the Company, Indemnitee shall be named as an insured in such a manner as to provide Indemnitee the same rights

012361

and benefits as are provided to the most favorably insured of the Company's directors. Upon request, the Company will provide to Indemnitee copies of all D&O Insurance applications, binders, policies, declarations, endorsements and other related materials.

17.    No Duplication of Payments. The Company shall not be liable under this Agreement to make any payment to Indemnitee in respect of any Losses to the extent Indemnitee has otherwise received payment under any insurance policy, any Other Indemnity Provisions or otherwise of the amounts otherwise indemnifiable by the Company hereunder.

18.    Subrogation. In the event of payment to Indemnitee under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee. Indemnitee shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents necessary to enable the Company effectively to bring suit to enforce such rights.

19.    Indemnitee Consent. The Company will not, without the prior written consent of Indemnitee, consent to the entry of any judgment against Indemnitee or enter into any settlement or compromise which (a) includes an admission of fault of Indemnitee, any non-monetary remedy imposed on Indemnitee or a Loss for which Indemnitee is not wholly indemnified hereunder or (b) with respect to any Claim with respect to which Indemnitee may be or is made a party or a participant or may be or is otherwise entitled to seek indemnification hereunder, does not include, as an unconditional term thereof, the full release of Indemnitee from all liability in respect of such Claim, which release will be in form and substance reasonably satisfactory to Indemnitee. Neither the Company nor Indemnitee will unreasonably withhold its consent to any proposed settlement; provided, however, Indemnitee may withhold consent to any settlement that does not provide a full and unconditional release of Indemnitee from all liability in respect of such Claim.

20.    Amendments. No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by both of the parties hereto. No waiver of any of the provisions of this Agreement shall be binding unless in the form of a writing signed by the party against whom enforcement of the waiver is sought, and no such waiver shall operate as a waiver of any other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver. Except as specifically provided herein, no failure to exercise or any delay in exercising any right or remedy hereunder shall constitute a waiver thereof.

21.    Binding Effect. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors (including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business and/or assets of the Company), assigns, spouses, heirs and personal and legal representatives. The Company shall require and cause any successor (whether direct or indirect by purchase, merger, consolidation or otherwise) to all, substantially all or a substantial part of the business and/or assets of the Company, by written agreement in form and substance satisfactory to Indemnitee, expressly to assume

012362

and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place.

22.     Severability. Each provision of this Agreement shall be considered severable and if for any reason any provision which is not essential to the effectuation of the basic purposes of this Agreement is determined by a court of competent jurisdiction to be invalid, unenforceable or contrary to the DGCL or existing or future applicable law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those provisions of this Agreement which are valid, enforceable and legal. In that case, this Agreement shall be construed so as to limit any term or provision so as to make it valid, enforceable and legal within the requirements of any applicable law, and in the event such term or provision cannot be so limited, this Agreement shall be construed to omit such invalid, unenforceable or illegal provisions.

23.     Notices. All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered by hand, against receipt, or mailed, by postage prepaid, certified or registered mail:

    (a)     if to Indemnitee, to the address set forth on the signature page hereto.

    (b)     if to the Company, to:

            Strand Advisors, Inc.
            Attention:      Isaac Leventon
            Address:        300 Crescent Court, Suite 700
                            Dallas, Texas 75201
            Email:          ileventon@highlandcapital.com

            Notice of change of address shall be effective only when given in accordance with this Section 23. All notices complying with this Section 23 shall be deemed to have been received on the date of hand delivery or on the third business day after mailing.

24.     Governing Law. THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF DELAWARE (OTHER THAN ITS RULES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY).

25.     Jurisdiction. The parties hereby agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort or otherwise, shall be brought in the United States District Court for the District of Delaware or in the Court of Chancery of the State of Delaware (or, if such court lacks subject matter jurisdiction, in the Superior Court of the State of Delaware), so long as one of such courts shall have subject-matter jurisdiction over such suit, action or proceeding, and that any case of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Delaware. Each of the parties hereby irrevocably

012363

consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum.

26.     Enforcement.

(a)     Without limiting Section 15, this Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral, written and implied, between the parties hereto with respect to the subject matter hereof.

(b)     The Company shall not seek from a court, or agree to, a "bar order" which would have the effect of prohibiting or limiting the Indemnitee's rights to receive advancement of Expenses under this Agreement other than in accordance with this Agreement.

27.     Headings and Captions. All headings and captions contained in this Agreement and the table of contents hereto are inserted for convenience only and shall not be deemed a part of this Agreement.

28.     Counterparts. This Agreement may be executed in counterparts, each of which shall constitute an original and all of which, when taken together, shall constitute one and the same agreement. Facsimile counterpart signatures to this Agreement shall be binding and enforceable.

29.     Guaranty By Debtor. The Debtor guarantees to Indemnitee the performance of the obligations of the Company hereunder (the "**Guaranteed Obligations**"). If the Company does not satisfy any of the Guaranteed Obligations when due, Indemnitee may demand that the Debtor satisfy such obligations and the Debtor shall be required to do so by making payment to, or for the benefit of, Indemnitee. Indemnitee can make any number of demands upon the Debtor and such demands can be made for all or part of the Guaranteed Obligations. This guaranty by the Debtor is for the full amount of the Guaranteed Obligations. The Debtor's obligations under this Agreement are continuing. Even though Indemnitee receives payments from or makes arrangements with the Company or anyone else, the Debtor shall remain liable for the Guaranteed Obligations until satisfied in full. The guaranty hereunder is a guaranty of payment, and not merely of collectability, and may be enforced against the Debtor. The Debtor's liability under this Section 29 is unconditional. It is not affected by anything that might release the Debtor from or limit all or part of its obligations.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

STRAND ADVISORS, INC.

By: _____
Name: Scott Ellington
Title: Secretary

HIGHLAND CAPITAL MANAGEMENT, L.P. (solely as to Section 29 hereunder)

By: Strand Advisors, Inc., its General Partner

By: _____
Name: Scott Ellington
Title: Secretary

[SIGNATURE PAGE – INDEMNIFICATION AND GUARANTY AGREEMENT]

012365

INDEMNITEE:

Name: JOHN DUBEL
Address: PO Box 535
Colts Neck, NJ 07722

Email: jdubel@dubel.com

DOCS_NY:40026.1 36027/002

012366

# EXHIBIT NNNNN

012367

**STRAND ADVISORS, INC.**

January 9, 2020

Honorable Russell Nelms

      **Re:**    **Strand Advisors, Inc. – Director Agreement**

Dear Judge Nelms:

On behalf of Strand Advisors, Inc. (the "Company"), I am pleased to have you join the Company's Board of Directors. This letter sets forth the terms of the Director Agreement (the "Agreement") that the Company is offering to you.

      **1.**      **APPOINTMENT TO THE BOARD OF DIRECTORS.**

      a.      <u>Title, Term and Responsibilities</u>.

      i.      Subject to terms set forth herein, the Company agrees to appoint you to serve as a Director on the Company's Board of Directors (the "Board"), and you hereby accept such appointment the date you sign this Agreement (the "Effective Date"). You will serve as a Director of the Board from the Effective Date until you voluntarily resign, are removed from the Board, or are not re-elected (the "Term"). Your rights, duties and obligations as a Director shall be governed by the Certificate of Incorporation and Bylaws of the Company, each as amended from time to time (collectively, the "Governing Documents"), except that where the Governing Documents conflict with this Agreement, this Agreement shall control.

      ii.      You acknowledge and understand that the Company is the general partner of Highland Capital Management, L.P. ("HCMLP") and that HCMLP is currently the debtor in possession in a chapter 11 bankruptcy proceeding (the "Bankruptcy") pending in the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court"). Your rights, duties, and obligations may in certain instances require your involvement, either directly or indirectly, in the Bankruptcy and such rights, duties, and obligations may be impacted in whole or in part by the Bankruptcy.

      b.      <u>Mandatory Board Meeting Attendance</u>. As a Director, you agree to apply all reasonable efforts to attend each regular meeting of the Board.  You also agree to devote sufficient time to matters that may arise at the Company from time to time that require your attention as a Director.

      c.      <u>Independent Contractor</u>. Under this Agreement, your relationship with the Company will be that of an independent contractor as you will not be an employee of the Company nor eligible to participate in regular employee benefit and compensation plans of the Company.

      d.      <u>Information Provided by the Company.</u> The Company shall: (i) provide you with reasonable access to management and other representatives of the Company and HCMLP; and (ii) furnish all data, material, and other information concerning the business, assets, liabilities, operations, cash flows, properties, financial condition and prospects of the Company and HCMLP that you request in connection with the services to be provided to the Company. You will rely, without further independent verification, on the accuracy and completeness of all publicly available information and information that is furnished by or on behalf of the Company and otherwise reviewed by you in connection with the services performed for the Company. The Company acknowledges and agrees that you are not responsible for the

accuracy or completeness of such information and shall not be responsible for any inaccuracies or omissions therein, provided that if you become aware of material inaccuracies or errors in any such information you shall promptly notify the Board of such errors, inaccuracies or concerns.

## 2.     COMPENSATION AND BENEFITS.

a.     Retainer. The Company will pay you a retainer for each month you serve on the Board (the "Retainer") to be paid in monthly installments of (a) $60,000 for each of the first three months, (b) $50,000 for each of the next three months, and (c) $30,000 for each of the following six months.  The parties will re-visit the Retainer after the sixth month.  The Company's obligation to pay the Retainer will cease upon the termination of the Term.

b.     Expense Reimbursement. The Company will reimburse you for all reasonable travel or other expenses, including expenses of counsel, incurred by you in connection with your services hereunder, in accordance with the Company's expense reimbursement policy as in effect from time to time.

c.     Invoices; Payment.

i.     In order to receive the compensation and reimbursement set forth in this Section 2, you are required to send to the Company regular monthly invoices indicating your fees, costs, and expenses incurred. Payment of the Retainer will be due on the first business day of each month regardless of whether an invoice has been provided.  Reimbursement of expenses will also occur on the first business day of each month, subject to the Company's receipt of appropriate documentation required by the Company's expenses reimbursement policy.

ii.     You further agree that the Company's obligation to pay the compensation and reimbursement set forth in this Section 2 is conditioned in all respects on the entry of a final order in the court overseeing the Bankruptcy that authorizes and requires HCMLP to reimburse the Company for all such payments to you.

d.     Indemnification; D&O Insurance. You will receive indemnification as a Director of the Company on the terms set forth in that certain Indemnification Agreement, dated January 9, 2020, a copy of which is attached hereto as **Appendix A** (the "Indemnification Agreement"). You will also be provided coverage under the Company's directors' and officers' insurance policy as set forth in the Indemnification Agreement.

e.     Tax Indemnification. You acknowledge that the Company will not be responsible for the payment of any federal or state taxes that might be assessed with respect to the Retainer and you agree to be responsible for all such taxes.

## 3.     PROPRIETARY INFORMATION OBLIGATIONS.

a.     Proprietary Information. You agree that during the Term and thereafter that you will take all steps reasonably necessary to hold all information of the Company, its affiliates, and related entities, which a reasonable person would believe to be confidential or proprietary information, in trust and confidence, and not disclose any such confidential or proprietary information to any third party without first obtaining the Company's express written consent on a case-by-case basis.

b.     Third Party Information. The Company has received and will in the future receive from third parties confidential or proprietary information ("Third Party Information") subject to a

012369

duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. You agree to hold such Third Party Information in confidence and not to disclose it to anyone (other than Company personnel who need to know such information in connection with their work for Company) or to use, except in connection with your services for Company under this Agreement, Third Party Information unless expressly authorized in writing by the Company.

       c.    <u>Return of Company Property</u>. Upon the end of the Term or upon the Company's earlier request, you agree to deliver to the Company any and all notes, materials and documents, together with any copies thereof, which contain or disclose any confidential or proprietary information or Third Party Information.

## 4. OUTSIDE ACTIVITIES.

       a.    <u>Investments and Interests</u>. Except as permitted by Section 4(b), you agree not to participate in, directly or indirectly, any position or investment known by you to be materially adverse to the Company or any of its affiliates or related entities.

       b.    <u>Activities</u>. Except with the prior written consent of the Board, you will not during your tenure as a member of the Company's Board undertake or engage in any other directorship, employment or business enterprise in direct competition with the Company or any of its affiliates or related entities, other than ones in which you are a passive investor or other activities in which you were a participant prior to your appointment to the Board as disclosed to the Company.

       c.    <u>Other Agreements</u>. You agree that you will not disclose to the Company or use on behalf of the Company any confidential information governed by any agreement between you and any third party except in accordance with such agreement.

## 5. TERMINATION OF DIRECTORSHIP.

       a.    <u>Voluntary Resignation, Removal Pursuant to Bylaws</u>. You may resign from the Board at any time with or without advance notice, with or without reason. Subject to any orders or agreements entered into in connection with the Bankruptcy, you may be removed from the Board at any time, for any reason, in any manner provided by the Governing Documents and applicable law.

       b.    <u>Continuation</u>. The provisions of this Agreement that give the parties rights or obligations beyond the termination of this Agreement will survive and continue to bind the parties.

       c.    <u>Payment of Fees; Reimbursement</u>. Following termination of this Agreement, any undisputed fees and expenses due to you will be remitted promptly following receipt by the Company of any outstanding invoices.

## 6. GENERAL PROVISIONS.

       a.    <u>Severability</u>. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law. If any provision of this Agreement is held to be invalid, illegal or unenforceable such provision will be reformed, construed and enforced to render it valid, legal, and enforceable consistent with the intent of the parties insofar as possible.

       b.    <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between you and the Company with respect to your service as a Director and supersedes any prior agreement, promise,

012370

representation or statement written between you and the Company with regard to this subject matter. It is entered into without reliance on any promise, representation, statement or agreement other than those expressly contained or incorporated herein, and it cannot be modified or amended except in a writing signed by the party or parties affected by such modification or amendment.

        c.    Successors and Assigns. This Agreement is intended to bind and inure to the benefit of and be enforceable by you and the Company and our respective successors, assigns, heirs, executors and administrators, except that you may not assign any of your rights or duties hereunder.

        d.    Governing Law. This Agreement will be governed by the law of the State of Delaware as applied to contracts made and performed entirely within Delaware.

We are all delighted to be able to extend you this offer and look forward to working with you. To indicate your acceptance of the Company's offer, please sign and date this Agreement below.

Sincerely,

**STRAND ADVISORS, INC.**

By: Scott Ellington
Its: Secretary

*[Signature Page Follows]*

**ACCEPTED AND AGREED:**

RUSSELL NELMS
Date: _____ 1 / 9 / 2020

012372

### INDEMNIFICATION AND GUARANTY AGREEMENT

This Indemnification and Guaranty Agreement ("**Agreement**"), dated as of January 9, 2020, is by and between STRAND ADVISORS, INC., a Delaware corporation (the "**Company**"), HIGHLAND CAPITAL MANAGEMENT, L.P., a Delaware partnership (the "**Debtor**") (solely as to <u>Section 29</u> hereunder), and Russell Nelms (the "**Indemnitee**").

WHEREAS, the Company is the general partner of the Debtor and, in such capacity, manages the business affairs of the Debtor;

WHEREAS, Indemnitee has agreed to serve as a member of the Company's board of directors (the "**Board**") effective as of the date hereof;

WHEREAS, the Board has determined that enhancing the ability of the Company, on its own behalf and for the benefit of the Debtor, to retain and attract as directors the most capable Persons is in the best interests of the Company and the Debtor and that the Company and the Debtor therefore should seek to assure such Persons that indemnification and insurance coverage is available; and

WHEREAS, in recognition of the need to provide Indemnitee with protection against personal liability, in order to procure Indemnitee's service as a director of the Company, in order to enhance Indemnitee's ability to serve the Company in an effective manner and in order to provide such protection pursuant to express contract rights (intended to be enforceable irrespective of, among other things, any amendment to the Company's Bylaws (as may be amended further from time to time, the "**Bylaws**"), any change in the composition of the Board or any change in control, business combination or similar transaction relating to the Company), the Company wishes to provide in this Agreement for the indemnification of, and the advancement of Expenses (as defined in <u>Section 1(g)</u> below) to, Indemnitee as set forth in this Agreement and for the coverage of Indemnitee under the Company's directors' and officers' liability or similar insurance policies ("**D&O Insurance**").

NOW, THEREFORE, in consideration of the foregoing and the Indemnitee's agreement to provide services to the Company, the parties (including the Debtor solely as to <u>Section 29</u> hereunder) agree as follows:

1.    <u>Definitions</u>. For purposes of this Agreement, the following terms shall have the following meanings:

(a)    "**Change in Control**" means the occurrence of any of the following: (i) the direct or indirect sale, lease, transfer, conveyance or other disposition, in one or a series of related transactions (including any merger or consolidation or whether by operation of law or otherwise), of all or substantially all of the properties or assets of the Company and its subsidiaries, to a third party purchaser (or group of affiliated third party purchasers) or (ii) the consummation of any transaction (including any merger or consolidation or whether by operation of law or otherwise), the result of which is that a third party purchaser (or group of affiliated third party purchasers) becomes the beneficial

owner, directly or indirectly, of more than fifty percent (50%) of the then outstanding Shares or of the surviving entity of any such merger or consolidation.

(b)    "**Claim**" means:

(i)    any threatened, pending or completed action, suit, claim, demand, arbitration, inquiry, hearing, proceeding or alternative dispute resolution mechanism, or any actual, threatened or completed proceeding, including any and all appeals, in each case, whether brought by or in the right of the Company or otherwise, whether civil, criminal, administrative, arbitrative, investigative or other, whether formal or informal, and whether made pursuant to federal, state, local, foreign or other law, and whether or not commenced prior to the date of this Agreement, in which Indemnitee was, is or will be involved as a party or otherwise, by reason of or relating to either (a) any action or alleged action taken by Indemnitee (or failure or alleged failure to act) or of any action or alleged action (or failure or alleged failure to act) on Indemnitee's part, while acting in his or her Corporate Status or (b) the fact that Indemnitee is or was serving at the request of the Company or any subsidiary of the Company as director, officer, employee, partner, member, manager, trustee, fiduciary or agent of another Enterprise, in each case, whether or not serving in such capacity at the time any Loss or Expense is paid or incurred for which indemnification or advancement of Expenses can be provided under this Agreement, except one initiated by Indemnitee to enforce his or her rights under this Agreement; or

(ii)    any inquiry, hearing or investigation that the Indemnitee determines might lead to the institution of any such action, suit, proceeding or alternative dispute resolution mechanism.

(c)    "**Controlled Entity**" means any corporation, limited liability company, partnership, joint venture, trust or other Enterprise, whether or not for profit, that is, directly or indirectly, controlled by the Company. For purposes of this definition, the term "control" means the possession, directly or indirectly, of the power to direct, or cause the direction of, the management or policies of an Enterprise, whether through the ownership of voting securities, through other voting rights, by contract or otherwise.

(d)    "**Corporate Status**" means the status of a Person who is or was a director, officer, employee, partner, member, manager, trustee, fiduciary or agent of the Company or of any other Enterprise which such Person is or was serving at the request of the Company or any subsidiary of the Company. In addition to any service at the actual request of the Company, Indemnitee will be deemed, for purposes of this Agreement, to be serving or to have served at the request of the Company or any subsidiary of the Company as a director, officer, employee, partner, member, manager, trustee, fiduciary or agent of another Enterprise if Indemnitee is or was serving as a director, officer, employee, partner, member, manager, fiduciary, trustee or agent of such Enterprise and (i) such Enterprise is or at the time of such service was a Controlled Entity, (ii) such Enterprise is or at the time of such service was an employee benefit plan (or related trust) sponsored or maintained by the Company or a Controlled Entity or (iii) the Company or a

2

Controlled Entity, directly or indirectly, caused Indemnitee to be nominated, elected, appointed, designated, employed, engaged or selected to serve in such capacity.

(e)  "**Disinterested Director**" means a director of the Company who is not and was not a party to the Claim in respect of which indemnification is sought by Indemnitee. Under no circumstances will James Dondero be considered a Disinterested Director.

(f)  "**Enterprise**" means the Company or any subsidiary of the Company or any other corporation, partnership, limited liability company, joint venture, employee benefit plan, trust or other entity or other enterprise of which Indemnitee is or was serving at the request of the Company or any subsidiary of the Company in a Corporate Status.

(g)  "**Expenses**" means any and all expenses, fees, including attorneys', witnesses' and experts' fees, disbursements and retainers, court costs, transcript costs, travel expenses, duplicating, printing and binding costs, telephone charges, postage, fax transmission charges, secretarial services, delivery services fees, and all other fees, costs, disbursements and expenses paid or incurred in connection with investigating, defending, prosecuting, being a witness in or participating in (including on appeal), or preparing to defend, prosecute, be a witness or participate in, any Claim. Expenses also shall include (i) Expenses paid or incurred in connection with any appeal resulting from any Claim, including, without limitation, the premium, security for, and other costs relating to any cost bond, supersedeas bond, or other appeal bond or its equivalent, and (ii) for purposes of Section 4 only, Expenses incurred by Indemnitee in connection with the interpretation, enforcement or defense of Indemnitee's rights under this Agreement, by litigation or otherwise. Expenses, however, shall not include amounts paid in settlement by Indemnitee or the amount of judgments or fines against Indemnitee.

(h)  "**Exchange Act**" means the Securities Exchange Act of 1934, as amended, or any successor statute thereto, and the rules and regulations of the United States Securities and Exchange Commission promulgated thereunder.

(i)  "**Expense Advance**" means any payment of Expenses advanced to Indemnitee by the Company pursuant to Section 4 or Section 5 hereof.

(j)  "**Indemnifiable Event**" means any event or occurrence, whether occurring before, on or after the date of this Agreement, related to the fact that Indemnitee is or was a manager, director, officer, employee or agent of the Company or any subsidiary of the Company, or is or was serving at the request of the Company or any subsidiary of the Company as a manager, director, officer, employee, member, manager, trustee or agent of any other Enterprise or by reason of an action or inaction by Indemnitee in any such capacity (whether or not serving in such capacity at the time any Loss is incurred for which indemnification can be provided under this Agreement).

(k)  "**Independent Counsel**" means a law firm, or a member of a law firm, that is experienced in matters of corporation law and neither presently performs, nor in the past three (3) years has performed, services for any of: (i) James Dondero, (ii) the

012375

Company or Indemnitee (other than in connection with matters concerning Indemnitee under this Agreement or of other indemnitees under similar agreements), or (iii) any other party to the Claim giving rise to a claim for indemnification hereunder. Notwithstanding the foregoing, the term "Independent Counsel" shall not include any Person who, under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Company or Indemnitee in an action to determine Indemnitee's rights under this Agreement.

(l) "**Losses**" means any and all Expenses, damages, losses, liabilities, judgments, fines (including excise taxes and penalties assessed with respect to employee benefit plans and ERISA excise taxes), penalties (whether civil, criminal or other), amounts paid or payable in settlement, including any interest, assessments, any federal, state, local or foreign taxes imposed as a result of the actual or deemed receipt of any payments under this Agreement and all other charges paid or payable in connection with investigating, defending, being a witness in or participating in (including on appeal), or preparing to defend, be a witness or participate in, any Claim.

(m) "**Person**" means any individual, corporation, firm, partnership, joint venture, limited liability company, estate, trust, business association, organization, governmental entity or other entity and includes the meaning set forth in Sections 13(d) and 14(d) of the Exchange Act.

(n) "**Shares**" means an ownership interest of a member in the Company, including each of the common shares of the Company or any other class or series of Shares designated by the Board.

(o) References to "**serving at the request of the Company**" include any service as a director, manager, officer, employee, representative or agent of the Company which imposes duties on, or involves services by, such director, manager, officer, employee or agent, including but not limited to any employee benefit plan, its participants or beneficiaries; and a Person who acted in good faith and in a manner he or she reasonably believed to be in and not opposed to the best interests of the Company in Indemnitee's capacity as a director, manager, officer, employee, representative or agent of the Company, including but not limited to acting in the best interest of participants and beneficiaries of an employee benefit plan will be deemed to have acted in a manner "**not opposed to the best interests of the Company**" as referred to under applicable law or in this Agreement.

2. <u>Indemnification</u>.

(a) Subject to <u>Section 9</u> and <u>Section 10</u> of this Agreement, the Company shall indemnify and hold Indemnitee harmless, to the fullest extent permitted by the laws of the State of Delaware in effect on the date hereof, or as such laws may from time to time hereafter be amended to increase the scope of such permitted indemnification, against any and all Losses and Expenses if Indemnitee was or is or becomes a party to or participant in, or is threatened to be made a party to or participant in, any Claim by reason of or arising in part out of an Indemnifiable Event, including, without limitation, Claims

4

012376

brought by or in the right of the Company, Claims brought by third parties, and Claims in which the Indemnitee is solely a witness.

(b)     For the avoidance of doubt, the indemnification rights and obligations contained herein shall also extend to any Claim in which the Indemnitee was or is a party to, was or is threatened to be made a party to or was or is otherwise involved in any capacity in by reason of Indemnitee's Corporate Status as a fiduciary capacity with respect to an employee benefit plan. In connection therewith, if the Indemnitee has acted in good faith and in a manner which appeared to be consistent with the best interests of the participants and beneficiaries of an employee benefit plan and not opposed thereto, the Indemnitee shall be deemed to have acted in a manner not opposed to the best interests of the Company.

3.     <u>Contribution</u>.

(a)     Whether or not the indemnification provided in <u>Section 2</u> is available, if, for any reason, Indemnitee shall elect or be required to pay all or any portion of any judgment or settlement in any Claim in which the Company is jointly liable with Indemnitee (or would be if joined in such Claim), the Company shall contribute to the amount of Losses paid or payable by Indemnitee in proportion to the relative benefits received by the Company and all officers, directors, managers or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such Claim), on the one hand, and Indemnitee, on the other hand, from the transaction or events from which such Claim arose; provided, however, that the proportion determined on the basis of relative benefit may, to the extent necessary to conform to law, be further adjusted by reference to the relative fault of the Company and all officers, directors, managers or employees of the Company other than Indemnitee who are jointly liable with Indemnitee (or would be if joined in such Claim), on the one hand, and Indemnitee, on the other hand, in connection with the transaction or events that resulted in such Losses, as well as any other equitable considerations which applicable law may require to be considered. The relative fault of the Company and all officers, directors, managers or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such Claim), on the one hand, and Indemnitee, on the other hand, shall be determined by reference to, among other things, the degree to which their actions were motivated by intent to gain personal profit or advantage, the degree to which their liability is primary or secondary and the degree to which their conduct is active or passive.

(b)     The Company hereby agrees to fully indemnify and hold Indemnitee harmless from any claims of contribution which may be brought by officers, directors, managers or employees of the Company, other than Indemnitee, who may be jointly liable with Indemnitee.

(c)     To the fullest extent permissible under applicable law, if the indemnification provided for in this Agreement is unavailable to Indemnitee for any reason whatsoever, the Company, in lieu of indemnifying Indemnitee, shall contribute to the amount incurred by Indemnitee, whether for judgments, fines, penalties, excise taxes,

012377

amounts paid or to be paid in settlement and/or for Expenses, in connection with any
Claim relating to an Indemnifiable Event under this Agreement, in such proportion as is
deemed fair and reasonable in light of all of the circumstances of such Claim in order to
reflect (i) the relative benefits received by the Company and Indemnitee as a result of the
event(s) and/or transaction(s) giving cause to such Claim; and/or (ii) the relative fault of
the Company (and its directors, managers, officers, employees and agents) and
Indemnitee in connection with such event(s) and/or transaction(s).

4.     Advancement of Expenses. The Company shall, if requested by Indemnitee,
advance, to the fullest extent permitted by law, to Indemnitee (an "**Expense Advance**")
any and all Expenses actually and reasonably paid or incurred (even if unpaid) by
Indemnitee in connection with any Claim arising out of an Indemnifiable Event (whether
prior to or after its final disposition). Indemnitee's right to such advancement is not
subject to the satisfaction of any standard of conduct. Without limiting the generality or
effect of the foregoing, within thirty (30) business days after any request by Indemnitee,
the Company shall, in accordance with such request, (a) pay such Expenses on behalf of
Indemnitee, (b) advance to Indemnitee funds in an amount sufficient to pay such
Expenses, or (c) reimburse Indemnitee for such Expenses. In connection with any request
for Expense Advances, Indemnitee shall not be required to provide any documentation or
information to the extent that the provision thereof would undermine or otherwise
jeopardize attorney-client privilege. Execution and delivery to the Company of this
Agreement by Indemnitee constitutes an undertaking by the Indemnitee to repay any
amounts paid, advanced or reimbursed by the Company pursuant to this Section 4, the
final sentence of Section 9(b), or Section 11(b) in respect of Expenses relating to, arising
out of or resulting from any Claim in respect of which it shall be determined, pursuant to
Section 9, following the final disposition of such Claim, that Indemnitee is not entitled to
indemnification hereunder. No other form of undertaking shall be required other than the
execution of this Agreement. Each Expense Advance will be unsecured and interest free
and will be made by the Company without regard to Indemnitee's ability to repay the
Expense Advance.

5.     Indemnification for Expenses in Enforcing Rights. To the fullest extent allowable
under applicable law, the Company shall also indemnify against, and, if requested by
Indemnitee, shall advance to Indemnitee subject to and in accordance with Section 4, any
Expenses actually and reasonably paid or incurred (even if unpaid) by Indemnitee in
connection with any action or proceeding by Indemnitee for (a) indemnification or
reimbursement or advance payment of Expenses by the Company under any provision of
this Agreement, or under any other agreement or provision of the Bylaws now or
hereafter in effect relating to Claims relating to Indemnifiable Events, and/or (b) recovery
under any D&O Insurance maintained by the Company, regardless of whether Indemnitee
ultimately is determined to be entitled to such indemnification or insurance recovery, as
the case may be. Indemnitee shall be required to reimburse the Company in the event that
a final judicial determination is made that such action brought by Indemnitee was
frivolous or not made in good faith.

6.     Partial Indemnity. If Indemnitee is entitled under any provision of this Agreement
to indemnification by the Company for a portion of any Losses in respect of a Claim

6

012378

related to an Indemnifiable Event but not for the total amount thereof, the Company shall nevertheless indemnify Indemnitee for the portion thereof to which Indemnitee is entitled.

7.    Notification and Defense of Claims.

(a)    Notification of Claims. Indemnitee shall notify the Company in writing as soon as reasonably practicable of any Claim which could relate to an Indemnifiable Event or for which Indemnitee could seek Expense Advances, including a brief description (based upon information then available to Indemnitee) of the nature of, and the facts underlying, such Claim, to the extent then known. The failure by Indemnitee to timely notify the Company hereunder shall not relieve the Company from any liability hereunder except to the extent the Company's ability to participate in the defense of such claim was materially and adversely affected by such failure. If at the time of the receipt of such notice, the Company has D&O Insurance or any other insurance in effect under which coverage for Claims related to Indemnifiable Events is potentially available, the Company shall give prompt written notice to the applicable insurers in accordance with the procedures, provisions, and terms set forth in the applicable policies. The Company shall provide to Indemnitee a copy of such notice delivered to the applicable insurers, and copies of all subsequent correspondence between the Company and such insurers regarding the Claim, in each case substantially concurrently with the delivery or receipt thereof by the Company.

(b)    Defense of Claims. The Company shall be entitled to participate in the defense of any Claim relating to an Indemnifiable Event at its own expense and, except as otherwise provided below, to the extent the Company so wishes, it may assume the defense thereof with counsel reasonably satisfactory to Indemnitee. After notice from the Company to Indemnitee of its election to assume the defense of any such Claim, the Company shall not be liable to Indemnitee under this Agreement or otherwise for any Expenses subsequently directly incurred by Indemnitee in connection with Indemnitee's defense of such Claim other than reasonable costs of investigation or as otherwise provided below. Indemnitee shall have the right to employ its own legal counsel in such Claim, but all Expenses related to such counsel incurred after notice from the Company of its assumption of the defense shall be at Indemnitee's own expense; provided, however, that if (i) Indemnitee's employment of its own legal counsel has been authorized by the Company, (ii) Indemnitee has reasonably determined that there may be a conflict of interest between Indemnitee and the Company in the defense of such Claim, (iii) after a Change in Control, Indemnitee's employment of its own counsel has been approved by the Independent Counsel or (iv) the Company shall not in fact have employed counsel to assume the defense of such Claim, then Indemnitee shall be entitled to retain its own separate counsel (but not more than one law firm plus, if applicable, local counsel in respect of any such Claim) and all Expenses related to such separate counsel shall be borne by the Company.

8.    Procedure upon Application for Indemnification. In order to obtain indemnification pursuant to this Agreement, Indemnitee shall submit to the Company a written request therefor, including in such request such documentation and information as

012379

is reasonably available to Indemnitee and is reasonably necessary to determine whether and to what extent Indemnitee is entitled to indemnification following the final disposition of the Claim, provided that documentation and information need not be so provided to the extent that the provision thereof would undermine or otherwise jeopardize attorney-client privilege. Indemnification shall be made insofar as the Company determines Indemnitee is entitled to indemnification in accordance with Section 9 below.

9.      Determination of Right to Indemnification.

      (a)      Mandatory Indemnification; Indemnification as a Witness.

          (i)      To the extent that Indemnitee shall have been successful on the merits or otherwise in defense of any Claim relating to an Indemnifiable Event or any portion thereof or in defense of any issue or matter therein, including without limitation dismissal without prejudice, Indemnitee shall be indemnified against all Losses relating to such Claim in accordance with Section 2, and no Standard of Conduct Determination (as defined in Section 9(b)) shall be required.

          (ii)      To the extent that Indemnitee's involvement in a Claim relating to an Indemnifiable Event is to prepare to serve and serve as a witness, and not as a party, the Indemnitee shall be indemnified against all Losses incurred in connection therewith to the fullest extent allowable by law and no Standard of Conduct Determination (as defined in Section 9(b)) shall be required.

      (b)      Standard of Conduct. To the extent that the provisions of Section 9(a) are inapplicable to a Claim related to an Indemnifiable Event that shall have been finally disposed of, any determination of whether Indemnitee has satisfied any applicable standard of conduct under Delaware law that is a legally required condition to indemnification of Indemnitee hereunder against Losses relating to such Claim and any determination that Expense Advances must be repaid to the Company (a "**Standard of Conduct Determination**") shall be made as follows:

          (i)      if no Change in Control has occurred, (A) by a majority vote of the Disinterested Directors, even if less than a quorum of the Board, (B) by a committee of Disinterested Directors designated by a majority vote of the Disinterested Directors, even though less than a quorum or (C) if there are no such Disinterested Directors, by Independent Counsel in a written opinion addressed to the Board, a copy of which shall be delivered to Indemnitee; and

          (ii)      if a Change in Control shall have occurred, (A) if the Indemnitee so requests in writing, by a majority vote of the Disinterested Directors, even if less than a quorum of the Board or (B) otherwise, by Independent Counsel in a written opinion addressed to the Board, a copy of which shall be delivered to Indemnitee.

Subject to Section 4, the Company shall indemnify and hold Indemnitee harmless against and, if requested by Indemnitee, shall reimburse Indemnitee for, or advance to Indemnitee, within thirty (30) business days of such request, any and all Expenses

012380

incurred by Indemnitee in cooperating with the Person or Persons making such Standard of Conduct Determination.

(c)      Making the Standard of Conduct Determination. The Company shall use its reasonable best efforts to cause any Standard of Conduct Determination required under Section 9(b) to be made as promptly as practicable. If the Person or Persons designated to make the Standard of Conduct Determination under Section 9(b) shall not have made a determination within ninety (90) days after the later of (A) receipt by the Company of a written request from Indemnitee for indemnification pursuant to Section 8 (the date of such receipt being the "**Notification Date**") and (B) the selection of an Independent Counsel, if such determination is to be made by Independent Counsel, then Indemnitee shall be deemed to have satisfied the applicable standard of conduct; provided that such 90-day period may be extended for a reasonable time, not to exceed an additional thirty (30) days, if the Person or Persons making such determination in good faith requires such additional time to obtain or evaluate information relating thereto. Notwithstanding anything in this Agreement to the contrary, no determination as to entitlement of Indemnitee to indemnification under this Agreement shall be required to be made prior to the final disposition of any Claim.

(d)      Payment of Indemnification. If, in regard to any Losses:

(i)      Indemnitee shall be entitled to indemnification pursuant to Section 9(a);

(ii)      no Standard of Conduct Determination is legally required as a condition to indemnification of Indemnitee hereunder; or

(iii)      Indemnitee has been determined or deemed pursuant to Section 9(b) or Section 9(c) to have satisfied the Standard of Conduct Determination,

then the Company shall pay to Indemnitee, within thirty (30) business days after the later of (A) the Notification Date or (B) the earliest date on which the applicable criterion specified in clause (i), (ii) or (iii) is satisfied, an amount equal to such Losses.

(e)      Selection of Independent Counsel for Standard of Conduct Determination. If a Standard of Conduct Determination is to be made by Independent Counsel pursuant to Section 9(b)(i), the Independent Counsel shall be selected by the Board and the Company shall give written notice to Indemnitee advising him of the identity of the Independent Counsel so selected. If a Standard of Conduct Determination is to be made by Independent Counsel pursuant to Section 9(b)(ii), the Independent Counsel shall be selected by Indemnitee, and Indemnitee shall give written notice to the Company advising it of the identity of the Independent Counsel so selected. In either case, Indemnitee or the Company, as applicable, may, within thirty (3) business days after receiving written notice of selection from the other, deliver to the other a written objection to such selection; provided, however, that such objection may be asserted only on the ground that the Independent Counsel so selected does not satisfy the criteria set forth in the definition of "Independent Counsel" in Section 1(k), and the objection shall

012381

set forth with particularity the factual basis of such assertion. Absent a proper and timely objection, the Person or firm so selected shall act as Independent Counsel. If such written objection is properly and timely made and substantiated, (i) the Independent Counsel so selected may not serve as Independent Counsel unless and until such objection is withdrawn or a court has determined that such objection is without merit; and (ii) the non-objecting party may, at its option, select an alternative Independent Counsel and give written notice to the other party advising such other party of the identity of the alternative Independent Counsel so selected, in which case the provisions of the two immediately preceding sentences, the introductory clause of this sentence and numbered clause (i) of this sentence shall apply to such subsequent selection and notice. If applicable, the provisions of clause (ii) of the immediately preceding sentence shall apply to successive alternative selections. If no Independent Counsel that is permitted under the foregoing provisions of this <u>Section 9(e)</u> to make the Standard of Conduct Determination shall have been selected within twenty (20) days after the Company gives its initial notice pursuant to the first sentence of this <u>Section 9(e)</u> or Indemnitee gives its initial notice pursuant to the second sentence of this <u>Section 9(e)</u>, as the case may be, either the Company or Indemnitee may petition the Court of Chancery of the State of Delaware ("**Delaware Court**") to resolve any objection which shall have been made by the Company or Indemnitee to the other's selection of Independent Counsel and/or to appoint as Independent Counsel a Person to be selected by the Court or such other Person as the Court shall designate, and the Person or firm with respect to whom all objections are so resolved or the Person or firm so appointed will act as Independent Counsel. In all events, the Company shall pay all of the reasonable fees and expenses of the Independent Counsel incurred in connection with the Independent Counsel's determination pursuant to <u>Section 9(b)</u>.

(f)     <u>Presumptions and Defenses</u>.

(i)     <u>Indemnitee's Entitlement to Indemnification</u>. In making any Standard of Conduct Determination, the Person or Persons making such determination shall presume that Indemnitee has satisfied the applicable standard of conduct and is entitled to indemnification, and the Company shall have the burden of proof to overcome that presumption and establish that Indemnitee is not so entitled. Any Standard of Conduct Determination that is adverse to Indemnitee may be challenged by the Indemnitee in the Delaware Court. No determination by the Company (including by its Board or any Independent Counsel) that Indemnitee has not satisfied any applicable standard of conduct may be used as a defense to enforcement by Indemnitee of Indemnitee's rights of indemnification or reimbursement or advance of payment of Expenses by the Company hereunder or create a presumption that Indemnitee has not met any applicable standard of conduct.

(ii)     <u>Reliance as a Safe Harbor</u>. For purposes of this Agreement, and without creating any presumption as to a lack of good faith if the following circumstances do not exist, Indemnitee shall be deemed to have acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Company if Indemnitee's actions or omissions to act are taken in good faith reliance upon the records of the Company, including its financial statements, or upon information, opinions, reports

012382

or statements furnished to Indemnitee by the officers or employees of the Company or any of its subsidiaries in the course of their duties, or by committees of the Board or by any other Person (including legal counsel, accountants and financial advisors) as to matters Indemnitee reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company. In addition, the knowledge and/or actions, or failures to act, of any director, manager, officer, agent or employee of the Company (other than Indemnitee) shall not be imputed to Indemnitee for purposes of determining the right to indemnity hereunder.

(iii)    <u>Defense to Indemnification and Burden of Proof</u>. It shall be a defense to any action brought by Indemnitee against the Company to enforce this Agreement (other than an action brought to enforce a claim for Losses incurred in defending against a Claim related to an Indemnifiable Event in advance of its final disposition) that it is not permissible under applicable law for the Company to indemnify Indemnitee for the amount claimed. In connection with any such action or any related Standard of Conduct Determination, the burden of proving such a defense or that the Indemnitee did not satisfy the applicable standard of conduct shall be on the Company.

10.    <u>Exclusions from Indemnification</u>. Notwithstanding anything in this Agreement to the contrary, the Company shall not be obligated to:

(a)    indemnify or advance funds to Indemnitee for Losses with respect to proceedings initiated by Indemnitee, including any proceedings against the Company or its managers, officers, employees or other indemnitees and not by way of defense, except:

(i)    proceedings referenced in <u>Section 4</u> above (unless a court of competent jurisdiction determines that each of the material assertions made by Indemnitee in such proceeding was not made in good faith or was frivolous); or

(ii)    where the Company has joined in or the Board has consented to the initiation of such proceedings.

(b)    indemnify Indemnitee if a final decision by a court of competent jurisdiction determines that such indemnification is prohibited by applicable law.

(c)    indemnify Indemnitee for the disgorgement of profits arising from the purchase or sale by Indemnitee of securities of the Company in violation of Section 16(b) of the Exchange Act, or any similar successor statute.

11.    <u>Remedies of Indemnitee</u>.

(a)    In the event that (i) a determination is made pursuant to <u>Section 9</u> that Indemnitee is not entitled to indemnification under this Agreement, (ii) an Expense Advance is not timely made pursuant to <u>Section 4</u>, (iii) no determination of entitlement to indemnification is made pursuant to <u>Section 9</u> within 90 days after receipt by the Company of the request for indemnification, or (iv) payment of indemnification is not made pursuant <u>Section 9(d)</u>, Indemnitee shall be entitled to an adjudication in a Delaware Court, or in any other court of competent jurisdiction, of Indemnitee's entitlement to such

012383

indemnification. Indemnitee shall commence such proceeding seeking an adjudication within 180 days following the date on which Indemnitee first has the right to commence such proceeding pursuant to this Section 11(a). The Company shall not oppose Indemnitee's right to seek any such adjudication.

(b)     In the event that Indemnitee, pursuant to this Section 11, seeks a judicial adjudication or arbitration of his or her rights under, or to recover damages for breach of, this Agreement, any other agreement for indemnification, payment of Expenses in advance or contribution hereunder or to recover under any director, manager, and officer liability insurance policies or any other insurance policies maintained by the Company, the Company will, to the fullest extent permitted by law and subject to Section 4, indemnify and hold harmless Indemnitee against any and all Expenses which are paid or incurred by Indemnitee in connection with such judicial adjudication or arbitration, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification, payment of Expenses in advance or contribution or insurance recovery. In addition, if requested by Indemnitee, subject to Section 4 the Company will (within thirty (30) days after receipt by the Company of the written request therefor), pay as an Expense Advance such Expenses, to the fullest extent permitted by law.

(c)     In the event that a determination shall have been made pursuant to Section 9 that Indemnitee is not entitled to indemnification, any judicial proceeding commenced pursuant to this Section 11 shall be conducted in all respects as a de novo trial on the merits, and Indemnitee shall not be prejudiced by reason of the adverse determination under Section 9.

(d)     If a determination shall have been made pursuant to Section 9 that Indemnitee is entitled to indemnification, the Company shall be bound by such determination in any judicial proceeding commenced pursuant to this Section 11, absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's misstatement not materially misleading in connection with the application for indemnification, or (ii) a prohibition of such indemnification under applicable law.

12.     Settlement of Claims. The Company shall not be liable to Indemnitee under this Agreement for any amounts paid in settlement of any threatened or pending Claim related to an Indemnifiable Event effected without the Company's prior written consent, which shall not be unreasonably withheld; provided, however, that if a Change in Control has occurred, the Company shall be liable for indemnification of the Indemnitee for amounts paid in settlement if an Independent Counsel (which, for purposes of this Section 12, shall be selected by the Company with the prior consent of the Indemnitee, such consent not to be unreasonably withheld or delayed) has approved the settlement. The Company shall not settle any Claim related to an Indemnifiable Event in any manner that would impose any Losses on the Indemnitee without the Indemnitee's prior written consent.

13.     Duration. All agreements and obligations of the Company contained herein shall continue during the period that Indemnitee is a manager of the Company (or is serving at the request of the Company as a director, manager, officer, employee, member, trustee or

012384

agent of another Enterprise) and shall continue thereafter (i) so long as Indemnitee may be subject to any possible Claim relating to an Indemnifiable Event (including any rights of appeal thereto) and (ii) throughout the pendency of any proceeding (including any rights of appeal thereto) commenced by Indemnitee to enforce or interpret his or her rights under this Agreement, even if, in either case, he or she may have ceased to serve in such capacity at the time of any such Claim or proceeding.

14. <u>Other Indemnitors</u>. The Company hereby acknowledges that Indemnitee may have certain rights to indemnification, advancement of Expenses and/or insurance provided by certain private equity funds, hedge funds or other investment vehicles or management companies and/or certain of their affiliates and by personal policies (collectively, the "**Other Indemnitors**"). The Company hereby agrees (i) that it is the indemnitor of first resort (i.e., its obligations to Indemnitee are primary and any obligation of the Other Indemnitors to advance Expenses or to provide indemnification for the same Expenses or liabilities incurred by Indemnitee are secondary), (ii) that it shall be required to advance the full amount of Expenses incurred by Indemnitee and shall be liable for the full amount of all Expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by the terms of this Agreement and the Bylaws (or any other agreement between the Company and Indemnitee), without regard to any rights Indemnitee may have against the Other Indemnitors, and, (iii) that it irrevocably waives, relinquishes and releases the Other Indemnitors from any and all claims against the Other Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The Company further agrees that no advancement or payment by the Other Indemnitors on behalf of Indemnitee with respect to any claim for which Indemnitee has sought indemnification from the Company shall affect the foregoing and the Other Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of Indemnitee against the Company. The Company and Indemnitee agree that the Other Indemnitors are express third party beneficiaries of the terms of this <u>Section 14</u>.

15. <u>Non-Exclusivity</u>. The rights of Indemnitee hereunder will be in addition to any other rights Indemnitee may have under the Bylaws, the General Corporation Law of the State of Delaware (as may be amended from time to time, the "**DGCL**"), any other contract, in law or in equity, and under the laws of any state, territory, or jurisdiction, or otherwise (collectively, "**Other Indemnity Provisions**"). The Company will not adopt any amendment to its Bylaws the effect of which would be to deny, diminish, encumber or limit Indemnitee's right to indemnification under this Agreement or any Other Indemnity Provision.

16. <u>Liability Insurance</u>. For the duration of Indemnitee's service as a director of the Company, and thereafter for so long as Indemnitee shall be subject to any pending Claim relating to an Indemnifiable Event, the Company shall use best efforts to continue to maintain in effect policies of D&O Insurance providing coverage that is at least substantially comparable in scope and amount to that provided by similarly situated companies. In all policies of D&O Insurance maintained by the Company, Indemnitee shall be named as an insured in such a manner as to provide Indemnitee the same rights

012385

and benefits as are provided to the most favorably insured of the Company's directors. Upon request, the Company will provide to Indemnitee copies of all D&O Insurance applications, binders, policies, declarations, endorsements and other related materials.

17.     No Duplication of Payments. The Company shall not be liable under this Agreement to make any payment to Indemnitee in respect of any Losses to the extent Indemnitee has otherwise received payment under any insurance policy, any Other Indemnity Provisions or otherwise of the amounts otherwise indemnifiable by the Company hereunder.

18.     Subrogation. In the event of payment to Indemnitee under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee. Indemnitee shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents necessary to enable the Company effectively to bring suit to enforce such rights.

19.     Indemnitee Consent. The Company will not, without the prior written consent of Indemnitee, consent to the entry of any judgment against Indemnitee or enter into any settlement or compromise which (a) includes an admission of fault of Indemnitee, any non-monetary remedy imposed on Indemnitee or a Loss for which Indemnitee is not wholly indemnified hereunder or (b) with respect to any Claim with respect to which Indemnitee may be or is made a party or a participant or may be or is otherwise entitled to seek indemnification hereunder, does not include, as an unconditional term thereof, the full release of Indemnitee from all liability in respect of such Claim, which release will be in form and substance reasonably satisfactory to Indemnitee. Neither the Company nor Indemnitee will unreasonably withhold its consent to any proposed settlement; provided, however, Indemnitee may withhold consent to any settlement that does not provide a full and unconditional release of Indemnitee from all liability in respect of such Claim.

20.     Amendments. No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by both of the parties hereto. No waiver of any of the provisions of this Agreement shall be binding unless in the form of a writing signed by the party against whom enforcement of the waiver is sought, and no such waiver shall operate as a waiver of any other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver. Except as specifically provided herein, no failure to exercise or any delay in exercising any right or remedy hereunder shall constitute a waiver thereof.

21.     Binding Effect. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors (including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business and/or assets of the Company), assigns, spouses, heirs and personal and legal representatives. The Company shall require and cause any successor (whether direct or indirect by purchase, merger, consolidation or otherwise) to all, substantially all or a substantial part of the business and/or assets of the Company, by written agreement in form and substance satisfactory to Indemnitee, expressly to assume

012386

and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place.

22.    Severability. Each provision of this Agreement shall be considered severable and if for any reason any provision which is not essential to the effectuation of the basic purposes of this Agreement is determined by a court of competent jurisdiction to be invalid, unenforceable or contrary to the DGCL or existing or future applicable law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those provisions of this Agreement which are valid, enforceable and legal. In that case, this Agreement shall be construed so as to limit any term or provision so as to make it valid, enforceable and legal within the requirements of any applicable law, and in the event such term or provision cannot be so limited, this Agreement shall be construed to omit such invalid, unenforceable or illegal provisions.

23.    Notices. All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered by hand, against receipt, or mailed, by postage prepaid, certified or registered mail:

(a)    if to Indemnitee, to the address set forth on the signature page hereto.

(b)    if to the Company, to:

Strand Advisors, Inc.
Attention:       Isaac Leventon
Address:         300 Crescent Court, Suite 700
                 Dallas, Texas 75201
Email:           ileventon@highlandcapital.com

Notice of change of address shall be effective only when given in accordance with this Section 23. All notices complying with this Section 23 shall be deemed to have been received on the date of hand delivery or on the third business day after mailing.

24.    Governing Law. THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF DELAWARE (OTHER THAN ITS RULES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY).

25.    Jurisdiction. The parties hereby agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort or otherwise, shall be brought in the United States District Court for the District of Delaware or in the Court of Chancery of the State of Delaware (or, if such court lacks subject matter jurisdiction, in the Superior Court of the State of Delaware), so long as one of such courts shall have subject-matter jurisdiction over such suit, action or proceeding, and that any case of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Delaware. Each of the parties hereby irrevocably

012387

consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum.

26.   Enforcement.

(a)   Without limiting Section 15, this Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral, written and implied, between the parties hereto with respect to the subject matter hereof.

(b)   The Company shall not seek from a court, or agree to, a "bar order" which would have the effect of prohibiting or limiting the Indemnitee's rights to receive advancement of Expenses under this Agreement other than in accordance with this Agreement.

27.   Headings and Captions. All headings and captions contained in this Agreement and the table of contents hereto are inserted for convenience only and shall not be deemed a part of this Agreement.

28.   Counterparts. This Agreement may be executed in counterparts, each of which shall constitute an original and all of which, when taken together, shall constitute one and the same agreement. Facsimile counterpart signatures to this Agreement shall be binding and enforceable.

29.   Guaranty By Debtor.  The Debtor guarantees to Indemnitee the performance of the obligations of the Company hereunder (the "**Guaranteed Obligations**").  If the Company does not satisfy any of the Guaranteed Obligations when due, Indemnitee may demand that the Debtor satisfy such obligations and the Debtor shall be required to do so by making payment to, or for the benefit of, Indemnitee.  Indemnitee can make any number of demands upon the Debtor and such demands can be made for all or part of the Guaranteed Obligations.  This guaranty by the Debtor is for the full amount of the Guaranteed Obligations.  The Debtor's obligations under this Agreement are continuing. Even though Indemnitee receives payments from or makes arrangements with the Company or anyone else, the Debtor shall remain liable for the Guaranteed Obligations until satisfied in full.  The guaranty hereunder is a guaranty of payment, and not merely of collectability, and may be enforced against the Debtor.  The Debtor's liability under this Section 29 is unconditional.  It is not affected by anything that might release the Debtor from or limit all or part of its obligations.

012388

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

STRAND ADVISORS, INC.

By: _____
Name: Scott Ellington
Title: Secretary

HIGHLAND CAPITAL MANAGEMENT, L.P. (solely as to Section 29 hereunder)

By: Strand Advisors, Inc., its General Partner

By: _____
Name: Scott Ellington
Title: Secretary

[SIGNATURE PAGE – INDEMNIFICATION AND GUARANTY AGREEMENT]

012389

INDEMNITEE:

Name: RUSSELL NELMS
Address: _115 Kaylan_
_Wentworth Village TX 76114_

Email: _rfargar@yahoo.com_

# EXHIBIT OOOOO

Case 19-34054-sgj11 Doc 1822-114 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 2 of 62
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:50:10 Page 91 of 62
Case 3:21-cv-00538-N   Document 26-46   Filed 06/09/21   Page 122 of 235   PageID 15314

**Exhibit D**

**Reporting Requirements**

## I. **Definitions**

    A.    "Court" means the United States Bankruptcy Court for the Northern District of Texas.

    B.    "NAV" means (A) with respect to an entity that is not a CLO, the value of such entity's assets less the value of its liabilities calculated as of the month end prior to any Transaction; and (B) with respect to a CLO, the CLO's gross assets less expenses calculated as of the quarter end prior to any Transaction.

    C.    "Non-Discretionary Account" means an account that is managed by the Debtor pursuant to the terms of an agreement providing, among other things, that the ultimate investment discretion does not rest with the Debtor but with the entity whose assets are being managed through the account.

    D.    "Related Entity" means collectively (A)(i) any non-publicly traded third party in which Mr. Dondero, Mr. Okada, or  Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor) has any direct or indirect economic or ownership interest, including as a beneficiary of a trust; (ii) any entity controlled directly or indirectly by Mr. Dondero, Mr. Okada, Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor); (iii) MGM Holdings, Inc.; (iv) any publicly traded company with respect to which the Debtor or any Related Entity has filed a Form 13D or Form 13G; (v) any relative (as defined in Section 101 of the Bankruptcy Code) of Mr. Dondero or Mr. Okada each solely to the extent reasonably knowable by the Debtor; (vi) the Hunter Mountain Investment Trust and Dugaboy Investment Trust; (vii) any entity or person that is an insider of the Debtor under Section 101(31) the Bankruptcy Code, including any "non-statutory" insider; and (viii) to the extent not included in (A)(i)-(vii), any entity included in the listing of related entities in **Schedule B** hereto (the "Related Entities Listing"); and (B) the following Transactions, (x) any intercompany Transactions with certain affiliates referred to in paragraphs 16.a through 16.e of the Debtor's cash management motion [Del. Docket No. 7]; and (y) any Transactions with Charitable DAF Fund, L.P. (provided, however, that additional parties may be added to this subclause (y) with the mutual consent of the Debtor and the Committee, such consent not to be unreasonably withheld).

    E.    "Stage 1" means the time period from the date of execution of a term sheet incorporating the protocols contained below the ("Term Sheet") by all applicable parties until approval of the Term Sheet by the Court.

    F.    "Stage 2" means the date from the appointment of a Board of Independent Directors at Strand Advisors, Inc. until 45 days after such appointment, such appointment being effective upon Court approval.

    G.    "Stage 3" means any date after Stage 2 while there is a Board of Independent Directors at Strand Advisors, Inc.

    H.    "Transaction" means (i) any purchase, sale, or exchange of assets, (ii) any lending or borrowing of money, including the direct payment of any obligations of another entity, (iii) the satisfaction of any capital call or other contractual

012393

requirement to pay money, including the satisfaction of any redemption requests, (iv) funding of affiliates and (v) the creation of any lien or encumbrance.

I.   "Ordinary Course Transaction" means any transaction with any third party which is not a Related Entity and that would otherwise constitute an "ordinary course transaction" under section 363(c) of the Bankruptcy Code.

J.   "Notice" means notification or communication in a written format and shall include supporting documents necessary to evaluate the propriety of the proposed transaction.

## II.   Transactions involving the (i) assets held directly on the Debtor's balance sheet or the balance sheet of the Debtor's wholly-owned subsidiaries, including Jefferies Prime Account, and (ii) the Highland Select Equity Fund, L.P., Highland Multi Strategy Credit Fund, L.P., and Highland Restoration Capital Partners

A.   **Covered Entities**: N/A (See entities above).

B.   **Operating Requirements**

1.   Ordinary Course Transactions do not require Court approval (All Stages).

   a)   Stage 1 and Stage 2:  ordinary course determined by the CRO.

   b)   Stage 3: ordinary course determined by the Debtor.

2.   Related Entity Transactions

   a)   Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

   b)   Stage 3:

      (1)   Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

      (2)   Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3.   Third Party Transactions (All Stages)

   a)   Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the

012394

Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)    The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c)    The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C.    **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

III.   **Transactions involving entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above)**

A.    **Covered Entities**: See **Schedule A** hereto. **Schedule A** includes or will include all entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above).[1]

B.    **Operating Requirements**

1.    Ordinary Course Transactions do not require Court approval (All Stages).

a)    Stage 1 and Stage 2: ordinary course determined by the CRO.

b)    Stage 3: ordinary course determined by the Debtor.

2.    Related Entity Transactions

a)    Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)    Stage 3:

(1)   Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on

---

[1] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

3

the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

(2)    Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3.    Third Party Transactions (All Stages)

a)    Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)    The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c)    The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C.    **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

**IV.    Transactions involving entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest**

A.    **Covered Entities**: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest.[2]

B.    **Operating Requirements**

1.    Ordinary Course Transactions do not require Court approval (All Stages).

a)    <u>Stage 1 and Stage 2</u>: ordinary course determined by the CRO.

b)    <u>Stage 3</u>: ordinary course determined by the Debtor.

---

[2] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

012396

2. Related Entity Transactions

    a) <u>Stage 1 and Stage 2</u>: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    b) <u>Stage 3</u>:

      (1) Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

      (2) Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3. Third Party Transactions (All Stages):

    a) Except as set forth in (b) and (c) below, any Transaction that decreases the NAV of an entity managed by the Debtor in excess of the greater of (i) 10% of NAV or (ii) $3,000,000 requires five business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    b) The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    c) The Debtor may take such steps as may be reasonably necessary to winddown any managed entity and make distributions as may be required in connection with such winddown to any required parties. The Debtor will provide the Committee with five business days advance notice of any distributions to be made to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

C. **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

012397

**V.     Transactions involving entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest**

    A.    Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest.[3]

    B.    Ordinary Course Transactions (All Stages): N/A

    C.    Operating Requirements: N/A

    D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VI.     Transactions involving entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest**

    A.    Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest.[4]

    B.    Ordinary Course Transactions (All Stages): N/A

    C.    Operating Requirements: N/A

    D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VII.     Transactions involving Non-Discretionary Accounts**

    A.    Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all non-discretionary accounts.[5]

    B.    Ordinary Course Transactions (All Stages): N/A

    C.    Operating Requirements: N/A

    D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

---

[3] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

[4] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

[5] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

012398

**VIII.** **Additional Reporting Requirements – All Stages (to the extent applicable)**

    A.    DSI will provide detailed lists and descriptions of internal financial and operational controls being applied on a daily basis for a full understanding by the Committee and its professional advisors three (3) business days in advance of the hearing on the approval of the Term Sheet and details of proposed amendments to said financial and operational controls no later than seven (7) days prior to their implementation.

    B.    The Debtor will continue to provide weekly budget to actuals reports referencing their 13-week cash flow budget, such reports to be inclusive of all Transactions with Related Entities.

**IX.** **Shared Services**

    A.    The Debtor shall not modify any shared services agreement without approval of the CRO and Independent Directors and seven business days' advance notice to counsel for the Committee.

    B.    The Debtor may otherwise continue satisfying its obligations under the shared services agreements.

**X.** **Representations and Warranties**

    A.    The Debtor represents that the Related Entities Listing included as **Schedule B** attached hereto lists all known persons and entities other than natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

    B.    The Debtor represents that the list included as **Schedule C** attached hereto lists all known natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

    C.    The Debtor represents that, if at any time the Debtor becomes aware of any person or entity, including natural persons, meeting the definition of Related Entities covered by Section I.D parts A(1)-(vii) above that is not included in the Related Entities Listing or Schedule C, the Debtor shall update the Related Entities Listing or Schedule C, as appropriate, to include such entity or person and shall give notice to the Committee thereof.

012399

## Schedule A[6]

Entities the Debtor manages and in which the Debtor holds a direct or indirect interest

    1.  Highland CLO Funding, Ltd. (0.63% Ownership Interest)
    2.  Dynamic Income Fund (0.26% Ownership Interest)

Entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest

    1.  Highland Prometheus Master Fund L.P.
    2.  NexAnnuity Life Insurance Company
    3.  PensionDanmark
    4.  Highland Argentina Regional Opportunity Fund
    5.  Longhorn A
    6.  Longhorn B
    7.  Collateralized Loan Obligations
        a)  Rockwall II CDO Ltd.
        b)  Grayson CLO Ltd.
        c)  Eastland CLO Ltd.
        d)  Westchester CLO, Ltd.
        e)  Brentwood CLO Ltd.
        f)  Greenbriar CLO Ltd.
        g)  Highland Park CDO Ltd.
        h)  Liberty CLO Ltd.
        i)  Gleneagles CLO Ltd.
        j)  Stratford CLO Ltd.
        k)  Jasper CLO Ltd.
        l)  Rockwall DCO Ltd.
        m)  Red River CLO Ltd.
        n)  Hi V CLO Ltd.
        o)  Valhalla CLO Ltd.
        p)  Aberdeen CLO Ltd.
        q)  South Fork CLO Ltd.
        r)  Legacy CLO Ltd.
        s)  Pam Capital
        t)  Pamco Cayman

Entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest

    1.  Highland Opportunistic Credit Fund
    2.  Highland Healthcare Opportunities Fund f/k/a Highland Long/Short Healthcare Fund
    3.  NexPoint Real Estate Strategies Fund
    4.  Highland Merger Arbitrage Fund
    5.  NexPoint Strategic Opportunities Fund
    6.  Highland Small Cap Equity Fund
    7.  Highland Global Allocation Fund

---

[6] NTD:  Schedule A is work in process and may be supplemented or amended.

012400

8. Highland Socially Responsible Equity Fund
9. Highland Income Fund
10. Stonebridge-Highland Healthcare Private Equity Fund ("Korean Fund")

11. SE Multifamily, LLC

Entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest

1. The Dugaboy Investment Trust
2. NexPoint Capital LLC
3. NexPoint Capital, Inc.
4. Highland IBoxx Senior Loan ETF
5. Highland Long/Short Equity Fund
6. Highland Energy MLP Fund
7. Highland Fixed Income Fund
8. Highland Total Return Fund
9. NexPoint Advisors, L.P.
10. Highland Capital Management Services, Inc.
11. Highland Capital Management Fund Advisors L.P.
12. ACIS CLO Management LLC
13. Governance RE Ltd
14. PCMG Trading Partners XXIII LP
15. NexPoint Real Estate Partners, LLC f/k/a HCRE Partners LLC
16. NexPoint Real Estate Advisors II LP
17. NexPoint Healthcare Opportunities Fund
18. NexPoint Securities
19. Highland Diversified Credit Fund
20. BB Votorantim Highland Infrastructure LLC
21. ACIS CLO 2017 Ltd.

Transactions involving Non-Discretionary Accounts

1. NexBank SSB Account
2. Charitable DAF Fund LP

012401

Case 19-34054-sgj11 Doc 1922-14 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 132 of 235
Case 19-34054-sgj11 Doc 3542-1 Filed 01/14/20 Entered 01/14/20 09:55:10 Page 9 of 12
Case 3:21-cv-00538-N Document 26-46 Filed 06/09/21 Page 132 of 235 PageID 15324

## Schedule B

**Related Entities Listing (other than natural persons)**

DOCS_NY:39943.15 36027/002

## Schedule C

1.  James Dondero
2.  Mark Okada
3.  Grant Scott
4.  John Honis
5.  Nancy Dondero
6.  Pamela Okada
7.  Thomas Surgent
8.  Scott Ellington
9.  Frank Waterhouse
10. Lee (Trey) Parker

DOCS_NY:39943.15 36027/002

012403

# EXHIBIT PPPPP

1/17/2020  Case 19-34054-sgj11 Doc 1822-115 Filed 01/22/21 Entered 01/22/21 21:50:07  Page 2 of
Highland Capital Says Ch. 11 Trustee Worst Possible Option - Law360

Case 3:21-cv-00538-N   Document 26-46   Filed 06/09/21   Page 135 of 235   PageID 15327



**Portfolio Media. Inc.** | 111 West 19th Street, 5th floor | New York, NY 10011 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

# Highland Capital Says Ch. 11 Trustee Worst Possible Option

By Vince Sullivan

Law360 (January 16, 2020, 6:58 PM EST) -- Bankrupt investment firm Highland Capital Management told a Texas judge late Wednesday that the appointment of a Chapter 11 trustee to manage the debtor during its bankruptcy case would be the worst possible option in the proceedings and is unnecessary given recent changes in the company's oversight.

In an objection to the motion for appointment of a Chapter 11 trustee from the Office of the United States Trustee, Highland Capital said it worked with the official committee of unsecured creditors to come to a resolution over issues about the corporate governance of the debtor that resolved the concerns voiced by the U.S. trustee.

The U.S. trustee filed its motion Dec. 23, saying historical issues surrounding alleged self-dealing by Highland Capital in relation to its affiliates would likely continue post-petition as Highland Capital owner James Dondero was still in charge of the company and its general partner, Strand Advisors Inc., at the time.

Since then, Highland Capital said the settlement deal with the committee has emplaced a board of independent directors at Strand and Dondero has agreed to limit his ability to remove and replace the directors only with consent of the committee and approval of the bankruptcy court. As the sole owner of Strand, Dondero previously had the ability to remove directors at will, the objection said.

The objection said since the complained-of conduct is no longer at issue, the Chapter 11 trustee motion should be denied.

"In fact, no outcome could be possibly worse from the perspective of this estate and the interests of stakeholders than appointing a single as yet unknown person to manage the debtor's complex business and replace the highly qualified independent board that was just appointed with the committee's support and this court's approval," Highland Capital said.

Although the settlement had not yet been approved when the U.S. trustee made its motion, Highland Capital said the bankruptcy watchdog was aware of the imminent filing of the deal, which came just four days later.

The U.S. trustee was the only entity that objected to the settlement motion, which was approved by the court on Jan. 9.

The committee likewise opposed the U.S. trustee's motion, saying if granted, it would torpedo the hard-fought deal it reached with Highland Capital.

"The committee believes that the debtor's new corporate governance structure, as embodied in the settlement, provides the debtor with the best opportunity to maximize value for its stakeholders," the committee said in its own objection. "Appointing a Chapter 11 trustee at this time would eviscerate the recently approved settlement and harm the debtor's estate and its creditors."

Representatives for Highland Capital and the committee did not immediately respond to requests for comment Thursday.

Highland Capital sought Chapter 11 protection in Delaware in mid-October, just ahead of a Chancery Court hearing there on summary judgment approval of a $189 million arbitration award won by investors in one of Highland's funds after a multiyear battle.

During a hearing early in the case, Ira D. Kharasch of Pachulski Stang Ziehl & Jones LLP, counsel to Highland Capital, told U.S. Bankruptcy Judge Christopher S. Sontchi the hedge fund resorted to bankruptcy because of the looming $189 million award, which would have been difficult to cover quickly. Although the debtor has some $2.5 billion in assets under management, many are not readily converted to cash.

Kharasch said the award followed the weakening of an investment fund, the Highland Crusader Fund, by a rush of redemption requests during the Great Recession. Highland began winding down and closing up the fund, but a group of investors seeking payout of their holdings, the Redeemer Committee, contested Highland's positions in Chancery Court, with an arbitrator eventually siding with the committee to the tune of $189 million.

Unsecured creditors successfully sought a transfer of the Chapter 11 venue to Dallas, where Judge Sontchi said the debtor had its principal business and most case parties were located.

Highland Capital is represented by Jeffrey N. Pomerantz, Ira D.Kharasch, Maxim B. Litvak and Gregory V. Demo of Pachulski Stang Ziehl & Jones LLP, and Melissa S. Hayward and Zachery Z. Annable of Hayward & Associates PLLC.

The committee is represented by Penny P. Reid, Paige Holden Montgomery, Juliana L. Hoffman, Bojan Guzina, Matthew A. Clemente, Dennis M. Twomey and Alyssa Russell of Sidley Austin LLP.

The Office of the United States Trustee is represented by Lisa L. Lambert.

The case is In re: Highland Capital Management, case number 19-34054, in the U.S. Bankruptcy Court for the Northern District of Texas.

--Editing by Stephen Berg.

All Content © 2003-2020, Portfolio Media, Inc.

# EXHIBIT QQQQQ



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

Signed January 9, 2020

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | § Chapter 11 |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § Case No. 19-34054-sgj11 |
| | § |
| Debtor. | § Related to Docket Nos. 7 & 259 |

**ORDER APPROVING SETTLEMENT WITH OFFICIAL COMMITTEE OF
UNSECURED CREDITORS REGARDING GOVERNANCE OF THE DEBTOR
AND PROCEDURES FOR OPERATIONS IN THE ORDINARY COURSE**

Upon the *Motion of the Debtor to Approve Settlement with Official Committee of
Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the
Ordinary Course* (the "Motion"),[2] filed by the above-captioned debtor and debtor in possession

_____

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address
for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

012407

(the "Debtor"); the Court having reviewed the Motion, and finding that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334, (b) this is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A), and (c) notice of this Motion having been sufficient under the circumstances and no other or further notice is required; and having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and having determined that the relief sought in the Motion is in the best interests of the Debtor and its estate; and after due deliberation and sufficient cause appearing therefore,

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED on the terms and conditions set forth herein, and the United States Trustee's objection to the Motion is OVERRULED.

2.      The Term Sheet is approved and the Debtor is authorized to take such steps as may be necessary to effectuate the settlement contained in the Term Sheet, including, but not limited to: (i) implementing the Document Production Protocol; and (ii) implementing the Protocols.

3.      The Debtor is authorized (A) to compensate the Independent Directors for their services by paying each Independent Director a monthly retainer of (i) $60,000 for each of the first three months, (ii) $50,000 for each of the next three months, and (iii) $30,000 for each of the following six months, provided that the parties will re-visit the director compensation after the sixth month and (B) to reimburse each Independent Director for all reasonable travel or other expenses, including expenses of counsel, incurred by such Independent Director in connection with its service as an Independent Director in accordance with the Debtor's expense reimbursement policy as in effect from time to time.

2

012408

4.     The Debtor is authorized to guarantee Strand's obligations to indemnify each Independent Director pursuant to the terms of the Indemnification Agreements entered into by Strand with each Independent Director on the date hereof.

5.     The Debtor is authorized to purchase an insurance policy to cover the Independent Directors.

6.     All of the rights and obligations of the Debtor referred to in paragraphs 3 and 4 hereof shall be afforded administrative expense priority under 11 U.S.C. § 503(b).

7.     Subject to the Protocols and the Term Sheet, the Debtor is authorized to continue operations in the ordinary course of its business.

8.     Pursuant to the Term Sheet, Mr. James Dondero will remain as an employee of the Debtor, including maintaining his title as portfolio manager for all funds and investment vehicles for which he currently holds that title; provided, however, that Mr. Dondero's responsibilities in such capacities shall in all cases be as determined by the Independent Directors and Mr. Dondero shall receive no compensation for serving in such capacities.  Mr. Dondero's role as an employee of the Debtor will be subject at all times to the supervision, direction and authority of the Independent Directors.  In the event the Independent Directors determine for any reason that the Debtor shall no longer retain Mr. Dondero as an employee, Mr. Dondero shall resign immediately upon such determination.

9.     Mr. Dondero shall not cause any Related Entity to terminate any agreements with the Debtor.

10.     No entity may commence or pursue a claim or cause of action of any kind against any Independent Director, any Independent Director's agents, or any Independent

Director's advisors relating in any way to the Independent Director's role as an independent

director of Strand without the Court (i) first determining after notice that such claim or cause of

action represents a colorable claim of willful misconduct or gross negligence against Independent

Director, any Independent Director's agents, or any Independent Director's advisors and (ii)

specifically authorizing such entity to bring such claim.  The Court will have sole jurisdiction to

adjudicate any such claim for which approval of the Court to commence or pursue has been

granted.

        11.      Nothing in the Protocols, the Term Sheet or this Order shall affect or impair

Jefferies LLC's rights under its Prime Brokerage Customer Agreements with the Debtor and non-

debtor Highland Select Equity Master Fund, L.P., or any of their affiliates, including, but not

limited to, Jefferies LLC's rights of termination, liquidation and netting in accordance with the

terms of the Prime Brokerage Customer Agreements or, to the extent applicable, under the

Bankruptcy Code's "safe harbor" protections, including under sections 555 and 561 of the

Bankruptcy Code.  The Debtor shall not conduct any transactions or cause any transactions to be

conducted in or relating to the Jefferies LLC accounts without the express consent and cooperation

of Jefferies LLC or, in the event that Jefferies withholds consent, as otherwise ordered by the

Court.  For the avoidance of doubt, Jefferies LLC shall not be deemed to have waived any rights

under the Prime Brokerage Customer Agreements or, to the extent applicable, the Bankruptcy

Code's "safe harbor" protections, including under sections 555 and 561 of the Bankruptcy Code,

and shall be entitled to take all actions authorized therein without further order of the Court

        12.      Notwithstanding any stay under applicable Bankruptcy Rules, this Order

shall be effective immediately upon entry.

012410

13.     The Court shall retain jurisdiction over all matters arising from or related to

the interpretation and implementation of this Order, including matters related to the Committee's

approval rights over the appointment and removal of the Independent Directors.

## END OF ORDER ##

# EXHIBIT RRRRR

**18-30264-sgj11 Acis Capital Management, L.P. - Court's Ruling on Plan Confirmation**

|   |   | jbinford, honeil, emcgee, mbales, BBarnes, srosen, |   |
|---|---|---|---|
| Traci Ellison | to: | jprostok, rpatel, jwielebinski, achiarello, robin, jenright, | 08/30/2018 09:24 PM |
|   |   | mkleinsasser, MHurst, mmaloney, PBessette, RMatsumura, |   |

| From: | Traci Ellison/TXNB/05/USCOURTS |
|---|---|
| To: | jbinford@foley.com, honeil@foley.com, emcgee@foley.com, mbales@foley.com, BBarnes@lynnllp.com, srosen@forsheyprostok.com, jprostok@forsheyprostok.com, rpatel@winstead.com, jwielebinski@winstead.com, achiarello@winstead.com, |

Dear Counsel:

The following is the court's ruling on the request of the Chapter 11 Trustee ("Acis Trustee") of Acis Capital Management, L.P. ("Acis") and Acis Capital Management GP, LLC (collectively, the "Debtors") to confirm the *First Amended Joint Plan for the Debtors  (the "Plan")*, as modified, which contains therein alternatives Plan A, Plan B, and Plan C.
The court will deny confirmation of Plans A, B, and C.   Below is some of the court's reasoning.

Plans B and C

First, Plans B and C are unconfirmable because they contemplate the amendment of the various CLO Indentures to which Acis is not a party.  Specifically, Section 3.24 (for Plan B) and Section 4.24 (for Plan C) each provide as follows:

"Amendment of Indentures. The Indentures shall be amended pursuant to section 1123(a)(5)(F) of the Bankruptcy Code to provide that the Acis CLOs cannot be called for redemption until the later of (a) the date on which all Allowed Claims against the Debtors have been paid in full, or (b) three (3) years after the Effective Date. In the event that the Acis CLOs are reset, any new indenture with respect to a reset CLO shall provide the reorganized Acis will continue as the portfolio manager and that the reset CLO cannot be called for redemption until the later of (y) the date on which all Allowed Claims against the Debtors have been paid in full, or (z) three (3) years after the Effective Date."

The court recognizes that section 1123(a)(5)(F) of the Bankruptcy Code provides that a Chapter 11 plan may provide for adequate means for the plan's implementation, *such as cancellation or modification of any indenture* or similar instrument.  However, the court concludes that section 1123(a)(5)(F) applies only to an indenture on which the debtor is a party–namely the issuer. While the court understands that oftentimes multiple, intertwined agreements are sometimes read together and treated in many respects as one integrated document, and while the court recognizes that, in this case, the CLO Indentures and CLO PMAs (the latter of which Acis is party to) are very interrelated, the court does not believe that this gives Acis the right to amend the Indentures without every single party thereto otherwise agreeing.  For this simple reason, the current Plans B and C will not be confirmed.

Plan A

Next, with regard to Plan A, the issues are much more complicated.  But the court finds Plan A unconfirmable because–while HCLOF has repeatedly asked the Bankruptcy Court for relief, and has also made certain demands upon the CLO Issuers, the Indenture Trustee and the Acis Trustee with regard to optional redemptions–HCLOF is *not the holder of a claim* against Acis, as defined in Section 101(5) of the Bankruptcy Code, to which the doctrine of equitable subrogation

can be applied.

Plan A, distilled to its essence, is premised upon: (1) treating HCLOF as an entity with a "claim" against Acis, pursuant to the Bankruptcy Code's definition in section 101(5)(B), that can be provided for in an Acis plan as an unsecured claim (Class 2); (2) monetizing or liquidating that claim–by calculating the amount HCLOF would realize if HCLOF received exactly what it has demanded from the CLO Issuers, the Indenture Trustee, and the Acis Trustee; (3) paying the monetized/liquidated claim of HCLOF in cash in full on the Effective Date of the Plan, with cash that the Acis Trustee would receive from Plan funder Oaktree; (4) after payment of HCLOF on its liquidated/monetized claim, the Acis Trustee would be entitled to step into the shoes of HCLOF, and be the new holder of HCLOF's Sub Notes, via the court's application of the common law doctrine of equitable subrogation to the Acis Trustee–it is argued that this would be equitable, since the Acis Trustee would essentially be paying the CLO Issuers' (a debtor's) obligations on the Sub Notes to HCLOF (a creditor) and, thus, should be able to step into that creditor's shoes to avert HCLOF's double recovery; and (5) the Acis Trustee, after acquiring the Sub Notes through equitable subrogation, would convey those Sub Notes to Oaktree, the plan funder.

HCLOF, Highland Capital Management ("Highland"), and the CLO Issuers object to this use of equitable subrogation–essentially arguing that, no matter what one calls it, this is forcing a non-debtor party to sell its property that is not property of the estate. The court does not find this to be an easy analysis at all. To be sure, this is a novel proposed application of the equitable subrogation doctrine. To be sure, the Acis Trustee's proposal, at first blush–and even after a second or third turn–looks a little like an effort to force a sale of non-debtor property. This would be a novel application of the equitable subrogation doctrine–which, admittedly, has grown from a somewhat narrow to a much broader doctrine over time, with the historical purpose always being to serve the interests of fairness and justice. It is worth noting that, initially, courts in New York attempted to limit the scope of equitable subrogation to apply only to persons standing directly in the place of a surety. Then, as courts in other states expanded the concept of equitable subrogation, so did the courts of New York, eventually expanding the concept to cover third party guarantors. It was further expanded to parties who pay off a mortgage and in the case of refinancing mortgagees. The doctrine essentially went from a narrow remedy only available to sureties, to a broad doctrine available to almost any party regardless of his legal interest.

But the court believes there are at least a couple of reasons the doctrine should not be applied here. First, the court does not believe HCLOF can be construed to have a "claim" against Acis, pursuant to section 101(5)(B) of the Bankruptcy Code.

The evidence (Exh. 38) was that HCLOF made statements in correspondence dated May 4, 2018, from HCLOF to U.S. Bank, the indenture trustee for all five Acis CLOs, arguing that Acis, as portfolio manager under the CLO-PMAs, was breaching its duties, and stating that both the CLO Issuer "and the Subordinated Noteholders have a claim for the losses caused by the actions of the Portfolio Manager and the Chapter 11 Trustee" and claiming setoff right against funds held by the indenture trustee belonging to the Debtors.

Additionally, the evidence was also that HCLOF has twice during the bankruptcy case purported to direct the CLO Issuers, the Indenture Trustee, and Acis "to effect an Optional Redemption of all Secured Notes and the Subordinated Notes in full." Exhs. 20 & 21. In the second notice, HCLOF added language that this would be "for the express purpose of placement of a portion of the portfolio assets held by the Co-issuers into a warehouse arrangement or a total return swap or other derivatives arrangement with Highland Capital Management, L.P." The end result of

this, of course, would be that the Debtor Acis would no longer have any assets to manage and no revenue stream to potentially pay its creditors.

Then, after the Trustee refused to effectuate an optional redemption, both HCLOF and Highland filed, on May 30, 2018, an adversary proceeding against the Acis Trustee, demanding that the Acis Trustee specifically perform and effectuate an optional redemption (the "Adversary"-- Adversary No. 18-03078-sgj).  The Adversary Complaint states: *"Under the [CLO] funds' governing documents, the investors [e.g. HCLOF] have the right to have their money returned upon demand. Consequently, to mitigate their on-going losses, the investors have instructed the Indenture Trustee and Acis LP, as the putative portfolio manager of the funds, to sell the funds' assets through a redemption process provided for in the Indenture, and return the investors' money to be invested elsewhere with higher yields . . . . The Debtors, which are controlled by a Chapter 11 Trustee, have refused to authorize the necessary processes to effectuate a redemption of the funds to allow the return of the investors' money  . . . . The investors are suffering daily losses because of the Chapter 11 Trustee's inaction. . . . The Plaintiffs file this Complaint to protect their interests and urge the Court to promptly enter a preliminary injunction enjoining the Chapter 11 Trustee from interfering with the redemption process and allowing the investors to have their money returned before they incur further losses."*  Para. 2.

The Original Complaint went on to state that the ACIS CLO PMAs are valid and enforceable contracts between the CLOs and Acis LP.  Under the PMAs, Acis LP provides investment advisory services to the CLOs. "Plaintiff HCLOF, who holds an equity position in the CLO, *is a third-party beneficiary of the PMA.*  The Chapter 11 Trustee, as Acis LP's Chapter 11 trustee, has anticipatorily breached the PMA by communicating their refusal to effect the Subordinated Noteholders' requested redemption as required by the PMA. The Chapter 11 Trustee's breach has caused damage to HCLOF."  Paragraphs 67-70.  See also paras. 74-77; 81-84; 88-91; 95-98.

Subsequently, HCLOF withdrew its two sets of redemption notices and on August 10, 2018 (after appealing a bankruptcy court preliminary injunction in the Adversary and after also moving to withdraw the reference in the Adversary), moved to amend the Adversary to ask for only the following: *"Pursuant to 28 U.S.C. § 2201, HCLOF seeks a declaration that the Chapter 11 Trustee has no authority to sell or transfer HCLOF's property without HCLOF's consent.  HCLOF seeks no money damages or other relief not sought in this Amended Complaint."*

Is this all enough for HCLOF to have a "claim" against the Debtor, pursuant to section 101(5)–in other words, does it amount to an assertion of a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment"–particularly when HCLOF has now withdrawn its two notices requesting the Indenture Trustee and Debtor commence an optional redemption process and has also sought to amend the Original Complaint to specify that it is not seeking any damages?

*The court believes no*.  The five CLO PMAs specifically provide that there are *no third party beneficiaries* (except that four of the five CLO PMAs carve out the Indenture Trustee as a third party beneficiary).  Thus, HCLOF–although it alleged in the Original Complaint–that it was an alleged "third party beneficiary," never had any basis to state that or to complain of Acis's alleged "anticipatory breach" of the CLO PMAs, as it purported to do in the Original Complaint. Moreover, there is, of course, no longer a PMA between Acis and HCLOF (f/k/a/ as ALF), as of October 27, 2017, as a result of the series of transactions that "the Highlands" apparently

orchestrated after the Josh Terry arbitration award and judgment.  Thus, HCLOF cannot claim any breach of contract between Acis and HCLOF.  Acis is technically not a party to the Indentures.  Thus, as far as the court is aware, *there is no contract between HCLOF and Acis whatsoever.  If there is some theory under which HCLOF can assert liability against Acis  , it has not been articulated.*

In summary, the court does not believe HCLOF (though it has made many threats and demands and filed an Adversary) has ever articulated a viable claim against Acis.  Without a viable claim, the court does not believe the equitable subrogation doctrine asserted by the Acis Trustee works.  And, without some sort of claim being validly asserted against Acis, any payment by it on account of the Sub Notes would appear to be voluntary.

The court recognizes that some courts have applied the equitable subrogation doctrine where a party paid a debt on which it had no liability and seemed to do it somewhat voluntarily–despite there being a long-standing exception to the doctrine for "voluntary payment."  The strongest example of this is the case of NY Stock Exchange v, Sloan, 1980 U.S. Dist. LEXIS 13316 (S.D.N.Y. Aug. 15. 2018).  But it appears to this court that, in any case where a court has allowed equitable subrogation where "voluntariness" was somewhat in existence, *there was a situation where there was a primary obligor who wasn't paying its obligation* .  Here, the CLO Issuers are perfectly willing and able to perform their obligations.  Thus, applying equitable subrogation here seems a bridge too far.  The Acis Trustee would appear to an "officious meddler" (although with good motives) and–with no real exposure to HCLOF, in the court's view–the payment of the Sub Notes obligations would be purely voluntary.  The court recognizes that the Acis Trustee would be attempting to  protect an interest of its own (the Acis PMA revenue stream) somewhat like the property developer in the Hamlet case.  Hamlet v. Northeast, 64 A.D.3d 85 (N.Y App. Div. Second Dept. 2009).  But, in Hamlet, the property developer who paid the Environmental fees to the town of Brookhaven, that the subcontractor had bonded and agreed to pay, was itself primarily liable on the Environmental fees (in other words, the Town had a claim against Hamlet).  Again, equitable subrogation under the exact facts and circumstances of this case seems a bridge too far.

## Miscellaneous Rulings

The court rules on a few miscellaneous matters that were contested, although it is denying confirmation.  This may be useful for any future appeals or for any future proposed plans.

### Assumption and Assignment of the PMAs would not violate section  365 of the Bankruptcy Code.

The court believes that the assumption of the CLO PMAs by the Acis Trustee and the assignment of the CLO PMAs to a third party (either Oaktree or Brigade or Cortland) would be permissible under section 365 of the Code.   Section 365 of the Bankruptcy Code does not prohibit the Trustee from assigning its rights under the PMAs without the written consent of the CLOs, the Subordinated Noteholders, and others. Section 365(c)(1) of the Bankruptcy Code provides:

"The trustee may not assume or assign any executory contract . . . if . . . applicable law excuses a party, other than the debtor, to such contract . . . from accepting performance or rendering performance to an entity other than the debtor or debtor in possession, whether or not such contract . . . prohibits or restricts assignment of rights; and . . . such party does not consent to such assumption or assignment[.]"

11 U.S.C. § 365(c)(1).

The court overrules any objection that there is some applicable law that excuses the

counterparties to the PMAs (i.e., the CLO Issuers) from accepting performance from a party other than the debtor.  First, these are not personal services contracts. Assessing whether a contract is a personal service contract "depends upon the subject of the contract, the circumstances of the case and the intent of the parties to the contract." Leonard v. Gen. Motors Corp. (In re Headquarters Dodge), 13 F.3d 674, 682-83 (3d Cir. 1993) (internal quotation marks omitted); see also In re Compass Van & Storage Corp., 65 B.R. 1007, 1011-12 (Bankr. E.D.N.Y. 1986) ("Ascertaining whether a contract is personal posits on close distinctions, e.g., the nature and subject matter of the contract, the circumstances of the case placed in juxtaposition with the intention of the parties."). Even "clauses in the contract . . . attesting to a personal relationship will not be dispositive." Leonard, 13 F.3d at 683. Ultimately, if "the identity of that person or entity [rendering performance under the contract] is an essential element of the contract, and if the contract is non-assignable under applicable non-bankruptcy law then the estate cannot assign the contract." Grove Rich Realty, 200 B.R. at 507. Accordingly, in order to determine whether the PMAs are personal service contracts, the court must assess the particular circumstances in the case, the nature of the services provided by Acis under the PMAs, and whether such services are nondelegable.  Highland contends that because the PMAs "depend on the skill and reputation of the performing party," the PMAs are personal service contracts, and thus unassignable.  If this were the standard, the exception would swallow the rule–any prudent party contracting for another's services considers the other party's skill, expertise, and reputation–and any contract for services premised on the skill and reputation of the party providing services would be a personal service contract. It is not whether the party providing services is skilled and reputable–it is whether such services are unique in nature. See Compass Van & Storage Corp., 65 B.R. at 1011. To support its contention, Highland cites New York cases under which hotel management contracts or consulting contracts were found to be personal service contracts .  In the Marriott case cited by Highland, in which the court found the hotel management to be a personal service contract, the court observed that the hotel manager had "full discretion . . . to manage virtually every aspect of the hotel." Marriott Int'l, Inc. v. Eden Roc, LLLP, 104 A.D.3d 583, 584 (N.Y. App. Div. 1st Dep't 2013). Marriott is distinguishable. Here, Acis did not manage virtually every aspect of the CLOs. Pursuant to the Shared Services Agreement and Sub-Advisory Agreement, Acis LP delegated certain of its responsibilities under the PMAs to Highland. Accordingly, the personal qualities of Acis LP were not essential to performance under the PMAs. While the expertise of Acis LP was relevant to its selection as portfolio manager, such expertise is not unique–as demonstrated by the expertise and reputation of Oaktree, Brigade, and others who act as CLO portfolio managers.  Also, importantly, the PMAs themselves provide that Acis may delegate the performance of its duties under the PMAs to third parties:  "In providing services hereunder, the Portfolio Manager may employ third parties, including its Affiliates, to render advice (including investment advice), to provide services to arrange for trade execution and otherwise provide assistance to the Issuer, and to perform any of the Portfolio Manager's duties under this Agreement; provided that the Portfolio Manager shall not be relieved of any of its duties hereunder regardless of the performance of any services by third parties." 2014-3 PMA § 3(h)(iii).   And although section 14 the PMAs requires consent for assignment, section 14 contemplates that an Affiliate assignee "has demonstrated ability, whether as an entity or by its personnel, to professionally and competently perform duties similar to those imposed upon the Portfolio Manager pursuant to this Agreement." Id. § 14(a). Further, sections 14 and 32 of the PMAs provide for merger, consolidation, or amalgamation of Acis with another company, where the resulting entity succeeds "to all or substantially all of the collateral management business of the Portfolio Manager." Pursuant to the terms of the PMAs themselves, the duties of Acis were not "so unique that the dut[ies were] thereby rendered nondelegable." See Compass Van & Storage, 65 B.R. at 1011 (citing RESTATEMENT (SECOND) OF CONTRACTS § 318(2) (1981)). As such, unlike personal service contracts, the PMAs do not "synthesize into those consensual agreements . . distinctive characteristics that commit to a special knowledge, unique skill or talent, singular judgment and taste." Compass

Van & Storage, 65 B.R. at 1011. Accordingly, because the duties of Acis LP under the PMAs are delegable (and were delegated) and are not unique, the PMAs cannot be personal service contracts that fall within the narrow exception of section 365(c)(1).

Additionally, Section 205(a)(2) of the Investment Advisors Act of 1940 ("IAA") is not a nonbankruptcy law that precludes assumption and assignment of the PMAs. Section 205(a)(2) of the IAA provides that a registered investment adviser (such as Acis) cannot enter into an investment advisory contract unless such contract provides "that no assignment of such contract shall be made by the investment adviser without the consent of the other party to the contract[.]" 15 U.S.C. § 80b-5(a)(2). Thus, this provision of the IAA merely requires that the PMAs contain an anti-assignment provision–the IAA is not "applicable law" that prohibits assumption or assignment without consent of the counterparties to the PMAs. Indeed, in the Southern District of New York, the court held:

"Section 205(a)(2) of the [IAA] . . . does not . . . prohibit an investment adviser's assignment of an investment advisory contract without client consent. The section merely provides that the contract must contain the specified provision. Thus, the assignment of a non-investment company advisory contract, without obtaining client consent, could constitute a breach of the advisory contract, but not a violation of Section 205(a)(2)."

CWCapital Cobalt VR Ltd. v. CWCapital Invs. LLC, 2018 U.S. Dist. LEXIS 90174, at *12 (S.D.N.Y. May 23, 2018). Assignment of the PMAs without consent of the counterparties simply constitutes breach of the PMAs, but the IAA is not "applicable law" that excuses the counterparties to the PMAs from accepting or rendering performance without such consent. Accordingly, the assignment of the PMAs to Oaktree does not violate the IAA or section 365(c)(1) of the Bankruptcy Code.

Preliminary Injunction

The preliminary injunction in place preventing HCLOF from pursuing optional redemptions will remain in place for now. The court believes there are automatic stay implications (section 362(a)(3)) with regard to HCLOF pursuing optional redemptions. The effect of an optional redemption is to *exercise control over the Acis PMAs and revenue stream* (property of the estate–see, e.g., Hometown Valley View v. Prime, 847 F.3d 302 (5ᵗʰ Cir. 2017)). While HCLOF is not itself a creditor (and while "the Highlands" entity separateness is not being challenged, and is not being disregarded be either the Acis Trustee, the court, or anyone else at this juncture), the court notes that HCLOF, Highland, and other Highland-related parties seem to work in tandem. Highland asserts a claim against Acis. Actions taken by HCLOF could be construed to be actions of Highland, an actual creditor. There is also a basis for keeping the preliminary injunction in place pending determination of the Acis Trustee's fraudulent transfer lawsuits. The evidence thus far has been compelling that numerous transfers after the Josh Terry judgment denuded Acis of value–perhaps even the ability to control its own destiny when the ALF PMA was essentially terminated without cause and Acis was made to sell its shares in ALF/HCLOF back to ALF/HCLOF. In the face of these facts, the court will be reluctant to terminate the preliminary injunction until this litigation is fully resolved.

End of Ruling



Traci A. Ellison, Courtroom Deputy
to the Honorable Stacey G. C. Jernigan
U.S. Bankruptcy Court, Northern District of Texas
(214)753-2046
sgj_settings@txnb.uscourts.gov

012419

# EXHIBIT SSSSS

# Plan Objections from Dondero-Related Entities: Organizational Charts

[1] CLO Holdco, Ltd., is a wholly-owned subsidiary of the Charitable Donor Advised Fund, L.P. (the "DAF"). HCMLP has terminated its shared services agreement with the DAF. The DAF owes HCMLP past due fees and expenses.

# EXHIBIT TTTTT

*Highland Capital Management, L.P.*
*Outstanding Debt & Funds*
*As of November 30, 2020*

| Entity | Note Type | Notes Principal | Notes Interest | Mgmt. Fees | Expense Reimbursements | Total |
|---|---|---|---|---|---|---|
| NexPoint Advisors, LP | Non-Demand | $  23,610,195 | $  710,246 | $  - | $  72,032 | $  24,392,473 |
| Dugaboy Investment Trust | Non-Demand | 18,286,268 | (298,480) | - | 14,380 | 18,002,168 |
| Highland Capital Mgmt Fund Advisors, LP | Demand | 10,635,564 | 155,517 | - | 1,962,380 | 12,753,461 |
| James Dondero | Demand | 8,929,625 | 66,772 | - | - | 8,996,397 |
| NexPoint Real Estate Partners (f/k/a HCRE Partners, LLC) | Non-Demand | 5,860,318 | 235,055 | - | - | 6,095,373 |
| NexPoint Real Estate Partners (f/k/a HCRE Partners, LLC) | Demand | 4,946,628 | 53,617 | - | - | 5,000,245 |
| Nexbank SSB [1] | No notes | 40,000 | - | 352,667 | 1,195,542 | 1,588,209 |
| NexPoint Capital | No notes | - | - | - | 84,496 | 84,496 |
| NexPoint Residential Trust (NXRT) | No notes | - | - | - | 13,140 | 13,140 |
| NexPoint Hospitality Trust | No notes | - | - | - | 11,738 | 11,738 |
| NexPoint Real Estate Strategies Fund | No notes | - | - | - | 5,194 | 5,194 |
| Nexbank Securities, Inc | No notes | - | - | - | 3,312 | 3,312 |
| | **Total** | $ 72,308,598 | $ 922,727 | $ 352,667 | $ 3,362,215 | $ 76,946,206 |

*[1] Amount currently disputed by NexBank*

012423

# EXHIBIT UUUUU

012424

## SECOND AMENDED AND RESTATED
## SHARED SERVICES AGREEMENT

THIS SECOND AMENDED AND RESTATED SHARED SERVICES AGREEMENT (this "*Agreement*") is entered into to be effective as of 8th day of February, 2013 (the "*Effective Date*") by and among Highland Capital Management, L.P., a Delaware limited partnership ("*HCMLP*"), and Highland Capital Management Fund Advisors, L.P., formerly known as Pyxis Capital, L.P., a Delaware limited partnership ("*HCMFA*"), and any affiliate of HCMFA that becomes a party hereto. Each of the signatories hereto is individually a "*Party*" and collectively the "*Parties*".

### RECITALS

A. During the Term, HCMLP will provide to HCMFA certain services as more fully described herein and the Parties desire to allocate the costs incurred for such services and assets among them in accordance with the terms and conditions in this Agreement.

### AGREEMENT

In consideration of the foregoing recitals and the mutual covenants and conditions contained herein, the Parties agree, intending to be legally bound, as follows:

### ARTICLE I
### DEFINITIONS

"*Actual Cost*" means, with respect to any period hereunder, one hundred percent (100%) of the actual costs and expenses caused by, incurred or otherwise arising from or relating to (i) the Shared Services and (ii) the Shared Assets, in each case during such period.

"*Affiliate*" means a Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, a specified Person. The term "*control*" (including, with correlative meanings, the terms "*controlled by*" and "*under common control with*") means the possession of the power to direct the management and policies of the referenced Person, whether through ownership interests, by contract or otherwise.

"*Agreement*" has the meaning set forth in the preamble.

"*Allocation Percentage*" has the meaning set forth in Section 4.01.

"*Applicable Margin*" shall mean an additional amount equal to 5% of all costs allocated by Service Provider to the other parties hereto under Article IV; provided that the parties may agree on a different margin percentage as to any item or items to the extent the above margin percentage, together with the allocated cost of such item or service, would not reflect an arm's length value of the particular service or item allocated.

"*Change*" has the meaning set forth in Section 2.02(a).

"*Change Request*" has the meaning set forth in Section 2.02(b).

"*Code*" means the Internal Revenue Code of 1986, as amended, and the related regulations and published interpretations.

"*Effective Date*" has the meaning set forth in the preamble.

"*Governmental Entity*" means any government or any regulatory agency, bureau, board, commission, court, department, official, political subdivision, tribunal or other instrumentality of any government, whether federal, state or local, domestic or foreign.

"*Liabilities*" means any cost, liability, indebtedness, obligation, co-obligation, commitment, expense, claim, deficiency, guaranty or endorsement of or by any Person of any nature (whether direct or indirect, known or unknown, absolute or contingent, liquidated or unliquidated, due or to become due, accrued or unaccrued, matured or unmatured).

"*Loss*" means any cost, damage, disbursement, expense, liability, loss, obligation, penalty or settlement, including interest or other carrying costs, legal, accounting and other professional fees and expenses incurred in the investigation, collection, prosecution and defense of claims and amounts paid in settlement, that may be imposed on or otherwise incurred or suffered by the referenced Person; provided, however, that the term "*Loss*" will not be deemed to include any special, exemplary or punitive damages, except to the extent such damages are incurred as a result of third party claims.

"*New Shared Service*" has the meaning set forth in Section 2.03.

"*Party*" or "*Parties*" has the meaning set forth in the preamble.

"*Person*" means an association, a corporation, an individual, a partnership, a limited liability company, a trust or any other entity or organization, including a Governmental Entity.

"*Quarterly Report*" has the meaning set forth in Section 5.01.

"*Recipient*" means HCMFA and any of HCMFA's direct or indirect Subsidiaries or managed funds or accounts in their capacity as a recipient of the Shared Services and/or Shared Assets.

"*Service Provider*" means any of HCMLP and its direct or indirect Subsidiaries in its capacity as a provider of Shared Services or Shared Assets.

"*Service Standards*" has the meaning set forth in Section 6.01.

"*Shared Assets*" shall have the meaning set forth in Section 3.02.

"*Shared Services*" shall have the meaning set forth in Section 2.01.

"*Subsidiary*" means, with respect to any Person, any Person in which such Person has a direct or indirect equity ownership interest in excess of 50%.

"*Tax*" or "*Taxes*" means: (i) all state and local sales, use, value-added, gross receipts, foreign, privilege, utility, infrastructure maintenance, property, federal excise and similar levies, duties and other similar tax-like charges lawfully levied by a duly constituted taxing authority against or upon the Shared Services and the Shared Assets; and (ii) tax-related surcharges or fees that are related to the Shared Services and the Shared Assets identified and authorized by applicable tariffs.

"*Term*" has the meaning set forth in Section 7.01.

012426

ARTICLE II
SHARED SERVICES

Section 2.01    Services.  During the Term, Service Provider will provide Recipient with Shared Services, including without limitation, all of the (i) finance and accounting services, (ii) human resources services, (iii) marketing services, (iv) legal services, (v) corporate services, (vi) information technology services, and (vii) operations services; each as requested by HCMFA and as described more fully on **Annex A** attached hereto, the "*Shared Services*"), it being understood that personnel providing Shared Services may be deemed to be employees of HCMFA to the extent necessary for purposes of the Investment Advisers Act of 1940, as amended.

Section 2.02    Changes to the Shared Services.

(a)    During the Term, the Parties may agree to modify the terms and conditions of a Service Provider's performance of any Shared Service in order to reflect new procedures, processes or other methods of providing such Shared Service, including modifying the applicable fees for such Shared Service to reflect the then current fair market value of such service (a "*Change*").  The Parties will negotiate in good faith the terms upon which a Service Provider would be willing to provide such New Shared Service to Recipient.

(b)    The Party requesting a Change will deliver a description of the Change requested (a "*Change Request*") and no Party receiving a Change Request may unreasonably withhold, condition or delay its consent to the proposed Change.

(c)    Notwithstanding any provision of this Agreement to the contrary, a Service Provider may make: (i) Changes to the process of performing a particular Shared Service that do not adversely affect the benefits to Recipient of Service Provider's provision or quality of such Shared Service in any material respect or increase Recipient's cost for such Shared Service; (ii) emergency Changes on a temporary and short-term basis; and/or (iii) Changes to a particular Shared Service in order to comply with applicable law or regulatory requirements, in each case without obtaining the prior consent of Recipient.  A Service Provider will notify Recipient in writing of any such Change as follows: in the case of clauses (i) and (iii) above, prior to the implementation of such Change, and, in the case of clause (ii) above, as soon as reasonably practicable thereafter.

Section 2.03    New Shared Services.  The Parties may, from time to time during the Term of this Agreement, negotiate in good faith for Shared Services not otherwise specifically listed in Section 2.01 (a "*New Shared Service*").  Any agreement between the Parties on the terms for a New Shared Service must be in accordance with the provisions of Article IV and Article V hereof, will be deemed to be an amendment to this Agreement and such New Shared Service will then be a "*Shared Service*" for all purposes of this Agreement.

Section 2.04    Subcontractors.  Nothing in this Agreement will prevent Service Provider from, with the consent of Recipient, using subcontractors, hired with due care, to perform all or any part of a Shared Service hereunder.  A Service Provider will remain fully responsible for the performance of its obligations under this Agreement in accordance with its terms, including any obligations it performs through subcontractors, and a Service Provider will be solely responsible for payments due to its subcontractors.

ARTICLE III
SHARED ASSETS

Section 3.01    Shared IP Rights.  Each Service Provider hereby grants to Recipient a non-exclusive right and license to use the intellectual property and other rights granted or licensed, directly or indirectly, to such Service Provider (the "**Shared IP Rights**") pursuant to third party intellectual property Agreements ("**Third Party IP Agreements**"), provided that the rights granted to Recipient hereunder are subject to the terms and conditions of the applicable Third Party IP Agreement, and that such rights shall terminate, as applicable, upon the expiration or termination of the applicable Third Party IP Agreement. Recipient shall be licensed to use the Shared IP Rights only for so long as it remains an Affiliate of HCMLP.  In consideration of the foregoing licenses, Recipient agrees to take such further reasonable actions as a Service Provider deems to be necessary or desirable to comply with its obligations under the Third Party IP Agreements.

Section 3.02    Other Shared Assets.  Subject to Section 3.01, each Service Provider hereby grants Recipient the right, license or permission, as applicable, to use and access the benefits under the agreements, contracts and licenses that such Service Provider will purchase, acquire, become a party or beneficiary to or license on behalf of Recipient (the "**Future Shared Assets**" and collectively with the Shared IP Rights, the "**Shared Assets**").

ARTICLE IV
COST ALLOCATION

Section 4.01    Actual Cost Allocation Formula.  The Actual Cost of any item relating to any Shared Services or Shared Assets shall be allocated based on the Allocation Percentage.  For purposes of this Agreement, "**Allocation Percentage**" means:

(a)    To the extent 100% of such item is demonstrably attributable to HCMFA, 100% of the Actual Cost of such item shall be allocated to HCMFA as agreed by HCMFA;

(b)    To the extent a specific percentage of use of such item can be determined (e.g., 70% for HCMLP and 30% for HCMFA), that specific percentage of the Actual Cost of such item will be allocated to HCMLP or HCMFA, as applicable and as agreed by HCMFA; and

(c)    All other portions of the Actual Cost of any item that cannot be allocated pursuant to clause (a) or (b) above shall be allocated between HCMLP and HCMFA in such proportion as is agreed in good faith between the parties.

Section 4.02    Non-Cash Cost Allocation.  The actual, fully burdened cost of any item relating to any Shared Services or Shared Assets that does not result in a direct, out of pocket cash expense may be allocated to HCMLP and HCMFA for financial statement purposes only, as agreed by HCMFA, without any corresponding cash reimbursement required, in accordance with generally accepted accounting principles, based on the Allocation Percentage principles described in Section 4.01 hereof.

ARTICLE V
PAYMENT OF COST AND REVENUE SHARE; TAXES

Section 5.01    Quarterly Statements.  Within thirty (30) days following the end of each calendar qaurter during the Term (or at such time as may be otherwise agreed by the parties), each Service Provider shall furnish the other Parties hereto with a written statement with respect to the Actual Cost paid by it in respect of Shared Services and Shared Assets provided by it, in each case, during such

period, setting forth (i) the cost allocation in accordance with Article IV hereof together with the Applicable Margin on such allocated amounts, and (ii) any amounts paid pursuant to Section 5.02 hereof, together with such other data and information necessary to complete the items described in Section 5.03 hereof (hereinafter referred to as the "*Quarterly Report*").

Section 5.02    <u>Settlement Payments</u>.    At any time during the Term, any Party may make payment of the amounts that are allocable to such Party together with the Applicable Margin related thereto, regardless of whether an invoice pursuant to Section 5.03 hereof has been issued with respect to such amounts.

Section 5.03    <u>Determination and Payment of Cost and Revenue Share.</u>

(a)    Within ten (10) days of the submission of the Quarterly Report described in Section 5.02 hereof (or at such other time as may be agreed by the parties), the Parties shall (i) agree on the cost share of each of the Parties and Applicable Margin as calculated pursuant to the provisions of this Agreement; and (ii) prepare and issue invoices for the cost share and Applicable Margin payments that are payable by any of the Parties.

(b)    Within ten (10) days of preparation of the agreement and the issuance of the invoice described in Section 5.03(a) (or at such other time as may be agreed by the parties), the Parties shall promptly make payment of the amounts that are set forth on such cost allocation invoice. Notwithstanding anything in this Agreement to the contrary, provision of the Shared Services shall commence from the Effective Date, but no fees shall be payable from Recipient or otherwise accrue with respect to such services provided during the month of December 2011.

Section 5.04    <u>Taxes</u>.

(a)    Recipient is responsible for and will pay all Taxes applicable to the Shared Services and the Shared Assets provided to Recipient, provided, that such payments by Recipient to Service Provider will be made in the most tax-efficient manner and provided further, that Service Provider will not be subject to any liability for Taxes applicable to the Shared Services and the Shared Assets as a result of such payment by Recipient.  Service Provider will collect such Tax from Recipient in the same manner it collects such Taxes from other customers in the ordinary course of Service Provider's business, but in no event prior to the time it invoices Recipient for the Shared Services and Shared Assets, costs for which such Taxes are levied.  Recipient may provide Service Provider with a certificate evidencing its exemption from payment of or liability for such Taxes.

(b)    Service Provider will reimburse Recipient for any Taxes collected from Recipient and refunded to Service Provider.  In the event a Tax is assessed against Service Provider that is solely the responsibility of Recipient and Recipient desires to protest such assessment, Recipient will submit to Service Provider a statement of the issues and arguments requesting that Service Provider grant Recipient the authority to prosecute the protest in Service Provider's name.  Service Provider's authorization will not be unreasonably withheld.  Recipient will finance, manage, control and determine the strategy for such protest while keeping Service Provider reasonably informed of the proceedings.  However, the authorization will be periodically reviewed by Service Provider to determine any adverse impact on Service Provider, and Service Provider will have the right to reasonably withdraw such authority at any time.  Upon notice by Service Provider that it is so withdrawing such authority, Recipient will expeditiously terminate all proceedings.  Any adverse consequences suffered by Recipient as a result of the withdrawal will be submitted to arbitration pursuant to Section 9.14.  Any contest for Taxes brought by Recipient may not result in any lien attaching to any property or rights of Service Provider or otherwise jeopardize Service Provider's interests or rights in any of its property.  Recipient agrees to

indemnify Service Provider for all Losses that Service Provider incurs as a result of any such contest by Recipient.

      (c)    The provisions of this Section 5.04 will govern the treatment of all Taxes arising as a result of or in connection with this Agreement notwithstanding any other Article of this Agreement to the contrary.

## ARTICLE VI
## SERVICE PROVIDER RESPONSIBILITIES

      Section 6.01    <u>Service Provider General Obligations</u>. Service Provider will provide the Shared Services and the Shared Assets to Recipient on a non-discriminatory basis and will provide the Shared Services and the Shared Assets in the same manner as if it were providing such services and assets on its own account (the "*Service Standards*"). Service Provider will conduct its duties hereunder in a lawful manner in compliance with applicable laws, statutes, rules and regulations and in accordance with the Service Standards, including, for avoidance of doubt, laws and regulations relating to privacy of customer information.

      Section 6.02    <u>Books and Records; Access to Information</u>. Service Provider will keep and maintain books and records on behalf of Recipient in accordance with past practices and internal control procedures. Recipient will have the right, at any time and from time to time upon reasonable prior notice to Service Provider, to inspect and copy (at its expense) during normal business hours at the offices of Service Provider the books and records relating to the Shared Services and Shared Assets, with respect to Service Provider's performance of its obligations hereunder. This inspection right will include the ability of Recipient's financial auditors to review such books and records in the ordinary course of performing standard financial auditing services for Recipient (but subject to Service Provider imposing reasonable access restrictions to Service Provider's and its Affiliates' proprietary information and such financial auditors executing appropriate confidentiality agreements reasonably acceptable to Service Provider). Service Provider will promptly respond to any reasonable requests for information or access. For the avoidance of doubt, all books and records kept and maintained by Service Provider on behalf of Recipient shall be the property of Recipient, and Service Provider will surrender promptly to Recipient any of such books or records upon Recipient's request (provided that Service Provider may retain a copy of such books or records) and shall make all such books and records available for inspection and use by the Securities and Exchange Commission or any person retained by Recipient at all reasonable times. Such records shall be maintained by Service Provider for the periods and in the places required by laws and regulations applicable to Recipient.

      Section 6.03    <u>Return of Property and Equipment</u>. Upon expiration or termination of this Agreement, Service Provider will be obligated to return to Recipient, as soon as is reasonably practicable, any equipment or other property or materials of Recipient that is in Service Provider's control or possession.

## ARTICLE VII
## TERM AND TERMINATION

      Section 7.01    <u>Term</u>. The term of this Agreement will commence as of the Effective Date and will continue in full force and effect until the first anniversary of the Effective Date (the "*Term*"), unless terminated earlier in accordance with Section 9.02. The Term shall automatically renew for successive one year periods unless sooner terminated under Section 7.02.

012430

Section 7.02    Termination.  Either Party may terminate this Agreement, with or without cause, upon at least 60 days advance written notice at any time prior to the expiration of the Term.

ARTICLE VIII
LIMITED WARRANTY

Section 8.01    Limited Warranty.  Service Provider will perform the Shared Services hereunder in accordance with the Service Standards.  Except as specifically provided in this Agreement, Service Provider makes no express or implied representations, warranties or guarantees relating to its performance of the Shared Services and the granting of the Shared Assets under this Agreement, including any warranty of merchantability, fitness, quality, non-infringement of third party rights, suitability or adequacy of the Shared Services and the Shared Assets for any purpose or use or purpose.  Service Provider will (to the extent possible and subject to Service Provider's contractual obligations) pass through the benefits of any express warranties received from third parties relating to any Shared Service and Shared Asset, and will (at Recipient's expense) assist Recipient with any warranty claims related thereto.

ARTICLE IX
MISCELLANEOUS

Section 9.01    No Partnership or Joint Venture; Independent Contractor.  Nothing contained in this Agreement will constitute or be construed to be or create a partnership or joint venture between or among HCMLP or HCMFA or their respective successors or assigns.  The Parties understand and agree that, with the exception of the procurement by Service Provider of licenses or other rights on behalf of Recipient pursuant to Section 3.01, this Agreement does not make any of them an agent or legal representative of the other for any purpose whatsoever.  With the exception of the procurement by Service Provider of licenses or other rights on behalf of Recipient pursuant to Section 3.01, no Party is granted, by this Agreement or otherwise, any right or authority to assume or create any obligation or responsibilities, express or implied, on behalf of or in the name of any other Party, or to bind any other Party in any manner whatsoever.  The Parties expressly acknowledge that Service Provider is an independent contractor with respect to Recipient in all respects, including with respect to the provision of the Shared Services.

Section 9.02    Amendments; Waivers.  Except as expressly provided herein, this Agreement may be amended only by agreement in writing of all Parties.  No waiver of any provision nor consent to any exception to the terms of this Agreement or any agreement contemplated hereby will be effective unless in writing and signed by all of the Parties affected and then only to the specific purpose, extent and instance so provided.  No failure on the part of any Party to exercise or delay in exercising any right hereunder will be deemed a waiver thereof, nor will any single or partial exercise preclude any further or other exercise of such or any other right.

Section 9.03    Schedules and Exhibits; Integration.  Each Schedule and Exhibit delivered pursuant to the terms of this Agreement must be in writing and will constitute a part of this Agreement, although schedules need not be attached to each copy of this Agreement.  This Agreement, together with such Schedules and Exhibits constitutes the entire agreement among the Parties pertaining to the subject matter hereof and supersedes all prior agreements and understandings of the Parties in connection therewith.

Section 9.04    Further Assurances.  Each Party will take such actions as any other Party may reasonably request or as may be necessary or appropriate to consummate or implement the transactions contemplated by this Agreement or to evidence such events or matters.

7

012431

Section 9.05    Governing Law.  This Agreement and the legal relations between the Parties will be governed by and construed in accordance with the laws of the State of Texas applicable to contracts made and performed in such State and without regard to conflicts of law doctrines unless certain matters are preempted by federal law.

Section 9.06    Assignment.  Except as otherwise provided hereunder, neither this Agreement nor any rights or obligations hereunder are assignable by one Party without the express prior written consent of the other Parties.

Section 9.07    Headings.  The descriptive headings of the Articles, Sections and subsections of this Agreement are for convenience only and do not constitute a part of this Agreement.

Section 9.08    Counterparts.   This Agreement and any amendment hereto or any other agreement delivered pursuant hereto may be executed in one or more counterparts and by different Parties in separate counterparts.  All counterparts will constitute one and the same agreement and will become effective when one or more counterparts have been signed by each Party and delivered to the other Parties.

Section 9.09    Successors and Assigns; No Third Party Beneficiaries.  This Agreement is binding upon and will inure to the benefit of each Party and its successors or assigns, and nothing in this Agreement, express or implied, is intended to confer upon any other Person or Governmental Entity any rights or remedies of any nature whatsoever under or by reason of this Agreement.

Section 9.10    Notices.  All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given: (i)immediately when personally delivered; (ii) when received by first class mail, return receipt requested; (iii) one day after being sent for overnight delivery by Federal Express or other overnight delivery service; or (iv) when receipt is acknowledged, either electronically or otherwise, if sent by facsimile, telecopy or other electronic transmission device.  Notices, demands and communications to the other Parties will, unless another address is specified by such Parties in writing, be sent to the addresses indicated below:

If to HCMLP, addressed to:

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  General Counsel
Fax:  (972) 628-4147

If to HCMFA, addressed to:

Highland Capital Management Fund Advisors, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  General Counsel
Fax:  (972) 628-4147

Section 9.11    Expenses.  Except as otherwise provided herein, the Parties will each pay their own expenses incident to the negotiation, preparation and performance of this Agreement, including the fees, expenses and disbursements of their respective investment bankers, accountants and counsel.

8

012432

Section 9.12 <u>Waiver</u>. No failure on the part of any Party to exercise or delay in exercising any right hereunder will be deemed a waiver thereof, nor will any single or partial exercise preclude any further or other exercise of such or any other right.

Section 9.13 <u>Severability</u>. If any provision of this Agreement is held to be unenforceable for any reason, it will be adjusted rather than voided, if possible, to achieve the intent of the Parties. All other provisions of this Agreement will be deemed valid and enforceable to the extent possible.

Section 9.14 <u>Arbitration; Jurisdiction</u>. Notwithstanding anything contained in this Agreement or the Annexes hereto to the contrary, in the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; <u>provided, however</u>, that either party or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. The Arbitration will be conducted by the American Arbitration Association, or another, mutually agreeable arbitration service. The arbitrator(s) shall be duly licensed to practice law in the State of Texas. The discovery process shall be limited to the following: Each side shall be permitted no more than (i) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production. In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents. The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted. The arbitrator(s) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. No arbitrator will have authority to render a decision that contains an outcome determinative error of state or federal law, or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law. In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable, arbitration service rules. The party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Agreement. Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury. All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

Section 9.15 <u>General Rules of Construction</u>. For all purposes of this Agreement and the Exhibits and Schedules delivered pursuant to this Agreement: (i) the terms defined in Article I have the meanings assigned to them in Article I and include the plural as well as the singular; (ii) all accounting terms not otherwise defined herein have the meanings assigned under GAAP; (iii) all references in this Agreement to designated "Articles," "Sections" and other subdivisions are to the designated Articles, Sections and other subdivisions of the body of this Agreement; (iv) pronouns of either gender or neuter will include, as appropriate, the other pronoun forms; (v) the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision; (vi) "or" is not exclusive; (vii) "including" and "includes" will be deemed to be followed by "but not limited to" and "but is not limited to, "respectively; (viii) any definition of or

9

012433

reference to any law, agreement, instrument or other document herein will be construed as referring to such law, agreement, instrument or other document as from time to time amended, supplemented or otherwise modified; and (ix) any definition of or reference to any statute will be construed as referring also to any rules and regulations promulgated thereunder.

012434

IN WITNESS HEREOF, each of the Parties has caused this Agreement to be executed by its duly authorized officers as of the day and year first above written.

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:   Strand Advisors, Inc., its general partner

By:_____

Name:  James Dondero
Title:    President


**HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.**

By:   Strand Advisors XVI, Inc., its general partner

By:_____

Name:  Brian Mitts
Title:   Assistant Secretary

11

012435

**Annex A**

**Shared Services**

Compliance

        General compliance

        Compliance systems

Facilities

        Equipment

        General Overhead

        Office Supplies

        Rent & Parking

Finance & Accounting

        Book keeping

        Cash management

        Cash forecasting

        Credit facility reporting

        Financial reporting

        Accounts payable

        Accounts receivable

        Expense reimbursement

        Vendor management

HR

        Drinks/snacks

        Lunches

        Recruiting

IT

        General support & maintenance (OMS, development, support)

        Telecom (cell, phones, broadband)

        WSO

Legal

        Corporate secretarial services

        Document review and preparation

        Litigation support

        Management of outside counsel

Marketing and PR

        Public relations

Tax

        Tax audit support

        Tax planning

        Tax prep and filing

Investments

        Investment research on an ad hoc basis as requested by HCMFA

Valuation Committee

Trading

Trading desk services

Operations

Trade settlement

13

012437

# EXHIBIT VVVVV

012438

November 30, 2020

Highland Capital Management Fund Advisors, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: General Counsel

> **RE:** **Termination of Second Amended and Restated Shared Services Agreement, effective as of February 8, 2013, by and among Highland Capital Management, L.P. ("<u>HCMLP</u>"), and Highland Capital Management Fund Advisors, L.P. (the "<u>Agreement</u>").**

To Whom It May Concern:

As set forth in Section 7.02 of the Agreement, the Agreement is terminable at will upon at least 60 days advance written notice.

By this letter, HCMLP is notifying you that it is terminating the Agreement. Such termination will be effective January 31, 2021. HCMLP reserves the right to rescind this notice of termination.

Please feel free to contact me with any questions.

Sincerely,

HIGHLAND CAPITAL MANAGEMENT, L.P.

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Chief Executive Officer
Chief Restructuring Officer

# EXHIBIT WWWWW

012440

## AMENDED AND RESTATED SHARED SERVICES AGREEMENT

This Amended and Restated Shared Services Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated effective as of January 1, 2018, is entered into by and between NexPoint Advisors, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the staff and services provider hereunder (in such capacity, the "Staff and Services Provider" and together with the Management Company, the "Parties").

## R E C I T A L S

WHEREAS, the Staff and Services Provider is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act");

WHEREAS, the Staff and Services Provider and the Management Company are engaged in the business of providing investment management services;

WHEREAS, the Parties entered into that certain Shared Services Agreement, dated effective as of January 1, 2013 (the "Original Agreement");

WHEREAS, the Parties desire to amend and restated the Original Agreement and the Staff and Services Provider is hereby being retained to provide certain back- and middle-office services and administrative, infrastructure and other services to assist the Management Company in conducting its business, and the Staff and Services Provider is willing to make such services available to the Management Company, in each case, on the terms and conditions hereof;

WHEREAS, the Management Company may employ certain individuals to perform portfolio selection and asset management functions for the Management Company, and certain of these individuals may also be employed simultaneously by the Staff and Services Provider during their employment with the Management Company; and

WHEREAS, each Person employed by both the Management Company and the Staff and Services Provider as described above (each, a "Shared Employee"), if any, is and shall be identified on the books and records of each of the Management Company and the Staff and Services Provider (as amended, modified, supplemented or restated from time to time).

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree, and the Original Agreement is hereby amended, restated and replaced in its entirety as follows:

## ARTICLE I

## DEFINITIONS

Section 1.01  Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings:

"Affiliate" shall mean with respect to a Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the first Person. The term "control" means (i) the legal or beneficial ownership of securities representing a majority of the voting power of any person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether by contract or otherwise.

"Applicable Asset Criteria and Concentrations" means any applicable eligibility criteria, portfolio concentration limits and other similar criteria or limits which the Management Company instructs in writing to the Staff and Services Provider in respect of the Portfolio or one or more Accounts, as such criteria or limits may be modified, amended or supplemented from time to time in writing by the Management Company;

"Applicable Law" shall mean, with respect to any Person or property of such Person, any action, code, consent decree, constitution, decree, directive, enactment, finding, guideline, law, injunction, interpretation, judgment, order, ordinance, policy statement, proclamation, formal guidance, promulgation, regulation, requirement, rule, rule of law, rule of public policy, settlement agreement, statute, writ, or any particular section, part or provision thereof of any Governmental Authority to which the Person in question is subject or by which it or any of its property is bound.

"Client or Account" shall mean any fund, client or account advised by the Management Company, as applicable.

"Covered Person" shall mean the Staff and Services Provider, any of its Affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)).

"Governmental Authority" shall mean (i) any government or quasi-governmental authority or political subdivision thereof, whether national, state, county, municipal or regional, whether U.S. or non-U.S.; (ii) any agency, regulator, arbitrator, board, body, branch, bureau, commission, corporation, department, master, mediator, panel, referee, system or instrumentality of any such government, political subdivision or other government or quasi-government entity, whether non-U.S. or U.S.; and (iii) any court, whether U.S. or non-U.S.

"Indebtedness" shall mean: (a) all indebtedness for borrowed money and all other obligations, contingent or otherwise, with respect to surety bonds, guarantees of borrowed money, letters of credit and bankers' acceptances whether or not matured, and hedges and other derivative contracts and financial instruments; (b) all obligations evidenced by notes, bonds, debentures, or similar instruments, or incurred under bank guaranty or letter of credit facilities or credit agreements; (c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property of the Management Company or any subsidiary; (d) all capital lease obligations; (e) all indebtedness guaranteed by such Person or any of its subsidiaries; and (f) all indebtedness guaranteed by such Person or any of its subsidiaries.

012442

"Operating Guidelines" means any operating guidelines attached to any portfolio management agreement, investment management agreement or similar agreement entered into between the Management Company and a Client or Account.

"Portfolio" means the portfolio of securities and other assets, including without limitation, financial instruments, equity investments, collateral loan obligations, debt securities, preferred return notes and other similar obligations held directly or indirectly by, or on behalf of, Clients and Accounts from time to time;

"Securities Act" shall mean the Securities Act of 1933, as amended.

Section 1.02    Interpretation.    The following rules apply to the use of defined terms and the interpretation of this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) "or" is not exclusive (unless preceded by "either") and "include" and "including" are not limiting; (iii) unless the context otherwise requires, references to agreements shall be deemed to mean and include such agreements as the same may be amended, supplemented, waived and otherwise modified from time to time; (iv) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder or any law enacted in substitution or replacement therefor; (v) a reference to a Person includes its successors and assigns; (vi) a reference to a Section without further reference is to the relevant Section of this Agreement; (vii) the headings of the Sections and subsections are for convenience and shall not affect the meaning of this Agreement; (viii) "writing", "written" and comparable terms refer to printing, typing, lithography and other shall mean of reproducing words in a visible form (including telefacsimile and electronic mail); (ix) "hereof", "herein", "hereunder" and comparable terms refer to the entire instrument in which such terms are used and not to any particular article, section or other subdivision thereof or attachment thereto; and (x) references to any gender include any other gender, masculine, feminine or neuter, as the context requires.

## ARTICLE II

## SERVICES

Section 2.01    General Authority.    Highland is hereby appointed as Staff and Services Provider for the purpose of providing such services and assistance as the Management Company may request from time to time to, and if applicable, to make available the Shared Employees to, the Management Company in accordance with and subject to the provisions of this Agreement and the Staff and Services Provider hereby accepts such appointment. The Staff and Services Provider hereby agrees to such engagement during the term hereof and to render the services described herein for the compensation provided herein, subject to the limitations contained herein.

Section 2.02    Provision of Services.    Without limiting the generality of Section 2.01 and subject to Section 2.04 (Applicable Asset Criteria and Concentrations) below, the Staff and Services Provider hereby agrees, from the date hereof, to provide the following back- and middle-office services and administrative, infrastructure and other services to the Management Company.

(a)    *Back- and Middle-Office*: Assistance and advice with respect to back- and middle-office functions including, but not limited to, investment research, trade desk services,

012443

including trade execution and settlement, finance and accounting, payments, operations, book keeping, cash management, cash forecasting, accounts payable, accounts receivable, expense reimbursement, vendor management, and information technology (including, without limitation, general support and maintenance (OMS, development, support), telecom (cellphones, telephones and broadband) and WSO);

      (b)    *Legal/Compliance/Risk Analysis.*  Assistance and advice with respect to legal issues, litigation support, management of outside counsel, compliance support and implementation and general risk analysis;

      (c)    *Tax.*  Assistance and advice with respect to tax audit support, tax planning and tax preparation and filing.

      (d)    *Management of Clients and Accounts.*  Assistance and advice with respect to (i) the adherence to Operating Guidelines by the Management Company, and (ii) performing any obligations of the Management Company under or in connection with any back- and middle-office function set forth in any portfolio management agreement, investment management agreement or similar agreement in effect between the Management Company and any Client or Account from time to time.

      (e)    *Valuation.*  Advice relating to the appointment of suitable third parties to provide valuations on assets comprising the Portfolio and including, but not limited to, such valuations required to facilitate the preparation of financial statements by the Management Company or the provision of valuations in connection with, or preparation of reports otherwise relating to, a Client or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity;

      (f)    *Execution and Documentation.*  Assistance relating to the negotiation of the terms of, and the execution and delivery by the Management Company of, any and all documents which the Management Company considers to be necessary in connection with the acquisition and disposition of an asset in the Portfolio by the Management Company or a Client or Account managed by the Management Company, transactions involving the Management Company or a Client or Account managed by the Management Company, and any other rights and obligations of the Management Company or a Client or Account managed by the Management Company;

      (g)    *Marketing.*  Provide access to marketing team representatives to assist with the marketing of the Management Company and any specified Clients or Accounts managed by the Management Company conditional on the Management Company's agreement that any incentive compensation related to such marketing shall be borne by the Management Company;

      (h)    *Reporting.*  Assistance relating to any reporting the Management Company is required to make in relation to the Portfolio or any Client or Account, including reports relating to (i) credit facility reporting and purchases, sales, liquidations, acquisitions, disposals, substitutions and exchanges of assets in the Portfolio, (ii) the requirements of an applicable regulator, or (iii) other type of reporting which the Management Company and Staff and Services Provider may agree from time to time;

4

   (i) *Administrative Services.* The provision of office space, information technology services and equipment, infrastructure, rent and parking and other related services requested or utilized by the Management Company from time to time;

   (j) *Shared Employees.* To the extent applicable, the provision of Shared Employees and such additional human capital as may be mutually agreed by the Management Company and the Staff and Services Provider in accordance with the provisions of Section 2.03 hereof;

   (k) *Ancillary Services.* Assistance and advice on all things ancillary or incidental to the foregoing; and

   (l) *Other.* Assistance and advice relating to such other back- and middle-office services in connection with the day-to-day business of the Management Company as the Management Company and the Staff and Services Provider may from time to time agree.

For the avoidance of doubt, none of the services contemplated hereunder shall constitute investment advisory services, and the Staff & Services Provider shall not provide any advice to the Management Company or perform any duties on behalf of the Management Company, other than the back- and middle-office services contemplated herein, with respect to (a) the general management of the Management Company, its business or activities, (b) the initiation or structuring of any Client or Account or similar securitization, (c) the substantive investment management decisions with respect to any Client or Account or any related collateral obligations or securitization, (d) the actual selection of any collateral obligation or assets by the Management Company, (e) binding recommendations as to any disposal of or amendment to any Collateral Obligation or (f) any similar functions.

  Section 2.03 Shared Employees.

   (a) The Staff and Services Provider hereby agrees and consents that each Shared Employee, if any, shall be employed by the Management Company, and the Management Company hereby agrees and consents that each Shared Employee shall be employed by the Staff and Services Provider. Except as may otherwise separately be agreed in writing between the applicable Shared Employee and the Management Company and/or the Staff and Services Provider, in each of their discretion, each Shared Employee is an at-will employee and no guaranteed employment or other employment arrangement is agreed or implied by this Agreement with respect to any Shared Employee, and for avoidance of doubt this Agreement shall not amend, limit, constrain or modify in any way the employment arrangements as between any Shared Employee and the Staff and Services Provider or as between any Shared Employee and the Management Company, it being understood that the Management Company may enter into a short-form employment agreement with any Shared Employee memorializing such Shared Employee's status as an employee of the Management Company. To the extent applicable, the Staff and Services Provider shall ensure that the Management Company has sufficient access to the Shared Employees so that the Shared Employees spend adequate time to provide the services required hereunder. The Staff and Services Provider may also employ the services of persons other than the Specified Persons as it deems fit in its sole discretion

012445

(b)    Notwithstanding that the Shared Employees, if any, shall be employed by both the Staff and Services Provider and the Management Company, the Parties acknowledge and agree that any and all salary and benefits of each Shared Employee shall be paid exclusively by the Staff and Services Provider and shall not be paid or borne by the Management Company and no additional amounts in connection therewith shall be due from the Management Company to the Staff and Services Provider.

(c)    To the extent that a Shared Employee participates in the rendering of services to the Management Company's clients, the Shared Employee shall be subject to the oversight and control of the Management Company and such services shall be provided by the Shared Employee exclusively in his or her capacity as a "supervised person" of, or "person associated with", the Management Company (as such terms are defined in Sections 202(a)(25) and 202(a)(17), respectively, of the Advisers Act).

(d)    Each Party may continue to oversee, supervise and manage the services of each Shared Employee in order to (1) ensure compliance with the Party's compliance policies and procedures, (2) ensure compliance with regulations applicable to the Party and (3) protect the interests of the Party and its clients; *provided* that Staff and Services Provider shall (A) cooperate with the Management Company's supervisory efforts and (B) make periodic reports to the Management Company regarding the adherence of Shared Employees to Applicable Law, including but not limited to the 1940 Act, the Advisers Act and the United States Commodity Exchange Act of 1936, as amended, in performing the services hereunder.

(e)    Where a Shared Employee provides services hereunder through both Parties, the Parties shall cooperate to ensure that all such services are performed consistently with Applicable Law and relevant compliance controls and procedures designed to prevent, among other things, breaches in information security or the communication of confidential, proprietary or material non-public information.

(f)    The Staff and Services Provider shall ensure that each Shared Employee has any registrations, qualifications and/or licenses necessary to provide the services hereunder.

(g)    The Parties will cooperate to ensure that information about the Shared Employees is adequately and appropriately disclosed to clients, investors (and potential investors), investment banks operating as initial purchaser or placement agent with respect to any Client or Account, and regulators, as applicable.  To facilitate such disclosure, the Staff and Services Provider agrees to provide, or cause to be provided, to the Management Company such information as is deemed by the Management Company to be necessary or appropriate with respect to the Staff and Services Provider and the Shared Employees (including, but not limited to, biographical information about each Shared Employee).

(h)    The Parties shall cooperate to ensure that, when so required, each has adopted a Code of Ethics meeting the requirements of the Advisers Act ("Code of Ethics") that is consistent with applicable law and which is substantially similar to the other Party's Code of Ethics.

012446

(i)     The Staff and Services Provider shall make reasonably available for use by the Management Company, including through Shared Employees providing services pursuant to this Agreement, any relevant intellectual property and systems necessary for the provision of the services hereunder.

(j)     The Staff and Services Provider shall require that each Shared Employee:

(i)     certify that he or she is subject to, and has been provided with, a copy of each Party's Code of Ethics and will make such reports, and seek prior clearance for such actions and activities, as may be required under the Codes of Ethics;

(ii)     be subject to the supervision and oversight of each Party's officers and directors, including without limitation its Chief Compliance Officer ("CCO"), which CCO may be the same Person, with respect to the services provided to that Party or its clients;

(iii)     provide services hereunder and take actions hereunder only as approved by the Management Company;

(iv)     provide any information requested by a Party, as necessary to comply with applicable disclosure or regulatory obligations;

(v)     to the extent authorized to transact on behalf of the Management Company or a Client or Account, take reasonable steps to ensure that any such transaction is consistent with any policies and procedures that may be established by the Parties and all Applicable Asset Criteria and Concentrations; and

(vi)     act, at all times, in a manner consistent with the fiduciary duties and standard of care owed by the Management Company to its members and direct or indirect investors or to a Client or Account as well as clients of Staff and Services Provider by seeking to ensure that, among other things, information about any investment advisory or trading activity applicable to a particular client or group of clients is not used to benefit the Shared Employee, any Party or any other client or group of clients in contravention of such fiduciary duties or standard of care.

(k)     Unless specifically authorized to do so, or appointed as an officer or authorized person of the Management Company with such authority, no Shared Employee may contract on behalf or in the name of the Management Company, acting as principal.

Section 2.04    Applicable Asset Criteria and Concentrations.  The Management Company will promptly inform the Staff and Services Provider in writing of any Applicable Asset Criteria and Concentrations to which it agrees from time to time and the Staff and Services Provider shall take such Applicable Asset Criteria and Concentrations into account when providing assistance and advice in accordance with Section 2.02 above and any other assistance or advice provided in accordance with this Agreement.

Section 2.05    Compliance with Management Company Policies and Procedures.  The Management Company will from time to time provide the Staff and Services Provider and the

012447

Shared Employees, if any, with any policy and procedure documentation which it establishes internally and to which it is bound to adhere in conducting its business pursuant to regulation, contract or otherwise. Subject to any other limitations in this Agreement, the Staff and Services Provider will use reasonable efforts to ensure any services it and the Shared Employees provide pursuant to this Agreement complies with or takes account of such internal policies and procedures.

Section 2.06    Authority.  The Staff and Services Provider's scope of assistance and advice hereunder is limited to the services specifically provided for in this Agreement.  The Staff and Services Provider shall not assume or be deemed to assume any rights or obligations of the Management Company under any other document or agreement to which the Management Company is a party.  Notwithstanding any other express or implied provision to the contrary in this Agreement, the activities of the Staff and Services Provider pursuant to this Agreement shall be subject to the overall policies of the Management Company, as notified to the Staff and Services Provider from time to time.   The Staff and Services Provider shall not have any duties or obligations to the Management Company unless those duties and obligations are specifically provided for in this Agreement (or in any amendment, modification or novation hereto or hereof to which the Staff and Services Provider is a party).

Section 2.07    Third Parties.

(a)     The Staff and Services Provider may employ third parties, including its affiliates, to render advice, provide assistance and to perform any of its duties under this Agreement; *provided* that notwithstanding the employment of third parties for any such purpose, the Staff and Services Provider shall not be relieved of any of its obligations or liabilities under this Agreement.

(b)     In providing services hereunder, the Staff and Services Provider may rely in good faith upon and will incur no liability for relying upon advice of nationally recognized counsel (which may be counsel for the Management Company, a Client or Account or any Affiliate of the foregoing), accountants or other advisers as the Staff and Services Provider determines, in its sole discretion, is reasonably appropriate in connection with the services provided by the Staff and Services Provider under this Agreement.

Section 2.08    Management Company to Cooperate with the Staff and Services Provider. In furtherance of the Staff and Services Provider's obligations under this Agreement the Management Company shall cooperate with, provide to, and fully inform the Staff and Services Provider of, any and all documents and information the Staff and Services Provider reasonably requires to perform its obligations under this Agreement.

Section 2.09    Power of Attorney.  If the Management Company considers it necessary for the provision by the Staff and Services Provider of the assistance and advice under this Agreement (after consultation with the Staff and Services Provider), it may appoint the Staff and Services Provider as its true and lawful agent and attorney, with full power and authority in its name to sign, execute, certify, swear to, acknowledge, deliver, file, receive and record any and all documents that the Staff and Services Provider reasonably deems appropriate or necessary in connection with the execution and settlement of acquisitions of assets as directed by the Management Company

012448

and the Staff and Services Provider's powers and duties hereunder (which for the avoidance of doubt shall in no way involve the discretion and/or authority of the Management Company with respect to investments). Any such power shall be revocable in the sole discretion of the Management Company.

## ARTICLE III

## CONSIDERATION AND EXPENSES

Section 3.01 <u>Consideration</u>. As compensation for its performance of its obligations as Staff and Services Provider under this Agreement, the Staff and Services Provider will be entitled to receive a flat fee of $168,000 per month (the "<u>Staff and Services Fee</u>"), payable monthly in advance on the first business day of each month.

Section 3.02 <u>Costs and Expenses</u>. Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Staff and Services Provider for any and all costs and expenses that may be borne properly by the Management Company.

Section 3.03 <u>Deferral</u>. Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any all and amounts payable to the Staff and Services Provider pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

## ARTICLE IV

## REPRESENTATIONS AND COVENANTS

Section 4.01 <u>Representations</u>. Each of the Parties hereto represents and warrants that:

(a) It has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

(b) this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(c) no consent, approval, authorization or order of or declaration or filing with any Governmental Authority is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(d) neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (i) its constituting and organizational documents; or (ii) the terms

012449

of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound.

## ARTICLE V

## COVENANTS

Section 5.01   Compliance; Advisory Restrictions.

(a)   The Staff and Services Provider shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Staff and Services Provider.  Specifically, the Staff and Services Provider agrees that it will provide the Management Company with reasonable access to information relating to the performance of Staff and Services Provider's obligations under this Agreement.

(b)   This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any portfolio management agreement or any part thereof.  It is the express intention of the parties hereto that this Agreement and all services performed hereunder comply in all respects with all (a) applicable contractual provisions and restrictions contained in each portfolio management agreement, investment management agreement or similar agreement and each document contemplated thereby; and (b) Applicable Laws (collectively, the "Advisory Restrictions").  If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the services to be provided under this Agreement shall automatically be limited without action by any person or entity, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Section 5.02   Records; Confidentiality.

The Staff and Services Provider shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; *provided* that the Staff and Services Provider shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

The Staff and Services Provider shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Staff and Services Provider hereunder and shall not disclose any such information to non-affiliated third parties, except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its

012450

rating of notes issued by a CLO or supplying credit estimates on any obligation included in the Portfolio, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any Client or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity, (iv) as required by (A) Applicable Law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Staff and Services Provider or any of its Affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Staff and Services Provider on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Staff and Services Provider may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any Client or Account, (ix) information relating to performance of the Portfolio as may be used by the Staff and Services Provider in the ordinary course of its business or (xx) such information as is routinely disclosed to the trustee, custodian or collateral administrator of any Client or Account in connection with such trustee's, custodian's or collateral administrator's performance of its obligations under the transaction documents related to such Client or Account. Notwithstanding the foregoing, it is agreed that the Staff and Services Provider may disclose without the consent of any Person (1) that it is serving as staff and services provider to the Management Company, (2) the nature, aggregate principal amount and overall performance of the Portfolio, (3) the amount of earnings on the Portfolio, (4) such other information about the Management Company, the Portfolio and the Clients or Accounts as is customarily disclosed by staff and services providers to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Staff and Services Provider, the Clients or Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

## ARTICLE VI

## EXCULPATION AND INDEMNIFICATION

Section 6.01    Standard of Care.    Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. To the extent not inconsistent with the foregoing, each Covered Person shall follow its customary standards, policies and procedures in performing its duties hereunder. No Covered Person shall deal with the income or assets of the Management Company in such Covered Person's own interest or for its own account. Each Covered Person in its respective sole and absolute discretion may separately engage or invest in any other business ventures, including those that may be in competition with the Management Company, and the Management Company will not have any rights in or to such ventures or the income or profits derived therefrom

11

Section 6.02   Exculpation.  To the fullest extent permitted by law, no Covered Person will be liable to the Management Company, any Member, or any shareholder, partner or member thereof, for (i) any acts or omissions by such Covered Person arising out of or in connection with the conduct of the business of the Management Company or its General Partner, or any investment made or held by the Management Company or its General Partner, unless it is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "Disabling Conduct") on the part of such Covered Person, (ii) any act or omission of any Investor, (iii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of such Covered Person, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of such Covered Person with reasonable care, or (iv) any consequential (including loss of profit), indirect, special or punitive damages.  To the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Management Company or any Member, no Covered Person acting under this Agreement shall be liable to the Management Company or to any such Member for its good-faith reliance on the provisions of this Agreement.  The exculpations set forth in this Section 6.02 shall exculpate any Covered Person regardless of such Covered Person's sole, comparative, joint, concurrent, or subsequent negligence.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to the Management Company or any Member solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to the Management Company or the Members, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to the Management Company or any Member in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care.

Section 6.03   Indemnification by the Management Company.   The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, causes of action (including, but not limited to, strict liability, negligence, statutory violation, regulatory violation, breach of contract, and all other torts and claims arising under common law), demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("Claims"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the investment or other activities of the Management Company or its General Partner, or activities undertaken in connection with the Management Company or its General Partner, or otherwise relating to or

012452

arising out of this Agreement, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "Proceeding"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "Damages"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person. The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons. Any Covered Person shall be indemnified under the terms of this Section 6.03 regardless of such Covered Person's sole, comparative, joint, concurrent, or subsequent negligence.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder shall be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder. The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives. Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this Section 6.03 shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Section 6.03 to the fullest extent permitted by law.

Section 6.04    Other Sources of Recovery etc. The indemnification rights set forth in Section 6.03 are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled. If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or indemnification from any Person in which any of the Clients or Accounts has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained.

012453

Section 6.05   Rights of Heirs, Successors and Assigns. The indemnification rights provided by Section 6.03 shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person.

Section 6.06   Reliance. A Covered Person shall incur no liability to the Management Company or any Member in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge. Each Covered Person may act directly or through his, her or its agents or attorneys.

## ARTICLE VII

## TERMINATION

Section 7.01   Termination. Either Party may terminate this Agreement at any time upon at least thirty (30) days' written notice to the other.

## ARTICLE VIII

## MISCELLANEOUS

Section 8.01   Amendments. This Agreement may not be amended or modified except by an instrument in writing signed by each Party.

Section 8.02   Assignment and Delegation.

(a)   Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in clauses (b) and (c) of this Section 8.02, without the prior written consent of the other Party and (ii) in accordance with Applicable Law.

(b)   Except as otherwise provided in this Section 8.02, the Staff and Services Provider may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with Applicable Law.

(c)   The Staff and Services Provider may, without satisfying any of the conditions of Section 8.02(a) other than clause (ii) thereof, (1) assign any of its rights or obligations under this Agreement to an Affiliate; *provided* that such Affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Staff and Services Provider pursuant to this Agreement and (ii) has the legal right and capacity to act as Staff and Services Provider under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Staff and Services Provider under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Staff and Services Provider in another corporate or similar form and has

14

012454

substantially the same staff; *provided further* that the Staff and Services Provider shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence. Upon the execution and delivery of any such assignment by the assignee, the Staff and Services Provider will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

      Section 8.03   Non-Recourse; Non-Petition.

      (a)    The Staff and Services Provider agrees that the payment of all amounts to which it is entitled pursuant to this Agreement shall be payable by the Management Company only to the extent of assets held in the Portfolio.

      (b)    Notwithstanding anything to the contrary contained herein, the liability of the Management Company to the Staff and Services Provider hereunder is limited in recourse to the Portfolio, and if the proceeds of the Portfolio following the liquidation thereof are insufficient to meet the obligations of the Management Company hereunder in full, the Management Company shall have no further liability in respect of any such outstanding obligations, and such obligations and all claims of the Staff and Services Provider or any other Person against the Management Company hereunder shall thereupon extinguish and not thereafter revive. The Staff and Services Provider accepts that the obligations of the Management Company hereunder are the corporate obligations of the Management Company and are not the obligations of any employee, member, officer, director or administrator of the Management Company and no action may be taken against any such Person in relation to the obligations of the Management Company hereunder.

      (c)    Notwithstanding anything to the contrary contained herein, any Staff and Services Provider agrees not to institute against, or join any other Person in instituting against, the Management Company any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under United States federal or state bankruptcy laws, or similar laws until at least one year and one day (or, if longer, the then applicable preference period plus one day) after the payment in full all amounts payable in respect of any Indebtedness incurred to finance any portion of the Portfolio; *provided* that nothing in this provision shall preclude, or be deemed to stop, the Staff and Services Provider from taking any action prior to the expiration of the aforementioned one year and one day period (or, if longer, the applicable preference period then in effect plus one day) in (i) any case or proceeding voluntarily filed or commenced by the Management Company, or (ii) any involuntary insolvency proceeding filed or commenced against the Management Company by a Person other than the Staff and Services Provider.

      (d)    The Management Company hereby acknowledges and agrees that the Staff and Services Provider's obligations hereunder shall be solely the corporate obligations of the Staff and Services Provider, and are not the obligations of any employee, member, officer, director or administrator of the Staff and Services Provider and no action may be taken against any such Person in relation to the obligations of the Staff and Services Provider hereunder.

      (e)    The provisions of this Section 8.03 shall survive termination of this Agreement for any reason whatsoever.

012455

Section 8.04    Governing Law.

(a)    This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas. The Parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

(b)    The Parties irrevocably agree for the benefit of each other that the courts of the State of Texas and the United States District Court located in the Northern District of Texas in Dallas are to have exclusive jurisdiction to settle any disputes (whether contractual or non-contractual) which may arise out of or in connection with this Agreement and that accordingly any action arising out of or in connection therewith (together referred to as "Proceedings") may be brought in such courts. The Parties irrevocably submit to the jurisdiction of such courts and waive any objection which they may have now or hereafter to the laying of the venue of any Proceedings in any such court and any claim that any Proceedings have been brought in an inconvenient forum and further irrevocably agree that a judgment in any Proceedings brought in such courts shall be conclusive and binding upon the Parties and may be enforced in the courts of any other jurisdiction.

Section 8.05    WAIVER OF JURY TRIAL.    EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

Section 8.06    Severability.    The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties.

Section 8.07    No Waiver.    The performance of any condition or obligation imposed upon any Party may be waived only upon the written consent of the Parties. Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other Party. Any failure by any Party to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Section 8.08    Counterparts.    This Agreement may be executed in any number of counterparts by facsimile or other written or electronic form of communication, each of which shall be deemed to be an original as against any Party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties reflected hereon as the signatories.

012456

Section 8.09   Third Party Beneficiaries.  This Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the Parties hereto and such permitted assigns, any legal or equitable rights hereunder. For avoidance of doubt, this Agreement is not for the benefit or and is not enforceable by any Shared Employee, Client or Account or any investor (directly or indirectly) in the Management Company.

Section 8.10   No Partnership or Joint Venture.  Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the Parties.  Except as expressly provided herein or in any other written agreement between the Parties, no Party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other Party.

Section 8.11   Independent Contractor.  Notwithstanding anything to the contrary, the Staff and Services Provider shall be deemed to be an independent contractor and, except as expressly provided or authorized herein, shall have no authority to act for or represent the Management Company or any Client or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity in any manner or otherwise be deemed an agent of the Management Company or any Client or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity.

Section 8.12   Written Disclosure Statement.  The Management Company acknowledges receipt of Part 2 of the Staff and Services Provider's Form ADV, as required by Rule 204-3 under the Advisers Act, on or before the date of execution of this Agreement.

Section 8.13   Headings.  The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 8.14   Entire Agreement.  This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the Parties with respect to such subject matter.

Section 8.15   Notices.  Any notice or demand to any Party to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail or email transmission or by delivering it by hand as follows:

      (a)    If to the Management Company:

          NexPoint Advisors, L.P.
          200 Crescent Court
          Suite 700
          Dallas, TX 75201

012457

(b)     If to the Staff and Services Provider:

        Highland Capital Management, L.P.
        300 Crescent Court
        Suite 700
        Dallas, TX 75201

or to such other address or email address as shall have been notified to the other Parties.

*[The remainder of this page intentionally left blank.]*

012458

IN WITNESS WHEREOF, each Party has caused this Agreement to be executed as of the date hereof by its duly authorized representative.

**NEXPOINT ADVISORS, L.P.**

By: NexPoint Advisors GP, LLC, its General Partner

By:_____
Name: Frank Waterhouse
Title: Treasurer

**HIGHLAND CAPITAL
MANAGEMENT, L.P.**

By: Strand Advisors, Inc., its General Partner

By:_____
Name: Frank Waterhouse
Title: Treasurer

# EXHIBIT XXXXX

012460

November 30, 2020

NexPoint Advisors, L.P.
200 Crescent Court, Suite 700
Dallas, Texas 75201

> **RE:** **Termination of Amended and Restated Shared Services Agreement, dated January 1, 2018, and among Highland Capital Management, L.P. ("HCMLP"), and NexPoint Advisors, L.P. (the "Agreement").**

To Whom It May Concern:

As set forth in Section 7.01 of the Agreement, the Agreement is terminable at will upon at least 30 days advance written notice.

By this letter, HCMLP is notifying you that it is terminating the Agreement. Such termination will be effective January 31, 2021. HCMLP reserves the right to rescind this notice of termination.

Please feel free to contact me with any questions.

Sincerely,

HIGHLAND CAPITAL MANAGEMENT, L.P.

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Chief Executive Officer
Chief Restructuring Officer

012461

# EXHIBIT YYYYY

## THIRD AMENDED AND RESTATED
## SHARED SERVICES AGREEMENT

This THIRD AMENDED AND RESTATED SHARED SERVICES AGREEMENT (this "*Agreement*"), dated September 26, 2017, and effective as of September 1, 2017 (the "*Effective Date*"), is entered into by and among Highland Capital Management, L.P. ("*HCMLP*") and NexBank Capital, Inc. ("*NCI*"), NexBank Securities, Inc. ("*NSI*"), NexBank Title, Inc. ("*NexVantage*") and NexBank SSB (the "*Bank*") (collectively, the "*Company*"). Each of the signatories hereto is individually a "*Party*" and collectively the "*Parties*".

## RECITALS

A.    WHEREAS, on September 24, 2013 HCMLP and NCI entered into that certain Shared Services Agreement (the "*Original Agreement*"), whereby HCMLP agreed to provide to NCI and each of its direct and indirect subsidiaries with certain business services as more fully described therein;

B.    WHEREAS, on February 6, 2014, HCMLP and NCI entered into an Amended and Restated Shared Services Agreement (the "*First Amended Agreement*") that superseded all prior agreements and understandings of the Parties in connection therewith, including the Original Agreement;

C.    WHEREAS, on October 1, 2014, HCMLP and NCI entered into a Second Amended and Restated Shared Services Agreement (the "*Second Amended Agreement*") that superseded all prior agreements and understandings of the Parties in connection therewith, including the Original Agreement;

D.    WHEREAS, on October 1, 2016, the Parties entered into an Amendment to the Second Amended Agreement (the "*Amendment*") (the Second Amended Agreement as amended by the Amendment is referred to herein as the "*Existing Agreement*");

E.    WHEREAS, the Parties now desire to amend and restate the Existing Agreement in its entirety with the terms and provisions hereunder, effective as of the Effective Date; and

F.    WHEREAS, during the term of this Agreement, HCMLP shall provide to the Company certain business services as more fully described herein.

## AGREEMENT

In consideration of the foregoing recitals and the mutual covenants and conditions contained herein, the Parties hereby agree, intending to be legally bound, to amend and restate the Existing Agreement in its entirety, effective as of the Effective Date, as follows:

## ARTICLE I

## DEFINITIONS

"*Affiliate*" means a Person that directly, or indirectly through one or more intermediaries,

012463

has Control over, or is controlled by, or is under common control with, a specified Person.

"**_Control_**," including, with correlative meanings, the terms "**_controlled by_**" and "**_under common control with_**," means the possession of the power to direct the management and policies of the referenced Person, whether through ownership interests, by contract, or otherwise.

"**_Governmental Entity_**" means any government or any regulatory agency, bureau, board, commission, court, department, official, political subdivision, tribunal or other instrumentality of any government, whether federal, state or local, domestic or foreign.

"**_Liability_**" means any cost, liability, indebtedness, obligation, co-obligation, commitment, expense, claim, deficiency, guaranty or endorsement of or by any Person of any nature (whether direct or indirect, known or unknown, absolute or contingent, liquidated or unliquidated, due or to become due, accrued or unaccrued, matured or unmatured).

"**_Loss_**" means any cost, damage, disbursement, expense, Liability, loss, obligation, penalty or settlement, including interest or other carrying costs, legal, accounting and other professional fees and expenses incurred in the investigation, collection, prosecution and defense of claims and amounts paid in settlement, that may be imposed on or otherwise incurred or suffered by the referenced Person; provided, however, that the term "**_Loss_**" shall not be deemed to include any special, exemplary or punitive damages, except to the extent such damages are incurred as a result of third party claims.

"**_Person_**" means an association, a corporation, an individual, a partnership, a limited liability company, a trust or any other entity or organization, including a Governmental Entity.

"**_Recipient_**" means each of NCI, NSI, NexVantage, the Bank and each of their direct and indirect Subsidiaries and Affiliates, and each of their respective managed funds and managed accounts, each in their capacity as a recipient of any Shared Services.

"**_Service Provider_**" means any of HCMLP, and each of its direct and indirect Subsidiaries and Affiliates, and each of their respective managed funds and managed accounts, each in their capacity as a provider of any Shared Services.

"**_Taxes_**" means: (i) all state and local sales, use, value-added, gross receipts, foreign, privilege, utility, infrastructure maintenance, property, federal excise and similar levies, duties and other similar tax-like charges lawfully levied by a duly constituted taxing authority or Governmental Entity against or upon the Shared Services; and (ii) tax-related surcharges or fees that are related to the Shared Services identified and authorized by applicable tariffs.

<div align="center">ARTICLE II</div>

<div align="center">SHARED SERVICES</div>

2.1     Services.  During the Term, Service Provider shall provide Recipient with: (a) the finance, accounting, human resource, legal, and information technology services (collectively, the "**_Services_**") specified on Annex A attached hereto; and (b) the right, license, or permission to use and access the benefits under certain agreements, contracts, and licenses that Service Provider may

<div align="center">2</div>

<div align="right">012464</div>

purchase, acquire, become a party or beneficiary to, or license on behalf of Recipient (the "***Assets***", and together with the Services, collectively the "***Shared Services***"). Notwithstanding anything to the Contrary in this Agreement, Service Provider shall not enter into any contract with a third party on behalf of a Recipient or provide any certification to a third party on behalf of a Recipient without (a) complying, in all material respects, with this Agreement and (ii) obtaining the Recipient's prior written consent (unless expressly permitted to take any such action by the terms of this Agreement).

2.2     Changes to the Shared Services.

a)     The Parties may, from time to time during the Term, agree to modify: (i) the terms and conditions of Service Provider's performance of any Shared Service in order to reflect new procedures, processes or other methods of providing such Shared Service; or (ii) the applicable fees for such Shared Service to reflect the then current fair market value of such service.

b)     The Party requesting any modification pursuant to Section 2.2(a) shall deliver to the other Party, in accordance with Section 8.10, a description of the requested modification (a "***Change Request***"). Upon receipt of a Change Request: (i) each Party shall negotiate in good faith the terms upon which the requested modification shall be effected; and (ii) no Party may unreasonably withhold, condition or delay its consent to the proposed modification.

c)     Notwithstanding anything to the contrary in this Agreement, and without obtaining the prior consent of Recipient, Service Provider may: (i) permanently modify the process of performing a particular Shared Service, provided that such modification (A) does not adversely or materially affect the quality, benefits, or cost to Recipient of Service Provider's provision of such Shared Service, or (B) is necessary to comply with applicable law or regulatory requirements; or (ii) temporarily modify the process of performing a particular Shared Service, provided that such modification (A) is necessary due to exigent or emergency circumstances beyond Recipient's or Service Provider's control, and (B) does not remain in effect for a period longer than 30 days without the prior written consent of the Company. In the event that Service Provider makes any modification pursuant to this Section 2.2(c), Service Provider shall notify the Company, in accordance with Section 8.10: (i) prior to the implementation of any modification that is made pursuant to Section 2.2(c)(i); and (ii) as soon as reasonably practicable after any modification that is made pursuant to Section 2.2(c)(ii).

2.3     New Shared Services. The Parties may, from time to time during the Term of this Agreement, negotiate in good faith for Shared Services not otherwise specified on Annex A attached hereto (a "***New Shared Service***"). Any agreement between the Parties on the terms for a New Shared Service: (a) must be in accordance with the provisions of Article IV and Article V hereof; and (b) shall be deemed to be an amendment to this Agreement, including an amendment to the term "***Shared Service***" such that the New Shared Service shall be deemed a "***Shared Service***" for all purposes of this Agreement.

2.4     Representatives.

a)     Subject to Section 2.1 of this Agreement, Service Provider may use any of its Affiliates (or any of its Affiliates' respective owners, members, shareholders, directors, officers,

3

012465

or employees) or any agents, consultants, independent contractors, subcontractors, advisors, or other representatives (collectively "***Representatives***"), hired with due care, to perform all or any part of a Shared Service.  Service Provider shall, (i) determine the fitness, qualifications, wages, and working conditions of all Representatives, except for any Representatives that are employed by Recipient, who provide Shared Services; (ii) hire, supervise, direct the work of, and discharge all employed Representatives, except for any Representatives that are employed by Recipient, who provide Shared Services; and (iii) be responsible for (A) the performance of its obligations under this Agreement in accordance with its terms, including any obligations it performs through Representatives, and (B) payments due to its subcontractors.  Service Provider shall, on a regular basis and in any event no less often than quarterly, keep Recipient reasonably informed of its actions under this Section 2.4(a).  Service Provider shall not be prohibited from employing or retaining any Person to provide Shared Services merely because such Person is employed by, receives any monetary or non-monetary benefit from, or controls or is controlled by Recipient or any of its Affiliates.

          b)      All debts and liabilities associated with: (i) the wages, bonuses, compensation, benefits, termination or severance expenses or liabilities, pension fund contribution obligations or liabilities, and other costs, benefits, expenses or liabilities and entitlements of or in connection with any Representative that is employed by Service Provider shall be the debts and liabilities only of the Service Provider; and (ii) the provision of Shared Services by a Representative shall be the debts and liabilities only of the Recipient that receives Shared Services provided by such Representative.

<div align="center">ARTICLE III</div>

<div align="center">CONFIDENTIAL AND PRIVILEGED INFORMATION</div>

3.1    <u>Confidential Information</u>.

          a)      In connection with Service Provider's provision of Shared Services, it may be necessary for a Party, Service Provider, or Recipient (the "***Disclosing Party***") to disclose to another Party, Service Provider, or Recipient (the "***Receiving Party***"), certain information that is non-public, proprietary, confidential, or that is subject to the attorney-client privilege, attorney-work-product doctrine, or other protection or immunity against disclosure (collectively, "***Confidential Information***").  Notwithstanding anything to the contrary in this Agreement, the term "Confidential Information" shall not include information which: (i) is in the public domain prior to any disclosure by Disclosing Party; (ii) becomes available to Receiving Party on a non-confidential basis from a source other than Disclosing Party, or a representative of Disclosing Party that is not bound by a confidentiality or similar agreement relating to the Confidential Information; (iii) enters the public domain, subsequent to any disclosure by Disclosing Party to Receiving Party, without any breach of this Agreement or fault by Receiving Party; or (iv) is independently developed by Receiving Party without reference to the Confidential Information.

          b)      Receiving Party agrees that it: (i) shall not (A) disclose any Confidential Information to any Person, except as otherwise expressly permitted herein, or (B) use any Confidential Information against or to the detriment of any Party, Service Provider, or Recipient, or for any reason or purpose other than as is necessary for Service Provider to provide Shared

<div align="center">4</div>

<div align="right">012466</div>

Services; and (ii) shall (A) secure and maintain Confidential Information in the same manner that Receiving Party secures and maintains its own confidential information, and (B) take all actions, legal or otherwise, that are necessary to prevent the disclosure of Confidential Information by Receiving Party or any of its Representatives.

c)     Notwithstanding anything to the contrary in this Agreement, Receiving Party may disclose Confidential Information: (i) to any of its Representatives that require such information for the purpose of providing Shared Services; (ii) to any Governmental Entity that has prudential regulatory and supervisory authority over Receiving Party in connection with any examination, visitation or similar undertaking consistent with such Governmental Entity's authorized powers; and (iii) to the extent that Receiving Party or any of its Representatives is legally commanded or compelled by any Governmental Entity to provide Confidential Information other than as contemplated by the immediately preceding clause, provided that Receiving Party shall (A) deliver to Disclosing Party, in accordance with Section 8.10, written notice of such legal proceedings, (B) only disclose the portion of Confidential Information that Recipient or its Representative is legally commanded or compelled to disclose, and (C) use reasonable efforts to obtain reliable assurance that confidential treatment shall be accorded by any Person to whom any Confidential Information is so disclosed.

c)     If any Party terminates this Agreement pursuant to Section 6.2, the provisions of this Section 3.1 shall continue to protect in perpetuity all Confidential Information disclosed prior to such termination.

3.2     Privileged Information.

a)     In connection with Service Provider's provision of Shared Services, it may be necessary for a Disclosing Party to exchange with Receiving Party certain Confidential Information that is subject to the attorney-client privilege, attorney-work-product doctrine, or other protection or immunity against disclosure (collectively, "***Privileged Information***").  Each of the Parties acknowledge and agree that: (i) they would not permit the disclosure of any Privileged Information but for the common legal interest created by the undertakings contained in this Agreement; (ii) the disclosure of Privileged Information shall not be deemed or intended to waive the attorney-client privilege, attorney-work-product doctrine, or other protection or immunity against disclosure; (iii) all Privileged Information that is disclosed to Receiving Party is the property of Disclosing Party and remains under its sole possession, custody, and control; (iv) Privileged Information shall continue to be held confidential and subject to the attorney-client privilege, attorney-work-product doctrine, or other protection or immunity against disclosure even if an adversity of interest may subsequently be discerned or arise between or among any of the Parties, any of the Service Providers, or any of the Recipients; and (v) the inadvertent or unintentional disclosure of Privileged Information, regardless of whether the information was so designated at the time of disclosure, shall not be deemed a waiver in whole or in part of the attorney-client privilege, attorney-work-product doctrine, or other protection or immunity against disclosure, either as to the specific information disclosed or as to any other information relating thereto or to related subject matter.

b)     Receiving Party shall not have the right or authority to waive on behalf of Disclosing Party any attorney-client privilege, attorney-work-product doctrine, or other protection

5

012467

or immunity against disclosure that might be applicable to any Privileged Information. Recipient shall retain the sole right and authority to waive the attorney-client privilege, attorney-work-product doctrine, or other protection or immunity against disclosure as to any Privileged Information that was created or commissioned by Service Provider or any of its Representatives for or on behalf of Recipient.

        c)     If any Party terminates this Agreement pursuant to Section 6.2, the provisions of this Section 3.2 shall continue to protect in perpetuity all Privileged Information disclosed prior to such termination.

<div align="center">

ARTICLE IV

PAYMENT OF SHARED SERVICE FEES AND TAXES

</div>

4.1     <u>Determination and Payment of Cost and Revenue Share.</u>

        a)     During the Term, the Company shall pay to HCMLP the fees (the "***Shared Service Fees***") specified on <u>Annex A</u> attached hereto.

        b)     On or before the 15th business day following the end of each fiscal quarter during the Term, HCMLP shall deliver to the Company, in accordance with Section 8.10, a written statement (the "***Quarterly Statement***") that details: (i) the nature of each Shared Service provided by Service Provider during such fiscal quarter; and (ii) the corresponding Shared Service Fees charged by Service Provider for each such Shared Service.

        c)     On or before the 30th day following the Company receipt of a Quarterly Statement, the Company shall either: (i) in the event that the Company does not dispute any of the Shared Service Fees included on a Quarterly Statement, remit payment to HCMLP of the full amount of Shared Service Fees included on such Quarterly Statement; or (ii) in the event that the Company disputes any of the Shared Service Fees included on a Quarterly Statement, both (A) deliver to HCMLP, in accordance with Section 8.10, written notice of the nature and amount of the disputed Shared Service Fees included on such Quarterly Statement, and (B) remit payment to HCMLP of the undisputed amount of Shared Service Fees included on such Quarterly Statement.

4.2     <u>Taxes.</u>

        a)     Recipient is responsible for and shall pay all Taxes applicable to the Shared Services provided to Recipient; provided, that: (i) such payments by Recipient to Service Provider shall be made in the most tax-efficient manner; (ii) Service Provider shall not be subject to any Liability for Taxes applicable to the Shared Services as a result of such payment by Recipient; and (iii) Recipient may provide Service Provider with a certificate evidencing its exemption from payment of or Liability for such Taxes. Service Provider shall collect Taxes from Recipient in the same manner it collects Taxes from other customers in the ordinary course of Service Provider's business, but in no event prior to the time Service Provider delivers a Quarterly Statement to Recipient that includes the Shared Services for which Taxes are being assessed.

        b)     Service Provider shall reimburse Recipient for any Taxes that are collected from Recipient but that are later refunded to Service Provider. In the event any Taxes are assessed

<div align="center">6</div>

against Service Provider that is solely the responsibility of Recipient, and Recipient desires to protest such assessment, Recipient shall deliver to Service Provider, in accordance with Section 8.10, a written statement of the issues and arguments requesting that Service Provider grant Recipient the authority to prosecute the protest in Service Provider's name. Service Provider's authorization shall not be unreasonably withheld. Recipient shall finance, manage, control and determine the strategy for such protest while keeping Service Provider reasonably informed of the proceedings. However, the authorization shall be periodically reviewed by Service Provider to determine any adverse impact on Service Provider, and Service Provider shall have the right to reasonably withdraw such authority at any time. Upon notice by Service Provider that it is so withdrawing such authority, Recipient shall expeditiously terminate all proceedings. Any adverse consequences suffered by Recipient as a result of the withdrawal shall be submitted to arbitration pursuant to Section 8.14. Any contest for Taxes brought by Recipient may not result in any lien attaching to any property or rights of Service Provider or otherwise jeopardize Service Provider's interests or rights in any of its property. Recipient agrees to indemnify Service Provider for all Loss that Service Provider incurs as a result of any such contest by Recipient.

c) Notwithstanding anything to the contrary in this Agreement, this Section 4.2 shall govern the treatment of all Taxes arising as a result of or in connection with the Shared Services.

## ARTICLE V

## SERVICE PROVIDER RESPONSIBILITIES

5.1     <u>Service Provider General Obligations</u>.  Service Provider shall: (a) provide the Shared Services to Recipient on a non-discriminatory basis, in a first-class manner, and shall use commercially reasonable efforts to provide the Shared Services in the same manner as if it were providing such services for itself on its own account (the "*Service Standards*"); (b) use commercially reasonable efforts to conduct its duties hereunder in a lawful manner, in compliance with all applicable laws, statutes, rules and regulations, and in accordance with the Service Standards; and (c) pass through any discounts, rebates or similar incentives received by Service Provider or any of its Affiliates in connection with the provision of any Shared Service.

5.2     <u>Books and Records; Access to Information</u>.  Service Provider shall keep and maintain books and records on behalf of Recipient in accordance with past practices and internal control procedures. Recipient shall have the right, at any time and from time to time upon reasonable prior notice to Service Provider, to inspect and copy (at Recipient's expense) during normal business hours at the offices of Service Provider the books and records relating to the Shared Services, with respect to Service Provider's performance of its obligations hereunder. This inspection right shall include the ability of Recipient's financial auditors to review such books and records in the ordinary course of performing standard financial auditing services for such Recipient (but subject to Service Provider imposing reasonable access restrictions to Service Provider's and its Affiliates' proprietary information and such financial auditors executing appropriate confidentiality agreements reasonably acceptable to Service Provider). Service Provider shall promptly respond to any reasonable requests for information or access, and consent to any such request shall not be unreasonably withheld by Service Provider.

5.3     <u>Return of Property and Equipment</u>.  Upon termination of this Agreement, Service Provider shall be obligated to return to Recipient, as soon as is reasonably practicable, all Confidential Information, equipment, or other property or materials of Recipient that is in Service Provider's control or possession.

<div align="center">ARTICLE VI</div>

<div align="center">TERM AND TERMINATION</div>

6.1     <u>Term</u>.  The term of this Agreement shall commence as of the Effective Date, and shall continue in full force and effect until the first anniversary of the Effective Date (the "*Term*"), unless terminated earlier in accordance with Section 6.2.  The Term shall automatically renew for successive one year periods unless sooner terminated under Section 6.2.

6.2     <u>Termination</u>.  At any time prior to the expiration of the Term, either Party may terminate this Agreement by providing the other Party, in accordance with Section 8.10, at least 30 calendar days advance written notice of such termination.  Within 30 calendar days after the termination of this Agreement, the Company shall pay HCMLP all accrued and unpaid Shared Service Fees.

6.3     <u>Transition Assistance</u>.  Upon a termination of the Agreement pursuant to Section 7.2 or a termination of any Shared Services pursuant to Section 2.2, at the request of the Company, HCMLP and Service Provider shall provide reasonable cooperation and transition assistance to the Company that is necessary to transfer the applicable Shared Services to any Person designated by the Company.  The Company shall continue to pay HCMLP Shared Service Fees with respect to all such transition assistance.

<div align="center">ARTICLE VII</div>

<div align="center">LIMITED WARRANTY; LIMITATION ON LIABILITY; INDEMNIFICATION</div>

7.1     <u>Limited Warranty</u>.  Service Provider shall: (a) provide the Shared Services in accordance with the Service Standards; and (b) to the extent reasonably possible, and subject to Service Provider's contractual obligations, pass through the benefits of any express warranties received from third parties relating to any Shared Service, and shall (at Recipient's expense) assist Recipient with any warranty claims related thereto.  Except as specifically provided in this Agreement, Service Provider makes no express or implied representations, warranties or guarantees relating to its provision of the Shared Services under this Agreement, including any warranty of merchantability, fitness, quality, non-infringement of third party rights, suitability or adequacy of the Shared Services for any purpose or use.

7.2     <u>Indemnification</u>.  Subject to applicable rules and regulations and subject to the limitations of liability set forth in Section 7.4, HCMLP and the Company shall indemnify and hold each other harmless against all Loss resulting from: (a) any Party's, any Service Provider's, or any Recipient's performance or failure to perform, in any material manner, any of its obligations under this Agreement; (b) the breach by any Party, any Service Provider, or any Recipient, in any material manner, of (i) any representation, warranty, covenant or agreement contained herein, or

<div align="center">8</div>

<div align="right">012470</div>

(ii) any license granted in Section 2.1(b); and (c) any Party's, Service Provider's or Recipient's use or provision of the Shared Services, but only to the extent that such Loss was proximately caused (i) by any negligent or willful act or omission by the Party from whom indemnity is sought or any of its Representatives, and (ii) in connection with the provision or receipt of the Shared Services.

7.3 <u>Notice and Procedures</u>. A Party seeking indemnification pursuant to Section 7.2 (the "*Indemnified Party*") shall, within thirty (30) days after the Indemnified Party's obtaining knowledge thereof, give prompt written notice (the "*Notice of Claim*") to the indemnifying Party (the "*Indemnifying Party*"), in accordance with Section 8.10, stating in reasonable detail the basis of any claim for which indemnification is being sought hereunder. The Indemnified Party's failure to provide any such notice to the Indemnifying Party shall not relieve the Indemnifying Party of or from any of its obligations hereunder, except to the extent that the Indemnifying Party suffers material prejudice as a result of such failure. If the facts giving rise to such indemnification involve an actual or threatened claim by or against a third party:

a) the Parties shall cooperate in the prosecution or defense of such claim and shall furnish such records, information and testimony and attend to such proceedings as may be reasonably requested in connection therewith; and

b) the Indemnified Party shall make no settlement of any claim that would give rise to liability on the part of the Indemnifying Party without the latter's prior written consent which shall not be unreasonably withheld or delayed, and the Indemnifying Party shall not be liable for the amount of any settlement affected without its prior written consent.

7.4 <u>Limitation on Liability</u>. Notwithstanding anything to the contrary in this agreement, except with respect to a Party's fraud or willful misconduct, and except with respect to damages sought by a third party in connection with a third party claim, none of the Parties, Service Providers, or Recipients, or any of their respective Affiliates, shall be liable to any Party, Service Provider, or Recipient, or any of their respective Affiliates, for any indirect, consequential, special, exemplary or punitive damages, regardless of the form of action, whether in contract, tort or otherwise, and even if such Person has been advised of the possibility of such damages. Each Party agrees that it is not entitled to recover and agrees to waive any claim with respect to, and shall not seek, indirect, consequential, special, exemplary or punitive damages as to any matter under, relating to or arising out of the transactions contemplated by this Agreement, except with respect to such claims and damages arising directly out of the fraud or willful misconduct by any Party, Service Provider, or Recipient, or with respect to damages sought by third parties in connection with third party claims.

<div align="center">

## ARTICLE VIII

### MISCELLANEOUS

</div>

8.1 <u>No Partnership or Joint Venture; Independent Contractor</u>. Nothing contained in this Agreement shall constitute or be construed to be or create a partnership, joint venture, or any other type of relationship between or among HCMLP or Service Provider or any of their respective Affiliates or any of their respective successors or assigns, on the one hand, and the Company or Recipient or any of their respective Affiliates or any of their respective successors or assigns, on

<div align="center">9</div>

<div align="right">012471</div>

the other hand. The Parties understand and agree that this Agreement does not make any of them an agent or legal representative of the other Party or Recipient for any purpose whatsoever. No Party is granted, by this Agreement or otherwise, any right or authority to assume or create any obligation or responsibilities, express or implied, on behalf of or in the name of any other Party or Recipient, or to bind any other Party or Recipient in any manner whatsoever. The Parties expressly acknowledge that Service Provider is an independent contractor with respect to Recipient in all respects, including with respect to the provision of the Shared Services. To the extent there is any inconsistency between the common law and the provisions of this Agreement, the provisions of this Agreement shall prevail, it being the intention of the parties that this Agreement shall be interpreted in accordance with general principles of contract interpretation without regard to the common law of agency except as expressly incorporated in the provisions of this Agreement.

8.2     Amendments; Waivers. Except as expressly provided herein, this Agreement may be amended only by agreement in writing of all Parties. No waiver of any provision nor consent to any exception to the terms of this Agreement or any agreement contemplated hereby shall be effective unless in writing and signed by all of the Parties affected and then only to the specific purpose, extent and instance so provided. No failure on the part of any Party to exercise or delay in exercising any right hereunder shall be deemed a waiver thereof, nor shall any single or partial exercise preclude any further or other exercise of such or any other right.

8.3     Schedules and Exhibits; Integration. This Agreement, together with Annex A attached hereto, constitutes the entire agreement among the Parties pertaining to the subject matter hereof and supersedes all prior agreements and understandings of the Parties in connection therewith.

8.4     Further Assurances. Each Party shall take such actions as any other Party may reasonably request or as may be necessary or appropriate to consummate or implement the transactions contemplated by this Agreement or to evidence such events or matters.

8.5     Governing Law. Subject to Section 8.14, this Agreement and the legal relations between the Parties shall be governed by and construed in accordance with the laws of the State of Texas applicable to contracts made and performed in such State and without regard to conflicts of law doctrines unless certain matters are preempted by federal law.

8.6     Assignment. Except as otherwise provided hereunder, neither this Agreement nor any rights or obligations hereunder are assignable by one Party without the express prior written consent of the other Party.

8.7     Headings. The descriptive headings of the Articles, Sections and subsections of this Agreement are for convenience only and do not constitute a part of this Agreement.

8.8     Counterparts. This Agreement and any amendment hereto or any other agreement delivered pursuant hereto may be executed in one or more counterparts and by different Parties in separate counterparts. All counterparts shall constitute one and the same agreement and shall become effective when one or more counterparts have been signed by each Party and delivered to the other Parties.

012472

8.9    Successors and Assigns; No Third Party Beneficiaries.  This Agreement is binding upon and shall inure to the benefit of each Party and its successors or assigns, and nothing in this Agreement, express or implied, is intended to confer upon any other Person or Governmental Entity any rights or remedies of any nature whatsoever under or by reason of this Agreement.

8.10    Notices.  All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given: (i) immediately when personally delivered; (ii) when received by first class mail, return receipt requested; (iii) one day after being sent for overnight delivery by Federal Express or other overnight delivery service; or (iv) when receipt is acknowledged, either electronically or otherwise, if sent by facsimile, telecopy or other electronic transmission device.  All notices, demands and communications that are contemplated by this Agreement shall, unless another address is specified by such Parties in writing, be sent to the addresses indicated below:

> If to HCMLP, addressed to:
>
> Highland Capital Management, L.P.
> 300 Crescent Court, Suite 700
> Dallas, Texas 75201
> Attention:  General Counsel
> Fax:  (972) 628-4147
>
> If to Recipient, addressed to:
>
> NexBank Capital, Inc.
> 2515 McKinney Avenue, Suite 1100
> Dallas, Texas 75201
> Attention:  General Counsel
> Fax:  (972) 934-4785

8.11    Expenses.  Except as otherwise provided herein, the Parties shall each pay their own expenses incident to the negotiation, preparation and performance of this Agreement, including the fees, expenses and disbursements of their respective investment bankers, accountants and counsel.

8.12    Waiver.  No failure on the part of any Party to exercise or delay in exercising any right hereunder shall be deemed a waiver thereof, nor shall any single or partial exercise preclude any further or other exercise of such or any other right.

8.13    Severability.  If any provision of this Agreement is held to be unenforceable for any reason, it shall be adjusted rather than voided, if possible, to achieve the intent of the Parties.  All other provisions of this Agreement shall be deemed valid and enforceable to the extent possible.

8.14    Governing Law; Jurisdiction; Venue; Waiver of Jury Trial.  This Agreement and all related documents, including all exhibits, schedules or annexes attached hereto, and all matters arising out of or relating to this Agreement, whether sounding in contract, tort, or statute are governed by, and construed in accordance with, the laws of the State of Texas, United States of

012473

America, without giving effect to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of Texas.

The parties hereby agree that any action, claim, litigation, or proceeding of any kind whatsoever against any other party in any way arising from or relating to this Agreement and all contemplated transactions, including, but not limited to, claims sounding in contract, equity, tort, fraud and statute ("*Dispute*") shall be submitted exclusively to the United States District Court for the Northern District of Texas or, if such court does not have subject matter jurisdiction, the courts of the State of Texas sitting in Dallas County, and any appellate court thereof ("*Enforcement Court*"). Each party irrevocably and unconditionally submits to the exclusive personal and subject matter jurisdiction of the Enforcement Court for any Dispute and agrees to bring any Dispute only in the Enforcement Court. Each party further agrees it shall not commence any Dispute in any forum, including, but not limited to, administrative, arbitration, or litigation, other than the Enforcement Court. Each party agrees that a final judgment in any such action, litigation, or proceeding is conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Any party found to have violated this provision by commencing a Dispute other than in the Enforcement Court shall by liable for all legal fees and expenses incurred by the Party seeking to enforce this provision.

EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL ACTION, PROCEEDING, CAUSE OF ACTION OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, INCLUDING ANY EXHIBITS, SCHEDULES, AND APPENDICES ATTACHED TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) IT HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) IT MAKES THIS WAIVER KNOWINGLY AND VOLUNTARILY, AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

8.15    General Rules of Construction. For all purposes of this Agreement and the Annex hereto: (a) the terms defined in Article I have the meanings assigned to them in Article I and include the plural as well as the singular; (b) all accounting terms not otherwise defined herein have the meanings assigned under GAAP; (c) all references in this Agreement to designated "Articles," "Sections" and other subdivisions are to the designated Articles, Sections and other subdivisions of the body of this Agreement; (d) pronouns of either gender or neuter shall include, as appropriate, the other pronoun forms; (e) the words "herein," "hereby," "hereto," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision; (f) "or" is not exclusive; (g) "include," "including," and "includes" shall be deemed to be followed by "but not limited to" and "but is not limited to," respectively; (h) any definition of or reference to any law, agreement, instrument or other document herein shall be construed as referring to such law, agreement, instrument or other document as from time to time amended, supplemented or otherwise modified; (i) any definition

012474

Case 3:21-cv-00538-N   Document 26-46   Filed 06/09/21   Page 205 of 235   PageID 15397

of or reference to any statute shall be construed as referring also to any rules and regulations promulgated thereunder; and (j) any reference to a Person shall be construed to comprise its successors and assigns.

**[Remainder of Page Intentionally Left Blank]**

012475

IN WITNESS HEREOF, each of the Parties has caused this Agreement to be executed by its duly authorized officers to be effective as of the Effective Date.

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: Strand Advisors, Inc., its general partner

By:
Name: Trey Parker
Title: Assistant Secretary

NEXBANK CAPITAL, INC.

By:
Name: Dirk Hohman
Title: EVP, General Counsel & Chief Risk Officer

NEXBANK SECURITIES, INC.

By:
Name: Craig Campbell
Title: President

NEXBANK TITLE, INC.

By:
Name: Ned Sichildi
Title: EVP, CD

NEXBANK SSB

By:
Name: Dirk Hohman
Title: EVP, General Counsel & Chief Risk Officer

14

012476

## ANNEX A

### Shared Services and Shared Service Fees

1.  **NexBank Capital, Inc.**

    A.  During the Term, Service Provider shall provide NexBank Capital, Inc. with the following Shared Services pursuant to Section 2.1 of the Agreement:

        i.  Finance and Accounting Services
            - Tax Review (including but not limited to the 1120S)
            - Tax Planning

        ii.  Human Resource Services
            - Multi-Company Benefit Plan Sponsorship – Health / Dental
            - Self-Funded Benefit Plan Accounting / Administration – Health / Dental
            - Multi-Company Benefit Plan Sponsorship – 401k & Profit Sharing
            - Annual Benefit Renewal Facilitation
            - Recruitment Assistance (as needed)

        iii.  Legal Services
            - Litigation support
            - Ad Hoc Transactional Support

        iv.  Information Technology Services
            - Multi-Company Business Account(s) – Sponsorship & Negotiation
            - Strategic Planning & Affiliate Alignment

    B.  During the Term, NexBank Capital, Inc. shall pay to Service Provider the following Shared Service Fees pursuant to Section 4.1 and 5.1 of the Agreement:

        i.  Four thousand four hundred and sixteen dollars and sixty-seven cents ($4,416.67) per calendar month; provided, however, that such monthly fee shall be prorated on a daily basis for any partial calendar month.

2.  **NexBank Securities, Inc.**

    A.  During the Term, Service Provider shall provide NexBank Securities, Inc. with the following Shared Services pursuant to Section 2.1 of the Agreement:

        i.  Compliance Services
            - FINRA Compliance Specialist Support
            - Data Monitoring (including but not limited to firm activities, licensing, and email)
            - Reporting
            - FINRA Registration and Termination

012477

     ii.   <u>Human Resource Services</u>
- Multi-Company Benefit Plan Sponsorship – Health / Dental
- Self-Funded Benefit Plan Accounting / Administration – Health / Dental
- Multi-Company Benefit Plan Sponsorship – 401k & Profit Sharing
- Annual Benefit Renewal Facilitation
- Recruitment Assistance (as needed)

     iii.   <u>Legal Services</u>
- Litigation support
- Ad Hoc Transactional Support

     iv.   <u>Information Technology Services</u>
- Multi-Company Business Account(s) – Sponsorship & Negotiation
- Strategic Planning & Affiliate Alignment

B.   During the Term, NexBank Securities, Inc. shall pay to Service Provider the following Shared Service Fees pursuant to Section 4.1 and 5.1 of the Agreement:

     i.   Seven thousand three hundred and thirty-three dollars and thirty-three cents ($7,333.33) per calendar month; provided, however, that such monthly fee shall prorated on a daily basis for any partial calendar month.

## 3.   <u>NexBank Title, Inc.</u>

A.   During the Term, Service Provider shall provide NexBank Title, Inc. with the following Shared Services pursuant to Section 2.1 of the Agreement:

     i.   <u>Human Resource Services</u>
- Multi-Company Benefit Plan Sponsorship – Health / Dental
- Self-Funded Benefit Plan Accounting / Administration – Health / Dental
- Multi-Company Benefit Plan Sponsorship – 401k & Profit Sharing
- Annual Benefit Renewal Facilitation
- Recruitment Assistance (as needed)

     ii.   <u>Legal Services</u>
- Litigation support
- Ad Hoc Transactional Support
- 

     iii.   <u>Information Technology Services</u>
- Multi-Company Business Account(s) – Sponsorship & Negotiation
- Strategic Planning & Affiliate Alignment

012478

B.  During the Term, NexBank Title, Inc. shall pay to Service Provider the following Shared Service Fees pursuant to Section 4.1 and 5.1 of the Agreement:

    i.  Four hundred and sixteen dollars and sixty-seven cents ($416.67) per calendar month; provided, however, that such monthly fee shall prorated on a daily basis for any partial calendar month.

4.  **NexBank SSB**

A.  During the Term, Service Provider shall provide NexBank SSB with the following Shared Services pursuant to Section 2.1 of the Agreement:

    i.  <u>Finance and Accounting Services</u>
- Tax Review (including but not limited to the 1120S)
- Tax Planning

    ii.  <u>Human Resource Services</u>
- Multi-Company Benefit Plan Sponsorship – Health / Dental
- Self-Funded Benefit Plan Accounting / Administration – Health / Dental
- Multi-Company Benefit Plan Sponsorship – 401k & Profit Sharing
- Annual Benefit Renewal Facilitation
- Recruitment Assistance (as needed)

    iii.  <u>Legal Services</u>
- Litigation support
- Ad Hoc Transactional Support

    iv.  <u>Information Technology Services</u>
- Multi-Company Business Account(s) – Sponsorship & Negotiation
- Strategic Planning & Affiliate Alignment

B.  During the Term, NexBank SSB shall pay to Service Provider the following Shared Service Fees pursuant to Section 4.1 and 5.1 of the Agreement:

    i.  Seven thousand eight hundred and thirty-three dollars and thirty-three cents ($7,833.33) per calendar month; provided, however, that such monthly fee shall prorated on a daily basis for any partial calendar month.

Annex A

012479

# EXHIBIT ZZZZZ

November 30, 2020

NexBank Capital, Inc.
2515 McKinney Avenue, Suite 1100
Dallas, Texas 75201
Attention: General Counsel

> **RE:** **Termination of Third Amended and Restated Shares Services Agreement, dated September 26, 2017, and effective as of September 1, 2017, by and among Highland Capital Management, L.P. ("HCMLP"), and NexBank Capital, Inc., NexBank Securities, Inc., NexBank Title, Inc., and NexBank, SSB (the "Agreement").**

To Whom It May Concern:

As set forth in Section 6.2 of the Agreement, the Agreement is terminable at will upon at least 30 days advance written notice.

By this letter, HCMLP is notifying you that it is terminating the Agreement.  Such termination will be effective January 31, 2021.  HCMLP reserves the right to rescind this notice of termination.

Please feel free to contact me with any questions.

Sincerely,

HIGHLAND CAPITAL MANAGEMENT, L.P.


/s/ James P. Seery, Jr.

James P. Seery, Jr.
Chief Executive Officer
Chief Restructuring Officer

012481

# EXHIBIT AAAAAA

## AMENDED AND RESTATED SHARED SERVICES AGREEMENT

This Amended and Restated Shared Services Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated effective as of January 1, 2018, is entered into by and between NexPoint Real Estate Advisors, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the staff and services provider hereunder (in such capacity, the "Staff and Services Provider" and together with the Management Company, the "Parties").

### R E C I T A L S

WHEREAS, the Staff and Services Provider is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act");

WHEREAS, the Staff and Services Provider and the Management Company are engaged in the business of providing investment management services;

WHEREAS, the Parties entered into that certain Shared Services Agreement, dated effective as of April 1, 2015 (the "Original Agreement");

WHEREAS, the Parties desire to amend and restated the Original Agreement and the Staff and Services Provider is hereby being retained to provide certain back- and middle-office services and administrative, infrastructure and other services to assist the Management Company in conducting its business, and the Staff and Services Provider is willing to make such services available to the Management Company, in each case, on the terms and conditions hereof;

WHEREAS, the Management Company may employ certain individuals to perform portfolio selection and asset management functions for the Management Company, and certain of these individuals may also be employed simultaneously by the Staff and Services Provider during their employment with the Management Company; and

WHEREAS, each Person employed by both the Management Company and the Staff and Services Provider as described above (each, a "Shared Employee"), if any, is and shall be identified on the books and records of each of the Management Company and the Staff and Services Provider (as amended, modified, supplemented or restated from time to time).

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree, and the Original Agreement is hereby amended, restated and replaced in its entirety as follows:

### ARTICLE I

### DEFINITIONS

Section 1.01  Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings:

"Affiliate" shall mean with respect to a Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the first Person. The term "control" means (i) the legal or beneficial ownership of securities representing a majority of the voting power of any person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether by contract or otherwise.

"Applicable Asset Criteria and Concentrations" means any applicable eligibility criteria, portfolio concentration limits and other similar criteria or limits which the Management Company instructs in writing to the Staff and Services Provider in respect of the Portfolio or one or more Accounts, as such criteria or limits may be modified, amended or supplemented from time to time in writing by the Management Company;

"Applicable Law" shall mean, with respect to any Person or property of such Person, any action, code, consent decree, constitution, decree, directive, enactment, finding, guideline, law, injunction, interpretation, judgment, order, ordinance, policy statement, proclamation, formal guidance, promulgation, regulation, requirement, rule, rule of law, rule of public policy, settlement agreement, statute, writ, or any particular section, part or provision thereof of any Governmental Authority to which the Person in question is subject or by which it or any of its property is bound.

"Client or Account" shall mean any fund, client or account advised by the Management Company, as applicable.

"Covered Person" shall mean the Staff and Services Provider, any of its Affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)).

"Governmental Authority" shall mean (i) any government or quasi-governmental authority or political subdivision thereof, whether national, state, county, municipal or regional, whether U.S. or non-U.S.; (ii) any agency, regulator, arbitrator, board, body, branch, bureau, commission, corporation, department, master, mediator, panel, referee, system or instrumentality of any such government, political subdivision or other government or quasi-government entity, whether non-U.S. or U.S.; and (iii) any court, whether U.S. or non-U.S.

"Indebtedness" shall mean: (a) all indebtedness for borrowed money and all other obligations, contingent or otherwise, with respect to surety bonds, guarantees of borrowed money, letters of credit and bankers' acceptances whether or not matured, and hedges and other derivative contracts and financial instruments; (b) all obligations evidenced by notes, bonds, debentures, or similar instruments, or incurred under bank guaranty or letter of credit facilities or credit agreements; (c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property of the Management Company or any subsidiary; (d) all capital lease obligations; (e) all indebtedness guaranteed by such Person or any of its subsidiaries; and (f) all indebtedness guaranteed by such Person or any of its subsidiaries.

012484

"Operating Guidelines" means any operating guidelines attached to any portfolio management agreement, investment management agreement or similar agreement entered into between the Management Company and a Client or Account.

"Portfolio" means the portfolio of securities and other assets, including without limitation, financial instruments, equity investments, collateral loan obligations, debt securities, preferred return notes and other similar obligations held directly or indirectly by, or on behalf of, Clients and Accounts from time to time;

"Securities Act" shall mean the Securities Act of 1933, as amended.

Section 1.02    Interpretation.  The following rules apply to the use of defined terms and the interpretation of this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) "or" is not exclusive (unless preceded by "either") and "include" and "including" are not limiting; (iii) unless the context otherwise requires, references to agreements shall be deemed to mean and include such agreements as the same may be amended, supplemented, waived and otherwise modified from time to time; (iv) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder or any law enacted in substitution or replacement therefor; (v) a reference to a Person includes its successors and assigns; (vi) a reference to a Section without further reference is to the relevant Section of this Agreement; (vii) the headings of the Sections and subsections are for convenience and shall not affect the meaning of this Agreement; (viii) "writing", "written" and comparable terms refer to printing, typing, lithography and other shall mean of reproducing words in a visible form (including telefacsimile and electronic mail); (ix) "hereof", "herein", "hereunder" and comparable terms refer to the entire instrument in which such terms are used and not to any particular article, section or other subdivision thereof or attachment thereto; and (x) references to any gender include any other gender, masculine, feminine or neuter, as the context requires.

## ARTICLE II

## SERVICES

Section 2.01    General Authority.  Highland is hereby appointed as Staff and Services Provider for the purpose of providing such services and assistance as the Management Company may request from time to time to, and if applicable, to make available the Shared Employees to, the Management Company in accordance with and subject to the provisions of this Agreement and the Staff and Services Provider hereby accepts such appointment.  The Staff and Services Provider hereby agrees to such engagement during the term hereof and to render the services described herein for the compensation provided herein, subject to the limitations contained herein.

Section 2.02    Provision of Services.  Without limiting the generality of Section 2.01 and subject to Section 2.04 (Applicable Asset Criteria and Concentrations) below, the Staff and Services Provider hereby agrees, from the date hereof, to provide the following back- and middle-office services and administrative, infrastructure and other services to the Management Company.

(a)    *Back- and Middle-Office*: Assistance and advice with respect to back- and middle-office functions including, but not limited to, investment research, trade desk services,

012485

including trade execution and settlement, finance and accounting, payments, operations, book keeping, cash management, cash forecasting, accounts payable, accounts receivable, expense reimbursement, vendor management, human resources services (including, without limitation, payroll services, health insurance and employee benefits) and information technology (including, without limitation, general support and maintenance (OMS, development, system infrastructure support), telecom (cellphones, telephones and broadband, website management and email and hardware support);

(b)      *Legal/Compliance/Risk Analysis.*  Assistance and advice with respect to legal issues, litigation support, management of outside counsel, compliance support and implementation and general risk analysis;

(c)      *Tax.*  Assistance and advice with respect to tax audit support, tax planning and tax preparation and filing.

(d)      *Management of Clients and Accounts.*  Assistance and advice with respect to (i) the adherence to Operating Guidelines by the Management Company, and (ii) performing any obligations of the Management Company under or in connection with any back- and middle-office function set forth in any portfolio management agreement, investment management agreement or similar agreement in effect between the Management Company and any Client or Account from time to time.

(e)      *Valuation.*  Advice relating to the appointment of suitable third parties to provide valuations on assets comprising the Portfolio and including, but not limited to, such valuations required to facilitate the preparation of financial statements by the Management Company or the provision of valuations in connection with, or preparation of reports otherwise relating to, a Client or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity;

(f)      *Execution and Documentation.*  Assistance relating to the negotiation of the terms of, and the execution and delivery by the Management Company of, any and all documents which the Management Company considers to be necessary in connection with the acquisition and disposition of an asset in the Portfolio by the Management Company or a Client or Account managed by the Management Company, transactions involving the Management Company or a Client or Account managed by the Management Company, and any other rights and obligations of the Management Company or a Client or Account managed by the Management Company;

(g)      *Marketing.*  Provide access to marketing team representatives to assist with the marketing of the Management Company and any specified Clients or Accounts managed by the Management Company conditional on the Management Company's agreement that any incentive compensation related to such marketing shall be borne by the Management Company;

(h)      *Reporting.*  Assistance relating to any reporting the Management Company is required to make in relation to the Portfolio or any Client or Account, including reports relating to (i) credit facility reporting and purchases, sales, liquidations, acquisitions, disposals, substitutions and exchanges of assets in the Portfolio, (ii) the requirements of an applicable

012486

regulator, or (iii) other type of reporting which the Management Company and Staff and Services Provider may agree from time to time;

      (i)    *Administrative Services.*   The provision of office space, information technology services and equipment, infrastructure, rent and parking and other related services requested or utilized by the Management Company from time to time;

      (j)    *Shared Employees.*   To the extent applicable, the provision of Shared Employees and such additional human capital as may be mutually agreed by the Management Company and the Staff and Services Provider in accordance with the provisions of Section 2.03 hereof;

      (k)    *Ancillary Services.*   Assistance and advice on all things ancillary or incidental to the foregoing; and

      (l)    *Other.*   Assistance and advice relating to such other back- and middle-office services in connection with the day-to-day business of the Management Company as the Management Company and the Staff and Services Provider may from time to time agree.

For the avoidance of doubt, none of the services contemplated hereunder shall constitute investment advisory services, and the Staff & Services Provider shall not provide any advice to the Management Company or perform any duties on behalf of the Management Company, other than the back- and middle-office services contemplated herein, with respect to (a) the general management of the Management Company, its business or activities, (b) the initiation or structuring of any Client or Account or similar securitization, (c) the substantive investment management decisions with respect to any Client or Account or any related collateral obligations or securitization, (d) the actual selection of any collateral obligation or assets by the Management Company, (e) binding recommendations as to any disposal of or amendment to any Collateral Obligation or (f) any similar functions.

      Section 2.03   Shared Employees.

      (a)    The Staff and Services Provider hereby agrees and consents that each Shared Employee, if any, shall be employed by the Management Company, and the Management Company hereby agrees and consents that each Shared Employee shall be employed by the Staff and Services Provider.  Except as may otherwise separately be agreed in writing between the applicable Shared Employee and the Management Company and/or the Staff and Services Provider, in each of their discretion, each Shared Employee is an at-will employee and no guaranteed employment or other employment arrangement is agreed or implied by this Agreement with respect to any Shared Employee, and for avoidance of doubt this Agreement shall not amend, limit, constrain or modify in any way the employment arrangements as between any Shared Employee and the Staff and Services Provider or as between any Shared Employee and the Management Company, it being understood that the Management Company may enter into a short-form employment agreement with any Shared Employee memorializing such Shared Employee's status as an employee of the Management Company.  To the extent applicable, the Staff and Services Provider shall ensure that the Management Company has sufficient access to the Shared Employees so that the Shared Employees spend adequate time to provide the services required

012487

hereunder. The Staff and Services Provider may also employ the services of persons other than the Specified Persons as it deems fit in its sole discretion

(b)     Notwithstanding that the Shared Employees, if any, shall be employed by both the Staff and Services Provider and the Management Company, the Parties acknowledge and agree that any and all salary and benefits of each Shared Employee shall be paid exclusively by the Staff and Services Provider and shall not be paid or borne by the Management Company and no additional amounts in connection therewith shall be due from the Management Company to the Staff and Services Provider.

(c)     To the extent that a Shared Employee participates in the rendering of services to the Management Company's clients, the Shared Employee shall be subject to the oversight and control of the Management Company and such services shall be provided by the Shared Employee exclusively in his or her capacity as a "supervised person" of, or "person associated with", the Management Company (as such terms are defined in Sections 202(a)(25) and 202(a)(17), respectively, of the Advisers Act).

(d)     Each Party may continue to oversee, supervise and manage the services of each Shared Employee in order to (1) ensure compliance with the Party's compliance policies and procedures, (2) ensure compliance with regulations applicable to the Party and (3) protect the interests of the Party and its clients; *provided* that Staff and Services Provider shall (A) cooperate with the Management Company's supervisory efforts and (B) make periodic reports to the Management Company regarding the adherence of Shared Employees to Applicable Law, including but not limited to the 1940 Act, the Advisers Act and the United States Commodity Exchange Act of 1936, as amended, in performing the services hereunder.

(e)     Where a Shared Employee provides services hereunder through both Parties, the Parties shall cooperate to ensure that all such services are performed consistently with Applicable Law and relevant compliance controls and procedures designed to prevent, among other things, breaches in information security or the communication of confidential, proprietary or material non-public information.

(f)     The Staff and Services Provider shall ensure that each Shared Employee has any registrations, qualifications and/or licenses necessary to provide the services hereunder.

(g)     The Parties will cooperate to ensure that information about the Shared Employees is adequately and appropriately disclosed to clients, investors (and potential investors), investment banks operating as initial purchaser or placement agent with respect to any Client or Account, and regulators, as applicable. To facilitate such disclosure, the Staff and Services Provider agrees to provide, or cause to be provided, to the Management Company such information as is deemed by the Management Company to be necessary or appropriate with respect to the Staff and Services Provider and the Shared Employees (including, but not limited to, biographical information about each Shared Employee).

(h)     The Parties shall cooperate to ensure that, when so required, each has adopted a Code of Ethics meeting the requirements of the Advisers Act ("Code of Ethics") that is

012488

consistent with applicable law and which is substantially similar to the other Party's Code of Ethics.

      (i)     The Staff and Services Provider shall make reasonably available for use by the Management Company, including through Shared Employees providing services pursuant to this Agreement, any relevant intellectual property and systems necessary for the provision of the services hereunder.

      (j)     The Staff and Services Provider shall require that each Shared Employee:

      (i)     certify that he or she is subject to, and has been provided with, a copy of each Party's Code of Ethics and will make such reports, and seek prior clearance for such actions and activities, as may be required under the Codes of Ethics;

      (ii)     be subject to the supervision and oversight of each Party's officers and directors, including without limitation its Chief Compliance Officer ("CCO"), which CCO may be the same Person, with respect to the services provided to that Party or its clients;

      (iii)     provide services hereunder and take actions hereunder only as approved by the Management Company;

      (iv)     provide any information requested by a Party, as necessary to comply with applicable disclosure or regulatory obligations;

      (v)     to the extent authorized to transact on behalf of the Management Company or a Client or Account, take reasonable steps to ensure that any such transaction is consistent with any policies and procedures that may be established by the Parties and all Applicable Asset Criteria and Concentrations; and

      (vi)     act, at all times, in a manner consistent with the fiduciary duties and standard of care owed by the Management Company to its members and direct or indirect investors or to a Client or Account as well as clients of Staff and Services Provider by seeking to ensure that, among other things, information about any investment advisory or trading activity applicable to a particular client or group of clients is not used to benefit the Shared Employee, any Party or any other client or group of clients in contravention of such fiduciary duties or standard of care.

      (k)     Unless specifically authorized to do so, or appointed as an officer or authorized person of the Management Company with such authority, no Shared Employee may contract on behalf or in the name of the Management Company, acting as principal.

      Section 2.04   Applicable Asset Criteria and Concentrations.  The Management Company will promptly inform the Staff and Services Provider in writing of any Applicable Asset Criteria and Concentrations to which it agrees from time to time and the Staff and Services Provider shall take such Applicable Asset Criteria and Concentrations into account when providing assistance and advice in accordance with Section 2.02 above and any other assistance or advice provided in accordance with this Agreement.

012489

Section 2.05   Compliance with Management Company Policies and Procedures.   The Management Company will from time to time provide the Staff and Services Provider and the Shared Employees, if any, with any policy and procedure documentation which it establishes internally and to which it is bound to adhere in conducting its business pursuant to regulation, contract or otherwise. Subject to any other limitations in this Agreement, the Staff and Services Provider will use reasonable efforts to ensure any services it and the Shared Employees provide pursuant to this Agreement complies with or takes account of such internal policies and procedures.

Section 2.06   Authority.  The Staff and Services Provider's scope of assistance and advice hereunder is limited to the services specifically provided for in this Agreement.  The Staff and Services Provider shall not assume or be deemed to assume any rights or obligations of the Management Company under any other document or agreement to which the Management Company is a party.  Notwithstanding any other express or implied provision to the contrary in this Agreement, the activities of the Staff and Services Provider pursuant to this Agreement shall be subject to the overall policies of the Management Company, as notified to the Staff and Services Provider from time to time.   The Staff and Services Provider shall not have any duties or obligations to the Management Company unless those duties and obligations are specifically provided for in this Agreement (or in any amendment, modification or novation hereto or hereof to which the Staff and Services Provider is a party).

Section 2.07   Third Parties.

(a)   The Staff and Services Provider may employ third parties, including its affiliates, to render advice, provide assistance and to perform any of its duties under this Agreement; *provided* that notwithstanding the employment of third parties for any such purpose, the Staff and Services Provider shall not be relieved of any of its obligations or liabilities under this Agreement.

(b)   In providing services hereunder, the Staff and Services Provider may rely in good faith upon and will incur no liability for relying upon advice of nationally recognized counsel (which may be counsel for the Management Company, a Client or Account or any Affiliate of the foregoing), accountants or other advisers as the Staff and Services Provider determines, in its sole discretion, is reasonably appropriate in connection with the services provided by the Staff and Services Provider under this Agreement.

Section 2.08   Management Company to Cooperate with the Staff and Services Provider.  In furtherance of the Staff and Services Provider's obligations under this Agreement the Management Company shall cooperate with, provide to, and fully inform the Staff and Services Provider of, any and all documents and information the Staff and Services Provider reasonably requires to perform its obligations under this Agreement.

Section 2.09   Power of Attorney.  If the Management Company considers it necessary for the provision by the Staff and Services Provider of the assistance and advice under this Agreement (after consultation with the Staff and Services Provider), it may appoint the Staff and Services Provider as its true and lawful agent and attorney, with full power and authority in its name to sign, execute, certify, swear to, acknowledge, deliver, file, receive and record any and all documents

012490

that the Staff and Services Provider reasonably deems appropriate or necessary in connection with the execution and settlement of acquisitions of assets as directed by the Management Company and the Staff and Services Provider's powers and duties hereunder (which for the avoidance of doubt shall in no way involve the discretion and/or authority of the Management Company with respect to investments). Any such power shall be revocable in the sole discretion of the Management Company.

## ARTICLE III

## CONSIDERATION AND EXPENSES

Section 3.01    Consideration. As compensation for its performance of its obligations as Staff and Services Provider under this Agreement, the Staff and Services Provider will be entitled to receive a flat fee of $80,000 per month (the "Staff and Services Fee"), payable monthly in advance on the first business day of each month.

Section 3.02    Costs and Expenses. Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Staff and Services Provider for any and all costs and expenses that may be borne properly by the Management Company.

Section 3.03    Deferral. Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any all and amounts payable to the Staff and Services Provider pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

## ARTICLE IV

## REPRESENTATIONS AND COVENANTS

Section 4.01    Representations. Each of the Parties hereto represents and warrants that:

(a)    It has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

(b)    this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(c)    no consent, approval, authorization or order of or declaration or filing with any Governmental Authority is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

012491

(d) neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (i) its constituting and organizational documents; or (ii) the terms of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound.

## ARTICLE V

## COVENANTS

Section 5.01    Compliance; Advisory Restrictions.

(a)    The Staff and Services Provider shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Staff and Services Provider. Specifically, the Staff and Services Provider agrees that it will provide the Management Company with reasonable access to information relating to the performance of Staff and Services Provider's obligations under this Agreement.

(b)    This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any portfolio management agreement or any part thereof. It is the express intention of the parties hereto that this Agreement and all services performed hereunder comply in all respects with all (a) applicable contractual provisions and restrictions contained in each portfolio management agreement, investment management agreement or similar agreement and each document contemplated thereby; and (b) Applicable Laws (collectively, the "Advisory Restrictions"). If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the services to be provided under this Agreement shall automatically be limited without action by any person or entity, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Section 5.02    Records; Confidentiality.

The Staff and Services Provider shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; *provided* that the Staff and Services Provider shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

The Staff and Services Provider shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services

012492

rendered by the Staff and Services Provider hereunder and shall not disclose any such information to non-affiliated third parties, except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its rating of notes issued by a CLO or supplying credit estimates on any obligation included in the Portfolio, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any Client or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity, (iv) as required by (A) Applicable Law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Staff and Services Provider or any of its Affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Staff and Services Provider on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Staff and Services Provider may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any Client or Account, (ix) information relating to performance of the Portfolio as may be used by the Staff and Services Provider in the ordinary course of its business or (xx) such information as is routinely disclosed to the trustee, custodian or collateral administrator of any Client or Account in connection with such trustee's, custodian's or collateral administrator's performance of its obligations under the transaction documents related to such Client or Account. Notwithstanding the foregoing, it is agreed that the Staff and Services Provider may disclose without the consent of any Person (1) that it is serving as staff and services provider to the Management Company, (2) the nature, aggregate principal amount and overall performance of the Portfolio, (3) the amount of earnings on the Portfolio, (4) such other information about the Management Company, the Portfolio and the Clients or Accounts as is customarily disclosed by staff and services providers to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Staff and Services Provider, the Clients or Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

## ARTICLE VI

## EXCULPATION AND INDEMNIFICATION

Section 6.01    Standard of Care.  Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  To the extent not inconsistent with the foregoing, each Covered Person shall follow its customary standards, policies and procedures in performing its duties hereunder.  No Covered Person shall deal with the income or assets of the Management Company in such Covered Person's own interest or for its own account.  Each Covered Person in its respective sole and absolute

012493

discretion may separately engage or invest in any other business ventures, including those that may be in competition with the Management Company, and the Management Company will not have any rights in or to such ventures or the income or profits derived therefrom.

Section 6.02 Exculpation. To the fullest extent permitted by law, no Covered Person will be liable to the Management Company, any Member, or any shareholder, partner or member thereof, for (i) any acts or omissions by such Covered Person arising out of or in connection with the conduct of the business of the Management Company or its General Partner, or any investment made or held by the Management Company or its General Partner, unless it is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "Disabling Conduct") on the part of such Covered Person, (ii) any act or omission of any Investor, (iii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of such Covered Person, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of such Covered Person with reasonable care, or (iv) any consequential (including loss of profit), indirect, special or punitive damages. To the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Management Company or any Member, no Covered Person acting under this Agreement shall be liable to the Management Company or to any such Member for its good-faith reliance on the provisions of this Agreement. The exculpations set forth in this Section 6.02 shall exculpate any Covered Person regardless of such Covered Person's sole, comparative, joint, concurrent, or subsequent negligence.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to the Management Company or any Member solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to the Management Company or the Members, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to the Management Company or any Member in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care.

Section 6.03 Indemnification by the Management Company. The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, causes of action (including, but not limited to, strict liability, negligence, statutory violation, regulatory violation, breach of contract, and all other torts and claims arising under common law), demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("Claims"), that may accrue to or be incurred by any

12

012494

Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the investment or other activities of the Management Company or its General Partner, or activities undertaken in connection with the Management Company or its General Partner, or otherwise relating to or arising out of this Agreement, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "Proceeding"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "Damages"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person. The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons. Any Covered Person shall be indemnified under the terms of this Section 6.03 regardless of such Covered Person's sole, comparative, joint, concurrent, or subsequent negligence.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder shall be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder. The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives. Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this Section 6.03 shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Section 6.03 to the fullest extent permitted by law.

Section 6.04   Other Sources of Recovery etc. The indemnification rights set forth in Section 6.03 are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled. If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or indemnification from any Person in which any of the Clients or Accounts has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management

012495

Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained.

Section 6.05    Rights of Heirs, Successors and Assigns. The indemnification rights provided by Section 6.03 shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person.

Section 6.06    Reliance. A Covered Person shall incur no liability to the Management Company or any Member in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge. Each Covered Person may act directly or through his, her or its agents or attorneys.

<div align="center">

**ARTICLE VII**

**TERMINATION**

</div>

Section 7.01    Termination. Either Party may terminate this Agreement at any time upon at least thirty (30) days' written notice to the other.

<div align="center">

**ARTICLE VIII**

**MISCELLANEOUS**

</div>

Section 8.01    Amendments. This Agreement may not be amended or modified except by an instrument in writing signed by each Party.

Section 8.02    Assignment and Delegation.

(a)    Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in clauses (b) and (c) of this Section 8.02, without the prior written consent of the other Party and (ii) in accordance with Applicable Law.

(b)    Except as otherwise provided in this Section 8.02, the Staff and Services Provider may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with Applicable Law.

(c)    The Staff and Services Provider may, without satisfying any of the conditions of Section 8.02(a) other than clause (ii) thereof, (1) assign any of its rights or obligations under this Agreement to an Affiliate; *provided* that such Affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Staff and Services Provider pursuant to this Agreement and (ii) has the legal right and capacity to act as Staff and Services Provider under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or

012496

transferee entity assumes all the obligations of the Staff and Services Provider under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Staff and Services Provider in another corporate or similar form and has substantially the same staff; *provided further* that the Staff and Services Provider shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence. Upon the execution and delivery of any such assignment by the assignee, the Staff and Services Provider will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

Section 8.03  Non-Recourse; Non-Petition.

(a)  The Staff and Services Provider agrees that the payment of all amounts to which it is entitled pursuant to this Agreement shall be payable by the Management Company only to the extent of assets held in the Portfolio.

(b)  Notwithstanding anything to the contrary contained herein, the liability of the Management Company to the Staff and Services Provider hereunder is limited in recourse to the Portfolio, and if the proceeds of the Portfolio following the liquidation thereof are insufficient to meet the obligations of the Management Company hereunder in full, the Management Company shall have no further liability in respect of any such outstanding obligations, and such obligations and all claims of the Staff and Services Provider or any other Person against the Management Company hereunder shall thereupon extinguish and not thereafter revive. The Staff and Services Provider accepts that the obligations of the Management Company hereunder are the corporate obligations of the Management Company and are not the obligations of any employee, member, officer, director or administrator of the Management Company and no action may be taken against any such Person in relation to the obligations of the Management Company hereunder.

(c)  Notwithstanding anything to the contrary contained herein, any Staff and Services Provider agrees not to institute against, or join any other Person in instituting against, the Management Company any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under United States federal or state bankruptcy laws, or similar laws until at least one year and one day (or, if longer, the then applicable preference period plus one day) after the payment in full all amounts payable in respect of any Indebtedness incurred to finance any portion of the Portfolio; *provided* that nothing in this provision shall preclude, or be deemed to stop, the Staff and Services Provider from taking any action prior to the expiration of the aforementioned one year and one day period (or, if longer, the applicable preference period then in effect plus one day) in (i) any case or proceeding voluntarily filed or commenced by the Management Company, or (ii) any involuntary insolvency proceeding filed or commenced against the Management Company by a Person other than the Staff and Services Provider.

(d)  The Management Company hereby acknowledges and agrees that the Staff and Services Provider's obligations hereunder shall be solely the corporate obligations of the Staff and Services Provider, and are not the obligations of any employee, member, officer, director or administrator of the Staff and Services Provider and no action may be taken against any such Person in relation to the obligations of the Staff and Services Provider hereunder.

012497

(e)      The provisions of this Section 8.03 shall survive termination of this Agreement for any reason whatsoever.

Section 8.04    Governing Law.

(a)      This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas.  The Parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

(b)      The Parties irrevocably agree for the benefit of each other that the courts of the State of Texas and the United States District Court located in the Northern District of Texas in Dallas are to have exclusive jurisdiction to settle any disputes (whether contractual or non-contractual) which may arise out of or in connection with this Agreement and that accordingly any action arising out of or in connection therewith (together referred to as "Proceedings") may be brought in such courts.  The Parties irrevocably submit to the jurisdiction of such courts and waive any objection which they may have now or hereafter to the laying of the venue of any Proceedings in any such court and any claim that any Proceedings have been brought in an inconvenient forum and further irrevocably agree that a judgment in any Proceedings brought in such courts shall be conclusive and binding upon the Parties and may be enforced in the courts of any other jurisdiction.

Section 8.05    WAIVER OF JURY TRIAL.  EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT.  EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

Section 8.06    Severability.  The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties.

Section 8.07    No Waiver.  The performance of any condition or obligation imposed upon any Party may be waived only upon the written consent of the Parties.  Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other Party.  Any failure by any Party to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Section 8.08    Counterparts.  This Agreement may be executed in any number of counterparts by facsimile or other written or electronic form of communication, each of which shall be deemed to be an original as against any Party whose signature appears thereon, and all of

012498

which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties reflected hereon as the signatories.

Section 8.09    Third Party Beneficiaries.    This Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the Parties hereto and such permitted assigns, any legal or equitable rights hereunder. For avoidance of doubt, this Agreement is not for the benefit or and is not enforceable by any Shared Employee, Client or Account or any investor (directly or indirectly) in the Management Company.

Section 8.10    No Partnership or Joint Venture.    Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the Parties.    Except as expressly provided herein or in any other written agreement between the Parties, no Party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other Party.

Section 8.11    Independent Contractor.    Notwithstanding anything to the contrary, the Staff and Services Provider shall be deemed to be an independent contractor and, except as expressly provided or authorized herein, shall have no authority to act for or represent the Management Company or any Client or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity in any manner or otherwise be deemed an agent of the Management Company or any Client or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity.

Section 8.12    Written Disclosure Statement.    The Management Company acknowledges receipt of Part 2 of the Staff and Services Provider's Form ADV, as required by Rule 204-3 under the Advisers Act, on or before the date of execution of this Agreement.

Section 8.13    Headings.    The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 8.14    Entire Agreement.    This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the Parties with respect to such subject matter.

Section 8.15    Notices.    Any notice or demand to any Party to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail or email transmission or by delivering it by hand as follows:

      (a)    If to the Management Company:

          NexPoint Real Estate Advisors, L.P.
          200 Crescent Court
          Suite 700
          Dallas, TX 75201

012499

(b)     If to the Staff and Services Provider:

Highland Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

or to such other address or email address as shall have been notified to the other Parties.

*[The remainder of this page intentionally left blank.]*

012500

IN WITNESS WHEREOF, each Party has caused this Agreement to be executed as of the date hereof by its duly authorized representative.

**NEXPOINT REAL ESTATE ADVISORS, L.P.**

By:  NexPoint Real Estate Advisors GP, LLC, its General Partner

By:_____
Name: Frank Waterhouse
Title: Treasurer


**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:  Strand Advisors, Inc., its General Partner

By:_____
Name: Frank Waterhouse
Title: Treasurer

012501

# EXHIBIT BBBBBB

November 30, 2020

NexPoint Real Estate Advisors, L.P.
200 Crescent Court, Suite 700
Dallas, Texas 75201

> **RE:** **Termination of Amended and Restated Shares Services Agreement, effective as of January 1, 2018, by and among Highland Capital Management, L.P. ("HCMLP"), and NexPoint Real Estate Advisors, L.P. (the "Agreement").**

To Whom It May Concern:

As set forth in Section 7.01 of the Agreement, the Agreement is terminable at will upon at least 30 days advance written notice.

By this letter, HCMLP is notifying you that it is terminating the Agreement. Such termination will be effective January 31, 2021. HCMLP reserves the right to rescind this notice of termination.

Please feel free to contact me with any questions.

Sincerely,

HIGHLAND CAPITAL MANAGEMENT, L.P.

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Chief Executive Officer
Chief Restructuring Officer

# EXHIBIT CCCCCC

012504

November 30, 2020

NexBank Credit Services
c/o NexBank, SSB
2515 McKinney Avenue, 11th Floor
Dallas, Texas 75201
Attention: Grant Smith, SVP & Chief Lending Officer

>       **RE:       Termination of Sub-Servicing Agreement Shared National Credit Program,
>       dated January 1, 2014, by and between Highland Capital Management, L.P.
>       ("<u>HCMLP</u>") and NexBank, SSB, d/b/a NexBank Credit Services (the
>       "<u>Agreement</u>").**

To Whom It May Concern:

As set forth in Section 5.2 of the Agreement, the Agreement is terminable at will upon at least 30 days advance written notice.

By this letter, HCMLP is notifying you that it is terminating the Agreement.  Such termination will be effective January 31, 2021.  HCMLP reserves the right to rescind this notice of termination.

Please feel free to contact me with any questions.

Sincerely,

HIGHLAND CAPITAL MANAGEMENT, L.P.


/s/ James P. Seery, Jr.

James P. Seery, Jr.
Chief Executive Officer
Chief Restructuring Officer

DOCS_NY:41564.2 36027/002

012505