**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | |
|---|---|---|
| **In Re:** Highland Capital Management, L.P | § | Case No.  19-34054-SGJ-11 |
| Highland Capital Management Fund Advisors, L.P. | | |
| et al | § | |
| Appellant | § | |
| vs. | § | |
| Highland Capital Management, L.P., | | |
| | § | 3:21-CV-00538-N |
| Appellee | § | |

[1943] **Order confirming the fifth amended chapter 11 plan,** Entered on 2/22/2021.

# APPELLANT RECORD
# VOLUME 49

MUNSCH HARDT KOPF & HARR, P.C.
Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
3800 Ross Tower
500 N. Akard Street
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

ATTORNEYS FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P. AND
NEXPOINT ADVISORS, L.P.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

In re:

HIGHLAND CAPITAL MANAGEMENT, L.P.

Debtor.

Chapter 11

Case No. 19-34054 (SGJ11)

*I N D E X*

## AMENDED DESIGNATION BY NEXPOINT ADVISORS, L.P. AND HIGHLAND
## CAPITAL MANAGEMENT FUND ADVISORS, L.P.
## OF ITEMS FOR THE RECORD ON APPEAL

COME NOW Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors,

L.P. (the "Appellants"), creditors and parties-in-interest in the above styled and numbered

bankruptcy case (the "Bankruptcy Case") of Highland Capital Management, L.P. (the "Debtor"),

and, with respect to their *Notice of Appeal* [docket no. 1957], hereby file their *Amended

Designation of Items for the Record on Appeal* (the "Designation") as follows:

| | Item | Bankruptcy Docket Number | Description |
|---|---|---|---|
| | | | **Pleadings and Items on Docket** |
| *Vol. 1* 000001 | 1 | 1957 | Notice of Appeal |
| 000165 000326 | 2 | 1943 | Order (i) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief |
| | 3 | | Docket Sheet of Bankruptcy Case No. 19-34054 |
| *Vol. 2* 000639 | 4 | 1606 | Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 000666 | 5 | 1648 | Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| 000675 | 6 | 1656 | Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 000820 | 7 | 1670 | Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 000870 | 8 | 1719 | Second Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| *Vol. 3* 000880 | 9 | 1749 | Third Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| 000886 | 10 | 1772 | Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| 000901 | 11 | 1791 | Notice of Withdrawal of Certain Executory Contracts and Unexpired Leases from List of Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan |
| 000906 | 12 | 1807 | Debtor's Omnibus Reply to Objections to Confirmation of the Fifth Amended Chapter 11 Plan of Reorganization of Highland Capital Management |
| 001031 | 13 | 1808 | Debtor's Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) |
| *Vol. 4* 001097 | 14 | 1811 | Notice of Filing Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (with Technical Modifications) |
| *Vol. 5* 001346 | 15 | 1814 | Debtor's Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |

*(handwritten left margin: Vol 5  001414  001421  001427  001475  001482)*

| | 16 | 1847 | Fourth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
|---|---|---|---|
| | 17 | 1873 | Fifth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| | 18 | 1875 | Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland of Highland Capital Management, L.P. (As Modified) |
| | 19 | 1887 | Supplemental Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| | 20 | 1671 | United States Trustee's Limited Objection to Confirmation of Debtors' Fifth Amended Plan of Reorganization |
| | | | **Evidence and Transcripts** |
| | 21 | 1894 | Transcript of February 2, 2021 Confirmation Hearing |
| | 22 | 1905 | Transcript of February 3, 2021 Confirmation Hearing |
| | 23 | 1917 | Transcript of February 8, 2021 Bench Ruling |
| | 24 | 1794 | All exhibits admitted into evidence during February 2 and February 3, 2021 Confirmation Hearing |
| | | 1795 | |
| | | 1822* | |
| | | 1863 | |
| | | 1866 | |
| | | 1877 | |
| | | 1895 | |
| | | 1915 | |

*(handwritten left margin notes beside rows 21–24: 001485, 081183, 002040, 081208/002188, Vol 12 - 002931, Vol 50 - 013295, -013297, Vol. 51 - 013373, Vol. 54 - 014182, Vol. 55 - 014506)*

*(handwritten below table):* ✱ 1822 - Vol. 12 — 50 (39 Volumes)

RESPECTFULLY SUBMITTED this 22d day of March, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
   Davor Rukavina, Esq.
   Texas Bar No. 24030781
   3800 Ross Tower
   500 N. Akard Street
   Dallas, Texas 75201-6659
   Telephone: (214) 855-7500
   Facsimile: (214) 855-7584
   Email:   drukavina@munsch.com

**ATTORNEYS FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P. AND
NEXPOINT ADVISORS, L.P.**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on this the 22d day of March, 2021, true and correct copies of this document were electronically served by the Court's ECF system on parties entitled to notice thereof, including on counsel for the Debtor.

By: /s/ Davor Rukavina
   Davor Rukavina, Esq.

# EXHIBIT PPPPP

Case 19-34054-sgj11 Doc 1822-1 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 2 of
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 7 of 243 PageID 15887
Docket #0271 Date Filed: 12/23/2019

United States Department of Justice
Office of the United States Trustee
1100 Commerce Street
Dallas, Texas 75242
(214) 767-1080

Lisa L. Lambert,
For the United States Trustee

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Case No. 19-34054-SGJ** |
| **MANAGEMENT, L.P.** | § | |
| | § | |
| **Debtors-in-Possession.** | § | **(Chapter 11)** |

## UNITED STATES TRUSTEE'S MOTION FOR AN ORDER DIRECTING
## THE APPOINTMENT OF A CHAPTER 11 TRUSTEE

**A hearing will be held on January 21, 2020. The objection
and response deadlines will be governed by the Scheduling
Order, ECF No. 269. The Court orally denied the U.S.
Trustee's request to have this motion considered in
connection with any Governance Motion. See Scheduling
Order, ECF. No. 269 and transcript.**

**TO THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE:**

The United States Trustee for Region 6 moves for an order directing the appointment of a

Chapter 11 Trustee based on cause and the best interests of the creditors. 11 U.S.C. § 1104(a).

The United States Trustee would show:

## Overview

Documented management concerns mandate a trustee in this case. This Court has recognized that Highland's management concerns involve a culture that surpasses the officers and board. Steps such as replacing the board or having a chief restructuring officer who reports to the Court rather do not fix Highland's problems.

Prior efforts to use external oversight to curtail Highland management's self-dealing have failed. As the Acis case demonstrated, the Highland Capital cases have many inter-connected relationships. A trustee can nimbly evaluate whether the inter-company transactions are in the best interests of the estate and creditors. In the Acis case, the trustee concluded other options were either superior, cheaper, or less-conflicted. A board is farther from the impact of the related-entity transactions and the culture of the debtor. It meets periodically. Here, the inter-connected relationships include the Debtor's bank as well as other legal entities.

The remedy Congress defined for these facts is a trustee. The Court should direct the appointment of a trustee.

## Jurisdiction, Power, and Standing

1.     The Court has subject matter jurisdiction under 28 U.S.C. § 1334, 28 U.S.C. § 157(a)(1), and the standing order of reference. Appointing a trustee or examiner impacts the case administration and therefore is a core matter that the Court has the power to resolve. 28 U.S.C. § 157(b)(2)(A).

2.     The United States Trustee has standing to seek appointment of a trustee or examiner. 11 U.S.C. §§ 307, 1104.

012951

<u>Facts</u>

*The Acis case involved findings of fraud, self-dealing, and mismanagement by this debtor:*

3.        This Court presided over the Acis bankruptcy case, case number 18-30264.  In *Acis*, the
Court catalogued the decision-making authority as belonging to James Dondero, as president;
Mark K. Akada, chief investment officer with a decreasing role; Frank Waterhouse, as
treasurer; and –by delegation of authority – Highland in-house counsel Scott Levington and
Isaac Leventon.  With the exception of Mark K. Akada, the same individuals have decision-
making authority for the debtor-in-possession.  *In re Acis Capital Mgmt., Inc.*, 584 B.R. 115,
119, 131.  The Court found the Acis witnesses' testimony "of questionable reliability and,
oftentimes, there seemed to be an effort to convey plausible deniability." *Acis*, 584 B.R. at
131.

4.        "[S]ince the arbitration award [in favor of Terry, the petitioning creditor], there has
been a calculated effort (largely by Highland) to effectively liquidate the Alleged [Acis]
Debtors." *Acis*, 584 B.R. at 148.  The Court found the Alleged Debtors were "really out to
protect –Highland and Highland-affiliates" in contravention of their fiduciary duties of loyalty.
*Acis*, 584 B.R. at 149.

5.        In addition to finding breaches of fiduciary duty when Highland promoted its self-
interests over those of Acis creditors, the Court found "evidence of both intentional and
constructive fraudulent transfers." *In re Acis Capital Mgmt., L.P.*, 2019 WL 417149, at *11
(confirmation opinion also referencing "actual intent to hinder, delay, or defraud").

6.        After the Court directed the appointment of the Acis chapter 11 trustee, the chapter 11
trustee found service providers unrelated to Highland entities.  These providers were cheaper
and decreased conflicts.

*The following section is redacted to honor the interim sealing order. The United States*

*Trustee has simultaneously filed an objection to the motion to seal.*





*Prior Efforts to Cabin Highland Capital Management's Self-Dealing and Other Willful and Intentional Acts Have Failed.*

14.     Highland has been found to engage in self-dealing and other misconduct for years. The prior efforts to remediate and change the culture have failed.

15.     In 2014, the SEC determined that Highland had historically engaged in multiple transactions in its client advisory accounts without disclosing that Highland was acting as principal or obtaining client consent before the trades were completed. The SEC required

Highland to retain an outside compliance consultant and to implement that consultant's recommendations.

16. ███████████████████████████████████████

17. Cumulatively, the findings of this Court and other tribunals establish that the problems exist in the management culture at Highland. These problems go beyond the officers and directors.

18. The general partner of Highland is controlled by Dondero.

19. Moreover, the integrated nature of the board for Highland-related entities allows for the possibility that individuals removed from the board and from management may still monitor the financial transactions and use their relationships with the Highland's employees to direct outcomes. For example, Highland proposes to bank, in part, with NexBank. The NexBank website reflects that Dondero chairs the board and Okada is a director. Similarly, Highland Management, the debtor, has intercompany transactions with Highland Capital Management Korea Limited, Highland Capital Management Latin America, L.P., and Highland Capital Management (Singapore) Pte Ltd.

**Legal Analysis and Argument**

20. The United States Trustee is charged with monitoring the federal bankruptcy system. *See* 28 U.S.C. § 586(a)(3); *see also United States Trustee v. Columbia Gas Sys., Inc.* (*In re Columbia Gas Sys., Inc.*) 33 F.3d 294, 295-96 (3d Cir. 1994).

21. Before confirmation, the Court "shall order the appointment of a trustee . . . for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, *either* before *or* after the commencement of the case, or similar

cause." 11 U.S.C. §1104(a)(1) (emphasis added). In addition, by adding appointment of a
trustee as a remedy in section 1112, "cause" also may be factors traditionally resulting in
dismissal or conversion. 11 U.S.C. §1112(b)(1). Here, an additional factor is "bad faith."
Alternatively, the Court must appoint a trustee "if such appointment is in the interest of the
creditors, any equity security holders, and other interests of the estate." 11 U.S.C. §
1104(a)(2).

22.     The Fifth Circuit has indicated that the burden of proof for the appointment of a trustee
is "clear and convincing" evidence, but the Court later adopted the dissent's opinion. *Cajun
Elec. Co. v. Louisiana Elec. Co. (In re Cajun Electric Power Co-Op, Inc.)*, 69 F.3d 746, *on
reh'g*, 74 F.3d 599 (5th Cir. 1996) (adopting dissent).[1]

23.     The duties of a trustee are defined in section 1106, and the Court has the ability to tailor
some of them. 11 U.S.C. § 1106(a).

24.     The "cause" to appoint an examiner or a trustee may be a reason other than the
enumerated factors. *Oklahoma Ref. Co. v. Blaik (In re Oklahoma Ref. Co.)*, 838 F.2d 1133,
1136 (10th Cir. 1988); *cf. Little Creek Dev. Corp. v. Commonwealth Mortg. Corp. (In re Little
Creek Dev. Corp.)*, 779 F.2d 1068, 1072 (5th Cir. 1986) (defining "cause" in context of
dismissal statute).

25.     For example, courts have appointed trustees or examiners when the debtor's insiders
have conflicts of interest arising from the sale of the Debtor's assets. In *Cajun Electric*, the
Fifth Circuit affirmed the appointment of a trustee, in part, because the co-operative members

---

[1] In *Grogan v. Garner*, the United States Supreme Court held that the burden of proof for dischargeability fraud
actions was preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 291 (1991). In reaching this
holding, the Supreme Court cataloged both bankruptcy and non-bankruptcy fraud statutes and held that Congress
generally imposed a preponderance standard for fraud in civil proceedings.

were interested in purchasing part or all of Cajun Electric's assets. *Cajun Elec. Power Cooperative, Inc. v. Central Louisiana Elec. Co., Inc. (In re Cajun Elec. Power Cooperative, Inc.)*, 69 F.3d 746, 751 (5th Cir. 1995) (Garza, J., dissenting), *adopted as majority opinion on reh'g*, 74 F.3d 599 (5th Cir. 1996). The Fifth Circuit held that "a trustee may be the only effective way to pursue reorganization" when the management has cross-purposes. *Cajun Elec.*, 69 F.2d at 751.

*Cause exists to appoint a chapter 11 trustee:*

26.     Here, both express statutory standards and the common law case standards for "cause" exist. Specifically, "fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor" and bad faith exist under the facts of this case.[2]

27.     The record regarding a series of self-dealing categories reflects both incompetence and gross mismanagement. *SEC Judgment, pp. 5-7.*

28.     Other "cause" exists to appoint a trustee because tribunals have historically found the management's testimony unreliable and the Debtor's actions as reflecting willfulness and intent. This Court has found that the Debtor's management had fraudulent intent when it removed assets from Acis.

*It is in the best interests of creditors to appoint a chapter 11 trustee.*

29.     Appointment of chapter 11 trustee is also in the interests of creditors, equity security holders, and other interests of the estate. The Court should direct the appointment of a chapter 11 trustee to serve the "interests of creditors, any equity security holders, and other interests of the estate." 11 U.S.C. §1104(a)(2).

---

[2] "The United States trustee shall move for the appointment of a trustee under subsection (a) if there are reasonable grounds to suspect that current members of the governing body of the debtor, the debtor's chief executive officer . . . participated in actual fraud, dishonesty, or criminal conduct in the management of the debtor or the debtor's public financial reporting." 11 U.S.C. §1104(e).

30.     First, it is in the best interest of the creditors to have an independent trustee to assume control over the estate in order to evaluate any alter ego claims, avoidance actions, and other tort claims.

31.     Second, it is in the best interest of the creditors and other parties-in-interest to have accurate financial information. Accurate financial information ensures parties understand the facts of the case and avoids post-petition liabilities for violations. Like the information provided to investors in securities filings, the information provided in a bankruptcy case depends on affirmative disclosure.

32.     Other efforts to check or monitor the Debtor's management have failed. The Acis trustee's actions reflect a need to be able to bid competing services and replace related-entities when conflicts of interest or cost concerns arise.

33.     Congress has defined the remedy for the facts of this case. "The court shall order the appointment of a trustee." 11 U.S.C. § 1104(a).

## Conclusion

For the foregoing reasons, the United States Trustee requests the Court to

a   order the United States Trustee to appoint a Chapter 11 Trustee; or

b   grant to the United States Trustee such other and further relief as is just and proper.

Dated: December 23, 2019                          Respectfully Submitted,
                                                  WILLIAM T. NEARY
                                                  UNITED STATES TRUSTEE

                                                  /s/Lisa L. Lambert
                                                  Lisa L. Lambert
                                                  Asst. U.S. Trustee, TX 11844250 (and NY)
                                                  Office of the United States Trustee
                                                  1100 Commerce St.  Room 976
                                                  Dallas, Texas 75242
                                                  (214) 767-1080
                                                  Lisa.L.Lambert@usdoj.gov

### Certificate of Service

I certify that on December 23, 2019, I sent copies of the foregoing document on to the attached service lists by first class United States mail and by ECF notification to those listed below.

                                                  /s/ Lisa L. Lambert
                                                  Lisa L. Lambert

**Highland Capital Management**
300 Crescent Court
Suite 700
Dallas, TX 75201

**Pachulski Stang Ziehl & Jones LLP**
Richard M. Pachulski, Jeffrey N. Pomerantz,
Ira D. Kharasch, Maxim B. Litvak, James E.
O'Neill
919 North Market Street
17th Floor
Wilmington, DE 19801

**Pachulski Stang Ziehl & Jones LLP**
Richard M. Pachulski, Jeffrey N. Pomerantz,
Ira D. Kharasch, Maxim B. Litvak, James E.
O'Neill
10100 Santa Monica Blvd, 13th Floor
Los Angeles, CA 90067

**Kurtzman Carson Consultants**
Joe Morrow
222 N. Pacific Coast Hwy Ste 300
El Segundo, CA 90245

**Hayward & Associates PLLC**
Melissa S. Hayward, Zachery Z. Annable
10501 N. Central Expy, Ste. 106
Dallas, TX 75231

**Pachulski Stang Ziehl & Jones LLP**
Maxim B. Litvak
150 California Street, 15th Floor
San Francisco, CA 94111-4500

**Pachulski Stang Ziehl & Jones LLP**
John A. Morris and Gregory V. Demo

780 Third Avenue, 34th Floor
New York, NY 10017-2024

**Ashby & Geddes, P.A.**
William P. Bowden, Esq., Michael D.
DeBaecke, Esq.
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899-1150

**BBVA**
Michael Doran
8080 North Central Expressway
Suite 1500
Dallas, TX 75206

**Blank Rome LLP**
John E. Lucian, Josef W. Mintz
1201 N. Market Street, Suite 800
Wilmington, DE 19801

**Carlyon Cica Chtd.**
Candace C. Carlyon, Esq., Tracy M. Osteen,
Esq.
265 E. Warm Springs Road, Suite 107
Las Vegas, NV 89119

**Chipman, Brown, Cicero & Cole, LLP**
Mark L. Desgrosseilliers
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, DE 19801

**Cole, Schotz, Meisel, Forman & Leonard, P.A.**
Michael D. Warner, Esq.
301 Commerce Street, Suite 1700
Fort Worth, TX 76102

**Condon Tobin Sladek Thornton PLLC**
J. Seth Moore
8080 Park Lane, Suite 700
Dallas, TX 75231

**Cross & Simon LLC**
Michael L. Vild, Esquire
1105 N. Market Street, Suite 901
Wilmington, DE 19801

**Dentons US LLP**
Lauren Macksoud, Esq.
1221 Avenue of the Americas
New York, NY 10020-1089

**Dentons US LLP**
Patrick C. Maxcy, Esq.
233 South Wacker Drive
Suite 5900
Chicago, IL 60606-6361

**Frontier State Bank**
Attn:  Steve Elliot
5100 South I-35 Service Road
Oklahoma City, OK 73129

**Frost Brown Todd LLC**
Mark A. Platt
100 Crescent Court, Suite 350
Dallas, TX 75201

**Gibson, Dunn & Crutcher LLP**
Marshall R. King, Esq., Michael A. Rosenthal,
Esq. & Alan Moskowitz, Esq.
200 Park Avenue
New York, NY 10066

**Gibson, Dunn & Crutcher LLP**
Matthew G. Bouslog, Esq.
3161 Michelson Drive
Irvine, CA 92612

**Hunter Mountain Investment Trust**
c/o Rand Advisors LLC
John Honis
87 Railroad Place Ste 403
Saratoga Springs, NY 12866

**Internal Revenue Service**
Attn Susanne Larson
31 Hopkins Plz Rm 1150
Baltimore, MD 21201

**Internal Revenue Service**
Centralized Insolvency Operation
PO Box 7346
Philadelphia, PA 19101-7346

**Internal Revenue Service**
Centralized Insolvency Operation
2970 Market St
Philadelphia, PA 19104

**Jackson Walker L.L.P.**
Michael S. Held
2323 Ross Avenue, Suite 600
Dallas, TX 75201

**Jefferies LLC**
Director of Compliance
520 Madison Avenue, 16th Floor
Re: Prime Brokerage Services
New York, NY 10022

**Jefferies LLC**
Office of the General Counsel
520 Madison Avenue, 16th Floor
Re: Prime Brokerage Services
New York, NY 10022

**Jenner & Block LLP**
Marc B. Hankin, Richard Levin
919 Third Avenue
New York, NY 10022-3908

**Kane Russell Coleman Logan PC**
John J. Kane
901 Main Street, Suite 5200
Dallas, TX 75242-1699

012960

<div style="display:flex">

**KeyBank National Association**
as Administrative Agent
225 Franklin Street, 18th Floor
Boston, MA 02110

**KeyBank National Association**
as Agent
127 Public Square
Cleveland, OH 44114

**Kurtzman Steady, LLC**
Jeffrey Kurtzman, Esq.
401 S. 2nd Street, Suite 200
Philadelphia, PA 19147

**Latham & Watkins LLP**
Asif Attarwala
330 N. Wabash Avenue, Ste. 2800
Chicago, IL 60611

**Latham & Watkins LLP**
Jeffrey E. Bjork
355 South Grand Avenue, Ste. 100
Los Angeles, CA 90071

**Linebarger Goggan Blair & Sampson LLP**
Elizabeth Weller, Laurie A. Spindler
2777 N. Stemmons Freeway
Suite 1000
Dallas, TX 75207

**Lynn Pinker Cox & Hurst, L.L.P.**
Michael K. Hurst, Esq.
2100 Ross Avenue, Ste 2700
Dallas, TX 75201

**Mark K. Okada**
300 Crescent Court
Suite 700
Dallas, TX 75201

**Morris, Nichols, Arsht & Tunnell LLP**
Curtis S. Miller, Kevin M. Coen
1201 North Market Street, Suite 1600
Wilmington, DE 19801

**Morrison Cohen LLP**
Joseph T. Moldovan, Esq. & Sally Siconolfi,
Esq.
909 Third Avenue
New York, NY 10022

**NexBank**
John Danilowicz
2515 McKinney Ave
Ste 1100
Dallas, TX 75201

**Nixon Peabody LLP**
Louis J. Cisz, III, Esq.
One Embarcadero Center, 32nd Floor
San Francisco, CA 94111

**Office of General Counsel**
Securities & Exchange Commission
100 F St NE
Washington, DC 20554

**Office of the Attorney General**
Ken Paxton
300 W. 15th Street
Austin, DE 78701

**Office of the Attorney General**
Main Justice Building, Room 5111
10th & Constitution Avenue, N.W.
Washington, DC 20530

**Office of the United States Attorney**
Erin Nealy Cox, Esquire
1100 Commerce Street, 3rd Floor
Dallas, TX 75202

**Office of the United States Trustee**
Lisa L. Lambert, Esquire
1100 Commerce Street, Room 976
Earle Cabell Federal Building
Dallas, TX 75242

**Pension Benefit Guaranty Corporation**
Michael I. Baird
Office of the General Counsel
1200 K Street, N.W.
Washington, DC 20005-4026

**Perdue, Brandon, Fielder, Collins & Mott,
L.L.P.**
Linda D. Reece
1919 S. Shiloh Rd., Suite 310
Garland, TX 75042

**Potter Anderson & Corroon LLP**
Jeremy W. Ryan, Esq., R. Stephen McNeill,
Esq. & D. Ryan Slaugh, Esq.
1313 North Market Street, 6th Floor
Wilmington, DE 19801

**Prime Brokerage Services**
Jefferies LLC
520 Madison Avenue
New York, NY 10022

**Pronske & Kathman, P.C.**
Jason P. Kathman
2701 Dallas Parkway, Suite 590
Plano, TX 75093

**Richards, Layton & Finger PA**
Michael J. Merchant, Sarah E. Silveira
One Rodney Square
920 North King Street
Wilmington, DE 19801

**Schulte Roth & Zabel LLP**
James T. Bentley
919 Third Avenue
New York, NY 10022

**Securities & Exchange Commission**
Andrew Calamari, Regional Director
New York Regional Office
Brookfield Place, Suite 400
200 Vesey Street
New York, NY 10281

**Securities & Exchange Commission**
Sharon Binger, Regional Director
Philadelphia Regional Office
One Penn Center, Suite 520
1617 JFK Boulevard
Philadelphia, PA 19103

**Sidley Austin LLP**
Bojan Guzina, Matthew Clemente, Alyssa
Russell, Elliot A. Bromagen
One South Dearborn Street
Chicago, IL 60603

**Sidley Austin LLP**
Jessica Boelter
787 Seventh Avenue
New York, NY 10019

**Sidley Austin LLP**
Lee S. Attanasio, Esq.
787 Seventh Avenue
New York, NY 10019

**Sidley Austin LLP**
Penny P. Reid, Paige Holden Montgomery,
Charles M. Person, Juliana Hoffman
2021 McKinney Avenue Suite 2000
Dallas, TX 75201

</div>

012961

**State Comptroller of Public Accounts**
Revenue Accounting Division-
Bankruptcy Section
P.O. Box 13258
Austin, TX 78711

**State of Delaware**
Division of Corporations - Franchise Tax
401 Federal Street
PO Box 898
Dover, DE 19903

**Strand Advisors, Inc.**
300 Crescent Court
Suite 700
Dallas, TX 75201

**Sullivan Hazeltine Allinson LLC**
William A. Hazeltine, Esq.
901 North Market Street, Suite 1300
Wilmington, DE 19801

**Texas Attorney General's Office**
Bankruptcy-Collections Division
P.O. Box 12548
Austin, TX 78711-2548

**The Dugaboy Investment Trust**
300 Crescent Court
Suite 700
Dallas, TX 75201

**The Mark and Pamela Okada Family Trust –
Exempt Trust #1**
300 Crescent Court
Suite 700
Dallas, TX 75201

**The Mark and Pamela Okada Family Trust –
Exempt Trust #2**
300 Crescent Court
Suite 700
Dallas, TX 75201

**U.S. Department of the Treasury**
Office of General Counsel
1500 Pennsylvania Avenue, NW
Washington, DC 20220

**United States Attorney General**
U.S. Department of Justice
William Barr, Esquire
950 Pennsylvania Avenue, NW,
Room 4400
Washington, DC 20530-0001

**Winstead PC**
Rakhee V. Patel, Phillip Lamberson
2728 N. Harwood Street, Suite 500
Dallas, TX 75201

**Young Conaway Stargatt & Taylor, LLP**
Michael R. Nestor, Edmon L. Morton, Sean M.
Beach, Esq., Jaclyn C. Weissgerber, Esq.
Rodney Square
1000 North King Street
Wilmington, DE 19801

**Zillah A. Frampton**
Bankruptcy Administrator
Delaware Division of Revenue
Carvel State Office Building, 8th Floor
820 N. French Street
Wilmington, DE 19801

012962

# EXHIBIT QQQQQQ

Case 19-34054-sgj11 Doc 428 Filed 02/05/20 Entered 01/22/21 21:50:03 Page 2 of
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 21 of 243 PageID 15901
Docket #0428 Date Filed: 02/05/2020



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

Signed February 4, 2020

_____

**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| ------------------------------------------------------------ | § | |
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | **Related to Docket Nos. 271, 362, 364** |
| ------------------------------------------------------------ | § | |

## ORDER DENYING UNITED STATES TRUSTEE'S MOTION
## FOR AN ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE

Upon the *United States Trustee's Motion for an Order Directing the Appointment of a*

*Chapter 11 Trustee* [Docket No. 271] (the "<u>Motion</u>"), filed by the United States Trustee for Region

6 (the "<u>UST</u>") on December 23, 2019; and this Court having considered the objections to the

Motion [Docket Nos. 362 and 364] filed by Highland Capital Management, L.P., the debtor and

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



1934054200205000000000002

debtor in possession herein (the "Debtor") and the Official Committee of Unsecured Creditors, respectively; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that no cause exists under 11 U.S.C. § 1104(a)(1) for the appointment of a chapter 11 trustee in this case and that the relief requested in the Motion is not in the best interests of the Debtor's estate or parties in interest for purposes of 11 U.S.C. § 1104(a)(1); and this Court having read the findings of fact and conclusions of law into the record in accordance with Fed. R. Bankr. P. 7052(a); and after due deliberation and sufficient cause appearing therefor, it is **HEREBY ORDERED THAT:**

1.      The Motion is **DENIED**.

2.      Notwithstanding any stay under applicable rules, this Order shall be effective immediately upon entry.

3.      The Court shall retain jurisdiction over all matters arising from or related to the interpretation and implementation of this Order.


### ### END OF ORDER ###

DOCS_SF:102542.1 36027/002

012965

# EXHIBIT RRRRRR

012966

```
                  IN THE UNITED STATES BANKRUPTCY COURT
1                 FOR THE NORTHERN DISTRICT OF TEXAS
                            DALLAS DIVISION
2
                              )    Case No. 19-34054-sgj-11
3    In Re:                   )    Chapter 11
                              )
4    HIGHLAND CAPITAL         )    Dallas, Texas
     MANAGEMENT, L.P.,        )    January 9, 2020
5                             )    9:30 a.m. Docket
                              )
6            Debtor.          )
                              )    DEBTOR'S MOTION TO COMPROMISE
7                             )    CONTROVERSY WITH OFFICIAL
                              )    COMMITTEE OF UNSECURED
8                             )    CREDITORS [281]
     _____)

9                       TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
10                UNITED STATES BANKRUPTCY JUDGE.

11   APPEARANCES:

12   For the Debtor:          Jeffrey N. Pomerantz
                              PACHULSKI STANG ZIEHL & JONES, LLP
13                            10100 Santa Monica Blvd.,
                               13th Floor
14                            Los Angeles, CA  90067-4003
                              (310) 277-6910
15
     For the Debtors:         Ira D. Kharasch
16                            PACHULSKI STANG ZIEHL & JONES, LLP
                              10100 Santa Monica Blvd.,
17                             13th Floor
                              Los Angeles, CA  90067-4003
18                            (310) 277-6910

19   For the Debtor:          John A. Morris
                              PACHULSKI STANG ZIEHL & JONES, LLP
20                            780 Third Avenue, 34th Floor
                              New York, NY  10017-2024
21                            (212) 561-7700

22   For the Debtors:         Melissa S. Hayward
                              Zachery Z. Annable
23                            HAYWARD & ASSOCIATES, PLLC
                              10501 N. Central Expressway,
24                             Suite 106
                              Dallas, TX  75231
25                            (972) 755-7104
```

012967

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 3 of
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 25 of 243 PageID 15905

2

```
 1   APPEARANCES, cont'd.

 2   For the Official Committee    Matthew A. Clemente
     of Unsecured Creditors:       Dennis M. Twomey
 3                                 SIDLEY AUSTIN, LLP
                                   One South Dearborn Street
 4                                 Chicago, IL  60603
                                   (312) 853-7539
 5
     For the Official Committee    Penny P. Reid
 6   of Unsecured Creditors:       SIDLEY AUSTIN, LLP
                                   2021 McKinney Avenue, Suite 2000
 7                                 Dallas, TX  75201
                                   (214) 981-3413
 8
     For the Issuer Group:         James T. Bentley
 9   (Telephonic)                  SCHULTE ROTH & ZABEL, LLP
                                   919 Third Avenue
10                                 New York, NY  10022
                                   (212) 756-2000
11
     For the Issuer Group:         James E. Bain
12   (Telephonic)                  JONES WALKER, LLP
                                   811 Main Street, Suite 2900
13                                 Houston, TX  77002
                                   (713) 437-1820
14
     For Acis Capital             Rakhee V. Patel
15   Management GP, LLC:          Annmarie Antoinette Chiarello
                                   WINSTEAD, P.C.
16                                 2728 N. Harwood Street, Suite 500
                                   Dallas, TX  75201
17                                 (214) 745-5250

18   For Redeemer Committee of     Terri L. Mascherin
     the Highland Crusader         JENNER& BLOCK, LLP
19   Fund:                         353 N. Clark Street
     (Telephonic)                  Chicago, IL  60654-3456
20                                 (312) 923-2799

21   For Redeemer Committee of     Mark B. Hankin
     the Highland Crusader         JENNER & BLOCK, LLP
22   Fund:                         919 Third Avenue
     (Telephonic)                  New York, NY  10022-3098
23                                 (212) 891-1600

24

25
```

012968

```
 1   APPEARANCES, cont'd.:

 2   For the U.S. Trustee:        Lisa L. Lambert
                                  Meredyth A. Kippes
 3                                OFFICE OF THE UNITED STATES
                                    TRUSTEE
 4                                1100 Commerce Street, Room 976
                                  Dallas, TX  75242
 5                                (214) 767-8967

 6   For Jefferies, LLC:          Patrick C. Maxcy
     (Telephonic)                 DENTONS US, LLP
 7                                233 South Wacker Drive, Suite 5900
                                  Chicago, IL  60606-6361
 8                                (312) 876-8000

 9   For Patrick Daugherty,       Patrick Daugherty
     Pro Se:
10
     Recorded by:                 Hawaii S. Jeng
11                                UNITED STATES BANKRUPTCY COURT
                                  1100 Commerce Street, 12th Floor
12                                Dallas, TX  75242
                                  (214) 753-2006
13
     Transcribed by:              Kathy Rehling
14                                311 Paradise Cove
                                  Shady Shores, TX  76208
15                                (972) 786-3063

16

17

18

19

20

21

22

23

24

25           Proceedings recorded by electronic sound recording;
                transcript produced by transcription service.
```

012969

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 5 of
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 27 of 243 PageID 15907

4

1          DALLAS, TEXAS - JANUARY 9, 2020 - 9:56 A.M.

2          THE COURT:  All right.  Let's roll to Highland now.

3    Let's get appearances from lawyers in the courtroom, please.

4          MR. POMERANTZ:  Good morning, Your Honor.  Jeff

5    Pomerantz; Pachulski Stang Ziehl & Jones.  Happy New Year,

6    Your Honor.

7          THE COURT:  Happy New Year.

8          MR. POMERANTZ:  Here on behalf of the Debtor.

9          THE COURT:  Okay.  Thank you.

10         MS. HAYWARD:  Good morning, Your Honor.  Melissa

11   Hayward and Zachery Annable on behalf of the Debtor.

12         THE COURT:  Good morning.

13         MS. LAMBERT:  Lisa Lambert, and I think Ms. Kippes

14   will be joining me, representing William Neary, the United

15   States Trustee.

16         THE COURT:  Thank you.

17         MS. CHIARELLO:  Good morning, Your Honor.  Annmarie

18   Chiarello and Rakhee Patel here on behalf of Acis Capital

19   Management, LP and Acis Capital Management GP, LLC.

20         THE COURT:  Thank you.

21         MR. CLEMENTE:  Good morning, Your Honor.  Matthew

22   Clemente from Sidley Austin on behalf of the Official

23   Committee of Unsecured Creditors.  With me today are my

24   partners Dennis Twomey and Penny Reid.

25         THE COURT:  Okay.  Good morning.  All right.  Is that

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 6 of
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 28 of 243 PageID 15908

5

1   all of the courtroom appearances?

2       All right.  We have several people on the phone.  I think

3   most of them are just listening in.  If you're on the phone,

4   though, and you wish to appear, you may do so at this time.

5           MR. BENTLEY:  Good morning, Your Honor.  This is

6   James Bentley of Schulte Roth & Zabel.  Also on the line is my

7   co-counsel, Joseph Bain of Jones Walker.  We represent the

8   Issuers.

9           THE COURT:  Okay.  Good morning.

10          MS. MASCHERIN:  Good morning, Your Honor.  This is --

11          MR. MAXCY:  Good morning.  Patrick --

12          MS. MASCHERIN:  Good morning, Your Honor.  This is

13  Terri Mascherin of Jenner & Block.  Also on the line with me

14  is my partner, Mark Hankin.  We represent the Redeemer

15  Committee of the Highland Crusader Fund, which is one of the

16  members of the Unsecured Creditors' Committee.

17          THE COURT:  Okay.  Good morning.

18          MR. MAXCY:  Good morning, Your Honor.  This is

19  Patrick Maxcy from Dentons US, LLP on behalf of Jefferies,

20  LLC.

21          THE COURT:  Okay.  Thank you.  All right.  Well, I

22  guess that is it for the phone appearances.

23      Mr. Pomerantz, we're -- we have just one matter on the

24  calendar, the motion to compromise with the Committee.  I saw

25  two limited objections, and then a U.S. Trustee's broader

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 7 of
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 29 of 243 PageID 15909

6

1    objection.  I'll start with, Do you have any of these

2    objections worked out?

3              MR. POMERANTZ:  Yes, we do.

4              THE COURT:  Okay.

5              MR. POMERANTZ:  We believe we have the Jefferies

6    objection worked out, as well as the objection of the Issuers.

7    And I'll, during the course of my presentation, alert Your

8    Honor to how that's worked out.

9              THE COURT:  Okay.

10             MR. POMERANTZ:  And then we'll have a revised order

11   that basically addresses each of their concerns, or at least

12   Jefferies' concerns, but the statements on the record for the

13   Issuers' concerns.

14             THE COURT:  Okay.  Very good.

15             MR. POMERANTZ:  Good morning again, Your Honor.  Jeff

16   Pomerantz; Pachulski, Stang, Ziehl & Jones.  I'm joined in the

17   courtroom by Ira Kharasch, Greg Demo, and John Morris from my

18   office.  I would also like to introduce the Court to the

19   proposed new members of the board of directors of Strand

20   Advisors, which is the Debtor's general partner.  They're all

21   sitting in the first row behind counsel's well.  And that's

22   Mr. James Seery, --

23             THE COURT:  Good morning.

24             MR. POMERANTZ:  -- Mr. John Dubel, --

25             THE COURT:  Good morning.

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 8 of
Case 3:21-cv-00538-N   Document 26-49   Filed 06/09/21   Page 30 of 243   PageID 15910

7

| | |
|---|---|
| 1 | MR. POMERANTZ:  -- and the Honorable Russell Nelms. |
| 2 | THE COURT:  Yes.  I've met him before. |
| 3 | MR. POMERANTZ:  As have we.  We thought you would |
| 4 | remember him. |
| 5 | The resumes of Mr. Seery and Mr. Dubel were attached to |
| 6 | the motion filed on December 27th, and those two resumes and |
| 7 | the resume of the Honorable Judge Nelms were attached to the |
| 8 | reply that was filed last evening.  And while Mr. Seery and |
| 9 | Mr. Dubel may be new names to Your Honor, we know that you are |
| 10 | familiar with Judge Nelms, who sat with you in this district. |
| 11 | THE COURT:  Uh-huh. |
| 12 | MR. POMERANTZ:  Also in the courtroom, Your Honor, is |
| 13 | Brad Sharp, the Debtor's chief restructuring officer from DSI, |
| 14 | -- |
| 15 | THE COURT:  Good morning. |
| 16 | MR. POMERANTZ:  -- and his colleague, Fred Caruso, |
| 17 | who spends most of his working hours at the Debtor's Dallas |
| 18 | headquarters. |
| 19 | THE COURT:  Good morning. |
| 20 | MR. POMERANTZ:  We have the declaration of Mr. Sharp |
| 21 | that we would move into evidence at this point in time. |
| 22 | THE COURT:  All right.  I've got a stack of paper. |
| 23 | If you have an extra copy for me to use, -- |
| 24 | MS. HAYWARD:  Your Honor, may I approach with the -- |
| 25 | THE COURT:  You may. |

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 9 of
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 31 of 243 PageID 15911

8

1          MS. HAYWARD:  Your Honor, it was filed, the

2    declaration was filed.  I'm not sure that we have a copy of --

3          MR. POMERANTZ:  Your Honor, we will also at the

4    appropriate time during my presentation, I'll bring up to Your

5    -- ask to bring up to Your Honor revisions to the term sheet

6    that was attached to the motion.

7          THE COURT:  Okay.

8          MR. POMERANTZ:  Copies have been given to Ms. Lambert

9    as well as the Committee.

10         THE COURT:  Okay. Very good.  All right.  Well, what

11   was handed to me was the preliminary term sheet as well as the

12   CVs for the proposed new board members.  I don't see the

13   declaration --

14         MR. POMERANTZ:  Your Honor, if I may approach, I have

15   a copy.

16         THE COURT:  You may.  All right.  Very good.

17         MR. POMERANTZ:  So we would move that declaration

18   into evidence.

19         THE COURT:  All right.  The Court will admit this.

20   It was filed on the docket at 327, but I will additionally

21   admit it as Exhibit 1 today.

22      (Debtor's Exhibit 1 is received into evidence.)

23         THE COURT:  At some point in time, I want to give

24   parties the opportunity to cross-examine Mr. Sharp.  Do you

25   want to do that now, or shall we hear an opening statement?

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 10
Case 3:21-cv-00538-N   Document 26-49   Filed 06/09/21   Page 32 of 243   PageID 15912

9

1          MR. POMERANTZ:  However Your Honor prefers.  I mean,

2     maybe it's helpful to hear argument first, and then, before

3     the Trustee --

4          THE COURT:  I think I'd like to hear opening

5     statements and then we'll --

6          MR. POMERANTZ:  Thank you.

7          THE COURT:  -- make the opportunity available.  Okay.

8              OPENING STATEMENT ON BEHALF OF THE DEBTOR

9          MR. POMERANTZ:  Your Honor, by way of background, we

10    appeared before Your Honor on December 6th and December 19th.

11    And during each of those hearings, we described for the Court

12    negotiations that were underway between the Committee and the

13    Debtor which, if successful, would have -- would eliminate the

14    need for contested and uncertain and costly litigation

15    regarding the appointment of a Chapter 11 trustee and really

16    put this case in a position where the Debtor and the Committee

17    would be able to work together constructively towards

18    negotiation of a plan.

19        As a result of our hearing on December 19th, Your Honor

20    entered a scheduling order that set deadlines for either the

21    filing of a motion to approve a settlement, or alternatively,

22    the filing of one or more motions for the appointment of a

23    trustee.

24        As set forth and required by the scheduling order, we

25    filed our motion on December 27th, and in that motion we

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 11
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 33 of 243 PageID 15913

10

1    sought approval of a term sheet and ancillary documents

2    between the Debtor and the Committee, which I'll describe

3    shortly.

4        While a couple of items had not yet been agreed to at the

5    time the motion was filed, I'm pleased to report that over the

6    last couple of days we've been able to reach closure with the

7    Committee with respect to those items, and there would also be

8    some modifications to the term sheet, which I'll go through in

9    a few moments.

10       The motion, Your Honor, seeks approval of the term sheet,

11   which accomplishes a variety of things that, again, will allow

12   the Debtor and the Committee to put the acrimony that has

13   existed in this case for the first three months behind us and

14   allow us to focus on productive matters.  In the last 24

15   hours, as I mentioned, there have been a few changes to the

16   term sheet that I will describe.  And I would like to hand up

17   Your Honor a redline and a clean copy of the revised term

18   sheet and exhibits.  May I approach?

19            THE COURT:  All right.  You may.  Do you have an

20   extra for the law clerk?  Okay.  Thank you.

21       (Pause.)

22            MR. POMERANTZ:  Your Honor, the term sheet does a

23   number of things.  Would you like me to give Your Honor some

24   time to look through the redlines?

25            THE COURT:  No.  You may proceed.

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 12
Case 3:21-cv-00538-N   Document 26-49   Filed 06/09/21   Page 34 of 243   PageID 15914

11

1          MR. POMERANTZ:  Okay.  The term sheet does a number

2     of things.  The first thing the term sheet does is appointment

3     of an independent board at Strand Advisors.  Strand Advisors

4     is the GP of the Debtor.  The Debtor is an LP.  The Debtor

5     previously had filed a motion to approve the retention of Brad

6     Sharp as the chief restructuring officer, and that initial

7     agreement and motion contain details regarding the scope of

8     Mr. Sharp's authority and the scope of what the Debtor could

9     do without Mr. Sharp's prior consent.

10         The Committee raised concerns that the structure was not

11    sufficient to ensure that decisions were being made for the

12    Debtor only in their best interests and without any

13    inappropriate influence from Mr. Dondero.

14         To address the Committee's concerns, a focal point of the

15    settlement was the Debtor's agreement to appoint an

16    independent board of directors at Strand who would be

17    responsible for managing the operations of the Debtor.

18         Over the last few weeks, a principal aspect of the

19    negotiations between the Committee and the Debtor have been

20    discussing who should the independent directors be.

21    Conceptually, the Debtor and the Committee both agreed that

22    the board should include, first, a person with significant

23    industry experience in which the Debtor operates -- hedge

24    funds, money management; second, a person with deep

25    restructuring experience from the financial advisor side; and

1    third, a person with some sort of judicial or governmental

2    experience.

3        The Debtor originally provided the Committee with three

4    proposed candidates.  The Committee considered the Debtor's

5    request, but instead presented the Debtor with four different

6    candidates and asked the Debtor to choose from those four.

7    The Debtors interviewed each of those people and ultimately

8    agreed on Messrs. Dubel and Seery, who were each on the

9    original list.

10       As of the deadline to file the motion on December 27th,

11   the Committee and the Debtor had still not agreed on the

12   identity of the third board member, but the parties were

13   hopeful that an agreement could ultimately be reached and we

14   decided to go ahead and file the motion.  As I'm sure Your

15   Honor saw in the motion, it was contingent upon everyone

16   agreeing on the third board member.

17       Ultimately, the Debtor and the Committee both agreed that

18   Mr. Dubel and Mr. Seery could identify the third board member

19   out of a pool of four people:  Two of the people originally

20   requested by the Committee and two people identified by the

21   Debtor.  This week and over the weekend, Mr. Seery and Mr.

22   Dubel interviewed each of the four candidates, and ultimately

23   decided on the appointment of Judge Nelms as the third

24   independent board member.

25       The board, as it will be constituted going forward, in the

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 14
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 36 of 243 PageID 15916

13

1   Debtor's opinion, consists of three exceptional individuals

2   who are independent of the Debtor, have a sterling reputation

3   in the community, and bring to the Debtor a variety of the

4   skills that we believe, and believe the Committee agrees,

5   gives the Debtor the best opportunity to achieve a consensual

6   restructuring and otherwise manage the affairs of the Debtor

7   in the best interests of the stakeholders.

8        It is contemplated that the Debtor will continue to retain

9   the services of DSI as the chief restructuring officer, and

10  ultimately the board will determine if it's important to

11  retain a CEO going forward.

12       The second thing that the term sheet does, Your Honor, was

13  the removal of Mr. Dondero as an officer and director of

14  Strand and eliminate all of his control over decision-making

15  of the Debtor.  The Debtor recognized early on in this case

16  that Mr. Dondero's continuing role with the Debtor in a

17  position of authority made the Committee extremely uneasy.

18  Accordingly, the term sheet provides for him removing himself

19  as an officer and director of Strand and that he would no

20  longer be in a position of control at the Debtor.

21       However, since the filing of the motion, over the last

22  several days, concerns have been raised about whether removing

23  Mr. Dondero from the business entirely would have unintended

24  consequences.  I believe I may have mentioned at prior

25  hearings that, because of his involvement as a portfolio

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 15
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 37 of 243 PageID 15917

14

1    manager under various contracts with third parties, that there

2    could be adverse economic consequences to the Debtor if he

3    didn't stay in some role.

4         As a result of discussions over the last 24 hours, the

5    Committee has agreed and the Debtor agreed to modify the term

6    sheet to allow the new board to decide whether to retain Mr.

7    Dondero in his capacity as a portfolio manager, provided,

8    however, that he will not receive any compensation and he will

9    agree to resign if requested by the board.

10        In any event, he will have no decision-making control at

11   all and he will report to the independent board.

12        The corporate governance documents that create the new

13   independent board of Strand also provide that Mr. Dondero, as

14   the owner of the equity in Strand, may not replace the board

15   without the Committee consent or court order.

16        The third major aspect of the term sheet, Your Honor, was

17   the agreement on operating protocols, and it really relates to

18   the ground rules for the Debtor's operations going forward and

19   when notice to the Committee is required of certain

20   transactions that would otherwise be in the ordinary course of

21   business.

22        Importantly, Your Honor, we are not trying to modify the

23   Bankruptcy Code in any way.  Any transactions out of the

24   ordinary course of business would still be subject to Your

25   Honor's approval.

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 16
Case 3:21-cv-00538-N   Document 26-49   Filed 06/09/21   Page 38 of 243   PageID 15918

15

1          However, in this case, as we indicated in the initial

2     motion we filed when the case was in Delaware, whether or not

3     something is ordinary is not straightforward in a case such as

4     the Debtor's, given the nature of the Debtor's operations.  So

5     we thought it was important to establish ground rules up

6     front, and establishing those ground rules was one of the

7     things we did initially in the case.  We had opposition from

8     the Committee, and we've worked through the opposition and

9     ultimately arrived at the operating protocols that are

10    attached to the term sheet.

11          They have been slightly modified in nonmaterial ways in

12    the documents I handed up to Your Honor.

13          They were subject to substantial negotiations between the

14    Debtor and the Committee, and we also expect them to be the

15    subject of future discussions with the Committee and the

16    independent board after the independent board takes -- takes

17    place.  Takes over.

18          Two parties in interest, Your Honor, Jefferies and a group

19    of Issuers, the CLOs, have filed comments to the term sheet,

20    which I'll describe in a few moments.

21              THE COURT:  Okay.

22              MR. POMERANTZ:  The next aspect, Your Honor, of the

23    term sheet was the provision of standing to the Creditors'

24    Committee to pursue certain insider claims.

25          During the negotiations, the Committee requested immediate

012981

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 17
Case 3:21-cv-00538-N   Document 26-49   Filed 06/09/21   Page 39 of 243   PageID 15919

16

1   standing to investigate and potentially prosecute claims

2   against insiders to the extent those insiders were not

3   employed by the Debtor.  Granting standing at this stage of

4   the case was a difficult give by the Debtor.  However, the

5   Committee impressed upon the Debtor the importance of them

6   being able to control the filing of any actions against the

7   insiders, and the Debtor decided to accede to the Committee's

8   request.

9       It still remains the Debtor's hope that, with the creation

10  of the independent board, that the Debtor, the Committee, and

11  any insiders who might be subject to any such claims will be

12  able to come together and negotiate a consensual resolution of

13  this case.  While all parties, I'm sure, can and know how to

14  litigate, hopefully they will agree that a negotiated outcome

15  is better than a litigated outcome.

16      The next aspect of the term sheet, Your Honor, was the

17  document preservation protocols, and it provides for certain

18  procedures to be put in place to address the Committee's

19  concerns about document preservation.  They are contained in

20  an exhibit to the term sheet.  Again, slight nonmaterial

21  modifications were made in what I handed up to Your Honor.

22  And essentially they provide also for the Committee's access

23  to privileged documents to aid in their investigation and

24  prosecution of claims to which they are granted standing, and

25  also sets forth a procedure to be followed to address concerns

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 18
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 40 of 243 PageID 15920

17

```
1   if the information is subject to shared privileges by several

2   entities.

3       As I mentioned, Your Honor, three parties have filed

4   responses to the motion.  The first is Jefferies.  Jefferies

5   is a secured creditor of the Debtor with respect to its margin

6   account held at Jefferies, and also has a similar account held

7   by a non-debtor affiliate.  They have asked for clarification

8   that, one, nothing in the protocols or the motion affects its

9   rights under the underlying agreements or the safe harbor

10  provisions of the Bankruptcy Code entitling them to enforce

11  their remedies; and two, that the Debtors will not trade in

12  the prime account without Jefferies' consent, and if that

13  consent is sought and not obtained, only subject to court

14  order.

15      The Debtor has agreed to include language in the order to

16  address Jefferies' concern, and at the conclusion of my

17  presentation I'll submit to Your Honor an order and a redline

18  containing that language.

19          THE COURT:  Okay.

20          MR. POMERANTZ:  The second objection -- or not

21  objection, Your Honor -- the second statement was filed by a

22  group of Issuers of CLO obligations.

23          THE COURT:  Uh-huh.

24          MR. POMERANTZ:  And they were concerned that certain

25  aspects of the operating protocols which require notice to the
```

012983

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 19
Case 3:21-cv-00538-N   Document 26-49   Filed 06/09/21   Page 41 of 243   PageID 15921

18

1    Committee prior to the Debtor being able to take certain

2    actions could conflict with the provisions of the underlying

3    agreements which might require the Debtor to take action on a

4    more expedited basis.

5         Neither the Issuers or the Debtor are aware of any

6    potential transactions that will arise prior to the next

7    hearing before Your Honor on January 21st.  We understand --

8    we were not party to these discussions between the Committee

9    and the Issuers yesterday, but we understand the way it's been

10   resolved is that the Issuers will withdraw their objection as

11   it relates to going forward today, subject to being able to

12   come back to the Court on the 21st and revisit the issue if

13   additional changes are not made acceptable to them to resolve

14   their issues and concerns.

15            THE COURT:  Okay.

16            MR. POMERANTZ:  But I think all parties acknowledge

17   that over the next 12 days this is a theoretical issue rather

18   than a practical issue.

19            THE COURT:  Okay.

20            MR. POMERANTZ:  This brings us, Your Honor, to the

21   United States Trustee's opposition, which is really the only

22   true objection to the motion that has been filed.  No creditor

23   has filed an objection, no investor has filed an objection,

24   and no governmental agency -- which the U.S. Trustee in its

25   objection purports to be pursuing their interests -- has filed

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 20
Case 3:21-cv-00538-N   Document 26-49   Filed 06/09/21   Page 42 of 243   PageID 15922

19

1   an objection, either.

2       As Your Honor probably recalls, at the December 19th

3   hearing the Trustee indicated its intent to oppose any

4   agreement between the Debtor and the Committee that would

5   involve corporate governance and to file its own motion for

6   the appointment of the trustee.  That motion is currently

7   scheduled for hearing on January 21st.  We had asked the U.S.

8   Trustee to reserve judgment on the Committee's and Debtor's

9   agreement until after we had come to an agreement and after we

10  had presented it to the Trustee, in hopes that it would

11  address their concerns.  However, as the Court told us -- as

12  the U.S. Trustee told us and Your Honor at the December 19th

13  hearing, there was nothing short of appointment of a trustee

14  that would satisfy the Trustee.

15      The comments really didn't make sense to us, and I believe

16  it perplexed Your Honor, but here we are.

17      At its core, Your Honor, the U.S. Trustee's objection is

18  really a request that the Court substitute its business

19  judgment for that of the Debtor and the Committee, the

20  Committee who represents the substantial majority of all

21  claims in this case, when both of them have decided that

22  agreeing to certain changes in corporate governance, among

23  other things, is preferable to the uncertain, costly, and

24  time-consuming litigation over a trustee, and also the

25  uncertainty, even if a trustee was appointed, on how the case

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 21
Case 3:21-cv-00538-N   Document 26-49   Filed 06/09/21   Page 43 of 243   PageID 15923

20

1   would be administered.

2       To the contrary, under the corporate governance proposal,

3   we have three highly-qualified individuals who are poised to

4   take over management of the Debtor, and each bring with them

5   various skills that one trustee would not have.

6       The Trustee has filed its motion for appointment of a

7   trustee, and I'm sure on the 21st will argue that the Code

8   requires it.  However, that's not the issue before Your Honor

9   today.  It's not whether a trustee is appropriate.  It's

10  whether the motion and the term sheet is a sound exercise of

11  the Debtor's business judgment under Section 363, and,

12  importantly, a reasonable compromise of the pending disputes

13  between the Debtor and the Committee.

14      The Trustee's objection raises three general points, none

15  of which have any merit.  First, the Trustee argues that there

16  is a lack of disclosure of significant matters.  The first

17  aspect that the Trustee raises to, or points to, is the

18  absence of identification of the third board member and the

19  absence of disclosure of the compensation that the board

20  members will receive, which will be backstopped by the Debtor.

21      As I described before, Your Honor, the identity of the

22  third member of the board was a fluid process which was only

23  resolved earlier this week, and the Debtor did not believe

24  that it was appropriate to reach agreement on director

25  compensation until all board members could provide input.

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 22
Case 3:21-cv-00538-N   Document 26-49   Filed 06/09/21   Page 44 of 243   PageID 15924

21

1    Last night, we filed a reply to the Trustee's objection in

2    which we disclosed the identity of the third board member, and

3    we'll also disclose the proposed compensation to be provided

4    to them, which essentially is as follows.  Each member of the

5    board will receive $60,000 a month for the first three months

6    of the case, $50,000 a month for the next three months of the

7    case, and the presumption thereafter would be $30,000 a month.

8    However, people recognize that this case will look a lot

9    differently six months from now, and while the presumption is

10   $30,000, the Debtor, the independent board members, and the

11   Committee will sit down, see how the case looks, and decide

12   whether any modifications are appropriate.

13        The amount of compensation, which at first blush may seem

14   significant, really reflects the significant amount of work

15   that the Debtor, the Committee, and the independent directors

16   anticipate will be required from them not only to get up to

17   speed about the case, but to effectively manage this complex

18   Debtor's business operations.  The directors have heard from

19   the Debtor and the Committee of all the issues, of all the

20   concerns, and this is not an enviable task that they are

21   undertaking.  The compensation they are being provided thus

22   far we believe is appropriate under the circumstances and

23   commensurate with the work that they are going to be expected

24   to complete.

25        If they are successful and they are able to achieve a

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 23
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 45 of 243 PageID 15925

22

1    consensual restructuring here, the million and a half or so

2    that will be spent on them will be best million and a half

3    dollars I think spent in this case.

4        Your Honor, we also have updated corporate governance

5    documents which --

6        (Pause.)

7            MR. POMERANTZ:  Your Honor, may I approach with the

8    updated corporate governance documents?

9            THE COURT:  You may.  Okay.

10           MR. POMERANTZ:  As I will discuss in a moment, Your

11   Honor, there is really no need for the Court to approve the

12   corporate governance documents, as they have been executed by

13   Strand, which is not a debtor before this Court.  However,

14   there are a couple of matters in those documents that I want

15   to bring to the Court's attention that do impact on the

16   Debtor.

17           THE COURT:  Okay.

18           MR. POMERANTZ:  First, as is typical for board

19   members, Strand has agreed to indemnify the independent

20   directors to the full extent permitted by law.  The

21   independent directors have requested that the Debtors backstop

22   Strand's agreement, and the Debtor and the Committee agree,

23   and the documents so provide.

24       Strand has also committed to obtain directors and officers

25   coverage for the independent directors.  It has been located,

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 24
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 46 of 243 PageID 15926

23

1    it's in the process of being finalized and bound, and the

2    Debtor will pay the cost of that coverage.

3        The independent directors have also asked for language in

4    the order approving the settlement that requires a party

5    seeking to assert a claim against the independent directors

6    relating to their role as an independent director to

7    demonstrate to this Court that a claim is colorable before

8    filing the claim and providing the Court with jurisdiction

9    over any such claim.  This is language that's similar in other

10   similar types of cases.

11           THE COURT:  Uh-huh.

12           MR. POMERANTZ:  That will be reflected in the order.

13       Next, the Trustee objects to the failure of the Debtor to

14   identify who the potential chief executive officer of the

15   Debtor will be.  And essentially, she's arguing that you have

16   to identify that CEO now; it has to be subject to court

17   approval.  However, there's no requirement that any company

18   retain a CEO.  It's not a corporate law requirement.  And the

19   fact that the board reserves the right to retain a CEO in the

20   future is consistent with corporate law and is not a basis to

21   deny the motion.  And in any event, normally, the retention of

22   a CEO is not a subject that is brought to the Court's

23   attention for Court approval.

24       So the lack of any clarity over the identity of the CEO is

25   a reflection of the fact that this independent board does not

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 25
Case 3:21-cv-00538-N   Document 26-49   Filed 06/09/21    Page 47 of 243   PageID 15927

24

1    know if a CEO is required.  They will come in, they are going

2    to interview all the employees, they're going to sit down with

3    the CRO, they're going to sit down with counsel, they're going

4    to sit down with the Committee, and ultimately they will

5    decide if a CEO is to be retained.  And if a CEO is to be

6    retained, they will go through the process of identifying who

7    that CEO is.  But again, it's not a reason to deny the motion.

8         The Trustee has also argued that because the Committee is

9    not granted standing to pursue claims against current

10   employees, as opposed to former employees, that there might be

11   some statute of limitations concerns with respect to claims

12   against those employees.  The argument doesn't really make

13   sense to us.  In the standard case, the Debtor retains causes

14   of action.  And the Committee can investigate causes of

15   action.  And at some point during the case, a Committee could

16   come in and could demand that the Debtor prosecute them, and

17   if the Debtor unreasonably refuses, could seek standing before

18   the Court.

19        In this case, the Debtors agreed up front that the

20   Committee has the standing to prosecute certain claims against

21   insiders that are not employees of the Debtor, which obviates

22   the need for standing.  So we've gone one step more.  But the

23   Trustee is arguing that that leaves a void for the claims that

24   are not subject to the agreement on standing.

25        However, the term sheet provides that the board is going

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 26
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 48 of 243 PageID 15928

25

1    to make determinations on what employees should remain, what

2    employees should not remain. To the extent the board

3    terminates any employees and there are claims against them,

4    then basically the Committee will have the ability to bring

5    those claims.

6      To the extent that those people aren't terminated, we have

7    no doubt that the Committee, in the course of its

8    investigation, will determine whether claims should be brought

9    against those people, and at some point in time may ask the

10    Debtor to prosecute those claims or ultimately seek standing.

11      In any event, these things are not being swept under the

12    rug. There's no real legitimate concern that there's any

13    statute of limitations issue that will prevent those claims

14    from being prosecuted.

15      I am very much aware and have no doubt that the Committee

16    is going to be laser-focused on claims, and any concern that

17    statute of limitations is going to lapse I think is not well-

18    taken.

19      The Trustee next argues that the Court does not have the

20    jurisdiction to implement the corporate governance matters,

21    and for that reason the motion should be denied. They -- she

22    argues that because Strand is not a debtor, that the Court has

23    no authority to appoint --

24        MS. LAMBERT: Your Honor, I object. The United

25    States Trustee is a he. I am not the United States Trustee,

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 27
Case 3:21-cv-00538-N   Document 26-49   Filed 06/09/21   Page 49 of 243   PageID 15929

26

1   and the attacks *ad hominem* are inappropriate.

2            THE COURT:  All right.  Well, clarification, the U.S.

3   Trustee is the guy in Washington.  But anyway, you may

4   proceed.

5            MR. POMERANTZ:  I apologize to Ms. Lambert.

6            MS. LAMBERT:  Actually, he's downstairs right now.

7   Bill Neary.

8            MR. POMERANTZ:  I apologize to --

9            THE COURT:  Oh, well, I thought you meant the big guy

10  in Washington.  But anyway, you may proceed.

11           MR. POMERANTZ:  I apologize to Ms. Lambert and no

12  offense was meant.

13           THE COURT:  Okay.

14           MR. POMERANTZ:  So, the U.S. Trustee argues that

15  because Strand is not a debtor that the Court has no authority

16  to appointment the independent directors and limit Mr.

17  Dondero's right to remove the independent directors.  The

18  Debtor is not really seeking authority to appoint -- to have

19  court authority for the appointment of the directors at

20  Strand.  Again, as I mentioned before, that authority exists

21  outside of bankruptcy.  Strand is not a debtor.  Strand could

22  appoint anyone it wants to carry out its responsibility as the

23  general partner of the Debtor, and it's exercising its

24  corporate authority to do so by installing a board at Strand.

25     Nor is the Debtor seeking court authority for Strand to

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 28
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 50 of 243 PageID 15930

27

1    enter into the corporate governance documents.  Other than the

2    couple of items I mentioned before, Your Honor, Strand can

3    enter into these documents without authority from this Court.

4    The only court authority that was required:  Debtor to

5    backstop the indemnification obligations, Debtor to pay

6    compensation to the board members, and Debtor to pay for the

7    D&O policy.

8         With respect to the Court's right to limit Mr. Dondero's

9    ability to terminate the independent directors, the term sheet

10   contemplates the Court approving a stipulation which limits

11   Mr. Dondero's ability to terminate the independent directors,

12   and if he does in fact seek to terminate the appointment of

13   the independent directors, he would be in violation of court

14   order.  But even more importantly, Your Honor, if he decided

15   to terminate the independent directors without the Committee's

16   consent and without the Debtor's consent, I wouldn't imagine

17   it would take anyone very long to come back before Your Honor

18   and ask Your Honor to very quickly appoint a trustee.

19        Accordingly, Your Honor, I think the argument of lack of

20   jurisdiction over Strand is a red herring and should be

21   denied.

22        Lastly, Your Honor, the Trustee makes a curious argument

23   that a trustee is needed to protect all investors and

24   governmental authorities.  The Trustee argues that this case

25   demands transparency which can only be accomplished by a

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 29
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 51 of 243 PageID 15931

28

1  Chapter 11 trustee.

2       One thing I think the Debtor and the Committee and the

3  U.S. Trustee will agree on, this case does demand

4  transparency.  And we believe we've installed a corporate

5  governance structure, an operating protocol structure, a

6  document preservation structure, that does just that, provides

7  transparency that this Debtor has not been subject to and

8  which is quite different from the case that was before Your

9  Honor before.

10      So we believe that what the Debtor and the Committee have

11  done is not only in the interests of the Debtor, the

12  creditors, but investors and all governmental entities.

13      And no investor or governmental entity has had any

14  concerns or any problems with what is being done.  They

15  haven't filed any objection.  The U.S. Trustee apparently is

16  proceeding by proxy asserting those interests.

17      Second, nothing in the term sheet or any of the documents

18  limits the rights of investors or of governmental entities to

19  seek a trustee, to seek documents, or to do anything they

20  would -- that they would be entitled to do under the

21  Bankruptcy Code.

22      In any event, Your Honor, the fact that the Trustee

23  believes that a trustee is more appropriate, again, is an

24  argument that they can make at the January 21st hearing.  It's

25  not a basis for denial of this motion.

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 30
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 52 of 243 PageID 15932

29

1   In conclusion, Your Honor, the only economic stakeholders

2   in this case believe that proceeding with the transactions

3   contemplated by the term sheet is in the best interest of the

4   estate, will maximize their ability to achieve a consensual

5   restructuring, and move this case through the system as

6   quickly and efficiently as possible.  The term sheet is a

7   valid exercise of the Debtor's business judgment under 363 and

8   an appropriate compromise of controversy, and the Trustee's

9   objections are really nothing more than a rehash of its

10  request for an appointment of a trustee.

11      For all these reasons, Your Honor, we request that the

12  Court overrule the U.S. Trustee's objection and approve the

13  motion.

14          THE COURT:  All right.  Well, before I hear from our

15  objectors, is there any friendly commentary?  Mr. Clemente, I

16  figured you might want to address this.

17          MR. CLEMENTE:  I do, Your Honor.  And good morning.

18          THE COURT:  Good morning.

19     OPENING STATEMENT ON BEHALF OF THE OFFICIAL COMMITTEE OF

20                       UNSECURED CREDITORS

21          MR. CLEMENTE:  For the record, Matthew Clemente from

22  Sidley Austin on behalf of the Official committee of Unsecured

23  Creditors.  I do have some comments that I would like to make,

24  Your Honor, some, so please bear with me.  I will try and be

25  brief.

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 31
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 53 of 243 PageID 15933

30

1          THE COURT:  Okay.

2          MR. CLEMENTE:  I think as late as 1:00 o'clock in the

3   morning I wasn't sure that I would be in front of you with

4   this settlement fully in place in a manner that was

5   satisfactory to my Committee.  As I mentioned to you in my

6   prior appearances in front of you, every provision was

7   important to the Committee, and they all work together.  As

8   Your Honor can imagine, there was a lot of negotiation that

9   took place, including late in the day and early morning, to

10  come to that conclusion.

11        Some comments on our perspective as a committee, Your

12  Honor.  As an initial matter, we were absolutely not okay with

13  the governance structure that was in place when the petition

14  was filed.  As we detailed in our objections to the CRO motion

15  and the protocol motion back when the case was in Delaware,

16  the Committee has very real and identifiable concerns about

17  the Debtor's ability to dispatch its fiduciary duty.  And the

18  Committee very seriously contemplated moving for a Chapter 11

19  trustee daily.  That conversation is something that the

20  Committee continues to -- continued to engage in, Your Honor.

21  So it's something that they considered very, very carefully.

22        That was the lens through which the Committee was

23  approaching negotiations over the settlement agreement and the

24  independent director structure.  That's how they viewed it.

25  That's the backdrop against which they came to it.

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 32
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 54 of 243 PageID 15934

31

1    The Committee had two primary goals that it had sought to

2  achieve with the settlement agreement.  The first was to

3  ensure that Mr. Dondero does not remain in a position of

4  management authority or control in any fashion with the

5  Debtor.  Goal number two was to ensure that the value of the

6  Debtor's estate is preserved and maximized.  Those two goals

7  needed to work together.

8    The Committee  believes that the carefully-crafted

9  settlement agreement achieves these objectives in a manner

10  that is more beneficial to the estate than a potential Chapter

11  11 trustee and a related fight over its appointment at this

12  time.

13    The lynchpin of the settlement, Your Honor, is the

14  appointment of the three independent directors.  And as Mr.

15  Pomerantz outlined for you, that was the subject of intense

16  discussion, negotiation, debate among the Committee and with

17  the Debtor.  But we believe that Mr. Seery, Mr. Dubel, and

18  Judge Nelms are fully independent, highly qualified, and bring

19  relevant and complementary skillsets to this board.  Mr.

20  Pomerantz referred to that, but we believe that the three

21  directors all bring unique talents and attributes that will

22  allow them to function effectively as a board and provide the

23  appropriate oversight and direction that we believe is

24  necessary here.

25    However, regardless of how independent or highly skilled

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 33
Case 3:21-cv-00538-N   Document 26-49   Filed 06/09/21   Page 55 of 243   PageID 15935

32

1    they may be, they would be of no use if they weren't bestowed

2    with the appropriate power.  So that was another point that

3    was very important to the Committee, and we believe that the

4    settlement does this.  The settlement makes clear that the

5    independent directors are granted exclusive control over the

6    Debtor, including over all employees.  That's absolutely

7    critical to the Committee.

8         The settlement also provides that the CRO and the Debtor's

9    professionals shall report and serve at the direction of the

10   independent directors.  That is also very important.

11        And let me be clear, Your Honor, because I think you may

12   have raised this at a prior hearing:  This is not a board that

13   we expect to work at 50,000 feet, as demonstrated by the

14   compensation structure that Mr. Pomerantz outlined for you.

15   This will be a board that's hands-on, members of which will be

16   on the ground, at the Debtor, with a strong presence and a

17   clear message of who is in charge.  That is critical for this

18   Committee.

19        Additionally, as Mr. Pomerantz mentioned, the new board,

20   in consultation with the Committee, is empowered to determine

21   whether a CEO should be retained.  It's possible that one of

22   the independent directors could be that CEO, Your Honor.  But

23   we wanted to make clear that that was an important part of the

24   structure, should the board determine that that was the way it

25   wanted to go.

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 34
Case 3:21-cv-00538-N   Document 26-49   Filed 06/09/21   Page 56 of 243   PageID 15936

33

1       So, in sum, Your Honor, we believe that the independent

2    board has the clear authority and the skillset that's

3    necessary to take control and will be actively and

4    aggressively doing so.

5       But let me be clear, rest assured, Your Honor, this is not

6    going to be a board that answers to the Committee in that

7    sense.  I think that we will all be moving together

8    directionally, but it's very possible that I will be in front

9    of Your Honor arguing against a decision that this independent

10    board made.  So I want to assure Your Honor that although the

11    Committee was very active and in fact picked Mr. Seery and Mr.

12    Dubel, and then Mr. Pomerantz detailed how the third director

13    was picked, we understand who their duty -- what their duty is

14    and we also understand that they're not a rubberstamp for the

15    Committee, Your Honor.  And so I wanted to make that point to

16    you to assure Your Honor that that's not the structure that's

17    being set up here, nor are they the type of individuals that

18    would allow that to happen.

19       Additionally, Your Honor, the settlement grants the

20    Committee standing to pursue estate causes of action against

21    the related parties.  That was very important to us, Your

22    Honor.

23       And in addition to that, the settlement provides the

24    Committee access to privileged documents and sets forth a

25    discovery protocol that will assist the Committee in its

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 35
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 57 of 243 PageID 15937

34

1    investigation.

2        The Committee strongly believes that Mr. Dondero's

3    repeated past behavior, that there are many questionable

4    transactions that will need to be thoroughly investigated and

5    pursued.  And so having those causes of action with the

6    economic party in interest related to those causes of action,

7    the Committee and its constituencies, we thought was very

8    important and very critical.

9        Granting standing, Your Honor, as I mentioned, avoids any

10   issues regarding who will be controlling those claims.

11       I'll touch on this in a moment, but Mr. Pomerantz talked

12   about Mr. Dondero remaining in name as an employee.  Let me

13   assure Your Honor that that is not a backdoor around the

14   Committee's ability to investigate and immediately pursue

15   claims against him should that be the course that we choose to

16   take.  So he's not part of that carve-out for current

17   employees.  That's not at all happening.  That would never be

18   something that my Committee would be comfortable with.  So I

19   wanted to make clear to Your Honor that that's not something

20   that's happening with sort of this late edition of Mr.

21   Dondero's continuing on in name as an employee.

22       Your Honor, the settlement also lays out a very detailed

23   set of operating protocols which we do believe are appropriate

24   and provides the Committee with transparency, which I've been

25   expressing to Your Honor we've needed since this case has

1    started.

2          Finally, as we point out in our reply and as would always

3    be the case, should new facts develop or the situation demand

4    it, the Committee reserves the right to seek a Chapter 11

5    trustee, as does any other party in interest, to the extent it

6    may be appropriate at that time.

7          In short, Your Honor, the Committee very carefully and

8    diligently weighed the independent director option versus the

9    Chapter 11 trustee option.  The Committee had very clear goals

10   in mind, as I expressed to you, and determined that those

11   goals could be achieved in a value-maximizing manner through

12   the independent director structure.

13         The negotiations were very intense, and it was only after

14   the Committee determined that each piece of the settlement was

15   to its satisfaction did it ultimately conclude that the

16   settlement maximizes value for all stakeholders while at the

17   same time protecting those stakeholders from exposure to

18   continuing insider dealing, breaches of duty, and

19   mismanagement.

20         Therefore, the Committee believes approving the settlement

21   is in the best interest of the estate, and therefore it

22   believes it should be approved.

23         I do want to offer a word about Mr. Dondero continuing as

24   an employee.  As Your Honor was aware, the term sheet as

25   originally filed provided that Mr. Dondero would, among other

013001

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 37
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 59 of 243 PageID 15939

36

1  things, resign as an employee of the Debtor.  Mid to late

2  afternoon yesterday, Mr. Ellington called me and said that the

3  Debtor was now of the view that Mr. Dondero should remain on

4  as an employee in that capacity for the benefit of the estate.

5  The Committee was, very appropriately, very skeptical of this,

6  as well as the sort of last-minute offer, last-minute, you

7  know, addition, however you want to view it -- some might

8  argue retrade -- that Mr. Dondero was to leave the Debtor,

9  period.  That was our view.  That was the way that the term

10  sheet was initially structured.  And under no circumstances

11  was the Committee going to allow Mr. Dondero to have any

12  control over this Debtor.

13      Your Honor, the Committee doesn't know what, if any, the

14  consequences are of removing Mr. Dondero as an employee.  And

15  we're not conceding at all that there are any value lost by

16  removing Mr. Dondero as an employee.  Instead, what we're

17  doing is we're staying true to our structure with the

18  independent directors and we're empowering them to decide.

19  And so it's consistent with, you know, our goals of having the

20  independent director structure in place.  And under the

21  settlement as now constructed, even with this late addition or

22  adjustment, Mr. Dondero would remain as an employee in name

23  only, subject in all respects to the direction, oversight, and

24  removal by the independent board.  And importantly, should

25  they decide to do that, Mr. Dondero shall resign.  And he

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 38
Case 3:21-cv-00538-N   Document 26-49   Filed 06/09/21    Page 60 of 243   PageID 15940

37

1    shall receive no compensation.

2        So he will not be in control of this Debtor.  The

3    independent directors are.  And he's not going to be empowered

4    to make decisions on behalf of the Debtor.  Instead, we're

5    empowering our independent directors to make those decisions

6    and determinations on behalf of the Debtor.

7        I wanted -- I thought it was important that I provide that

8    perspective to Your Honor, as this is something that came in

9    at a very, very late hour.

10        Overall, Your Honor, for the reasons I have stated and the

11    reasons in our reply, the Committee, as a fiduciary of all

12    creditors in this case, believes that the settlement is in the

13    best interests of the creditors and should be approved.  And

14    at this time, it's the better alternative than the cost,

15    delay, and uncertainty resulting from a Chapter 11 trustee

16    fight and the potential appointment of a Chapter 11 trustee.

17        It is time to put the governance issues behind us, Your

18    Honor, and to move forward to determine how to maximize value

19    for the creditors and how to get them paid.

20        Your Honor, just regarding the specific resolutions of

21    objections that Mr. Pomerantz put on the record, I agree with

22    how Mr. Pomerantz characterized those, and the Committee is

23    supportive of those resolutions as well.

24        Those are all my remarks, Your Honor, but I am happy to

25    answer any questions or address any concerns Your Honor may

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 39
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 61 of 243 PageID 15941

38

```
 1    have.
 2              THE COURT:  Okay.  Two follow-up questions.  First, I
 3    know I asked you this at a previous hearing and you told me,
 4    but your Committee, as I recall, is very well constituted.
 5    Just remind me of the members.
 6              MR. CLEMENTE:  Yes.
 7              THE COURT:  You have a representative from the
 8    Redeemer Committee, --
 9              MR. CLEMENTE:  Yes, Your Honor.
10              THE COURT:  -- which is a $140 million or so
11    arbitration award?
12              MR. CLEMENTE:  Yes, Your Honor.
13              THE COURT:  Okay.  And who else is on the Committee?
14    Is an Acis representative?
15              MR. CLEMENTE:  Acis is on the Committee, Your Honor.
16              THE COURT:  Uh-huh.
17              MR. CLEMENTE:  Meta-e Discovery, who is a trade
18    vendor of the Debtor, is on the Committee.  And UBS
19    Securities, who is also --
20              THE COURT:  Okay.
21              MR. CLEMENTE:  -- a litigation claimant, is on the
22    Committee.
23         It was the U.S. Trustee in Delaware's parting gift to me
24    to name a four-member committee, Your Honor.
25         (Laughter.)
```

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 40
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 62 of 243 PageID 15942

39

1           THE COURT:  Okay.  Makes it awkward at times.  And

2     then back to the Dondero subject.

3           MR. CLEMENTE:  Yes, Your Honor.

4           THE COURT:  I mean, again, both Mr. Pomerantz and you

5     clarified that the proposal now is the new board will decide

6     if he stays on, Mr. Pomerantz said as a portfolio manager.

7           MR. CLEMENTE:  That is correct, Your Honor.

8           THE COURT:  Am I -- I mean, I'm hearing that

9     correctly?

10          MR. CLEMENTE:  That is correct, Your Honor.

11          THE COURT:  So, right now, whatever officer positions

12    he has, he's technically not resigning?  Or --

13          MR. CLEMENTE:  He is resigning as an officer of the

14    company, Your Honor.

15          THE COURT:  Okay.  He's resigning?  So the board will

16    just decide, is he going to be a portfolio manager or some --

17    whatever the employee title is?

18          MR. CLEMENTE:  Or they could decide that he's not

19    necessary.

20          THE COURT:  Or not necessary?  In any event, no

21    compensation?

22          MR. CLEMENTE:  That is correct, Your Honor.

23          THE COURT:  Okay.

24          MR. CLEMENTE:  And as you can see, the term sheet

25    provides that Mr. Dondero shall not cause any related entity

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 41
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 63 of 243 PageID 15943

40

1   to terminate any agreements with the Debtor as well.  That was

2   language that was added last night as well.

3           THE COURT:  All right.  So they're going to make the

4   decision, does he help preserve value by staying in some

5   capacity or not?

6           MR. CLEMENTE:  That is correct, Your Honor.

7           THE COURT:  Okay.

8           MR. CLEMENTE:  That, cutting through it, that is the

9   way that ultimately the Committee views it.

10          THE COURT:  Okay.

11          MR. CLEMENTE:  And if there's an opportunity -- and

12  I'm not conceding that there is.  I'm not conceding that he

13  preserves any value.

14          THE COURT:  Uh-huh.

15          MR. CLEMENTE:  But we wanted to give the option to

16  our independent directors to make that determination.  Because

17  if there's an opportunity to preserve value, that's what we're

18  trying to achieve.

19          THE COURT:  Okay.  And I don't even know if you've

20  thought through this.  Would there be some sort of notice

21  filed on record in the case if --

22          MR. CLEMENTE:  If --

23          THE COURT:  -- if the decision is made to --

24          MR. CLEMENTE:  To -- to --

25          THE COURT:  -- hire him or keep him as a portfolio

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 42
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 64 of 243 PageID 15944

41

1    manager?

2           MR. CLEMENTE:  So, I think the default under the term

3    sheet, as revised, is he stays in that capacity in terms of

4    name.  The independent directors will -- they're subject to

5    his control and direction, and they could decide to remove

6    him.

7           THE COURT:  Uh-huh.

8           MR. CLEMENTE:  Perhaps if Your Honor --

9           THE COURT:  Okay.

10          MR. CLEMENTE:  We could provide notice if they make

11   the determination to remove him, but I think the default is

12   that, you know, he's in that -- he's remaining as that

13   employee name currently.  So that's the current default.

14          THE COURT:  Okay.  All right.  Thank you.

15          MR. CLEMENTE:  Thank you very much, Your Honor.

16          THE COURT:  Well, Ms. Patel, you're getting up so

17   I'll hear -- I don't know who all has been in the loop over

18   this overnight development.

19      OPENING STATEMENT ON BEHALF OF ACIS CAPITAL MANAGEMENT

20          MS. PATEL:  Your Honor, Acis has been in the loop as

21   a member of the Committee.  And I will be very brief with

22   respect to Acis's individual comments.  And I just want to be

23   clear:  Obviously, I'm here as counsel for Acis, and so this

24   is Acis's individual position.  Mr. Clemente aptly and very

25   ably handled the Committee's overall position with respect to

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 43
Case 3:21-cv-00538-N   Document 26-49   Filed 06/09/21   Page 65 of 243   PageID 15945

42

1    this.

2       But Your Honor, I just want to, on behalf of Acis, make

3    sure that, because of these developments, that's really -- I

4    really had hoped to have zero role today, but I want to make

5    sure that we're -- Acis is on record with respect to our

6    position.  And obviously, given Your Honor's knowledge and

7    oversight of the long history of Acis's bankruptcy case and

8    seeing some of the events that transpired there, I'm sure that

9    this will all, against that backdrop, make an awful lot of

10   sense.

11      But, you know, it's this continued role for Mr. Dondero

12   that is of concern.  You know, this issue even being raised

13   within like the last 48 hours by Mr. Ellington, the timing of

14   it just creates an issue.  I mean, did this -- how could this

15   possibly have come out of left field when this is such a huge

16   part of what the Debtor does in its ordinary course of

17   business, is serve as a portfolio manager, and these are

18   contracts that have been negotiated, generally speaking,

19   internally by Highland.  So the fact that if Mr. Dondero were

20   to exit the structure and there would be some potential

21   ramifications to that, I've got to wonder how much of a

22   surprise could that really have been to Highland folks.

23      But I just wanted to highlight, in connection with the

24   term sheet -- this is the preliminary term sheet that was

25   handed up Your Honor, and I believe Your Honor has a redline

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 44
Case 3:21-cv-00538-N   Document 26-49   Filed 06/09/21    Page 66 of 243   PageID 15946

43

1    version of it as well --

2              THE COURT:  Uh-huh.

3              MS. PATEL:  -- on Page 2, with respect to the role of

4    Mr. James Dondero, there's various provisions in there.  And I

5    guess I would be remiss, Your Honor, if I didn't say, at least

6    out of the gate, Acis obviously supports the implementation of

7    this independent board of directors.  We believe all the

8    candidates are very capable and are -- we put our reliance

9    upon them.

10        Obviously, we don't concede any issues.  We'll see what

11   we're going to do.  But certainly, for the time being, we do

12   support the entry of this agreement of the settlement -- or,

13   I'm sorry, approval of the settlement agreement by the Court

14   that lets the independent board be put into place.

15        But what I'll focus the Court on, on Page 2 under the role

16   of Mr. James Dondero, it goes through various provisions as to

17   what he'll resign to -- positions he'll resign from and that

18   he will remain as an employee of the Debtor, including

19   maintaining his title as portfolio manager for all funds and

20   investment vehicles for which he currently holds that title.

21   And then it goes on to provide as to who he'll report to and

22   how he will be governed, which includes by the independent

23   board, he will receive no compensation, and that he will be

24   subject to at all times the supervision, direction, and

25   authority of the independent directors.

1        Again, we have faith that the independent directors will

2    oversee this and will govern his role accordingly.  However,

3    given Acis's history with how transactions have transpired at

4    Highland, we remain highly cautious with respect to what

5    happens next.

6        And to that end, Your Honor, the very last sentence there

7    on Page 2, "Mr. Dondero shall not cause any related entity to

8    terminate any agreements with the Debtor," is a key provision

9    of this that keeps Acis, as a Committee member, on board with

10   this agreement.  I wanted to highlight that and note that, in

11   the last less than 48 hours, in the last 12 hours, or maybe a

12   little bit more than that, call it 18 to be safe, that's where

13   -- that's a provision that's been -- that's where we've ended

14   up.  It's all of these issues have been going at lightning

15   speed, but I did want to just, for the record and so everybody

16   is clear, that is an important piece of this agreement to --

17   for Acis.

18       And as Your Honor knows, this Debtor, Highland, is wont to

19   try to terminate agreements and to try -- in an attempt to try

20   and transfer valuable contracts away and valuable revenue

21   stream away from an entity to an alternate entity.  And that's

22   really the heart of our concern, Your Honor.

23       So, with that, I just wanted to be clear and be on record

24   as to Acis's position.  Thank you.

25            THE COURT:  Thank you.  All right.

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 46
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 68 of 243 PageID 15948

45

1          MR. POMERANTZ:  Your Honor, if I briefly may respond

2    to the issues with Mr. Dondero while they are fresh in Your

3    Honor's mind?

4          THE COURT:  Okay.  Okay.

5          MR. POMERANTZ:  Your Honor, look, we appreciate the

6    timing of this coming to the attention of the Committee as

7    being less than optimal.  As Your Honor can appreciate, this

8    case that's been filed three months ago, a lot of people are

9    looking very carefully at what's happening to the Debtor.

10   Investors are looking.  There was a transfer of venue.  There

11   have been a lot of reports about potential trustee motions.

12   And we believe a lot of parties are waiting to see the outcome

13   of this hearing and the trustee hearing to determine whether

14   they will determine to continue to do business with the

15   Debtor.

16      It's not only an issue of contractual rights.  It's also

17   an issue of whether investors feel comfortable on who is

18   managing, who is managing their investments.

19      This issue of Mr. Dondero's continuing role has been

20   something that at the Debtor we've continued to grapple with

21   over the last several weeks.  It's always been our thought

22   that we should do nothing that would unduly harm the company

23   from an economic standpoint.  I think the Committee shares

24   that.  That if it's determined by an independent board -- and

25   don't take current Debtor professionals, don't take current

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 47
Case 3:21-cv-00538-N   Document 26-49   Filed 06/09/21   Page 69 of 243   PageID 15949

46

1    Debtor employees' word for it -- but if they determine that

2    there's an economic benefit by keeping him on to preserve

3    material revenue stream, they should be able to make that

4    determination.  I think that's really at the core here.  And I

5    think the Committee got ultimately comfortable with it because

6    it will be an independent board, the majority of the members

7    identified and chosen by them and accepted by the Debtor.

8         So, again, we apologize to the parties and the Court for

9    bringing this on late.  It wasn't my intent to come here and

10   present modified versions of the term sheet that hadn't been

11   filed.  But that's where we are, and that's why it has come

12   up, and that's why it's an extremely important issue, because

13   preserving whatever revenue we can for the Debtor is

14   important.

15        Now, at the end of the day, the board may either decide

16   that he doesn't preserve the revenue, or the negatives from

17   keeping him involved with the company outweigh any benefits.

18   And that's a decision they will have to make, and it'll be

19   their province to make.  So I just wanted to give Your Honor

20   that perspective.

21             THE COURT:  Okay.

22             MR. DAUGHERTY:  Your Honor, may I approach?

23             THE COURT:  Mr. Daugherty?  You may.

24        OPENING STATEMENT ON BEHALF OF PATRICK DAUGHERTY

25             MR. DAUGHERTY:  I apologize.  I was not planning to

1    address the Court at all today.  I would have had my attorney

2    here for it.  But I just ask a little bit of indulgence to

3    represent myself *pro se* for this issue.

4         This is the first I've heard that Mr. Dondero would stay

5    with the company.  I think it's an awful idea.  There's a

6    litany of reasons for that.

7         By the way, I'm completely in support of this -- of this

8    board that's been chosen.  I have every confidence that

9    they'll be able to make good decisions eventually.  But

10   they're stepping into this thing new.  Obviously, I've been

11   through this in your court with *Acis* and other matters, and I

12   have deep, deep concerns about Mr. Dondero continuing in that

13   role, simply because of the influence it has on the rest of

14   the organization and the message that it sends, both

15   internally and externally, of where the company goes from

16   here.

17        So I just wanted to let you know my thoughts.  I wasn't

18   planning to make them.  I haven't filed anything.  But that's

19   where I stand.

20            THE COURT:  All right.  Thank you, Mr. Daugherty.

21        All right.  Before we hear from the U.S. Trustee, who I

22   know is going to have a lot to say, let me just circle back

23   briefly to Jefferies counsel and the CLO Issuers' counsel.

24   You heard the representations of Mr. Pomerantz earlier about,

25   well, first, in the case of Jefferies, that the Debtor has

013013

1  agreed to language to address your concerns.  Do you want to

2  weigh in on that and confirm that you're content that you're

3  going to have language to work out your concerns?

4        OPENING STATEMENT ON BEHALF OF JEFFERIES, LLC

5        MR. MAXCY:  Thank you, Your Honor.  Patrick Maxcy for

6  Jefferies.

7     No, I don't have anything additional to add to what Mr.

8  Pomerantz said.  The language that we have worked out will

9  speak for itself and will be included in the order.

10       THE COURT:  All right.  Thank you.

11    And counsel for the CLO and CDO Issuers, do you confirm

12 that you would be in agreement to basically withdraw your

13 objections for now, but perhaps come back and make argument on

14 the 21st if you have not worked out language with the

15 Committee that you think works?

16       OPENING STATEMENT ON BEHALF OF THE ISSUER GROUP

17       MR. BENTLEY:  James Bentley from Schulte Roth for the

18 Issuers, Your Honor.

19     I believe the deal that Mr. Pomerantz and Mr. Clemente

20 and I have discussed was adjourning our objection to the 21st,

21 --

22       THE COURT:  Okay.

23       MR. BENTLEY:  -- rather than withdrawing it.

24       THE COURT:  Okay.

25       MR. BENTLEY:  We're -- we believe we will be able to

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 50
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 72 of 243 PageID 15952

49

1    come up with language acceptable to the Issuers, but we would

2    like to reserve the right to come back to the Court on our

3    limited objection if we cannot, given that our issue is really

4    -- really only relates to the 25 Issuers we represent.

5           THE COURT: Okay. Thank you very much.

6      All right. Ms. Lambert?

7      OPENING STATEMENT ON BEHALF OF THE UNITED STATES TRUSTEE

8          MS. LAMBERT: May it please the Court. As the Debtor

9    acknowledges, the motion that they are settling, the issues

10    that they are settling, are the issues that the U.S. Trustee

11    has raised in his motion to appoint a Chapter 11 trustee. As

12    a matter of statutory construction, Section 1104 does not

13    contemplate settlement of these issues. 1112, in contrast,

14    has a provision that if the Court finds and determines that

15    there is cause to convert a case, there are unusual

16    circumstances and the Court can find a reasonable

17    justification for the wrongdoing or the error that occurred

18    that led to cause -- for example, administrative defects in

19    1112, not filing monthly operating reports -- and that can be

20    cured. The Court has to make a finding that those -- these

21    defects can be cured within a reasonable period of time.

22    Section 1104 contains no analog to his.

23      If the Court finds cause to direct the appointment of a

24    Chapter 11 trustee, then the Court is supposed to appoint a

25    Chapter 11 trustee. And *Trailer Ferry* and *AWECO* both stand

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 51
Case 3:21-cv-00538-N   Document 26-49   Filed 06/09/21   Page 73 of 243   PageID 15953

50

1   for the proposition that, on today's day, we're supposed to

2   have evidence about what the management issues are that led to

3   this agreement.  There's been no evidence.  There's been no

4   allegations in the motion for settlement.  And so the U.S.

5   Trustee is prepared to put that evidence on.

6        And Your Honor, one aspect of this is that the arbitration

7   agreement has been sealed.  And there are people on the phone.

8   I don't know who's on the phone.  The U.S. Trustee has opposed

9   the sealing of the arbitration -- not arbitration agreement,

10  the arbitration judgment -- has opposed the sealing of that.

11  And then they referenced a confidentiality order as the basis

12  to seal it.  The U.S. Trustee also opposed that

13  confidentiality motion, which was filed subsequently to the

14  motion to seal.

15       There is no confidentiality order.  An interim order was

16  entered sealing the arbitration award, but -- and the U.S.

17  Trustee has honored that by redacting all of the pleadings

18  that we filed relating to that, but it's important today for

19  the U.S. Trustee to be able to discuss it in argument, and it

20  is here -- and we have it prepared to be admitted into an

21  exhibit.

22       So, to proceed with my argument, Your Honor, I need some

23  clarification about what I can say.

24            THE COURT:  You want clarification from me on what

25  you can say?

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 52
Case 3:21-cv-00538-N    Document 26-49    Filed 06/09/21    Page 74 of 243    PageID 15954

51

1          MS. LAMBERT:  Well, I mean, either that or we need to

2     clear the room.

3          THE COURT:  I've read the arbitration award.

4          MS. LAMBERT:  Right.

5          THE COURT:  It's in my brain.

6          MS. LAMBERT:  Right.  Okay.

7          THE COURT:  Uh-huh.

8          MS. LAMBERT:  And so one of the arguments here today

9     is that the U.S. Trustee is representing the SEC and

10    representing other Government agencies and things.  No.

11    Obviously, that is not the U.S. Trustee --

12         THE COURT:  I didn't hear that.

13         MS. LAMBERT:  Okay.  The -- one of the positions has

14    been, in the papers, is, well, that we don't have standing to

15    raise their issues.  And that's true.

16         THE COURT:  Okay.

17         MS. LAMBERT:  But the problem is that the U.S.

18    Trustee has been constrained from discussing those issues with

19    the SEC.  The arbitration award is very relevant to the SEC's

20    oversight.  I anticipate the evidence today will be that the

21    SEC, after the financial crisis of 2008, imposed restrictions

22    on this Debtor on breach of fiduciary duty issues.  I

23    anticipate that the arbitration findings would be very

24    relevant to whether those issues are ongoing or not.

25         THE COURT:  Okay.  Let me weigh in.  I view the legal

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 53
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 75 of 243 PageID 15955

52

1   standard that this Court has to weigh today as being:  Is the

2   Debtor proposing something that is reflective of sound

3   business judgment, reasonable business judgment?  And to the

4   extent this is a compromise of controversies with the

5   Committee, is this fair and equitable and in the best interest

6   of the estate?

7       And as Mr. Pomerantz has said, you know, a lot of this

8   maybe doesn't even need Court approval.  But to the extent

9   there are aspects of this that are appropriate to seek Court

10  approval on, you know, this is my task.  I have to look at

11  what's presented, and is this reflective of sound business

12  judgment?  Is this fair and equitable?  Is it in the best

13  interest?

14      So, assuming there are tons of bad facts here reflected in

15  the arbitration award, reflected in other evidence, bad facts

16  that might justify a trustee, a Chapter 11 trustee, is this

17  nevertheless, what's proposed today, a reasonable compromise

18  of, you know, the trustee arguments the Committee could make

19  or, you know, is this a reasonable framework for going

20  forward?  Okay?

21      So I guess what I'm saying is I'm confused about, you

22  know, do I need to look at the arbitration award?  Do we need

23  to have evidence of all of that?  I can assume that there are

24  terrible facts out there that might justify a trustee, but I'm

25  looking at what's proposed.  Is this a fair and equitable way

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 54
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 76 of 243 PageID 15956

53

1  to resolve the disputes?  Is it sound business judgment?

2  Frankly, is it a pragmatic solution here to preserve value?

3  So that's the legal standard I have in my mind here.

4          MS. LAMBERT:  Yes, Your Honor.

5          THE COURT:  Okay.

6          MS. LAMBERT:  The standard is whether it is fair and

7  equitable to resolve the issues in the Chapter 11 trustee

8  motion, and it is the U.S. Trustee's position that they are

9  not resolved by this.  And how are they not resolved?  Number

10  one, they're not resolved because the problems that led to the

11  breach of fiduciary duty issues and findings are more

12  pervasive, both based on this Court' finding in the *Acis* case

13  and in the arbitration court's finding in Mr. Dondero.  Other

14  officers are implicated.

15          THE COURT:  But how --

16          MS. LAMBERT:  Other employees are implicated.

17          THE COURT:  Okay.  I feel like maybe we're talking at

18  each other, not getting each other.  I've got a proposed

19  solution here to totally change the playing field, if you

20  will.  Bring in incredibly qualified people to --

21          MS. LAMBERT:  Those people --

22          THE COURT:  -- to change out the, you know, the

23  person that you say breached fiduciary duties, the, you know,

24  mismanagement, whatever bad labels we have here, but bring in

25  a clean slate.

013019

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 55
Case 3:21-cv-00538-N   Document 26-49   Filed 06/09/21   Page 77 of 243   PageID 15957

54

1          MS. LAMBERT:  No, Your Honor, because employees

2     remain at the Debtor who are problematic.  The board that is

3     appointed owes a fiduciary duty to whom?  Strand.  Dondero.

4     He's still the board -- he is the sole stockholder.  Yes.  In

5     addition, --

6          THE COURT:  And they won't be taking directions from

7     him.

8          MS. LAMBERT:  In addition, --

9          THE COURT:  The term sheet is they won't be taking

10    directions from him.

11         MS. LAMBERT:  Your Honor, there is no evidence before

12    the Court today that Mr. Dondero has entered a stipulation.

13    This is part of the problem.  This continues --

14         THE COURT:  Well, if he doesn't, in five minutes the

15    Committee is going to be filing their trustee motion, right?

16         MS. LAMBERT:  Well, then we haven't saved any time or

17    any money.  This is the whole issue.  They have to put on

18    evidence that this is a resolution of issues.  We're going to

19    have the motion to appoint a Chapter 11 trustee either way.

20         THE COURT:  All right.  Well, we did have the

21    evidence of Mr. Sharp.  Would you like to cross-examine him at

22    this point?

23         MS. LAMBERT:  Your Honor, I would like to put the

24    U.S. Trustee's exhibits into evidence and then cross-examine

25    him.

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 56
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 78 of 243 PageID 15958

55

1          THE COURT: All right. Your exhibits?

2          MR. POMERANTZ: Your Honor, we would object to any

3 exhibits. The Trustee has not filed an exhibit list.

4          MS. LAMBERT: Your Honor, this matter was set on an

5 expedited basis and the Court does not require exhibit and

6 witnesses lists when a matter is filed on an expedited basis.

7 It's impossible, when a response is filed at 5:00 o'clock the

8 evening before and supplements are made in the morning of the

9 hearing, for the U.S. Trustee to put on a witness and exhibit

10 list.

11          MR. POMERANTZ: Your Honor, we were here on the 19th.

12 We set out a briefing schedule. And maybe it was a couple

13 days short of normal notice. Ms. Lambert agreed to issue

14 discovery by a certain date, and she at no point said that

15 because there was 13 days' notice as opposed to longer period

16 that she couldn't comply and provide a witness list.

17     We provided with a witness list. We provided an exhibit

18 list. The Trustee's effort and attempt to now submit exhibits

19 and rely on maybe there were some changes this morning, that

20 just doesn't cut it, and that's not fair and that's not due

21 process.

22          THE COURT: Okay. I sustain the objection. The

23 exhibits won't be admitted since there was no exhibit list.

24          MS. LAMBERT: Your Honor, I do not have an exhibit

25 list from them. And they --

013021

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 57
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 79 of 243 PageID 15959

56

1          THE COURT:  Well, they haven't offered any.

2          MS. LAMBERT:  They put on new exhibits this morning.

3   The exhibits that the U.S. Trustee has are all things that

4   they are familiar with.

5          THE COURT:  Let me back up.  They didn't introduce

6   any exhibits.  They --

7          MS. LAMBERT:  But they introduced the declaration,

8   they introduced the supplements to the agreement that were

9   drafted this morning, they've introduced the new corporate

10  resolutions, all of which they handed me this morning.

11         THE COURT:  All right.  Well, the declaration of Mr.

12  Sharp, it's two pages long.  It is, I don't think, any kind of

13  surprise information.

14         MS. LAMBERT:  Your Honor, --

15         THE COURT:  I'll allow you to cross-examine him.

16         MS. LAMBERT:  -- the U.S. Trustee's exhibits are no

17  surprise, either.  The *Acis* opinion is no surprise to anybody

18  in this courtroom.

19         THE COURT:  Okay.  Well, what are your exhibits?

20         MS. LAMBERT:  The --

21         THE COURT:  I probably should have asked.

22         MS. LAMBERT:  The exhibits are the *Acis* opinion, the

23  arbitration awards or the determinations, both the partial and

24  the final, and the SEC's original judgment.  There are four

25  exhibits.

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 58
Case 3:21-cv-00538-N    Document 26-49    Filed 06/09/21    Page 80 of 243    PageID 15960

57

1          THE COURT:  All right.  Well, Mr. Pomerantz, what

2   would you like to say?  One of them I have obviously seen,

3   since I wrote it.

4          MR. POMERANTZ:  Yes, you've written it.  You wrote

5   it.

6      (Laughter.)

7          MR. POMERANTZ:  Your Honor, I think this is a tempest

8   in a teapot.  The Committee's brief that it filed in

9   opposition to the CRO retention, the ordinary course

10  protocols, and the cash management motion had a litany of

11  description of the Redeemer litigation, of the SEC litigation.

12  There are plenty of bad facts out here.  Okay?  We have an

13  interim order to seal.  There was no hearing set today for our

14  final hearing.

15      The Trustee has objected to that order, and I suspect that

16  will be heard on the 21st.  We don't think it's appropriate to

17  introduce the Redeemer award.  However, we have read the

18  redacted provisions or portion of the U.S. Trustee's brief,

19  and we have no problem if the U.S. Trustee limits its argument

20  to the redacted portion in presenting that to the Court.

21      In other words, we don't believe that the few sentences

22  that were redacted need to be redacted.

23      However, to the extent they intend to submit the

24  arbitration award, we don't think it's appropriate, we don't

25  think it's necessary, we think Your Honor hit it right, that

1    the issues today are not whether there's mismanagement at the

2    Debtor.  Okay?

3        The U.S. Trustee's position is, notwithstanding this new

4    structure, it doesn't work.  She has a trustee motion on.  She

5    can argue on the 21st that it doesn't work.  Nobody is

6    prejudicing her right to do so.

7        We think it's prejudicial, it's unfair, it's procedurally

8    improper to submit the Redeemer arbitration award and to allow

9    the Trustee to do anything other than describe exactly what

10    she has in her pleading.

11        THE COURT:  Okay.  I sustain the objection to those

12    exhibits.  Again, I've read them.  They're in my brain.  I

13    wrote one of them.  But I will allow you to cross-examine Mr.

14    Sharp.  So, Mr. Sharp, would you please come to the witness

15    stand?  Please raise your right hand.

16        BRADLEY SHARP, DEBTOR'S WITNESS, SWORN

17        THE COURT:  All right.  Please be seated.

18        MS. LAMBERT:  To clarify, Your Honor, has the Court

19    considered the *Acis* opinion and the arbitration opinions based

20    on judicial notice?

21        THE COURT:  And we're doing a lot of hair-splitting

22    here.  I'm just letting you know I -- the facts are in my

23    brain.  You can't extract them from my brain.  Okay?

24        MS. LAMBERT:  Okay.

25        THE COURT:  I know there have been a lot of bad

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 60
Case 3:21-cv-00538-N   Document 26-49   Filed 06/09/21   Page 82 of 243   PageID 15962

Sharp - Cross                    59

 1   things, arguably bad things.  But to me, the real issue here

 2   today is whether this framework that has been heavily

 3   negotiated with the Committee reflects reasonable business

 4   judgment on the part of the Debtor, is a fair and equitable

 5   resolution of the Committee's, you know, arguments in favor of

 6   a trustee, and whether this makes, you know, sense going

 7   forward to allow this Debtor to go forward without a trustee.

 8   Okay?

 9        So I really think that the evidence you want is not

10   terribly relevant.  We technically aren't here on a trustee

11   motion today.  We're here on whether a new board and the

12   terms, the protocols suggested, reflect reasonable business

13   judgment and reflect a fair compromise of arguments the

14   Committee has raised.  All right?  So I don't know how much

15   more clear I can make that.  I guess the technical answer is

16   I'm not taking judicial notice of those things for purposes of

17   today.

18        All right.  You may proceed.

19                     CROSS-EXAMINATION

20   BY MS. LAMBERT:

21   Q    Mr. Strand, can you state your name for --

22   A    Sorry.  Bradley Sharp, S-H-A-R-P.

23   Q    Sharp.  Mr. -- oh, sorry.

24   A    No relation to Strand.

25   Q    All right.  Strand is the general partner of the Debtor,

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 61
Case 3:21-cv-00538-N   Document 26-49   Filed 06/09/21   Page 83 of 243   PageID 15963

Sharp - Cross                          60

1    right?

2    A    That is correct.

3    Q    And there has been no change in the board of the Debtor

4    except Mr. Dondero's resignation; is that right?

5    A    Well, it's a little different, because the -- Strand is

6    the general partner of the Debtor.

7    Q    Yes.

8    A    So the new board will be acting and in control of the

9    Debtor.

10   Q    Yes.  And there is -- Strand is a non-debtor, correct?

11   A    That is correct.

12   Q    And the stock of the non-debtor, Strand, is owned by

13   Dondero?

14   A    Mr. Dondero owns Strand Advisors.

15   Q    In its entirety?

16   A    That is correct.

17   Q    So the board will owe a fiduciary duty to Mr. -- to Mr.

18   Dondero?

19   A    The board will have a fiduciary duty to the Debtor and to

20   Strand Advisors.

21   Q    All right.

22   A    Their duty is to the entity.

23   Q    The -- Strand, as the general partner, as an entity, owes

24   a fiduciary duty to the Debtor, right?

25            MR. MORRIS:  Objection to the extent it calls for a

013026

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 62
Case 3:21-cv-00538-N   Document 26-49   Filed 06/09/21   Page 84 of 243   PageID 15964

Sharp - Cross                              61

1    legal conclusion.

2              THE COURT:  Sustained.

3    BY MS. LAMBERT:

4    Q    Do you know?

5    A    As a lay person.  I'm not an attorney.

6    Q    Okay.  So you don't know what the fiduciary roles of the

7    board will be; is that right?

8    A    Well, the fiduciary board will be acting -- you know,

9    looking at it from my perspective as the chief restructuring

10   officer, the new board will be acting as the Debtor-in-

11   Possession.  And, you know, they will be directing the Debtor-

12   in-Possession.  You know, the Debtor-in-Possession has duties

13   to all parties in interest, and they will be directing the

14   Debtor.  They will be directing me as CRO.

15   Q    And, in addition, there may be a CEO, right?

16   A    That is contemplated, correct.

17   Q    It is contemplated?  It --

18   A    It is -- it is an option that the board has if they think

19   a CEO is necessary.

20   Q    But you don't know whether a CEO is going to be appointed

21   or not?

22   A    That's up to the board.

23   Q    And you don't know what the compensation for that

24   individual might be, right?

25   A    Again, that's up to the board.

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 63
Case 3:21-cv-00538-N   Document 26-49   Filed 06/09/21   Page 85 of 243   PageID 15965

Sharp - Cross                              62

1   Q   Mr. Dondero is going to be an employee of the Debtor,

2   right?

3   A   That's correct.

4   Q   And Mr. Dondero started the Debtor, correct?

5   A   I believe so.

6   Q   And he also started Strand, right?

7   A   I believe that's correct.

8   Q   And he is also in control of a number of entities that the

9   Debtor does business with; is that right?

10  A   That is correct.

11  Q   Mr. Ellington is going to remain on with the Debtor?

12  A   That -- Mr. Ellington is an employee.  All employees are

13  now subject to the board.

14  Q   Okay.  And Mr. Ellington's role with the Debtor is what?

15  A   He is general counsel with the Debtor.

16  Q   And there are other in-house attorneys with the Debtor,

17  right?

18  A   That's correct.

19  Q   And who else is there currently?

20  A   I don't have the list in front of me, you know, the

21  employee list.  As of now, because obviously this is still --

22  hasn't been effected, so the board has not made any decisions

23  with respect to any employees going forward.

24  Q   And the CFO remains the same?

25  A   Yeah, that is, again, as of now.  I don't know what the

1   board is going to do, if anything.

2   Q   Do you have any anticipation of what you would recommend

3   to the board regarding the CFO?

4   A   You know, I have many recommendations I have not made to

5   the board yet.  I just met them this morning.

6   Q   Are you aware that historically this Court has found that

7   the lawyers provided bad advice to the Debtor?

8           MR. MORRIS:  Objection to the form of the question.

9           THE COURT:  Sustained.

10  BY MS. LAMBERT:

11  Q   Do you have any knowledge about whether there have been

12  findings that the law firm gave erroneous advice to the

13  Debtor?  Or, I mean, the in-house counsel gave erroneous

14  advice.

15          MR. MORRIS:  Objection to the form of the question.

16          THE COURT:  Sustained.

17          MS. LAMBERT:  Your Honor, I'm asking for the

18  foundation.

19          THE COURT:  Rephrase.

20  BY MS. LAMBERT:

21  Q   Do you -- are you aware of any concerns about the in-house

22  counsel?

23  A   Yes.

24  Q   What is your knowledge?

25  A   I have read the rulings from this Court.

1  Q   And what is your understanding of those rulings?

2  A   I don't recall specifically.  I read that early on when I

3  was first employed.  But there have been concerns with respect

4  to, you know, management of the Debtor.

5  Q   As the CRO, have you made any recommendations to change

6  employees to date?

7  A   As of now, I don't have a -- the board.  You know, the

8  board has just been employed.  We have not made

9  recommendations up to this point.  We are still -- obviously,

10  have been evaluating our position and what needs to happen.  I

11  think it's important for the Debtor at this time, a little

12  stability would be a good thing for -- until we develop the

13  direction going forward.

14  Q   Are you familiar with the compensation terms for the

15  directors?

16  A   Yes.

17  Q   And the directors are employees of Strand but paid by the

18  Debtor; is that right?

19  A   Oh, I'm not sure they're employees of Strand, but they are

20  paid by the Debtor, their compensation.  That's correct.

21  Q   And yet the compensation is technically through Strand,

22  right?

23  A   They -- they are.  They have to act through the general

24  partner of the Debtor because of the corporate structure.

25  Q   One of the portions of the agreement is that the Committee

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 66
Case 3:21-cv-00538-N   Document 26-49   Filed 06/09/21   Page 88 of 243   PageID 15968

Sharp - Cross                          65

1    acquires litigation claims.  Are you familiar with that?

2    A    I am.

3    Q    Have you parsed out which litigation claims those might be

4    at this point?

5    A    I think the agreement says they have litigation claims

6    against insiders and related parties.  So I don't know what

7    those individual claims are.  I don't know what exists.

8    Q    Are you aware that the Committee obtains the attorney-

9    client privilege and work product privilege?

10   A    Yeah.  Subject to the terms of those agreements, correct.

11   Q    Have you gone through the documents and determined which

12   ones would fall on -- which attorney files would fall on which

13   side?

14   A    Not as of yet.

15   Q    Have you been taking direction from Mr. Dondero?

16   A    We've had -- I've had limited interaction with Mr. Dondero

17   since my retention.  You know, we have been complying with the

18   protocols that we had been negotiating with the Committee and

19   providing information to the Committee.  We have been, as a

20   result of those protocols, instructing management of the

21   company on compliance with those protocols.  So they have

22   brought to us transactions that they would like to do.  We

23   have reviewed those transactions and compared it to the

24   proposed protocols and have been enforcing those.  So if

25   management has asked to do a transaction that does not meet

 1  within those protocols, we have been declining the

 2  transaction.  And that -- you know, the company has agreed

 3  with that decision and accepted that decision.

 4  Q   When you say management, who are you -- to whom are you

 5  referring?

 6  A   You know, the whole management team at the company.  In-

 7  house counsel.  The CFO.  You know, I've had limited

 8  interaction with Mr. Dondero.  One interaction was he did

 9  question one of my decisions that I made.  We discussed it and

10  he accepted my conclusion.

11  Q   You're at the Debtor every day?

12  A   My team is.

13  Q   You are not?

14  A   I have had some travel restrictions due to a medical

15  issue, but I have three of my team there every day.

16  Q   Is Mr. Dondero there every day?

17  A   I don't know.  I don't think so.  In the few days I'm

18  there, I've not seen him.

19  Q   Is Mr. Ellington there every day?

20  A   No.

21  Q   Who on the management team is there every day?

22  A   You know, our primary interaction is with Isaac Leventon,

23  Frank Waterhouse, the CFO.  You know, primary interaction, you

24  know, with David Klos, who is the controller, in dealing with

25  the financial issues.

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 68
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 90 of 243 PageID 15970

Sharp - Cross                                    67

1    Obviously, we spend a lot -- my team spends a lot of time

2    with the head of compliance.

3    Q   Were you surprised by this addition that Mr. Dondero would

4    remain as an employee?

5    A   I can't say I was surprised.  It is an issue that we

6    struggle with, given the nature of this company's business.

7    You know, I see the change in the language and, you know, as

8    CRO, I am comfortable with it.

9    Q   So, as CRO, if Mr. Dondero is necessary now, you recognize

10   that he was necessary three weeks ago?

11   A   I'm not saying that he's necessary.  I'm saying that it is

12   important for the board to be able to make that decision.

13   Q   And it wasn't important when the settlement was filed?

14   A   It was the -- it was a struggle at the time.  I was

15   concerned at the time it was filed the unintended consequences

16   of Mr. Dondero resigning completely and disappearing, because

17   there are a significant number of funds that the Debtor deals

18   with related parties that are controlled by Mr. Dondero, and I

19   was worried about the financial impact with it.  I knew this

20   issue was important to the Committee.  And if that's something

21   that the Debtor agreed to and the Committee agreed to, so be

22   it.

23       You know, I think the last-minute compromise is acceptable

24   and appropriate.  I think the language as negotiated is going

25   to be very helpful to the Debtor.  And I think, then, it's up

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21  Entered 01/22/21 21:50:07  Page 69
Case 3:21-cv-00538-N  Document 26-49  Filed 06/09/21  Page 91 of 243  PageID 15971

Sharp - Cross                          68

1  to the board to make the decision, with full knowledge on

2  what's the best avenue forward.

3  Q    And the language as negotiated was added because, in the

4  past, there have been problems with Mr. Dondero changing or

5  terminating agreements with related entities, right?

6  A    There was that -- I've seen that -- issues raised in the

7  *Acis* case.

8              MS. LAMBERT:  No further questions.

9              THE COURT:  All right.  Any redirect?

10             MR. POMERANTZ:  Not from the Debtor.

11             THE COURT:  Anyone have examination?  No?  All right.

12  Thank you, Mr. Sharp.  You're excused.

13             THE WITNESS:  Thank you.

14      (The witness steps down.)

15             THE COURT:  All right.  Are we going to have any

16  other, I guess, witnesses, evidence?

17               CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

18             MR. POMERANTZ:  No, Your Honor.  I just had a couple

19  points.  One, Ms. Lambert mentioned that she hadn't seen a

20  copy of the stipulation referred to, which was prohibiting Mr.

21  Dondero from terminating the board.  There's a good reason for

22  her not having seen it.  I hadn't provided it to her.  It just

23  came this morning, right before the hearing.  I have one

24  signed copy.  I have other copies that I could represent, even

25  though they're unsigned, are the same, so I would like to

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 70
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 92 of 243 PageID 15972

69

 1  provide Your Honor.  I'll keep the signed copy but provide you

 2  with an unsigned copy, but it's the same, and also give one to

 3  the U.S. Trustee.

 4          THE COURT:  But you've got a signature of Mr. Dondero

 5  on that?

 6          MR. POMERANTZ:  Yes, I do.

 7          THE COURT:  Okay.

 8          MR. POMERANTZ:  May I approach?

 9          THE COURT:  You may.  Thank you.

10          MR. POMERANTZ:  Your Honor, maybe for the record it

11  would be appropriate for me to show Your Honor the signature,

12  so you could say that you've seen it?

13          THE COURT:  Yes.  Yes.

14          MR. POMERANTZ:  May I approach again?

15          THE COURT:  You may.  (Pause.)  Okay.  Thank you.

16  The record will reflect I've seen Mr. Dondero's signature.

17          MR. POMERANTZ:  Your Honor, one of the threads that

18  Ms. Lambert said to Your Honor is that there were employees

19  still remaining at the Debtor and that those employees may

20  have been involved in some wrongdoing.

21      I submit, Your Honor, if Your Honor appointed a Chapter 11

22  trustee today, what would a Chapter 11 trustee do?  A Chapter

23  11 trustee wouldn't terminate every employee at the Debtor.  A

24  Chapter 11 trustee, if he or she was doing what they should

25  do, would go down to the company, would interview members of

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 71
Case 3:21-cv-00538-N   Document 26-49   Filed 06/09/21   Page 93 of 243   PageID 15973

70

1    the company, senior management, and decide who should stay on

2    and who should not stay on.

3        That, I submit, Your Honor, is exactly what this board

4    will do.  So the concept of there being something different

5    done, if you have a board here or not, I don't think makes

6    sense.

7        And lastly, Your Honor, Ms. Lambert expressed the issue as

8    whether it's fair and equitable to resolve the U.S. Trustee

9    issues in this way.  I don't think that's the standard.  The

10   only fair and equitable I understand is in plan confirmation.

11   I think Your Honor said it straight, which is:  Is this a

12   valid exercise of the Debtor's business judgment and is it an

13   appropriate compromise of controversy?  That is the standard.

14   And, again, we have always acknowledged that, notwithstanding

15   how Your Honor rules today, the Trustee reserves the right to

16   come back to court and argue a trustee is appropriate on the

17   21st.

18       We believe, Your Honor, that many of the cases, in this

19   circuit and elsewhere, look to the continuing management of

20   the company and whether management issues have been addressed

21   as a significant factor in determining whether a trustee is

22   appointed.  And it'll come as no surprise, of course, if Your

23   Honor grants our motion today, this will be a lynchpin of our

24   opposition to the trustee motion.

25       But, again, those issues are for another day, and we

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 72
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 94 of 243 PageID 15974

71

1    believe that we have satisfied our standard, and we request

2    that Your Honor approve the motion.

3              THE COURT:  All right.  Other closing arguments?

4         CLOSING ARGUMENT ON BEHALF OF THE UNITED STATES TRUSTEE

5              MS. LAMBERT:  Yes, Your Honor.  As the Debtor

6    acknowledges, the Court has no jurisdiction over Strand.  This

7    is a complicated structure.  A trustee avoids all of the

8    complications involved in the Court exercising jurisdiction

9    over an entity that it doesn't have jurisdiction over.

10        To enter a stock stipulation related to a non-debtor is

11   highly irregular, and Mr. Dondero is the person behind that.

12   It has happened in cases where people have been in these kinds

13   of structures, like that FSLIC used to put in these kinds of

14   structures -- there's published opinion, the *Goubert*

15   (phonetic) case -- where the person continued to exercise

16   control even though they had a stock trust.

17        The Court needs a person beholden to the Court.  The

18   evidence is that, historically, this Debtor has entered into

19   things that breached its fiduciary duty and resulted in self-

20   dealing and liability for the Debtor.  The evidence is that

21   these go beyond Mr. Dondero and the Court does not have

22   jurisdiction over his stock.  The Court does not have

23   jurisdiction over Strand.  The board members of Strand are not

24   employees of the Court, they're employees of Strand, a non-

25   debtor.  These members have a fiduciary duty to Strand.

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 73
Case 3:21-cv-00538-N    Document 26-49    Filed 06/09/21    Page 95 of 243    PageID 15975

72

1        Yes, Strand is the general partner of this Debtor and has

2    a fiduciary duty, but all these fiduciary duties intermix in

3    ways that result in conflicts for this case.  These conflicts

4    are unnecessary.  The Court could just appoint a trustee who

5    only owes a fiduciary duty to the members and creditors of

6    this case, as well as the next (inaudible).

7        There is no evidence that this is cheaper.  There is no

8    evidence that this is a total resolution, because issues are

9    left open, such as whether or not a CEO is going to be

10   appointed, how much that person is going to cost.

11       Finally, Your Honor, the sealing has constrained the

12   ability of some of the parties to understand what's going on

13   in this case.  And that is material to the argument about who

14   is here, because we don't know who -- that all the people who

15   would have participated in this discussion had an opportunity

16   to participate in it.

17       Yes, the creditors have a fiduciary duty, and I believe

18   that they represented to the best of their ability, but they

19   are not charged with the issues that others are charged with,

20   such as the SEC.

21       There is no evidence that the officers are disinterested.

22   Rather, the new officers are going to be conflicted by the

23   nature of their position.  There's no evidence that it's

24   cheaper.  And a trustee, if appointed, could be appointed on

25   an hourly basis.  This is a Chapter 11 trustee.

013038

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 74
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 96 of 243 PageID 15976

73

1    They argue that the trustee would not have the knowledge,

2    and yet they've been able to find three candidates to serve

3    for the board who are qualified.  So there's no evidence that

4    it would not be better to have a trustee for that reason as

5    well.

6        The evidence is that, historically, the Redeemer Committee

7    was set up to prevent these kinds of transactions and have

8    oversight.  Historically, the evidence is it did not work.

9    For this reason, the statute provides a solution, and the

10   Court should impose it.  The Court should deny this motion as

11   not being in the interest of the estate, as not being a sound

12   exercise of discretion, because it's really the discretion of

13   Strand, not the Debtor, and it will remain the discretion of

14   Strand, not the Debtor.

15       Thank you.

16            THE COURT:  All right.  Anyone else have comments?

17            MR. POMERANTZ:  Your Honor, just a couple of minor

18   points.

19            THE COURT:  Okay.

20             CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

21            MR. POMERANTZ:  Ms. Lambert started by saying the

22   Court doesn't have jurisdiction over Strand.  I know I just

23   handed her the stipulation, but the last paragraph of the

24   stipulation specifically says that the parties stipulate and

25   agree that the Court shall have exclusive jurisdiction over

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 75
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 97 of 243 PageID 15977

74

1    all matters arising from or related to the interpretation and

2    implementation of this stipulation and the adjudication of any

3    parties breaching the stipulation.

4        So the Court does have jurisdiction now that the

5    stipulation has been signed, assuming that the Court enters

6    it, so I think that addresses that issue.

7        Your Honor, the evidence of the disinterestedness of the

8    members of the board, we've provided their *curriculum vitaes*.

9    We've made representations that they have no connections with

10   the Debtor or any of the parties in interest.  We don't think

11   that, just because they become appointed and become a director

12   of Strand, that that renders them disinterested [sic], and we

13   think that the Trustee's arguments that being at a different

14   level creates different duties is just not -- is not accurate.

15   I don't think that the Committee would have had any appetite

16   for this type of structure had they believed that each of

17   these board members wouldn't feel that their fiduciary duty

18   was to the Debtor's estate.  And they all are seasoned

19   restructuring people from different aspects, all understand

20   their fiduciary duties well, and all are prepared to carry

21   them out.

22       Lastly, the Trustee points to the historic issues, and

23   specifically mentioned the Redeemer Committee and that

24   structure didn't work.  Well, I think it speaks volumes, Your

25   Honor, that not only the Redeemer Committee, are they on the

013040

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 76
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 98 of 243 PageID 15978

75

1    Committee and the Committee has supported this motion, but the

2    Redeemer Committee hasn't come to Your Honor and said that,

3    notwithstanding that structure that may or may not have been

4    effective, this structure is ineffective.

5         And at the end, Your Honor, the Trustee is trying to

6    replace the business judgment of the Debtor.  The Debtor is

7    entitled to deference of the judgment, again, focusing on the

8    correct standard.  And, again, the Trustee will have her day

9    in -- his day in court in connection with the ultimate trustee

10   motion on the 21st.

11        Thank you, Your Honor.

12             THE COURT:  Anyone else?

13        All right.  Well, the Court is going to note a few things

14   as part of its ruling, obviously.  The new proposed

15   independent board members for Strand, Strand obviously being

16   the general partner of the Debtor, Highland -- Mr. James

17   Seery, Mr. John Dubel, and retired Judge Russ Nelms -- are

18   highly-qualified individuals with respect to the industry.

19   Some of them with respect to restructuring.  Certainly, in the

20   case of retired Judge Nelms, with regard to fiduciary duties

21   and the Bankruptcy Code requirements.

22        These three individuals were chosen by the Creditors'

23   Committee, whose constituency is broad, whose constituency is

24   owed well over $100 million.  And they were chosen by the

25   Committee after literally months of negotiation.  Obviously,

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 77
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 99 of 243 PageID 15979

76

1    this bankruptcy was filed in October, and it appears to this

2    Court, from the representations of counsel, that from the very

3    beginning of the case -- the Committee was, I guess, appointed

4    a week or two after the case was filed in October -- there's

5    been haggling over corporate governance of this Debtor.

6        So we have highly-qualified individuals.  We have

7    individuals who were chosen by the well-constituted Creditors'

8    Committee.  And what has been proposed to the Court is that it

9    is these independent directors that would have sole and

10   exclusive management and control of the Debtor.

11       An interesting jurisdictional argument has been made, and

12   it's one of those arguments that, frankly, you know, sounds

13   good when you first hear it, but when you really drill down

14   about the governance structure here, I mean, obviously, this

15   Debtor is a limited partnership and it acts through a general

16   partner.  It's the general partner that controls the Debtor

17   entity.  And while Strand Advisors, Inc., the general partner,

18   may not technically be in bankruptcy, it's the structure of

19   these entities such that it controls the Debtor.  So the

20   jurisdictional argument, when you drill down, feels a little

21   off.

22       Moreover, we have language in the stipulation where Strand

23   is stipulating and consenting, if you will, to this Court's

24   exercise of jurisdiction over it.

25       There are many things about the compromise here that have

1   very compelling appeal.  Among them, certainly, the Committee

2   that's negotiated this term sheet retains the right at any

3   time to move for a Chapter 11 trustee if it believes there are

4   grounds.  The Committee is granted standing to pursue estate

5   claims, certain estate claims right off the bat, without

6   having to come back and ask the Court, without having to rely

7   on the Debtor to pursue that.  There are document production

8   provisions, document preservation provisions, a shared

9   privilege negotiated, that are very powerful tools for the

10  Committee, and certainly operating protocols that have been

11  negotiated regarding the Debtor's operations that are very

12  powerful tools for the Committee.

13       I said many times during the *Acis* case -- those who were

14  here will remember -- that the company, *Acis*, was not a great

15  fit for Chapter 11.  Lots of companies aren't great fits for

16  Chapter 11, I suppose, but the kind of business it was was

17  kind of tough to maneuver in Chapter 11.  Human beings and

18  their expertise create value.  And while we had a Chapter 11

19  trustee, a stranger come in and take control over Acis, you

20  know, there's great uncertainty whether that stranger is going

21  to be able to preserve value and have the smooth transition

22  into Chapter 11 that's really going to be the best fit.

23       Here, as I've said earlier, the legal standard I view as

24  controlling here is 363 and whether what has been proposed

25  reflects reasonable business judgment.  Is there a sound

013043

1  business justification for proposing the independent slate of

2  directors at the GP level for the Debtor, the protocols, the

3  negotiation with the Committee, the document sharing, the

4  standing given to them?  Does all of this reflect reasonable

5  business judgment?  And I find, quite clearly, it does.  I

6  find it to be a pragmatic solution to the Committee's concerns

7  about existing management and control.

8      And I think I used the words "fair and equitable," not

9  just Ms. Lambert, because it is also presented to the Court as

10  a 9019 compromise of disputes with the Committee, and we

11  traditionally use a fair and equitable and best interest of

12  the estate analysis in this context.  So, to the extent that

13  applies, I do find this a fair and equitable way of resolving

14  the disputes with the Committee, and I find this to be in the

15  best interest of the estate.  So I do approve this.

16      And by approving this motion, I'm approving the term sheet

17  as it's been presented, the various terms therein, the

18  exhibits thereto.  I'm specifically approving the new

19  independent directors, the document management and

20  preservation process, the standing to the Committee over

21  certain of the estate claims, the reporting requirements, the

22  operating protocols, the whole bundle of provisions.

23      Now, there is one specific thing I want to say about the

24  role of Mr. Dondero.  When Ms. Patel got up and talked about

25  the newest language that has been added to the term sheet, she

1  highlighted in particular the very last sentence on Page 2 of

2  the term sheet, the sentence reading, "Mr. Dondero shall not

3  cause any related entity to terminate any agreements with the

4  Debtor."  Her statement that that was important, it really

5  resonated with me, because, you know, as I said earlier, I

6  can't extract what I learned during the *Acis* case, it's in my

7  brain, and we did have many moments during the *Acis* case where

8  the Chapter 11 trustee came in and credibly testified that,

9  whether it was Mr. Dondero personally or others at Highland,

10 they were surreptitiously liquidating funds, they were

11 changing agreements, assigning agreements to others.  They

12 were doing things behind the scenes that were impacting the

13 value of the Debtor in a bad way.

14     So not only do I think that language is very important,

15 but I am going to require that language to be put in the

16 order.  Okay?  So we're not just going to have an order

17 approving the term sheet that has that language.  I want

18 language specifically in the order.  You know, you can figure

19 out where the appropriate place to stick it in the order is,

20 but I want specific language in here regarding Mr. Dondero's

21 role.  I also -- the language in there that his role as an

22 employee of the Debtor will be subject at all times to the

23 supervision, direction, and authority of the Debtors, I want

24 that language in there as well.  Let's go ahead and put the

25 language in there that at any time, in any event, the

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 81
Case 3:21-cv-00538-N   Document 26-49   Filed 06/09/21   Page 103 of 243   PageID 15983

80

1    independent directors can determine he's no longer going to be

2    retained.  I want that in the order.

3        And I'm sure most of you can read my mind why, but I want

4    it crystal clear that if he violates these terms, he's

5    violated a federal court order, and contempt will be one of

6    the tools available to the Court.  He needs to understand

7    that.  Mr. Ellington needs to understand that.  You know, if

8    there are any games behind the scene, not only do I expect the

9    Committee  is going to come in and highlight that to the Court

10   and file a motion for a trustee or whatever, but we're going

11   to have a contempt of court issue.

12       So, anybody want to respond to that?

13           MR. POMERANTZ:  Your Honor, Jeff Pomerantz; Pachulski

14   Stang Ziehl & Jones.

15       We hear Your Honor.  What I thought I'd do now is I have a

16   clean redline of the order, of course not including the

17   provision you just requested, --

18           THE COURT:  Uh-huh.

19           MR. POMERANTZ:  -- which we will go back and upload

20   and hope to get an order signed by Your Honor today, if you're

21   around.  But to go over the other changes, the changes to

22   Jefferies, the other language changes I discussed before.  I

23   gave a copy to Ms. Lambert and to the Committee.  May I

24   approach with a --

25           THE COURT:  You may.

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 82
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 104 of 243 PageID 15984

81

1          MR. POMERANTZ:  Thank you.

2          THE COURT:  Okay.  All right.  (Pause.)  All right.

3   The form of order looks fine to me.  Obviously, you'll add the

4   Dondero-related language, and we may have further wording

5   tweaks negotiated with the CLO Issuers.  But, again, I approve

6   all of this.  I didn't say on the record the compensation, but

7   certainly I am approving that as reasonable.  I expect these

8   three directors are going to be working very, very hard.  And

9   so, as you said, not 50,000-foot level monitoring, actually

10  rolling up sleeves on-site, so I think the compensation is

11  reasonable.

12         MR. POMERANTZ:  Thank you, Your Honor.  We will

13  submit an order shortly that includes Your Honor's language

14  requested.

15         THE COURT:  Okay.

16         MR. POMERANTZ:  Are you around this afternoon?

17         THE COURT:  I am around, --

18         MR. POMERANTZ:  Okay.

19         THE COURT:  -- so just pick up the phone or send an

20  email to Traci, my courtroom deputy, --

21         MR. POMERANTZ:  Yes.

22         THE COURT:  -- so she can tell me, "It's in your

23  queue to sign."

24         MR. POMERANTZ:  She has been extremely helpful and

25  responsive.

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 83
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 105 of 243 PageID 15985

82

1          THE COURT:  Good.  I'm glad to hear that.

2          MR. POMERANTZ:  Yes.

3          THE COURT:  Now, as far as future scheduling, I did

4     have her sitting by, listening, in case we needed to discuss

5     anything.  Obviously, we're going to have a kind of a

6     carryover placeholder on the 21st as part of the trustee

7     motion hearing for any remaining issues with the CLO Issuer.

8     And, you know, that's just a placeholder if necessary to hear

9     language controversies.

10         My courtroom deputy was concerned, because you have a lot

11    of pending motions that have just sort of sat there pending

12    because this was the big issue, right?  She wants to make sure

13    she sets anything you need a setting on.  And I don't know if

14    you want to discuss that today or go back as a group and --

15         MR. POMERANTZ:  We're happy to -- I think, you know,

16    I think that's appropriate to do.  We had the motion to

17    appoint the CRO.

18         THE COURT:  Uh-huh.

19         MR. POMERANTZ:  That was pending.  That gets resolved

20    by this motion.  We will submit an order --

21         THE COURT:  Okay.

22         MR. POMERANTZ:  -- with the new agreement that was

23    attached to the term sheet.

24         We had the cash management order which Judge Sontchi had

25    issued an interim order.  We will have a final order with

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 84
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 106 of 243 PageID 15986

83

1    respect to that.

2              THE COURT:  Okay.

3              MR. POMERANTZ:  We will be withdrawing the motion to

4    approve ordinary course protocols which was originally on for

5    hearing.

6              THE COURT:  Uh-huh.

7              MR. POMERANTZ:  I think on the 21st we have currently

8    set a motion to approve the retention or Mercer, which is the

9    Debtor's compensation consultant, --

10             THE COURT:  Uh-huh.

11             MR. POMERANTZ:  -- and an analog motion that was

12   originally set for today with respect to insiders, non-

13   insiders, but is on for non-insiders and insiders on the 21st,

14   --

15             THE COURT:  Uh-huh.

16             MR. POMERANTZ:  -- which is the motion to approve

17   bonuses.

18             THE COURT:  Uh-huh.

19             MR. POMERANTZ:  Of course, the Debtor's new board is

20   going to be wanting to very carefully review that.  And we are

21   going back and today having our first new board meeting with

22   the board to start bringing them up to speed.  But we

23   presently intend, subject to, obviously, their direction, to

24   go forward on the 21st.

25        We also have the retention of Lynn Pinker and Foley

013049

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 85
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 107 of 243 PageID 15987

84

1  Gardere, which had been filed and was brought on for hearing

2  previously.  It had been delayed, again, for the board to look

3  at the issues.  We expect to have that on for the 21st.  And I

4  believe, I believe that would be it.

5          MS. LAMBERT:  No, Your Honor, the --

6          MR. POMERANTZ:  No?

7          MS. LAMBERT:  -- U.S. Trustee has objected to the

8  motion to seal, which was the second item on the Wilmington

9  Court's docket that got -- and it got transferred here.  The

10 U.S. Trustee has also objected to the motion for protective

11 order.  The issues overlap.  We request that they be set as

12 quickly as possible.

13         MR. POMERANTZ:  We're happy to set both of those for

14 the 21st as well.

15         THE COURT:  All right.  So I think what I'm going to

16 ask you to do is just get on the phone, one of you, with Traci

17 and just make sure she's clear on everything you need set on

18 the 21st, and then you can do a big notice of hearing, just

19 kind of listing all of these matters.

20         MR. POMERANTZ:  Your Honor, with respect to the CRO

21 motion -- order and the cash management order, I was wondering

22 if it would be helpful for my colleague Mr. Demo to go over

23 the amendments to those orders -- we would like those to be

24 entered today -- to see if Your Honor has any questions.

25         THE COURT:  All right.  That would be good.  Mr.

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 86
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 108 of 243 PageID 15988

85

```
1    Clemente, did you have something first?

2            MR. CLEMENTE:  Just very quickly, Your Honor.  We had

3    filed our retention applications for the Committee

4    professionals and filed CNOs, and your office had indicated

5    you wanted to get through today, which I totally understand,

6    but I just wanted to make sure that Your Honor didn't lose

7    sight of those.  I don't believe there were any objections to

8    those, but I think your intent was probably to deal with them

9    after today, but I just wanted to --

10           THE COURT:  All right.  Yes, it was to get through

11   today.

12           MR. CLEMENTE:  Yes.

13           THE COURT:  So, since you've had plenty of time run

14   on those, you can submit orders and I'll get them signed in

15   chambers.

16           MR. CLEMENTE:  Thank you very much, Your Honor.

17   Appreciate it.

18           THE COURT:  Okay.  Thank you.  Counsel?

19           MR. DEMO:  Good afternoon, Your Honor.  Greg Demo,

20   Pachulski Stang, on behalf of the Debtor.  I'm happy to keep

21   this as brief as possible, but I think walking through the

22   cash management motion has the most changes.

23           THE COURT:  Okay.

24           MR. DEMO:  The biggest change there, and we had

25   discussed this with the United Stated Trustee in Delaware, is
```

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 87
Case 3:21-cv-00538-N  Document 26-49  Filed 06/09/21    Page 109 of 243  PageID 15989

86

1  that in our initial motion we disclosed that the Debtor had

2  bank accounts at BBVA and then also at NexBank.  Those

3  accounts have been moved to East West Bank, --

4            THE COURT:  Okay.

5            MR. DEMO:  -- which is a party to a depository

6  agreement with the United Stated Trustee.

7            THE COURT:  Okay.

8            MR. DEMO:  The only exception to that is a

9  certificate of deposit that is at NexBank.  It's a relatively

10  small amount of money.  It's $135,000.  But it also is pledged

11  as collateral on a lease.  So that has been -- proven

12  problematic to move.  The Trustee for Delaware did say that

13  was okay.  I would hope that the Trustee for Texas would agree

14  with that.  We did disclose it in the initial debtor

15  interview.

16      But those are the bank accounts.  The bank accounts at

17  BBVA and NexBank, with the exception of that CD, were all

18  closed as of yesterday.

19            THE COURT:  Okay.

20            MR. DEMO:  So now we are going to be using East West

21  Bank for all operating accounts, all cash, going forward.

22      The other two accounts are the account at Jefferies, which

23  is the prime brokerage account.

24            THE COURT:  Uh-huh.

25            MR. DEMO:  That account, we are keeping open.

013052

1    Obviously, there have been conversations with Jefferies that

2    are going to be reflected in the proposed order on the

3    settlement, but we do propose to keep the Jefferies prime

4    brokerage account open as well.

5        And then we filed a supplement for another prime brokerage

6    account that we have at a prime broker called Maxim Group.

7    That account has $30 million in securities in it, give or

8    take, and then literally like $100 in cash.  The Debtor

9    considers that account more an investment than actual

10   operating account, but we would like to keep that account open

11   as well, just so it can continue holding those securities.

12       Jefferies and Maxim, neither of them are on the depository

13   list, so we are requesting a waiver of 345(b) for those two

14   accounts, and then also requesting a waiver of 345(b) with

15   respect to the certificate of deposit at NexBank.

16            THE COURT:  Okay.

17            MR. DEMO:  That's where we're at at cash management.

18   And I guess, sorry, one more thing.  In the original cash

19   management motion, we had a series of intercompany

20   transactions that we disclosed, and we had gotten interim

21   relief from the Delaware court to make those payments up to a

22   hundred -- or, $1.7 million.  We are below that account, and

23   on a go-forward basis, all of those intercompany transactions

24   are getting subsumed into the settlement motion and the

25   operating protocols and all of that.  But we are asking for

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 89
Case 3:21-cv-00538-N  Document 26-49   Filed 06/09/21   Page 111 of 243   PageID 15991

88

1    final relief on the intercompany transactions that we made

2    under the interim order.

3            THE COURT:  Okay.  All right.  Who wishes to be heard

4    on this?  I don't know how much discussion we've had outside

5    the courtroom on this.

6            MS. LAMBERT:  We haven't -- normally, a bond would be

7    appropriate for the Jefferies and the other small account.

8    The estate is at risk on the CD, but it's not that much money.

9    It's not worth bonding.  It'll be more expensive to bond it.

10        NexBank, as you know, Your Honor, is a bank where Mr.

11   Dondero is the CEO.  So that was part of the reason that

12   NexBank was carved out.  But the -- so I would like them to

13   bid bonds on the Jefferies and the other account.  And if we

14   -- let's carry it on those issues so that we can see how

15   expensive bonding it would be, and if it's cost-prohibitive,

16   maybe we reconsider.  But in the past, the bonds haven't been

17   very expensive, relatively.

18           MR. DEMO:  We're happy to discuss that with the U.S.

19   Trustee.  I mean, just for the record, the Jefferies account,

20   you know, does support a margin loan.  It's $80 million in

21   securities.  It's $30 million at Maxim.  They're SIPC.  I

22   mean, it's Jefferies and, you know, another large prime

23   broker.  Again, we're happy to discuss it with the Trustee.  I

24   don't know that it's necessary, but we will discuss it.

25           THE COURT:  Okay.  Well, you all can discuss it, and

1    if you have an unopposed order, an agreed order, --

2              MR. DEMO:  Uh-huh.

3              THE COURT:  -- you can upload it and I'll sign it.

4    Otherwise, if you need hearing time on the 21st, --

5              MR. DEMO:  Okay.

6              THE COURT:  -- we'll get it all figured out then and

7    --

8              MR. DEMO:  Okay.  All right.

9              THE COURT:  -- resolve it then.

10             MR. DEMO:  Thank you, Your Honor.  And then I guess

11   the other motion is the CRO retention.  This one should

12   hopefully be pretty brief.  We are just filing a new proposed

13   order that attaches the engagement letter, as has been

14   modified by all of the settlement discussions.  I believe the

15   Committee is on board with that, and it's consistent.  It was

16   one of the attachments that you approved this morning in

17   connection with the settlement.

18             THE COURT:  All right.  Comments on that?

19             A VOICE:  None, Your Honor.

20             THE COURT:  Committee,  you're good?

21             MS. LAMBERT:  The U.S. Trustee had also objected to

22   the CRO motion, but it's some of the same issues that the

23   Committee raised.  And the CRO, my understanding, is now not

24   an employee of the board but totally overseen by the board,

25   and with that, we can withdraw our objection.

013055

Case 19-34054-sgj11 Doc 1822-143 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 91
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 113 of 243 PageID 15993

90

```
1          THE COURT:  All right.  Very good.  I'll sign your

2    order on the CRO, then.

3          MR. DEMO:  Okay.  Thank you, Your Honor.

4          THE COURT:  All right.  Well, if there's nothing

5    else, I'll be on the lookout for your orders.  And, again, if

6    you could coordinate with Traci to make sure she's clear on

7    everything you need set on the 21st.

8          MR. POMERANTZ:  Thank you very much, Your Honor.

9          THE COURT:  All right.

10         MR. CLEMENTE:  Thank you, Your Honor.

11         MR. DEMO:  Thank you, Your Honor.

12         THE CLERK:  All rise.

13       (Proceedings concluded at 11:54 a.m.)

14                          --oOo--

15

16

17

18

19

20                      CERTIFICATE

21     I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23    /s/ Kathy Rehling                        12/10/2020

24   _____    _____
     Kathy Rehling, CETD-444                        Date
25   Certified Electronic Court Transcriber
```

91

INDEX

PROCEEDINGS                                                    4

OPENING STATEMENTS

By Mr. Pomerantz                                              9
By Mr. Clemente                                             29
By Ms. Patel                                                41
By Mr. Pomerantz                                            45
By Mr. Daugherty                                            46
By Mr. Maxcy                                                48
By Mr. Bentley                                              48
By Ms. Lambert                                              49

WITNESSES

Debtor's Witnesses

Bradley Sharp
- Direct Testimony by Declaration                           8
- Cross-Examination by Ms. Lambert                         59

EXHIBITS

Debtor's Exhibits                         Identified Received

1    Bradley Sharp Declaration              8      8

CLOSING ARGUMENTS

By Mr. Pomerantz                                            68
By Mr. Clemente                                            71
By Mr. Pomerantz                                           73

RULINGS                                                     75

END OF PROCEEDINGS                                          90

INDEX                                                       91

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT SSSSSS

```
                   IN THE UNITED STATES BANKRUPTCY COURT
                    FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION

                                      )   Case No. 19-34054-sgj-11
    In Re:                            )   Chapter 11
                                      )
    HIGHLAND CAPITAL                   )   Dallas, Texas
    MANAGEMENT, L.P.,                  )   Tuesday, October 27, 2020
                                      )   10:30 a.m. Docket
            Debtor.                   )
                                      )   - AMENDED DISCLOSURE STATEMENT
                                      )     (#1080)
                                      )   - MOTION FOR ENTRY OF AN ORDER
                                      )     APPROVING THE ADEQUACY OF
                                      )     THE DISCLOSURE STATEMENT
                                      )     (#1108)
    _____  )

                        TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                    UNITED STATES BANKRUPTCY JUDGE.

    WEBEX/TELEPHONIC APPEARANCES:

    For the Debtor:          Jeffrey N. Pomerantz
                             Ira D. Kharasch
                             PACHULSKI STANG ZIEHL & JONES, LLP
                             10100 Santa Monica Blvd.,
                              13th Floor
                             Los Angeles, CA  90067
                             (310) 277-6910

    For the Debtor:          Gregory V. Demo
                             PACHULSKI STANG ZIEHL & JONES, LLP
                             780 Third Avenue, 34th Floor
                             New York, NY  10017-2024
                             (212) 561-7700

    For the Official Committee  Matthew A. Clemente
    of Unsecured Creditors:     SIDLEY AUSTIN, LLP
                                One South Dearborn
                                Chicago, IL  60603
                                (312) 853-7539

    For the Official Committee  Penny P. Reid
    of Unsecured Creditors:     SIDLEY AUSTIN, LLP
                                2021 McKinney Avenue, Suite 2000
                                Dallas, TX  75201
                                (214) 981-3413
```

013059

2

```
 1   APPEARANCES, cont'd.:

 2   For UBS Securities:          Kimberly A. Posin
                                  LATHAM & WATKINS, LLP
 3                                355 South Grand Avenue, Suite 100
                                  Los Angeles, CA  90071-1560
 4                                (213) 891-7322

 5   For Acis Capital             Rakhee V. Patel
     Management, GP, LLC:         Annmarie Antoinette Chiarello
 6                                WINSTEAD, P.C.
                                  2728 N. Harwood Street, Suite 500
 7                                Dallas, TX  75201
                                  (214) 745-5250
 8
     For Redeemer Committee of    Terri L. Mascherin
 9   the Highland Crusader        JENNER & BLOCK, LLP
     Fund:                        353 N. Clark Street
10                                Chicago, IL  60654-3456
                                  (312) 923-2799
11
     For Redeemer Committee of    Mark B. Hankin
12   the Highland Crusader        JENNER & BLOCK, LLP
     Fund:                        919 Third Avenue
13                                New York, NY  10022-3098
                                  (212) 891-1600
14
     For Redeemer Committee of    Mark A. Platt
15   the Highland Crusader        FROST BROWN TODD, LLC
     Fund:                        100 Crescent Court, Suite 350
16                                Dallas, TX  75201
                                  (214) 580-5852
17
     For Patrick Daugherty:       Jason Patrick Kathman
18                                PRONSKE & KATHMAN, P.C.
                                  2701 Dallas Parkway, Suite 590
19                                Plano, TX  75093
                                  (214) 658-6500
20
     For HarbourVest, et al.:     Daniel E. Stroik
21                                DEBEVOISE & PLIMPTON, LLP
                                  919 Third Avenue
22                                New York, NY  10022
                                  (212) 909-6621
23

24

25
```

013060

3

```
1   APPEARANCES, cont'd.:

2   For the U.S. Trustee:        Lisa L. Lambert
                                 OFFICE OF THE UNITED STATES
3                                   TRUSTEE
                                 1100 Commerce Street, Room 976
4                                Dallas, TX  75242
                                 (214) 767-8967
5
    For the Pension Benefit      Michael I. Baird
6   Guaranty Corporation:        PENSION BENEFIT GUARANTY
                                    CORPORATION
7                                Office of the General Counsel
                                 1200 K Street, N.W.
8                                Washington, D.C.  20005
                                 (202)  326-4020 Ext. 3946
9
    Recorded by:                 Michael F. Edmond, Sr.
10                               UNITED STATES BANKRUPTCY COURT
                                 1100 Commerce Street, 12th Floor
11                               Dallas, TX  75242
                                 (214) 753-2062
12
    Transcribed by:              Kathy Rehling
13                               311 Paradise Cove
                                 Shady Shores, TX  76208
14                               (972) 786-3063

15

16

17

18

19

20

21

22

23

24
             Proceedings recorded by electronic sound recording;
25              transcript produced by transcription service.
```

013061

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 5 of
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 119 of 243 PageID 15999

4

| | |
|---|---|
| 1 | DALLAS, TEXAS - OCTOBER 27, 2020 - 10:38 A.M. |
| 2 | THE COURT: A Highland hearing this morning regarding |
| 3 | the disclosure statement. I know we have a lot of people on |
| 4 | the phone, so let me try to do the quickest roll call I can |
| 5 | here. For the Debtor team, who do we have appearing? |
| 6 | MR. POMERANTZ: Good morning, Your Honor. Jeffrey |
| 7 | Pomerantz along with Ari Kharasch and Greg Demo on behalf of |
| 8 | the Debtor-in-Possession. |
| 9 | THE COURT: All right. Good morning. |
| 10 | MR. POMERANTZ: Also on the line is James Seery, the |
| 11 | chief executive officer of the Debtor. |
| 12 | THE COURT: Thank you. All right. For the Unsecured |
| 13 | Creditors' Committee, who do we have appearing? |
| 14 | MR. CLEMENTE: Good morning, Your Honor. Matthew |
| 15 | Clemente; Sidley Austin; on behalf of the Committee. And my |
| 16 | partner Penny Reid is also with me today. |
| 17 | THE COURT: All right. Good morning to you. All |
| 18 | right. Let's, I guess, next go to UBS. Do we have a team for |
| 19 | UBS appearing? |
| 20 | MS. POSIN: Good morning, Your Honor. Kim Posin of |
| 21 | Latham & Watkins, counsel for UBS. |
| 22 | THE COURT: All right. Thank you. All right. What |
| 23 | about Acis? I'm not sure if you have pending disclosure |
| 24 | statement objections, but I'll go ahead and hear any |
| 25 | appearances for Acis. |

013062

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 6 of
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 120 of 243 PageID 16000

5

1          MS. PATEL:  Rakhee Patel and Annmarie Chiarello on

2    behalf of Acis Capital Management, LP, appearing.

3          THE COURT:  All right.  Thank you.  What about the

4    Redeemer Committee?  Anyone here for them?

5          MS. MASCHERIN:  Yes, Your Honor.  Terri Mascherin;

6    Jenner & Block, LLP.  From my firm, Mark Hankin.  And also our

7    local counsel, Mark Platt from Frost Brown Todd, appearing for

8    the Redeemer Committee.

9          THE COURT:  All right.  Good morning.  All right.

10   Pat Daugherty.  We have an objection.  Who is there for Pat

11   Daugherty?

12         MR. KATHMAN:  Good morning, Your Honor.  Jason

13   Kathman on behalf of Pat Daugherty.

14         THE COURT:  Good morning.  All right.  HarbourVest.

15   Do we have someone appearing for HarbourVest?

16         MR. STROIK:  Yes, Your Honor.  Good morning.  This is

17   Daniel Stroik from Debevoise & Plimpton representing

18   HarbourVest.

19         THE COURT:  All right.  Thank you, Mr. Stroik.

20      Well, the PBGC had an objection.  Do we have someone for

21   the PBGC?  (No response.)  All right.  If you're trying to

22   appear, I do not hear you, so make sure you unmute your

23   device.  (No response.)  All right.  Maybe not.

24      We had an objection from Jeffries.  Do we have anyone from

25   Jeffries on the line?  (No response.)  All right.  Maybe not.

1      Is there anyone else who wished to appear who has not

2   appeared?  (No response.)

3      U.S. Trustee, by chance?

4          MS. LAMBERT:  Judge Jernigan, this is Lisa Lambert.

5   I am on the phone, and I am aware that the PBGC had worked on

6   some comments.  We had made comments informally with the

7   Debtor, because the U.S. Trustee's objections were subsumed in

8   other objections and (garbled).  But they go to confirmation

9   and (garbled) those objections.  I don't think we need to make

10  an appearance today.

11         THE COURT:  Okay.

12         MS. LAMBERT:  Or we don't need to advocate today.

13         THE COURT:  All right.  Thank you.

14     All right.  Last call.  Anyone else wishing to appear?

15  (No response.)

16     All right.  Well, I will remind folks that, here in the

17  courtroom, we will often mute everyone's devices when we hear

18  background noise.  Rather than ferreting out who was the

19  offender, we'll just mute everyone.  So if you wish to talk

20  and you think you've not muted yourself, you may still be

21  muted because the Court did it.  So, please make sure when you

22  want to talk you unmute your device.

23     All right.  Well, Mr. Pomerantz, are you going to kick

24  things off and let us know where things stand on the second

25  amended disclosure statement?

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 8 of
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 122 of 243 PageID 16002

7

1          MR. POMERANTZ:  Yes, I am, Your Honor.  I will

2    present on the disclosure statement, and then I will have Mr.

3    Demo present on the actual solicitation procedures and also go

4    through the proposed timing for the dates that follow, if that

5    is okay with Your Honor.

6          THE COURT:  All right.

7          MR. POMERANTZ:  So, good morning, Your Honor, and

8    thank you for agreeing to continue the hearing from last

9    Thursday.  We have put the time to good use and have worked

10   hard to address many of the issues that were raised by the

11   objections and to try to narrow the remaining disputes.  We

12   think we've been partly successful.  We haven't resolved

13   everything.  But I think you'll find that the disputes have

14   narrowed.

15       Sunday evening, we filed revised versions of the plan and

16   disclosure statement reflecting changes made from the last

17   versions filed with the Court.  We also filed a reply, which

18   attached as Exhibit B a chart that summarized all the

19   objections and the Debtor's response thereto.  And then last

20   night we filed an additional proceeding that identified a

21   handful of additional disclosure changes we would propose

22   adding to the disclosure statement which is solicited for

23   voting.

24       At the outset, Your Honor, I would like to focus the Court

25   on what is coming before the Court.  Today, the Debtor seeks a

8

```
 1   finding by the Court that the disclosure statement provides

 2   adequate information within the meaning of Section 1125 of the

 3   Bankruptcy Code.  And the Debtor therefore requests approval

 4   of the disclosure statement so that the Debtor may solicit

 5   votes in connection with the second amended plan.

 6        The plan essentially contemplates a transfer of assets to

 7   the Claimant Trust, which would monetize those assets in a

 8   manner designed to maximize value.

 9        The Debtor received five substantive objections to the

10   disclosure statement:  From the Committee; HarbourVest;

11   Daugherty; PBGC; and a late-filed objection from UBS.  The

12   Debtor also received a reservation of rights from Jeffries,

13   the Class 1 creditor, and three joinders to the Committee

14   objection by the Redeemer Committee, Acis, and Meta-e.

15        To address those concerns, Your Honor, the disclosure

16   statement has been amended to do the following:  With respect

17   to the Committee's disclosure statement objections, the

18   disclosure statement now includes a more robust discussion

19   surrounding the risks in the plan.  It adds additional

20   references to the Committee not supporting the plan.

21        We have also received a draft of the Committee letter

22   urging the creditors to vote against the plan.  We have

23   provided some comments, which the Committee has accepted, and

24   we have no objection to the letter being included in the

25   solicitation material.
```

013066

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 10
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 124 of 243 PageID 16004

9

1          The disclosure statement also clarifies certain statements

2     the Committee wanted clarified concerning the nature of the

3     plan.

4          To address UBS's disclosure concerns, the disclosure

5     statement now contains an estimate of the amount of claims and

6     recoveries for creditors under the plan.  It includes

7     discussion regarding the HarbourVest and HVA claims.  It

8     references the summary judgment motion filed with respect to

9     the UBS claims.

10          UBS did not provide us with additional disclosure

11     regarding how it wanted its claims identified.  We believe, as

12     it sits today, the disclosure statement is sufficient in that

13     regard.

14          The disclosure statement also contains references to the

15     Court's approval last week of the Redeemer Committee

16     settlement, and it also contains additional information to

17     supplement the explanation of why the Debtor's assets have

18     declined in value during the course of this case.

19          To address HarbourVest's concerns, the disclosure

20     statement now includes disclosure regarding the nature of

21     HarbourVest's claims against the estate and the Debtor's

22     responses.

23          And to address the various concerns, the disclosure

24     statement now contains an explanation of the difference

25     between the book value of the Debtor's assets and the expected

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 11
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 125 of 243 PageID 16005

10

1    distributable value from those assets, net of expenses.

2        Lastly, to address the PBGC's concerns, the disclosure

3    statement adds additional language regarding the Debtor's

4    pension plan and the Debtor's -- or PBGC's reservation of

5    rights in connection therewith.  That language has been agreed

6    to by the PBGC, and I suspect that is the reason why they may

7    not be appearing today.

8        Your Honor, with respect to the filing of the plan

9    supplement, the motion to approve the disclosure statement

10   actually had committed to file the supplement seven days in

11   advance of the voting and of the objection deadline.  There

12   was an inconsistency in the plan which indicated it'd be filed

13   on the voting deadline.  Certain creditors picked that up, and

14   that's now been clarified.

15       And Your Honor, we would submit that courts in this

16   district have routinely approved the filing of a plan

17   supplement on this timeline, as reflected by the several case

18   citations contained in our reply.

19       The plan supplement will include documents necessary for

20   implementation of the plan, including the Claimant Trust

21   Agreement, which will address a variety of issues.  We

22   identify the members of the Claim Oversight Committee and the

23   Claimant Trustee, their respective compensation, the rights

24   and responsibilities of the Claim Oversight Committee and the

25   Claimant Trustee, and detail provisions regarding the

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 12
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 126 of 243 PageID 16006

11

1    establishment and rules regarding a disputed claims reserve

2    which the Debtor contemplates will be substantially similar to

3    disputed claims reserves in other classes.

4        While certain parties have taken issue with the issue --

5    with the information included in the plan projections and the

6    liquidation analysis, the Debtor believes that the documents

7    attached to the disclosure statement --

8        (Interruption.)

9        THE COURT:  It's Mr. Baird.  All right, Mr. Baird.

10   That was a distraction.  All right.  We've got you on mute

11   now.

12       Mr. Pomerantz, continue.

13       MR. POMERANTZ:  Okay.  While some parties have taken

14   issue with the information included in the plan projections

15   and the liquidation analysis, Your Honor, the Debtor believes

16   that the documents attached to the disclosure statement are

17   sufficient, that no additional disclosure is necessary at

18   this time.

19       Accordingly, the Debtor believes that the second amended

20   disclosure statement contains adequate information and this

21   Court should authorize the Debtor to solicit votes in

22   connection therewith.

23       However, certain parties, Your Honor -- principally, the

24   Committee -- have nonetheless argued to the Court that the

25   plan contains fatal flaws, is not confirmable, and that the

1  Court should short-circuit the plan process before it has

2  begun.

3      The Committee appears to want to turn this hearing into a

4  confirmation hearing, litigating a small subset of issues

5  that have eluded resolution thus far.  The theme running

6  through the Committee's objection is that because the Debtor

7  is insolvent the Debtor has no real role in the confirmation

8  process and should essentially step aside and accede to any

9  demand the Committee makes.

10      Your Honor, the Debtor disagrees.  First, as a threshold

11  matter, the Debtor does not admit that it is insolvent.

12  While the base case projections attached to the disclosure

13  statement contemplate less than a hundred percent recovery to

14  General Unsecured Creditors, the Debtors believe that those

15  projections are conservative and that there is a possibility

16  that the Debtor would generate sufficient funds to pay all

17  creditors, including General Unsecured Creditors, in full.

18      However, Your Honor, the issue of insolvency is really a

19  red herring.  Even if the Debtor is insolvent, it does not

20  mean that the Committee should be able to dictate to the

21  Debtor the type of plan it should be pursuing -- it thinks

22  should be pursued, have veto right over all documents, et

23  cetera.  There is just no concept in the Bankruptcy Code of a

24  committee-in-possession.

25      If insolvency was the determining factor of who can --

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 14
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 128 of 243 PageID 16008

13

1   who should control what is in a plan, then Committees should

2   be able to dictate how cases proceed in the vast majority of

3   cases that are filed in this Court and around the country

4   where the debtors are admittedly insolvent.  Your Honor, as a

5   debtor-in-possession, the Debtor has a fiduciary duty to all

6   stakeholders, and is entitled to pursue confirmation of a

7   plan that it believes is in the best interests of the estate

8   and meets the confirmation requirements of Section 1129.

9        That is not to say, Your Honor, that the Committee's

10  views and that of its members are not relevant and should be

11  ignored.  And the Debtor has not ignored the Committee at

12  all.  Over the last several weeks, the Debtor has made

13  substantial progress with the Committee to resolve

14  outstanding issues, and is hopeful that at the time of

15  confirmation the Committee will support the plan, and its

16  members, like other General Unsecured Creditors, will vote in

17  favor of the plan.

18       However, Your Honor, even if the Committee does not

19  support the plan and some of the Committee members vote to

20  reject the plan, the plan is still able to meet the

21  confirmation requirements -- excuse me, Your Honor -- of

22  Section 1129 of the Code.

23       In any event, Your Honor, each of the issues that the

24  Committee and the other parties raised regarding confirmation

25  do not render the plan patently unconfirmable such that the

1    Debtor should be prohibited from soliciting votes on the

2    plan, nor do they justify the disenfranchisement of the

3    Debtor's other stakeholders.

4        While these confirmation issues are not presently before

5    Your Honor, I just would like to briefly address the

6    principle confirmation issues raised by the Committee, UBS,

7    and Daugherty.

8        The first issue, which there has been a lot of papers on,

9    are the releases.  As Your Honor is aware, it is usual and

10   customary in Chapter 11 cases.  This plan, as initially

11   filed, contained releases for the Debtor, its officers,

12   directors, employees, and agents, subject to standard carve-

13   outs for gross negligence and willful misconduct.

14       The Committee argued that the releases were improper

15   under Fifth Circuit law.  They argued that the Debtor did not

16   identify who would be released, nor what consideration was

17   being provided for those releases.  And the Debtor has

18   addressed several of the Committee's concerns by

19   modifications it made to the releases in the recently-filed

20   plan.

21       First, and I know it's an issue of focus for everyone in

22   this case, the plan now makes clear that not only are James

23   Dondero and Mark Okada excluded from the release, but also

24   NexPoint Advisors, NexBank, Highland CLO Funding, the

25   (inaudible) Fund, Highland Capital Management Fund Advisors,

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 16
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 130 of 243 PageID 16010

15

1    CLO Holdco, Dugaboy, and the related entities are

2    specifically carved out for the release.

3        The release, as it presently stands, essentially covers

4    the employees, officers and directors who have worked hard

5    during the course of this case to get the case to where it is

6    today and have done everything that the independent board has

7    asked of them in the process.

8        Second, Your Honor, the Debtor has expanded the carve-

9    outs to the release to not only include gross negligence and

10   willful misconduct, but also to include avoidance actions.

11       And lastly, Your Honor, to address the issue of

12   consideration, the plan now provides that the employees will

13   forfeit their releases if they do not cooperate with the

14   Claimant Trustee in monetizing assets or objecting to claims.

15   This cooperation requirement will apply whether or not the

16   person is employed by the Claimant Trust after the effective

17   date.

18       The determination of whether an employee has cooperated

19   will be made by the Claimant Trustee, subject to the

20   agreement of the independent members of the Claim Oversight

21   Committee.

22       Accordingly, Your Honor, at confirmation, the Court will

23   have to decide whether this consideration is sufficient to

24   support the releases.

25       I would note, Your Honor, that the Debtor is not aware of

013073

1    any claims that exist against any of these parties being

2    released.

3        The Committee is granted exclusively authority to

4    investigate and prosecute claims against these parties.  And

5    while the Debtor understands that the Committee's

6    investigation may be (garbled), the fact is the Committee has

7    not identified any such claims yet.

8        However, it does bear repeating that the releases contain

9    broad carve-outs for gross negligence, willful misconduct,

10   and avoidance actions.  As such, if the Committee, or

11   subsequently the Litigation Trustee, determine that there are

12   causes of action against any of the released parties and

13   those causes of action fall within the carve-out, the

14   Litigation Trustee will be able to still pursue those actions

15   under the plan.

16       Because of the broad carve-outs, the releases essentially

17   are only releasing claims for things like simple negligence.

18       Accordingly, Your Honor, there is nothing patently

19   unconfirmable about the Debtor releases, and the Debtor will

20   be prepared to carry its burden at confirmation to

21   demonstrate that the releases are justified.

22       A dispute over whether the plan will or will not include

23   the releases and the scope of those releases is not properly

24   decided at this hearing, which is simply to determine the

25   adequacy of disclosure.

1      The next issue, Your Honor, is issues regarding

2  classification.  The Committee raised several issues

3  regarding the Debtor's classification of General Unsecured

4  Creditors.  First, the Committee requested that the employee

5  claims, which are essentially bonuses that certain senior

6  management employees were entitled to receive during the

7  course of the case but did not, be collapsed into the general

8  convenience class that is now Class 7 under the plan.  The

9  Debtor agreed to make that change.

10     Second, the Committee requested that the threshold for

11  convenience claims be reduced to $1 million instead of $2.5

12  million.  The Debtor agreed to make those changes, but unlike

13  the Committee's request, the Debtor felt it was appropriate

14  to allow any creditors to be able to reduce their claims to a

15  million dollars and elect convenience class treatment.  So

16  the Debtor's plan, which has not been agreed to by the

17  Committee, contains an opt-in to the convenience class.

18     Third, the Committee requested that the distribution to

19  convenience creditors be increased from 75 percent to 85

20  percent.  The Debtor agreed to make that change.

21     And lastly, the Committee requested that holders of

22  convenience class claims be permitted to opt in to the

23  general treatment of unsecured claims in Class 8 if they

24  prefer to roll the dice and ultimately the chance to receive

25  100 percent of their claims over time in lieu of 85 percent.

1    And the Debtor has agreed to make that change.

2        So Your Honor, other than the opt-in issue, which, again,

3    is not a disclosure statement issue, the Debtor believes it's

4    adequately addressed the Committee's classification issues.

5        The Debtor has also created a new Class 6 under the

6    amended plan which includes the paid time off claims of

7    employees in excess of the statutory cap.  These claims are

8    expected in the aggregate to be no more than $760,000, and

9    the plan now treats them as unimpaired.

10        Patrick Daugherty has argued that the separation of

11    Unsecured Creditor claims into a convenience class and to a

12    general unsecured class is improper.  The issue is a

13    confirmation issue as well, Your Honor, but I will say that

14    the creation of an administrative convenience class under a

15    plan is customary in Chapter 11 plans and is not prohibited

16    under Fifth Circuit law.

17        The Debtor did not create that plan to gerrymander votes,

18    but rather to recognize that creditors with relatively small

19    claims in the context of this case should be cashed out for a

20    discount, or at least offered the opportunity to be cashed

21    out at a discount, and not be lumped in with a class

22    consisting of primarily large litigation claims, many of

23    which are unliquidated.

24        Next, Your Honor, a dispute has arisen between the Debtor

25    and the Committee regarding the appropriate interest rate to

1    be provided to General Unsecured Creditors if the Debtor ends

2    up being solvent.  Both the Debtor and the Committee seem to

3    agree that the appropriate rate from the petition date to the

4    effective date is the federal judgment rate.

5        The parties, however, disagree on the appropriate rate

6    from the effective date until the date of payment.  However,

7    Your Honor, interest in a solvent case, that's a legal issue,

8    that's a confirmation issue, and Your Honor does not have to

9    decide that issue today.

10        Lastly, Your Honor, the Committee has raised concerns

11    about whether the Debtor should have a say in certain plan-

12    related issues.  Consistent with its position that the

13    Committee should control the plan process and the Debtor

14    should essentially just act as a scrivener, the Committee

15    does not believe that the Debtor's reasonable consent should

16    be required for the identity of the independent members of

17    the Claimant Oversight Committee, the identity of the

18    Claimant Trustee, the form of the Claimant Trust Agreement,

19    or the form of the other transactional documents to implement

20    the plan.

21        The Debtor just has a philosophical disagreement with the

22    Committee.  As a debtor-in-possession, the Debtor's plan, the

23    Debtor should have reasonable consent rights with respect to

24    these matters.

25        However, Your Honor, to avoid what the Debtor believes is

013077

1    ultimately a theoretical as opposed to practical issue, the

2    Debtor has urged the Committee to engage with the Debtor on

3    documentation and identifying Oversight Committee Members,

4    the Claimant Trustee, and the Litigation Trustee.  And a

5    couple of days ago, Your Honor, the Committee identified the

6    independent board member and the Litigation Trustee, and

7    those people are acceptable to the Debtor and will be

8    disclosed in the plan supplement.

9        The parties have also exchanged drafts of the Claimant

10   Trust Agreement and the plan implementation documents, and

11   the Debtor is cautiously optimistic that the parties will

12   reach agreement on the form of these documents prior to

13   filing the plan supplement.

14       Accordingly, Your Honor, the negotiation over these

15   documents is happening exactly how it should be, and there is

16   no reason for the Court to step in and give the Committee

17   complete decision-making authority at this stage.  If there

18   is a dispute at confirmation, the Court can certainly weigh

19   in.  We understand that we need to try to work out the issues

20   with the Committee, and I'm cautiously optimistic we can.

21       UBS and Daugherty have raised additional confirmation

22   issues such as failure to satisfy the best interests of

23   creditors test, violation of the absolutely priority rule,

24   and the failure to demonstrate feasibility.  None of these

25   issues, Your Honor, have any merit, and, of course, are not

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 22
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 136 of 243 PageID 16016

21

1   properly before the Court in connection with the disclosure

2   statement hearing.

3       The liquidation analysis demonstrates that distributions

4   in a Chapter 7 would be less than under a plan.  If people

5   want to flaunt that at confirmation, they can.  As General

6   Unsecured Creditors are not promised any amount of a

7   distribution but will receive the net proceeds of the

8   monetization of assets, the structure is, by definition,

9   feasible.  And Equity, while receiving contingent interests

10  in the Trust, will not receive anything until creditors are

11  paid a hundred percent, plus interest.  So there is no

12  violation of the absolutely priority rule.

13      However, as I mentioned, Your Honor, these are all

14  confirmation issues that the parties are free to raise before

15  Your Honor, who will have a full evidentiary and legal record

16  to make those decisions at confirmation.

17      In conclusion, Your Honor, as I mentioned at the outset,

18  all we are asking the Court to do today is to find that the

19  disclosure statement contains adequate information within the

20  meaning of Section 1125 of the Bankruptcy Code.  We submit

21  that the changes that have been made by the Debtor easily

22  meet that standard.  And while we surely hope to have the

23  Committee and its members on board with the plan at

24  confirmation, the lack of agreement at this stage is not

25  fatal, and subject to voting, the plan can be confirmed

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 23
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 137 of 243 PageID 16017

22

1    without the support of certain of the Committee members.

2        Similarly, Your Honor, none of the confirmation issues

3    raised by the parties render the plan patently unconfirmable.

4    They raise a variety of legal and factual issues that the

5    Court will decide with full briefing and a full evidentiary

6    record.

7        For these reasons, Your Honor, the Debtor requests that

8    the Court grant the Debtor's motion and permit the Debtor to

9    solicit votes in connection therewith.

10       I'm happy to answer any questions Your Honor may have.

11            THE COURT:  All right.  Well, I'm probably going to

12   have a couple, but they may end up getting answered in the

13   presentations, so I'll hold my questions for now.

14       We did see Mr. Baird on the screen for the PBGC.

15            MR. BAIRD:  Good morning, Your Honor.

16            THE COURT:  Good morning.

17            MR. BAIRD:  I apologize.  I was trying to appear

18   telephonically and I think I was muted by the Court and so

19   I'm coming obviously through WebEx now.  And I apologize for

20   that technical snafu.

21       Debtor's counsel's representations are accurate.  The

22   PBGC's objection was resolved consensually by agreed-upon

23   language, and I thank the Debtors for their hard work in

24   getting us to that place.

25            Thank you, Your Honor.

1          THE COURT:  All right.  Thank you, Mr. Baird.

2       All right.  Well, Mr. Clemente, I will turn to you or Ms.

3   Reid next to hear what you have to say about the status of

4   the disclosure statement.

5          MR. CLEMENTE:  Yes.  Thank you, Your Honor.  Matt

6   Clemente on behalf of the Committee.

7       I think Mr. Pomerantz accurately characterized the fact

8   that we still have some issues with respect to the plan and

9   we do believe that the plan as currently constructed is not

10  capable of confirmation from a legal perspective, but perhaps

11  equally, if not more importantly, from a practical

12  perspective.

13      As I think about my comments to Your Honor, Your Honor

14  may be asking me, what is it that I want, and maybe I'll

15  start there.  I think it's been clear from the outset of the

16  case that this plan needs to ultimately reflect that which

17  its key voting constituency finds acceptable.  Your Honor,

18  that will happen.  The only question is when and how much

19  delay and how much a waste of resources and time will be

20  necessary.  And that's how I'm framing the way that I'm

21  approaching my comments.

22      The second thing I would offer, Your Honor, is Mr.

23  Pomerantz's discussion to start the hearing is perfectly

24  appropriate and one that I've heard many times in 99 out of a

25  hundred other cases.  But Your Honor, I think, as I've

1    consistently said to you from the beginning, I just don't see

2    how in this particular case there can or, frankly, should be

3    a plan that doesn't enjoy the support of the Committee and

4    its members.  And, again, frankly, Your Honor, I think it's

5    foolhardy in trying to pursue such a plan.

6        We are not the only constituency objecting.  We have

7    objections and joinders from each member of the Committee, as

8    well as other creditors in this case.  In fact, I'm not sure

9    there's any party that supports the current construct of the

10   plan.

11       What we need, Your Honor, and what we've been clear about

12   since the beginning of the case, is for the Debtor to

13   understand the context of this case.  I apologize for

14   continuing to use that word, but I do think it's appropriate,

15   because it isn't like a typical Chapter 11 case.  The key

16   constituency here are the General Unsecured Creditors, the

17   overwhelming majority of whom are here because of litigation

18   claims, Your Honor, and therefore the conduct of this Debtor.

19   This cannot be overlooked, and particularly thinking about

20   the release provisions of this plan.

21       As I have said, context is critical, and it is indeed

22   critical here.  Your Honor, the Debtor is not a maker of

23   widgets who ran into industry headwinds.  It didn't overlever

24   itself with junk bonds.  Nor are its insiders and key

25   employees the victims of uncontrollable market forces or

1    other happenings beyond their control.

2        Your Honor, the Debtor fled into Bankruptcy Court to

3    protect itself from litigation and judgments which found it

4    liable for breaches of duty and fraudulent and other conduct

5    over the course of a decade.  Here, Your Honor, I think what

6    is important is conduct and the actions taken by people, the

7    very same people the Debtor is seeking to release under its

8    proposed plan for no value and over the creditors' objection,

9    people who this Court and other tribunals have found to be

10   dishonest and lacking credibility, and the people whose

11   conduct has resulted in the very litigation judgments and

12   claims which precipitated this filing.

13       Your Honor, I submit in the context of this case, in

14   particular with respect to the release provisions, we need to

15   stop now and have the Debtor finally recognize and understand

16   what its only constituency has said to it in this context.

17   It needs and requires a new plan, in particular as it relates

18   to the releases.

19       The release provision, Your Honor, even as modified in

20   the most recently-filed plan -- and I'll be careful with my

21   words here, Your Honor -- I believe is highly inappropriate,

22   and frankly, is emblematic of a debtor that still doesn't get

23   it.

24       Although I think one could argue that no release at all

25   is appropriate in this context, the Committee is prepared to

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 27
Case 3:21-cv-00538-N   Document 26-49   Filed 06/09/21    Page 141 of 243   PageID 16021

26

1   consider an appropriately-drawn and narrow release covering

2   certain parties.  But providing a blanket but full release --

3   and make no mistake, that is exactly what the plan does --

4   for insiders and other similar persons who are the people

5   whose conduct spawned the very claims that drove this

6   bankruptcy and gave rise to the massive claims against the

7   estate, frankly, is inappropriate, and I think one could say

8   is offensive, in particular to the creditors whose claims

9   remain unpaid.  We are here because of their conduct, Your

10  Honor, and a broad release as the default role is simply not

11  appropriate.

12      With respect to the carve-outs and the modifications to

13  the release that Mr. Pomerantz talked about and the

14  justification of future cooperation on asset sales, it won't

15  somehow otherwise revive an otherwise faulty release, Your

16  Honor.  The carve-outs for willful misconduct and gross

17  negligence add nothing, and, more importantly, probably renew

18  nothing, given public policy.  But more importantly, perhaps,

19  Your Honor, the Committee or Litigation Trustee shouldn't

20  have to parse through language, release language, to

21  determine whether something does or doesn't fall within the

22  carve-out or outside of it, again, in the context of this

23  case.

24      We live in a world of unintended consequences, but,

25  perhaps, Your Honor, intended consequences when it comes to

013084

1  the release, and we simply should not be confronted with the

2  potential impact on claims and causes of action a release

3  given today will have in the future.

4      In particular here, I know Mr. Pomerantz suggested that

5  there is upside.  I'd like to think I have upside in my world

6  too, but in particular here, the Debtor's own projections

7  show the General Unsecured Creditors are not likely to

8  recover in full from the assets.

9      And therefore, the point is causes of action will provide

10  a likely (inaudible) of recovery here, Your Honor.  If in

11  fact it turns out we need someone so badly in order to assist

12  who will undoubtedly be a very capable Claim Trustee tasked

13  with monetizing the assets in a value-maximizing way, we can

14  offer the release at that point in time, Your Honor, as

15  opposed to having to deal with that decision now and deal

16  with the consequences of having a release thrust upon us now.

17      And frankly, Your Honor, I'm not sure what level of

18  cooperation one could expect to get when the default is

19  taking something away from somebody, which is exactly what

20  the Debtors have proposed here.

21      Your Honor, let me be clear.  What none of us want, and I

22  assume Your Honor doesn't want, either, is us spending the

23  next six weeks fighting the plan.  To the contrary, the

24  Committee wants to spend all of its resources and energies on

25  confirming an appropriate plan.  But at this juncture, it is

013085

1    the Committee and its members view that it is a waste of time

2    and resources to move forward with a plan that it doesn't

3    support, and the Debtor needs to understand that message,

4    Your Honor.

5         Let me offer a couple further comments, Your Honor.  The

6    Committee is not attempting to usurp or disenfranchise

7    creditors.  First, many of the key ones have spoken for

8    themselves.  They aren't supporting this plan and won't

9    support this plan.

10        Second, the Committee has a fiduciary duty which it has

11   and will continue to dispatch appropriately.  One could more

12   appropriately question the duty of this Debtor who insists on

13   attempting to ram through, from what I can surmise, releases

14   that enjoy no support, for the very employees who brought

15   this case about in the first place and whose conduct has

16   resulted in the claims of my constituents.  Your Honor, I

17   scratch my head as to what the actual explanation is for

18   that, but it doesn't appear that there is one, and certainly

19   not one that's acceptable to the Committee.

20        Your Honor, let me address why is this a disclosure

21   statement issue.  I don't think the Debtor should be given an

22   opportunity to make its case at confirmation on this.  As we

23   laid out in our papers, we don't need to wait for a

24   confirmation hearing to realize the Debtor can't satisfy the

25   standard against which the releases will be judged, including

1    the paramount factor of Committee creditor support.

2         Additionally, Your Honor, the disclosure the Debtor wants

3    to make that purports to cure the issue is woefully

4    inadequate and skews it the wrong way.  The default in this

5    case is simply not that the releases are appropriate until

6    proven otherwise.  That is not the law.  It's not the

7    default.  It may be practice, but this isn't the usual case.

8    And Your Honor, I think it's just plain wrong.

9         Context, again, Your Honor, matters.  This isn't the

10   typical Chapter 11 case where a debtor is balancing multiple

11   competing interests in a complicated capital structure,

12   (inaudible) and things of that nature.  We have a liquidation

13   here, plain and simple.  There aren't competing interest to

14   balance.  This is about maximizing the value of existing

15   assets through an orderly liquidation after preserving and

16   pursuing causes of action.

17        I don't understand the noble cause that the Debtor may

18   think it's pursuing here, in particular with respect to the

19   releases.  There simply isn't the case as to why it should go

20   forward at this time.  From a legal perspective, we think

21   it's patently unconfirmable, the way that the releases are

22   restructure.  And from a practical perspective, given the

23   objections that have been filed, there simply isn't any point

24   in moving forward with a plan that is not capable of

25   confirmation at this point in time, Your Honor.

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 31
Case 3:21-cv-00538-N  Document 26-49   Filed 06/09/21   Page 145 of 243   PageID 16025

30

1        We did give the Debtor a couple of extra days to try and

2   resolve our issues -- specifically, Your Honor, where we are

3   with respect to the release.  The conflict with related

4   persons, Your Honor, which is contained in the release, must

5   be removed.  It's overly broad.  It overly broadens the

6   release by including former officers, directors, things of

7   that nature.  It just shouldn't belong there.

8        Second.  Someone can be removed.  Again, it's unintended

9   consequences.  We do believe, obviously, that our directors

10  should enjoy a release, but the idea of (inaudible) part of

11  the release, we just think that that unnecessarily broadens

12  it.

13        And with respect to the officers and employees of the

14  Debtor, Your Honor, you know the Committee's feelings on

15  certain of the officers and employees of the Debtor.  We

16  think that it needs to be appropriately carved back to ensure

17  that certain of those officers and employees are not covered.

18        So, Your Honor, that's where we are with respect to the

19  releases.  And we think that the construct of the release

20  makes the plan patently unconfirmable, and practically not

21  confirmable, given the objections that have been filed.

22        Similarly, Your Honor, with respect to the exculpation

23  and injunction provision, I think if we remove the concept of

24  a related person there, I think that appropriately narrows

25  the exculpation and injunction.

013088

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 32
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 146 of 243 PageID 16026

31

1      Your Honor, with respect to the interest rate, I

2  appreciate Mr. Pomerantz's concern that this is something

3  that should be addressed at the confirmation hearing.  I

4  would just simply suggest to Your Honor that, given the

5  (inaudible) decision and the District Court decision, I think

6  it's entirely supportive of the position that the Committee

7  has taken in terms of what an appropriate interest rate

8  should be.

9      Your Honor, with respect to various provisions of the

10 plan that the Debtor has carved back for itself, a consent

11 right, Your Honor, we do endeavor to continue to work with

12 the Debtor to resolve those particular types of issues as we

13 move forward, and we have been able to make tremendous

14 progress on that.  We think there simply is, Your Honor, it

15 is part of the underlying theme.  The Committee has its duty

16 to the constituency here, other creditors, and it's just

17 confounding as to what it is that the Debtor continues to

18 believe it needs to push forward with in terms of its duty or

19 whom it's particularly protecting in those contexts, Your

20 Honor.

21     So, with that, Your Honor, I'll conclude my remarks.  I

22 am happy to answer any questions Your Honor would have,

23 particularly with respect to the releases.  They render the

24 plan patently unconfirmable, Your Honor, and frankly, from a

25 practical perspective.  We should just stop this now.  The

1    Debtor should realize that the plan is going to look the way

2    that its creditor constituency believes it should look, and

3    should make those adjustments, instead of spending the next

4    six weeks heading into a confirmation hearing where the

5    result is inevitable.

6        Thank you, Your Honor.

7            THE COURT:  All right.  I know there are other

8    parties who want to weigh in, but I'm going to interject

9    right now.  Actually, I'm going to go back to Mr. Pomerantz.

10       With regard to these releases -- and they are, I'll just

11   be clear, Debtor releases, not third parties releasing third

12   parties.  But nevertheless, you know, I think there's an

13   issue there of they would need to be fair and equitable, in

14   the best interest of creditors, and in the paramount interest

15   of creditors would be something the Court would focus on

16   there.  While I appreciate that you've tried to add more

17   definition and carved people out, I tend to agree

18   wholeheartedly with what Mr. Clemente said as far as context.

19   This is not your normal case where this is the type of

20   provision you see in many, many, many Chapter 11 plans.  We

21   don't have, for example, a lender and its professionals

22   getting released from the Debtor because, for goodness sakes,

23   they've made DIP loans and made all kinds of concessions.  We

24   certainly don't have anything close to the so-called grand

25   compromise.

1       This does seem like a big deal to me, where we know there

2   is going to be post-confirmation litigation.  This provision

3   to me seems to guarantee that, in every type of post-

4   confirmation litigation that might be waged, there would be a

5   Level 1 phase of that litigation, Oh, this is barred by the

6   plan release.

7       So what is the -- and I understand you are going to tell

8   me it's a confirmation objection, but it seems like a big

9   deal that we ought to confront right now.  So what is your

10  response to that?

11          MR. POMERANTZ:  Your Honor, I do agree context is

12  important.  And we've heard from the beginning of this case

13  from Mr. Clemente and others about how the employees and

14  their involvement in Redeemer or their involvement in Acis

15  are bad people, okay?  But what have we seen in the last

16  year?  We've seen, and Mr. Seery will be prepared to testify

17  at confirmation, that everything that the independent board

18  has asked of these employees during the course of this case,

19  they have come through, and we are where we are in part

20  because of the dedication and hard work.  Okay?

21      Second point, Your Honor.  The Committee on January 9th

22  had the ability to pursue claims against insiders,

23  affiliates, employees.  I know Mr. Clemente will say that we

24  still haven't produced emails, but the fact of the matter is

25  they have received a substantial amount of discovery.  We are

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 35
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 149 of 243 PageID 16029

34

1   nine months after that.  And the Committee cannot identify

2   one single claim against any of these employees.  Whether

3   it's because of the animus of the Committee members, whether

4   it's because of the desire to hold them hostage, the bottom

5   line is there is nothing in the record of these cases that

6   the employees who have worked hard should not get a release.

7       But it's more important than that, Your Honor.  Mr. Seery

8   will testify at the confirmation that it is critical to

9   obtain the support of certain key employees, not only to

10  monetize assets but to deal with the objections to claims.

11  The objections to the claims filed by UBS, which, as Your

12  Honor has heard, the Debtor doesn't believe are valid.  The

13  objection to the claims of HarbourVest.  So to argue that the

14  cooperation requirement that is now part of the plan and its

15  consideration should be overlooked and is irrelevant, this is

16  not the case, Your Honor.

17      I talked to you about objections to claims.  Mr. Clemente

18  stands up before Your Honor and talks about how the Committee

19  members and other parties are not supporting this plan.

20  Let's look at that a little further.  First of all, the

21  Committee has Meta-e on its Committee.  Meta-e, I suspect,

22  now that it's getting 85 percent of its distribution, I

23  suspect they will support the plan.

24      UBS, Your Honor.  UBS does not have a claim, the Debtor

25  believes.  So the views of a disputed creditor.

1     We acknowledge Acis and Redeemer have claims.  We

2     acknowledge maybe they will object to the plan.  But let's

3     look who else objected.

4     HarbourVest.  The Debtor -- the Court has not heard a

5     full hearing on the Debtor's views on the HarbourVest claim.

6     That will come preliminarily in the 3018 motion that

7     HarbourVest filed.  We don't believe HarbourVest has a claim.

8     Patrick Daugherty.  We have objected to their claim as

9     well, and there'll be a 3018.

10     So this whole concept of the creditor body at large

11     objected to the claims, if you really strip through it, you

12     have several disputed creditors who have objected to the

13     claims.  You have two legitimate creditors in Acis and

14     Redeemer, which we acknowledge at this point have not

15     accepted.  But you also have a year of a record where Mr.

16     Clemente, despite all the effort and time that Sidley and FTI

17     and the Committee have put into this case, have not

18     identified a solitary issue.

19     So, Your Honor, we hope to be able to resolve this issue

20     prior to confirmation.  We don't think that Mr. Clemente is

21     right that this is legally unconfirmable.  I think Mr.

22     Clemente has acknowledged it's an issue of sufficiency of the

23     consideration.  And we respect the Committee's view to say

24     that the Debtor will not meet its burden.  But at this stage,

25     based upon a series of unfounded allegations and ephemeral

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 37
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 151 of 243 PageID 16031

36

1    allegations that just because they were involved in some

2    prepetition litigation, ignores the right of this independent

3    board, ignores the services that they have provided, and is

4    just not something that the Court needs to determine today,

5    absent a full evidentiary hearing on these issues.

6        I realize I may have been testifying from the podium.

7    That's not my intent.  But the right place to deal with this

8    issue, if it's still an issue at confirmation, is with a full

9    evidentiary record so Your Honor can make the decisions not

10   based upon innuendo, allegations, and just what the history

11   of Highland is, but really on what the facts are and whether

12   the facts justify a release.

13           THE COURT:  Okay.  Let me ask this.  It sounds like

14   what we're talking about is a group of employees that

15   Highland, you know, the board of Strand, Mr. Seery, feel like

16   have been invaluable and will continue to be invaluable.  Why

17   not just list the employees who would be the subject of the

18   release, instead of kind of working backwards and granting a

19   release that's somewhat broad and then saying, Oh, but we're

20   carving out Dondero, Okada, you know, HCLOF.  If what we're

21   really talking about essentially is some key employees, why

22   not just list them?

23           MR. POMERANTZ:  Well, Your Honor, it's not only the

24   key employees.  It's all employees.  I don't think I've ever

25   seen a plan that has identified every employee that would get

1    a release.  That's something we could do.  We are mindful of

2    privacy issues from individuals, and individuals tend not to

3    like to see their names in pleadings.

4        I think it's pretty clear who's getting released here.

5    It's these employees.  We've had sufficient carve-outs.  If

6    Mr. Clemente doesn't like the language we thought was pretty

7    broad to make sure there is no -- there is no potential of

8    having Mr. Okada, Mr. Dondero, or any of their entities,

9    we're happy to work on an expanded inclusion.  If Your Honor

10   requires we -- us to identify the names, we can.  We just

11   don't think it's really appropriate to have a list of 50, 60,

12   whoever the employees are, in a public document like that.

13              THE COURT:  All right.

14              MR. CLEMENTE:  Your Honor, if I might, and I can be

15   very brief.  I do appreciate Mr. Pomerantz's impassioned

16   response.  Let me say just a couple things in response.

17       I have never cast aspersions on any particular employee.

18   That's just what the record has reflected from prior

19   proceedings.  And that, Your Honor, is what the context is,

20   which is why it is different.

21       Your Honor has accurately pinpointed the issue.  As I've

22   used before, Your Honor, this is a Byzantine empire.  We

23   don't know what the release is going to be when we think

24   about claims that will be brought by the Litigation Trust

25   into the future.  And so the idea that you have a broad

013095

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 39
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 153 of 243 PageID 16033

38

1   release that then you try and carve back, frankly, is

2   unworkable in this particular context.

3       With respect to Mr. Pomerantz, again, pointing the finger

4   at me and the Committee, I'm not sure why the paradigm is

5   that the releases again in this context are appropriate and

6   it was up to the Committee to present claims against these

7   employees.  That's never been the construct of this case,

8   Your Honor.  It's always been one where the Committee has

9   been very cost-conscious.  They believe the appropriate way

10  to ultimately do it is in the context of the Litigation

11  Trust.  I don't see why that decision should be taken away

12  from them in the context of this case and with respect to

13  this Debtor.

14      And just one final point, Your Honor.  This one I

15  actually do find offensive, with Mr. Pomerantz referring to

16  the conduct of individual Committee members.  I can

17  absolutely assure you that every single one of these

18  Committee members will continue to act in accordance with

19  their fiduciary duties, even if that may mean it may cause

20  them to make a decision that Mr. Pomerantz thinks that they

21  shouldn't make.

22      So let me be very clear on that.  And that one, Your

23  Honor, I do take umbrage with.

24      Your Honor, I'm happy to answer any questions, but I did

25  want to make those comments in response to what Mr. Pomerantz

1    had to say.

2            THE COURT:  Okay.  Let me turn to a different topic.

3    There had been an objection regarding the Committee's consent

4    rights over the Claimant Trust Agreement, the initial members

5    of the Oversight Board, employees retained, et cetera, et

6    cetera.  I'm not sure where the Committee is right now on

7    that.  I understand the Debtor made some concessions.  And,

8    well, I guess what I understood was you proposed someone to

9    be the Liquidating Trustee.  They agreed.  You proposed

10   someone to be on the Oversight Board.  They agreed.  Where

11   are we on that objection?

12           MR. CLEMENTE:  Correct, Your Honor.  I believe

13   there's two points that are still salient there.  One is this

14   leads back, perhaps, to the release issue, but the idea that

15   the Committee will be told who the retained employees are.

16   The Committee believes that that is a decision that should be

17   made by them through the Claimant Trust, after confirmation

18   and in connection therewith.  Which remains salient, Your

19   Honor, and maybe more so:  The Debtor shouldn't be able to

20   veto it.  That's the problem with that.  With respect to the

21   document, Your Honor, --

22           THE COURT:  Let me stop you there.  Is the concern

23   there -- okay.  One view might be you're micromanaging saying

24   who they retain, but I think the concern there is they would

25   be entitled to bonuses and maybe some significant

013097

1    compensation if retained that would -- you know, I don't know

2    if their contracts would be assumed or those obligations

3    would somehow be assumed.  Is that the issue there, that

4    you're concerned about --

5              MR. CLEMENTE:  That's correct, Your Honor.

6              THE COURT:  -- lucrative compensation, perhaps?

7              MR. CLEMENTE:  The identity of those individuals and

8    what function they're going to perform.  Again,

9    micromanaging, Your Honor, that point very well taken.  But

10   again, I think here, in particular, given the atmosphere of

11   this case, that it's important for the Committee to be

12   participating in that process and not to have the Debtor say,

13   This is how it's going to be.  If you don't like it, vote

14   against the plan.

15             THE COURT:  Okay.

16             MR. POMERANTZ:  Your Honor, if I may address that

17   point, because I think it reflects a fundamental

18   misunderstanding of the Committee, which we tried to address

19   in our reply.

20        The issue of retained employees -- let me take a step

21   back.  The Debtor has a bonus program that has been in place

22   for years.  Bonus payments are staggered, and will be due at

23   various times.  The next bonus payment will come due at the

24   end of February.

25        Under the plan, only if an employee is actually employed

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 42
Case 3:21-cv-00538-N  Document 26-49  Filed 06/09/21    Page 156 of 243  PageID 16036

41

1    on the date will they be entitled to a bonus.  It doesn't

2    matter if they're terminated with or without cause.  So the

3    key date for determining whether these employees are entitled

4    to a bonus is February 28 of next year.  The plan provides

5    that these retained employees will have these contingent

6    claims, contingent bonus claims, which will vest essentially

7    if they're employed on February 28th, that they be retained

8    and those claims, contingent claims, will exist after the

9    effective date.

10        The Claimant Trustee, whoever that person is, whether

11   it's Mr. Seery or otherwise, and the Oversight Committee will

12   have plenty of time between the time of the effective date

13   and February 28th to address those issues.

14        It's patently inappropriate for the Committee to, before

15   confirmation, be micromanaging -- your word, Your Honor --

16   the Debtor's determination.  And in fact, it doesn't matter.

17   This concern that claims will arise and they'll be stuck with

18   millions of dollars of claims before the post-effective date

19   structure can go in is just wrong.  So, Your Honor, we don't

20   think there needs to be any change.  It'll be the Claimant

21   Trustee, subject to the oversight of the Oversight Committee.

22            THE COURT:  Okay.  Let me think through this.  How

23   are you going to deal with their voting rights?  Because now

24   they're in Class 7 of the plan, right?  The bonus --

25            MR. POMERANTZ:  I think those claims, Your Honor,

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 43
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 157 of 243 PageID 16037

42

1    are unimpaired.  And they're reinstating those, so they're

2    presumed to accept the plan.  They're not an impaired --

3    they're not going to be an impaired --

4              THE COURT:  Okay.

5              MR. POMERANTZ:  -- consenting class that's going to

6    support confirmation.  Essentially, it's just a ride-through.

7              THE COURT:  Okay.

8              MR. POMERANTZ:  I mean, perhaps we shouldn't have

9    even had a class.  We could have had it ride through.  We

10   wanted to be transparent.  We wanted to identify those.

11       But again, we tried to address it in the reply, and I

12   hope my comments today to Your Honor and to Mr. Clemente

13   makes the Committee realize that there really is no

14   substantive issue here.  There is no disagreement.  The

15   Claimant Trustee and the Oversight Committee will be able to

16   make a decision before any of those claims vest.

17             THE COURT:  All right.  Well, let me go through the

18   other what I'll call consent issues that were raised in the

19   objection.  Are we down to just that one, Mr. Clemente, or

20   were there other issues that remain?

21             MR. CLEMENTE:  Your Honor, I believe on the consent

22   points we are down to just that issue.  Again, you know, we

23   understand that we have to continue to work through the

24   documentation with Mr. Pomerantz.  You know, we will endeavor

25   to do that.

1          THE COURT:  All right.  So, all of these items, such

2     as who's going to be on the Oversight Board, who's going to

3     be the Litigation Trustee, who's going to be the Claimant

4     Trustee, compensation, these are all going to be put in the

5     plan supplement, and the Committee is okay with that plan

6     supplement being filed seven days before the voting deadline?

7          MR. CLEMENTE:  Yes, Your Honor.  We're okay with

8     that, with that structure.

9          And let me be clear.  We have some wood to chop with

10    respect to that, some of the things that you raised.  But

11    again, I think the expectation is we should be able to

12    negotiate through all of those things so that we don't have

13    to bring them before Your Honor.

14          THE COURT:  Okay.  You know, I always like to defer

15    to the economic stakeholders, and yet I just have to ask, why

16    delay?  Why delay disclosure of all of these items until a

17    plan supplement seven days before the voting deadline?  I

18    don't know if other creditors are going to raise this or not.

19    But as we have said a couple of times, context matters.  This

20    is really not your typical case.

21          I see the plan supplement feature in just about every

22    single complex Chapter 11 case for 20 years.  But it seems to

23    me that that feature evolved because so often the debtor is

24    under the gun, right?  You know, maybe they've got milestones

25    or deadlines in their DIP order that you've got to get a plan

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 45
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 159 of 243 PageID 16039

44

1   on file by X date or you default under the DIP, or some other

2   deadline is looming.  And so I think that's why that whole

3   plan supplement concept first evolved.

4       But we don't have that here.  So what is -- I know it's

5   rare for a bankruptcy judge to say, What is the rush?  We

6   like you to hurry things along, typically.  But in this

7   context, I wonder, why can't we just have it all in the

8   document that goes out?  I guess that goes to Mr. Pomerantz.

9           MR. POMERANTZ:  Sure, Your Honor.  Look, we have

10  endeavored to try to make as much progress on these issues as

11  possible.  We started exchanging documents regarding the

12  Claimant Trust Agreement and the corporate documents.  I

13  believe Mr. Clemente's firm prepared the initial draft of the

14  Claimant Trust Agreement a few weeks ago.

15      Obviously, there's been a lot going on in this case.

16  There has been a rush to confirmation, I think primarily

17  because people recognize the substantial burn rate in this

18  case.

19      There is nothing sacrosanct about having the confirmation

20  hearing on December 3rd, as originally scheduled.  We

21  actually, in any event, asked for an extension, given that

22  this hearing came after.  There is nothing that would prevent

23  us from waiting two, three weeks, other than the substantial

24  burn rate.

25      We do think that a week in advance is sufficient for

1    parties to review it.  All the objectors are represented by

2    very sophisticated, very knowledgeable counsel.

3         But if Your Honor wanted to provide more time to review

4    the information in the plan supplement and either delay

5    solicitation, which I would hope neither, perhaps give more

6    time between the plan supplement and the voting and the

7    objection deadline, which then would move the confirmation

8    hearing to sometime to mid, late December, assuming we don't

9    get in the middle of the holidays, we wouldn't have a

10   conceptual problem.

11        But we do recognize, and the independent board has

12   recognized and the Committee has recognized, that there is a

13   substantial burn rate to this case, and the quicker we can

14   get to confirmation and effective date, the quicker we could

15   reduce that.

16        But again, subject to Mr. Clemente, because he has been

17   the one, and his Committee, been lighting the fire under the

18   Debtor to make sure we move.  If they're okay with moving it,

19   you know, a couple of weeks or so to try to get these things

20   done, we would have no objection.

21             THE COURT:  Okay.

22             MR. CLEMENTE:  Perhaps, Your Honor -- this is Matt

23   Clemente.  Perhaps, you know, just looking at the proposed

24   schedule -- so I apologize for looking at my computer screen

25   here -- but is it the concept of the seven days, Your Honor?

013103

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 47
Case 3:21-cv-00538-N   Document 26-49   Filed 06/09/21   Page 161 of 243   PageID 16041

46

1   Because we could probably move the plan supplement date just

2   up to provide more time.

3       I think the reality is, Your Honor, is we do have some

4   work to do on some of those documents.  And so, first of all,

5   I don't think the disclosure statement should be approved

6   today, so it could be, you know, a nullity, meaning we may

7   have more time to be discussing those items anyway.

8       But if Your Honor was otherwise inclined -- which, again,

9   I would urge Your Honor not to -- the current plan supplement

10  deadline, I think, Mr. Pomerantz, will be November 23rd.  And

11  then maybe we could address Your Honor by just backing that

12  up by a week or ten days to allow the materials to be put out

13  before the November 23rd date.

14          THE COURT:  All right.

15          MR. KATHMAN:  Your Honor, Jason Kathman.  May I be

16  heard on this issue?  Because I think it directly affects my

17  client, as well as HarbourVest and UBS.  I suspect they may

18  want to speak up on this issue as well.

19          THE COURT:  All right.  Well, I do need to roll to

20  the other objectors, so I guess this is a good time.  Go

21  ahead, Mr. Kathman.

22          MR. KATHMAN:  Your Honor, I'll start with this

23  specific issue.  We agree with Your Honor that the plan

24  supplement, or at least the disclosure and the Liquidating

25  Trust Agreement, should be provided in advance, further

1  advance than the seven days that's currently being provided.

2  And the reason is -- I agree with Mr. Pomerantz, generally

3  seven days is enough. But in this particular plan, the way

4  that creditors are being paid -- specifically, Mr. Pomerantz

5  referenced that there are three large creditors, and that's

6  the first, the largest creditor, potentially, UBS; the third

7  largest creditor, HarbourVest; and my client, the fourth

8  largest creditor in this case, are all what the plan calls

9  disputed claims. And the plan provides that those --

10       THE COURT: Let me stop you right there. Does Mr.

11  Daugherty have at least a portion of his claim not disputed?

12  I lose track of the history of litigation there. I know he's

13  asserted a, what, a $30 million-plus proof of claim, but is

14  there some chunk of that that is beyond dispute?

15       MR. KATHMAN: Correct, Your Honor. You have a very

16  good memory. There's approximately $3.7 million that the

17  Debtor does not dispute. And they answer that in their

18  adversary proceeding, and even in their supplemental

19  materials they filed last night in a footnote.

20       Their calculations on proposals of what recoveries will

21  be is based on assumption of Mr. Daugherty's claim being $3.7

22  million.

23       The filed claim of record is $37 million currently, Your

24  Honor, and then we filed a request to amend the claim to make

25  it $41 million on Friday, along with a 45-page brief on our

1    3018 motion that goes into the underlying bases for that

2    claim, Your Honor, which I'll just say, in brief summary, is

3    really what the Debtor's *modus operandi* has been.  Small

4    judgment to Mr. -- to Daugherty, and then they fight it like

5    hell in multiple jurisdictions, and the small number becomes

6    a very big number.

7        We are currently litigating that issue in Delaware.

8    We're in the third day of a trial in Delaware in a case where

9    the Delaware judge actually found the crime fraud exception

10   to attorney-client privilege applied and required the Debtor

11   to disclose attorney-client-privileged emails, emails that

12   actually go to some of the issues that Mr. Clemente and Mr.

13   Pomerantz were talking about, about these releases and

14   individuals, Your Honor.

15       And I don't want to get off of kind of what we're talking

16   about here, which is the disclosure of this Liquidating Trust

17   Agreement.

18       Your Honor, the plan provides that these quote/unquote

19   disputed claims are going to be paid in connection or

20   consistent with the Liquidating Trust Agreement.  And so, as

21   Mr. Clemente said throughout this case, context is important.

22   In this case, that Liquidating Trust Agreement is dictating

23   how the first, third, and fourth largest claims are going to

24   be paid in this case.  And if that's not being disclosed

25   until a week before confirmation, Your Honor, I think the

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 50
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 164 of 243 PageID 16044

49

1   disclosure statement does lack adequate information, because

2   we have very, very large claims here.  UBS, who has been a

3   major player in this case; HarbourVest, who has a potentially

4   very large claim; and my client that has a very large claim,

5   whose claims at this point in the disclosure statement are

6   unclear how they're being treated because the plan says it's

7   going to be treated consistent with a trust agreement and we

8   don't know what the trust agreement says.

9       And so, Your Honor, I have some other objections that

10  I'll raise later.  I'll let the other parties talk about this

11  issue so that we're not mincing -- mixing issues.  But I

12  wanted to speak up specifically on this issue because we --

13  and HarbourVest has raised this issue in their objection.  We

14  think that that Claimant Trust Agreement should be provided

15  well in advance of seven days, on the facts in this case, at

16  least.

17          THE COURT:  All right.  I'll hear the rest of your

18  objections at this time.  Go ahead.

19          MR. KATHMAN:  Thank you, Your Honor.  I'll be very

20  brief with the other objections.

21      The first one being, we did object that we think the plan

22  unfairly gerrymanders the claim, really, for the convenience

23  class.  A million dollars.  I understand that that's been

24  negotiated with the Committee.  But still, a million dollars

25  is an extremely large convenience class, and I don't think

1   that's consistent with what 1122 was indicated to address.

2        When you add onto that, Your Honor, that the majority of

3   the claimants in the claimant or in the convenience class,

4   quote/unquote, is -- are the law firms, I mean, the

5   overwhelming majority of the claims in the convenience class

6   are the Debtor's law firms that are unpaid.  And so what

7   essentially we have is the Debtor has created this class that

8   they call a quote/unquote convenience class for their

9   lawyers, and then they're negotiating a 15 percent discount

10  for their lawyers to be paid.  And again, these law firms are

11  the law firms that the Debtor has been using for years and

12  years to really promote the litigation that Your Honor is

13  familiar with.

14       Our second issue, Your Honor, really goes to the absolute

15  priority rule argument that we raise.  The plan provides that

16  the limited partners are going to receive these quote/unquote

17  contingent interests.  And I understand the Debtor's response

18  to that, and their argument is, hey, if the Debtor doesn't

19  end up being solvent, then those contingent interests never

20  vest.

21       Nevertheless, the plan expressly provides -- and I'll

22  read the language from the plan, Your Honor, and this is the

23  same language for both Class 9 and Class 10 now.  "In full

24  satisfaction, settlement, discharge, and release of, and in

25  exchange for such claim, they shall receive their contingent

1    claim interest."

2        So we have a plan of reorganization, Your Honor, that's

3    being proposed that facially in the disclosure statement says

4    they're going to pay creditors 91 cents on the dollars, and

5    yet their plan is getting these contingent interests to

6    equity holders.  My argument is it doesn't matter whether

7    those contingent interests ever vest or not.  They are

8    getting a legal right.  They are getting a contingent

9    interest for their limited partnership interest.  Under the

10   Bankruptcy Code, that's just not permitted.

11       Your Honor, the third argument is, in addition to what I

12   had earlier, is just we don't believe there's adequate

13   information over the Class 5 causes of action.  There's

14   approximately $94 million worth of Chapter 5 causes of action

15   disclosed in the Statement of Financial Affairs.  The

16   Debtor's response was, hey, the -- that's the Creditors'

17   Committee's job, is to go investigate those, and they have

18   full duty to go investigate those and determine what claims

19   and causes of action there are.

20       I don't know if they think that that kind of alleviates

21   them of their obligation or requirement to investigate those

22   or to make some sort of disclosure, but $94 million is a

23   pretty substantial asset.  And if we think back to what Mr.

24   Clemente was saying, that causes of action is going to be a

25   substantial source of recovery for creditors in this case, I

1    believe that in, I think, *Metrocraft* and the other cases the

2    talked about sufficient adequate information have talked

3    about disclosure of what the value of the Chapter 5 cause of

4    action should be disclosed in the disclosure statement, and I

5    don't believe the Debtor can just get off by saying, hey,

6    that's the Creditors' Committee's job, is to go investigate

7    the -- investigate that and give us some information.

8    Because it doesn't have that information, Your Honor, and

9    because we believe that the trust agreement should be

10   disclosed in this case, we'd ask that the Court deny approval

11   of the disclosure statement.

12            THE COURT:  Let me follow up.  Potentially $90

13   million of Chapter 5 avoidance actions.  Did you go, what, to

14   the Statement of Financial Affairs and look at any payments

15   made in the 90 days before, or where did you come up with

16   that?

17            MR. KATHMAN:  Yes.  Specifically, Your Honor, the

18   Statement of Financial Affairs #4 discloses $36 million to

19   insiders, Chapter 5 causes of action to insiders.  In

20   addition, there is approximately $30-some-odd million of

21   transfers made to insiders disclosed on #13 of the Statement

22   of Financial Affairs.  And then in addition to that, within

23   the 90 days, entities that you can pick out that the Court is

24   familiar, Highland CLO Funding, various different insiders

25   that are definitely insiders of the Debtor, the additional

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 54
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 168 of 243 PageID 16048

53

```
 1   sum of that $90 million disclosed in the Statement of

 2   Financial Affairs.

 3           THE COURT:  Okay.  So you're saying, to avoid being

 4   barred, estopped from potential avoidance actions, they need

 5   to disclose these?  You know, there may be like, you know,

 6   defenses and whatnot, but they need to be disclosed to avoid

 7   estoppel, or what?

 8           MR. KATHMAN:  No, Your Honor.  I wasn't even going

 9   the whole United Operating preserve-the-claim-or-cause-of-

10   action route.  As a pure matter of adequate information,

11   Metrocraft and the other cases that talked about the factors

12   that a court should determine in determining whether a

13   disclosure statement has adequate information, one of the

14   factors that each of those courts say that should be

15   disclosed in any disclosure statement --

16           THE COURT:  Okay.

17           MR. KATHMAN:  -- is what is the value and potential

18   recovery on Chapter 5 causes of action?  There's none of that

19   in the disclosure statement.

20           THE COURT:  All right.  Thank you.

21       Mr. Pomerantz, I'm going to turn back to you on the

22   convenience --

23           MR. POMERANTZ:  Sure.

24           THE COURT:  -- class issue and the alleged improper

25   classification.
```

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 55
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 169 of 243 PageID 16049

54

1      So, okay, first, hypothetically, we could be in a

2  situation, right, where this is your impaired accepting

3  class, the convenience class, right?  If -- if the --

4          MR. POMERANTZ:  That is correct.  It could -- it

5  could be.

6          THE COURT:  All right.  Is it law firms, mostly just

7  former law firms, or do we have small little vendors that

8  we're trying not to get trapped up in this process?  Not --

9          MR. POMERANTZ:  Well, let's take a --

10          THE COURT:  I mean, relatively speaking.  I guess

11  you could say a law firm with a million-dollar claim is, you

12  know, a small little vendor in the context of this case.  But

13  let's be real.  What are we talking about in that class?

14          MR. POMERANTZ:  Sure.  So, let's take a step back.

15  I think you heard from Mr. Clemente that the Committee does

16  not have any objections to the classification.  And the

17  reason for that is the Committee in this case not only

18  includes large litigation claims but also includes Meta-e,

19  which is a creditor, with a claim less than a million

20  dollars.  These issues, the convenience class, the identity,

21  the thresholds, were negotiated with the Committee, Meta-e,

22  acting in a fiduciary capacity.  And to the extent Mr.

23  Clemente took my prior comments to say that Committee members

24  weren't acting in a fiduciary capacity, I did not mean to say

25  that at all.

Case 19-34054-sgj11  Doc 1822-144  Filed 01/22/21    Entered 01/22/21 21:50:07    Page 56
Case 3:21-cv-00538-N  Document 26-49   Filed 06/09/21    Page 170 of 243   PageID 16050

55

1      But this was a negotiation with the quintessential

2  convenience class creditor in this case.

3      Now, Your Honor, we don't dispute that many creditors in

4  this class are law firms.  That may be true.  They are law

5  firms that were stiffed by the Debtor.  So the concept that

6  basically they're the Debtor's friends because the Debtor

7  filed bankruptcy owing millions of dollars to law firms, I

8  know my law firm, when we get caught up in a bankruptcy case,

9  we aren't particularly thrilled with the debtor (inaudible)

10  size of the receivable.  So I think the premise is incorrect,

11  that basically just because these are debtor law firms.

12      They are service providers.  They are different from the

13  other creditors, the litigation creditors.  We think there's

14  a compelling reason in this case to treat small creditors and

15  give them the opportunity to accept a discount as opposed to

16  being rolled up with all the litigation creditors.

17      And Your Honor, importantly, the evidence will show, when

18  Your Honor has a full evidentiary hearing and Mr. Seery

19  testifies, that the reason for the separate classification

20  had nothing to do with gerrymandering but with the process I

21  described.  And under Fifth Circuit law, that is acceptable.

22          THE COURT:  All right.  Well, let me hear from UBS

23  next.

24          MR. POMERANTZ:  Your Honor, do you want me to

25  address Mr. Daugherty's Class 5, the avoidance action claim,

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 57
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 171 of 243 PageID 16051

56

1  --

2            THE COURT:  Yes.

3            MR. POMERANTZ:  -- you want me to do it now, or do

4  you want me to do it later?

5            THE COURT:  Yes, go ahead, if you would, now.

6            MR. POMERANTZ:  Okay.  So, Your Honor, I've done a

7  lot of Chapter 11 work.  I'm sure Mr. Kathman does as well.

8  I can't recall a case where the specific valuation of Chapter

9  5 causes of action are included in the disclosure statement.

10  And the reason for that is that work is typically done post-

11  confirmation.  And, again, we did mention that the Committee

12  is responsible for looking into the insider actions.  That is

13  the case.  I note that even under our release, avoidance

14  actions are limited.

15      But I think, to use Mr. Clemente's term, context matters.

16  Okay?  Why, in a case like this, where assets are being

17  transferred to a Claimant Trust which is going to monetize

18  the assets, why is it relevant whether avoidance actions are

19  worth $20 million, $30 million, or zero?  This is essentially

20  putting the assets and the causes of action in the Claimant

21  Trust.

22      In some cases, avoidance actions amount may be relevant.

23  I find it hard to believe that in this context, in this case,

24  that a creditor sitting there will make a determination to

25  support the plan or not support the plan because avoidance

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 58
Case 3:21-cv-00538-N  Document 26-49  Filed 06/09/21   Page 172 of 243  PageID 16052

57

1  actions may have some value that brings the creditors' claims

2  up to $.94 or not.

3      So, I think in the context of this case, the specific

4  identity of the avoidance actions is not relevant.  The

5  Committee is working on language on retained causes of action

6  that would be included in the plan supplement to deal with

7  the estoppel issue.

8      So, Your Honor, I just think this issue is a red herring

9  in this case, for the reasons stated.

10         THE COURT:  All right.  Thank you.  UBS, I'll hear

11  your objection.

12         MS. POSIN:  Thank you, Your Honor.  Kim Posin of

13  Latham & Watkins, counsel for UBS.

14     Good morning, Your Honor.  We -- UBS filed its objection

15  to the Debtor's disclosure statement on October 20, pursuant

16  to which it raised certain confirmation objections as well as

17  disclosure objections, and we also joined in the Committee's

18  separate objection.

19     I'm going to try very hard to try not to duplicate the

20  argument that you've already heard.  We do agree with many if

21  not most or all of the arguments that Mr. Clemente and Mr.

22  Kathman have already made this morning.

23     We have also reviewed the amended plan and disclosure

24  statement, as well as the omnibus reply brief that the Debtor

25  filed late on Sunday, as well as the additional disclosures

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 59
Case 3:21-cv-00538-N   Document 26-49   Filed 06/09/21   Page 173 of 243   PageID 16053

58

1  that they filed -- or, they filed yesterday.

2      I did want to make one point first, Your Honor, and that

3  is with respect to the assertion the Debtor made this

4  morning, and also in Footnote 4 of its reply brief, that UBS

5  was not authorized to file its objection at one day after the

6  original due date.  I wanted to assure the Court that UBS

7  takes the Court's deadlines very seriously, and was, in fact,

8  justified in filing its objections when it did based on an

9  email that Mr. Pomerantz sent to Mr. Clemente on October

10 19th, which I have reviewed and will be happy to provide to

11 the Court, in which Mr. Pomerantz explicitly confirmed an

12 agreement to extend the objection deadline for the Committee

13 and each of its members to October 20.  And we did, in fact,

14 file an objection within that time frame.

15     Nevertheless, we were pleased to see that the Debtor had

16 included additional disclosures in its Sunday and Monday

17 filings that addressed certain but not all of UBS's

18 objections.

19     From a confirmation perspective, we have many of the same

20 arguments that have already been raised this morning.  We

21 believe there are still four reasons why the plan is patently

22 unconfirmable, and other -- why it would be futile to allow

23 the current disclosure statement to be sent out for

24 solicitation to creditors.

25     First, as Mr. Clemente has already addressed, the plan,

013116

1    we believe, continues to contain improper release and

2    exculpation provisions.

3        Second, we also agree that the plan potentially unfairly

4    discriminates against certain of the Debtor's General

5    Unsecured Creditors by placing the General Unsecured

6    Creditors into multiple different classes and providing each

7    of those classes with a different percentage recovery.  And

8    as Mr. Clemente and the other Committee members have made

9    clear in their filings, none of the members currently intend,

10   to my knowledge, to vote in favor of the plan as it's

11   currently drafted.

12       Third, there continue to be serious flaws from our

13   perspective in the Debtor's liquidation analysis.  They make

14   certain assumptions that are not -- that appear to have no

15   real basis.  They're not explained at all.  And that, we

16   believe, prevents a finding that this plan satisfies the best

17   interests test as well.

18       And, finally, we believe the disclosure statement does

19   not contain sufficient information or evidence to show that

20   the plan is feasible and that it was filed in good faith.

21   Currently, as drafted, there are a number of payments that

22   will be going out to the various creditors, and including

23   administrative claimants, on or around the effective date.

24   It does not appear from the information that we have seen

25   there will be sufficient funding to pay for those claims and

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 61
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 175 of 243 PageID 16055

60

1    those amounts in the time frame required by the plan.

2         Your Honor, each of these issues are addressed in more

3    detail in our objections, and certain of them have clearly

4    been already addressed by certain of the parties today and I

5    won't belabor them further now.

6         To the extent the Court ultimately determines that these

7    are all confirmation issues and more properly addressed at a

8    confirmation hearing, UBS, of course, reserves all of its

9    rights to assert those objections at that time.

10        However, as Mr. Kathman has already pointed out, the

11   disclosure statement is still devoid of any information with

12   respect to the Debtor's disputed claims reserve.  As this

13   Court is well aware, UBS has filed a large claim against it

14   as we speak, and the Debtor has objected to that claim, which

15   means that UBS now holds one of those disputed claims.  For

16   claims like UBS's and HarbourVest's and Mr. Daugherty's that

17   have not yet been allowed, the plan simply provides for the

18   creation of a disputed claims reserve, but that's it.  It

19   doesn't provide any additional information regarding the

20   reserve.

21        For example, there are no details as to what assets the

22   Debtor intends to use to fund that reserve.  Right now, there

23   is relatively little cash at the Debtor, and it's mostly made

24   up of assets, some of which are relatively illiquid.  And

25   there is no discussion as to whether that disputed claims

1    reserve will be made up of cash or assets, or, if assets,

2    whether those will be illiquid assets or assets that are

3    capable of being liquidated at some point in time and capable

4    of an estimated value.

5         There is no information about how the Debtor plans to

6    deal with -- to reserve beneficial interests in a trust, the

7    Claimant Trust, for disputed claims.  There is no information

8    about how the Debtor intends to determine the amount to be

9    reserved in that disputed claims reserve on account of

10   disputed claims on the effective date, which, of course,

11   could affect recovery of the other claimants.  There is no

12   information about whether and when the Debtor intends to seek

13   to estimate disputed claims for reserve purposes, to allow

14   distributions to be made to other creditors on or around the

15   effective date.

16        And finally, there's no information about how

17   distributions made by the Claimant Trust will be treated vis-

18   à-vis the claims that remain disputed, contingent, and/or

19   unliquidated as of the effective date, to assure that all

20   claims in the same class will ultimately receive the same pro

21   rata treatment.

22        Not only does this lack of detail prevent a finding, from

23   our perspective, that the plan is feasible on its face, but

24   the bigger issue from our perspective is, without an

25   understanding with respect to the mechanics of the reserve,

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 63
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 177 of 243 PageID 16057

62

1    it will be very difficult for any creditor to really

2    understand and ascertain when they are likely to receive a

3    recovery, and ultimately, the likely recovery that they will

4    receive.

5        In response to these objections, which we did raise in

6    the objection we filed on October 20, the Debtor notes in its

7    reply brief, and also Mr. Pomerantz noted this morning, that

8    the Claimant Trust Agreement will, in fact, include all of

9    these details regarding the administration of the disputed

10    claims reserve.

11        However, as the Court has pointed out, that trust

12    agreement has not been filed.  We have seen drafts as a

13    member of the Committee, but it certainly is not in final

14    form.  And, frankly, the last draft I reviewed didn't have

15    any provisions or mechanics with respect to the disputed

16    claims reserve.

17        And, again, as the Court pointed out, that document is

18    not intended to be filed until one week before the voting

19    deadline.

20        Your Honor, we believe that creditors should have more

21    than one week, for sure, to consider plan provisions that

22    could really substantially affect the outcome of these

23    proceedings if any of these very large disputed claims,

24    including UBS's claim, are ultimately allowed in any

25    meaningful amount.

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 64
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 178 of 243 PageID 16058

63

1    So we believe that these are key terms which should be

2    included in the disclosure statement and in the plan and at

3    the time of solicitation, and not submitted later in the plan

4    supplement that won't be filed for a few more weeks.

5        Thank you, Your Honor.

6        THE COURT:  Let me ask you one follow-up question.

7    One objection UBS made in its pleading was that there was not

8    an adequate description of why the Debtor's assets declined

9    in value during the case, in value by over $210 million

10   between the petition date and June 30th, and why they were

11   expected to decline an additional $40 million more in the

12   last six months of 2020.

13       The Debtor has incorporated language, it says -- I don't

14   have it at my fingertips -- to address these issues.  Do you

15   feel like the Debtor did adequately address this objection?

16       MS. POSIN:  I can say I think the Debtor addressed

17   it.  I don't know if I would say that it's adequate.  It's a

18   substantial amount of money.  I mean, we thought at the

19   beginning of the case (garbled) of in excess of $500 million

20   in assets, and we're now down to less than $200 million.

21   That's obviously a substantial change in a year.  I know

22   there is a high burn rate, but that certainly doesn't provide

23   for that rationale, that substantial drop in asset value.

24       But it did make an attempt to address it in the

25   disclosures that were filed with the Court yesterday.  COVID-

013121

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 65
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 179 of 243 PageID 16059

64

1   related.  I know there are some additional things they added.

2   We certainly would like more detail.  But at this point, we

3   feel like at least an attempt was made to try to address that

4   concern.

5          THE COURT:  All right.  Mr. Pomerantz, would you

6   point the language out to me?  Because I'm not sure I went

7   back and looked at that one.

8          MR. POMERANTZ:  Sure, Your Honor.  In the

9   supplemental disclosure we filed yesterday, on Page 2, at the

10  bottom, we include a partial bridge.  So there's really two

11  issues going on here.  What is the bridge of asset values to

12  the last mark we have is June the 30th.

13      The second issue, though, is how do you turn those asset

14  values into cash and how do you monetize them or what the

15  expenses are.

16      So, when Ms. Posin referenced a roughly $200 million,

17  it's not the right comparison.  The right comparison is what

18  we have in the supplement, where we said that it was

19  essentially $550 -- $566 million down to $351 million,

20  largely comprised of three issues.

21      One is a reduction in value of the investments because of

22  COVID.  Second, an offset in the note.  And third, primarily

23  due to the costs of the case.

24      But from that point of June 30th, to actually monetize

25  the assets, through the liquidation analysis, through the

1   plan projections, those are based upon what we think we can

2   generate for value.

3       And I understand Ms. Posin or UBS may not agree with our

4   liquidation analysis.  They may not agree with our

5   projections.  But we think they are sufficiently before

6   creditors to enable them to vote.  And to the extent there

7   are any issues, they can be raised at that time.

8       Your Honor, should I address the other points that Ms.

9   Posin made, or would you like me to address your questions?

10          THE COURT:  Yes, go ahead.

11          MR. POMERANTZ:  Okay.  First, Your Honor, in terms

12   of the date, Mr. Clemente provided me with an advance copy of

13   his objection, because we were trying to see if we could work

14   things out.  It indicated in there that each of the Committee

15   members intended to file joinders.  So when I told Mr.

16   Clemente that the Committee and its members could have an

17   extension, what I contemplated was the joinders.  I didn't

18   contemplate a 25-page separate supplemental objection that I

19   think that went well beyond the issues raised by the

20   Committee.  So that's why we had indicated that we believed

21   it was filed late.

22       Your Honor, we've already talked about the release and

23   exculpation and the unfair discrimination provisions --

24   arguments, so I won't go into them anymore.

25       But the liquidation analysis, we think it's pretty clear.

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 67
Case 3:21-cv-00538-N  Document 26-49  Filed 06/09/21    Page 181 of 243  PageID 16061

66

1    We are going to generate less value if a trustee is going to

2    liquidate these assets.  That should be pretty self-evident.

3    Mr. Seery, who has become intimately familiar with these

4    assets over the last year or ten months since his

5    involvement, there can't be a lot of argument that Mr. Seery

6    is not going to -- is going to be able to generate more value

7    for these assets than if you just put a Chapter 7 trustee in.

8        Secondly, having a whole set of professionals, a trustee,

9    all his professionals, or our professionals, get up to speed

10   is going to drive up the costs.

11       So those two issues in and of themselves sort of prove

12   that the plan will provide more value than in a Chapter 7.

13   And we think the liquidation analysis is sufficient.  And,

14   again, we don't quite understand, really, the feasibility

15   argument.  Again, the projections demonstrate that the

16   company, post-reorganization, will have sufficient cash to

17   fund its operations, to sell assets and make distributions.

18       Now, again, Ms. Posin may disagree.  She may disagree and

19   think the assumptions are too rosy.  May think that the

20   expenses cost more.  And she is free to raise those issues in

21   connection with confirmation.

22       And lastly, Your Honor, the disputed claims reserve,

23   maybe perhaps it could have been included in the plan and

24   disclosure statement.  But to allay everyone's fears, what

25   will ultimately be contemplated is allowance of the claims,

1    if not by agreement, by the Court, in terms of an allowance

2    for a disputed claims reserve, and then when cash is

3    distributed, reserving the cash.  There's no contemplation of

4    trying to stick people with illiquid assets as part of the

5    reserve, the reserve issue.

6        So, look, we understand we have to fill in the blanks on

7    those -- the disputed claim reserve.  But people shouldn't

8    get concerned that we're trying to do anything untoward.  We

9    want to make sure people have sufficient opportunity to look

10   at it.  Again, we don't think seven days is an unreasonably

11   short time.  However, as we discussed before, if Your Honor

12   wants to move out the process, stretch it out a little bit to

13   give people more time, the Debtor would not have an objection

14   to that.

15           THE COURT:  All right.  Let me ask you this.  The

16   details of how -- the details, if any, on how the assets will

17   be liquidated by the Claimant Trust, and timing, you know,

18   like I don't know if there's going to be a deadline put on

19   doing that and getting people paid:  I mean, is that -- is

20   that all going to be detailed in the Claim Trust Agreement?

21   Or no?

22           MR. POMERANTZ:  No, it isn't, Your Honor.  Look.

23   You know, we provided projections.  The projections say that

24   the assets will be liquidated in two years.  The notes -- the

25   demand notes collected during that two-year period.  And that

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 69
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 183 of 243 PageID 16063

68

1   any long-term notes will be monetized.  Okay?

2       That is the broad brush.  It would be against the

3   creditors' interests if we were to provide more detail on

4   specific assets and the timing of liquidation, on the timing

5   of monetization of those assets.  It is very important to

6   maintain flexibility within that two-year time frame so Mr.

7   Seery or whoever is the Claimant Trustee to monetize these

8   assets in a way that's designed to maximize value, with the

9   input of the Oversight Committee.

10      If we were put in here that Asset X is going to be

11  liquidated in 90 days, and that's a public document, what is

12  that going to do to the market for that asset?  Well, I can

13  tell you, people will wait it out and we will have disastrous

14  results in value.  We're already dealing with a fine line in

15  two years, I mean, disclosing that, but Mr. Seery believes,

16  based upon his intimate knowledge of these assets, that he

17  can generate maximum value within that two-year period.

18      So, yes, Your Honor, it is important on what assets get

19  liquidated when.  There are a lot of assumptions that go into

20  that, because these are not, for the most part, liquid

21  assets.  There are some public securities.  But Your Honor,

22  what we're trying to do -- again, in some sense, it's protect

23  the creditors against themselves if they want that additional

24  disclosure -- is monetize these assets in the way that's

25  going to maximize value.  And the type and level of

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 70
Case 3:21-cv-00538-N   Document 26-49   Filed 06/09/21   Page 184 of 243   PageID 16064

69

1   disclosure we provided we believe is sufficient, and anything

2   in addition will be contrary to that goal.

3          THE COURT:  Okay.  All right.  I guess the only

4   objector I've not heard from is HarbourVest.  So I'll hear

5   from Mr. Stroik.

6          MR. STROIK:  Thank you, Your Honor.  Daniel Stroik

7   from Debevoise & Plimpton representing HarbourVest.

8       We, like the UCC and others who spoke earlier today, also

9   had some issues with the substance of the proposed plan, but

10  intend to defer those until confirmation if they cannot be

11  resolved before then.  So, really, our issues are ones of

12  disclosure.

13      I'll turn to the first one, because -- and we can cross

14  it off the list, happily.  The description of HarbourVest's

15  claims which the Debtors revised in their amended disclosure

16  statement is something that we can live with now.  Obviously,

17  it doesn't reflect all of the specific language that was

18  circulated, but we appreciate their attempt to address our

19  primary concerns.  In particular, the revised description

20  does a better job of describing the underlying allegations of

21  serious misconduct which form the basis for our client's

22  claims, and it also removes any mistaken impression that

23  those claims are about to be readily resolved on the basis of

24  their one-sentence inclusion of an -- in an omnibus

25  objection, with other procedural objections to other claims.

1    So, we're resolved on that front.

2    As we raised in our filed objection, however, we do still

3    take issue with the fact -- as do, apparently, many other

4    creditors -- that the disclosure statement and proposed plan

5    (inaudible) the Claimant Trust Agreement, which, of course,

6    is not filed or otherwise available to our client.

7    Much of this has already been neatly discussed by Mr.

8    Kathman and Ms. Posin.  We don't want to belabor the point,

9    but did want to spend a few moments on that topic.

10    While the UCC evidently has visibility and input into the

11    Claimant Trust Agreement and related plan supplement

12    documents, the Debtor's major creditors who are not members

13    of the Committee also need to be able to weigh in, with

14    sufficient time to raise any issues with the plan mechanics

15    effectively embedded in that agreement before confirmation

16    and before making a voting decision in order for that

17    decision to be an informed one.

18    At least some members of the UCC, as indicated by UCC

19    counsel, may be okay with the timing and structure of the way

20    those plan mechanics are being disclosed, but the UCC is

21    heavily involved in closed-door negotiations on its contents.

22    Our client, as well as other major creditors, is not.  So, in

23    this respect, we're -- HarbourVest is positioned, as are

24    other creditors, worse than UBS, who also has an issue with

25    the lack of disclosure, as we don't have an interim drafts,

1    nor have our views on those important documents been

2    solicited so far.

3        As Your Honor noted, of course, it's not unheard of for

4    governance documents to be filed later in the case in a

5    supplement, but we're not talking about filling in the

6    details of reasonable and customary organizational documents,

7    and we're not talking about a case which, you know, has some

8    real time constraint such that we need to play fast and loose

9    with disclosure.

10       Instead, in an important sense, the Claimant Trust

11   Agreement really is part of the plan.  Many of the plan

12   mechanics simply indicate work as described in the trust

13   agreement itself.  We just don't see any reason, in this

14   particular case, to defer disclosure on those key issues.

15   Our view is, of course, that those mechanics, at least at a

16   high level, do need to be described in the disclosure

17   statement and not deferred to a supplement.  But at a

18   minimum, creditors do need more than a week between voting on

19   a plan and their first disclosure of some of its key terms,

20   particularly creditors who have not received advance copies,

21   especially when those terms are going to be disclosed when

22   piled on top of other more typical supplementary materials at

23   the same time in the supplement.

24            THE COURT:  All right.  Thank you.

25            MR. STROIK:  Thank you.

1          THE COURT:  I believe I've heard from everyone who

2    lodged an objection.  Correct?

3          MS. MASCHERIN:  Terri Mascherin on behalf of the

4    Redeemer Committee.  Would you indulge me just very briefly

5    to speak to the release issue?

6          THE COURT:  Yes.  Go ahead.

7          MS. MASCHERIN:  Thank you, Your Honor.  I just

8    wanted to underscore, Your Honor, the conviction of the -- of

9    my client and the Creditors' Committee with regard to the

10   release issue.  And I think it really -- you know, I could

11   regale Your Honor with dramatic readings from the arbitration

12   awards in my case, in the case that we brought against the

13   Debtor, but Your Honor is already quite familiar from the

14   Acis case with the misdeeds committed by several senior

15   inside employees of the Debtor.  And that's really what we're

16   talking about.  That's where the rubber hits the road with

17   regard to these releases and our disagreement with the

18   Debtor.

19        Now, while my client has the utmost respect for Mr. Seery

20   and for the independent board, we just have a fundamental

21   disagreement with respect to how to deal with the situation

22   of this limited number of senior insider employees whose

23   conduct has been found by Your Honor and has been found by

24   the arbitration panel in the Redeemer Committee case to have

25   given rise to at least over $160 million towards our allowed

1    claims against this estate.

2        We're not talking about something ethereal, as Mr.

3    Pomerantz said earlier.  We are talking about a limited

4    number of senior people who -- who had been doing things that

5    have brought liability on the estate already.  And we're

6    talking not only about the possibility that, Your Honor, that

7    the estate might have claims against those individuals, but

8    we're talking about their knowledge.  Your Honor has alluded,

9    both in this hearing and a week ago, to the Byzantine

10   structure of Highland Capital Management and its affiliates.

11   We're talking about giving releases out of the gate to a

12   limited number of very senior, very knowledgeable employees

13   who, you know, to use a colloquial term, know where the bodies

14   are buried, know how things were done.  That knowledge will be

15   very important to the Litigation Trustee when he comes on the

16   job.

17       And Your Honor, I liken this to the situation in the movie

18   *The Untouchables*.  You know, Al Capone's accountant gets a

19   free pass after he has cooperated.  That's all we're asking

20   for here, Your Honor.  If these releases are to be given to

21   these very senior employees who truly know where the bodies

22   are buried, then it ought to only be after the fact and if

23   they have cooperated, not only with respect to monetizing

24   assets and determining claims, which, after all, they've been

25   pretty handsomely compensated for already over the past year,

013131

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 75
Case 3:21-cv-00538-N   Document 26-49   Filed 06/09/21    Page 189 of 243   PageID 16069

74

1    but if they give value, new value to the estate by assisting

2    or providing their knowledge with respect to pursuing these

3    claims.

4        Thank you, Your Honor.

5            THE COURT:  Thank you, Ms. Mascherin.

6            MR. POMERANTZ:  Your Honor, if I may briefly respond

7    to Ms. Mascherin's comments?

8            THE COURT:  You may.

9            MS. PATEL:  Your Honor, this is Rakhee Patel.  If I

10   could just very briefly be heard, I think that might expedite

11   Mr. Pomerantz's response.

12           THE COURT:  Go ahead.

13           MS. PATEL:  But just for the record, on behalf of

14   Acis -- on behalf of Acis Capital Management, Your Honor, we

15   did file a joinder in the Committee's overall objection, and I

16   just wanted to point that out.  I think the Court would

17   perhaps might be aware of it.  And it can be found at Docket

18   1241.  Again, 1241.

19       And I just wanted to -- I'm not going to point, Your

20   Honor, I think we incorporate Mr. Clemente and Ms. Posin and

21   Ms. Mascherin's points, so I won't cover it, particularly in

22   light of the fact that we had a very lengthy hearing relating

23   to many of Acis's claims, and Your Honor is very familiar with

24   these issues, just last week.

25       So, but I did want to, at least just for purposes of the

013132

1  record and so the Court is clear and understands that the

2  Committee is in lockstop with respect to this, I did want to

3  at least raise for the Court that Acis did file that joinder.

4           THE COURT:  All right.  Thank you.

5           MR. POMERANTZ:  Your --

6           THE COURT:  And I -- you know, I didn't mean to

7  neglect either Redeemer Committee or Acis.  What -- I looked

8  at your objections last week, but then I looked at the

9  Debtor's chart of who had been addressed, and I thought maybe

10 we were just down to the UCC generally, UBS, HarbourVest,

11 Daugherty, and PBGC.  So that's why I went to those five and

12 said, Are we done?

13     All right.  Mr. Pomerantz, your last words in rebuttal?

14           MR. POMERANTZ:   Sure.  Your Honor, I think Ms.

15 Mascherin's comments are very revealing.  She did not try to

16 tell Your Honor at all that the estate has claims against the

17 people getting released.  What she clearly said is what the

18 Committee wants to do, is hold the releases hostage so that

19 these people can participate.  She's making the argument,

20 which she's entitled to make, that sufficient consideration

21 will include cooperation.

22     Now, Your Honor at the confirmation hearing will have to

23 weigh two things.  On one hand, you'll have to weigh what

24 claims exist that are being released and what consideration is

25 being provided.

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 77
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 191 of 243 PageID 16071

76

1    Now, this is not about claims against individual

2    employees.  I think Ms. Mascherin was pretty clear about that.

3    It's being able to use those employees to pursue the agenda of

4    the Litigation Trustee.

5    Now, of course, any of the employees will have a duty to

6    respond to subpoenas, to provide information, to give

7    testimony.  So whether a release is provided or not, they are

8    going to have to provide information to assist the Litigation

9    Trustee.

10    But I thought it was very revealing.  And, again, this is

11    really not about claims asserted against people.  Because,

12    let's be honest, in lieu of this case even pending, the

13    Committee would have filed those claims if they did exist.

14    So, Your Honor, again, we think this is purely a

15    confirmation issue.  The Court does not have an evidentiary

16    record on any of these issues, cannot make the decision, and

17    we should be allowed to proceed to confirmation to address any

18    remaining objections, including the ones that were raised

19    today.

20    THE COURT:  All right.  I actually have one more

21    question.  Should I be clear from reading the disclosure

22    statement or will it be in the plan supplement on this point:

23    Okay.  I know the Debtor manages about I guess we're at $300

24    million or so of its own assets.  I mean, that's the number

25    we've talked about has gone down during COVID.  I guess it's

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 78
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 192 of 243 PageID 16072

77

1    -- well, it was $566 million as of the petition date.  It was

2    down to $351 million on June 30th.  Okay.  Here's my question.

3    Should I be clear from the disclosure statement that it's that

4    pot of assets which will be monetized over time, plus any

5    causes of action the Committee pursues and monetizes, that

6    that's the bundle of assets?  Or, or with regard to funds

7    owned by related entities -- I know people don't like me using

8    it, but you know what I'm talking about, other Highland

9    entities -- you know, I've heard at some point, read at some

10   point, there's $6 billion or so of funds that Highland

11   manages, you know, through the shared services agreement.

12   Would the stream of revenue that Highland earns managing those

13   assets, would that be something that the creditors might

14   receive the benefit of under the plan, or no?  Should that be

15   clear to me one way or another, or no?

16          MR. POMERANTZ:  I think it should be clear, Your

17   Honor, and I think at this point it is not anticipated that

18   several of those related entities' shared services agreements

19   would continue.

20      I think the Debtor is in negotiations with Mr. Dondero and

21   his related entities to provide some type of transition,

22   hopefully consensually, and then some perhaps shared use of

23   certain resources, like physical location, computer systems,

24   and whatnot.

25      But the way the creditors are going to get paid are

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 79
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 193 of 243 PageID 16073

78

1   primarily for -- from the monetization of the assets that

2   make up the $351 million as of June 30th that you identified.

3   And I believe that should be clear in the disclosure

4   statement.

5            THE COURT:  All right.  But let me just ask, for

6   example, Mr. Clemente:  Was that -- is that clear to you?

7   Because it wasn't clear to me, and I had this huge question in

8   my mind.

9        I mean, I don't know what that revenue stream is that

10  Highland earns for providing management services or portfolio

11  management services, shared services, to those related

12  entities and their $6 billion of funds, but I would imagine

13  it's a very significant cash flow stream.  That is not going

14  to be used.  You know, I understand the hope is it wouldn't

15  need to be used because we would never hit the $300 million or

16  so of Debtor-owned assets.  But is that clear to you, Mr.

17  Clemente, that if things don't go the Debtor's way and UBS

18  gets a big claim and HarbourVest gets a big claim and HVA,

19  that there isn't going to be any revenue source from

20  Highland's -- the Reorganized Debtor's ongoing management;

21  that, in fact, those services are going to be transitioned, I

22  guess, to Dondero or others?  Mr. Clemente, is this clear to

23  the creditors, do you think, from the disclosure statement, or

24  not?

25            MR. CLEMENTE:  You know, let me -- Your Honor, let me

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 80
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 194 of 243 PageID 16074

79

1    offer a couple of comments on that.  I mean, in light of --

2    again, the direction is obviously the monetization and

3    liquidation.  And so from the perspective of the Committee,

4    the decision to either continue supporting the contracts that

5    you're referring to now or jettisoning them is sort of a cost-

6    benefit one.  And the concept of having to keep the

7    infrastructure in place to continue to service those contracts

8    is something that the Committee took into consideration in

9    connection with the current plan construct.  And so embedded

10   in that decision is the consequence that that would be

11   transitioned away because, frankly, it's -- it wasn't cost-

12   effective for the Debtor to continue to provide those services

13   on a reorganized basis.

14        In terms of having them transition to Mr. Dondero, you

15   know, that's something that's still subject to debate among

16   the Committee as to whether there may be a more efficient or

17   effective way to deal with those agreements, Your Honor.  But

18   at a fundamental point, yes, the Committee has understood that

19   that revenue stream would ultimately go away because it simply

20   isn't cost-effective for the Debtor to continue to provide

21   those services.

22        THE COURT:  It's not cost-effective to continue to

23   provide the services of managing $6 billion of assets?  I

24   mean, you're the one --

25        MR. POMERANTZ:  Your Honor, if I may.

1          THE COURT:  -- who's looked into this, not me, but

2     that seems surprising to me.

3          MR. POMERANTZ:  Yeah.  Your Honor, the Debtor ran at

4     an operational deficit.  So the costs of the case were not

5     only the professional fees in the bankruptcy and

6     infrastructure, but as Mr. Clemente noted, the revenue that's

7     generated was not sufficient for the infrastructure that was

8     required to provide those services, the 70 or so employees

9     that the Debtor has.

10         So the plan contemplates the Debtor essentially

11    terminating those employees.  Again, it's our view that the

12    Claimant Trustee, under the auspices of the Oversight

13    Committee, will have that decision.  But if we thought that

14    there could be value in retaining those contracts, we would

15    have done so and the Committee would have wanted us to do so.

16         But this, again, is one important issue that the Committee

17    and the Debtor have worked through and have come to agreement

18    on.  So, again, everyone is focused today on the issues that

19    the Committee and the Debtor haven't been able to resolve, but

20    the reason this plan process is taking a long time, because

21    it's not the typical process, and the issues, one of the

22    issues on what should the post-effective date structure,

23    organization, and business operations do is something we have

24    shared a lot of information with the Committee and have come

25    to agreement with.

1       So, this is one of these instances where the process has

2   worked.  We deal with the Committee; the Committee deals with

3   us.  It's just not cost-effective to continue to provide those

4   services.

5           THE COURT:  All right.  Well, I'm hesitating and this

6   one is a hard one for me.  Maybe I'm comparing apples to

7   oranges.  But in Acis, there was interest in portfolio

8   managers bidding on the shared services agreement and the sub-

9   advisory agreement.  You know, we had an entity called Brigade

10  and we had a stalking horse called Oak Tree.  These were, you

11  know, not without risks, but people were interested in

12  stepping in that management role.

13      So, again, I'm hesitating here.  I don't want to get in

14  the middle of negotiations.  But my real question was a

15  disclosure question, because I wasn't clear, reading the

16  disclosure statement, whether that was a stream of revenue

17  that might inure to the benefit of the Creditor Trust, might

18  be monetized.  So, I think, at the very least, we need some

19  disclosure about that having been evaluated and decided it

20  wasn't, you know, value-producing or whatever.

21          MR. KATHMAN:  Your Honor?  Your Honor, may I just

22  real briefly?  Jason Kathman, for the record.

23      I will share that it's not my client's opinion that it's

24  not cost-effective.  In fact, my client has made proposals to

25  the Debtor and its Committee to assist in those type of things

013139

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 83
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 197 of 243 PageID 16077

82

1   in a cost-effective manner, and perhaps even do it at 20

2   percent of what the Debtor is currently doing.

3        So I would agree with Your Honor.  There needs to be at

4   least some disclosure, and the Debtor maybe can disclose what

5   they've done to investigate that, because it's my client's

6   opinion that it can -- that there can be a cost-effective way

7   to do that and that those shared services agreements do have

8   some value in this case.

9             THE COURT:  All right.

10            MR. POMERANTZ:  Your Honor, I'll point out that these

11  contracts, shared service contracts are terminable at will,

12  number one.  They are arguably personal service contracts.

13  While the Debtor did receive and the independent board members

14  did receive Mr. Daugherty's proposal, didn't find it

15  particularly executable or something worth considering.

16       But we'll be happy to add additional disclosure, a few

17  sentences on this issue, and Mr. Seery at confirmation will be

18  happy to testify regarding these issues, what he did, and the

19  conclusions that he reached that have led to the decisions

20  that we are making.

21            THE COURT:  Okay.  All right.  Well, we're going to

22  slow this down a little, and I've got different ideas about

23  how we do this.  Here are two disclosure statement objections

24  that I am sustaining, and then I'm going to give you a big-

25  picture point.

1          With regard to the various objections that the releases

2     are overbroad, vague, improper, I sustain those objections.  I

3     think a simple solution -- that the Debtor doesn't like,

4     apparently -- is just listing out the human beings who the

5     Debtor proposes to give a release to, even if that's 70

6     employees.  I just think the current drafting is completely

7     unworkable because you have to kind of start with, here's a

8     release, oh, but here are the carve-outs, and then you've

9     offered more carve-outs, which is appreciated, but I just feel

10    like, in a case like this, where a big part of potential

11    future recovery is causes of action, maybe avoidance actions,

12    and where there has been, you know, findings by prior

13    arbitration panels of misconduct here and there, there is just

14    no way we can have a release like this.

15         So I am going to sustain the objection to the release, and

16    the Debtor can either make another stab at it or abandon it,

17    whatever you think, because we would obviously potentially

18    have a confirmation issue down the road as well.  But right

19    now, we have a plain old disclosure problem:  inadequate,

20    vague, overbroad.  It's just going to lead to confusion.

21         The second disclosure statement objection that I'm going

22    to sustain, well, it all boils down to the plan supplement.  I

23    think, in the context of this case, we need to have a plan

24    supplement as part of the disclosure statement that goes out,

25    whether it's all worked into this document or attached as an

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 85
Case 3:21-cv-00538-N   Document 26-49   Filed 06/09/21   Page 199 of 243   PageID 16079

84

1   exhibit or -- and I'm hesitating because I don't want, you

2   know, a thousand-page document to go out.  You're going to

3   have to be thoughtful.  But there's just too much that I think

4   is too significant in the context of this case to defer to --

5   I think now we have November 23rd, the Monday before

6   Thanksgiving.  I mean, so many very essential components of

7   the plan, I think, are going to be described in that

8   Claimants' Trust Agreement, the Litigation Trust Agreement,

9   the human beings, the compensation.

10      And, again, if we were under the gun, so to speak, with

11   deadlines, you know, we had a debtor-in-possession financing

12   order about to expire or other deadlines looming, I would be

13   inclined to use the same old path we use in so many Chapter

14   11s, where, you know, let's go ahead and send out the

15   disclosure statement and plan, and the plan supplement later.

16   But I think, in the context of this case, it's just needlessly

17   delaying important information getting in the hands of the

18   creditors.

19      So, those are the two disclosure statement issues.  Now,

20   I'm going to say, third, just kind of a big-picture issue:  I

21   am really, really concerned about marching forward with

22   solicitation of a plan that lacks support of the Creditors'

23   Committee.  And again, as we've said so many times, context is

24   everything.  This isn't a case where we have, you know, the

25   secured lender with a blanket lien on everything and a

1    creditors' committee upset because they're getting a pittance

2    in a litigation trust and they don't, you know, maybe

3    understand there's just no value here beyond secured debt.

4    You know, that's what we all see 99 times out of a hundred in

5    Chapter 11 cases.

6        This is a case that is all about the Unsecured Creditors.

7    And, you know, early on in the case they backed off of wanting

8    a Chapter 11 trustee, the Committee did, because of the

9    corporate governance agreements they reached and their being

10   given standing to pursue causes of action.  And, you know, at

11   some point we've got to move forward, even without consensus,

12   but I'm just concerned at this juncture that this is where we

13   are.

14       Now, we're still in exclusivity, and I don't know how much

15   longer we will still be in exclusivity.  It's getting kind of

16   close.  And I'm not hearing from the Creditors' Committee that

17   they have the proverbial plan in their briefcase ready to

18   file.  So, you know, that's significant to me.  It's not like

19   they're offering a competing plan.  But I'm real concerned

20   that we've got a plan without support of our Creditors'

21   Committee.

22       And as a subset of that, I am concerned about this

23   potential cramdown scenario, where an administrative

24   convenience class, consisting mainly of the Debtor's former

25   law firms, being the impaired accepting class.  You know, that

013143

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 87
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 201 of 243 PageID 16081

86

1  it's not *per se* improper, but when I think of the Fifth

2  Circuit authority that's talked about is there a business

3  justification for separately classifying unsecured creditors

4  of similar priority, I'm not sure I've ever seen it in a

5  situation like this.  We know it's usually in a situation of

6  separately classifying a big unsecured deficiency claim of a

7  secured creditor from the trade debt.  Or, you know, I guess

8  we've seen it maybe in contexts of litigation claims versus,

9  you know, small little vendors.

10      But I'm concerned about this scenario, so I'll just let

11  you know that I might be convinced, but right now I'm a little

12  concerned about that.

13      So, we're slowing down the train a little.  And, again,

14  I'm very sensitive about the so-called burn rate on this.  You

15  know, I see the interim fee statements.  I know how expensive

16  this case is getting.  But at this point, I think we need to

17  slow it down a little and get adequate information worked into

18  this document.

19      So, let's talk about what makes sense timing-wise.

20          MR. POMERANTZ:  Your Honor, I have a couple comments

21  and then a proposal on timing, and I'd like to make it.

22          THE COURT:  Okay.  Go ahead.

23          MR. POMERANTZ:  So, first, I want to, and I think

24  it's important for everyone to hear and make sure at least I

25  understand and the company understands:  The issue on the

 1    releases from a disclosure perspective would be addressed by

 2    identifying all of the people getting releases?  Is that what

 3    Your Honor has said?  Am I understanding Your Honor correctly?

 4            THE COURT:  Yes.  I don't know how else we can do it.

 5    I mean, --

 6            MR. POMERANTZ:  Okay.  Understood.

 7            THE COURT:  -- there still may be a confirmation

 8    objection, but I'm just saying our exclusions are getting so

 9    big and so many that at this point I feel like you just need

10    to list out the people and then people know.

11            MR. POMERANTZ:  Understood.

12            THE COURT:  Uh-huh.

13            MR. POMERANTZ:  Understood.  My next question is, if

14    the Debtor did that and if the Committee ultimately decided

15    that was still insufficient, based upon your comments of the

16    Committee's support, would you at the disclosure statement

17    hearing say, okay, I'm allowing that to go out for voting, or

18    are you going to say to the Debtor, I understand you've

19    addressed the disclosure issue, but if the Committee is not on

20    board then I'm not letting it go out for voting?  I just want

21    to understand Your Honor's thought process there.

22            THE COURT:  Well, narrowing in on this one issue, if

23    you list out, Here are the people we propose to get releases,

24    okay, they say, We're not going to support it, if this is the

25    issue we were down to, I would let it go out and then you'd

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 89
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 203 of 243 PageID 16083

88

```
 1    have to put on evidence at the confirmation hearing why these
 2    were appropriate, legally-permissible releases.  You'd have a
 3    burden of proof.
 4              MR. POMERANTZ:  Totally understand.
 5              THE COURT:  Uh-huh.
 6              MR. POMERANTZ:  Totally understand, and we understand
 7    the Court's comments.  We understand the Committee.  But I
 8    think that was helpful so that we could hear Your Honor's
 9    thinking about it.
10         With respect to the plan supplement agreement, on the
11    timing here, just looking at a calendar and obviously without
12    the benefit of conferring with anyone, you know, least of
13    which Mr. Seery, who I answer to, I would look at filing an
14    amended disclosure statement to address some of the issues
15    that were raised today and the plan supplement agreement with
16    the Claimant Trustee Agreement, the identity of the members,
17    the compensation.  I'm not sure we necessarily need to have
18    the corporate documents by then, but to do that by November
19    13th, to then provide that any objections to the disclosure
20    statement and the plan supplement could be filed by November
21    19th, and then a hearing to consider the adequacy of the
22    disclosure statement on November 23rd.
23         I think that would give us time to thoroughly work through
24    the issues with the Committee on these issues.  It will give
25    people time to respond.  And then we could have a disclosure
```

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 90
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 204 of 243 PageID 16084

89

1    statement hearing in advance of the Thanksgiving holiday.

2    Would that make sense to Your Honor?

3           THE COURT:  All right.  Well, I think I'm okay with

4    this.  I'll hear contrary arguments.  Mr. Clemente?

5           MR. CLEMENTE:  Yes, Your Honor.  Just a couple of --

6    if I may just back up for a second.  I very much appreciate

7    the ruling that Your Honor gave.  I think -- and just to be

8    clear, I don't think it really changes anything from where we

9    are today.  Listing insiders in the disclosure statement is

10   not going to change the view of the Committee from a

11   perspective of whether that releases should just be dead on

12   arrival going out to creditors.

13       So, again, I appreciate your clarifying comments, but I

14   just wanted to make sure that Your Honor was clear that I

15   don't think that that's really, you know, the issue that the

16   Committee has been focused on.  It's -- it is the substance of

17   those releases.  And so putting a list together of those

18   releases I don't think makes sense.  Or, excuse me, makes

19   perfect sense because of Your Honor, but I don't think that it

20   resolves the issue that the Committee has focused on.

21       Second, Your Honor, you know, another thing to consider --

22          THE COURT:  I guess, thinking through that -- and

23   I've got to hurry up here because I have a 1:30 hearing and a

24   2:30 hearing and we need a lunch break.  But thinking through

25   that issue, I guess, you know, the Debtor is going to bear a

013147

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 91
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 205 of 243 PageID 16085

90

1   risk -- or I don't know if you'd call it a risk -- but that we

2   get to -- everyone's going to bear a risk that we get to

3   confirmation and they don't sustain their burden of showing

4   either the permissibility or the appropriateness of, let's

5   say, a release against John Doe or a release against ten

6   different employees, and then, okay, can we sever that out and

7   the plan is still confirmed?  I mean, --

8             MR. CLEMENTE:  Your Honor, --

9             THE COURT:  -- we're going to have a risk on that,

10  right?

11            MR. CLEMENTE:  We'd agree.  And the risk,

12  respectfully, is not the borne by the Debtor.  As Your Honor

13  aptly pointed out, --

14            THE COURT:  Uh-huh.

15            MR. CLEMENTE:  -- it is the Unsecured Creditors here

16  that bear the brunt of this case.  And the idea that we should

17  go forward where the outcome is, well, if the Debtor is, you

18  know, ultimately not able to bear its burden, that's its

19  issue.  But it's actually our issue, Your Honor, which is why,

20  you know, the expediency of the situation is now in addressing

21  that, as opposed to sending something out to vote that we know

22  we're not going to have the Committee's support on, rolling

23  into a confirmation hearing, and then you have creditors that

24  are faced with the outcome being a plan that isn't confirmed

25  and having spent the time, money, and resources up to that

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 92
Case 3:21-cv-00538-N  Document 26-49  Filed 06/09/21    Page 206 of 243  PageID 16086

91

1    point.

2        That's the difficulty that the Committee will continue to

3    find itself in, Your Honor.

4            THE COURT:  Okay.  All right.  Anyone want to comment

5    about the timing?

6            MR. CLEMENTE:  Your Honor, one, I guess, one

7    question, I suppose.  It seems like we're sort of kicking this

8    out quite a bit.  I'm wondering whether there isn't some sort

9    of interim step that can be taken in terms of timing.  But,

10   you know, maybe back for some sort of status call or something

11   like that, Your Honor, to let you know where we are.  But it

12   sounds like -- but I don't have a problem with Mr. Pomerantz's

13   scheduling concept.  I just want to make sure that we're not

14   needlessly extending things out.

15           THE COURT:  Well, I think this sounds appropriate,

16   and I dangled out there, you know, the proverbial question:

17   Do you have a plan in your briefcase?  I mean, I don't know

18   when -- I don't remember the deadline on exclusivity here.

19   But --

20           MR. POMERANTZ:  I was going to address that, Your

21   Honor.  Our deadline was extended, I believe, to December 5th,

22   which is the day after confirmation.  Obviously, we're not

23   getting to confirmation on December 4th.  And we would seek an

24   extension of exclusivity until the end of the confirmation

25   hearing.

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 93
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 207 of 243 PageID 16087

92

1      So, again, Your Honor doesn't have to decide that now.  If

2   Your Honor wants, I guess we could deal with that at the

3   continued hearing on the disclosure statement.  I'm not sure

4   if Your Honor would want a separate motion filed.  But the

5   point is that, if Your Honor does give the Debtor the

6   opportunity to go to confirmation and for some reason doesn't

7   confirm, that we should still be able to then deal with it at

8   that time and not have exclusivity automatically expire.

9           THE COURT:  All right.  Well, --

10          MR. CLEMENTE:  Your Honor, I think, if I may very

11   quickly.

12          THE COURT:  Go ahead.

13          MR. CLEMENTE:  The plan, Your Honor, yes, I don't

14   have it in my pocket, but it's not very complicated.  I think

15   you know exactly what our issues are.  So the idea that we

16   would go to a disclosure statement and then not have that

17   approved and have a further exclusivity extension, Your Honor,

18   just -- it just -- your comments are well taken.  The

19   Committee will decide whether we'll come before you seeking to

20   terminate exclusivity even before the currently -- you know,

21   the next scheduled disclosure statement.

22          THE COURT:  All right.  Well, I am going to require a

23   motion to be filed for any extension for the Debtor or

24   certainly any termination.  So, you know, we're now over a

25   year into the case, and I'm just letting you know, Mr.

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 94
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 208 of 243 PageID 16088

93

1  Pomerantz, I'm not likely to extend exclusivity unless I hear

2  something really compelling that I'm not hearing yet in this

3  case.

4      So, let me see about the Monday before Thanksgiving.

5      (Court confers with Clerk.)

6          THE COURT:  We can give you 1:30 on November 23rd.

7  Okay?

8          MR. POMERANTZ:  That works, Your Honor.

9      (Court confers with Clerk.)

10         THE COURT:  All right.  So, Mr. Pomerantz, if you

11 could upload an order continuing this hearing on the

12 disclosure statement, and note in it the November 13th

13 deadline, the November 19th deadline, and then the hearing at

14 1:30 on November 23rd.

15     All right.  Well, I guess I'm going to see you at least

16 once before then, on the UBS motion for summary judgment,

17 which I think is November 20th.

18         MR. POMERANTZ:  Your Honor, we also have a 3018

19 motion for HarbourVest, which is, I believe, maybe the 10th.

20         THE COURT:  Okay.

21         MR. POMERANTZ:  And then there's also a 3018 motion

22 for Daugherty, which I don't know if we have a date yet.  I

23 know there's a briefing schedule.  The motion has been filed.

24 We will confer with Mr. Daugherty's counsel and then approach

25 your Clerk and figure out an appropriate date for that hearing

Case 19-34054-sgj11 Doc 1822-144 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 95
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 209 of 243 PageID 16089

94

1    as well.

2              THE COURT:  All right.  Thank you.  Well, I really

3    wish you good luck in further good-faith negotiations here.

4    We really have more big open issues than I would like to have,

5    but my most concerning one is no agreement with the Creditors'

6    Committee.  So, anyway, I hope that some progress is made.

7    All right.  We stand adjourned.

8              MR. POMERANTZ:  Thank you, Your Honor.

9              THE CLERK:  All rise.

10        (Proceedings concluded at 12:51 p.m.)

11                        --oOo--

12

13

14

15

16

17

18

19                      CERTIFICATE

20        I certify that the foregoing is a correct transcript to
     the best of my ability from the electronic sound recording of
21   the proceedings in the above-entitled matter.

22    **/s/ Kathy Rehling**                        **10/28/2020**

23   _____        _____

24   Kathy Rehling, CETD-444                        Date
     Certified Electronic Court Transcriber

25

95

INDEX

PROCEEDINGS                                                          4

WITNESSES

-none-

EXHIBITS

-none-

RULINGS                                                            82

END OF PROCEEDINGS                                                 94

INDEX                                                              95

# EXHIBIT TTTTTT

013154

```
                      IN THE UNITED STATES BANKRUPTCY COURT
                       FOR THE NORTHERN DISTRICT OF TEXAS
                                 DALLAS DIVISION

                                      )    Case No. 19-34054-sgj-11
        In Re:                        )    Chapter 11
                                      )
        HIGHLAND CAPITAL              )    Dallas, Texas
        MANAGEMENT, L.P.,             )    Wednesday, October 28, 2020
                                      )    9:30 a.m. Docket
                Debtor.               )
                                      )    PATRICK DAUGHERTY'S MOTION
                                      )    TO CONFIRM STATUS OF
                                      )    AUTOMATIC STAY [1099]
        _____)

                           TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                      UNITED STATES BANKRUPTCY JUDGE.

        WEBEX APPEARANCES:

        For the Debtor:              John A. Morris
                                     PACHULSKI STANG ZIEHL & JONES, LLP
                                     780 Third Avenue, 34th Floor
                                     New York, NY  10017-2024
                                     (212) 561-7700

        For Patrick Daugherty:       Jason Patrick Kathman
                                     PRONSKE & KATHMAN, P.C.
                                     2701 Dallas Parkway, Suite 590
                                     Plano, TX  75093
                                     (214) 658-6500

        For Patrick Daugherty:       Thomas A. Uebler
                                     MCCOLLOM D'EMILIO SMITH UEBLER,
                                       LLC
                                     Little Falls Centre Two
                                     2751 Centerville Road, Suite 401
                                     Wilmington, Delaware 19808
                                     (302) 468-5960

        Recorded by:                 Michael F. Edmond, Sr.
                                     UNITED STATES BANKRUPTCY COURT
                                     1100 Commerce Street, 12th Floor
                                     Dallas, TX  75242
                                     (214) 753-2062
```

013155

2

1    Transcribed by:              Kathy Rehling
                                  311 Paradise Cove
2                                 Shady Shores, TX  76208
                                  (972) 786-3063
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
            Proceedings recorded by electronic sound recording;
25             transcript produced by transcription service.

Case 19-34054-sgj11 Doc 1822-145 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 4 of
Case 3:21-cv-00538-N   Document 26-49   Filed 06/09/21    Page 214 of 243   PageID 16094

3

1             DALLAS, TEXAS - OCTOBER 28, 2020 - 9:41 A.M.

2             THE COURT:  We have a Highland setting today.  It

3    feels like we were just here yesterday, and I think we were.

4    This is Case No. 19-34054, Patrick Daugherty's Motion to

5    Confirm Status of Automatic Stay, or alternatively to modify

6    it.  For the Movant, Mr. Daugherty, I see we have Mr. Kathman

7    here, correct?

8             MR. KATHMAN:  Good morning, Your Honor.  Jason

9    Kathman on behalf of Mr. Daugherty.  And I also have with me

10   my co-counsel from Delaware, Tom Uebler with the firm McCollum

11   D'Emilio Smith & Uebler.  And he's been admitted *pro hac vice*

12   in the case, Your Honor.

13            THE COURT:  Okay.  Good morning to both of you.

14            MR. UEBLER:  Good morning, Your Honor.

15            THE COURT:  We had one objection to this motion by

16   the Debtor.  Who do we have appearing for the Debtor team?  I

17   see Mr. Demo's name up there.  Are you going to be taking the

18   lead for the Debtor this morning, Mr. Demo?

19            MR. MORRIS:  Good morning, Your Honor.  This is John

20   Morris.  I'm from Pachulski Stang Ziehl & Jones.  I'll be

21   handling this matter today.

22            THE COURT:  Okay.

23            MR. MORRIS:  And --

24            THE COURT:  Good morning.

25            MR. MORRIS:  And just there's not only -- we filed

Case 19-34054-sgj11 Doc 1822-145 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 5 of
Case 3:21-cv-00538-N   Document 26-49   Filed 06/09/21    Page 215 of 243   PageID 16095

4

1    not only an opposition, but just to be clear, there's a cross-

2    motion for the extension of the stay to the nondebtors.  And

3    just to make sure the Court is aware, we also filed an

4    adversary proceeding seeking either a 105 injunction, or

5    alternatively, the extension of the stay to the Delaware

6    action.

7        So if Your Honor hadn't seen it, all of that is part of

8    today, so it's -- they're related to today's proceedings.

9        THE COURT:  All right.  Well, I was aware of the

10    adversary, but just to be clear, we don't -- we don't have

11    your countermotion, if you will, set for hearing technically

12    today, correct?

13        MR. MORRIS:  I think that's right, although it's

14    styled as the same thing and it's part and parcel of the

15    objection.

16        THE COURT:  All right.  Well, I didn't see any other

17    parties in interest file a pleading in this contested matter.

18    So, I know there are lots of interested observers on the

19    video, but I won't at this time take appearances from others.

20        So, with that, Mr. Kathman or Mr. Uebler, how did you want

21    to proceed this morning?

22        MR. KATHMAN:  Your Honor, I'll be handling the

23    majority of the argument this morning, and Mr. Uebler really

24    is here this morning if Your Honor had questions about what

25    has gone on in Delaware or what has occurred in the Delaware

5

1    cases.  Mr. Uebler has been the one that's litigated all those

2    issues, so he's kind of a point of information if Your Honor

3    had questions regarding that.

4              THE COURT:  All right.

5              MR. KATHMAN:  Your Honor, what I thought I would do

6    is my argument is actually pretty brief, but what I thought I

7    would do also in a part of my argument is take a little bit of

8    this time just to give Your Honor kind of a summary of kind of

9    what the basis of Mr. Daugherty's claims are in this case, so

10   that you can understand how that fits into the context of this

11   case.

12       That word "context," I know, has been used a lot during

13   the pendency of this case, and so I thought, while we have the

14   time this morning, I would just spend just a few minutes just

15   kind of explaining what the basis of Mr. Daugherty's claim is.

16   And I think that that will be relevant, you'll see, in how

17   that ties into what the relief is that we're requesting this

18   morning.

19             THE COURT:  Okay.

20             MR. KATHMAN:  Your Honor, the hearing actually this

21   morning is really pretty straightforward.  Fifth Circuit law

22   is clear that the stay does not apply to nondebtors, and Fifth

23   Circuit law is also clear that seeking the severance of a

24   debtor does not violate the automatic stay.

25       I filed this motion really out of an abundance of caution

Case 19-34054-sgj11 Doc 1822-145 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 7 of
Case 3:21-cv-00538-N   Document 26-49   Filed 06/09/21   Page 217 of 243   PageID 16097

6

1    as a so-called "belt and suspenders," because when it comes to

2    the automatic stay, I'm of the opinion to always be more

3    overly cautious than underly cautious, one.  And number two,

4    in a situation where we have a history of a very, very, very

5    litigious debtor here, it was just a risk that I wasn't

6    willing to take, even in the face of blatant Fifth Circuit law

7    that this doesn't violate.  This is just one of those

8    situations where I'd rather ask for permission and have your

9    Court -- have Your Honor bless it before we go take actions in

10   the Delaware court.

11       Number two, Your Honor, the Debtor, by filing an adversary

12   proceeding seeking a 105 injunction, pretty much implicitly

13   agrees that the stay doesn't apply to the nondebtors.  Because

14   if it applied to the nondebtors, then they wouldn't need to

15   seek a 105 injunction and wouldn't need to be seeking Your

16   Honor to extend the automatic stay to those parties.

17       So the way I see it, Your Honor, we have Fifth Circuit law

18   that says that the stay doesn't apply to nondebtors.  That's

19   pretty abundantly clear.  And two, we have the Debtor

20   essentially implicitly agreeing to that position.

21       And the final thing, Your Honor, I would say is that --

22   and Your Honor hit on this -- is that the temporary injunction

23   is not set for hearing this morning.  They filed an adversary

24   proceeding.  They sought a temporary injunction.  My client's

25   answer deadline to that temporary injunction has not yet

Case 19-34054-sgj11 Doc 1822-145 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 8 of
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 218 of 243 PageID 16098

7

1    passed.  We have until November 18th to answer that.

2         The law in this circuit and in other circuits are, when

3    you're seeking a 105 injunction, you're entitled to due

4    process, which includes my ability and my client's ability to

5    answer that lawsuit, and we will answer that lawsuit, and we

6    can take up the 105 injunction issues at that time, but that's

7    simply just not set for hearing this morning.

8         So, Your Honor, in getting a little bit now to kind of the

9    context, and I will be brief, Mr. Daugherty's claim arises

10   like many of the other creditors in this case, from a judgment

11   that he rightfully and legally obtained and that Highland then

12   fought tooth and nail to pay, and -- fought tooth and nail,

13   sorry, not to pay, and worked really to make Mr. Daugherty's

14   life utterly miserable.

15        As we noted in our 3018 brief that we filed last Friday,

16   the Debtor knew how to carry out its strategy against Mr.

17   Terry related to the Acis matter because they had done it to

18   Mr. Daugherty first.

19        In 2011, after ten years of employment at Highland, Mr.

20   Daugherty resigned for a number of reasons, including

21   disagreements with Mr. Dondero about actions that Mr. Dondero

22   was requesting Mr. Daugherty to take.  Those actions, Your

23   Honor, would later be related to the basis of the Redeemer

24   Crusader arbitration awards and the basis of the claims that

25   the Court approved last week.

Case 19-34054-sgj11 Doc 1822-145 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 9 of
Case 3:21-cv-00538-N   Document 26-49   Filed 06/09/21   Page 219 of 243   PageID 16099

8

1    Because of what had gone on with those transactions, Mr.

2  Daugherty retained certain confidential information upon his

3  departure in order to protect the record.  Highland then sued

4  Mr. Daugherty for breach of contract for retaining those

5  documents, and Mr. Daugherty third-party sued an entity called

6  Highland Employee Retention Assets, which everyone refers to

7  as HERA.  HERA had been set up during the wake of the Great

8  Recession in 2008/2009 as a way for the Debtor to retain its

9  top talent, and as a part of that, Mr. Daugherty received

10  approximately 19 percent of the preferred units in HERA.  And

11  it's important to note, Your Honor, at this point that HERA,

12  when it was set up, it was set up specifically and its

13  governing documents were set up specifically such that Mr.

14  Dondero, Mr. Okada, and Highland could not own preferred units

15  in HERA.

16    So, during the trial, which we'll refer to as the Texas

17  Trial, the Debtor sought, like it has in a lot of the other

18  cases here, to denude and transfer the assets away from HERA

19  so that if Daugherty ultimately got a judgment against HERA

20  there wouldn't be any assets at HERA to be able to collect.

21  And it did this by Mr. Dondero and Mr. Surgent putting

22  together a scheme by which the Debtor would buy all of the

23  preferred units in HERA except for Mr. Daugherty's.

24    So Highland purported to buy all of the interests in HERA

25  except for Mr. Daugherty's, and then they transferred all the

Case 19-34054-sgj11 Doc 1822-145 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 10
Case 3:21-cv-00538-N   Document 26-49   Filed 06/09/21   Page 220 of 243   PageID 16100

9

1  assets from HERA to Highland.

2       As they were preparing for trial, though, Your Honor, they

3  realized that if that were to come out in trial, that they

4  transferred all of HERA's assets to Highland, that wouldn't

5  look real great to a Texas jury and to a Texas trial.  And so

6  what they did is they purported to set up a "escrow account"

7  with a firm called Abrams & Bayliss in Delaware.  And during

8  that trial, Mr. Dondero told the Texas judge and jury that

9  they had transferred Mr. Daugherty's 19 percent assets, his

10  portion of the 19 percent HERA assets, into this escrow.  And

11  Mr. Dondero testified at that trial that if Mr. Daugherty won,

12  he would get the assets in the escrow.

13       Your Honor, that was just a lie, and we know it's a lie

14  because of the documents in evidence that we got in the

15  Delaware action later.

16       Now, if some of this is sounding familiar, you'll recall

17  that in the Acis case in relation to Mr. Daugherty's claim in

18  that case, I sought to take a number of depositions of

19  Highland employees related to the transfer of these assets

20  with the escrow.  The Court will recall we had a hearing on a

21  Motion to Quash certain subpoenas I was serving, and Mr.

22  Leventon testified at that hearing.

23       And if the Court will recall, I asked Mr. Leventon how

24  certain of these assets were transferred into the escrow, and

25  one of those assets, Your Honor, that was supposed to be

Case 19-34054-sgj11 Doc 1822-145 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 11
Case 3:21-cv-00538-N   Document 26-49   Filed 06/09/21   Page 221 of 243   PageID 16101

10

1   transferred into the escrow were HERA's shares in Restoration

2   Capital Partners.

3       Now, I know Your Honor is familiar with that asset,

4   Restoration Capital Partners, because it's been the subject of

5   some of the hearings during this case.  But when I asked Mr.

6   Leventon about the transfer of that Restoration Capital

7   Partners, his answer was, It's fuzzy.  And it's fuzzy, Your

8   Honor, because it never happened.

9       Fast-forward now to the Delaware -- or sorry, fast-forward

10  to the end of that trial.  Mr. Daugherty obtained a judgment

11  against HERA for $2.6 million, plus pre- and post-judgment

12  interest.  That judgment is appealed and ultimately affirmed

13  by the Appellate Court.  Upon that appeal, upon the opinion

14  being entered, the Debtor starts working to completely unwind

15  that escrow on the day that the opinion was entered.  There is

16  internal correspondence between the Debtor and its lawyers and

17  with the escrow agent Abrams & Bayliss and the Debtor's in-

18  house counsel, Mr. Ellington, talking specifically about how

19  Abrams & Bayliss is going to resign as the escrow agent and

20  that all of the assets will then just be returned back to

21  Highland.

22      And in the Delaware case, Your Honor, we challenged the

23  privilege log to obtain those documents.  And the Delaware

24  court reviewed those documents *in camera*, and this is what she

25  -- her finding was.  She found that the crime fraud exception

1    to attorney-client privilege applied, and her ruling

2    specifically was Debtor -- sorry, Daugherty has made a prima

3    facie showing that a reasonable basis exists to believe that a

4    fraud has been perpetrated and that Highland sought Abrams &

5    Bayliss to serve as escrow agent and to provide legal analysis

6    in furtherance of that fraud specifically to protect the

7    escrowed assets from Daugherty while the Texas case was

8    pending and then to transfer them back to Highland after the

9    Texas verdict was finalized.  I conclude my privileged

10   Highland claims over Bayliss -- Abrams & Bayliss's legal

11   advice regarding the escrow agent and Abrams & Bayliss's

12   resignation has been stripped from the crime fraud exception.

13        So why do I kind of bring all of this up and how does this

14   fit into the context, Your Honor?  It's because these lawyers

15   -- Mr. Leventon, Mr. Ellington, Mr. Surgent, the people, the

16   nondebtors that are the subject of our lawsuit in Delaware --

17   these are the same people that the Debtor is seeking to give

18   releases to that was the big subject of yesterday's hearing,

19   okay?  These are the -- these are the releases of these

20   individuals that put together the scheme to strip the escrow

21   assets as to Mr. Daugherty --

22        MR. MORRIS:  Your Honor, I really apologize, but we

23   are now testifying.  I've just got to lodge this objection.

24   We're having extensive testimony about evidence that's not in

25   the record, and we have arguments now that have absolutely

 1   nothing to do with the motion.  I thought this was going to be

 2   a brief opening, Your Honor.  This is not proper.

 3              THE COURT:  All right.  Relevance objection and --

 4   among other things.  Your response, Mr. Kathman?

 5              MR. KATHMAN:  Your Honor, none of this is evidence,

 6   and Your Honor, I know, isn't going to take it as evidence.

 7   I'm just trying to explain.  There was a big hearing

 8   yesterday, and a big part of that hearing yesterday was these

 9   releases.  That was a big part of the hearing yesterday on the

10   disclosure statement hearing.  And those releases apply to the

11   exact people that we're suing in Delaware.  How does that tie

12   into this motion, Your Honor, --

13              THE COURT:  Okay.  I overrule --

14              MR. KATHMAN:  -- is those people --

15              THE COURT:  -- the objection.  You can go ahead.  Go

16   ahead.

17              MR. KATHMAN:  Okay.  Your Honor, and I'll tell you,

18   I'm almost done.

19       It ties into this hearing, Your Honor, because these are

20   the nondebtors.  Mr. Leventon, Mr. Ellington, Mr. Surgent, and

21   the lawyers that the Delaware Court found the crime fraud

22   exception applied to -- Mr. Katz, Mr. Hurst -- in trial in

23   Delaware.  Mr. Uebler asked Mr. Dondero about these actions,

24   and Mr. Dondero pointed the finger at his lawyers, both in-

25   house and outside counsel, and said that he did all of that on

1    advice of counsel.

2         That's why we filed the second lawsuit, Your Honor.  Those

3    lawyers were a part of a fraud to take these assets out of the

4    escrow account, and that's the basis of our lawsuit in

5    Delaware, Your Honor.  The stay does not apply to those

6    people.

7         And so I'm asking Your Honor to confirm that the stay did

8    not apply to those people so that we can sever the Debtor out

9    of the litigation with those people.  Mr. Dondero.  And

10   certain of those lawyers are not -- they're in a separate

11   lawsuit, of which the Debtor is not a party.  But Mr. Dondero

12   and HERA are a part of a lawsuit with the Debtor that was in

13   its second day of trial in Delaware.  And so I'm asking the

14   Court to allow us to sever the Debtor out of that litigation

15   so we can pursue our claims against the nondebtor.

16        As I started, Fifth Circuit is abundantly clear it doesn't

17   apply to nondebtors, and we believe Your Honor should confirm

18   what the Fifth Circuit says and grant our motion to allow us

19   to sever those parties so that we can proceed against the

20   nondebtors in Delaware.

21        Thank you.

22             THE COURT:  All right.  Thank you.  Mr. Morris, your

23   opening statement?

24             MR. MORRIS:  Yes, Your Honor.  John Morris, Pachulski

25   Stang Ziehl & Jones for the Debtor.

1          Context.  Everyone wants to talk about context.  Mr.

2     Daugherty has a claim against the Debtor in this court.  That

3     claim will be litigated in this court.  That claim is based

4     almost exclusively, with the exception of a defamation claim

5     and I think maybe a tax claim, on the very pleading that Mr.

6     Kathman seeks to pursue in Delaware.

7          That claim is not only going to be litigated in this

8     court, but it's the subject of a scheduling order that's been

9     agreed upon by the parties, and it's going to be heard this

10    spring.  This is simply another instance, Your Honor, and at

11    this point I hope the Court sees how hard the Debtor is trying

12    to stop this flow of litigation.

13         Mr. Daugherty, he can make whatever motion he wants, but

14    the fact of the matter is these two cases in Delaware are

15    Cases No. 7 and Cases No. 8, and both of them implicate the

16    Debtor itself.  Severance is not going to change that.  The

17    debtor is going to be harmed if these cases proceed.  This has

18    nothing to do with the individuals, Your Honor, but the fact

19    of the matter is that his claim in this court is based on

20    these lawsuits, and these lawsuits arise from the exact same

21    set of operative facts.  Maybe they found out more allegations

22    against more individuals, but like so many parties in this

23    case, unfortunately, they just continued this scorched-earth

24    practice that is going to continue to harm the Debtor.

25         This case, there's no urgency here.  The status quo has

013168

1    remained for over a year.  In fact, Mr. Daugherty told the

2    Court in Delaware over a year ago on the petition date that he

3    was content to put the case on ice.  He has done nothing for a

4    year.  There's no urgency here, right?

5        All he's looking for is a little leverage, Your Honor.

6    That's all that's happening here.  But the consequences of

7    opening the floodgates and allowing him to proceed and giving

8    him the comfort that he's seeking from this Court will be

9    disastrous for the Debtor.  It will -- the Debtor is going to

10   be forced to participate in the process, even if it's not

11   named, because Mr. Daugherty himself has alleged a unity of

12   interest between the Debtor and the nondebtor Defendants.  Mr.

13   Daugherty himself has alleged that the Debtor participated in

14   the conspiracy with the nondebtors.

15       There is no way to separate the Debtor from the nondebtor,

16   so the Debtor will be forced to spend time and money.  The

17   Debtor will be forced to confront the possibility of

18   preclusive rulings.  The Debtor will be forced to, you know,

19   devote more resources, to the detriment of all creditors in

20   this case.

21       There is no reason to give this Plaintiff comfort.  We

22   have our adversary proceeding here.  He is well aware of that.

23   If necessary, (garbled) motion this afternoon for a TRO.  I

24   hope that's not necessary, but everybody is on notice as to

25   exactly what is happening here.  And there's no reason,

Case 19-34054-sgj11 Doc 1822-145 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 17
Case 3:21-cv-00538-N    Document 26-49    Filed 06/09/21    Page 227 of 243    PageID 16107

16

1    frankly, for this Court, six or eight weeks before

2    confirmation, with a scheduling order in place for the

3    litigation of Mr. Daugherty's claim, to upset the apple cart

4    and just open the floodgates to yet more litigation.  We think

5    that would be disastrous for the Debtor, for its estate, and

6    for all creditors.

7        Give me just one second, Your Honor.  (Pause.)  I just

8    want to go through some of the factors that we cited in our

9    papers to make the record quite clear as to what's going on

10   here.

11       The allegations -- there can't be any dispute that the

12   allegations in both pending Delaware actions are inextricably

13   interwoven with the claim that's pending in this case.  In

14   fact, as I mentioned, the claim is based on the lawsuit.  Both

15   the lawsuits and the proof of claim are based on the

16   allegation that Highland and the nondebtors conspired to

17   transfer assets to prevent Mr. Daugherty from collecting on

18   his judgment.

19       Your Honor, I must point out that the Debtor has conceded

20   that Mr. Daugherty has an allowed proof of claim for the value

21   of the judgment that he previously obtained for $3.7 million.

22   That's not even in dispute.

23       I would point out that Mr. Daugherty's expert in Delaware,

24   as long as we're going to talk about Delaware, filed an expert

25   report with damages of $4 to $5 million.  We can challenge

1  that, but that's -- that's what he's looking to get in

2  Delaware, and we've already conceded $3.7 million of it, Your

3  Honor.

4      Mr. Daugherty expressly alleges an identity of interests.

5  He expressly alleges that Highland conspired with every single

6  one of these nondebtor defendants.  Mr. Daugherty specifically

7  alleges that the corporate defendants, including the Debtor,

8  HERA Assets, HERA Management, were all controlled by Mr.

9  Dondero.  If we open the floodgates here, we not only run the

10  risk of preclusive rulings, not only cost the Debtors more,

11  but you can be sure that the Debtor will face yet more

12  indemnification claims from its employees.  The Debtor will

13  have to participate.

14      You know, let's talk about what the relief requested is

15  here.  He wants to sever the Debtor so that he can consolidate

16  these two cases.  How is that even possible?  You've got one

17  case that apparently is in the second day of trial, and you've

18  got another case that's still in the pleading stage where

19  there's a motion to dismiss pending.  If you consolidate those

20  cases, how do you do that consistent with due process.  How

21  can you do that?  I mean, what do you tell the defendants in

22  case number one?  We've consolidated the case, but now you

23  have to sit tight while I go through the pleading and the

24  motion to dismiss and then discovery and wait for the case

25  number two to come up to speed?  Or do you tell the defendants

1  in case number two, We're going to just start now on day two

2  of trial?

3      What they're asking for I don't even think was well

4  thought out.  But let's take it a step further.  Let's say

5  they did that, Your Honor.  Let's say -- let's say they went

6  tomorrow and they went to Delaware and everything -- they had

7  their trial and it ended on Friday and they got a judgment.

8  What do you think the chances are of an appeal?  And then --

9  and then what?

10      What happens in the spring?  Do we have Mr. Daugherty tell

11  this Court that we can't litigate his claim pursuant to the

12  agreed-upon schedule because we have to wait for the outcome

13  of the appeal?  Or do we have Mr. Daugherty say, No, we're

14  just -- for the second time, and run the risk of inconsistent

15  verdicts, of running the risk of a waste of judicial

16  resources?

17      How -- how does he even -- I can't even wrap my head

18  around how this would even work.  But even if he could come up

19  with a theory about how it would work, it will harm the

20  Debtor.  Mr. Daugherty has a claim against the Debtor.  It's

21  scheduled to be heard in this court.  It's an agreed-upon

22  schedule.  He hasn't sought any relief for over a year.  Let

23  him resolve his claim against the Debtor.  That's why --

24  that's why companies file for bankruptcy, to get that

25  protection, to have their claims adjudicated in their

1    courtroom, where they chose to file.

2         And there is no way, there is simply no way -- and it's

3    why -- it's why there's no mention of it at all by Mr.

4    Daugherty or his counsel -- there is no way to separate the

5    Debtor from the nondebtors in this case.

6         And so, Your Honor, I think the request ought to be

7    denied.  I'll move at this time for a TRO based on the

8    argument that I've made.  If Your Honor wants me to file a

9    formal motion on shortened notice, I'm happy to do that.  But

10   the Debtor -- Mr. Daugherty is now on notice.  We've made our

11   motion.  We've made our cross-motion.  We have filed our

12   adversary proceeding.  He knows exactly what our position is

13   here, so there is no surprise.  Okay?

14        But we, we've got to stop this litigation train, Your

15   Honor.  There's just no reason to do it now.  Thank you.

16             MR. KATHMAN:  Your Honor, may I respond?

17             THE COURT:  Well, I mean, at this point, I'd just

18   like to know what evidence you're each going to rely on today.

19   I don't know if it's purely legal argument, or are you going

20   to put on evidence?

21             MR. KATHMAN:  I'm just going to rely on our

22   declaration we filed in support of our motion, Your Honor.  I

23   don't intend to put on any evidence.  And I'd like to resp...

24   and here's the reason why, Your Honor.  Is I think what you

25   heard Mr. Morris arguing there is why the Debtor shouldn't be

1   severed, okay?  Before Your Honor today is not a motion to

2   sever the Debtor.  Before Your Honor is a motion to confirm

3   that the stay does not apply to nondebtors so that we can go

4   seek that relief from Delaware.

5       Those arguments are inextricably intertwined, and the

6   Debtor shouldn't be severed out, all those arguments for the

7   court in Delaware when we file our motion to sever in

8   Delaware.  The Debtor says it wants Your Honor to hear that.

9   They could have removed that case in Delaware when they filed

10  the case.  If they wanted those issues to be heard by a

11  bankruptcy court, if they wanted those issues to be heard by

12  Your Honor, they could have removed the case and had it

13  transferred down here.  They didn't do that.  They left the

14  case in Delaware.

15      So they're now trying to say, when I'm trying to pick the

16  forum, when we're going to forum that they left at -- they

17  didn't remove the case, they didn't transfer it to the case,

18  okay, they didn't transfer it to Your Honor -- we're going to

19  go to that forum, Delaware, and litigate these issues.  And so

20  the arguments -- the overwhelming majority of Mr. Morris's

21  arguments were these are inextricably intertwined, there's

22  identity of interest -- all those issues are severance issues.

23  They should be raised at that time.

24      Before Your Honor today, and the only motion that's before

25  Your Honor today, is a motion to confirm that the stay does

Case 19-34054-sgj11 Doc 1822-145 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 22
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 232 of 243 PageID 16112

21

1   not apply to nondebtors, and that if we were to go seek that

2   severance motion in Delaware, we are not violating the

3   automatic stay.  That's just pure legal argument, Your Honor.

4           THE COURT:  Okay.  Let me clarify a few points here.

5   You're wanting not just confirmation that the stay would not

6   apply to severance of the Debtor, but you're also wanting sort

7   of like a comfort order that you can go forward after

8   severance, if permitted by the Delaware court, against all

9   these nondebtors, okay?

10          MR. KATHMAN:  Correct, Your Honor.  Correct.

11          THE COURT:  All right.  Let me clarify that I

12  understand the nature of the lawsuit.  There is the first what

13  I'll call main lawsuit where Mr. Daugherty sued Highland, the

14  Debtor, plus Highland Employee Retention Assets, Highland ERA

15  Management, and James Dondero.  And I think there may have

16  been a third-party intervenor that has another Highland ERA

17  name.  And that's the one that Highland, on the third day of

18  trial, --

19          MR. KATHMAN:  Correct.

20          THE COURT:  -- filed bankruptcy.  Okay.  So that's

21  lawsuit number one.

22      And then lawsuit number two involves, I think, all of

23  these very same parties, plus the law firm Hunton Andrews

24  Kurth, lawyer Marc or Marci Katz, Michael Hurst, in-house

25  lawyer Scott Ellington, employee, and in-house lawyer Tom

Case 19-34054-sgj11 Doc 1822-145 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 23
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 233 of 243 PageID 16113

22

```
 1   Surgent, and then Isaac Leventon, okay?  So that's the other
 2   lawsuit that wasn't as far along?
 3            MR. KATHMAN:  Correct.
 4            THE COURT:  Now, there's one theory that I, you know,
 5   I don't hear anyone talking about, so I'm assuming it doesn't
 6   apply, but I'll ask.  While obviously 362(a)(1) doesn't apply
 7   as a technical matter as to suits against nondebtors, if the
 8   claims in the lawsuits happen to be property of the estate,
 9   causes of action that, you know, all of a sudden become
10   property of the estate once there's a bankruptcy filed, then
11   under 362(a)(3) there may be a theory of the automatic stay
12   being implicated.
13      I'm taking it that that is not a concern here.  These are
14   all direct claims of Mr. Daugherty for harm directly to him,
15   not fraudulent transfer claims or anything that might be a
16   derivative claim.  I'm assuming the Creditor's Committee would
17   have weighed in if that concern was there.
18            MR. KATHMAN:  Correct.  No *S.I. Acquisition*-type
19   issues, Your Honor.
20      There are fraudulent transfer claims alleged, but they're
21   not fraudulent transfer claims of the Debtor.  It's where the
22   Debtor is the recipient of the fraudulent transfer.  In other
23   words, the Debtor was not the one -- Highland was not the one
24   making the fraudulent transfer.
25            THE COURT:  All right.  Okay.
```

1          MR. KATHMAN:  That would be -- that would be an *S.I.*

2  *Acquisition*-type situation.

3          THE COURT:  Okay.  Okay.

4          MR. MORRIS:  Your Honor, may I --

5          THE COURT:  All right.  So I am looking at the

6  declaration of Pat Daugherty that was attached to your motion.

7  You're relying on that as your evidence.

8      All right.  I can't remember.  Did I cut you off in the

9  middle of a sentence with my questions?  Were you through with

10  your --

11          MR. KATHMAN:  Your Honor, I just want to check my

12  notes.  I'm sorry.

13      The only other thing, Your Honor, I just would add is, to

14  the extent that they try to make the identity of interest

15  argument here, to the extent they try to make that argument,

16  the law in this district, as Your Honor is aware, *Seatco*, *In*

17  *re Bernhard Steiner*, and *In re Couture Hotel Corporation*, puts

18  that bar at -- identity of interest at a very, very -- I would

19  say extremely high bar in this district.

20      In *Bernhard Steiner*, it was actually Mr. Steiner that

21  makes the pianos, Bernhard Steiner, that that the injunction

22  was granted in favor of.  And in Seatco, it was a single-

23  member LLC where he was the only employee making the seats.

24  And in *Couture Hotel Corporation*, Judge Houser specifically

25  talked about those two different cases and talked about, at

1 least in this district, the very, very high bar it is for

2 identity of interest.

3 It's not merely just, hey, it would disrupt the debtor.

4 It's not just merely these are employees or people that are

5 important to the debtor. It's where, when it says identity of

6 interest in this district, it means essentially singularly the

7 same person, like in *Bernhard Steiner* and in *Seatco*. And

8 obviously, none of these nondebtors are -- these are lawyers.

9 They certainly don't have that identity of interest, at least

10 that this district has set as the standard for identity of

11 interest in order to obtain this sort of injunction.

12 But again, that's not really before the Court this

13 morning. And to the extent that Mr. Morris is now kind of

14 making an oral motion for a temporary restraining order,

15 obviously, in order to get a temporary restraining order, even

16 a 105 injunction, you have to meet all of the four

17 requirements that go to success on the merits, all of those

18 things. And Your Honor, that's just not proper to make that

19 on the record here. They filed a lawsuit. That's the way

20 they proceeded. We have an opportunity to answer. And we can

21 take up the 105 injunction at that time if they still want to

22 pursue that.

23 THE COURT: All right.

24 MR. MORRIS: Your Honor, if I may?

25 THE COURT: You may. Are you going to have evidence

013178

1  yourself, Mr. Morris?

2          MR. MORRIS:  Not today, Your Honor.

3          THE COURT:  Okay.

4          MR. MORRIS:  It is undisputed that the sole recipient

5  of the alleged fraudulent transfers was the Debtor.  There is

6  no way to try a fraudulent transfer case without preclusive --

7  without causing preclusive rulings against the Debtor.

8  There's just no way that that's going to happen.

9       With respect to the assertion on the identify of interest,

10  I find it very ironic.  If you just look at the pleadings,

11  Your Honor, it's Mr. Daugherty who alleges that there's a

12  unity of -- an identity -- he specifically alleges that they

13  were controlled by Mr. -- that the Debtor was controlled.  He

14  specifically alleges that they were all part and parcel of the

15  same conspiracy.  So to hear them running away from the

16  identity of interest is just contradicted by the allegations

17  that they make in their very own pleading.

18       Finally, Your Honor, with respect to severance, I daresay

19  that this Court -- actually, a couple of more points.

20  Severance, you know, this Court is the one who should be

21  deciding whether this Debtor is subject to claims elsewhere.

22  I mean, what if the court -- what if the Delaware court says,

23  I just -- I don't feel like severing?  Does he get to proceed

24  against the Debtor in that event?  Because, after all, the

25  Delaware court is making the decision.  That's -- that court

1    is not supposed -- this Court is supposed to be the one that

2    decides who gets to proceed against the Debtor.  And the Court

3    should not allow Mr. Daugherty at this point to go against the

4    Debtor in this case.

5        Your Honor also made, I think, a pretty good point on the

6    claims that are being adjudicated in that case.  It will

7    affect the Debtor's estate, and the stay really does apply.

8    How will it affect the Debtor's estate?  It will affect the

9    Debtor's estate through the assertion, as I said before, of

10   the indemnification claims.

11            THE COURT:  Let me --

12            MR. MORRIS:  These employees have already --

13            THE COURT:  Let me --

14            MR. MORRIS:  Yeah.

15            THE COURT:  -- interject.  That makes me go back to

16   Mr. Kathman's argument that, you know, the Debtor has had --

17   or the nondebtor defendants have had over a year now to remove

18   the Delaware actions to this Court if they wanted to make sure

19   there weren't, you know, differing rulings, duplicative

20   litigation, and nobody has.

21            MR. MORRIS:  I would say, Your Honor, I would just

22   flip it and say they could have done the same thing.  What the

23   Debtor did is rely on the representation made on the record on

24   the petition date in the Delaware Chancery Court by Mr.

25   Daugherty's counsel that he was putting this case on ice.

Case 19-34054-sgj11 Doc 1822-145 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 28
Case 3:21-cv-00538-N Document 26-49 Filed 06/09/21 Page 238 of 243 PageID 16118

27

1  That's what we relied upon. And the only thing that's

2  happened in case number two, the only thing that's happened in

3  case number two is a motion to dismiss.

4     There's been no discovery. The Debtor hasn't been

5  impacted by case number two. And if the Court wants to -- you

6  know, if the Court wants the motion to dismiss to proceed, the

7  Debtor has no objection. But nothing else should happen.

8  Nothing else should happen.

9     We relied on Mr. Daugherty's counsel's representations,

10  and I think it's grossly unfair for any suggestion that the

11  Debtor has sat on its hands. We received this motion. We

12  will respond to it quickly, both with an adversary proceeding

13  and an opposition. But we relied on the statement on the

14  record by Mr. Daugherty's counsel, and I quote, that he was

15  willing to put this case on ice. And that's what we did.

16          THE COURT: Okay. Anything else?

17          MR. KATHMAN: And the only other thing I would say,

18  Your Honor, is Mr. Morris obviously is raising a preclusion

19  issue. I've argued that issue when I represent debtors as

20  well. But Your Honor is familiar with the elements of issue

21  preclusion. You've written a number of opinions on it. The

22  *Clem* opinion, and just recently the *Dean* opinion I think from

23  just about two months ago. One of the elements of preclusion,

24  that the parties were cast as adversaries. The Debtor is not

25  a party to the litigation that we're going to go pursue in

1    Delaware, one.  And two, Mr. Morris raised the issue, what if
2    the Delaware court decides to let us proceed against the
3    Debtor up there?  Well, we can't do that, Your Honor, because
4    the actions against the Debtor are stayed.  That's why we're
5    severing the Debtor out of the case.
6         So the case against the Debtor would be severed, and that
7    case would remain "on ice" because it's stayed by nature of
8    the automatic stay.
9         What we're asking is to remove the nondebtors from the
10   entity so we can proceed against those -- from those --
11   against those entities.
12        If they want to, again, if they want to argue that they
13   shouldn't be severed, they can go make those arguments in
14   Delaware, but before Your Honor is really just that we confirm
15   what the -- what the Fifth Circuit law is.  Thank you.
16             THE COURT:  All right.  I'm going to grant this
17   motion.  Obviously, 362 is the governing authority and --
18   construing 362, and guided by the cases that construe 362,
19   such as the *Wedgeworth v. Fibreboard Corp.* case mentioned in
20   the pleadings, I find that and conclude that the stay does not
21   apply to severance of a debtor, mere severance of a debtor in
22   a pre-petition lawsuit, and I don't believe it applies in the
23   context of this case to any of the nondebtor defendants.
24        So I'm giving you a comfort order primarily, but I'll also
25   rule that there is cause under 362(d), to the extent I am

1   wrong and a broad interpretation of the stay would be that the

2   stay does somehow apply here, I find cause to lift the stay to

3   allow Mr. Daugherty to go forward against all of the nondebtor

4   defendants.

5       You know, I find a lot of aspects of this -- I don't know

6   what the word is to use.  I mean, I guess, ironic.  You know,

7   on the one hand, Mr. Morris said it's ironic to hear

8   Daugherty's counsel running away from the identity of interest

9   argument, but it's also to me ironic to hear Debtor's

10  counseling running to that, when all through the history of

11  this bankruptcy I feel like people cringe when you refer to a

12  Highland affiliate and want to distance themselves from saying

13  some entity in the Highland umbrella is a related party or

14  anything like that.  So there's a lot of irony to go around, I

15  suppose, here.

16      And I do find it -- I understand if the comment was made,

17  we're going to put this lawsuit or the these lawsuits on ice,

18  I can understand that possibly being a reason for the Debtor

19  not to remove these lawsuits.  But the fact is, if they're

20  worried about inconsistent findings, preclusive findings, you

21  know, duplication of effort, any expense to the Debtor in

22  having to pay attention to what's going on in these Delaware

23  lawsuits as they go forward, the Debtor could remove.

24  Nondebtor defendants could remove.  It sounds like there is a

25  related-to argument that is being articulated by the Debtor

013183

1    because of the fact that indemnification claims might arise

2    back against the Debtor if these nondebtor defendants are

3    imposed with liability.  So there's a simple solution here to

4    avoid all of the things the Debtor seems to be worried about.

5         So, and I'll just throw in one last bit of food for

6    thought.  I think everybody knows how much I wish that a grand

7    compromise would be reached in this case.  And you know, we

8    have a couple of very significant compromises that have

9    recently been approved, but we still have these very large

10   litigation claims.  And the Debtor has had a year now, close

11   to a year now, to knock some of these out, you know, maybe

12   reach some compromises with some of the related Highland

13   parties and officers, to maybe participate in the plan with

14   some sort of contribution, and it's just not happening.  It's

15   not happening.  Now we're looking at a plan that's still very

16   contested, with some large litigation claims.

17        So, at this point, I would be hard-pressed to protect any

18   nondebtor defendants who aren't ponying up something to the

19   whole plan reorganization process.  So that's not an advisory

20   opinion.  That's just letting you know where I am at the

21   moment on nondebtor defendants seeking some sort of extended

22   stay to protect them or allegedly the Debtor.

23        So, anyway, I reserve the right to supplement and amend in

24   my written ruling.

25        Mr. Kathman, will you please upload an order?

013184

```
1              MR. KATHMAN:  I will, Your Honor.  Thank you.

2              THE COURT:  All right.  Thank you.  We stand

3    adjourned.

4              THE CLERK:  All rise.

5         (Proceedings concluded at 10:25 a.m.)

6                           --oOo--

7

8

9

10

11

12

13

14

15

16

17

18

19                       CERTIFICATE

20      I certify that the foregoing is a correct transcript to
     the best of my ability from the electronic sound recording of
21   the proceedings in the above-entitled matter.

22    /s/ Kathy Rehling                        10/28/2020

23   _____      _____

24   Kathy Rehling, CETD-444                        Date
     Certified Electronic Court Transcriber

25
```

013185

32

                                   INDEX

PROCEEDINGS                                                        3

WITNESSES

-none-

EXHIBITS

-none-

RULINGS                                                          28

END OF PROCEEDINGS                                              31

INDEX                                                           32

013186