**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | |
|---|---|---|
| **In Re:** Highland Capital Management, L.P | § | Case No. 19-34054-SGJ-11 |
| Highland Capital Management Fund Advisors, L.P. | | |
| et al | § | |
| Appellant | § | |
| vs. | § | |
| Highland Capital Management, L.P., | | |
| | § | 3:21-CV-00538-N |
| Appellee | § | |

[1943] **Order confirming the fifth amended chapter 11 plan,** Entered on 2/22/2021.

# APPELLANT RECORD
# VOLUME 50

MUNSCH HARDT KOPF & HARR, P.C.
Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
3800 Ross Tower
500 N. Akard Street
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

ATTORNEYS FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P. AND
NEXPOINT ADVISORS, L.P.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | Case No. 19-34054 (SGJ11) |
| Debtor. | |

*I N D E X*

## AMENDED DESIGNATION BY NEXPOINT ADVISORS, L.P. AND HIGHLAND
## CAPITAL MANAGEMENT FUND ADVISORS, L.P.
## OF ITEMS FOR THE RECORD ON APPEAL

COME NOW Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors,

L.P. (the "Appellants"), creditors and parties-in-interest in the above styled and numbered

bankruptcy case (the "Bankruptcy Case") of Highland Capital Management, L.P. (the "Debtor"),

and, with respect to their *Notice of Appeal* [docket no. 1957], hereby file their *Amended

Designation of Items for the Record on Appeal* (the "Designation") as follows:

| | Item | Bankruptcy Docket Number | Description |
|---|---|---|---|
| *Vol. 1* **000001** | | | **Pleadings and Items on Docket** |
| | 1 | 1957 | Notice of Appeal |
| **000165** **000326** | 2 | 1943 | Order (i) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief |
| | 3 | | Docket Sheet of Bankruptcy Case No. 19-34054 |
| *Vol. 2* **000639** | 4 | 1606 | Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| **000666** | 5 | 1648 | Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| **000675** | 6 | 1656 | Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| **000820** | 7 | 1670 | Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| **000870** | 8 | 1719 | Second Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| *Vol. 3* **000880** | 9 | 1749 | Third Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| **000886** | 10 | 1772 | Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| **000901** | 11 | 1791 | Notice of Withdrawal of Certain Executory Contracts and Unexpired Leases from List of Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan |
| **000906** | 12 | 1807 | Debtor's Omnibus Reply to Objections to Confirmation of the Fifth Amended Chapter 11 Plan of Reorganization of Highland Capital Management |
| **001031** | 13 | 1808 | Debtor's Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) |
| *Vol. 4* **001097** | 14 | 1811 | Notice of Filing Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (with Technical Modifications) |
| *Vol. 5* **001346** | 15 | 1814 | Debtor's Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |

| | | | |
|---|---|---|---|
| *Vol 5* *00 1414* | 16 | 1847 | Fourth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| *00 1421* | 17 | 1873 | Fifth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith |
| *00 1427* | 18 | 1875 | Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland of Highland Capital Management, L.P. (As Modified) |
| *00 1475* | 19 | 1887 | Supplemental Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. |
| *00 1482* | 20 | 1671 | United States Trustee's Limited Objection to Confirmation of Debtors' Fifth Amended Plan of Reorganization |
| | | **Evidence and Transcripts** | |
| *00 1488* *001763* | 21 | 1894 | Transcript of February 2, 2021 Confirmation Hearing |
| *002040* | 22 | 1905 | Transcript of February 3, 2021 Confirmation Hearing |
| | 23 | 1917 | Transcript of February 8, 2021 Bench Ruling |
| *002108* *002091* *vol 12 - 002931* *vol 50 - 013295* *- 013297* *vol. 51 - 013373* *vol. 54 - 014182* *vol 55 - 014506* | 24 | 1794 1795 1822✗ 1863 1866 1877 1895 1915 | All exhibits admitted into evidence during February 2 and February 3, 2021 Confirmation Hearing |

*✗ 1822 - Vol. 12 — 50 ( 39 Volumes)*

RESPECTFULLY SUBMITTED this 22d day of March, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    3800 Ross Tower
    500 N. Akard Street
    Dallas, Texas 75201-6659
    Telephone: (214) 855-7500
    Facsimile: (214) 855-7584
    Email:   drukavina@munsch.com

**ATTORNEYS FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P. AND
NEXPOINT ADVISORS, L.P.**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on this the 22d day of March, 2021, true and correct copies of this document were electronically served by the Court's ECF system on parties entitled to notice thereof, including on counsel for the Debtor.

By: /s/ Davor Rukavina
    Davor Rukavina, Esq.

# EXHIBIT UUUUUU

013187

```
                 IN THE UNITED STATES BANKRUPTCY COURT
                 FOR THE NORTHERN DISTRICT OF TEXAS
                           DALLAS DIVISION

                                 )   Case No. 19-34054-sgj-11
In Re:                           )   Chapter 11
                                 )
HIGHLAND CAPITAL                 )   Dallas, Texas
MANAGEMENT, L.P.,                )   December 10, 2020
                                 )   9:30 a.m. Docket
        Debtor.                  )
_____ )
                                 )
HIGHLAND CAPITAL                 )   Adversary Proceeding 20-3190-sgj
MANAGEMENT, L.P.,                )
                                 )
        Plaintiff,               )   - MOTION FOR PRELIMINARY
                                 )     INJUNCTION
v.                               )   - MOTION FOR TEMPORARY
                                 )     RESTRAINING ORDER
JAMES D. DONDERO,                )
                                 )
        Defendant.               )
_____ )
```

                        TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                    UNITED STATES BANKRUPTCY JUDGE.

WEBEX/TELEPHONIC APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | Jeffrey N. Pomerantz<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>10100 Santa Monica Blvd.,<br>  13th Floor<br>Los Angeles, CA  90067-4003<br>(310) 277-6910 |
| For the Plaintiff: | John A. Morris<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>780 Third Avenue, 34th Floor<br>New York, NY  10017-2024<br>(212) 561-7700 |
| For the Official Committee<br>of Unsecured Creditors: | Matthew A. Clemente<br>SIDLEY AUSTIN, LLP<br>One South Dearborn<br>Chicago, IL  60603<br>(312) 853-7539 |

013188

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 3 of
Case 3:21-cv-00538-N Document 26-50 Filed 06/09/21 Page 8 of 191 PageID 16131

2

```
 1   APPEARANCES, cont'd.:

 2   For the Defendant:          D. Michael Lynn
                                 John Y. Bonds, III
 3                               BONDS ELLIS EPPICH SCHAFER JONES,
                                   LLP
 4                               420 Throckmorton Street,
                                   Suite 1000
 5                               Fort Worth, TX  76102-5304
                                 (817) 405-6903
 6
     For the NexPoint Parties:   James A. Wright, III
 7                               K&L GATES
                                 State Street Financial Center
 8                               One Lincoln Street
                                 Boston, MA  02111
 9                               (617) 261-3193

10   For the CLOs/Issuer Group:  James E. Bain
                                 JONES WALKER, LLP
11                               811 Main Street, Suite 2900
                                 Houston, TX  77002
12                               (713) 437-1820

13   Recorded by:                Michael F. Edmond, Sr.
                                 UNITED STATES BANKRUPTCY COURT
14                               1100 Commerce Street, 12th Floor
                                 Dallas, TX  75242
15                               (214) 753-2062

16   Transcribed by:             Kathy Rehling
                                 311 Paradise Cove
17                               Shady Shores, TX  76208
                                 (972) 786-3063
18

19

20

21

22

23

24
           Proceedings recorded by electronic sound recording;
25             transcript produced by transcription service.
```

013189

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 4 of
Case 3:21-cv-00538-N Document 26-50 Filed 06/09/21 Page 9 of 191 PageID 16132

3

| | |
|---|---|
| 1 | DALLAS, TEXAS - DECEMBER 10, 2020 - 9:58 A.M. |
| 2 | THE COURT:  We only have left today the Highland |
| 3 | matter.  There may be people on the line for the RE Palm |
| 4 | Springs matter, but if you're on the line for that, the Court |
| 5 | granted a motion for continuance that was filed by SR |
| 6 | Construction, Inc. a few days ago.  So if you were on the line |
| 7 | for that, that's been continued at the Movant's request.  Or |
| 8 | the Objector's request, I should say.  And it's to be reset at |
| 9 | such point in time as the lawyers seek that. |
| 10 | All right.  So, with that, I am going to turn to Highland |
| 11 | and our emergency motion for a temporary restraining order |
| 12 | against James Dondero that was filed by the Debtor.  First, |
| 13 | for the Debtor team, who do we have appearing? |
| 14 | MR. POMERANTZ:  Good morning, Your Honor.  It's Jeff |
| 15 | Pomerantz, also with John Morris.  John Morris will be handling the |
| 16 | hearing today on behalf of the Debtor. |
| 17 | THE COURT:  All right.  Thank you.  For Mr. Dondero, who |
| 18 | do we have appearing? |
| 19 | MR. BONDS:  Your Honor, John Bonds and Michael Lynn. |
| 20 | THE COURT:  All right.  Thank you.  The Committee, I know, |
| 21 | is interested in this.  Who do we have appearing for the Committee? |
| 22 | MR. CLEMENTE:  Good morning, Your Honor.  Matthew |
| 23 | Clemente; Sidley Austin; on behalf of the Committee. |
| 24 | THE COURT:  All right.  I'm going to ask, do we have |
| 25 | anyone appearing for certain parties who filed another emergency |

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 5 of
Case 3:21-cv-00538-N Document 26-50 Filed 06/09/21 Page 10 of 191 PageID 16133

4

1   motion yesterday, I think involving what seemed like very

2   overlapping issues.  The parties that I'm talking about are Highland

3   Fixed Income Fund; NexPoint Advisors, LP; NexPoint Capital, Inc.;

4   and NexPoint Strategic Opportunities Fund.  Do we have anyone -- I

5   think it was the K&L Gates firm who filed an emergency motion

6   yesterday on, like I said, what I think are some overlapping issues

7   with what we're going to hear about today.  Anyone here on the line

8   for those entities?

9            MR. WRIGHT:  Yes.  Good morning, Your Honor.  It's James

10  Wright, K&L Gates.  I wasn't expecting this matter to be on today,

11  so I need to apologize for not having a coat and a tie.

12           THE COURT:  Okay.  Well, I realize I picked you out.  But

13  could you, for the court reporter, say your last name again?  It was

14  a little garbley.

15           MR. WRIGHT:  Yes.  It's James Wright, W-R-I-G-H-T.

16           THE COURT:  Okay.  Thank you.  Well, we have a lot of

17  other folks on the line, so I'll just ask:  Is there anyone else out

18  there who desires to appear?  This was obviously set very expedited,

19  so maybe people did not file a pleading to weigh in, but maybe

20  they're wanting to appear.  If so, go ahead.  (No response.)  All

21  right.  Hearing no others, I will go to you, I guess, Mr. --

22           MR. BAIN:  Your Honor?

23           THE COURT:  Oh, go ahead.

24           MR. BAIN:  Your Honor?

25           THE COURT:  Yes?

013191

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 6 of
Case 3:21-cv-00538-N   Document 26-50   Filed 06/09/21   Page 11 of 191   PageID 16134

5

1          MR. BAIN:  I'm sorry.  I was on mute.  This is Joseph Bain

2     of the law firm of Jones Walker.  I represent the CLOs.  And Your

3     Honor, at the appropriate time, if Your Honor doesn't mind, I have a

4     few comments that may help inform the Court on kind of what's going

5     on.  But I'm happy to wait until the appropriate time.

6          THE COURT:  Okay.  Very good.  Well, and the reason why I

7     picked out Mr. Wright regarding that newest emergency motion is, you

8     know, I know they've asked for an emergency setting next Tuesday,

9     and I have not -- I've not made a decision on that.  I kind of

10    wanted to see what I hear about today and figure out if there's

11    really, you know, a need for that or not.

12        So, thank you, Mr. Bain.  We'll talk to you at some point

13    today.

14          MR. BAIN:  Thank you, Your Honor.

15          THE COURT:  Any other appearances?

16        All right.  Well, I was about to go back to or go to Mr.

17    Morris.  But let me ask Mr. Bonds or Mr. Lynn:  Did you file a

18    responsive pleading?  When I left here yesterday afternoon, I

19    did not see one.  But was there one filed late at night, by

20    chance, that I just haven't seen?

21          MR. BONDS:  No, Your Honor, we have not.

22          THE COURT:  Okay.  Thank you.

23          MR. BONDS:  (garbled)

24          THE COURT:  All right.  Mr. Morris, go ahead.

25          MR. MORRIS:  Thank you, Your Honor.  John Morris;

6

1   Pachulski, Stang, Ziehl & Jones; for the Debtor.

2       Let me begin by thanking Your Honor for hearing us on such

3   shortened notice.  What I thought I'd do is spend a few

4   minutes, Your Honor, talking about why we're here, summarizing

5   the facts, and then summarizing for the Court the relief that

6   we're seeking.

7       As Your Honor, I presume, is aware, we filed this motion

8   on Monday, together with a declaration from Jim Seery, the

9   Debtor's CEO and CRO, with 29 separate exhibits.  And if it

10  pleases the Court, I'd like to proceed in that manner.

11          THE COURT:  All right.  You may.

12          MR. MORRIS:  Okay.  Your Honor, we do regret that

13  we're here, frankly.  The Debtor has worked very hard during

14  the course of this case to get to where we are.  We have a

15  plan on file that calls for the monetization of the Debtor's

16  assets for distribution to holders of allowed claims, we have

17  an approved disclosure statement, and confirmation is just

18  five weeks away.

19      Unfortunately, in the last couple of weeks, Mr. Dondero

20  has engaged in what we firmly believe is wrongful conduct and

21  can't really be credibly disputed or justified.  As Mr. Seery

22  lays out in his declaration and as Mr. Dondero's own written

23  words show, Mr. Dondero recently interfered with the Debtor's

24  operations and decisions and made some rather explicit

25  threats.

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 8 of
Case 3:21-cv-00538-N   Document 26-50   Filed 06/09/21    Page 13 of 191   PageID 16136

7

1    We're not here to punish Mr. Dondero.  We're not here

2  seeking sanctions for violation of the automatic stay.

3  Rather, we're here to simply set some very clear and firm

4  ground rules on a go-forward basis so the Debtor can get

5  across the finish line without interference or coercion by Mr.

6  Dondero or anyone acting on his behalf.  That's all we're here

7  to do today.

8    We tried to work with Mr. Dondero's counsel on a

9  stipulation, but regrettably were unable to do so.

10    So let me describe for the Court the facts that support

11  the motion, and at the end of that I will offer our exhibits

12  into evidence.

13    I do want to provide some context into how we got here.

14  The facts are pretty simple.  As Your Honor will recall, back

15  in January, with this Court's approval, Mr. Dondero

16  surrendered control of the Debtor to an independent board of

17  directors, including Mr. Seery.  As Your Honor knows, though,

18  Mr. Dondero was retained as a portfolio manager and as an

19  unpaid employee of the Debtor.

20    Pursuant to the Court's order and the term sheet entered

21  into with the Unsecured Creditors' Committee, Mr. Dondero's

22  responsibilities were to be determined by the board, and he

23  agreed to resign at the board's request.

24    Over the summer, as Your Honor will recall, Mr. Seery was

25  appointed the Debtor's CEO and CRO.  Throughout this time, Mr.

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 9 of
Case 3:21-cv-00538-N   Document 26-50   Filed 06/09/21   Page 14 of 191   PageID 16137

8

1    Seery worked closely with Mr. Dondero.  And one of the things

2    they worked on was trying to come up with a so-called pot

3    plan, the goal of which was to come to a consensual resolution

4    of this case.  Mr. Seery's goal, the (garbled) goal, the

5    Debtor's goal, was to try to give the estate an alternative to

6    the monetization of the Debtor's assets, and Mr. Seery worked

7    hard and in good faith in that regard.

8        As Your Honor will also recall, in late summer the Debtor

9    and certain litigation creditors agreed to mediate these

10   disputes.  In September, the Debtor announced that it had

11   reached an agreement with Josh Terry and Acis to resolve their

12   claims.  I don't need to remind the Court of the nature of the

13   disputes between Mr. Dondero and Mr. Terry, but suffice it to

14   say that Mr. Dondero made clear that he opposed not only the

15   settlement that was reached at the mediation, but, really, any

16   settlement at all with Mr. Terry.

17       At around the same time, while still trying to get to the

18   pot plan and a consensual resolution, the Debtor did present

19   its plan of reorganization that provides for the monetization

20   of the assets for the benefit of creditors.  By the end of

21   September, Mr. Dondero made it clear that he would oppose both

22   the Acis settlement and the Debtor's plan.

23       He has every right to do that, Your Honor.  Well, those

24   steps are contrary to the interests of the Debtor.  In

25   addition, it also became clear that Mr. Dondero, through

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 10
Case 3:21-cv-00538-N   Document 26-50   Filed 06/09/21   Page 15 of 191   PageID 16138

9

1   (garbled) trust, has continued to press his claims that the

2   Debtor had -- that the Debtor had mismanaged Multi-Strat

3   during the case.

4       For these reasons, I think on October 2nd the board asked

5   Mr. Dondero to resign, and he did so on October 9th.

6       With confirmation on the horizon, in the last couple of

7   weeks, regrettably, Mr. Dondero has, in fact, interfered with

8   the Debtor's business.  There's no dispute that the Debtor

9   serves as the manager of certain CLOs.  There's no dispute

10  that Mr. Dondero and certain of his affiliates hold a portion

11  of the preferred notes in the CLOs managed by the Debtors.  I

12  don't think there's any dispute that the Debtor's duty is to

13  the CLOs and not to any particular holder of CLO interests.

14      In late November, in furtherance of his duties, Mr. Seery

15  directed that certain assets held by the CLOs be sold.  Mr.

16  Dondero and certain entities he controls, the ones that we

17  mentioned earlier, Your Honor, the ones that are the

18  (garbled), apparently disagreed with Mr. Seery's business

19  judgment, and that happens.

20      I do want to point out, I don't know if Your Honor has had

21  a chance to read the competing TRO, --

22          THE COURT:  I have.

23          MR. MORRIS:  -- but what's notable -- okay.  What's

24  notable in there, Your Honor, is that they expressly admit,

25  and I'm quoting, the Debtor is responsible for making

013196

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 11
Case 3:21-cv-00538-N   Document 26-50   Filed 06/09/21   Page 16 of 191   PageID 16139

10

1   decisions to sell the CLOs' assets.  They admit that in their

2   request for a TRO.

3       So there's no dispute that Mr. Seery has the right to do

4   what he set out to do.  Nevertheless, Mr. Dondero intervened

5   and personally stopped the trades that Mr. Seery authorized.

6   It's in writing.  It can't be disputed.  In fact, it's set

7   forth in Exhibit 8, which is attached to Mr. Seery's

8   declaration, which can be found at Docket 4 to the adversary

9   proceeding.

10      Not only did Mr. Dondero cause the trades to halt, he told

11  certain people, including the Debtor's chief compliance

12  officer, not to do it again, and (inaudible) that they would

13  face personal liability if they did so.

14      The Debtor sent cease-and-desist letters to Mr. Dondero

15  and his affiliated entities.  Those letters are attached as

16  Exhibits 9 and 10 to Mr. Seery's declaration.  And the fact

17  is, Your Honor, for this particular part of the episode, Mr.

18  Seery's conduct is simply unacceptable and was one of the

19  events that precipitated the filing of this motion.

20          THE COURT:  You said Mr. Seery.  I think you meant

21  Mr. Dondero.

22          MR. MORRIS:  I apologize, Your Honor.  I certainly

23  did, yes.

24          THE COURT:  Okay.

25          MR. MORRIS:  The other event that caused the Debtor

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 12
Case 3:21-cv-00538-N Document 26-50 Filed 06/09/21 Page 17 of 191 PageID 16140

11

1    to file this motion was a rather explicit written threat that

2    Mr. Dondero made to Mr. Seery promptly after the Debtor acted

3    to fulfill its fiduciary duties to the estate.

4         As the Court may generally be aware, Mr. Dondero and

5    certain of his affiliates are the makers under a series of

6    promissory notes in favor of the Debtor.  The notes are

7    attached as Exhibits 11 through 23 to Mr. Seery's declaration.

8    Certain of these notes are demand notes, meaning that they

9    don't have a term, they don't expire at some defined point in

10   the future, they're payable upon demand by the holder.  The

11   Debtor is the holder of these notes.

12        Last week, the Debtor exercised its right to make a demand

13   for payment of all unpaid principal and accrued interest,

14   estimated to be approximately $30 million in the aggregate.

15   Those demands are set forth in Exhibits 24 through 27 in Mr.

16   Seery's declaration.

17        The demand notes are property of the Debtor's estate,

18   collection of the notes is part of the Debtor's liquidity

19   plan, and the proceeds are expected to be used to pay

20   creditors' claims.

21        Shortly after the demand for payment on the notes was

22   made, Mr. Seery [sic] sent a short text that can be found at

23   Exhibit 28, saying simply, Be careful what you do.  Last

24   warning.

25        To Mr. Seery's surprise, Mr. Dondero called him the

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 13
Case 3:21-cv-00538-N   Document 26-50   Filed 06/09/21   Page 18 of 191   PageID 16141

12

1   following morning, ostensibly to talk about his pot plan.  As

2   laid out in his declaration, Mr. Seery expressed considerable

3   concern over the threat, expressed his view that he thought it

4   was unlawful, and was surprised, really, at the nature of the

5   conversation.

6       Mr. Dondero didn't apologize during that call.  He didn't

7   express regret.  Instead, he suggested that the lawyers would

8   handle that issue.  And only at the end of the call, when Mr.

9   Seery pressed, did Mr. Dondero begrudgingly say that he didn't

10  mean any physical harm.

11      Your Honor, we're five weeks away from confirmation.  The

12  Debtor is laser-focused on getting there.  We are -- continue

13  -- we have resolved substantial claims.  We continue to

14  resolve substantial claims.  And though if there was a viable

15  pot plan the Debtor would still pursue it, the Debtor is

16  seeking a smooth transition into its post-bankruptcy state.

17  We continue to negotiate with creditors who have outstanding

18  claims.  And we need peace.  We need the freedom to get there.

19      As a result of the foregoing, the Debtor seeks the entry

20  of a temporary restraining order in the form of Exhibit A

21  attached to the motion, which is on Docket #2 in the adversary

22  proceeding.  In substance, the form is intended to prevent Mr.

23  Dondero from interfering with the Debtor's business, engaging

24  in threatening or coercive conduct, and using his affiliates

25  or others acting on his behalf to do the same.

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 14
Case 3:21-cv-00538-N   Document 26-50   Filed 06/09/21   Page 19 of 191   PageID 16142

13

1      In our discussions with Mr. Dondero's counsel, it became

2   clear that Mr. Dondero was not interested at this time in

3   resolving the entirety of the dispute.  We wanted to get this

4   whole adversary proceeding open and closed and put this behind

5   us.  But regrettably, we're here today to press the motion

6   because we were unable to come to that agreement.

7      So, in addition to the entry of the order attached to the

8   motion, the Debtor also requests that the Court hold an

9   evidentiary hearing on the Debtor's request for a preliminary

10   injunction on January 4th, when we already have time on the

11   Court's calendar.

12      And so that there's no misunderstanding, if the parties

13   cannot resolve this matter beforehand, the Debtors do intend

14   to take discovery during the intervening period.  We will be

15   prepared on January 4th, and we would expect, if forced to, to

16   call Mr. Dondero as a witness at that hearing.

17      I have nothing further, Your Honor.  Oh, actually, I do

18   have something further.  The Debtor moves for the entry into

19   evidence of the declaration of Mr. James P. Seery, Jr.

20   (muffled).

21         THE COURT:  Okay.  You got a little garbley.  I think

22   someone unmuted their device during your --

23         THE CLERK:  Mr. Bonds --

24         THE COURT:  Okay.  But the request was that the Court

25   admit into evidence the declaration of Mr. Seery at Docket

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 15
Case 3:21-cv-00538-N Document 26-50 Filed 06/09/21 Page 20 of 191 PageID 16143

14

1   Entry #4, along with the 29 exhibits that were attached to

2   that declaration. Any objection? (No response.) All right.

3   Those will be admitted into evidence.

4       (Debtor's 29 exhibits are received into evidence.)

5           THE COURT: All right. Mr. Bonds, what does Mr.

6   Dondero wish to tell the Court? All right. I think you put

7   yourself back on mute when I made the comment. Please unmute

8   your device.

9           MR. BONDS: I'm sorry, Your Honor. Can you hear me?

10          THE COURT: I can.

11          MR. BONDS: Your Honor, I would first like to

12  apologize for Mr. Dondero's email to Mr. Seery. It should not

13  have been sent. It is unfortunate that Mr. Dondero had

14  several good points to make, but the message he was trying to

15  send to the Debtor seems to have been lost, and for that I

16  apologize.

17      Mr. Dondero had serious concerns about the way in which

18  the Debtor's employees have been treated in this case. As the

19  Court knows, the employees who built this company will be

20  terminated either on December 31st or upon confirmation of the

21  Debtor's most recent plan. Mr. Dondero does not agree to such

22  termination or the financial treatment of the employees,

23  especially the treatment over the last few months, in which

24  they have seen their claims be substantially reduced.

25      Your Honor, Mr. Dondero is further concerned with the

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 16
Case 3:21-cv-00538-N Document 26-50 Filed 06/09/21 Page 21 of 191 PageID 16144

15

1   Debtor's lack of sale of assets, especially the lack of

2   competitive bidding.  Mr. Dondero may want to bid on some of

3   those assets, and under the Debtor's procedure, he is being

4   precluded from bidding, even if the sale is outside of the

5   ordinary course of business.

6       Mr. Dondero is further frustrated by the Debtor's sale of

7   certain CLOs under applicable law.  Is this an attempt around

8   the hearing on the 16th?  I don't know, Your Honor, but we are

9   set for the 16th on the issue of whether or not the sales are

10  being made outside the ordinary course of business.  Is the

11  Debtor trying to sell its assets without competitive business

12  -- bidding?  Why is that?

13      And what the Debtor would like you to sign is as an overly

14  broad TRO written, I suspect, with a peppering of anger

15  throughout.  The relief requested is basically in the

16  declaration of Jim Seery.  It contains a number of acts which

17  the Debtor seeks to have this Court determine are prohibited

18  conduct.  That term is defined in the Debtor's motion for TRO.

19  We assert that such language is overly broad and its

20  (inaudible) behavior which Debtor seeks to prohibit is not

21  justified, inapplicable, or simply does not make common sense.

22      Your Honor, in the second paragraph of the proposed TRO,

23  there are five general concepts that are listed as prohibited

24  conduct.  The first category of prohibited conduct which we

25  have issues with relates to Mr. Dondero communicating with the

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 17
Case 3:21-cv-00538-N Document 26-50 Filed 06/09/21 Page 22 of 191 PageID 16145

16

1    Debtor's employees except as it relates to the shared services

2    provided by or controlled by Mr. Dondero.  Such a prohibition

3    is unreasonably broad and seemingly may well violate the First

4    and the Fourth Amendments.

5        Your Honor, we ask the question:  Can Mr. Dondero

6    communicate something as basic as an employment contract with

7    an employee who is going to be let go without violating the

8    TRO?

9        The second category of prohibited conduct relates to

10   allegedly interfering or otherwise impeding, directly or

11   indirectly, the Debtor's business concerning its operations,

12   management, treatment of claims, disposition of assets owned

13   or controlled by the Debtor, and pursuit of the plan or any

14   alternative to the plan.  Your Honor, what does the word

15   indirectly mean?  Does such prohibition prohibit the Debtor

16   from pursuing -- or Mr. Dondero from pursuing his Acis 9019

17   motion or appeal?  What does the language mean with regard to

18   pursuit of the plan or any plan alternative?  Has the Debtor

19   turned the shield into a sword?  Can the Debtor -- can Mr.

20   Dondero try to sell his pot plan which he and the mediators

21   have worked so diligently on?  Does Mr. Dondero violate the

22   terms of the TRO simply by voting against the plan?

23       Is this really what the Debtor wants, or does the Debtor

24   want to return the most money that it can to the Debtor's

25   creditors?

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 18
Case 3:21-cv-00538-N   Document 26-50   Filed 06/09/21   Page 23 of 191   PageID 16146

17

1    Can Mr. Dondero even (inaudible) in the organization

2    without violating the TRO?

3    Finally, the proposed order provides that Mr. Dondero is

4    further temporarily causing -- temporarily enjoined and

5    restrained from causing, encouraging, or conspiring with (a)

6    an entity owned or controlled by him and/or any person or any

7    entity acting on his behalf from directly or indirectly

8    engaging in any prohibited conduct.  Again, what does the word

9    causing mean?  What about the word encouraging?  Does that

10   mean that the Debtor simply cannot do any action to protect

11   himself -- Mr. Dondero cannot take any action to protect

12   himself?  Are we setting up Mr. Dondero to fail?

13   Your Honor, what we would ask, what we would ask the Court

14   to do is either deny the TRO as being overly broad or order

15   the Debtor to come up with some reasonable restrictions going

16   forward.  We are happy to consider anything reasonable, but

17   the proposed TRO is anything but reasonable.

18   In summary, we ask the Court how the status quo would be

19   altered by a TRO.

20   Your Honor, I think Mr. Morris has indicated that the

21   Debtor intends to be able to confirm a plan on the 5th -- or

22   the 12th, excuse me, of January.  Your Honor, we don't believe

23   that that's appropriate.  Is Mr. Dondero prohibited from

24   trying to get his plan confirmed?  Is he -- I mean, it seems

25   to me that he basically is.

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 19
Case 3:21-cv-00538-N Document 26-50 Filed 06/09/21 Page 24 of 191 PageID 16147

18

1    Your Honor, with regard to two arguments made by Mr.

2    Morris, or at least one, we deny that any demand notes

3    precipitated Mr. Dondero's email.  It had absolutely nothing

4    to do with it.  But we're not here to talk about Mr. Dondero's

5    demand notes at this point.

6        I don't think I have anything further.

7            MR. MORRIS:  If I may respond very briefly, Your

8    Honor?

9            THE COURT:  You may.  Go ahead.

10           MR. MORRIS:  Okay.  Your Honor, we are cognizant, and

11   we don't mean, with all due respect to Mr. Bonds, to infringe

12   on any way Mr. Dondero's right to make applications to this

13   Court, to file motions.  I think I heard mention of, you know,

14   questions as to whether Mr. Dondero could pursue his motion

15   against Acis, his appeal of the Acis, about whether or not or

16   he could file things in this Court.  We expressly put in a

17   footnote, in order to try to make it clear, that Mr. Dondero

18   has and will continue to have a right to make any application

19   he wants to this Court, to object to any motion that's made.

20   That's not the point of the exercise.  The point of the

21   exercise is to protect the Debtor from interference -- to

22   protect the Debtor (echoing) from interference, coercion, and

23   from threats.  It's really that simple.  I don't know why

24   words that we use in common language every day, such as

25   causing or conspiring or encouraging, should be deemed to be

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 20
Case 3:21-cv-00538-N Document 26-50 Filed 06/09/21 Page 25 of 191 PageID 16148

19

1    ambiguous.  I think, given the importance of these issues, one

2    ought to be able to stay on the right side of that line

3    without questioning whether or not they're actually conspiring

4    with somebody or encouraging somebody to do something that

5    they're otherwise prohibited from doing.

6        What the Debtor will not tolerate, Your Honor, is play

7    whack-the-mole, where we get an order against Mr. Dondero,

8    only to have one of his affiliated entities or somebody acting

9    on his behalf attempt to say, oh, no, I'm here acting on my

10   own independent behalf, and they're going to do exactly what

11   Mr. Dondero is prohibited from doing.  So that's all.

12       Again, Your Honor, we're not here with hysteria.  I don't

13   think our papers were intended to nor did they project any

14   hysteria.  I think, with counsel, as provided for in the

15   proposed order, we would be delighted to continue to work with

16   Mr. Dondero constructively.  If he's got ideas on his pot

17   plan, we're not precluding him from doing that at all.  All

18   we're saying is that he's got to participate with counsel and

19   that he's not going to make any further direct communications

20   to the Debtor's officers, directors, or employees.  That's

21   all, Your Honor.  We think it's really quite reasonable under

22   the circumstances.

23       I have nothing further.

24           THE COURT:  All right.  Well, --

25           MR. BAIN:  Your Honor?

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 21
Case 3:21-cv-00538-N Document 26-50 Filed 06/09/21 Page 26 of 191 PageID 16149

20

1          THE COURT:  Who just spoke up?

2          MR. BAIN:  (garbled)  Yes.  Joseph Bain on behalf of

3    the CLOs, if I may be heard.

4          THE COURT:  Okay.  Everybody else mute their line.

5    Okay.  Go ahead, Mr. Bain.

6          MR. BAIN:  Yes, Your Honor.  And can you hear me

7    okay?

8          THE COURT:  I can.

9          MR. BAIN:  Wonderful.  Your Honor, for the record,

10   Joseph Bain of the law firm of Jones Walker on behalf of the

11   CLOs.

12       Our role in this is obviously very sensitive, given the

13   nature and relationships that exist.  One of the things I did

14   want to let Your Honor know, though, is that -- two things.

15   One, one of the most outstanding issues, at least in my

16   opinion, regarding confirmation of the plan is essentially

17   what to do with the CLOs and collateral management agreements.

18   That's still an open issue.  If that's not resolved, there are

19   significant rejection damages that could come from that.  So

20   that's the bad news.

21       The good news, however, is, up until this week, we've been

22   negotiating with the Debtors and we have calls set for

23   NexPoint -- with NexPoint to negotiate what all parties kind

24   of refer to as a soft landing for the CLOs, which, to a large

25   extent, involve the issues that are before you today.

013207

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 22
Case 3:21-cv-00538-N Document 26-50 Filed 06/09/21 Page 27 of 191 PageID 16150

21

1        I just, I just wanted to provide that context because the

2   parties are talking and we are kind of taken aback by kind of

3   the most recent event this week, because from an outsider's

4   perspective, the current issues that are currently kind of at

5   dispute here, we thought everyone was working towards a deal.

6   And I think it is a little ironic that -- and as Your Honor

7   knows, I was involved in the *Hoactzin* case, and I thought that

8   that was a very -- I represented Mac Murray (phonetic) in that

9   case, and I thought Ms. Byrnes and Mr. Hendricks did an

10  excellent job of pulling all the parties together.

11       And Your Honor, I don't want to stray too far outside of

12  my lane to suggest that that same approach is what is needed

13  here, but I just want to raise for Your Honor to let you know

14  that we are here.  We're kind of the party stuck in the

15  middle.  And we're hoping and we're -- remain willing to

16  negotiate all the outstanding issues.  But obviously, given

17  the nature of some of the allegations, it's more complicated

18  right now.

19              THE COURT:  Okay.

20              MR. BAIN:  And that's all I have, Your Honor.

21              THE COURT:  All right.  Well, I appreciate you

22  speaking up.  And you may or may not remember that the Court

23  ordered mediation last July, global mediation, including Mr.

24  Dondero, mediation among the Debtor, Mr. Dondero, UBS, Acis,

25  the Crusader Redeemer Committee, and we had a co-mediation

1    team.  Retired Bankruptcy Judge Allan Gropper and former Weil

2    Gotshal partner Sylvia Mayer.  And while I don't communicate

3    with mediators, I fully believe from the parties' reports that

4    was mediation that the parties and lawyers tried very, very

5    hard in to get to some settlements, and in fact, they did get

6    to a settlement with Acis and the Redeemer Committee.

7        So, I have a heck of a lot of thoughts here, and I'll

8    refrain from sharing every one of them, but I'm going to share

9    a few of them.  While I appreciate Mr. Bonds doing what was an

10   honorable thing and apologizing on behalf of his client for

11   the written communications that were worded in such a way

12   where someone might think they were threatening or a violation

13   of the stay, it wasn't an apology from Mr. Dondero directly.

14   I think the really, really honorable thing might have been if

15   Mr. Dondero came here, hat in hand, willing to go under oath

16   and explain himself.  You can share that with him, that's what

17   this judge thinks, that the apology through counsel fell a

18   little short, although I definitely appreciate counsel

19   expressing the apology.

20       You know, I've been going back and forth looking at my

21   computer screen today, and, you know, it's rather shocking to

22   see in writing, you know, with the photo shot of a text where

23   Dondero says, "Be careful what you do-last warning."  I mean,

24   that's just pretty shocking.

25            MR. BONDS:  Your Honor?  Your Honor?

013209

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 24
Case 3:21-cv-00538-N Document 26-50 Filed 06/09/21 Page 29 of 191 PageID 16152

23

1          THE COURT:  Yes.

2          MR. BONDS:  Can I have a second?  Mr. Dondero did

3    apologize to counsel and to Mr. Seery as well, and so the idea

4    that Mr. Dondero has not apologized is not entirely correct.

5          THE COURT:  Okay.  Well, if I misunderstood, I

6    apologize.  But I guess what I was really trying to convey is,

7    in a situation like this, I think coming into court and taking

8    his lumps and saying things under oath might have been a

9    better way to proceed.

10         I guess the second thing I want to say is I wish Mr.

11   Dondero was here, because maybe I'm reading this wrong, but I

12   think he needs to hear and know he is not in charge anymore of

13   Highland.  It may have been his baby.  He may have created its

14   wealth.  But when he and the board made the decision to file

15   Chapter 11, number one, that changed everything.  And then

16   number two, when the Committee was formed and was threatening

17   "We think we need a Chapter 11 trustee because of conflicts of

18   interest of Mr. Dondero and others," and when the Committee

19   negotiated something short of that with the Debtor in January

20   2020, you know, a settlement that involved Mr. Dondero no

21   longer being in charge, no longer being CEO, no longer having

22   any role except portfolio manager with the Debtor, and when

23   various protocols were negotiated, heavily negotiated, for

24   weeks, detailed, complex protocols, life changed even further.

25   It changed when he filed Chapter 11, when he put his baby,

013210

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 25
Case 3:21-cv-00538-N   Document 26-50   Filed 06/09/21   Page 30 of 191   PageID 16153

24

1    Highland, in Chapter 11, and then it changed further in

2    January 2020 when this global corporate governance settlement

3    was reached.  As we know, it involved independent new board

4    members coming in and eventually a new CEO.  He's not in

5    charge.

6         Now, that doesn't mean he's not a party in interest, and

7    he can certainly weigh in with pleadings in the bankruptcy

8    court.  But these communications that I've admitted into

9    evidence, and the declaration, the sworn declaration of Mr.

10   Seery, suggest to me that he's not fully appreciating that,

11   sorry, you're not in charge.  And when you chose to put the

12   company in bankruptcy because of the overwhelming debt, it

13   started a cascade of events, so that now I'm depending on a

14   debtor-in-possession with a new board and a new CEO and a

15   Committee of very sophisticated members and professionals who

16   are working in tandem with the Debtor to be in charge,

17   basically.  All right?  So that's another thing I just feel

18   compelled to say for Mr. Dondero's benefit.

19        I guess another thing is there was a little bit of a

20   theme, Mr. Bonds, in your comments that Mr. Dondero is just

21   concerned, more than anything else, about the way employees

22   are being treated, or at least that's a major concern.  And I

23   don't find that to be especially compelling.  I mean, maybe if

24   he was sworn under oath and testified, I would believe that,

25   but it doesn't feel like what's really going on here.  Again,

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 26
Case 3:21-cv-00538-N   Document 26-50   Filed 06/09/21   Page 31 of 191   PageID 16154

25

1    he took the step of deciding that the company should file

2    Chapter 11.  We had the change in corporate governance in

3    January.  And he has the ability -- everyone, I think, would

4    very much be interested in a plan that he supports.  You know,

5    he wants to get the company back.  That has been made clear in

6    hearings from time to time, and I believe, from Seery's

7    declaration and Highland's lawyers, that they've been and will

8    remain receptive to Mr. Dondero's ideas for a different type

9    of plan that might allow him to get back into control of

10   Highland, if he puts in adequate consideration that makes the

11   Committee and others happy.

12        But we're in a proverbial the-train-is-leaving-the-station

13   posture right now.  Okay?  We've got confirmation coming up

14   the second week of January or something like that.  Okay.  So

15   the train is leaving the station, so we're running out of time

16   to hear what Dondero might want to do as far as an alternative

17   plan.

18        So, as far as the requested TRO, I appreciate that Mr.

19   Dondero and his counsel are worried about some ambiguity, but

20   I'm looking through the literal wording that has been

21   proposed, and the wording proposed is that Dondero is

22   temporarily enjoined and restrained for communicating, whether

23   orally, in writing, or otherwise, directly or indirectly, with

24   any board member, unless Mr. Dondero's counsel and counsel for

25   the Debtor are included in such communications.  Not ambiguous

1    at all to me, and not unreasonable.  Okay?  Time to have

2    counsel involved in these conversations because, you know, we

3    can't have businesspeople-to-businesspeople sending texts that

4    look like threats to me.

5        Second, making any express or implied threats of any

6    nature against the Debtor or any of its directors, officers,

7    employees, professionals, or agents.  I don't think that's too

8    much to ask.  Please don't let him make threats to us anymore.

9        C, communicating with any of the Debtor's employees,

10   except as it specifically relates to shared services currently

11   provided to affiliates owned or controlled by Mr. Dondero.

12   That seems reasonable to me because of the evidence in front

13   of me.

14       Then D, interfering with or otherwise impeding, directly

15   or indirectly, the Debtor's business, including but not

16   limited to the Debtor's decisions concerning its operations,

17   management, treatment of claims, disposition of assets owned

18   or controlled by the Debtor, and pursuit of the plan or any

19   alternative to the plan.

20       Now, I guess maybe you're confused or feel like that is

21   ambiguous.  I will just say, for the sake of any doubt, and I

22   think I heard Mr. Morris saying precisely this, that, you

23   know, Dondero can file pleadings.  Okay?  He can file

24   pleadings asking for relief.  He can object to the plan.  He

25   can vote against the plan.  And they are completely still open

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 28
Case 3:21-cv-00538-N Document 26-50 Filed 06/09/21 Page 33 of 191 PageID 16156

27

1  to hearing about -- and I think they would have a fiduciary

2  duty -- to hear about a pot plan that might be more favorable

3  than what's on the table right now.  But Mr. Morris, have I

4  put words into your mouth?  Isn't that exactly what you were

5  saying?

6          MR. MORRIS:  That is exactly right, Your Honor.  And

7  if you look, I think there's a footnote there that expressly

8  provides -- gives Mr. Dondero the right --

9          THE COURT:  Okay.

10         MR. MORRIS:  -- confirms his right to do exactly what

11 you just described.

12    (Echoing.)

13         THE COURT:  Okay.  Thank you for that.  And I should

14 say exclusivity is still in place, right?  We don't -- I mean,

15 I'm not inviting him to file a plan right now in violation of

16 the exclusivity provisions, but I'm just saying discussions

17 among lawyers, I think, are not only not prohibited but

18 encouraged here.

19    And then, last, otherwise violating Section 362 of the

20 Bankruptcy Code.  Okay, the sky is blue.  That is obviously

21 not problematic.

22    Okay.  So the next paragraph, James Dondero is further

23 temporarily enjoined and restrained from causing, encouraging,

24 or conspiring with any entity owned or controlled by him

25 and/or any person or entity acting on his behalf from directly

013214

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 29
Case 3:21-cv-00538-N Document 26-50 Filed 06/09/21 Page 34 of 191 PageID 16157

28

1    or indirectly engaging in any prohibited conduct.

2         You know, I don't -- I understand that indirectly, you

3    know, there might be some concern about the ambiguity, but it

4    looks like to me just sort of a catchall, okay, to the extent

5    we didn't explicitly say it in the preceding paragraph, we

6    don't want Dondero causing some employee of an affiliate he

7    controls to do exactly what Dondero himself is prohibited from

8    doing.

9         I don't think it's ambiguous.  And if it is, if someone

10   runs in here, he's violated Paragraph 3 of the TRO, well,

11   obviously we would have a contested hearing where I'm not

12   going to hold him in contempt of court unless I've got an

13   evidentiary showing that would convince me of that.

14        So, I guess, on balance, I'm overruling the objections and

15   I am granting the TRO.

16        And just to be clear, I'll make a record that bankruptcy

17   courts certainly under Section 105 can issue a TRO, and courts

18   are usually bound by the traditional factors of Rule 65 --

19   that is, looking at has there been a showing of immediate and

20   irreparable harm?  Is there a probability of success on the

21   merits that the Debtor will be entitled to this when we have a

22   later more fulsome hearing on the preliminary injunction

23   request?  Would the balance of equities favor the Movant

24   Debtor here?  And would the injunction serve the public

25   interest?

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 30
Case 3:21-cv-00538-N Document 26-50 Filed 06/09/21 Page 35 of 191 PageID 16158

29

1     I find from the evidence, the declaration of Mr. Seery,

2     and the supporting documents, that all four prongs for a TRO

3     are met here, so I am ordering it.

4     A couple of remaining things.  We'll come back on January

5     4th to consider whether extension of this relief in a

6     preliminary injunction is appropriate.  I don't have at my

7     fingertips the time of day where it's set on the 4th.  Is it

8     -- I think that's the Monday after the New Year's Day holiday.

9     So I'm guessing we're set at 1:30.

10     Traci, if you're out there, can you confirm it's 1:30 on

11     January 4th?

12     Okay.  I'm not hearing a response from her.  But Nate,

13     maybe you can double-check that.

14     (Echoing.)

15     All right.  Well, let's talk a minute about what is going

16     to happen next week.

17     Mr. Bonds, I set -- okay, back on November -- please take

18     your phone off mute when I am talking.  Or put it on mute when

19     I'm talking, please.

20     On November 19th, you filed the motion, basically -- I

21     can't remember the wording of it -- but something like wanting

22     to change the protocol for non-ordinary-course sales of

23     assets.  And you asked for an emergency hearing, and I denied

24     that.  And I was very concerned that it looked like an attempt

25     to renegotiate the January protocol order that the Committee

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 31
Case 3:21-cv-00538-N   Document 26-50   Filed 06/09/21   Page 36 of 191   PageID 16159

30

1  had worked so hard to negotiate on.  But it's set, finally.  I

2  think it's this next Thursday, a week from today.

3      But meanwhile, you know, again, I feel like the issues

4  raised in that are very much overlapping with what we talked

5  about today, as well as I feel like the January protocol order

6  controls here, and it's an attempt to revisit that a month

7  before confirmation.

8      But this newest emergency motion filed by Mr. Wright's

9  client, it feels like, as I think I mentioned, the same type

10 of motion dressed a little bit differently from entities

11 controlled by Dondero rather than Dondero directly.  And

12 meanwhile, Mr. Wright has asked for a hearing next Tuesday.

13 I'm not going to have three hearings on the same issue.  So I

14 guess I'll hear first from Mr. Dondero's counsel.  I mean,

15 what do you think I'm going to hear next Thursday that is

16 going to change my mind about this was all covered in the

17 January protocol order and I'm not going to revisit it a month

18 before confirmation?  Mr. Lynn, are you here to address that

19 one?

20      MR. LYNN:  Yes, Your Honor.  First of all, I think

21 the hearing is actually set for next Wednesday.

22      THE COURT:  Okay.

23      MR. LYNN:  Secondly, the motion filed by Mr. Wright,

24 as I understand it, has to do with sales of assets by the CLOs

25 that the Debtor manages as portfolio manager and not -- and

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 32
Case 3:21-cv-00538-N Document 26-50 Filed 06/09/21 Page 37 of 191 PageID 16160

31

1    does not have to do with any sales of assets by the Debtor or

2    its estate.  So they're two different issues.

3        As I understand Mr. Wright's pleading, he is arguing that

4    under the Advisers Investment Act, if I have that name right,

5    that Mr. Seery, on behalf of the Debtor, ought not to ignore

6    directions from or suggestions, requests, as they actually

7    are, from investors in the CLOs with respect to the assets of

8    the CLOs.  That's entirely different from the concern that we

9    are expressing with respect to sales of assets by the Debtor.

10       Secondly, while Mr. Dondero may have some influence on the

11   CLOs, it is my understanding that the investors that Mr.

12   Wright represents are governed by an independent board of

13   directors, which Mr. Dondero may be on.  I don't know whether

14   he is or not.

15       Third, we are not trying to change the protocols.  We do

16   not believe anything in the protocols at all -- we've

17   identified nothing in the protocols at all that says that the

18   Debtor, and, by extension, Mr. Seery and the independent

19   board, may take actions outside the ordinary course of

20   business without notice and an opportunity for hearing before

21   this Court.

22       We have asked in the alternative that if somehow the

23   protocols authorize these actions, that the Court alter the

24   protocols.

25       What triggered this, Your Honor, was a sale of an entity

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 33
Case 3:21-cv-00538-N Document 26-50 Filed 06/09/21 Page 38 of 191 PageID 16161

32

1    known as SSP, which belonged to Trussway, which in turn

2    belongs to the Debtor.  We believe but we do not know for sure

3    that the sale is below the price that could have been

4    obtained.  However, the sale was undertaken, as we understand,

5    without competitive bidding, without notice -- certainly,

6    there was no notice to Mr. Dondero -- and without an

7    opportunity for anyone to be heard.

8        We do not think that the intention of the protocols was

9    for this Court to abdicate its authority to oversee the

10   Debtor's operations and to limit the authorities entitled to

11   participate in decisions involving disposition of assets of

12   major value, to limit the decision-makers to the independent

13   board -- in particular, Mr. Seery -- and to limit it to the

14   members of the Creditors' Committee, rather than providing

15   notice generally to creditors, rather than providing a method

16   for competitive bidding, rather than letting people know what

17   is going on.

18       Your Honor has often stated, not just in this case, your

19   concern that the process should be transparent.  We believe

20   that at this point the Debtor is attempting to use the

21   protocols in an effort to avoid the transparency that

22   creditors, equity interest owners, and most of all, this

23   Court, are entitled to.

24           THE COURT:  All right.  Well, I don't know if anyone

25   wants to respond to that, but --

1          MR. MORRIS:  If I may, Your Honor.

2          THE COURT:  Go ahead, Mr. Morris.

3          MR. MORRIS:  Just very briefly.  I think I heard

4    Judge Lynn say that there's nothing in the protocols that

5    authorizes the Debtor to sell assets outside the ordinary

6    course of business.  And if he made that admission, I still

7    don't see the point of this motion next week.  All they're

8    doing is questioning the Debtor's business judgment.  They

9    don't really have a right to do that.  Mr. Dondero doesn't

10   have a right to participate in the sale of those assets.  The

11   Debtor -- you know, there's no evidence before the Court,

12   there will be no evidence before the Court, as to how the

13   Debtor decided, what factors they considered when deciding to

14   sell these assets.  This is just completely improper.

15      (Echoing.)

16      Mr. Dondero personally participated in the corporate

17   governance resolution last January.  There has been no

18   complaint by him or anybody else about the protocols, about

19   the Debtor having operated outside the protocols.  The Debtor

20   is transparent.  Every single month, we file monthly operating

21   reports.  You can see what's happening with assets, right?  We

22   work with the Committee.  The Committee's not here joining in

23   this motion.  The Committee hasn't complained about the

24   process.  It's just Mr. Dondero.  He's simply trying to

25   exercise -- this is just another attempt to further exercise

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 35
Case 3:21-cv-00538-N Document 26-50 Filed 06/09/21 Page 40 of 191 PageID 16163

34

1    control.  He can make his motion.  It will be denied because

2    the facts simply don't support it.

3              THE COURT:  Mr. Clemente, is it wrong of me to assume

4    that you and your clients are very vigilant in paying

5    attention to trades, transfers, outside the ordinary course?

6    I assume since, again, you have a committee of sophisticated

7    parties who are owed hundreds of millions of dollars, and you

8    so heavily negotiated the January protocol order, that you're

9    following it meticulously and paying attention to what's

10   happening.  Do you care to comment?

11             MR. CLEMENTE:  Thank you, Your Honor.  I do.  Matt

12   Clemente, for the record, on behalf of the Committee.

13        You're exactly right, Your Honor, and Your Honor actually

14   touched on several things that I would have said earlier.

15        First of all, the Committee is made up of very

16   sophisticated members, which makes my job sometimes easy and

17   sometimes challenging, because they are very hands-on and they

18   do understand the business of Highland and we did heavily

19   negotiate the protocols early in the case, Your Honor, and

20   they were designed with exactly these types of transactions in

21   mind, so that the Debtor had to come to the Committee and lay

22   out its case for a particular transaction.

23        With respect to the transaction at issue, that's exactly

24   what happened, Your Honor.  We're not going to get into,

25   obviously, Committee deliberations, but I can tell you that

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 36
Case 3:21-cv-00538-N    Document 26-50    Filed 06/09/21    Page 41 of 191    PageID 16164

35

1    the protocols have been followed.

2        As Your Honor knows, when we've had an issue under the

3    protocols, I remember several months ago when we argued about

4    certain distributions being made, the Committee certainly was

5    not shy about bringing it to Your Honor's attention.

6        So we have been very vigilant and very diligent in holding

7    the Debtor accountable under the protocols.  And we believe

8    that -- although, again, when we've had an issue, we've come

9    to Your Honor.  We believe that the protocols have worked as

10   they were intended to and as they were designed, Your Honor.

11       So I can assure you that the Committee has been very

12   vigilant and the Committee will continue to be very vigilant.

13   These issues were all raised in the context of negotiating the

14   protocols.  That was before Your Honor.  Mr. Dondero was

15   involved with that.  It was very difficult negotiations, Your

16   Honor.

17       But this does seem like somebody now trying to renegotiate

18   what it was that the parties agreed to and Your Honor approved

19   early on in this case.

20       So, Your Honor, rest assured, the Committee has been very

21   vigilant and will continue to be very vigilant.

22            THE COURT:  All right.  And I guess the last thing

23   I'll say on that point is, while of course we always want

24   transparency --

25            (Interruption.)

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 37
Case 3:21-cv-00538-N   Document 26-50   Filed 06/09/21   Page 42 of 191   PageID 16165

36

1          THE COURT:  While we, of course, always want

2     transparency and notice and opportunity to object, I mean,

3     these are not your typical run-of-the-mill assets.  They're

4     not a parcel of real property or a building somewhere or

5     inventory somewhere or intellectual property.  I mean, these

6     are -- you know, again, we have a unique business here.  And I

7     think that was very much recognized in the process of

8     negotiating the protocols, that this is not the type of

9     business where you do a 363 motion on 21 days' notice any time

10    you feel like, oh, today's a great day to trade this or that

11    in whatever fund.

12         Well, we will go forward on this motion, because Mr.

13    Dondero is entitled to his day in court to make his argument,

14    put on his evidence, and try to convince me that this is not

15    just trying to renegotiate something Mr. Dondero agreed to 11

16    months ago on the eve of confirmation.  But I want to make

17    sure -- oh, we're getting --

18         (Echoing.)

19         (Clerk advises Court.)

20         THE COURT:  Okay.  You're on mute.  You're on mute,

21    Mr. Lynn.

22         MR. LYNN:  Your Honor, may I explain briefly?  This

23    is very distressing.  Mr. Morris says that it is the ordinary

24    course of this Debtor's business to sell a subsidiary.  This

25    is not the ordinary course of the Debtor's business.  There is

013223

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 38
Case 3:21-cv-00538-N Document 26-50 Filed 06/09/21 Page 43 of 191 PageID 16166

37

1    nothing in the protocols that says that the independent board

2    and just the creditors on the Creditors' Committee may make

3    decisions concerning major sales.  We will present evidence to

4    that effect when it occurs, and we believe strongly -- and I

5    want to state, Your Honor, I didn't participate in

6    negotiations of those protocols.  I wasn't involved.  And I've

7    looked at them.  There's nothing that says that this can occur

8    without going to a hearing.  And there is nothing in the

9    protocols that defines ordinary course of business to involve

10    this.

11        This motion was not filed because Mr. Dondero wanted to

12    get in the way.  It was filed because I thought it was the

13    right thing to do because I thought that this was contrary to

14    the way bankruptcy and Chapter 11 should work.  And it was

15    reasoned by me, with Mr. Dondero's consent.  And I very, very

16    much am upset to hear things people say that he's trying to

17    get in the way with this.  He is not.  He's asking for

18    something that is very, very, very reasonable.  If they have

19    nothing to hide, and I hope they don't and don't believe they

20    do, but if the Debtor has nothing to hide, what is wrong with

21    notice and a chance for hearing?

22        MR. POMERANTZ:  Your Honor, this is Jeff Pomerantz.

23    If I briefly may be heard.

24        THE COURT:  Go ahead.

25        MR. POMERANTZ:  I actually did negotiate the

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 39
Case 3:21-cv-00538-N Document 26-50 Filed 06/09/21 Page 44 of 191 PageID 16167

38

1    protocols.  And I think what Mr. Lynn is conflating is the

2    Debtor selling Debtor assets and the Debtor acting in its

3    management capacity to sell assets of entities it manages.

4        We will also present the case law that basically an entity

5    that is not a debtor whose assets are being sold by the Debtor

6    acting as a manager is not within the purview of this Court.

7        So Mr. Lynn can be frustrated, could be upset with what's

8    happening, but we dealt with these issues last year.  Because

9    as Your Honor mentioned, this Debtor is not the typical

10   debtor.  And we had long negotiations with the Committee on

11   what is ordinary course and what is not ordinary course.  And

12   as I mentioned to you the last time we were here, Your Honor,

13   as I mentioned to you in January when we had this approved, we

14   were not seeking to get authority to sell assets out of the

15   ordinary course of business or do any transactions out of the

16   ordinary course of business.

17       Mr. Lynn thinks that what's happening is out of the

18   ordinary course of the business.  This Court has said it's

19   not.  So we are prepared to go forward with the hearing.

20   We've also spoken to the affiliated entities about putting

21   their hearing on for the same date, because we also agree they

22   -- both motions raise similar issues.  And I think we're close

23   to an agreement on having both of those motions heard at the

24   same time on the 16th.

25       Thank you, Your Honor.

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 40
Case 3:21-cv-00538-N Document 26-50 Filed 06/09/21 Page 45 of 191 PageID 16168

39

1          THE COURT:  All right.  So it's the 16th, Wednesday.

2     Did we look that up, Nate?

3          THE CLERK:  It's at 1:30.

4          THE COURT:  It's at 1:30?  All right.  So we will go

5     forward with the Dondero motion Wednesday, December 16th, at

6     1:30, and we will go ahead and set the what I consider closely

7     overlapping motion filed by the NexPoint entities and Highland

8     Fixed Income Fund by Mr. Wright, we'll go ahead and set that

9     at the same time.

10         Let me say this as clearly as I can.  If there's going to

11    be a challenge to the Debtor's business judgment, Mr. Dondero,

12    he needs to be present at the hearing on video and he needs to

13    testify, okay?  I understand what Mr. Lynn said, that this was

14    his idea, he thought the January protocol order violated the

15    Bankruptcy Code, blah, blah, blah, but I am going to order

16    that Mr. Dondero be present December 16th at 1:30 and testify.

17    Okay?

18         So I've kind of modified that.  I said if the business

19    judgment of the Debtor is being challenged, but no, I'm

20    broadening that.  I think Mr. Dondero just needs to provide

21    testimony on Wednesday.  Given everything I heard today with

22    the TRO request, and given that, in substance, he's -- he is

23    challenging the Debtor's business judgment and the mechanism

24    where the Committee oversees it, he just needs to testify.

25    All right?  So please convey that to him.

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 41
Case 3:21-cv-00538-N   Document 26-50   Filed 06/09/21   Page 46 of 191   PageID 16169

40

1        Now, Mr. Wright, I'm first going to ask, I know you

2    weren't -- you were just listening in today, but do you want

3    to say anything?  I see you put your jacket on now.  Thank

4    you.

5            MR. WRIGHT:  I did.  I did find a jacket.  I'm sorry,

6    Your Honor.

7            THE COURT:  Okay.  Go ahead.

8            MR. WRIGHT:  (muffled)  So I, you know, I can address

9    why we're asking for limited relief.  I can also address the

10   underlying motion, which (inaudible) some of -- in the

11   underlying motion --

12           THE COURT:  Okay.  Your sound is very difficult to

13   hear.  Could you repeat what you just said?  I didn't get it.

14           MR. WRIGHT:  Yes, Your Honor.  I'm happy to address

15   our motion for an emergency hearing.  I'm also happy to

16   address the underlying motion we're asking be heard on an

17   emergency basis.  I didn't know, do you want me to address

18   both or just the motion for why we're asking for emergency

19   relief?

20           THE COURT:  Well, I've gone ahead and said I will set

21   it next Wednesday.  It sounds like the Debtor saw the

22   efficiencies maybe in having this one heard at the same time

23   as the Dondero motion.

24       I have a couple of things I want to say for the benefit of

25   you and your client, but I was giving you the chance to say

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 42
Case 3:21-cv-00538-N Document 26-50 Filed 06/09/21 Page 47 of 191 PageID 16170

41

1    something first.

2        Here's what I'm thinking, going into this, so you can be

3    prepared to address this next Wednesday.  Your motion feels to

4    me exactly like what we litigated *ad nauseam* in the Acis case.

5    Now, if any of the Acis lawyers are on the line or Mr. Terry

6    is on the line, I wonder if they are chuckling.  And what I

7    mean is -- I heard a chuckle.  I don't know if that was Ms.

8    Patel.  We had hearings --

9            MS. PATEL:  It was, Your Honor.

10           THE COURT:  Okay.  We had hearings in the Acis case.

11   Remember, Acis was a portfolio manager for CLOs.  And the

12   party that was in the bottom tranche of the CLOs, okay, the

13   equivalent, I think, to your clients here, the NexPoint

14   entities and Highland Fixed Income Fund, we sometimes called

15   them the subordinated debtholders or the equity-holders, that

16   party -- it was a party named HCLOF -- began during the *Acis*

17   case trying to do a call, trying -- redemption notice.  Acis,

18   liquidate these CLOs.  We are -- we're done.  We're tired.

19   You know, we're outside the reinvestment period.  We want you

20   to liquidate.  And started to kind of force that issue.

21   Highland was the sub-manager of Acis at that time.  So, guess

22   what, the Chapter 11 trustee filed an adversary proceeding

23   asking for TROs, saying, you know, this is the portfolio

24   manager's discretion.  And not only that, what they're doing

25   isn't a reflection of reasonable business judgment because,

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 43
Case 3:21-cv-00538-N   Document 26-50   Filed 06/09/21   Page 48 of 191   PageID 16171

42

1   you know, we don't think it's the right time actually to

2   liquidate these CLOs, they're just trying to deprive the

3   portfolio manager of his stream of revenue for managing this.

4        So we had multiple hearings about this.  I issued a TRO

5   saying stop it, bottom tranche of the CLOs.  It seems

6   transparent you're just trying to deprive Acis, the portfolio

7   manager, of value.  And you know, irony, irony, it's like the

8   backwards situation here.  They were saying, but we're so late

9   in the life of these CLOs, it makes sense to liquidate them.

10  Why would you want to keep these things going?  We're not

11  violating the stay.  We're not jacking with the estate value

12  and trying to deprive Acis of its revenue stream.  Anybody

13  knows it makes sense to liquidate these late-in-life CLOs.

14  Very ironic to me, although maybe it's not the situation,

15  apples to apples, but here, you see what I'm saying, it feels

16  like same situation, only flip-flopped.  The portfolio manager

17  here, Highland, is going to be engaged in liquidating the

18  CLOs, and your client, bottom tranche of equity, is saying no,

19  don't do that.  You know, there's still value there.

20       Now, I will say, in my Acis case, the equity tranche, they

21  kind of -- their theory evolved over time.  They were like,

22  well, we actually just want CLOs managed by Highland, a

23  Highland entity, and Acis isn't a Highland entity.

24       So, bottom line, I issued a TRO.  Stop it, equity tranche.

25  This is not your call, it's the portfolio manager, and I think

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 44
Case 3:21-cv-00538-N Document 26-50 Filed 06/09/21 Page 49 of 191 PageID 16172

43

1    you're just jacking with the portfolio manager to screw up the

2    reorganization.  And guess what, we even had then a

3    preliminary injunction and then a plan injunction.  And of

4    course, there were bells and whistles on what would evaporate

5    the injunction.  But that's now on appeal to the Fifth

6    Circuit.

7          So, you know, at my confirmation hearing at least in Acis,

8    if not previous hearings, we even had expert witnesses and we

9    pored through the language of the portfolio management

10   agreements.  And I don't know if here we have the same

11   situation, but it was complicated in Acis because we had the

12   portfolio management agreements between the CLO manager and

13   the CLO issuers, but then there was a separate management

14   agreement between the equity tranche and, I don't know, I

15   can't remember who the counterparty to that one was.  But

16   there, there were multiple agreements, and you had to parse

17   through it, and we had experts testifying about, you know,

18   discretion of the equity-holder versus not, or portfolio

19   manager, da, da, da, da, da.  And I ruled as I ruled.  I

20   granted the injunction, to the detriment of the equity

21   tranche.  And maybe the Fifth Circuit one day will tell me I

22   was wrong.  You know, I really think it's a hard, hard, hard

23   issue.

24         But I'm just telling you, that's how I ruled on, I think,

25   three occasions.

013230

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 45
Case 3:21-cv-00538-N   Document 26-50   Filed 06/09/21   Page 50 of 191   PageID 16173

44

1        Maybe the portfolio management agreements are worded

2   differently here.  You know, maybe -- maybe it's a different

3   issue.  But I will say I read your motion yesterday with

4   frustration.  I'm like, haven't I ruled on this like three

5   times in the Acis case?  And then, you know, maybe I haven't.

6   Again, maybe, maybe the portfolio management agreements in

7   this case would convince me differently.  But were you aware

8   of how I ruled in Acis?

9        MR. WRIGHT:  Your Honor, I'm aware of the Acis case,

10  but no, I wasn't aware that this particular issue was

11  addressed in such depth.

12        THE COURT:  Okay.

13        MR. WRIGHT:  (muffled)  I will, of course, go take a

14  look at all those hearings.  I anticipate that I'm going to

15  try to draw some distinctions between my situation and the

16  situations there, but I certainly will be prepared to address

17  that next week.

18        I think the thing that I would say just very broadly is

19  that we are not -- I think our request is very limited in what

20  we're asking for.  All we are asking for is that there is a

21  temporary pause on the Debtor exercising its right as

22  portfolio manager to direct sales that we don't agree with for

23  a ten-day period.  And we would then use that period of time

24  to explore, either consensually or through rights that we

25  (inaudible).  And then in the process of looking at this, Your

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 46
Case 3:21-cv-00538-N Document 26-50 Filed 06/09/21 Page 51 of 191 PageID 16174

45

1   Honor, under the documents effecting a transfer of portfolio

2   management, you know, these documents, they're based on the

3   rights of the preference holders.

4       You know, my client's concern is really about the, you

5   know, the investment time window of claim today versus the

6   funds, the relevant -- again, Mr. Macur (phonetic) -- my

7   clients include two advisors that are, you know, that are

8   ultimately I think controlled by a vehicle that Mr. Dondero

9   controls, but also I have a few clients that are funds that

10  are required by SEC rules, as I understand it, to have a

11  majority independent board.  So I dispute that they're a

12  Dondero-controlled entity, but I understand that that's

13  testimony (inaudible).  But I -- that's -- that's not right.

14      And so the funds, --

15          THE COURT:  Who are the board members?

16          MR. WRIGHT:  I can have that for you next week, Your

17  Honor.

18          THE COURT:  Okay.

19          MR. WRIGHT:  I don't have it in front of me.  But

20  they're required by SEC rules to have a majority independent

21  board.  And so we -- the funds that are an advisor of my

22  clients, they have a much longer-term investment horizon.  So,

23  you know, in my mind, I probably overly-simplistically

24  analogize it to the difference between saving money for a

25  house you intend to buy in a year and how you might invest

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 47
Case 3:21-cv-00538-N   Document 26-50   Filed 06/09/21   Page 52 of 191   PageID 16175

1   that versus saving money for retirement that you might do in

2   20 years.  And I think any investment advisor will tell you

3   you're going to -- you're going to do that differently,

4   because with a long horizon you can accept (inaudible) and

5   bucket changes and stuff like that.  When they go out a long

6   time, you know, it'll be okay.  And on a short horizon, you

7   know, you need to sort of make sure you're holding onto what

8   you have and just approach it differently.

9       Highland, under its plan, is intending to liquidate at the

10  end of 2022, which that's -- that's fine.  That's what they're

11  intending to do.  But that's a very different investment time

12  horizon than my clients, and so we -- you know, and they're --

13  they're proceeding to run, you know, their liquidations that

14  way.  I don't think that there's anything wrong with that.

15  You know, that's their discretion.  But we think that we'd be

16  better served with a portfolio manager that is taking a long-

17  term time horizon, which once was Highland but now not, given

18  the bankruptcy case.  And so, you know, we'd like to ask that

19  -- and we're just -- we're really not -- we're not asking for

20  a TRO.  I think Mr. Morris (inaudible) a TRO.  I understand

21  that's their position.  But I dispute it.

22      Highland is in bankruptcy, and so it's subject to the, you

23  know, it's subject to the bankruptcy system and subject to the

24  control of the Court.  What we are asking would be for the

25  Court to use its power under 363 and 1107 and 105 to tell

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 48
Case 3:21-cv-00538-N   Document 26-50   Filed 06/09/21   Page 53 of 191   PageID 16176

47

1    Highland rough -- for 30 -- within 30 days to figure out if

2    they can replace you under the documents or if there can be a

3    deal, as Mr. -- Mr. Bain mentions, there will be discussion of

4    a (inaudible) to reach a consensual resolution in which the

5    portfolio manager would change that would have to involve the

6    CLOs and probably my clients and also the Debtor, probably, to

7    see if we can get there.  And, you know, if we can't, we

8    can't.  That's really the limited nature of what we're asking

9    for now.  It may be different than what you were describing in

10   the Acis case.  But again, I will go and read those cases and

11   I will be prepared to address that more fully next week.

12           MR. POMERANTZ:  I mean, Your Honor, this is Jeff

13   Pomerantz, if I may briefly respond.

14           THE COURT:  Go ahead.

15           MR. POMERANTZ:  I think there's a fundamental problem

16   with the argument that Mr. Wright just made.  First of all,

17   there are other investors and other people with interests in

18   those CLOs.  It's not Mr. Wright's clients only.

19       And also, the premise that the decisions that are being

20   made in terms of liquidating those assets have to do with the

21   Debtor's timeline on liquidation, just, you'll hear from Mr.

22   Seery next week, is fundamentally incorrect.  Mr. Seery is

23   making decisions on behalf of Highland that he believes are

24   within his fiduciary duty to the funds to maximize value.

25       So the whole premise of the argument that this is between

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 49
Case 3:21-cv-00538-N Document 26-50 Filed 06/09/21 Page 54 of 191 PageID 16177

48

1 a long-term horizon and a short-term horizon is just

2 incorrect. And there are other people that Mr. Seery has to

3 worry about. He has a duty to the CLO, and just because one

4 set of investors wanted to do certain things, they don't have

5 that right. It's -- it's -- it wasn't lost on us that, in Mr.

6 Wright's motion, he did not point to any language in any

7 agreements that in any way give him that right.

8 So while we appreciate that these CLOs have to be

9 addressed, and we have engaged in discussions with Mr.

10 Wright's client and Mr. Bain's client to try to have a soft

11 landing, they have not occurred yet. And in the interim, the

12 Debtor has to do what it is obligated to do and act in a

13 fiduciary manner and act consistent with the agreements.

14 That's why we objected and we will be objecting to any

15 moratorium on any of those efforts.

16 THE COURT: Okay. All right. So, Mr. Wright, I am

17 also going to direct that you have a client witness to testify

18 about these things. And I do want to understand, you know,

19 who you're taking instructions from and who is on the board on

20 these entities.

21 You know, we had a hearing before I think you were

22 involved where the Committee was seeking discovery of

23 documents, and a lot of the what I'm going to call Highland

24 affiliates -- and I know people sometimes cringe when I use

25 that word affiliates; you know, it may or may not meet the

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 50
Case 3:21-cv-00538-N Document 26-50 Filed 06/09/21 Page 55 of 191 PageID 16178

49

1  Bankruptcy Code 101 definition of affiliate. But entities in

2  the Highland umbrella, many of them resisted production of

3  documents from the Committee. And I got concerned at that

4  point in time of who is instructing the lawyers, because I

5  felt like, in many instances -- not all, but in several

6  instances -- you know, I was concerned it's in the estate's

7  best interest to get these documents. You know, the Committee

8  was the one seeking the documents, but we've got entities in

9  the Highland umbrella resisting. And so it felt like there

10  was a conflict. And if the same human beings were employees

11  of the Debtor, and --

12      Anyway, I think we got through a lot of that, but I

13  remember, in connection with all of that, looking at the list

14  of Highland entities who filed proofs of claim in the

15  bankruptcy case. And I remember asking, in some cases, like,

16  who filed the proof of claim, and I was told that Mr.

17  Dondero's counsel prepared a lot of these proofs of claim of

18  the different entities. And at least signatories, I saw that

19  Frank Waterhouse has signed the proofs of claim at least for

20  NexPoint Advisors, NexPoint Capital, Inc., NexPoint Strategic

21  Opportunities Fund.

22      Anyway, we had a discussion about my concerns about

23  conflicts back around that time, but here's what I'm getting

24  at. I'm worried all over again about do we have any human

25  beings involved calling the shots for your client, Mr. Wright,

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 51
Case 3:21-cv-00538-N Document 26-50 Filed 06/09/21 Page 56 of 191 PageID 16179

50

1    that have fiduciary duties to the Debtor, and maybe this is

2    getting in conflict with that.  I just don't know.  I just

3    don't know.  But it's concerning to the Court.  So, what would

4    help is if we have a human being testify for your clients so

5    we can clear the air on that one.  Okay?

6        So, next Wednesday, December 16th, at 1:30, we'll have a

7    hearing on the Dondero motion and on these NexPoint motions of

8    your client, Mr. Wright.  And we're going to have a witness

9    for Mr. Wright's client and we're going to have a witness --

10   and we're going to have Dondero being a witness.  And Mr.

11   Morris is going to upload your TRO, and we're going to have a

12   follow-up hearing on January 4th on the preliminary injunction

13   request.

14       All right.  So, anything else?

15           MR. MORRIS:  Yes, Your Honor.  It's John Morris for

16   the Debtor.  I've got Mr. Seery on the phone, the Debtor's CEO

17   --

18           THE COURT:  Okay.

19           MR. MORRIS:  -- and CRO.  And if it pleases the

20   Court, he would just like to spend a moment giving the Court

21   an update as to where he is in the process.

22           THE COURT:  Thank you.  He may.

23           MR. MORRIS:  Is that okay?

24           THE COURT:  Uh-huh.

25           MR. MORRIS:  Okay.

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 52
Case 3:21-cv-00538-N Document 26-50 Filed 06/09/21 Page 57 of 191 PageID 16180

51

1           MR. SEERY:  Thank you, Your Honor.  Can you hear me?

2           THE COURT:  Yes.

3           MR. SEERY:  I appreciate the Court's time.  I think

4    with the overlapping motions it would be useful just to tick

5    through very quickly, not to take too much of your time, where

6    we are and why some of these things have come before you in

7    the last couple days.

8           First, as you're aware, we have a plan out for a vote.  We

9    believe we're going to get confirmed.  We believe we'll get

10   the votes.  We're still waiting on the votes.  And we're still

11   working on claims.  So, as we speak, including even this

12   morning, trying to resolve certain of the other open claims.

13          The Debtor is still managing its assets.  And what that

14   means is we're addressing financing with underlying assets

15   that are in portfolio companies.  We are addressing our own

16   debtor-owned assets, some of which we are selling in the

17   ordinary course.  So, for example, securities.  Where we have

18   securities in an account, we have been selling those where we

19   think the market opportunity was ripe.

20          Up until mid-March, Mr. Dondero controlled those accounts.

21   He was the portfolio manager.  We took them away after they

22   lost considerable amounts of money, about ninety million

23   bucks.  Real money.  So we took over control of those accounts

24   since then, and we've been managing to sell them down to

25   create cash where we think the market opportunity is correct.

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 53
Case 3:21-cv-00538-N Document 26-50 Filed 06/09/21 Page 58 of 191 PageID 16181

52

1      With respect to subsidiaries, we don't have any plans to

2   sell any PV assets now.  These are companies that are part-

3   owned, either directly or indirectly, through subsidiaries,

4   with a number of other (inaudible) who are interest holders.

5      SSP, for example, there's been a lot of noise this

6   morning, no real facts.  I will tell you that we did sell SSP.

7   We did it in conjunction, as Mr. Clemente indicated, with the

8   Committee.  We looked at number of bids.  That entity was a

9   private-equity-owned asset.  We believe that it was sold

10  appropriately.  It wasn't selling an asset of the estate.  It

11  was actually a thrice-removed asset, also with other interest

12  holders, including mostly completely independent, including

13  SIBC -- SBIC owners who wanted to choose off that asset as

14  well.  We believe we got a very good price and executed that

15  well.  Happy to litigate and defend that at any time.

16      The CLOs, we're the manager of the CLOs.  What we're

17  trying to do in our plan is assign CLOs back to NexPoint

18  Advisors.  The reason for that is, while they do generate

19  income, we didn't believe that the income was enough to

20  justify us maintaining them.  They would not be assets that we

21  would continue to hold through the case.  Or through the

22  liquidation.  Unclear whether NexPoint wants those assets now

23  back or not.  We have been working, as Mr. Bain indicated,

24  closely with the Issuers and the Issuers' counsel, because

25  there's very particular, specific ways to deal with those

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 54
Case 3:21-cv-00538-N Document 26-50 Filed 06/09/21 Page 59 of 191 PageID 16182

53

1   assets under the documents that protect the various investors.

2   As Mr. Morris pointed out, entities related, controlled by,

3   managed by Mr. Dondero are not the only investors in these

4   CLOs.  Our duty is to the CLOs.  We believe that we are

5   adhering to that duty.  We are happy to at some day litigate

6   that.

7        With respect to asset sales, the Debtor has a team that

8   manages these assets.  The team came to me to sell certain

9   assets.  Mr. Dondero, NexPoint Advisors, they don't monitor

10  these assets.  They don't know anything about them.  The

11  assets we're talking about are loans, though the Debtor hasn't

12  sold any of those, or securities that trade, equity securities

13  that trade in the liquid markets.  These are securities, you

14  can go on the screen, you can go on Yahoo Finance and see how

15  they trade.

16       Our team came to us and suggested that we sell some.  I

17  sat down with the analyst and the analyst suggested we sell.

18  The manager of the day-to-day operations of CLOs suggested we

19  sell.  We set the sell notice within the context of the

20  market.  This wasn't a dumping.  We thought that the market

21  would support what we were doing, and it did.

22       Another asset that we were going to sell is an asset we

23  don't have an analyst on.  Haven't had one for years,

24  apparently.  It's not very much money.  Mr. Dondero's related

25  entities don't hold very much of the interests in the CLOs

Case 19-34054-sgj11  Doc 1822-146  Filed 01/22/21    Entered 01/22/21 21:50:07    Page 55
Case 3:21-cv-00538-N   Document 26-50   Filed 06/09/21   Page 60 of 191  PageID 16183

54

1  that have that.  They have debt which is owned by third

2  parties.  It's a good trade, in our opinion.  Our analysis was

3  it made sense to sell it within the context of the market.

4  The Equity has no decision as to whether we do that.  We're

5  the manager.

6      Mr. Wright's example and his offer is, frankly, silly.  If

7  those public funds want to indemnify the Debtor and CLOs for

8  any potential losses, that would be great, we can do that, we

9  can talk about that, how to arrange that.

10     As to the pot plan, nobody has worked harder on the pot

11  plan -- and I include Mr. Dondero -- than I have.  Nobody.  I

12  didn't do it because I was trying to help Mr. Dondero.  I

13  thought it would be in the best interest of the estate, which

14  means the creditors, the employees, and the investors whose

15  funds we manage, to try to get a consensual deal done.  So

16  far, we've been unable to do that.  In my declaration, there's

17  a footnote.  Not only did I help work on the idea, I actually

18  drafted the term sheet.  (inaudible) to do it, I presented it

19  to the Creditors' Committee.  Not that I wanted to do it.  I

20  thought they should do it.  I did it.  No one has worked

21  harder for that.

22     The employees, unbelievably frustrated to hear that.  Mr.

23  Dondero put this company into bankruptcy.  Our management of

24  this estate has required that we fight with a lot of folks

25  about keeping the team together.  Again, we did it, not so

013241

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 56
Case 3:21-cv-00538-N Document 26-50 Filed 06/09/21 Page 61 of 191 PageID 16184

55

1  much for the individual team members, but we thought that

2  would be the best way to enhance value for the estate and it

3  would encourage an alternative plan that could be value-

4  maximizing.

5      The employees have deferred compensation.  That was all

6  set up by Mr. Dondero.  The money that was taken out and used

7  in this -- by this company for other things rather than paying

8  employees cash on a regular basis was used by Mr. Dondero well

9  before I ever came into this case.  If there are repercussions

10 to employees because we are liquidating this entity or

11 monetizing these assets, and because we have to do it through

12 this vehicle, Mr. Dondero can stay in the mirror and not

13 abort.  It's very insulting and frustrating to hear that from

14 counsel, who doesn't understand a thing about what we've done

15 to try to keep the business together.

16     The CLO part of the business, we'd like to assign.  We

17 would like to assign as many of the employees over to help

18 manage the business and have those go to Mr. Dondero's

19 entities.  And that's fine with us.  You know, that is a

20 concrete benefit to him, because it's also beneficial to the

21 estate.  We're not in the anger business.  We are independent.

22 The only thing that makes us angry is that when somebody just

23 makes up noise, not facts, just statements that have no basis

24 in reality of what's happened in this case, when we're trying

25 to hold it together and come to a conclusion.

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 57
Case 3:21-cv-00538-N   Document 26-50   Filed 06/09/21   Page 62 of 191   PageID 16185

56

1      Sorry if I sound frustrated, Your Honor, because I really

2   am, and I thought you should see that going forward before we

3   go into next week.  If the NexPoint entities want the CLOs,

4   let's just work on that transfer.  We have Mr. Bain and his

5   clients.  They are very good.  They are CLO specialists.  His

6   co-counsel at Schulte is renowned in this space.  We will work

7   through it and make sure it works for the Issuers, make sure

8   it works for NexPoint, and of course make sure it works for

9   the estate.

10      Thank you, Your Honor.

11          THE COURT:  All right.  Mr. Seery, I really

12   appreciate these comments.  They've been very helpful to my

13   thinking.  In fact, I want to make sure it's under oath in

14   case I ever want to take judicial notice of anything you've

15   said just now.  Do you solemnly swear or affirm that the

16   statements you made were true and correct today, so help you

17   God?

18          MR. SEERY:  I do, Your Honor.

19          THE COURT:  All right.

20          MR. SEERY:  And just to be clear, if I ever make a

21   statement to the Court, I consider it under oath.

22          THE COURT:  Okay.  Thank you.  I appreciate that.

23      All right.  So, again, I feel like that was so very

24   helpful.  And, you know, this is a precise example of why I am

25   directing, if Mr. Dondero is going to urge a position with the

013243

Case 19-34054-sgj11 Doc 1822-146 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 58
Case 3:21-cv-00538-N Document 26-50 Filed 06/09/21 Page 63 of 191 PageID 16186

57

1   Court next Wednesday, he needs to testify. And if NexPoint,

2   through whoever their decision-maker is, is wanting to urge a

3   position to the Court, they need a human being to testify.

4   And I'll hear Seery and I'll hear Dondero and I'll hear

5   whoever that person is, and that's what's going to matter, you

6   know, most to me. Yeah, we have some legal issues, certainly,

7   but I like to hear business people explain things, no offense

8   to the lawyers. But it's always very helpful to hear the

9   business people in addition to the lawyers. All right. So,

10  Mr. Morris, you're going to upload that TRO for me.

11              MR. MORRIS: Yes, Your Honor.

12              THE COURT: Mr. Wright, you can upload your order

13  setting your motion for hearing next Wednesday at 1:30. And I

14  think we have our game plan for now. Anything else? All

15  right. We're adjourned.

16              THE CLERK: All rise.

17      (Proceedings concluded at 11:33 a.m.)

18                          --oOo--

19

20                          CERTIFICATE

21      I certify that the foregoing is a correct transcript to
    the best of my ability from the electronic sound recording of
22  the proceedings in the above-entitled matter.

23   **/s/ Kathy Rehling**                        **12/11/2020**

24  _____        _____

25  Kathy Rehling, CETD-444                        Date
    Certified Electronic Court Transcriber

INDEX

PROCEEDINGS                                                    3

WITNESSES

-none-

EXHIBITS

Debtor's Exhibits                              Received 14

RULINGS                                        21/36/39/48

END OF PROCEEDINGS                                           57

INDEX                                                       58

013245

# EXHIBIT VVVVVV

013246

Claim #184  Date Filed: 5/26/2020

**Fill in this information to identify the case:**

Debtor ___Highland Capital Management, L.P.___

United States Bankruptcy Court for the: ___Northern___ District of ___Texas___
(State)

Case number ___19-34054___

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) **that you received.**

| Part 1: | Identify the Claim |
| --- | --- |

| | | |
| --- | --- | --- |
| 1. | **Who is the current creditor?** | Isaac D. Leventon<br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor _____ |
| 2. | **Has this claim been acquired from someone else?** | ☑ No<br>☐ Yes.  From whom? _____ |

3. **Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
| --- | --- |
| Isaac D. Leventon<br>c/o David Neier, Winston Strawn LLP<br>200 Park Avenue<br>New York, NY 10166 | Isaac D. Leventon<br>409 Pleasant Valley Lane<br>Richardson, TX 75080 |
| Contact phone ___21229467005391___ | Contact phone _____ |
| Contact email ___dneier@winston.com___ | Contact email ___ILeventon@HighlandCapital.com___ |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

| | | |
| --- | --- | --- |
| 4. | **Does this claim amend one already filed?** | ☑ No<br>☐ Yes.  Claim number on court claims registry (if known) _____   Filed on _____<br>MM  /  DD  /  YYYY |
| 5. | **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No<br>☐ Yes. Who made the earlier filing? _____ |

19340542005260000000000007

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6.** **Do you have any number you use to identify the debtor?**
☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

**7.** **How much is the claim?**   $ _not less than 1,342,379.68_ . **Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8.** **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

_Employment - see attached_

**9.** **Is all or part of the claim secured?**
☑ No

☐ Yes.  The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**                    $_____
**Amount of the claim that is secured:**    $_____
**Amount of the claim that is unsecured:**  $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**   $_____

**Annual Interest Rate** (when case was filed)_____%
☐ Fixed
☐ Variable

**10.** **Is this claim based on a lease?**
☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**   $_____

**11.** **Is this claim subject to a right of setoff?**
☑ No

☐ Yes. Identify the property: _____

Official Form 410                    **Proof of Claim**

1934054200526000000000007

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ No<br>☑ Yes**.** *Check all that apply:* | | **Amount entitled to priority** |
|---|---|---|---|
| | | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | | ☑ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ 13,650.00 |
| | | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |
| | | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |

| 13. **Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No<br><br>☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.<br><br>$_____ |
|---|---|

---

| **Part 3:** | **Sign Below** |
|---|---|

| **The person completing this proof of claim must sign and date it. FRBP 9011(b).**<br><br>If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.<br><br>**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | *Check the appropriate box:*<br><br>☑ I am the creditor.<br><br>☐ I am the creditor's attorney or authorized agent.<br><br>☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br><br>☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct.<br><br>Executed on date  05/26/2020<br>　　　　　　　　 MM / DD / YYYY<br><br><br>/s/Isaac D. Leventon<br>　　　Signature<br><br>Print the name of the person who is completing and signing this claim:<br><br>Name  Isaac D. Leventon<br>　　　　First name　　　　　　Middle name　　　　　　Last name<br><br>Title  _____<br><br>Company  _____<br>　　　　Identify the corporate servicer as the company if the authorized agent is a servicer.<br><br>Address<br><br><br><br>Contact phone  _____　　Email  _____ |

1934054200526000000000007

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** | |
| 19-34054 - Highland Capital Management, L.P. | |
| **District:** | |
| Northern District of Texas, Dallas Division | |

| | |
|---|---|
| **Creditor:** | **Has Supporting Documentation:** |
| Isaac D. Leventon | Yes, supporting documentation successfully uploaded |
| c/o David Neier, Winston Strawn LLP | **Related Document Statement:** |
| 200 Park Avenue | |
| | **Has Related Claim:** |
| New York, NY, 10166 | No |
| **Phone:** | **Related Claim Filed By:** |
| 21229467005391 | |
| **Phone 2:** | |
| | **Filing Party:** |
| **Fax:** | Creditor |
| 212-294-4700 | |
| **Email:** | |
| dneier@winston.com | |

| | |
|---|---|
| **Disbursement/Notice Parties:** | |
| Isaac D. Leventon | |
| 409 Pleasant Valley Lane | |
| Richardson, TX, 75080 | |
| **Phone:** | |
| **Phone 2:** | |
| **Fax:** | |
| **E-mail:** | |
| ILeventon@HighlandCapital.com | |
| **DISBURSEMENT ADDRESS** | |

| | |
|---|---|
| **Other Names Used with Debtor:** | **Amends Claim:** |
| | No |
| | **Acquired Claim:** |
| | No |
| **Basis of Claim:** | **Last 4 Digits:** | **Uniform Claim Identifier:** |
| Employment - see attached | No | |
| **Total Amount of Claim:** | **Includes Interest or Charges:** |
| not less than 1,342,379.68 | No |
| **Has Priority Claim:** | **Priority Under:** |
| Yes | 11 U.S.C. §507(a)(4): 13,650.00 |
| **Has Secured Claim:** | **Nature of Secured Amount:** |
| No | **Value of Property:** |
| **Amount of 503(b)(9):** | |
| No | **Annual Interest Rate:** |
| **Based on Lease:** | **Arrearage Amount:** |
| No | |
| | **Basis for Perfection:** |
| **Subject to Right of Setoff:** | |
| No | **Amount Unsecured:** |
| **Submitted By:** | |
| Isaac D. Leventon on 26-May-2020 11:59:12 a.m. Eastern Time | |
| **Title:** | |
| **Company:** | |

**Fill in this information to identify the case:**

Debtor 1 _____Highland Capital Management, L.P._____

Debtor 2 _____
(Spouse, if filing)

United States Bankruptcy Court for the: Northern District of Texas

Case number _____19-34054-SGJ-11_____

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. **Do not use this form to make a request for payment of an administrative expense.** Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

| Part 1: | Identify the Claim |
| --- | --- |

| | | |
| --- | --- | --- |
| 1. Who is the current creditor? | Isaac D. Leventon | |
| | Name of the current creditor (the person or entity to be paid for this claim) | |
| | Other names the creditor used with the debtor _____ | |
| 2. Has this claim been acquired from someone else? | ☑ No<br>☐ Yes. From whom? _____ | |
| 3. Where should notices and payments to the creditor be sent?<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?**<br><br>David Neier, Winston & Strawn LLP<br>Name<br><br>200 Park Avenue, 40th Floor<br>Number       Street<br><br>New York               NY        10166<br>City                  State          ZIP Code<br><br>Contact phone 212-294-5318<br><br>Contact email dneier@winston.com | **Where should payments to the creditor be sent?** (if different)<br><br>Isaac D. Leventon<br>Name<br><br>409 Pleasant Valley Lane<br>Number       Street<br><br>Richardson             TX        75080<br>City                  State          ZIP Code<br><br>Contact phone 972-628-4100<br><br>Contact email idleventon@gmail.com |
| | Uniform claim identifier for electronic payments in chapter 13 (if you use one):<br><br>__ __ __ __ __ __ — __ __ __ __ — __ __ __ __ — __ __ __ __ | |
| 4. Does this claim amend one already filed? | ☑ No<br>☐ Yes. Claim number on court claims registry (if known) _____ | Filed on _____<br>MM / DD / YYYY |
| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☑ No<br>☐ Yes. Who made the earlier filing? _____ | |

013251

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**  $_____1,342,379.68  **Does this amount include interest or other charges?**

NOT LESS THAN THE ABOVE AMOUNT, SEE ATTACHED

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Employment (see attached)

**9. Is all or part of the claim secured?**

☑ No  Except for setoff/reimbursement. See attached.

☐ Yes. The claim is secured by a lien on property.

Nature of property:

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: **SEE ATTACHED**

Basis for perfection: **SEE ATTACHED**

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property: $_____

Amount of the claim that is secured: $_____

Amount of the claim that is unsecured: $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition: $_____

Annual Interest Rate (when case was filed)_____%
☐ Fixed
☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

013252

| | |
|---|---|
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☐ No |
| | ☑ Yes. *Check one:* |

|  | **Amount entitled to priority** |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☑ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $         13,650.00 |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

---

| **Part 3:** | **Sign Below** |
|---|---|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    05/26/2020
                    MM / DD / YYYY

*Isaac Leventon*
Signature

Print the name of the person who is completing and signing this claim:

| Name | Isaac D. Leventon |
|---|---|
| | First name        Middle name        Last name |
| Title | _____ |
| Company | _____ |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 409 Pleasant Valley Lane |
| | Number        Street |
| | Richardson                    TX        75080 |
| | City                          State     ZIP Code |
| Contact phone | 972-628-4100        Email  idleventon@gmail.com |

---

Official Form 410                    Proof of Claim                    page 3

013253

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P.,[1] | § | Case No. 19-34054-SGJ-11 |
| | § | |
| Debtor. | § | |

## ATTACHMENT TO PROOF OF CLAIM

1.      Isaac Leventon ("Claimant") submits this attachment to his proof of claim (the "Claim") against Debtor Highland Capital Management, L.P. ("Highland" or the "Debtor") in the above-captioned Chapter 11 case (the "Case").

2.      On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware, commencing the Case, which was subsequently transferred to the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court").  On April 3, 2020, the Bankruptcy Court entered an order establishing May 26, 2020 at 5:00 p.m. (prevailing Central Time) as the deadline for the Debtor's employees to file claims against the Debtor that arose before the Petition Date.  *See* ECF No. 560.

Compensation.

3.      Claimant is an employee of the Debtor.  Claimant is owed compensation for his services, including, without limitation, (i) all salaries and wages; benefits; (ii) bonuses (including performance bonuses, retention bonuses, and similar awards), (iii) vacation and paid time off, and (iv) retirement contributions, pensions and deferred compensation.  The amount of the Claim for

---

[1] The Debtor's last four digits of its taxpayer identification code are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

013254

such compensation includes both liquidated and unliquidated amounts. Furthermore, such claims may be in the form of stock, including stock of entities other than the Debtor, or the cash equivalent thereof to be paid or caused to be paid by the Debtor to Claimant, including dividends that continue to accrue on such stock. Documents supporting this Claim contain personal confidential information of Claimant and, as more fully set forth below, shall be provided by counsel to Claimant under separate cover to counsel for the Debtor upon written request therefor.

4.      In addition to the foregoing, Claimant is entitled to reimbursement for travel and other business related expenses incurred in connection with performing any services to which the Claimant is entitled. Claimant has previously provided or will provide to the Debtor details with respect to the amount of reimbursement that is owed.

Indemnification.

5.      Claimant is an employee of the Debtor. Claimant is entitled to indemnification, including, without limitation, for all acts performed or omitted to be performed on behalf of or in connection with the Debtor's business. As part of the Claim for indemnification, Claimant is entitled to, among other things, contribution, reimbursement, advancement, or other payments, including for damages, costs, and expenses, related thereto. The Claim for indemnification includes both liquidated and unliquidated amounts, including, without limitation, attorneys' fees and expenses that continue to accrue. Among other things, the Claim for indemnification includes, but is not limited to, indemnification for all claims, liabilities, damages, losses, fees, expenses, and costs related to the following matters (the "Indemnified Matters"):

   a.   *Acis Capital Management, L.P., Acis Capital Management, GP, LLC, Reorganized Debtors v. James Dondero, Frank Waterhouse, Scott Ellington, Hunter Covitz, Isaac Leventon, Jean Paul Sevilla, Thomas Surgent, Grant Scott, Heather Bestwick, William Scott, and CLO Holdco, Ltd.*, Case No. 20-03060, pending in the Bankruptcy Court;

013255

b. *Acis Capital Management, L.P., Acis Capital Management, GP, LLC v. Gary T. Cruciani, Jamie R. Welton, Paul B. Lackey, Jean Paul Sevilla, Isaac D. Leventon, Thomas J. Surgent, Scott B. Ellington, McKool Smith, a professional corporation, and Lackey Hershman, L.L.P.*, Case No. DC-20-05534 pending in the 14th District Court of Dallas County, Texas; and

c. *Patrick Daugherty v. James Dondero, Highland ERA Management, LLC et al.,* C.A. No. 2019-0956 pending in the Court of Chancery of the State of Delaware.

6.      The Claim Amount in Part 2, Question 7 of Form 410 attached hereto does not include any amount of alleged damages claimed in the Indemnified Matters. Claimant reserves the right to amend, supplement, or modify the Claim to include alleged damages amounts.

7.      In addition to the foregoing, Claimant is entitled to the benefits of the Debtor's directors' and officers' insurance programs and any other insurance policies that provide coverage for Claimant.

8.      The Claim for indemnification is based on applicable law, the Debtor's organizational documents, contracts, agreements, arrangements, and corporate employee policies, including, without limitation, that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P. dated as of December 14, 2015 ("LPA") and to the Resolution of the Board of Directors of Strand Advisor, Inc. as General Partner of the Debtor, dated May 12, 2020 ("Resolution"). Pursuant to LPA §4.1(h) and the Resolution, Claimant is entitled to indemnification from the Debtor for all acts performed or omitted to be performed on behalf of or in connection with the Debtor's business.

9.      Documents supporting this Claim (i) are in the possession of the Debtor; (ii) are too voluminous attach hereto; and (iii) contain personal confidential information of the Claimant. The supporting documentation is available (subject to entry of appropriate confidentiality agreements and redaction of personal identification information to the extent necessary) upon written request to counsel for Claimant as set forth below.

013256

10.     Claimant reserves the right to amend, supplement or modify the Claim at any time. The Claim include amounts that continue to accrue, including interest as permitted by contract or law.

11.     Claimant reserves its rights to pursue claims (including but not limited to the claims described herein) against the Debtor based upon additional or alternative legal theories and reserves the right to file additional or other pleadings to assert any of the amounts set forth in this Claim or any amendments thereto, including, without limitation, any postpetition administrative expenses pursuant to the Bankruptcy Code, including sections 503 and 507 thereof, or other applicable non-bankruptcy law.

12.     This Claim is filed to preserve any and all claims, rights, and entitlements, including contingent claims, that the Claimant may have against the Debtor, and nothing herein should be construed as an admission that any valid claims or causes of action exist against Claimant.

13.     To the extent that the Debtor asserts claims against Claimant, Claimant reserves the right to assert that such claims are subject to rights of setoff and/or recoupment, whether or not arising under the transactions set forth in this Claim, which rights are treated as secured claims under the Bankruptcy Code, and state and federal laws of similar import as well as in equity.

14.     Claimant does not waive any of its rights to claim specific assets or any other rights or rights of action that Claimant has or may have against the Debtor, and Claimant expressly reserves such rights.  Claimant reserves all rights accruing to it against the Debtor, and the filing of this Claim is not intended to be, and shall not be construed as, an election of remedy or a waiver or limitation of any rights of any Claimant.

15.     The filing of this Claim is not and shall not be deemed or construed as:  (i) a waiver, release or limitation of Claimant's rights against any person, entity, or property; (ii) a waiver,

013257

release or limitation of Claimant's right to have any and all final orders in any and all non-core matters or proceedings entered only after de novo review by a United States District Court; (iii) a waiver of Claimant's right to move to withdraw the reference with respect to the subject matter of this Claim, any objection thereto and/or other proceeding which may be commenced in this case against or otherwise involving Claimant; or (iv) a consent by Claimant to the final determination or adjudication of any claim or right pursuant to 28 U.S.C. § 157(c).

16.     All matters concerning this Claim, including any request for supporting documentation or additional information regarding this Claim should be made in writing directed to the following counsel for Claimant:

WINSTON & STRAWN LLP
David Neier
dneier@winston.com
200 Park Avenue, 40th Floor
New York, NY 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700

013258

# EXHIBIT WWWWWW

Claim #182 Date Filed: 7/16/2020

**Fill in this information to identify the case:**

Debtor    Highland Capital Management, L.P.

United States Bankruptcy Court for the:   Northern    District of   Texas
                                                                        (State)

Case number    19-34054

Official Form 410

# Proof of Claim
                                                        04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) **that you received.**

## Part 1:   Identify the Claim

| | | |
|---|---|---|
| 1. **Who is the current creditor?** | Scott B. Ellington<br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor _____ | |
| 2. **Has this claim been acquired from someone else?** | ☑ No<br>☐ Yes.   From whom? _____ | |
| 3. **Where should notices and payments to the creditor be sent?**<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?**<br><br>Scott B. Ellington<br>c/o David Neier, Winston Strawn LLP<br>200 Park Avenue<br>New York, NY 10166, United States<br><br>Contact phone   2122946700x5391<br>Contact email   dneier@winston.com<br><br>Uniform claim identifier for electronic payments in chapter 13 (if you use one):<br><br>___ ___ ___ ___ — ___ ___ ___ ___ — ___ ___ ___ ___ — ___ ___ ___ ___ | **Where should payments to the creditor be sent?** (if different)<br><br>Scott B. Ellington<br>2525 No. Pearl Street<br>#1202<br>Dallas, TX 75201, United States<br><br>Contact phone   214-649-5475<br>Contact email   SEllington@HighlandCapital.com |
| 4. **Does this claim amend one already filed?** | ☐ No<br>☑ Yes.   Claim number on court claims registry (if known)   187 | Filed on   5/26/2020<br>         MM / DD / YYYY |
| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No<br>☐ Yes. Who made the earlier filing? _____ | |

1934054200716000000000001

**Part 2:    Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| 6. **Do you have any number you use to identify the debtor?** | ☑ No<br><br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___ |

| | |
|---|---|
| 7. **How much is the claim?** | $ <u>not less than 7,604,375.00</u> . **Does this amount include interest or other charges?**<br><br>☑ No<br><br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

| | |
|---|---|
| 8. **What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.<br><br>Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br><br>Limit disclosing information that is entitled to privacy, such as health care information.<br><br><u>Employment - see attached</u> |

| | |
|---|---|
| 9. **Is all or part of the claim secured?** | ☑ No<br><br>☐ Yes.  The claim is secured by a lien on property.<br><br>**Nature or property:**<br><br>☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*<br><br>☐ Motor vehicle<br><br>☐ Other. Describe: _____<br><br>**Basis for perfection:** _____<br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>**Value of property:**                 $_____<br>**Amount of the claim that is secured:**      $_____<br>**Amount of the claim that is unsecured:**    $_____(The sum of the secured and unsecured amount should match the amount in line 7.)<br><br>**Amount necessary to cure any default as of the date of the petition:**    $_____<br><br>**Annual Interest Rate** (when case was filed)_____%<br>☐ Fixed<br>☐ Variable |

| | |
|---|---|
| 10. **Is this claim based on a lease?** | ☑ No<br><br>☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $_____ |

| | |
|---|---|
| 11. **Is this claim subject to a right of setoff?** | ☑ No<br><br>☐ Yes. Identify the property: _____ |

1934054200716000000000001

| 12. | **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | | | **Amount entitled to priority** |
|---|---|---|---|---|
| | A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ No | | |
| | | ☑ Yes. *Check all that apply:* | | |
| | | ☐ | Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | | ☐ | Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | | ☑ | Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ 13,650.00 |
| | | ☐ | Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | | ☐ | Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | | ☐ | Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |
| | | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | | |

| 13. | **Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No |
|---|---|---|
| | | ☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim. |
| | | $_____ |

---

| **Part 3:** | **Sign Below** |
|---|---|

| **The person completing this proof of claim must sign and date it. FRBP 9011(b).** | *Check the appropriate box:* |
|---|---|
| If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is. | ☑ I am the creditor. |
| | ☐ I am the creditor's attorney or authorized agent. |
| | ☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004. |
| | ☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005. |
| **A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt. |
| | I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct. |
| | I declare under penalty of perjury that the foregoing is true and correct. |
| | Executed on date   07/16/2020 |
| | MM  /  DD  /  YYYY |
| | |
| | /s/Scott B. Ellington |
| | Signature |
| | **Print the name of the person who is completing and signing this claim:** |
| | Name   Scott B. Ellington |
| | First name        Middle name        Last name |
| | Title _____ |
| | Company _____ |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| | Address |
| | Contact phone _____    Email _____ |

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** | |
| 19-34054 - Highland Capital Management, L.P. | |
| **District:** | |
| Northern District of Texas, Dallas Division | |

| | |
|---|---|
| **Creditor:** | **Has Supporting Documentation:** |
| Scott B. Ellington | Yes, supporting documentation successfully uploaded |
| c/o David Neier, Winston Strawn LLP | **Related Document Statement:** |
| 200 Park Avenue | |
| | **Has Related Claim:** |
| New York, NY, 10166 | No |
| United States | **Related Claim Filed By:** |
| **Phone:** | |
| 2122946700x5391 | |
| **Phone 2:** | **Filing Party:** |
| | Creditor |
| **Fax:** | |
| 212-294-4700 | |
| **Email:** | |
| dneier@winston.com | |

| | |
|---|---|
| **Disbursement/Notice Parties:** | |
| Scott B. Ellington | |
| 2525 No. Pearl Street | |
| #1202 | |
| Dallas, TX, 75201 | |
| United States | |
| **Phone:** | |
| 214-649-5475 | |
| **Phone 2:** | |
| **Fax:** | |
| n/a | |
| **E-mail:** | |
| SEllington@HighlandCapital.com | |
| **DISBURSEMENT ADDRESS** | |

| | |
|---|---|
| **Other Names Used with Debtor:** | **Amends Claim:** |
| | Yes - 187, 5/26/2020 |
| | **Acquired Claim:** |
| | No |
| **Basis of Claim:** | **Last 4 Digits:** **Uniform Claim Identifier:** |
| Employment - see attached | No |
| **Total Amount of Claim:** | **Includes Interest or Charges:** |
| not less than 7,604,375.00 | No |
| **Has Priority Claim:** | **Priority Under:** |
| Yes | 11 U.S.C. §507(a)(4): 13,650.00 |
| **Has Secured Claim:** | **Nature of Secured Amount:** |
| No | **Value of Property:** |
| **Amount of 503(b)(9):** | **Annual Interest Rate:** |
| No | |
| **Based on Lease:** | **Arrearage Amount:** |
| No | |
| **Subject to Right of Setoff:** | **Basis for Perfection:** |
| No | **Amount Unsecured:** |
| **Submitted By:** | |
| Scott B. Ellington on 16-Jul-2020 7:14:21 a.m. Eastern Time | |
| **Title:** | |
| **Company:** | |

VN: B255C54F0F6A0DC0DFDCEBAE70DABC65

013263

**Fill in this information to identify the case:**

Debtor 1 ___Highland Capital Management, L.P.___

Debtor 2 _____
(Spouse, if filing)

United States Bankruptcy Court for the: Northern District of Texas

Case number ___19-34054-SGJ-11___

---

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. **Do not use this form to make a request for payment of an administrative expense.** Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309)** that you received.

---

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Scott B. Ellington
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| David Neier, Winston & Strawn LLP | Scott B. Ellington |
| Name | Name |
| 200 Park Avenue, 40th Floor | 2525 N. Pearl Street, #1202 |
| Number  Street | Number  Street |
| New York  NY  10166 | Dallas  TX  75201 |
| City  State  ZIP Code | City  State  ZIP Code |
| Contact phone 212-294-5318 | Contact phone 214-649-5475 |
| Contact email dneier@winston.com | Contact email sellington@highlandcapital.com |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ — __ __ __ __ — __ __ __ __ — __ __ __ __

**4. Does this claim amend one already filed?**

☐ No
☑ Yes. Claim number on court claims registry (if known) _187_

Filed on _05/26/2020_
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

---

**Proof of Claim**

013264

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

---

**7. How much is the claim?**  $ _____ 7,604,375.00  **Does this amount include interest or other charges?**

NOT LESS THAN THE ABOVE AMOUNT, SEE ATTACHED

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

---

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Employment (see attached)

---

**9. Is all or part of the claim secured?**

☑ No  Except for setoff/reimbursement. See attached.

☐ Yes.  The claim is secured by a lien on property.

Nature of property:

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe:  **SEE ATTACHED**

Basis for perfection:  **SEE ATTACHED**

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property:  $ _____

Amount of the claim that is secured:  $ _____

Amount of the claim that is unsecured:  $ _____  (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition:  $ _____

Annual Interest Rate (when case was filed) _____ %

☐ Fixed

☐ Variable

---

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**  $ _____

---

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

---

013265

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? <br><br> A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ No <br> ☑ Yes. *Check one:* | **Amount entitled to priority** |
|---|---|---|
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ _____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ _____ |
| | ☑ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ 13,650.00 |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ _____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ _____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $ _____ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |

**Part 3:  Sign Below**

| The person completing this proof of claim must sign and date it. FRBP 9011(b). <br><br> If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is. <br><br> **A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | *Check the appropriate box:* <br><br> ☑ I am the creditor. <br> ☐ I am the creditor's attorney or authorized agent. <br> ☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004. <br> ☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005. <br><br> I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt. <br><br> I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct. <br><br> I declare under penalty of perjury that the foregoing is true and correct. <br><br> Executed on date  07/15/2020 <br>             MM / DD / YYYY <br><br> _____ <br> Signature <br><br> **Print the name of the person who is completing and signing this claim:** <br><br> Name    Scott B. Ellington <br>         First name       Middle name       Last name <br><br> Title    _____ <br><br> Company    _____ <br>         Identify the corporate servicer as the company if the authorized agent is a servicer. <br><br> Address    2525 N. Pearl Street, #1202 <br>         Number     Street <br>         Parker                   TX      75201 <br>         City                     State     ZIP Code <br><br> Contact phone    214-649-5475        Email  sellington@highlandcapital.com |

013266

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P.,[1] | § | Case No. 19-34054-SGJ-11 |
| | § | |
| Debtor. | § | |

## ATTACHMENT TO AMENDED PROOF OF CLAIM

1.      Scott Ellington ("Claimant") submits this attachment to his amended proof of claim (the "Claim") against Debtor Highland Capital Management, L.P. ("Highland" or the "Debtor") in the above-captioned Chapter 11 case (the "Case").

2.      On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware, commencing the Case, which was subsequently transferred to the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court").  On April 3, 2020, the Bankruptcy Court entered an order establishing May 26, 2020 at 5:00 p.m. (prevailing Central Time) as the deadline for the Debtor's employees to file claims against the Debtor that arose before the Petition Date.  *See* ECF No. 560.

Compensation.

3.      Claimant is an employee of the Debtor.  Claimant is owed compensation for his services, including, without limitation, (i) all salaries and wages; benefits; (ii) bonuses (including performance bonuses, retention bonuses, and similar awards), (iii) vacation and paid time off, and (iv) retirement contributions, pensions and deferred compensation.  The amount of the Claim for

---

[1] The Debtor's last four digits of its taxpayer identification code are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

013267

such compensation includes both liquidated and unliquidated amounts. Furthermore, such claims may be in the form of stock, including stock of entities other than the Debtor, or the cash equivalent thereof to be paid or caused to be paid by the Debtor to Claimant, including dividends that continue to accrue on such stock. Additionally, Claimant's Form 410, Part 2, Question 7 has now been amended to include the estimated value of 5% equity in HCRE Partners, LLC n/k/a NexPoint Real Estate Partners, LLC ("HCRE") or the cash equivalent of the distributions payable therefrom, as awarded to Claimant by the Debtor in compensation. Documents supporting this Claim contain personal confidential information of Claimant and, as more fully set forth below, shall be provided by counsel to Claimant under separate cover to counsel for the Debtor upon written request therefor.

4.       In addition to the foregoing, Claimant is entitled to reimbursement for travel and other business related expenses incurred in connection with performing any services to which the Claimant is entitled. Claimant has previously provided or will provide to the Debtor details with respect to the amount of reimbursement that is owed.

5.       Finally, Claimant is party to that certain Employment Agreement dated June 1, 2008 by and between the Debtor and Claimant ("Employment Agreement"). Claimant is entitled to any and all amounts under the Employment Agreement, including, but not limited to, any amounts payable under Employment Agreement Article IV.

Indemnification.

6.       Claimant is an employee of the Debtor. Claimant is entitled to indemnification, including, without limitation, for all acts performed or omitted to be performed on behalf of or in connection with the Debtor's business. As part of the Claim for indemnification, Claimant is entitled to, among other things, contribution, reimbursement, advancement, or other payments,

013268

including for damages, costs, and expenses, related thereto. The Claim for indemnification

includes both liquidated and unliquidated amounts, including, without limitation, attorneys' fees

and expenses that continue to accrue. Among other things, the Claim for indemnification includes,

but is not limited to, indemnification for all claims, liabilities, damages, losses, fees, expenses, and

costs related to the following matters (the "Indemnified Matters"):

     a.   *Acis Capital Management, L.P., Acis Capital Management, GP, LLC, Reorganized Debtors v. James Dondero, Frank Waterhouse, Scott Ellington, Hunter Covitz, Isaac Leventon, Jean Paul Sevilla, Thomas Surgent, Grant Scott, Heather Bestwick, William Scott, and CLO Holdco, Ltd.*, Case No. 20-03060, pending in the Bankruptcy Court;

     b.   *Acis Capital Management, L.P., Acis Capital Management, GP, LLC v. Highland Capital Management, L.P. Highland CLO Funding, Ltd., William Scott, Heather Bestwick, J.P. Sevilla, Scott Ellington, and James Dondero*, Case Nos. 18-302624 and 18-30265, which have been administratively consolidated and are pending in the Bankruptcy Court;

     c.   *Acis Capital Management, L.P., Acis Capital Management, GP, LLC v. Gary T. Cruciani, Jamie R. Welton, Paul B. Lackey, Jean Paul Sevilla, Isaac D. Leventon, Thomas J. Surgent, Scott B. Ellington, McKool Smith, a professional corporation, and Lackey Hershman, L.L.P.*, Case No. DC-20-05534 pending in the 14th District Court of Dallas County, Texas; and

     d.   *Patrick Daugherty v. James Dondero, Highland ERA Management, LLC et al.*, C.A. No. 2019-0956 pending in the Court of Chancery of the State of Delaware.

7.     The Claim Amount in Part 2, Question 7 of Form 410 attached hereto does not

include any amount of alleged damages claimed in the Indemnified Matters. Claimant reserves

the right to amend, supplement, or modify the Claim to include alleged damages amounts.

8.     In addition to the foregoing, Claimant is entitled to the benefits of the Debtor's

directors' and officers' insurance programs and any other insurance policies that provide coverage

for Claimant.

9.     The Claim for indemnification is based on applicable law, the Debtor's

organizational documents, contracts, agreements, arrangements, and corporate employee policies,

013269

including, without limitation, that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P. dated as of December 14, 2015 ("LPA") and to the Resolution of the Board of Directors of Strand Advisor, Inc. as General Partner of the Debtor, dated May 12, 2020 ("Resolution"). Pursuant to LPA §4.1(h) and the Resolution, Claimant is entitled to indemnification from the Debtor for all acts performed or omitted to be performed on behalf of or in connection with the Debtor's business.

10.     Documents supporting this Claim (i) are in the possession of the Debtor; (ii) are too voluminous attach hereto; and (iii) contain personal confidential information of the Claimant. The supporting documentation is available (subject to entry of appropriate confidentiality agreements and redaction of personal identification information to the extent necessary) upon written request to counsel for Claimant as set forth below.

11.     Claimant reserves the right to amend, supplement or modify the Claim at any time. The Claim include amounts that continue to accrue, including interest as permitted by contract or law.

12.     Claimant reserves its rights to pursue claims (including but not limited to the claims described herein) against the Debtor based upon additional or alternative legal theories and reserves the right to file additional or other pleadings to assert any of the amounts set forth in this Claim or any amendments thereto, including, without limitation, any postpetition administrative expenses pursuant to the Bankruptcy Code, including sections 503 and 507 thereof, or other applicable non-bankruptcy law.

13.     This Claim is filed to preserve any and all claims, rights, and entitlements, including contingent claims, that the Claimant may have against the Debtor, and nothing herein should be construed as an admission that any valid claims or causes of action exist against Claimant.

013270

14.     To the extent that the Debtor asserts claims against Claimant, Claimant reserves the right to assert that such claims are subject to rights of setoff and/or recoupment, whether or not arising under the transactions set forth in this Claim, which rights are treated as secured claims under the Bankruptcy Code, and state and federal laws of similar import as well as in equity.

15.     Claimant does not waive any of its rights to claim specific assets or any other rights or rights of action that Claimant has or may have against the Debtor, and Claimant expressly reserves such rights.  Claimant reserves all rights accruing to it against the Debtor, and the filing of this Claim is not intended to be, and shall not be construed as, an election of remedy or a waiver or limitation of any rights of any Claimant.

16.     The filing of this Claim is not and shall not be deemed or construed as:  (i) a waiver, release or limitation of Claimant's rights against any person, entity, or property; (ii) a waiver, release or limitation of Claimant's right to have any and all final orders in any and all non-core matters or proceedings entered only after de novo review by a United States District Court; (iii) a waiver of Claimant's right to move to withdraw the reference with respect to the subject matter of this Claim, any objection thereto and/or other proceeding which may be commenced in this case against or otherwise involving Claimant; or (iv) a consent by Claimant to the final determination or adjudication of any claim or right pursuant to 28 U.S.C. § 157(c).

17.     All matters concerning this Claim, including any request for supporting documentation or additional information regarding this Claim should be made in writing directed to the following counsel for Claimant:

013271

WINSTON & STRAWN LLP
David Neier
dneier@winston.com
200 Park Avenue, 40th Floor
New York, NY 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700

013272

# EXHIBIT XXXXXX

013273

Case 19-34054-sgj11 Doc 1822-149 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 2 of
Case 19-34054-sgj11 Doc 1844-2 Filed 12/27/19 Entered 12/27/19 21:33:05 Page 0 of 19
Case 3:21-cv-00538-N   Document 26-50   Filed 06/09/21   Page 93 of 191   PageID 16216

November 2019

**James P. Seery, Jr.**

New York, NY



 James P. Seery, Jr. is a high yield and distressed investing professional who was most recently a Senior Managing Director and co-Head of Credit at Guggenheim Securities LLC, where he is responsible for helping direct the development of a leveraged finance and credit distribution business.  Prior to joining Guggenheim, Mr. Seery was the President and a senior investing partner of River Birch Capital, LLC, a $1.3bn global credit fund manager.  In that role, he developed and led many of the firm's most profitable credit investments.  Mr. Seery is a licensed attorney and was formerly a partner and co-Head of the Sidley Austin LLP New York Corporate Reorganization and Bankruptcy Group, and he also recently served as a Commissioner on The American Bankruptcy Institute's Commission to Study the Reform of Chapter 11.

Before his joining Sidley Austin, Mr. Seery was a Managing Director and the Global Head of Lehman Brothers' Fixed Income Loan business. In that position, he was responsible for managing the Lehman Brothers' Fixed Income investment grade and high yield loan businesses, including underwriting commitments, distribution, hedging, trading and sales (including CLO manager relationships), portfolio management, and restructuring. Mr. Seery was also a member of the Lehman Brothers' Fixed Income Operating Committee and Global Credit Products Operating Committee as well as the High Yield Commitment and New Business Committees.  From 2000 to 2004, Mr. Seery ran Lehman Brothers' restructuring and workout businesses with responsibility for management of distressed corporate debt investments, and in 2008 he was a key member of the small team that successfully sold Lehman to Barclays.

Mr. Seery was selected as one of the Top Restructuring Lawyers in the U.S. Under 40 by *Turnarounds and Workouts* in 1999. Mr. Seery graduated in 1990 from New York Law School, *magna cum laude*, where he was an editor of the Law Review and Colgate University in 1984. He was a member of the Board of Directors of the Loan Syndications and Trading Association from 2006 to 2008 and a member of the INSOL International Lenders Group from 2016-2017.

013274

# JAMES P. SEERY, JR.

795 Columbus Ave., 12A
New York, New York 10025
631-804-2049 · jpseeryjr@gmail.com

## Experience

**Guggenheim Securities LLC,** New York, New York                    Aug. 2017-Nov. 2019
Senior Managing Director, Co-Head Credit
- Responsible for developing leveraged finance and credit portfolio advisory businesses
- Management of teams of leveraged finance bankers and trading and sales professionals

**River Birch Capital, LLC**, New York, New York                    April 2012-July 2017
President, River Birch Capital, LLC
- President and senior investing partner at New York based $1.3bn global long-short credit fund focused on corporate credit from investment grade to distressed
- Responsible for originating, executing and managing stressed and distressed credit investments with a team of 6 investing partners and 5 analysts and traders
- Led finance and operations team with CFO/CCO; firm grew from approx. $200mm in 2012 to $1.3bn in 2017

**Sidley Austin LLP**, New York, New York                    May 2009-April 2012
Co-head New York Corporate and Reorganization Group
- Built and managed a creditor focused restructuring group as part of an international company side practice in a nearly 2000 attorney firm
- Represented banks, corporations, hedge funds, and structured investment vehicles in a variety of restructuring, financing and litigation matters

**Lehman Brothers**, New York, New York                    April 1999-May 2009
Global Head Fixed Income Loans
- Managing Director responsible for managing the global fixed income loan business, including investment grade and high yield commitments, global distribution, hedging, trading and sales, CLO origination, portfolio management, and restructuring; managed underwritten loan commitments and teams of credit sales and trading professionals as well as structuring, portfolio management and work-out specialists
- Member Fixed Income Operating Committee, Global Credit Products Operating Committee, and High Yield Commitment and New Business Committees
- Responsible for originating, structuring and managing proprietary distressed debt investments, rescue financings, and restructurings 1999-2004
- Key member of team that negotiated and completed the sale of Lehman Brothers to Barclays Sept. 2008; remained at Barclays through April 2009

**Phillips Nizer**, Garden City, New York                    May 1995-April 1999
- Senior Associate in corporate reorganization group of boutique New York City law firm

**Cadwalader, Wickersham & Taft**, New York, New York                    May 1989-May 1995
- Associate in corporate reorganization group of New York City based international law firm

## Education

New York Law School, New York, New York, J.D., *magna cum laude*, Editor Law Review          1990
Colgate University, Hamilton, New York, B.A. History                    1984

**Experience**

| | |
|---|---|
| Director, River Birch International, Ltd. Board | 2015-2017 |
| Director, Camphill Foundation Board | 2017-2019 |
| Member, INSOL International Lenders Group Board | 2016-2017 |
| Commissioner, ABI Commission to Study Reform of Ch. 11 | 2012-2015 |
| Director, Loan Syndications and Trading Association | 2006-2008 |

**Selected River Birch Sample Investments**

Cash America International *5.75% Senior Unsecured Notes due 2018 and Litigation Claim – Developed and led execution of successful note purchase and make-whole litigation strategy based on company's improper spin of payday lending business; U.S. District Court published decision in note holders' favor led to settlement*

Chesapeake Energy Corp *6.775% Senior Notes due 2019 Litigation Claims – Developed and led execution of successful note purchase and make-whole litigation strategy based on company's improper call of notes; ultimately prevailed in $450mm judgment discussed in published Second Circuit and U.S. District Court decisions*

Caesars Entertainment Resort Properties *8% 1st Lien Notes due 2020; 11% 2d Lien Notes due 2021 – Developed and led (with senior investment analyst partner) execution of successful bankruptcy investment strategy focused on lower beta part of the capital structure of bankrupt casino operator; investment designed for high return with significant downside protection*

Intelsat Jackson Holdings *9.5% Senior Secured Notes due 2022 – Developed and led (with senior investment analyst partner) execution of successful new issue stressed secured note investment strategy; responsible for structuring and tightening covenant package and increasing size of offering after determining that potential litigation threat was low risk; responsible for recommending ICF 12.5% note investment in the low 80s in February 2018*

Motors Liquidation Company *GUC Trust Publicly Traded Units – Developed and led successful investment strategy in publicly traded bankruptcy liquidation units (GM); took the opposite side of sell-side analyst recommendations and engineered a successful settlement in high return/low downside position*

Hypo Alpe Adria Bank (Hetar) *Senior Guaranteed Notes – Developed and led (with senior investment analyst partner) execution of successful investment strategy in insolvent Austrian bank with notes guaranteed by an Austrian State*

Presidio Inc. *10.25% Senior Notes due 2023 – Developed and led execution of successful investment strategy to purchase newly developed mezzanine part of the capital structure on struggling new issue deal; ultimately sponsor purchased the mezzanine but aggressive structuring and bidding for the mezzanine tranche led to outsized allocation of new notes*

Nortel Networks Ltd. *6.875% Senior Notes due 2023 – Developed and led (with senior investment analyst partner) execution of bankruptcy liquidation strategy based on litigation and ultimate leverage of Canadian liquidating estate*

Case 19-34054-sgj11 Doc 1822-2 Filed 01/23/21 Entered 01/23/21 23:50:07 Page 5 of 19
Case 19-34054-sgj11 Doc 1841-2 Filed 12/27/23 Entered 12/27/23 23:05:07 Page 4 of 9
Case 3:21-cv-00538-N   Document 26-50   Filed 06/09/21   Page 96 of 191   PageID 16219

**Selected Speaking Engagements**

American Law Institute/ NYU Law – Credit Markets and Corporate Reorganization, New York City, April 2017
Moderator, *Auctions and Asset Sales In and Out of Bankruptcy*

University of Texas Law/American Bankruptcy Institute -- Emerging Valuation Issues in Bankruptcy, Las Vegas, March 2017
Panelist, *Determining Valuation and the Fulcrum Security*
Panelist, *Distressed Investments Strategies*

NYU Law – Claim Priority Roundtable, New York City, September 2016
Panelist, *Allocating Value in and Out of Bankruptcy*

University of Texas Law/ABI – Emerging Valuation Issues in Bankruptcy, Las Vegas, March 2016
Panelist, *ABI Commission Report Proposed Amendments and Their Impact on Valuation*

The M&A Advisor – Distressed Investing Summit, Palm Beach, January 2016
Panelist, *Using Options to Bridge Value Gaps*

NYU Law – Seligman Bankruptcy and Business Reorganization Workshop, New York City, September 2015
Panelist, *Valuation Approaches and Methodologies*

Skadden Arps/Colgate University – Law and Finance Summit, New York City, November 2014
Presenter, *Recent Developments in Bankruptcy and Distressed Debt*

# EXHIBIT YYYYYY

**Dubel & Associates, L.L.C.**

# John S. Dubel
# Board of Directors Experience

- **Purdue Pharma Inc. – July 2019 to Present** - Independent Board Member and Chair of the Special Committee of Directors

    In addition to being a member of the Board of Directors of Purdue Pharma Inc., I am the Chair of the Special Committee of Independent Directors charged with overseeing the investigation of relationships between Purdue and Purdue owners, the Sackler family.

- **WMC Mortgage, LLC – Indirect Subsidiary GE – July 2018 to December 2019** - Independent Board Member and Chair of the Special Independent Committee of Directors

    WMC's chapter 11 plan was recently confirmed and WMC will emerge from Chapter 11 in early December 2019. I am the Chair of the Special Independent Committee of Independent Directors for this indirect subsidiary of GE. The Special Committee was tasked with reviewing the relationship between the insolvent WMC and GE and resolving its insolvency issues through a court supervised chapter 11 proceeding. I was the lead person responsible for negotiations with the parent concerning the level of support that the parent was required to provide and worked with our creditors to negotiate a resolution amongst all parties.

- **Werner Co.** – January 2013 to Present – Sole Independent Director

    Werner is a global leader in access equipment, secure storage, light duty construction and fall protection products with operations across all geographies. A consortium of private equity investors bought the assets out of a bankruptcy proceeding in 2007. I was asked to serve on the Board as the sole Independent Director by the largest shareholder. Werner more than doubled the size of its business, diversified its product offering and substantially improved its EBITDA prior to its sale in July 2017. As an independent director, working with one other director, we lead the effort in the sale process that achieved an additional $180 million increase in the sale price of the company for its distressed investors. I am currently the lead director responsible for the resolution of post-sale purchase price adjustments.

- **Old PSG f/k/a Performance Sports Group** – August 2017 to December 2017

    Asked to serve on the Board, by the Official Equity Committee, after the sale of Performance Sports Group's assets. My role was to oversee the plan of reorganization process to drive to a smooth confirmation.

013279

**Dubel & Associates, L.L.C.**

- **FXI Holdings** – September 2010 to October 2017 – Independent Director

  FXI is a leading producer of engineered polyurethane foam solutions serving the largest customers in the largest markets. It has the broadest customer and consumer reach of any North American foam producer. FXI's assets where purchased during a bankruptcy proceeding in 2009. I was asked to serve on the board of directors by one of the two private equity firms that owned FXI. Shortly after joining the Board, I was asked to Chair a Special Committee of the Board to manage certain litigation and government investigations related to alleged anti-trust infractions. FXI was the subject of over 50 different class action and individual litigations alleging damages in excess of $3 billion. Over a period of several years, FXI was able to settle all of its litigation for a minor fraction of the alleged damages and all investigations by the government were dropped. During this time, the company's performance improved in a consistent manner with EBITDA more than doubling. Once these litigations were settled, the company was marketed and ultimately sold in October 2017.

- **ResCap Liquidating Trust** – December 2013 to March 2017 – Chairman of the Board - December 2013 to late 2015

  After the ResCap chapter 11 plan was confirmed, I served on the Board of the ResCap Liquidating Trust, as FGIC's representative, to guide the wind down of the remaining assets and prosecute claims in excess of $4 billion against institutions that caused harm to ResCap. During this time, I also served as Liquidating Trustee while we brought on board a new in-house lawyer to prosecute these claims and transitioned this individual into the permanent Liquidating Trustee role.

- **FGIC Corporation and FGIC** - December 2008 to April 2014 – Chairman of the Board during various parts of that time frame – while serving as CEO

- **Barneys New York** – February 2012 to May 2012 – Sole Independent Director

  After Barneys' 2007 sale to Istithmar World, the Government of Dubai's private investment fund, Barneys was impacted by the recession in the late 2000's. I was brought in to serve as the sole independent director during the out of court restructuring process which resulted in a consensual change of control for Barneys to its distressed investor creditors.

- **The Leslie Fay Companies** – April 1993 to May 1996 – while serving as the EVP of Restructuring and CFO

- Mr. Dubel has also served as a member and chairperson of various ad hoc and official creditor committees.

013280

**Dubel & Associates, L.L.C.**

# John S. Dubel
# Key Management Experience

- **Noble Environmental Power –** Restructuring Advisor to the Company - 2018

  Noble was the owner of two utility scale wind power plants in upstate New York which were in default on their debt instruments. Working closely with Noble's investment bankers we were able to complete a sale of these plants while keeping the companies out of chapter 11 and returning net sale proceeds to its shareholders.

- **SunEdison, Inc.** – Chief Executive Officer and Chief Restructuring Officer – 2016-2017

  SunEdison was the largest global renewable energy development company prior to its filing for chapter 11 in April 2016. SunEdison had over $10 billion of liabilities and 4,500 employees spread across operations in over 50 countries on 6 continents. A decline in energy prices along with loss of faith in management by investors and numerous litigations filed against the company caused the closing of the capital markets for SunEdison which led to its filing for chapter 11. I was brought in as a requirement of the DIP agreement. SunEdison's assets were sold in a manner to preserve the greatest value for its creditors. I am currently assisting the wind down SunEdison entity as requested.

- **Financial Guaranty Insurance Company** – Chairman and Chief Executive Officer – 2008-2014

  FGIC was the third largest monoline bond insurer, insuring in excess of $300 billion of public finance instruments, RMBS securitizations and CDS contracts with over $4 billion of capital. After the collapse of the residential mortgage market in the 2007/08 timeframe, FGIC lost its AAA ratings and experienced tremendous losses on its insurance contracts. This led to an insolvency proceeding under NY State insurance law with an innovative resolution through a pre-arranged rehabilitation plan. This enabled it to continue to pay its policy holders in a timely manner.

- **Residential Capital** – Co-Chairman of the Official Creditors Committee – 2012-2013

  ResCap, a wholly owned subsidiary of Ally Financial, was one of the largest mortgage originators in the US. FGIC was its 2nd largest creditor and after its chapter 11 filing in May of 2012, I was appointed as the Co-Chair of ResCap's Official Unsecured Creditors Committee. As the lead negotiator for the UCC, the UCC was able to negotiate an increase in the contribution to the plan of reorganization by the parent, Ally, from approximately $650 million to $2.1 billion. This contribution settled all of the litigation between Ally and Rescap and enabled ResCap to emerge from chapter 11.

013281

## Dubel & Associates, L.L.C.

- **Anchor Glass Container Corporation** – Chief Restructuring Officer – 2005-2006

  Anchor Glass was the 3rd largest manufacturer of glass containers in the US, with Anheuser Busch and Snapple as its largest customers, where it provided "just in time" deliveries to enable its customers plants to operate 24/7. Its third trip through chapter 11 resulted from poor contract pricing and high legacy costs. I worked closely with the CEO to renegotiate these contracts and reduce the cost structure which enabled it to emerge from chapter 11 as a viable business which continues to operate today.

- **RCN Corporation** – President and Chief Operating Officer - 2004

  RCN was a Bundled 3-product cable provider offering integrated voice, video and data products in the US Northeast, Midwest and West Coast markets with over $1.7 billion of debt incurred during its build out period. Working with the Lead Director, a pre-arranged chapter 11 plan was negotiated with all of its creditor constituencies to enable it to emerge as a profitable business in its markets where it continues to operate today.

- **Cable & Wireless America** – Chief Executive Officer – 2003-2004

  C&W America was a premier hosting business with 14% share of the US market and world class a Tier 1 IP Network. When its British parent company experienced financial difficulties, they attempted to abandon C&W America which caused stress for its major customers, including Yahoo, Google and others. A plan was put in place, though a chapter 11 process, to dramatically reduce its daily cash burn and sell the entity while maintaining its customer base.

- **Acterna Corporation** – Chief Restructuring Officer  - 2003

  Acterna was a multi-national manufacturer of telecommunications and cable equipment with revenues of approximately $1.7 billion  and debt of $1 billion prior to the industry down turn. I worked closely with the CEO to stabilize the operations and avoid a fire sale of the business. A quick turn through chapter 11 enabled it to emerge as a viable business, where upon the CEO was able to regrow the business and position it for a successful sale to an industry player 18 months later.

- **WorldCom, Inc.** – Chief Financial Officer – 2002, Advisor – 2003

  WorldCom was one of the largest telecommunication companies with assets of over $107 billion and operations across the globe. It filed for chapter 11 during 2002 due to a massive fraud which covered up the significant operational deficiencies and losses it was experiencing. I was brought in as a condition of the DIP agreement and worked closely with the CEO and other members of the senior management to stabilize the company, restructure the operations to reduce opex, provide stability to the international operations and assist with the plan of reorganization negotiations and confirmation.

**Dubel & Associates, L.L.C.**

- **CellNet Data Systems, Inc.** – Chief Restructuring Officer – 1999-2001

  CellNet was a startup technology company that provided smart grid and smart metering and billing solutions for the utility industry. After burning through in excess of $600 million of initial funding it was not able to access the capital markets to continue to build out its platform and realize the cost synergies across contracts that would make it profitable. Working closely with the new CEO, we reduced the cost structure and sold the company to one of its meter suppliers enabling it to continue to operate in a successful manner.

- **Barneys New York** – Chief Financial Officer – 1996-1999

  Barneys was, at this time, a family owned high end retail store chain operating with over 30 stores and international affiliations in Asia. After an uncontrolled growth plan and management that did not understand its cost structure, it filed for chapter 11. I was brought in a the request of the DIP lender to oversee the family's management, to control its costs, close unprofitable locations, renegotiate store leases and work out a consensual chapter 11 plan that included its largest creditors providing financing through a rights offering to enable Barneys to successfully emerge from chapter 11 as a profitable retailer.

- **The Leslie Fay Companies** – EVP Restructuring and Chief Financial Officer – 1993-1995

  Leslie Fay was one of the larger designer and manufacturer of ladies dresses, sportwear and suits in the US. A public company, it was the victim of fraud by its financial management team to hide the true cost of operations and manufacturing of its products. This led to a chapter 11 filing. I worked closely with the CEO and President to stabilize its financial management team, reduce costs and position it for an emergence from chapter 11.

- **Robert Maxwell Group** – Head of US Private Companies – 1991-1993

  Robert Maxwell was a British entrepreneur who invested heavily in the publishing space. After financial improprieties were uncovered and his subsequent suicide, I was appointed by the UK Administrators to run all of his US operations, which included over 40 private companies. I worked closely with the UK administers to realize value through sales of these US operations and turn those proceeds over to the UK Administrators.

013283

**Dubel & Associates, L.L.C.**

Mr. Dubel is a past board member and officer of the Association of Insolvency and
Reorganization Advisors, a Certified Insolvency and Reorganization Advisor and is
a member of the Turnaround Management Association and the American
Bankruptcy Institute. Mr. Dubel received a Bachelor in Business Administration
degree from the College of William and Mary.

013284

013285

# Dubel & Associates, LLC

## Selected Case Studies

# SunEdison, Inc.
## John Dubel – Chief Executive Officer and Chief Restructuring Officer

### Situation

- SunEdison (SUNE) was the largest global renewable energy development company prior to its filing for chapter 11 in April 2016. SUNE had over $10 billion of liabilities and 4,500 employees spread across operations in over 50 countries on 6 continents

- Continued downward pressure on energy prices caused renewable energy projects to experience stress. Lack of proper integration of acquisitions and overpayment on other acquisitions caused a liquidity crisis. Public spin-offs of profitable yieldco assets cut off cash flow that was needed to run the operations.

- Senior management control of the Yieldcos enabled borrowings from the Yieldcos which could not be repaid

### Actions Taken

- Hired initially as CRO with a clear mandate to take on CEO responsibilities

- An immediate assessment of the opportunity to maintain a going concern was initiated.

- Programs were put in place to plug the employee exodus that SUNE was experiencing

- In consultation with our lenders made the determination that an orderly sale of assets was the best path to optimum value realization

- Maintained an open line of communication with the DIP, 1L and 2 L lenders to build back trust in the company

- Engaged with the Board of the Yieldcos, TERP and GLBL, to work towards a resolution of the disputes between the Yieldcos and SUNE

### Results

- Took on CEO role after a short transition with the former CEO

- Reorganization of key personnel functions including the hiring of a new CFO and Controller provided stability in the Finance functions for the company to operate within the limits of the DIP agreement.

- Executed a global marketing process which resulted in over 60 asset sales with approximately $1.5 billion of gross proceeds

- Executed a plan which resulted in the transition of administrative and operational functions from SUNE to the Yieldcos which helped stabilize the value of our ownership stake in these entities

013286

Case 19-34054-sgj11 Doc 2822-155 Filed 04/12/21 Entered 04/12/21 23:50:07 Page 106 of 15

# SunEdison, Inc. (continued)
## John Dubel – Chief Executive Officer and Chief Restructuring Officer

| Situation | Actions Taken | Results |
|---|---|---|
| ► Class and individual litigation against SUNE and the Yieldcos related to these control issues ensued. | ► Engaged with the Board and management of the Yieldcos, TERP and GLBL, to start to work towards a resolution of the disputes between the Yieldcos and SUNE | ► Drove a plan, through a directed litigation strategy, to force a resolution of the over $3 billion of claims brought against SUNE by the Yieldcos which resulted in a cooperative sale of the Yieldcos netting SUNE approximately $825 million |
| ► Shortly after a Feb 2016 2L financing the company has exhausted those funds and was out of available funds to operate the business. | ► Put in place a path to seek resolution of all of the Class Action and individual shareholder litigations by seeking a mediation in the District Court and Bankruptcy Court litigation related to both SUNE and the Yieldcos | ► A replacement DIP agreement was put in place to eliminate certain concerned creditors and align the interests of the DIP lenders and the prepetition secured creditors. |
| ► Additional litigation commenced related to cancelled acquisitions. | ► Commenced negotiations to settle the various litigations amongst SUNE's creditor groups and between SUNE and its Yieldcos | ► Settlements of the vast majority of class and individual shareholders were negotiated |
| ► During this timeframe, the creditors lost faith in the CEO and CFO. | ► Worked closely with Chief Judge Morris, the mediator appointed in the case, to craft a resolution to all intercreditor disputes | ► A mediated resolution amongst SUNE's creditor resulted in a successful chapter plan of reorg funded by a rights offering led by SUNE's 2L creditors |
| ► SUNE filed for chapter 11 in late April 2016 funded by a DIP provided by the 1L and 2L creditors. | | |

013287

Case 1:13-cv-01454-sgll-1-Doc-2822 1 FSD-F120 0/1/22/21 Entered 04/12/23-23:65:0: PagPg 150 f 19
of 15

## Financial Guaranty Insurance Company
### John Dubel – Chief Executive Officer and member of the Board of Directors

### Situation

➤ FGIC was the third largest monoline bond insurer, insuring in excess of $300 billion of public finance instruments, RMBS securitizations and CDS contracts

➤ At the start of 2008, FGIC was at risk of losing its AAA ratings

➤ The residential real estate meltdown caused FGIC to face billions of dollars of claims from CDS and RMBS contracts it had insured

➤ In addition, several of FGIC's largest public finance deals were on the cusp of defaulting

➤ In late 2009, FGIC's statutory capital went negative and was subject to immediate takeover by the NYS Department of Financial Services

### Actions Taken

➤ Raised capital surplus by $830 million through reinsurance agreements and preferred stock

➤ Negotiated settlements of CDS contracts

➤ Managed the workout of multiple public finance insurance contracts

➤ Managed affirmative litigation actions to recover from parties that harmed FGIC's insurance contracts

➤ Developed an innovative restructuring plan to allow FGIC to file a pre-arranged rehabilitation plan in NYS Court

➤ Positioned the company to be able to operate in the post rehabilitation environment to pay claims to policyholders in a timely manner

### Results

➤ Planned and executed an orderly Rehabilitation Plan process which resulted in an innovative and precedent setting proceeding for FGIC's policyholders

➤ Managed down the overall exposure from $312 billion to under $30 billion

➤ Settled parent/subsidiary issues without litigation

➤ Recovered in excess of $1.25 billion for policyholders from parties that harmed FGIC's contracts

➤ All of these results were accomplished while maintaining an independent view towards protecting all policyholders interests

013288

# RCN Corporation – Integrated Triple Play Service Provider
## John Dubel – President and Chief Operating Officer

### Situation

- Bundled 3-product cable provider offering integrated voice, video and data products in the US Northeast, Midwest and West Coast markets

- Revenues of approximately $500 million

- Over 1 million connections

- $1.7 BN of debt in default

- Secured creditors pushing the Company to a forced liquidation

- Lack of confidence in management's business plan and ability to rationalize the business

- Company lacked adequate liquidity to maintain operations

### Actions Taken

- Hired as President and CRO to lead RCN during this crisis.

- Implemented reorganization of operating costs achieving positive EBITDA and cash flow

- Actions included:
  – Rationalized customer base
  – Segmented Customer Service activity and automated where possible
  – Consolidated Network Operations to drive efficiency
  – Reduced IT functions
  – Reduced customer service call volume through web-based solutions
  – Simplified product offering
  – Generated Tech Operations savings

### Results

- Streamlined operations and reduced breakeven costs achieving positive cash flow and EBITDA

- Reduced annualized SG&A costs by 20%

- Reduced headcount by 25%

- Improved Customer Service quality

- Company emerged with over $125 million of cash in hand

- Instituted rigorous cost reduction procedures within the company

- Positioned the company for future positive growth

013289

# Cable & Wireless America – Successfully Positioned the Company for a Sale

John Dubel – Chief Executive Officer

## Situation

- Premier hosting business with 14% share of the US market by revenue and World Class Tier 1 IP Network

- Parent company's announcement of intention to exit the US market created uncertainty for customers, suppliers, and employees

- Daily cash burn estimated at $2M

- Need to stabilize standalone operations and facilitate a sale transaction

## Actions Taken

- Negotiated terms of separation from parent company and obtained ongoing funding commitment

- Stabilized skittish customer base

- Took control of cash management and forecasting process

- Implemented cost cutting strategy to achieve cash flow breakeven within 9 months

- Managed extensive due diligence process by multiple bidders

## Results

- Reduced daily cash burn to $0.7M

- Planned and executed orderly Chapter 11 filing with the support of a "stalking horse" bidder to facilitate a 363 sale

- Active auction process resulted in total bid consideration of $167.5M, a threefold increase over the stalking horse bid value

013290

# Acterna – Reduced Costs, Drove a Successful Turnaround
John Dubel – Chief Restructuring Officer

## Situation

‣ Leading Telecom Network equipment supplier with worldwide operations that was facing a severe liquidity crisis

‣ Test equipment market was crippled by the drought of capital spending from Telecom Network companies

‣ Debt levels were not sustainable in then current market conditions

## Actions Taken

‣ Assumed role of CRO to lead company through Chapter 11

‣ Restructured $1.0 BN of debt

‣ Preserved non-domestic assets across 30 countries necessary to a successful reorganization.

‣ Focused sales activity on core markets

‣ Worked with management to reduce SG&A costs

‣ Rationalized headcount through centralization of manufacturing activity

‣ Managed the subsidiary divestiture program

‣ Integrated worldwide cash control procedures improving liquidity

## Results

‣ Acterna emerged from Chapter 11 with 80% less debt and a reduction of 85% of interest costs in less than 6 months

‣ Improved international cash liquidity sufficiently for non-US operations to become self funding

‣ Cash at emergence was over $60 million

‣ Reduced operating cash costs so the company was self funding and the DIP was never used to operate the company

‣ 18 months after C-11, Acterna announced a sale to JDS Uniphase, for a three fold increase in value.

013291

Case 1:03-md-01554-sgll-1-Doc 28122-15-06 04/42/Entered 04/42/23 23:05:07 Page Page 15 of 15

# WorldCom – Stabilized Operations and Finance Function

### John Dubel – Chief Financial Officer

## Situation

- A massive fraud which masked operational, financial and reporting issues crippled the company's credibility

- WorldCom suffered from excess debt with declining value of assets, financial fraud issues, contentious relationship with creditors, and a substantial cash burn

- Significant negative cash flow from international operations

- WorldCom filed for bankruptcy in July of 2002, becoming the largest bankruptcy filing in history at the time

## Actions Taken

- Assumed role  Chief Financial Officer until a permanent management team could be put in place then worked as financial advisor for pendency of Chapter 11 case

- Put turnaround teams, operational restructuring plans, and cash management plans in place

- Led the international restructuring efforts

- Assisted in negotiations with creditors

- Implemented an achievable 2003 business plan, facilitated several cost reduction initiatives, and managed the 13-week cash flow forecast

- Reduced capital spending

## Results

- Achieved $2 BN of operational savings

- Increased cash flow by more than $100M in international operations and avoided bankruptcy in many jurisdictions

- Worked with all stakeholders to reach consensus on a plan of reorganization

- Successfully restructured the balance sheet

013292

# EXHIBIT ZZZZZZ

Russell Nelms

115 Kay Lane

Westworth Village, Texas, 76114

682-433-9110

rfargar@yahoo.com

Mr. Nelms served as a bankruptcy judge in Fort Worth, Texas from 2004 to 2018.  During that time he consistently received top ratings  from the Tarrant County Bar for his knowledge of the law, fairness, and judicial temperament. His experience, coupled with his unconventional sense of humor, led to frequent speaking engagements at bankruptcy forums in and outside of Texas.

Mr. Nelms received a B.A. with high honors from Texas Tech in 1975, and a J.D. with high honors from Texas Tech School of Law in 1978. He served in the United States Army Judge Advocate General's Corps from 1978 to 1984. Mr. Nelms practiced with Carrington, Coleman, Sloman and Blumenthal, LLP from 1984 to 2004, spending the last 15 years as a partner in its bankruptcy litigation section.

From 2012 to 2018, Mr. Nelms was a contributing editor to the Collier Handbook for Trustees and Debtors in Possession.  For his service on the bench and to his community, Mr. Nelms was named as a Sergeant in the American Inns of Court.

Currently, Mr. Nelms is serving as the chairman of the independent board of directors of Warrior Custom Golf, a company in chapter 11 in Houston, Texas.  He also serves as the trustee of the Think Financial Litigation Trust, a trust created by the confirmed plan of Think Financial, a debtor in possession in Dallas, Texas.

013294

**EXHIBIT 2**

013295

### Holdings of Preference Shares[1] in CLOs

| CLO | HIF | NSOF | NC | Total |
|---|---|---|---|---|
| Aberdeen | 0% | 30.21% | 0% | **30.21%** |
| Brentwood | 0% | 40.06% | 0% | **40.06%** |
| Eastland | 31.16% | 10.53% | 0% | **41.69%** |
| Gleneagles | 9.74% | 8.52% | 0% | **18.26%** |
| Grayson | 49.10% | 10.75% | 0.63% | **60.48%** |
| Greenbriar | 0% | 53.44% | 0% | **53.44%** |
| Jasper | 0% | 17.86% | 0% | **17.86%** |
| Liberty | 0% | 10.64% | 0% | **10.64%** |
| Red River | 0% | 10.49% | 0% | **10.49%** |
| Rockwall | 6.14% | 19.57% | 0% | **25.71%** |
| Rockwall II | 14.56% | 5.65% | 0% | **20.21%** |
| Southfork | 0% | 7.30% | 0% | **7.30%** |
| Stratford | 0% | 69.05% | 0% | **69.05%** |
| Loan Funding VII (aka Valhalla) | 0% | 1.83% | 0% | **1.83%** |
| Westchester | 0% | 44.38% | 0% | **44.38%** |

---

[1] Class E Certificates for Liberty CLO, Ltd.

# EXHIBIT SSSSS

# Plan Objections from Dondero-Related Entities: Organizational Charts

[1] CLO Holdco, Ltd., is a wholly-owned subsidiary of the Charitable Donor Advised Fund, L.P. (the "DAF"). HCMLP has terminated its shared services agreement with the DAF. The DAF owes HCMLP past due fees and expenses.

[2] Amounts owed as of November 30, 2020.

013298

# EXHIBIT AAAAAAA

013299

# Highland Multi Strategy Credit Fund, Ltd.

## Statement of Value and Activity

October 1, 2020 through October 31, 2020

fundaccounting@hcmlp.com
190 Elgin Avenue
George Town, Grand Cayman KY1-9005
Cayman Islands

| | | | |
|---|---|---|---|
| Account ID: | CLOHold | Attention: | |
| Account Name: | CLO Holdco, Ltd. | Fax Number: | |
| Currency: | US Dollar | Email: | fundaccounting@hcmlp.com |

## For Your Information

Your Statement of Value and Activity has been designed to keep you up-to-date on the activity in your account. It provides you with an easy to read summary of your account balance and history of your transactions during the periods.

## Your Portfolio Value Month - to - Date

(*) Net asset value per share has been rounded to two decimal places for presentation purposes.

SEI Investments
Alternative Investments Fund Services
One Freedom Valley Drive
Oaks, PA 19456
(610) 676-8725
AIFS-IS_Highland@seic.com

013300

# Highland Multi Strategy Credit Fund, Ltd.

**Statement of Value and Activity**

October 1, 2020 through October 31, 2020

The Dugaboy Investment Trust
300 Crescent Court
Suite 700
Dallas, TX 75201

| | | | |
|---|---|---|---|
| Account ID: | Dugaboy | Attention: | |
| Account Name: | The Dugaboy Investment Trust | Fax Number: | |
| Currency: | US Dollar | Email: | jdondero@hcmlp.com |

## For Your Information

Your Statement of Value and Activity has been designed to keep you up-to-date on the activity in your account. It provides you with an easy to read summary of your account balance and history of your transactions during the periods.

**Your Portfolio Value Month - to - Date**



(*) Net asset value per share has been rounded to two decimal places for presentation purposes.

SEI Investments
Alternative Investments Fund Services
One Freedom Valley Drive
Oaks, PA 19456
(610) 676-8725
AIFS-IS_Highland@seic.com

013301

# Highland Multi Strategy Credit Fund, Ltd.

### Statement of Value and Activity

October 1, 2020 through October 31, 2020

Waterhouse, Frank

| | | | |
|---|---|---|---|
| Account ID: | HCMS | Attention: | |
| Account Name: | Highland Capital Management Services, Inc. | Fax Number: | |
| Currency: | US Dollar | Email: | fwaterhouse@hcmlp.com |

### For Your Information

Your Statement of Value and Activity has been designed to keep you up-to-date on the activity in your account. It provides you with an easy to read summary of your account balance and history of your transactions during the periods.

### Your Portfolio Value Month - to - Date



(*) Net asset value per share has been rounded to two decimal places for presentation purposes.

SEI Investments
Alternative Investments Fund Services
One Freedom Valley Drive
Oaks, PA 19456
(610) 676-8725
AIFS-IS_Highland@seic.com

013302

# Highland Multi Strategy Credit Fund, Ltd.

**Statement of Value and Activity**

October 1, 2020 through October 31, 2020

---

| | |
|---|---|
| Account ID: | Highland |
| Account Name: | Highland Capital Management, LP |
| Currency: | US Dollar |

| | |
|---|---|
| Attention: | |
| Fax Number: | |
| Email: | |

**For Your Information**

Your Statement of Value and Activity has been designed to keep you up-to-date on the activity in your account. It provides you with an easy to read summary of your account balance and history of your transactions during the periods.

**Your Portfolio Value Month - to - Date**

(*) Net asset value per share has been rounded to two decimal places for presentation purposes.

SEI Investments
Alternative Investments Fund Services
One Freedom Valley Drive
Oaks, PA 19456
(610) 676-8725
AIFS-IS_Highland@seic.com

013303

# Highland Multi Strategy Credit Fund, Ltd.

### Statement of Value and Activity

October 1, 2020 through October 31, 2020

Mark Okada
300 Crescent Court
Suite 700
Dallas, TX 75201

| | | | |
|---|---|---|---|
| Account ID: | Okada | Attention: | |
| Account Name: | Mark K. Okada | Fax Number: | |
| Currency: | US Dollar | Email: | MOkada@hcmlp.com |

## For Your Information

Your Statement of Value and Activity has been designed to keep you up-to-date on the activity in your account. It provides you with an easy to read summary of your account balance and history of your transactions during the periods.

**Your Portfolio Value Month - to - Date**



(*) Net asset value per share has been rounded to two decimal places for presentation purposes.

SEI Investments
Alternative Investments Fund Services
One Freedom Valley Drive
Oaks, PA 19456
(610) 676-8725
AIFS-IS_Highland@seic.com

013304

# EXHIBIT BBBBBBB

013305



# Highland Income Fund

## Semi-Annual Report
## June 30, 2020

Beginning on January 1, 2021, as permitted by regulations adopted by the U.S. Securities and Exchange Commission, paper copies of the Fund's annual and semi-annual shareholder reports will no longer be sent by mail, unless you specifically request paper copies of the reports. Instead, the reports will be made available on the Fund's website (highlandfunds.com), and you will be notified by mail each time a report is posted and provided with a website link to access the report.

If you already elected to receive shareholder reports electronically, you will not be affected by this change and you need not take any action. You may elect to receive shareholder reports and other communications from the Fund electronically by contacting your financial intermediary (such as a broker-dealer or bank) or, if you are a direct investor, by contacting the Fund's transfer agent at 1-800-357-9167.

You may elect to receive all future reports in paper free of charge. If you invest through a financial intermediary, you can contact your financial intermediary to request that you continue to receive paper copies of your shareholder reports. If you invest directly with the Fund, you can call 1-800-357-9167 to let the Fund know you wish to continue receiving paper copies of your shareholder reports. Your election to receive reports in paper will apply to all funds held in your account if you invest through your financial intermediary or all funds held with the fund complex if you invest directly with the Fund.

# Highland Income Fund

## TABLE OF CONTENTS

Consolidated Fund Profile ................................................................................. 1
Consolidated Financial Statements .................................................................... 2
   Consolidated Investment Portfolio............................................................... 3
   Consolidated Statement of Assets and Liabilities ......................................... 12
   Consolidated Statement of Operations ....................................................... 13
   Consolidated Statements of Changes in Net Assets...................................... 14
   Consolidated Statement of Cash Flows ....................................................... 15
   Consolidated Financial Highlights ............................................................... 16
Notes to Consolidated Financial Statements ...................................................... 18
Additional Information.................................................................................... 38
Important Information About This Report ........................................................... 42

Economic and market conditions change frequently.
There is no assurance that the trends described in this report will continue or commence.

013307

# CONSOLIDATED FUND PROFILE (unaudited)

**Highland Income Fund**

## Objective

Highland Income Fund seeks to provide a high level of current income, consistent with preservation of capital.

## Net Assets as of June 30, 2020

$911.6 million

## Portfolio Data as of June 30, 2020

The information below provides a snapshot of Highland Income Fund at the end of the reporting period. Highland Income Fund is actively managed and the composition of its portfolio will change over time. Current and future holdings are subject to risk.

| Quality Breakdown as of 6/30/2020 (%)[1] | |
|---|---|
| AAA | 0.80 |
| BBB | 0.93 |
| BB | 15.50 |
| B | 38.70 |
| CCC | 9.00 |
| CC | 0.61 |
| D | 1.31 |
| NR | 33.15 |

| Sectors as of 6/30/2020 (%)[1][2] | |
|---|---|
| Real Estate | 34.8 |
| Financials | 23.7 |
| Information Technology | 5.9 |
| Healthcare | 5.2 |
| Communication Services | 4.3 |

| Top 10 Holdings as of 6/30/2020 (%)[2][3] | |
|---|---|
| Creek Pine 10.25%, (Preferred Stock) | 24.0 |
| NFRO REIT SUB, LLC (Common Stock) | 10.9 |
| CCS Medical, Inc., Term Loan 12.25%, 5/31/2021 (U.S. Senior Loans) | 5.9 |
| EDS Legacy Partners 7.50%, 12/14/2023 (U.S. Senior Loans) | 5.7 |
| FREMF Mortgage Trust, 11/25/2029 (Agency Collateralized Mortgage Obligations) | 5.3 |
| SFR WLIF II, LLC, (LLC Interest) | 4.8 |
| Metro-Goldwyn-Mayer, Inc. (Common Stock) | 4.5 |
| Creative Science Properties, Inc., (Preferred Stock) | 3.9 |
| SFR WLIF III, LLC, (LLC Interest) | 2.4 |
| FREMF Mortgage Trust, 1/25/2030 (Agency Collateralized Mortgage Obligations) | 2.2 |

[1] Quality is calculated as a percentage of total credit instruments held by the portfolio. Sectors and holdings are calculated as a percentage of total net assets. The quality ratings reflected were issued by Standard & Poors, a nationally recognized statistical rating organization. Ratings are measured on a scale that generally ranges from AAA (highest) to D (lowest). Quality ratings reflect the credit quality of the underlying bonds in the Fund's portfolio and not that of the Fund itself. Credit quality ratings assigned by a rating agency are subjective opinions, not statements of fact, and are subject to change, including daily. The ratings assigned by credit rating agencies are but one of the considerations that the Fund's investment adviser incorporates into its credit analysis process, along with such other issuer specific factors as cash flows, capital structure and leverage ratios, ability to deleverage through free cash flow, quality of management, market positioning and access to capital, as well as such security-specific factors as the terms of the security (e.g., interest rate, and time to maturity) and the amount of any collateral.

[2] Sectors and holdings are calculated as a percentage of total net assets.

[3] Excludes the Fund's investment in a cash equivalent.

013308

# CONSOLIDATED FINANCIAL STATEMENTS

**June 30, 2020**                                                                      **Highland Income Fund**

**A guide to understanding the Fund's consolidated financial statements**

| | |
|---|---|
| **Consolidated Investment Portfolio** | The Investment Portfolio details all of the Fund's holdings and its market value as of the last day of the reporting period. Portfolio holdings are organized by type of asset and industry to demonstrate areas of concentration and diversification. |
| **Consolidated Statement of Assets and Liabilities** | This statement details the Fund's assets, liabilities, net assets and share price for each share class as of the last day of the reporting period. Net assets are calculated by subtracting all of the Fund's liabilities (including any unpaid expenses) from the total of the Fund's investment and noninvestment assets. The net asset value per share for each class is calculated by dividing net assets allocated to that share class by the number of shares outstanding in that class as of the last day of the reporting period. |
| **Consolidated Statement of Operations** | This statement reports income earned by the Fund and the expenses incurred by the Fund during the reporting period. The Statement of Operations also shows any net gain or loss the Fund realized on the sales of its holdings during the period as well as any unrealized gains or losses recognized over the period. The total of these results represents the Fund's net increase or decrease in net assets from operations. |
| **Consolidated Statements of Changes in Net Assets** | These statements detail how the Fund's net assets were affected by its operating results, distributions to shareholders and shareholder transactions (e.g., subscriptions, redemptions and distribution reinvestments) during the reporting periods. The Statement of Changes in Net Assets also details changes in the number of shares outstanding. |
| **Consolidated Statement of Cash Flows** | This statement reports net cash and foreign currency provided or used by operating, investing and financing activities and the net effect of those flows on cash and foreign currency during the period. |
| **Consolidated Financial Highlights** | The Financial Highlights demonstrate how the Fund's net asset value per share was affected by the Fund's operating results. The Financial Highlights also disclose the classes' performance and certain key ratios (e.g., net expenses and net investment income as a percentage of average net assets). |
| **Notes to Consolidated Financial Statements** | These notes disclose the organizational background of the Fund, certain of its significant accounting policies (including those surrounding security valuation, income recognition and distributions to shareholders), federal tax information, fees and compensation paid to affiliates and significant risks and contingencies. |

013309

# CONSOLIDATED INVESTMENT PORTFOLIO (unaudited)

**As of June 30, 2020**                                          **Highland Income Fund**

| Principal Amount ($) | Value ($) |
|---|---|
| **U.S. Senior Loans (a) - 39.9%** | |
| **BUSINESS EQUIPMENT & SERVICES - 1.0%** | |
| VM Consolidated Inc., Term Loan B1, 1st | |
| 9,803,479   Lien, 02/28/25 ......................... | 9,386,832 |
| **COMMERCIAL SERVICES - 0.4%** | |
| Fort Dearborn Holding Company, Inc., | |
| Initial Term Loan, | |
| VAR LIBOR USD | |
| 3,502,592   3 Month+4.000%, 10/19/23 ............ | 3,302,944 |
| | 3,302,944 |
| **COMMUNICATION SERVICES - 0.7%** | |
| TerreStar Corporation, Term Loan D, | |
| 6,467,947   11.00% PIK 02/27/28 (b)(c) ............ | 6,429,140 |
| TerreStar Corporation, Term Loan, 1st | |
| 50,260   Lien, 02/28/22 (b)(c) .................... | 49,958 |
| | 6,479,098 |
| **CONSUMER DISCRETIONARY - 2.5%** | |
| Truck Hero, Inc., Initial Term Loan, 1st Lien, | |
| VAR LIBOR USD | |
| 8,501,927   3 Month+3.750%, 04/22/24 ............ | 7,781,941 |
| Truck Hero, Inc., Initial Term Loan, 2nd Lien, | |
| VAR LIBOR USD | |
| 4,076,667   3 Month+8.250%, 04/21/25 ............ | 3,791,300 |
| USS Ultimate Holdings, Inc., Initial Term | |
| Loan, 1st Lien, | |
| VAR LIBOR USD | |
| 11,784,991   3 Month+3.750%, 08/09/24 ............ | 11,130,865 |
| | 22,704,106 |
| **CONSUMER PRODUCTS - 0.2%** | |
| Dayco Products, LLC, Term Loan B, | |
| VAR LIBOR USD | |
| 3,317,015   3 Month+4.250%, 05/08/23 ............ | 2,118,743 |
| **ENERGY - 1.5%** | |
| Fieldwood Energy LLC, Closing Date Loan, | |
| 2nd Lien, | |
| VAR LIBOR USD | |
| 15,904,030   3 Month+7.250%, 04/11/23 ............ | 318,081 |
| Traverse Midstream Partners LLC, | |
| Term Loan, | |
| VAR LIBOR USD | |
| 15,771,555   3 Month+4.000%, 09/27/24 ............ | 13,297,392 |
| | 13,615,473 |
| **FINANCIALS - 1.0%** | |
| Edelman Financial Center (The), Initial | |
| Term Loan, | |
| VAR LIBOR USD | |
| 935,253   3 Month+3.250%, 07/21/25 ............ | 896,234 |
| Edelman Financial Group (The), Term | |
| Loan, 2nd Lien, | |
| VAR LIBOR USD | |
| 9,447,348   3 Month+6.750%, 06/26/26 ............ | 8,659,108 |
| | 9,555,342 |
| **GAMING/LEISURE - 1.3%** | |
| Ginn-LA CS Borrower LLC, Tranche A Term | |
| Loan Credit-Linked Deposit, 1st | |
| 22,764,040   Lien, (b)(c)(d) ......................... | 724,306 |

| Principal Amount ($) | Value ($) |
|---|---|
| **GAMING/LEISURE (continued)** | |
| Ginn-LA CS Borrower LLC, Tranche B Term | |
| 48,791,955   Loan, 1st Lien, (b)(c)(d).................... | — |
| LLV Holdco, LLC, Revolving Exit Loan, | |
| 13,442,392   09/03/20 (b)(c)(e) ........................ | 10,753,914 |
| | 11,478,220 |
| **HEALTHCARE - 7.7%** | |
| American Renal Holdings Inc., | |
| Term Loan B, | |
| VAR LIBOR USD | |
| 2,667,085   3 Month+3.250%, 06/21/24 ............ | 2,520,396 |
| BW NHHC Holdco Inc., Initial Term Loan, | |
| 1st Lien, | |
| VAR LIBOR USD | |
| 13,611,111   3 Month+5.000%, 05/15/25 ............ | 10,733,654 |
| Castle US Holding Corporation, Initial | |
| 1,995,833   Dollar Term Loan, 1st Lien, 01/29/27 .... | 1,831,177 |
| CCS Medical, Inc., Term Loan, | |
| 61,921,486   05/31/21 (b)(c)(e) ......................... | 53,376,277 |
| Sound Inpatient Physicians Holdings LLC, | |
| 2nd Lien, | |
| VAR LIBOR USD | |
| 1,777,778   3 Month+6.750%, 06/19/26 ............ | 1,706,667 |
| | 70,168,171 |
| **INDUSTRIALS - 1.8%** | |
| Hayward Industries, Inc., | |
| Initial Term Loan, 1st Lien, | |
| VAR LIBOR USD | |
| 4,510,098   3 Month+3.500%, 08/05/24 ............ | 4,357,882 |
| Omnimax International, Inc., Unsecured | |
| Term Loan, 14.00% PIK | |
| 10,299,501   02/06/21 (b)(c)(e) ......................... | 2,554,276 |
| PSC Industrial Holdings Corp., Initial | |
| Term Loan, 2nd Lien, | |
| VAR LIBOR USD | |
| 4,000,000   3 Month+8.500%, 10/11/25 ............ | 3,100,000 |
| PSC Industrial Holdings Corp., Term Loan, | |
| 1st Lien, | |
| VAR LIBOR USD | |
| 6,908,127   3 Month+3.750%, 10/11/24 ............ | 6,240,319 |
| | 16,252,477 |
| **INFORMATION TECHNOLOGY - 9.4%** | |
| Avaya Inc., Tranche B Term Loan, | |
| VAR LIBOR USD | |
| 8,834,475   3 Month+4.250%, 12/15/24 ............ | 8,185,142 |
| EDS Legacy Partners, | |
| VAR LIBOR USD | |
| 57,000,000   3 Month+2.750%, 12/14/23 (b)(c)(e) .... | 51,471,000 |
| Intermedia Holdings, Inc., New Term | |
| Loan, 1st Lien, | |
| VAR LIBOR USD | |
| 9,850,000   3 Month+6.000%, 07/21/25 ............ | 9,668,415 |
| Kronos Incorporated, Initial Term Loan, | |
| 2nd Lien, | |
| VAR LIBOR USD | |
| 2,800,000   3 Month+8.250%, 11/01/24 ............ | 2,811,382 |
| Procera Networks, Inc., Initial Term Loan, | |
| VAR LIBOR USD | |
| 14,251,549   3 Month+4.500%, 10/30/25 ............ | 13,681,486 |
| | 85,817,425 |

See Glossary on page 11 for abbreviations along with accompanying Notes to Consolidated Financial Statements.   |   3

**CONSOLIDATED INVESTMENT PORTFOLIO (unaudited) (continued)**

**As of June 30, 2020**                                                **Highland Income Fund**

| Principal Amount ($) | | Value ($) |
|---|---|---|
| | **U.S. Senior Loans (continued)** | |
| | **REAL ESTATE - 2.2%** | |
| 9,092,308 | Forest City Enterprises, L.P., Replacement Term Loan, 1st Lien, 12/08/25 . . . . . . . . . . | 8,546,769 |
| | Specialty Building Products Holdings, LLC, Initial Term Loan, VAR LIBOR USD | |
| 11,850,000 | 3 Month+5.750%, 09/25/25 . . . . . . . . . . . . | 11,316,750 |
| | | 19,863,519 |
| | **RETAIL - 4.8%** | |
| | Academy, Ltd., Initial Term Loan, VAR LIBOR USD | |
| 13,468,126 | 3 Month+4.000%, 07/01/22 . . . . . . . . . . . . | 10,909,182 |
| | Dealer Tire LLC, Term B-1 Loan, | |
| 15,651,350 | 1st Lien, 12/12/25 . . . . . . . . . . . . . . . . . . . . . . | 14,999,158 |
| | General Nutrition Centers, Inc., FILO Term Loan, VAR LIBOR USD | |
| 1,178,368 | 3 Month+7.000%, 12/31/22 . . . . . . . . . . . . | 1,129,272 |
| | General Nutrition Centers, Inc., Tranche B-2 Term Loan, 1st Lien, VAR LIBOR USD | |
| 9,069,634 | 3 Month+8.750%, 03/04/21 . . . . . . . . . . . . | 6,613,260 |
| | Jo-Ann Stores, LLC, Initial Loan, 1st Lien, VAR LIBOR USD | |
| 10,073,808 | 3 Month+5.000%, 10/20/23 . . . . . . . . . . . . | 6,296,130 |
| | Jo-Ann Stores, LLC, Initial Loan, 2nd Lien, VAR LIBOR USD | |
| 9,554,955 | 3 Month+9.250%, 05/21/24 . . . . . . . . . . . . | 3,583,108 |
| | | 43,530,110 |
| | **SERVICE - 2.2%** | |
| | Advantage Sales & Marketing Inc., Initial Term Loan, 1st Lien, VAR LIBOR USD | |
| 3,621,602 | 3 Month+3.250%, 07/23/21 . . . . . . . . . . . . | 3,328,198 |
| | Advantage Sales & Marketing Inc., Term Loan, 2nd Lien, VAR LIBOR USD | |
| 13,710,000 | 3 Month+6.500%, 07/25/22 . . . . . . . . . . . . | 11,444,148 |
| | EnergySolutions, LLC (aka Envirocare of Utah, LLC), Initial Term Loan, 1st Lien, VAR LIBOR USD | |
| 5,929,827 | 3 Month+3.750%, 05/09/25 . . . . . . . . . . . . | 5,504,837 |
| | | 20,277,183 |
| | **TRANSPORTATION - 1.2%** | |
| | Gruden Acquisition, Inc., Incremental Term Loan, 1st Lien, VAR LIBOR USD | |
| 11,608,587 | 3 Month+5.500%, 08/18/22 . . . . . . . . . . . . | 10,810,497 |
| | **UTILITIES - 2.0%** | |
| | Granite Acquisition, Inc., Term Loan B, 2nd Lien, VAR LIBOR USD | |
| 2,319,304 | 3 Month+7.250%, 12/19/22 . . . . . . . . . . . . | 2,287,413 |
| | Lightstone Holdco LLC, Refinancing Term Loan B, | |
| 11,780,034 | 3 Month+3.750%, 01/30/24 . . . . . . . . . . . . | 10,082,295 |

| Principal Amount ($) | | Value ($) |
|---|---|---|
| | **UTILITIES (continued)** | |
| | Lightstone Holdco LLC, Refinancing Term Loan C, VAR LIBOR USD | |
| 664,412 | 3 Month+3.750%, 01/30/24 . . . . . . . . . . | 568,657 |
| | PG&E Corp, Term Loan, | |
| 5,000,000 | 1st Lien, 06/18/25 . . . . . . . . . . . . . . . . . . . . | 4,920,000 |
| | Texas Competitive Electric Holdings Co., | |
| 59,127,210 | LLC, Extended Escrow Loan, (f) . . . . . . . . | 44,346 |
| | | 17,902,711 |
| | Total U.S. Senior Loans (Cost $503,969,693) . . . . . . . . . . . . . . . . . | 363,262,851 |
| | **Shares** | |
| | **Preferred Stock - 37.0%** | |
| | **ENERGY - 1.1%** | |
| 1,790,983 | Crestwood Equity Partners 9.25% (g) . . . | 9,796,677 |
| | **FINANCIALS - 9.1%** | |
| | Creative Science Properties, | |
| 2,356,665 | Inc. (b)(c)(g)(h)(i) . . . . . . . . . . . . . . . . . . . . . | 35,349,975 |
| 34,500 | Eastland CLO, Ltd. (h) . . . . . . . . . . . . . . . . . | 11,442,500 |
| 3,980 | Eastland Ltd. 1.00%, 05/01/2022 (j) . . . . . | 1,320,033 |
| | Federal Home Loan Mortgage | |
| 525,000 | 5.30% (g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5,985,000 |
| 162,000 | Federal Home Loan Mortgage (g)(h) . . . . | 1,850,075 |
| | Federal Home Loan Mortgage | |
| 225,315 | 5.90% (g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,435,257 |
| | Federal National Mortgage Association | |
| 69,500 | 7.63% (g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 483,025 |
| | Federal National Mortgage | |
| 252,000 | Association (g)(h) . . . . . . . . . . . . . . . . . . . . | 2,699,760 |
| | Federal National Mortgage Association | |
| 59,449 | 5.38% (g) . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,418,260 |
| | Federal National Mortgage Association | |
| 25,000 | 8.25% (g) . . . . . . . . . . . . . . . . . . . . . . . . . . . | 181,750 |
| | Federal National Mortgage Association | |
| 3,840 | 4.75% (g) . . . . . . . . . . . . . . . . . . . . . . . . . . . | 46,080 |
| | Federal National Mortgage Association | |
| 30,000 | 5.13% (g) . . . . . . . . . . . . . . . . . . . . . . . . . . . | 372,000 |
| | Grayson CLO, Ltd. , | |
| 62,600 | 11/01/2021 (b)(c)(h)(j) . . . . . . . . . . . . . . . . | 19,321,490 |
| | | 82,905,205 |
| | **REAL ESTATE - 26.8%** | |
| | Braemar Hotels & Resorts, REIT | |
| 645,161 | 5.50% (g)(i)(k) . . . . . . . . . . . . . . . . . . . . . . . | 6,509,674 |
| 180,008 | Creek Pine, REIT 10.25% (b)(c)(g)(i) . . . . . | 218,952,776 |
| 249,514 | G-LA Resorts Holdings (h)(i) . . . . . . . . . . . . | 249,514 |
| | Jernigan Capital, Inc., REIT | |
| 17,755 | 7.00% (b)(c)(g)(i) . . . . . . . . . . . . . . . . . . . . | 17,311,009 |
| | Wheeler Real Estate Investment Trust, | |
| 97,992 | REIT 9.00% (g) . . . . . . . . . . . . . . . . . . . . . . . | 690,844 |
| | Wheeler Real Estate Investment Trust, | |
| 74,600 | REIT 10.75%, 09/21/2023 (g)(l) . . . . . . . . | 901,789 |
| | | 244,615,606 |
| | Total Preferred Stock (Cost $322,802,138) . . . . . . . . . . . . . . . . | 337,317,488 |

4 | See Glossary on page 11 for abbreviations along with accompanying Notes to Consolidated Financial Statements.

013311

## CONSOLIDATED INVESTMENT PORTFOLIO (unaudited) (continued)

**As of June 30, 2020**

**Highland Income Fund**

| Shares | | Value ($) |
|---|---|---|
| **Common Stocks - 18.0%** | | |
| **COMMUNICATION SERVICES - 5.7%** | | |
| 49,600 | Loral Space & Communications, Inc. ...... | 968,192 |
| 502,161 | Metro-Goldwyn-Mayer, Inc. (i)(m) ........ | 41,344,422 |
| 27,134 | TerreStar Corporation (b)(c)(i)(m) ......... | 9,205,209 |
| | | 51,517,823 |
| **CONSUMER DISCRETIONARY - 0.2%** | | |
| 1,450 | Toys 'R' Us (i)................................ | 152,819 |
| 1,450 | Tru Kids, Inc. (i) ............................ | 1,375,385 |
| | | 1,528,204 |
| **ENERGY - 0.0%** | | |
| 167,419 | Fieldwood Energy LLC (i).................. | 16,742 |
| 1,118,286 | Value Creation, Inc. (b)(c)(i) .............. | 1 |
| | | 16,743 |
| **FINANCIALS - 0.0%** | | |
| 17,630 | NexPoint Real Estate Finance (e) ......... | 295,302 |
| **GAMING/LEISURE - 0.0%** | | |
| | LLV Holdco LLC - Series A, Membership | |
| 34,512 | Interest (b)(c)(e)(i) ........................ | — |
| | LLV Holdco LLC - Series B, Membership | |
| 436 | Interest (b)(c)(e)(i) ........................ | — |
| | | — |
| **HEALTHCARE - 0.0%** | | |
| 207,031 | CCS Medical Inc. (b)(c)(e)(i) ............... | 122,976 |
| **HOUSING - 0.0%** | | |
| 1,648,350 | Westgate Investments LLC (b)(c)(i) ....... | — |
| **INDUSTRIALS - 0.0%** | | |
| 250,627 | Remington Outdoor Co., Inc. (i) .......... | 203,635 |
| **MATERIALS - 0.2%** | | |
| 299,032 | MPM Holdings, Inc. (i) ..................... | 1,495,160 |
| 14,621 | Omnimax International, Inc. (b)(c)(e)(i) ... | 585 |
| | | 1,495,745 |
| **REAL ESTATE - 11.9%** | | |
| 1,437,555 | Allenby (b)(c)(e)(i) ......................... | 1 |
| 10,119,979 | Claymore (b)(c)(e)(i) ....................... | 10 |
| 331,800 | Independence Realty Trust, Inc., REIT..... | 3,812,382 |
| 31,232 | Jernigan Capital, Inc., REIT................ | 427,254 |
| 147,489 | NexPoint Residential Trust, REIT (e) ....... | 5,213,736 |
| 5,425,728 | NFRO REIT SUB, LLC (b)(c)(e)(i) ........... | 99,391,206 |
| | | 108,844,589 |
| | Total Common Stocks | |
| | (Cost $458,004,553) .................. | 164,025,017 |

**Principal Amount ($)**

| Principal Amount ($) | | | Value ($) |
|---|---|---|---|
| **Collateralized Loan Obligations - 16.7%** | | | |
| | Acis CLO, Ltd., | | |
| | Series 2014-4A, Class D | | |
| | VAR ICE LIBOR USD 3 Month+3.100%, | | |
| 750,000 | 3.79%, 5/1/2026 (j) ...................... | | 670,036 |

| Principal Amount ($) | | Value ($) |
|---|---|---|
| | Acis CLO, Ltd., | |
| | Series 2017-7A, Class E | |
| | VAR ICE LIBOR USD 3 Month+6.000%, | |
| 10,500,000 | 6.69%, 5/1/2027 (b)(c)(j) ................. | 8,664,540 |
| | Acis CLO, Ltd., | |
| | Series 2015-6A, Class E | |
| | VAR ICE LIBOR USD 3 Month+5.490%, | |
| 7,500,000 | 6.18%, 5/1/2027 (j) ...................... | 4,715,625 |
| | Acis CLO, Ltd., Series 2014-4A, Class E | |
| | VAR ICE LIBOR USD 3 Month+4.800%, | |
| 14,750,000 | 5.49%, 5/1/2026 (j) ...................... | 11,505,000 |
| | Acis CLO, Ltd., Series 2015-6A, Class D | |
| | VAR ICE LIBOR USD 3 Month+3.770%, | |
| 1,000,000 | 4.46%, 5/1/2027 (j) ...................... | 897,500 |
| | Acis CLO, Ltd., Series 2014-3A, Class E | |
| | VAR ICE LIBOR USD 3 Month+4.750%, | |
| 4,000,000 | 5.44%, 2/1/2026 (j) ...................... | 2,793,400 |
| | AMMC CLO XIV, | |
| | Series 2017-14A, Class B2L2 | |
| | VAR ICE LIBOR USD 3 Month+6.530%, | |
| 1,000,000 | 7.52%, 7/25/2029 (j) ..................... | 715,000 |
| | Apex Credit CLO 2019, | |
| | Series 2019-1A, Class D | |
| | VAR ICE LIBOR USD 3 Month+7.100%, | |
| 2,000,000 | 8.24%, 4/18/2032 (j) ..................... | 1,500,000 |
| | Apidos CLO XV, | |
| | Series 2018-15A, Class ERR | |
| | VAR ICE LIBOR USD 3 Month+5.700%, | |
| 1,400,000 | 6.84%, 4/20/2031 (j) ..................... | 1,176,000 |
| | Apidos CLO XXI, | |
| | Series 2018-21A, Class ER | |
| | VAR ICE LIBOR USD 3 Month+8.250%, | |
| 1,750,000 | 9.39%, 7/18/2027 (j) ..................... | 1,104,687 |
| | Apidos CLO XXIX, | |
| | Series 2018-29A, Class D | |
| | VAR ICE LIBOR USD 3 Month+5.250%, | |
| 3,800,000 | 6.24%, 7/25/2030 (j) ..................... | 3,078,000 |
| | Atlas Senior Loan Fund, | |
| | Series 2017-8A, Class F | |
| | VAR ICE LIBOR USD 3 Month+7.150%, | |
| 1,500,000 | 8.33%, 1/16/2030 (j) ..................... | 840,000 |
| | Atlas Senior Loan Fund XII, | |
| | Series 2018-12A, Class E | |
| | VAR ICE LIBOR USD 3 Month+5.950%, | |
| 2,400,000 | 6.97%, 10/24/2031 (j) .................... | 1,680,000 |
| | Babson CLO, | |
| | Series 2017-2A, Class ER | |
| | VAR ICE LIBOR USD 3 Month+6.450%, | |
| 3,000,000 | 7.59%, 10/20/2030 (j) .................... | 2,550,000 |
| | Benefit Street Partners CLO XI, | |
| | Series 2017-11A, Class E | |
| | VAR ICE LIBOR USD 3 Month+7.200%, | |
| 2,000,000 | 8.42%, 4/15/2029 (j) ..................... | 1,180,000 |
| | BlueMountain CLO, Ltd., | |
| | Series 2018-3A, Class E | |
| | VAR ICE LIBOR USD 3 Month+8.080%, | |
| 3,500,000 | 9.22%, 4/20/2031 (j) ..................... | 1,989,750 |
| | California Street CLO IX, | |
| | Series 2019-9A, Class FR2 | |
| | VAR ICE LIBOR USD 3 Month+8.520%, | |
| 3,500,000 | 10.36%, 7/16/2032 (j) .................... | 2,467,500 |

# CONSOLIDATED INVESTMENT PORTFOLIO (unaudited) (continued)

**As of June 30, 2020**                                                    **Highland Income Fund**

| Principal Amount ($) | | Value ($) |
|---|---|---|
| | **Collateralized Loan Obligations (continued)** | |
| | Canyon Capital CLO, | |
| | Series 2018-1A, Class ER | |
| | VAR ICE LIBOR USD 3 Month+5.750%, | |
| 2,000,000 | 6.97%, 7/15/2031 (j) ..................... | 1,680,000 |
| | Carlyle Global Market Strategies CLO, | |
| | Series 2018-1A, Class ER | |
| | VAR ICE LIBOR USD 3 Month+5.400%, | |
| 1,875,000 | 6.53%, 4/17/2031 (j) ..................... | 1,401,562 |
| | Catamaran CLO, Ltd., | |
| | Series 2014-2A, Class D | |
| | VAR ICE LIBOR USD 3 Month+4.850%, | |
| 3,000,000 | 5.99%, 10/18/2026 (j) ..................... | 1,862,400 |
| | Catamaran CLO, Ltd., | |
| | Series 2015-1A, Class E | |
| | VAR ICE LIBOR USD 3 Month+5.150%, | |
| 2,250,000 | 6.25%, 4/22/2027 (j) ..................... | 1,597,500 |
| | Cathedral Lake CLO, | |
| | Series 2019-4A, Class E2R | |
| | VAR ICE LIBOR USD 3 Month+7.830%, | |
| 4,000,000 | 8.97%, 10/20/2028 (j) ..................... | 2,680,000 |
| | Cathedral Lake CLO, | |
| | Series 2017-1A, Class DR | |
| | VAR ICE LIBOR USD 3 Month+7.250%, | |
| 1,250,000 | 8.47%, 10/15/2029 (j) ..................... | 983,500 |
| | CENT CLO, Ltd., | |
| | Series 2018-28A, Class D | |
| | VAR ICE LIBOR USD 3 Month+6.170%, | |
| 1,500,000 | 6.64%, 11/7/2030 (j) ..................... | 1,128,750 |
| | CIFC Funding, | |
| | Series 2019-1A, Class D2R | |
| | VAR ICE LIBOR USD 3 Month+4.430%, | |
| 1,000,000 | 5.54%, 10/21/2031 (j) ..................... | 973,800 |
| | CIFC Funding, Ltd., | |
| | Series 2018-1A, Class ER2 | |
| | VAR ICE LIBOR USD 3 Month+5.850%, | |
| 1,000,000 | 6.99%, 1/18/2031 (j) ..................... | 880,000 |
| | CIFC Funding, Ltd., | |
| | Series 2017-3A, Class D | |
| | VAR ICE LIBOR USD 3 Month+6.000%, | |
| 1,225,000 | 7.14%, 7/20/2030 (j) ..................... | 1,058,400 |
| | Covenant Credit Partners CLO III, | |
| | Series 2017-1A, Class F | |
| | VAR ICE LIBOR USD 3 Month+7.950%, | |
| 4,000,000 | 9.17%, 10/15/2029 (j) ..................... | 2,200,000 |
| | Dryden 41 Senior Loan Fund, | |
| | Series 2018-41A, Class FR | |
| | VAR ICE LIBOR USD 3 Month+7.200%, | |
| 4,250,000 | 8.42%, 4/15/2031 (j) ..................... | 2,550,000 |
| | Dryden 41 Senior Loan Fund, | |
| | Series 2018-41A, Class ER | |
| | VAR ICE LIBOR USD 3 Month+5.300%, | |
| 2,000,000 | 6.52%, 4/15/2031 (j) ..................... | 1,690,000 |
| | Dryden 45 Senior Loan Fund, | |
| | Series 2018-45A, Class FR | |
| | VAR ICE LIBOR USD 3 Month+8.120%, | |
| 2,000,000 | 9.34%, 10/15/2030 (j) ..................... | 1,480,000 |
| | Dryden 49 Senior Loan Fund, | |
| | Series 2017-49A, Class F | |
| | VAR ICE LIBOR USD 3 Month+7.550%, | |
| 1,500,000 | 8.69%, 7/18/2030 (j) ..................... | 1,080,000 |

| Principal Amount ($) | | Value ($) |
|---|---|---|
| | Eaton Vance CLO, | |
| | Series 2019-1A, Class F | |
| | VAR ICE LIBOR USD 3 Month+8.250%, | |
| 8,000,000 | 9.47%, 4/15/2031 (j) ..................... | 5,600,000 |
| | Flatiron CLO, | |
| | Series 2015-1A, Class F | |
| | VAR ICE LIBOR USD 3 Month+5.500%, | |
| 2,000,000 | 6.72%, 4/15/2027 (j) ..................... | 1,400,000 |
| | Galaxy XIX CLO, | |
| | Series 2017-19A, Class D1R | |
| | VAR ICE LIBOR USD 3 Month+6.530%, | |
| 2,100,000 | 7.55%, 7/24/2030 (j) ..................... | 1,879,500 |
| | Galaxy XXIV CLO, | |
| | Series 2017-24A, Class E | |
| | VAR ICE LIBOR USD 3 Month+5.500%, | |
| 1,000,000 | 6.72%, 1/15/2031 (j) ..................... | 750,000 |
| | Galaxy XXVI CLO, | |
| | Series 2018-26A, Class E | |
| | VAR ICE LIBOR USD 3 Month+8.000%, | |
| 5,450,000 | 8.36%, 11/22/2031 (j) ..................... | 3,733,250 |
| | GoldenTree Loan Management US CLO 3, | |
| | Series 2018-3A, Class F | |
| | VAR ICE LIBOR USD 3 Month+6.500%, | |
| 3,000,000 | 7.64%, 4/20/2030 (j) ..................... | 1,500,000 |
| | GoldenTree Loan Management US CLO 4, | |
| | Series 2019-4A, Class F | |
| | VAR ICE LIBOR USD 3 Month+6.400%, | |
| 3,500,000 | 7.42%, 4/24/2031 (j) ..................... | 2,380,000 |
| | GoldenTree Loan Opportunities IX, Ltd., | |
| | Series 2018-9A, Class FR2 | |
| | VAR ICE LIBOR USD 3 Month+7.640%, | |
| 3,500,000 | 8.48%, 10/29/2029 (j) ..................... | 2,502,500 |
| | Grippen Park CLO, | |
| | Series 2017-1A, Class E | |
| | VAR ICE LIBOR USD 3 Month+5.700%, | |
| 2,000,000 | 6.84%, 1/20/2030 (j) ..................... | 1,710,000 |
| | Jamestown CLO IX, | |
| | Series 2019-9A, Class DR | |
| | VAR ICE LIBOR USD 3 Month+6.940%, | |
| 5,500,000 | 8.08%, 10/20/2028 (b)(c)(j) .............. | 4,665,810 |
| | Jay Park CLO, Ltd., | |
| | Series 2018-1A, Class ER | |
| | VAR ICE LIBOR USD 3 Month+7.350%, | |
| 4,000,000 | 8.49%, 10/20/2027 (j) ..................... | 3,080,000 |
| | KKR CLO 18, | |
| | Series 2017-18, Class E | |
| | VAR ICE LIBOR USD 3 Month+6.450%, | |
| 3,000,000 | 7.59%, 7/18/2030 (j) ..................... | 2,430,000 |
| | Madison Park Funding XVII, | |
| | Series 2017-17A, Class FR | |
| | VAR ICE LIBOR USD 3 Month+7.480%, | |
| 2,000,000 | 8.59%, 7/21/2030 (j) ..................... | 1,360,000 |
| | Madison Park Funding XX, | |
| | Series 2018-20A, Class ER | |
| | VAR ICE LIBOR USD 3 Month+5.300%, | |
| 1,400,000 | 6.29%, 7/27/2030 (j) ..................... | 1,120,000 |
| | Madison Park Funding XXIV, | |
| | Series 2019-24A, Class ER | |
| | VAR ICE LIBOR USD 3 Month+7.200%, | |
| 2,000,000 | 8.34%, 10/20/2029 (j) ..................... | 1,870,000 |
| | Madison Park Funding XXIX, | |
| | Series 2018-29A, Class E | |
| | VAR ICE LIBOR USD 3 Month+7.570%, | |
| 1,000,000 | 8.71%, 10/18/2030 (j) ..................... | 817,500 |

6 | See Glossary on page 11 for abbreviations along with accompanying Notes to Consolidated Financial Statements.

## CONSOLIDATED INVESTMENT PORTFOLIO (unaudited) (continued)

**As of June 30, 2020**  **Highland Income Fund**

| Principal Amount ($) | Value ($) |
|---|---|
| **Collateralized Loan Obligations (continued)** | |
| Madison Park Funding XXX, Series 2018-30A, Class F VAR ICE LIBOR USD 3 Month+6.850%, | |
| 1,000,000  8.07%, 4/15/2029 (j) | 710,000 |
| Magnetite VII, Ltd., Series 2018-7A, Class ER2 VAR ICE LIBOR USD 3 Month+6.500%, | |
| 490,000  7.72%, 1/15/2028 (j) | 367,500 |
| Man GLG US CLO, Series 2018-1A, Class DR VAR ICE LIBOR USD 3 Month+5.900%, | |
| 4,500,000  7.04%, 4/22/2030 (j) | 3,037,500 |
| Mountain View Clo XIV, Series 2019-1A, Class F VAR ICE LIBOR USD 3 Month+8.700%, | |
| 500,000  9.92%, 4/15/2029 (j) | 320,700 |
| MP CLO VII, Series 2018-1A, Class FRR VAR ICE LIBOR USD 3 Month+7.910%, | |
| 5,800,000  9.05%, 10/18/2028 (j) | 2,978,880 |
| Neuberger Berman CLO XX, Ltd., Series 2017-20A, Class FR VAR ICE LIBOR USD 3 Month+7.450%, | |
| 4,250,000  8.67%, 1/15/2028 (j) | 2,600,316 |
| Northwoods Capital XII-B, Ltd., Series 2018-12BA, Class F VAR ICE LIBOR USD 3 Month+8.170%, | |
| 4,000,000  8.48%, 6/15/2031 (j) | 1,600,000 |
| OCP CLO, Series 2015-9A, Class E VAR ICE LIBOR USD 3 Month+6.400%, | |
| 1,000,000  7.62%, 7/15/2027 (j) | 810,000 |
| Octagon Investment Partners 46, Series 2020-2A, Class D VAR ICE LIBOR USD 3 Month+4.600%, | |
| 1,250,000  0.00%, 7/15/2033 (j) | 1,250,000 |
| OHA Credit Partners XII, Series 2018-12A, Class FR VAR ICE LIBOR USD 3 Month+7.680%, | |
| 2,900,000  8.72%, 7/23/2030 (j) | 2,129,470 |
| OZLM Funding III, Series 2016-3A, Class DR VAR ICE LIBOR USD 3 Month+7.770%, | |
| 1,000,000  8.87%, 1/22/2029 (j) | 800,000 |
| OZLM XXII, Ltd., Series 2018-22A, Class E VAR ICE LIBOR USD 3 Month+7.390%, | |
| 3,110,000  8.52%, 1/17/2031 (j) | 1,586,100 |
| Palmer Square CLO, Ltd., Series 2019-1A, Class DR2 VAR ICE LIBOR USD 3 Month+6.250%, | |
| 1,750,000  6.62%, 5/21/2029 (j) | 1,602,125 |
| Saranac CLO III, Ltd., Series 2018-3A, Class F VAR ICE LIBOR USD 3 Month+7.500%, | |
| 3,219,235  7.81%, 6/22/2030 (j) | 1,330,286 |
| Saranac CLO VI, Ltd., Series 2018-6A, Class E VAR ICE LIBOR USD 3 Month+6.400%, | |
| 5,000,000  6.71%, 8/13/2031 (j) | 3,285,000 |

| Principal Amount ($) | Value ($) |
|---|---|
| SCOF-2, Series 2018-2A, Class ER VAR ICE LIBOR USD 3 Month+5.710%, | |
| 2,160,000  6.93%, 7/15/2028 (j) | 1,684,800 |
| Symphony CLO XXI, Series 2019-21A, Class E VAR ICE LIBOR USD 3 Month+6.750%, | |
| 1,500,000  7.97%, 7/15/2032 (j) | 1,386,750 |
| TCW CLO, Series 2019-1A, Class F VAR ICE LIBOR USD 3 Month+8.670%, | |
| 1,000,000  9.06%, 2/15/2029 (j) | 850,000 |
| TCW CLO, Series 2019-2A, Class D2A VAR ICE LIBOR USD 3 Month+4.890%, | |
| 1,750,000  6.03%, 10/20/2032 (j) | 1,723,750 |
| TICP CLO I-2, Series 2018-IA, Class E VAR ICE LIBOR USD 3 Month+8.000%, | |
| 2,238,503  8.99%, 4/26/2028 (j) | 1,670,371 |
| TICP CLO III-2, Ltd., Series 2018-3R, Class F VAR ICE LIBOR USD 3 Month+7.980%, | |
| 4,150,000  9.12%, 4/20/2028 (j) | 3,098,390 |
| Trinitas CLO III, Ltd., Series 2015-3A, Class E VAR ICE LIBOR USD 3 Month+5.250%, | |
| 2,035,800  6.47%, 7/15/2027 (j) | 916,110 |
| Trinitas CLO X, Series 2019-10A, Class F VAR ICE LIBOR USD 3 Month+7.785%, | |
| 5,000,000  9.00%, 4/15/2032 (j) | 3,416,667 |
| Vibrant CIO IX, Series 2018-9A, Class D VAR ICE LIBOR USD 3 Month+6.250%, | |
| 1,000,000  7.39%, 7/20/2031 (j) | 720,000 |
| Voya CLO, Ltd., Series 2018-4A, Class ER VAR ICE LIBOR USD 3 Month+9.050%, | |
| 3,200,000  10.36%, 7/14/2031 (j) | 1,436,122 |
| Webster Park CLO, Series 2018-1A, Class ER VAR ICE LIBOR USD 3 Month+7.750%, | |
| 1,000,000  8.89%, 7/20/2030 (j) | 810,000 |
| Zais CLO 3 Ltd., Series 2018-3A, Class DR VAR ICE LIBOR USD 3 Month+6.910%, | |
| 3,000,000  8.13%, 7/15/2031 (j) | 1,275,000 |
| Zais CLO 8, Series 2018-1A, Class E VAR ICE LIBOR USD 3 Month+5.250%, | |
| 3,359,069  6.47%, 4/15/2029 (j) | 1,477,991 |
| **Total Collateralized Loan Obligations** (Cost $197,449,873) | 152,445,338 |
| **LLC INTEREST - 10.3%** | |
| 624,311  NREF OP II, L.P. (e) | 10,457,205 |
| 489,109  NREF OP IV, L.P. (e) | 8,192,574 |
| 11,854,986  SFR WLIF I, LLC (b)(c)(e) | 9,786,173 |
| 52,666,032  SFR WLIF II, LLC (b)(c)(e) | 43,737,559 |
| 25,478,982  SFR WLIF III, LLC (b)(c)(e) | 22,057,409 |
| **Total LLC Interest** (Cost $112,268,393) | 94,230,920 |

See Glossary on page 11 for abbreviations along with accompanying Notes to Consolidated Financial Statements. | 7

013314

# CONSOLIDATED INVESTMENT PORTFOLIO (unaudited) (continued)

**As of June 30, 2020** — Highland Income Fund

| Principal Amount ($) | | Value ($) |
|---|---|---|
| **Collateralized Loan Obligations (continued)** | | |
| **AGENCY COLLATERALIZED MORTGAGE OBLIGATIONS - 8.1%** | | |
| 114,251,827 | FREMF Mortgage Trust, Series 2019-K99, Class D 0.00%, 11/25/2029 (j)(n)(o) | 47,962,741 |
| 54,160,055 | FREMF Mortgage Trust, Series 2019-K97, Class D 0.00%, 1/25/2030 (j)(n)(o) | 20,271,025 |
| 588,310,827 | FREMF Mortgage Trust, Series 2019-K97, Class X2A 0.10%, 7/25/2029 (j)(n)(p) | 4,718,253 |
| 133,593,827 | FREMF Mortgage Trust, Series 2019-K97, Class X2B 0.10%, 1/25/2030 (j)(n)(p) | 1,047,375 |
| | Total Agency Collateralized Mortgage Obligations (Cost $80,305,458) | 73,999,394 |

| Shares | | |
|---|---|---|
| **Registered Investment Companies - 1.4%** | | |
| 48,649 | Highland Global Allocation Fund (e)(k) | 313,300 |
| 1,156,943 | NexPoint Strategic Opportunities Fund (e) | 12,171,040 |
| | Total Registered Investment Companies (Cost $19,726,415) | 12,484,340 |

| Principal Amount ($) | | |
|---|---|---|
| **Corporate Bonds & Notes - 0.1%** | | |
| **ENERGY - 0.0%** | | |
| 15,600,000 | Ocean Rig UDW, Inc. 7.25%, 04/01/19 (b)(c)(d)(j) | — |
| **INDUSTRIALS - 0.0%** | | |
| 7,500,000 | American Airlines (d)(f) | 119,168 |
| **REAL ESTATE - 0.1%** | | |
| 2,000,000 | CBL & Associates 5.95%, 12/15/26 | 580,810 |
| **UTILITIES - 0.0%** | | |
| 15,222,107 | Bruce Mansfield Pass-Through Trust 6.85%, 06/01/34 (d) | — |
| 8,000,000 | Texas Competitive Electric Holdings Co., LLC 11.50%, (d)(f) | 20,000 |
| | | 20,000 |
| | Total Corporate Bonds & Notes (Cost $15,012,949) | 719,978 |

| Contracts | | |
|---|---|---|
| **Purchased Call Options (i) - 0.0%** | | |
| | Total Purchased Call Options (Cost $1,300,000) | 213,400 |

| Principal Amount ($) | | Value ($) |
|---|---|---|
| **Claims (q) - 0.0%** | | |
| **COMMUNICATION SERVICES - 0.0%** | | |
| 3,791,858 | Lehman Brothers Commercial Paper LCPI Claim Facility (b)(c)(d) | 52,138 |
| | Total Claims (Cost $1,814,883) | 52,138 |

| Units | | |
|---|---|---|
| **Warrants - 0.0%** | | |
| **ENERGY - 0.0%** | | |
| 5,801 | Arch Resources, Expires 10/08/2023 (i) | 14,503 |
| **INDUSTRIALS - 0.0%** | | |
| 453 | Omnimax International, Inc., Expires 12/31/2049 (b)(c)(e)(i) | 18 |
| 178,140 | Remington Outdoor Co., Inc., Expires (b)(c)(i) | — |
| | | 18 |
| | Total Warrants (Cost $264,794) | 14,521 |

| Shares | | |
|---|---|---|
| **Cash Equivalents - 18.2%** | | |
| **MONEY MARKET FUND (r) - 18.2%** | | |
| 165,786,201 | Dreyfus Treasury & Agency Cash Management, Institutional Class 0.100% | 165,786,201 |
| | Total Cash Equivalents (Cost $165,786,201) | 165,786,201 |

| Principal Amount ($) | | |
|---|---|---|
| **Repurchase Agreement (s)(t) - 0.0%** | | |
| 63,675 | Citigroup Global Markets 0.120%, dated 06/30/20, to be repurchased on 07/01/20, repurchase price $63,675 (collateralized by various U.S. Government Agency and U.S. Treasury Obligations, par value $2 - $37,487, 0.000% - 3.750%, 07/08/20 - 11/15/2043, with a total market value of $64,953) | 63,675 |
| | Total Repurchase Agreement (Cost $63,675) | 63,675 |
| **Total Investments - 149.7%** | | **1,364,615,261** |
| (Cost $1,878,769,025) | | |
| **Securities Sold Short - (0.7)%** | | |
| **Common Stock - (0.7)%** | | |
| **INFORMATION TECHNOLOGY - (0.7)%** | | |
| (53,300) | Texas Instruments, Inc. | (6,767,501) |
| | Total Common Stocks (Proceeds $6,381,954) | (6,767,501) |
| | Total Securities Sold Short - (0.7)% (Proceeds $6,381,954) | (6,767,501) |
| **Other Assets & Liabilities, Net - (49.0)% (u)** | | **(446,253,618)** |
| **Net Assets - 100.0%** | | **911,594,142** |

8 | See Glossary on page 11 for abbreviations along with accompanying Notes to Consolidated Financial Statements.

013315

## CONSOLIDATED INVESTMENT PORTFOLIO (unaudited) (continued)

**As of June 30, 2020**                                             **Highland Income Fund**

(a) Senior loans (also called bank loans, leveraged loans, or floating rate loans) in which the Fund invests generally pay interest at rates which are periodically determined by reference to a base lending rate plus a spread (unless otherwise identified, all senior loans carry a variable rate of interest). These base lending rates are generally (i) the Prime Rate offered by one or more major United States banks, (ii) the lending rate offered by one or more European banks such as the London Interbank Offered Rate ("LIBOR") or (iii) the Certificate of Deposit rate. As of June 30, 2020, the LIBOR USD 3 Month rate was 0.30% and the Prime Rate was 3.25%. Senior loans, while exempt from registration under the Securities Act of 1933, as amended (the "1933 Act"), contain certain restrictions on resale and cannot be sold publicly. Senior secured floating rate loans often require prepayments from excess cash flow or permit the borrower to repay at its election. The degree to which borrowers repay, whether as a contractual requirement or at their election, cannot be predicted with accuracy. As a result, the actual remaining maturity maybe substantially less than the stated maturity shown.

(b) Securities with a total aggregate value of $613,977,756, or 67.4% of net assets, were classified as Level 3 within the three-tier fair value hierarchy. Please see Notes to Investment Portfolio for an explanation of this hierarchy, as well as a list of unobservable inputs used in the valuation of these instruments.

(c) Represents fair value as determined by the Fund's Board of Trustees (the "Board"), or its designee in good faith, pursuant to the policies and procedures approved by the Board. The Board considers fair valued securities to be securities for which market quotations are not readily available and these securities may be valued using a combination of observable and unobservable inputs. Securities with a total aggregate value of $613,977,756, or 67.4% of net assets, were fair valued under the Fund's valuation procedures as of June 30, 2020. Please see Notes to Investment Portfolio.

(d) The issuer is, or is in danger of being, in default of its payment obligation.

(e) Affiliated issuer. Assets with a total aggregate market value of $329,894,563, or 36.2% of net assets, were affiliated with the Fund as of June 30, 2020.

(f) Represents value held in escrow pending future events. No interest is being accrued.

(g) Perpetual security with no stated maturity date.

(h) There is currently no rate available.

(i) Non-income producing security.

(j) Securities exempt from registration under Rule 144A of the 1933 Act. These securities may only be resold in transaction exempt from registration to qualified institutional buyers. At June 30, 2020, these securities amounted to $247,086,255 or 27.1% of net assets.

(k) Securities (or a portion of securities) on loan. As of June 30, 2020, the market value of securities loaned was $60,938. The loaned securities were secured with cash and securities collateral of $63,675. Collateral is calculated based on prior day's prices.

(l) Step Bonds - Represents the current rate, the step rate, and the step date.

(m) Restricted Securities. These securities are not registered and may not be sold to the public. There are legal and/or contractual restrictions on resale. The Fund does not have the right to demand that such securities be registered. The values of these securities are determined by valuations provided by pricing services, brokers, dealers, market makers, or in good faith under the procedures established by the Fund's Board of Trustees. Additional Information regarding such securities follows:

| Restricted Security | Security Type | Acquisition Date | Cost of Security | Market Value at Period End | Percent of Net Assets |
|---|---|---|---|---|---|
| Metro-Goldwyn-Mayer, Inc. | Common Stocks | 12/20/2010 | $21,845,688 | $41,344,422 | 4.5% |
| TerreStar Corporation | Common Stocks | 3/16/2018 | $ 3,093,276 | $ 9,205,209 | 1.0% |

(n) As of June 30, 2020, investments with a total aggregate value of $29,260,775 were fully or partially segregated with broker(s)/custodian as collateral for reverse repurchase agreements.

(o) Principal only security ("PO"). These types of securities represent the right to receive the monthly principal payments on an underlying pool of mortgages. No payments of interest on the pool are passed through to the "principal only" holder.

(p) Interest only security ("IO"). These types of securities represent the right to receive the monthly interest payments on an underlying pool of mortgages. Payments of principal on the pool reduce the value of the "interest only" holding.

(q) These positions represent claims that have been filed with the United States Bankruptcy Court Southern District of New York against Lehman Commercial Paper, Inc. UKBranch.

(r) Rate shown is 7 day effective yield.

(s) This security was purchased with cash collateral held from securities on loan. The total value of such securities as of June 30, 2020 was $63,675.

(t) Tri-Party Repurchase Agreement.

(u) As of June 30, 2020, $22,369,153 in cash was segregated or on deposit with the brokers to cover investments sold short and is included in "Other Assets & Liabilities, Net".

**CONSOLIDATED INVESTMENT PORTFOLIO (unaudited) (concluded)**

**As of June 30, 2020**                                                                                              **Highland Income Fund**

Futures contracts outstanding as of June 30, 2020 were as follows:

| Description | Expiration Date | Number of Contracts | Notional Value | Unrealized Depreciation | Value |
|---|---|---|---|---|---|
| **Short Futures:** | | | | | |
| Russell 2000 Index E-MINI | September 2020 | 1,674 | $192,724,329 | $(895,601) | $(193,619,930) |

Purchased options contracts outstanding as of June 30, 2020 were as follows:

| Description | Exercise price | Counterparty | Expiration Date | Number of Contracts | Notional Value | Premium | Value |
|---|---|---|---|---|---|---|---|
| **PURCHASED CALL OPTIONS:** | | | | | | | |
| USD Call/CNH Put | $7.70 | BNP | October 2020 | 200,000,000 | $1,414,000,000 | $1,300,000 | $213,400 |

The average amount of borrowing by the Fund on reverse repurchase agreements outstanding during the period ended June 30, 2020 was $80,596,300 at a weighted average interest rate of 2.25%.

Reverse Repurchase Agreements outstanding as of June 30, 2020 were as follows:

| Counterparty | Collateral Pledged | Interest Rate | Trade Date | Maturity Date | Repurchase Amount | Principal Amount | Value |
|---|---|---|---|---|---|---|---|
| Mizuho | FREMF Mortgage Trust, Series 2019-K99, Class D, 0.00%, 11/25/2029 | 2.70 | 6/19/2020 | 7/17/2020 | $24,960,307 | $42,505,341 | $24,908,000 |
| Mizuho | FREMF Mortgage Trust, Series 2019-K97, Class D, 0.00%, 1/25/2049 | 3.10 | 5/1/2020 | 12/31/2049 | 25,690,899 | 20,271,025 | 13,290,000 |
| Mizuho | FREMF Mortgage Trust, Series 2019-K97, Class X2A, 0.10%, 7/25/2029 | 2.70 | 6/19/2020 | 7/25/2020 | 2,681,016 | 4,718,253 | 2,677,000 |
| Mizuho | FREMF Mortgage Trust, Series 2019-K97, Class X2B, 0.10%, 1/25/2030 | 2.70 | 6/19/2020 | 7/9/2020 | 521,782 | 1,047,376 | 521,000 |
| **Total Reverse Repurchase Agreements** | | | | | | | $41,396,000 |

013317

# GLOSSARY: (abbreviations that may be used in the preceding statements)(unaudited)

## Other Abbreviations:

| | |
|---|---|
| CLO | Collateralized Loan Obligation |
| FREMF | Freddie Mac Multi-Family |
| ICE | Intercontinental Exchange |
| LIBOR | London Interbank Offered Rate |
| PIK | Payment In-Kind |
| REIT | Real Estate Investment Trust |
| USD | United States Dollar |
| VAR | Variable |

013318

## CONSOLIDATED STATEMENT OF ASSETS AND LIABILITIES (unaudited)

| As of June 30, 2020 | Highland Income Fund |
| --- | --- |
| | ($) |
| **Assets** | |
| Investments from unaffiliated issuers, at value (a) | 868,870,822 |
| Affiliated investments, at value (Note 10) | 329,894,563 |
| Total Investments, at value (Cost $1,712,919,149) | 1,198,765,385 |
| Cash equivalents (Note 2) | 165,786,201 |
| Repurchase Agreements, at value | 63,675 |
| Cash | 6,229,265 |
| Restricted Cash — Securities Sold Short (Note 2) | 6,664,584 |
| Restricted Cash — Futures (Note 3) | 17,248,880 |
| Receivable for: | |
| Investments sold and principal paydowns | 6,394,077 |
| Dividends and interest | 9,601,455 |
| Fund shares sold | 124,646 |
| Prepaid expenses and other assets | 814,621 |
| Total assets | 1,412,582,749 |
| **Liabilities:** | |
| Line of credit (Note 6) | 300,000,000 |
| Securities sold short, at value (Proceeds $6,381,954) (Notes 2 and 8) | 6,767,501 |
| Reverse repurchase agreements (Note 3) | 41,396,000 |
| Payable for: | |
| Upon return of securities loaned (Note 4) | 63,675 |
| Investments purchased | 8,377,720 |
| Payable for variation margin | 2,451,515 |
| Investment advisory and administration fees (Note 7) | 1,021,043 |
| Interest expense and commitment fee payable (Note 6) | 120,665 |
| Accrued expenses and other liabilities | 1,034,239 |
| Total liabilities | 361,232,358 |
| **Mezzanine Equity:** | |
| Cumulative preferred shares (Series A), net of deferred financing costs (Notes 1 and 2) | 139,756,249 |
| **Net Assets** | **911,594,142** |
| **Net Assets Consist of:** | |
| Paid-in capital | 1,614,644,629 |
| Total accumulated losses | (703,050,487) |
| **Net Assets** | **911,594,142** |
| Investments, at cost | 1,041,069,421 |
| Affiliated investments, at cost (Note 10) | 671,849,728 |
| Cash equivalents, at cost (Note 2) | 165,786,201 |
| Repurchase Agreements, at cost | 63,675 |
| Proceeds from securities sold short | 6,381,954 |
| (a) Includes market value of securities on loan | 60,938 |
| **Common Shares** | |
| Shares outstanding ($0.001 par value; unlimited authorization) | 71,409,281 |
| Net asset value per share (Net assets/shares outstanding) | 12.77 |

## CONSOLIDATED STATEMENT OF OPERATIONS (unaudited)

| For the Period Ended June 30, 2020 | Highland Income Fund |
|---|---:|
| | ($) |
| **Investment Income** | |
| **Income:** | |
| Dividends from unaffiliated issuers | 6,270,807 |
| Dividends from affiliated issuers (Note 10) | 199,335 |
| Securities lending income (Note 4) | 504 |
| Interest from unaffiliated issuers | 10,413,841 |
| Interest from affiliated issuers | 20,983,587 |
| Interest paid in kind from unaffiliated issuers | 820,899 |
| Interest paid in kind from affiliated issuers (Note 10) | 3,923,248 |
| Total income | 42,612,221 |
| | |
| **Expenses:** | |
| Investment advisory (Note 7) | 4,430,926 |
| Administration fees (Note 7) | 1,419,531 |
| Interest expense, commitment fees, and financing costs (Note 6) | 5,105,031 |
| Legal fees | 738,720 |
| Accounting services fees | 365,014 |
| Dividends and fees on securities sold short (Note 2) | 283,663 |
| Expedited settlement facility (Note 7) | 197,167 |
| Reports to shareholders | 187,317 |
| Audit fees | 176,432 |
| Transfer agent fees | 103,982 |
| Trustees fees (Note 6) | 103,081 |
| Insurance | 91,599 |
| Pricing fees | 55,577 |
| Registration fees | 43,867 |
| Custodian/wire agent fees | 41,121 |
| Other | 545,095 |
| Total operating expenses | 13,888,123 |
| Net investment income | 28,724,098 |
| Preferred dividend expense | (7,182,289) |
| **Net Realized and Unrealized Gain (Loss) on Investments** | |
| **Realized gain (loss) on:** | |
| Investments from unaffiliated issuers | (59,945,867) |
| Investments in affiliated issuers | 1,843,260 |
| Securities sold short (Note 2) | 34,650,098 |
| Written options contracts (Note 3) | 18,882,098 |
| Futures contracts (Note 3) | 66,579,079 |
| | |
| **Net Change in Unrealized Appreciation (Depreciation) on:** | |
| Investments | (84,879,244) |
| Investments in affiliated issuers | (42,494,340) |
| Securities sold short (Note 2) | 218,347 |
| Written options contracts (Note 3) | (4,437,523) |
| Futures contracts (Note 3) | 1,393,763 |
| Net realized and unrealized gain (loss) on investments | (68,190,329) |
| Total decrease in net assets resulting from operations | (46,648,520) |

**CONSOLIDATED STATEMENTS OF CHANGES IN NET ASSETS**

| | Highland Income Fund | |
|---|---|---|
| | **Six Months Ended June 30, 2020 (unaudited) ($)** | **Year Ended December 31, 2019 ($)** |
| **Increase (Decrease) in Net Assets** | | |
| **Operations:** | | |
| Net investment income | 28,724,098 | 60,675,649 |
| Preferred dividend expense | (7,182,289) | (3,285,411) |
| Net realized gain (loss) on investments, securities sold short, written options, futures contracts and foreign currency transactions | 62,008,668 | (74,038,344) |
| Net increase (decrease) in unrealized appreciation (depreciation) on investments, securities sold short, written options, futures contracts and foreign currency transactions | (130,198,997) | 53,928,243 |
| Net increase (decrease) from operations | (46,648,520) | 37,280,137 |
| **Distributions** | | |
| Shares of closed-end fund | (33,095,689) | (58,214,363) |
| **Return of capital:** | | |
| Shares of closed-end fund | — | (8,201,030) |
| **Total distributions** | (33,095,689) | (66,415,393) |
| Decrease in net assets from operations and distributions | (79,744,209) | (29,135,256) |
| **Share transactions:** | | |
| Shares of closed-end fund | | |
| Value of distributions reinvested | 787,019 | 1,291,961 |
| Shares repurchased of closed-end fund (Note 1) | (4,853,593) | (3,163,298) |
| Net decrease from shares transactions | (4,066,574) | (1,871,337) |
| **Total decrease in net assets** | (83,810,783) | (31,006,593) |
| **Net Assets** | | |
| Beginning of period | 995,404,925 | 1,026,411,518 |
| End of period | 911,594,142 | 995,404,925 |
| **Change in Common Shares:** | | |
| Issued for distribution reinvested | 85,214 | 98,540 |
| Shares redeemed | (412,008) | (235,049) |
| Net Decrease in fund shares | (326,794) | (136,509) |

**CONSOLIDATED STATEMENT OF CASH FLOWS (unaudited)**

| For the Period Ended June 30, 2020 | Highland Income Fund |
|---|---|
| | ($) |
| **Cash Flows Provided by Operating Activities:** | |
| Net decrease in net assets resulting from operations | (46,648,520) |
| **Adjustments to Reconcile Net Investment Gain to Net Cash Provided by Operating Activities:** | |
| Purchases of investment securities from unaffiliated issuers | (290,553,899) |
| Purchases of investment securities from affiliated issuers | (55,588,557) |
| Interest paid in kind from unaffiliated issuers | (820,899) |
| Interest paid in kind from affiliated issuers | (3,923,248) |
| Proceeds from disposition of investment securities from unaffiliated issuers | 441,344,834 |
| Proceeds from disposition of investment securities from affiliated issuers | 14,549,927 |
| Purchases to cover securities sold short | 328,821,964 |
| Proceeds from securities sold short | (296,262,535) |
| Purchases to cover written options | (46,934,154) |
| Proceeds from written options | 59,860,728 |
| Paydowns at cost | 3,244,994 |
| Net accretion of discount | (1,329,114) |
| Net realized loss on Investments from unaffiliated issuers | 59,945,867 |
| Net realized gain on Investments from affiliated issuers | (1,843,260) |
| Net realized gain on securities sold short, written options contracts, futures contracts, and foreign currency transactions | (53,532,196) |
| Net change in unrealized appreciation/(depreciation) on investments, securities sold short, and foreign currency related transactions | 131,592,760 |
| Decrease in receivable for investments sold and principal paydowns | 2,984,408 |
| Decrease in receivable for dividends and interest | 3,521,020 |
| Decrease in receivable for variation margin | 783,337 |
| Decrease in due from broker | 3,734,575 |
| Decrease in prepaid expenses and other assets | 121,366 |
| Increase in payable for investments purchased | 8,362,610 |
| Decrease in payable to investment advisory | (114,725) |
| Decrease due to broker | (3,324,533) |
| Increase in payable for upon return of securities loaned | 63,675 |
| Increase in payable for variation margin | 2,451,515 |
| Decrease in payable to custody | (123,375) |
| Decrease in payable for commitment fees and interest expense | (889,095) |
| Increase in accrued expenses and other liabilities | 512,446 |
| Net cash flow provided by operating activities | 260,007,916 |
| **Cash Flows Used In Financing Activities:** | |
| Distributions paid in cash, net of receivable | (32,308,670) |
| Shares repurchased of closed-end fund | (4,853,593) |
| Proceeds from shares sold | (23,080) |
| Proceeds from reverse repurchase agreements, net | (78,400,600) |
| Net cash flow used by financing activities | (115,585,943) |
| Net increase in cash | 144,421,973 |
| **Cash, cash equivalents and Restricted Cash:** | |
| Beginning of period | 51,506,957 |
| End of period | 195,928,930 |
| **Supplemental disclosure of cash flow information:** | |
| Reinvestment of distributions | 787,019 |
| Cash paid during the period for interest expense and commitment fees | 5,994,126 |

See accompanying Notes to Consolidated Financial Statements. | 15

013322

# CONSOLIDATED FINANCIAL HIGHLIGHTS

Highland Income Fund

**Selected data for a share outstanding throughout each period is as follows:**

| | For the Period Ended June 30, 2020 (unaudited) | For the Year Ended December 31, 2019 | For the Period Ended December 31, 2018** | For the Years Ended June 30, | | | |
|---|---|---|---|---|---|---|---|
| | | | | 2018*‡ | 2017*‡ | 2016*‡ | 2015*‡ |
| **Net Asset Value, Beginning of Period** | $ 13.88 | $ 14.28 | $ 15.12 | $ 15.01 | $ 14.33 | $ 16.17 | $ 16.91 |
| **Income from Investment Operations:** | | | | | | | |
| Net investment income(a) | 0.40 | 0.85 | 0.42 | 0.75 | 0.68 | 0.89 | 0.74 |
| Preferred dividend expense | (0.10) | (0.05) | — | — | — | — | — |
| Net realized and unrealized gain (loss) | (0.95) | (0.28) | (0.80) | 0.18 | 0.74 | (1.84) | (0.74) |
| Total Income from Investment Operations | (0.65) | 0.52 | (0.38) | 0.93 | 1.42 | (0.95) | —(b) |
| **Less Distributions Declared to shareholders:** | | | | | | | |
| From net investment income | (0.46) | (0.81) | (0.45) | (0.72) | (0.74) | (0.89) | (0.74) |
| From return of capital | — | (0.11) | (0.01) | (0.10) | — | — | — |
| Total distributions declared to shareholders | (0.46) | (0.92) | (0.46) | (0.82) | (0.74) | (0.89) | (0.74) |
| **Net Asset Value, End of Period(c)** | $ 12.77 | $ 13.88 | $ 14.28 | $ 15.12 | $ 15.01 | $ 14.33 | $ 16.17 |
| **Market Value, End of Period** | $ 8.05 | $ 12.43 | $ 12.80 | $ 15.62 | $ — | $ — | $ — |
| Total Return(d) | (31.87)% | 4.30% | (15.44)%(e) | 9.77% | 10.05% | (5.77)% | 0.11% |
| **Ratios to Average Net Assets / Supplemental Data:(f)(g)** | | | | | | | |
| Net Assets, End of Period (000's) | $911,594 | $995,405 | $1,026,412 | $1,085,547 | $389,278 | $241,197 | $283,673 |
| Gross operating expenses(h)(i) | 3.02% | 3.39% | 3.10% | 1.79% | 1.20%(j) | 1.38% | 1.03% |
| Net investment income(i) | 6.25% | 5.93% | 5.48% | 4.98% | 4.61% | 5.65% | 4.55% |
| Portfolio turnover rate | 25% | 18% | 27%(e) | 177% | 63% | 53% | 55% |
| Average commission rate paid(k) | $ 0.0067 | $ 0.0032 | $ 0.0243 | $ 0.0300 | | | |

---

* Per share data prior to November 3, 2017 has been adjusted to give effect to an approximately 2 to 1 reverse stock split as part of the conversion to a closed-end fund. (Note 1)

** For the six month period ended December 31, 2018. Effective April 11, 2019, the Fund had a fiscal year change from June 30 to December 31 (Note 1).

‡ Reflects the financial highlights of Class Z of the open-end fund prior to the conversion.

(a) Per share data was calculated using average shares outstanding during the period.

(b) Represents less than $0.005 per share.

(c) The Net Asset Value per share and total return have been calculated based on net assets which include adjustments made in accordance with U.S. Generally Accepted Accounting Principles required at period end for financial reporting purposes. These figures do not necessarily reflect the Net Asset Value per share or total return experienced by the shareholder at period end

(d) Total return is based on market value per share for periods after November 3, 2017. Distributions are assumed for purposes of this calculation to be reinvested at prices obtained under the Fund's Dividend Reinvestment Plan. Prior to November 3, 2017, total return is at net asset value assuming all distributions are reinvested. For periods with waivers/reimbursements, had the Fund's investment adviser not waived or reimbursed a portion of expenses, total return would have been lower.

(e) Not annualized.

(f) All ratios for the period have been annualized, unless otherwise indicated.

(g) Supplemental expense ratios are shown below.

(h) Includes dividends and fees on securities sold short.

(i) Includes 12b-1 fees from partial period operating as an open-end fund. Following the conversion on November 3, 2017, the Fund is no longer subject to 12b-1fees.

(j) Refer to Note 7 in the Notes to the Financial Statements for discussion of prior period custodian out-of-pocket expenses that were communicated to the Fund in the current period. The amount of the reimbursement was immaterial on a per share basis and did not impact the total return of the Fund. The Ratios of Gross Operating Expenses and Net Operating Expenses to Average Net Assets would be unchanged as the reimbursement of custodian fees was offset against current period expense waivers/ reimbursements with no impact to net expenses or net investment income.

(k) Represents the total dollar amount of commissions paid on portfolio transactions divided by total number of portfolio shares purchased and sold for which commissions were charged. The period prior to the Conversion Date is not presented.

013323

**CONSOLIDATED FINANCIAL HIGHLIGHTS (continued)**

**Highland Income Fund**

**Supplemental Expense Ratios:**

| | For the Period Ended June 30, 2020 (unaudited) | For the Year Ended December 31, 2019 | For the Period Ended December 31, 2018** | For the Years Ended June 30, | | | |
|---|---|---|---|---|---|---|---|
| | | | | 2018*‡ | 2017*‡ | 2016*‡ | 2015*‡ |
| Net operating expenses (net of waiver/reimbursement, if applicable, but gross of all other operating expenses) | 3.02% | 3.39% | 3.10% | 1.79% | 1.12% | 1.11% | 1.04% |
| Interest expense and commitment fees, and preferred dividend expense | 2.67% | 1.90% | 1.63% | 0.49% | 0.01% | 0.15% | 0.04% |
| Dividends and fees on securities sold short | 0.06% | 0.01% | —%[I] | —%[I] | 0.01% | 0.01% | 0.05% |

(I)    Represents less than 0.005%.

See accompanying Notes to Consolidated Financial Statements. | 17

013324

# NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (unaudited)

June 30, 2020                                                                 Highland Income Fund

## Note 1. Organization

Highland Income Fund (the "Fund") is organized as an unincorporated business trust under the laws of The Commonwealth of Massachusetts. The Fund is registered with the U.S. Securities and Exchange Commission (the "SEC") under the Investment Company Act of 1940, as amended (the "1940 Act"), as a non-diversified, closed-end management investment company. On September 25, 2017, the Fund acquired the assets of Highland Floating Rate Opportunities Fund (the "Predecessor Fund"), a series of Highland Funds I, a Delaware statutory trust. The Fund is the successor to the accounting and performance information of the Predecessor Fund.

Effective April 11, 2019, the Fund changed its fiscal year end to December 31. The previous fiscal year end was June 30.

On May 20, 2019, the Fund changed its name from Highland Floating Rate Opportunities Fund to Highland Income Fund.

On November 3, 2017, shareholders of the Fund approved a proposal authorizing the Board of Trustees (the "Board") of the Fund to convert the fund from an open-end fund to a closed-end fund at a special meeting of shareholders. The Board took action to convert the Fund to a closed-end fund effective shortly after 4:00 p.m. Eastern Time on November 3, 2017 (the "Conversion Date"). The Fund also effected an approximately 1-for-2 reverse stock split of the Fund's issued and outstanding shares on November 3, 2017, thereby reducing the number of shares outstanding. Shareholders were paid cash for any fractional shares resulting from the reverse stock split. The Fund began listing its shares for trading on the New York Stock Exchange (the "NYSE") on November 6, 2017 under the ticker symbol "HFRO". The Fund may issue an unlimited number of common shares, par value $0.001 per share ("Common Shares"). Prior to the Conversion Date, the Fund issued Class A, Class C, and Class Z shares. The Fund incurred $1,076,274 in Conversion costs related to the fund conversion to a closed-end fund.

On October 29, 2019, the Board of the Fund authorized the repurchase of up to $25 million of the Fund's shares. Under this program, the Fund repurchased 235,049 shares through December 2019. Upon retirement of the repurchased shares, the net asset value ("NAV") was $3.2 million, or $13.46 per share.

On July 29, 2019, the Fund issued 5.4 million 5.375% Series A Cumulative Preferred shares (NYSE: HFRO.PR.A) with an aggregate liquidation value of $135 million. Subsequently on August 9, 2019, the underwriters exercised their option to purchase additional overallotment shares of $10mm, resulting in a total Preferred outstanding offering of $145mm.

The Series A Preferred shares are perpetual, non-callable for five years, and have a liquidation preference of $25.00 per share. Distributions are scheduled quarterly, with payments beginning on September 30, 2019. Series A Preferred shares trade on the NYSE. Moody's Investors Service has assigned an A1 rating to the preferred shares.

On October 14, 2019, the Board of the Fund approved an amendment to the Third Amended and Restated Agreement and Declaration of Trust of the Fund to require the affirmative vote or consent of the holders of 75% of each class of shares outstanding (with each such class voting separately thereon) for certain transactions involving a Principal Shareholder. For purposes of this requirement, Principal Shareholder is defined any person which is the beneficial owner, directly or indirectly, of more than 5% of the outstanding shares of the Fund or of any class and shall include any "affiliate" or "associate", as such terms are defined in Rule 12b-2 of the General Rules and Regulations under the Securities Exchange Act of 1934, as amended. The certain transactions covered by this requirement include: (i) a merger or consolidation of the Fund or any subsidiary of the Fund with or into any Principal Shareholder; (ii) the issuance of any securities of the Fund to any Principal Shareholder for cash; (iii) the sale, lease or exchange of all or any substantial part of the assets of the Fund to any Principal Shareholder (except assets determined by the Board to have an aggregate fair market value of less than $1,000,000, aggregating for the purpose of such computation all assets sold, leased or exchanged in any series of similar transactions within a twelve-month period or assets sold in the ordinary course of business); and (iv) the sale, lease or exchange to or with the Fund or any subsidiary thereof, in exchange for securities of the Fund, of any assets of any Principal Shareholder (except assets determined by the Board to have an aggregate fair market value of less than $1,000,000 aggregating for the purpose of such computation all assets sold, leased or exchanged in any series of similar transactions within a twelve-month period).

On April 24, 2020, the Board of the Fund authorized the repurchase of up to 10% of the Fund's shares over a twelve-month period. Under this program, the Fund repurchased 412,008 shares through June 2020, at an average price of $7.3, for a total investment of $3.0 million.

On August 13, 2020, the Board of the Fund approved an amendment to the Third Amended and Restated Agreement and Declaration of Trust of the Fund to provide that holders of control shares of the Fund acquired in a control share acquisition have no voting rights with respect to the control shares except to the extent approved by the shareholders by the affirmative vote of at least two-thirds of all votes entitled to be cast on the matter, excluding all interested shares. For such purposes, "control shares" are shares of the Funds that, when aggregated with other shares controlled by the

013325

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (unaudited) (continued)**

June 30, 2020                                                                                                    Highland Income Fund

shareholder, entitle the person to exercise voting power in electing directors within certain ranges of voting power (i.e., 10-33%, 33-50%, greater than 50%). Control shares include shares only to the extent that the "acquiring person," following the acquisition of shares, is entitled to exercise voting power in electing directors within any of these levels of voting power for which shareholder approval has not been obtained. An "acquiring person" is a person who makes or proposes to make a "control share acquisition," which in turn is defined as the direct or indirect acquisition of ownership or control of control shares.

## Note 2. Significant Accounting Policies
The following summarizes the significant accounting policies consistently followed by the Fund in the preparation of its financial statements.

## Use of Estimates
The Fund is an investment company that applies the accounting and reporting guidance of Accounting Standards Codification Topic 946 applicable to investment companies. The Fund's consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America ("GAAP"), which require Highland Capital Management Fund Advisors, L.P., the Fund's investments adviser ("HCMFA" or the "Investment Adviser") to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenue and expenses during the reporting period. Changes in the economic environment, financial markets and any other parameters used in determining these estimates could cause actual results to differ materially.

## Basis of Consolidation
The Fund consolidates HFRO Sub, LLC ("HFRO Sub"), a Delaware wholly owned subsidiary, for financial reporting, and the holdings of HFRO Sub, LLC are included within the Consolidated Financial Statements for the Fund. HFRO Sub is a bankruptcy remote financing vehicle used to obtain leverage with the portfolio of bank loans serving as collateral. All inter-company accounts and transactions have been eliminated in the consolidation.

## Fund Valuation
The net asset value ("NAV") of the Fund's common shares is calculated daily on each day that the NYSE is open for business as of the close of the regular trading session on the NYSE, usually 4:00 PM, Eastern Time. The NAV is calculated by dividing the value of the Fund's net assets attributable to common shares by the numbers of common shares outstanding.

## Valuation of Investments
In computing the Fund's net assets attributable to shares, securities with readily available market quotations on the NYSE, National Association of Securities Dealers Automated Quotation ("NASDAQ") or other nationally recognized exchange, use the closing quotations on the respective exchange for valuation of those securities. Securities for which there are no readily available market quotations will be valued pursuant to policies adopted by the Fund's Board of Trustees (the "Board"). Typically, such securities will be valued at the mean between the most recently quoted bid and ask prices provided by the principal market makers. If there is more than one such principal market maker, the value shall be the average of such means. Securities without a sale price or quotations from principal market makers on the valuation day may be priced by an independent pricing service. Generally, the Fund's loan and bond positions are not traded on exchanges and consequently are valued based on a mean of the bid and ask price from the third-party pricing services or broker-dealer sources that the Investment Adviser has determined to have the capability to provide appropriate pricing services which have been approved by the Board.

Securities for which market quotations are not readily available, or for which the Fund has determined that the price received from a pricing service or broker-dealer is "stale" or otherwise does not represent fair value (such as when events materially affecting the value of securities occur between the time when market price is determined and calculation of the Fund's net asset value ("NAV"), will be valued by the Fund at fair value, as determined by the Board or its designee in good faith in accordance with procedures approved by the Board, taking into account factors reasonably determined to be relevant, including, but not limited to: (i) the fundamental analytical data relating to the investment; (ii) the nature and duration of restrictions on disposition of the securities; and (iii) an evaluation of the forces that influence the market in which these securities are purchased and sold. In these cases, the Fund's NAV will reflect the affected portfolio securities' fair value as determined in the judgment of the Board or its designee instead of being determined by the market. Using a fair value pricing methodology to value securities may result in a value that is different from a security's most recent sale price and from the prices used by other investment companies to calculate their NAVs. Determination of fair value is uncertain because it involves subjective judgments and estimates.

There can be no assurance that the Fund's valuation of a security will not differ from the amount that it realizes upon the sale of such security. Those differences could have a material impact to the Fund. The NAV shown in the Fund's consolidated financial statements may vary from the NAV published by the Fund as of its period end because portfolio

013326

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (unaudited) (continued)

June 30, 2020                                                                Highland Income Fund

securities transactions are accounted for on the trade date (rather than the day following the trade date) for financial statement purposes.

### Deferred Financing Costs on the Preferred Stock

Deferred financing costs on the preferred shares consist of fees and expenses incurred in connection with the closing of the preferred stock offerings, and are capitalized at the time of payment. Based on ASC 480-10-S99, preferred stock that, by its terms, is contingently redeemable upon the occurrence of an event that is outside of the issuer's control should be classified as mezzanine equity; therefore, these costs are only amortized once it is probable the shares will become redeemable. As of June 30, 2020, the Fund is compliant with all contingent redemption provisions of the preferred offering, therefore the financing costs are currently unamortized and probable. Deferred financing costs of $5.2 million are presented net with the mezzanine equity on the Consolidated Statement of Assets and Liabilities.

| Issuer | Shares at December 31, 2019 | Beginning Value as of December 31, 2019 | Issuance Net Liquidation Value | Deferred Issuance Costs | Paydowns | Balance net of Deferred Financing Costs at June 30, 2020 | Shares at June 30, 2020 |
|---|---|---|---|---|---|---|---|
| Cumulative preferred shares (Series A) | 5,800,000 | $139,756,249 | $145,000,000 | $5,243,571 | $— | $139,756,249 | 5,800,000 |

### Fair Value Measurements

The Fund has performed an analysis of all existing investments and derivative instruments to determine the significance and character of inputs to their fair value determination. The levels of fair value inputs used to measure the Fund's investments are characterized into a fair value hierarchy. Where inputs for an asset or liability fall into more than one level in the fair value hierarchy, the investment is classified in its entirety based on the lowest level input that is significant to that investment's valuation. The three levels of the fair value hierarchy are described below:

Level 1 — Quoted unadjusted prices for identical instruments in active markets to which the Fund has access at the date of measurement;

Level 2 — Quoted prices for similar instruments in active markets; quoted prices for identical or similar instruments in markets that are not active, but are valued based on executed trades; broker quotations that constitute an executable price; and alternative pricing sources supported by observable inputs are classified within Level 2. Level 2 inputs are either directly or indirectly observable for the asset in connection with market data at the measurement date; and

Level 3 — Model derived valuations in which one or more significant inputs or significant value drivers are unobservable. In certain cases, investments classified within Level 3 may include securities for which the Fund has obtained indicative quotes from broker-dealers that do not necessarily represent prices the broker may be willing to trade on, as such quotes can be subject to material management judgment. Unobservable

inputs are those inputs that reflect the Fund's own assumptions that market participants would use to price the asset or liability based on the best available information.

The Investment Adviser has established policies and procedures, as described above and approved by the Board, to ensure that valuation methodologies for investments and financial instruments that are categorized within all levels of the fair value hierarchy are fair and consistent. A Pricing Committee has been established to provide oversight of the valuation policies, processes and procedures, and is comprised of personnel from the Investment Adviser and its affiliates. The Pricing Committee meets monthly to review the proposed valuations for investments and financial instruments and is responsible for evaluating the overall fairness and consistent application of established policies.

As of June 30, 2020, the Fund's investments consisted of senior loans, foreign denominated or domiciled senior loans, collateralized loan obligations, corporate bonds and notes, U.S. asset-backed securities, non-U.S. asset-backed securities, claims, common stocks, registered investment companies, cash equivalents, rights, warrants, preferred stock, agency collateralized mortgage obligations, LLC interests, purchased call options, and registered investment companies. The fair value of the Fund's senior loans and bonds are generally based on quotes received from brokers or independent pricing services. Loans, bonds and asset-backed securities with quotes that are based on actual trades with a sufficient level of activity on or near the measurement date are classified as Level 2 assets. Loans and bonds that are priced using quotes derived from implied values, indicative bids, or a limited number of actual trades are classified as Level 3 assets because the inputs used by the brokers and pricing services to derive the values are not readily observable.

013327

# NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (unaudited) (continued)

**June 30, 2020**                                            **Highland Income Fund**

The fair value of the Fund's common stocks, registered investment companies, rights and warrants that are not actively traded on national exchanges are generally priced using quotes derived from implied values, indicative bids, or a limited amount of actual trades and are classified as Level 3 assets because the inputs used by the brokers and pricing services to derive the values are not readily observable. Exchange-traded options are valued based on the last trade price on the primary exchange on which they trade. If an option does not trade, the mid-price, which is the mean of the bid and ask price, is utilized to value the option.

At the end of each calendar quarter, the Investment Adviser evaluates the Level 2 and 3 assets and liabilities for changes in liquidity, including but not limited to: whether a broker is willing to execute at the quoted price, the depth and con-

sistency of prices from third party services, and the existence of contemporaneous, observable trades in the market. Additionally, the Investment Adviser evaluates the Level 1 and 2 assets and liabilities on a quarterly basis for changes in listings or delistings on national exchanges.

Due to the inherent uncertainty of determining the fair value of investments that do not have a readily available market value, the fair value of the Fund's investments may fluctuate from period to period. Additionally, the fair value of investments may differ significantly from the values that would have been used had a ready market existed for such investments and may differ materially from the values the Fund may ultimately realize. Further, such investments may be subject to legal and other restrictions on resale or otherwise less liquid than publicly traded securities.

The inputs or methodology used for valuing securities are not necessarily an indication of the risk associated with investing in those securities. Transfers in and out of the levels are recognized at the value at the end of the period. A summary of the inputs used to value the Fund's assets as of June 30, 2020 is as follows:

| | Total value at June 30, 2020 | Level 1 Quoted Price | Level 2 Significant Observable Inputs | Level 3 Significant Unobservable Inputs |
|---|---|---|---|---|
| **Highland Income Fund** | | | | |
| Assets | | | | |
| U.S. Senior Loans | | | | |
| Business Equipment & Services | $ 9,386,832 | $ — | $ 9,386,832 | $ — |
| Commercial Services | 3,302,944 | — | 3,302,944 | — |
| Communication Services | 6,479,098 | — | — | 6,479,098 |
| Consumer Discretionary | 22,704,106 | — | 22,704,106 | — |
| Consumer Products | 2,118,743 | — | 2,118,743 | — |
| Energy | 13,615,473 | — | 13,615,473 | — |
| Financials | 9,555,342 | — | 9,555,342 | — |
| Gaming/Leisure | 11,478,220 | — | — | 11,478,220 |
| Healthcare | 70,168,171 | — | 16,791,894 | 53,376,277 |
| Industrials | 16,252,477 | — | 13,698,201 | 2,554,276 |
| Information Technology | 85,817,425 | — | 34,346,425 | 51,471,000 |
| Real Estate | 19,863,519 | — | 19,863,519 | — |
| Retail | 43,530,110 | — | 43,530,110 | — |
| Service | 20,277,183 | — | 20,277,183 | — |
| Transportation | 10,810,497 | — | 10,810,497 | — |
| Utilities | 17,902,711 | — | 17,902,711 | — |
| Preferred Stock | | | | |
| Energy | 9,796,677 | 9,796,677 | — | — |
| Financials | 82,905,205 | 1,129,510 | 27,104,230 | 54,671,465 |
| Real Estate | 244,615,606 | — | 8,351,821 | 236,263,785 |
| Common Stocks | | | | |
| Communication Services | 51,517,823 | 968,192 | 41,344,422 | 9,205,209 |
| Consumer Discretionary | 1,528,204 | — | 1,528,204 | — |
| Energy | 16,743 | — | 16,742 | 1 |
| Financials | 295,302 | 295,302 | — | — |
| Gaming/Leisure[1] | — | — | — | — |
| Healthcare | 122,976 | — | — | 122,976 |
| Housing[1] | — | — | — | — |
| Industrials | 203,635 | — | 203,635 | — |
| Materials | 1,495,745 | — | 1,495,160 | 585 |
| Real Estate | 108,844,589 | 9,453,372 | — | 99,391,217 |
| Collateralized Loan Obligations | 152,445,338 | — | 139,114,988 | 13,330,350 |

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (unaudited) (continued)**

June 30, 2020        **Highland Income Fund**

| | Total value at June 30, 2020 | Level 1 Quoted Price | Level 2 Significant Observable Inputs | Level 3 Significant Unobservable Inputs |
|---|---|---|---|---|
| LLC Interest | $ 94,230,920 | $ — | $ 18,649,779 | $ 75,581,141 |
| Agency Collateralized Mortgage Obligations | 73,999,394 | — | 73,999,394 | — |
| Registered Investment Companies | 12,484,340 | 12,484,340 | — | — |
| Corporate Bonds & Notes | | | | |
| Energy[1] | — | — | — | — |
| Industrials | 119,168 | — | 119,168 | — |
| Real Estate | 580,810 | — | 580,810 | — |
| Utilities | 20,000 | — | 20,000 | — |
| Purchased Call Options | 213,400 | — | 213,400 | — |
| Claims | 52,138 | — | — | 52,138 |
| Warrants | | | | |
| Energy | 14,503 | — | 14,503 | — |
| Industrials | 18 | — | — | 18 |
| Cash Equivalents | 165,786,201 | 165,786,201 | — | — |
| Repurchase Agreement | 63,675 | — | 63,675 | — |
| **Total Assets** | 1,364,615,261 | 199,913,594 | 550,723,911 | 613,977,756 |
| **Liabilities** | | | | |
| Securities Sold Short[2] | (6,767,501) | (6,767,501) | — | — |
| **Total Liabilities** | (6,767,501) | (6,767,501) | — | — |
| **Total** | $1,357,847,760 | $193,146,093 | $550,723,911 | $613,977,756 |

[1] This category includes securities with a value of zero.
[2] See Investment Portfolio detail for industry breakout.

The table below sets forth a summary of changes in the Fund's assets measured at fair value using significant unobservable inputs (Level 3) for the period ended June 30, 2020.

| | Balance as of December 31, 2019 $ | Transfers into Level 3 $ | Transfers Out of Level 3 $ | Net Amortization (Accretion) of Premium/ (Discount) $ | Net Realized Gains/ (Losses) $ | Net Unrealized Gains/ (Losses) $ | Net Purchases $ | Net (Sales) $ | Distribution to Return Capital $ | Balance as of June 30, 2020 $ | Change in Unrealized Appreciation (Depreciation) from Investments at June 30, 2020 $ |
|---|---|---|---|---|---|---|---|---|---|---|---|
| U.S. Senior Loans | | | | | | | | | | | |
| Communication Services | 6,107,407 | — | — | (495) | — | 321,926 | 50,260 | — | — | 6,479,098 | 321,926 |
| Gaming/Leisure | 10,753,914 | — | — | (58,674) | 4,211 | 924,670 | — | (145,901) | — | 11,478,220 | 924,670 |
| Healthcare | 47,733,657 | — | — | — | — | 2,404,179 | 3,238,441 | — | — | 53,376,277 | 2,404,179 |
| Industrials | 8,105,187 | — | — | 190,143 | — | (5,741,054) | — | — | — | 2,554,276 | (5,741,054) |
| Information Technology | 56,829,000 | — | — | — | — | (5,358,000) | — | — | — | 51,471,000 | (5,358,000) |
| Preferred Stock | | | | | | | | | | | |
| Financial | — | 7,749,990 | — | — | — | (397,510) | 47,318,985 | — | — | 54,671,465 | (397,510) |
| Real Estate | 233,025,297 | — | — | 351,780 | — | (11,963,354) | 22,668,666 | (7,314,604) | (504,000) | 236,263,785 | (11,963,354) |
| Common Stocks | | | | | | | | | | | |
| Communication Services | 7,520,731 | — | — | — | — | 1,684,478 | — | — | — | 9,205,209 | 1,684,478 |
| Energy | 1 | — | — | — | — | — | — | — | — | 1 | — |
| Healthcare | 72,254 | — | — | — | — | 50,722 | — | — | — | 122,976 | 50,722 |
| Materials | 45,617 | — | — | — | — | (45,032) | — | — | — | 585 | (45,032) |
| Real Estate | 95,747,531 | — | — | — | — | (19,024,980) | 22,668,666 | — | — | 99,391,217 | (19,024,980) |
| Collateralized Loan Obligations | — | 5,354,559 | — | — | — | 2,095,791 | 5,880,000 | — | — | 13,330,350 | 2,095,791 |

013329

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (unaudited) (continued)**

June 30, 2020                                                      **Highland Income Fund**

| | Balance as of December 31, 2019 $ | Transfers into Level 3 $ | Transfers Out of Level 3 $ | Net Amortization (Accretion) of Premium/ (Discount) $ | Net Realized Gains/ (Losses) $ | Net Unrealized Gains/ (Losses) $ | Net Purchases $ | Net (Sales) $ | Distribution to Return Capital $ | Balance as of June 30, 2020 $ | Change in Unrealized Appreciation (Depreciation) from Investments at June 30, 2020 $ |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Corporate Bonds & Notes | | | | | | | | | | | |
| Energy | 1,076,400 | — | — | — | — | (1,076,400) | — | — | — | — | (1,076,400) |
| LLC Interest | 88,777,470 | — | — | 99,131 | — | (13,295,460) | — | — | — | 75,581,141 | (13,295,460) |
| Warrants | | | | | | | | | | | |
| Industrials | 1,412 | — | — | — | — | (1,394) | — | — | — | 18 | (1,394) |
| Claims | 52,138 | — | — | — | — | — | — | — | — | 52,138 | — |
| **Total** | 555,848,016 | 13,104,549 | — | 230,105 | 355,991 | (49,421,418) | 101,825,018 | (7,460,505) | (504,000) | 613,977,756 | (49,421,418) |

Investments designated as Level 3 may include assets valued using quotes or indications furnished by brokers which are based on models or estimates and may not be executable prices. In light of the developing market conditions, the Investment Adviser continues to search for observable data points and evaluate broker quotes and indications received for portfolio investments. Determination of fair values is uncertain because it involves subjective judgments and estimates that are unobservable.

The following is a summary of significant unobservable inputs used in the fair valuations of assets and liabilities categorized within Level 3 of the fair value hierarchy:

| Category | Market Value at 06/30/2020 $ | Valuation Technique | Unobservable Inputs | Input Value(s) |
|---|---|---|---|---|
| U.S. Senior Loans | 125,358,871 | Adjusted Appraisal | Liquidity Discount | 10% |
| | | | Asset Specific Discount | 10% |
| | | Multiples Analysis | Multiple of EBITDA less CAPEX | 6.50x -10.50x |
| | | Transaction Analysis | Multiple of EBITDA less CAPEX | 8.50x -10.50x |
| | | Transaction Indication of Value | % of Par | 20% |
| | | Black-Scholes Model | Volatility Assumption | 25% - 60% |
| | | Discounted Cash Flow | Discount Rate | 11.00% - 11.35% |
| | | | Spread Adjustment | 0.35% |
| | | Transaction Indication of Value | Enterprise Value ($mm) | $13.25 |
| Preferred Stock | 290,935,250 | Discounted Cash Flow | Discount Rate | 11% - 13% |
| | | Transaction Indication of Value | Transaction Price per Share | $15.00 |
| | | Third Party Indication of Value | Broker Quote | Various |
| Common Stocks | 108,719,988 | Multiples Analysis | Multiple of EBITDA less CAPEX | 6.50x -10.50x |
| | | | Multiple of EBITDA | 6.25x - 7.00x |
| | | | Unadjusted Price/MHz-PoP | $0.10 - $0.95 |
| | | Discounted Cash Flow | Discount Rate | 11.00% - 21.50% |
| | | | Capitalization Rate | 6.75% - 7.75% |
| | | Transaction Analysis | Multiple of EBITDA | 6.25x- 6.75x |
| | | | Multiple of EBITDA less CAPEX | 8.50x- 10.50x |
| | | Transaction Indication of Value | Enterprise Value ($mm) | $771 |
| | | Black-Scholes Model | Volatility Assumption | 25%- 60% |
| | | Net Asset Value | N/A | N/A |
| LLC Interest | 75,581,141 | Discounted Cash Flow | Discount Rate | 1.30% - 6.93% |
| | | Net Asset Value | N/A | N/A |
| Collateralized Loan Obligations | 13,330,350 | Third Party Indication of Value | Broker Quote | Various |
| Warrants | 18 | Discounted Cash Flow | Discount Rate | 20% |
| | | Multiples Analysis | Multiple of EBITDA | 6.25x -7.00x |
| | | Transaction Analysis | Multiple of EBITDA | 6.25x- 6.75x |
| | | Black-Scholes Model | Volatility Assumption | 50%- 60% |
| Claims | 52,138 | Pricing Feed | Indication of Value | 1.375 |
| **Total** | 613,977,756 | | | |

013330

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (unaudited) (continued)

June 30, 2020                                                                Highland Income Fund

In addition to the unobservable inputs utilized for various valuation methodologies, the Fund frequently uses a combination of two or more valuation methodologies to determine fair value for a single holding. In such instances, the Fund assesses the methodologies and ascribes weightings to each methodology. The weightings ascribed to any individual methodology ranged from as low as 5% to as high as 95% as of June 30, 2020. The selection of weightings is an inherently subjective process, dependent on professional judgement. These selections may have a material impact to the concluded fair value for such holdings.

The significant unobservable inputs used in the fair value measurement of the Fund's preferred stock assets are the discount rate, broker quotes, and transaction price per share. Significant decreases (increases) in any of those inputs in isolation could result in a significantly higher (lower) fair value measurement.

The significant unobservable inputs used in the fair value measurement of the Fund's bank loan securities are: liquidity discount, asset specific discount, multiple of adjusted EBITDA, volatility assumption, transaction indication of value, discount rate and spread adjustment. Significant increases (decreases) in any of those inputs in isolation could result in a significantly lower (higher) fair value measurement.

The significant unobservable inputs used in the fair value measurement of the Fund's common equity securities are: multiple of EBITDA, multiple of adjusted EBITDA, price/MHz-PoP multiple, capitalization rate, discount rate, volatility assumption and transaction indication of value. Significant increases (decreases) in any of those inputs in isolation could result in a significantly lower (higher) fair value measurement.

### Security Transactions

Security transactions are accounted for on the trade date. Realized gains/(losses) on investments sold are recorded on the basis of the specific identification method for both financial statement and U.S. federal income tax purposes taking into account any foreign taxes withheld.

### Income Recognition

Corporate actions (including cash dividends) are recorded on the ex-dividend date, net of applicable withholding taxes, except for certain foreign corporate actions, which are recorded as soon after ex-dividend date as such information becomes available and is verified. Interest income is recorded on the accrual basis.

Accretion of discount on taxable bonds and loans is computed to the call date, while amortization of premium on

taxable bonds and loans is computed to the call or maturity date, whichever is shorter, both using the effective yield method. Withholding taxes on foreign dividends have been provided for in accordance with the Fund's understanding of the applicable country's tax rules and rates.

The Fund records distributions received from investments in REITs and partnerships in excess of income from underlying investments as a reduction of cost of investments and/or realized gain. Such amounts are based on estimates if actual amounts are not available, and actual amounts of income, realized gain and return of capital may differ from the estimated amounts. The Fund adjusts the estimated amounts once the issuers provide information about the actual composition of the distributions.

### U.S. Federal Income Tax Status

The Fund is treated as a separate taxpayer for U.S. federal income tax purposes. The Fund intends to qualify each year as a "regulated investment company" under Subchapter M of the Internal Revenue Code of 1986, as amended, and will distribute substantially all of its taxable income and gains, if any, for the tax year, and as such will not be subject to U.S. federal income taxes. In addition, the Fund intends to distribute, in each calendar year, all of its net investment income, capital gains and certain other amounts, if any, such that the Fund should not be subject to U.S. federal excise tax. Therefore, no U.S. federal income or excise tax provisions are recorded.

The Investment Adviser has analyzed the Fund's tax positions taken on U.S. federal income tax returns for all open tax years (current and prior three tax years), and has concluded that no provision for U.S. federal income tax is required in the Fund's consolidated financial statements. The Fund's U.S. federal and state income and U.S. federal excise tax returns for tax years for which the applicable statutes of limitations have not expired are subject to examination by the Internal Revenue Service and state departments of revenue. Furthermore, the Investment Adviser of the Fund is also not aware of any tax positions for which it is reasonably possible that the total amounts of unrecognized tax benefits will significantly change in the next 12 months.

The Fund recognizes interest and penalties, if any, related to unrecognized tax benefits as income tax expenses in the Statement of Operations. During the period ended June 30, 2020, the Fund did not incur any interest or penalties.

### Distributions to Shareholders

The Fund plans to pay distributions from net investment income monthly and net realized capital gains annually to common shareholders. To permit the Fund to maintain more stable monthly distributions and annual distributions, the Fund may from time to time distribute less than the entire

013331

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (unaudited) (continued)**

June 30, 2020                                                                    Highland Income Fund

amount of income and gains earned in the relevant month or year, respectively. The undistributed income and gains would be available to supplement future distributions. In certain years, this practice may result in the Fund distributing, during a particular taxable year, amounts in excess of the amount of income and gains earned therein. Such distributions would result in a portion of each distribution occurring in that year to be treated as a return of capital to shareholders. Shareholders of the Fund will automatically have all distributions reinvested in Common Shares of the Fund issued by the Fund in accordance with the Fund's Dividend Reinvestment Plan (the "Plan") unless an election is made to receive cash. The number of newly issued Common Shares to be credited to each participant's account will be determined by dividing the dollar amount of the dividend by the lesser of (i) the NAV per Common Share determined on the Declaration Date and (ii) the market price per Common Share as of the close of regular trading on the NYSE on the Declaration Date. Participants in the Plan requesting a sale of securities through the plan agent of the Plan are subject to a sales fee and a brokerage commission.

## Cash & Cash Equivalents

The Fund considers liquid assets deposited with a bank and certain short-term debt instruments of sufficient credit quality with original maturities of three months or less to be cash equivalents. These investments represent amounts held with financial institutions that are readily accessible to pay Fund expenses or purchase investments. Cash and cash equivalents are valued at cost plus accrued interest, which approximates market value. The value of cash equivalents denominated in foreign currencies is determined by converting to U.S. dollars on the date of the Consolidated Statement of Assets and Liabilities.

## Foreign Currency

Accounting records of the Fund are maintained in U.S. dollars. Foreign currencies, investments and other assets and liabilities denominated in foreign currencies are translated into U.S. dollars at exchange rates using the current 4:00 PM London Time Spot Rate. Fluctuations in the value of the foreign currencies and other assets and liabilities resulting from changes in exchange rates, between trade and settlement dates on securities transactions and between the accrual and payment dates on dividends, interest income and foreign withholding taxes, are recorded as unrealized foreign currency gains/(losses). Realized gains/(losses) and unrealized appreciation/(depreciation) on investment securities and income and expenses are translated on the respective dates of such transactions. The effects of changes in foreign currency exchange rates on investments in securities are not segregated in the Consolidated Statement of Operations from the effects of changes in market prices of those

securities, but are included with the net realized and unrealized gain or loss on investment securities.

## Securities Sold Short

The Fund may sell securities short. A security sold short is a transaction in which the Fund sells a security it does not own in anticipation that the market price of that security will decline. When the Fund sells a security short, it must borrow the security sold short from a broker-dealer and deliver it to the buyer upon conclusion of the transaction. The Fund may have to pay a fee to borrow particular securities and is obligated to pay over any dividends or other payments received on such borrowed securities. In some circumstances, the Fund may be allowed by its prime broker to utilize proceeds from securities sold short to purchase additional investments, resulting in leverage. Cash held as collateral for securities sold short and written options contracts is classified as restricted cash on the Consolidated Statement of Assets and Liabilities, as applicable. Restricted cash in the amount of $6,664,584 was held with the broker for the Fund. Securities valued at $22,369,153 were posted in the Fund's segregated account as collateral.

## Other Fee Income

Fee income may consist of origination/closing fees, amendment fees, administrative agent fees, transaction break-up fees and other miscellaneous fees. Origination fees, amendment fees, and other similar fees are non-recurring fee sources. Such fees are received on a transaction by transaction basis and do not constitute a regular stream of income and are recognized when incurred.

## Note 3. Derivative Transactions

The Fund is subject to equity securities risk, interest rate risk and currency risk in the normal course of pursuing its investment objectives. The Fund enters into derivative transactions for the purpose of hedging against the effects of changes in the value of portfolio securities due to anticipated changes in market conditions, to gain market exposure for residual and accumulating cash positions and for managing the duration of fixed income investments. As of June 30, 2020 we had no hedge accounting derivatives.

## Futures Contracts

A futures contract represents a commitment for the future purchase or sale of an asset at a specified price on a specified date. The Fund may invest in interest rate, financial and stock or bond index futures contracts subject to certain limitations. The Fund invests in futures contracts to manage its exposure to the stock and bond markets and fluctuations in currency values. Buying futures tends to increase the Fund's exposure to the underlying instrument while selling futures tends to decrease the Fund's exposure to the underlying

013332

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (unaudited) (continued)

June 30, 2020                 Highland Income Fund

instrument, or economically hedge other Fund investments. With futures contracts, there is minimal counterparty credit risk to the Fund since futures contracts are exchange-traded and the exchange's clearinghouse, as counterparty to all traded futures, guarantees the futures against default. The Fund's risks in using these contracts include changes in the value of the underlying instruments, non-performance of the counterparties under the contracts' terms and changes in the liquidity of the secondary market for the contracts. Futures contracts are valued at the settlement price established each day by the board of trade or exchange on which they principally trade.

Upon entering into a financial futures contract, the Fund is required to pledge to the broker an amount of cash and/or other assets equal to a certain percentage of the contract amount, known as initial margin deposit. Subsequent payments, known as variation margins, are made or can be received by the Fund each day, depending on the daily fluctuation in the fair value of the underlying security. The Fund records an unrealized gain/(loss) equal to the daily variation margin. Should market conditions move unexpectedly, the Fund may not achieve the anticipated benefits of the futures contracts and may incur a loss. The Fund recognizes a realized gain/(loss) on the expiration or closing of a futures contract.

During the period ended June 30, 2020, the Fund entered into futures transactions for the purpose of hedging against the effects of changes in the value of portfolio securities due to anticipated changes in market conditions, and to gain market exposure for residual and accumulating cash positions. Cash held as collateral for futures contracts is shown on the Consolidated Statement of Assets and Liabilities as "Restricted Cash —Futures."

### Options

The Fund may utilize options on securities or indices to varying degrees as part of their principal investment strategy. An option on a security is a contract that gives the holder of the option, in return for a premium, the right to buy from (in the case of a call) or sell to (in the case of a put) the writer of the option the security underlying the option at a specified exercise or "strike" price. The writer of an option on a security has the obligation upon exercise of the option to deliver the underlying security upon payment of the exercise price or to pay the exercise price upon delivery of the underlying security. The Fund may hold options, write option contracts, or both.

If an option written by the Fund expires unexercised, the Fund realizes on the expiration date a capital gain equal to the premium received by the Fund at the time the option was written. If an option purchased by the Fund expires unexercised, the Fund realizes a capital loss equal to the premium paid. Prior to the earlier of exercise or expiration, an exchange-traded option may be closed out by an offsetting purchase or sale of an option of the same series (type, underlying security, exercise price and expiration). There can be no assurance, however, that a closing purchase or sale transaction can be effected when the Fund desires.

The Fund will realize a capital gain from a closing purchase transaction if the cost of the closing option is less than the premium received from writing the option, or, if the cost of the closing option is more than the premium received from writing the option, a capital loss. The Fund will realize a capital gain from a closing sale transaction if the premium received from the sale is more than the original premium paid when the option position was opened, or a capital loss, if the premium received from a sale is less than the original premium paid.

For the period ended June 30, 2020, the Fund had written options to provide leveraged short exposure, and purchased options to provide leveraged long exposure, to the underlying equity, which is consistent with the investment strategies of the Fund.

### Reverse Repurchase Agreements

The Fund engages in reverse repurchase agreement transactions with respect to instruments that are consistent with the Fund's investment objective or policies. This creates leverage for the Fund because the cash received can be used to purchase other securities. See Note 6 for additional information on the Fund's reverse repurchase agreements.

### Additional Derivative Information

The Fund follows adopted amendments to authoritative guidance on disclosures about derivative instruments and hedging activities which require that the Fund disclose; a) how and why an entity uses derivative instruments; b) how derivative instruments and related hedged items are accounted for; c) how derivative instruments and related hedged items affect an entity's financial position, financial performance and cash flows; and d) how the netting of derivatives subject to master netting arrangements (if applicable) affects the net exposure of the Fund related to the derivatives.

The fair value of derivative instruments on the Statement of Assets and Liabilities have the following risk exposure at June 30, 2020:

| Risk Exposure | Fair Value | |
| --- | --- | --- |
| | Asset Derivative | Liability Derivative |
| Equity Price Risk | $ — | $(895,601)[2] |
| Foreign Currency Risk | 213,400[1] | — |

013333

# NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (unaudited) (continued)

June 30, 2020                      Highland Income Fund

(1) Statement of Assets and Liabilities location: Investments, at value. Purchased options only.

(2) Includes cumulative unrealized depreciation of futures contracts as reported in the Investment Portfolio and within the components of net assets section of the Statement of Assets and Liabilities. Only the current day's variation margin is reported within the receivables and/or payables of the Statement of Assets and Liabilities.

The effect of derivative instruments on the Statement of Operations for the six months ended June 30, 2020, is as follows:

| Risk Exposure | Net Realized Gain/(Loss) on Derivatives | Net Change in Unrealized Appreciation/ (Depreciation) on Derivatives |
|---|---|---|
| Equity Price Risk | $70,538,291[1][2][3] | $(13,515,764)[4][5] |
| Foreign Currency Risk | (1,582,250)[1] | 761,050[4] |

(1) Statement of Operations location: Realized gain (loss) on investments from unaffiliated issuers. Purchased options only.

(2) Statement of Operations location: Realized gain (loss) on written options contracts.

(3) Statement of Operations location: Realized gain (loss) on futures contracts.

(4) Statement of Operations location: Net increase (decrease) in unrealized appreciation (depreciation) on investments. Purchased options only.

(5) Statement of Operations location: Net increase (decrease) in unrealized appreciation (depreciation) on futures contracts.

The average monthly volume of derivative activity for the period ended June 30, 2020 is as follows:

| Income Fund | Units/ Contracts | Appreciation/ (Depreciation) |
|---|---|---|
| Purchased Options Contracts | 354,205,867 | — |
| Written Options Contracts | 1,197 | — |
| Futures Contracts | — | $(7,995,953) |

## Note 4. Securities Lending

Effective January, 7, 2020, the Fund entered into a securities lending agreement with The Bank of New York Mellon ("BNY" or the "Lending Agent"). Securities lending transactions are entered into by the Fund under the Securities Lending Agreement, which permits the Fund, under certain circumstances such as an event of default, to offset amounts payable by the Fund to the same counterparty against amounts receivable from the counterparty to create a net payment due to or from the Fund.

The following is a summary of securities lending agreements held by the Fund, with cash collateral of overnight maturities and non-cash collateral, which would be subject to offset as of June 30, 2020:

| Gross Amount of Recognized Assets (Value of Securities on Loan) | Value of Cash Collateral Received[1] | Value of Non-Cash Collateral Received | Net Amount |
|---|---|---|---|
| $60,938 | $60,938 | $— | $— |

(1) Collateral received in excess of market value of securities on loan is not presented in this table. The total cash collateral received by the Fund is disclosed in the Statement of Assets and Liabilities.

The value of loaned securities and related collateral outstanding at June 30, 2020 are shown in the Schedule of Investments. The value of the collateral held may be temporarily less than that required under the lending contract. As of June 30, 2020, the cash collateral was invested in repurchase agreements with the following maturities:

| | Overnight and Continuous | <30 Days | Between 30 & 90 Days | >90 Days | Total |
|---|---|---|---|---|---|
| Repurchase Agreements | $63,675 | $— | $— | $— | $63,675 |

The Fund could seek additional income by making secured loans of its portfolio securities through its custodian. Such loans would be in an amount not greater than one-third of the value of the Fund's total assets. BNY would charge a fund fees based on a percentage of the securities lending income. The market value of the loaned securities is determined at the close of each business day of the Fund and any additional required collateral is delivered to the Fund, or excess collateral is returned by the Fund, on the next business day. The Fund would receive collateral consisting of cash (U.S. and foreign currency), securities issued or guaranteed by the U.S. government or its agencies or instrumentalities, sovereign debt, convertible bonds, irrevocable bank letters of credit or such other collateral as may be agreed on by the parties to a securities lending arrangement, initially with a value of 102% or 105% of the market value of the loaned securities and thereafter maintained at a value of 100% of the market value of the loaned securities. If the collateral consists of non-cash collateral, the borrower would pay the Fund a loan premium fee. If the collateral consists of cash, BNY would reinvest the cash in repurchase agreements and money market accounts. Although voting rights, or rights to consent, with respect to the loaned securities pass to the borrower, the Fund would recall the loaned securities upon reasonable notice in order that the securities could be voted by the Fund if the holders of such securities are asked to vote upon or consent to matters materially affecting the investment. The Fund also could call such loans in order to sell the securities involved.

Securities lending transactions were entered into pursuant to Securities Loan Agreements ("SLA"), which would provide the right, in the event of default (including bankruptcy or insolvency) for the non-defaulting party to liquidate the collateral and calculate a net exposure to the defaulting party or request additional collateral. In the event that a borrower defaulted, the Fund, as lender, would offset the market value of the collateral received against the market value of

013334

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (unaudited) (continued)

**June 30, 2020**                                             **Highland Income Fund**

the securities loaned. The value of the collateral is typically greater than that of the market value of the securities loaned, leaving the lender with a net amount payable to the defaulting party. However, bankruptcy or insolvency laws of a particular jurisdiction may impose restrictions on or prohibitions against such a right of offset in the event of an SLA counterparty's bankruptcy or insolvency. Under the SLA, the Fund can reinvest cash collateral, or, upon an event of default, resell or repledge the collateral, and the borrower can resell or repledge the loaned securities. The risks of securities lending also include the risk that the borrower may not provide additional collateral when required or may not return the securities when due. To mitigate this risk, the Fund benefits from a borrower default indemnity provided by BNY. BNY's indemnity generally provides for replacement of securities lent or the approximate value thereof.

### Note 5. U.S. Federal Income Tax Information

The character of income and gains to be distributed is determined in accordance with income tax regulations which may differ from U.S. GAAP. These differences include (but are not limited to) investments organized as partnerships for tax purposes, tax treatment of organizational start-up costs, losses deferred due to wash sale transactions, and tax attributes from Fund reorganizations. Reclassifications are made to the Fund's capital accounts to reflect income and gains available for distribution (or available capital loss carryovers) under income tax regulations. These reclassifications have no impact on net investment income, realized gains or losses, or NAV of the Fund. The calculation of net investment income per share in the Financial Highlights table excludes these adjustments.

For the year ended December 31, 2019, permanent differences chiefly resulting from partnership basis adjustments, return of capital distributions paid by the fund, differences in premium amortization methods for book and tax, foreign currency gains and losses, reorganization expenses, and paydown reclasses were identified and reclassified among the components of the Fund's net assets as follows:

| Distributable Earnings (Accumulated Losses) | Paid-in-Capital |
|---|---|
| $(162,876) | $162,876 |

At December 31, 2019, the Fund's most recent tax year end, components of distributable earnings on a tax basis are as follows:

| Other Temporary Differences | Accumulated Capital and Other Losses | Unrealized Appreciation (Depreciation)[1] |
|---|---|---|
| $— | $(213,623,033) | $(409,683,245) |

[1] Any differences between book-basis and tax-basis net unrealized appreciation/(depreciation) are primarily due to wash sales, non-taxable dividends, partnership, REIT basis adjustments and difference in premium amortization methods for book and tax.

As of December 31, 2019, the Fund has capital loss carry-overs as indicated below. The capital loss carryovers are available to offset future realized capital gains to the extent provided in the Code and regulations promulgated thereunder. To the extent that these carryover losses are used to offset future capital gains, the gains offset will not be distributed to shareholders.

| No Expiration Short-Term[1] | No Expiration Long-Term | Total |
|---|---|---|
| $38,056,401 | $175,566,632 | $213,623,033 |

During the year ended December 31, 2019, the Fund did not utilize capital carryforwards to offset capital gains.

The tax character of distributions paid during the last two fiscal year/period ended December 31, and the year ended June 30, 2018 is as follows:

| | Ordinary Income | Long-term Capital Gain | Return of Capital |
|---|---|---|---|
| 2019 | $58,214,363 | $— | $8,201,030 |
| 2018 | 32,468,254 | — | 720,948 |
| 2018* | 49,645,426 | — | 6,936,337 |

[1] For tax purposes, short-term capital gains distributions, if any, are considered ordinary income distributions.
* Year ended June 30.

Unrealized appreciation and depreciation at June 30, 2020, based on cost of investments for U.S. federal income tax purposes was:

| Gross Appreciation | Gross Depreciation | Net Appreciation/ (Depreciation) | Cost |
|---|---|---|---|
| $83,439,072 | $(597,592,836) | $(514,153,764) | $1,878,769,025 |

### Qualified Late Year Ordinary and Post October Losses

Under current laws, certain capital losses and specified losses realized after October 31 may be deferred and treated as occurring on the first day of the following fiscal year. For the fiscal year ended December 31, 2019, the Fund did not elect to defer net realized losses incurred from November 1, 2019 through December 31, 2019.

### Note 6. Credit Agreement and Reverse Repurchase Agreement

On February 2, 2018, HFRO Sub, LLC a wholly-owned subsidiary of the Fund entered into a financing arrangement (the "Financing Arrangement") with Bank of America Merrill Lynch and Bank of America, N.A. The Fund is in compliance with the Financing Arrangement.

013335

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (unaudited) (continued)

**June 30, 2020**                                                              **Highland Income Fund**

Pursuant to the terms of the Financing Arrangement, and subject to certain customary conditions, HFRO Sub, LLC may borrow on a revolving basis a maximum of $350 million, with a maturity date of February 2, 2022. In connection with the Financing Arrangement, HFRO Sub, LLC and the Fund have made representations and warranties regarding the loans and underlying collateral and are required to comply with various covenants, reporting requirements and other customary requirements. The Financing Arrangement also limits the recourse of the lender to the assets of HFRO Sub, LLC and includes usual and customary events of default for senior secured revolving facilities of this nature. At June 30, 2020, current outstanding and fair value amounts were $300,000,000 and $300,751,153, respectively, and would be categorized as Level 3 within the fair value hierarchy. The Fund's average daily balance was $300,000,000 at a weighted average interest rate of 3.02% for the days outstanding.

On March 21, 2017, the Fund entered into a leverage facility agreement (the "BNP Agreement") with BNP Paribas Prime Brokerage International, Ltd., BNP Prime Brokerage, Inc., acting through its New York Branch, and BNP Paribas (together, the "BNPP Entities"). Under the BNP Agreement, the BNPP Entities may make margin loans to Fund at a rate of one-month LIBOR + 0.50%. The BNP Agreement may be terminated by either the Fund or the BNPP Entities with 30 days' notice. As of May 15, 2020, this BNP Agreement was terminated with the BNP Entities.

On February 9, 2018, the Fund entered into an agreement with BNP Paribas Securities Corporation ("BNP Securities") under which it may from time to time enter into reverse repurchase transactions pursuant to the terms of a master repurchase agreement and related annexes (collectively the "Repurchase Agreement"). A reverse repurchase transaction is a repurchase transaction in which the Fund is the seller of securities or other assets and agrees to repurchase them at a date certain or on demand. Pursuant to the Repurchase Agreement, the Fund may agree to sell securities or other assets to BNP Securities for an agreed upon price (the "Purchase Price"), with a simultaneous agreement to repurchase such securities or other assets from BNP Securities for the Purchase Price plus a price differential that is economically similar to interest. The price differential is negotiated for each transaction. This creates leverage for the Fund because the cash received can be used to purchase other securities. As of May 15, 2020, this Repurchase Agreement was terminated with BNP Securities.

On March 6, 2019, the Fund entered into an agreement with Mizuho Securities USA LLC ("Mizuho Securities") under which it may from time to time enter into reverse repurchase transactions pursuant to the terms of a master

repurchase agreement and related annexes (collectively the "Repurchase Agreement"). A reverse repurchase transaction is a repurchase transaction in which the Fund is the seller of securities or other assets and agrees to repurchase them at a date certain or on demand. Pursuant to the Repurchase Agreement, the Fund may agree to sell securities or other assets to Mizuho Securities for an agreed upon price (the "Purchase Price"), with a simultaneous agreement to repurchase such securities or other assets from Mizuho Securities for the Purchase Price plus a price differential that is economically similar to interest. The price differential is negotiated for each transaction. This creates leverage for the Fund because the cash received can be used to purchase other securities.

At June 30, 2020, the Fund's outstanding balance on the Mizuho Securities was $41,396,000. The Fund's average daily balance was $37,890,456 at a weighted average interest rate of 3.02% for the days outstanding.

### Note 7. Investment Advisory, Administration and Trustee Fees

For its investment advisory services, the Fund pays the Investment Adviser a monthly fee, computed and accrued daily, based on an annual rate of the Fund's Average Daily Managed Assets. Average Daily Managed Assets of a Fund means the average daily value of the total assets of a Fund less all accrued liabilities of a Fund (other than the aggregate amount of any outstanding borrowings constituting financial leverage).

The table below shows the Fund's contractual advisory fee with the Investment Adviser for the year ended June 30, 2020:

| Annual Fee Rate to the Investment Advisor | >1 Billion | > 2 Billion |
|---|---|---|
| 0.65% | 0.60% | 0.55% |

### Administration Fee

The Investment Adviser provides administrative services to the Fund. For its services, the Investment Adviser receives an annual fee, payable monthly, in an amount equal to 0.20% of the average weekly value of the Fund's Managed Assets. Under a separate sub-administration agreement, the Investment Adviser delegates certain administrative functions and pays the sub-administrator directly for these sub-administration services. Effective October 1, 2018, the Investment Adviser entered into an administrative services agreement with SEI Investments Global Funds Services, a wholly owned subsidiary of SEI Investments Company. Prior to October 1, 2018, State Street served as sub-administrator to the Fund.

013336

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (unaudited) (continued)**

June 30, 2020                                                      Highland Income Fund

### Fees Paid to Officers and Trustees

Each Trustee receives an annual retainer of $150,000 payable in quarterly installments and allocated among each portfolio in the Highland Funds Complex overseen by such Trustee based on relative net assets. Trustees are reimbursed for actual out-of-pocket expenses relating to attendance at meetings, however, the Chairman of the Board and the Chairman of the Audit Committee each receive an additional payment of $10,000 payable in quarterly installments and allocated among each portfolio in the Highland Funds Complex based on relative net assets. The Trustees do not receive any separate compensation in connection with service on Committees or for attending Board or Committee Meetings. The Trustees do not have any pension or retirement plan. The "Highland Funds Complex" consists of all of the registered investment companies advised by the Investment Adviser or its affiliated advisers and NexPoint Capital, Inc., a closed-end management investment company that has elected to be treated as a business development company under the 1940 Act as of the date of this report.

The Fund pays no compensation to its officers, all of whom are employees of the Investment Adviser or one of its affiliates.

### Expedited Settlement Agreements

On June 15, 2017 and May 14, 2019, the Fund entered into Expedited Settlement Agreements with two major dealers in the floating rate loan market, pursuant to which the Fund has the right to designate certain loans it sells to the dealer to settle on or prior to three days from the trade date in exchange for a quarterly fee (the "Expedited Settlement Agreements"). The Expedited Settlement Agreements are designed to reduce settlement times from the standard seven days to three days for eligible loans. For the period ended June 30, 2020, the Fund paid $197,167 to the dealers as part of the Expedited Settlement Agreements.

While the Expedited Settlement Agreements are intended to provide the Fund with additional liquidity with respect to such loans, and may not represent the exclusive method of expedited settlement of such loans, no assurance can be given that the Expedited Settlement Agreements or other methods for expediting settlements will provide the Fund with sufficient liquidity in the event of abnormally large redemptions.

### Indemnification

Under the Fund's organizational documents, the officers and Trustees have been granted certain indemnification rights against certain liabilities that may arise out of performance of their duties to the Fund. Additionally, in the normal course of business, the Fund may enter into contracts with service providers that contain a variety of indemnification clauses. The Fund's maximum exposure under these arrangements is dependent on future claims that may be made against the Fund and, therefore, cannot be estimated.

### Note 8. Disclosure of Significant Risks and Contingencies

The primary risks of investing in the Fund are described below in alphabetical order:

### Counterparty Risk

Counterparty risk is the potential loss the Fund may incur as a result of the failure of a counterparty or an issuer to make payments according to the terms of a contract. Counterparty risk is measured as the loss the Fund would record if its counterparties failed to perform pursuant to the terms of their obligations to the Fund. Because the Fund may enter into over-the-counter forwards, options, swaps and other derivative financial instruments, the Fund may be exposed to the credit risk of its counterparties. To limit the counterparty risk associated with such transactions, the Fund conducts business only with financial institutions judged by the Investment Adviser to present acceptable credit risk.

### Credit Risk

Investments rated below investment grade are commonly referred to as high-yield, high risk or "junk debt." They are regarded as predominantly speculative with respect to the issuing company's continuing ability to meet principal and/or interest payments. Investments in high yield debt and high yield Senior Loans may result in greater NAV fluctuation than if the Fund did not make such investments.

Corporate debt obligations, including Senior Loans, are subject to the risk of non-payment of scheduled interest and/or principal. Non-payment would result in a reduction of income to the Fund, a reduction in the value of the corporate debt obligation experiencing non-payment and a potential decrease in the NAV of the Fund.

Loans in which the Fund invests include covenant-lite loans, which carry more risk to the lender than traditional loans as they may contain fewer or less restrictive covenants on the borrower than traditionally included in loan documentation or may contain other borrower-friendly characteristics. The Fund may experience relatively greater difficulty or delays in enforcing its rights on its holdings of certain covenant-lite loans and debt securities than its holdings of loans or securities with the usual covenants.

### Currency Risk

A portion of the Fund's assets may be quoted or denominated in non-U.S. currencies. These securities may be adversely affected by fluctuations in relative currency exchange rates and by exchange control regulations. The Fund's investment performance may be negatively affected by a devaluation of a currency in which the Fund's investments are quoted or denominated. Further, the Fund's investment performance may be significantly affected, either positively or negatively,

013337

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (unaudited) (continued)

**June 30, 2020**                                                    **Highland Income Fund**

by currency exchange rates because the U.S. dollar value of securities quoted or denominated in another currency will increase or decrease in response to changes in the value of such currency in relation to the U.S. dollar.

### Derivatives Risk

Derivatives risk is a combination of several risks, including the risks that: (1) an investment in a derivative instrument may not correlate well with the performance of the securities or asset class to which the Fund seeks exposure, (2) derivative contracts, including options, may expire worthless and the use of derivatives may result in losses to the Fund, (3) a derivative instrument entailing leverage may result in a loss greater than the principal amount invested, (4) derivatives not traded on an exchange may be subject to credit risk, for example, if the counterparty does not meet its obligations (see also "Counterparty Risk"), and (5) derivatives not traded on an exchange may be subject to liquidity risk and the related risk that the instrument is difficult or impossible to value accurately. As a general matter, when the Fund establishes certain derivative instrument positions, such as certain futures, options and forward contract positions, it will segregate liquid assets (such as cash, U.S. Treasury bonds or commercial paper) equivalent to the Fund's outstanding obligations under the contract or in connection with the position. In addition, changes in laws or regulations may make the use of derivatives more costly, may limit the availability of derivatives, or may otherwise adversely affect the use, value or performance of derivatives. A Fund's ability to pursue its investment strategy, including its strategy of investing in certain derivative instruments, may be limited to or adversely affected by the Fund's intention to qualify as a regulated investment company, and its strategy may bear adversely on its ability to so qualify.

### Distressed and Defaulted Securities Risk

The Fund may invest in companies that are troubled, in distress or bankrupt. As such, they are subject to a multitude of legal, industry, market, environmental and governmental forces that make analysis of these companies inherently difficult. Further, the Investment Adviser relies on company management, outside experts, market participants and personal experience to analyze potential investments for the Fund. There can be no assurance that any of these sources will prove credible, or that the resulting analysis will produce accurate conclusions.

### Financial Services Industry Risk

The risk associated with the fact that the Trust's investments in Senior Loans are arranged through private negotiations between a borrower ("Borrower") and several financial institutions. Investments in the financial services sector may be subject to credit risk, interest rate risk, and regulatory risk, among others. Banks and other financial institutions can be affected by such factors as downturns in the U.S. and foreign

economies and general economic cycles, fiscal and monetary policy, adverse developments in the real estate market, the deterioration or failure of other financial institutions, and changes in banking or securities regulations. The financial services industry is subject to extensive government regulation, which can limit both the amounts and types of loans and other financial commitments financial services companies can make and the interest rates and fees they can charge. Profitability is largely dependent on the availability and cost of capital funds, and can fluctuate significantly when interest rates change. Because financial services companies are highly dependent on short-term interest rates, they can be adversely affected by downturns in the U.S. and foreign economies or changes in banking regulations. Losses resulting from financial difficulties of Borrowers can negatively affect financial services companies. The financial services industry is currently undergoing relatively rapid change as existing distinctions between financial service segments become less clear. This change may make it more difficult for the Investment Adviser to analyze investments in this industry. Additionally, the recently increased volatility in the financial markets and implementation of the recent financial reform legislation may affect the financial services industry as a whole in ways that may be difficult to predict.

### Hedging Risk

The Fund may engage in "hedging," the practice of attempting to offset a potential loss in one position by establishing an opposite position in another investment. Hedging strategies in general are usually intended to limit or reduce investment risk, but can also be expected to limit or reduce the potential for profit. For example, if the Fund has taken a defensive posture by hedging its portfolio, and stock prices advance, the return to investors will be lower than if the portfolio had not been hedged. No assurance can be given that any particular hedging strategy will be successful, or that the Investment Adviser will elect to use a hedging strategy at a time when it is advisable.

### Illiquid and Restricted Securities Risk

Certain investments made by the Fund are, and others may be, illiquid, and consequently the Fund may not be able to sell such investments at prices that reflect the Investment Adviser's assessment of their value or the amount originally paid for such investments by the Fund. Illiquidity may result from the absence of an established market for the investments as well as legal, contractual or other restrictions on their resale and other factors. Furthermore, the nature of the Fund's investments, especially those in financially distressed companies, may require a long holding period prior to profitability.

Restricted securities (i.e., securities acquired in private placement transactions) and illiquid securities may offer higher yields than comparable publicly traded securities. The Fund, however, may not be able to sell these securities when

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (unaudited) (continued)**

June 30, 2020                                                     Highland Income Fund

the Investment Adviser considers it desirable to do so or, to the extent they are sold privately, may have to sell them at less than the price of otherwise comparable securities. Restricted securities are subject to limitations on resale which can have an adverse effect on the price obtainable for such securities. Also, if in order to permit resale the securities are registered under the Securities Act at a Fund's expense, the Fund's expenses would be increased. A high percentage of illiquid securities in a Fund creates a risk that such a Fund may not be able to redeem its shares without causing significant dilution to remaining shareholders.

### Interest Rate Risk

The risk that fixed income securities will decline in value because of changes in interest rates. When interest rates decline, the value of fixed rate securities already held by the Funds can be expected to rise. Conversely, when interest rates rise, the value of existing fixed rate portfolio securities can be expected to decline. A Fund with a longer average portfolio duration will be more sensitive to changes in interest rates than a fund with a shorter average portfolio duration.

On July 27, 2017, the head of the United Kingdom's Financial Conduct Authority announced a desire to phase out the use of LIBOR by the end of 2021. Due to this announcement, there remains uncertainty regarding the future utilization of LIBOR and the nature of any replacement rate. As such, the potential effect of a transition away from LIBOR on the Funds or the financial instruments in which the Fund invests can not yet be determined. A successor rate could impact the liquidity and potentially the value of investments that reference LIBOR. The transition process may involve, among other things, increased volatility or illiquidity in markets for instruments that currently rely on LIBOR. The transition may also result in a change in (i) the value of certain instruments held by the Trust, (ii) the cost of temporary borrowing for the Trust, or (iii) the effectiveness of related Trust transactions such as hedges, as applicable. When LIBOR is discontinued, the LIBOR replacement rate may be lower than market expectations, which could have an adverse impact on the value of preferred and debt-securities with floating or fixed-to-floating rate coupons. Any such effects of the transition away from LIBOR, as well as other unforeseen effects, could result in losses to the Fund. Since the usefulness of LIBOR as a benchmark could deteriorate during the transition period, these effects could occur prior to the end of 2021.

### Leverage Risk

The Fund may use leverage in its investment program, including the use of borrowed funds and investments in certain types of options, such as puts, calls and warrants, which may be purchased for a fraction of the price of the underlying securities. While such strategies and techniques increase the

opportunity to achieve higher returns on the amounts invested, they also increase the risk of loss. To the extent the Fund purchases securities with borrowed funds, its net assets will tend to increase or decrease at a greater rate than if borrowed funds are not used. If the interest expense on borrowings were to exceed the net return on the portfolio securities purchased with borrowed funds, the Fund's use of leverage would result in a lower rate of return than if the Fund were not leveraged.

### Non-U.S. Securities Risk

The Fund may invest in non-U.S. securities. Investing in non-U.S. securities involves certain risks not involved in domestic investments, including, but not limited to: fluctuations in foreign exchange rates; future foreign economic, financial, political and social developments; different legal systems; the possible imposition of exchange controls or other foreign governmental laws or restrictions; lower trading volume; much greater price volatility and illiquidity of certain non-U.S. securities markets; different trading and settlement practices; less governmental supervision; changes in currency exchange rates; high and volatile rates of inflation; fluctuating interest rates; less publicly available information; and different accounting, auditing and financial recordkeeping standards and requirements.

### Options Risk

There are several risks associated with transactions in options on securities. For example, there are significant differences between the securities and options markets that could result in an imperfect correlation between these markets, causing a given transaction not to achieve its objectives. A transaction in options or securities may be unsuccessful to some degree because of market behavior or unexpected events.

When the Fund writes a covered call option, the Fund forgoes, during the option's life, the opportunity to profit from increases in the market value of the security covering the call option above the sum of the premium and the strike price of the call, but retains the risk of loss should the price of the underlying security decline. The writer of an option has no control over the time when it may be required to fulfill its obligation and once an option writer has received an exercise notice, it must deliver the underlying security in exchange for the strike price.

When the Fund writes a covered put option, the Fund bears the risk of loss if the value of the underlying stock declines below the exercise price minus the put premium. If the option is exercised, the Fund could incur a loss if it is required to purchase the stock underlying the put option at a price greater than the market price of the stock at the time of exercise plus the put premium the Fund received when it

013339

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (unaudited) (continued)**

June 30, 2020                                                    Highland Income Fund

wrote the option. While the Fund's potential gain in writing a covered put option is limited to distributions earned on the liquid assets securing the put option plus the premium received from the purchaser of the put option, the Fund risks a loss equal to the entire exercise price of the option minus the put premium.

## Pandemics and Associated Economic Disruption

An outbreak of respiratory disease caused by a novel corona-virus was first detected in China in December 2019 and subsequently spread internationally. This coronavirus has resulted in the closing of borders, enhanced health screen-ings, healthcare service preparation and delivery, quar-antines, cancellations, disruptions to supply chains and customer activity, as well as general anxiety and economic uncertainty. The impact of this coronavirus may be short term or may last for an extended period of time and result in a substantial economic downturn. Health crises caused by outbreaks of disease, such as the coronavirus, may exacerbate other pre-existing political, social and economic risks. This outbreak, and other epidemics and pandemics that may arise in the future, could negatively affect the global economy, as well as the economies of individual coun-tries, individual companies and the market in general in sig-nificant and unforeseen ways. For example, a widespread health crisis such as a global pandemic could cause sub-stantial market volatility, exchange trading suspensions and closures, impact the Fund's ability to complete repurchase requests, and affect Fund performance. Any such impact could adversely affect the Fund's performance, the perform-ance of the securities in which the Fund invests, lines of credit available to the Fund and may lead to losses on your investment in the Fund. In addition, the increasing inter-connectedness of markets around the world may result in many markets being affected by events or conditions in a single country or region or events affecting a single or small number of issuers.

## Preferred stock risk

Preferred stock, which may include preferred stock in real estate transactions, represents an equity or ownership interest in an issuer that pays dividends at a specified rate and that has precedence over common stock in the payment of dividends. In the event an issuer is liquidated or declares bankruptcy, the claims of creditors and owners of bonds take precedence over the claims of those who own preferred and common stock. If interest rates rise, the fixed dividend on preferred stocks may be less attractive, causing the price of preferred stocks to decline. Preferred stock may have man-datory sinking fund provisions, as well as provisions allowing the stock to be called or redeemed prior to its maturity, which can have a negative impact on the stock's price when interest rates decline. Unlike interest on debt securities, preferred stock dividends are payable only if declared by the

issuer's board. The value of convertible preferred stock can depend heavily upon the value of the security into which such convertible preferred stock is converted, depending on whether the market price of the underlying security exceeds the conversion price.

## Preferred Share Risk

The risk associated with the issuance of preferred shares to leverage the common shares. When preferred shares are issued, the NAV and market value of the common shares become more volatile, and the yield to the holders of common shares will tend to fluctuate with changes in the shorter-term dividend rates on the preferred shares. The Trust will pay (and the holders of common shares will bear) all costs and expenses relating to the issuance and ongoing maintenance of the preferred shares, including higher advi-sory fees. Accordingly, the issuance of preferred shares may not result in a higher yield or return to the holders of the common shares. If the dividend rate and other costs of the preferred shares approach the net rate of return on the Trust's investment portfolio, the benefit of leverage to the holders of the common shares would be reduced. If the dividend rate and other costs of the preferred shares exceed the net rate of return on the Trust's investment portfolio, the leverage will result in a lower rate of return to the hold-ers of common shares than if the Trust had not issued pre-ferred shares.

## Real Estate Investment Trust Risk

Real estate investments are subject to various risk factors. Generally, real estate investments could be adversely affected by a recession or general economic downturn where the properties are located. Real estate investment performance is also subject to the success that a particular property manager has in managing the property.

## Real Estate Market Risk

The Trust is exposed to economic, market and regulatory changes that impact the real estate market generally through its investment in NFRO REIT Sub, LLC (the "REIT Subsidiary"), which may cause the Trust's operating results to suffer. A number of factors may prevent the REIT Sub-sidiary's properties and other real estate-related invest-ments from generating sufficient net cash flow or may adversely affect their value, or both, resulting in less cash available for distribution, or a loss, to us. These factors include: national, regional and local economic conditions; changing demographics; the ability of property managers to provide capable management and adequate maintenance; the quality of a property's construction and design; increases in costs of maintenance, insurance, and operations (including energy costs and real estate taxes); potential environmental and other legal liabilities; the level of financing used by the REIT Subsidiary and the availability and cost of refinancing;

013340

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (unaudited) (continued)**

June 30, 2020                                                                          Highland Income Fund

potential instability, default or bankruptcy of tenants in the properties owned by the REIT Subsidiary; the relative illiquidity of real estate investments in general, which may make it difficult to sell a property at an attractive price or within a reasonable time frame.

## Senior Loans Risk

The Fund's investments in Senior Loans are typically below investment grade and are considered speculative because of the credit risk of their issuers. As with any debt instrument, Senior Loans are generally subject to the risk of price declines and to increases in interest rates, particularly long-term rates. Senior loans are also subject to the risk that, as interest rates rise, the cost of borrowing increases, which may increase the risk of default. In addition, the interest rates of floating rate loans typically only adjust to changes in short-term interest rates; long-term interest rates can vary dramatically from short-term interest rates. Therefore, Senior Loans may not mitigate price declines in a rising long-term interest rate environment. The secondary market for loans is generally less liquid than the market for higher grade debt. Less liquidity in the secondary trading market could adversely affect the price at which the Fund could sell a loan, and could adversely affect the Fund's income. The volume and frequency of secondary market trading in such loans varies significantly over time and among loans. Although Senior Loans in which the Fund will invest will often be secured by collateral, there can be no assurance that liquidation of such collateral would satisfy the Borrower's obligation in the event of a default or that such collateral could be readily liquidated.

LIBOR is the average offered rate for various maturities of short-term loans between major international banks who are members of the British Bankers Association. LIBOR is the most common benchmark interest rate index used to make adjustments to variable-rate loans. It is used throughout global banking and financial industries to determine interest rates for a variety of financial instruments (such as debt instruments and derivatives) and borrowing arrangements.

Due to manipulation allegations in 2012 and reduced activity in the financial markets that it measures, in July 2017, the Financial Conduct Authority (the "FCA"), the United Kingdom financial regulatory body, announced a desire to phase out the use of LIBOR by the end of 2021. Please refer to "Interest Rate Risk" for more information.

## Short Sales Risk

Short sales by the Fund that are not made where there is an offsetting long position in the asset that it is being sold short theoretically involve unlimited loss potential since the market price of securities sold short may continuously increase. Short selling allows the Fund to profit from declines in market prices to the extent such decline exceeds the transaction costs and

costs of borrowing the securities. However, since the borrowed securities must be replaced by purchases at market prices in order to close out the short position, any appreciation in the price of the borrowed securities would result in a loss. Purchasing securities to close out the short position can itself cause the price of securities to rise further, thereby exacerbating the loss. The Fund may mitigate such losses by replacing the securities sold short before the market price has increased significantly. Under adverse market conditions, the Fund might have difficulty purchasing securities to meet margin calls on its short sale delivery obligations, and might have to sell portfolio securities to raise the capital necessary to meet its short sale obligations at a time when fundamental investment considerations would not favor such sales.

## Structured Finance Securities Risk

A portion of the Trust's investments may consist of equipment trust certificates, collateralized mortgage obligations, collateralized bond obligations, collateralized loan obligations or similar instruments. Such structured finance securities are generally backed by an asset or a pool of assets, which serve as collateral. Depending on the type of security, the collateral may take the form of a portfolio of mortgage loans or bonds or other assets. The Trust and other investors in structured finance securities ultimately bear the credit risk of the underlying collateral. In some instances, the structured finance securities are issued in multiple tranches, offering investors various maturity and credit risk characteristics, often categorized as senior, mezzanine and subordinated/equity according to their degree of risk. The riskiest securities are the equity tranche, which bears the bulk of defaults from the bonds or loans serving as collateral, and thus may protect the other, more senior tranches from default. If there are defaults or the relevant collateral otherwise underperforms, scheduled payments to senior tranches of such securities take precedence over those of mezzanine tranches, and scheduled payments to mezzanine tranches take precedence over those to subordinated/equity tranches. A senior tranche typically has higher ratings and lower yields than the underlying securities, and may be rated investment grade. Despite the protection from the equity tranche, other tranches can experience substantial losses due to actual defaults, increased sensitivity to defaults due to previous defaults and the disappearance of protecting tranches, market anticipation of defaults and aversion to certain structured finance securities as a class.

## Valuation Risk

Certain of the Fund's assets are fair valued, including the Fund's investment in equity issued by TerreStar Corporation ("TerreStar"). TerreStar is a nonoperating company that does not currently generate substantial revenue and which primarily derives its value from licenses for use of two spectrum frequencies, the license with respect to one of which

# NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (unaudited) (continued)

June 30, 2020                                                                                   Highland Income Fund

was granted a conditional waiver by the FCC on April 30, 2020. The fair valuation of TerreStar involves significant uncertainty as it is materially dependent on estimates of the value of both spectrum licenses.

## Gain Contingency

Claymore Holdings, LLC, a partially-owned affiliate of the Fund, is engaged in ongoing litigation that could result in a possible gain contingency to the Fund. The probability, timing, and potential amount of recovery, if any, are unknown.

## Note 9. Investment Transactions

### Purchases & Sales of Securities

The cost of purchases and the proceeds from sales of investments, other than short-term securities and short-term options, for the period ended June 30, 2020, were as follows:

| | U.S Government Securities | | Other Securities | |
|---|---|---|---|---|
| | Purchases | Sales | Purchases | Sales |
| | $— | $77,325,693 | $408,342,079 | $234,483,187 |

## Note 10. Affiliated Issuers and Other Affiliate Matters

Under Section 2 (a)(3) of the Investment Company Act of 1940, as amended, a portfolio company is defined as "affiliated" if a fund owns five percent or more of its outstanding voting securities or if the portfolio company is under common control. The table below shows affiliated issuers of the Fund as of June 30, 2020:

| Issuer | Shares at December 31, 2019 | Beginning Value as of December 31, 2019 $ | Purchases at Cost $ | Proceeds from Sales $ | Distribution to Return of Capital $ | Net Realized Gain/(Loss) on Sales of Affiliated Issuers $ | Change in Unrealized Appreciation/ (Depreciation) $ | Ending Value as of June 30, 2020 $ | Shares at June 30, 2020 | Affiliated Income $ |
|---|---|---|---|---|---|---|---|---|---|---|
| **Majority Owned, Not Consolidated** | | | | | | | | | | |
| Allenby (Common Stocks) | 1,393,678 | 1 | 43,877 | — | — | — | (43,877) | 1 | 1,437,555 | — |
| Claymore (Common Stocks) | 9,370,190 | 9 | 749,789 | — | — | — | (749,788) | 10 | 10,119,979 | — |
| **Other Affiliates** | | | | | | | | | | |
| CCS Medical, Inc. (U.S. Senior Loans & Common Stocks) | 58,920,016 | 47,805,911 | 3,208,451 | — | — | — | 2,484,892 | 53,499,254 | 62,128,467 | 6,649,398 |
| EDS Legacy Partners (U.S. Senior Loans) | 57,000,000 | 56,829,000 | — | — | — | — | (5,358,000) | 51,471,000 | 57,000,000 | 4,282,044 |
| Highland Global Allocation Fund (Registered Investment Company) | — | — | 197,609 | — | — | — | 115,691 | 313,300 | 48,649 | 16,346 |
| Highland Income Fund (Registered Investment Company) | — | — | 3,009,959 | (4,853,219) | — | 1,843,260 | — | — | — | — |
| LLV Holdco LLC (U.S. Senior Loans, Common Stocks and Warrants) | 13,442,392 | 10,753,914 | — | — | (58,674) | — | 58,674 | 10,753,914 | 13,477,340 | 40,103 |
| NREF OP II, IV, L.P. (LLC Interest) | — | — | 22,268,393 | — | — | — | (3,618,614) | 18,649,779 | 1,113,420 | 694,914 |
| NexPoint Real Estate Finance (Common Stocks) | — | — | 218,169 | — | — | — | 77,133 | 295,302 | 17,630 | 7,052 |
| NexPoint Residential Trust (Common Stocks) | — | — | 5,324,978 | (38,049) | — | — | (73,193) | 5,213,736 | 147,489 | 7,639 |
| NexPoint Strategic Opportunities Fund (Registered Investment Company) | 989,143 | 17,517,723 | 1,740,630 | — | — | — | (7,087,313) | 12,171,040 | 1,156,943 | 158,188 |
| NFRO REIT SUB, LLC (Common Stocks) | 4,328,483 | 95,747,521 | 21,875,000 | — | (9,599,985) | — | (8,631,330) | 99,391,206 | 5,425,728 | 10,697 |
| Omnimax International, Inc. (U.S. Senior Loans, Common Stocks, Warrants) | 9,629,768 | 8,152,216 | 874,950 | — | — | — | (6,472,287) | 2,554,879 | 10,299,501 | 1,512,313 |
| SFR WLIF I, II, III, LLC (LLC Interest) | 90,000,000 | 88,777,470 | — | — | — | — | (13,196,328) | 75,581,142 | 90,000,000 | 7,804,228 |
| Total | 245,073,670 | 325,583,765 | 59,511,805 | (4,891,268) | (9,658,659) | 1,843,260 | (42,494,340) | 329,894,563 | 252,372,701 | 21,182,922 |

013342

# NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (unaudited) (continued)

June 30, 2020          Highland Income Fund

The Investment Adviser has been historically affiliated through common control with Highland Capital Management, L.P. ("HCMLP"), an SEC-registered investment adviser. On October 16, 2019, HCMLP filed for Chapter 11 bankruptcy protection with the United States Bankruptcy Court for the District of Delaware. The case was subsequently transferred to the United States Bankruptcy Court for the Northern District of Texas. On January 9, 2020, the bankruptcy court approved a change of control of HCMLP, which involved the resignation of James Dondero as the sole director of, and the appointment of an independent board to, HCMLP's general partner. Mr. Dondero will, however, remain as an employee of HCMLP and as portfolio manager for all funds and vehicles for which he currently holds such titles. Nevertheless, given Mr. Dondero's historic role with HCMLP and his continued ownership interest and roles with respect to the Highland platform as a whole, as well as the shared services agreements between HCMLP and our Investment Adviser, we still treat HCMLP and its affiliates as our affiliates for purposes hereof.

On August 12, 2020, HCMLP filed of a plan of reorganization (the "Filed Plan") with the Court in advance of a mediation process to resolve the case (the "Mediation Plan") involving HCMLP, the official committee of unsecured creditors, and other parties involved in the reorganization proceedings. Under both the Filed Plan and the Mediation Plan (together the "Plans"), HCMLP's investment and business activities are expected to continue without interruption, including the shared services arrangement with HCMFA. Under this arrangement the Investment Adviser may utilize employees from HCMLP in connection with various services such as human resources, accounting, tax, valuation, information technology services, office space, employees, compliance and legal. HCMFA is neither party to HCMLP's bankruptcy filing nor subject to the Plans.

We do not expect HCMLP's bankruptcy filings to impact its provision of services to HCMFA at this time.

## Note 11. New Accounting Pronouncements
In November 2016, the FASB issued Accounting Standards Update 2016-18, Statement of Cash Flows (Topic 230): Restricted Cash. The amendments in this update require the statement of cash flows to explain the change during the period in the total of cash, restricted cash and cash equivalents. Amounts generally described as restricted cash or restricted cash equivalents should be included with cash and cash equivalents when reconciling the beginning-of-period and end-of-period total amounts shown on the statement of cash flows. For public entities this update will be effective for fiscal years beginning after December 15, 2017, and for interim periods within those fiscal years. The Investment Adviser has evaluated the impact of this new guidance and effective April 1, 2018, the Fund no longer reports the

change in restricted cash and cash equivalents in the operating and investing sections in our Consolidated Statement of Cash Flows. Restricted cash and cash equivalents are now included in the beginning and end of the period cash and cash equivalents on the Consolidated Statement of Cash Flows. These changes have been applied using a retrospective transition method to each period presented.

In August 2018, the FASB issued Accounting Standards Update 2018-13, Fair Value Measurement (Topic 820). The new guidance includes additions and modifications to disclosures requirements for fair value measurements. For public entities, the amendments are effective for consolidated financial statements issued for fiscal years beginning after December 15, 2019, and interim periods within those fiscal years.

## Note 12. Asset Coverage
The Fund is required to maintain 300% asset coverage with respect to amounts outstanding (excluding short-term borrowings) under its various leverage facilities. Additionally the fund is required to maintain 200% asset coverage with respect to the preferred share issuance as well as its various leverage facilities. Asset coverage is calculated by subtracting the Fund's total liabilities, not including any amount representing bank borrowings and senior securities, from the Fund's total assets and dividing the result by the principal amount of the borrowings outstanding. As of the dates indicated below, the Fund's debt outstanding and asset coverage was as follows:

| Date | Amount Outstanding Excluding Preferred Shares | % of Asset Coverage of Indebtedness Excluding Preferred Shares | Amount Outstanding Including Preferred Shares | % of Asset Coverage of Indebtedness Including Preferred Shares [2] |
|---|---|---|---|---|
| 6/30/2020 | 341,396,000 | 367.02% | 486,396,000 | 287.42% |
| 12/31/2019 | 419,796,600 | 337.13% | 564,796,600 | 276.25% |
| 12/31/2018[1] | 496,141,100 | 306.80% | 496,141,100 | 306.80% |
| 6/30/2018 | 498,563,423 | 317.70% | 498,563,423 | 317.70% |
| 6/30/2017 | N/A | N/A | N/A | N/A |
| 6/30/2016 | N/A | N/A | N/A | N/A |
| 6/30/2015 | 51,500,000 | 1641.40% | 51,500,000 | 1641.40% |
| 6/30/2014 | 60,000,000 | 1577.60% | 60,000,000 | 1577.60% |
| 6/30/2013 | N/A | N/A | N/A | N/A |
| 6/30/2012 | 89,000,000 | 718.40% | 89,000,000 | 718.40% |
| 6/30/2011 | 135,000,000 | 659.90% | 135,000,000 | 659.90% |
| 6/30/2010 | 115,000,000 | 606.00% | 115,000,000 | 606.00% |
| 6/30/2009 | 181,000,000 | 465.80% | 181,000,000 | 465.80% |

[1] For the six month period ended December 31, 2018. Effective April 11, 2019, the Fund had a fiscal year change from June 30 to December 31 (Note 1).

[2] As referenced in Note 1, the Fund issued $145mm in preferred shares subject to the 200% Asset Coverage of Indebtedness requirements under the 40 Act.

013343

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (unaudited) (concluded)**

June 30, 2020                                                                    Highland Income Fund

## Note 13. Unconsolidated Significant Subsidiaries

In accordance with Regulation S-X and GAAP, the Fund is not permitted to consolidate any subsidiary or other entity that is not an investment company, including those in which the Fund has a controlling interest unless the business of the controlled subsidiary consists of providing services to the Fund. In accordance with Regulation S-X Rules 3-09 and 4-08(g), the Fund evaluates its unconsolidated controlled subsidiaries as significant subsidiaries under the respective rules. As of June 30, 2020, NFRO REIT Sub LLC was considered a significant unconsolidated subsidiary under Regulation S-X Rule 4 08(g). This subsidiary is wholly owned by the Fund. Based on the requirements under Regulation S-X Rule 4-08(g), the summarized consolidated financial information of these unconsolidated subsidiaries is presented below:

| | NFRO REIT Sub, LLC June 30, 2020 |
| --- | --- |
| **Balance Sheet:** | |
| Current Assets | $ 5,038,000 |
| Noncurrent Assets | 215,463,000 |
| **Total Assets** | 220,501,000 |
| Current Liabilities | 8,914,000 |
| Noncurrent Liabilities | 125,832,000 |
| **Total Liabilities** | 134,746,000 |
| Preferred Stock | 1,000 |
| Non-controlling interest (in consolidated investments) | 104,000 |
| Invested Equity | 85,650,000 |
| **Total Equity** | 85,755,000 |

| | NFRO REIT Sub, LLC For the Year Ended June 30, 2020 |
| --- | --- |
| **Summary of Operations:** | |
| Net Sales | $ 790,000 |
| Gross Profit | (7,445,000) |
| Net Income | (7,437,000) |
| Net Income attributable to non-controlling interest (in consolidated investments), preferred shares, and other comprehensive income | 8,000 |

## Note 14. Subsequent Events

The Investment Adviser has evaluated the impact of all subsequent events on the Fund through the date the consolidated financial statements were issued, and has determined that there were no such subsequent events to report which have not already been recorded or disclosed in these financial statements and accompanying notes except as noted below.

On August 3, 2020, Jernigan Capital, Inc. ("JCAP"), an owner of self-storage facilities and a leading capital partner for self-storage entrepreneurs nationwide, announced that it had entered into a definitive merger agreement with an affiliate of the Fund, pursuant to which JCAP will be acquired by the Fund, certain of its affiliates and certain third parties in an all-cash transaction valued at approximately $900 million, including debt and preferred stock to be assumed or refinanced.

013344

**ADDITIONAL INFORMATION (unaudited)**

June 30, 2020                                                    Highland Income Fund

## Additional Portfolio Information

The Investment Adviser and its affiliates manage other accounts, including registered and private funds and individual accounts. Although investment decisions for the Fund are made independently from those of such other accounts, the Investment Adviser may, consistent with applicable law, make investment recommendations to other clients or accounts that may be the same or different from those made to the Fund, including investments in different levels of the capital structure of a company, such as equity versus senior loans, or that involve taking contradictory positions in multiple levels of the capital structure. The Investment Adviser has adopted policies and procedures that address the allocation of investment opportunities, execution of portfolio transactions, personal trading by employees and other potential conflicts of interest that are designed to ensure that all client accounts are treated equitably over time. Nevertheless, this may create situations where a client could be disadvantaged because of the investment activities conducted by the Investment Adviser for other client accounts. When the Fund and one or more of such other accounts is prepared to invest in, or desire to dispose of, the same security, available investments or opportunities for each will be allocated in a manner believed by the Investment Adviser to be equitable to the Fund and such other accounts. The Investment Adviser also may aggregate orders to purchase and sell securities for the Fund and such other accounts. Although the Investment Adviser believes that, over time, the potential benefits of participating in volume transactions and negotiating lower transaction costs should benefit all accounts including the Fund, in some cases these activities may adversely affect the price paid or received by the Fund or the size of the position obtained or disposed of by the Fund.

## Dividend Reinvestment Plan

Unless the registered owner of Common Shares elects to receive cash by contacting American Stock Transfer & Trust Company, LLC ("AST" or the "Plan Agent"), as agent for shareholders in administering the Plan, a registered owner will receive newly issued Common Shares for all dividends declared for Common Shares of the Fund. If a registered owner of Common Shares elects not to participate in the Plan, they will receive all dividends in cash paid by check mailed directly to them (or, if the shares are held in street or other nominee name, then to such nominee) by AST, as dividend disbursing agent. Shareholders may elect not to participate in the Plan and to receive all dividends in cash by sending written instructions or by contacting AST, as dividend disbursing agent, at the address set forth below.

Participation in the Plan is completely voluntary and may be terminated or resumed at any time without penalty by contacting the Plan Agent before the dividend record date;

otherwise such termination or resumption will be effective with respect to any subsequently declared dividend. Some brokers may automatically elect to receive cash on the shareholders' behalf and may reinvest that cash in additional Common Shares of the Fund for them. The Plan Agent will open an account for each shareholder under the Plan in the same name in which such shareholder's Common Shares are registered.

Whenever the Fund declares a dividend payable in cash, non-participants in the Plan will receive cash and participants in the Plan will receive the equivalent in Common Shares. The Common Shares will be acquired by the Plan Agent through receipt of additional unissued but authorized Common Shares from the Fund ("newly issued Common Shares"). The number of newly issued Common Shares to be credited to each participant's account will be determined by dividing the dollar amount of the dividend by the lesser of (i) the net asset value per Common Share determined on the Declaration Date and (ii) the market price per Common Share as of the close of regular trading on the New York Stock Exchange (the "NYSE") on the Declaration Date. The Plan Agent maintains all shareholders' accounts in the Plan and furnishes written confirmation of all transactions in the accounts, including information needed by shareholders for tax records. Common Shares in the account of each Plan participant will be held by the Plan Agent on behalf of the Plan participant, and each shareholder proxy will include those shares purchased or received pursuant to the Plan. The Plan Agent will forward all proxy solicitation materials to participants and vote proxies for shares held under the Plan in accordance with the instructions of the participants. In the case of shareholders such as banks, brokers or nominees which hold shares for others who are the beneficial owners, the Plan Agent will administer the Plan on the basis of the number of Common Shares certified from time to time by the record shareholder's name and held for the account of beneficial owners who participate in the Plan. There will be no brokerage charges with respect to Common Shares issued directly by the Fund.

The automatic reinvestment of dividends will not relieve participants of any federal, state or local income tax that may be payable (or required to be withheld) on such dividends. Accordingly, any taxable dividend received by a participant that is reinvested in additional Common Shares will be subject to federal (and possibly state and local) income tax even though such participant will not receive a corresponding amount of cash with which to pay such taxes. Participants who request a sale of shares through the Plan Agent pay a brokerage commission of $0.04 per share sold. The Fund reserves the right to amend or terminate the Plan. There is no direct service charge to participants in the Plan; however, the Fund reserves the right to amend the Plan to

**ADDITIONAL INFORMATION (unaudited) (continued)**

June 30, 2020                                                                    Highland Income Fund

include a service charge payable by the participants. All correspondence concerning the Plan should be directed to the Plan Agent at American Stock Transfer & Trust Company, LLC 6201 15th Avenue Brooklyn, NY 11219; telephone (718) 921-8200.

To promote loyalty and long-time alignment of interests among the Trust's shareholders, the Investment Adviser offers an incentive to shareholders that buy and hold the Trust's common shares for a period of at least twelve months through its Shareholder Loyalty Plan (the "Plan"). To participate in the Plan, existing shareholders must open an account (the "Account") with the Plan's administrator, Global Shares. Subsequently, if a participant makes contributions to the Account during a defined trading period to purchase shares, Highland will make a corresponding contribution on such participant's behalf (the "Gross-up"). The Gross-up is determined by Highland and may be adjusted at any point without notice by Highland prospectively from time to time in accordance with the terms of the Plan. For example, if a participant contributes $10,000 to the Account during a defined trading period to purchase shares and Highland has determined the participant's Gross-up will be 2%, Highland will make a corresponding contribution of $200, or 2% of the total $10,000, to purchase additional Shares for the participant (the "Gross-up Shares"). In addition, Plan participants will not be required to pay any customary purchase commissions or distribution fees on the purchase of shares under the Plan.

Highland will pay all expenses incident to the purchase of shares under the Plan and for operation of the Plan, including the costs of recordkeeping, accounting fees, legal fees and the costs of delivery of stock certificates, if any, to participants; provided, however, that Highland will not pay any expenses incurred in connection with any sale or transfer of shares credited to a participant's Account. Expenses incurred in connection with any such sales will be deducted from the proceeds of sale prior to any remittance to the participant.

While the portion of the Trust's common shares that are acquired through the participant's contribution will vest immediately, the Gross-up Shares will not vest until the first anniversary of the date that the Gross-up Shares were purchased. Vested shares and Gross-up Shares will be held in the Account with Global Shares' broker, Maxim Group, LLC ("Maxim"). A participant may not sell or otherwise withdraw, pledge, transfer, assign, hypothecate or dispose of any Gross-up Shares prior to the date on which they become vested Shares. Under the Plan, participants must contribute a minimum of $2,500 for purchases of shares in the initial contribution and each subsequent monthly contribution unless Highland, in its sole discretion, decides to permit contributions for a lesser amount. The maximum monthly

contribution limit under the Plan is $1,000,000, which amount may be adjusted from time to time by Highland in its sole discretion.

All dividends received on shares that are purchased under the Plan will be automatically reinvested through the Plan. Shares acquired through the reinvestment of dividends paid to the holder of a vested share will vest immediately. Shares acquired through the reinvestment of dividends paid to the holder of a non-vested Gross-up share will vest on the first anniversary of the reinvest date. In addition, for dividends paid to holders of vested shares, Highland will provide a Gross-up on the amount of such reinvested dividends.

Maxim maintains all shareholders' accounts in the Plan and, upon request, furnishes written confirmation of all transactions in the accounts, including information needed by shareholders for tax records. Shares in the account of each Plan participant will be held by Maxim on behalf of the Plan participant, and each shareholder proxy will include those shares purchased or received pursuant to the Plan. Maxim will forward all proxy solicitation materials to participants and vote proxies for shares held under the Plan in accordance with the instructions of the participants.

In the case of shareholders such as banks, brokers or nominees which hold shares for others who are the beneficial owners, Global Shares and Maxim will administer the Plan on the basis of the number of common shares certified from time to time by the record shareholder's name and held for the account of beneficial owners who participate in the Plan.

Highland reserves the right to amend or terminate the Plan. To help align the interests of Highland's employees with the interests of the Trust's shareholders, Highland also offers the Plan to its employees.

Participants in the Plan should be aware that their receipt of Gross-up Shares under the Plan constitutes taxable income to them. In addition, such participants owe taxes on that portion of any distribution that constitutes taxable income in respect of shares of our common stock held in their Plan accounts, whether or not such shares of common stock have vested in the hands of the participants. To the extent any payments or distributions under the Plan are subject to U.S. federal, state or local taxes, the Trust, any participating affiliate of the Trust or the agent for the Plan may satisfy its tax withholding obligation by (1) withholding shares allocated to the participant's account or (2) deducting cash from the participant's account. Plan participants should consult their tax advisers regarding the tax consequences to them of participating in the Plan.

The Plan may create an incentive for shareholders to invest additional amounts in the Trust. Because the Adviser's management fee is based on a percentage of the assets of

013346

## ADDITIONAL INFORMATION (unaudited) (continued)

June 30, 2020                                                                                     Highland Income Fund

the Trust, the Plan will result in increased net revenues to Highland if the increase in the management fee due to the increased asset base offsets the costs associated with establishing and maintaining the Plan.

### Change in Independent Registered Public Accounting Firms:

On June 8, 2020, the Fund dismissed PricewaterhouseCoopers LLP ("PwC") as the Fund's independent registered public accounting firm, effective on such date. The decision to dismiss PwC was approved by the audit committee and by the full Board. On June 18, 2020, the Funds approved the appointment of Cohen & Company ("Cohen") as the Fund's independent registered public accounting firm. Cohen was engaged by the Fund on August 7, 2020. During the Fund's year ended December 31, 2019 and the subsequent interim period through June 8, 2020, during which PwC served as the Fund's independent registered public accounting firm, there were no: (1) disagreements (as defined in Item 304(a)(1)(iv) of Regulation S-K and the related instructions) with PwC on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedures, which disagreements if not resolved to their satisfaction would have caused them to make reference in connection with their opinion to the subject matter of the disagreement, or (2) reportable events (as described in Item 304(a)(1)(v) of Regulation S-K). PwC was also the auditor of the Fund for the year ended December 31, 2018. During the year ended December 31, 2019 and the subsequent interim period through June 8, 2020, neither Management, the Fund, nor anyone on its behalf, consulted Cohen regarding either (i) the application of accounting principles to a specified transaction, either completed or proposed, or the type of

audit opinion that might be rendered on the financial statements of the Fund and no written report or oral advice was provided to the Fund by Cohen or (ii) any matter that was either the subject of a disagreement (as defined in Item 304(a)(1)(iv) of Regulation S-K and the related instructions) or a reportable event (as described in Item 304(a)(1)(v) of Regulation S-K). The Fund provided PwC with a copy of the disclosure it is making in response to Item 304(a) of Regulation SK and requested that PwC furnish the Fund with letters addressed to the SEC, pursuant to Item 304(a) stating their agreement with the statements made and, if not, stating the respects in which they do not agree, including any new information, clarification of the Fund's expression of its view, or the respects in which it does not agree with the statements made by the Fund in response to Item 304(a).

### Submission of Proposal to a Vote of Shareholders

The annual meeting of shareholders of the Fund was held on June 12, 2020. The following is a summary of the proposal submitted to shareholders for a vote at the meeting and the votes cast.

| Proposal | Votes For | Votes Withheld |
|---|---|---|
| To elect Dr. Bob Froehlich as a Class II Trustee of the Fund, to serve for a three-year term expiring at the 2023 Annual Meeting or until his successor is duly elected and qualifies, by the holders of the Fund's 5.375% Series A Cumulative Preferred Shares. | 3,911,774 | 448,495 |

In addition to the one Trustee who was elected at the annual meeting, as noted above, the following other Trustees continued in office after the Fund's annual meeting: John Honis, Ethan Powell and Bryan A. Ward.

013347

**ADDITIONAL INFORMATION (unaudited) (concluded)**

June 30, 2020                                                                                      **Highland Income Fund**

### Privacy Policy

We recognize and respect your privacy expectations, whether you are a visitor to our web site, a potential shareholder, a current shareholder or even a former shareholder.

*Collection of Information.* We may collect nonpublic personal information about you from the following sources:

- *Account applications and other forms,* **which may include your name, address and social security number, written and electronic correspondence and telephone contacts;**
- *Web site information,* **including any information captured through the use of "cookies"; and**
- *Account history,* **including information about the transactions and balances in your accounts with us or our affiliates.**

*Disclosure of Information.* We may share the information we collect with our affiliates. We may also disclose this information as otherwise permitted by law. We do not sell your personal information to third parties for their independent use.

*Confidentiality and Security of Information.* We restrict access to nonpublic personal information about you to our employees and agents who need to know such information to provide products or services to you. We maintain physical, electronic and procedural safeguards that comply with federal standards to guard your nonpublic personal information, although you should be aware that data protection cannot be guaranteed.

**A prospectus must precede or accompany this report. Please read the prospectus carefully before you invest.**

013348

## IMPORTANT INFORMATION ABOUT THIS REPORT

**Investment Adviser**

Highland Capital Management Fund Advisors, L.P.
300 Crescent Court, Suite 700
Dallas, TX 75201

**Transfer Agent**

American Stock Transfer & Trust Company, LLC
6201 15th Avenue
Brooklyn, NY 11219

**Underwriter**

NexPoint Securities, Inc.
300 Crescent Court, Suite 700
Dallas, TX 75201

**Custodian**

Bank of New York Mellon
240 Greenwich Street
New York, NY 10286

**Independent Registered Public Accounting Firm**

Cohen & Company, Ltd.
1350 Euclid Ave., Suite 800
Cleveland, OH 44115

**Fund Counsel**

K&L Gates LLP
1 Lincoln Street
Boston, MA 02111

This report has been prepared for shareholders of Highland Income Fund (the "Fund"). The Fund mails one shareholder report to each shareholder address. If you would like more than one report, please call shareholder services at 1-800-357-9167 to request that additional reports be sent to you.

A description of the policies and procedures that the Fund uses to determine how to vote proxies relating to their portfolio securities, and the Fund's proxy voting records for the most recent 12-month period ended June 30, are available (i) without charge, upon request, by calling 1-800-357-9167 and (ii) on the Securities and Exchange Commission's website at http://www.sec.gov.

The Fund files its complete schedules of portfolio holdings with the Securities and Exchange Commission for the first and third quarters of each fiscal year as an exhibit to its report on Form N-PORT. The Fund's Form N-PORT are available on the Commission's website at http://www.sec.gov and also may be reviewed and copied at the Commission's Public Reference Room in Washington, DC. Information on the Public Reference Room may be obtained by calling 1-800-SEC-0330. Shareholders may also obtain the Form N-PORT by visiting the Fund's website at www.highlandfunds.com.

The Statement of Additional Information includes additional information about the Fund's Trustees and is available upon request without charge by calling 1-800-357-9167.

013349

**THIS PAGE LEFT BLANK INTENTIONALLY**

013350

**THIS PAGE LEFT BLANK INTENTIONALLY**

013351

**THIS PAGE LEFT BLANK INTENTIONALLY**

013352

**HIGHLAND CAPITAL MANAGEMENT**

**Highland Funds**
**c/o American Stock Transfer & Trust Company, LLC**
**6201 15th Avenue**
**Brooklyn, NY 11219**

# Highland Income Fund

Semi-Annual Report, June 30, 2020

www.highlandfunds.com

HIF-SAR-0620

013353

# EXHIBIT CCCCCCC

| Name | EIN | Formation Date | Jurisdiction | Foreign Qualification | Category |
|---|---|---|---|---|---|
| **CLO HoldCo, Ltd.** | | | Cayman Islands | N/A | DAF |



013355

| Owners | Ownership Type | Ownership % | Director/Manager/ Trustee |
|---|---|---|---|
| | | | |
| Charitable DAF Fund, L.P. | Shareholder | 100 | Grant Scott (Intertrust) |

013356

| Officers | Fund Contact | Accounting Contact Books & Records | Dissolve (Y/N) | Termination Date |
|---|---|---|---|---|



n/a

013357

| Entity Description (one sentence) | Other Notes |
| --- | --- |



013358

# EXHIBIT DDDDDDD

013359

**Highland Capital Management, L.P.**
*Disclaimer For Financial Projections*

This document includes financial projections for July 2020 through December 2022 (the "Projections") for Highland Capital Management, L.P. "Company"). These Projections have been prepared by DSI with input from management at the Company. The historical information utilized in these Projections has not been audited or reviewed for accuracy by DSI.

This document includes certain statements, estimates and forecasts provided by the Company with respect to the Company's anticipated future performance. These estimates and forecasts contain significant elements of subjective judgment and analysis that may or may not prove to be accurate or correct. There can be no assurance that these statements, estimates and forecasts will be attained and actual outcomes and results may differ materially from what is estimated or forecast herein.

These Projections should not be regarded as a representation of DSI that the projected results will be achieved.

Management may update or supplement these Projections in the future, however, DSI expressly disclaims any obligation to update its report.

These Projections were not prepared with a view toward compliance with published guidelines of the Securities and Exchange Commission or the American Institute of Certified Public Accountants regarding historical financial statements, projections or forecasts.

*Highland Capital Management, L.P.*
*Statement of Assumptions*

A. Plan effective date is March 1, 2021

B. All investment assets are sold by December 31, 2022.

C. All demand notes are collected in the year 2021; 3 term notes defaulted and have been demanded based on default provisions; payment estimated in 2021

D. Dugaboy term note with maturity date beyond 12/31/2022 are sold in Q1 2022; in the interim interest income and principal payments are not collected due to prepayment on note

E. Fixed assets currently used in daily operations are sold in June 2021 for $0

F. Highland bonus plan has been terminated in accordance with its terms. Accrual for employee bonuses as of January 2021 are reversed and not paid.

G. All Management advisory or shared service contracts are terminated on their terms by the effective date or shortly thereafter

H. Post-effective date, the reorganized Debtor would retain up to ten HCMLP employees (or hire similar employees) to help monetize the remaining assets.

I. Litigation Trustee budget is $6,500,000.

J. Unrealized gains or losses are not recorded on a monthly basis; all gains or losses are recorded as realized gains or losses upon sale of asset.

K. Plan does not provide for payment of interest to Class 8 holders of general unsecured claims, as set forth in the Plan. If holders of general unsecured claims receive 100% of their allowed claims, they would then be entitled to receive interest at the federal judgement rate, prior to any funds being available for claims or interest of junior priority.

L. Plan assumes zero allowed claims for IFA and Hunter Mountain Investment Trust ("HMI"); UBS claim based on voting amount of $94.8 million, but Debtor and UBS have agreed in principal regarding UBS's allowed claim

M. Claim amounts listed in Plan vs. Liquidation schedule are subject to change; claim amounts in Class 8 assume $0 for IFA and HMI, $94.8 million for UBS and $45 million HV. Assumes RCP claims will offset against HCMLP's interest in fund and will not be paid from Debtor assets

N. With the exception of Class 2 - Frontier, Classes 1-7 will be paid in full within 30 days of effective date.

O. Class 7 payout limited to 85% of each individual creditor claim or in the aggregate $13.15 million. Plan currently projects Class 7 payout of $10.3 million.

P. See below for Class 8 estimated payout schedule; payout is subject to certain assets being monetized by payout date (no Plan requirement to do so):

   o  By September 30, 2021 - $50,000,000

   o  By March 31, 2022 – additional $50,000,000

   o  By June 30, 2022 – additional $25,000,000

   o  All remaining proceeds are assumed to be paid out on or soon after all remaining assets are monetized.

Q. Assumptions subject to revision based on business decision and performance of the business

1/28/2021

013362

Case 19-34054-sgj11 Doc 1866-5 Filed 01/29/21   Entered 01/29/21 18:30:16   Page 4 of 8

**Highland Capital Management, L.P.**
*Plan Analysis Vs. Liquidation Analysis*
*(US $000's)*

| | Plan Analysis | Liquidation Analysis |
|---|---|---|
| Estimated cash on hand at 1/31/2020 | $ 24,290 | $ 24,290 |
| Estimated proceeds from monetization of assets [1][2] | 257,941 | 191,946 |
| Estimated expenses through final distribution[1][3] | (59,573) | (41,488) |
| Total estimated $ available for distribution | 222,658 | 174,748 |
| Less: Claims paid in full | | |
| Unclassified [4] | (1,080) | (1,080) |
| Administrative claims [5] | (10,574) | (10,574) |
| Class 1 - Jefferies Secured Claim | - | - |
| Class 2 - Frontier Secured Claim [6] | (5,781) | (5,781) |
| Class 3 - Other Secured Claims | (62) | (62) |
| Class 4 - Priority Non-Tax Claims | (16) | (16) |
| Class 5 - Retained Employee Claims | - | - |
| Class 6 - PTO Claims [5] | - | - |
| Class 7 – Convenience Claims [7][8] | (10,280) | (17,514) |
| Subtotal | (27,793) | |
| Estimated amount remaining for distribution to general unsecured claims | 194,865 | 157,235 |
| % Distribution to Class 7 (Class 7 claims included in Class 8 in Liquidation scenario) | 85.00% | 0.00% |
| Class 8 – General Unsecured Claims [8][10] | 313,588 | 326,468 |
| Subtotal | 313,588 | 326,468 |
| % Distribution to general unsecured claims | 62.14% | 48.16% |
| Estimated amount remaining for distribution | - | - |
| Class 9 – Subordinated Claims | no distribution | no distribution |
| Class 10 – Class B/C Limited Partnership Interests | no distribution | no distribution |
| Class 11 – Class A Limited Partnership Interest | no distribution | no distribution |

*Footnotes:*

[1] Assumes chapter 7 Trustee will not be able to achieve same sales proceeds as Claimant Trustee

[2] Assumes Chapter 7 Trustee engages new professionals to help liquidate assets and terminates any management agreements with funds or CLOS

[2] Sale of investment assets, sale of fixed assets, collection of accounts receivable and interest receivable; Plan includes revenue from managing CLOs

[3] Estimated expenses through final distribution exclude non-cash expenses:

   Depreciation of $462 thousand in 2021; Bad debt of $124K in 2021

[4] Unclassified claims include payments for priority tax claims and settlements with previously approved by the Bankruptcy Court

[5] Represents $4.7 million in unpaid professional fees, $4.5 million in timing of payments to vendors and $1.2 million to pay PTO

[6] Debtor will pay all unpaid interest estimated at $253 thousand of Frontier on effective date and continue to pay interest quarterly at 5.25% until Frontier's collateral is sold

[7] Claims payout limited to 85% of each individual creditor claim or limited to a total class payout of $13.15 million

[8] Plan: Class 7 includes $1.2 million estimate for aggregate contract rejections damage; Liquidation Class 8 includes $2.0 million for estimated rejection damages

[10] Class estimates $0 allowed claim for the following creditors: IFA and HM; assumes RCP claims offset against HCMLP interest in RCP fund

   UBS claim included at voting amount of $94.8 million. Debtor and UBS have agreed in principal regarding UBS's allowed claim

*Notes:*

All claim amounts are estimated as of January 26, 2020 and subject to change

Case 19-34054-sgj11 Doc 1866-5 Filed 01/29/21   Entered 01/29/21 18:30:16   Page 5 of 8

**Highland Capital Management, L.P.**
*Balance Sheet*
*(US $000's)*

| | Actual Jun-20 | Actual Sep-20 | Forecast --> Dec-20 | Mar-21 | Jun-21 | Sep-21 | Dec-21 | Mar-22 | Jun-22 | Sep-22 | Dec-22 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | | |
| Cash and Cash Equivalents | $ 14,994 | $ 5,888 | $ 31,047 | $ 10,328 | $ 40,063 | $ 42,833 | $ 135,137 | $ 80,733 | $ 72,238 | $ 69,368 | $ - |
| Other Current Assets | 13,182 | 13,651 | 13,784 | 15,172 | 14,671 | 14,220 | 9,943 | 8,268 | 8,417 | 8,567 | - |
| Investment Assets | 320,912 | 305,961 | 283,812 | 280,946 | 233,234 | 171,174 | 47,503 | 47,503 | 25,888 | 25,888 | - |
| Net Fixed Assets | 3,055 | 2,823 | 2,592 | 1,348 | - | - | - | - | - | - | - |
| **TOTAL ASSETS** | **$ 352,142** | **$ 328,323** | **$ 331,235** | **$ 307,793** | **$ 287,968** | **$ 228,227** | **$ 192,583** | **$ 136,504** | **$ 106,542** | **$ 103,823** | **$ -** |
| | | | | | | | | | | | |
| **Liabilities** | | | | | | | | | | | |
| Post-petition Liabilities | $ 142,730 | $ 135,597 | $ 131,230 | $ 12,891 | $ 10,249 | $ 10,503 | $ - | $ - | $ - | $ - | $ - |
| Pre-petition Liabilities | 9,861 | 9,884 | 10,000 | - | - | - | - | - | - | - | - |
| Claims | | | | | | | | | | | |
| Unclassified | - | - | - | - | - | - | - | - | - | - | - |
| Class 1 – Jefferies Secured Claim | - | - | - | - | - | - | - | - | - | - | - |
| Class 2 - Frontier Secured Claim | - | - | - | - | - | - | - | - | - | - | - |
| Class 3 - Other Secured Claims | - | - | - | 5,528 | - | - | - | - | - | - | - |
| Class 4 – Priority Non-Tax Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 5 – Retained Employee Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 6 – PTO Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 7 – Convenience Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 8 – General Unsecured Claims | - | - | - | 313,588 | 313,588 | 263,588 | 263,588 | 213,588 | 188,588 | 188,588 | 118,723 |
| Class 9 – Subordinated Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 10 – Class B/C Limited Partnership Interests | - | - | - | - | - | - | - | - | - | - | - |
| Class 11 – Class A Limited Partnership Interests | - | - | - | - | - | - | - | - | - | - | - |
| Claim Payable | 9,861 | 9,884 | 10,000 | 319,115 | 313,588 | 263,588 | 263,588 | 213,588 | 188,588 | 188,588 | 118,723 |
| **TOTAL LIABILITIES** | **$ 152,591** | **$ 145,481** | **141,230** | **332,007** | **323,836** | **274,091** | **263,588** | **213,588** | **188,588** | **188,588** | **118,723** |
| Partners' Capital | 199,551 | 182,842 | 190,005 | (24,214) | (35,868) | (45,863) | (71,004) | (77,083) | (82,045) | (84,764) | (118,722) |
| **TOTAL LIABILITIES AND PARTNERS' CAPITAL** | **$ 352,142** | **$ 328,323** | **$ 331,235** | **$ 307,793** | **$ 287,968** | **$ 228,227** | **$ 192,583** | **$ 136,504** | **$ 106,543** | **$ 103,823** | **$ -** |

**Highland Capital Management, L.P.**
**Profit/Loss**
**(US $000's)**

| | Actual Jan 2020 to June 2020 Total | Actual 3 month ended Sept 2020 | Forecast --> 3 month ended Dec 2020 | Total 2020 | 3 month ended Mar 2021 | 3 month ended Jun 2021 | 3 month ended Sept 2021 | 3 month ended Dec 2021 | Total 2021 |
|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | |
| Management Fees | $ 6,572 | $ 1,949 | $ 2,804 | $ 11,325 | $ 1,329 | $ 856 | $ 856 | $ 856 | $ 3,897 |
| Shared Service Fees | 7,672 | 3,765 | 3,788 | 15,225 | 1,373 | 45 | 45 | - | 1,463 |
| Other Income | 3,126 | 538 | 340 | 4,004 | 316 | 274 | - | - | 590 |
| **Total revenue** | $ 17,370 | $ 6,252 | $ 6,931 | $ 30,554 | $ 3,018 | $ 1,176 | $ 901 | $ 856 | $ 5,951 |
| Operating Expenses [1] | 13,328 | 9,171 | 9,399 | 31,899 | 12,168 | 4,897 | 3,973 | 3,333 | 24,371 |
| **Income/(loss) From Operations** | $ 4,042 | $ (2,918) | $ (2,468) | $ (1,345) | $ (9,149) | $ (3,722) | $ (3,072) | $ (2,477) | $ (18,420) |
| Professional Fees | 17,522 | 7,707 | 8,351 | 33,581 | 7,478 | 6,583 | 2,268 | 1,810 | 18,139 |
| Other Income/(Expenses) [2] | 2,302 | 1,518 | 1,059 | 4,879 | (196,410) | 326 | (93) | 29 | (196,148) |
| **Operating Gain/(Loss)** | $ (11,178) | $ (9,107) | $ (9,761) | $ (30,046) | $ (213,037) | $ (9,978) | $ (5,433) | $ (4,259) | $ (232,707) |
| **Realized and Unrealized Gain/(Loss)** | | | | | | | | | |
| Other Realized Gains/(Loss) | | | | | | | | | |
| Net Realized Gain/(Loss) on Sale of Investment | (28,418) | 1,549 | (8,850) | (35,719) | (1,013) | 522 | - | - | (491) |
| Net Change in Unrealized Gain/(Loss) of Investments | (29,925) | (7,450) | 4,523 | (32,857) | (168) | (2,198) | (4,563) | (7,581) | (14,510) |
| Net Realized Gain /(Loss) from Equity Method Investees | - | - | (364) | (364) | - | - | - | - | - |
| Net Change in Unrealized Gain /(Loss) from Equity Method Investees | (80,782) | (1,700) | - | (82,482) | - | - | - | (13,301) | (13,301) |
| **Total Realized and Unrealized Gain/(Loss)** | $ (139,129) | $ (7,601) | $ (4,692) | $ (151,422) | $ (1,182) | $ (1,675) | $ (4,563) | $ (20,882) | $ (28,302) |
| **Net Income** | $ (150,307) | $ (16,708) | $ (14,453) | $ (181,468) | $ (214,219) | $ (11,654) | $ (9,996) | $ (25,141) | $ (261,009) |

_Footnotes:_
[1] Operating expenses include an adjustment in January 2021 to account for expenses that have not been accrued or paid prior to effective date.
[2] Other income and expenses of $197.3 million in Q1 2021 includes:
  [a] $209.7 million was expensed to record for the increase of allowed claims.
  [b] Income of $11.7 million for the accrued, but unpaid payroll liability related to the Debtor's deferred bonus programs amount written-off.

1/28/2021

013365

**Highland Capital Management, L.P.**
*Profit/Loss*
*(US $000's)*

| | Forecast ---> | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 3 month ended Mar 2022 | 3 month ended Jun 2022 | 3 month ended Sept 2022 | 3 month ended Dec 2022 | Total 2022 | Plan |
| **Revenue** | | | | | | |
| Management Fees | $ 580 | $ 580 | $ 580 | $ 580 | $ 2,318 | $ 6,215 |
| Shared Service Fees | - | - | - | - | - | 1,463 |
| Other Income | - | - | - | - | - | 591 |
| **Total revenue** | $ 580 | $ 580 | $ 580 | $ 580 | $ 2,318 | $ 8,269 |
| Operating Expenses | 3,635 | 2,679 | 1,739 | 6,425 | 14,478 | 38,849 |
| **Income/(loss) From Operations** | $ (3,056) | $ (2,099) | $ (1,159) | $ (5,846) | $ (12,160) | $ (30,580) |
| Professional Fees | 2,921 | 2,761 | 1,461 | 2,176 | 9,318 | 27,455 |
| Other Income/(Expenses) | (103) | (101) | (100) | (350) | (654) | (196,803) |
| **Operating Gain/(Loss)** | $ (6,079) | $ (4,961) | $ (2,719) | $ (8,371) | $ (22,131) | $ (254,838) |
| **Realized and Unrealized Gain/(Loss)** | | | | | | |
| Other Realized Gains/(Loss) | - | - | - | (25,587) | (25,587) | (26,078) |
| Net Realized Gain/(Loss) on Sale of Investment | - | - | - | - | - | (14,510) |
| Net Change in Unrealized Gain/(Loss) of Investments | - | - | - | - | - | - |
| Net Realized Gain /(Loss) from Equity Method Investees | - | - | - | - | - | (13,301) |
| Net Change in Unrealized Gain /(Loss) from Equity Method Investees | - | - | - | - | - | - |
| **Total Realized and Unrealized Gain/(Loss)** | $ - | $ - | $ - | $ (25,587) | $ (25,587) | $ (53,889) |
| **Net Income** | $ (6,079) | $ (4,961) | $ (2,719) | $ (33,958) | $ (47,718) | $ (308,727) |

**Highland Capital Management, L.P.**
*Cash Flow Indirect*
*(US $000's)*

| | Sep-20 | Dec-20 | Mar-21 | Jun-21 | Sep-21 | Dec-21 | Mar-22 | Jun-22 | Sep-22 | Dec-22 |
|---|---|---|---|---|---|---|---|---|---|---|
| | Forecast ---> | | | | | | | | | |
| Net (Loss) Income | $ (16,708) | $ (14,453) | $ (214,219) | $ (11,654) | $ (9,996) | $ (25,141) | $ (6,079) | $ (4,961) | $ (2,719) | $ (33,108) |
| Cash Flow from Operating Activity | | | | | | | | | | |
| (Increase) / Decrease in Cash | | | | | | | | | | |
| Depreciation and amortization | 231 | 231 | 231 | 231 | - | - | - | - | - | - |
| Other realized (gain)/loss | - | - | 1,013 | (522) | - | - | - | - | - | 25,587 |
| Investment realized (gain)/ loss | (1,549) | 9,214 | 168 | 2,198 | 4,563 | 20,882 | - | - | - | - |
| Unrealized (gain)/ loss | (9,150) | 4,523 | - | - | - | - | - | - | - | - |
| (Increase) Decrease in Current Assets | (470) | (133) | (1,388) | 501 | 450 | 4,277 | 1,675 | (149) | (150) | - |
| Increase (Decrease) in Current Liabilities | (7,110) | (4,251) | (44,172) | (2,643) | 255 | (10,503) | - | - | - | - |
| Net Cash Increase / (Decrease) - Operating Activities | (34,757) | (4,868) | (258,366) | (11,889) | (4,727) | (10,485) | (4,404) | (5,110) | (2,870) | (7,483) |
| | | | | | | | | | | |
| Cash Flow From Investing Activities | | | | | | | | | | |
| Proceeds from Sale of Fixed Assets | - | - | - | - | - | - | - | - | - | - |
| Proceeds from Investment Assets | 25,650 | 30,027 | 2,698 | 47,152 | 57,498 | 102,788 | - | 21,616 | - | 7,960 |
| Net Cash Increase / (Decrease) - Investing Activities | 25,650 | 30,027 | 2,698 | 47,152 | 57,498 | 102,788 | - | 21,616 | - | 7,960 |
| | | | | | | | | | | |
| Cash Flow from Financing Activities | | | | | | | | | | |
| Claims payable | - | - | (73,997) | - | - | - | - | - | - | - |
| Claim reclasses/(paid) | - | - | 319,115 | (5,528) | (50,000) | - | (50,000) | (25,000) | - | (69,802) |
| Maple Avenue Holdings | - | - | (4,975) | - | - | - | - | - | - | - |
| Frontier Note | - | - | (5,195) | - | - | - | - | - | - | - |
| Net Cash Increase / (Decrease) - Financing Activities | - | - | 234,948 | (5,528) | (50,000) | - | (50,000) | (25,000) | - | (69,802) |
| | | | | | | | | | | |
| Net Change in Cash | $ (9,107) | $ 25,159 | $ (20,719) | $ 29,735 | $ 2,770 | $ 92,303 | $ (54,404) | $ (8,495) | $ (2,870) | $ (69,843) |
| Beginning Cash | 14,994 | 5,888 | 31,047 | 10,328 | 40,063 | 42,833 | 135,137 | 80,733 | 72,238 | 69,368 |
| Ending Cash | $ 5,888 | $ 31,047 | $ 10,328 | $ 40,063 | $ 42,833 | $ 135,137 | $ 80,733 | $ 72,238 | $ 69,368 | $ (475) |

# EXHIBIT EEEEEEE

013367

**Highland Capital Management, L.P.**
**Plan Disclosure Statement Forecast**
*Profit/Loss*
*in (000)'s*

| | Actual | Actual | Actual | Actual | Actual | Forecast --> | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Jan - 5/31/2020 | Jun-20 | Jul-20 | Aug-20 | Sep-20 | Oct-20 | Nov-20 | Dec-20 | Total 2020 |
| **Operating expenses** | | | | | | | | | |
| Compensations and benefits | 6,991 | 2,044 | 1,686 | 1,890 | 1,668 | 1,822 | 1,822 | 1,822 | 19,746 |
| Deferred compensation / Cash Bonus | - | - | - | - | - | - | - | - | - |
| Professional services | 1,081 | 187 | 257 | 387 | 190 | 400 | 490 | 480 | 3,473 |
| Investment research and consulting | 295 | 148 | 5 | 4 | 241 | 250 | 250 | 250 | 1,444 |
| Other operating expenses | 1,721 | 345 | 376 | 495 | 464 | 450 | 500 | 860 | 5,211 |
| Less: amount allocated to other entities | - | - | - | - | - | (100) | (400) | (100) | (600) |
| Marketing and advertising expense | 60 | (8) | 30 | 33 | 36 | - | - | - | 150 |
| Depreciation | 389 | 76 | 78 | 77 | 76 | 77 | 77 | 77 | 927 |
| Bad debt | - | - | - | 1,053 | 124 | 124 | 124 | 124 | 1,549 |
| Total operating expenses | $ 10,537 | $ 2,792 | $ 2,432 | $ 3,940 | $ 2,799 | $ 3,023 | $ 2,863 | $ 3,513 | $ 31,899 |
| | | | | | | | | | |
| **Professional fees** | | | | | | | | | |
| Independent director fees | 915 | 207 | 495 | 330 | 30 | 220 | 220 | 220 | 2,637 |
| Other Bankruptcy Fees | 13,588 | 2,813 | 1,760 | 1,276 | 3,816 | 2,360 | 2,610 | 2,720 | 30,944 |
| Total professional fees | $ 14,503 | $ 3,019 | $ 2,255 | $ 1,606 | $ 3,846 | $ 2,580 | $ 2,830 | $ 2,940 | $ 33,581 |

013369

*Highland Capital Management, L.P.*
*Plan Disclosure Statement Forecast*
*Profit/Loss*
*in (000)'s*

Effective Date

| | Jan-21 | Feb-21 | Mar-21 | Apr-21 | May-21 | Jun-21 | Jul-21 | Aug-21 | Sep-21 | Oct-21 | Nov-21 | Dec-21 | Total 2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Operating expenses | | | | | | | | | | | | | |
| Compensations and benefits | 1,100 | 1,100 | 259 | 259 | 259 | 259 | 259 | 259 | 259 | 259 | 259 | 259 | 4,792 |
| Deferred compensation / Cash Bonus | - | - | - | - | 1,118 | 413 | 773 | - | - | - | - | 773 | 3,076 |
| Professional services | 2,304 | 339 | 359 | 259 | 149 | 149 | 149 | 149 | 524 | 124 | 124 | 124 | 4,753 |
| Investment research and consulting | 250 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 360 |
| Other operating expenses | 3,062 | 2,497 | 623 | 451 | 666 | 654 | 565 | 602 | 404 | 419 | 457 | 505 | 10,904 |
| Less: amount allocated to other entities | (100) | - | - | - | - | - | - | - | - | - | - | - | (100) |
| Marketing and advertising expense | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Depreciation | 77 | 77 | 77 | 77 | 77 | 77 | - | - | - | - | - | - | 462 |
| Bad debt | 124 | - | - | - | - | - | - | - | - | - | - | - | 124 |
| Total operating expenses | $ 6,817 | $ 4,023 | $ 1,328 | $ 1,056 | $ 2,280 | $ 1,562 | $ 1,756 | $ 1,020 | $ 1,197 | $ 812 | $ 851 | $ 1,671 | $ 24,371 |
| | | | | | | | | | | | | | |
| Professional fees | | | | | | | | | | | | | |
| Independent director fees | 220 | 210 | 210 | 210 | 210 | 1,710 | 210 | 210 | 210 | 210 | 210 | 210 | 4,030 |
| Other Bankruptcy Fees | 2,442 | 3,475 | 920 | 850 | 718 | 2,885 | 593 | 533 | 513 | 440 | 370 | 370 | 14,108 |
| Total professional fees | $ 2,662 | $ 3,685 | $ 1,130 | $ 1,060 | $ 928 | $ 4,595 | $ 803 | $ 743 | $ 723 | $ 650 | $ 580 | $ 580 | $ 18,138 |

013370

*Highland Capital Management, L.P.*
*Plan Disclosure Statement Forecast*
*Profit/Loss*
*in ($000)'s*

| | Jan-22 | Feb-22 | Mar-22 | Apr-22 | May-22 | Jun-22 | Jul-22 | Aug-22 | Sep-22 | Oct-22 | Nov-22 | Dec-22 | Total 2022 | 2 Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating expenses** | | | | | | | | | | | | | | |
| Compensations and benefits | 259 | 259 | 259 | 259 | 259 | 259 | 259 | 259 | 259 | 259 | 259 | 259 | 3,111 | 7,903 |
| Deferred compensation / Cash Bonus | - | - | - | - | - | 773 | - | - | - | - | - | 3,228 | 4,000 | 7,076 |
| Professional services | 104 | 184 | 154 | 104 | 104 | 104 | 94 | 94 | 294 | 94 | 94 | 344 | 1,768 | 6,521 |
| Investment research and consulting | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 120 | 480 |
| Other operating expenses | 592 | 1,412 | 381 | 299 | 125 | 363 | 253 | 85 | 111 | 111 | (917) | 2,664 | 5,479 | 16,383 |
| *Less: amount allocated to other entities* | - | - | - | - | - | - | - | - | - | - | - | - | - | (100) |
| Marketing and advertising expense | | | | | | | | | | | | | | |
| Depreciation | - | - | - | - | - | - | - | - | - | - | - | - | - | 462 |
| Bad debt | - | - | - | - | - | - | - | - | - | - | - | - | - | 124 |
| Total operating expenses | $ 965 | $ 1,866 | $ 804 | $ 672 | $ 498 | $ 1,509 | $ 616 | $ 449 | $ 674 | $ 474 | $ (553) | $ 6,505 | $ 14,478 | $ 38,849 |
| | | | | | | | | | | | | | | |
| **Professional fees** | | | | | | | | | | | | | | |
| Independent director fees | 210 | 210 | 210 | 210 | 210 | 210 | 210 | 210 | 210 | 210 | 210 | 925 | 3,235 | 7,265 |
| Other Bankruptcy Fees | 1,737 | 277 | 277 | 277 | 277 | 1,577 | 277 | 277 | 277 | 277 | 277 | 277 | 6,083 | 20,190 |
| Total professional fees | $ 1,947 | $ 487 | $ 487 | $ 487 | $ 487 | $ 1,787 | $ 487 | $ 487 | $ 487 | $ 487 | $ 487 | $ 1,202 | $ 9,318 | $ 27,455 |

1/28/2021

013371

**Highland Capital Management, L.P.**
*Profit/Loss*
*(US $000's)*

|  | Forecast --> | | | | | |
|  | 3 month ended Mar 2022 | 3 month ended Jun 2022 | 3 month ended Sept 2022 | 3 month ended Dec 2022 | Total 2022 | Plan |
|---|---|---|---|---|---|---|
| **Revenue** | | | | | | |
| Management Fees | $ 580 | $ 580 | $ 580 | $ 580 | $ 2,318 | $ 6,215 |
| Shared Service Fees | - | - | - | - | - | 1,463 |
| Other Income | - | - | - | - | - | 591 |
| Total revenue | $ 580 | $ 580 | $ 580 | $ 580 | $ 2,318 | $ 8,269 |
| Operating Expenses | 3,635 | 2,679 | 1,739 | 6,425 | 14,478 | 38,849 |
| Income/(loss) From Operations | $ (3,056) | $ (2,099) | $ (1,159) | $ (5,846) | $ (12,160) | $ (30,580) |
| Professional Fees | 2,921 | 2,761 | 1,461 | 2,176 | 9,318 | 27,455 |
| Other Income/(Expenses) | (103) | (101) | (100) | (350) | (654) | (196,803) |
| Operating Gain/(Loss) | $ (6,079) | $ (4,961) | $ (2,719) | $ (8,371) | $ (22,131) | $ (254,838) |
| **Realized and Unrealized Gain/(Loss)** | | | | | | |
| Other Realized Gains/(Loss) | - | - | - | (25,587) | (25,587) | (26,078) |
| Net Realized Gain/(Loss) on Sale of Investment | - | - | - | - | - | (14,510) |
| Net Change in Unrealized Gain/(Loss) of Investments | - | - | - | - | - | - |
| Net Realized Gain /(Loss) from Equity Method Investees | - | - | - | - | - | (13,301) |
| Net Change in Unrealized Gain /(Loss) from Equity Method Investees | - | - | - | - | - | - |
| Total Realized and Unrealized Gain/(Loss) | $ - | $ - | $ - | $ (25,587) | $ (25,587) | $ (53,889) |
| Net Income | $ (6,079) | $ (4,961) | $ (2,719) | $ (33,958) | $ (47,718) | $ (308,727) |

**Highland Capital Management, L.P.**
*Cash Flow Indirect*
*(US $000's)*

| | Forecast ---> Sep-20 | Dec-20 | Mar-21 | Jun-21 | Sep-21 | Dec-21 | Mar-22 | Jun-22 | Sep-22 | Dec-22 |
|---|---|---|---|---|---|---|---|---|---|---|
| Net (Loss) Income | $ (16,708) | $ (14,453) | $ (214,219) | $ (11,654) | $ (9,996) | $ (25,141) | $ (6,079) | $ (4,961) | $ (2,719) | $ (33,...) |
| Cash Flow from Operating Activity | | | | | | | | | | |
| (Increase) / Decrease in Cash | | | | | | | | | | |
| Depreciation and amortization | 231 | 231 | 231 | 231 | - | - | - | - | - | - |
| Other realized (gain)/loss | - | - | 1,013 | (522) | - | - | - | - | - | - |
| Investment realized (gain)/ loss | (1,549) | 9,214 | 168 | 2,198 | 4,563 | 20,882 | - | - | - | 25,587 |
| Unrealized (gain)/ loss | (9,150) | 4,523 | - | - | - | - | 1,675 | (149) | (150) | - |
| (Increase) Decrease in Current Assets | (470) | (133) | (1,388) | 501 | 450 | 4,277 | - | - | - | - |
| Increase (Decrease) in Current Liabilities | (7,110) | (4,251) | (44,172) | (2,643) | 255 | (10,503) | - | - | - | - |
| Net Cash Increase / (Decrease) - Operating Activities | (34,757) | (4,868) | (258,366) | (11,889) | (4,727) | (10,485) | (4,404) | (5,110) | (2,870) | (7,960) |
| Cash Flow From Investing Activities | | | | | | | | | | |
| Proceeds from Sale of Fixed Assets | - | - | - | - | - | - | - | - | - | - |
| Proceeds from Investment Assets | 25,650 | 30,027 | 2,698 | 47,152 | 57,498 | 102,788 | - | 21,616 | - | 7,960 |
| Net Cash Increase / (Decrease) - Investing Activities | 25,650 | 30,027 | 2,698 | 47,152 | 57,498 | 102,788 | - | 21,616 | - | 7,960 |
| Cash Flow from Financing Activities | | | | | | | | | | |
| Claims payable | - | - | (73,997) | (5,528) | - | - | - | - | - | - |
| Claim reclasses/(paid) | - | - | 319,115 | - | (50,000) | - | (50,000) | (25,000) | - | (69,8...) |
| Maple Avenue Holdings | - | - | (4,975) | - | - | - | - | - | - | - |
| Frontier Note | - | - | (5,195) | - | - | - | - | - | - | - |
| Net Cash Increase / (Decrease) - Financing Activities | - | - | 234,948 | (5,528) | (50,000) | - | (50,000) | (25,000) | - | (69,8...) |
| Net Change in Cash | $ (9,107) | $ 25,159 | $ (20,719) | $ 29,735 | $ 2,770 | $ 92,303 | $ (54,404) | $ (8,495) | $ (2,870) | $ (69,8...) |
| Beginning Cash | 14,994 | 5,888 | 31,047 | 10,328 | 40,063 | 42,833 | 135,137 | 80,733 | 72,238 | 69,368 |
| Ending Cash | $ 5,888 | $ 31,047 | $ 10,328 | $ 40,063 | $ 42,833 | $ 135,137 | $ 80,733 | $ 72,238 | $ 69,368 | $ 69,3... |